**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P**.**

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 30**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru Vol. 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7<br>003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8<br>004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9<br>005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 9 | | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 005330 | 04/17/2026 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 005590 | 04/21/2026 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 005594 | 04/22/2026 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005615 | 04/22/2026 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 005682 | 04/22/2026 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

Vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 04/28/2026<br>005746 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026<br>005755 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026<br>005761 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026<br>005767 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026<br>005776 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026<br>005783 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| Vol. 11 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10).22 008156 | 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 | 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 | 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). ~~(Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery)~~ |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed ~~by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612~~ List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28 010664 | 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010736 | 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 011150 | 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 011734 | 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 013203 Thru Vol 33 | 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014888 | 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35<br>05/11/2026<br>015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026<br>015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026<br>015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026<br>015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026<br>015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026<br>015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36<br>05/18/2026<br>015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 39 | | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 016729 | 07/10/2026 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 016731 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 016733 | 07/24/2026 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 016742 | 07/28/2026 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Michael J. Edney*

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S THIRD AMENDED**
**EXHIBIT LIST FOR THE MAY 11, 2026 HEARING**

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Exhibit List for the May 11, 2026 Hearing in the Bankruptcy Case.

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | HCM-D10000002-HCM-D10000013 |
| 2 | Settlement Agreement and General Release | 000813-000836 |
| 3 | 6/4/2024 First Affidavit of Mark Patrick | Dkt. 401-2 (21-03076-sgj) |
| 4 | 7/21/2025 [4-33] Original DAF Org Chart | Dkt. 4-33 (25-11376-BLS) |
| 5 | 7/11/2011 Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP | Dkt. 4-36 (25-11376-BLS) |
| 6 | 2/20/2025 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd. | Dkt. 4-06 (25-11376-BLS) |
| 7 | 11/9/2023 Shields Work Plan Memorandum | |
| 8 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 9 | 12/12/2024 Certificate of Formation of CDFMCAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 10 | 12/18/2024 Charitable DAF HoldCo, Ltd. Unanimous Written Resolutions of all of the Directors of the Company | Dkt. 4-45 (25-11376-BLS) |
| 11 | 9/30/2024 Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 12 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 13 | 3/27/2025 CDMCFAD, LLC Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 14 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D100000330 |
| 15 | 2/12/2025 Membership Interest Purchase Agreement | HCM-D10000021-HCM-D10000036 |
| 16 | 2/12/2025 Member Consent of Beacon Mountain | HCM-D10000019-HCM-D10000020 |
| 17 | 11/30/2015 Amended and Restated Limited Partnership Agreement of Atlas IDF, LP | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 18 | 6/26/2025 Audit of RAND PE Fund I, LP | HMIT_Entities_000022-HMIT_Entities_000039 |
| 19 | 3/6/2024 DAF Structure Chart in 2024 and 2025 | |
| 20 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | |
| 21 | 12/2015-8/2022 Rand Structure Chart | |
| 22 | 2/12/2025 Feb. and May 2025 Rand Structure Chart | |
| 23 | 10/15/2019 Empower Dallas Foundation, Inc. Partial Surrender Request | |
| 24 | 2/22/2021 Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief | Dkt. 1943 (19-34054-sgj11) |
| 25 | 4/8/2025 Email regarding Settlement Agreement | HCMLPHMIT00000656-HCMLPHMIT00000661 |
| 26 | 12/16/2015 Crown Global Deferred Variable Annuity Policy for Empower Dallas Foundation, Inc. | |
| 27 | 11/30/2015 Participation Agreement between Crown Global Life Insurance Ltd. and Other Entities | |
| 28 | 9/12/2025 First Affidavit of Mark Eric Patrick | |
| 29 | 10/21/2025 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 9/30/2025 | Dkt. 4438 (19-34054-sgj11) |
| 30 | 10/21/2025 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 9/30/2025 | Dkt. 4439 (19-34054-sgj11) |
| 31 | 1/21/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 12/31/2025 | Dkt. 4503 (19-34054-sgj11) |
| 32 | 1/21/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 12/31/2025 | Dkt. 4504 (19-34054-sgj11) |
| 33 | 4/20/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 3/31/2026 | Dkt. 4552 (19-34054-sgj11) |
| 34 | 4/20/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 3/31/2026 | Dkt. 4553 (19-34054-sgj11) |
| 35 | 6/25/2025 Hearing Transcript for Case No. 19-34054-sgj-11 | |
| 36 | 4/16/2025 Affidavit of James David Dondero | Dkt. 4534-7 (19-34054-sgj11) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 37 | 6/9/2025 Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC § 363 Approving Settlement with the HMIT Entities | Dkt. 4230 (19-34054-sgj11) |
| 38 | HMIT Structure as of 8/12/2022 – 2/12/2025 | |
| 39 | 2/6/2025 Letter to Dolomiti LLC re Notice of Your Withdrawal from Rand PE Fund I, L.P. | |
| 40 | 2024 Tax Form 990 – Highland Dallas Foundation Inc. | Dkt. 4556-2 (19-34054-sgj11) |
| 41 | 3/27/2025 Admission and Amendment to No. 1 Agreement | Dkt. 4-54 (25-11376-BLS) |
| 42 | 12/12/2024 Certificate of Formation of CDMCFAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 43 | 2/7/2015 Unanimous Written Resolutions of the Board of Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-22 (25-11376-BLS) |
| 44 | 12/18/2024 Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-45 (25-11376-BLS) |
| 45 | 4/2/2025 Written Resolutions of the Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-47 (25-11376-BLS) |
| 46 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 47 | 7/21/2025 Defendants' Motion to Dismiss and Plea to the Jurisdiction filed in Cause No. 25-BC-01B-0027, The Highland Foundation, Inc. et al. v. Mark Patrick, et al., The Business Court of Texas, First Division | Dkt. 4-91 (25-11376-BLS) |
| 48 | 3/27/2025 Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 49 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 50 | 9/30/2024 Valuation Analysis of 100 Participation Shars of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 51 | 3/7/2024 Written Consent of the Managing Member of Charitable DAF GP, LLC | Dkt. 4-38 (25-11376-BLS) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 52 | 6/9/2025 Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000001-HCM-D10000001 |
| 53 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) on December 17, 2015 | HCM-D10000002-HCM-D10000013 |
| 54 | Email chain regarding the sale of Class C limited partnership interests from Highland Capital Management, L.P. to Hunter Mountain Investment Trust. Mark Patrick | HCM-D10000014-HCM-D10000015 |
| 55 | Email from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer. | HCM-D10000016-HCM-D10000016 |
| 56 | Email chain from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer | HCM-D10000017-HCM-D10000018 |
| 57 | CLO Holdco, LLC's purchase of all membership interests in Beacon Mountain, LLC from Rand PE Fund I, L.P. | HCM-D10000019-HCM-D10000020 |
| 58 | Membership Interest Purchase Agreement - | HCM-D10000021-HCM-D10000036 |
| 59 | Organizational structure of HMIT entities before and after February 12, 2025. | HCM-D10000037-HCM-D10000038 |
| 60 | Investment Management Agreement -establishes Rand Advisors, LLC as the investment manager for Atlas IDF, LP. | HCM-D10000039-HCM-D10000045 |
| 61 | Investment Management Agreement - establishes Rand Advisors, LLC as the investment manager for Rand PE Fund I, L.P. | HCM-D10000046-HCM-D10000052 |
| 62 | Register of Members for CLO Holdco, Ltd. | HCM-D10000053-HCM-D10000055 |
| 63 | Unanimous Written Consent - executed by Mark Patrick as sole director of Rand Advisors Holding Corp. | HCM-D10000056-HCM-D10000069 |
| 64 | Charitable DAF Fund, LP transferred DAF Holdings stock to CLO HoldCo, Ltd | HCM-D10000070-HCM-D10000072 |
| 65 | Register of Members for Liberty CLO Holdco, Ltd. CLO Holdco, Ltd. | HCM-D10000073-HCM-D10000073 |
| 66 | Limited Liability Company Agreement - establishing Liberty CLO Holdco, LLC as a Delaware limited liability company. | HCM-D10000074-HCM-D10000090 |
| 67 | Register for CDH GP, Ltd. | HCM-D10000091-HCM-D10000091 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 68 | Register of Members for CDH GP, Ltd. | HCM-D10000092-HCM-D10000092 |
| 69 | Register for CLO HoldCo, Ltd. | HCM-D10000093-HCM-D10000094 |
| 70 | Register of General Partners for Charitable DAF Fund, LP. | HCM-D10000095-HCM-D10000095 |
| 71 | Register of Limited Partners for Charitable DAF Fund, LP | HCM-D10000096-HCM-D10000096 |
| 72 | Limited Liability Company Agreement for CDMCFAD, LLC. | HCM-D10000097-HCM-D10000124 |
| 73 | Collation of various documents including resolutions from CDMCFAD, LLC, and a March 2025 letter from Seyfarth Shaw LLP to the IRS reporting potential tax violations by Highland Dallas Foundation, Inc. (Jim Dondero). | HCM-D10000125-HCM-D10000251 |
| 74 | Letter from three Highland foundations to Paul Murphy | HCM-D10000264-HCM-D10000265 |
| 75 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000266-HCM-D10000267 |
| 76 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000268-HCM-D10000269 |
| 77 | Email chain between K. Hendrix and J. Seery, et al. | HCM-D10000270-HCM-D10000271 |
| 78 | Email chain James Seery to Mark Patrick and Shawn Raver | HCM-D10000272-HCM-D10000272 |
| 79 | Email chain from Shawn Raver to J. Seery, et al. | HCM-D10000273-HCM-D10000273 |
| 80 | Email chain from M. Tax to S. Raver, et al. | HCM-D10000274-HCM-D10000274 |
| 81 | Email chain from K. Hendrix to S. Raver, et al. | HCM-D10000275-HCM-D10000276 |
| 82 | Email chain from S. Raver to K. Hendrix, et al. | HCM-D10000277-HCM-D10000278 |
| 83 | Email chain from S. Raver to M. Tax, et al. | HCM-D10000279-HCM-D10000280 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 84 | Note Elevation and Assignment Agreement | HCM-D10000281-HCM-D10000301 |
| 85 | Email from A. Hurt to T. Cournoyer, et al. | HCM-D10000302-HCM-D10000303 |
| 86 | Letter to Dugaboy Investment Trust | HCM-D10000304-HCM-D10000308 |
| 87 | Claims Assignment Agreement | HCM-D10000309-HCM-D10000315 |
| 88 | Email from David Klos at Highland Capital Management to James Seery | HCM-D10000316-HCM-D10000316 |
| 89 | Trust Agreement establishes the Hunter Mountain Investment Trust on December 17, 2015 | HCM-D10000317-HCM-D10000328 |
| 90 | Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000329-HCM-D10000329 |
| 91 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D10000330-HCM-D10000330 |
| 92 | Email from K. Hendrix to A. Gunther, et al. | HCM-D10000331-HCM-D10000332 |
| 93 | Email from K. Hendrix to D. Klos, et al. | HCM-D10000333-HCM-D10000334 |
| 94 | Letter from Campbells LLP to James Seery (CEO of Highland Capital Management, L.P.) and Marc Kirschner | HCM-D10000335-HCM-D10000338 |
| 95 | Email chain from A. Kapuria to S. Raver, et al. | HMIT_Entities_000001-HMIT_Entities_000006 |
| 96 | Email chain from K. Jackson to S. Raver, et al. | HMIT_Entities_000007-HMIT_Entities_000010 |
| 97 | Email chain from S. Reynolds to S. Raver, et al. | HMIT_Entities_000011-HMIT_Entities_000015 |
| 98 | Email from Chris Rice to K. Jackson, et al. | HMIT_Entities_000016-HMIT_Entities_000020 |
| 99 | Email from Chris Rice to S. Raver, et al. | HMIT Entities 000021-HMIT Entities 000021 |
| 100 | Audited financial statements for Rand PE Fund I, L.P. | HMIT_Entities_000022-HMIT_Entities_000039 |
| 101 | Email chain from K. Jackson to S. Raver | HMIT_Entities_000040-HMIT_Entities_000043 |
| 102 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000044-HMIT_Entities_000047 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 103 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities_000048- HMIT Entities 000051 |
| 104 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000052- HMIT_Entities_000054 |
| 105 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000055- HMIT Entities 000057 |
| 106 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000058- HMIT Entities 000058 |
| 107 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000059- HMIT Entities 000059 |
| 108 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000060- HMIT_Entities_000060 |
| 109 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000061- HMIT Entities 000061 |
| 110 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000062- HMIT Entities 000063 |
| 111 | Email chain between Crown Global Insurance and Rand Advisors | HMIT_Entities_000064- HMIT_Entities_000065 |
| 112 | Email from Robert Kipp to M. Patrick, et al. | HMIT Entities 000066- HMIT Entities 000066 |
| 113 | Email chain from A. Gunther to S. Raver, et al. | HMIT Entities 000067- HMIT Entities 000070 |
| 114 | Email chain from S. Raver to A. Gunther, et al. | HMIT_Entities_000071- HMIT_Entities_000074 |
| 115 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000075- HMIT_Entities_000076 |
| 116 | Email chain from S. Raver to J. Seery, et al. | HMIT Entities 000077- HMIT Entities 000078 |
| 117 | Email from C. Rice to S. Raver, et al. | HMIT Entities_000079- HMIT Entities_000079 |
| 118 | Bloomberg invoice | HMIT Entities 000080- HMIT Entities 000080 |
| 119 | Email thread with S&P Global | HMIT_Entities_000081- HMIT_Entities_000083 |
| 120 | S&P Global invoice | HMIT Entities_000084- HMIT Entities_000084 |
| 121 | Email exchange between auditors Chris Rice (NexPoint Services) and Patrick Casale (Cohen & Co) | HMIT Entities_000085- HMIT Entities_000086 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 122 | Financial statement audit | HMIT_Entities_000087-HMIT_Entities_000103 |
| 123 | Email chain C. Rice to S. Raver | HMIT_Entities_000104-HMIT_Entities_000114 |
| 124 | Email chain from S. Raver to C. Rice | HMIT_Entities_000115-HMIT_Entities_000124 |
| 125 | Email from K. Longwell to M. Tax, et al. | HMIT Entities_000125-HMIT Entities_000125 |
| 126 | Civil Investigative Demand issued by the Texas Attorney General's Office to Hunter Mountain Investment Trust (HMIT) on July 14, 2025 | HMIT_Entities_000126-HMIT_Entities_000133 |
| 127 | Email from K. Longwell to M. Tax, et al. | HMIT Entities 000134-HMIT Entities 000134 |
| 128 | Dkt. 23, Notice of Hearing dated 8/27/2025 | HMIT_Entities_000135-HMIT_Entities_000254 |
| 129 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000260-HMIT_Entities_000261 |
| 130 | Email chain from D. Klos to K. Hendrix, et al. | HMIT_Entities_000262-HMIT_Entities_000263 |
| 131 | Email chain from M. Tax to J. Seery, et al. | HMIT_Entities_000264-HMIT_Entities_000264 |
| 132 | Email chain from K. Hendrix to S. Raver, et al. | HMIT_Entities_000265-HMIT_Entities_000266 |
| 133 | Email chain from K. Hendrix to A. Gunther, et al. | HMIT_Entities_000267-HMIT_Entities_000268 |
| 134 | DAF entity structure | VALUESCOPE 000001-VALUESCOPE 000001 |
| 135 | DAF/Rand entity structure | VALUESCOPE_000002-VALUESCOPE_000002 |
| 136 | Law firm forwards legal filing to Mark Patrick (DAF HoldCo) re Chapter 15 filing | VALUESCOPE_000003-VALUESCOPE_000007 |
| 137 | Chapter 15 Petition filing | VALUESCOPE_000008-VALUESCOPE_000026 |
| 138 | Charitable DAF Org structure | VALUESCOPE_000027-VALUESCOPE_000027 |
| 139 | Letter from Reed Smith LLP | VALUESCOPE_000028-VALUESCOPE_000029 |
| 140 | ValueScope, LLC Response | VALUESCOPE_000030-VALUESCOPE_000030 |
| 141 | Certificate of Incorporation, Charitable DAF HoldCo, Ltd. | TDIT004698 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 142 | Legal Relationship Agreement, Highland Kansas City Foundation | TDIT003396–TDIT003398 |
| 143 | Supporting Organization Operating Agreement - Highland Dallas Foundation, Inc. | TDIT003399–TDIT003406 |
| 144 | Supporting Organization Operating Agreement - Highland Santa Barbara Foundation, Inc. | TDIT003407–TDIT003413 |
| 145 | Letter - Highland Dallas Foundation, Inc. | TDIT003389–TDIT003390 |
| 146 | Letter - Highland Santa Barbara Foundation, Inc. | TDIT003391–TDIT003393 |
| 147 | Letter - Highland Kansas City Foundation, Inc. | TDIT003394–TDIT003395 |
| 148 | Employment Agreement - Mark Patrick | TDIT003971–TDIT003988 |
| 149 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011256–TDIT011268 |
| 150 | Memo - Harneys (H&B) | TDIT004274–TDIT004278 |
| 151 | Invoice - G.K. Management Limited | TDIT011038–TDIT011039 |
| 152 | Invoice - G.K. Management Limited | TDIT011040 |
| 153 | Invoice - G.K. Management Limited | TDIT011041 |
| 154 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011058–TDIT011062 |
| 155 | Certificate of Incorporation - Highland Kansas City Foundation, Inc. | TDIT003304–TDIT003306 |
| 156 | Certificate of Incorporation - Highland Dallas Foundation, Inc. | TDIT003326–TDIT003328 |
| 157 | Certificate of Incorporation - Highland Santa Barbara Foundation, Inc. | TDIT003344–TDIT003346 |
| 158 | Invoice - G.K. Management Limited | TDIT011042–TDIT011043 |
| 159 | Invoice - G.K. Management Limited | TDIT011044–TDIT011045 |
| 160 | Invoice - G.K. Management Limited | TDIT011046–TDIT011047 |
| 161 | Invoice - G.K. Management Limited | TDIT011048–TDIT011049 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 162 | Invoice - G.K. Management Limited | TDIT011050–TDIT011051 |
| 163 | Invoice - G.K. Management Limited | TDIT011052–TDIT011053 |
| 164 | Invoice - G.K. Management Limited | TDIT011054–TDIT011055 |
| 165 | Expense Reimbursement - G.K. Management Limited | TDIT011056–TDIT011057 |
| 166 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011088–TDIT011092 |
| 167 | Memorandum – Work Plan - Shields Legal Group | TDIT004699–TDIT004706 |
| 168 | Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT011093–TDIT011128 |
| 169 | Email - Shields Legal Group | TDIT003704 |
| 170 | Limited Partnership Agreement - Charitable DAF Fund, LP | TDIT003414–TDIT003431 |
| 171 | ValueScope Report - ValueScope, Inc. | TDIT004017–TDIT004075 |
| 172 | Expense Report - CLO HoldCo, Ltd. | TDIT003432–TDIT003435 |
| 173 | Audited Financial Statements - Highland Santa Barbara Foundation, Inc. | TDIT003989–TDIT004016 |
| 174 | Resolution of the Directors - Mark Patrick | TDIT003961–TDIT003962 |
| 175 | Resolution of the Directors - Mark Patrick | TDIT003963–TDIT003970 |
| 176 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011129–TDIT011136 |
| 177 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011137–TDIT011150 |
| 178 | Letter - Highland Dallas Foundation, Inc. | TDIT003707–TDIT003708 |
| 179 | Email - Paul Murphy | TDIT003709–TDIT003713 |
| 180 | Email - Walkers | TDIT003714–TDIT003719 |
| 181 | Certificate of Incorporation - DFW Charitable Foundation | TDIT003701–TDIT003703 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 182 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011151–TDIT011164 |
| 183 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011165–TDIT011170 |
| 184 | Resolution - Charitable DAF HoldCo, Ltd. | TDIT003720–TDIT003726 |
| 185 | Assignment - Charitable DAF HoldCo, Ltd. | TDIT003727–TDIT003732 |
| 186 | Agreement - CDMCFAD, LLC | TDIT003733–TDIT003760 |
| 187 | Email - David N. Corkern | TDIT003791–TDIT003792 |
| 188 | ValueScope Report - ValueScope, LLC | TDIT004076–TDIT004130 |
| 189 | Draft Legal Advice - Walkers | TDIT003761–TDIT003765 |
| 190 | Share Issuance Resolution - Charitable DAF HoldCo, Ltd. | TDIT003766–TDIT003790 |
| 191 | Email - PricewaterhouseCoopers (PwC) | TDIT004305–TDIT004323 |
| 192 | Memorandum and Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT003267–TDIT003303 |
| 193 | Form ADV - Rand Advisors, LLC | TDIT003646–TDIT003674 |
| 194 | Brochure - Rand Advisors, LLC | TDIT003675–TDIT003700 |
| 195 | Email - Mark Patrick | TDIT004324–TDIT004340 |
| 196 | ValueScope Report - ValueScope, LLC | TDIT004131–TDIT004205 |
| 197 | Email - FTI Consulting | TDIT004341–TDIT004358 |
| 198 | Director Services Agreement - CDMCFAD, LLC | TDIT011171–TDIT011185 |
| 199 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003955–TDIT003957 |
| 200 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003958–TDIT003959 |
| 201 | Prospectus - NexPoint Real Estate Strategies Fund | TDIT003463–TDIT003599 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 202 | Proxy Statement - NexPoint Capital, Inc. | TDIT003440–TDIT003462 |
| 203 | Written Resolution - CLO HoldCo, Ltd. | TDIT011196–TDIT011197 |
| 204 | Texas Petition - Highland Dallas Foundation, Inc. | TDIT004443–TDIT004688 |
| 205 | Rule 11 Agreement - Highland Dallas Foundation, Inc. | TDIT004693–TDIT004695 |
| 206 | Exhibit Index to Affidavit - Margot MacInnis | TDIT003261-TDIT004712 |
| 207 | Affidavit - Jim Dondero Dugaboy Investment Trust | TDIT004713-TDIT004778 |
| 208 | Texas Petition (Amended) - Highland Dallas Foundation, Inc. | TDIT006527–TDIT006580 |
| 209 | Liquidator's Certificate - Margot MacInnis (JOL) | TDIT006492 |
| 210 | Form ADV - Mark Patrick, Rand PE Fund | TDIT006581-TDIT006609 |
| 211 | Affidavit & Exhibit Index - Margot MacInnis | TDIT004967-TDIT006484 |
| 212 | Affidavit & Exhibit Index | TDIT006485-TDIT006580 |
| 213 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011394-TDIT011405 |
| 214 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011382-TDIT011393 |
| 215 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011425-TDIT011443 |
| 216 | Objection filed by Highland Dallas Foundation, Inc. Grant James Scott III | TDIT011444-TDIT011475 |
| 217 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011476-TDIT011509 |
| 218 | Supplemental Declaration - DFW Charitable Foundation CDMCFAD LLC | TDIT004869-TDIT004945 |
| 219 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) | TDIT006664-TDIT006675 |
| 220 | Affirmation by Mark Patrick | TDIT010529-TDIT010532 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 221 | Operating agreement between Highland Dallas Foundation, Inc. and The Dallas Foundation. | TDIT011406-TDIT011406 |
| 222 | Email exchange between Michael Stockham and Paul Murphy | TDIT010831-TDIT010840 |
| 223 | Form ADV Instructions - None | TDIT006628-TDIT006663 |
| 224 | Declaration by Caroline Maron | TDIT004846-TDIT004868 |
| 225 | Email from Louis M. Phillips requesting execution of two letters with attached documents | TDIT011318-TDIT011323 |
| 226 | Auditor's Report - Highland Capital Management L.P. | TDIT006610-TDIT006627 |
| 227 | Email chain from March 2025 | TDIT011407-TDIT011424 |
| 228 | Amended and Restated Limited Partnership Agreement - Atlas IDF LP | TDIT004779-TDIT004812 |
| 229 | Participation Agreement establishes the framework for Crown Global Life Insurance Ltd to purchase | TDIT004813-TDIT004845 |
| 230 | Investment Management Agreement - Rand PE Fund I | TDIT004946-TDIT004952 |
| 231 | Investment Management Agreement - Rand PE Fund I, L.P. | TDIT004953-TDIT004959 |
| 232 | Limited Partnership Agreement - Rand PE Fund | TDIT004960-TDIT004966 |
| 233 | By-Laws - Highland Kansas City Foundation, Inc. | TDIT003307–TDIT003325 |
| 234 | By-Laws - Highland Dallas Foundation, Inc. | TDIT003329–TDIT003343 |
| 235 | By-Laws - Highland Santa Barbara Foundation, Inc. | TDIT003347–TDIT003361 |
| 236 | Organizational Procedures - Greater Kansas City Community Foundation | TDIT003362–TDIT003388 |
| 237 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003705 |
| 238 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003706 |
| 239 | Expenses Table - Charitable DAF HoldCo, Ltd. | TDIT003960 |
| 240 | Delaware Division of Corporations Search Results - DFW Charitable Foundation | TDIT004696 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 241 | Delaware Division of Corporations Search Results - CDMCFAD, LLC | TDIT004697 |
| 242 | Demonstrative: DAF-Rand Structure Chart | |
| 243 | Certificate of Incorporation of CDH GP, Ltd. | Dkt. 4-95 (25-11376-BLS) |

Dugaboy also reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

Dated: May 11, 2026

Respectfully submitted,

*/s/ Avery Joseph Welker*
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)

New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 11, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*<u>/s/ Avery Joseph Welker</u>*
Avery Joseph Welker

## FORM ADV PART 2A

# RAND ADVISORS, LLC

March 2025

2101 Cedar Springs Road, Suite 1200
Dallas, TX 75201
www.RANDADVISORS.com
(214) 288-9555

This brochure provides information about the qualifications and business practices of Rand Advisors, LLC. If you have any questions about the contents of this brochure, please contact us at mpatrick@randadvisors.com. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority. Additional information about Rand Advisors, LLC is also available at the Securities and Exchange Commission's website www.adviserinfo.sec.gov. Our registration as an investment adviser does not imply any level of skill or training.

# ITEM 2. MATERIAL CHANGES

As of our last annual amendment filing on March 4, 2024, we have no material changes to disclose.

We will ensure that you receive a summary of any material changes to this and subsequent brochures within 120 days of the close of our fiscal year, which is December 31st. We will provide other ongoing disclosure information about material changes as they occur. We will also provide you with information on how to obtain the complete brochure. Currently, our brochure may be requested at any time, without charge, by contacting Mark Patrick at (214) 908-8130.

# ITEM 3. TABLE OF CONTENTS

ITEM 1. COVER PAGE ..... i
ITEM 2. MATERIAL CHANGES ..... ii
ITEM 3. TABLE OF CONTENTS ..... iii
ITEM 4. ADVISORY BUSINESS ..... 1
ITEM 5. FEES AND COMPENSATION ..... 2
ITEM 6. PERFORMANCE-BASED FEES ..... 4
ITEM 7. TYPES OF CLIENTS ..... 5
ITEM 8. METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS ..... 6
ITEM 9. DISCIPLINARY INFORMATION ..... 9
ITEM 10. OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS ..... 10
ITEM 11. CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING ..... 11
ITEM 12. BROKERAGE PRACTICES ..... 16
ITEM 13. REVIEW OF ACCOUNTS ..... 18
ITEM 14. CLIENT REFERRALS AND OTHER COMPENSATION ..... 19
ITEM 15. CUSTODY ..... 20
ITEM 16. INVESTMENT DISCRETION ..... 21
ITEM 17. VOTING CLIENT SECURITIES ..... 22
ITEM 18. FINANCIAL INFORMATION ..... 23

# ITEM 4. ADVISORY BUSINESS

We are the sub-adviser to Rand Advisors Series I Insurance Fund (the “Rand Fund”), and adviser to the Rand PE Fund I, L.P. (the “Rand PE Fund”) and Atlas IDF, LP (the “Atlas Fund”) (all such entities shall collectively be referred to as the “Funds” or “Clients”), all of which are unregistered investment funds. The Rand Fund held its initial offering in October 2013. The Rand PE Fund and the Atlas Fund were funded in 2015.

OWNERSHIP

Rand Advisors, LLC (“Rand,” “Adviser”, “we” or “us”) is owned 100% by Charitable DAF Holdings Corp. and was founded in 2013 by John Honis.

TYPES OF ADVISORY SERVICES

The Funds are our sole advisory clients at this time. The Funds seek to achieve their respective investment objectives primarily through the strategies described in “ITEM 8. METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS” and in the Private Placement Memoranda (each, a “PPM”) for each Fund.

REGULATORY ASSETS UNDER MANAGEMENT

As of December 31, 2024, the amount of our total discretionary regulatory assets under management was $153,660,847.

All assets are managed on a discretionary basis.

# ITEM 5. FEES AND COMPENSATION

For providing investment advisory services, Rand typically charges the Client a management fee and other fees as necessary and agreed to (including, but not limited to, expenses related to servicing accounts, such as administration and legal services). Fees may be deducted directly from the Funds.

We have entered into a shared services agreement with Highgate Consulting Group Inc., d.b.a Skyview ("HCG or "Highgate"). Please refer to the PPM for each Fund for a list of services to be provided by HCG.

The Funds incur brokerage and other transaction costs associated with Rand's management of Client Accounts. Please see the section titled ITEM 12 Brokerage Practices of this ADV Part 2 for a discussion of Rand's brokerage practices.

FEE SCHEDULE

Please refer to the PPM or other applicable offering documents for each of the Funds for a detailed description of fees, expenses and use of proceeds.

UNREGISTERED INVESTMENT FUNDS

As compensation for our advisory services, each of the Funds typically pays Rand management fees based on each Fund's agreements. Management fees are based upon outstanding capital accounts or amounts of committed capital. In some cases, certain investors in one Fund may pay a different fee than others based on the terms of their agreement with Rand.

In addition to management fees, brokerage and transaction costs, investors in the Funds will indirectly bear the fees and expenses paid by the Funds, including custody fees, administration, legal, audit and tax preparation fees, overhead allocation, and certain other fees and expenses. Each of the Fund's PPM's or offering documents include more detailed information about the fees and expenses paid by each of the Funds.

OTHER COMPENSATION

Fund Accounts may hold significant positions, individually or collectively, in the securities issued by a company. Accordingly, Rand may have the right to appoint a board member or officer for such company. Rand may appoint an employee or a third party to such position as it sees fit in the best interest of Rand and the Funds. Employees are permitted to retain all compensation received for such positions except to the extent contrary to the governing documents for one or more Fund Accounts, in which case the proportion of such compensation related to such Fund Account(s) will be paid to those Account(s) (generally in proportion to relative assets of the Fund Account as of the date paid).

In addition, to the extent permitted by the offering and/or governing documents of the applicable advised accounts, Rand and/or its affiliates receive other fees for services provided to portfolio companies, provided such fees are on arms-length terms. See also ITEM 10 Other Financial Industry Activities and Affiliations.

We have established procedures designed to address possible conflicts of interest that such board or officer positions might present, including requiring authorization from the Chief Compliance Officer prior to an officer or employee serving as a board member. As a result of such activities, Rand may acquire confidential information, which may restrict Fund Accounts from transacting in certain securities. As a result, we may not initiate a transaction on behalf of Clients which we otherwise might have.

## ITEM 6. PERFORMANCE-BASED FEES

At this time, we do not charge any performance-based or incentive-based fees or allocations. These are fees or allocations based on a share of capital gains on, or capital appreciation of, the assets of the client.

## ITEM 7. TYPES OF CLIENTS

Our sole advisory clients are the Atlas IDF, Rand PE Fund 1 and the Rand Series 1 Fund, all being limited partnerships.



CONFIDENTIAL

# ITEM 8. METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS

INVESTMENT STRATEGY

The items below are general descriptions of the types of investment strategies we currently utilize, although we may add or subtract from this list based on various factors including macro-economic conditions.

INVESTMENT STRATEGIES

***The Rand Series 1 Fund***

*Bank Loan Strategy*

Rand's bank loan strategy seeks to generate attractive absolute returns by opportunistically making investments across the capital structure, with a core focus in senior secured bank loans. The bank loan strategy is long-biased and U.S. focused.

*Structured Finance Investments*

Rand invests in various structured finance instruments, including collateralized loan obligations and collateralized debt obligations. The rate of return on the structured finance instrument may be determined by applying a multiplier to the rate of total return on the reference loan or loans. Application of a multiplier is comparable to the use of financial leverage, a speculative technique. Leverage magnifies the potential for gain and the risk of loss, because of a relatively small decline in the value of a reference loan could result in a relatively large loss for the value of a structured finance instrument.

Please see the PPM for the Rand Series 1 Fund for a complete description of the investment objectives and strategies of the fund.

***The Rand PE Fund 1***

The Rand PE Fund's strategy is to invest in small- to medium-sized companies that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions.

Please see the PPM for the Rand Series 1 Fund for a complete description of the investment objectives and strategies of the fund.

***The Atlas IDF Fund***

The Atlas Fund's strategy may include investing in long and short equity positions, arbitrage, bank loans, cash, fixed income securities, high yield bonds, derivative transactions, foreign investments, companies, money market instruments, collateralized loan obligations and currency hedging. Please see the PPM for the Rand PE Fund 1 for a complete description of the investment objectives and strategies of the fund.

Please see the PPM for the Atlas IDF Fund for a complete description of the investment objectives and strategies of the fund.

METHOD OF ANALYSIS

The investment process used by Rand to evaluate potential investments employs a combination of rigorous qualitative (issuer, portfolio and legal considerations) and quantitative (structural, cash flow, collateral valuation and pricing/relative value) analysis. Rand uses a proprietary quantitative analytical tool and 3rd party software in connection with gathering information on investments. The sell discipline is largely enforced by ongoing monitoring of individual names.

Other sources of information include obtaining and reviewing due diligence packages prepared by debt issuers and underwriters of institutional private placements and meetings with management of issuers.

MATERIAL RISKS OF SIGNIFICANT STRATEGIES

Some, but not necessarily all, of the risks involved in the strategies used by Rand in order to meet the stated investment objectives in the Funds include:

- Credit
- Illiquid Securities
- Inflation
- Investment in Distressed Assets
- Investments in Structured Finance Instruments
- Investments in Senior Secured Loans
- Maturity
- Market or Interest Rates
- Valuation of Portfolio Holdings
- Competition
- Volatility
- Market Liquidity

- Over-the-Counter-Trading
- Leverage

MATERIAL RISKS OF METHODS OF ANALYSIS

Qualitative Analysis – The major risk involved with qualitative analysis is that it is subjective in nature; assigning probability and impacts to risks is a subjective exercise.

Quantitative Analysis – The major risk involved with the use of quantitative risk analysis is the limited availability of data. Therefore, any lack of data concerning the structure, cash flow, collateral valuation and pricing/relative value of the underlying investment can restrict the Adviser's ability to perform thorough research into the suitability of the investment for the Funds.

Please refer to the PPM or other offering documents for each Fund for a complete description of the risks involved with the investment strategies of the Funds.

## ITEM 9. DISCIPLINARY INFORMATION

We do not have any information to disclose concerning the Adviser or John Honis, Mark Patrick or Shawn Raver. We adhere to high ethical standards.

# ITEM 10. OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

We have no industry activities or affiliations to disclose. Additional information regarding potential conflicts of interest is provided in Item 11 Code of Ethics, Participation or Interest in Client Transactions and Personal Trading and the Conflicts of Interest description in the PPM or offering documents for each of the Funds.

# ITEM 11. CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

We maintain a policy of strict compliance with the highest standards of ethical business conduct and the provisions of applicable federal securities laws, including rules and regulations promulgated by the SEC, and have adopted policies and procedures described in our Code of Ethics. The Code of Ethics applies to each of our "access persons" as defined in the U.S. Investment Advisers Act of 1940. It is designed to ensure compliance with legal requirements of our standard of business conduct.

A complete copy of our Code of Ethics is available to any client or prospective client upon request.

STANDARDS OF CONDUCT

We and our access persons are expected to comply with all applicable federal and state laws and regulations. Access persons are expected to adhere to the highest standards of ethical conduct and maintain confidentiality of all information obtained with respect to client matters and bring any risk issues, violations, or potential violations to the attention of our Chief Compliance Officer. Access persons are expected to deal with clients fairly and disclose any activity that may create an actual or potential conflict of interest between them and us or any client.

ETHICAL BUSINESS PRACTICES

Falsification or alteration of records or reports, also known as a prohibited financial practice, or knowingly approving such conduct is prohibited. Payments to government officials or employees are prohibited except for political contributions approved by our Chief Compliance Officer. We seek to outperform our competition fairly and honestly and seek competitive advantages through superior performance not illegal or unethical dealings. Access persons are strictly prohibited from (i) participating in online blogging and communication with the media, and (ii) spreading of false rumors pertaining to any publicly traded company.

CONFIDENTIALITY

Access persons must maintain the confidentiality of our proprietary and confidential information and that of our clients, and must not disclose that information unless the necessary approval is obtained. We have a particular duty and responsibility, as investment adviser, to safeguard client information. Information concerning the identity and transactions of investors is confidential, and such information will only be disclosed to those access persons and outside parties who need to know it in order to fulfill their responsibilities.

GIFT AND ENTERTAINMENT POLICY

Access persons are permitted, on occasion, to accept gifts and invitations to attend entertainment events. When doing so, however, employees should always act in our best interests and that of our clients and should avoid any activity that might create an actual or perceived conflict of interest or impropriety in the course of our business relationships. Under no circumstances may (i) gifts of cash or cash equivalents be accepted or (ii) any gifts be received in consideration or recognition of any services provided to, or transactions entered into by, Client Accounts.

PERSONAL TRADING

*Personal Trading Policy*

Access persons are allowed to trade reportable securities. Access persons are not permitted to trade any security of which we or a Client own any portion of the capital structure or that is on our restricted list without permission. Access persons who violate the personal trading policy are reprimanded in accordance with the sanctions provisions outlined in the Code of Ethics. Personal securities transactions are reviewed by the Chief Compliance Officer or his/her designee for compliance with the personal trading policy and applicable SEC rules and regulations.

*Prohibition against Insider Trading*

We forbid any access person from trading, either personally or on behalf of others, including the Funds, on material non-public information or communicating material non-public information to others in violation of the law or duty owed to another party. This conduct is frequently referred to as "insider trading". The concepts of material non-public information, penalties for insider trading, and processes for identifying insider trading are addressed in detail in the Compliance Manual and Code of Ethics.

*Reporting Requirements*

In compliance with SEC rules, access persons are required to disclose all of their reportable securities holdings within 10 days of becoming an access person, within 10 days of opening a new account, and annually thereafter. Additionally, at the end of each month after quarter-end, all access persons must report all transactions in reportable securities over which the access person had any direct or indirect beneficial ownership. Access persons are also required annually to affirm all reportable transactions from the prior year.

POTENTIAL CONFLICTS

Rand and its affiliates may engage in a broad range of activities, including activities for their own account and for the accounts of the Clients. This section describes various potential conflicts that may arise in respect of its business, as well as how Rand addresses such conflicts of interest. The discussion below does not describe all conflicts that may arise.

Any of the potential conflicts of interest will be discussed and resolved on a case by case basis. Rand's determination as to which factors are relevant, and the resolution of such conflicts, will be made using Rand's best judgment, but in its sole discretion. In resolving conflicts, Rand will take into consideration the interests of the relevant clients, the circumstances giving rise to the conflict and applicable laws.

Certain procedures for resolving specific conflicts of interest are set forth below. The following list is not all inclusive and for a complete description of the conflicts of interest for a particular Fund, please read the applicable PPM or offering documents.

*Allocation of Investment Opportunities*

Rand may act as investment adviser to clients that have similar investment objectives and pursue similar strategies. Certain investments identified by Rand may be appropriate for multiple clients. Investment decisions for such clients are made by Rand in its best judgment, but in its discretion, taking into account such factors as Rand believes relevant. Such factors may include investment objectives, regulatory restrictions, current holdings, availability of cash for investment, the size of investments generally, and limitations and restrictions on a Client's Account that are imposed by such client.

*Conflicts Related to Investment Activities*

Rand has an incentive to allocate assets into vehicles that produce the greatest fees for Rand. Each of these situations give rise to a potential conflict of interest in the allocation of investment opportunities. As previously described, Rand has adopted trade allocation policies and procedures that seek to ensure fair and equitable access to investment opportunities for all accounts.

*Trade Aggregation*

In some circumstances, Rand may seek to buy or sell the same securities contemporaneously for multiple client accounts. Rand may, in appropriate circumstances aggregate securities trades for a client with similar trades for other clients, but is not required to do so. In particular, Rand may determine not to aggregate transactions that relate to portfolio management decisions that are made independently for different accounts or if Rand and/or its affiliates determine that aggregation is not practicable, not required or inconsistent with client direction.

*Errors*

Rand's responsibility for its trade errors is set forth in the governing documents for the relevant Fund. No soft-dollars may be used to satisfy any trade errors. In addition, Rand may not use the securities in one client's account to settle the trade error in another client's account.

*Conflicts Related to Valuation*

Rand may have a role in determining asset values with respect to client accounts and may be required to price an asset when a market price is unavailable or unreliable. This may give rise to a conflict of interest because Rand may be paid an asset-based fee on certain client accounts. In order to mitigate these conflicts, Rand and its affiliates determine asset values in accordance with valuation procedures, which generally are set forth in Rand's Compliance Manual.

*Other Potential Conflicts*

Rand or its affiliates may invest (or recommend that one of the Funds invest) in securities issued by one of the Funds and may hedge derivative positions by buying or selling securities issued by one of the Funds. A potential conflict may arise in such circumstances because Rand may be incentivized to favor one Fund that issues securities over the Fund on whose behalf Rand is making the investment. In addition to the Funds, some of Rand's service providers are issuers of securities. Rand may determine that it is in the best interests of one of the Funds to purchase securities issued by one of these entities. Rand has adopted policies and procedures designed to address conflicts of interest arising from the foregoing activities. Furthermore, it is Rand's general policy not to take into account the fact that an issuer is a client, service provider or vendor when making investment decisions.

Certain qualified employees and affiliates may invest in the Funds either through general partner entities or as limited partners, shareholders or otherwise. Rand generally reduces or waives all or a portion of the management fee related to the investments by such persons.

*Conflicts Related to Information Possessed by or Provided by Rand*

Certain persons within Rand or its affiliates may receive or create information (*e.g.*, proprietary technical models) that is not generally available to the public. Rand has no obligation to provide such information to any of the Funds or effect transactions for any of the Funds on the basis of such information and in many cases Rand or its affiliates will be prohibited from trading for the Funds based on the information. Similarly, one Fund may have access to information regarding Rand's transactions or views that is not available to one of the other Funds, and may act on that information through accounts managed by persons other than Rand or its affiliates. Such

transactions may negatively impact other clients (*e.g.*, through market movements or decreasing availability or liquidity of securities).

# ITEM 12. BROKERAGE PRACTICES

BROKER-DEALER SELECTION

Rand has an obligation to obtain "best execution" for Client transactions considering the execution price and overall commission costs paid and certain other factors. Our trading desk route orders to various broker-dealers for execution at their discretion. Where possible, we deal directly with the dealers who make a market in the securities involved, except in those circumstances where it believes better prices and execution are available elsewhere.

Factors involved in selecting brokerage firms include such factors as:

*Broker Specific*

- Size of broker
- Reputation
- Quality of service
- Experience
- Financial stability and creditworthiness
- Financial statements
- Regulatory filings
- Standing in financial community
- Ability to handle block trades
- Acceptable record of delivery and payment on past transactions
- Quality of research and investment information provided

*Transaction Specific*

- Best available execution
- Market knowledge regarding specific industries and securities
- Access to sources of supply or markets
- Nature of the market for the security

THE APPROVAL PROCESS

Rand's trading desk is only allowed to trade with approved broker-dealers.

If a Fund Account is under the custody of one brokerage firm and another brokerage firm is a selling group member for an underwriting syndicate, such a Client Account may not be able to participate in the purchase of securities in the underwriting because the custodial

brokerage firm was not a selling group member. In addition, to the extent that a Client directs brokerage trades to be placed with a particular broker, the allocation of securities transactions may be impacted.

DIRECTED BROKERAGE

Due to the nature of the Adviser's business, Rand does not currently allow directed brokerage.

TRADE AGGREGATION

Rand does not have any separately managed accounts. Please see Item 11 Code of Ethics, Participation or Interest in Client Transactions, and Personal Trading and the PPM and offering documents for each Fund for additional information regarding Rand's trade aggregation procedures.

## ITEM 13. REVIEW OF ACCOUNTS

We provide reporting as agreed with each of our Clients. Please refer to the PPM or offering documents for each Fund for a description of the reporting practices for each Fund.

## ITEM 14. CLIENT REFERRALS AND OTHER COMPENSATION

Rand may pay compensation to a third-party/broker-dealer who refer prospective investors to us. Prior to paying such referral fees, we will verify that the third party is appropriately registered to receive such compensation. Please refer to the PPM or offering documents for each of the Funds for information regarding client referrals.

## ITEM 15. CUSTODY

Because the Advisor is under common control with the general partner of the Atlas IDF, Rand PE 1 and Rand Series 1 funds, we may be deemed to have custody of those Funds' assets. Assets for which we have custody are held only at qualified custodians and in accordance with applicable regulations. These regulations require us to maintain Fund assets with a qualified custodian in a separate account for each Fund under each Fund's name. The Funds' securities and other assets are held in the custody or US Bank and State Street.

# ITEM 16. INVESTMENT DISCRETION

We intend to manage the Funds on a discretionary basis. For a description of limitations imposed on our discretionary authority to manage securities, please see Item 4 Advisory Business and the PPM or offering documents for each Fund.

All investors of the Funds must complete the subscription documentation we required in order to accept an investment, which may include a joinder to the applicable governing documents of the vehicle. This documentation includes an authorization granting us investment discretion for the Funds.

# ITEM 17. VOTING CLIENT SECURITIES

SECURITIES HELD IN CLIENT ACCOUNTS

Rand's proxy voting policy ensures proxies are voted on behalf of each Fund Account's securities and in the best economic interests of such Fund Account, without regard to the interests of Rand or any other Fund under Rand's management. Rand evaluates the subject matter of each proxy and votes on behalf of the Fund Account in accordance to the guidelines set forth in our proxy voting policy.

If Rand determines that there is a potential material conflict of interest in voting a proxy, it will abstain from voting. Rand also may determine not to vote proxies with respect to securities of any issuer if it determines it would be in its Client's overall best interests not to vote.

OBTAINING A COPY OF THE POLICY

Clients and prospective clients can obtain a copy of the proxy voting policy or information on how we voted proxies by contacting our Chief Compliance Officer at mpatrick@randadvisors.com.

# ITEM 18. FINANCIAL INFORMATION

We are required to provide you with certain financial information or disclosures about our financial condition. We have no financial commitment that would impair our ability to meet any contractual and fiduciary commitments to you, our client. We have not been the subject of any bankruptcy proceedings.

In no event shall we charge advisory fees that are both in excess of twelve hundred dollars and more than six months in advance of advisory services rendered.

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Mark Patrick <mpatrick@dafholdco.com> |
| **Sent:** | 17 March 2025 1:48 PM |
| **To:** | Geoffrey Sykes |
| **Cc:** | Bart Higgins; Brandon R. Schaller; Barnaby Gowrie; Philip Aubry; Hugh Anderson |
| **Subject:** | Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181] |

**[this message is from an external sender]**

Agree we need to finalize the reports. I thought they were finalized. We should request any limits on use removed.

We are seeking U.S. tax counsel to send emails to both Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of the its interests.

After that, an alternative approach is to give them what they want - liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero.

US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled. That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions (all of which they will do anyway under a wind up).

We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is....

Note : US LLC would make DFW its sole owner.

On Mon, Mar 17, 2025, 1:11 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

> Hi Mark, Bart, Brandon
>
> **IRS complaint**
>
> Thanks for providing the draft IRS complaint. We have reviewed and attach our comments on the Cayman Islands aspects of the letter.

**Details of transfer**

In response to Brandon's question, we would not advise seeking to perform the redemption in the alternative. In our view, any purported redemption would be susceptible to challenge for the reasons previously set out, and accordingly we should focus on the forced transfer under Article 21.

In respect of the details of a forced transfer, noting Mark's comments, our views are as follows:

*The signatories to the share transfer instrument*

1. Article 21 provides that "*If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles*." The Articles do not provide that the directors may complete the transfer on behalf of the relevant Restricted Person, rather than they can give notice to require that the shares are transferred. In the absence of any additional guidance in the Articles, and in light of Article 17 noted below, we anticipate that this will require that the directors give notice to the relevant Restricted Person requiring them to transfer their shares to a person who is not a Restricted Person within a reasonable period of time to comply with Article 21. Failing this, the Company, would need to bring proceedings in the Cayman Court to seek orders that the shares are transferred as is required under the Articles.

2. Article 17 provides that "*The instrument of transfer of any Share shall … be executed by or on behalf of the transferor*". We appreciate your comments that it may not make sense for the transferor to be required to sign the transfer form when a transfer is being forced, and that Article 17 also provides that the directors have discretion as to the form of the instrument of transfer. However, on our reading of Article 17, whatever form the transfer instrument may be in, we cannot escape the requirement for it to be signed by the transferor. Article 21 does not provide that the transfer mechanics for shares are altered in the case of a Restricted Person and as such, Article 17 will still apply. If we purported to transfer the shares without the signature of the transferor, it is difficult to say that the transfer is made in accordance with the Articles, we may have difficulty convincing the Registered Office to update the register (and in Cayman the Register is *prima facie* evidence of the true shareholders of the company), and in any event we consider that the transfer would be more susceptible to challenge.

*The identity of the transferee*

3. Article 21 does not confer upon the directors the power to dictate to whom those shares may be transferred, although Article 18 provides the directors with "*absolute discretion decline to register any transfer of Shares without assigning any reason therefor [sic]*". On that basis, whilst the directors cannot force a transfer to any particular entity, the letter requiring Highland Dallas Foundation ("**HDF**") to transfer its shares could indicate that the directors would approve a transfer to the DFW Charitable Foundation ("**DFW**").

*The price of the transfer*

4. Similarly, the directors do not have the power to mandate the price paid for the transfer. If HDF found a willing buyer and the directors approved of them, HDF could transfer the shares for whatever value they could agree with the buyer. However, if we had the agreement of DFW to pay a certain price, then in addition to indicating that DFW would accept the transfer, the letter to HDF requiring the transfer of shares could also indicate a suggested price.

5. To come up with a suggested price, we should look to our valuation reports. We note Mark's preference for the ValueScope report as it specifies a figure rather than percentage discount. However, as we already have two reports we consider that we should have regard to both in arriving at market value (and if we choose to rely only on one we may need to be able to justify why that was appropriate). Further:

    a. The reports are in draft form and should be finalised before we rely on them;
    b. We have substantive comments on both draft reports, which we consider should be addressed before the reports are finalised; and
    c. Both reports have limitations on use including that they may not be circulated to third parties without the written consent of the authors (FTI report at [1.8]-[1.10], ValueScope report at page 38). Whilst we may not wish to circulate the reports initially, we may be called upon to justify our approach and will likely want to rely on them at that stage. Accordingly, we will need the valuers to give us their written consent for the reports to be used in this context.

6. If the transfer price could not be agreed with HDF, establishing an appropriate price could form part of an application to Court to force the transfer.

**Next steps**

On the basis of the above, the following are what we see as the next steps:

7. **Finalise valuation reports**

    a. We will reach out to ValueScope and FTI to request that they finalise their reports on the basis outlined above, noting the context in which we will seek to rely on them. We appreciate that this is likely to delay the subsequent steps to a degree, however we consider it to be a critical part of the plan, and part which should be completed before the letters to the IRS and HDF are issued.

8. **Seek DFW's views**

    a. We suggest that Mark reaches out to DFW (we understand he has the relationship) to confirm whether they are prepared to become involved on the basis set out above (in principle and subject to review of the documents).

9. **Resolutions**

    a. Mark and Paul execute resolutions in respect of the issue of the letter to the IRS, and the forced transfer of shares (including the payment of market value on the basis set out above). We do not consider resolutions in respect of sending the letter to be strictly speaking necessary, but we do consider that

there is no harm in doing so and it will add an extra layer of protection. We do, however, consider resolutions in respect of Article 21 to be necessary.

10. **IRS letter**

    a. The letter is issued to the IRS.

11. **Letter to Highland Dallas Foundation**

    a. Immediately after the IRS letter is issued, a letter should be issued to the Highland Dallas Foundation requiring it to transfer its shares under Article 21. A copy of the IRS letter should be sent at the same time, along with the board resolutions in respect of the issue of the IRS letter and the share transfer, a share purchase agreement, and the share transfer instrument. That letter will specify a reasonable time for Highland Dallas to sign the transfer documents or otherwise transfer its shares, following which we will reserve the right to commence proceedings to force the transfer without further notice.

12. **IRS letter issued to other recipients**

    a. Copies of the IRS letter should then be sent to the other intended recipients, who we understand are the other Participating Shareholders and the Texas Attorney-General.

13. **Prepare for litigation**

    a. At this stage, this seems likely to take the form of us commencing proceedings to enforce the Articles and force the transfer, or HDF commencing proceedings potentially by filing a just and equitable winding up petition relying in part on the attempt to force the transfer.

Please let us know if you have any comments on the above approach. Subject to your views, concurrently with seeking finalised valuation reports, we will circle back as soon as possible with drafts of the following for consideration:

14. the resolutions in respect of the issue of the letter to the IRS, and the forced transfer of shares;
15. the letter to the Highland Dallas Foundation;
16. a short form share purchase agreement; and
17. the share transfer instrument.

Finally, we have followed Tony up regarding his availability to discuss the further documents, and will let you know once we have some proposed times.

Please let us know if you have any comments or if you would like to discuss.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 15 March 2025 06:13
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Walkers:

If a holder is determined to be a Restricted Person by the directors, and so under article 21 the directors can cause a transfer of that holder's shares, then implicit in the execution of Article 21 is that the directors are causing effectuation of the transfer. Therefore, the Transfer Agreement would look similar to a redemption action of such shares, in that the directors would be sole signatories to the document (acting in the place of the transferor) and DFW Foundation as the appointed transferee (by the directors / or management shareholder) - would be the accepting party.

It would make no sense that a participation holder would agree to the Restricted label and sign any document. Therefore, Article 21 leaves corporate discretion in the practical implementation of such Article 21 as it implicitly assumes the non-agreement by the former Restricted person holder.

Further, directors could cause the value of such interest to be paid to the former holder, but it's not clear that would be consistent with the charitable mission of the company. However it would be consistent perhaps following corporate formalities (like a redemption) of giving value for property had. Therefore, It would seem conservative here to pay out such value to the holder nevertheless via director resolution for the Transfer.

I would agree and reference FTI valuation and ValueScope valuations in the resolutions, and use the specific number valuescope determined (as both valuations where independently arrived yet determined the same method of valuation) to pay for the share transfered. (Taking the conservative approach in balance)

In sum, corporate effectuation of Article 21 via implementation at the directors discretion as to what the corporate plumbing might look like is as follows:

1. Transfer Agreement written similar to a redemption. Directors sign, transferring the Restricted person's shares to dfw Foundation. The current holder does not sign the agreement (as it's akin to a forced redemption for value).

2. Dfw Foundation "accepts" the transfer either as a separate acknowledgement letter or signs the transfer agreement. Consider both proposals.

3. The transfer is recorded in the books of the company and register.

4. A Notice document is sent to the former holder Restricted Person, (like a redemption would do) along with consideration paid for such transfer.

Does the company attach the two valuations conducted with such Notice and payment or just reference it? What happens in a typical forced redemption situation?

Thoughts on this overall approach?

Mark

On Fri, Mar 14, 2025, 12:38 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

> Hi Bart, Brandon
>
> Taking your initial questions in turn:

1. *Do you think any other provisions are relevant?*

    a. There are other provisions in the M&A which refer to redemption, for example the Memorandum at Para 7, and Article 30. However, on further consideration, in our view the relevant point is that the Participating Shares were not issued as redeemable (as per their definition), and the rights attaching to them do not appear to have been varied. On that basis, they are not liable to be redeemed at the option of either shareholder or company.

2. *If you take the position that "non-redeemable" is operative, doesn't that make other provisions inoperative?*

    a. Whilst there are provisions in the M&A which refer to redemption, the better view is that they do not provide redemption rights or indicate that the Company necessarily holds such rights; they contemplate that redeemable shares may be issued. Those provisions are currently 'inoperative' in relation to the Participating Shares, but may be 'operative' in relation to Management Shares (noting that Management shares are redeemable by the Company). Further, they may become 'operative' in relation to the Participating Shares if those shares are converted to redeemable, or if further Participating Shares are issued which are redeemable.

3. *If you take the position that "non-redeemable" is operative, do you think the directors could amend the definition of Participating Shares pursuant to Art. 14 (without Participating Shareholder consent) to make them redeemable and then consummate the redemption?*

    a. We do not consider that such an amendment could be made without Participating Shareholder consent. In our view, amending the definition of Participating Shares to convert them to redeemable would likely constitute a material adverse variation or abrogation of the rights of the Participating Shareholders, and as such it would require a two-thirds majority of the Participating Shareholders (Article 13).
    b. Further consideration would need to be given as to whether the rights of the Participating Shares could be varied in that manner even with two-thirds Participating Shareholder consent. As we do not expect there will be any appetite to seek the consent of the Participating Shareholders at this stage, we have not considered that question in detail.
    c. However, the directors have a right to require the transfer of Participating Shares held by a Restricted Person (Article 21). If the directors form the view that one of the Participating Shareholders is a Restricted Person, assuming they are acting for proper purposes they would be able to exercise that right to require the transfer of those Participating Shares. Noting that the M&A is silent on the mechanics of a required transfer, if the directors intend to exercise that right further consideration will need to be given as to how that would work in practice, for example whether consideration would be required, and to whom the shares may be transferred. However, we note that if the directors can require the shares of one of the Highland Foundations to be transferred to the DFW Charitable Foundation, it would then hold 67.09% of the Participating Shares.
    d. At that stage, if any further action was required, further consideration could be given as to whether we seek to vary the rights of the Participating Shares with two-thirds consent of the Participating Shareholders, or to pursue another course of action, for example agreeing with DFW Charitable Foundation a repurchase of the relevant shares, which could then be cancelled, and new shares issued which are redeemable by the Company.

We are available to discuss this afternoon at 3pm, including regarding the preparation of the documents as below. Please let us know if that is convenient for you.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 14 March 2025 11:53
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey,

In the interim, can you please continue prepping the documents for (i) redemption and (ii) exercising rights under Art. 21?

We need these to be ready to execute on Monday.

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Friday, March 14, 2025 9:51 AM
**To:** Bart Higgins <bhiggins@shieldslegal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Thanks Bart, noted.

We will do what we can.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Bart Higgins <bhiggins@shieldslegal.com>
**Sent:** 14 March 2025 09:44
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey, client would like a conference today if you can make it work.

Sent from my iPhone

On Mar 14, 2025, at 9:38 AM, Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

CAUTION: This email originated from outside of the organization.

Hi Brandon

Apologies for the delay, we are finalising our views and will revert back as soon as possible regarding a call, which will likely be this afternoon or early next week.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 14 March 2025 08:32
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Geoffrey,

Adding Mark. We were hoping to have a call scheduled by now. Please let us know.

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Wednesday, March 12, 2025 12:14 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Hi Brandon

Thanks for the below. We will revert back in substance once we've had a chance to consider, including regarding a time for a call.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 12 March 2025 09:56
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey,

Trying to collect the relevant provisions in one email for reference.

Pro-redemption

1. Art. 8: suggests Directors can redeem shares.
2. Art. 14: Rights conferred on Participating Shares shall not be materially adversely varied or abrogated by…redemption…of any Participating Shares…by the Company.
    1. Art. 13: Participating Shares can vote if materially adversely varied or abrogated.
    2. Arts. 13 and 14: Directors can redeem Participating Shares, and Participating Shares cannot vote on that.

Anti-redemption

1. Definition of "Participating Share: "non-redeemable".
2. Art. 28(b) and (d): refers to "any redeemable Shares", suggesting some are redeemable and others may not be.

Do you think any other provisions are relevant?

If you take the position that "non-redeemable" is operative, doesn't that make other provisions inoperative?

If you take the position that "non-redeemable" is operative, do you think the directors could amend the definition of Participating Shares pursuant to Art. 14 (without Participating Shareholder consent) to make them redeemable and then consummate the redemption?

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Brandon R. Schaller
**Sent:** Wednesday, March 12, 2025 8:31 AM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

Thanks Geoffrey. Can you please let us know some times you are available to discuss?

Also, we agree that a call with Tony prior to his next draft would be helpful, and we are happy to join that.

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, March 11, 2025 11:23 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Hi Brandon

We have forwarded those documents to counsel for review. Once Tony has had a chance to consider, we suggest that a call to discuss would be helpful.

Regarding the question as to redeemability of the Participating Shares, in light of Tony's advice we have considered and discussed further with colleagues in our corporate team. We note that the Memorandum at Para 7 appears to provide the Company with the right to redeem its shares, and certain provisions of the Articles envisage redemption by the Company (e.g. Arts 14 and 28). On the other hand, the rights attached to the Participating Shares as per their definition include that they are non-redeemable (without specifying whether that applies to the company or the shareholder). Following further consideration, on the basis of the documents we have seen we consider that the better view is that the Participating Shares are not redeemable by either the company or the shareholder. If you are aware of any further documents (e.g. resolutions) which might operate to alter the rights attached to the Participating Shares, please let us know.

However, we note that Tony's advice, with which we agree, is that the company does have the power to force the transfer of shares held by a Restricted Person. In the circumstances, we may be able to rely on that power.

Once Tony has considered the further documents we will revert back regarding a time for a call.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 06 March 2025 12:24
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

Hi Brandon

Thanks for your time on the phone and the below.

We will share those documents with Tony and discuss his advice in light of them.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 06 March 2025 11:38
**To:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Materials for KC

**[this message is from an external sender]**

---

Walkers team,

Here are factual materials to be shared with KC:

1. Carrington Coleman (US law firm) tax memo – this provides a general history (see Exhibit C) of the facts, so we would suggest the review begin here.
2. ValueScope Presentation to Supporting Organizations – this was presented to the Supporting Organizations on November 20, 2024 and provides financial background.
3. Paul Murphy Presentation – this was presented to the Supporting Organizations in early December 2024 and provides corporate governance background.
4. Walkers Presentation re: Participation Shareholder rights – this provides an overview of the rights of the Participation Shareholders
5. UBS Petition – this provides background on Dondero's various misdeeds. In particular, search for "Sentinel". It is not necessary to review the entire petition.
6. Highland Employee Retention Assets Petition – this provides background on Dondero's various misdeeds. In particular, search for "A Recurring Theme" and read pgs. 36-47.
7. News article re: Judge Jernigan -Texas Judge Jernigan Accused of More Ethics Violations – Dondero attempted to weaponize the U.S. Securities and Exchange Commission to investigate Judge Jernigan, who had ruled against him in numerous bankruptcy matters.

We are happy to discuss with KC after he has had a chance to review. Let us know of any questions.

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

---

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

---

# VALUATION ANALYSIS OF CERTAIN PARTICIPATION SHARES OF CHARITABLE DAF HOLDCO, LTD

AS OF
MARCH 25, 2025

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

***RE: Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[1]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.

---

[1] Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the DAF will continue as a going concern.[2] The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Participation Shares.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's management shareholder ("Management"). To understand the environment in which DAF operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo, Ltd. as of September 30, 2024
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd, amended and restated as of January 24, 2024

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

- Information regarding the Company's history and current operations
- Historical distributions paid to the holders of the Subject Interest
- The organizational structure chart for Charitable DAF HoldCo, Ltd
- Discussions with the Company's Management
- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024
- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date
- An interview with Management regarding expectations for future distributions
- An application of appropriate valuation techniques and procedures, including the income approach
- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,



ValueScope, LLC

## TABLE OF CONTENTS


**ENGAGEMENT OVERVIEW ....... 1**

DESCRIPTION OF THE ASSIGNMENT ....... 1
SCOPE ....... 1
PROCEDURES ....... 1

**DAF OVERVIEW ....... 2**

COMPANY OVERVIEW ....... 2
CAPITALIZATION TABLE ....... 2
COMPANY STRUCTURE CHART ....... 3
FINANCIAL POSITION ....... 3
SUBJECT INTEREST OVERVIEW ....... 6

**ECONOMIC AND INDUSTRY OVERVIEW ....... 8**

OVERVIEW OF THE U.S. ECONOMY ....... 8
OVERVIEW OF THE PRIVATE EQUITY... & INVESTMENT VEHICLES INDUSTRY ....... 16

**VALUATION METHODOLOGY ....... 17**

VALUATION APPROACHES ....... 17
VALUATION METHODS ....... 18
SUMMARY OF THE VALUATION APPROACHES AND METHODS ....... 18

**VALUATION ANALYSIS ....... 20**

INCOME APPROACH ANALYSIS ....... 20

**CONCLUSION OF VALUE - SUBJECT INTEREST ....... 22**

DISCOUNT FOR LACK OF MARKETABILITY ....... 22
PRE-IPO STUDIES ....... 34
APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST ....... 35
DISCOUNT ADJUSTMENT DISCUSSION ....... 36
SUBJECT INTEREST DISCOUNT CALCULATION ....... 37
FAIR MARKET VALUE CONCLUSION ....... 38

**ASSUMPTIONS AND LIMITING CONDITIONS ....... 39**

**APPRAISAL CERTIFICATION ....... 44**

TABLE OF SCHEDULES

**VALUATION SUMMARY ........ SUMMARY SCHEDULE**

**HISTORICAL FINANCIAL ANALYSIS ........ A**

HISTORICAL DISTRIBUTIONS TABLE ........ A.1
HISTORICAL DISTRIBUTIONS CHARTS ........ A.2
CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........ A.3

**INCOME APPROACH ........ B**

DISCOUNTED CASH FLOW (DCF) ANALYSIS ........ B.1
SENSITIVITY ANALYSIS – HYPOTHETICAL RISK-FREE BOND ........ B.2

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS ........ C**

RESTRICTED STOCK STUDIES........ C.1
RESTRICTED STOCK STUDIES SUMMARY STATISTICS........ C.2
DLOM QUALITATIVE SCORING ........ C.3
CALCULATION OF MARKETABILITY DISCOUNT........ C.4
DLOM FOOTNOTES AND COMMENTS........ C.5

## ENGAGEMENT OVERVIEW

### DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[3]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

### SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Subject Interest. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

### PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

3 Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

## DAF OVERVIEW

### COMPANY OVERVIEW[4]

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law"). As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities. In recent periods, however, the DAF's underlying assets have been allocated across a broader and more diverse range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

### CAPITALIZATION TABLE

On February 7, 2025, the Company issued 318 participation shares to *DFW Charitable Foundation*, increasing the total number of participation shares to 623, composed of:

- 318 participation shares held by *DFW Charitable Foundation*
- 100 participation shares held by *Highland Dallas Foundation, Inc.*
- 100 participation shares held by *Highland Kansas City Foundation, Inc.*
- 100 participation shares held by *Highland Santa Barbara Foundation, Inc.*
- 5 participation shares held by *The Community Foundation of North Texas*

All the Company's management shares are held by Mark Patrick.

[4] Based on the Company's memorandum and articles of association and information from Management.

## COMPANY STRUCTURE CHART




## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million. CLO HoldCo has net assets of $269.1 million on its books as of September 30, 2024. The Balance Sheet is presented below and in Schedule A.3.

## *CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

The Company paid distributions to the Participation Shareholders of $819,050 in 2019, $619,050 in 2020, $834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three quarters of 2024. Fourth quarter distributions were historically larger than in the first three quarters.[5] Historical Distributions are presented in the following charts and in Schedules A.1 and A.2.

[5] Distributions are typically paid a few months following the end of a quarter. As a result, fourth quarter distributions may be paid in the first or second quarter of the following calendar year.




Note: Q4 2024 distributions have not yet been paid.



## SUBJECT INTEREST OVERVIEW

The Subject Interest consists of participation shares, which from time to time may receive discretionary cash distributions intended to support the charitable and expense goals of the holders. The rights and limitations of the participation shares are defined by the DAF Agreement and are directly influenced by the discretion and actions of the Company's Management and directors.

The DAF Agreement grants the directors substantial discretion over distributions, share issuances, governance, and financial transparency, leaving participation shareholders with little influence over corporate decisions. They are subject to potential dilutions, transfer restrictions, and limited access to information, with limited voting rights and no ability to amend governing documents. Given these extensive limitations, the participation shares represent a highly restricted and passive financial interest with limited control or enforceable rights.

### *Limited Rights Over Distributions*

Participation shareholders do not have:

- The right to cause, vote on, or receive pro-rata distributions.
- The right to annual, timed, or guaranteed distributions.
- The right to receive notice of distributions made to other participation shareholders.
- The ability to amend the DAF Agreement to modify distribution rights.

### *Governance and Voting Limitations*

Participation shareholders do not have:

- The right to remove or appoint directors.
- The right to vote on the issuance of additional participation shares, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of share redemptions.

The appointed directors and Management have full control over the management, operations, and affairs of the Company (subject to requiring a two-thirds majority of the participation shareholders for any material adverse variation or abrogation of rights attached to the participation shares), including the issuance and purchase of shares on terms they determine. Since participation shareholders do not have voting or approval rights over further issuances, additional participation shares may be issued at any time, potentially impacting the economic interests associated with existing shares (noting that

the purchase of participation shares, or issuance of further shares ranking pari passu or subsequent to the participation shares, is not regarded as causing a material adverse variation or abrogation of the rights of the participation shareholders). Additionally, the transfer of participation shares requires director approval, and directors may reject transfer at their discretion.

***Restrictions on Meetings and Information Access***

Participation shareholders do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at the director's sole discretion (or in the very limited circumstances conferred by law).
- The ability to modify or amend the DAF Agreement in any capacity.

***Restricted Persons Clause***

Certain individuals or entities may be classified as Restricted Persons, including:

- Any holder of participation shares in breach of applicable laws.
- Any holder that is not exempt from taxation under Section 501(c)(3).
- Any holder whose participation, in the opinion of the directors, could cause the Company to incur tax, legal, regulatory, administrative, or pecuniary liabilities that it would not otherwise face.

If the directors become aware that any participation shares are held by a Restricted Person, they may, by written notice, require the transfer of such shares in accordance with the DAF Agreement.

For further details, refer to Appendix A for key provisions of the DAF Agreement.

# ECONOMIC AND INDUSTRY OVERVIEW

## OVERVIEW OF THE U.S. ECONOMY

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter. Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target. After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December. The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election. Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

### Gross Domestic Product[6]

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending. These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.




6 U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

***Population***

Population growth is an important driver of long-term growth in an economy. The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7] The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward/flat. In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]







7 U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

8 Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

9 U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

***Employment***

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]







Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

10 U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### *Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].




11 Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

12 Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

13 Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

### *Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14] The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]




The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]




14 Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

15 Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

16 Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2025.

17 Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]




***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.




18 U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2025.

### *Stock Markets*[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024. The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024. The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024. In the graph below, the December 30, 2022, values were set to 100.




### *Construction & Housing Starts*

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20] Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

---

19 CapIQ Database, last accessed January 10, 2025.

20 U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

21 U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.




***Consumer Sentiment***

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.




22 University of Michigan, *Surveys of Consumers*, November 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[23]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### *Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

---

23 IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

### VALUATION APPROACHES

#### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

#### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

#### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1. Discounted Cash Flow Method (multi-period model)
2. Direct Capitalization Method (single period model)
3. Excess Earnings Method

B. Market Approach
1. Guideline Public Company Method
2. Merger and Acquisition Method

C. Asset-Based Approach
1. Reproduction Cost Method
2. Replacement Cost Method
3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up. Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.[24]

Given the nature of the participation shares, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[25]

---

24 Previous valuations conducted by ValueScope did not account for the rights of the participation shares under the applicable law, specifically that these shares confer an extremely limited enforceable claim to the entity's underlying NAV.

25 The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the participation shares.

This approach estimates the present value of expected future distributions, if any, based on reasonable assumptions regarding the manager's discretion in making such distributions. If no future distributions are expected, the value of the Subject Interest would be nominal. The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Participation Shares.

## VALUATION ANALYSIS

### INCOME APPROACH ANALYSIS

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits. In the case of the Participation Shares, these economic benefits are exclusively tied to discretionary distributions made by the director, rather than earnings or cash flows of the DAF's underlying assets. The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these payments. The resulting present value represents the fair market value of the Subject Interest.

#### *Discounted Cash Flow Method*

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date. The DCF method projects the distributions that the Participation Shareholders are expected to receive. Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

#### *Projected Distributions*

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions. Management indicated that the timing and size of future distributions will be discretionary, and that DAF does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid over the past 12 to 24 months. We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000. Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

#### *Cost of Equity*

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, extremely limited claim on underlying NAV, and absence of control over distributions. This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature of potential cash flows, significant legal and governance risks, and the

inability to force a sale or liquidity event. The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions. Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

***Conclusion – Income Approach Analysis***

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[26]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows. In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied. Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%. However, this analysis does not reflect the substantial risks associated with the Subject Interest.

---

26 Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

## CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

## DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity. A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions. These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

### *Restricted Stock Studies*

The restricted stock studies reviewed included data from 1966 through 2010. The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity. The restricted stocks were identical to the traded stock except for marketability. A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

**Summary of Restricted Stock Studies**




## SEC Institutional Investor Study[27]

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969. The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer. The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer. Stocks listed on the major exchanges had lower

27 U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

discounts than smaller exchanges and over-the-counter stocks. The study found higher discounts for companies with smaller sales and lower earnings.

**Johnson & Racette Study[28]**

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973. The study included 86 observations sent from 75 investment companies that met the selection criteria. Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

**Gelman Study[29]**

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970. The investment companies were formed in 1968 to specialize in restricted securities. A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders. Gelman's analysis found mean and median discounts of approximately 33%. In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

**Trout Study[30]**

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972. Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares. Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

28 Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

29 Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company, "*The Journal of Taxation*, June 1972, 353-354.

30 Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

**Moroney Study**[31]

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972. The study was subsequently published in 1973. The analysis focused on 146 transactions in restricted securities by 10 registered investment companies. The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

**Maher Study**[32]

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976. The study observed discounts for 34 restricted stock transactions from 1966 to 1973. The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

**Standard Research Consultants Study**[33]

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982. The discounts varied from 7% to 91% with a median of 45%. The results of the study tend to suggest higher discounts for companies with smaller revenues.

**Wruck Study**[34]

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample. On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%. The median discount indicated was similar at 12.2%.

---

31 Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

32 J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

33 William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

34 Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

**FMV Opinions Study**[35]

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144. The mean and median discounts were 22.3% and 20.1%, respectively. The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

**Barclay, Holderness, Sheehan Study**[36]

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996. Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management. Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements. In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

**Hertzel & Smith Study**[37]

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987. The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms. While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

35 Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

36 Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

37 Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

**Management Planning Study[38]**

Management Planning, Inc. published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H. Meyers, ASA, CFA. They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights. A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|---|---|---|---|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment. Certain factors were also cited by the authors as the most influential in determining discounts. The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

**Hertzel, Lemmon, Linck, Rees Study[39]**

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996. A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million. Of the 619 private

---

38 A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370. Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability*. 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

39 Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts. The study indicated a mean discount of 16.5% and a median discount of 13.4%.

**Wruck & Wu Study[40]**

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies between 1980 and 1999. 1,976 private placements were selected in the sample. Of these, 1,854 had data for observed discounts. The study found a mean discount of 11.33% and a median discount of 10.96%.

**Angrist, Curtis, Kerrigan (MPI) Study[41]**

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

**Results of Angrist, Curtis, Kerrigan (MPI) Study**

| Period | Observations | Mean Discount | Median Discount |
|---|---|---|---|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

**Willamette Management Associates Study[42]**

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984. There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study. The Willamette study resulted in a mean discount of 31.2%.

---

40 Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.

41 Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.

42 Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

**Silber Study**[43]

William L. Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989. Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%. Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

**Krishnamurthy, et al. Study**[44]

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992. The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined). The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively. The overall mean discount was 19.4%.

**Wu Study**[45]

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004. The study analyzed 301 private placements taking place from 1986 to 1997. Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

**Bajaj Study**[46]

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith. This study analyzed 88 private placements occurring between 1990 and 1995. The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively. The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

43 William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

44 Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

45 Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

46 Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

**Johnson Study (Business Valuation Review)**[47]

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995. The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%. Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

**Finnerty Study**[48]

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008. The first study focused on private placements from 1991 to 1997 and resulted in mean and median discounts of 26% and 20%, respectively. The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

**Chaplinsky Purchase Discount and Warrant Study**[49]

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms. The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount. The indicated mean discount considering only the purchase discount was 19%, and the median was 15%. The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

**Brophy PIPE Study**[50]

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors. The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

47 Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

48 John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

49 Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

50 David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

### Columbia Financial Advisors Study[51]

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998. The one-year holding period became effective April 29, 1997. A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

| | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|---|---|---|
| Number of Transactions | 23 | 15 |
| Low | 0.8% | 0.0% |
| Mean | 21.0% | 13.0% |
| Median | N/A | 9.0% |
| High | 67.5% | 30.0% |

### Meidan Study[52]

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003. The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%. The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample. The weighted average of the mean discounts was calculated as 9.8%.

### Verdasca Study[53]

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions. The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

51 Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

52 Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

53 Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

**Billett & Floros Study[54]**

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008. These factors were found to both complement and substitute for the other depending on individual circumstances. By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

**Stout Risius Ross Study[55]**

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods. The chosen time period includes transactions both before and after Rule 144 implementation. The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively. Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

**Harris-Trugman Study[56]**

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables. The study originally included 80 transactions of restricted stock sales that took place in 2007-2008. Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011. For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively. The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively. The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively. The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

54 Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

55 Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

56 William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

## Summary of Restricted Stock Studies

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010. Reported mean discounts range from 8.7% to 35.6%. The average of reported mean discounts was 20.8%, while the median was 19.4%. Reported median discounts range from 9.0% to 45.0%. The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed. Prior to April 1997, the SEC-required holding period for restricted stocks was two years. That was decreased to one year on April 29, 1997. Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

### Analysis of Restricted Stock Studies for Different Periods

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | Mean | Median |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

The studies also cited several company and security specific factors in determining the estimated discount.

## PRE-IPO STUDIES

In recent years, a number of pre-IPO studies were performed to support marketability discounts. The methodology applied in these studies is based on the initial offering price (the price prior to public trading). This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period. The resulting amount is divided by the initial offering price to arrive at the appropriate discount. The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders. Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

### *Emory Studies*

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC. Emory has completed nine studies with the original published in June 1986. The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share. The ninth study deviated from the previous studies as follows:

- Included only companies with “com” in their names
- Review period was increased from 18 months in the previous studies to 35 months
- All transactions were actual sales as opposed to the previous studies that included options
- Most of the companies did not have earnings

The study consisted of 53 transactions. The mean and median discounts by study are presented in the following chart.




### *Willamette Management Associates Pre-IPO Study*

This study observed 556 companies and 1,007 transactions from 1975 through 1997. The adjusted mean discount[57] for each time period varied from 28.9% to 56.8%. The mean for the entire review period was 44.2%. The median discount range was from 31.8% to 73.1% with the overall median at 50.4%. The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

### *Valuation Advisors Pre-IPO Study*

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000. The mean discount of these studies was 48.9%. The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO. The study confirmed the author's initial hypothesis that higher discounts accompany longer holding periods.

## APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest. The mean and median discounts from the restricted stock studies ranged from 9% to 45%. The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

57 Excluded highest and lowest deciles of indicated discounts

The latest restricted stock studies indicate mean and median marketability discounts in 14% range. We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis. Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions. Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company. We did not use these studies for our analysis.

***Factors Affecting Marketability***

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase. We also note that various other factors affected discounts observed in the other studies. Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

**DISCOUNT ADJUSTMENT DISCUSSION**

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section. Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison. Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature. Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest. This results in a range of outputs from -4 to +4

(from significantly worse to significantly better). The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature. An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

**SUBJECT INTEREST DISCOUNT CALCULATION**

***Adjustment Analysis – Marketability***

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile. The Participation Shares have restrictions on the transfer of their shares and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock. Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis. Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

## FAIR MARKET VALUE CONCLUSION

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest. Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated. They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC. Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein. This report may be used alongside other appraisals or studies for comparative or analytical purposes. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.
2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.
3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.
4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.
5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.
6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.
7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.
8. This report and analysis were prepared under the direction of Steven C. Hastings.
9. I am in compliance with all professional appraisal certifications and licensing.
10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By: ValueScope, LLC



Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

**APPENDIX A**
**KEY DAF AGREEMENT PROVISIONS**

1. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restriction whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided. [Paragraph 7, Memorandum]

2. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   a. issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   b. and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued. [Article 7]

3. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, establishing and designated (or re-designated as the case may be) and the variations in the relative rights (including without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligation as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution. [Article 8]

4. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether

absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerages as may be lawful on any issue of Shares. [Article 9]

5. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason. [Article 10]

6. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote in general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles. [Article 12]

7. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes. [Article 13]

8. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares raking *pari passu* with or subsequent to them or the redemption of purchase of any Participating Shares of any Class by the Company. [Article 14]

9. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws. [Article 18]

10. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles. [Article 21]

11. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution. [Article 65]

12. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed. [Article 72]

13. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article. [Article 77]

14. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor. [Article 100]

15. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors. [Article 101]

16. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rate basis as to the paid-up or par value of the Shares. [Article 105]

17. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions and regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors of by Ordinary Resolution. [Article 110]

**APPENDIX B**
**QUALIFICATIONS OF THE APPRAISER**

***Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA***
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

**EMPLOYMENT HISTORY**

*2006 – Present* *ValueScope, LLC*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006 *Value Capital, LLC*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000* *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001* *MedCare Financial Solutions, Inc.*

*President*
Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994 *H.D. Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986 *Arthur Andersen & Co.*

*Senior Manager*
Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.

- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.

- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*

- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*

- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.

- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.

- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.

- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.

- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.

- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

SCHEDULES

**Charitable DAF HoldCo, Ltd**
**Table of Contents** **Valuation Date: March 25, 2025**

Table of Contents


| Schedule Name | Schedule |
|---|---|
| **Valuation Summary and Conclusion** | Summary Schedule |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| **Income Approach** | |
| Discounted Cash Flow (DCF) Analysis | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discount | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

**Charitable DAF HoldCo, Ltd** — **Summary Schedule**
**Valuation Summary and Conclusion** — **Valuation Date: March 25, 2025**

*Synthesis of Fair Market Value*

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | **Value** | **Reference** |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | **Shares** | **Fair Market Value** |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

**Charitable DAF HoldCo, Ltd** **Schedule A.1**
**Historical Financial Analysis** **Valuation Date: March 25, 2025**

*Historical Distributions Table*

| Quarterly Distributions - Previous 5 Years | | | | | |
|---|---|---|---|---|---|
| **Organization** | **Highland Dallas Foundation, Inc.** | **Highland Kansas City Foundation, Inc.** | **Highland Santa Barbara Foundation, Inc.** | **The Community Foundation of North Texas** | **Total** |
| **Holding** | **100 Participation Shares** | **100 Participation Shares** | **100 Participation Shares** | **5 Participation Shares** | **305 Participation Shares** |
| **31-Mar-19** | 39,750 | - | $51,000 | - | $90,750 |
| **30-Jun-19** | 39,438 | - | 50,688 | - | 90,125 |
| **30-Sep-19** | 36,813 | - | 48,063 | - | 84,875 |
| **31-Dec-19** | 231,738 | - | 53,313 | - | 553,300 |
| **2019 Subtotal** | **$347,738** | **$168,250** | **$203,063** | **$100,000** | **$819,050** |
| **31-Mar-20** | 25,750 | - | 37,000 | - | 62,750 |
| **30-Jun-20** | 27,625 | - | 38,875 | - | 66,500 |
| **30-Sep-20** | 27,125 | - | 38,375 | - | 65,500 |
| **31-Dec-20** | 162,738 | 120,250 | 41,313 | 100,000 | 424,300 |
| **2020 Subtotal** | **$243,238** | **$120,250** | **$155,563** | **$100,000** | **$619,050** |
| **31-Mar-21** | 33,188 | - | 44,438 | - | 77,625 |
| **30-Jun-21** | 40,063 | - | 51,313 | - | 91,375 |
| **30-Sep-21** | 43,063 | - | 54,313 | - | 97,375 |
| **31-Dec-21** | 236,513 | 176,250 | 55,313 | 100,000 | 568,075 |
| **2021 Subtotal** | **$352,825** | **$176,250** | **$205,375** | **$100,000** | **$834,450** |
| **31-Mar-22** | 46,438 | - | 57,688 | - | 104,125 |
| **30-Jun-22** | 52,438 | - | 63,688 | - | 116,125 |
| **30-Sep-22** | 50,750 | - | 62,000 | - | 112,750 |
| **31-Dec-22** | 285,013 | 191,750 | 59,188 | 100,000 | 635,950 |
| **2022 Subtotal** | **$434,638** | **$191,750** | **$242,563** | **$100,000** | **$968,950** |
| **31-Mar-23** | 48,313 | - | 59,563 | - | 107,875 |
| **30-Jun-23** | 45,750 | - | 57,000 | - | 102,750 |
| **30-Sep-23** | 47,688 | - | 58,938 | - | 106,625 |
| **31-Dec-23** | 277,741 | 195,712 | 60,178 | 100,000 | 633,631 |
| **2023 Subtotal** | **$419,491** | **$195,712** | **$235,678** | **$100,000** | **$950,881** |
| **31-Mar-24** | 47,608 | - | 58,858 | - | 106,467 |
| **30-Jun-24** | 46,939 | - | 58,189 | - | 105,127 |
| **30-Sep-24** | 47,476 | - | 58,726 | - | 106,202 |
| **31-Dec-24** | **TBD** | **TBD** | **TBD** | **TBD** | **TBD** |
| **2024 Subtotal** | **$142,023** | **$0** | **$175,773** | **$0** | **$317,796** |
| **Grand Total (2019 - 2024)** | **$1,939,952** | **$852,212** | **$1,218,013** | **$500,000** | **$4,510,177** |

Note: Payments are typically made a few months following the end of each period.

Charitable DAF HoldCo, Ltd
Historical Financial Analysis

Schedule A.2
Valuation Date: March 25, 2025

*Historical Distributions Charts*







Note: Q4 2024 distributions have not yet been paid.

**Charitable DAF HoldCo, Ltd** **Schedule A.3**
**Historical Financial Analysis** **Valuation Date: March 25, 2025**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**Charitable DAF HoldCo, Ltd** — **Schedule B.1**
**Income Approach** — **Valuation Date: March 25, 2025**
*Discounted Cash Flow (DCF) Analysis*

| | | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **18-Apr-25** | **30-Jun-25** | **30-Sep-25** | **31-Dec-25** | **31-Mar-26** | **30-Jun-26** | **30-Sep-26** | **31-Dec-26** | **31-Mar-27** | **30-Jun-27** | **30-Sep-27** | **31-Dec-27** | **Residual (Annual)** |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = | 68.3% | *0.9663* | *0.8484* | *0.7449* | *0.6540* | *0.5742* | *0.5041* | *0.4426* | *0.3886* | *0.3412* | *0.2995* | *0.2630* | *0.2309* | |
| **Present Value (PV) Net Cash Flow** | | **$613,430** | **$90,926** | **$77,423** | **$69,593** | **$373,598** | **$55,377** | **$47,153** | **$42,384** | **$227,533** | **$33,726** | **$28,718** | **$25,813** | |

| | |
|---|---|
| PV net cash flow | $1,685,675 |
| PV residual value | $359,856 |
| **Value of Subject Interest, Minority, Marketable** | **$2,045,531** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$1,637,192** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$5,368** |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | *0.2309* |
| PV residual value : | $359,856 |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

**Charitable DAF HoldCo, Ltd** **Schedule B.2**
**Income Approach** **Valuation Date: March 25, 2025**

*Sensitivity Analysis - Hypothetical Risk-Free Bond*

| | | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **18-Apr-25** | **30-Jun-25** | **30-Sep-25** | **31-Dec-25** | **31-Mar-26** | **30-Jun-26** | **30-Sep-26** | **31-Dec-26** | **31-Mar-27** | **30-Jun-27** | **30-Sep-27** | **31-Dec-27** | **Residual (Annual)** |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ Risk Free Rate = | 4.7% | *0.9970* | *0.9858* | *0.9746* | *0.9636* | *0.9527* | *0.9420* | *0.9313* | *0.9208* | *0.9104* | *0.9001* | *0.8899* | *0.8799* | |
| **Present Value (PV) Net Cash Flow** | | **$632,896** | **$105,644** | **$101,300** | **$102,540** | **$619,894** | **$103,473** | **$99,219** | **$100,433** | **$607,158** | **$101,348** | **$97,180** | **$98,370** | |

| | |
|---|---|
| PV net cash flow | $2,769,456 |
| PV residual value | $41,969,350 |
| **Value of Subject Interest, Minority, Marketable** | **$44,738,806** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$35,807,821** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$117,403** |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 4.7% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 46.5x |
| Residual value : | $47,699,415 |
| x PV factor : | *0.8799* |
| PV residual value : | $41,969,350 |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |





CONFIDENTIAL

**Charitable DAF HoldCo, Ltd** — **Schedule C.1**
**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: March 25, 2025**



*DLOM Determination - Restricted Stock Studies*

| | Restricted Stock Studies | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

Charitable DAF HoldCo, Ltd — Schedule C.2
Discount for Lack of Marketability (DLOM) Analysis — Valuation Date: March 25, 2025

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

**Charitable DAF HoldCo, Ltd** **Schedule C.3**
**Discount for Lack of Marketability (DLOM) Analysis** **Valuation Date: March 25, 2025**

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on director discretion as to the timing and amount. Distributions are not required. However, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size. Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. The Company and CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years. Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the directors. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Participating shareholders have no direct rights to the underlying net asset value other than in a winding up. CLO HoldCo is expected to generate revenue well in excess of the expected distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets. The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | Participation shareholders are small, private foundations. The foundations must be 501c3 non-profit organizations. At the director's discretion, participating shareholders may be diluted through the issuance of additional participation shares to non-existing participating shareholders. | Poor | Worse |

**Charitable DAF HoldCo, Ltd** — **Schedule C.4**
**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: March 25, 2025**

*Calculation of Marketability Discount*

| Feature | Net Advantage | Gross Adjustment | Importance | Weight | Adjustment | Scaling Adjustment | Final Adjustment |
|---|---|---|---|---|---|---|---|
| | A (Schedules B) | B = F(A) | C | D = F(C) | E = B x D | F = 1+E or 1/(1-E) | |
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | 104% | 0.8% |
| **Net Scaling Adjustment** | **G = Product ($F_i$), i = 1 to n** | | | | | **96%** | **-0.8%** |
| | | | | | | | |
| **Marketability Discount** | | | | | | | |
| Unadjusted discount | I (See Report) | | | | 20.8% | | |
| Scaling adjustment | G (See above) | | | | 96% | | |
| **Concluded Marketability Discount** | **J = G x I** | | | | | **20.0%** | |

| Charitable DAF HoldCo, Ltd<br>Discount for Lack of Marketability (DLOM) Analysis | Schedule C.5<br>Valuation Date: March 25, 2025 |
|---|---|

*DLOM Footnotes and Comments*

**A)** Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.
1 = Poor 2 = Weak 3 = Fair 4 = Good 5 = Excellent
We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

| | | | | |
|---|---|---|---|---|
| 0 = Equal | 1 = Slightly Better | 2 = Better | 3 = Much Better | 4 = Significantly Better |
| | -1 = Slightly Worse | -2 = Worse | -3 = Much Worse | -4 = Significantly Worse |

**B)** B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

**C)** The importance of the feature is assessed.
1 = Low 2 = Medium 3 = High

**D)** Weights are allocated as follows:
Low = 25% Medium = 50% High = 100%

**E)** To compute the adjustment, B is multiplied by D.

**F)** The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

**G)** The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

**H)** The net scaling adjustment for control factors is the product of all control features' scaling adjustments.

**I)** This is the concluded baseline marketability discount determined for comparable investments.

**J)** This is the baseline marketability discount multiplied by the scaling factor.

**K)** This is the concluded baseline minority interest discount determined for comparable investments.

**L)** This is the baseline minority interest discount multiplied by the scaling factor.

**M)** This is the combined discount of both marketability and minority interest discounts.

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Anaman, Alexis <Alexis.Anaman@fticonsulting.com> |
| **Sent:** | 27 March 2025 2:11 AM |
| **To:** | Geoffrey Sykes; Shek, Chun Yin |
| **Cc:** | Barnaby Gowrie; Philip Aubry; Chris Beck |
| **Subject:** | RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181] |
| **Attachments:** | Non reliance letter (Template).docx |

**[this message is from an external sender]**

Hi Geoffrey,

Thanks for the comments. A few questions

- You have asked for us to include language which notes: "We understand that the Directors acting in the best interests of the company is generally regarded as the interests of the members as a whole, which includes future members ..." The underlined language is new. Can you confirm reference to a member relates to participating shareholders? What is the intention of adding that directors should act in the interests of future members? I am struggling conceptually to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders. Therefore the addition seems unnecessary.
- I am surprised that distributions were made. This seems inconsistent with a phone call we had. But perhaps I misheard. Can you provide more detail as to the nature of the distributions. The proposed language is as follows: "From 2019, DAF became involved in a legal dispute, and whilst DAF has still made distributions to allow the Participating Shareholders to make unrestricted grants to the supported community foundations, it has curtailed additional discretionary distributions". What is an unrestricted grant? What falls in the category of additional discretionary distributions?
- The limitations in our note will remain. To do a valuation which can support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. However, this will require *inter alia* approval from our risk committee to proceed and more information on the proposed transaction and situation.
- We are happy for CDMCFAD LLC to have our memo on a non-reliance basis – please see attached for our template NRL. But this memo should not be used to support a transaction.

Happy to discuss.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 26 March 2025 13:02
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for the below.

We have discussed further with our client and onshore counsel, and together with them set out some further clarificatory amendments as per the comments in the attached.

In addition to those minor amendments, we note that:

1. we have not received any material addressing reliance on the memorandum by CDMCFAD LLC; and
2. the "*Limitations and restrictions*" section is unchanged, and still provides that the memorandum "*should not be used to support a transaction*" ([1.8]-[1.10]).

In order for the memorandum to be useful in the circumstances, CDMCFAD needs to be able to rely on it (in addition to DAF HoldCo), or a separate, comparable memorandum would need to be addressed to CDMCFAD on which it may rely. Further, both entities will need to be able to rely on the memorandum(s) to support the proposed transaction. We confirm that we do not intend to disclose the memorandum(s) to any third parties. Apologies if we did not communicate those points clearly during our call on Friday.

Please let us know if there are any issues with either of those – if so, of course we would be happy to discuss.

Otherwise, we would be grateful to receive a draft engagement letter addressed to CDMCFAD LLC, and appropriate amendments to the memorandum(s) regarding reliance by both entities, and in support of a transaction.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 25 March 2025 10:54
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey, please find attached a comparison against the last draft of the original version on our server.

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**

+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 25 March 2025 12:55
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Thanks Alexis.

Please could you also send a redline against the previous version in word?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 25 March 2025 02:15
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

Please find attached an updated memo.

Thank you

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 24 March 2025 17:55

**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

A Participating Shareholder may consider an absence of distributions to be sufficient grounds for a winding up order on the just and equitable basis, and they would be able to present a winding up petition on those grounds. However, it is difficult for us to say whether that petition would be successful, i.e. whether a Court would agree with the Participating Shareholder. In coming to a determination, the Court would consider all of the circumstances surrounding the absence of distributions, whatever those circumstances might be. In saying that, one point which would be relevant to the Court's determination is that the quantum of dividends is to be determined by the directors "*in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis*" (Article 104).

If a winding up petition is presented and a winding up order is then made, any alteration in the status of a company's members after the petition was presented is void unless the Court orders otherwise (Companies Act sections 99 and 100). On that basis, if: (a) a Participating Shareholder presented a winding up petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and accordingly would not impact the amounts the existing Participating Shareholders would receive in the winding up (unless the Court ordered otherwise).

Please let us know if you need anything else.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 22 March 2025 03:36
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

Many thanks for your response.

Would an absence of distributions be sufficient grounds to make an application to wind the company up?

If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 21 March 2025 20:00
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for your time on the phone last night and your email.

We confirm that, if DAF HoldCo was wound up, the Participating Shareholders would receive distributions. Those distributions would be made *pari passu*, and Mark (if he was the liquidator) would not be able to ensure that the existing Participating Shareholders get nothing. Article 122 provides that in a winding up, the assets available for distribution between Shareholders shall be applied: (a) first to pay both Participating and Management Shareholders *pari passu* for the par value of their shares, then (b) to pay any balance to the Participating Shareholders "*in proportion to the number of Participating Shares of the relevant Class and Series held*". The M&A are attached for convenience.

Whilst the Participating Shareholders have the right to seek to cause a winding up under the Companies Act, they need to have a proper basis on which to make an application to wind the company up. Until they have such a basis, they cannot cause the company to be wound up. We can only assume that the current Participating Shareholders have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so, but of course we do not know what is in their minds.

Please let us know if we can be of any further assistance.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 21 March 2025 09:34
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Walkers team,

Your comments note that "the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles)".

Can you confirm that if the firm was wound down, it would result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing?

Given they haven't received dividends since 2019 (and presumably would like cash from DAF), why haven't the existing participating shareholders just triggered a wind down?

If the holder of the share can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 20:23
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Further to the below, and noting that it is getting quite late for you, we could do a call this afternoon at 4.30pm (Cayman) / 9.30pm (London) if that was more convenient than tomorrow?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Geoffrey Sykes
**Sent:** 20 March 2025 14:31
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

We appreciate you making yourself available at that hour this evening, but unfortunately we cannot do 8pm UK tonight.

We are under some time pressure from the client to progress the proposed transaction, and accordingly to have the report finalised as soon as we can. We would prefer to have the call before Monday if possible, are there any times tomorrow that would suit you?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 20 March 2025 14:07
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey,

I am travelling at that time tomorrow.

Monday would be better if possible. I can also do 20.00 UK time tonight.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 18:42
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

We think it would be best to discuss on a call, are you available tomorrow at 10am (Cayman) / 3pm (London)?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 20 March 2025 12:45
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Excellent. Many thanks.

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 14:19
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for getting back to us.

We are instructed that our client has settled your invoice this morning.

We will otherwise consider your comments and revert back.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 20 March 2025 05:50

**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

Some comments below in red.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 00:47
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

We have considered your draft valuation report dated 28 February 2025, and attach a version including our comments (along with the current Memorandum and Articles dated 20 February 2025).

**The Substance of the Report**

Most significantly:

1. We have obtained clarification from onshore counsel regarding the operation of the DAF structure. Accordingly, please replace [2.2] and [2.3] with the following amended versions:
   "*2.2 DAF is set up in a structure such that the Participating Shareholders (i.e., nonprofit organisations) hold a passive economic, non-voting interest. The Participating Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed – we understand that any attempts to do so may be regarded as a criminal offense by the IRS or result in significant tax liabilities.*
   *2.3 The foregoing tax issues and structure is the primary reason for the separation of control between Participating Shares (holders of which have very limited rights as described further in Section 3) and the Management Shares (holders of which have effective control over DAF). That is, the holder of the Management Shares needs to exercise independence and act on an arms' length basis to the holders of the Participating Shares and their affiliates.*" Fine to make change.

2. It is stated at [3.2(1)] that Mr Patrick has "*an ultimate right to override the articles*". However, any amendment to the articles which constitutes a material adverse variation or abrogation of the rights of the Participating Shareholders must be approved by two-thirds of the Participating Shareholders, which is a significant restriction on Mr Patrick's ability to affect the rights of the Participating Shareholders (Article 13). We can delete this paragraph.

3. It is stated at [3.2(2)] that "*there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission*". However, as a matter of Cayman law, DAF's directors owe their various duties to the company, and must act in the best interests of the company. The best interests of the company are generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in the best interests of the company. Can you explain how it was in the interests of the company to materially dilute the existing shareholders?

4. It is stated at [3.10] that "*the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company*". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles). Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states *"Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed".*

5. As per our comments in a number of places, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege. Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction? The more colour you can give the better.

In addition, we note that you were provided with material which indicated that the Participating Shares were redeemable at the option of the Company but not at the option of the shareholder. On further consideration, we consider the better view to be that the Participating Shares are not redeemable at the option of the Company or the shareholder. It appears that your report refers to redemption rights at [3.1], [3.19]-[3.20], and [4.1]. Noting your comments that "*the discount applied to the factors above would also cover the risk of redemption*" (at [3.20]) this may not impact your assessment of value, but please consider and make amendments to the draft as necessary. Sure, will do.

The above comments are also reflected in the attached, along with some other comments which are relatively minor and we hope will be self-explanatory. In any event, please let us know if you have any queries. We can run through these comments.

Of course, please consider the impact that any of the above may have on your assessment of value.

**The Permitted Uses of the Report**

Further, the context in which our client is operating has changed since your draft report was issued. Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDMCFAD, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDMCFAD, and in turn DAF HoldCo. This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDMCFAD, LLC redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note that our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets.

**Next Steps**

On the basis of the above, please could you provide an updated draft:

1. In light of our comments as above and in the attached, including to account for any amendment to your assessment of value; and
2. With the section headed "*Limitations and restrictions* " (at [1.8]-[1.10]) amended so as to permit the report to be used and relied on in the manner set out above.

If you could consider the next step (prior to the above) being our invoice for work done so far to be settled it would be appreciated.

Please let us know if you would like to discuss.

Best regards,

**Geoffrey Sykes**
Associate

**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 18 March 2025 02:12
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Great. Look forward to receiving the comments and thanks re invoice.

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 17 March 2025 23:36
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for your timely email.

We do have some comments on your draft report – we are discussing with onshore counsel and our client and will revert back in substance in the coming days.

We have also passed on a reminder regarding your invoice.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 17 March 2025 11:45
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>

**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

Trust all is well with the report?

Will the invoice be settled soon?

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 03 March 2025 15:15
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Many thanks for the below.

We will consider in tandem with our client, and will let you know if we have any comments.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 02 March 2025 10:26
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Walkers team,

Please find attached our draft memo and invoice (fees are at the bottom of our fee estimate range).

If you have any comments on the draft memo, or would like to discuss it, please do let me know.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 February 2025 14:52
**To:** Shek, Chun Yin <Marco.shek@fticonsulting.com>; Mark Patrick <mpatrick@dafholdco.com>
**Cc:** Stahl, Matt <Matt.Stahl@fticonsulting.com>; Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Mark, Marco

That suits us, and thanks Marco and team for making yourselves available at that hour.

**Mark** – please let us know if that suits you.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Sent:** 20 February 2025 09:30
**To:** Mark Patrick <mpatrick@dafholdco.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Stahl, Matt <Matt.Stahl@fticonsulting.com>; Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Mark, Geoffrey,

Alexis and I are available to speak at 3-4pm Cayman (8-9pm UK) today, if that works for you.

Otherwise please suggest times for Friday/early next week and we will try our best to accommodate.

Best regards,
Marco

**Chun Yin (Marco) Shek, CFA**
Senior Director

**FTI Consulting**
+44 203 727 1410 T | +44 7976 326 013 M
Email: marco.shek@fticonsulting.com

200 Aldersgate | Aldersgate Street
London | EC1A 4HD | United Kingdom
www.fticonsulting.com

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 20 February 2025 00:09
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Shek, Chun Yin <Marco.shek@fticonsulting.com>; Stahl, Matt <Matt.Stahl@fticonsulting.com>; Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

I'm traveling in the morning tomorrow. Either late afternoon Thursday or late afternoon Friday works for me.

On Wed, Feb 19, 2025, 6:01 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

> Hi Mark, Marco
>
> Mark, as we understand you have discussed with Brandon, and Marco, as per our previous emails with you, we are arranging a call to further discuss the valuation exercise.
>
> In particular, Mark would like to discuss his plans for future distributions, and Marco and the FTI team would like to discuss the 30 September 2024 valuation and the 7 February 2025 share issue.
>
> Please let us know if you are available tomorrow (Thursday) at 10.30am (CT) / 11.30am (Cayman) / 4.30pm (London).
>
> Otherwise, we are available tomorrow anytime after that, or on Friday during the Cayman morning.

Best regards,

**Geoffrey Sykes**
Associate
Walkers (Cayman) LLP

**Walkers** | Making financial services work

**T** +1 345 814 6834 | **M** +1 345 814 6834 | **E** Geoffrey.Sykes@walkersglobal.com
190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands
www.walkersglobal.com

**Secretary**
Alexandra Irwin | **T** +1 345 814 4609 | **E** Alexandra.Irwin@walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.

FTI Consulting LLP. Registered Number OC372614. Registered in England and Wales at 200 Aldersgate, Aldersgate Street, London, EC1A 4HD. A full list of Members is available for inspection at the registered address.

**[to be printed on relevant FTI letterhead]**

[COMPANY]
[ADDRESS 1]
[ADDRESS 2]
[ADDRESS 3]
[ADDRESS 4]

[date]

Dear Sir or Madam,

**Release Letter for [*matter description / project name]***

FTI Consulting LLP ("FTI") refers to its report regarding [●] (the "Report") regarding [●], supplied to [●] (the "Client") pursuant to an engagement letter between FTI and Client dated [●] 20[●].

FTI understands that you are [*insert description of recipient and purpose of disclosure of report*] (the "Purpose") and wish to be provided with a copy of the Report. The Client has authorised FTI to provide a copy of the Report to you. This letter sets out the terms on which FTI will agree to release the Report to you and explains certain matters in relation to the Report. Those terms are:

1) You accept that in providing you with a copy of the Report and otherwise communicating with you concerning the Report or the Client, FTI shall have no responsibility or liability to you, whether in contract, tort (including negligence) or otherwise. Any use that you or any of Representatives (as defined below) make of the Report is entirely at your own risk. You agree to release FTI and its personnel from any claim arising out of or in connection with the Report (and shall procure that your Representatives (as defined below) do the same).

2) You shall keep the Report confidential and shall not provide the Report to third parties by any means without FTI's prior written consent, unless you are requested to do so by order of a court of competent jurisdiction or pursuant to law or regulation or any valid request or demand of any governmental or regulatory body or authority. Unless FTI has given its consent in this release letter, it may, at its sole discretion, withhold consent. Whether or not FTI has given its consent, FTI will not accept any liability or responsibility to any third party who may get access to the Report.

3) You may make copies of the Report available to your directors and officers, those employees involved in considering the Report, and your legal advisers (your "Representatives"), provided that in each case you take reasonable steps to ensure that they understand and agree that:

a) The Report is confidential and may not be disclosed to any other parties without FTI's prior written consent;

b) The Representatives may use the Report only for the Purpose, in the case of advisers, only for the purpose of advising you in relation to the Purpose; and

c) FTI accepts no duty of care to the Representatives in respect of any use they may make of the Report, and/or any other information and explanations we may provide.

You shall be responsible for any breach of the terms of this letter agreement by your Representatives.

The terms of this letter will continue to apply in respect of the Report released under its terms, even if FTI later agrees to accept a duty of care to you in respect of some other report.

The work underlying the Report covered only the matters set out in FTI's contract or engagement letter with Client. In agreeing to the scope of work with the Client, FTI had regard to possible areas of interest to Client in general, but without the interests or concerns of any other third party in mind. The issues covered in the Report and the emphasis placed upon them, may not address or reflect your specific requirements, interests or circumstances.

FTI has not carried out any work or made any enquiries of the Client's management since [●] 20[●] being the date on which we completed our fieldwork. The Report does not incorporate the effects, if any, of events and circumstances which may have occurred or information which may have come to light subsequent to that date. FTI makes no representation as to whether, had it carried out such work or made such enquiries, there would have been a material effect on the Report. Further, FTI has no obligation to notify you if any matters come to its attention which might affect the continuing validity of the comments or conclusions in the Report.

The Report may contain Personal Data as defined by the General Data Protection Regulation (EU) 2016/679. In respect of any such Personal Data, we shall each be separate and individual controllers and shall each be responsible for compliance with our own obligations under applicable data protection laws. You shall ensure that you will comply with the requirements of applicable data protection laws in respect of your receipt, use and any subsequent disclosure of the Personal Data, including any disclosures made pursuant to this release.

This letter, any non-contractual obligations arising out of or in connection with it and our relationship with you, shall be governed by and interpreted in accordance with the laws of England & Wales. The English courts shall have exclusive jurisdiction in respect of all disputes or claims (including non-contractual disputes or claims) arising out of or in connection with this letter or the Report.

If you wish to receive a copy of the Report on the terms set out above, please acknowledge and agree to the terms by signing the enclosed copy of this letter in the space provided and returning it to FTI.

Yours faithfully,

**[*name*]**
**Senior Managing Director**
**For and on behalf of FTI Consulting LLP**

**Confirmation**

We confirm that we wish to receive a copy of the Report on the Client and acknowledge and agree to abide by the terms set out in the letter dated [●] from FTI Consulting LLP. We also acknowledge and agree that these terms will apply to each version of the Report provided to us.

ACKNOWLEDGED AND AGREED:

For and on behalf of [*INSERT NAME OF RECIPIENT COMPANY*]

By: ________________________________________
Signature

________________________________________
Title

________________________________________
Date

THE PARTIES LISTED IN SCHEDULE 1

AND

PAUL MURPHY

---

AMENDED AND RESTATED DIRECTOR SERVICES AGREEMENT

---

TABLE OF CONTENTS


| | | |
|---|---|---|
| 1 | Definitions and Interpretation | 3 |
| 2 | Appointment of Director | 5 |
| 3 | Experts and Advisors | 5 |
| 4 | Companies' Obligations and Acknowledgements | 5 |
| 5 | Fees, Costs and Expenses | 7 |
| 6 | The Director's Liability and Indemnity | 7 |
| 7 | Non-Exclusivity | 8 |
| 8 | Status | 8 |
| 9 | Restrictions | 8 |
| 10 | Termination | 9 |
| 11 | Notices | 10 |
| 12 | General | 10 |
| 13 | Governing Law and Jurisdiction | 10 |

**THIS AGREEMENT** is effective as of 27th March 2025 (**Agreement**)

**BETWEEN:**

1) **The parties listed in Schedule 1 of this Agreement** (a **Company** or the **Companies** as the context dictates); and

2) **Paul Murphy**, a natural person resident in the Cayman Islands whose address is 67 Fort Street, George Town, Grand Cayman KY1-1007, Cayman Islands (the **Director**).

**RECITALS:**

A) Reference is made to the Director Services Agreement, dated as of December 12, 2024, between Paul Murphy and the other parties thereto (the **Original DSA**).

B) The parties to the Original DSA desire to amend and restate the Original DSA in its entirety and replace the Original DSA with this Agreement. This Agreement shall replace the Original DSA but shall not novate or extinguish the rights and obligations of the parties thereto, except as expressly provided herein.

C) The Companies want the Director to be appointed and/or continue to serve as a director of the Companies and the Director wants to provide the Services to the Companies on the terms of this Agreement.

**IT IS AGREED AS FOLLOWS:**

1 **Definitions and Interpretation**

1.1 In this agreement, unless the context otherwise requires, the following expressions shall have the following meanings:

**Affiliate** means any parent or subsidiary of a Companies or any other Companies which has the same ultimate parent;

**AML** means the money laundering and terrorist and proliferation financing risks which may need to be addressed by the Director under the AML Regime;

**AML Regime** the Cayman Islands Proceeds of Crime Act (as revised), Terrorism Act (as revised), Proliferation Financing (Prohibition) Act (as revised), Anti-Money Laundering Regulations (as revised), Guidance Notes on the Prevention and Detection of Money Laundering, Terrorist Financing and Proliferation Financing in the Cayman Islands, Guidance on Targeted Financial Sanctions, directives and guidance issued by CIMA and the Financial Reporting Authority of the Cayman Islands and other requirements that may be imposed on the Director to address AML (such anti-money laundering legislation, regulations, guidance notes, directives and guidance, as amended from time to time);

**Articles** means the articles of association of the Companies as the context requires;

**Business Day** means any day on which commercial retail banks are open for banking business in the Cayman Islands (not being a Saturday or a Sunday);

**Charitable DAF** means Charitable DAF HoldCo, Ltd., a Cayman Islands exempted company which was placed into court supervised liquidation in the Grand Court of the Cayman Islands on 6th May 2025.

**Law** means the laws of the Cayman Islands or other jurisdiction which may be relevant to the operations of the Companies, including the Companies Act (As Revised) of the Cayman Islands;

**Losses** means any loss, cost, charge, expense, payment, interest, demand, claim, proceeding, suit, penalty, damages, legal fees, liability, obligation, detriment, adverse judgment, order or other sanction;

**Member** means any member from time to time of the Companies;

**Memorandum** means the memorandum of association of the Companies as the context requires; and

**Services** means the services to be provided by the Director to the Companies listed in Schedule 2 to this Agreement.

In this agreement, any reference to:

1.2 a recital, a clause, a sub-clause or a schedule is, unless the context otherwise requires, a reference to a recital, a clause or sub-clause of, or a schedule to, this agreement;

1.3 this agreement or to any agreement or document referred to in this agreement shall be construed as a reference to such agreement or document as amended, varied, modified, supplemented, restated, novated or replaced from time to time; and

1.4 any statute or statutory provision shall, unless the context otherwise requires, be construed as a reference to such statute or statutory provision as it may have been amended, modified, extended, consolidated, re-enacted or replaced and shall include any subordinate legislation made thereunder.

1.5 In this agreement, except where the context otherwise requires, words denoting the singular include the plural and vice versa, words denoting a gender include every gender and references to persons include bodies corporate and unincorporated.

1.6 The recitals and the schedule form part of this agreement and shall have the same force and effect as if they were expressly set out in the body of this agreement.

1.7 Clause headings in this agreement are inserted for convenience only and shall not affect the construction of this agreement.

2 **Appointment of Director**

2.1 Subject to the provisions of this agreement, the Director agrees with the Companies to provide director services to the Companies upon the terms and conditions contained in this agreement.

2.2 The Director will undertake his duties in accordance with what he considers to be the best interests of the Company. However, the Director, in performing his duties as a director of the Companies, shall not be obliged to act in any manner which, in his opinion:

(a) constitute a breach of his fiduciary duties, or otherwise conflict with any laws of the Cayman Islands or other jurisdiction which may be relevant to the operations of the Companies, or be otherwise illegal or immoral; be unethical, unduly onerous or be of such nature that it might damage the reputation of or be detrimental to the Director;

(b) may conflict with any provision of the Memorandum or Articles; or

(c) would result in the risk of prosecution or other sanction of any kind in any jurisdiction or the withdrawal of, or imposition of any conditions in respect of, any licence, consent or other authorisation issued to the Director by any legal, governmental or regulatory authority in any applicable jurisdiction.

2.3 Without prejudice to his general duties as a director of the Companies, the Director agrees with the Companies to discharge his duties and obligations as director of the each Company in accordance with the Articles and to provide and undertake the specific duties listed in Schedule 2 to this agreement.

3 **Experts and Advisors**

3.1 In carrying out the services rendered pursuant to this agreement, the Director shall be entitled to retain on his behalf the services of attorneys, accountants/auditors and other advisers as shall be reasonably necessary for the Director to perform such services and the Company shall be liable to pay all reasonable fees and disbursements thus incurred.

3.2 The Director shall be entitled to rely upon any advice so obtained if the Director reasonably believes that such professional persons are reliable and competent in the matters and/or advice prepared or presented and/or such matters and/or advice is within the person's professional qualifications and competence.

3.3 The Director shall in no event have any liability for anything done or omitted to be done in good faith in reliance upon such advice unless the Director knew the advice to be tainted by manifest error.

4 **Companies' Obligations and Acknowledgements**

4.1 During the continuance of this agreement, the Companies shall:

(a) promptly provide the Director with all such information, documentation and records (as well as notification of any changes which relate to or affect the services being provided hereunder) as the Director may require to perform his duties as a director of the Companies;

(b) keep the Director fully informed as to the business, affairs, financial position and prospects of the Companies;

(c) promptly provide upon request from time to time, all necessary information and documentation required by the Director to comply with any applicable obligations under the AML Regime and supply information in response to the Director's enquiries (if any) to enable the Director to comply with any applicable obligations under the AML Regime and all other statutory responsibilities to make disclosures to relevant authorities in respect of AML and any other criminal activity that the Director may encounter during performance of the Services and the Companies acknowledges that any such disclosures may include confidential information;

(d) neither cause nor permit anything to be done which will or is likely to impose any civil or criminal liability or penalty on the Director; and

(e) provide the following promptly on request from time to time by the Director:

(i) written explanation of the nature of the Companies' business and a detailed business plan;

(ii) evidence satisfactory to the Director of the identity of, and references in relation to, (i) any other directors of the Companies, and (ii) any person (or persons) on whose instructions the Director may act in relation to the Companies; and

(iii) other information and documentation as the Director may from time to time reasonably require in relation to the Companies, its directors, Members or activities.

4.2 The Companies acknowledge that:

(a) the Director shall be entitled for all purposes in relation to dealings with all persons, to rely on the authenticity and accuracy of all information and communications of whatever nature received by the Director in good faith and shall not be responsible or liable to any person for any loss arising by virtue of any such information or communication not being authentic and/or accurate; and

(b) the Director shall be entitled to rely on the authenticity and accuracy of all information and communications received in good faith through facsimile, the Internet or similar systems and shall not be responsible or liable to any person for any loss or damage caused by any such information not being authentic, accurate or any communication transmitted to or by the Director having been interfered with or manipulated by any person.

4.3 The Companies shall procure that:

(a) financial statements of the Companies and any Affiliates of the Companies shall be prepared in respect of each financial year of the Companies or the respective Affiliate in accordance with generally accepted accounting principles; and

(b) such financial statements of the Companies and the Affiliate shall be delivered to the Director.

5 **Fees, Costs and Expenses**

5.1 In consideration of the provision of the services of the Director under this agreement, the Companies shall pay to the Director the fees set out in Schedule 3 to this Agreement.

5.2 The Annual Fee (as defined in Schedule 3 of this Agreement) is not refundable in the event of resignation or removal of the Director, irrespective of the reason or whether the removal was for cause or on notice without cause.

5.3 The fees payable by the Companies to the Director shall not be modified unless otherwise agreed by the Director and the Companies.

5.4 The Director shall be entitled to recover from the Companies all expenses and disbursements (including courier, telephone, facsimile, printing and photocopying) properly incurred or paid by the Director on behalf of the Companies.

6 **The Director's Liability and Indemnity**

6.1 The Director shall not be liable for any Losses whatsoever which he or the Companies may sustain or suffer at any time as a result of, in connection with or in the course of the discharge of their respective duties or obligations under this Agreement or otherwise arising as a result of this Agreement, other than Losses arising by reason of the fraud, dishonesty, wilful neglect and wilful default of the Director. For the avoidance of doubt, the Director will not be answerable for the acts, receipts, neglects or defaults of any other director, employee, officer, partner, limited partner, general partner, manager, agent or trustee of the Company, for the solvency or honesty of any persons with whom assets of the Company are lodged or deposited, for any insufficiency of any security upon which any monies of the Company may be invested, or for any other Losses.

6.2 The Companies shall indemnify and hold harmless, to the fullest extent permitted by Cayman Islands law, on a full indemnity basis, the Director against all Losses which may be made against or incurred by the Director in connection with or as a result of the Director acting as a director of the Companies, the performance of this Agreement, any regulatory action relating to or involving the Companies or any service provider thereto including the Director, and any acts or omissions of the Companies or any service provider thereto otherwise than by reason of the fraud, dishonesty, wilful neglect or wilful default of the Director as aforesaid.

6.3 Where the Articles grant indemnities to the directors of the Companies which provide the Director with additional or greater protection than those contained in clause 6.2, the indemnities under the Articles shall be deemed to apply.

6.4 The Companies shall advance any costs and expenses incurred by the Director (including attorney's fees) in defending any action, suit, proceeding or investigation for which for which indemnity has been sought. The Director shall reimburse the Companies for any such advances in the event that a final non appealable judgment is given against the Director which finds them to have acted fraudulently, dishonestly, with wilful neglect, or with wilful default. The Companies shall also

advance any documented costs and expenses incurred by the Director in relation to any and all proceedings arising from the liquidation of Charitable DAF including any allegations that the Director has been fraudulent, dishonest, wilfully neglectful, wilfully defaulted or mismanaged Charitable DAF's affairs. The Companies agree to provide any necessary information that will allow the Director to assess the assets of the Companies and that the Companies will be jointly and severally liable for any indemnity.

6.5 For the avoidance of doubt, references in this Agreement to fraud, dishonesty, wilful neglect and wilful default shall mean a final non-appealable finding to such effect by a competent court in relation to the conduct of the relevant party.

6.6 The provisions of this clause 6 shall survive the termination of this Agreement and shall inure to the benefit of the Director in respect of all acts performed by him prior to such termination of office.

**7 Non-Exclusivity**

7.1 The services of the Director under this agreement are not exclusive, and the Director or any Affiliate shall be free to provide similar services to other persons. The Director or any Affiliate shall not be deemed to be given notice of, or to be under any duty to disclose to, the Companies, any fact or thing which may come to the notice of the Director or any Affiliate in the course of the Director or any Affiliate providing similar services to other persons or in the course of the Director's business in any other capacity or in any manner whatsoever otherwise than in the course of carrying out the Director's duties under this agreement.

**8 Status**

8.1 This agreement constitutes a contract for the provision of services and not a contract of employment.

8.2 None of the provisions of this agreement shall create or be deemed to create a relationship of partnership between the parties to this agreement.

**9 Restrictions**

9.1 The Director shall not, without the written consent of the Companies, at any time after the termination of the services under this agreement, represent himself as being in any way connected with or interested in the business of the Companies.

9.2 None of the parties to this agreement shall do any act, matter or thing which would or might prejudice or bring into disrepute the business or reputation of the other parties to this agreement.

9.3 The Director shall not at any time disclose to any person, and shall treat as confidential, any information relating to the business, finances or other matters of the Companies that he may have obtained as a result of his role under this agreement provided however that the provisions of this clause shall not apply:

(a) to the disclosure of any information already known to the recipient prior to the entering into of this agreement;

(b) to the disclosure of any such information which is or becomes public knowledge otherwise than as a result of the unauthorised or improper conduct of the recipient;

(c) to any extent that disclosure is required under Cayman Islands law or any other applicable law or by an order of the Cayman Islands courts or any other court of competent jurisdiction or pursuant to any direction, request or requirement (whether or not having the force of law) of, the Cayman Islands Monetary Authority and the Cayman Islands Financial Reporting Authority;

(d) to the disclosure of any information to professional advisors who receive the same under a duty of confidentiality; or

(e) to the disclosure of any information with the consent of the parties hereto.

9.4 For the avoidance of doubt, this clause does not preclude the Director from disclosing that he is a director of the Companies.

9.5 In the event of this agreement being terminated for whatever reasons, the provisions of this clause 9 shall remain in full force and effect.

**10 Termination**

10.1 The Director may be removed or cease to hold office in any manner permitted by the Articles, and without prejudice to the generality thereof, shall be entitled to resign from office at will and without recourse by any Party solely by virtue of such resignation.

10.2 This agreement shall be terminated:

(a) upon the Director or the Company or Companies giving 30 days' notice of termination of this Agreement;

(b) upon the Director or the Company giving notice that either Party has committed any material breach of the provisions of this Agreement, and if such breach is capable of remedy, that breach has not remedied said breach within 30 days after the service of written notice requiring it to be remedied;

(c) if a court or tribunal of competent jurisdiction finds that the Director has committed actual fraud or wilful neglect in relation to the Companies or the Director does not challenge an allegation of fraud or wilful neglect by the Companies; or

(d) the Cayman Islands Monetary Authority instructs the Companies that the Director can no longer be a director.

10.3 The termination of this agreement shall be without prejudice to any antecedent liability of the parties to this agreement and, without limitation, the Director shall be entitled to receive all fees, disbursements and other expenses accrued due up to the date of such termination.

10.4 The Company shall expeditiously notify the registrar of companies of any resignation of the Director in accordance with section 55(1)(b) of the Companies Act of the Cayman Islands, but the Director

retains the right to give such notice of his resignation to the Registrar and any other registry or person.

**11 Notices**

11.1 Notices to be given hereunder shall be delivered by hand or mailed by prepaid airmail or emailed to the respective addresses set out under the signatories of each party to this agreement.

**12 General**

12.1 This agreement sets out the entire agreement and understanding between the parties in respect of the subject matter of this agreement.

12.2 This agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

12.3 If at any time any one or more of the provisions of this agreement is or becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions hereof shall not be in any way affected or impaired thereby.

12.4 The rights of the parties hereunder are cumulative, may be exercised as often as they consider appropriate and are in addition to their respective rights under the general law. They shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing, and in particular any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other right. No act or course of conduct or negotiation on the part of either party shall in any way preclude it from exercising any right or constitute a suspension or variation of any right that it may have hereunder.

12.5 Each party shall do, execute and perform such further acts, deeds and documents as may be required to give full legal and practical effect to this agreement.

12.6 No variation of this agreement shall be effective unless signed by or on behalf of all the parties to this agreement.

12.7 This agreement may be executed in any number of counterparts and provided that every party has executed a counterpart, the counterparts together shall constitute a binding and enforceable agreement between the parties.

**13 Governing Law and Jurisdiction**

13.1 This agreement is governed by and shall be construed in accordance with the laws of Cayman Islands.

13.2 Each of the parties hereto irrevocably agrees that the courts of Cayman Islands shall have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this agreement and, for such purposes, irrevocably submits to the exclusive jurisdiction of such courts.

[SIGNATURE PAGE FOLLOWS]

This Agreement has been entered into by the parties on the day and year first above written.

**SIGNED** for and on behalf of the **COMPANIES**:

) Duly Authorised Signatory
)
) Name: Mark Patrick
)
) Title: Manager of CDMCFAD, LLC
Director of CDH GP, Ltd.
Director of the General Partner of Charitable DAF Fund 2, LP
Director of the General Partner of Charitable DAF Fund, LP
Manager of CLO HoldCo, LLC
Authorized Person of Acis CLO Value Fund II Charitable DAF Ltd
Director of CLO HoldCo, Ltd.
Director of MGM Studios Holdco, Ltd.

**SIGNED** for and on behalf of the **DIRECTOR**:

)
)
)
) Name: Paul Murphy
)
) Title: Director

## SCHEDULE 1: PARTIES

The following companies are parties to this Agreement:

1. CDMCFAD, LLC
2. CDH GP, Ltd.
3. Charitable DAF Fund 2, LP
4. Charitable DAF Fund, LP
5. CLO HoldCo, LLC
6. Charitable DAF Fund, L.P.
7. Acis CLO Value Fund II Charitable DAF Ltd,
8. CLO HoldCo, Ltd.
9. MGM Studios Holdco, Ltd.

The Parties may agree to appoint the Director to any other companies as agreed in writing and remove the Director from any of the Companies as agreed in writing. The Director may accept appointments on any USA based entity in an equivalent position.

## SCHEDULE 2: SERVICES

1. The Director will devote as much of his time, attention, ability and skills as are required to perform his normal duties as Director of the Companies.

2. The Director will perform his duties faithfully, efficiently and diligently and use all reasonable endeavours to promote the best interests and reputation of the Companies. In particular, the Director's specific services to the Companies will include:

- to declare dividends from time to time subject to be satisfied that the Company declaring the dividend is solvent;
- signing contracts, filings, resolutions, representations and other documents on behalf of the Companies;
- attending all meetings of the Board of the respective Companies in person or by phone; provided that the dates of such meetings have been communicated to the Director by the Companies or its corporate secretary, as applicable, with reasonable advance notice; and provided further that the Director may not be able attend a meeting due to illness or incapacity or any other reasonable circumstances;
- considering all documents contained in board packs provided in advance to the Director by the Companies or its corporate secretary, as applicable, in order to be able to participate in full in the Board's deliberations;
- bringing independent judgment to bear on issues of strategy, policy, resources, performance and regulatory matters;
- providing advice and direction on all matters affecting the Companies;
- planning, developing and enhancing the future strategic direction of the Companies;
- where necessary or appropriate, liaising with the Company's respective shareholders, professional advisers, service providers and regulators; and
- sharing responsibility with the other director(s) of the Companies for the effective control of each Company.

3. Assist the joint official liquidators of Charitable DAF including taking any and all steps necessary to defend any allegations against Mark Patrick arising from the management of Charitable DAF's affairs.

## SCHEDULE 3: FEES

The Director shall be paid fees in accordance with the following provisions:

1. US$500,000 per annum payable in instalments of US$41,666.67 on the last business day of each calendar month. The fees payable pursuant to this section shall be backdated to 1 January 2025 and a deduction made for any sums advanced pursuant to an earlier agreement.

2. A discretionary bonus or bonuses in an amount and time determined by the current Chief Executive Officer (or equivalent ultimate control person) of the Companies which may also include issuing equitable interests or creating a long-term incentive plan.

3. The Companies may pay the Director in advance for any fees or expenses in circumstances where the Companies may have an inability to discharge their financial obligations to the Director, for example, where freezing injunctions or temporary restraining orders may be sought against the Companies.

Fees shall be paid in cleared funds to the following bank account:

Instructions to: BNY Mellon NY

Swift BIC: IRVTUS3NXXX

ABA No: 021000018

For credit: Butterfield Bank (Cayman) Limited

Swift BIC: BNTBKYKYXXX

Account at BNY: 8033265086

For further credit to: Paul Richard Murphy

Account number: 1361530160011

CHARITABLE DAF HOLDCO, LTD
(THE "COMPANY")

---

WRITTEN RESOLUTIONS OF THE DIRECTORS
OF THE COMPANY DATED 2 APRIL 2025

---

1. **DECLARATION AND PAYMENT OF DIVIDENDS**

1.1 **IT IS NOTED** that:

(a) CDMCFAD, LLC (the "**LLC**"), a Delaware limited liability company, redeemed the Company's entire limited liability company interests in the LLC on 27 March 2025 (the "**CDMCFAD Redemption**") for the aggregate amount of US$1,637,192;

(b) the current Amended and Restated Articles of Association of the Company (the "**Articles**") provide that all dividends shall be declared and paid in such amounts as may be declared by the Directors in their absolute discretion;

(c) following receipt of the proceeds of the CDMCFAD Redemption, the Company wishes to make a payment as at the date hereof of dividends on a pro-rata basis to the Participating Shareholders (but excluding DFW Charitable Foundation; collectively, the "**Shareholders**") in the amount of (i) $528,587.54 with respect to each of Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc.; and (ii) $26,429.39 with respect to The Community Foundation of North Texas;

(d) the Directors have determined that the sum of **$1,612,192.01** is lawfully available for distribution as profits or share premium of the Company and is distributable in accordance with the Articles and the Companies Act (as amended) (the "**Companies Act**");

(e) the Directors have confirmed no awareness of any subsequent losses by the Company as at the date hereof which would affect the amount of profits or share premium available for distribution; and

(f) a distribution may be unlawful, even where the provisions of the Articles and the Companies Act have been complied with, where the Directors are unable to reasonably conclude that the Company would have sufficient funds to be able to continue to be able to meet its debts as they fall due.

1.2 **IT IS RESOLVED** that:

(a) In the opinion of the Directors, it is reasonable to conclude that following making the payment of the Dividends, the Company will have sufficient funds to be able to continue to be able to meet its debts as they fall due; and

(b) the Directors make a payment of dividends to the Shareholders as set forth in Section 1.1(c) above.

2. **GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is authorised, in the

name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3. **RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

[signature]
Mark Patrick
**Director**

Paul Murphy
**Director**

State of Texas
Canty of Dallas

The foregoing instument was acknowledged before me by means of physical prescence on this day, April 2, 2025 by Mark Patrick. He appeared before me, is personally known to me, has executed the document/instument, for the purposes and considerations therein expressed.

NATALIE R OLVERA
Notary ID #130890197
My Commission Expires
March 29, 2027

[signature]
Signature of Notary - State of TX
My commission expires: 3/29/27



36901511.2.C8889.187150

name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3. RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

| | |
|---|---|
| Mark Patrick<br>**Director** | Paul Murphy<br>**Director** |

**SIGNED IN THE PRESENCE OF**

Amy Altneu
Notary Public in and for The Cayman Islands
Dated this 2 day of April, 20 25
(My commission expires on 31 January 20 26)

CHARITABLE DAF HOLDCO, LTD
(THE "COMPANY")

WRITTEN RESOLUTIONS OF THE DIRECTORS
OF THE COMPANY DATED April 2 2025

1. ASSIGNMENT OF UNDERTAKINGS

1.1 IT IS NOTED that:

(a) the Directors have received a draft letter agreement to assign all of the contracts listed in Schedule A of the letter agreement ("**Assigned Contracts**") from the Company to CDMCFAD, LLC (the "**Document**"); and

(b) in connection with the Assigned Contracts, CDMCFAD, LLC has agreed to assume all responsibilities and risks in any manner connected with the Assigned Contracts, whether now existing or hereafter arising.

1.2 IT IS RESOLVED that:

(a) in the opinion of the Directors, the entry into and performance by the Company of its obligations under the Document would be in the best interests of the Company;

(b) the transactions contemplated by the Document be approved;

(c) the Company enter into the Document;

(d) the form of the Document be approved on behalf of the Company subject to such amendments and additions thereto as any Director or (if applicable) any Attorney or Authorised Signatory (defined below) in their absolute discretion and opinion deem appropriate, the signature of any Director or any Attorney or Authorised Signatory on the Document being due evidence for all purposes of the approval of any such amendment or addition and the final terms thereof on behalf of the Company;

(e) the Company do give, make, sign, execute and deliver all such notes, deeds, agreements, letters, notices, certificates, acknowledgements, instructions, fee letters and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any Director or any Attorney or Authorised Signatory be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Document and the Company do all such acts and things as might in the opinion and absolute discretion of any Director or any Attorney or Authorised Signatory be necessary or desirable for the purposes stated above;

(f) the Ancillary Documents be in such form as any Director or any Attorney or Authorised Signatory in their absolute discretion and opinion approve, the signature of any Director or any Attorney or Authorised Signatory on any of the Ancillary Documents being due evidence for all purposes of their approval of the terms thereof on behalf of the Company; and

(g) the Document and Ancillary Documents, where required to be executed by the Company (whether under hand or as a deed), be executed by the signature thereof of any Director

or any Attorney or Authorised Signatory and where required to be sealed, by affixing thereto of the Seal of the Company, witnessed as required by the Articles of Association of the Company.

2. GENERAL AUTHORISATION

2.1 IT IS RESOLVED that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3. **RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

Mark Patrick
**Director**

Paul Murphy
**Director**

Before me, Mark Patrick, personally appeared to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed for purposes expressed therein.

NATALIE R OLVERA
Notary ID #130890197
My Commission Expires
March 29, 2027

Natalie Olvera, as Notary Public

My commission expires 3/29/27

State of Texas
County of Dallas

PAUL MURPHY WAS
**SIGNED IN THE PRESENCE OF**

Amy Altneu
Notary Public in and for The Cayman Islands
Dated this 2 day of April, 2025
(My commission expires on 31 January 2026)



35941326.1 C8689 187155

As filed with the Securities and Exchange Commission on April 30, 2025

1933 Act File No. 333-209022
1940 Act File No. 811-23129

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM N-2
**(Check appropriate box or boxes)**

## REGISTRATION STATEMENT
***UNDER***
***THE SECURITIES ACT OF 1933*** ☒
**Pre-Effective Amendment No.** ☐
**Post-Effective Amendment No. 14** ☒

## REGISTRATION STATEMENT
***UNDER***
***THE INVESTMENT COMPANY ACT OF 1940*** ☒
**Amendment No. 16** ☒

# NexPoint Real Estate Strategies Fund
**(Registrant Exact Name as Specified in Charter)**

**300 Crescent Court, Suite 700**
**Dallas, Texas 75201**
**(Address of Principal Executive Offices, Number, Street, City, State, Zip Code)**

**(833) 697-6246**
**(Registrant's Telephone Number, including area code)**

**Ms. Stephanie Vitiello**
**NexPoint Real Estate Strategies Fund**
**300 Crescent Court, Suite 700**
**Dallas, Texas 75201**
**(Name and Address (Number, Street, City, State, Zip Code) of Agent for Service)**

**Copies of Communications to:**
**Jon-Luc Dupuy, Esquire**
**K&L Gates LLP**
**1 Congress Street, Suite 2900**
**Boston, Massachusetts 02114**

**Approximate Date of Proposed Public Offering:**
**As soon as practicable after the effective date of this Registration Statement.**

☐ Check box if the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans.
☒ Check box if any securities being registered on this Form will be offered on a delayed or continuous basis in reliance on Rule 415 under the Securities Act of 1933 ("Securities Act"), other than securities offered in connection with a dividend reinvestment plan.
☐ Check box if this Form is a registration statement pursuant to General Instruction A.2 or a post-effective amendment thereto.
☐ Check box if this Form is a registration statement pursuant to General Instruction B or a post-effective amendment thereto that will become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act.
☐ Check box if this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction B to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act.

It is proposed that this filing will become effective (check appropriate box)

☐ when declared effective pursuant to Section 8(c) of the Securities Act
☐ immediately upon filing pursuant to paragraph (b)
☒ on April 30, 2025, pursuant to paragraph (b)
☐ 60 days after filing pursuant to paragraph (a)
☐ on (date) pursuant to paragraph (a)

If appropriate, check the following box:

☐ This [post-effective] amendment designates a new effective date for a previously filed [post-effective amendment] [registration statement].
☐ This Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, and the Securities Act registration statement number of the earlier effective registration statement for the same offering is:______.
☐ This Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, and the Securities Act registration statement number of the earlier effective registration statement for the same offering is:______.
☐ This Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, and the Securities Act registration statement number of the earlier effective registration statement for the same offering is:______.

Check each box that appropriately characterizes the Registrant:

☒ Registered Closed-End Fund (closed-end company that is registered under the Investment Company Act of 1940 ("Investment Company Act")).
☐ Business Development Company (closed-end company that intends or has elected to be regulated as a business development company under the Investment Company Act).
☒ Interval Fund (Registered Closed-End Fund or a Business Development Company that makes periodic repurchase offers under Rule 23c-3 under the Investment Company Act).
☐ A.2 Qualified (qualified to register securities pursuant to General Instruction A.2 of this Form).
☐ Well-Known Seasoned Issuer (as defined by Rule 405 under the Securities Act).
☐ Emerging Growth Company (as defined by Rule 12b-2 under the Securities Exchange Act of 1934 ("Exchange Act").
☐ If an Emerging Growth Company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of Securities Act.
☐ New Registrant (registered or regulated under the Investment Company Act for less than 12 calendar months preceding this filing).

**PROSPECTUS**

# NexPoint Real Estate Strategies Fund

**Class A (NRSAX), Class C (NRSCX)
and Class Z (NRSZX) Shares**

---

The Fund. NexPoint Real Estate Strategies Fund (the "Fund") is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund.

This Prospectus provides the information that a prospective investor should know about the Fund before investing. You are advised to read this Prospectus carefully and to retain it for future reference. Additional information about the Fund, including a Statement of Additional Information ("SAI") dated April 30, 2025, has been filed with the U.S. Securities and Exchange Commission ("SEC"). The SAI is available upon request and without charge by writing the Fund at NexPoint Real Estate Strategies Fund, c/o SS&C Technologies, Inc., P.O. Box 219630, Kansas City, MO, 64121-9730, or by calling toll-free (844) 485-9167. You may request the Fund's SAI, annual and semi-annual reports, and other information about the Fund or make shareholder inquiries by calling (844) 485-9167 or by visiting https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/. The SAI, which is incorporated by reference into (legally made a part of) this Prospectus, is also available on the SEC's website at http://www.sec.gov. The address of the SEC's website is provided solely for the information of prospective shareholders and is not intended to be an active link.

Investment Objective. The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective.

Investment Strategy. The Fund pursues its investment objective by investing, under normal circumstances, at least 80% of its assets (defined as net assets plus the amount of any borrowing for investment purposes) in real estate and real estate-related securities, as further described in this Prospectus.

Securities Offered. The Fund engages in a continuous offering of three classes of shares of beneficial interest of the Fund: Class A shares, Class C shares and Class Z shares. The Fund is authorized as a Delaware statutory trust to issue an unlimited number of shares. The Fund is offering to sell, through its principal underwriter, NexPoint Securities, Inc. (the "Distributor"), under the terms of this Prospectus, an unlimited number of shares of beneficial interest of each class. The shares of each class are offered on a continuous basis at the Fund's net asset value ("NAV") per share plus the applicable sales load. See "Fees and Fund Expenses" and "Plan of Distribution". The Distributor is not required to sell any specific number or dollar amount of the Fund's shares, but will use reasonable efforts to sell the shares. Funds received will be invested promptly and no arrangements have been made to place such funds in an escrow, trust or similar account. Assets that cannot be invested promptly in real estate or real estate-related securities will be invested in cash or cash equivalents. The shares of beneficial interest of the Fund are continuously offered under Rule 415 of the Securities Act of 1933, as amended (the "Securities Act").

Use of Leverage. The Fund incurs leverage as a part of its investment strategy. The Fund may also invest in private and public real estate investment funds or trusts, including real estate investment funds or trusts managed by affiliated or unaffiliated managers or entities wholly-owned by the Fund, that may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho Securities USA LLC ("Mizuho") that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025. See "Risk Factors — Leverage Risk".

Non-Traded REITs. The Fund may invest in publicly registered non-traded real estate investment trusts ("REITs"), which are illiquid and are not subject to the protections of the Investment Company Act of 1940, as amended (the "1940 Act"). Some or all of these funds may be managed by NexPoint Advisors, L.P., the Fund's investment adviser (the "Adviser" or "NexPoint"), or an affiliate.

**Investors should understand that:**

- **the Fund does not currently intend to list its shares on any securities exchange;**
- **there is no secondary market for the Fund's shares, and the Fund does not expect that such a market will develop at this time; and**
- **your investment in the Fund will be illiquid.**

**Before investing, you should therefore consider the following factors:**

- **You may not have access to the money you invest for an extended period of time.**
- **You may not be able to sell your shares at the time of your choosing regardless of how the Fund performs.**
- **Because you may not be able to sell your shares at the time of your choosing, you may not be able to reduce your exposure in a market downturn.**
- **An investment in the Fund may not be suitable for investors who may need the money they invested in a specified timeframe.**
- **The amount of distributions that the Fund may pay, if any, is uncertain.**
- **The Fund may pay distributions in significant part from sources that may not be available in the future and that are unrelated to the Fund's performance, such as from offering proceeds, borrowings, and amounts from the Fund's affiliates that are subject to repayment by investors. All or a portion of a distribution may consist of a return of capital. Because a return of capital may reduce a shareholder's tax basis, it will increase the amount of gain or decrease the amount of loss on a subsequent disposition of the shareholder's shares.**

---

**The Fund has implemented a share repurchase program, but it is only required to repurchase up to 5% of its outstanding shares per quarter. In the event a repurchase offer is oversubscribed, the Fund may not repurchase all of the shares tendered but will repurchase shares tendered on a** *pro rata* **basis, and no assurance can be given that the Fund will repurchase all of a shareholder's tendered shares over any period. In addition, the Fund may in the future determine to list its shares on a public securities exchange, but even if an active secondary market in the Fund's shares were to develop as a result, closed-end fund shares frequently trade at a discount from their NAV. Investing in the Fund involves a considerable degree of risk. See "Risk Factors" on page 40 of this Prospectus.**

**Neither the SEC nor any state securities commission has approved or disapproved these securities or determined if this Prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The Fund is offering the shares in a continuous offering through the Distributor at NAV plus the applicable sales load. The Distributor also may enter into selected dealer agreements with other broker-dealers for the sale and distribution of the Fund's shares. The Fund currently offers the following three share classes to investors, Class A, Class C and Class Z Shares. See "Plan of Distribution" of page 73 of this Prospectus.

| | Class A Shares | Class C Shares | Class Z Shares |
|---|---|---|---|
| Public Offering Price Per Share | $ 15.83 | $ 16.06 | $ 16.06 |
| Maximum Sales Load as a Percentage of Purchase Amount[1,2] | 6.08% | None | None |
| Amount of Securities | Unlimited | Unlimited | Unlimited |

(1) For Class A shares, "maximum sales load" includes: (i) broker commissions of 5.00% of the Fund's public offering price per Class A share; and (ii) distributor fees of 0.75% of the Fund's public offering price per Class A share. See "Fees and Fund Expenses."

(2) The Adviser and/or its affiliates, in their discretion and from their own resources (which may include the Adviser's legitimate profits from the management fee it receives from the Fund), may pay additional compensation to brokers or dealers in connection with the sale and distribution of Fund shares. There is no limit on the amount of additional compensation paid by the Adviser or its affiliates, subject to the limitations imposed by FINRA. In addition, the Fund, the Adviser and/or their respective affiliates may pay a servicing fee to the Distributor and to other selected broker-dealers and other financial industry professionals for providing ongoing services in respect of holders of Class A and Class C shares with whom they have distributed shares of the Fund. The Fund's (and, indirectly, Class A and Class C holders') share of such servicing fees will not exceed an annual rate of 0.25% of the Fund's average daily net asset value attributable to Class A and Class C shares, respectively. See "Plan of Distribution."

**Distributor**

**NexPoint Securities, Inc.**

**Member FINRA/ SIPC**

**The date of this Prospectus is April 30, 2025.**

**TABLE OF CONTENTS**



| | |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| FEES AND FUND EXPENSES | 15 |
| FINANCIAL HIGHLIGHTS | 18 |
| THE FUND | 27 |
| USE OF PROCEEDS | 27 |
| INVESTMENT OBJECTIVE, POLICIES AND STRATEGIES | 28 |
| RISK FACTORS | 40 |
| MANAGEMENT OF THE FUND | 59 |
| DETERMINATION OF NET ASSET VALUE | 63 |
| CONFLICTS OF INTEREST | 65 |
| QUARTERLY REPURCHASES OF SHARES | 68 |
| DISTRIBUTION POLICY | 71 |
| DISTRIBUTION REINVESTMENT POLICY | 72 |
| U.S. FEDERAL INCOME TAX MATTERS | 73 |
| DESCRIPTION OF CAPITAL STRUCTURE AND SHARES | 75 |
| ANTI-TAKEOVER PROVISIONS IN THE DECLARATION OF TRUST | 76 |
| PLAN OF DISTRIBUTION | 77 |
| LEGAL MATTERS | 84 |
| REPORTS TO SHAREHOLDERS | 84 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 85 |
| ADDITIONAL INFORMATION | 85 |
| TABLE OF CONTENTS OF THE STATEMENT OF ADDITIONAL INFORMATION | |

## PROSPECTUS SUMMARY

*The following summary highlights information contained elsewhere in this Prospectus. This summary may not contain all of the information that you should consider before investing in the Fund. You should review the more detailed information contained in this Prospectus and in the Statement of Additional Information ("SAI"), especially the information set forth under the heading "Risk Factors."*

### The Fund

NexPoint Real Estate Strategies Fund (the "Fund") is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund. See "The Fund." As an interval fund, the Fund will offer to make repurchases of no less than 5% of its outstanding shares at net asset value ("NAV"), on a quarterly basis, unless such offer is suspended or postponed in accordance with regulatory requirements. See "Quarterly Repurchases of Shares."

### Investment Objective and Policies

***Investment Objective.*** The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective.

***Investment Strategy.*** The Fund pursues its investment objective by investing, under normal circumstances, at least 80% of its assets in "real estate and real estate-related securities" (as defined below). In particular, the Fund will pursue its investment objective by investing the Fund's assets primarily in: (1) commercial mortgage-backed securities ("CMBS") and residential mortgage-backed securities ("RMBS"); (2) direct preferred equity and mezzanine investments in real properties; (3) equity securities of public (both traded and non-traded) and private debt and equity real estate investment trusts ("REITs") and/or real estate operating companies ("REOCs"); and (4) opportunistic and value added direct real estate strategies. The Fund will effect its direct real estate strategy through investments in one or more REIT subsidiaries, including through NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC (each, a "REIT Subsidiary" and collectively, the "REIT Subsidiaries"), which were formed on July 8, 2016 and June 6, 2022, respectively. The REIT Subsidiaries entered into separate investment advisory agreements with the Fund's investment advisor, NexPoint Advisors, L.P. (the "Adviser" or "NexPoint"), concurrent with their formation.

Preferred equity and mezzanine investments in real estate transactions come in various forms which may or may not be documented in the borrower's organizational documents. Generally, real estate preferred equity and/or mezzanine investments are typically junior to first mortgage financing but senior to the borrower's or sponsor's equity contribution. The investments are typically structured as an investment by a third-party investor in the real estate owner or various affiliates in the chain of ownership in exchange for a direct or indirect ownership interest in the real estate owner entitling it to a preferred/priority return on its investment. Sometimes, the investment is structured much like a loan where (i) "interest" on the investment is required to be paid monthly by the "borrower" regardless of available property cash flow; (ii) the entire investment is required to be paid by a certain maturity date; (iii) default rate "interest" and penalties are assessed against the "borrower" in the event payments are not made timely; and (iv) a default in the repayment of investment potentially results in the loss of management and/or ownership control by the "borrower" in the company in favor of the investor or other third-party.

In addition, subject to the 15% Limitation (as defined below), the Fund may invest up to 20% of its total assets in equity or debt securities other than real estate and real estate-related securities. The Adviser will evaluate each opportunity within the context of whether the Adviser believes the various real estate subsectors are within the

broader real estate cycle and tactically allocate among these opportunities. Also, the Adviser will select investments it believes offer the best potential outcomes and relative risk to assemble the most appropriate portfolio to meet the risk-adjusted return goals of the Fund. The Adviser has broad discretion to allocate the Fund's assets among equity or debt securities other than real estate and real estate-related securities and to change allocations as conditions warrant.

This portfolio construction strategy seeks to: (i) recognize and allocate capital based upon where the Adviser believes we are in the current real estate cycle; and (ii) minimize drawdowns during market downturns and maximize risk adjusted returns during all market cycles, though there can be no assurance that this strategy will achieve this objective. The Fund will rely on the expertise of the Adviser and its affiliates to determine the appropriate structure for structured credit investments, which may include bridge loans, common and preferred equity or other debt-like positions, as well as the acquisition of such instruments from banks, servicers or other third parties.

The Fund defines "real estate and real estate-related securities" to consist of common stock, convertible or non-convertible preferred stock, warrants, convertible or non-convertible secured or unsecured debt, and partnership or membership interests issued by:

- CMBS, RMBS and other real estate credit investments, which include existing first and second mortgages on real estate, either originated or acquired in the secondary market, and secured, unsecured and/or convertible notes offered by REOCs and REITs;
- publicly traded REITs managed by affiliated or unaffiliated asset managers and their foreign equivalents ("Public REITs");
- REOCs;
- private real estate investment funds managed by affiliated or unaffiliated institutional asset managers ("Private Real Estate Investment Funds");
- registered closed-end funds that invest principally in real estate (collectively, "Public Investment Funds");
- real estate exchange traded funds ("ETFs"); and
- publicly-registered non-traded REITs ("Non-Traded REITs") and private REITs, generally wholly-owned by the Fund or wholly-owned or managed by an affiliate.

REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests, and REOCs are companies that invest in real estate and whose shares trade on public exchanges. Foreign REIT equivalents are entities located in jurisdictions that have adopted legislation substantially similar to the REIT tax provisions in that they provide for favorable tax treatment for the foreign REIT equivalent and require distributions of income to shareholders.

The Fund has not imposed limitations on the portion of its assets that may be invested in any of the categories outlined above other than certain Private Real Estate Investment Funds. The Fund, however, will limit its investments in Private Real Estate Investment Funds and any other investments that are excluded from the definition of "investment company" under the 1940 Act by Section 3(c)(1) or Section 3(c)(7) of the 1940 Act to no more than 15% of its net assets (the "15% Limitation"). Such entities are typically private equity funds and hedge funds. The 15% Limitation does not apply to any collateralized loan obligations ("CLOs"), certain of which may rely on Section 3(c)(1) or 3(c)(7) of the 1940 Act. For purposes of compliance with the 15% Limitation, the Fund will not count its direct investments in wholly-owned subsidiaries but will look through such subsidiaries and count their underlying holdings. The Fund may engage in short sales and securities lending.

***Leverage.*** The Fund incurs leverage as part of its investment strategy. The Fund may also invest in private and public real estate investment funds or trusts, including real estate investment funds or trusts managed by affiliated or unaffiliated managers or entities wholly-owned by the Fund, that may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025. See "Risk Factors — Leverage Risk".

In addition to any indebtedness incurred by the Fund, any subsidiary of the Fund, including the REIT Subsidiaries, may also utilize leverage, including by mortgaging properties held by special purpose vehicles, or by acquiring property with existing debt. Any such borrowings will generally be the sole obligation of each respective special purpose vehicle, without any recourse to any other special purpose vehicle, the REIT Subsidiaries, the Fund or its assets, and the Fund will not treat such non-recourse borrowings as senior securities (as defined in the 1940 Act) for purposes of complying with the 1940 Act's limitations on leverage unless the financial statements of the special purpose vehicle, or the subsidiary of the Fund that owns such special purpose vehicle, will be consolidated in accordance with Regulation S-X and other accounting rules. If cash flow is insufficient to pay principal and interest on a special purpose vehicle's borrowings, a default could occur, ultimately resulting in foreclosure of any security instrument securing the debt and a complete loss of the investment, which could result in losses to the REIT Subsidiaries and, therefore, to the Fund. To the extent that any subsidiaries of the Fund, including the REIT Subsidiaries, directly incur leverage in the form of debt (as opposed to non-recourse borrowings made through special purpose vehicles), the amount of such recourse leverage used by the Fund and such subsidiaries, including the REIT Subsidiaries, will be consolidated and treated as senior securities for purposes of complying with the 1940 Act's limitations on leverage by the Fund. See "Investment Objective, Policies and Strategies."

***Policies.*** The Fund's 80% policy with respect to investment in real estate and real estate-related securities is not fundamental and may be changed by the Fund's board of trustees (the "Board") without shareholder approval. However, shareholders will be given at least 60 days' notice prior to any change in the 80% Policy. The Fund's SAI contains a list of all of the fundamental and non-fundamental investment policies of the Fund under the heading, "Investment Objective and Policies." For purposes of the Fund's 80% policy, the Fund will invest only in Public Investment Funds and Private Real Estate Investment Funds that either: (1) have adopted a policy to invest, under normal circumstances, at least 80% of their net assets, plus borrowings for investment purposes, in real estate and real estate-related securities; or (2) do not have a stated 80% policy, but do invest, under normal circumstances, at least 80% of their net assets, plus borrowings for investment purposes, in real estate and real estate-related securities, as determined by the Adviser's review of their portfolio holdings, investment objectives and strategies. Prior to investing in an underlying fund that does not have a stated 80% policy, the Adviser will review the underlying fund's prospectus or offering memorandum, financial statements, and any available third party research, and may also meet with the underlying fund's management team in order to determine whether the underlying fund follows an 80% policy under normal circumstances. Following the Fund's investment in the underlying fund, the Adviser will continue to monitor the underlying fund on an ongoing basis, reviewing all relevant information as it becomes available. If at any point the Adviser has reason to believe that the underlying fund's investment strategy has changed, or that the underlying asset mix has changed in a way that no longer satisfies the 80% policy, the Adviser will immediately reclassify the investment for purposes of testing the Fund's compliance with its 80% policy. If the Fund were to temporarily fall out of compliance with its 80% Policy as a result of the reclassification of an underlying fund, the Fund would take one or more of the following actions in order to come back into compliance with its 80% Policy: (i) restricting additional investments that do not fall within the 80% Policy; (ii) selling one or more investments that are outside of the 80% Policy;

(iii) deploying new capital raised in the Offering in investments that fall within the 80% Policy; or (iv) if available, utilizing borrowings from a credit facility to make investments that fall within the 80% Policy.

The Fund concentrates investments in the real estate and real estate-related industry, meaning that, under normal circumstances, it invests 25% or more of its total assets in real estate and real estate-related industry securities. This policy is fundamental and may not be changed by the Board without shareholder approval. The Fund's SAI contains a list of all of the fundamental and non-fundamental investment policies of the Fund, under the heading "Investment Objective and Policies."

**Investment Adviser and Fees**

NexPoint Advisors, L.P., which serves as the investment adviser of the Fund, is registered with the SEC as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act") and is an affiliate of NexPoint Asset Management, L.P. ("NAM"). The Adviser also externally manages NexPoint Capital, Inc., a non-traded business development company (a "BDC"), NexPoint Event Driven Fund, NexPoint Merger Arbitrage Fund, and NexPoint Climate Tech Fund. NAM manages Highland Opportunities and Income Fund ("HFRO") and Highland Global Allocation Fund ("GAF"), registered closed-end funds whose shares trade on the NYSE.

The Adviser has entered into a Services Agreement with Skyview Group ("Skyview"), pursuant to which the Adviser will receive administrative and operational support services to enable it to provide the required advisory services to the Fund.

Certain Skyview personnel became dual-employees of NexPoint Services, Inc., a wholly-owned subsidiary of the Adviser. The same services are being performed by the dual-employees. The Adviser, and not the Fund, will compensate all Adviser, Skyview, and dual-employee personnel who provide services to the Fund.

The Adviser's senior management team has experience across private lending, private equity, real estate investing and other investment strategies. Collectively, the Adviser and its affiliates managed approximately $16.9 billion in assets as of December 31, 2024, including approximately $12.5 billion in gross real estate assets.

Pursuant to an investment advisory agreement with the Fund (the "Investment Advisory Agreement"), the Adviser receives a monthly fee at the annual rate of 1.25% of the Fund's Daily Gross Assets. Daily Gross Assets is defined in the Investment Advisory Agreement as total assets, including assets resulting from leverage, less any liabilities. For purposes of calculating the Fund's Daily Gross Assets, derivatives will be valued at their market value, not their notional value.

The Adviser and the Fund have entered into an expense limitation and reimbursement agreement (the "Expense Limitation Agreement") under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily Gross Assets (the "Expense Limitation"). "Daily Gross Assets" is defined in the Expense Limitation Agreement as an amount equal to total assets, less any liabilities, but excluding liabilities evidencing leverage. If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared effective by the SEC and to commence

operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement may not be amended or terminated for one year from the date of this Prospectus, unless approved by the Board. See "Management of the Fund."

The REIT Subsidiaries entered into separate investment advisory agreements with the Adviser in July 2016 and June 2022. To the extent fees are paid to the Adviser by the REIT Subsidiaries, such fees will be offset against fees otherwise payable by the Fund to the Adviser, such that shareholders of the Fund will only be subject to one layer of fees to the Adviser. Notwithstanding this arrangement, the Fund and its shareholders will indirectly bear the expenses associated with forming the REIT Subsidiaries, non-advisory fees paid by the REIT Subsidiaries (if any) and operating expenses, including maintaining their REIT qualification. To the extent the Fund forms one or more other REIT subsidiaries, it is expected that they will enter into separate investment advisory agreements that have substantially similar terms. The Fund may invest in funds not managed by an affiliate of the Adviser (including closed-end funds, ETFs, private funds, externally managed traded and non-traded REITs, etc.), in which case two layers of fees will be paid by the Fund.

**Transfer Agent and Fund Administrator/Sub-Administrator**

SS&C Technologies, Inc. ("SS&C") serves as the transfer agent of the Fund. The Adviser serves as the Fund's Administrator. SEI Global Funds Services ("SEI") serves as the Fund's Sub-Administrator. See "Management of the Fund."

**Distribution Fees**

Class C shares will pay to the Distributor a distribution fee (the "Distribution Fee") that will accrue at an annual rate equal to 0.75% of the Fund's average daily net assets attributable to Class C shares, and is payable on a quarterly basis. Class A and Class Z shares are not subject to a Distribution Fee. See "Plan of Distribution."

**Shareholder Servicing Fee**

The Fund (and, indirectly, the Class A and Class C shareholders) will pay a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of Class A and Class C shares. The Fund will not pay a monthly shareholder servicing fee in connection with Class Z shares.

**Closed-End Fund Structure**

Closed-end funds differ from open-end management investment companies (commonly referred to as mutual funds) in that closed-end funds do not typically redeem their shares at the option of the shareholder. Rather, closed-end fund shares typically trade in the secondary market via a stock exchange. Unlike many closed-end funds, however, the Fund's shares will not be listed on a stock exchange. Instead, the Fund will operate as an interval fund, meaning that the Fund will provide limited liquidity to shareholders by offering to repurchase a limited amount of shares (at least 5%) on a quarterly basis, which is discussed in more detail below. An investment in the Fund is suitable only for investors who can bear the risks associated with the limited liquidity of the shares and should be viewed as a long-term investment. The Fund is subject to continuous asset in-flows, although not subject to continuous out-flows. The Board may, in the future, seek shareholder approval to list the Fund's shares on a national securities exchange depending on market conditions and other factors.

Case 3:26-cv-02496-D Document 17-30 Filed 09/08/26 Page 208 of 608 PageID 12359

**Share Classes**

The Fund currently offers three different classes of shares: Class A, Class C, and Class Z shares. The Fund has received exemptive relief from the SEC to issue multiple classes of shares and to impose asset-based distribution fees and early-withdrawal charges (also described as contingent deferred sales charges, or "CDSCs," in this Prospectus). An investment in any share class of the Fund represents an investment in the same assets of the Fund. However, the purchase restrictions and ongoing fees and expenses for each share class are different. The fees and expenses for the Fund are set forth in "Fees and Fund Expenses." If an investor has hired an intermediary and is eligible to invest in more than one class of shares, the intermediary may help determine which share class is appropriate for that investor. When selecting a share class, you should consider which share classes are available to you, how much you intend to invest, how long you expect to own shares, and the total costs and expenses associated with a particular share class.

Each investor's financial considerations are different. You should speak with your financial advisor to help you decide which share class is best for you. Not all Financial Intermediaries (as defined below) offer all classes of shares. If your Financial Intermediary offers more than one class of shares, you should carefully consider which class of shares to purchase.

**Investor Suitability**

An investment in the Fund involves a considerable amount of risk. It is possible that you may lose money. An investment in the Fund is suitable only for investors who can bear the risks associated with the limited liquidity of the shares and should be viewed as a long-term investment. Before making your investment decision, you should: (i) consider the suitability of this investment with respect to your investment objectives and personal financial situation; and (ii) consider factors such as your personal net worth, income, age, risk tolerance and liquidity needs.

**Repurchases of Shares**

The Fund is an interval fund and, as such, has adopted a fundamental policy to make quarterly repurchase offers, at NAV, of no less than 5% of the shares outstanding. There is no guarantee that shareholders will be able to sell all of the shares they desire in a quarterly repurchase offer because shareholders, in total, may wish to sell more than 5% of the Fund's shares. If the amount of repurchase requests exceeds the number of shares the Fund offers to repurchase, the Fund will repurchase shares on a pro rata basis. Limited liquidity will be provided to shareholders only through the Fund's quarterly repurchases. The Fund will maintain liquid securities or cash or, if available, will borrow in amounts sufficient to meet quarterly redemption requirements. See "Quarterly Repurchases of Shares."

**Summary of Risks**

Investing in the Fund involves risks, including the risk that you may receive little or no return on your investment or that you may lose part or all of your investment. Consequently, you can lose money by investing in the Fund. No assurance can be given that the Fund will achieve its investment objective, and investment results may vary substantially over time and from period to period. An investment in the Fund is not appropriate for all investors. Each risk summarized below is a principal risk of investing in the Fund, and different risks may be more significant at different times depending upon market conditions or other factors.

An investment in the Fund is not a deposit of any bank and is not insured or guaranteed by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency.

***Substantial Conflicts of Interest.*** As a result of the Fund's arrangements with NexPoint, there may be times when NexPoint or its affiliates have interests that differ from those of the Fund's shareholders, giving rise to a

conflict of interest. The Fund's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund does, or of investment funds managed by the Adviser or its affiliates. Similarly, the Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. For example, the Fund's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Adviser and its affiliates.

The Fund's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles.

As a result, those individuals may face conflicts in the allocation of investment opportunities among the Fund and other investment funds or accounts advised by or affiliated with the Adviser. The Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is fair and equitable over time and consistent with its allocation policy. However, the Fund can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time. In addition, it is anticipated that a significant portion of the Fund's assets will be represented by securities sponsored, organized and/or managed by the Adviser and its affiliates, which may include REITs, asset-backed securities and/or structured finance securities. The Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Fund with an opportunity to periodically review the Fund's investments in such REITs, asset-backed securities and/or structured finance securities and assure themselves that continued investment in such securities remains in the best interests of the Fund and its shareholders. Please see "Risk Factors — Conflicts of Interest" for a description of risks associated with conflicts of interest.

***Closed-End Fund ("CEF") Risk.*** The Fund is a CEF. CEFs differ from open-end management investment companies (commonly referred to as mutual funds) in that CEFs may list their shares for trading on a securities exchange and do not redeem their shares at the option of the shareholder. By comparison, mutual funds issue securities redeemable at net asset value at the option of the shareholder and typically engage in a continuous offering of their shares. Mutual funds are subject to continuous asset in-flows and out-flows that can complicate portfolio management, whereas CEFs generally can stay more fully invested in securities consistent with the CEF's investment objective and policies. In addition, in comparison to open-end funds, CEFs have greater flexibility in their ability to make certain types of investments, including investments in illiquid securities.

***Concentration in Real Estate Securities Risk.*** The Fund will not invest in real estate directly, but, because the Fund will concentrate its investments in investment vehicles that invest principally in real estate and real estate-related securities, its portfolio will be significantly impacted by the performance of the real estate market and may experience more volatility and be exposed to greater risk than a more diversified portfolio. The values of companies engaged in the real estate industry are affected by: (i) changes in general economic and market conditions; (ii) changes in the value of real estate properties; (iii) risks related to local economic conditions, overbuilding and increased competition; (iv) increases in property taxes and operating expenses; (v) changes in zoning laws; (vi) casualty and condemnation losses; (vii) variations in rental income, neighborhood values or the appeal of property to tenants; (viii) the availability of financing; and (ix) changes in interest rates and leverage.

***Mortgage-Backed Securities Risk.*** Mortgage-backed securities are bonds which evidence interests in, or are secured by, commercial or residential mortgage loans, as the case may be. Accordingly, mortgage-backed securities are subject to all of the risks of the underlying mortgage loans. In a rising interest rate environment, the value of mortgage-backed securities may be adversely affected when payments on underlying mortgages do not occur as anticipated. The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities markets as a

whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the underlying commercial or residential mortgage properties. Mortgage-backed securities are also subject to several risks created through the securitization process.

The Fund may invest in the residual or equity tranches of CMBS, which are referred to as subordinate CMBS and interest-only CMBS. Subordinate CMBSs are paid interest only to the extent there are funds available to make payments. There are multiple tranches of CMBS, offering investors various maturity and credit risk characteristics. Tranches are categorized as senior, mezzanine, and subordinated/equity, according to their degree of risk. The most senior tranche of a CMBS has the greatest collateralization and pays the lowest interest rate. If there are defaults or the collateral otherwise underperforms, scheduled payments to senior tranches take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. Lower tranches represent lower degrees of credit quality and pay higher interest rates intended to compensate for the attendant risks. The return on the lower tranches is especially sensitive to the rate of defaults in the collateral pool. The lowest tranche (i.e. the "equity" or "residual" tranche) specifically receives the residual interest payments (i.e., money that is left over after the higher tranches have been paid and expenses of the issuing entities have been paid) rather than a fixed interest rate. As a result, interest only CMBS possess the risk of total loss of investment in the event of prepayment of the underlying mortgages. There is no limit on the portion of the Fund's total assets that may be invested in interest-only multifamily CMBS.

The Fund also may invest in interest-only multifamily CMBS issued by multifamily mortgage loan securitizations. However, these interest-only multifamily CMBS typically only receive payments of interest to the extent that there are funds available in the securitization to make the payment and may introduce increased risks since these securities have no underlying principal cash flows.

***Debt Securities Risk.*** When the Fund invests in debt securities, the value of your investment in the Fund will fluctuate with changes in interest rates. Typically, a rise in interest rates causes a decline in the value of debt securities. In general, the market price of debt securities with longer maturities will increase or decrease more in response to changes in interest rates than shorter-term securities. Other risk factors include credit risk (the debtor may default) and prepayment risk (the debtor may pay its obligation early, reducing the amount of interest payments). These risks could affect the value of a particular investment, possibly causing the Fund's share price and total return to be reduced or fluctuate more than other types of investments. This kind of market risk is generally greater for funds investing in debt securities with longer maturities.

***Non-Payment Risk.*** Debt securities are subject to the risk of non-payment of scheduled interest and/or principal. Nonpayment would result in a reduction of income to the Fund, a reduction in the value of the security experiencing nonpayment and a potential decrease in the NAV of the Fund. There can be no assurance that the liquidation of any collateral would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that such collateral could be readily liquidated.

***Securities Market Risk.*** An investment in the Fund's shares is subject to investment risk, including the possible loss of the entire principal amount invested. An investment in the Fund's shares represents an indirect investment in the securities owned by the Fund. The value of these securities, like other market investments, may move up or down, sometimes rapidly and unpredictably, due to factors affecting particular companies or the securities markets generally. Economic, political and financial conditions, industry or economic trends and developments or public health risks, such as epidemics or pandemics, may, from time to time, and for varying periods of time, cause volatility, illiquidity or other potentially adverse effects in the financial markets. The value of your shares at any point in time may be worth less than the value of your original investment, even after taking into account any reinvestment of dividends and distributions.

***Illiquid and Restricted Securities.*** The Fund may not be able to readily dispose of illiquid securities at prices that approximate those at which the Fund could sell such securities if they were more widely traded and, as a result of such illiquidity, the Fund may have to sell other investments or engage in borrowing transactions if necessary to raise cash to meet its obligations.

***Distribution Policy Risk.*** The Fund's distribution policy may, under certain circumstances, have certain adverse consequences to the Fund and its shareholders because it may result in a return of capital resulting in less of a shareholder's assets being invested in the Fund and, over time, increase the Fund's expense ratio. The distribution policy also may cause the Fund to sell a security at a time it would not otherwise do so in order to manage the distribution of income and gain. Pending the investment of the net proceeds in accordance with the investment objective and policies, all or a portion of the Fund's distributions may consist of a return of capital (i.e. from your original investment).

***Public and Private Investment Funds Risk.*** For investments in Public Investment Funds and Private Real Estate Investment Funds not managed by the Adviser or its affiliates, Fund shareholders will bear two layers of fees and expenses: asset-based fees and expenses at the Fund level, and asset-based fees, incentive allocations or fees and expenses at the Public Investment Fund or Private Real Estate Investment Fund level. The Fund's performance depends, in part, upon the performance of the Public Investment Fund and Private Real Estate Investment Fund managers and their selected strategies, the adherence by such managers to such selected strategies, the instruments used by such managers, and the Adviser's ability to select managers and strategies and effectively allocate Fund assets among them.

Private Real Estate Investment Funds are not publicly traded and therefore are not liquid investments. To determine the value of the Fund's investments in Private Real Estate Investment Funds, the Adviser considers, among other things, information provided by the Private Real Estate Investment Funds, including quarterly unaudited financial statements, which if inaccurate could adversely affect the Adviser's ability to accurately value the Fund's shares. In addition to valuation risk, shareholders of Private Real Estate Investment Funds are not entitled to the protections of the 1940 Act.

To the extent the Fund invests in Private Real Estate Investment Funds managed by the Adviser or its affiliates, fees paid at the Private Real Estate Investment Fund level will be reimbursed to the Fund so that shareholders will only pay fees at the Fund level.

***REIT Risk.*** REITs may be affected by changes in the real estate markets generally as well as changes in the values of the properties owned by the REIT or securing the mortgages owned by the REIT. REITs are dependent upon management skill and are not diversified. REITs are also subject to heavy cash flow dependency, defaults by borrowers, self-liquidation, and the possibility of failing to qualify for favorable tax treatment under the Internal Revenue Code of 1986, as amended (the "Code"), and to maintain an exemption under the 1940 Act. Finally, certain REITs may be self-liquidating at the end of a specified term, and run the risk of liquidating at an economically inopportune time.

***Non-Traded REIT Risk.*** Non-traded REITs are subject to the following risks in addition to those described in "REIT Risk." Non-Traded REITs are subject to significant commissions, expenses, and organizational and offering costs that reduce the value of an investor's (including the Fund's) investment. Non-Traded REITs are not liquid, and investments in Non-Traded REITs may not be accessible for an extended period of time. There is no guarantee of any specific return on the principal amount or the repayment of all or a portion of the principal amount invested in Non-Traded REITs. In addition, there is no guarantee that investors (including the Fund) will receive distributions. Distributions from Non-Traded REITs may be derived from sources other than cash flow from operations, including the proceeds of the offering, from borrowings, or from the sale of assets. Payments of distributions from sources other than cash flow from operations will decrease or diminish an investor's interest.

***Private REIT Risk.*** Private REITs are subject to the following risks in addition to those described in "Public and Private Real Estate Investment Funds Risk" and "REIT Risk." Private REITS are unlisted, making them more difficult to value and trade. Moreover, private REITs generally are exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), and, as such, are not subject to the same disclosure requirements as Public REITs and Non-Traded REITs, which makes private REITs more difficult to evaluate from an investment perspective. In addition, Private REITs may not have audited financial statements.

***ETF Risk.*** The value of ETFs can be expected to increase and decrease in value in proportion to increases and decreases in the indices that they are designed to track. The volatility of different index tracking stocks can be expected to vary in proportion to the volatility of the particular index they track. ETFs are traded similarly to stocks of individual companies. Although an ETF is designed to provide investment performance corresponding to its index, it may not be able to exactly replicate the performance of its index because of its operating expenses and other factors. The underlying indices that an ETF is designed to track may also experience volatility due to disruptive events, such as natural disasters, pandemic or epidemics or other widespread health crises. Any such impact could adversely affect the Fund's performance and may lead to losses on your investment in the Fund. Because ETFs trade on a securities exchange, extreme market volatility or potential lack of an active trading market for an ETF's shares may trade at a premium or discount to their net asset value. The Fund's investment in shares of ETFs subject it to the risks of owning the securities underlying the ETF, as well as certain structural risks, including authorized participant concentration risk, market maker risk, premium/discount risk and trading issues risk. As a shareholder in an ETF, the Fund bears its proportionate share of the ETF's expenses.

***Issuer Risk.*** The value of a specific security can perform differently from the market as a whole for reasons related to the issuer, such as management performance, financial leverage and reduced demand for the issuer's goods and services.

***Leverage Risk.*** Leverage creates a greater risk of loss, as well as a potential for more gain, for the Fund's shares than if leverage were not used. The use of leverage, such as borrowing money to purchase securities, will cause the Fund or a Public Investment Fund or Private Real Estate Investment Fund in which the Fund has invested, to incur additional expenses and significantly magnify the Fund's losses in the event of underperformance of the Fund's (or Public Investment Fund's or Private Real Estate Investment Fund's) underlying investments. Interest on borrowings (or dividends on preferred shares) may be at a fixed or floating rate and generally will be based on short-term rates. Interest payments and fees incurred in connection with such borrowings will reduce the amount of distributions available to the Fund's shareholders. As long as the rate of return, net of applicable Fund expenses, on the Fund's portfolio investments purchased with leverage exceeds the costs associated with such leverage, the Fund will generate more return or income than will be needed to pay such costs. In this event, the excess will be available to pay higher dividends to the Fund's shareholders. Conversely, if the Fund's return on such assets is less than the cost of leverage and other Fund expenses, the return to the Fund's shareholders shares will diminish or may be eliminated altogether. To the extent that the Fund uses leverage, the net asset value of the Fund's shares and the yield to the Fund's shareholders will be more volatile. The Fund's leveraging strategy may not be successful. The Fund's investments in Public Investment Funds and REITs managed by affiliated or unaffiliated institutional asset managers may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to the higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025.

In addition, a lender to the Fund or a Private Real Estate Investment Fund or a Public Investment Fund may terminate or refuse to renew any credit facility. If the Fund or Private Real Estate Investment Fund or a Public Investment Fund is unable to access additional credit, it may be forced to sell investments at inopportune times,

which may further reduce the amount of distributions available to Fund shareholders. The Fund's investments in Public Investment Funds and REITs managed by affiliated or unaffiliated institutional asset managers may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. See "Risk Factors — Leverage Risk".

***Reverse Repurchase Agreement Risk.*** The Fund may enter into reverse repurchase transactions with Mizuho or other banks and securities dealers. A reverse repurchase transaction is a repurchase transaction in which the Fund is the seller of, rather than the investor in, securities or other assets and agrees to repurchase them at a date certain or on demand. Use of a reverse repurchase transaction may be preferable to a regular sale and later repurchase of securities or other assets because it avoids certain market risks and transaction costs. Reverse repurchase transactions involve the risk that the market value of securities and/or other assets purchased by the Fund with the proceeds received by the Fund in connection with such reverse repurchase transactions may decline below the market value of the securities the Fund is obligated to repurchase under such transactions. They also involve the risk that the counterparty may liquidate the securities delivered to it by the Fund under the reverse repurchase agreement following the occurrence of an event of default by the Fund under the reverse repurchase agreement. At the time when the Fund enters into a reverse repurchase transaction, liquid securities (e.g., cash, U.S. Government securities or other "high grade" debt obligations) of the Fund having a value at least as great as the Purchase Price of the securities to be purchased will be segregated on the books of the Fund throughout the period of the obligation. The use of these investment strategies may increase net asset value fluctuation.

***Liquidity Risk.*** There is currently no secondary market for the shares and the Fund expects that no secondary market will develop. Limited liquidity is provided to shareholders only through the Fund's quarterly repurchase offers for no less than 5% of the shares outstanding at NAV. There is no guarantee that shareholders will be able to sell all of the shares they desire in a quarterly repurchase offer. The Fund's investments are also subject to liquidity risk. Liquidity risk exists when particular investments of the Fund would be difficult to purchase or sell, possibly preventing the Fund from selling such illiquid securities at an advantageous time or price, or possibly requiring the Fund to dispose of other investments at unfavorable times or prices in order to satisfy its obligations. Funds with principal investment strategies that involve securities of companies with smaller market capitalizations, derivatives or securities with substantial market and/or credit risk tend to have the greatest exposure to liquidity risk.

***Management Risk.*** Management Risk is the risk associated with the fact that the Fund relies on the Adviser's ability to achieve its investment objective. The Adviser may be incorrect in its assessment of the intrinsic value of the companies whose securities the Fund holds, which may result in a decline in the value of Fund shares and failure to achieve its investment objective.

***Medium and Small Capitalization Company Risk.*** Compared to investment companies that focus only on large capitalization companies, the Fund's NAV may be more volatile because it also invests in medium and small capitalization companies. Compared to larger companies, medium and small capitalization companies are more likely to have: (i) more limited product lines or markets and less mature businesses; (ii) fewer capital resources; (iii) more limited management depth; and (iv) shorter operating histories. Further, compared to larger companies, the securities of small and medium capitalization companies are more likely to experience more significant changes in market values, be harder to sell at times and at prices that the Adviser believes appropriate, and offer greater potential for gains and losses.

***Non-Diversification Risk.*** While the Adviser intends to invest in a number of real estate and real estate-related securities issued by different issuers and employ multiple investment strategies with respect to the Fund's investment portfolio, it is possible that a significant amount of the Fund's investments could be invested in the

instruments of only a few companies or other issuers or that at any particular point in time one investment strategy could be more heavily weighted than the others. The focus of the Fund's investment portfolio in any one issuer would subject the Fund to a greater degree of risk with respect to defaults by such issuer or other adverse events affecting that issuer, and the focus of the portfolio in any one industry or group of industries would subject the Fund to a greater degree of risk with respect to economic downturns relating to such industry or industries.

***Valuation Risk.*** Portfolio securities may be valued using techniques other than market quotations, under the circumstances described under "Determination of Net Asset Value." The value established for a portfolio security may be different than what would be produced through the use of another methodology or if it had been priced using market quotations. Portfolio securities that are valued using techniques other than market quotations, including "fair valued" securities, may be subject to greater fluctuation in their value from one day to the next than would be the case if market quotations were used. In addition, there is no assurance that the Fund could sell a portfolio security for the value established for it at any time and it is possible that the Fund would incur a loss because a portfolio security is sold at a discount to its established value.

Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, fair value pricing may not reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

***Equity Securities Risk.*** The market prices of equity securities owned by the Fund may fall over short or long periods of time. In addition, equity securities represent a share of ownership in a company, and rank after bonds and preferred stock in their claim on the company's assets in the event of bankruptcy.

***Preferred Securities Risk.*** Preferred securities are subject to credit risk and interest rate risk. Interest rate risk is, in general, that the price of a debt security falls when interest rates rise. Securities with longer maturities tend to be more sensitive to interest rate changes. Credit risk is the risk that an issuer of a security may not be able to make principal and interest or dividend payments on the security as they become due. The credit quality of preferred stock and convertible securities held by the Fund may be lowered if an issuer's financial condition changes, leading to greater volatility in the price of the security. Holders of preferred securities may not receive dividends, or the payment can be deferred for some period of time. In bankruptcy, creditors are generally paid before the holders of preferred securities. Preferred stock, which may include preferred stock in real estate transactions, represents an equity or ownership interest in an issuer that pays dividends at a specified rate and that has precedence over common stock in the payment of dividends.

***Repurchase Policy Risks.*** Quarterly repurchases by the Fund of its shares typically will be funded from available cash or sales of portfolio securities. However, payment for repurchased shares may require the Fund to liquidate portfolio holdings earlier than the Adviser otherwise would liquidate such holdings, potentially resulting in losses, and may increase the Fund's portfolio turnover. The Adviser may take measures to attempt to avoid or minimize such potential losses and turnover, and instead of liquidating portfolio holdings, may borrow money to finance repurchases of shares. If the Fund borrows to finance repurchases, interest on any such borrowings will negatively affect shareholders who do not tender their shares in a repurchase offer by increasing the Fund's expenses and reducing net investment income. The Fund's quarterly repurchase offers are a shareholder's only means of liquidity with respect to his or her shares.

***Short Sales Risk.*** Short sales risk is the risk of loss associated with any appreciation on the price of a security borrowed in connection with a short sale. The Fund may engage in short sales that are not made

"against-the-box," which means that the Fund may sell short securities even when they are not actually owned or otherwise covered at all times during the period the short position is open. Short sales that are not made "against-the-box" involve unlimited loss potential since the market price of securities sold short may continuously increase.

***Securities Lending Risk.*** Securities lending risk is the risk that the Fund may make secured loans of its portfolio securities. Any decline in the value of a portfolio security that occurs while the security is out on loan is borne by the Fund, and will adversely affect performance. Also, there may be delays in recovery of securities loaned, losses in the investment of collateral, and loss of rights in the collateral should the borrower of the securities fail financially while holding the security.

***Risks Relating to Fund's Tax Status.*** To remain eligible for the favorable tax treatment accorded to regulated investment companies ("RICs") and their shareholders under the Code, the Fund must meet certain source of income, asset diversification and annual distribution requirements. If the Fund were to fail to comply with the income, diversification or distribution requirements, all of its taxable income regardless of whether timely distributed to shareholders would be subject to fund-level tax at the applicable corporate income tax rate and all of its distributions from earnings and profits (including from net long-term capital gains) would be taxable to shareholders as ordinary income. In any such event, the resulting corporate taxes could substantially reduce the Fund's net assets, the amount of income available for distribution and the amount of its distributions. Any such failure would have a material adverse effect on the Fund and its shareholders.

***RIC-Related Risks of Investments Generating Non-Cash Taxable Income.*** Certain of the Fund's investments will require the Fund to recognize taxable income in a taxable year in excess of the cash received from those investments during that year. In particular, the Fund expects that a portion of its investments in loans and bonds will be treated as having "market discount" and/or "original issue discount" for U.S. federal income tax purposes, which, in some cases, could be significant. Because the Fund may be required to recognize income in respect of these investments before or without receiving cash representing such income, the Fund may have difficulty satisfying the annual distribution requirements applicable to RICs and avoiding Fund-level U.S. federal income or excise taxes. Accordingly, the Fund may be required to sell portfolio securities, including at potentially disadvantageous times or prices, raise additional debt or equity capital, or reduce new investments, to obtain the cash needed to make the necessary income distributions. If the Fund liquidates portfolio securities to raise cash, the Fund may realize gain or loss on such liquidations; in the event the Fund realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

***REIT Tax Risk for REIT Subsidiaries.*** The REIT Subsidiaries and any REIT subsidiary the Fund may form in the future will elect to be taxed as REITs beginning with the first year in which they commence material operations. In order for each REIT Subsidiary and any future REIT subsidiary to qualify and maintain its qualification as a REIT, it must satisfy certain requirements set forth in the Code and Treasury Regulations that depend on various factual matters and circumstances. The Fund and the Adviser intend to cause the REIT Subsidiaries and any future REIT subsidiaries to structure their activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is not entirely clear, and it is possible that the Internal Revenue Service ("IRS") may interpret or apply those requirements in a manner that jeopardizes the ability of such REIT subsidiary to satisfy all of the requirements for qualification as a REIT.

If any REIT Subsidiary or future REIT subsidiary fails to qualify as a REIT for any taxable year that it is operational and does not qualify for certain statutory relief provisions, it will be subject to U.S. federal income tax on its taxable income at the applicable corporate income tax rate. In addition, it will generally be disqualified from treatment as a REIT for the four taxable years following any taxable year in which it fails to qualify as a REIT.

**U.S. Federal Income Tax Matters**

The Fund has elected to be taxed for U.S. federal income tax purposes, and intends to continue to qualify annually, as a RIC under Subchapter M of the Code. As a RIC, the Fund generally will not be subject to fund-level U.S. federal income taxes on any ordinary income or capital gain that it timely distributes to its shareholders from its taxable earnings and profits. Even if the Fund qualifies as a RIC, it generally will be subject to U.S. federal corporate income tax on its undistributed taxable income and could be subject to U.S. federal excise, state, local and foreign taxes. To maintain RIC tax treatment, the Fund must meet specified source-of-income and asset diversification requirements and distribute annually at least the sum of 90% of its ordinary income and net short-term capital gain in excess of net long-term capital loss, if any, and 90% of net exempt interest income. See "U.S. Federal Income Tax Matters."

**Distribution Policy**

The Fund's distribution policy is to make monthly distributions to shareholders. The Board has the ultimate discretion as to whether such distributions will be in stock or in cash. However, this distribution policy is subject to change and there is no guarantee the target rate will be achieved. Unless a shareholder elects otherwise, the shareholder's distributions will be reinvested in additional shares under the Fund's distribution reinvestment policy. Shareholders who elect not to participate in the Fund's distribution reinvestment policy will receive all distributions in cash paid to the shareholder of record (or, if the shares are held in street or other nominee name, then to such nominee). The Fund's historical distributions approved by the Board may be found on the Fund's website, located at https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/. See "Distribution Policy" and "Distribution Reinvestment Policy."

**Custodian**

The Bank of New York Mellon ("BNY Mellon") serves as the Fund's custodian. See "Management of the Fund."

**FEES AND FUND EXPENSES**

The following table is intended to assist you in understanding the costs and expenses that an investor in this offering will bear directly or indirectly.

| | Class A Shares | Class C Shares | Class Z Shares |
|---|---|---|---|
| **Shareholder Transaction Expenses** | | | |
| Maximum Sales Load (as a percent of offering price)[1] | 5.75% | None | None |
| Contingent Deferred Sales Charge[2] | 1.00% | 1.00% | None |
| Exchange Fee | None | None | None |
| **Annual Expenses (as a percentage of net assets attributable to shares)** | | | |
| Management Fees | 1.25% | 1.25% | 1.25% |
| Interest Payments on Borrowed Funds[3] | 0.80% | 0.80% | 0.80% |
| Dividends and Fees on Securities Sold Short | 0.46% | 0.46% | 0.46% |
| Other Expenses[3] | 1.24% | 1.24% | 1.24% |
| Distribution Fee[4] | None | 0.75% | None |
| Shareholder Servicing Fee[5] | 0.25% | 0.25% | None |
| Total Annual Expenses | 4.00% | 4.75% | 3.75% |
| Fee Waiver and Reimbursement[6] | 0.74% | 0.74% | 0.74% |
| Total Annual Expenses (after fee waiver and reimbursement)[7] | 3.26% | 4.01% | 3.01% |

1. A portion of the sales load payable on Class A shares will be a reallowance to participating broker-dealers (see page 77 of this Prospectus). In addition, up to 0.75% of this sales load will be paid to the Fund's Distributor. There are no sales loads on reinvested distributions. The Fund reserves the right to waive broker commissions.
2. Class A shares purchased without an initial sales charge in accounts aggregating $500,000 or more may be subject to a 1.00% CDSC on shares redeemed during the first 18 months after their purchase. Class C shares are subject to a 1.00% CDSC for redemptions of shares within 18 months after their purchase.
3. As of December 31, 2024, the Fund employed leverage in an amount equal to 8% of net assets. The Fund may employ leverage going forward. This variable rate is based on current interest rates under the Fund's committed facility and is subject to change. The interest rate will increase in rising interest rate environments and, therefore, the actual interest rate expense borne by Fund shareholders will increase over time in a rising interest rate environment. While the Fund has no present intention to issue preferred shares within the next twelve months, if an attractive preferred shares financing opportunity were to come to the Fund's attention during that period, the Fund may consider that opportunity. See "Principal Risks of the Fund — Leverage Risk" in the Prospectus for a brief description of the Fund's Repurchase Agreement with Mizuho.
4. Class C shares will pay to the Distributor a Distribution Fee that will accrue at an annual rate equal to 0.75% of the average daily net assets attributable to Class C shares, and is payable on a quarterly basis. These Distribution fees may be paid to broker or Financial Intermediaries as compensation to sell Fund shares. Class A and Class Z shares are not subject to a Distribution Fee. See "Plan of Distribution."
5. Shareholder Servicing Fees may be used to compensate financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. Please refer to page 79 of this Prospectus for information.
6. The Adviser and the Fund have entered into an Expense Limitation Agreement under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary annual operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily

Case 3:26-cv-02496-D Document 17-30 Filed 09/08/26 Page 218 of 608 PageID 12369

Gross Assets (the "Expense Limitation"). If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared effective by the SEC and to commence operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement will remain in effect until at least May 1, 2026 unless and until the Board approves its modification or termination. The Expense Limitation Agreement may not be amended or terminated unless approved by the Board. See "Management of the Fund." "Fee Waiver and Reimbursement" have been restated from fiscal year amounts to reflect current fees and expenses.

7. The value included in the "Total Annual Expenses" line item corresponds to the Expense Limitation pursuant to the Expense Limitation Agreement. The value in the "Fees and Fund Expenses" table is presented as a percentage of net assets, while the Expense Limitation, pursuant to the Expense Limitation Agreement, is calculated based on average Daily Gross Assets, but converted and expressed as a percentage of net assets for purposes of the fees and fund expenses table presentation. "Total Annual Expenses (after fee waiver and reimbursement)" have been restated from fiscal year amounts to reflect current fees and expenses.

The Fees and Fund Expenses Table describes the fees and expenses that you may pay if you buy and hold shares of the Fund. You may qualify for sales charge discounts on purchases of shares if you and your family invest, or agree to invest in the future, at least $50,000 in the Fund. More information about these and other discounts is available from your financial professional and in the "Plan of Distribution — Purchasing Shares" section of this Prospectus. More information about management fees, fee waivers and other expenses is available in the "Management of the Fund" section of this Prospectus.

**EXAMPLE**

The following example illustrates the hypothetical expenses that you would pay on a $1,000 investment assuming annual expenses attributable to shares remain unchanged and shares earn a 5% annual return. The example reflects total annual expenses after fee waivers and expense reimbursements for the one-year period and the first year of the three-, five-, and ten-year periods:

| Example | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|
| Class A Shares | $ 88 | $ 166 | $ 245 | $ 450 |
| Class C Shares | | | | |
| If you do not sell your shares | $ 40 | $ 136 | $ 233 | $ 477 |
| If you sold all of your shares at the end of the period | $ 50 | $ 136 | $ 233 | $ 477 |
| Class Z Shares | $ 30 | $ 108 | $ 187 | $ 395 |

**The example should not be considered a representation of actual future expenses. Actual expenses may be higher or lower than those shown.**

If shareholders request repurchase proceeds be paid by wire transfer, such shareholders will be assessed an outgoing wire transfer fee at prevailing rates charged by SS&C, currently $10.00. The purpose of the above table is to help a holder of shares understand the fees and expenses that such holder would bear directly or indirectly. There can be no assurance that the Expense Limitation Agreement will be renewed. In the event the Expense Limitation Agreement is terminated by either party, investors will likely bear higher expenses.

**FINANCIAL HIGHLIGHTS**

The following Financial Highlights table is intended to help you understand the Fund's financial performance since inception. Certain information reflects the financial results for a single Fund share. The total returns in the tables represent the rate that an investor would have earned or lost on an investment in the Fund (assuming reinvestment of all dividends and distributions). This information for the years ended December 31, 2024, 2023, 2022, 2021 and 2020 has been audited by Cohen & Company, Ltd., an independent registered public accounting firm. Financial statements for the fiscal year ended December 31, 2024 and the Report of the Independent Registered Public Accounting Firm thereon appear in the Fund's Annual Report for the Fiscal Year Ended December 31, 2024, which is incorporated by reference into the Statement of Additional Information and available from the Fund upon request. The Fund's performance has been enhanced by the existence of contractual waivers of fees and expenses, which may not continue into the future.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class A**

**Selected data for a share outstanding throughout each year is as follows:**

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| **Net Asset Value, Beginning of Year** | $17.51 | $ 19.73 | $21.31 | $ 16.19 | $ 20.36 |
| **Income from Investment Operations:** | | | | | |
| Net investment income[(a)] | 0.48 | 0.51 | 0.31 | 0.09 | 0.48 |
| Net realized and unrealized gain (loss) | (0.59) | (1.31) | (0.47) | 6.46 | (3.23) |
| Total from Investment Operations | (0.11) | (0.80) | (0.16) | 6.55 | (2.75) |
| **Less Distributions Declared to shareholders:** | | | | | |
| From net investment income | (0.57) | (0.52) | (0.30) | (0.34) | (0.39) |
| From return of capital | (0.85) | (0.90) | (1.12) | (1.09) | (1.03) |
| Total distributions declared to shareholders | (1.42) | (1.42) | (1.42) | (1.43) | (1.42) |
| **Net Asset Value, End of year[(b)]** | $15.98 | $ 17.51 | $19.73 | $ 21.31 | $ 16.19 |
| Total Return[(b)(c)] | (0.60)% | (4.30)% | (1.15)% | 42.42% | (12.98)% |
| **Ratios to Average Net Assets / Supplemental Data:[(d)]** | | | | | |
| Net Assets, End of Year (000's) | $7,555 | $ 9,265 | $9,288 | $ 5,903 | $ 2,273 |
| Gross operating expenses[(e)] | 4.00% | 4.25% | 2.87% | 3.08% | 3.41% |
| Net investment income (loss) | 2.88% | 2.66% | 1.42% | 0.51% | 2.97% |
| Portfolio turnover rate | 13% | 10% | 41% | 41% | 42% |
| Average commission rate paid[(f)] | $ — | $0.0289 | $ — | $0.0225 | $0.0348 |

(a) Per share data was calculated using average shares outstanding during the year.

(b) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.

(c) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's Investment Adviser not waived or reimbursed a portion of expenses, total return would have been lower.

(d) All ratios for the period have been annualized, unless otherwise indicated.

(e) Supplemental expense ratios are shown below:

(f) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses)[(g)] | 3.32% | 3.18% | 2.28% | 1.99% | 2.44% |
| Interest expense and commitment fees | 0.80% | 0.77% | 0.25% | — % | 0.34% |
| Dividends and fees on securities sold short | 0.46% | 0.47% | 0.06% | 0.02% | — % |

(g) This includes the additional voluntarily elected waiver by the Investment Adviser during the year which resulted in a 0.06% impact to the net expenses ratio.

Amounts designated as " —" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class A**

**Selected data for a share outstanding throughout each period is as follows:**

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[(a)] |
| **Net Asset Value, Beginning of Period** | $ 18.99 | $ 20.65 | $ 20.62 | $ 20.00 |
| **Income from Investment Operations:** | | | | |
| Net investment income[(b)] | 0.94 | 0.95 | 1.44 | 0.14 |
| Net realized and unrealized gain/(loss) | 1.83 | (1.33) | 0.19 | 0.68 |
| Total from investment operations | 2.77 | (0.38) | 1.63 | 0.82 |
| **Less Distributions Declared to Shareholders:** | | | | |
| From net investment income | (0.91) | (1.28) | (1.39) | (0.20) |
| From net realized gains | (0.49) | — | (0.21) | — |
| Total distributions declared to shareholders | (1.40) | (1.28) | (1.60) | (0.20) |
| **Net Asset Value, End of Period[(c)]** | $ 20.36 | $ 18.99 | $ 20.65 | $ 20.62 |
| Total Return[(c)(d)] | 14.59% | (2.42)% | 8.18% | 4.12%[(e)] |
| **Ratios to Average Net Assets[(f)] / Supplemental Data:** | | | | |
| Net assets, end of period (in 000's) | $ 1,546 | $ 414 | $ 126 | $ 1 |
| Gross operating expenses[(g)] | 4.33% | 4.20% | 4.75% | 10.78% |
| Net investment income (loss) | 4.56% | 4.82% | 6.99% | 1.56% |
| Portfolio turnover rate | 39% | 49% | 99% | 14%[(e)] |
| Average commission rate paid[(h)] | $0.0222 | $0.0111 | $0.0155 | $0.0295 |

(a) Class commenced operations on July 21, 2016.
(b) Net investment income (loss) per share was calculated using average shares outstanding during the period.
(c) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(d) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(e) Not annualized.
(f) All ratios for the period have been annualized, unless otherwise indicated.
(g) Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[(a)] |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 2.50% | 2.38% | 2.01% | 2.08% |
| Interest expense and commitment fees | 0.76% | 0.22% | — % | — % |
| Dividends and fees on securities sold short | — % | 0.08% | 0.01% | — % |

(h) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

Amounts designated as " —" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class C**

**Selected data for a share outstanding throughout each year is as follows:**

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| **Net Asset Value, Beginning of Year** | $17.73 | $ 19.96 | $21.56 | $ 16.37 | $ 20.53 |
| **Income from Investment Operations:** | | | | | |
| Net investment income (loss)[(a)] | 0.36 | 0.36 | 0.15 | (0.04) | 0.36 |
| Net realized and unrealized gain (loss) | (0.60) | (1.31) | (0.49) | 6.52 | (3.22) |
| Total from Investment Operations | (0.24) | (0.95) | (0.34) | 6.48 | (2.86) |
| **Less Distributions Declared to shareholders:** | | | | | |
| From net investment income | (0.52) | (0.47) | (0.26) | (0.32) | (0.34) |
| From return of capital | (0.77) | (0.81) | (1.00) | (0.97) | (0.96) |
| Total distributions declared to shareholders | (1.29) | (1.28) | (1.26) | (1.29) | (1.30) |
| **Net Asset Value, End of year[(b)]** | $16.20 | $ 17.73 | $19.96 | $ 21.56 | $ 16.37 |
| Total Return[(b)(c)] | (1.36)% | (5.02)% | (1.93)% | 41.32% | (13.45)% |
| **Ratios to Average Net Assets / Supplemental Data:[(d)]** | | | | | |
| Net Assets, End of Year (000's) | $2,885 | $ 3,964 | $4,558 | $ 2,706 | $ 1,791 |
| Gross operating expenses[(e)] | 4.74% | 4.98% | 3.64% | 3.85% | 4.13% |
| Net investment income (loss) | 2.11% | 1.90% | 0.69% | (0.21)% | 2.14% |
| Portfolio turnover rate | 13% | 10% | 41% | 41% | 42% |
| Average commission rate paid[(f)] | $ — | $0.0289 | $ — | $0.0225 | $0.0348 |

(a) Per share data was calculated using average shares outstanding during the year.
(b) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(c) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's Investment Adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(d) All ratios for the period have been annualized, unless otherwise indicated.
(e) Supplemental expense ratios are shown below:
(f) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses)[(g)] | 4.07% | 3.93% | 3.05% | 2.74% | 3.18% |
| Interest expense and commitment fees | 0.80% | 0.77% | 0.25% | — % | 0.34% |
| Dividends and fees on securities sold short | 0.46% | 0.47% | 0.06% | 0.02% | — % |

(g) This includes the additional voluntarily elected waiver by the Investment Adviser during the year which resulted in a 0.06% impact to the net expenses ratio.

Amounts designated as " –" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class C**

**Selected data for a share outstanding throughout each period is as follows:**

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[(a)] |
| **Net Asset Value, Beginning of Period** | $ 19.10 | $ 20.72 | $ 20.58 | $ 20.00 |
| **Income from Investment Operations:** | | | | |
| Net investment income[(b)] | 0.79 | 0.83 | 1.12 | 0.04 |
| Net realized and unrealized gain | 1.89 | (1.30) | 0.46 | 0.71 |
| Total from investment operations | 2.68 | (0.47) | 1.58 | 0.75 |
| **Less Distributions Declared to Shareholders:** | | | | |
| From net investment income | (0.83) | (1.15) | (1.23) | (0.17) |
| From net realized gains | (0.42) | — | (0.21) | — |
| Total distributions declared to shareholders | (1.25) | (1.15) | (1.44) | (0.17) |
| **Net Asset Value, End of Period[(c)]** | $ 20.53 | $ 19.10 | $ 20.72 | $ 20.58 |
| Total Return[(c)(d)] | 13.97% | (2.90)% | 7.94% | 3.78%[(e)] |
| **Ratios to Average Net Assets[(f)] / Supplemental Data:** | | | | |
| Net assets, end of period (in 000's) | $ 880 | $ 511 | $ 1 | $ 1 |
| Gross operating expenses[(g)] | 5.08% | 4.93% | 5.05% | 11.53% |
| Net investment income (loss) | 3.81% | 4.08% | 5.39% | 0.45% |
| Portfolio turnover rate | 39% | 49% | 99% | 14%[(e)] |
| Average commission rate paid[(h)] | $0.0222 | $0.0111 | $0.0155 | $0.0295 |

(a) Class commenced operations on July 21, 2016.
(b) Net investment income (loss) per share was calculated using average shares outstanding during the period.
(c) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(d) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(e) Not annualized.
(f) All ratios for the period have been annualized, unless otherwise indicated.
(g) Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[(a)] |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 3.28% | 3.12% | 2.87% | 2.83% |
| Interest expense and commitment fees | 0.76% | 0.22% | — % | — % |
| Dividends and fees on securities sold short | — % | 0.08% | 0.13% | — % |

(h) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

Amounts designated as "—" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class Z**

**Selected data for a share outstanding throughout each year is as follows:**

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| **Net Asset Value, Beginning of Year** | $ 17.74 | $ 19.97 | $ 21.54 | $ 16.36 | $ 20.55 |
| **Income from Investment Operations:** | | | | | |
| Net investment income[a] | 0.53 | 0.57 | 0.36 | 0.14 | 0.53 |
| Net realized and unrealized gain (loss) | (0.60) | (1.33) | (0.46) | 6.51 | (3.26) |
| Total from Investment Operations | (0.07) | (0.76) | (0.10) | 6.65 | (2.73) |
| **Less Distributions Declared to shareholders:** | | | | | |
| From net investment income | (0.58) | (0.54) | (0.31) | (0.38) | (0.44) |
| From return of capital | (0.88) | (0.93) | (1.16) | (1.09) | (1.02) |
| Total distributions declared to shareholders | (1.46) | (1.47) | (1.47) | (1.47) | (1.46) |
| **Net Asset Value, End of year[b]** | $ 16.21 | $ 17.74 | $ 19.97 | $ 21.54 | $ 16.36 |
| Total Return[b][c] | (0.34)% | (4.06)% | (0.85)% | 42.68% | (12.75)% |
| **Ratios to Average Net Assets / Supplemental Data:[d]** | | | | | |
| Net Assets, End of Year (000's) | $24,109 | $27,165 | $25,711 | $15,493 | $12,709 |
| **Gross operating expenses[e]** | 3.75% | 4.02% | 2.61% | 2.85% | 3.24% |
| Net investment income (loss) | 3.12% | 2.95% | 1.66% | 0.78% | 3.24% |
| Portfolio turnover rate | 13% | 10% | 41% | 41% | 42% |
| Average commission rate paid[f] | $ — | $0.0289 | $ — | $0.0225 | $0.0348 |

(a) Per share data was calculated using average shares outstanding during the year.
(b) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(c) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's Investment Adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(d) All ratios for the period have been annualized, unless otherwise indicated.
(e) Supplemental expense ratios are shown below:
(f) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses)[g] | 3.07% | 2.94% | 2.03% | 1.73% | 2.19% |
| Interest expense and commitment fees | 0.80% | 0.77% | 0.25% | — % | 0.34% |
| Dividends and fees on securities sold short | 0.46% | 0.47% | 0.06% | 0.02% | — % |

(g) This includes the additional voluntarily elected waiver by the Investment Adviser during the year which resulted in a 0.06% impact to the net expenses ratio.

Amounts designated as " —" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class Z**

**Selected data for a share outstanding throughout each period is as follows:**

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[a] |
| **Net Asset Value, Beginning of Period** | $ 19.08 | $ 20.73 | $ 20.57 | $ 19.95 |
| **Income from Investment Operations:** | | | | |
| Net investment income[b] | 0.99 | 1.04 | 1.33 | 0.24 |
| Net realized and unrealized gain | 1.93 | (1.36) | 0.48 | 0.59 |
| Total from investment operations | 2.92 | (0.32) | 1.81 | 0.83 |
| **Less Distributions Declared to Shareholders:** | | | | |
| From net investment income | (0.97) | (1.33) | (1.44) | (0.21) |
| From net realized gains | (0.48) | — | (0.21) | — |
| Total distributions declared to shareholders | (1.45) | (1.33) | (1.65) | (0.21) |
| **Net Asset Value, End of Period[c]** | $ 20.55 | $ 19.08 | $ 20.73 | $ 20.57 |
| Total Return[c][d] | 15.40% | (2.17)% | 9.12% | 4.17%[e] |
| **Ratios to Average Net Assets[f] / Supplemental Data:** | | | | |
| Net assets, end of period (in 000's) | $17,837 | $13,132 | $ 8,011 | $ 7,279 |
| Gross operating expenses[g] | 4.09% | 3.94% | 4.60% | 11.26% |
| Net investment income (loss) | 4.80% | 5.08% | 6.44% | 2.45% |
| Portfolio turnover rate | 39% | 49% | 99% | 14%[e] |
| Average commission rate paid[h] | $0.0222 | $0.0111 | $0.0155 | $0.0295 |

(a) Class commenced operations on July 1, 2016.
(b) Net investment income per share was calculated using average shares outstanding during the period.
(c) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(d) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(e) Not annualized.
(f) All ratios for the period have been annualized, unless otherwise indicated.
(g) Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[a] |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 2.30% | 2.13% | 1.87% | 1.83% |
| Interest expense and commitment fees | 0.76% | 0.22% | — % | — % |
| Dividends and fees on securities sold short | — % | 0.08% | — % | — % |

(h) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| Borrowings at end of year | | | | | |
| Aggregate Amount Outstanding | 2,988,000 | 6,036,000 | 3,966,000 | 29,000 | 31,000 |
| Asset Coverage Per $1,000 | 12,551.77 | 771.07 | 1,036.22 | 832,099.72 | 542,072.06 |

| | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|
| Borrowings at end of period | | | | |
| Aggregate Amount Outstanding including Preferred Shares | 6,459,135 | 3,354,013 | — | — |
| Asset Coverage Per $1,000 | 4,137.16 | 5,191.05 | N/A | N/A |

Amounts designated as "—" are zero or have been rounded to zero.

## THE FUND

The Fund is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund. The Fund was organized as a Delaware statutory trust on January 11, 2016. The Fund's principal office is located at 300 Crescent Court, Suite 700, Dallas, Texas 75201, and its telephone number is (833) 697-6246.

## USE OF PROCEEDS

The net proceeds of the continuous offering of shares will be invested in accordance with the Fund's investment objective and policies (as stated below) as soon as practicable after receipt. The Fund will pay its organizational and offering expenses incurred with respect to its initial and continuous offering, less amounts advanced pursuant to the Expense Limitation Agreement. Since February 9, 2018, NexPoint Advisors, L.P., the Fund's investment adviser (the "Adviser" or "NexPoint") has paid or reimbursed the Fund's organizational and offering expenses incurred with respect to its initial and continuous offering and will not seek recoupment of such fees. Pending investment of net proceeds in accordance with the Fund's investment objective and policies, the Fund will invest in money market or short-term, high quality fixed-income mutual funds. Investors should expect, therefore, that before the Fund has fully invested the proceeds of the offering in accordance with its investment objective and policies, the Fund's assets would earn interest income at a modest rate which may be less than the Fund's distribution rate. The Fund's distributions may exceed its earnings and profits. As a result, a portion of the distributions the Fund makes may represent a return of capital for tax purposes. A return of capital is a return of your investment rather than a return of earnings or gains derived from our investment activities. Any invested capital that is returned to shareholders will be reduced by the Fund's fees and expenses, as well as the applicable sales load, which is non-refundable to its shareholders.

## INVESTMENT OBJECTIVE, POLICIES AND STRATEGIES

**Investment Objective and Policies**

***Investment Objective.*** The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective. The Fund's investment objective is non-fundamental and may be changed by the Board of Trustees (the "Board") without shareholder approval. Shareholders will, however, receive at least 60 days' prior notice of any change in this investment objective.

***Investment Strategy.*** The Fund pursues its investment objective by investing, under normal circumstances, at least 80% of its assets in "real estate and real estate-related securities" (as defined below). In particular, the Fund will pursue its investment objective by investing the Fund's assets primarily in: (1) commercial mortgage-backed securities ("CMBS") and residential mortgage-backed securities ("RMBS"); (2) direct preferred equity and mezzanine investments in real properties; (3) equity securities of public (both traded and non-traded) and private debt and equity real estate investment trusts ("REITs") and/or real estate operating companies ("REOCs"); and (4) opportunistic and value added direct real estate strategies. The Fund will effect its direct real estate strategy through investments in one or more REIT subsidiaries, including through the REIT Subsidiaries, which were formed on July 8, 2016 and June 6, 2022, respectively. The REIT Subsidiaries entered into separate investment advisory agreements with the Adviser concurrent with their formation. Preferred equity and mezzanine investments in real estate transactions come in various forms which may or may not be documented in the borrower's organizational documents. Generally, real estate preferred equity and/or mezzanine investments are typically junior to first mortgage financing but senior to the borrower's or sponsor's equity contribution. The investments are typically structured as an investment by a third-party investor in the real estate owner or various

affiliates in the chain of ownership in exchange for a direct or indirect ownership interest in the real estate owner entitling it to a preferred/priority return on its investment. Sometimes, the investment is structured much like a loan where: (i) "interest" on the investment is required to be paid monthly by the "borrower" regardless of available property cash flow; (ii) the entire investment is required to be paid by a certain maturity date; (iii) default rate "interest" and penalties are assessed against the "borrower" in the event payments are not made timely; and (iv) a default in the repayment of investment potentially results in the loss of management.

In addition, subject to the 15% Limitation, the Fund may invest up to 20% of its total assets in equity or debt securities other than real estate and real estate-related securities. The Adviser will evaluate each opportunity within the context of where the Adviser believes the various real estate subsectors are within the broader real estate cycle and tactically allocate among these opportunities. The Adviser has broad discretion to allocate the Fund's assets among these investment categories and to change allocations as conditions warrant. Also, the Adviser will select investments it believes offer the best potential outcomes and relative risk to assemble the most appropriate portfolio to meet the risk-adjusted return goals of the Fund.

This portfolio construction strategy seeks to: (i) recognize and allocate capital based upon where the Adviser believes we are in the current real estate cycle; and (ii) minimize drawdowns during market downturns and maximize risk adjusted returns during all market cycles, though there can be no assurance that this strategy will achieve this objective. The Fund will rely on the expertise of the Adviser and its affiliates to determine the appropriate structure for structured credit investments, which may include bridge loans, common and preferred equity or other debt-like positions, as well as the acquisition of such instruments from banks, servicers or other third parties.



The Fund defines "real estate and real estate-related securities" to consist of common stock, convertible or non-convertible preferred stock, warrants, convertible or non-convertible secured or unsecured debt, and partnership or membership interests issued by:

- CMBS, RMBS and other real estate credit investments, which include existing first and second mortgages on real estate, either originated or acquired in the secondary market, and secured, unsecured and/or convertible notes offered by REOCs and REITs;
- Public REITs;
- REOCs;
- Private Real Estate Investment Funds;
- Public Investment Funds;
- Real estate ETFs; and
- Non-Traded REITs and private REITs, generally wholly-owned by the Fund or wholly-owned or managed by an affiliate.

REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests, and REOCs are companies that invest in real estate and whose shares trade on public exchanges. Foreign REIT equivalents are entities located in jurisdictions that have adopted legislation substantially similar to the REIT tax provisions in that they provide for favorable tax treatment for the foreign REIT equivalent and require distributions of income to shareholders.

The Fund has not imposed limitations on the portion of its assets that may be invested in any of the categories outlined above other than Private Real Estate Investment Funds. The Fund, however, will limit its investments in Private Real Estate Investment Funds and any other investments that are excluded from the definition of "investment company" under the 1940 Act by Section 3(c)(1) or Section 3(c)(7) of the 1940 Act to no more than 15% of its net assets (the "15% Limitation"). Such entities are typically private equity funds and hedge funds.

This limitation does not apply to any collateralized loan obligations ("CLOs"), certain of which may rely on Section 3(c)(1) or 3(c)(7) of the 1940 Act. For purposes of compliance with the 15% Limitation, the Fund will not count its direct investments in wholly-owned subsidiaries but will look through such subsidiaries and count their underlying holdings. The Fund may engage in short sales and securities lending.

***Leverage.*** The Fund incurs leverage as part of its investment strategy. There can be no assurance that any leveraging strategy the Fund employs will be successful during any period in which it is employed. The Fund may also invest in Private Real Estate Investment Funds, Public REITs, REOCs and Non-Traded REITs, which may incur higher levels of leverage. Accordingly, the Fund through these investments may be exposed to higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement.

In addition to any indebtedness incurred by the Fund, any subsidiary of the Fund, including the REIT Subsidiaries, may also utilize leverage, including by mortgaging properties held by special purpose vehicles, or by acquiring property with existing debt. Any such borrowings will generally be the sole obligation of each respective special purpose vehicle, without any recourse to any other special purpose vehicle, the REIT Subsidiaries, the Fund or its assets, and the Fund will not treat such non-recourse borrowings as senior securities (as defined in the 1940 Act) for purposes of complying with the 1940 Act's limitations on leverage unless the financial statements of the special purpose vehicle, or the subsidiary of the Fund that owns such special purpose vehicle, will be consolidated in accordance with Regulation S-X and other accounting rules. If cash flow is



insufficient to pay principal and interest on a special purpose vehicle's borrowings, a default could occur, ultimately resulting in foreclosure of any security instrument securing the debt and a complete loss of the investment, which could result in losses to the REIT Subsidiaries and, therefore, to the Fund. To the extent that any subsidiaries of the Fund, including the REIT Subsidiaries, directly incur leverage in the form of debt (as opposed to non-recourse borrowings made through special purpose vehicles), the amount of such recourse leverage used by the Fund and such subsidiaries, including the REIT Subsidiaries, will be consolidated and treated as senior securities for purposes of complying with the 1940 Act's limitations on leverage by the Fund.

***Policies.*** The Fund's Statement of Additional Information ("SAI") contains a list of all of the fundamental and non-fundamental investment policies of the Fund, under the heading "Investment Objective and Policies."

***Actively-Managed Liquid Real Estate Securities***

Fears of broader equity market volatility, and uncertain interest rates has created opportunities in publicly traded REITs. Deceleration in net operating income growth expectations in certain sectors, rising financing costs and tighter lending conditions have made it more difficult for public REITs to grow net asset value or make accretive acquisitions. These changes in investors expectations and the way in which public REITs capitalize their investments

has lead to discounts of public REIT shares compared to the private market values of the real estate in which they own for a number of property sectors. Amidst this backdrop of underlying discount to net asset, the Adviser believes that: (i) opportunities to purchase traded REITs and source public and private debt will remain more attractive than purchasing property directly; and (ii) in the near term, investors seeking exposure to real estate should allocate to defensive, risk-adjusted strategies. Over the near term, the Adviser will seek to actively source and manage these opportunities on behalf of the Fund in such a way as to attempt to maximize risk adjusted yields and total return across a full real estate market cycle.

Because of the large discounts between what properties could be sold for in the private markets versus where they trade in the public markets, the Adviser believes a near term opportunity exists to purchase equity interests in certain property types at inherent discounts to the Adviser's large and sophisticated equity team has decades of expertise in identifying and executing deep value and value type investments. These resources may be utilized by the Fund to identify and profit from dislocations in the public equity REIT markets.

***Actively-Managed Private Real Estate Securities***

Although commercial property prices in select markets have roughly doubled since their 2009 trough, the dislocation (or, mispricing of assets) in the real estate debt markets, which emerged as a by-product of the larger global credit crisis and the ensuing recession, provided opportunities for sophisticated investors as borrowers were being held to stricter lending criteria. The ensuing gap between what lenders are willing to lend and what sponsors are willing to put up in equity capital, is also a byproduct of cyclical patterns and investors' evolving return expectations — leveraged private investors can no longer easily expect to generate mid-to-high teen leveraged internal rates of return to hit or exceed return hurdles that allow sponsors to maximize their promote fees. Thus, the Adviser believes demand for real estate debt and preferred equity financing significantly outweighs the supply of such product, and that this imbalance creates inefficiency and provides the Fund an opportunity for attractive lending opportunities secured or supported by real estate asset values. Please see "Investment Strategy" for a description of the types of preferred equity and mezzanine investments the Fund may make.

The Adviser expects these opportunistic investment opportunities to continue in both the private and public real estate markets, at least for the medium-term, and that the volume of potential deal flow is likely to be very material (based on the experience of the Adviser). In sum, the Fund will seek to allocate capital to each area of the market where dislocation is persisting and in the Adviser's opinion, unwarranted. Additionally, the Adviser believes that as the real estate cycle nears the top of the Expansion phase and begins to enter the Early Downturn



phase, there will be a convergence emerging between capitalization rates of core (high quality properties located in historically strong markets that generally do not require upgrades or renovations) and value add (properties that are high quality but whose value can increase through some event, such as upgrades or renovations) real estate assets that will allow the Fund to selectively and strategically find opportunities to purchase high quality core properties at capitalization rates similar to value add properties.

**Investment Highlights**

***Fully Integrated Platform — One Sponsor.*** The Fund has access to NexPoint and its affiliates' fully integrated commercial finance, investment, management, and servicing platform. The resources available to the investment team provide the capability to pursue complex transactions in an efficient and expeditious manner and should enhance the Fund's ability to engage in "one-off" opportunities due to NexPoint's strong presence in the real estate sector. The investment approach is developed, executed and managed by a seasoned team of professionals that have generated superior returns in real estate investing, all under one platform. As a result, the Adviser is more accountable directly to the Fund and its shareholders by directly managing Fund investments in most cases while charging the Fund a single layer of fees (fees paid to entities managed by an affiliate will be rebated back to the Fund. See "Management of the Fund — Investment Adviser").

***Experienced Investment Team.*** The management team available to the Fund has an extensive history of underwriting, originating, purchasing, and servicing debt secured by commercial real estate and purchasing direct real estate investments. NexPoint and its affiliates invest in various credit and equity strategies through, REITs, DST 1301 exchange, non-traded funds, publicly traded funds, closed-end funds, mutual funds and an ETF, and manages strategies such as direct real estate, real estate credit and originated or structured real estate credit investments. Together with its affiliates, NexPoint had approximately $16.9 billion in assets under management as of December 31, 2024.

***Reduced Exposure to Downturns.*** If the real estate markets deteriorate, the Adviser believes that its strategies should generally reduce the Fund's exposure to market downturns. Through its preferred equity investments and direct real estate strategies (i.e., ownership through wholly-owned REITs), the Adviser believes that it should be able to eliminate the common equity investments in the underlying properties by taking control of the properties and owning the underlying assets at 60-80% of the improved cost, thereby creating a hedge against market downturns. The public debt and equity positions will be subject to market movements.

***Strategy for All Market Cycles.*** The Fund's strategy, as devised by the Adviser, is designed to produce potentially superior total returns, high yields and capital preservation over all market cycles; however, there is no guarantee that the Adviser will produce these results during all market conditions. The Adviser continuously analyzes the real estate markets, both geographically and across each sector, and determines where in the cycle each sector is. Based on this determination, the Adviser allocates capital to sectors and within the capital structure of real estate investments it deems will produce the best investment results. In this way, the Adviser attempts to limit drawdowns by creating a "hedge" when the real estate cycle is in a downturn.

***Unique Market Opportunity for Liquid Real Estate Securities.*** The Adviser believes that the current discounts to underlying net asset values of public REITs presents a unique opportunity for astute real estate investors. Additionally, the low capitalization rate environment and volume of refinancing transactions set to take place in the next few years will potentially allow the Fund to originate credit and preferred equity investments to high quality operators backed by high quality properties. The Fund's investment approach will include fundamental company analysis, with detailed property-level underwriting with particular attention to the management team's capital allocation.

***History as a Fiduciary.*** In addition to making capital decisions to maximize returns for investors, NexPoint fosters a culture of fiduciary responsibility throughout the company. NexPoint has invested substantial sums directly in real estate and real estate credit investments. It has extensive experience in converting debt

investments into equity and working out distressed real estate situations. These capabilities will be utilized for the benefit of the Fund. Members of the Fund's management team also operate: externally managed publicly traded REITs, NexPoint Residential Trust, Inc. ("NXRT"), that manages a portfolio of Class B, value add multifamily properties, and NexPoint Diversified Real Estate Trust ("NXDT"); VineBrook Homes Trust, Inc., an externally managed private REIT that manages a portfolio of single-family housing properties in the Midwest U.S. ("VineBrook"); NexPoint Hospitality Trust, an externally managed publicly traded REIT ("NHT") listed on

the TSX Venture Exchange, that manages a portfolio of hospitality assets located in the U.S; NexPoint Real Estate Finance, Inc., an externally managed publicly traded mortgage REIT ("NREF"); NexPoint Storage Partners, Inc. ("NSP"), an externally managed private REIT that manages a portfolio of self-storage facilities nationwide; and multiple a private REITs which are wholly-owned by closed-end registered investment companies affiliated with the Fund.

***Access to a Large Investment Platform.*** Through NexPoint and its affiliates, the Fund has access to a fully integrated investment platform that, as of December 31, 2024, had acquired more than $16.9 billion across multiple strategies and product types up and down the capital stack, and owned approximately $12.5 billion in gross real estate assets. NexPoint's position in the markets gives it access to unique sourcing opportunities for investments not typically available to retail investors in a registered fund product.

NexPoint is a select sponsor with Freddie Mac and has experience structuring financing solutions behind first mortgage lenders, including banks, life insurance companies, Freddie Mac and the Federal National Mortgage Association, or Fannie Mae, including mezzanine loans and preferred equity investments. NexPoint and its affiliates have successfully tailored financing solutions for property owners in creative and highly symbiotic ways with respect to a typical Freddie Mac or Fannie Mae first mortgage. NexPoint's multifamily loan and investment platform complies with current Freddie Mac and Fannie Mae standards, giving the Fund a unique opportunity to invest alongside quality sponsors and the largest multifamily lenders in the U.S.

**Investment Selection, Diversification and Criteria Used in Selecting Investments**

***Investment Selection.*** The Fund's assets will be primarily public and private debt, equity and preferred equity investments, originated by the Adviser. The Adviser sources investments through its public and private market research and exposure, third party brokerages, current partners and financing intermediaries. The Fund expects that a majority of its private investments will be held in special purpose entities, which may be joint ventures with a third party (whether wholly owned or a joint venture, a "Subpartnership") and managed by the Adviser or an affiliate of the Adviser. Performing debt and preferred equity investments will generally provide current income from periodic interest payments. There can be no assurance that any or all of the Fund's investment strategies will be successful.

The Adviser will utilize its in-house experience and third party experts to continuously analyze the real estate markets to determine the point at which the real estate cycle is at any given moment. The Adviser cannot provide any assurance that its assessments of when real estate sectors are at the top or bottom will be correct or that it will accurately assess when the real estate cycle is moving between different phases. However, the Adviser believes that NexPoint's position in various investment markets, its high quality investment staff, its access to third party research and other experts gives it an educated view on the real estate market.

***Financing Strategy.*** The Adviser may elect in the future for the Fund to obtain one or more credit facilities with financial institutions, which may be secured by the Fund's investments. The intent of these borrowings will be to generate positive returns in excess of the costs associated with such borrowings. In addition, or alternatively, the Adviser may seek to leverage investments on a case-by-case basis. The Fund is authorized to borrow money in connection with its investment activities, subject to the limits of the asset coverage requirement of the 1940 Act. The Fund also may borrow money to satisfy repurchase requests from Fund shareholders and to otherwise provide the Fund with temporary liquidity. The 1940 Act requires a registered investment company to satisfy an

asset coverage requirement of 300% of its indebtedness, including amounts borrowed, and measured at the time indebtedness occurs. This means that the value of the Fund's total indebtedness may not exceed one-third of the value of its total assets, including the value of the assets purchased with the proceeds of its indebtedness. Private and Public Real Estate Investment Funds, REITs and REOCs may utilize leverage in their investment activities. However, such entities' borrowings are not subject to the asset coverage requirement of the Fund. Accordingly, the Fund, through its investments in such entities, may be exposed to the risk of leveraged investment programs.

There can be no assurance that any or all of the Fund's investment strategies will be successful. See "Principal Risks of the Fund — Leverage Risk" in the Prospectus for a brief description of the Fund's Repurchase Agreement with Mizuho.

***Diversification of Asset Managers.*** On occasion, and when investing in private debt and/or equity, the Fund may identify and invest side-by-side with one or more unaffiliated asset managers in investment opportunities sourced by such manager with expertise in managing portfolios of real estate. Using information generally available to investors, the Adviser will evaluate asset managers based on their experience, track record, current portfolios, and ability to weather real estate cycles by employing effective risk management and mitigation strategies.

***Other Information Regarding Investment Strategy.*** The Fund may, from time to time, take defensive positions that are inconsistent with the Fund's principal investment strategy in attempting to respond to adverse market, economic, political or other conditions. During such times, the Adviser may determine that the Fund should invest up to 100% of its assets in cash or cash equivalents, consisting of money market instruments, prime commercial paper, repurchase agreements, Treasury bills and other short-term obligations of the U.S. Government, its agencies or instrumentalities. In these and in other cases, the Fund may not achieve its investment objective. The Adviser may invest the Fund's cash balances in any investments it deems appropriate. The Adviser expects that such investments will be made, without limitation and as permitted under the 1940 Act, in money market funds, repurchase agreements, U.S. Treasury and U.S. agency securities, municipal bonds and bank accounts. Any income earned from such investments is ordinarily reinvested by the Fund in accordance with its investment program. Many of the considerations entering into recommendations and decisions of the Adviser and the Fund's portfolio managers are subjective.

The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025.

The Fund has no intent to use leverage through the issuance of preferred shares during the next twelve months. However, the Board may decide to issue preferred shares in the future, subject to the asset coverage requirements of the 1940 Act, which generally require that a fund have asset coverage of at least 300% of the issue size. The Fund may borrow for investment purposes, for temporary liquidity, or to finance repurchases of its shares, as permitted under the 1940 Act. In addition, the Fund may be deemed to incur economic leverage embedded in instruments in which it may invest.

The frequency and amount of portfolio purchases and sales (known as the "portfolio turnover rate") will vary from year to year. It is anticipated that the Fund's portfolio turnover rate will ordinarily be between 25% and 75%. The portfolio turnover rate is not expected to exceed 100%, but may vary greatly from year to year and will not be a limiting factor when the Adviser deems portfolio changes appropriate. Although the Fund generally does not intend to trade for short-term profits, the Fund may engage in short-term trading strategies, and securities may be sold without regard to the length of time held when, in the opinion of the Adviser, investment considerations warrant such action. These policies may have the effect of increasing the annual rate of portfolio turnover of the Fund. Higher rates of portfolio turnover would likely result in higher brokerage commissions and may generate short-term capital gains taxable as ordinary income. If securities are not held for certain applicable holding periods, dividends paid on them will not qualify for the advantageous federal tax rates applicable to

"qualified dividend income" under the Internal Revenue Code of 1986, as amended (the "Code"). For the fiscal year ended December 31, 2024, the Fund's portfolio turnover rate was 13%. There is no assurance what portion, if any, of the Fund's distributions will qualify to be treated as "qualified dividend income" under the Code and thus taxable to individual shareholders at the rate applicable to long-term capital gain. See "U.S. Federal Income Tax Matters."

**Portfolio Investments**

The Fund may invest in the following types of securities, subject to certain limitations as set forth below. The Fund is under no obligation to invest in any of these securities:

***Mortgage-Backed Securities.*** The Fund may invest in mortgage-backed securities. Common examples of mortgage-backed securities include CMBS and RMBS. Mortgage-backed securities differ from conventional debt securities because principal is paid back over the life of the security rather than at maturity. The Fund may receive unscheduled prepayments of principal before the security's maturity date due to voluntary prepayments, refinancings, or foreclosures on the underlying mortgage loans. To the Fund this means a loss of anticipated interest and a portion of its principal investment represented by any premium the Fund may have paid. Mortgage prepayments generally increase when interest rates fall. Collateralized Mortgage Obligations ("CMOs") are obligations fully collateralized by a portfolio of mortgages or mortgage-related securities. Payments of principal and interest on the mortgages are passed through to the holders of the CMOs on the same schedule as they are received, although certain classes of CMOs have priority over others with respect to the receipt of prepayments on the mortgages. Therefore, depending on the type of CMOs in which the Fund invests, the investment may be subject to a greater or lesser risk of prepayment than other types of mortgage-related securities.

Mortgage-backed securities also are subject to extension risk, which is when rising interest rates can cause mortgage-backed security's average maturity to lengthen unexpectedly due to a drop in mortgage prepayments. This will increase a mortgage-backed security's sensitivity to rising interest rates and its potential for price declines.

CMBS are a type of mortgage-backed security that is secured by a single commercial mortgage loan or a pool of commercial real estate loans. Like all mortgage-backed securities, CMBS are subject to all of the risks of the underlying mortgage loans. Because they are not standardized, CMBS can be difficult to value. Commercial real estate loans are secured by multifamily or commercial property and are subject to risks of delinquency and foreclosure. The ability of a borrower to repay a loan secured by an income-producing property typically is dependent primarily upon the successful operation of such property rather than upon the existence of independent income or assets of the borrower. If the net operating income of the property is reduced, the borrower's ability to repay the loan may be impaired. Net operating income of an income-producing property can be affected by, among other things: tenant mix, success of tenant businesses, property management decisions, property location and condition, competition from comparable types of properties, changes in laws that increase operating expenses or limit rents that may be charged, any need to address environmental contamination at the property, the occurrence of any uninsured casualty at the property, changes in national, regional or local economic conditions and/or specific industry segments, declines in regional or local real estate values, declines in regional or local rental or occupancy rates, increases in interest rates, real estate tax rates and other operating expenses, and changes in governmental rules, regulations and fiscal policies, including environmental legislation, natural disasters, terrorism, social unrest and civil disturbances.

RMBS are a type of mortgage-backed security that is backed by mortgages on residential real estate. Credit-related risk on RMBS arises from losses due to delinquencies and defaults by the borrowers in payments on the underlying mortgage loans and breaches by originators and servicers of their obligations under the underlying documentation pursuant to which the RMBS are issued. The rate of delinquencies and defaults on residential mortgage loans and the aggregate amount of the resulting losses will be affected by a number of factors, including general economic conditions, particularly those in the area where the related mortgaged property is located, the level of the borrower's equity in the mortgaged property and the individual financial circumstances of the borrower. If a residential

mortgage loan is in default, foreclosure on the related residential property may be a lengthy and difficult process involving significant legal and other expenses. The net proceeds obtained by the holder on a residential mortgage loan following the foreclosure on the related property may be less than the total amount that remains due on the loan. The prospect of incurring a loss upon the foreclosure of the related property may lead the holder of the residential mortgage loan to restructure the residential mortgage loan or otherwise delay the foreclosure process.

The Fund may also invest in the residual or equity tranches of CMBS, which are referred to as subordinate CMBS and interest-only CMBS. Subordinate CMBSs are paid interest only to the extent that there are funds available to make payments. To the extent the collateral pool includes a large percentage of delinquent loans, there is a risk that interest payment on subordinate CMBSs will not be fully paid. There are multiple tranches of CMBS, offering investors various maturity and credit risk characteristics. Tranches are categorized as senior, mezzanine, and subordinated/equity, according to their degree of risk. The most senior tranche of a CMBS has the greatest collateralization and pays the lowest interest rate. If there are defaults or the collateral otherwise underperforms, scheduled payments to senior tranches take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. Lower tranches represent lower degrees of credit quality and pay higher interest rates intended to compensate for the attendant risks. The return on the lower tranches is especially sensitive to the rate of defaults in the collateral pool. The lowest tranche (i.e. the “equity” or “residual” tranche) specifically receives the residual interest payments (i.e., money that is left over after the higher tranches have been paid and expenses of the issuing entities have been paid) rather than a fixed interest rate. The Fund expects its investments in subordinate CMBSs will be subject to risks arising from delinquencies and foreclosures, thereby exposing the Fund’s investment portfolio to potential losses. Subordinate securities of CMBSs are also subject to greater credit risk than those CMBSs that are more highly rated. The Fund also may invest in interest-only multifamily CMBS issued by multifamily mortgage loan securitizations. However, these interest-only multifamily CMBS typically only receive payments of interest to the extent that there are funds available in the securitization to make the payment and may introduce increased risks since these securities have no underlying principal cash flows.

In the event of any default under a mortgage loan held by the Fund, the Fund will bear a risk of loss of principal to the extent of any deficiency between the value of the collateral and the principal and accrued interest of the mortgage loan. Foreclosure of a mortgage loan can be an expensive and lengthy process that could have a substantial negative effect on anticipated returns on the foreclosed mortgage loan.

If the Fund makes or invests in mortgage loans and there are defaults under those mortgage loans, the Fund may not be able to repossess and sell the underlying properties in a timely manner. The resulting time delay could reduce the value of the investment in the defaulted mortgage loans.

Investments in commercial real estate loans are subject to changes in credit spreads. When credit spreads widen, the economic value of such investments decrease. Even though a loan may be performing in accordance with its loan agreement and the underlying collateral has not changed, the economic value of the loan may be negatively impacted by the incremental interest foregone from the widened credit spread.

The value of mortgage-backed securities may change due to shifts in the market’s perception of issuers and regulatory or tax changes adversely affecting the mortgage securities market as a whole. Mortgage-backed securities are also subject to several risks created through the securitization process. Subordinate mortgage-backed securities are paid interest only to the extent that there are funds available to make payments. To the extent the collateral pool includes delinquent loans, there is a risk that the interest payment on subordinate mortgage-backed securities will not be fully paid. Subordinate mortgage-backed securities are also subject to greater credit risk than those mortgage-backed securities that are more highly rated.

Case 3:26-cv-02496-D Document 17-30 Filed 09/08/26 Page 236 of 608 PageID 12387

***Real Estate Investment Trusts (REITs).***

The Fund intends to invest in public (including non-traded REITs) and private REITs. When investing in private or non-traded REITs, the investments will be primarily in REITs wholly-owned by the Fund and managed by an affiliate or in REITs not wholly-owned by the Fund but managed by an affiliate. REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests. REITs are subject to risks similar to those associated with direct ownership of real estate (including loss to casualty or condemnation, increases in property taxes and operating expenses, zoning law amendments, changes in interest rates, overbuilding and increased competition, variations in market value, adverse changes in the real estate

markets generally or in specific sectors of the real estate industry and possible environmental liabilities), as well as additional risks discussed below.

REITs are generally classified as equity REITs, mortgage REITs or a combination of equity and mortgage REITs. Equity REITs invest the majority of their assets directly in real property and derive income primarily from the collection of rents. Equity REITs can also realize capital gains by selling properties that have appreciated in value. Mortgage REITs invest the majority of their assets in real estate mortgages and derive income from the collection of interest payments. REITs are not taxed on income distributed to shareholders provided they comply with the applicable requirements of the Code. The Fund will indirectly bear its proportionate share of any management and other expenses paid by REITs in which it invests in addition to the expenses paid by the Fund. Debt securities issued by REITs are, for the most part, general and unsecured obligations and are subject to risks associated with REITs.

Investing in REITs involves certain unique risks in addition to those risks associated with investing in the real estate industry in general. An equity REIT may be affected by changes in the value of the underlying properties owned by the REIT. A mortgage REIT may be affected by changes in interest rates and the ability of the issuers of its portfolio mortgages to repay their obligations. REITs are dependent upon the skills of their managers and are not diversified. REITs are generally dependent upon maintaining cash flows to repay borrowings and to make distributions to shareholders and are subject to the risk of default by lessees or borrowers. REITs whose underlying assets are concentrated in properties used by a particular industry, such as health care, are also subject to risks associated with such industry. REITs are often leveraged or invest in properties that are themselves leveraged, exposing them to the risks of leverage generally. Among other things, leverage will generally increase losses during periods of real estate market declines.

REITs (especially mortgage REITs) are also subject to interest rate risks. When interest rates decline, the value of a REIT’s investment in fixed rate obligations can be expected to rise. Conversely, when interest rates rise, the value of a REIT’s investment in fixed rate obligations can be expected to decline. If the REIT invests in adjustable rate mortgage loans the interest rates on which are reset periodically, yields on a REIT’s investments in such loans will gradually align themselves to reflect changes in market interest rates. This causes the value of such investments to fluctuate less dramatically in response to interest rate fluctuations than would investments in fixed rate obligations.

REITs may have limited financial resources, may trade less frequently and in a more limited volume and may be subject to more abrupt or erratic price movements than larger company securities.

The Fund’s strategy for investing in publicly traded REITs is to take advantage of situations where the REIT is trading at a discount to the fair value of the REITs underlying properties as determined by the Adviser as well as gaining exposure to certain real estate sectors with an element of liquidity. The Fund may also invest in publicly traded REITs that are commonly referred to as “mortgage REITs” that invest in various debt investments collateralized or secured by real estate. The Fund will invest in publicly traded mortgage REITs to gain exposure to real estate credit investments that are trading at a discount to inherent value of the underlying debt, as determined by the Adviser.

Effective for taxable years beginning after December 31, 2017 and before January 1, 2026, the Code generally allows individuals and certain other non-corporate entities a deduction for 20% of qualified REIT dividends. Regulations allow a RIC to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met. As a result, a shareholder in the Fund will be eligible to receive the benefit of the same 20% deduction with respect to qualified REIT dividends included in Fund distributions that is available to direct investors in REITs.

Dividends paid by REITs will generally not qualify for the reduced federal income tax rates applicable to qualified dividends under the Code. See "U.S. Federal Income Tax Matters."

***Closed-End Funds.***

The Fund may invest its assets in "closed-end" investment companies (or "closed-end funds") that invest, directly or indirectly, in real estate, especially where discounts to net asset values are present. A core strategy of the Fund is to take advantage of dislocations in various markets, as determined by the Adviser, where the Adviser believes a near-term catalyst exists for the discount to narrow.

The Fund generally will purchase shares of closed-end funds in the secondary market. The Fund will incur normal brokerage costs on such purchases similar to the expenses the Fund would incur for the purchase of securities of any other type of issuer in the secondary market. The Fund may, however, also purchase securities of a closed-end fund in an initial public offering when, in the opinion of the Adviser, based on a consideration of the nature of the closed-end fund's proposed investments, the prevailing market conditions and the level of demand for such securities, they represent an attractive opportunity for growth of capital. The initial offering price typically will include a dealer spread paid to the underwriter, which may be higher than the applicable brokerage cost if the Fund purchased such securities in the secondary market.

***Private Real Estate Investment Funds and Public Investment Funds.***

Although the Fund does not anticipate investing a large percentage of the Fund's capital in unaffiliated Private Real Estate Investment Funds, the Adviser may allocate capital to these investments on an opportunistic basis. The Fund will limit its investments in Private Real Estate Investment Funds and any other investments that are excluded from the definition of "investment company" under the 1940 Act by Section 3(c)(1) or Section 3(c)(7) of the 1940 Act to no more than 15% of its net assets (the "15% Limitation"). Such entities are typically private equity funds and hedge funds. For purposes of compliance with the 15% Limitation, the Fund will not count its direct investments in wholly-owned subsidiaries but will look through such subsidiaries and count their underlying holdings. The Fund may also invest in Public Investment Funds that are trading at discounts to net asset values. Private Real Estate Investment Funds and Public Investment Funds may employ a wide variety of investment strategies, including:

- *Diversified Equities.* A long/short investment strategy of investing in equity, equity-related and other securities.
- *Debt and Equity Opportunities.* A long/short investment strategy in corporate debt and equity securities of leveraged companies and financially distressed firms and other investments.
- *Credit Opportunities.* A long/short investment strategy in corporate debt and equity securities to capture credit opportunities in all market environments.
- *Structured Credit.* A long/short investment strategy in structured mortgage-backed securities.
- *Managed Futures.* A strategy that generates returns from convergent and divergent trends in the financial and currency futures markets.

***Real Estate Operating Companies.***

The Fund intends to invest in REOCs. REOCs are companies that invest in real estate and whose shares trade on public exchanges. The market value of REOC shares and the ability of REOCs to distribute income may be adversely affected by the same factors as those described above for REITs. However, REOCs differ from REITs in that dividends received by REOC shareholders are taxed similar to dividends of a standard corporation, REOCs have less investment limitations and investments can be funded with internally generated funds without penalty (i.e., forfeiting tax advantages), and REOCs do not need to hire outside management for certain assets such as hotels.

***Repurchase Agreements.***

The Fund may invest up to 33 1/3% of its assets in repurchase agreements. It may enter into repurchase agreements with broker-dealers, member banks of the Federal Reserve System and other financial institutions.

Repurchase agreements are loans or arrangements under which the Fund purchases securities and the seller agrees to repurchase the securities within a specific time and at a specific price. The repurchase price is generally higher than the Fund's purchase price, with the difference being income to the Fund. Under the direction of the Board, the Adviser reviews and monitors the creditworthiness of any institution which enters into a repurchase agreement with the Fund. The counterparty's obligations under the repurchase agreement are collateralized with U.S. Treasury and/or agency obligations with a market value of not less than 100% of the obligations, valued daily. Collateral is held by the Fund's custodian in a segregated, safekeeping account for the benefit of the Fund. Repurchase agreements afford the Fund an opportunity to earn income on temporarily available cash at relatively low risk. In the event of commencement of bankruptcy or insolvency proceedings with respect to the seller of the security before repurchase of the security under a repurchase agreement, the Fund may encounter delay and incur costs before being able to sell the security. Such a delay may involve loss of interest or a decline in price of the security. If the court characterizes the transaction as a loan and the Fund has not perfected a security interest in the security, the Fund may be required to return the security to the seller's estate and be treated as an unsecured creditor of the seller. As an unsecured creditor, the Fund would be at risk of losing some or all of the principal and interest involved in the transaction.

***Reverse Repurchase Agreements.***

A reverse repurchase agreement is an investment technique under which the Fund sells an underlying debt security and simultaneously obtains the commitment of the purchaser (generally, a commercial bank or a broker or dealer) to sell the security back to the Fund at an agreed upon price on an agreed upon date. The repurchase price is generally higher than the Fund's sale price. Reverse repurchase agreements could involve certain risks in the event of default or insolvency of the other party, including possible delays or restrictions upon the Fund's ability to dispose of the underlying securities. An additional risk is that the market value of securities sold by the Fund under a reverse repurchase agreement could decline below the price at which the Fund is obligated to repurchase them. Reverse repurchase agreements will be considered borrowings by the Fund and as such would be subject to any restrictions on borrowing.

Reverse repurchase agreements are also generally subject to earmarking and coverage requirements, with the result that the Fund will designate on its books and records on an ongoing basis cash, U.S. government securities, or other liquid securities in an amount at least equal to the Fund's obligations under the reverse repurchase agreement.

***Exchange Traded Funds ("ETFs").***

Subject to the limitations on investment in other investment companies, the Fund may invest its assets in ETFs that invest primarily in real estate markets where investing directly would be cost prohibitive to the Fund or

inefficient. ETFs, such as SPDRs, NASDAQ 100 Index Trading Stock (QQQs), iShares and various country index funds, are funds whose shares are traded on a national securities exchange or the National Association of Securities Dealers' Automatic Quotation System (NASDAQ). Certain ETFs focus on the real estate sector and provide investors an opportunity to gain exposure to these sectors of the market. ETFs may be based on underlying equity or fixed income securities. SPDRs, for example, seek to provide investment results that generally correspond to the performance of the component common stocks of the S&P 500. ETFs do not sell individual shares directly to investors and only issue their shares in large blocks known as "creation baskets." The investor purchasing a creation basket may sell the individual shares on a secondary market. Therefore, the liquidity of ETFs depends on the adequacy of the secondary market. An ETF's investment objective may not be achieved. ETFs based on an index may not replicate and maintain exactly the composition and relative weightings of securities in the index, and for these and other reasons the returns of an ETF may diverge significantly from the index which it is designed to track. ETFs are subject to the risks of investing in the underlying securities. The Fund, as a holder of the securities of an ETF, will bear its pro rata portion of the ETF's expenses, including advisory fees. These expenses are in addition to the direct expenses of the Fund's own operations. The underlying indices that an ETF is designed to track may also experience volatility due to disruptive events, such as natural disasters, pandemic or epidemics or other widespread health crises. Any such impact could adversely affect the Fund's performance and may lead to losses on your investment in the Fund.

**RISK FACTORS**

An investment in the Fund's shares is subject to risks. The value of the Fund's investments will increase or decrease based on changes in the prices of the investments it holds. This will cause the value of the Fund's shares to increase or decrease. You could lose money by investing in the Fund. By itself, the Fund does not constitute a complete investment program. Before investing in the Fund you should consider carefully the following risks the Fund faces through its direct investments in real estate-related securities. The risks set out below are not the only risks the Fund faces, but they are the principal risks associated with an investment in the Fund as well as generally associated with investment in a fund with investment objectives, investment policies, capital structure or trading markets similar to the Fund's. Additional risks and uncertainties not currently known to the Fund or that are currently immaterial also may materially adversely affect the Fund's business, financial condition and/or operating results. If any of the following events occur, the Fund's business, financial condition and results of operations could be materially adversely affected.

***Substantial Conflicts of Interest.*** The Adviser and/or its general partner, limited partners, officers, affiliates and employees provide investment advice to other parties and manage other accounts and private investment vehicles similar to the Fund. For the purposes of this section, the term "NexPoint" shall include the Adviser and its affiliated investment advisors, and all affiliates listed on its Form ADV, as filed with the SEC March 28, 2025 (CRD No. 163564). In connection with such other investment management activities, the Adviser and/or its general partner, limited partners, officers, affiliates and employees may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Fund's monies, in a particular security or strategy. In addition, the Adviser and such other persons will determine the allocation of funds from the Fund and such other accounts to investment strategies and techniques on whatever basis they consider appropriate or desirable in their sole and absolute discretion.

NexPoint has built a professional working environment, a firm-wide compliance culture and compliance procedures and systems designed to protect against potential incentives that may favor one account over another. NexPoint has adopted policies and procedures that address the allocation of investment opportunities, execution of portfolio transactions, personal trading by employees and other potential conflicts of interest that are designed to ensure that all client accounts are treated equitably over time. Nevertheless, NexPoint furnishes advisory services to numerous clients in addition to the Fund, and NexPoint may, consistent with applicable law, make investment recommendations to other clients or accounts (including accounts that have performance or higher fees paid to NexPoint or in which portfolio managers have a personal interest in the receipt of such fees) that may be the same as or different from those made to the Fund. In addition, NexPoint, its affiliates and any of their partners, directors, officers, stockholders or employees may or may not have an interest in the securities whose purchase and sale the Adviser recommends to the Fund. Actions with respect to securities of the same kind may be the same as or different from the action that the Adviser, or any of its affiliates, or any of their partners, directors, officers, stockholders or employees or any member of their families may take with respect to the same securities. Moreover, the Adviser may refrain from rendering any advice or services concerning securities of companies of which any of the Adviser's (or its affiliates') partners, directors, officers or employees are directors or officers, or companies as to which the Adviser or any of its affiliates or partners, directors, officers and employees of any of them has any substantial economic interest or possesses material non-public information.

The Adviser, its affiliates or their partners, directors, officers or employees similarly serve or may serve other entities that operate in the same or related lines of business, including accounts managed by an investment adviser affiliated with the Adviser. Accordingly, these individuals may have obligations to investors in those entities or funds or to other clients, the fulfillment of which might not be in the best interests of the Fund. As a result, the Adviser will face conflicts in the allocation of investment opportunities to the Fund and other funds and clients. In order to enable such affiliates to fulfill their fiduciary duties to each of the clients for which they have responsibility, the Adviser will endeavor to allocate investment opportunities in a fair and equitable manner, pursuant to policies and procedures adopted by the Adviser and its advisory affiliates that are designed to manage potential conflicts of interest, which may, subject to applicable regulatory constraints, involve pro rata



co-investment by the Fund and such other clients or may involve a rotation of opportunities among the Fund and such other clients. The Fund will only make investments in which the Adviser or an affiliate hold an interest to the extent permitted under the 1940 Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Adviser and certain funds affiliated with the Fund, dated April 19, 2016. For example, exemptive relief is not required for the Fund to invest in syndicated deals and secondary loan market transactions in which the Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," including future closed-end investment companies registered under the 1940 Act that are managed by the Adviser, which includes the Fund. The Fund, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order. To mitigate any actual or perceived conflicts of interest, allocation of limited offering securities (such as IPOs and registered secondary offerings) to principal accounts that do not include third party investors may only be made after all other client account orders for the security have been filled. However, there can be no assurance that such policies and procedures will in every case ensure fair and equitable allocations of investment opportunities, particularly when considered in hindsight.

Conflicts may arise in cases when clients and/or the Adviser and other affiliated entities invest in different parts of an issuer's capital structure, including circumstances in which one or more clients own private securities or obligations of an issuer and other clients may own public securities of the same issuer. In addition, one or more clients may invest in securities, or other financial instruments, of an issuer that are senior or junior to securities, or financial instruments, of the same issuer that are held by or acquired for, one or more other clients. For example, if such issuer encounters financial problems, decisions related to such securities (such as over the terms of any workout or proposed waivers and amendments to debt covenants) may raise conflicts of interests. In such a distressed situation, a client holding debt securities of the issuer may be better served by a liquidation of the issuer in which it may be paid in full, whereas a client holding equity securities of the issuer might prefer a reorganization that holds the potential to create value for the equity holders. In the event of conflicting interests within an issuer's capital structure, NexPoint will generally pursue the strategy that NexPoint believes best reflects what would be expected to be negotiated in an arm's length transaction, but in all instances with due consideration being given to NexPoint's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or fees received from such accounts). This strategy may be recommended by one or more NexPoint investment professionals. A single person may make decisions with respect to more than one part of an issuer's capital structure. NexPoint personnel board members may still make recommendations to the applicable investment professional(s). A portfolio manager with respect to any applicable NexPoint registered investment company clients ("Retail Accounts") will make an independent determination as to which course of action he or she determines is in the best interest of the applicable Retail Accounts. NexPoint may use external counsel for guidance and assistance. The Adviser and its affiliates have both subjective and objective procedures and policies in place designed to manage potential conflicts of interest involving clients so that, for example, investment opportunities are allocated in a fair and equitable manner among the Fund and such other clients. An investment opportunity that is suitable for multiple clients of the Adviser and its affiliates may not be capable of being shared among some or all of such clients due to the limited scale of the opportunity or other factors, including regulatory restrictions imposed by the 1940 Act. There can be no assurance that the Adviser's or its affiliates' efforts to allocate any particular investment opportunity fairly among all clients for whom such opportunity is appropriate will result in an allocation of all or part of such opportunity to the Fund. Not all conflicts of interest can be expected to be resolved in favor of the Fund.

Another type of conflict may arise if one client account buys a security and another client sells or shorts the same security. Currently, such opposing positions are generally not permitted within the same account without prior trade approval by the Adviser's Chief Compliance Officer. However, a portfolio manager may enter into opposing positions for different clients to the extent each such client has a different investment objective and each such position is consistent with the investment objective of the applicable client. In addition, transactions in investments by one or more affiliated client accounts may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other client accounts.



Because certain client accounts may have investment objectives, strategies or legal, contractual, tax or other requirements that differ (such as the need to take tax losses, realize profits, raise cash, diversification, etc.), an affiliated adviser may purchase, sell or continue to hold securities for certain client accounts contrary to other recommendations. In addition, an affiliated adviser may be permitted to sell securities or instruments short for certain client accounts and may not be permitted to do so for other affiliated client accounts.

As a result of the Fund's arrangements with NexPoint, there may be times when NexPoint, the Adviser or their affiliates have interests that differ from those of the Fund's shareholders, giving rise to a conflict of interest. NexPoint and the Adviser are under common ownership, and the Fund's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund does, or of investment funds managed by the Adviser or its affiliates. Similarly, the Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. For example, the Fund's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Adviser and its affiliates. The Fund's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles. As a result, those individuals may face conflicts in the allocation of investment opportunities among the Fund and other investment funds or accounts advised by or affiliated with the Adviser. The Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is

fair and equitable over time and consistent with its allocation policy. However, the Fund can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time.

In addition, it is anticipated that a significant portion of the Fund's assets will be represented by securities sponsored, organized and/or managed by NexPoint and its affiliates, which may include REITs, asset-backed securities and/or structured finance securities. The Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Fund with an opportunity to periodically review the Fund's investments in such REITs, asset-backed securities and/or structured finance securities and assure themselves that continued investment in such securities remains in the best interests of the Fund and its shareholders. The Adviser may effect client cross-transactions where it causes a transaction to be effected between the Fund and another client advised by the Adviser or any of its affiliates. The Adviser may engage in a client cross-transaction involving the Fund any time that the Adviser believes such transaction to be fair to the Fund and the other client of the Adviser or its affiliates.

The Adviser may direct the Fund to acquire or dispose of investments in cross trades between the Fund and other clients of the Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the 1940 Act and SEC staff interpretations, the Fund may make and/or hold an investment, including an investment in securities, in which the Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Adviser's own investments in such companies.

***Closed-End Fund ("CEF") Risk.*** The Fund is a CEF. CEFs differ from open-end management investment companies (commonly referred to as mutual funds) in that CEFs may list their shares for trading on a securities exchange and do not redeem their shares at the option of the shareholder. By comparison, mutual funds issue securities redeemable at net asset value at the option of the shareholder and typically engage in a continuous offering of their shares. Mutual funds are subject to continuous asset in-flows and out-flows that can complicate portfolio management, whereas CEFs generally can stay more fully invested in securities consistent with the CEF's investment objective and policies. In addition, in comparison to open-end funds, CEFs have greater flexibility in their ability to make certain types of investments, including investments in illiquid securities.

***Debt Securities Risk.*** When the Fund invests in debt securities, the value of your investment in the Fund will fluctuate with changes in interest rates. Typically, a rise in interest rates causes a decline in the value of debt



securities. In general, the market price of debt securities with longer maturities will increase or decrease more in response to changes in interest rates than shorter-term securities. Other risk factors include credit risk (the debtor may default) and prepayment risk (the debtor may pay its obligation early, reducing the amount of interest payments). These risks could affect the value of a particular investment, possibly causing the Fund's share price and total return to be reduced or fluctuate more than other types of investments. The kind of market risk is generally greater for funds investing in debt securities with longer maturities. In the course of investing in such investments, we may come into possession of material nonpublic information and, because of prohibitions on trading in securities of issuers while in possession of such information, we may be unable to enter into a transaction in a publicly-traded security for that issuer when it would otherwise be advantageous for us to do so. Alternatively, we may choose not to receive material nonpublic information about an issuer of such loans, with the result that we may have less information about such issuers than other investors who transact in such assets.

***Structured Finance Securities Risk.*** A portion of the Fund's investments may consist of collateralized mortgage obligations, collateralized bond obligations, collateralized loan obligations or similar instruments. Such structured finance securities are generally backed by an asset or a pool of assets, which serve as collateral. Depending on the type of security, the collateral may take the form of a portfolio of mortgage loans or bonds or other assets. The Fund and other investors in structured finance securities ultimately bear the credit risk of the underlying collateral. In some instances, the structured finance securities are issued in multiple tranches, offering investors various maturity and credit risk characteristics, often categorized as senior, mezzanine and subordinated/equity according to their degree of risk. The riskiest securities are the equity tranche, which bears the bulk of defaults from the bonds or loans serving as collateral, and thus may protect the other, more senior tranches from default. If there are defaults or the relevant collateral otherwise underperforms, scheduled payments to senior tranches of such securities take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. A senior tranche typically has higher ratings and lower yields than the underlying securities, and may be rated investment grade. Despite the protection from the equity tranche, other tranches can experience substantial losses due to actual defaults, increased sensitivity to defaults due to previous defaults and the disappearance of protecting tranches, market anticipation of defaults and aversion to certain structured finance securities as a class.

***Non-Payment Risk.*** Debt securities are subject to the risk of non-payment of scheduled interest and/or principal. Nonpayment would result in a reduction of income to the Fund, a reduction in the value of the security experiencing nonpayment and a potential decrease in the net asset value ("NAV") of the Fund. There can be no assurance that the liquidation of any collateral would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that such collateral could be readily liquidated. Moreover, as a practical matter, most borrowers cannot satisfy their debts by selling their assets. Borrowers pay their debts from the cash flow they generate. This is particularly the case for borrowers that are highly leveraged. If the borrower's cash flow is insufficient to pay its debts as they come due, the borrower is far more likely to seek to restructure its debts than it is to sell off assets to pay its debts. Borrowers may try to restructure their debts either by seeking protection from creditors under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") or negotiating a work out. In the event of bankruptcy of a borrower, the Fund could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing a debt security. The agent generally is responsible for determining that the lenders have obtained a perfected security interest in the collateral securing the debt security. If a borrower files for protection from creditors under Chapter 11 of the Bankruptcy Code, the Bankruptcy Code will impose an automatic stay that prohibits the agent from liquidating collateral. The agent may ask the bankruptcy court to lift the stay. As a practical matter, the court is unlikely to lift the stay if it concludes that the borrower has a chance to emerge from the reorganization proceedings and the collateral is likely to hold most of its value. If the lenders have a perfected security interest, the debt security will be treated as a separate class in the reorganization proceedings and will retain a priority interest in the collateral. Chapter 11 reorganization plans typically are the product of negotiation among the borrower and the various creditor classes. Successful negotiations may require the lenders to extend the time for repayment, change the interest rate or accept some consideration in the form of junior debt or equity securities. A work out outside of bankruptcy may produce similar concessions by senior lenders.

***Distribution Policy Risk.*** The Fund's distribution policy may, under certain circumstances, have certain adverse consequences to the Fund and its shareholders because it may result in a return of capital resulting in less of a shareholder's assets being invested in the Fund and, over time, increase the Fund's expense ratio. A return of capital may also reduce a shareholder's tax basis, resulting in higher taxes when the shareholder sells his or her shares, and may cause a shareholder to pay taxes even if he or she sells such shares for less than the original purchase price. The distribution policy also may cause the Fund to sell a security at a time it would not otherwise do so in order to manage the distribution of income and gain. The initial distribution will be declared on a date determined by the Board. If the Fund's investments are delayed, the initial distribution may consist principally of a return of capital. Pending the investment of the net proceeds in accordance with the Fund's investment objective and policies, all or a portion of the Fund's distributions may consist of a return of capital (i.e. from your original investment). Shareholders should not assume that the source of a distribution from the Fund is net profit. Shareholders should note that return of capital will reduce the tax basis of their shares (but not below zero) and potentially increase the taxable gain, if any, or decrease any loss recognized for tax purposes upon disposition of their shares.

***Illiquid and Restricted Securities.*** The Fund may not be able to readily dispose of illiquid securities at prices that approximate those at which the Fund could sell such securities if they were more widely traded and, as a result of such illiquidity, the Fund may have to sell other investments or engage in borrowing transactions if necessary to raise cash to meet its obligations.

The Fund may purchase certain securities ("Rule 144A Securities") eligible for resale to qualified institutional buyers as contemplated by Rule 144A under the Securities Act. Rule 144A provides an exemption from the registration requirements of the Securities Act for the resale of certain restricted securities to certain qualified institutional buyers. One effect of Rule 144A is that certain restricted securities may be considered liquid, though no assurance can be given that a liquid market for Rule 144A Securities will develop or be maintained. However, where a substantial market of qualified institutional buyers has developed for certain unregistered securities purchased by the Fund pursuant to Rule 144A under the Securities Act, the Fund intends to treat such securities as liquid securities in accordance with procedures approved by the Board. Because it is not possible to predict with assurance how the market for Rule 144A Securities will develop, the Board has directed the Adviser to monitor carefully the Fund's investments in such securities with particular regard to trading activity, availability of reliable price information and other relevant information. To the extent that, for a period of time, qualified institutional buyers cease purchasing restricted securities pursuant to Rule 144A, the Fund's investments in such securities may have the effect of increasing the level of illiquidity in its investment portfolio during such period.

***Management Fee Risk.*** The management fee paid to the Adviser is based on the Fund's Daily Gross Assets, as defined in the Investment Advisory Agreement. As a result, investors in the Fund's shares will invest on a "gross" basis and receive distributions on a "net" basis after expenses, resulting in a lower rate of return than one might achieve through direct investments. Because the management fee is based on the Fund's gross assets, the Adviser will benefit if and when the Fund issues additional equity, incurs debt or uses leverage. The use of leverage will increase the likelihood of default under any credit facility or other debt instruments the Fund enters into, which would disfavor the holders of Fund shares, including investors in this offering.

***Public and Private Investment Funds Risk.*** The Fund's performance depends in part upon the performance of the Public and Private Investment Fund managers and their selected strategies, the adherence by such Public and Private Investment Fund managers to such selected strategies, the instruments used by such Public and Private Investment Fund managers and the Adviser's ability to select Public and Private Investment Fund managers and strategies and effectively allocate Fund assets among them. Fund shareholders will bear two layers of fees and expenses: asset-based fees and expenses at the Fund level, and asset-based fees, which may include incentive allocations or fees and expenses at the Public or Private Investment Fund level.

The Fund is subject to, and indirectly invests in Public Investment Funds and Private Real Estate Investment Funds that are subject to risks associated with legal and regulatory changes applicable to financial institutions



generally or to Public Investment Funds or Private Real Estate Investment Funds in particular. The Fund may not be able to invest in certain Public Investment Funds or Private Real Estate Investment Funds that are oversubscribed or closed, or the Fund may be able to allocate only a limited amount of assets to a Public Investment Fund or a Private Real Estate Investment Fund that has been identified as an attractive opportunity. The Fund's investments in certain Public Investment Funds and Private Real Estate Investment Funds may be subject to lock-up periods, during which the Fund may not withdraw its investment. The Fund may invest indirectly a substantial portion of its assets in Public Investment Funds and Private Real Estate Investment Funds that follow a particular type of investment strategy, which may expose the Fund to the risks of that strategy. Many of the Fund's assets will be priced in the absence of a readily available market and may be priced based on determinations of fair value, which may prove to be inaccurate. The Fund, upon its redemption of all or a portion of its interest in a Public Investment Fund or a Private Real Estate Investment Fund, may receive an in-kind distribution of securities that are illiquid or difficult to value and difficult to dispose of.

Public Investment Fund and Private Real Estate Investment Fund returns may exhibit greater correlations among each other or with fixed-income or equity indices than anticipated by the Adviser, particularly during times of general market turmoil. Public and Private Investment Fund managers may invest the Public Investment Funds' or the Private Real Estate Investment Funds' assets in securities of non-U.S. issuers, including those in emerging markets, and the Fund's assets may be invested in Public Investment Funds or Private Real Estate Investment Funds that may be denominated in non-U.S. currencies, thereby exposing the Fund to various risks that may not be applicable to U.S. securities. Public and Private Investment Fund Managers focus primarily on the real estate industry, which subjects Public Investment Funds and Private Real Estate Investment Funds, and thus the Fund, to greater risk and volatility than if investments had been made in issuers in a broader range of industries. Public and Private Investment Fund Managers may focus on a particular country or geographic region, which may subject Public Investment Funds and Private Real Estate Investment Funds, and thus the Fund, to greater risk and volatility than if investments had been made in issuers in a broader range of geographic regions.

Public Investment Fund managers may use derivatives for speculative or hedging purposes. Public Investment Fund managers may have limited operating histories upon which to evaluate their performance. Public Investment Funds may incur leverage for investment or other purposes, which may increase the volatility of the Public Investment Funds. Public Investment Fund managers may sell short securities held by Public Investment Funds, which presents the theoretical risk of unlimited loss because of increases in the market price of the security sold short, and the risk that Public Investment Funds' short selling activities may be adversely affected by regulatory restrictions that may be imposed at any time. Public Investment Fund managers may invest the Public Investment Funds' assets without limitation in restricted and illiquid securities. Public Investment Fund managers may invest the Public Investment Funds' assets in equity securities without limitation as to market capitalization. Public Investment Funds may invest in equity securities issued by smaller capitalization companies, including micro-cap companies, the prices of which may be subject to erratic market movements.

Private Real Estate Investment Funds are not publicly traded and therefore are not liquid investments. Please see "Liquidity Risk" for a description of risks associated with illiquid securities. As a result, the Fund may consider information provided by the asset manager to determine the value of the Fund's investment in the Private Real Estate Investment Fund. The valuation provided by an asset manager as of a specific date may vary from the actual sale price that may be obtained if such investment were sold to a third party. The Adviser will conduct reasonable due diligence to value securities and may also consider information provided by the Private Real Estate Investment Funds, including quarterly unaudited financial statements, which if inaccurate could adversely affect the Adviser's ability to value accurately the Fund's shares. Private Real Estate Investment Funds that invest primarily in publicly traded securities are more easily valued.

In addition to valuation risk, shareholders of Private Real Estate Investment Funds are not entitled to the protections of the 1940 Act. For example, Private Real Estate Investment Funds need not have independent boards, may not require shareholder approval of advisory contracts, may leverage to an unlimited extent, and may engage in joint transactions with affiliates. As a result, Private Real Estate Investment Funds may make significant use of leverage,



which has the potential to magnify losses versus funds that do not employ leverage. Please see "Leveraging Risk" below for a description of risks associated with the use of leverage. Additionally, Private Real Estate Investment Fund managers may have limited operating histories upon which to evaluate their performance, and some Private Real Estate Investment Fund managers may not be registered under the Advisers Act. Further, Private Real Estate Investment Fund managers may charge investors (such as the Fund) asset-based fees of up to 2.0% of total assets and incentive allocations or fees of as much as 20% of a Private Real Estate Investment Fund's net profits (or more in certain limited circumstances), which may create incentives for Private Real Estate Investment Fund managers to make investments that are riskier or more speculative than in the absence of these fees. These characteristics present additional risks, including the possibility of total risk of loss, for shareholders.

***REIT Risk.*** REITs may be affected by changes in the real estate markets generally as well as changes in the values of the properties owned by the REIT or securing the mortgages owned by the REIT. REITs are dependent upon management skill and are not diversified. REITs are also subject to heavy cash flow dependency, defaults by borrowers, self-liquidation, and the possibility of failing to qualify for favorable tax treatment under the Code and to maintain an exemption under the 1940 Act. For example, because a REIT may acquire debt securities of issuers primarily engaged in or related to the real estate industry, it also could conceivably own real estate directly as a result of a default on such securities. Any rental income or income from the

disposition of such real estate could adversely affect its ability to retain its tax status, which would have adverse tax consequences on its shareholders. Finally, certain REITs may be self-liquidating at the end of a specified term, and run the risk of liquidating at an economically inopportune time.

***Non-Traded REIT Risk.*** Non-traded REITs are subject to the following risks in addition to those described in "REIT Risk." Non-Traded REITs are subject to significant commissions, expenses, and organizational and offering costs that reduce the value of an investor's (including the Fund's) investment. Non-Traded REITs are not liquid, and investments in Non-Traded REITs may not be accessible for an extended period of time.

Redemption programs offered by Non-Traded REITs may have significant restrictions, such as caps on the amount of shares that can be redeemed annually, limits on the amounts and sources of funds that may be used to fund redemptions and the ability of the REIT to suspend or terminate the program at its discretion. There is no guarantee of any specific return on the principal amount or the repayment of all or a portion of the principal amount invested in Non-Traded REITs. In addition, there is no guarantee that investors (including the Fund) will receive distributions. Distributions from Non-Traded REITs may be derived from sources other than cash flow from operations, including proceeds of the offering, from borrowings, or from the sale of assets. Payments of distributions from sources other than cash flow from operations will decrease or diminish an investor's interest. Dividends paid by Non-Traded REITs may vary based on economic risks, geopolitical risks, changes in the real estate market, performance of the REIT, regulatory changes, and key personnel changes. Distributions from Non-Traded REITs can be suspended for a period of time or halted altogether.

***Private REIT Risk.*** Private REITs are subject to the following risks in addition to those described in "Public and Private Real Estate Investment Fund Risk" and "REIT Risk." Private REITs are typically smaller and financially less stable than Public REITs. Private REITS are unlisted, making them more difficult to value and trade. Moreover, private REITs generally are exempt from Securities Act registration and, as such, are not subject to the same disclosure requirements as Public REITs and Non-Traded REITs, which makes private REITs more difficult to evaluate from an investment perspective. In addition, Private REITs may not have audited financial statements.

***Asset-Backed Securities.*** Because asset-backed securities often are secured by the loans underlying the securities, the Fund may lose money if there are defaults on the loans underlying the securities. Such defaults have increased the risk for asset-backed securities that are secured by home-equity loans related to sub-prime mortgage loans, especially in a declining residential real estate market. Asset-backed securities also may be subject to more rapid repayment than their stated maturity dates indicate, due to changing economic conditions. To maintain its position in such securities, the Fund may reinvest the reductions in principal amounts resulting



from the prepayments. Yields on those reinvested amounts are subject to prevailing market rates. Because prepayments of principal generally increase when rates are falling, the Fund generally has to reinvest proceeds from prepayments at lower rates. Investments in asset-backed securities may also be subject to valuation risk.

***Mortgage-Backed Securities Risk.*** Mortgage-backed securities are bonds which evidence interests in, or are secured by, a single commercial or residential mortgage loan or a pool of commercial or residential mortgage loans. Accordingly, mortgage-backed securities in which the Fund intends to invest are subject to all of the risks of the underlying mortgage loans. In a rising interest rate environment, the value of mortgage-backed securities may be adversely affected when payments on underlying mortgages do not occur as anticipated, resulting in the extension of the security's effective maturity and the related increase in interest rate sensitivity of a longer-term investment. The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities markets as a whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the underlying mortgage properties. In certain instances, third party guarantees or other forms of credit support can reduce the credit risk. Mortgage-backed securities are also subject to several risks created through the securitization process. Subordinate CMBSs are paid interest only to the extent that there are funds available to make payments. To the extent the collateral pool includes a large percentage of delinquent loans, there is a risk that interest payment on subordinate CMBSs will not be fully paid. Subordinate securities of CMBSs are also subject to greater credit risk than those CMBSs that are more highly rated. We also may invest in interest-only multifamily CMBS issued by multifamily mortgage loan securitizations. However, these interest-only multifamily CMBS typically only receive payments of interest to the extent that there are funds available in the securitization to make the payment and may introduce increased risks since these securities have no underlying principal cash flows. As a result, interest only CMBS possess the risk of total loss of investment in the event of prepayment of the underlying mortgages. We have not imposed a limit in the portion of our total assets that may be invested in interest-only multifamily CMBS.

***Issuer Risk.*** The value of a specific security can be more volatile than the market as a whole and can perform differently from the value of the market as a whole, for reasons related to the issuer, such as management performance, financial leverage and reduced demand for the issuer's goods and services.

***Leverage Risk.*** The use of leverage, such as borrowing money to purchase securities, by the Fund or a Private Real Estate Investment Fund or a Public Investment Fund will magnify the Fund's gains or losses. The use of leverage via short selling by a Private Real Estate Investment Fund or a Public Investment Fund will also magnify the Fund's gains or losses. Generally, the use of leverage also will cause the Fund and a Private Real Estate Investment Fund or a Public Investment Fund to have higher expenses (especially interest and/or short selling-related dividend expenses) than those of funds that do not use such techniques. Interest on borrowings (or dividends on preferred shares) may be at a fixed or floating rate and generally will be based on short-term rates. Interest payments and fees incurred in connection with such borrowings will reduce the amount of distributions available to the Fund's shareholders. As long as the rate of return, net of applicable Fund expenses, on the Fund's portfolio investments purchased with leverage exceeds the costs associated with such leverage, the Fund will generate more return or income than will be needed to pay such costs. In this event, the excess will be available to pay higher dividends to the Fund's shareholders. Conversely, if the Fund's return on such assets is less than the cost of leverage and other Fund expenses, the return to the Fund's shareholders will diminish or may be eliminated entirely. To the extent that the Fund uses leverage, the net asset value of the Fund's shares and the yield to the Fund's shareholders will be more volatile. The Fund's leveraging strategy may not be successful.

In addition, a lender to the Fund or a Private Real Estate Investment Fund or a Public Investment Fund may terminate or refuse to renew any credit facility. If the Fund or Private Real Estate Investment Fund or a Public Investment Fund is unable to access additional credit, it may be forced to sell investments at inopportune times, which may further reduce the amount of distributions available to Fund shareholders. The Fund's investments in Public Investment Funds and REITs managed by affiliated or unaffiliated institutional asset managers may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities.



The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025.

***Liquidity Risk.*** The Fund is a closed-end investment company structured as an "interval fund" and designed for long-term investors. Unlike many closed-end investment companies, the Fund's shares are not listed on any securities exchange and are not publicly traded. There is currently no secondary market for the shares and the Fund expects that no secondary market will develop. Limited liquidity is provided to shareholders only through the Fund's quarterly repurchase offers for no less than 5% of the shares outstanding at NAV. There is no guarantee that shareholders will be able to sell all of the shares they desire in a quarterly repurchase offer. The Fund's investments are also subject to liquidity risk. Liquidity risk exists when particular investments of the Fund would be difficult to purchase or sell, possibly preventing the Fund from selling such illiquid securities at an advantageous time or price, or possibly requiring the Fund to dispose of other investments at unfavorable times or prices in order to satisfy its obligations. Funds with principal investment strategies that involve securities of companies with smaller market capitalizations, derivatives or securities with substantial market and/or credit risk tend to have the greatest exposure to liquidity risk.

***Management Risk.*** The Fund is subject to management risk because it relies on the Adviser's ability to achieve its investment objective. The Fund runs the risk that the Adviser's investment techniques will fail to produce desired results and cause the Fund to incur significant losses. The Adviser also may fail to use derivatives effectively, choosing to hedge or not to hedge positions at disadvantageous times. In addition, if one or more key individuals leave, the Adviser may not be able to hire qualified replacements or may require an extended time to do so. This situation could prevent the Fund from achieving its investment objectives.

***Securities Market Risk.*** An investment in shares is subject to investment risk, including the possible loss of the entire principal amount invested. An investment in shares represents an indirect investment in the securities owned by the Fund. The value of these securities, like other market investments, may move up or down, sometimes rapidly and unpredictably. Economic, political and financial conditions, industry or economic trends and developments or public health risks, such as epidemics or pandemics, may, from time to time, and for varying periods of time, cause volatility, illiquidity or other potentially adverse effects in the financial markets. The value of your shares at any point in time may be worth less than the value of your original investment, even after taking into account any reinvestment of dividends and distributions.

***Medium and Small Capitalization Company Risk.*** The Fund will concentrate its investments in real estate-related securities. Many issuers of real estate securities are medium or small capitalization companies which may be newly-formed or have limited product lines, distribution channels and financial and managerial resources. The risks associated with these investments are generally greater than those associated with investments in the securities of larger, more-established companies. This may cause the Fund's NAV to be more volatile when compared to investment companies that focus only on large capitalization companies.

Generally, securities of medium and small capitalization companies are more likely to experience sharper swings in market values and are generally more volatile than those of larger companies. In addition, such securities generally trade in less liquid markets, in which it may be more difficult for the Adviser to sell and at prices that the Adviser believes appropriate. Compared to large companies, smaller companies are more likely to have: (i) less information publicly available; (ii) more limited product lines or markets and less mature businesses; (iii) fewer capital resources; (iv) more limited management depth; and (v) shorter operating histories. Further, the equity securities of smaller companies are often traded over-the-counter and generally experience a lower trading volume than is typical for securities that are traded on a national securities exchange. Consequently, the Fund may be required to dispose of these securities over a longer period of time (and potentially at less favorable prices) than would be the case for securities of larger companies, offering greater potential for gains and losses and associated tax consequences.



---

***Concentration in Real Estate Securities Risk.*** The Fund will not invest in real estate directly, but because the Fund will concentrate its investments in investment vehicles that invest principally in real estate and real estate-related securities, its portfolio will be significantly impacted by the performance of the real estate market and may experience more volatility and be exposed to greater risk than a more diversified portfolio. Although the Fund will not invest in real estate directly, the Fund may be subject to risks similar to those associated with direct ownership in real property. The value of the Fund's shares will be affected by factors affecting the value of real estate and the earnings of companies engaged in the real estate industry. These factors include, among others: (i) changes in general economic and market conditions; (ii) changes in the value of real estate properties; (iii) risks related to local economic conditions, overbuilding and increased competition; (iv) increases in property taxes and operating expenses; (v) changes in zoning laws; (vi) casualty and condemnation losses; (vii) variations in rental income, neighborhood values or the appeal of property to tenants; (viii) the availability of financing; and (ix) changes in interest rates. Many real estate companies utilize leverage, which increases investment risk and could adversely affect a company's operations and market value in periods of rising interest rates. The value of securities of companies in the real estate industry may go through cycles of relative under-performance and over-performance in comparison to equity securities markets in general. There are also special risks associated with real estate operations generally, as described below:

- *Land.* Land may be affected by development risks including insufficient tenant demand to build or construction delays as well as adverse changes in local and national economic and market conditions*.*
- *Development Issues.* Certain real estate companies may engage in the development or construction of real estate properties. These companies in which the Fund invests ("portfolio companies") are exposed to a variety of risks inherent in real estate development and construction, such as the risk that there will be insufficient tenant demand to occupy newly-developed properties, and the risk that prices of construction materials or construction labor may rise materially during the development.
- *Lack of Insurance.* Certain of the portfolio companies may fail to carry comprehensive liability, fire, flood, earthquake extended coverage and rental loss insurance, or insurance in place may be subject to various policy specifications, limits and deductibles. Should any type of uninsured loss occur, the portfolio company could lose its investment in, and anticipated profits and cash flows from, a number of properties and, as a result, adversely affect the Fund's investment performance.
- *Dependence on Tenants.* The value of the Fund's portfolio companies' properties and the ability to make distributions to their shareholders depend upon the ability of the tenants at their properties to generate enough income in excess of their operating expenses to make their lease payments. Changes beyond the control of our portfolio companies may adversely affect their tenants' ability to make their lease payments and, in such event, would substantially reduce both their income from operations and ability to make distributions to our portfolio companies and, consequently, the Fund.
- *Financial Leverage.* Real estate companies may be highly leveraged and financial covenants may affect the ability of real estate companies to operate effectively.
- *Environmental Issues.* In connection with the ownership (direct or indirect), operation, management and development of real properties that may contain hazardous or toxic substances, a portfolio company may be considered an owner, operator or responsible party of such properties and, therefore, may be potentially liable for removal or remediation costs, as well as certain other costs, including governmental fines and liabilities for injuries to persons and property. The existence of any such material environmental liability could have a material adverse effect on the results of operations and cash flow of any such portfolio company and, as a result, the amount available to make distributions on shares of the Fund could be reduced.
- *Financing Issues.* Financial institutions in which the Fund may invest are subject to extensive government regulation. This regulation may limit both the amount and types of loans and other financial commitments a financial institution can make, and the interest rates and fees it can charge. In addition, interest and investment rates are highly sensitive and are determined by many factors beyond a financial institution's control, including general and local economic conditions (such as inflation,



---

recession, money supply and unemployment) and the monetary and fiscal policies of various governmental agencies such as the Federal Reserve Board. These limitations may have a significant impact on the profitability of a financial institution since profitability is attributable, at least in part, to the institution's ability to make financial commitments such as loans. Profitability of a financial institution is largely dependent upon the availability and cost of the institution's funds, and can fluctuate significantly when interest rates change.

***Multifamily Real Estate Sector in General.*** While we intend to seek to diversify our investment portfolio among real estate sectors, we expect to invest a portion of our assets in investments in the multifamily real estate sector. Our business may be adversely affected by various operating risks common to the multifamily industry. We plan to invest in target assets, which are typically debt and preferred equity investments where the underlying real estate is comprised of multifamily properties. Multifamily properties have different economic characteristics than many other real estate assets. A typical office property, for example, has long-term leases with third-party tenants, which provides a relatively stable long-term stream of revenue. Multifamily properties, on the other hand, generate revenue from tenants that typically have short-term leases (generally one year or less in duration), which causes the rental rate and occupancy levels at multifamily properties to change frequently, and results in earnings that can be volatile.

In addition, our borrowers operating such multifamily properties will be subject to various operating risks common to the multifamily industry, including, among others, the following:

- competition from other multifamily properties in the markets in which a borrower operates;
- over-building of multifamily properties in the markets in which a borrower operates, which results in increased supply and will adversely affect occupancy and revenues at such borrower's multifamily properties;
- requirements for periodic capital reinvestment to repair and upgrade multifamily properties;
- increases in operating costs due to inflation and other factors that may not be offset by increased rental rates;
- changes in interest rates;
- changes in the availability, cost, and terms of financing;
- changes in governmental laws and regulations, fiscal policies, and zoning ordinances and the related costs of compliance with laws and regulations, fiscal policies, and ordinances;
- adverse effects of international, national, regional and local economic and market conditions; and
- risks generally associated with the ownership of multifamily properties and real estate, as discuss in some greater detail below.

The occurrence of any of the foregoing could adversely impact a borrower's ability to successfully own and operate a multifamily that will be the primary source of repayment of our Investment. In addition, should we foreclose on an investment and acquire the underlying asset, we, as the multifamily operator, would be faced with these same risks.

***Non-Diversification Risk.*** While the Adviser intends to invest in a number of real estate and real estate-related securities issued by different issuers and employ multiple investment strategies with respect to the Fund's investment portfolio, it is possible that a significant amount of the Fund's investments could be invested in the instruments of only a few companies or other issuers or that at any particular point in time one investment strategy could be more heavily weighted than the others. The focus of the Fund's investment portfolio in any one issuer would subject the Fund to a greater degree of risk

with respect to defaults by such issuer or other adverse events affecting that issuer, and the focus of the portfolio in any one industry or group of industries would subject



the Fund to a greater degree of risk with respect to economic downturns relating to such industry or industries. The focus of the Fund's investment portfolio in any one investment strategy would subject the Fund to a greater degree of risk than if the Fund's investment portfolio were varied in its investments with respect to several investment strategies.

***Valuation Risk.*** Portfolio securities may be valued using techniques other than market quotations, under the circumstances described under "Determination of Net Asset Value." The value established for a portfolio security may be different than what would be produced through the use of another methodology or if it had been priced using market quotations. Portfolio securities that are valued using techniques other than market quotations, including "fair valued" securities, may be subject to greater fluctuation in their value from one day to the next than would be the case if market quotations were used. In addition, there is no assurance that the Fund could sell a portfolio security for the value established for it at any time and it is possible that the Fund would incur a loss because a portfolio security is sold at a discount to its established value.

Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, fair value pricing may not reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

***Equity Securities Risk.*** The market prices of equity securities owned by the Fund may go up or down, sometimes rapidly or unpredictably. The value of a security may decline for a number of reasons that may directly relate to the issuer, such as management performance, fundamental changes to the business, financial leverage, non-compliance with regulatory requirements and reduced demand for the issuer's goods or services. The values of equity securities also may decline due to general market conditions that are not specifically related to a particular company, such as real or perceived adverse economic conditions, changes in the general outlook for corporate earnings, changes in interest or currency rates, unexpected trading activity among retail investors or adverse investor sentiment generally. Certain equity securities may decline in value even during periods when the prices of equity securities in general are rising, or may not perform as well as the market in general. In addition to these risks, preferred stock and convertible securities are also subject to the risk that issuers will not make payments on securities held by the Fund, which could result in losses to the Fund. The credit quality of preferred stock and convertible securities held by the Fund may be lowered if an issuer's financial condition changes, leading to greater volatility in the price of the security. In addition, a company's preferred stock generally pays dividends only after the company makes required payments to holders of its bonds and other debt. For this reason, the value of preferred stock will usually react more strongly than bonds and other debt to actual or perceived changes in the company's financial condition or prospects. The market value of convertible securities also tends to fall when prevailing interest rates rise.

***Preferred Securities Risk.*** Preferred securities are subject to credit risk and interest rate risk. Interest rate risk is, in general, that the price of a debt security falls when interest rates rise. Securities with longer maturities tend to be more sensitive to interest rate changes. Credit risk is the risk that an issuer of a security may not be able to make principal and interest or dividend payments on the security as they become due. Holders of preferred securities may not receive dividends, or the payment can be deferred for some period of time. In bankruptcy, creditors are generally paid before the holders of preferred securities.

***Convertible Securities Risk.*** Convertible securities are hybrid securities that have characteristics of both bonds and common stocks and are subject to risks associated with both debt securities and equity securities. Convertible securities are similar to fixed-income securities because they usually pay a fixed interest rate (or dividend) and are obligated to repay principal on a given date in the future. The market value of fixed-income and preferred securities tends to decline as interest rates increase and tends to increase as interest rates decline. Convertible



securities have characteristics of a fixed-income security and are particularly sensitive to changes in interest rates when their conversion value is lower than the value of the bond or preferred share. Fixed-income and preferred securities also are subject to credit risk, which is the risk that an issuer of a security may not be able to make principal and interest or dividend payments on the security as they become due. Fixed-income and preferred securities also may be subject to prepayment or redemption risk. If a convertible security held by the Fund is called for redemption, the Fund will be required to surrender the security for redemption, convert it into the issuing company's common stock or cash or sell it to a third party at a time that may be unfavorable to the Fund.

In addition, the Fund may invest in fixed-income and preferred securities rated less than investment grade that are sometimes referred to as high yield or "junk bonds." These securities are speculative investments that carry greater risks and are more susceptible to real or perceived adverse economic and competitive industry conditions than higher quality securities. Such securities also may be subject to resale restrictions. The lack of a liquid market for these securities could decrease the Fund's share price. Convertible securities have characteristics similar to common stocks especially when their conversion value is the same as the value of the bond or preferred share. The price of equity securities may rise or fall because of economic or political changes. Stock prices in general may decline over short or even extended periods of time. Market prices of equity securities in broad market segments may be adversely affected by a prominent issuer having experienced losses or by the lack of earnings or such an issuer's failure to meet the market's expectations with respect to new products or services, or even by factors wholly unrelated to the value or condition of the issuer, such as changes in interest rates.

***ETF Risk.*** The value of ETFs can be expected to increase and decrease in value in proportion to increases and decreases in the indices that they are designed to track. The volatility of different index tracking stocks can be expected to vary in proportion to the volatility of the particular index they track. ETFs are traded similarly to stocks of individual companies. Although an ETF is designed to provide investment performance corresponding to its index, it may not be able to exactly replicate the performance of its index because of its operating expenses and other factors. The underlying indices that an ETF is designed to track may also experience volatility due to disruptive events, such as natural disasters, pandemic or epidemics or other widespread health crises. Any such impact could adversely affect the Fund's performance and may lead to losses on your investment in the Fund. Because ETFs trade on a securities exchange, extreme market volatility or potential lack of an active trading market for an ETF's shares may trade at a premium or discount to their net asset value. The Fund's investment in shares of ETFs subject it to the risks of owning the securities underlying the ETF, as well as certain structural risks, including authorized participant concentration risk, market maker risk, premium/discount risk and trading issues risk. As a shareholder in an ETF, the Fund bears its proportionate share of the ETF's expenses.

***Counterparty Risk.*** Counterparty risk is the risk that a counterparty (the other party to a transaction or an agreement or the party with whom the Fund executes transactions) to a transaction with the Fund may be unable or unwilling to make timely principal, interest or settlement payments, or otherwise honor its obligations. In an attempt to limit the counterparty risk associated with such transactions, the Fund conducts business only with financial institutions judged by the Adviser to present acceptable credit risk. For example, repurchase agreements are loans of money or arrangements under which the Fund purchases securities and the seller agrees to repurchase the securities within a specific time and at a specific price. The repurchase price is generally higher than the Fund's purchase price, with the difference being income to the Fund. The counterparty's obligations under the repurchase agreement are collateralized with U.S. Treasury and/or agency obligations with a market value of not less than 100% of the obligations, valued daily. Collateral is held by the Fund's custodian in a segregated, safekeeping account for the benefit of the Fund. Repurchase agreements afford the Fund an opportunity to earn income at low risk on temporarily available cash. If bankruptcy or insolvency proceedings commence with respect to the seller of the securities before repurchase of the securities under a repurchase agreement, the Fund may encounter delays and incur costs before being able to sell the securities. Such a delay may involve loss of interest or a decline in price of the securities. If a court characterizes the transaction as a loan and the Fund has not perfected a security interest in the securities, the Fund may be required to return the securities to the seller's estate and be treated as an unsecured creditor of the seller. As an unsecured creditor, the Fund would be at risk of losing some or all of the principal and interest involved in the transaction.



***Derivatives Risk.*** While the Fund does not intend to invest in derivatives or utilize hedging strategies as a principal investment strategy, the Private Real Estate Investment Funds and Public Investment Funds in which the Fund invests will use derivatives (consisting of forwards, options, repurchase agreements, futures, warrants, and swaps) to enhance returns or hedge against market declines. A Private Real Estate Investment Fund's or Public Investment Fund's use of derivative instruments involves risks different from, or possibly greater than, the risks associated with investing directly in securities and other traditional investments. These risks include: (i) the risk that the counterparty to a derivative transaction may not fulfill its contractual obligations; (ii) risk of mispricing or improper valuation; and (iii) the risk that changes in the value of the derivative may not correlate perfectly with the underlying asset, rate or index. Derivative prices are highly volatile and may fluctuate substantially during a short period of time. Such prices are influenced by numerous factors that affect the markets, including, but not limited to: (i) changing supply and demand relationships; government programs and policies; (ii) national and international political and economic events; (iii) changes in interest rates; (iv) inflation and deflation; and

(v) changes in supply and demand relationships. Certain derivatives have the potential for unlimited loss, regardless of the size of the initial investment. When a fund uses derivatives for leverage, investments in that fund will tend to be more volatile, resulting in larger gains or losses in response to market changes. To limit risks associated with leverage, a fund is required to comply with Rule 18f-4 under the 1940 Act (the "Derivatives Rule") as outlined below.

The Derivatives Rule mandates that a fund adopt and/or implement: (i) value-at-risk limitations (VaR); (ii) a written derivatives risk management program; (iii) new board oversight responsibilities; and (iv) new reporting and recordkeeping requirements. In the event that a fund's derivative exposure is 10% or less of its net assets, excluding certain currency and interest rate hedging transactions, it can elect to be classified as a limited derivatives user (Limited Derivatives User) under the Derivatives Rule, in which case the fund is not subject to the full requirements of the Derivatives Rule. Limited Derivatives Users are excepted from VaR testing, implementing a derivatives risk management program, and certain board oversight and reporting requirements mandated by the Derivatives Rule. However, a Limited Derivatives User is still required to implement written compliance policies and procedures reasonably designed to manage its derivatives risks.

The Derivatives Rule also provides special treatment for reverse repurchase agreements, similar financing transactions and unfunded commitment agreements. Specifically, a fund may elect whether to treat reverse repurchase agreements and similar financing transactions as "derivatives transactions" subject to the requirements of the Derivatives Rule or as senior securities equivalent to bank borrowings for purposes of Section 18 of the 1940 Act. In addition, when-issued or forward settling securities transactions that physically settle within 35-days are deemed not to involve a senior security.

***Short Sales Risk.*** Short selling involves selling securities that may or may not be owned and borrowing the same securities for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the Fund to profit from declines in market prices to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. However, because the borrowed securities must be replaced by purchases at market prices in order to close out the short position, any appreciation in the price of the borrowed securities would result in a loss. The securities necessary to cover a short position may not be available for purchase. Purchasing securities to close out the short position can itself cause the price of the securities to rise further, thereby exacerbating the loss. The Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions, the Fund might have difficulty purchasing securities to meet margin calls on its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales by the Fund that are not made "against the box" theoretically involve unlimited loss potential, since the market price of securities sold short may continuously increase. If other short positions of the same security are closed out at the same time, a "short squeeze" can occur where demand exceeds the supply for the security sold short. A short squeeze makes it more likely that the Fund will need to replace the borrowed security at an unfavorable price.



***Foreign Investment Risk.*** Investing in foreign securities typically involves more risks than investing in U.S. securities, and includes risks associated with: political and economic developments — the political, economic and social structures of some foreign countries may be less stable and more volatile than those in the United States; trading practices — government supervision and regulation of foreign securities and currency markets, trading systems and brokers may be less than in the United States; availability of information — foreign issuers may not be subject to the same disclosure, accounting and financial reporting standards and practices as U.S. issuers; and limited markets — the securities of certain foreign issuers may be less liquid (harder to sell) and more volatile.

To the extent the Fund invests in investment vehicles that hold securities that are denominated in foreign currencies, the value of securities denominated in foreign currencies can change significantly when foreign currencies strengthen or weaken relative to the U.S. dollar. Currency rates in foreign countries may fluctuate significantly over short periods of time for a number of reasons, including changes in interest rates and the imposition of currency controls or other political developments in the United States or abroad. These currency movements may negatively impact the value of the Fund even when there is no change in the value of the security in the issuer's home country.

The risks of foreign investments may be greater in developing or emerging market countries.

***Other Investment Companies.*** The Fund may invest in other investment companies. Investment companies combine shareholders' funds for investment in a variety of instruments, including equity securities, debt securities, and money market instruments and may invest primarily in a particular type of security, a particular industry or a mix of securities and industries. An investment company is not taxed on income distributed to shareholders if, among other things, it distributes to its shareholders substantially all of its taxable income for each taxable year. As a shareholder of another investment company, the Fund may bear a proportionate share of the expenses of such other investment company, including management fees, administration fees and custodial fees, in addition to the expenses of the Fund. To the extent permitted by and subject to applicable law or SEC exemptive relief, the Fund may invest in shares of investment companies (including money market mutual funds) advised or sub-advised by NexPoint or its affiliates.

***Securities Lending Risk.*** Securities lending is subject to the risk that loaned securities may not be available to the Fund on a timely basis and the Fund may, therefore, lose the opportunity to sell the securities at a desirable price. Any loss in the market price of securities loaned by the Fund that occurs during the term of the loan would be borne by the Fund and would adversely affect the Fund's performance. Also, there may be delays in recovery, or no recovery, of securities loaned should the borrower of the securities fail financially while the loan is outstanding. In addition, voting rights with respect to loaned securities generally pass to the borrower. The Fund, as the lender, retains the right to recall the loans and obtain the return of the securities loaned in order to vote the loaned securities. However, in many circumstances the Fund may be unable to recall the securities in time to vote or may determine that the benefits to the Fund of voting are outweighed by the indirect or direct costs of such a recall. In these circumstances, loaned securities may be voted or not voted in a manner adverse to the best interests of the Fund. All of the aforementioned risks may be greater for non-U.S. securities.

These lending transactions must be fully collateralized at all times, but involve some credit risk to the Fund if the borrower or the party (if any) guaranteeing the loan should default on its obligation and the Fund is delayed in or prevented from recovering the collateral. In addition, any income or gains and losses from investing and reinvesting any cash collateral delivered by a borrower pursuant to a loan are generally at the Fund's risk, and to the extent any such losses reduce the amount of cash below the amount required to be returned to the borrower upon the termination of any loan, the Fund may be required to pay or cause to be paid to such borrower or another entity an amount equal to such shortfall in cash. The Fund generally accepts cash (U.S. and foreign currency), securities issued or guaranteed by the U.S. government or its agencies or instrumentalities, or sovereign debt as collateral for these lending transactions, although in the future may accept other types of collateral. There is also a risk of loss should the borrower default before the securities are returned, and due to market movements the value of the collateral held has fallen and/or the value of the securities on loan has risen.



***Repurchase Policy Risks.*** Quarterly repurchases by the Fund of its shares typically will be funded from available cash or sales of portfolio securities. However, payment for repurchased shares may require the Fund to liquidate portfolio holdings earlier than the Adviser otherwise would liquidate such holdings, potentially resulting in losses, and may increase the Fund's portfolio turnover.

The Adviser may take measures to attempt to avoid or minimize such potential losses and turnover, and instead of liquidating portfolio holdings, may borrow money to finance repurchases of shares. If the Fund borrows to finance repurchases, interest on any such borrowings will negatively affect shareholders who do not tender their shares in a repurchase offer by increasing the Fund's expenses and reducing net investment income. To the extent the Fund finances repurchase proceeds by selling investments, the Fund may hold a larger proportion of its gross assets in less liquid securities. Also, the sale of securities to fund repurchases could reduce the market price of those securities, which in turn would reduce the Fund's NAV.

Repurchase of shares will tend to reduce the amount of outstanding shares and, depending upon the Fund's investment performance, its net assets. A reduction in the Fund's net assets may increase the Fund's expense ratio, to the extent that additional shares are not sold. In addition, the repurchase of shares by the Fund may be a taxable event to shareholders.

The Fund's quarterly repurchase offers are a shareholder's only means of liquidity with respect to his or her shares. The shares are not traded on a national securities exchange and no secondary market exists for the shares, nor does the Fund expect a secondary market for its shares to exist in the future.

***Reverse Repurchase Agreement Risk.*** The Fund may enter into reverse repurchase agreements with respect to securities held by the Fund that could otherwise be sold by the Fund. In a reverse repurchase agreement the Fund sells a security held by the Fund and simultaneously obtains the commitment of the purchaser (typically, a commercial bank or a broker or dealer) to sell the security back to the Fund at an agreed-upon price on an agreed-upon date. The Fund will maintain cash or liquid securities in an amount sufficient to cover its obligations with respect to reverse repurchase agreements. The Fund receives payment for such securities only upon physical delivery or evidence of book entry transfer by its custodian. Regulations of the SEC require that, if securities are sold by a fund under a reverse repurchase agreement, the fund designate or segregate liquid assets in an amount equal to the fund's daily marked-to-market value of such agreement. Reverse repurchase agreements are considered borrowings of money by the Fund and as such would be subject to the restrictions on issuing senior securities.

Reverse repurchase agreements could involve certain risks in the event of default or insolvency of the counterparty, including possible delays or restrictions upon the Fund's ability to dispose of the proceeds of the sale received from the counterparty. An additional risk is that the market value of securities sold by the Fund under a reverse repurchase agreement could decline below the price at which the Fund is obligated to repurchase them.

***Risks Relating to Fund's Tax Status.*** To remain eligible for the favorable tax treatment accorded to regulated investment companies ("RICs") and their shareholders under the Code, the Fund must meet certain source of income, asset diversification and annual distribution requirements. Very generally, in order to qualify as a RIC, the Fund must derive at least 90% of its gross income for each taxable year from dividends, interest, payments with respect to certain securities loans, gains from the sale or other disposition of stock, securities or foreign currencies, other income derived with respect to its business of investing in stock or other securities, or income from qualified publicly traded partnerships. In some cases, if the Fund fails to meet these income requirements at the end of a taxable year, it will be able to cure such failure by paying a Fund-level tax to avoid the loss of its RIC status; such tax could be substantial. The Fund must also meet certain asset diversification requirements at the end of each quarter of each of its taxable years. Failure to meet these diversification requirements on the last day of a quarter will result in the Fund's loss of RIC status, unless it is able to cure such failure, for instance, by disposing of certain investments, including at potentially disadvantageous times and prices, and, in some cases, by paying a Fund-level tax.



In addition, in order to be eligible for the favorable tax treatment accorded RICs, the Fund must meet the annual distribution requirement, requiring it to distribute with respect to each taxable year at least the sum of 90% of its "investment company taxable income" (generally-its taxable ordinary income and realized net short-term capital gains in excess of realized net long-term capital losses, if any) and 90% of its net tax-exempt income (if any), to its shareholders. Because the Fund may leverage its portfolio through a master repurchase agreement, may enter into reverse repurchase transactions from time to time, and may use additional debt financing in the future, the Fund is subject to certain asset coverage ratio requirements under the 1940 Act that could, under certain circumstances, restrict the Fund from making the distributions necessary to satisfy this annual distribution requirement and to avoid fund-level U.S. federal income or excise taxes. Any taxable income (including net long-term capital gains) that the Fund is unable to distribute will be subject to fund-level tax at the applicable corporate income tax rate. Further, if the Fund fails to meet the annual distribution requirement or either of the RIC qualification requirements in respect of a taxable year and is ineligible to or otherwise does not cure such failure for any such year, all of its taxable income regardless of whether timely distributed to shareholders will be subject to fund-level tax at the applicable corporate income tax rate and all of its distributions from earnings and profits (including from net long-term capital gains) will be taxable to shareholders as ordinary income. Some portions of such distributions may be eligible for the dividends-received deduction in the case of corporate shareholders and may be eligible to be treated as "qualified dividend income" in the case of shareholders taxed as individuals, provided, in both cases, the shareholder meets certain holding period and other requirements in respect of the Fund's shares. See "U.S. Federal Income Tax Matters."

If the Fund were to fail to qualify or were ineligible for treatment as a RIC, the resulting fund-level taxes could substantially reduce the Fund's net assets, the amount of income available for distribution and the amount of its distributions. Such a failure would have a material adverse effect on the Fund and its shareholders. In addition, in some cases, the Fund could be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions in order to re-qualify as a RIC.

***RIC-Related Risks of Investments Generating Non-Cash Taxable Income.*** Certain of the Fund's investments will require the Fund to recognize taxable income in a taxable year in excess of the cash actually received by the Fund with respect to those investments during that year. In particular, the Fund expects that a substantial portion of its investments in loans and other debt obligations will be treated as having "market discount" and/or "original issue discount" for U.S. federal income tax purposes, which, in some cases, could be significant. Because the Fund may be required to recognize income in respect of these investments before or without receiving cash representing such income, the Fund may have difficulty satisfying the annual distribution requirements applicable to RICs and avoiding Fund-level U.S. federal income or excise taxes. Accordingly, the Fund may be required to sell portfolio securities, including at potentially disadvantageous times or prices, raise additional debt or equity capital, or reduce new investments, to obtain the cash needed to make these income distributions. If the Fund liquidates portfolio securities to raise cash, the Fund may realize gain or loss on such liquidations; in the event the Fund realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

***REIT Tax Risk for REIT Subsidiaries.*** The REIT Subsidiaries and any REIT subsidiary the Fund may form in the future will elect to be taxed as REITs beginning with the first year in which they commence material operations. In order for each REIT Subsidiary and any future REIT subsidiary to qualify and maintain its qualification as a REIT, it must satisfy certain requirements set forth in the Code and Treasury Regulations that depend on various factual matters and circumstances. The Fund and the Adviser intend to cause the REIT Subsidiaries and any future REIT subsidiaries to structure their activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is not entirely clear, and it is possible that the Internal Revenue Service ("IRS") may interpret or apply those requirements in a manner that jeopardizes the ability of such REIT subsidiary to satisfy all of the requirements for qualification as a REIT.

If any REIT Subsidiary or future REIT subsidiary fails to qualify as a REIT for any taxable year that it is operational and it does not qualify for certain statutory relief provisions, it will be subject to U.S. federal income



tax on its taxable income at the applicable corporate income tax rate. In addition, it would generally be disqualified from treatment as a REIT for the four taxable years following any taxable year in which it fails to qualify as a REIT. Loss of REIT status would reduce a REIT subsidiary's net earnings available for investment or distribution to the Fund as a result of the imposition of entity-level tax on the REIT subsidiary. In addition, distributions to the Fund would no longer qualify for the dividends paid deduction, and the REIT subsidiary would no longer be required to make distributions. If this occurs, the REIT subsidiary might be required to borrow funds or liquidate some investments in order to pay the applicable tax.

To obtain the favorable tax treatment afforded to REITs under the Code, among other things each REIT subsidiary generally will be required each year to distribute to its shareholders at least 90% of its REIT taxable income determined without regard to the dividends-paid deduction and excluding net capital gain. To the extent that it does not distribute all of its net capital gains, or distributes at least 90%, but less than 100%, of its REIT taxable income, as adjusted, it will have to pay an entity-level tax on amounts retained. Furthermore, if it fails to distribute during each calendar year at least the sum of (a) 85% of its ordinary income for that year, (b) 95% of its capital gain net income for that year, and (c) any undistributed taxable income from prior periods, it would have to pay a 4% nondeductible excise tax on the excess of the amounts required to be distributed over the sum of (x) the amounts that it actually distributed and (y) the amounts it retained and upon which it paid income tax at the entity level. These requirements could cause it to distribute amounts that otherwise would be spent on investments in real estate assets, and it is possible that the REIT subsidiary might be required to borrow funds, possibly at unfavorable rates, or sell assets to fund the required distributions.

In order to qualify as a REIT, not more than 50% of the value of a REIT subsidiary's shares may be owned, directly or indirectly, through the application of certain attribution rules under the Code, by any five or fewer individuals, as defined in the Code to include specified entities, during the last half of any taxable year other than the REIT subsidiary's first taxable year (the "50% Test"). For purposes of the 50% Test, the REIT subsidiary will "look through" to the beneficial owners of the Fund's shares. Accordingly, if five or fewer individuals or certain specified entities during the last half of any calendar year own, directly or indirectly, more than 50% of the REIT subsidiary's shares through the Fund, then the REIT subsidiary's qualification as a REIT could be jeopardized. The Adviser intends to monitor all purchases and transfers of a REIT subsidiary's shares and the Fund's shares by regularly reviewing, among other things, ownership filings required by the federal securities laws to monitor the beneficial ownership of a REIT subsidiary's shares to ensure that the REIT subsidiary will meet and will continue to meet the 50% Test. However, the Adviser may not have the information necessary for it to ascertain with certainty whether or not a REIT subsidiary satisfies the 50% test and may not be able to prevent the REIT subsidiary from failing the 50% Test. If a REIT subsidiary fails to satisfy the requirements related to the direct or indirect ownership of its outstanding capital stock, the REIT subsidiary would fail to qualify as a REIT and the REIT subsidiary would be required to pay U.S. federal income tax on its taxable income, and distributions to its shareholders would not be deductible by it in determining its taxable income.

***Operational and Technology Risk.*** The Fund, its service providers, and other market participants increasingly depend on complex information technology and communications systems to conduct business functions. These

systems are subject to a number of different threats or risks that could adversely affect the Fund and its shareholders, despite the efforts of the Fund and its service providers to adopt technologies, processes, and practices intended to mitigate these risks. For example, unauthorized third parties may attempt to improperly access, modify, disrupt the operations of, or prevent access to these systems of the Fund, the Fund's service providers, counterparties, or other market participants or data within them (a "cyber-attack").

Power or communications outages, acts of god, information technology equipment malfunctions, operational errors, and inaccuracies within software or data processing systems may also disrupt business operations or impact critical data. Market events also may trigger a volume of transactions that overloads current information technology and communication systems and processes, impacting the ability to conduct the Fund's operations.

Cyber-attacks, disruptions, or failures that affect the Fund's service providers or counterparties may adversely affect the Fund and its shareholders, including by causing losses for the Fund or impairing Fund operations. For example, the Fund's or its service providers' assets or sensitive or confidential information may be misappropriated, data may be corrupted, and operations may be disrupted (e.g., cyber-attacks or operational failures may cause the release of private shareholder information or confidential Fund information, interfere with the processing of shareholder transactions, impact the ability to calculate the Fund's NAV, and impede trading). In addition, cyber-attacks, disruptions, or failures may cause reputational damage and subject the Fund or its service providers to regulatory fines, litigation costs, penalties or financial losses, reimbursement or other compensation costs, and/or additional compliance costs.

While the Fund and its service providers may establish business continuity and other plans and processes to address the possibility of cyber-attacks, disruptions, or failures, there are inherent limitations in such plans and systems, including that they do not apply to third parties, such as other market participants, as well as the possibility that certain risks have not been identified or that unknown threats may emerge in the future.

Similar types of operational and technology risks are also present for issuers of the Fund's investments, which could have material adverse consequences for such issuers, and may cause the Fund's investments to lose value. In addition, cyber-attacks involving a Fund counterparty could affect such counterparty's ability to meet its obligations to the Fund, which may result in losses to the Fund and its shareholders. Furthermore, as a result of cyber-attacks, disruptions, or failures, an exchange or market may close or issue trading halts on specific securities or the entire market, which may result in the Fund being, among other things, unable to buy or sell certain securities or financial instruments or unable to accurately price its investments. The Fund cannot directly control any cybersecurity plans and systems put in place by its service providers, Fund counterparties, issuers in which the Fund invests, or securities markets and exchanges.

In addition, other disruptive events, including (but not limited to) natural disasters and public health crises may adversely affect the Fund's ability to conduct business, in particular if the Fund's employees or the employees of its service providers are unable or unwilling to perform their responsibilities as a result of any such event. Even if the Fund's employees and the employees of its service providers are able to work remotely, those remote work arrangements could result in the Fund's business operations being less efficient than under normal circumstances, could lead to delays in its processing of transactions, and could increase the risk of cyber-attacks.

## MANAGEMENT OF THE FUND

The Fund is a party to contractual arrangements with various parties, including, among others, the Adviser, the Distributor, the fund administrator, and the transfer agent, who provide services to the Fund. Shareholders are not parties to, or intended ("third-party") beneficiaries of, any such contractual arrangements, and such contractual arrangements are not intended to create in any individual shareholder or group of shareholders any right to enforce them against the service providers or to seek any remedy under them against the service providers, either directly or on behalf of the Fund. Neither this Prospectus, nor the related SAI, is intended, or should be read, to be or to give rise to an agreement or contract between the Fund and any investor, or to give rise to any rights in any shareholder or other person other than any rights under federal or state law that may not be waived.

### Trustees and Officers

The Board is responsible for the overall management of the Fund, including supervision of the duties performed by the Adviser. The Board is comprised of four trustees (each, a "Trustee"). The Trustees are responsible for the Fund's overall management, including adopting the investment and other policies of the Fund, electing and replacing officers and selecting and supervising the Fund's investment adviser. The name and business address of the Trustees and officers of the Fund and their principal occupations and other affiliations during the past five years, as well as a description of committees of the Board, are set forth under "Management" in the SAI.

### Investment Adviser

NexPoint Advisors, L.P., which serves as the Adviser to the Fund, is registered with the SEC as an investment adviser under the Advisers Act and is an affiliate of NAM. NexPoint has its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. James Dondero, along with Mark Okada, founded the parent of the Adviser in April 1993. The Adviser also externally manages NexPoint Capital, Inc., a non-traded BDC. NAM manages Highland Opportunities and Income Fund ("HFRO") and Highland Global Allocation Fund ("GAF"), registered closed-end funds whose shares trade on the NYSE. The Adviser's senior management team has experience across private lending, private equity, real estate investing and other investment strategies. Collectively, the Adviser and its affiliates managed approximately $16.9 billion in assets as of December, 31, 2024 including approximately $12.5 billion in gross real estate assets. The Adviser is controlled by James Dondero by virtue of his control of its general partner, NexPoint Advisors GP, LLC.

Under the general supervision of the Board, the Adviser will carry out the investment and reinvestment of the net assets of the Fund, will furnish continuously an investment program with respect to the Fund, and determine which securities should be purchased, sold or exchanged. In addition, the Adviser will supervise and provide oversight of the Fund's service providers. The Adviser has entered into a Services Agreement (the "Services Agreement") with Skyview Group ("Skyview"), pursuant to which the Adviser will receive administrative and operational support services to enable it to provide the required advisory services to the Fund. The Adviser will compensate all Adviser and Skyview personnel who provide services to the Fund. In return for these services, facilities and payments, the Fund has agreed to pay the Adviser as compensation under the Investment Advisory Agreement a monthly management fee computed at the annual rate of 1.25% of the Daily Gross Assets of the Fund. The Adviser may employ research services and service providers to assist in the Adviser's market analysis and investment selection.

A discussion regarding the basis for the Board's approval of the Fund's Investment Advisory Agreement is available in the Fund's annual report to shareholders for the year ended December 31, 2024.

The Adviser and the Fund have entered into the Expense Limitation Agreement under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by

the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily Gross Assets (the "Expense Limitation"). If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared effective by the SEC and to commence operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement will remain in effect until at least May 1, 2026, unless and until the Board approves its modification or termination. The Expense Limitation Agreement may not be amended or terminated unless approved by the Board.

The REIT Subsidiaries entered into a separate investment advisory agreement with the Adviser in July 2016 and June 2022. To the extent fees are paid to the Adviser by the REIT Subsidiaries, such fees will be offset against fees otherwise payable by the Fund to the Advisor, such that shareholders of the Fund will only be subject to one layer of fees to the Adviser. Notwithstanding this arrangement, the Fund and its shareholders will indirectly bear the expenses associated with forming the REIT Subsidiaries, non-advisory fees paid by the REIT Subsidiaries (if any) and operating expenses, including maintaining their REIT qualification. To the extent the Fund forms one or more other REIT subsidiaries, it is expected that they will enter into separate investment advisory agreements that have substantially similar terms. The Fund may invest in funds not managed by an affiliate of the Adviser (including closed-end funds, ETFs, private funds, externally managed traded and non-traded REITs, etc.), in which case two layers of fees will be paid by the Fund.

Pursuant to the Investment Advisory Agreement, the Adviser provides administration services to the Fund, provides executive and other personnel necessary to administer the Fund and furnishes office space. Under a separate sub-administration agreement, dated July 23, 2018, the Adviser has delegated certain administrative functions to SEI Global Funds Services ("SEI") and pays SEI a portion of the fee it receives from the Fund. Under the Sub-Administration Agreement, SEI has agreed to provide fund accounting services; asset data services; fund administration and reporting services; and regulatory administration services, including preparation and filing of various reports with the appropriate regulatory agencies and the SEC for the Fund.

**Portfolio Managers**

James Dondero and Matthew McGraner serve as the portfolio managers and are primarily responsible for the day-to-day management of the Fund.

**James Dondero** is the founder and President of NexPoint Advisors, L.P. ("NexPoint") and co-founder of NexPoint Asset Management, L.P. ("NAM"). Mr. Dondero has over 30 years of experience investing across the alternative landscape. In that time, he established a number of integrated businesses to manage investments in real estate, private equity, and high-yield and structured credit, among other areas. Mr. Dondero holds various leadership roles at NexPoint Advisors, L.P., NexPoint Asset Management, L.P., and other NexPoint affiliates. Mr. Dondero holds various leadership roles across the NexPoint businesses; he serves as a portfolio manager for several funds and is an officer and director at NexPoint's publicly traded REITs. Additionally, Mr. Dondero holds director positions at several companies within financial services, real estate, and other industries. He is the chairman of NexBank Capital, Inc. and a director of SeaOne Holdings, LLC. A dedicated philanthropist, Mr. Dondero actively contributes to initiatives in education, veterans' affairs, and community and economic development, and has been instrumental in supporting a number of civic and cultural institutions in the Dallas-Fort Worth area. He is a member of the Southern Methodist University Cox School of Business Executive Board

and the George W. Bush Presidential Center Executive Advisory Council. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He received certification as a Certified Public Accountant (CPA) and a Certified Managerial Accountant (CMA) and is a holder of the right to use the Chartered Financial Analyst (CFA) designation.

**Mr. McGraner** has extensive experience in real estate and private equity transactions and currently leads the operations of the real estate platform of NexPoint Advisors, L.P. and its affiliates, a suite of leading alternative investment managers he co-founded. In that role, he sources and executes investments, manages risk and develops potential business opportunities, including fundraising, private investments and joint ventures. In his role at NexPoint, Mr. McGraner has served as the Executive VP and Chief Investment Officer of NXRT, a multifamily real estate investment trust, since 2016; NREF, a mortgage REIT, since 2020; VineBrook Homes Trust, a single family rental REIT, since 2019; NexPoint Diversified Real Estate Trust, a diversified REIT, since 2022; and as a member of the board of directors and President of NexPoint Storage Partners, a self-storage REIT, since 2020. Mr. McGraner is also a licensed attorney and was formerly an attorney at an AmLaw 20 multinational law firm, where his practice primarily focused on private equity, real estate and mergers and acquisitions. Since 2013, Mr. McGraner has led the acquisition and financing of over $20.0 billion of real estate investments. Mr. McGraner holds a B.S. from Vanderbilt University and a J.D. from the Washington University School of Law.

The SAI provides additional information about the Fund's portfolio managers' compensation, other accounts managed and ownership of Fund shares.

**Transfer Agent**

SS&C serves as the transfer agent of the Fund.

**Custodian**

Bank of New York Mellon ("BNY"), with principal offices at 240 Greenwich Street, New York, New York 10286, serves as custodian for the securities and cash of the Fund's portfolio. Under a Custodian Agreement, BNY holds the Fund's assets in safekeeping and keeps all necessary records and documents relating to its duties.

**Fund Expenses**

The Adviser is obligated to pay expenses associated with providing the services stated in the Investment Advisory Agreement, including compensation of and office space for its officers and employees connected with investment and economic research, trading and investment management and administration of the Fund. The Adviser is obligated to pay the fees of any Trustee of the Fund who is affiliated with it. The Adviser will provide such services either directly or through the Services Agreement with Skyview.

The Fund pays all other expenses incurred in the operation of the Fund, which consist of: (i) expenses for legal and independent accountants' services; (ii) costs of printing proxies, share certificates, if any, and reports to shareholders; (iii) charges of the custodian and transfer agent in connection with the Fund's distribution reinvestment policy; (iv) fees and expenses of independent Trustees; (v) printing costs; (vi) membership fees in trade associations; (vii) fidelity bond coverage for the Fund's officers and Trustees; (viii) errors and omissions insurance for the Fund's officers and Trustees; (ix) brokerage costs; (x) taxes; (xi) costs associated with the Fund's quarterly repurchase offers; (xii) servicing fees; and (xiii) other extraordinary or non-recurring expenses and other expenses properly payable by the Fund. The expenses incident to the offering and issuance of shares to be issued by the Fund will be capitalized and amortized on a straight-line basis over 12 months.

Class C shares will pay to the Distributor a Distribution Fee that will accrue at an annual rate equal to 0.75% of the Fund's average daily net assets attributable to Class C shares, and is payable on a quarterly basis. Class A and Class Z shares are not subject to Distribution Fees. The Fund will also pay a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Class A and Class C shares. See "Plan of Distribution."

The Fund will pay organizational costs and offering expenses incurred with respect to the offering of its shares from the proceeds of the offering, less amounts advanced under the Expense Limitation. Since February 9, 2018, the Adviser paid or reimbursed the Fund's organizational and offering expenses incurred with respect to its initial and continuous offering and will not seek recoupment of such fees. For tax purposes, offering costs cannot be deducted by the Fund or the Fund's shareholders. Therefore, for tax purposes, the expenses incident to the offering and issuance of shares to be issued by the Fund will be capitalized and amortized on a straight-line basis over 12 months.

The Investment Advisory Agreement authorizes the Adviser to select brokers or dealers (including affiliates) to arrange for the purchase and sale of Fund securities, including principal transactions. Any commission, fee or other remuneration paid to an affiliated broker or dealer will be paid in compliance with the Fund's procedures adopted in accordance with Rule 17e-1 under the 1940 Act.

## DETERMINATION OF NET ASSET VALUE

The net asset value (or NAV) per share of each class of shares of the Fund is calculated as of 4:00 p.m., Eastern Time, on each day that the NYSE is open for business, except on days on which regular trading on the NYSE is scheduled to close before 4:00 p.m., when the Fund calculates NAV as of the scheduled close of regular trading. The NYSE is open Monday through Friday, but currently is scheduled to be closed on New Year's Day, Dr. Martin Luther King, Jr. Day, Presidents' Day, Good Friday, Memorial Day, Juneteenth Independence Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day or on the preceding Friday or subsequent Monday when a holiday falls on a Saturday or Sunday, respectively. The NAV per share of each class of shares of the Fund is computed by dividing the value of the Fund's net assets (i.e., the value of its securities and other assets less its liabilities, including expenses payable or accrued but excluding capital stock and surplus) attributable to the class of shares by the total number of shares of the class outstanding at the time the determination is made. The value of the Fund's portfolio assets may change on days the Fund is closed. Class A shares will be offered at net asset value plus their respective sales load, while Class C and Class Z shares will be offered at net asset value. During the continuous offering, the price of the shares will increase or decrease on a daily basis according to the net asset value of the shares.

Pursuant to Rule 2a-5 under the 1940 Act, the Board has designated NexPoint as the Fund's valuation designee (the "Valuation Designee") to perform the fair valuation determination for securities and other assets held by the Fund. NexPoint acting through its "Valuation Committee," is responsible for determining the fair value of investments for which market quotations are not readily available. The Valuation Committee is comprised of officers of NexPoint and certain of NexPoint's affiliated companies and determines fair value and oversees the calculation of the NAV. The Valuation Designee is subject to Board oversight and certain reporting and other requirements intended to provide the Board the information it needs to oversee the Valuation Designee.

The Fund's portfolio securities are valued in accordance with valuation policies and procedures established by the Adviser and approved by the Board.

NexPoint uses the following valuation methods to determine either current market value for investments for which market quotations are available or, if not available, the fair value, as determined in good faith pursuant to NexPoint's policies and procedures:

- The market value of each security listed or traded on any recognized securities exchange or automated quotation system will be the last reported sale price at the relevant valuation date on the composite tape or on the principal exchange on which such security is traded. If no sale is reported on that date, or for over-the-counter securities, the Adviser utilizes, when available, pricing quotations from principal market makers. Such quotations may be obtained from third-party pricing services or directly from investment brokers and dealers in the secondary market. Generally, the Fund's loan and bond positions are not traded on exchanges and consequently are valued based on market prices received from third-party pricing services or broker-dealer sources.
- Dividends declared but not yet received, and rights in respect of securities which are quoted ex-dividend or ex-rights, will be recorded at the fair value thereof, as determined by the Adviser, which may (but need not) be the value so determined on the day such securities are first quoted ex-dividend or ex-rights.
- Listed options, or over-the-counter options for which representative brokers' quotations are available, will be valued in the same manner as listed or over-the-counter securities as hereinabove provided. Premiums for the sale of such options written by the Fund will be included in the assets of the Fund, and the market value of such options shall be included as a liability.
- The Fund's non-marketable investments for which market quotations are not readily available will generally be valued in such manner as the Adviser determines in good faith to reflect their fair values under procedures approved by the Board. The Valuation Committee has been established to provide

oversight of the valuation policies, processes and procedures, and is comprised of personnel from the Adviser and its affiliates. The Valuation Committee meets monthly to review the proposed valuations for investments and financial instruments and is responsible for evaluating the overall fairness and consistent application of established policies.

- The pricing of all assets that are fair valued in this manner will be subsequently reported to the Board. Pursuant to the Fund's pricing procedures, securities for which market quotations are not readily available may include securities that are subject to legal or contractual restrictions on resale, securities for which no or limited trading activity has occurred for a period of time, or securities that are otherwise deemed to be illiquid (i.e., securities that cannot be disposed of within seven days at approximately the price at which the security is currently priced by the Fund). Swaps and other derivatives would generally fall under this category.
- Investments by the Fund in any other mutual fund are valued at their respective NAVs as determined by those mutual funds each business day. The prospectuses for those mutual funds explain the circumstances under which those funds will use fair value pricing and the effects of using fair value pricing.

Rule 2a-5 states that a market quotation is readily available only when that quotation is a quoted price (unadjusted) in active markets for identical investments that the Fund can access at the measurement date, provided that a quotation will not be readily available if it is not reliable. Market quotations may also be not "readily available" if a significant event occurs that causes the Adviser to believe that the market price of a security no longer represents the security's current value at the time of the Fund's NAV calculation. In determining the fair value price of a security, the Adviser may use a number of other methodologies, including those based on discounted cash flows, multiples, recovery rates, yield to maturity or discounts to public comparables.

When determining the fair value of an asset, the Adviser will seek to determine the price that the Fund might reasonably expect to receive from the current sale of that asset in an arm's-length transaction. Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value determinations are based upon all available factors that the Adviser deems relevant. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, there can be no assurance that fair value pricing will reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

Private Real Estate Investment Funds and Non-Traded REITs will be difficult to value, particularly to the extent that their underlying investments are not publicly traded. In the event a Non-Traded REIT does not report a value to the Fund on a timely basis, the Adviser, acting pursuant to policies approved by the Board, will determine the fair value of the Fund's investment based on the most recent value reported by the Non-Traded REIT, as well as any other relevant information available at the time the Fund values its investments. Following procedures approved by the Board, in the absence of specific transaction activity in a particular investment fund, the Adviser will consider whether it is appropriate, in light of all relevant circumstances, to value the Fund's investment at the net asset value reported by the Non-Traded REIT at the time of valuation or to adjust the value to reflect a premium or discount.

The Adviser will provide the Board with periodic reports, no less frequently than quarterly, that discuss the functioning of the valuation process, if applicable to that period, and that identify issues and valuation problems that have arisen, if any.

**CONFLICTS OF INTEREST**

As a general matter, certain conflicts of interest may arise in connection with a portfolio manager's management of a fund's investments, on the one hand, and the investments of other accounts for which the portfolio manager is responsible, on the other. For example, it is possible that the various accounts managed could have different investment strategies that, at times, might conflict with one another to the possible detriment of the Fund. Alternatively, to the extent that the same investment opportunities might be desirable for more than one account, possible conflicts could arise in determining how to allocate them. Other potential conflicts might include conflicts created by specific portfolio manager compensation arrangements, and conflicts relating to selection of brokers or dealers to execute Fund portfolio trades and/or specific uses of commissions from Fund portfolio trades (for example, research, or "soft dollars", if any). The Adviser has adopted policies and procedures and has structured its portfolio managers' compensation in a manner reasonably designed to safeguard the Fund from being negatively affected as a result of any such potential conflicts. These policies and procedures generally require that the Adviser distribute investment opportunities among client accounts in a fair and equitable manner (*i.e.,* on a pro rata basis, relative to the size of the order) and seek best execution for securities transactions executed on the Fund's behalf.

If a potential investment is appropriate for either the Fund or another entity managed by the Adviser or its affiliates, such as NXDT, NXRT, VineBrook, NHT, NREF, NexPoint Real Estate Capital, LLC, NexPoint Real Estate Opportunities, LLC, NFRO REIT Sub, LLC or NexPoint Capital REIT, LLC, the Adviser and its affiliates have an allocation policy that provides that opportunities will be allocated among those accounts for which participation in the respective opportunity is considered most appropriate, taking into account, among other considerations with respect to any real estate investments:

First, the allocation policy looks to the investment objectives of the funds managed by the Adviser and its affiliates. To the extent the opportunity is consistent with the investment objectives of more than one fund managed by the Adviser and its affiliates, the allocation policy then looks to other factors, such as:

- which fund has available cash (including availability under lines of credit) to acquire the investment;
- whether there are any positive or negative income tax effects on any of the funds relating to the purchase;
- whether the investment opportunity creates geographic, asset class or tenant concentration / diversification concerns for any of the funds;
- how the investment size, potential leverage, transaction structure and anticipated cash flows affect each fund, including earnings and distribution coverage; and
- whether one or more of the funds has an existing relationship with the tenant(s), operator, facility or system associated with the investment, or a significant geographic presence that would make the investment strategically more important.

The Adviser will allocate investment opportunities across the entities for which such opportunities are appropriate, consistent with its internal conflict of interest and allocation policies. The Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Fund fairly or equitably in the short-term or over time and there can be no assurance that the Fund will be able to participate in all such investment opportunities that are suitable for it. Please see "Risk Factors — Conflicts of Interest" for a description of risks associated with conflicts of interest.

Below are policies and procedures developed by the Adviser to address various conflicts of interest that may involve the Fund.

*Affiliated Services*

In situations where NexPoint and/or its affiliates, including, without limitation, any of their respective employees, provide services (including serving as an officer or director) to various companies in which the Fund has an interest, the relevant employee(s) must promptly notify NexPoint's Chief Compliance Officer of the activity prior to commencement of the service. All compensation in whatever form, including any non-cash compensation such as restricted shares, attributable to NexPoint and/or its affiliates serving as an officer or director to such companies must be immediately paid to the Fund in proportion to the Fund's relative ownership of such companies as of the date paid.

*Portfolio Management*

The Adviser's policies also require the Adviser and its personnel to: (i) ensure that the investment advice provided to the Fund is suitable to the Fund's investment objectives, needs and circumstances; (ii) ensuring fair and equitable allocations of investment opportunities among the Fund and the Adviser's other advisory clients and in the aggregation of orders; and (iii) trading for the Fund only on an agency basis.

The portfolio managers and their teams are responsible for the monitoring and positioning of the investments of the Fund. This includes the evaluation of a variety of factors affecting each investment such as industry and currency risks, concentration and liquidity and the suitability of the investment for the Fund.

The Adviser will not consider: (i) performance fees or differences in management fees between accounts in determining allocations; (ii) direct and indirect ownership of the Adviser or its affiliates or employees in an account in determining allocations; and (iii) relative performance of accounts in determining allocations.

The Adviser and/or any of its affiliates may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund, or of other investment funds managed by the Adviser or its affiliates. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. The Fund may compete with other entities managed by the Adviser and its affiliates for capital and investment opportunities.

There is no limitation or restriction on the Adviser or any of its affiliates with regard to acting as investment manager (or in a similar role) to other parties or persons. This and other future activities of the Adviser and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may be related to obligations that the Adviser or its affiliates have to other clients.

Subject to prior approval of the Board, certain affiliates of the Adviser, including NexBank and Governance Re Ltd. among others, may provide banking, agency, insurance and other services to the Fund and its subsidiaries for customary fees, and neither the Fund, nor its subsidiaries will have a right to any such fees.

*Capital Structure Conflicts*

Conflicts may arise in cases when the Fund invests in different parts of an issuer's capital structure, including circumstances in which one or more advisory clients of NexPoint or its affiliates own private securities or obligations of an issuer and other clients may own public securities of the same issuer. As discussed above, in the event of conflicting interests within an issuer's capital structure, NexPoint will generally pursue the strategy that NexPoint believes best reflects what would be expected to be negotiated in an arm's length transaction with due consideration being given to NexPoint's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or the fees received from such accounts).

*Affiliated Transactions and Cross Trading*

As further described below, the Adviser may effect client cross-transactions where the Adviser causes a transaction to be effected between the Fund and another client advised by the Adviser or any of its affiliates. The

Adviser may engage in a client cross-transaction involving the Fund any time that the Adviser believes such transaction to be fair to the Fund and the other client of the Adviser or its affiliates in accordance with the Adviser's internal written cross-transaction policies and procedures.

The Adviser may direct the Fund to acquire or dispose of investments in cross trades between the Fund and other clients of the Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the 1940 Act and SEC staff interpretation, the Fund may make and/or hold an investment, including an investment in securities, in which the Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Adviser's own investments in such companies.

*Participation in Creditor Committees, Underwriting and Other Activities*

The Adviser and/or any of its affiliates may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout or foreclosure of the Fund's investments. In such circumstances, the Adviser may take positions on behalf of itself or its affiliates that are adverse to the Fund's interests.

The Adviser and/or any of its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Fund. Such transactions are on an arm's-length basis and may be subject to arm's-length fees. There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Adviser and/or any of its affiliates and neither the Fund nor its shareholders shall have the right to any such fees.

*Material Non-Public Information*

There are generally no ethical screens or information barriers among the Adviser and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Adviser, any of its personnel or its affiliates were to receive material non-public information about an investment or issuer, or have an interest in causing us to acquire a particular investment, the Adviser may be prevented from causing the Fund to purchase or sell such asset due to internal restrictions imposed on the Adviser. Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Adviser, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material non-public information could have adverse effects on the Adviser's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Adviser's ability to perform its investment management services to the Fund. In addition, while the Adviser and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Adviser's ability to operate as an integrated platform could also be impaired, which would limit the Adviser's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

NexPoint and its affiliates believe these policies and procedures are reasonably designed to prevent violations of the federal securities laws with respect to the conflicts identified above.

**QUARTERLY REPURCHASES OF SHARES**

Once each quarter, the Fund will offer to repurchase at NAV no less than 5% of the outstanding shares of the Fund, unless such offer is suspended or postponed in accordance with regulatory requirements (as discussed below). The offer to purchase shares is a fundamental policy that may not be changed without the vote of the holders of a majority of the Fund's outstanding voting securities (as defined in the 1940 Act). Shareholders will be notified in writing of each quarterly repurchase offer and the date the repurchase offer ends (the "Repurchase Request Deadline"). Shares received by the Fund or a Financial Intermediary (as defined below) prior to the Repurchase Request Deadline will be repurchased at the NAV per share determined as of the close of regular trading on the NYSE no later than the 14th day after the Repurchase Request Deadline, or the next business day if the 14th day is not a business day (each a "Repurchase Pricing Date").

Shareholders will be notified in writing about each quarterly repurchase offer, how they may request that the Fund repurchase their shares and the "Repurchase Request Deadline," which is the date the repurchase offer ends. The Fund will be deemed to have received a repurchase request order prior to the Repurchase Request Deadline when a financial intermediary or its agent or authorized designee (which may include other intermediaries designated by the financial intermediary to receive orders on the Fund's behalf) (collectively, "Financial Intermediaries") receives the order from the shareholder prior to the Repurchase Request Deadline, provided the Fund receives the repurchase request order from the Financial Intermediary prior to 11:59 p.m. Eastern Time on the date the repurchase offer ends. Financial Intermediaries are responsible for placing orders correctly and promptly with the Fund. Shares tendered for repurchase by shareholders prior to any Repurchase Request Deadline will be repurchased subject to the aggregate repurchase amounts established for that Repurchase Request Deadline. The time between the notification to shareholders and the Repurchase Request Deadline is generally 30 days, but may vary from no more than 42 days to no less than 21 days. Payment pursuant to the repurchase will be made by checks to the shareholder's address of record, or credited directly to a predetermined bank account on the Purchase Payment Date, which will be no more than seven days after the Repurchase Pricing Date. The Board may establish other policies for repurchases of shares that are consistent with the 1940 Act, regulations thereunder and other pertinent laws.

**Determination of Repurchase Offer Amount**

The Board, or a committee thereof, in its sole discretion, will determine the number of shares that the Fund will offer to repurchase (the "Repurchase Offer Amount") for a given Repurchase Request Deadline. The Repurchase Offer Amount will be no less than 5% and no more than 25% of the total number of shares outstanding on the Repurchase Request Deadline. In determining the Repurchase Offer Amount, the Board, or a committee thereof, may consider any information it deems necessary or appropriate, including the percentage of the Fund's outstanding shares tendered in previous repurchase offers; the Adviser's assessment of the liquidity of the Fund's investment portfolio; the potential impact of the Repurchase Offer Amount on Fund shareholders who do not tender their shares; and the potential impact of the Repurchase Offer Amount on the Fund's ability to achieve its investment objective. Investors should not rely on repurchase offers being made in amounts in excess of 5% of Fund assets, even in the event that shareholders tender more than the Repurchase Offer Amount with respect a repurchase offer.

If shareholders tender for repurchase more than the Repurchase Offer Amount for a given repurchase offer, the Fund will repurchase the shares on a pro rata basis. However, the Fund may accept all shares tendered for repurchase by shareholders who own less than one hundred shares and who tender all of their shares, before prorating other amounts tendered. In addition, the Fund will accept the total number of shares tendered in connection with required minimum distributions from an IRA or other qualified retirement plan. It is the shareholder's obligation to both notify and provide the Fund supporting documentation of a required minimum distribution from an individual retirement account ("IRA") or other qualified retirement plan.

**Notice to Shareholders**

Approximately 30 days (but no less than 21 days and more than 42 days) before each Repurchase Request Deadline, the Fund shall send to each shareholder of record and to each beneficial owner of the shares that are the subject of the repurchase offer a notification ("Shareholder Notification"). The Shareholder Notification will contain information shareholders should consider in deciding whether or not to tender their shares for repurchase. The notice also will include detailed instructions on how to tender shares for repurchase, state the Repurchase Offer Amount and identify the dates of the Repurchase Request Deadline, the scheduled Repurchase Pricing Date, and the date the repurchase proceeds are scheduled for payment (the "Repurchase Payment Deadline"), which will be no more than seven days after the Repurchase Pricing Date. The notice also will set forth the NAV that has been computed no more than seven days before the date of notification, and how shareholders may ascertain the NAV after the notification date.

**Repurchase Price**

The repurchase price of the shares will be the NAV as of the close of regular trading on the NYSE on the Repurchase Pricing Date. You may call (844) 485-9167 to learn the NAV. The notice of the repurchase offer also will provide information concerning the NAV, such as the NAV as of a recent date or a sampling of recent NAVs, and a toll-free number for information regarding the repurchase offer.

**Repurchase Amounts and Payment of Proceeds**

Shares tendered for repurchase by shareholders prior to any Repurchase Request Deadline will be repurchased subject to the aggregate Repurchase Offer Amount established for that Repurchase Request Deadline. Payment pursuant to the repurchase offer will be made by check to the shareholder's address of record, or credited directly to a predetermined bank account on the Repurchase Payment Deadline. The Board may establish other policies for repurchases of shares that are consistent with the 1940 Act, regulations thereunder and other pertinent laws.

If shareholders tender for repurchase more than the Repurchase Offer Amount for a given repurchase offer, the Board may, but is not required to, authorize the Fund to repurchase an additional amount of shares not to exceed 2% of the outstanding shares of the Fund on the Repurchase Request Deadline. If the Fund determines not to repurchase more than the Repurchase Offer Amount, or if shareholders tender shares in an amount exceeding the Repurchase Offer Amount plus 2% of the outstanding shares on the Repurchase Request Deadline, the Fund will repurchase the shares on a pro rata basis. However, the Fund may accept all shares tendered for repurchase by shareholders who own less than one hundred shares and who tender all of their shares, before prorating other amounts tendered.

**Contingent Deferred Sales Charge ("CDSC")**

Selling brokers, or other Financial Intermediaries that have entered into distribution agreements with the Distributor with respect to the sale of Class A and Class C shares, may receive a commission of up to 1.00% of the purchase price of Class A or Class C shares of $5,000,000 or more. Shareholders who tender for repurchase of such shareholder's Class A or Class C shares within 18 months of purchase will be subject to a CDSC of 1.00% of the original purchase price, which will be deducted from repurchase proceeds, if: (i) the original purchase was for amounts of $500,000 or more; and (ii) the shares were purchased without an initial sales charge. The Distributor may waive the imposition of the CDSC in the following situations: (1) shareholder death; or (2) shareholder disability. Any such waiver does not imply that the CDSC will be waived at any time in the future or that such CDSC will be waived for any other shareholder. Class Z shares will not be subject to an early-withdrawal charge.

**Suspension or Postponement of Repurchase Offer**

The Fund may suspend or postpone a repurchase offer only: (a) if making or effecting the repurchase offer would cause the Fund to lose its status as a RIC under the Code; (b) for any period during which the NYSE or any

market on which the securities owned by the Fund are principally traded is closed, other than customary weekend and holiday closings, or during which trading in such market is restricted; (c) for any period during which an emergency exists as a result of which disposal by the Fund of securities owned by it is not reasonably practicable, or during which it is not reasonably practicable for the Fund fairly to determine the value of its net assets; or (d) for such other periods as the Commission may by order permit for the protection of shareholders of the Fund.

**Liquidity Requirements**

The Fund must maintain liquid assets equal to the Repurchase Offer Amount from the time that the notice is sent to shareholders until the Repurchase Pricing Date. The Fund will ensure that a percentage of its net assets equal to at least 100% of the Repurchase Offer Amount consists of assets that can be sold or disposed of in the ordinary course of business at approximately the price at which the Fund has valued the investment within the time period between the Repurchase Request Deadline and the Repurchase Payment Deadline. The Board has adopted procedures that are reasonably designed to ensure that the Fund's assets are sufficiently liquid so that the Fund can comply with the repurchase offer and the liquidity requirements described in the previous paragraph. If, at any time, the Fund falls out of compliance with these liquidity requirements, the Board will take whatever action it deems appropriate to ensure compliance.

**Consequences of Repurchase Offers**

Repurchase offers will typically be funded from available cash or sales of portfolio securities. Payment for repurchased shares, however, may require the Fund to liquidate portfolio holdings earlier than the Adviser otherwise would, thus increasing the Fund's portfolio turnover and potentially causing the Fund to realize losses.

The Adviser intends to take measures to attempt to avoid or minimize such potential losses and turnover, and instead of liquidating portfolio holdings, may borrow money to finance repurchases of shares. If the Fund borrows to finance repurchases, interest on that borrowing will negatively affect shareholders who do not tender their shares in a repurchase offer by increasing the Fund's expenses and reducing any net investment income. To the extent the Fund finances repurchase amounts by selling Fund investments, the Fund may hold a larger proportion of its assets in less liquid securities. The sale of portfolio securities to fund repurchases also could reduce the market price of those underlying securities, which in turn would reduce the Fund's NAV.

Repurchase of the Fund's shares will tend to reduce the amount of outstanding shares and, depending upon the Fund's investment performance, its net assets. A reduction in the Fund's net assets would increase the Fund's expense ratio, to the extent that additional shares are not sold and expenses otherwise remain the same (or increase). In addition, the repurchase of shares by the Fund will be a taxable event to shareholders.

The Fund is intended as a long-term investment. The Fund's quarterly repurchase offers are a shareholder's only means of liquidity with respect to his or her shares. Shareholders have no rights to redeem or transfer their shares, other than limited rights of a shareholder's descendants to redeem shares in the event of such shareholder's death pursuant to certain conditions and restrictions. The shares are not traded on a national securities exchange and no secondary market exists for the shares, nor does the Fund expect a secondary market for its shares to exist in the future.

**DISTRIBUTION POLICY**

The Fund's distribution policy is to make monthly distributions to shareholders. The Fund's Board has the ultimate discretion as to whether such distributions will be in kind or in cash. If, for any distribution, investment company taxable income (which term includes net short-term capital gain), if any, and net tax-exempt income, if any, is less than the amount of the distribution, such difference will generally constitute a tax-free return of capital distributed from the Fund's assets. The Fund's final distribution for each taxable year will include any remaining investment company taxable income and net tax-exempt income undistributed during the year, as well as all net capital gain realized during the year. If the total distributions made in any taxable year exceed investment company taxable income, net tax-exempt income and net capital gain, such excess distributed amount would be treated as ordinary dividend income to the extent of the Fund's current and accumulated earnings and profits. Distributions in excess of the earnings and profits would first be a tax-free return of capital to the extent of a shareholder's adjusted tax basis in the shares. After such adjusted tax basis is reduced to zero, the distribution would constitute capital gain (assuming the shares are held as capital assets).

This distribution policy may, under certain circumstances, have certain adverse consequences to the Fund and its shareholders because it may result in a return of capital, which in turn may result in fewer of a shareholder's assets being invested in the Fund and which, over time, would increase the Fund's expense ratio and decrease returns of shareholders. The distribution policy also may cause the Fund to sell securities at a time it would not otherwise do so in order to manage the distribution of income and gain. The initial distribution will be declared on a date determined by the Board. If the Fund's investments are delayed, the initial distribution may consist principally of a return of capital.

Unless the registered owner of shares elects to receive cash, all dividends declared on shares will be automatically reinvested in additional shares of the Fund. See "Distribution Reinvestment Policy."

The dividend distribution described above may result in the payment of approximately the same amount or percentage to the Fund's shareholders each period.

Shareholders receiving periodic payments from the Fund may be under the impression that they are receiving net profits. However, all or a portion of a distribution may consist of a return of capital. Shareholders should not assume that the source of a distribution from the Fund is net profit. A return of capital distribution is not taxable to a shareholder unless it exceeds a shareholder's tax cost (or "tax basis") in the Fund's shares. Returns of capital distributions reduce a shareholder's tax basis, thereby potentially increasing the taxable gain, if any, or decreasing the loss recognized by a shareholder upon a subsequent disposition of Fund shares. Once a shareholder's tax basis is reduced to zero, any further return of capital distribution would be taxable as capital gains, provided shares are held as capital assets. As required under Section 19(a) of the 1940 Act, the Fund will provide a notice to shareholders at the time of distribution when such distribution does not consist solely of net income. Additionally, each distribution payment will be accompanied by a written statement which discloses the source or sources of each distribution. The IRS requires you to report the amounts so received in any calendar year, excluding returns of capital, in each case as determined and reported on Forms 1099 (which amounts may differ from the sum of the amounts reported in prior notices under Section 19(a) as a result of the Fund's performance subsequent to such notices), on your income tax return, generally for the calendar year in which such amounts were received. The Fund will provide disclosures, with each distribution, that estimate the percentages of the current and year-to-date distributions that represent: (1) net investment income; (2) capital gains; and (3) return of capital. At the end of the year, the Fund may be required under applicable law to re-characterize distributions made previously during that year among: (1) ordinary income; (2) capital gains; and (3) return of capital for tax purposes. An additional distribution may be made in December, and other additional distributions may be made with respect to a particular fiscal year in order to comply with applicable law. Shareholders should read any written disclosure provided pursuant to Section 19(a) and Rule 19a-1 carefully and should not assume that the source of any distribution from the Fund is net profit.

The Board reserves the right to change the monthly distribution policy from time to time.

**DISTRIBUTION REINVESTMENT POLICY**

The Fund will operate under a distribution reinvestment policy administered by SS&C (the "Agent"). Pursuant to the policy, the Fund's ordinary income dividends, capital gain distributions or other distributions (each, a "Distribution" and collectively, "Distributions"), net of any applicable U.S. withholding tax, are reinvested in shares of the Fund.

Shareholders automatically participate in the distribution reinvestment policy, unless and until an election is made to withdraw from the policy on behalf of such participating shareholder. Shareholders who do not wish to have Distributions automatically reinvested should so notify the Agent in writing at NexPoint Real Estate Strategies Fund, c/o SS&C Technologies, Inc., P.O. Box 219630, Kansas City, MO 64121-9730. Such written notice must be received by the Agent 30 days prior to the record date of the Distribution or the shareholder will receive such Distribution in shares through the distribution reinvestment policy. Under the distribution reinvestment policy, the Fund's Distributions to shareholders are reinvested in full and fractional shares as described below.

When the Fund declares a Distribution, the Agent, on the shareholder's behalf, will receive additional authorized shares from the Fund either newly-issued or repurchased from shareholders by the Fund and held as treasury shares. The number of shares to be received when Distributions are reinvested will be determined by dividing the amount of the Distribution by the Fund's NAV per share.

The Agent will maintain all shareholder accounts and furnish written confirmations of all transactions in the accounts, including information needed by shareholders for personal and tax records. The Agent will hold shares in the account of the shareholders in non-certificated form in the name of the participant, and each shareholder's proxy, if any, will include those shares purchased pursuant to the distribution reinvestment policy. Each participant, nevertheless, has the right to request certificates for whole and fractional shares owned. The Fund will issue certificates in its sole discretion. The Agent will distribute all proxy solicitation materials, if any, to participating shareholders.

In the case of shareholders, such as banks, brokers or nominees, that hold shares for others who are beneficial owners participating under the distribution reinvestment policy, the Agent will administer the distribution reinvestment policy on the basis of the number of shares certified from time to time by the record shareholder as representing the total amount of shares registered in the shareholder's name and held for the account of beneficial owners participating under the distribution reinvestment policy.

Neither the Agent nor the Fund shall have any responsibility or liability beyond the exercise of ordinary care for any action taken or omitted pursuant to the distribution reinvestment policy, nor shall they have any duties, responsibilities or liabilities except as expressly set forth herein. Neither shall they be liable hereunder for any act done in good faith or for any good faith omissions to act, including, without limitation, failure to terminate a participant's account prior to receipt of written notice of his or her death or with respect to prices at which shares are purchased or sold for the participants account and the terms on which such purchases and sales are made, subject to applicable provisions of the federal securities laws.

The automatic reinvestment of Distributions will not relieve participants of any federal, state or local income tax that may be payable (or required to be withheld) on such Distributions. See "U.S. Federal Income Tax Matters."

The Fund reserves the right to amend or terminate the distribution reinvestment policy. There is no direct service charge to participants with regard to purchases under the distribution reinvestment policy; however, the Fund reserves the right to amend the distribution reinvestment policy to include a service charge payable by the participants.

All correspondence concerning the distribution reinvestment policy should be directed to the Agent at NexPoint Real Estate Strategies Fund, c/o SS&C Technologies, Inc., P.O. Box 219630, Kansas City, MO 64121-9730. Certain transactions can be performed by calling the toll free number (844) 485-9167.

## U.S. FEDERAL INCOME TAX MATTERS

The following briefly summarizes some of the important federal income tax consequences to shareholders of investing in the Fund's shares, reflects the federal tax law as of the date of this Prospectus, and does not address special tax rules applicable to certain types of investors, such as corporate, tax-exempt and foreign investors. The summary discusses certain U.S. federal income tax consequences that may be relevant to a shareholder of the Fund that acquires, holds and/or disposes of shares of the Fund, and reflects provisions of the Code, existing Treasury regulations, rulings published by the IRS, and other applicable authority, as of the date of this Prospectus. These authorities are subject to change by legislative or administrative action, possibly with retroactive effect. The following discussion is only a summary of some of the important tax considerations generally applicable to investments in the Fund and the discussion set forth herein does not constitute tax advice. For more detailed information regarding tax considerations, see the SAI. There may be other tax considerations applicable to particular investors such as those holding shares in a tax-advantaged account such as an IRA or 401(k) plan. In addition, income earned through an investment in the Fund may be subject to state, local and foreign taxes. Investors should consult their tax advisers regarding other federal, state or local tax considerations that may be applicable in their particular circumstances, as well as any proposed tax law changes.

The Fund has elected to be treated and intends to qualify each year for taxation as a RIC under Subchapter M of the Code. In order for the Fund to qualify as a RIC, it must meet certain requirements regarding the sources of its income, the diversification of its assets, and the amount and timing of its distributions each year. If the Fund meets such requirements and so qualifies for the favorable tax treatment accorded to RICs, the Fund (but not the shareholder) will not be subject to federal income tax on income or gains distributed in a timely manner to its shareholders in the form of dividends or capital gain distributions. The Code imposes a 4% nondeductible excise tax on RICs, such as the Fund, to the extent they do not meet certain distribution requirements by the end of each calendar year. The Fund anticipates meeting these distribution requirements so as to avoid being subject to the 4% excise tax.

The Fund intends to make distributions of investment company taxable income after payment of the Fund's operating expenses no less frequently than annually. Unless a shareholder is ineligible to participate or elects otherwise, all distributions will be automatically reinvested in additional shares of the Fund pursuant to the distribution reinvestment policy. For U.S. federal income tax purposes, all dividends are generally taxable whether a shareholder receives them in cash or reinvests them in additional shares of the Fund. Distributions of the Fund's investment company taxable income (including short-term capital gains) will generally be taxable to shareholders as ordinary income to the extent of the Fund's current and accumulated earnings and profits. Distributions of the Fund's net capital gains (that is, the excess of net long-term capital gain over net short-term capital loss, in each case determined with reference to any loss carryforwards) properly reported by the Fund as capital gain dividends ("Capital Gain Dividends"), if any, are taxable to shareholders as long-term capital gains, regardless of the length of time shares have been held by shareholders. Distributions, if any, in excess of the Fund's earnings and profits will first reduce the adjusted tax basis of a holder's shares (thereby increasing any taxable gain or decreasing any taxable loss in connection with a subsequent taxable disposition of such shares) and, after that basis has been reduced to zero, will constitute capital gains to the shareholder of the Fund (assuming the shares are held as a capital asset). Some portions of the Fund's distributions may be eligible for the dividends-received deduction in the case of corporate shareholders and may be eligible to be treated as qualified dividend income in the case of shareholders taxed as individuals, provided, in both cases, the shareholder meets certain holding period and other requirements in respect of the Fund's shares. Dividends received by the Fund from a REIT will not qualify for the corporate dividends-received deduction and generally will not constitute qualified dividend income. There can be no assurance as to what portion of Fund distributions, if any, may be eligible for the dividends received deduction or for treatment as qualified dividend income.

If you sell, exchange or otherwise dispose of any of your shares of the Fund (including (i) exchanging them for shares of another eligible Fund as described in "Exchange of Shares" below or (ii) through a redemption) you will generally recognize a gain or loss in an amount equal to the difference between your tax basis in such shares

of the Fund and the amount you receive upon disposition of such shares. If you hold your shares as capital assets, any such gain or loss will be long-term capital gain or loss if you have held (or are treated as having held) such shares for more than one year at the time of sale. All or a portion of any loss you realize on a taxable sale or exchange of your shares of the Fund will be disallowed if you acquire other shares of the Fund (whether through the automatic reinvestment of dividends or otherwise) within a 61-day period beginning 30 days before and ending 30 days after your sale or exchange of the shares. In such case, the basis of the shares acquired will be adjusted to reflect the disallowed loss.

In addition, any loss realized upon a taxable sale or exchange of Fund shares held (or deemed held) by you for six months or less will be treated as long-term, rather than short-term, to the extent of any capital gain dividends received (or deemed received) by you with respect to those shares.

The Fund will inform its shareholders of the source and tax status of all distributions promptly after the close of each calendar year.

## DESCRIPTION OF CAPITAL STRUCTURE AND SHARES

The Fund is an unincorporated statutory trust established under the laws of the State of Delaware upon the filing of a Certificate of Trust with the Secretary of State of Delaware on January 11, 2016. The Fund's Agreement and Declaration of Trust (the "Declaration of Trust") provides that the Trustees of the Fund may authorize separate classes of shares of beneficial interest. The Trustees have authorized an unlimited number of shares. The Fund does not intend to hold annual meetings of its shareholders.

The Declaration of Trust, which has been filed with the SEC, permits the Fund to issue an unlimited number of full and fractional shares of beneficial interest, no par value. The Fund offers three different classes of shares: Class A, Class C, and Class Z shares. The Fund has received exemptive relief from the SEC to issue multiple classes of shares and to impose asset-based distribution fees and early-withdrawal charges (See IC Release No. 28908, September 22, 2009). An investment in any share class of the Fund represents an investment in the same assets of the Fund. However, the minimum investment amounts, sales loads, and ongoing fees and expenses for each share class are different. The fees and expenses for the Fund are set forth in "Fees and Fund Expenses." The details of each share class are set forth in "Plan of Distribution."

Holders of shares will be entitled to the payment of dividends when, as and if declared by the Board. The Fund currently intends to make dividend distributions to its shareholders after payment of Fund operating expenses including interest on outstanding borrowings, if any, no less frequently than quarterly. Unless the registered owner of shares elects to receive cash, all dividends declared on shares will be automatically reinvested for shareholders in additional shares of the same class of the Fund. See "Distribution Policy." The 1940 Act may limit the payment of dividends to the holders of shares.

Each whole share shall be entitled to one vote as to matters on which it is entitled to vote pursuant to the terms of the Declaration of Trust on file with the SEC. Upon liquidation of the Fund, after paying or adequately providing for the payment of all liabilities of the Fund, and upon receipt of such releases, indemnities and refunding agreements as they deem necessary for their protection, the Trustees may distribute the remaining assets of the Fund among its shareholders. The shares are not liable to further calls or to assessment by the Fund. There are no pre-emptive rights associated with the shares. The Declaration of Trust provides that the Fund's shareholders are not liable for any liabilities of the Fund. Although shareholders of an unincorporated statutory trust established under Delaware law, in certain limited circumstances, may be held personally liable for the obligations of the Fund as though they were general partners, the provisions of the Declaration of Trust described in the foregoing sentence make the likelihood of such personal liability remote.

The Fund generally will not issue share certificates. However, upon written request to the Fund's transfer agent, a share certificate may be issued at the Fund's discretion for any or all of the full shares credited to an investor's account. Share certificates that have been issued to an investor may be returned at any time. The Fund's transfer agent will maintain an account for each shareholder upon which the registration of shares are recorded, and transfers, permitted only in rare circumstances, such as death or bona fide gift, will be reflected by bookkeeping entry, without physical delivery. The transfer agent will require that a shareholder provide requests in writing, accompanied by a valid signature guarantee form, when changing certain information in an account such as wiring instructions or telephone privileges.

The following table shows the amounts of Fund shares that have been authorized and are outstanding as of March 31, 2025:

| Title of Class | Amount Authorized | Amount Held by Fund or for its Account | Amount Outstanding Excluding Amount Shown Under |
|---|---|---|---|
| Class A | Unlimited | None | 464,693 |
| Class C | Unlimited | None | 162,541 |
| Class Z | Unlimited | None | 1,432,029 |

Case 3:26-cv-02496-D Document 17-30 Filed 09/08/26 Page 266 of 608 PageID 12417

**ANTI-TAKEOVER PROVISIONS IN THE DECLARATION OF TRUST**

The Declaration of Trust includes provisions that could have the effect of limiting the ability of other entities or persons to acquire control of the Fund or to change the composition of the Board, and could have the effect of depriving the Fund's shareholders of an opportunity to sell their shares at a premium over prevailing market prices, if any, by discouraging a third party from seeking to obtain control of the Fund. These provisions may have the effect of discouraging attempts to acquire control of the Fund, which attempts could have the effect of increasing the expenses of the Fund and interfering with the normal operation of the Fund. The Trustees are elected for indefinite terms and do not stand for reelection. A Trustee may be removed from office without cause only by a written instrument signed or adopted by a majority of the remaining Trustees or by a vote of the holders of at least two-thirds of the class of shares of the Fund that are entitled to elect a Trustee and that are entitled to vote on the matter. The Declaration of Trust does not contain any other specific inhibiting provisions that would operate only with respect to an extraordinary transaction such as a merger, reorganization, tender offer, sale or transfer of substantially all of the Fund's asset, or liquidation.

**PLAN OF DISTRIBUTION**

NexPoint Securities, Inc., located at 200 Crescent Court, Suite 700, Dallas, Texas 75201, serves as the Fund's principal underwriter, within the meaning of the 1940 Act, and acts as the distributor of the Fund's shares on a reasonable efforts basis, subject to various conditions. The Distributor is an affiliate of the Adviser. The Fund's shares are offered for sale through the Distributor at NAV plus the applicable sales load. The Distributor also may enter into selected dealer agreements with other broker-dealers for the sale and distribution of the Fund's shares. No arrangement has been made to place funds received in an escrow, trust or similar account. The Distributor is not required to sell any specific number or dollar amount of the Fund's shares, but will use its reasonable efforts to sell the shares. Shares of the Fund will not be listed on any national securities exchange and the Distributor will not act as a market marker in Fund shares.

On a quarterly basis, Class C shares will pay a Distribution Fee that will accrue at an annual rate equal to 0.75% of the Fund's average daily net assets attributable to Class C shares. Class A and Class Z shares are not subject to Distribution Fees. Class A and Class C shares are subject to a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Fund attributable to each respective share class.

**Additional Broker Dealer Compensation**

The Adviser or its affiliates, in the Adviser's discretion and from their own resources (which may include the Adviser's legitimate profits from the advisory fee it receives from the Fund), may pay additional compensation to brokers or dealers in connection with the sale and distribution of Fund shares (the "Additional Compensation"). In return for the Additional Compensation, the Fund may receive certain marketing advantages including access to a broker's or dealer's registered representatives, placement on a list of investment options offered by a broker or dealer, or the ability to assist in training and educating the broker's or dealer's registered representatives. The Additional Compensation may differ among brokers or dealers in amount or in the manner of calculation: payments of Additional Compensation may be fixed dollar amounts, or based on the aggregate value of outstanding shares held by shareholders introduced by the broker or dealer, or determined in some other manner. The receipt of Additional Compensation by a selling broker or dealer may create potential conflicts of interest between an investor and its broker or dealer who is recommending the Fund over other potential investments. The payment of Additional Compensation may also have the effect of increasing the Fund's assets under management, which would increase management fees payable to the Adviser. There is no limit on the amount of additional compensation paid by the Adviser or its affiliates, subject to the limitations imposed by FINRA.

Additionally, the Fund, the Adviser and/or their respective affiliates, may pay a servicing fee to the Distributor and to other selected securities dealers and other financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. Such services may include electronic processing of client orders, electronic fund transfers between clients and the Fund, account reconciliations with the Fund's transfer agent, facilitation of electronic delivery to clients of Fund documentation, monitoring client accounts for back-up withholding and any other special tax reporting obligations, maintenance of books and records with respect to the foregoing, and such other information and liaison services as the Fund or the Adviser may reasonably request. Pursuant to a Shareholder Servicing Plan and Agreement, the Fund's (and, indirectly, the Class A and Class C holders') share of such servicing fees will not exceed an annual rate of 0.25% of the Fund's average daily net asset value.

Prior to the initial public offering of shares, the Adviser purchased $101,750 in shares of the Fund, which amount meets the net worth requirements of Section 14(a) of the 1940 Act.

**Purchasing Shares**

Investors may purchase shares directly from the Fund in accordance with the instructions below. Investors may buy and sell shares of the Fund through Financial Intermediaries that have made arrangements with the Fund and

are authorized to buy and sell shares of the Fund. Orders will be priced at the appropriate price next computed after it is received by the Fund or a Financial Intermediary. A Financial Intermediary may hold shares in an omnibus account in the Financial Intermediary's name or the Financial Intermediary may maintain individual ownership records. The Fund may pay the Financial Intermediary for maintaining individual ownership records as well as providing other shareholder services. Financial Intermediaries may charge fees for the services they provide in connection with processing your transaction order or maintaining an investor's account with them. Investors should check with their Financial Intermediary to determine if their account is subject to these arrangements. The Fund will be deemed to have received a purchase order prior when a Financial Intermediary receives the order from the shareholder. Financial Intermediaries are responsible for placing orders correctly and promptly with the Fund, forwarding payment promptly. Orders transmitted with a Financial Intermediary before the close of regular trading (generally 4:00 p.m., Eastern Time) on a day that the NYSE is open for business will be priced based on the Fund's NAV next computed after it is received by the Financial Intermediary.

**By Mail**

To make an initial purchase by mail, complete an account application and mail the application, together with a check made payable to NexPoint Real Estate Strategies Fund to:

**Regular Mail**

NexPoint Real Estate Strategies Fund
c/o SS&C Technologies, Inc.
P.O. Box 219630
Kansas City, MO 64121-9730

**Express Mail**

NexPoint Real Estate Strategies Fund
c/o SS&C Technologies, Inc.
801 Pennsylvania Ave
Kansas City, MO 64105

All checks must be in U.S. Dollars drawn on a domestic bank. The Fund will not accept payment in cash or money orders. The Fund also does not accept cashier's checks in amounts of less than $500. To prevent check fraud, the Fund will neither accept third party checks, Treasury checks, credit card checks, traveler's checks or starter checks for the purchase of shares, nor post-dated checks, post-dated on-line bill pay checks, or any conditional purchase order or payment.

It is the policy of the Fund not to accept applications under certain circumstances or in amounts considered disadvantageous to shareholders. The Fund reserves the right to reject any application.

**By Wire — Initial Investment**

To make an initial investment in the Fund, the transfer agent must receive a completed account application before an investor wires funds. Investors may mail or overnight deliver an account application to the transfer agent. Upon receipt of the completed account application, the transfer agent will establish an account. The account number assigned will be required as part of the instruction that should be provided to an investor's bank to send the wire. An investor's bank must include both the name of the Fund, the account number, and the investor's name so that monies can be correctly applied. If you wish to wire money to make an investment in the Fund, please call the Fund at (844) 485-9167 for wiring instructions and to notify the Fund that a wire transfer is coming. Any commercial bank can transfer same-day funds via wire. The Fund will normally accept wired funds for investment on the day received if they are received by the Fund's designated bank before the close of regular

trading on the NYSE. Your bank may charge you a fee for wiring same-day funds. The bank should transmit funds by wire to:

ABA #: (number provided by calling toll-free number above)
Credit: SS&C Technologies, Inc.
Account #: (number provided by calling toll-free number above)
Further Credit:
NexPoint Real Estate Strategies Fund
(shareholder registration)
(shareholder account number)

**By Wire — Subsequent Investments**

Before sending a wire, investors must contact the transfer agent to advise them of the intent to wire funds. This will ensure prompt and accurate credit upon receipt of the wire. Wired funds must be received prior to 4:00 p.m. Eastern time to be eligible for same day pricing. The Fund, and its agents, including the transfer agent and custodian, are not responsible for the consequences of delays resulting from the banking or Federal Reserve wire system, or from incomplete wiring instructions.

**Automatic Investment Plan — Subsequent Investments**

You may participate in the Fund's Automatic Investment Plan, an investment plan that automatically moves money from your bank account and invests it in the Fund through the use of electronic funds transfers or automatic bank drafts. You may elect to make subsequent investments by transfers of a minimum of $50 on specified days of each month into your established Fund account. Please contact the Fund at (844) 485-9167 for more information about the Fund's Automatic Investment Plan.

**By Telephone**

Investors may purchase additional shares of the Fund by calling (844) 485-9167. If an investor elected this option on the account application, and the account has been open for at least 15 days, telephone orders will be accepted via electronic funds transfer from your bank account through the Automated Clearing House (ACH) network. Banking information must be established on the account prior to making a purchase. Orders for shares received prior to 4 p.m. Eastern time will be purchased at the appropriate price calculated on that day.

Telephone trades must be received by or prior to market close. During periods of high market activity, shareholders may encounter higher than usual call waits. Please allow sufficient time to place your telephone transaction.

In compliance with the USA Patriot Act of 2001, SS&C will verify certain information on each account application as part of the Fund's Anti-Money Laundering Program. As requested on the application, investors must supply full name, date of birth, social security number and permanent street address. Mailing addresses containing only a P.O. Box will not be accepted. Investors may call SS&C at (844) 485-9167 for additional assistance when completing an application.

If SS&C does not have a reasonable belief of the identity of a customer, the account will be rejected or the customer will not be allowed to perform a transaction on the account until such information is received. The Fund also may reserve the right to close the account within 5 business days if clarifying information/documentation is not received.

**Exchange of Shares**

Shareholders of the Fund whose shares are repurchased during a Repurchase Offer may exchange those shares for shares of the same share class of any series within NexPoint Funds I or NexPoint Funds II. Such exchanges

will be effected at the daily NAV per share, such exchanges will be available during all Repurchase offer periods, subject to the limitations set forth below. **Call (844) 485-9167 for the prospectus of the fund being purchased, including applicable investment minimums, and read it carefully before investing.**

Your exchange privilege will be revoked if the exchange activity is considered excessive. In addition, the Fund may reject any exchange request for any reason, including if it does not think that the exchange is in the best interests of the Fund and/or its shareholders. The Fund may also terminate your exchange privilege if the Adviser determines that your exchange activity is likely to adversely impact its ability to manage the Fund or if the Fund otherwise determines that your exchange activity is contrary to its short-term trading policies and procedures.

Unless you are a tax-exempt investor or investing through a tax-advantaged retirement account or other tax-advantaged arrangement, an exchange is generally a taxable event, and you may realize a gain or a loss for federal income tax purposes. See "U.S. Federal Income Tax Matters." To exchange by telephone, call (844) 485-9167. Please have your account and taxpayer identification number available when calling.

**Financial Consultants — Subsequent Investments**

Investors may purchase additional shares of the Fund by contacting their financial consultants, such as a broker or investment adviser, and such intermediaries can arrange additional purchases for them.

**Share Class Considerations**

When selecting a share class, you should consider the following:

- which share classes are available to you;
- how much you intend to invest;
- how long you expect to own the shares; and
- total costs and expenses associated with a particular share class.

Each investor's financial considerations are different. You should speak with your financial advisor to help you decide which share class is best for you. Not all Financial Intermediaries offer all classes of shares. If your Financial Intermediary offers more than one class of shares, you should carefully consider which class of shares to purchase.

**Purchase Terms**

**Class A Shares**

Class A shares are sold at the prevailing net asset value per Class A share plus the applicable sales load (which may be reduced as described below); however, the following are additional features that should be taken into account when purchasing Class A shares:

- a minimum initial investment of $500 for regular accounts and $50 for retirement plan accounts, and a minimum subsequent investment of: (i) $50 under the Fund's automatic investment program; and (ii) $50 if not made pursuant to the automatic investment program;
- a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Fund attributable to Class A shares; and
- shareholders tendering Class A shares fewer than 18 months after the original purchase date may be subject to a CDSC of 1.00%, which will be deducted from repurchase proceeds, if: (i) the original purchase was for amounts of $500,000 or more; and (ii) the shares were purchased without an initial sales charge.

The price of the Class A shares during the Fund's continuous offering will fluctuate over time with the net asset value of the Class A shares. Investors in Class A shares will pay a sales load based on the amount of their investment in the Fund. The sales load payable by each investor depends upon the amount invested by such investor in the Fund, but may range from 0.00% to 5.75%, as set forth in the table below. A reallowance to participating broker-dealers will be made by the Distributor from the sales load paid by each investor. There are no sales loads on reinvested distributions. The Fund reserves the right to waive broker commissions. The following sales loads apply to your purchases of Class A shares of the Fund:

| Amount Invested | Dealer Reallowance | Distributor Fee | Total Sales Load as a % of Offering Price | Total Sales Load as a % of Amount Invested |
|---|---|---|---|---|
| Under $50,000 | 5.00% | 0.75% | 5.75% | 6.10% |
| $50,000 to $99,999 | 4.50% | 0.50% | 5.00% | 5.26% |
| $100,000 to $249,999 | 3.50% | 0.50% | 4.00% | 4.17% |
| $250,000 to $499,999 | 2.50% | 0.50% | 3.00% | 3.09% |
| $500,000 and above* | ** | None | ** | see below |

* Class A Shares bought without an initial sales charge in accounts aggregating $500,000 or more at the time of purchase are subject to a 1.00% CDSC if the shares are sold within 18 months of purchase. Subsequent Class A Share purchases that bring a shareholder's account value above $500,000 are not subject to a front-end sales charge, but are subject to a CDSC if redeemed within 18 months of purchase. The 18-month period begins on the day the purchase is made. The CDSC does not apply to load waived shares purchased for certain retirement plans or other eligible fee-based programs.

** A selling broker may receive a commission on purchases of Class A shares of $500,000 or above as detailed below:

| Amount Invested | Dealer Reallowance |
|---|---|
| Less than $5,000,000 | 1.00% |
| $5,000,000 to less than $25,000,000 | 0.50% |
| $25,000,000 or more | 0.25% |

You may be able to buy Class A shares without a sales charge (i.e., "load-waived") when you are:

- reinvesting dividends or distributions;
- participating in an investment advisory or agency commission program under which you pay a fee to an investment advisor or other firm for portfolio management or brokerage service;
- exchanging an investment in Class A (or equivalent type) shares of another fund for an investment in the Fund;
- a current or former director or Trustee of the Fund;
- an employee (including the employee's spouse, domestic partner, children, grandchildren, parents, grandparents, siblings or any dependent of the employee, as defined in section 152 of the Code) of the Fund's Adviser or its affiliates or of a broker-dealer authorized to sell shares of the Fund;
- purchasing shares through the Fund's Adviser; or
- purchasing shares through a financial services firm (such as a broker-dealer, investment adviser or financial institution) that has a special arrangement with the Fund.

In addition, concurrent purchases of Class A shares by related accounts may be combined to determine the application of the sales load. The Fund will combine purchases made by an investor, the investor's spouse or domestic partner, and dependent children when it calculates the sales load.

It is the investor's responsibility to determine whether a reduced sales load would apply. The Fund is not responsible for making such determination. To receive a reduced sales load, notification must be provided at the time of the purchase order. If you purchase Class A shares directly from the Fund, you must notify the Fund in writing. Otherwise, notice should be provided to the Financial Intermediary through whom the purchase is made so they can notify the Fund.

***Right of Accumulation***

For the purposes of determining the applicable reduced sales charge, the right of accumulation allows you to include prior purchases of Class A shares of the Fund as part of your current investment as well as reinvested dividends. To qualify for this option, you must be either:

- an individual;
- an individual and spouse purchasing shares for your own account or trust or custodial accounts for your minor children; or
- a fiduciary purchasing for any one trust, estate or fiduciary account, including employee benefit plans created under Sections 401, 403 or 457 of the Code, including related plans of the same employer.

If you plan to rely on this right of accumulation, you must notify the Fund's Distributor at the time of your purchase. You will need to give the Distributor your account numbers. Existing holdings of family members or other related accounts of a shareholder may be combined for purposes of determining eligibility. If applicable, you will need to provide the account numbers of your spouse and your minor children as well as the ages of your minor children.

**Class C Shares**

Class C shares are sold at the prevailing NAV per Class C share; however, the following are additional features that should be taken into account when purchasing Class C shares:

- a minimum initial investment of $500 for regular accounts and $50 for retirement plan accounts, and a minimum subsequent investment of: (i) $50 under the Fund's automatic investment program; and (ii) $50 if not made pursuant to the automatic investment program;
- a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Fund attributable to Class C shares;
- a Distribution Fee which will accrue at an annual rate equal to 0.75% of the average daily net assets of the Fund attributable to Class C shares; and
- a CDSC equal to 1.00% of the original purchase price of Class C shares repurchased by the Fund for repurchases of Class C shares within 18 months following such shareholder's initial purchase.
- The Distributor will pay your financial advisor an up-front commission of 1.00% on sales of Class C shares.

The price of the Class C shares during the Fund's continuous offering will fluctuate over time with the net asset value of the Class C shares. Investors in Class C shares will not pay any upfront sales charges. A selling broker may receive commissions on purchases of Class C shares over $1,000,000.

**Class Z Shares**

Class Z shares will be sold at the prevailing NAV per Class Z share and are not subject to any upfront sales charge. The Class Z shares are not subject to a Distribution Fee, a CDSC or a monthly shareholder servicing fee. Class Z shares may only be available through certain Financial Intermediaries. Because the Class Z shares of the

Fund are sold at the prevailing NAV per Class Z share without an upfront sales charge, the entire amount of your purchase is invested immediately. However, Class Z shares require a minimum investment of $100,000 and a minimum subsequent investment in any amount. The Fund reserves the right to waive minimum investment amounts.

**Shareholder Service Expenses**

The Fund has adopted a "Shareholder Servicing Plan and Agreement" (the "Plan") under which the Fund may compensate financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. The Plan operates in a manner consistent with Rule 12b-1 under the 1940 Act, which regulates the manner in which an open-end investment company may directly or indirectly bear the expenses of distributing its shares. Although the Fund is not an open-end investment company, it has undertaken to comply with the terms of Rule 12b-1 as a condition of an exemptive order under the 1940 Act which permits it to have a multi-class structure, CDSCs and distribution and shareholder servicing fees. Such services may include electronic processing of client orders, electronic fund transfers between clients and the Fund, account reconciliations with the Fund's transfer agent, facilitation of electronic delivery to clients of Fund documentation, monitoring client accounts for back-up withholding and any other special tax reporting obligations, maintenance of books and records with respect to the foregoing, and such other information and liaison services as the Fund or the Adviser may reasonably request. Under the Shareholder Servicing Plan and Agreement, the Fund may incur expenses on an annual basis equal to 0.25% of its average net assets attributable to Class A and Class C shares.

In addition to payments under the Plan, from time to time the Fund may pay broker-dealers and other intermediaries' account-based fees for networking and account maintenance. In addition, the Adviser and/or the Distributor may, from time to time, at their own expense out of the revenues they receive from the Fund and/or its own financial resources, make cash payments to broker-dealers and other Financial Intermediaries (directly and not as an expense of the Fund) as an incentive to sell shares of the Fund and/or to promote retention of customer assets in the Fund. Such cash payments may be calculated on sales of shares of the Fund ("Sales-Based Payments") or on the average daily net assets of the Fund attributable to that particular broker-dealer or other Financial Intermediary ("Asset-Based Payments"). Each of the Adviser and/or the Distributor may agree to make such cash payments to a broker-dealer or other Financial Intermediary in the form of either or both Sales-Based Payments and Asset-Based Payments.

The Adviser and/or the Distributor may also make other cash payments to broker-dealers or other Financial Intermediaries in addition to or in lieu of Sales-Based Payments and Asset-Based Payments, in the form of payment for travel expenses, including lodging, incurred in connection with trips taken by qualifying registered representatives of those broker-dealers or other Financial Intermediaries and their families to places within or outside the United States; meeting fees; entertainment; transaction processing and transmission charges; advertising or other promotional expenses; allocable portions, based on shares of the Fund sold, of salaries and bonuses of registered representatives of an affiliated broker-dealer or other Financial Intermediary that is a financial advisor; or other expenses as determined in the Adviser or the Distributor's discretion, as applicable. In certain cases these other payments could be significant to the broker-dealers or other Financial Intermediaries. Any payments described above will not change the price paid by investors for the purchase of the shares of the Fund, the amount that the Fund will receive as proceeds from such sales, or the amounts payable under the Plan.

**LEGAL MATTERS**

K&L Gates, LLP, located at 1 Congress Street, Suite 2900, Boston, Massachusetts 02114, acts as the Fund's legal counsel.

**REPORTS TO SHAREHOLDERS**

The Fund will send to its shareholders unaudited semi-annual and audited annual reports (or, if applicable, a notice of electronic accessibility thereof), including a list of investments held.

**Householding**

In an effort to decrease costs, the Fund intends to reduce the number of duplicate annual and semi-annual reports (or, if applicable, notices of electronic accessibility thereof) by sending only one copy of each to those addresses shared by two or more accounts and to shareholders reasonably believed to be from the same family or household. Once implemented, a shareholder must call (844) 485-9167 to discontinue householding and request individual copies of these documents. Once the Fund receives notice to stop householding, individual copies will be sent beginning thirty days after receiving your request. This policy does not apply to account statements.

INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Cohen & Company, Ltd. has been appointed as the independent registered public accounting firm for the Fund. Cohen & Company, Ltd. is located at 1350 Euclid Ave, Suite 800, Cleveland, Ohio 44115.

ADDITIONAL INFORMATION

The Prospectus and the SAI do not contain all of the information set forth in the Registration Statement that the Fund has filed with the SEC (File No. 333-209022). The complete Registration Statement may be obtained from the SEC at www.sec.gov. See the cover page of this Prospectus for information about how to obtain a paper copy of the Registration Statement or SAI without charge.

**PRIVACY NOTICE**

The Fund recognizes and respects your privacy expectations, whether you are a visitor to the Fund's web site, a potential shareholder, a current shareholder or even a former shareholder.

**I. Collection of Information.**

The Fund may collect nonpublic personal information about you from the following sources:

1. *Account applications and other forms,* which may include your name, address and social security number, written and electronic correspondence and telephone contacts;
2. *Web site information,* including any information captured through our use of "cookies"; and
3. *Account history,* including information about the transactions and balances in your accounts with us or our affiliates.

**II. Disclosure of Information.**

The Fund may share the information it collects with its affiliates, the Fund may also disclose this information as otherwise as permitted by law. The Fund does not sell your personal information to third parties for their independent use.

**III. Confidentiality and Security of Information.**

The Fund restricts access to nonpublic personal information about you to its employees and agents who need to know such information to provide products or services to you. The Fund maintains physical, electronic and procedural safeguards that comply with federal standards to guard your nonpublic personal information, although you should be aware that data protection cannot be guaranteed.

# NexPoint Real Estate Strategies Fund

**Class A (NRSAX), Class C (NRSCX)**
**and Class Z (NRSZX) Shares**

**PROSPECTUS**

**Distributor**

**NexPoint Securities, Inc.**

**Member FINRA/ SIPC**

**April 30, 2025**

All dealers that buy, sell or trade the Fund's shares, whether or not participating in this offering, may be required to deliver a prospectus when acting on behalf of the Fund's Distributor.

You should rely only on the information contained in this Prospectus. The Fund has not authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. The Fund is not making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted.

NRES-PROS-0425

**STATEMENT OF ADDITIONAL INFORMATION**

# NEXPOINT REAL ESTATE STRATEGIES FUND

**Principal Executive Offices**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(833) 697-6246**

This Statement of Additional Information ("SAI") is not a prospectus. This SAI should be read in conjunction with the prospectus of NexPoint Real Estate Strategies Fund (the "Fund"), dated April 30, 2025 (the "Prospectus"), as it may be supplemented from time to time. The Prospectus is hereby incorporated by reference into this SAI (legally made a part of this SAI). Capitalized terms used but not defined in this SAI have the meanings given to them in the Prospectus. This SAI does not include all information that a prospective investor should consider before purchasing the Fund's securities.

You should obtain and read the Prospectus and any related Prospectus supplement prior to purchasing any of the Fund's securities. A copy of the Prospectus may be obtained without charge by calling the Fund toll-free at (844) 485-9167 or by visiting the Fund's website at https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/. Information on the website is not incorporated herein by reference. The registration statement of which the Prospectus is a part can be reviewed and copied at the Public Reference Room of the U.S. Securities and Exchange Commission ("SEC") at 100 F Street NE, Washington, D.C. You may obtain information on the operation of the Public Reference Room by calling the SEC at 202-551-8090. The Fund's filings with the SEC are also available to the public on the SEC's Internet web site at *www.sec.gov*. Copies of these filings may be obtained, after paying a duplicating fee, by electronic request at the following E-mail address: publicinfo@sec.gov, or by writing the SEC's Public Reference Section, 100 F Street NE, Washington, D.C. 20549-0102.

**April 30, 2025**

**TABLE OF CONTENTS**



| | |
|---|---|
| GENERAL INFORMATION AND HISTORY | S-1 |
| INVESTMENT OBJECTIVE AND POLICIES | S-1 |
| MANAGEMENT OF THE FUND | S-15 |
| CODES OF ETHICS | S-22 |
| PROXY VOTING POLICIES AND PROCEDURES | S-22 |
| CONTROL PERSONS AND PRINCIPAL HOLDERS | S-22 |
| INVESTMENT ADVISORY AND OTHER SERVICES | S-24 |
| PORTFOLIO MANAGERS | S-29 |
| ALLOCATION OF BROKERAGE | S-31 |
| TAX STATUS | S-33 |
| OTHER INFORMATION | S-46 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | S-46 |
| FINANCIAL STATEMENTS | S-47 |
| APPENDIX A | A-1 |

## GENERAL INFORMATION AND HISTORY

The Fund is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund. The Fund is a non-diversified investment company, which means that the Fund is not limited by the Investment Company Act of 1940, as amended (the "1940 Act") with respect to the proportion of its assets that may be invested in the securities of a single issuer. As a registered investment company (a "RIC"), however, the Fund will be required to comply with certain asset diversification tests at the end of each quarter of its taxable year. The Fund was organized as a Delaware statutory trust on January 11, 2016. The Fund's principal office is located at 300 Crescent Court, Suite 700, Dallas, Texas 75201, and its telephone number is (833) 697-6246. The Fund is advised by NexPoint Advisors, L.P. ("NexPoint" or the "Adviser"). The investment objective and principal investment strategies of the Fund, as well as the principal risks associated with the Fund's investment strategies, are set forth in the Prospectus. Certain additional investment information is set forth below.

## INVESTMENT OBJECTIVE AND POLICIES

**Investment Objective**

The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective. The Fund's investment objective is non-fundamental and may be changed by the Board of Trustees (the "Board") without shareholder approval. Shareholders will, however, receive at least 60 days' prior notice of any change in this investment objective.

**Fundamental Policies**

The Fund's stated fundamental policies, which may only be changed by the affirmative vote of a majority of the outstanding voting securities of the Fund (the shares), are listed below. For the purposes of this SAI, "majority of the outstanding voting securities of the Fund" means the vote, at an annual or special meeting of shareholders, duly called: (a) of 67% or more of the shares present at such meeting, if the holders of more than 50% of the outstanding shares are present or represented by proxy; or (b) of more than 50% of the outstanding shares, whichever is less.

The Fund may not:

(1) Borrow money, except to the extent permitted by the 1940 Act (which currently limits borrowing to no more than 33-1/3% of the value of the Fund's total assets, including the value of the assets purchased with the proceeds of its indebtedness, if any). The Fund may borrow for investment purposes, for temporary liquidity, or to finance repurchases of its shares.

(2) Issue senior securities, except to the extent permitted by Section 18 of the 1940 Act (which currently limits the issuance of a class of senior securities that is indebtedness to no more than 33-1/3% of the value of the Fund's total assets or, if the class of senior security is stock, to no more than 50% of the value of the Fund's total assets).

(3) Purchase securities on margin.

(4) Underwrite securities of other issuers, except insofar as the Fund may be deemed an underwriter under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the disposition of its portfolio securities. The Fund may invest in restricted securities (those that must be registered under the Securities Act before they may be offered or sold to the public).

(5) Invest 25% or more of the value of its total assets in the securities of companies or entities engaged in any one industry or group of industries, except that, under normal circumstances, the Fund will invest

over 25% of its total assets in the securities of companies in the real estate industry. This limitation does not apply to investment in the securities of the U.S. Government, its agencies or instrumentalities. For purposes of this limitation, the Fund will define an industry or group of industries by reference to Standard & Poor's Global Industry Classification Standard codes for industry classifications.

(6) Purchase or sell commodities, unless acquired as a result of ownership of securities or other investments, except that the Fund may purchase and sell forward and futures contracts and options to the full extent permitted under the 1940 Act, sell foreign currency contracts in accordance with any rules of the Commodity Futures Trading Commission, invest in securities or other instruments backed by or linked to commodities, and invest in companies that are engaged in a commodities business or have a significant portion of their assets in commodities, and may invest in commodity pools and other entities that purchase and sell commodities and commodity contracts.

(7) Make loans to others, except (a) where each loan is represented by a note executed by the borrower, (b) through the purchase of debt securities in accordance with its investment objective and policies, (c) to the extent the entry into a repurchase agreement, in a manner consistent with the Fund's investment policies or as otherwise permitted under the 1940 Act, is deemed to be a loan, and (d) by loaning portfolio securities.

(8) Purchase or sell real estate, except that the Fund may invest in securities of companies that deal in real estate or are engaged in the real estate business, including real estate investment Funds and real estate operating companies, and instruments secured by real estate or interests therein and the Fund may acquire, hold and sell real estate acquired through default, liquidation, or other distributions of an interest in real estate as a result of the Fund's ownership of such other assets.

In addition, the Fund has adopted a fundamental policy that it will make quarterly repurchase offers for no less than for 5% of the Fund's shares outstanding at net asset value ("NAV") less any repurchase fee, unless suspended or postponed in accordance with regulatory requirements, and each repurchase pricing shall occur no later than the 14th day after the Repurchase Request Deadline, or the next business day if the 14th is not a business day.

If a restriction on the Fund's investments is adhered to at the time an investment is made, a subsequent change in the percentage of Fund assets invested in certain securities or other instruments, or change in average duration of the Fund's investment portfolio, resulting from changes in the value of the Fund's total assets, will not be considered a violation of the restriction; provided, however, that the asset coverage requirement applicable to borrowings shall be maintained in the manner contemplated by applicable law.

There can be no assurance that any leveraging strategy the Fund employs will be successful during any period in which it is employed. The Fund may also invest in private real estate investment funds ("Private Real Estate Investment Funds"), public real estate investment trusts ("REITs"), real estate operating companies ("REOCs"), and non-traded REITs, which may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to. The Fund's asset coverage was 1,172% as of March 31, 2025. See "Risk Factors – Leverage Risk".

In addition to any indebtedness incurred by the Fund, any subsidiary of the Fund, including NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC (the "REIT Subsidiaries"), may also utilize leverage, including by mortgaging properties held by special purpose vehicles, or by acquiring property with existing debt. Any such borrowings will generally be the sole obligation of each respective special purpose vehicle, without any recourse to any other special purpose vehicle, the REIT Subsidiaries, the Fund or its assets, and the Fund will not treat such non-recourse borrowings as senior securities (as defined in the 1940 Act) for purposes of complying with the 1940 Act's limitations on leverage unless the financial statements of the special purpose vehicle, or the subsidiary of the Fund that owns such special purpose vehicle, will be consolidated in accordance with Regulation S-X and other accounting rules. If cash flow is insufficient to pay principal and interest on a special purpose vehicle's borrowings, a default could occur, ultimately resulting in foreclosure of any security instrument securing the debt and a complete

loss of the investment, which could result in losses to the REIT Subsidiaries and, therefore, to the Fund. To the extent that any subsidiaries of the Fund, including the REIT Subsidiaries, directly incur leverage in the form of debt (as opposed to non-recourse borrowings made through special purpose vehicles), the amount of such recourse leverage used by the Fund and such subsidiaries, including the REIT Subsidiaries, will be consolidated and treated as senior securities for purposes of complying with the 1940 Act's limitations on leverage by the Fund.

**Non-Fundamental Policies**

The following are additional investment limitations of the Fund and may be changed by the Board without shareholder approval.

***80% Investment Policy.*** The Fund has adopted a policy to invest at least 80% of its assets (defined as net assets plus the amount of any borrowing for investment purposes) in "real estate and real estate-related securities," as defined in the Prospectus. Shareholders of the Fund will be provided with at least 60 days prior notice of any change in the Fund's 80% policy.

If a restriction on the Fund's investments is adhered to at the time an investment is made, a subsequent change in the percentage of Fund assets invested in certain securities or other instruments, or change in average duration of the Fund's investment portfolio, resulting from changes in the value of the Fund's total assets, will not be considered a violation of the restriction; provided, however, that the asset coverage requirement applicable to borrowings shall be maintained in the manner contemplated by applicable law.

***Covered Obligations.*** Consistent with U.S. Securities and Exchange Commission ("SEC") staff guidance, financial instruments that involve obligations to make future payments to third parties will not be viewed as creating any senior security provided that the Fund covers its obligations as described below.

Those financial instruments can include, among others: (i) securities purchased on a when-issued, delayed delivery, and to be announced basis; (ii) futures contracts; (iii) forward currency contracts; (iv) written options; and (vi) securities sold short. Consistent with SEC staff guidance, the Fund will consider its obligations involving such a financial instrument as "covered" when the Fund: (1) maintains an offsetting financial position; or (2) segregates liquid assets (constituting cash, cash equivalents or other liquid portfolio securities) equal to the Fund's exposures relating to the financial instrument, as determined on a daily basis. Dedicated Fund compliance policies and procedures, which the Board has approved, govern the kinds of transactions that can be deemed to be offsetting transactions for purposes of (1) above, and the amounts of assets that need to be segregated for purposes of (2) above. The Fund will seek to value financial instruments on a mark-to-market basis but may also rely on the instrument's notional value or upon valuations provided by third party pricing services, subject to the approval of the Board.

***Short Selling.*** Although the Fund does not currently intend to engage in short sales as a principal investment strategy, the Fund may engage in short sales for hedging purposes.

**Non-Principal Investment Strategies**

***Convertible Securities.*** The Fund may invest in convertible securities, which are typically issued as bonds or preferred shares with the option to convert to equities. As a result, convertible securities are a hybrid that have characteristics of both bonds and common stocks and are subject to risks associated with both debt securities and equity securities. The market value of bonds and preferred shares tend to decline as interest rates increase. Fixed-income and preferred securities also are subject to credit risk, which is the risk that an issuer of a security may not be able to make principal and interest or dividend payments as due. Convertible securities may have characteristics similar to common stocks especially when their conversion value is higher than their value as a bond. The price of equity securities into which a convertible security may convert may fall because of economic

or political changes. Stock prices in general may decline over short or even extended periods of time. Additionally, the value of the embedded conversion option may be difficult to value and evaluate because the option does not trade separately from the convertible security.

***Foreign Securities.*** The Fund may invest in non-U.S. real estate companies and other foreign securities. Purchases of foreign securities entail certain risks. For example, there may be less information publicly available about a foreign company than about a U.S. company, and foreign companies generally are not subject to accounting, auditing and financial reporting standards and practices comparable to those in the U.S. Other risks associated with investments in foreign securities include changes in restrictions on foreign currency transactions and rates of exchanges, changes in the administrations or economic and monetary policies of foreign governments, the imposition of exchange control regulations, the possibility of expropriation decrees and other adverse foreign governmental action, the imposition of foreign taxes, less liquid markets, less government supervision of exchanges, brokers and issuers, difficulty in enforcing contractual obligations, delays in settlement of securities transactions and greater price volatility. In addition, investing in foreign securities will generally result in higher commissions than investing in similar domestic securities.

***Money Market Instruments.*** The Fund may invest, for defensive purposes or otherwise, some or all of its assets in high quality fixed-income securities, money market instruments and money market mutual funds, or hold cash or cash equivalents in such amounts as the Adviser deems appropriate under the circumstances. In addition, the Fund or a Private Real Estate Investment Fund or registered closed-end funds that invest principally in real estate may invest in these instruments pending allocation of its respective offering proceeds. Money market instruments are high quality, short-term fixed-income obligations, which generally have remaining maturities of one year or less and may include U.S. Government securities, commercial paper, certificates of deposit and bankers acceptances issued by domestic branches of U.S. banks that are members of the Federal Deposit Insurance Corporation, and repurchase agreements.

***Investment Companies.*** The Fund may invest in investment companies such as open-end funds (mutual funds), closed-end funds and exchange traded funds (also referred to as "Underlying Funds"). Such investments are subject to limitations prescribed by the 1940 Act unless a U.S. Securities and Exchange Commission (the "SEC") exemption is applicable or as may be permitted by rules under the 1940 Act, including Section 12 of the 1940 Act, or SEC staff interpretations thereof. The Fund may invest in other investment companies beyond the statutory limits set forth in Section 12 of the 1940 Act to the extent permitted by an exemptive rule adopted by the SEC. The 1940 Act limitations currently provide, in part, that the Fund may not purchase shares of an investment company if: (a) such a purchase would cause the Fund to own in the aggregate more than 3% of the total outstanding voting stock of the investment company; (b) such a purchase would cause the Fund to have more than 5% of its total assets invested in the investment company; or (c) more than 10% of the Fund's total assets would be invested in the aggregate in all investment companies. The Fund may invest in excess of the foregoing limitations in an exchange-traded fund ("ETF") that is not part of the same group of investment companies (e.g., an unaffiliated ETF) if the ETF has obtained exemptive relief from the SEC and both the ETF and the Fund adhere to the conditions in the exemptive relief. Accordingly, when affiliated persons hold shares of any of the Underlying Funds, the Fund's ability to invest fully in shares of those funds may be restricted, and the Adviser must then, in some instances, select alternative investments that would not have been its first preference.

The Fund may invest in investment companies that are advised by the Adviser or its affiliates, including ETFs, to the extent permitted by applicable law and/or pursuant to exemptive relief from the SEC. These investment companies typically incur fees that are separate from those fees incurred directly by the Fund. The Fund's purchase of such investment company securities results in the layering of expenses, such that shareholders would indirectly bear a proportionate share of the operating expenses of such investment companies, including advisory fees, in addition to paying Fund expenses.

The 1940 Act also provides that an Underlying Fund whose shares are purchased by the Fund will be obligated to redeem shares held by the Fund only in an amount up to 1% of the Underlying Fund's outstanding securities

during any period of less than 30 days. Shares held by the Fund in excess of 1% of an Underlying Fund's outstanding securities therefore, will be considered not readily marketable securities, which, together with other such securities, may not exceed 15% of the Fund's total assets.

Under certain circumstances an Underlying Fund may determine to make payment of a redemption by the Fund wholly or partly by a distribution in kind of securities from its portfolio, in lieu of cash, in conformity with the rules of the SEC. In such cases, the Fund may hold securities distributed by an Underlying Fund until the Adviser determines that it is appropriate to dispose of such securities.

Investment decisions by the investment advisers of the Underlying Funds are made independently of the Fund and its Adviser. Therefore, the investment advisor of one Underlying Fund may be purchasing shares of the same issuer whose shares are being sold by the investment advisor of another such fund. The result would be an indirect expense to the Fund without accomplishing any investment purpose. Because other investment companies employ an investment adviser, such investments by the Fund may cause shareholders to bear duplicate fees.

***Hedge Funds.*** The Fund may invest up to 15% of its gross assets in "hedge funds," which are private investment funds that would be required to register as investment companies but for an exemption under section 3(c)(1) or 3(c)(7) of the 1940 Act. Hedge funds are not subject to the requirements and protections of the 1940 Act and carry all of the risks associated with Private Real Estate Investment Funds, as disclosed in the Fund's prospectus. In addition, investors should be aware that hedge funds often engage in leverage, short-selling, arbitrage, hedging, derivatives, and other speculative investment practices that may significantly increase investment loss. Hedge funds are highly illiquid, are not required to provide periodic pricing or valuation information to investors, and often charge high fees that can erode investment performance. Certain hedge funds charge performance fees that may create an incentive for its manager to make investments that are riskier or more speculative than those it might have made in the absence of a performance fee. Additionally, hedge funds need not have independent boards of trustees and do not require investor approval of advisory contracts.

***Debtor-in-Possession ("DIP") Loans.*** The Fund may invest in or extend loans to companies that have filed for protection under Chapter 11 of the United States Bankruptcy Code ("Chapter 11"). DIP financings allow the entity to continue its business operations while reorganizing under Chapter 11 and such financings must be approved by the bankruptcy court. These DIP loans are most often working-capital facilities put into place at the outset of a Chapter 11 case to provide the debtor with both immediate cash and the ongoing working capital that will be required during the reorganization process. DIP financings are typically fully secured by a lien on the debtor's otherwise unencumbered assets or secured by a junior lien on the debtor's encumbered assets (so long as the loan is fully secured based on the most recent current valuation or appraisal report of the debtor). DIP financings are often required to close with certainty and in a rapid manner in order to satisfy existing creditors and to enable the issuer to emerge from bankruptcy or to avoid a bankruptcy proceeding. There is a risk that the borrower will not emerge from Chapter 11 bankruptcy proceedings and be forced to liquidate its assets under Chapter 7 of the United States Bankruptcy Code. In the event of liquidation, the Fund's only recourse will be against the property securing the DIP financing.

***Rights Offerings and Warrants to Purchase.*** The Fund may participate in rights offerings and may purchase warrants, which are privileges issued by corporations enabling the owners to subscribe to and purchase a specified number of shares of the corporation at a specified price during a specified period of time. Subscription rights normally have a short life span to expiration. The purchase of rights or warrants involves the risk that the Fund could lose the purchase value of a right or warrant if the right to subscribe to additional shares is not exercised prior to the rights' and warrants' expiration. Also, the purchase of rights and/or warrants involves the risk that the effective price paid for the right and/or warrant added to the subscription price of the related security may exceed the value of the subscribed security's market price such as when there is no movement in the level of the underlying security.

***Special Situations.*** The Fund may invest in companies undergoing work-outs, liquidations, reorganizations, bankruptcies, insolvencies or other fundamental changes or similar transactions. In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, will take considerable time or will result in a distribution of cash or new securities the value of which will be less than the purchase price to the Fund of the securities or other financial instruments in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Fund may be required to sell its investment at a loss. The consummation of such transactions can be prevented or delayed by a variety of factors, including but not limited to: (i) intervention of a regulatory agency; (ii) market conditions resulting in material changes in securities prices; (iii) compliance with any applicable bankruptcy, insolvency or securities laws; and (iv) the inability to obtain adequate financing. Because there is substantial uncertainty concerning the outcome of transactions involving financially troubled companies in which the Fund intends to invest, there is a potential risk of loss by the Fund of its entire investment in such companies.

***Certain Bankruptcy and Insolvency Issues.*** Some of the companies in which the Fund invests may be involved in a complex bankruptcy or insolvency proceeding in the United States or elsewhere. There are a number of significant risks inherent in the bankruptcy or insolvency process. The Fund cannot guarantee the outcome of any bankruptcy or insolvency proceeding.

Under U.S. bankruptcy proceedings or other insolvency proceedings, the Fund may risk taking a loss on its investment and having its claim released or discharged against the debtor and third parties. For example, under a plan of reorganization, the Fund could receive a cash distribution for less than its initial investment or receive securities or other financial instruments in exchange for its claims, which then could be discharged and released against the debtor or other third parties. In addition, under U.S. bankruptcy proceedings, a debtor can effectuate a sale of assets with a purchaser acquiring such assets free and clear of any claims or liens underlying the Fund's investment with the Fund having only potential recourse to the proceeds of the sale.

Under certain circumstances, payments to the Fund may be reclaimed, recharacterized or avoided if any such payment or distribution is later determined by the applicable court to have been a fraudulent conveyance, fraudulent transfer, a preferential payment or otherwise subject to avoidance under applicable law. In addition, especially in the case of investments made prior to the commencement of bankruptcy proceedings, creditors can lose their ranking and priority if they exercise "domination and control" of a debtor and other creditors can demonstrate that they have been harmed by such actions.

Many events in a bankruptcy are often beyond the control of the creditors. While creditors may be given an opportunity to object to or otherwise participate in significant actions, there can be no assurance that a court in the exercise of its broad powers or discretion would not approve actions that would be contrary to the interests of the Fund as a creditor.

The duration of a bankruptcy or insolvency proceeding is difficult to predict. A creditor's return on investment can be adversely impacted by delays while a plan of reorganization is being negotiated, approved by the creditors, confirmed by the bankruptcy court and until the plan ultimately becomes effective. Similar delays can occur while a court may be considering a sale or other restructuring transaction. In addition, the administrative costs in connection with a bankruptcy or insolvency proceeding are frequently high and will be paid out of the debtor's estate prior to any return to unsecured creditors or equity holders. If a proceeding involves protracted or difficult litigation, or turns into a liquidation, substantial assets may be devoted to administrative costs. Also, in the early stages of the bankruptcy process, it is often difficult to estimate the extent of, or even to identify, any contingent claims that might be made. Further, certain claims that have priority by law (for example, claims for taxes) may be quite substantial.

The effect of a bankruptcy filing on or by a portfolio company may adversely and permanently affect the portfolio company. The portfolio company may lose its market position, going concern value and key employees and otherwise become incapable of restoring itself as a viable entity. If for this or any other reason the proceeding is converted to a liquidation, the liquidation value of the portfolio company may not equal the liquidation value that was believed to exist at the time of the investment.

***Co-Investments.*** Opportunities for co-investments may arise when the Adviser or its affiliates become aware of investment opportunities that may be appropriate for the Fund and its affiliates' other clients. The Fund will only make investments in which the Adviser or an affiliate hold an interest to the extent permitted under the 1940 Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Adviser and certain funds affiliated with the Fund, dated April 19, 2016. For example, exemptive relief is not required for the Fund to invest in syndicated deals and secondary loan market transactions in which the Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," which includes future closed-end investment companies registered under the 1940 Act that are managed by the Adviser, which includes the Fund. The Fund, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order.

Investment opportunities that are presented to an affiliate's other clients may be referred to the Fund and vice versa. For each such referral, the Adviser intends to independently analyze and evaluate whether the co-investment transaction is appropriate for the Fund. In addition, co-investment transactions that are recommended and approved by the Adviser will generally be subject to the review and approval by a committee consisting of independent trustees on the Fund's Board. For each type of co-investment transaction, the Fund intends to apply a specific protocol, which will be approved by the Fund's independent trustees and be designed to ensure the fairness to the Fund of the specific type of co-investment transaction. However, neither the Fund nor any affiliates' other clients will be obligated to invest or co-invest when investment opportunities are referred to by the Fund or them.

***Short-Term Trading.*** The portfolio managers of the Fund may also give trading desk personnel of the Adviser general authorization to enter into a limited amount of short-term trades (purchases expected to be sold within 15 business days) in debt instruments on behalf of the Fund. Over time, it is expected that these trades will not exceed 2% of the Fund's assets.

**Derivatives**

***Generally.*** The Fund may invest up to 10% of its gross assets in transactions involving options, futures and other derivative financial instruments for speculative purposes or to hedge against risks or other factors and variables that may affect the values of the Fund's portfolio securities. A hedging transaction may not perform as anticipated, and the Fund may suffer losses as a result of its hedging activities. Derivatives can be volatile and involve various types and degrees of risk. By using derivatives, the Fund may be permitted to increase or decrease the level of risk, or change the character of the risk, to which the portfolio is exposed.

A small investment in derivatives could have a substantial impact on the Fund's performance. The market for many derivatives is, or suddenly can become, illiquid. Changes in liquidity may result in significant and rapid changes in the prices for derivatives. If the Fund were to invest in derivatives at an inopportune time, or the Adviser evaluates market conditions incorrectly, the Fund's derivative investment could negatively impact the Fund's return, or result in a loss. In addition, the Fund could experience a loss if its derivatives were poorly correlated with its other investments, or if the Fund were unable to liquidate its position because of an illiquid secondary market.

***Options and Futures.*** The Fund may engage in the use of options and futures contracts, so-called "synthetic" options, including options on baskets of specific securities, or other derivative instruments written by broker-dealers or other financial intermediaries. These transactions may be effected on securities exchanges or in the over-the-counter market, or they may be negotiated directly with counterparties. In cases where instruments are purchased over-the-counter or negotiated directly with counterparties, the Fund is subject to the risk that the counterparty will be unable or unwilling to perform its obligations under the contract. These transactions may also be illiquid and, if so, it might be difficult to close out the Fund's position.

Case 3:26-cv-02496-D Document 17-30 Filed 09/08/26 Page 287 of 608 PageID 12438

The Fund may purchase call and put options on specific securities. The Fund may also write and sell covered or uncovered call and put options for both hedging and speculative purposes. A put option gives the purchaser of the option the right to sell, and obligates the writer to buy, the underlying security at a stated price at any time before the option expires. Similarly, a call option gives the purchaser of the option the right to buy, and obligates the writer to sell, the underlying security at a stated price at any time before the option expires.

In a covered call option, the Fund owns the underlying security. The sale of such an option exposes the Fund to a potential loss of opportunity to realize appreciation in the market price of the underlying security during the term of the option. Using covered call options might expose the Fund to other risks, as well. For example, the Fund might be required to continue holding a security that the Fund might otherwise have sold to protect against depreciation in the market price of the security.

In a covered put option, cash or liquid securities are placed in a segregated account on the Fund's books. The sale of such an option exposes the seller, during the term of the option, to a decline in price of the underlying security while also depriving the seller of the opportunity to invest the segregated assets.

When writing options, the Fund may close its position by purchasing an option on the same security with the same exercise price and expiration date as the option that it has previously written on the security. If the amount paid to purchase an option is less or more than the amount received from the sale, the Fund will, accordingly, realize a profit or loss. To close out a position as a purchaser of an option, the Fund would liquidate the position by selling the option previously purchased.

The use of derivatives that are subject to regulation by the Commodity Futures Trading Commission (the "CFTC") under the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), by the Fund could cause the Fund to be a commodity pool, which, absent an available exemption would require the Fund to comply with certain rules of the CFTC. In connection with its management of the Fund, the Adviser has claimed an exclusion from the definition of commodity pool operator under the Commodity Exchange Act ("CEA") and is therefore not currently subject to registration or regulation as a pool operator.

The Fund may enter into futures contracts in U.S. domestic markets or on exchanges located outside the United States. Foreign markets may offer advantages, such as trading opportunities or arbitrage possibilities not available in the United States, but they also may subject the Fund to greater risk than domestic markets. For example, common clearing facilities may not exist in markets where foreign exchanges are the principal markets, and investors may look only to the broker to perform the contract. Adverse changes in the exchange rate could eliminate any profits that might be realized in trading, or a loss could be incurred as a result of those changes. Transactions on foreign exchanges may include both commodities traded on domestic exchanges and those that are not. Unlike trading on domestic commodity exchanges, trading on foreign commodity exchanges is not regulated by the CFTC.

Engaging in these transactions involves risk of loss, which could adversely affect the value of the Fund's gross assets. No assurance can be made that a liquid market will exist for any particular futures contract at any particular time. Many futures exchanges and boards of trade limit the amount of fluctuation permitted in futures contract prices during a single trading day. Once the daily limit has been reached in a particular contract, no trades may be made that day at a price beyond that limit, or trading may be suspended for specified periods during the trading day. Futures contract prices could move to the limit for several consecutive trading days with little or no trading, thereby preventing prompt liquidation of positions, and potentially subjecting the Fund to substantial losses.

Successful use of futures also is subject to the Adviser's ability to correctly predict movements in the relevant market and to evaluate the appropriate correlation between the transaction being hedged and the price movements of the futures contract.

The Fund may also purchase and sell stock index futures contracts. A stock index futures contract obligates the Fund to pay or receive an amount of cash equal to a fixed dollar amount specified in the futures contract, multiplied by the difference between the settlement price of the contract on the contract's last trading day, and the value of the index based on the stock prices of the securities that comprise it at the opening of trading in those securities on the next business day. The Fund may purchase and sell interest rate futures contracts, which represent obligations to purchase or sell an amount of a specific debt security at a future date at a specific price. In addition, the Fund may purchase and sell currency futures or commodity futures. A currency future creates an obligation to purchase or sell an amount of a specific currency at a future date at a specific price. A commodity future creates an obligation to purchase or sell an amount of a specific commodity at a future date at a specific price.

***Options on Securities Indexes.*** The Fund may purchase and sell call and put options on stock indexes listed on national securities exchanges or traded in the over-the-counter market for hedging and speculative purposes. A stock index fluctuates with changes in the market values of the stocks included in the index. Accordingly, successful use of options on stock indexes will be subject to the Adviser's ability to correctly evaluate movements in the stock market generally, or of a particular industry or market segment.

***Swap Agreements.*** The Fund may enter into a swap agreements, which generally include equity, interest rate, and index and currency rate swap agreements. The Fund is not limited to any particular form of swap agreement if the Adviser determines that other forms are consistent with the Fund's investment objective and policies. Swap agreements are contracts entered into by two parties (primarily institutional investors) for periods ranging from a few weeks to more than a year. In a standard swap transaction, the parties agree to exchange the returns (or differentials in rates of return) earned or realized on particular predetermined investments or instruments, which may be adjusted for an interest factor. The gross returns to be exchanged or "swapped" between the parties are generally calculated with respect to a "notional amount," *i.e.*, the return on or increase in value of a particular dollar amount invested at a particular interest rate, in a particular foreign currency, or in a "basket" of securities representing a particular index. Additional forms of swap agreements include: (i) interest rate caps, under which, in return for a premium, one party agrees to make payments to the other to the extent interest rates exceed a specified rate or "cap"; (ii) interest rate floors, under which, in return for a premium, one party agrees to make payments to the other to the extent interest rates fall below a specified level or "floor"; and (iii) interest rate collars, under which a party sells a cap and purchases a floor (or vice versa) in an attempt to protect itself against interest rate movements exceeding certain minimum or maximum levels.

Generally, the Fund's obligations (or rights) under a swap agreement will be equal only to the net amount to be paid or received under the agreement, based on the relative values of the positions held by the parties. The risk of loss is limited to the net amount of interest payments that a party is contractually required to make. As such, if the counterparty to a swap defaults, the Fund's risk of loss consists of the net amount of payments that it is entitled to receive.

***Derivatives Rule.*** The regulation of the U.S. and non-U.S. derivatives markets has undergone substantial change in recent years and such change may continue. In particular, on October 28, 2020, the SEC adopted new regulations governing the use of derivatives by registered investment companies ("Rule 18f-4" or the "Derivatives Rule"). Funds were required to implement and comply with Rule18f-4 by August 19, 2022. Rule 18f-4 eliminates the asset segregation framework formerly used by funds to comply with Section 18 of the 1940 Act, as amended.

The Derivatives Rule mandates that a fund adopt and/or implement: (i) value-at-risk limitations ("VaR"); (ii) a written derivatives risk management program; (iii) new board oversight responsibilities; and (iv) new reporting and recordkeeping requirements. In the event that a fund's derivative exposure is 10% or less of its net assets, excluding certain currency and interest rate hedging transactions, it can elect to be classified as a limited derivatives user ("Limited Derivatives User") under the Derivatives Rule, in which case the fund is not subject to the full requirements of the Derivatives Rule. Limited Derivatives Users are excepted from VaR testing,

implementing a derivatives risk management program, and certain board oversight and reporting requirements mandated by the Derivatives Rule. However, a Limited Derivatives User is still required to implement written compliance policies and procedures reasonably designed to manage its derivatives risks.

The Derivatives Rule also provides special treatment for reverse repurchase agreements, similar financing transactions and unfunded commitment agreements. Specifically, a fund may elect whether to treat reverse repurchase agreements and similar financing transactions as "derivatives transactions" subject to the requirements of the Derivatives Rule or as senior securities equivalent to bank borrowings for purposes of Section 18 of the 1940 Act. Repurchase agreements are not subject to the Derivatives Rule, but are still subject to other provisions of the 1940 Act. In addition, when-issued or forward settling securities transactions that physically settle within 35-days are deemed not to involve a senior security.

Additional legislation may be enacted subsequent to the date of this SAI that could negatively affect the assets of the Fund. Legislation or regulation may change the way in which the Fund itself is regulated. The Adviser cannot predict the effects of any new governmental regulation that may be implemented, and there can be no assurance that any new governmental regulation will not adversely affect the Fund's performance or ability to achieve its investment objectives.

In addition, regulations adopted by the prudential regulators that took effect with regards to most funds in 2019 require certain banks to include in a range of financial contracts, including derivative and short-term funding transactions, terms delaying or restricting a counterparty's default, termination and other rights in the event that the bank and/or its affiliates become subject to certain types of resolution or insolvency proceedings. The regulations could limit the Fund's ability to exercise a range of cross-default rights if its counterparty, or an affiliate of the counterparty, is subject to bankruptcy or similar proceedings. Such regulations could further negatively impact the Fund's use of derivatives.

***Valuation of Derivative Instruments.*** The Fund will seek to value financial instruments on a mark-to-market basis, but may also rely on valuations provided by third party pricing services.

**Portfolio Turnover**

The Fund's portfolio turnover rate is not expected to exceed 100%, but may vary greatly from year to year and will not be a limiting factor when the Adviser deems portfolio changes appropriate. Although the Fund generally does not intend to trade for short-term profits, the Fund may engage in short-term trading strategies, and securities may be sold without regard to the length of time held when, in the opinion of the Adviser, investment considerations warrant such action. These policies may have the effect of increasing the annual rate of portfolio turnover of the Fund. Higher rates of portfolio turnover would likely result in higher brokerage commissions and may generate short-term capital gains taxable as ordinary income. If securities are not held for certain applicable holding periods, dividends paid on them will not qualify for the advantageous federal tax rates applicable to "qualified dividend income." See "Tax Status."

For the fiscal year ended December 31, 2023, the Fund's portfolio turnover rate was 10%. For the fiscal year ended December 31, 2024, the Fund's portfolio turnover rate was 13%.

**Repurchases and Transfers of Shares**

***Repurchase Offers.*** The Board has adopted a resolution setting forth the Fund's fundamental policy that it will conduct quarterly repurchase offers (the "Repurchase Offer Policy"). The Repurchase Offer Policy sets the interval between each repurchase offer at one quarter and provides that the Fund shall conduct a repurchase offer each quarter (unless suspended or postponed in accordance with regulatory requirements). The Repurchase Offer Policy also provides that the repurchase pricing shall occur not later than the 14th day after the Repurchase Request Deadline or the next business day if the 14th day is not a business day. Under normal circumstances, it is

expected that the repurchase pricing date will be the Repurchase Request Deadline and that the repurchase price will be the Fund's NAV determined after the close of business on the Repurchase Request Deadline. The Fund's Repurchase Offer Policy is fundamental and cannot be changed without shareholder approval. The Fund may, for the purpose of paying for repurchased shares, be required to liquidate portfolio holdings earlier than the Adviser would otherwise have liquidated these holdings. Such liquidations may result in losses, and may increase the Fund's portfolio turnover.

*Repurchase Offer Policy Summary of Terms.*

1. The Fund will make repurchase offers at periodic intervals pursuant to Rule 23c-3 under the 1940 Act, as that rule may be amended from time to time. Rule 23c-3 establishes requirements that closed-end funds must follow when making repurchase offers to their shareholders.
2. The repurchase offers will be made in March, June, September and December of each year.
3. The Fund must receive repurchase requests submitted by shareholders in response to the Fund's repurchase offer within 21 to 42 days of the date the repurchase offer is made (or the preceding business day if the New York Stock Exchange is closed on that day), as specified by the Fund (the "Repurchase Request Deadline").
4. The maximum time between the Repurchase Request Deadline and the next date on which the Fund determines the NAV applicable to the purchase of shares (the "Repurchase Pricing Date") is 14 calendar days (or the next business day if the fourteenth day is not a business day).

The Fund may not condition a repurchase offer upon the tender of any minimum amount of shares. The Fund may deduct from the repurchase proceeds only a repurchase fee that is paid to the Fund and is reasonably intended to compensate the Fund for expenses directly related to the repurchase. The repurchase fee may not exceed 2% of the proceeds. However, the Fund does not currently charge a repurchase fee. The Fund may rely on Rule 23c-3 only so long as the Board satisfies the fund governance standards defined in Rule 0-1(a)(7) under the 1940 Act.

***Procedures.*** All periodic repurchase offers must comply with the following procedures:

*Repurchase Offer Amount.* Each quarter, the Fund may offer to repurchase at least 5% and no more than 25% of the Fund's outstanding shares on the Repurchase Request Deadline (the "Repurchase Offer Amount"). The Board shall determine the quarterly Repurchase Offer Amount.

*Shareholder Notification.* Thirty days before each Repurchase Request Deadline, the Fund shall send to each shareholder of record and to each beneficial owner of the shares that are the subject of the repurchase offer a notification ("Shareholder Notification") providing the following information:

1. A statement that the Fund is offering to repurchase its shares from shareholders at NAV;
2. Any fees applicable to such repurchase, if any;
3. The Repurchase Offer Amount;
4. The dates of the Repurchase Request Deadline, Repurchase Pricing Date, and the date by which the Fund must pay shareholders for any shares repurchased (which shall not be more than seven days after the Repurchase Pricing Date) (the "Repurchase Payment Deadline");
5. The risk of fluctuation in NAV between the Repurchase Request Deadline and the Repurchase Pricing Date, and the possibility that the Fund may use an earlier Repurchase Pricing Date;
6. The procedures for shareholders to request repurchase of their shares and the right of shareholders to withdraw or modify their repurchase requests until the Repurchase Request Deadline;

7. The procedures under which the Fund may repurchase such shares on a pro rata basis if shareholders tender more than the Repurchase Offer Amount;
8. The circumstances in which the Fund may suspend or postpone a repurchase offer;
9. The NAV of the shares computed no more than seven days before the date of the notification and the means by which shareholders may ascertain the NAV thereafter; and
10. The market price, if any, of the shares on the date on which such NAV was computed, and the means by which shareholders may ascertain the market price thereafter.

The Fund must file a Form N-23c-3 ("Notification of Repurchase Offer") and three copies of the Shareholder Notification with the SEC within three business days after sending the notification to shareholders.

*Notification of Beneficial Owners*. Where the Fund knows that shares subject to a repurchase offer are held of record by a broker, dealer, voting trustee, bank, association or other entity that exercises fiduciary powers in nominee name or otherwise, the Fund must follow the procedures for transmitting materials to beneficial owners of securities that are set forth in Rule 14a-13 under the Securities Exchange Act of 1934.

*Repurchase Requests*. Repurchase requests must be submitted by shareholders by the Repurchase Request Deadline. The Fund shall permit repurchase requests to be withdrawn or modified at any time until the Repurchase Request Deadline, but shall not permit repurchase requests to be withdrawn or modified after the Repurchase Request Deadline.

*Repurchase Requests in Excess of the Repurchase Offer Amount*. If shareholders tender more than the Repurchase Offer Amount, the Fund may, but is not required to, repurchase an additional amount of shares not to exceed 2% of the outstanding shares of the Fund on the Repurchase Request Deadline. If the Fund determines not to repurchase more than the Repurchase Offer Amount, or if shareholders tender shares in an amount exceeding the Repurchase Offer Amount plus 2% of the outstanding shares on the Repurchase Request Deadline, the Fund shall repurchase the shares tendered on a pro rata basis. This policy, however, does not prohibit the Fund from:

1. Accepting all repurchase requests by persons who own, beneficially or of record, an aggregate of not more than 100 shares and who tender all of their stock for repurchase, before prorating shares tendered by others, or
2. Accepting by lot shares tendered by shareholders who request repurchase of all shares held by them and who, when tendering their shares, elect to have either: (i) all or none; or (ii) at least a minimum amount or none accepted, if the Fund first accepts all shares tendered by shareholders who do not make this election.

*Suspension or Postponement of Repurchase Offers*. The Fund shall not suspend or postpone a repurchase offer except pursuant to a vote of a majority of the Board, including a majority of the Trustees who are not interested persons of the Fund, and only:

1. If the repurchase would cause the Fund to lose its status as a RIC under Subchapter M of the Internal Revenue Code of 1986, as amended (the "Code");
2. If the repurchase would cause the shares that are the subject of the offer that are either listed on a national securities exchange or quoted in an inter-dealer quotation system of a national securities association to be neither listed on any national securities exchange nor quoted on any inter-dealer quotation system of a national securities association;
3. For any period during which the New York Stock Exchange or any other market in which the securities owned by the Fund are principally traded is closed, other than customary weekend and holiday closings, or during which trading in such market is restricted;

4. For any period during which an emergency exists as a result of which disposal by the Fund of securities owned by it is not reasonably practicable, or during which it is not reasonably practicable for the Fund fairly to determine the value of its net assets; or

5. For such other periods as the SEC may by order permit for the protection of shareholders of the Fund.

If a repurchase offer is suspended or postponed, the Fund shall provide notice to shareholders of such suspension or postponement. If the Fund renews the repurchase offer, the Fund shall send a new Shareholder Notification to shareholders.

*Computing Net Asset Value*. The Fund's current NAV shall be computed no less frequently than weekly, and daily on the five business days preceding a Repurchase Request Deadline, on such days and at such specific time or times during the day as set by the Board. Currently, the Board has determined that the Fund's NAV shall be determined daily following the close of the New York Stock Exchange. The Fund's NAV need not be calculated on:

1. Days on which changes in the value of the Fund's portfolio securities will not materially affect the current NAV of the shares;

2. Days during which no order to purchase shares is received, other than days when the NAV would otherwise be computed; or

3. Customary national, local, and regional business holidays described or listed in the Prospectus.

*Liquidity Requirements*. From the time the Fund sends a Shareholder Notification to shareholders until the Repurchase Pricing Date, a percentage of the Fund's assets equal to at least 100% of the Repurchase Offer Amount (the "Liquidity Amount") shall consist of assets that individually can be sold or disposed of in the ordinary course of business, at approximately the price at which the Fund has valued the investment, within a period equal to the period between a Repurchase Request Deadline and the Repurchase Payment Deadline, or of assets that mature by the next Repurchase Payment Deadline. This requirement means that individual assets must be salable under these circumstances. It does not require that the entire Liquidity Amount must be salable. In the event that the Fund's assets fail to comply with this requirement, the Board shall cause the Fund to take such action as it deems appropriate to ensure compliance.

*Liquidity Policy*. The Board may delegate day-to-day responsibility for evaluating liquidity of specific assets to the Adviser, but shall continue to be responsible for monitoring the Adviser's performance of its duties and the overall composition of the portfolio. Accordingly, the Board has approved this policy that is reasonably designed to ensure that the Fund's portfolio assets are sufficiently liquid so that the Fund can comply with its fundamental policy on repurchases and comply with the liquidity requirements in the preceding paragraph.

1. In evaluating liquidity, the following factors are relevant, but not necessarily determinative:

   (a) The frequency of trades and quotes for the security.

   (b) The number of dealers willing to purchase or sell the security and the number of potential purchasers.

   (c) Dealer undertakings to make a market in the security.

   (d) The nature of the marketplace trades (e.g., the time needed to dispose of the security, the method of soliciting offer and the mechanics of transfer).

   (e) The size of the fund's holdings of a given security in relation to the total amount of outstanding of such security or to the average trading volume for the security.

2. If market developments impair the liquidity of a security, the Adviser should review the advisability of retaining the security in the portfolio. The Adviser should report to the basis for its determination to retain a security at the next Board meeting.

3. The Board shall review the overall composition and liquidity of the Fund's portfolio on a quarterly basis.

4. These procedures may be modified as the Board deems necessary.

*Registration Statement Disclosure*. The Fund's registration statement must disclose its intention to make or consider making such repurchase offers.

*Annual Report Disclosure*. The Fund shall include in its annual report to shareholders the following:

1. Disclosure of its fundamental policy regarding periodic repurchase offers.

2. Disclosure regarding repurchase offers by the Fund during the period covered by the annual report, which disclosure shall include:

   (a) the number of repurchase offers,

   (b) the repurchase offer amount and the amount tendered in each repurchase offer,

   (c) and the extent to which in any repurchase offer the Fund repurchased stock pursuant to the procedures in Rule 23c-3(b)(5) under the 1940 Act.

*Advertising*. The Fund, or any underwriter for the Fund, must comply, as if the Fund were an open-end company, with the provisions of Section 24(b) of the 1940 Act and the rules thereunder and file, if necessary, with FINRA or the SEC any advertisement, pamphlet, circular, form letter, or other sales literature addressed to or intended for distribution to prospective investors.

***Transfers of Shares.*** No person may become a substituted shareholder without the written consent of the Board, which consent may be withheld for any reason in the sole and absolute discretion of the Board. Shares may be transferred only: (i) by operation of law pursuant to the death, bankruptcy, insolvency or dissolution of a shareholder; or (ii) with the written consent of the Board, which may be withheld in its sole and absolute discretion. The Board may, in its discretion, delegate to the Adviser its authority to consent to transfers of shares. Each shareholder and transferee is required to pay all expenses, including attorneys and accountants fees, incurred by the Fund in connection with such transfer.

## MANAGEMENT OF THE FUND

The Board has overall responsibility to manage and control the business affairs of the Fund, including the complete and exclusive authority to oversee and to establish policies regarding the management, conduct and operation of the Fund's business. The Board exercises the same powers, authority and responsibilities on behalf of the Fund as are customarily exercised by the board of directors of a registered investment company organized as a corporation. The business of the Fund is managed under the direction of the Board in accordance with the Agreement and Declaration of Trust and the Fund's Bylaws (the "Governing Documents"), each as amended from time to time, which have been filed with the SEC and are available upon request.

The Board consists of five individuals, four of whom are not "interested persons" (as defined under the 1940 Act) of the Fund, the Adviser, or the Fund's distributor ("Independent Trustees"). Interested Persons generally include affiliates, immediate family members of affiliates, any partner or employee of the Fund's legal counsel, and any person who has engaged in portfolio transactions for the Fund or who has loaned the Fund money or property within the previous six months. Pursuant to the Governing Documents of the Fund, the Trustees shall elect officers including a President, a Secretary, a Treasurer, a Principal Executive Officer and a Principal Accounting Officer. The Board retains the power to conduct, operate and carry on the business of the Fund and has the power to incur and pay any expenses, which, in the opinion of the Board, are necessary or incidental to carry out any of the Fund's purposes. The Trustees, officers, employees and agents of the Fund, when acting in such capacities, shall not be subject to any personal liability except for his or her own bad faith, willful misfeasance, gross negligence or reckless disregard of his or her duties.

**Trustee Qualifications**

Generally, the Fund believes that each Trustee is competent to serve because of their individual overall merits including: (i) experience; (ii) qualifications; (iii) attributes; and (iv) skills.

The Fund does not believe any one factor is determinative in assessing a Trustee's qualifications, but that the collective experience of each Trustee makes them each highly qualified.

Following is a list of the Trustees and executive officers of the Fund and their principal occupation over the last five years.

The "Fund Complex," as referred to herein consists of: the Fund, each series of NexPoint Funds I ("NFI"), each series of NexPoint Funds II ("NFII"), Highland Global Allocation Fund ("GAF"), Highland Opportunities and Income Fund ("HFRO"), and NexPoint Capital, Inc. (the "BDC"), a closed-end management investment company that has elected to be treated as a business development company under the 1940 Act.

**Trustees**

| Name, Date of Birth, Position(s) with the Fund and Length of Time Served, Term of Office[1] and Number of Portfolios in the Fund Complex Overseen by the Trustee | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|
| **Independent Trustees** | | |
| **Dr. Bob Froehlich**<br>(4/28/1953)<br><br>Trustee since March 2016; Indefinite term<br>7 funds | Retired.<br><br>Director of KC Concessions, Inc. (from January 2013 to March 2025); Director of American Sports Enterprise, Inc. (since January 2013); Chairman and owner, Kane | Significant experience in the financial industry; significant managerial and executive experience; significant experience on other boards of directors, including as a member of several audit committees. |

| Name, Date of Birth, Position(s) with the Fund and Length of Time Served, Term of Office[1] and Number of Portfolios in the Fund Complex Overseen by the Trustee | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|
| | County Cougars Baseball Club (from January 2013 to March 2025); Director of The Midwest League of Professional Baseball Clubs, Inc. (from January 2013 to December 2021); Director of Kane County Cougars Foundation, Inc. (from January 2013 to March 2025); Director of Galen Robotics, Inc. (from August 2016 to September 2023); Director and Special Advisor to Vault Data, LLC (since February 2018); Director of American Association of Professional Baseball, Inc. (since February 2021); Director of National Amateur Fall Baseball Federation (since December 2023) and Executive Director of Kane County Cougars Baseball Foundation Inc. (from July 2023 to March 2025) (remaining as Director). | |
| **Ethan Powell**<br>(6/20/1975)<br>Trustee since March 2016; Chairman of the Board since March 2016;<br>Indefinite term<br>7 funds | Principal and CIO of Brookmont Capital Management, LLC (since May 2020); CEO, Chairman and Founder of Impact Shares LLC (since December 2015); Trustee /Director of the Fund Complex (from June 2012 until July 2013 and since December 2013); and Trustee of Strategic Trust (since August 2021).<br>Trustee of Tidal Trust III (formerly Impact Shares Trust I) (since May 2016) | Significant experience in the financial industry; significant executive experience including past service as an officer of funds in the Fund Complex; significant administrative and managerial experience. |
| **Bryan A. Ward**<br>(2/4/1955)<br>Trustee since March 2016;<br>Indefinite term<br>7 funds | President – Private Banking, Lakeside Bank (since September 2023); Business Development Banker, CrossFirst Bank (from January 2023 to April 2023) (President-Dallas from October 2020 until January 2023 and Senior Advisor from April 2019 until October 2022); and Private Investor, BW Consulting, LLC (since 2014); and Anderson Consulting/Accenture (from 1991 to 2013).<br>Director of Equity Metrix, LLC | Significant experience on this and/or other boards of directors/trustees, Audit Committee Chair; significant managerial and executive experience; significant experience as a management consultant. |

| Name, Date of Birth, Position(s) with the Fund and Length of Time Served, Term of Office[1] and Number of Portfolios in the Fund Complex Overseen by the Trustee | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|
| **Dorri McWhorter**<br>(6/30/1973)<br><br>Trustee since May 2022;<br>Indefinite term<br>7 funds | President & CEO, YMCA of Metropolitan Chicago (from 2021 to 2025); Chief Executive Officer, YWCA Metropolitan Chicago (from 2013 to 2021).<br><br>Board Director of William Blair Funds (since 2019); Board Director of Skyway Concession Company, LLC (since 2018); Board Director of Illinois CPA Society (from 2017 to 2022); Board Director of Lifeway Foods, Inc. (since 2020); Board Director of Green Thumb Industries, Inc. (from February 2022 to October 2022); Member of Financial Accounting Standards Advisory Council (since 2021); Board Director of LanzaTech Global, Inc. (since 2023). | Significant managerial and executive experience, including experience as president and chief executive officer; significant background and experience in financial accounting; significant experience on other boards of directors, including for other registered investment companies. |
| **Interested Trustees** | | |
| **John Honis[2]**<br>(6/16/1958)<br><br>Trustee since March 2016;<br>Indefinite term<br>7 funds | President of Rand Advisors, LLC (August 2013 – August 2022); CEO of Valience Group, LLC (since July 2021) and Consultant of Rand Advisors, LLC (since August 2022). | Significant experience in the financial industry; significant managerial and executive experience, including experience as president, chief executive officer or chief restructuring officer of five telecommunication firms; experience on other boards of directors. |

1 On an annual basis, as a matter of Board policy, the Governance and Compliance Committee reviews each Trustee's performance and determines whether to extend each such Trustee's service for another year. The Board has adopted a retirement policy wherein the Governance and Compliance Committee shall not recommend the continued service as a Trustee of a Board member who is older than 80 years of age at the time the Governance and Compliance Committee reports its findings to the Board.

2 In light of certain relationships between Mr. Honis and historically affiliated entities of the Adviser, including Highland Capital Management, L.P. ("HCMLP"), arising out of HCMLP's pending Chapter 11 proceedings, Mr. Honis is treated as an Interested Trustee of the Trust effective January 28, 2020.

**Officers***

| Name, Date of Birth, Position(s) held with the Trust and Length of Time Served, Term of Office | Principal Occupations(s) During the Past Five Years |
|---|---|
| **James Dondero**<br>(6/29/1962)<br>President and Principal Executive Officer since March 2016; Indefinite Term | Founder of NexPoint; Co-founder of HCMLP and NexPoint Asset Management, L.P. ("NAM"); Chairman of the Board of NexPoint Residential Trust, Inc. since 2015; NexPoint Hospitality Trust, NexPoint Real Estate Finance, Inc., Texmark Timber Treasury, L.P., and SeaOne Holdings, LLC; Portfolio Manager of GAF, HFRO, NexPoint Event Driven Fund and NexPoint Merger Arbitrage Fund (each a series of NFI); NexPoint Climate Tech Fund (series of NFII); the BDC; and NRESF. |
| **Frank Waterhouse**<br>(4/14/1971)<br>Treasurer since March 2016; Principal Financial and Accounting Officer since April 2021; Indefinite Term | Chief Financial Officer of Skyview Group since February 2021; Chief Financial Officer and Partner of HCMLP from December 2011 and March 2015, respectively, to February 2021; Treasurer of the Fund Complex since May 2015. |
| **Dustin Norris**<br>(1/6/1984)<br>Executive Vice President since April 2019; Indefinite Term | Head of Distribution and Chief Product Strategist at NexPoint since March 2019; President of NexPoint Securities, Inc. since April 2018; Officer of the Fund Complex since November 2012. |
| **Stephanie Vitiello**<br>(6/21/1983)<br>Secretary since April 2021; Chief Compliance Officer and Anti-Money Laundering Officer since November 2021; Indefinite Term | Chief Compliance Officer and Counsel of Skyview Group since February 2021. Prior to her current role at Skyview Group, Ms. Vitiello served as Managing Director – Distressed, Assistant General Counsel, Associate General Counsel and In-House Counsel for HCMLP. |
| **Will Mabry**<br>(7/2/1986)<br>Assistant Treasurer since April 2021; Indefinite Term | Director, Fund Analysis of Skyview Group, since February 2021. Prior to his current role at Skyview Group, Mr. Mabry served as Senior Manager – Fund Analysis, Manager – Fund Analysis, and Senior Fund Analyst for HCMLP. |

* The address for each Trustee and Officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Board Committees**

***Audit and Qualified Legal Compliance Committee.*** The members of the Audit and Qualified Legal Compliance Committee are Dr. Froehlich and Messrs. Powell and Ward and Ms. McWhorter, each of whom is independent for purposes of the 1940 Act. Mr. Ward serves as Chairperson of the Audit and Qualified Legal Compliance Committee. The Audit and Qualified Legal Compliance Committee is responsible for: (i) approving the Fund's independent accountants; (ii) reviewing with the Fund's independent accountants the plans and results of the audit engagement and reviewing the adequacy of the Fund's internal accounting controls; and (iii) approving professional services provided by the Fund's independent accountants. The Audit and Qualified Legal Compliance Committee is charged with compliance with Rules 205.2(k) and 205.3(c) of Title 17 of the Code of Federal Regulations regarding alternative reporting procedures for attorneys representing the Fund who appear

and practice before the SEC on behalf of the Fund. The Audit Committee also oversees valuations determined by the Adviser, who pursuant to Rule 2a-5 under the 1940 Act, has been designated by the Board as the Fund's valuation designee to perform the fair valuation determination for securities and other assets held by the Fund in accordance with valuation policies and procedures established by the Adviser and approved by the Board. In addition, each member of the Audit and Qualified Legal Compliance Committee meets the current independence and experience requirements of Rule 10A-3 under the Exchange Act.

During the fiscal year ended December 31, 2024, the Audit and Qualified Legal Compliance Committee held five meetings.

***The Governance and Compliance Committee.*** The Fund's Governance and Compliance Committee's function is to oversee and make recommendations to the full Board or the Independent Trustees, as applicable, with respect to the governance of the Fund, selection and nomination of Trustees, compensation of Trustees, and related matters, as well as to oversee and assist Board oversight of the Fund's compliance with legal and regulatory requirements and to seek to address any potential conflicts of interest between the Fund and the Adviser in connection with any potential or existing litigation or other legal proceeding related to securities held by the Fund and the Adviser or another client of the Adviser. The Governance and Compliance Committee is also responsible for evaluating each Trustee and determining whether to recommend each Trustee's continued service in that capacity. The Governance and Compliance Committee will consider recommendations for Trustee nominees from shareholders sent to the Secretary of the Fund, 300 Crescent Court, Suite 700, Dallas, Texas 75201. A nomination submission must include all information relating to the recommended nominee that is required to be disclosed in solicitations or proxy statements for the election of Trustees, as well as information sufficient to evaluate the recommended nominee's ability to meet the responsibilities of a Trustee of the Fund. Nomination submissions must be accompanied by a written consent of the individual to stand for election if nominated by the Board and to serve if elected by the shareholders, and such additional information must be provided regarding the recommended nominee as reasonably requested by the Governance and Compliance Committee. The Governance and Compliance Committee is currently comprised of Dr. Froehlich and Messrs. Ward and Powell and Ms. McWhorter, each of whom is independent for purposes of the 1940 Act. Dr. Froehlich serves as the Chairperson of the Governance and Compliance Committee. The Governance and Compliance Committee met five times during the fiscal year ended December 31, 2024.

***The Administration and Operations Committee.*** The members of the Administration and Operations Committee are Dr. Froehlich and Messrs. Honis, Ward, and Powell and Ms. McWhorter. Mr. Honis serves as Chairperson of the Administration and Operations Committee. The Administration and Operations Committee is responsible for reviewing arrangements with financial intermediaries who provide service to the Fund, including Fund payments to financial intermediaries, and for overseeing any funds that, in the Board's determination, employ alternative investment strategies. The Administration and Operations Committee met five times during the fiscal year ended December 31, 2024.

**Board Leadership Structure**

The Board is led by Ethan Powell, an Independent Trustee, who has served as the Chairman of the Board since March 2016. Under certain 1940 Act governance guidelines that apply to the Fund, the Independent Trustees will meet in executive session, at least quarterly. Under the Fund's governing documents, the Chairman of the Board is responsible for: (a) presiding at board meetings; (b) calling special meetings on an as-needed basis; and (c) execution and administration of Fund policies, including: (i) setting the agendas for board meetings; and (ii) providing information to board members in advance of each board meeting and between board meetings. The Fund believes that the Chairman, and, as an entity, the full Board, provide effective leadership that is in the best interests of the Fund and each shareholder.

The Board periodically reviews its leadership structure, including the role of the Chairman. The Board also completes an annual self-assessment during which it reviews its leadership and Committee structure and

considers whether its structure remains appropriate in light of the Fund's current operations. The Board believes that its leadership structure, including the current percentage of the Board who are Independent Trustees is appropriate given its specific characteristics. These characteristics include: (i) the extent to which the work of the Board is conducted through the standing committees, and that the Audit and Qualified Legal Compliance Committee and the Governance and Compliance Committee meetings are each chaired by an Independent Trustee; (ii) the extent to which the Independent Trustees meet as needed, together with their independent legal counsel, in the absence of members of management and any member of the Board who is considered an "interested person" of the Fund; and (iii) Mr. Powell's and Mr. Honis' previous positions with NAM and/or historical affiliates of the Adviser which enhances the Board's understanding of the operations of the Adviser.

**Board Oversight of Risk Management**

The Board's role is one of oversight, rather than active management. This oversight extends to the Fund's risk management processes. These processes are embedded in the responsibilities of officers of, and service providers to, the Fund. For example, the Adviser and other service providers to the Fund are primarily responsible for the management of the Fund's investment risks. The Board has not established a formal risk oversight committee. However, much of the regular work of the Board and its standing Committees addresses aspects of risk oversight. For example, the Trustees seek to understand the key risks facing the Fund, including those involving conflicts of interest; how management identifies and monitors these risks on an ongoing basis; how management develops and implements controls to mitigate these risks; and how management tests the effectiveness of those controls.

In the course of providing that oversight, the Board will receive a wide range of reports on the Fund's activities from the Adviser and other service providers, including reports regarding the Fund's investment portfolio, the compliance of the Fund with applicable laws, and the Fund's financial accounting and reporting. The Board will also meet periodically with the Fund's Chief Compliance Officer to receive reports regarding the compliance of the Fund with the federal securities laws and the Fund's internal compliance policies and procedures and meets with the Fund's Chief Compliance Officer periodically, including at least annually, to review the Chief Compliance Officer's annual report. The Board's Audit and Qualified Legal Compliance Committee will also meet regularly with the Chief Financial Officer and Treasurer and the Fund's independent public accounting firm to discuss, among other things, the internal control structure of the Fund's financial reporting function. The Board will also meet periodically with the portfolio managers of the Fund to receive reports regarding the management of the Fund, including its investment risks.

The Board recognizes that not all risks that may affect the Fund can be identified, that it may not be practical or cost-effective to eliminate or mitigate certain risks, that it may be necessary to bear certain risks (such as investment-related risks) to achieve the Fund's goals, that reports received by the Trustees with respect to risk management matters are typically summaries of the relevant information, and that the processes, procedures and controls employed to address risks may be limited in their effectiveness. As a result of the foregoing and other factors, risk management oversight by the Board and by the Committees is subject to substantial limitations.

**Trustee Ownership**

The following table indicates the dollar range of equity securities that each Trustee beneficially owned in the Fund and the aggregate dollar range of equity securities owned by the Trustees in all funds overseen by the Trustees in the Fund Complex as of December 31, 2024.

| Name of Trustee | Dollar Range of Equity Securities in the Fund | Aggregate Dollar Range of Equity Securities[1] Owned in All Funds of the Funds Complex Overseen by Trustee[2] |
|---|---|---|
| **Independent Trustees** | | |
| Ethan Powell | None | $50,001 - $100,000 |
| Dr. Bob Froehlich | None | Over $100,000 |
| Bryan A. Ward | None | $10,001 - $50,000 |
| Dorri McWhorter | None | None |
| **Interested Trustee** | | |
| John W. Honis | None | $1 - $10,000 |

1 Based on market value as of December 31, 2024.
2 Dollar ranges are as follows: None, $1-$10,000, $10,001-$50,000, $50,001-$100,000 and over $100,000.

**Compensation**

The executive officers of the Fund receive no direct remuneration from the Fund. Each Trustee who oversees all of the funds in the Fund Complex receives an annual retainer of $150,000 payable in quarterly installments and allocated among each portfolio in the Fund Complex based on relative net assets. Trustees are reimbursed for actual out-of-pocket expenses relating to attendance at meetings The Trustees do not receive any separate compensation in connection with service on Committees or for attending Board or Committee Meetings; however, the Chairman of the Board receives an additional annual payment of $20,000 and the Chairperson of the each Committee each receive an additional annual payment of $10,000 payable in quarterly installments and allocated among each portfolio in the Fund Complex based on relative net assets. The Trustees do not have any pension or retirement plan.

The table below details the amount of compensation the Trustees received from the Fund during the fiscal year ended December 31, 2024. The Fund does not have a bonus, profit sharing, pension or retirement plan.

| Name of Trustee | Aggregate Compensation From the Fund | Pension or Retirement Benefits Accrued as Part of the Fund's Expenses | Estimated Annual Benefits Upon Retirement | Aggregate Compensation From the Funds Complex |
|---|---|---|---|---|
| **Independent Trustees** | | | | |
| Dr. Bob Froehlich | $ 3,181 | $ 0 | $ 0 | $ 160,000 |
| Bryan A. Ward | $ 3,181 | $ 0 | $ 0 | $ 160,000 |
| Ethan Powell | $ 3,379 | $ 0 | $ 0 | $ 170,000 |
| Dorri McWhorter | $ 2,982 | $ 0 | $ 0 | $ 150,000 |
| **Interested Trustees** | | | | |
| John W. Honis | $ 3,181 | $ 0 | $ 0 | $ 160,000 |

**CODES OF ETHICS**

The Fund and the Adviser have adopted codes of ethics under Rule 17j-1 of the 1940 Act. These codes permit personnel subject to the codes to invest in securities, including securities that may be purchased or held by the Fund. The codes of ethics are available on the EDGAR Database on the SEC's web site (http://www.sec.gov), and copies of these codes may be obtained, after paying a duplicating fee, by electronic request at the following e-mail address: publicinfo@sec.gov, or by writing the SEC's Public Reference Section, Washington, D.C. 20549-0102.

**PROXY VOTING POLICIES AND PROCEDURES**

The Board has delegated the voting of proxies for Fund securities to the Adviser pursuant to the Adviser's proxy voting policies and procedures. Under these policies and procedures, the Adviser will vote proxies related to Fund securities in the best interests of the Fund and its shareholders. A copy of the Adviser's proxy voting policies and procedures is attached as Appendix A to this SAI. The Fund's proxy voting record for the most recent 12-month period ended June 30 is available: (i) without charge, upon request, by calling 844-485-9167; and (ii) on the SEC's web site (http://www.sec.gov).

**CONTROL PERSONS AND PRINCIPAL HOLDERS**

A principal shareholder is any person who owns (either of record or beneficially) 5% or more of the outstanding shares of a fund. A control person is one who owns, either directly or indirectly more than 25% of the voting securities of a company or acknowledges the existence of control. A control person may be able to determine the outcome of a matter put to a shareholder vote.

As of March 31, 2025, as a result of Mr. Dondero's controlling interest in the Adviser, the Trustees and officers beneficially owned approximately 8.57% of the Fund's outstanding shares.

Case 3:26-cv-02496-D Document 17-30 Filed 09/08/26 Page 302 of 608 PageID 12453

As of March 31, 2025, the only persons known by the Fund to own of record or beneficially 5% or more of any class of the outstanding shares of the Fund were as follows:

| Name and Address | Outstanding Shares Held | Percentage of Class (%) |
|---|---|---|
| **NEXPOINT REAL ESTATE STRATEGIES FUND – CLASS A** | | |
| Pershing LLC<br>PO Box 2052<br>Jersey City, NJ 07303-2052 | 43,054 | 9.11% |
| Calton & Associates, Inc.<br>2701 N Rocky Point Dr.<br>Suite 1000<br>Tampa, FL 33607 | 29,815 | 6.31% |
| **NEXPOINT REAL ESTATE STRATEGIES FUND – CLASS C** | | |
| Hilltop Securities Inc.<br>717 N Harwood Street Suite 3400<br>Dallas, TX 75201-6534 | 18,648 | 10.61% |
| Pershing LLC<br>PO Box 2052<br>Jersey City, NJ 07303-2052 | 13,310 | 7.58% |
| **NEXPOINT REAL ESTATE STRATEGIES FUND – CLASS Z** | | |
| Liberty CLO Holdco Ltd.<br>300 Crescent Court<br>Dallas, TX 75206 | 500,120 | 33.63% |
| Charles Schwab & Co. Inc.<br>Special Custody Account FBO Customers<br>Attn. Mutual Funds<br>211 Main Street<br>San Francisco, CA 94105 | 407,285 | 27.38% |
| Axos Clearing LLC<br>FBO #861 PB BOX 6503<br>Englewood, CO 80155-6503 | 107,431 | 7.22% |

## INVESTMENT ADVISORY AND OTHER SERVICES

**The Adviser**

NexPoint Advisors, L.P., which serves as the investment adviser of the Fund, is registered with the SEC as an investment adviser under the Advisers Act. NexPoint is owned by The Dugaboy Investment Trust, of which James Dondero is the beneficiary, and NexPoint Advisors GP, LLC, NexPoint's general partner. Mr. Dondero is the President and sole member of NexPoint Advisors GP, LLC.

The Adviser also externally manages NexPoint Capital, Inc., a non-traded business development company. Affiliates of the Adviser manage NXDT, a diversified REIT whose share trades on the NYSE; NXRT, a publicly-traded REIT whose shares trade on the NYSE; VineBrook Homes Trust, Inc., a Private Real Estate Investment Fund that manages a portfolio of single-family housing properties in the Midwest U.S.; NexPoint Hospitality Trust ("NHT"), a REIT listed on the TSX Venture Exchange that manages a portfolio of hospitality assets located in the U.S.; NexPoint Real Estate Finance, Inc., an externally managed publicly traded mortgage REIT ("NREF"); and certain wholly-owned REIT subsidiaries of other closed-end funds in the Fund Complex. NexPoint Asset Management, L.P., an affiliate of the Adviser, manages Highland Opportunities and Income Fund ("HFRO") and Highland Global Allocation Fund ("GAF"), registered closed-end funds whose shares trade on the NYSE. The Adviser's senior management team has experience across private lending, private equity, real estate investing and other investment strategies. Collectively, the Adviser and its affiliates managed approximately $16.8 billion in assets as of January 31, 2025, including approximately $11.7 billion in gross real estate assets.

Under the general supervision of the Board, the Adviser will carry out the investment and reinvestment of the net assets of the Fund, will furnish continuously an investment program with respect to the Fund, and determine which securities should be purchased, sold or exchanged. In addition, the Adviser will supervise and provide oversight of the Fund's service providers. The Adviser has entered into a Services Agreement (the "Services Agreement") with Skyview Group ("Skyview"), pursuant to which NexPoint will receive administrative and operational support services to enable it to provide the required advisory services to the Fund.

Certain Skyview personnel became dual-employees of NexPoint Services, Inc., a wholly-owned subsidiary of the Adviser. The same services are being performed by the dual-employees. The Adviser, and not the Fund, will compensate all Adviser, Skyview, and dual-employee personnel who provide services to the Fund.

Pursuant to the Investment Advisory Agreement with the Fund, the Adviser receives a monthly fee at the annual rate of 1.25% of the Fund's Daily Gross Assets. Daily Gross Assets is defined in the Investment Advisory Agreement as total assets, less any liabilities, but excluding liabilities evidencing leverage. A discussion regarding the basis for the Board's approval of the Fund's Investment Advisory Agreement is available in the Fund's annual report for the period ended December 31, 2024.

The Adviser and the Fund have entered into the Expense Limitation Agreement under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily Gross Assets (the "Expense Limitation"). "Daily Gross Assets" is defined in the Expense Limitation Agreement as an amount equal to total assets, less any liabilities, but excluding liabilities evidencing leverage. If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared

effective by the SEC and to commence operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement may not be amended or terminated for one year from the date of the Prospectus, unless approved by the Board. See "Management of the Fund." During the fiscal year ended December 31, 2022, the Fund paid $419,640 in advisory fees. The Adviser waived $195,464 in advisory fees during that same period. During the fiscal year ended December 31, 2023, the Fund paid $535,940 in advisory fees. The Adviser waived $461,692 in advisory fees during that same period. During the fiscal year ended December 31, 2024, the Fund paid $479,153 in advisory fees. The Adviser waived $331,916 in advisory fees during that same period.

**Other Services.** Pursuant to the Investment Advisory Agreement, the Adviser provides administration services to the Fund, provides executive and other personnel necessary to administer the Fund and furnishes office space. The Adviser waived its fees for administration services for the fiscal year ended December 31, 2017. Under a separate sub-administration agreement entered into as of October 1, 2018, the Adviser has delegated certain administrative functions to SEI Global Funds Services ("SEI") and pays SEI a fee for administration services. Under the administration agreement, SEI has agreed to provide fund accounting services; asset data services; fund administration and reporting services; and regulatory administration services, including preparation and filing of various reports with the appropriate regulatory agencies and the SEC for the Fund. The Adviser generally assists in all aspects of the Fund's administration and operations and furnishes offices, necessary facilities, equipment and personnel. SS&C Technologies, Inc. ("SS&C") serves as the transfer agent of the Fund.

**Conflicts of Interest**

Because each portfolio manager manages other accounts, including accounts that may pay higher fees, potential conflicts of interest exist, including potential conflicts between the investment strategy of the Fund and the investment strategy of the other accounts managed by the portfolio manager and potential conflicts in the allocation of investment opportunities between the Fund and the other accounts. The Adviser has policies and procedures in place that are reasonably designed to mitigate these conflicts of interest, which are also described below.

The Adviser and/or its general partner, limited partners, officers, affiliates and employees provide investment advice to other parties and manage other accounts and investment vehicles similar to the Fund. For the purposes of this section, the term "NexPoint" shall include the Adviser and its affiliated investment advisors and all affiliates listed on its Form ADV, as filed with the SEC March 28, 2025 (CRD No. 163564).

In connection with such other investment management activities, the Adviser and/or its general partner, limited partners, officers, affiliates and employees may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Fund's monies, in a particular security or strategy. In addition, the Adviser and such other persons will determine the allocation of funds from the Fund and such other accounts to investment strategies and techniques on whatever basis they consider appropriate or desirable in their sole and absolute discretion.

NexPoint has built a professional working environment, a firm-wide compliance culture and compliance procedures and systems designed to protect against potential incentives that may favor one account over another. The Adviser has adopted policies and procedures that address the allocation of investment opportunities, execution of portfolio transactions, personal trading by employees and other potential conflicts of interest that are designed to ensure that all client accounts are treated equitably over time. Nevertheless, the Adviser furnishes advisory services to numerous clients in addition to the Fund, and the Adviser may, consistent with applicable law, make investment recommendations to other clients or accounts (including accounts that have performance or higher fees paid to the Adviser or in which portfolio managers have a personal interest in the receipt of such

fees) that may be the same as or different from those made to the Fund. In addition, the Adviser, its affiliates and any of their partners, directors, officers, stockholders or employees may or may not have an interest in the securities whose purchase and sale the Adviser recommends to the Fund. Actions with respect to securities of the same kind may be the same as or different from the action that the Adviser, or any of its affiliates, or any of their partners, directors, officers, stockholders or employees or any member of their families may take with respect to the same securities. Moreover, the Adviser may refrain from rendering any advice or services concerning securities of companies of which any of the Adviser's (or its affiliates') partners, directors, officers or employees are directors or officers, or companies as to which the Adviser or any of its affiliates or partners, directors, officers and employees of any of them has any substantial economic interest or possesses material non-public information.

The Adviser, its affiliates or their partners, directors, officers or employees similarly serve or may serve other entities that operate in the same or related lines of business, including accounts managed by an investment adviser affiliated with the Adviser. Accordingly, these individuals may have obligations to investors in those entities or funds or to other clients, the fulfillment of which might not be in the best interests of the Fund. As a result, the Adviser will face conflicts in the allocation of investment opportunities to the Fund and other funds and clients. In order to enable such affiliates to fulfill their fiduciary duties to each of the clients for which they have responsibility, the Adviser will endeavor to allocate investment opportunities in a fair and equitable manner, pursuant to policies and procedures adopted by the Adviser and its advisory affiliates that are designed to manage potential conflicts of interest, which may, subject to applicable regulatory constraints, involve pro rata co-investment by the Fund and such other clients or may involve a rotation of opportunities among the Fund and such other clients. The Fund will only make investments in which the Adviser or an affiliate hold an interest to the extent permitted under the 1940 Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Adviser and certain funds affiliated with the Fund, dated April 19, 2016. For example, exemptive relief is not required for the Fund to invest in syndicated deals and secondary loan market transactions in which the Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," including future closed-end investment companies registered under the 1940 Act that are managed by the Adviser, which includes the Fund. The Fund, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order. To mitigate any actual or perceived conflicts of interest, allocation of limited offering securities (such as IPOs and registered secondary offerings) to principal accounts that do not include third party investors may only be made after all other client account orders for the security have been filled. However, there can be no assurance that such policies and procedures will in every case ensure fair and equitable allocations of investment opportunities, particularly when considered in hindsight.

Conflicts may arise in cases when clients and/or the Adviser and other affiliated entities invest in different parts of an issuer's capital structure, including circumstances in which one or more clients own private securities or obligations of an issuer and other clients may own public securities of the same issuer. In addition, one or more clients may invest in securities, or other financial instruments, of an issuer that are senior or junior to securities, or financial instruments, of the same issuer that are held by or acquired for, one or more other clients. For example, if such issuer encounters financial problems, decisions related to such securities (such as over the terms of any workout or proposed waivers and amendments to debt covenants) may raise conflicts of interests. In such a distressed situation, a client holding debt securities of the issuer may be better served by a liquidation of the issuer in which it may be paid in full, whereas a client holding equity securities of the issuer might prefer a reorganization that holds the potential to create value for the equity holders. In the event of conflicting interests within an issuer's capital structure, the Adviser will generally pursue the strategy that the Adviser believes best reflects what would be expected to be negotiated in an arm's length transaction, but in all instances with due consideration being given to NexPoint's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or fees received from such accounts). This strategy may be recommended by one or more NexPoint investment professionals. A single person may make decisions with respect to more than one part of an issuer's capital structure. Adviser personnel board members may still make recommendations to the applicable investment professional(s). A portfolio manager with respect to any applicable NexPoint registered investment

company clients ("Retail Accounts") will make an independent determination as to which course of action he or she determines is in the best interest of the applicable Retail Accounts. NexPoint may use external counsel for guidance and assistance.

The Adviser and its affiliates have both subjective and objective procedures and policies in place designed to manage potential conflicts of interest involving clients so that, for example, investment opportunities are allocated in a fair and equitable manner among the Fund and such other clients. An investment opportunity that is suitable for multiple clients of the Adviser and its affiliates may not be capable of being shared among some or all of such clients due to the limited scale of the opportunity or other factors, including regulatory restrictions imposed by the 1940 Act. There can be no assurance that the Adviser's or its affiliates' efforts to allocate any particular investment opportunity fairly among all clients for whom such opportunity is appropriate will result in an allocation of all or part of such opportunity to the Fund. Not all conflicts of interest can be expected to be resolved in favor of the Fund.

Another type of conflict may arise if one client account buys a security and another client account sells or shorts the same security. Currently, such opposing positions are generally not permitted within the same account without prior trade approval by the Chief Compliance Officer. However, a portfolio manager may enter into opposing positions for different clients to the extent each such client has a different investment objective and each such position is consistent with the investment objective of the applicable client. In addition, transactions in investments by one or more affiliated client accounts may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other client accounts.

Because certain client accounts may have investment objectives, strategies or legal, contractual, tax or other requirements that differ (such as the need to take tax losses, realize profits, raise cash, diversification, etc.), an affiliated adviser may purchase, sell or continue to hold securities for certain client accounts contrary to other recommendations. In addition, an affiliated adviser may be permitted to sell securities or instruments short for certain client accounts and may not be permitted to do so for other affiliated client accounts.

As a result of the Fund's arrangements with NexPoint, there may be times when NexPoint, the Adviser or their affiliates have interests that differ from those of the Fund's shareholders, giving rise to a conflict of interest. NexPoint and the Adviser are under common ownership, and the Fund's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund does, or of investment funds managed by the Adviser or its affiliates. Similarly, the Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. For example, the Fund's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Adviser and its affiliates. The Fund's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles. As a result, those individuals may face conflicts in the allocation of investment opportunities among the Fund and other investment funds or accounts advised by or affiliated with the Adviser. The Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is fair and equitable over time and consistent with its allocation policy. However, the Fund can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time.

In addition, it is anticipated that a significant portion of the Fund's assets will be represented by securities sponsored, organized and/or managed by NexPoint and its affiliates, which may include REITs, asset-backed securities and/or structured finance securities. The Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Fund with an opportunity to periodically review the Fund's investments in such REITs, asset-backed securities and/or structured finance securities and assure themselves that continued investment in such securities remains in the best interests of the Fund and its shareholders.

The Adviser may direct the Fund to acquire or dispose of investments in cross trades between the Fund and other clients of the Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the 1940 Act and SEC staff interpretations, the Fund may make and/or hold an investment, including an investment in securities, in which the Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Adviser's own investments in such companies.

**Shareholder Service Expenses**

The Fund has adopted a "Shareholder Servicing Plan and Agreement" (the "Plan") under which the Fund may compensate financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. The Plan operates in a manner consistent with Rule 12b-1 under the 1940 Act, which regulates the manner in which an open-end investment company may directly or indirectly bear the expenses of distributing its shares. Although the Fund is not an open-end investment company, it has undertaken to comply with the terms of Rule 12b-1 as a condition of an exemptive order under the 1940 Act which permits it to have a multi-class structure, CDSCs and distribution and shareholder servicing fees. Such services may include electronic processing of client orders, electronic fund transfers between clients and the Fund, account reconciliations with the Fund's transfer agent, facilitation of electronic delivery to clients of Fund documentation, monitoring client accounts for back-up withholding and any other special tax reporting obligations, maintenance of books and records with respect to the foregoing, and such other information and liaison services as the Fund or the Adviser may reasonably request. Under the Shareholder Servicing Plan and Agreement, the Fund may incur expenses on an annual basis equal to 0.25% of the average daily net assets of the Class A and Class C shares.

In addition to payments under the Plan, from time to time the Fund may pay broker-dealers and other intermediaries' account-based fees for networking and account maintenance. In addition, the Adviser and/or the Distributor may, from time to time, at their own expense out of the revenues they receive from the Fund and/or its own financial resources, make cash payments to broker-dealers and other financial intermediaries (directly and not as an expense of the Fund) as an incentive to sell shares of the Fund and/or to promote retention of customer assets in the Fund. Such cash payments may be calculated on sales of shares of the Fund ("Sales-Based Payments") or on the average daily net assets of the Fund attributable to that particular broker-dealer or other financial intermediary ("Asset-Based Payments"). Each of the Adviser and/or the Distributor may agree to make such cash payments to a broker-dealer or other financial intermediary in the form of either or both Sales-Based Payments and Asset-Based Payments.

The Adviser and/or the Distributor may also make other cash payments to broker-dealers or other financial intermediaries in addition to or in lieu of Sales-Based Payments and Asset-Based Payments, in the form of payment for travel expenses, including lodging, incurred in connection with trips taken by qualifying registered representatives of those broker-dealers or other financial intermediaries and their families to places within or outside the United States; meeting fees; entertainment; transaction processing and transmission charges; advertising or other promotional expenses; allocable portions, based on shares of the Fund sold, of salaries and bonuses of registered representatives of an affiliated broker-dealer or other financial intermediary that is a financial advisor; or other expenses as determined in the Adviser or the Distributor's discretion, as applicable. In certain cases these other payments could be significant to the broker-dealers or other financial intermediaries. Any payments described above will not change the price paid by investors for the purchase of the shares of the Fund, the amount that the Fund will receive as proceeds from such sales, or the amounts payable under the Plan.

**PORTFOLIO MANAGERS**

As described in the prospectus, James Dondero and Matthew McGraner serve as portfolio managers and are primarily responsible for the day-to-day management of the Fund.

**Mr. Dondero** is the founder and President of NexPoint Advisors, L.P. ("NexPoint") and co-founder of NAM. Mr. Dondero has over 30 years of experience investing across the alternative landscape. In that time, he established a number of integrated businesses to manage investments in real estate, private equity, and high-yield and structured credit, among other areas. Mr. Dondero holds various leadership roles at NexPoint Advisors, L.P., NexPoint Asset Management, L.P., and other NexPoint affiliates. Mr. Dondero holds various leadership roles across the NexPoint businesses; he serves as a portfolio manager for several funds and is an officer and director at NexPoint's publicly traded REITs. Additionally, Mr. Dondero holds director positions at several companies within financial services, real estate, and other industries. He is the chairman of NexBank Capital, Inc. and a director of SeaOne Holdings, LLC. A dedicated philanthropist, Mr. Dondero actively contributes to initiatives in education, veterans' affairs, and community and economic development, and has been instrumental in supporting a number of civic and cultural institutions in the Dallas-Fort Worth area. He is a member of the Southern Methodist University Cox School of Business Executive Board and the George W. Bush Presidential Center Executive Advisory Council. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He received certification as a Certified Public Accountant (CPA) and a Certified Managerial Accountant (CMA) and is a holder of the right to use the Chartered Financial Analyst (CFA) designation.

**Mr. McGraner** has extensive experience in real estate and private equity transactions and currently leads the operations of the real estate platform of NexPoint Advisors, L.P. and its affiliates, a suite of leading alternative investment managers he co-founded. In that role, he sources and executes investments, manages risk and develops potential business opportunities, including fundraising, private investments and joint ventures. In his role at NexPoint, Mr. McGraner has served as the Executive VP and Chief Investment Officer of NXRT, a multifamily real estate investment trust, since 2016; NREF, a mortgage REIT, since 2020; VineBrook Homes Trust, a single family rental REIT, since 2019; NexPoint Diversified Real Estate Trust, a diversified REIT, since 2022; and as a member of the board of directors and President of NexPoint Storage Partners, a self-storage REIT, since 2020. Mr. McGraner is also a licensed attorney and was formerly an attorney at an AmLaw 20 multinational law firm, where his practice primarily focused on private equity, real estate and mergers and acquisitions. Since 2013, Mr. McGraner has led the acquisition and financing of over $20.0 billion of real estate investments. Mr. McGraner holds a B.S. from Vanderbilt University and a J.D. from the Washington University School of Law.

As of March 31, 2025, Mr. Dondero beneficially owned approximately 4.4% of the Fund's outstanding shares, Mr. McGraner beneficially owned approximately 2.59% of the Fund's outstanding shares. Of shares beneficially owned by Mr. Dondero, approximately 0.7% of such shares are held by the Dugaboy Investment Trust, of which Mr. Dondero is the beneficiary. Approximately 0.9% of such shares are held by NexPoint. Mr. Dondero is the President and sole member of NexPoint Advisors GP, LLC, NexPoint's general partner, and may be deemed to be an indirect beneficial owner of shares held by NexPoint. Mr. Dondero disclaims beneficial ownership of all such shares except to the extent of his pecuniary interest therein.

**Compensation of Portfolio Managers**

The Fund's financial arrangements with its portfolio managers, its competitive compensation and its career path emphasis at all levels reflect the value senior management places on key resources. Compensation may include a variety of components and may vary from year to year based on a number of factors, including the pre-tax relative performance of the portfolio manager's underlying account, the pre-tax combined performance of the

portfolio manager's underlying accounts, and the pre-tax relative performance of the portfolio manager's underlying accounts measured against other employees.

The principal components of compensation include a base salary, a discretionary bonus, and various retirement benefits.

*Base compensation*. Generally, the portfolio managers will receive base compensation based on his seniority and/or position with the Fund, which may include the amount of assets supervised and other management roles within the Fund. Base compensation is determined by taking into account current industry norms and market data to ensure that the Fund pays a competitive base compensation.

*Discretionary compensation*. In addition to base compensation, the portfolio managers may receive discretionary compensation, which can be a substantial portion of total compensation. Discretionary compensation can include a discretionary cash bonus paid to recognize specific business contributions and to ensure that the total level of compensation is competitive with the market.

Because the portfolio manager's compensation is based on his individual performance, the Fund does not have a typical percentage split among base salary, bonus and other compensation. Senior portfolio managers who perform additional management functions may receive additional compensation in these other capacities. Compensation is structured such that key professionals benefit from remaining with the Fund.

As of December 31, 2024, the portfolio managers were responsible for the management of the following types of accounts other than the Fund:

**James Dondero**

| Type of Account | Number of Accounts Managed | Total Assets (millions) | Number of Accounts Managed Subject to Performance-Based Advisory Fee | Total Assets Subject to Performance-Based Advisory Fee (millions) |
|---|---|---|---|---|
| Registered Investment Companies | 6 | $ 2,050 | 1 | $ 58 |
| Other Pooled Investment Vehicles | 3 | $ 4,941 | 3 | $ 4,941 |
| Other Accounts | — | $ — | — | $ — |

**Matthew McGraner**

| Type of Account | Number of Accounts | Total Assets (millions) | Number of Accounts Managed Subject to Performance-Based Advisory Fee | Total Assets Subject to Performance-Based Advisory Fee (millions) |
|---|---|---|---|---|
| Registered Investment Companies | — | $ — | — | $ — |
| Other Pooled Investment Vehicles | 3 | $ 4,941 | 3 | $ 4,941 |
| Other Accounts | — | $ — | — | $ — |

**Distributor**

NexPoint Securities, Inc. (the "Distributor"), located at 200 Crescent Court, Suite 700, Dallas, Texas 75201, serves as the Fund's principal underwriter and acts as the distributor of the Fund's shares on a reasonable efforts basis, subject to various conditions.

## ALLOCATION OF BROKERAGE

Specific decisions to purchase or sell securities for the Fund are made by the portfolio managers who are employees of the Adviser. The Adviser is authorized by the Trustees to allocate the orders placed on behalf of the Fund to brokers or dealers who may, but need not, provide research or statistical material or other services to the Fund or the Adviser for the Fund's use. Such allocation is to be in such amounts and proportions as the Adviser may determine. Some of the services received as the result of Fund transactions may primarily benefit accounts other than the Fund, while services received as the result of portfolio transactions effected on behalf of those other accounts may primarily benefit the Fund. While such services are useful and important in supplementing its own research and facilities, the Adviser believes the value of such services is not determinable and does not significantly reduce its expenses. Any research or other benefits received by the Adviser from a broker-dealer, for transactions where the Fund will be "paying-up", will qualify for the safe harbor provisions under Section 28(e) of the Securities Exchange Act of 1934.

In selecting a broker or dealer to execute each particular transaction, the Adviser will take the following into consideration:

- the best net price available;
- the reliability, integrity and financial condition of the broker or dealer;
- the size of and difficulty in executing the order; and
- the value of the expected contribution of the broker or dealer to the investment performance of the Fund on a continuing basis.

Brokers or dealers executing a portfolio transaction on behalf of the Fund may receive a commission in excess of the amount of commission another broker or dealer would have charged for executing the transaction if the Adviser determines in good faith that such commission is reasonable in relation to the value of brokerage and research services provided to the Fund. In allocating portfolio brokerage, the Adviser may select brokers or dealers who also provide brokerage, research and other services to other accounts over which the Adviser exercises investment discretion. Some of the services received as the result of Fund transactions may primarily benefit accounts other than the Fund, while services received as the result of portfolio transactions effected on behalf of those other accounts may primarily benefit the Fund.

During the fiscal year ended December 31, 2022, the Fund paid brokerage commissions of $0, of which $0 was paid to NexBank.

During the fiscal year ended December 31, 2023, the Fund paid brokerage commissions of $0, of which $0 was paid to NexBank.

During the fiscal year ended December 31, 2024, the Fund paid brokerage commissions of $0, of which $0 was paid to NexBank.

During the fiscal year ended December 31, 2024, the Fund did not acquire any securities of its regular brokers or dealers. At that date, the Fund did not hold any securities of its regular brokers or dealers. For these purposes, regular brokers or dealers are: (a) the brokers or dealers that received the greatest dollar amount of brokerage commissions by virtue of direct or indirect participation in the Fund's portfolio transactions during the Fund's most recent fiscal year; (b) the brokers or dealers that engaged as principal in the largest dollar amount of portfolio transactions of the Fund during the Fund's most recent fiscal year; or (c) the brokers or dealers that sold the largest dollar amount of securities of the Fund during the Fund's most recent fiscal year.

**Affiliated Party Transactions**

The Adviser and its affiliates will not purchase securities or other property from, or sell securities or other property to, the Fund, except that the Fund may in accordance with rules under the 1940 Act engage in

Case 3:26-cv-02496-D Document 17-30 Filed 09/08/26 Page 311 of 608 PageID 12462

transactions with accounts that are affiliated with the Fund as a result of common officers, directors, advisers, members, managing general partners or common control. These transactions would be effected in circumstances pursuant to policies adopted by the Trustees pursuant to Rule 17a-7 under the 1940 Act, in which the Adviser determined that it would be appropriate for the Fund to purchase and another client to sell, or the Fund to sell and another client to purchase, the same security or instrument on the same day.

If the Adviser places Fund trades through an affiliated broker, the trades will be executed under a policy adopted by the Trustees pursuant to Section 17(e) and Rule 17(e)(1) under the 1940 Act which places limitations on the securities transactions effected through affiliates. The policy of the Fund with respect to brokerage is reviewed by the Trustees from time to time. Because of the possibility of further regulatory developments affecting the securities exchanges and brokerage practices generally, the foregoing practices may be modified.

## TAX STATUS

The following discussion is general in nature and should not be regarded as an exhaustive presentation of all possible tax ramifications.

The discussion summarizes certain U.S. federal income tax consequences that may be relevant to a shareholder of the Fund that acquires, holds and/or disposes of shares of the Fund, and reflects provisions of the Code, existing Treasury regulations, rulings published by the IRS, and other applicable authority as of the date of this SAI. These authorities are subject to change by legislative or administrative action, possibly with retroactive effect. The following discussion is only a summary of some of the important tax considerations generally applicable to investments in the Fund and the discussion set forth herein does not constitute tax advice. There may be other tax considerations applicable to particular investors such as those holding shares in a tax-advantaged account such as an IRA or 401(k) plan. In addition, income earned through an investment in the Fund may be subject to state, local and foreign taxes. All shareholders should consult a qualified tax adviser regarding their investment in the Fund.

The Fund has elected to be treated and intends to qualify each year for taxation as a RIC under Subchapter M of the Code, which requires compliance with certain requirements concerning the sources of its income, diversification of its assets, and the amount and timing of its distributions to shareholders (as described below). If the Fund so qualifies, the Fund will not be subject to federal income or excise tax on net investment income or net capital gain that are distributed to shareholders in accordance with the applicable timing requirements. Net investment income and net capital gain of the Fund will be computed in accordance with Section 852 of the Code. Very generally, net investment income consists of dividends and interest less expenses. Net capital gain for a fiscal year is computed by taking into account any capital loss carryforward of the Fund.

The Fund intends to distribute all of its net investment income, any excess of net short-term capital gains over net long-term capital losses, and any excess of net long-term capital gains over net short-term capital losses in accordance with the timing requirements imposed by the Code so as to avoid imposition of federal income or excise taxes. Distributions of net investment income will be made quarterly and net capital gain will be made no later than December 31 of each year. Both types of distributions will be in shares of the Fund unless a shareholder elects to receive cash.

In order to qualify for the favorable tax treatment accorded to RICs under Subchapter M of the Code, the Fund must: (a) derive at least 90% of its gross income for each taxable year from dividends, interest, payments with respect to certain securities loans, net income from interests in “qualified publicly traded partnerships” and gains from the sale or other disposition of stock, securities or foreign currencies, or other income (including, but not limited to, gains from options, futures or forward contracts) derived with respect to the business of investing in such stock, securities or currencies, and net income derived from interests in “qualified publicly traded partnerships”; (b) diversify its holdings so that, at the end of each quarter of its taxable year: (i) at least 50% of the market value of the Fund’s assets is represented by cash, U.S. government securities and securities of other RICs, and other securities (for purposes of this calculation, generally limited in respect of any one issuer, to an amount not greater than 5% of the market value of the Fund’s assets and 10% of the outstanding voting securities of such issuer); and (ii) not more than 25% of the value of its assets is invested, including through corporations in which it owns a 20% or more voting stock interest, in the securities of (other than U.S. government securities or the securities of other RICs) any one issuer, two or more issuers which the Fund controls and which are determined to be engaged in the same or similar trades or businesses, or the securities of one or more “qualified publicly traded partnerships”; and (c) distribute to its shareholders with respect to each taxable year at least the sum of 90% of the Fund’s “investment company taxable income” (as that term is defined in the Code, without regard to the deduction for dividends paid — generally taxable ordinary income and the excess, if any, of net short-term capital gains over net long-term capital losses) and 90% of any net tax-exempt interest income (the excess of the Fund’s gross tax-exempt interest over certain disallowed deductions), for such year, in a manner qualifying for the dividends paid deduction.

If the Fund qualifies and is eligible for treatment as a RIC (i.e., satisfies the source of income and diversification requirements described in (i) and (ii) above and satisfies the annual distribution requirement described in (iii) above), it will not be subject to U.S. federal income tax on income distributed in a timely manner to its shareholders in the form of dividends (including Capital Gain Dividends, as defined below). If the Fund were not a "publicly offered" RIC within the meaning of Code Section 67(c)(2)(B) for any year, certain of the Fund's direct and indirect expenses, including management fees and certain other advisory expenses, would be subject to special "pass-through" rules. Such rules would treat these expenses as additional dividends to certain of the Fund's direct or indirect shareholders (generally including individuals and entities that compute their taxable income in the same manner as an individual).

If, for any taxable year, the Fund were to fail to meet the income, diversification or distribution test described above, the Fund could in some cases cure such failure, including by paying a fund-level tax, paying interest, making additional distributions, or disposing of certain assets. If the Fund were ineligible to or otherwise did not cure such failure for any year, or if the Fund were otherwise to fail to qualify as a RIC accorded favorable tax treatment for such year, the Fund would be subject to tax on its taxable income at the applicable corporate income tax rate, and all distributions from earnings and profits, including any distributions of net tax-exempt income and net long-term capital gains, would be taxable to shareholders as ordinary income. Some portions of such distributions may be eligible for the dividends-received deduction in the case of corporate shareholders and may be eligible to be treated as "qualified dividend income" and thus taxable at the lower long-term capital gain rate in the case of shareholders taxed at individual rates, provided, in both cases, the shareholder meets certain holding period and other requirements in respect of the Fund's shares (as described below). In addition, the Fund could be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions before re-qualifying as a RIC that is accorded favorable tax treatment.

If in a calendar year the Fund fails to distribute at least an amount equal to the sum of 98% of its ordinary income for such year and 98.2% of its capital gain net income (adjusted for certain ordinary losses) for the one-year period ending on October 31 of such year (unless an election is made to use the Fund's taxable year), plus any such undistributed amounts from the prior year, the Fund will be subject to a nondeductible 4% excise tax on the undistributed amounts. For purposes of the required excise tax distribution, a RIC's ordinary gains and losses from the sale, exchange or other taxable disposition of property that would otherwise be taken into account after October 31 of a calendar year generally (unless an election is made to use the Fund's taxable year) are treated as arising on January 1 of the following calendar year. Also, for these purposes, the Fund will be treated as having distributed any amount on which the Fund has been subject to corporate income tax in the taxable year ending with the calendar year. The Fund reserves the right to pay the excise tax when circumstances warrant. Under ordinary circumstances, the Fund expects to make sufficient distributions so as to avoid liability for this tax.

The Fund is not permitted to deduct capital losses in excess of capital gains ("net capital losses") against its net investment income. Instead, potentially subject to certain limitations, it may carry net capital losses from any taxable year forward to subsequent taxable years to offset capital gains, if any, realized during such subsequent taxable year. Capital loss carryforwards are reduced to the extent they offset current-year net realized capital gains, whether the Fund retains or distributes such gains. Net capital losses will be carried forward to one or more subsequent taxable years without expiration to offset capital gains realized during such subsequent taxable years; any such carryforward losses will retain their character as short-term or long-term.

Distributions of taxable net investment income and the excess of net short-term capital gain over net long-term capital loss are taxable to shareholders as ordinary income.

Distributions of net capital gain (that is, the excess of net long-term capital gain over net short-term capital loss, in each case determined with reference to any loss carryforwards) properly reported by the Fund as capital gain dividends ("Capital Gain Dividends") generally are taxable to shareholders as long-term capital gain, regardless of the length of time the shares of the Fund have been held by such shareholders.

In order for some portion of the dividends received by one of the Fund's shareholders to be qualified dividend income, the Fund must meet holding period and other requirements with respect to some portion of the dividend-paying stocks in its portfolio and the shareholder must meet holding period and other requirements with respect to Fund shares. In general, a dividend will not be treated as qualified dividend income (at either the corporate or stockholder level): (1) if the dividend is received with respect to any share of stock held for fewer than 61 days during the 121-day period beginning on the date which is 60 days before the date on which such share becomes ex-dividend with respect to such dividend (or, in the case of certain preferred stock, 91 days during the 181-day period beginning 90 days before such date); (2) to the extent that the recipient is under an obligation (whether pursuant to a short sale or otherwise) to make related payments with respect to positions in substantially similar or related property; (3) if the recipient elects to have the dividend income treated as investment income for purposes of the limitation on deductibility of investment interest; or (4) if the dividend is received from a foreign corporation that is: (a) not eligible for the benefits of a comprehensive income tax treaty with the United States (with the exception of dividends paid on stock of such a foreign corporation readily tradable on an established securities market in the United States); or (b) treated as a passive foreign investment company.

In general, distributions of investment income the Fund designates as derived from qualified dividend income will be treated as qualified dividend income by a shareholder taxed at individual rates, provided the shareholder meets the holding period and other requirements described in the paragraph immediately above with respect to Fund shares. The Fund does not expect a significant portion of its distributions to constitute qualified dividend income.

"Qualified REIT dividends" (i.e., ordinary REIT dividends other than capital gain dividends and portions of REIT dividends designated as qualified dividend income) are treated as eligible for a 20% deduction by non-corporate taxpayers. This deduction, if allowed in full, equates to a maximum effective tax rate of 29.6% (37% top rate applied to income after 20% deduction). Regulations allow a RIC to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met.

In general, dividends of net investment income received by the Fund's corporate shareholders will qualify for the 50% dividends-received deduction generally available to corporations to the extent of the amount of eligible dividends the Fund receives from domestic corporations for the taxable year. A dividend the Fund receives will not be treated as a qualifying dividend: (i) if it has been received with respect to any share of stock that the Fund has held for less than 46 days (91 days in the case of certain preferred stock) during the 91-day period beginning on the date which is 45 days before the date on which such share becomes ex-dividend with respect to such dividend (during the 181-day period beginning 90 days before such date in the case of certain preferred stock); or (ii) to the extent that the Fund is under an obligation (pursuant to a short sale or otherwise) to make related payments with respect to positions in substantially similar or related property. Moreover, the dividends-received deduction may be disallowed or reduced: (i) if the corporate stockholder fails to satisfy the foregoing requirements with respect to Fund shares; or (ii) by application of various provisions of the Code (for instance, the dividends-received deduction is reduced in the case of a dividend received on debt-financed portfolio stock (generally, stock acquired with borrowed funds)). The Fund does not expect a significant portion of its distributions to be eligible for this corporate dividends-received deduction.

When the Fund makes a repurchase offer for its shares (as described in "Quarterly Repurchase of Shares") and a shareholder tenders all shares he or she holds, or is considered to be holding, and such shareholder does not hold (directly or by attribution) any other of the Fund's shares, such shareholder will be treated as having sold his or her shares and generally will realize a capital gain or loss (as described further below). If a shareholder tenders fewer than all of his or her shares or continues to hold (directly or by attribution) other units of the Fund's shares, there is some risk that such shareholder may be treated as having received a dividend distribution under Section 301 of the Code (a "Section 301 distribution") unless the redemption is treated as being either: (i) "substantially disproportionate"; or (ii) otherwise "not essentially equivalent to a dividend" under the relevant rules of the Code. A Section 301 distribution is not treated as a sale or exchange giving rise to a capital gain or loss, but rather is treated as a dividend to the extent supported by the Fund's current and accumulated earnings

and profits, with the excess treated as a return of capital reducing a shareholder's tax basis in Fund shares, but not below zero, and thereafter as capital gain. Where a redeeming shareholder is treated as receiving a dividend, there is a risk that non-tendering shareholders whose interests in the Fund increase as a result of such tender will be treated as having received a taxable distribution from the Fund. Dividend treatment of a tender would also affect the amount and character of income that the Fund is required to distribute for the year in which the redemption occurred. It is possible that such a dividend would qualify as "qualified dividend income"; otherwise, it would be taxable as ordinary income. To the extent the Fund recognizes net gains on the liquidation of portfolio securities to meet such tenders, the Fund will be required to make additional distributions to its common shareholders.

A disposition of Fund shares by a shareholder treated as a sale or exchange will generally result in the recognition of taxable gain or loss in an amount equal to the difference between the amount realized and the shareholder's tax basis in his or her Fund shares. Such gain or loss is treated as a capital gain or loss if the shares are held as capital assets. However, any loss realized upon the sale or exchange of shares within six months from the date of their purchase will be treated as a long-term capital loss to the extent of any amounts treated as Capital Gain Dividends during such six-month period. All or a portion of any loss realized upon the sale or exchange of shares may be disallowed under the "wash sale" rules of the Code to the extent shares are purchased (including shares acquired by means of reinvested dividends) within 30 days before or after such sale or exchange. In such case, the basis of the shares acquired will be adjusted to reflect the disallowed loss. Sales or exchanges of Fund shares are also subject to reporting requirements.

Distributions of taxable net investment income and net capital gain will be taxable as described above, whether received in additional cash or reinvested in additional shares. Shareholders electing to receive distributions in the form of additional shares will have a cost basis for federal income tax purposes in each share so received equal to the net asset value of a share on the reinvestment date.

All distributions of taxable net investment income and net capital gain, whether received in shares or in cash, must be reported by each taxable shareholder on his or her federal income tax return. Dividends or distributions declared in October, November or December as of a record date in such a month, if any, will be deemed to have been received by shareholders on December 31, if paid during January of the following year.

Under the Code, the Fund will be required to report to the Internal Revenue Service all distributions of taxable income and capital gains as well as gross proceeds from the sale or exchange of Fund shares, except in the case of certain exempt shareholders. Under the backup withholding provisions of Section 3406 of the Code, distributions of taxable net investment income and net capital gain and proceeds from the sale or exchange of the shares of a RIC may be subject to withholding of federal income tax: (i) in the case of non-exempt shareholders who fail to furnish the Fund with their taxpayer identification numbers ("TIN") and with required certifications regarding their status under the federal income tax law; or (ii) if the Fund is notified by the IRS or a broker that withholding is required due to an incorrect TIN or a shareholder's previous failure to report taxable interest or dividends. If the backup withholding provisions are applicable, any such distributions and proceeds, whether received in cash or reinvested in additional shares, will be reduced by the amounts required to be withheld. Backup withholding is not an additional tax. Any amounts withheld may be credited against the shareholder's federal income tax liability, provided the appropriate information is furnished to the IRS.

The Code imposes a 3.8% Medicare contribution tax on the "net investment income" of certain individuals, estates and trusts to the extent their income exceeds certain amounts. Net investment income generally includes for this purpose dividends the Fund pays, including any Capital Gain Dividends, and net capital gains recognized on the sale or exchange of Fund shares. Shareholders are advised to consult their tax advisors regarding the possible implications of this additional tax on their investment with the Fund.

**Return of Capital Distributions**

If, for any taxable year, the Fund's total distributions exceed both current and accumulated earnings and profits, the excess will generally be treated as a tax-free return of capital up to the amount of your tax basis in Fund shares. The amount treated as a tax-free return of capital will reduce your tax basis in Fund shares, thereby increasing your potential gain or reducing your potential loss on the subsequent sale of Fund shares. Any such amounts distributed to you in excess of your tax basis in Fund shares will be taxable to you as capital gain.

Distributions the Fund pays with respect to its shares are generally subject to U.S. federal income tax as described herein to the extent they do not exceed the Fund's realized income and gains, even though such dividends and distributions may economically represent a return of a particular shareholder's investment. Such distributions are likely to occur in respect of shares purchased at a time when the Fund's net asset value reflects either unrealized gains, or realized but undistributed income or gains, that were therefore included in the price the shareholder paid. Such distributions may reduce the value of Fund shares below the shareholder's cost basis in those shares. As described above, the Fund is required to distribute realized income and gains regardless of whether its net asset value also reflects unrealized losses.

**Tax Implications of Certain Investments**

Some debt obligations with a fixed maturity date of more than one year from the date of issuance that the Fund acquires in the secondary market may be treated as having "market discount." Very generally, market discount is the excess of the stated redemption price of a debt obligation (or in the case of an obligation issued with OID (as defined below), its "revised issue price") over the purchase price of such obligation. Generally, any gain recognized on the disposition of, and any partial payment of principal on, a debt obligation having market discount is treated as ordinary income to the extent the gain, or principal payment, does not exceed the "accrued market discount" on such debt obligation. Alternatively, a holder may elect to accrue market discount currently. If the Fund makes this election, it would be required to include currently any accrued market discount on such debt obligations in its taxable income (as ordinary income) and thus distribute it over the terms of the obligations, even though payment of those amounts is not received until a later time, upon partial or full repayment or disposition of the applicable debt obligations. The rate at which market discount accrues, and thus is included in the Fund's income, will depend upon which of the permitted accrual methods it elects.

In addition, some debt obligations with a fixed maturity date of more than one year from the date of issuance (and zero-coupon debt obligations with a fixed maturity date of more than one year from the date of issuance) that the Fund originates or acquires will be treated as debt obligations that are issued originally at a discount. Generally, the amount of the original issue discount ("OID") is treated as interest income and is included in taxable income (and the Fund is required to distribute it) over the term of the debt obligation, even though payment of that amount is not received until a later time, upon partial or full repayment or disposition of the debt obligation. In addition, payment-in-kind ("PIK") securities the Fund originates or acquires will give rise to income which is required to be distributed and is taxable even though the Fund receives no interest payment in cash on the security during the year in which the income was accrued.

Some debt obligations with a fixed maturity date of one year or less from the date of issuance that the Fund originates or acquires may be treated as having OID or, in certain cases, "acquisition discount" (very generally, the excess of the stated redemption price over the purchase price). Generally, the Fund will be required to include the OID or acquisition discount in income (as ordinary income) over the term of the debt obligation and thus distribute it over the term of the debt obligation, even though payment of that amount is not received until a later time, upon partial or full repayment or disposition of the debt obligation. The rate at which OID or acquisition discount accrues, and thus is included in the Fund's income, will depend upon which of the permitted accrual methods the Fund elects.

Some preferred securities may include provisions that permit the issuer, at its discretion, to defer the payment of distributions for a stated period without any adverse consequences to the issuer. If the Fund owns a preferred

security that is deferring the payment of its distributions, the Fund may be required to report income for U.S. federal income tax purposes to the extent of any such deferred distribution even though it has not yet actually received the cash distribution.

As a result of holding the foregoing kinds of obligations, the Fund may be required to pay out as an income distribution each year an amount which is greater than the total amount of cash interest (or dividends in the case of preferred securities) the Fund actually received. Such distributions may be made from, among other things, the Fund's cash assets or cash generated from its liquidation of portfolio securities. The Fund may realize gains or losses from such liquidations. In the event the Fund realizes net long-term or short- term capital gains from such transactions, its shareholders may receive a larger capital gain or ordinary dividend, respectively, than they would in the absence of such transactions.

Investments in distressed debt obligations that are at risk of or in default present special tax issues. Tax rules are not entirely clear about issues such as whether and to what extent the Fund should recognize market discount on these debt obligations; when the Fund may cease to accrue interest, OID or market discount; when and to what extent the Fund may take deductions for bad debts or worthless securities and how the Fund should allocate payments received on obligations in default between principal and income. The Fund will address these and other related issues when, as and if it invests in such obligations, in order to seek to ensure that it distributes sufficient income to preserve its eligibility for treatment as a RIC and does not become subject to U.S. federal income or excise tax.

A portion of the OID accrued on certain high-yield discount obligations the Fund owns may not be deductible to the issuer and will instead be treated as a dividend paid by the issuer for purposes of the dividends-received deduction. In such cases, if the issuer of the obligation is a domestic corporation, dividend payments the Fund makes may be eligible for the dividends-received deduction to the extent of the deemed dividend portion of such OID.

The Fund's transactions, if any, in options, futures contracts, hedging transactions, forward contracts, straddles and foreign currencies will be subject to special tax rules (including mark-to-market, constructive sale, straddle, wash sale and short sale rules), the effect of which may be to accelerate income to the Fund, defer losses to the Fund, cause adjustments in the holding periods of the Fund's securities, convert long-term capital gains into short-term capital gains and convert short-term capital losses into long-term capital losses. These rules could therefore affect the amount, timing and character of distributions to shareholders.

Certain of the Fund's hedging activities (including its transactions, if any, in foreign currencies or foreign currency-denominated instruments) are likely to produce a difference between its book income and its taxable income. If the Fund's book income exceeds its taxable income, the distribution (if any) of such excess book income will be treated as: (i) a dividend to the extent of the Fund's remaining earnings and profits (including earnings and profits arising from tax-exempt income); (ii) thereafter, as a return of capital to the extent of the recipient's basis in the shares; and (iii) thereafter, as gain from the sale or exchange of a capital asset. If the Fund's book income is less than its taxable income, the Fund could be required to make distributions exceeding book income to qualify as a RIC that is accorded favorable tax treatment and to avoid an entity-level tax.

Because the tax rules applicable to derivative financial instruments are in some cases uncertain under current law, an adverse determination or future guidance by the IRS with respect to these rules (which determination or guidance could be retroactive) may affect whether the Fund has made sufficient distributions, and otherwise satisfied the relevant requirements, to maintain its qualification as a RIC and avoid a fund-level tax.

Pursuant to a notice issued by the IRS and Treasury Regulations that have yet to be issued but may apply retroactively, a portion of the Fund's income (including income allocated from certain pass-through entities) that is attributable to a residual interest in a real estate mortgage investment conduit or taxable mortgage pool (referred to in the Code as an "excess inclusion") will be subject to U.S. federal income tax in all events. This

notice also provides, and the regulations are expected to provide, that excess inclusion income of a RIC will be allocated to shareholders of the RIC in proportion to the dividends received by such shareholders, with the same consequences as if the shareholders held the related interest directly. As a result, to the extent the Fund invests in any such interests, it may not be a suitable investment for certain tax-exempt shareholders. Although the Fund does not expect to make investments that generate or pass through excess inclusion income in the manner described above, the Fund may make such investments, and may need to make certain elections set forth in the IRS notice governing such matters.

In general, excess inclusion income allocated to shareholders: (i) cannot be offset by net operating losses (subject to a limited exception for certain thrift institutions); (ii) will constitute unrelated business taxable income ("UBTI") to entities (including a qualified pension plan, an individual retirement account, a 401(k) plan, a Keogh plan or other tax-exempt entity) subject to tax on UBTI, thereby potentially requiring such an entity that is allocated excess inclusion income, and otherwise might not be required to file a U.S. federal income tax return, to file such a tax return and pay tax on such income; and (iii) in the case of a non-U.S. shareholder, will not qualify for any reduction in U.S. federal withholding tax. A shareholder will be subject to U.S. federal income tax on such inclusions notwithstanding any exemption from such income tax otherwise available under the Code.

**Passive Foreign Investment Companies**

Equity investments by the Fund in certain "passive foreign investment companies" ("PFICs") could subject the Fund to a U.S. federal income tax (including interest charges) on distributions received from the company or on proceeds received from the disposition of shares in the company, which tax cannot be eliminated by making distributions to Fund shareholders. However, the Fund may elect to treat a PFIC as a "qualified electing fund" ("QEF election"), in which case the Fund will be required to include its share of the company's income and net capital gains annually, regardless of whether they receives any distribution from the company.

The Fund also may make an election to mark the gains (and to a limited extent losses) in such holdings "to the market" as though it had sold and repurchased its holdings in those PFICs on the last day of the Fund's taxable year. Such gains and losses are treated as ordinary income and loss. The QEF and mark-to-market elections may accelerate the recognition of income (without the receipt of cash) and increase the amount required to be distributed for the Fund to avoid taxation. Making either of these elections therefore may require the Fund to liquidate other investments (including when it is not advantageous to do so) to meet its distribution requirement, which also may accelerate the recognition of gain and affect the Fund's total return. Because it is not always possible to identify a foreign corporation as a PFIC, the Fund may incur the tax and interest charges described above in some instances.

**Foreign Currency Transactions**

The Fund's transactions in foreign currencies, foreign currency-denominated debt securities and certain foreign currency options, futures contracts and forward contracts (and similar instruments) may give rise to ordinary income or loss to the extent such income or loss results from fluctuations in the value of the foreign currency concerned. Such ordinary income treatment may accelerate the Fund's distributions to shareholders and increase the distributions taxed to shareholders as ordinary income. The Fund cannot carry forward any net ordinary losses so created to offset income or gains earned in subsequent years.

**Foreign Taxation**

Income received by the Fund from sources within foreign countries may be subject to withholding and other taxes imposed by such countries. Tax treaties and conventions between certain countries and the U.S. may reduce or eliminate such taxes. If more than 50% of the value of the Fund's total assets at the close of its taxable year consists of securities of foreign corporations, the Fund may be able to elect to "pass through" to the Fund's shareholders the amount of eligible foreign income and similar taxes paid by the Fund. If this election is made, a

shareholder generally will be required to include in gross income (in addition to taxable dividends actually received) his or her pro rata share of the foreign taxes paid by the Fund, and may be entitled either to deduct (as an itemized deduction), or claim a credit for, his or her pro rata share of such foreign taxes in computing his or her taxable income, subject to certain limitations. In particular, a shareholder must hold his or her shares (without protection from risk of loss) on the ex-dividend date and for at least 15 more days during the 30-day period surrounding the ex-dividend date to be eligible to claim a foreign tax credit with respect to a dividend. No deduction for foreign taxes may be claimed by a shareholder who does not itemize deductions. Each shareholder will be notified within 60 days after the close of the Fund's taxable year whether the foreign taxes paid by the Fund will "pass through" for that year. If the Fund does not qualify for or does not make such election, shareholders generally will not be entitled to claim a credit or deduction with respect to foreign taxes paid by the Fund; in that case the foreign tax will nonetheless reduce the Fund's taxable income.

**Non-U.S. Shareholders**

Distributions the Fund pays to shareholders that are not "U.S. persons" within the meaning of the Code ("foreign shareholders") and that the Fund properly reports as: (1) Capital Gain Dividends; (2) interest-related dividends; and (3) short-term capital gain dividends, each as defined below and subject to certain conditions described below, generally are not subject to withholding of U.S. federal income tax."

In general, the Code defines: (1) "short-term capital gain dividends" as distributions of net short-term capital gains in excess of net long-term capital losses; and (2) "interest-related dividends" as distributions from U.S. source interest income of types similar to those not subject to U.S. federal income tax if earned directly by an individual foreign shareholder, in each case to the extent such distributions are properly reported as such by the Fund in a written notice to shareholders. The exceptions to withholding for Capital Gain Dividends and short-term capital gain dividends do not apply to: (A) distributions to an individual foreign shareholder who is present in the United States for a period or periods aggregating 183 days or more during the year of the distribution and (B) distributions attributable to gain that is treated as effectively connected with the conduct by the foreign shareholder of a trade or business within the United States under special rules regarding the disposition of U.S. real property interests. The exception to withholding for "interest-related dividends" does not apply to distributions to a foreign shareholder: (A) that has not provided a satisfactory statement that the beneficial owner is not a U.S. person; (B) to the extent that the dividend is attributable to certain interest on an obligation if the foreign shareholder is the issuer or is a 10% shareholder of the issuer; (C) that is within certain foreign countries that have inadequate information exchange with the United States; or (D) to the extent the dividend is attributable to interest paid by a person that is a related person of the foreign shareholder and the foreign shareholder is a controlled foreign corporation. The Fund is permitted to report such part of the Fund's dividends as interest-related and/or short-term capital gain dividends as are eligible, but is not required to do so. In the case of shares held through an intermediary, the intermediary may withhold even if the Fund reports all or a portion of a payment as an interest-related or short-term capital gain dividend to shareholders.

Foreign shareholders should contact their intermediaries regarding the application of these rules to their accounts.

Distributions to foreign shareholders other than Capital Gain Dividends, interest-related dividends, and short-term capital gain dividends (e.g., dividends attributable to dividend and foreign-source interest income or to short-term capital gains or U.S. source interest income to which the exception from withholding described above does not apply) are generally subject to withholding of U.S. federal income tax at a rate of 30% (or lower applicable treaty rate).

A foreign shareholder is not, in general, subject to U.S. federal income tax on gains (and is not allowed a deduction for losses) realized on the sale of the Fund's shares unless: (i) such gain is effectively connected with the conduct of a trade or business carried on by such holder within the United States; (ii) in the case of an individual holder, the holder is present in the United States for a period or periods aggregating 183 days or more during the year of the sale and certain other conditions are met; or (iii) certain special rules relating to gain attributable to the sale or exchange of U.S. real property interests apply to the foreign shareholder's sale of the Fund's shares.

Foreign shareholders with respect to whom income from the Fund is effectively connected with a trade or business conducted by the foreign shareholder within the United States will in general be subject to U.S. federal income tax on the income derived from the Fund at the graduated rates applicable to U.S. citizens, residents or domestic corporations, whether such income is received in cash or reinvested in additional units of the Fund's shares and, in the case of a foreign corporation, may also be subject to a branch profits tax. If a foreign shareholder is eligible for the benefits of a tax treaty, any effectively connected income or gain will generally be subject to U.S. federal income tax on a net basis only if it is also attributable to a permanent establishment maintained by the shareholder in the United States. More generally, foreign shareholders who are residents of a country with an income tax treaty with the United States may obtain different tax results than those described herein, and are urged to consult their tax advisors.

Special rules would apply if the Fund were a qualified investment entity ("QIE") because it is either a "U.S. real property holding corporation" ("USRPHC") or would be a USRPHC but for the operation of certain exceptions to the definition of U.S. real property interests ("USRPIs") described below. Very generally, a USRPHC is a domestic corporation that holds USRPIs the fair market value of which equals or exceeds 50% of the sum of the fair market values of the corporation's USRPIs, interests in real property located outside the United States, and other trade or business assets. USRPIs generally are defined as any interest in U.S. real property and any interest (other than solely as a creditor) in a USRPHC or, very generally, an entity that has been a USRPHC in the last five years. A fund that holds, directly or indirectly, significant interests in REITs may be a USRPHC. Interests in domestically controlled QIEs, including REITs and RICs that are QIEs, not-greater-than-10% interests in publicly traded classes of stock in REITs and not-greater-than-5% interests in publicly traded classes of stock in RICs generally are not USRPIs, but these exceptions do not apply for purposes of determining whether the Fund is a QIE.

If an interest in the Fund were a USRPI, a greater-than-5% foreign shareholder, or any foreign shareholder if shares in the Fund are not considered regularly traded on an established securities market, generally would be required to file a U.S. tax return in connection with the sale of its Fund shares, and pay related taxes due on any gain realized on the sale.

Moreover, if the Fund were a USRPHC or, very generally, had been one in the last five years, it would be required to withhold on amounts distributed to a greater-than-5% foreign shareholder to the extent such amounts would not be treated as a dividend, i.e., are in excess of the Fund's current and accumulated "earnings and profits" for the applicable taxable year. Such withholding generally is not required if the Fund is a domestically controlled QIE.

If the Fund were a QIE, under a special "look-through" rule, any distributions to a foreign shareholder attributable directly or indirectly to:
(i) distributions received by the Fund from a lower-tier RIC or REIT that the Fund is required to treat as USRPI gain in its hands; and (ii) gains realized on the disposition of USRPIs by the Fund would retain their character as gains realized from USRPIs in the hands of the Fund's foreign shareholders and would be subject to U.S. tax withholding. In addition, such distributions could result in the foreign shareholder being required to file a U.S. tax return and pay tax on the distributions at regular U.S. federal income tax rates. The consequences to a foreign shareholder, including the rate of such withholding and character of such distributions (e.g., as ordinary income or USRPI gain), would vary depending upon the extent of the foreign shareholder's current and past ownership of the Fund.

Foreign shareholders of the Fund also may be subject to "wash sale" rules to prevent the avoidance of the tax-filing and -payment obligations discussed above through the sale and repurchase of Fund shares.

In order to have qualified for any exemption from withholding described above (to the extent applicable) or for lower withholding tax rates under income tax treaties, or to establish an exemption from backup withholding, a foreign shareholder must have complied with applicable certification and filing requirements relating to its non-U.S. status (including, in general, furnishing an IRS Form W-8BEN, Form W-8BEN-E or substitute form). Foreign shareholders should contact their tax advisors in this regard.

Special rules (including withholding and reporting requirements) apply to foreign partnerships and those holding Fund shares through foreign partnerships. Additional considerations may apply to foreign trusts and estates. Investors holding Fund shares through foreign entities should consult their tax advisors.

A foreign shareholder may be subject to state and local tax and to the U.S. federal estate tax in addition to the U.S. federal tax on income referred to above.

**Other Reporting and Withholding Requirements**

Sections 1471-1474 of the Code, and the U.S. Treasury Regulations and IRS guidance issued thereunder (collectively, "FATCA"), generally require the Fund to obtain information sufficient to identify the status of each of the Fund's shareholders under FATCA or under an applicable intergovernmental agreement (an "IGA"). If a shareholder fails to provide the required information or otherwise fails to comply with FATCA or an IGA, the Fund or its agent may be required to withhold under FATCA 30% of the ordinary dividends that it pays to that shareholder. Proposed regulations (having current effect) eliminate the application of the withholding tax that was scheduled to take effect in 2019 with respect to the gross proceeds of the sale, redemption or exchange of Fund shares and certain Capital Gain Dividends it pays to that shareholder. If the Fund makes a payment that is subject to FATCA withholding, the Fund, or its agent, are required to withhold even if the payment would otherwise be exempt from withholding under rules applicable to non-U.S. shareholders (e.g., Capital Gain Dividends, short-term capital gain dividends and interest-related dividends). You are urged to consult your tax advisor regarding the applicability of FATCA and any other reporting requirements. In addition, foreign countries are considering, and may implement, laws similar in purpose and scope to FATCA.

**REIT Subsidiary**

***Taxation of a REIT Subsidiary***

As discussed above, the Fund may hold certain of its assets, including qualifying real estate investments in the form of debt securities, structured credit, preferred equity and mezzanine investments in real estate properties, through a REIT subsidiary, including the REIT Subsidiaries. The Fund intends to monitor the value of the shares of any REIT subsidiary such that not more than 25% of the value of the Fund's total assets is invested in REIT subsidiaries.

The Fund intends that any REIT subsidiary would elect to be treated, and qualify annually, as a REIT under the Code beginning with the first year in which it commenced material operations. The Fund believes that if a REIT subsidiary were to satisfy the 50% Test (as defined below), that subsidiary would be able to qualify as a REIT. A REIT subsidiary's ability to satisfy the 50% Test, is not certain. Given the highly complex nature of the rules governing REITs, the ongoing importance of factual determinations and the possibility of future changes in circumstances or applicable law, no assurance can be given that a REIT subsidiary would qualify as a REIT for any particular year.

Qualification and taxation as a REIT depends on a REIT subsidiary's ability to meet, on a continuing basis, through actual results of operations, distribution levels, share ownership and various other qualification requirements imposed upon REITs by the Code. In addition, a REIT subsidiary's ability to qualify as a REIT may depend in part upon the operating results, organizational structure and entity classification for U.S. federal income tax purposes of certain entities in which the REIT subsidiary invests. A REIT subsidiary's ability to qualify as a REIT also requires that it satisfy certain asset and income tests, some of which depend upon the fair market value of assets directly or indirectly owned by it or which serve as security for loans made by it. Such values may not be susceptible to a precise determination. Accordingly, no assurance can be given that the actual results of a REIT subsidiary's operations for any taxable year will satisfy the requirements for qualification and taxation as a REIT.

**Requirements for Qualification as a REIT**

To qualify for the beneficial tax regime applicable to REITs, a REIT subsidiary must meet and continue to meet the requirements described below relating to organization, sources of income, nature of assets and distributions of income to its shareholders.

***Organizational Requirements***

The Code defines a REIT as a domestic corporation, trust or association:

(1) which is managed by one or more trustees or directors;

(2) the beneficial ownership of which is evidenced by transferable shares or by transferable certificates of beneficial interest;

(3) which would be taxable as a domestic corporation but for Sections 856 through 859 of the Code;

(4) which is neither a financial institution nor an insurance company subject to certain provisions of the Code;

(5) the beneficial ownership of which is held by 100 or more persons;

(6) not more than 50.0% in value of the outstanding stock of which is owned, directly or indirectly applying various attribution rules, by or for five or fewer individuals (as defined in the Code to include for these purposes certain entities) (the "50% Test");

(7) which makes an election to be a REIT (or has made such election for a previous taxable year which has not been revoked or terminated) and satisfies all relevant filing and other administrative requirements established by the IRS that must be met to elect and maintain REIT status;

(8) which uses the calendar year as its taxable year; and

(9) which meets certain other tests, described below, regarding the nature of its income and assets and the amount of its distributions.

The Code provides that conditions (1) through (4), inclusive, must be met during the entire taxable year, that condition (5) must be met during at least 335 days of a taxable year of 12 months, or during a proportionate part of a taxable year of less than 12 months, and that condition (6) must be met during the last half of each taxable year. For purposes of condition (6), the beneficiaries of a pension or profit-sharing trust described in Section 401(a) of the Code, and not the pension or profit-sharing trust itself, are treated as REIT shareholders. Conditions (5) and (6) do not apply to a REIT until the second taxable year in which the REIT has made an election to be treated as such. A REIT subsidiary would be treated as having met condition (6) above for a taxable year if it complied with certain Treasury Regulations for ascertaining the ownership of its stock for such year and if it did not know (or after the exercise of reasonable diligence would not have known) that its stock was sufficiently closely held during such year to cause it to fail condition (6).

The Fund intends to structure and operate any REIT subsidiary and conduct its activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is complex, and it is possible that the IRS may interpret or apply those requirements in a manner that jeopardizes the ability of a REIT subsidiary to satisfy all of the requirements for qualification as a REIT or that the REIT subsidiary may be unable to satisfy all of the applicable requirements.

To obtain the favorable tax treatment afforded to REITs under the Code, among other things, a REIT subsidiary generally will be required each year to distribute to its shareholders at least 90% of its REIT taxable income determined without regard to the dividends-paid deduction and excluding net capital gain. To the extent that it does not distribute all of its net capital gains, or distributes at least 90%, but less than 100%, of its REIT taxable income, as adjusted, it will have to pay an entity-level tax on amounts retained. Furthermore, if it fails to distribute during

each calendar year at least the sum of: (a) 85% of its ordinary income for that year; (b) 95% of its capital gain net income for that year; and (c) any undistributed taxable income from prior periods, it would have to pay a 4% nondeductible excise tax on the excess of the amounts required to be distributed over the sum of (x) the amounts that it actually distributed and (y) the amounts it retained and upon which it paid income tax at the entity level.

These requirements could cause a REIT subsidiary to distribute amounts that otherwise would be spent on investments in real estate assets, and it is possible that the REIT subsidiary might be required to borrow funds, possibly at unfavorable rates, or sell assets to fund the required distributions.

***Investment in a REIT Subsidiary***

Provided that a REIT subsidiary qualifies as a REIT, distributions made to the Fund out of the REIT subsidiary's current or accumulated earnings and profits, and not designated as capital gain dividends, would generally be taken into account by the Fund as ordinary dividend income and would not be eligible for the dividends received deduction for corporations. In determining the extent to which a distribution with respect to a REIT subsidiary's common shares constituted a dividend for U.S. federal income tax purposes, a REIT subsidiary's earnings and profits would be allocated first to distributions with respect to the REIT subsidiary's preferred stock, if any, and then to the REIT subsidiary's common shares. Dividends received from REITs are generally not eligible to be taxed at the preferential qualified dividend income rates applicable to individual U.S. shareholders who receive dividends from taxable subchapter C corporations.

Effective for taxable years beginning after December 31, 2017 and before January 1, 2026, the Code generally allows individuals and certain other non-corporate entities a deduction for 20% of qualified REIT dividends. Regulations allow a RIC to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met. As a result, a shareholder in the Fund will be eligible to receive the benefit of the same 20% deduction with respect to qualified REIT dividends included in Fund distributions that is available to direct investors in REITs.

In addition, distributions from a REIT subsidiary that are designated as capital gain dividends will be treated by the Fund as long-term capital gain income, to the extent that they do not exceed the actual net capital gain of the REIT subsidiary for the taxable year, without regard to the period for which the Fund has held the REIT subsidiary's shares. To the extent that a REIT subsidiary elects under the applicable provisions of the Code to retain the REIT subsidiary's net capital gains, the Fund would be treated as having received, for U.S. federal income tax purposes, the REIT subsidiary's undistributed capital gains as well as a corresponding credit or refund, as the case may be, for taxes paid by the REIT subsidiary on such retained capital gains. The Fund would increase its adjusted tax basis in the REIT subsidiary's common shares by the difference between its allocable share of such retained capital gain and its share of the tax paid by the REIT subsidiary.

Distributions from a REIT subsidiary in excess of the REIT subsidiary's current or accumulated earnings and profits would not be taxable to the Fund to the extent that they do not exceed the Fund's adjusted tax basis in the REIT subsidiary's common shares in respect of which the distributions were made, but rather would reduce the adjusted tax basis of these shares, thus reducing any loss or increasing any gain on a subsequent taxable disposition by the Fund of these shares. To the extent that such distributions exceed the adjusted tax basis of the Fund's shares of the REIT subsidiary's common shares, they would be included in income as long-term capital gain, or short-term capital gain if the shares have been held for one year or less. In addition, any dividend declared by a REIT subsidiary in October, November or December of any year and payable to the Fund if it is the holder of record on a specified date in any such month would be treated as both paid by the REIT subsidiary and received by the Fund on December 31 of such year if the dividend is actually paid by the REIT subsidiary in January of the following calendar year.

To the extent that a REIT subsidiary has available net operating losses and capital losses carried forward from prior tax years, such losses may reduce the amount of distributions that must be made in order to comply with the

REIT distribution requirements. Such losses, however, would not be passed through to the Fund and do not offset income of the Fund from other sources, nor do they affect the character of any distributions that are actually made by a REIT subsidiary, which are generally treated as taxable income in the hands of the Fund to the extent that the REIT subsidiary has current or accumulated earnings and profits.

Case 3:26-cv-02496-D Document 17-30 Filed 09/08/26 Page 325 of 608 PageID 12476

**OTHER INFORMATION**

Each share represents a proportional interest in the assets of the Fund. Each share has one vote at shareholder meetings, with fractional shares voting proportionally, on matters submitted to the vote of shareholders. There are no cumulative voting rights. Shares do not have pre-emptive or conversion or redemption provisions. In the event of a liquidation of the Fund, shareholders are entitled to share pro rata in the net assets of the Fund available for distribution to shareholders after all expenses and debts have been paid.

**Legal Counsel**

K&L Gates, LLP, located at 1 Congress Street, Suite 2900, Boston, Massachusetts 02114, acts as the Fund's legal counsel.

**Custodian**

BNY Mellon ("BNY"), with principal offices at 240 Greenwich Street, New York, New York, 10286, serves as custodian for the securities and cash of the Fund's portfolio. Under a Custodian Agreement, BNY holds the Fund's assets in safekeeping and keeps all necessary records and documents relating to its duties.

**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Cohen & Company, Ltd. has been appointed the independent registered public accounting firm for the Fund. Cohen & Company, Ltd. is located at 1350 Euclid Avenue, Suite 800, Cleveland, Ohio 44115.

**FINANCIAL STATEMENTS**

The Fund's audited financial statements appearing in the Fund's annual shareholder report for the year ended December 31, 2024 are incorporated by reference in this Statement of Additional Information and have been so incorporated in reliance upon the report of Cohen & Company, Ltd., the independent registered public accounting firm for the Fund. The Fund's annual and semiannual shareholder reports are available upon request and without charge by writing to the Fund at 300 Crescent Court, Suite 700, Dallas, Texas 75201 or by calling (844) 485-9167 and viewed on the Fund's website at https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/.

**Part C**

**Other Information**

**Item 25.** ***Financial Statements and Exhibits***

**1. Financial Statements**

Part A — Financial Highlights.

Part B — Audited financial statements for the fiscal year ended December 31, 2024 are incorporated by reference herein to the Registrant's annual report for the fiscal year ended December 31, 2024.

**2. Exhibits**

| | | |
|---|---|---|
| (a) | | Amended and Restated Agreement and Declaration of Trust of Registrant (2) |
| (b) | | By-Laws (1) |
| (c) | | Not applicable |
| (d) | | Provisions of instruments defining the rights of holders of securities are contained in the Registrant's Amended and Restated Agreement and Declaration of Trust and By-Laws |
| (e) | | Dividend Reinvestment Plan (8) |
| (f) | | Not applicable |
| (g) | (1) | Investment Advisory and Administrative Services Agreement, dated May 18, 2016, between the Registrant and NexPoint Advisors, L.P. (2) |
| (g) | (2) | Advisory Agreement for NRESF REIT Sub, LLC (3) |
| (g) | (3) | Advisory Agreement for NRESF REIT Sub II, LLC (12) |
| (h) | (1) | Distribution Agreement, dated May 18, 2016, between the Registrant and NexPoint Securities, Inc. (formerly, Highland Capital Funds Distributor, Inc.) (2) |
| (h) | (2) | Form of Selling Agreement (1) |
| (h) | (3) | Form of Shareholder Servicing Plan and Agreement (4) |
| (h) | (4) | Distribution Plan for Class C Shares (2) |
| (i) | | Not applicable |
| (j) | (1) | Master Custodian Agreement with Bank of New York Mellon, dated October 3, 2018 (7) |
| (j) | (2) | Amendment 1 to Master Custodian Agreement, dated April 8, 2019 (7) |
| (j) | (3) | Amendment 2 to Master Custodian Agreement, dated April 8, 2019 (7) |
| (j) | (4) | Amendment 3 to Master Custodian Agreement, dated June 14, 2019 (8) |
| (j) | (5) | Amendment 4 to Master Custodian Agreement, dated December 21, 2020 (9) |
| (j) | (6) | Amendment 5 to Master Custodian Agreement, dated February 18, 2021 (9) |
| (j) | (7) | Amendment 6 to Master Custodian Agreement, dated March 18, 2021 (9) |
| (k) | (1) | Amended and Restated Expense Limitation and Reimbursement Agreement, dated May 1, 2025, between the Registrant and NexPoint Advisors, L.P. (13) |
| (k) | (2) | Master Sub-Administration Agreement, dated July 23, 2018, between NexPoint Advisors, L.P., on behalf of the Registrant, and SEI Investments Global Funds Services (6) |
| (k) | (3) | Agency Agreement, dated August 5, 2014, between the Registrant and SS&C Technologies, Inc. (formerly DST Systems, Inc.) (4) |

(k) (4) Amendment No. 1 to Agency Agreement, dated June 10, 2016, between the Registrant and SS&C Technologies, Inc. (formerly DST Systems, Inc.) (4)

(k) (5) Form of Joinder Agreement to Agency Agreement, dated September 6, 2016, between the Registrant and SS&C Technologies, Inc. (formerly DST Systems, Inc.) (5)

(k) (6) U.S. Prime Brokerage Agreement, dated September 25, 2018, between the Registrant and BNP Paribas Securities Corp. (6)

(k) (7) Annex to the Master Repurchase Agreement dated October 3, 2019, between the Registrant and Mizuho Securities USA LLC. (8).

(k) (8) Bridge Credit Agreement dated February 7, 2020, between NexPoint Real Estate Finance Operating Partnership, L.P., the Registrant, Highland Opportunities and Income Fund (formerly Highland Income Fund), Highland Global Allocation Fund, NexPoint Strategic Opportunities Fund and KeyBank, National Association. (8)

(l) (1) Opinion and Consent of Counsel (2)

(l) (2) Consent of Counsel (13)

(m) Not applicable

(n) Consent of Independent Registered Public Accounting Firm (13)

(o) Not applicable

(p) (1) Subscription Agreement dated April 19, 2016, between the Registrant and NexPoint Advisors, L.P. (4)

(p) (2) Subscription Agreement dated June 9, 2016, between the Registrant and NexPoint Advisors, L.P. (4)

(q) Not applicable

(r) (1) Code of Ethics of the Registrant (9)

(r) (2) Code of Ethics of NexPoint Advisors, L.P. (12)

(r) (3) Code of Ethics of the NexPoint Securities, Inc. (formerly, Highland Capital Funds Distributor, Inc.) (4)

(s) Not applicable

(t) Powers of Attorney dated June 8, 2021 and January 11, 2022 (10)

(t) (1) Powers of Attorney dated May 1, 2022 (11)

---

(1) Incorporated by reference to Pre-Effective Amendment No. 2 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 22, 2016.
(2) Incorporated by reference to Pre-Effective Amendment No. 3 to the Registrant's Registration Statement on Form N-2 filed with the SEC on June 17, 2016.
(3) Incorporated by reference to Post-Effective Amendment No. 2 to the Registrant's Registration Statement on Form N-2 filed with the SEC on August 22, 2016.
(4) Incorporated by reference to Post-Effective Amendment No. 4 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 28, 2017.
(5) Incorporated by reference to Post-Effective Amendment No. 6 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 26, 2018.
(6) Incorporated by reference to Post-Effective Amendment No. 7 to the Registrant's Registration Statement on Form N-2 filed with the SEC on October 9, 2018.
(7) Incorporated by reference to Post-Effective Amendment No. 8 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2019.
(8) Incorporated by reference to Post-Effective Amendment No. 9 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2020.
(9) Incorporated by reference to Post-Effective Amendment No. 10 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 30, 2021.

(10) Incorporated by reference to Post-Effective Amendment No. 11 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2022.
(11) Incorporated by reference to Post-Effective Amendment No. 12 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 28, 2023.
(12) Incorporated by reference to Post-Effective Amendment No. 13 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2024.
(13) Filed herewith.

**Item 26.** ***Marketing Arrangements***

Reference is made to the Distribution Agreement and Form of Selling Agreement included as Exhibits (h)(1) and (h)(2) hereto.

**Item 27.** ***Other Expenses of Issuance and Distribution***

The following table sets forth the estimated expenses to be incurred in connection with all offerings described in this Registration Statement:

| | |
|---|---|
| SEC Registration Fee | $ 0 |
| FINRA Fee | $ 0 |
| Legal fees | $ 1,500,000 |
| Blue Sky fees | $ 100,000 |
| Accounting fees | $ 1,000,000 |
| Printing and Mailing | $ 2,500,000 |
| Total | $ 5,100,000 |

**Item 28.** ***Persons Controlled by or Under Common Control with the Registrant***

NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC are wholly-owned subsidiaries of the Registrant. NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC are organized under the laws of Delaware and have elected to be treated as real estate investment trusts.

**Item 29.** ***Number of Holders of Shares***

The following table sets forth the approximate numbers of record holders of the Registrant's outstanding shares as of March 31, 2025:

| Title of Class | Number of Record Holders |
|---|---|
| Common Shares of Beneficial Interest | |
| Class A | 230 |
| Class C | 142 |
| Class Z | 284 |

**Item 30.** ***Indemnification***

Reference is made to Article VIII, Section 2 of the Registrant's Amended and Restated Agreement and Declaration of Trust (the "Declaration of Trust"), incorporated by reference hereto, and to Section 8 of the Registrant's Distribution Agreement, incorporated by reference hereto. The Registrant hereby undertakes that it will apply the indemnification provisions of the Declaration of Trust and Distribution Agreement in a manner consistent with Release 40-11330 of the Securities and Exchange Commission (the "SEC") under the Investment Company Act of 1940, as amended (the "1940 Act"), so long as the interpretation therein of Sections 17(h) and 17(i) of the 1940 Act remains in effect. The Registrant maintains insurance on behalf of any person who is or was an independent trustee, officer, employee, or agent of the Registrant against certain liability asserted against and

incurred by, or arising out of, his or her position. However, in no event will the Registrant pay that portion of the premium, if any, for insurance to indemnify any such person for any act for which the Registrant itself is not permitted to indemnify.

Insofar as indemnification for liability arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

**Item 31. *Business and Other Connections of Investment Advisor***

A description of any other business, profession, vocation, or employment of a substantial nature in which the investment adviser of the Registrant, and each member, director, executive officer, or partner of any such investment adviser, is or has been, at any time during the past two fiscal years, engaged in for his or her own account or in the capacity of member, trustee, officer, employee, partner or director, is set forth in the Registrant's prospectus and statement of additional information in the sections entitled "Management of the Fund." Information as to the members and officers of the Adviser is included in its Form ADV as filed with the SEC (CRD No. 163564), and is incorporated herein by reference.

**Item 32. *Location of Accounts and Records***

(1) SS&C Technologies, Inc. (formerly DST Asset Manager Solutions, Inc.), 30 Braintree Hill Office Park, Suite 400, Braintree, MA 02184 (records relating to its function as transfer agent).

(2) Bank of New York Mellon, 240 Greenwich Street, New York, NY 10286 (records relating to its function as custodian).

(3) NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (records relating to its function as adviser and administrator).

(4) SEI Investments Global Fund Services, One Freedom Valley Drive, Oaks, Pennsylvania 19456 (records relating to its function as sub-administrator).

(5) NexPoint Securities, Inc., 200 Crescent Court, Suite 700, Dallas, Texas 75201 (records relating to its function as distributor).

(6) Skyview Group, 2101 Cedar Springs Road, Suite 1200, Dallas, Texas 75201 (records relating to its function as administrator).

**Item 33. *Management Services***

Not Applicable.

**Item 34. *Undertakings***

1. The Registrant undertakes to suspend the offering of Shares until the prospectus is amended if (1) subsequent to the effective date of its registration statement, the net asset value of the Fund declines more than ten percent from its net asset value as of the effective date of the registration statement or (2) the net asset value of the Fund increases to an amount greater than its net proceeds as stated in the prospectus.

2. Not Applicable.

3. The Registrant undertakes:

(a) to file, during any period in which offers or sales are being made, a post-effective amendment to the registration statement:

(1) to include any prospectus required by Section 10(a)(3) of the Securities Act;

(2) to reflect in the prospectus any facts or events after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Filing Fee Tables" in the effective registration statement; and

(3) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(b) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(c) The Registrant undertakes to remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(d) The Registrant undertakes that, for the purpose of determining liability under the Securities Act:

(1) Not Applicable;

(2) if the Registrant is subject to Rule 430C, each prospectus filed pursuant to Rule 424(b) under the Securities Act as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be a part of and included in the registration statement as of the date it is first used after effectiveness; *provided, however*, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract or sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(e) The Registrant undertakes that, for the purpose of determining liability of the Registrant under the Securities Act to any purchaser in the initial distribution of securities, in a primary offering of securities of the undersigned Registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned Registrant will be a seller to the purchaser and will be considered to offer or sell such securities to the purchaser:

(1) any preliminary prospectus or prospectus of the undersigned Registrant relating to the offering required to be filed pursuant to Rule 424 under the Securities Act;

(2) free writing prospectus relating to the offering prepared by or on behalf of the undersigned Registrant or used or referred to by the undersigned Registrant;

(3) the portion of any advertisement pursuant to Rule 482 under the Securities Act relating to the offering containing material information about the undersigned Registrant or its securities provided by or on behalf of the undersigned Registrant; and

(4) any other communication that is an offer in the offering made by the undersigned Registrant to the purchaser.

4. Not Applicable.

5. Not Applicable.

6. Not Applicable.

7. The Registrant undertakes to send by first class mail or other means designed to ensure equally prompt delivery within two business days of receipt of a written or oral request, the Registrant's statement of additional information.

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended (the "1933 Act) and the Investment Company Act of 1940, as amended (the "1940 Act"), the Registrant certifies that it meets all of the requirements for effectiveness of this Registration Statement pursuant to Rule 486(b) under the 1933 Act and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Dallas and the State of Texas, on the 30th day of April, 2025.

NEXPOINT REAL ESTATE STRATEGIES FUND

/s/ James Dondero
James Dondero
President
(Principal Executive Officer)

Pursuant to the requirements of the 1933 Act and the 1940 Act, this Registration Statement has been signed by the following persons in the capacities set forth below on the 30th day of April, 2025.

| Signature | Title |
|---|---|
| /s/ James Dondero<br>James Dondero | President<br>(Principal Executive Officer) |
| /s/ Frank Waterhouse<br>Frank Waterhouse | Treasurer (Principal Financial and Principal Accounting Officer) |
| /s/ Ethan Powell*<br>Ethan Powell | Chairman of the Board of Trustees |
| /s/ Dr. Bob Froehlich*<br>Dr. Bob Froehlich | Trustee |
| /s/ John Honis*<br>John Honis | Trustee |
| /s/ Bryan A. Ward*<br>Bryan A. Ward | Trustee |
| /s/ Dorri McWhorter*<br>Dorri McWhorter | Trustee |

* By: /s/ Frank Waterhouse
Frank Waterhouse
Attorney in Fact*

* Pursuant to powers of attorney dated May 1, 2022, incorporated herein by reference to Post-Effective Amendment No. 12 to the Registration Statement previously filed with the Commission on April 28, 2023 (Accession Number 0001193125-23-126043), and June 8, 2021 incorporated herein by reference to Post-Effective Amendment No. 11 to the Registration Statement previously filed with the Commission on April 29, 2022 (Accession Number 0001193125-22-131260).

**EXHIBIT INDEX**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| (k)(1) | Amended and Restated Expense Limitation and Reimbursement Agreement, dated May 1, 2025, between the Registrant and NexPoint Advisors, L.P. |
| (l)(2) | Consent of Counsel |
| (n) | Consent of Independent Registered Public Accounting Firm |

Case 3:26-cv-02496-D Document 17-30 Filed 05/08/26 Page 335 of 608 PageID 12486

DEF 14A 1 d889398ddef14a.htm NEXPOINT CAPITAL, INC.

**SCHEDULE 14A**
**(RULE 14a-101)**

**INFORMATION REQUIRED IN PROXY STATEMENT**

**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**

Filed by the Registrant ☑
Filed by a Party other than the Registrant ☐

Check the appropriate box:
☐ Preliminary Proxy Statement
☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2)
☑ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to § 240.14a-12

**NexPoint Capital, Inc.**
(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.

☐ Fee paid previously with preliminary materials.

☐ Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

**NEXPOINT CAPITAL, INC.**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(844) 485-9167**

**May 7, 2025**

Dear Stockholder:

Enclosed you will find the proxy materials for the 2025 Annual Meeting of Stockholders of NexPoint Capital, Inc. (the "Corporation") to be held at 300 Crescent Court, Suite 700, Dallas, Texas 75201, on Monday, June 16, 2025, at 8:15 a.m. Central Time (the "Annual Meeting").

At the Annual Meeting, you will be asked to elect two (2) Class I Directors to each serve a three-year term. In addition to voting on the Election of Directors, which is described in more detail in the accompanying Notice of Annual Meeting of Stockholders and Proxy Statement, you will have an opportunity to hear a report on the Corporation and to discuss other matters of interest to you as a stockholder.

**It is very important that your shares be represented at the Annual Meeting.** Whether or not you plan to attend, I urge you to please complete, date, sign and mail the enclosed proxy card to us to assure that your shares are represented at the Annual Meeting.

Sincerely,

/s/ James Dondero
James Dondero
President and Principal Executive Officer

**NEXPOINT CAPITAL, INC.**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(844) 485-9167**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**
**TO BE HELD ON JUNE 16, 2025**

Notice is hereby given to holders of shares of common stock of NexPoint Capital, Inc., a Delaware corporation (the "Corporation"), that the 2025 Annual Meeting of Stockholders will be held at 300 Crescent Court, Suite 700, Dallas, Texas 75201, on Monday, June 16, 2025, at 8:15 a.m. Central Time (the "Annual Meeting").

Please vote your shares in accordance with the instructions on the enclosed proxy card whether or not you attend the Annual Meeting. The Annual Meeting will be held for the following purposes:

1. To elect each of Ethan Powell and Bryan A. Ward as a Class I Director of the Corporation to serve for a three-year term expiring at the 2028 Annual Meeting of Stockholders or until his successor is duly elected and qualifies (the "Proposal"); and
2. To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

**THE BOARD OF DIRECTORS, INCLUDING EACH OF THE INDEPENDENT DIRECTORS, UNANIMOUSLY RECOMMENDS A VOTE FOR THE PROPOSAL.**

The close of business on April 30, 2025 has been fixed as the record date for the determination of stockholders entitled to notice of, and to vote at, the Annual Meeting and any adjournment or postponement thereof. Please call (844) 485-9167 for directions on how to attend the Annual Meeting and vote in person.

**Important Notice Regarding Availability of Proxy Materials for the Stockholder Meeting to be held on June 16, 2025: Copies of these proxy materials, including the Corporation's Annual Report, the Notice for the Annual Meeting, the Proxy Statement and the form of proxy, are available to you on the Internet at https://vote.proxyonline.com/nexpoint/docs/bdc.pdf. Copies of the proxy materials are also available upon request, without charge, by writing to EQ Fund Solutions, LLC at EQ Fund Solutions, LLC, ATTN: NexPoint 20589 Fulfillment, 55 Challenger Road, Ridgefield Park, New Jersey 07660, by calling (866) 796-1292, or by sending an e-mail to corporateservices@equiniti.com using subject line: NexPoint 20589 Fulfillment. Stockholders are encouraged to read all of the proxy materials before voting as the proxy materials contain important information necessary to make an informed decision.**

**The Board of Directors is requesting your vote. Your vote is important regardless of the number of shares that you own. Please complete and sign the enclosed proxy card and return it promptly in the enclosed envelope, which needs no postage if mailed in the United States. If you desire to vote in person at the Annual Meeting, you may revoke your proxy at any time before it is exercised.**

By Order of the Board of Directors,

/s/ Stephanie Vitiello
Stephanie Vitiello
Secretary

May 7, 2025
Dallas, Texas

**NEXPOINT CAPITAL, INC.**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(844) 485-9167**

**PROXY STATEMENT**
**ANNUAL MEETING OF STOCKHOLDERS**
**JUNE 16, 2025**

This Proxy Statement is furnished in connection with the solicitation of proxies on behalf of the Board of Directors (the "Board") of NexPoint Capital, Inc., a Delaware corporation (the "Corporation"), for use at the Corporation's 2025 Annual Meeting of Stockholders (the "Annual Meeting") to be held at 300 Crescent Court, Suite 700, Dallas, Texas 75201, on Monday, June 16, 2025, at 8:15 a.m. Central Time, and at any and all adjournments or postponements thereof, for the purposes set forth in the accompanying Notice of Annual Meeting of Stockholders dated May 7, 2025. The Corporation is a closed-end management investment company that has elected to be treated as a business development company under the Investment Company Act of 1940, as amended (the "1940 Act"). NexPoint Advisors, L.P., a Delaware limited partnership (the "Adviser") serves as the investment adviser and the administrator ("Administrator") to the Corporation. The principal executive offices of each of the Corporation and the Adviser are located at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

This Proxy Statement and the accompanying Notice of Annual Meeting of Stockholders and form of proxy are being provided to stockholders on or about May 7, 2025. The Board has fixed the close of business on April 30, 2025 as the record date (the "Record Date") for the determination of stockholders entitled to receive notice of, and to vote at, the Annual Meeting. As of the Record Date, 9,146,110.355 shares of the Corporation's Common Stock were issued and outstanding, and the Corporation had not issued any shares of preferred stock. Stockholders of the Corporation are entitled to one vote for each share held and fractional votes for each fractional share held.

If the form of proxy is properly executed and returned in time to be voted at the Annual Meeting, the shares covered thereby will be voted at the Annual Meeting in accordance with the instructions marked thereon. All properly executed proxies received by the Board that do not specify how shares should be voted will be voted (i) **"FOR"** the election as a Director of each of the nominees listed in the Proposal below, and (ii) in the discretion of the persons named as proxies in connection with any other matter which may properly come before the Annual Meeting or any adjournment or postponement thereof.

The Board does not know of any matters to be considered at the Annual Meeting other than the Election of Directors referred to in this Proxy Statement and the Notice of Annual Meeting. A stockholder may revoke his or her proxy any time before it is exercised by (i) voting in person at the Annual Meeting, (ii) giving written notice of such revocation to the Secretary of the Corporation or (iii) returning a properly executed, later-dated proxy before the Annual Meeting.

In addition to soliciting proxies by mail, officers of the Corporation or officers or employees of the Adviser may solicit proxies by the Internet or by telephone. Copies of the Notice for the Annual Meeting, the Proxy Statement, the form of proxy and the Corporation's annual report are available at https://vote.proxyonline.com/nexpoint/docs/bdc.pdf. The Corporation has engaged EQ Fund Solutions, LLC, at EQ Fund Solutions, LLC, ATTN: NexPoint 20589 Fulfillment, 55 Challenger Road, Ridgefield Park, New Jersey 07660 to provide stockholder meeting services, including the distribution of this Proxy Statement and related materials to stockholders, as well as assisting the Corporation in soliciting proxies for the Annual Meeting, at an approximate cost of $23,968. The costs of proxy solicitation and expenses incurred in connection with the preparation of this Proxy Statement and its enclosures will be paid by the Corporation.

**Quorum**

A quorum must be present at the Annual Meeting for any business to be conducted. The presence in person or by proxy of the holders of a majority of the shares of Common Stock entitled to vote shall constitute a quorum for the Annual Meeting. Shares represented by properly executed proxies with respect to which (i) a vote is withheld or (ii) the stockholder abstains will be treated as shares that are present and entitled to vote for purposes of determining a quorum.

Shares of Common Stock held by a broker or other nominee for which the nominee has not received voting instructions from the record holder and does not have discretionary authority to vote the shares on non-routine proposals are considered “broker non-votes” with respect to such proposals. Because the election of a Director is a non-routine matter, broker non-votes are not entitled to vote at the Annual Meeting. Therefore, broker non-votes will be treated as shares that are not present for quorum purposes at the Annual Meeting.

If a quorum is not present at the Annual Meeting, or if a quorum is present but sufficient votes to approve the Proposal are not received, the persons named as proxies may propose one or more adjournments or postponements of the Annual Meeting to permit further solicitation of proxies. Any adjournment or postponement will require the affirmative vote of a majority of those shares that are represented at the Annual Meeting in person or by proxy, whether or not a quorum is present.

**Vote Required**

The election of a Director requires the affirmative vote of a majority of the shares of Common Stock cast at the Annual Meeting in person or by proxy. Abstentions are counted as present at the Annual Meeting for purposes of determining a quorum, but, assuming the presence of a quorum, will have the effect of a vote against a nominee.

Broker non-votes are described as votes cast by a broker or other nominee on behalf of a beneficial holder who does not provide explicit voting instructions to such broker or nominee and who does not attend the Annual Meeting. The election of a Director is a non-routine matter. As a result, if you hold shares in “street name” through a broker, bank or other nominee, your broker, bank or nominee will **not** be permitted to exercise voting discretion with respect to the Proposal at the Annual Meeting to elect each of Ethan Powell and Bryan A. Ward as a Class I Director of the Corporation. Thus, if you do not give your broker or nominee specific instructions on how to vote for you or do not vote for yourself by returning a proxy card or by other arrangement with your broker or nominee, your shares will have no effect on the election of the Class I Directors at the Annual Meeting.

## THE PROPOSAL

## ELECTION OF DIRECTORS

The Board is currently composed of five Directors, who are divided into three classes with staggered terms of three years each, with the term of office of one of the three classes expiring at each annual meeting of the stockholders.

At the Annual Meeting, the holders of the Corporation’s shares of Common Stock are being asked to re-elect Ethan Powell and Bryan A. Ward as Class I Directors of the Corporation, each to serve for a three-year term expiring at the 2028 annual meeting of stockholders or until his successor is duly elected and qualifies. Ethan Powell and Bryan A. Ward are currently serving as Class I Directors of the Corporation and have agreed to continue to serve as Class I Directors, if re-elected. If Ethan Powell and Bryan A. Ward are not available for re-election at the time of the Annual Meeting, the persons named as proxies will vote for such substitute nominee(s) as the Corporation’s Governance and Compliance Committee may select.

John Honis is currently serving as a Class III Director and was last elected to serve until the 2027 annual meeting of stockholders at the Corporation’s annual meeting of stockholders held on June 26, 2024. Dr. Bob Froehlich

and Ms. Dorri McWhorter are currently serving as Class II Directors and each was last elected to serve until the 2026 annual meeting of stockholders at the Corporation's annual meeting of stockholders held on June 16, 2023. Ethan Powell and Bryan A. Ward are currently serving as Class I Directors and each was last elected to serve until the 2025 annual meeting of stockholders at the Corporation's annual meeting of stockholders held on June 10, 2022. Messrs. Powell and Ward will continue to serve as Class I Directors if re-elected at the Annual Meeting until the 2028 annual meeting of shareholders or until their respective successors are duly elected and qualify. The Corporation's Directors are not required to attend the Corporation's annual stockholder meetings.

**THE BOARD, INCLUDING EACH OF THE INDEPENDENT DIRECTORS, UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" THE RE-ELECTION OF EACH OF THE NOMINEES AS A DIRECTOR.**

**Qualifications and Additional Information about the Director Nominees and the Continuing Directors**

The following provides an overview of the considerations that led the Board to conclude that the individual nominees for Director or the individuals serving as continuing Directors of the Corporation should be nominated or so serve, as well as each nominee's and each Director's name and certain biographical information as reported by them to the Corporation. Among the factors the Board considered when concluding that an individual should be a nominee for Director or serve on the Board were the following: the individual's experience, skills, expertise, education, knowledge, diversity, personal and professional integrity, character, business judgment, time availability in light of other commitments, dedication, the candidate's ability to qualify as an Independent Director and the existence of any other relationships that might give rise to a conflict of interest and other relevant factors that the Corporation's Governance and Compliance Committee considers appropriate in the context of the needs of the Board (e.g., whether a candidate is an "audit committee financial expert" under the federal securities laws).

In respect of the Director nominees and each continuing Director, the individual's professional accomplishments and prior experience, including, in some cases, in fields related to the operations of the Corporation, were a significant factor in the determination that each of the individuals should be a nominee for Director or serve as a Director of the Corporation. Each Director nominee's and each continuing Director's professional experience and additional considerations that contributed to the Board's conclusion that an individual should serve on the Board are summarized in the table below.

The "Fund Complex," as referred to herein consists of: the Corporation, each series of NexPoint Funds I ("NFI"), each series of NexPoint Funds II ("NFII"), Highland Opportunities and Income Fund ("HFRO"), Highland Global Allocation Fund ("GAF"), and NexPoint Real Estate Strategies Fund ("NRESF").

***Class III Director (continuing Director not up for re-election at the Annual Meeting)***

| Name, Year of Birth and Address[1] | Position(s) held with the Corporation | Term of Office and Length of Time Served[2] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[3] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| ***Interested Director*** | | | | | |
| John Honis[4] (1958) | Director | Term expires 2027; Class III Director since 2014 | President of Rand Advisors, LLC (August 2013 to August 2022); President of Valience Group, LLC (since July 2021); and Consultant of Rand Advisors, LLC (since August 2022). | None | Significant experience in the financial industry; significant managerial and executive experience, including experience as president, chief executive officer or chief restructuring officer of five telecommunication firms; experience on other boards of directors/trustees. |

***Class II Directors (continuing Directors not up for re-election at the Annual Meeting)***

| Name, Year of Birth and Address[(1)] | Position(s) held with the Corporation | Term of Office and Length of Time Served[(2)] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[(3)] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| ***Independent Directors*** | | | | | |
| Dr. Bob Froehlich (1953) | Director | Term expires 2026; Class II Director since 2014 | Retired. | Director of KC Concessions, Inc. (from January 2013 to March 2025); Director of American Sports Enterprise, Inc. (since January 2013); Chairman and owner, Kane County Cougars Baseball Club (from January 2013 to March 2025); Director of The Midwest League of Professional Baseball Clubs, Inc. (from January 2013 to December 2021); Director of Kane County Cougars Foundation, Inc. (from January 2013 to March 2025); Director of Galen Robotics, Inc. (from August 2016 to September 2023); Director and Special Advisor to Vault Data, LLC (since February 2018); Director of American Association of Professional Baseball, Inc. (since February 2021); Director of National Amateur Fall Baseball Federation (since December 2023); and Executive Director of Kane County Cougars Baseball Foundation Inc. (from July 2023 to March 2025) (remaining as Director). | Significant experience in the financial industry; significant managerial and executive experience; significant experience on other boards of directors, including as a member of several audit committees. |
| Dorri McWhorter (1973) | Director | Term expires 2026; Class II Director since 2022 | President and CEO, YMCA of Metropolitan Chicago (from 2021 to 2025); and Chief Executive Officer, YWCA Metropolitan Chicago (from 2013 to 2021). | Board Director of William Blair Funds (since 2019); Board Director of Skyway Concession Company, LLC (since 2018); Board Director of Illinois CPA Society (from 2017 to 2022); Board Director of Lifeway Foods, Inc. (since 2020); Board Director of Green Thumb Industries, Inc. (from February 2022 to October 2022); Member of Financial Accounting Standards Advisory Council (since 2021); and Board Director of LanzaTech Global, Inc. (since 2023). | Significant managerial and executive experience, including experience as president and chief executive officer; significant background and experience in financial accounting; significant experience on other boards of directors, including for other registered investment companies. |

***Nominees for Class I Directors***

| Name, Year of Birth and Address[1] | Position(s) held with the Corporation | Term of Office and Length of Time Served[2] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[3] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| ***Independent Directors*** | | | | | |
| Ethan Powell (1975) | Director and Chairman of the Board | Term expires 2025; Class I Director since 2014 | Principal and CIO of Brookmont Capital Management, LLC (since May 2020); CEO, Chairman and Founder of Impact Shares LLC (since December 2015); Trustee/Director of the Fund Complex (from June 2012 to July 2013 and since December 2013); and Trustee of Strategic Trust (since August 2021). | Trustee of Tidal Trust III (formerly Impact Shares Funds I Trust) (since 2016). | Significant experience in the financial industry; significant executive experience including past service as an officer of funds in the Fund Complex; significant administrative and managerial experience. |

| Name, Year of Birth and Address[(1)] | Position(s) held with the Corporation | Term of Office and Length of Time Served[(2)] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[(3)] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| Bryan A. Ward (1955) | Director | Term expires 2025; Class I Director since 2014 | President – Private Banking, Lakeside Bank (since September 2023); Business Development Banker, CrossFirst Bank (from January 2023 to April 2023) (President-Dallas from October 2020 to January 2023 and Senior Advisor from April 2019 to October 2022); and Private Investor, BW Consulting, LLC (since 2014) and Anderson Consulting/Accenture (from 1991 to 2013). | Director of Equity Metrix, LLC. | Significant experience on this and/or other boards of directors/trustees; Audit and Qualified Legal Compliance Committee Chairperson; significant managerial and executive experience; significant experience as a management consultant. |

(1) The address for the nominees and each Director is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.
(2) On an annual basis, as a matter of Board policy, the Governance and Compliance Committee reviews each Director's performance and determines whether to extend each such Director's service for another year. Effective June 2013, the Board adopted a retirement policy wherein the Governance and Compliance Committee shall not recommend the continued service as a Director of a Board member who is older than 80 years of age at the time the Governance and Compliance Committee reports its findings to the Board.
(3) Each of the Directors and the nominees oversee 7 portfolios in the Fund Complex.
(4) In light of certain relationships between Mr. Honis and historically affiliated entities of the Adviser, including Highland Capital Management, L.P. ("HCMLP"), arising out of HCMLP's pending Chapter 11 proceedings, Mr. Honis is treated as an Interested Director of the Corporation effective January 28, 2020.

**Information about the Executive Officers**

Set forth below are the names and certain information regarding the Corporation's executive officers. Each executive officer serves until his or her successor has been duly elected and qualifies, or until his or her earlier resignation or removal.

| Name, Year of Birth and Address(1) | Position(s) held with the Corporation | Principal Occupation(s) During Past Five Years |
|---|---|---|
| James Dondero (1962) | President and Principal Executive Officer since 2014 | Founder of the Adviser; Co-founder of HCMLP and NexPoint Asset Management, L.P. ("NexPoint"); Chairman of the Board of NexPoint Residential Trust, Inc. (NYSE: NXRT) since May 2015; President and a member of the investment committee of NRESF since February 2020; Chief Executive Officer and director of NexPoint Diversified Real Estate Trust ("NXDT") since December 2018; Portfolio Manager of NexPoint Event Driven Fund, Highland Global Allocation Fund, Highland Opportunities and Income Fund and NexPoint Merger Arbitrage Fund (each a series of NFI), NexPoint Climate Tech Fund (a series of NFII), the Corporation and NRESF. |
| Dustin Norris (1984) | Executive Vice President since April 2019 | Head of Distribution and Chief Product Strategist at the Adviser since March 2019; President of NexPoint Securities, Inc. since April 2018; and Officer of the Fund Complex since November 2012. |
| Frank Waterhouse (1971) | Treasurer and Principal Accounting Officer since May 2015 and Principal Financial Officer since April 2021 | Chief Financial Officer of Skyview Group since February 2021; Chief Financial Officer and Partner of HCMLP from December 2011 and March 2015, respectively, to February 2021; Treasurer of the Fund Complex since May 2015; Principal Financial Officer of NFI, NFII, GAF, HFRO, and NXDT since April 2021 and from October 2017 to February 2021; and Principal Executive Officer of NFI, NFII, GAF and HFRO from February 2018 to February 2021 and since April 2021. |
| Stephanie Vitiello (1983) | Secretary since April 2021 and Chief Compliance Officer and Anti-Money Laundering Officer since November 2021 | Chief Compliance Officer and Counsel of Skyview Group since February 2021. Prior to her current role at Skyview Group, Ms. Vitiello served as Managing Director – Distressed, Assistant General Counsel, Associate General Counsel, and In-House Counsel for HCMLP. |
| Will Mabry (1986) | Assistant Treasurer since April 2021 | Director, Fund Analysis of Skyview Group since February 2021. Prior to his current role at Skyview Group, Mr. Mabry served as Senior Manager – Fund Analysis, Manager – Fund Analysis, and Senior Fund Analyst for HCMLP. |

(1) The address for each officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth certain ownership information with respect to our Common Stock, as of April 30, 2025, for those persons who directly or indirectly own, control or hold with the power to vote, five percent or more of our outstanding Common Stock and all officers and Directors, individually and as a group.

| Name and Address | Type of Ownership | Shares Owned | Value of Securities | Percentage of Outstanding Shares as of April 30, 2025 |
|---|---|---|---|---|
| Liberty CLO Holdco Ltd.(1) | Beneficial | 2,549,002.292 | $12,923,441.62 | 29.5% |
| All officers and Directors as a group (10 persons)(2) | N/A | None | $ 0 | 0% |

(1) The address for Liberty CLO Holdco Ltd. is One Nexus Way, Camana Bay, George Town, Grand Cayman KY 19005.
(2) The address for each Director or officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Dollar Range of Equity Securities Beneficially Owned by Directors**

Set forth in the table below is the dollar range of shares beneficially owned by each Director in (i) the Corporation and (ii) all registered investment companies in the Fund Complex overseen by such Director.

| Name of Director | Dollar Range of Shares of the Corporation(1) | Aggregate Dollar Range of Equity Securities(1) Owned in All Registered Investment Companies Overseen by Director in the Fund Complex |
|---|---|---|
| ***Independent Directors*** | | |
| Dr. Bob Froehlich | None | Over $100,000 |
| Bryan A. Ward | None | $50,001-$100,000 |
| Ethan Powell | None | $50,001-$100,000 |
| Dorri McWhorter | None | None |
| ***Interested Director*** | | |
| John Honis(2) | None | $1-$10,000 |

(1) Based on market value as of December 31, 2024.
(2) In light of certain relationships between Mr. Honis and historically affiliated entities of the Adviser, including HCMLP, arising out of HCMLP's pending Chapter 11 proceedings, Mr. Honis is treated as an Interested Director of the Corporation effective January 28, 2020.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules thereunder require that the Corporation's Directors and officers and persons who own beneficially, directly or indirectly, more than 10 percent of any class of the Corporation's securities file initial reports of beneficial ownership and reports of changes in beneficial ownership with the U.S. Securities and Exchange Commission ("SEC") and furnish the Corporation with copies of all such reports. Specific due dates for those reports have been established, and the Corporation is required to report in this Proxy Statement any known failure to file such reports by those due dates during the past fiscal year. Based solely upon a review of the copies of such reports furnished, the Corporation does not know of any Director, officer or person who beneficially owns more than 10 percent of any class of the Corporation's securities who failed to file on a timely basis the required reports during the past fiscal year.

**Role of the Board of Directors, Leadership Structure and Risk Oversight**

***The Role of the Board***

The Board oversees the management and operations of the Corporation. Like most business development companies and registered investment companies, the day-to-day management and operation of the Corporation is performed by various service providers to the Corporation, such as the Adviser, custodian and transfer agent. The Board has appointed senior employees of certain of these service providers as officers of the Corporation, with responsibility to monitor and report to the Board on the Corporation's operations. The Board receives regular reports from these officers and service providers regarding the Corporation's operations. For example, the Chief Financial Officer provides reports as to financial reporting matters and investment personnel report on the performance of the Corporation. The Board has appointed a Chief Compliance Officer who administers the Corporation's compliance program and regularly reports to the Board as to compliance matters. Some of these reports are provided as part of formal Board meetings, which are typically held quarterly and involve the Board's review of, among other items, recent Corporation operations. The Board also periodically holds telephonic meetings as part of its review of the Corporation's activities. From time to time, one or more members of the Board may also meet with management in less formal settings, between scheduled Board meetings, to discuss various topics. In all cases, however, the role of the Board and of any individual Director is one of oversight and not of management of the day-to-day affairs of the Corporation and its oversight role does not make the Board a guarantor of the Corporation's investments, operations or activities.

***Board Structure and Leadership***

The Board has structured itself in a manner that it believes allows it to perform its oversight function effectively. The Board consists of five Directors, four of whom are not "interested persons," as defined in the 1940 Act, of the Corporation. These individuals are referred to as the Corporation's independent Directors (the "Independent Directors"). During the fiscal year ended December 31, 2024, the Board convened eight times. Each Director then serving in such capacity attended at least 75% of the meetings. The Corporation encourages, but does not require, Directors to attend the Annual Meeting.

The Board periodically reviews its leadership structure, including the role of the Chairman. The Board also completes an annual self-assessment during which it reviews its leadership and Committee structure and considers whether its structure remains appropriate in light of the Corporation's current operations. The Board believes that its leadership structure, including the current percentage of the Board who are Independent Directors is appropriate given its specific characteristics. These characteristics include: (i) the extent to which the work of the Board is conducted through the standing committees, and that the Audit and Qualified Legal Compliance Committee (the "Audit Committee") and the Governance and Compliance Committee meetings are each chaired by an Independent Director; (ii) the extent to which the Independent Directors meet as needed, together with their independent legal counsel, in the absence of members of management and any member of the Board who is considered an "interested person" of the Corporation; and (iii) Mr. Powell's and Mr. Honis' previous positions with NexPoint and/or historical affiliates of the Adviser, which enhances the Board's understanding of the operations of the Adviser.

***Board Oversight of Risk Management.*** The Board's role is one of oversight, rather than active management. This oversight extends to the Corporation's risk management processes. These processes are embedded in the responsibilities of officers of, and service providers to, the Corporation. For example, the Adviser and other service providers to the Corporation are primarily responsible for the management of the Corporation's investment risks. The Board has not established a formal risk oversight committee. However, much of the regular work of the Board and its standing Committees addresses aspects of risk oversight. For example, the Directors seek to understand the key risks facing the Corporation, including those involving conflicts of interest; how management identifies and monitors these risks on an ongoing basis; how management develops and implements controls to mitigate these risks; and how management tests the effectiveness of those controls.

In the course of providing that oversight, the Board receives a wide range of reports on the Corporation's activities from the Adviser and other service providers, including reports regarding the Corporation's investment portfolio, the compliance of the Corporation with applicable laws, and the Corporation's financial accounting and reporting. The Board also meets periodically with the Corporation's Chief Compliance Officer to receive reports regarding the compliance of the Corporation with the federal securities laws and the Corporation's internal compliance policies and procedures and meets with the Corporation's Chief Compliance Officer periodically, including at least annually, to review the Chief Compliance Officer's annual report, including the Chief Compliance Officer's risk-based analysis for the Corporation. The Board's Audit Committee also meets regularly with the Chief Financial Officer and the Corporation's independent registered public accounting firm to discuss, among other things, the internal control structure of the Corporation's financial reporting function. The Board also meets periodically with the portfolio managers of the Corporation to receive reports regarding the management of the Corporation, including its investment risks.

The Board recognizes that not all risks that may affect the Corporation can be identified, that it may not be practical or cost-effective to eliminate or mitigate certain risks, that it may be necessary to bear certain risks (such as investment-related risks) to achieve the Corporation's goals, that reports received by the Directors with respect to risk management matters are typically summaries of the relevant information, and that the processes, procedures and controls employed to address risks may be limited in their effectiveness. As a result of the foregoing and other factors, risk management oversight by the Board and by the Committees is subject to substantial limitations.

**Committees of the Board**

The Board conducts much of its work through certain standing Committees. The Board has three Committees, the Audit Committee, the Governance and Compliance Committee, and the Administration and Operations Committee, each of which are discussed in greater detail below. The Board has adopted charters for each of these Committees.

For the fiscal year ended December 31, 2024, the Audit Committee held five meetings, the Governance and Compliance Committee held five meetings, and the Administration and Operations Committee held five meetings. Each Director then serving in such capacity attended at least 75% of the meetings of the Committees of which he or she is a member.

***Audit and Qualified Legal Compliance Committee***

The members of the Audit Committee are Dr. Froehlich, Messrs. Ward and Powell, and Ms. McWhorter, each of whom is an Independent Director. Mr. Ward serves as Chairperson of the Audit Committee. The Audit Committee is responsible for (i) approving the Corporation's independent registered public accounting firm, (ii) reviewing with the Corporation's independent accountants the plans and results of the audit engagement and the adequacy of the Corporation's internal accounting controls, and (iii) approving professional services provided by the independent registered public accounting firm. The Audit Committee is charged with compliance with Rules 205.2(k) and 205.3(c) of Title 17 of the Code of Federal Regulations regarding alternative reporting procedures for attorneys representing the Corporation who appear and practice before the SEC on behalf of the Corporation. The Audit Committee also oversees valuations determined by the Adviser, who pursuant to Rule 2a-5 under the 1940 Act, has been designated by the Board as the Corporation's valuation designee to perform the fair valuation determination for securities and other assets held by the Corporation in accordance with valuation policies and procedures established by the Adviser and approved by the Board. The Board has determined that Mr. Ward is an "audit committee financial expert," as defined under Item 407(d)(5) of Regulation S-K under the Exchange Act. In addition, each member of the Audit Committee meets the current independence and experience requirements of Rule 10A-3 under the Exchange Act.

A current copy of the Corporation's Audit Committee Charter is available on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/.

***Governance and Compliance Committee***

The members of the Governance and Compliance Committee are Dr. Froehlich, Messrs. Powell and Ward, and Ms. McWhorter, each of whom is independent for purposes of the 1940 Act. Dr. Froehlich serves as the Chairperson of the Governance and Compliance Committee. The Governance and Compliance Committee's function is to oversee and make recommendations to the full Board or the Independent Directors, as applicable, with respect to the Corporation's governance, selection and nomination of Directors, compensation of Directors, and related matters, as well as to oversee and assist Board oversight of the Corporation's compliance with legal and regulatory requirements and to seek to address any potential conflicts of interest between the Corporation and the Adviser in connection with any potential or existing litigation or other legal proceeding related to securities held by the Corporation and the Adviser or another client of the Adviser. The Governance and Compliance Committee is also responsible for evaluating each Director and determining whether to recommend each Director's continued service in that capacity.

The Governance and Compliance Committee considers nominees properly recommended by the Corporation's stockholders. The Corporation's bylaws provide that for any nomination to be properly brought by a stockholder for a meeting, such stockholder will have to comply with advance notice requirements and provide the Corporation with certain information. Generally, to be timely, a stockholder's notice must be received at the Corporation's principal executive offices not less than 90 days nor more than 120 days prior to the first anniversary of the date the proxy statement for the immediately preceding annual meeting of stockholders was released to the Corporation's stockholders.

The Corporation's bylaws further provide that nominations of persons for election to the Board at a special meeting may be made only by or at the direction of the Board and, provided that the Board has determined that Directors will be elected at the meeting, by a stockholder who is entitled to vote at the meeting and who has complied with the advance notice provisions of the bylaws.

This notice must contain, as to each nominee, all of the information relating to such person as would be required to be disclosed in a proxy statement meeting the requirements of Regulation 14A under the Exchange Act, and certain other information set forth in the bylaws, including the following information for each Director nominee: full name, age and address; principal occupation during the past five years; directorships on publicly held companies and investment companies during the past five years; number of shares of Common Stock owned, if any; and a written consent of the individual to stand for election if nominated by the Board and to serve if elected by the stockholders. In order to be eligible to be a nominee for election as a Director, such potential nominee may be required to provide additional information to determine his or her qualifications or eligibility to serve on the Board.

The Governance and Compliance Committee has not established any specific, minimum qualifications that must be met for an individual to be considered for nomination as a Director. Criteria and attributes considered by the Governance and Compliance Committee in evaluating the qualifications of individuals for election as a Director, including individuals nominated by stockholders, include the following: experience, skills, expertise, education, knowledge, diversity, personal and professional integrity, character, business judgment, time availability in light of other commitments, dedication, the individual's ability to qualify as an Independent Director and the existence of any other relationships that might give rise to a conflict of interest and other relevant factors that the Governance and Compliance Committee considers appropriate in the context of the needs of the Board (e.g., whether a candidate is an "audit committee financial expert" under the federal securities laws).

A current copy of the Corporation's Governance and Compliance Committee Charter is available on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/.

***Administration and Operations Committee***

The members of the Administration and Operations Committee are Dr. Froehlich, Messrs. Honis, Powell and Ward, and Ms. McWhorter. The Administration and Operations Committee is responsible for reviewing the

administrative operations of the Corporation, reviewing arrangements with financial intermediaries who provide service to the Corporation, including Corporation payments to financial intermediaries and for overseeing any funds that, in the Board's determination, employ alternative investment strategies. Mr. Honis serves as Chairperson of the Administration and Operations Committee.

***Compensation Committee***

As none of the Corporation's executive officers are compensated by the Corporation, the Corporation does not have a compensation committee and neither the Board nor a Committee thereof produces and/or reviews a report on executive officers compensation practices. The Governance and Compliance Committee reviews and evaluates compensation payable to the Directors at least annually to ensure that such compensation continues to be appropriate in light of the responsibilities of the Directors. The Governance and Compliance Committee makes any recommendations regarding changes to the Directors' compensation to the Board, and the full Board approves the Directors' compensation.

**Compensation of Directors and Executive Officers**

The executive officers of the Corporation receive no direct remuneration from the Corporation. Each Director of the Corporation who oversees all of the funds in the Fund Complex receives an annual retainer of $150,000 payable in quarterly installments and allocated among each portfolio in the Fund Complex based upon relative net assets. The Directors are reimbursed for actual out-of-pocket expenses relating to attendance at meetings. The Directors do not receive any separate compensation in connection with service on Committees or for attending Board or Committee meetings; however, the Chairman of the Board receives an additional annual payment of $20,000 and the Chairperson of each Committee receives an additional annual payment of $10,000, payable in quarterly installments and allocated among each portfolio in the Fund Complex based on relative net assets. The Directors do not receive equity awards or incentive-based compensation and do not have any pension or retirement plan.

The following table summarizes the compensation paid by the Corporation to its Directors and the aggregate compensation paid by the Fund Complex to the Directors for services rendered in the fiscal year ended December 31, 2024.

| Name of Director | Aggregate Compensation from the Corporation | Aggregate Compensation from the Fund Complex |
|---|---|---|
| ***Independent Directors*** | | |
| Bryan A. Ward | $ 3,947 | $ 160,000 |
| Dr. Bob Froehlich | $ 3,947 | $ 160,000 |
| Ethan Powell | $ 4,192 | $ 170,000 |
| Dorri McWhorter | $ 3,700 | $ 150,000 |
| ***Interested Director*** | | |
| John Honis | $ 3,947 | $ 160,000 |

**Code of Conduct and Code of Ethics**

The Corporation expects each of its officers and Directors, as well as any person affiliated with its operations, to act in accordance with the highest standards of personal and professional integrity at all times and to comply with the Corporation's policies and procedures and all laws, rules and regulations of any applicable international, federal, provincial, state or local government. To this effect, the Corporation has adopted a Sarbanes-Oxley ("SOX") Code of Ethics, which is posted on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/. The SOX Code of Ethics applies to the Corporation's principal executive officer and principal financial officer.

As required by the 1940 Act, the Corporation and the Adviser have each adopted a Code of Ethics (the "Rule 17j-1 Code of Ethics") that establishes procedures that apply to the Corporation's Directors, executive officers, officers, their respective staffs and the employees of the Adviser with respect to their personal investments and investment transactions. Each Rule 17j-1 Code of Ethics generally does not permit investments by the Corporation's Directors, officers or any other covered person in securities that may be purchased or held by the Corporation. You may access the Corporation's Rule 17j-1 Code of Ethics on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/.

**Certain Relationships and Related Party Transactions**

The Corporation has entered into agreements with the Adviser and Administrator. Certain members of the Corporation's senior management have ownership and financial interests in the Adviser and the Administrator. Members of senior management also serve as officers of other investment managers affiliated with the Adviser that do and may in the future manage investment funds, accounts or other investment vehicles with investment objectives similar to those of the Corporation. In addition, the Corporation's executive officers and Directors and the partners of the Adviser serve or may serve as officers, directors or principals of entities that operate in the same, or related, lines of business as the Corporation does or of investment funds, accounts or other investment vehicles managed by the Corporation's affiliates. These investment funds, accounts or other investment vehicles may have investment objectives similar to the Corporation's investment objective.

As a result, the Corporation may not be given the opportunity to participate in certain investments made by investment funds, accounts or other investment vehicles managed by the Adviser or its affiliates. However, in order to fulfill its fiduciary duties to each of its clients, the Adviser intends to allocate investment opportunities in a manner that is fair and equitable over time and is consistent with the Adviser's allocation policy, investment objective and strategies so that the Corporation is not disadvantaged in relation to any other client. Where the Corporation is able to co-invest consistent with the requirements of the 1940 Act, if sufficient securities or loan amounts are available to satisfy the Corporation's and each such account's proposed demand, the opportunity will be allocated in accordance with the Adviser's pre-transaction determination. If there is an insufficient amount of an investment opportunity to satisfy the Corporation's demand and that of other accounts sponsored or managed by the Adviser or its affiliates, the allocation policy provides that allocations among the Corporation and such other accounts will generally be made pro rata based on the amount that each such party would have invested if sufficient securities or loan amounts were available. Where the Corporation is unable to co-invest consistent with the requirements of the 1940 Act, the Adviser's allocation policy further provides for investments to be allocated on a random or rotational basis to assure that all clients have fair and equitable access to such investment opportunities.

The Board, in consultation with the Corporation's Chief Executive Officer, Chief Compliance Officer and legal counsel, may review potential related party transactions and, during these reviews, it may also consider any conflicts of interest brought to its attention pursuant to the Corporation's Code of Conduct or the Corporation's or the Adviser's Rule 17j-1 Code of Ethics.

The Corporation has entered into an investment advisory agreement with the Adviser pursuant to which the Adviser has agreed to provide investment advisory services to the Corporation. In exchange for these services, the Corporation will pay the Adviser a fee for investment management services consisting of a base management fee and a performance-based incentive fee. For the fiscal year ended December 31, 2024, the Adviser earned a base management fee of $945,241. For the fiscal year ended December 31, 2024, the Adviser did not earn an incentive fee. Effective December 20, 2017, the Adviser ended its voluntary waiver of advisory fees. Fees waived before June 10, 2016 are not subject to recoupment. The Adviser may elect to recoup any fees voluntarily waived from and after June 10, 2016 within three years from the date that such fees were otherwise payable, provided that the recoupment of the Adviser will be limited to the amount of such voluntarily waived fees (excluding any fees the Adviser has indicated are not subject to recoupment) and will not cause the sum of the Corporation's advisory fees, administration fees, and "Other Expenses" (as defined in the Expense Limitation Agreement), nor will any recoupment exceed the annual rate of 3.40% of average gross assets.

The Corporation has also entered into an administration agreement pursuant to which the Adviser furnishes the Corporation with office facilities, equipment and clerical, bookkeeping, recordkeeping and other administrative services to enable the Corporation to operate. The Corporation has agreed to reimburse the Adviser for its allocable portion of overhead and other expenses incurred by the Adviser in performing its obligations under the administration agreement. To the extent that the Adviser outsources any of its functions, the Corporation will pay the fees associated with such functions on a direct basis without profit to the Adviser. In no event, however, will the Corporation reimburse the Adviser under the administration agreement in an amount that exceeds an annual rate of 0.4% of the Corporation's gross assets, including cash and cash equivalents and assets purchased with borrowed funds.

The Adviser has entered into a Services Agreement with Skyview Group ("Skyview") pursuant to which the Adviser will receive administrative and operational support services to enable it to provide the required advisory services to the Corporation.

Certain Skyview personnel became dual-employees of NexPoint Services, Inc., a wholly-owned subsidiary of the Adviser. The same services are being performed by the dual-employees. The Adviser, and not the Corporation, will compensate all Adviser, Skyview, and dual-employee personnel who provide services to the Corporation.

In the future, the Corporation may engage the Adviser or certain of its affiliates to provide services other than those discussed above. Any arrangements would be subject to approval by the Board prior to the Adviser or its affiliates being engaged to provide services to the Corporation.

**Information About the Independent Registered Public Accounting Firm**

Cohen & Company, Ltd. ("Cohen"), an independent registered public accounting firm located at 1350 Euclid Avenue, Suite 800, Cleveland, OH 44115, currently serves as the independent registered public accounting firm for the Corporation. Representative(s) of Cohen will not attend the Annual Meeting, but Cohen has been given the opportunity to make a statement if they desire to do so and will be available should any matter arise requiring their presence. After reviewing the Corporation's audited financial statements for the fiscal year ended December 31, 2024, the Corporation's Audit Committee recommended to the Corporation's Board that such statements be included in the Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2024. A copy of the Audit Committee's report appears below.

**Independent Registered Public Accounting Firm Fees and Services**

The following table presents fees for professional services rendered by Cohen for the Corporation's fiscal years ended December 31, 2024 and 2023. One hundred percent (100%) of all services provided by Cohen were pre-approved and no fees were subject to pre-approval by the Audit Committee pursuant to Rule 2-01(c)(7)(i)(C) of Regulation S-X. The audit services are approved by the Audit Committee pursuant to an audit engagement letter, and, in accordance with the Corporation's pre-approval policies and procedures, the Audit Committee of the Corporation must pre-approve all non-audit services provided by Cohen, and all non-audit services provided by Cohen to the Adviser, or any entity controlling, controlled by, or under common control with the Adviser that provides ongoing services to the Corporation that are related to the operations and financial reporting of the Corporation. In some circumstances, when certain services were not recognized at the time of the engagement to be non-audit services, the pre-approval requirement may be waived if the aggregate amount of the fees for such non-audit services constitutes less than five percent of the total amount of revenues paid to Cohen by the Corporation during the fiscal year in which the non-audit services are provided. Cohen provides permitted non-audit services to certain entities controlling, controlled by or under common control with the Adviser that provide ongoing services to the Corporation.

| | Fiscal Year Ended December 31, 2024 | | Fiscal Year Ended December 31, 2023 | |
|---|---|---|---|---|
| Audit Fees paid by the Corporation | $ | 135,000 | $ | 135,000 |
| Audit-Related Fees paid by the Corporation | $ | 31,500 | $ | 31,500 |
| Tax Fees paid by the Corporation | $ | 15,500 | $ | 15,500 |
| All Other Fees paid by the Corporation | $ | 0 | $ | 0 |
| Total Fees | $ | 182,000 | $ | 182,000 |

***Audit Fees.*** Audit fees consist of fees billed for professional services rendered for the audit of the Corporation's year-end financial statements and reviews of the interim financial statements included in quarterly reports and services that are normally provided by the independent registered public accounting firm in connection with statutory and regulatory filings. These services also include the required audits of the Corporation's internal controls over financial reporting.

***Audit-Related Fees.*** Audit-related fees consist of fees billed for assurance and related services that are reasonably related to the performance of the audit or review of the Corporation's financial statements and are not reported under "Audit Fees." These services include attestation services that are not required by statute or regulation, consultations concerning financial accounting and reporting standards, and fees related to requests for documentation and information from regulatory and other government agencies.

***Tax Fees.*** Tax fees consist of fees billed for professional services for tax compliance. These services include assistance regarding federal, state, and local tax compliance.

***All Other Fees***. All other fees include fees for products and services other than the services reported above.

**Report of the Audit Committee**[(1)]

The following is the report of the Audit Committee (the "Committee") of NexPoint Capital, Inc. (the "Corporation") with respect to the Corporation's audited financial statements for the fiscal year ended December 31, 2024.

The Committee oversees the Corporation's accounting and financial reporting processes and the audits of the Corporation's financial statements. Management is responsible for the preparation, presentation and integrity of the Corporation's financial statements, the Corporation's accounting and financial and reporting principles, and internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The Committee reviewed the audited financial statements in the Corporation's annual report on Form 10-K for the fiscal year ended December 31, 2024 with management and discussed the quality of the accounting principles, the reasonableness of significant judgments and the clarity of disclosures in the financial statements.

The Committee has considered and discussed the above-described December 31, 2024 audited financial statements with management and with Cohen. The Committee has also discussed with Cohen the matters required to be discussed by the statement on Auditing Standards No. 1301, as amended (AICPA, Professional Standards, Vol. 1. AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T, *The Auditor's Communication With Those Charged With Governance*. The Committee reviewed with Cohen, who is responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgment as to the quality, not just the acceptability, of the Corporation's accounting principles and such other matters as are required to be discussed with the Committee

(1) The material in this report is not "soliciting material," is not deemed "filed" with the SEC, and is not to be incorporated by reference into any filing of the Corporation under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.

under generally accepted auditing standards. Finally, the Committee reviewed the written disclosures and the letters from Cohen required by PCAOB Rule 3526, *Communication with Audit Committees Concerning Independence*, as currently in effect, has considered whether the provision of other non-audit services by Cohen to the Corporation are compatible with maintaining Cohen's independence, and has discussed with Cohen its independence of the Corporation.

The Committee discussed with Cohen the overall scope and plans for the audit. The Committee met with Cohen to discuss the results of their audit, their evaluations of the Corporation's internal controls and the overall quality of the Corporation's financial reporting.

Based upon the reports and discussions described in this report, and subject to the limitations on the role and responsibilities of the Committee referred to in this proxy statement and in the Committee's Charter, the Committee recommended to the Board (and the Board has approved) that the Corporation's audited financial statements be included in the Corporation's annual report on Form 10-K for the fiscal year ended December 31, 2024 and filed with the SEC.

Stockholders are reminded, however, that the members of the Committee are not professionally engaged in the practice of auditing or accounting. Members of the Committee rely, without independent verification, on the information provided to them and on the representations made by management and Cohen. Accordingly, the Committee's oversight does not provide an independent basis to determine that management has maintained appropriate accounting and financial reporting principles or appropriate internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. Furthermore, the Committee's considerations and discussions, referred to above, do not assure that the audit of the Corporation's financial statements has been carried out in accordance with the standards of the PCAOB, that the financial statements are presented in conformity with accounting principles generally accepted in the United States of America or that the Corporation's independent registered public accounting firm is, in fact, "independent."

Bryan A. Ward, Committee Chair
Dr. Bob Froehlich, Committee Member
Ethan Powell, Committee Member
Dorri McWhorter, Committee Member

## OTHER MATTERS TO COME BEFORE THE ANNUAL MEETING

The Directors do not intend to present any other business at the Annual Meeting nor are they aware that any stockholder intends to do so. If, however, any other matters are properly brought before the Annual Meeting, the persons named in the proxy will vote thereon in accordance with their judgment.

## ADDITIONAL INFORMATION

**Stockholder Proposals**

The Corporation expects that the 2026 Annual Meeting of Stockholders will be held in June 2026, but the exact date, time and location of such meeting have yet to be determined. Proposals to be included in the proxy statement for the 2026 Annual Meeting must be submitted by eligible stockholders who have complied with the relevant regulations of the SEC and received no later than January 7, 2026. In addition, the Corporation's bylaws contain an advance notice provision requiring that, if a stockholder's proposal, including nomination of a Director, is brought before the next annual meeting of the Corporation's stockholders, such stockholder must provide timely notice thereof in writing addressed to Stephanie Vitiello, Secretary, c/o NexPoint Capital, Inc., 300 Crescent Court, Suite 700, Dallas, Texas 75201. Notices of intention to present proposals, including nomination of a Director, at the 2026 Annual Meeting must be received by the Corporation between January 7,

2026 and 5:00 p.m. Central Time on February 6, 2026. The submission of a proposal does not guarantee its inclusion in the Corporation's proxy statement or presentation at the 2026 Annual Meeting of the Stockholders unless certain securities law requirements are met. The Corporation reserves the right to reject, rule out of order, or to take other appropriate action with respect to any proposal that does not comply with these and other applicable requirements. Proxies solicited by the Corporation will confer discretionary voting authority with respect to these proposals if the proposals are not received by the Corporation, in good order and complying with all applicable legal requirements, by February 6, 2026, and may confer discretionary voting authority with respect to proposals received before such date, in each case subject to SEC rules governing the exercise of this authority.

**Delivery Requirements**

The SEC has adopted rules that permit companies and intermediaries such as brokers to satisfy delivery requirements for proxy statements with respect to two or more stockholders sharing the same address by delivering a single proxy statement or Notice of Internet Availability of Proxy Materials ("Notice") addressed to those stockholders or by sending separate Notices for each household account in a single envelope. This process, which is commonly referred to as "householding," potentially provides extra convenience for stockholders and cost savings for companies. The Corporation and some brokers household proxy materials or Notices, delivering a single proxy statement or Notice to multiple stockholders sharing an address unless contrary instructions have been received from the affected stockholders. Once a stockholder has received notice from a broker or the Corporation that they will be householding materials to the stockholder's address, householding will continue until the stockholder is notified otherwise or until the stockholder revokes consent. If a stockholder does not want Corporation mailings consolidated and would prefer to receive separate mailings at any time in the future, the stockholder should call the Corporation at (844) 485-9167 or write the Corporation c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 and the Corporation will furnish separate mailings, in accordance with instructions.

**COPIES OF THE CORPORATION'S ANNUAL REPORT DATED DECEMBER 31, 2024 TO STOCKHOLDERS ARE AVAILABLE UPON REQUEST, WITHOUT CHARGE, BY WRITING TO EQ FUND SOLUTIONS, LLC AT EQ FUND SOLUTIONS, LLC, ATTN: NEXPOINT 20589 FULFILLMENT, 55 CHALLENGER ROAD, RIDGEFIELD PARK, NEW JERSEY 07660, BY CALLING (866) 796-1292, OR BY SENDING AN E-MAIL TO CORPORATESERVICES@EQUINITI.COM, USING SUBJECT LINE: NEXPOINT 20589 FULFILLMENT.**

**Communications with Directors**

Stockholders of the Corporation who wish to communicate with the Directors (or with an individual Director) should send communications to the attention of Stephanie Vitiello, Secretary and Chief Compliance Officer, c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201, and all communications will be directed to the Director or Directors indicated in the communication or, if no Director or Directors are indicated, to all Directors.

**It is important that proxies be returned promptly. You are urged to complete and sign the enclosed proxy card and return it promptly in the enclosed envelope, which needs no postage if mailed in the United States.**

Dallas, Texas
May 7, 2025

NEXPOINT ADVISORS

**PROXY CARD**

YOUR VOTE IS IMPORTANT NO MATTER HOW MANY SHARES YOU OWN. **PLEASE CAST YOUR PROXY VOTE *TODAY!***

**SIGN, DATE** AND **VOTE** ON THE REVERSE SIDE

**PROXY VOTING OPTIONS**

1. **MAIL** your signed and voted proxy back in the postage paid envelope provided
2. **ONLINE** at **vote.proxyonline.com** using your proxy control number found below
3. By **IVR** when you call (888) 227-9349 (toll-free) to reach an automated touchtone voting line
4. By **PHONE** with a live operator when you call (866)-796-1292 (toll-free) Monday through Friday 9 a.m. to 10 p.m. Eastern time

**CONTROL NUMBER**

## NEXPOINT CAPITAL, INC.

PROXY FOR AN ANNUAL MEETING OF STOCKHOLDERS TO BE HELD ON JUNE 16, 2025

The undersigned holder of shares of NexPoint Capital, Inc., a Delaware corporation (the "Corporation"), revoking prior proxies, hereby appoints Stephanie Vitiello and Will Mabry, as attorneys-in-fact and proxies of the undersigned, granted in connection with the voting of the shares subject hereto. Each of them, with full power of substitution, are entitled to vote shares held in the name of the undersigned as of the record date at the Annual Meeting of Stockholders of NexPoint Capital, Inc. at 300 Crescent Court, Suite 700, Dallas, Texas 75201 on June 16, 2025, at 8:15 a.m. Central Time (the "Annual Meeting"), or at any adjournment or postponement thereof, upon the Proposal described in the Notice of Meeting and accompanying Proxy Statement. The undersigned acknowledges receiving the Notice of Meeting and accompanying Proxy Statement.

**Do you have questions?**
If you have any questions about how to vote your proxy or about the meeting in general, please call toll-free (866) 796-1292. Representatives are available to assist you Monday through Friday 9 a.m. to 10 p.m. Eastern Time.

**IMPORTANT NOTICE REGARDING AVAILABILITY OF PROXY MATERIALS FOR THE ANNUAL MEETING OF STOCKHOLDERS TO BE HELD JUNE 16, 2025:**

**The proxy statement is available online at:** https://vote.proxyonline.com/nexpoint/docs/bdc.pdf

**NEXPOINT CAPITAL, INC.**

## PROXY CARD

**YOUR SIGNATURE IS REQUIRED FOR YOUR VOTE TO BE COUNTED.** The signer(s) acknowledge(s) receipt of this Proxy Statement of the Board of Directors. Your signature(s) on this should be exactly as your name(s) appear on this Proxy (reverse side). If the shares are held jointly, each holder should sign this Proxy. Attorneys-in-fact, executors, administrators, trustees or guardians should indicate the full title and capacity in which they are signing.

SIGNATURE (AND TITLE IF APPLICABLE) DATE

SIGNATURE (IF HELD JOINTLY) DATE

**This proxy is solicited on behalf of the Corporation's Board of Directors.** The Proposal has been unanimously approved by the Board of Directors and recommended for approval by stockholders. When properly executed, this proxy will be voted as indicated or "FOR" the proposal if no choice is indicated. The proxy will be voted in accordance with the proxy holders' best judgment as to any other matters that may arise at the Annual Meeting.

**THE BOARD OF DIRECTORS, INCLUDING EACH OF THE INDEPENDENT DIRECTORS, UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" THE ELECTION OF THE NOMINEES AS A DIRECTOR.**

TO VOTE, MARK CIRCLES BELOW IN BLUE OR BLACK INK AS FOLLOWS. Example: ●

**PROPOSAL(S):**

1. To elect each of Ethan Powell and Bryan A. Ward as a Class I Director of the Corporation to serve for a three-year term expiring at the 2028 Annual Meeting of Stockholders or until his successor is duly elected and qualifies (the "Proposal"); and

| | FOR | WITHHOLD |
|---|---|---|
| 1.1 Ethan Powell | ○ | ○ |
| 1.2 Bryan A. Ward | ○ | ○ |

2. To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

**THANK YOU FOR VOTING**

**CLO HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE DIRECTORS OF THE COMPANY**

**MADE ON 12th May 2025**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions.

1. **APPROVAL OF ENHANCED RETAINERS FOR LEGAL COUNSEL & SERVICE PROVIDERS, EXECUTION OF AMENDED DIRECTOR'S SERVICES AGREEMENT AND PREPAYMENT OF CERTAIN OBLIGATIONS.**

1.1 **NOTED THAT:**

(a) On 6th May 2025, Charitable DAF HoldCo, Ltd. (**"DAF"**) was placed into Court Supervised liquidation in the Grand Court of the Cayman Islands with representatives of Grant Thornton appointed as Joint Official Liquidators (**"JOLs"**).

(b) The JOLs were appointed by certain participating shareholders in the DAF which are financially backed by James Dondero (**"JD Shareholders"**) and whose stated aim, as outlined in affidavit evidence from Julie Diaz and James Donero, is to seek to gain control of assets which were either directly or indirectly owned by the DAF until the DAF redeemed its interests in CDMCFAD LLC (**"CMD"**).

(c) Grant Thornton, since their appointment, have issued certain notices to CMD asset holding entities and are actively seeking, at the JD Shareholders' behest, to attempt to gain control of those assets or, at the very least, there is a distinct possibility that the JOLs may seek interim injunctive relief in the US and/or Cayman Islands in order to take control.

(d) In the event CMD's asset holding entities are even temporarily injuncted, it could cause disruption to the Company and the asset holding entities' ability to manage assets and pay for its defence in the liquidation and other proceedings.

(e) [redacted]

(f) The Director Paul Murphy, an attorney with over 20 years' of experience in England and the Cayman Islands, and who has knowledge of bankruptcy and insolvency proceedings in the USA, is also aware that service providers and attorneys will customarily request enhanced retainers to offset the risk that key service providers will be paid and companies and directors will be able to fund any proceedings.

(g) Finally, the Company and asset owning entities have various financial obligations to the Directors.

If the assets of these companies are frozen, it is likely to take considerable time to have the injunctions overturned and, in circumstances where:

a. the Directors have acted upon the advice of US and Cayman Islands counsel in restructuring the DAF;

b. believe the steps they have undertaken are lawful and consistent with protecting the charitable interests of CMD and protecting the assets from James Dondero and JD Shareholders[1]; and

c. the risk profile and litigation management the Directors must now face as part of the liquidation and asset protection strategy,

the Directors resolve as follows:

**1.2** **IT IS RESOLVED** by unanimous written resolution that:

(a) The Directors authorize and approve the payment of enhanced retainers to legal counsel and other service providers.

(b) Paul Murphy's amended director's services agreement dated 27th March 2025 be approved and executed by the Company and be binding on other companies identified in that agreement.

(c) Paul Murphy's basic compensation payable pursuant to any agreement for his professional services be prepaid up to the end of 2025.

(d) Mark Patrick be paid a discretionary bonus for the year 2025 in the amount of two thirds his base compensation with the provision that if the compensation committee determines that a discretionary bonus was not merited for the year 2025, any such amount is due and repayable by Mark Patrick which may be offset against any future obligations to Mark Patrick.

Executed by the Directors comprising the entire Board of Directors of the Company:

**BY** ______________________________
Paul Murphy - Director

CHARITABLE DAF HOLDCO, LTD.

**BY** ______________________________
Mark Patrick - Director

CHARITABLE DAF HOLDCO, LTD.

[1] Of note, James Dondero has findings of fraud and vexatious litigation made against him including an application by UBS to proceed to summary judgment in a $1b fraud claim.

**CAUSE NO. ____________________**

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,**<br><br>*Plaintiffs*,<br><br>**v.**<br><br>**MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd.,**<br><br>*Defendants.* | **IN THE TEXAS BUSINESS COURT**<br><br>**1ST DIVISION**<br><br>**DALLAS, TEXAS** |

**PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**

**TO THE HONORABLE JUDGE OF SAID COURT:** The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (collectively, the "Plaintiffs" or "Supporting Organizations") file this Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Application for Appointment of Receiver, and in support thereof, respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1.1 Defendant, Mark Patrick, through a host of corporate manipulations, took over $270 million in cash and assets that supported some of the most important community-based

charities in the country. In Patrick's own testimony from just last Wednesday, June 25th, the Supporting Organizations, plaintiffs here, were left with "nothing."[1]

1.2 Through the mechanism of Charitable DAF GP, LLC (organized in Delaware) and later via a secretly incorporated entity, CDH GP, Ltd., Mark Patrick held the sole control position of what was a $270 million charitable fund (Charitable DAF Fund, LP) that four charities and the Supporting Organizations relied on to perform vital and sustained philanthropic work in specific communities in the United States. Patrick flagrantly violated both his express and implied fiduciary duties to the Supporting Organizations. He did so in order to redirect the fund's beneficial ownership to a brand-new sham charitable organization controlled by him, DFW Charitable Foundation. These actions come against a backdrop and pattern of sustained self-aggrandizement by Patrick using the fund's resources and his technical authority over them. If the Defendants here are not immediately prevented from taking further adverse actions, then placed into receivership and subjected to judicial scrutiny, the Plaintiffs will be cut off from the lifeblood of their charitable work by the very person whose duty was to act in their interests. Accordingly, Plaintiffs seek a Temporary Restraining Order and Temporary Injunction freezing the funds, followed by the appointment of a Receiver over the funds and the organization holding them.

## II. DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1 Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure. Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

[1] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200)

2.2 Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III. PARTIES

3.1 **The Highland Dallas Foundation, Inc. ("HDF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HDF provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of public needs.

3.2 **The Highland Kansas City Foundation, Inc. ("HKCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HKCF provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $7 billion in in charitable grants that support a broad range of public needs.

3.3 **The Highland Santa Barbara Foundation, Inc. ("HSBF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HSBF provides funding to the Santa Barbara Foundation, established in 1928, that supports a broad range of public needs.

3.4 **DFW Charitable Foundation ("DFWCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. It was organized on December 9, 2024, with Defendant Mark Patrick as DFWCF's sole member. It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes. DFWCF is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254. DFWCF maintains a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, where it may be served with process.

3.5 **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Fund structure, as explained more thoroughly below. Patrick resides and may be served with process at 6716 Glenhurst Drive, Dallas, Texas 75254, or served anywhere he may be found.

3.6 **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at 6716 Glenhurst Drive, Dallas, Texas 75254. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3.7 **CDH GP, Ltd**. is a Cayman Island limited company with its registered office at Campbells Corporate Services Limited, Floor 4 Willow House, Cricket Square, Grand Cayman Ky1-9010. It may be served with process through Patrick, its 100% owner and sole director, at 6716 Glenhurst Drive, Dallas, Texas 75254, or anywhere he may be found.

3.8 **CHARITABLE DAF GP, LLC** is a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## IV. JURISDICTION AND VENUE

4.1 Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and DAF HoldCo, Ltd;

- and is an action by an owner of an organization, namely the Supporting Organizations as participating and beneficial owners of DAF HoldCo, Ltd and thereby Charitable DAF, L.P., and is brought against a controlling person and managerial official of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFWCF, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF, GP, LLC's, and CDH GP, Ltd's obligations in the capacity of a controlling person and managerial official of DAF HoldCo, Ltd and Charitable DAF, L.P.;
- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Supporting Organizations as a controlling owner of DAF HoldCo, Ltd, CDMCFAD, LLC, and Charitable DAF, L.P., DFW Charitable Foundation by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith.

4.2 The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3 The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4 Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident,

Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition. Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas. Defendants have also consented to the jurisdiction of Texas courts.

4.5 Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas. On information and belief, DFWCF, CDH GP, Ltd. and CDMCFAD are headquartered in Dallas County. Dallas County is within the 1st Division of the Texas Business Court.

## V. FACTUAL BACKGROUND

### A. *The Fund Structure*

5.1 James Dondero was the President of Highland Capital Management, L.P. ("**Highland**"), an SEC registered investment advisor. At Mr. Dondero's direction, in 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States.

5.2 To that end, in 2011, "Charitable DAF Fund, L.P. ("**Charitable DAF Fund**") was formed to hold the donated assets.

5.3 The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4 At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, Ltd ("**Charitable DAF HoldCo**"), a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5 The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities and their supporting organizations in California, Kansas, and Texas. Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo. The four Supporting Organization held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the four Supporting Organizations owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Supporting Organizations are the Plaintiffs in this Lawsuit.

5.6 In turn and as intended, the funds provided to the Plaintiff Supporting Organizations from the Charitable DAF Fund empowered them to provide funding directly to charitable foundations in three regions of the United States. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Supporting Organizations and receive regular grants for charitable work ultimately funded by Charitable DAF Fund.

5.7 Since the Charitable DAF Fund's inception, the Supporting Organizations have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Supporting Organizations and the charitable organizations perform irreplaceable philanthropic work in their respective communities, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

**B.** ***Control of the Fund***

5.8 The founders of the Charitable DAF Fund and of Charitable DAF HoldCo wanted to ensure that the fund assets were professionally managed by experts. So, although the Supporting Organizations were the sole beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it, management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those organizations but rather in "Management Shares," with general partner status. These "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations.

5.9 So, the "Management Shares" exercised control over the assets and over the operations of Charitable DAF HoldCo, even though they conveyed no economic benefit. In the interest of efficient management, the Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the "**Control Position**." The Control Position was therefore responsible to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of their economic beneficiaries—the "Supporting Organizations," which held their "Participating Shares." The Control Position therefore owed the

Supporting Organizations fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10 In essence, the governing documents of Charitable DAF HoldCo grant complete control of Charitable DAF Fund structure to the holder of the 100 Management Shares in Charitable DAF HoldCo. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Charitable DAF Fund structure.

5.11 The Charitable DAF Fund, however, is also expressly, separately controlled by the Control Position. Similar to control over Charitable DAF HoldCo, control over the Charitable DAF Fund is separate from the beneficial economic ownership of the Charitable DAF Fund (which belongs entirely to the Supporting Organizations). Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC[2] (the "**Delaware GP**"). The Delaware GP was the managing general partner in the Charitable DAF Fund.

5.12 The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund, dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. The ARLPA makes it clear the Control Position is to exercise his powers for the sole benefit of the Supporting Organizations.

5.13 For example, the Preamble to the ARLPA states: "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code

[2] The Charitable DAF GP, LLC, held all the general partnership shares in Charitable DAF Fund, which provided all management control over the Charitable DAF Fund, but conveyed no beneficial economic interest.

of 1986, as amended and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein[.]"

5.14 Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*."[3]

5.15 Section 1.6 (Powers) likewise emphasizes: "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*."[4]

5.16 The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Indirect Charitable Owners" and contemplates the engagement of investment (and other service) advisors to achieve this. In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support. The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Supporting Organizations.

5.17 Grant Scott was initially selected for the Control Position. Mr. Scott was a longtime friend of Mr. Dondero's and a lawyer in North Carolina. Mr. Dondero knew and trusted Mr. Scott.

---

[3] Emphasis added.
[4] Emphasis added.

Mr. Scott effectively served the Supporting Organizations' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of decade. During this time, the Supporting Organizations and their respective charitable foundations made great strides in creating philanthropic, and charitable, work that was efficient, that was steady and reliable, and that grew and built on their progress year after year.

**C. *Mark Patrick's Assumption of Control***

5.18 Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

5.19 Mark Patrick, a tax attorney and employee of Mr. Dondero who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested to Mr. Scott and Mr. Dondero that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund. At the time, Patrick was an employee of Mr. Dondero's enterprises and was serving as Mr. Dondero's attorney and Mr. Dondero had no objection to Mr. Scott transferring the Control Position to Patrick. As a result of his attorney and employee status, Mr. Patrick owed significant fiduciary duties to Mr. Dondero's entities and to the Charitable DAF Fund structure—fiduciary duties that he has violated in a series of self-serving and self-dealing transactions.

5.20 On March 25, 2021, Mr. Scott resigned and appointed Patrick as director of DAF HoldCo, transferring all his management shares and membership interest to Patrick for nominal consideration. Patrick therefore assumed the Control Position from that date. Patrick then hired

Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

5.21 At the time Patrick assumed the Control Position, he was employed at Skyview Partners, a service organization that provided support primarily to Mr. Dondero and entities in which Mr. Dondero had an interest. As an employee of Skyview, he owed fiduciary duties to his employer.

**D. *Patrick's Breaches of Fiduciary Duty***

5.22 In 2023, while still employed by Dondero entities, and as the sole fiduciary for the Charitable DAF Fund and DAF HoldCo, Patrick initiated a two-year pattern of malfeasance all culminating in his current effort to abscond with $270 million. His initial small infidelities quickly blossomed into a brazen, fraudulent play for the Charitable DAF Fund and its $270 million in holdings, putting at risk the charitable works supported by the Supporting Organizations.

**E. *Undisclosed Self-Dealing***

5.23 In June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity, which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

**F. *Attempted Fraudulent Kickback Scheme***

5.24 In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that

the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.25 Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.26 Mr. Dondero ensured that Supporting Organizations were also informed about Patrick's kickback scheme. Despite significant concern, the Supporting Organizations had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

**G. *Insider Trading***

5.27 In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview to advise The Dallas Foundation to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

5.28 Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.29 Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

**H. *Financial Irregularities and Lack of Transparency***

5.30 After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Supporting Organizations were essentially cut off from any view into the financial transactions and soundness of the fund. As of September 2024, the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Supporting Organizations and ultimately their supported Charities.

5.31 But a review of the Charitable DAF Fund's last accessible financial records showed dramatic and unexplained increases in expenditures:

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).
- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).
- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.32 Despite repeated requests from the Supporting Organizations and their counsel and counsel for the Charitable DAF Fund, Patrick and Murphy have ignored and refused to provide requested financial information or explanations for these dramatic expenditure increases.

5.33 Patrick must have personally benefited from the dramatic increases in director's fees and, given Patrick's prior attempt to implement a kickback scheme through Mr. Cronin, the other remarkable increases in expenses raise deep concerns about potential self-dealing.

**I. *Patrick Ignores the Supporting Organizations Concerns***

5.34 On November 11, 2024, given what the Supporting Organizations already knew, the three major Supporting Organizations drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[5]

5.35 The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."[6]

5.36 Patrick and Murphy never responded to the letter, other than a threat that if the Supporting Organizations did not withdraw it, then Patrick and Murphy would embark on an effort at the Internal Revenue Service to revoke the Supporting Organizations' charitable status.

5.37 In January 2025, the Supporting Organizations demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. Murphy responded via email to this request stating that he and Patrick would "present directly to the foundations/supporting organi[z]ations" to address some of the concerns in the No Confidence Letter. Murphy never did.[7]

---

[5] *See* Ex. 4-A, Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)
[6] *Id.*
[7] *See* Ex. 4-B, Email chain ending Jan. 23, 2025 (Appx. Pg. 171)

5.38 Counsel for the Supporting Organizations and for the Charitable DAF Fund exchanged further communications, but Patrick, Murphy, and the Charitable DAF Fund's counsel never provided answers and information in response to the Supporting Organizations' basic requests. Instead, they wrapped all their future communications in half-truths and subterfuge.[8] At the same time, they offered the Supporting Organizations vague assurances that all their maneuvers were to improve the structure, focus, and performance of the fund, for the benefit of the Supporting Organizations.

5.39 The Charitable DAF Fund's counsel promised a meeting to address the Supporting Organizations' concerns, but after the Supporting Organizations' counsel suggested dates, the Charitable DAF Fund and its counsel delayed and delayed until it eventually went silent.[9]

5.40 In the interim, Patrick accelerated his multi-year fraud.

**J. *Dilution Scheme and Liquidation Maneuver***

5.41 Between December 2024 and the present, Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund, and alienate those same assets entirely away from them. The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets. In short, he stole them.

5.42 In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself in a brazen act of self-dealing. He never notified the Supporting Organizations of this massive

[8] *See* Exs. 4-A, Ltr. of Feb. 14, 2025 & Ex. 4-C Ltr. of Feb. 27, 2025 (Appx. Pg. 162-182).
[9] *See* Ex. 4-C, Email chain ending April 9, 2025 (Appx Pg. 179-182).

reorganization of the Charitable DAF Fund. Indeed, the Supporting Organizations found out about this monumental reorganization only when Patrick and his counsel had to admit it in a Cayman court as part of the Supporting Organization's successful effort to appoint Cayman Liquidators to unravel Patrick's fraud in that jurisdiction.

5.43 In a move that would make most fraudsters blanch, and certainly continued to violate all his fiduciary duties, on December 9, 2024, Patrick formed Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and its registered address was Patrick's home. Patrick then issued his charity a fifty-one percent (51%) interest in the charitable assets. In essence, Patrick awarded himself the ability to distribute over half of the Charitable DAF Fund's $270 million in economic interest to his own entity, from his living room in Dallas.

5.44 Three days later, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.45 In secret, and without notice to the Supporting Organizations, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100 percent of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100 percent of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick ensured a different and new entity (CDMCFAD) held Charitable DAF Fund.

5.46 Patrick's fraud continued to evolve in February 2025. On February 7, 2025, again without notice to the Supporting Organizations, DAF HoldCo (in an *ultra vires act)* allotted 318

participating shares to DFWCF, the Sham Charity controlled by Patrick. This sham dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[10] interest was diluted from 1.639% to 0.80%. Said another way, Patrick absconded with over half of the participating interest of the Supporting Organizations and other charitable funds. Before, during, and after this action—and at all times it was contemplated and executed—Patrick and Charitable DAF HoldCo still owed fiduciary duties to the Supporting Organizations.

5.47 In February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Patrick's complete control of the assets of Charitable DAF Fund.

5.48 On March 27, 2025, Patrick caused CDMCFAD (the holder of $270 million in assets) to issue shares to the Sham Charity, *and only to the Sham Charity*. He issued no shares in CDMCFAD to the Supporting Organizations. His fraudulent scam was nearly complete. Now, Patrick's Sham Charity controlled all the direct economic interest in the entity Patrick had inserted between Charitable DAF HoldCo and the assets in Charitable DAF Fund, and the Supporting Organizations were left out in the cold.

5.49 On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6

[10] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

million, a ridiculous transaction bereft of reasonably equivalent value.[11] After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[12]

5.50 Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Patrick allegedly distributed a paltry portion of $1.6 million to the Supporting Organizations, receipt of those funds has yet to be verified. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Supporting Organizations' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Supporting Organizations.

**K. *The Cayman Island Proceedings***

5.51 On April 2, 2025, again unbeknownst to the Supporting Organizations, Patrick placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.52 But the Supporting Organizations already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Supporting Organizations well-

---

[11] *See* Ex. 3, p. 5, Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[12] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, CaseNo. 19-34054-sgj-11; (Appx. Pg. 200).

founded concerns including their expression of no-confidence; (3) engaged in a pattern of fraudulent self-dealing; (4) taken all participating ownership from the Supporting Organizations without any approval or appropriate compensation; and (5) and restructured the underlying funds. This was enough to convince the Supporting Organizations to take action.

5.53 The Supporting Organizations filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Supporting Organizations would not have learned about Patrick's voluntary liquidation.

5.54 Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFWCF and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.55 The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[13]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

[13] Ex. 8, Supervision Order (Appx. Pg. 244-246)

> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:
>
> a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;
>
> b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and
>
> c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.56 While the Cayman Islands-appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick, DFWCF, and CDMCFAD (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the Charitable DAF Fund and DAF HoldCo. In the meantime, the rightful beneficial owners, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the Charitable DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that rely on funding from the Charitable DAF Fund.

## VI. CAUSES OF ACTION

### Count I - Breach of Fiduciary Duty Against Patrick, CDH GP, Ltd., and Charitable DAF GP, LLC

6.1 Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

6.2 In "a limited partnership, the general partner stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of a trust." *Hughes v. St. David's Support Corp.,* 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (There "has never been any serious doubt that

the general partner of a Delaware limited partnership owes fiduciary duties."). Likewise, under traditional principles of equity, and various statutes generally hold that a manager of an LLC would qualify as a fiduciary of that LLC and its members. *Auriga Capital Corp. v. Gatz Properties,* 40 A.3d 839, 850 (Del. Ch. 2012), judgment entered sub nom. *Auriga Capital Corp. v. Gatz Properties, LLC* (Del. Ch. 2012), aff'd, 59 A.3d 1206 (Del. 2012); *Davis v. Crawford*, 700 S.W.3d 438, 449 (Tex. App.—Eastland 2024, no pet.) ("[T]he relationship between a managing member of an LLC and a nonmanaging member is similar to that of a general partner/limited partner relationship, and that such an arrangement thereby creates a fiduciary obligation on the part of the managing member.").

6.3 By virtue of Patrick's Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, Patrick owed fiduciary duties to the Plaintiffs.

6.4 Patrick breached his fiduciary duties to the Plaintiffs by stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.5 Patrick breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.6 Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.

6.7 Patrick breached his fiduciary duty by successfully soliciting a charitable contribution ultimately from a Supporting Organization to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.8 The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support. Plaintiffs have suffered damages as a result of Patrick's breach of his fiduciary duties.

**Count II - Constructive Fraud Against Patrick**

6.9 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.10 "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied). "[I]n a claim for constructive fraud, the actor's intent is irrelevant." *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 879 (Tex. App.—El Paso 2021, pet. denied). "[C]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.*

6.11 As a fiduciary, Patrick's conduct in diluting the Plaintiffs' interests, selling assets at below-market values to undisclosed parties, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.12 Patrick injured public interests by his conduct. Plaintiffs have suffered damages as a result of Patrick's fraud.

**Count III - Unjust Enrichment Against Patrick, CDMCFAD, and DFWCF**

6.13 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.14 A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.15 Patrick and DFWCF stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.16 Patrick and DFWCF took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with DFWCF.

6.17 Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.18 Patrick and DFWCF have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damages by Patrick's unjust enrichment.

**Count IV – Conversion Against Patrick, CDMCFAD, and DFWCF**

6.19 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.20 Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the defendant refused the plaintiff's demand for return of the property. *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

6.21 The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.22 Patrick with DFWCF has unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial economic interests to Patrick's controlled entity, DFWCF.

6.23 The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which Patrick and now, DFWCF, have ignored and refused. Plaintiffs have been damages as a result of these conversions.

**Count V – Imposition of Constructive Trust Against Patrick, CDMCFAD, and DFWCF**

6.24 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.25 "A constructive trust is considered a legal fiction and is a creation of equity to prevent a wrongdoer from profiting from his wrongful acts." *In re Harding*, 563 S.W.3d 366, 372 (Tex. App.—Texarkana 2018, no pet.). "[T]o obtain a constructive trust, [a party] must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Id.* (cleaned up).

6.26 Patrick through DFWCF has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of DFWCF and Patrick.

6.27 All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

## VII. EMERGENCY APPLICATION FOR RECEIVERSHIP

7.1 Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

7.2 The Plaintiffs seek the immediate appointment of a receiver over Defendants DFWCF and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code §§ 64.001(a)(3), (7), Texas Business and Organizations Code § 11.410, and the Court's inherent equitable powers.

### A. *Texas Civil Practice & Remedies Code*

7.3 [U]nder section 64.001 of the Texas Civil Practice and Remedies Code ("**CPRC**"), a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," CPRC §§ 64.001(a)(3) or "in any case in which a receiver may be appointed under the rules of equity." CPRC §§ 64.001(a)(7); *Elliott v. Weatherman*, 396 S.W.3d 224, 228 (Tex. App.—Austin 2013, no pet.).

7.4 A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. CPRC § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5 A probable interest exists by statute in actions between partners and in actions between joint owners of property. CPRC § 64.001(a)(3).

7.6 One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM*

*Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App. – Dallas 2024, pet. denied, reh'g denied).

**B. *Texas Business and Organizations Code***

7.7 Like CPRC § 64.001, a court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." Tex. Bus. & Orgs. Code § 11.403(a)(3).

7.8 Additionally, under Section 11.410 of the Texas Business and Organizations Code ("TBOC"), a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. TBOC § 11.410(a).

**C. *Rules of Equity***

7.9 In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. The CPRC, § 64.004 makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision.

**D. *Receivership Standards Under Texas Law and Equity***

7.10 "The appointment of a receiver lies within the sound discretion of the trial court." *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.). "The appointment of a receiver, either as authorized by statute or usages of equity, will not be disturbed on appeal unless the record reveals a clear abuse of discretion." *O & G Carriers, Inc. v. Smith Energy 1986-A P'ship*, 826 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1992, no writ).

7.11 The party submitting an application for appointment of a receiver bears the burden of proof to present evidence justifying the appointment. *Furgerson v. First Nat'l Bank*, 218 S.W.2d 1019, 1020 (Tex. Civ. App. – Texarkana 1949, no writ). The party can meet that burden by submitting a sworn verification supporting the claimed grounds for the appointment, *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App. – Corpus Christi 1999, no pet.), and a court may consider oral testimony as evidence in support of an application. *See Furgerson*, 218 S.W.2d at 1020.

7.12 An application seeking a receivership pursuant to a statutory provision must allege facts that meet the elements of the provision. *Associated Bankers Credit Co. v. Meis*, 456 S.W.2d 744, 748 (Tex. Civ. App. – Corpus Christi 1970, no writ). The facts alleged in the application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.], no writ).

7.13 Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

**E. *The Supporting Organizations are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities***

7.14 The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.15 Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.16 Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure. The Plaintiffs have not received any

just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17 Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.18 Patrick dominates and controls the Receivership Entities. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.19 The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.20 The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

7.21 The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.22 The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate

the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.23 Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

**Count VI – APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP**

8.1. Plaintiffs seek immediate injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund as of the instant date of this filing, regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.2. A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." Tex. Civ. Prac. & Rem. Code § 65.011. "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties.'" *Lometa Bancshares, Inc. v. Potts*, 952 S.W.2d 631, 633 (Tex. App.-Austin 1997) (*quoting Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966)). "In cases like the present, an applicant for the writ must show (1) a probable right to

recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued." *Lometa*, 952 S.W.2d at 633 (citing Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (West 1997); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968)).

8.3. Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending. In other words, "the adequacy of an available legal remedy must be judged in the circumstances of the particular case[,]" and "[i]n such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety[.]" *Lometa*, 952 S.W.2d at 633; *see also Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters*., 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ); *Baucum v. Texam Oil Corp*., 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.4. The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

8.5. Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without

limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.6. Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Restraining Order ("**TRO**") is not granted against the Defendants. Accordingly, Plaintiffs request the Court issue a TRO that freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.7. The harm to Plaintiffs is imminent, and if the Court does not issue a TRO and injunctive relief, it will be irreparably injured, as set forth herein. Conversely, the granting of a TRO will merely require Defendants to refrain from doing anything with the funds for two weeks. If the Defendants prevail on the merits, the funds will still be available to them for their use in future. The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent immediate injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.8. The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants due to the entry of a TRO, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent

scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

8.9. A temporary restraining order is necessary to maintain the *status quo* during the pendency of this action. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("defining the status quo as "the last, actual, peaceable, non-contested status which preceded the pending controversy.") The facts above establish the required elements for Plaintiffs to obtain a TRO against Defendant, specifically: (1) a cause of action against Defendants with a probable right to relief; (2) a probable, imminent, and irreparable injury to Plaintiffs in the interim; (3) the threatened injury outweighs any damage the injunction might cause the opposing party; and (4) the injunction will not disserve the public interest. *See Butnaru v. Ford Motor Co*., 84 S.W.3d 198. 204 (Tex. 2002).

**A. *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.***

8.10. Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See Miller Paper Co. v. Roberts Paper Co*., 901 S.W.2d 593, 597 (Tex. App.— Amarillo 1995, no writ). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58; *see also Gryphon Master Fund, L.P. v. Path 1 Network Technologies, Inc*., No. 3:06 CV 0107 D, 2007 WL 1723703, at *5 (N.D. Tex., Jun. 14, 2007) (citing *Metcalfe*).

8.11. Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail

above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that forms the lifeblood of vital philanthropic efforts relied upon by key communities across the nation. The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B. *Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.***

8.12. Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above. Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *Lometa*, 952 S.W.2d at 633; see also *Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters*., 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp*., 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.13. Plaintiffs have no adequate remedy at law. Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds. These losses, as well as others which will inevitably occur if Defendants are not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seeks a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

## VIII. PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B. Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C. Require the reversal of the dilution scheme and unauthorized asset transfers;

D. Impose a constructive trust over the res of DAF HoldCo, CDMCFAD, LLC and the Charitable DAF Fund wrongfully taken from the Plaintiffs;

E. Award actual damages in an amount to be proven at trial;

F. Award exemplary damages as permitted by law;

G. Award attorneys' fees and costs;

H. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**McCarty Law PLLC**

*/s/ Darren L. McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street
Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, July 1, 2025, on all counsel or parties of record.

*/s/ Darren L. McCarty*
Darren L. McCarty

**VERIFICATION**

I, Julie Diaz, Vice President of Highland Dallas Foundation, Inc., and President of The Dallas Foundation, have read the above and foregoing Petition and the facts stated therein are true and correct to the best of my knowledge and belief.

Julie Diaz

My name is Julie Diaz, my date of birth is 3/23/64, and my address is 5711 Prestwick Lane Dallas. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Barnstable County, State of MA, on the 1 day of July, 2025

Julie Diaz

**The Business Court of Texas,**
**First Division**

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § | |
| *Plaintiffs*, | § | Cause No. _____________ |
| v. | § | |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | § | |
| *Defendants*. | § | |

**Table of Contents—Exhibits**

| Exhibit | Document | Appx. Page Nos. |
|---|---|---|
| Exhibit 1-A | DFW Charitable Foundation Formation Documents (12/9/2024) | 40-42 |
| Exhibit 1-B | CDMCFAD, LLC Formation Documents (12/12/2024) | 43 |
| Exhibit 1-C | CDH GP, Ltd. Formation Documents | 44-45 |
| Exhibit 2-A | Nov. 7, 2011, Amended and Restated Exempted Limited Partnership Agreement | 46-66 |

| | | |
|---|---|---|
| Exhibit 2-B | Jan. 19, 2025, Amended and Restated Memorandum and Articles of Association | 67-96 |
| Exhibit 3 | Sykes Affidavit Exhibit GS-I | 97-161 |
| Exhibit 4-A | Nov. 11, 2024, No Confidence Letter | 162-163 |
| Exhibit 4-B | Jan. 23-Feb. 7, 2025, Emails Julie Diaz, Mark Partick, Paul Murphy, and Michael Stockham | 164-177 |
| Exhibit 4-C | Feb 14-April 3, 2025, Letters and Emails between David Rosenberg, Paul Murphy, Michael Stockham, and Douglas Mancino | 178-182 |
| Exhibit 5 | Hearing Transcript (Patrick Testimony) | 183-209 |
| Exhibit 6 | Dondero Declaration | 210-221 |
| Exhibit 7 | Diaz Declaration | 222-243 |
| Exhibit 8 | Supervision Order | 244-246 |

EXHIBIT
1-A

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:06 PM 12/09/2024
FILED 04:06 PM 12/09/2024
SR 20244432762 - File Number 10030937

# CERTIFICATE OF INCORPORATION
# OF
# DFW CHARITABLE FOUNDATION
a nonprofit nonstock corporation

## I.

The name of the Corporation is DFW Charitable Foundation.

## II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

## III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

## IV.

A. The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person. It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B. In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

## V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

## VI.

A. No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

B. Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

**VII.**

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

**VIII.**

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

**IX.**

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

/s/ Douglas Mancino
Douglas Mancino, Incorporator

EXHIBIT
1-B

# CERTIFICATE OF FORMATION

# OF

# CDMCFAD, LLC

This Certificate of Formation of CDMCFAD, LLC (the "Company"), is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 *Del. C.* § 18-101 *et seq.*) (the "Act").

1. Name. The name of the limited liability company formed hereby is CDMCFAD, LLC.

2. Registered Office. The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

3. Registered Agent. The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation in accordance with the Act.

Name: Mark Patrick
Authorized Person

4930-4296-2948\1

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:33 AM 12/12/2024
FILED 11:33 AM 12/12/2024
SR 20244471736 - File Number 10035168

EXHIBIT
1-C

# Search Report

**Entity Name :** CDH GP, Ltd.
**Jurisdiction :** Cayman Islands
**Registration Number :** 407515
**Registration Date :** 27th February 2024
**Entity Type :** EXEMPT
**Registered Office :** CAMPBELLS CORPORATE SERVICES LIMITED
Floor 4
Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands
**Initial Subscriber:**
**Authorised Share Capital:** CI$41,000.00
**Nature of Business:** General Partner
**Financial Year End:** 31st December

**Status :** ACTIVE
**Status Date :** 27th February 2024

- INFORMATION REGARDING THE CORPORATE RECORDS AND REGISTERS ARE NOT AVAILABLE FOR PUBLIC INSPECTION
- THIS REPORT DOES NOT CONFIRM THE ENTITY IS IN GOOD STANDING

Authorisation Code : 379989138381
www.verify.gov.ky
10 February 2025

# Director Details

Entity Name: **CDH GP, LTD.**

| Director Name |
| --- |
| Mark E. Patrick |

EXHIBIT
2-A

**DATED NOVEMBER 7, 2011**

**AMENDED AND RESTATED**

**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF**

**CHARITABLE DAF FUND, LP**

---

**WARNING**

**THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY**

# TABLE OF CONTENTS


| | | PAGE |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS; COMPENSATION AND EXPENSES | 2 |
| 1.1 | Continuation | 2 |
| 1.2 | Name | 2 |
| 1.3 | Purpose and Powers | 2 |
| 1.4 | Registered Office | 2 |
| 1.5 | Partners | 2 |
| 1.6 | Powers. | 2 |
| 1.7 | Term | 3 |
| 1.8 | Admission of New Partners | 3 |
| 1.9 | Taxable Year | 3 |
| 1.10 | Liability of Partners | 3 |
| 1.11 | Limitation on Assignability of Partners' Interests. | 3 |
| 1.12 | Definitions | 4 |
| 1.13 | Service Providers | 4 |
| 1.14 | Partnership Expenses | 4 |
| 1.15 | Withdrawal of Initial Limited Partner | 5 |
| ARTICLE II | POWERS | 5 |
| 2.1 | Partnership Powers | 5 |
| 2.2 | Rights, Powers, Limitations on Liability and Indemnification of General Partner. | 6 |
| ARTICLE III | CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES | 9 |
| 3.1 | Capital Contributions. | 9 |
| 3.2 | Capital Account; Allocation of Profits and Losses. | 9 |
| ARTICLE IV | LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT | 9 |
| 4.1 | Legal Interest | 9 |
| 4.2 | Distributions. | 10 |
| 4.3 | Withdrawal | 10 |
| ARTICLE V | DURATION OF PARTNERSHIP | 10 |
| 5.1 | Termination | 10 |
| 5.2 | Winding Up | 11 |
| ARTICLE VI | MISCELLANEOUS | 11 |
| 6.1 | Tax Matters Partner | 11 |
| 6.2 | Right to Hire | 11 |
| 6.3 | Applicable Law, etc | 12 |
| 6.4 | Power of Attorney | 12 |
| 6.5 | Tax Elections Under the Internal Revenue Code | 12 |
| 6.6 | Amendments to Partnership Agreement | 12 |

6.7 Investment Representation ....................13
6.8 Notices ....................13
6.9 General Partner Determinations ....................14
6.10 Dispute Resolution ....................14
6.11 Successors and Assigns ....................16
6.12 Severability ....................16
6.13 No Third Party Rights ....................16
6.14 No Right to Partition ....................16

**AMENDED AND RESTATED**
**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF**
**CHARITABLE DAF FUND, LP**

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1) Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2) Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3) Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4) Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

## ARTICLE I
## GENERAL PROVISIONS; COMPENSATION AND EXPENSES

1.1 Continuation. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2 Name. The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3 Purpose and Powers. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 Registered Office. The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5 Partners. The name and addresses of the Partners are as follows:

| **Name** | **Address** |
|---|---|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |
| Charitable DAF HoldCo Ltd<br>(Limited Partner) | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |

1.6 Powers.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and



CONFIDENTIAL

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7 Term. The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8 Admission of New Partners. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9 Taxable Year. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10 Liability of Partners.

(a) The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b) Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11 Limitation on Assignability of Partners' Interests.

(a) A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

(b) The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12 Definitions. For the purpose of this Agreement, unless the context otherwise requires:

(a) General Partner. The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) Indirect Charitable Owners. The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(c) Limited Partner. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(d) Partner. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13 Service Providers. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14 Partnership Expenses. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

1.15 Withdrawal of Initial Limited Partner. The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

## ARTICLE II
## POWERS

2.1 Partnership Powers. The Partnership shall have the following powers:

(a) To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

(b) To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c) To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d) To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e) To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f) To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g) To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2 Rights, Powers, Limitations on Liability and Indemnification of General Partner.

(a) Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b) To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the



CONFIDENTIAL 011538 1230

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e) Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f) The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g) The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h) **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i) **<u>WAIVER OF CONSUMER RIGHTS</u>: The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j) No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person. Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k) This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

## ARTICLE III
## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1 Capital Contributions.

(a) Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2 Capital Account; Allocation of Profits and Losses.

(a) There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(b) Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(c) For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(d) To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(e) Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV
## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT

4.1 Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

4.2 Distributions.

(a) Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

(b) The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3 Withdrawal. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V
## DURATION OF PARTNERSHIP

5.1 Termination. The Partnership shall be required to be wound up and dissolved upon:

(a) the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

(b) the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c) the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2 Winding Up. Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law. Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement. The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

## ARTICLE VI
## MISCELLANEOUS

6.1 Tax Matters Partner. The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership. In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2 Right to Hire.

(a) Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

(b) Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3 Applicable Law, etc. This Limited Partnership Agreement: (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require. The term "gross negligence" and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4 Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement. This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5 Tax Elections Under the Internal Revenue Code. The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6 Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7 Investment Representation. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8 Notices. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

6.9 General Partner Determinations. Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10 Dispute Resolution. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation.

(1) Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2) The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3) The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(4) Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b) Arbitration. If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of this document will control.

(1) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the

Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5) All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6) The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11 Successors and Assigns. Subject to the limitations set forth in Section 1.11, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12 Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13 No Third Party Rights. Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14 No Right to Partition. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: ______________________
James D. Dondero
Managing Member

Witnessed By: ______________________

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: ______________________
Name: Grant Scott
Title: Director

Witnessed By: ______________________

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: ______________________
Name:
Title:

Witnessed by: ______________________

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: ______________________________
James D. Dondero
Managing Member

Witnessed By: ______________________

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: [signature]
Name: Grant Scott
Title: Director

Witnessed By: [signature] Candi L. Riggs

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: [signature]
Name: ROD PALMER
Title:

Witnessed by: [signature] Gráinne Ó Leary



CONFIDENTIAL

EXHIBIT
2-B

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

WALKERS

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100 F +1 345 949 7886 www.walkersglobal.com

REF: SSJ/VT/H0851-120776

AMER_Docs 11255406.3 H0851.120776

GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

**THE COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**OF**

# CHARITABLE DAF HOLDCO, LTD

**(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)**

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.





GENERAL REGISTRY CAYMAN ISLANDS
*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

## TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 4 |
| SHARES | 4 |
| MANAGEMENT SHARES | 5 |
| PARTICIPATING SHARES | 6 |
| MODIFICATION OF RIGHTS | 6 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |

GENERAL REGISTRY CAYMAN ISLANDS

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

THE SEAL ..... 15

DISQUALIFICATION OF DIRECTORS ..... 15

PROCEEDINGS OF DIRECTORS ..... 16

DIVIDENDS ..... 18

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ..... 18

CAPITALISATION OF RESERVES ..... 19

SHARE PREMIUM ACCOUNT ..... 20

NOTICES ..... 20

NON-RECOGNITION OF TRUSTS ..... 21

WINDING UP ..... 21

AMENDMENT OF ARTICLES OF ASSOCIATION ..... 22

CLOSING OF REGISTER OR FIXING RECORD DATE ..... 22

REGISTRATION BY WAY OF CONTINUATION ..... 22

MERGERS AND CONSOLIDATION ..... 22

DISCLOSURE ..... 23

INDEMNITY ..... 23

DISPUTE RESOLUTION ..... 24





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Law and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Law and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "**Participating Shares**" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the US Internal Revenue Code of 1986, as amended (the "**Code**") or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;





GENERAL REGISTRY CAYMAN ISLANDS
*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*



CONFIDENTIAL

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

2. Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

**SHARES**

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b) grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions,



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

12. Any Management Shares held by Grant Scott will be automatically redeemed by the Company upon his death or upon the Company receiving written notice from two board certified physicians confirming that he is of unsound mind or otherwise incapacitated ("**Automatic Redemption**").

13. If at the time of an Automatic Redemption, Grant Scott is the sole Director of the Company, such office will be automatically vacated by Grant Scott.

14. Upon an Automatic Redemption, the Company shall issue 100 Management Shares to a successor management shareholder ("**Successor Management Shareholder**") designated by James Dondero ("**Designator**"), or, if he is unable or declines to act, by an individual or individuals designated by James Dondero ("**Successor Designator**"), in either case within 15 days of the Automatic Redemption. If the Designator is:

(a) deceased and has not named a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made in accordance with the provisions of the Designator's will, or if his will contains no such provisions, by the qualified personal representative of his estate (the "**Designator's Personal Representative**"); or

(b) otherwise incapacitated and has not previously designated a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made by the Designator's attorney-in-fact appointed for such purpose, under a valid, effective power of attorney instrument (the "**Designator's Attorney**").

15. Any designation of a Successor Management Shareholder must be notified to the Company in writing and signed by either the Designator, the Successor Designator, the Designator's Personal Representative, or the Designator's Attorney, as appropriate, and accompanied by a consent to become a Shareholder signed by the Successor Management Shareholder ("**Issue Notice**"). The issue of the 100 Management Shares to the Successor Management Shareholder shall take effect upon receipt by the Company of the Issue Notice and the Register will be updated accordingly.



GENERAL REGISTRY CAYMAN ISLANDS
*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*



CONFIDENTIAL

16. The Designator may name a Successor Designator (including an individual, or a series of individuals) at any time pursuant to a written notice delivered to the Company during his lifetime or by a provision in his will. Each Successor Designator upon succeeding and replacing the Designator or a prior Successor Designator, may in the same manner as set out above, designate an individual, or a series of individuals, to succeed him as Successor Designator. In the event of a conflict between such instruments, the one bearing the latest date shall control. A Successor Designator will assume such office upon consenting to so act.

17. The Successor Management Shareholder may not be a "disqualified person" (as that term is defined in Section 4946 of the United States Internal Revenue Code of 1986, as amended), other than a foundation manager, with respect to Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., or Highland Kansas City Foundation, Inc.

18. In connection with the appointment of the Successor Management Shareholder, the Company and its registered office service provider will be entitled to rely on the advice of counsel confirming that the designation of the Successor Management Shareholder has been made in accordance with the procedures set out in these Articles.

**PARTICIPATING SHARES**

19. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

**MODIFICATION OF RIGHTS**

20. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

21. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

**CERTIFICATES**

22. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

**FRACTIONAL SHARES**

23. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

**TRANSFER OF SHARES**

24. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

25. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

26. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

27. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

28. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

**TRANSMISSION OF SHARES**

29. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

30. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

31. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

32. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

33. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

34. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

35. Subject to the Law, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

36. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

37. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

38. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

39. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

40. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

41. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

42. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

43. The Directors may, whenever they think fit, convene a general meeting of the Company.

44. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

45. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

46. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

47. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

48. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

49. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

50. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

51. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

52. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

53. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

54. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

55. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

56. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

57. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

58. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

59. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

60. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

61. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

62. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

63. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

64. On a poll votes may be given either personally or by proxy.

65. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

66. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

67. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

68. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

69. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS**

70. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

**DIRECTORS**

71. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

72. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

73. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

74. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

75. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

76. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

77. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

**ALTERNATE DIRECTOR**

78. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

79. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

**POWERS AND DUTIES OF DIRECTORS**

80. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

81. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

82. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

83. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

84. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

85. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

86. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

87. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

88. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

89. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

**THE SEAL**

90. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

91. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

92. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

93. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or






*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

94. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

95. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

96. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

97. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

98. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

99. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

GENERAL REGISTRY CAYMAN ISLANDS





Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

100. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

101. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

102. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

103. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

104. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

105. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

106. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

107. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

## DIVIDENDS

108. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

109. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

110. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

111. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

112. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

113. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

114. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

115. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

116. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

117. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

118. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

119. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

120. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

121. Subject to the Law and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares,



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

**SHARE PREMIUM ACCOUNT**

122. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

123. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

**NOTICES**

124. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

125. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

126. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

127. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

128. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

129. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

130. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such

GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

133. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

134. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

135. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

136. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

**REGISTRATION BY WAY OF CONTINUATION**

137. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

**MERGERS AND CONSOLIDATION**

138. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

## DISCLOSURE

139. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

## INDEMNITY

140. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or Gross Negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

141. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

142. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

143. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

144. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

**DISPUTE RESOLUTION**

145. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in these Articles and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



CONFIDENTIAL

reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

EXHIBIT
3

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 99 OF 2025 (JAJ)**

| | |
|---|---|
| **IN THE MATTER OF:** | **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)** |
| **AND IN THE MATTER OF:** | **CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)** |
| **BETWEEN** | **(1) THE HIGHLAND DALLAS FOUNDATION, INC.**<br>**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**<br>**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**<br>**(4) THE HCMLP CHARITABLE FUND** |

**PLAINTIFFS**

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

**DEFENDANT**

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 20**26
**Date:** 27 April 2025.

**NOTARY PUBLIC**

JOHNSTONE
LAW

24 April 2025

Charitable DAF HoldCo Ltd
c/o Campbells Corporate Services Limited
Floor 4, Willow House, Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

Dear Sir or Madam

**In the matter of Charitable DAF HoldCo Ltd | FSD No. 99 of 2025 | Service of Documents**

We act for the participating shareholders of the Charitable DAF HoldCo Ltd (***Company***), namely: (i) Highland Dallas Foundation, Inc., (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) HCMLP Charitable Fund (***Supporting Organisations***) which presented a winding up petition in relation to the Company (***Petition***), and a summons dated 10 April 2025 (***Summons***).

The Summons is listed for hearing before Justice Asif at 2pm on 28 April 2025.

Please find enclosed by way of service copies of the following:

1. The Petition (including Notice of Hearing)
2. The Summons
3. Affirmation of Julie Diaz and Exhibit JD-1
4. Affirmation of James Dondero and Exhibit JDD-1
5. Consent to act of Margot MacInnis and Exhibit MM-1
6. Consent to act of Sandipan Bhowmik and Exhibit SB-1

*Acknowledgment of Service*

I ________________________________ am duly authorised to accept service of the enclosed documents, which were served at _______ pm on 24 April 2025.

__________________________________
**Signed**

If you have any questions in relation to the above, please contact our office.

Yours faithfully

Johnstone Law

**Johnstone Law**

Walkers

**BY EMAIL**

25 April 2025 Our Ref: PP/PA/187150

Johnstone Law
10 Market Street, PO Box 926
Grand Cayman KY1-9006

Dear Mr Johnstone

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

1. We act as Cayman Islands counsel to the Company.

2. We refer to the documents served yesterday by your firm on the Company at its registered office, which include a winding up petition ("**Petition**"), an application for the appointment of provisional liquidators ("**PL Application**"), and a cover letter of service ("**Service Letter**").

**The Company is already in Voluntary Liquidation**

3. Please note the following (all documents enclosed):

   (a) On 29 March 2025, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd executed a consent to act as joint voluntary liquidators of the Company ("**JVLs**").

   (b) On 2 April 2025: (i) the directors of the Company executed written resolutions including to recommend to the management shareholder that the Company be wound up voluntarily and the JVLs be appointed; (ii) the management shareholder executed special resolutions that the Company be wound up voluntarily and the JVLs be appointed; and (iii) the directors of the Company executed a declaration of solvency.

   (c) On 14 April 2025, Gazette Issue No. 8/2025 was published, which included notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the JVLs appointed.

4. Further, please see enclosed:

   (a) The current Memorandum and Articles of the Company, dated 20 February 2025 ("**M&A**").

(b) The current Register of Members of the Company, dated 25 April 2025.

(c) An email chain between your firm and our firm dated 23-24 April 2025.

5. As outlined above, the Company is in Voluntary Liquidation.

6. That fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice referred to at paragraph 3(c) above.

7. Further, the email chain referred to at paragraph 4(c) above is all that we received from your firm by way of pre-action correspondence. We enquired as to the nature of the proceedings to be served, and had we been informed that it was a winding up petition and application for the appointment of provisional liquidators (rather than simply that the proceedings were in the process of being served on the Company's registered office), we would have informed you that the Company was already in Voluntary Liquidation.

8. There is nothing in the M&A which entitles your clients to receive notice from the Company of its entry into Voluntary Liquidation.

**The appropriate course of action**

9. As the Company is already in Voluntary Liquidation, the Petition and PL Application are plainly redundant, and we invite your clients to withdraw them without delay.

10. If the JVLs (or your clients) consider it appropriate that the Voluntary Liquidation be brought under the supervision of the court, any of them may make an application for a supervision order pursuant to the Companies Act section 131. If your clients would like to discuss such an application with the JVLs, including in respect of funding, please let us know.

11. In the event that the Petition and PL Application are not withdrawn, or at the very least the hearing of the PL Application (which we understand from your firm's Service Letter is listed on Monday 28 April 2025 at 2pm) is not adjourned, this letter must be brought to the attention of the Court, and we will appear on behalf of the Company.

12. If it becomes appropriate to do so, we will put this letter before the Court including on the question of costs.

Yours faithfully

Walkers (Cayman) LLP

**WALKERS (CAYMAN) LLP**

Direct Tel: +1 345 914 6365
Email: Barnaby.Gowrie@walkersglobal.com

**THE COMPANIES ACT (AS AMENDED)**

**JOINT VOLUNTARY LIQUIDATORS' CONSENT TO ACT**

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

To: The Registrar of Companies

**TAKE NOTICE** that we, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, hereby consent to act as Joint Voluntary Liquidators of the above-named Company with effect from the commencement of the liquidation.

**DATED** this 29th day of March, 2025.

____________________________

**Mitchell Mansfield**
**Joint Voluntary Liquidator**

E: mitchell.mansfield@kroll.com
T: +1 345 743 8805

____________________________

**William Clarke**
**Joint Voluntary Liquidator**

E: will.clarke@kroll.com
T: +1 345 623 9905

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY DATED 2 APRIL 2025**

---

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025), unless the context otherwise requires.

The undersigned, being all the Directors of the Company for the time being, hereby take the following actions and adopt the following resolutions.

**1. VOLUNTARY LIQUIDATION**

1.1 **IT IS NOTED** that:

(a) the Company's sole investment, being 100% of the limited liability company interests in CDMCFAD, LLC, a Delaware limited liability company, was redeemed on 27 March 2025 (the "**CDMCFAD Redemption**");

(b) proceeds lawfully available for distribution from the CDMCFAD Redemption in the amount of $1,612,192 were distributed to holders of Participating Shares of the Company by way of a cash dividend paid on April 2;

(c) the Company will not be engaging in any further business or investment activity and the operations of the Company have been fully wound down;

(d) the Company has no assets and no liabilities;

(e) in the circumstances, there is no reason for the Company to continue as a going concern and the Directors are of the view that the Company should therefore be wound up voluntarily;

(f) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands have indicated that they consent to act as joint voluntary liquidators of the Company (the "**JVLs**") if so appointed;

(g) the Directors have received and reviewed a liquidation proposal from the JVLs, together with its terms and conditions (the "**Liquidation Proposal**");

(h) the Directors have conducted a full enquiry into the Company's affairs and to the best of the Directors' knowledge and belief the Company will be able to pay its debts in full together with interest at the prescribed rate within twelve-month period from the commencement of the voluntary winding up; and

(i) the Directors have received a form of the declaration of solvency for execution pursuant to section 124 of the Companies Act (as amended) (the "**Declaration of Solvency**").

1.2 **IT IS RESOLVED** that:

(a) the Liquidation Proposal be approved;

(b) the Directors recommend to Mark Patrick, being the only Shareholder having the right to receive notice of, attend, speak at and vote at general meetings of the Company, that:

(i) the Company be wound up voluntarily; and

(ii) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company; and

(c) if the Company is wound up voluntarily, each Director execute the Declaration of Solvency.

**2. GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively), and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3. RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

Mark Patrick
**Director**

Paul Murphy
**Director**



35894721.2.C8689.187150



CONFIDENTIAL

011587[1279]

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE VOTING SHAREHOLDER OF THE COMPANY DATED 2 APRIL 2025**

---

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025) (the "**Articles**"), unless the context otherwise requires.

The undersigned, being the only Shareholder of the Company having the right to receive notice of, attend, speak at and vote at general meetings and having considered the written resolutions of the Directors dated 2 April 2025 which state that the Directors recommend that the Company be wound up voluntarily and that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands be appointed as the joint voluntary liquidators of the Company (the "**JVLs**"), hereby consents to the following actions and adopts the resolutions set out below.

**1. VOLUNTARY LIQUIDATION**

1.1 **IT IS RESOLVED BY SPECIAL RESOLUTION** that:

(a) the Company be wound up voluntarily; and

(b) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company.

1.2 **IT IS RESOLVED BY ORDINARY RESOLUTION** that:

(a) the JVLs be authorised, in accordance with Article 123 of the Articles, to divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for that purpose, set such value as they deem fair upon any property to be divided as aforesaid and may determine how such division will be carried out as between the Participating Shareholders or different Classes; and

(b) the JVLs shall have the power to retain the Company's administrator, manager or such other person as determined by the JVLs to assist them in discharging any registration and notification obligations and any obligation to complete the Company's final filings and retain records pursuant to the US Foreign Account Tax Compliance Act and/or Common Reporting Standard and/or Economic Substance Reporting.

[signature]
Mark Patrick

**THE COMPANIES ACT (AS AMENDED)**

**DECLARATION OF SOLVENCY**

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

We, Mark Patrick and Paul Murphy, being the Directors of the Company do solemnly and sincerely declare that we have made a full inquiry into the affairs of the Company and that, having done so, we believe that the Company will be able to pay its debts in full, together with interest at the prescribed rate within a period of twelve (12) months from the commencement of the winding up.

________________________

**Mark Patrick**

6716 Glenhurst Drive, Dallas, Texas, TX 75254, United States

Date of signature: 4/2/2025

Date of appointment as Director: 25 March 2021

________________________

**Paul Murphy**

Windsor Village, Unit 24, South Sound, Grand Cayman, Cayman Islands

Date of signature: 2nd April 2025

Date of appointment as Director: 22 April 2021

**Contacts for enquiries:**
Bryce Doran or Zhouming Kang
Telephones: (345) 949 7576 or +852 2583 1167
Emails: BDoran@RHRestructuring.com
or zhouming.kang@acclime.com

**GATN FINANCE LIMITED**
**Notice of Voluntary Winding Up (O.13, r.2)**
**(In Voluntary Liquidation)**
**The Companies Act (As Amended)**

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman, KY1-1102 Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

**AMP FUNDING LIMITED**
**(In Voluntary Liquidation)**
**The Companies Act (As Amended)**
**Notice of Voluntary Winding Up (O.13, r.2)**

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman KY1-1102, Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

**CHARITABLE DAF HOLDCO, LTD.**
**(In Voluntary Liquidation)**
**("The Company")**
**The Companies Act (As Amended)**
**Notice Of Voluntary Winding Up**
**Registration No: 263805**

TAKE NOTICE that the Company was put into liquidation on 2 April 2025 by a special resolution passed by written resolution of the sole voting shareholder of the Company, executed on 2 April 2025.

AND FURTHER TAKE NOTICE that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, have been appointed as joint voluntary liquidators of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice and to establish any title they may have under the Companies Act (as amended) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of



CONFIDENTIAL

any distribution made before such debts and/or claims are proved or from objecting to the distribution.

**Dated this 14th day of April 2025**

MITCHELL MANSFIELD AND WILLIAM CLARKE
Joint Voluntary Liquidators

**Contact for enquiries:**
William Clarke
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman KY1-1204
Cayman Islands
E: will.clarke@kroll.com
T: +1 345 623 9905

**Address for service:**
Kroll (Cayman) Ltd
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman, KY1-1204
Cayman Islands

**AARO DIRECTIONAL CRYPTO MULTIFUND LIMITED**
**(In Voluntary Liquidation)**
**(the Company)**
**Notice Of Voluntary Winding Up**
**Registration No: 390083**

TAKE NOTICE that the Company was placed into voluntary liquidation on 28 March 2025 by a special resolution passed by written resolution of the voting shareholder of the Company.

AND FURTHER TAKE NOTICE that R&H Restructuring VL Services Ltd. of Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands has been appointed voluntary liquidator of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice to establish any title they may have under the Companies Act (as revised) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of any distribution made before such debts and/or claims are proved or from objecting to the distribution.

**Dated: 03 April 2025**

OWEN WALKER
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator

MARTIN TROTT
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator

**Contact for Enquiries:**
Robert Knight
Telephone: +1 (345) 949 7576
Email: RKnight@RHRestructuring.com

**XP PHALANX CT FUND**
**(In Voluntary Liquidation)**
**(the "Company")**
**The Companies Act (as amended)**
**Notice of Voluntary Winding Up**
**Registration No: 391110**

TAKE NOTICE that the above-named Company was put into liquidation on 26 March 2025 by a Special Resolution passed by the sole voting shareholder by way of a written resolution in lieu of a meeting.

AND FURTHER TAKE NOTICE that FFP Limited of 2nd Floor Harbour Centre, 159 Mary Street, George Town, Grand Cayman, Cayman Islands has been appointed Voluntary Liquidator of the Company.

CREDITORS OF THE COMPANY are to prove their debts or claims within 21 days of the publication of this notice, and to establish any title they may have under the Companies Act (as amended) or are to be excluded from the benefit of any distribution made before the debts are proved or from objecting to the distribution.

**Dated this 3rd day of April 2025**

FFP LIMITED
Voluntary Liquidator

**Contact for enquiries:**
James Allen
FFP Limited
2nd Floor Harbour Centre
159 Mary Street
George Town, Grand Cayman
Cayman Islands



CONFIDENTIAL

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are:

   (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

   (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805



CONFIDENTIAL

**TABLE OF CONTENTS**


| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 5 |
| SHARES | 6 |
| MANAGEMENT SHARES | 6 |
| PARTICIPATING SHARES | 7 |
| MODIFICATION OF RIGHTS | 7 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 8 |
| TRANSMISSION OF SHARES | 8 |
| ALTERATION OF SHARE CAPITAL | 9 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 9 |
| TREASURY SHARES | 10 |
| GENERAL MEETINGS | 11 |
| NOTICE OF GENERAL MEETINGS | 11 |
| PROCEEDINGS AT GENERAL MEETINGS | 11 |
| VOTES OF SHAREHOLDERS | 13 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 14 |
| DIRECTORS | 14 |
| POWERS AND DUTIES OF DIRECTORS | 15 |


GENERAL REGISTRY CAYMAN ISLANDS



www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

**BORROWING POWERS OF DIRECTORS** ..... 17

**THE SEAL** ..... 17

**DISQUALIFICATION OF DIRECTORS** ..... 17

**PROCEEDINGS OF DIRECTORS** ..... 18

**DIVIDENDS** ..... 21

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION** ..... 21

**CAPITALISATION OF RESERVES** ..... 22

**SHARE PREMIUM ACCOUNT** ..... 23

**NOTICES** ..... 23

**NON-RECOGNITION OF TRUSTS** ..... 24

**WINDING UP** ..... 25

**AMENDMENT OF ARTICLES OF ASSOCIATION** ..... 25

**CLOSING OF REGISTER OR FIXING RECORD DATE** ..... 25

**REGISTRATION BYWAY OF CONTINUATION** ..... 26

**MERGERS AND CONSOLIDATION** ..... 26

**DISCLOSURE** ..... 26

**INDEMNITY** ..... 27

**DISPUTE RESOLUTION** ..... 28

**AEOI** ..... 30



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805



**CONFIDENTIAL**

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as amended) of the Cayman Islands.

"**AEOI**" means:

(i) sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii) the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

(iii) any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv) any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



GENERAL REGISTRY CAYMAN ISLANDS
www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h) any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act; and

(i) sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2. Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

**SHARES**

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.



GENERAL REGISTRY CAYMAN ISLANDS

www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495



CONFIDENTIAL

## PARTICIPATING SHARES

12. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**TRANSFER OF SHARES**

17. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

**TRANSMISSION OF SHARES**

22. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

28. Subject to the Act, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495



CONFIDENTIAL

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

32. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

**NOTICE OF GENERAL MEETINGS**

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

**PROCEEDINGS AT GENERAL MEETINGS**

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.



www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

0116091301

CONFIDENTIAL

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS**

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

**DIRECTORS**

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

69. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70. The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

**POWERS AND DUTIES OF DIRECTORS**

71. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495



CONFIDENTIAL

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

80. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

**THE SEAL**

81. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

84. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;



www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495



CONFIDENTIAL

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

85. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director



GENERAL REGISTRY CAYMAN ISLANDS

www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

0116141306

CONFIDENTIAL

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

95. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## DIVIDENDS

99. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

107. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.



GENERAL REGISTRY CAYMAN ISLANDS
www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
0116171309
CONFIDENTIAL

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

112. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

(iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

**SHARE PREMIUM ACCOUNT**

113. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

**NOTICES**

115. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

117. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

120. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

121. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

124. Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

125. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,



GENERAL REGISTRY CAYMAN ISLANDS

www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BYWAY OF CONTINUATION

128. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

129. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

## DISCLOSURE

130. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.



GENERAL REGISTRY CAYMAN ISLANDS

www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

011622[1314]

CONFIDENTIAL

**INDEMNITY**

131. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

0116231315

CONFIDENTIAL

135. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

**DISPUTE RESOLUTION**

136. Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act
("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable



GENERAL REGISTRY CAYMAN ISLANDS
www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495



CONFIDENTIAL

opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c) Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

**AEOI**

137. Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138. In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

(iii) ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139. In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

(a) create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b) may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c) allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d) adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).



GENERAL REGISTRY CAYMAN ISLANDS
www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

## Annexure

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Share Class: Management**

**Authorised Capital of USD 1.00 divided into 100.00 Management shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **WNL Limited**<br>190 Elgin Avenue<br>George Town<br>Grand Cayman KY1-9001<br>Cayman Islands | 7-Nov-2011 | | 1.00 | 0.01 | In Full | 7-Nov-2011 : Allotment of 1.00 Management share(s) | 7-Nov-2011 | 1.00 | | 0.00 | 7-Nov-2011 : Repurchase of 1.00 Management share(s) |
| 2 | **Grant James Scott**<br>Highland Capital Managment, L.P.<br>13455 Noel Road, Suite 800<br>Dallas, TX 75240<br>USA | 7-Nov-2011 | | 100.00 | 1.00 | In Full | 7-Nov-2011 : Allotment of 100.00 Management share(s) | 25-Mar-2021 | 100.00 | | 0.00 | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick |
| 3 | **Mark E. Patrick**<br>6716 Glenhurst Dr<br>Dallas, TX 75254<br>USA | 25-Mar-2021 | | 100.00 | 1.00 | In Full | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick | | 0.00 | | 100.00 | |

Notes

1 *Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.*

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Mark E. Patrick | 100.00 | Management |
| | | |
| **Total Management Shares outstanding: 100.00** | | |
| **Total Management Shares remaining unissued: 0.00** | | |

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Share Class: Participating**

**Authorised Capital of USD 49,999.00 divided into 4,999,900.00 Participating shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **The Highland Capital Management Partners CharitableTrust #2**<br>Highland Capital Management, L.P<br>13455 Noel Rd, Suite 800<br>TX 75240<br>Dallas Texas<br>USA | 7-Nov-2011 | | 300.00 | 3.00 | In Full | 7-Nov-2011 : Allotment of 300.00 Participating share(s) | 30-Nov-2011 | 300.00 | | 0.00 | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc<br>30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc<br>30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc |
| 2 | **Highland Kansas City Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc | | 0.00 | | 100.00 | |
| 3 | **Highland Dallas Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc | | 0.00 | | 100.00 | |
| 4 | **Highland Santa Barbara Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc | | 0.00 | | 100.00 | |



**CONFIDENTIAL**
Printed on 25 April 2025



**CONFIDENTIAL**

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Forth Worth TX 76102 USA | 13-Aug-2015 | | 5.00 | 0.05 | In Full | 13-Aug-2015 : Allotment of 5.00 Participating share(s) | | 0.00 | | 5.00 | |
| 6 | **DFW Charitable Foundation** The Corporation Trust Company 1209 Orange Street Wilmington, DE 19801 United States | 7-Feb-2025 | | 318.00 | 3.18 | In Full | 7-Feb-2025 : Allotment of 318.00 Participating share(s) | | 0.00 | | 318.00 | |

Notes

1 *Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.*

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Highland Kansas City Foundation, Inc | 100.00 | Participating |
| Highland Dallas Foundation, Inc | 100.00 | Participating |
| Highland Santa Barbara Foundation, Inc | 100.00 | Participating |
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT | 5.00 | Participating |
| DFW Charitable Foundation | 318.00 | Participating |
| **Total Participating Shares outstanding: 623.00** | | |
| **Total Participating Shares remaining unissued: 4,999,277.00** | | |

**Geoffrey Sykes**

| | |
|---|---|
| **From:** | Andrew Johnstone <aj@j-law.ky> |
| **Sent:** | 24 April 2025 11:46 AM |
| **To:** | Geoffrey Sykes; Barnaby Gowrie |
| **Cc:** | Rhiannon Zanetic; Philip Aubry; Nicholas Geldard; Chris Beck |
| **Subject:** | Re: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181] |

**[this message is from an external sender]**

Hi Geoff

Given your failure to respond yesterday, we are in the course of serving on Charitable DAF HoldCo Ltd at its registered office.

Best

AJ

**Andrew Johnstone**
Founder | Partner

**+1 (345) 929-3000**
**www.j-law.ky** | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 24 April 2025 11:35
**To:** Andrew Johnstone <aj@j-law.ky>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181]

Dear Mr Johnstone

Please could you confirm the nature of the proceeding to be served.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Andrew Johnstone <aj@j-law.ky>
**Sent:** 23 April 2025 13:42
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>
**Subject:** Charitable DAF HoldCo, Ltd

**[this message is from an external sender]**

Dear Colleagues

We act for the Participating Shareholders of Charitable DAF HoldCo, Ltd (the ***Company***).

Please can you confirm whether you are instructed to act for and accept service on behalf of the Company.

Best

AJ

**Andrew Johnstone**
Founder | Partner

**+1 (345) 929-3000**
**www.j-law.ky** | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

**Geoffrey Sykes**

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 24 April 2025 4:52 PM
**To:** Barnaby Gowrie; Philip Aubry; Geoffrey Sykes; Chris Beck
**Cc:** mpatrick@dafholdco.com; Paul Murphy; sraver@dafholdco.com; Bart Higgins
**Subject:** FW: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]
**Attachments:** 2025 24 04 - Charitable DAF HoldCo Ltd.zip

**Importance:** High

**[this message is from an external sender]**

FYI

**Brandon R. Schaller**
ATTORNEY

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

**From:** Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 4:45 PM
**To:** Michelle Richie | Campbells <MRichie@campbellslegal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]
**Importance:** High

CAUTION: This email originated from outside of the organization.

All

Johnstone law, who are acting for the participating shareholders of Charitable DAF HoldCo Ltd, served the following documents this afternoon (via Campbells, as we remain Charitable DAF's registered office):

- A Petition seeking orders that Charitable DAF be wound up and that joint official liquidators be appointed.
- A Summons seeking an order appointing joint provisional liquidators over Charitable DAF.
- Supporting affirmations of Julie Diaz (of The Dallas Foundation) and James Dondero.
- Consent to acts as a liquidator from Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton.

The Summons seeking the appointment of joint provisional liquidators over Charitable DAF has been listed for hearing before Justice Asif at 2pm on **Monday, 28 April 2025**.

We will forward copies of the attached materials to Kroll, as the voluntary liquidators of Charitable DAF. Our understanding is that Kroll will be taking point on next steps as the voluntary liquidators, but we will review and are available to assist. We will also forward these materials onto Walkers, who have requested a copy.

Kind regards

**Matheo Vinciullo**
Associate

E mvinciullo@campbellslegal.com
T +1 345 949 2648 D +1 345 914 6931 C +1 345 327 6931

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010, Cayman Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is subject to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.

---

**From:** Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 1:00 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]

Brandon

We have not received anything as yet but will provide copies when we do. We have received a similar request from Walkers attached. Do we have authorisation to provide the same to them?

**Michelle Richie**
Partner

E mrichie@campbellslegal.com
T +1 345 949 2648 D +1 345 914 6933 C +1 345 525 6933

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010, Cayman Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Thursday, April 24, 2025 12:48 PM
**To:** Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Charitable DAF HoldCo, Ltd.

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

---

Campbells team,

We heard that Johnstone law is attempting service on Charitable DAF HoldCo, Ltd. as its registered office. Can you please advise if you have received anything, and if not, provide us a copy when you do?

Thanks,
Brandon

**Brandon R. Schaller**
ATTORNEY

16400 Dallas Parkway, Suite 300
Dallas, TX 75248

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

**Geoffrey Sykes**

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 27 April 2025 12:51 AM
**To:** Mansfield, Mitchell
**Cc:** Paul Murphy
**Subject:** Voluntary Liquidators

**[this message is from an external sender]**

Dear Voluntary Liquidators

I write to you in my capacity as the management shareholder and director of the company. My fellow director, Paul Murphy, is copied to this email and agrees with its contents.

Please note the following:

The management shareholder of the company and its directors intend in providing cooperation to the voluntary liquidators in accordance with Cayman law.
The management shareholder has no intention of taking any steps to remove the voluntary liquidators from office.
Assuming the voluntary liquidators consider it appropriate having consulted with relevant stakeholders of the company, the management shareholder and the directors have no objections to the voluntary liquidators making the necessary court application to have the voluntary liquidation brought under the supervision of the Cayman Court.
If you have any questions, please do not hesitate to contact me.

Kind regards.

Mark Patrick
Management Shareholder



CONFIDENTIAL

# Before


The Dallas Foundation (nonprofit)
Greater Kansas City Community Foundation (nonprofit)
Santa Barbara Foundation (nonprofit)
The Community Foundation of North Texas (nonprofit)
DFW Charitable Foundation (nonprofit)
Highland Dallas Foundation, Inc. (nonprofit)
Highland Kansas City Foundation, Inc. (nonprofit)
Highland Santa Barbara Foundation, Inc. (nonprofit)
.80%
5 Participating Shares
51.04%
318 Participating Shares
16.05%
100 Participating Shares
16.05%
100 Participating Shares
16.05%
100 Participating Shares
Mark Patrick
Management Shares
Charitable DAF HoldCo, Ltd. (Cayman Islands)
100% and sole Director
Manager
CDH GP, Ltd. (Cayman Islands)
CDMCFAD, LLC (Delaware)
CDH GP, Ltd. (Cayman Islands)
General Partner
General Partner
Charitable DAF Fund 2, LP (Cayman Islands)
Charitable DAF Fund, LP (Cayman Islands)
CLO HoldCo, Ltd. (Cayman Islands)
Liberty CLO HoldCo, Ltd. (Cayman Islands)
HCT Holdco 2, Ltd. (Cayman Islands)
MGM Studios Holdco, Ltd. (Cayman Islands)
CLO HoldCo, LLC (Delaware)
Liberty CLO HoldCo, LLC (Delaware)
Liberty Sub, Ltd. (Delaware)
Charitable DAF Holdings Corp. (Delaware)
Rand Advisors, LLC (Delaware)
DST Investco, LLC (Delaware)
Allanon Capital Management LLC (Texas)
CDHC Royse City Land, LLC (Texas)
Royse City Land Company, LLC (Texas)
CDHC Assets, LLC (Texas)
CDHC Fort Worth Land, LLC (Texas)
CDHC Stewart Creek, LLC (Texas)
BVP Property, LLC (Delaware with CA Registration)

# Current – DAF Holdco



1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 99 OF 2025 (JAJ)**

**IN THE MATTER OF:** **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF:** **CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)**

**BETWEEN**

**(1) THE HIGHLAND DALLAS FOUNDATION, INC.**
**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**
**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**
**(4) THE HCMLP CHARITABLE FUND**

**<u>PLAINTIFFS</u>**

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

**<u>DEFENDANT</u>**

---

**FIRST AFFIDAVIT OF GEOFFREY SYKES**

---

I, **GEOFFREY SYKES**, of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands being duly sworn **MAKE OATH and SAY** as follows:

**Preliminary**

1. I am an Attorney-at-Law and Associate in the Insolvency and Dispute Resolution Group at Walkers (Cayman) LLP ("**Walkers**"), and I act for Charitable DAF HoldCo, Ltd (in Voluntary Liquidation) (the "**Company**").

2. I make this Affidavit in response to the winding up petition by which Cause No. FSD 99 of 2025 was commenced, and the summons listed in that proceeding seeking, among other things, "*An order appointing joint provisional liquidators over Charitable DAF HoldCo…*".

3. There is now shown to me a bundle of documents marked Exhibit "**GS-1**" and references to page numbers herein are to pages of that Exhibit. For the avoidance of doubt, no privilege is waived by the inclusion of the information set out herein.

4. Save where the contrary is stated to be the case, the facts and matters to which I depose are within my own knowledge and are true. Where the facts and matters are not within my own knowledge, they derive from my instructions by the company, acting either through its directors or the Joint Voluntary Liquidators (defined below) as the case may be at the relevant time, or I identify the source of my knowledge and confirm that those facts and matters are true to the best of my knowledge and belief.

**Recent events and documents**

5. On 24 April 2025, Johnstone Law served on the Company at its registered office a bundle of documents including the winding up petition and the summons referred to above. A copy of the cover letter to this bundle of documents is at

**page 1** (noting that the remainder of the documents will already be before the Court).

6. On 25 April 2025, Walkers sent to Johnstone Law a letter enclosing the following documents:

(a) A consent to act as joint voluntary liquidators of the Company by Mitchell Mansfield and William Clarke of Kroll Cayman Ltd (the "**Joint Voluntary Liquidators**"), dated 29 March 2025;

(b) Written resolutions of the directors of the Company including to recommend to the management shareholder that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(c) Special resolutions of the management shareholder of the Company that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(d) A declaration of solvency by the directors of the Company, dated 2 April 2025;

(e) An extract from Gazette Issue No. 8/2025, which includes notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the Joint Voluntary Liquidators were appointed, dated 14 April 2025;

(f) The current Memorandum and Articles of the Company, dated 20 February 2025;

(g) The current Register of Members of the Company, dated 25 April 2025; and

(h) An email chain between Walkers and Johnstone law, dated 23-24 April 2025.

7. That letter and its enclosures are at **pages 2 – 53**.

8. On 24 April 2025, emails were exchanged between Campbells LLP as the registered office of the Company, and Shields Legal (acting for the directors of the Company), in respect of the bundle of documents served by Johnstone Law. A copy of that email chain is at **pages 54 – 56**.

9. On 27 April 2025, Mark Patrick (in his capacity as the management shareholder and a director of the Company) sent an email to the Joint Voluntary Liquidators in respect of the joint voluntary liquidation. A copy of that email is at **page 57**.

10. A copy of the structure chart of the Company prior to 27 March 2025 is at **page 58**. A copy of the current structure chart Company as of 27 March 2025 is at **page 59**.

**SWORN** at George Town, )
Grand Cayman )
on the 27th day of April 2025 )
before me )

**GEOFFREY SYKES**

**NOTARY PUBLIC**

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 2026**
**Date:** 27th April 2025

This AFFIDAVIT is filed by Walkers (Cayman) LLP, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Applicant whose address for service is care of said Attorneys-at-Law.

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 99 OF 2025 (JAJ)

IN THE MATTER OF: SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF: CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)

BETWEEN

(1) THE HIGHLAND DALLAS FOUNDATION, INC.
(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.
(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.
(4) THE HCMLP CHARITABLE FUND

<u>PLAINTIFFS</u>

and

CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)

<u>DEFENDANT</u>

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 20**26
**Date:** 27 April 2025.

NOTARY PUBLIC

EXHIBIT 4-A

November 11, 2024

**From**: Highland Dallas Foundation, Inc.
Highland Kansas City Foundation, Inc.
Highland Santa Barbara Foundation, Inc.

**To**: Mr. Paul Murphy
Director of Charitable DAF HoldCo, Ltd.
and Charitable DAF Holdings Corp.
paul@gkmanagement.com.ky

Dear Mr. Murphy:

We write to you collectively on behalf of the following organizations:

1. Highland Dallas Foundation, Inc., a participation shareholder in Charitable DAF HoldCo, Ltd., of which you are a director along with Mark Patrick. As you know, Mr. Patrick also is the managing member of the Charitable DAF GP, LLC, which governs the related Charitable DAF Fund, LP.

2. Highland Kansas City Foundation, Inc., also a participation shareholder in Charitable DAF HoldCo, Ltd.

3. Highland Santa Barbara Foundation, Inc., also a participation shareholder in Charitable DAF Holdco, Ltd.

Highland Dallas Foundation, Inc is a supporting organization of The Dallas Foundation. Highland Kansas City Foundation, Inc. is a supporting organization of Greater Kansas City Community Foundation. Highland Santa Barbara Foundation, Inc. is a supporting organization of Santa Barbara Foundation. The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (collectively the "Foundations") have worked closely with their respective supporting organizations named above to award grants and funding to a wide range of charitable causes that have made tangible, lasting impacts on the communities they serve. Our primary commitment has been, and always will be, our concern for the community, respect for donors, thoughtful giving, and careful investing—core values that have guided each of us throughout our existence.

With these core values and with the well-being of these Foundations in mind, we write you to voice that we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "DAF-related entities"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable. Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner

Docusign Envelope ID: 11CD8132-6630-49A0-A1FE-D8548E9451F8



workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities.

Thank you for your attention to this matter. Our counsel with the law firm of Holland & Knight LLP is copied on this letter should you have any questions.

Sincerely yours,

HIGHLAND DALLAS FOUNDATION, INC.

Signed by:
By: [signature]
8C324EA989434F3...
Julie Diaz
Vice President

HIGHLAND KANSAS CITY FOUNDATION, INC.

DocuSigned by:
By: Deborah L Wilkerson
71ED433BB136439...
Debbie Wilkerson
Vice President

HIGHLAND SANTA BARBARA FOUNDATION, INC.

DocuSigned by:
By: Jackie Carrera
66D757ACD1A1461...
Jacqueline M. Carrera
Secretary and Treasurer

cc: David M. Rosenberg
(via email at david.rosenberg@hklaw.com)

Michael Stockham
(via email at michael.stockham@hklaw.com)

EXHIBIT 4-B

**Rhiannon Zanetic**

**Subject:** [EXTERNAL]-RE: DAFHoldCo information request

**From:** Michael.Stockham@hklaw.com
**Date:** February 7, 2025 at 12:43:56 PM CST
**To:** Paul Murphy <paul@gkmanagement.com.ky>, Julie Diaz <jdiaz@dallasfoundation.org>, mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>, Jackie Carrera <jcarrera@sbfoundation.org>, David.Rosenberg@hklaw.com, DMancino@seyfarth.com
**Subject: [EXTERNAL]-RE: DAFHoldCo information request**

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Paul-

I appreciate your email, and your willingness to find a framework to resolve the concerns, but am flummoxed by your, "struggle" to understand our growing frustration.

I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees. If I'm wrong, please educate me.

Your failure to be forthcoming about the underlying assets, the investment philosophy of the fund, and the "revised" governance, have caused me to start digging. I am not only a lawyer but also a Certified Fraud Examiner and a Certified Compliance & Ethics

Professional, and what I have found is nothing short of alarming.

- As I mentioned, director fees for 2024 appeared to be on track to exceed $5 million, which was an over 12,000 percent increase—up from zero. It is hard to fathom what you and Mr. Patrick have changed or contributed to the funds to warrant such a drastic change in director fees. I could be wrong, but if so, then tell me why. What is the dramatic value add?

- As I understand it, the annualized expenses of the funds were on pace to outstrip the actual return on the investments. So I am at a loss as to how you can justify running the fund at a loss while apparently paying the directors handsomely and freezing Supporting Organizations (the shareholders) out of basic information.

On November 6, 2024, we had an introductory video call with Doug Mancino, who announced himself as Compliance Counsel. But no details of the assets or financial condition of the funds were communicated.

On November 20, 2024, we had another video call with folks from your side, including ValueScope, and it was informative; however, the thrust of the presentation was why you refused proposed investments from NexPoint. It had nothing to do with the underlying assets and financial conditions of the fund. This was perplexing as ValueScope has been the valuation firm for the fund for years; yet they were silent about the condition of the fund.

On December 11, 2024, we had a video call with you, Doug Mancino, and your Cayman counsel. The thrust of that discussion was your vision of running the fund more as an institutional investment vehicle and a promise to provide financial information in the future. But the presentation again lacked any information on the underlying assets and financial conditions of the fund. It did, however, include a discussion that the Supporting Orgs had no right to information under the structure of the funds.

Shortly after the December 11 call, we received your first demand to withdraw our concerns about the governance of the funds, and it also advanced that if the Supporting Organizations wanted more

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*

Dear Mike,

We remain open to finding a framework within which we can resolve your clients' concerns.

I don't want to repeat points already made in my email dated 30th January 2025, but our understanding was that we were to prepare a presentation for the Foundations to address these concerns. This was a course of action suggested by you in our call last year and one which we thought was very sensible.

We are struggling to understand what happened between 21st January (when David Rosenburg, from your firm, confirmed a video conference would be acceptable) and 23rd January when an email was sent to Mark's old email address repeating various allegations that we were going to address in the presentation.



CONFIDENTIAL 011651 1343

We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so.
Many thanks,
Paul.

---

**From:** Michael.Stockham@hklaw.com <Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; David.Rosenberg@hklaw.com; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you are represented by counsel, I believe it appropriate to loop him in for this communication. I also told you that I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 — before Mr. Patrick shut down that line of communication and information — showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. Yet, no information has been provided by you

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

---

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Julie,

I am an independent director of Charitable DAF HoldCo, Ltd. (which I believe is the entity you refer to as "DAF HoldCo" in your email dated 28 January 2025 (the "**28 January Email**")).

As an initial matter, I hope you will find the tone of this initial response to the 28 January Email conciliatory as I am keen to avoid any misunderstandings in circumstances where I had understood the next steps following the meetings between our respective legal

representatives (Douglas Mancino and David Rosenberg) in December last year was for us to present directly to the foundations/supporting organizations in order to address some of the concerns in the letter dated 11 November 2024 (the "**11 November Letter**"). This proposed presentation would supplement the two Zoom conference calls with your attorneys held by me and our independent valuation experts, ValueScope, in December last year as well as the ValueScope 9/30/24 report sent to you on 7 January that provided a balance sheet and information on all investment holdings.

As recently as 21 January 2025, David again confirmed that a Zoom conference call with yourselves would be an effective way to address your concerns and move forward in a cooperative manner.

Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter. Please note that neither Mark nor myself received your email dated 23 January 2025 given that it was sent to an out-of-use email address for Mark (which I understand he communicated to you and your assistant in person) and did not copy me. Therefore, the basis of the concerns and request to wind-up expressed in the 28 January Email, appears to be the single failure to respond to an email that was sent to a defunct email address. Having now been reminded that the email address is not functional, I hope you can take some comfort that you were not being ignored.
However, given the content and tone of the 28 January Email and David's request to progress the direct presentation to the foundations/supporting organizations only 7 days prior on 21 January 2025, there seems to be a disconnect between the conciliatory approach adopted in the latter and the more aggressive position set out in the former.

For our part, at this stage we are more than happy to continue to engage with the foundations/supporting organizations in an

effort to provide clarity on investments and the DAF HoldCo governance structure.

I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.

Please let us know if you are prepared to withdraw the allegations made in the 11 November Letter and the 23 and 28 January Emails and are content to proceed with our proposed delivery of the presentation which we are confident will provide a complete answer to your concerns.

Finally, as a matter of record, it is important that I outline the following:

The 11 November 2024 Letter was not directly sent to me. I received it from Charitable DAF HoldCo's US attorneys who had, in turn, received it from a US law firm acting for Mr. Dondero. As set out above, this supports our belief, which is also based on other actions we have seen to date, that Mr. Dondero is seeking to improperly



CONFIDENTIAL 011656[1348]

exerting influence over the foundations and supporting organizations for self-serving purposes to the detriment of DAF HoldCo, the foundations and supporting organizations.

We note that your communications to date contain several misstatements of fact and we reject all of your allegations. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.

We look forward to hearing from you in relation to the proposed presentation and withdrawal of the allegations.

Kind regards,

Paul.

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman KY1-1007
Cayman Islands
**Phone:** +1 345 946 3459
**Mobile:** +1 345 324 1121
**Fax:** +1 345 946 3493
**E-mail:** paul@gkmanagement.com.ky

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Tuesday, January 28, 2025 9:14 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Michael.Stockham@hklaw.com; Rosenberg, David M (DFW - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

Mark and Paul-

We have great concern that our reasonable requests below have not been acknowledged. This failure to provide the courtesy of a response continues a pattern of a lack of communication and transparency as to assets and financials of DAF HoldCo under your stewardship. These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

---

**From:** Julie Diaz
**Sent:** Thursday, January 23, 2025 9:45 AM
**To:** MPatrick@CharitableDAF.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>
**Subject:** DAFHoldCo information request

Hi Mark –



CONFIDENTIAL

Since we spoke last fall, the three CEOs from Santa Barbara, Kansas City, and Dallas community foundations (copied here) were discussing our plans for 2025 and wanted to reach out to you to check in on the DAFHoldCo. We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place.

Specifically, could you send:

- **Income Statements for the last for years**: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses
- **Listing of Underlying Assets**: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.
- **Audited Financial Statements**: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.
- **Current Structure of DAFHoldCo Operations:** An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

As you can appreciate, our job as leaders of our respective community foundations is to ensure proper stewardship of the charitable assets that are owned by our organizations. We are grateful for the decade plus of charitable investments that we have been able to make from the proceeds of the DAFHoldCo and would like to have confidence that this vehicle will continue to grow and make

additional meaningful contributions to our respective communities.

Please let us know your ability to get this information to us by Feb. 10, 2025.

Thank you and happy New Year.

---

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything

in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

---

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

<~WRD0000.jpg> <~WRD0000.jpg> <~WRD0000.jpg>

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Skyview Group. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Skyview Group.

EXHIBIT 4-C

February 27, 2025

*Via Email: dmancino@seyfarth.com*

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

Sincerely yours,

Michael W. Stockham

cc: David Rosenberg

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 18 March 2025 09:27 |
| **To:** | Mancino, Douglas; Michael.Stockham@hklaw.com |
| **Cc:** | Paul Murphy |
| **Subject:** | RE: Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this. |

Doug, we are available on:

- Wednesday March 26, after 4:00 p.m. U.S. Central Daylight Time.
- Monday, March 31, until 12:00 p.m. U.S. Central Daylight Time.
- Thursday, April 3 until 12:00 p.m. U.S. Central Daylight Time.

**David Rosenberg | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** Mancino, Douglas
**Sent:** Monday, March 17, 2025 1:00 PM
**To:** Rosenberg, David M (DAL - X61508) ; Stockham, Michael W (DAL - X62515)
**Cc:** Paul Murphy
**Subject:** Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.

Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 03 April 2025 09:51 |
| **To:** | Mancino, Douglas |
| **Cc:** | Michael.Stockham@hklaw.com; Paul Murphy |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, no such call is on our calendar, so I am not sure of the source of the confusion. We will circle back with our clients and provide some windows starting on April 16.

I wish your wife the best of health with her back. Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | https://urldefense.proofpoint.com/v2/url?u=http-3A__www.hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dUaYK7RyBQ-__Uvhuz_UbZY9LLgA8fqgfSQfMU9IREk&e=

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <https://urldefense.proofpoint.com/v2/url?u=http-3A__David.Rosenberg-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dK186X1LRwbLe82XNr4DiwVprLY83NgIEL5KUk2L9wM&e=>
Cc: Stockham, Michael W (DAL - X62515) <https://urldefense.proofpoint.com/v2/url?u=http-3A__Michael.Stockham-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=H8AOyc2PQyRIKod6ljjomBwRDxne7__BsTh9i-RGFDY&e=>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |



CONFIDENTIAL

---------------------------------------------
CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.
---------------------------------------------

**Rosenberg, David M (DAL - X61508)**

**From:** Rosenberg, David M (DAL - X61508)
**Sent:** Wednesday, April 9, 2025 11:40 AM
**To:** Mancino, Douglas
**Cc:** Stockham, Michael W (DAL - X62515)
**Subject:** RE: Zoom call with Paul Murphy

Doug, here is our availability beginning April 16 and for the next week:

April 16 - available after 2:30 p.m.

April 17 - available between 10:00 a.m. and noon and after 1:30 p.m.

April 21 - generally available after 1:30 p.m.

April 22 - available after 2:00 p.m.

April 23 - generally available except between 11:00 a.m. and 12:30 p.m.

All times are CDT. Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
Cc: Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar.
Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

EXHIBIT 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Dallas, Texas June 25, 2025 9:30 a.m. Docket |
| Reorganized Debtor. | ) | - MOTION TO EXTEND DURATION OF TRUSTS (4213) - MOTION TO APPROVE SETTLEMENT (4216) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For the Highland Capital Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>(212) 561-7732 |
| For the Highland Capital Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>(310) 277-6910 |
| For Marc S. Kirschner, Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>295 5th Avenue<br>New York, NY 10016<br>(212) 849-7000 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Hunter Mountain Entities: | Louis M. Phillips<br>Amelia L. Hurt<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For the Dugaboy Investment Trust: | Deborah Rose Deitsch-Perez<br>STINSON, LLP<br>2200 Ross Avenue, Suite 2900<br>Dallas, TX 75201<br>(214) 560-2201 |
| For the Dugaboy Investment Trust: | Michael Justin Lang<br>CRAWFORD WISHNEW & LANG, PLLC<br>1700 Pacific Avenue, Suite 2390<br>Dallas, TX 75201<br>(214) 817-4500 |
| For Crown Global Life Insurance, Ltd. and The Dallas Foundation: | David L. Curry, Jr.<br>OKIN ADAMS, LLP<br>1113 Vine Street, Suite 240<br>Houston, TX 77002<br>(713) 228-4100 |
| For Patrick Daugherty: | Andrew K. York<br>Drake Rayshell<br>Joshua Smeltzer<br>GRAY REED & MCGRAW, LLP<br>1601 Elm Street, Suite 4600<br>Dallas, TX 75201<br>(214) 954-4135 |
| For the U.S. Trustee: | Erin Marie Schmidt<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242-1496<br>(214) 767-1075 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

THE WITNESS: My bad.

THE COURT: -- call my attention to it when you find it.

THE WITNESS: All right.

(The witness steps down.)

THE COURT: All right. Your next witness?

MR. YORK: I believe we're calling Mark Patrick.

THE COURT: All right, Mr. Patrick. All right. Please raise your right hand.

MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT: All right. Please be seated.

And, Courtney, you're going to start the clock going. I show 2:12. I don't know if my clock's right.

You may proceed.

MR. LANG: And, Your Honor, may I hand the witness -- this is from Mr. Morris' opening. May I use this as Exhibit 3?

THE COURT: Oh, okay. You're talking about the back page of his PowerPoint?

MR. LANG: Yes. Org chart.

THE COURT: Yes. I've got it in front of me. And for the record, I'm going to put this PowerPoint, even though it's not an exhibit *per se*, as a demonstrative aid in the file for this matter. And so it's the last item of the Highland PowerPoint. All right.

MR. LANG: Yes.

DIRECT EXAMINATION

BY MR. LANG:

Q Mr. Patrick, does this Hunter Mountain Investment Trust org chart that I just handed you accurately reflect the structure of the Hunter Mountain Investment Trust ownership today?

A Just give me a few moments to review.

Q Sure.

MR. LEWIS: Your Honor, I had mentioned early on that we object to this whole line of questioning because it's outside the scope of the objection of Dugaboy. And I don't want to interrupt, but I want to make sure that my objection is continuing, because this has nothing to do with the objection presented by Dugaboy.

THE COURT: All right.

MR. PHILLIPS: So we object to the question.

THE COURT: Okay. So the record will reflect basically a running objection from Hunter Mountain?

MR. PHILLIPS: We would appreciate that, Your Honor.

THE COURT: Okay. In light of the failure of Dugaboy to disclose Mark Patrick as a witness, as well as the failure to challenge in a written objection his authority. Okay. So I recognized that this was quite a persuasive objection, but given the magnitude, I would say, of what is going on here,

potentially a settlement that could come very close to ending this long-running plan implementation process, I'm erring, if it's an error, I'm erring on the side of allowing this. All right. But you have a running objection that the record will reflect if one day there is an appeal.

MR. MORRIS: And, Your Honor, the Highland Claimant Trust and the Highland Litigation Subtrust and Highland Capital Management, LP join Mr. Phillips' objection.

THE COURT: Okay. Understood.

MR. PHILLIPS: Thank you very much, Your Honor.

THE COURT: All right.

BY MR. LANG:

Q Mr. Patrick, have you had time to study this Hunter Mountain Investment Trust org chart?

A Yes, I have.

Q And does this accurately show the ownership structure for Hunter Mountain Investment Trust today?

A I'm not sure, without reviewing the underlying corporate documents on some of these entities that you have listed here.

Q Did you help prepare this chart?

A No.

Q No? Okay. So Hunter Mountain Investment Trust is owned by Beacon Mountain, LLC, correct?

A Yes.

Q And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

correct?
A Correct.
Q And CLO Holdco, LLC is owned by CLO Holdco, Limited?
A That's correct.
Q And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?
A Correct.
Q And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?
A The ultimate beneficial owner is DFW Charitable Foundation. To my -- to the best of my recollection, I would say that appears accurate. I'm just not a hundred percent.
Q Okay. And --
A But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner. And I'm a hundred percent that Dugaboy Investment Trust has no interest in it. And I'm also a hundred percent that The Dallas Foundation or any --
MR. LANG: Judge, I haven't asked --
THE WITNESS: -- or any other nonprofit has any --
MR. LANG: -- any of these questions.
THE COURT: Okay. There's an objection, nonresponsive. I sustain.
BY MR. LANG:
Q Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?
A (Pause.) I'm just waiting for a relevancy. I don't

understand how that's relevant to my authority --

THE COURT: Okay. You're not allowed to make a relevancy objection. Okay.

MR. PHILLIPS: Your Honor, I think the problem is that, if I could, we have made an objection. And our objection, our running objection is founded on relevancy and founded on improper process. So I would like to just tell the Court, and so my client representative can hear it, that the fact that I'm not standing up every time there's a problematic question, --

THE COURT: Okay.

MR. PHILLIPS: -- because every question is problematic, my objection is being maintained to every question that's being asked.

THE COURT: Okay. You understand that, right?

THE WITNESS: I --

THE COURT: There's a running relevancy objection. You're the witness. You can't make the objection. But it's on the record for whatever use it might have down the road.

MR. PHILLIPS: I have objected to every question that's coming in connection with this line of questioning on the basis of relevance.

THE COURT: I got it. I think we all have it.

MR. PHILLIPS: I'm just --

MR. LANG: Understood.

THE COURT: Yes. And you're thinking he's eating into your 30 minutes?

MR. LANG: Yes.

THE COURT: Okay. We've got it.

THE CLERK: I stopped the time.

MR. LANG: So -- thank you.

THE COURT: Did you stop the time for a minute?

THE CLERK: Yes, I did.

MR. LANG: Thank you.

THE COURT: Okay.

BY MR. LANG:

Q So, to my question, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct? Charitable DAF Holdco, Limited?

A And where is that on the chart?

Q I'm asking, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, Limited.

A Can you show me a corporate document so I know the precise corporation you're referring to?

Q You're the -- you are the manager of -- or the control person of CDHGP Limited, correct?

A Again, I'd have to refresh my recollection, but I am the control person over CDMC.

Q Okay. And CDMC --

A As well as Charitable DAF Fund. I'll represent that to

you.

Q Okay. Was there a transaction in December of 2024 where Charitable DAF Holdco, Limited sold its interest or transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A I know you're trying to help other litigation and --

MR. PHILLIPS: Mark.

THE COURT: Okay. Nonresponsive.

THE WITNESS: Your Honor, he's using your time to fish for other litigation to support that --

THE COURT: Okay. Okay. We have a running objection to relevance. I'm going to say that one more time. Okay. Just answer the question as best you can.

THE WITNESS: I'd have to review the corporate documents to refresh my recollection for that time period.

BY MR. LANG:

Q Up until December of 2024, Charitable DAF Fund, LP was owned 100 percent by Charitable DAF Holdco, Limited, wasn't it?

A I don't know what entity you're referring to without a refreshment of corporate documents of that entity. There could be a lot of entities called that.

Q You're aware that there is a proceeding in the Caymans investigating the December 2024 transaction that sold -- where Charitable DAF Holdco, Limited sold its interest in -- and or

transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?
A There are several parts to that question. So the answer is no.
Q Are you aware of a proceeding pending in the Caymans involving Charitable DAF Holdco, Limited?
A Again, I don't know what entity you're referring to. Show me a -- show me a corporate document.
MR. LANG: Your Honor, this was on the Foundation's exhibit list. We cross-designated any document designated as an exhibit by any other party in this case. And I'd like to hand this to the witness.
MR. MORRIS: Which exhibit is it?
THE COURT: Which is -- yes.
MR. LANG: It was on the -- it was on the DAF -- or, the Foundation's exhibit list.
MR. MORRIS: They haven't been admitted into evidence and they've withdrawn their objection. We object, Your Honor.
THE COURT: Yes, they've not been admitted.
MR. LANG: Okay. Well, can I --
MR. PHILLIPS: We object to that, Your Honor. We object to any witness --
MR. LANG: We cross-designated every --
THE COURT: I already discussed at the beginning what we were admitting and that was not disclosed.

MR. LANG: Okay.

THE COURT: As I recall, I said you've only designated the plan and settlement agreement, and the answer was yes.

MR. LANG: Okay.

BY MR. LANG:

Q And we're aware that the Joint Official -- are you aware that there is a Joint Official Liquidator appointed over a Charitable DAF entity in the Cayman Islands?

MR. PHILLIPS: Objection to form.

THE WITNESS: Again, without more specific --

THE COURT: Overruled. Yes.

THE WITNESS: -- specificity, there could be a thousand different actions that you're referring to, in my mind.

BY MR. LANG:

Q Are you aware that the Joint Official Liquidators in the Caymans are investigating transactions involving Charitable DAF Fund, LP and Charitable DAF Holdco, Limited?

A Again, again, I don't specifically know what you're referring to.

MR. PHILLIPS: Your Honor, may I -- excuse me. I don't know that my running objection includes an objection to form for each of the questions. This objection is to form of the questions about, quote, --

THE COURT: What's wrong with the form?

MR. PHILLIPS: -- investigation.

THE COURT: What is wrong with the form of that question? I'm not clear.

MR. PHILLIPS: My objection to form is that the question is an open-ended question with an undefined term, investigation.

THE COURT: Overruled. I don't think that's a vague term. So you may answer.

THE WITNESS: If you show me some document, some complaint or something, I'll be very happy to verify whatever questions related to that. But just giving me verbal words of entities and names and actions, I don't know precisely what you are talking about.

BY MR. LANG:

Q Mr. Patrick, who set up the entities in the Hunter Mountain Investment Trust org chart that is sitting in front of you?

A I'm sorry. Repeat the question?

Q Who set up the various entities that are in the org chart that is on your -- on the stand?

MR. PHILLIPS: Objection to form. Set up. What does that mean?

THE WITNESS: It -- yeah, it's very --

THE COURT: I think we know what it means. Creating,

perhaps.

BY MR. LANG:

Q Created?

A Who? Are you asking if I created it?

Q Did you participate in creating them?

A Did I participate? In which ones?

Q CDMC FAD, LLC.

A What do you mean by participate?

Q Were you involved in creating -- did you initiate the creation of CDMC FAD, LLC?

A Lawyers were.

Q Did you engage in any capacity on behalf of any entity? Were you involved in engaging the lawyers to set up CDMC FAD, LLC?

A Yes, I engaged lawyers to set up entities.

MR. LANG: Objection. Nonresponsive.

THE COURT: Sustained.

MR. LANG: Did you --

THE COURT: He asked about this one particular entity, I think.

BY MR. LANG:

Q Did you --

A Which entity, again, did you ask?

Q CDMC FAD, LLC.

A Yes, I believe I hired a lawyer.

Q And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?

A Around the end of March of 2025. I believe.

Q And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?

A What do you mean by involved? How?

THE COURT: Okay. I can see what's happening here or I have an impression of what's happening here. I feel like you're slowing down this process where I've given 30 minutes to this lawyer. Okay? And I feel like you're feigning confusion. I don't mean to be insulting, but that's how it comes across. Okay? So I need you to speed up your answers and not be confused about things you shouldn't be confused about. Okay?

THE WITNESS: Okay.

THE COURT: I feel like it's late 1980s *Dondi*. Does anyone know what I mean by that? Okay. We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling. That's what they did in *Dondi*. Confusion. Delay. Okay?

So I don't mean to chastise you. I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this. Okay?

THE WITNESS: Understood.

THE COURT: Thank you.

BY MR. LANG:

Q Okay. So you were involved in the transaction in which CDMC FAD, LLC acquired 100 percent ownership interest in Charitable DAF Fund, LP in or around March of 2025, correct?

A Correct.

Q Who did CDMC FAD, LLC obtain its interests in Charitable DAF Fund, LP from in March of 2025?

A From an -- from an entity called Charitable DAF Holdco, Ltd.

Q Charitable DAF Holdco, Ltd., the entity that I asked about earlier, correct?

A Of the same name.

Q Yes. And Charitable DAF Holdco, Ltd. has had Joint Liquidated -- Liquidators, Joint Official Liquidators appointed over it in the Cayman Islands, correct?

A Yes.

Q And those Joint Official Liquidators were appointed over Charitable DAF Holdco, Limited in or around May 6th, 2025?

A In May is what I recall.

MR. LANG: Your Honor, we'll pass the witness.

THE COURT: All right. Do we have any questions?

MR. YORK: No questions, Your Honor.

THE COURT: Okay. Any cross?

MR. MORRIS: Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q Mr. Patrick, do you know who initiated the proceedings to get the appointment of the Joint Official Liquidators in the Cayman Islands?

A The director and myself, we initially filed for a voluntary joint liquidation in May.

Q And did there come a time when the Cayman court appointed the Joint Official Liquidators?

A Yes.

Q Do you know who asked the court to appoint the Joint Official Liquidators?

A We did, as well as other -- it was an agreement with the participation holders of that entity.

Q And who are the participation holders of that entity?

A It was the DFW Charitable Foundation as a 51 percent holder as well as the Highland Dallas Foundation, Highland Santa Barbara Foundation, and the Highland Kansas City Foundation.

Q And those three foundations that you just mentioned, do you know who controls them?

A Jim Dondero.

Q Is it your understanding that Mr. Dondero was funding the litigation in the Cayman Islands?

A Yes.
Q The Joint Official Liquidators, are you aware of any statement that they've ever made that you are not authorized to act on behalf of any of the HMIT entities?
A Yeah, they've never made a statement that I'm not authorized to act under any of those entities.
Q Okay. Did you receive a letter last night that was purportedly authored by the Joint Official Liquidators?
A Yes.
Q Did you review that letter?
A Yes.
Q Did that letter refer to today's hearing?
A Yes.
Q Are you aware of the Joint Official Liquidators making any appearance in this proceeding?
A No, I'm not aware they made any appearance in this proceeding.
Q Based on your recollection of the contents of that letter, did the Joint Official Liquidators challenge your authority to enter into the settlement agreement on behalf of the HMIT entities?
A No, they did not, because there's no ownership interest.
Q Okay. And what do you mean by that?
A The entity in liquidation owns nothing. And the DFW Charitable Foundation is the ultimate beneficial owner.

Q Are you aware that The Dallas Foundation filed an objection to the settlement agreement on behalf of Empower Dallas Foundation, the Okada Family Foundation, and Crown Global?
A Yes.
Q Are you aware that that objection was withdrawn?
A Yes.
Q Was the withdrawal of that objection the product of negotiations that your counsel had with lawyers for The Dallas Foundation and Crown Global?
A Yes, it was.
Q Did The Dallas Foundation or Crown Global require you to surrender your control position of the HMIT entities as a condition to the withdrawal of their objection?
A To give up my control? No.
Q They didn't ask you to do that, did they?
A No. No.
Q You are the control person for each of the HMIT entities that are party to the settlement agreement, correct?
A That is correct.
Q Are you aware of any requirement in any of the governance documents --
MR. CURRY: Your Honor, I'm not questioning, but I'm going to object to the line of questioning here about what was asked and what was not received into negotiations, because,

frankly, you're getting an imperfect picture there. And I don't think it should be misrepresented. The communications didn't happen with Mr. Patrick.

THE COURT: Okay. I don't know if that objection was a confidential settlement communications.

MR. CURRY: It's a combination of foundation and that he's going into confidential settlement discussions.

MR. MORRIS: Your Honor, it's a very simple question. I'll ask it again.

THE COURT: Okay. We'll let --

BY MR. MORRIS:

Q To the best of best of your knowledge, Mr. Patrick, did The Dallas Foundation or any of the entities on whose behalf it filed its objection require you to surrender your position as the control person of the HMIT entities in exchange for the withdrawal of their objection?

A No, they did not.

Q Thank you. Are you aware -- are you familiar with the governance documents for the HMIT entities?

A Yes, I am.

Q Are you aware of any restriction on your ability to act on behalf of those HMIT entities with respect to -- withdrawn. Are you required to obtain the consent of anyone in order to enter into the settlement agreement on behalf of the HMIT entities?

A No, I am not. I'm the sole authority and control person for that entity.

Q And do you believe that you're entering into the settlement agreement on behalf of the HMIT entities in good faith?

A Yes, I do.

Q Have you received legal counsel before entering into the agreement?

A Yes, I have.

Q Do you believe that you've negotiated the best terms that you could get on behalf of the HMIT entities?

A Yes, I do.

Q Do you believe that you received the information that you believed you required in order to make an informed decision before you entered into the settlement agreement on behalf of the HMIT entities?

A Yes, I did.

MR. MORRIS: I have no further questions, Your Honor.

THE COURT: All right. Mr. Phillips, anything from you?

MR. PHILLIPS: No questions.

THE COURT: Okay. Any redirect?

MR. LANG: Briefly.

THE COURT: Uh-huh.

MR. LANG: Your Honor, because they mentioned the

letter of last night from Grant Thornton, the Liquidators, I'm going to offer that into evidence as the letter that we talked about this morning. But Mr. Morris directly asked him if he reviewed it and asked him questions about it.

THE COURT: Response?

MR. MORRIS: No objection, Your Honor. Go right ahead.

THE COURT: I'll admit it.

MR. LANG: This is --

THE COURT: Do I have it in my notebook?

MR. LANG: -- Dugaboy --

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. LANG:

Q Mr. Patrick, I've handed you --

THE COURT: We're going to call this Dugaboy 3?

MR. LANG: Dugaboy 3.

THE COURT: Okay.

(Dugaboy Investment Trust's Exhibit 3 is admitted into evidence.)

BY MR. LANG:

Q Mr. Patrick, I've handed you a letter. It's from Grant Thornton dated June 24th, 2025. Do you see that?

A Yes.

Q And is this a true and correct copy of the letter that you

received or that you reviewed from the Joint Liquidators that you referred to in your answers to Mr. Morris' questions?

A Well, it's a PDF. I mean, I'm assuming it's from the Official Liquidators.

Q But this is the letter you were referring to in your testimony a few minutes ago?

A Yes.

Q And do you see on the second paragraph it says that, on May 6th, 2025, the Grand Court of Cayman Islands Financial Services Division appointed Margot MacInnis and Sandipan Bhowmik, each of Grant Thornton Special Services (Cayman) Limited, as the Joint Official Liquidators of the company. Do you see that?

A Yes.

Q And do you see on the second page, it says: Since our appointment, we have been diligently investigating these transactions, including a corporate transaction that occurred in or around December 2024 where the company transferred a hundred percent of its interest in the Fund to CDMC FAD, LLC, which resulted in the company being the sole member of CDM and subsequent redemptions of the company's interests in CDM.

Do you see that?

A Yes.

Q Is that your understanding of what is happening in the Caymans right now, is investigating these transactions?

A Correct.
MR. LANG: Pass the witness.
MR. MORRIS: May I just have that letter, please?
THE COURT: Any recross?
MR. MORRIS: Yeah, just real brief.

RECROSS-EXAMINATION

BY MR. MORRIS:
Q None of the transactions that you were just asked about has anything to do with any of the HMIT entities, correct?
A That's absolutely correct.
Q Okay. And now that we have the letter in the record, if you could look at the third paragraph. Do you see --
A Yeah.
Q Do you see it refers to the Highland Dallas Foundation, Highland Santa Barbara Foundation, and Highland Kansas City Foundation?
A Yes.
Q Are those the three entities that you referred to earlier that are, to the best of your understanding, controlled by Mr. Dondero?
A Yes.
Q Okay. And this is the letter that you said you reviewed and concluded that the Joint Official Liquidators weren't challenging your authority to enter into the agreement on behalf of the HMIT entities; do I have that right?

A Yes. Yes, you do.

MR. MORRIS: I have no further questions, Your Honor.

THE COURT: Okay. I have a question or two.

EXAMINATION BY THE COURT

THE COURT: And again, I apologize if I sounded harsh earlier. I recognize different people present different ways when they testify. It just appeared to me that maybe we were slowing things down unnecessarily. All right?

THE WITNESS: I apologize, too. I'm just a little emotionally upset they're using this proceeding for a benefit someplace else.

THE COURT: Okay. My question, very general question: Do you think this settlement is fair and equitable as far as HMIT is concerned?

THE WITNESS: Absolutely.

THE COURT: And could you tell me why?

THE WITNESS: Yeah. There was no obvious pathway for HMIT to, in my mind, to receive the residual interest of the bankruptcy estate without a settlement with the Debtor. Otherwise, it just seemed to me that it would go on forever. And then I balanced that against the existing litigation and the probability of the outcome weighted against the costs, and determined that it made sense from HMIT's perspective to enter into the settlement agreement.

THE COURT: Okay. And you understand that, as part

of this, you're giving up some litigation claims that have been waged now for a couple of years or more?

THE WITNESS: That is correct, but I'm also receiving the Kirschner Litigation, which I did negotiate to receive.

THE COURT: Okay. And there was a note that the estate -- I've heard it called at some point the $57 million note that HMIT owed Highland, a December 2015 note -- that basically gets credited against the capital account. You understand that?

THE WITNESS: Yes, I do.

THE COURT: Okay. And then you understand that if I approve this deal, I'm not sure why there's going to be $500,000 to HMIT and then also another $10 million to HMIT, but subsequent payments could get held up if there are litigation threats to the Highland Claimant Trust. You understand that, correct?

THE WITNESS: Yes, I do.

THE COURT: Okay. I just, I have to ask. I'm confused about what's going on here. I thought that -- well, let me just ask this: Would you consider yourself crossways with Mr. Dondero now?

THE WITNESS: No, but I'll answer the question. Upon advice of counsel, I quit Skyview Group. And upon advice of counsel, I terminated the back office services that Skyview Group was providing to the DAF.

THE COURT: Okay. Well, you said you're getting maybe a little emotional because of other litigation. I'm just trying -- I don't understand what all that other --

THE WITNESS: Unrelated -- well, unrelated to that. They're clearly trying to use this forum to benefit their Cayman actions. They hired U.S. counsel called Reed Smith, and they've been begging for an organization chart to issue a variety of frivolous lawsuits against the operating DAF entities. So I do apologize, but that's a little upsetting to me because I know we're going to -- that I've just fed them a list of targets in another unrelated matter.

THE COURT: Okay. Reed Smith. Here we go again with -- they've made an appearance for Mr. Seery in this litigation.

MR. MORRIS: Exactly. And we have raised that issue.

THE COURT: Okay.

MR. MORRIS: And I'm surprised to hear that they think they still have the ability to do this. But we will pursue that later.

THE COURT: Okay. All right. I had nothing further. Thank you, Mr. Patrick.

(The witness steps down.)

THE COURT: All right. So where are we now? I said that, again, just trying to balance the playing field, if Dugaboy was given the ability to question Mr. Patrick, then I

EXHIBIT 6

**CAUSE NO. ____________________**

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., et al.,**<br>*Plaintiffs*,<br>**v.**<br>**MARK PATRICK, et al.,**<br>*Defendants.* | **IN THE TEXAS BUSINESS COURT**<br>**1ST DIVISION**<br>**DALLAS, TEXAS** |

**DECLARATION OF JAMES DAVID DONDERO**

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, DECLARE under penalty of perjury:

1. I am the President of NexPoint Advisors, L.P. (***NexPoint***), an investment advisor registered with the U.S. Securities and Exchange Commission (***SEC***). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

3. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding $16 billion in value. I was formerly the President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or

my affiliates. In December 2015, I divested my majority stake of Highland (***2015 Transaction***).

**THE FUND**

4. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

5. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the ***Supporting Organizations***) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the ***Charities***).

6. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (***ARLPA***), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (***Articles***), govern the Fund and its partners.

7. The LP held 100% of the economic interest in the Fund. The Fund's general partner, Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011, held management shares.

8. The LP issued 100 management shares (the ***Management Shares***) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in

the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

9. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

10. The governing documents of the Fund plainly state in multiple places that all of the powers of the Control Position exist solely for the purpose of benefitting the Supporting Organizations and their Charities. This ubiquitous language was created for an express purpose. The expectation by the founders of the Fund (myself included) at the time it was formed was that the governing documents would ensure that the Control Position would be bound through his or her fiduciary obligations to safeguard and advance the interests of the charitable organizations that held actual beneficial ownership of the Fund.

**GRANT SCOTT**

11. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

12. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr. Scott as the Control Person. However, Mr. Scott had complete discretion in adopting or rejecting the

investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr. Scott was paid $60,000 per annum.

13. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

14. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax- deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr. Patrick served that role at Highland from 2008 until his departure in February 2021.

15. In March 2021, Mr. Patrick was hired by Skyview as Tax Counsel and continued to perform substantially similar tax counsel duties for me. At Mr. Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

16. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr. Patrick working with outside counsel. Mr. Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

17. In March 2021, Mr. Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the bankruptcy of Highland filed in 2019, and he did not believe he was equipped to handle those disputes. Mr. Patrick suggested to Mr. Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr. Patrick was my attorney and Mr. Scott was my trusted friend, and I was happy for Mr. Scott to pass the Control Position to Mr. Patrick.

18. On 25 March 2021, Mr. Scott: (i) resigned as director of the LP, (ii) appointed Mr. Patrick as director of the LP, and (iii) transferred to Mr. Patrick the Management Shares for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

19. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr. Murphy, Mr. Patrick's vote counts as the tiebreaker for corporate voting.

**MR. PATRICK'S CONTROL OF THE FUND**

20. In the initial period following Mr. Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr. Patrick was free (as Mr. Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

21. Subsequently, however, communications between Mr. Patrick, Skyview, and me began to become less frequent, and over time I came to suspect that Mr. Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the

Fund, but rather for his own personal enrichment.

22. On 28 June 2023, Mr. Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms. Short learned that the directors of the entity were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick had made the grant request without disclosing his and/or his family's involvement.

23. Ms. Short discussed the matter with Mr. Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms. Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms. Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely. I was informed of this process by Ms. Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

24. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr. Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

25. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr. Cronin was known to me personally. In September 2023, Mr. Cronin and I met, and he informed me that he had been approached by Mr. Patrick with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick as a supplement to Mr. Patrick's compensation. Mr. Cronin informed me that he had asked Mr. Patrick if this arrangement would amount to fraud, and that Mr. Patrick's response had been: "*you can't steal from yourself*."

26. Mr. Cronin informed me that he understood from this statement that Mr. Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr. Cronin further informed me that he was uncomfortable about Mr. Patrick's proposal and that he subsequently communicated this to Mr. Patrick, whereupon Mr. Patrick cut off all further communications between them.

27. Mr. Cronin's allegations that Mr. Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my attorneys in the United States that, had Mr. Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr. Cronin contacted me, I met with Mr. Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations about the matter and Mr. Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr. Patrick's powers or remove him from his position.

28. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr. Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the ***Expense Summary***) which indicated substantial increases in expenditures during Mr. Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a) Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023 – and increased even further to around $2.25 million in the first half of 2024 alone.

(b) Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

29. The Expense Summary reinforced my concern that Mr. Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

30. In August 2024, I became aware of yet another issue concerning Mr. Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the

Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr. Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

31. I was informed that my director of charitable giving had been contacted by Ms. Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms. Diaz stated that on August 28, 2024, Mr. Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr. Patrick through his employment at Skyview and constituted MNPI, which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr. Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr. Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr. Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

32. Upon receipt of the allegations against Mr. Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr. Patrick's knowledge, so as to avoid potentially tipping off Mr. Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr. Patrick's actions constituted a serious breach of his compliance and employee obligations. On October 1, 2024, as part of the finalization of the investigation report, Skyview's chief compliance officer interviewed Ms. Diaz about the allegations against Mr. Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on October 11,

2024 and concluded that Mr. Patrick had attempted a serious breach of U.S. securities laws.

33. On October 2, 2024, Mr. Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr. Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr. Patrick became aware of the investigation into his behavior and resigned before the report was published.

34. On the same day that Mr. Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr. Patrick as my counsel, I believe that Mr. Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

**FUNDING OF PROCEEDINGS**

35. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations for the purpose of understanding how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. I am only one of three votes, and the other two votes on each board are held by the respective Charity. Historically, the boards have had no hesitation in exercising their powers to chart

independent courses even if those decisions differ from my preferences.

36. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

**************REMAINER OF PAGE INTENTIONALLY LEFT BLANK**************

My name is James David Dondero, my date of birth is June 29, 1962, and my address is 300 Crecent Court, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing is true and correct. Executed in Dallas County, State of Texas, on the 1st day of July 2025.

**JAMES DAVID DONDERO**

EXHIBIT 7

**CAUSE NO. ____________________**

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,**<br><br>*Plaintiffs*,<br><br>**v.**<br><br>**MARK PATRICK and DFW CHARITABLE FOUNDATION,CDMCFAD, LLC, CDH GP, Ltd., and CHARITABLE DAF FUND, LP**<br><br>*Defendants.* | **IN THE TEXAS BUSINESS COURT**<br><br>**1ST DIVISION**<br><br>**DALLAS, TEXAS** |

**DECLARATION OF JULIE DIAZ**

I, **JULIE DIAZ**, of 3000 Pegasus Park Dr, Suite 930, Dallas, Texas 75247, declare under penalty of perjury as follows:

1. I am the President and Chief Executive Officer of The Dallas Foundation, an exempt charitable organization based in Dallas, Texas which partners with donors and works with the community to support various philanthropic causes in Greater Dallas.

2. I am also a Director of the Highland Dallas Foundation Inc., an exempt charitable entity incorporated in Delaware as a supporting organization to provide funding directly to The Dallas Foundation.

3. I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4. This Declaration is presented in support of Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver in the above-captioned case. I verify that, to the best of my knowledge, information, and belief, the statements in it are true.

**PROFESSIONAL EXPERIENCE**

5. I hold a Bachelor's Degree in Arts Management from Salem College, and a Masters Degree in Business Administration from Boston University.

6. I joined The Dallas Foundation in 2019 as Vice President, Philanthropic Partnerships. I was appointed as President and CEO in 2024.

7. I have extensive nonprofit experience in strategy, governance, and revenue growth, having led resource development teams at the Perot Museum, Greenhill School and Southern Methodist University, and having held leadership roles at the Philadelphia Orchestra, the Boston Symphony Orchestra, and GBH Public Television and Radio in Boston.

8. I am an active member of The Dallas Assembly and Charter 100, organizations which champion collaboration in community development and philanthropy.

9. I also served in 2018 as an adjunct professor at SMU Meadows School for the Arts.

**THE FUND**

10. The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Walkers Corporate Services Ltd, Walker House, 87 Mary St, George Town, Grand Cayman, KY1-9005, Cayman Islands.

11. The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the ***ARLPA***).

12. From approximately its inception until approximately March 2025, the sole limited partner of the Fund (the LP) was a Cayman Islands exempt company incorporated on 27 October 2011

(registration number 263805) called Charitable DAF Holdco, Ltd.

13. The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the ***Articles*****).**

14. The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011.

<u>Ownership and Management</u>

15. The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the* ***Code****) … for the economic benefit of the Limited Partner and its <u>Indirect Charitable Owners</u>*" (ARLPA, Recitals).

16. From my experience in nonprofit entities, I understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organizations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities. The relationship between a supporting organization and its supported charity is sometimes described as similar to that of a parent and subsidiary.

17. In this context:

(a) The LP holds or held all of the economic interest in the Fund. The GP held control shares, but had no economic interest.

(b) The LP issued 305 participation shares (the ***Participation Shares***), 300 of which are held by three Delaware corporate entities (together, the ***Supporting Organizations*** and/or ***Petitioners***). Each Supporting Organization provides funding to its respective U.S.-charitable foundation (together, the ***Charities***) which are the ultimate beneficial



CONFIDENTIAL

owners of the Fund's entire economic interest. These Supporting Organizations are the Plaintiffs in the above-captioned litigation.

(c) The LP also issued 100 management shares (the ***Management Shares***) which attach the only voting rights for all shareholders of the LP. The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the entire issued share capital in the GP (the ***Membership Interest***).

18. The Management Shares and Membership Interest have at all material times been held by a single individual who as a result has substantial control of the Fund structure (the ***Control Position***). In this regard, the relevant terms of the ARLPA and Articles are as follows.

(a) **The ARLPA**

Clause 1.12

(a) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

Clause 1.6

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have

full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

(b) **The Articles**

Article 11

The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. *Management Shares confer no other right to participate*

*in the profits or assets of the Company*.

Article 19

Participating Shares … shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## SUPPORTING ORGANIZATIONS

19. The Supporting Organizations provide funding directly to the Charities as follows:

(a) Prior to the events at issue in this Action, The Highland Dallas Foundation, Inc. (***HDF***) held 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1.2 billion in charitable grants that support a broad range of public needs and manages over $650 million in assets.

(b) Prior to the events at issue in this Action, The Highland Kansas City Foundation, Inc. (***HKCF***) held 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants that support a broad range of public needs and currently manages over $5 billion in assets.

(c) Prior to the events at issue in this Action, The Highland Santa Barbara Foundation, Inc. (***HSBF***) held 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

(d) Prior to the events at issue in this Action, HCMLP Charitable Fund (***HCMLP***) held 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million that support a broad

range of public needs and donated $38.9 million to local nonprofits in 2023.

20. Since the Fund's inception in 2011, the Supporting Organizations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

## BACKGROUND

21. As stated in paragraph 6 above, I joined The Dallas Foundation in 2019 and do not therefore have direct personal knowledge of any factual matters, including regarding the formation of the Fund and/or the Fund's operations, prior to that time. I understand these matters are covered in the declaration of James Dondero.

22. A summary of those matters that I understand to be most relevant to this application are accurately summarized as follows:

(a) **Control Position**. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr. Scott: (i) resigned as director of the Fund and LP (ii) appointed Mark Patrick as director of the Fund and LP; and (iii) transferred to Mr. Patrick the Management Shares in the LP and Management Interest in the GP for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

(b) **Mark Patrick**. From 2008 to 2021, Mr. Patrick was employed as tax counsel by Highland Capital Management, LP (***Highland***), an investment advisor founded by Mr. Dondero. From March 2021 to October 2024, Mr. Patrick was employed as tax counsel at Skyview Group (***Skyview***). In both positions, Mr. Patrick acted as an advisor to Mr. Dondero. Mr. Patrick played a significant role in developing the overall Charitable DAF Fund structure.

## CONCERNS ABOUT MR. PATRICK'S CONDUCT

23. I became aware that in June 2023, Mr. Patrick made a grant request to the Highland Dallas Foundation in relation to 'Creative HEARTS TX', an entity of which Mr. Patrick and his family



CONFIDENTIAL

were directors, without disclosing this information. I became aware of this situation contemporaneously with its occurrence and it caused me concern regarding Mr. Patrick.

24. I understand from the Dondero Declaration (not my personal knowledge) that in September 2023, Mr. Patrick approached Kevin Cronin of Fortaris with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick. I became aware of this situation shortly after its occurrence and it caused me concern regarding Mr. Patrick.

25. In August 2024, I personally became aware of the potential disclosure of material non-public information (***MNPI***) to the Highland Dallas Foundation (***HDF***). On 28 August 2024, I was informed by David Rosenberg of Holland & Knight (***H&K***), the Charities' US-attorneys, that Mr. Douglas Mancino, an attorney with Seyfarth Shaw LLP (***Seyfarth***) in Los Angeles, California, had called Mr. Rosenberg, identified himself as Mr. Patrick's "*outside compliance counsel*" and recommended that Mr. Rosenberg advise HDF to exercise put-options over units it holds in the NexPoint Hospitality Trust (***NHT***). Mr. Rosenberg reported this to me. I was very concerned by this information and therefore immediately contacted Lucy Bannon, an employee of NexPoint and someone I have known in a professional capacity for many years, to inform her of the situation.

26. I have since become aware through my position at The Dallas Foundation and role as a board member of HDF, that the information Mr. Mancino provided to H&K could have constituted MNPI. This matter is discussed in more detail in paragraphs 33-35 of Dondero 1.

**<u>FINANCIAL IRREGULARITIES</u>**

27. In or around August 2024, NexPoint provided the Charities with a financial analysis of the Fund's annual expenses (the ***Expense Summary***) which appeared to indicate substantial

increases in expenditures in recent years.

28. As stated in paragraph 31 of Dondero 1, the Expense Summary indicated as follows:

(a) Directors' fees increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, directors' fees increased further to around US$2.25 million.

(b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount had been spent in2023 (i.e. US$18.6 million). I was not aware of any basis for this extraordinary legal expenditure in a period of just 18 months.

29. The Charities were concerned by the Expense Summary and considered it was necessary to seek to verify and/or understand the apparent increases in expenditure. Accordingly, in October 2024, the Charities made a reasonable request to Mr. Patrick for financial information about the Fund, which Mr. Patrick failed to provide at that time, or any time thereafter.

30. On 11 November 2024, the Charities' US-attorneys, Holland & Knight (***H&K***), conveyed a letter to Mr. Murphy from the Charities (the ***No Confidence Letter***) advising that the Charities no longer have confidence in the governance of the Fund and consider a reorganization is required:

> "Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. **The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed**. **As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts**.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

31. The Charities did not receive a response to the No Confidence Letter. Accordingly, on 23 January 2025, I sent an email to Mr. Murphy (a director that Mr. Patrick appointed in the Cayman Islands) stating that the Charities wished to better understand the Fund's asset position and requesting that the Fund provide certain information by 10 February 2025, including: (i) income statements for the past four years, (ii) listing of underlying assets, (iii) audited financial statements, and (iv) the current structure of the LP's operations.

32. On 28 January 2025, I sent a further email to Mr. Patrick and Mr. Murphy expressing serious concern that the Charities' requests continued to be disregarded, reflecting an ongoing lack of transparency about the Fund:

"...These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the

assets further".

33. On 30 January 2025, I received a response from Mr. Murphy stating that neither he nor Mr. Patrick received my 23 January 2025 email, and that he understood the next step was that he and Mr. Patrick would "present directly to the foundations/supporting organizations" to address some of the concerns in the No Confidence Letter:

"…**we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets.** As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control … any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero …

…**We note that your communications to date contain several misstatements of fact and we reject all of your allegations**. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

**Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so** (which is not disputed).

In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies."

34. I understand (and as stated in paragraph 12 of Dondero 1) the Control Position to be responsible for governance and management functions to enable the Fund to carry out its sole purpose of benefiting its ultimate beneficial owners (i.e. the Charities). In this context, the Charities were very surprised and concerned by Mr. Patrick and Mr. Murphy's responses to requests for information and the lack of transparency regarding the Fund's financial position. It remains unclear to the Charities the basis upon which access to such information was (and continues to be) restricted.

35. On 31 January 2025, H&K responded to Mr. Murphy's email as follows:

"As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions

...

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024, before Mr. Patrick shut down [communication] **showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022.** If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. **Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024.** Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. **Yet, no information has been provided by you and Mr. Patrick,**



CONFIDENTIAL

**no clarity given.** It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10% on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. **If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns**…

36. On 4 February 2025, Mr. Murphy responded that while open to resolving the concerns, they were struggling to understand the Charities' change in position.

37. On 7 February 2025, H&K responded as follows:

> "I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees.
>
> …
>
> Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted."

38. On 14 February 2025, H&K received a fax from Seyfarth which rejected the reported increases



CONFIDENTIAL

in legal and directors' fees and sent a further email on 18 February 2025 which attached a valuation of the Fund from 2020 in support of his suggestion that similar information was provided to the Charities when Mr. Scott was in the Control Position. Copies are at **Tabs 15** and **16**, respectively.

39. On 27 February 2025, H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund.

40. On 17 March 2025, Seyfarth sent an email to H&K requesting available dates for Mr. Murphy to make a presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth replied, stating they had just learned of a call arranged for the following day, and seeking to reschedule. H&K responded that they had no knowledge of the purported call and would revert with available dates from 16 April 2025. On 9 April 2025, HK responded with its availability.

41. At the date of this declaration, none of the financial information requested by the Charities has been provided by Mr. Patrick or Mr. Murphy.

**MR. PATRICK DILUTES THE SUPPORTING ORGANIZATION'S INTERESTS IN THE CHARITABLE DAF FUND.**

42. I am aware that between December 2024 and the present, Mr. Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund and then to entirely alienate those assets. Mr. Patrick's acted to eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets, while awarding ownership to at least one purported charitable entity that he personally controls.

43. I have come to know now that Mr. Patrick held the controlling general partner shares in the

Charitable DAF Fund via the Delaware GP. Without any prior notice or even disclosure to the Supporting Organizations, in February 2024, Mr. Patrick incorporated CDH GP, Ltd in the Cayman Islands, with Mr. Patrick as the sole director. He used this newly created Cayman Islands entity to replace and redomicile Delaware GP. CDH GP became the general partner holding all the controlling shares in the DAF Fund. The Supporting Organizations only found out about the replacement and redomicile of the Delaware GP in February 2025, through independent investigation.

44. On December 9, 2024, Mr. Patrick created Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Mr. Patrick was named the Sham Charity's sole member and sole director; its registered address is Mr. Patrick's home address. The apparent purpose and the clear effect of forming DFWCF was to create a facsimile of the Charitable DAF Fund beneficiaries—the nonprofit charities and their Supporting Organizations—but in the form of a "charitable" entity controlled by Mr. Patrick.

45. I learned that Mr. Patrick later incorporated CDMCFAD, LLC, a Delaware limited liability company.

46. Without notice to the Supporting Organizations or to me, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC. The Supporting Organizations' technical interest was in Charitable DAF Holdco. As a result, CDMCFAD effectively was inserted as a company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets in Charitable DAF Fund. Instead, a different and new entity (CDMCFAD) held the assets in Charitable DAF Fund; the Supporting Organizations only held shares in an

entity (Charitable DAF Holdco) that notionally held that new entity.

47. On February 7, 2025, again without notice to the Supporting Organizations or to me, DAF HoldCo allotted 318 participating shares to DFWCF, the Sham Charity controlled by Mr. Patrick himself. This dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF Holdco from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; and (iii) HSBFI's interest was diluted from 32.787% to 16.05%.

48. I now know that in February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Mr. Patrick's complete control of the assets of DAF Fund.

49. And I now know that on March 27, 2025, Mr. Patrick caused CDMCFAD to issue shares to the Sham Charity, and only to the Sham Charity. None of the Supporting Organizations were issued shares in CDMDFAD. Now, the sham charity controlled by Mr. Patrick held a direct economic interest in the entity that Mr. Patrick had newly inserted between Charitable DAF Holdco and the assets in Charitable DAF Fund. Meanwhile, the two direct beneficial owners of CDMCFAD were (1) Charitable DAF Holdco—in which the Supporting Organizations still held a minority beneficial interest; and (2) Mr. Patrick's new sham charity, which he controlled.

50. On April 2, 2025, Mr. Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million, after which Charitable DAF Holdco purportedly had no assets and no remaining interest in Charitable DAF Fund at all. Needless to say, a one-time $1.6 Million payment for the release of the beneficial ownership of more than

$270 Million in the Fund—held entirely for the benefit of the Supporting Organizations as late as December 2024—is not an exchange that I or any other person with fiduciary loyalty to the Supporting Organizations would ever have approved, had we known it was happening at the time. As a result, Mr. Patrick's Sham Charity, Defendant DFWCF, was the sole remaining limited partner and beneficial owner of Charitable DAF Fund, through its 100% ownership of the fund by CDMCFAD. The effect of this final step was to consummate the complete severance of the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund.

51. Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned more than 98% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Mr. Patrick purportedly caused $1.6 million to be distributed to the Supporting Organizations receipt of those funds have yet to be verified.

**REPLACEMENT OF GP**

52. For the first time, in February 2025, I learned that Mr. Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior. This information was, I understand, obtained via background checks into the various parties.

53. I understand that on 27 February 2024, CDH GP, Ltd (the ***New GP***) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

54. I also understand that Mr. Patrick is the sole director of the New GP.

55. It is unclear to the Charities on what basis Mr. Patrick and/or Mr. Murphy removed and redomiciled the general partner of the Fund, nor the reason the Charities were not notified of

this change.

## PURPOSE OF APPLICATION

56. It is clear the Fund's assets are being diminished for the benefit of Mr. Patrick and Mr. Murphy; and in any case, the Defendants in this Action are engaged in a series of secretive transactions intended to completely alienate from the Supporting Organizations more than $270 Million that was held for their benefit, and upon which their charitable activities depend. These are the sole motivations of the Charities in bringing this application.

57. Unless enjoined, Mr. Patrick and the other Defendants will cause and continue to cause irreparable harm to the Charities including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $250 Million that can never be replaced because the Defendants lack the means. In addition to the permanent loss of funds in the future, the immediate continuation of key programs at the Charities is imperiled by the conduct at issue here and the reality that the Charities, as of this moment, are cut off from the funds intended for their support. Moreover, the conduct of the Defendants to date creates a pattern suggesting that further creative transfers, alienation, spending, and dissipation of the monies in the fund are likely to be imminent. If this happens, it is likely they will never be recovered.

58. The harm to the Charities is imminent if the Defendants are not enjoined. Enjoining the Defendants will merely require them to refrain from doing anything with the Funds for two weeks. If the Defendants are not acting adversely to the Charities, the Funds will still be available to them for their use in future. The Charities suffer a greater burden as they stand to lose everything.

59. Enjoining the Defendants will not disserve the public interest as without the injunction, there is significant potential for irreparable harm to the Charities and the Defendants will not be harmed

if enjoined. Freezing the funds to ensure that Mr. Patrick's scheme is not hurting charitable interests vital to key communities serves the public interest.

**ARGUMENTS THAT MAY BE MADE BY THE RESPONDENT**

60. I draw attention to the following matters which the Defendants may raise by way of attempted defense against the application.

61. The Defendants may assert (as they have repeatedly suggested in correspondence) that the Charities are acting on the instructions of Mr. Dondero and that we are being used as a proxy for his own disputes with Mr. Patrick. Any suggestion of that nature is entirely rejected. On the contrary, the Charities have at all times taken steps to independently verify information provided to them by Mr. Dondero and entities associated with him, have taken advice solely from their own attorneys in the US and Cayman, and have required Mr. Dondero to recuse himself from board meetings of the Supporting Organisations at which decisions as to whether to bring these proceedings were discussed. The Charities have no interest in any dispute there may be between Mr. Patrick and Mr. Dondero.

62. The Defendants also may assert that the Charities are not entitled to any information regarding the Fund, and that the structure was designed specifically to exclude the Charities from information or control rights. Whether that is true or not, the Charities are the sole economic beneficiaries of the Fund's activities, and Defendants owed and owe them fiduciary duties of care, loyalty, and candor. If the Fund is being used for a purpose other than that for which it was established, that cannot be allowed to continue to the detriment of the charitable causes and in violation of those duties. The Fund would otherwise be an unsupervised vehicle susceptible to being used for the wishes and benefit of the individual holding the Control Position, to the detriment of the Charities and the express purposes of the governing documents.

63. The Defendants may deny that the expenditures are as significant as that appearing from the documents. If that is the case, the Defendants have had ample opportunity to correct this, but have chosen not to do so.

64. I am not aware of any other points that the Defendants have made or alluded to in correspondence which could materially affect this application.

**THE CAYMAN ISLANDS PROCEEDINGS**

65. Given Patrick's pattern of malfeasance the Supporting Organizations filed an involuntary Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*

66. Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, DFWCF as a Delaware entity was not expressly named in the Grand Court proceedings.

67. The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:



CONFIDENTIAL

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

68. While the Cayman Islands appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick and DFWCF (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the DAF Fund and DAF HoldCo. In the meantime, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that relief on funding from the DAF Fund.

69. Further, while Defendants Patrick and DFWCF wrongfully remain in control of the participation shares that rightfully belong to the Supporting Organizations, the Defendants wrongfully hold a seat on the liquidators' committee.

## ORDERS SOUGHT

70. Given the refusal of the Defendants to answer legitimate questions raised by the Charities and the weight of evidence that suggests that the Defendants are dealing with or spending the assets of the Fund in a manner that is not in the best interest of the Charities, the Charities respectfully seek orders placing the Fund, its Limited Partner, and its General Partner under the control of an independent Receiver who can investigate the affairs of the Fund and the decisions taken by management, and manage those affairs for the benefit of the intended beneficiaries, under the supervision of the Court. The Charities have no confidence in the current management to provide this information themselves without independent oversight.

71. Until such time as a Receiver may be appointed, the Charities further seek a temporary

restraining order and temporary injunction to prevent the Defendants from the use, transfer, dispersal, and/or alienation of any interests or assets, regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment.

My name is Julie Diaz, my date of birth is 3/23/64, and my address is 5711 Prestwick Lane Dallas, TX 75252. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Barnstable County, State of MA,

on the 1 day of July, 2025.

/s/ Julie Diaz
JULIE DIAZ

EXHIBIT 8

FSD NO. 116 OF 2025 (JAJ)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

## SUPERVISION ORDER

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1. The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).

2. The following persons are appointed as joint official liquidators of the Company:

| Name | Address | Contact Details |
|---|---|---|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588 margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588 sandipan.bhowmik@uk.gt.com |

3. The joint official liquidators may act jointly and severally.

4. The joint official liquidators are not required to give security for their appointment.

5. The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

   a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

   b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6. The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

   a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

   b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

   c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7. The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8. The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9. The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.

10. The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**

Filed 6 May 2025

______________________________________

**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN

**DuaneMorris®**

*FIRM and AFFILIATE OFFICES*

JOSEPH M. COX
PARTNER
DIRECT DIAL: +1 214 257 7252
PERSONAL FAX: +1 214 853 9480
*E-MAIL:* JMCox@duanemorris.com

*www.duanemorris.com*

HANOI
HO CHI MINH CITY
SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NORTH JERSEY
LAS VEGAS
SOUTH JERSEY
SYDNEY
MYANMAR

ALLIANCES IN MEXICO

July 11, 2025

Mr. Brian Shaw
Carrington, Coleman, Sloman, & Blumenthal
901 Main Street, Suite 5500
Dallas, Texas 75202
bshaw@ccsb.com

*Sent via email*

**Re: The Highland Dallas Foundation, Inc, et al v. Mark Patrick, et al,**
**Cause No. 25-BC01B-0027**
**Rule 11 Agreement**

Dear Mr. Shaw:

Pursuant to Texas Rule of Civil Procedure 11, the parties in this matter The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (collectively "Plaintiffs"), and Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd. (collectively "Defendants"), agree to the following:

(1) The "Covered Entities" as referred to herein is defined to include collectively Charitable DAF Fund, LP and/or any of its subsidiaries, the DFW Charitable Foundation and/or any of its subsidiaries, CDMCFAD, LLC and/or any of its subsidiaries, and/or any of its subsidiaries, and CDH GP, Ltd. and/or any of its subsidiaries.

(2) Defendants shall have until Monday, July 14, 2025, to file a challenge to the court's jurisdiction (the "Plea").

(3) Plaintiffs shall have until Monday, July 21, 2025, to file a response to the Plea.

(4) Defendants shall have until Thursday, July 24, 2025, to file a reply to the Plea.

(5) The Parties agree to the following limits on discovery prior to any hearing on Plaintiffs' application for temporary injunction/appointment of receiver (the "Temporary Injunction")

DuaneMorris



in this matter (these limits shall have no effect on any discovery conducted after the Temporary Injunction is decided):

a. Plaintiffs and Defendants each (not per party) may serve 25 requests for production to the other, may serve 5 interrogatories, may serve 10 requests for admission, and may take 3 depositions (2 of which shall be limited to 3 hours, and one of which shall be limited to 6 hours, the selection of the witness for the six hour deposition to be determined by the party seeking the deposition).

b. The Parties shall serve all discovery requests no later than Wednesday, July 16, 2025.

c. Responses to the written discovery and substantial completion of related any related document production shall be served as follows: (1) if the Court denies the Plea as to any Defendant, seven business days after the Court order denying the Plea is entered; (2) if the Court grants the Plea as to all Defendants, then responses to written discovery shall not be due, if at all, until seven business days after the Court's order granting the Plea is reversed or overturned.

   Depositions shall take place within seven days after the written discovery responses and documents are served as set forth in c. above.

(6) If the Court denies the Plea, the Temporary Injunction shall be heard as reasonably practicable after the ruling, unless stayed by an appellate court. If the Plea is granted, but is later reversed or overturned, the same timelines for discovery provided in (5) above shall be followed and the Parties shall then seek to expeditiously set a hearing before the Court.

(7) Pending the Court's decision on the Temporary Injunction or grant of the Plea relating to the Temporary Injunction or Plea), the Covered Entities and their respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for any Covered Entity, agree:

a. not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares outside of the ordinary course of business;

b. not take any action to increase the compensation paid to any employee of the Covered Entities;

c. not to take any action to dissolve, winddown, liquidate, or otherwise alter the corporate standing of Covered Entities;

d. not to take any action to modify or alter the corporate governance of the Covered Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

e. not to take any action to sell, exchange, or dispossess any asset of one of the Covered Entities unless (i) the sale is to a bona third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide

DuaneMorris



purchaser is made aware of this Rule 11 Agreement, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the Covered Entities;

f. not to alter, conceal, or destroy any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(8) This Agreement shall be filed with the Court and, as provided in the first sentence of this letter, constitutes an enforceable agreement pursuant to Texas Rule of Civil Procedure 11. This Agreement shall expire and be of no force or effect on the earlier of (a) thirty days after a final order of the Court dismissing this case or (b) the Court's ruling on Plaintiffs' current request for a temporary injunction (or as subsequently amended). This does not prevent a party from requesting that a court of appeals issue an order to keep this Rule 11 Agreement in place during the pendency of such appeal or any objection to such request.

If the terms above accurately reflect our agreement, please acknowledge your agreement by signing below.

Best regards.

Sincerely,

[signature]

Joseph M. Cox

AGREED TO FORM AND CONTENT:

[signature]
Brian Shaw, Counsel for Defendants

JMC/kr
cc: (all via email)
Darren McCarty, Esq.
Craig Warner, Esq.
Clients

DM1\16831875.1