**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P**.**

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 31**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

Vol. 2

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| | | |

000648 thru Vol. 3

Vol. 4 001843

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 4 001845 thru Vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7<br>003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8<br>004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9<br>005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 9 | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 04/17/2026 005330 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 04/21/2026 005590 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026 005594 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026 005615 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026 005682 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

Vol. II

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 04/28/2026 005746 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005755 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005761 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 005767 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 005776 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 005783 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | **Date Filed** | **Docket No.** | **Description/Docket Text** |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

Vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 05/06/2026<br>005913 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026<br>005920 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026<br>005927 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 05/07/2026<br>005929 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/08/2026<br>005936 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 05/08/2026<br>005939 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 05/08/2026<br>005942 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026<br>005945 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 05/08/2026<br>006100 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

Thru Vol 21

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10).22 008156 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28 05/11/2026 010664 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 05/11/2026 010736 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 05/11/2026 011150 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 05/11/2026 011734 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 05/11/2026 013203 Thru Vol 33 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 05/11/2026 014888 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 015349 | 05/11/2026 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 015505 | 05/11/2026 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 015506 | 05/12/2026 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 015538 | 05/12/2026 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 015565 | 05/12/2026 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 015566 | 05/15/2026 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 015569 | 05/18/2026 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 015996 05/18/2026 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 39 | | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 016729 | 07/10/2026 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 016731 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 016733 | 07/24/2026 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 016742 | 07/28/2026 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S THIRD AMENDED**
**<u>EXHIBIT LIST FOR THE MAY 11, 2026 HEARING</u>**

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Exhibit List for the May 11, 2026 Hearing in the Bankruptcy Case.

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | HCM-D10000002-HCM-D10000013 |
| 2 | Settlement Agreement and General Release | 000813-000836 |
| 3 | 6/4/2024 First Affidavit of Mark Patrick | Dkt. 401-2 (21-03076-sgj) |
| 4 | 7/21/2025 [4-33] Original DAF Org Chart | Dkt. 4-33 (25-11376-BLS) |
| 5 | 7/11/2011 Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP | Dkt. 4-36 (25-11376-BLS) |
| 6 | 2/20/2025 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd. | Dkt. 4-06 (25-11376-BLS) |
| 7 | 11/9/2023 Shields Work Plan Memorandum | |
| 8 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 9 | 12/12/2024 Certificate of Formation of CDFMCAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 10 | 12/18/2024 Charitable DAF HoldCo, Ltd. Unanimous Written Resolutions of all of the Directors of the Company | Dkt. 4-45 (25-11376-BLS) |
| 11 | 9/30/2024 Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 12 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 13 | 3/27/2025 CDMCFAD, LLC Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 14 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D100000330 |
| 15 | 2/12/2025 Membership Interest Purchase Agreement | HCM-D10000021-HCM-D10000036 |
| 16 | 2/12/2025 Member Consent of Beacon Mountain | HCM-D10000019-HCM-D10000020 |
| 17 | 11/30/2015 Amended and Restated Limited Partnership Agreement of Atlas IDF, LP | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 18 | 6/26/2025 Audit of RAND PE Fund I, LP | HMIT_Entities_000022-HMIT_Entities_000039 |
| 19 | 3/6/2024 DAF Structure Chart in 2024 and 2025 | |
| 20 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | |
| 21 | 12/2015-8/2022 Rand Structure Chart | |
| 22 | 2/12/2025 Feb. and May 2025 Rand Structure Chart | |
| 23 | 10/15/2019 Empower Dallas Foundation, Inc. Partial Surrender Request | |
| 24 | 2/22/2021 Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief | Dkt. 1943 (19-34054-sgj11) |
| 25 | 4/8/2025 Email regarding Settlement Agreement | HCMLPHMIT00000656-HCMLPHMIT00000661 |
| 26 | 12/16/2015 Crown Global Deferred Variable Annuity Policy for Empower Dallas Foundation, Inc. | |
| 27 | 11/30/2015 Participation Agreement between Crown Global Life Insurance Ltd. and Other Entities | |
| 28 | 9/12/2025 First Affidavit of Mark Eric Patrick | |
| 29 | 10/21/2025 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 9/30/2025 | Dkt. 4438 (19-34054-sgj11) |
| 30 | 10/21/2025 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 9/30/2025 | Dkt. 4439 (19-34054-sgj11) |
| 31 | 1/21/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 12/31/2025 | Dkt. 4503 (19-34054-sgj11) |
| 32 | 1/21/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 12/31/2025 | Dkt. 4504 (19-34054-sgj11) |
| 33 | 4/20/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 3/31/2026 | Dkt. 4552 (19-34054-sgj11) |
| 34 | 4/20/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 3/31/2026 | Dkt. 4553 (19-34054-sgj11) |
| 35 | 6/25/2025 Hearing Transcript for Case No. 19-34054-sgj-11 | |
| 36 | 4/16/2025 Affidavit of James David Dondero | Dkt. 4534-7 (19-34054-sgj11) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 37 | 6/9/2025 Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC § 363 Approving Settlement with the HMIT Entities | Dkt. 4230 (19-34054-sgj11) |
| 38 | HMIT Structure as of 8/12/2022 – 2/12/2025 | |
| 39 | 2/6/2025 Letter to Dolomiti LLC re Notice of Your Withdrawal from Rand PE Fund I, L.P. | |
| 40 | 2024 Tax Form 990 – Highland Dallas Foundation Inc. | Dkt. 4556-2 (19-34054-sgj11) |
| 41 | 3/27/2025 Admission and Amendment to No. 1 Agreement | Dkt. 4-54 (25-11376-BLS) |
| 42 | 12/12/2024 Certificate of Formation of CDMCFAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 43 | 2/7/2015 Unanimous Written Resolutions of the Board of Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-22 (25-11376-BLS) |
| 44 | 12/18/2024 Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-45 (25-11376-BLS) |
| 45 | 4/2/2025 Written Resolutions of the Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-47 (25-11376-BLS) |
| 46 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 47 | 7/21/2025 Defendants' Motion to Dismiss and Plea to the Jurisdiction filed in Cause No. 25-BC-01B-0027, The Highland Foundation, Inc. et al. v. Mark Patrick, et al., The Business Court of Texas, First Division | Dkt. 4-91 (25-11376-BLS) |
| 48 | 3/27/2025 Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 49 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 50 | 9/30/2024 Valuation Analysis of 100 Participation Shars of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 51 | 3/7/2024 Written Consent of the Managing Member of Charitable DAF GP, LLC | Dkt. 4-38 (25-11376-BLS) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 52 | 6/9/2025 Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000001-HCM-D10000001 |
| 53 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) on December 17, 2015 | HCM-D10000002-HCM-D10000013 |
| 54 | Email chain regarding the sale of Class C limited partnership interests from Highland Capital Management, L.P. to Hunter Mountain Investment Trust. Mark Patrick | HCM-D10000014-HCM-D10000015 |
| 55 | Email from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer. | HCM-D10000016-HCM-D10000016 |
| 56 | Email chain from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer | HCM-D10000017-HCM-D10000018 |
| 57 | CLO Holdco, LLC's purchase of all membership interests in Beacon Mountain, LLC from Rand PE Fund I, L.P. | HCM-D10000019-HCM-D10000020 |
| 58 | Membership Interest Purchase Agreement - | HCM-D10000021-HCM-D10000036 |
| 59 | Organizational structure of HMIT entities before and after February 12, 2025. | HCM-D10000037-HCM-D10000038 |
| 60 | Investment Management Agreement -establishes Rand Advisors, LLC as the investment manager for Atlas IDF, LP. | HCM-D10000039-HCM-D10000045 |
| 61 | Investment Management Agreement - establishes Rand Advisors, LLC as the investment manager for Rand PE Fund I, L.P. | HCM-D10000046-HCM-D10000052 |
| 62 | Register of Members for CLO Holdco, Ltd. | HCM-D10000053-HCM-D10000055 |
| 63 | Unanimous Written Consent - executed by Mark Patrick as sole director of Rand Advisors Holding Corp. | HCM-D10000056-HCM-D10000069 |
| 64 | Charitable DAF Fund, LP transferred DAF Holdings stock to CLO HoldCo, Ltd | HCM-D10000070-HCM-D10000072 |
| 65 | Register of Members for Liberty CLO Holdco, Ltd. CLO Holdco, Ltd. | HCM-D10000073-HCM-D10000073 |
| 66 | Limited Liability Company Agreement - establishing Liberty CLO Holdco, LLC as a Delaware limited liability company. | HCM-D10000074-HCM-D10000090 |
| 67 | Register for CDH GP, Ltd. | HCM-D10000091-HCM-D10000091 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 68 | Register of Members for CDH GP, Ltd. | HCM-D10000092-HCM-D10000092 |
| 69 | Register for CLO HoldCo, Ltd. | HCM-D10000093-HCM-D10000094 |
| 70 | Register of General Partners for Charitable DAF Fund, LP. | HCM-D10000095-HCM-D10000095 |
| 71 | Register of Limited Partners for Charitable DAF Fund, LP | HCM-D10000096-HCM-D10000096 |
| 72 | Limited Liability Company Agreement for CDMCFAD, LLC. | HCM-D10000097-HCM-D10000124 |
| 73 | Collation of various documents including resolutions from CDMCFAD, LLC, and a March 2025 letter from Seyfarth Shaw LLP to the IRS reporting potential tax violations by Highland Dallas Foundation, Inc. (Jim Dondero). | HCM-D10000125-HCM-D10000251 |
| 74 | Letter from three Highland foundations to Paul Murphy | HCM-D10000264-HCM-D10000265 |
| 75 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000266-HCM-D10000267 |
| 76 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000268-HCM-D10000269 |
| 77 | Email chain between K. Hendrix and J. Seery, et al. | HCM-D10000270-HCM-D10000271 |
| 78 | Email chain James Seery to Mark Patrick and Shawn Raver | HCM-D10000272-HCM-D10000272 |
| 79 | Email chain from Shawn Raver to J. Seery, et al. | HCM-D10000273-HCM-D10000273 |
| 80 | Email chain from M. Tax to S. Raver, et al. | HCM-D10000274-HCM-D10000274 |
| 81 | Email chain from K. Hendrix to S. Raver, et al. | HCM-D10000275-HCM-D10000276 |
| 82 | Email chain from S. Raver to K. Hendrix, et al. | HCM-D10000277-HCM-D10000278 |
| 83 | Email chain from S. Raver to M. Tax, et al. | HCM-D10000279-HCM-D10000280 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 84 | Note Elevation and Assignment Agreement | HCM-D10000281-HCM-D10000301 |
| 85 | Email from A. Hurt to T. Cournoyer, et al. | HCM-D10000302-HCM-D10000303 |
| 86 | Letter to Dugaboy Investment Trust | HCM-D10000304-HCM-D10000308 |
| 87 | Claims Assignment Agreement | HCM-D10000309-HCM-D10000315 |
| 88 | Email from David Klos at Highland Capital Management to James Seery | HCM-D10000316-HCM-D10000316 |
| 89 | Trust Agreement establishes the Hunter Mountain Investment Trust on December 17, 2015 | HCM-D10000317-HCM-D10000328 |
| 90 | Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000329-HCM-D10000329 |
| 91 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D10000330-HCM-D10000330 |
| 92 | Email from K. Hendrix to A. Gunther, et al. | HCM-D10000331-HCM-D10000332 |
| 93 | Email from K. Hendrix to D. Klos, et al. | HCM-D10000333-HCM-D10000334 |
| 94 | Letter from Campbells LLP to James Seery (CEO of Highland Capital Management, L.P.) and Marc Kirschner | HCM-D10000335-HCM-D10000338 |
| 95 | Email chain from A. Kapuria to S. Raver, et al. | HMIT_Entities_000001-HMIT_Entities_000006 |
| 96 | Email chain from K. Jackson to S. Raver, et al. | HMIT_Entities_000007-HMIT_Entities_000010 |
| 97 | Email chain from S. Reynolds to S. Raver, et al. | HMIT_Entities_000011-HMIT_Entities_000015 |
| 98 | Email from Chris Rice to K. Jackson, et al. | HMIT_Entities_000016-HMIT_Entities_000020 |
| 99 | Email from Chris Rice to S. Raver, et al. | HMIT Entities 000021-HMIT Entities 000021 |
| 100 | Audited financial statements for Rand PE Fund I, L.P. | HMIT_Entities_000022-HMIT_Entities_000039 |
| 101 | Email chain from K. Jackson to S. Raver | HMIT_Entities_000040-HMIT_Entities_000043 |
| 102 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000044-HMIT_Entities_000047 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 103 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities_000048- HMIT Entities 000051 |
| 104 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000052- HMIT_Entities_000054 |
| 105 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000055- HMIT Entities 000057 |
| 106 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000058- HMIT Entities 000058 |
| 107 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000059- HMIT Entities 000059 |
| 108 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000060- HMIT_Entities_000060 |
| 109 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000061- HMIT Entities 000061 |
| 110 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000062- HMIT Entities 000063 |
| 111 | Email chain between Crown Global Insurance and Rand Advisors | HMIT_Entities_000064- HMIT_Entities_000065 |
| 112 | Email from Robert Kipp to M. Patrick, et al. | HMIT Entities 000066- HMIT Entities 000066 |
| 113 | Email chain from A. Gunther to S. Raver, et al. | HMIT Entities 000067- HMIT Entities 000070 |
| 114 | Email chain from S. Raver to A. Gunther, et al. | HMIT_Entities_000071- HMIT_Entities_000074 |
| 115 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000075- HMIT_Entities_000076 |
| 116 | Email chain from S. Raver to J. Seery, et al. | HMIT Entities 000077- HMIT Entities 000078 |
| 117 | Email from C. Rice to S. Raver, et al. | HMIT Entities_000079- HMIT Entities_000079 |
| 118 | Bloomberg invoice | HMIT Entities 000080- HMIT Entities 000080 |
| 119 | Email thread with S&P Global | HMIT_Entities_000081- HMIT_Entities_000083 |
| 120 | S&P Global invoice | HMIT Entities_000084- HMIT Entities_000084 |
| 121 | Email exchange between auditors Chris Rice (NexPoint Services) and Patrick Casale (Cohen & Co) | HMIT Entities_000085- HMIT Entities_000086 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 122 | Financial statement audit | HMIT_Entities_000087-HMIT_Entities_000103 |
| 123 | Email chain C. Rice to S. Raver | HMIT_Entities_000104-HMIT_Entities_000114 |
| 124 | Email chain from S. Raver to C. Rice | HMIT_Entities_000115-HMIT_Entities_000124 |
| 125 | Email from K. Longwell to M. Tax, et al. | HMIT Entities_000125-HMIT Entities_000125 |
| 126 | Civil Investigative Demand issued by the Texas Attorney General's Office to Hunter Mountain Investment Trust (HMIT) on July 14, 2025 | HMIT_Entities_000126-HMIT_Entities_000133 |
| 127 | Email from K. Longwell to M. Tax, et al. | HMIT Entities 000134-HMIT Entities 000134 |
| 128 | Dkt. 23, Notice of Hearing dated 8/27/2025 | HMIT_Entities_000135-HMIT_Entities_000254 |
| 129 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000260-HMIT_Entities_000261 |
| 130 | Email chain from D. Klos to K. Hendrix, et al. | HMIT_Entities_000262-HMIT_Entities_000263 |
| 131 | Email chain from M. Tax to J. Seery, et al. | HMIT_Entities_000264-HMIT_Entities_000264 |
| 132 | Email chain from K. Hendrix to S. Raver, et al. | HMIT_Entities_000265-HMIT_Entities_000266 |
| 133 | Email chain from K. Hendrix to A. Gunther, et al. | HMIT_Entities_000267-HMIT_Entities_000268 |
| 134 | DAF entity structure | VALUESCOPE 000001-VALUESCOPE 000001 |
| 135 | DAF/Rand entity structure | VALUESCOPE_000002-VALUESCOPE_000002 |
| 136 | Law firm forwards legal filing to Mark Patrick (DAF HoldCo) re Chapter 15 filing | VALUESCOPE_000003-VALUESCOPE_000007 |
| 137 | Chapter 15 Petition filing | VALUESCOPE_000008-VALUESCOPE_000026 |
| 138 | Charitable DAF Org structure | VALUESCOPE_000027-VALUESCOPE_000027 |
| 139 | Letter from Reed Smith LLP | VALUESCOPE_000028-VALUESCOPE_000029 |
| 140 | ValueScope, LLC Response | VALUESCOPE_000030-VALUESCOPE_000030 |
| 141 | Certificate of Incorporation, Charitable DAF HoldCo, Ltd. | TDIT004698 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 142 | Legal Relationship Agreement, Highland Kansas City Foundation | TDIT003396–TDIT003398 |
| 143 | Supporting Organization Operating Agreement - Highland Dallas Foundation, Inc. | TDIT003399–TDIT003406 |
| 144 | Supporting Organization Operating Agreement - Highland Santa Barbara Foundation, Inc. | TDIT003407–TDIT003413 |
| 145 | Letter - Highland Dallas Foundation, Inc. | TDIT003389–TDIT003390 |
| 146 | Letter - Highland Santa Barbara Foundation, Inc. | TDIT003391–TDIT003393 |
| 147 | Letter - Highland Kansas City Foundation, Inc. | TDIT003394–TDIT003395 |
| 148 | Employment Agreement - Mark Patrick | TDIT003971–TDIT003988 |
| 149 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011256–TDIT011268 |
| 150 | Memo - Harneys (H&B) | TDIT004274–TDIT004278 |
| 151 | Invoice - G.K. Management Limited | TDIT011038–TDIT011039 |
| 152 | Invoice - G.K. Management Limited | TDIT011040 |
| 153 | Invoice - G.K. Management Limited | TDIT011041 |
| 154 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011058–TDIT011062 |
| 155 | Certificate of Incorporation - Highland Kansas City Foundation, Inc. | TDIT003304–TDIT003306 |
| 156 | Certificate of Incorporation - Highland Dallas Foundation, Inc. | TDIT003326–TDIT003328 |
| 157 | Certificate of Incorporation - Highland Santa Barbara Foundation, Inc. | TDIT003344–TDIT003346 |
| 158 | Invoice - G.K. Management Limited | TDIT011042–TDIT011043 |
| 159 | Invoice - G.K. Management Limited | TDIT011044–TDIT011045 |
| 160 | Invoice - G.K. Management Limited | TDIT011046–TDIT011047 |
| 161 | Invoice - G.K. Management Limited | TDIT011048–TDIT011049 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 162 | Invoice - G.K. Management Limited | TDIT011050–TDIT011051 |
| 163 | Invoice - G.K. Management Limited | TDIT011052–TDIT011053 |
| 164 | Invoice - G.K. Management Limited | TDIT011054–TDIT011055 |
| 165 | Expense Reimbursement - G.K. Management Limited | TDIT011056–TDIT011057 |
| 166 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011088–TDIT011092 |
| 167 | Memorandum – Work Plan - Shields Legal Group | TDIT004699–TDIT004706 |
| 168 | Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT011093–TDIT011128 |
| 169 | Email - Shields Legal Group | TDIT003704 |
| 170 | Limited Partnership Agreement - Charitable DAF Fund, LP | TDIT003414–TDIT003431 |
| 171 | ValueScope Report - ValueScope, Inc. | TDIT004017–TDIT004075 |
| 172 | Expense Report - CLO HoldCo, Ltd. | TDIT003432–TDIT003435 |
| 173 | Audited Financial Statements - Highland Santa Barbara Foundation, Inc. | TDIT003989–TDIT004016 |
| 174 | Resolution of the Directors - Mark Patrick | TDIT003961–TDIT003962 |
| 175 | Resolution of the Directors - Mark Patrick | TDIT003963–TDIT003970 |
| 176 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011129–TDIT011136 |
| 177 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011137–TDIT011150 |
| 178 | Letter - Highland Dallas Foundation, Inc. | TDIT003707–TDIT003708 |
| 179 | Email - Paul Murphy | TDIT003709–TDIT003713 |
| 180 | Email - Walkers | TDIT003714–TDIT003719 |
| 181 | Certificate of Incorporation - DFW Charitable Foundation | TDIT003701–TDIT003703 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 182 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011151–TDIT011164 |
| 183 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011165–TDIT011170 |
| 184 | Resolution - Charitable DAF HoldCo, Ltd. | TDIT003720–TDIT003726 |
| 185 | Assignment - Charitable DAF HoldCo, Ltd. | TDIT003727–TDIT003732 |
| 186 | Agreement - CDMCFAD, LLC | TDIT003733–TDIT003760 |
| 187 | Email - David N. Corkern | TDIT003791–TDIT003792 |
| 188 | ValueScope Report - ValueScope, LLC | TDIT004076–TDIT004130 |
| 189 | Draft Legal Advice - Walkers | TDIT003761–TDIT003765 |
| 190 | Share Issuance Resolution - Charitable DAF HoldCo, Ltd. | TDIT003766–TDIT003790 |
| 191 | Email - PricewaterhouseCoopers (PwC) | TDIT004305–TDIT004323 |
| 192 | Memorandum and Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT003267–TDIT003303 |
| 193 | Form ADV - Rand Advisors, LLC | TDIT003646–TDIT003674 |
| 194 | Brochure - Rand Advisors, LLC | TDIT003675–TDIT003700 |
| 195 | Email - Mark Patrick | TDIT004324–TDIT004340 |
| 196 | ValueScope Report - ValueScope, LLC | TDIT004131–TDIT004205 |
| 197 | Email - FTI Consulting | TDIT004341–TDIT004358 |
| 198 | Director Services Agreement - CDMCFAD, LLC | TDIT011171–TDIT011185 |
| 199 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003955–TDIT003957 |
| 200 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003958–TDIT003959 |
| 201 | Prospectus - NexPoint Real Estate Strategies Fund | TDIT003463–TDIT003599 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 202 | Proxy Statement - NexPoint Capital, Inc. | TDIT003440–TDIT003462 |
| 203 | Written Resolution - CLO HoldCo, Ltd. | TDIT011196–TDIT011197 |
| 204 | Texas Petition - Highland Dallas Foundation, Inc. | TDIT004443–TDIT004688 |
| 205 | Rule 11 Agreement - Highland Dallas Foundation, Inc. | TDIT004693–TDIT004695 |
| 206 | Exhibit Index to Affidavit - Margot MacInnis | TDIT003261-TDIT004712 |
| 207 | Affidavit - Jim Dondero Dugaboy Investment Trust | TDIT004713-TDIT004778 |
| 208 | Texas Petition (Amended) - Highland Dallas Foundation, Inc. | TDIT006527–TDIT006580 |
| 209 | Liquidator's Certificate - Margot MacInnis (JOL) | TDIT006492 |
| 210 | Form ADV - Mark Patrick, Rand PE Fund | TDIT006581-TDIT006609 |
| 211 | Affidavit & Exhibit Index - Margot MacInnis | TDIT004967-TDIT006484 |
| 212 | Affidavit & Exhibit Index | TDIT006485-TDIT006580 |
| 213 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011394-TDIT011405 |
| 214 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011382-TDIT011393 |
| 215 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011425-TDIT011443 |
| 216 | Objection filed by Highland Dallas Foundation, Inc. Grant James Scott III | TDIT011444-TDIT011475 |
| 217 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011476-TDIT011509 |
| 218 | Supplemental Declaration - DFW Charitable Foundation CDMCFAD LLC | TDIT004869-TDIT004945 |
| 219 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) | TDIT006664-TDIT006675 |
| 220 | Affirmation by Mark Patrick | TDIT010529-TDIT010532 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 221 | Operating agreement between Highland Dallas Foundation, Inc. and The Dallas Foundation. | TDIT011406-TDIT011406 |
| 222 | Email exchange between Michael Stockham and Paul Murphy | TDIT010831-TDIT010840 |
| 223 | Form ADV Instructions - None | TDIT006628-TDIT006663 |
| 224 | Declaration by Caroline Maron | TDIT004846-TDIT004868 |
| 225 | Email from Louis M. Phillips requesting execution of two letters with attached documents | TDIT011318-TDIT011323 |
| 226 | Auditor's Report - Highland Capital Management L.P. | TDIT006610-TDIT006627 |
| 227 | Email chain from March 2025 | TDIT011407-TDIT011424 |
| 228 | Amended and Restated Limited Partnership Agreement - Atlas IDF LP | TDIT004779-TDIT004812 |
| 229 | Participation Agreement establishes the framework for Crown Global Life Insurance Ltd to purchase | TDIT004813-TDIT004845 |
| 230 | Investment Management Agreement - Rand PE Fund I | TDIT004946-TDIT004952 |
| 231 | Investment Management Agreement - Rand PE Fund I, L.P. | TDIT004953-TDIT004959 |
| 232 | Limited Partnership Agreement - Rand PE Fund | TDIT004960-TDIT004966 |
| 233 | By-Laws - Highland Kansas City Foundation, Inc. | TDIT003307–TDIT003325 |
| 234 | By-Laws - Highland Dallas Foundation, Inc. | TDIT003329–TDIT003343 |
| 235 | By-Laws - Highland Santa Barbara Foundation, Inc. | TDIT003347–TDIT003361 |
| 236 | Organizational Procedures - Greater Kansas City Community Foundation | TDIT003362–TDIT003388 |
| 237 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003705 |
| 238 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003706 |
| 239 | Expenses Table - Charitable DAF HoldCo, Ltd. | TDIT003960 |
| 240 | Delaware Division of Corporations Search Results - DFW Charitable Foundation | TDIT004696 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 241 | Delaware Division of Corporations Search Results - CDMCFAD, LLC | TDIT004697 |
| 242 | Demonstrative: DAF-Rand Structure Chart | |
| 243 | Certificate of Incorporation of CDH GP, Ltd. | Dkt. 4-95 (25-11376-BLS) |

Dugaboy also reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

Dated: May 11, 2026

Respectfully submitted,

*/s/ Avery Joseph Welker*
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)

New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 11, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Avery Joseph Welker*
Avery Joseph Welker

Plaintiff
M MacInnis
First Affidavit
15 July 2025
Exhibit MM-1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**EXHIBIT MM-1**

---

This is the Exhibit shown to me and marked "**MM-1**" to the First Affidavit of **MARGOT MACINNIS**.

Sworn before me this 15TH day of July 2025

Rachel Baxendale
Notary Public - Cayman Islands

Commission expires on 31 January 2026

Notary Public

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for
309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/

## INDEX TO EXHIBIT MM-1
## TO FIRST AFFIDAVIT OF MARGOT MACINNIS



| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 1. | Company's Memorandum and Articles | 20 February 2025 | 1-37 |
| 2. | Highland Kansas Foundation – Certificate of Incorporation | 23 November 2021 | 38-40 |
| 3. | Highland Kansas Foundation – By-laws | Undated | 41-59 |
| 4. | Highland Dallas Foundation – Certificate of Incorporation | 23 November 2021 | 60-62 |
| 5. | Highland Dallas Foundation – By-laws | Undated | 63-77 |
| 6. | Highland Santa Barbara Foundation – Certificate of Incorporation | 23 November 2021 | 78-80 |
| 7. | Highland Santa Barbara Foundation – By-laws | Undated | 81-95 |
| 8. | Procedures for Establishment and Operation of Funds and Supporting Organizations | Undated | 96-122 |
| 9. | Highland Dallas Foundation – IRS Determination Letter | 19 January 2013 | 123-124 |
| 10. | Highland Santa Barbara Foundation - IRS Determination Letter | 12 February 2013 | 125-127 |
| 11. | Highland Kansas Foundation - IRS Determination Letter | 21 March 2013 | 128-129 |
| 12. | Highland Kansas City Foundation - Legal Relationship Agreement | 30 November 2011 | 130-132 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 13. | Highland Dallas Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 133-140 |
| 14. | Highland Santa Barbara Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 141-147 |
| 15. | Charitable DAF Fund, LP - LPA | 11 March 2024 | 148-165 |
| 16. | CLO HoldCo - Expense report of as of 30 June 2024 | 30 June 2024 | 166-169 |
| 17. | Letter from Stinson LLP to the JOLs | 8 May 2025 | 170-173 |
| 18. | NexPoint Capital, Inc. – Proxy Statement | 7 May 2025 | 174-196 |
| 19. | NexPoint Real Estate Strategies Fund – Prospectus | 30 April 2025 | 197-333 |
| 20. | Complaint - Liberty CLO HoldCo, Ltd v Nancy Dondero and others (United States District Court for the State of Delaware) | 28 February 2025 | 334-345 |
| 21. | CDHC Royse City Land, LLC – Property Tax Assessments | Various | 346-356 |
| 22. | CDHC Assets, LLC - Property Tax Assessments | May 2025 | 357-368 |
| 23. | CDHC Fort Worth Land, LLC - Property Tax Assessments | Various | 369-378 |
| 24. | CDHC Stewart Creek, LLC – Property Tax Assessment | 29 May 2025 | 379 |
| 25. | Rand Advisors LLC – Form ADV | March 2025 | 380-408 |
| 26. | Rand Advisors LLC – Brochure | March 2025 | 409-434 |
| 27. | DFW Charitable Foundation – Certificate of Incorporation | 9 December 2024 | 435-437 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 28. | Email from Shields Legal to Mr Patrick | 5 February 2024 | 438 |
| 29. | Structure chart showing the JOLs' understanding of the Fund holding structure prior to the Relevant Transactions | Undated | 439 |
| 30. | Structure chart showing the JOLs' understanding of the Fund holding structure after the Relevant Transactions | Undated | 440 |
| 31. | No Confidence Letter | 11 November 2024 | 441-442 |
| 32. | Email from Mr Murphy to Mr Patrick | 26 November 2024 | 443-447 |
| 33. | Email from Walkers to the Directors | 27 November 2024 | 448-453 |
| 34. | 18 December Resolution | 18 December 2024 | 454-460 |
| 35. | CDM Assignment | 18 December 2024 | 461-466 |
| 36. | CDMCFAD, LLC LLC Agreement | 18 December 2024 | 467-494 |
| 37. | Walkers' Draft Advice | February 2025 | 495-499 |
| 38. | Share Issuance Resolution | 7 February 2025 | 500-524 |
| 39. | Carrington Coleman Email | 18 December 2024 | 525-526 |
| 40. | Letter Agreement | 27 March 2025 | 527-531 |
| 41. | Manager Consent (Admission and Redemption Documents exhibited) | 27 March 2025 | 532-688 |
| 42. | Resolution of the Directors (Redemption) | 2 April 2025 | 689-691 |
| 43. | Resolution of the Directors (Assignment) | 2 April 2025 | 692-693 |
| 44. | Expenses Table | Undated | 694 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 45. | Resolution of the Directors (Mr Patrick's Salary) | 13 September 2024 | 695-696 |
| 46. | Resolution of the Directors (Mr Patrick's LTI Payment and Annual Discretionary Bonus) | 1 October 2024 | 697-704 |
| 47. | Employment Agreement | 24 March 2021 | 705-722 |
| 48. | Santa Barbara Foundation - Audited Financial Statements (year ended 31 December 2023) | 5 September 2024 | 723-750 |
| 49. | Valuescope Report | 11 April 2024 | 751-809 |
| 50. | Valuescope Report | 7 January 2025 | 810-864 |
| 51. | Valuescope Report | 26 March 2025 | 865-939 |
| 52. | Carrington Coleman Memo | 25 March 2025 | 940-956 |
| 53. | IRS Complaint | 20 March 2025 | 957-973 |
| 54. | FTI Report | 27 March 2025 | 974-987 |
| 55. | Mercer Report | 26 August 2024 | 988-1007 |
| 56. | H&B Memorandum | 9 July 2021 | 1008-1012 |
| 57. | Opinion (Mr Tony Beswetherick KC) | 5 March 2025 | 1013-1038 |
| 58. | Email from PwC to Walkers | 11 February 2025 | 1039-1057 |
| 59. | Email from Mr Patrick to Walkers | 17 March 2025 | 1058-1074 |
| 60. | Email chain between FTI and Walkers | 26 March 2025 | 1075-1092 |
| 61. | Letter from Campbells to the JOLs | 16 May 2025 | 1093-1095 |
| 62. | Letter from Johnstone Law to Campbells | 30 May 2025 | 1096-1097 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 63. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 30 May 2025 | 1098-1112 |
| 64. | Letter from Johnstone Law to Campbells | 5 June 2025 | 1113-1116 |
| 65. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 9 June 2025 | 1117-1124 |
| 66. | Letter from Maples to Campbells (enclosing draft protocol) | 19 June 2025 | 1125-1136 |
| 67. | Letter from Campbells to Maples (enclosing Revised Campbells Draft Protocol) | 29 June 2025 | 1137-1170 |
| 68. | Email from Kobre & Kim to Maples | 30 June 2025 | 1171-1173 |
| 69. | Email from Baker & Partners to Maples | 30 June 2025 | 1174-1176 |
| 70. | Texas Petition | 1 July 2025 | 1177-1422 |
| 71. | Texas Petition – Proposed Order | Undated | 1423-1426 |
| 72. | Second Rule 11 Agreement | 11 July 2025 | 1427-1429 |
| 73. | DFW Charitable Foundation – Delaware Division of Corporations Search Results | Undated | 1430 |
| 74. | CDMCFAD, LLC – Delaware Division of Corporations Search Results | Undated | 1431 |
| 75. | Company's Certificate of Incorporation | 27 October 2011 | 1432 |
| 76. | Shields Legal – Memorandum – Work Plan | 9 November 2023 | 1433-1440 |
| 77. | Letter from Seyfarth Shaw LLP to the IRS | 1 May 2025 | 1441-1446 |

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)




*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

*www.verify.gov.ky File#: 263805*

35631852.5.C8689.187150

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are:

   (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

   (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power





GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

**TABLE OF CONTENTS**

**CLAUSE** **PAGE**

**TABLE A** ..... 1
**INTERPRETATION** ..... 1
**PRELIMINARY** ..... 5
**SHARES** ..... 6
**MANAGEMENT SHARES** ..... 6
**PARTICIPATING SHARES** ..... 7
**MODIFICATION OF RIGHTS** ..... 7
**CERTIFICATES** ..... 7
**FRACTIONAL SHARES** ..... 7
**TRANSFER OF SHARES** ..... 8
**TRANSMISSION OF SHARES** ..... 8
**ALTERATION OF SHARE CAPITAL** ..... 9
**REDEMPTION, PURCHASE AND SURRENDER OF SHARES** ..... 9
**TREASURY SHARES** ..... 10
**GENERAL MEETINGS** ..... 11
**NOTICE OF GENERAL MEETINGS** ..... 11
**PROCEEDINGS AT GENERAL MEETINGS** ..... 11
**VOTES OF SHAREHOLDERS** ..... 13
**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS** ..... 14
**DIRECTORS** ..... 14
**POWERS AND DUTIES OF DIRECTORS** ..... 15



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

BORROWING POWERS OF DIRECTORS .......... 17
THE SEAL .......... 17
DISQUALIFICATION OF DIRECTORS .......... 17
PROCEEDINGS OF DIRECTORS .......... 18
DIVIDENDS .......... 21
ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION .......... 21
CAPITALISATION OF RESERVES .......... 22
SHARE PREMIUM ACCOUNT .......... 23
NOTICES .......... 23
NON-RECOGNITION OF TRUSTS .......... 24
WINDING UP .......... 25
AMENDMENT OF ARTICLES OF ASSOCIATION .......... 25
CLOSING OF REGISTER OR FIXING RECORD DATE .......... 25
REGISTRATION BYWAY OF CONTINUATION .......... 26
MERGERS AND CONSOLIDATION .......... 26
DISCLOSURE .......... 26
INDEMNITY .......... 27
DISPUTE RESOLUTION .......... 28
AEOI .......... 30



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as amended) of the Cayman Islands.

"**AEOI**" means:

(i) sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii) the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

(iii) any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in



Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv) any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h) any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act; and

(i) sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2. Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

**SHARES**

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**PARTICIPATING SHARES**

12. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

**MODIFICATION OF RIGHTS**

13. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

**CERTIFICATES**

15. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

**FRACTIONAL SHARES**

16. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

**TRANSFER OF SHARES**

17. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

**TRANSMISSION OF SHARES**

22. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

28. Subject to the Act, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

32. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

**NOTICE OF GENERAL MEETINGS**

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

**PROCEEDINGS AT GENERAL MEETINGS**

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS**

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

**DIRECTORS**

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.



Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

69. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70. The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

**POWERS AND DUTIES OF DIRECTORS**

71. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

80. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

**THE SEAL**

81. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

84. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

85. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director






Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

95. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**DIVIDENDS**

99. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106. No dividend shall bear interest against the Company.

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION**

107. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

112. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

(iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

**SHARE PREMIUM ACCOUNT**

113. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

**NOTICES**

115. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

117. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

120. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

121. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

124. Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

125. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,






Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

**REGISTRATION BYWAY OF CONTINUATION**

128. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

**MERGERS AND CONSOLIDATION**

129. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

**DISCLOSURE**

130. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## INDEMNITY

131. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

135. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

**DISPUTE RESOLUTION**

136. Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c) Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

**AEOI**

137. Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138. In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(iii) ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139. In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

(a) create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b) may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c) allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d) adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).



**Annexure**

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

# Delaware

PAGE 1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND KANSAS CITY FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-THIRD DAY OF NOVEMBER, A.D. 2011, AT 4:23 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

5070449 8100

111227849

SECRETARY OF STATE · 1776 · DELAWARE · 1970

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9179752

DATE: 11-28-11

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:03 PM 11/23/2011
FILED 04:23 PM 11/23/2011
SRV 111227849 - 5070449 FILE

# CERTIFICATE OF INCORPORATION

# OF

# HIGHLAND KANSAS CITY FOUNDATION, INC.

FIRST: The name of the corporation is Highland Kansas City Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit the Greater Kansas City Community Foundation, a Missouri nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by the Greater Kansas City Community Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation

exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to the Greater Kansas City Community Foundation. If the Greater Kansas City Community Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22nd day of November, 2011.

James Dondero



78673.000002 EMF_US 37829386v4

HIGHLAND KANSAS CITY FOUNDATION, INC.

**Unanimous Written Consent of Directors**
**In Lieu of Organizational Meeting**

THE UNDERSIGNED, being all of the directors of Highland Kansas City Foundation, Inc. (the "Foundation"), a Delaware nonprofit nonstock corporation, do hereby consent to the adoption of, and do hereby adopt, the following resolutions pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, and hereby direct that this Written Consent be filed with the minutes of the proceedings of the Board of Directors of the Foundation:

Approval of Certificate of Incorporation

The Certificate of Incorporation, filed with the Secretary of State of Delaware on November 23, 2011, is ratified and approved; and the Secretary is hereby ordered to file the Certificate of Incorporation in the minute book.

Adoption of Bylaws

The bylaws attached to this consent is hereby adopted and approved as the Bylaws of the Foundation; and the Secretary is ordered to file a copy of the Bylaws in the minute book.

Election of Officers

The following persons are elected as officers of the Foundation in the capacities set forth opposite their respective names below to serve until the next annual meeting of the Board of Directors and until their respective successors are elected and qualified or until their earlier death, resignation or removal:

| | |
|---|---|
| President | James Dondero |
| Secretary and Treasurer | Grant Scott |

Confirmation of Tax-Exempt Status

The officers are authorized (i) to proceed with preparation of an exemption application (IRS Form 1023) seeking to have the Foundation classified as a charitable organization under Section 501(c)(3) of the Internal Revenue Code, (ii) to sign the application and related documents on behalf of the Foundation, (iii) to file the completed application package with the Internal Revenue Service, and (iv) to deal with the Service in all matters relating to the exemption application both in person and

through attorneys and other agents, all without any requirement to seek further authorization from the Board. When the Service issues a determination letter recognizing the Foundation's tax-exempt status, the Secretary is ordered to make copies of the exemption application and the IRS determination letter available for public inspection at the Foundation's principal office during regular business hours, as required by Section 6104(d) of the Internal Revenue Code.

Ratification of Preorganization Activities

The Foundation hereby adopts, approves, ratifies and confirms all contracts and agreements entered into and all other actions taken or performed by the incorporator of the Foundation in connection with the incorporation, organization and commencement of business of this Foundation.

Establishment of Corporate Bank Accounts

The officers of the Foundation are hereby authorized to open one or more commercial banking accounts for and in the name of the Foundation anywhere within the United States, at any time and from time to time, and to deposit to the credit of the Foundation in such banking accounts any monies, checks, drafts, orders or other commercial paper payable to the Foundation or its order, and at any time and from time to time to withdraw all or any part of the funds on deposit in the name of the Foundation in any such banking accounts and to designate or change the designation of the officer or officers or their designees who are authorized to make such deposits or withdrawals;

the forms of banking resolutions used by any banks in which accounts of the Foundation are established pursuant to the immediately preceding resolution, are hereby approved and adopted as if set forth herein in full;

the proper officers of the Foundation are hereby authorized to execute on behalf of the Foundation and to file with such banks (and the President or any Vice President or the Secretary of the Foundation is hereby authorized to certify) such forms of banking resolutions, together with proper signature cards designating the officers and agents of the Foundation who are authorized to sign checks and drafts to be paid from the Foundation's accounts in order to be filed in the minute book of the Foundation; and

with respect to any such banking accounts, any banking institution may act in reliance on such banking resolutions and signature cards until receipt of actual notice of the modification or revocation of the same.

Enabling Resolution

The officers of this Foundation be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Foundation, to take any and all further actions, to negotiate for and enter into agreements and amendments to agreements, to perform all such acts and things, to make, execute, file, deliver or record in the name and on behalf of the Foundation all such certificates, instruments, agreements, applications, papers or other documents, and to make all such payments as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, advisable or appropriate in order to carry out the purposes and intent of, or consummate the transactions contemplated by, the foregoing resolutions and/or all of the transactions contemplated therein or thereby, and to carry on the business of this Foundation, the authorization therefor to be conclusively evidenced by the taking of such action or the execution and delivery of such certificates, instruments, agreements or documents.

*[Remainder of page intentionally left blank; signatures appear on following page.]*

IN WITNESS WHEREOF, the undersigned, being all of the directors of the Foundation, have caused this Unanimous Written Consent to be executed as of the 30th day of November, 2011.

James Dondero

Grant Scott

Deborah L. Wilkerson

78673.000002 EMF_US 38037496v2

# BYLAWS

# OF

# HIGHLAND KANSAS CITY FOUNDATION, INC.

# TABLE OF CONTENTS

Page

ARTICLE I OFFICES ....1

Section 1.1 Registered Office ....1
Section 1.2 Other Offices ....1

ARTICLE II MEMBERSHIP ....1

Section 2.1 Classes and Number ....1
Section 2.2 Voting ....1
Section 2.3 Transfer of Membership ....1
Section 2.4 Resignation of Member ....2
Section 2.5 Place of Meetings ....2
Section 2.6 Annual Meetings ....2
Section 2.7 Special Meetings ....2
Section 2.8 Notice of Meetings of Members ....2
Section 2.9 Quorum ....3
Section 2.10 Voting ....3
Section 2.11 Proxies ....3
Section 2.12 Action by Written Consent ....3

ARTICLE III DIRECTORS ....4

Section 3.1 General Powers ....4
Section 3.2 Number of Directors ....4
Section 3.3 Vacancies ....4
Section 3.4 Place of Meetings ....4
Section 3.5 Committees of Directors ....4
Section 3.6 Compensation of Directors ....4
Section 3.7 Annual Meeting ....4
Section 3.8 Additional Regular Meetings ....5
Section 3.9 Special Meetings ....5
Section 3.10 Method and Timing of Notice ....5
Section 3.11 Purpose not Required in Notice ....5
Section 3.12 Waiver of Notice ....5
Section 3.13 Action by Written Consent ....6
Section 3.14 Validation of Action by Consent ....6
Section 3.15 Quorum and Manner of Acting ....6
Section 3.16 Resignation and Removal of Directors ....6

ARTICLE IV OFFICERS ....6

Section 4.1 Officers ....6
Section 4.2 Election, Term of Office and Eligibility ....7
Section 4.3 Subordinate Officers ....7

| | | |
|---|---|---|
| Section 4.4 | Removal | 7 |
| Section 4.5 | The President | 7 |
| Section 4.6 | The Secretary | 7 |
| Section 4.7 | The Assistant Secretaries | 7 |
| Section 4.8 | Chairman | 8 |
| Section 4.9 | The Chief Financial Officer | 8 |
| Section 4.10 | The Assistant Chief Financial Officers | 8 |
| Section 4.11 | Delegation of Duties | 8 |
| ARTICLE V | BOOKS AND RECORDS | 8 |
| Section 5.1 | Location | 8 |
| Section 5.2 | Inspection | 9 |
| ARTICLE VI | MISCELLANEOUS PROVISIONS | 9 |
| Section 6.1 | Fiscal Year | 9 |
| Section 6.2 | Depositories | 9 |
| Section 6.3 | Checks, Drafts and Notes | 9 |
| Section 6.4 | Contracts and Other Instruments | 9 |
| Section 6.5 | Conflicts of Interest | 9 |
| Section 6.6 | Waivers of Notice | 10 |
| Section 6.7 | Ownership Interests in Other Entities | 10 |
| Section 6.8 | Indemnification. | 10 |
| Section 6.9 | Amendment of Bylaws. | 12 |

BYLAWS

OF

HIGHLAND KANSAS CITY FOUNDATION, INC.

**ARTICLE I**

**OFFICES**

Section 1.1 Registered Office. The registered office of Highland Kansas City Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

**ARTICLE II**

**MEMBERSHIP**

Section 2.1 Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be the Greater Kansas City Community Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4 Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5 Place of Meetings. All meetings of the members shall be held by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6 Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7 Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8 Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9 Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10 Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11 Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.13. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7 Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11 Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV

## OFFICERS

Section 4.1 Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2 Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3 Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4 Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5 The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6 The Secretary. The Secretary shall:

(a) keep the minutes of the meetings of the members and of the Board of Directors;

(b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c) be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d) in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7 The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 Chairman. The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 The Chief Financial Officer. The Chief Financial Officer, if any, shall:

(a) receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5 Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6 Waivers of Notice. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7 Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8 Indemnification.

(a) Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b) If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9 Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors.

# Delaware



*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND DALLAS FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:34 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

5069985 8100

111224468

You may verify this certificate online at corp.delaware.gov/authver.shtml

SECRETARY OF STATE · 1776 · DELAWARE · 1970

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177054

DATE: 11-23-11

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:34 PM 11/22/2011
SRV 111224468 - 5069985 FILE

# CERTIFICATE OF INCORPORATION

# OF

# HIGHLAND DALLAS FOUNDATION, INC.

FIRST: The name of the corporation is Highland Dallas Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to The Dallas Foundation. If The Dallas Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 2nd day of November, 2011.

[signature]
James Dondero

**BYLAWS**
**OF**

**HIGHLAND DALLAS FOUNDATION, INC.**

## TABLE OF CONTENTS

**Page**

ARTICLE I OFFICES ....................1

Section 1.1 Registered Office ....................1
Section 1.2 Other Offices....................1

ARTICLE II MEMBERSHIP....................1

Section 2.1 Classes and Number....................1
Section 2.2 Voting ....................1
Section 2.3 Transfer of Membership ....................1
Section 2.4 Resignation of Member....................2
Section 2.5 Place of Meetings....................2
Section 2.6 Annual Meetings....................2
Section 2.7 Special Meetings....................2
Section 2.8 Notice of Meetings of Members ....................2
Section 2.9 Quorum ....................3
Section 2.10 Voting ....................3
Section 2.11 Proxies....................3
Section 2.12 Action by Written Consent ....................3

ARTICLE III DIRECTORS ....................4

Section 3.1 General Powers ....................4
Section 3.2 Number of Directors ....................4
Section 3.3 Vacancies ....................4
Section 3.4 Place of Meetings....................4
Section 3.5 Committees of Directors ....................4
Section 3.6 Compensation of Directors ....................4
Section 3.7 Annual Meeting ....................4
Section 3.8 Additional Regular Meetings....................5
Section 3.9 Special Meetings....................5
Section 3.10 Method and Timing of Notice....................5
Section 3.11 Purpose not Required in Notice ....................5
Section 3.12 Waiver of Notice....................5
Section 3.13 Action by Written Consent. ....................6
Section 3.14 Validation of Action by Consent ....................6
Section 3.15 Quorum and Manner of Acting....................6
Section 3.16 Resignation and Removal of Directors ....................6

ARTICLE IV OFFICERS....................6

Section 4.1 Officers ....................6
Section 4.2 Election, Term of Office and Eligibility....................7

Section 4.3 Subordinate Officers ....7
Section 4.4 Removal ....7
Section 4.5 The President ....7
Section 4.6 The Secretary ....7
Section 4.7 The Assistant Secretaries ....7
Section 4.8 Chairman ....8
Section 4.9 The Chief Financial Officer ....8
Section 4.10 The Assistant Chief Financial Officers ....8
Section 4.11 Delegation of Duties ....8

ARTICLE V BOOKS AND RECORDS ....8

Section 5.1 Location ....8
Section 5.2 Inspection ....9

ARTICLE VI MISCELLANEOUS PROVISIONS ....9

Section 6.1 Fiscal Year ....9
Section 6.2 Depositories ....9
Section 6.3 Checks, Drafts and Notes ....9
Section 6.4 Contracts and Other Instruments ....9
Section 6.5 Conflicts of Interest ....9
Section 6.6 Waivers of Notice ....10
Section 6.7 Ownership Interests in Other Entities ....10
Section 6.8 Indemnification ....10
Section 6.9 Amendment of Bylaws ....11

BYLAWS

OF

HIGHLAND DALLAS FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1 Registered Office. The registered office of Highland Dallas Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1 Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4 Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5 Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6 Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7 Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8 Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9 Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10 Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11 Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7 Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11 Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV

## OFFICERS

Section 4.1 Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2 Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3 Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4 Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5 The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6 The Secretary. The Secretary shall:

(a) keep the minutes of the meetings of the members and of the Board of Directors;

(b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c) be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d) in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7 The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 Chairman. The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 The Chief Financial Officer. The Chief Financial Officer, if any, shall:

(a) receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5 Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6 Waivers of Notice. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7 Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8 Indemnification.

(a) Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b) If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9 Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the

Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

# Delaware

PAGE 1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND SANTA BARBARA FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:36 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

5069989 8100

AUTHENTICATION: 9177064

111224480

DATE: 11-23-11

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:36 PM 11/22/2011
SRV 111224480 - 5069989 FILE

# CERTIFICATE OF INCORPORATION

# OF

# HIGHLAND SANTA BARBARA FOUNDATION, INC.

FIRST: The name of the corporation is Highland Santa Barbara Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated, exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit Santa Barbara Foundation, a California nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code of 1986 as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by Santa Barbara Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to Santa Barbara Foundation. If Santa Barbara Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 21st day of November, 2011.

James Dondero

# BYLAWS
# OF

# HIGHLAND SANTA BARBARA FOUNDATION, INC.

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I | OFFICES | 1 |
| Section 1.1 | Registered Office | 1 |
| Section 1.2 | Other Offices | 1 |
| ARTICLE II | MEMBERSHIP | 1 |
| Section 2.1 | Classes and Number | 1 |
| Section 2.2 | Voting | 1 |
| Section 2.3 | Transfer of Membership | 1 |
| Section 2.4 | Resignation of Member | 2 |
| Section 2.5 | Place of Meetings | 2 |
| Section 2.6 | Annual Meetings | 2 |
| Section 2.7 | Special Meetings | 2 |
| Section 2.8 | Notice of Meetings of Members | 2 |
| Section 2.9 | Quorum | 3 |
| Section 2.10 | Voting | 3 |
| Section 2.11 | Proxies | 3 |
| Section 2.12 | Action by Written Consent. | 3 |
| ARTICLE III | DIRECTORS | 4 |
| Section 3.1 | General Powers | 4 |
| Section 3.2 | Number of Directors | 4 |
| Section 3.3 | Vacancies | 4 |
| Section 3.4 | Place of Meetings | 4 |
| Section 3.5 | Committees of Directors. | 4 |
| Section 3.6 | Compensation of Directors. | 4 |
| Section 3.7 | Annual Meeting | 4 |
| Section 3.8 | Additional Regular Meetings. | 5 |
| Section 3.9 | Special Meetings. | 5 |
| Section 3.10 | Method and Timing of Notice | 5 |
| Section 3.11 | Purpose not Required in Notice | 5 |
| Section 3.12 | Waiver of Notice | 5 |
| Section 3.13 | Action by Written Consent | 6 |
| Section 3.14 | Validation of Action by Consent | 6 |
| Section 3.15 | Quorum and Manner of Acting | 6 |
| Section 3.16 | Resignation and Removal of Directors | 6 |
| ARTICLE IV | OFFICERS | 6 |
| Section 4.1 | Officers. | 6 |
| Section 4.2 | Election, Term of Office and Eligibility | 7 |

| | | |
|---|---|---|
| Section 4.3 | Subordinate Officers | 7 |
| Section 4.4 | Removal | 7 |
| Section 4.5 | The President | 7 |
| Section 4.6 | The Secretary | 7 |
| Section 4.7 | The Assistant Secretaries | 7 |
| Section 4.8 | Chairman | 8 |
| Section 4.9 | The Chief Financial Officer | 8 |
| Section 4.10 | The Assistant Chief Financial Officers | 8 |
| Section 4.11 | Delegation of Duties | 8 |
| ARTICLE V | BOOKS AND RECORDS | 8 |
| Section 5.1 | Location | 8 |
| Section 5.2 | Inspection | 9 |
| ARTICLE VI | MISCELLANEOUS PROVISIONS | 9 |
| Section 6.1 | Fiscal Year | 9 |
| Section 6.2 | Depositories. | 9 |
| Section 6.3 | Checks, Drafts and Notes | 9 |
| Section 6.4 | Contracts and Other Instruments. | 9 |
| Section 6.5 | Conflicts of Interest | 9 |
| Section 6.6 | Waivers of Notice | 10 |
| Section 6.7 | Ownership Interests in Other Entities | 10 |
| Section 6.8 | Indemnification. | 10 |
| Section 6.9 | Amendment of Bylaws. | 11 |

BYLAWS

OF

HIGHLAND SANTA BARBARA FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1 Registered Office. The registered office of Highland Santa Barbara Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1 Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be Santa Barbara Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4 Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5 Place of Meetings. All meetings of the members shall be held by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6 Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7 Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8 Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9 Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10 Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11 Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.13. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7 Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11 Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV

## OFFICERS

Section 4.1 Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2 Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3 Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4 Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5 The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6 The Secretary. The Secretary shall:

(a) keep the minutes of the meetings of the members and of the Board of Directors;

(b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c) be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d) in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7 The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 Chairman. The Chairman, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 The Chief Financial Officer. The Chief Financial Officer, if any, shall:

(a) receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5 Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6 Waivers of Notice. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7 Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8 Indemnification.

(a) Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b) If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9 Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations

or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors.

GREATER KANSAS CITY COMMUNITY FOUNDATION

# PROCEDURES FOR ESTABLISHMENT AND OPERATION OF FUNDS AND SUPPORTING ORGANIZATIONS

---

INDEX


**PART A.** **RULES GOVERNING ALL FUNDS AND SUPPORTING ORGANIZATIONS** 1

Section 1. TYPES OF DONORS, FUNDS, SUPPORTING ORGANIZATIONS AND SPLIT-INTEREST ARRANGEMENTS 1
- a. Eligible Donors
- b. Funds
- c. Supporting Organizations
- d. Split-Interest Arrangements

Section 2. ACCEPTANCE OF CONTRIBUTIONS 2
- a. General Policies and Approval
- b. Review and Approval of Contributions
- c. Written Acknowledgment of Acceptance of Contributions
- d. Donor's Counsel
- e. Minimum Initial Contributions
- f. Additional Contributions
- g. Contributions are Irrevocable
- h. Donor Restrictions on Use of Property
- i. Policy to Sell Contributed Property
- j. Tax Deduction vs. Net Proceeds from Sale of Contributed Property
- k. Confidentiality and Privacy Policy

Section 3. INVESTMENT POLICIES 4

Section 4. ADMINISTRATIVE EXPENSES 5

Section 5. CHARITABLE PURPOSE 5

Section 6. EDUCATIONAL PROGRAM 5

Section 7. AMENDMENTS 5

**PART B.** **FUNDS** 5

Section 1. TYPES OF FUNDS 5
- a. Donor-Advised Funds
- b. Designated Funds
- c. Organization Funds
- d. Field of Interest Funds
- e. Scholarship Funds
- f. Unrestricted Funds

Section 2. GENERAL POLICIES 6

Section 3. DONOR MAY SELECT NAME OF FUND 6

Section 4. DISTRIBUTIONS 6
a. Grants Shall Follow Donor's Intent
b. Grants Will Normally Identify the Name of the Fund
c. Grants Must Not Provide More Than an Incidental Benefit to Donor
d. Other Limits on Distributions
e. Donor Generally Cannot Control Timing of Grants
f. Board May Identify Specific Charitable Needs of the Community

Section 5. VARIANCE POWER AND MONITORING FUNCTION 8
a. Community Foundation to Follow General Donor Intent if Variance Power is Exercised
b. Fund to Keep Donor's Name if Variance Power Exercised
c. Community Foundation to Monitor Beneficiary's Performance of Terms of Grant

Section 6. ADVISORY COMMITTEES OF FUNDS 8
a. General Rules
b. Usually Majority Vote is Required
c. Authority to Act as Agent of Community Foundation Restricted
d. Fundraising
e. Divorce/Separation of Current Donor Advisors

Section 7. SPECIAL RULES FOR DONOR-ADVISED FUNDS 10
a. Establishment and Purpose
b. Distributions from Donor-Advised Funds
c. Minimum Grant Amount from Donor-Advised Funds
d. Grant Activity Policy
e. Eligible Advisors During the Donor(s)' Lifetime
f. Successor Advisors After the Death of Donor(s)
g. Option to Split Funds for Successor Advisors
h. Conversion of Donor-Advised Fund After Advisory Privilege Ends

Section 8. SPECIAL RULES FOR DESIGNATED FUNDS 13
a. Establishment and Purpose
b. Monitoring Function and Variance Power

Section 9. SPECIAL RULES FOR ORGANIZATION FUNDS 13
a. Establishment and Purpose
b. Monitoring Function and Variance Power

Section 10. SPECIAL RULES FOR FIELD OF INTEREST FUNDS 13
a. Establishment and Purpose
b. Geographic Affiliates
c. Monitoring Function and Variance Power

Section 11. SPECIAL RULES FOR SCHOLARSHIP FUNDS 14
a. Establishment and Purpose
b. Employer-Sponsored Scholarship Funds
c. Other Permitted Grants to Individuals
d. Monitoring Function and Variance Power
e. Conflict of Interest

| | | |
|---|---|---|
| Section 12. | SPECIAL RULES FOR TRUSTS CREATED AS COMPONENT FUNDS | 16 |
| **PART C.** | **SUPPORTING ORGANIZATIONS** | 16 |
| Section 1. | ESTABLISHMENT AND PURPOSE<br>a. Definition and Tax Status<br>b. Technical Requirements Under the Tax Laws<br>c. Tax Advantages of Supporting Organization | 16 |
| Section 2. | POLICIES APPLICABLE TO A SUPPORTING ORGANIZATION | 17 |
| Section 3. | TERMINATION OF RELATIONSHIP | 18 |
| **PART D.** | **SPLIT-INTEREST ARRANGEMENTS** | 18 |
| Section 1. | DEFINITIONS<br>a. Charitable Gift Annuity<br>b. Charitable Remainder Annuity Trust<br>c. Charitable Remainder Unitrust<br>d. Charitable Lead Trust<br>e. Retained Life Estate | 18 |
| Section 2. | COMMUNITY FOUNDATION AS TRUSTEE; MINIMUM CONTRIBUTIONS; OTHER CONDITIONS<br>a. Community Foundation as Trustee of Split-Interest Gifts<br>b. Minimum Contributions<br>c. Other Conditions | 19 |
| **APPENDIX** | | 21 |
| **TAX LAWS THAT GOVERN INCOME TAX CHARITABLE CONTRIBUTIONS** | | 21 |
| Section 1. | TIMING OF INCOME TAX DEDUCTIONS | 21 |
| Section 2. | EVIDENCE OF DEDUCTION REQUIRED<br>a. Any Contribution of $250 or More<br>b. Appraisals Required for Gifts of Property Over $5,000; Exceptions for Cash and Publicly Traded Securities | 21 |
| Section 3. | AMOUNT OF INCOME TAX DEDUCTION | 22 |
| Section 4. | ANNUAL DEDUCTION LIMITATIONS<br>a. Individuals<br>b. Business Entities<br>c. Trusts and Estates | 22 |
| Section 5. | TREATMENT OF EXCESS BUSINESS HOLDINGS | 23 |


Approved: 5/31/00;
Updated 5/24/01, 9/13/06, 12/6/06, 12/13/07,
12/10/08, 12/09/09, 12/08/10, 3/9/11, 11/14/12,
9/29/16, 9/11/19, 9/16/20, 11/16/22 and 9/13/2023

# PROCEDURES FOR ESTABLISHMENT AND OPERATION OF FUNDS AND SUPPORTING ORGANIZATIONS

THE GREATER KANSAS CITY COMMUNITY FOUNDATION has established the following procedures in order to carry out its mission:

Improve the quality of life in Greater Kansas City by increasing charitable giving, educating and connecting donors to community needs they care about, and leading on critical community issues.

## PART A. RULES GOVERNING ALL FUNDS AND SUPPORTING ORGANIZATIONS

**Section 1.** ***Types of Donors, Funds, Supporting Organizations and Split-Interest Arrangements***

A Donor may establish with the Community Foundation one or more Funds, Supporting Organizations and Split-Interest Arrangements. A Fund is a component part of the Community Foundation; grants are made from each Fund to carry out the charitable purposes specified by the Donor. Supporting Organizations and Split-Interest Trusts are not Funds and generally constitute separate legal entities. Split-Interest Arrangements are ways to make a deferred gift to establish a Fund. Included within these categories are:

a. Eligible Donors

The Community Foundation will accept contributions from the following types of Donors:

1. Individuals and family members
2. Corporations/Partnerships/Limited Liability Companies
3. Nonprofit Organizations
4. Private Foundations
5. Various Branches of Government
6. Collective private groups of concerned citizens and associations
7. Bequests and Trusts

b. Funds

1. Donor-Advised Funds
2. Designated Funds
3. Nonprofit Organization Funds
4. Field of Interest Funds
5. Scholarship Funds
6. Unrestricted Funds

c. Supporting Organizations

d. Split-Interest Arrangements

1. Charitable Gift Annuities
2. Charitable Remainder Annuity Trusts
3. Charitable Remainder Unitrusts
4. Charitable Lead Trusts
5. Retained Life Estate

**Section 2.** ***Acceptance of Contributions***

a. General Policies and Approval

Requests to establish Funds, Supporting Organizations or Split-Interest Arrangements with the Community Foundation will be reviewed by the staff (and by the Board of Directors (or a designated committee) if the staff determines such a review is necessary) for consistency with the Community Foundation's charitable purposes and specific charitable needs. The senior management officers of the Community Foundation have the authority to approve the establishment of individual Funds and affiliated relationships/agreements/contracts. With respect to supporting organizations, the senior management officers have the authority to recommend approval of a particular supporting organization relationship to the Board of Directors, but the Board of Directors (or a designated committee) shall have the final authority to formally approve the relationship by appointing the requisite number of directors to the supporting organization's board.

b. Review and Approval of Contributions

All contributions are subject to the review and approval by the Community Foundation prior to acceptance. The Community Foundation's staff generally has the authority to accept contributions of cash and marketable securities (those that are actively traded and sellable on the open market). A senior management officer of the Community Foundation before acceptance will review contributions of all other assets that are not readily marketable and shall consider the value of the asset, the likelihood that the asset can be quickly liquidated, the charitable nature of the gift, potential risks to the Foundation, carrying costs, and unrelated business income tax consequences. Contributions of illiquid assets include but are not limited to closely held securities, limited liability companies (LLC's), limited partnerships and tangible personal property and require prior approval per gift acceptance policies as established and approved by the Board of Directors (or a designated committee). Contributions of real estate shall be handled by the Real Estate Charitable Foundation, a supporting organization of the Community Foundation, and are subject to the review and approval by the board of directors of the Real Estate Charitable Foundation.

Contributions that would violate the excess business holdings rule for donor-advised funds under the Pension Protection Act of 2006 are generally prohibited, but may be accepted in special circumstances if reviewed and approved by a senior management officer of the Community Foundation. Any interest in an entity in which any interest is owned by a donor or advisor to a donor-advised fund, by a family member of any such person, or by an entity in which any of the foregoing persons has an interest shall be referred to the Foundation's senior management and legal team for an opinion on the possible application of Section 4943 of the Internal Revenue Code of 1986, as amended (hereinafter "Code"). *See* Appendix: Section 5 for treatment of excess business holdings.

For any publicly traded non-cash assets held in a Fund, should sufficient liquidity not be available in the Fund to cover any expenses, taxes or liabilities due as a result of the Fund's ownership of such assets, the Donor will be expected to contribute additional liquid assets to the Fund as necessary to fully and timely fund such obligations.

For illiquid non-cash assets, the Donor will be required to sign a gift agreement whereby the Donor agrees to indemnify and reimburse the Community Foundation for, from and against all taxes owed or expenses and liabilities incurred because of the Community Foundation's ownership of the asset. The Donor must also agree to contribute additional liquid assets to their Fund as necessary to cover such obligations should sufficient liquidity not be available in their Fund.

c. Written Acknowledgment of Acceptance of Contributions

The Community Foundation will provide written confirmation at the time of acceptance of any contribution that is required by the IRS to be documented by an acknowledgment for the Donor's tax return. The

Community Foundation, in its discretion, may also provide written confirmation of contributions that are not otherwise required by the IRS to be acknowledged. Contributions not accepted will be returned as soon as practical. The confirmation will include the dollar amount of the contribution of any cash gifts and may include the average of the high and low selling prices on the date of the gift for marketable securities such as publicly traded stocks, bonds and mutual fund shares. Acknowledgement of illiquid non-cash assets will only include a description of the gift but will not include a dollar value of the donated asset. Donors should obtain a qualified appraisal prior to making such a contribution. (The IRS generally requires a donor to obtain a qualified appraisal for illiquid assets no earlier than 60 days before the date of the gift and no later than the due date (including extensions) for the income tax return where the donor first claims a deduction for the gift.)

d. Donor's Counsel

The Community Foundation encourages each prospective Donor to have the terms of all proposed agreements reviewed by the Donor's legal, tax and/or financial advisors. The Community Foundation does not provide legal, tax or financial advice. The Donor is advised that it is the Donor's responsibility to obtain any necessary appraisals, file appropriate tax returns, and defend against any challenges to claims of tax benefits.

e. Minimum Initial Contributions

Generally, there is no minimum amount to establish a named Fund with the exception of Scholarship Funds, which require a minimum contribution of $25,000 to establish.

The minimum amounts to establish a Split-Interest Arrangement are:

| | | |
|---|---|---|
| 1. | Charitable Gift Annuity | $100,000 |
| 2. | Charitable Remainder Annuity Trust | $250,000 |
| 3. | Charitable Remainder Unitrust | $250,000 |

The minimum amounts necessary to establish a Supporting Organization will be mutually agreed upon by the Board of Directors (or its designated committee) and the Donor or the governing body of the Supporting Organization.

f. Additional Contributions

Additional contributions of cash and actively traded marketable securities to an established Fund may be made in any amount at any time. Gifts of other assets (illiquid assets) require advanced approval per gift acceptance policies approved by the Board of Directors (or a designated committee) (see Section 2.b. above). However, federal tax laws prohibit additional contributions to a charitable remainder annuity trust or a charitable gift annuity. In these cases, a new trust or annuity agreement will be necessary.

g. Contributions are Irrevocable

Any contribution made to the Community Foundation, once accepted, represents an irrevocable charitable contribution to the Greater Kansas City Community Foundation. Contributions to the Community Foundation are not refundable.

h. Donor Restrictions on Use of Property

Federal tax laws provide that a Donor to the Community Foundation may not impose any "material restriction" (a term defined in the Treasury Regulations), which prevents the Community Foundation from freely and effectively employing the contributed assets, or the income derived therefrom, in furtherance of

its charitable purposes. Any restriction (beyond the specified charitable purposes stated in the instrument of transfer) sought to be imposed by a Donor is subject to review and approval by the Community Foundation.

i. Policy to Sell Contributed Property

The general policy of the Community Foundation is to sell all contributed property as soon as practical after receipt so as to minimize market risk. For non-publicly traded securities or other assets for which no readily liquid market exists, the Community Foundation will exercise discretion as to the timing and price of sales. Closely held stock or other assets for which no readily liquid market exists that are retained for any reason and that are valued in excess of $3,000,000 (or, in the aggregate, are of material value compared to the other assets of the Community Foundation), shall be revalued every three (3) years from the date of the gift to the Community Foundation. The cost of the valuation shall be an expense of the Fund, Supporting Organization or Split-Interest Arrangement holding such asset.

Any costs incurred by the Community Foundation necessary for the disposition of securities and other assets (i.e., legal and appraisal fees) and for the management of such assets prior to disposition will be an expense of the Fund. Should sufficient liquidity not be available in the Fund to cover any expenses, taxes or liabilities due as a result of the Fund's ownership of such assets, the Donor will be expected to contribute additional funds to the Fund as necessary to fully and timely fund such obligations. Exceptions to this general policy will be made only in unusual circumstances and only with the prior approval of a senior management officer of the Community Foundation and in accordance with policies as established and approved by the Investment Committee.

j. Tax Deduction vs. Net Proceeds from Sale of Contributed Property

An individual for income tax purposes can deduct a charitable contribution only in the year in which the contribution is actually paid or ownership has transferred (excess contributions above adjusted gross income percentage limitations may be carried forward for up to five additional years). Tax laws generally provide rules on how the value of the contribution deduction is to be determined. Gifts to the Greater Kansas City Community Foundation are deductible at the highest "public charity" level allowed by law. Please see the Appendix for a further explanation of tax laws governing charitable contributions.

The value of the contribution for tax deduction purposes may vary from the net proceeds realized by the Community Foundation upon the sale of the contributed property. Donors are encouraged to consult with their professional tax advisors to determine the appropriate value for tax deduction purposes.

k. Confidentiality and Privacy Policy

All agreements with Donors and all information concerning Donors and prospective Donors shall be held in strict confidence by the Community Foundation, subject to legally authorized and enforceable requests for information by government agencies and courts. All other requests for or releases of information concerning a Donor will be honored or allowed only if permission is obtained from the Donor prior to release of such information. All personal data collected through our websites, email or any Community Foundation form is subject to the Community Foundation's privacy policy, which can be found at www.growyourgiving.org/privacy-policy.

**Section 3.** ***Investment Policies***

The Community Foundation's investment program shall seek to provide competitive market returns with reasonable levels of risk. The officers of the Community Foundation so empowered or the Investment Committee shall direct the investments of these Funds consistent with the objective. Copies of the Community Foundation's investment program and policies are available to any interested party upon request.

Generally, if a particular investment portfolio is not recommended by the Donor, Donor Advisor(s) or Advisory Committee as provided below, Funds shall be invested in the Community Foundation's money market pool. If a Donor, Donor Advisor(s) or an Advisory Committee is interested in having all or a portion of a Fund invested in a particular investment portfolio provided by the Community Foundation, then the current Donor, Donor Advisor(s) or Advisory Committee may make an appropriate recommendation to the Community Foundation in accordance with the policies and procedures approved by the Investment Committee. Such recommendations are advisory, and the Community Foundation will exercise independent authority over the investments of the principal and income of each Fund. Segregated asset accounts may be permitted, with advanced approval. The Fund holding such accounts shall pay the direct costs of such arrangements, including additional administrative costs.

**Section 4.** ***Administrative Expenses***

Each Fund, Supporting Organization and Split-Interest Arrangement will be charged in accordance with the current administrative fee schedule. If an expense is directly associated with a specific Fund, Supporting Organization or Split-Interest Arrangement, then the expense will generally be directly charged to the applicable fund. The current Community Foundation fee schedule is available to any interested party upon request.

**Section 5.** ***Charitable Purpose***

For purposes of these Procedures, a "charitable purpose" is an educational, religious, scientific, literary, public or other purpose permitted to be carried on by organizations described in Code Sections 170(c)(1) and 170(c)(2)(B).

**Section 6.** ***Educational Program***

The Community Foundation's mission and activities and the needs of the community will be well served by active promotion and community education concerning such activities and needs. The Community Foundation shall conduct educational programs that help connect donors to the priorities they care about and the needs of the community.

**Section 7.** ***Amendments***

The Procedures for Establishment and Operation of Funds and Supporting Organizations may be amended by a majority vote of the Board of Directors (or a designated committee) at any regular or special meeting.

## PART B. FUNDS

**Section 1.** ***Types of Funds***

Funds are categorized by their charitable purpose.

a. *Donor-Advised Funds*: the Donor, Donor Advisor(s) or Advisory Committee may recommend charitable grant recipients from time to time.

b. *Designated Funds*: this type of fund is created to ensure that support will be provided to one specific charitable organization named by the Donor(s).

c. *Organization Funds*: this type of fund (also referred to as an agency fund) is established by an organization that is recognized as a public charity described in Code Section 509(a)(1), (a)(2) or (a)(3) for the benefit of that organization.

d. *Field of Interest Funds*: this type of fund allows the Donor to support multiple named organizations or an area of charitable interest, defined broadly (such as education) or narrowly (such as cancer research). A Donor can also select a defined geographic area or specific community to benefit from grant distributions.

e. *Scholarship Funds*: Donors can support worthy students at an institution (high school, college, technical), students in a particular field of study, students from a particular geographic area, or students who have attended a specific high school or school district, provided that the students are selected through an objective and non-discriminatory competitive selection process.

f. *Unrestricted Funds*: Donors may choose an unrestricted fund that allows the Community Foundation to determine where annual grant distributions will do the most good.

**Section 2.** ***General Policies***

Each Fund, whether administered directly by the Community Foundation or through a separate trust, custodial account or agency agreement, shall be considered part of (and legally owned by) the Community Foundation and shall be governed by its Articles of Incorporation, Bylaws and by these Procedures. The Community Foundation is vested with ultimate authority and control over the principal and income of each Fund.

**Section 3.** ***Donor May Select Name of Fund***

Each Fund will be named as the Donor wishes. However, the Community Foundation reserves the right to reject names that it finds objectionable.

**Section 4.** ***Distributions***

a. Grants Shall Follow Donor's Intent

Grants will be made from each Fund consistent with the instructions given by the Donor at the time that the Fund was established. If, however, (1) the Donor's instructions are contrary to the Articles of Incorporation, Bylaws or Procedures, or (2) the "variance power" (described below in Sections B.5; B.8(b); B.9(b); B.10(c); and B.11(d)) is exercised, then the Donor's instructions shall be modified to a degree that is necessary for compliance with these Procedures. To the extent practicable or feasible, the Board of Directors shall distribute amounts for purposes that are consistent with the Donor's charitable interests. The Community Foundation is vested with ultimate authority and control over the principal and income of each Fund.

b. Grants Will Normally Identify the Name of the Fund

Unless otherwise requested by the Donor Advisor, any distribution shall identify the name of the Fund from which it is made.

c. Grants Must Not Provide More Than an Incidental Benefit to Donor

The Community Foundation will not make a grant that provides a financial benefit to a Donor, Donor Advisor, Advisory Committee member, any person in whose honor a Fund is created or named, or any related party to such a person (for purposes of this Manual, a “related party” shall include (i) any family member of such person (i.e., such person’s spouse, ancestors, children, grandchildren, great-grandchildren, brothers, sisters, nieces, nephews and any of their spouses) and (ii) any entity in which such a person or a combination of such persons owns more than 35% of the combined voting power, profits interest or beneficial interest). (The preceding sentence does not apply to grants made out of an Organization Fund to the Organization for which the Fund was established.)

Distributions from the Community Foundation may not be used in whole or in part for any private benefit such as tickets or tables at charitable events, goods and services bought at charitable auctions, or priority seating at athletic events, ticket rights or points.

The Community Foundation may make grants that provide a Donor, Donor Advisor(s), Advisory Committee member or related party with name recognition and such other benefits that the Internal Revenue Service has recognized as not providing the Donor with more than an incidental benefit.

d. Other Limits on Distributions

Additional rules apply to funds classified as "donor-advised funds" under the Pension Protection Act of 2006. The legal definition of a donor-advised fund under this law is a fund or account that (i) is separately identified by reference to contributions of a donor or donors; (ii) is owned and controlled by a "sponsoring organization" (i.e., the Community Foundation); and (iii) the donor (or any person appointed or designated by the donor – a "donor advisor") has, or reasonably expects to have, advisory privileges with respect to the distribution or investment of amounts held in the fund or account by reason of the donor's status as a donor. This definition could include funds that the Community Foundation has classified as Donor-Advised Funds, Designated Funds or Field of Interest Funds.

The Community Foundation will not make any grant, loan, compensation or similar payment (including expense reimbursement) to a Donor, Donor Advisor, Advisory Committee member, any person in whose honor a Fund is created or named or any related party from any fund.

The Community Foundation will also not make any grant directly to an individual or to an organization for the benefit of a specified individual from any fund other than a Scholarship Fund, a disaster relief fund or personal hardship fund.

If a distribution is proposed from any fund that is classified as a donor-advised fund under the law to a non-charitable entity or to a Type III supporting organization that is not "functionally integrated" with its supported organization as defined by law, then such distribution will not be allowed until it has been reviewed by a senior management officer of the Community Foundation - and, if required by law, procedures are in place so that the Community Foundation can exercise "expenditure responsibility" over such distribution. Expenditure responsibility generally requires the Community Foundation to exert all reasonable efforts and establish adequate procedures to (i) see that the distribution is spent solely for the charitable purpose for which it is made, (ii) obtain full and complete reports from the distributee regarding the use of such distribution and (iii) make full and detailed reports regarding such distribution to the Secretary of the Treasury, if applicable.

e. Donor Generally Cannot Control Timing of Grants

The ultimate right to direct the timing and amount of all distributions of income or principal from any Fund is vested in the Board of Directors. As is required by federal tax regulations, a Donor may not reserve the right to direct the timing of distributions from the Fund. However, a Donor can specify in the establishing document or instrument of transfer:

1. That some or all of the principal (as opposed to income or specific assets) may not be distributed for a specified period of time.
2. That distributions are limited to income only.
3. That distributions should be made annually (or more frequently).

If distributions are limited to income, and unless otherwise specified in the instrument of transfer, income shall be annually computed based on the current spending policy of the Community Foundation. The current spending policy of the Community Foundation is 5% of the average past three year-end Fund asset balances.

f. Board May Identify Specific Charitable Needs of the Community

In fulfilling that part of the Community Foundation's mission of providing leadership on critical community issues, the Board may enumerate specific charitable needs and specific organizations that it deems are most deserving of support.

**Section 5.** ***Variance Power And Monitoring Function***

a. Community Foundation to Follow General Donor Intent if Variance Power is Exercised

If the Board of Directors exercises the variance power described in Section B.8(b), B.9(b), B.10(c), or B.11(d) to modify a Designated Fund, Organization Fund, Field of Interest Fund, or Scholarship Fund, or if the privilege of the Donor, Donor Advisor(s) or Advisory Committee and other persons designated to make recommendations from a Donor-Advised Fund has been terminated in accordance with Section B.7, then the Board of Directors shall convert the Fund into its choice of either an Unrestricted Fund or a Field of Interest Fund. To the extent practicable or feasible, the Board of Directors shall distribute charitable grants from the converted Fund for purposes that are consistent with the original Donor's charitable interests.

b. Fund To Keep Donor's Name If Variance Power Exercised

Generally the Fund shall retain the name given by the Donor unless the Board of Directors, in its discretion, has chosen to deposit all of the Fund's assets into an Unrestricted Fund.

c. Community Foundation to Monitor Beneficiary's Performance of Terms of Grant

In addition to the Monitoring Functions hereinafter stated, the Board of Directors through the Board Committees and the Staff may periodically review the effectiveness with which agencies that receive grants from Funds and Supporting Organizations are performing their responsibilities in the utilization of these grants toward attainment of the Community Foundation's and the Donor's objectives. Where necessary, the Board shall initiate corrective action.

**Section 6.** ***Advisory Committees of Funds***

a. General Rules

A Donor or the Board of Directors may appoint an Advisory Committee for a Donor-Advised, Designated, Nonprofit Organization or Unrestricted Fund.

With respect to a Field of Interest Fund, the Donor may recommend an Advisory Committee (which may include the Donor) to be appointed by the Community Foundation in which case the senior management officers of the Community Foundation shall have the authority to appoint the Advisory Committee on behalf of the Board of Directors of the Community Foundation.

The rules governing an Advisory Committee for a Scholarship Fund are set forth in Section B.11(a)(3) below.

The Advisory Committee may make recommendations to the Board of Directors concerning grants from the Fund and any other matters that it deems of importance. Generally, each Advisory Committee should select one person who will have the authority to transmit the Advisory Committee's recommendations to the Community Foundation.

b. Usually Majority Vote Is Required

Unless contrary instructions have been made by the Donor or by the Community Foundation, whenever two persons are designated to make recommendations they shall act by unanimous consent; whenever more than two persons are so designated, then a recommendation by a majority of such persons shall constitute an effective recommendation for consideration by the Community Foundation. Otherwise, each committee may operate under such procedures as it finds appropriate.

c. Authority to Act as Agent of Community Foundation Restricted

The Community Foundation generally encourages Donors to contribute to the Community Foundation and its Funds. However, no person has the authority to act as the agent of the Community Foundation unless he or she has received express written authority from the Community Foundation. In particular, the Community Foundation does not authorize any volunteer or advisor to accept contributions on its behalf, to commit Community Foundation resources to any activity, or to engage in fundraising activities in the name of the Community Foundation or on behalf of any of its Funds without written permission from the Board of Directors or an authorized employee.

The Community Foundation is generally supportive of charitable activities that benefit the residents of this region. The restrictions in this section are necessitated, in part, because of compliance with tax and other laws that require disclosure of benefits associated with charitable contributions as well as contemporaneous written acknowledgements to certain Donors of contributions (the failure for which could subject the Community Foundation and its Funds to fines and penalties). We need to be informed about activities being done in the name of the Community Foundation (and its Funds) and to monitor any obligations associated with those activities.

d. Fundraising

The Community Foundation will not sponsor or assist with any fundraising or other events for any Fund, and will not process event registrations or tickets or be responsible for any funds collected by a third-party or crowdfunding source. The Community Foundation will only be responsible for purely charitable donations. Any advertising, promotional or other materials must be consistent with this policy and any additional fundraising guidelines published by the Community Foundation.

e. Divorce/Separation of Current Donor Advisors

This policy generally will only affect current Donor Advisors whereby either spouse may request grant distributions from a Fund.

In the event spouses serve as the only Advisors to a Fund, and a legal action for divorce, separation or annulment is pending between the spouses, the Community Foundation may, upon receiving notice of such action:

1. suspend processing any grant distribution recommendation for such Fund(s) unless and until the spouses both agree in writing to approve the grant distribution recommendation, or

2. suspend processing any grant distribution recommendations for such Fund(s) unless and until the spouses have jointly agreed in writing to an alternative procedure, acceptable to the Community Foundation, to provide for the future administration of such Fund(s). Subject to the approval of the Community Foundation, the spouses may jointly authorize the Community Foundation to bifurcate any Fund(s), designating one spouse or other successor Advisor to serve as the Advisor to one of the successor Fund(s) and designating the other spouse or other successor Advisor to serve as the Advisor to the other successor Fund(s) created as a result of bifurcation.

In the event that the spouses cannot jointly agree as provided above and no divorce decree, order of legal separation, order of annulment, property settlement agreement, agreement of the parties or other legal order has been entered or approved which would otherwise resolve the issue to the satisfaction of the Community Foundation, the Community Foundation may, in its sole discretion, bifurcate any Fund(s) so affected into equal shares and designate one spouse to serve as the Advisor to one of the successor Fund(s) and designate the other spouse to serve as the Advisor to the other successor Fund(s) created as a result of bifurcation. However, the Community Foundation shall not take such action until at least six months have transpired since the date upon which the action for divorce, separation or annulment was filed with the court of record.

**Section 7.** ***Special Rules for Donor-Advised Funds***

a. Establishment and Purpose

A Donor may establish a Donor-Advised Fund whereby the individual Donor(s) and/or designated Advisors, retain a lifetime privilege to recommend charitable grant recipients to the Community Foundation. Corporate Donor-Advised Funds may continue to advise on charitable distributions as long as the Corporation continues to operate.

b. Distributions from Donor-Advised Funds

Donors and/or Donor Advisors may make written recommendations of grants to tax exempt charitable organizations described in Code Section 501(c)(3), other than private non-operating foundations. Charitable organizations must be public charities as described in Code Sections 509(a)(1) or 509(a)(2), supporting organizations described in Code Sections 509(a)(3) that are Type I, Type II or Type III functionally-integrated or private operating foundations. Distributions shall not reference the existence of a charitable pledge. As provided in the Internal Revenue Code and Regulations, the Board of Directors has the absolute right to direct all distributions of income and/or principal from Donor-Advised Funds.

c. Minimum Grant Amount from Donor-Advised Funds

The Board of Directors may designate a minimum grant amount for Donor-Advised Funds.

d. Grant Activity Policy

As the legal owner of assets contributed to the Community Foundation and held in its funds, the Community Foundation is responsible for ensuring the funds are used for grantmaking, exclusively for charitable purposes, and do not confer any private benefit on the Donor or any other person. With donor-advised funds, the Community Foundation works with the Donor and/or Donor Advisor(s) to determine when grants will be made from those funds. To that end, the Community Foundation monitors the use of donor-advised funds to ensure their activity leads to charitable distributions.

1. Examples of Fund Activity. The following are examples of Fund activity that lead to distributions. If this policy ever conflicts with federal law or state law (including the Uniform Prudent Management of Institutional Funds Act, commonly known as UPMIFA), the relevant law controls. A Fund is considered active when there is regular communication between a Donor, Donor Advisor(s) (or named successors) and the Community Foundation regarding the existence and purpose of that Fund. Examples of some of the activities that would deem a Fund active include, but are not limited to:

    a. Regular Grant Recommendations. Donor advisor generally recommends grants at least annually to qualified charitable organizations. The amount of grantmaking can vary from year to year.

b. Developing a Philanthropic Program. Donor makes a substantial contribution to a Fund, for example upon the sale of his or her business, and refrains from recommending grants for a given initial period while the Donor consults with the Community Foundation and/or does his or her own research to determine what types of grants will best meet community needs and/or the Donor's philanthropic goals.

c. Long-term Giving Plan. Donor Advisor deliberately reduces the frequency or size of grant recommendations from the Fund, for example:

   i. During his or her working years, with the intention of increasing the Fund balance to support grantmaking during retirement when the Donor Advisor expects his or her income to change.

   ii. To build a Fund over time so the Donor's children can make grants later (the idea being the Donor is leaving a charitable legacy for the next generation to administer).

   iii. When the Fund is invested in an illiquid or undervalued investment and the Donor Advisor intends to begin making grant recommendations when the investment can be sold at a reasonable price.

d. Project Grants. Donor makes a substantial contribution to a Fund and determines to recommend grants to a specific qualified charitable organization over a period of years so that the Donor can monitor how the charitable organization performs, and to consider whether another organization would better achieve the Donor's charitable objectives.

e. Starter Fund. Donor wants to build the Fund balance to make substantial grants to the community. Therefore, there may be no distributions made until the Fund balance reaches an amount stated in the Fund file based on the Community Foundation's conversations with the Donor and/or Donor Advisor(s).

f. Specific Occasion Grant. Donor Advisor refrains from recommending grants for a number of years with the specific charitable goal of recommending a grant upon a specific occasion. Examples may include, but are not limited to:

   i. Donor is incapacitated with no successor Advisor(s) named so the Community Foundation waits until the Donor's death to distribute the Fund according to the Donor's original intent on file with the Community Foundation;

   ii. The Fund has transitioned to named successor Advisors, but they are minors and no adult representative is named to represent them (so grants resume when successor Advisors are adults);

   iii. Founders of Fund who are also the Donor Advisors are getting divorced so that grants are suspended until both the spouses agree on grants, which may include splitting the Fund into two separate funds, one for each spouse to advise, or eventually dissolving the Fund by the making of charitable grants;

   iv. Grants are suspended during litigation involving a Fund (e.g., the Donor left his/her estate to a Fund, but the Donor's heirs are disputing the bequest so the Community Foundation does not allow grants until the litigation is resolved); or

   v. Donor leaves a bequest to a Fund and distributions are made periodically to the Fund during the estate settlement process, but grants are not made until the estate is fully settled and the Fund receives a final distribution from the estate.

2. Re-Activating Grantmaking. Should there be no grant activity in a donor-advised fund for at least three years, steps will be taken by the staff of the Community Foundation to activate the Fund. These steps may include, but are not limited to:

   a. Notifying the Fund Advisor regularly and periodically (at least annually over a period of three years) to encourage the Advisor to activate the fund.

   b. Distributing grants from the Fund to qualified grant recipients that align with the Donor's intent, but if the Community Foundation determines such intent is obsolete, incapable of being fulfilled, impractical, or inconsistent with the community's charitable needs, then the Community Foundation shall exercise its variance power to enable the Community Foundation to continue to use its resources to meet the needs of the community and to address the charitable purposes for which the funds were committed.

e. Eligible Advisors During the Donor(s)' Lifetime

Recommendations for distributions shall be subject to the following rules:

1. Generally, the Donor(s) may designate any adult (i.e., at least age 18) person(s) to have the privilege of making recommendations throughout the lifetime of the Donor or his or her spouse, unless earlier terminated by resignation or incapacity. Donor(s) may designate additional and/or alternative Advisors at any time during the Donor(s)' lifetime.

2. A Donor other than an individual, such as a corporation, partnership or trust, will not be subject to a time limit for its privilege to make recommendations.

f. Successor Advisors After the Death of Donor(s)

1. The Donor(s) may designate one or more adult (i.e., at least age 18) person(s) to have the privilege of making recommendations throughout their lifetimes, unless earlier terminated by resignation or incapacity. If more than one person is named, then the successor Advisors shall operate under the rules governing Advisory Committees described in Section B.6.

2. Subject to the terms of the instrument of transfer, each successor Advisor to the Fund that was designated by the Donor may likewise designate a successor Advisor to act in his or her place (who in turn may designate a successor Advisor to act in his or her place, and so on).

3. After the Donor's death (or Donors' deaths), the Community Foundation will contact the successor Advisors in writing to inform them that they have been named as successor Advisors for the Fund. If after three years from the date of the Community Foundation's initial written correspondence to the successor Advisor(s) there has been no response or action from the successor Advisor(s), and the Community Foundation has tried to contact the successor Advisors at least annually during that three-year period, then the Community Foundation will become the successor Advisor for the Fund. In that case, the Community Foundation will endeavor to use the Fund in a way that is consistent with the original Donor's/Donors' charitable interests that may be known to the Community Foundation.

g. Option to Split Funds for Successor Advisors

If a Donor has designated successor Advisors and if the charitable interests of the successor Advisors are sufficiently diverse, then the Community Foundation may, with the consent of the successor Advisors and subject to the terms of the Donor's instrument of transfer, divide the Donor-Advised Fund into multiple Donor-Advised Funds and limit each successor Advisor's advisory privilege to a separate Fund.

h. Conversion of Donor-Advised Fund After Advisory Privilege Ends

Upon termination of the advisory privilege, a Donor-Advised Fund will be converted at the discretion of the Community Foundation to an Unrestricted Fund or a Field of Interest Fund as provided for in Part B, Section 5.

**Section 8.** ***Special Rules for Designated Funds***

a. Establishment and Purpose

A Donor may establish a Designated Fund for one public charity described in Code Sections 509(a)(1), (a)(2) or (a)(3).

b. Monitoring Function and Variance Power

The Community Foundation shall monitor the performance of the designated charitable organization to determine that it is using payments for charitable purposes consistent with the Community Foundation's purposes and the Donor's intention at the time the contribution was made. If the Board of Directors determines that continued payments for the designated organization have become unnecessary, obsolete, incapable of fulfillment, impractical or inconsistent with the community's charitable needs the Board may, in its discretion, select an alternative public charity with a similar mission and charitable purpose of the original Designated Charity as specified in the instrument of transfer or convert the Designated Fund to an Unrestricted Fund or Field of Interest Fund. The Fund shall then continue in accordance with the provisions of Section B.5.

**Section 9.** ***Special Rules for Organization Funds***

a. Establishment and Purpose

An Organization described in Code Section 509(a)(1), (a)(2) or (a)(3) may establish an Organization Fund (also referred to as an agency fund) for its benefit.

b. Monitoring Function and Variance Power

The Community Foundation shall monitor the performance of the designated charitable organization to determine that it is using payments for charitable purposes consistent with the Community Foundation's purposes and the Donor's intention at the time the contribution was made. If the Board of Directors determines that continued payments for the designated organization have become unnecessary, obsolete, incapable of fulfillment, impractical or inconsistent with the community's charitable needs the Board may, in its discretion, select an alternative public charity with a similar mission and charitable purpose of the original Designated Nonprofit Charitable Organization as specified in the instrument of transfer or convert the Organization Fund to an Unrestricted Fund or Field of Interest Fund. The Fund shall then continue in accordance with the provisions of Section B.5.

**Section 10.** ***Special Rules for Field of Interest Funds***

a. Establishment and Purpose

A Donor or the Community Foundation may establish a Field of Interest Fund from which payments are made to multiple named organizations or for a specific charitable purpose (field of interest). The specified purpose may be broad, such as support of education, health care or arts and humanities; or narrow, such as the prevention of child abuse. Field of Interest Funds may also be established for specific geographic areas such as a neighborhood, section of city, county or metropolitan area. Any proposed Field of Interest Fund that is intended to provide aid to individuals who have suffered loss as a result of a personal hardship or

catastrophic disaster shall be reviewed and approved in advance by the Community Foundation's legal team to ensure compliance with additional Internal Revenue Service rules. In short, personal hardship and disaster relief funds must have a sufficiently large or indefinite pool of grantees and recipients must be selected based on a written and objective determination of need that is reviewed by an independent selection committee that is controlled by the Community Foundation.

b. Geographic Affiliates

The Community Foundation's governing body maintains oversight and control over geographic affiliates. A geographic affiliate is a component fund (or collection of component funds), established within or by the Community Foundation, serving a defined geographic region under a common advisory board. Grants recommended by the advisory board of a geographic affiliate shall be subject to the same due diligence process exercised by the Community Foundation for all other Field of Interest funds.

c. Monitoring Function and Variance Power

The Community Foundation shall periodically evaluate all Field of Interest Funds. If the Board of Directors determines that continued payments for the specified charitable purpose have become unnecessary, obsolete, incapable of fulfillment, impractical, or inconsistent with the community's charitable needs, the Board in its discretion, may change the field of interest of the Fund or convert it to an Unrestricted Fund. The Fund shall then continue in accordance with the provisions of Section B.5.

**Section 11.** ***Special Rules for Scholarship Funds***

a. Establishment and Purpose

A Donor or the Community Foundation may establish a Scholarship Fund from which grants are made for study or other similar purposes to support one or more worthy recipients, provided that the recipients are selected through an objective and non-discriminatory competitive selection process.

Scholarships must be awarded in accordance with a selection process that is consistent with the Community Foundation's tax-exempt status and consistent with the allowance of tax deductions for individuals making contributions to the Community Foundation. In addition, the selection process must include the following:

1. A sufficiently broad pool of potential grantees. The pool of scholarship applicants must be sufficiently broad so that the making of grants to the members of the group will be considered as furthering a charitable purpose and not merely benefiting private interests. However, if the scholarship program requires the selection of an exceptionally qualified individual to carry out its purposes and the pool of such individuals is small, the Fund shall include documentation of the efforts made to determine qualified members of the class of potential recipients. Any proposed limitation on the pool of grantees that is based on race or any other characteristic that might be counter to law or public policy or inconsistent with the Community Foundation's tax-exempt status shall be reviewed by the Community Foundation's legal team.

2. Objective and non-discriminatory selection criteria. The criteria used in selecting scholarship recipients shall be objectively related to the purpose of the scholarship and applied equally to all applicants. Criteria might include, but need not be limited to: prior academic performance, recommendations from professors, financial need, or evidence of an applicant's motivation, character, ability and potential. The specified criteria may be broad, such as attending any institution of higher learning at the discretion of the student, or narrow, such as a specific major at a specified named institution. Scholarship Funds may also be established for specific geographic areas such as a section of city, county or metropolitan area. Scholarships may be awarded for students to attend a specific institution (elementary through high school, college, technical);

students in a particular field of study or major; students from a particular geographic area; or students who have attended a specific high school or school district.

3. A sufficiently independent selection committee. The Donor may designate the Community Foundation to serve as the selection committee to review scholarship applications and select recipients. Alternatively, the Donor may recommend an Advisory Committee (which may include the Donor) to be appointed by the Community Foundation in which case the senior management officers of the Community Foundation shall have the authority to appoint the Advisory Committee on behalf of the Board of Directors of the Community Foundation. The Advisory Committee will review scholarship applications and select scholarship recipients, and, if needed, the manager of scholarship funds for the Community Foundation shall control the Advisory Committee by having the equivalent of a supermajority vote on the Advisory Committee. The manager of scholarship funds for the Community Foundation shall have the ultimate authority to select the scholarship recipients and the Donor, Donor Advisor(s) and any persons related to the Donor or Donor Advisor(s) shall not directly or indirectly control the Advisory Committee. Donors who recommend Advisory Committees for Scholarship Funds shall strive to recommend individuals who are familiar with the community and who have expertise related to the scholarship being awarded.

b. Employer-Sponsored Scholarship Funds

Any proposed Scholarship Fund that will be sponsored by an employer and awarding scholarships to employees or family members of employees shall be reviewed and approved in advance by the Community Foundation's legal team to ensure compliance with additional Internal Revenue Service rules governing such scholarship programs.

c. Other Permitted Grants to Individuals

In addition to scholarship grants for study at an educational institution described in Code Section 170(b)(1)(A)(ii) (i.e., an educational institution which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of students at the institution), Scholarship Funds may also provide for (1) grants to individuals that constitute a prize or award if the recipient is chosen from the general public and without any action on the recipient's part, the recipient is not required to render substantial services as a condition of receiving the prize or award and the prize or award otherwise complies with Code Section 4945(g)(2); or (2) grants to individuals that are made for the purpose of achieving a specific objective, producing a report or other similar product, or improving or enhancing a literary, artistic, musical, scientific, teaching or other similar capacity, skill or talent of the recipient as provided in Code Section 4945(g)(3).

d. Monitoring Function and Variance Power

The Community Foundation shall periodically evaluate all Scholarship Funds. If the Board of Directors determines that continued payments for the specified charitable purpose have become unnecessary, obsolete, incapable of fulfillment, impractical, or inconsistent with the community's charitable needs, the Board in its discretion, may change the scholarship criteria of eligibility or convert it to an Unrestricted Fund. The Fund shall then continue in accordance with the provisions of Section B.5.

e. Conflict of Interest

No scholarship award shall be made to a Donor's family member including direct ancestors and direct lineal descendants, spouse, and other relatives including brothers, sisters, nieces, nephews, aunts, uncles, cousins, and their respective spouses and children. Non-donor Advisory Committee members shall also adhere to the same policy regarding scholarship recipients awarded to Advisory Committee family members.

**Section 12.** ***Special Rules for Trusts Created as Component Funds***

The tax regulations provide that in order for a trust to be treated as a component part of a community foundation (rather than a separate trust), the following requirements must be met:

a. The terms of the trust instrument and the Donor's instrument of transfer must subject the trust to the operation of the Articles of Incorporation and Bylaws of the Community Foundation;

b. The Community Foundation must have the power to modify any restriction or condition on the distribution of assets for any specified charitable purpose or to any specified organization if, in the sole judgment of the Board of Directors, such restriction or condition becomes, in effect, unnecessary, incapable of fulfillment, or inconsistent with the charitable needs of the community served;

c. The Community Foundation must have the power to replace the trustee for breach of fiduciary duty under state law;

d. The Community Foundation must have the power to replace any participating trustee for failure to produce a reasonable return of net income over a reasonable period of time;

e. The Donor may not impose any "material restriction" (as that term is defined in the Treasury regulations) with respect to the transferred assets; and

f. The Community Foundation must accept the contribution.

## PART C. SUPPORTING ORGANIZATIONS

**Section 1.** ***Establishment and Purpose***

a. Definition and Tax Status

A supporting organization is:

1. A charitable corporation or trust

2. Classified by the IRS as:

   (a) a Section 501(c)(3) charity, and

   (b) as a public charity (rather than a private foundation) because it supports a publicly supported charity, such as a community foundation.

The tax laws provide that a supporting organization will be a public charity, even if all contributions have come from related parties or even if it has not received any contributions over a period of years (either situation would normally cause a charity to be a private foundation).

b. Technical Requirements Under The Tax Laws

In order to be a supporting organization of the Community Foundation under Code Section 509(a)(3), the establishing Donor seeking supporting organization status must prove to the IRS that it:

1. Is organized to support the Community Foundation,

2. Is not controlled by "disqualified persons",

Disqualified persons include substantial contributors to the supporting organization (donors who gave more than $5,000 to the supporting organization if this amount is also more than 2% of the organization's total contributions by the end of the taxable year), members of that person's family and businesses controlled by the person. By law, they cannot have 50% or more of the voting power of the governing body or a veto power over the actions of the organization since that would constitute "control."

3. Is operated, supervised, or controlled "by" or "in connection with" the Community Foundation.

(a) "by" means that the Community Foundation appoints a majority of the governing body of the supporting organization,

-or-

(b) "in connection with" is a much more complicated procedure by which the supporting organization must show that:

i. The Community Foundation appoints at least one member of the governing body of the supporting organization, and

ii. Through its operations, the supporting organization does either one of the following:

1. Engages in activities that the Community Foundation would otherwise do itself but for the supporting organization, or

2. Distributes 85% or more of its income to or for the use of the Community Foundation in such a way that the Community Foundation is "attentive" to the supporting organization.

c. Tax Advantages of Supporting Organization

1. Avoid Private Foundation Taxes and Administrative Requirements
A supporting organization is treated as a public charity and is free from private foundation excise taxes and administrative requirements of a private non-operating foundation.

2. Greater Tax Benefits for Donors
A donor to a supporting organization can frequently claim greater tax benefits than if the same property was given to a private non-operating foundation:

a. A larger tax deduction for gifts of real estate or closely held stock (fair market value vs. cost basis).
b. A larger deduction can be claimed each year, if the donor is subject to the annual charitable deduction limitation.

**Section 2. *Policies Applicable to a Supporting Organization***

The terms of the relationship to become a supporting organization of the Community Foundation and the benefits and services that one organization may provide to the other shall be mutually agreed upon by the governing bodies of both organizations. In general, this relationship requires the active oversight and involvement of the Community Foundation. Consequently, the following information must be obtained from the supporting organization:

1. Copies of the organization's articles of incorporation and bylaws, if in corporate form, or trust instrument, if in trust form, and tax exemption letter from the Internal Revenue Service.

2. Copies of all board meeting notices and minutes of the board meetings;
3. Notification when any board member appointed by the Community Foundation finishes his or her term, resigns or otherwise ceases to serve;
4. Financial reports at least quarterly (unless all of the supporting organization's assets are already held at the Community Foundation);
5. Copies of all account statements upon request of the Community Foundation (if the supporting organization's assets are not all held at the Community Foundation);
6. Copies of the annual 990 reports to the Internal Revenue Service; and
7. Information concerning all grants so that the grants can be processed through the Community Foundation.

In return, the Community Foundation's role is to provide the supporting organization with the following primary services (additional services may be separately negotiated):

1. Appointment of the requisite number of members to the supporting organization's board as required by the organization's governing document(s);
2. Periodic financial statements;
3. Access to on-line tools provided to donors by the Community Foundation;
4. Information upon request regarding grant-making opportunities; and
5. The processing of all grants.

The tax laws require that organizational documents (articles of incorporation or trust instrument) of the supporting organization must (1) specify that the Community Foundation will be the supported organization and (2) specify charitable purposes that are supportive of, and not broader than, those of the Community Foundation. In addition, the supporting organization's activities must support the Community Foundation.

**Section 3. *Termination of Relationship***

Either the Board of Directors or the Governing Body of the supporting organization may terminate the relationship upon such notice as is prescribed in the agreement between the Community Foundation and the supporting organization. Termination may cause the supporting organization to lose its public charity tax status and be reclassified as a private non-operating foundation.

## PART D. SPLIT-INTEREST ARRANGEMENTS

**Section 1. *Definitions***

Split-interest arrangements are sometimes referred to as "deferred gifts". They generally pay income to a Donor (or someone else who is named by the Donor) over the person's life and then distribute the assets to a charity upon death.

a. Charitable Gift Annuity (Immediate or Deferred) - A contract with the Community Foundation to receive a fixed dollar amount each year over a person's life; the annuity contract must meet the tax requirements of Code Section 514(c)(5). Payments are generally based upon the American Council on Gift Annuities approved tables in effect at the time that the gift is made.

The rate of return the Donor(s) receives depends upon the age (and, if applicable, the age of the spouse) at the time of the gift. The older the Donor, the higher the rate of return will be. Payments may be made annually or in more frequent intervals. The remaining proceeds are distributed to a named charitable Fund established by the Donor at the Community Foundation, excluding an Organization Fund. (See Part B, Section 1)

b. Charitable Remainder Annuity Trust - A trust that pays a fixed dollar amount (at least 5% of the value of the property contributed to the trust). Payments are made annually (or more frequently) to

one or more income beneficiaries for life (or for a fixed term of years -- maximum 20). The remaining proceeds are distributed to a named charitable Fund established by the Donor at the Community Foundation, excluding an Organization Fund. (See Part B, Section 1)

c. Charitable Remainder Unitrust - A trust that pays a fixed percentage (at least 5%) of the value of the trust's assets each year (as valued at the beginning of each year) to one or more income beneficiaries for life (or for a fixed term of years -- maximum 20). The remaining proceeds are distributed to a named charitable Fund established by the Donor at the Community Foundation, excluding an Organization Fund. (See Part B, Section 1)

d. Charitable Lead Trust - This is the inverse of a charitable remainder annuity trust or unitrust. Income is distributed to the Community Foundation, into a named charitable Fund established by the Donor, (over a period of years or the lifetime of the Donor) and the remainder is usually distributed to members of the Donor's family. Such a trust can be a useful part of an estate plan to keep a rapidly appreciating asset (such as real estate or stock) within a family.

Currently, the Community Foundation does not trustee charitable lead trusts. However, the Community Foundation will be pleased to work with the Donor to help find an appropriate trustee.

e. Retained Life Estate - Donors may leave their principal residence, vacation home or farm to a named charitable Fund established by the Donor or to an existing Fund at the Community Foundation and retain the right to live in the house or farm for the Donor's lifetime (the life of a surviving spouse can also be added). The Donor receives a sizable charitable income tax deduction the year the property is donated through the Retained Life Estate. The amount of the tax deduction is dependent on the age(s) of the Donor and the value of the home or farm. A gift of a personal residence now, with retained life residency for the Donor and/or spouse, gives the Donor the same estate tax benefits as a gift by will plus an immediate income tax deduction.

**Section 2.** ***Community Foundation as Trustee; Minimum Contributions; Other Conditions***

a. Community Foundation as Trustee of Split-Interest Gifts

The Community Foundation offers Charitable Gift Annuities to Donors. The Community Foundation can also serve as trustee for charitable remainder annuity trusts and charitable remainder unitrusts. The Community Foundation will not trustee Charitable Lead Trusts. However, Donors may designate a named charitable Fund at the Community Foundation as the income beneficiary of the lead interest.

b. Minimum Contributions

| | | |
|---|---|---|
| 1. | Charitable Gift Annuity | $100,000 |
| 2. | Charitable Remainder Annuity Trust | $250,000 |
| 3. | Charitable Remainder Unitrust | $250,000 |

c. Other Conditions

1. Charitable Gift Annuities

Under the tax laws, the entire remainder interest of a charitable gift annuity must be distributed to the Community Foundation. A Donor may recommend that the proceeds be used to establish a Donor-Advised, Designated, Field-of-Interest, Scholarship or Unrestricted Fund or be added to any existing Fund. In the absence of such a recommendation, the proceeds will generally be used to establish (or be added to) a named Unrestricted Fund.

2. Charitable Remainder Trusts

In order for it to serve as the trustee, the Community Foundation must be named as the beneficiary of the remainder interest of a charitable remainder annuity trust or a charitable remainder unitrust. A Donor may establish or add to an Unrestricted, Designated, Field-of-Interest, Scholarship or Donor-Advised Fund with the remainder proceeds of the charitable remainder trust. In the absence of such a designation, the proceeds will generally be used to establish (or be added to) a named Unrestricted Fund.

3. Policies Concerning Contributions

The general rules described in Part A (concerning contributions to the Community Foundation) generally apply to contributions to split-interest arrangements (particularly Section A.2 which gives the Community Foundation the authority to reject assets that are hard to sell or carry potential liabilities).

4. Independent Review by Legal Counsel

A Donor is advised to consult independent legal counsel concerning contributions to Split-Interest Arrangements including the drafting and review of all documents establishing the split-interest gift.

# APPENDIX

## TAX LAWS THAT GOVERN INCOME TAX CHARITABLE CONTRIBUTIONS

**Section 1.** ***Timing of Income Tax Deductions***

The tax laws generally provide that a contribution is deductible in the year that the property is delivered to the Community Foundation. Delivery is considered made under the following circumstances:

(1) Unconditional delivery or mailing of a check to the Community Foundation which subsequently clears in due course will constitute an effective contribution on the date of delivery or, if the check is received in the ordinary course of the mails, on the date of mailing.

(2) Unconditional delivery or mailing of a properly endorsed stock or bond certificate will constitute an effective contribution on the date of delivery or, if such certificate is received in the ordinary course of the mails, on the date of mailing.

(3) If a contribution is made subject to compliance with certain conditions, then the contribution is not effective until the Community Foundation agrees to comply with such conditions.

(4) Except as provided in paragraph (5), if a Donor delivers a stock certificate to his or her bank, broker, other agent or the issuing corporation for transfer to the Community Foundation, or instructs his or her bank, broker, other agent or the issuing corporation to transfer stock to the Community Foundation, then the gift is effective on the date the stock is transferred on the books of the issuing corporation.

(5) If stock is registered in a nominee name by a bank, broker or other agent and such bank, broker or other agent agrees to hold the stock in such nominee name on behalf of the Community Foundation, so that the stock will not be transferred on the books of the issuing corporation, then the gift of such stock is effective on the earlier of the date on which such bank, broker or other agent (i) acknowledges in writing that it holds the stock on behalf of the Community Foundation, or (ii) makes the appropriate entry in its books and records to reflect that it holds the stock on behalf of the Community Foundation.

(6) Delivery to the Community Foundation will be effective upon receipt by a senior management officer of the Community Foundation, or the employee or agent authorized by any such officer to accept the contributions.

**Section 2.** ***Evidence of Deduction Required***

a. Any Contribution of $250 or More

Donors will not be able to claim a charitable deduction for any gift of cash or property of $250 or more to any charity unless a "contemporaneous written acknowledgement" from the charity can be produced; cancelled checks will not suffice. To meet the requirements, the receipt (1) must contain certain information and (2) must be received within certain time limits.

1. Contents of Acknowledgment

The acknowledgment must state (a) the amount of cash and a description (but not value) of any property contributed and (b) whether the charity had provided any goods or services in exchange for the property described in clause (if so, then it must state the value of the goods and services).

2. Time Limits

An acknowledgment will generally be considered to be "contemporaneous" if you obtain it before you file your tax return for that year.

b. Appraisals Required for Gifts of Property Over $5,000; Exceptions for Cash and Publicly Traded Securities

Donors who contribute property (other than publicly traded securities) valued at more than $5,000 in any year must substantiate the value with "qualified appraisals" from "qualified appraisers". The $5,000 threshold is increased to $10,000 in the case of non-publicly traded stock. The requirement does NOT apply to contributions of cash or publicly traded stock. By law, the cost of the appraisal must be borne by the Donor.

The Donor must attach a copy of IRS Form 8283 ("Non-cash Charitable Contributions") to the tax return in the year of the contribution. A charitable organization (including a community foundation) that receives such property must sign a copy of the appraisal report (IRS Form 8283), which should then be attached to the Donor's income tax return.

If the Community Foundation sells the property listed on IRS Form 8283 within three years of receipt, it is required by law to disclose the sale price to the IRS and to the Donor on IRS Form 8282.

**Section 3.** ***Amount of Income Tax Deduction***

Generally the Donor can deduct the amount of cash or the fair market value of the long-term capital gain property contributed to the Community Foundation. Usually the best results are for gifts of appreciated long-term capital gain stock and real estate because a Donor can generally deduct the entire fair market value for gifts of such property to the Community Foundation.

**Section 4.** ***Annual Deduction Limitations***

a. Individuals

The maximum amount of the deduction depends on (1) the type of property contributed (cash, ordinary income property, short-term capital gain property or long-term capital gain property), (2) the nature of the charitable organization (public charity or private foundation), and (3) the amount of adjusted gross income ("AGI") shown on the IRS Form 1040. Deductions for amounts in excess of these annual limitations can usually be carried forward for five additional years.

The annual deduction limitations for INDIVIDUALS for cash and long-term capital gain property, the most common types of gifts to the Community Foundation, are:

| **Type of Charity** | ***Cash*** | ***Long-term Capital Gain Property (Stock & Real Estate)*** |
|---|---|---|
| **Public Charity** (including a Fund in the Community Foundation) | 60% of AGI | 30% of AGI |
| **Private Foundation** | 30% of AGI | 20% of AGI |

Amounts that exceed the deduction percentage limitation may be carried forward for five additional years.

b. Business Entities

C Corporations may generally deduct up to 10% of their taxable income. However, the charitable deduction for entities such as S Corporations, Limited Liability Companies and Partnerships generally passes through to its shareholders, members or partners.

c. Trusts and Estates

Estates and trusts are eligible for an unlimited income tax charitable deduction, provided that the contribution came from income rather than corpus and was made pursuant to the governing instrument.

**Section 5. *Treatment of Excess Business Holdings***

Under the Pension Protection Act of 2006 (PPA), the private foundation excess business holdings rules now apply to donor-advised funds as if they were private foundations[1]. That is, the holdings of a donor-advised fund in a business enterprise, **together with the holdings of persons who are disqualified persons with respect to that fund**, may not exceed any of the following:

• Twenty percent[2] of the voting stock[3] of an incorporated business

• Twenty percent of the profits interest of a partnership or joint venture or the beneficial interest of a trust or similar entity.

Ownership of unincorporated businesses that are not substantially related to the fund's purposes is also prohibited.

Donor-Advised funds receiving gifts of interests in a business enterprise after the date of the PPA's enactment (August 17, 2006) will have five years to divest holdings that are above the permitted amount, with the possibility of an additional five years if approved by the Secretary of the Treasury. Funds that held such assets on August 17, 2006 will have a much longer period to divest under the same complicated transition relief given to private foundations in 1969[4].

**What is a business enterprise?**

A "business enterprise" is the active conduct of a trade or business, including any activity which is regularly carried on for the production of income from the sale of goods or the performance of services. Specifically excluded from the definition are:

- Holdings that take the form of bonds or other debt instruments unless they are a disguised form of equity
- Income from dividends, interest, royalties and from the sale of capital assets
- Income from leases unless the income would be taxed as unrelated business income
- "Functionally-related" businesses and program-related investments
- Businesses that derive at least 95 percent of their income from passive sources (dividends, interest, rent, royalties, capital gains). This will have the effect of excluding gifts of interests in most family limited partnerships, and other types of holding company arrangements.

**What is a disqualified person?**

Donors and persons appointed or designated by donors are disqualified persons if they have—or reasonably expect to have—advisory privileges with respect to the donor-advised fund by virtue of their status as

donors. Members of donors' and advisors' families are also disqualified, but the section does not define "family" and does not cross-reference either section 4958 or 4946 for the definition. Finally, the term includes 35-percent-controlled entities as defined in section 4958(f)(3).

**Community Foundation Policy with regard to assets categorized under the PPA as "excess business holdings"**

The Community Foundation will identify and monitor any new gift to a donor-advised fund of any interest qualifying as an "excess business holding" under the PPA. The Community Foundation will exercise its best effort to dispose of the contributed interest at the best possible price within five years of the date of the gift, as required under the PPA. In any event, the Community Foundation will dispose of any excess business holding prior to the five-year time limit, except in the event that the Treasury Department grants an additional five-year holding period. The Community Foundation will notify potential donors of such interests of this requirement prior to the contribution of such interest.

[1] The language is clear that it is only the donor-advised fund—not the sponsoring charity—that is to be treated as a private foundation. Accordingly, it appears that this section does not apply to assets held by the sponsoring charity's investment pools, or assets held by funds that are not donor-advised.

[2] Thirty-five percent if it can be shown that persons who are not disqualified persons have effective control of the business.

[3] Additionally, the donor-advised fund will be barred from holding non-voting stock of an incorporated business unless the disqualified persons collectively own less than 20 percent of the voting stock. Under the *de minimis* rule, the donor-advised fund could continue to hold an interest that did not exceed two percent of the voting stock and two percent of the value. Additional rules apply to cover situations such as mergers, redemptions, and acquisitions.

[4] Excess holdings acquired by purchase must be disposed of immediately. If purchases by disqualified persons cause the donor-advised fund to have excess holdings, the donor-advised fund will have 90 days to dispose of the excess.

***The above Appendix is intended to provide a general overview of charitable tax law. The above does not constitute tax or legal advice. Donors should consult their professional tax advisor and/or legal counsel before making a charitable gift to the Greater Kansas City Community Foundation.***

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: JAN 19 2013

HIGHLAND DALLAS FOUNDATION INC
C/O HUNTON & WILLIAMS LLP
DOUGLAS M MANCINO
550 S HOPE ST STE 2000
LOS ANGELES, CA 90071

Employer Identification Number:
45-3961755
DLN:
17053058308022
Contact Person:
SHEILA M ROBINSON ID# 31220
Contact Telephone Number:
(877) 829-5500
Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 22, 2011
Contribution Deductibility:
Yes
Addendum Applies:
No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Specifically, we have determined that you are a Type I supporting organization under section 509(a)(3). A Type I supporting organization is operated, supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

Letter 947 (DO/CG)

HIGHLAND DALLAS FOUNDATION INC

Sincerely,

Holly O. Paz

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

Letter 947 (DO/CG)

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: FEB 12 2013

HIGHLAND SANTA BARBARA FOUNDATION
INC
C/O MARK PATRICK
300 CRESCENT CT STE 700
DALLAS, TX 75201

Employer Identification Number:
45-3962008
DLN:
17053060398012
Contact Person:
GINGER L JONES ID# 31646
Contact Telephone Number:
(877) 829-5500

Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 22, 2011
Contribution Deductibility:
Yes
Addendum Applies:
No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

Letter 947 (DO/CG)

HIGHLAND SANTA BARBARA FOUNDATION

We have sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

Holly O. Paz

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

Letter 947 (DO/CG)

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: MAR 21 2013

HIGHLAND KANSAS CITY FOUNDATION INC
C/O HUNTON & WILLIAMS LLP
MARGARET S ALFORD
1445 ROSS AVE STE 3700
DALLAS, TX 75202

Employer Identification Number:
45-3961865
DLN:
17053066302032
Contact Person:
GREGORY WOO ID# 95340
Contact Telephone Number:
(877) 829-5500
Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 23, 2011
Contribution Deductibility:
Yes
Addendum Applies:
Yes

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Specifically, we have determined that you are a Type I supporting organization under section 509(a)(3). A Type I supporting organization is operated, supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

Letter 947 (DO/CG)

HIGHLAND KANSAS CITY FOUNDATION INC

Sincerely,

Holly O. Paz

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

Letter 947 (DO/CG)

## Agreement and
## Acknowledgment of Legal Relationship

The Highland Kansas City Foundation, Inc. (the "Foundation") will request the IRS to grant to it public charity status, effective as of the date of its incorporation, by reason of its supporting organization relationship with the Greater Kansas City Community Foundation, a Missouri nonprofit corporation ("Community Foundation"). This relationship requires the active oversight and involvement of the Community Foundation. In furtherance of this relationship, the Community Foundation and the Foundation agree as follows:

The Community Foundation shall provide the following Base Services to the Foundation: (1) quarterly statements evidencing all account transactions including receipts, disbursements and investment earnings, (2) access to on-line tools provided to donors by the Community Foundation, (3) information upon request regarding grant making opportunities, (4) processing of all grants, (5) all other services generally provided for donor advised funds by the Community Foundation under the standard administrative fee schedule, and (6) appointment of two of the three directors of the Foundation as required by the Foundation's Articles of Incorporation and Bylaws. Additional services may be provided for an additional fee. Both parties shall agree in writing as to any additional services to be provided and the fee for such additional services.

The Community Foundation shall perform no management, accounting, tax or other services with respect to any subsidiaries of the Foundation, or any entities in which the Foundation owns or holds any interest.

In consideration of the Base Services to be provided, the Foundation shall pay the greater of (i) $62,500 or (ii) the administrative fee as set forth in the Community Foundation's then current public Administrative Fee Schedule (the "Administrative Fee Schedule"). The Foundation hereby acknowledges receipt of the current Administrative Fee Schedule attached as Exhibit B and accepts the terms of said schedule. This fee will be applied against the market value of assets held in the Foundation. Such fees will be assessed monthly, however the Foundation shall at all times maintain a cash reserve sufficient to cover the estimated fees for one year. Any and all direct operating expenses incurred by the Community Foundation, such as transaction fees, courier services, tax return preparation fees for Forms 990, legal fees and special audit fees, will be billed at actual cost. The Administrative Fee Schedule is subject to modification and may be increased or decreased at the sole discretion of the Community Foundation's Board of Directors. The Community Foundation shall promptly notify the Foundation of any such modification and send to the Foundation the new, modified Administrative Fee Schedule.

The Foundation agrees to provide the Community Foundation with any other records and data necessary for the Community Foundation to provide the Foundation with the Base Services and any additional services, and further, the Foundation warrants that any such records and data provided shall be accurate and true and that the Community Foundation may rely on such records and data in fulfilling its obligations hereunder. Further the Foundation shall cooperate in any audit of the Community Foundation for which information related to the Foundation is requested. The Foundation agrees to provide the Community Foundation with any and all information needed to fulfill the Community Foundation's obligations hereunder on such forms and in such format as may be reasonably requested by the Community Foundation.

Specifically, the Foundation agrees to provide the Community Foundation with the following on a timely basis (1) copies of the Foundation's Articles of Incorporation and Bylaws and tax exemption letter from the Internal Revenue Service, (2) copies of all Board meeting notices and minutes of the Board meetings, (3) financial reports at least quarterly, (4) copies of all account statements of the Foundation upon request of the Community Foundation, and (5) a copy of the Foundation's annual Form 990 report to the Internal Revenue Service. Further, the Foundation will notify the Community Foundation when any director appointed by the Community Foundation that is not otherwise affiliated with the Community Foundation finishes his or her term, resigns or otherwise ceases to serve.

This Agreement shall commence on November 30, 2011 and shall continue in effect until terminated by either party. Either party may terminate this Agreement upon 60 days advance written notice to the other party.

The Community Foundation is a public charity and any and all terms and conditions of this agreement which would otherwise adversely affect its status as a public charity shall be considered null and void.

This Agreement shall be interpreted and enforced according to the laws of the State of Missouri.

This Agreement contains the entire understanding of the parties and shall not be supplemented with any other term or condition unless such term or condition is reduced to writing and specifically incorporated herein by written agreement of the parties.

The undersigned have read and understand the contents of this agreement and are authorized to enter into this agreement on behalf of the parties hereto.

| | |
|---|---|
| James Dondero, President | Laura W. McKnight, President |
| Highland Kansas City Foundation, Inc. | Greater Kansas City Community Foundation |
| Date: November 30, 2011 | Date: 11/30/11 |

**EXHIBIT B**

# ADMINISTRATIVE FEES
## TO SUPPORT THE GREATER KANSAS CITY COMMUNITY FOUNDATION'S MISSION-BASED OPERATIONS

This administrative fee schedule applies to all funds at the Greater Kansas City Community Foundation and its regional affiliates. Through economies of scale, the Foundation is able to charge minimal fees compared to the cost of establishing and maintaining your own private foundation. The fees are used exclusively to support the Community Foundation's operating expenses—your investment in a public charity dedicated to improving the quality of life in our region and ensuring that each philanthropic investment returns the greatest personal and civic benefit possible.

**ANNUAL ADMINISTRATIVE FEES ON THE MARKET VALUE OF FUND ASSETS**

**1.00% on the first $500,000**
0.60% on the next $500,000
0.30% on the next $2 million
0.10% on the next $4 million

Funds with assets in excess of $7 million will be charged a flat fee of 0.25% on the total assets. The minimum fee is $250 per year. The minimum amount to establish a fund is $10,000. The fees stated above are the annual fees; fees are charged to the fund monthly based on the average fair market value of assets. For newly established funds, the minimum annual fee is prorated over the remainder of the year.

Funds will be charged for any extraordinary direct expenses incurred on behalf of a specific fund, such as commissions for the sale of contributed stock. Additional fees may be assessed for extraordinary services such as special grant processing and review or other non-standard services.

21481479\V-3

**THE DALLAS FOUNDATION**

**SUPPORTING ORGANIZATION OPERATING AGREEMENT**

THIS SUPPORTING ORGANIZATION OPERATING AGREEMENT (this "Agreement") is made and entered into on November 30, 2011, by and between **THE DALLAS FOUNDATION** ("Foundation") and the **HIGHLAND DALLAS FOUNDATION, INC.** ("Supporting Organization").

**RECITALS:**

A. Foundation is a Texas nonprofit corporation exempt from taxation under Internal Revenue Code ("Code") Section 501(c)(3), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code. The principal objective of Foundation is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily but not exclusively in or for the benefit of Dallas County, Texas.

B. Supporting Organization, a Delaware nonprofit non-stock charitable corporation, is established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Foundation.

C. Supporting Organization expects to obtain a determination letter from the Internal Revenue Service (the "IRS") that Supporting Organization is a tax-exempt organization described in Section 501(c)(3) of the Code and a Type 1 supporting organization described in Section 509(a)(3) of the Code.

D. Foundation and Supporting Organization have entered into this Agreement for the purpose of documenting their agreements relating to the operation of Supporting Organization as a Type 1 supporting organization of Foundation. It is the intent of the parties that the assets held by Supporting Organization will generate funds for grantmaking primarily but not exclusively in Dallas County and for the payment of fees to Foundation under this Agreement.

**NOW THEREFORE,** the parties agree as follows:

## 1. GOVERNANCE OF SUPPORTING ORGANIZATION

**1.1 OPERATIONS.** Supporting Organization is a separately-incorporated corporation, solely responsible for its own operations and for its compliance with tax and other laws. At all times during the term of this Agreement, Supporting Organization shall operate as a Type 1 supporting organization of Foundation, as contemplated in Section 509(a)(3)(B)(i) of the Code. Foundation recognizes that assets contributed to Supporting Organization will be held in the name of Supporting Organization and will be subject to spending and investment policies as shall be determined by the Board of Directors of Supporting Organization from time to time.

**1.2 BOARD OF DIRECTORS.** Supporting Organization's Board of Directors will be the governing body for Supporting Organization. Unless otherwise agreed by the parties, Supporting Organization's initial Board of Directors shall consist of three (3) members.

**(a) FOUNDATION APPOINTMENTS.** Foundation's Board of Trustees, as required by the Code, will at all times appoint a majority of Supporting Organization's directors. Foundation will cooperate with Supporting Organization to ensure that all persons appointed by Foundation are committed to the purposes of Supporting Organization. Foundation's appointees to Supporting Organization's Board of Directors may include Foundation's trustees or staff, as well as third parties selected by Foundation. Foundation's appointees shall not, apart from their service as Supporting

Organization directors or officers, be "disqualified persons" with respect to Supporting Organization as defined in Sections 509(a)(3)(C) and 4946 of the Code. Supporting Organization shall notify Foundation if any appointee is a disqualified person other than by virtue of his or her service as a Supporting Organization director or officer. Foundation's appointees to Supporting Organization's Board of Directors shall serve in accordance with Supporting Organization's Bylaws.

(b) **SUPPORTING ORGANIZATION APPOINTMENTS.** Mr. James Dondero or his successor shall elect or appoint a minority of the members of the Board of Directors of Supporting Organization (i.e., one, as long as the Board of Directors numbers three), who may be a disqualified person(s).

(c) **DISQUALIFIED PERSONS.** Under no circumstances shall individuals who are disqualified persons (other than by virtue of their service as directors or officers of Supporting Organization) have majority control of Supporting Organization's Board of Directors or have veto powers over actions by the Supporting Organization's Board of Directors, nor shall disqualified persons described in Section 4946 of the Code and persons described in Section 4958(c)(3)(B) of the Code be compensated by Supporting Organization or receive grants, loans or similar payments from Supporting Organization.

1.3 **NO COMPENSATION.** The parties agree that in order to avoid even the perception of personal benefit, no directors of Supporting Organization shall receive compensation for their service as such. Notwithstanding the foregoing, Supporting Organization's directors may be reimbursed for reasonable and necessary out of pocket expenses actually incurred for their board service.

1.4 **MEETINGS.** Supporting Organization's Board of Directors shall meet at least once annually in a manner permitted under Delaware law. The directors shall meet at least once annually in person, unless unforeseen circumstances make attendance in person impossible.

## 2. FINANCE AND OPERATIONS

2.1 **FISCAL YEAR.** Supporting Organization's fiscal year shall be the calendar year.

2.2 **SERVICES.** Foundation will provide the services to Supporting Organization described in **SCHEDULE A**, attached, and as such schedule may be amended by Foundation and Supporting Organization in writing from time to time.

2.3 **FEES:**

(a) In consideration for Foundation's services under this Agreement, Supporting Organization shall pay to Foundation the annual fees described more particularly in **SCHEDULE B,** attached.

(b) The parties may agree to additional fees in respect to the performance of any additional services not described in **SCHEDULE A** to this agreement. Foundation shall notify the Supporting Organization in advance of any changes in annual fees set forth in **SCHEDULE A.**

2.4 **INVESTMENTS**

(a) From time to time, some or all of Supporting Organization's funds may be invested with the pooled endowment funds of Foundation to achieve economies of scale and strive for the highest expected level of returns for a given level of risk with the goal of enabling Supporting Organization to achieve its philanthropic and financial objectives. Decisions with respect to the retention, investment, or reinvestment of assets or commingling of assets shall be made by Foundation's Board of Trustees or by a committee or agent authorized by the Board of Trustees, in accordance with Foundation's investment policies. Supporting Organization's funds will be accounted for and reported on separately.

(b) Supporting Organization may at any time remove any or all of its funds invested with Foundation's pooled investment fund and invest its own funds separately from those of Foundation, subject to limitations on investment withdrawals with regard to any particular investment class (e.g., limitations on early withdrawals from "fund of funds"). Supporting Organization may select its own custodian and investment consultant and pay the relevant fees directly, subject to Section 1.2(c) of this Agreement.

3. TERM

3.1 **COMMENCEMENT.** The term of this Agreement commenced upon the contribution of funds to Supporting Organization on November 30, 2011.

3.2 **TERM.** Supporting Organization and Foundation intend to engage in a long-term relationship. The initial term of this agreement shall be one year, and the term shall be renewed automatically for successive one-year periods. Notwithstanding the foregoing, this agreement may be terminated at any time by either party providing the other party with 30 days advance written notice of its intent to terminate the Agreement. Should either party wish to terminate this relationship, the following process will be followed:

(a) The parties will agree on amendments to the certificate of incorporation and bylaws of Supporting Organization. The amendments will change the status of Supporting Organization from a supporting organization of Foundation and provide for the transfer of Supporting Organization's assets to one or more of the following entities as determined by Supporting Organization:

(i) A stand-alone publicly-supported organization described in Section 501(c)(3) of the Code.

(ii) A supporting organization of another publicly-supported 501(c)(3) organization.

(iii) A donor-advised fund of a publicly-supported organization described in Section 501(c)(3) of the Code.

(b) Neither party will unreasonably withhold its approval of these amendments.

(c) In the event of the termination of this Agreement, each party shall be responsible for its own fees and costs related to the termination.

3.3 **LOSS OF TAX-EXEMPT STATUS.** This agreement shall be automatically terminated in the event that Supporting Organization is determined to not qualify as a tax-exempt organization described in Section 501(c)(3) of the Code.

4. INDEMNIFICATION AND INSURANCE

4.1 Foundation will indemnify, defend, and hold harmless Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Foundation, its officers, employees, members, agents, and affiliated organizations, under this Agreement. Foundation will maintain at all times during the term of this Agreement general liability and director and officer liability insurance in such amounts and against such risks as are standard in the industry, naming Supporting Organization and its directors and officers as additional insureds. The coverage will protect against the acts or omissions of Supporting Organization, its officers, directors, agents, and employees.

4.2 Supporting Organization will indemnify, defend, and hold harmless Foundation, its officers, trustees, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations, under this Agreement.

5. **MISCELLANEOUS**

5.1 **GOVERNING LAW.** This Agreement and the legal relations between the parties shall be governed by and construed under the laws of the State of Texas.

5.2 **RECORDS.** Supporting Organization will supply to Foundation on a timely basis copies of the following materials as they are created, updated, or amended: incorporation documents; annual filings with the State of Texas; meeting minutes and actions of the Board of Directors and of any committee with Board authority; board contact information; investment statements; and board policies.

5.3 **PUBLICITY.** Foundation may disclose the existence, funding and grants of the Supporting Organization in its Annual Report and other documentation published by Foundation. Any information presented for publication by the media shall be approved in advance by Supporting Organization. Foundation reserves the right to approve in advance any publicity from Supporting Organization mentioning Foundation.

5.4 **FURTHER ASSURANCES.** Each of the parties hereto does hereby covenant and agree, without any further consideration, to execute, acknowledge, and deliver all such other documents and to take all such other actions as may be necessary or convenient in order to carry out more effectively any of the purposes of this Agreement.

5.5 **AMENDMENTS.** This Agreement may be amended from time to time only by written instrument signed by both parties; and this Agreement shall be amended by the parties whenever necessary or advisable in order to comply with requirements of the Code relating to tax-exempt organizations and supporting organizations.

5.6 **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements between the parties with regard to such subject matter.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

| | |
|---|---|
| **HIGHLAND DALLAS FOUNDATION, INC.** | **DALLAS FOUNDATION** |
| James Dondero, President | Mary M. Jalonick, President |

## SCHEDULE A

## SCHEDULE OF SERVICES

Foundation will provide to Supporting Organization the services indicated below:

1.1 Administrative Services.

a. Maintenance of Supporting Organization's records, reports and files.

b. Performance of related accounting services for Supporting Organization.

c. Payment of accounts payable and other liabilities of Supporting Organization.

d. Preparation and distribution of all financial statements required to be generated by Supporting Organization.

e. Oversight of the preparation and filing of all federal and state returns required of Supporting Organization.

f. As needed, preparation and distribution to the governing body of Supporting Organization of periodic reports on the financial condition of the Supporting Organization.

1.2 Corporate Formalities Services.

a. Calendaring of required member and board meetings.

b. Notice of all meetings.

c. Facilities and administrative support for member and board meetings.

d. Preparation of minutes.

e. Maintenance of minute book.

f. Assistance with selection of candidates for the board.

1.3 Grant Administration.

a. Assistance with development of program goals, guidelines and a form of Request for Proposal.

b. Disseminate RFP to target groups.

c. Receive and screen all proposals.

d. Preparation of a summary grid of proposals for review and decision by the Supporting Organization.

e. Prepare and send responses to applicants.

f. Disbursement of grants with grant letters.

g. Monitor performance of grantees.

h. Receive and review interim and annual reports from grantees.

Supporting Organization acknowledges that Foundation is providing only the services listed above. Any services not selected, and any services not listed above, shall not be within the scope of Foundation's responsibilities under this Agreement. Without limiting the foregoing, Supporting Organization acknowledges that Foundation is not providing any investment advice or services to Supporting Organization, and that Supporting Organization is responsible for the management and investment of its assets.

## SCHEDULE B

## SCHEDULE OF FEES

In consideration of the services provided to Supporting Organization by Foundation, Supporting Organization shall pay Foundation an annual administrative fee (Fee) in the amount of .25% of the assets owned directly or indirectly by Supporting Organization, plus out-of-pocket costs. The Fee is payable in quarterly installments in arrears in the amount of .0625% of the prior quarter-end net asset value, plus out-of-pocket expenses for said quarter.

# SANTA BARBARA FOUNDATION

## SUPPORTING ORGANIZATION OPERATING AGREEMENT

THIS AGREEMENT is made and entered into on November 30, 2011, by and between the **SANTA BARBARA FOUNDATION** ("Foundation") and the **Highland Santa Barbara Foundation, Inc.** ("Supporting Organization").

**RECITALS:**

A. Foundation is a California nonprofit public benefit corporation exempt from taxation under Internal Revenue Code ("Code") Section 501(c)(3), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code. The principal objective of Foundation is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily but not exclusively in, or for the benefit of Santa Barbara County.

B. Supporting Organization, a Delaware nonprofit non-stock charitable corporation, is a "Type 1 Supporting Organization" under Section 509(a)(3) of the Code established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Foundation.

C. Supporting Organization expects to obtain a determination letter from the Internal Revenue Service that it is a tax-exempt organization under Section 501(c)(3) and a Type 1 supporting organization.

D. Foundation and Supporting Organization have entered into this Agreement for the purpose of documenting their agreements relating to the operation of Supporting Organization as a Type 1 Supporting Organization of Foundation. It is the intent of the parties that each year the assets held by Supporting Organization will generate funds for grantmaking primarily but not exclusively in Santa Barbara County and for the payment of fees to Foundation under this Agreement.

**NOW THEREFORE**, the parties agree as follows:

## 1. GOVERNANCE OF SUPPORTING ORGANIZATION

1.1 **OPERATIONS.** Supporting Organization is a separately-incorporated corporation, solely responsible for its own operations and for its compliance with tax and other laws. At all times during the term of this Agreement, Supporting Organization shall operate as a Type 1 Supporting Organization of Foundation, as contemplated in Section 509(a)(3)(B)(i) of the Code. Foundation recognizes that assets contributed to Supporting Organization will be held in the name of Supporting Organization and will be subject to spending and investment policies as shall be determined by the Board of Directors of Supporting Organization from time to time.

1.2 **BOARD OF DIRECTORS.** Supporting Organization's Board of Directors will be the governing body for Supporting Organization. Unless otherwise agreed by the parties, Supporting Organization's initial Board of Directors shall consist of 3 members.

(a) **FOUNDATION APPOINTMENTS.** Foundation's Board of Trustees, as required by the Code, will at all times appoint a majority of Supporting Organization's directors. Foundation will cooperate with Supporting Organization to ensure that all persons appointed by Foundation are committed to the purposes of Supporting Organization. Foundation's appointees to Supporting Organization's Board of Directors may include Foundation's trustees or staff, as well as third parties selected by Foundation.

Foundation's appointees shall not, apart from their service as Supporting Organization directors or officers, be "disqualified persons" as defined in Sections 509(a)(3)(C) and 4946 of the Code. Supporting Organization shall notify Foundation if any appointee is a disqualified person other than by virtue of his or her service as a Supporting Organization director or officer. Foundation's appointees to Supporting Organization's Board of Directors shall serve at the will of Foundation or for terms outlined in Supporting Organization's Bylaws.

(b) **SUPPORTING ORGANIZATION APPOINTMENTS.** Mr. James Dondero or his successor shall elect or appoint a minority of the board members (i.e., one, as long as the Board of Directors numbers three), who may be a disqualified person(s).

(c) **DISQUALIFIED PERSONS.** Under no circumstances shall individuals who are disqualified persons (other than by virtue of their service as directors or officers of Supporting Organization) have majority control of Supporting Organization's board or have veto powers over Supporting Organization's board. Disqualified persons described in Section 4946 of the Code and persons described in Section 4958(c)(3)(B) of the Code cannot be compensated by Supporting Organization or receive grants, loans or similar payments from Supporting Organization.

1.3 **COMPENSATION.** Foundation does not pay trustees or hire trustees to provide specific services. The parties agree that in order to avoid even the perception of personal benefit, no directors of Supporting Organization shall receive compensation for their service as such. Notwithstanding the foregoing, Supporting Organization's directors may be reimbursed for reasonable and necessary out of pocket expenses actually incurred for their board service.

1.4 **MEETINGS.** Supporting Organization's Board of Directors shall meet at least once annually in a manner permitted under Delaware law.

1.5 **POLICIES.** Within the first year of Supporting Organization's existence, Supporting Organization's Board of Directors shall establish the following policies, and provide copies of such policies to Foundation when they are created and amended: Charitable Mission Statement, Gift Acceptance Policy, Investment Policy, and Grantmaking Policy.

## 2. FINANCE AND OPERATIONS

2.1 **FISCAL YEAR.** Supporting Organization's fiscal year will be the calendar year.

2.2 **SERVICES.** Foundation will provide the services to Supporting Organization described in **SCHEDULE A**, attached, and as such schedule may be amended by Foundation and Supporting Organization in writing from time to time.

2.3 **FEES:**

(a) Supporting Organization shall pay to Foundation the fees described more particularly in **SCHEDULE B**, attached.

(b) The parties may agree to additional fees in respect to the performance of any additional services not described in **SCHEDULE A** to this agreement. Foundation shall notify the Supporting Organization in advance of any changes in administrative fees enacted by Foundation's Board of Trustees.

2.4 INVESTMENTS

(a) From time to time, some or all of Supporting Organization's funds may be invested with the pooled endowment funds of Foundation to achieve economies of scale and strive for the highest expected level of returns for a given level of risk with the goal of enabling Supporting Organization to achieve its philanthropic and financial objectives. Decisions with respect to the retention, investment, or reinvestment of assets or commingling of assets shall be made by Foundation's Board of Trustees or by a committee or agent authorized by the Board of Trustees, in accordance with Foundation's investment policies. Supporting Organization's funds will be accounted for and reported on separately.

(b) Supporting Organization may at any time remove any or all of its funds invested with Foundation's pooled investment fund and invest its own funds separately from those of Foundation, subject to limitations on investment withdrawals with regard to any particular investment class (e.g., limitations on early withdrawals from "fund of funds"). Supporting Organization may select its own custodian and investment consultant and pay the relevant fees directly.

3. TERM

3.1 COMMENCEMENT. The term of this Agreement shall commence upon the contribution of funds to Supporting Organization.

3.2 TERM. Supporting Organization and Foundation intend to engage in a long-term relationship. The initial term of this agreement shall be one year, and the term shall be renewed automatically for successive one-year periods. Notwithstanding the foregoing, this agreement may be terminated at any time by either party providing the other party with 30 days advance written notice of its intent to terminate the Agreement. Should either party wish to dissolve this relationship, the following process will be followed:

(a) The parties will agree on amendments to the certificate of incorporation and bylaws of Supporting Organization. The amendments will change the status of Supporting Organization from a supporting organization of Foundation and provide for the transfer of Supporting Organization's assets to one or more of the following entities as determined by Supporting Organization:

(i) A stand-alone publicly-supported 501(c)(3) organization, or

(ii) A supporting organization of another publicly-supported 501(c)(3) organization.

(iii) A donor-advised fund of a publicly-supported 501(c)(3) organization.

(b) Neither party will unreasonably withhold its approval of these amendments.

(c) In the event of the dissolution of this relationship, each party shall be responsible for its own fees and costs related to the dissolution.

3.3 LOSS OF TAX-EXEMPT STATUS. This agreement shall be automatically terminated upon the date the IRS determines that Supporting Organization is not a tax-exempt organization under Section 501(c)(3) of the Code.

4. **INDEMNIFICATION AND INSURANCE**

**4.1** Foundation will indemnify, defend, and hold harmless Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Foundation, its officials, employees, members, agents, and affiliated organizations, under this Agreement. Foundation will maintain at all times during the term of this Agreement general liability and director and officer liability insurance in such amounts and against such risks as are standard in the industry, naming Supporting Organization and its directors and officers as additional insureds. The coverage will protect against the acts or omissions of Supporting Organization, its officers, directors, agents, and employees.

**4.2** Supporting Organization will indemnify, defend, and hold harmless Foundation, its officers, trustees, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations, under this Agreement.

5. **MISCELLANEOUS**

**5.1** **GOVERNING LAW.** This Agreement and the legal relations between the parties shall be governed under the laws of the State of California.

**5.2** **RECORDS.** Supporting Organization will supply to Foundation on a timely basis copies of the following materials as they are created, updated, or amended: incorporation documents; annual filings with the State of California and IRS; meeting minutes and actions of the Board and of any committee with Board authority; board contact information; investment statements; and board policies.

**5.3** **PUBLICITY.** Foundation may disclose the existence, funding and grants of the Supporting Organization in its Annual Report and other documentation published byFoundation. Any information presented for publication by the media shall be approved in advance by Supporting Organization. Foundation reserves the right to approve any publicity from Supporting Organization mentioning Foundation.

**5.4** **FURTHER ASSURANCES.** Each of the parties hereto does hereby covenant and agree, without any further consideration, to execute, acknowledge, and deliver all such other documents and to take all such other actions as may be necessary or convenient in order to carry out more effectively any of the purposes of this Agreement.

**5.5** **AMENDMENTS.** This Agreement may be amended from time to time by written instrument signed by the parties; and this Agreement shall be amended by the parties whenever necessary or advisable in order to comply with requirements of the Code relating to tax-exempt organizations and supporting organizations.

**5.6** **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements between the parties with regard to such subject matter.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**HIGHLAND SANTA BARBARA FOUNDATION, INC.**

James Dondero, President
November 30, 2011

**SANTA BARBARA FOUNDATION**

Ronald V. Gallo, President & CEO
November 30, 2011

**SCHEDULE A**

**SCHEDULE OF SERVICES**

Foundation will provide to Supporting Organization the services indicated below:

1.1 Administrative Services.

a. Maintenance of Supporting Organization's records, reports and files.

b. Performance of related accounting services for Supporting Organization.

c. Payment of accounts payable and other liabilities of Supporting Organization.

d. Preparation and distribution of all financial statements required to be generated by Supporting Organization.

e. Oversight of the preparation and filing of all federal and state returns required of Supporting Organization.

f. As needed, preparation and distribution to the governing body of Supporting Organization of periodic reports on the financial condition of the Supporting Organization.

1.2 Corporate Formalities Services.

a. Calendaring of required member and board meetings.

b. Notice of all meetings.

c. Facilities and secretarial support for member and board meetings.

d. Preparation of minutes.

e. Maintenance of minute book.

f. Assistance with selection of candidates for the board.

1.3 Grant Administration.

a. Assistance with development of program goals, guidelines and a form of Request for Proposal.

b. Disseminate RFP to target groups.

c. Receive and screen all proposals.

d. Preparation of a summary grid of proposals for review and decision by the Corporation's governing board or officers.

e. Prepare and send responses to applicants.

f. Disbursement of grants with grant letters.

g. Monitor performance of grantees.

h. Receive and review interim and annual reports from grantees.

Supporting Organization acknowledges that Foundation is providing only the services listed above. Any services not selected, and any services not listed above, shall not be within the scope of Foundation's responsibilities under this Agreement. Without limiting the foregoing, Supporting Organization acknowledges that Foundation is not providing any investment advice or services to Supporting Organization, and that Supporting Organization is responsible for the management and investment of its assets.

## SCHEDULE B

## SCHEDULE OF FEES

In consideration of the services provided to Supporting Organization by Foundation, Supporting Organization shall pay Foundation an annual support fee (Fee) as outlined below. Fees are payable quarterly in arrears and are based on the prior quarter-end net asset value.

1% (100 basis points) per annum (i.e., 25 basis points per quarter) on the first $3 million
0.75% (75 basis points) per annum (i.e., 18.75 basis points per quarter) on the next $2 million
0.50% (50 basis points) per annum (i.e., 12.5 basis points per quarter) on the next $5 million up to $10 million
0.25% (25 basis points) per annum (i.e., 6.25 basis points per quarter) on all amounts over $10 million

*Execution Version*

**DATED 11 March 2024**

**SECOND AMENDED AND RESTATED**
**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

---

WARNING
THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY

**TABLE OF CONTENTS**


| | | PAGE |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS; COMPENSATION AND EXPENSES | 1 |
| 1.1 | Continuation. | 1 |
| 1.2 | Name. | 1 |
| 1.3 | Purpose and Powers. | 1 |
| 1.4 | Registered Office. | 1 |
| 1.5 | Partners. | 1 |
| 1.6 | Powers. | 1 |
| 1.7 | Term. | 2 |
| 1.8 | Admission of New Partners. | 2 |
| 1.9 | Taxable Year. | 2 |
| 1.10 | Liability of Partners | 2 |
| 1.11 | Limitation on Assignability of Partners' Interests. | 2 |
| 1.12 | Definitions. | 2 |
| 1.13 | Service Providers. | 3 |
| 1.14 | Partnership Expenses. | 3 |
| 1.15 | Partnership Records. | 3 |
| 1.16 | Limited Partner Information. | 3 |
| ARTICLE II | POWERS | 4 |
| 2.1 | Partnership Powers. | 4 |
| 2.2 | Rights, Powers, Limitations on Liability and Indemnification of General Partner. | 5 |
| ARTICLE III | CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES | 7 |
| 3.1 | Capital Contributions. | 7 |
| 3.2 | Capital Account; Allocation of Profits and Losses. | 7 |
| ARTICLE IV | LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWLS FROM CAPITAL ACCOUNT | 8 |
| 4.1 | Legal Interest. | 8 |
| 4.2 | Distributions. | 8 |
| 4.3 | Withdrawal. | 8 |
| ARTICLE V | DURATION OF PARTNERSHIP | 9 |
| 5.1 | Commencement of Winding Up. | 9 |
| 5.2 | Winding Up. | 9 |
| 5.3 | Termination. | 9 |
| ARTICLE VI | MISCELLANEOUS | 9 |
| 6.1 | Tax Matters Partner. | 9 |
| 6.2 | Right to Hire. | 9 |
| 6.3 | Applicable Law, etc. | 10 |
| 6.4 | Power of Attorney. | 10 |
| 6.5 | Tax Elections Under the Internal Revenue Code. | 10 |
| 6.6 | Amendments to Partnership Agreement. | 10 |
| 6.7 | Investment Representation. | 11 |
| 6.8 | Notices. | 11 |
| 6.9 | General Partner Determinations. | 11 |
| 6.10 | Dispute Resolution. | 11 |
| 6.11 | Successors and Assigns. | 13 |
| 6.12 | Severability. | 13 |
| 6.13 | No Third Party Rights. | 13 |
| 6.14 | No Right to Partition. | 14 |

*Execution Version*

**SECOND AMENDED AND RESTATED**

**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**THIS SECOND AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "Agreement") is made on 11 March 2024

BETWEEN

(1) CDH GP, Ltd., a Cayman Islands exempted company having its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands as general partner (the "**General Partner**");

(2) Charitable DAF HoldCo, Ltd, a Cayman Islands exempted company having its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3) Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed on October 25, 2011 and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Act (as amended) of the Cayman Islands (the "**Act**"), and an Initial Limited Partnership Agreement of the Partnership was entered into as of the same date (the "**Initial Agreement**");

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein;

**WHEREAS**, the Limited Partner and Charitable DAF GP, LLC, as general partner of the Partnership, amended and restated the Initial Agreement in its entirety on November 7, 2011 ("**A&R LPA**");

**WHEREAS**, Charitable DAF GP, LLC assigned to the General Partner its general partnership interest and the General Partner assumed the obligations of Charitable DAF GP, LLC, as general partner of the Partnership pursuant to an assignment and assumption agreement dated 7 March 2024; and

**WHEREAS**, the Limited Partner and the General Partner, desire to amend and restate the A&R LPA in its entirety as set forth below.

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

## ARTICLE I

## GENERAL PROVISIONS; COMPENSATION AND EXPENSES

1.1 Continuation. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Act.

1.2 Name. The name of the Partnership is Charitable DAF Fund, LP or such other name as the General Partner may from time to time determine provided that the words "Limited Partnership" or the abbreviations "LP" or "L.P." shall be included in the name as required by the Act.

1.3 Purpose and Powers. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments, and to engage in any lawful activity for which exempted limited partnerships may be formed under the Act. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 Registered Office. The registered office of the Partnership is c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or such other place in the Cayman Islands as the General Partner may in its absolute discretion from time to time determine. The General Partner shall make the required filings with the Registrar of Exempted Limited Partnerships of any change to the Partnership's registered office in accordance with the Act.

1.5 Partners. The name and addresses of the Partners are as follows:

| **Name** | **Address** |
|---|---|
| CDH GP, LTD. (General Partner) | c/o Campbells Corporate Services Limited<br>Floor 4, Willow House<br>Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |
| Charitable DAF HoldCo, Ltd (Limited Partner) | c/o Campbells Corporate Services Limited<br>Floor 4, Willow House<br>Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |

1.6 Powers.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and conduct of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of an exempted limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in

this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management or conduct of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7 Term. The Partnership was established on October 25, 2011 and shall continue until wound up and subsequently dissolved in accordance with this Agreement or any amendment or modification thereof.

1.8 Admission of New Partners. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9 Taxable Year. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10 Liability of Partners

(a) The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b) Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. Limited Partners should not take part in the conduct of the business of the Partnership and should not deal with third parties, nor for the return of any distributions from the Partnership to the Limited Partner, or otherwise hold itself out, as a general partner of the Partnership. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1

1.11 Limitation on Assignability of Partners' Interests.

(a) A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

(b) The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part. The General Partner shall file, or cause to be filed, any amended Section 10 Statement with the Cayman Islands Registrar of Exempted Limited Partnerships required to be filed pursuant to Section 10 of the Act to give effect to the provisions of this Section 1.11.

1.12 Definitions. For the purpose of this Agreement, unless the context otherwise requires:

(a) General Partner. The term "**General Partner**" shall refer to CDH GP, Ltd., and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

Indirect Charitable Owners. The term "Indirect Charitable Owner" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 50l(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(b) Limited Partner. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(c) Partner. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13 Service Providers. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14 Partnership Expenses. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

1.15 Partnership Records. The General Partner shall cause to be maintained at the principal office of the Partnership, or at such other place as the Act may permit, a register of limited partnership interests which shall include such information as may be required by the Act (the "**Register**"). The Register shall not be part of this Agreement. The General Partner shall, from time to time, update the Register as required by the Act to accurately reflect the information therein and no action of any Limited Partner shall be required to amend or update the Register. [Upon the prior consent of the General Partner, the Limited Partners shall have the right to inspect the Register.] Any reference in this Agreement to the Register shall be deemed a reference to the Register as in effect from time to time. Subject to the terms of this Agreement, the General Partner may take any action authorised hereunder in respect of the Register, including making the Register available at the registered office to satisfy any order or notice pursuant to the Tax Information Authority Act (as amended) without any need to obtain the consent of any other Partner.

1.16 Limited Partner Information. Other than what has been expressly agreed to be provided to the Limited Partners herein, the Limited Partners are not entitled to any other additional information regarding the Partnership (including for the purposes of section 22 of the Act (which is disapplied with respect to the Partnership)) unless agreed by the General Partner in its sole discretion.

**ARTICLE II**

**POWERS**

2.1 Partnership Powers.

The Partnership shall have the following powers:

(a) To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non- U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

(b) To possess, transfer, mortgage, pledge, charge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c) To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d) To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, charge,

conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge, charge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e) To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f) To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g) To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2 Rights, Powers, Limitations on Liability and Indemnification of General Partner.

(a) Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a **"Covered Person"** and collectively, **"Covered Persons")** shall be subject to the provisions of this Section.

(b) To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the **"Indemnitees"),** from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection

with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e) Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f) The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g) The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h) **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i) **<u>WAIVER OF CONSUMER RIGHTS:</u> The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j) No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person. Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k) This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

## ARTICLE III

## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1 Capital Contributions.

(a) Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2 Capital Account; Allocation of Profits and Losses.

(b) There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(c) Since the General Partner's capital account and contributions shall be the minimum required by Act, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(d) For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(e) To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(f) Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV

## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWLS FROM CAPITAL ACCOUNT

4.1 Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

4.2 Distributions.

(a) Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704- 1(b)(2)(ii)(b)(3).

(b) The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

(c) For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership. Notwithstanding anything to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, will not be required to make a distribution to any Partner on account of its interest in the Partnership if such distribution would violate any provision of the Act or any other applicable law.

4.3 Withdrawal. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may require the withdrawal of all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V

**DURATION OF PARTNERSHIP**

5.1 Commencement of Winding Up. The Partnership shall be required to be wound up and subsequently dissolved pursuant to the provisions of Section 36(1)(a) of the Act after the earliest of:

(a) the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

(b) the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c) the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint to act as liquidator of the Partnership.

5.2 Winding Up. Upon the commencement of the winding up of the Partnership, the General Partner (or a duly appointed liquidator, as applicable) shall proceed with the liquidation and distribution of the assets of the Partnership in an orderly manner in accordance with this Agreement and the Act.

5.3 Termination. Upon completion of the winding up of affairs of the Partnership in accordance with the Act and this Agreement, the General Partner (or liquidator, as applicable) shall execute a notice of dissolution ("**Notice of Dissolution**") in respect of the Partnership and cause such Notice of Dissolution to be filed with the Registrar of Exempted Limited Partnerships of the Cayman Islands, and this Agreement shall terminate.

**ARTICLE VI**

**MISCELLANEOUS**

6.1 Tax Matters Partner. The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership. In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2 Right to Hire.

(a) Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership. For the avoidance of doubt, the General Partner and the Limited Partners confirm that any such compensation is received by the General Partner in its capacity as general partner of the Partnership and in

furtherance of the General Partner's authority to conduct the Partnership's business and affairs on behalf of the Partnership.

(b) Each of the Partners consents that the General Partner or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others, including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner and any affiliate or employee of such General Partner, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3 Applicable Law, etc. This Agreement: (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and iii) may be executed in more than one counterpart, all of which taken together shall constitute one and the same instrument.

6.4 Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement.

This power of attorney is intended to secure a proprietary interest of the General Partner and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5 Tax Elections Under the Internal Revenue Code. The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6 Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange

Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; provided, that in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; provided further, that the General Partner shall give notice to the Limited Partners of any such amendment.

6.7 Investment Representation. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8 Notices. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the address set forth in this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of such notice sent simultaneously to the General Partner at 6716 Glenhurst Dr., Dallas, TX 75254; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

6.9 General Partner Determinations. Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10 Dispute Resolution. The following procedures shall be used to resolve any controversy or claim **("Dispute")** arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation.

(1) Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2) The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3) The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(4) Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b) Arbitration. If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect **("Arbitration Rules").** In the event of a conflict, the provisions of this document will control.

(1) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("FAA"), and resolved by the arbitrators, provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code§ 38.001(8), which rights the parties expressly waive.

(4) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty- five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5) All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6) The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11 Successors and Assigns. Subject to the limitations set forth in Section 1.11, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12 Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13 No Third Party Rights. Any Covered Person not being a party to this Agreement, may enforce any rights granted to it pursuant to this Agreement in its own right as if it were a party to this Agreement. Except as expressly provided in the foregoing sentence, a person who is not a party to this Agreement shall not have any rights under the Contracts (Rights of Third Parties) Act (as amended)

of the Cayman Islands to enforce any term of this Agreement. Notwithstanding any term of this Agreement, the consent of or notice to any person who is not a party to this Agreement shall not be required for any termination, rescission or agreement to any variation, waiver, assignment, novation, release or settlement under this Agreement at any time."

6.14 No Right to Partition. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

**[Signature Page follows.]**

**IN WITNESS WHEREOF,** the undersigned have executed and delivered this Amended and Restated Exempted Limited Partnership Agreement as a Deed on the day and year first above written.

**EXECUTED AS A DEED by Charitable DAF Holdco, Ltd, as Limited Partner:**

Duly Authorised Signatory

**Name:** Mark Patrick

**Title:** Director

in the presence of:

Signature of Witness

Name: Kasey J. Rose

Address: 16400 Dallas Pkwy, Ste 300 Dallas, TX 75248

**EXECUTED AS A DEED by CDH GP, Ltd. as General Partner:**

Duly Authorised Signatory

**Name:** Mark Patrick

**Title:** Director

in the presence of:

Signature of Witness

Name: Kasey J. Rose

Address: 16400 Dallas Pkwy, Ste 300 Dallas, TX 75248

**CLO HoldCo, Ltd.**
Balance Sheet
6/30/2024

| Position Name | Par Amount | 5/31 Mark | 6/30 Mark | MV | Repo Financing | Secured Loan To Frontier Bank |
|---|---|---|---|---|---|---|
| TerreStar Corporation Term Loan A - Non Convertible | 82,981,754.50 | 99.78 | 99.80 | 82,815,790.99 | - | - |
| NexPoint Skorpios | 65,000.00 | 525.90 | 452.95 | 29,441,954.82 | - | - |
| NREA SB II Holdings, LLC | 25,000.00 | - | 1,005.92 | 25,147,991.14 | - | - |
| Highland CLO Funding, Ltd. | 75,061,661.00 | 0.19 | 0.19 | 14,029,024.44 | - | - |
| NexPoint Capital, INC. | 2,549,002.29 | 5.32 | 5.22 | 13,305,791.96 | - | - |
| NRSZX | 500,119.62 | 16.95 | 16.88 | 8,442,019.20 | - | - |
| NCI Royse City Land, LLC | 1.00 | 5,649,400.00 | 5,649,400.00 | 5,649,400.00 | - | - |
| NREF | 395,033.00 | 14.22 | 13.72 | 5,419,852.76 | - | - |
| NexPoint Adare - Tranche 1 | 19,500.00 | 294.48 | 273.45 | 5,332,269.21 | - | - |
| WMG BELLE AVENUE MEZZANINE, LLC | 424,000.00 | 9.59 | 9.67 | 4,098,074.48 | - | - |
| SRTY | 119,086.00 | 27.22 | 27.79 | 3,309,399.94 | - | - |
| Conservation Equity Fund I | 1.00 | 3,031,280.00 | 3,001,654.00 | 3,001,654.00 | - | - |
| .SERENG | 1.00 | 2,652,593.75 | 2,741,693.11 | 2,741,693.11 | - | - |
| FFWM | 407,241.00 | 5.92 | 6.55 | 2,667,428.55 | - | - |
| SPXU | 89,724.00 | 32.21 | 28.82 | 2,585,845.68 | - | - |
| WMG Belle Avenue Orlando Partners, LLC | 145,200.00 | 15.23 | 15.23 | 2,211,531.04 | - | - |
| NXRT | 53,129.00 | 36.67 | 39.51 | 2,099,126.79 | - | - |
| SQQQ | 246,117.00 | 10.02 | 8.28 | 2,037,848.76 | - | - |
| NHF | 353,094.00 | 5.51 | 5.53 | 1,952,609.82 | - | - |
| TerreStar Corporation New Common | 5,082.00 | 325.41 | 322.82 | 1,640,571.24 | - | - |
| NLA Assets, LLC | 1.00 | 1,301,900.00 | 1,301,900.00 | 1,301,900.00 | - | - |
| NCI Stewart Creek, LLC | 100.00 | 12,500.00 | 12,500.00 | 1,250,000.00 | - | - |
| NCI Apache Trail, LLC | 1.00 | 940,000.00 | 940,000.00 | 940,000.00 | - | - |
| NCI Fort Worth Land, LLC | 1.00 | 874,200.00 | 874,200.00 | 874,200.00 | - | - |
| NexPoint Polo Glen DST | 101.06 | 6,591.94 | 6,621.74 | 669,192.92 | - | - |
| UDFI | 946,492.00 | 0.62 | 0.58 | 545,936.59 | - | - |
| MPMQ Appraisal Rights Claims | 105,492.00 | 5.00 | 5.00 | 527,460.00 | - | - |
| TGTX | 14,250.00 | 16.30 | 17.79 | 253,507.50 | - | - |
| TMO | 457.00 | 567.98 | 553.00 | 252,721.00 | - | - |
| Multi Strat | 1.00 | 218,841.51 | 213,864.25 | 213,864.25 | - | - |
| ACHC US | 2,500.00 | 68.89 | 67.54 | 168,850.00 | - | - |
| SRG | 30,000.00 | 5.26 | 4.67 | 140,100.00 | - | - |
| NHT Holdco, LLC - Membership Units | 2,108,589.00 | 0.07 | 0.05 | 109,056.22 | - | - |
| Highland CLO Funding, Ltd. - Participation Rights | 520,517.33 | 0.19 | 0.19 | 97,284.69 | - | - |
| COLL | 2,997.00 | 33.14 | 32.20 | 96,503.40 | - | - |
| Big Valley Power Property, LLC | 1.00 | 94,000.00 | 94,000.00 | 94,000.00 | - | - |
| BIO | 332.00 | 286.86 | 273.11 | 90,672.52 | - | - |
| MT Statutory Trust 2002 7.740% - 06/2023 @ Float 7.7400 6/19/2023 | 77,380.04 | 100.03 | 100.03 | 77,405.13 | - | - |
| Crusader Fund II, Ltd., Prior | 147,959.88 | 0.28 | 0.28 | 41,294.60 | - | - |
| TerreStar Corporation Term Loan C - Non Convertible | 38,968.65 | 99.78 | 99.80 | 38,890.71 | - | - |
| Total Wire - Convertible Promissory Note | 20,560.00 | 100.00 | 100.00 | 20,560.00 | - | - |
| HRTX | 5,500.00 | 3.70 | 3.50 | 19,250.00 | - | - |
| ACRG/A/U CN | 17,526.00 | 0.37 | 0.29 | 4,994.91 | - | - |
| ACRG/B/U CN | 7,511.00 | 0.43 | 0.22 | 1,652.42 | - | - |
| PRTK | 18,600.00 | 0.08 | 0.08 | 1,488.00 | - | - |
| iHeartCommunications, Inc. (fka Clear Channel Communications, Inc.) 6.375% - 05/2026 - 45174HBC0 FIX 6.375% 5/1/2026 | 411.00 | 76.64 | 77.86 | 320.00 | - | - |
| ABERD NOT LISTED | 1,000.00 | 0.01 | 0.01 | 11.04 | - | - |
| AMERICAN ENERGY/AEPB FIX @ 7.38% 11/01/2021 02563LAC2 | 464.00 | 0.50 | 0.50 | 2.30 | - | - |
| Total | | | | 225,760,996.14 | $ - | $ - |

| | |
|---|---|
| Cash - Jefferies | 34,790,228 |
| Cash - Cantor | 414,812 |
| Cash - Charles Schwab | 13,421,413 |
| Cash - Vista Bank | 19,145,999 |
| Cash - NexBank 639 | 12,438,971 |
| Cash - NexBank 057 | - |
| Cash - JPM | 1,582,718 |
| Cash - Wells Fargo | 717,926 |
| Cash - Hancock Whitney | 6,040,851 |
| HCT Holdco | - |
| Collateral Receivable | 81,419 |
| Prepaid Admin Fees | - |
| Accrued Income | 777,205 |
| Dividend Receivable | 184,427 |
| Due from affiliate | - |
| Distributions Receivable | - |
| Due from broker | 637,419 |
| HCMSI Loan - Interest | - |
| HCMSI Loan | 1,371,222 |
| Deferred loan fees | - |
| **Total Assets** | **317,365,603.10** |
| **Payables:** | |
| Accrued Expenses | (191,847) |
| Repo Financing Payable | - |
| Secured Notes Payable | - |
| Unsecured Notes Payable | (32,801,593) |
| Nexvest Notes Payable | (1,650,000) |
| HCRE Note | (1,911,125) |
| Due to Broker | (824,037) |
| Loan Interest Payable | (9,649,816) |
| Repo Interest Payable | - |
| Total Amounts Payable | $ (47,028,418) |
| **Total Net Assets** | **$ 270,337,185** |

CLO HoldCo, Ltd.
Performance Summary

| Month | Beginning NAV | Subs/Reds | P&L | Management Fee | Incentive Fee | Ending NAV | Gross Return | YTD Gross Return | Net Return | YTD Net |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2023 | 276,241,856 | (363,206.75) | 1,829,396 | - | - | 277,708,046 | 0.66% | 0.66% | 0.66% | 0.66% |
| 2/28/2023 | 277,708,046 | - | 2,004,483 | - | - | 279,712,529 | 0.72% | 1.39% | 0.72% | 1.39% |
| 3/31/2023 | 279,712,529 | - | (4,484,591) | - | - | 275,227,938 | -1.60% | -0.24% | -1.60% | -0.24% |
| 4/30/2023 | 275,227,938 | (635,950.00) | 987,731 | - | - | 275,579,718 | 0.36% | 0.12% | 0.36% | 0.12% |
| 5/31/2023 | 275,579,718 | - | (1,357,105) | - | - | 274,222,613 | -0.49% | -0.37% | -0.49% | -0.37% |
| 6/30/2023 | 274,222,613 | (252,646.00) | (3,555,966) | - | - | 270,414,002 | -1.30% | -1.66% | -1.30% | -1.66% |
| 7/31/2023 | 270,414,002 | - | 2,746,212 | - | - | 273,160,213 | 1.02% | -0.67% | 1.02% | -0.67% |
| 8/31/2023 | 273,160,213 | 11,870,127.43 | 1,975,180 | - | - | 287,005,521 | 0.72% | 0.05% | 0.72% | 0.05% |
| 9/30/2023 | 287,005,521 | (554,287.00) | 2,432,777 | - | - | 288,884,011 | 0.85% | 0.90% | 0.85% | 0.90% |
| 10/31/2023 | 288,884,011 | - | (6,284,402) | - | - | 282,599,608 | -2.18% | -1.29% | -2.18% | -1.29% |
| 11/30/2023 | 282,599,608 | - | (10,686,904) | - | - | 271,912,704 | -3.78% | -5.03% | -3.78% | -5.03% |
| 12/31/2023 | 271,912,704 | (500,000.00) | 6,458,980 | - | - | 277,871,684 | 2.38% | -2.77% | 2.38% | -2.77% |
| 1/31/2024 | 277,871,684 | (90,122.50) | (3,976,081) | - | - | 273,805,480 | -1.43% | -1.43% | -1.43% | -1.43% |
| 2/29/2024 | 273,805,480 | - | (48,855) | - | - | 273,756,625 | -0.02% | -1.45% | -0.02% | -1.45% |
| 3/31/2024 | 273,756,625 | - | (1,307,067) | - | - | 272,449,558 | -0.48% | -1.92% | -0.48% | -1.92% |
| 4/30/2024 | 272,449,558 | (355,890.00) | (261,066) | - | - | 271,832,602 | -0.10% | -2.01% | -0.10% | -2.01% |
| 5/31/2024 | 271,832,602 | - | (2,381,482) | - | - | 269,451,120 | -0.88% | -2.87% | -0.88% | -2.87% |
| 6/30/2024 | 269,451,120 | - | 886,065 | - | - | 270,337,185 | 0.33% | -2.55% | 0.33% | -2.55% |

CLO HoldCo, Ltd.
Top 10 Holdings

| Position | Quantity | FMV |
|---|---|---|
| TerreStar Corporation Term Loan A - Non Convertible | 82,981,754.50 | 82,815,790.99 |
| NexPoint Skorpios | 65,000.00 | 29,441,954.82 |
| NREA SB II Holdings, LLC | 25,000.00 | 25,147,991.14 |
| Highland CLO Funding, Ltd. | 75,061,661.00 | 14,029,024.44 |
| NexPoint Capital, INC. | 2,549,002.29 | 13,305,791.96 |
| NRSZX | 500,119.62 | 8,442,019.20 |
| NCI Royse City Land, LLC | 1.00 | 5,649,400.00 |
| NREF | 395,033.00 | 5,419,852.76 |
| NexPoint Adare - Tranche 1 | 19,500.00 | 5,332,269.21 |
| WMG BELLE AVENUE MEZZANINE, LLC | 424,000.00 | 4,098,074.48 |
| **Grand Total** | **162,021,071.41** | **193,682,169.01** |

CLO HoldCo, Ltd.
YTD Expense

| Expense | 1/31/2024 | 2/29/2024 | 3/31/2024 | 4/30/2024 | 5/31/2024 | 6/30/2024 | YTD ($) | YTD (%) |
|---|---|---|---|---|---|---|---|---|
| Legal Fee Expense | 1,082,141 | 1,333,388 | 871,969 | 1,012,494 | 1,232,228 | 652,525 | 6,184,745 | 32.71% |
| Rent Expense | 1,014,693 | - | 2,029,385 | 1,045,133 | 1,045,133 | 1,045,133 | 6,179,477 | 32.68% |
| Directors Fees | - | 2,189,500 | - | - | - | - | 2,189,500 | 11.58% |
| Tax Fee Expense | 95,177 | 56,462 | 288 | 1,038,780 | 69,445 | - | 1,260,152 | 6.66% |
| Interest Expense | 138,361 | 128,977 | 138,168 | 133,776 | 138,375 | 134,209 | 811,866 | 4.29% |
| Fund Administration Expense | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 499,998 | 2.64% |
| Valuation Expense | 48,452 | 40,143 | 34,973 | 93,219 | 87,396 | 109,480 | 413,663 | 2.19% |
| Valuation Expense | 22,178 | 40,143 | 31,058 | 50,421 | 79,680 | 64,412 | 287,892 | 1.52% |
| Misc Fee Expense | 1,849 | 54,951 | 17,451 | 77,710 | 65,125 | 32,968 | 250,054 | 1.32% |
| Acquisition Fee Expense | 70,000 | - | 70,000 | - | - | 70,000 | 210,000 | 1.11% |
| Withholding Expense | 40,753 | 19,460 | 53,802 | 25,972 | 19,502 | 41,506 | 200,995 | 1.06% |
| Clearing Fees | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 120,000 | 0.63% |
| Consulting Fees | 30,000 | - | 30,000 | - | - | 30,000 | 90,000 | 0.48% |
| Administrator Expense | 15,169 | 14,965 | 14,963 | 14,897 | 14,867 | 14,748 | 89,609 | 0.47% |
| Directors and Officers Fee Expense | - | 6,236 | 61,925 | - | - | - | 68,161 | 0.36% |
| Dividend Expense | 1,667 | - | - | 50,868 | - | - | 52,535 | 0.28% |
| Government Fees - Liberty | 1,468 | - | - | - | - | - | 1,468 | 0.01% |
| **Totals** | 2,665,241 | 3,987,558 | 3,457,315 | 3,646,603 | 2,855,084 | 2,298,314 | 18,910,115 | 100.00% |

Deborah Deitsch-Perez
**PARTNER**
DIRECT: 214.560.2218
OFFICE: 214.560.2201
deborah.deitschperez@stinson.com

May 8, 2025

Via Electronic Mail

Margot MacInnis
Grant Thornton Specialist Services
(Cayman) Limited
2nd floor Century Yard,
Cricket Square,
PO Box 1044
Grand Cayman KY1-1102
margot.macinnis@uk.gt.com

Sandipan Bhowmik
Grant Thornton Specialist Services
(Cayman) Limited
2nd floor Century Yard,
Cricket Square,
PO Box 1044,
Grand Cayman KY1-1102
sandipan.bhowmik@uk.gt.com

Re: Litigation Related to Charitable DAF HoldCo LTD.

Dear Ms. MacInnis and Mr. Blowmik:

My firm represents The Dugaboy Investment Trust, NexPoint Advisors, L.P., NexPoint Advisors GP, LLC, NexPoint Real Estate Advisors IV, L.P, NexPoint Real Estate Advisors GP, LLC, NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC, The SLHC Trust, and Highland Capital Management Services, Inc. (the "Clients") in various pieces of litigation that appear to be connected with your role as the Official Liquidators of Charitable DAF HoldCo LTD. (the "DAF").

The purpose of this letter is to provide you with a summary and update of the litigation so that you can determine whether you, on behalf of the DAF, need to take any steps with respect to your role as Official Liquidators and with respect to assets that may have been inappropriately diverted from the DAF. Specifically, as you are most likely aware, it is our understanding that Mark Patrick surreptitiously formed a new corporate structure to which he transferred the DAF's assets (the "Fraudulent Transferee") in an effort to place the DAF's assets beyond the reach of the DAF's rightful beneficial owners, namely the Dallas Foundation, Santa Barbara Foundation, Kansas City Foundation, and the Community Foundation of North Texas (collectively the "Charities").

The litigation matters and related transactions that we're currently handling may give rise to monies that should be due to entities formerly indirectly owned by the DAF, but are now owned by the Fraudulent Transferee or others. We want to make sure that you are

aware of these matters so that you may intervene or take other actions you deem appropriate and that we are not subject to a claim by the DAF if the subsidiaries of the Fraudulent Transferee are successful in recovering on these claims. A primary concern is that the pending litigation may convert certain securities positions held by the former DAF subsidiaries into cash, which would be easier for Mr. Patrick to place beyond the reach of both the Official Liquidators and the Charities.

The litigation is as follows:

1. **Liberty CLO HoldCo, Ltd. v. Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant James Scott, as Trustee of The SLHC Trust, NexPoint Advisors, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Advisors GP, LLC, and NexPoint Real Estate Advisors GP, LLC, Case 1:25-cv-00236-UNA, pending in the United States District Court for the District of Delaware.**

In this litigation, Liberty CLO HoldCo, Ltd. ("Liberty"), an entity that was formerly indirectly owned 100% by the DAF, alleges that Defendants breached their contractual obligation to purchase Liberty's membership interests in NexPoint Polo Glen Holdings, LLC within 30 days of Liberty exercising its put option under the Option Agreement, dated Jane 13, 2024. Defendants allege that Liberty breached the Option Agreement by failing to "execute, acknowledge and deliver such further instruments and to do such other acts as may be reasonably necessary or appropriate to" effectuate the transaction as expressly required by the Option Agreement. Rather than perform its contractual obligations, Liberty filed suit. Defendants further allege that Liberty breached the Option Agreement by demanding that The Dugaboy Investment Trust ("Dugaboy") pay any taxes on the option purchase price, rather than withholding the amount of any tax obligation. Defendants also contend that they are not liable to Plaintiff because Plaintiff refused to act in a commercially reasonable manner to execute the necessary sales documents it was required to execute under the Option Agreement.

Plaintiff has conceded that it is required to enter into a transfer agreement and now agrees that it is responsible for taxes upon the transfer and that Respondent is required to withhold those taxes to ensure they are paid. The current purchase price is $594,907.35; the amount to be withheld for taxes is $ $92,119.46, with Seller to receive $502,787.00.

Please let us know if you object to our proceeding to effectuate this transaction. If you have any objection to our remitting the proceeds to Liberty CLO HoldCo, Ltd please give us specific instructions by May 15, 2025. Be aware that we need some official communication, preferably from a court, if you want us to not remit the proceeds to Liberty.

2. **Atlas IDF, LP, v. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC and Nancy Dondero, as Trustee of the Dugaboy Investment**

**Trust, Cause No. 25-BC01B-0004, pending in the Business Court of Texas, First Division.**

In this litigation, Plaintiff is attempting to collect on $13,905,223.93 in allegedly unpaid principal and interest on two demand promissory notes against Defendant NexPoint, as well on an alleged guaranty against Defendant Dugaboy, a trust for which Mr. Patrick and Shawn Raver previously both were counsel. The Defendants have denied liability and asserted third-party claims against Mr. Patrick and Mr. Raver for using their position as Dugaboy's trusted counsel to fraudulently induce Dugaboy to execute the alleged guaranty.

Assuming no other secret changes to the DAF structure by Mr. Patrick, the Dallas Foundation, through an insurance annuity policy issued by Crown Global Insurance, is the primary economic owner and beneficiary of Plaintiff. The DAF entities have a general partnership control position, but no economic interest.

On February 20, 2025, Mr. Patrick sought to have the two promissory notes transferred for $500,000 to Liberty, which we now understand is owned indirectly by a new entity created by Mr. Patrick. Atlas' fund documents require limited partner consent to related party transactions. Crown Global, at the instructions of the Dallas Foundation, did not consent to the transaction. Mr. Patrick asked for consent again on February 27, 2025, with proposed revised economics of the transaction. Crown Global, again instructed by Dallas Foundation, withheld consent. At no point in time did Mr. Patrick disclose that Liberty, the proposed transferee, was under the new ownership of an entity created and controlled by Mr. Patrick.

This litigation is proceeding quickly and my clients are writing to confirm that you are aware of this litigation and understand that Plaintiff, which was previously indirectly owned by the DAF, is seeking to collect this money. Therefore, we are writing to allow you to take any actions you feel might be necessary to protect the assets at issue in the litigation.

3. **Liberty CLO HoldCo, LTD., v. Highland Capital Management Services, Inc., Civil Action No. 3:25-CV-477-L, pending in the United States District Court for the Northern District of Texas, Dallas Division.**

In this litigation, Plaintiff seeks to collect on a $3,006,776.00 promissory note against Defendant. Plaintiff alleges that Defendant failed to make a payment when due, and Plaintiff accelerated the debt, alleging that Defendant owes $1,334,980.74 on the promissory note as of February 3, 2025.

Defendant alleges that is not liable on the promissory note because any payment obligations on the promissory note were timely satisfied when Defendant paid a third

party to satisfy a debt that Plaintiff owed to that same third party, and accounted for that payment as a payment on the note.

As with the Atlas litigation described above, my clients are writing to confirm that you are aware of this litigation and understand that Plaintiff, which was also previously owned by the DAF, is seeking to collect this money. Therefore, we are writing to allow you to take any actions you feel might be necessary to protect the assets at issue in the litigation.

************************

In connection with each of these matters, we would need compelling documentation to persuade any of the courts to either stay the action or hold proceeds in the registry of the court. We are happy to provide you any of the publicly available court filings in order to aid in your decision.

Please feel free to call me with any questions.

Sincerely,

**Stinson LLP**

Deborah Deitsch-Perez

DRD:clt

DEF 14A 1 d889398ddef14a.htm NEXPOINT CAPITAL, INC.

**SCHEDULE 14A**
**(RULE 14a-101)**

**INFORMATION REQUIRED IN PROXY STATEMENT**

**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**

Filed by the Registrant ☑
Filed by a Party other than the Registrant ☐

Check the appropriate box:
☐ Preliminary Proxy Statement
☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2)
☑ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to § 240.14a-12

**NexPoint Capital, Inc.**
(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.

☐ Fee paid previously with preliminary materials.

☐ Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

**NEXPOINT CAPITAL, INC.**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(844) 485-9167**

**May 7, 2025**

Dear Stockholder:

Enclosed you will find the proxy materials for the 2025 Annual Meeting of Stockholders of NexPoint Capital, Inc. (the "Corporation") to be held at 300 Crescent Court, Suite 700, Dallas, Texas 75201, on Monday, June 16, 2025, at 8:15 a.m. Central Time (the "Annual Meeting").

At the Annual Meeting, you will be asked to elect two (2) Class I Directors to each serve a three-year term. In addition to voting on the Election of Directors, which is described in more detail in the accompanying Notice of Annual Meeting of Stockholders and Proxy Statement, you will have an opportunity to hear a report on the Corporation and to discuss other matters of interest to you as a stockholder.

**It is very important that your shares be represented at the Annual Meeting.** Whether or not you plan to attend, I urge you to please complete, date, sign and mail the enclosed proxy card to us to assure that your shares are represented at the Annual Meeting.

Sincerely,

/s/ James Dondero
James Dondero
President and Principal Executive Officer

**NEXPOINT CAPITAL, INC.**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(844) 485-9167**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**
**TO BE HELD ON JUNE 16, 2025**

Notice is hereby given to holders of shares of common stock of NexPoint Capital, Inc., a Delaware corporation (the "Corporation"), that the 2025 Annual Meeting of Stockholders will be held at 300 Crescent Court, Suite 700, Dallas, Texas 75201, on Monday, June 16, 2025, at 8:15 a.m. Central Time (the "Annual Meeting").

Please vote your shares in accordance with the instructions on the enclosed proxy card whether or not you attend the Annual Meeting. The Annual Meeting will be held for the following purposes:

1. To elect each of Ethan Powell and Bryan A. Ward as a Class I Director of the Corporation to serve for a three-year term expiring at the 2028 Annual Meeting of Stockholders or until his successor is duly elected and qualifies (the "Proposal"); and

2. To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

**THE BOARD OF DIRECTORS, INCLUDING EACH OF THE INDEPENDENT DIRECTORS, UNANIMOUSLY RECOMMENDS A VOTE FOR THE PROPOSAL.**

The close of business on April 30, 2025 has been fixed as the record date for the determination of stockholders entitled to notice of, and to vote at, the Annual Meeting and any adjournment or postponement thereof. Please call (844) 485-9167 for directions on how to attend the Annual Meeting and vote in person.

**Important Notice Regarding Availability of Proxy Materials for the Stockholder Meeting to be held on June 16, 2025: Copies of these proxy materials, including the Corporation's Annual Report, the Notice for the Annual Meeting, the Proxy Statement and the form of proxy, are available to you on the Internet at https://vote.proxyonline.com/nexpoint/docs/bdc.pdf. Copies of the proxy materials are also available upon request, without charge, by writing to EQ Fund Solutions, LLC at EQ Fund Solutions, LLC, ATTN: NexPoint 20589 Fulfillment, 55 Challenger Road, Ridgefield Park, New Jersey 07660, by calling (866) 796-1292, or by sending an e-mail to corporateservices@equiniti.com using subject line: NexPoint 20589 Fulfillment. Stockholders are encouraged to read all of the proxy materials before voting as the proxy materials contain important information necessary to make an informed decision.**

**The Board of Directors is requesting your vote. Your vote is important regardless of the number of shares that you own. Please complete and sign the enclosed proxy card and return it promptly in the enclosed envelope, which needs no postage if mailed in the United States. If you desire to vote in person at the Annual Meeting, you may revoke your proxy at any time before it is exercised.**

By Order of the Board of Directors,

/s/ Stephanie Vitiello
Stephanie Vitiello
Secretary

May 7, 2025
Dallas, Texas

**NEXPOINT CAPITAL, INC.**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(844) 485-9167**

**PROXY STATEMENT**
**ANNUAL MEETING OF STOCKHOLDERS**
**JUNE 16, 2025**

This Proxy Statement is furnished in connection with the solicitation of proxies on behalf of the Board of Directors (the "Board") of NexPoint Capital, Inc., a Delaware corporation (the "Corporation"), for use at the Corporation's 2025 Annual Meeting of Stockholders (the "Annual Meeting") to be held at 300 Crescent Court, Suite 700, Dallas, Texas 75201, on Monday, June 16, 2025, at 8:15 a.m. Central Time, and at any and all adjournments or postponements thereof, for the purposes set forth in the accompanying Notice of Annual Meeting of Stockholders dated May 7, 2025. The Corporation is a closed-end management investment company that has elected to be treated as a business development company under the Investment Company Act of 1940, as amended (the "1940 Act"). NexPoint Advisors, L.P., a Delaware limited partnership (the "Adviser") serves as the investment adviser and the administrator ("Administrator") to the Corporation. The principal executive offices of each of the Corporation and the Adviser are located at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

This Proxy Statement and the accompanying Notice of Annual Meeting of Stockholders and form of proxy are being provided to stockholders on or about May 7, 2025. The Board has fixed the close of business on April 30, 2025 as the record date (the "Record Date") for the determination of stockholders entitled to receive notice of, and to vote at, the Annual Meeting. As of the Record Date, 9,146,110.355 shares of the Corporation's Common Stock were issued and outstanding, and the Corporation had not issued any shares of preferred stock. Stockholders of the Corporation are entitled to one vote for each share held and fractional votes for each fractional share held.

If the form of proxy is properly executed and returned in time to be voted at the Annual Meeting, the shares covered thereby will be voted at the Annual Meeting in accordance with the instructions marked thereon. All properly executed proxies received by the Board that do not specify how shares should be voted will be voted (i) **"FOR"** the election as a Director of each of the nominees listed in the Proposal below, and (ii) in the discretion of the persons named as proxies in connection with any other matter which may properly come before the Annual Meeting or any adjournment or postponement thereof.

The Board does not know of any matters to be considered at the Annual Meeting other than the Election of Directors referred to in this Proxy Statement and the Notice of Annual Meeting. A stockholder may revoke his or her proxy any time before it is exercised by (i) voting in person at the Annual Meeting, (ii) giving written notice of such revocation to the Secretary of the Corporation or (iii) returning a properly executed, later-dated proxy before the Annual Meeting.

In addition to soliciting proxies by mail, officers of the Corporation or officers or employees of the Adviser may solicit proxies by the Internet or by telephone. Copies of the Notice for the Annual Meeting, the Proxy Statement, the form of proxy and the Corporation's annual report are available at https://vote.proxyonline.com/nexpoint/docs/bdc.pdf. The Corporation has engaged EQ Fund Solutions, LLC, at EQ Fund Solutions, LLC, ATTN: NexPoint 20589 Fulfillment, 55 Challenger Road, Ridgefield Park, New Jersey 07660 to provide stockholder meeting services, including the distribution of this Proxy Statement and related materials to stockholders, as well as assisting the Corporation in soliciting proxies for the Annual Meeting, at an approximate cost of $23,968. The costs of proxy solicitation and expenses incurred in connection with the preparation of this Proxy Statement and its enclosures will be paid by the Corporation.

**Quorum**

A quorum must be present at the Annual Meeting for any business to be conducted. The presence in person or by proxy of the holders of a majority of the shares of Common Stock entitled to vote shall constitute a quorum for the Annual Meeting. Shares represented by properly executed proxies with respect to which (i) a vote is withheld or (ii) the stockholder abstains will be treated as shares that are present and entitled to vote for purposes of determining a quorum.

Shares of Common Stock held by a broker or other nominee for which the nominee has not received voting instructions from the record holder and does not have discretionary authority to vote the shares on non-routine proposals are considered “broker non-votes” with respect to such proposals. Because the election of a Director is a non-routine matter, broker non-votes are not entitled to vote at the Annual Meeting. Therefore, broker non-votes will be treated as shares that are not present for quorum purposes at the Annual Meeting.

If a quorum is not present at the Annual Meeting, or if a quorum is present but sufficient votes to approve the Proposal are not received, the persons named as proxies may propose one or more adjournments or postponements of the Annual Meeting to permit further solicitation of proxies. Any adjournment or postponement will require the affirmative vote of a majority of those shares that are represented at the Annual Meeting in person or by proxy, whether or not a quorum is present.

**Vote Required**

The election of a Director requires the affirmative vote of a majority of the shares of Common Stock cast at the Annual Meeting in person or by proxy. Abstentions are counted as present at the Annual Meeting for purposes of determining a quorum, but, assuming the presence of a quorum, will have the effect of a vote against a nominee.

Broker non-votes are described as votes cast by a broker or other nominee on behalf of a beneficial holder who does not provide explicit voting instructions to such broker or nominee and who does not attend the Annual Meeting. The election of a Director is a non-routine matter. As a result, if you hold shares in “street name” through a broker, bank or other nominee, your broker, bank or nominee will **not** be permitted to exercise voting discretion with respect to the Proposal at the Annual Meeting to elect each of Ethan Powell and Bryan A. Ward as a Class I Director of the Corporation. Thus, if you do not give your broker or nominee specific instructions on how to vote for you or do not vote for yourself by returning a proxy card or by other arrangement with your broker or nominee, your shares will have no effect on the election of the Class I Directors at the Annual Meeting.

**THE PROPOSAL**

**ELECTION OF DIRECTORS**

The Board is currently composed of five Directors, who are divided into three classes with staggered terms of three years each, with the term of office of one of the three classes expiring at each annual meeting of the stockholders.

At the Annual Meeting, the holders of the Corporation’s shares of Common Stock are being asked to re-elect Ethan Powell and Bryan A. Ward as Class I Directors of the Corporation, each to serve for a three-year term expiring at the 2028 annual meeting of stockholders or until his successor is duly elected and qualifies. Ethan Powell and Bryan A. Ward are currently serving as Class I Directors of the Corporation and have agreed to continue to serve as Class I Directors, if re-elected. If Ethan Powell and Bryan A. Ward are not available for re-election at the time of the Annual Meeting, the persons named as proxies will vote for such substitute nominee(s) as the Corporation’s Governance and Compliance Committee may select.

John Honis is currently serving as a Class III Director and was last elected to serve until the 2027 annual meeting of stockholders at the Corporation’s annual meeting of stockholders held on June 26, 2024. Dr. Bob Froehlich

and Ms. Dorri McWhorter are currently serving as Class II Directors and each was last elected to serve until the 2026 annual meeting of stockholders at the Corporation's annual meeting of stockholders held on June 16, 2023. Ethan Powell and Bryan A. Ward are currently serving as Class I Directors and each was last elected to serve until the 2025 annual meeting of stockholders at the Corporation's annual meeting of stockholders held on June 10, 2022. Messrs. Powell and Ward will continue to serve as Class I Directors if re-elected at the Annual Meeting until the 2028 annual meeting of shareholders or until their respective successors are duly elected and qualify. The Corporation's Directors are not required to attend the Corporation's annual stockholder meetings.

**THE BOARD, INCLUDING EACH OF THE INDEPENDENT DIRECTORS, UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" THE RE-ELECTION OF EACH OF THE NOMINEES AS A DIRECTOR.**

**Qualifications and Additional Information about the Director Nominees and the Continuing Directors**

The following provides an overview of the considerations that led the Board to conclude that the individual nominees for Director or the individuals serving as continuing Directors of the Corporation should be nominated or so serve, as well as each nominee's and each Director's name and certain biographical information as reported by them to the Corporation. Among the factors the Board considered when concluding that an individual should be a nominee for Director or serve on the Board were the following: the individual's experience, skills, expertise, education, knowledge, diversity, personal and professional integrity, character, business judgment, time availability in light of other commitments, dedication, the candidate's ability to qualify as an Independent Director and the existence of any other relationships that might give rise to a conflict of interest and other relevant factors that the Corporation's Governance and Compliance Committee considers appropriate in the context of the needs of the Board (e.g., whether a candidate is an "audit committee financial expert" under the federal securities laws).

In respect of the Director nominees and each continuing Director, the individual's professional accomplishments and prior experience, including, in some cases, in fields related to the operations of the Corporation, were a significant factor in the determination that each of the individuals should be a nominee for Director or serve as a Director of the Corporation. Each Director nominee's and each continuing Director's professional experience and additional considerations that contributed to the Board's conclusion that an individual should serve on the Board are summarized in the table below.

The "Fund Complex," as referred to herein consists of: the Corporation, each series of NexPoint Funds I ("NFI"), each series of NexPoint Funds II ("NFII"), Highland Opportunities and Income Fund ("HFRO"), Highland Global Allocation Fund ("GAF"), and NexPoint Real Estate Strategies Fund ("NRESF").

*Class III Director (continuing Director not up for re-election at the Annual Meeting)*

| Name, Year of Birth and Address[1] | Position(s) held with the Corporation | Term of Office and Length of Time Served[2] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[3] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| ***Interested Director*** | | | | | |
| John Honis[4] (1958) | Director | Term expires 2027; Class III Director since 2014 | President of Rand Advisors, LLC (August 2013 to August 2022); President of Valience Group, LLC (since July 2021); and Consultant of Rand Advisors, LLC (since August 2022). | None | Significant experience in the financial industry; significant managerial and executive experience, including experience as president, chief executive officer or chief restructuring officer of five telecommunication firms; experience on other boards of directors/trustees. |

*Class II Directors (continuing Directors not up for re-election at the Annual Meeting)*

| Name, Year of Birth and Address(1) | Position(s) held with the Corporation | Term of Office and Length of Time Served(2) | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years(3) | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| ***Independent Directors*** | | | | | |
| Dr. Bob Froehlich (1953) | Director | Term expires 2026; Class II Director since 2014 | Retired. | Director of KC Concessions, Inc. (from January 2013 to March 2025); Director of American Sports Enterprise, Inc. (since January 2013); Chairman and owner, Kane County Cougars Baseball Club (from January 2013 to March 2025); Director of The Midwest League of Professional Baseball Clubs, Inc. (from January 2013 to December 2021); Director of Kane County Cougars Foundation, Inc. (from January 2013 to March 2025); Director of Galen Robotics, Inc. (from August 2016 to September 2023); Director and Special Advisor to Vault Data, LLC (since February 2018); Director of American Association of Professional Baseball, Inc. (since February 2021); Director of National Amateur Fall Baseball Federation (since December 2023); and Executive Director of Kane County Cougars Baseball Foundation Inc. (from July 2023 to March 2025) (remaining as Director). | Significant experience in the financial industry; significant managerial and executive experience; significant experience on other boards of directors, including as a member of several audit committees. |
| Dorri McWhorter (1973) | Director | Term expires 2026; Class II Director since 2022 | President and CEO, YMCA of Metropolitan Chicago (from 2021 to 2025); and Chief Executive Officer, YWCA Metropolitan Chicago (from 2013 to 2021). | Board Director of William Blair Funds (since 2019); Board Director of Skyway Concession Company, LLC (since 2018); Board Director of Illinois CPA Society (from 2017 to 2022); Board Director of Lifeway Foods, Inc. (since 2020); Board Director of Green Thumb Industries, Inc. (from February 2022 to October 2022); Member of Financial Accounting Standards Advisory Council (since 2021); and Board Director of LanzaTech Global, Inc. (since 2023). | Significant managerial and executive experience, including experience as president and chief executive officer; significant background and experience in financial accounting; significant experience on other boards of directors, including for other registered investment companies. |

*Nominees for Class I Directors*

| Name, Year of Birth and Address[1] | Position(s) held with the Corporation | Term of Office and Length of Time Served[2] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[3] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| ***Independent Directors*** | | | | | |
| Ethan Powell (1975) | Director and Chairman of the Board | Term expires 2025; Class I Director since 2014 | Principal and CIO of Brookmont Capital Management, LLC (since May 2020); CEO, Chairman and Founder of Impact Shares LLC (since December 2015); Trustee/Director of the Fund Complex (from June 2012 to July 2013 and since December 2013); and Trustee of Strategic Trust (since August 2021). | Trustee of Tidal Trust III (formerly Impact Shares Funds I Trust) (since 2016). | Significant experience in the financial industry; significant executive experience including past service as an officer of funds in the Fund Complex; significant administrative and managerial experience. |

| Name, Year of Birth and Address(1) | Position(s) held with the Corporation | Term of Office and Length of Time Served(2) | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years(3) | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| Bryan A. Ward (1955) | Director | Term expires 2025; Class I Director since 2014 | President – Private Banking, Lakeside Bank (since September 2023); Business Development Banker, CrossFirst Bank (from January 2023 to April 2023) (President-Dallas from October 2020 to January 2023 and Senior Advisor from April 2019 to October 2022); and Private Investor, BW Consulting, LLC (since 2014) and Anderson Consulting/Accenture (from 1991 to 2013). | Director of Equity Metrix, LLC. | Significant experience on this and/or other boards of directors/trustees; Audit and Qualified Legal Compliance Committee Chairperson; significant managerial and executive experience; significant experience as a management consultant. |

(1) The address for the nominees and each Director is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.
(2) On an annual basis, as a matter of Board policy, the Governance and Compliance Committee reviews each Director's performance and determines whether to extend each such Director's service for another year. Effective June 2013, the Board adopted a retirement policy wherein the Governance and Compliance Committee shall not recommend the continued service as a Director of a Board member who is older than 80 years of age at the time the Governance and Compliance Committee reports its findings to the Board.
(3) Each of the Directors and the nominees oversee 7 portfolios in the Fund Complex.
(4) In light of certain relationships between Mr. Honis and historically affiliated entities of the Adviser, including Highland Capital Management, L.P. ("HCMLP"), arising out of HCMLP's pending Chapter 11 proceedings, Mr. Honis is treated as an Interested Director of the Corporation effective January 28, 2020.

**Information about the Executive Officers**

Set forth below are the names and certain information regarding the Corporation's executive officers. Each executive officer serves until his or her successor has been duly elected and qualifies, or until his or her earlier resignation or removal.

| Name, Year of Birth and Address(1) | Position(s) held with the Corporation | Principal Occupation(s) During Past Five Years |
|---|---|---|
| James Dondero (1962) | President and Principal Executive Officer since 2014 | Founder of the Adviser; Co-founder of HCMLP and NexPoint Asset Management, L.P. ("NexPoint"); Chairman of the Board of NexPoint Residential Trust, Inc. (NYSE: NXRT) since May 2015; President and a member of the investment committee of NRESF since February 2020; Chief Executive Officer and director of NexPoint Diversified Real Estate Trust ("NXDT") since December 2018; Portfolio Manager of NexPoint Event Driven Fund, Highland Global Allocation Fund, Highland Opportunities and Income Fund and NexPoint Merger Arbitrage Fund (each a series of NFI), NexPoint Climate Tech Fund (a series of NFII), the Corporation and NRESF. |
| Dustin Norris (1984) | Executive Vice President since April 2019 | Head of Distribution and Chief Product Strategist at the Adviser since March 2019; President of NexPoint Securities, Inc. since April 2018; and Officer of the Fund Complex since November 2012. |
| Frank Waterhouse (1971) | Treasurer and Principal Accounting Officer since May 2015 and Principal Financial Officer since April 2021 | Chief Financial Officer of Skyview Group since February 2021; Chief Financial Officer and Partner of HCMLP from December 2011 and March 2015, respectively, to February 2021; Treasurer of the Fund Complex since May 2015; Principal Financial Officer of NFI, NFII, GAF, HFRO, and NXDT since April 2021 and from October 2017 to February 2021; and Principal Executive Officer of NFI, NFII, GAF and HFRO from February 2018 to February 2021 and since April 2021. |
| Stephanie Vitiello (1983) | Secretary since April 2021 and Chief Compliance Officer and Anti-Money Laundering Officer since November 2021 | Chief Compliance Officer and Counsel of Skyview Group since February 2021. Prior to her current role at Skyview Group, Ms. Vitiello served as Managing Director – Distressed, Assistant General Counsel, Associate General Counsel, and In-House Counsel for HCMLP. |
| Will Mabry (1986) | Assistant Treasurer since April 2021 | Director, Fund Analysis of Skyview Group since February 2021. Prior to his current role at Skyview Group, Mr. Mabry served as Senior Manager – Fund Analysis, Manager – Fund Analysis, and Senior Fund Analyst for HCMLP. |

(1) The address for each officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth certain ownership information with respect to our Common Stock, as of April 30, 2025, for those persons who directly or indirectly own, control or hold with the power to vote, five percent or more of our outstanding Common Stock and all officers and Directors, individually and as a group.

| Name and Address | Type of Ownership | Shares Owned | Value of Securities | Percentage of Outstanding Shares as of April 30, 2025 |
|---|---|---|---|---|
| Liberty CLO Holdco Ltd.[1] | Beneficial | 2,549,002.292 | $12,923,441.62 | 29.5% |
| All officers and Directors as a group (10 persons)[2] | N/A | None | $ 0 | 0% |

(1) The address for Liberty CLO Holdco Ltd. is One Nexus Way, Camana Bay, George Town, Grand Cayman KY 19005.
(2) The address for each Director or officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Dollar Range of Equity Securities Beneficially Owned by Directors**

Set forth in the table below is the dollar range of shares beneficially owned by each Director in (i) the Corporation and (ii) all registered investment companies in the Fund Complex overseen by such Director.

| Name of Director | Dollar Range of Shares of the Corporation[1] | Aggregate Dollar Range of Equity Securities[1] Owned in All Registered Investment Companies Overseen by Director in the Fund Complex |
|---|---|---|
| ***Independent Directors*** | | |
| Dr. Bob Froehlich | None | Over $100,000 |
| Bryan A. Ward | None | $50,001-$100,000 |
| Ethan Powell | None | $50,001-$100,000 |
| Dorri McWhorter | None | None |
| ***Interested Director*** | | |
| John Honis[2] | None | $1-$10,000 |

(1) Based on market value as of December 31, 2024.
(2) In light of certain relationships between Mr. Honis and historically affiliated entities of the Adviser, including HCMLP, arising out of HCMLP's pending Chapter 11 proceedings, Mr. Honis is treated as an Interested Director of the Corporation effective January 28, 2020.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules thereunder require that the Corporation's Directors and officers and persons who own beneficially, directly or indirectly, more than 10 percent of any class of the Corporation's securities file initial reports of beneficial ownership and reports of changes in beneficial ownership with the U.S. Securities and Exchange Commission ("SEC") and furnish the Corporation with copies of all such reports. Specific due dates for those reports have been established, and the Corporation is required to report in this Proxy Statement any known failure to file such reports by those due dates during the past fiscal year. Based solely upon a review of the copies of such reports furnished, the Corporation does not know of any Director, officer or person who beneficially owns more than 10 percent of any class of the Corporation's securities who failed to file on a timely basis the required reports during the past fiscal year.

**Role of the Board of Directors, Leadership Structure and Risk Oversight**

***The Role of the Board***

The Board oversees the management and operations of the Corporation. Like most business development companies and registered investment companies, the day-to-day management and operation of the Corporation is performed by various service providers to the Corporation, such as the Adviser, custodian and transfer agent. The Board has appointed senior employees of certain of these service providers as officers of the Corporation, with responsibility to monitor and report to the Board on the Corporation's operations. The Board receives regular reports from these officers and service providers regarding the Corporation's operations. For example, the Chief Financial Officer provides reports as to financial reporting matters and investment personnel report on the performance of the Corporation. The Board has appointed a Chief Compliance Officer who administers the Corporation's compliance program and regularly reports to the Board as to compliance matters. Some of these reports are provided as part of formal Board meetings, which are typically held quarterly and involve the Board's review of, among other items, recent Corporation operations. The Board also periodically holds telephonic meetings as part of its review of the Corporation's activities. From time to time, one or more members of the Board may also meet with management in less formal settings, between scheduled Board meetings, to discuss various topics. In all cases, however, the role of the Board and of any individual Director is one of oversight and not of management of the day-to-day affairs of the Corporation and its oversight role does not make the Board a guarantor of the Corporation's investments, operations or activities.

***Board Structure and Leadership***

The Board has structured itself in a manner that it believes allows it to perform its oversight function effectively. The Board consists of five Directors, four of whom are not "interested persons," as defined in the 1940 Act, of the Corporation. These individuals are referred to as the Corporation's independent Directors (the "Independent Directors"). During the fiscal year ended December 31, 2024, the Board convened eight times. Each Director then serving in such capacity attended at least 75% of the meetings. The Corporation encourages, but does not require, Directors to attend the Annual Meeting.

The Board periodically reviews its leadership structure, including the role of the Chairman. The Board also completes an annual self-assessment during which it reviews its leadership and Committee structure and considers whether its structure remains appropriate in light of the Corporation's current operations. The Board believes that its leadership structure, including the current percentage of the Board who are Independent Directors is appropriate given its specific characteristics. These characteristics include: (i) the extent to which the work of the Board is conducted through the standing committees, and that the Audit and Qualified Legal Compliance Committee (the "Audit Committee") and the Governance and Compliance Committee meetings are each chaired by an Independent Director; (ii) the extent to which the Independent Directors meet as needed, together with their independent legal counsel, in the absence of members of management and any member of the Board who is considered an "interested person" of the Corporation; and (iii) Mr. Powell's and Mr. Honis' previous positions with NexPoint and/or historical affiliates of the Adviser, which enhances the Board's understanding of the operations of the Adviser.

***Board Oversight of Risk Management.*** The Board's role is one of oversight, rather than active management. This oversight extends to the Corporation's risk management processes. These processes are embedded in the responsibilities of officers of, and service providers to, the Corporation. For example, the Adviser and other service providers to the Corporation are primarily responsible for the management of the Corporation's investment risks. The Board has not established a formal risk oversight committee. However, much of the regular work of the Board and its standing Committees addresses aspects of risk oversight. For example, the Directors seek to understand the key risks facing the Corporation, including those involving conflicts of interest; how management identifies and monitors these risks on an ongoing basis; how management develops and implements controls to mitigate these risks; and how management tests the effectiveness of those controls.

In the course of providing that oversight, the Board receives a wide range of reports on the Corporation's activities from the Adviser and other service providers, including reports regarding the Corporation's investment portfolio, the compliance of the Corporation with applicable laws, and the Corporation's financial accounting and reporting. The Board also meets periodically with the Corporation's Chief Compliance Officer to receive reports regarding the compliance of the Corporation with the federal securities laws and the Corporation's internal compliance policies and procedures and meets with the Corporation's Chief Compliance Officer periodically, including at least annually, to review the Chief Compliance Officer's annual report, including the Chief Compliance Officer's risk-based analysis for the Corporation. The Board's Audit Committee also meets regularly with the Chief Financial Officer and the Corporation's independent registered public accounting firm to discuss, among other things, the internal control structure of the Corporation's financial reporting function. The Board also meets periodically with the portfolio managers of the Corporation to receive reports regarding the management of the Corporation, including its investment risks.

The Board recognizes that not all risks that may affect the Corporation can be identified, that it may not be practical or cost-effective to eliminate or mitigate certain risks, that it may be necessary to bear certain risks (such as investment-related risks) to achieve the Corporation's goals, that reports received by the Directors with respect to risk management matters are typically summaries of the relevant information, and that the processes, procedures and controls employed to address risks may be limited in their effectiveness. As a result of the foregoing and other factors, risk management oversight by the Board and by the Committees is subject to substantial limitations.

**Committees of the Board**

The Board conducts much of its work through certain standing Committees. The Board has three Committees, the Audit Committee, the Governance and Compliance Committee, and the Administration and Operations Committee, each of which are discussed in greater detail below. The Board has adopted charters for each of these Committees.

For the fiscal year ended December 31, 2024, the Audit Committee held five meetings, the Governance and Compliance Committee held five meetings, and the Administration and Operations Committee held five meetings. Each Director then serving in such capacity attended at least 75% of the meetings of the Committees of which he or she is a member.

***Audit and Qualified Legal Compliance Committee***

The members of the Audit Committee are Dr. Froehlich, Messrs. Ward and Powell, and Ms. McWhorter, each of whom is an Independent Director. Mr. Ward serves as Chairperson of the Audit Committee. The Audit Committee is responsible for (i) approving the Corporation's independent registered public accounting firm, (ii) reviewing with the Corporation's independent accountants the plans and results of the audit engagement and the adequacy of the Corporation's internal accounting controls, and (iii) approving professional services provided by the independent registered public accounting firm. The Audit Committee is charged with compliance with Rules 205.2(k) and 205.3(c) of Title 17 of the Code of Federal Regulations regarding alternative reporting procedures for attorneys representing the Corporation who appear and practice before the SEC on behalf of the Corporation. The Audit Committee also oversees valuations determined by the Adviser, who pursuant to Rule 2a-5 under the 1940 Act, has been designated by the Board as the Corporation's valuation designee to perform the fair valuation determination for securities and other assets held by the Corporation in accordance with valuation policies and procedures established by the Adviser and approved by the Board. The Board has determined that Mr. Ward is an "audit committee financial expert," as defined under Item 407(d)(5) of Regulation S-K under the Exchange Act. In addition, each member of the Audit Committee meets the current independence and experience requirements of Rule 10A-3 under the Exchange Act.

A current copy of the Corporation's Audit Committee Charter is available on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/.

***Governance and Compliance Committee***

The members of the Governance and Compliance Committee are Dr. Froehlich, Messrs. Powell and Ward, and Ms. McWhorter, each of whom is independent for purposes of the 1940 Act. Dr. Froehlich serves as the Chairperson of the Governance and Compliance Committee. The Governance and Compliance Committee's function is to oversee and make recommendations to the full Board or the Independent Directors, as applicable, with respect to the Corporation's governance, selection and nomination of Directors, compensation of Directors, and related matters, as well as to oversee and assist Board oversight of the Corporation's compliance with legal and regulatory requirements and to seek to address any potential conflicts of interest between the Corporation and the Adviser in connection with any potential or existing litigation or other legal proceeding related to securities held by the Corporation and the Adviser or another client of the Adviser. The Governance and Compliance Committee is also responsible for evaluating each Director and determining whether to recommend each Director's continued service in that capacity.

The Governance and Compliance Committee considers nominees properly recommended by the Corporation's stockholders. The Corporation's bylaws provide that for any nomination to be properly brought by a stockholder for a meeting, such stockholder will have to comply with advance notice requirements and provide the Corporation with certain information. Generally, to be timely, a stockholder's notice must be received at the Corporation's principal executive offices not less than 90 days nor more than 120 days prior to the first anniversary of the date the proxy statement for the immediately preceding annual meeting of stockholders was released to the Corporation's stockholders.

The Corporation's bylaws further provide that nominations of persons for election to the Board at a special meeting may be made only by or at the direction of the Board and, provided that the Board has determined that Directors will be elected at the meeting, by a stockholder who is entitled to vote at the meeting and who has complied with the advance notice provisions of the bylaws.

This notice must contain, as to each nominee, all of the information relating to such person as would be required to be disclosed in a proxy statement meeting the requirements of Regulation 14A under the Exchange Act, and certain other information set forth in the bylaws, including the following information for each Director nominee: full name, age and address; principal occupation during the past five years; directorships on publicly held companies and investment companies during the past five years; number of shares of Common Stock owned, if any; and a written consent of the individual to stand for election if nominated by the Board and to serve if elected by the stockholders. In order to be eligible to be a nominee for election as a Director, such potential nominee may be required to provide additional information to determine his or her qualifications or eligibility to serve on the Board.

The Governance and Compliance Committee has not established any specific, minimum qualifications that must be met for an individual to be considered for nomination as a Director. Criteria and attributes considered by the Governance and Compliance Committee in evaluating the qualifications of individuals for election as a Director, including individuals nominated by stockholders, include the following: experience, skills, expertise, education, knowledge, diversity, personal and professional integrity, character, business judgment, time availability in light of other commitments, dedication, the individual's ability to qualify as an Independent Director and the existence of any other relationships that might give rise to a conflict of interest and other relevant factors that the Governance and Compliance Committee considers appropriate in the context of the needs of the Board (e.g., whether a candidate is an "audit committee financial expert" under the federal securities laws).

A current copy of the Corporation's Governance and Compliance Committee Charter is available on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/.

***Administration and Operations Committee***

The members of the Administration and Operations Committee are Dr. Froehlich, Messrs. Honis, Powell and Ward, and Ms. McWhorter. The Administration and Operations Committee is responsible for reviewing the

administrative operations of the Corporation, reviewing arrangements with financial intermediaries who provide service to the Corporation, including Corporation payments to financial intermediaries and for overseeing any funds that, in the Board's determination, employ alternative investment strategies. Mr. Honis serves as Chairperson of the Administration and Operations Committee.

***Compensation Committee***

As none of the Corporation's executive officers are compensated by the Corporation, the Corporation does not have a compensation committee and neither the Board nor a Committee thereof produces and/or reviews a report on executive officers compensation practices. The Governance and Compliance Committee reviews and evaluates compensation payable to the Directors at least annually to ensure that such compensation continues to be appropriate in light of the responsibilities of the Directors. The Governance and Compliance Committee makes any recommendations regarding changes to the Directors' compensation to the Board, and the full Board approves the Directors' compensation.

**Compensation of Directors and Executive Officers**

The executive officers of the Corporation receive no direct remuneration from the Corporation. Each Director of the Corporation who oversees all of the funds in the Fund Complex receives an annual retainer of $150,000 payable in quarterly installments and allocated among each portfolio in the Fund Complex based upon relative net assets. The Directors are reimbursed for actual out-of-pocket expenses relating to attendance at meetings. The Directors do not receive any separate compensation in connection with service on Committees or for attending Board or Committee meetings; however, the Chairman of the Board receives an additional annual payment of $20,000 and the Chairperson of each Committee receives an additional annual payment of $10,000, payable in quarterly installments and allocated among each portfolio in the Fund Complex based on relative net assets. The Directors do not receive equity awards or incentive-based compensation and do not have any pension or retirement plan.

The following table summarizes the compensation paid by the Corporation to its Directors and the aggregate compensation paid by the Fund Complex to the Directors for services rendered in the fiscal year ended December 31, 2024.

| Name of Director | Aggregate Compensation from the Corporation | Aggregate Compensation from the Fund Complex |
|---|---|---|
| ***Independent Directors*** | | |
| Bryan A. Ward | $ 3,947 | $ 160,000 |
| Dr. Bob Froehlich | $ 3,947 | $ 160,000 |
| Ethan Powell | $ 4,192 | $ 170,000 |
| Dorri McWhorter | $ 3,700 | $ 150,000 |
| ***Interested Director*** | | |
| John Honis | $ 3,947 | $ 160,000 |

**Code of Conduct and Code of Ethics**

The Corporation expects each of its officers and Directors, as well as any person affiliated with its operations, to act in accordance with the highest standards of personal and professional integrity at all times and to comply with the Corporation's policies and procedures and all laws, rules and regulations of any applicable international, federal, provincial, state or local government. To this effect, the Corporation has adopted a Sarbanes-Oxley ("SOX") Code of Ethics, which is posted on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/. The SOX Code of Ethics applies to the Corporation's principal executive officer and principal financial officer.

As required by the 1940 Act, the Corporation and the Adviser have each adopted a Code of Ethics (the "Rule 17j-1 Code of Ethics") that establishes procedures that apply to the Corporation's Directors, executive officers, officers, their respective staffs and the employees of the Adviser with respect to their personal investments and investment transactions. Each Rule 17j-1 Code of Ethics generally does not permit investments by the Corporation's Directors, officers or any other covered person in securities that may be purchased or held by the Corporation. You may access the Corporation's Rule 17j-1 Code of Ethics on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/.

**Certain Relationships and Related Party Transactions**

The Corporation has entered into agreements with the Adviser and Administrator. Certain members of the Corporation's senior management have ownership and financial interests in the Adviser and the Administrator. Members of senior management also serve as officers of other investment managers affiliated with the Adviser that do and may in the future manage investment funds, accounts or other investment vehicles with investment objectives similar to those of the Corporation. In addition, the Corporation's executive officers and Directors and the partners of the Adviser serve or may serve as officers, directors or principals of entities that operate in the same, or related, lines of business as the Corporation does or of investment funds, accounts or other investment vehicles managed by the Corporation's affiliates. These investment funds, accounts or other investment vehicles may have investment objectives similar to the Corporation's investment objective.

As a result, the Corporation may not be given the opportunity to participate in certain investments made by investment funds, accounts or other investment vehicles managed by the Adviser or its affiliates. However, in order to fulfill its fiduciary duties to each of its clients, the Adviser intends to allocate investment opportunities in a manner that is fair and equitable over time and is consistent with the Adviser's allocation policy, investment objective and strategies so that the Corporation is not disadvantaged in relation to any other client. Where the Corporation is able to co-invest consistent with the requirements of the 1940 Act, if sufficient securities or loan amounts are available to satisfy the Corporation's and each such account's proposed demand, the opportunity will be allocated in accordance with the Adviser's pre-transaction determination. If there is an insufficient amount of an investment opportunity to satisfy the Corporation's demand and that of other accounts sponsored or managed by the Adviser or its affiliates, the allocation policy provides that allocations among the Corporation and such other accounts will generally be made pro rata based on the amount that each such party would have invested if sufficient securities or loan amounts were available. Where the Corporation is unable to co-invest consistent with the requirements of the 1940 Act, the Adviser's allocation policy further provides for investments to be allocated on a random or rotational basis to assure that all clients have fair and equitable access to such investment opportunities.

The Board, in consultation with the Corporation's Chief Executive Officer, Chief Compliance Officer and legal counsel, may review potential related party transactions and, during these reviews, it may also consider any conflicts of interest brought to its attention pursuant to the Corporation's Code of Conduct or the Corporation's or the Adviser's Rule 17j-1 Code of Ethics.

The Corporation has entered into an investment advisory agreement with the Adviser pursuant to which the Adviser has agreed to provide investment advisory services to the Corporation. In exchange for these services, the Corporation will pay the Adviser a fee for investment management services consisting of a base management fee and a performance-based incentive fee. For the fiscal year ended December 31, 2024, the Adviser earned a base management fee of $945,241. For the fiscal year ended December 31, 2024, the Adviser did not earn an incentive fee. Effective December 20, 2017, the Adviser ended its voluntary waiver of advisory fees. Fees waived before June 10, 2016 are not subject to recoupment. The Adviser may elect to recoup any fees voluntarily waived from and after June 10, 2016 within three years from the date that such fees were otherwise payable, provided that the recoupment of the Adviser will be limited to the amount of such voluntarily waived fees (excluding any fees the Adviser has indicated are not subject to recoupment) and will not cause the sum of the Corporation's advisory fees, administration fees, and "Other Expenses" (as defined in the Expense Limitation Agreement), nor will any recoupment exceed the annual rate of 3.40% of average gross assets.

The Corporation has also entered into an administration agreement pursuant to which the Adviser furnishes the Corporation with office facilities, equipment and clerical, bookkeeping, recordkeeping and other administrative services to enable the Corporation to operate. The Corporation has agreed to reimburse the Adviser for its allocable portion of overhead and other expenses incurred by the Adviser in performing its obligations under the administration agreement. To the extent that the Adviser outsources any of its functions, the Corporation will pay the fees associated with such functions on a direct basis without profit to the Adviser. In no event, however, will the Corporation reimburse the Adviser under the administration agreement in an amount that exceeds an annual rate of 0.4% of the Corporation's gross assets, including cash and cash equivalents and assets purchased with borrowed funds.

The Adviser has entered into a Services Agreement with Skyview Group ("Skyview") pursuant to which the Adviser will receive administrative and operational support services to enable it to provide the required advisory services to the Corporation.

Certain Skyview personnel became dual-employees of NexPoint Services, Inc., a wholly-owned subsidiary of the Adviser. The same services are being performed by the dual-employees. The Adviser, and not the Corporation, will compensate all Adviser, Skyview, and dual-employee personnel who provide services to the Corporation.

In the future, the Corporation may engage the Adviser or certain of its affiliates to provide services other than those discussed above. Any arrangements would be subject to approval by the Board prior to the Adviser or its affiliates being engaged to provide services to the Corporation.

## Information About the Independent Registered Public Accounting Firm

Cohen & Company, Ltd. ("Cohen"), an independent registered public accounting firm located at 1350 Euclid Avenue, Suite 800, Cleveland, OH 44115, currently serves as the independent registered public accounting firm for the Corporation. Representative(s) of Cohen will not attend the Annual Meeting, but Cohen has been given the opportunity to make a statement if they desire to do so and will be available should any matter arise requiring their presence. After reviewing the Corporation's audited financial statements for the fiscal year ended December 31, 2024, the Corporation's Audit Committee recommended to the Corporation's Board that such statements be included in the Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2024. A copy of the Audit Committee's report appears below.

### Independent Registered Public Accounting Firm Fees and Services

The following table presents fees for professional services rendered by Cohen for the Corporation's fiscal years ended December 31, 2024 and 2023. One hundred percent (100%) of all services provided by Cohen were pre-approved and no fees were subject to pre-approval by the Audit Committee pursuant to Rule 2-01(c)(7)(i)(C) of Regulation S-X. The audit services are approved by the Audit Committee pursuant to an audit engagement letter, and, in accordance with the Corporation's pre-approval policies and procedures, the Audit Committee of the Corporation must pre-approve all non-audit services provided by Cohen, and all non-audit services provided by Cohen to the Adviser, or any entity controlling, controlled by, or under common control with the Adviser that provides ongoing services to the Corporation that are related to the operations and financial reporting of the Corporation. In some circumstances, when certain services were not recognized at the time of the engagement to be non-audit services, the pre-approval requirement may be waived if the aggregate amount of the fees for such non-audit services constitutes less than five percent of the total amount of revenues paid to Cohen by the Corporation during the fiscal year in which the non-audit services are provided. Cohen provides permitted non-audit services to certain entities controlling, controlled by or under common control with the Adviser that provide ongoing services to the Corporation.

| | Fiscal Year Ended December 31, 2024 | Fiscal Year Ended December 31, 2023 |
|---|---|---|
| Audit Fees paid by the Corporation | $ 135,000 | $ 135,000 |
| Audit-Related Fees paid by the Corporation | $ 31,500 | $ 31,500 |
| Tax Fees paid by the Corporation | $ 15,500 | $ 15,500 |
| All Other Fees paid by the Corporation | $ 0 | $ 0 |
| Total Fees | $ 182,000 | $ 182,000 |

***Audit Fees.*** Audit fees consist of fees billed for professional services rendered for the audit of the Corporation's year-end financial statements and reviews of the interim financial statements included in quarterly reports and services that are normally provided by the independent registered public accounting firm in connection with statutory and regulatory filings. These services also include the required audits of the Corporation's internal controls over financial reporting.

***Audit-Related Fees.*** Audit-related fees consist of fees billed for assurance and related services that are reasonably related to the performance of the audit or review of the Corporation's financial statements and are not reported under "Audit Fees." These services include attestation services that are not required by statute or regulation, consultations concerning financial accounting and reporting standards, and fees related to requests for documentation and information from regulatory and other government agencies.

***Tax Fees.*** Tax fees consist of fees billed for professional services for tax compliance. These services include assistance regarding federal, state, and local tax compliance.

***All Other Fees***. All other fees include fees for products and services other than the services reported above.

**Report of the Audit Committee[(1)]**

The following is the report of the Audit Committee (the "Committee") of NexPoint Capital, Inc. (the "Corporation") with respect to the Corporation's audited financial statements for the fiscal year ended December 31, 2024.

The Committee oversees the Corporation's accounting and financial reporting processes and the audits of the Corporation's financial statements. Management is responsible for the preparation, presentation and integrity of the Corporation's financial statements, the Corporation's accounting and financial and reporting principles, and internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The Committee reviewed the audited financial statements in the Corporation's annual report on Form 10-K for the fiscal year ended December 31, 2024 with management and discussed the quality of the accounting principles, the reasonableness of significant judgments and the clarity of disclosures in the financial statements.

The Committee has considered and discussed the above-described December 31, 2024 audited financial statements with management and with Cohen. The Committee has also discussed with Cohen the matters required to be discussed by the statement on Auditing Standards No. 1301, as amended (AICPA, Professional Standards, Vol. 1. AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T, *The Auditor's Communication With Those Charged With Governance*. The Committee reviewed with Cohen, who is responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgment as to the quality, not just the acceptability, of the Corporation's accounting principles and such other matters as are required to be discussed with the Committee

(1) The material in this report is not "soliciting material," is not deemed "filed" with the SEC, and is not to be incorporated by reference into any filing of the Corporation under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.

under generally accepted auditing standards. Finally, the Committee reviewed the written disclosures and the letters from Cohen required by PCAOB Rule 3526, *Communication with Audit Committees Concerning Independence*, as currently in effect, has considered whether the provision of other non-audit services by Cohen to the Corporation are compatible with maintaining Cohen's independence, and has discussed with Cohen its independence of the Corporation.

The Committee discussed with Cohen the overall scope and plans for the audit. The Committee met with Cohen to discuss the results of their audit, their evaluations of the Corporation's internal controls and the overall quality of the Corporation's financial reporting.

Based upon the reports and discussions described in this report, and subject to the limitations on the role and responsibilities of the Committee referred to in this proxy statement and in the Committee's Charter, the Committee recommended to the Board (and the Board has approved) that the Corporation's audited financial statements be included in the Corporation's annual report on Form 10-K for the fiscal year ended December 31, 2024 and filed with the SEC.

Stockholders are reminded, however, that the members of the Committee are not professionally engaged in the practice of auditing or accounting. Members of the Committee rely, without independent verification, on the information provided to them and on the representations made by management and Cohen. Accordingly, the Committee's oversight does not provide an independent basis to determine that management has maintained appropriate accounting and financial reporting principles or appropriate internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. Furthermore, the Committee's considerations and discussions, referred to above, do not assure that the audit of the Corporation's financial statements has been carried out in accordance with the standards of the PCAOB, that the financial statements are presented in conformity with accounting principles generally accepted in the United States of America or that the Corporation's independent registered public accounting firm is, in fact, "independent."

Bryan A. Ward, Committee Chair
Dr. Bob Froehlich, Committee Member
Ethan Powell, Committee Member
Dorri McWhorter, Committee Member

**OTHER MATTERS TO COME BEFORE THE ANNUAL MEETING**

The Directors do not intend to present any other business at the Annual Meeting nor are they aware that any stockholder intends to do so. If, however, any other matters are properly brought before the Annual Meeting, the persons named in the proxy will vote thereon in accordance with their judgment.

**ADDITIONAL INFORMATION**

**Stockholder Proposals**

The Corporation expects that the 2026 Annual Meeting of Stockholders will be held in June 2026, but the exact date, time and location of such meeting have yet to be determined. Proposals to be included in the proxy statement for the 2026 Annual Meeting must be submitted by eligible stockholders who have complied with the relevant regulations of the SEC and received no later than January 7, 2026. In addition, the Corporation's bylaws contain an advance notice provision requiring that, if a stockholder's proposal, including nomination of a Director, is brought before the next annual meeting of the Corporation's stockholders, such stockholder must provide timely notice thereof in writing addressed to Stephanie Vitiello, Secretary, c/o NexPoint Capital, Inc., 300 Crescent Court, Suite 700, Dallas, Texas 75201. Notices of intention to present proposals, including nomination of a Director, at the 2026 Annual Meeting must be received by the Corporation between January 7,

2026 and 5:00 p.m. Central Time on February 6, 2026. The submission of a proposal does not guarantee its inclusion in the Corporation's proxy statement or presentation at the 2026 Annual Meeting of the Stockholders unless certain securities law requirements are met. The Corporation reserves the right to reject, rule out of order, or to take other appropriate action with respect to any proposal that does not comply with these and other applicable requirements. Proxies solicited by the Corporation will confer discretionary voting authority with respect to these proposals if the proposals are not received by the Corporation, in good order and complying with all applicable legal requirements, by February 6, 2026, and may confer discretionary voting authority with respect to proposals received before such date, in each case subject to SEC rules governing the exercise of this authority.

**Delivery Requirements**

The SEC has adopted rules that permit companies and intermediaries such as brokers to satisfy delivery requirements for proxy statements with respect to two or more stockholders sharing the same address by delivering a single proxy statement or Notice of Internet Availability of Proxy Materials ("Notice") addressed to those stockholders or by sending separate Notices for each household account in a single envelope. This process, which is commonly referred to as "householding," potentially provides extra convenience for stockholders and cost savings for companies. The Corporation and some brokers household proxy materials or Notices, delivering a single proxy statement or Notice to multiple stockholders sharing an address unless contrary instructions have been received from the affected stockholders. Once a stockholder has received notice from a broker or the Corporation that they will be householding materials to the stockholder's address, householding will continue until the stockholder is notified otherwise or until the stockholder revokes consent. If a stockholder does not want Corporation mailings consolidated and would prefer to receive separate mailings at any time in the future, the stockholder should call the Corporation at (844) 485-9167 or write the Corporation c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 and the Corporation will furnish separate mailings, in accordance with instructions.

**COPIES OF THE CORPORATION'S ANNUAL REPORT DATED DECEMBER 31, 2024 TO STOCKHOLDERS ARE AVAILABLE UPON REQUEST, WITHOUT CHARGE, BY WRITING TO EQ FUND SOLUTIONS, LLC AT EQ FUND SOLUTIONS, LLC, ATTN: NEXPOINT 20589 FULFILLMENT, 55 CHALLENGER ROAD, RIDGEFIELD PARK, NEW JERSEY 07660, BY CALLING (866) 796-1292, OR BY SENDING AN E-MAIL TO CORPORATESERVICES@EQUINITI.COM, USING SUBJECT LINE: NEXPOINT 20589 FULFILLMENT.**

**Communications with Directors**

Stockholders of the Corporation who wish to communicate with the Directors (or with an individual Director) should send communications to the attention of Stephanie Vitiello, Secretary and Chief Compliance Officer, c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201, and all communications will be directed to the Director or Directors indicated in the communication or, if no Director or Directors are indicated, to all Directors.

**It is important that proxies be returned promptly. You are urged to complete and sign the enclosed proxy card and return it promptly in the enclosed envelope, which needs no postage if mailed in the United States.**

Dallas, Texas
May 7, 2025

**PROXY CARD**

NEXPOINT ADVISORS

YOUR VOTE IS IMPORTANT NO MATTER HOW MANY SHARES YOU OWN. **PLEASE CAST YOUR PROXY VOTE *TODAY!***

**SIGN, DATE** AND **VOTE** ON THE REVERSE SIDE

**PROXY VOTING OPTIONS**

1. **MAIL** your signed and voted proxy back in the postage paid envelope provided
2. **ONLINE** at **vote.proxyonline.com** using your proxy control number found below
3. By **IVR** when you call (888) 227-9349 (toll-free) to reach an automated touchtone voting line
4. By **PHONE** with a live operator when you call (866)-796-1292 (toll-free) Monday through Friday 9 a.m. to 10 p.m. Eastern time

**CONTROL NUMBER**

## NEXPOINT CAPITAL, INC.

PROXY FOR AN ANNUAL MEETING OF STOCKHOLDERS TO BE HELD ON JUNE 16, 2025

The undersigned holder of shares of NexPoint Capital, Inc., a Delaware corporation (the "Corporation"), revoking prior proxies, hereby appoints Stephanie Vitiello and Will Mabry, as attorneys-in-fact and proxies of the undersigned, granted in connection with the voting of the shares subject hereto. Each of them, with full power of substitution, are entitled to vote shares held in the name of the undersigned as of the record date at the Annual Meeting of Stockholders of NexPoint Capital, Inc. at 300 Crescent Court, Suite 700, Dallas, Texas 75201 on June 16, 2025, at 8:15 a.m. Central Time (the "Annual Meeting"), or at any adjournment or postponement thereof, upon the Proposal described in the Notice of Meeting and accompanying Proxy Statement. The undersigned acknowledges receiving the Notice of Meeting and accompanying Proxy Statement.

**Do you have questions?**
If you have any questions about how to vote your proxy or about the meeting in general, please call toll-free (866) 796-1292. Representatives are available to assist you Monday through Friday 9 a.m. to 10 p.m. Eastern Time.

**IMPORTANT NOTICE REGARDING AVAILABILITY OF PROXY MATERIALS FOR THE ANNUAL MEETING OF STOCKHOLDERS TO BE HELD JUNE 16, 2025:**

**The proxy statement is available online at:** https://vote.proxyonline.com/nexpoint/docs/bdc.pdf

Case 3:26-cv-02496-D Document 27-31 Filed 09/08/26 Page 243 of 1493 PageID 13002

**NEXPOINT CAPITAL, INC.**

## PROXY CARD

**YOUR SIGNATURE IS REQUIRED FOR YOUR VOTE TO BE COUNTED.** The signer(s) acknowledge(s) receipt of this Proxy Statement of the Board of Directors. Your signature(s) on this should be exactly as your name(s) appear on this Proxy (reverse side). If the shares are held jointly, each holder should sign this Proxy. Attorneys-in-fact, executors, administrators, trustees or guardians should indicate the full title and capacity in which they are signing.

SIGNATURE (AND TITLE IF APPLICABLE) DATE

SIGNATURE (IF HELD JOINTLY) DATE

**This proxy is solicited on behalf of the Corporation's Board of Directors.** The Proposal has been unanimously approved by the Board of Directors and recommended for approval by stockholders. When properly executed, this proxy will be voted as indicated or "FOR" the proposal if no choice is indicated. The proxy will be voted in accordance with the proxy holders' best judgment as to any other matters that may arise at the Annual Meeting.

**THE BOARD OF DIRECTORS, INCLUDING EACH OF THE INDEPENDENT DIRECTORS, UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" THE ELECTION OF THE NOMINEES AS A DIRECTOR.**

TO VOTE, MARK CIRCLES BELOW IN BLUE OR BLACK INK AS FOLLOWS. Example: ●

**PROPOSAL(S):**

1. To elect each of Ethan Powell and Bryan A. Ward as a Class I Director of the Corporation to serve for a three-year term expiring at the 2028 Annual Meeting of Stockholders or until his successor is duly elected and qualifies (the "Proposal"); and

| | FOR | WITHHOLD |
|---|---|---|
| 1.1 Ethan Powell | ○ | ○ |
| 1.2 Bryan A. Ward | ○ | ○ |

2. To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

## THANK YOU FOR VOTING

As filed with the Securities and Exchange Commission on April 30, 2025

1933 Act File No. 333-209022
1940 Act File No. 811-23129

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

---

## FORM N-2
**(Check appropriate box or boxes)**

---

## REGISTRATION STATEMENT
***UNDER***
***THE SECURITIES ACT OF 1933*** ☒
**Pre-Effective Amendment No.** ☐
**Post-Effective Amendment No. 14** ☒

## REGISTRATION STATEMENT
***UNDER***
***THE INVESTMENT COMPANY ACT OF 1940*** ☒
**Amendment No. 16** ☒

---

# NexPoint Real Estate Strategies Fund
**(Registrant Exact Name as Specified in Charter)**

---

**300 Crescent Court, Suite 700**
**Dallas, Texas 75201**
**(Address of Principal Executive Offices, Number, Street, City, State, Zip Code)**

**(833) 697-6246**
**(Registrant's Telephone Number, including area code)**

---

**Ms. Stephanie Vitiello**
**NexPoint Real Estate Strategies Fund**
**300 Crescent Court, Suite 700**
**Dallas, Texas 75201**
**(Name and Address (Number, Street, City, State, Zip Code)**
**of Agent for Service)**

**Copies of Communications to:**
**Jon-Luc Dupuy, Esquire**
**K&L Gates LLP**
**1 Congress Street, Suite 2900**
**Boston, Massachusetts 02114**

---

**Approximate Date of Proposed Public Offering:**
**As soon as practicable after the effective date of this Registration Statement.**

---

☐ Check box if the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans.
☒ Check box if any securities being registered on this Form will be offered on a delayed or continuous basis in reliance on Rule 415 under the Securities Act of 1933 ("Securities Act"), other than securities offered in connection with a dividend reinvestment plan.
☐ Check box if this Form is a registration statement pursuant to General Instruction A.2 or a post-effective amendment thereto.
☐ Check box if this Form is a registration statement pursuant to General Instruction B or a post-effective amendment thereto that will become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act.
☐ Check box if this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction B to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act.

It is proposed that this filing will become effective (check appropriate box)

☐ when declared effective pursuant to Section 8(c) of the Securities Act
☐ immediately upon filing pursuant to paragraph (b)
☒ on April 30, 2025, pursuant to paragraph (b)
☐ 60 days after filing pursuant to paragraph (a)
☐ on (date) pursuant to paragraph (a)

If appropriate, check the following box:

☐ This [post-effective] amendment designates a new effective date for a previously filed [post-effective amendment] [registration statement].
☐ This Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, and the Securities Act registration statement number of the earlier effective registration statement for the same offering is:______.
☐ This Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, and the Securities Act registration statement number of the earlier effective registration statement for the same offering is:______.
☐ This Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, and the Securities Act registration statement number of the earlier effective registration statement for the same offering is:______.

Check each box that appropriately characterizes the Registrant:

☒ Registered Closed-End Fund (closed-end company that is registered under the Investment Company Act of 1940 ("Investment Company Act")).
☐ Business Development Company (closed-end company that intends or has elected to be regulated as a business development company under the Investment Company Act).
☒ Interval Fund (Registered Closed-End Fund or a Business Development Company that makes periodic repurchase offers under Rule 23c-3 under the Investment Company Act).
☐ A.2 Qualified (qualified to register securities pursuant to General Instruction A.2 of this Form).
☐ Well-Known Seasoned Issuer (as defined by Rule 405 under the Securities Act).
☐ Emerging Growth Company (as defined by Rule 12b-2 under the Securities Exchange Act of 1934 ("Exchange Act").
☐ If an Emerging Growth Company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of Securities Act.
☐ New Registrant (registered or regulated under the Investment Company Act for less than 12 calendar months preceding this filing).

**PROSPECTUS**

# NexPoint Real Estate Strategies Fund

**Class A (NRSAX), Class C (NRSCX)**
**and Class Z (NRSZX) Shares**

---

The Fund. NexPoint Real Estate Strategies Fund (the "Fund") is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund.

This Prospectus provides the information that a prospective investor should know about the Fund before investing. You are advised to read this Prospectus carefully and to retain it for future reference. Additional information about the Fund, including a Statement of Additional Information ("SAI") dated April 30, 2025, has been filed with the U.S. Securities and Exchange Commission ("SEC"). The SAI is available upon request and without charge by writing the Fund at NexPoint Real Estate Strategies Fund, c/o SS&C Technologies, Inc., P.O. Box 219630, Kansas City, MO, 64121-9730, or by calling toll-free (844) 485-9167. You may request the Fund's SAI, annual and semi-annual reports, and other information about the Fund or make shareholder inquiries by calling (844) 485-9167 or by visiting https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/. The SAI, which is incorporated by reference into (legally made a part of) this Prospectus, is also available on the SEC's website at http://www.sec.gov. The address of the SEC's website is provided solely for the information of prospective shareholders and is not intended to be an active link.

Investment Objective. The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective.

Investment Strategy. The Fund pursues its investment objective by investing, under normal circumstances, at least 80% of its assets (defined as net assets plus the amount of any borrowing for investment purposes) in real estate and real estate-related securities, as further described in this Prospectus.

Securities Offered. The Fund engages in a continuous offering of three classes of shares of beneficial interest of the Fund: Class A shares, Class C shares and Class Z shares. The Fund is authorized as a Delaware statutory trust to issue an unlimited number of shares. The Fund is offering to sell, through its principal underwriter, NexPoint Securities, Inc. (the "Distributor"), under the terms of this Prospectus, an unlimited number of shares of beneficial interest of each class. The shares of each class are offered on a continuous basis at the Fund's net asset value ("NAV") per share plus the applicable sales load. See "Fees and Fund Expenses" and "Plan of Distribution". The Distributor is not required to sell any specific number or dollar amount of the Fund's shares, but will use reasonable efforts to sell the shares. Funds received will be invested promptly and no arrangements have been made to place such funds in an escrow, trust or similar account. Assets that cannot be invested promptly in real estate or real estate-related securities will be invested in cash or cash equivalents. The shares of beneficial interest of the Fund are continuously offered under Rule 415 of the Securities Act of 1933, as amended (the "Securities Act").

Use of Leverage. The Fund incurs leverage as a part of its investment strategy. The Fund may also invest in private and public real estate investment funds or trusts, including real estate investment funds or trusts managed by affiliated or unaffiliated managers or entities wholly-owned by the Fund, that may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho Securities USA LLC ("Mizuho") that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025. See "Risk Factors — Leverage Risk".

Non-Traded REITs. The Fund may invest in publicly registered non-traded real estate investment trusts ("REITs"), which are illiquid and are not subject to the protections of the Investment Company Act of 1940, as amended (the "1940 Act"). Some or all of these funds may be managed by NexPoint Advisors, L.P., the Fund's investment adviser (the "Adviser" or "NexPoint"), or an affiliate.

**Investors should understand that:**

- **the Fund does not currently intend to list its shares on any securities exchange;**
- **there is no secondary market for the Fund's shares, and the Fund does not expect that such a market will develop at this time; and**
- **your investment in the Fund will be illiquid.**

**Before investing, you should therefore consider the following factors:**

- **You may not have access to the money you invest for an extended period of time.**
- **You may not be able to sell your shares at the time of your choosing regardless of how the Fund performs.**
- **Because you may not be able to sell your shares at the time of your choosing, you may not be able to reduce your exposure in a market downturn.**
- **An investment in the Fund may not be suitable for investors who may need the money they invested in a specified timeframe.**
- **The amount of distributions that the Fund may pay, if any, is uncertain.**
- **The Fund may pay distributions in significant part from sources that may not be available in the future and that are unrelated to the Fund's performance, such as from offering proceeds, borrowings, and amounts from the Fund's affiliates that are subject to repayment by investors. All or a portion of a distribution may consist of a return of capital. Because a return of capital may reduce a shareholder's tax basis, it will increase the amount of gain or decrease the amount of loss on a subsequent disposition of the shareholder's shares.**

**The Fund has implemented a share repurchase program, but it is only required to repurchase up to 5% of its outstanding shares per quarter. In the event a repurchase offer is oversubscribed, the Fund may not repurchase all of the shares tendered but will repurchase shares tendered on a** *pro rata* **basis, and no assurance can be given that the Fund will repurchase all of a shareholder's tendered shares over any period. In addition, the Fund may in the future determine to list its shares on a public securities exchange, but even if an active secondary market in the Fund's shares were to develop as a result, closed-end fund shares frequently trade at a discount from their NAV. Investing in the Fund involves a considerable degree of risk. See "Risk Factors" on page 40 of this Prospectus.**

**Neither the SEC nor any state securities commission has approved or disapproved these securities or determined if this Prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The Fund is offering the shares in a continuous offering through the Distributor at NAV plus the applicable sales load. The Distributor also may enter into selected dealer agreements with other broker-dealers for the sale and distribution of the Fund's shares. The Fund currently offers the following three share classes to investors, Class A, Class C and Class Z Shares. See "Plan of Distribution" of page 73 of this Prospectus.

| | Class A Shares | Class C Shares | Class Z Shares |
|---|---|---|---|
| Public Offering Price Per Share | $ 15.83 | $ 16.06 | $ 16.06 |
| Maximum Sales Load as a Percentage of Purchase Amount[1,2] | 6.08% | None | None |
| Amount of Securities | Unlimited | Unlimited | Unlimited |

(1) For Class A shares, "maximum sales load" includes: (i) broker commissions of 5.00% of the Fund's public offering price per Class A share; and (ii) distributor fees of 0.75% of the Fund's public offering price per Class A share. See "Fees and Fund Expenses."

(2) The Adviser and/or its affiliates, in their discretion and from their own resources (which may include the Adviser's legitimate profits from the management fee it receives from the Fund), may pay additional compensation to brokers or dealers in connection with the sale and distribution of Fund shares. There is no limit on the amount of additional compensation paid by the Adviser or its affiliates, subject to the limitations imposed by FINRA. In addition, the Fund, the Adviser and/or their respective affiliates may pay a servicing fee to the Distributor and to other selected broker-dealers and other financial industry professionals for providing ongoing services in respect of holders of Class A and Class C shares with whom they have distributed shares of the Fund. The Fund's (and, indirectly, Class A and Class C holders') share of such servicing fees will not exceed an annual rate of 0.25% of the Fund's average daily net asset value attributable to Class A and Class C shares, respectively. See "Plan of Distribution."

**Distributor**

**NexPoint Securities, Inc.**

**Member FINRA/ SIPC**

**The date of this Prospectus is April 30, 2025.**

**TABLE OF CONTENTS**



| | |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| FEES AND FUND EXPENSES | 15 |
| FINANCIAL HIGHLIGHTS | 18 |
| THE FUND | 27 |
| USE OF PROCEEDS | 27 |
| INVESTMENT OBJECTIVE, POLICIES AND STRATEGIES | 28 |
| RISK FACTORS | 40 |
| MANAGEMENT OF THE FUND | 59 |
| DETERMINATION OF NET ASSET VALUE | 63 |
| CONFLICTS OF INTEREST | 65 |
| QUARTERLY REPURCHASES OF SHARES | 68 |
| DISTRIBUTION POLICY | 71 |
| DISTRIBUTION REINVESTMENT POLICY | 72 |
| U.S. FEDERAL INCOME TAX MATTERS | 73 |
| DESCRIPTION OF CAPITAL STRUCTURE AND SHARES | 75 |
| ANTI-TAKEOVER PROVISIONS IN THE DECLARATION OF TRUST | 76 |
| PLAN OF DISTRIBUTION | 77 |
| LEGAL MATTERS | 84 |
| REPORTS TO SHAREHOLDERS | 84 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 85 |
| ADDITIONAL INFORMATION | 85 |
| TABLE OF CONTENTS OF THE STATEMENT OF ADDITIONAL INFORMATION | |

**PROSPECTUS SUMMARY**

*The following summary highlights information contained elsewhere in this Prospectus. This summary may not contain all of the information that you should consider before investing in the Fund. You should review the more detailed information contained in this Prospectus and in the Statement of Additional Information ("SAI"), especially the information set forth under the heading "Risk Factors."*

**The Fund**

NexPoint Real Estate Strategies Fund (the "Fund") is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund. See "The Fund." As an interval fund, the Fund will offer to make repurchases of no less than 5% of its outstanding shares at net asset value ("NAV"), on a quarterly basis, unless such offer is suspended or postponed in accordance with regulatory requirements. See "Quarterly Repurchases of Shares."

**Investment Objective and Policies**

***Investment Objective.*** The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective.

***Investment Strategy.*** The Fund pursues its investment objective by investing, under normal circumstances, at least 80% of its assets in "real estate and real estate-related securities" (as defined below). In particular, the Fund will pursue its investment objective by investing the Fund's assets primarily in: (1) commercial mortgage-backed securities ("CMBS") and residential mortgage-backed securities ("RMBS"); (2) direct preferred equity and mezzanine investments in real properties; (3) equity securities of public (both traded and non-traded) and private debt and equity real estate investment trusts ("REITs") and/or real estate operating companies ("REOCs"); and (4) opportunistic and value added direct real estate strategies. The Fund will effect its direct real estate strategy through investments in one or more REIT subsidiaries, including through NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC (each, a "REIT Subsidiary" and collectively, the "REIT Subsidiaries"), which were formed on July 8, 2016 and June 6, 2022, respectively. The REIT Subsidiaries entered into separate investment advisory agreements with the Fund's investment advisor, NexPoint Advisors, L.P. (the "Adviser" or "NexPoint"), concurrent with their formation.

Preferred equity and mezzanine investments in real estate transactions come in various forms which may or may not be documented in the borrower's organizational documents. Generally, real estate preferred equity and/or mezzanine investments are typically junior to first mortgage financing but senior to the borrower's or sponsor's equity contribution. The investments are typically structured as an investment by a third-party investor in the real estate owner or various affiliates in the chain of ownership in exchange for a direct or indirect ownership interest in the real estate owner entitling it to a preferred/priority return on its investment. Sometimes, the investment is structured much like a loan where (i) "interest" on the investment is required to be paid monthly by the "borrower" regardless of available property cash flow; (ii) the entire investment is required to be paid by a certain maturity date; (iii) default rate "interest" and penalties are assessed against the "borrower" in the event payments are not made timely; and (iv) a default in the repayment of investment potentially results in the loss of management and/or ownership control by the "borrower" in the company in favor of the investor or other third-party.

In addition, subject to the 15% Limitation (as defined below), the Fund may invest up to 20% of its total assets in equity or debt securities other than real estate and real estate-related securities. The Adviser will evaluate each opportunity within the context of whether the Adviser believes the various real estate subsectors are within the

broader real estate cycle and tactically allocate among these opportunities. Also, the Adviser will select investments it believes offer the best potential outcomes and relative risk to assemble the most appropriate portfolio to meet the risk-adjusted return goals of the Fund. The Adviser has broad discretion to allocate the Fund's assets among equity or debt securities other than real estate and real estate-related securities and to change allocations as conditions warrant.

This portfolio construction strategy seeks to: (i) recognize and allocate capital based upon where the Adviser believes we are in the current real estate cycle; and (ii) minimize drawdowns during market downturns and maximize risk adjusted returns during all market cycles, though there can be no assurance that this strategy will achieve this objective. The Fund will rely on the expertise of the Adviser and its affiliates to determine the appropriate structure for structured credit investments, which may include bridge loans, common and preferred equity or other debt-like positions, as well as the acquisition of such instruments from banks, servicers or other third parties.

The Fund defines "real estate and real estate-related securities" to consist of common stock, convertible or non-convertible preferred stock, warrants, convertible or non-convertible secured or unsecured debt, and partnership or membership interests issued by:

- CMBS, RMBS and other real estate credit investments, which include existing first and second mortgages on real estate, either originated or acquired in the secondary market, and secured, unsecured and/or convertible notes offered by REOCs and REITs;
- publicly traded REITs managed by affiliated or unaffiliated asset managers and their foreign equivalents ("Public REITs");
- REOCs;
- private real estate investment funds managed by affiliated or unaffiliated institutional asset managers ("Private Real Estate Investment Funds");
- registered closed-end funds that invest principally in real estate (collectively, "Public Investment Funds");
- real estate exchange traded funds ("ETFs"); and
- publicly-registered non-traded REITs ("Non-Traded REITs") and private REITs, generally wholly-owned by the Fund or wholly-owned or managed by an affiliate.

REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests, and REOCs are companies that invest in real estate and whose shares trade on public exchanges. Foreign REIT equivalents are entities located in jurisdictions that have adopted legislation substantially similar to the REIT tax provisions in that they provide for favorable tax treatment for the foreign REIT equivalent and require distributions of income to shareholders.

The Fund has not imposed limitations on the portion of its assets that may be invested in any of the categories outlined above other than certain Private Real Estate Investment Funds. The Fund, however, will limit its investments in Private Real Estate Investment Funds and any other investments that are excluded from the definition of "investment company" under the 1940 Act by Section 3(c)(1) or Section 3(c)(7) of the 1940 Act to no more than 15% of its net assets (the "15% Limitation"). Such entities are typically private equity funds and hedge funds. The 15% Limitation does not apply to any collateralized loan obligations ("CLOs"), certain of which may rely on Section 3(c)(1) or 3(c)(7) of the 1940 Act. For purposes of compliance with the 15% Limitation, the Fund will not count its direct investments in wholly-owned subsidiaries but will look through such subsidiaries and count their underlying holdings. The Fund may engage in short sales and securities lending.

***Leverage.*** The Fund incurs leverage as part of its investment strategy. The Fund may also invest in private and public real estate investment funds or trusts, including real estate investment funds or trusts managed by affiliated or unaffiliated managers or entities wholly-owned by the Fund, that may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025. See "Risk Factors — Leverage Risk".

In addition to any indebtedness incurred by the Fund, any subsidiary of the Fund, including the REIT Subsidiaries, may also utilize leverage, including by mortgaging properties held by special purpose vehicles, or by acquiring property with existing debt. Any such borrowings will generally be the sole obligation of each respective special purpose vehicle, without any recourse to any other special purpose vehicle, the REIT Subsidiaries, the Fund or its assets, and the Fund will not treat such non-recourse borrowings as senior securities (as defined in the 1940 Act) for purposes of complying with the 1940 Act's limitations on leverage unless the financial statements of the special purpose vehicle, or the subsidiary of the Fund that owns such special purpose vehicle, will be consolidated in accordance with Regulation S-X and other accounting rules. If cash flow is insufficient to pay principal and interest on a special purpose vehicle's borrowings, a default could occur, ultimately resulting in foreclosure of any security instrument securing the debt and a complete loss of the investment, which could result in losses to the REIT Subsidiaries and, therefore, to the Fund. To the extent that any subsidiaries of the Fund, including the REIT Subsidiaries, directly incur leverage in the form of debt (as opposed to non-recourse borrowings made through special purpose vehicles), the amount of such recourse leverage used by the Fund and such subsidiaries, including the REIT Subsidiaries, will be consolidated and treated as senior securities for purposes of complying with the 1940 Act's limitations on leverage by the Fund. See "Investment Objective, Policies and Strategies."

***Policies.*** The Fund's 80% policy with respect to investment in real estate and real estate-related securities is not fundamental and may be changed by the Fund's board of trustees (the "Board") without shareholder approval. However, shareholders will be given at least 60 days' notice prior to any change in the 80% Policy. The Fund's SAI contains a list of all of the fundamental and non-fundamental investment policies of the Fund under the heading, "Investment Objective and Policies." For purposes of the Fund's 80% policy, the Fund will invest only in Public Investment Funds and Private Real Estate Investment Funds that either: (1) have adopted a policy to invest, under normal circumstances, at least 80% of their net assets, plus borrowings for investment purposes, in real estate and real estate-related securities; or (2) do not have a stated 80% policy, but do invest, under normal circumstances, at least 80% of their net assets, plus borrowings for investment purposes, in real estate and real estate-related securities, as determined by the Adviser's review of their portfolio holdings, investment objectives and strategies. Prior to investing in an underlying fund that does not have a stated 80% policy, the Adviser will review the underlying fund's prospectus or offering memorandum, financial statements, and any available third party research, and may also meet with the underlying fund's management team in order to determine whether the underlying fund follows an 80% policy under normal circumstances. Following the Fund's investment in the underlying fund, the Adviser will continue to monitor the underlying fund on an ongoing basis, reviewing all relevant information as it becomes available. If at any point the Adviser has reason to believe that the underlying fund's investment strategy has changed, or that the underlying asset mix has changed in a way that no longer satisfies the 80% policy, the Adviser will immediately reclassify the investment for purposes of testing the Fund's compliance with its 80% policy. If the Fund were to temporarily fall out of compliance with its 80% Policy as a result of the reclassification of an underlying fund, the Fund would take one or more of the following actions in order to come back into compliance with its 80% Policy: (i) restricting additional investments that do not fall within the 80% Policy; (ii) selling one or more investments that are outside of the 80% Policy;

(iii) deploying new capital raised in the Offering in investments that fall within the 80% Policy; or (iv) if available, utilizing borrowings from a credit facility to make investments that fall within the 80% Policy.

The Fund concentrates investments in the real estate and real estate-related industry, meaning that, under normal circumstances, it invests 25% or more of its total assets in real estate and real estate-related industry securities. This policy is fundamental and may not be changed by the Board without shareholder approval. The Fund's SAI contains a list of all of the fundamental and non-fundamental investment policies of the Fund, under the heading "Investment Objective and Policies."

**Investment Adviser and Fees**

NexPoint Advisors, L.P., which serves as the investment adviser of the Fund, is registered with the SEC as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act") and is an affiliate of NexPoint Asset Management, L.P. ("NAM"). The Adviser also externally manages NexPoint Capital, Inc., a non-traded business development company (a "BDC"), NexPoint Event Driven Fund, NexPoint Merger Arbitrage Fund, and NexPoint Climate Tech Fund. NAM manages Highland Opportunities and Income Fund ("HFRO") and Highland Global Allocation Fund ("GAF"), registered closed-end funds whose shares trade on the NYSE.

The Adviser has entered into a Services Agreement with Skyview Group ("Skyview"), pursuant to which the Adviser will receive administrative and operational support services to enable it to provide the required advisory services to the Fund.

Certain Skyview personnel became dual-employees of NexPoint Services, Inc., a wholly-owned subsidiary of the Adviser. The same services are being performed by the dual-employees. The Adviser, and not the Fund, will compensate all Adviser, Skyview, and dual-employee personnel who provide services to the Fund.

The Adviser's senior management team has experience across private lending, private equity, real estate investing and other investment strategies. Collectively, the Adviser and its affiliates managed approximately $16.9 billion in assets as of December 31, 2024, including approximately $12.5 billion in gross real estate assets.

Pursuant to an investment advisory agreement with the Fund (the "Investment Advisory Agreement"), the Adviser receives a monthly fee at the annual rate of 1.25% of the Fund's Daily Gross Assets. Daily Gross Assets is defined in the Investment Advisory Agreement as total assets, including assets resulting from leverage, less any liabilities. For purposes of calculating the Fund's Daily Gross Assets, derivatives will be valued at their market value, not their notional value.

The Adviser and the Fund have entered into an expense limitation and reimbursement agreement (the "Expense Limitation Agreement") under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily Gross Assets (the "Expense Limitation"). "Daily Gross Assets" is defined in the Expense Limitation Agreement as an amount equal to total assets, less any liabilities, but excluding liabilities evidencing leverage. If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared effective by the SEC and to commence

operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement may not be amended or terminated for one year from the date of this Prospectus, unless approved by the Board. See "Management of the Fund."

The REIT Subsidiaries entered into separate investment advisory agreements with the Adviser in July 2016 and June 2022. To the extent fees are paid to the Adviser by the REIT Subsidiaries, such fees will be offset against fees otherwise payable by the Fund to the Adviser, such that shareholders of the Fund will only be subject to one layer of fees to the Adviser. Notwithstanding this arrangement, the Fund and its shareholders will indirectly bear the expenses associated with forming the REIT Subsidiaries, non-advisory fees paid by the REIT Subsidiaries (if any) and operating expenses, including maintaining their REIT qualification. To the extent the Fund forms one or more other REIT subsidiaries, it is expected that they will enter into separate investment advisory agreements that have substantially similar terms. The Fund may invest in funds not managed by an affiliate of the Adviser (including closed-end funds, ETFs, private funds, externally managed traded and non-traded REITs, etc.), in which case two layers of fees will be paid by the Fund.

**Transfer Agent and Fund Administrator/Sub-Administrator**

SS&C Technologies, Inc. ("SS&C") serves as the transfer agent of the Fund. The Adviser serves as the Fund's Administrator. SEI Global Funds Services ("SEI") serves as the Fund's Sub-Administrator. See "Management of the Fund."

**Distribution Fees**

Class C shares will pay to the Distributor a distribution fee (the "Distribution Fee") that will accrue at an annual rate equal to 0.75% of the Fund's average daily net assets attributable to Class C shares, and is payable on a quarterly basis. Class A and Class Z shares are not subject to a Distribution Fee. See "Plan of Distribution."

**Shareholder Servicing Fee**

The Fund (and, indirectly, the Class A and Class C shareholders) will pay a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of Class A and Class C shares. The Fund will not pay a monthly shareholder servicing fee in connection with Class Z shares.

**Closed-End Fund Structure**

Closed-end funds differ from open-end management investment companies (commonly referred to as mutual funds) in that closed-end funds do not typically redeem their shares at the option of the shareholder. Rather, closed-end fund shares typically trade in the secondary market via a stock exchange. Unlike many closed-end funds, however, the Fund's shares will not be listed on a stock exchange. Instead, the Fund will operate as an interval fund, meaning that the Fund will provide limited liquidity to shareholders by offering to repurchase a limited amount of shares (at least 5%) on a quarterly basis, which is discussed in more detail below. An investment in the Fund is suitable only for investors who can bear the risks associated with the limited liquidity of the shares and should be viewed as a long-term investment. The Fund is subject to continuous asset in-flows, although not subject to continuous out-flows. The Board may, in the future, seek shareholder approval to list the Fund's shares on a national securities exchange depending on market conditions and other factors.

**Share Classes**

The Fund currently offers three different classes of shares: Class A, Class C, and Class Z shares. The Fund has received exemptive relief from the SEC to issue multiple classes of shares and to impose asset-based distribution fees and early-withdrawal charges (also described as contingent deferred sales charges, or "CDSCs," in this Prospectus). An investment in any share class of the Fund represents an investment in the same assets of the Fund. However, the purchase restrictions and ongoing fees and expenses for each share class are different. The fees and expenses for the Fund are set forth in "Fees and Fund Expenses." If an investor has hired an intermediary and is eligible to invest in more than one class of shares, the intermediary may help determine which share class is appropriate for that investor. When selecting a share class, you should consider which share classes are available to you, how much you intend to invest, how long you expect to own shares, and the total costs and expenses associated with a particular share class.

Each investor's financial considerations are different. You should speak with your financial advisor to help you decide which share class is best for you. Not all Financial Intermediaries (as defined below) offer all classes of shares. If your Financial Intermediary offers more than one class of shares, you should carefully consider which class of shares to purchase.

**Investor Suitability**

An investment in the Fund involves a considerable amount of risk. It is possible that you may lose money. An investment in the Fund is suitable only for investors who can bear the risks associated with the limited liquidity of the shares and should be viewed as a long-term investment. Before making your investment decision, you should: (i) consider the suitability of this investment with respect to your investment objectives and personal financial situation; and (ii) consider factors such as your personal net worth, income, age, risk tolerance and liquidity needs.

**Repurchases of Shares**

The Fund is an interval fund and, as such, has adopted a fundamental policy to make quarterly repurchase offers, at NAV, of no less than 5% of the shares outstanding. There is no guarantee that shareholders will be able to sell all of the shares they desire in a quarterly repurchase offer because shareholders, in total, may wish to sell more than 5% of the Fund's shares. If the amount of repurchase requests exceeds the number of shares the Fund offers to repurchase, the Fund will repurchase shares on a pro rata basis. Limited liquidity will be provided to shareholders only through the Fund's quarterly repurchases. The Fund will maintain liquid securities or cash or, if available, will borrow in amounts sufficient to meet quarterly redemption requirements. See "Quarterly Repurchases of Shares."

**Summary of Risks**

Investing in the Fund involves risks, including the risk that you may receive little or no return on your investment or that you may lose part or all of your investment. Consequently, you can lose money by investing in the Fund. No assurance can be given that the Fund will achieve its investment objective, and investment results may vary substantially over time and from period to period. An investment in the Fund is not appropriate for all investors. Each risk summarized below is a principal risk of investing in the Fund, and different risks may be more significant at different times depending upon market conditions or other factors.

An investment in the Fund is not a deposit of any bank and is not insured or guaranteed by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency.

***Substantial Conflicts of Interest.*** As a result of the Fund's arrangements with NexPoint, there may be times when NexPoint or its affiliates have interests that differ from those of the Fund's shareholders, giving rise to a

conflict of interest. The Fund's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund does, or of investment funds managed by the Adviser or its affiliates. Similarly, the Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. For example, the Fund's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Adviser and its affiliates.

The Fund's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles.

As a result, those individuals may face conflicts in the allocation of investment opportunities among the Fund and other investment funds or accounts advised by or affiliated with the Adviser. The Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is fair and equitable over time and consistent with its allocation policy. However, the Fund can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time. In addition, it is anticipated that a significant portion of the Fund's assets will be represented by securities sponsored, organized and/or managed by the Adviser and its affiliates, which may include REITs, asset-backed securities and/or structured finance securities. The Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Fund with an opportunity to periodically review the Fund's investments in such REITs, asset-backed securities and/or structured finance securities and assure themselves that continued investment in such securities remains in the best interests of the Fund and its shareholders. Please see "Risk Factors — Conflicts of Interest" for a description of risks associated with conflicts of interest.

***Closed-End Fund ("CEF") Risk.*** The Fund is a CEF. CEFs differ from open-end management investment companies (commonly referred to as mutual funds) in that CEFs may list their shares for trading on a securities exchange and do not redeem their shares at the option of the shareholder. By comparison, mutual funds issue securities redeemable at net asset value at the option of the shareholder and typically engage in a continuous offering of their shares. Mutual funds are subject to continuous asset in-flows and out-flows that can complicate portfolio management, whereas CEFs generally can stay more fully invested in securities consistent with the CEF's investment objective and policies. In addition, in comparison to open-end funds, CEFs have greater flexibility in their ability to make certain types of investments, including investments in illiquid securities.

***Concentration in Real Estate Securities Risk.*** The Fund will not invest in real estate directly, but, because the Fund will concentrate its investments in investment vehicles that invest principally in real estate and real estate-related securities, its portfolio will be significantly impacted by the performance of the real estate market and may experience more volatility and be exposed to greater risk than a more diversified portfolio. The values of companies engaged in the real estate industry are affected by: (i) changes in general economic and market conditions; (ii) changes in the value of real estate properties; (iii) risks related to local economic conditions, overbuilding and increased competition; (iv) increases in property taxes and operating expenses; (v) changes in zoning laws; (vi) casualty and condemnation losses; (vii) variations in rental income, neighborhood values or the appeal of property to tenants; (viii) the availability of financing; and (ix) changes in interest rates and leverage.

***Mortgage-Backed Securities Risk.*** Mortgage-backed securities are bonds which evidence interests in, or are secured by, commercial or residential mortgage loans, as the case may be. Accordingly, mortgage-backed securities are subject to all of the risks of the underlying mortgage loans. In a rising interest rate environment, the value of mortgage-backed securities may be adversely affected when payments on underlying mortgages do not occur as anticipated. The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities markets as a

whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the underlying commercial or residential mortgage properties. Mortgage-backed securities are also subject to several risks created through the securitization process.

The Fund may invest in the residual or equity tranches of CMBS, which are referred to as subordinate CMBS and interest-only CMBS. Subordinate CMBSs are paid interest only to the extent there are funds available to make payments. There are multiple tranches of CMBS, offering investors various maturity and credit risk characteristics. Tranches are categorized as senior, mezzanine, and subordinated/equity, according to their degree of risk. The most senior tranche of a CMBS has the greatest collateralization and pays the lowest interest rate. If there are defaults or the collateral otherwise underperforms, scheduled payments to senior tranches take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. Lower tranches represent lower degrees of credit quality and pay higher interest rates intended to compensate for the attendant risks. The return on the lower tranches is especially sensitive to the rate of defaults in the collateral pool. The lowest tranche (i.e. the “equity” or “residual” tranche) specifically receives the residual interest payments (i.e., money that is left over after the higher tranches have been paid and expenses of the issuing entities have been paid) rather than a fixed interest rate. As a result, interest only CMBS possess the risk of total loss of investment in the event of prepayment of the underlying mortgages. There is no limit on the portion of the Fund’s total assets that may be invested in interest-only multifamily CMBS.

The Fund also may invest in interest-only multifamily CMBS issued by multifamily mortgage loan securitizations. However, these interest-only multifamily CMBS typically only receive payments of interest to the extent that there are funds available in the securitization to make the payment and may introduce increased risks since these securities have no underlying principal cash flows.

***Debt Securities Risk.*** When the Fund invests in debt securities, the value of your investment in the Fund will fluctuate with changes in interest rates. Typically, a rise in interest rates causes a decline in the value of debt securities. In general, the market price of debt securities with longer maturities will increase or decrease more in response to changes in interest rates than shorter-term securities. Other risk factors include credit risk (the debtor may default) and prepayment risk (the debtor may pay its obligation early, reducing the amount of interest payments). These risks could affect the value of a particular investment, possibly causing the Fund’s share price and total return to be reduced or fluctuate more than other types of investments. This kind of market risk is generally greater for funds investing in debt securities with longer maturities.

***Non-Payment Risk.*** Debt securities are subject to the risk of non-payment of scheduled interest and/or principal. Nonpayment would result in a reduction of income to the Fund, a reduction in the value of the security experiencing nonpayment and a potential decrease in the NAV of the Fund. There can be no assurance that the liquidation of any collateral would satisfy the borrower’s obligation in the event of non-payment of scheduled interest or principal payments, or that such collateral could be readily liquidated.

***Securities Market Risk.*** An investment in the Fund’s shares is subject to investment risk, including the possible loss of the entire principal amount invested. An investment in the Fund’s shares represents an indirect investment in the securities owned by the Fund. The value of these securities, like other market investments, may move up or down, sometimes rapidly and unpredictably, due to factors affecting particular companies or the securities markets generally. Economic, political and financial conditions, industry or economic trends and developments or public health risks, such as epidemics or pandemics, may, from time to time, and for varying periods of time, cause volatility, illiquidity or other potentially adverse effects in the financial markets. The value of your shares at any point in time may be worth less than the value of your original investment, even after taking into account any reinvestment of dividends and distributions.

***Illiquid and Restricted Securities.*** The Fund may not be able to readily dispose of illiquid securities at prices that approximate those at which the Fund could sell such securities if they were more widely traded and, as a result of such illiquidity, the Fund may have to sell other investments or engage in borrowing transactions if necessary to raise cash to meet its obligations.

***Distribution Policy Risk.*** The Fund's distribution policy may, under certain circumstances, have certain adverse consequences to the Fund and its shareholders because it may result in a return of capital resulting in less of a shareholder's assets being invested in the Fund and, over time, increase the Fund's expense ratio. The distribution policy also may cause the Fund to sell a security at a time it would not otherwise do so in order to manage the distribution of income and gain. Pending the investment of the net proceeds in accordance with the investment objective and policies, all or a portion of the Fund's distributions may consist of a return of capital (i.e. from your original investment).

***Public and Private Investment Funds Risk.*** For investments in Public Investment Funds and Private Real Estate Investment Funds not managed by the Adviser or its affiliates, Fund shareholders will bear two layers of fees and expenses: asset-based fees and expenses at the Fund level, and asset-based fees, incentive allocations or fees and expenses at the Public Investment Fund or Private Real Estate Investment Fund level. The Fund's performance depends, in part, upon the performance of the Public Investment Fund and Private Real Estate Investment Fund managers and their selected strategies, the adherence by such managers to such selected strategies, the instruments used by such managers, and the Adviser's ability to select managers and strategies and effectively allocate Fund assets among them.

Private Real Estate Investment Funds are not publicly traded and therefore are not liquid investments. To determine the value of the Fund's investments in Private Real Estate Investment Funds, the Adviser considers, among other things, information provided by the Private Real Estate Investment Funds, including quarterly unaudited financial statements, which if inaccurate could adversely affect the Adviser's ability to accurately value the Fund's shares. In addition to valuation risk, shareholders of Private Real Estate Investment Funds are not entitled to the protections of the 1940 Act.

To the extent the Fund invests in Private Real Estate Investment Funds managed by the Adviser or its affiliates, fees paid at the Private Real Estate Investment Fund level will be reimbursed to the Fund so that shareholders will only pay fees at the Fund level.

***REIT Risk.*** REITs may be affected by changes in the real estate markets generally as well as changes in the values of the properties owned by the REIT or securing the mortgages owned by the REIT. REITs are dependent upon management skill and are not diversified. REITs are also subject to heavy cash flow dependency, defaults by borrowers, self-liquidation, and the possibility of failing to qualify for favorable tax treatment under the Internal Revenue Code of 1986, as amended (the "Code"), and to maintain an exemption under the 1940 Act. Finally, certain REITs may be self-liquidating at the end of a specified term, and run the risk of liquidating at an economically inopportune time.

***Non-Traded REIT Risk.*** Non-traded REITs are subject to the following risks in addition to those described in "REIT Risk." Non-Traded REITs are subject to significant commissions, expenses, and organizational and offering costs that reduce the value of an investor's (including the Fund's) investment. Non-Traded REITs are not liquid, and investments in Non-Traded REITs may not be accessible for an extended period of time. There is no guarantee of any specific return on the principal amount or the repayment of all or a portion of the principal amount invested in Non-Traded REITs. In addition, there is no guarantee that investors (including the Fund) will receive distributions. Distributions from Non-Traded REITs may be derived from sources other than cash flow from operations, including the proceeds of the offering, from borrowings, or from the sale of assets. Payments of distributions from sources other than cash flow from operations will decrease or diminish an investor's interest.

***Private REIT Risk.*** Private REITs are subject to the following risks in addition to those described in "Public and Private Real Estate Investment Funds Risk" and "REIT Risk." Private REITS are unlisted, making them more difficult to value and trade. Moreover, private REITs generally are exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), and, as such, are not subject to the same disclosure requirements as Public REITs and Non-Traded REITs, which makes private REITs more difficult to evaluate from an investment perspective. In addition, Private REITs may not have audited financial statements.

***ETF Risk.*** The value of ETFs can be expected to increase and decrease in value in proportion to increases and decreases in the indices that they are designed to track. The volatility of different index tracking stocks can be expected to vary in proportion to the volatility of the particular index they track. ETFs are traded similarly to stocks of individual companies. Although an ETF is designed to provide investment performance corresponding to its index, it may not be able to exactly replicate the performance of its index because of its operating expenses and other factors. The underlying indices that an ETF is designed to track may also experience volatility due to disruptive events, such as natural disasters, pandemic or epidemics or other widespread health crises. Any such impact could adversely affect the Fund's performance and may lead to losses on your investment in the Fund. Because ETFs trade on a securities exchange, extreme market volatility or potential lack of an active trading market for an ETF's shares may trade at a premium or discount to their net asset value. The Fund's investment in shares of ETFs subject it to the risks of owning the securities underlying the ETF, as well as certain structural risks, including authorized participant concentration risk, market maker risk, premium/discount risk and trading issues risk. As a shareholder in an ETF, the Fund bears its proportionate share of the ETF's expenses.

***Issuer Risk.*** The value of a specific security can perform differently from the market as a whole for reasons related to the issuer, such as management performance, financial leverage and reduced demand for the issuer's goods and services.

***Leverage Risk.*** Leverage creates a greater risk of loss, as well as a potential for more gain, for the Fund's shares than if leverage were not used. The use of leverage, such as borrowing money to purchase securities, will cause the Fund or a Public Investment Fund or Private Real Estate Investment Fund in which the Fund has invested, to incur additional expenses and significantly magnify the Fund's losses in the event of underperformance of the Fund's (or Public Investment Fund's or Private Real Estate Investment Fund's) underlying investments. Interest on borrowings (or dividends on preferred shares) may be at a fixed or floating rate and generally will be based on short-term rates. Interest payments and fees incurred in connection with such borrowings will reduce the amount of distributions available to the Fund's shareholders. As long as the rate of return, net of applicable Fund expenses, on the Fund's portfolio investments purchased with leverage exceeds the costs associated with such leverage, the Fund will generate more return or income than will be needed to pay such costs. In this event, the excess will be available to pay higher dividends to the Fund's shareholders. Conversely, if the Fund's return on such assets is less than the cost of leverage and other Fund expenses, the return to the Fund's shareholders shares will diminish or may be eliminated altogether. To the extent that the Fund uses leverage, the net asset value of the Fund's shares and the yield to the Fund's shareholders will be more volatile. The Fund's leveraging strategy may not be successful. The Fund's investments in Public Investment Funds and REITs managed by affiliated or unaffiliated institutional asset managers may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to the higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025.

In addition, a lender to the Fund or a Private Real Estate Investment Fund or a Public Investment Fund may terminate or refuse to renew any credit facility. If the Fund or Private Real Estate Investment Fund or a Public Investment Fund is unable to access additional credit, it may be forced to sell investments at inopportune times,

which may further reduce the amount of distributions available to Fund shareholders. The Fund's investments in Public Investment Funds and REITs managed by affiliated or unaffiliated institutional asset managers may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. See "Risk Factors — Leverage Risk".

***Reverse Repurchase Agreement Risk.*** The Fund may enter into reverse repurchase transactions with Mizuho or other banks and securities dealers. A reverse repurchase transaction is a repurchase transaction in which the Fund is the seller of, rather than the investor in, securities or other assets and agrees to repurchase them at a date certain or on demand. Use of a reverse repurchase transaction may be preferable to a regular sale and later repurchase of securities or other assets because it avoids certain market risks and transaction costs. Reverse repurchase transactions involve the risk that the market value of securities and/or other assets purchased by the Fund with the proceeds received by the Fund in connection with such reverse repurchase transactions may decline below the market value of the securities the Fund is obligated to repurchase under such transactions. They also involve the risk that the counterparty may liquidate the securities delivered to it by the Fund under the reverse repurchase agreement following the occurrence of an event of default by the Fund under the reverse repurchase agreement. At the time when the Fund enters into a reverse repurchase transaction, liquid securities (e.g., cash, U.S. Government securities or other "high grade" debt obligations) of the Fund having a value at least as great as the Purchase Price of the securities to be purchased will be segregated on the books of the Fund throughout the period of the obligation. The use of these investment strategies may increase net asset value fluctuation.

***Liquidity Risk.*** There is currently no secondary market for the shares and the Fund expects that no secondary market will develop. Limited liquidity is provided to shareholders only through the Fund's quarterly repurchase offers for no less than 5% of the shares outstanding at NAV. There is no guarantee that shareholders will be able to sell all of the shares they desire in a quarterly repurchase offer. The Fund's investments are also subject to liquidity risk. Liquidity risk exists when particular investments of the Fund would be difficult to purchase or sell, possibly preventing the Fund from selling such illiquid securities at an advantageous time or price, or possibly requiring the Fund to dispose of other investments at unfavorable times or prices in order to satisfy its obligations. Funds with principal investment strategies that involve securities of companies with smaller market capitalizations, derivatives or securities with substantial market and/or credit risk tend to have the greatest exposure to liquidity risk.

***Management Risk.*** Management Risk is the risk associated with the fact that the Fund relies on the Adviser's ability to achieve its investment objective. The Adviser may be incorrect in its assessment of the intrinsic value of the companies whose securities the Fund holds, which may result in a decline in the value of Fund shares and failure to achieve its investment objective.

***Medium and Small Capitalization Company Risk.*** Compared to investment companies that focus only on large capitalization companies, the Fund's NAV may be more volatile because it also invests in medium and small capitalization companies. Compared to larger companies, medium and small capitalization companies are more likely to have: (i) more limited product lines or markets and less mature businesses; (ii) fewer capital resources; (iii) more limited management depth; and (iv) shorter operating histories. Further, compared to larger companies, the securities of small and medium capitalization companies are more likely to experience more significant changes in market values, be harder to sell at times and at prices that the Adviser believes appropriate, and offer greater potential for gains and losses.

***Non-Diversification Risk.*** While the Adviser intends to invest in a number of real estate and real estate-related securities issued by different issuers and employ multiple investment strategies with respect to the Fund's investment portfolio, it is possible that a significant amount of the Fund's investments could be invested in the

instruments of only a few companies or other issuers or that at any particular point in time one investment strategy could be more heavily weighted than the others. The focus of the Fund's investment portfolio in any one issuer would subject the Fund to a greater degree of risk with respect to defaults by such issuer or other adverse events affecting that issuer, and the focus of the portfolio in any one industry or group of industries would subject the Fund to a greater degree of risk with respect to economic downturns relating to such industry or industries.

***Valuation Risk.*** Portfolio securities may be valued using techniques other than market quotations, under the circumstances described under "Determination of Net Asset Value." The value established for a portfolio security may be different than what would be produced through the use of another methodology or if it had been priced using market quotations. Portfolio securities that are valued using techniques other than market quotations, including "fair valued" securities, may be subject to greater fluctuation in their value from one day to the next than would be the case if market quotations were used. In addition, there is no assurance that the Fund could sell a portfolio security for the value established for it at any time and it is possible that the Fund would incur a loss because a portfolio security is sold at a discount to its established value.

Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, fair value pricing may not reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

***Equity Securities Risk.*** The market prices of equity securities owned by the Fund may fall over short or long periods of time. In addition, equity securities represent a share of ownership in a company, and rank after bonds and preferred stock in their claim on the company's assets in the event of bankruptcy.

***Preferred Securities Risk.*** Preferred securities are subject to credit risk and interest rate risk. Interest rate risk is, in general, that the price of a debt security falls when interest rates rise. Securities with longer maturities tend to be more sensitive to interest rate changes. Credit risk is the risk that an issuer of a security may not be able to make principal and interest or dividend payments on the security as they become due. The credit quality of preferred stock and convertible securities held by the Fund may be lowered if an issuer's financial condition changes, leading to greater volatility in the price of the security. Holders of preferred securities may not receive dividends, or the payment can be deferred for some period of time. In bankruptcy, creditors are generally paid before the holders of preferred securities. Preferred stock, which may include preferred stock in real estate transactions, represents an equity or ownership interest in an issuer that pays dividends at a specified rate and that has precedence over common stock in the payment of dividends.

***Repurchase Policy Risks.*** Quarterly repurchases by the Fund of its shares typically will be funded from available cash or sales of portfolio securities. However, payment for repurchased shares may require the Fund to liquidate portfolio holdings earlier than the Adviser otherwise would liquidate such holdings, potentially resulting in losses, and may increase the Fund's portfolio turnover. The Adviser may take measures to attempt to avoid or minimize such potential losses and turnover, and instead of liquidating portfolio holdings, may borrow money to finance repurchases of shares. If the Fund borrows to finance repurchases, interest on any such borrowings will negatively affect shareholders who do not tender their shares in a repurchase offer by increasing the Fund's expenses and reducing net investment income. The Fund's quarterly repurchase offers are a shareholder's only means of liquidity with respect to his or her shares.

***Short Sales Risk.*** Short sales risk is the risk of loss associated with any appreciation on the price of a security borrowed in connection with a short sale. The Fund may engage in short sales that are not made

"against-the-box," which means that the Fund may sell short securities even when they are not actually owned or otherwise covered at all times during the period the short position is open. Short sales that are not made "against-the-box" involve unlimited loss potential since the market price of securities sold short may continuously increase.

***Securities Lending Risk.*** Securities lending risk is the risk that the Fund may make secured loans of its portfolio securities. Any decline in the value of a portfolio security that occurs while the security is out on loan is borne by the Fund, and will adversely affect performance. Also, there may be delays in recovery of securities loaned, losses in the investment of collateral, and loss of rights in the collateral should the borrower of the securities fail financially while holding the security.

***Risks Relating to Fund's Tax Status.*** To remain eligible for the favorable tax treatment accorded to regulated investment companies ("RICs") and their shareholders under the Code, the Fund must meet certain source of income, asset diversification and annual distribution requirements. If the Fund were to fail to comply with the income, diversification or distribution requirements, all of its taxable income regardless of whether timely distributed to shareholders would be subject to fund-level tax at the applicable corporate income tax rate and all of its distributions from earnings and profits (including from net long-term capital gains) would be taxable to shareholders as ordinary income. In any such event, the resulting corporate taxes could substantially reduce the Fund's net assets, the amount of income available for distribution and the amount of its distributions. Any such failure would have a material adverse effect on the Fund and its shareholders.

***RIC-Related Risks of Investments Generating Non-Cash Taxable Income.*** Certain of the Fund's investments will require the Fund to recognize taxable income in a taxable year in excess of the cash received from those investments during that year. In particular, the Fund expects that a portion of its investments in loans and bonds will be treated as having "market discount" and/or "original issue discount" for U.S. federal income tax purposes, which, in some cases, could be significant. Because the Fund may be required to recognize income in respect of these investments before or without receiving cash representing such income, the Fund may have difficulty satisfying the annual distribution requirements applicable to RICs and avoiding Fund-level U.S. federal income or excise taxes. Accordingly, the Fund may be required to sell portfolio securities, including at potentially disadvantageous times or prices, raise additional debt or equity capital, or reduce new investments, to obtain the cash needed to make the necessary income distributions. If the Fund liquidates portfolio securities to raise cash, the Fund may realize gain or loss on such liquidations; in the event the Fund realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

***REIT Tax Risk for REIT Subsidiaries.*** The REIT Subsidiaries and any REIT subsidiary the Fund may form in the future will elect to be taxed as REITs beginning with the first year in which they commence material operations. In order for each REIT Subsidiary and any future REIT subsidiary to qualify and maintain its qualification as a REIT, it must satisfy certain requirements set forth in the Code and Treasury Regulations that depend on various factual matters and circumstances. The Fund and the Adviser intend to cause the REIT Subsidiaries and any future REIT subsidiaries to structure their activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is not entirely clear, and it is possible that the Internal Revenue Service ("IRS") may interpret or apply those requirements in a manner that jeopardizes the ability of such REIT subsidiary to satisfy all of the requirements for qualification as a REIT.

If any REIT Subsidiary or future REIT subsidiary fails to qualify as a REIT for any taxable year that it is operational and does not qualify for certain statutory relief provisions, it will be subject to U.S. federal income tax on its taxable income at the applicable corporate income tax rate. In addition, it will generally be disqualified from treatment as a REIT for the four taxable years following any taxable year in which it fails to qualify as a REIT.

**U.S. Federal Income Tax Matters**

The Fund has elected to be taxed for U.S. federal income tax purposes, and intends to continue to qualify annually, as a RIC under Subchapter M of the Code. As a RIC, the Fund generally will not be subject to fund-level U.S. federal income taxes on any ordinary income or capital gain that it timely distributes to its shareholders from its taxable earnings and profits. Even if the Fund qualifies as a RIC, it generally will be subject to U.S. federal corporate income tax on its undistributed taxable income and could be subject to U.S. federal excise, state, local and foreign taxes. To maintain RIC tax treatment, the Fund must meet specified source-of-income and asset diversification requirements and distribute annually at least the sum of 90% of its ordinary income and net short-term capital gain in excess of net long-term capital loss, if any, and 90% of net exempt interest income. See "U.S. Federal Income Tax Matters."

**Distribution Policy**

The Fund's distribution policy is to make monthly distributions to shareholders. The Board has the ultimate discretion as to whether such distributions will be in stock or in cash. However, this distribution policy is subject to change and there is no guarantee the target rate will be achieved. Unless a shareholder elects otherwise, the shareholder's distributions will be reinvested in additional shares under the Fund's distribution reinvestment policy. Shareholders who elect not to participate in the Fund's distribution reinvestment policy will receive all distributions in cash paid to the shareholder of record (or, if the shares are held in street or other nominee name, then to such nominee). The Fund's historical distributions approved by the Board may be found on the Fund's website, located at https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/. See "Distribution Policy" and "Distribution Reinvestment Policy."

**Custodian**

The Bank of New York Mellon ("BNY Mellon") serves as the Fund's custodian. See "Management of the Fund."

**FEES AND FUND EXPENSES**

The following table is intended to assist you in understanding the costs and expenses that an investor in this offering will bear directly or indirectly.

| | Class A Shares | Class C Shares | Class Z Shares |
|---|---|---|---|
| **Shareholder Transaction Expenses** | | | |
| Maximum Sales Load (as a percent of offering price)[1] | 5.75% | None | None |
| Contingent Deferred Sales Charge[2] | 1.00% | 1.00% | None |
| Exchange Fee | None | None | None |
| **Annual Expenses (as a percentage of net assets attributable to shares)** | | | |
| Management Fees | 1.25% | 1.25% | 1.25% |
| Interest Payments on Borrowed Funds[3] | 0.80% | 0.80% | 0.80% |
| Dividends and Fees on Securities Sold Short | 0.46% | 0.46% | 0.46% |
| Other Expenses[3] | 1.24% | 1.24% | 1.24% |
| Distribution Fee[4] | None | 0.75% | None |
| Shareholder Servicing Fee[5] | 0.25% | 0.25% | None |
| Total Annual Expenses | 4.00% | 4.75% | 3.75% |
| Fee Waiver and Reimbursement[6] | 0.74% | 0.74% | 0.74% |
| Total Annual Expenses (after fee waiver and reimbursement)[7] | 3.26% | 4.01% | 3.01% |

1. A portion of the sales load payable on Class A shares will be a reallowance to participating broker-dealers (see page 77 of this Prospectus). In addition, up to 0.75% of this sales load will be paid to the Fund's Distributor. There are no sales loads on reinvested distributions. The Fund reserves the right to waive broker commissions.
2. Class A shares purchased without an initial sales charge in accounts aggregating $500,000 or more may be subject to a 1.00% CDSC on shares redeemed during the first 18 months after their purchase. Class C shares are subject to a 1.00% CDSC for redemptions of shares within 18 months after their purchase.
3. As of December 31, 2024, the Fund employed leverage in an amount equal to 8% of net assets. The Fund may employ leverage going forward. This variable rate is based on current interest rates under the Fund's committed facility and is subject to change. The interest rate will increase in rising interest rate environments and, therefore, the actual interest rate expense borne by Fund shareholders will increase over time in a rising interest rate environment. While the Fund has no present intention to issue preferred shares within the next twelve months, if an attractive preferred shares financing opportunity were to come to the Fund's attention during that period, the Fund may consider that opportunity. See "Principal Risks of the Fund — Leverage Risk" in the Prospectus for a brief description of the Fund's Repurchase Agreement with Mizuho.
4. Class C shares will pay to the Distributor a Distribution Fee that will accrue at an annual rate equal to 0.75% of the average daily net assets attributable to Class C shares, and is payable on a quarterly basis. These Distribution fees may be paid to broker or Financial Intermediaries as compensation to sell Fund shares. Class A and Class Z shares are not subject to a Distribution Fee. See "Plan of Distribution."
5. Shareholder Servicing Fees may be used to compensate financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. Please refer to page 79 of this Prospectus for information.
6. The Adviser and the Fund have entered into an Expense Limitation Agreement under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary annual operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily

Gross Assets (the "Expense Limitation"). If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared effective by the SEC and to commence operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement will remain in effect until at least May 1, 2026 unless and until the Board approves its modification or termination. The Expense Limitation Agreement may not be amended or terminated unless approved by the Board. See "Management of the Fund." "Fee Waiver and Reimbursement" have been restated from fiscal year amounts to reflect current fees and expenses.

7. The value included in the "Total Annual Expenses" line item corresponds to the Expense Limitation pursuant to the Expense Limitation Agreement. The value in the "Fees and Fund Expenses" table is presented as a percentage of net assets, while the Expense Limitation, pursuant to the Expense Limitation Agreement, is calculated based on average Daily Gross Assets, but converted and expressed as a percentage of net assets for purposes of the fees and fund expenses table presentation. "Total Annual Expenses (after fee waiver and reimbursement)" have been restated from fiscal year amounts to reflect current fees and expenses.

The Fees and Fund Expenses Table describes the fees and expenses that you may pay if you buy and hold shares of the Fund. You may qualify for sales charge discounts on purchases of shares if you and your family invest, or agree to invest in the future, at least $50,000 in the Fund. More information about these and other discounts is available from your financial professional and in the "Plan of Distribution — Purchasing Shares" section of this Prospectus. More information about management fees, fee waivers and other expenses is available in the "Management of the Fund" section of this Prospectus.

**EXAMPLE**

The following example illustrates the hypothetical expenses that you would pay on a $1,000 investment assuming annual expenses attributable to shares remain unchanged and shares earn a 5% annual return. The example reflects total annual expenses after fee waivers and expense reimbursements for the one-year period and the first year of the three-, five-, and ten-year periods:

| Example | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|
| Class A Shares | $ 88 | $ 166 | $ 245 | $ 450 |
| Class C Shares | | | | |
| If you do not sell your shares | $ 40 | $ 136 | $ 233 | $ 477 |
| If you sold all of your shares at the end of the period | $ 50 | $ 136 | $ 233 | $ 477 |
| Class Z Shares | $ 30 | $ 108 | $ 187 | $ 395 |

**The example should not be considered a representation of actual future expenses. Actual expenses may be higher or lower than those shown.**

If shareholders request repurchase proceeds be paid by wire transfer, such shareholders will be assessed an outgoing wire transfer fee at prevailing rates charged by SS&C, currently $10.00. The purpose of the above table is to help a holder of shares understand the fees and expenses that such holder would bear directly or indirectly. There can be no assurance that the Expense Limitation Agreement will be renewed. In the event the Expense Limitation Agreement is terminated by either party, investors will likely bear higher expenses.

Case 3:26-cv-02496-D Document 27-31 Filed 09/08/25 Page 266 of 1493 PageID 13025

**FINANCIAL HIGHLIGHTS**

The following Financial Highlights table is intended to help you understand the Fund's financial performance since inception. Certain information reflects the financial results for a single Fund share. The total returns in the tables represent the rate that an investor would have earned or lost on an investment in the Fund (assuming reinvestment of all dividends and distributions). This information for the years ended December 31, 2024, 2023, 2022, 2021 and 2020 has been audited by Cohen & Company, Ltd., an independent registered public accounting firm. Financial statements for the fiscal year ended December 31, 2024 and the Report of the Independent Registered Public Accounting Firm thereon appear in the Fund's Annual Report for the Fiscal Year Ended December 31, 2024, which is incorporated by reference into the Statement of Additional Information and available from the Fund upon request. The Fund's performance has been enhanced by the existence of contractual waivers of fees and expenses, which may not continue into the future.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class A**

**Selected data for a share outstanding throughout each year is as follows:**

| | For the Years Ended December 31, 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| **Net Asset Value, Beginning of Year** | $17.51 | $ 19.73 | $21.31 | $ 16.19 | $ 20.36 |
| **Income from Investment Operations:** | | | | | |
| Net investment income[a] | 0.48 | 0.51 | 0.31 | 0.09 | 0.48 |
| Net realized and unrealized gain (loss) | (0.59) | (1.31) | (0.47) | 6.46 | (3.23) |
| Total from Investment Operations | (0.11) | (0.80) | (0.16) | 6.55 | (2.75) |
| **Less Distributions Declared to shareholders:** | | | | | |
| From net investment income | (0.57) | (0.52) | (0.30) | (0.34) | (0.39) |
| From return of capital | (0.85) | (0.90) | (1.12) | (1.09) | (1.03) |
| Total distributions declared to shareholders | (1.42) | (1.42) | (1.42) | (1.43) | (1.42) |
| **Net Asset Value, End of year[b]** | $15.98 | $ 17.51 | $19.73 | $ 21.31 | $ 16.19 |
| Total Return[b][c] | (0.60)% | (4.30)% | (1.15)% | 42.42% | (12.98)% |
| **Ratios to Average Net Assets / Supplemental Data:[d]** | | | | | |
| Net Assets, End of Year (000's) | $7,555 | $ 9,265 | $9,288 | $ 5,903 | $ 2,273 |
| Gross operating expenses[e] | 4.00% | 4.25% | 2.87% | 3.08% | 3.41% |
| Net investment income (loss) | 2.88% | 2.66% | 1.42% | 0.51% | 2.97% |
| Portfolio turnover rate | 13% | 10% | 41% | 41% | 42% |
| Average commission rate paid[f] | $ — | $0.0289 | $ — | $0.0225 | $0.0348 |

(a) Per share data was calculated using average shares outstanding during the year.
(b) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(c) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's Investment Adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(d) All ratios for the period have been annualized, unless otherwise indicated.
(e) Supplemental expense ratios are shown below:
(f) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses)[g] | 3.32% | 3.18% | 2.28% | 1.99% | 2.44% |
| Interest expense and commitment fees | 0.80% | 0.77% | 0.25% | — % | 0.34% |
| Dividends and fees on securities sold short | 0.46% | 0.47% | 0.06% | 0.02% | — % |

(g) This includes the additional voluntarily elected waiver by the Investment Adviser during the year which resulted in a 0.06% impact to the net expenses ratio.

Amounts designated as " —" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class A**

**Selected data for a share outstanding throughout each period is as follows:**

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[(a)] |
| **Net Asset Value, Beginning of Period** | $ 18.99 | $ 20.65 | $ 20.62 | $ 20.00 |
| **Income from Investment Operations:** | | | | |
| Net investment income[(b)] | 0.94 | 0.95 | 1.44 | 0.14 |
| Net realized and unrealized gain/(loss) | 1.83 | (1.33) | 0.19 | 0.68 |
| Total from investment operations | 2.77 | (0.38) | 1.63 | 0.82 |
| **Less Distributions Declared to Shareholders:** | | | | |
| From net investment income | (0.91) | (1.28) | (1.39) | (0.20) |
| From net realized gains | (0.49) | — | (0.21) | — |
| Total distributions declared to shareholders | (1.40) | (1.28) | (1.60) | (0.20) |
| **Net Asset Value, End of Period[(c)]** | $ 20.36 | $ 18.99 | $ 20.65 | $ 20.62 |
| Total Return[(c)(d)] | 14.59% | (2.42)% | 8.18% | 4.12%[(e)] |
| **Ratios to Average Net Assets[(f)] / Supplemental Data:** | | | | |
| Net assets, end of period (in 000's) | $ 1,546 | $ 414 | $ 126 | $ 1 |
| Gross operating expenses[(g)] | 4.33% | 4.20% | 4.75% | 10.78% |
| Net investment income (loss) | 4.56% | 4.82% | 6.99% | 1.56% |
| Portfolio turnover rate | 39% | 49% | 99% | 14%[(e)] |
| Average commission rate paid[(h)] | $0.0222 | $0.0111 | $0.0155 | $0.0295 |

(a) Class commenced operations on July 21, 2016.
(b) Net investment income (loss) per share was calculated using average shares outstanding during the period.
(c) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(d) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(e) Not annualized.
(f) All ratios for the period have been annualized, unless otherwise indicated.
(g) Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[(a)] |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 2.50% | 2.38% | 2.01% | 2.08% |
| Interest expense and commitment fees | 0.76% | 0.22% | — % | — % |
| Dividends and fees on securities sold short | — % | 0.08% | 0.01% | — % |

(h) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

Amounts designated as " —" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class C**

**Selected data for a share outstanding throughout each year is as follows:**

| | For the Years Ended December 31, 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| **Net Asset Value, Beginning of Year** | $17.73 | $ 19.96 | $21.56 | $ 16.37 | $ 20.53 |
| **Income from Investment Operations:** | | | | | |
| Net investment income (loss)[(a)] | 0.36 | 0.36 | 0.15 | (0.04) | 0.36 |
| Net realized and unrealized gain (loss) | (0.60) | (1.31) | (0.49) | 6.52 | (3.22) |
| Total from Investment Operations | (0.24) | (0.95) | (0.34) | 6.48 | (2.86) |
| **Less Distributions Declared to shareholders:** | | | | | |
| From net investment income | (0.52) | (0.47) | (0.26) | (0.32) | (0.34) |
| From return of capital | (0.77) | (0.81) | (1.00) | (0.97) | (0.96) |
| Total distributions declared to shareholders | (1.29) | (1.28) | (1.26) | (1.29) | (1.30) |
| **Net Asset Value, End of year[(b)]** | $16.20 | $ 17.73 | $19.96 | $ 21.56 | $ 16.37 |
| Total Return[(b)(c)] | (1.36)% | (5.02)% | (1.93)% | 41.32% | (13.45)% |
| **Ratios to Average Net Assets / Supplemental Data:[(d)]** | | | | | |
| Net Assets, End of Year (000's) | $2,885 | $ 3,964 | $4,558 | $ 2,706 | $ 1,791 |
| Gross operating expenses[(e)] | 4.74% | 4.98% | 3.64% | 3.85% | 4.13% |
| Net investment income (loss) | 2.11% | 1.90% | 0.69% | (0.21)% | 2.14% |
| Portfolio turnover rate | 13% | 10% | 41% | 41% | 42% |
| Average commission rate paid[(f)] | $ — | $0.0289 | $ — | $0.0225 | $0.0348 |

(a) Per share data was calculated using average shares outstanding during the year.
(b) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(c) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's Investment Adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(d) All ratios for the period have been annualized, unless otherwise indicated.
(e) Supplemental expense ratios are shown below:
(f) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses)[(g)] | 4.07% | 3.93% | 3.05% | 2.74% | 3.18% |
| Interest expense and commitment fees | 0.80% | 0.77% | 0.25% | — % | 0.34% |
| Dividends and fees on securities sold short | 0.46% | 0.47% | 0.06% | 0.02% | — % |

(g) This includes the additional voluntarily elected waiver by the Investment Adviser during the year which resulted in a 0.06% impact to the net expenses ratio.

Amounts designated as " –" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class C**

**Selected data for a share outstanding throughout each period is as follows:**

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016(a) |
| **Net Asset Value, Beginning of Period** | $ 19.10 | $ 20.72 | $ 20.58 | $ 20.00 |
| **Income from Investment Operations:** | | | | |
| Net investment income(b) | 0.79 | 0.83 | 1.12 | 0.04 |
| Net realized and unrealized gain | 1.89 | (1.30) | 0.46 | 0.71 |
| Total from investment operations | 2.68 | (0.47) | 1.58 | 0.75 |
| **Less Distributions Declared to Shareholders:** | | | | |
| From net investment income | (0.83) | (1.15) | (1.23) | (0.17) |
| From net realized gains | (0.42) | — | (0.21) | — |
| Total distributions declared to shareholders | (1.25) | (1.15) | (1.44) | (0.17) |
| **Net Asset Value, End of Period(c)** | $ 20.53 | $ 19.10 | $ 20.72 | $ 20.58 |
| Total Return(c)(d) | 13.97% | (2.90)% | 7.94% | 3.78%(e) |
| **Ratios to Average Net Assets(f) / Supplemental Data:** | | | | |
| Net assets, end of period (in 000's) | $ 880 | $ 511 | $ 1 | $ 1 |
| Gross operating expenses(g) | 5.08% | 4.93% | 5.05% | 11.53% |
| Net investment income (loss) | 3.81% | 4.08% | 5.39% | 0.45% |
| Portfolio turnover rate | 39% | 49% | 99% | 14%(e) |
| Average commission rate paid(h) | $0.0222 | $0.0111 | $0.0155 | $0.0295 |

(a) Class commenced operations on July 21, 2016.
(b) Net investment income (loss) per share was calculated using average shares outstanding during the period.
(c) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(d) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(e) Not annualized.
(f) All ratios for the period have been annualized, unless otherwise indicated.
(g) Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016(a) |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 3.28% | 3.12% | 2.87% | 2.83% |
| Interest expense and commitment fees | 0.76% | 0.22% | — % | — % |
| Dividends and fees on securities sold short | — % | 0.08% | 0.13% | — % |

(h) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

Amounts designated as "—" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class Z**

**Selected data for a share outstanding throughout each year is as follows:**

| | For the Years Ended December 31, 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| **Net Asset Value, Beginning of Year** | $ 17.74 | $ 19.97 | $ 21.54 | $ 16.36 | $ 20.55 |
| **Income from Investment Operations:** | | | | | |
| Net investment income[(a)] | 0.53 | 0.57 | 0.36 | 0.14 | 0.53 |
| Net realized and unrealized gain (loss) | (0.60) | (1.33) | (0.46) | 6.51 | (3.26) |
| Total from Investment Operations | (0.07) | (0.76) | (0.10) | 6.65 | (2.73) |
| **Less Distributions Declared to shareholders:** | | | | | |
| From net investment income | (0.58) | (0.54) | (0.31) | (0.38) | (0.44) |
| From return of capital | (0.88) | (0.93) | (1.16) | (1.09) | (1.02) |
| Total distributions declared to shareholders | (1.46) | (1.47) | (1.47) | (1.47) | (1.46) |
| **Net Asset Value, End of year[(b)]** | $ 16.21 | $ 17.74 | $ 19.97 | $ 21.54 | $ 16.36 |
| Total Return[(b)(c)] | (0.34)% | (4.06)% | (0.85)% | 42.68% | (12.75)% |
| **Ratios to Average Net Assets / Supplemental Data:[(d)]** | | | | | |
| Net Assets, End of Year (000's) | $24,109 | $27,165 | $25,711 | $15,493 | $12,709 |
| **Gross operating expenses[(e)]** | 3.75% | 4.02% | 2.61% | 2.85% | 3.24% |
| Net investment income (loss) | 3.12% | 2.95% | 1.66% | 0.78% | 3.24% |
| Portfolio turnover rate | 13% | 10% | 41% | 41% | 42% |
| Average commission rate paid[(f)] | $ — | $0.0289 | $ — | $0.0225 | $0.0348 |

(a) Per share data was calculated using average shares outstanding during the year.
(b) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(c) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's Investment Adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(d) All ratios for the period have been annualized, unless otherwise indicated.
(e) Supplemental expense ratios are shown below:
(f) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses)[(g)] | 3.07% | 2.94% | 2.03% | 1.73% | 2.19% |
| Interest expense and commitment fees | 0.80% | 0.77% | 0.25% | — % | 0.34% |
| Dividends and fees on securities sold short | 0.46% | 0.47% | 0.06% | 0.02% | — % |

(g) This includes the additional voluntarily elected waiver by the Investment Adviser during the year which resulted in a 0.06% impact to the net expenses ratio.

Amounts designated as " —" are zero or have been rounded to zero.

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class Z**

**Selected data for a share outstanding throughout each period is as follows:**

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[(a)] |
| **Net Asset Value, Beginning of Period** | $ 19.08 | $ 20.73 | $ 20.57 | $ 19.95 |
| **Income from Investment Operations:** | | | | |
| Net investment income[(b)] | 0.99 | 1.04 | 1.33 | 0.24 |
| Net realized and unrealized gain | 1.93 | (1.36) | 0.48 | 0.59 |
| Total from investment operations | 2.92 | (0.32) | 1.81 | 0.83 |
| **Less Distributions Declared to Shareholders:** | | | | |
| From net investment income | (0.97) | (1.33) | (1.44) | (0.21) |
| From net realized gains | (0.48) | — | (0.21) | — |
| Total distributions declared to shareholders | (1.45) | (1.33) | (1.65) | (0.21) |
| **Net Asset Value, End of Period[(c)]** | $ 20.55 | $ 19.08 | $ 20.73 | $ 20.57 |
| Total Return[(c)(d)] | 15.40% | (2.17)% | 9.12% | 4.17%[(e)] |
| **Ratios to Average Net Assets[(f)] / Supplemental Data:** | | | | |
| Net assets, end of period (in 000's) | $17,837 | $13,132 | $ 8,011 | $ 7,279 |
| Gross operating expenses[(g)] | 4.09% | 3.94% | 4.60% | 11.26% |
| Net investment income (loss) | 4.80% | 5.08% | 6.44% | 2.45% |
| Portfolio turnover rate | 39% | 49% | 99% | 14%[(e)] |
| Average commission rate paid[(h)] | $0.0222 | $0.0111 | $0.0155 | $0.0295 |

(a) Class commenced operations on July 1, 2016.
(b) Net investment income per share was calculated using average shares outstanding during the period.
(c) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(d) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(e) Not annualized.
(f) All ratios for the period have been annualized, unless otherwise indicated.
(g) Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[(a)] |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 2.30% | 2.13% | 1.87% | 1.83% |
| Interest expense and commitment fees | 0.76% | 0.22% | — % | — % |
| Dividends and fees on securities sold short | — % | 0.08% | — % | — % |

(h) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| Borrowings at end of year | | | | | |
| Aggregate Amount Outstanding | 2,988,000 | 6,036,000 | 3,966,000 | 29,000 | 31,000 |
| Asset Coverage Per $1,000 | 12,551.77 | 771.07 | 1,036.22 | 832,099.72 | 542,072.06 |

| | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|
| Borrowings at end of period | | | | |
| Aggregate Amount Outstanding including Preferred Shares | 6,459,135 | 3,354,013 | — | — |
| Asset Coverage Per $1,000 | 4,137.16 | 5,191.05 | N/A | N/A |

Amounts designated as "—" are zero or have been rounded to zero.

## THE FUND

The Fund is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund. The Fund was organized as a Delaware statutory trust on January 11, 2016. The Fund's principal office is located at 300 Crescent Court, Suite 700, Dallas, Texas 75201, and its telephone number is (833) 697-6246.

## USE OF PROCEEDS

The net proceeds of the continuous offering of shares will be invested in accordance with the Fund's investment objective and policies (as stated below) as soon as practicable after receipt. The Fund will pay its organizational and offering expenses incurred with respect to its initial and continuous offering, less amounts advanced pursuant to the Expense Limitation Agreement. Since February 9, 2018, NexPoint Advisors, L.P., the Fund's investment adviser (the "Adviser" or "NexPoint") has paid or reimbursed the Fund's organizational and offering expenses incurred with respect to its initial and continuous offering and will not seek recoupment of such fees. Pending investment of net proceeds in accordance with the Fund's investment objective and policies, the Fund will invest in money market or short-term, high quality fixed-income mutual funds. Investors should expect, therefore, that before the Fund has fully invested the proceeds of the offering in accordance with its investment objective and policies, the Fund's assets would earn interest income at a modest rate which may be less than the Fund's distribution rate. The Fund's distributions may exceed its earnings and profits. As a result, a portion of the distributions the Fund makes may represent a return of capital for tax purposes. A return of capital is a return of your investment rather than a return of earnings or gains derived from our investment activities. Any invested capital that is returned to shareholders will be reduced by the Fund's fees and expenses, as well as the applicable sales load, which is non-refundable to its shareholders.

INVESTMENT OBJECTIVE, POLICIES AND STRATEGIES

**Investment Objective and Policies**

***Investment Objective.*** The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective. The Fund's investment objective is non-fundamental and may be changed by the Board of Trustees (the "Board") without shareholder approval. Shareholders will, however, receive at least 60 days' prior notice of any change in this investment objective.

***Investment Strategy.*** The Fund pursues its investment objective by investing, under normal circumstances, at least 80% of its assets in "real estate and real estate-related securities" (as defined below). In particular, the Fund will pursue its investment objective by investing the Fund's assets primarily in: (1) commercial mortgage-backed securities ("CMBS") and residential mortgage-backed securities ("RMBS"); (2) direct preferred equity and mezzanine investments in real properties; (3) equity securities of public (both traded and non-traded) and private debt and equity real estate investment trusts ("REITs") and/or real estate operating companies ("REOCs"); and (4) opportunistic and value added direct real estate strategies. The Fund will effect its direct real estate strategy through investments in one or more REIT subsidiaries, including through the REIT Subsidiaries, which were formed on July 8, 2016 and June 6, 2022, respectively. The REIT Subsidiaries entered into separate investment advisory agreements with the Adviser concurrent with their formation. Preferred equity and mezzanine investments in real estate transactions come in various forms which may or may not be documented in the borrower's organizational documents. Generally, real estate preferred equity and/or mezzanine investments are typically junior to first mortgage financing but senior to the borrower's or sponsor's equity contribution. The investments are typically structured as an investment by a third-party investor in the real estate owner or various

affiliates in the chain of ownership in exchange for a direct or indirect ownership interest in the real estate owner entitling it to a preferred/priority return on its investment. Sometimes, the investment is structured much like a loan where: (i) "interest" on the investment is required to be paid monthly by the "borrower" regardless of available property cash flow; (ii) the entire investment is required to be paid by a certain maturity date; (iii) default rate "interest" and penalties are assessed against the "borrower" in the event payments are not made timely; and (iv) a default in the repayment of investment potentially results in the loss of management.

In addition, subject to the 15% Limitation, the Fund may invest up to 20% of its total assets in equity or debt securities other than real estate and real estate-related securities. The Adviser will evaluate each opportunity within the context of where the Adviser believes the various real estate subsectors are within the broader real estate cycle and tactically allocate among these opportunities. The Adviser has broad discretion to allocate the Fund's assets among these investment categories and to change allocations as conditions warrant. Also, the Adviser will select investments it believes offer the best potential outcomes and relative risk to assemble the most appropriate portfolio to meet the risk-adjusted return goals of the Fund.

This portfolio construction strategy seeks to: (i) recognize and allocate capital based upon where the Adviser believes we are in the current real estate cycle; and (ii) minimize drawdowns during market downturns and maximize risk adjusted returns during all market cycles, though there can be no assurance that this strategy will achieve this objective. The Fund will rely on the expertise of the Adviser and its affiliates to determine the appropriate structure for structured credit investments, which may include bridge loans, common and preferred equity or other debt-like positions, as well as the acquisition of such instruments from banks, servicers or other third parties.



The Fund defines "real estate and real estate-related securities" to consist of common stock, convertible or non-convertible preferred stock, warrants, convertible or non-convertible secured or unsecured debt, and partnership or membership interests issued by:

- CMBS, RMBS and other real estate credit investments, which include existing first and second mortgages on real estate, either originated or acquired in the secondary market, and secured, unsecured and/or convertible notes offered by REOCs and REITs;
- Public REITs;
- REOCs;
- Private Real Estate Investment Funds;
- Public Investment Funds;
- Real estate ETFs; and
- Non-Traded REITs and private REITs, generally wholly-owned by the Fund or wholly-owned or managed by an affiliate.

REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests, and REOCs are companies that invest in real estate and whose shares trade on public exchanges. Foreign REIT equivalents are entities located in jurisdictions that have adopted legislation substantially similar to the REIT tax provisions in that they provide for favorable tax treatment for the foreign REIT equivalent and require distributions of income to shareholders.

The Fund has not imposed limitations on the portion of its assets that may be invested in any of the categories outlined above other than Private Real Estate Investment Funds. The Fund, however, will limit its investments in Private Real Estate Investment Funds and any other investments that are excluded from the definition of "investment company" under the 1940 Act by Section 3(c)(1) or Section 3(c)(7) of the 1940 Act to no more than 15% of its net assets (the "15% Limitation"). Such entities are typically private equity funds and hedge funds.

This limitation does not apply to any collateralized loan obligations ("CLOs"), certain of which may rely on Section 3(c)(1) or 3(c)(7) of the 1940 Act. For purposes of compliance with the 15% Limitation, the Fund will not count its direct investments in wholly-owned subsidiaries but will look through such subsidiaries and count their underlying holdings. The Fund may engage in short sales and securities lending.

***Leverage.*** The Fund incurs leverage as part of its investment strategy. There can be no assurance that any leveraging strategy the Fund employs will be successful during any period in which it is employed. The Fund may also invest in Private Real Estate Investment Funds, Public REITs, REOCs and Non-Traded REITs, which may incur higher levels of leverage. Accordingly, the Fund through these investments may be exposed to higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement.

In addition to any indebtedness incurred by the Fund, any subsidiary of the Fund, including the REIT Subsidiaries, may also utilize leverage, including by mortgaging properties held by special purpose vehicles, or by acquiring property with existing debt. Any such borrowings will generally be the sole obligation of each respective special purpose vehicle, without any recourse to any other special purpose vehicle, the REIT Subsidiaries, the Fund or its assets, and the Fund will not treat such non-recourse borrowings as senior securities (as defined in the 1940 Act) for purposes of complying with the 1940 Act's limitations on leverage unless the financial statements of the special purpose vehicle, or the subsidiary of the Fund that owns such special purpose vehicle, will be consolidated in accordance with Regulation S-X and other accounting rules. If cash flow is



insufficient to pay principal and interest on a special purpose vehicle's borrowings, a default could occur, ultimately resulting in foreclosure of any security instrument securing the debt and a complete loss of the investment, which could result in losses to the REIT Subsidiaries and, therefore, to the Fund. To the extent that any subsidiaries of the Fund, including the REIT Subsidiaries, directly incur leverage in the form of debt (as opposed to non-recourse borrowings made through special purpose vehicles), the amount of such recourse leverage used by the Fund and such subsidiaries, including the REIT Subsidiaries, will be consolidated and treated as senior securities for purposes of complying with the 1940 Act's limitations on leverage by the Fund.

***Policies.*** The Fund's Statement of Additional Information ("SAI") contains a list of all of the fundamental and non-fundamental investment policies of the Fund, under the heading "Investment Objective and Policies."

***Actively-Managed Liquid Real Estate Securities***

Fears of broader equity market volatility, and uncertain interest rates has created opportunities in publicly traded REITs. Deceleration in net operating income growth expectations in certain sectors, rising financing costs and tighter lending conditions have made it more difficult for public REITs to grow net asset value or make accretive acquisitions. These changes in investors expectations and the way in which public REITs capitalize their investments

has lead to discounts of public REIT shares compared to the private market values of the real estate in which they own for a number of property sectors. Amidst this backdrop of underlying discount to net asset, the Adviser believes that: (i) opportunities to purchase traded REITs and source public and private debt will remain more attractive than purchasing property directly; and (ii) in the near term, investors seeking exposure to real estate should allocate to defensive, risk-adjusted strategies. Over the near term, the Adviser will seek to actively source and manage these opportunities on behalf of the Fund in such a way as to attempt to maximize risk adjusted yields and total return across a full real estate market cycle.

Because of the large discounts between what properties could be sold for in the private markets versus where they trade in the public markets, the Adviser believes a near term opportunity exists to purchase equity interests in certain property types at inherent discounts to the Adviser's large and sophisticated equity team has decades of expertise in identifying and executing deep value and value type investments. These resources may be utilized by the Fund to identify and profit from dislocations in the public equity REIT markets.

***Actively-Managed Private Real Estate Securities***

Although commercial property prices in select markets have roughly doubled since their 2009 trough, the dislocation (or, mispricing of assets) in the real estate debt markets, which emerged as a by-product of the larger global credit crisis and the ensuing recession, provided opportunities for sophisticated investors as borrowers were being held to stricter lending criteria. The ensuing gap between what lenders are willing to lend and what sponsors are willing to put up in equity capital, is also a byproduct of cyclical patterns and investors' evolving return expectations — leveraged private investors can no longer easily expect to generate mid-to-high teen leveraged internal rates of return to hit or exceed return hurdles that allow sponsors to maximize their promote fees. Thus, the Adviser believes demand for real estate debt and preferred equity financing significantly outweighs the supply of such product, and that this imbalance creates inefficiency and provides the Fund an opportunity for attractive lending opportunities secured or supported by real estate asset values. Please see "Investment Strategy" for a description of the types of preferred equity and mezzanine investments the Fund may make.

The Adviser expects these opportunistic investment opportunities to continue in both the private and public real estate markets, at least for the medium-term, and that the volume of potential deal flow is likely to be very material (based on the experience of the Adviser). In sum, the Fund will seek to allocate capital to each area of the market where dislocation is persisting and in the Adviser's opinion, unwarranted. Additionally, the Adviser believes that as the real estate cycle nears the top of the Expansion phase and begins to enter the Early Downturn



phase, there will be a convergence emerging between capitalization rates of core (high quality properties located in historically strong markets that generally do not require upgrades or renovations) and value add (properties that are high quality but whose value can increase through some event, such as upgrades or renovations) real estate assets that will allow the Fund to selectively and strategically find opportunities to purchase high quality core properties at capitalization rates similar to value add properties.

**Investment Highlights**

***Fully Integrated Platform — One Sponsor.*** The Fund has access to NexPoint and its affiliates' fully integrated commercial finance, investment, management, and servicing platform. The resources available to the investment team provide the capability to pursue complex transactions in an efficient and expeditious manner and should enhance the Fund's ability to engage in "one-off" opportunities due to NexPoint's strong presence in the real estate sector. The investment approach is developed, executed and managed by a seasoned team of professionals that have generated superior returns in real estate investing, all under one platform. As a result, the Adviser is more accountable directly to the Fund and its shareholders by directly managing Fund investments in most cases while charging the Fund a single layer of fees (fees paid to entities managed by an affiliate will be rebated back to the Fund. See "Management of the Fund — Investment Adviser").

***Experienced Investment Team.*** The management team available to the Fund has an extensive history of underwriting, originating, purchasing, and servicing debt secured by commercial real estate and purchasing direct real estate investments. NexPoint and its affiliates invest in various credit and equity strategies through, REITs, DST 1301 exchange, non-traded funds, publicly traded funds, closed-end funds, mutual funds and an ETF, and manages strategies such as direct real estate, real estate credit and originated or structured real estate credit investments. Together with its affiliates, NexPoint had approximately $16.9 billion in assets under management as of December 31, 2024.

***Reduced Exposure to Downturns.*** If the real estate markets deteriorate, the Adviser believes that its strategies should generally reduce the Fund's exposure to market downturns. Through its preferred equity investments and direct real estate strategies (i.e., ownership through wholly-owned REITs), the Adviser believes that it should be able to eliminate the common equity investments in the underlying properties by taking control of the properties and owning the underlying assets at 60-80% of the improved cost, thereby creating a hedge against market downturns. The public debt and equity positions will be subject to market movements.

***Strategy for All Market Cycles.*** The Fund's strategy, as devised by the Adviser, is designed to produce potentially superior total returns, high yields and capital preservation over all market cycles; however, there is no guarantee that the Adviser will produce these results during all market conditions. The Adviser continuously analyzes the real estate markets, both geographically and across each sector, and determines where in the cycle each sector is. Based on this determination, the Adviser allocates capital to sectors and within the capital structure of real estate investments it deems will produce the best investment results. In this way, the Adviser attempts to limit drawdowns by creating a "hedge" when the real estate cycle is in a downturn.

***Unique Market Opportunity for Liquid Real Estate Securities.*** The Adviser believes that the current discounts to underlying net asset values of public REITs presents a unique opportunity for astute real estate investors. Additionally, the low capitalization rate environment and volume of refinancing transactions set to take place in the next few years will potentially allow the Fund to originate credit and preferred equity investments to high quality operators backed by high quality properties. The Fund's investment approach will include fundamental company analysis, with detailed property-level underwriting with particular attention to the management team's capital allocation.

***History as a Fiduciary.*** In addition to making capital decisions to maximize returns for investors, NexPoint fosters a culture of fiduciary responsibility throughout the company. NexPoint has invested substantial sums directly in real estate and real estate credit investments. It has extensive experience in converting debt

investments into equity and working out distressed real estate situations. These capabilities will be utilized for the benefit of the Fund. Members of the Fund's management team also operate: externally managed publicly traded REITs, NexPoint Residential Trust, Inc. ("NXRT"), that manages a portfolio of Class B, value add multifamily properties, and NexPoint Diversified Real Estate Trust ("NXDT"); VineBrook Homes Trust, Inc., an externally managed private REIT that manages a portfolio of single-family housing properties in the Midwest U.S. ("VineBrook"); NexPoint Hospitality Trust, an externally managed publicly traded REIT ("NHT") listed on

the TSX Venture Exchange, that manages a portfolio of hospitality assets located in the U.S; NexPoint Real Estate Finance, Inc., an externally managed publicly traded mortgage REIT ("NREF"); NexPoint Storage Partners, Inc. ("NSP"), an externally managed private REIT that manages a portfolio of self-storage facilities nationwide; and multiple a private REITs which are wholly-owned by closed-end registered investment companies affiliated with the Fund.

***Access to a Large Investment Platform.*** Through NexPoint and its affiliates, the Fund has access to a fully integrated investment platform that, as of December 31, 2024, had acquired more than $16.9 billion across multiple strategies and product types up and down the capital stack, and owned approximately $12.5 billion in gross real estate assets. NexPoint's position in the markets gives it access to unique sourcing opportunities for investments not typically available to retail investors in a registered fund product.

NexPoint is a select sponsor with Freddie Mac and has experience structuring financing solutions behind first mortgage lenders, including banks, life insurance companies, Freddie Mac and the Federal National Mortgage Association, or Fannie Mae, including mezzanine loans and preferred equity investments. NexPoint and its affiliates have successfully tailored financing solutions for property owners in creative and highly symbiotic ways with respect to a typical Freddie Mac or Fannie Mae first mortgage. NexPoint's multifamily loan and investment platform complies with current Freddie Mac and Fannie Mae standards, giving the Fund a unique opportunity to invest alongside quality sponsors and the largest multifamily lenders in the U.S.

**Investment Selection, Diversification and Criteria Used in Selecting Investments**

***Investment Selection.*** The Fund's assets will be primarily public and private debt, equity and preferred equity investments, originated by the Adviser. The Adviser sources investments through its public and private market research and exposure, third party brokerages, current partners and financing intermediaries. The Fund expects that a majority of its private investments will be held in special purpose entities, which may be joint ventures with a third party (whether wholly owned or a joint venture, a "Subpartnership") and managed by the Adviser or an affiliate of the Adviser. Performing debt and preferred equity investments will generally provide current income from periodic interest payments. There can be no assurance that any or all of the Fund's investment strategies will be successful.

The Adviser will utilize its in-house experience and third party experts to continuously analyze the real estate markets to determine the point at which the real estate cycle is at any given moment. The Adviser cannot provide any assurance that its assessments of when real estate sectors are at the top or bottom will be correct or that it will accurately assess when the real estate cycle is moving between different phases. However, the Adviser believes that NexPoint's position in various investment markets, its high quality investment staff, its access to third party research and other experts gives it an educated view on the real estate market.

***Financing Strategy.*** The Adviser may elect in the future for the Fund to obtain one or more credit facilities with financial institutions, which may be secured by the Fund's investments. The intent of these borrowings will be to generate positive returns in excess of the costs associated with such borrowings. In addition, or alternatively, the Adviser may seek to leverage investments on a case-by-case basis. The Fund is authorized to borrow money in connection with its investment activities, subject to the limits of the asset coverage requirement of the 1940 Act. The Fund also may borrow money to satisfy repurchase requests from Fund shareholders and to otherwise provide the Fund with temporary liquidity. The 1940 Act requires a registered investment company to satisfy an

asset coverage requirement of 300% of its indebtedness, including amounts borrowed, and measured at the time indebtedness occurs. This means that the value of the Fund's total indebtedness may not exceed one-third of the value of its total assets, including the value of the assets purchased with the proceeds of its indebtedness. Private and Public Real Estate Investment Funds, REITs and REOCs may utilize leverage in their investment activities. However, such entities' borrowings are not subject to the asset coverage requirement of the Fund. Accordingly, the Fund, through its investments in such entities, may be exposed to the risk of leveraged investment programs.

There can be no assurance that any or all of the Fund's investment strategies will be successful. See "Principal Risks of the Fund — Leverage Risk" in the Prospectus for a brief description of the Fund's Repurchase Agreement with Mizuho.

***Diversification of Asset Managers.*** On occasion, and when investing in private debt and/or equity, the Fund may identify and invest side-by-side with one or more unaffiliated asset managers in investment opportunities sourced by such manager with expertise in managing portfolios of real estate. Using information generally available to investors, the Adviser will evaluate asset managers based on their experience, track record, current portfolios, and ability to weather real estate cycles by employing effective risk management and mitigation strategies.

***Other Information Regarding Investment Strategy.*** The Fund may, from time to time, take defensive positions that are inconsistent with the Fund's principal investment strategy in attempting to respond to adverse market, economic, political or other conditions. During such times, the Adviser may determine that the Fund should invest up to 100% of its assets in cash or cash equivalents, consisting of money market instruments, prime commercial paper, repurchase agreements, Treasury bills and other short-term obligations of the U.S. Government, its agencies or instrumentalities. In these and in other cases, the Fund may not achieve its investment objective. The Adviser may invest the Fund's cash balances in any investments it deems appropriate. The Adviser expects that such investments will be made, without limitation and as permitted under the 1940 Act, in money market funds, repurchase agreements, U.S. Treasury and U.S. agency securities, municipal bonds and bank accounts. Any income earned from such investments is ordinarily reinvested by the Fund in accordance with its investment program. Many of the considerations entering into recommendations and decisions of the Adviser and the Fund's portfolio managers are subjective.

The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025.

The Fund has no intent to use leverage through the issuance of preferred shares during the next twelve months. However, the Board may decide to issue preferred shares in the future, subject to the asset coverage requirements of the 1940 Act, which generally require that a fund have asset coverage of at least 300% of the issue size. The Fund may borrow for investment purposes, for temporary liquidity, or to finance repurchases of its shares, as permitted under the 1940 Act. In addition, the Fund may be deemed to incur economic leverage embedded in instruments in which it may invest.

The frequency and amount of portfolio purchases and sales (known as the "portfolio turnover rate") will vary from year to year. It is anticipated that the Fund's portfolio turnover rate will ordinarily be between 25% and 75%. The portfolio turnover rate is not expected to exceed 100%, but may vary greatly from year to year and will not be a limiting factor when the Adviser deems portfolio changes appropriate. Although the Fund generally does not intend to trade for short-term profits, the Fund may engage in short-term trading strategies, and securities may be sold without regard to the length of time held when, in the opinion of the Adviser, investment considerations warrant such action. These policies may have the effect of increasing the annual rate of portfolio turnover of the Fund. Higher rates of portfolio turnover would likely result in higher brokerage commissions and may generate short-term capital gains taxable as ordinary income. If securities are not held for certain applicable holding periods, dividends paid on them will not qualify for the advantageous federal tax rates applicable to

"qualified dividend income" under the Internal Revenue Code of 1986, as amended (the "Code"). For the fiscal year ended December 31, 2024, the Fund's portfolio turnover rate was 13%. There is no assurance what portion, if any, of the Fund's distributions will qualify to be treated as "qualified dividend income" under the Code and thus taxable to individual shareholders at the rate applicable to long-term capital gain. See "U.S. Federal Income Tax Matters."

**Portfolio Investments**

The Fund may invest in the following types of securities, subject to certain limitations as set forth below. The Fund is under no obligation to invest in any of these securities:

***Mortgage-Backed Securities.*** The Fund may invest in mortgage-backed securities. Common examples of mortgage-backed securities include CMBS and RMBS. Mortgage-backed securities differ from conventional debt securities because principal is paid back over the life of the security rather than at maturity. The Fund may receive unscheduled prepayments of principal before the security's maturity date due to voluntary prepayments, refinancings, or foreclosures on the underlying mortgage loans. To the Fund this means a loss of anticipated interest and a portion of its principal investment represented by any premium the Fund may have paid. Mortgage prepayments generally increase when interest rates fall. Collateralized Mortgage Obligations ("CMOs") are obligations fully collateralized by a portfolio of mortgages or mortgage-related securities. Payments of principal and interest on the mortgages are passed through to the holders of the CMOs on the same schedule as they are received, although certain classes of CMOs have priority over others with respect to the receipt of prepayments on the mortgages. Therefore, depending on the type of CMOs in which the Fund invests, the investment may be subject to a greater or lesser risk of prepayment than other types of mortgage-related securities.

Mortgage-backed securities also are subject to extension risk, which is when rising interest rates can cause mortgage-backed security's average maturity to lengthen unexpectedly due to a drop in mortgage prepayments. This will increase a mortgage-backed security's sensitivity to rising interest rates and its potential for price declines.

CMBS are a type of mortgage-backed security that is secured by a single commercial mortgage loan or a pool of commercial real estate loans. Like all mortgage-backed securities, CMBS are subject to all of the risks of the underlying mortgage loans. Because they are not standardized, CMBS can be difficult to value. Commercial real estate loans are secured by multifamily or commercial property and are subject to risks of delinquency and foreclosure. The ability of a borrower to repay a loan secured by an income-producing property typically is dependent primarily upon the successful operation of such property rather than upon the existence of independent income or assets of the borrower. If the net operating income of the property is reduced, the borrower's ability to repay the loan may be impaired. Net operating income of an income-producing property can be affected by, among other things: tenant mix, success of tenant businesses, property management decisions, property location and condition, competition from comparable types of properties, changes in laws that increase operating expenses or limit rents that may be charged, any need to address environmental contamination at the property, the occurrence of any uninsured casualty at the property, changes in national, regional or local economic conditions and/or specific industry segments, declines in regional or local real estate values, declines in regional or local rental or occupancy rates, increases in interest rates, real estate tax rates and other operating expenses, and changes in governmental rules, regulations and fiscal policies, including environmental legislation, natural disasters, terrorism, social unrest and civil disturbances.

RMBS are a type of mortgage-backed security that is backed by mortgages on residential real estate. Credit-related risk on RMBS arises from losses due to delinquencies and defaults by the borrowers in payments on the underlying mortgage loans and breaches by originators and servicers of their obligations under the underlying documentation pursuant to which the RMBS are issued. The rate of delinquencies and defaults on residential mortgage loans and the aggregate amount of the resulting losses will be affected by a number of factors, including general economic conditions, particularly those in the area where the related mortgaged property is located, the level of the borrower's equity in the mortgaged property and the individual financial circumstances of the borrower. If a residential

mortgage loan is in default, foreclosure on the related residential property may be a lengthy and difficult process involving significant legal and other expenses. The net proceeds obtained by the holder on a residential mortgage loan following the foreclosure on the related property may be less than the total amount that remains due on the loan. The prospect of incurring a loss upon the foreclosure of the related property may lead the holder of the residential mortgage loan to restructure the residential mortgage loan or otherwise delay the foreclosure process.

The Fund may also invest in the residual or equity tranches of CMBS, which are referred to as subordinate CMBS and interest-only CMBS. Subordinate CMBSs are paid interest only to the extent that there are funds available to make payments. To the extent the collateral pool includes a large percentage of delinquent loans, there is a risk that interest payment on subordinate CMBSs will not be fully paid. There are multiple tranches of CMBS, offering investors various maturity and credit risk characteristics. Tranches are categorized as senior, mezzanine, and subordinated/equity, according to their degree of risk. The most senior tranche of a CMBS has the greatest collateralization and pays the lowest interest rate. If there are defaults or the collateral otherwise underperforms, scheduled payments to senior tranches take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. Lower tranches represent lower degrees of credit quality and pay higher interest rates intended to compensate for the attendant risks. The return on the lower tranches is especially sensitive to the rate of defaults in the collateral pool. The lowest tranche (i.e. the “equity” or “residual” tranche) specifically receives the residual interest payments (i.e., money that is left over after the higher tranches have been paid and expenses of the issuing entities have been paid) rather than a fixed interest rate. The Fund expects its investments in subordinate CMBSs will be subject to risks arising from delinquencies and foreclosures, thereby exposing the Fund’s investment portfolio to potential losses. Subordinate securities of CMBSs are also subject to greater credit risk than those CMBSs that are more highly rated. The Fund also may invest in interest-only multifamily CMBS issued by multifamily mortgage loan securitizations. However, these interest-only multifamily CMBS typically only receive payments of interest to the extent that there are funds available in the securitization to make the payment and may introduce increased risks since these securities have no underlying principal cash flows.

In the event of any default under a mortgage loan held by the Fund, the Fund will bear a risk of loss of principal to the extent of any deficiency between the value of the collateral and the principal and accrued interest of the mortgage loan. Foreclosure of a mortgage loan can be an expensive and lengthy process that could have a substantial negative effect on anticipated returns on the foreclosed mortgage loan.

If the Fund makes or invests in mortgage loans and there are defaults under those mortgage loans, the Fund may not be able to repossess and sell the underlying properties in a timely manner. The resulting time delay could reduce the value of the investment in the defaulted mortgage loans.

Investments in commercial real estate loans are subject to changes in credit spreads. When credit spreads widen, the economic value of such investments decrease. Even though a loan may be performing in accordance with its loan agreement and the underlying collateral has not changed, the economic value of the loan may be negatively impacted by the incremental interest foregone from the widened credit spread.

The value of mortgage-backed securities may change due to shifts in the market’s perception of issuers and regulatory or tax changes adversely affecting the mortgage securities market as a whole. Mortgage-backed securities are also subject to several risks created through the securitization process. Subordinate mortgage-backed securities are paid interest only to the extent that there are funds available to make payments. To the extent the collateral pool includes delinquent loans, there is a risk that the interest payment on subordinate mortgage-backed securities will not be fully paid. Subordinate mortgage-backed securities are also subject to greater credit risk than those mortgage-backed securities that are more highly rated.

***Real Estate Investment Trusts (REITs).***

The Fund intends to invest in public (including non-traded REITs) and private REITs. When investing in private or non-traded REITs, the investments will be primarily in REITs wholly-owned by the Fund and managed by an affiliate or in REITs not wholly-owned by the Fund but managed by an affiliate. REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests. REITs are subject to risks similar to those associated with direct ownership of real estate (including loss to casualty or condemnation, increases in property taxes and operating expenses, zoning law amendments, changes in interest rates, overbuilding and increased competition, variations in market value, adverse changes in the real estate

markets generally or in specific sectors of the real estate industry and possible environmental liabilities), as well as additional risks discussed below.

REITs are generally classified as equity REITs, mortgage REITs or a combination of equity and mortgage REITs. Equity REITs invest the majority of their assets directly in real property and derive income primarily from the collection of rents. Equity REITs can also realize capital gains by selling properties that have appreciated in value. Mortgage REITs invest the majority of their assets in real estate mortgages and derive income from the collection of interest payments. REITs are not taxed on income distributed to shareholders provided they comply with the applicable requirements of the Code. The Fund will indirectly bear its proportionate share of any management and other expenses paid by REITs in which it invests in addition to the expenses paid by the Fund. Debt securities issued by REITs are, for the most part, general and unsecured obligations and are subject to risks associated with REITs.

Investing in REITs involves certain unique risks in addition to those risks associated with investing in the real estate industry in general. An equity REIT may be affected by changes in the value of the underlying properties owned by the REIT. A mortgage REIT may be affected by changes in interest rates and the ability of the issuers of its portfolio mortgages to repay their obligations. REITs are dependent upon the skills of their managers and are not diversified. REITs are generally dependent upon maintaining cash flows to repay borrowings and to make distributions to shareholders and are subject to the risk of default by lessees or borrowers. REITs whose underlying assets are concentrated in properties used by a particular industry, such as health care, are also subject to risks associated with such industry. REITs are often leveraged or invest in properties that are themselves leveraged, exposing them to the risks of leverage generally. Among other things, leverage will generally increase losses during periods of real estate market declines.

REITs (especially mortgage REITs) are also subject to interest rate risks. When interest rates decline, the value of a REIT's investment in fixed rate obligations can be expected to rise. Conversely, when interest rates rise, the value of a REIT's investment in fixed rate obligations can be expected to decline. If the REIT invests in adjustable rate mortgage loans the interest rates on which are reset periodically, yields on a REIT's investments in such loans will gradually align themselves to reflect changes in market interest rates. This causes the value of such investments to fluctuate less dramatically in response to interest rate fluctuations than would investments in fixed rate obligations.

REITs may have limited financial resources, may trade less frequently and in a more limited volume and may be subject to more abrupt or erratic price movements than larger company securities.

The Fund's strategy for investing in publicly traded REITs is to take advantage of situations where the REIT is trading at a discount to the fair value of the REITs underlying properties as determined by the Adviser as well as gaining exposure to certain real estate sectors with an element of liquidity. The Fund may also invest in publicly traded REITs that are commonly referred to as "mortgage REITs" that invest in various debt investments collateralized or secured by real estate. The Fund will invest in publicly traded mortgage REITs to gain exposure to real estate credit investments that are trading at a discount to inherent value of the underlying debt, as determined by the Adviser.

Effective for taxable years beginning after December 31, 2017 and before January 1, 2026, the Code generally allows individuals and certain other non-corporate entities a deduction for 20% of qualified REIT dividends. Regulations allow a RIC to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met. As a result, a shareholder in the Fund will be eligible to receive the benefit of the same 20% deduction with respect to qualified REIT dividends included in Fund distributions that is available to direct investors in REITs.

Dividends paid by REITs will generally not qualify for the reduced federal income tax rates applicable to qualified dividends under the Code. See "U.S. Federal Income Tax Matters."

***Closed-End Funds.***

The Fund may invest its assets in "closed-end" investment companies (or "closed-end funds") that invest, directly or indirectly, in real estate, especially where discounts to net asset values are present. A core strategy of the Fund is to take advantage of dislocations in various markets, as determined by the Adviser, where the Adviser believes a near-term catalyst exists for the discount to narrow.

The Fund generally will purchase shares of closed-end funds in the secondary market. The Fund will incur normal brokerage costs on such purchases similar to the expenses the Fund would incur for the purchase of securities of any other type of issuer in the secondary market. The Fund may, however, also purchase securities of a closed-end fund in an initial public offering when, in the opinion of the Adviser, based on a consideration of the nature of the closed-end fund's proposed investments, the prevailing market conditions and the level of demand for such securities, they represent an attractive opportunity for growth of capital. The initial offering price typically will include a dealer spread paid to the underwriter, which may be higher than the applicable brokerage cost if the Fund purchased such securities in the secondary market.

***Private Real Estate Investment Funds and Public Investment Funds.***

Although the Fund does not anticipate investing a large percentage of the Fund's capital in unaffiliated Private Real Estate Investment Funds, the Adviser may allocate capital to these investments on an opportunistic basis. The Fund will limit its investments in Private Real Estate Investment Funds and any other investments that are excluded from the definition of "investment company" under the 1940 Act by Section 3(c)(1) or Section 3(c)(7) of the 1940 Act to no more than 15% of its net assets (the "15% Limitation"). Such entities are typically private equity funds and hedge funds. For purposes of compliance with the 15% Limitation, the Fund will not count its direct investments in wholly-owned subsidiaries but will look through such subsidiaries and count their underlying holdings. The Fund may also invest in Public Investment Funds that are trading at discounts to net asset values. Private Real Estate Investment Funds and Public Investment Funds may employ a wide variety of investment strategies, including:

- *Diversified Equities.* A long/short investment strategy of investing in equity, equity-related and other securities.
- *Debt and Equity Opportunities.* A long/short investment strategy in corporate debt and equity securities of leveraged companies and financially distressed firms and other investments.
- *Credit Opportunities.* A long/short investment strategy in corporate debt and equity securities to capture credit opportunities in all market environments.
- *Structured Credit.* A long/short investment strategy in structured mortgage-backed securities.
- *Managed Futures.* A strategy that generates returns from convergent and divergent trends in the financial and currency futures markets.

***Real Estate Operating Companies.***

The Fund intends to invest in REOCs. REOCs are companies that invest in real estate and whose shares trade on public exchanges. The market value of REOC shares and the ability of REOCs to distribute income may be adversely affected by the same factors as those described above for REITs. However, REOCs differ from REITs in that dividends received by REOC shareholders are taxed similar to dividends of a standard corporation, REOCs have less investment limitations and investments can be funded with internally generated funds without penalty (i.e., forfeiting tax advantages), and REOCs do not need to hire outside management for certain assets such as hotels.

***Repurchase Agreements.***

The Fund may invest up to 33 1/3% of its assets in repurchase agreements. It may enter into repurchase agreements with broker-dealers, member banks of the Federal Reserve System and other financial institutions.

Repurchase agreements are loans or arrangements under which the Fund purchases securities and the seller agrees to repurchase the securities within a specific time and at a specific price. The repurchase price is generally higher than the Fund's purchase price, with the difference being income to the Fund. Under the direction of the Board, the Adviser reviews and monitors the creditworthiness of any institution which enters into a repurchase agreement with the Fund. The counterparty's obligations under the repurchase agreement are collateralized with U.S. Treasury and/or agency obligations with a market value of not less than 100% of the obligations, valued daily. Collateral is held by the Fund's custodian in a segregated, safekeeping account for the benefit of the Fund. Repurchase agreements afford the Fund an opportunity to earn income on temporarily available cash at relatively low risk. In the event of commencement of bankruptcy or insolvency proceedings with respect to the seller of the security before repurchase of the security under a repurchase agreement, the Fund may encounter delay and incur costs before being able to sell the security. Such a delay may involve loss of interest or a decline in price of the security. If the court characterizes the transaction as a loan and the Fund has not perfected a security interest in the security, the Fund may be required to return the security to the seller's estate and be treated as an unsecured creditor of the seller. As an unsecured creditor, the Fund would be at risk of losing some or all of the principal and interest involved in the transaction.

***Reverse Repurchase Agreements.***

A reverse repurchase agreement is an investment technique under which the Fund sells an underlying debt security and simultaneously obtains the commitment of the purchaser (generally, a commercial bank or a broker or dealer) to sell the security back to the Fund at an agreed upon price on an agreed upon date. The repurchase price is generally higher than the Fund's sale price. Reverse repurchase agreements could involve certain risks in the event of default or insolvency of the other party, including possible delays or restrictions upon the Fund's ability to dispose of the underlying securities. An additional risk is that the market value of securities sold by the Fund under a reverse repurchase agreement could decline below the price at which the Fund is obligated to repurchase them. Reverse repurchase agreements will be considered borrowings by the Fund and as such would be subject to any restrictions on borrowing.

Reverse repurchase agreements are also generally subject to earmarking and coverage requirements, with the result that the Fund will designate on its books and records on an ongoing basis cash, U.S. government securities, or other liquid securities in an amount at least equal to the Fund's obligations under the reverse repurchase agreement.

***Exchange Traded Funds ("ETFs").***

Subject to the limitations on investment in other investment companies, the Fund may invest its assets in ETFs that invest primarily in real estate markets where investing directly would be cost prohibitive to the Fund or

inefficient. ETFs, such as SPDRs, NASDAQ 100 Index Trading Stock (QQQs), iShares and various country index funds, are funds whose shares are traded on a national securities exchange or the National Association of Securities Dealers' Automatic Quotation System (NASDAQ). Certain ETFs focus on the real estate sector and provide investors an opportunity to gain exposure to these sectors of the market. ETFs may be based on underlying equity or fixed income securities. SPDRs, for example, seek to provide investment results that generally correspond to the performance of the component common stocks of the S&P 500. ETFs do not sell individual shares directly to investors and only issue their shares in large blocks known as "creation baskets." The investor purchasing a creation basket may sell the individual shares on a secondary market. Therefore, the liquidity of ETFs depends on the adequacy of the secondary market. An ETF's investment objective may not be achieved. ETFs based on an index may not replicate and maintain exactly the composition and relative weightings of securities in the index, and for these and other reasons the returns of an ETF may diverge significantly from the index which it is designed to track. ETFs are subject to the risks of investing in the underlying securities. The Fund, as a holder of the securities of an ETF, will bear its pro rata portion of the ETF's expenses, including advisory fees. These expenses are in addition to the direct expenses of the Fund's own operations. The underlying indices that an ETF is designed to track may also experience volatility due to disruptive events, such as natural disasters, pandemic or epidemics or other widespread health crises. Any such impact could adversely affect the Fund's performance and may lead to losses on your investment in the Fund.

**RISK FACTORS**

An investment in the Fund's shares is subject to risks. The value of the Fund's investments will increase or decrease based on changes in the prices of the investments it holds. This will cause the value of the Fund's shares to increase or decrease. You could lose money by investing in the Fund. By itself, the Fund does not constitute a complete investment program. Before investing in the Fund you should consider carefully the following risks the Fund faces through its direct investments in real estate-related securities. The risks set out below are not the only risks the Fund faces, but they are the principal risks associated with an investment in the Fund as well as generally associated with investment in a fund with investment objectives, investment policies, capital structure or trading markets similar to the Fund's. Additional risks and uncertainties not currently known to the Fund or that are currently immaterial also may materially adversely affect the Fund's business, financial condition and/or operating results. If any of the following events occur, the Fund's business, financial condition and results of operations could be materially adversely affected.

***Substantial Conflicts of Interest.*** The Adviser and/or its general partner, limited partners, officers, affiliates and employees provide investment advice to other parties and manage other accounts and private investment vehicles similar to the Fund. For the purposes of this section, the term "NexPoint" shall include the Adviser and its affiliated investment advisors, and all affiliates listed on its Form ADV, as filed with the SEC March 28, 2025 (CRD No. 163564). In connection with such other investment management activities, the Adviser and/or its general partner, limited partners, officers, affiliates and employees may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Fund's monies, in a particular security or strategy. In addition, the Adviser and such other persons will determine the allocation of funds from the Fund and such other accounts to investment strategies and techniques on whatever basis they consider appropriate or desirable in their sole and absolute discretion.

NexPoint has built a professional working environment, a firm-wide compliance culture and compliance procedures and systems designed to protect against potential incentives that may favor one account over another. NexPoint has adopted policies and procedures that address the allocation of investment opportunities, execution of portfolio transactions, personal trading by employees and other potential conflicts of interest that are designed to ensure that all client accounts are treated equitably over time. Nevertheless, NexPoint furnishes advisory services to numerous clients in addition to the Fund, and NexPoint may, consistent with applicable law, make investment recommendations to other clients or accounts (including accounts that have performance or higher fees paid to NexPoint or in which portfolio managers have a personal interest in the receipt of such fees) that may be the same as or different from those made to the Fund. In addition, NexPoint, its affiliates and any of their partners, directors, officers, stockholders or employees may or may not have an interest in the securities whose purchase and sale the Adviser recommends to the Fund. Actions with respect to securities of the same kind may be the same as or different from the action that the Adviser, or any of its affiliates, or any of their partners, directors, officers, stockholders or employees or any member of their families may take with respect to the same securities. Moreover, the Adviser may refrain from rendering any advice or services concerning securities of companies of which any of the Adviser's (or its affiliates') partners, directors, officers or employees are directors or officers, or companies as to which the Adviser or any of its affiliates or partners, directors, officers and employees of any of them has any substantial economic interest or possesses material non-public information.

The Adviser, its affiliates or their partners, directors, officers or employees similarly serve or may serve other entities that operate in the same or related lines of business, including accounts managed by an investment adviser affiliated with the Adviser. Accordingly, these individuals may have obligations to investors in those entities or funds or to other clients, the fulfillment of which might not be in the best interests of the Fund. As a result, the Adviser will face conflicts in the allocation of investment opportunities to the Fund and other funds and clients. In order to enable such affiliates to fulfill their fiduciary duties to each of the clients for which they have responsibility, the Adviser will endeavor to allocate investment opportunities in a fair and equitable manner, pursuant to policies and procedures adopted by the Adviser and its advisory affiliates that are designed to manage potential conflicts of interest, which may, subject to applicable regulatory constraints, involve pro rata



co-investment by the Fund and such other clients or may involve a rotation of opportunities among the Fund and such other clients. The Fund will only make investments in which the Adviser or an affiliate hold an interest to the extent permitted under the 1940 Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Adviser and certain funds affiliated with the Fund, dated April 19, 2016. For example, exemptive relief is not required for the Fund to invest in syndicated deals and secondary loan market transactions in which the Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," including future closed-end investment companies registered under the 1940 Act that are managed by the Adviser, which includes the Fund. The Fund, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order. To mitigate any actual or perceived conflicts of interest, allocation of limited offering securities (such as IPOs and registered secondary offerings) to principal accounts that do not include third party investors may only be made after all other client account orders for the security have been filled. However, there can be no assurance that such policies and procedures will in every case ensure fair and equitable allocations of investment opportunities, particularly when considered in hindsight.

Conflicts may arise in cases when clients and/or the Adviser and other affiliated entities invest in different parts of an issuer's capital structure, including circumstances in which one or more clients own private securities or obligations of an issuer and other clients may own public securities of the same issuer. In addition, one or more clients may invest in securities, or other financial instruments, of an issuer that are senior or junior to securities, or financial instruments, of the same issuer that are held by or acquired for, one or more other clients. For example, if such issuer encounters financial problems, decisions related to such securities (such as over the terms of any workout or proposed waivers and amendments to debt covenants) may raise conflicts of interests. In such a distressed situation, a client holding debt securities of the issuer may be better served by a liquidation of the issuer in which it may be paid in full, whereas a client holding equity securities of the issuer might prefer a reorganization that holds the potential to create value for the equity holders. In the event of conflicting interests within an issuer's capital structure, NexPoint will generally pursue the strategy that NexPoint believes best reflects what would be expected to be negotiated in an arm's length transaction, but in all instances with due consideration being given to NexPoint's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or fees received from such accounts). This strategy may be recommended by one or more NexPoint investment professionals. A single person may make decisions with respect to more than one part of an issuer's capital structure. NexPoint personnel board members may still make recommendations to the applicable investment professional(s). A portfolio manager with respect to any applicable NexPoint registered investment company clients ("Retail Accounts") will make an independent determination as to which course of action he or she determines is in the best interest of the applicable Retail Accounts. NexPoint may use external counsel for guidance and assistance. The Adviser and its affiliates have both subjective and objective procedures and policies in place designed to manage potential conflicts of interest involving clients so that, for example, investment opportunities are allocated in a fair and equitable manner among the Fund and such other clients. An investment opportunity that is suitable for multiple clients of the Adviser and its affiliates may not be capable of being shared among some or all of such clients due to the limited scale of the opportunity or other factors, including regulatory restrictions imposed by the 1940 Act. There can be no assurance that the Adviser's or its affiliates' efforts to allocate any particular investment opportunity fairly among all clients for whom such opportunity is appropriate will result in an allocation of all or part of such opportunity to the Fund. Not all conflicts of interest can be expected to be resolved in favor of the Fund.

Another type of conflict may arise if one client account buys a security and another client sells or shorts the same security. Currently, such opposing positions are generally not permitted within the same account without prior trade approval by the Adviser's Chief Compliance Officer. However, a portfolio manager may enter into opposing positions for different clients to the extent each such client has a different investment objective and each such position is consistent with the investment objective of the applicable client. In addition, transactions in investments by one or more affiliated client accounts may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other client accounts.



Because certain client accounts may have investment objectives, strategies or legal, contractual, tax or other requirements that differ (such as the need to take tax losses, realize profits, raise cash, diversification, etc.), an affiliated adviser may purchase, sell or continue to hold securities for certain client accounts contrary to other recommendations. In addition, an affiliated adviser may be permitted to sell securities or instruments short for certain client accounts and may not be permitted to do so for other affiliated client accounts.

As a result of the Fund's arrangements with NexPoint, there may be times when NexPoint, the Adviser or their affiliates have interests that differ from those of the Fund's shareholders, giving rise to a conflict of interest. NexPoint and the Adviser are under common ownership, and the Fund's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund does, or of investment funds managed by the Adviser or its affiliates. Similarly, the Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. For example, the Fund's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Adviser and its affiliates. The Fund's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles. As a result, those individuals may face conflicts in the allocation of investment opportunities among the Fund and other investment funds or accounts advised by or affiliated with the Adviser. The Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is

fair and equitable over time and consistent with its allocation policy. However, the Fund can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time.

In addition, it is anticipated that a significant portion of the Fund's assets will be represented by securities sponsored, organized and/or managed by NexPoint and its affiliates, which may include REITs, asset-backed securities and/or structured finance securities. The Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Fund with an opportunity to periodically review the Fund's investments in such REITs, asset-backed securities and/or structured finance securities and assure themselves that continued investment in such securities remains in the best interests of the Fund and its shareholders. The Adviser may effect client cross-transactions where it causes a transaction to be effected between the Fund and another client advised by the Adviser or any of its affiliates. The Adviser may engage in a client cross-transaction involving the Fund any time that the Adviser believes such transaction to be fair to the Fund and the other client of the Adviser or its affiliates.

The Adviser may direct the Fund to acquire or dispose of investments in cross trades between the Fund and other clients of the Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the 1940 Act and SEC staff interpretations, the Fund may make and/or hold an investment, including an investment in securities, in which the Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Adviser's own investments in such companies.

***Closed-End Fund ("CEF") Risk.*** The Fund is a CEF. CEFs differ from open-end management investment companies (commonly referred to as mutual funds) in that CEFs may list their shares for trading on a securities exchange and do not redeem their shares at the option of the shareholder. By comparison, mutual funds issue securities redeemable at net asset value at the option of the shareholder and typically engage in a continuous offering of their shares. Mutual funds are subject to continuous asset in-flows and out-flows that can complicate portfolio management, whereas CEFs generally can stay more fully invested in securities consistent with the CEF's investment objective and policies. In addition, in comparison to open-end funds, CEFs have greater flexibility in their ability to make certain types of investments, including investments in illiquid securities.

***Debt Securities Risk.*** When the Fund invests in debt securities, the value of your investment in the Fund will fluctuate with changes in interest rates. Typically, a rise in interest rates causes a decline in the value of debt



securities. In general, the market price of debt securities with longer maturities will increase or decrease more in response to changes in interest rates than shorter-term securities. Other risk factors include credit risk (the debtor may default) and prepayment risk (the debtor may pay its obligation early, reducing the amount of interest payments). These risks could affect the value of a particular investment, possibly causing the Fund's share price and total return to be reduced or fluctuate more than other types of investments. The kind of market risk is generally greater for funds investing in debt securities with longer maturities. In the course of investing in such investments, we may come into possession of material nonpublic information and, because of prohibitions on trading in securities of issuers while in possession of such information, we may be unable to enter into a transaction in a publicly-traded security for that issuer when it would otherwise be advantageous for us to do so. Alternatively, we may choose not to receive material nonpublic information about an issuer of such loans, with the result that we may have less information about such issuers than other investors who transact in such assets.

***Structured Finance Securities Risk.*** A portion of the Fund's investments may consist of collateralized mortgage obligations, collateralized bond obligations, collateralized loan obligations or similar instruments. Such structured finance securities are generally backed by an asset or a pool of assets, which serve as collateral. Depending on the type of security, the collateral may take the form of a portfolio of mortgage loans or bonds or other assets. The Fund and other investors in structured finance securities ultimately bear the credit risk of the underlying collateral. In some instances, the structured finance securities are issued in multiple tranches, offering investors various maturity and credit risk characteristics, often categorized as senior, mezzanine and subordinated/equity according to their degree of risk. The riskiest securities are the equity tranche, which bears the bulk of defaults from the bonds or loans serving as collateral, and thus may protect the other, more senior tranches from default. If there are defaults or the relevant collateral otherwise underperforms, scheduled payments to senior tranches of such securities take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. A senior tranche typically has higher ratings and lower yields than the underlying securities, and may be rated investment grade. Despite the protection from the equity tranche, other tranches can experience substantial losses due to actual defaults, increased sensitivity to defaults due to previous defaults and the disappearance of protecting tranches, market anticipation of defaults and aversion to certain structured finance securities as a class.

***Non-Payment Risk.*** Debt securities are subject to the risk of non-payment of scheduled interest and/or principal. Nonpayment would result in a reduction of income to the Fund, a reduction in the value of the security experiencing nonpayment and a potential decrease in the net asset value ("NAV") of the Fund. There can be no assurance that the liquidation of any collateral would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that such collateral could be readily liquidated. Moreover, as a practical matter, most borrowers cannot satisfy their debts by selling their assets. Borrowers pay their debts from the cash flow they generate. This is particularly the case for borrowers that are highly leveraged. If the borrower's cash flow is insufficient to pay its debts as they come due, the borrower is far more likely to seek to restructure its debts than it is to sell off assets to pay its debts. Borrowers may try to restructure their debts either by seeking protection from creditors under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") or negotiating a work out. In the event of bankruptcy of a borrower, the Fund could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing a debt security. The agent generally is responsible for determining that the lenders have obtained a perfected security interest in the collateral securing the debt security. If a borrower files for protection from creditors under Chapter 11 of the Bankruptcy Code, the Bankruptcy Code will impose an automatic stay that prohibits the agent from liquidating collateral. The agent may ask the bankruptcy court to lift the stay. As a practical matter, the court is unlikely to lift the stay if it concludes that the borrower has a chance to emerge from the reorganization proceedings and the collateral is likely to hold most of its value. If the lenders have a perfected security interest, the debt security will be treated as a separate class in the reorganization proceedings and will retain a priority interest in the collateral. Chapter 11 reorganization plans typically are the product of negotiation among the borrower and the various creditor classes. Successful negotiations may require the lenders to extend the time for repayment, change the interest rate or accept some consideration in the form of junior debt or equity securities. A work out outside of bankruptcy may produce similar concessions by senior lenders.

***Distribution Policy Risk.*** The Fund's distribution policy may, under certain circumstances, have certain adverse consequences to the Fund and its shareholders because it may result in a return of capital resulting in less of a shareholder's assets being invested in the Fund and, over time, increase the Fund's expense ratio. A return of capital may also reduce a shareholder's tax basis, resulting in higher taxes when the shareholder sells his or her shares, and may cause a shareholder to pay taxes even if he or she sells such shares for less than the original purchase price. The distribution policy also may cause the Fund to sell a security at a time it would not otherwise do so in order to manage the distribution of income and gain. The initial distribution will be declared on a date determined by the Board. If the Fund's investments are delayed, the initial distribution may consist principally of a return of capital. Pending the investment of the net proceeds in accordance with the Fund's investment objective and policies, all or a portion of the Fund's distributions may consist of a return of capital (i.e. from your original investment). Shareholders should not assume that the source of a distribution from the Fund is net profit. Shareholders should note that return of capital will reduce the tax basis of their shares (but not below zero) and potentially increase the taxable gain, if any, or decrease any loss recognized for tax purposes upon disposition of their shares.

***Illiquid and Restricted Securities.*** The Fund may not be able to readily dispose of illiquid securities at prices that approximate those at which the Fund could sell such securities if they were more widely traded and, as a result of such illiquidity, the Fund may have to sell other investments or engage in borrowing transactions if necessary to raise cash to meet its obligations.

The Fund may purchase certain securities ("Rule 144A Securities") eligible for resale to qualified institutional buyers as contemplated by Rule 144A under the Securities Act. Rule 144A provides an exemption from the registration requirements of the Securities Act for the resale of certain restricted securities to certain qualified institutional buyers. One effect of Rule 144A is that certain restricted securities may be considered liquid, though no assurance can be given that a liquid market for Rule 144A Securities will develop or be maintained. However, where a substantial market of qualified institutional buyers has developed for certain unregistered securities purchased by the Fund pursuant to Rule 144A under the Securities Act, the Fund intends to treat such securities as liquid securities in accordance with procedures approved by the Board. Because it is not possible to predict with assurance how the market for Rule 144A Securities will develop, the Board has directed the Adviser to monitor carefully the Fund's investments in such securities with particular regard to trading activity, availability of reliable price information and other relevant information. To the extent that, for a period of time, qualified institutional buyers cease purchasing restricted securities pursuant to Rule 144A, the Fund's investments in such securities may have the effect of increasing the level of illiquidity in its investment portfolio during such period.

***Management Fee Risk.*** The management fee paid to the Adviser is based on the Fund's Daily Gross Assets, as defined in the Investment Advisory Agreement. As a result, investors in the Fund's shares will invest on a "gross" basis and receive distributions on a "net" basis after expenses, resulting in a lower rate of return than one might achieve through direct investments. Because the management fee is based on the Fund's gross assets, the Adviser will benefit if and when the Fund issues additional equity, incurs debt or uses leverage. The use of leverage will increase the likelihood of default under any credit facility or other debt instruments the Fund enters into, which would disfavor the holders of Fund shares, including investors in this offering.

***Public and Private Investment Funds Risk.*** The Fund's performance depends in part upon the performance of the Public and Private Investment Fund managers and their selected strategies, the adherence by such Public and Private Investment Fund managers to such selected strategies, the instruments used by such Public and Private Investment Fund managers and the Adviser's ability to select Public and Private Investment Fund managers and strategies and effectively allocate Fund assets among them. Fund shareholders will bear two layers of fees and expenses: asset-based fees and expenses at the Fund level, and asset-based fees, which may include incentive allocations or fees and expenses at the Public or Private Investment Fund level.

The Fund is subject to, and indirectly invests in Public Investment Funds and Private Real Estate Investment Funds that are subject to risks associated with legal and regulatory changes applicable to financial institutions



generally or to Public Investment Funds or Private Real Estate Investment Funds in particular. The Fund may not be able to invest in certain Public Investment Funds or Private Real Estate Investment Funds that are oversubscribed or closed, or the Fund may be able to allocate only a limited amount of assets to a Public Investment Fund or a Private Real Estate Investment Fund that has been identified as an attractive opportunity. The Fund's investments in certain Public Investment Funds and Private Real Estate Investment Funds may be subject to lock-up periods, during which the Fund may not withdraw its investment. The Fund may invest indirectly a substantial portion of its assets in Public Investment Funds and Private Real Estate Investment Funds that follow a particular type of investment strategy, which may expose the Fund to the risks of that strategy. Many of the Fund's assets will be priced in the absence of a readily available market and may be priced based on determinations of fair value, which may prove to be inaccurate. The Fund, upon its redemption of all or a portion of its interest in a Public Investment Fund or a Private Real Estate Investment Fund, may receive an in-kind distribution of securities that are illiquid or difficult to value and difficult to dispose of.

Public Investment Fund and Private Real Estate Investment Fund returns may exhibit greater correlations among each other or with fixed-income or equity indices than anticipated by the Adviser, particularly during times of general market turmoil. Public and Private Investment Fund managers may invest the Public Investment Funds' or the Private Real Estate Investment Funds' assets in securities of non-U.S. issuers, including those in emerging markets, and the Fund's assets may be invested in Public Investment Funds or Private Real Estate Investment Funds that may be denominated in non-U.S. currencies, thereby exposing the Fund to various risks that may not be applicable to U.S. securities. Public and Private Investment Fund Managers focus primarily on the real estate industry, which subjects Public Investment Funds and Private Real Estate Investment Funds, and thus the Fund, to greater risk and volatility than if investments had been made in issuers in a broader range of industries. Public and Private Investment Fund Managers may focus on a particular country or geographic region, which may subject Public Investment Funds and Private Real Estate Investment Funds, and thus the Fund, to greater risk and volatility than if investments had been made in issuers in a broader range of geographic regions.

Public Investment Fund managers may use derivatives for speculative or hedging purposes. Public Investment Fund managers may have limited operating histories upon which to evaluate their performance. Public Investment Funds may incur leverage for investment or other purposes, which may increase the volatility of the Public Investment Funds. Public Investment Fund managers may sell short securities held by Public Investment Funds, which presents the theoretical risk of unlimited loss because of increases in the market price of the security sold short, and the risk that Public Investment Funds' short selling activities may be adversely affected by regulatory restrictions that may be imposed at any time. Public Investment Fund managers may invest the Public Investment Funds' assets without limitation in restricted and illiquid securities. Public Investment Fund managers may invest the Public Investment Funds' assets in equity securities without limitation as to market capitalization. Public Investment Funds may invest in equity securities issued by smaller capitalization companies, including micro-cap companies, the prices of which may be subject to erratic market movements.

Private Real Estate Investment Funds are not publicly traded and therefore are not liquid investments. Please see "Liquidity Risk" for a description of risks associated with illiquid securities. As a result, the Fund may consider information provided by the asset manager to determine the value of the Fund's investment in the Private Real Estate Investment Fund. The valuation provided by an asset manager as of a specific date may vary from the actual sale price that may be obtained if such investment were sold to a third party. The Adviser will conduct reasonable due diligence to value securities and may also consider information provided by the Private Real Estate Investment Funds, including quarterly unaudited financial statements, which if inaccurate could adversely affect the Adviser's ability to value accurately the Fund's shares. Private Real Estate Investment Funds that invest primarily in publicly traded securities are more easily valued.

In addition to valuation risk, shareholders of Private Real Estate Investment Funds are not entitled to the protections of the 1940 Act. For example, Private Real Estate Investment Funds need not have independent boards, may not require shareholder approval of advisory contracts, may leverage to an unlimited extent, and may engage in joint transactions with affiliates. As a result, Private Real Estate Investment Funds may make significant use of leverage,



which has the potential to magnify losses versus funds that do not employ leverage. Please see "Leveraging Risk" below for a description of risks associated with the use of leverage. Additionally, Private Real Estate Investment Fund managers may have limited operating histories upon which to evaluate their performance, and some Private Real Estate Investment Fund managers may not be registered under the Advisers Act. Further, Private Real Estate Investment Fund managers may charge investors (such as the Fund) asset-based fees of up to 2.0% of total assets and incentive allocations or fees of as much as 20% of a Private Real Estate Investment Fund's net profits (or more in certain limited circumstances), which may create incentives for Private Real Estate Investment Fund managers to make investments that are riskier or more speculative than in the absence of these fees. These characteristics present additional risks, including the possibility of total risk of loss, for shareholders.

***REIT Risk.*** REITs may be affected by changes in the real estate markets generally as well as changes in the values of the properties owned by the REIT or securing the mortgages owned by the REIT. REITs are dependent upon management skill and are not diversified. REITs are also subject to heavy cash flow dependency, defaults by borrowers, self-liquidation, and the possibility of failing to qualify for favorable tax treatment under the Code and to maintain an exemption under the 1940 Act. For example, because a REIT may acquire debt securities of issuers primarily engaged in or related to the real estate industry, it also could conceivably own real estate directly as a result of a default on such securities. Any rental income or income from the

disposition of such real estate could adversely affect its ability to retain its tax status, which would have adverse tax consequences on its shareholders. Finally, certain REITs may be self-liquidating at the end of a specified term, and run the risk of liquidating at an economically inopportune time.

***Non-Traded REIT Risk.*** Non-traded REITs are subject to the following risks in addition to those described in "REIT Risk." Non-Traded REITs are subject to significant commissions, expenses, and organizational and offering costs that reduce the value of an investor's (including the Fund's) investment. Non-Traded REITs are not liquid, and investments in Non-Traded REITs may not be accessible for an extended period of time.

Redemption programs offered by Non-Traded REITs may have significant restrictions, such as caps on the amount of shares that can be redeemed annually, limits on the amounts and sources of funds that may be used to fund redemptions and the ability of the REIT to suspend or terminate the program at its discretion. There is no guarantee of any specific return on the principal amount or the repayment of all or a portion of the principal amount invested in Non-Traded REITs. In addition, there is no guarantee that investors (including the Fund) will receive distributions. Distributions from Non-Traded REITs may be derived from sources other than cash flow from operations, including proceeds of the offering, from borrowings, or from the sale of assets. Payments of distributions from sources other than cash flow from operations will decrease or diminish an investor's interest. Dividends paid by Non-Traded REITs may vary based on economic risks, geopolitical risks, changes in the real estate market, performance of the REIT, regulatory changes, and key personnel changes. Distributions from Non-Traded REITs can be suspended for a period of time or halted altogether.

***Private REIT Risk.*** Private REITs are subject to the following risks in addition to those described in "Public and Private Real Estate Investment Fund Risk" and "REIT Risk." Private REITs are typically smaller and financially less stable than Public REITs. Private REITS are unlisted, making them more difficult to value and trade. Moreover, private REITs generally are exempt from Securities Act registration and, as such, are not subject to the same disclosure requirements as Public REITs and Non-Traded REITs, which makes private REITs more difficult to evaluate from an investment perspective. In addition, Private REITs may not have audited financial statements.

***Asset-Backed Securities.*** Because asset-backed securities often are secured by the loans underlying the securities, the Fund may lose money if there are defaults on the loans underlying the securities. Such defaults have increased the risk for asset-backed securities that are secured by home-equity loans related to sub-prime mortgage loans, especially in a declining residential real estate market. Asset-backed securities also may be subject to more rapid repayment than their stated maturity dates indicate, due to changing economic conditions. To maintain its position in such securities, the Fund may reinvest the reductions in principal amounts resulting



from the prepayments. Yields on those reinvested amounts are subject to prevailing market rates. Because prepayments of principal generally increase when rates are falling, the Fund generally has to reinvest proceeds from prepayments at lower rates. Investments in asset-backed securities may also be subject to valuation risk.

***Mortgage-Backed Securities Risk.*** Mortgage-backed securities are bonds which evidence interests in, or are secured by, a single commercial or residential mortgage loan or a pool of commercial or residential mortgage loans. Accordingly, mortgage-backed securities in which the Fund intends to invest are subject to all of the risks of the underlying mortgage loans. In a rising interest rate environment, the value of mortgage-backed securities may be adversely affected when payments on underlying mortgages do not occur as anticipated, resulting in the extension of the security's effective maturity and the related increase in interest rate sensitivity of a longer-term investment. The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities markets as a whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the underlying mortgage properties. In certain instances, third party guarantees or other forms of credit support can reduce the credit risk. Mortgage-backed securities are also subject to several risks created through the securitization process. Subordinate CMBSs are paid interest only to the extent that there are funds available to make payments. To the extent the collateral pool includes a large percentage of delinquent loans, there is a risk that interest payment on subordinate CMBSs will not be fully paid. Subordinate securities of CMBSs are also subject to greater credit risk than those CMBSs that are more highly rated. We also may invest in interest-only multifamily CMBS issued by multifamily mortgage loan securitizations. However, these interest-only multifamily CMBS typically only receive payments of interest to the extent that there are funds available in the securitization to make the payment and may introduce increased risks since these securities have no underlying principal cash flows. As a result, interest only CMBS possess the risk of total loss of investment in the event of prepayment of the underlying mortgages. We have not imposed a limit in the portion of our total assets that may be invested in interest-only multifamily CMBS.

***Issuer Risk.*** The value of a specific security can be more volatile than the market as a whole and can perform differently from the value of the market as a whole, for reasons related to the issuer, such as management performance, financial leverage and reduced demand for the issuer's goods and services.

***Leverage Risk.*** The use of leverage, such as borrowing money to purchase securities, by the Fund or a Private Real Estate Investment Fund or a Public Investment Fund will magnify the Fund's gains or losses. The use of leverage via short selling by a Private Real Estate Investment Fund or a Public Investment Fund will also magnify the Fund's gains or losses. Generally, the use of leverage also will cause the Fund and a Private Real Estate Investment Fund or a Public Investment Fund to have higher expenses (especially interest and/or short selling-related dividend expenses) than those of funds that do not use such techniques. Interest on borrowings (or dividends on preferred shares) may be at a fixed or floating rate and generally will be based on short-term rates. Interest payments and fees incurred in connection with such borrowings will reduce the amount of distributions available to the Fund's shareholders. As long as the rate of return, net of applicable Fund expenses, on the Fund's portfolio investments purchased with leverage exceeds the costs associated with such leverage, the Fund will generate more return or income than will be needed to pay such costs. In this event, the excess will be available to pay higher dividends to the Fund's shareholders. Conversely, if the Fund's return on such assets is less than the cost of leverage and other Fund expenses, the return to the Fund's shareholders will diminish or may be eliminated entirely. To the extent that the Fund uses leverage, the net asset value of the Fund's shares and the yield to the Fund's shareholders will be more volatile. The Fund's leveraging strategy may not be successful.

In addition, a lender to the Fund or a Private Real Estate Investment Fund or a Public Investment Fund may terminate or refuse to renew any credit facility. If the Fund or Private Real Estate Investment Fund or a Public Investment Fund is unable to access additional credit, it may be forced to sell investments at inopportune times, which may further reduce the amount of distributions available to Fund shareholders. The Fund's investments in Public Investment Funds and REITs managed by affiliated or unaffiliated institutional asset managers may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities.



The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025.

***Liquidity Risk.*** The Fund is a closed-end investment company structured as an "interval fund" and designed for long-term investors. Unlike many closed-end investment companies, the Fund's shares are not listed on any securities exchange and are not publicly traded. There is currently no secondary market for the shares and the Fund expects that no secondary market will develop. Limited liquidity is provided to shareholders only through the Fund's quarterly repurchase offers for no less than 5% of the shares outstanding at NAV. There is no guarantee that shareholders will be able to sell all of the shares they desire in a quarterly repurchase offer. The Fund's investments are also subject to liquidity risk. Liquidity risk exists when particular investments of the Fund would be difficult to purchase or sell, possibly preventing the Fund from selling such illiquid securities at an advantageous time or price, or possibly requiring the Fund to dispose of other investments at unfavorable times or prices in order to satisfy its obligations. Funds with principal investment strategies that involve securities of companies with smaller market capitalizations, derivatives or securities with substantial market and/or credit risk tend to have the greatest exposure to liquidity risk.

***Management Risk.*** The Fund is subject to management risk because it relies on the Adviser's ability to achieve its investment objective. The Fund runs the risk that the Adviser's investment techniques will fail to produce desired results and cause the Fund to incur significant losses. The Adviser also may fail to use derivatives effectively, choosing to hedge or not to hedge positions at disadvantageous times. In addition, if one or more key individuals leave, the Adviser may not be able to hire qualified replacements or may require an extended time to do so. This situation could prevent the Fund from achieving its investment objectives.

***Securities Market Risk.*** An investment in shares is subject to investment risk, including the possible loss of the entire principal amount invested. An investment in shares represents an indirect investment in the securities owned by the Fund. The value of these securities, like other market investments, may move up or down, sometimes rapidly and unpredictably. Economic, political and financial conditions, industry or economic trends and developments or public health risks, such as epidemics or pandemics, may, from time to time, and for varying periods of time, cause volatility, illiquidity or other potentially adverse effects in the financial markets. The value of your shares at any point in time may be worth less than the value of your original investment, even after taking into account any reinvestment of dividends and distributions.

***Medium and Small Capitalization Company Risk.*** The Fund will concentrate its investments in real estate-related securities. Many issuers of real estate securities are medium or small capitalization companies which may be newly-formed or have limited product lines, distribution channels and financial and managerial resources. The risks associated with these investments are generally greater than those associated with investments in the securities of larger, more-established companies. This may cause the Fund's NAV to be more volatile when compared to investment companies that focus only on large capitalization companies.

Generally, securities of medium and small capitalization companies are more likely to experience sharper swings in market values and are generally more volatile than those of larger companies. In addition, such securities generally trade in less liquid markets, in which it may be more difficult for the Adviser to sell and at prices that the Adviser believes appropriate. Compared to large companies, smaller companies are more likely to have: (i) less information publicly available; (ii) more limited product lines or markets and less mature businesses; (iii) fewer capital resources; (iv) more limited management depth; and (v) shorter operating histories. Further, the equity securities of smaller companies are often traded over-the-counter and generally experience a lower trading volume than is typical for securities that are traded on a national securities exchange. Consequently, the Fund may be required to dispose of these securities over a longer period of time (and potentially at less favorable prices) than would be the case for securities of larger companies, offering greater potential for gains and losses and associated tax consequences.



---

***Concentration in Real Estate Securities Risk.*** The Fund will not invest in real estate directly, but because the Fund will concentrate its investments in investment vehicles that invest principally in real estate and real estate-related securities, its portfolio will be significantly impacted by the performance of the real estate market and may experience more volatility and be exposed to greater risk than a more diversified portfolio. Although the Fund will not invest in real estate directly, the Fund may be subject to risks similar to those associated with direct ownership in real property. The value of the Fund's shares will be affected by factors affecting the value of real estate and the earnings of companies engaged in the real estate industry. These factors include, among others: (i) changes in general economic and market conditions; (ii) changes in the value of real estate properties; (iii) risks related to local economic conditions, overbuilding and increased competition; (iv) increases in property taxes and operating expenses; (v) changes in zoning laws; (vi) casualty and condemnation losses; (vii) variations in rental income, neighborhood values or the appeal of property to tenants; (viii) the availability of financing; and (ix) changes in interest rates. Many real estate companies utilize leverage, which increases investment risk and could adversely affect a company's operations and market value in periods of rising interest rates. The value of securities of companies in the real estate industry may go through cycles of relative under-performance and over-performance in comparison to equity securities markets in general. There are also special risks associated with real estate operations generally, as described below:

- *Land.* Land may be affected by development risks including insufficient tenant demand to build or construction delays as well as adverse changes in local and national economic and market conditions.
- *Development Issues.* Certain real estate companies may engage in the development or construction of real estate properties. These companies in which the Fund invests ("portfolio companies") are exposed to a variety of risks inherent in real estate development and construction, such as the risk that there will be insufficient tenant demand to occupy newly-developed properties, and the risk that prices of construction materials or construction labor may rise materially during the development.
- *Lack of Insurance.* Certain of the portfolio companies may fail to carry comprehensive liability, fire, flood, earthquake extended coverage and rental loss insurance, or insurance in place may be subject to various policy specifications, limits and deductibles. Should any type of uninsured loss occur, the portfolio company could lose its investment in, and anticipated profits and cash flows from, a number of properties and, as a result, adversely affect the Fund's investment performance.
- *Dependence on Tenants.* The value of the Fund's portfolio companies' properties and the ability to make distributions to their shareholders depend upon the ability of the tenants at their properties to generate enough income in excess of their operating expenses to make their lease payments. Changes beyond the control of our portfolio companies may adversely affect their tenants' ability to make their lease payments and, in such event, would substantially reduce both their income from operations and ability to make distributions to our portfolio companies and, consequently, the Fund.
- *Financial Leverage.* Real estate companies may be highly leveraged and financial covenants may affect the ability of real estate companies to operate effectively.
- *Environmental Issues.* In connection with the ownership (direct or indirect), operation, management and development of real properties that may contain hazardous or toxic substances, a portfolio company may be considered an owner, operator or responsible party of such properties and, therefore, may be potentially liable for removal or remediation costs, as well as certain other costs, including governmental fines and liabilities for injuries to persons and property. The existence of any such material environmental liability could have a material adverse effect on the results of operations and cash flow of any such portfolio company and, as a result, the amount available to make distributions on shares of the Fund could be reduced.
- *Financing Issues.* Financial institutions in which the Fund may invest are subject to extensive government regulation. This regulation may limit both the amount and types of loans and other financial commitments a financial institution can make, and the interest rates and fees it can charge. In addition, interest and investment rates are highly sensitive and are determined by many factors beyond a financial institution's control, including general and local economic conditions (such as inflation,



---

recession, money supply and unemployment) and the monetary and fiscal policies of various governmental agencies such as the Federal Reserve Board. These limitations may have a significant impact on the profitability of a financial institution since profitability is attributable, at least in part, to the institution's ability to make financial commitments such as loans. Profitability of a financial institution is largely dependent upon the availability and cost of the institution's funds, and can fluctuate significantly when interest rates change.

***Multifamily Real Estate Sector in General.*** While we intend to seek to diversify our investment portfolio among real estate sectors, we expect to invest a portion of our assets in investments in the multifamily real estate sector. Our business may be adversely affected by various operating risks common to the multifamily industry. We plan to invest in target assets, which are typically debt and preferred equity investments where the underlying real estate is comprised of multifamily properties. Multifamily properties have different economic characteristics than many other real estate assets. A typical office property, for example, has long-term leases with third-party tenants, which provides a relatively stable long-term stream of revenue. Multifamily properties, on the other hand, generate revenue from tenants that typically have short-term leases (generally one year or less in duration), which causes the rental rate and occupancy levels at multifamily properties to change frequently, and results in earnings that can be volatile.

In addition, our borrowers operating such multifamily properties will be subject to various operating risks common to the multifamily industry, including, among others, the following:

- competition from other multifamily properties in the markets in which a borrower operates;
- over-building of multifamily properties in the markets in which a borrower operates, which results in increased supply and will adversely affect occupancy and revenues at such borrower's multifamily properties;
- requirements for periodic capital reinvestment to repair and upgrade multifamily properties;
- increases in operating costs due to inflation and other factors that may not be offset by increased rental rates;
- changes in interest rates;
- changes in the availability, cost, and terms of financing;
- changes in governmental laws and regulations, fiscal policies, and zoning ordinances and the related costs of compliance with laws and regulations, fiscal policies, and ordinances;
- adverse effects of international, national, regional and local economic and market conditions; and
- risks generally associated with the ownership of multifamily properties and real estate, as discuss in some greater detail below.

The occurrence of any of the foregoing could adversely impact a borrower's ability to successfully own and operate a multifamily that will be the primary source of repayment of our Investment. In addition, should we foreclose on an investment and acquire the underlying asset, we, as the multifamily operator, would be faced with these same risks.

***Non-Diversification Risk.*** While the Adviser intends to invest in a number of real estate and real estate-related securities issued by different issuers and employ multiple investment strategies with respect to the Fund's investment portfolio, it is possible that a significant amount of the Fund's investments could be invested in the instruments of only a few companies or other issuers or that at any particular point in time one investment strategy could be more heavily weighted than the others. The focus of the Fund's investment portfolio in any one issuer would subject the Fund to a greater degree of risk

with respect to defaults by such issuer or other adverse events affecting that issuer, and the focus of the portfolio in any one industry or group of industries would subject



the Fund to a greater degree of risk with respect to economic downturns relating to such industry or industries. The focus of the Fund's investment portfolio in any one investment strategy would subject the Fund to a greater degree of risk than if the Fund's investment portfolio were varied in its investments with respect to several investment strategies.

***Valuation Risk.*** Portfolio securities may be valued using techniques other than market quotations, under the circumstances described under "Determination of Net Asset Value." The value established for a portfolio security may be different than what would be produced through the use of another methodology or if it had been priced using market quotations. Portfolio securities that are valued using techniques other than market quotations, including "fair valued" securities, may be subject to greater fluctuation in their value from one day to the next than would be the case if market quotations were used. In addition, there is no assurance that the Fund could sell a portfolio security for the value established for it at any time and it is possible that the Fund would incur a loss because a portfolio security is sold at a discount to its established value.

Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, fair value pricing may not reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

***Equity Securities Risk.*** The market prices of equity securities owned by the Fund may go up or down, sometimes rapidly or unpredictably. The value of a security may decline for a number of reasons that may directly relate to the issuer, such as management performance, fundamental changes to the business, financial leverage, non-compliance with regulatory requirements and reduced demand for the issuer's goods or services. The values of equity securities also may decline due to general market conditions that are not specifically related to a particular company, such as real or perceived adverse economic conditions, changes in the general outlook for corporate earnings, changes in interest or currency rates, unexpected trading activity among retail investors or adverse investor sentiment generally. Certain equity securities may decline in value even during periods when the prices of equity securities in general are rising, or may not perform as well as the market in general. In addition to these risks, preferred stock and convertible securities are also subject to the risk that issuers will not make payments on securities held by the Fund, which could result in losses to the Fund. The credit quality of preferred stock and convertible securities held by the Fund may be lowered if an issuer's financial condition changes, leading to greater volatility in the price of the security. In addition, a company's preferred stock generally pays dividends only after the company makes required payments to holders of its bonds and other debt. For this reason, the value of preferred stock will usually react more strongly than bonds and other debt to actual or perceived changes in the company's financial condition or prospects. The market value of convertible securities also tends to fall when prevailing interest rates rise.

***Preferred Securities Risk.*** Preferred securities are subject to credit risk and interest rate risk. Interest rate risk is, in general, that the price of a debt security falls when interest rates rise. Securities with longer maturities tend to be more sensitive to interest rate changes. Credit risk is the risk that an issuer of a security may not be able to make principal and interest or dividend payments on the security as they become due. Holders of preferred securities may not receive dividends, or the payment can be deferred for some period of time. In bankruptcy, creditors are generally paid before the holders of preferred securities.

***Convertible Securities Risk.*** Convertible securities are hybrid securities that have characteristics of both bonds and common stocks and are subject to risks associated with both debt securities and equity securities. Convertible securities are similar to fixed-income securities because they usually pay a fixed interest rate (or dividend) and are obligated to repay principal on a given date in the future. The market value of fixed-income and preferred securities tends to decline as interest rates increase and tends to increase as interest rates decline. Convertible



securities have characteristics of a fixed-income security and are particularly sensitive to changes in interest rates when their conversion value is lower than the value of the bond or preferred share. Fixed-income and preferred securities also are subject to credit risk, which is the risk that an issuer of a security may not be able to make principal and interest or dividend payments on the security as they become due. Fixed-income and preferred securities also may be subject to prepayment or redemption risk. If a convertible security held by the Fund is called for redemption, the Fund will be required to surrender the security for redemption, convert it into the issuing company's common stock or cash or sell it to a third party at a time that may be unfavorable to the Fund.

In addition, the Fund may invest in fixed-income and preferred securities rated less than investment grade that are sometimes referred to as high yield or "junk bonds." These securities are speculative investments that carry greater risks and are more susceptible to real or perceived adverse economic and competitive industry conditions than higher quality securities. Such securities also may be subject to resale restrictions. The lack of a liquid market for these securities could decrease the Fund's share price. Convertible securities have characteristics similar to common stocks especially when their conversion value is the same as the value of the bond or preferred share. The price of equity securities may rise or fall because of economic or political changes. Stock prices in general may decline over short or even extended periods of time. Market prices of equity securities in broad market segments may be adversely affected by a prominent issuer having experienced losses or by the lack of earnings or such an issuer's failure to meet the market's expectations with respect to new products or services, or even by factors wholly unrelated to the value or condition of the issuer, such as changes in interest rates.

***ETF Risk***. The value of ETFs can be expected to increase and decrease in value in proportion to increases and decreases in the indices that they are designed to track. The volatility of different index tracking stocks can be expected to vary in proportion to the volatility of the particular index they track. ETFs are traded similarly to stocks of individual companies. Although an ETF is designed to provide investment performance corresponding to its index, it may not be able to exactly replicate the performance of its index because of its operating expenses and other factors. The underlying indices that an ETF is designed to track may also experience volatility due to disruptive events, such as natural disasters, pandemic or epidemics or other widespread health crises. Any such impact could adversely affect the Fund's performance and may lead to losses on your investment in the Fund. Because ETFs trade on a securities exchange, extreme market volatility or potential lack of an active trading market for an ETF's shares may trade at a premium or discount to their net asset value. The Fund's investment in shares of ETFs subject it to the risks of owning the securities underlying the ETF, as well as certain structural risks, including authorized participant concentration risk, market maker risk, premium/discount risk and trading issues risk. As a shareholder in an ETF, the Fund bears its proportionate share of the ETF's expenses.

***Counterparty Risk***. Counterparty risk is the risk that a counterparty (the other party to a transaction or an agreement or the party with whom the Fund executes transactions) to a transaction with the Fund may be unable or unwilling to make timely principal, interest or settlement payments, or otherwise honor its obligations. In an attempt to limit the counterparty risk associated with such transactions, the Fund conducts business only with financial institutions judged by the Adviser to present acceptable credit risk. For example, repurchase agreements are loans of money or arrangements under which the Fund purchases securities and the seller agrees to repurchase the securities within a specific time and at a specific price. The repurchase price is generally higher than the Fund's purchase price, with the difference being income to the Fund. The counterparty's obligations under the repurchase agreement are collateralized with U.S. Treasury and/or agency obligations with a market value of not less than 100% of the obligations, valued daily. Collateral is held by the Fund's custodian in a segregated, safekeeping account for the benefit of the Fund. Repurchase agreements afford the Fund an opportunity to earn income at low risk on temporarily available cash. If bankruptcy or insolvency proceedings commence with respect to the seller of the securities before repurchase of the securities under a repurchase agreement, the Fund may encounter delays and incur costs before being able to sell the securities. Such a delay may involve loss of interest or a decline in price of the securities. If a court characterizes the transaction as a loan and the Fund has not perfected a security interest in the securities, the Fund may be required to return the securities to the seller's estate and be treated as an unsecured creditor of the seller. As an unsecured creditor, the Fund would be at risk of losing some or all of the principal and interest involved in the transaction.



***Derivatives Risk***. While the Fund does not intend to invest in derivatives or utilize hedging strategies as a principal investment strategy, the Private Real Estate Investment Funds and Public Investment Funds in which the Fund invests will use derivatives (consisting of forwards, options, repurchase agreements, futures, warrants, and swaps) to enhance returns or hedge against market declines. A Private Real Estate Investment Fund's or Public Investment Fund's use of derivative instruments involves risks different from, or possibly greater than, the risks associated with investing directly in securities and other traditional investments. These risks include: (i) the risk that the counterparty to a derivative transaction may not fulfill its contractual obligations; (ii) risk of mispricing or improper valuation; and (iii) the risk that changes in the value of the derivative may not correlate perfectly with the underlying asset, rate or index. Derivative prices are highly volatile and may fluctuate substantially during a short period of time. Such prices are influenced by numerous factors that affect the markets, including, but not limited to: (i) changing supply and demand relationships; government programs and policies; (ii) national and international political and economic events; (iii) changes in interest rates; (iv) inflation and deflation; and

(v) changes in supply and demand relationships. Certain derivatives have the potential for unlimited loss, regardless of the size of the initial investment. When a fund uses derivatives for leverage, investments in that fund will tend to be more volatile, resulting in larger gains or losses in response to market changes. To limit risks associated with leverage, a fund is required to comply with Rule 18f-4 under the 1940 Act (the "Derivatives Rule") as outlined below.

The Derivatives Rule mandates that a fund adopt and/or implement: (i) value-at-risk limitations (VaR); (ii) a written derivatives risk management program; (iii) new board oversight responsibilities; and (iv) new reporting and recordkeeping requirements. In the event that a fund's derivative exposure is 10% or less of its net assets, excluding certain currency and interest rate hedging transactions, it can elect to be classified as a limited derivatives user (Limited Derivatives User) under the Derivatives Rule, in which case the fund is not subject to the full requirements of the Derivatives Rule. Limited Derivatives Users are excepted from VaR testing, implementing a derivatives risk management program, and certain board oversight and reporting requirements mandated by the Derivatives Rule. However, a Limited Derivatives User is still required to implement written compliance policies and procedures reasonably designed to manage its derivatives risks.

The Derivatives Rule also provides special treatment for reverse repurchase agreements, similar financing transactions and unfunded commitment agreements. Specifically, a fund may elect whether to treat reverse repurchase agreements and similar financing transactions as "derivatives transactions" subject to the requirements of the Derivatives Rule or as senior securities equivalent to bank borrowings for purposes of Section 18 of the 1940 Act. In addition, when-issued or forward settling securities transactions that physically settle within 35-days are deemed not to involve a senior security.

***Short Sales Risk.*** Short selling involves selling securities that may or may not be owned and borrowing the same securities for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the Fund to profit from declines in market prices to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. However, because the borrowed securities must be replaced by purchases at market prices in order to close out the short position, any appreciation in the price of the borrowed securities would result in a loss. The securities necessary to cover a short position may not be available for purchase. Purchasing securities to close out the short position can itself cause the price of the securities to rise further, thereby exacerbating the loss. The Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions, the Fund might have
difficulty purchasing securities to meet margin calls on its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales by the Fund that are not made "against the box" theoretically involve unlimited loss potential, since the market price of securities sold short may continuously increase. If other short positions of the same security are closed out at the same time, a "short squeeze" can occur where demand exceeds the supply for the security sold short. A short squeeze makes it more likely that the Fund will need to replace the borrowed security at an unfavorable price.



***Foreign Investment Risk.*** Investing in foreign securities typically involves more risks than investing in U.S. securities, and includes risks associated with: political and economic developments — the political, economic and social structures of some foreign countries may be less stable and more volatile than those in the United States; trading practices — government supervision and regulation of foreign securities and currency markets, trading systems and brokers may be less than in the United States; availability of information — foreign issuers may not be subject to the same disclosure, accounting and financial reporting standards and practices as U.S. issuers; and limited markets — the securities of certain foreign issuers may be less liquid (harder to sell) and more volatile.

To the extent the Fund invests in investment vehicles that hold securities that are denominated in foreign currencies, the value of securities denominated in foreign currencies can change significantly when foreign currencies strengthen or weaken relative to the U.S. dollar. Currency rates in foreign countries may fluctuate significantly over short periods of time for a number of reasons, including changes in interest rates and the imposition of currency controls or other political developments in the United States or abroad. These currency movements may negatively impact the value of the Fund even when there is no change in the value of the security in the issuer's home country.

The risks of foreign investments may be greater in developing or emerging market countries.

***Other Investment Companies.*** The Fund may invest in other investment companies. Investment companies combine shareholders' funds for investment in a variety of instruments, including equity securities, debt securities, and money market instruments and may invest primarily in a particular type of security, a particular industry or a mix of securities and industries. An investment company is not taxed on income distributed to shareholders if, among other things, it distributes to its shareholders substantially all of its taxable income for each taxable year. As a shareholder of another investment company, the Fund may bear a proportionate share of the expenses of such other investment company, including management fees, administration fees and custodial fees, in addition to the expenses of the Fund. To the extent permitted by and subject to applicable law or SEC exemptive relief, the Fund may invest in shares of investment companies (including money market mutual funds) advised or sub-advised by NexPoint or its affiliates.

***Securities Lending Risk.*** Securities lending is subject to the risk that loaned securities may not be available to the Fund on a timely basis and the Fund may, therefore, lose the opportunity to sell the securities at a desirable price. Any loss in the market price of securities loaned by the Fund that occurs during the term of the loan would be borne by the Fund and would adversely affect the Fund's performance. Also, there may be delays in recovery, or no recovery, of securities loaned should the borrower of the securities fail financially while the loan is outstanding. In addition, voting rights with respect to loaned securities generally pass to the borrower. The Fund, as the lender, retains the right to recall the loans and obtain the return of the securities loaned in order to vote the loaned securities. However, in many circumstances the Fund may be unable to recall the securities in time to vote or may determine that the benefits to the Fund of voting are outweighed by the indirect or direct costs of such a recall. In these circumstances, loaned securities may be voted or not voted in a manner adverse to the best interests of the Fund. All of the aforementioned risks may be greater for non-U.S. securities.

These lending transactions must be fully collateralized at all times, but involve some credit risk to the Fund if the borrower or the party (if any) guaranteeing the loan should default on its obligation and the Fund is delayed in or prevented from recovering the collateral. In addition, any income or gains and losses from investing and reinvesting any cash collateral delivered by a borrower pursuant to a loan are generally at the Fund's risk, and to the extent any such losses reduce the amount of cash below the amount required to be returned to the borrower upon the termination of any loan, the Fund may be required to pay or cause to be paid to such borrower or another entity an amount equal to such shortfall in cash. The Fund generally accepts cash (U.S. and foreign currency), securities issued or guaranteed by the U.S. government or its agencies or instrumentalities, or sovereign debt as collateral for these lending transactions, although in the future may accept other types of collateral. There is also a risk of loss should the borrower default before the securities are returned, and due to market movements the value of the collateral held has fallen and/or the value of the securities on loan has risen.



***Repurchase Policy Risks.*** Quarterly repurchases by the Fund of its shares typically will be funded from available cash or sales of portfolio securities. However, payment for repurchased shares may require the Fund to liquidate portfolio holdings earlier than the Adviser otherwise would liquidate such holdings, potentially resulting in losses, and may increase the Fund's portfolio turnover.

The Adviser may take measures to attempt to avoid or minimize such potential losses and turnover, and instead of liquidating portfolio holdings, may borrow money to finance repurchases of shares. If the Fund borrows to finance repurchases, interest on any such borrowings will negatively affect shareholders who do not tender their shares in a repurchase offer by increasing the Fund's expenses and reducing net investment income. To the extent the Fund finances repurchase proceeds by selling investments, the Fund may hold a larger proportion of its gross assets in less liquid securities. Also, the sale of securities to fund repurchases could reduce the market price of those securities, which in turn would reduce the Fund's NAV.

Repurchase of shares will tend to reduce the amount of outstanding shares and, depending upon the Fund's investment performance, its net assets. A reduction in the Fund's net assets may increase the Fund's expense ratio, to the extent that additional shares are not sold. In addition, the repurchase of shares by the Fund may be a taxable event to shareholders.

The Fund's quarterly repurchase offers are a shareholder's only means of liquidity with respect to his or her shares. The shares are not traded on a national securities exchange and no secondary market exists for the shares, nor does the Fund expect a secondary market for its shares to exist in the future.

***Reverse Repurchase Agreement Risk.*** The Fund may enter into reverse repurchase agreements with respect to securities held by the Fund that could otherwise be sold by the Fund. In a reverse repurchase agreement the Fund sells a security held by the Fund and simultaneously obtains the commitment of the purchaser (typically, a commercial bank or a broker or dealer) to sell the security back to the Fund at an agreed-upon price on an agreed-upon date. The Fund will maintain cash or liquid securities in an amount sufficient to cover its obligations with respect to reverse repurchase agreements. The Fund receives payment for such securities only upon physical delivery or evidence of book entry transfer by its custodian. Regulations of the SEC require that, if securities are sold by a fund under a reverse repurchase agreement, the fund designate or segregate liquid assets in an amount equal to the fund's daily marked-to-market value of such agreement. Reverse repurchase agreements are considered borrowings of money by the Fund and as such would be subject to the restrictions on issuing senior securities.

Reverse repurchase agreements could involve certain risks in the event of default or insolvency of the counterparty, including possible delays or restrictions upon the Fund's ability to dispose of the proceeds of the sale received from the counterparty. An additional risk is that the market value of securities sold by the Fund under a reverse repurchase agreement could decline below the price at which the Fund is obligated to repurchase them.

***Risks Relating to Fund's Tax Status.*** To remain eligible for the favorable tax treatment accorded to regulated investment companies ("RICs") and their shareholders under the Code, the Fund must meet certain source of income, asset diversification and annual distribution requirements. Very generally, in order to qualify as a RIC, the Fund must derive at least 90% of its gross income for each taxable year from dividends, interest, payments with respect to certain securities loans, gains from the sale or other disposition of stock, securities or foreign currencies, other income derived with respect to its business of investing in stock or other securities, or income from qualified publicly traded partnerships. In some cases, if the Fund fails to meet these income requirements at the end of a taxable year, it will be able to cure such failure by paying a Fund-level tax to avoid the loss of its RIC status; such tax could be substantial. The Fund must also meet certain asset diversification requirements at the end of each quarter of each of its taxable years. Failure to meet these diversification requirements on the last day of a quarter will result in the Fund's loss of RIC status, unless it is able to cure such failure, for instance, by disposing of certain investments, including at potentially disadvantageous times and prices, and, in some cases, by paying a Fund-level tax.



In addition, in order to be eligible for the favorable tax treatment accorded RICs, the Fund must meet the annual distribution requirement, requiring it to distribute with respect to each taxable year at least the sum of 90% of its "investment company taxable income" (generally-its taxable ordinary income and realized net short-term capital gains in excess of realized net long-term capital losses, if any) and 90% of its net tax-exempt income (if any), to its shareholders. Because the Fund may leverage its portfolio through a master repurchase agreement, may enter into reverse repurchase transactions from time to time, and may use additional debt financing in the future, the Fund is subject to certain asset coverage ratio requirements under the 1940 Act that could, under certain circumstances, restrict the Fund from making the distributions necessary to satisfy this annual distribution requirement and to avoid fund-level U.S. federal income or excise taxes. Any taxable income (including net long-term capital gains) that the Fund is unable to distribute will be subject to fund-level tax at the applicable corporate income tax rate. Further, if the Fund fails to meet the annual distribution requirement or either of the RIC qualification requirements in respect of a taxable year and is ineligible to or otherwise does not cure such failure for any such year, all of its taxable income regardless of whether timely distributed to shareholders will be subject to fund-level tax at the applicable corporate income tax rate and all of its distributions from earnings and profits (including from net long-term capital gains) will be taxable to shareholders as ordinary income. Some portions of such distributions may be eligible for the dividends-received deduction in the case of corporate shareholders and may be eligible to be treated as "qualified dividend income" in the case of shareholders taxed as individuals, provided, in both cases, the shareholder meets certain holding period and other requirements in respect of the Fund's shares. See "U.S. Federal Income Tax Matters."

If the Fund were to fail to qualify or were ineligible for treatment as a RIC, the resulting fund-level taxes could substantially reduce the Fund's net assets, the amount of income available for distribution and the amount of its distributions. Such a failure would have a material adverse effect on the Fund and its shareholders. In addition, in some cases, the Fund could be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions in order to re-qualify as a RIC.

***RIC-Related Risks of Investments Generating Non-Cash Taxable Income.*** Certain of the Fund's investments will require the Fund to recognize taxable income in a taxable year in excess of the cash actually received by the Fund with respect to those investments during that year. In particular, the Fund expects that a substantial portion of its investments in loans and other debt obligations will be treated as having "market discount" and/or "original issue discount" for U.S. federal income tax purposes, which, in some cases, could be significant. Because the Fund may be required to recognize income in respect of these investments before or without receiving cash representing such income, the Fund may have difficulty satisfying the annual distribution requirements applicable to RICs and avoiding Fund-level U.S. federal income or excise taxes. Accordingly, the Fund may be required to sell portfolio securities, including at potentially disadvantageous times or prices, raise additional debt or equity capital, or reduce new investments, to obtain the cash needed to make these income distributions. If the Fund liquidates portfolio securities to raise cash, the Fund may realize gain or loss on such liquidations; in the event the Fund realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

***REIT Tax Risk for REIT Subsidiaries.*** The REIT Subsidiaries and any REIT subsidiary the Fund may form in the future will elect to be taxed as REITs beginning with the first year in which they commence material operations. In order for each REIT Subsidiary and any future REIT subsidiary to qualify and maintain its qualification as a REIT, it must satisfy certain requirements set forth in the Code and Treasury Regulations that depend on various factual matters and circumstances. The Fund and the Adviser intend to cause the REIT Subsidiaries and any future REIT subsidiaries to structure their activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is not entirely clear, and it is possible that the Internal Revenue Service ("IRS") may interpret or apply those requirements in a manner that jeopardizes the ability of such REIT subsidiary to satisfy all of the requirements for qualification as a REIT.

If any REIT Subsidiary or future REIT subsidiary fails to qualify as a REIT for any taxable year that it is operational and it does not qualify for certain statutory relief provisions, it will be subject to U.S. federal income



tax on its taxable income at the applicable corporate income tax rate. In addition, it would generally be disqualified from treatment as a REIT for the four taxable years following any taxable year in which it fails to qualify as a REIT. Loss of REIT status would reduce a REIT subsidiary's net earnings available for investment or distribution to the Fund as a result of the imposition of entity-level tax on the REIT subsidiary. In addition, distributions to the Fund would no longer qualify for the dividends paid deduction, and the REIT subsidiary would no longer be required to make distributions. If this occurs, the REIT subsidiary might be required to borrow funds or liquidate some investments in order to pay the applicable tax.

To obtain the favorable tax treatment afforded to REITs under the Code, among other things each REIT subsidiary generally will be required each year to distribute to its shareholders at least 90% of its REIT taxable income determined without regard to the dividends-paid deduction and excluding net capital gain. To the extent that it does not distribute all of its net capital gains, or distributes at least 90%, but less than 100%, of its REIT taxable income, as adjusted, it will have to pay an entity-level tax on amounts retained. Furthermore, if it fails to distribute during each calendar year at least the sum of (a) 85% of its ordinary income for that year, (b) 95% of its capital gain net income for that year, and (c) any undistributed taxable income from prior periods, it would have to pay a 4% nondeductible excise tax on the excess of the amounts required to be distributed over the sum of (x) the amounts that it actually distributed and (y) the amounts it retained and upon which it paid income tax at the entity level. These requirements could cause it to distribute amounts that otherwise would be spent on investments in real estate assets, and it is possible that the REIT subsidiary might be required to borrow funds, possibly at unfavorable rates, or sell assets to fund the required distributions.

In order to qualify as a REIT, not more than 50% of the value of a REIT subsidiary's shares may be owned, directly or indirectly, through the application of certain attribution rules under the Code, by any five or fewer individuals, as defined in the Code to include specified entities, during the last half of any taxable year other than the REIT subsidiary's first taxable year (the "50% Test"). For purposes of the 50% Test, the REIT subsidiary will "look through" to the beneficial owners of the Fund's shares. Accordingly, if five or fewer individuals or certain specified entities during the last half of any calendar year own, directly or indirectly, more than 50% of the REIT subsidiary's shares through the Fund, then the REIT subsidiary's qualification as a REIT could be jeopardized. The Adviser intends to monitor all purchases and transfers of a REIT subsidiary's shares and the Fund's shares by regularly reviewing, among other things, ownership filings required by the federal securities laws to monitor the beneficial ownership of a REIT subsidiary's shares to ensure that the REIT subsidiary will meet and will continue to meet the 50% Test. However, the Adviser may not have the information necessary for it to ascertain with certainty whether or not a REIT subsidiary satisfies the 50% test and may not be able to prevent the REIT subsidiary from failing the 50% Test. If a REIT subsidiary fails to satisfy the requirements related to the direct or indirect ownership of its outstanding capital stock, the REIT subsidiary would fail to qualify as a REIT and the REIT subsidiary would be required to pay U.S. federal income tax on its taxable income, and distributions to its shareholders would not be deductible by it in determining its taxable income.

***Operational and Technology Risk.*** The Fund, its service providers, and other market participants increasingly depend on complex information technology and communications systems to conduct business functions. These

systems are subject to a number of different threats or risks that could adversely affect the Fund and its shareholders, despite the efforts of the Fund and its service providers to adopt technologies, processes, and practices intended to mitigate these risks. For example, unauthorized third parties may attempt to improperly access, modify, disrupt the operations of, or prevent access to these systems of the Fund, the Fund's service providers, counterparties, or other market participants or data within them (a "cyber-attack").

Power or communications outages, acts of god, information technology equipment malfunctions, operational errors, and inaccuracies within software or data processing systems may also disrupt business operations or impact critical data. Market events also may trigger a volume of transactions that overloads current information technology and communication systems and processes, impacting the ability to conduct the Fund's operations.

Cyber-attacks, disruptions, or failures that affect the Fund's service providers or counterparties may adversely affect the Fund and its shareholders, including by causing losses for the Fund or impairing Fund operations. For example, the Fund's or its service providers' assets or sensitive or confidential information may be misappropriated, data may be corrupted, and operations may be disrupted (e.g., cyber-attacks or operational failures may cause the release of private shareholder information or confidential Fund information, interfere with the processing of shareholder transactions, impact the ability to calculate the Fund's NAV, and impede trading). In addition, cyber-attacks, disruptions, or failures may cause reputational damage and subject the Fund or its service providers to regulatory fines, litigation costs, penalties or financial losses, reimbursement or other compensation costs, and/or additional compliance costs.

While the Fund and its service providers may establish business continuity and other plans and processes to address the possibility of cyber-attacks, disruptions, or failures, there are inherent limitations in such plans and systems, including that they do not apply to third parties, such as other market participants, as well as the possibility that certain risks have not been identified or that unknown threats may emerge in the future.

Similar types of operational and technology risks are also present for issuers of the Fund's investments, which could have material adverse consequences for such issuers, and may cause the Fund's investments to lose value. In addition, cyber-attacks involving a Fund counterparty could affect such counterparty's ability to meet its obligations to the Fund, which may result in losses to the Fund and its shareholders. Furthermore, as a result of cyber-attacks, disruptions, or failures, an exchange or market may close or issue trading halts on specific securities or the entire market, which may result in the Fund being, among other things, unable to buy or sell certain securities or financial instruments or unable to accurately price its investments. The Fund cannot directly control any cybersecurity plans and systems put in place by its service providers, Fund counterparties, issuers in which the Fund invests, or securities markets and exchanges.

In addition, other disruptive events, including (but not limited to) natural disasters and public health crises may adversely affect the Fund's ability to conduct business, in particular if the Fund's employees or the employees of its service providers are unable or unwilling to perform their responsibilities as a result of any such event. Even if the Fund's employees and the employees of its service providers are able to work remotely, those remote work arrangements could result in the Fund's business operations being less efficient than under normal circumstances, could lead to delays in its processing of transactions, and could increase the risk of cyber-attacks.

**MANAGEMENT OF THE FUND**

The Fund is a party to contractual arrangements with various parties, including, among others, the Adviser, the Distributor, the fund administrator, and the transfer agent, who provide services to the Fund. Shareholders are not parties to, or intended ("third-party") beneficiaries of, any such contractual arrangements, and such contractual arrangements are not intended to create in any individual shareholder or group of shareholders any right to enforce them against the service providers or to seek any remedy under them against the service providers, either directly or on behalf of the Fund. Neither this Prospectus, nor the related SAI, is intended, or should be read, to be or to give rise to an agreement or contract between the Fund and any investor, or to give rise to any rights in any shareholder or other person other than any rights under federal or state law that may not be waived.

**Trustees and Officers**

The Board is responsible for the overall management of the Fund, including supervision of the duties performed by the Adviser. The Board is comprised of four trustees (each, a "Trustee"). The Trustees are responsible for the Fund's overall management, including adopting the investment and other policies of the Fund, electing and replacing officers and selecting and supervising the Fund's investment adviser. The name and business address of the Trustees and officers of the Fund and their principal occupations and other affiliations during the past five years, as well as a description of committees of the Board, are set forth under "Management" in the SAI.

**Investment Adviser**

NexPoint Advisors, L.P., which serves as the Adviser to the Fund, is registered with the SEC as an investment adviser under the Advisers Act and is an affiliate of NAM. NexPoint has its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. James Dondero, along with Mark Okada, founded the parent of the Adviser in April 1993. The Adviser also externally manages NexPoint Capital, Inc., a non-traded BDC. NAM manages Highland Opportunities and Income Fund ("HFRO") and Highland Global Allocation Fund ("GAF"), registered closed-end funds whose shares trade on the NYSE. The Adviser's senior management team has experience across private lending, private equity, real estate investing and other investment strategies. Collectively, the Adviser and its affiliates managed approximately $16.9 billion in assets as of December, 31, 2024 including approximately $12.5 billion in gross real estate assets. The Adviser is controlled by James Dondero by virtue of his control of its general partner, NexPoint Advisors GP, LLC.

Under the general supervision of the Board, the Adviser will carry out the investment and reinvestment of the net assets of the Fund, will furnish continuously an investment program with respect to the Fund, and determine which securities should be purchased, sold or exchanged. In addition, the Adviser will supervise and provide oversight of the Fund's service providers. The Adviser has entered into a Services Agreement (the "Services Agreement") with Skyview Group ("Skyview"), pursuant to which the Adviser will receive administrative and operational support services to enable it to provide the required advisory services to the Fund. The Adviser will compensate all Adviser and Skyview personnel who provide services to the Fund. In return for these services, facilities and payments, the Fund has agreed to pay the Adviser as compensation under the Investment Advisory Agreement a monthly management fee computed at the annual rate of 1.25% of the Daily Gross Assets of the Fund. The Adviser may employ research services and service providers to assist in the Adviser's market analysis and investment selection.

A discussion regarding the basis for the Board's approval of the Fund's Investment Advisory Agreement is available in the Fund's annual report to shareholders for the year ended December 31, 2024.

The Adviser and the Fund have entered into the Expense Limitation Agreement under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by

the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily Gross Assets (the "Expense Limitation"). If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared effective by the SEC and to commence operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement will remain in effect until at least May 1, 2026, unless and until the Board approves its modification or termination. The Expense Limitation Agreement may not be amended or terminated unless approved by the Board.

The REIT Subsidiaries entered into a separate investment advisory agreement with the Adviser in July 2016 and June 2022. To the extent fees are paid to the Adviser by the REIT Subsidiaries, such fees will be offset against fees otherwise payable by the Fund to the Advisor, such that shareholders of the Fund will only be subject to one layer of fees to the Adviser. Notwithstanding this arrangement, the Fund and its shareholders will indirectly bear the expenses associated with forming the REIT Subsidiaries, non-advisory fees paid by the REIT Subsidiaries (if any) and operating expenses, including maintaining their REIT qualification. To the extent the Fund forms one or more other REIT subsidiaries, it is expected that they will enter into separate investment advisory agreements that have substantially similar terms. The Fund may invest in funds not managed by an affiliate of the Adviser (including closed-end funds, ETFs, private funds, externally managed traded and non-traded REITs, etc.), in which case two layers of fees will be paid by the Fund.

Pursuant to the Investment Advisory Agreement, the Adviser provides administration services to the Fund, provides executive and other personnel necessary to administer the Fund and furnishes office space. Under a separate sub-administration agreement, dated July 23, 2018, the Adviser has delegated certain administrative functions to SEI Global Funds Services ("SEI") and pays SEI a portion of the fee it receives from the Fund. Under the Sub-Administration Agreement, SEI has agreed to provide fund accounting services; asset data services; fund administration and reporting services; and regulatory administration services, including preparation and filing of various reports with the appropriate regulatory agencies and the SEC for the Fund.

**Portfolio Managers**

James Dondero and Matthew McGraner serve as the portfolio managers and are primarily responsible for the day-to-day management of the Fund.

**James Dondero** is the founder and President of NexPoint Advisors, L.P. ("NexPoint") and co-founder of NexPoint Asset Management, L.P. ("NAM"). Mr. Dondero has over 30 years of experience investing across the alternative landscape. In that time, he established a number of integrated businesses to manage investments in real estate, private equity, and high-yield and structured credit, among other areas. Mr. Dondero holds various leadership roles at NexPoint Advisors, L.P., NexPoint Asset Management, L.P., and other NexPoint affiliates. Mr. Dondero holds various leadership roles across the NexPoint businesses; he serves as a portfolio manager for several funds and is an officer and director at NexPoint's publicly traded REITs. Additionally, Mr. Dondero holds director positions at several companies within financial services, real estate, and other industries. He is the chairman of NexBank Capital, Inc. and a director of SeaOne Holdings, LLC. A dedicated philanthropist, Mr. Dondero actively contributes to initiatives in education, veterans' affairs, and community and economic development, and has been instrumental in supporting a number of civic and cultural institutions in the Dallas-Fort Worth area. He is a member of the Southern Methodist University Cox School of Business Executive Board

and the George W. Bush Presidential Center Executive Advisory Council. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He received certification as a Certified Public Accountant (CPA) and a Certified Managerial Accountant (CMA) and is a holder of the right to use the Chartered Financial Analyst (CFA) designation.

**Mr. McGraner** has extensive experience in real estate and private equity transactions and currently leads the operations of the real estate platform of NexPoint Advisors, L.P. and its affiliates, a suite of leading alternative investment managers he co-founded. In that role, he sources and executes investments, manages risk and develops potential business opportunities, including fundraising, private investments and joint ventures. In his role at NexPoint, Mr. McGraner has served as the Executive VP and Chief Investment Officer of NXRT, a multifamily real estate investment trust, since 2016; NREF, a mortgage REIT, since 2020; VineBrook Homes Trust, a single family rental REIT, since 2019; NexPoint Diversified Real Estate Trust, a diversified REIT, since 2022; and as a member of the board of directors and President of NexPoint Storage Partners, a self-storage REIT, since 2020. Mr. McGraner is also a licensed attorney and was formerly an attorney at an AmLaw 20 multinational law firm, where his practice primarily focused on private equity, real estate and mergers and acquisitions. Since 2013, Mr. McGraner has led the acquisition and financing of over $20.0 billion of real estate investments. Mr. McGraner holds a B.S. from Vanderbilt University and a J.D. from the Washington University School of Law.

The SAI provides additional information about the Fund's portfolio managers' compensation, other accounts managed and ownership of Fund shares.

**Transfer Agent**

SS&C serves as the transfer agent of the Fund.

**Custodian**

Bank of New York Mellon ("BNY"), with principal offices at 240 Greenwich Street, New York, New York 10286, serves as custodian for the securities and cash of the Fund's portfolio. Under a Custodian Agreement, BNY holds the Fund's assets in safekeeping and keeps all necessary records and documents relating to its duties.

**Fund Expenses**

The Adviser is obligated to pay expenses associated with providing the services stated in the Investment Advisory Agreement, including compensation of and office space for its officers and employees connected with investment and economic research, trading and investment management and administration of the Fund. The Adviser is obligated to pay the fees of any Trustee of the Fund who is affiliated with it. The Adviser will provide such services either directly or through the Services Agreement with Skyview.

The Fund pays all other expenses incurred in the operation of the Fund, which consist of: (i) expenses for legal and independent accountants' services; (ii) costs of printing proxies, share certificates, if any, and reports to shareholders; (iii) charges of the custodian and transfer agent in connection with the Fund's distribution reinvestment policy; (iv) fees and expenses of independent Trustees; (v) printing costs; (vi) membership fees in trade associations; (vii) fidelity bond coverage for the Fund's officers and Trustees; (viii) errors and omissions insurance for the Fund's officers and Trustees; (ix) brokerage costs; (x) taxes; (xi) costs associated with the Fund's quarterly repurchase offers; (xii) servicing fees; and (xiii) other extraordinary or non-recurring expenses and other expenses properly payable by the Fund. The expenses incident to the offering and issuance of shares to be issued by the Fund will be capitalized and amortized on a straight-line basis over 12 months.

Class C shares will pay to the Distributor a Distribution Fee that will accrue at an annual rate equal to 0.75% of the Fund's average daily net assets attributable to Class C shares, and is payable on a quarterly basis. Class A and Class Z shares are not subject to Distribution Fees. The Fund will also pay a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Class A and Class C shares. See "Plan of Distribution."

The Fund will pay organizational costs and offering expenses incurred with respect to the offering of its shares from the proceeds of the offering, less amounts advanced under the Expense Limitation. Since February 9, 2018, the Adviser paid or reimbursed the Fund's organizational and offering expenses incurred with respect to its initial and continuous offering and will not seek recoupment of such fees. For tax purposes, offering costs cannot be deducted by the Fund or the Fund's shareholders. Therefore, for tax purposes, the expenses incident to the offering and issuance of shares to be issued by the Fund will be capitalized and amortized on a straight-line basis over 12 months.

The Investment Advisory Agreement authorizes the Adviser to select brokers or dealers (including affiliates) to arrange for the purchase and sale of Fund securities, including principal transactions. Any commission, fee or other remuneration paid to an affiliated broker or dealer will be paid in compliance with the Fund's procedures adopted in accordance with Rule 17e-1 under the 1940 Act.

**DETERMINATION OF NET ASSET VALUE**

The net asset value (or NAV) per share of each class of shares of the Fund is calculated as of 4:00 p.m., Eastern Time, on each day that the NYSE is open for business, except on days on which regular trading on the NYSE is scheduled to close before 4:00 p.m., when the Fund calculates NAV as of the scheduled close of regular trading. The NYSE is open Monday through Friday, but currently is scheduled to be closed on New Year's Day, Dr. Martin Luther King, Jr. Day, Presidents' Day, Good Friday, Memorial Day, Juneteenth Independence Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day or on the preceding Friday or subsequent Monday when a holiday falls on a Saturday or Sunday, respectively. The NAV per share of each class of shares of the Fund is computed by dividing the value of the Fund's net assets (i.e., the value of its securities and other assets less its liabilities, including expenses payable or accrued but excluding capital stock and surplus) attributable to the class of shares by the total number of shares of the class outstanding at the time the determination is made. The value of the Fund's portfolio assets may change on days the Fund is closed. Class A shares will be offered at net asset value plus their respective sales load, while Class C and Class Z shares will be offered at net asset value. During the continuous offering, the price of the shares will increase or decrease on a daily basis according to the net asset value of the shares.

Pursuant to Rule 2a-5 under the 1940 Act, the Board has designated NexPoint as the Fund's valuation designee (the "Valuation Designee") to perform the fair valuation determination for securities and other assets held by the Fund. NexPoint acting through its "Valuation Committee," is responsible for determining the fair value of investments for which market quotations are not readily available. The Valuation Committee is comprised of officers of NexPoint and certain of NexPoint's affiliated companies and determines fair value and oversees the calculation of the NAV. The Valuation Designee is subject to Board oversight and certain reporting and other requirements intended to provide the Board the information it needs to oversee the Valuation Designee.

The Fund's portfolio securities are valued in accordance with valuation policies and procedures established by the Adviser and approved by the Board.

NexPoint uses the following valuation methods to determine either current market value for investments for which market quotations are available or, if not available, the fair value, as determined in good faith pursuant to NexPoint's policies and procedures:

- The market value of each security listed or traded on any recognized securities exchange or automated quotation system will be the last reported sale price at the relevant valuation date on the composite tape or on the principal exchange on which such security is traded. If no sale is reported on that date, or for over-the-counter securities, the Adviser utilizes, when available, pricing quotations from principal market makers. Such quotations may be obtained from third-party pricing services or directly from investment brokers and dealers in the secondary market. Generally, the Fund's loan and bond positions are not traded on exchanges and consequently are valued based on market prices received from third-party pricing services or broker-dealer sources.
- Dividends declared but not yet received, and rights in respect of securities which are quoted ex-dividend or ex-rights, will be recorded at the fair value thereof, as determined by the Adviser, which may (but need not) be the value so determined on the day such securities are first quoted ex-dividend or ex-rights.
- Listed options, or over-the-counter options for which representative brokers' quotations are available, will be valued in the same manner as listed or over-the-counter securities as hereinabove provided. Premiums for the sale of such options written by the Fund will be included in the assets of the Fund, and the market value of such options shall be included as a liability.
- The Fund's non-marketable investments for which market quotations are not readily available will generally be valued in such manner as the Adviser determines in good faith to reflect their fair values under procedures approved by the Board. The Valuation Committee has been established to provide

oversight of the valuation policies, processes and procedures, and is comprised of personnel from the Adviser and its affiliates. The Valuation Committee meets monthly to review the proposed valuations for investments and financial instruments and is responsible for evaluating the overall fairness and consistent application of established policies.

- The pricing of all assets that are fair valued in this manner will be subsequently reported to the Board. Pursuant to the Fund's pricing procedures, securities for which market quotations are not readily available may include securities that are subject to legal or contractual restrictions on resale, securities for which no or limited trading activity has occurred for a period of time, or securities that are otherwise deemed to be illiquid (i.e., securities that cannot be disposed of within seven days at approximately the price at which the security is currently priced by the Fund). Swaps and other derivatives would generally fall under this category.
- Investments by the Fund in any other mutual fund are valued at their respective NAVs as determined by those mutual funds each business day. The prospectuses for those mutual funds explain the circumstances under which those funds will use fair value pricing and the effects of using fair value pricing.

Rule 2a-5 states that a market quotation is readily available only when that quotation is a quoted price (unadjusted) in active markets for identical investments that the Fund can access at the measurement date, provided that a quotation will not be readily available if it is not reliable. Market quotations may also be not "readily available" if a significant event occurs that causes the Adviser to believe that the market price of a security no longer represents the security's current value at the time of the Fund's NAV calculation. In determining the fair value price of a security, the Adviser may use a number of other methodologies, including those based on discounted cash flows, multiples, recovery rates, yield to maturity or discounts to public comparables.

When determining the fair value of an asset, the Adviser will seek to determine the price that the Fund might reasonably expect to receive from the current sale of that asset in an arm's-length transaction. Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value determinations are based upon all available factors that the Adviser deems relevant. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, there can be no assurance that fair value pricing will reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

Private Real Estate Investment Funds and Non-Traded REITs will be difficult to value, particularly to the extent that their underlying investments are not publicly traded. In the event a Non-Traded REIT does not report a value to the Fund on a timely basis, the Adviser, acting pursuant to policies approved by the Board, will determine the fair value of the Fund's investment based on the most recent value reported by the Non-Traded REIT, as well as any other relevant information available at the time the Fund values its investments. Following procedures approved by the Board, in the absence of specific transaction activity in a particular investment fund, the Adviser will consider whether it is appropriate, in light of all relevant circumstances, to value the Fund's investment at the net asset value reported by the Non-Traded REIT at the time of valuation or to adjust the value to reflect a premium or discount.

The Adviser will provide the Board with periodic reports, no less frequently than quarterly, that discuss the functioning of the valuation process, if applicable to that period, and that identify issues and valuation problems that have arisen, if any.

**CONFLICTS OF INTEREST**

As a general matter, certain conflicts of interest may arise in connection with a portfolio manager's management of a fund's investments, on the one hand, and the investments of other accounts for which the portfolio manager is responsible, on the other. For example, it is possible that the various accounts managed could have different investment strategies that, at times, might conflict with one another to the possible detriment of the Fund. Alternatively, to the extent that the same investment opportunities might be desirable for more than one account, possible conflicts could arise in determining how to allocate them. Other potential conflicts might include conflicts created by specific portfolio manager compensation arrangements, and conflicts relating to selection of brokers or dealers to execute Fund portfolio trades and/or specific uses of commissions from Fund portfolio trades (for example, research, or "soft dollars", if any). The Adviser has adopted policies and procedures and has structured its portfolio managers' compensation in a manner reasonably designed to safeguard the Fund from being negatively affected as a result of any such potential conflicts. These policies and procedures generally require that the Adviser distribute investment opportunities among client accounts in a fair and equitable manner (*i.e.*, on a pro rata basis, relative to the size of the order) and seek best execution for securities transactions executed on the Fund's behalf.

If a potential investment is appropriate for either the Fund or another entity managed by the Adviser or its affiliates, such as NXDT, NXRT, VineBrook, NHT, NREF, NexPoint Real Estate Capital, LLC, NexPoint Real Estate Opportunities, LLC, NFRO REIT Sub, LLC or NexPoint Capital REIT, LLC, the Adviser and its affiliates have an allocation policy that provides that opportunities will be allocated among those accounts for which participation in the respective opportunity is considered most appropriate, taking into account, among other considerations with respect to any real estate investments:

First, the allocation policy looks to the investment objectives of the funds managed by the Adviser and its affiliates. To the extent the opportunity is consistent with the investment objectives of more than one fund managed by the Adviser and its affiliates, the allocation policy then looks to other factors, such as:

- which fund has available cash (including availability under lines of credit) to acquire the investment;
- whether there are any positive or negative income tax effects on any of the funds relating to the purchase;
- whether the investment opportunity creates geographic, asset class or tenant concentration / diversification concerns for any of the funds;
- how the investment size, potential leverage, transaction structure and anticipated cash flows affect each fund, including earnings and distribution coverage; and
- whether one or more of the funds has an existing relationship with the tenant(s), operator, facility or system associated with the investment, or a significant geographic presence that would make the investment strategically more important.

The Adviser will allocate investment opportunities across the entities for which such opportunities are appropriate, consistent with its internal conflict of interest and allocation policies. The Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Fund fairly or equitably in the short-term or over time and there can be no assurance that the Fund will be able to participate in all such investment opportunities that are suitable for it. Please see "Risk Factors — Conflicts of Interest" for a description of risks associated with conflicts of interest.

Below are policies and procedures developed by the Adviser to address various conflicts of interest that may involve the Fund.

*Affiliated Services*

In situations where NexPoint and/or its affiliates, including, without limitation, any of their respective employees, provide services (including serving as an officer or director) to various companies in which the Fund has an interest, the relevant employee(s) must promptly notify NexPoint's Chief Compliance Officer of the activity prior to commencement of the service. All compensation in whatever form, including any non-cash compensation such as restricted shares, attributable to NexPoint and/or its affiliates serving as an officer or director to such companies must be immediately paid to the Fund in proportion to the Fund's relative ownership of such companies as of the date paid.

*Portfolio Management*

The Adviser's policies also require the Adviser and its personnel to: (i) ensure that the investment advice provided to the Fund is suitable to the Fund's investment objectives, needs and circumstances; (ii) ensuring fair and equitable allocations of investment opportunities among the Fund and the Adviser's other advisory clients and in the aggregation of orders; and (iii) trading for the Fund only on an agency basis.

The portfolio managers and their teams are responsible for the monitoring and positioning of the investments of the Fund. This includes the evaluation of a variety of factors affecting each investment such as industry and currency risks, concentration and liquidity and the suitability of the investment for the Fund.

The Adviser will not consider: (i) performance fees or differences in management fees between accounts in determining allocations; (ii) direct and indirect ownership of the Adviser or its affiliates or employees in an account in determining allocations; and (iii) relative performance of accounts in determining allocations.

The Adviser and/or any of its affiliates may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund, or of other investment funds managed by the Adviser or its affiliates. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. The Fund may compete with other entities managed by the Adviser and its affiliates for capital and investment opportunities.

There is no limitation or restriction on the Adviser or any of its affiliates with regard to acting as investment manager (or in a similar role) to other parties or persons. This and other future activities of the Adviser and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may be related to obligations that the Adviser or its affiliates have to other clients.

Subject to prior approval of the Board, certain affiliates of the Adviser, including NexBank and Governance Re Ltd. among others, may provide banking, agency, insurance and other services to the Fund and its subsidiaries for customary fees, and neither the Fund, nor its subsidiaries will have a right to any such fees.

*Capital Structure Conflicts*

Conflicts may arise in cases when the Fund invests in different parts of an issuer's capital structure, including circumstances in which one or more advisory clients of NexPoint or its affiliates own private securities or obligations of an issuer and other clients may own public securities of the same issuer. As discussed above, in the event of conflicting interests within an issuer's capital structure, NexPoint will generally pursue the strategy that NexPoint believes best reflects what would be expected to be negotiated in an arm's length transaction with due consideration being given to NexPoint's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or the fees received from such accounts).

*Affiliated Transactions and Cross Trading*

As further described below, the Adviser may effect client cross-transactions where the Adviser causes a transaction to be effected between the Fund and another client advised by the Adviser or any of its affiliates. The

Adviser may engage in a client cross-transaction involving the Fund any time that the Adviser believes such transaction to be fair to the Fund and the other client of the Adviser or its affiliates in accordance with the Adviser's internal written cross-transaction policies and procedures.

The Adviser may direct the Fund to acquire or dispose of investments in cross trades between the Fund and other clients of the Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the 1940 Act and SEC staff interpretation, the Fund may make and/or hold an investment, including an investment in securities, in which the Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Adviser's own investments in such companies.

*Participation in Creditor Committees, Underwriting and Other Activities*

The Adviser and/or any of its affiliates may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout or foreclosure of the Fund's investments. In such circumstances, the Adviser may take positions on behalf of itself or its affiliates that are adverse to the Fund's interests.

The Adviser and/or any of its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Fund. Such transactions are on an arm's-length basis and may be subject to arm's-length fees. There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Adviser and/or any of its affiliates and neither the Fund nor its shareholders shall have the right to any such fees.

*Material Non-Public Information*

There are generally no ethical screens or information barriers among the Adviser and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Adviser, any of its personnel or its affiliates were to receive material non-public information about an investment or issuer, or have an interest in causing us to acquire a particular investment, the Adviser may be prevented from causing the Fund to purchase or sell such asset due to internal restrictions imposed on the Adviser. Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Adviser, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material non-public information could have adverse effects on the Adviser's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Adviser's ability to perform its investment management services to the Fund. In addition, while the Adviser and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Adviser's ability to operate as an integrated platform could also be impaired, which would limit the Adviser's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

NexPoint and its affiliates believe these policies and procedures are reasonably designed to prevent violations of the federal securities laws with respect to the conflicts identified above.

**QUARTERLY REPURCHASES OF SHARES**

Once each quarter, the Fund will offer to repurchase at NAV no less than 5% of the outstanding shares of the Fund, unless such offer is suspended or postponed in accordance with regulatory requirements (as discussed below). The offer to purchase shares is a fundamental policy that may not be changed without the vote of the holders of a majority of the Fund's outstanding voting securities (as defined in the 1940 Act). Shareholders will be notified in writing of each quarterly repurchase offer and the date the repurchase offer ends (the "Repurchase Request Deadline"). Shares received by the Fund or a Financial Intermediary (as defined below) prior to the Repurchase Request Deadline will be repurchased at the NAV per share determined as of the close of regular trading on the NYSE no later than the 14th day after the Repurchase Request Deadline, or the next business day if the 14th day is not a business day (each a "Repurchase Pricing Date").

Shareholders will be notified in writing about each quarterly repurchase offer, how they may request that the Fund repurchase their shares and the "Repurchase Request Deadline," which is the date the repurchase offer ends. The Fund will be deemed to have received a repurchase request order prior to the Repurchase Request Deadline when a financial intermediary or its agent or authorized designee (which may include other intermediaries designated by the financial intermediary to receive orders on the Fund's behalf) (collectively, "Financial Intermediaries") receives the order from the shareholder prior to the Repurchase Request Deadline, provided the Fund receives the repurchase request order from the Financial Intermediary prior to 11:59 p.m. Eastern Time on the date the repurchase offer ends. Financial Intermediaries are responsible for placing orders correctly and promptly with the Fund. Shares tendered for repurchase by shareholders prior to any Repurchase Request Deadline will be repurchased subject to the aggregate repurchase amounts established for that Repurchase Request Deadline. The time between the notification to shareholders and the Repurchase Request Deadline is generally 30 days, but may vary from no more than 42 days to no less than 21 days. Payment pursuant to the repurchase will be made by checks to the shareholder's address of record, or credited directly to a predetermined bank account on the Purchase Payment Date, which will be no more than seven days after the Repurchase Pricing Date. The Board may establish other policies for repurchases of shares that are consistent with the 1940 Act, regulations thereunder and other pertinent laws.

**Determination of Repurchase Offer Amount**

The Board, or a committee thereof, in its sole discretion, will determine the number of shares that the Fund will offer to repurchase (the "Repurchase Offer Amount") for a given Repurchase Request Deadline. The Repurchase Offer Amount will be no less than 5% and no more than 25% of the total number of shares outstanding on the Repurchase Request Deadline. In determining the Repurchase Offer Amount, the Board, or a committee thereof, may consider any information it deems necessary or appropriate, including the percentage of the Fund's outstanding shares tendered in previous repurchase offers; the Adviser's assessment of the liquidity of the Fund's investment portfolio; the potential impact of the Repurchase Offer Amount on Fund shareholders who do not tender their shares; and the potential impact of the Repurchase Offer Amount on the Fund's ability to achieve its investment objective. Investors should not rely on repurchase offers being made in amounts in excess of 5% of Fund assets, even in the event that shareholders tender more than the Repurchase Offer Amount with respect a repurchase offer.

If shareholders tender for repurchase more than the Repurchase Offer Amount for a given repurchase offer, the Fund will repurchase the shares on a pro rata basis. However, the Fund may accept all shares tendered for repurchase by shareholders who own less than one hundred shares and who tender all of their shares, before prorating other amounts tendered. In addition, the Fund will accept the total number of shares tendered in connection with required minimum distributions from an IRA or other qualified retirement plan. It is the shareholder's obligation to both notify and provide the Fund supporting documentation of a required minimum distribution from an individual retirement account ("IRA") or other qualified retirement plan.

**Notice to Shareholders**

Approximately 30 days (but no less than 21 days and more than 42 days) before each Repurchase Request Deadline, the Fund shall send to each shareholder of record and to each beneficial owner of the shares that are the subject of the repurchase offer a notification ("Shareholder Notification"). The Shareholder Notification will contain information shareholders should consider in deciding whether or not to tender their shares for repurchase. The notice also will include detailed instructions on how to tender shares for repurchase, state the Repurchase Offer Amount and identify the dates of the Repurchase Request Deadline, the scheduled Repurchase Pricing Date, and the date the repurchase proceeds are scheduled for payment (the "Repurchase Payment Deadline"), which will be no more than seven days after the Repurchase Pricing Date. The notice also will set forth the NAV that has been computed no more than seven days before the date of notification, and how shareholders may ascertain the NAV after the notification date.

**Repurchase Price**

The repurchase price of the shares will be the NAV as of the close of regular trading on the NYSE on the Repurchase Pricing Date. You may call (844) 485-9167 to learn the NAV. The notice of the repurchase offer also will provide information concerning the NAV, such as the NAV as of a recent date or a sampling of recent NAVs, and a toll-free number for information regarding the repurchase offer.

**Repurchase Amounts and Payment of Proceeds**

Shares tendered for repurchase by shareholders prior to any Repurchase Request Deadline will be repurchased subject to the aggregate Repurchase Offer Amount established for that Repurchase Request Deadline. Payment pursuant to the repurchase offer will be made by check to the shareholder's address of record, or credited directly to a predetermined bank account on the Repurchase Payment Deadline. The Board may establish other policies for repurchases of shares that are consistent with the 1940 Act, regulations thereunder and other pertinent laws.

If shareholders tender for repurchase more than the Repurchase Offer Amount for a given repurchase offer, the Board may, but is not required to, authorize the Fund to repurchase an additional amount of shares not to exceed 2% of the outstanding shares of the Fund on the Repurchase Request Deadline. If the Fund determines not to repurchase more than the Repurchase Offer Amount, or if shareholders tender shares in an amount exceeding the Repurchase Offer Amount plus 2% of the outstanding shares on the Repurchase Request Deadline, the Fund will repurchase the shares on a pro rata basis. However, the Fund may accept all shares tendered for repurchase by shareholders who own less than one hundred shares and who tender all of their shares, before prorating other amounts tendered.

**Contingent Deferred Sales Charge ("CDSC")**

Selling brokers, or other Financial Intermediaries that have entered into distribution agreements with the Distributor with respect to the sale of Class A and Class C shares, may receive a commission of up to 1.00% of the purchase price of Class A or Class C shares of $5,000,000 or more. Shareholders who tender for repurchase of such shareholder's Class A or Class C shares within 18 months of purchase will be subject to a CDSC of 1.00% of the original purchase price, which will be deducted from repurchase proceeds, if: (i) the original purchase was for amounts of $500,000 or more; and (ii) the shares were purchased without an initial sales charge. The Distributor may waive the imposition of the CDSC in the following situations: (1) shareholder death; or (2) shareholder disability. Any such waiver does not imply that the CDSC will be waived at any time in the future or that such CDSC will be waived for any other shareholder. Class Z shares will not be subject to an early-withdrawal charge.

**Suspension or Postponement of Repurchase Offer**

The Fund may suspend or postpone a repurchase offer only: (a) if making or effecting the repurchase offer would cause the Fund to lose its status as a RIC under the Code; (b) for any period during which the NYSE or any

market on which the securities owned by the Fund are principally traded is closed, other than customary weekend and holiday closings, or during which trading in such market is restricted; (c) for any period during which an emergency exists as a result of which disposal by the Fund of securities owned by it is not reasonably practicable, or during which it is not reasonably practicable for the Fund fairly to determine the value of its net assets; or (d) for such other periods as the Commission may by order permit for the protection of shareholders of the Fund.

**Liquidity Requirements**

The Fund must maintain liquid assets equal to the Repurchase Offer Amount from the time that the notice is sent to shareholders until the Repurchase Pricing Date. The Fund will ensure that a percentage of its net assets equal to at least 100% of the Repurchase Offer Amount consists of assets that can be sold or disposed of in the ordinary course of business at approximately the price at which the Fund has valued the investment within the time period between the Repurchase Request Deadline and the Repurchase Payment Deadline. The Board has adopted procedures that are reasonably designed to ensure that the Fund's assets are sufficiently liquid so that the Fund can comply with the repurchase offer and the liquidity requirements described in the previous paragraph. If, at any time, the Fund falls out of compliance with these liquidity requirements, the Board will take whatever action it deems appropriate to ensure compliance.

**Consequences of Repurchase Offers**

Repurchase offers will typically be funded from available cash or sales of portfolio securities. Payment for repurchased shares, however, may require the Fund to liquidate portfolio holdings earlier than the Adviser otherwise would, thus increasing the Fund's portfolio turnover and potentially causing the Fund to realize losses.

The Adviser intends to take measures to attempt to avoid or minimize such potential losses and turnover, and instead of liquidating portfolio holdings, may borrow money to finance repurchases of shares. If the Fund borrows to finance repurchases, interest on that borrowing will negatively affect shareholders who do not tender their shares in a repurchase offer by increasing the Fund's expenses and reducing any net investment income. To the extent the Fund finances repurchase amounts by selling Fund investments, the Fund may hold a larger proportion of its assets in less liquid securities. The sale of portfolio securities to fund repurchases also could reduce the market price of those underlying securities, which in turn would reduce the Fund's NAV.

Repurchase of the Fund's shares will tend to reduce the amount of outstanding shares and, depending upon the Fund's investment performance, its net assets. A reduction in the Fund's net assets would increase the Fund's expense ratio, to the extent that additional shares are not sold and expenses otherwise remain the same (or increase). In addition, the repurchase of shares by the Fund will be a taxable event to shareholders.

The Fund is intended as a long-term investment. The Fund's quarterly repurchase offers are a shareholder's only means of liquidity with respect to his or her shares. Shareholders have no rights to redeem or transfer their shares, other than limited rights of a shareholder's descendants to redeem shares in the event of such shareholder's death pursuant to certain conditions and restrictions. The shares are not traded on a national securities exchange and no secondary market exists for the shares, nor does the Fund expect a secondary market for its shares to exist in the future.

**DISTRIBUTION POLICY**

The Fund's distribution policy is to make monthly distributions to shareholders. The Fund's Board has the ultimate discretion as to whether such distributions will be in kind or in cash. If, for any distribution, investment company taxable income (which term includes net short-term capital gain), if any, and net tax-exempt income, if any, is less than the amount of the distribution, such difference will generally constitute a tax-free return of capital distributed from the Fund's assets. The Fund's final distribution for each taxable year will include any remaining investment company taxable income and net tax-exempt income undistributed during the year, as well as all net capital gain realized during the year. If the total distributions made in any taxable year exceed investment company taxable income, net tax-exempt income and net capital gain, such excess distributed amount would be treated as ordinary dividend income to the extent of the Fund's current and accumulated earnings and profits. Distributions in excess of the earnings and profits would first be a tax-free return of capital to the extent of a shareholder's adjusted tax basis in the shares. After such adjusted tax basis is reduced to zero, the distribution would constitute capital gain (assuming the shares are held as capital assets).

This distribution policy may, under certain circumstances, have certain adverse consequences to the Fund and its shareholders because it may result in a return of capital, which in turn may result in fewer of a shareholder's assets being invested in the Fund and which, over time, would increase the Fund's expense ratio and decrease returns of shareholders. The distribution policy also may cause the Fund to sell securities at a time it would not otherwise do so in order to manage the distribution of income and gain. The initial distribution will be declared on a date determined by the Board. If the Fund's investments are delayed, the initial distribution may consist principally of a return of capital.

Unless the registered owner of shares elects to receive cash, all dividends declared on shares will be automatically reinvested in additional shares of the Fund. See "Distribution Reinvestment Policy."

The dividend distribution described above may result in the payment of approximately the same amount or percentage to the Fund's shareholders each period.

Shareholders receiving periodic payments from the Fund may be under the impression that they are receiving net profits. However, all or a portion of a distribution may consist of a return of capital. Shareholders should not assume that the source of a distribution from the Fund is net profit. A return of capital distribution is not taxable to a shareholder unless it exceeds a shareholder's tax cost (or "tax basis") in the Fund's shares. Returns of capital distributions reduce a shareholder's tax basis, thereby potentially increasing the taxable gain, if any, or decreasing the loss recognized by a shareholder upon a subsequent disposition of Fund shares. Once a shareholder's tax basis is reduced to zero, any further return of capital distribution would be taxable as capital gains, provided shares are held as capital assets. As required under Section 19(a) of the 1940 Act, the Fund will provide a notice to shareholders at the time of distribution when such distribution does not consist solely of net income. Additionally, each distribution payment will be accompanied by a written statement which discloses the source or sources of each distribution. The IRS requires you to report the amounts so received in any calendar year, excluding returns of capital, in each case as determined and reported on Forms 1099 (which amounts may differ from the sum of the amounts reported in prior notices under Section 19(a) as a result of the Fund's performance subsequent to such notices), on your income tax return, generally for the calendar year in which such amounts were received. The Fund will provide disclosures, with each distribution, that estimate the percentages of the current and year-to-date distributions that represent: (1) net investment income; (2) capital gains; and (3) return of capital. At the end of the year, the Fund may be required under applicable law to re-characterize distributions made previously during that year among: (1) ordinary income; (2) capital gains; and (3) return of capital for tax purposes. An additional distribution may be made in December, and other additional distributions may be made with respect to a particular fiscal year in order to comply with applicable law. Shareholders should read any written disclosure provided pursuant to Section 19(a) and Rule 19a-1 carefully and should not assume that the source of any distribution from the Fund is net profit.

The Board reserves the right to change the monthly distribution policy from time to time.

**DISTRIBUTION REINVESTMENT POLICY**

The Fund will operate under a distribution reinvestment policy administered by SS&C (the "Agent"). Pursuant to the policy, the Fund's ordinary income dividends, capital gain distributions or other distributions (each, a "Distribution" and collectively, "Distributions"), net of any applicable U.S. withholding tax, are reinvested in shares of the Fund.

Shareholders automatically participate in the distribution reinvestment policy, unless and until an election is made to withdraw from the policy on behalf of such participating shareholder. Shareholders who do not wish to have Distributions automatically reinvested should so notify the Agent in writing at NexPoint Real Estate Strategies Fund, c/o SS&C Technologies, Inc., P.O. Box 219630, Kansas City, MO 64121-9730. Such written notice must be received by the Agent 30 days prior to the record date of the Distribution or the shareholder will receive such Distribution in shares through the distribution reinvestment policy. Under the distribution reinvestment policy, the Fund's Distributions to shareholders are reinvested in full and fractional shares as described below.

When the Fund declares a Distribution, the Agent, on the shareholder's behalf, will receive additional authorized shares from the Fund either newly-issued or repurchased from shareholders by the Fund and held as treasury shares. The number of shares to be received when Distributions are reinvested will be determined by dividing the amount of the Distribution by the Fund's NAV per share.

The Agent will maintain all shareholder accounts and furnish written confirmations of all transactions in the accounts, including information needed by shareholders for personal and tax records. The Agent will hold shares in the account of the shareholders in non-certificated form in the name of the participant, and each shareholder's proxy, if any, will include those shares purchased pursuant to the distribution reinvestment policy. Each participant, nevertheless, has the right to request certificates for whole and fractional shares owned. The Fund will issue certificates in its sole discretion. The Agent will distribute all proxy solicitation materials, if any, to participating shareholders.

In the case of shareholders, such as banks, brokers or nominees, that hold shares for others who are beneficial owners participating under the distribution reinvestment policy, the Agent will administer the distribution reinvestment policy on the basis of the number of shares certified from time to time by the record shareholder as representing the total amount of shares registered in the shareholder's name and held for the account of beneficial owners participating under the distribution reinvestment policy.

Neither the Agent nor the Fund shall have any responsibility or liability beyond the exercise of ordinary care for any action taken or omitted pursuant to the distribution reinvestment policy, nor shall they have any duties, responsibilities or liabilities except as expressly set forth herein. Neither shall they be liable hereunder for any act done in good faith or for any good faith omissions to act, including, without limitation, failure to terminate a participant's account prior to receipt of written notice of his or her death or with respect to prices at which shares are purchased or sold for the participants account and the terms on which such purchases and sales are made, subject to applicable provisions of the federal securities laws.

The automatic reinvestment of Distributions will not relieve participants of any federal, state or local income tax that may be payable (or required to be withheld) on such Distributions. See "U.S. Federal Income Tax Matters."

The Fund reserves the right to amend or terminate the distribution reinvestment policy. There is no direct service charge to participants with regard to purchases under the distribution reinvestment policy; however, the Fund reserves the right to amend the distribution reinvestment policy to include a service charge payable by the participants.

All correspondence concerning the distribution reinvestment policy should be directed to the Agent at NexPoint Real Estate Strategies Fund, c/o SS&C Technologies, Inc., P.O. Box 219630, Kansas City, MO 64121-9730. Certain transactions can be performed by calling the toll free number (844) 485-9167.

**U.S. FEDERAL INCOME TAX MATTERS**

The following briefly summarizes some of the important federal income tax consequences to shareholders of investing in the Fund's shares, reflects the federal tax law as of the date of this Prospectus, and does not address special tax rules applicable to certain types of investors, such as corporate, tax-exempt and foreign investors. The summary discusses certain U.S. federal income tax consequences that may be relevant to a shareholder of the Fund that acquires, holds and/or disposes of shares of the Fund, and reflects provisions of the Code, existing Treasury regulations, rulings published by the IRS, and other applicable authority, as of the date of this Prospectus. These authorities are subject to change by legislative or administrative action, possibly with retroactive effect. The following discussion is only a summary of some of the important tax considerations generally applicable to investments in the Fund and the discussion set forth herein does not constitute tax advice. For more detailed information regarding tax considerations, see the SAI. There may be other tax considerations applicable to particular investors such as those holding shares in a tax-advantaged account such as an IRA or 401(k) plan. In addition, income earned through an investment in the Fund may be subject to state, local and foreign taxes. Investors should consult their tax advisers regarding other federal, state or local tax considerations that may be applicable in their particular circumstances, as well as any proposed tax law changes.

The Fund has elected to be treated and intends to qualify each year for taxation as a RIC under Subchapter M of the Code. In order for the Fund to qualify as a RIC, it must meet certain requirements regarding the sources of its income, the diversification of its assets, and the amount and timing of its distributions each year. If the Fund meets such requirements and so qualifies for the favorable tax treatment accorded to RICs, the Fund (but not the shareholder) will not be subject to federal income tax on income or gains distributed in a timely manner to its shareholders in the form of dividends or capital gain distributions. The Code imposes a 4% nondeductible excise tax on RICs, such as the Fund, to the extent they do not meet certain distribution requirements by the end of each calendar year. The Fund anticipates meeting these distribution requirements so as to avoid being subject to the 4% excise tax.

The Fund intends to make distributions of investment company taxable income after payment of the Fund's operating expenses no less frequently than annually. Unless a shareholder is ineligible to participate or elects otherwise, all distributions will be automatically reinvested in additional shares of the Fund pursuant to the distribution reinvestment policy. For U.S. federal income tax purposes, all dividends are generally taxable whether a shareholder receives them in cash or reinvests them in additional shares of the Fund. Distributions of the Fund's investment company taxable income (including short-term capital gains) will generally be taxable to shareholders as ordinary income to the extent of the Fund's current and accumulated earnings and profits. Distributions of the Fund's net capital gains (that is, the excess of net long-term capital gain over net short-term capital loss, in each case determined with reference to any loss carryforwards) properly reported by the Fund as capital gain dividends ("Capital Gain Dividends"), if any, are taxable to shareholders as long-term capital gains, regardless of the length of time shares have been held by shareholders. Distributions, if any, in excess of the Fund's earnings and profits will first reduce the adjusted tax basis of a holder's shares (thereby increasing any taxable gain or decreasing any taxable loss in connection with a subsequent taxable disposition of such shares) and, after that basis has been reduced to zero, will constitute capital gains to the shareholder of the Fund (assuming the shares are held as a capital asset). Some portions of the Fund's distributions may be eligible for the dividends-received deduction in the case of corporate shareholders and may be eligible to be treated as qualified dividend income in the case of shareholders taxed as individuals, provided, in both cases, the shareholder meets certain holding period and other requirements in respect of the Fund's shares. Dividends received by the Fund from a REIT will not qualify for the corporate dividends-received deduction and generally will not constitute qualified dividend income. There can be no assurance as to what portion of Fund distributions, if any, may be eligible for the dividends received deduction or for treatment as qualified dividend income.

If you sell, exchange or otherwise dispose of any of your shares of the Fund (including (i) exchanging them for shares of another eligible Fund as described in "Exchange of Shares" below or (ii) through a redemption) you will generally recognize a gain or loss in an amount equal to the difference between your tax basis in such shares

of the Fund and the amount you receive upon disposition of such shares. If you hold your shares as capital assets, any such gain or loss will be long-term capital gain or loss if you have held (or are treated as having held) such shares for more than one year at the time of sale. All or a portion of any loss you realize on a taxable sale or exchange of your shares of the Fund will be disallowed if you acquire other shares of the Fund (whether through the automatic reinvestment of dividends or otherwise) within a 61-day period beginning 30 days before and ending 30 days after your sale or exchange of the shares. In such case, the basis of the shares acquired will be adjusted to reflect the disallowed loss.

In addition, any loss realized upon a taxable sale or exchange of Fund shares held (or deemed held) by you for six months or less will be treated as long-term, rather than short-term, to the extent of any capital gain dividends received (or deemed received) by you with respect to those shares.

The Fund will inform its shareholders of the source and tax status of all distributions promptly after the close of each calendar year.

## DESCRIPTION OF CAPITAL STRUCTURE AND SHARES

The Fund is an unincorporated statutory trust established under the laws of the State of Delaware upon the filing of a Certificate of Trust with the Secretary of State of Delaware on January 11, 2016. The Fund's Agreement and Declaration of Trust (the "Declaration of Trust") provides that the Trustees of the Fund may authorize separate classes of shares of beneficial interest. The Trustees have authorized an unlimited number of shares. The Fund does not intend to hold annual meetings of its shareholders.

The Declaration of Trust, which has been filed with the SEC, permits the Fund to issue an unlimited number of full and fractional shares of beneficial interest, no par value. The Fund offers three different classes of shares: Class A, Class C, and Class Z shares. The Fund has received exemptive relief from the SEC to issue multiple classes of shares and to impose asset-based distribution fees and early-withdrawal charges (See IC Release No. 28908, September 22, 2009). An investment in any share class of the Fund represents an investment in the same assets of the Fund. However, the minimum investment amounts, sales loads, and ongoing fees and expenses for each share class are different. The fees and expenses for the Fund are set forth in "Fees and Fund Expenses." The details of each share class are set forth in "Plan of Distribution."

Holders of shares will be entitled to the payment of dividends when, as and if declared by the Board. The Fund currently intends to make dividend distributions to its shareholders after payment of Fund operating expenses including interest on outstanding borrowings, if any, no less frequently than quarterly. Unless the registered owner of shares elects to receive cash, all dividends declared on shares will be automatically reinvested for shareholders in additional shares of the same class of the Fund. See "Distribution Policy." The 1940 Act may limit the payment of dividends to the holders of shares.

Each whole share shall be entitled to one vote as to matters on which it is entitled to vote pursuant to the terms of the Declaration of Trust on file with the SEC. Upon liquidation of the Fund, after paying or adequately providing for the payment of all liabilities of the Fund, and upon receipt of such releases, indemnities and refunding agreements as they deem necessary for their protection, the Trustees may distribute the remaining assets of the Fund among its shareholders. The shares are not liable to further calls or to assessment by the Fund. There are no pre-emptive rights associated with the shares. The Declaration of Trust provides that the Fund's shareholders are not liable for any liabilities of the Fund. Although shareholders of an unincorporated statutory trust established under Delaware law, in certain limited circumstances, may be held personally liable for the obligations of the Fund as though they were general partners, the provisions of the Declaration of Trust described in the foregoing sentence make the likelihood of such personal liability remote.

The Fund generally will not issue share certificates. However, upon written request to the Fund's transfer agent, a share certificate may be issued at the Fund's discretion for any or all of the full shares credited to an investor's account. Share certificates that have been issued to an investor may be returned at any time. The Fund's transfer agent will maintain an account for each shareholder upon which the registration of shares are recorded, and transfers, permitted only in rare circumstances, such as death or bona fide gift, will be reflected by bookkeeping entry, without physical delivery. The transfer agent will require that a shareholder provide requests in writing, accompanied by a valid signature guarantee form, when changing certain information in an account such as wiring instructions or telephone privileges.

The following table shows the amounts of Fund shares that have been authorized and are outstanding as of March 31, 2025:

| Title of Class | Amount Authorized | Amount Held by Fund or for its Account | Amount Outstanding Excluding Amount Shown Under |
|---|---|---|---|
| Class A | Unlimited | None | 464,693 |
| Class C | Unlimited | None | 162,541 |
| Class Z | Unlimited | None | 1,432,029 |

**ANTI-TAKEOVER PROVISIONS IN THE DECLARATION OF TRUST**

The Declaration of Trust includes provisions that could have the effect of limiting the ability of other entities or persons to acquire control of the Fund or to change the composition of the Board, and could have the effect of depriving the Fund's shareholders of an opportunity to sell their shares at a premium over prevailing market prices, if any, by discouraging a third party from seeking to obtain control of the Fund. These provisions may have the effect of discouraging attempts to acquire control of the Fund, which attempts could have the effect of increasing the expenses of the Fund and interfering with the normal operation of the Fund. The Trustees are elected for indefinite terms and do not stand for reelection. A Trustee may be removed from office without cause only by a written instrument signed or adopted by a majority of the remaining Trustees or by a vote of the holders of at least two-thirds of the class of shares of the Fund that are entitled to elect a Trustee and that are entitled to vote on the matter. The Declaration of Trust does not contain any other specific inhibiting provisions that would operate only with respect to an extraordinary transaction such as a merger, reorganization, tender offer, sale or transfer of substantially all of the Fund's asset, or liquidation.

**PLAN OF DISTRIBUTION**

NexPoint Securities, Inc., located at 200 Crescent Court, Suite 700, Dallas, Texas 75201, serves as the Fund's principal underwriter, within the meaning of the 1940 Act, and acts as the distributor of the Fund's shares on a reasonable efforts basis, subject to various conditions. The Distributor is an affiliate of the Adviser. The Fund's shares are offered for sale through the Distributor at NAV plus the applicable sales load. The Distributor also may enter into selected dealer agreements with other broker-dealers for the sale and distribution of the Fund's shares. No arrangement has been made to place funds received in an escrow, trust or similar account. The Distributor is not required to sell any specific number or dollar amount of the Fund's shares, but will use its reasonable efforts to sell the shares. Shares of the Fund will not be listed on any national securities exchange and the Distributor will not act as a market marker in Fund shares.

On a quarterly basis, Class C shares will pay a Distribution Fee that will accrue at an annual rate equal to 0.75% of the Fund's average daily net assets attributable to Class C shares. Class A and Class Z shares are not subject to Distribution Fees. Class A and Class C shares are subject to a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Fund attributable to each respective share class.

**Additional Broker Dealer Compensation**

The Adviser or its affiliates, in the Adviser's discretion and from their own resources (which may include the Adviser's legitimate profits from the advisory fee it receives from the Fund), may pay additional compensation to brokers or dealers in connection with the sale and distribution of Fund shares (the "Additional Compensation"). In return for the Additional Compensation, the Fund may receive certain marketing advantages including access to a broker's or dealer's registered representatives, placement on a list of investment options offered by a broker or dealer, or the ability to assist in training and educating the broker's or dealer's registered representatives. The Additional Compensation may differ among brokers or dealers in amount or in the manner of calculation: payments of Additional Compensation may be fixed dollar amounts, or based on the aggregate value of outstanding shares held by shareholders introduced by the broker or dealer, or determined in some other manner. The receipt of Additional Compensation by a selling broker or dealer may create potential conflicts of interest between an investor and its broker or dealer who is recommending the Fund over other potential investments. The payment of Additional Compensation may also have the effect of increasing the Fund's assets under management, which would increase management fees payable to the Adviser. There is no limit on the amount of additional compensation paid by the Adviser or its affiliates, subject to the limitations imposed by FINRA.

Additionally, the Fund, the Adviser and/or their respective affiliates, may pay a servicing fee to the Distributor and to other selected securities dealers and other financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. Such services may include electronic processing of client orders, electronic fund transfers between clients and the Fund, account reconciliations with the Fund's transfer agent, facilitation of electronic delivery to clients of Fund documentation, monitoring client accounts for back-up withholding and any other special tax reporting obligations, maintenance of books and records with respect to the foregoing, and such other information and liaison services as the Fund or the Adviser may reasonably request. Pursuant to a Shareholder Servicing Plan and Agreement, the Fund's (and, indirectly, the Class A and Class C holders') share of such servicing fees will not exceed an annual rate of 0.25% of the Fund's average daily net asset value.

Prior to the initial public offering of shares, the Adviser purchased $101,750 in shares of the Fund, which amount meets the net worth requirements of Section 14(a) of the 1940 Act.

**Purchasing Shares**

Investors may purchase shares directly from the Fund in accordance with the instructions below. Investors may buy and sell shares of the Fund through Financial Intermediaries that have made arrangements with the Fund and

are authorized to buy and sell shares of the Fund. Orders will be priced at the appropriate price next computed after it is received by the Fund or a Financial Intermediary. A Financial Intermediary may hold shares in an omnibus account in the Financial Intermediary's name or the Financial Intermediary may maintain individual ownership records. The Fund may pay the Financial Intermediary for maintaining individual ownership records as well as providing other shareholder services. Financial Intermediaries may charge fees for the services they provide in connection with processing your transaction order or maintaining an investor's account with them. Investors should check with their Financial Intermediary to determine if their account is subject to these arrangements. The Fund will be deemed to have received a purchase order prior when a Financial Intermediary receives the order from the shareholder. Financial Intermediaries are responsible for placing orders correctly and promptly with the Fund, forwarding payment promptly. Orders transmitted with a Financial Intermediary before the close of regular trading (generally 4:00 p.m., Eastern Time) on a day that the NYSE is open for business will be priced based on the Fund's NAV next computed after it is received by the Financial Intermediary.

**By Mail**

To make an initial purchase by mail, complete an account application and mail the application, together with a check made payable to NexPoint Real Estate Strategies Fund to:

**Regular Mail**

NexPoint Real Estate Strategies Fund
c/o SS&C Technologies, Inc.
P.O. Box 219630
Kansas City, MO 64121-9730

**Express Mail**

NexPoint Real Estate Strategies Fund
c/o SS&C Technologies, Inc.
801 Pennsylvania Ave
Kansas City, MO 64105

All checks must be in U.S. Dollars drawn on a domestic bank. The Fund will not accept payment in cash or money orders. The Fund also does not accept cashier's checks in amounts of less than $500. To prevent check fraud, the Fund will neither accept third party checks, Treasury checks, credit card checks, traveler's checks or starter checks for the purchase of shares, nor post-dated checks, post-dated on-line bill pay checks, or any conditional purchase order or payment.

It is the policy of the Fund not to accept applications under certain circumstances or in amounts considered disadvantageous to shareholders. The Fund reserves the right to reject any application.

**By Wire — Initial Investment**

To make an initial investment in the Fund, the transfer agent must receive a completed account application before an investor wires funds. Investors may mail or overnight deliver an account application to the transfer agent. Upon receipt of the completed account application, the transfer agent will establish an account. The account number assigned will be required as part of the instruction that should be provided to an investor's bank to send the wire. An investor's bank must include both the name of the Fund, the account number, and the investor's name so that monies can be correctly applied. If you wish to wire money to make an investment in the Fund, please call the Fund at (844) 485-9167 for wiring instructions and to notify the Fund that a wire transfer is coming. Any commercial bank can transfer same-day funds via wire. The Fund will normally accept wired funds for investment on the day received if they are received by the Fund's designated bank before the close of regular

trading on the NYSE. Your bank may charge you a fee for wiring same-day funds. The bank should transmit funds by wire to:

ABA #: (number provided by calling toll-free number above)
Credit: SS&C Technologies, Inc.
Account #: (number provided by calling toll-free number above)
Further Credit:
NexPoint Real Estate Strategies Fund
(shareholder registration)
(shareholder account number)

**By Wire — Subsequent Investments**

Before sending a wire, investors must contact the transfer agent to advise them of the intent to wire funds. This will ensure prompt and accurate credit upon receipt of the wire. Wired funds must be received prior to 4:00 p.m. Eastern time to be eligible for same day pricing. The Fund, and its agents, including the transfer agent and custodian, are not responsible for the consequences of delays resulting from the banking or Federal Reserve wire system, or from incomplete wiring instructions.

**Automatic Investment Plan — Subsequent Investments**

You may participate in the Fund's Automatic Investment Plan, an investment plan that automatically moves money from your bank account and invests it in the Fund through the use of electronic funds transfers or automatic bank drafts. You may elect to make subsequent investments by transfers of a minimum of $50 on specified days of each month into your established Fund account. Please contact the Fund at (844) 485-9167 for more information about the Fund's Automatic Investment Plan.

**By Telephone**

Investors may purchase additional shares of the Fund by calling (844) 485-9167. If an investor elected this option on the account application, and the account has been open for at least 15 days, telephone orders will be accepted via electronic funds transfer from your bank account through the Automated Clearing House (ACH) network. Banking information must be established on the account prior to making a purchase. Orders for shares received prior to 4 p.m. Eastern time will be purchased at the appropriate price calculated on that day.

Telephone trades must be received by or prior to market close. During periods of high market activity, shareholders may encounter higher than usual call waits. Please allow sufficient time to place your telephone transaction.

In compliance with the USA Patriot Act of 2001, SS&C will verify certain information on each account application as part of the Fund's Anti-Money Laundering Program. As requested on the application, investors must supply full name, date of birth, social security number and permanent street address. Mailing addresses containing only a P.O. Box will not be accepted. Investors may call SS&C at (844) 485-9167 for additional assistance when completing an application.

If SS&C does not have a reasonable belief of the identity of a customer, the account will be rejected or the customer will not be allowed to perform a transaction on the account until such information is received. The Fund also may reserve the right to close the account within 5 business days if clarifying information/documentation is not received.

**Exchange of Shares**

Shareholders of the Fund whose shares are repurchased during a Repurchase Offer may exchange those shares for shares of the same share class of any series within NexPoint Funds I or NexPoint Funds II. Such exchanges

will be effected at the daily NAV per share, such exchanges will be available during all Repurchase offer periods, subject to the limitations set forth below. **Call (844) 485-9167 for the prospectus of the fund being purchased, including applicable investment minimums, and read it carefully before investing.**

Your exchange privilege will be revoked if the exchange activity is considered excessive. In addition, the Fund may reject any exchange request for any reason, including if it does not think that the exchange is in the best interests of the Fund and/or its shareholders. The Fund may also terminate your exchange privilege if the Adviser determines that your exchange activity is likely to adversely impact its ability to manage the Fund or if the Fund otherwise determines that your exchange activity is contrary to its short-term trading policies and procedures.

Unless you are a tax-exempt investor or investing through a tax-advantaged retirement account or other tax-advantaged arrangement, an exchange is generally a taxable event, and you may realize a gain or a loss for federal income tax purposes. See "U.S. Federal Income Tax Matters." To exchange by telephone, call (844) 485-9167. Please have your account and taxpayer identification number available when calling.

**Financial Consultants — Subsequent Investments**

Investors may purchase additional shares of the Fund by contacting their financial consultants, such as a broker or investment adviser, and such intermediaries can arrange additional purchases for them.

**Share Class Considerations**

When selecting a share class, you should consider the following:

- which share classes are available to you;
- how much you intend to invest;
- how long you expect to own the shares; and
- total costs and expenses associated with a particular share class.

Each investor's financial considerations are different. You should speak with your financial advisor to help you decide which share class is best for you. Not all Financial Intermediaries offer all classes of shares. If your Financial Intermediary offers more than one class of shares, you should carefully consider which class of shares to purchase.

**Purchase Terms**

**Class A Shares**

Class A shares are sold at the prevailing net asset value per Class A share plus the applicable sales load (which may be reduced as described below); however, the following are additional features that should be taken into account when purchasing Class A shares:

- a minimum initial investment of $500 for regular accounts and $50 for retirement plan accounts, and a minimum subsequent investment of: (i) $50 under the Fund's automatic investment program; and (ii) $50 if not made pursuant to the automatic investment program;
- a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Fund attributable to Class A shares; and
- shareholders tendering Class A shares fewer than 18 months after the original purchase date may be subject to a CDSC of 1.00%, which will be deducted from repurchase proceeds, if: (i) the original purchase was for amounts of $500,000 or more; and (ii) the shares were purchased without an initial sales charge.

The price of the Class A shares during the Fund's continuous offering will fluctuate over time with the net asset value of the Class A shares. Investors in Class A shares will pay a sales load based on the amount of their investment in the Fund. The sales load payable by each investor depends upon the amount invested by such investor in the Fund, but may range from 0.00% to 5.75%, as set forth in the table below. A reallowance to participating broker-dealers will be made by the Distributor from the sales load paid by each investor. There are no sales loads on reinvested distributions. The Fund reserves the right to waive broker commissions. The following sales loads apply to your purchases of Class A shares of the Fund:

| Amount Invested | Dealer Reallowance | Distributor Fee | Total Sales Load as a % of Offering Price | Total Sales Load as a % of Amount Invested |
|---|---|---|---|---|
| Under $50,000 | 5.00% | 0.75% | 5.75% | 6.10% |
| $50,000 to $99,999 | 4.50% | 0.50% | 5.00% | 5.26% |
| $100,000 to $249,999 | 3.50% | 0.50% | 4.00% | 4.17% |
| $250,000 to $499,999 | 2.50% | 0.50% | 3.00% | 3.09% |
| $500,000 and above* | ** | None | ** | see below |

* Class A Shares bought without an initial sales charge in accounts aggregating $500,000 or more at the time of purchase are subject to a 1.00% CDSC if the shares are sold within 18 months of purchase. Subsequent Class A Share purchases that bring a shareholder's account value above $500,000 are not subject to a front-end sales charge, but are subject to a CDSC if redeemed within 18 months of purchase. The 18-month period begins on the day the purchase is made. The CDSC does not apply to load waived shares purchased for certain retirement plans or other eligible fee-based programs.

** A selling broker may receive a commission on purchases of Class A shares of $500,000 or above as detailed below:

| Amount Invested | Dealer Reallowance |
|---|---|
| Less than $5,000,000 | 1.00% |
| $5,000,000 to less than $25,000,000 | 0.50% |
| $25,000,000 or more | 0.25% |

You may be able to buy Class A shares without a sales charge (i.e., "load-waived") when you are:

- reinvesting dividends or distributions;
- participating in an investment advisory or agency commission program under which you pay a fee to an investment advisor or other firm for portfolio management or brokerage service;
- exchanging an investment in Class A (or equivalent type) shares of another fund for an investment in the Fund;
- a current or former director or Trustee of the Fund;
- an employee (including the employee's spouse, domestic partner, children, grandchildren, parents, grandparents, siblings or any dependent of the employee, as defined in section 152 of the Code) of the Fund's Adviser or its affiliates or of a broker-dealer authorized to sell shares of the Fund;
- purchasing shares through the Fund's Adviser; or
- purchasing shares through a financial services firm (such as a broker-dealer, investment adviser or financial institution) that has a special arrangement with the Fund.

In addition, concurrent purchases of Class A shares by related accounts may be combined to determine the application of the sales load. The Fund will combine purchases made by an investor, the investor's spouse or domestic partner, and dependent children when it calculates the sales load.

It is the investor's responsibility to determine whether a reduced sales load would apply. The Fund is not responsible for making such determination. To receive a reduced sales load, notification must be provided at the time of the purchase order. If you purchase Class A shares directly from the Fund, you must notify the Fund in writing. Otherwise, notice should be provided to the Financial Intermediary through whom the purchase is made so they can notify the Fund.

***Right of Accumulation***

For the purposes of determining the applicable reduced sales charge, the right of accumulation allows you to include prior purchases of Class A shares of the Fund as part of your current investment as well as reinvested dividends. To qualify for this option, you must be either:

- an individual;
- an individual and spouse purchasing shares for your own account or trust or custodial accounts for your minor children; or
- a fiduciary purchasing for any one trust, estate or fiduciary account, including employee benefit plans created under Sections 401, 403 or 457 of the Code, including related plans of the same employer.

If you plan to rely on this right of accumulation, you must notify the Fund's Distributor at the time of your purchase. You will need to give the Distributor your account numbers. Existing holdings of family members or other related accounts of a shareholder may be combined for purposes of determining eligibility. If applicable, you will need to provide the account numbers of your spouse and your minor children as well as the ages of your minor children.

**Class C Shares**

Class C shares are sold at the prevailing NAV per Class C share; however, the following are additional features that should be taken into account when purchasing Class C shares:

- a minimum initial investment of $500 for regular accounts and $50 for retirement plan accounts, and a minimum subsequent investment of: (i) $50 under the Fund's automatic investment program; and (ii) $50 if not made pursuant to the automatic investment program;
- a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Fund attributable to Class C shares;
- a Distribution Fee which will accrue at an annual rate equal to 0.75% of the average daily net assets of the Fund attributable to Class C shares; and
- a CDSC equal to 1.00% of the original purchase price of Class C shares repurchased by the Fund for repurchases of Class C shares within 18 months following such shareholder's initial purchase.
- The Distributor will pay your financial advisor an up-front commission of 1.00% on sales of Class C shares.

The price of the Class C shares during the Fund's continuous offering will fluctuate over time with the net asset value of the Class C shares. Investors in Class C shares will not pay any upfront sales charges. A selling broker may receive commissions on purchases of Class C shares over $1,000,000.

**Class Z Shares**

Class Z shares will be sold at the prevailing NAV per Class Z share and are not subject to any upfront sales charge. The Class Z shares are not subject to a Distribution Fee, a CDSC or a monthly shareholder servicing fee. Class Z shares may only be available through certain Financial Intermediaries. Because the Class Z shares of the

Fund are sold at the prevailing NAV per Class Z share without an upfront sales charge, the entire amount of your purchase is invested immediately. However, Class Z shares require a minimum investment of $100,000 and a minimum subsequent investment in any amount. The Fund reserves the right to waive minimum investment amounts.

**Shareholder Service Expenses**

The Fund has adopted a "Shareholder Servicing Plan and Agreement" (the "Plan") under which the Fund may compensate financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. The Plan operates in a manner consistent with Rule 12b-1 under the 1940 Act, which regulates the manner in which an open-end investment company may directly or indirectly bear the expenses of distributing its shares. Although the Fund is not an open-end investment company, it has undertaken to comply with the terms of Rule 12b-1 as a condition of an exemptive order under the 1940 Act which permits it to have a multi-class structure, CDSCs and distribution and shareholder servicing fees. Such services may include electronic processing of client orders, electronic fund transfers between clients and the Fund, account reconciliations with the Fund's transfer agent, facilitation of electronic delivery to clients of Fund documentation, monitoring client accounts for back-up withholding and any other special tax reporting obligations, maintenance of books and records with respect to the foregoing, and such other information and liaison services as the Fund or the Adviser may reasonably request. Under the Shareholder Servicing Plan and Agreement, the Fund may incur expenses on an annual basis equal to 0.25% of its average net assets attributable to Class A and Class C shares.

In addition to payments under the Plan, from time to time the Fund may pay broker-dealers and other intermediaries' account-based fees for networking and account maintenance. In addition, the Adviser and/or the Distributor may, from time to time, at their own expense out of the revenues they receive from the Fund and/or its own financial resources, make cash payments to broker-dealers and other Financial Intermediaries (directly and not as an expense of the Fund) as an incentive to sell shares of the Fund and/or to promote retention of customer assets in the Fund. Such cash payments may be calculated on sales of shares of the Fund ("Sales-Based Payments") or on the average daily net assets of the Fund attributable to that particular broker-dealer or other Financial Intermediary ("Asset-Based Payments"). Each of the Adviser and/or the Distributor may agree to make such cash payments to a broker-dealer or other Financial Intermediary in the form of either or both Sales-Based Payments and Asset-Based Payments.

The Adviser and/or the Distributor may also make other cash payments to broker-dealers or other Financial Intermediaries in addition to or in lieu of Sales-Based Payments and Asset-Based Payments, in the form of payment for travel expenses, including lodging, incurred in connection with trips taken by qualifying registered representatives of those broker-dealers or other Financial Intermediaries and their families to places within or outside the United States; meeting fees; entertainment; transaction processing and transmission charges; advertising or other promotional expenses; allocable portions, based on shares of the Fund sold, of salaries and bonuses of registered representatives of an affiliated broker-dealer or other Financial Intermediary that is a financial advisor; or other expenses as determined in the Adviser or the Distributor's discretion, as applicable. In certain cases these other payments could be significant to the broker-dealers or other Financial Intermediaries. Any payments described above will not change the price paid by investors for the purchase of the shares of the Fund, the amount that the Fund will receive as proceeds from such sales, or the amounts payable under the Plan.

## LEGAL MATTERS

K&L Gates, LLP, located at 1 Congress Street, Suite 2900, Boston, Massachusetts 02114, acts as the Fund's legal counsel.

## REPORTS TO SHAREHOLDERS

The Fund will send to its shareholders unaudited semi-annual and audited annual reports (or, if applicable, a notice of electronic accessibility thereof), including a list of investments held.

**Householding**

In an effort to decrease costs, the Fund intends to reduce the number of duplicate annual and semi-annual reports (or, if applicable, notices of electronic accessibility thereof) by sending only one copy of each to those addresses shared by two or more accounts and to shareholders reasonably believed to be from the same family or household. Once implemented, a shareholder must call (844) 485-9167 to discontinue householding and request individual copies of these documents. Once the Fund receives notice to stop householding, individual copies will be sent beginning thirty days after receiving your request. This policy does not apply to account statements.

**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Cohen & Company, Ltd. has been appointed as the independent registered public accounting firm for the Fund. Cohen & Company, Ltd. is located at 1350 Euclid Ave, Suite 800, Cleveland, Ohio 44115.

**ADDITIONAL INFORMATION**

The Prospectus and the SAI do not contain all of the information set forth in the Registration Statement that the Fund has filed with the SEC (File No. 333-209022). The complete Registration Statement may be obtained from the SEC at www.sec.gov. See the cover page of this Prospectus for information about how to obtain a paper copy of the Registration Statement or SAI without charge.

**PRIVACY NOTICE**

The Fund recognizes and respects your privacy expectations, whether you are a visitor to the Fund's web site, a potential shareholder, a current shareholder or even a former shareholder.

**I. Collection of Information.**

The Fund may collect nonpublic personal information about you from the following sources:

1. *Account applications and other forms,* which may include your name, address and social security number, written and electronic correspondence and telephone contacts;
2. *Web site information,* including any information captured through our use of "cookies"; and
3. *Account history,* including information about the transactions and balances in your accounts with us or our affiliates.

**II. Disclosure of Information.**

The Fund may share the information it collects with its affiliates, the Fund may also disclose this information as otherwise as permitted by law. The Fund does not sell your personal information to third parties for their independent use.

**III. Confidentiality and Security of Information.**

The Fund restricts access to nonpublic personal information about you to its employees and agents who need to know such information to provide products or services to you. The Fund maintains physical, electronic and procedural safeguards that comply with federal standards to guard your nonpublic personal information, although you should be aware that data protection cannot be guaranteed.

# NexPoint Real Estate Strategies Fund

**Class A (NRSAX), Class C (NRSCX)**
**and Class Z (NRSZX) Shares**

**PROSPECTUS**

**Distributor**

**NexPoint Securities, Inc.**

**Member FINRA/ SIPC**

**April 30, 2025**

All dealers that buy, sell or trade the Fund's shares, whether or not participating in this offering, may be required to deliver a prospectus when acting on behalf of the Fund's Distributor.

You should rely only on the information contained in this Prospectus. The Fund has not authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. The Fund is not making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted.

NRES-PROS-0425

**STATEMENT OF ADDITIONAL INFORMATION**

# NEXPOINT REAL ESTATE STRATEGIES FUND

**Principal Executive Offices**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(833) 697-6246**

This Statement of Additional Information ("SAI") is not a prospectus. This SAI should be read in conjunction with the prospectus of NexPoint Real Estate Strategies Fund (the "Fund"), dated April 30, 2025 (the "Prospectus"), as it may be supplemented from time to time. The Prospectus is hereby incorporated by reference into this SAI (legally made a part of this SAI). Capitalized terms used but not defined in this SAI have the meanings given to them in the Prospectus. This SAI does not include all information that a prospective investor should consider before purchasing the Fund's securities.

You should obtain and read the Prospectus and any related Prospectus supplement prior to purchasing any of the Fund's securities. A copy of the Prospectus may be obtained without charge by calling the Fund toll-free at (844) 485-9167 or by visiting the Fund's website at https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/. Information on the website is not incorporated herein by reference. The registration statement of which the Prospectus is a part can be reviewed and copied at the Public Reference Room of the U.S. Securities and Exchange Commission ("SEC") at 100 F Street NE, Washington, D.C. You may obtain information on the operation of the Public Reference Room by calling the SEC at 202-551-8090. The Fund's filings with the SEC are also available to the public on the SEC's Internet web site at *www.sec.gov*. Copies of these filings may be obtained, after paying a duplicating fee, by electronic request at the following E-mail address: publicinfo@sec.gov, or by writing the SEC's Public Reference Section, 100 F Street NE, Washington, D.C. 20549-0102.

**April 30, 2025**

**TABLE OF CONTENTS**


| | |
|---|---|
| GENERAL INFORMATION AND HISTORY | S-1 |
| INVESTMENT OBJECTIVE AND POLICIES | S-1 |
| MANAGEMENT OF THE FUND | S-15 |
| CODES OF ETHICS | S-22 |
| PROXY VOTING POLICIES AND PROCEDURES | S-22 |
| CONTROL PERSONS AND PRINCIPAL HOLDERS | S-22 |
| INVESTMENT ADVISORY AND OTHER SERVICES | S-24 |
| PORTFOLIO MANAGERS | S-29 |
| ALLOCATION OF BROKERAGE | S-31 |
| TAX STATUS | S-33 |
| OTHER INFORMATION | S-46 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | S-46 |
| FINANCIAL STATEMENTS | S-47 |
| APPENDIX A | A-1 |

**GENERAL INFORMATION AND HISTORY**

The Fund is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund. The Fund is a non-diversified investment company, which means that the Fund is not limited by the Investment Company Act of 1940, as amended (the "1940 Act") with respect to the proportion of its assets that may be invested in the securities of a single issuer. As a registered investment company (a "RIC"), however, the Fund will be required to comply with certain asset diversification tests at the end of each quarter of its taxable year. The Fund was organized as a Delaware statutory trust on January 11, 2016. The Fund's principal office is located at 300 Crescent Court, Suite 700, Dallas, Texas 75201, and its telephone number is (833) 697-6246. The Fund is advised by NexPoint Advisors, L.P. ("NexPoint" or the "Adviser"). The investment objective and principal investment strategies of the Fund, as well as the principal risks associated with the Fund's investment strategies, are set forth in the Prospectus. Certain additional investment information is set forth below.

**INVESTMENT OBJECTIVE AND POLICIES**

**Investment Objective**

The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective. The Fund's investment objective is non-fundamental and may be changed by the Board of Trustees (the "Board") without shareholder approval. Shareholders will, however, receive at least 60 days' prior notice of any change in this investment objective.

**Fundamental Policies**

The Fund's stated fundamental policies, which may only be changed by the affirmative vote of a majority of the outstanding voting securities of the Fund (the shares), are listed below. For the purposes of this SAI, "majority of the outstanding voting securities of the Fund" means the vote, at an annual or special meeting of shareholders, duly called: (a) of 67% or more of the shares present at such meeting, if the holders of more than 50% of the outstanding shares are present or represented by proxy; or (b) of more than 50% of the outstanding shares, whichever is less.

The Fund may not:

(1) Borrow money, except to the extent permitted by the 1940 Act (which currently limits borrowing to no more than 33-1/3% of the value of the Fund's total assets, including the value of the assets purchased with the proceeds of its indebtedness, if any). The Fund may borrow for investment purposes, for temporary liquidity, or to finance repurchases of its shares.

(2) Issue senior securities, except to the extent permitted by Section 18 of the 1940 Act (which currently limits the issuance of a class of senior securities that is indebtedness to no more than 33-1/3% of the value of the Fund's total assets or, if the class of senior security is stock, to no more than 50% of the value of the Fund's total assets).

(3) Purchase securities on margin.

(4) Underwrite securities of other issuers, except insofar as the Fund may be deemed an underwriter under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the disposition of its portfolio securities. The Fund may invest in restricted securities (those that must be registered under the Securities Act before they may be offered or sold to the public).

(5) Invest 25% or more of the value of its total assets in the securities of companies or entities engaged in any one industry or group of industries, except that, under normal circumstances, the Fund will invest

over 25% of its total assets in the securities of companies in the real estate industry. This limitation does not apply to investment in the securities of the U.S. Government, its agencies or instrumentalities. For purposes of this limitation, the Fund will define an industry or group of industries by reference to Standard & Poor's Global Industry Classification Standard codes for industry classifications.

(6) Purchase or sell commodities, unless acquired as a result of ownership of securities or other investments, except that the Fund may purchase and sell forward and futures contracts and options to the full extent permitted under the 1940 Act, sell foreign currency contracts in accordance with any rules of the Commodity Futures Trading Commission, invest in securities or other instruments backed by or linked to commodities, and invest in companies that are engaged in a commodities business or have a significant portion of their assets in commodities, and may invest in commodity pools and other entities that purchase and sell commodities and commodity contracts.

(7) Make loans to others, except (a) where each loan is represented by a note executed by the borrower, (b) through the purchase of debt securities in accordance with its investment objective and policies, (c) to the extent the entry into a repurchase agreement, in a manner consistent with the Fund's investment policies or as otherwise permitted under the 1940 Act, is deemed to be a loan, and (d) by loaning portfolio securities.

(8) Purchase or sell real estate, except that the Fund may invest in securities of companies that deal in real estate or are engaged in the real estate business, including real estate investment Funds and real estate operating companies, and instruments secured by real estate or interests therein and the Fund may acquire, hold and sell real estate acquired through default, liquidation, or other distributions of an interest in real estate as a result of the Fund's ownership of such other assets.

In addition, the Fund has adopted a fundamental policy that it will make quarterly repurchase offers for no less than for 5% of the Fund's shares outstanding at net asset value ("NAV") less any repurchase fee, unless suspended or postponed in accordance with regulatory requirements, and each repurchase pricing shall occur no later than the 14th day after the Repurchase Request Deadline, or the next business day if the 14th is not a business day.

If a restriction on the Fund's investments is adhered to at the time an investment is made, a subsequent change in the percentage of Fund assets invested in certain securities or other instruments, or change in average duration of the Fund's investment portfolio, resulting from changes in the value of the Fund's total assets, will not be considered a violation of the restriction; provided, however, that the asset coverage requirement applicable to borrowings shall be maintained in the manner contemplated by applicable law.

There can be no assurance that any leveraging strategy the Fund employs will be successful during any period in which it is employed. The Fund may also invest in private real estate investment funds ("Private Real Estate Investment Funds"), public real estate investment trusts ("REITs"), real estate operating companies ("REOCs"), and non-traded REITs, which may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to. The Fund's asset coverage was 1,172% as of March 31, 2025. See "Risk Factors – Leverage Risk".

In addition to any indebtedness incurred by the Fund, any subsidiary of the Fund, including NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC (the "REIT Subsidiaries"), may also utilize leverage, including by mortgaging properties held by special purpose vehicles, or by acquiring property with existing debt. Any such borrowings will generally be the sole obligation of each respective special purpose vehicle, without any recourse to any other special purpose vehicle, the REIT Subsidiaries, the Fund or its assets, and the Fund will not treat such non-recourse borrowings as senior securities (as defined in the 1940 Act) for purposes of complying with the 1940 Act's limitations on leverage unless the financial statements of the special purpose vehicle, or the subsidiary of the Fund that owns such special purpose vehicle, will be consolidated in accordance with Regulation S-X and other accounting rules. If cash flow is insufficient to pay principal and interest on a special purpose vehicle's borrowings, a default could occur, ultimately resulting in foreclosure of any security instrument securing the debt and a complete

loss of the investment, which could result in losses to the REIT Subsidiaries and, therefore, to the Fund. To the extent that any subsidiaries of the Fund, including the REIT Subsidiaries, directly incur leverage in the form of debt (as opposed to non-recourse borrowings made through special purpose vehicles), the amount of such recourse leverage used by the Fund and such subsidiaries, including the REIT Subsidiaries, will be consolidated and treated as senior securities for purposes of complying with the 1940 Act's limitations on leverage by the Fund.

**Non-Fundamental Policies**

The following are additional investment limitations of the Fund and may be changed by the Board without shareholder approval.

***80% Investment Policy.*** The Fund has adopted a policy to invest at least 80% of its assets (defined as net assets plus the amount of any borrowing for investment purposes) in "real estate and real estate-related securities," as defined in the Prospectus. Shareholders of the Fund will be provided with at least 60 days prior notice of any change in the Fund's 80% policy.

If a restriction on the Fund's investments is adhered to at the time an investment is made, a subsequent change in the percentage of Fund assets invested in certain securities or other instruments, or change in average duration of the Fund's investment portfolio, resulting from changes in the value of the Fund's total assets, will not be considered a violation of the restriction; provided, however, that the asset coverage requirement applicable to borrowings shall be maintained in the manner contemplated by applicable law.

***Covered Obligations.*** Consistent with U.S. Securities and Exchange Commission ("SEC") staff guidance, financial instruments that involve obligations to make future payments to third parties will not be viewed as creating any senior security provided that the Fund covers its obligations as described below.

Those financial instruments can include, among others: (i) securities purchased on a when-issued, delayed delivery, and to be announced basis; (ii) futures contracts; (iii) forward currency contracts; (iv) written options; and (vi) securities sold short. Consistent with SEC staff guidance, the Fund will consider its obligations involving such a financial instrument as "covered" when the Fund: (1) maintains an offsetting financial position; or (2) segregates liquid assets (constituting cash, cash equivalents or other liquid portfolio securities) equal to the Fund's exposures relating to the financial instrument, as determined on a daily basis. Dedicated Fund compliance policies and procedures, which the Board has approved, govern the kinds of transactions that can be deemed to be offsetting transactions for purposes of (1) above, and the amounts of assets that need to be segregated for purposes of (2) above. The Fund will seek to value financial instruments on a mark-to-market basis but may also rely on the instrument's notional value or upon valuations provided by third party pricing services, subject to the approval of the Board.

***Short Selling.*** Although the Fund does not currently intend to engage in short sales as a principal investment strategy, the Fund may engage in short sales for hedging purposes.

**Non-Principal Investment Strategies**

***Convertible Securities.*** The Fund may invest in convertible securities, which are typically issued as bonds or preferred shares with the option to convert to equities. As a result, convertible securities are a hybrid that have characteristics of both bonds and common stocks and are subject to risks associated with both debt securities and equity securities. The market value of bonds and preferred shares tend to decline as interest rates increase. Fixed-income and preferred securities also are subject to credit risk, which is the risk that an issuer of a security may not be able to make principal and interest or dividend payments as due. Convertible securities may have characteristics similar to common stocks especially when their conversion value is higher than their value as a bond. The price of equity securities into which a convertible security may convert may fall because of economic

or political changes. Stock prices in general may decline over short or even extended periods of time. Additionally, the value of the embedded conversion option may be difficult to value and evaluate because the option does not trade separately from the convertible security.

***Foreign Securities.*** The Fund may invest in non-U.S. real estate companies and other foreign securities. Purchases of foreign securities entail certain risks. For example, there may be less information publicly available about a foreign company than about a U.S. company, and foreign companies generally are not subject to accounting, auditing and financial reporting standards and practices comparable to those in the U.S. Other risks associated with investments in foreign securities include changes in restrictions on foreign currency transactions and rates of exchanges, changes in the administrations or economic and monetary policies of foreign governments, the imposition of exchange control regulations, the possibility of expropriation decrees and other adverse foreign governmental action, the imposition of foreign taxes, less liquid markets, less government supervision of exchanges, brokers and issuers, difficulty in enforcing contractual obligations, delays in settlement of securities transactions and greater price volatility. In addition, investing in foreign securities will generally result in higher commissions than investing in similar domestic securities.

***Money Market Instruments.*** The Fund may invest, for defensive purposes or otherwise, some or all of its assets in high quality fixed-income securities, money market instruments and money market mutual funds, or hold cash or cash equivalents in such amounts as the Adviser deems appropriate under the circumstances. In addition, the Fund or a Private Real Estate Investment Fund or registered closed-end funds that invest principally in real estate may invest in these instruments pending allocation of its respective offering proceeds. Money market instruments are high quality, short-term fixed-income obligations, which generally have remaining maturities of one year or less and may include U.S. Government securities, commercial paper, certificates of deposit and bankers acceptances issued by domestic branches of U.S. banks that are members of the Federal Deposit Insurance Corporation, and repurchase agreements.

***Investment Companies.*** The Fund may invest in investment companies such as open-end funds (mutual funds), closed-end funds and exchange traded funds (also referred to as "Underlying Funds"). Such investments are subject to limitations prescribed by the 1940 Act unless a U.S. Securities and Exchange Commission (the "SEC") exemption is applicable or as may be permitted by rules under the 1940 Act, including Section 12 of the 1940 Act, or SEC staff interpretations thereof. The Fund may invest in other investment companies beyond the statutory limits set forth in Section 12 of the 1940 Act to the extent permitted by an exemptive rule adopted by the SEC. The 1940 Act limitations currently provide, in part, that the Fund may not purchase shares of an investment company if: (a) such a purchase would cause the Fund to own in the aggregate more than 3% of the total outstanding voting stock of the investment company; (b) such a purchase would cause the Fund to have more than 5% of its total assets invested in the investment company; or (c) more than 10% of the Fund's total assets would be invested in the aggregate in all investment companies. The Fund may invest in excess of the foregoing limitations in an exchange-traded fund ("ETF") that is not part of the same group of investment companies (e.g., an unaffiliated ETF) if the ETF has obtained exemptive relief from the SEC and both the ETF and the Fund adhere to the conditions in the exemptive relief. Accordingly, when affiliated persons hold shares of any of the Underlying Funds, the Fund's ability to invest fully in shares of those funds may be restricted, and the Adviser must then, in some instances, select alternative investments that would not have been its first preference.

The Fund may invest in investment companies that are advised by the Adviser or its affiliates, including ETFs, to the extent permitted by applicable law and/or pursuant to exemptive relief from the SEC. These investment companies typically incur fees that are separate from those fees incurred directly by the Fund. The Fund's purchase of such investment company securities results in the layering of expenses, such that shareholders would indirectly bear a proportionate share of the operating expenses of such investment companies, including advisory fees, in addition to paying Fund expenses.

The 1940 Act also provides that an Underlying Fund whose shares are purchased by the Fund will be obligated to redeem shares held by the Fund only in an amount up to 1% of the Underlying Fund's outstanding securities

during any period of less than 30 days. Shares held by the Fund in excess of 1% of an Underlying Fund's outstanding securities therefore, will be considered not readily marketable securities, which, together with other such securities, may not exceed 15% of the Fund's total assets.

Under certain circumstances an Underlying Fund may determine to make payment of a redemption by the Fund wholly or partly by a distribution in kind of securities from its portfolio, in lieu of cash, in conformity with the rules of the SEC. In such cases, the Fund may hold securities distributed by an Underlying Fund until the Adviser determines that it is appropriate to dispose of such securities.

Investment decisions by the investment advisers of the Underlying Funds are made independently of the Fund and its Adviser. Therefore, the investment advisor of one Underlying Fund may be purchasing shares of the same issuer whose shares are being sold by the investment advisor of another such fund. The result would be an indirect expense to the Fund without accomplishing any investment purpose. Because other investment companies employ an investment adviser, such investments by the Fund may cause shareholders to bear duplicate fees.

***Hedge Funds.*** The Fund may invest up to 15% of its gross assets in "hedge funds," which are private investment funds that would be required to register as investment companies but for an exemption under section 3(c)(1) or 3(c)(7) of the 1940 Act. Hedge funds are not subject to the requirements and protections of the 1940 Act and carry all of the risks associated with Private Real Estate Investment Funds, as disclosed in the Fund's prospectus. In addition, investors should be aware that hedge funds often engage in leverage, short-selling, arbitrage, hedging, derivatives, and other speculative investment practices that may significantly increase investment loss. Hedge funds are highly illiquid, are not required to provide periodic pricing or valuation information to investors, and often charge high fees that can erode investment performance. Certain hedge funds charge performance fees that may create an incentive for its manager to make investments that are riskier or more speculative than those it might have made in the absence of a performance fee. Additionally, hedge funds need not have independent boards of trustees and do not require investor approval of advisory contracts.

***Debtor-in-Possession ("DIP") Loans*.** The Fund may invest in or extend loans to companies that have filed for protection under Chapter 11 of the United States Bankruptcy Code ("Chapter 11"). DIP financings allow the entity to continue its business operations while reorganizing under Chapter 11 and such financings must be approved by the bankruptcy court. These DIP loans are most often working-capital facilities put into place at the outset of a Chapter 11 case to provide the debtor with both immediate cash and the ongoing working capital that will be required during the reorganization process. DIP financings are typically fully secured by a lien on the debtor's otherwise unencumbered assets or secured by a junior lien on the debtor's encumbered assets (so long as the loan is fully secured based on the most recent current valuation or appraisal report of the debtor). DIP financings are often required to close with certainty and in a rapid manner in order to satisfy existing creditors and to enable the issuer to emerge from bankruptcy or to avoid a bankruptcy proceeding. There is a risk that the borrower will not emerge from Chapter 11 bankruptcy proceedings and be forced to liquidate its assets under Chapter 7 of the United States Bankruptcy Code. In the event of liquidation, the Fund's only recourse will be against the property securing the DIP financing.

***Rights Offerings and Warrants to Purchase.*** The Fund may participate in rights offerings and may purchase warrants, which are privileges issued by corporations enabling the owners to subscribe to and purchase a specified number of shares of the corporation at a specified price during a specified period of time. Subscription rights normally have a short life span to expiration. The purchase of rights or warrants involves the risk that the Fund could lose the purchase value of a right or warrant if the right to subscribe to additional shares is not exercised prior to the rights' and warrants' expiration. Also, the purchase of rights and/or warrants involves the risk that the effective price paid for the right and/or warrant added to the subscription price of the related security may exceed the value of the subscribed security's market price such as when there is no movement in the level of the underlying security.

***Special Situations.*** The Fund may invest in companies undergoing work-outs, liquidations, reorganizations, bankruptcies, insolvencies or other fundamental changes or similar transactions. In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, will take considerable time or will result in a distribution of cash or new securities the value of which will be less than the purchase price to the Fund of the securities or other financial instruments in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Fund may be required to sell its investment at a loss. The consummation of such transactions can be prevented or delayed by a variety of factors, including but not limited to: (i) intervention of a regulatory agency; (ii) market conditions resulting in material changes in securities prices; (iii) compliance with any applicable bankruptcy, insolvency or securities laws; and (iv) the inability to obtain adequate financing. Because there is substantial uncertainty concerning the outcome of transactions involving financially troubled companies in which the Fund intends to invest, there is a potential risk of loss by the Fund of its entire investment in such companies.

***Certain Bankruptcy and Insolvency Issues.*** Some of the companies in which the Fund invests may be involved in a complex bankruptcy or insolvency proceeding in the United States or elsewhere. There are a number of significant risks inherent in the bankruptcy or insolvency process. The Fund cannot guarantee the outcome of any bankruptcy or insolvency proceeding.

Under U.S. bankruptcy proceedings or other insolvency proceedings, the Fund may risk taking a loss on its investment and having its claim released or discharged against the debtor and third parties. For example, under a plan of reorganization, the Fund could receive a cash distribution for less than its initial investment or receive securities or other financial instruments in exchange for its claims, which then could be discharged and released against the debtor or other third parties. In addition, under U.S. bankruptcy proceedings, a debtor can effectuate a sale of assets with a purchaser acquiring such assets free and clear of any claims or liens underlying the Fund's investment with the Fund having only potential recourse to the proceeds of the sale.

Under certain circumstances, payments to the Fund may be reclaimed, recharacterized or avoided if any such payment or distribution is later determined by the applicable court to have been a fraudulent conveyance, fraudulent transfer, a preferential payment or otherwise subject to avoidance under applicable law. In addition, especially in the case of investments made prior to the commencement of bankruptcy proceedings, creditors can lose their ranking and priority if they exercise "domination and control" of a debtor and other creditors can demonstrate that they have been harmed by such actions.

Many events in a bankruptcy are often beyond the control of the creditors. While creditors may be given an opportunity to object to or otherwise participate in significant actions, there can be no assurance that a court in the exercise of its broad powers or discretion would not approve actions that would be contrary to the interests of the Fund as a creditor.

The duration of a bankruptcy or insolvency proceeding is difficult to predict. A creditor's return on investment can be adversely impacted by delays while a plan of reorganization is being negotiated, approved by the creditors, confirmed by the bankruptcy court and until the plan ultimately becomes effective. Similar delays can occur while a court may be considering a sale or other restructuring transaction. In addition, the administrative costs in connection with a bankruptcy or insolvency proceeding are frequently high and will be paid out of the debtor's estate prior to any return to unsecured creditors or equity holders. If a proceeding involves protracted or difficult litigation, or turns into a liquidation, substantial assets may be devoted to administrative costs. Also, in the early stages of the bankruptcy process, it is often difficult to estimate the extent of, or even to identify, any contingent claims that might be made. Further, certain claims that have priority by law (for example, claims for taxes) may be quite substantial.

The effect of a bankruptcy filing on or by a portfolio company may adversely and permanently affect the portfolio company. The portfolio company may lose its market position, going concern value and key employees and otherwise become incapable of restoring itself as a viable entity. If for this or any other reason the proceeding is converted to a liquidation, the liquidation value of the portfolio company may not equal the liquidation value that was believed to exist at the time of the investment.

***Co-Investments.*** Opportunities for co-investments may arise when the Adviser or its affiliates become aware of investment opportunities that may be appropriate for the Fund and its affiliates' other clients. The Fund will only make investments in which the Adviser or an affiliate hold an interest to the extent permitted under the 1940 Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Adviser and certain funds affiliated with the Fund, dated April 19, 2016. For example, exemptive relief is not required for the Fund to invest in syndicated deals and secondary loan market transactions in which the Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," which includes future closed-end investment companies registered under the 1940 Act that are managed by the Adviser, which includes the Fund. The Fund, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order.

Investment opportunities that are presented to an affiliate's other clients may be referred to the Fund and vice versa. For each such referral, the Adviser intends to independently analyze and evaluate whether the co-investment transaction is appropriate for the Fund. In addition, co-investment transactions that are recommended and approved by the Adviser will generally be subject to the review and approval by a committee consisting of independent trustees on the Fund's Board. For each type of co-investment transaction, the Fund intends to apply a specific protocol, which will be approved by the Fund's independent trustees and be designed to ensure the fairness to the Fund of the specific type of co-investment transaction. However, neither the Fund nor any affiliates' other clients will be obligated to invest or co-invest when investment opportunities are referred to by the Fund or them.

***Short-Term Trading.*** The portfolio managers of the Fund may also give trading desk personnel of the Adviser general authorization to enter into a limited amount of short-term trades (purchases expected to be sold within 15 business days) in debt instruments on behalf of the Fund. Over time, it is expected that these trades will not exceed 2% of the Fund's assets.

**Derivatives**

***Generally.*** The Fund may invest up to 10% of its gross assets in transactions involving options, futures and other derivative financial instruments for speculative purposes or to hedge against risks or other factors and variables that may affect the values of the Fund's portfolio securities. A hedging transaction may not perform as anticipated, and the Fund may suffer losses as a result of its hedging activities. Derivatives can be volatile and involve various types and degrees of risk. By using derivatives, the Fund may be permitted to increase or decrease the level of risk, or change the character of the risk, to which the portfolio is exposed.

A small investment in derivatives could have a substantial impact on the Fund's performance. The market for many derivatives is, or suddenly can become, illiquid. Changes in liquidity may result in significant and rapid changes in the prices for derivatives. If the Fund were to invest in derivatives at an inopportune time, or the Adviser evaluates market conditions incorrectly, the Fund's derivative investment could negatively impact the Fund's return, or result in a loss. In addition, the Fund could experience a loss if its derivatives were poorly correlated with its other investments, or if the Fund were unable to liquidate its position because of an illiquid secondary market.

***Options and Futures.*** The Fund may engage in the use of options and futures contracts, so-called "synthetic" options, including options on baskets of specific securities, or other derivative instruments written by broker-dealers or other financial intermediaries. These transactions may be effected on securities exchanges or in the over-the-counter market, or they may be negotiated directly with counterparties. In cases where instruments are purchased over-the-counter or negotiated directly with counterparties, the Fund is subject to the risk that the counterparty will be unable or unwilling to perform its obligations under the contract. These transactions may also be illiquid and, if so, it might be difficult to close out the Fund's position.

The Fund may purchase call and put options on specific securities. The Fund may also write and sell covered or uncovered call and put options for both hedging and speculative purposes. A put option gives the purchaser of the option the right to sell, and obligates the writer to buy, the underlying security at a stated price at any time before the option expires. Similarly, a call option gives the purchaser of the option the right to buy, and obligates the writer to sell, the underlying security at a stated price at any time before the option expires.

In a covered call option, the Fund owns the underlying security. The sale of such an option exposes the Fund to a potential loss of opportunity to realize appreciation in the market price of the underlying security during the term of the option. Using covered call options might expose the Fund to other risks, as well. For example, the Fund might be required to continue holding a security that the Fund might otherwise have sold to protect against depreciation in the market price of the security.

In a covered put option, cash or liquid securities are placed in a segregated account on the Fund's books. The sale of such an option exposes the seller, during the term of the option, to a decline in price of the underlying security while also depriving the seller of the opportunity to invest the segregated assets.

When writing options, the Fund may close its position by purchasing an option on the same security with the same exercise price and expiration date as the option that it has previously written on the security. If the amount paid to purchase an option is less or more than the amount received from the sale, the Fund will, accordingly, realize a profit or loss. To close out a position as a purchaser of an option, the Fund would liquidate the position by selling the option previously purchased.

The use of derivatives that are subject to regulation by the Commodity Futures Trading Commission (the "CFTC") under the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), by the Fund could cause the Fund to be a commodity pool, which, absent an available exemption would require the Fund to comply with certain rules of the CFTC. In connection with its management of the Fund, the Adviser has claimed an exclusion from the definition of commodity pool operator under the Commodity Exchange Act ("CEA") and is therefore not currently subject to registration or regulation as a pool operator.

The Fund may enter into futures contracts in U.S. domestic markets or on exchanges located outside the United States. Foreign markets may offer advantages, such as trading opportunities or arbitrage possibilities not available in the United States, but they also may subject the Fund to greater risk than domestic markets. For example, common clearing facilities may not exist in markets where foreign exchanges are the principal markets, and investors may look only to the broker to perform the contract. Adverse changes in the exchange rate could eliminate any profits that might be realized in trading, or a loss could be incurred as a result of those changes. Transactions on foreign exchanges may include both commodities traded on domestic exchanges and those that are not. Unlike trading on domestic commodity exchanges, trading on foreign commodity exchanges is not regulated by the CFTC.

Engaging in these transactions involves risk of loss, which could adversely affect the value of the Fund's gross assets. No assurance can be made that a liquid market will exist for any particular futures contract at any particular time. Many futures exchanges and boards of trade limit the amount of fluctuation permitted in futures contract prices during a single trading day. Once the daily limit has been reached in a particular contract, no trades may be made that day at a price beyond that limit, or trading may be suspended for specified periods during the trading day. Futures contract prices could move to the limit for several consecutive trading days with little or no trading, thereby preventing prompt liquidation of positions, and potentially subjecting the Fund to substantial losses.

Successful use of futures also is subject to the Adviser's ability to correctly predict movements in the relevant market and to evaluate the appropriate correlation between the transaction being hedged and the price movements of the futures contract.

The Fund may also purchase and sell stock index futures contracts. A stock index futures contract obligates the Fund to pay or receive an amount of cash equal to a fixed dollar amount specified in the futures contract, multiplied by the difference between the settlement price of the contract on the contract's last trading day, and the value of the index based on the stock prices of the securities that comprise it at the opening of trading in those securities on the next business day. The Fund may purchase and sell interest rate futures contracts, which represent obligations to purchase or sell an amount of a specific debt security at a future date at a specific price. In addition, the Fund may purchase and sell currency futures or commodity futures. A currency future creates an obligation to purchase or sell an amount of a specific currency at a future date at a specific price. A commodity future creates an obligation to purchase or sell an amount of a specific commodity at a future date at a specific price.

***Options on Securities Indexes.*** The Fund may purchase and sell call and put options on stock indexes listed on national securities exchanges or traded in the over-the-counter market for hedging and speculative purposes. A stock index fluctuates with changes in the market values of the stocks included in the index. Accordingly, successful use of options on stock indexes will be subject to the Adviser's ability to correctly evaluate movements in the stock market generally, or of a particular industry or market segment.

***Swap Agreements.*** The Fund may enter into a swap agreements, which generally include equity, interest rate, and index and currency rate swap agreements. The Fund is not limited to any particular form of swap agreement if the Adviser determines that other forms are consistent with the Fund's investment objective and policies. Swap agreements are contracts entered into by two parties (primarily institutional investors) for periods ranging from a few weeks to more than a year. In a standard swap transaction, the parties agree to exchange the returns (or differentials in rates of return) earned or realized on particular predetermined investments or instruments, which may be adjusted for an interest factor. The gross returns to be exchanged or "swapped" between the parties are generally calculated with respect to a "notional amount," *i.e*., the return on or increase in value of a particular dollar amount invested at a particular interest rate, in a particular foreign currency, or in a "basket" of securities representing a particular index. Additional forms of swap agreements include: (i) interest rate caps, under which, in return for a premium, one party agrees to make payments to the other to the extent interest rates exceed a specified rate or "cap"; (ii) interest rate floors, under which, in return for a premium, one party agrees to make payments to the other to the extent interest rates fall below a specified level or "floor"; and (iii) interest rate collars, under which a party sells a cap and purchases a floor (or vice versa) in an attempt to protect itself against interest rate movements exceeding certain minimum or maximum levels.

Generally, the Fund's obligations (or rights) under a swap agreement will be equal only to the net amount to be paid or received under the agreement, based on the relative values of the positions held by the parties. The risk of loss is limited to the net amount of interest payments that a party is contractually required to make. As such, if the counterparty to a swap defaults, the Fund's risk of loss consists of the net amount of payments that it is entitled to receive.

***Derivatives Rule.*** The regulation of the U.S. and non-U.S. derivatives markets has undergone substantial change in recent years and such change may continue. In particular, on October 28, 2020, the SEC adopted new regulations governing the use of derivatives by registered investment companies ("Rule 18f-4" or the "Derivatives Rule"). Funds were required to implement and comply with Rule18f-4 by August 19, 2022. Rule 18f-4 eliminates the asset segregation framework formerly used by funds to comply with Section 18 of the 1940 Act, as amended.

The Derivatives Rule mandates that a fund adopt and/or implement: (i) value-at-risk limitations ("VaR"); (ii) a written derivatives risk management program; (iii) new board oversight responsibilities; and (iv) new reporting and recordkeeping requirements. In the event that a fund's derivative exposure is 10% or less of its net assets, excluding certain currency and interest rate hedging transactions, it can elect to be classified as a limited derivatives user ("Limited Derivatives User") under the Derivatives Rule, in which case the fund is not subject to the full requirements of the Derivatives Rule. Limited Derivatives Users are excepted from VaR testing,

implementing a derivatives risk management program, and certain board oversight and reporting requirements mandated by the Derivatives Rule. However, a Limited Derivatives User is still required to implement written compliance policies and procedures reasonably designed to manage its derivatives risks.

The Derivatives Rule also provides special treatment for reverse repurchase agreements, similar financing transactions and unfunded commitment agreements. Specifically, a fund may elect whether to treat reverse repurchase agreements and similar financing transactions as "derivatives transactions" subject to the requirements of the Derivatives Rule or as senior securities equivalent to bank borrowings for purposes of Section 18 of the 1940 Act. Repurchase agreements are not subject to the Derivatives Rule, but are still subject to other provisions of the 1940 Act. In addition, when-issued or forward settling securities transactions that physically settle within 35-days are deemed not to involve a senior security.

Additional legislation may be enacted subsequent to the date of this SAI that could negatively affect the assets of the Fund. Legislation or regulation may change the way in which the Fund itself is regulated. The Adviser cannot predict the effects of any new governmental regulation that may be implemented, and there can be no assurance that any new governmental regulation will not adversely affect the Fund's performance or ability to achieve its investment objectives.

In addition, regulations adopted by the prudential regulators that took effect with regards to most funds in 2019 require certain banks to include in a range of financial contracts, including derivative and short-term funding transactions, terms delaying or restricting a counterparty's default, termination and other rights in the event that the bank and/or its affiliates become subject to certain types of resolution or insolvency proceedings. The regulations could limit the Fund's ability to exercise a range of cross-default rights if its counterparty, or an affiliate of the counterparty, is subject to bankruptcy or similar proceedings. Such regulations could further negatively impact the Fund's use of derivatives.

***Valuation of Derivative Instruments.*** The Fund will seek to value financial instruments on a mark-to-market basis, but may also rely on valuations provided by third party pricing services.

**Portfolio Turnover**

The Fund's portfolio turnover rate is not expected to exceed 100%, but may vary greatly from year to year and will not be a limiting factor when the Adviser deems portfolio changes appropriate. Although the Fund generally does not intend to trade for short-term profits, the Fund may engage in short-term trading strategies, and securities may be sold without regard to the length of time held when, in the opinion of the Adviser, investment considerations warrant such action. These policies may have the effect of increasing the annual rate of portfolio turnover of the Fund. Higher rates of portfolio turnover would likely result in higher brokerage commissions and may generate short-term capital gains taxable as ordinary income. If securities are not held for certain applicable holding periods, dividends paid on them will not qualify for the advantageous federal tax rates applicable to "qualified dividend income." See "Tax Status."

For the fiscal year ended December 31, 2023, the Fund's portfolio turnover rate was 10%. For the fiscal year ended December 31, 2024, the Fund's portfolio turnover rate was 13%.

**Repurchases and Transfers of Shares**

***Repurchase Offers.*** The Board has adopted a resolution setting forth the Fund's fundamental policy that it will conduct quarterly repurchase offers (the "Repurchase Offer Policy"). The Repurchase Offer Policy sets the interval between each repurchase offer at one quarter and provides that the Fund shall conduct a repurchase offer each quarter (unless suspended or postponed in accordance with regulatory requirements). The Repurchase Offer Policy also provides that the repurchase pricing shall occur not later than the 14th day after the Repurchase Request Deadline or the next business day if the 14th day is not a business day. Under normal circumstances, it is

expected that the repurchase pricing date will be the Repurchase Request Deadline and that the repurchase price will be the Fund's NAV determined after the close of business on the Repurchase Request Deadline. The Fund's Repurchase Offer Policy is fundamental and cannot be changed without shareholder approval. The Fund may, for the purpose of paying for repurchased shares, be required to liquidate portfolio holdings earlier than the Adviser would otherwise have liquidated these holdings. Such liquidations may result in losses, and may increase the Fund's portfolio turnover.

*Repurchase Offer Policy Summary of Terms.*

1. The Fund will make repurchase offers at periodic intervals pursuant to Rule 23c-3 under the 1940 Act, as that rule may be amended from time to time. Rule 23c-3 establishes requirements that closed-end funds must follow when making repurchase offers to their shareholders.
2. The repurchase offers will be made in March, June, September and December of each year.
3. The Fund must receive repurchase requests submitted by shareholders in response to the Fund's repurchase offer within 21 to 42 days of the date the repurchase offer is made (or the preceding business day if the New York Stock Exchange is closed on that day), as specified by the Fund (the "Repurchase Request Deadline").
4. The maximum time between the Repurchase Request Deadline and the next date on which the Fund determines the NAV applicable to the purchase of shares (the "Repurchase Pricing Date") is 14 calendar days (or the next business day if the fourteenth day is not a business day).

The Fund may not condition a repurchase offer upon the tender of any minimum amount of shares. The Fund may deduct from the repurchase proceeds only a repurchase fee that is paid to the Fund and is reasonably intended to compensate the Fund for expenses directly related to the repurchase. The repurchase fee may not exceed 2% of the proceeds. However, the Fund does not currently charge a repurchase fee. The Fund may rely on Rule 23c-3 only so long as the Board satisfies the fund governance standards defined in Rule 0-1(a)(7) under the 1940 Act.

***Procedures.*** All periodic repurchase offers must comply with the following procedures:

*Repurchase Offer Amount*. Each quarter, the Fund may offer to repurchase at least 5% and no more than 25% of the Fund's outstanding shares on the Repurchase Request Deadline (the "Repurchase Offer Amount"). The Board shall determine the quarterly Repurchase Offer Amount.

*Shareholder Notification*. Thirty days before each Repurchase Request Deadline, the Fund shall send to each shareholder of record and to each beneficial owner of the shares that are the subject of the repurchase offer a notification ("Shareholder Notification") providing the following information:

1. A statement that the Fund is offering to repurchase its shares from shareholders at NAV;
2. Any fees applicable to such repurchase, if any;
3. The Repurchase Offer Amount;
4. The dates of the Repurchase Request Deadline, Repurchase Pricing Date, and the date by which the Fund must pay shareholders for any shares repurchased (which shall not be more than seven days after the Repurchase Pricing Date) (the "Repurchase Payment Deadline");
5. The risk of fluctuation in NAV between the Repurchase Request Deadline and the Repurchase Pricing Date, and the possibility that the Fund may use an earlier Repurchase Pricing Date;
6. The procedures for shareholders to request repurchase of their shares and the right of shareholders to withdraw or modify their repurchase requests until the Repurchase Request Deadline;

7. The procedures under which the Fund may repurchase such shares on a pro rata basis if shareholders tender more than the Repurchase Offer Amount;

8. The circumstances in which the Fund may suspend or postpone a repurchase offer;

9. The NAV of the shares computed no more than seven days before the date of the notification and the means by which shareholders may ascertain the NAV thereafter; and

10. The market price, if any, of the shares on the date on which such NAV was computed, and the means by which shareholders may ascertain the market price thereafter.

The Fund must file a Form N-23c-3 (“Notification of Repurchase Offer’’) and three copies of the Shareholder Notification with the SEC within three business days after sending the notification to shareholders.

*Notification of Beneficial Owners*. Where the Fund knows that shares subject to a repurchase offer are held of record by a broker, dealer, voting trustee, bank, association or other entity that exercises fiduciary powers in nominee name or otherwise, the Fund must follow the procedures for transmitting materials to beneficial owners of securities that are set forth in Rule 14a-13 under the Securities Exchange Act of 1934.

*Repurchase Requests*. Repurchase requests must be submitted by shareholders by the Repurchase Request Deadline. The Fund shall permit repurchase requests to be withdrawn or modified at any time until the Repurchase Request Deadline, but shall not permit repurchase requests to be withdrawn or modified after the Repurchase Request Deadline.

*Repurchase Requests in Excess of the Repurchase Offer Amount*. If shareholders tender more than the Repurchase Offer Amount, the Fund may, but is not required to, repurchase an additional amount of shares not to exceed 2% of the outstanding shares of the Fund on the Repurchase Request Deadline. If the Fund determines not to repurchase more than the Repurchase Offer Amount, or if shareholders tender shares in an amount exceeding the Repurchase Offer Amount plus 2% of the outstanding shares on the Repurchase Request Deadline, the Fund shall repurchase the shares tendered on a pro rata basis. This policy, however, does not prohibit the Fund from:

1. Accepting all repurchase requests by persons who own, beneficially or of record, an aggregate of not more than 100 shares and who tender all of their stock for repurchase, before prorating shares tendered by others, or

2. Accepting by lot shares tendered by shareholders who request repurchase of all shares held by them and who, when tendering their shares, elect to have either: (i) all or none; or (ii) at least a minimum amount or none accepted, if the Fund first accepts all shares tendered by shareholders who do not make this election.

*Suspension or Postponement of Repurchase Offers*. The Fund shall not suspend or postpone a repurchase offer except pursuant to a vote of a majority of the Board, including a majority of the Trustees who are not interested persons of the Fund, and only:

1. If the repurchase would cause the Fund to lose its status as a RIC under Subchapter M of the Internal Revenue Code of 1986, as amended (the “Code”);

2. If the repurchase would cause the shares that are the subject of the offer that are either listed on a national securities exchange or quoted in an inter-dealer quotation system of a national securities association to be neither listed on any national securities exchange nor quoted on any inter-dealer quotation system of a national securities association;

3. For any period during which the New York Stock Exchange or any other market in which the securities owned by the Fund are principally traded is closed, other than customary weekend and holiday closings, or during which trading in such market is restricted;

4. For any period during which an emergency exists as a result of which disposal by the Fund of securities owned by it is not reasonably practicable, or during which it is not reasonably practicable for the Fund fairly to determine the value of its net assets; or

5. For such other periods as the SEC may by order permit for the protection of shareholders of the Fund.

If a repurchase offer is suspended or postponed, the Fund shall provide notice to shareholders of such suspension or postponement. If the Fund renews the repurchase offer, the Fund shall send a new Shareholder Notification to shareholders.

*Computing Net Asset Value*. The Fund's current NAV shall be computed no less frequently than weekly, and daily on the five business days preceding a Repurchase Request Deadline, on such days and at such specific time or times during the day as set by the Board. Currently, the Board has determined that the Fund's NAV shall be determined daily following the close of the New York Stock Exchange. The Fund's NAV need not be calculated on:

1. Days on which changes in the value of the Fund's portfolio securities will not materially affect the current NAV of the shares;

2. Days during which no order to purchase shares is received, other than days when the NAV would otherwise be computed; or

3. Customary national, local, and regional business holidays described or listed in the Prospectus.

*Liquidity Requirements*. From the time the Fund sends a Shareholder Notification to shareholders until the Repurchase Pricing Date, a percentage of the Fund's assets equal to at least 100% of the Repurchase Offer Amount (the "Liquidity Amount") shall consist of assets that individually can be sold or disposed of in the ordinary course of business, at approximately the price at which the Fund has valued the investment, within a period equal to the period between a Repurchase Request Deadline and the Repurchase Payment Deadline, or of assets that mature by the next Repurchase Payment Deadline. This requirement means that individual assets must be salable under these circumstances. It does not require that the entire Liquidity Amount must be salable. In the event that the Fund's assets fail to comply with this requirement, the Board shall cause the Fund to take such action as it deems appropriate to ensure compliance.

*Liquidity Policy*. The Board may delegate day-to-day responsibility for evaluating liquidity of specific assets to the Adviser, but shall continue to be responsible for monitoring the Adviser's performance of its duties and the overall composition of the portfolio. Accordingly, the Board has approved this policy that is reasonably designed to ensure that the Fund's portfolio assets are sufficiently liquid so that the Fund can comply with its fundamental policy on repurchases and comply with the liquidity requirements in the preceding paragraph.

1. In evaluating liquidity, the following factors are relevant, but not necessarily determinative:

    (a) The frequency of trades and quotes for the security.

    (b) The number of dealers willing to purchase or sell the security and the number of potential purchasers.

    (c) Dealer undertakings to make a market in the security.

    (d) The nature of the marketplace trades (e.g., the time needed to dispose of the security, the method of soliciting offer and the mechanics of transfer).

    (e) The size of the fund's holdings of a given security in relation to the total amount of outstanding of such security or to the average trading volume for the security.

2. If market developments impair the liquidity of a security, the Adviser should review the advisability of retaining the security in the portfolio. The Adviser should report to the basis for its determination to retain a security at the next Board meeting.

3. The Board shall review the overall composition and liquidity of the Fund's portfolio on a quarterly basis.

4. These procedures may be modified as the Board deems necessary.

Registration Statement Disclosure. The Fund's registration statement must disclose its intention to make or consider making such repurchase offers.

Annual Report Disclosure. The Fund shall include in its annual report to shareholders the following:

1. Disclosure of its fundamental policy regarding periodic repurchase offers.

2. Disclosure regarding repurchase offers by the Fund during the period covered by the annual report, which disclosure shall include:

   (a) the number of repurchase offers,

   (b) the repurchase offer amount and the amount tendered in each repurchase offer,

   (c) and the extent to which in any repurchase offer the Fund repurchased stock pursuant to the procedures in Rule 23c-3(b)(5) under the 1940 Act.

Advertising. The Fund, or any underwriter for the Fund, must comply, as if the Fund were an open-end company, with the provisions of Section 24(b) of the 1940 Act and the rules thereunder and file, if necessary, with FINRA or the SEC any advertisement, pamphlet, circular, form letter, or other sales literature addressed to or intended for distribution to prospective investors.

***Transfers of Shares.*** No person may become a substituted shareholder without the written consent of the Board, which consent may be withheld for any reason in the sole and absolute discretion of the Board. Shares may be transferred only: (i) by operation of law pursuant to the death, bankruptcy, insolvency or dissolution of a shareholder; or (ii) with the written consent of the Board, which may be withheld in its sole and absolute discretion. The Board may, in its discretion, delegate to the Adviser its authority to consent to transfers of shares. Each shareholder and transferee is required to pay all expenses, including attorneys and accountants fees, incurred by the Fund in connection with such transfer.

## MANAGEMENT OF THE FUND

The Board has overall responsibility to manage and control the business affairs of the Fund, including the complete and exclusive authority to oversee and to establish policies regarding the management, conduct and operation of the Fund's business. The Board exercises the same powers, authority and responsibilities on behalf of the Fund as are customarily exercised by the board of directors of a registered investment company organized as a corporation. The business of the Fund is managed under the direction of the Board in accordance with the Agreement and Declaration of Trust and the Fund's Bylaws (the "Governing Documents"), each as amended from time to time, which have been filed with the SEC and are available upon request.

The Board consists of five individuals, four of whom are not "interested persons" (as defined under the 1940 Act) of the Fund, the Adviser, or the Fund's distributor ("Independent Trustees"). Interested Persons generally include affiliates, immediate family members of affiliates, any partner or employee of the Fund's legal counsel, and any person who has engaged in portfolio transactions for the Fund or who has loaned the Fund money or property within the previous six months. Pursuant to the Governing Documents of the Fund, the Trustees shall elect officers including a President, a Secretary, a Treasurer, a Principal Executive Officer and a Principal Accounting Officer. The Board retains the power to conduct, operate and carry on the business of the Fund and has the power to incur and pay any expenses, which, in the opinion of the Board, are necessary or incidental to carry out any of the Fund's purposes. The Trustees, officers, employees and agents of the Fund, when acting in such capacities, shall not be subject to any personal liability except for his or her own bad faith, willful misfeasance, gross negligence or reckless disregard of his or her duties.

### Trustee Qualifications

Generally, the Fund believes that each Trustee is competent to serve because of their individual overall merits including: (i) experience; (ii) qualifications; (iii) attributes; and (iv) skills.

The Fund does not believe any one factor is determinative in assessing a Trustee's qualifications, but that the collective experience of each Trustee makes them each highly qualified.

Following is a list of the Trustees and executive officers of the Fund and their principal occupation over the last five years.

The "Fund Complex," as referred to herein consists of: the Fund, each series of NexPoint Funds I ("NFI"), each series of NexPoint Funds II ("NFII"), Highland Global Allocation Fund ("GAF"), Highland Opportunities and Income Fund ("HFRO"), and NexPoint Capital, Inc. (the "BDC"), a closed-end management investment company that has elected to be treated as a business development company under the 1940 Act.

### Trustees

| Name, Date of Birth, Position(s) with the Fund and Length of Time Served, Term of Office[1] and Number of Portfolios in the Fund Complex Overseen by the Trustee | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|
| **Independent Trustees** | | |
| **Dr. Bob Froehlich**<br>(4/28/1953)<br><br>Trustee since March 2016; Indefinite term<br>7 funds | Retired.<br><br>Director of KC Concessions, Inc. (from January 2013 to March 2025); Director of American Sports Enterprise, Inc. (since January 2013); Chairman and owner, Kane | Significant experience in the financial industry; significant managerial and executive experience; significant experience on other boards of directors, including as a member of several audit committees. |

| Name, Date of Birth, Position(s) with the Fund and Length of Time Served, Term of Office[1] and Number of Portfolios in the Fund Complex Overseen by the Trustee | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|
| | County Cougars Baseball Club (from January 2013 to March 2025); Director of The Midwest League of Professional Baseball Clubs, Inc. (from January 2013 to December 2021); Director of Kane County Cougars Foundation, Inc. (from January 2013 to March 2025); Director of Galen Robotics, Inc. (from August 2016 to September 2023); Director and Special Advisor to Vault Data, LLC (since February 2018); Director of American Association of Professional Baseball, Inc. (since February 2021); Director of National Amateur Fall Baseball Federation (since December 2023) and Executive Director of Kane County Cougars Baseball Foundation Inc. (from July 2023 to March 2025) (remaining as Director). | |
| **Ethan Powell**<br>(6/20/1975)<br>Trustee since March 2016; Chairman of the Board since March 2016;<br>Indefinite term<br>7 funds | Principal and CIO of Brookmont Capital Management, LLC (since May 2020); CEO, Chairman and Founder of Impact Shares LLC (since December 2015); Trustee /Director of the Fund Complex (from June 2012 until July 2013 and since December 2013); and Trustee of Strategic Trust (since August 2021).<br>Trustee of Tidal Trust III (formerly Impact Shares Trust I) (since May 2016) | Significant experience in the financial industry; significant executive experience including past service as an officer of funds in the Fund Complex; significant administrative and managerial experience. |
| **Bryan A. Ward**<br>(2/4/1955)<br>Trustee since March 2016;<br>Indefinite term<br>7 funds | President – Private Banking, Lakeside Bank (since September 2023); Business Development Banker, CrossFirst Bank (from January 2023 to April 2023) (President-Dallas from October 2020 until January 2023 and Senior Advisor from April 2019 until October 2022); and Private Investor, BW Consulting, LLC (since 2014); and Anderson Consulting/Accenture (from 1991 to 2013).<br>Director of Equity Metrix, LLC | Significant experience on this and/or other boards of directors/trustees, Audit Committee Chair; significant managerial and executive experience; significant experience as a management consultant. |

| Name, Date of Birth, Position(s) with the Fund and Length of Time Served, Term of Office[1] and Number of Portfolios in the Fund Complex Overseen by the Trustee | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|
| **Dorri McWhorter**<br>(6/30/1973)<br><br>Trustee since May 2022;<br>Indefinite term<br>7 funds | President & CEO, YMCA of Metropolitan Chicago (from 2021 to 2025); Chief Executive Officer, YWCA Metropolitan Chicago (from 2013 to 2021).<br><br>Board Director of William Blair Funds (since 2019); Board Director of Skyway Concession Company, LLC (since 2018); Board Director of Illinois CPA Society (from 2017 to 2022); Board Director of Lifeway Foods, Inc. (since 2020); Board Director of Green Thumb Industries, Inc. (from February 2022 to October 2022); Member of Financial Accounting Standards Advisory Council (since 2021); Board Director of LanzaTech Global, Inc. (since 2023). | Significant managerial and executive experience, including experience as president and chief executive officer; significant background and experience in financial accounting; significant experience on other boards of directors, including for other registered investment companies. |
| **Interested Trustees** | | |
| **John Honis**[2]<br>(6/16/1958)<br><br>Trustee since March 2016;<br>Indefinite term<br>7 funds | President of Rand Advisors, LLC (August 2013 – August 2022); CEO of Valience Group, LLC (since July 2021) and Consultant of Rand Advisors, LLC (since August 2022). | Significant experience in the financial industry; significant managerial and executive experience, including experience as president, chief executive officer or chief restructuring officer of five telecommunication firms; experience on other boards of directors. |

1 On an annual basis, as a matter of Board policy, the Governance and Compliance Committee reviews each Trustee's performance and determines whether to extend each such Trustee's service for another year. The Board has adopted a retirement policy wherein the Governance and Compliance Committee shall not recommend the continued service as a Trustee of a Board member who is older than 80 years of age at the time the Governance and Compliance Committee reports its findings to the Board.

2 In light of certain relationships between Mr. Honis and historically affiliated entities of the Adviser, including Highland Capital Management, L.P. ("HCMLP"), arising out of HCMLP's pending Chapter 11 proceedings, Mr. Honis is treated as an Interested Trustee of the Trust effective January 28, 2020.

**Officers***

| Name, Date of Birth, Position(s) held with the Trust and Length of Time Served, Term of Office | Principal Occupations(s) During the Past Five Years |
|---|---|
| **James Dondero**<br>(6/29/1962)<br>President and Principal Executive Officer since March 2016; Indefinite Term | Founder of NexPoint; Co-founder of HCMLP and NexPoint Asset Management, L.P. ("NAM"); Chairman of the Board of NexPoint Residential Trust, Inc. since 2015; NexPoint Hospitality Trust, NexPoint Real Estate Finance, Inc., Texmark Timber Treasury, L.P., and SeaOne Holdings, LLC; Portfolio Manager of GAF, HFRO, NexPoint Event Driven Fund and NexPoint Merger Arbitrage Fund (each a series of NFI); NexPoint Climate Tech Fund (series of NFII); the BDC; and NRESF. |
| **Frank Waterhouse**<br>(4/14/1971)<br>Treasurer since March 2016; Principal Financial and Accounting Officer since April 2021; Indefinite Term | Chief Financial Officer of Skyview Group since February 2021; Chief Financial Officer and Partner of HCMLP from December 2011 and March 2015, respectively, to February 2021; Treasurer of the Fund Complex since May 2015. |
| **Dustin Norris**<br>(1/6/1984)<br>Executive Vice President since April 2019; Indefinite Term | Head of Distribution and Chief Product Strategist at NexPoint since March 2019; President of NexPoint Securities, Inc. since April 2018; Officer of the Fund Complex since November 2012. |
| **Stephanie Vitiello**<br>(6/21/1983)<br>Secretary since April 2021; Chief Compliance Officer and Anti-Money Laundering Officer since November 2021; Indefinite Term | Chief Compliance Officer and Counsel of Skyview Group since February 2021. Prior to her current role at Skyview Group, Ms. Vitiello served as Managing Director – Distressed, Assistant General Counsel, Associate General Counsel and In-House Counsel for HCMLP. |
| **Will Mabry**<br>(7/2/1986)<br>Assistant Treasurer since April 2021; Indefinite Term | Director, Fund Analysis of Skyview Group, since February 2021. Prior to his current role at Skyview Group, Mr. Mabry served as Senior Manager – Fund Analysis, Manager – Fund Analysis, and Senior Fund Analyst for HCMLP. |

* The address for each Trustee and Officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Board Committees**

***Audit and Qualified Legal Compliance Committee.*** The members of the Audit and Qualified Legal Compliance Committee are Dr. Froehlich and Messrs. Powell and Ward and Ms. McWhorter, each of whom is independent for purposes of the 1940 Act. Mr. Ward serves as Chairperson of the Audit and Qualified Legal Compliance Committee. The Audit and Qualified Legal Compliance Committee is responsible for: (i) approving the Fund's independent accountants; (ii) reviewing with the Fund's independent accountants the plans and results of the audit engagement and reviewing the adequacy of the Fund's internal accounting controls; and (iii) approving professional services provided by the Fund's independent accountants. The Audit and Qualified Legal Compliance Committee is charged with compliance with Rules 205.2(k) and 205.3(c) of Title 17 of the Code of Federal Regulations regarding alternative reporting procedures for attorneys representing the Fund who appear

and practice before the SEC on behalf of the Fund. The Audit Committee also oversees valuations determined by the Adviser, who pursuant to Rule 2a-5 under the 1940 Act, has been designated by the Board as the Fund's valuation designee to perform the fair valuation determination for securities and other assets held by the Fund in accordance with valuation policies and procedures established by the Adviser and approved by the Board. In addition, each member of the Audit and Qualified Legal Compliance Committee meets the current independence and experience requirements of Rule 10A-3 under the Exchange Act.

During the fiscal year ended December 31, 2024, the Audit and Qualified Legal Compliance Committee held five meetings.

***The Governance and Compliance Committee.*** The Fund's Governance and Compliance Committee's function is to oversee and make recommendations to the full Board or the Independent Trustees, as applicable, with respect to the governance of the Fund, selection and nomination of Trustees, compensation of Trustees, and related matters, as well as to oversee and assist Board oversight of the Fund's compliance with legal and regulatory requirements and to seek to address any potential conflicts of interest between the Fund and the Adviser in connection with any potential or existing litigation or other legal proceeding related to securities held by the Fund and the Adviser or another client of the Adviser. The Governance and Compliance Committee is also responsible for evaluating each Trustee and determining whether to recommend each Trustee's continued service in that capacity. The Governance and Compliance Committee will consider recommendations for Trustee nominees from shareholders sent to the Secretary of the Fund, 300 Crescent Court, Suite 700, Dallas, Texas 75201. A nomination submission must include all information relating to the recommended nominee that is required to be disclosed in solicitations or proxy statements for the election of Trustees, as well as information sufficient to evaluate the recommended nominee's ability to meet the responsibilities of a Trustee of the Fund. Nomination submissions must be accompanied by a written consent of the individual to stand for election if nominated by the Board and to serve if elected by the shareholders, and such additional information must be provided regarding the recommended nominee as reasonably requested by the Governance and Compliance Committee. The Governance and Compliance Committee is currently comprised of Dr. Froehlich and Messrs. Ward and Powell and Ms. McWhorter, each of whom is independent for purposes of the 1940 Act. Dr. Froehlich serves as the Chairperson of the Governance and Compliance Committee. The Governance and Compliance Committee met five times during the fiscal year ended December 31, 2024.

***The Administration and Operations Committee.*** The members of the Administration and Operations Committee are Dr. Froehlich and Messrs. Honis, Ward, and Powell and Ms. McWhorter. Mr. Honis serves as Chairperson of the Administration and Operations Committee. The Administration and Operations Committee is responsible for reviewing arrangements with financial intermediaries who provide service to the Fund, including Fund payments to financial intermediaries, and for overseeing any funds that, in the Board's determination, employ alternative investment strategies. The Administration and Operations Committee met five times during the fiscal year ended December 31, 2024.

**Board Leadership Structure**

The Board is led by Ethan Powell, an Independent Trustee, who has served as the Chairman of the Board since March 2016. Under certain 1940 Act governance guidelines that apply to the Fund, the Independent Trustees will meet in executive session, at least quarterly. Under the Fund's governing documents, the Chairman of the Board is responsible for: (a) presiding at board meetings; (b) calling special meetings on an as-needed basis; and (c) execution and administration of Fund policies, including: (i) setting the agendas for board meetings; and (ii) providing information to board members in advance of each board meeting and between board meetings. The Fund believes that the Chairman, and, as an entity, the full Board, provide effective leadership that is in the best interests of the Fund and each shareholder.

The Board periodically reviews its leadership structure, including the role of the Chairman. The Board also completes an annual self-assessment during which it reviews its leadership and Committee structure and

considers whether its structure remains appropriate in light of the Fund's current operations. The Board believes that its leadership structure, including the current percentage of the Board who are Independent Trustees is appropriate given its specific characteristics. These characteristics include: (i) the extent to which the work of the Board is conducted through the standing committees, and that the Audit and Qualified Legal Compliance Committee and the Governance and Compliance Committee meetings are each chaired by an Independent Trustee; (ii) the extent to which the Independent Trustees meet as needed, together with their independent legal counsel, in the absence of members of management and any member of the Board who is considered an "interested person" of the Fund; and (iii) Mr. Powell's and Mr. Honis' previous positions with NAM and/or historical affiliates of the Adviser which enhances the Board's understanding of the operations of the Adviser.

**Board Oversight of Risk Management**

The Board's role is one of oversight, rather than active management. This oversight extends to the Fund's risk management processes. These processes are embedded in the responsibilities of officers of, and service providers to, the Fund. For example, the Adviser and other service providers to the Fund are primarily responsible for the management of the Fund's investment risks. The Board has not established a formal risk oversight committee. However, much of the regular work of the Board and its standing Committees addresses aspects of risk oversight. For example, the Trustees seek to understand the key risks facing the Fund, including those involving conflicts of interest; how management identifies and monitors these risks on an ongoing basis; how management develops and implements controls to mitigate these risks; and how management tests the effectiveness of those controls.

In the course of providing that oversight, the Board will receive a wide range of reports on the Fund's activities from the Adviser and other service providers, including reports regarding the Fund's investment portfolio, the compliance of the Fund with applicable laws, and the Fund's financial accounting and reporting. The Board will also meet periodically with the Fund's Chief Compliance Officer to receive reports regarding the compliance of the Fund with the federal securities laws and the Fund's internal compliance policies and procedures and meets with the Fund's Chief Compliance Officer periodically, including at least annually, to review the Chief Compliance Officer's annual report. The Board's Audit and Qualified Legal Compliance Committee will also meet regularly with the Chief Financial Officer and Treasurer and the Fund's independent public accounting firm to discuss, among other things, the internal control structure of the Fund's financial reporting function. The Board will also meet periodically with the portfolio managers of the Fund to receive reports regarding the management of the Fund, including its investment risks.

The Board recognizes that not all risks that may affect the Fund can be identified, that it may not be practical or cost-effective to eliminate or mitigate certain risks, that it may be necessary to bear certain risks (such as investment-related risks) to achieve the Fund's goals, that reports received by the Trustees with respect to risk management matters are typically summaries of the relevant information, and that the processes, procedures and controls employed to address risks may be limited in their effectiveness. As a result of the foregoing and other factors, risk management oversight by the Board and by the Committees is subject to substantial limitations.

**Trustee Ownership**

The following table indicates the dollar range of equity securities that each Trustee beneficially owned in the Fund and the aggregate dollar range of equity securities owned by the Trustees in all funds overseen by the Trustees in the Fund Complex as of December 31, 2024.

| Name of Trustee | Dollar Range of Equity Securities in the Fund | Aggregate Dollar Range of Equity Securities[1] Owned in All Funds of the Funds Complex Overseen by Trustee[2] |
|---|---|---|
| **Independent Trustees** | | |
| Ethan Powell | None | $50,001 - $100,000 |
| Dr. Bob Froehlich | None | Over $100,000 |
| Bryan A. Ward | None | $10,001 - $50,000 |
| Dorri McWhorter | None | None |
| **Interested Trustee** | | |
| John W. Honis | None | $1 - $10,000 |

1 Based on market value as of December 31, 2024.
2 Dollar ranges are as follows: None, $1-$10,000, $10,001-$50,000, $50,001-$100,000 and over $100,000.

**Compensation**

The executive officers of the Fund receive no direct remuneration from the Fund. Each Trustee who oversees all of the funds in the Fund Complex receives an annual retainer of $150,000 payable in quarterly installments and allocated among each portfolio in the Fund Complex based on relative net assets. Trustees are reimbursed for actual out-of-pocket expenses relating to attendance at meetings The Trustees do not receive any separate compensation in connection with service on Committees or for attending Board or Committee Meetings; however, the Chairman of the Board receives an additional annual payment of $20,000 and the Chairperson of the each Committee each receive an additional annual payment of $10,000 payable in quarterly installments and allocated among each portfolio in the Fund Complex based on relative net assets. The Trustees do not have any pension or retirement plan.

The table below details the amount of compensation the Trustees received from the Fund during the fiscal year ended December 31, 2024. The Fund does not have a bonus, profit sharing, pension or retirement plan.

| Name of Trustee | Aggregate Compensation From the Fund | Pension or Retirement Benefits Accrued as Part of the Fund's Expenses | Estimated Annual Benefits Upon Retirement | Aggregate Compensation From the Funds Complex |
|---|---|---|---|---|
| **Independent Trustees** | | | | |
| Dr. Bob Froehlich | $ 3,181 | $ 0 | $ 0 | $ 160,000 |
| Bryan A. Ward | $ 3,181 | $ 0 | $ 0 | $ 160,000 |
| Ethan Powell | $ 3,379 | $ 0 | $ 0 | $ 170,000 |
| Dorri McWhorter | $ 2,982 | $ 0 | $ 0 | $ 150,000 |
| **Interested Trustees** | | | | |
| John W. Honis | $ 3,181 | $ 0 | $ 0 | $ 160,000 |

## CODES OF ETHICS

The Fund and the Adviser have adopted codes of ethics under Rule 17j-1 of the 1940 Act. These codes permit personnel subject to the codes to invest in securities, including securities that may be purchased or held by the Fund. The codes of ethics are available on the EDGAR Database on the SEC's web site (http://www.sec.gov), and copies of these codes may be obtained, after paying a duplicating fee, by electronic request at the following e-mail address: publicinfo@sec.gov, or by writing the SEC's Public Reference Section, Washington, D.C. 20549-0102.

## PROXY VOTING POLICIES AND PROCEDURES

The Board has delegated the voting of proxies for Fund securities to the Adviser pursuant to the Adviser's proxy voting policies and procedures. Under these policies and procedures, the Adviser will vote proxies related to Fund securities in the best interests of the Fund and its shareholders. A copy of the Adviser's proxy voting policies and procedures is attached as Appendix A to this SAI. The Fund's proxy voting record for the most recent 12-month period ended June 30 is available: (i) without charge, upon request, by calling 844-485-9167; and (ii) on the SEC's web site (http://www.sec.gov).

## CONTROL PERSONS AND PRINCIPAL HOLDERS

A principal shareholder is any person who owns (either of record or beneficially) 5% or more of the outstanding shares of a fund. A control person is one who owns, either directly or indirectly more than 25% of the voting securities of a company or acknowledges the existence of control. A control person may be able to determine the outcome of a matter put to a shareholder vote.

As of March 31, 2025, as a result of Mr. Dondero's controlling interest in the Adviser, the Trustees and officers beneficially owned approximately 8.57% of the Fund's outstanding shares.

As of March 31, 2025, the only persons known by the Fund to own of record or beneficially 5% or more of any class of the outstanding shares of the Fund were as follows:

| Name and Address | Outstanding Shares Held | Percentage of Class (%) |
|---|---|---|
| **NEXPOINT REAL ESTATE STRATEGIES FUND – CLASS A** | | |
| Pershing LLC<br>PO Box 2052<br>Jersey City, NJ 07303-2052 | 43,054 | 9.11% |
| Calton & Associates, Inc.<br>2701 N Rocky Point Dr.<br>Suite 1000<br>Tampa, FL 33607 | 29,815 | 6.31% |
| **NEXPOINT REAL ESTATE STRATEGIES FUND – CLASS C** | | |
| Hilltop Securities Inc.<br>717 N Harwood Street Suite 3400<br>Dallas, TX 75201-6534 | 18,648 | 10.61% |
| Pershing LLC<br>PO Box 2052<br>Jersey City, NJ 07303-2052 | 13,310 | 7.58% |
| **NEXPOINT REAL ESTATE STRATEGIES FUND – CLASS Z** | | |
| Liberty CLO Holdco Ltd.<br>300 Crescent Court<br>Dallas, TX 75206 | 500,120 | 33.63% |
| Charles Schwab & Co. Inc.<br>Special Custody Account FBO Customers<br>Attn. Mutual Funds<br>211 Main Street<br>San Francisco, CA 94105 | 407,285 | 27.38% |
| Axos Clearing LLC<br>FBO #861 PB BOX 6503<br>Englewood, CO 80155-6503 | 107,431 | 7.22% |

## INVESTMENT ADVISORY AND OTHER SERVICES

**The Adviser**

NexPoint Advisors, L.P., which serves as the investment adviser of the Fund, is registered with the SEC as an investment adviser under the Advisers Act. NexPoint is owned by The Dugaboy Investment Trust, of which James Dondero is the beneficiary, and NexPoint Advisors GP, LLC, NexPoint's general partner. Mr. Dondero is the President and sole member of NexPoint Advisors GP, LLC.

The Adviser also externally manages NexPoint Capital, Inc., a non-traded business development company. Affiliates of the Adviser manage NXDT, a diversified REIT whose share trades on the NYSE; NXRT, a publicly-traded REIT whose shares trade on the NYSE; VineBrook Homes Trust, Inc., a Private Real Estate Investment Fund that manages a portfolio of single-family housing properties in the Midwest U.S.; NexPoint Hospitality Trust ("NHT"), a REIT listed on the TSX Venture Exchange that manages a portfolio of hospitality assets located in the U.S.; NexPoint Real Estate Finance, Inc., an externally managed publicly traded mortgage REIT ("NREF"); and certain wholly-owned REIT subsidiaries of other closed-end funds in the Fund Complex. NexPoint Asset Management, L.P., an affiliate of the Adviser, manages Highland Opportunities and Income Fund ("HFRO") and Highland Global Allocation Fund ("GAF"), registered closed-end funds whose shares trade on the NYSE. The Adviser's senior management team has experience across private lending, private equity, real estate investing and other investment strategies. Collectively, the Adviser and its affiliates managed approximately $16.8 billion in assets as of January 31, 2025, including approximately $11.7 billion in gross real estate assets.

Under the general supervision of the Board, the Adviser will carry out the investment and reinvestment of the net assets of the Fund, will furnish continuously an investment program with respect to the Fund, and determine which securities should be purchased, sold or exchanged. In addition, the Adviser will supervise and provide oversight of the Fund's service providers. The Adviser has entered into a Services Agreement (the "Services Agreement") with Skyview Group ("Skyview"), pursuant to which NexPoint will receive administrative and operational support services to enable it to provide the required advisory services to the Fund.

Certain Skyview personnel became dual-employees of NexPoint Services, Inc., a wholly-owned subsidiary of the Adviser. The same services are being performed by the dual-employees. The Adviser, and not the Fund, will compensate all Adviser, Skyview, and dual-employee personnel who provide services to the Fund.

Pursuant to the Investment Advisory Agreement with the Fund, the Adviser receives a monthly fee at the annual rate of 1.25% of the Fund's Daily Gross Assets. Daily Gross Assets is defined in the Investment Advisory Agreement as total assets, less any liabilities, but excluding liabilities evidencing leverage. A discussion regarding the basis for the Board's approval of the Fund's Investment Advisory Agreement is available in the Fund's annual report for the period ended December 31, 2024.

The Adviser and the Fund have entered into the Expense Limitation Agreement under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily Gross Assets (the "Expense Limitation"). "Daily Gross Assets" is defined in the Expense Limitation Agreement as an amount equal to total assets, less any liabilities, but excluding liabilities evidencing leverage. If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared

effective by the SEC and to commence operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement may not be amended or terminated for one year from the date of the Prospectus, unless approved by the Board. See "Management of the Fund." During the fiscal year ended December 31, 2022, the Fund paid $419,640 in advisory fees. The Adviser waived $195,464 in advisory fees during that same period. During the fiscal year ended December 31, 2023, the Fund paid $535,940 in advisory fees. The Adviser waived $461,692 in advisory fees during that same period. During the fiscal year ended December 31, 2024, the Fund paid $479,153 in advisory fees. The Adviser waived $331,916 in advisory fees during that same period.

**Other Services.** Pursuant to the Investment Advisory Agreement, the Adviser provides administration services to the Fund, provides executive and other personnel necessary to administer the Fund and furnishes office space. The Adviser waived its fees for administration services for the fiscal year ended December 31, 2017. Under a separate sub-administration agreement entered into as of October 1, 2018, the Adviser has delegated certain administrative functions to SEI Global Funds Services ("SEI") and pays SEI a fee for administration services. Under the administration agreement, SEI has agreed to provide fund accounting services; asset data services; fund administration and reporting services; and regulatory administration services, including preparation and filing of various reports with the appropriate regulatory agencies and the SEC for the Fund. The Adviser generally assists in all aspects of the Fund's administration and operations and furnishes offices, necessary facilities, equipment and personnel. SS&C Technologies, Inc. ("SS&C") serves as the transfer agent of the Fund.

**Conflicts of Interest**

Because each portfolio manager manages other accounts, including accounts that may pay higher fees, potential conflicts of interest exist, including potential conflicts between the investment strategy of the Fund and the investment strategy of the other accounts managed by the portfolio manager and potential conflicts in the allocation of investment opportunities between the Fund and the other accounts. The Adviser has policies and procedures in place that are reasonably designed to mitigate these conflicts of interest, which are also described below.

The Adviser and/or its general partner, limited partners, officers, affiliates and employees provide investment advice to other parties and manage other accounts and investment vehicles similar to the Fund. For the purposes of this section, the term "NexPoint" shall include the Adviser and its affiliated investment advisors and all affiliates listed on its Form ADV, as filed with the SEC March 28, 2025 (CRD No. 163564).

In connection with such other investment management activities, the Adviser and/or its general partner, limited partners, officers, affiliates and employees may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Fund's monies, in a particular security or strategy. In addition, the Adviser and such other persons will determine the allocation of funds from the Fund and such other accounts to investment strategies and techniques on whatever basis they consider appropriate or desirable in their sole and absolute discretion.

NexPoint has built a professional working environment, a firm-wide compliance culture and compliance procedures and systems designed to protect against potential incentives that may favor one account over another. The Adviser has adopted policies and procedures that address the allocation of investment opportunities, execution of portfolio transactions, personal trading by employees and other potential conflicts of interest that are designed to ensure that all client accounts are treated equitably over time. Nevertheless, the Adviser furnishes advisory services to numerous clients in addition to the Fund, and the Adviser may, consistent with applicable law, make investment recommendations to other clients or accounts (including accounts that have performance or higher fees paid to the Adviser or in which portfolio managers have a personal interest in the receipt of such

fees) that may be the same as or different from those made to the Fund. In addition, the Adviser, its affiliates and any of their partners, directors, officers, stockholders or employees may or may not have an interest in the securities whose purchase and sale the Adviser recommends to the Fund. Actions with respect to securities of the same kind may be the same as or different from the action that the Adviser, or any of its affiliates, or any of their partners, directors, officers, stockholders or employees or any member of their families may take with respect to the same securities. Moreover, the Adviser may refrain from rendering any advice or services concerning securities of companies of which any of the Adviser's (or its affiliates') partners, directors, officers or employees are directors or officers, or companies as to which the Adviser or any of its affiliates or partners, directors, officers and employees of any of them has any substantial economic interest or possesses material non-public information.

The Adviser, its affiliates or their partners, directors, officers or employees similarly serve or may serve other entities that operate in the same or related lines of business, including accounts managed by an investment adviser affiliated with the Adviser. Accordingly, these individuals may have obligations to investors in those entities or funds or to other clients, the fulfillment of which might not be in the best interests of the Fund. As a result, the Adviser will face conflicts in the allocation of investment opportunities to the Fund and other funds and clients. In order to enable such affiliates to fulfill their fiduciary duties to each of the clients for which they have responsibility, the Adviser will endeavor to allocate investment opportunities in a fair and equitable manner, pursuant to policies and procedures adopted by the Adviser and its advisory affiliates that are designed to manage potential conflicts of interest, which may, subject to applicable regulatory constraints, involve pro rata co-investment by the Fund and such other clients or may involve a rotation of opportunities among the Fund and such other clients. The Fund will only make investments in which the Adviser or an affiliate hold an interest to the extent permitted under the 1940 Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Adviser and certain funds affiliated with the Fund, dated April 19, 2016. For example, exemptive relief is not required for the Fund to invest in syndicated deals and secondary loan market transactions in which the Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," including future closed-end investment companies registered under the 1940 Act that are managed by the Adviser, which includes the Fund. The Fund, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order. To mitigate any actual or perceived conflicts of interest, allocation of limited offering securities (such as IPOs and registered secondary offerings) to principal accounts that do not include third party investors may only be made after all other client account orders for the security have been filled. However, there can be no assurance that such policies and procedures will in every case ensure fair and equitable allocations of investment opportunities, particularly when considered in hindsight.

Conflicts may arise in cases when clients and/or the Adviser and other affiliated entities invest in different parts of an issuer's capital structure, including circumstances in which one or more clients own private securities or obligations of an issuer and other clients may own public securities of the same issuer. In addition, one or more clients may invest in securities, or other financial instruments, of an issuer that are senior or junior to securities, or financial instruments, of the same issuer that are held by or acquired for, one or more other clients. For example, if such issuer encounters financial problems, decisions related to such securities (such as over the terms of any workout or proposed waivers and amendments to debt covenants) may raise conflicts of interests. In such a distressed situation, a client holding debt securities of the issuer may be better served by a liquidation of the issuer in which it may be paid in full, whereas a client holding equity securities of the issuer might prefer a reorganization that holds the potential to create value for the equity holders. In the event of conflicting interests within an issuer's capital structure, the Adviser will generally pursue the strategy that the Adviser believes best reflects what would be expected to be negotiated in an arm's length transaction, but in all instances with due consideration being given to NexPoint's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or fees received from such accounts). This strategy may be recommended by one or more NexPoint investment professionals. A single person may make decisions with respect to more than one part of an issuer's capital structure. Adviser personnel board members may still make recommendations to the applicable investment professional(s). A portfolio manager with respect to any applicable NexPoint registered investment

company clients ("Retail Accounts") will make an independent determination as to which course of action he or she determines is in the best interest of the applicable Retail Accounts. NexPoint may use external counsel for guidance and assistance.

The Adviser and its affiliates have both subjective and objective procedures and policies in place designed to manage potential conflicts of interest involving clients so that, for example, investment opportunities are allocated in a fair and equitable manner among the Fund and such other clients. An investment opportunity that is suitable for multiple clients of the Adviser and its affiliates may not be capable of being shared among some or all of such clients due to the limited scale of the opportunity or other factors, including regulatory restrictions imposed by the 1940 Act. There can be no assurance that the Adviser's or its affiliates' efforts to allocate any particular investment opportunity fairly among all clients for whom such opportunity is appropriate will result in an allocation of all or part of such opportunity to the Fund. Not all conflicts of interest can be expected to be resolved in favor of the Fund.

Another type of conflict may arise if one client account buys a security and another client account sells or shorts the same security. Currently, such opposing positions are generally not permitted within the same account without prior trade approval by the Chief Compliance Officer. However, a portfolio manager may enter into opposing positions for different clients to the extent each such client has a different investment objective and each such position is consistent with the investment objective of the applicable client. In addition, transactions in investments by one or more affiliated client accounts may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other client accounts.

Because certain client accounts may have investment objectives, strategies or legal, contractual, tax or other requirements that differ (such as the need to take tax losses, realize profits, raise cash, diversification, etc.), an affiliated adviser may purchase, sell or continue to hold securities for certain client accounts contrary to other recommendations. In addition, an affiliated adviser may be permitted to sell securities or instruments short for certain client accounts and may not be permitted to do so for other affiliated client accounts.

As a result of the Fund's arrangements with NexPoint, there may be times when NexPoint, the Adviser or their affiliates have interests that differ from those of the Fund's shareholders, giving rise to a conflict of interest. NexPoint and the Adviser are under common ownership, and the Fund's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund does, or of investment funds managed by the Adviser or its affiliates. Similarly, the Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. For example, the Fund's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Adviser and its affiliates. The Fund's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles. As a result, those individuals may face conflicts in the allocation of investment opportunities among the Fund and other investment funds or accounts advised by or affiliated with the Adviser. The Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is fair and equitable over time and consistent with its allocation policy. However, the Fund can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time.

In addition, it is anticipated that a significant portion of the Fund's assets will be represented by securities sponsored, organized and/or managed by NexPoint and its affiliates, which may include REITs, asset-backed securities and/or structured finance securities. The Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Fund with an opportunity to periodically review the Fund's investments in such REITs, asset-backed securities and/or structured finance securities and assure themselves that continued investment in such securities remains in the best interests of the Fund and its shareholders.

The Adviser may direct the Fund to acquire or dispose of investments in cross trades between the Fund and other clients of the Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the 1940 Act and SEC staff interpretations, the Fund may make and/or hold an investment, including an investment in securities, in which the Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Adviser's own investments in such companies.

**Shareholder Service Expenses**

The Fund has adopted a "Shareholder Servicing Plan and Agreement" (the "Plan") under which the Fund may compensate financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. The Plan operates in a manner consistent with Rule 12b-1 under the 1940 Act, which regulates the manner in which an open-end investment company may directly or indirectly bear the expenses of distributing its shares. Although the Fund is not an open-end investment company, it has undertaken to comply with the terms of Rule 12b-1 as a condition of an exemptive order under the 1940 Act which permits it to have a multi-class structure, CDSCs and distribution and shareholder servicing fees. Such services may include electronic processing of client orders, electronic fund transfers between clients and the Fund, account reconciliations with the Fund's transfer agent, facilitation of electronic delivery to clients of Fund documentation, monitoring client accounts for back-up withholding and any other special tax reporting obligations, maintenance of books and records with respect to the foregoing, and such other information and liaison services as the Fund or the Adviser may reasonably request. Under the Shareholder Servicing Plan and Agreement, the Fund may incur expenses on an annual basis equal to 0.25% of the average daily net assets of the Class A and Class C shares.

In addition to payments under the Plan, from time to time the Fund may pay broker-dealers and other intermediaries' account-based fees for networking and account maintenance. In addition, the Adviser and/or the Distributor may, from time to time, at their own expense out of the revenues they receive from the Fund and/or its own financial resources, make cash payments to broker-dealers and other financial intermediaries (directly and not as an expense of the Fund) as an incentive to sell shares of the Fund and/or to promote retention of customer assets in the Fund. Such cash payments may be calculated on sales of shares of the Fund ("Sales-Based Payments") or on the average daily net assets of the Fund attributable to that particular broker-dealer or other financial intermediary ("Asset-Based Payments"). Each of the Adviser and/or the Distributor may agree to make such cash payments to a broker-dealer or other financial intermediary in the form of either or both Sales-Based Payments and Asset-Based Payments.

The Adviser and/or the Distributor may also make other cash payments to broker-dealers or other financial intermediaries in addition to or in lieu of Sales-Based Payments and Asset-Based Payments, in the form of payment for travel expenses, including lodging, incurred in connection with trips taken by qualifying registered representatives of those broker-dealers or other financial intermediaries and their families to places within or outside the United States; meeting fees; entertainment; transaction processing and transmission charges; advertising or other promotional expenses; allocable portions, based on shares of the Fund sold, of salaries and bonuses of registered representatives of an affiliated broker-dealer or other financial intermediary that is a financial advisor; or other expenses as determined in the Adviser or the Distributor's discretion, as applicable. In certain cases these other payments could be significant to the broker-dealers or other financial intermediaries. Any payments described above will not change the price paid by investors for the purchase of the shares of the Fund, the amount that the Fund will receive as proceeds from such sales, or the amounts payable under the Plan.

**PORTFOLIO MANAGERS**

As described in the prospectus, James Dondero and Matthew McGraner serve as portfolio managers and are primarily responsible for the day-to-day management of the Fund.

**Mr. Dondero** is the founder and President of NexPoint Advisors, L.P. ("NexPoint") and co-founder of NAM. Mr. Dondero has over 30 years of experience investing across the alternative landscape. In that time, he established a number of integrated businesses to manage investments in real estate, private equity, and high-yield and structured credit, among other areas. Mr. Dondero holds various leadership roles at NexPoint Advisors, L.P., NexPoint Asset Management, L.P., and other NexPoint affiliates. Mr. Dondero holds various leadership roles across the NexPoint businesses; he serves as a portfolio manager for several funds and is an officer and director at NexPoint's publicly traded REITs. Additionally, Mr. Dondero holds director positions at several companies within financial services, real estate, and other industries. He is the chairman of NexBank Capital, Inc. and a director of SeaOne Holdings, LLC. A dedicated philanthropist, Mr. Dondero actively contributes to initiatives in education, veterans' affairs, and community and economic development, and has been instrumental in supporting a number of civic and cultural institutions in the Dallas-Fort Worth area. He is a member of the Southern Methodist University Cox School of Business Executive Board and the George W. Bush Presidential Center Executive Advisory Council. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He received certification as a Certified Public Accountant (CPA) and a Certified Managerial Accountant (CMA) and is a holder of the right to use the Chartered Financial Analyst (CFA) designation.

**Mr. McGraner** has extensive experience in real estate and private equity transactions and currently leads the operations of the real estate platform of NexPoint Advisors, L.P. and its affiliates, a suite of leading alternative investment managers he co-founded. In that role, he sources and executes investments, manages risk and develops potential business opportunities, including fundraising, private investments and joint ventures. In his role at NexPoint, Mr. McGraner has served as the Executive VP and Chief Investment Officer of NXRT, a multifamily real estate investment trust, since 2016; NREF, a mortgage REIT, since 2020; VineBrook Homes Trust, a single family rental REIT, since 2019; NexPoint Diversified Real Estate Trust, a diversified REIT, since 2022; and as a member of the board of directors and President of NexPoint Storage Partners, a self-storage REIT, since 2020. Mr. McGraner is also a licensed attorney and was formerly an attorney at an AmLaw 20 multinational law firm, where his practice primarily focused on private equity, real estate and mergers and acquisitions. Since 2013, Mr. McGraner has led the acquisition and financing of over $20.0 billion of real estate investments. Mr. McGraner holds a B.S. from Vanderbilt University and a J.D. from the Washington University School of Law.

As of March 31, 2025, Mr. Dondero beneficially owned approximately 4.4% of the Fund's outstanding shares, Mr. McGraner beneficially owned approximately 2.59% of the Fund's outstanding shares. Of shares beneficially owned by Mr. Dondero, approximately 0.7% of such shares are held by the Dugaboy Investment Trust, of which Mr. Dondero is the beneficiary. Approximately 0.9% of such shares are held by NexPoint. Mr. Dondero is the President and sole member of NexPoint Advisors GP, LLC, NexPoint's general partner, and may be deemed to be an indirect beneficial owner of shares held by NexPoint. Mr. Dondero disclaims beneficial ownership of all such shares except to the extent of his pecuniary interest therein.

**Compensation of Portfolio Managers**

The Fund's financial arrangements with its portfolio managers, its competitive compensation and its career path emphasis at all levels reflect the value senior management places on key resources. Compensation may include a variety of components and may vary from year to year based on a number of factors, including the pre-tax relative performance of the portfolio manager's underlying account, the pre-tax combined performance of the

portfolio manager's underlying accounts, and the pre-tax relative performance of the portfolio manager's underlying accounts measured against other employees.

The principal components of compensation include a base salary, a discretionary bonus, and various retirement benefits.

*Base compensation*. Generally, the portfolio managers will receive base compensation based on his seniority and/or position with the Fund, which may include the amount of assets supervised and other management roles within the Fund. Base compensation is determined by taking into account current industry norms and market data to ensure that the Fund pays a competitive base compensation.

*Discretionary compensation*. In addition to base compensation, the portfolio managers may receive discretionary compensation, which can be a substantial portion of total compensation. Discretionary compensation can include a discretionary cash bonus paid to recognize specific business contributions and to ensure that the total level of compensation is competitive with the market.

Because the portfolio manager's compensation is based on his individual performance, the Fund does not have a typical percentage split among base salary, bonus and other compensation. Senior portfolio managers who perform additional management functions may receive additional compensation in these other capacities. Compensation is structured such that key professionals benefit from remaining with the Fund.

As of December 31, 2024, the portfolio managers were responsible for the management of the following types of accounts other than the Fund*:*

**James Dondero**

| Type of Account | Number of Accounts Managed | Total Assets (millions) | Number of Accounts Managed Subject to Performance-Based Advisory Fee | Total Assets Subject to Performance-Based Advisory Fee (millions) |
|---|---|---|---|---|
| Registered Investment Companies | 6 | $ 2,050 | 1 | $ 58 |
| Other Pooled Investment Vehicles | 3 | $ 4,941 | 3 | $ 4,941 |
| Other Accounts | — | $ — | — | $ — |

**Matthew McGraner**

| Type of Account | Number of Accounts | Total Assets (millions) | Number of Accounts Managed Subject to Performance-Based Advisory Fee | Total Assets Subject to Performance-Based Advisory Fee (millions) |
|---|---|---|---|---|
| Registered Investment Companies | — | $ — | — | $ — |
| Other Pooled Investment Vehicles | 3 | $ 4,941 | 3 | $ 4,941 |
| Other Accounts | — | $ — | — | $ — |

**Distributor**

NexPoint Securities, Inc. (the "Distributor"), located at 200 Crescent Court, Suite 700, Dallas, Texas 75201, serves as the Fund's principal underwriter and acts as the distributor of the Fund's shares on a reasonable efforts basis, subject to various conditions.

**ALLOCATION OF BROKERAGE**

Specific decisions to purchase or sell securities for the Fund are made by the portfolio managers who are employees of the Adviser. The Adviser is authorized by the Trustees to allocate the orders placed on behalf of the Fund to brokers or dealers who may, but need not, provide research or statistical material or other services to the Fund or the Adviser for the Fund's use. Such allocation is to be in such amounts and proportions as the Adviser may determine. Some of the services received as the result of Fund transactions may primarily benefit accounts other than the Fund, while services received as the result of portfolio transactions effected on behalf of those other accounts may primarily benefit the Fund. While such services are useful and important in supplementing its own research and facilities, the Adviser believes the value of such services is not determinable and does not significantly reduce its expenses. Any research or other benefits received by the Adviser from a broker-dealer, for transactions where the Fund will be "paying-up", will qualify for the safe harbor provisions under Section 28(e) of the Securities Exchange Act of 1934.

In selecting a broker or dealer to execute each particular transaction, the Adviser will take the following into consideration:

- the best net price available;
- the reliability, integrity and financial condition of the broker or dealer;
- the size of and difficulty in executing the order; and
- the value of the expected contribution of the broker or dealer to the investment performance of the Fund on a continuing basis.

Brokers or dealers executing a portfolio transaction on behalf of the Fund may receive a commission in excess of the amount of commission another broker or dealer would have charged for executing the transaction if the Adviser determines in good faith that such commission is reasonable in relation to the value of brokerage and research services provided to the Fund. In allocating portfolio brokerage, the Adviser may select brokers or dealers who also provide brokerage, research and other services to other accounts over which the Adviser exercises investment discretion. Some of the services received as the result of Fund transactions may primarily benefit accounts other than the Fund, while services received as the result of portfolio transactions effected on behalf of those other accounts may primarily benefit the Fund.

During the fiscal year ended December 31, 2022, the Fund paid brokerage commissions of $0, of which $0 was paid to NexBank.

During the fiscal year ended December 31, 2023, the Fund paid brokerage commissions of $0, of which $0 was paid to NexBank.

During the fiscal year ended December 31, 2024, the Fund paid brokerage commissions of $0, of which $0 was paid to NexBank.

During the fiscal year ended December 31, 2024, the Fund did not acquire any securities of its regular brokers or dealers. At that date, the Fund did not hold any securities of its regular brokers or dealers. For these purposes, regular brokers or dealers are: (a) the brokers or dealers that received the greatest dollar amount of brokerage commissions by virtue of direct or indirect participation in the Fund's portfolio transactions during the Fund's most recent fiscal year; (b) the brokers or dealers that engaged as principal in the largest dollar amount of portfolio transactions of the Fund during the Fund's most recent fiscal year; or (c) the brokers or dealers that sold the largest dollar amount of securities of the Fund during the Fund's most recent fiscal year.

**Affiliated Party Transactions**

The Adviser and its affiliates will not purchase securities or other property from, or sell securities or other property to, the Fund, except that the Fund may in accordance with rules under the 1940 Act engage in

transactions with accounts that are affiliated with the Fund as a result of common officers, directors, advisers, members, managing general partners or common control. These transactions would be effected in circumstances pursuant to policies adopted by the Trustees pursuant to Rule 17a-7 under the 1940 Act, in which the Adviser determined that it would be appropriate for the Fund to purchase and another client to sell, or the Fund to sell and another client to purchase, the same security or instrument on the same day.

If the Adviser places Fund trades through an affiliated broker, the trades will be executed under a policy adopted by the Trustees pursuant to Section 17(e) and Rule 17(e)(1) under the 1940 Act which places limitations on the securities transactions effected through affiliates. The policy of the Fund with respect to brokerage is reviewed by the Trustees from time to time. Because of the possibility of further regulatory developments affecting the securities exchanges and brokerage practices generally, the foregoing practices may be modified.

## TAX STATUS

The following discussion is general in nature and should not be regarded as an exhaustive presentation of all possible tax ramifications.

The discussion summarizes certain U.S. federal income tax consequences that may be relevant to a shareholder of the Fund that acquires, holds and/or disposes of shares of the Fund, and reflects provisions of the Code, existing Treasury regulations, rulings published by the IRS, and other applicable authority as of the date of this SAI. These authorities are subject to change by legislative or administrative action, possibly with retroactive effect. The following discussion is only a summary of some of the important tax considerations generally applicable to investments in the Fund and the discussion set forth herein does not constitute tax advice. There may be other tax considerations applicable to particular investors such as those holding shares in a tax-advantaged account such as an IRA or 401(k) plan. In addition, income earned through an investment in the Fund may be subject to state, local and foreign taxes. All shareholders should consult a qualified tax adviser regarding their investment in the Fund.

The Fund has elected to be treated and intends to qualify each year for taxation as a RIC under Subchapter M of the Code, which requires compliance with certain requirements concerning the sources of its income, diversification of its assets, and the amount and timing of its distributions to shareholders (as described below). If the Fund so qualifies, the Fund will not be subject to federal income or excise tax on net investment income or net capital gain that are distributed to shareholders in accordance with the applicable timing requirements. Net investment income and net capital gain of the Fund will be computed in accordance with Section 852 of the Code. Very generally, net investment income consists of dividends and interest less expenses. Net capital gain for a fiscal year is computed by taking into account any capital loss carryforward of the Fund.

The Fund intends to distribute all of its net investment income, any excess of net short-term capital gains over net long-term capital losses, and any excess of net long-term capital gains over net short-term capital losses in accordance with the timing requirements imposed by the Code so as to avoid imposition of federal income or excise taxes. Distributions of net investment income will be made quarterly and net capital gain will be made no later than December 31 of each year. Both types of distributions will be in shares of the Fund unless a shareholder elects to receive cash.

In order to qualify for the favorable tax treatment accorded to RICs under Subchapter M of the Code, the Fund must: (a) derive at least 90% of its gross income for each taxable year from dividends, interest, payments with respect to certain securities loans, net income from interests in "qualified publicly traded partnerships" and gains from the sale or other disposition of stock, securities or foreign currencies, or other income (including, but not limited to, gains from options, futures or forward contracts) derived with respect to the business of investing in such stock, securities or currencies, and net income derived from interests in "qualified publicly traded partnerships"; (b) diversify its holdings so that, at the end of each quarter of its taxable year: (i) at least 50% of the market value of the Fund's assets is represented by cash, U.S. government securities and securities of other RICs, and other securities (for purposes of this calculation, generally limited in respect of any one issuer, to an amount not greater than 5% of the market value of the Fund's assets and 10% of the outstanding voting securities of such issuer); and (ii) not more than 25% of the value of its assets is invested, including through corporations in which it owns a 20% or more voting stock interest, in the securities of (other than U.S. government securities or the securities of other RICs) any one issuer, two or more issuers which the Fund controls and which are determined to be engaged in the same or similar trades or businesses, or the securities of one or more "qualified publicly traded partnerships"; and (c) distribute to its shareholders with respect to each taxable year at least the sum of 90% of the Fund's "investment company taxable income" (as that term is defined in the Code, without regard to the deduction for dividends paid — generally taxable ordinary income and the excess, if any, of net short-term capital gains over net long-term capital losses) and 90% of any net tax-exempt interest income (the excess of the Fund's gross tax-exempt interest over certain disallowed deductions), for such year, in a manner qualifying for the dividends paid deduction.

If the Fund qualifies and is eligible for treatment as a RIC (i.e., satisfies the source of income and diversification requirements described in (i) and (ii) above and satisfies the annual distribution requirement described in (iii) above), it will not be subject to U.S. federal income tax on income distributed in a timely manner to its shareholders in the form of dividends (including Capital Gain Dividends, as defined below). If the Fund were not a "publicly offered" RIC within the meaning of Code Section 67(c)(2)(B) for any year, certain of the Fund's direct and indirect expenses, including management fees and certain other advisory expenses, would be subject to special "pass-through" rules. Such rules would treat these expenses as additional dividends to certain of the Fund's direct or indirect shareholders (generally including individuals and entities that compute their taxable income in the same manner as an individual).

If, for any taxable year, the Fund were to fail to meet the income, diversification or distribution test described above, the Fund could in some cases cure such failure, including by paying a fund-level tax, paying interest, making additional distributions, or disposing of certain assets. If the Fund were ineligible to or otherwise did not cure such failure for any year, or if the Fund were otherwise to fail to qualify as a RIC accorded favorable tax treatment for such year, the Fund would be subject to tax on its taxable income at the applicable corporate income tax rate, and all distributions from earnings and profits, including any distributions of net tax-exempt income and net long-term capital gains, would be taxable to shareholders as ordinary income. Some portions of such distributions may be eligible for the dividends-received deduction in the case of corporate shareholders and may be eligible to be treated as "qualified dividend income" and thus taxable at the lower long-term capital gain rate in the case of shareholders taxed at individual rates, provided, in both cases, the shareholder meets certain holding period and other requirements in respect of the Fund's shares (as described below). In addition, the Fund could be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions before re-qualifying as a RIC that is accorded favorable tax treatment.

If in a calendar year the Fund fails to distribute at least an amount equal to the sum of 98% of its ordinary income for such year and 98.2% of its capital gain net income (adjusted for certain ordinary losses) for the one-year period ending on October 31 of such year (unless an election is made to use the Fund's taxable year), plus any such undistributed amounts from the prior year, the Fund will be subject to a nondeductible 4% excise tax on the undistributed amounts. For purposes of the required excise tax distribution, a RIC's ordinary gains and losses from the sale, exchange or other taxable disposition of property that would otherwise be taken into account after October 31 of a calendar year generally (unless an election is made to use the Fund's taxable year) are treated as arising on January 1 of the following calendar year. Also, for these purposes, the Fund will be treated as having distributed any amount on which the Fund has been subject to corporate income tax in the taxable year ending with the calendar year. The Fund reserves the right to pay the excise tax when circumstances warrant. Under ordinary circumstances, the Fund expects to make sufficient distributions so as to avoid liability for this tax.

The Fund is not permitted to deduct capital losses in excess of capital gains ("net capital losses") against its net investment income. Instead, potentially subject to certain limitations, it may carry net capital losses from any taxable year forward to subsequent taxable years to offset capital gains, if any, realized during such subsequent taxable year. Capital loss carryforwards are reduced to the extent they offset current-year net realized capital gains, whether the Fund retains or distributes such gains. Net capital losses will be carried forward to one or more subsequent taxable years without expiration to offset capital gains realized during such subsequent taxable years; any such carryforward losses will retain their character as short-term or long-term.

Distributions of taxable net investment income and the excess of net short-term capital gain over net long-term capital loss are taxable to shareholders as ordinary income.

Distributions of net capital gain (that is, the excess of net long-term capital gain over net short-term capital loss, in each case determined with reference to any loss carryforwards) properly reported by the Fund as capital gain dividends ("Capital Gain Dividends") generally are taxable to shareholders as long-term capital gain, regardless of the length of time the shares of the Fund have been held by such shareholders.

In order for some portion of the dividends received by one of the Fund's shareholders to be qualified dividend income, the Fund must meet holding period and other requirements with respect to some portion of the dividend-paying stocks in its portfolio and the shareholder must meet holding period and other requirements with respect to Fund shares. In general, a dividend will not be treated as qualified dividend income (at either the corporate or stockholder level): (1) if the dividend is received with respect to any share of stock held for fewer than 61 days during the 121-day period beginning on the date which is 60 days before the date on which such share becomes ex-dividend with respect to such dividend (or, in the case of certain preferred stock, 91 days during the 181-day period beginning 90 days before such date); (2) to the extent that the recipient is under an obligation (whether pursuant to a short sale or otherwise) to make related payments with respect to positions in substantially similar or related property; (3) if the recipient elects to have the dividend income treated as investment income for purposes of the limitation on deductibility of investment interest; or (4) if the dividend is received from a foreign corporation that is: (a) not eligible for the benefits of a comprehensive income tax treaty with the United States (with the exception of dividends paid on stock of such a foreign corporation readily tradable on an established securities market in the United States); or (b) treated as a passive foreign investment company.

In general, distributions of investment income the Fund designates as derived from qualified dividend income will be treated as qualified dividend income by a shareholder taxed at individual rates, provided the shareholder meets the holding period and other requirements described in the paragraph immediately above with respect to Fund shares. The Fund does not expect a significant portion of its distributions to constitute qualified dividend income.

"Qualified REIT dividends" (i.e., ordinary REIT dividends other than capital gain dividends and portions of REIT dividends designated as qualified dividend income) are treated as eligible for a 20% deduction by non-corporate taxpayers. This deduction, if allowed in full, equates to a maximum effective tax rate of 29.6% (37% top rate applied to income after 20% deduction). Regulations allow a RIC to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met.

In general, dividends of net investment income received by the Fund's corporate shareholders will qualify for the 50% dividends-received deduction generally available to corporations to the extent of the amount of eligible dividends the Fund receives from domestic corporations for the taxable year. A dividend the Fund receives will not be treated as a qualifying dividend: (i) if it has been received with respect to any share of stock that the Fund has held for less than 46 days (91 days in the case of certain preferred stock) during the 91-day period beginning on the date which is 45 days before the date on which such share becomes ex-dividend with respect to such dividend (during the 181-day period beginning 90 days before such date in the case of certain preferred stock); or (ii) to the extent that the Fund is under an obligation (pursuant to a short sale or otherwise) to make related payments with respect to positions in substantially similar or related property. Moreover, the dividends-received deduction may be disallowed or reduced: (i) if the corporate stockholder fails to satisfy the foregoing requirements with respect to Fund shares; or (ii) by application of various provisions of the Code (for instance, the dividends-received deduction is reduced in the case of a dividend received on debt-financed portfolio stock (generally, stock acquired with borrowed funds)). The Fund does not expect a significant portion of its distributions to be eligible for this corporate dividends-received deduction.

When the Fund makes a repurchase offer for its shares (as described in "Quarterly Repurchase of Shares") and a shareholder tenders all shares he or she holds, or is considered to be holding, and such shareholder does not hold (directly or by attribution) any other of the Fund's shares, such shareholder will be treated as having sold his or her shares and generally will realize a capital gain or loss (as described further below). If a shareholder tenders fewer than all of his or her shares or continues to hold (directly or by attribution) other units of the Fund's shares, there is some risk that such shareholder may be treated as having received a dividend distribution under Section 301 of the Code (a "Section 301 distribution") unless the redemption is treated as being either: (i) "substantially disproportionate"; or (ii) otherwise "not essentially equivalent to a dividend" under the relevant rules of the Code. A Section 301 distribution is not treated as a sale or exchange giving rise to a capital gain or loss, but rather is treated as a dividend to the extent supported by the Fund's current and accumulated earnings

and profits, with the excess treated as a return of capital reducing a shareholder's tax basis in Fund shares, but not below zero, and thereafter as capital gain. Where a redeeming shareholder is treated as receiving a dividend, there is a risk that non-tendering shareholders whose interests in the Fund increase as a result of such tender will be treated as having received a taxable distribution from the Fund. Dividend treatment of a tender would also affect the amount and character of income that the Fund is required to distribute for the year in which the redemption occurred. It is possible that such a dividend would qualify as "qualified dividend income"; otherwise, it would be taxable as ordinary income. To the extent the Fund recognizes net gains on the liquidation of portfolio securities to meet such tenders, the Fund will be required to make additional distributions to its common shareholders.

A disposition of Fund shares by a shareholder treated as a sale or exchange will generally result in the recognition of taxable gain or loss in an amount equal to the difference between the amount realized and the shareholder's tax basis in his or her Fund shares. Such gain or loss is treated as a capital gain or loss if the shares are held as capital assets. However, any loss realized upon the sale or exchange of shares within six months from the date of their purchase will be treated as a long-term capital loss to the extent of any amounts treated as Capital Gain Dividends during such six-month period. All or a portion of any loss realized upon the sale or exchange of shares may be disallowed under the "wash sale" rules of the Code to the extent shares are purchased (including shares acquired by means of reinvested dividends) within 30 days before or after such sale or exchange. In such case, the basis of the shares acquired will be adjusted to reflect the disallowed loss. Sales or exchanges of Fund shares are also subject to reporting requirements.

Distributions of taxable net investment income and net capital gain will be taxable as described above, whether received in additional cash or reinvested in additional shares. Shareholders electing to receive distributions in the form of additional shares will have a cost basis for federal income tax purposes in each share so received equal to the net asset value of a share on the reinvestment date.

All distributions of taxable net investment income and net capital gain, whether received in shares or in cash, must be reported by each taxable shareholder on his or her federal income tax return. Dividends or distributions declared in October, November or December as of a record date in such a month, if any, will be deemed to have been received by shareholders on December 31, if paid during January of the following year.

Under the Code, the Fund will be required to report to the Internal Revenue Service all distributions of taxable income and capital gains as well as gross proceeds from the sale or exchange of Fund shares, except in the case of certain exempt shareholders. Under the backup withholding provisions of Section 3406 of the Code, distributions of taxable net investment income and net capital gain and proceeds from the sale or exchange of the shares of a RIC may be subject to withholding of federal income tax: (i) in the case of non-exempt shareholders who fail to furnish the Fund with their taxpayer identification numbers ("TIN") and with required certifications regarding their status under the federal income tax law; or (ii) if the Fund is notified by the IRS or a broker that withholding is required due to an incorrect TIN or a shareholder's previous failure to report taxable interest or dividends. If the backup withholding provisions are applicable, any such distributions and proceeds, whether received in cash or reinvested in additional shares, will be reduced by the amounts required to be withheld. Backup withholding is not an additional tax. Any amounts withheld may be credited against the shareholder's federal income tax liability, provided the appropriate information is furnished to the IRS.

The Code imposes a 3.8% Medicare contribution tax on the "net investment income" of certain individuals, estates and trusts to the extent their income exceeds certain amounts. Net investment income generally includes for this purpose dividends the Fund pays, including any Capital Gain Dividends, and net capital gains recognized on the sale or exchange of Fund shares. Shareholders are advised to consult their tax advisors regarding the possible implications of this additional tax on their investment with the Fund.

**Return of Capital Distributions**

If, for any taxable year, the Fund's total distributions exceed both current and accumulated earnings and profits, the excess will generally be treated as a tax-free return of capital up to the amount of your tax basis in Fund shares. The amount treated as a tax-free return of capital will reduce your tax basis in Fund shares, thereby increasing your potential gain or reducing your potential loss on the subsequent sale of Fund shares. Any such amounts distributed to you in excess of your tax basis in Fund shares will be taxable to you as capital gain.

Distributions the Fund pays with respect to its shares are generally subject to U.S. federal income tax as described herein to the extent they do not exceed the Fund's realized income and gains, even though such dividends and distributions may economically represent a return of a particular shareholder's investment. Such distributions are likely to occur in respect of shares purchased at a time when the Fund's net asset value reflects either unrealized gains, or realized but undistributed income or gains, that were therefore included in the price the shareholder paid. Such distributions may reduce the value of Fund shares below the shareholder's cost basis in those shares. As described above, the Fund is required to distribute realized income and gains regardless of whether its net asset value also reflects unrealized losses.

**Tax Implications of Certain Investments**

Some debt obligations with a fixed maturity date of more than one year from the date of issuance that the Fund acquires in the secondary market may be treated as having "market discount." Very generally, market discount is the excess of the stated redemption price of a debt obligation (or in the case of an obligation issued with OID (as defined below), its "revised issue price") over the purchase price of such obligation. Generally, any gain recognized on the disposition of, and any partial payment of principal on, a debt obligation having market discount is treated as ordinary income to the extent the gain, or principal payment, does not exceed the "accrued market discount" on such debt obligation. Alternatively, a holder may elect to accrue market discount currently. If the Fund makes this election, it would be required to include currently any accrued market discount on such debt obligations in its taxable income (as ordinary income) and thus distribute it over the terms of the obligations, even though payment of those amounts is not received until a later time, upon partial or full repayment or disposition of the applicable debt obligations. The rate at which market discount accrues, and thus is included in the Fund's income, will depend upon which of the permitted accrual methods it elects.

In addition, some debt obligations with a fixed maturity date of more than one year from the date of issuance (and zero-coupon debt obligations with a fixed maturity date of more than one year from the date of issuance) that the Fund originates or acquires will be treated as debt obligations that are issued originally at a discount. Generally, the amount of the original issue discount ("OID") is treated as interest income and is included in taxable income (and the Fund is required to distribute it) over the term of the debt obligation, even though payment of that amount is not received until a later time, upon partial or full repayment or disposition of the debt obligation. In addition, payment-in-kind ("PIK") securities the Fund originates or acquires will give rise to income which is required to be distributed and is taxable even though the Fund receives no interest payment in cash on the security during the year in which the income was accrued.

Some debt obligations with a fixed maturity date of one year or less from the date of issuance that the Fund originates or acquires may be treated as having OID or, in certain cases, "acquisition discount" (very generally, the excess of the stated redemption price over the purchase price). Generally, the Fund will be required to include the OID or acquisition discount in income (as ordinary income) over the term of the debt obligation and thus distribute it over the term of the debt obligation, even though payment of that amount is not received until a later time, upon partial or full repayment or disposition of the debt obligation. The rate at which OID or acquisition discount accrues, and thus is included in the Fund's income, will depend upon which of the permitted accrual methods the Fund elects.

Some preferred securities may include provisions that permit the issuer, at its discretion, to defer the payment of distributions for a stated period without any adverse consequences to the issuer. If the Fund owns a preferred

security that is deferring the payment of its distributions, the Fund may be required to report income for U.S. federal income tax purposes to the extent of any such deferred distribution even though it has not yet actually received the cash distribution.

As a result of holding the foregoing kinds of obligations, the Fund may be required to pay out as an income distribution each year an amount which is greater than the total amount of cash interest (or dividends in the case of preferred securities) the Fund actually received. Such distributions may be made from, among other things, the Fund's cash assets or cash generated from its liquidation of portfolio securities. The Fund may realize gains or losses from such liquidations. In the event the Fund realizes net long-term or short- term capital gains from such transactions, its shareholders may receive a larger capital gain or ordinary dividend, respectively, than they would in the absence of such transactions.

Investments in distressed debt obligations that are at risk of or in default present special tax issues. Tax rules are not entirely clear about issues such as whether and to what extent the Fund should recognize market discount on these debt obligations; when the Fund may cease to accrue interest, OID or market discount; when and to what extent the Fund may take deductions for bad debts or worthless securities and how the Fund should allocate payments received on obligations in default between principal and income. The Fund will address these and other related issues when, as and if it invests in such obligations, in order to seek to ensure that it distributes sufficient income to preserve its eligibility for treatment as a RIC and does not become subject to U.S. federal income or excise tax.

A portion of the OID accrued on certain high-yield discount obligations the Fund owns may not be deductible to the issuer and will instead be treated as a dividend paid by the issuer for purposes of the dividends-received deduction. In such cases, if the issuer of the obligation is a domestic corporation, dividend payments the Fund makes may be eligible for the dividends-received deduction to the extent of the deemed dividend portion of such OID.

The Fund's transactions, if any, in options, futures contracts, hedging transactions, forward contracts, straddles and foreign currencies will be subject to special tax rules (including mark-to-market, constructive sale, straddle, wash sale and short sale rules), the effect of which may be to accelerate income to the Fund, defer losses to the Fund, cause adjustments in the holding periods of the Fund's securities, convert long-term capital gains into short-term capital gains and convert short-term capital losses into long-term capital losses. These rules could therefore affect the amount, timing and character of distributions to shareholders.

Certain of the Fund's hedging activities (including its transactions, if any, in foreign currencies or foreign currency-denominated instruments) are likely to produce a difference between its book income and its taxable income. If the Fund's book income exceeds its taxable income, the distribution (if any) of such excess book income will be treated as: (i) a dividend to the extent of the Fund's remaining earnings and profits (including earnings and profits arising from tax-exempt income); (ii) thereafter, as a return of capital to the extent of the recipient's basis in the shares; and (iii) thereafter, as gain from the sale or exchange of a capital asset. If the Fund's book income is less than its taxable income, the Fund could be required to make distributions exceeding book income to qualify as a RIC that is accorded favorable tax treatment and to avoid an entity-level tax.

Because the tax rules applicable to derivative financial instruments are in some cases uncertain under current law, an adverse determination or future guidance by the IRS with respect to these rules (which determination or guidance could be retroactive) may affect whether the Fund has made sufficient distributions, and otherwise satisfied the relevant requirements, to maintain its qualification as a RIC and avoid a fund-level tax.

Pursuant to a notice issued by the IRS and Treasury Regulations that have yet to be issued but may apply retroactively, a portion of the Fund's income (including income allocated from certain pass-through entities) that is attributable to a residual interest in a real estate mortgage investment conduit or taxable mortgage pool (referred to in the Code as an "excess inclusion") will be subject to U.S. federal income tax in all events. This

notice also provides, and the regulations are expected to provide, that excess inclusion income of a RIC will be allocated to shareholders of the RIC in proportion to the dividends received by such shareholders, with the same consequences as if the shareholders held the related interest directly. As a result, to the extent the Fund invests in any such interests, it may not be a suitable investment for certain tax-exempt shareholders. Although the Fund does not expect to make investments that generate or pass through excess inclusion income in the manner described above, the Fund may make such investments, and may need to make certain elections set forth in the IRS notice governing such matters.

In general, excess inclusion income allocated to shareholders: (i) cannot be offset by net operating losses (subject to a limited exception for certain thrift institutions); (ii) will constitute unrelated business taxable income ("UBTI") to entities (including a qualified pension plan, an individual retirement account, a 401(k) plan, a Keogh plan or other tax-exempt entity) subject to tax on UBTI, thereby potentially requiring such an entity that is allocated excess inclusion income, and otherwise might not be required to file a U.S. federal income tax return, to file such a tax return and pay tax on such income; and (iii) in the case of a non-U.S. shareholder, will not qualify for any reduction in U.S. federal withholding tax. A shareholder will be subject to U.S. federal income tax on such inclusions notwithstanding any exemption from such income tax otherwise available under the Code.

**Passive Foreign Investment Companies**

Equity investments by the Fund in certain "passive foreign investment companies" ("PFICs") could subject the Fund to a U.S. federal income tax (including interest charges) on distributions received from the company or on proceeds received from the disposition of shares in the company, which tax cannot be eliminated by making distributions to Fund shareholders. However, the Fund may elect to treat a PFIC as a "qualified electing fund" ("QEF election"), in which case the Fund will be required to include its share of the company's income and net capital gains annually, regardless of whether they receives any distribution from the company.

The Fund also may make an election to mark the gains (and to a limited extent losses) in such holdings "to the market" as though it had sold and repurchased its holdings in those PFICs on the last day of the Fund's taxable year. Such gains and losses are treated as ordinary income and loss. The QEF and mark-to-market elections may accelerate the recognition of income (without the receipt of cash) and increase the amount required to be distributed for the Fund to avoid taxation. Making either of these elections therefore may require the Fund to liquidate other investments (including when it is not advantageous to do so) to meet its distribution requirement, which also may accelerate the recognition of gain and affect the Fund's total return. Because it is not always possible to identify a foreign corporation as a PFIC, the Fund may incur the tax and interest charges described above in some instances.

**Foreign Currency Transactions**

The Fund's transactions in foreign currencies, foreign currency-denominated debt securities and certain foreign currency options, futures contracts and forward contracts (and similar instruments) may give rise to ordinary income or loss to the extent such income or loss results from fluctuations in the value of the foreign currency concerned. Such ordinary income treatment may accelerate the Fund's distributions to shareholders and increase the distributions taxed to shareholders as ordinary income. The Fund cannot carry forward any net ordinary losses so created to offset income or gains earned in subsequent years.

**Foreign Taxation**

Income received by the Fund from sources within foreign countries may be subject to withholding and other taxes imposed by such countries. Tax treaties and conventions between certain countries and the U.S. may reduce or eliminate such taxes. If more than 50% of the value of the Fund's total assets at the close of its taxable year consists of securities of foreign corporations, the Fund may be able to elect to "pass through" to the Fund's shareholders the amount of eligible foreign income and similar taxes paid by the Fund. If this election is made, a

shareholder generally will be required to include in gross income (in addition to taxable dividends actually received) his or her pro rata share of the foreign taxes paid by the Fund, and may be entitled either to deduct (as an itemized deduction), or claim a credit for, his or her pro rata share of such foreign taxes in computing his or her taxable income, subject to certain limitations. In particular, a shareholder must hold his or her shares (without protection from risk of loss) on the ex-dividend date and for at least 15 more days during the 30-day period surrounding the ex-dividend date to be eligible to claim a foreign tax credit with respect to a dividend. No deduction for foreign taxes may be claimed by a shareholder who does not itemize deductions. Each shareholder will be notified within 60 days after the close of the Fund's taxable year whether the foreign taxes paid by the Fund will "pass through" for that year. If the Fund does not qualify for or does not make such election, shareholders generally will not be entitled to claim a credit or deduction with respect to foreign taxes paid by the Fund; in that case the foreign tax will nonetheless reduce the Fund's taxable income.

**Non-U.S. Shareholders**

Distributions the Fund pays to shareholders that are not "U.S. persons" within the meaning of the Code ("foreign shareholders") and that the Fund properly reports as: (1) Capital Gain Dividends; (2) interest-related dividends; and (3) short-term capital gain dividends, each as defined below and subject to certain conditions described below, generally are not subject to withholding of U.S. federal income tax."

In general, the Code defines: (1) "short-term capital gain dividends" as distributions of net short-term capital gains in excess of net long-term capital losses; and (2) "interest-related dividends" as distributions from U.S. source interest income of types similar to those not subject to U.S. federal income tax if earned directly by an individual foreign shareholder, in each case to the extent such distributions are properly reported as such by the Fund in a written notice to shareholders. The exceptions to withholding for Capital Gain Dividends and short-term capital gain dividends do not apply to: (A) distributions to an individual foreign shareholder who is present in the United States for a period or periods aggregating 183 days or more during the year of the distribution and (B) distributions attributable to gain that is treated as effectively connected with the conduct by the foreign shareholder of a trade or business within the United States under special rules regarding the disposition of U.S. real property interests. The exception to withholding for "interest-related dividends" does not apply to distributions to a foreign shareholder: (A) that has not provided a satisfactory statement that the beneficial owner is not a U.S. person; (B) to the extent that the dividend is attributable to certain interest on an obligation if the foreign shareholder is the issuer or is a 10% shareholder of the issuer; (C) that is within certain foreign countries that have inadequate information exchange with the United States; or (D) to the extent the dividend is attributable to interest paid by a person that is a related person of the foreign shareholder and the foreign shareholder is a controlled foreign corporation. The Fund is permitted to report such part of the Fund's dividends as interest-related and/or short-term capital gain dividends as are eligible, but is not required to do so. In the case of shares held through an intermediary, the intermediary may withhold even if the Fund reports all or a portion of a payment as an interest-related or short-term capital gain dividend to shareholders.

Foreign shareholders should contact their intermediaries regarding the application of these rules to their accounts.

Distributions to foreign shareholders other than Capital Gain Dividends, interest-related dividends, and short-term capital gain dividends (e.g., dividends attributable to dividend and foreign-source interest income or to short-term capital gains or U.S. source interest income to which the exception from withholding described above does not apply) are generally subject to withholding of U.S. federal income tax at a rate of 30% (or lower applicable treaty rate).

A foreign shareholder is not, in general, subject to U.S. federal income tax on gains (and is not allowed a deduction for losses) realized on the sale of the Fund's shares unless: (i) such gain is effectively connected with the conduct of a trade or business carried on by such holder within the United States; (ii) in the case of an individual holder, the holder is present in the United States for a period or periods aggregating 183 days or more during the year of the sale and certain other conditions are met; or (iii) certain special rules relating to gain attributable to the sale or exchange of U.S. real property interests apply to the foreign shareholder's sale of the Fund's shares.

Foreign shareholders with respect to whom income from the Fund is effectively connected with a trade or business conducted by the foreign shareholder within the United States will in general be subject to U.S. federal income tax on the income derived from the Fund at the graduated rates applicable to U.S. citizens, residents or domestic corporations, whether such income is received in cash or reinvested in additional units of the Fund's shares and, in the case of a foreign corporation, may also be subject to a branch profits tax. If a foreign shareholder is eligible for the benefits of a tax treaty, any effectively connected income or gain will generally be subject to U.S. federal income tax on a net basis only if it is also attributable to a permanent establishment maintained by the shareholder in the United States. More generally, foreign shareholders who are residents of a country with an income tax treaty with the United States may obtain different tax results than those described herein, and are urged to consult their tax advisors.

Special rules would apply if the Fund were a qualified investment entity ("QIE") because it is either a "U.S. real property holding corporation" ("USRPHC") or would be a USRPHC but for the operation of certain exceptions to the definition of U.S. real property interests ("USRPIs") described below. Very generally, a USRPHC is a domestic corporation that holds USRPIs the fair market value of which equals or exceeds 50% of the sum of the fair market values of the corporation's USRPIs, interests in real property located outside the United States, and other trade or business assets. USRPIs generally are defined as any interest in U.S. real property and any interest (other than solely as a creditor) in a USRPHC or, very generally, an entity that has been a USRPHC in the last five years. A fund that holds, directly or indirectly, significant interests in REITs may be a USRPHC. Interests in domestically controlled QIEs, including REITs and RICs that are QIEs, not-greater-than-10% interests in publicly traded classes of stock in REITs and not-greater-than-5% interests in publicly traded classes of stock in RICs generally are not USRPIs, but these exceptions do not apply for purposes of determining whether the Fund is a QIE.

If an interest in the Fund were a USRPI, a greater-than-5% foreign shareholder, or any foreign shareholder if shares in the Fund are not considered regularly traded on an established securities market, generally would be required to file a U.S. tax return in connection with the sale of its Fund shares, and pay related taxes due on any gain realized on the sale.

Moreover, if the Fund were a USRPHC or, very generally, had been one in the last five years, it would be required to withhold on amounts distributed to a greater-than-5% foreign shareholder to the extent such amounts would not be treated as a dividend, i.e., are in excess of the Fund's current and accumulated "earnings and profits" for the applicable taxable year. Such withholding generally is not required if the Fund is a domestically controlled QIE.

If the Fund were a QIE, under a special "look-through" rule, any distributions to a foreign shareholder attributable directly or indirectly to:
(i) distributions received by the Fund from a lower-tier RIC or REIT that the Fund is required to treat as USRPI gain in its hands; and (ii) gains realized on the disposition of USRPIs by the Fund would retain their character as gains realized from USRPIs in the hands of the Fund's foreign shareholders and would be subject to U.S. tax withholding. In addition, such distributions could result in the foreign shareholder being required to file a U.S. tax return and pay tax on the distributions at regular U.S. federal income tax rates. The consequences to a foreign shareholder, including the rate of such withholding and character of such distributions (e.g., as ordinary income or USRPI gain), would vary depending upon the extent of the foreign shareholder's current and past ownership of the Fund.

Foreign shareholders of the Fund also may be subject to "wash sale" rules to prevent the avoidance of the tax-filing and -payment obligations discussed above through the sale and repurchase of Fund shares.

In order to have qualified for any exemption from withholding described above (to the extent applicable) or for lower withholding tax rates under income tax treaties, or to establish an exemption from backup withholding, a foreign shareholder must have complied with applicable certification and filing requirements relating to its non-U.S. status (including, in general, furnishing an IRS Form W-8BEN, Form W-8BEN-E or substitute form). Foreign shareholders should contact their tax advisors in this regard.

Special rules (including withholding and reporting requirements) apply to foreign partnerships and those holding Fund shares through foreign partnerships. Additional considerations may apply to foreign trusts and estates. Investors holding Fund shares through foreign entities should consult their tax advisors.

A foreign shareholder may be subject to state and local tax and to the U.S. federal estate tax in addition to the U.S. federal tax on income referred to above.

**Other Reporting and Withholding Requirements**

Sections 1471-1474 of the Code, and the U.S. Treasury Regulations and IRS guidance issued thereunder (collectively, “FATCA”), generally require the Fund to obtain information sufficient to identify the status of each of the Fund’s shareholders under FATCA or under an applicable intergovernmental agreement (an “IGA”). If a shareholder fails to provide the required information or otherwise fails to comply with FATCA or an IGA, the Fund or its agent may be required to withhold under FATCA 30% of the ordinary dividends that it pays to that shareholder. Proposed regulations (having current effect) eliminate the application of the withholding tax that was scheduled to take effect in 2019 with respect to the gross proceeds of the sale, redemption or exchange of Fund shares and certain Capital Gain Dividends it pays to that shareholder. If the Fund makes a payment that is subject to FATCA withholding, the Fund, or its agent, are required to withhold even if the payment would otherwise be exempt from withholding under rules applicable to non-U.S. shareholders (e.g., Capital Gain Dividends, short-term capital gain dividends and interest-related dividends). You are urged to consult your tax advisor regarding the applicability of FATCA and any other reporting requirements. In addition, foreign countries are considering, and may implement, laws similar in purpose and scope to FATCA.

**REIT Subsidiary**

***Taxation of a REIT Subsidiary***

As discussed above, the Fund may hold certain of its assets, including qualifying real estate investments in the form of debt securities, structured credit, preferred equity and mezzanine investments in real estate properties, through a REIT subsidiary, including the REIT Subsidiaries. The Fund intends to monitor the value of the shares of any REIT subsidiary such that not more than 25% of the value of the Fund’s total assets is invested in REIT subsidiaries.

The Fund intends that any REIT subsidiary would elect to be treated, and qualify annually, as a REIT under the Code beginning with the first year in which it commenced material operations. The Fund believes that if a REIT subsidiary were to satisfy the 50% Test (as defined below), that subsidiary would be able to qualify as a REIT. A REIT subsidiary’s ability to satisfy the 50% Test, is not certain. Given the highly complex nature of the rules governing REITs, the ongoing importance of factual determinations and the possibility of future changes in circumstances or applicable law, no assurance can be given that a REIT subsidiary would qualify as a REIT for any particular year.

Qualification and taxation as a REIT depends on a REIT subsidiary’s ability to meet, on a continuing basis, through actual results of operations, distribution levels, share ownership and various other qualification requirements imposed upon REITs by the Code. In addition, a REIT subsidiary’s ability to qualify as a REIT may depend in part upon the operating results, organizational structure and entity classification for U.S. federal income tax purposes of certain entities in which the REIT subsidiary invests. A REIT subsidiary’s ability to qualify as a REIT also requires that it satisfy certain asset and income tests, some of which depend upon the fair market value of assets directly or indirectly owned by it or which serve as security for loans made by it. Such values may not be susceptible to a precise determination. Accordingly, no assurance can be given that the actual results of a REIT subsidiary’s operations for any taxable year will satisfy the requirements for qualification and taxation as a REIT.

**Requirements for Qualification as a REIT**

To qualify for the beneficial tax regime applicable to REITs, a REIT subsidiary must meet and continue to meet the requirements described below relating to organization, sources of income, nature of assets and distributions of income to its shareholders.

***Organizational Requirements***

The Code defines a REIT as a domestic corporation, trust or association:

(1) which is managed by one or more trustees or directors;

(2) the beneficial ownership of which is evidenced by transferable shares or by transferable certificates of beneficial interest;

(3) which would be taxable as a domestic corporation but for Sections 856 through 859 of the Code;

(4) which is neither a financial institution nor an insurance company subject to certain provisions of the Code;

(5) the beneficial ownership of which is held by 100 or more persons;

(6) not more than 50.0% in value of the outstanding stock of which is owned, directly or indirectly applying various attribution rules, by or for five or fewer individuals (as defined in the Code to include for these purposes certain entities) (the "50% Test");

(7) which makes an election to be a REIT (or has made such election for a previous taxable year which has not been revoked or terminated) and satisfies all relevant filing and other administrative requirements established by the IRS that must be met to elect and maintain REIT status;

(8) which uses the calendar year as its taxable year; and

(9) which meets certain other tests, described below, regarding the nature of its income and assets and the amount of its distributions.

The Code provides that conditions (1) through (4), inclusive, must be met during the entire taxable year, that condition (5) must be met during at least 335 days of a taxable year of 12 months, or during a proportionate part of a taxable year of less than 12 months, and that condition (6) must be met during the last half of each taxable year. For purposes of condition (6), the beneficiaries of a pension or profit-sharing trust described in Section 401(a) of the Code, and not the pension or profit-sharing trust itself, are treated as REIT shareholders. Conditions (5) and (6) do not apply to a REIT until the second taxable year in which the REIT has made an election to be treated as such. A REIT subsidiary would be treated as having met condition (6) above for a taxable year if it complied with certain Treasury Regulations for ascertaining the ownership of its stock for such year and if it did not know (or after the exercise of reasonable diligence would not have known) that its stock was sufficiently closely held during such year to cause it to fail condition (6).

The Fund intends to structure and operate any REIT subsidiary and conduct its activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is complex, and it is possible that the IRS may interpret or apply those requirements in a manner that jeopardizes the ability of a REIT subsidiary to satisfy all of the requirements for qualification as a REIT or that the REIT subsidiary may be unable to satisfy all of the applicable requirements.

To obtain the favorable tax treatment afforded to REITs under the Code, among other things, a REIT subsidiary generally will be required each year to distribute to its shareholders at least 90% of its REIT taxable income determined without regard to the dividends-paid deduction and excluding net capital gain. To the extent that it does not distribute all of its net capital gains, or distributes at least 90%, but less than 100%, of its REIT taxable income, as adjusted, it will have to pay an entity-level tax on amounts retained. Furthermore, if it fails to distribute during

each calendar year at least the sum of: (a) 85% of its ordinary income for that year; (b) 95% of its capital gain net income for that year; and (c) any undistributed taxable income from prior periods, it would have to pay a 4% nondeductible excise tax on the excess of the amounts required to be distributed over the sum of (x) the amounts that it actually distributed and (y) the amounts it retained and upon which it paid income tax at the entity level.

These requirements could cause a REIT subsidiary to distribute amounts that otherwise would be spent on investments in real estate assets, and it is possible that the REIT subsidiary might be required to borrow funds, possibly at unfavorable rates, or sell assets to fund the required distributions.

***Investment in a REIT Subsidiary***

Provided that a REIT subsidiary qualifies as a REIT, distributions made to the Fund out of the REIT subsidiary's current or accumulated earnings and profits, and not designated as capital gain dividends, would generally be taken into account by the Fund as ordinary dividend income and would not be eligible for the dividends received deduction for corporations. In determining the extent to which a distribution with respect to a REIT subsidiary's common shares constituted a dividend for U.S. federal income tax purposes, a REIT subsidiary's earnings and profits would be allocated first to distributions with respect to the REIT subsidiary's preferred stock, if any, and then to the REIT subsidiary's common shares. Dividends received from REITs are generally not eligible to be taxed at the preferential qualified dividend income rates applicable to individual U.S. shareholders who receive dividends from taxable subchapter C corporations.

Effective for taxable years beginning after December 31, 2017 and before January 1, 2026, the Code generally allows individuals and certain other non-corporate entities a deduction for 20% of qualified REIT dividends. Regulations allow a RIC to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met. As a result, a shareholder in the Fund will be eligible to receive the benefit of the same 20% deduction with respect to qualified REIT dividends included in Fund distributions that is available to direct investors in REITs.

In addition, distributions from a REIT subsidiary that are designated as capital gain dividends will be treated by the Fund as long-term capital gain income, to the extent that they do not exceed the actual net capital gain of the REIT subsidiary for the taxable year, without regard to the period for which the Fund has held the REIT subsidiary's shares. To the extent that a REIT subsidiary elects under the applicable provisions of the Code to retain the REIT subsidiary's net capital gains, the Fund would be treated as having received, for U.S. federal income tax purposes, the REIT subsidiary's undistributed capital gains as well as a corresponding credit or refund, as the case may be, for taxes paid by the REIT subsidiary on such retained capital gains. The Fund would increase its adjusted tax basis in the REIT subsidiary's common shares by the difference between its allocable share of such retained capital gain and its share of the tax paid by the REIT subsidiary.

Distributions from a REIT subsidiary in excess of the REIT subsidiary's current or accumulated earnings and profits would not be taxable to the Fund to the extent that they do not exceed the Fund's adjusted tax basis in the REIT subsidiary's common shares in respect of which the distributions were made, but rather would reduce the adjusted tax basis of these shares, thus reducing any loss or increasing any gain on a subsequent taxable disposition by the Fund of these shares. To the extent that such distributions exceed the adjusted tax basis of the Fund's shares of the REIT subsidiary's common shares, they would be included in income as long-term capital gain, or short-term capital gain if the shares have been held for one year or less. In addition, any dividend declared by a REIT subsidiary in October, November or December of any year and payable to the Fund if it is the holder of record on a specified date in any such month would be treated as both paid by the REIT subsidiary and received by the Fund on December 31 of such year if the dividend is actually paid by the REIT subsidiary in January of the following calendar year.

To the extent that a REIT subsidiary has available net operating losses and capital losses carried forward from prior tax years, such losses may reduce the amount of distributions that must be made in order to comply with the

REIT distribution requirements. Such losses, however, would not be passed through to the Fund and do not offset income of the Fund from other sources, nor do they affect the character of any distributions that are actually made by a REIT subsidiary, which are generally treated as taxable income in the hands of the Fund to the extent that the REIT subsidiary has current or accumulated earnings and profits.

**OTHER INFORMATION**

Each share represents a proportional interest in the assets of the Fund. Each share has one vote at shareholder meetings, with fractional shares voting proportionally, on matters submitted to the vote of shareholders. There are no cumulative voting rights. Shares do not have pre-emptive or conversion or redemption provisions. In the event of a liquidation of the Fund, shareholders are entitled to share pro rata in the net assets of the Fund available for distribution to shareholders after all expenses and debts have been paid.

**Legal Counsel**

K&L Gates, LLP, located at 1 Congress Street, Suite 2900, Boston, Massachusetts 02114, acts as the Fund's legal counsel.

**Custodian**

BNY Mellon ("BNY"), with principal offices at 240 Greenwich Street, New York, New York, 10286, serves as custodian for the securities and cash of the Fund's portfolio. Under a Custodian Agreement, BNY holds the Fund's assets in safekeeping and keeps all necessary records and documents relating to its duties.

**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Cohen & Company, Ltd. has been appointed the independent registered public accounting firm for the Fund. Cohen & Company, Ltd. is located at 1350 Euclid Avenue, Suite 800, Cleveland, Ohio 44115.

**FINANCIAL STATEMENTS**

The Fund's audited financial statements appearing in the Fund's annual shareholder report for the year ended December 31, 2024 are incorporated by reference in this Statement of Additional Information and have been so incorporated in reliance upon the report of Cohen & Company, Ltd., the independent registered public accounting firm for the Fund. The Fund's annual and semiannual shareholder reports are available upon request and without charge by writing to the Fund at 300 Crescent Court, Suite 700, Dallas, Texas 75201 or by calling (844) 485-9167 and viewed on the Fund's website at https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/.

**Part C**

**Other Information**

**Item 25.** ***Financial Statements and Exhibits***

**1. Financial Statements**

Part A — Financial Highlights.

Part B — Audited financial statements for the fiscal year ended December 31, 2024 are incorporated by reference herein to the Registrant's annual report for the fiscal year ended December 31, 2024.

**2. Exhibits**

| | | |
|---|---|---|
| (a) | | Amended and Restated Agreement and Declaration of Trust of Registrant (2) |
| (b) | | By-Laws (1) |
| (c) | | Not applicable |
| (d) | | Provisions of instruments defining the rights of holders of securities are contained in the Registrant's Amended and Restated Agreement and Declaration of Trust and By-Laws |
| (e) | | Dividend Reinvestment Plan (8) |
| (f) | | Not applicable |
| (g) | (1) | Investment Advisory and Administrative Services Agreement, dated May 18, 2016, between the Registrant and NexPoint Advisors, L.P. (2) |
| (g) | (2) | Advisory Agreement for NRESF REIT Sub, LLC (3) |
| (g) | (3) | Advisory Agreement for NRESF REIT Sub II, LLC (12) |
| (h) | (1) | Distribution Agreement, dated May 18, 2016, between the Registrant and NexPoint Securities, Inc. (formerly, Highland Capital Funds Distributor, Inc.) (2) |
| (h) | (2) | Form of Selling Agreement (1) |
| (h) | (3) | Form of Shareholder Servicing Plan and Agreement (4) |
| (h) | (4) | Distribution Plan for Class C Shares (2) |
| (i) | | Not applicable |
| (j) | (1) | Master Custodian Agreement with Bank of New York Mellon, dated October 3, 2018 (7) |
| (j) | (2) | Amendment 1 to Master Custodian Agreement, dated April 8, 2019 (7) |
| (j) | (3) | Amendment 2 to Master Custodian Agreement, dated April 8, 2019 (7) |
| (j) | (4) | Amendment 3 to Master Custodian Agreement, dated June 14, 2019 (8) |
| (j) | (5) | Amendment 4 to Master Custodian Agreement, dated December 21, 2020 (9) |
| (j) | (6) | Amendment 5 to Master Custodian Agreement, dated February 18, 2021 (9) |
| (j) | (7) | Amendment 6 to Master Custodian Agreement, dated March 18, 2021 (9) |
| (k) | (1) | Amended and Restated Expense Limitation and Reimbursement Agreement, dated May 1, 2025, between the Registrant and NexPoint Advisors, L.P. (13) |
| (k) | (2) | Master Sub-Administration Agreement, dated July 23, 2018, between NexPoint Advisors, L.P., on behalf of the Registrant, and SEI Investments Global Funds Services (6) |
| (k) | (3) | Agency Agreement, dated August 5, 2014, between the Registrant and SS&C Technologies, Inc. (formerly DST Systems, Inc.) (4) |

(k) (4) Amendment No. 1 to Agency Agreement, dated June 10, 2016, between the Registrant and SS&C Technologies, Inc. (formerly DST Systems, Inc.) (4)

(k) (5) Form of Joinder Agreement to Agency Agreement, dated September 6, 2016, between the Registrant and SS&C Technologies, Inc. (formerly DST Systems, Inc.) (5)

(k) (6) U.S. Prime Brokerage Agreement, dated September 25, 2018, between the Registrant and BNP Paribas Securities Corp. (6)

(k) (7) Annex to the Master Repurchase Agreement dated October 3, 2019, between the Registrant and Mizuho Securities USA LLC. (8).

(k) (8) Bridge Credit Agreement dated February 7, 2020, between NexPoint Real Estate Finance Operating Partnership, L.P., the Registrant, Highland Opportunities and Income Fund (formerly Highland Income Fund), Highland Global Allocation Fund, NexPoint Strategic Opportunities Fund and KeyBank, National Association. (8)

(l) (1) Opinion and Consent of Counsel (2)

(l) (2) Consent of Counsel (13)

(m) Not applicable

(n) Consent of Independent Registered Public Accounting Firm (13)

(o) Not applicable

(p) (1) Subscription Agreement dated April 19, 2016, between the Registrant and NexPoint Advisors, L.P. (4)

(p) (2) Subscription Agreement dated June 9, 2016, between the Registrant and NexPoint Advisors, L.P. (4)

(q) Not applicable

(r) (1) Code of Ethics of the Registrant (9)

(r) (2) Code of Ethics of NexPoint Advisors, L.P. (12)

(r) (3) Code of Ethics of the NexPoint Securities, Inc. (formerly, Highland Capital Funds Distributor, Inc.) (4)

(s) Not applicable

(t) Powers of Attorney dated June 8, 2021 and January 11, 2022 (10)

(t) (1) Powers of Attorney dated May 1, 2022 (11)

---

(1) Incorporated by reference to Pre-Effective Amendment No. 2 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 22, 2016.
(2) Incorporated by reference to Pre-Effective Amendment No. 3 to the Registrant's Registration Statement on Form N-2 filed with the SEC on June 17, 2016.
(3) Incorporated by reference to Post-Effective Amendment No. 2 to the Registrant's Registration Statement on Form N-2 filed with the SEC on August 22, 2016.
(4) Incorporated by reference to Post-Effective Amendment No. 4 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 28, 2017.
(5) Incorporated by reference to Post-Effective Amendment No. 6 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 26, 2018.
(6) Incorporated by reference to Post-Effective Amendment No. 7 to the Registrant's Registration Statement on Form N-2 filed with the SEC on October 9, 2018.
(7) Incorporated by reference to Post-Effective Amendment No. 8 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2019.
(8) Incorporated by reference to Post-Effective Amendment No. 9 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2020.
(9) Incorporated by reference to Post-Effective Amendment No. 10 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 30, 2021.

(10) Incorporated by reference to Post-Effective Amendment No. 11 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2022.
(11) Incorporated by reference to Post-Effective Amendment No. 12 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 28, 2023.
(12) Incorporated by reference to Post-Effective Amendment No. 13 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2024.
(13) Filed herewith.

**Item 26.** ***Marketing Arrangements***

Reference is made to the Distribution Agreement and Form of Selling Agreement included as Exhibits (h)(1) and (h)(2) hereto.

**Item 27.** ***Other Expenses of Issuance and Distribution***

The following table sets forth the estimated expenses to be incurred in connection with all offerings described in this Registration Statement:

| | |
|---|---|
| SEC Registration Fee | $ 0 |
| FINRA Fee | $ 0 |
| Legal fees | $ 1,500,000 |
| Blue Sky fees | $ 100,000 |
| Accounting fees | $ 1,000,000 |
| Printing and Mailing | $ 2,500,000 |
| Total | $ 5,100,000 |

**Item 28.** ***Persons Controlled by or Under Common Control with the Registrant***

NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC are wholly-owned subsidiaries of the Registrant. NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC are organized under the laws of Delaware and have elected to be treated as real estate investment trusts.

**Item 29.** ***Number of Holders of Shares***

The following table sets forth the approximate numbers of record holders of the Registrant's outstanding shares as of March 31, 2025:

| Title of Class | Number of Record Holders |
|---|---|
| Common Shares of Beneficial Interest | |
| Class A | 230 |
| Class C | 142 |
| Class Z | 284 |

**Item 30.** ***Indemnification***

Reference is made to Article VIII, Section 2 of the Registrant's Amended and Restated Agreement and Declaration of Trust (the "Declaration of Trust"), incorporated by reference hereto, and to Section 8 of the Registrant's Distribution Agreement, incorporated by reference hereto. The Registrant hereby undertakes that it will apply the indemnification provisions of the Declaration of Trust and Distribution Agreement in a manner consistent with Release 40-11330 of the Securities and Exchange Commission (the "SEC") under the Investment Company Act of 1940, as amended (the "1940 Act"), so long as the interpretation therein of Sections 17(h) and 17(i) of the 1940 Act remains in effect. The Registrant maintains insurance on behalf of any person who is or was an independent trustee, officer, employee, or agent of the Registrant against certain liability asserted against and

incurred by, or arising out of, his or her position. However, in no event will the Registrant pay that portion of the premium, if any, for insurance to indemnify any such person for any act for which the Registrant itself is not permitted to indemnify.

Insofar as indemnification for liability arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

**Item 31.** ***Business and Other Connections of Investment Advisor***

A description of any other business, profession, vocation, or employment of a substantial nature in which the investment adviser of the Registrant, and each member, director, executive officer, or partner of any such investment adviser, is or has been, at any time during the past two fiscal years, engaged in for his or her own account or in the capacity of member, trustee, officer, employee, partner or director, is set forth in the Registrant's prospectus and statement of additional information in the sections entitled "Management of the Fund." Information as to the members and officers of the Adviser is included in its Form ADV as filed with the SEC (CRD No. 163564), and is incorporated herein by reference.

**Item 32.** ***Location of Accounts and Records***

(1) SS&C Technologies, Inc. (formerly DST Asset Manager Solutions, Inc.), 30 Braintree Hill Office Park, Suite 400, Braintree, MA 02184 (records relating to its function as transfer agent).

(2) Bank of New York Mellon, 240 Greenwich Street, New York, NY 10286 (records relating to its function as custodian).

(3) NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (records relating to its function as adviser and administrator).

(4) SEI Investments Global Fund Services, One Freedom Valley Drive, Oaks, Pennsylvania 19456 (records relating to its function as sub-administrator).

(5) NexPoint Securities, Inc., 200 Crescent Court, Suite 700, Dallas, Texas 75201 (records relating to its function as distributor).

(6) Skyview Group, 2101 Cedar Springs Road, Suite 1200, Dallas, Texas 75201 (records relating to its function as administrator).

**Item 33.** ***Management Services***

Not Applicable.

**Item 34.** ***Undertakings***

1. The Registrant undertakes to suspend the offering of Shares until the prospectus is amended if (1) subsequent to the effective date of its registration statement, the net asset value of the Fund declines more than ten percent from its net asset value as of the effective date of the registration statement or (2) the net asset value of the Fund increases to an amount greater than its net proceeds as stated in the prospectus.

2. Not Applicable.

3. The Registrant undertakes:

(a) to file, during any period in which offers or sales are being made, a post-effective amendment to the registration statement:

(1) to include any prospectus required by Section 10(a)(3) of the Securities Act;

(2) to reflect in the prospectus any facts or events after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Filing Fee Tables" in the effective registration statement; and

(3) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(b) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(c) The Registrant undertakes to remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(d) The Registrant undertakes that, for the purpose of determining liability under the Securities Act:

(1) Not Applicable;

(2) if the Registrant is subject to Rule 430C, each prospectus filed pursuant to Rule 424(b) under the Securities Act as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be a part of and included in the registration statement as of the date it is first used after effectiveness; *provided, however*, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract or sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(e) The Registrant undertakes that, for the purpose of determining liability of the Registrant under the Securities Act to any purchaser in the initial distribution of securities, in a primary offering of securities of the undersigned Registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned Registrant will be a seller to the purchaser and will be considered to offer or sell such securities to the purchaser:

(1) any preliminary prospectus or prospectus of the undersigned Registrant relating to the offering required to be filed pursuant to Rule 424 under the Securities Act;

(2) free writing prospectus relating to the offering prepared by or on behalf of the undersigned Registrant or used or referred to by the undersigned Registrant;

(3) the portion of any advertisement pursuant to Rule 482 under the Securities Act relating to the offering containing material information about the undersigned Registrant or its securities provided by or on behalf of the undersigned Registrant; and

(4) any other communication that is an offer in the offering made by the undersigned Registrant to the purchaser.

4. Not Applicable.

5. Not Applicable.

6. Not Applicable.

7. The Registrant undertakes to send by first class mail or other means designed to ensure equally prompt delivery within two business days of receipt of a written or oral request, the Registrant's statement of additional information.

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended (the "1933 Act) and the Investment Company Act of 1940, as amended (the "1940 Act"), the Registrant certifies that it meets all of the requirements for effectiveness of this Registration Statement pursuant to Rule 486(b) under the 1933 Act and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Dallas and the State of Texas, on the 30th day of April, 2025.

NEXPOINT REAL ESTATE STRATEGIES FUND

/s/ James Dondero
James Dondero
President
(Principal Executive Officer)

Pursuant to the requirements of the 1933 Act and the 1940 Act, this Registration Statement has been signed by the following persons in the capacities set forth below on the 30th day of April, 2025.

| Signature | Title |
|---|---|
| /s/ James Dondero<br>James Dondero | President<br>(Principal Executive Officer) |
| /s/ Frank Waterhouse<br>Frank Waterhouse | Treasurer (Principal Financial and Principal Accounting Officer) |
| /s/ Ethan Powell*<br>Ethan Powell | Chairman of the Board of Trustees |
| /s/ Dr. Bob Froehlich*<br>Dr. Bob Froehlich | Trustee |
| /s/ John Honis*<br>John Honis | Trustee |
| /s/ Bryan A. Ward*<br>Bryan A. Ward | Trustee |
| /s/ Dorri McWhorter*<br>Dorri McWhorter | Trustee |

* By: /s/ Frank Waterhouse
Frank Waterhouse
Attorney in Fact*

* Pursuant to powers of attorney dated May 1, 2022, incorporated herein by reference to Post-Effective Amendment No. 12 to the Registration Statement previously filed with the Commission on April 28, 2023 (Accession Number 0001193125-23-126043), and June 8, 2021 incorporated herein by reference to Post-Effective Amendment No. 11 to the Registration Statement previously filed with the Commission on April 29, 2022 (Accession Number 0001193125-22-131260).

**EXHIBIT INDEX**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| (k)(1) | Amended and Restated Expense Limitation and Reimbursement Agreement, dated May 1, 2025, between the Registrant and NexPoint Advisors, L.P. |
| (l)(2) | Consent of Counsel |
| (n) | Consent of Independent Registered Public Accounting Firm |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIBERTY CLO HOLDCO, LTD.<br><br>Plaintiff,<br><br>v.<br><br>NANCY DONDERO, as Trustee of The Dugaboy Investment Trust, GRANT JAMES SCOTT as Trustee of The SLHC Trust, NEXPOINT ADVISORS, L.P., NEXPOINT ADVISORS GP, LLC, NEXPOINT REAL ESTATE ADVISORS IV, L.P. and NEXPOINT REAL ESTATE ADVISORS GP, LLC<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. ____________ |

## COMPLAINT

Plaintiff Liberty CLO Holdco, Ltd. ("Liberty") files this Original Complaint against Defendants Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant James Scott, as Trustee of The SLHC Trust, NexPoint Advisors, L.P. ("NexPoint Advisors"), NexPoint Real Estate Advisors IV, L.P. (collectively the "NexPoint Affiliates"), NexPoint Advisors GP, LLC, and NexPoint Real Estate Advisors GP, LLC (together with NexPoint Advisors GP, LLC, the "NexPoint GPs") and states as follows:

## SUMMARY OF COMPLAINT

1. The NexPoint Affiliates breached their contractual put-option obligation to buy membership interests of NexPoint Polo Glen Holdings, LLC ("Polo Glen") owned by Liberty. Indeed, while the NexPoint Affiliates purported to accept the put, they failed to consummate the sale within 30 days of Liberty's exercise of the put, and instead offered only vague assurances that they would draft transactional documents and close at some unknown time in the future. And when

draft transactional documents were presented after the 30-day deadline to exercise the put, they contained numerous terms that Liberty is not required to agree to under the Option Agreement, including broad releases, indemnification obligations, and representations.

2. The NexPoint Affiliates therefore breached the Option Agreement. Moreover, though NexPoint Advisors guaranteed the NexPoint Affiliates' payment and performance obligations under the Option Agreement, it failed to pay Liberty for its Polo Glen membership interests after demand, and has therefore breached its Guaranty with Liberty. For these reasons, Liberty seeks (1) an order of specific performance compelling the NexPoint Affiliates and NexPoint GPs to consummate the purchase of Liberty's membership interests in Polo Glen; (2) a judgment against NexPoint Advisors for $692,660.51, plus its reasonable attorney's fees, costs, and pre- and post-judgment interest for breach of the Guaranty; and/or (3) a declaratory judgment that either (a) the NexPoint Affiliates have forfeited their right to purchase the Polo Glen membership interests and that Liberty may sell those interests free and clear of any rights of the NexPoint Affiliates, or (b) that Liberty is not required to execute documents containing broad releases, indemnification obligations, and representations and warranties to effectuate its put under the Option Agreement.

## PARTIES, JURISDICTION, AND VENUE

3. Liberty is an exempted company organized under the laws of the Cayman Islands with its principal place of business located at Floor 4, Willow House, Cricket Square, Grand Cayman KY-9010 KY, and it is a foreign citizen for purposes of diversity jurisdiction.

4. Defendant Nancy Dondero is the sole Trustee for The Dugaboy Investment Trust, who, on information and belief, is a Florida citizen for diversity purposes. She may be served with process at 1510 Coral Oak Ln. # 1305, Vero Beach, FL 32963, or wherever she may be found.

5. Defendant Grant James Scott is the sole Trustee for The SLHC Trust, who, on information and belief, is a North Carolina citizen for diversity purposes. He may be served with process at 5311 Tannat Ct, #204, Raleigh, NC 27612, or 1712 Scales St, Raleigh, NC 27608, or wherever he may be found.

6. Defendant NexPoint Advisors, L.P. is a Delaware limited partnership, whose general partner is NexPoint Advisors GP, LLC. NexPoint Advisors GP, LLC is a Delaware limited liability company, whose sole member is James D. Dondero, who is a Texas citizen for diversity purposes. NexPoint Advisors, L.P. has one limited partner, The Dugaboy Investment Trust, a Delaware perpetual nonrevocable trust with its principal place of business in Dallas County, Texas. Nancy Marie Dondero is The Dugaboy Investment Trust's sole trustee, who on information and belief is an individual and a Florida citizen for diversity purposes. NexPoint Advisors, L.P. may be served with process through its registered agent, The Corporation Trust Company, at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

7. Defendant NexPoint Advisors GP, LLC is a Delaware limited liability company, whose sole member is James D. Dondero, who is a Texas citizen for diversity purposes. NexPoint Advisors GP, LLC may be served with process through its registered agent, The Corporation Trust Company, at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

8. Defendant NexPoint Real Estate Advisors IV, L.P. is a Delaware limited partnership, whose general partner is NexPoint Real Estate Advisors GP, LLC. NexPoint Real Estate Advisors GP, LLC is a Delaware limited liability company, whose sole member is NexPoint Advisors, LP. NexPoint Advisors, L.P. is a Delaware limited partnership, whose general partner is NexPoint Advisors GP, LLC. NexPoint Advisors GP, LLC is a Delaware limited liability company, whose sole member is James D. Dondero, who is an individual and Texas citizen for

diversity purposes. NexPoint Advisors, L.P., has one limited partner, The Dugaboy Investment Trust, a Delaware perpetual nonrevocable trust with its principal place of business in Dallas County, Texas. Nancy Marie Dondero is The Dugaboy Investment Trust's sole trustee, who on information and belief is an individual and a Florida citizen for diversity purposes. NexPoint Real Estate Advisors IV, L.P. may be served with process through its registered agent, The Corporation Trust Company, at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

9. Defendant NexPoint Real Estate Advisors GP, LLC is a Delaware limited liability company, whose sole member is NexPoint Advisors, LP. NexPoint Advisors, L.P. is a Delaware limited partnership, whose general partner is NexPoint Advisors GP, LLC. NexPoint Advisors GP, LLC is a Delaware limited liability company, whose sole member is James D. Dondero, who is an individual and Texas citizen for diversity purposes. NexPoint Advisors, L.P. has one limited partner, The Dugaboy Investment Trust, a Delaware perpetual nonrevocable trust with its principal place of business in Dallas County, Texas. Nancy Marie Dondero is The Dugaboy Investment Trust's sole trustee, who on information and belief is an individual and a Florida citizen for diversity purposes. NexPoint Real Estate Advisors GP, LLC may be served with process through its registered agent, The Corporation Trust Company, at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

10. This Court has subject-matter jurisdiction over this civil action under 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the matter in controversy, exclusive of interest and costs, exceeds $75,000.00. In addition to diversity jurisdiction, the Court has supplemental jurisdiction under 28 U.S.C. § 1367.

11. This Court has personal jurisdiction over the NexPoint Affiliates and the NexPoint GPs. In the Option Agreement at issue, the NexPoint Affiliates submitted to the jurisdiction of the

courts of the State of Delaware and of the United States District Court for the District of Delaware. Option Agreement § 4.

12. Venue is proper in the United States District Court for the District of Delaware because the NexPoint Affiliates and NexPoint GPs waived any objection to this District being the venue for any dispute arising out of or relating to the agreement in the Option Agreement at issue. Option Agreement § 4.

## FACTUAL BACKGROUND

5. On or about June 13, 2024, the NexPoint Affiliates executed a letter agreement which provided Liberty with a put option for its interests in NexPoint Polo Glen Holdings, LLC (the "Option Agreement"). A true and correct copy of the Option Agreement is attached as **Exhibit 1**. Liberty holds 100% of the Class I Membership Interests in Polo Glen, as outlined in the Polo Glen Limited Liability Company Agreement. A true and correct copy of the Polo Glen Limited Liability Company Agreement is attached as **Exhibit 2**.

6. Under the Option Agreement, Liberty has the right to require the NexPoint Affiliates to purchase all of Liberty's Class I Membership Interests in Polo Glen 30 days after Liberty serves a written notice of its election to exercise the put option (the "Class I Put Option"). Option Agreement § 1. Specifically, the Option Agreement provides that "each constituent of the collectively designated NexPoint Affiliates, agrees that it is jointly and severally liable to purchase the Class I Put Option, within thirty (30) days after exercise by [Liberty]." Option Agreement § 1(c).[1] NexPoint Advisors guaranteed the payment and performance of this Option Agreement under a Guaranty Agreement executed between NexPoint Advisors and Liberty, among others,

[1] The Option Agreement uses the same definition for "NexPoint Affiliates" and "Class I Put Option" as used herein.

dated June 13, 2024 (the "Guaranty"). A true and correct copy of the Guaranty is attached as **Exhibit 3**.

7. On January 15, 2025, Liberty sent the required written notice that it elected to exercise its Class I Put Option to the NexPoint Affiliates (the "Notice"). A true and correct copy of the Notice is attached as **Exhibit 4**. Thus, the NexPoint Affiliates had until February 14, 2025—30 days after the Notice—to "purchase the Class I Put Option." Option Agreement § 1(c).

8. On February 14, 2025, instead of complying with the terms of the Option Agreement and purchasing Liberty's membership interests (that is, *paying* for them), the NexPoint Affiliates merely notified Liberty that they had received the Notice and advised that Dugaboy *intended* to purchase the interests, but it needed an unspecified, additional amount of time to prepare the necessary documents to close the transaction. A true and correct copy of the response is attached as **Exhibit 5**.

9. On February 26, 2025, the NexPoint Affiliates circulated draft "put option purchase" documents to Liberty. Not only were those documents late, but they contained numerous improper provisions that were not required by the Option Agreement and that Liberty is not obligated to accept—namely, broad releases of the NexPoint Affiliates, a broad indemnification in favor of the NexPoint Affiliates, and several representations and warranties to be made by Liberty. As a result, none of the NexPoint Affiliates have complied with the Option Agreement and purchased the interests from Liberty.

10. Before filing this suit, Liberty served notice on NexPoint Advisors under the Guaranty, demanding that it pay $692,660.51 for Liberty's Polo Glen membership interests (the "Guaranty Notice"). A true and correct copy of the Guaranty Notice is attached as **Exhibit 6**. But

to date, NexPoint Advisors has failed to comply with its guaranty obligations and has not paid Liberty for its Polo Glen membership interests.

## Cause of Action

11. Each cause of action and theory of recovery below incorporates all of the allegations outlined above as if fully set forth therein.

12. All conditions precedent have been performed, waived, or have occurred.

## COUNT ONE

## Breach of Option Agreement Against NexPoint Affiliates and NexPoint GPs

13. The Option Agreement is a valid and enforceable contract.

14. The Option Agreement's plain terms state that the NexPoint Affiliates must purchase Liberty's Polo Glen membership interests, and are jointly and severally liable to do so, within 30 days of receipt of written notice from Liberty that it is exercising its put option. *See* Option Agreement § 1(c). The NexPoint GPs are jointly and severally liable for the acts of their respective limited partnerships.

15. Liberty sent the required Notice to the NexPoint Affiliates on January 15, 2025. *See* Liberty Notice. Thus, the NexPoint Affiliates had to purchase Liberty's membership interests by no later than February 14, 2025. *See* Option Agreement § 1(c). The NexPoint Affiliates failed to purchase the subject interests by February 14, 2025, and still have not purchased the subject interests to date.

16. As a result of the NexPoint Affiliates' (and the NexPoint GPs') failure to purchase Liberty's membership interest, Liberty has suffered injury, and will continue to suffer injury.

17. Liberty seeks an order of specific performance compelling the NexPoint Affiliates and the NexPoint GPs to consummate the purchase of Liberty's Polo Glen membership interests.

Specific performance is a remedy for breach of contract which takes the form of a mandatory injunction requiring a party to fulfill its contractual obligations. *26 Capital Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 464 (Del. Ch. 2023). Specific performance is available when ordinary damages would not provide adequate relief. *Id.*

18. Ordinary damages would not provide Liberty adequate relief because Liberty no longer wishes to own its interests in Polo Glen and seeks to exercise its right to sell those interests to the NexPoint Affiliates. Accordingly, Liberty seeks the equitable relief of specific performance of the Option Agreement, including but not limited to a mandatory injunction requiring the NexPoint Affiliates (and, by extension, the NexPoint GPs) to purchase Liberty's interests as required by the Option Agreement.

## COUNT TWO

### BREACH OF GUARANTY AGAINST NEXPOINT ADVISORS

19. The Guaranty is a valid and enforceable contract.

20. The Guaranty's plain terms state that NexPoint Advisors must purchase Liberty's Polo Glen membership interests to the extent the NexPoint Affiliates failed to perform under the Option Agreement, after NexPoint Advisors receives notice of that failure. *See* Guaranty §§ 2, 4.

21. Liberty sent the required Guaranty Notice to NexPoint Advisors on February 27, 2025, which triggered NexPoint Advisors' obligation to purchase Liberty's Polo Glen membership interests. *See* Guaranty Notice. But to date, NexPoint Advisors has failed to purchase the subject interests.

22. As a result, Liberty has suffered injury, and will continue to suffer injury, in the amount of at least $692,660.51, plus costs and pre- and post-judgment interest. Moreover, Liberty

had to engage counsel to enforce its rights under the Guaranty, and it is entitled to recover its reasonable attorney's fees incurred in connection with that enforcement effort. *See* Guaranty § 12.

**COUNT THREE**

**DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201**

23. In the alternative to Counts One and Two, Liberty seeks a declaration of the parties' rights and duties under the Option Agreement pursuant to 28 U.S.C. §§ 2201 and 2202. An actual and justiciable controversy exists between Liberty and the NexPoint Affiliates concerning (1) whether the NexPoint Affiliates have forfeited their right to purchase Liberty's Polo Glen membership interests under the Option Agreement because they did not comply with the Option Agreement's terms; or (2) whether Liberty is required to execute documentation to effectuate the purchase of its Polo Glen membership interests that include excess terms, such as releases, indemnification provisions, and representations and warranties.

24. This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment. The Option Agreement specifically provides that the NexPoint Affiliates are entitled to purchase Liberty's Polo Glen membership interests "within 30 days after exercise by [Liberty]." *See* Option Agreement § 1(c). The Option Agreement does not create any right for the NexPoint Affiliates to purchase the Polo Glen membership interests outside of that 30-day period. But the NexPoint Affiliates did not consummate the purchase of Liberty's Polo Glen membership interests within 30 days of Liberty's exercise of their put rights. And the Option Agreement does not require Liberty to execute documentation including unreasonably broad releases, indemnification provisions, and representations and warranties.

25. Accordingly, Liberty seeks a declaration from the Court that:

a. The NexPoint Affiliates have forfeited their right to purchase Liberty's Polo Glen membership interests under the Option Agreement and Liberty may sell

its Polo Glen membership interests free and clear of any rights of the NexPoint Affiliates; or

b. Liberty is not required to execute documents containing broad releases, indemnification obligations, or representations and warranties to effectuate its put under the Option Agreement.

26. Liberty also seeks any other declaratory relief that would be useful to the resolution of the dispute between the parties.

**PRAYER FOR RELIEF**

Plaintiff Liberty CLO Holdco, Ltd. respectfully requests that Defendants Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant James Scott, as Trustee of The SLHC Trust, NexPoint Advisors, L.P., NexPoint Advisors GP, LLC, NexPoint Real Estates Advisors IV, L.P., and NexPoint Real Estate Advisors GP, LLC, be cited to appear and answer herein, and requests that the Court enter a final judgment:

a. Ordering specific performance of the NexPoint Affiliates' and the NexPoint GPs' obligation to purchase Liberty's Polo Glen membership interests under the Option Agreement;

b. Awarding Liberty a judgment against NexPoint Advisors for $692,660.51, plus its reasonably attorney's fees, costs, and pre- and post-judgment interest; or

c. A declaration pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202 that:

i. The NexPoint Affiliates have forfeited their right to purchase Liberty's Polo Glen membership interests under the Option Agreement and that Liberty may sell its Polo Glen membership interests free and clear of any rights of the NexPoint Affiliates; or

ii. Liberty is not required to execute documents containing broad releases,

indemnification obligations, or representations and warranties to effectuate its put under the Option Agreement; and

d. all other relief to which Liberty is justly entitled.

Dated: February 28, 2025

DORSEY & WHITNEY (DELAWARE) LLP

*/s/* Eric Lopez Schnabel
Eric Lopez Schnabel (DE Bar No. 3672)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone: (302) 425-7171
Facsimile: (302) 425-7177
E-mail: *schnabel.eric@dorsey.com*

-and-

Brian Shaw (*pro hac vice pending*)
Texas Bar No. 24053473
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3003
E-mail: *bshaw@ccsb.com*

Monica Gaudioso (*pro hac vice pending*)
Texas Bar No. 24084570
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3088
E-mail: *mgaudioso@ccsb.com*

Abbie Blaker (*pro hac vice pending*)
Texas Bar No. 24131268
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3058
E-mail: *ablaker@ccsb.com*

**ATTORNEYS FOR PLAINTIFF LIBERTY CLO HOLDCO, LTD.**

# PID 11041 | AUTUMN

Property Summary Report | 2025
Online Services | Rockwall Central Appraisal District

## GENERAL INFO

### ACCOUNT

Property ID: 11041
Geographic ID: 0104-0000-0004-00-0R
Type: R
Zoning:
Agent: SOUTHLAND PROPERTY TAX
Legal Description: A0104 W J HART, TRACT 4, ACRES 28.198 (PT OF 49.258 AC TR PLUS 655 AC IN COLLIN CO)
Property Use: D1

### OWNER

Name: NCI ROYSE CITY LAND LLC
Secondary Name:
Mailing Address: 6716 GLENHURST DR DALLAS TX US 75254
Owner ID: 1068183
% Ownership: 100.000000
Exemptions:

### LOCATION

Address: AUTUMN
Market Area:
Market Area CD: NC099-2022
Map ID: 5-3

### PROTEST

Protest Status:
Informal Date:
Formal Date:

## VALUES

### CURRENT VALUES

| | |
|---|---|
| Land Homesite: | $0 |
| Land Non-Homesite: | $578,059 |
| Special Use Land Market: | $0 |
| Total Land: | $578,059 |
| Improvement Homesite: | $0 |
| Improvement Non-Homesite: | $0 |
| Total Improvement: | $0 |
| Market: | $578,059 |
| Special Use Exclusion (-): | $0 |
| Appraised: | $578,059 |
| Value Limitation Adjustment (-): | $9,588 |
| Net Appraised: | $568,471 |

### VALUE HISTORY




Values for the current year are preliminary and are subject to change.

### VALUE HISTORY

| Year | Land Market | Improvement | Special Use Exclusion | Appraised | Value Limitation Adj (-) | Net Appraised |
|---|---|---|---|---|---|---|
| 2025 | $578,059 | $0 | $0 | $578,059 | $9,588 | $568,471 |
| 2024 | $578,059 | $0 | $0 | $578,059 | $104,333 | $473,726 |
| 2023 | $394,772 | $0 | $0 | $394,772 | $0 | $394,772 |
| 2022 | $394,770 | $0 | $0 | $394,770 | $0 | $394,770 |
| 2021 | $225,580 | $0 | $0 | $225,580 | $0 | $225,580 |

## TAXING UNITS

| Unit | Description | Tax Rate | Net Appraised | Taxable Value |
|---|---|---|---|---|
| CRC | CITY OF ROYSE CITY | 0.578000 | $568,471 | $568,471 |
| GRW | ROCKWALL COUNTY | 0.254700 | $568,471 | $568,471 |
| SRC | ROYSE CITY ISD | 1.255200 | $568,471 | $568,471 |

DO NOT PAY FROM THIS ESTIMATE. This is only an estimate provided for informational purposes and may not include any special assessments that may also be collected. Please contact the tax office for actual amounts.

## IMPROVEMENT

## LAND

| Land | Description | Acres | SQFT | Cost per SQFT | Market Value | Special Use Value |
|---|---|---|---|---|---|---|
| C1 | VACANT LT/TR NON WF | 28.1980 | 1,228,304 | $0.47 | $578,059 | $0 |

## DEED HISTORY

| Deed Date | Type | Description | Grantor/Seller | Grantee/Buyer | Book ID | Volume | Page | Instrument |
|---|---|---|---|---|---|---|---|---|
| 7/3/14 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ROYSE CITY LAND LLC | | 2014 | 0000009498 | |
| 10/4/11 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | | 6576 | 223 | 456682 |
| 9/7/10 | STD | SUBSTITUTE TRUSTEE | OAKMONT LAND TEN LP | NEXBANK SSB | | 6220 | 141 | 438881 |
| 8/31/07 | WD | WARRANTY DEED | OAKMONT CAPITAL GROUP INC | OAKMONT LAND TEN LP | | | | |
| 3/16/07 | WD | WARRANTY DEED | DFW PRECAST CONTRACTORS | OAKMONT CAPITAL GROUP INC | | 5011 | 95 | |
| 5/17/01 | WD | WARRANTY DEED | JDI PROPERTIES LLC TRUSTEE | LIN JAMES C & | | 2146 | 299/303 | 0 |
| 5/17/01 | WD | WARRANTY DEED | LIN JAMES C & | DFW PRECAST CONTRACTORS | | 2146 | 264 | 0 |
| 10/27/00 | WD | WARRANTY DEED | BALEY TEDDY | JDI PROPERTIES LLC TRUSTEE | | 1995 | 28 | 0 |
| 7/12/96 | WD | WARRANTY DEED | 1994 LAND FUND II-DALLAS I, LP | BALEY TEDDY | | 1135 | 146 | 0 |
| 10/5/93 | STD | SUBSTITUTE TRUSTEE | SOUTHWEST DALLAS 10 INC | RESOLUTION TRUST CORP/RCVR | | 830 | 305 | 0 |
| 12/23/92 | WD | WARRANTY DEED | TELECOM CORPORATION | SOUTHWEST DALLAS 10 INC | | 750 | 100 | 0 |
| 7/26/88 | STD | SUBSTITUTE TRUSTEE | TELECOM CORPORATION | TELECOM CORPORATION | | 417 | 36 | 0 |
| | OT | | MORTON REALTY CO | TELECOM CORPORATION | | | | 0 |
| | OT | | GODWIN M L TRUSTEE | MORTON REALTY CO | | | | 0 |
| | OT | | GENTRY C R & R M | GODWIN M L TRUSTEE | | | | 0 |

# PID 11045 |

Property Summary Report | 2025
Online Services | Rockwall Central Appraisal District

## GENERAL INFO

### ACCOUNT

Property ID: 11045
Geographic ID: 0104-0000-0009-00-0R
Type: R
Zoning:
Agent: SOUTHLAND PROPERTY TAX
Legal Description: A0104 W J HART, TRACT 9, ACRES 14.6, (PT OF 49.258 AC TR PLUS 655 AC IN COLLIN CO)
Property Use: D1

### OWNER

Name: NCI ROYSE CITY LAND LLC
Secondary Name:
Mailing Address: 6716 GLENHURST DR DALLAS TX US 75254
Owner ID: 1068183
% Ownership: 100.000000
Exemptions:

### LOCATION

Address:

Market Area:
Market Area CD: NC099-2022
Map ID: 5-3

### PROTEST

Protest Status:
Informal Date:
Formal Date:

## VALUES

### CURRENT VALUES

| | |
|---|---|
| Land Homesite: | $0 |
| Land Non-Homesite: | $299,300 |
| Special Use Land Market: | $0 |
| Total Land: | $299,300 |
| Improvement Homesite: | $0 |
| Improvement Non-Homesite: | $0 |
| Total Improvement: | $0 |
| Market: | $299,300 |
| Special Use Exclusion (-): | $0 |
| Appraised: | $299,300 |
| Value Limitation Adjustment (-): | $4,964 |
| Net Appraised: | $294,336 |

### VALUE HISTORY




Values for the current year are preliminary and are subject to change.

### VALUE HISTORY

| Year | Land Market | Improvement | Special Use Exclusion | Appraised | Value Limitation Adj (-) | Net Appraised |
|---|---|---|---|---|---|---|
| 2025 | $299,300 | $0 | $0 | $299,300 | $4,964 | $294,336 |
| 2024 | $299,300 | $0 | $0 | $299,300 | $54,020 | $245,280 |
| 2023 | $204,400 | $0 | $0 | $204,400 | $0 | $204,400 |
| 2022 | $204,400 | $0 | $0 | $204,400 | $0 | $204,400 |
| 2021 | $116,800 | $0 | $0 | $116,800 | $0 | $116,800 |

## TAXING UNITS

| Unit | Description | Tax Rate | Net Appraised | Taxable Value |
|---|---|---|---|---|
| CRC | CITY OF ROYSE CITY | 0.578000 | $294,336 | $294,336 |
| GRW | ROCKWALL COUNTY | 0.254700 | $294,336 | $294,336 |
| SRC | ROYSE CITY ISD | 1.255200 | $294,336 | $294,336 |

DO NOT PAY FROM THIS ESTIMATE. This is only an estimate provided for informational purposes and may not include any special assessments that may also be collected. Please contact the tax office for actual amounts.

## IMPROVEMENT

## LAND

| Land | Description | Acres | SQFT | Cost per SQFT | Market Value | Special Use Value |
|---|---|---|---|---|---|---|
| C1 | VACANT LT/TR NON WF | 14.6000 | 635,976 | $0.47 | $299,300 | $0 |

## DEED HISTORY

| Deed Date | Type | Description | Grantor/Seller | Grantee/Buyer | Book ID | Volume | Page | Instrument |
|---|---|---|---|---|---|---|---|---|
| 7/3/14 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ROYSE CITY LAND LLC | | 2014 | 0000009498 | |
| 10/4/11 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | | 6576 | 223 | 456682 |
| 9/7/10 | STD | SUBSTITUTE TRUSTEE | OAKMONT LAND TEN LP | NEXBANK SSB | | 6220 | 141 | 438881 |
| 8/31/07 | WD | WARRANTY DEED | OAKMONT CAPITAL GROUP INC | OAKMONT LAND TEN LP | | | | |
| 3/16/07 | WD | WARRANTY DEED | DFW PRECAST CONTRACTORS | OAKMONT CAPITAL GROUP INC | | 5011 | 95 | |
| 9/10/01 | WD | WARRANTY DEED | BALEY TEDDY | DFW PRECAST CONTRACTORS | | 2261 | 163 | 0 |
| 7/12/96 | WD | WARRANTY DEED | 1994 LAND FUND II-DALLAS I, LP | BALEY TEDDY | | 1135 | 146 | 0 |
| 10/5/93 | STD | SUBSTITUTE TRUSTEE | SOUTHWEST DALLAS 10 INC | RESOLUTION TRUST CORP/RCVR | | 830 | 305 | 0 |
| 12/23/92 | WD | WARRANTY DEED | TELECOM CORPORATION | SOUTHWEST DALLAS 10 INC | | 750 | 100 | 0 |
| 7/26/88 | STD | SUBSTITUTE TRUSTEE | TELECOM CORPORATION | TELECOM CORPORATION | | 417 | 36 | 0 |
| | OT | | MORTON REALTY CO | TELECOM CORPORATION | | | | 0 |
| | OT | | GODWIN M L TR | MORTON REALTY CO | | | | 0 |
| | OT | | WOODWARD MADALENE | GODWIN M L TR | | | | 0 |

# PID 54550 |

Property Summary Report | 2025
Online Services | Rockwall Central Appraisal District

## GENERAL INFO

### ACCOUNT

Property ID: 54550
Geographic ID: 0104-0000-0004-01-0R
Type: R
Zoning:
Agent: SOUTHLAND PROPERTY TAX
Legal Description: A0104, W J HART, TRACT 4-1, 6.46 ACRES (PT OF 49.258 AC TR PLUS 655 AC IN COLLIN CO)
Property Use: D1

### OWNER

Name: NCI ROYSE CITY LAND LLC
Secondary Name:
Mailing Address: 6716 GLENHURST DR DALLAS TX US 75254
Owner ID: 1068183
% Ownership: 100.000000
Exemptions:

### LOCATION

Address:

Market Area:
Market Area CD: NC099-2022
Map ID: 5-3

### PROTEST

Protest Status:
Informal Date:
Formal Date:

## VALUES

### CURRENT VALUES

| | |
|---|---|
| Land Homesite: | $0 |
| Land Non-Homesite: | $25,840 |
| Special Use Land Market: | $0 |
| Total Land: | $25,840 |
| Improvement Homesite: | $0 |
| Improvement Non-Homesite: | $0 |
| Total Improvement: | $0 |
| Market: | $25,840 |
| Special Use Exclusion (-): | $0 |
| Appraised: | $25,840 |
| Value Limitation Adjustment (-): | $0 |
| Net Appraised: | $25,840 |

### VALUE HISTORY




Values for the current year are preliminary and are subject to change.

### VALUE HISTORY

| Year | Land Market | Improvement | Special Use Exclusion | Appraised | Value Limitation Adj (-) | Net Appraised |
|---|---|---|---|---|---|---|
| 2025 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |
| 2024 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |
| 2023 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |
| 2022 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |
| 2021 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |

## TAXING UNITS

| Unit | Description | Tax Rate | Net Appraised | Taxable Value |
|---|---|---|---|---|
| CRC | CITY OF ROYSE CITY | 0.578000 | $25,840 | $25,840 |
| GRW | ROCKWALL COUNTY | 0.254700 | $25,840 | $25,840 |
| SRC | ROYSE CITY ISD | 1.255200 | $25,840 | $25,840 |

DO NOT PAY FROM THIS ESTIMATE. This is only an estimate provided for informational purposes and may not include any special assessments that may also be collected. Please contact the tax office for actual amounts.

## IMPROVEMENT

## LAND

| Land | Description | Acres | SQFT | Cost per SQFT | Market Value | Special Use Value |
|---|---|---|---|---|---|---|
| C1 | VACANT LT/TR NON WF | 6.4600 | 281,397.6 | $0.09 | $25,840 | $0 |

## DEED HISTORY

| Deed Date | Type | Description | Grantor/Seller | Grantee/Buyer | Book ID | Volume | Page | Instrument |
|---|---|---|---|---|---|---|---|---|
| 7/3/14 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ROYSE CITY LAND LLC | | 2014 | 0000009498 | |
| 10/4/11 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | | 6576 | 223 | 456682 |
| 9/7/10 | STD | SUBSTITUTE TRUSTEE | OAKMONT LAND TEN LP | NEXBANK SSB | | 6220 | 141 | 438881 |
| 8/31/07 | WD | WARRANTY DEED | OAKMONT CAPITAL GROUP INC | OAKMONT LAND TEN LP | | | | |
| 3/16/07 | WD | WARRANTY DEED | DFW PRECAST CONTRACTORS | OAKMONT CAPITAL GROUP INC | | 5011 | 95 | |
| 5/17/01 | WD | WARRANTY DEED | LIN JAMES C & | M R DEVELOPMENT | | 2146 | 307 | 0 |

**Scott Grigg**
**Tax Assessor\Collector**
**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**

**Physical Location:**
**2300 Bloomdale Road Ste. 2324**
**McKinney, TX 75071**
**Ph: 972-547-5020**

**TAX STATEMENT 2024+**

1
V1.1

**STATEMENT DATE:** **05/29/2025**
**ACCOUNT:** **R671000000201**

LEGAL: ABS A0710 JOHN PENNINGTON SURVEY
TRACT 2
153.28 ACRES

OWNER: NCI ROYSE CITY LAND LLC
PARCEL ADDRESS: 0000233 COUNTY ROAD 588
EXEMPTION CODES: AG002

PIDN: 1286012
ACRES: 153.28

| AG DEFERRED VAL | AG LAND | APPRAISED VALUE | | | |
|---|---|---|---|---|---|
| 2,273,909 | 25,291 | 2,299,200 | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | **BASE TAX** | **PENALTY & INTEREST** |
|---|---|---|---|---|---|
| COLLIN COUNTY | 2,273,909 | 25,291 | 0.149343 | 0.00 | 0.00 |
| COLLIN COLLEGE | 2,273,909 | 25,291 | 0.081220 | 0.00 | 0.00 |
| | | | SUBTOTAL | 0.00 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

*^ Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

**TOTAL AMOUNT DUE**
**$0.00**

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI ROYSE CITY LAND LLC
1286012

ACCOUNT: R671000000201 2024+

NCI ROYSE CITY LAND LLC
6716 GLENHURST DR
DALLAS TX 75254-8621

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |
| AUG | 0.00 |
| SEP | 0.00 |
| OCT | 0.00 |
| NOV | 0.00 |

20240R671000000201000000000000000000000000000000000000000000C01

**Scott Grigg**
**Tax Assessor\Collector**
**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**

COLLIN COUNTY

**Physical Location:**
**2300 Bloomdale Road Ste. 2324**
**McKinney, TX 75071**
**Ph: 972-547-5020**

**TAX STATEMENT 2024+**

1
V1.1

**STATEMENT DATE:** **05/29/2025**
**ACCOUNT:** **R668300001101**

LEGAL: ABS A0683 TURNER ODELL SURVEY TRACT 11 2.5 ACRES; (SPLIT BY COUNTY LINE)

OWNER: NCI ROYSE CITY LAND LLC
PARCEL ADDRESS:
EXEMPTION CODES: AG002

PIDN: 1288760
ACRES: 2.5

| AG DEFERRED VAL | AG LAND | APPRAISED VALUE | | | |
|---|---|---|---|---|---|
| 67,087 | 413 | 67,500 | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | **BASE TAX** | **PENALTY & INTEREST** |
|---|---|---|---|---|---|
| COLLIN COUNTY | 67,087 | 413 | 0.149343 | 0.00 | 0.00 |
| COLLIN COLLEGE | 67,087 | 413 | 0.081220 | 0.00 | 0.00 |
| | | | SUBTOTAL | 0.00 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

*^ Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

**TOTAL AMOUNT DUE**
**$0.00**

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI ROYSE CITY LAND LLC
1288760

ACCOUNT: R668300001101 2024+

NCI ROYSE CITY LAND LLC
6716 GLENHURST DR
DALLAS TX 75254-8621

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |
| AUG | 0.00 |
| SEP | 0.00 |
| OCT | 0.00 |
| NOV | 0.00 |

20240R66830000110100000000000000000000000000000000000000000C01

**Scott Grigg**
**Tax Assessor\Collector**
**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**

**Physical Location:**
**2300 Bloomdale Road Ste. 2324**
**McKinney, TX 75071**
**Ph: 972-547-5020**

**TAX STATEMENT 2024+**

1
V1.1

**STATEMENT DATE:** **05/29/2025**
**ACCOUNT:** **R696600000601**

LEGAL: ABS A0966 WILLIAM WILSON SURVEY
TRACT 6 SPLIT BY COUNTY LINE
41.492 ACRES

OWNER: NCI ROYSE CITY LAND LLC
PARCEL ADDRESS: COUNTY ROAD 979
EXEMPTION CODES: AG002

PIDN: 2520624
ACRES: 41.492

| AG DEFERRED VAL | AG LAND | APPRAISED VALUE | | | |
|---|---|---|---|---|---|
| 1,030,454 | 6,846 | 1,037,300 | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | **BASE TAX** | **PENALTY & INTEREST** |
|---|---|---|---|---|---|
| COLLIN COUNTY | 1,030,454 | 6,846 | 0.149343 | 0.00 | 0.00 |
| COLLIN COLLEGE | 1,030,454 | 6,846 | 0.081220 | 0.00 | 0.00 |
| | | | SUBTOTAL | 0.00 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

^ *Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

**TOTAL AMOUNT DUE**
**$0.00**

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI ROYSE CITY LAND LLC
2520624

ACCOUNT: R696600000601 2024+

NCI ROYSE CITY LAND LLC
6716 GLENHURST DR
DALLAS TX 75254-8621

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |
| AUG | 0.00 |
| SEP | 0.00 |
| OCT | 0.00 |
| NOV | 0.00 |

20240R696600000601000000000000000000000000000000000000000C01

**Scott Grigg**
**Tax Assessor\Collector**
**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**

**Physical Location:**
**2300 Bloomdale Road Ste. 2324**
**McKinney, TX 75071**
**Ph: 972-547-5020**

**TAX STATEMENT 2024+**

1
V1.1

**STATEMENT DATE:** **05/29/2025**
**ACCOUNT:** **R624600000101**

LEGAL: ABS A0246 JOHN DAVIS SURVEY
TRACT 1
136.053 ACRES

OWNER: NCI ROYSE CITY LAND LLC
PARCEL ADDRESS: COUNTY ROAD 588
EXEMPTION CODES: AG002

PIDN: 2673936
ACRES: 136.053

| AG DEFERRED VAL | AG LAND | APPRAISED VALUE | | | |
|---|---|---|---|---|---|
| 2,698,612 | 22,448 | 2,721,060 | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | **BASE TAX** | **PENALTY & INTEREST** |
|---|---|---|---|---|---|
| COLLIN COUNTY | 2,698,612 | 22,448 | 0.149343 | 0.00 | 0.00 |
| COLLIN COLLEGE | 2,698,612 | 22,448 | 0.081220 | 0.00 | 0.00 |
| | | | SUBTOTAL | 0.00 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

*^ Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

**TOTAL AMOUNT DUE**
**$0.00**

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI ROYSE CITY LAND LLC
2673936

ACCOUNT: R624600000101 2024+

NCI ROYSE CITY LAND LLC
6716 GLENHURST DR
DALLAS TX 75254-8621

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |
| AUG | 0.00 |
| SEP | 0.00 |
| OCT | 0.00 |
| NOV | 0.00 |

20240R6246000001010000000000000000000000000000000000000000C01

**Scott Grigg**
**Tax Assessor\Collector**
**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**

**Physical Location:**
**2300 Bloomdale Road Ste. 2324**
**McKinney, TX 75071**
**Ph: 972-547-5020**

**TAX STATEMENT 2024+**

F
1F$F

**STATEMENT DATE:** **05/29/2025**
**ACCOUNT:** **R667000000201**

LEGAL: ABS A06V0 4OS NAILE SUR1EY
TRACT 2
. 25$6FV ACRES

OWNER: NCI ROYSE CITY LAND LLC
PARCEL ADDRESS: COUNTY ROAD 970
EXEMPTION CODES: AG002

PIDN: 26V. 7. V
ACRES: . 25$6FV

| AG DE3ERRED 1AL | AG LAND | APPRAISED 1ALUE | | | |
|---|---|---|---|---|---|
| 58 668956 | 9. 8962 | 585208F0J | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE 1ALUE | TAX RATE PER , F00 | **BASE TAX** | **PENALTY & INTEREST** |
|---|---|---|---|---|---|
| COLLIN COUNTY | 58 668956 | 9. 8962 | 0$F57. 5. | 0$00 | 0$00 |
| COLLIN COLLEGE | 58 668956 | 9. 8962 | 0$0JF220 | 0$00 | 0$00 |
| | | | SUBTOTAL | 0$00 | 0$00 |
| | | | PRIOR YEARS | 0$00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

*^ Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

**TOTAL AMOUNT DUE**
**$0.00**

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI ROYSE CITY LAND LLC
26V. 7. V

ACCOUNT: R667000000201 2024+

NCI ROYSE CITY LAND LLC
6716 GLENHURST DR
DALLAS TX 75254-8621

| IF PAID IN | AMOUNT DUE |
|---|---|
| 4UN | 0$00 |
| 4UL | 0$00 |
| AUG | 0$00 |
| SEP | 0$00 |
| OCT | 0$00 |
| NO1 | 0$00 |

20240R66700000020100000000000000000000000000000000000000000C01

# Kaufman CAD Property Search

## Property Details

| | | | |
|---|---|---|---|
| **Account** | | | |
| **Property ID:** | 6578 | **Geographic ID:** 99.0171.0000.0775.00.02.02 | |
| **Type:** | R | **Zoning:** | |
| **Property Use:** | | **Condo:** | |
| **Location** | | | |
| **Situs Address:** | 0 HWY 80 FORNEY, TX | | |
| **Map ID:** | C1-D-2 | **Mapsco:** | |
| **Legal Description:** | JNO GREGG, TRACT 775.00; 9.32 ACRES | | |
| **Abstract/Subdivision:** | A0171 | | |
| **Neighborhood:** | (21-002) Forney in City Limits (Misc.) | | |
| **Owner** | | | |
| **Owner ID:** | 197251 | | |
| **Name:** | NLA ASSETS LLC | | |
| **Agent:** | 9252 | | |
| **Mailing Address:** | 6716 GLENHURST DR<br>DALLAS, TX 75254 | | |
| **% Ownership:** | 100.0% | | |
| **Exemptions:** | For privacy reasons not all exemptions are shown online. | | |

## Property Values

| | |
|---|---|
| **Improvement Homesite Value:** | $0 (+) |
| **Improvement Non-Homesite Value:** | $0 (+) |
| **Land Homesite Value:** | $0 (+) |
| **Land Non-Homesite Value:** | $265,691 (+) |
| **Agricultural Market Valuation:** | $0 (+) |
| **Market Value:** | $265,691 (=) |
| **Agricultural Value Loss:** | $0 (-) |
| **Appraised Value:** | $265,691 (=) |
| **HS Cap Loss:** | $0 (-) |
| **Circuit Breaker:** | $13,979 (-) |
| **Assessed Value:** | $251,712 |

| | |
|---|---|
| **Ag Use Value:** | $0 |

Information provided for research purposes only. Legal descriptions and acreage amounts are for Appraisal District use only and should be verified prior to using for legal purpose and or documents. Please contact the Appraisal District to verify all information for accuracy.

## Property Taxing Jurisdiction

**Owner:** NLA ASSETS LLC **%Ownership:** 100.0%

| Entity | Description | Market Value | Taxable Value | Freeze Ceiling |
|---|---|---|---|---|
| CF | CITY OF FORNEY | $265,691 | N/A | |
| KC | KAUFMAN COUNTY | $265,691 | N/A | |
| SF | FORNEY ISD | $265,691 | N/A | |
| P2 | PRECINCT 2 | $265,691 | N/A | |
| RB | ROAD & BRIDGE | $265,691 | N/A | |
| CAD | KAUFMAN CAD | $265,691 | N/A | |

## Property Land

| Type | Description | Acreage | Sqft | Eff Front | Eff Depth | Market Value | Prod. Value |
|---|---|---|---|---|---|---|---|
| ZC | NATIVE PASTURE | 3.32 | 144,619.20 | 0.00 | 0.00 | $139,572 | $0 |
| ZC | NATIVE PASTURE | 6.00 | 261,360.00 | 0.00 | 0.00 | $126,119 | $0 |

## Property Roll Value History

| Year | Improvements | Land Market | Ag Valuation | Appraised | HS Cap Loss | Assessed |
|---|---|---|---|---|---|---|
| 2025 | $0 | $265,691 | $0 | $265,691 | $0 | $251,712 |
| 2024 | $0 | $215,990 | $0 | $215,990 | $0 | $209,760 |
| 2023 | $0 | $174,800 | $0 | $174,800 | $0 | $174,800 |
| 2022 | $0 | $153,290 | $0 | $153,290 | $0 | $153,290 |
| 2021 | $0 | $162,030 | $0 | $162,030 | $0 | $162,030 |
| 2020 | $0 | $162,030 | $0 | $162,030 | $0 | $162,030 |
| 2019 | $0 | $162,030 | $0 | $162,030 | $0 | $162,030 |
| 2018 | $0 | $174,750 | $0 | $174,750 | $0 | $174,750 |
| 2017 | $0 | $174,750 | $0 | $174,750 | $0 | $174,750 |
| 2016 | $0 | $174,750 | $0 | $174,750 | $0 | $174,750 |

## Property Deed History

| Deed Date | Type | Description | Grantor | Grantee | Volume | Page | Number |
|---|---|---|---|---|---|---|---|
| 12/15/2014 | WD | WARRANTY DEED | NCI ASSETS HOLDING COMPANY LLC | NLA ASSETS LLC | 4794 | 260 | 9661 |
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | 4794 | 242 | 9659 |
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ASSETS HOLDING COMPANY LLC | 4794 | 251 | 9660 |

# Kaufman CAD Property Search

## Property Details

| | | | |
|---|---|---|---|
| **Account** | | | |
| **Property ID:** | 14114 | **Geographic ID:** 99.0517.0000.0015.00.06.06 | |
| **Type:** | R | **Zoning:** | |
| **Property Use:** | | **Condo:** | |
| **Location** | | | |
| **Situs Address:** | COLQUITT RD TERRELL, TX | | |
| **Map ID:** | C3-B-4 | **Mapsco:** | |
| **Legal Description:** | SWING & LAWS, TRACT 15; 17.39 ACRES | | |
| **Abstract/Subdivision:** | A0517 | | |
| **Neighborhood:** | (28-002N) CITY OF TERRELL NORTH OF 80 | | |
| **Owner** | | | |
| **Owner ID:** | 197251 | | |
| **Name:** | NLA ASSETS LLC | | |
| **Agent:** | 9252 | | |
| **Mailing Address:** | 6716 GLENHURST DR<br>DALLAS, TX 75254 | | |
| **% Ownership:** | 100.0% | | |
| **Exemptions:** | For privacy reasons not all exemptions are shown online. | | |

## Property Values

| | |
|---|---|
| **Improvement Homesite Value:** | $0 (+) |
| **Improvement Non-Homesite Value:** | $0 (+) |
| **Land Homesite Value:** | $0 (+) |
| **Land Non-Homesite Value:** | $0 (+) |
| **Agricultural Market Valuation:** | $0 (+) |
| **Market Value:** | $0 (=) |
| **Agricultural Value Loss:** | $0 (-) |
| **Appraised Value:** | $0 (=) |
| **HS Cap Loss:** | $0 (-) |
| **Circuit Breaker:** | $0 (-) |
| **Assessed Value:** | $0 |

| | |
|---|---|
| **Ag Use Value:** | $0 |

Information provided for research purposes only. Legal descriptions and acreage amounts are for Appraisal District use only and should be verified prior to using for legal purpose and or documents. Please contact the Appraisal District to verify all information for accuracy.

## Property Taxing Jurisdiction

**Owner:** NLA ASSETS LLC **%Ownership:** 100.0%

| Entity | Description | Market Value | Taxable Value | Freeze Ceiling |
|---|---|---|---|---|
| CT | CITY OF TERRELL | $409,812 | N/A | |
| KC | KAUFMAN COUNTY | $409,812 | N/A | |
| ST | TERRELL ISD | $409,812 | N/A | |
| TV | TRINITY VALLEY CC | $409,812 | N/A | |
| P3 | PRECINCT 3 | $409,812 | N/A | |
| RB | ROAD & BRIDGE | $409,812 | N/A | |
| CAD | KAUFMAN CAD | $409,812 | N/A | |

## Property Land

| Type | Description | Acreage | Sqft | Eff Front | Eff Depth | Market Value | Prod. Value |
|---|---|---|---|---|---|---|---|
| ZC | NATIVE PASTURE | 17.39 | 757,508.40 | 0.00 | 0.00 | $409,812 | $0 |

## Property Roll Value History

| Year | Improvements | Land Market | Ag Valuation | Appraised | HS Cap Loss | Assessed |
|---|---|---|---|---|---|---|
| 2025 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2024 | $0 | $409,812 | $0 | $409,812 | $0 | $409,812 |
| 2023 | $0 | $363,700 | $0 | $363,700 | $0 | $363,700 |
| 2022 | $0 | $274,000 | $0 | $274,000 | $0 | $274,000 |
| 2021 | $0 | $208,680 | $0 | $208,680 | $0 | $208,680 |
| 2020 | $0 | $208,680 | $0 | $208,680 | $0 | $208,680 |
| 2019 | $0 | $148,200 | $0 | $148,200 | $0 | $148,200 |
| 2018 | $0 | $109,900 | $0 | $109,900 | $0 | $109,900 |
| 2017 | $0 | $109,900 | $0 | $109,900 | $0 | $109,900 |
| 2016 | $0 | $109,900 | $0 | $109,900 | $0 | $109,900 |

## Property Deed History

| Deed Date | Type | Description | Grantor | Grantee | Volume | Page | Number |
|---|---|---|---|---|---|---|---|
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | 4794 | 242 | 9659 |
| 12/15/2014 | WD | WARRANTY DEED | NCI ASSETS HOLDING COMPANY LLC | NLA ASSETS LLC | 4794 | 260 | 9661 |
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ASSETS HOLDING COMPANY LLC | 4794 | 251 | 9660 |

# Kaufman CAD Property Search

## Property Details

| | | | |
|---|---|---|---|
| **Account** | | | |
| **Property ID:** | 75256 | **Geographic ID:** 00.3699.0000.0002.00.06.06 | |
| **Type:** | R | **Zoning:** | |
| **Property Use:** | | **Condo:** | |
| **Location** | | | |
| **Situs Address:** | I 20 TX | | |
| **Map ID:** | D4-D-4 | **Mapsco:** | |
| **Legal Description:** | TERRELL CHRISTIAN ACADEMY, LOT 2 | | |
| **Abstract/Subdivision:** | S3699 | | |
| **Neighborhood:** | (28-001) Terrell ISD | | |
| **Owner** | | | |
| **Owner ID:** | 197251 | | |
| **Name:** | NLA ASSETS LLC | | |
| **Agent:** | 9252 | | |
| **Mailing Address:** | 6716 GLENHURST DR<br>DALLAS, TX 75254 | | |
| **% Ownership:** | 100.0% | | |
| **Exemptions:** | For privacy reasons not all exemptions are shown online. | | |

## Property Values

| | |
|---|---|
| **Improvement Homesite Value:** | $0 (+) |
| **Improvement Non-Homesite Value:** | $0 (+) |
| **Land Homesite Value:** | $0 (+) |
| **Land Non-Homesite Value:** | $0 (+) |
| **Agricultural Market Valuation:** | $0 (+) |
| **Market Value:** | $0 (=) |
| **Agricultural Value Loss:** | $0 (-) |
| **Appraised Value:** | $0 (=) |
| **HS Cap Loss:** | $0 (-) |
| **Circuit Breaker:** | $0 (-) |
| **Assessed Value:** | $0 |

| | |
|---|---|
| **Ag Use Value:** | $0 |

Information provided for research purposes only. Legal descriptions and acreage amounts are for Appraisal District use only and should be verified prior to using for legal purpose and or documents. Please contact the Appraisal District to verify all information for accuracy.

## Property Taxing Jurisdiction

**Owner:** NLA ASSETS LLC **%Ownership:** 100.0%

| Entity | Description | Market Value | Taxable Value | Freeze Ceiling |
|---|---|---|---|---|
| CT | CITY OF TERRELL | $807,439 | N/A | |
| KC | KAUFMAN COUNTY | $807,439 | N/A | |
| ST | TERRELL ISD | $807,439 | N/A | |
| TV | TRINITY VALLEY CC | $807,439 | N/A | |
| P1 | PRECINCT 1 | $807,439 | N/A | |
| RB | ROAD & BRIDGE | $807,439 | N/A | |
| CAD | KAUFMAN CAD | $807,439 | N/A | |

## Property Land

| Type | Description | Acreage | Sqft | Eff Front | Eff Depth | Market Value | Prod. Value |
|---|---|---|---|---|---|---|---|
| UNDEVLND | UNDEVELOPED LAND | 14.83 | 645,951.24 | 0.00 | 5.00 | $807,439 | $0 |

## Property Roll Value History

| Year | Improvements | Land Market | Ag Valuation | Appraised | HS Cap Loss | Assessed |
|---|---|---|---|---|---|---|
| 2025 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2024 | $0 | $807,439 | $0 | $807,439 | $0 | $807,439 |
| 2023 | $0 | $783,200 | $0 | $783,200 | $0 | $783,200 |
| 2022 | $0 | $807,439 | $0 | $807,439 | $0 | $807,439 |
| 2021 | $0 | $645,950 | $0 | $645,950 | $0 | $645,950 |
| 2020 | $0 | $645,950 | $0 | $645,950 | $0 | $645,950 |
| 2019 | $0 | $575,000 | $0 | $575,000 | $0 | $575,000 |
| 2018 | $0 | $575,000 | $0 | $575,000 | $0 | $575,000 |
| 2017 | $0 | $575,000 | $0 | $575,000 | $0 | $575,000 |
| 2016 | $0 | $575,000 | $0 | $575,000 | $0 | $575,000 |

## Property Deed History

| Deed Date | Type | Description | Grantor | Grantee | Volume | Page | Number |
|---|---|---|---|---|---|---|---|
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | 4794 | 242 | 9659 |
| 12/15/2014 | WD | WARRANTY DEED | NCI ASSETS HOLDING COMPANY LLC | NLA ASSETS LLC | 4794 | 260 | 9661 |
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ASSETS HOLDING COMPANY LLC | 4794 | 251 | 9660 |

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC
@TarrantCoTax

V5.5

DISCOVER VISA mastercard AMERICAN EXPRESS

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

**STATEMENT DATE:** **05/29/2025** **TAX STATEMENT 2024+**
**ACCOUNT:** **00000933422**
LEGAL: FIELDS HILLSIDE ADDITION BLOCK V
LOT 2

OWNER: NCI FORT WORTH LAND LLC
PARCEL ADDRESS: 0001019 W PEACH ST
EXEMPTION CODES: TF001

PIDN: 13780 V 2
ACRES: 0.1148

| LAND VALUE | APPRAISED VALUE | | | | |
|---|---|---|---|---|---|
| 125,000 | 125,000 | | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | **BASE TAX** | **PENALTY & INTEREST** |
|---|---|---|---|---|---|
| FT WORTH CITY | 0 | 125,000 | 0.672500 | 840.63 | 0.00 |
| TARRANT COUNTY | 0 | 125,000 | 0.187500 | 234.38 | 0.00 |
| REG WATER DIST | 0 | 125,000 | 0.026700 | 33.38 | 0.00 |
| T C HOSPITAL | 0 | 125,000 | 0.182500 | 228.13 | 0.00 |
| T C COLLEGE | 0 | 125,000 | 0.112280 | 140.35 | 0.00 |
| CFW PID #1 | 0 | 125,000 | 0.130000 | 162.50 | 0.00 |
| FT WORTH ISD | 0 | 125,000 | 1.062400 | 1328.00 | 0.00 |
| | | | SUBTOTAL | 2,967.37 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |

**YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER**

NCI FORT WORTH LAND LLC

RETURN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933422 2024+

13780----V----2 TC

NCI FORT WORTH LAND LLC
6716 GLENHURST DR
DALLAS TX 75254

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE TO PAY NOW

00000933422 0000000000 0000000000 0000000000 0529202500000

012125 369

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC
@TarrantCoTax

V5.5

**IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE PAYMENT OF THESE TAXES.**

**TOTAL AMOUNT DUE** 0.00

****YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER****

NCI FORT WORTH LAND LLC

RETURN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933422 2024+

13780----V----2 TC

NCI FORT WORTH LAND LLC
6716 GLENHURST DR
DALLAS TX 75254

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE TO PAY NOW

00000933422 0000000000 0000000000 0000000000 0529202500000

012126 370

**CONFIDENTIAL**

TDIT003636

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC
@TarrantCoTax

V5.5

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

**STATEMENT DATE:** **025 95 0/ 2** **TAX STATEMENT / 0/ 4+**
**ACCOUNT:** **00000933430**
LEGAL: FIELDS HILLSIDE ADDITION BLOCK V
LOT 2

OWNER: NCI FORT WORTH LAND LLC
PARCEL ADDRESS: 0001015 W PEACH ST
EXEMPTION CODES: TF001

PIDN: 12780 V 2
ACRES: 0.1148

| LAND VAL3E | APPRAISED VAL3E | | | | |
|---|---|---|---|---|---|
| 1$5,000 | 1$5,000 | | | | |

| TAXING ENTITIES | EXEMPTION AMO3NT | TAXABLE VAL3E | TAX RATE PER U100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| FT WORTH CITY | 0 | 1$5,000 | 0.67$500 | 840.62 | 0.00 |
| TARRANT CO3NTY | 0 | 1$5,000 | 0.187500 | $24.28 | 0.00 |
| REG WATER DIST | 0 | 1$5,000 | 0.0$6700 | 22.28 | 0.00 |
| T C HOSPITAL | 0 | 1$5,000 | 0.18$500 | $$8.12 | 0.00 |
| T C COLLEGE | 0 | 1$5,000 | 0.11$$80 | 140.25 | 0.00 |
| CFW PID #1 | 0 | 1$5,000 | 0.120000 | 16$.50 | 0.00 |
| FT WORTH ISD | 0 | 1$5,000 | 1.06$400 | 12$8.00 | 0.00 |
| | | | S3BTOTAL | $,967.27 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |

****YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER****

NCI FORT WORTH LAND LLC

RET3RN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933430 2024+

12780----V----2 TC

NCI FORT WORTH LAND LLC
6716 GLENH3RST DR
DALLAS TX 75$54

| IF PAID IN | AMOUNT DUE |
|---|---|
| J3N | 0.00 |
| J3L | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE
TO PAY NOW

00000933430 00000000000 00000000000 00000000000 0529202500000

012127 371

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC
@TarrantCoTax

V5.5

**IF YOU ARE 62 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE PAYMENT OF THESE TAXES.**

**TOTAL AMOUNT DUE** 0.00

****YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER****

NCI FORT WORTH LAND LLC

RET3 RN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933430 2024+

12780----V----2 TC

NCI FORT WORTH LAND LLC
6716 GLENH3 RST DR
DALLAS TX 75$54

| IF PAID IN | AMOUNT DUE |
|---|---|
| J3 N | 0.00 |
| J3 L | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE TO PAY NOW

00000933430 0000000000 0000000000 0000000000 0529202500000

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC
@TarrantCoTax

V5.5

**STATEMENT DATE:** **025 95 0/ 2** **TAX STATEMENT / 0/ 4+**
**ACCOUNT:** **00000933449**
LEGAL: FIELDS BILLSIDE ADDITION KLOC2 V
LOT 4

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

OWNER: NCI FORT WORTB LAND LLC
PARCEL ADDRESS: 000101HW PEACB ST
EXEMPTION CODES: TF001

PIDN: 1H780 V 4
ACRES: 0.1148

| LAND VAL3E | APPRAISED VAL3E | | | | |
|---|---|---|---|---|---|
| 1$5,000 | 1$5,000 | | | | |

| TAXING ENTITIES | EXEMPTION AMO3NT | TAXAKLE VAL3E | TAX RATE PER U100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| FT WORTB CITY | 0 | 1$5,000 | 0.67$500 | 840.6H | 0.00 |
| TARRANT CO3NTY | 0 | 1$5,000 | 0.187500 | $H4.H8 | 0.00 |
| REG WATER DIST | 0 | 1$5,000 | 0.0$6700 | HH.H8 | 0.00 |
| T C BOSPITAL | 0 | 1$5,000 | 0.18$500 | $$8.1H | 0.00 |
| T C COLLEGE | 0 | 1$5,000 | 0.11$$80 | 140.H5 | 0.00 |
| CFW PID #1 | 0 | 1$5,000 | 0.1H0000 | 16$.50 | 0.00 |
| FT WORTB ISD | 0 | 1$5,000 | 1.06$400 | 1H$8.00 | 0.00 |
| | | | S3KTOTAL | $,967.H7 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |

**YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER**

NCI FORT WORTB LAND LLC

RET3RN WITB PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933449 2024+

1H780----V----4 TC

NCI FORT WORTB LAND LLC
6716 GLENB3RST DR
DALLAS TX 75$54

| IF PAID IN | AMOUNT DUE |
|---|---|
| J3N | 0.00 |
| J3L | 0.00 |

Make checks payable to:
RIC2 D. KARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE TO PAY NOW

00000933449 0000000000 0000000000 0000000000 0529202500000

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC
@TarrantCoTax

V5.5

**IF YOU ARE 62 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE PAYMENT OF THESE TAXES.**

**TOTAL AMOUNT DUE** 0.00

****YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER****

NCI FORT WORTB LAND LLC

RET3RN WITB PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933449 2024+

1H780----V----4 TC

NCI FORT WORTB LAND LLC
6716 GLENB3RST DR
DALLAS TX 75$54

| IF PAID IN | AMOUNT DUE |
| --- | --- |
| J3N | 0.00 |
| J3L | 0.00 |

Make checks payable to:
RIC2 D. KARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE TO PAY NOW

00000933449 0000000000 0000000000 0000000000 0529202500000

012130 374

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC
@TarrantCoTax

V5.5

**STATEMENT DATE:** **07/14/2025** **TAX STATEMENT 2024+**
**ACCOUNT:** **00000933457**
LEGAL: FIELDS HILLSIDE ADDITION BLOCK V
LOT 5

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

OWNER: NCI FORT WORTH LAND LLC
PARCEL ADDRESS: 0001009 W PEACH ST
EXEMPTION CODES: TF001

PIDN: 13780 V 5
ACRES: 0.1148

| LAND VALUE | APPRAISED VALUE | | | | |
|---|---|---|---|---|---|
| 125,000 | 125,000 | | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| FT WORTH CITY | 0 | 125,000 | 0.672500 | 840.63 | 0.00 |
| TARRANT COUNTY | 0 | 125,000 | 0.187500 | 234.38 | 0.00 |
| REG WATER DIST | 0 | 125,000 | 0.026700 | 33.38 | 0.00 |
| T C HOSPITAL | 0 | 125,000 | 0.182500 | 228.13 | 0.00 |
| T C COLLEGE | 0 | 125,000 | 0.112280 | 140.35 | 0.00 |
| CFW PID #1 | 0 | 125,000 | 0.130000 | 162.50 | 0.00 |
| FT WORTH ISD | 0 | 125,000 | 1.062400 | 1328.00 | 0.00 |
| | | | SUBTOTAL | 2,967.37 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |

**YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER**

NCI FORT WORTH LAND LLC

RETURN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933457 2024+

13780----V----5 TC

NCI FORT WORTH LAND LLC
6716 GLENHURST DR
DALLAS TX 75254

| IF PAID IN | AMOUNT DUE |
|---|---|
| AUG | 0.00 |
| SEP | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE TO PAY NOW

00000933457 0000000000 0000000000 0000000000 0714202500000

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC

@TarrantCoTax

V5.5

**IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE PAYMENT OF THESE TAXES.**

**TOTAL AMOUNT DUE** 0.00

****YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER****

NCI FORT WORTH LAND LLC

RETURN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933457 2024+

13780----V----5 TC

NCI FORT WORTH LAND LLC
6716 GLENHURST DR
DALLAS TX 75254

| IF PAID IN | AMOUNT DUE |
|---|---|
| AUG | 0.00 |
| SEP | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE TO PAY NOW

00000933457 00000000000 00000000000 00000000000 0714202500000

012132 376

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC
@TarrantCoTax

V5.5

**STATEMENT DATE:** **05/29/2025** **TAX STATEMENT 2024+**
**ACCOUNT:** **00000933538**
LEGAL: FIELDS KILLSIDE ADDITION HLOC2 V
LOT 13

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

OWNER: NCI FORT WORTK LAND LLC
PARCEL ADDRESS: 0001014 W HLBFF ST
EXEMPTION CODES: TF001

PIDN: 1U780 V 13 A
ACRES: 0.1148

| LAND VALBE | APPRAISED VALBE | | | | |
|---|---|---|---|---|---|
| 135,000 | 135,000 | | | | |

| TAXING ENTITIES | EXEMPTION AMOBNT | TAXAHLE VALBE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| FT WORTK CITY | 0 | 135,000 | 0.673500 | 840.6U | 0.00 |
| TARRANT COBNTY | 0 | 135,000 | 0.187500 | 3U4.U8 | 0.00 |
| REG WATER DIST | 0 | 135,000 | 0.036700 | UU.U8 | 0.00 |
| T C KOSPITAL | 0 | 135,000 | 0.183500 | 338.1U | 0.00 |
| T C COLLEGE | 0 | 135,000 | 0.113380 | 140.U5 | 0.00 |
| CFW PID #1 | 0 | 135,000 | 0.1U0000 | 163.50 | 0.00 |
| FT WORTK ISD | 0 | 135,000 | 1.063400 | 1U38.00 | 0.00 |
| | | | SBHTOTAL | 3,967.U7 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |

**YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER**

NCI FORT WORTK LAND LLC

RETBRN WITK PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933538 2024+

1U780----V---13---A TC

NCI FORT WORTK LAND LLC
6716 GLENKBRST DR
DALLAS TX 75354

| IF PAID IN | AMOUNT DUE |
|---|---|
| JBN | 0.00 |
| JBL | 0.00 |

Make checks payable to:
RIC2 D. HARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE TO PAY NOW

00000933538 00000000000 00000000000 00000000000 0529202500000

012133 377

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC

@TarrantCoTax

V5.5

**IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE PAYMENT OF THESE TAXES.**

**TOTAL AMOUNT DUE** 0.00

****YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER****

NCI FORT WORTK LAND LLC

RETBRN WITK PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933538 2024+

1U780----V---13---A TC

NCI FORT WORTK LAND LLC
6716 GLENKBRST DR
DALLAS TX 75354

| IF PAID IN | AMOUNT DUE |
| --- | --- |
| JBN | 0.00 |
| JBL | 0.00 |

Make checks payable to:
RIC2 D. HARNES, TAX ASSESSOR-COLLECTOR

SCAN BARCODE TO PAY NOW

00000933538 00000000000 00000000000 00000000000 0529202500000

**Scott Grigg**
**Tax Assessor\Collector**
**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**

**Physical Location:**
**2300 Bloomdale Road Ste. 2324**
**McKinney, TX 75071**
**Ph: 972-547-5020**

**TAX STATEMENT 2024+**

1
V1.1

**STATEMENT DATE:** **05/29/2025**
**ACCOUNT:** **R94480A000002**

LEGAL: TWIN CREEKS BLK A LOT 1

OWNER: NCI STEWART CREEK LLC
PARCEL ADDRESS: ROCK CREEK LN
EXEMPTION CODES:

PIDN: 2-630601
ACRES: 45.732

| NON-HOMESITE VAL | APPRAISED VALUE | | | | |
|---|---|---|---|---|---|
| 796,834 | 796,834 | | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | **BASE TAX** | **PENALTY & INTEREST** |
|---|---|---|---|---|---|
| FRISCO CITY | 0 | 796,834 | 0.425517 | 3390.66 | 440.79 |
| | | | SUBTOTAL | 3,390.66 | 440.79 |
| | | | PRIOR YEARS | 11.93 | |
| | | | PENALTY & INTEREST | 440.79 | |
| | | | **TOTAL AMOUNT DUE** | **3,843.38** | |

**IF THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE COLLIN COUNTY TAX OFFICE REGARDING A RIGHT YOU MAY HAVE TO ENTER INTO AN INSTALLMENT AGREEMENT DIRECTLY WITH THE COLLIN COUNTY TAX OFFICE FOR THE PAYMENT OF THESE TAXES.**

*This top portion and your canceled check will serve as your receipt.*

*^ Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

**TOTAL AMOUNT DUE**
**$3,843.38**

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI STEWART CREEK LLC
2-630601

**NOTE: TOTAL SHOWS CURRENT AND PRIOR YEAR TAXES DUE.**
ACCOUNT: R94480A000002 2024+

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 3,911.28 |
| JUL | 4,613.24 |
| AUG | 4,652.32 |
| SEP | 4,691.40 |
| OCT | 4,730.50 |
| NOV | 4,769.58 |

NCI STEWART CREEK LLC
6716 GLENHURST DR
DALLAS TX 75254-8621

20240R94480A00000200003843380000391128000046132400000000000C01

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS

| Primary Business Name: RAND ADVISORS, LLC | CRD Number: 172839 |
|---|---|
| Annual Amendment - All Sections | Rev. 10/2021 |
| 3/17/2025 8:51:05 AM | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A. Your full legal name (if you are a sole proprietor, your last, first, and middle names):
**RAND ADVISORS, LLC**

B. (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
**RAND ADVISORS, LLC**

*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

(2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

*If you check this box, complete a Schedule R for each relying adviser.*

C. If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
☐ your legal name or ☐ your primary business name:

D. (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-80265**
(2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:
(3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

| CIK Number |
|---|
| 1660386 |
| 1660401 |

E. (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **172839**

*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

(2) If you have additional *CRD* Numbers, your additional *CRD* numbers:
No Information Filed

F. *Principal Office and Place of Business*
(1) Address (do not use a P.O. Box):

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| 2101 CEDAR SPRINGS ROAD | | SUITE 1200 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

(2) Days of week that you normally conduct business at your *principal office and place of business:*
◉ Monday - Friday ○ Other:

Normal business hours at this location:
9AM-5PM

(3) Telephone number at this location:
214-908-8130

(4) Facsimile number at this location, if any:

(5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?
0

G. Mailing address, if different from your *principal office and place of business* address:

Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

| | Yes | No |
|---|---|---|
| I. Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)? | ◉ | ○ |

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J. Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name: Other titles, if any:
Telephone number: Facsimile number, if any:
Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:

IRS Employer Identification Number:

K. Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name: Titles:
Telephone number: Facsimile number, if any:
Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

| | Yes | No |
|---|---|---|
| L. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*? | ◉ | ○ |

*If "yes," complete Section 1.L. of Schedule D.*

| | Yes | No |
|---|---|---|
| M. Are you registered with a *foreign financial regulatory authority*? | ○ | ◉ |

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

| | Yes | No |
|---|---|---|
| N. Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934? | ○ | ◉ |

| | Yes | No |
|---|---|---|
| O. Did you have $1 billion or more in assets on the last day of your most recent fiscal year? If yes, what is the approximate amount of your assets: | ○ | ◉ |

$2 billion to less than $10 billion

$10 billion to less than $50 billion

$50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P. Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

**SECTION 1.B. Other Business Names**

No Information Filed

**SECTION 1.F. Other Offices**

No Information Filed

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform: HTTP://WWW.RANDADVISORS.COM/

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
HIGHGATE CONSULTING GROUP INC

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| 2101 CEDAR SPRINGS RD | | SUITE 1200 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

Telephone Number: 214-550-4459

Facsimile number, if any:

This is (check one):

- ○ one of your branch offices or affiliates.
- ◉ a third-party unaffiliated recordkeeper.
- ○ other.

Briefly describe the books and records kept at this location.
ALL BOOKS AND RECORDS OF THE ADVISER

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

**Item 2 SEC Registration / Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A. To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑ (1) are a **large advisory firm** that either:

(a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

(b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐ (2) are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

(a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

(b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

*Click **HERE** for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.*

(3) Reserved

☐ (4) have your *principal office and place of business* **outside the United States**;

☐ (5) are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐ (6) are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐ (7) are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐ (8) are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

*If you check this box, complete* Section 2.A.(8) of Schedule D.

☐ (9) are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days;**

*If you check this box, complete* Section 2.A.(9) of Schedule D.

☐ (10) are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

*If you check this box, complete* Section 2.A.(10) of Schedule D.

☐ (11) are an **Internet adviser** relying on rule 203A-2(e);

*If you check this box, complete* Section 2.A.(11) of Schedule D.

☐ (12) have **received an SEC order** exempting you from the prohibition against registration with the SEC;

*If you check this box, complete* Section 2.A.(12) of Schedule D.

☐ (13) are **no longer eligible** to remain registered with the SEC.

***State Securities Authority Notice Filings* and State Reporting by *Exempt Reporting Advisers***

C. Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |

| | | | |
|---|---|---|---|
| ☐ CA | ☐ KY | ☐ NM | ☐ UT |
| ☐ CO | ☐ LA | ☑ NY | ☐ VT |
| ☐ CT | ☐ ME | ☐ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | |
| ☐ ID | ☐ MT | ☐ RI | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

**SECTION 2.A.(11) Internet Adviser**

If you are relying on rule 203A-2(e), the Internet adviser exemption from the prohibition on registration, you are required to make a representation about your eligibility for SEC registration. By checking the appropriate box, you will be deemed to have made the required representation.

If you are applying for registration as an investment adviser with the SEC or changing your existing Item 2 response regarding your eligibility for SEC registration, you must make this representation:

☐ I will provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

If you are filing an annual updating amendment to your existing registration and are continuing to rely on the Internet adviser exemption for SEC registration, you must make this representation:

☐ I have provided and will continue to provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

**SECTION 2.A.(12) SEC Exemptive *Order***

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:
803-

Date of *order*:

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A. How are you organized?

- ○ Corporation
- ○ Sole Proprietorship
- ○ Limited Liability Partnership (LLP)
- ○ Partnership
- ◉ Limited Liability Company (LLC)
- ○ Limited Partnership (LP)
- ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B. In what month does your fiscal year end each year?
DECEMBER

C. Under the laws of what state or country are you organized?

| State | Country |
|---|---|
| Delaware | United States |

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

**Item 4 Successions**

| | Yes | No |
|---|---|---|
| A. Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)? | ○ | ◉ |

*If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B. Date of Succession: (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

**SECTION 4 Successions**

No Information Filed

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

***Employees***

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

A. Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.

1

B. (1) Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

1

(2) Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

0

(3) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

0

(4) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

0

(5) Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees and count a firm only once – do not count each of the firm's employees that solicit on your behalf.*

**Clients**

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C. (1) To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

0

(2) Approximately what percentage of your *clients* are non-*United States persons*?

0%

D. *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*
*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (1)(d) or (3)(d) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| Type of *Client* | (1) Number of *Client(s)* | (2) Fewer than 5 *Clients* | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | 0 | ☐ | $ 0 |
| (b) *High net worth individuals* | 0 | ☐ | $ 0 |
| (c) Banking or thrift institutions | 0 | ☐ | $ 0 |
| (d) Investment companies | 0 | | $ 0 |
| (e) Business development companies | 0 | | $ 0 |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 153,660,847 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | 0 | ☐ | $ 0 |
| (h) Charitable organizations | 0 | ☐ | $ 0 |
| (i) State or municipal *government entities* (including government pension plans) | 0 | ☐ | $ 0 |
| (j) Other investment advisers | 0 | ☐ | $ 0 |

| | | | |
|---|---|---|---|
| (k) Insurance companies | 0 | ☐ | $ 0 |
| (l) Sovereign wealth funds and foreign official institutions | 0 | ☐ | $ 0 |
| (m) Corporations or other businesses not listed above | 0 | ☐ | $ 0 |
| (n) Other: | 0 | ☐ | $ 0 |

**Compensation Arrangements**

E. You are compensated for your investment advisory services by (check all that apply):

- ☑ (1) A percentage of assets under your management
- ☐ (2) Hourly charges
- ☐ (3) Subscription fees (for a newsletter or periodical)
- ☐ (4) Fixed fees (other than subscription fees)
- ☐ (5) Commissions
- ☐ (6) *Performance-based fees*
- ☐ (7) Other (specify):

**Item 5 Information About Your Advisory Business - Regulatory Assets Under Management**

**Regulatory Assets Under Management**

Yes No

F. (1) Do you provide continuous and regular supervisory or management services to securities portfolios? ◉ Yes ○ No

(2) If yes, what is the amount of your regulatory assets under management and total number of accounts?

| | | U.S. Dollar Amount | | Total Number of Accounts |
|---|---|---|---|---|
| Discretionary: | (a) | $ 153,660,847 | (d) | 80 |
| Non-Discretionary: | (b) | $ 0 | (e) | 0 |
| Total: | (c) | $ 153,660,847 | (f) | 80 |

*Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

(3) What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

$ 0

**Item 5 Information About Your Advisory Business - Advisory Activities**

**Advisory Activities**

G. What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1) Financial planning services
- ☐ (2) Portfolio management for individuals and/or small businesses
- ☐ (3) Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☑ (4) Portfolio management for pooled investment vehicles (other than investment companies)
- ☐ (5) Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☐ (6) Pension consulting services
- ☐ (7) Selection of other advisers (including *private fund* managers)
- ☐ (8) Publication of periodicals or newsletters
- ☐ (9) Security ratings or pricing services
- ☐ (10) Market timing services
- ☐ (11) Educational seminars/workshops
- ☐ (12) Other(specify):

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in Section 5.G.(3) of Schedule D.*

H. If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○ 0
- ○ 1 - 10
- ○ 11 - 25
- ○ 26 - 50
- ○ 51 - 100
- ○ 101 - 250
- ○ 251 - 500
- ○ More than 500

If more than 500, how many?
(round to the nearest 500)

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

| | | Yes | No |
|---|---|---|---|
| I. | (1) Do you participate in a *wrap fee program*? | ○ | ◉ |

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

(a) *sponsor* to a *wrap fee program*
$

(b) portfolio manager for a *wrap fee program*?
$

(c) *sponsor* to and portfolio manager for the same *wrap fee program*?
$

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in Section 5.I.(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

| | | Yes | No |
|---|---|---|---|
| J. | (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ◉ |
| | (2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management? | ○ | ◉ |

K. Separately Managed Account *Clients*

| | Yes | No |
|---|---|---|
| (1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)? | ○ | ◉ |

*If yes, complete Section 5.K.(1) of Schedule D.*

| | Yes | No |
|---|---|---|
| (2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ◉ |

*If yes, complete Section 5.K.(2) of Schedule D.*

| | Yes | No |
|---|---|---|
| (3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ◉ |

*If yes, complete Section 5.K.(2) of Schedule D.*

| | Yes | No |
|---|---|---|
| (4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? | ○ | ◉ |

*If yes, complete Section 5.K.(3) of Schedule D for each custodian.*

L. Marketing Activities

| | Yes | No |
|---|---|---|
| (1) Do any of your *advertisements* include: | | |
| (a) Performance results? | ○ | ◉ |
| (b) A reference to specific investment advice provided by you (as that phrase is used in rule 206(4)-1(a)(5))? | ○ | ◉ |
| (c) *Testimonials* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ◉ |
| (d) *Endorsements* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ◉ |
| (e) *Third-party ratings*? | ○ | ◉ |
| (2) If you answer "yes" to L(1)(c), (d), or (e) above, do you pay or otherwise provide cash or non-cash compensation, directly or indirectly, in connection with the use of *testimonials*, *endorsements*, or *third-party ratings*? | ○ | ○ |
| (3) Do any of your *advertisements* include *hypothetical performance* ? | ○ | ◉ |

(4) Do any of your advertisements include predecessor performance?

## SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies

No Information Filed

## SECTION 5.I.(2) *Wrap Fee Programs*

No Information Filed

## SECTION 5.K.(1) Separately Managed Accounts

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | Mid-year | End of year |
|---|---|---|
| (i) Exchange-Traded Equity Securities | % | % |
| (ii) Non Exchange-Traded Equity Securities | % | % |
| (iii) U.S. Government/Agency Bonds | % | % |
| (iv) U.S. State and Local Bonds | % | % |
| (v) *Sovereign Bonds* | % | % |
| (vi) Investment Grade Corporate Bonds | % | % |
| (vii) Non-Investment Grade Corporate Bonds | % | % |
| (viii) Derivatives | % | % |
| (ix) Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x) Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi) Cash and Cash Equivalents | % | % |
| (xii) Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | End of year |
|---|---|
| (i) Exchange-Traded Equity Securities | % |
| (ii) Non Exchange-Traded Equity Securities | % |
| (iii) U.S. Government/Agency Bonds | % |
| (iv) U.S. State and Local Bonds | % |
| (v) *Sovereign Bonds* | % |
| (vi) Investment Grade Corporate Bonds | % |
| (vii) Non-Investment Grade Corporate Bonds | % |
| (viii) Derivatives | % |
| (ix) Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x) Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development | % |

| | |
|---|---|
| companies) | |
| (xi) Cash and Cash Equivalents | % |
| (xii) Other | % |

Generally describe any assets included in "Other"

**SECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings* and Derivatives**

☑ **No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)**

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a) In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b) In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* |
|---|---|---|
| **Less than 10%** | $ | $ |
| **10-149%** | $ | $ |
| **150% or more** | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

**Item 6 Other Business Activities**

In this Item, we request information about your firm's other business activities.

A. You are actively engaged in business as a (check all that apply):

- ☐ (1) broker-dealer (registered or unregistered)
- ☐ (2) registered representative of a broker-dealer
- ☐ (3) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (4) futures commission merchant
- ☐ (5) real estate broker, dealer, or agent
- ☐ (6) insurance broker or agent
- ☐ (7) bank (including a separately identifiable department or division of a bank)
- ☐ (8) trust company
- ☐ (9) registered municipal advisor
- ☐ (10) registered security-based swap dealer
- ☐ (11) major security-based swap participant
- ☐ (12) accountant or accounting firm
- ☐ (13) lawyer or law firm
- ☐ (14) other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

| | Yes | No |
|---|---|---|
| B. (1) Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ◉ |
| (2) If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

| | Yes | No |
|---|---|---|
| (3) Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ◉ |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

**SECTION 6.B.(3) Description of Other Products and Services**

Describe other products or services you sell to your *client*. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A. This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- ☐ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- ☐ (2) other investment adviser (including financial planners)
- ☐ (3) registered municipal advisor
- ☐ (4) registered security-based swap dealer
- ☐ (5) major security-based swap participant
- ☐ (6) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (7) futures commission merchant
- ☐ (8) banking or thrift institution
- ☐ (9) trust company
- ☐ (10) accountant or accounting firm
- ☐ (11) lawyer or law firm
- ☐ (12) insurance company or agency
- ☐ (13) pension consultant
- ☐ (14) real estate broker or dealer
- ☐ (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- ☐ (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

**SECTION 7.A. Financial Industry Affiliations**

No Information Filed

**Item 7 *Private Fund* Reporting**

| | Yes | No |
|---|---|---|
| B. Are you an adviser to any *private fund*? | ◉ | ○ |

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

**SECTION 7.B.(1) *Private Fund* Reporting**

**Funds per Page:** 15 Total Funds: 2

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:
ATLAS IDF, LP
(b) *Private fund* identification number:
(include the "805-" prefix also)
805-9274628204

2. Under the laws of what state or country is the *private fund* organized:

State: Delaware
Country: United States

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| ATLAS IDF GP, LLC |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

No Information Filed

4. The *private fund* (check all that apply; you must check at least one):
- [ ] (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
- [x] (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

No Information Filed

6. (a) Is this a "master fund" in a master-feeder arrangement? Yes ○ No ◉
(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

No Information Filed

(c) Is this a "feeder fund" in a master-feeder arrangement? Yes ○ No ◉
(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

| | | Yes | No |
|---|---|---|---|
| 8. | (a) Is this *private fund* a "fund of funds"? | ○ | ◉ |
| | NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies. | | |
| | (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

| | | Yes | No |
|---|---|---|---|
| 9. | During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ◉ |

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ◉ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 29,902,788

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

2

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

| | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

| | | Yes | No |
|---|---|---|---|
| 17. | (a) Are you a subadviser to this *private fund*? | ○ | ◉ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

No Information Filed

| | | Yes | No |
|---|---|---|---|
| 18. | (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

No Information Filed

| | | Yes | No |
|---|---|---|---|
| 19. | Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

Yes No

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? ◉ Yes ○ No

22. If yes, provide the *private fund's* Form D file number (if any):

No Information Filed

B. SERVICE PROVIDERS

**Auditors**

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? ◉ Yes ○ No

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? ◉ Yes ○ No

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

COHEN & CO.

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

(d) Is the auditing firm an *independent public accountant*? ◉ Yes ○ No

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board? ◉ Yes ○ No

If yes, Public Company Accounting Oversight Board-Assigned Number:

925

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? ◉ Yes ○ No

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? ◉ Yes ○ No

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

24. (a) Does the *private fund* use one or more prime brokers? ○ Yes ◉ No

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? ◉ Yes ○ No

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
US BANK

(c) Primary business name of custodian:
US BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

(e) Is the custodian a *related person* of your firm? Yes ○ No ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

Administrator

26. (a) Does the *private fund* use an administrator other than your firm? Yes ◉ No ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

(d) Is the administrator a *related person* of your firm? Yes ○ No ◉

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors) ○ Some (provided to some but not all investors) ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
100%
Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

Marketers

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? Yes ○ No ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

RAND PE FUND I, L.P.

(b) *Private fund* identification number:
(include the "805-" prefix also)

805-7357834832

2. Under the laws of what state or country is the *private fund* organized:

| State: | Country: |
|---|---|
| Delaware | United States |

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| RAND PE FUND MANAGEMENT, LLC |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

No Information Filed

4. The *private fund* (check all that apply; you must check at least one):

☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

No Information Filed

Yes No

6. (a) Is this a "master fund" in a master-feeder arrangement? ○ Yes ◉ No

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

No Information Filed

Yes No

(c) Is this a "feeder fund" in a master-feeder arrangement? ○ Yes ◉ No

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their

assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

8. (a) Is this *private fund* a "fund of funds"? [Yes ○ No ●]

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? [Yes ○ No ○]

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? [Yes ○ No ●]

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ● private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 0

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

3

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

(b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? [Yes ● No ○]

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

17. (a) Are you a subadviser to this *private fund*? [Yes ○ No ●]

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

No Information Filed

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? [Yes ○ No ●]

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

No Information Filed

19. Are your *clients* solicited to invest in the *private fund*? [Yes ○ No ●]

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

| | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ◉ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

No Information Filed

B. SERVICE PROVIDERS

**Auditors**

| | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

COHEN & CO

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

| | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:

925

| | Yes | No |
|---|---|---|
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ◉ | ○ |

| | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

| | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

| | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(c) Primary business name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ◉ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 69862
CRD Number (if any):
285852

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

Administrator

| | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ◉ | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

| | Yes | No |
|---|---|---|
| (d) Is the administrator a *related person* of your firm? | ○ | ◉ |

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors) ○ Some (provided to some but not all investors) ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
100%
Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

Marketers

Yes No

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? ○ ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

**Funds per Page:** 15 Total Funds: 2

**SECTION 7.B.(2) *Private Fund* Reporting**

1. Name of the *private fund*:
RAND ADVISORS SERIES I INSURANCE FUND SERIES INTERESTS OF THE SALI MULTISERIES

2. *Private fund* identification number:
(include the "805-" prefix also)
805-9425927696

3. Name and SEC File number of adviser that provides information about this *private fund* in Section 7.B.(1) of Schedule D of its Form ADV filing
Name:
SALI FUND SERVICES
SEC File Number:
801 - 61702

Yes No

4. Are your *clients* solicited to invest in this *private fund*? ○ ◉

In answering this question, disregard feeder funds' investment in a master fund. For purposes of this question, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**Proprietary Interest in *Client* Transactions**

A. Do you or any *related person*: Yes No

(1) buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? ○ ◉

(2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? ◉ ○

(3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? ◉ ○

**Sales Interest in *Client* Transactions**

B. Do you or any *related person*: Yes No

(1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? ○ ◉

(2) recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? ◉ ○

(3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? ○ ◉

**Investment or Brokerage Discretion**

C. Do you or any *related person* have *discretionary authority* to determine the: Yes No

(1) securities to be bought or sold for a *client's* account? ◉ ○

(2) amount of securities to be bought or sold for a *client's* account? — Yes: ◉ No: ○

(3) broker or dealer to be used for a purchase or sale of securities for a *client's* account? — Yes: ◉ No: ○

(4) commission rates to be paid to a broker or dealer for a *client's* securities transactions? — Yes: ◉ No: ○

D. If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*? — Yes: ○ No: ◉

E. Do you or any *related person* recommend brokers or dealers to *clients*? — Yes: ◉ No: ○

F. If you answer "yes" to E. above, are any of the brokers or dealers *related persons*? — Yes: ○ No: ◉

G. (1) Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions? — Yes: ◉ No: ○

(2) If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934? — Yes: ◉ No: ○

H. (1) Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals? — Yes: ○ No: ◉

(2) Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)? — Yes: ○ No: ◉

I. Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals? — Yes: ○ No: ◉

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

**Item 9 Custody**

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

A. (1) Do you have *custody* of any advisory *clients'*: **Yes No**

(a) cash or bank accounts? — Yes: ◉ No: ○

(b) securities? — Yes: ◉ No: ○

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ 153,649,022 | (b) 3 |

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

B. (1) In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*: **Yes No**

(a) cash or bank accounts? — Yes: ○ No: ◉

(b) securities? — Yes: ○ No: ◉

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody*:

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ | (b) |

C. If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

(1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage. ☐

(2) An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements ☑

are distributed to the investors in the pools.

(3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities. ☐

(4) An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities. ☐

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

D. Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?

| | Yes | No |
|---|---|---|
| (1) you act as a qualified custodian | ○ | ◉ |
| (2) your *related person(s)* act as qualified custodian(s) | ○ | ◉ |

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:

F. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons,* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients?*
2

**SECTION 9.C. *Independent Public Accountant***

No Information Filed

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

| | Yes | No |
|---|---|---|
| A. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ◉ |

*If yes, complete Section 10.A. of Schedule D.*

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

**SECTION 10.A. *Control Persons***

No Information Filed

**SECTION 10.B. *Control Person* Public Reporting Companies**

No Information Filed

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you.

If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

| | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ◉ |

For "yes" answers to the following questions, complete a Criminal Action DRP:

| | Yes | No |
|---|---|---|
| A. In the past ten years, have you or any *advisory affiliate*: | | |
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ◉ |
| (2) been *charged* with any *felony*? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

| | Yes | No |
|---|---|---|
| B. In the past ten years, have you or any *advisory affiliate*: | | |
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ◉ |
| (2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

For "yes" answers to the following questions, complete a Regulatory Action DRP:

| | Yes | No |
|---|---|---|
| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ◉ |
| (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ◉ |
| D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | | |
| (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ◉ |
| (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ◉ |
| (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ◉ |
| (5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ◉ |
| E. Has any *self-regulatory organization* or commodities exchange ever: | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? | ○ | ◉ |
| F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? | ○ | ◉ |
| G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? | ○ | ◉ |

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

| | Yes | No |
|---|---|---|
| H. (1) Has any domestic or foreign court: | | |

(a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? ○ ◉

(b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? ○ ◉

(c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*? ○ ◉

(2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)? ○ ◉

**Item 12 Small Businesses**

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

| | Yes | No |
|---|---|---|
| A. Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |
| *If "yes," you do not need to answer Items 12.B. and 12.C.* | | |
| B. Do you: | | |
| (1) *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| C. Are you: | | |
| (1) *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

**Schedule A**

**Direct Owners and Executive Officers**

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.
   (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;
   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and
   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.
3. Do you have any indirect owners to be reported on Schedule B? ◉ Yes ○ No
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.
5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are: NA - less than 5%; B - 10% but less than 25%; D - 50% but less than 75%; A - 5% but less than 10%; C - 25% but less than 50%; E - 75% or more
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does

not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| CHARITABLE DAF HOLDINGS CORP. | DE | OWNER | 08/2022 | E | Y | N | |
| Patrick, Mark | I | CCO | 08/2022 | NA | Y | N | 7626259 |

**Schedule B**

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.
2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:
   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.
3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.
5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are: C - 25% but less than 50% E - 75% or more
   D - 50% but less than 75% F - Other (general partner, trustee, or elected manager)
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| LIBERTY CLO HOLDCO, LTD. | FE | CHARITABLE DAF HOLDINGS CORP. | OWNER OF CHARITABLE DAF HOLDINGS CORP. | 04/2023 | E | Y | N | |
| CHARITABLE DAF HOLDCO LTD. | FE | LIBERTY CLO HOLDCO, LTD. | OWNER OF CHARITABLE DAF FUND, L.P. | 11/2011 | E | Y | N | |
| CDH GP, LTD | DE | LIBERTY CLO HOLDCO, LTD. | GNEREAL PARTNER OF CHARITABLE DAF FUND, L.P | 03/2024 | F | Y | N | |
| Patrick, Mark | I | CDH GP, LTD | SOLE OWNER AND SOLE DIRECTOR OF CDH GP, LTD. | 03/2024 | E | Y | N | 7626259 |

**Schedule D - Miscellaneous**

You may use the space below to explain a response to an Item or to provide any other information.

**Schedule R**

No Information Filed

**DRP Pages**

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients. If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

| | Yes | No |
|---|---|---|
| Are you exempt from delivering a brochure to all of your clients under these rules? | ○ | ◉ |

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 400181 | ADV PART 2A | Private funds or pools |
| 409351 | ADV PART 2 | Private funds or pools |

**Part 3**

| CRS | Type(s) | Affiliate Info | Retire |
|---|---|---|---|

There are no CRS filings to display.

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

### Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

### Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:
SHAWN RAVER

Date: MM/DD/YYYY
03/17/2025

Printed Name:
SHAWN RAVER

Title:
OPERATIONS

Adviser *CRD* Number:
172839

**NON-RESIDENT INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature: Date: MM/DD/YYYY
Printed Name: Title:
Adviser *CRD* Number:
172839

# FORM ADV PART 2A

# RAND ADVISORS, LLC

March 2025

2101 Cedar Springs Road, Suite 1200
Dallas, TX 75201
www.RANDADVISORS.com
(214) 288-9555

This brochure provides information about the qualifications and business practices of Rand Advisors, LLC. If you have any questions about the contents of this brochure, please contact us at mpatrick@randadvisors.com. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority. Additional information about Rand Advisors, LLC is also available at the Securities and Exchange Commission's website www.adviserinfo.sec.gov. Our registration as an investment adviser does not imply any level of skill or training.

## ITEM 2. MATERIAL CHANGES

As of our last annual amendment filing on March 4, 2024, we have no material changes to disclose.

We will ensure that you receive a summary of any material changes to this and subsequent brochures within 120 days of the close of our fiscal year, which is December 31st. We will provide other ongoing disclosure information about material changes as they occur. We will also provide you with information on how to obtain the complete brochure. Currently, our brochure may be requested at any time, without charge, by contacting Mark Patrick at (214) 908-8130.

# ITEM 3. TABLE OF CONTENTS


ITEM 1. COVER PAGE ..... i

ITEM 2. MATERIAL CHANGES ..... ii

ITEM 3. TABLE OF CONTENTS ..... iii

ITEM 4. ADVISORY BUSINESS ..... 1

ITEM 5. FEES AND COMPENSATION ..... 2

ITEM 6. PERFORMANCE-BASED FEES ..... 4

ITEM 7. TYPES OF CLIENTS ..... 5

ITEM 8. METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS ..... 6

ITEM 9. DISCIPLINARY INFORMATION ..... 9

ITEM 10. OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS ..... 10

ITEM 11. CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING ..... 11

ITEM 12. BROKERAGE PRACTICES ..... 16

ITEM 13. REVIEW OF ACCOUNTS ..... 18

ITEM 14. CLIENT REFERRALS AND OTHER COMPENSATION ..... 19

ITEM 15. CUSTODY ..... 20

ITEM 16. INVESTMENT DISCRETION ..... 21

ITEM 17. VOTING CLIENT SECURITIES ..... 22

ITEM 18. FINANCIAL INFORMATION ..... 23

# ITEM 4. ADVISORY BUSINESS

We are the sub-adviser to Rand Advisors Series I Insurance Fund (the "Rand Fund"), and adviser to the Rand PE Fund I, L.P. (the "Rand PE Fund") and Atlas IDF, LP (the "Atlas Fund") (all such entities shall collectively be referred to as the "Funds" or "Clients"), all of which are unregistered investment funds. The Rand Fund held its initial offering in October 2013. The Rand PE Fund and the Atlas Fund were funded in 2015.

OWNERSHIP

Rand Advisors, LLC ("Rand," "Adviser", "we" or "us") is owned 100% by Charitable DAF Holdings Corp. and was founded in 2013 by John Honis.

TYPES OF ADVISORY SERVICES

The Funds are our sole advisory clients at this time. The Funds seek to achieve their respective investment objectives primarily through the strategies described in "ITEM 8. METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS" and in the Private Placement Memoranda (each, a "PPM") for each Fund.

REGULATORY ASSETS UNDER MANAGEMENT

As of December 31, 2024, the amount of our total discretionary regulatory assets under management was $153,660,847.

All assets are managed on a discretionary basis.

# ITEM 5. FEES AND COMPENSATION

For providing investment advisory services, Rand typically charges the Client a management fee and other fees as necessary and agreed to (including, but not limited to, expenses related to servicing accounts, such as administration and legal services). Fees may be deducted directly from the Funds.

We have entered into a shared services agreement with Highgate Consulting Group Inc., d.b.a Skyview ("HCG or "Highgate"). Please refer to the PPM for each Fund for a list of services to be provided by HCG.

The Funds incur brokerage and other transaction costs associated with Rand's management of Client Accounts. Please see the section titled ITEM 12 Brokerage Practices of this ADV Part 2 for a discussion of Rand's brokerage practices.

FEE SCHEDULE

Please refer to the PPM or other applicable offering documents for each of the Funds for a detailed description of fees, expenses and use of proceeds.

UNREGISTERED INVESTMENT FUNDS

As compensation for our advisory services, each of the Funds typically pays Rand management fees based on each Fund's agreements. Management fees are based upon outstanding capital accounts or amounts of committed capital. In some cases, certain investors in one Fund may pay a different fee than others based on the terms of their agreement with Rand.

In addition to management fees, brokerage and transaction costs, investors in the Funds will indirectly bear the fees and expenses paid by the Funds, including custody fees, administration, legal, audit and tax preparation fees, overhead allocation, and certain other fees and expenses. Each of the Fund's PPM's or offering documents include more detailed information about the fees and expenses paid by each of the Funds.

OTHER COMPENSATION

Fund Accounts may hold significant positions, individually or collectively, in the securities issued by a company. Accordingly, Rand may have the right to appoint a board member or officer for such company. Rand may appoint an employee or a third party to such position as it sees fit in the best interest of Rand and the Funds. Employees are permitted to retain all compensation received for such positions except to the extent contrary to the governing documents for one or more Fund Accounts, in which case the proportion of such compensation related to such Fund Account(s) will be paid to those Account(s) (generally in proportion to relative assets of the Fund Account as of the date paid).

In addition, to the extent permitted by the offering and/or governing documents of the applicable advised accounts, Rand and/or its affiliates receive other fees for services provided to portfolio companies, provided such fees are on arms-length terms. See also ITEM 10 Other Financial Industry Activities and Affiliations.

We have established procedures designed to address possible conflicts of interest that such board or officer positions might present, including requiring authorization from the Chief Compliance Officer prior to an officer or employee serving as a board member. As a result of such activities, Rand may acquire confidential information, which may restrict Fund Accounts from transacting in certain securities. As a result, we may not initiate a transaction on behalf of Clients which we otherwise might have.

## ITEM 6. PERFORMANCE-BASED FEES

At this time, we do not charge any performance-based or incentive-based fees or allocations. These are fees or allocations based on a share of capital gains on, or capital appreciation of, the assets of the client.

Case 3:26-cv-02496-D Document 17-3 Filed 09/08/26 Page 463 of 1493 PageID 13222

## ITEM 7. TYPES OF CLIENTS

Our sole advisory clients are the Atlas IDF, Rand PE Fund 1 and the Rand Series 1 Fund, all being limited partnerships.

# ITEM 8. METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS

INVESTMENT STRATEGY

The items below are general descriptions of the types of investment strategies we currently utilize, although we may add or subtract from this list based on various factors including macro-economic conditions.

INVESTMENT STRATEGIES

***The Rand Series 1 Fund***

*Bank Loan Strategy*

Rand's bank loan strategy seeks to generate attractive absolute returns by opportunistically making investments across the capital structure, with a core focus in senior secured bank loans. The bank loan strategy is long-biased and U.S. focused.

*Structured Finance Investments*

Rand invests in various structured finance instruments, including collateralized loan obligations and collateralized debt obligations. The rate of return on the structured finance instrument may be determined by applying a multiplier to the rate of total return on the reference loan or loans. Application of a multiplier is comparable to the use of financial leverage, a speculative technique. Leverage magnifies the potential for gain and the risk of loss, because of a relatively small decline in the value of a reference loan could result in a relatively large loss for the value of a structured finance instrument.

Please see the PPM for the Rand Series 1 Fund for a complete description of the investment objectives and strategies of the fund.

***The Rand PE Fund 1***

The Rand PE Fund's strategy is to invest in small- to medium-sized companies that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions.

Please see the PPM for the Rand Series 1 Fund for a complete description of the investment objectives and strategies of the fund.

***The Atlas IDF Fund***

> The Atlas Fund's strategy may include investing in long and short equity positions, arbitrage, bank loans, cash, fixed income securities, high yield bonds, derivative transactions, foreign investments, companies, money market instruments, collateralized loan obligations and currency hedging. Please see the PPM for the Rand PE Fund 1 for a complete description of the investment objectives and strategies of the fund.
>
> Please see the PPM for the Atlas IDF Fund for a complete description of the investment objectives and strategies of the fund.

METHOD OF ANALYSIS

The investment process used by Rand to evaluate potential investments employs a combination of rigorous qualitative (issuer, portfolio and legal considerations) and quantitative (structural, cash flow, collateral valuation and pricing/relative value) analysis. Rand uses a proprietary quantitative analytical tool and 3rd party software in connection with gathering information on investments. The sell discipline is largely enforced by ongoing monitoring of individual names.

Other sources of information include obtaining and reviewing due diligence packages prepared by debt issuers and underwriters of institutional private placements and meetings with management of issuers.

MATERIAL RISKS OF SIGNIFICANT STRATEGIES

Some, but not necessarily all, of the risks involved in the strategies used by Rand in order to meet the stated investment objectives in the Funds include:

- Credit
- Illiquid Securities
- Inflation
- Investment in Distressed Assets
- Investments in Structured Finance Instruments
- Investments in Senior Secured Loans
- Maturity
- Market or Interest Rates
- Valuation of Portfolio Holdings
- Competition
- Volatility
- Market Liquidity

- Over-the-Counter-Trading
- Leverage

MATERIAL RISKS OF METHODS OF ANALYSIS

Qualitative Analysis – The major risk involved with qualitative analysis is that it is subjective in nature; assigning probability and impacts to risks is a subjective exercise.

Quantitative Analysis – The major risk involved with the use of quantitative risk analysis is the limited availability of data. Therefore, any lack of data concerning the structure, cash flow, collateral valuation and pricing/relative value of the underlying investment can restrict the Adviser's ability to perform thorough research into the suitability of the investment for the Funds.

Please refer to the PPM or other offering documents for each Fund for a complete description of the risks involved with the investment strategies of the Funds.

## ITEM 9. DISCIPLINARY INFORMATION

We do not have any information to disclose concerning the Adviser or John Honis, Mark Patrick or Shawn Raver. We adhere to high ethical standards.

Case 3:26-cv-02496-D Document 17-31 Filed 09/08/24 Page 468 of 1493 PageID 13227

## ITEM 10. OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

We have no industry activities or affiliations to disclose. Additional information regarding potential conflicts of interest is provided in Item 11 Code of Ethics, Participation or Interest in Client Transactions and Personal Trading and the Conflicts of Interest description in the PPM or offering documents for each of the Funds.

# ITEM 11. CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

We maintain a policy of strict compliance with the highest standards of ethical business conduct and the provisions of applicable federal securities laws, including rules and regulations promulgated by the SEC, and have adopted policies and procedures described in our Code of Ethics. The Code of Ethics applies to each of our "access persons" as defined in the U.S. Investment Advisers Act of 1940. It is designed to ensure compliance with legal requirements of our standard of business conduct.

A complete copy of our Code of Ethics is available to any client or prospective client upon request.

STANDARDS OF CONDUCT

We and our access persons are expected to comply with all applicable federal and state laws and regulations. Access persons are expected to adhere to the highest standards of ethical conduct and maintain confidentiality of all information obtained with respect to client matters and bring any risk issues, violations, or potential violations to the attention of our Chief Compliance Officer. Access persons are expected to deal with clients fairly and disclose any activity that may create an actual or potential conflict of interest between them and us or any client.

ETHICAL BUSINESS PRACTICES

Falsification or alteration of records or reports, also known as a prohibited financial practice, or knowingly approving such conduct is prohibited. Payments to government officials or employees are prohibited except for political contributions approved by our Chief Compliance Officer. We seek to outperform our competition fairly and honestly and seek competitive advantages through superior performance not illegal or unethical dealings. Access persons are strictly prohibited from (i) participating in online blogging and communication with the media, and (ii) spreading of false rumors pertaining to any publicly traded company.

CONFIDENTIALITY

Access persons must maintain the confidentiality of our proprietary and confidential information and that of our clients, and must not disclose that information unless the necessary approval is obtained. We have a particular duty and responsibility, as investment adviser, to safeguard client information. Information concerning the identity and transactions of investors is confidential, and such information will only be disclosed to those access persons and outside parties who need to know it in order to fulfill their responsibilities.

GIFT AND ENTERTAINMENT POLICY

Access persons are permitted, on occasion, to accept gifts and invitations to attend entertainment events. When doing so, however, employees should always act in our best interests and that of our clients and should avoid any activity that might create an actual or perceived conflict of interest or impropriety in the course of our business relationships. Under no circumstances may (i) gifts of cash or cash equivalents be accepted or (ii) any gifts be received in consideration or recognition of any services provided to, or transactions entered into by, Client Accounts.

PERSONAL TRADING

*Personal Trading Policy*

Access persons are allowed to trade reportable securities. Access persons are not permitted to trade any security of which we or a Client own any portion of the capital structure or that is on our restricted list without permission. Access persons who violate the personal trading policy are reprimanded in accordance with the sanctions provisions outlined in the Code of Ethics. Personal securities transactions are reviewed by the Chief Compliance Officer or his/her designee for compliance with the personal trading policy and applicable SEC rules and regulations.

*Prohibition against Insider Trading*

We forbid any access person from trading, either personally or on behalf of others, including the Funds, on material non-public information or communicating material non-public information to others in violation of the law or duty owed to another party. This conduct is frequently referred to as "insider trading". The concepts of material non-public information, penalties for insider trading, and processes for identifying insider trading are addressed in detail in the Compliance Manual and Code of Ethics.

*Reporting Requirements*

In compliance with SEC rules, access persons are required to disclose all of their reportable securities holdings within 10 days of becoming an access person, within 10 days of opening a new account, and annually thereafter. Additionally, at the end of each month after quarter-end, all access persons must report all transactions in reportable securities over which the access person had any direct or indirect beneficial ownership. Access persons are also required annually to affirm all reportable transactions from the prior year.

POTENTIAL CONFLICTS

Rand and its affiliates may engage in a broad range of activities, including activities for their own account and for the accounts of the Clients. This section describes various potential conflicts that may arise in respect of its business, as well as how Rand addresses such conflicts of interest. The discussion below does not describe all conflicts that may arise.

Any of the potential conflicts of interest will be discussed and resolved on a case by case basis. Rand's determination as to which factors are relevant, and the resolution of such conflicts, will be made using Rand's best judgment, but in its sole discretion. In resolving conflicts, Rand will take into consideration the interests of the relevant clients, the circumstances giving rise to the conflict and applicable laws.

Certain procedures for resolving specific conflicts of interest are set forth below. The following list is not all inclusive and for a complete description of the conflicts of interest for a particular Fund, please read the applicable PPM or offering documents.

*Allocation of Investment Opportunities*

Rand may act as investment adviser to clients that have similar investment objectives and pursue similar strategies. Certain investments identified by Rand may be appropriate for multiple clients. Investment decisions for such clients are made by Rand in its best judgment, but in its discretion, taking into account such factors as Rand believes relevant. Such factors may include investment objectives, regulatory restrictions, current holdings, availability of cash for investment, the size of investments generally, and limitations and restrictions on a Client's Account that are imposed by such client.

*Conflicts Related to Investment Activities*

Rand has an incentive to allocate assets into vehicles that produce the greatest fees for Rand. Each of these situations give rise to a potential conflict of interest in the allocation of investment opportunities. As previously described, Rand has adopted trade allocation policies and procedures that seek to ensure fair and equitable access to investment opportunities for all accounts.

*Trade Aggregation*

In some circumstances, Rand may seek to buy or sell the same securities contemporaneously for multiple client accounts. Rand may, in appropriate circumstances aggregate securities trades for a client with similar trades for other clients, but is not required to do so. In particular, Rand may determine not to aggregate transactions that relate to portfolio management decisions that are made independently for different accounts or if Rand and/or its affiliates determine that aggregation is not practicable, not required or inconsistent with client direction.

*Errors*

Rand's responsibility for its trade errors is set forth in the governing documents for the relevant Fund. No soft-dollars may be used to satisfy any trade errors. In addition, Rand may not use the securities in one client's account to settle the trade error in another client's account.

*Conflicts Related to Valuation*

Rand may have a role in determining asset values with respect to client accounts and may be required to price an asset when a market price is unavailable or unreliable. This may give rise to a conflict of interest because Rand may be paid an asset-based fee on certain client accounts. In order to mitigate these conflicts, Rand and its affiliates determine asset values in accordance with valuation procedures, which generally are set forth in Rand's Compliance Manual.

*Other Potential Conflicts*

Rand or its affiliates may invest (or recommend that one of the Funds invest) in securities issued by one of the Funds and may hedge derivative positions by buying or selling securities issued by one of the Funds. A potential conflict may arise in such circumstances because Rand may be incentivized to favor one Fund that issues securities over the Fund on whose behalf Rand is making the investment. In addition to the Funds, some of Rand's service providers are issuers of securities. Rand may determine that it is in the best interests of one of the Funds to purchase securities issued by one of these entities. Rand has adopted policies and procedures designed to address conflicts of interest arising from the foregoing activities. Furthermore, it is Rand's general policy not to take into account the fact that an issuer is a client, service provider or vendor when making investment decisions.

Certain qualified employees and affiliates may invest in the Funds either through general partner entities or as limited partners, shareholders or otherwise. Rand generally reduces or waives all or a portion of the management fee related to the investments by such persons.

*Conflicts Related to Information Possessed by or Provided by Rand*

Certain persons within Rand or its affiliates may receive or create information (*e.g.*, proprietary technical models) that is not generally available to the public. Rand has no obligation to provide such information to any of the Funds or effect transactions for any of the Funds on the basis of such information and in many cases Rand or its affiliates will be prohibited from trading for the Funds based on the information. Similarly, one Fund may have access to information regarding Rand's transactions or views that is not available to one of the other Funds, and may act on that information through accounts managed by persons other than Rand or its affiliates. Such

transactions may negatively impact other clients (*e.g.*, through market movements or decreasing availability or liquidity of securities).

# ITEM 12. BROKERAGE PRACTICES

BROKER-DEALER SELECTION

Rand has an obligation to obtain "best execution" for Client transactions considering the execution price and overall commission costs paid and certain other factors. Our trading desk route orders to various broker-dealers for execution at their discretion. Where possible, we deal directly with the dealers who make a market in the securities involved, except in those circumstances where it believes better prices and execution are available elsewhere.

Factors involved in selecting brokerage firms include such factors as:

*Broker Specific*

- Size of broker
- Reputation
- Quality of service
- Experience
- Financial stability and creditworthiness
- Financial statements
- Regulatory filings
- Standing in financial community
- Ability to handle block trades
- Acceptable record of delivery and payment on past transactions
- Quality of research and investment information provided

*Transaction Specific*

- Best available execution
- Market knowledge regarding specific industries and securities
- Access to sources of supply or markets
- Nature of the market for the security

THE APPROVAL PROCESS

Rand's trading desk is only allowed to trade with approved broker-dealers.

If a Fund Account is under the custody of one brokerage firm and another brokerage firm is a selling group member for an underwriting syndicate, such a Client Account may not be able to participate in the purchase of securities in the underwriting because the custodial

brokerage firm was not a selling group member. In addition, to the extent that a Client directs brokerage trades to be placed with a particular broker, the allocation of securities transactions may be impacted.

DIRECTED BROKERAGE

Due to the nature of the Adviser's business, Rand does not currently allow directed brokerage.

TRADE AGGREGATION

Rand does not have any separately managed accounts. Please see Item 11 Code of Ethics, Participation or Interest in Client Transactions, and Personal Trading and the PPM and offering documents for each Fund for additional information regarding Rand's trade aggregation procedures.

## ITEM 13. REVIEW OF ACCOUNTS

We provide reporting as agreed with each of our Clients. Please refer to the PPM or offering documents for each Fund for a description of the reporting practices for each Fund.

# ITEM 14. CLIENT REFERRALS AND OTHER COMPENSATION

Rand may pay compensation to a third-party/broker-dealer who refer prospective investors to us. Prior to paying such referral fees, we will verify that the third party is appropriately registered to receive such compensation. Please refer to the PPM or offering documents for each of the Funds for information regarding client referrals.

## ITEM 15. CUSTODY

Because the Advisor is under common control with the general partner of the Atlas IDF, Rand PE 1 and Rand Series 1 funds, we may be deemed to have custody of those Funds' assets. Assets for which we have custody are held only at qualified custodians and in accordance with applicable regulations. These regulations require us to maintain Fund assets with a qualified custodian in a separate account for each Fund under each Fund's name. The Funds' securities and other assets are held in the custody or US Bank and State Street.

## ITEM 16. INVESTMENT DISCRETION

We intend to manage the Funds on a discretionary basis. For a description of limitations imposed on our discretionary authority to manage securities, please see Item 4 Advisory Business and the PPM or offering documents for each Fund.

All investors of the Funds must complete the subscription documentation we required in order to accept an investment, which may include a joinder to the applicable governing documents of the vehicle. This documentation includes an authorization granting us investment discretion for the Funds.

# ITEM 17. VOTING CLIENT SECURITIES

SECURITIES HELD IN CLIENT ACCOUNTS

Rand's proxy voting policy ensures proxies are voted on behalf of each Fund Account's securities and in the best economic interests of such Fund Account, without regard to the interests of Rand or any other Fund under Rand's management. Rand evaluates the subject matter of each proxy and votes on behalf of the Fund Account in accordance to the guidelines set forth in our proxy voting policy.

If Rand determines that there is a potential material conflict of interest in voting a proxy, it will abstain from voting. Rand also may determine not to vote proxies with respect to securities of any issuer if it determines it would be in its Client's overall best interests not to vote.

OBTAINING A COPY OF THE POLICY

Clients and prospective clients can obtain a copy of the proxy voting policy or information on how we voted proxies by contacting our Chief Compliance Officer at mpatrick@randadvisors.com.

## ITEM 18. FINANCIAL INFORMATION

We are required to provide you with certain financial information or disclosures about our financial condition. We have no financial commitment that would impair our ability to meet any contractual and fiduciary commitments to you, our client. We have not been the subject of any bankruptcy proceedings.

In no event shall we charge advisory fees that are both in excess of twelve hundred dollars and more than six months in advance of advisory services rendered.

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:06 PM 12/09/2024
FILED 04:06 PM 12/09/2024
SR 20244432762 - File Number 10030937

# CERTIFICATE OF INCORPORATION
OF
DFW CHARITABLE FOUNDATION
a nonprofit nonstock corporation

I.

The name of the Corporation is DFW Charitable Foundation.

II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

IV.

A. The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person. It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B. In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

VI.

A. No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

B. Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

VII.

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

VIII.

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

IX.

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

/s/ Douglas Mancino
Douglas Mancino, Incorporator

**Rachel Baxendale**

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 05 February 2024 1:20 PM
**To:** Philip Aubry
**Cc:** Geoffrey Sykes; Bart Higgins
**Subject:** FW: Cayman GP
**Attachments:** image001.png

**[this message is from an external sender]**

FYI

SHIELDS LEGAL GROUP

**BRANDON R. SCHALLER**
**Attorney**
16400 Dallas Parkway, Suite 300
Dallas, Texas 75248
Direct: (469) 726-3055
Email: bschaller@shieldslegal.com

**Legal Solutions. Business Insight. Your Trusted Advisor.**

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Monday, February 5, 2024 12:18 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Shawn Raver <sraver@hotmail.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Re: Cayman GP

CAUTION: This email originated from outside of the organization.

Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.

On Mon, Feb 5, 2024, 11:43 AM Brandon R. Schaller <bschaller@shieldslegal.com> wrote:

> Mark,
>
> Question from Walkers. Do you want the new Cayman GP to be a Cayman LLC or an exempted company?

# Before






012195

CONFIDENTIAL

439
TDIT003705

# Current – DAF Holdco




012196

Docusign Envelope ID: 11CD8132-6630-49A0-A1FE-D8548E9451F8

November 11, 2024

**From**: Highland Dallas Foundation, Inc.
Highland Kansas City Foundation, Inc.
Highland Santa Barbara Foundation, Inc.

**To**: Mr. Paul Murphy
Director of Charitable DAF HoldCo, Ltd.
and Charitable DAF Holdings Corp.
paul@gkmanagement.com.ky

Dear Mr. Murphy:

We write to you collectively on behalf of the following organizations:

1. Highland Dallas Foundation, Inc., a participation shareholder in Charitable DAF HoldCo, Ltd., of which you are a director along with Mark Patrick. As you know, Mr. Patrick also is the managing member of the Charitable DAF GP, LLC, which governs the related Charitable DAF Fund, LP.

2. Highland Kansas City Foundation, Inc., also a participation shareholder in Charitable DAF HoldCo, Ltd.

3. Highland Santa Barbara Foundation, Inc., also a participation shareholder in Charitable DAF Holdco, Ltd.

Highland Dallas Foundation, Inc is a supporting organization of The Dallas Foundation. Highland Kansas City Foundation, Inc. is a supporting organization of Greater Kansas City Community Foundation. Highland Santa Barbara Foundation, Inc. is a supporting organization of Santa Barbara Foundation. The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (collectively the "Foundations") have worked closely with their respective supporting organizations named above to award grants and funding to a wide range of charitable causes that have made tangible, lasting impacts on the communities they serve. Our primary commitment has been, and always will be, our concern for the community, respect for donors, thoughtful giving, and careful investing—core values that have guided each of us throughout our existence.

With these core values and with the well-being of these Foundations in mind, we write you to voice that we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "DAF-related entities"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable. Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner

workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities.

Thank you for your attention to this matter. Our counsel with the law firm of Holland & Knight LLP is copied on this letter should you have any questions.

Sincerely yours,

HIGHLAND DALLAS FOUNDATION, INC.

Signed by:
By: [signature]
5C324EA088434F5...
Julie Diaz
Vice President

HIGHLAND KANSAS CITY FOUNDATION, INC.

DocuSigned by:
By: Deborah L Wilkerson
77ED433BB136439...
Debbie Wilkerson
Vice President

HIGHLAND SANTA BARBARA FOUNDATION, INC.

DocuSigned by:
By: Jackie Carrera
Jacqueline M. Carrera
Secretary and Treasurer

cc: David M. Rosenberg
(via email at david.rosenberg@hklaw.com)

Michael Stockham
(via email at michael.stockham@hklaw.com)

**Rachel Baxendale**

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** 26 November 2024 6:32 PM
**To:** Mark Patrick; Geoffrey Sykes
**Cc:** Brandon R. Schaller; dmancino@seyfarth.com; Shawn Raver; Bart Higgins; Lauren Vernon; Philip Aubry; Barnaby Gowrie
**Subject:** RE: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Thanks for this Geoffry,

Mark, I'll let Walkers come back but here are my thoughts:

1. Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful that they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management/revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground to claim just and equitable grounds.

2. Management shareholders have a right to object to the winding up but they have no special status by virtue of being management shares. I'll have to double check the docs but this would be different if there were something in the articles of association/share issuance agreement where there was an explicit provision where they had agreed not to present a winding up petition. The just and equitable ground is specifically designed to prevent unfair prejudice to a shareholder.

3. I think our main point is to stress that if they take any action they significantly undermine Donderro's position in the bankruptcy and UBS action because he will be seen as the alter ego of DAF as they've always claimed. Additionally, taking steps to preserve independence improves the DAFs standing in those proceedings. This isn't related to the advice but something for the call next week.

Paul.

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 5:43 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Paul Murphy <paul@gkmanagement.com.ky>; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

Another consideration,  is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceedong? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.

On Tue, Nov 26, 2024, 4:26 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

> Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP. As a limited partner, Holdco cannot force the partnership to wind its affairs?
>
> On Tue, Nov 26, 2024, 4:11 PM Mark Patrick <mpatrick@dafholdco.com> wrote:
>
>> If new participating shares are issued to a new non-profit, and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help? Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.
>>
>> On Tue, Nov 26, 2024, 3:34 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:
>>
>>> Hi Brandon
>>>
>>> Thanks for your time on the phone last week and the below.
>>>
>>> As discussed, please see attached in draft the high priority memo as updated with a new Section E in respect of winding up petitions on the just and equitable ground.
>>>
>>> We look forward to speaking with you tomorrow morning.
>>>
>>> Best regards,
>>>
>>> **Geoffrey Sykes**
>>> Associate
>>> **Walkers (Cayman) LLP**
>>>
>>> **T** +1 345 814 6834 | **M** +1 345 814 6834
>>> www.walkersglobal.com
>>>
>>> Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore
>>>
>>> ---
>>>
>>> **From:** Brandon R. Schaller <bschaller@shieldslegal.com>
>>> **Sent:** Friday, November 22, 2024 1:36 PM
>>> **To:** dmancino@seyfarth.com; Philip Aubry <Philip.Aubry@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
>>> **Cc:** Paul Murphy <paul@gkmanagement.com.ky>; mpatrick@dafholdco.com; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
>>> **Subject:** DAF - Participating Shares Summary

**[this message is from an external sender]**

---

Doug and Walkers team,

As discussed, here are our notes from a review of the provisions applicable to Participating Shares in the Articles for Charitable DAF HoldCo, Ltd. As you know, we are not licensed in the Cayman Islands, so we would appreciate Walkers' help to confirm/expand our views.

**Rights of Participating Shares*:**

Rights

1. Participate (receive) discretionary dividends. See "Participating Share" and Articles generally.
2. If new shares/classes are issued, and the change would materially adversely vary the Participating Shares, then 2/3rds Participating Shareholder consent is required. See #13.
   a. Issuance of authorized but unissued Participating Shares (i.e., dilution of existing shareholders) makes this consent right contingent on outstanding shares. See #14 and #7.
3. Rights to assets in a winding up in accordance with the waterfall. See #122-124.
4. Certain foundations own 100 Participating Shares out of a total of authorized 4,999,900 Participating Shares. See #7.

No rights

1. Cannot vote shares. See #12.
2. Cannot redeem shares. See "Participating Shares."
3. No rights to information. See #12.
4. No rights to attend meetings. See #12.
5. No rights to notice of meetings. See #12.
6. No rights to pro rata distributions based on % of Participating Shares. See #105.
7. No rights to appoint or remove directors or officers. See Articles generally and #65.
8. No rights to receive notice of issuance of additional shares. See Articles generally.
9. No rights to receive notice of distributions to other Participating Shareholders. See Articles generally.
10. No pre-emptive rights. See Articles generally.

Restrictions

1. If a Participating Shareholder is (i) in breach of any law, (ii) is not a non-profit, or (iii) the directors are of the opinion such Shareholder might result in the Company incurring additional liability, including for legal reasons, the directors may require such Shareholder to transfer its shares. See #21. *Walkers to review.*
2. May be diluted by the directors issuing additional Participating Shares. See #8.
   a. Including additional pari passu shares. See #14.
   b. Dilution may, ultimately, affect the ability of the existing Participating Shareholders to consent to changes to the rights attached to the Participating Shares. See #14, #7, and Articles generally.

*Suggest the foundations confirm that they have the latest version of the Articles (attached). We suspect they do not.

Best regards,

Brandon

**Brandon R. Schaller**

ATTORNEY

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

**Rachel Baxendale**

**From:** Barnaby Gowrie
**Sent:** 27 November 2024 9:09 AM
**To:** Mark Patrick; Paul Murphy
**Cc:** Geoffrey Sykes; Brandon R. Schaller; dmancino@seyfarth.com; Shawn Raver; Bart Higgins; Lauren Vernon; Philip Aubry
**Subject:** RE: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]
**Attachments:** Aquapoint L.P. v Xiaohu Fan (CICA (Civil) Appeal No. 14 of 2022).pdf; In the matter of Sigma Finance Corporation (Cause No. FSD 171 of 2024 (DDJ) 19 July 2024).pdf

Hi Mark, Paul

Thanks for your emails. Our answers to Mark's questions are as follows, and we generally agree with Paul's comments in respect of them:

1. *If new participating shares are issued to a new non-profit, and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help?*
   a. Yes, if other shareholders are opposed to an equitable winding up that will be taken into consideration and would likely help. However, it may not be determinative – the question will still be whether, in all of the circumstances, it is just and equitable for the company to be wound up.

2. *Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.*
   a. The right to seek a winding up order on the just and equitable ground is provided by legislation (see the Companies Act (2023 Revision) sections 92(e)) and 95(3)).

3. *Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP. As a limited partner, Holdco cannot force the partnership to wind its affairs?*
   a. As a limited partner of Charitable DAF Fund LP, Charitable DAF HoldCo Ltd does have standing to present a petition seeking the winding up of Charitable DAF Fund LP, including on the just and equitable basis.

4. *Another consideration, is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceeding? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.*
   a. As above, on the hearing of a winding up petition on the just and equitable ground, the question will be whether, in all of the circumstances, it is just and equitable for the company to be wound up. The rights and views of the holder of the management shares will be relevant to that consideration, but may not be determinative. If a winding up order is made and a liquidator appointed, the rights of the holder of the management shares will be varied in line with relevant legislation and the articles. Noting the meeting tomorrow morning we have not explored this in detail but please let us know if you would like further advice in that regard.

5. *Please provide a couple Cayman Cases where Equitable wind up occurred for my review based on mismanagement, etc. I'd like some context if this procedure is extra ordinary / rare or an action that does occur leading to Cayman Case Law.*
   a. Winding up orders on the just and equitable ground are not extraordinary or rare in the Cayman Islands. Please see attached two Cayman decisions involving winding up orders on the just and equitable ground (noting that partnerships may be wound up on the just and equitable ground under the same provisions as companies, and that the *Aquapoint* decision is currently on appeal to the Judicial Committee of the Privy Council).

Please let us know if you would like anything further before the meeting tomorrow morning.

Best regards,

Barney

**Barnaby Gowrie**
Partner
**Walkers (Cayman) LLP**

**T** +1 345 914 6365 | **M** +1 345 525 3385
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 6:44 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

1. Agreed about the perception.

However, I have been exploring funding a large campus in DFW with a major church building, housing, and conference center, and exhibitions. In addition we been having exploring other large donations in the future on the scale of tens of millions leading to hundreds millions for educational buildings for an existing University in Dallas.

People I have spoken to have suggested I form a non profit now to work these endeavors.

On Tue, Nov 26, 2024, 5:31 PM Paul Murphy <paul@gkmanagement.com.ky> wrote:

> Thanks for this Geoffry,
>
> Mark, I'll let Walkers come back but here are my thoughts:
>
> 1. Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful that they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management/revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground to claim just and equitable grounds.
>
> 2. Management shareholders have a right to object to the winding up but they have no special status by virtue of being management shares. I'll have to double check the docs but this would be different if there were something in the articles of association/share issuance agreement where there was an explicit provision where

they had agreed not to present a winding up petition. The just and equitable ground is specifically designed to prevent unfair prejudice to a shareholder.

3. I think our main point is to stress that if they take any action they significantly undermine Donderro's position in the bankruptcy and UBS action because he will be seen as the alter ego of DAF as they've always claimed. Additionally, taking steps to preserve independence improves the DAFs standing in those proceedings. This isn't related to the advice but something for the call next week.

Paul.

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 5:43 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Paul Murphy <paul@gkmanagement.com.ky>; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

Another consideration, is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceedong? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.

On Tue, Nov 26, 2024, 4:26 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

> Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP. As a limited partner, Holdco cannot force the partnership to wind its affairs?
>
> On Tue, Nov 26, 2024, 4:11 PM Mark Patrick <mpatrick@dafholdco.com> wrote:
>
>> If new participating shares are issued to a new non-profit, and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help? Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.
>>
>> On Tue, Nov 26, 2024, 3:34 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

Hi Brandon

Thanks for your time on the phone last week and the below.

As discussed, please see attached in draft the high priority memo as updated with a new Section E in respect of winding up petitions on the just and equitable ground.

We look forward to speaking with you tomorrow morning.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Friday, November 22, 2024 1:36 PM
**To:** dmancino@seyfarth.com; Philip Aubry <Philip.Aubry@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Paul Murphy <paul@gkmanagement.com.ky>; mpatrick@dafholdco.com; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Participating Shares Summary

**[this message is from an external sender]**

---

Doug and Walkers team,

As discussed, here are our notes from a review of the provisions applicable to Participating Shares in the Articles for Charitable DAF HoldCo, Ltd. As you know, we are not licensed in the Cayman Islands, so we would appreciate Walkers' help to confirm/expand our views.

**Rights of Participating Shares*:**

Rights

1. Participate (receive) discretionary dividends. See "Participating Share" and Articles generally.
2. If new shares/classes are issued, and the change would materially adversely vary the Participating Shares, then 2/3rds Participating Shareholder consent is required. See #13.

    a. Issuance of authorized but unissued Participating Shares (i.e., dilution of existing shareholders) makes this consent right contingent on outstanding shares. See #14 and #7.

3. Rights to assets in a winding up in accordance with the waterfall. See #122-124.
4. Certain foundations own 100 Participating Shares out of a total of authorized 4,999,900 Participating Shares. See #7.

No rights

1. Cannot vote shares. See #12.
2. Cannot redeem shares. See "Participating Shares."
3. No rights to information. See #12.
4. No rights to attend meetings. See #12.
5. No rights to notice of meetings. See #12.
6. No rights to pro rata distributions based on % of Participating Shares. See #105.
7. No rights to appoint or remove directors or officers. See Articles generally and #65.
8. No rights to receive notice of issuance of additional shares. See Articles generally.
9. No rights to receive notice of distributions to other Participating Shareholders. See Articles generally.
10. No pre-emptive rights. See Articles generally.

Restrictions

1. If a Participating Shareholder is (i) in breach of any law, (ii) is not a non-profit, or (iii) the directors are of the opinion such Shareholder might result in the Company incurring additional liability, including for legal reasons, the directors may require such Shareholder to transfer its shares. See #21. *Walkers to review.*
2. May be diluted by the directors issuing additional Participating Shares. See #8.

    a. Including additional pari passu shares. See #14.
    b. Dilution may, ultimately, affect the ability of the existing Participating Shareholders to consent to changes to the rights attached to the Participating Shares. See #14, #7, and Articles generally.

*Suggest the foundations confirm that they have the latest version of the Articles (attached). We suspect they do not.

Best regards,

Brandon

**Brandon R. Schaller**

ATTORNEY

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

---

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

---

**CHARITABLE DAF HOLDCO, LTD**
the ("**Company**")

**Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company**

**1 Declaration of Interests**

**IT IS NOTED THAT** the directors of the Company (each, a "**Director**" and together, the "**Directors**") have declared their respective interests (if any) in the matters contemplated by these resolutions, and any such interest be and is hereby noted, ratified and acknowledged.

**2 Transfer of interest in the Partnership**

2.1 **IT IS NOTED THAT:**

(a) In connection with a corporate restructure of the Company's group, the Company proposes to transfer, convey, assign or otherwise contribute to CDMCFAD, LLC, a Delaware limited liability company (the "**Transferee**"), 100% of the Company's interests in CHARITABLE DAF FUND, LP, an exempted limited partnership established in the Cayman Islands (the "**Partnership**") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liablity company interests in the Transferee (the "**Transfer**").

(b) In connection with the Transfer, the Company proposes to enter into a deed of assignment and assumption (the "**Deed**"), substantially in the form that was circulated to and carefully considered by the Directors, to be entered into by and among the Company, the Transferee and CDH GP, LTD, solely in its capacity as general partner (the "**GP**") of the Partnership, under the terms of which the Company will transfer, convey, assign or otherwise contribute all of its Transferred Interest (as defined in the Deed) to the Transferee on the terms and conditions set out therein.

(c) Section 1.11(a) of the amended and restated limited partnership agreement of the Partnership dated as of 7 November 2011 as amended on 26 July 2022 and as further amended and restated as of 11 March 2024 (as further amended, restated and/or supplemented from time to time) (the "**Partnership Agreement**") provides that a Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner (each term as defined in the Partnership Agreement).

(d) Under the terms of the Deed, it is expected that:

(i) the Transferee will make in favour of the GP and the Company, each representation, as was made by the Company in connection with its admission as a Limited Partner;

(ii) the Transferee will undertake to perform all of the obligations of a Limited Partner and be bound by and receive the benefit of all terms of the Partnership Agreement and replace the Company as a Limited Partner and will assume all the duties, liabilities and obligations, whether past (to the extent permitted by law), present or future, under the Partnership Agreement with respect to the Transferred Interest;

(iii) the GP will: (x) consent to the assignment and assumption contemplated thereby; (y) acknowledge that all requirements and conditions for the Transfer and the admission of the Transferee as a Limited Partner of the Partnership have been satisfied or waived; and (z) certify that the Transferee will, in accordance with Section 1.15 of the Partnership Agreement, be listed in the books and records of the Partnership as a Limited Partner and as sole legal owner of the Transferred Interest;

(iv) the GP will agree to admit the Transferee as a Limited Partner in respect of the Transferred Interest and remove, in accordance with Section 1.15 of the Partnership Agreement, the name of the Company from the register of Limited Partners maintained in respect of the Partnership; and

(v) the Company and Transferee will undertake to jointly and severally indemnify the GP and the Partnership from any expense arising from the transactions contemplated by the Deed or any losses arising from the breach of the Deed or the Partnership Agreement.

(e) All the requirements of the transfer provisions contained in the Partnership Agreement have been or will be either satisfied by the Company and Transferee or waived by the GP.

(f) U.S. tax counsel has advised the Company and its Directors that reorganization of the Company and its subsidiaries pursuant to the Transfer generally would provide the following benefits and protections to the Company, the Partnership, and the Company's subsidiaries (collectively, the "**DAF**"):

(i) The Transfer would help insulate the DAF from exposure to James Dondero and his entities (collectively, "**Dondero**"), who may be at risk of causing the Internal Revenue Service (the "**IRS**") to revoke the tax-exempt status of one or more of the participating shareholders/supporting organizations, which could imperil the assets of the DAF;

(A) Each Internal Revenue Code (the "**IRC**") Section 501(c)(3) organization must be organized and operating primarily for charitable purposes;

(B) Treasury Regulation Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than

an insubstantial part of its activities is not in furtherance of an exempt purpose"; and

(C) An IRC Section 501(c)(3) organization cannot be operated for the benefit of an individual or entity due to the private benefit/private inurement prohibition.

(ii) The Transfer would help reduce the influence of Dondero and, as such, would broaden the charitable scope of DAF for its benefit and the benefit of the public;

(iii) The IRS would look favorably upon any and all attempts for DAF to maintain its influence from "what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement"; and

(iv) Further, due to Dondero's attempts to control the DAF and its assets, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities.

(g) Delaware counsel has advised the Company and its Directors that, as a result of the Transfer, the Transferred Interest shall be held by the Transferee, and that certain Limited Liabiltiy Company Agreement of the Transferee (the "**LLC Agreement**"), along with the Transfer generally, shall provide the following benefits and protections to the Company and the Partnership:

(i) Under Delaware law and the Delaware Limited Liability Compay Act (the "**LLC Act**"), there are very few required adminstrative or other requirements for a limited liablity company that cannot be modified or elimintated in a limited liablity company agreement and therefore, the Company and the Partnership will benefit from the contractual freedom and flexbility to provide for its desired terms under the LLC Agreement;

(ii) As a Delaware limited liability company, the Transferee will be governed by the LLC Act, which unlike the statutes in almost every other jurisidction, is updated annually to stay current based on the needs of companies forming in Delaware and the changing markets, as well as any needed changes due to the results of case law;

(iii) Under the LLC Act, the only required filing in Delaware is a certificate of formation that contains only the name of the company and its registered agent and registered office, therefore maintaining the privacy of the members and managers of the company by allowing them to put their business terms into a limited liablity company agreement that is a private document not avialable to the public;

(iv) Under the LLC Act, and the LLC Agreement, the neither the Company nor the Partnership shall be personally liable for the debts, obligations and liabilities of the Transferee, whether such debts, obligations or liabilities arise in contract, tort or otherwise;

(v) As permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee;

(vi) It will be very difficult to dissolve and terminate the Transferee, with any such voluntary decision requiring the consent of the manager of the Transferee;

(vii) The cost to maintain a limited liability company in Delaware is relatively low, with only a $300 annual state franchise tax and minimal expenses to maintain a Delaware registered agent and registered office;

(viii) Any enforcement action with respect to the LLC Agreement will likely occur in the Delaware Chancery Court, which is known as being one of the most respected and sophisticated business courts in the United States.

2.2 **IT IS HEREBY RESOLVED THAT:**

(a) It is in the best interests of the Company to enter into the Transfer and execute and enter into the Deed and consummate the transactions contemplated thereunder.

(b) A draft of the Deed having been provided to the Directors, the form thereof be approved on behalf of the Company, subject to such amendments and additions thereto as any director, officer or attorney of the Company in his absolute discretion and opinion deems appropriate, the signature of any director, officer or attorney of the Company on the Deed being due evidence for all purposes of his approval of any such amendment or addition and the final terms thereof on behalf of the Company.

(c) The Company do give, make, sign, execute and deliver all such notes, deeds, agreements, letters, notices, certificates, acknowledgments, instructions, fee letters and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any director, officer or attorney of the Company be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Deed and the Company do all other such acts and things as might in the sole opinion and absolute discretion of any director, officer or attorney of the Company be necessary or desirable for the purposes aforesaid.

(d) The Ancillary Documents be in such form as any director, officer or attorney of the Company should in his absolute discretion and sole opinion approve, the signature of any director, officer or attorney of the Company on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company.

(e) The Deed and the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereon of any director, officer or attorney of the Company and the Company deliver and perform the Deed and Ancillary Documents.

(f) Any director, officer or attorney of the Company be and they are hereby authorised to take such further actions as they may consider necessary or convenient to effect the foregoing resolutions.

(g) All prior acts of any of the directors, officers or attorneys of the Company in connection with the foregoing resolutions be and they hereby are confirmed, ratified and approved.

[*Signature Page follows*]

**IN WITNESS WHEREOF** the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

____________________________

Name: **Mark E. Patrick**

Title: Director

____________________________

Name: **Paul Murphy**

Title: Director

**IN WITNESS WHEREOF** the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

______________________________

Name: **Mark E. Patrick**

Title: Director

______________________________

Name: **Paul Murphy**

Title: Director

# Deed of Assignment and Assumption

This Deed of Assignment and Assumption (this "**Deed**") is made on the 18th day of December 2024

**BY AND AMONG:**

(1) **CDH GP, LTD**, a company incorporated under the laws of the Cayman Islands, with registered number 407515, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**General Partner**"), in its capacity as general partner of **CHARITABLE DAF FUND, LP**, an exempted limited partnership formed under the laws of the Cayman Islands, with registered number 53083, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**Partnership**");

(2) **CHARITABLE DAF HOLDCO, LTD**, a company incorporated under the laws of the Cayman Islands, with registered number 263805, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**Transferor**"); and

(3) **CDMCFAD, LLC**, a Delaware limited liability company (the "**Transferee**").

**WHEREAS:**

(A) The General Partner is the general partner of the Partnership which is governed by an amended and restated limited partnership agreement of the Partnership dated as of 7 November 2011 as amended on 26 July 2022 and as further amended and restated as of 11 March 2024 (as further amended, restated and/or supplemented from time to time) (the "**Partnership Agreement**").

(B) Unless otherwise defined, capitalised terms used in this Deed have the meanings given to them in the Partnership Agreement.

(C) In connection with a corporate restructuring of the Transferor's corporate group, the Transferor now wishes to assign to the Transferee the entirety of its interest in the Partnership, together with the rights and obligations attaching thereto (together, the "**Transferred Interest**") for the Consideration (as defined below) to the Transferor, and the Transferee wishes to assume all of the rights and obligations with respect to the Transferred Interest and be admitted to the Partnership, subject to the terms and conditions of this Deed (the "**Assignment**").

(D) The General Partner, whose consent is required for the purpose of the assignment of any interest in the Partnership, hereby provides its consent, subject to the terms and conditions of this Deed.

**NOW IT IS HEREBY AGREED AS FOLLOWS:**

## 1 Assignment of Transferred Interest

1.1 Subject to the terms and conditions of this Deed, the Transferor hereby assigns the Transferred Interest to the Transferee with effect on and from the date of this Deed (the "**Transfer Date**") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liablity company interests in the Transferee (the "**Consideration**") to the Transferor, and without prejudice to its obligations under clause 7 hereof and subject to the remaining terms and conditions of this Deed, the Transferee shall exercise its reasonable best endeavours to facilitate the implementation of the transfer, assignment, conveyance and contribution of the Consideration to the Transferor, with effect as of the date of this Deed.

1.2 Except as expressly provided herein, no further action by any party hereto and no additional document or instrument of transfer shall be required to evidence such assignment, transfer and assumption.

## 2 Undertaking to be Bound and Power of Attorney

2.1 In accordance with the terms of the Partnership Agreement and upon the General Partner giving its consent to the Assignment, and making appropriate entries for the name and details of the Transferee, including as required by sections 1.11(a) and 1.15 of the Partnership Agreement, into the register of Limited Partners, the Transferee undertakes to the General Partner and the Partnership that it will be bound by and have full benefit of all the terms of the Partnership Agreement and this Deed in the place of and instead of the Transferor in respect of the Transferred Interest and will assume all the duties, liabilities and obligations, whether past (to the extent permitted by law), present or future, of the Transferor under the Partnership Agreement with respect to the Transferred Interest as if the Transferee had been a Limited Partner in the Partnership with respect to the Transferred Interest with effect from the date upon which the Transferor became a Limited Partner pursuant to the terms of the Partnership Agreement and for all other purposes under the Partnership Agreement and any other relevant agreements. Furthermore, the General Partner hereby confirms the satisfaction or due waiver by the General Partner of any and all applicable conditions and restrictions set forth in the Partnership Agreement (or any other relevant agreements) to the proposed Assignment.

2.2 Without limitation to clause 2.1 above, the Transferee hereby constitutes, appoints and grants to the General Partner the power of attorney set out in section 6.4 of the Partnership Agreement with effect on and from the Transfer Date.

2.3 The Transferee hereby makes in favour of the General Partner and the Transferee, each representation, as was made by the Transferor in connection with its admission as a Limited Partner.

3 **Distributions and other accrued sums in respect of the Transferred Interest**

3.1 The Transferor agrees that:

(a) on and from the Transfer Date, it shall cease to have any further entitlement to allocations of income or distributions whatsoever or any other rights or benefits in respect of the Transferor's interest in the Partnership (including, for the avoidance of doubt, any dividends which may be payable in connection with the Transferred Shares relating to the period up to the Transfer Date but which may be paid after the Transfer Date) (collectively, the "**Distributions**");

(b) all Distributions payable to the Transferor under the terms of the Partnership Agreement in respect of the Transferred Interest transferred and assigned hereunder and which accrue during, or are payable by reference to, any period prior to the Transfer Date shall be payable to the Transferee; and

(c) any sums paid to the Partnership in connection with its admission as a Limited Partner or other costs or expenses paid in connection with the establishment or ongoing administration of the Partnership shall not be reimbursed.

4 **Accession**

In consideration of the mutual covenants contained herein, the General Partner, Transferor and Transferee hereby agree that, with effect from the Transfer Date, the Transferee shall have the rights and benefits under, and be bound by the provisions of, the Partnership Agreement in respect of the Transferred Interest and all parties, other than the Transferor, shall be bound by the terms of the Partnership Agreement in every way as if the Transferee was named therein in substitution of and for the Transferor.

5 **Approval of General Partner and Updates to Register of Limited Partners**

5.1 In reliance upon the undertakings, representations and warranties given by the Transferor and Transferee (as applicable) under this Deed, the General Partner:

(a) consents, for the purposes of section 1.11 of the Partnership Agreement and for all other purposes, to the transactions contemplated by this Deed;

(b) acknowledges that all requirements and conditions relating to such transactions have been satisfied or waived; and

(c) certifies that the Transferee will be listed in the books and records of the Partnership as a Limited Partner and as sole legal owner of the Transferred Interest in substitution of and for the Transferor; and

shall, on the Transfer Date, promptly:

(d) record the assignment of the Transferred Interest in accordance with applicable law;

(e) admit the Transferee as a Limited Partner in respect of the Transferred Interest; and

(f) remove the name of the Transferor from the register of Limited Partners.

## 6 Indemnification

6.1 The Transferor and the Transferee hereby agree to indemnify and hold the General Partner and the Partnership harmless from any damage, loss, claim or expense resulting from:

(a) the transactions contemplated by this Deed; or

(b) any breach of this Deed or the Partnership Agreement by the Transferor or the Transferree, whether such breach occurred prior to, on or after the Transfer Date.

6.2 The liability of the Transferor and the Transferee under clause 6.1 shall be joint and several.

## 7 Further Assurances

Each of the parties hereto shall, at any time and from time to time, at the request of the other, promptly and duly execute and deliver any and all such further documents and instruments as may be reasonably required for the Transferor and Transferee to obtain the full benefit of the transactions contemplated by this Deed or as may be required pursuant to the Partnership Agreement to complete the substitution of the Transferor by the Transferee as a Limited Partner of the Partnership.

## 8 Miscellaneous

8.1 All words and terms which are defined in the Partnership Agreement and which are used in this Deed shall (where so used, and save only: (a) where otherwise expressly provided; or (b) where the context otherwise requires) have the same meanings as are given to such words and terms in the Partnership Agreement.

8.2 In this Deed, the clause headings are for convenience only and shall not affect the construction of this Deed, words and terms (including defined terms) denoting the singular shall include the plural and vice versa and words importing any gender shall include all genders.

8.3 The Transferor and the Transferee shall jointly and severally be obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses) in connection with the transfer and assignment of the Transferred Interest from the Transferor to the Transferee in accordance with this Deed.

8.4 Neither the Transferor nor the Transferee shall assign all or any part of their rights or obligations under this Deed.

8.5 If any provision of this Deed shall be held to be illegal or unenforceable, the enforceability of the remainder of this Deed shall not be affected.

8.6 This Deed may be signed in any number of counterparts. Any single counterpart or a set of counterparts signed, in either case, by all the parties hereto shall constitute a full and original Deed for all purposes.

8.7 This Deed and the rights of the parties hereto shall be governed by, and interpreted in accordance with, the laws of the Cayman Islands. The parties hereto hereby submit to the non-exclusive jurisdiction of the Cayman Islands courts.

*[signature page to follow]*

**IN WITNESS WHEREOF** the parties have executed and delivered this document as a deed on the date first written above.

*GENERAL PARTNER*

**EXECUTED AND DELIVERED AS A DEED** by

[signature]

Name: Mark E Patrick
Title: Director
for and on behalf of
**CDH GP, LTD.**
as general partner of
**CHARITABLE DAF FUND, LP,**
in the presence of:

[signature]

Name: MaryNell Cash
Title: Witness

*TRANSFEREE*

**EXECUTED AND DELIVERED AS A DEED** by

[signature]

Name: Mark E Patrick
Manager
for and on behalf of
**CDMCFAD, LLC**

in the presence of:

[signature]

Name: MaryNell Cash
Title: Witness

*TRANSFEROR*

**EXECUTED AND DELIVERED AS A DEED** by

[signature]

Name:
Title: Director
for and on behalf of
**CHARITABLE DAF HOLDCO, LTD**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CDMCFAD, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**December 18, 2024**

**TABLE OF CONTENTS**

**Page**

Section 1 Definitions....1

1.1 Specific Definitions....1
1.2 General Usage....5

Section 2 Formation....6

2.1 Formation and Name....6
2.2 Term....6
2.3 Purpose and Scope....6
2.4 Principal Office....7
2.5 Delaware Office and Agent....7
2.6 Admission of Members....7
2.7 Contact Information of the Members....7
2.8 Additional Documents....7
2.9 Title to Property....7

Section 3 Capitalization....7

3.1 Capital Contributions....7
3.2 Limitation on Capital Contributions....8
3.3 Withdrawal and Return of Capital....8
3.4 Loans to the Company....8
3.5 Interest on Capital....8
3.6 Limitation of Liability; Return/Withholding of Certain Distributions....8

Section 4 Profits and Losses....9

4.1 Allocations of Company Profits and Losses....9
4.2 Allocation Adjustments Required to Comply With Section 704(b) of the Code....9
4.3 General Allocation and Capital Account Maintenance Provisions....11
4.4 Nonallocation of Distributions to Increases in Minimum Gain....12
4.5 Allocation of Liabilities....12
4.6 Modifications to Preserve Underlying Economic Objectives....12
4.7 Withholding Taxes....12
4.8 Intent of Allocations/Cash Savings Clause....13

Section 5 Distributions....14

5.1 Distributions....14
5.2 Limitation on Distributions....15

Section 6 Administration; Management....15

6.1 Management Powers and Authority of the Manager ....15
6.2 Designation of Manager ....16
6.3 Manager's Power to Bind the Company ....16
6.4 Action by Members ....16
6.5 No Duties to the Company ....16
6.6 Manager and Member Expenses ....16
6.7 Tax Matters; Partnership Representative ....17
6.8 Records and Financial Statements ....18
6.9 Valuation of Company Assets ....18
6.10 Officers. ....19

Section 7 Transfers and Resignations ....19

7.1 Transfers of Interests ....19
7.2 Resignation/Removal of a Member ....19
7.3 Redemption ....19

Section 8 Dissolution and Liquidation ....19

8.1 Dissolving Events ....19
8.2 Winding Up and Liquidation ....20
8.3 Deficit Restoration/Liability ....21

Section 9 Exculpation; Indemnification ....21

9.1 Exculpation ....21
9.2 Indemnification ....21

Section 10 General Provisions ....22

10.1 Meetings ....22
10.2 Action Without a Meeting ....22
10.3 Entire Agreement ....22
10.4 Amendments ....22
10.5 Counterparts; Binding upon Members ....22
10.6 No Third Party Beneficiaries ....22
10.7 Notices, Consents, Elections, Etc ....23
10.8 Severability ....23
10.9 Governing Law ....23
10.10 Status Under the Act ....23
10.11 Partnership for Tax Purposes Only ....23
10.12 Miscellaneous ....23

SCHEDULE A – Member Information

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# CDMCFAD, LLC

# A DELAWARE LIMITED LIABILITY COMPANY

This Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, is entered into as of December 18, 2024 and is hereby made effective as of the Effective Date (as defined below).

## SECTION 1

## DEFINITIONS

**1.1** ***Specific Definitions***. As used in this Agreement:

***Act*** shall mean the Delaware Limited Liability Company Act, Title 6, Delaware Code, Section 18-101 *et seq*.

***Adjusted Capital Account Deficit*** shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a) The Capital Account shall be increased by any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b) The Capital Account shall be decreased by the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

***Affiliate*** shall mean, with respect to any Person, any other Person with regard to which the Person is controlling, controlled or commonly controlled. For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of a Person, whether through ownership of voting Securities, by agreement, or otherwise.

***Agreement*** shall mean this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, including all schedules, appendices, and exhibits hereto, as amended in accordance with the terms hereof.

***Allocation Percentage*** shall mean, for each Member, the percentage set forth on Schedule A, which shall be adjusted as necessary to reflect the Members' varying interests in the Company. For the avoidance of doubt, the aggregate Allocation Percentages of all Members shall at all times equal one hundred percent (100%).

***Capital Account*** shall mean, for each Member, a separate account that is:

(a) Increased by: (i) the amount of such Member's Capital Contribution and (ii) allocations of Profits to such Member pursuant to Section 4;

(b) Decreased by: (i) the amount of cash distributed to such Member by the Company; (ii) the Fair Market Value of any other property distributed to such Member by the Company (determined as of the time of distribution and net of liabilities secured by such property that the Member assumes or to which the Member's ownership of the property is subject); and (iii) allocations of Losses to such Member pursuant to Section 4;

(c) Otherwise adjusted in accordance with the provisions of this Agreement; and

(d) Revalued in connection with any event described in paragraph (a) of the definition of "Gross Asset Value" to the extent the Manager determines that a revaluation is necessary to preserve the economic arrangement of the Members. In determining the amount of any liability for purposes of subparagraphs (a) and (b) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Treasury Regulations.

Capital Accounts shall be maintained in accordance with Treasury Regulations Section 1.704-1(b) and specifically in a manner consistent with the Member's interest in the Company and the provisions of this Agreement shall be interpreted and applied in a manner consistent with such regulations and intent.

***Capital Contribution*** shall mean, for any Member, the sum of the net amount of cash and the Fair Market Value of any other property (determined as of the time of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by such Member to the capital of the Company. For purposes of this Agreement, each Capital Contribution shall be deemed to have been made at the later of: (i) the Close of Business on the due date of such Capital Contribution as determined in accordance with this Agreement; or (ii) the Close of Business on the date on which such Capital Contribution is actually received by the Company.

***Certificate*** shall mean the Certificate of Formation of the Company, as amended and/or restated from time to time.

***Close of Business*** shall mean 5:00 p.m., local time, in New York, New York.

***Code*** shall mean the United States Internal Revenue Code of 1986, as amended.

***Company*** shall mean CDMCFAD, LLC, a Delaware limited liability company.

***Depreciation*** shall mean, for each Fiscal Year or other period, an amount equal to the federal income tax depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

***Fair Market Value*** shall have the meaning set forth in Section 6.9(b).

***Fiscal Period*** shall mean the Fiscal Year or such shorter period as necessary to take into account the Members' varying interests in the Company.

***Fiscal Year*** shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

***Gross Asset Value*** shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes (except that the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of the asset on the date of contribution), except as follows:

(a) The Gross Asset Value of all Company assets shall be adjusted to equal their respective fair market values upon the occurrence of any of the events listed in Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5); provided, however, that adjustments pursuant to this clause (a) (other than in a liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g)) shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(b) The Gross Asset Value of any Company asset distributed to any Member shall be the Fair Market Value of such asset on the date of distribution.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a) or paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

***Interest*** shall mean, for each Member, the entirety of such Member's rights, duties and limited liability company interest in respect of the Company in such Member's capacity as such (as distinguished from any other capacity such as employee, debtor or creditor) and shall include such Member's right, if any, to vote on Company matters, bind the Company vis-à-vis third parties, or receive distributions as well as such Member's obligation under this Agreement, if any, to provide services, make Capital Contributions or take any other action.

***Manager*** shall mean the Person designated as the Manager in Section 6.2.

***Member*** shall mean those Persons admitted as members under this Agreement as shown on Schedule A as such schedule may be updated from time to time, each in such Person's capacity as a member of the Company. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members.

***Member Minimum Gain*** has the same meaning as the term "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i)(2).

***Member Nonrecourse Deduction*** shall mean an item of loss, expense or deduction attributable to a nonrecourse liability of the Company for which a Member bears the economic risk of loss within the meaning of Treasury Regulations Section 1.704-2(i).

***Minimum Gain*** of the Company or ***Company Minimum Gain*** shall, as provided in Treasury Regulations Section 1.704-2, mean the total amount of gain the Company would realize for federal income tax purposes if it disposed of all assets subject to nonrecourse liability for no consideration other than full satisfaction thereof.

***Person*** shall mean an individual, partnership, corporation, limited liability company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

***Principal Office*** shall have the meaning set forth in Section 2.4.

***Profits*** and ***Losses*** shall mean, for each Fiscal Year or other Fiscal Period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other Fiscal Period, as applicable, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a) Any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to (or subtracted from, as the case may be) such taxable income or loss;

(b) Any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from (or added to, as the case may be) such taxable income or loss;

(c) In the event that the Gross Asset Value of any Company asset is adjusted in accordance with paragraphs (a) or (b) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d) Gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed

by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e) In lieu of the depreciation, amortization and other cost recovery deductions that would otherwise be taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other Fiscal Period, computed in accordance with the definition of "Depreciation" above; and

(f) Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Sections 4.2 or 4.3 shall not be taken into account in computing Profits or Losses.

***Securities*** shall mean debt, equity and synthetic securities of any type.

***Term*** shall have the meaning set forth in Section 2.2. Where not capitalized, "term" shall mean the entire period of the Company's existence, including any period of winding-up and liquidation following the dissolution of the Company pursuant to Section 8.1.

***Title XI 2015 RBA*** shall have the meaning set forth in Section 6.7(d).

***Transfer*** shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

***Treasury Regulations*** shall mean the regulations issued by the United States Treasury Department and relating to a matter arising under the Code.

***Updated Capital Account*** shall mean, with respect to a Member, such Member's Capital Account determined as if, immediately prior to the time of determination, all of the Company's assets had been sold for Fair Market Value and any previously unallocated Profits and Losses had been allocated pursuant to Section 4.

**1.2** ***General Usage***. The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Except where the context clearly requires to the contrary: (i) each reference in this Agreement to a designated "Section," "Schedule," "Exhibit," or "Appendix" is to the corresponding Section, Schedule, Exhibit, or Appendix of or to this Agreement; (ii) instances of gender or entity-specific usage (*e.g.*, "his," "her," "its," "person" or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (iii) the word "or" shall not be applied in its exclusive sense; (iv) "including" shall mean "including, without limitation"; (v) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto; (vi) references to any specific statute or similar codification of law shall mean such statute or other codification as construed, modified, extended or enabled by any applicable binding governmental rules or regulations; (vii) references to "law" shall mean any applicable law, whether embodied in statute, governmental rule or regulation, case law or other legally binding format; (viii) references to "$" or "dollars" shall mean the lawful

currency of the United States; (ix) references to "federal" shall be to laws, agencies or other attributes of the United States (and not to any State or locality thereof); (x) the meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States; (xi) references to "days" shall mean calendar days and references to "business days" shall mean all days other than Saturdays, Sundays and days that are legal holidays in the State of New York; (xii) references to months or years shall be to the actual calendar months or years at issue (taking into account the actual number of days in any such month or year); (xiii) days, business days and times of day shall be determined by reference to local time in New York, New York; and (xiv) the English language version of this Agreement shall govern all questions of interpretation relating to this Agreement, notwithstanding that this Agreement may have been translated into, and executed in, other languages.

## SECTION 2

## FORMATION

**2.1** ***Formation and Name***.

(a) The Members hereby enter into this Agreement and form the Company as a limited liability company in accordance with the Act. Mark Patrick is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware (such filing being hereby approved and ratified in all respects and the time at which the initial Certificate of Formation is filed with the Secretary of State of the State of Delaware, the "**Effective Date**"). Upon the filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, his powers as an "authorized person" of the Company ceased, and the Manager thereupon became the designated "authorized person" of the Company and shall continue as the designated "authorized person" of the Company within the meaning of the Act. The Manager, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware. The Member shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any other jurisdiction in which the Company may wish to conduct business.

(b) The name of the Company shall be "CDMCFAD, LLC."

**2.2** ***Term***. The "Term" of the Company commenced as of the filing of the Certificate with the Secretary of State of the State of Delaware and shall continue until the Company is dissolved and then wound up pursuant to Section 8.1. Except as provided in Section 8.1, the Company shall not be dissolved.

**2.3** ***Purpose and Scope***. Within the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act, as determined by the Manager.

**2.4** ***Principal Office***. The Company shall have a single "Principal Office" which shall at all times be located within the United States. The Principal Office shall be located at such location as may hereafter be determined by the Manager.

**2.5** ***Delaware Office and Agent***. The Company shall maintain a Delaware registered office and agent for service of process as required by the Act. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be, each in accordance with the Act.

**2.6** ***Admission of Members***. Each Person as of the date hereof that has executed this Agreement and whose name is listed under Name and Contact Information on Schedule A, as such Schedule A may be updated from time to time by the Manager, is hereby admitted as a member of the Company. With the consent of the Manager, additional Members may be admitted to the Company from time to time upon each such Person's execution of a counterpart signature page to this Agreement or other joinder agreeing to be bound by the terms of this Agreement.

**2.7** ***Contact Information of the Members***. Set forth below the name of each Member on Schedule A shall be appropriate contact information for such Member. Each Member shall promptly provide the Company with the information required to be set forth for such Member on Schedule A and shall thereafter promptly notify the Company of any change to such information.

**2.8** ***Additional Documents***. The Manager shall cause to be executed, filed, recorded, published, or amended any documents, as the Manager in its reasonable discretion determines to be necessary or advisable: (x) in connection with the formation, operation, dissolution, winding-up, or termination of the Company pursuant to applicable law; or (y) to otherwise give effect to the terms of this Agreement. The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

**2.9** ***Title to Property***. Title to all Company property shall be held in the name of the Company; provided, however, that publicly traded Securities may be held in "street name" or through a similar arrangement with a reputable financial institution.

---

## SECTION 3

## CAPITALIZATION

---

**3.1** ***Capital Contributions***.

(a) ***Initial Capital Contributions***. Each Member has contributed (or is deemed to have contributed) such capital to the Company as set forth on the books and records of the Company. Except to the extent set forth on the books and records of the Company or agreed to by the Manager, all Capital Contributions shall be in cash and/or cash equivalents.

(b) ***Increased Capital Contributions***. The Members may make additional Capital Contributions to the Company at such times and in such amounts as shall be determined by the Manager and the Member making such additional Capital Contribution.

(c) ***Adjustment of Member Allocation Percentages***. Upon (i) the admission of a Member following the date hereof or (ii) the acceptance of Capital Contributions by the Company from a Member following contribution of such Member's initial Capital Contribution, the Manager shall adjust the Allocation Percentage of each Member, and shall accordingly update Schedule A hereto, so that the Allocation Percentages of the Members represent their Interest in the Company taking into account a revaluation of the Company's assets, if any, and in accordance with the economic arrangement of the Members.

**3.2** ***Limitation on Capital Contributions***. Except as specifically provided in this Section 3, no Person shall be permitted or required to make a contribution to the capital of the Company.

**3.3** ***Withdrawal and Return of Capital***. Except as provided in Section 5 and Section 8 or as otherwise agreed to by the Manager, no Member shall be entitled to the return of such Member's Capital Contribution, a distribution in respect of such Member's Capital Account balance, or any other distribution in respect of such Member's Interest.

**3.4** ***Loans to the Company***. No Member shall be required to lend any money to the Company or to guaranty any Company indebtedness.

**3.5** ***Interest on Capital***. No Member shall be entitled to interest on such Member's Capital Contribution, Capital Account balance, or share of unallocated Profits.

**3.6** ***Limitation of Liability; Return/Withholding of Certain Distributions***.

(a) Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member or manager of the Company.

(b) A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under applicable law shall return such distribution within thirty (30) days after demand therefor by the Manager. The Company may elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member.

(c) Nothing in this Section 3.6 shall be applied to release any Member from (i) its obligation to make Capital Contributions or other payments specifically required under this Agreement or (ii) its obligations pursuant to any relationship between the Company and such Member acting in a capacity other than as a Member (including, for example, as a borrower, employee or independent contractor).

## SECTION 4

## PROFITS AND LOSSES

**4.1** ***Allocations of Company Profits and Losses***. Except as otherwise provided in this Agreement, Profits and Losses for each Fiscal Period shall be allocated as follows:

(a) Profits shall be allocated among the Members in the following order of priority:

(i) First, among the Members on a pro rata basis so as to reverse prior allocations of Losses for prior Fiscal Periods under Section 4.1(b)(ii) until cumulative Profit allocated under this Section 4.1(a)(i) equals the cumulative Losses allocated under Section 4.1(b)(ii); and

(ii) Second, among the Members in proportion to their Allocation Percentages.

(b) Losses shall be allocated among the Members in the following order of priority:

(i) First, among the Members on a pro rata basis so as to reverse allocations of Profits for prior Fiscal Periods under Sections 4.1(a)(i) and 4.1(a)(ii), in reverse order, until Losses allocated under this Section 4.1(b)(i) equal the cumulative Profit previously allocated under Sections 4.1(a)(i) and 4.1(a)(ii); and

(ii) Second, among the Members in proportion to their Allocation Percentages.

**4.2** ***Allocation Adjustments Required to Comply With Section 704(b) of the Code***.

(a) ***Limitation on Allocation of Losses***. If an item of Losses otherwise allocable to a Member under Section 4.1(b) would cause such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year (or increase the amount of such Member Adjusted Capital Account Deficit), the item shall not be allocated to such Member, but shall instead be specially allocated as follows:

(i) To the Members in proportion to their respective positive Capital Account balances, until the Capital Account balance of each Member has been reduced to (but not less than) zero; and

(ii) Next, to the Members as a group in proportion to their respective Allocation Percentages as determined in the reasonable discretion of the Manager.

To the extent that there have been special allocations of Losses away from a Member under this Section 4.2(a) that have not subsequently been reversed pursuant to this sentence or Sections 4.2(f)

or 4.3(e), the next available items of Profits otherwise allocable to such Member pursuant to Section 4.1(a) shall be specially allocated to the Members to whom such items of Losses had been specially allocated under this Section 4.2(a) so as to first offset in reverse order such special allocations of Losses.

(b) ***Qualified Income Offset***. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(b) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.2(b) were not in this Agreement.

(c) ***Gross Income Allocation***. In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, that Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4 have been made, as if Section 4.2(b) and this Section 4.2(c) were not in this Agreement.

(d) ***Member Nonrecourse Deductions***. In accordance with the provisions of Treasury Regulations Section 1.704-2(i), each item of Member Nonrecourse Deduction shall be allocated among the Members in proportion to the economic risk of loss that the Members bear with respect to the nonrecourse liability of the Company to which such item of Member Nonrecourse Deduction is attributable.

(e) ***Minimum Gain Chargeback***. This Section 4.2(e) hereby incorporates by reference the "minimum gain chargeback" provisions of Treasury Regulations Section 1.704-2. In general, upon a reduction of Company Minimum Gain or Member Minimum Gain, the preceding sentence shall require that items of income and gain be allocated among the Members in a manner that reverses prior allocations of deductions attributable to liabilities giving rise to Company Minimum Gain or Member Nonrecourse Deductions as well as reductions in the Members' Capital Account balances resulting from distributions that, notwithstanding Section 4.4, are allocable to increases in the Company Minimum Gain. Subject to the provisions of Section 704 of the Code and the Treasury Regulations thereunder, if the Manager determines in its reasonable discretion at any time that operation of such "minimum gain chargeback" provisions likely will not achieve such a reversal by the conclusion of the liquidation of the Company, the Manager shall adjust the allocation provisions of this Section 4 as necessary to accomplish that result.

(f) ***Intent of Regulatory Allocations***. The allocations set forth in Sections 4.2(a) through 4.2(e) are intended to comply with certain regulatory requirements under the Code. The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to Sections 4.2(a) through 4.2(e) or with special allocations of other items of Company income, gain,

loss or deduction pursuant to this Section 4.2(f). Accordingly, the Manager is hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this Section 4.2(f) in whatever manner the Manager determines is appropriate so that, after such offsetting special allocations are made, the Capital Accounts of the Members are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Sections 4.2(a) through 4.2(e) were not contained in this Agreement and all Company income, gain, loss, and deduction were instead allocated in accordance with the provisions of Section 4.1.

**4.3** ***General Allocation and Capital Account Maintenance Provisions***.

(a) ***Book - Tax Accounting Disparities***. If Company property is reflected in the Capital Accounts of the Members at a value that differs from the adjusted tax basis of such property (whether because such property was contributed to the Company by a Member or because of a revaluation of the Members' Capital Accounts under Treasury Regulations Section 1.704-1(b)), allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members in a manner which takes such difference into account in accordance with Code Section 704(c) and the Treasury Regulations issued thereunder using a method determined in the reasonable discretion of the Manager.

(b) ***Allocations in Event of Transfer***. If an Interest in the Company is Transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made using any method selected by the Manager and permitted under Section 706 of the Code.

(c) ***Adjustment to Capital Accounts for Distributions of Property***. If property distributed in kind is reflected in the Capital Accounts of the Members at a value that differs from the Fair Market Value of such property at the time of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of Section 4.

(d) ***Tax Credits and Similar Items***. Any tax credits or similar items not allocable pursuant to Sections 4.1, 4.2 and 4.3(a) through 4.3(c) shall be allocated to the Members in proportion to their respective Allocation Percentages. Notwithstanding the preceding sentence, if Company expenditures that give rise to tax credits also give rise to Member Nonrecourse Deductions, the tax credits attributable to such expenditures shall be allocated in accordance with Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) ***Reallocation of Certain Losses***. To the extent that: (i) Losses which otherwise would have been allocated to a Member under this Section 4.3 were allocated to one or more other Members pursuant to Section 4.2(a) or any other provision of this Agreement that prohibits the allocation to a Member of Losses which would reduce such Member's Capital Account (or Updated Capital Account) balance below a specified amount; (ii) such allocation has not been reversed pursuant to the subsequent operation of Section 4.2(a) or this Section 4.3(e); and (iii) the Member thereafter returns a distributed amount as required under Section 3.6(b) or otherwise makes a contribution to the capital of the Company, the Capital Accounts of the Members shall be adjusted in connection with such return or contribution (to the extent of the value thereof) to effect a reallocation, in reverse order, of such Losses to the Member.

(f) ***Tax Allocations***. It is intended that items of Company income, gain, loss, deduction or credit recognized for federal income tax purposes shall be allocated among the Members for federal income tax purposes in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated pursuant to Sections 4.1 and 4.2 hereof, to the extent consistent with the requirements of the Code and the Treasury Regulations.

**4.4** ***Nonallocation of Distributions to Increases in Minimum Gain***. To the extent permitted under Treasury Regulations Section 1.704-2(h), distributions to Members shall not be allocable to increases in the Company Minimum Gain. In general, and except as provided in such Treasury Regulations, the preceding sentence is intended to ensure that reductions in a Member's Capital Account balance resulting from distributions of money or other property to that Member are not reversed by the minimum gain chargeback provisions of Section 4.2(e).

**4.5** ***Allocation of Liabilities***. Solely for purposes of determining the Members' respective shares of the nonrecourse liabilities of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in Company Profits shall be equal to the ratio that such Member's Allocation Percentage bears to the aggregate Allocation Percentages of the Members.

**4.6** ***Modifications to Preserve Underlying Economic Objectives***. In the event that (i) there is a change in the federal income tax law, (ii) the Company borrows money or property, or (iii) the Company makes an election to adjust the basis of the Company's assets under Section 754 of the Code, the Manager, acting in his reasonable discretion after consultation with tax counsel to the Company, shall make the minimum modifications to the allocation provisions of this Agreement necessary to preserve the underlying economic objectives of the Members as reflected in this Agreement and, in the case of such a borrowing or election, to properly allocate the tax items relating to such borrowing or election in accordance with the Code and the Treasury Regulations.

**4.7** ***Withholding Taxes***.

(a) The Company shall be permitted to withhold taxes from distributions to, and allocations among, the Members to the extent required by law (as determined by the Manager in the Manager's sole discretion). Except as otherwise provided in this Section 4.7, any amount so withheld by the Company with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1. An amount shall be considered withheld by the Company if, and at the time, remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Manager as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs. Nothing in this Section 4.7(a) shall have any bearing on amounts withheld from a Member in respect of compensation paid or payable to such Member in such Member's capacity as an employee of the Company or pursuant to a bona fide written employment agreement between such Member and the Company.

(b) If, pursuant to Section 4.7(a), an amount withheld with regard to a Member is treated for purposes of this Agreement as an amount distributed to such Member pursuant to

Section 5.1, subsequent actual distributions to such Member pursuant to Section 5.1 shall be reduced as necessary to, as quickly as possible, cause the aggregate distributions to such Member over the term of the Company (including actual distributions and distributions deemed to have occurred pursuant to Section 4.7(a)) to equal the actual distributions that would have been made to such Member if Section 4.7(a) were not part of this Agreement.

(c) To the extent that operation of Section 4.7(a) would create a negative balance in a Member's Updated Capital Account or increase the amount by which such Updated Capital Account balance is negative, the amount of the deemed distribution shall instead be treated as a loan by the Company to such Member, which loan shall be payable upon demand by the Company and shall bear interest at a floating rate equal to the prime rate as announced from time to time by the Wall Street Journal, compounded daily.

(d) In the event that the Manager determines in its discretion that the Company lacks sufficient cash available to pay withholding taxes in respect of a Member, the Manager may, in its sole and absolute discretion, make a loan to the Company to enable the Company to pay such taxes. Any such loan shall be full-recourse to the Company and shall bear interest at a floating rate equal to the prime rate as published from time to time by The Wall Street Journal, compounded daily. Notwithstanding any provision of this Agreement to the contrary, any loan (including interest accrued thereon) made to the Company by a Member or the Manager pursuant to this Section 4.7(d) shall be repaid or returned as promptly as is reasonably possible.

(e) Each Member hereby agrees to indemnify the Company and the other Members for (i) any liability they may incur for failure to properly withhold taxes in respect of such Member, and (ii) any tax liabilities imposed on the Company with respect to such Member; moreover, each Member hereby agrees that neither the Company nor any other Member shall be liable for any excess taxes withheld in respect of such Member's Interest and that, in the event of overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority. The obligations of a Member set forth in this Section 4.7 shall survive the resignation of any Member from the Company or any Transfer of a Member's Interest.

**4.8** ***Intent of Allocations/Cash Savings Clause***. The parties intend that the foregoing allocation provisions of this Section 4 shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances under Section 8.2(d) hereof to be made in a manner identical to the order of priorities set forth in Section 5.1(b). To the extent that the allocation provisions of this Section 4 would fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Manager without the consent of any Member or other Person, if and to the extent necessary to produce such result and (ii) income and loss of the Company for prior open years (including items of gross income and deduction of the Company for such years) shall be reallocated by the Manager among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, as approved by the Manager. This Section 4.8 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service ("**IRS**") or any other taxing authority. The Manager shall have the power to amend this Agreement without the consent of the Members, as it reasonably considers advisable, to make the allocations and adjustments described in this Section 4.8. To the extent that after making the allocations and

adjustments described in this Section 4.8, the distributions that any Member will receive under this Agreement are less than the amount of the distributions such Member would receive if all such distributions were made pursuant to the order of priority set forth in Section 5.1(b), the Company may make a guaranteed payment (within the meaning of Section 707(c) of the Code) to such Member (to be made at the time such Member would otherwise receive the distributions that have been reduced) to the extent such payment does not violate the requirements of Sections 704(b) and 514(c)(9)(E) of the Code or may take such other action as reasonably determined by the Manager to offset such reduction.

## SECTION 5

## DISTRIBUTIONS

**5.1** ***Distributions***.

(a) ***General***. Except as otherwise provided in this Agreement, distributions prior to the dissolution of the Company shall be made in accordance with this Section 5.1 and each Member actually receiving amounts pursuant to a specific distribution by the Company shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share under this Agreement of the total amount to be included in such distribution).

(b) ***Discretionary Distributions***. The Manager may at any time in its sole discretion to the extent the Company has cash and any property available for distribution taking into account current and anticipated needs (including without limitation operating expenses, debt service, guaranteed payments and a reserve for future operating costs), distribute such excess cash and any property available for distributions to the Members in accordance with their respective Allocation Percentages.

(c) ***Tax Distributions.***

(i) Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each Fiscal Year, or as soon as reasonably practicable thereafter, an amount of cash equal to the product of the Tax Percentage for such Fiscal Year and such Member's allocated share of the Company's net taxable income and gain for such Fiscal Year as shown on the Company's federal income tax return. The Manager may, in its sole discretion and determination, make distributions pursuant to this Section 5.1(c) on a quarterly basis so as to permit the Members to make quarterly estimated tax payments.

(ii) For purposes of this Section 5.1(c), the "Tax Percentage" shall equal the highest combined federal, state and local marginal tax rate for an individual resident of the State of Texas with respect to net taxable income or net short term capital gains or with respect to net long term capital gains, as applicable. The Manager may adjust the determination of the Tax Percentage to reflect a change in law or rates.

(iii) For purposes of determining whether the Company has satisfied its distribution obligation under Section 5.1(c)(i), all cash distributions made during a Fiscal Year shall be treated as distributions made to satisfy Section 5.1(c)(i) in respect of such Fiscal Year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 5.1(c)(i) in respect of one or more prior Fiscal Years, in which case such distributions shall be treated as having been made pursuant to Section 5.1(c)(i) in respect of such prior Fiscal Year(s)). Further, distributions made in respect of this Section 5.1(c) during any Fiscal Year shall be treated as satisfying the distribution requirement of Section 5.1(b) hereof with respect to such Fiscal Year (except to the extent that such distributions were made in respect of a prior Fiscal Year, in which case such distribution shall be treated as having been made in respect of such prior Fiscal Year(s)).

(iv) At the election of the Manager, no distribution shall be required pursuant to Section 5.1(c)(i) in respect of any Fiscal Year if the total net taxable income and gain of the Company for such Fiscal Year is less than or equal to One Hundred Thousand Dollars ($100,000).

(v) No distribution shall be required to be made pursuant to this Section 5.1(c) to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(vi) The Company shall not make a distribution under this Section 5.1(c) to a Member to the extent such Member is allocated net taxable income and gain solely in connection with (A) redemption of such Member's Interest or (B) a liquidation of the Company**.**

(d) ***Source of Items Available for Distribution***. In the event that, at the time of a distribution, items available for distribution include items from more than one source, the source of those items actually distributed shall be determined by the Manager in its sole discretion.

**5.2** ***Limitation on Distributions***. No distribution shall be made to a Member pursuant to Section 5.1 if and to the extent that such distribution would: (i) create a negative balance in the Updated Capital Account of such Member or increase the amount by which such Updated Capital Account balance is negative; (ii) cause the Company to be insolvent; or (iii) render the Member liable for a return of such distribution under applicable law. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to a Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

---

## SECTION 6

## ADMINISTRATION; MANAGEMENT

---

**6.1** ***Management Powers and Authority of the Manager***. Except as otherwise specifically provided in this Agreement, the Company and its business shall be managed, controlled and operated exclusively by the Manager, which shall be the "manager" of the Company

within the meaning of Section 18-101 of the Act and shall have all of the powers and authority in respect of the Company permitted to managers under the Act.

**6.2** ***Designation of Manager***. The initial Manager shall be Mark Patrick. In the event that Mark Patrick dies or is unable to serve as such, the will or other testamentary documentation for Mark Patrick shall designate a successor Manager. To the extent that the will or other related documentation for Mark Patrick fails to provide for a successor Manager or if any such designated individual shall be unable or is unwilling to fill such position, the managing shareholder of Charitable DAF HoldCo, Ltd., shall appoint a successor Manager. To the extent that Mark Patrick desires to resign as Manager, he shall appoint his successor.

**6.3** ***Manager's Power to Bind the Company***.

(a) Notwithstanding any provision of this Agreement to the contrary, any contract agreement, deed, lease, note or other document or instrument executed on behalf of the Company by a Manager shall be deemed to have been duly executed by the Company; no Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied.

(b) The Manager is hereby authorized to file with any governmental entity, on behalf of the Company and the Members, a certificate or similar instrument that evidences the Manager's power to bind the Company as set forth in the preceding paragraph (a).

(c) To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard.

**6.4** ***Action by Members***. Except as set forth in Section 6.2, no Member shall have any right to vote with respect to any Company action.

**6.5** ***No Duties to the Company***. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.

**6.6** ***Manager and Member Expenses***.

(a) ***General***. Except as otherwise provided in this Section 6.6, no Manager or Member shall be reimbursed for expenses incurred on behalf of, or otherwise in connection with,

the Company. Any reimbursement paid by a third party for expenses actually reimbursed by the Company shall be retained by (or paid over by the recipient thereof to) the Company.

(b) ***Manager***. The Manager shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred by the Manager on behalf of the Company.

(c) ***Member***. A Member shall be reimbursed for expenses incurred on behalf of the Company only with the approval of the Manager, which approval may be withheld by the Manager in its sole and absolute discretion.

**6.7** ***Tax Matters; Partnership Representative***.

(a) ***Partnership Classification for Tax Purposes***. Except to the extent otherwise required by applicable law (disregarding for this purpose any requirement that can be avoided through the filing of an election or similar administrative procedure), the Manager shall cause the Company to take the position that the Company is a "partnership" or disregarded entity, as applicable, for federal, state and local income tax purposes and shall cause to be filed with the appropriate tax authorities any elections or other documents necessary to give due legal effect to such position. A Member shall not file (and each Member hereby represents that it has not filed) any income tax election or other document that is inconsistent with the Company's position regarding its classification as a "partnership" for applicable federal, state and local income tax purposes.

(b) ***Notice of Inconsistent Treatment of Company Item***. No Member shall file a notice with the IRS under Section 6222(b) of the Code in connection with such Member's intention to treat an item on such Member's federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's federal income tax return.

(c) ***Notice of Settlement Agreement***. Any Member entering into a settlement agreement with the United States Department of the Treasury which concerns a Company item shall notify the Manager of such settlement agreement and its terms within sixty (60) days after the date thereof.

(d) ***Partnership Representative and Audits***.

(i) The Manager shall be the "partnership representative" of the Company (the "**Partnership Representative**") pursuant to and to the extent permitted by Section 6223 of Title XI of the Bipartisan Budget Act of 2015 ("**Title XI 2015 BBA**"). In the event of any pending tax action, investigation, claim or controversy at the Company level that may result in a "partnership adjustment," within the meaning of Section 6241(2) of Title XI 2015 BBA (a "**Partnership Adjustment**"), to any item reported on a federal tax return of any Member(s), the Partnership Representative, shall keep such Member(s) fully and timely informed by written notice of any audit, administrative or judicial proceedings, meetings or conferences with the IRS or other similar material matters that come to its attention in its capacity as Partnership Representative. The Partnership Representative will give the Members not less than fifteen (15) days' prior written notice as to any action to be taken or of any decision not to take action with respect to any such material matter. The Partnership Representative shall act in any similar capacity under applicable state, local or foreign law, subject to similar restrictions and obligations.

The Company shall reimburse the Partnership Representative for its reasonable expenses in connection with the performance of his duties hereunder.

(ii) For any Partnership Adjustment or proposed Partnership Adjustment to the federal income tax returns of the Company for which an "imputed underpayment," within the meaning of Section 6225(b) of Title XI 2015 BBA would arise, then either, (1) the Partnership Representative may require that the Member(s) affected by such Partnership Adjustment file amended returns that take into account such Partnership Adjustments and pay any additional tax due pursuant to Section 6225(c) of Title XI 2015 BBA or (2) if the Partnership Representative does not require the affected Member(s) to file such amended returns as provided in clause (1), and the affected Member(s) do not otherwise file such amended returns, the Partnership Representative may elect application of Section 6226 of Title XI 2015 BBA. In any case, the affected Member(s) shall keep the Partnership Representative fully and timely informed by written notice of any administrative or judicial proceedings, meetings or conferences with the IRS or other similar matters with respect to the Partnership Adjustment, and the Partnership Representative shall have the right to review and comment on any submissions to the IRS, and attend and jointly participate in any meetings or conferences with the IRS.

(iii) This Section 6.7(d) is intended to comply with certain provisions under Title XI 2015 BBA that may be subject to change or further interpretation by the U.S. Treasury or IRS. In the event of such change or further interpretation, the Manager is hereby authorized to amend this Agreement consistent with the provisions of Sections 6.7(d)(i) and 6.7(d)(ii) above.

**6.8** ***Records and Financial Statements***.

(a) The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company. The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Notwithstanding anything in Section 18-305 of the Act, except as provided in Section 6.8(b), no Member shall have any right to review or inspect any of the books or records of the Company or receive any other Company information.

(b) Within ninety (90) days after the end of each Fiscal Year, or as soon as reasonably practicable thereafter, the Company shall supply to each Member such Member's IRS Schedule K-1 for such Fiscal Year.

**6.9** ***Valuation of Company Assets***.

(a) ***General***. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.

(b) ***Binding Effect***. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.

**6.10** ***Officers***. The Manager may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "**Officers**") and assign titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person. Unless the Manager decides otherwise, if the title given to an Officer is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this Section 6.10 may be revoked at any time by the Manager. An Officer may be removed with or without cause by the Manager.

## SECTION 7

## TRANSFERS AND RESIGNATIONS

**7.1** ***Transfers of Interests***. To the fullest extent permitted by law, a Member shall not Transfer all or any portion of its Interest without the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.2** ***Resignation/Removal of a Member***. No Member shall resign from the Company or otherwise cease to be a Member without the consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.3** ***Redemption***. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion.

## SECTION 8

## DISSOLUTION AND LIQUIDATION

**8.1** ***Dissolving Events***. The Company shall be Dissolved upon the occurrence of any of the following events:

(a) An election in writing by the Manager to dissolve the Company;

(b) Any time there are no members of the Company, unless the Company is continued in accordance with the Act; or

(c) The entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

To the maximum extent permitted by the Act, the Members hereby waive their rights to seek a judicial dissolution of the Company.

**8.2** ***Winding Up and Liquidation***.

(a) Upon dissolution of the Company, the Manager shall promptly wind up the affairs of, and liquidate the Company. In furtherance thereof, the Manager, as the "liquidating trustee" of the Company within the meaning of the Act shall: (i) continue to have all of the administrative and management rights and powers of the Manager (including the power to bind the Company); and (ii) be reimbursed for Company expenses it incurs. Following dissolution, the Company shall sell or otherwise dispose of assets determined by the Manager to be unsuitable for distribution to the Members, but shall engage in no other business activities except as may be necessary to preserve the value of the Company's assets during the period of winding-up and liquidation. At the conclusion of the winding-up and liquidation of the Company, the Manager shall: (i) hold the books and records of the Company for not less than six years following the termination of the Company under the Act; and (ii) execute, file and record, as necessary, a certificate of cancellation or similar document to effect the termination of the Company under the Act and other applicable laws.

(b) Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Manager. Distributions in kind shall be valued at Fair Market Value as determined in accordance with the provisions of Section 6.9 and shall be subject to such conditions and restrictions as may be necessary or advisable to preserve the value of the property so distributed or to comply with applicable law. Each Member actually receiving amounts pursuant to a specific distribution shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share of the total amount to be included in such distribution).

(c) The Profits and Losses of the Company during the period of winding-up and liquidation shall be allocated among the Members in accordance with the provisions of Section 4. If any property is to be distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.3(c).

(d) The assets of the Company (including proceeds from the sale or other disposition of any assets during the period of winding-up and liquidation) shall be applied as follows:

(i) First, to repay any claims and obligations of the Company, whether to third parties or the Members, in the order of priority required by law and to the creation of any reserves which the Manager, or the liquidating trustee, as applicable, reasonably deems necessary for all contingent, conditional or unmatured claims or obligations of the Company (which reserves when they become unnecessary in accordance with the Act, shall be distributed in accordance with the provisions of clause (i), below); and

(ii) Next, to the Members in proportion to their respective positive Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.2(c)).

**8.3** ***Deficit Restoration/Liability***. Except as otherwise specifically provided in this Agreement, a Member shall have no obligation to restore a negative balance in such Member's Capital Account at the time of dissolution of the Company and no liability to the Company or to any other Member in respect of a negative balance in such Member's Capital Account during the term of the Company or at the conclusion of the Company's termination.

## SECTION 9

## EXCULPATION; INDEMNIFICATION

**9.1** ***Exculpation***. To the fullest extent permitted by applicable law, neither the Manager, Partnership Representative nor any Officer or Member nor any officer, director, employee, agent or Affiliate of the foregoing (collectively, the "**Covered Persons**"), shall be liable to the Company, or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Person's gross negligence or willful misconduct.

**9.2** ***Indemnification***.

(a) To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 9.2 by the Company shall be provided out of and to the extent of Company assets only, and no Member nor the Manager shall have personal liability on account thereof.

(b) To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon the receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 9.2.

(c) A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to

the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

(d) The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(e) The foregoing provisions of this Section 9.2 shall survive any termination of this Agreement.

## SECTION 10

## GENERAL PROVISIONS

**10.1** ***Meetings***. There shall be no requirement of annual or periodic meetings of the Company's members or managers within the meaning of the Act.

**10.2** ***Action Without a Meeting***. Any action of the Manager may be taken by written consent of the Manager. Any consent or approval required by this Agreement to be "written" may also be made by the use of electronic transmission.

**10.3** ***Entire Agreement***. This Agreement and the other agreements referred to herein, including any employment, services, granting or other similar agreements, contain the entire understanding among the Members, and supersede any prior written or oral agreement between them, with respect to the Company. There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Company which are not fully expressed in this Agreement (or any employment, services, granting or other similar agreements).

**10.4** ***Amendments***. This Agreement may be amended, in whole or in part, only through a written amendment executed by the Manager.

**10.5** ***Counterparts; Binding upon Members***. This Agreement may be executed in any number of counterparts and, when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart.

**10.6** ***No Third Party Beneficiaries***. The provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party and shall not give rise to a right on the part of any third party to require a Member to make a Capital Contribution, return distributions, or make other payments to the Company as set forth in this Agreement.

**10.7** ***Notices, Consents, Elections, Etc***. All notices, consents, agreements, elections, amendments, demands and approvals provided for or permitted by this Agreement or otherwise relating to the Company shall be in writing and signed copies thereof shall be retained with the books of the Company. For purposes of the following provisions of this Section 10.7, the term "notice" shall be deemed to include any notice, statement, report, consent or similar item required or permitted to be provided to one or more Persons under this Agreement or applicable law.

**10.8** ***Severability***. In the event that any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

**10.9** ***Governing Law***. The interpretation and enforceability of this Agreement and the rights and liabilities of the Members and the Manager as such shall be governed by the laws of the State of Delaware. To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law.

**10.10** ***Status Under the Act***. This Agreement is the "limited liability company agreement" of the Company within the meaning of Section 18-101 of the Act.

**10.11** ***Partnership for Tax Purposes Only***. As set forth in Section 2.1, the Members hereby form the Company as a limited liability company under the Act. The Members expressly do not intend hereby to form a partnership except insofar as the Company may be treated as a partnership solely for tax purposes.

**10.12** ***Miscellaneous***. This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties. Each Member hereby specifically consents to the selection of all other Members admitted to the Company pursuant to the terms of this Agreement.

*[remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties have executed this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, as of the date first above written.

**MEMBERS**:

CHARITABLE DAF HOLDCO, LTD.

By: [signature]
Name: Mark Patrick
Title: Director

**MANAGER**:

[signature]
Name: Mark Patrick

4937-0258-2788\4

**CDMCFAD, LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

**MEMBER INFORMATION**

**Revised: December 18, 2024**

| Name and Contact Information | Allocation Percentage |
|---|---|
| Charitable DAF Holdco, Ltd.<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |

Walkers Draft: [XX]/2025

Walkers

# Memorandum

**To:** Shields Legal Group, P.C and Charitable DAF Holdco, Ltd.

**From:** Walkers (Cayman) LLP

**Date:** [XX] February 2025

**Subject:** Issuing new shares and seeking declaratory relief, and amending the articles in respect of mediation and arbitration

---

This memorandum is limited to the matters referred to herein and shall not be construed as extending to any other matter or document not referred to herein. This memorandum is given solely for the benefit of Shields Legal Group, P.C and Charitable DAF Holdco, Ltd. and may not be relied upon by any other person without our prior written consent. For greater certainty, this memorandum shall be construed in accordance with the laws of the Cayman Islands. We are Cayman Islands Attorneys at Law and provide no advice or express no views as to any laws other than the laws of the Cayman Islands in force and as interpreted at the date of this memorandum. We have not, for the purposes of this memorandum, made any investigation of the laws, rules or regulations of any other jurisdiction.

The memorandum being provided is a reasoned memorandum based on the laws of the Cayman Islands and court decisions, and we have accordingly applied certain principles established in court decisions to the factors which we think are relevant in connection with the Charitable DAF HoldCo Ltd (and other relevant entities) at the date hereof. Further, where there is an absence of case law or authority in respect of Cayman Islands companies, we have (to the extent possible) applied and consider it reasonable to apply Cayman Islands/English law corporate legal principles. The Grand Court of the Cayman Islands (the "**Cayman Court**") might, however, take into account different factors (or view the factors considered herein differently). Moreover, although the views we have reached are based on reasoning and analysis which is in our view consistent with the authorities reviewed, the Cayman Court could apply different reasoning and, hence, reach a conclusion different to that set out in this opinion.

## A. Introduction

1. You have asked us to consider the following questions:

   (a) In light of a possible just and equitable winding up petition filed by one of the Participating Shareholders, could and should the current articles be amended as they relate to mediation and arbitration; and

   (b) Whether Charitable DAF HoldCo Ltd ("**HoldCo**") could:

      (i) issue new participating shares which would have the effect of diluting the current Participating Shareholders (the "**Share Issue**"); and

Walkers Draft: [XX]/2025

(ii) seek declaratory relief in respect of the issue of those shares.

2. The issues which have been outlined to us with respect to the Company and the articles are highly unusual, and the below actions are not without risk. Whilst the articles do confer upon the directors and the Management Shareholder rights including as set out below, the manner in which it appears the company is intended to operate is highly unusual, and at least on one view, appears to cut across certain fundamental principles of Cayman law. As such, the actions being considered are novel to a significant degree, and it is difficult to be certain how a Cayman Court may approach these questions.

3. In summary, in our view:

(a) We recommend amending the articles so as to provide that the Company and the Participating Shareholders must agree that a dispute should be submitted to mediation and/or arbitration. Simultaneously, we recommend amending the memorandum of association to bring the objects of the Company into line with its mission statement; and

(b) In respect of the Share Issue:

(i) The articles of HoldCo grant the directors the power to issue new participating shares which would have the effect of diluting the current Participating Shareholders; and

(ii) We do not recommend that HoldCo issues the shares then immediately seeks declaratory relief – the prospects of success of that application would be low, as the Court will not entertain hypothetical applications, there must be a real and present dispute between the parties.

**B. Amendment of memorandum and articles re object, mediation and arbitration**

*Articles in respect of mediation and arbitration*

4. The mediation and arbitration procedures as set out in Article 137 "*shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company … [and/or] its Shareholders*".

5. The Management Shareholder has the power to amend the articles by written resolution:

"*Subject to the Companies Act (as amended) and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part*" (Article 125).

6. Further, the directors may authorise the variation in rights attaching to the Participating Shares:

"*The Directors, or the Shareholders by Ordinary Resolution, may authorise … the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution*" (Article 8); and

7. Article 8 also provides that such variation may be authorised by the Shareholders by Ordinary Resolution, which in this instance means by the Management Shareholders as Participating Shareholders are not entitled to vote at general meetings of the company:

(a) ""*Ordinary Resolution" means a resolution:*

(i) *passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or*

(ii) *approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed*";

(b) ""*Participating Share" means a non-voting, participating, non-redeemable share in the capital of the Company…*" (Article 1); and

(c) "*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article*" (Article 12).

8. However, any material adverse variation or abrogation of the rights attaching to the participating shares requires the written consent of at least two-thirds of the participating shareholders:

> *"…the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting*" (Article 13).

9. If the Articles were to be amended such that the Company was able to unilaterally elect whether or not a dispute was to be submitted to mediation and/or arbitration, in our view that would likely be considered a material adverse variation of the rights attaching to the Participating Shares. In that case, a two-thirds majority of the Participating Shareholders would be required to consent to such change. We understand that there is no appetite to put changes to the Articles to the Participating Shareholders.

10. However, if the Articles were amended such that any dispute would only be subject to mediation and/or arbitration if the holders of the Participating Shares and the Company were to agree on that course of action, in our view that is unlikely to constitute a material adverse variation of the rights attaching to the Participating Shares, as their rights relative to the rights of the Company (at least arguably) would not have changed.

11. Participating Shareholders are entitled to vote at separate meetings in respect of any material adverse variation or abrogation of their rights (Article 12). However, the Articles do not provide Participating Shareholders with the right to vote on, or to receive notice of, any variation in their rights which does not constitute a material adverse variation or abrogation. Accordingly, in our view, the directors could amend the articles to provide that disputes are to be subject to mediation and arbitration if the holders of the shares and the Company were to agree, without being required to provide notice of that change to the Participating Shareholders.

*Memorandum in respect of object*

12. The memorandum of the company states at paragraph 3 that "*the objects for which the company is established are unrestricted*". We are instructed that the mission statement of the company is: "*Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*" (email from B Schaller dated 7 February 2025).

Walkers Draft: [XX]/2025

13. In order to clarify the proper objects and purpose for which the company was established, the objects of the company should be specifically tied to the mission statement. We consider that amending paragraph 3 of the memorandum so as to specify that the object of the company is as per the mission statement above (rather than generating profit for its shareholders) would provide further support for the argument that the Share Issue is in the interests of the company as a whole (as discussed further below). For clarity, "*a company may, by special resolution, alter its memorandum of association with respect to any objects, powers or other matters specified therein*" (Companies Act (as amended), section 10).

**C. Share Issue**

14. The directors of HoldCo have the power to issue new shares by written resolution:

> "…*all Shares for the time being unissued shall be under the control of the Directors who may: (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine*" (Article 7).

15. The rights attached to any class of shares, including the participating shares, may:

> "*only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting*" (Article 13).

16. However, the issue of further participating shares is not deemed to be a material adverse variation or abrogation of the rights of the Participating Shareholders:

> "*The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not … be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Participating Shares ranking pari passu with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company*" (Article 14).

17. On the basis of the above, in our view, the Articles confer upon the directors of HoldCo the power to issue shares which dilute the Participating Shareholders. The Participating Shareholders do not have any pre-emption rights, or the right to vote on, or receive notice of, the issuance of further participating shares.

18. Directors of Cayman Islands companies are subject to a duty to act in the best interests of the company, which duty is owed to the company as a whole. Accordingly, while the Articles grant the directors the power to issue new shares as outlined above, there must be a corporate benefit to the exercise of that power. In this instance, given that the threat to the Company is coming from one or more of the Participating Shareholders, and that it is a threat to the purpose and existence of the Company, there may be a reasonable basis for the directors to form the view that issuing shares with the intention of mitigating that threat is in the best interests of the Company as a whole (notwithstanding that it would not be in the best interests of the individual Participating Shareholders).

19. In addition, if the incoming Participating Shareholder purchases its new shares, that would distinguish it from the existing Participating Shareholders (who we are instructed paid nothing for their shares) and provide further corporate benefit.

20. Further, we recommend issuing the new shares after the amendment of the memorandum and articles as above, such that the Share Issue is in line with the (new) objects of the Company. Otherwise, we recommend issuing the new shares sooner rather than later, so that the issue is

complete before any winding up petition is presented. If a winding up petition in respect of HoldCo is presented to the Court, and a winding up order is ultimately made, any alteration in the status of the company's members made after the presentation of the petition will be void (unless the Court orders otherwise) (Companies Winding Up Rules (as amended), ss 99 and 100(2)).

**D. Application for declaratory relief**

21. It has been suggested that HoldCo could seek declaratory relief from the Cayman Courts in respect of the Share Issue, seeking to bolster the legitimacy of the Share Issue and protect it from challenge.

22. Applications for declaratory relief may be made in the Cayman Islands pursuant to the Grand Court Rules O.15, r.16:

> "*No action or other proceeding shall be open to objection on the ground that a merely declaratory judgment or order is sought thereby, and the Court may make binding declarations of right whether or not any consequential relief is or could be claimed.*"

23. The principles which apply to applications for declaratory relief include the following:

(a) "*There must, in general, be a real and present dispute between the parties before the court as to the existence or extent of a legal right between them…*"; and

(b) "*the court must be satisfied that all sides of the argument will be fully and properly put. It must therefore ensure that all those affected are either before it or will have their arguments put before the court*".[1]

24. We understand that the attraction of seeking declaratory relief immediately following the Share Issue to have been avoiding litigation against the Participating Shareholders.

25. However, on the basis of the principles outlined above, if an application for declaratory relief was made immediately following the Share Issue, i.e. before any dispute had arisen with the Participating Shareholders and/or without the Participating Shareholders being before the Court, that application would have low prospects of success.

26. Accordingly, we do not recommend pursing the declaratory relief application in that context. However, if and when a dispute does arise with the participating shareholders in respect of the Share Issue, a declaratory application may still be a useful card to play.

[1] *In the matter of Principal Investing Fund et al*, FSD 268 of 2021 (IKJ), 15 July 2024, at [9], citations omitted.

**Charitable DAF HoldCo, Ltd**
(the "**Company**")

---

**Unanimous Written Resolutions of the Board of Directors of the Company**

---

## 1 Directors' Interests

1.1 It is noted that none of the directors of the Company (together the "**Directors**", and each a "**Director**") have any monetary or financial interest in the matters referred to herein.

## 2 Recent Developments

2.1 It is noted that the Directors have received communications from certain current Participating Shareholders requesting information and making false and misleading claims regarding the Company's and its subsidiaries' finances.

2.2 It is noted that the Directors believe the aforementioned communications were motivated and/or directed by James Dondero as retaliation for Mark Patrick's resignation from Skyview Group and the Company's various efforts to create independence between the Company and its subsidiaries on the one hand and James Dondero and his affiliates on the other hand.

2.3 It is noted that the Directors have knowledge that the false and misleading information forming the basis of these claims was provided by SEI, a back-office service provider to the Company and certain of its subsidiaries, to employees of certain Dondero-controlled entities such as Skyview Group or NexPoint.

2.4 It is noted that none of the concerns raised by the current Participating Shareholders were raised prior to Mark Patrick's resignations from Skyview Group, despite there being no change in the information provided or the frequency of information provided.

## 3 U.S. Counsel Tax Advice

3.1 It is noted that the Directors have received United States Tax Counsel advice that, among other things:

(a) "there is a significantly heightened risk that the Internal Revenue Service of the United States could severely penalize and/or revoke the tax-exempt status of one or more of the current Participating Shareholders, which could imperil the status and assets of the Company"; and

(b) "Increasing the number of Participating Shareholders would mitigate considerations of undue influence/private inurement/private beneift and broaden the scope of DAF's charitable reach to the public; and

(c) "The IRS will look favorably upon any and all attempts for DAF to maintain its

independence from what seems to be persistent attempts by James Dondero and the entities controled by him to use DAF for his private benefit and private inurement."

3.2 It is noted that the Directors believe the Share Issuance (as defined below) to DFW (as defined below) is based on this U.S. tax advice and will protect the Company and the current Participating Shareholders and will also further the Company's charitable mission.

## 4 Cayman Counsel Legal Advice

4.1 It is noted that the Directors have sought and obtained legal advice from separate Cayman Islands counsel ("**Walkers**"), who have confirmed that (i) the Directors have the ability to issue new Participating Shares as contemplated by the Share Issuance, (ii) if the Directors believe the Participating Shares are held by a Restricted Person (as defined in Article 21 of the Company's M&A), the Directors may require such shareholder to transfer its shares, and (iii) the Participating Shareholders have no or limited rights to information.

4.2 It is noted that attached as Exhibit A hereto is the Walkers presentation outlining the rights accompanying the Participating Shares (the "**Walkers Presentation**").

## 5 Issue of Shares

5.1 It is noted that the Company proposes to issue 318 Participating Shares of a nominal or par value of US$0.01 each as fully paid up (the "**Participating Shares**") to DFW Charitable Foundation ("**DFW**"), a Delaware non-profit non-stock corporation (the "**Share Issuance**").

5.2 Following the Share Issuance, DFW shall own 51.04% of the issued Participating Shares of the Company.

5.3 It is resolved that:

(a) the Share Issuance be approved with effect from the date of these resolutions;

(b) Campbells Corporate Services Limited be and is hereby instructed to make the appropriate entry in the register of members of the Company in respect of the Share Issuance;

(c) any and all actions of the Company, the Directors or any officer of the Company taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such actions had been presented for approval and approved by the Directors prior to such action(s) being taken; and

(d) the Directors shall meet on not less than a quarterly basis to discuss recent developments and how to best protect the Company and its shareholders.

## 6 Ancillary Documents

6.1 It is further resolved that:

(a) the Company do give, make, sign, execute and deliver all such agreements, letters, notices, certificates, acknowledgements, instructions and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any Director be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in all or any of the documents referred to above and the Company do all other such acts and things as might in the sole opinion and absolute discretion of any Director be necessary or desirable for the purpose aforesaid;

(b) the Ancillary Documents be in such form as any Director should in his absolute discretion and sole opinion approve, the signature of any such person on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company;

(c) the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereof of any one Director together with such changes as such Director shall in his absolute discretion consider necessary or appropriate (the signature of such Director on any Ancillary Document being conclusive evidence of his approval of the same for and on behalf of the Company);

(d) the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner aforesaid;

(e) any and all actions of the Company, or of any Director or officer, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and hereby are ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval, and approved by, the Directors prior to such action being taken; and

(f) the prior execution of any Ancillary Documents by any Director are approved, ratifed and confirmed in all respects.

[*signature page(s) follow(s)*]

Name: **Mark Patrick**
Title: Director

Date: 2-7-2025

Name: **Paul Murphy**
Title: Director

Date: 7th February 2025

Signature Page
Unanimous Written Resolutions of the Board of Directors

#6777948v3

**Exhibit A**

**Walkers Presentation**

Walkers

# Participating Shareholder Rights
# **Charitable DAF Holdco Ltd.**

Making financial services work

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore



012261

# Binding Effect of Articles of Association







CONFIDENTIAL

506
TDIT003772

# Binding Effect of Articles of Association

"… the binding effect of the Articles as they stand … is given statutory force by section 25(3) of the Companies Law which reads:

> '(3) Where registered the said articles of association shall bind the company and the members thereof to the same extent as if each member had subscribed his name and affixed his seal thereto, and there were in such articles contained a covenant on the part of himself, his heirs, executors and administrators to conform to all the regulations contained in such articles subject to this law; ….'"

(*In the Matter of Strategic Turnaround Master Partnership Ltd* [2008] CIGC J1128-1, per Chief Justice Smellie at paragraph 135)

# Participation in Discretionary Dividends

# Participate in Discretionary Dividends

"The Participating Shares shall confer upon the Shareholders … the right to participate in the profits or assets of the Company in accordance with these Articles." **(Art 12)**

# Participation in Discretionary Dividends

"The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit." **(Art 102)**

"Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares." **(Art 105)**

**Participating Shareholders do not have:**

- **the right to cause or vote on distributions;**
- **the right to pro rata distributions based on their shareholding;**
- **the right to annual or timed distributions; or**
- **the right to receive notice of distributions to other Participating Shareholders.**

# Removal of Directors





CONFIDENTIAL

# Removal of Directors

"Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution." **(Art 65)**

**Participating Shareholders do not have:**

- the right to remove Directors; or
- the right to appoint Directors.

**Note: the right to appoint Directors is held by the Management Shareholder and the Directors, and the right to remove Directors is held solely by the Management Shareholder (Articles 64, 65, and 69, and Definition of "Ordinary Resolution").**

# Modification of Rights





CONFIDENTIAL

513
TDIT003779

# Modification of Rights

"… the rights attached to [any] Class may … only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting." **(Art 13)**

**Participating Shareholders do not have:**

- **the right to cause a distribution; or**
- **the right to amend the Articles.**

# Modification of Rights – Issuance of Shares

"The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company." **(Art 14)**

"… all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued." **(Art 7)**

**Participating Shareholders do not have:**

- **the right to vote on the issuance of further Participating Shares;**
- **pre-emption rights; or**
- **the right to receive notice of such issuance.**

# Modification of Rights – Issuance of Shares

"The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each…" **(Art 7)**

**Note:** Of the authorised share capital of the Company, 305 Participating Shares have been issued. In accordance with the Articles, the Directors may unilaterally issue additional Participating Shares and thereby dilute the power of existing shareholders for the purposes of voting on matters that may materially adversely vary or abrogate the rights of the Participating Shareholders.

**Additional Note: many of the rights that shareholders of a company typically hold (e.g. the right to receive notices, and the right to vote at general meetings, including in respect of the appointment and removal of directors) are held by the Management Shareholder (Mark Patrick) rather than the Participating Shareholders. In addition, the Directors (Mark Patrick and Paul Murphy) have the ability to unilaterally declare dividends and issue new Participating Shares without the approval of the Participating Shareholders (or the Management Shareholder).**

# Share Redemption





CONFIDENTIAL

# Share Redemption

“**"Participating Share"** means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles…”

“… the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them…” **(Paragraph 7, Memorandum)**

“The rights conferred upon the holders of the Participating Shares … shall not … be deemed to be materially adversely varied or abrogated by … the redemption or purchase of any Participating Shares of any Class by the Company.” **(Art 14)**

**Participating Shareholders do not have:**

- the right to redeem their shares; or
- the right to vote on the Company’s redemption of their shares.

# Transfer of Shares





CONFIDENTIAL

# Share Transfer by Notice of the Directors – Restricted Person

"If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles." **(Art 21)**

"**Restricted Person**" means any Person holding Participating Shares:

a) in breach of the law or requirements of any country or governmental authority;

b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501 (c)(3) of the Code; or

c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered."

**Note: the Directors have duties to act, and to exercise their powers, in the best interests of the Company. The scope of those duties includes continually evaluating whether any Participating Shareholder may pose a threat to the Company which could cause them to fall within the definition of Restricted Person, and how best to protect the Company against any such threat.**

# General Meetings

# General Meetings

**"**Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company…" **(Art 12)**

**Participating Shareholders do not have:**

- **the right to receive notice of general meetings;**
- **the right to attend general meetings;**
- **the right to speak at general meetings;**
- **the right to vote at general meetings; or**
- **the right to information regarding proceedings of general meetings.**

# Limited Information Rights







CONFIDENTIAL

# Limited Information Rights

"The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors." **(Art 108)**

"The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution." **(Art 110)**

**Participating shareholders have very limited information rights. Specifically, the articles do not provide the Participating Shareholders with the following:**

- **the right to inspect any account;**
- **the right to inspect any book; or**
- **the right to inspect any document of the Company.**

Further to the above, we note that :

- This only applies to the limited company which issued the participation shares, i.e. DAF HoldCo;
- It does not apply to subsidiary entities;
- It does not apply to entities in which DAF HoldCo holds a passive interest; and
- There is no "look- through" down through all the entities in the structure.

**Rachel Baxendale**

**From:** David N. Corkern <DCorkern@CCSB.com>
**Sent:** 18 December 2024 11:24 PM
**To:** Brandon R. Schaller
**Cc:** Bart Higgins; Brian P. Shaw
**Subject:** DAF--proposed reorganization

CAUTION: This email originated from outside of the organization.

Brian,

In accordance with our conversation this morning with Mark Patrick, here are my initial thoughts regarding the U.S. tax issues that merit a reorganization of Charitable DAF Holco, Ltd. ("DAF"). It is my understanding that DAF currently has four (4) non-voting participating shareholders/supporting organizations, each of which is an IRC Section 501(c)(3) organization (per filings with the IRS) and controlled, directly or indirectly, by James Dondero ("Dondero"). You have detailed instances in which you believe Dondero has acted in ways that create a per se conflict of interest between him and each of the participating shareholders that he controls, as well as DAF. For example, it is my understanding that as recently as November, 2023, Dondero requested the current manager of DAF to transfer approximately $1,000,000 to Sentinel Reinsurance, Ltd. (a Dondero-controlled entity) in payment of legal fees unrelated to DAF or its charitable purposes. It is my further understanding that Grant Scott, the prior manager of DAF and a college friend of Dondero, had a history of using DAF funds to benefit Dondero personally. While the current manager has been acting independently of Dondero and those under Dondero's influence and/or control, this pattern of Dondero's using DAF as his personal "piggy bank" has caused the perception among many of Dondero's creditors that DAF has been or is as his financial alter ego. As such, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities.

To the extent that the participating shareholders/supporting organizations have either encouraged or acquiesced in Dondero's accessing DAF funds for his personal benefit, either directly or through the entities that he controls or in which he has considerable financial interest, those organizations run the risk of losing their tax-exempt status with the IRS. Each IRC Section 501(c)(3) organization must be organized and operating primarily for charitable purposes. Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." Additionally, an IRC Section 501(c)(3) organization cannot be operated for the benefit of an individual or entity—private benefit/private inurement prohibition.

Given what has been detailed about Dondero's past and continued actions with the participating shareholders/supporting organizations and DAF, there is a heightened risk that the IRS could revoke the tax-exempt status of one or more of said participating shareholders/supporting organizations, which could imperil the status and assets of DAF. To help insulate DAF from any such exposure and to facilitate and expand its charitable purposes, DAF is considering a two-prong restructure/reorganization that will bring in additional participating shareholders and create a Delaware blocking LLC. Clearly, expanding the number of shareholders of DAF will dilute the influence of Dondero and the entities controlled by him and, as such, will broaden the charitable scope of DAF for the benefit of the public. The IRS will look favorably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement.

David

**David N. Corkern**
*Senior Counsel*

O 214.855.3099
DCorkern@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

Admitted in Texas, Louisana, and D.C.
LLM in Taxation
**Board Certified Tax Law Specialist —**
**Louisiana Board of Legal Specialization**

**David N. Corkern**
*Senior Counsel*

CARRINGTON COLEMAN

O 214.855.3099
DCorkern@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

Admitted in Texas, Louisana, and D.C.
LLM in Taxation
**Board Certified Tax Law Specialist —**
**Louisiana Board of Legal Specialization**

This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone at 214-855-3000, and delete the message from your system. Carrington, Coleman, Sloman & Blumenthal, L.L.P. www.carringtoncoleman.com

March 27, 2025

**Re: Letter Agreement re: Assignment of Undertakings**

To whom it may concern:

This letter agreement (this "Agreement") is to confirm in writing an agreement made by Charitable DAF HoldCo, Ltd., a Cayman Islands limited company ("Holdco") and CDMCFAD, LLC, a Delaware limited liability company ("DAF"). Each party hereto may be referred to generically as a "Party" or collectively as the "Parties" in this Agreement.

WHEREAS, DAF completed a restructuring on March 27, 2025, that (i) issued new membership interests in DAF to DFW Charitable Foundation, a Delaware 501(c)(3) non-profit organization and (ii) redeemed the membership interests in DAF owned by Holdco (collectively, the "Issuance and Redemption Transaction");

WHEREAS, Mark Patrick and Paul Murphy, the Directors of Holdco intend to wind up the affairs of Holdco and engage liquidators to complete that process; and

WHEREAS, in connection with the Issuance and Redemption Transaction, Holdco and DAF have mutually agreed to assign all of the contracts and agreements listed on Schedule A hereto (collectively, the "Assigned Contracts") from Holdco to DAF.

NOW, THEREFORE, as material inducement to each Party entering this Agreement, and in consideration of the mutual representations and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Assignment of Undertakings. Subject to the terms hereof, Holdco hereby assigns the Assigned Contracts to DAF with effect on and from the date first written above in consideration for the assumption of liabilities set forth herein (the "Assignment of Undertakings").

2. Assumption of Liabilities. In connection with the Assignment of Undertakings, DAF has agreed to assume all responsibilities and risks in any manner connected with the Assigned Contracts, whether now existing or hereafter arising.

3. Further Assurances. Until such time as Holdco completes its liquidation, Holdco agrees to cooperate (at DAF's sole expense) with DAF to take any further actions requested by DAF in connection with this Assignment of Undertakings, including executing assignment or similar agreements necessary to cause DAF to enter into the Assigned Contracts and obtain consent from counterparties. Notwithstanding anything to the contrary set forth herein, DAF shall not be responsible for funding any litigation of adverse actions relating to Holdco arising after the date hereof.

4. Representations and Warranties. By its execution and delivery hereof, each of the Parties represents and warrants to the other Party that, as of the date hereof and after giving effect to this Agreement:

(a) (i) such Party has all requisite power and authority to execute and deliver this Agreement, (ii) this Agreement has been duly executed and delivered by each Party to the other, and (iii) this Agreement constitutes the legal, valid, and binding obligations of such Party, enforceable in accordance with its respective terms;

(b) neither the execution, delivery, and performance of this Agreement, nor the consummation of any transactions contemplated herein or therein, will (i) contravene the terms of the trust agreement, limited liability company agreement, or other governing documents as applicable to such Party hereto; (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any lien under, or require any payment to be made under (a) any contractual obligation to which such Party is bound or affecting such Party or its respective properties or (b) any order, injunction, writ or decree of any governmental authority or any arbitral award to which such Party or such Party's property is subject; or (iii) violate any applicable law; and

(c) no approval, consent, exemption, authorization, or other action by, notice to, or filing with, any governmental authority or other person not previously obtained is necessary or required in connection with the execution, delivery, or performance by, or enforcement against, such Party to this Agreement.

5. Assignment. Neither Party may assign this Agreement without the other Party's prior written consent.

6. Governing Law; Venue. The Parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Texas and to the jurisdiction of the federal courts with jurisdiction covering Dallas, Texas, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Texas or the federal courts with jurisdiction covering Dallas, Texas, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

7. Further Assurances. Each Party agrees to execute, acknowledge, and deliver such further instruments and to do all such other acts as may be reasonably necessary or appropriate in order to carry out the purposes and intent of this Letter.

8. Notices. All notices or requests required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when hand delivered or sent by certified mail, return receipt requested, or by reputable overnight courier, in each case with receipt verified in writing, addressed in accordance with the respective Parties' signature on the signature pages hereto.

9. Signature; Counterparts. This Agreement may be executed electronically, or in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

10. Enforceability. If one or more provisions of this Agreement is found by a court of competent jurisdiction to be illegal, invalid, or unenforceable in whole or in part, the remaining terms and provisions of this Agreement shall remain in full force and effect disregarding such illegal, invalid, or unenforceable portion and such court shall be empowered to modify, if possible, such illegal, invalid, or unenforceable provision to the extent necessary to make it enforceable in accordance with the intent and purposes of the Parties expressed herein to the fullest extent permitted by applicable law.

11. WAIVER OF JURY TRIAL. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF

THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

12. Merger; Amendment. This Agreement (i) is the only agreement between the Parties concerning the subject matter hereof and supersedes, terminates and cancels any prior statements, representations or agreements between the Parties concerning the subject matter hereof, (ii) is being executed by the Parties without reliance upon any representation, warranty, or other statement of any kind whatsoever, whether oral or written, which is not expressly set forth herein, and (iii) may not be changed orally, but only in a writing signed by duly authorized representatives of each of the Parties.

[*Remainder of Page Intentionally Blank*]

The undersigned have executed this Agreement as of the date first written above.

**Agreed and Accepted:**

**Charitable DAF HoldCo, Ltd.**,
a Cayman Islands limited company

By: ______________________
Name: Mark Patrick
Title: Director

By: ______________________
Name: Paul Murphy
Title: Director

Address for Notices:
Email: mpatrick@dafholdco.com
Email: pmurphy@dafholdco.com

**CDMCFAD, LLC**,
a Delaware limited liability company

By: ______________________
Name: Mark Patrick
Title: Manager

Address for Notices:
Email: mpatrick@dafholdco.com

**Schedule A**

**Assigned Contracts and Agreements**

1. Engagement Letter between Stone Hilton PLLC and Charitable DAF HoldCo, Ltd. dated February 27, 2025
2. Engagement Letter between Shields Legal Group, P.C. and Charitable DAF HoldCo, Ltd. (among others) dated September 27, 2023
3. Terms of Engagement by Walkers (Cayman) LLP to Charitable DAF HoldCo, Ltd.
4. Firestarter Proposal between Firestarter and Charitable DAF HoldCo, Ltd. dated January 15, 2025
5. Various ValueScope agreements, which we do not have
6. Engagement Letter between Seyfarth Shaw LLP and Charitable DAF HoldCo, Ltd. dated October 23, 2023
7. Engagement Letter between Deloitte Tax LLP and Charitable DAF HoldCo, Ltd. dated January 17, 2023
    a. Engagement Letter between Deloitte Tax LLP and Charitable DAF HoldCo, Ltd. dated February 7, 2022
8. Acknowledgment and Ratification Agreement among Grant James Scott, Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, and Charitable DAF Fund, LP dated July 1, 2024
9. Engagement Letter among Charitable DAF HoldCo, Ltd. (and other DAF entities) and Carrington Coleman dated March 22, 2024
10. Engagement Letter among Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, and Hueston Hennigan LLP dated January 26, 2024
11. In DAF's sole discretion, any other contract which they deem necessary to achieve a voluntary and solvent liquidation of Holdco

**WRITTEN CONSENT**
**OF THE MANAGER**
**OF**
**CDMCFAD, LLC**

**March 27, 2025**

The undersigned, being the manager (the "Manager") of CDMCFAD, LLC, a Delaware limited liability company (the "Company"), does hereby consent to, adopt and approve, ratify and confirm by written consent the following resolutions and directs that this written consent be filed with the minutes of the proceedings of the Company:

**WHEREAS**, the current sole member of the Company is Charitable DAF Holdco, Ltd. (the "Current Member");

**WHEREAS**, the Company is currently governed by that certain Limited Liability Company Agreement of the Company, dated December 18, 2024 (the "LLC Agreement");

**WHEREAS**, the Company is part of a larger group of entities that include the Current Member (collectively the "DAF"), and the mission statement of the Current Member (which is representative of DAF as a whole) is as follows: "*Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*" (the "Mission Statement");

**WHEREAS**, the Highland Dallas Foundation, Inc., the Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc. (collectively, the "Highland Foundations") are Participating Shareholders in the Current Member and may be entitled to discretionary dividends if declared by the current Directors of the Current Member;

**WHEREAS**, the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii);

**WHEREAS**, and in connection therewith, the Manager desires to cause the Company to (i) admit DFW Charitable Foundation as an additional member of the Company and to amend the LLC Agreement to reflect the same, each pursuant to the terms of that certain Admission and Amendment No. 1 Agreement, a form of which is attached hereto as Exhibit A (the "Admission Agreement") and (ii) redeem the entire limited liability company interests in the Company held by the Current Member and to amend the LLC Agreement to reflect the same, each pursuant to the terms of that certain Redemption and Amendment No. 2 Agreement, a form of which is attached hereto as Exhibit B (the "Redemption Agreement" and together with the Admission Agreement, jointly, the "Restructure Agreements");

**WHEREAS**, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests

of the Company from ValueScope and (ii) FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests;

**WHEREAS**, for the foregoing reasons, and others, the Manager has determined it to be in the best interests of the Company and its members for the Company to take all steps necessary to complete the transactions contemplated by the Restructure Agreements (such transactions collectively, the "Member Reorganization") so that the Company and DAF can again fulfill its Mission Statement and charitable purpose.

**NOW, THEREFORE, BE IT RESOLVED**, that the Member Reorganization is hereby approved in all respects in accordance with the terms set forth in the Restructure Agreements; and be it

**RESOLVED FURTHER**, that the terms, conditions and provisions of each of the Restructure Agreements are hereby approved in all respects; and be it

**RESOLVED FURTHER**, that the Manager, acting alone, be, and hereby is, authorized and empowered to execute and deliver in the name and on behalf of the Company and to cause the Company to perform its obligations under, such other and further agreements, instruments or documents (with such changes as the Manager deems necessary or advisable, such determination to be conclusively evidenced by the Manager's execution thereof) and to take all other actions that the Manager deems necessary or advisable to evidence and finalize the Member Reorganization and to carry out the intent and accomplish the purposes of these resolutions; and be it

**RESOLVED FURTHER**, that all acts of the Manager taken prior to the adoption of the foregoing resolutions, which acts are consistent with the purposes of the foregoing resolutions are hereby severally ratified, confirmed, approved and adopted as acts of the Company.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date first set forth above.

**MANAGER:**

[signature]

Name: Mark E. Patrick

EXHIBIT A

Admission Agreement

# ADMISSION AND AMENDMENT NO. 1 AGREEMENT

This Admission and Amendment No. 1 Agreement (this "**Agreement**"), is entered into by the undersigned on March 27, 2025 (the "**Effective Date**"). Capitalized terms used herein and not otherwise defined shall have the meanings for such terms set forth in the LLC Agreement (as defined below).

## RECITALS

WHEREAS, CDMCFAD, LLC, a Delaware limited liability company (the "**Company**") is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of December 18, 2024 (the "**LLC Agreement**");

WHEREAS, in accordance with the terms of the LLC Agreement, the parties hereto desire to: (i) admit the undersigned new Member (the "**New Member**") as an additional Member of the Company with the capital contribution of $1,637,192 (the "**Capital Contribution**") and Allocation Percentage set forth in Exhibit A hereto and (ii) amend Schedule A to the LLC Agreement as set forth in Exhibit A hereto to reflect the foregoing, as of the Effective Date; and

WHEREAS, the Manager hereby consents to and approves of the admission of the New Member and the amendments to Schedule A to the LLC Agreement as contemplated herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENTS

**I. Admission.** Each of the parties hereto hereby consents to the admission of the undersigned New Member as an additional Member of the Company. In exchange for the payment to the Company of the Capital Contribution, the New Member is hereby issued a limited liability company interest in the Company with an Allocation Percentage as set forth on Exhibit A attached hereto as of the Effective Date. Upon the execution of this Agreement, the undersigned New Member is hereby admitted as an additional Member of the Company as of the Effective Date and in such capacity, hereby agrees to and shall be bound by the terms of the LLC Agreement commencing as of the Effective Date. For the avoidance of doubt, the execution and delivery of this Agreement by the undersigned New Member shall constitute the execution and delivery of a counterpart signature page to the LLC Agreement as required under Section 2.6 of the LLC Agreement.

**II. Amendments.**

A. Schedule A of the LLC Agreement is hereby amended and restated in its entirety and replaced with Exhibit A attached hereto.

**III. Miscellaneous.**

A. Agreement in Effect. Except as otherwise hereby amended, the LLC Agreement shall remain in full force and effect.

B. Governing Law. This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

C. Counterparts. This Agreement may be executed in counterparts (including by facsimile or other electronic transmission), each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

D. Successors and Assigns. This Agreement is binding upon and will inure to the benefit of the parties to this Agreement and their successors and assigns.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

**MANAGER:**

Name: Mark Patrick

**NEW MEMBER:**

DFW CHARITABLE FOUNDATION

By: ________________________
Name: Mark Patrick
Title: President

*[Signature Page to Admission and Amendment No. 1 Agreement – CDMCFAD, LLC]*

**EXHIBIT A**

**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

**MEMBER INFORMATION**

**Revised: March 27, 2025**

| Name and Contact Information | Allocation Percentage |
|---|---|
| Charitable DAF Holdco, Ltd.<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 50% |
| DFW Charitable Foundation<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 50% |

EXHIBIT B

Redemption Agreement

# REDEMPTION AND AMENDMENT NO. 2 AGREEMENT

This Redemption and Amendment No. 2 Agreement (this "**Agreement**"), is entered into by the undersigned on March 27, 2025 (the "**Effective Date**"). Capitalized terms used herein and not otherwise defined shall have the meanings for such terms set forth in the LLC Agreement (as defined below).

## RECITALS

WHEREAS, CDMCFAD, LLC, a Delaware limited liability company (the "**Company**") is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of December 18, 2024 (as heretofore amended, the "**LLC Agreement**"); and

WHEREAS, in accordance with the terms of the LLC Agreement, Manager desires to: (i) redeem the entire limited liability company interest in the Company currently held by Charitable DAF HoldCo, Ltd. (the "**Redeemed Member**") effective as of the Effective Date for $1,637,192 (the "**Redemption Price**"), such amount being the Fair Market Value for the Redeemed Member's Interest as determined by the Manager, and (ii) amend Schedule A to the LLC Agreement as set forth in Exhibit A hereto to reflect the foregoing, as of the Effective Date.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENTS

**I. Redemption.** The Manager hereby approves and as of the Effective Date, the Redeemed Member's entire Interest in the Company is hereby redeemed by the Company for the payment of the Redemption Price. As of the redemption contemplated by this Section I, the Redeemed Member shall cease to be a member of the Company and shall thereupon cease to have any rights or obligations as a member of the Company under the LLC Agreement, the Act or otherwise.

**II. Amendments.**

A. Schedule A of the LLC Agreement is hereby amended and restated in its entirety and replaced with Exhibit A attached hereto.

**III. Miscellaneous.**

A. Agreement in Effect. Except as otherwise hereby amended, the LLC Agreement shall remain in full force and effect.

B. Governing Law. This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

Seyfarth

**Seyfarth Shaw LLP**
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
**T** (310) 277-7200
**F** (310) 201-5219

dmancino@seyfarth.com
T (310) 201-5241

www.seyfarth.com

March 20, 2025

**FEDEX**

TEGE Referrals Group
Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re: Highland Dallas Foundation, Inc. (EIN: 45-3961755)

Dear Sir or Madam:

I am writing on behalf of my client, Charitable DAF Holdco, Ltd., a Cayman Islands exempt[1] company ("DAF Holdco"), concerning the deterioration of its relationship with one of its Participating Shareholders, Highland Dallas Foundation, Inc. ("Highland Dallas"). Highland Dallas is a supporting organization of the Dallas Foundation.[2]

The deterioration of this relationship is due directly to the undue influence and control exercised over Highland Dallas by James D. Dondero and his affiliates, as described in this Form 13909, *Tax-Exempt Organization Complaint (Referral).* This disclosure letter supplements in detail and in exhibits the more general information described in the accompanying Form 13909 and is an integral part of that form (collectively, the Form 13909 and this letter are referred to as the "Referral").

We believe the information described in this Referral will demonstrate clearly that Mr. Dondero's influence and control is an inappropriate donor relationship with representatives of the Dallas Foundation who serve on the Board of Directors of and as officers of Highland Dallas. We believe this undue influence and control potentially jeopardizes the tax-exempt status of Highland Dallas as an organization described in section 501(c)(3) and, at a minimum, causes it to fail to remain a supporting organization described in section 509(a)(3) because of the

---

[1] To be clear, DAF Holdco is not a tax-exempt organization under U.S. tax law, notwithstanding the use of the term "DAF" in its corporate name.. However, under its Cayman Islands Articles of Association, a "Restricted Person," i.e., an entity that *cannot* own Participating Shares, is an organization that is *not* described in section 501(c)(3) of the Code. As a consequence, all Participating Shareholders of DAF Holdco must be and remain organizations described in section 501(c)(3).
[2] The Dallas Foundation is a tax-exempt community foundation described in sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code of 1986 (the "Code").

excessive influence of a disqualified person and substantial contributor, i.e., Mr. Dondero, under section 509(a)(3)(C).

This Referral is divided into three major parts, with multiple subparts.

Part I provides the Internal Revenue Service (the "IRS" or the "Service") with extensive factual information concerning Highland Dallas, its governance and control. As will be seen, Mr. Dondero exerts undue influence and control over Highland Dallas directly, as a director, President and substantial contributor, and indirectly through his and his associates' influence over Highland Dallas's supported organization representatives on the Highland Dallas Board of Directors, and the Dallas Foundation itself.

Part II provides the IRS with background information on DAF Holdco and Mr. Dondero's efforts to exert dominion and control over DAF Holdco and its assets. Because Highland Dallas is a Participating Shareholder of DAF Holdco, Mr. Dondero's efforts (both successful and unsuccessful) to control DAF Holdco for his personal gain directly affect Highland Dallas financially and provide him an additional amount of private benefit and private inurement from a donation where he once benefitted from a charitable contribution deduction to a charitable remainder trust ("CRT").

As will be discussed in Part III, the tax discussion section, Mr. Dondero's influence and control is pervasive and is exercised primarily for Mr. Dondero's financial benefit directly and for the financial benefit he derives indirectly through several entities owned or controlled by him. We believe he therefore derives more than insubstantial benefit form Highland Dallas and causes its net earnings to inure to his benefit, all in violation of section 501(c)(3)'s most basic operational requirements. Also, at a minimum, we believe his influence and control over Highland Dallas has caused it to become a private foundation, thereby subjecting Mr. Dondero to Chapter 42 excise tax exposure.

## I. Background Concerning the Formation and Legal Structure of Highland Dallas, Highland Capital Management, L.P., and NexPoint Advisors, L.P.

### A. Highland Dallas

Highland Dallas was incorporated as a Delaware nonprofit nonstock corporation by Mr. Dondero in 2011 in connection with his desire to form three tax-exempt public charities to become the three remaindermen of a CRT of which he was the income beneficiary. Highland Dallas applied for and was recognized by the IRS as a charitable organization described in section 501(c)(3) of the Code and as a supporting organization of the Dallas Foundation described in section 509(a)(3) of the Code. Highland Dallas did not register as a foreign corporation to do business in Texas until 2020.

At the time of its formation, Mr. Dondero became the sole "individual" member of Highland Dallas, with the legal power to select one director. The Dallas Foundation became the sole "institutional" member of Highland Dallas, with the power to select two directors. Thus, in 2011, Highland Dallas satisfied the requirements for being classified as a Type I supporting organization of the Dallas Foundation.

In addition, Mr. Dondero, in 2011, became and remains today the President of Highland Dallas and a member of its Board of Directors.

The other two supporting organizations are the Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara") (EIN: 45-3962008) and the Highland Kansas City Foundation, Inc. ("Highland Kansas City") (EIN: 45-3961885). These two supporting organizations of the Santa Barbara Foundation and Greater Kansas City Community Foundation, respectively, also have the same legal structure as Highland Dallas and, like Highland Dallas, each owns 100 Participating Shares of DAF Holdco.

We do not believe either Highland Santa Barbara or Highland Kansas City is as easily manipulated by Mr. Dondero and his affiliates as Highland Dallas because, according to their Forms 990 for 2023 (which is the last year those forms are available on Guidestar.com), Participating Shares of DAF Holdco are their only assets. By contrast, Mr. Dondero has made substantial additional contributions to Highland Dallas after 2011, either directly or through trusts or other entities owned or controlled by Mr. Dondero, some of which will be addressed later in this Referral. Thus, we believe Mr. Dondero is in a position to exert greater influence as a substantial contributor to Highland Dallas on the Directors of Highland Dallas appointed by the Dallas Foundation (including the Dallas Foundation's President & CEO, Julie Diaz).[3]

**B. Mr. Dondero and Highland Capital Management, L.P.**

Highland Capital Management, L.P. ("HCM") is an investment management firm located in Dallas, Texas that was co-founded in 1993 and controlled by Mr. Dondero and individuals close to him. As described on page 7 of the *Special Turnover Petition* filed by UBS Securities LLC and UBS AG London Branch in the New York Supreme Court in 2023, a complete copy of which is enclosed with this Referral as Exhibit 1 (the "2023 UBS Petition"), before HCM filed for bankruptcy, "HCM was an investment management firm that managed billions of dollars in assets through its organizational structure of approximately 2,000 separate business entities." (citation omitted). It is estimated by a plaintiff in another action that, at its height, HCM managed as much as $40 billion in assets.

Mr. Dondero was not only HCM's co-founder with Mark Okada,[4] he served as HCM's President and Chief Executive Officer until he was removed by the bankruptcy trustee in 2020.

---

[3] By way of example, the consolidated financial statements of the Dallas Foundation for 2023 available on its website include the assets of seven supporting organization, including Highland Dallas. Page 22 of the statements disclose that approximately $163.4 million of its assets were held by supporting organizations. On page 19, it appears that approximately $92.3 million (almost 57%) represent Highland Dallas' assets. Also, in 2023, Highland Dallas received almost $34 million in charitable contributions, presumably all from Mr. Dondero and entities affiliated with or controlled by him. Thus, it is understandable why the Dallas Foundation representatives who serve on the Highland Dallas Board would acquiesce to almost any request or demand made by Mr. Dondero or one of his associates such as Lucy Bannon.
[4] In the Dallas Foundation's 2022 Form 990, the most recent available on Guidestar.com, Mr. Okada was listed as a member of the Board of Governors of the Dallas Foundation. On its website, the Dallas Foundation identifies another confidant and employee of Mr. Dondero, Lucy Bannon, as an "Advisory Member" of the Board of Governors (last visited March 5, 2025). Thus, Mr. Dondero continues to exert substantial indirect influence over Highland Dallas's supported organization, the Dallas Foundation.

### C. Mr. Dondero, NexPoint Advisors, L.P., and NexPoint Hospitality Trust

In 2012, prior to his removal as President of HCM in 2020, Mr. Dondero formed NexPoint Advisors, L.P. ("NexPoint Advisors"), a Dallas-based portfolio real estate and investment firm. NexPoint Advisors is one of a vast array of entities operating under the "NexPoint" umbrella. After the HCM bankruptcy, Mr. Dondero and his affiliates seamlessly shifted their operations from HCM to NexPoint Advisors and its affiliates.

As alleged in another lawsuit filed in 2021 in the United States Bankruptcy Court of the Northern District of Texas by Marc S. Kirshner as a litigation trustee in the HCM bankruptcy case, "NexPoint [Advisors] was effectively a shell entity that Dondero created in March 2012 to siphon profits from [HCM] in order to evade [HCM's] creditors." *See Complaint and Objection to Claims in Kirschner v. Dondero, et. Al.* Case No. 19-34054-sgj11, at pages 18-21, a copy of which is attached as Exhibit 2.

Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.

One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").

Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026. See the Dugaboy/REIT documents included as Exhibit 2.

The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,606,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy. We also assume that Highland Dallas signed a Form 8283, *Noncash Charitable Contributions*, form acknowledging it received the Units that would have been included with Mr. Dondero's 2019 Form 1040 along with a qualified appraisal of the Units (we have no actual knowledge of this, however).

On information and belief, we believe Mr. Dondero has used his influence and control over Highland Dallas to cause it defer exercising the Put Option at least through the effective time of the merger for at least three reasons.

- First, the forbearance to exercise the Put Option allows Mr. Dondero and Dugaboy to enjoy the benefits of an interest-free loan of $9,285,000 (the put exercise price ($6.19 x 1,500,000 units) while the Put Option remains outstanding and unexercised.

- Second, the forbearance to exercise the Put Option effectively has protected Mr. Dondero from the declining value of the REIT between December 2019 and November 2024. As of November 22, 2024, the reported fair value of the Units was $0.015 per Unit, so the fair value on that date of 1,500,000 Units was only $22,500, less than one percent of the Put Option value of $9,285,000.

- Third, most charitable organizations have a policy of immediately selling contributed shares that are listed for trading on a stock exchange in order both to diversify and to reinvest the sale proceeds in a manner that aligns more closely with the charity's investment policy. Had Highland Dallas sold the Units on the TSXV at any time within three years after their receipt, Highland Dallas would have been required to file a Form 8282, *Donee Information Return,* with the Service that would likely have reflected a much lower value of the original contribution amount claimed in 2019. Thus, in effect, Highland Dallas was acting to protect Mr. Dondero from having to address the precipitous fall in fair market value as the REIT Units plummeted in value beginning shortly after the gift was made.

Highland Dallas's failure to exercise the Put Option up until now becomes all the more significant because on November 25, 2024, the REIT announced the execution of a definitive agreement (the "Merger Agreement") pursuant to which the REIT will be dissolved and its subsidiary entities will be merged with and into entities owned or controlled, directly or indirectly, by NexPoint Diversified Real Estate Trust. Under the Merger Agreement, The proposed price per Unit is $0.36 per Unit. According to the press release issued by the REIT announcing the merger, "[t]he proposed price of US$0.36 per Unit represents a premium of approximately 2300% to the 30-day volume weighted average price per Unit on the TSXV ended November 22, 2024 of US$0.015."

Last month, in a press release issued on February 21, 2025, it was announced that a majority of minority votes approved of the merger. Under Canadian law, when a person such as Mr. Dondero owns or controls a majority of a Canadian public company's voting shares, a transaction such as this merger must be approved by two-thirds of the minority shares, or in this instance the 5,131,020 Class B non-voting Units.

Based on public filings with the U.S. Securities and Exchange Commission, we believe the REIT had approximately 29,353,660 Units, of which 82.52% were owned by entities owned or controlled by Mr. Dondero.

We have to assume that Highland Dallas voted its 1,500,000 Units in favor of the merger at Mr. Dondero's request.[5] That suggests that the merger needed Highland Dallas's 29.2% (almost one-third of the two-thirds vote required) of minority Unit's approval. That also suggests that

---

[5] We understand that the Board of Directors of Highland Dallas usually acts by Unanimous Written Consent Without a Meeting, which means the Mr. Dondero along with the two Dallas Foundation Board appointees would have approved voting in favor of the merger. Presumably the same would be true if a decision were taken by the Board to refrain from exercising the Put Option.

Highland Dallas chose not to exercise its Put Option to permit Mr. Dondero to retain control over the REIT even as its finances deteriorated.

We have no way of knowing whether Highland Dallas will exercise the Put Option before the REIT is dissolved (projected for the end of the first quarter of 2025, i.e., by the end of this month), but clearly if it fails to do so this will result in a $9 million inappropriate windfall to both Dugaboy and Mr. Dondero. Obtaining the answer to this question would only require the IRS to open an examination of Highland Dallas and issue an Information Document Request and/or issue a third-party subpoena to Dugaboy.[5]

**D. Highland Dallas's Assumed Name**

In March 2024, Highland Dallas filed an Assumed Name certificate with the Texas Secretary of State to permit it to operate under the name "NexPoint Philanthropies Dallas, Inc." This is consistent with Mr. Dondero's current ownership and control of NexPoint Advisers and his loss of control of HCM in the bankruptcy and consistent with the goal of allowing a private company (NexPoint) and Mr. Dondero to take credit for and enjoy the halo effect from NexPoint Philanthropies Dallas's (really Highland Dallas's) charitable giving.

**E. Mr. Dondero's Firearms Contributions to Highland Dallas**

Several years ago, Mr. Dondero (either directly or through entities owned and controlled by him) made contributions of a collection of firearms to Highland Dallas. Presumably, a Highland Dallas officer signed the donee acknowledgement on Form 8283, *Noncash Charitable Contributions*, and checked the box "No" asking whether the organization intended to use the property for an unrelated use, because checking "Yes" would limit Mr. Dondero's charitable contribution deduction to his adjusted basis and not its appraised fair market value. This in itself demonstrates Mr. Dondero's improper influence over the Dallas Foundation representatives serving as Board members and officers of Highland Dallas, especially as it is hard to believe a supporting organization of a community foundation could possibly use firearms in a related trade or business.

But to further demonstrate his abuse and diversions of assets for his own benefit, earlier this year in 2025 he diverted a substantial debt service payment of $1.3 million on a loan owed to one of DAF Holdco's subsidiaries to pay for a specially-designed and built vault for those firearms (shotguns). That diversion of assets has caused a default of that loan that has now landed in Texas State court, thereby depleting DAF Holdco's assets further because of legal fees. It is unknown whether the vault was requested by anyone associated with the Dallas Foundation serving as a director or officer of Highland Dallas, such as Julie Diaz, but we believe it likely was.

**F. Mr. Dondero's Character**

Mr. Dondero has a demonstrated pattern of behavior of stealing assets from those he perceives as adversaries. What is also demonstrated by even a cursory reading of the 2023 UBS Petition

---

[5] We will be happy to provide the IRS with a copy of the S-4 filed with the SEC available on EDGAR and the REIT's press releases that were used to develop this data.

and the *First Amended Original Complaint* filed by Highland Employee Retention Assets LLC against Mr. Dondero and his affiliates on July 15, 2024 in the U.S. District Court for the Northern District of Texas, Dallas Division, a complete copy of which is enclosed as Exhibit 4 with this Referral (the "2024 Complaint"), Mr. Dondero, to put it mildly, has no respect for corporate formalities and is willing to engage in self-dealing to strip entities of their assets without regard to any fiduciary duty of care or loyalty to serve his personal needs and to benefit himself financially to the detriment of others, including his own former HCM employees.[7]

The 2023 UBS Petition outlines how Mr. Dondero, facing a $1 billion judgment, directed various entities he owned and controlled to shift substantially all of their assets offshore to a Cayman Islands insurance company for a fraudulent insurance policy. The 2023 UBS Petition is an attempt to collect on a 2020 $1 billion judgment in favor of the UBS entities. Mr. Dondero has been so successful at hiding assets that the UBS entities have not been paid.

The 2024 Complaint seeks recovery of hundreds of millions from Mr. Dondero. It describes how a former Mr. Dondero employee at HCM, Patrick Daugherty, had a falling out with Mr. Dondero. After the falling out, Mr. Dondero took extraordinary steps to ruin Mr. Daugherty's life—depriving him of assets, removing his long-term incentive plan, embroiling him in lawsuits, and the list goes on.

These are not isolated incidents. In the ACIS Capital Management, L.P. matter,[8] Mr. Dondero had a falling out with Josh Terry, a former employee of HCM, and took extraordinary steps to ruin Mr. Terry's life—the same playbook as above with Mr. Daugherty.

In fact, Mr. Dondero and his litigiousness is widely known in the Dallas/Fort Worth area. Mr. Dondero is variously described as "Highland Capital's Giraffe-Eating Hedge Fund Manager" (Dallas Observer June 1, 2012), and "the distressed debt investor who was once a scourge to private equity. . . " (Financial Times March 10, 2023).

As it relates to this Referral more specifically, in a May 3, 2023 post entitled "James Dondero: Dallas's Surprising Philanthropy Hero," the post states: "Most gifts are made through the Highland Dallas Foundation, Inc., the philanthropic arm of Highland Capital Management." Note that this post appears to have been prepared by Mr. Dondero himself and appeared three years after he was ousted as HCM's President. What's more to the point is that it outlines in Mr. Dondero's own words the likely failures of Highland Dallas to comply with the section 509(a)(3) operational test discussed below. A copy of that post is included as Exhibit 6.

### G. Skyview Group

Skyview Group is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or controlled by Mr. Dondero. Mr. Mark Patrick was engaged as a tax

---

[7] *See also In Re: Highland Capital Management L.P. v. Dondero,* Case No. 19-34054-sgj11 (June 6, 2021), a decision by the U.S. Bankruptcy Court for the Northern District of Dallas. In that opinion, the Bankruptcy Judge found Mr. Dondero to be in contempt for violating a temporary restraining order. A copy of that opinion is enclosed as Exhibit 5.
[8] We can provide the IRS with a copy of this complaint if that would be of interest.

consultant by Skyview Group until Mr. Patrick resigned in October 2024 on the advice of the undersigned counsel. Skyview Group charged DAF Holdco management fees for its services.

Skyview Group is nominally owned and controlled by Scott Ellington, who was HCM's Chief Legal Officer and General Counsel until his removal by the bankruptcy trustee in 2021. Despite this nominal ownership and control by Mr. Ellington, Mr. Dondero controls all compensation decisions, including decisions relating to Mr. Ellington's compensation, and thus dominates Skyview Group as if he owned it himself.

Since Mr. Patrick's resignation from Skyview Group, Mr. Patrick has been directly employed and compensated by DAF Holdco rather than Skyview Group. In addition, Mr. Patrick, again acting on advice of counsel, caused DAF Holdco to give six-months' notice in October 2024 to Skyview Group that it was terminating its contract with Skyview Group.

Mr. Dondero became furious when he learned of these actions, and that is when (for the first time in over a decade) Highland Dallas and Dallas Foundation executives and attorneys started raising questions about DAF Holdco's investments and management. In addition, this is when Highland Dallas, and Julie Diaz (who serves as both the President of the Dallas Foundation and as a Director and Vice President of Highland Dallas), began voicing concerns over DAF Holdco's investment performance, concerns that were never raised when Mr. Dondero's lackey, Grant Scott was rubber-stamping NexPoint and other Dondero-related investments and that were never raised prior to Mr. Patrick's resignation from Skyview Group.

## II. DAF Holdco

### A. The Grant Scott Control Era

Back in 2011, when Highland Dallas and the two other supporting organizations were being formed, one of the highly successful types of investments designed and marketed by HCM through investment partnerships were collateralized loan obligations, or CLOs.

A CLO is a single security backed by a pool of corporate debt issued by corporate borrowers with low credit ratings or loans taken out by private equity firms to conduct leveraged buyouts. With a CLO, the investor receives scheduled debt payments from the underlying loans, assuming most of the risk in the event of a default. In exchange for taking on that default risk, the investor is offered greater diversity and the potential for higher-than-average investment returns. DAF Holdco was formed initially in 2011 to hold partnership interests in partnerships that held CLOs.

Mr. Dondero caused DAF Holdco to be formed to have a structure through which he could have his CRT make remainder interest distributions of the Participating Shares of DAF Holdco to Highland Dallas and to the other two supporting organizations.[9] How CLOs work is not relevant

---

[9] This is documented in Part III, Line 4a of each of the three supporting organizations' Form 990, *Return of Organization Exempt From Income Tax*, for 2023 (the last year for which a Form 990 for the organizations was posted on Guidestar.com).

to this Referral except to the extent that Management Shares of DAF Holdco were initially issued to Mr. Dondero's college roommate and long-time close friend, Grant Scott.[17]

Grant Scott's ownership of the Management Shares from 2011 to 2021 effectively allowed Mr. Dondero to retain control of DAF Holdco and, thereby, use DAF Holdco's assets as a piggybank for other investments described below. Management Shares have no economic right to distributions; the value for Mr. Dondero is in their control over DAF Holdco and the ability to utilize its assets either to make dividend distributions to the Participating Shareholders (i.e., the supporting organizations) or to fund Dondero-managed investments on non-market terms and with below-market returns on investment.

NexPoint Advisors repeatedly reached out to DAF Holdco for investment-backing with below market terms and rates of returns while under the control of Grant Scott. Grant Scott consummated these transactions without hiring outside counsel or valuation experts for DAF Holdco. The lack of arm's-length dealing under Grant Scott's control is made patently obvious in the ValueScope November 18, 2024 presentation materials included as Exhibit 7. The economics of these transactions clearly show that Mr. Dondero was directing Grant Scott to cause DAF Holdco to enter into below-market deals for DAF Holdco that redirected the profits to Mr. Dondero and entities he owns. In other words, Mr. Dondero was stealing from DAF Holdco and, in turn, the supporting organizations.

Mr. Dondero's theft was not limited to below-market transactions. In March 2020, Mr. Dondero and his affiliates directed Grant Scott to make a $1 million payment to an entity called Tall Pine Group, LLC. The payment was allegedly for professional services rendered, but no such services were rendered to DAF Holdco. In subsequent court filings, it became clear that the $1 million went to pay Mr. Dondero's affiliates' employment compensation bonuses, which could not be paid in the normal course because HCM was subject to various bankruptcy restrictions at the time. Further detail is available in the *Kirschner* Complaint, at page 61, a copy of which is attached hereto as Exhibit 2.

**B. The Mark Patrick Control Era (including present day)**

Grant Scott assigned the Management Shares to Mark Patrick in March 2021. Mr. Patrick now controls DAF Holdco and the timing of distributions to the supporting organizations, including Highland Dallas. Mr. Patrick also controls the negotiations and approvals of the terms and conditions of all investments since he assumed control. Since then, under Mark Patrick's leadership DAF Holdco has begun to diversify away from Dondero-managed investments.

Total DAF Holdco (including its subsidiaries) exposure to Dondero-managed investments was over $100 million in June 2023. Because of the formation history of DAF Holdco and the various transactions between DAF Holdco and Dondero-managed investments, DAF Holdco has been named as a defendant in numerous lawsuits claiming it is an alter ego of Mr. Dondero and his

[17] On pages 7 and 8 of the litigation trustee's Complaint and Objection to Claims in *Kirschner v. Dondero* included as Exhibit 2, the trustee described Grant Scott as follows: "Dondero personally selected Scott as his successor to run the Charitable DAF Fund. ... Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and [HCM's] directives without asking questions or requesting additional information."

entities and that the initial funds transferred to DAF Holdco from the CPT were fraudulent transfers. These lawsuits have been very expensive and time-consuming for DAF Holdco, which disadvantages Highland Dallas and the other Participating Shareholders because the payment of legal fees depletes available cash.

Because Mr. Patrick viewed the $100 million exposure to Dondero-related and the lawsuits as a risk to DAF Holdco (and therefore the Participating Shareholders), he has taken steps to create layers of independence between DAF Holdco and Mr. Dondero. As documented by an independent valuation consultant, ValueScope, LLC (a copy of the ValueScope report is enclosed as Exhibit 7), upon assuming control of DAF Holdco, Mr. Patrick engaged independent counsel to assist him in negotiating "market" terms and returns on investment for investments with all outside parties, especially those controlled by or affiliated with Mr. Dondero, such as NexPoint Advisors. Neither Mr. Dondero nor his associates expected this because no market discipline was exercised by DAF Holdco when it was controlled by Mr. Dondero's college roommate and close friend Grant Scott.

Outside counsel and valuation experts frequently either negotiated more market-standard (and more favorable to DAF Holdco) terms for Dondero-managed investments or advised against the transactions on the terms proposed by Mr. Dondero (via his various entities, including NexPoint Advisors). And, because Mr. Patrick refused to simply rubber-stamp Dondero-related investment asks, Mr. Dondero became upset with Mr. Patrick and demanded that Mr. Patrick provide him with increased levels of control over DAF Holdco, including meetings between Mr. Patrick and Mr. Dondero three times per week when he was still a consultant with Skyview Group, and permitting one of Mr. Dondero's affiliates increased access to DAF Holdco information and finances. Mr. Patrick refused these requests.

Mr. Patrick also hired an independent director for DAF Holdco, Paul Murphy. During Mr. Scott's control, Mr. Scott served as sole director and sole person in control. There was no requirement under Cayman law to hire an independent director; Mr. Patrick did so for the benefit of DAF Holdco (and, indirectly, Highland Dallas and the other Participating Shareholders).

Mark Patrick also resigned from Skyview Group in October 2024. As noted above, Mr. Dondero effectively controls Skyview Group, and it is nominally owned by one of his affiliates, Scott Ellington. Mr. Dondero viewed this as the last straw—he viewed this as his final loss of control over DAF Holdco and its assets. On the same day, in order to complete the separation, Mr. Patrick directed DAF Holdco to terminate a services agreement with Skyview Group.

Mr. Patrick's resignation from Skyview Group was recommended by outside counsel, including this firm. Mr. Patrick recognizes he has fiduciary duties to DAF Holdco and its subsidiaries. Mr. Dondero created tension with these duties by demanding that Mr. Patrick rubber-stamp Dondero-managed investments, as did Grant Scott. For example, in September 2024, Mr. Dondero recommended that DAF Holdco consummate a real property acquisition on The Campus at Legacy (described in Exhibit 7) for $45 million and provide one of Mr. Dondero's entities a repurchase option if the price were to appreciate. In no uncertain terms, DAF Holdco would take all the downside financial and real estate risk and transfer the upside financial benefit to Mr. Dondero if this proposal had been accepted. This was typical for Dondero-managed investments.

Mr. Dondero also demanded that Mr. Patrick cause DAF Holdco to wire one of Mr. Dondero's offshore entities, Sentinel, $1.5 million in November 2023. Mr. Patrick sought the advice of outside counsel, who told Mr. Patrick the payment would be "impermissible and illegal for a number of reasons". Mr. Patrick accordingly refused the payment (i.e., embezzlement) request.

Mr. Dondero's behavior and attitude toward DAF Holdco is nothing if not consistent. Whether Mr. Scott or Mr. Patrick was in control, Mr. Dondero never abandoned the belief that the assets he caused his CRT to distribute to DAF Holdco remained his own. Mr. Patrick's steps toward independence and then resigning from Skyview Group in October 2024 led to Mr. Dondero exerting his influence over Highland Dallas in a manner we believe results in improper private benefit accruing to him as discussed in the tax aspects portion of this disclosure letter.

Following Mr. Patrick's resignation from Skyview Group, Mr. Dondero directed his entities to cease all principal and interest payments owed on Dondero-managed investments to DAF Holdco and its subsidiaries, which has led to several ongoing lawsuits discussed below and outlined in Exhibit 7. It is inevitable that Mr. Patrick will receive the same treatment as Mr. Daugherty and Mr. Terry (described above)—he will be subject to frivolous, vexatious lawsuits and harassment because he is Mr. Dondero's newest villain.

### C. October 2024 to Present

The events that have unfolded show Mr. Dondero's anger at his loss of control of DAF Holdco's assets. Mr. Patrick met with Highland Dallas shortly after his resignation from Skyview Group and assured Julie Diaz of Highland Dallas and the Dallas Foundation that his resignation would not modify management of distributions to the Dallas Foundation. Mr. Patrick believed the meeting went well. Ms. Diaz voiced no concerns and actually requested additional distributions.

Shortly thereafter, Highland Dallas and the two other Participating Shareholders hired the law firm Holland & Knight (which had already represented the Dallas Foundation for years) to represent them and to send a "no confidence" letter to DAF Holdco. This purported lack of confidence was a new sentiment by Highland Dallas, which had never previously expressed any concern when it received ValueScope reports from Grant Scott. The "no confidence" letter came out of the blue—there were no calls, emails, or other communications that expressed a lack of confidence or requested any information whatsoever.

DAF Holdco subsequently learned that Mr. Dondero directed his subordinates at Skyview Group and NexPoint Advisors to provide false and misleading financial information to Highland Dallas and to the other Participating Shareholders. Rather than contact DAF Holdco or Mr. Patrick to question this information (especially given the questionable source), Highland Dallas sent the "no confidence" letter without any attempt to verify it. (As a post-script, DAF Holdco has refuted the false and misleading information, but the dispute continues because it was never really about that.)

Despite the November 11, 2024 date on the "no confidence" letter, DAF Holdco did not receive it until December 6, 2024, after the November 18, 2024 presentation to the supporting organizations' attorneys, Holland &Knight. In addition, DAF Holdco received the "no confidence" letter from Mr. Dondero's personal attorneys, who do not represent Highland Dallas or the other Participating Shareholders.

DAF Holdco responded and voiced its concerns that Mr. Dondero was directing Highland Dallas to take these actions. Recall that Mr. Dondero is a Director and President of Highland Dallas. Holland & Knight ignored the accusations that Mr. Dondero was calling the shots and began sending acrimonious (but toothless) emails to DAF Holdco. Finally, Julie Diaz, a Director and Vice President of Highland Dallas (and President of the Dallas Foundation), sent an email requesting a winding up of DAF Holdco and distribution of all of its assets to Highland Dallas and the other Participating Shareholders.

Paul Murphy, an independent Director of DAF Holdco, made a presentation to the supporting organizations' attorneys from Holland & Knight in which he reviewed all of the governance and management improvements that have already been made, but they persist behind the scenes to facilitate Mr. Dondero's attempts to undermine Mr. Patrick and regain control over DAF Holdco's assets for use by NexPoint for investments.

DAF Holdco was contacted in February 2025 by Cayman Islands counsel stating they represent "DAF 2." DAF Holdco believes this "DAF 2" is an attempt by Mr. Dondero and his affiliates to fraudulently obtain DAF's assets.

In February 2025, DAF Holdco subsidiaries filed two lawsuits against Mr. Dondero's entities for non-payment on Dondero-managed investments. Mr. Patrick also directed a non-DAF entity he controls to file a third lawsuit against Mr. Dondero's entities for non-payment. These lawsuits are fundamentally the same as other lawsuits where creditors have sued Mr. Dondero and his entities for nonpayment. Mr. Dondero has not changed—he refuses to pay his debts and he believes he is the rightful owner of DAF Holdco's assets. Mr. Dondero's instrument is Highland Dallas. He controls Highland Dallas and will cause it to continue its crusade against DAF Holdco. As noted by James Seery, the HCM bankruptcy trustee who removed Mr. Dondero from HCM, Mr. Dondero will "burn the place down" if he does not get his way.

**III. Discussion of Tax Exemption-Related Lack of Compliance and Outright Avoidance**

In order for an organization to qualify for tax-exempt status under section 501(a) of the Code as a charitable organization described in section 501(c)(3) of the Code, it must be organized and operated exclusively for one or more charitable purposes described in section 501(c)(3) and the Treasury Regulations promulgated thereunder. We do not question whether Highland Dallas is organized for charitable purposes, nor do we question whether Highland Dallas's grantmaking to the Dallas Foundation and other bona-fide charitable organizations is consistent with its charitable purposes.

We do question whether Mr. Dondero's influence and control over at least Highland Dallas has allowed some portion of their net earnings to indirectly inure to Mr. Dondero's benefit as a result of his historic access to DAF Holdco's assets at below market rates and terms that appear to have been acquiesced to by each supporting organization. As we discuss below, Mr. Dondero's influence and control over DAF Holdco when Grant Scott was the Management Shareholder was never of concern, especially to Highland Dallas, even as each supporting organization received periodic valuation reports prepared by ValueScope detailing DAF Holdco's NexPoint investments. See report prepared for Grant Scott by ValueScope, attached hereto as Exhibit 8. In fact, we believe those valuation reports were used by each of them to prepare their Forms 990 and to prepare consolidated financial statements.

We also believe that each of the supporting organizations operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets now that Mr. Patrick declined NexPoint investment requests that are both on non-market proposed terms and provide below market returns on investment.

If Highland Dallas elects not to exercise the Put Option before the REIT dissolves, we believe that would be an excess benefit transaction under section 4958 of the Code in which the organization managers had to have knowingly participated.

We also believe Mr. Dondero exercises such control as a substantial contributor of Highland Dallas, resulting from gifts he has made since the initial gift of Participating Shares were made by the ORT in 2011, that Highland Dallas should no longer satisfy the requirement in section 509(a)(3)(C) that there be no control by disqualified persons.

Finally, as discussed briefly below, we believe the donor advised fund rules in section 4966 and 4967 may be implicated, but have insufficient knowledge of the facts to assert conclusively that they do apply.

**A. Private Benefit**

We respectfully submit that Highland Dallas in particular no longer satisfies the operational test of section 501(c)(3) because its actions taken at Mr. Dondero's direction serve his private interests more than incidentally as prohibited by Treasury Regulation § 1.501(c)(3)-1(d)(*1*)(ii).

As we have outlined above, Mr. Dondero and affiliates such as NexPoint Advisors used DAF Holdco, when it was controlled by Grant Scott, as his personal piggybank. And, when Grant Scott controlled DAF Holdco, neither Julie Diaz (in her capacity as Director and Vice President of Highland Dallas) nor the Dallas Foundation questioned whether DAF Holdco's investment were prudent or generated market returns. Rather, even as they received and used for tax and financial reporting purposes the ValueScope valuation opinions which disclosed DAF Holdco's NexPoint and other Dondero-related investments, they never questioned whether the terms were market terms or whether the asset allocations were prudent. It was only after Mr. Patrick took over as Management Shareholder of DAF Holdco and (a) started declining NexPoint investment asks—really demands, (b) started diversifying DAF Holdco's investments away from NexPoint investments, (c) began demanding repayment of amounts owed with respect to NexPoint investments, and (d) Mr. Patrick resigned from Skyview Group and terminated its contract for back office and other services, that the supporting organizations collectively hired outside counsel and, under the lead of Julie Diaz, a Director and Vice President of Highland Dallas began sending no-confidence emails to DAF Holdco Directors (including Mr. Patrick and Mr. Murphy) demanding information to which they were not even legally entitled (a fact that their attorneys openly acknowledged in a Zoom call) and a complete restructuring of DAF Holdco to bring it back under Mr. Dondero's control.

In the seminal decision, *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the Tax Court concluded that the absence of private inurement to the benefit of a private shareholder or individual does not end the analysis of whether an organization satisfies the operational test of exemption under section 501(c)(3). It went on to state: "when the Court concludes that no prohibited inurement of net earnings exists, it cannot stop there but must

inquire further and determine whether a prohibited private benefit is conferred."(citations omitted) *Id.* at 1070. It concluded that "an organization's conferral of benefits on disinterested persons may cause it to serve 'a private interest' within the meaning of section 1.501(c)(3)-1(d)(1)(ii)." *Id.* at 1070.

Finally, after looking at the organization's exclusive source of funding (much the same as Mr. Dondero's exclusive funding of Highland Dallas), control of a majority of the Board by members of the Republican Party (analogous to Mr. Dondero's role as President and Director of Highland Dallas and his substantial influence over the two Dallas Foundation directors evidenced by their epiphany that something has to be done since Mr. Dondero no longer controls DAF Holdco), and several other factors, "we conclude that petitioner is operated for the benefit of private interests, a nonexempt purpose." *Id.* at 1080.

In another case, *Airlie Foundation, Inc. v. United States*, 55 F.3d 684 (D.C. Cir. 1995), the relationship between the founder and executive director of the foundation bears a strong resemblance to the relationship between Mr. Dondero and Highland Dallas and served as a basis for sustain the Service's revocation of its section 501(c)(3) exemption on the ground that it provided more than incidental private benefit to the founder. Although the actual basis for revocation of exemption was a finding of inurement of net earnings, the pervasive control of the founder clearly influenced the D.C. Circuit to affirm the District Court and, equally important, the court cited *American Campaign Academy* for the proposition that an organization does not operate exclusively for tax-exempt purpose if it serves a private interest rather than a public interest and "[t]his requirement applies to the organization's actual, not purported purposes." *Id.* at 75 AFTR 2d 95-2068, 95-2071.

**B. Potential Inurement**

Section 501(c)( also requires that "no part of the net earnings" of the organization may "inure to the benefit of any private shareholder or individual." As observed in the *Airlie Foundation* case, "the extent of the inurement is immaterial." *Id.* As noted in that case, and as is the case with Mr. Dondero, the founder of Airlie Foundation, Inc. "established and controlled a network of taxable and tax-exempt entities. The transactions that took place within the network organizations formed the basis for the IRS's revocation of AFI's tax-exempt status, as discussed at length by the district court."

We respectfully submit that if the Service audits Highland Dallas it will identify many more instances of inurement, beyond the single instance of forgiving $33,672 by Airlie Foundation Inc. owed by one of the founder's affiliated entities. The Dugaboy effective interest-free loan and potential windfall if Highland Dallas fails to exercise its Put Option should be enough, but we believe there will be many other transactions such as management and administrative fees that generate income for Dondero-related entities.

As discussed above in Section II.A., during the Grant Scott control era of DAF Holdco, Mr. Dondero's effective control of DAF Holdco led DAF Holdco to make investments that benefited him personally. These investment deprived DAF Holdco of assets that could be distributed to Participating Shareholders, including Highland Dallas.

**C. The Failure to Exercise the Put Option as an Excess Benefit Transaction**

As you know, section 4958 treats as excess benefit transactions between a public charity such as Highland Dallas and a disqualified person such as Mr. Dondero economic arrangements that are above or below market between them. Section 4958(c)(3)(A) also treats as "automatic" excess benefit transactions "any grant, loan, compensation or other similar payment to" a disqualified person such as a substantial contributor.

We believe, upon examination, the Service will find that Highland Dallas has engaged in multiple automatic excess benefit transactions with Mr. Dondero or entities owed and controlled by him such as NexPoint Advisors.

First, the forbearance to exercise the Put Option effectively created an interest free loan to Dugaboy, a disqualified person. Thus, the mere fact it has remained outstanding for years means it is an automatic excess benefit transaction that requires not only the payment of the 25% excise tax by Dugaboy but also the correction of it through the payment of the full $8,250,000 plus interest.

Second, if NexPoint Advisors performs investment management services for a fee, that would be an automatic excess benefit transaction requiring not only correction but also payment of the 25% excise tax. In fact, we know from public SEC filings that NexPoint Advisors or one of its affiliates does perform investment management services for the REIT, which may itself be an excess benefit transaction requiring correction.

Finally, while other excess benefit transactions may be identified during an examination of Highland Dallas, any forbearance to exercise the Put Option to benefit Dugaboy should be regarded, at a minimum, as a "similar payment" given the fact that Mr. Dondero benefits economically in a substantial way from that forbearance.

Given that the other two directors must act to approve these actions, it is likely they have done so knowingly and willfully.

**D. Potential Non-Compliance with Section 509(a)(3) Operational Test Sufficient to Cause Highland Dallas to be Reclassified as a Private Foundation and Thus Subject to Chapter 42 Rules**

In Mr. Dondero's article entitled "James Dondero: Dallas's Surprising Philanthropy Hero" (May 3, 2023, copy enclosed as Exhibit 6), Mr. Dondero said as follows:

> "Mr. Dondero and his firm have supported The Family Place, The Dallas Zoo, SMU's Tower Scholars program, The Perot Museum of Nature and Science, Education is Freedom, and many more local charity organizations. Most gift are made through the philanthropic arm of Highland Capital Management."

Thus, in his own words, Mr. Dondero has acknowledged Highland Dallas has violated the section 509(a)(3) operational test in Treasury Regulation § 1.509(a)-4(e)(1) concerning permissible beneficiaries of a supporting organization and should be re-classified as a private foundation. That would mean that all dealings between Highland Dallas and entities owned or controlled by Mr. Dondero should be scrutinized to determine whether they constitute acts of

self-dealing described in section 4941 of the Code or violate other provisions of Chapter 42 of the Code, such as the taxable expenditure rules in section 4945.

Under Treasury Regulation § 1.509(a)-4(e)(1), "[a] supporting organization will be regarded as 'operated exclusively' to support one or more specified publicly supported organizations **only if it engages solely in activities which support or benefit the specified publicly supported organizations.**" (emphasis supplied)

The only exception to the requirement that a supporting organization benefit the supported organization "solely" is when the supporting organization provides benefits to individual members of the charitable class benefitted by the supported organization, such as by granting scholarships to graduates of a particular high school for college. *See, e.g., Nellie Callahan Scholarship Fund v. Commissioner*, 73 T.C. 626 (1980). The word "solely" is unambiguous; therefore, Mr. Dondero's own acknowledgement that Highland Dallas is the source of his funding of other admittedly charitable organizations provides conclusive evidence that Highland Dallas fails the operational test of section 509(a)(3).

Furthermore, section 509(a)(3)(C) provides that a supporting organization may not be controlled directly or indirectly by a disqualified person. A substantial contributor to a supporting organization is a disqualified person under section 4946(a)(1)(A). Thus, Mr. Donero's Dugaboy gift of the REIT Units to Highland Dallas made him a disqualified person and his effective veto power places him in control of Highland Dallas.

Therefore, we respectfully submit that that the Service should examine Highland Dallas to determine if it should be reclassified as a private foundation for the foregoing reasons and, if it is so-reclassified, all transactions between Mr. Dondero and his related or controlled entities should be evaluated to determine whether any constitute acts of self-dealing under section 4941. This should include the failure on the part of Highland Dallas to exercise its Put Option.

**E. Potential Non-Compliance with Section 4966/4967 Rules Applicable to Donor Advised Funds**

Finally, we respectfully submit that the Service should examine Highland Dallas to determine whether it, in effect, functions as a donor advised fund of Mr. Dondero given the fact he provided substantially all of its funding, effectively controls it and may personally benefit financially more than incidentally through entities he owns or controls from management fees, charity special events such as banquets and other means.

* * * *

Representatives of DAF Holdco will be available to be interviewed by the Service in a manner that will not result in compromising confidentiality under section 6103 and without the need for an administrative summons.

Very truly yours,

SEYFARTH SHAW LLP

Douglas M. Mancino

Douglas M. Mancino

cc. Mark Patrick, Paul Murphy and Texas, California and Missouri Offices of the Attorney General (Charitable Trusts Sections)

DMM

## LIST OF EXHIBITS

1. Special Turnover Petition filed in March 2023 in *UBS Securities LLC and UBS AG London Branch v. James Dondero et. al.*, in the Supreme Court of the State of New York
2. Complaint and Objection to Claims filed in October 2021 in *Kirschner v. Dondero et.al.,*Case No. 19-34054-sgj11 in U.S. Bankruptcy Court, Northern District of Texas
3. Documents pertaining to The Dugaboy Investment Trust charitable contribution of 1,500,000 Class Units of NexPoint Hospitality Trust to Highland Dallas
4. Plaintiff's First Amended Complaint filed in July 2024 in *Highland Employee Retention LLC v James Dondero et.al.,* Case No. 3:24-cv-00498-K, in the U.S. District Court for the Northern District of Texas
5. Bankruptcy Court Memorandum Opinion issued in June 2021 in *In Re: Highland Capital Management, L.P. v. James Dondero,* Case No. 19-34054-sgj11
6. Post dated May 3, 2023 by James Dondero entitled: "James Dondero: Dallas's Surprising Philanthropy Hero"
7. ValueScope, LLC Slide Deck presented to Supporting Organizations' legal counsel in a Zoom call on November 18, 2024
8. Example of ValueScope, Inc. Valuation Analysis prepared for Grant Scott when he was in control of DAF Holdco

316700053v.11

C. Successors and Assigns. This Agreement is binding upon and will inure to the benefit of the parties to this Agreement and their successors and assigns.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Manager executed this Agreement as of the day and date first above written.

**MANAGER:**

Name: Mark Patrick

**EXHIBIT A**

**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

**MEMBER INFORMATION**

**Revised: March 27, 2025**

| Name and Contact Information | Allocation Percentage |
|---|---|
| DFW Charitable Foundation<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |

Exhibit C

Seyfarth Shaw LLP Letter to IRS (with copies to California, Missouri, and Texas Attorney Generals)

Seyfarth

Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
T (310) 277-7200
F (310) 201-5219

dmancino@seyfarth.com
T (310) 201-5241

www.seyfarth.com

March 20, 2025

**FEDEX**

TEGE Referrals Group
Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re: Highland Dallas Foundation, Inc. (EIN: 45-3961755)

Dear Sir or Madam:

I am writing on behalf of my client, Charitable DAF Holdco, Ltd., a Cayman Islands exempt[1] company ("DAF Holdco"), concerning the deterioration of its relationship with one of its Participating Shareholders, Highland Dallas Foundation, Inc. ("Highland Dallas"). Highland Dallas is a supporting organization of the Dallas Foundation.[2]

The deterioration of this relationship is due directly to the undue influence and control exercised over Highland Dallas by James D. Dondero and his affiliates, as described in this Form 13909, *Tax-Exempt Organization Complaint (Referral).* This disclosure letter supplements in detail and in exhibits the more general information described in the accompanying Form 13909 and is an integral part of that form (collectively, the Form 13909 and this letter are referred to as the "Referral").

We believe the information described in this Referral will demonstrate clearly that Mr. Dondero's influence and control is an inappropriate donor relationship with representatives of the Dallas Foundation who serve on the Board of Directors of and as officers of Highland Dallas. We believe this undue influence and control potentially jeopardizes the tax-exempt status of Highland Dallas as an organization described in section 501(c)(3) and, at a minimum, causes it to fail to remain a supporting organization described in section 509(a)(3) because of the

---

[1] To be clear, DAF Holdco is not a tax-exempt organization under U.S. tax law, notwithstanding the use of the term "DAF" in its corporate name.. However, under its Cayman Islands Articles of Association, a "Restricted Person," i.e., an entity that *cannot* own Participating Shares, is an organization that is *not* described in section 501(c)(3) of the Code. As a consequence, all Participating Shareholders of DAF Holdco must be and remain organizations described in section 501(c)(3).
[2] The Dallas Foundation is a tax-exempt community foundation described in sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code of 1986 (the "Code").

excessive influence of a disqualified person and substantial contributor, i.e., Mr. Dondero, under section 509(a)(3)(C).

This Referral is divided into three major parts, with multiple subparts.

Part I provides the Internal Revenue Service (the "IRS" or the "Service") with extensive factual information concerning Highland Dallas, its governance and control. As will be seen, Mr. Dondero exerts undue influence and control over Highland Dallas directly, as a director, President and substantial contributor, and indirectly through his and his associates' influence over Highland Dallas's supported organization representatives on the Highland Dallas Board of Directors, and the Dallas Foundation itself.

Part II provides the IRS with background information on DAF Holdco and Mr. Dondero's efforts to exert dominion and control over DAF Holdco and its assets. Because Highland Dallas is a Participating Shareholder of DAF Holdco, Mr. Dondero's efforts (both successful and unsuccessful) to control DAF Holdco for his personal gain directly affect Highland Dallas financially and provide him an additional amount of private benefit and private inurement from a donation where he once benefitted from a charitable contribution deduction to a charitable remainder trust ("CRT").

As will be discussed in Part III, the tax discussion section, Mr. Dondero's influence and control is pervasive and is exercised primarily for Mr. Dondero's financial benefit directly and for the financial benefit he derives indirectly through several entities owned or controlled by him. We believe he therefore derives more than insubstantial benefit form Highland Dallas and causes its net earnings to inure to his benefit, all in violation of section 501(c)(3)'s most basic operational requirements. Also, at a minimum, we believe his influence and control over Highland Dallas has caused it to become a private foundation, thereby subjecting Mr. Dondero to Chapter 42 excise tax exposure.

## I. Background Concerning the Formation and Legal Structure of Highland Dallas, Highland Capital Management, L.P., and NexPoint Advisors, L.P.

### A. Highland Dallas

Highland Dallas was incorporated as a Delaware nonprofit nonstock corporation by Mr. Dondero in 2011 in connection with his desire to form three tax-exempt public charities to become the three remaindermen of a CRT of which he was the income beneficiary. Highland Dallas applied for and was recognized by the IRS as a charitable organization described in section 501(c)(3) of the Code and as a supporting organization of the Dallas Foundation described in section 509(a)(3) of the Code. Highland Dallas did not register as a foreign corporation to do business in Texas until 2020.

At the time of its formation, Mr. Dondero became the sole "individual" member of Highland Dallas, with the legal power to select one director. The Dallas Foundation became the sole "institutional" member of Highland Dallas, with the power to select two directors. Thus, in 2011, Highland Dallas satisfied the requirements for being classified as a Type I supporting organization of the Dallas Foundation.

In addition, Mr. Dondero, in 2011, became and remains today the President of Highland Dallas and a member of its Board of Directors.

The other two supporting organizations are the Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara") (EIN: 45-3962008) and the Highland Kansas City Foundation, Inc. ("Highland Kansas City") (EIN: 45-3961885). These two supporting organizations of the Santa Barbara Foundation and Greater Kansas City Community Foundation, respectively, also have the same legal structure as Highland Dallas and, like Highland Dallas, each owns 100 Participating Shares of DAF Holdco.

We do not believe either Highland Santa Barbara or Highland Kansas City is as easily manipulated by Mr. Dondero and his affiliates as Highland Dallas because, according to their Forms 990 for 2023 (which is the last year those forms are available on Guidestar.com), Participating Shares of DAF Holdco are their only assets. By contrast, Mr. Dondero has made substantial additional contributions to Highland Dallas after 2011, either directly or through trusts or other entities owned or controlled by Mr. Dondero, some of which will be addressed later in this Referral. Thus, we believe Mr. Dondero is in a position to exert greater influence as a substantial contributor to Highland Dallas on the Directors of Highland Dallas appointed by the Dallas Foundation (including the Dallas Foundation's President & CEO, Julie Diaz).[3]

**B. Mr. Dondero and Highland Capital Management, L.P.**

Highland Capital Management, L.P. ("HCM") is an investment management firm located in Dallas, Texas that was co-founded in 1993 and controlled by Mr. Dondero and individuals close to him. As described on page 7 of the *Special Turnover Petition* filed by UBS Securities LLC and UBS AG London Branch in the New York Supreme Court in 2023, a complete copy of which is enclosed with this Referral as Exhibit 1 (the "2023 UBS Petition"), before HCM filed for bankruptcy, "HCM was an investment management firm that managed billions of dollars in assets 'through its organizational structure of approximately 2,000 separate business entities.'" (citation omitted). It is estimated by a plaintiff in another action that, at its height, HCM managed as much as $40 billion in assets.

Mr. Dondero was not only HCM's co-founder with Mark Okada,[4] he served as HCM's President and Chief Executive Officer until he was removed by the bankruptcy trustee in 2020.

[3] By way of example, the consolidated financial statements of the Dallas Foundation for 2023 available on its website include the assets of seven supporting organization, including Highland Dallas. Page 22 of the statements disclose that approximately $163.4 million of its assets were held by supporting organizations. On page 19, it appears that approximately $92.3 million (almost 57%) represent Highland Dallas' assets. Also, in 2023, Highland Dallas received almost $34 million in charitable contributions, presumably all from Mr. Dondero and entities affiliated with or controlled by him. Thus, it is understandable why the Dallas Foundation representatives who serve on the Highland Dallas Board would acquiesce to almost any request or demand made by Mr. Dondero or one of his associates such as Lucy Bannon.
[4] In the Dallas Foundation's 2022 Form 990, the most recent available on Guidestar.com, Mr. Okada was listed as a member of the Board of Governors of the Dallas Foundation. On its website, the Dallas Foundation identifies another confidant and employee of Mr. Dondero, Lucy Bannon, as an "Advisory Member" of the Board of Governors (last visited March 5, 2025). Thus, Mr. Dondero continues to exert substantial indirect influence over Highland Dallas's supported organization, the Dallas Foundation.

**C. Mr. Dondero, NexPoint Advisors, L.P., and NexPoint Hospitality Trust**

In 2012, prior to his removal as President of HCM in 2020, Mr. Dondero formed NexPoint Advisors, L.P. ("NexPoint Advisors"), a Dallas-based portfolio real estate and investment firm. NexPoint Advisors is one of a vast array of entities operating under the "NexPoint" umbrella. After the HCM bankruptcy, Mr. Dondero and his affiliates seamlessly shifted their operations from HCM to NexPoint Advisors and its affiliates.

As alleged in another lawsuit filed in 2021 in the United States Bankruptcy Court of the Northern District of Texas by Marc S. Kirshner as a litigation trustee in the HCM bankruptcy case, "NexPoint [Advisors] was effectively a shell entity that Dondero created in March 2012 to siphon profits from [HCM] in order to evade [HCM's] creditors." *See Complaint and Objection to Claims in Kirschner v. Dondero, et. Al.* Case No. 19-34054-sgj11, at pages 18-21, a copy of which is attached as Exhibit 2.

Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.

One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").

Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026. *See* the Dugaboy/REIT documents included as Exhibit 2.

The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,606,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy. We also assume that Highland Dallas signed a Form 8283, *Noncash Charitable Contributions*, form acknowledging it received the Units that would have been included with Mr. Dondero's 2019 Form 1040 along with a qualified appraisal of the Units (we have no actual knowledge of this, however).

On information and belief, we believe Mr. Dondero has used his influence and control over Highland Dallas to cause it defer exercising the Put Option at least through the effective time of the merger for at least three reasons.

- First, the forbearance to exercise the Put Option allows Mr. Dondero and Dugaboy to enjoy the benefits of an interest-free loan of $9,285,000 (the put exercise price ($6.19 x 1,500,000 units) while the Put Option remains outstanding and unexercised.

- Second, the forbearance to exercise the Put Option effectively has protected Mr. Dondero from the declining value of the REIT between December 2019 and November 2024. As of November 22, 2024, the reported fair value of the Units was $0.015 per Unit, so the fair value on that date of 1,500,000 Units was only $22,500, less than one percent of the Put Option value of $9,285,000.

- Third, most charitable organizations have a policy of immediately selling contributed shares that are listed for trading on a stock exchange in order both to diversify and to reinvest the sale proceeds in a manner that aligns more closely with the charity's investment policy. Had Highland Dallas sold the Units on the TSXV at any time within three years after their receipt, Highland Dallas would have been required to file a Form 8282, *Donee Information Return,* with the Service that would likely have reflected a much lower value of the original contribution amount claimed in 2019. Thus, in effect, Highland Dallas was acting to protect Mr. Dondero from having to address the precipitous fall in fair market value as the REIT Units plummeted in value beginning shortly after the gift was made.

Highland Dallas's failure to exercise the Put Option up until now becomes all the more significant because on November 25, 2024, the REIT announced the execution of a definitive agreement (the "Merger Agreement") pursuant to which the REIT will be dissolved and its subsidiary entities will be merged with and into entities owned or controlled, directly or indirectly, by NexPoint Diversified Real Estate Trust. Under the Merger Agreement, The proposed price per Unit is $0.36 per Unit. According to the press release issued by the REIT announcing the merger, "[t]he proposed price of US$0.36 per Unit represents a premium of approximately 2300% to the 30-day volume weighted average price per Unit on the TSXV ended November 22, 2024 of US$0.015."

Last month, in a press release issued on February 21, 2025, it was announced that a majority of minority votes approved of the merger. Under Canadian law, when a person such as Mr. Dondero owns or controls a majority of a Canadian public company's voting shares, a transaction such as this merger must be approved by two-thirds of the minority shares, or in this instance the 5,131,020 Class B non-voting Units.

Based on public filings with the U.S. Securities and Exchange Commission, we believe the REIT had approximately 29,353,660 Units, of which 82.52% were owned by entities owned or controlled by Mr. Dondero.

We have to assume that Highland Dallas voted its 1,500,000 Units in favor of the merger at Mr. Dondero's request.[5] That suggests that the merger needed Highland Dallas's 29.2% (almost one-third of the two-thirds vote required) of minority Unit's approval. That also suggests that

[5] We understand that the Board of Directors of Highland Dallas usually acts by Unanimous Written Consent Without a Meeting, which means the Mr. Dondero along with the two Dallas Foundation Board appointees would have approved voting in favor of the merger. Presumably the same would be true if a decision were taken by the Board to refrain from exercising the Put Option.

Highland Dallas chose not to exercise its Put Option to permit Mr. Dondero to retain control over the REIT even as its finances deteriorated.

We have no way of knowing whether Highland Dallas will exercise the Put Option before the REIT is dissolved (projected for the end of the first quarter of 2025, i.e., by the end of this month), but clearly if it fails to do so this will result in a $9 million inappropriate windfall to both Dugaboy and Mr. Dondero. Obtaining the answer to this question would only require the IRS to open an examination of Highland Dallas and issue an Information Document Request and/or issue a third-party subpoena to Dugaboy.[5]

**D. Highland Dallas's Assumed Name**

In March 2024, Highland Dallas filed an Assumed Name certificate with the Texas Secretary of State to permit it to operate under the name "NexPoint Philanthropies Dallas, Inc." This is consistent with Mr. Dondero's current ownership and control of NexPoint Advisers and his loss of control of HCM in the bankruptcy and consistent with the goal of allowing a private company (NexPoint) and Mr. Dondero to take credit for and enjoy the halo effect from NexPoint Philanthropies Dallas's (really Highland Dallas's) charitable giving.

**E. Mr. Dondero's Firearms Contributions to Highland Dallas**

Several years ago, Mr. Dondero (either directly or through entities owned and controlled by him) made contributions of a collection of firearms to Highland Dallas. Presumably, a Highland Dallas officer signed the donee acknowledgement on Form 8283, *Noncash Charitable Contributions*, and checked the box "No" asking whether the organization intended to use the property for an unrelated use, because checking "Yes" would limit Mr. Dondero's charitable contribution deduction to his adjusted basis and not its appraised fair market value. This in itself demonstrates Mr. Dondero's improper influence over the Dallas Foundation representatives serving as Board members and officers of Highland Dallas, especially as it is hard to believe a supporting organization of a community foundation could possibly use firearms in a related trade or business.

But to further demonstrate his abuse and diversions of assets for his own benefit, earlier this year in 2025 he diverted a substantial debt service payment of $1.3 million on a loan owed to one of DAF Holdco's subsidiaries to pay for a specially-designed and built vault for those firearms (shotguns). That diversion of assets has caused a default of that loan that has now landed in Texas State court, thereby depleting DAF Holdco's assets further because of legal fees. It is unknown whether the vault was requested by anyone associated with the Dallas Foundation serving as a director or officer of Highland Dallas, such as Julie Diaz, but we believe it likely was.

**F. Mr. Dondero's Character**

Mr. Dondero has a demonstrated pattern of behavior of stealing assets from those he perceives as adversaries. What is also demonstrated by even a cursory reading of the 2023 UBS Petition

---

[5] We will be happy to provide the IRS with a copy of the S-4 filed with the SEC available on EDGAR and the REIT's press releases that were used to develop this data.

and the *First Amended Original Complaint* filed by Highland Employee Retention Assets LLC against Mr. Dondero and his affiliates on July 15, 2024 in the U.S. District Court for the Northern District of Texas, Dallas Division, a complete copy of which is enclosed as Exhibit 4 with this Referral (the "2024 Complaint"), Mr. Dondero, to put it mildly, has no respect for corporate formalities and is willing to engage in self-dealing to strip entities of their assets without regard to any fiduciary duty of care or loyalty to serve his personal needs and to benefit himself financially to the detriment of others, including his own former HCM employees.[7]

The 2023 UBS Petition outlines how Mr. Dondero, facing a $1 billion judgment, directed various entities he owned and controlled to shift substantially all of their assets offshore to a Cayman Islands insurance company for a fraudulent insurance policy. The 2023 UBS Petition is an attempt to collect on a 2020 $1 billion judgment in favor of the UBS entities. Mr. Dondero has been so successful at hiding assets that the UBS entities have not been paid.

The 2024 Complaint seeks recovery of hundreds of millions from Mr. Dondero. It describes how a former Mr. Dondero employee at HCM, Patrick Daugherty, had a falling out with Mr. Dondero. After the falling out, Mr. Dondero took extraordinary steps to ruin Mr. Daugherty's life—depriving him of assets, removing his long-term incentive plan, embroiling him in lawsuits, and the list goes on.

These are not isolated incidents. In the ACIS Capital Management, L.P. matter,[8] Mr. Dondero had a falling out with Josh Terry, a former employee of HCM, and took extraordinary steps to ruin Mr. Terry's life—the same playbook as above with Mr. Daugherty.

In fact, Mr. Dondero and his litigiousness is widely known in the Dallas/Fort Worth area. Mr. Dondero is variously described as "Highland Capital's Giraffe-Eating Hedge Fund Manager" (Dallas Observer June 1, 2012), and "the distressed debt investor who was once a scourge to private equity. . . " (Financial Times March 10, 2023).

As it relates to this Referral more specifically, in a May 3, 2023 post entitled "James Dondero: Dallas's Surprising Philanthropy Hero," the post states: "Most gifts are made through the Highland Dallas Foundation, Inc., the philanthropic arm of Highland Capital Management." Note that this post appears to have been prepared by Mr. Dondero himself and appeared three years after he was ousted as HCM's President. What's more to the point is that it outlines in Mr. Dondero's own words the likely failures of Highland Dallas to comply with the section 509(a)(3) operational test discussed below. A copy of that post is included as Exhibit 6.

**G. Skyview Group**

Skyview Group is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or controlled by Mr. Dondero. Mr. Mark Patrick was engaged as a tax

---

[7] *See also In Re: Highland Capital Management L.P. v. Dondero,* Case No. 19-34054-sgj11 (June 6, 2021), a decision by the U.S. Bankruptcy Court for the Northern District of Dallas. In that opinion, the Bankruptcy Judge found Mr. Dondero to be in contempt for violating a temporary restraining order. A copy of that opinion is enclosed as Exhibit 5.
[8] We can provide the IRS with a copy of this complaint if that would be of interest.

consultant by Skyview Group until Mr. Patrick resigned in October 2024 on the advice of the undersigned counsel. Skyview Group charged DAF Holdco management fees for its services.

Skyview Group is nominally owned and controlled by Scott Ellington, who was HCM's Chief Legal Officer and General Counsel until his removal by the bankruptcy trustee in 2021. Despite this nominal ownership and control by Mr. Ellington, Mr. Dondero controls all compensation decisions, including decisions relating to Mr. Ellington's compensation, and thus dominates Skyview Group as if he owned it himself.

Since Mr. Patrick's resignation from Skyview Group, Mr. Patrick has been directly employed and compensated by DAF Holdco rather than Skyview Group. In addition, Mr. Patrick, again acting on advice of counsel, caused DAF Holdco to give six-months' notice in October 2024 to Skyview Group that it was terminating its contract with Skyview Group.

Mr. Dondero became furious when he learned of these actions, and that is when (for the first time in over a decade) Highland Dallas and Dallas Foundation executives and attorneys started raising questions about DAF Holdco's investments and management. In addition, this is when Highland Dallas, and Julie Diaz (who serves as both the President of the Dallas Foundation and as a Director and Vice President of Highland Dallas), began voicing concerns over DAF Holdco's investment performance, concerns that were never raised when Mr. Dondero's lackey, Grant Scott was rubber-stamping NexPoint and other Dondero-related investments and that were never raised prior to Mr. Patrick's resignation from Skyview Group.

## II. DAF Holdco

### A. The Grant Scott Control Era

Back in 2011, when Highland Dallas and the two other supporting organizations were being formed, one of the highly successful types of investments designed and marketed by HCM through investment partnerships were collateralized loan obligations, or CLOs.

A CLO is a single security backed by a pool of corporate debt issued by corporate borrowers with low credit ratings or loans taken out by private equity firms to conduct leveraged buyouts. With a CLO, the investor receives scheduled debt payments from the underlying loans, assuming most of the risk in the event of a default. In exchange for taking on that default risk, the investor is offered greater diversity and the potential for higher-than-average investment returns. DAF Holdco was formed initially in 2011 to hold partnership interests in partnerships that held CLOs.

Mr. Dondero caused DAF Holdco to be formed to have a structure through which he could have his CRT make remainder interest distributions of the Participating Shares of DAF Holdco to Highland Dallas and to the other two supporting organizations.[9] How CLOs work is not relevant

---

[9] This is documented in Part III, Line 4a of each of the three supporting organizations' Form 990, *Return of Organization Exempt From Income Tax*, for 2023 (the last year for which a Form 990 for the organizations was posted on Guidestar.com).

to this Referral except to the extent that Management Shares of DAF Holdco were initially issued to Mr. Dondero's college roommate and long-time close friend, Grant Scott.[16]

Grant Scott's ownership of the Management Shares from 2011 to 2021 effectively allowed Mr. Dondero to retain control of DAF Holdco and, thereby, use DAF Holdco's assets as a piggybank for other investments described below. Management Shares have no economic right to distributions; the value for Mr. Dondero is in their control over DAF Holdco and the ability to utilize its assets either to make dividend distributions to the Participating Shareholders (i.e., the supporting organizations) or to fund Dondero-managed investments on non-market terms and with below-market returns on investment.

NexPoint Advisors repeatedly reached out to DAF Holdco for investment-backing with below market terms and rates of returns while under the control of Grant Scott. Grant Scott consummated these transactions without hiring outside counsel or valuation experts for DAF Holdco. The lack of arms'-length dealing under Grant Scott's control is made patently obvious in the ValueScope November 18, 2024 presentation materials included as Exhibit 7. The economics of these transactions clearly show that Mr. Dondero was directing Grant Scott to cause DAF Holdco to enter into below-market deals for DAF Holdco that redirected the profits to Mr. Dondero and entities he owns. In other words, Mr. Dondero was stealing from DAF Holdco and, in turn, the supporting organizations.

Mr. Dondero's theft was not limited to below-market transactions. In March 2020, Mr. Dondero and his affiliates directed Grant Scott to make a $1 million payment to an entity called Tall Pine Group, LLC. The payment was allegedly for professional services rendered, but no such services were rendered to DAF Holdco. In subsequent court filings, it became clear that the $1 million went to pay Mr. Dondero's affiliates' employment compensation bonuses, which could not be paid in the normal course because HCM was subject to various bankruptcy restrictions at the time. Further detail is available in the *Kirschner* Complaint, at page 61, a copy of which is attached hereto as Exhibit 2.

**B. The Mark Patrick Control Era (including present day)**

Grant Scott assigned the Management Shares to Mark Patrick in March 2021. Mr. Patrick now controls DAF Holdco and the timing of distributions to the supporting organizations, including Highland Dallas. Mr. Patrick also controls the negotiations and approvals of the terms and conditions of all investments since he assumed control. Since then, under Mark Patrick's leadership DAF Holdco has begun to diversify away from Dondero-managed investments.

Total DAF Holdco (including its subsidiaries) exposure to Dondero-managed investments was over $100 million in June 2023. Because of the formation history of DAF Holdco and the various transactions between DAF Holdco and Dondero-managed investments, DAF Holdco has been named as a defendant in numerous lawsuits claiming it is an alter ego of Mr. Dondero and his

[16] On pages 7 and 8 of the litigation trustee's Complaint and Objection to Claims in *Kirschner v. Dondero* included as Exhibit 2, the trustee described Grant Scott as follows: "Dondero personally selected Scott as his successor to run the Charitable DAF Fund. . . . Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and [HCM's] directives without asking questions or requesting additional information."

entities and that the initial funds transferred to DAF Holdco from the CBT were fraudulent transfers. These lawsuits have been very expensive and time-consuming for DAF Holdco, which disadvantages Highland Dallas and the other Participating Shareholders because the payment of legal fees depletes available cash.

Because Mr. Patrick viewed the $100 million exposure to Dondero-related and the lawsuits as a risk to DAF Holdco (and therefore the Participating Shareholders), he has taken steps to create layers of independence between DAF Holdco and Mr. Dondero. As documented by an independent valuation consultant, ValueScope, LLC (a copy of the ValueScope report is enclosed as Exhibit 7), upon assuming control of DAF Holdco, Mr. Patrick engaged independent counsel to assist him in negotiating "market" terms and returns on investment for investments with all outside parties, especially those controlled by or affiliated with Mr. Dondero, such as NexPoint Advisors. Neither Mr. Dondero nor his associates expected this because no market discipline was exercised by DAF Holdco when it was controlled by Mr. Dondero's college roommate and close friend Grant Scott.

Outside counsel and valuation experts frequently either negotiated more market-standard (and more favorable to DAF Holdco) terms for Dondero-managed investments or advised against the transactions on the terms proposed by Mr. Dondero (via his various entities, including NexPoint Advisors). And, because Mr. Patrick refused to simply rubber-stamp Dondero-related investment asks, Mr. Dondero became upset with Mr. Patrick and demanded that Mr. Patrick provide him with increased levels of control over DAF Holdco, including meetings between Mr. Patrick and Mr. Dondero three times per week when he was still a consultant with Skyview Group, and permitting one of Mr. Dondero's affiliates increased access to DAF Holdco information and finances. Mr. Patrick refused these requests.

Mr. Patrick also hired an independent director for DAF Holdco, Paul Murphy. During Mr. Scott's control, Mr. Scott served as sole director and sole person in control. There was no requirement under Cayman law to hire an independent director; Mr. Patrick did so for the benefit of DAF Holdco (and, indirectly, Highland Dallas and the other Participating Shareholders).

Mark Patrick also resigned from Skyview Group in October 2024. As noted above, Mr. Dondero effectively controls Skyview Group, and it is nominally owned by one of his affiliates, Scott Ellington. Mr. Dondero viewed this as the last straw—he viewed this as his final loss of control over DAF Holdco and its assets. On the same day, in order to complete the separation, Mr. Patrick directed DAF Holdco to terminate a services agreement with Skyview Group.

Mr. Patrick's resignation from Skyview Group was recommended by outside counsel, including this firm. Mr. Patrick recognizes he has fiduciary duties to DAF Holdco and its subsidiaries. Mr. Dondero created tension with these duties by demanding that Mr. Patrick rubber-stamp Dondero-managed investments, as did Grant Scott. For example, in September 2024, Mr. Dondero recommended that DAF Holdco consummate a real property acquisition on The Campus at Legacy (described in Exhibit 7) for $45 million and provide one of Mr. Dondero's entities a repurchase option if the price were to appreciate. In no uncertain terms, DAF Holdco would take all the downside financial and real estate risk and transfer the upside financial benefit to Mr. Dondero if this proposal had been accepted. This was typical for Dondero-managed investments.

Mr. Dondero also demanded that Mr. Patrick cause DAF Holdco to wire one of Mr. Dondero's offshore entities, Sentinel, $1.5 million in November 2023. Mr. Patrick sought the advice of outside counsel, who told Mr. Patrick the payment would be "impermissible and illegal for a number of reasons". Mr. Patrick accordingly refused the payment (i.e., embezzlement) request.

Mr. Dondero's behavior and attitude toward DAF Holdco is nothing if not consistent. Whether Mr. Scott or Mr. Patrick was in control, Mr. Dondero never abandoned the belief that the assets he caused his CRT to distribute to DAF Holdco remained his own. Mr. Patrick's steps toward independence and then resigning from Skyview Group in October 2024 led to Mr. Dondero exerting his influence over Highland Dallas in a manner we believe results in improper private benefit accruing to him as discussed in the tax aspects portion of this disclosure letter.

Following Mr. Patrick's resignation from Skyview Group, Mr. Dondero directed his entities to cease all principal and interest payments owed on Dondero-managed investments to DAF Holdco and its subsidiaries, which has led to several ongoing lawsuits discussed below and outlined in Exhibit 7. It is inevitable that Mr. Patrick will receive the same treatment as Mr. Daugherty and Mr. Terry (described above)—he will be subject to frivolous, vexatious lawsuits and harassment because he is Mr. Dondero's newest villain.

**C. October 2024 to Present**

The events that have unfolded show Mr. Dondero's anger at his loss of control of DAF Holdco's assets. Mr. Patrick met with Highland Dallas shortly after his resignation from Skyview Group and assured Julie Diaz of Highland Dallas and the Dallas Foundation that his resignation would not modify management of distributions to the Dallas Foundation. Mr. Patrick believed the meeting went well. Ms. Diaz voiced no concerns and actually requested additional distributions.

Shortly thereafter, Highland Dallas and the two other Participating Shareholders hired the law firm Holland & Knight (which had already represented the Dallas Foundation for years) to represent them and to send a "no confidence" letter to DAF Holdco. This purported lack of confidence was a new sentiment by Highland Dallas, which had never previously expressed any concern when it received ValueScope reports from Grant Scott. The "no confidence" letter came out of the blue—there were no calls, emails, or other communications that expressed a lack of confidence or requested any information whatsoever.

DAF Holdco subsequently learned that Mr. Dondero directed his subordinates at Skyview Group and NexPoint Advisors to provide false and misleading financial information to Highland Dallas and to the other Participating Shareholders. Rather than contact DAF Holdco or Mr. Patrick to question this information (especially given the questionable source), Highland Dallas sent the "no confidence" letter without any attempt to verify it. (As a post-script, DAF Holdco has refuted the false and misleading information, but the dispute continues because it was never really about that.)

Despite the November 11, 2024 date on the "no confidence" letter, DAF Holdco did not receive it until December 6, 2024, after the November 18, 2024 presentation to the supporting organizations' attorneys, Holland &Knight. In addition, DAF Holdco received the "no confidence" letter from Mr. Dondero's personal attorneys, who do not represent Highland Dallas or the other Participating Shareholders.

DAF Holdco responded and voiced its concerns that Mr. Dondero was directing Highland Dallas to take these actions. Recall that Mr. Dondero is a Director and President of Highland Dallas. Holland & Knight ignored the accusations that Mr. Dondero was calling the shots and began sending acrimonious (but toothless) emails to DAF Holdco. Finally, Julie Diaz, a Director and Vice President of Highland Dallas (and President of the Dallas Foundation), sent an email requesting a winding up of DAF Holdco and distribution of all of its assets to Highland Dallas and the other Participating Shareholders.

Paul Murphy, an independent Director of DAF Holdco, made a presentation to the supporting organizations' attorneys from Holland & Knight in which he reviewed all of the governance and management improvements that have already been made, but they persist behind the scenes to facilitate Mr. Dondero's attempts to undermine Mr. Patrick and regain control over DAF Holdco's assets for use by NexPoint for investments.

DAF Holdco was contacted in February 2025 by Cayman Islands counsel stating they represent "DAF 2." DAF Holdco believes this "DAF 2" is an attempt by Mr. Dondero and his affiliates to fraudulently obtain DAF's assets.

In February 2025, DAF Holdco subsidiaries filed two lawsuits against Mr. Dondero's entities for non-payment on Dondero-managed investments. Mr. Patrick also directed a non-DAF entity he controls to file a third lawsuit against Mr. Dondero's entities for non-payment. These lawsuits are fundamentally the same as other lawsuits where creditors have sued Mr. Dondero and his entities for nonpayment. Mr. Dondero has not changed—he refuses to pay his debts and he believes he is the rightful owner of DAF Holdco's assets. Mr. Dondero's instrument is Highland Dallas. He controls Highland Dallas and will cause it to continue its crusade against DAF Holdco. As noted by James Seery, the HCM bankruptcy trustee who removed Mr. Dondero from HCM, Mr. Dondero will "burn the place down" if he does not get his way.

### III. Discussion of Tax Exemption-Related Lack of Compliance and Outright Avoidance

In order for an organization to qualify for tax-exempt status under section 501(a) of the Code as a charitable organization described in section 501(c)(3) of the Code, it must be organized and operated exclusively for one or more charitable purposes described in section 501(c)(3) and the Treasury Regulations promulgated thereunder. We do not question whether Highland Dallas is organized for charitable purposes, nor do we question whether Highland Dallas's grantmaking to the Dallas Foundation and other bona-fide charitable organizations is consistent with its charitable purposes.

We do question whether Mr. Dondero's influence and control over at least Highland Dallas has allowed some portion of their net earnings to indirectly inure to Mr. Dondero's benefit as a result of his historic access to DAF Holdco's assets at below market rates and terms that appear to have been acquiesced to by each supporting organization. As we discuss below, Mr. Dondero's influence and control over DAF Holdco when Grant Scott was the Management Shareholder was never of concern, especially to Highland Dallas, even as each supporting organization received periodic valuation reports prepared by ValueScope detailing DAF Holdco's NexPoint investments. See report prepared for Grant Scott by ValueScope, attached hereto as Exhibit 8. In fact, we believe those valuation reports were used by each of them to prepare their Forms 990 and to prepare consolidated financial statements.

We also believe that each of the supporting organizations operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets now that Mr. Patrick declined NexPoint investment requests that are both on non-market proposed terms and provide below market returns on investment.

If Highland Dallas elects not to exercise the Put Option before the REIT dissolves, we believe that would be an excess benefit transaction under section 4958 of the Code in which the organization managers had to have knowingly participated.

We also believe Mr. Dondero exercises such control as a substantial contributor of Highland Dallas, resulting from gifts he has made since the initial gift of Participating Shares were made by the CRT in 2011, that Highland Dallas should no longer satisfy the requirement in section 509(a)(3)(C) that there be no control by disqualified persons.

Finally, as discussed briefly below, we believe the donor advised fund rules in section 4966 and 4967 may be implicated, but have insufficient knowledge of the facts to assert conclusively that they do apply.

**A. Private Benefit**

We respectfully submit that Highland Dallas in particular no longer satisfies the operational test of section 501(c)(3) because its actions taken at Mr. Dondero's direction serve his private interests more than incidentally as prohibited by Treasury Regulation § 1.501(c)(3)-1(d)(*1*)(ii).

As we have outlined above, Mr. Dondero and affiliates such as NexPoint Advisors used DAF Holdco, when it was controlled by Grant Scott, as his personal piggybank. And, when Grant Scott controlled DAF Holdco, neither Julie Diaz (in her capacity as Director and Vice President of Highland Dallas) nor the Dallas Foundation questioned whether DAF Holdco's investment were prudent or generated market returns. Rather, even as they received and used for tax and financial reporting purposes the ValueScope valuation opinions which disclosed DAF Holdco's NexPoint and other Dondero-related investments, they never questioned whether the terms were market terms or whether the asset allocations were prudent. It was only after Mr. Patrick took over as Management Shareholder of DAF Holdco and (a) started declining NexPoint investment asks—really demands, (b) started diversifying DAF Holdco's investments away from NexPoint investments, (c) began demanding repayment of amounts owed with respect to NexPoint investments, and (d) Mr. Patrick resigned from Skyview Group and terminated its contract for back office and other services, that the supporting organizations collectively hired outside counsel and, under the lead of Julie Diaz, a Director and Vice President of Highland Dallas began sending no-confidence emails to DAF Holdco Directors (including Mr. Patrick and Mr. Murphy) demanding information to which they were not even legally entitled (a fact that their attorneys openly acknowledged in a Zoom call) and a complete restructuring of DAF Holdco to bring it back under Mr. Dondero's control.

In the seminal decision, *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the Tax Court concluded that the absence of private inurement to the benefit of a private shareholder or individual does not end the analysis of whether an organization satisfies the operational test of exemption under section 501(c)(3). It went on to state: "when the Court concludes that no prohibited inurement of net earnings exists, it cannot stop there but must

inquire further and determine whether a prohibited private benefit is conferred."(citations omitted) *Id.* at 1070. It concluded that "an organization's conferral of benefits on disinterested persons may cause it to serve 'a private interest' within the meaning of section 1.501(c)(3)-1(d)(1)(ii)." *Id.* at 1070.

Finally, after looking at the organization's exclusive source of funding (much the same as Mr. Dondero's exclusive funding of Highland Dallas), control of a majority of the Board by members of the Republican Party (analogous to Mr. Dondero's role as President and Director of Highland Dallas and his substantial influence over the two Dallas Foundation directors evidenced by their epiphany that something has to be done since Mr. Dondero no longer controls DAF Holdco), and several other factors, "we conclude that petitioner is operated for the benefit of private interests, a nonexempt purpose." *Id.* at 1080.

In another case, *Airlie Foundation, Inc. v. United States*, 55 F.3d 684 (D.C. Cir. 1995), the relationship between the founder and executive director of the foundation bears a strong resemblance to the relationship between Mr. Dondero and Highland Dallas and served as a basis for sustain the Service's revocation of its section 501(c)(3) exemption on the ground that it provided more than incidental private benefit to the founder. Although the actual basis for revocation of exemption was a finding of inurement of net earnings, the pervasive control of the founder clearly influenced the D.C. Circuit to affirm the District Court and, equally important, the court cited *American Campaign Academy* for the proposition that an organization does not operate exclusively for tax-exempt purpose if it serves a private interest rather than a public interest and "[t]his requirement applies to the organization's actual, not purported purposes." *Id.* at 75 AFTR 2d 95-2068, 95-2071.

**B. Potential Inurement**

Section 501(c)( also requires that "no part of the net earnings" of the organization may "inure to the benefit of any private shareholder or individual." As observed in the *Airlie Foundation* case, "the extent of the inurement is immaterial." *Id.* As noted in that case, and as is the case with Mr. Dondero, the founder of Airlie Foundation, Inc. "established and controlled a network of taxable and tax-exempt entities. The transactions that took place within the network organizations formed the basis for the IRS's revocation of AFI's tax-exempt status, as discussed at length by the district court."

We respectfully submit that if the Service audits Highland Dallas it will identify many more instances of inurement, beyond the single instance of forgiving $33,672 by Airlie Foundation Inc. owed by one of the founder's affiliated entities. The Dugaboy effective interest-free loan and potential windfall if Highland Dallas fails to exercise its Put Option should be enough, but we believe there will be many other transactions such as management and administrative fees that generate income for Dondero-related entities.

As discussed above in Section II.A., during the Grant Scott control era of DAF Holdco, Mr. Dondero's effective control of DAF Holdco led DAF Holdco to make investments that benefited him personally. These investment deprived DAF Holdco of assets that could be distributed to Participating Shareholders, including Highland Dallas.

**C. The Failure to Exercise the Put Option as an Excess Benefit Transaction**

As you know, section 4958 treats as excess benefit transactions between a public charity such as Highland Dallas and a disqualified person such as Mr. Dondero economic arrangements that are above or below market between them. Section 4958(c)(3)(A) also treats as "automatic" excess benefit transactions "any grant, loan, compensation or other similar payment to" a disqualified person such as a substantial contributor.

We believe, upon examination, the Service will find that Highland Dallas has engaged in multiple automatic excess benefit transactions with Mr. Dondero or entities owed and controlled by him such as NexPoint Advisors.

First, the forbearance to exercise the Put Option effectively created an interest free loan to Dugaboy, a disqualified person. Thus, the mere fact it has remained outstanding for years means it is an automatic excess benefit transaction that requires not only the payment of the 25% excise tax by Dugaboy but also the correction of it through the payment of the full $8,250,000 plus interest.

Second, if NexPoint Advisors performs investment management services for a fee, that would be an automatic excess benefit transaction requiring not only correction but also payment of the 25% excise tax. In fact, we know from public SEC filings that NexPoint Advisors or one of its affiliates does perform investment management services for the REIT, which may itself be an excess benefit transaction requiring correction.

Finally, while other excess benefit transactions may be identified during an examination of Highland Dallas, any forbearance to exercise the Put Option to benefit Dugaboy should be regarded, at a minimum, as a "similar payment" given the fact that Mr. Dondero benefits economically in a substantial way from that forbearance.

Given that the other two directors must act to approve these actions, it is likely they have done so knowingly and willfully.

**D. Potential Non-Compliance with Section 509(a)(3) Operational Test Sufficient to Cause Highland Dallas to be Reclassified as a Private Foundation and Thus Subject to Chapter 42 Rules**

In Mr. Dondero's article entitled "James Dondero: Dallas's Surprising Philanthropy Hero" (May 3, 2023, copy enclosed as Exhibit 6), Mr. Dondero said as follows:

> "Mr. Dondero and his firm have supported The Family Place, The Dallas Zoo, SMU's Tower Scholars program, The Perot Museum of Nature and Science, Education is Freedom, and many more local charity organizations. Most gift are made through the philanthropic arm of Highland Capital Management."

Thus, in his own words, Mr. Dondero has acknowledged Highland Dallas has violated the section 509(a)(3) operational test in Treasury Regulation § 1.509(a)-4(e)(1) concerning permissible beneficiaries of a supporting organization and should be re-classified as a private foundation. That would mean that all dealings between Highland Dallas and entities owned or controlled by Mr. Dondero should be scrutinized to determine whether they constitute acts of

self-dealing described in section 4941 of the Code or violate other provisions of Chapter 42 of the Code, such as the taxable expenditure rules in section 4945.

Under Treasury Regulation § 1.509(a)-4(e)(1), "[a] supporting organization will be regarded as 'operated exclusively' to support one or more specified publicly supported organizations **only if it engages solely in activities which support or benefit the specified publicly supported organizations**." (emphasis supplied)

The only exception to the requirement that a supporting organization benefit the supported organization "solely" is when the supporting organization provides benefits to individual members of the charitable class benefitted by the supported organization, such as by granting scholarships to graduates of a particular high school for college. *See, e.g., Nellie Callahan Scholarship Fund v. Commissioner*, 73 T.C. 626 (1980). The word "solely" is unambiguous; therefore, Mr. Dondero's own acknowledgement that Highland Dallas is the source of his funding of other admittedly charitable organizations provides conclusive evidence that Highland Dallas fails the operational test of section 509(a)(3).

Furthermore, section 509(a)(3)(C) provides that a supporting organization may not be controlled directly or indirectly by a disqualified person. A substantial contributor to a supporting organization is a disqualified person under section 4946(a)(1)(A). Thus, Mr. Donero's Dugaboy gift of the REIT Units to Highland Dallas made him a disqualified person and his effective veto power places him in control of Highland Dallas.

Therefore, we respectfully submit that that the Service should examine Highland Dallas to determine if it should be reclassified as a private foundation for the foregoing reasons and, if it is so-reclassified, all transactions between Mr. Dondero and his related or controlled entities should be evaluated to determine whether any constitute acts of self-dealing under section 4941. This should include the failure on the part of Highland Dallas to exercise its Put Option.

E. **Potential Non-Compliance with Section 4966/4967 Rules Applicable to Donor Advised Funds**

Finally, we respectfully submit that the Service should examine Highland Dallas to determine whether it, in effect, functions as a donor advised fund of Mr. Dondero given the fact he provided substantially all of its funding, effectively controls it and may personally benefit financially more than incidentally through entities he owns or controls from management fees, charity special events such as banquets and other means.

* * * *

Representatives of DAF Holdco will be available to be interviewed by the Service in a manner that will not result in compromising confidentiality under section 6103 and without the need for an administrative summons.

Very truly yours,

SEYFARTH SHAW LLP

Douglas M. Mancino

Douglas M. Mancino

cc. Mark Patrick, Paul Murphy and Texas, California and Missouri Offices of the Attorney General (Charitable Trusts Sections)

DMM

## LIST OF EXHIBITS

1. Special Turnover Petition filed in March 2023 in *UBS Securities LLC and UBS AG London Branch v. James Dondero et. al.*, in the Supreme Court of the State of New York
2. Complaint and Objection to Claims filed in October 2021 in *Kirschner v. Dondero et.al.,*Case No. 19-34054-sgj11 in U.S. Bankruptcy Court, Northern District of Texas
3. Documents pertaining to The Dugaboy Investment Trust charitable contribution of 1,500,000 Class Units of NexPoint Hospitality Trust to Highland Dallas
4. Plaintiff's First Amended Complaint filed in July 2024 in *Highland Employee Retention LLC v James Dondero et.al.,* Case No. 3:24-cv-00498-K, in the U.S. District Court for the Northern District of Texas
5. Bankruptcy Court Memorandum Opinion issued in June 2021 in *In Re: Highland Capital Management, L.P. v. James Dondero,* Case No. 19-34054-sgj11
6. Post dated May 3, 2023 by James Dondero entitled: "James Dondero: Dallas's Surprising Philanthropy Hero"
7. ValueScope, LLC Slide Deck presented to Supporting Organizations' legal counsel in a Zoom call on November 18, 2024
8. Example of ValueScope, Inc. Valuation Analysis prepared for Grant Scott when he was in control of DAF Holdco

316700053v.11

Exhibit D

Carrington Coleman Tax Advice to DAF

CARRINGTON COLEMAN
David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

From: David N. Corkern
To: Charitable DAF HoldCo, Ltd.
Date: March 25, 2025

Executive Summary

This memorandum will serve to amplify the initial thoughts I provided regarding the U.S. tax issues as they related to the issuance of new participation shares in and reorganization of Charitable DAF HoldCo, Ltd. and its related companies (collectively "DAF"). My analysis is based upon a review of relevant sections of the Internal Revenue Code of 1986, as amended ("Code"), United States Treasury regulations ("Treasury Regulations" or "Treas. Reg."), relevant case law, and the facts that you have provided to me (outlined below) concerning DAF, James Dondero ("Dondero"), DAF's shareholders/supporting organizations, i.e., Highland Dallas Foundation, Inc. ("Highland Dallas"), Highland Kansas City Foundation, Inc. ("Highland Kansas City"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara"), and HMLP Charitable Fund (collectively "SOs"), and the historical interactions by and among DAF, Dondero, Dondero affiliates/entities, and SOs. I have not been asked to nor have I independently verified the facts that you have provided to me as they relate to DAF, Dondero, SOs (individually or collectively, including tax-exempt status by the IRS), and other individuals or entities associated therewith or who may have contracted or interacted therewith.

Facts[1]

DAF currently has four (4) non-voting SOs, each of which has been recognized as an organization exempt from U.S. income taxes under Code Section 501(c)(3).

Dondero appointed his college roommate, Grant Scott ("Scott"), to be the control person of DAF, who, at no time during his tenure at DAF, hired outside counsel, an independent director, or outside valuation experts to evaluate the transactions that Dondero undertook with DAF, either directly or through various entities that he controlled or exercised significant influence, including, but not limited to, SOs. In addition, Highland Capital Management, LP, an entity controlled by Dondero, charged investment manager fees to DAF. (It is my understanding that Scott never evaluated the reasonableness of those fees.) As outlined in the ValueScope Presentation (defined below), Scott approved deals with various Dondero-controlled entities for below-mark investment returns, effectively enriching Dondero to the detriment of both DAF and SOs, and the charitable organizations that they serve.

Dondero has operated his businesses (including Highland and now NexPoint) with very little excess cash and has looked to DAF as a source of $300 million that he can control, typically

[1] See Exhibit C for a timeline of relevant events.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

approaching DAF to serve as short-term or emergency bridge financing to enable his businesses to close speculative investments, each of which require DAF to take outsize risk for below-market investment returns.

In November 2023, Dondero attempted to exert influence over DAF's current director/manager, Mark Patrick, asking him to transfer from DAF approximately $1,500,000 to Sentinel Reinsurance, Ltd. (a Dondero-owned entity)[2] in payment of legal fees unrelated to DAF or its charitable purposes. This request would have taken money from DAF and its charitable beneficiaries and put it into Dondero's pockets. Outside counsel advised DAF leadership that the cash transfer proposed by Dondero would be "impermissible and illegal for a number of reasons."

Dondero is enmeshed in Highland Dallas, Highland Kansas City, and Highland Santa Barbara (the "Highland SOs"). Dondero is the Individual Member under the Bylaws of each. Dondero is also one of three members of the Board of Directors of each Highland SO, as well as the President of each. In addition to the authority granted by the Bylaws of the Highland SOs to Dondero, Dondero wields broad influence over the Highland SOs and their officers and directors, who view him as the "donor"[3] with respect to DAF. Dondero has appointed his public relations specialist, Lucy Bannon, as his primary contact with the Highland SOs.[4]

On October 2, 2024, Mark Patrick resigned from his position at Skyview Group, which is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or owned by Dondero. Skyview Group itself is owned by Scott Ellington, a long-time associate of Dondero.[5] On the same date, Mark Patrick also directed the DAF to terminate its services agreement with Skyview Group. Douglas Mancino of Seyfarth Shaw LLP, long-time compliance counsel to DAF, advised Mark Patrick to resign from Skyview Group to create more independence from Dondero. While Mark Patrick was at Skyview Group, Dondero had made demands that Mark Patrick meet with him three times a week in person regarding various Dondero-proposed investment opportunities to benefit Dondero and/or his affiliated entities, which demands Mark Patrick declined on behalf of DAF. While Mark Patrick was at Skyview Group, the Highland SOs had never raised a concern with Mark Patrick's leadership or his investment decisions or the financial information provided to the SOs. When Mark Patrick resigned from Skyview Group, he

[2] Dondero used Sentinel as part of a fraudulent insurance scheme to hide assets from a creditor of a fund and other investors.
[3] Dondero has donated an antique gun collection and hedge fund interest to the Highland Dallas Foundation. A confidential source has indicated to DAF that Dondero is promising the Dallas Foundation he will donate NexBank stock (the predominant source of his wealth) into a similar structure as DAF.
[4] DAF believes Ms. Bannon is assisting in writing the correspondence (detailed below) from Holland & Knight. A confidential source has indicated to DAF that Ms. Bannon has been appointed to an official position with the Highland SOs to act on their behalf.
[5] Although Ellington owns Skyview Group, all Skyview employees know, including its human resources department, that Dondero determines Skyview's employee's compensation, including Scott Ellington's. This is another example of Dondero creating a façade of an independent entity that is not independent.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

made clear to Dondero associates that he did not intend to have further conversations directly with Dondero and that Mark Patrick viewed his resignation and the termination of the Skyview Group services agreement as in the best interest of DAF.

Immediately after Mark Patrick's resignation from Skyview Group, Dondero was furious and directed his associates at Skyview Group and NexPoint to begin a campaign to turn the Highland SOs against DAF. Dondero's associates, including Chris Rice (who works for both Skyview Group and NexPoint), reached out to DAF's back-office services provider, SEI, and requested financial information on the DAF. Chris Rice did not reveal to SEI that he was working at Dondero's behest. Chris Rice promptly took this information, after modifying it and trying to frame it as a parade of horrible, to the Highland SOs. The inaccurate information Chris Rice presented to the Highland SOs included: (i) 2024 director fees were on track to exceed $5 million (which is false and several multiples higher than the true amount) and (ii) 2024 legal expenses were on track to equal $12 million (which is again false and represents an annualized number only through June 30, 2024). Skyview Group had access to DAF financials throughout Mark Patrick's tenure, but Skyview Group did not go running to the Highland SOs until after Mark Patrick resigned from Skyview Group. Other than via the Skyview Group and the ValueScope quarterly reports, the Highland SOs do not have access to any of DAF's financial information.

Following Mark Patrick's resignation from Skyview Group and to assure the Highland SOs that DAF's charitable giving to the Highland SOs would continue as usual and that the Highland SOs would continue to receive the quarterly ValueScope reports as usual, Mark Patrick arranged meetings with the heads of the Highland SOs[6]. These meetings went well, and the discussions raised no concerns about DAF, its finances, or its governance. Despite these meetings and open lines of communication, Mark Patrick was never asked whether the information Chris Rice presented to the Highland SOs was true or false, which demonstrates the Highland SOs had marching orders by Dondero to attempt to wind up DAF and reject any other solution.

In early November 2024, DAF made clear it would not proceed with a Dondero-recommended investment, TCAL, which is outlined in the ValueScope presentation. NexPoint proposed TCAL to DAF in September 2024. TCAL represented an illiquid asset with no income, and the Dondero-proposed structure would have required DAF to pay all the costs while providing a right of repurchase to a Dondero-controlled entity to capture the upside, if any. This is another example of Dondero's hubris and his view of DAF's money as his money.

While the meetings by and among Mark Patrick, Doug Mancino, and the SOs were occurring, during October and November 2024, Dondero directed his personal attorney, Johnny Sutton at Ashcroft Sutton Reyes LLC, to reach out to DAF's counsel and ask if Mark Patrick would accept money to resign from the DAF. Sutton made various offers, including offering Mark Patrick

[6] These meetings are listed on Exhibit C.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

large sums of money, his own island in the Caribbean, and other accommodations (including releases) to resign. Each of these offers were rejected. Mark Patrick believed that Dondero made these offers because Dondero sensed he had lost any semblance of control over DAF and its assets. Mark Patrick believed that, if he were to resign, Dondero would appoint another individual loyal to Dondero's personal interests, which would enable Dondero to use DAF's assets to enrich himself once again at DAF's expenses. Johnny Sutton also suggested that he spoke on behalf of the Highland SOs.

On November 20, 2024, DAF arranged a presentation by ValueScope, a financial services provider to DAF, to counsel to the Highland SOs (the "ValueScope Presentation"). Attached as Exhibit A is the ValueScope Presentation. Among other things, this detailed DAF's historical investments and Dondero's influence on DAF's investments, and it also explained the voluminous and expensive lawsuits for which Dondero was responsible. It detailed that DAF had been named as a defendant in at least eight lawsuits due to its affiliation with Dondero and had also brought at least four lawsuits at Dondero's recommendation and insistence. The ValueScope presentation also outlines certain transactions proposed by Dondero to DAF that would have had outsized benefits for Dondero's own pockets[7] while creating significant risk and capped upside for DAF.

Courts have ruled that Dondero is a "vexatious litigant" due to his long, documented, and colorful history of bringing frivolous lawsuits motivated by personal animus, which are, almost without exception, losing cases.[8] Dondero's lawsuits follow a consistent theme: Dondero is sued for taking other peoples' money.[9] This is precisely what Dondero has tried to do with DAF.

Unbeknownst to DAF, prior to the ValueScope Presentation, the Highland SOs had written a letter dated November 11, 2024, asserting that the Highland SOs had no confidence in the governance structures of DAF and directing (without authority) DAF to avoid any depletion of assets (the "No Confidence Letter"). The No Confidence Letter was not mentioned during the

[7] There are numerous examples of Dondero financially benefitting from the DAF. A few include: (i) the Tall Pine scheme where Dondero employees appropriated $1MM from the DAF in a fraudulent transaction, (ii) directing money due by a Dondero entity to a DAF entity to instead pay one of Dondero's personal friends, Patrick McCabe, for a payment McCabe was owed by a Highland SO, and (iii) the aforementioned embezzlement request for Sentinel.

[8] Attached as Exhibit D is Dondero's Vexatious Reply Brief, in which he acknowledges he has no indirect or direct control over DAF and transferred control of Charitable DAF GP, LLC, the general partner of Charitable DAF Fund, LP to Grant Scott.

[9] A examples include: (i) Dondero diverted $160MM from a Highland-advised fund to a private insurance company under the guise of a fraudulent insurance policy to frustrate UBS on collection of a judgment and now is being sued in New York State Court by UBS for over $1 billion, (ii) Dondero withdrew tens of millions in cash from a fund called Crusader and justified it as "management fees owed"; the eventual arbitration award against him was so large his investment company had to file bankruptcy, (iii) Dondero funneled assets from a joint venture he had with Highland partner Josh Terry; this resulted in an involuntary bankruptcy to prevent the assets being funneled out of a joint venture to a Dondero entity, and (iv) after a falling out with Patrick Daughtery, Dondero funneled assets out of an employee retention vehicle and effectively away from Daughtery, resulting in extensive litigation.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

ValueScope Presentation. Further, the No Confidence Letter was not received from the Highland SOs or their counsel—the No Confidence Letter was provided by Johnny Sutton of Ashcroft, Dondero's personal attorneys, nearly a month after it was written, on December 6, 2024. Given the timing (barely a month after Mark Patrick had resigned from Skyview Group) and the source (Dondero's personal attorneys), it seems highly probable that the No Confidence Letter was written at Dondero's behest.

The No Confidence Letter also came as a surprise to DAF and its counsel because the ValueScope Presentation and the Murphy Presentation were well received. The Highland SOs made no effort to verify the information provided to them by Chris Rice and were undeterred and even communicating in bad faith given the No Confidence Letter's timing and the ValueScope and Murphy Presentations.

Following the ValueScope Presentation, on December 11, 2024, DAF held a presentation by its independent director, Paul Murphy, that provided extensive corporate governance and investment information (the "Murphy Presentation"), which is attached as Exhibit B. During the Murphy Presentation, Michael Stockham of H&K said the contents of the presentation were exactly what he wanted to hear and asked Paul Murphy to present it directly to the Highland SOs. Walkers (Cayman counsel to DAF) was also scheduled to present on the rights of participation shareholders during the Walkers presentation, but Stockham indicated that if Walkers were there to detail the limited rights of participation shareholders, he was already aware, and the presentation was unnecessary.

Based on the reception to the presentations (including Michael Stockham indicating he wanted to end on a "positive" note), and with a promise to continue addressing the Highland SOs' concerns, DAF's counsel requested the No Confidence Letter be withdrawn. This request was rejected. Notwithstanding the rejection of this request, DAF and the Highland SOs' counsel agreed that the best next step was to schedule a presentation by Paul Murphy directly to the Highland SOs.

On January 7, 2025, the ValueScope quarterly financial update was provided to the Highland SOs, which has been provided on a quarterly basis for years.

On January 10, 2025, Mark Patrick successfully negotiated that Dondero direct about $8 million to pay amounts that were due to DAF on the Small Bay II transaction. Since Mark Patrick's resignation from Skyview Group in October, Dondero had directed NexPoint to cease required payments to DAF on Small Bay II and other NexPoint-led investments.

On January 21, 2025, the Highland SOs' counsel emailed a request to set up a Zoom call for the Murphy presentation to the Highland SOs. Only two days later, on January 23, 2025, despite the pending Zoom call, Julie Diaz, CEO of the Highland Dallas Foundation, emailed Mark

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Patrick's out-of-use email address (which was communicated to her previously) to request additional financial information by February 10, 2025. On January 28, 2025, despite the pending Zoom call and the timeline in January 23, 2025, email, Julie Diaz sends a second email, this time requesting a winding up of DAF. These emails, of course, were inconsistent with the Zoom call with Paul Murphy.

On January 30, 2025, DAF responded to the Highland SOs and expressed concern (not for the first time) that Dondero was directing the Highland SOs to express these concerns and send this inconsistent communication.

On January 31, 2025, the Highland SOs' counsel responded and ignored DAF's concern that Dondero was controlling the Highland SOs. Instead, the Highland SOs' counsel adopted a confrontational, accusatory, and threatening tone, in stark contrast to the "positive" note that concluded the Murphy Presentation.

DAF emailed on February 4, 2025; to express it was willing to cooperate with the Highland SOs and provide them information but also requested the Highland SOs confirm they would like to continue to work with DAF to resolve their concerns.

H&K responded with an adversarial email on February 7, 2025, that contained misleading claims such as "over the last three months, you have not provided any information about the assets and financial health of the fund." This email ignored the fact that DAF provided the quarterly financial report for 9/30/24 on January 7, 2025, the ValueScope Presentation, and the Murphy Presentation. It is clear to DAF's leadership that the Highland SOs will not be satisfied by additional information and are being directed and controlled by their Individual Member, Director, and President—Dondero. Holland & Knight, as counsel to the Highland SOs, has opted for an adversarial, ostrich-head-in-the-sand approach to Dondero's misdeeds.

H&K's February 7, 2025, response also discussed Charitable DAF GP, LLC, the former general partner of Charitable DAF Fund, LP. Historically, Dondero once owned Charitable DAF GP, LLC, but transferred it to Grant Scott in 2012. DAF and its counsel identified that Dondero would be likely to contest the transfer to Scott and thereby seek to gain control of DAF and its assets, so for compliance purposes, DAF dissolved Charitable DAF GP, LLC and transitioned to a Cayman general partner for Charitable DAF Fund, LP.[10]

---

[10] Prior to receiving the February 7, 2025, email, DAF also heard from a confidential source that Dondero's associates were planning to assert control of Charitable DAF GP, LLC and thereby regain control of DAF. DAF interpreted this as a strategy that Dondero would attempt to assert his transfer to Grant Scott was invalid and then Dondero would control the general partner and direct the DAF to distribute its assets to Dondero or Dondero's affiliates.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

On February 12, 2025, Andrew Johnstone of Johnstone Law emailed Paul Murphy to say he represents Charitable DAF Fund 2 LP (DAF 2) and requested a meeting with Paul to discuss "DAF 1 and DAF 2." DAF has information that Dondero has been working to form another "DAF" with the intention to combine the two DAFs and assert control over the assets. DAF believes this is another attempt, directly or indirectly, by Dondero to assert control over DAF and its assets.

On February 13, 2025, Atlas IDF, LP, an entity controlled by Mark Patrick, filed a lawsuit against NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC ("NREP") and Nancy Dondero, as Trustee of The Dugaboy Investment Trust, due to NREP's and Dugaboy's (as a guarantor) failure to repay ~$13 million in demand notes. While Atlas IDF, LP is not owned by DAF, this filing shows more independence between Mark Patrick and Dondero.

On February 14, 2025, Doug Mancino emailed Michael Stockham of H&K correcting the various financial misstatements in H&K's email, addressing the control that Dondero is seeking to exert over DAF and the Participating Shareholders, and offering to have a call with Paul Murphy as previously discussed.

On February 25, 2025, Liberty CLO HoldCo, Ltd. ("Liberty"), a subsidiary of Charitable DAF HoldCo, Ltd., filed a lawsuit against Highland Capital Management Services, Inc. ("HCMSI"), an entity believed to be controlled by NexPoint and/or Dondero, because HCMSI defaulted on a ~$1.3 million promissory note payable to Liberty. Instead of making a required payment to Liberty, HCMSI directed the payment to a personal friend of Dondero named Patrick McCabe. This is more evidence that NexPoint and Dondero fail to repay their debts and more evidence of independence between DAF and Dondero.

On February 27, 2025: Michael Stockham of H&K sent letter requesting presentation from Paul Murphy in the next two weeks, as initially discussed in December. This request is a change of course from the January 21 and January 28 letters from Julie Diaz, which said that a presentation would not occur before DAF turned over to them substantial financial information.

On February 28, 2025, Liberty filed a lawsuit against Nancy Dondero, as Trustee for Dugaboy, Grant Scott, as Trustee of The SLHC Trust, NexPoint Advisors, and other NexPoint entities due to the NexPoint Affiliates' failure to satisfy their obligations under a put option contract. This is more evidence that Dondero and his entities fail to repay their debts and more evidence of independence between DAF and Dondero.

---

DAF believes the frustration in H&K's email is due, in large part, to the realization that the Dondero-GP strategy would not work. H&K attempted to twist the GP reorganization as evidence Mark Patrick was going rogue, but the GP reorganization also had benefits from a Cayman legal standpoint. This Dondero-GP strategy is also inconsistent with Dondero's Vexatious Reply Brief attached as Exhibit D, in which he acknowledges (i) he has no direct or indirect control over DAF and (ii) he transferred Charitable DAF GP, LLC to Grant Scott.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Historically, DAF was funded with assets from Highland Capital Management Partners Charitable Trust #2, which Dondero funded and obtained a charitable deduction for his contribution.

Application

1. Donative intent; Self-dealing penalties

Under U.S. tax law, when someone donates to charity, they have to give up "dominion and control" of the donated assets, meaning the donor has to completely and irrevocably transfer ownership and control of the property to the charity. This includes relinquishing any power to change the use or disposition of the donated assets. For the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used. See Code Section 170; Code Section 2511; Treas. Reg. Section 25.2511-2(b). The aforementioned facts suggest that Dondero is attempting, through his control of the Highland SOs, to exert dominion and control over the cash and property that he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit). If the Internal Revenue Service ("IRS") were to make a finding that Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he took, and impose civil penalties, including, but not limited to, the accuracy-related penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663.

In addition, Code Section 4941 imposes significant penalties on self-dealings between a private foundation (such as each Highland SO) and a "disqualified person." The term "disqualified person" is defined by Code Section 4946(a)(1) to include a "substantial contributor," as well as a "foundation manager" (i.e., officer, director, or trustee of a foundation) Based upon the facts provided, it seems clear that Dondero would be considered a "disqualified person" with respect to each and every Highland SOs. Dondero's past transactions (e.g., NexPoint) and other attempts to garner personal benefit at the expense of DAF and the Highland SOs. Along with the potential for self-dealing penalties under Code Section 4941, Dondero's persistent pattern of self-dealing with the Highland SOs exposes each of those entities to revocation by the IRS of its tax-exempt status. If the IRS were to determine that Dondero's pattern of self-dealing constituted a willful attempt to evade or avoid federal income taxes, then the IRS could refer to the matter for criminal prosecution. See Code Section 7201, et seq.

2. Private inurement/benefit

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Organizations enjoying tax-exempt status under Code Section 501(c)(3) must comply with requirements set forth in relevant Code sections, as well as relevant Treasury Regulations. Code Section 501(c)(3) provides:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to ) any candidate for public office. (*Emphasis added*.)

The prohibition against private inurement is a statutory in nature and is also set forth in Treas. Reg. Section 1.501(c)(3)-1(c)(2). Private inurement is a subset of private benefit (discussed below) and has often been restricted to unjust payments of money to those individuals in positions of control within tax-exempt organizations. See IRS EO CPE (2001).

The concept of private benefit is derived from that part of Code Section 501(c)(3) that requires organizations (such as SOs) to be operated exclusively for tax-exempt purposes. Organizations will not be deemed exempt under Code Section 501(c)(3) unless they serve public rather than a private function. According to Treas. Reg. Section 1.501(c)(3)-1(d)(ii), an organization will not be deemed exempt unless it serves a public rather than a private interest. This concept was endorsed by the United States Supreme Court when it addressed the predecessor to Code Section 501(c)(3). See Better Business Bureau of Washington, D.C. v. United States, 326 U.S. 279 (1945). If an activity would benefit an individual or for-profit entity (regardless of whether such individual or for-profit entity is affiliated with or controls the tax-exempt entity) substantially, then the transaction would run afoul of the private benefit proscription, regardless of whether payments were unreasonable or excessive. See Church by Mail v. Commissioner, 765 F. 2d 1387 (9th Cir. 1985), aff'g TCM 1984-349 (1984). Other examples of private benefit/inurement have involved an inadequately secured loan (Lowry Hospital Association v. Commissioner, 66 T.C. 850 (1976) and payment of excessive rent (Texas Trade School v. Commissioner, 30 T.C. 642, aff'd 272 F. 2d 168 (5th Cir. 1959). The United States Tax Court has opined that, while some benefits can be conferred without jeopardizing an organizations tax-exempt status, "private benefits" should be defined as "nonincidental benefits conferred on disinterested persons that serve private interests."

CARRINGTON COLEMAN

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

IRS and Treasury Regulations require that organizations enjoying tax-exempt status under Code Section 501(c)(3) be both organized and operated exclusively for tax-exempt purposes. Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." While it is my understanding that each of the SOs has met the organizational test of Code Section 501(c)(3) and relevant Treasury Regulations, each SO must also pass the operational test throughout its existence. Whether a tax-exempt organization has engaged in activities that violate the proscriptions against private inurement and/or private benefit is highly fact specific. Treas. Reg. Section 1.501(c)(3)-1(d)(ii) places the burden of proof squarely upon a tax-exempt organization to demonstrate its continued compliance with the operational test described above.

While the current manager has been acting independently of Dondero and those under Dondero's influence and/or control, this pattern of Dondero's using DAF as his personal "piggy bank" may be perceived by the IRS and Dondero's creditors that DAF has been or is as his financial alter ego. Any suggestion or perception of alter ego status between Dondero and DAF increases the risk that DAF could find itself embroiled in litigation directed against Dondero, one or more SOs, and any of the other entities that he does or may control, whether directly or indirectly.

To the extent that any of the SOs have either encouraged or acquiesced in Dondero's accessing DAF funds for his personal benefit, either directly or through the entities that he controls or in which he has considerable financial interest, those organizations run an increased risk of losing their tax-exempt status by operating for private and not public benefit. As discussed above, each organization that has received tax-exempt status under Code Section 501(c)(3) must be organized <u>and</u> operating primarily for charitable purposes.

Given what has been detailed about Dondero's past and continued actions with SOs and DAF, there is a significantly heightened risk that the IRS could severely penalized and/or revoke the tax-exempt status of one or more SOs, which could imperil the status and assets of DAF. To help insulate DAF from any such exposure and to facilitate and expand its charitable purposes, DAF adopted a corporate restructuring on December 18, 2024, which resulted in the use of a Delaware blocking corporation to lessen the negative effect to DAF of Dondero's influence over the existing SOs.

Increasing the number of supporting organizations to current SOs would mitigate considerations of undue influence/private inurement/private benefit and broaden the scope of DAF's charitable reach to the public. The IRS will look favorably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and private inurement.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

**Exhibit A**

**November 20, 2024, ValueScope Presentation to Foundations**

[See attached.]

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

**Exhibit B**

**December 11, 2024, Paul Murphy Presentation to Foundations**

[See attached.]

**Exhibit C**

**Timeline**

- June 2023: DAF exposure to NexPoint DST transactions is over $100MM.[11]
- October 2023: DAF turns down NexPoint-proposed Storage Partners DST IV due to unfavorable economics for DAF.
- November 2023: DAF turns down NexPoint-proposed Storage Partners DST V due to unfavorable economics for DAF.
- November 2023: Dondero requests Mark Patrick direct DAF to wire money to Dondero's entity, Sentinel Reinsurance Ltd., so that Sentinel can pay some legal bills. The legal bills bear no relation to the DAF. Mark seeks the advice of counsel who suggests doing this may be illegal, so Mark refuses to do so.
- March 7, 2024: David Rosenberg emails Mark Patrick and NexPoint to inform them that Highland Dallas Foundation, Inc. will do business in Texas under the assumed name NexPoint Philanthropies, Inc.
- June 13, 2024: DAF closes NexPoint-proposed Small Bay II transaction, which diverts $10MM to Dondero's trust, Dugaboy.
- August 22, 2024: Doug Mancino speaks with David Rosenberg about various developments regarding the Highland Dallas Foundation and Jim Dondero
- September 2024: DAF turns down two NexPoint-proposed transactions that would benefit NexPoint and Dondero: (i) the preferred dividend financing and (ii) a new Storage Partners DST VI.
    - Rob Harris, NexPoint' s general counsel, tells Shields that if DAF does not do the deal, "People will lose their jobs, and it isn't going to be me."
- September 2024: NexPoint proposed DAF invest $45 million in TCAL, receive a capped upside on its investment, and assume all the financial risk.
- September 26, 2024: Scott Ellington and Dylan Wiltermuth at Carey Olsen reach out to Paul Murphy and ask whether Paul would consider becoming a director of the DAF (which he obviously already was).
- September 30, 2024: Doug Mancino provides advice to Mark Patrick that there is a conflict of interest between DAF and Skyview Group and recommends Mark Patrick resign from Skyview Group and terminate the services agreement with Skyview Group

---

[11] From June 2023 until the present day, DAF and its counsel have successfully reduced this exposure level to about $700k in February 2025. In October 2023, DAF received advice from counsel "…you should substantially reduce any such [Dondero-led investments] so that they compromise only an insubstantial amount of the assets held in the DAF structure" due to concerns that, as of June 2023, DAF entities' investments in Dondero-led investments was 44% of its total investments. DAF was concerned that Dondero would direct his entities (including NexPoint) to stop payment on Dondero-led investments if DAF rejected Dondero's proposals. This concern was validated in October, November, and December of 2024 because, when Mark Patrick left Skyview Group, Dondero directed NexPoint to stop paying DAF about $8 million that it was due on Small Bay II.

- October 2, 2024: Mark Patrick resigns from Skyview Group
- October 2, 2024: DAF terminates services agreement with Skyview Group
- October 3-October 24, 2024: Chris Rice (a Skyview Group employee and a NexPoint employee) reaches out to SEI and convinces SEI to provide financial information relating to the DAF
- October 10, 2024
    - Mark Patrick meets with Julie Diaz of the Highland Dallas Foundation, Inc.
    - Mark Patrick has a telephone call with Debbie Wilkerson, the CEO of Highland Kansas City Foundation, Inc.
- October 10, 2024: NexPoint ceases payments to DAF that NexPoint is contractually obligated to make regarding Small Bay II
- October 14, 2024: Doug Mancino talks to Tammy Sims Johnson of the Highland Santa Barbara Foundation, Inc.
- October 3-November 11, 2024: Supporting organizations hire H&K (including a litigator) to represent them
- November 8, 2024: DAF effectively declines TCAL transaction proposed to Mark Patrick by Dondero because the economics were unfavorable for DAF
- November 11, 2024: Supporting organizations sign letter addressed to Paul Murphy, conspicuously not signed by Dondero
    - This letter is the first indication to DAF, Mark Patrick, Paul Murphy, and Doug Mancino that the supporting organizations have any issues, despite
- November 20, 2024: ValueScope and Doug Mancino make presentation to H&K, counsel to the supporting organizations
- December 6, 2024: Supporting organizations' letter received by Brian Shaw, counsel to DAF/Mark Patrick, who forwards it to Paul Murphy, who confirms he had not previously received it.
- December 11, 2024: DAF holds presentation with Paul Murphy re: corporate governance and investments. Walkers (Cayman counsel) also joins. H&K declines to hear from Walkers re: participation share rights.
- December 13, 2024: Doug Mancino emails H&K requesting withdrawal of the November 11 letter and proposing a path forward.
- December 18, 2024: Doug Mancino follows up on his December 13, 2024, email.
- December 19, 2024: David Rosenberg of H&K refuses to withdraw letter and discusses a presentation by Paul Murphy to the foundations.
- January 7, 2025: the ValueScope 9/30/24 quarterly report is provided to the Highland SOs.
- January 8, 2025: David Rosenberg of H&K proposes times for presentation by Paul Murphy to the foundations.

- January 10, 2025: In a matter related to the HCMLP bankruptcy, Mark Patrick successfully negotiated that Dondero direct about $8 million to pay amounts that were due to DAF on the Small Bay II transaction.
- January 21, 2025: David Rosenberg confirms a Zoom call is fine.
- January 23, 2025: Julie Diaz, CEO of the Highland Dallas Foundation, emailed Mark Patrick's out-of-use email address (which was communicated to her previously) to request additional financial information by February 10, 2025
- January 28, 2025: Julie Diaz sends a second email, this time requesting a winding up of the DAF.
- January 30, 2025: DAF (Paul Murphy) responded to the Highland SOs and expressed concern (not for the first time) that Dondero was directing the Highland SOs to express these concerns and send this inconsistent communication.
- January 31, 2025: Michael Stockham of H&K sends an adversarial email ignoring DAF's concerns.
- February 4, 2025: DAF (Paul Murphy) emails and says it is willing to cooperate with the Highland SOs and provide them with information but also requested the Highland SOs confirm they would like to continue to work with DAF to resolve their concerns.
- February 7, 2025: DAF HoldCo approves issuance of participation shares to DFW Charitable Foundation, which result in DFW Charitable Foundation holding 51.04% of the participation shares.
- February 7, 2025: Michael Stockham of H&K sends another adversarial email that contains misleading claims.
- February 12, 2025: Andrew Johnstone of Johnstone Law emails Paul Murphy saying Johnstone acts for "Charitable DAF Fund 2 LP (DAF 2)".
- February 13, 2025: Atlas IDF, LP, an entity controlled by Mark Patrick, filed lawsuit against NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, and Nancy Dondero, as Trustee of The Dugaboy Investment Trust, alleging that NexPoint (as payor) and Dugaboy (as guarantor) failed to repay ~$13 million in demand notes following demand.
- February 14, 2025: Doug Mancino emails Michael Stockham of H&K correcting the various financial misstatements in H&K's email, addressing the control that Dondero is seeking to exert over DAF and the Participating Shareholders, and offering to have a call with Paul Murphy as previously discussed.
- February 25, 2025: Liberty CLO HoldCo, Ltd. ("Liberty"), a subsidiary of Charitable DAF HoldCo, Ltd., filed lawsuit against Highland Capital Management Services, Inc. ("HCMSI"), an entity believed to be controlled by NexPoint and/or Dondero, alleging that HCMSI defaulted on a ~$1.3 million promissory note payable to Liberty. Instead of making a payment to Liberty, HCMSI directed the payment to a personal friend of Dondero, Patrick McCabe.

- February 27, 2025: Michael Stockham of H&K sent letter requesting presentation from Paul Murphy in the next two weeks.
    - This is the presentation that was planned for January prior to the letters on January 21, 2025 and January 28, 2025, which effectively retracted the request for a presentation.
- February 28, 2025: Liberty filed lawsuit against Nancy Dondero, as Trustee for Dugaboy, Grant Scott, as Trustee of The SLHC Trust, NexPoint Advisors, and other NexPoint entities due to the NexPoint Affiliates' failure to satisfy their obligations under a put option contract.
- February 28, 2025: Charitable DAF HoldCo, Ltd. received FTI Consulting valuation analysis that suggests a discount of 95% of net value should be applied to the Participation Shares.
- March 3, 2025: Charitable DAF HoldCo, Ltd. received ValueScope valuation analysis of 100 Participation Shares at $529,183.
- March 20, 2025: Charitable DAF HoldCo, Ltd. sends letter to Internal Revenue Service raising issues with Highland Dallas Foundation, Inc.
- March 21, 2025: Charitable DAF HoldCo, Ltd. sent copy of IRS letter to Texas AG, Missouri AG, and California AG

**<u>Exhibit D</u>**

**Vexatious Reply Brief**

Dondero Vexatiuos
Reply Brief and DAF

Exhibit E

ValueScope and FTI Consulting Valuations

# VALUATION ANALYSIS OF
# 100% MEMBERSHIP INTEREST IN
# CDMCFAD, LLC

AS OF
MARCH 25, 2025

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

***RE: Valuation Analysis of Membership Interest in CDMCFAD, LLC***

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of the 100% non-controlling membership interest (the "Subject Interest" or the "Membership Interest") in CDMCFAD, LLC (the "Company") as of March 25, 2025 (the "Valuation Date").[1] This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of membership interests), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

---

[1] Our analysis assumes that the Company and CLO HoldCo's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the Company will continue as a going concern.[2] The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Membership Interest. The Membership Interest does not confer control and has an extremely limited claim to the underlying net asset value of CLO HoldCo, Ltd ("CLO HoldCo"). Economic benefits are contingent on discretionary distributions made by the Company's manager ("Management"). Given these characteristics, the going concern approach appropriately reflects their value.

**SCOPE OF WORK**

To gain an understanding of Company's operations, we reviewed the Company's financial and operational data and spoke with Management. To understand the environment in which Company operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry. We also studied economic conditions as of the Valuation Date and their impact on the Company and its industry.

We valued the Subject Interest in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo as of September 30, 2024
- The Limited Liability Company Agreement of CDMCFAD, LLC, as of December 18, 2024
- Information regarding the Company's history and current operations

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

- Historical distributions from CLO HoldCo
- The organizational structure chart for CDMCFAD, LLC
- Discussions with Management
- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024
- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date
- An interview with Management regarding expectations for future distributions
- An application of appropriate valuation techniques and procedures, including the income approach
- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| **Value of Subject Interest, Minority, Non-Marketable** | | **$1,637,192** | |

We are independent of the Company and its affiliates and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope

ValueScope, LLC

## TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW .......... 1**
DESCRIPTION OF THE ASSIGNMENT .......... 1
SCOPE .......... 1
PROCEDURES .......... 1
**COMPANY OVERVIEW .......... 2**
CDMCFAD, LLC OVERVIEW .......... 2
CAPITALIZATION TABLE .......... 2
COMPANY STRUCTURE CHART .......... 3
FINANCIAL POSITION .......... 3
SUBJECT INTEREST OVERVIEW .......... 6
**ECONOMIC AND INDUSTRY OVERVIEW .......... 8**
OVERVIEW OF THE U.S. ECONOMY .......... 8
OVERVIEW OF THE PRIVATE EQUITY... & INVESTMENT VEHICLES INDUSTRY .......... 16
**VALUATION METHODOLOGY .......... 17**
VALUATION APPROACHES .......... 17
VALUATION METHODS .......... 18
SUMMARY OF THE VALUATION APPROACHES AND METHODS .......... 18
**VALUATION ANALYSIS .......... 20**
INCOME APPROACH ANALYSIS .......... 20
**CONCLUSION OF VALUE - SUBJECT INTEREST .......... 22**
DISCOUNT FOR LACK OF MARKETABILITY .......... 22
PRE-IPO STUDIES .......... 34
APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST .......... 35
DISCOUNT ADJUSTMENT DISCUSSION .......... 36
SUBJECT INTEREST DISCOUNT CALCULATION .......... 37
FAIR MARKET VALUE CONCLUSION .......... 38
**ASSUMPTIONS AND LIMITING CONDITIONS .......... 39**
**APPRAISAL CERTIFICATION .......... 44**

## TABLE OF SCHEDULES

**VALUATION SUMMARY ........................................ SUMMARY SCHEDULE**

**HISTORICAL FINANCIAL ANALYSIS ........................................ A**

HISTORICAL DISTRIBUTIONS TABLE ........................................ A.1
HISTORICAL DISTRIBUTIONS CHARTS ........................................ A.2
CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........................................ A.3

**INCOME APPROACH ........................................ B**

DISCOUNTED CASH FLOW (DCF) ANALYSIS ........................................ B.1
SENSITIVITY ANALYSIS – HYPOTHETICAL RISK-FREE BOND ........................................ B.2

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS ........................................ C**

RESTRICTED STOCK STUDIES........................................ C.1
RESTRICTED STOCK STUDIES SUMMARY STATISTICS........................................ C.2
DLOM QUALITATIVE SCORING ........................................ C.3
CALCULATION OF MARKETABILITY DISCOUNT........................................ C.4
DLOM FOOTNOTES AND COMMENTS........................................ C.5

## ENGAGEMENT OVERVIEW

### DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of the 100% non-controlling membership interest (the “Subject Interest” or the “Membership Interest”) in CDMCFAD, LLC (the “Company”) as of March 25, 2025 (the “Valuation Date”).[3] This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of membership interests), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

### SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Subject Interest. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

### PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company’s operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

3 Our analysis assumes that the Company and CLO HoldCo’s financial position remains materially consistent between September 30, 2024 and the Valuation Date.

## COMPANY OVERVIEW

### CDMCFAD, LLC OVERVIEW[4]

CDMCFAD, LLC is a Delaware limited liability company formed in December 2024. Upon the members' acceptance of the interest, the members agreed to the provisions of the Limited Liability Company Agreement of CDMCFAD, LLC (the "Company Agreement") and the Companies Law of the state of Delaware (as amended from time to time, the "Law"). As a holding company, the Company's underlying assets have been allocated across a broad range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

### CAPITALIZATION TABLE

The Company's membership interest is held by Charitable DAF HoldCo, Ltd. Mark Patrick is the Manager of the Company.

[4] Based on the Company Agreement and a discussion with Management.

## COMPANY STRUCTURE CHART




## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million. CLO HoldCo has net assets of $269.1

million on its books as of September 30, 2024. The Balance Sheet is presented below and in Schedule A.3.

***CLO HoldCo, Ltd - Summary Balance Sheet***

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

CLO HoldCo historically paid distributions of $819,050 in 2019, $619,050 in 2020, $834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three quarters of 2024. Fourth quarter distributions were historically larger than in the first three quarters.[5] Historical Distributions are presented in the following charts and in Schedules A.1 and A.2.

5 Distributions are typically paid a few months following the end of a quarter. As a result, fourth quarter distributions may be paid in the first or second quarter of the following calendar year.




Note: Q4 2024 distributions have not yet been paid



## SUBJECT INTEREST OVERVIEW

The Subject Interest consists of a 100% non-controlling membership interest in the Company. The Subject Interest may receive discretionary cash distributions from time to time. The rights and limitations of the Membership Interest are defined by the Company Agreement and are directly influenced by the discretion and actions of Management.

The Company Agreement grants Management substantial discretion over distributions, interest allocation, governance, and financial transparency, leaving members with little influence over corporate decisions. The Membership Interest is subject to transfer restrictions and limited access to information, with limited voting rights and no ability to amend governing documents. Given these extensive limitations, the Membership Interest represents a highly restricted and passive financial interest with little control or enforceable rights.

### *Limited Rights Over Distributions*

Members do not have:

- The right to cause, vote on, or receive distributions.
- The right to annual, timed, or guaranteed distributions.
- The ability to amend the Company Agreement to modify distribution rights.

### *Governance and Voting Limitations*

Members do not have:

- The right to remove or appoint Management.
- The right to vote on the issuance of additional membership interest, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of membership redemptions.

The appointed Management has full control over the management, operations, and affairs of the Company, including the reallocation of the membership interests on terms they determine. Since members do not have voting or approval rights over reallocation, the membership interest may be reallocated at any time, potentially impacting the economic interests associated with existing interest. Additionally, the transfer of membership interest requires Management consent, and Management may reject transfers at their discretion. Furthermore, Management may cause any membership interest to be redeemed by the Company for any reason.

***Restrictions on Meetings and Information Access***

Members do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at Management's sole discretion.
- The ability to modify or amend the Company Agreement in any capacity.

For further details, refer to Appendix A for key provisions of the Company Agreement.

## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter. Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target. After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December. The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election. Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

### Gross Domestic Product[6]

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending. These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.




6 U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

***Population***

Population growth is an important driver of long-term growth in an economy. The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7] The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward/flat. In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]







---

7 U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

8 Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

9 U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

***Employment***

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]







Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

10 U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### *Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].




11 Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

12 Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

13 Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

### *Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14] The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]




The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]




[14] Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[15] Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[16] Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2025.

[17] Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]




***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.




18 U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2025.

***Stock Markets***[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024. The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024. The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024. In the graph below, the December 30, 2022, values were set to 100.




***Construction & Housing Starts***

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20] Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

---

19 CapIQ Database, last accessed January 10, 2025.

20 U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

21 U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.




***Consumer Sentiment***

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.




22 University of Michigan, *Surveys of Consumers*, November 2024

**OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[23]**

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

***Executive Summary***

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

[23] IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

### VALUATION APPROACHES

#### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

#### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

#### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
   1. Discounted Cash Flow Method (multi-period model)
   2. Direct Capitalization Method (single period model)
   3. Excess Earnings Method

B. Market Approach
   1. Guideline Public Company Method
   2. Merger and Acquisition Method

C. Asset-Based Approach
   1. Reproduction Cost Method
   2. Replacement Cost Method
   3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as the Company, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the Membership Interest under consideration, the asset-based approach is not applicable. The Subject Interest does not confer control and only have a claim in respect of the underlying assets of CLO HoldCo in a winding up. Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of this interest are contingent upon discretionary distributions by Management. As such, the value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.

Given the nature of the Membership Interest, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[24] This approach estimates the present value of expected future distributions, if any, based

[24] The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the Membership Interest.

on reasonable assumptions regarding Management's discretion in making such distributions. If no future distributions are expected, the value of the Subject Interest would be nominal. The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Membership Interest.

## VALUATION ANALYSIS

### INCOME APPROACH ANALYSIS

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits. In the case of the Membership Interest, these economic benefits are exclusively tied to discretionary distributions made by Management, rather than earnings or cash flows of the underlying NAV of the Company or CLO HoldCo. The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these distributions. The resulting present value represents the fair market value of the Subject Interest.

#### *Discounted Cash Flow Method*

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date. The DCF method projects the distributions that the member is expected to receive. Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

#### *Projected Distributions*

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions. Management indicated that the timing and size of future distributions will be discretionary, and that the Company does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid by CLO HoldCo over the past 12 to 24 months. We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000. Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

#### *Cost of Equity*

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, lack of claim on underlying NAV, and absence of control over distributions. This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature

of potential cash flows, significant legal and governance risks, and the inability to force a sale or liquidity event. The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions. Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

***Conclusion – Income Approach Analysis***

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[25]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows. In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied. Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%. However, this analysis does not reflect the substantial risks associated with the Subject Interest.

---

[25] Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

## CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

### DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity. A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions. These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

#### *Restricted Stock Studies*

The restricted stock studies reviewed included data from 1966 through 2010. The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity. The restricted stocks were identical to the traded stock except for marketability. A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

**Summary of Restricted Stock Studies**




## SEC Institutional Investor Study[26]

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969. The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer. The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer. Stocks listed on the major exchanges had lower

[26] U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

discounts than smaller exchanges and over-the-counter stocks. The study found higher discounts for companies with smaller sales and lower earnings.

**Johnson & Racette Study**[27]

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973. The study included 86 observations sent from 75 investment companies that met the selection criteria. Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

**Gelman Study**[28]

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970. The investment companies were formed in 1968 to specialize in restricted securities. A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders. Gelman's analysis found mean and median discounts of approximately 33%. In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

**Trout Study**[29]

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972. Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares. Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

27 Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

28 Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company, "*The Journal of Taxation*, June 1972, 353-354.

29 Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

**Moroney Study[30]**

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972. The study was subsequently published in 1973. The analysis focused on 146 transactions in restricted securities by 10 registered investment companies. The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

**Maher Study[31]**

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976. The study observed discounts for 34 restricted stock transactions from 1966 to 1973. The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

**Standard Research Consultants Study[32]**

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982. The discounts varied from 7% to 91% with a median of 45%. The results of the study tend to suggest higher discounts for companies with smaller revenues.

**Wruck Study[33]**

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample. On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%. The median discount indicated was similar at 12.2%.

---

30 Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

31 J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

32 William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

33 Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

**FMV Opinions Study[34]**

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144. The mean and median discounts were 22.3% and 20.1%, respectively. The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

**Barclay, Holderness, Sheehan Study[35]**

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996. Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management. Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements. In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

**Hertzel & Smith Study[36]**

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987. The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms. While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

[34] Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

[35] Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

[36] Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

### Management Planning Study[37]

Management Planning, Inc. published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H. Meyers, ASA, CFA. They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights. A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|---|---|---|---|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment. Certain factors were also cited by the authors as the most influential in determining discounts. The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

### Hertzel, Lemmon, Linck, Rees Study[38]

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996. A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million. Of the 619 private

---

[37] A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370. Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability*. 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

[38] Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts. The study indicated a mean discount of 16.5% and a median discount of 13.4%.

**Wruck & Wu Study[39]**

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies between 1980 and 1999. 1,976 private placements were selected in the sample. Of these, 1,854 had data for observed discounts. The study found a mean discount of 11.33% and a median discount of 10.96%.

**Angrist, Curtis, Kerrigan (MPI) Study[40]**

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

**Results of Angrist, Curtis, Kerrigan (MPI) Study**

| Period | Observations | Mean Discount | Median Discount |
|---|---|---|---|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

**Willamette Management Associates Study[41]**

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984. There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study. The Willamette study resulted in a mean discount of 31.2%.

39 Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.

40 Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.

41 Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

**Silber Study[42]**

William L. Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989. Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%. Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

**Krishnamurthy, et al. Study[43]**

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992. The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined). The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively. The overall mean discount was 19.4%.

**Wu Study[44]**

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004. The study analyzed 301 private placements taking place from 1986 to 1997. Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

**Bajaj Study[45]**

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith. This study analyzed 88 private placements occurring between 1990 and 1995. The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively. The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

42 William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

43 Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

44 Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

45 Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

**Johnson Study (Business Valuation Review)**[46]

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995. The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%. Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

**Finnerty Study**[47]

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008. The first study focused on private placements from 1991 to 1997 and resulted in mean and median discounts of 26% and 20%, respectively. The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

**Chaplinsky Purchase Discount and Warrant Study**[48]

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms. The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount. The indicated mean discount considering only the purchase discount was 19%, and the median was 15%. The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

**Brophy PIPE Study**[49]

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors. The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

46 Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

47 John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

48 Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

49 David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

## Columbia Financial Advisors Study[50]

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998. The one-year holding period became effective April 29, 1997. A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

| | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|---|---|---|
| Number of Transactions | 23 | 15 |
| Low | 0.8% | 0.0% |
| Mean | 21.0% | 13.0% |
| Median | N/A | 9.0% |
| High | 67.5% | 30.0% |

## Meidan Study[51]

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003. The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%. The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample. The weighted average of the mean discounts was calculated as 9.8%.

## Verdasca Study[52]

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions. The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

50 Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

51 Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

52 Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

**Billett & Floros Study[53]**

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008. These factors were found to both complement and substitute for the other depending on individual circumstances. By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

**Stout Risius Ross Study[54]**

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods. The chosen time period includes transactions both before and after Rule 144 implementation. The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively. Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

**Harris-Trugman Study[55]**

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables. The study originally included 80 transactions of restricted stock sales that took place in 2007-2008. Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011. For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively. The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively. The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively. The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

53 Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

54 Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

55 William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

## Summary of Restricted Stock Studies

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010. Reported mean discounts range from 8.7% to 35.6%. The average of reported mean discounts was 20.8%, while the median was 19.4%. Reported median discounts range from 9.0% to 45.0%. The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed. Prior to April 1997, the SEC-required holding period for restricted stocks was two years. That was decreased to one year on April 29, 1997. Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

### Analysis of Restricted Stock Studies for Different Periods

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

The studies also cited several company and security specific factors in determining the estimated discount.

## PRE-IPO STUDIES

In recent years, a number of pre-IPO studies were performed to support marketability discounts. The methodology applied in these studies is based on the initial offering price (the price prior to public trading). This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period. The resulting amount is divided by the initial offering price to arrive at the appropriate discount. The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders. Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

### *Emory Studies*

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC. Emory has completed nine studies with the original published in June 1986. The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share. The ninth study deviated from the previous studies as follows:

- Included only companies with “com” in their names
- Review period was increased from 18 months in the previous studies to 35 months
- All transactions were actual sales as opposed to the previous studies that included options
- Most of the companies did not have earnings

The study consisted of 53 transactions. The mean and median discounts by study are presented in the following chart.




### *Willamette Management Associates Pre-IPO Study*

This study observed 556 companies and 1,007 transactions from 1975 through 1997. The adjusted mean discount[56] for each time period varied from 28.9% to 56.8%. The mean for the entire review period was 44.2%. The median discount range was from 31.8% to 73.1% with the overall median at 50.4%. The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

### *Valuation Advisors Pre-IPO Study*

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000. The mean discount of these studies was 48.9%. The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO. The study confirmed the author's initial hypothesis that higher discounts accompany longer holding periods.

## APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest. The mean and median discounts from the restricted stock studies ranged from 9% to 45%. The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

[56] Excluded highest and lowest deciles of indicated discounts

The latest restricted stock studies indicate mean and median marketability discounts in 14% range. We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis. Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions. Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company. We did not use these studies for our analysis.

***Factors Affecting Marketability***

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase. We also note that various other factors affected discounts observed in the other studies. Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

## DISCOUNT ADJUSTMENT DISCUSSION

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section. Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison. Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature. Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest. This results in a range of outputs from -4 to +4

(from significantly worse to significantly better). The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature. An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

**SUBJECT INTEREST DISCOUNT CALCULATION**

***Adjustment Analysis – Marketability***

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile. The Membership Interest has restrictions on the transfer of the interest and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock. Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis. Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

## FAIR MARKET VALUE CONCLUSION

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | **Value** | **Reference** |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| **Value of Subject Interest, Minority, Non-Marketable** | | **$1,637,192** | |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest. Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated. They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC. Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein. This report may be used alongside other appraisals or studies for comparative or analytical purposes. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

## OPERATIONAL ASSUMPTIONS

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

## COMPETENT MANAGEMENT ASSUMED

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

## NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

**REGULATORY AND ENVIRONMENTAL CONSIDERATIONS**

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

**POTENTIAL FUTURE SALES**

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

## INDEMNIFICATION BY THE COMPANY

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.
2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.
3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.
4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.
5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.
6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.
7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.
8. This report and analysis were prepared under the direction of Steven C. Hastings.
9. I am in compliance with all professional appraisal certifications and licensing.
10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By: ValueScope, LLC



Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

## APPENDIX A
## KEY COMPANY AGREEMENT PROVISIONS

1. With the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act, as determined by the Manager. [Section 2.3]

2. Except as otherwise provided in this Agreement, Profits and Losses for each Fiscal Period shall be allocated as follow: (a) Profits shall be allocated among the Members in the following order and priority: (i) First, among the Members on a pro rata basis so as to reverse prior allocations of Losses for prior Fiscal Periods under Sections 4.1(b)(ii) until cumulative Profit allocated under this Section 4.1(a)(i) equals the cumulative Losses allocated under Section 4.1(b)(ii); and (ii) Second, among the Members in proportion to their Allocation Percentages. [Section 4.1(a)]

3. The Manager may at any time in its sole discretion to the extent the Company has cash and any property available for distribution taking into account current and anticipated needs (including without limitation operating expenses, debt service, guaranteed payments and a reserve for future operating costs), distribute such excess cash and any property available for distributions to the Members in accordance with their respective Allocation Percentages. [Section 5.1(b)]

4. Except as otherwise specifically provided in this Agreement, the Company and its business shall be managed, controlled and operated exclusively by the Manager, which shall be the "manager" of the Company within the meaning of Section 18-101 of the Act and shall have all of the powers and authority in respect of the Company permitted to managers under the Act. [Section 6.1]

5. The initial Manager shall be Mark Patrick. In the event that Mark Patrick dies or is unable to serve as such, the will or other testamentary documentation for Mark Patrick shall designate a successor Manager. To the extent that the will or other related documentation for Mark Patrick fails to provide for a successor Manager or if any such designated individual shall be unable or is unwilling to fill such position, the managing shareholder of Charitable DAF HoldCo, Ltd., shall appoint a successor Manager. To the extent that Mark Patrick desires to resign as Manager, he shall appoint his successor. [Section 6.2]

6. Notwithstanding any provision of this Agreement to the contrary, any contract agreement, deed, lease, note or other document or instrument executed on

behalf of the Company by a Manager shall be deemed to have been duly executed by the Company; no Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied. [Section 6.3(a)]

7. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard. [Section 6.3(c)]

8. Except as set forth in Section 6.2, no Member shall have any right to vote with respect to any Company action. [Section 6.4]

9. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing. [Section 6.5]

10. The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company. The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Notwithstanding anything in Section 18-305 of the Act, except as provided in Section 6.8(b), no Member shall have any right to review or inspect any of the books or records of the Company or receive any other Company information. [Section 6.8(a)]

11. To the fullest extent permitted by law, a Member shall not Transfer all or any portion of its Interest without the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion. [Section 7.1]

12. No Member shall resign from the Company or otherwise cease to be a Member without the consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion. [Section 7.2]

13. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion. [Section 7.3]

14. There shall be no requirement of annual or periodic meetings of the Company's members or managers within the meaning of the Act. [Section 10.1]

15. Any action of the Manager may be taken by written consent of the Manager. Any consent or approval required by this Agreement to be "written" may also be made by the use of electronic transmission. [Section 10.2]

16. This Agreement may be amended, in whole or in part, only through a written amendment executed by the Manager. [Section 10.4]

## APPENDIX B
## QUALIFICATIONS OF THE APPRAISER

***Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA***
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

**EMPLOYMENT HISTORY**

*2006 – Present* *ValueScope, LLC*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006 *Value Capital, LLC*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000* *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001* *MedCare Financial Solutions, Inc.*

*President*

Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994 *H.D. Vest Financial Services*

*Executive Vice President and CFO*

As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hastings was instrumental in implementing this line of business at HD Vest.

1979 – 1986 *Arthur Andersen & Co.*

*Senior Manager*

Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.

- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.

- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*

- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*

- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.

- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.

- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.

- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.

- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.

- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

**CDMCFAD, LLC**
**Table of Contents** **Valuation Date: March 25, 2025**

| Table of Contents | |
|---|---|
| **Schedule Name** | **Schedule** |
| **Valuation Summary and Conclusion** | Summary Schedule |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| **Income Approach Analysis** | |
| Synthesis of Net Cash Flow | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discounts | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

**CDMCFAD, LLC** | **Summary Schedule**
**Valuation Summary and Conclusion** | **Valuation Date: March 25, 2025**

*Synthesis of Fair Market Value*

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | **Value** | **Reference** |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| **Value of Subject Interest, Minority, Non-Marketable** | | **$1,637,192** | |

**CDMCFAD, LLC** | **Schedule A.1**
**Historical Financial Analysis** | **Valuation Date: March 25, 2025**

*Historical Distributions Table*

| Quarterly Distributions - Previous 5 Years | |
|---|---|
| **Quarter** | **Total** |
| **31-Mar-19** | $90,750 |
| **30-Jun-19** | 90,125 |
| **30-Sep-19** | 84,875 |
| **31-Dec-19** | 553,300 |
| **2019 Subtotal** | **$819,050** |
| **31-Mar-20** | 62,750 |
| **30-Jun-20** | 66,500 |
| **30-Sep-20** | 65,500 |
| **31-Dec-20** | 424,300 |
| **2020 Subtotal** | **$619,050** |
| **31-Mar-21** | 77,625 |
| **30-Jun-21** | 91,375 |
| **30-Sep-21** | 97,375 |
| **31-Dec-21** | 568,075 |
| **2021 Subtotal** | **$834,450** |
| **31-Mar-22** | 104,125 |
| **30-Jun-22** | 116,125 |
| **30-Sep-22** | 112,750 |
| **31-Dec-22** | 635,950 |
| **2022 Subtotal** | **$968,950** |
| **31-Mar-23** | 107,875 |
| **30-Jun-23** | 102,750 |
| **30-Sep-23** | 106,625 |
| **31-Dec-23** | 633,631 |
| **2023 Subtotal** | **$950,881** |
| **31-Mar-24** | 106,467 |
| **30-Jun-24** | 105,127 |
| **30-Sep-24** | 106,202 |
| **31-Dec-24** | **TBD** |
| **2024 Subtotal** | **$317,796** |
| **Grand Total (2019 - 2024)** | **$4,510,177** |

Note: Payments are typically made two to three months following the end of each period.

**CDMCFAD, LLC** | **Schedule A.2**
**Historical Financial Analysis** | **Valuation Date: March 25, 2025**

*Historical Distributions Charts*







Note: Q4 2024 distributions have not yet been paid

**CDMCFAD, LLC** **Schedule A.3**
**Historical Financial Analysis** **Valuation Date: March 25, 2025**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**CDMCFAD, LLC**
**Income Approach Analysis**
*Synthesis of Net Cash Flow*

**Schedule B.1**
**Valuation Date: March 25, 2025**

| | | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = | 68.3% | *0.9663* | *0.8484* | *0.7449* | *0.6540* | *0.5742* | *0.5041* | *0.4426* | *0.3886* | *0.3412* | *0.2995* | *0.2630* | *0.2309* | |
| **Present Value (PV) Net Cash Flow** | | **$613,430** | **$90,926** | **$77,423** | **$69,593** | **$373,598** | **$55,377** | **$47,153** | **$42,384** | **$227,533** | **$33,726** | **$28,718** | **$25,813** | |

| | |
|---|---|
| PV net cash flow | $1,685,675 |
| PV residual value | $359,856 |
| **Value of Subject Interest, Minority, Marketable** | **$2,045,531** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$1,637,192** |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | *0.2309* |
| PV residual value : | $359,856 |

012424

**CDMCFAD, LLC**
**Income Approach Analysis**

**Schedule B.2**
**Valuation Date: March 25, 2025**

*Sensitivity Analysis - Hypothetical Risk-Free Bond*

| | | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ Risk Free Rate = | 4.7% | *0.9970* | *0.9858* | *0.9746* | *0.9636* | *0.9527* | *0.9420* | *0.9313* | *0.9208* | *0.9104* | *0.9001* | *0.8899* | *0.8799* | |
| **Present Value (PV) Net Cash Flow** | | **$632,896** | **$105,644** | **$101,300** | **$102,540** | **$619,894** | **$103,473** | **$99,219** | **$100,433** | **$607,158** | **$101,348** | **$97,180** | **$98,370** | |

| | |
|---|---|
| PV net cash flow | $2,769,456 |
| PV residual value | $41,969,350 |
| **Value of Subject Interest, Minority, Marketable** | **$44,738,806** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$35,807,821** |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 4.7% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 46.5x |
| Residual value : | $47,699,415 |
| x PV factor : | *0.8799* |
| PV residual value : | $41,969,350 |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |

**CDMCFAD, LLC** — **Schedule C.1**
**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies*

| | Restricted Stock Studies | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**CDMCFAD, LLC** — **Schedule C.2**

**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

**CDMCFAD, LLC** **Schedule C.3**
**Discount for Lack of Marketability (DLOM) Analysis** **Valuation Date: March 25, 2025**

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on manager discretion as to the timing and amount. Distributions are not required. Howevever, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size. Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years. Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the managers. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Members have extremely limited rights to the underlying net asset value. CLO HoldCo is expected to generate revenue well in excess of the expected distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets. The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | At the manager's discretion, members may be diluted through the issuance of additional membership interests to non-existing members. | Poor | Worse |

**CDMCFAD, LLC** | **Schedule C.4**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: March 25, 2025**

*Calculation of Marketability Discounts*

| Feature | Net Advantage | Gross Adjustment | Importance | Weight | Adjustment | Scaling Adjustment | Final Adjustment |
|---|---|---|---|---|---|---|---|
| | **A (Schedules B)** | **B = F(A)** | **C** | **D = F(C)** | **E = B x D** | **F = 1+E or 1/(1-E)** | |
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | 104% | 0.8% |
| **Net Scaling Adjustment** | **G = Product ($F_i$), i = 1 to n** | | | | | **96%** | **-0.8%** |
| | | | | | | | |
| **Marketability Discount** | | | | | | | |
| Unadjusted discount | H (See Report) | | | | 20.8% | | |
| Scaling adjustment | G (See above) | | | | 96% | | |
| **Concluded Marketability Discount** | **I = G x H** | | | | | **20.0%** | |

012429

**CDMCFAD, LLC** | **Schedule C.5**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: March 25, 2025**

*DLOM Footnotes and Comments*

---

**A)** Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.

1 = Poor 2 = Weak 3 = Fair 4 = Good 5 = Excellent

We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

| | | | | |
|---|---|---|---|---|
| 0 = Equal | 1 = Slightly Better | 2 = Better | 3 = Much Better | 4 = Significantly Better |
| | -1 = Slightly Worse | -2 = Worse | -3 = Much Worse | -4 = Significantly Worse |

**B)** B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

**C)** The importance of the feature is assessed.
1 = Low 2 = Medium 3 = High

**D)** Weights are allocated as follows:
Low = 25% Medium = 50% High = 100%

**E)** To compute the adjustment, B is multiplied by D.

**F)** The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

**G)** The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

**H)** This is the concluded baseline marketability discount determined for comparable investments.

**I)** This is the baseline marketability discount multiplied by the scaling factor.

FTI CONSULTING

# Memorandum

TO: **Charitable DAF Holdco, Ltd**

FROM: **FTI Consulting**

DATE: **27 March 2025**

RE: **Discounts relating to participation shares**

PRIVILEGED AND CONFIDENTIAL

## 1. Introduction

1.1 Charitable DAF Holdco, Ltd ("**DAF**") is a Cayman Islands registered company formed in 2011. We understand DAF invests in real estate, hedge funds, and money market funds.

1.2 DAF's share classes comprise: (i) Management Shares; and (ii) Participating Shares. The 100 Management Shares are solely held by Mark Patrick ("**Mr Patrick**"), a director of DAF at all relevant times.[1] In respect of the Participating Shares:

(1) 305 Participating Shares had been issued as of 30 September 2024 (the "**Valuation Date**").[2] These were held by: (i) Highland Dallas Foundation, Inc; (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) The Community Foundation of North Texas. We understand that these companies are all "Support Organizations" for nonprofit charities, except for The Community Foundation of North Texas which is a nonprofit charity itself;

(2) 623 Participating Shares had been issued as of 11 February 2025 following the Board's resolution on 7 February 2025 ("**Feb 2025 Resolution**"). Under the Feb 2025 Resolution, 318 new Participating Shares were issued to DFW Charitable Foundation (a nonprofit charity). We understand that the number of Participating Shares held by each of the other parties in point (1) above has not changed.

1.3 Holders of Participating Shares may, from time to time and subject to the Directors' sole discretion, receive cash distributions from DAF to fulfil their charitable goals. As we explain further in this memo, the rights conferred to the Management Shares and Participating Shares are significantly different.

[1] Paul Murphy is the other director of DAF. Based on our discussion, we understand that Mr Patrick is the main decision maker.

[2] Valuescope Report, page 7.

1.4 Valuescope, Inc prepared a report dated 7 January 2025 (the "**Valuescope Report**") for Mr Patrick.[3] Valuescope's scope was to perform a valuation of the fair market value of 100 Participation Shares of DAF as of the Valuation Date, and they conclude on a value of US$ 76m as summarised in the table below.

**Table 1-1: Summary of Valuescope's conclusions**

| | | |
|---|---|---|
| DAF's net asset value ("**NAV**") | [a] | US$ 269.05m |
| Participation Shares outstanding | [b] | 305 |
| **NAV per share** | **[c] = [a]/[b]** | **US$0.88m** |
| Discount for lack of control | [d] | 8.1% |
| Discount for lack of marketability | [e] | 6.3% |
| Subject shares | [f] | 100 |
| **FMV of subject shares** | **[g] = [c] x (1-[d]-[e]) x [f]** | **$75.96m** |

*Source: Valuescope Report, page 4.*

**FTI's scope**

1.5 We have been asked to prepare a memorandum setting out our indicative view of the discount applicable (if any) in assessing the fair market value of Participating Shares by considering: (i) how the rights associated with the Participating Shares differ from the rights typically associated with ordinary shares in a company; and (ii) the impact of the existence of an additional share class (being the management shares owned by Mr Patrick).

1.6 We understand the above issues have not been considered by Valuescope in their report. That is, we assume that Valuescope's conclusions are based on a valuation of 100 Participating Shares as if they confer rights that are typically attached to a minority holding of ordinary shares in a private company.

1.7 As we explain in this memorandum, we consider that the rights conferred to Participating Shares are extremely limited, and the potential distribution of cash flows is highly dependent on whether the shareholder's specific circumstance is aligned with the mission of DAF. As a result, we expect:

(1) a limited discount due to lack of control and marketability (i.e., close to the range concluded by Valuescope) if the shareholder is fully aligned with the mission of DAF; and

(2) a high discount due to lack of control and marketability for a shareholder who is not aligned with the mission of DAF of over **95%** to be applicable. The reason for not fully discounting the value is that there may be some option value to the shareholder if, with the passage of time, the interests of the Managing Shareholder become aligned with the shareholder's interests.

3 We understand that Valuescope provides quarterly updates of such report.

**Limitations and restrictions**

1.8 We understand that this memo will be used by the DAF in order to assist it in the context of understanding how a valuation expert may assess the discount referenced in 1.5. It is understood that this analysis is indicative in nature and should not be used to support a transaction. This memo does not constitute: (i) our views on the value of any Participating Shares; and/or (ii) financial or tax advice on the fair value (or any other basis of value) of such shares. It should not be relied upon for any other purpose other than that as stated.

1.9 It is not within our scope to verify or assess the accuracy of any financial information of DAF, including its NAV (as provided in the Valuescope Report or otherwise). We do not opine on matters of law. If any of our assumptions regarding legal matters change, then our opinion may change.

1.10 This memorandum is confidential. It should not be used, reproduced or circulated for any other purpose, in whole or in part, without our prior written consent.

**Structure of memorandum**

1.11 In the remainder of this memorandum, we:

(1) summarise our understanding of the history and structure of DAF relevant to our assessment. This is set out in Section 2;

(2) explain whether the rights of holders in Participating Shares materially affects the value of the shares compared to ordinary shares. This is set out in Section 3 below; and

(3) conclude on the discount applicable in valuing the Participating Shares. This is summarised in Section 4 below.

## 2. Our understanding of DAF's history and structure

2.1 We have the following understanding from Mr Patrick in relation to DAF's history and current position, in respect of: (i) intent of the shareholding structure; (ii) dividend distribution policy; and (iii) the assets that are held by DAF and its reported NAV. We summarise our understanding of these topics in turn below.

**Intent of the shareholding structure**

2.2 DAF is set up in a structure such that the Participating Shareholders (i.e., nonprofit organisations) hold a passive economic, non-voting interest. The Participating Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed – we understand that any attempts to do so may be regarded as a criminal offense by the IRS or result in significant tax liabilities.

2.3 The foregoing tax issues and structure is the primary reason for the separation of control between Participating Shares (holders of which have very limited rights as described further in Section 3) and the Management Shares (holders of which have effective control over DAF). That is, the holder of the Management Shares needs to exercise independence and act on an arms' length basis to the holders of the Participating Shares and their affiliates.

**CDMCFAD LLC**

2.4 As at February 2025, DAF holds a 100% of CDMCFAD LLC (the "**Delaware LLC**"), a Delaware limited liability company, which in turn owns a 100% LP interest in Charitable DAF Fund, LP. Mr Patrick is the Manager of the Delaware LLC.[4]

2.5 We understand that Mr Patrick, as the Manager of the Delaware LLC, has similar rights to the Delaware LLC as he does to DAF. Therefore, we consider the discount applicable to the shares in Delaware LLC to be the same as the discount we estimate for the Participation Shares.

2.6 We understand that no specific arrangements in the LLC agreement are considered to be extraordinary. In this context, we note that the discount applicable when determining the value of the DAF shares (which is based on the value of CLO Holdco, Ltd) should only consider the discount we estimate as applicable to the Participation Shares (as opposed to discount applicable to the Participation Shares multiplied by the discount applicable to the Delaware LLC shares).

**Dividend distribution policy**

2.7 When DAF was created in 2011, it was roughly targeting US$ 3m to 4m of annual distributions. It has done so until around 2019. From 2019, DAF became involved in a legal dispute, and the quantum of distributions has declined. [5]

---

4 2025.02.12 DAF Structure Chart.

5 We have not received details supporting the figure of historical distributions by DAF.

2.8 Going forwards, we understand that DAF has recently wrote its charitable mission into its corporate documents. The Directors of DAF aim to use and distribute DAF's funds to organisations that are aligned DAF's charitable mission, which may include educational and communal projects.

**Assets held by DAF**

2.9 We understand that, in addition to cash and liquid assets (such as money market type funds), DAF holds CLOs and real estate assets. We provide a snapshot of the assets as at 30 September 2024, as shown in the Valuescope Report.

FTI CONSULTING

Privileged and Confidential

**Figure 2-1: NAV reported by DAF as of 30 September 2024**

| | Balance Sheet as of: 9/30/2024 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. (Participation Rights) | 69,385 | 0.0% |
| MidWave Common | 1,640,571 | 0.5% |
| MidWave - Term Loan A | 85,552,571 | 27.1% |
| MidWave - Term Loan C | 40,174 | 0.0% |
| NexPoint Capital, Inc. (BDC) | 14,223,433 | 4.5% |
| NexPoint Real Estate Strategies Fund Z | 8,487,030 | 2.7% |
| NexPoint Real Estate Finance (NREF) | 6,174,381 | 2.0% |
| NexPoint Residential (NXRT) | 2,338,207 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 2,331,025 | 0.7% |
| Small Bay II (Class I) | 3,770,609 | 1.2% |
| Small Bay II (Class II) | 4,047,276 | 1.3% |
| Small Bay II (Class III) | 2,357,682 | 0.7% |
| Polo Glen | 678,545 | 0.2% |
| NHT Holdco | 109,056 | 0.0% |
| ACHC | 158,525 | 0.1% |
| COLL | 115,804 | 0.0% |
| HRTX | 10,945 | 0.0% |
| ACRG/AU | 3,267 | 0.0% |
| ACRG/BU | 1,409 | 0.0% |
| TGTX | 333,308 | 0.1% |
| TMO | 282,686 | 0.1% |
| BIO | 111,081 | 0.0% |
| iHeart Communications | 365 | 0.0% |
| Multi Strat | 107,324 | 0.0% |
| Crusader Fund II, Ltd. | 38,131 | 0.0% |
| BVP Property | 94,000 | 0.0% |
| NCI Apache Trail | 1,104,000 | 0.3% |
| NCI Fort Worth Land | 874,200 | 0.3% |
| NCI Royse City Land | 11,448,367 | 3.6% |
| NCI Stewart Creek | 1,250,000 | 0.4% |
| NLA Assets | 1,766,000 | 0.6% |
| FFWM | 2,541,184 | 0.8% |
| SRG | 139,500 | 0.0% |
| SRTY | 2,380,529 | 0.8% |
| SQQQ | 1,818,805 | 0.6% |
| SPXU | 2,174,013 | 0.7% |
| Serengetti | 2,951,678 | 0.9% |
| Conservation Equity Fund | 3,253,139 | 1.0% |
| MMPQ | 527,460 | 0.2% |
| Total Wire Convertible Promissory Note | 20,560 | 0.0% |
| Sable Permian Resources | 2 | 0.0% |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

*Source: Valuescope report, page 46.*

2.10 We understand that the NAV in the snapshot above is unlikely to reflect updated market value of the assets. For example, some real estate assets are reported at historical cost, which are dated and would not reflect their market values as at the reporting date.

2.11 Valuescope applies two discounts to the reported NAV of $269m in their valuation:

(1) a 8.1% discount for lack of control. This is calculated by reference to the average discount in traded close-end funds against their reported NAV; and

(2) a 6.3% discount for lack of marketability. This is calculated as the average of: (i) 2.8%, calculated using a put option approach; and (ii) 9.7%, based on findings of studies on restricted stocks.

2.12 We understand from you that Valuescope has not considered the rights of the Participating Shares in their assessment of the above discounts. That is, Valuescope valued the Participating Shares as if they confer rights that are typically attached to a hypothetical minority holding of ordinary shares in a private company.

2.13 The studies and approaches considered by Valuescope are commonly referred to in valuations in the context of tax reporting in US. We consider that other approaches may be used and further adjustments may be required to reflect the circumstance of DAF's history (even in respect of valuing a hypothetical ordinary share).[6] However, it is not within our scope to review and/or adjust Valuescope's assessment.

6 Further, the discount to NAV observed in traded close-end funds may not necessarily reflect a 'lack of control'. Such discounts may be due to the assumptions regarding the yield curve and other assumptions used by the fund in determining its NAV.

## 3. Participating Shareholder Rights

3.1 In this section, we discuss the rights of the holders in Participating Shares, specifically in respect of:

(1) the issuance of new shares;

(2) dividends;

(3) voting and the appointment and removal of directors;

(4) share transfers;

(5) share redemption; and

(6) the access to information.

3.2 The analysis of these rights is based on information you have provided to us.

3.3 At the outset, we note an overarching point relating to the Participating Shares. That is, we understand from you that Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission. We understand that the Directors acting in the best interests of the company is generally regarded as the interests of the members as a whole and in certain circumstances the object of the company may be taken into account when determining what is in the best interests of the company. In preparing this note, we have assumed, as agreed with you, that Directors acting in the best interests of the company relates to the interests of the members, and ensuring charitable causes are served, in alignment with, as we understand it, DAF's mission.

**(1) Issuance of new shares**

3.4 We understand that Participating Shareholders do not have: (i) the right to vote on the issuance of further Participating Shares; (ii) pre-emption rights; or (iii) the right to receive notice of such issuance.

3.5 In accordance with the Articles, DAF's Directors may unilaterally issue additional Participating Shares and thereby dilute the power of existing shareholders. On 7 February 2025, through the Board's resolution, DAF issued 318 new Participating Shares (reflecting 51% of all outstanding Participating Shares) to DFW Charitable Foundation, thereby diluting the power of other shareholders.

3.6 Based on the above, we understand that the Participation Shares can be diluted (without corresponding price or compensation paid to existing shareholders) without approval from any shareholders. This introduces a high uncertainty to the value of such shares. Such risks of dilution (without compensation) in the Participating Shares would therefore be materially higher than ordinary shares in typical companies, which confer rights to block such dilution.

FTI CONSULTING



**(2) Dividends**

3.7 In respect of the timing and amounts of dividends in Participation Shares, DAF's Directors have "*sole and absolute discretion*" to declare dividends "*without a requirement to pay such dividends on a pro-rata basis*".

3.8 We understand from you that Participating Shareholder do not have

- the right to cause or vote on distributions;
- the right to pro rata distributions based on their shareholding;
- the right to annual or timed distributions; or
- the right to receive notice of distributions to other Participating Shareholders.

3.9 With respect to these four points, we have regard to the UK 'Model Articles for private companies limited by shares' as a guide to what would be considered typical rights to ordinary shareholders in respect of dividends.[7] [8]

(1) **Cause or vote on distributions**. Dividends may be declared 'by ordinary resolution'. A dividend must not be declared unless the directors have made a recommendation for such amount. Therefore, whilst ordinary shareholders typically have a final vote on distributions, it is expected that such dividends need to be recommended by the director in the first place. In the context of DAF, the lack of rights to cause or vote on distributions may not merit a significant discount because of the common reliance placed on the directors' recommendation.

(2) **Pro rata distributions**. Under the UK's model articles: "*Unless the shareholders' resolution to declare or directors' decision to pay a dividend, or the terms on which shares are issued, specify otherwise, it must be paid by reference to each shareholder's holding of shares*".[9] The default position of ordinary shareholder is that they would receive dividends on a pro rata basis (by reference to each shareholder's holding of shares). Alternatively, if the terms of shares allow, or that there would be a shareholders' resolution, there may be non pro rata distributions. However, in our experience we expect the extent of the disproportionate distribution to be clearly defined in the company's articles or shareholder's agreement (e.g., Shareholder A gets 10% voting rights but 50 % access to dividends).

---

7 We understand that in Cayman Islands, the companies act is designed to be flexible so that the memorandum and articles can be tailored to meet the requirements of the company. Therefore we have chosen the UK's guide as that would be more informative of the expectations of a 'typical ordinary shareholder'.

8 https://www.gov.uk/government/publications/model-articles-for-private-companies-limited-by-shares/model-articles-for-private-companies-limited-by-shares#declaringdividends

9 See also UK government's guide on directors' duties, stating that "*You must usually pay dividends to all shareholders.*" https://www.gov.uk/running-a-limited-company/print

In the context of DAF, we consider that the discount relating to the uncertainty of dividends is high, given that: (i) the directors have the sole discretion to issue dividends without the Participating Shareholders' approval; and (ii) the terms do not specify to the extent of the potential non pro rata distribution, such that the uncertainty arises for each dividend payment.

(3) **Annual or timed distributions**. This is not a typical right attached to ordinary shareholders (such characteristic may be more prevalent in preference shares). We therefore do not consider this to merit additional discount.

(4) **Right to receive notice of distributions to other shareholders.** In itself, this right is not valuable if the shareholders are expected to receive a pro rata dividend (or are clear about the extent of disproportion of their dividends), as they can calculate the dividends received by each shareholder. It is only the uncertainty of non pro rata distributions (i.e., point 2 above) which means this right may be useful. We therefore do not consider any additional discounts applied based on point 2 above.

3.10 As above, since 2019, DAF has continued to make distributions, albeit of a reduced quantum. Therefore, in respect of the Participating Shareholder, there is a high uncertainty regarding: (i) whether its charity goals are aligned with DAF's mission such that it would receive distributions (this may change over time but also appears binary at any given date); (ii) the timing of any future cash flows; and (iii) the relevant amount of such cash flows.

3.11 We understand that the Participating Shareholders' only right to DAF's assets is in the situation where DAF gets wound up.[10] We understand that the Participating Shareholders have the right to seek a winding up of the company, as conferred upon them by the Companies Act. However, it is not clear whether the court would approve the winding up of the company. We understand that if the company is acting in a manner consistent with its articles then the winding up petition is unlikely to be successful.

3.12 Given the differences to rights that are typically attached to ordinary shareholders as explained above, we consider that a very material discount to be applicable.

**(3) Voting and the appointment and removal of directors**

3.13 Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the company. Further, the right to appoint or remove directors is held by the Management Shareholder.

3.14 The above rights are typically granted to ordinary shareholders. In this regard, the Participating Shares are similar to typical 'preferred shares' or non-voting shares. This can be considered as a lack of control over the company's operations or investments.

---

10 Article 121 to 123, Memorandum and articles of association.

FTI CONSULTING



3.15 Normally, the discount applied to non-voting rights is relatively low (valuers typically consider a range of 3-5%[11]). This is because this risk, generally labelled as corporate governance risk, is somewhat contained by the directors' duties to act in the best interest of the shareholders. For example, the UK companies act requires a director of a company to act in the way he or she considers, in good faith, would "*most likely promote the success of the company for the benefit of its members as a whole*" and having regard to "*the need to act fairly as between members of the company*."[12]

3.16 We understand that the above is not fully applicable to DAF, given the Articles of the company and that its Directors only need to act to promote its charitable mission without any influence exerted by the holders of the Participating Shares.[13]

3.17 In our view, the lack of rights to appoint or remove directors would merit a discount that would be more material than the usual discounts considered for a lack of voting rights.

**(4) Share transfer**

3.18 DAF's Directors may require the transfer of Participating Shares if it comes into notice that such shares are held by a Restricted Person, i.e., a person in breach of laws and regulations or in the Directors' opinion might result in DAF incurring liabilities or suffering penalties.

3.19 Given that such transfer happens only in cases relating to potential threats to the company (including legal threats), we understand that this clause offers protection to DAF's operations. Therefore, additional discounts to the Participating Shareholders may not be applicable, unless there is doubt as to the Directors' judgement, which is discussed in the topic of appointment and removal of directors above.

**(5) Redemption of shares**

3.20 Participating Shares are defined as non-redeemable shares. We therefore do not consider discounts relating to this feature in respect of the Participating Shares.

3.21 To the extent that CDMCFAD LLC shares are redeemable, given the potential dilution and no guarantee to a pro rata cash distribution rights (as explained above), we have not considered any additional discount to be applied on this factor. That is, we consider that the discount applied to the factors above would also cover the risk of redemption.

---

11 See, e.g., BVR's guide to discounts for lack of marketability, page 281; and Stanford Law Review (2019), Nonvoting Shares and Efficient Corporate Governance, page 44.

12 https://www.legislation.gov.uk/ukpga/2006/46/section/172

13 As explained above, the attempt to exert influence may be a criminal tax offense.

**(6) Access to information**

3.22 Participating shareholders have limited information rights (except those as conferred by law or authorised by the Directors). Specifically, the articles do not provide the Participating Shareholders with the following: (i) the right to inspect any account; (ii) the right to inspect any book; or (iii) the right to inspect any document of the Company.

3.23 The lack of information creates uncertainty to the shareholder. However, we understand that the shareholders have quarterly financial reports that provide basic access to the company's financial information but are not entitled to further information except as provided at the discretion of management. For the purpose of a valuation of the Participating Shares' fair market value based on its NAV - which we understand to be accurate for the purpose of our exercise - a discount may not be applicable (or in any case would be covered under the lack of control).

## 4. Discounts applicable in valuing the Participating Shares

4.1 The table below summarises our view of the materiality of each factors in considering the value of Participating Shares as discussed in Section 3.

**Table 4-1 Materiality of rights in Participating Shareholders in valuation**

| | **Materiality (in principle)** |
|---|---|
| Issuance of new shares | Very material due to potential dilution effect |
| Dividends | Very material due to no rights for pro-rata distribution, and uncertainty as to alignment with mission of DAF |
| Voting and change in Directors | Material due to uncertainty as to alignment with mission of DAF |
| Share transfer | Limited |
| Share redemption | None for Participating Shares. Potentially material for CDMCFAD LLC; however discount would be covered in the discount due to lack of control over issuance of new shares and rights to dividends |
| Access to information | Very limited – has certain access conferred by law |

4.2 Judge Laro's comments in *Mandelbaum v Commissioner* on discount for lack of marketability is often referred to by valuation practitioners determining discounts for lack of marketability:

> *"Ascertaining the appropriate discount for lack of marketability is a factual determination. Critical to this determination is an appreciation of the fundamental elements of value that are used by an investor making his or her investment decision."*

4.3 The list of issues that Judge Laro went on to cite as important in a determination of the discount are now commonly referred to as the "Mandelbaum factors", which are broadly summarised as:

(1) Financial statement analysis

(2) Dividend policy

(3) Nature of the company (history, position in industry, economic outlook)

(4) Company's management

(5) Amount of control in the transferred shares

(6) Restrictions on transferability of stock

(7) Holding period for stock

(8) Company's redemption policy

(9) Costs associated with a public offering

4.4 Due to the specific context of DAF (including the tax-related constraints for the Participating Shareholders and the Directors' control), the discounts primarily relate to dividend, nature of the company, company's management, and amount of control.

4.5 The restricted stock studies (which suggests typical discounts of 10% - 35%) or put option approach relied upon by Valuescope focus on the restrictions on transferability of stock (i.e., discount for the shares requiring between six months and one year to be sold).[14] In our view such studies do not provide a guide as to the discount for the rights of the Participating Shares.

4.6 As explained above, the rights conferred to Participating Shares are extremely limited, and the potential distribution of cash flows is highly dependent on whether the shareholder's specific circumstance is aligned with the mission of DAF. As a result, we expect:

(1) a limited discount due to lack of control and marketability (i.e., close to the range concluded by Valuescope) if the shareholder is fully aligned with the mission of DAF; and

(2) a high discount due to lack of control and marketability for a shareholder who is not aligned with the mission of DAF of over **95%** to be applicable. The reason for not fully discounting the value is that there may be some option value to the acquirer that with the passage of time: (i) they become aligned with the Managing Shareholder's interest; or (ii) there is a change in the Managing Shareholder.

4.7 Our indicative view, as set out in this memorandum, may change if we are provided with further information.

14 Valuescope Report, pages 26 and 53.

CHARITABLE DAF HOLDCO, LTD
(THE "COMPANY")

---

WRITTEN RESOLUTIONS OF THE DIRECTORS
OF THE COMPANY DATED 2 APRIL 2025

---

**1. DECLARATION AND PAYMENT OF DIVIDENDS**

1.1 **IT IS NOTED** that:

(a) CDMCFAD, LLC (the "**LLC**"), a Delaware limited liability company, redeemed the Company's entire limited liability company interests in the LLC on 27 March 2025 (the "**CDMCFAD Redemption**") for the aggregate amount of US$1,637,192;

(b) the current Amended and Restated Articles of Association of the Company (the "**Articles**") provide that all dividends shall be declared and paid in such amounts as may be declared by the Directors in their absolute discretion;

(c) following receipt of the proceeds of the CDMCFAD Redemption, the Company wishes to make a payment as at the date hereof of dividends on a pro-rata basis to the Participating Shareholders (but excluding DFW Charitable Foundation; collectively, the "**Shareholders**") in the amount of (i) $528,587.54 with respect to each of Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc.; and (ii) $26,429.39 with respect to The Community Foundation of North Texas;

(d) the Directors have determined that the sum of **$1,612,192.01** is lawfully available for distribution as profits or share premium of the Company and is distributable in accordance with the Articles and the Companies Act (as amended) (the "**Companies Act**");

(e) the Directors have confirmed no awareness of any subsequent losses by the Company as at the date hereof which would affect the amount of profits or share premium available for distribution; and

(f) a distribution may be unlawful, even where the provisions of the Articles and the Companies Act have been complied with, where the Directors are unable to reasonably conclude that the Company would have sufficient funds to be able to continue to be able to meet its debts as they fall due.

1.2 **IT IS RESOLVED** that:

(a) In the opinion of the Directors, it is reasonable to conclude that following making the payment of the Dividends, the Company will have sufficient funds to be able to continue to be able to meet its debts as they fall due; and

(b) the Directors make a payment of dividends to the Shareholders as set forth in Section 1.1(c) above.

**2. GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the

name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3. **RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

[signature]
Mark Patrick
**Director**

Paul Murphy
**Director**

State of Texas
County of Dallas

The foregoing instrument was acknowledged before me by means of physical prescence on this day, April 2, 2025 by Mark Patrick. He appeared before me, is personally known to me, has executed the document/instrument, for the purposes and considerations therein expressed.

NATALIE R OLVERA
Notary ID #130890197
My Commission Expires
March 29, 2027

[signature]
Signature of Notary - State of TX

My commission expires: 3/29/27



35901511.2.C8689.187150

name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3. RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

Mark Patrick
**Director**

Paul Murphy
**Director**



**SIGNED IN THE PRESENCE OF**

Amy Altneu
Notary Public in and for The Cayman Islands
Dated this 2 day of April, 2025
(My commission expires on 31 January 2026)



35901511.2.C8689.187150

CHARITABLE DAF HOLDCO, LTD
(THE "COMPANY")

---

WRITTEN RESOLUTIONS OF THE DIRECTORS
OF THE COMPANY DATED April 2 2025

---

1. ASSIGNMENT OF UNDERTAKINGS

1.1 IT IS NOTED that:

(a) the Directors have received a draft letter agreement to assign all of the contracts listed in Schedule A of the letter agreement ("**Assigned Contracts**") from the Company to CDMCFAD, LLC (the "**Document**"); and

(b) in connection with the Assigned Contracts, CDMCFAD, LLC has agreed to assume all responsibilities and risks in any manner connected with the Assigned Contracts, whether now existing or hereafter arising.

1.2 **IT IS RESOLVED** that:

(a) in the opinion of the Directors, the entry into and performance by the Company of its obligations under the Document would be in the best interests of the Company;

(b) the transactions contemplated by the Document be approved;

(c) the Company enter into the Document;

(d) the form of the Document be approved on behalf of the Company subject to such amendments and additions thereto as any Director or (if applicable) any Attorney or Authorised Signatory (defined below) in their absolute discretion and opinion deem appropriate, the signature of any Director or any Attorney or Authorised Signatory on the Document being due evidence for all purposes of the approval of any such amendment or addition and the final terms thereof on behalf of the Company;

(e) the Company do give, make, sign, execute and deliver all such notes, deeds, agreements, letters, notices, certificates, acknowledgements, instructions, fee letters and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any Director or any Attorney or Authorised Signatory be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Document and the Company do all such acts and things as might in the opinion and absolute discretion of any Director or any Attorney or Authorised Signatory be necessary or desirable for the purposes stated above;

(f) the Ancillary Documents be in such form as any Director or any Attorney or Authorised Signatory in their absolute discretion and opinion approve, the signature of any Director or any Attorney or Authorised Signatory on any of the Ancillary Documents being due evidence for all purposes of their approval of the terms thereof on behalf of the Company; and

(g) the Document and Ancillary Documents, where required to be executed by the Company (whether under hand or as a deed), be executed by the signature thereof of any Director

or any Attorney or Authorised Signatory and where required to be sealed, by affixing thereto of the Seal of the Company, witnessed as required by the Articles of Association of the Company.

2. GENERAL AUTHORISATION

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3. **RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

[signature]
Mark Patrick
**Director**

[signature]
Paul Murphy
**Director**

Before me, Mark Patrick, personally appeared to be the person whose name is subscribed to the foregoing Instrument and acknowledged to me that he executed for purposes expressed therein.

NATALIE R OLVERA
Notary ID #130890197
My Commission Expires
March 29, 2027

Natalie Olvera, as Notary Public
[signature]
My commission expires 3/29/27

State of Texas
County of Dallas

PAUL MURPHY HAS
**SIGNED IN THE PRESENCE OF**
[signature] JA

Amy Altneu
Notary Public in and for The Cayman Islands
Dated this 2 day of April, 2025
(My commission expires on 31 January 2026)

Commercial in Confidence

| Total Annual Expenses ($) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Expense** | **12/31/2018** | **12/31/2019** | **12/31/2020** | **12/31/2021** | **12/31/2022** | **12/31/2023** | **6/30/2024** |
| Legal Fee Expense | 66,797.39 | 116,173.18 | 398,091.82 | 4,346,447.57 | 4,337,827.65 | 8,044,320.10 | 6,184,744.91 |
| Investment Expense | - | - | - | - | - | 3,044,078.13 | 6,179,478.60 |
| Directors fees | - | - | - | 49,000.00 | 40,250.00 | 599,473.64 | 2,257,660.66 |
| Professional fees expense | 104,844.77 | 93,255.12 | 537,769.44 | 1,100,599.17 | 626,856.17 | 1,197,513.69 | 995,497.60 |
| Interest expense | 5,105,931.21 | 6,886,101.21 | 3,928,638.85 | 2,747,813.34 | 2,072,787.45 | 1,667,391.35 | 811,866.58 |
| Valuation services expense | - | - | 48,072.72 | 286,599.05 | 181,516.46 | 2,044,488.51 | 701,556.14 |
| Administration fees | 179,215.18 | 149,110.70 | 122,603.91 | 895,861.24 | 1,180,146.01 | 1,181,933.45 | 589,608.35 |
| Other expense | 344,897.87 | 1,062,261.79 | 679,023.69 | 388,462.74 | 449,838.72 | 805,068.65 | 571,048.05 |
| Dividend expense | - | 131,955.82 | 7,468.07 | 12,996.55 | 4,988,446.12 | 21,739.62 | 52,534.35 |
| Government fees | 46,343.20 | 52,782.23 | 30,765.73 | 251.20 | 4,647.69 | 7,076.35 | 1,468.44 |
| Management Fees | 5,472,982.35 | 4,468,290.73 | 3,576,464.98 | 230,460.41 | - | - | - |
| Trustee fees | 158,025.00 | 246,150.00 | 290,407.53 | 145,000.00 | - | - | - |
| Deferred Loan Fees Expense | (4,986.97) | 16,095.79 | 8,870.28 | - | 523.67 | - | - |
| Other Income | - | - | - | (2,400,000.00) | (12,768.67) | - | - |
| | | | | | | | |
| | 11,474,050.00 | 13,222,176.57 | 9,628,177.02 | 7,803,491.27 | 13,870,071.27 | 18,613,083.49 | 18,345,463.68 |

*Item flowing through other income as an expense was a true-up/correction of an item that had been booked incorrectly by the fund administrator

| Percentage of Total Expenses | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Expense** | **12/31/2018** | **12/31/2019** | **12/31/2020** | **12/31/2021** | **12/31/2022** | **12/31/2023** | **6/30/2024** |
| Legal Fee Expense | 0.58% | 0.88% | 4.13% | 55.70% | 31.27% | 43.22% | 33.71% |
| Investment Expense | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 16.35% | 33.68% |
| Directors fees | 0.00% | 0.00% | 0.00% | 0.63% | 0.29% | 3.22% | 12.31% |
| Professional fees expense | 0.91% | 0.71% | 5.59% | 14.10% | 4.52% | 6.43% | 5.43% |
| Interest expense | 44.50% | 52.08% | 40.80% | 35.21% | 14.94% | 8.96% | 4.43% |
| Valuation services expense | 0.00% | 0.00% | 0.50% | 3.67% | 1.31% | 10.98% | 3.82% |
| Administration fees | 1.56% | 1.13% | 1.27% | 11.48% | 8.51% | 6.35% | 3.21% |
| Other expense | 3.01% | 8.03% | 7.05% | 4.98% | 3.24% | 4.33% | 3.11% |
| Dividend expense | 0.00% | 1.00% | 0.08% | 0.17% | 35.97% | 0.12% | 0.29% |
| Government fees | 0.40% | 0.40% | 0.32% | 0.00% | 0.03% | 0.04% | 0.01% |
| Management Fees | 47.70% | 33.79% | 37.15% | 2.95% | 0.00% | 0.00% | 0.00% |
| Trustee fees | 1.38% | 1.86% | 3.02% | 1.86% | 0.00% | 0.00% | 0.00% |
| Deferred Loan Fees Expense | -0.04% | 0.12% | 0.09% | 0.00% | 0.00% | 0.00% | 0.00% |
| Other Income | 0.00% | 0.00% | 0.00% | -30.76% | -0.09% | 0.00% | 0.00% |
| | | | | | | | |
| | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

| Percentage change Y/Y | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Expense** | **12/31/2018** | **12/31/2019** | **12/31/2020** | **12/31/2021** | **12/31/2022** | **12/31/2023** | **6/30/2024** |
| Legal Fee Expense | - | 73.92% | 242.67% | 991.82% | -0.20% | 85.45% | -23.12% |
| Investment Expense | - | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 103.00% |
| Directors fees | - | 0.00% | 0.00% | 0.00% | -17.86% | 1389.38% | 276.61% |
| Professional fees expense | - | -11.05% | 476.66% | 104.66% | -43.04% | 91.03% | -16.87% |
| Interest expense | - | 34.86% | -42.95% | -30.06% | -24.57% | -19.56% | -51.31% |
| Valuation services expense | - | 0.00% | 0.00% | 496.18% | -36.67% | 1026.34% | -65.69% |
| Administration fees | - | -16.80% | -17.78% | 630.70% | 31.73% | 0.15% | -50.11% |
| Other expense | - | 207.99% | -36.08% | -42.79% | 15.80% | 78.97% | -29.07% |
| Dividend expense | - | 0.00% | -94.34% | 74.03% | 38282.85% | -99.56% | 141.65% |
| Government fees | - | 13.89% | -41.71% | -99.18% | 1750.20% | 52.26% | -79.25% |
| Management Fees | - | -18.36% | -19.96% | -93.56% | -100.00% | 0.00% | 0.00% |
| Trustee fees | - | 55.77% | 17.98% | -50.07% | -100.00% | 0.00% | 0.00% |
| Deferred Loan Fees Expense | - | -422.76% | -44.89% | -100.00% | 0.00% | -100.00% | 0.00% |
| Other Income | - | 0.00% | 0.00% | 0.00% | -99.47% | -100.00% | 0.00% |

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY**

**MADE ON 13th September 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions.

1. **REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK.**

1.1 **NOTED THAT:**

(a) Since 24 March 2021, Mr. Mark Patrick has been appointed as President, Chief Investment Officer and General Counsel of the Company, and appointed as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(b) In or about March 2024, the Company, including Charitable DAF Fund LP, engaged Mercer LLP to conduct an independent compensation review of Mr. Mark Patrick's duties as President, Chief Investment Officer and General Counsel of the Company, and as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(c) Mercer LLP prepared an independent report dated 26 August 2024 ("Mercer Report") which contains a summary of Mr. Patrick's roles and responsibilities and their methodology for calculating market comparables. At page 5 of that report, Mercer recommended that Mr Patrick's compensation be structured as follows:

a. Base salary: USD $850,000 or USD $750,000 if general partner liability insurance can be acquired to mitigate Mr Patrick's personal risk exposure.

b. Long-term incentive ("LTI") tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(d) The Mercer report raised two issue for the Company to consider::

a. Whether performance for the LTI compensation be calculated based on 2021 performance or start for the 2022 cycle; and

b. Whether the LTI calculation should be calculated net of all Company expenses or new of fund expenses only.

(e) On 12th September 2024, Mr. Paul Murphy, a co-director of the Company, spoke to Heidi O'Brien, a Partner at Mercer, to discuss the issues identified in 1, 1.1 (d) a. and b. Following this conversation and based on the fact that (i) Ms. O'Brien confirmed that it was not uncommon for similar companies to award employees for the complete fiscal year when starting part way through the year, and (ii) Mr. Patrick was appointed in March 2021, the Directors have concluded that Mr. Patrick's LTI compensation should be calculated on the basis of the 2021 cycle.

(f) In addition, the Directors have concluded that the Company should assess the legal expenses

attributable to investments which impact the LTI compensation and, after that assessment, determine whether the LTI compensation should be increased.

(g) Based on the knowledge of the Directors of Mr. Patrick's roles and responsibilities, the Mercer LLP report and fact that Mr. Patrick is considered a key employee, the Directors have concluded that Mr. Patrick's compensation should be set in accordance with the recommendation in the Mercer report with the additional caveat that Mercer identified that CEOs and CIOs are often compensated on the basis of a base salary, annual incentive and LTI and an annual incentive is not included in the Mercer report. The Directors have concluded that it is in the Company's interest to determine whether an annual incentive should also be included as part of Mr. Patrick's compensation and, if so, how this is to be assessed.

(h) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

1.2 **IT IS RESOLVED** by unanimous written resolution that:

(a) Mr. Patrick's compensation be fixed, in accordance with recommendation of the Mercer LLP report, as follows:

a. Base salary: USD $850,000, provided that, 100% of the base salary for calendar year 2024 may be paid on or about the date of these resolutions.

b. Long-term incentive tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return), less any amounts previously advanced to Mr. Patrick.

(b) The Directors will assess:

a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

Executed by the Directors comprising the entire Board of Directors of the Company:

**BY** ________________________
Paul Murphy - Director
CHARITABLE DAF HOLDCO, LTD.

**BY** ________________________
Mark Patrick - Director
CHARITABLE DAF HOLDCO, LTD.

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE DIRECTORS OF THE COMPANY**

**MADE ON 1 October 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions. Any capitalized terms not defined herein are taken from the Directors' Resolution dated 12th September 2024.

**1. ESTABLISHMENT OF COMPENSATION COMMITTEE/GUIDELINES AND APPOINTMENT OF MEMBERS OF COMPENSATION COMMITTEE.**

1.1 **NOTED THAT:**

(a) The Company does not presently have a compensation committee and the Directors believe it is in the best interest of the Company to establish a compensation committee which will be guided and governed by compensation committee guidelines established by the Directors.

(b) Given the Directors knowledge and experience of the Company, the initial appointments to the compensation committee will be Mark Patrick and Paul Murphy.

1.2 **IT IS RESOLVED THAT:**

(a) The Company establish a compensation committee (**"Compensation Committee"**) and adopt the guidelines in the form substantially contained in Appendix 1 to these resolutions (**"Compensation Committee Guidelines"**).

(b) Mark Patrick and Paul Murphy be appointed to the Compensation Committee.

(c) The Company empowers the Compensation Committee to make recommendations to the Directors on all matters outlined in the Compensation Committee Guidelines, provided that, all recommendations by the Compensation Committee are subject to review and approval by the Directors.

(d) The Compensation Committee shall not make any recommendations in relation to Mark Patrick's compensation arising from the resolution passed by the Directors on 12th September 2024, in particular, the LTI payment and annual bonus resolution passed in these Directors' Resolutions paragraph number 2.

**2. FURTHER REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK AND EMPLOYMENT AGREEMENT.**

2.1 **NOTED THAT:**

(a) On 12 September 2024, the Directors passed a directors' resolution addressing Mark Patrick's compensation as a Director, President/CEO, Chief Investment Officer and General Counsel of the Company. The Directors approved compensation in the following amounts:

a. Base salary: USD $850,000.

b. LTI tied to Charitable DAF Fund LP ("DAF LP") returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(b) In addition, the Directors resolved that they would assess:

a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

LTI

(c) Paul Murphy noted that the return of the Company is impacted by whether legal expenses should be included as an operational expense of the Company (in which case the LTI payment would be lower) or whether legal expenses have been incurred not as an operational expense but as an expense to preserve, protect and maximize returns to the Company (in which case it is appropriate to exclude these expenses when assessing the Company's return thereby raising the LTI payment, in whole or in part).

(d) Paul Murphy, having a detailed and working knowledge of the Company's legal issues, and having commissioned Shawn Raver, legal advisor to the Company, to provide a breakdown of legal fees (i) which are attributable to the normal operation of the Company's investment portfolio, and (ii) which have been incurred to preserve, protect and maximize returns to the Company, who has assessed that 75% of those legal fees have been incurred to preserve, protect and maximize returns to the Company.

(e) Accordingly, the LTI calculation should be adjusted to award 75% of the difference between the figures noted in page 9 of the Mercer Report which is $975,000.[1]

Annual Bonus

(f) Paul Murphy conducted an independent assessment of whether Mark Patrick should receive an annual bonus and the basis of that annual bonus having regard to the Mercer Report, further discussions with Heidi O'Brien (Partner at Mercer), further review of industry comparables with CEO/CIO roles in complex structured finance senior positions, and assessment of other charitable organisations/structures (acknowledging that the Company and its subsidiaries are not subject to United States of America regulations).

(g) Having (i) reviewed the Compensation Committee Guidelines and, (ii) a detailed working knowledge of the Company and Mark Patrick's roles and responsibilities, Paul Murphy assessed that Mark Patrick is eligible for an annual bonus in the amount of 2.5 times his base salary for the year 2023 and payable immediately for, inter alia, the following reasons:

a. CEOs and CIOs in comparable positions are typically awarded a base salary, annual bonus and form of long term incentive plan which is designed to compensate senior executives for their performance and value to a company on an annual and long term basis (see Mercer Report page 17, which is consistent with and supported by Paul Murphy's

---

[1] The calculation net of all expense is $4,459,000 and net of fund expenses is $5,759,000 leaving a difference of $1.3m of which $975,000 is 75%.

knowledge of US based asset managers).

b. The Company, in the absence of a senior executive willing to undertake the roles and responsibilities of a CEO, CIO and general counsel would, in the US, have to incur annual expenses of at least $3-4m at the median range and $5-6m at the upper range[2] to appropriately staff these positions.[3] By undertaking the roles of CEO, CIO and General Counsel, Mark Patrick would be undercompensated if the Company were only to award a base salary and LTI.

c. The Company has faced/is facing significant and complex legal issues in Texas, New York, the Cayman Islands and, until recently, Guernsey, which it has had to manage on a reactive and proactive basis and which Mark Patrick has been instrumental in the prosecution and defence of. These include sophisticated parties including US Bank, UBS and a Trustee in Bankruptcy.

d. Mark Patrick was instrumental in 2023/2024 defeating an action by UBS against the Company in New York which significantly reduced the Company's potential liabilities.

e. The risk profile to Mark Patrick as a director, CEO and CIO is high and his decision making will and is likely to be scrutinized which may lead to personal liability. He is undertaking these positions without the benefit of directors' and officers' insurance.

f. Mark Patrick has been instrumental in implementing and driving forward policies that will bring rigorous scrutiny and governance to the Company.

g. The Company's investments over the past three years have outperformed the S&P 500 significantly where the average returns for the S&P 500 over the same period returned 11.49% compared to 16.46% for the Company.

h. To date, Mark Patrick has not been awarded an annual bonus during his tenure at the Company nor has he received benefits which a CEO/CIO would typically enjoy.

(h) These are not a comprehensive list of factors Paul Murphy took into account but form the basis of his independent conclusion that the Directors should (i) enter into an employment agreement in a form drafted by the Company's US and Cayman Islands counsel which reflects the on-going compensation package, and (ii) award an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

(i) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

2.2 **IT IS RESOLVED** by unanimous written resolution that:

---

[2] Per Mercer Report at page 7 and adjusted to account for base compensation and annual bonus/long term incentive for general counsel.
[3] It is noted that the basis for these figures includes assessment of charities and foundations in the US which the Company is not. Whilst useful guidance, the Company must be mindful of the fact that the Company is a Cayman Islands company that holds complex structured financial products through Cayman Islands companies and is not bound by the same provisions that relate to US charities and foundations.

(a) Mark Patrick be awarded:

a. An adjustment to the LTI incentive payment in the amount of $975,000.

b. An annual bonus for the year 2023, payable immediately, of 2.5 times his base salary.

c. No annual bonus for the years 2021 and 2022 given the entirety of the compensation package provided to Mark Patrick as of 12th September 2024 and the date of this resolution.

Executed by the Directors comprising the entire Board of Directors of the Company:

**BY** ______________________________
Paul Murphy - Director

CHARITABLE DAF HOLDCO, LTD.

**BY** ______________________________
Mark Patrick - Director

CHARITABLE DAF HOLDCO, LTD.

**APPENDIX 1**
**COMPENSATION COMMITTEE GUIDELINES**

**Compensation Policy for Executives and Directors**

As adopted on October 1, 2024

1. **Overview and Objectives**

This document sets forth the Compensation Policy for Executives and Directors of Charitable DAF HoldCo, Ltd., its subsidiaries, and CDH GP, Ltd. (collectively, "**Company**").

Compensation is a key component of the Company's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance the Company's value and otherwise assist the Company's to reach its long-term goals. Accordingly, the structure of this Policy is established to tie the compensation of each officer to the Company's goals and performance.

For purposes of this Policy, "Executive Officers" shall mean the Company's Chief Executive Officer, Chief Investment Officer, Chief Company Officer, and Chief Operating Officer, and such other executive officers as appointed by the Company from time to time.

For purposes of this Policy, "Directors" shall mean the Directors as defined in the organizational and governing documents of the Company.

This Policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from, provisions of applicable law to the extent not permitted.

This Policy shall apply to compensation agreements and arrangements which will be approved after the date on which this Policy is adopted and shall serve as Company's Compensation Policy for five (5) years, commencing as of its adoption, unless amended earlier.

The Compensation Committee and the Board of Directors of the Company (the "**Compensation Committee**" and the "**Board**", respectively) shall review and reassess the adequacy of this Policy from time to time.

The Compensation Committee and Board shall have regard to the fact that Charitable DAF HoldCo, Ltd. and its subsidiaries are incorporated and subject to Cayman Islands law (**"Cayman Islands Entities"**). Accordingly, whilst US law, regulation and industry standards (**"US Practices"**) may be taken into account when considering the Objectives (as defined below), the US Practices are not binding on the Cayman Islands Entities, the Cayman Islands Entities having been purposely established as non-US entities, and the Compensation Committee will have regard to all factors which, in its discretion, achieve the Objectives (as defined below).

2. **Objectives**

Company's objectives and goals in setting this Policy are to attract, motivate and retain highly experienced leaders who will contribute to Company's success and enhance shareholder value, while demonstrating professionalism in a highly achievement-oriented culture that is based on merit and rewards excellent performance in the long term, and embedding Company's core values as part of a motivated behavior (**"Objectives"**). To that end, this Policy is designed, among others:

2.1. To closely align the interests of the Executive Officers and Directors with those of Company's shareholders in order to enhance shareholder value;

2.2. To align a significant portion of the Executive Officers' and Directors' compensation with Company's short and long-term goals and performance;

2.3. To provide the Executive Officers and Directors with a structured compensation package, including competitive salaries, performance-motivating cash and equity incentive programs and benefits;

2.4. To strengthen the retention and the motivation of Executive Officers and Directors in the long term; and

2.5. To provide appropriate awards in order to incentivize superior individual excellency and corporate performance.

3. **Compensation Instruments**

3.1 Compensation instruments under this Policy may include, but need not be limited to, the following:

3.1.1 Base salary;

3.1.2 Benefits;

3.1.3 Annual cash bonuses;

3.1.4 Change of control terms;

3.1.5 Retirement and termination terms; and

3.1.6 Long-term and short-term incentive payments

3.2 When fixing compensation instruments the Company may have regard to any matter which, in the Company's complete discretion, is commensurate with the Objectives. Without limitation, this may include:

3.2.1 Assessing an Executive Officer and Director's performance with regard to their contribution to and management of any assets or investments the Company sources or owns from time to time;

3.2.2 Assessing the performance of assets or investments of the Company in relation to overall returns to the Company;

3.2.3 Mitigation of Company liabilities;

3.2.4 Ensuring sound and prudent corporate governance including compliance with all legal, regulatory and industry standards;

3.2.5 Efficient management of service providers;

3.2.6 Risk the Executive Officer and/or the Director is exposed to;

3.2.7 Responsibilities the Executive Officer and/or the Director undertakes; and

3.2.8 Achieving the Company's business and charitable objectives

4. **Benefits**

4.1 The following benefits may be granted to the Executive Officers and Directors in order, among other things, to comply with legal requirements:

4.1.1 Vacation days in accordance with market practice;

4.1.2 Sick days in accordance with market practice;

4.1.3 Convalescence pay according to applicable law;

4.1.4 Company may contribute on behalf of the Executive Officer or Director to an insurance policy (including, without limitation, split-dollar life insurance) or a pension fund, as allowed by applicable law and with reference to Company's policies and procedures and the practice in peer group companies (including contributions on bonus payments); and

4.1.5 Company may contribute on behalf of the Executive Officer or Director towards work disability insurance, as allowed by applicable law and with reference to Company's policies and procedures and to the practice in peer group companies.

4.2 In events of relocation or repatriation of an Executive Officer or Director to another geography, such Executive Officer or Director may receive other similar, comparable or customary benefits as applicable in the relevant jurisdiction in which he or she is employed or additional payments to reflect adjustments in cost of living. Such benefits may include reimbursement for out of pocket one-time payments and other ongoing expenses, such as housing allowance, car allowance, and home leave visit, etc.

4.3 Company may offer additional benefits to its Executive Officers and Directors, which will be comparable to customary market practices, such as, but not limited to: cellular and land line phone benefits, company car and travel benefits, reimbursement of business travel including a daily stipend when traveling and other business related expenses, insurances, other benefits (such as newspaper subscriptions, academic and professional studies), etc., provided, however, that such additional benefits shall be determined in accordance with Company's policies and procedures.

5. **Miscellaneous**

5.1 Nothing in this Policy shall be deemed to grant to any of Company's Executive Officers, employees, directors, or any third party any right or privilege in connection with their employment by or service to the Company, nor deemed to require Company to provide any compensation or benefits to any person. Such rights and privileges shall be governed by applicable personal

employment agreements or other separate compensation arrangements entered into between Company and the recipient of such compensation or benefits. The Board may determine that none or only part of the payments, benefits and perquisites detailed in this Policy shall be granted, and is authorized to cancel or suspend a compensation package or any part of it.

5.2 In the event that new regulations or law amendment in connection with Executive Officers' and Directors' compensation will be enacted following the adoption of this Policy, Company may follow such new regulations or law amendments, even if such new regulations are in contradiction to the compensation terms set forth herein.

*********************

This Policy is designed solely for the benefit of Company and none of the provisions thereof are intended to provide any rights or remedies to any person other than Company.

# EXECUTIVE EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "**Agreement**") is made and entered into effective as of March 24, 2021 (the "**Effective Date**"), by and between MARK PATRICK ("**Executive**") and CHARITABLE DAF HOLDCO, LTD., a Cayman Islands company (the "**Company**"), as a "**Party**" or collectively as the "**Parties**".

**WHEREAS**, the Company has employed Executive on the terms and conditions set forth herein since March 24, 2021; and

**WHEREAS**, Executive agrees to be employed by the Company on such terms and conditions as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and obligations set forth herein, the Parties agree as follows:

**1.** **Employment Term**. Executive's employment hereunder shall be effective as of the Effective Date and shall continue until terminated pursuant to Section 5 of this Agreement.

**2.** **Position and Duties**.

**2.1** **Position**. During the Employment Term, Executive shall serve as the President and CEO, Chief Investment Officer, Chief Financial Officer, and General Counsel of the Company, reporting to the Directors of the Company (the "**Directors**"). In such position, Executive shall have such duties, authority, and responsibilities as shall be determined from time to time by the Directors, which duties, authority, and responsibilities are consistent with Executive's position.

**2.2** **Duties**. During the Employment Term, Executive shall perform such duties, as are reasonably assigned to Executive and devote a reasonable amount of Executive's business time and attention to the performance of Executive's duties, including, without limitation, service as an officer for other affiliates and subsidiaries of the Company.

**3.** **Place of Performance**. The principal place of Executive's employment shall be the place as determined by the Parties; however, Executive shall be permitted to work remotely so long as doing so does not interfere with the Executive's responsibilities under this Agreement. Executive may also be required to travel on Company business during the Employment Term. The Company may provide a remote travel office, or transportation, to accommodate the Executive in his performance of his duties.

**4.** **Compensation**.

**4.1** **Base Salary**. Beginning with the 2023 calendar year, the Company shall pay Executive an annual base salary of $850,000 (the "**Base Salary**") in periodic installments in accordance with customary payroll practices and applicable wage payment laws. Notwithstanding the foregoing, the Executive's annual base salary may be advanced in one or more installments from time to time pursuant to a Director's resolution, but in such amounts not to exceed one year of Base Salary. The Base Salary may be adjusted within the first sixty

(60) days of any calendar year by an amendment to this Agreement in accordance with Section 14 below.

**4.2** **Annual Bonus**. For each fiscal year of the Employment Term, Executive shall be eligible to earn an annual bonus (the "**Annual Bonus**"). The decision to provide an Annual Bonus and the amount and terms of such Annual Bonus shall be in the sole and absolute discretion of the Directors, which may be paid in advance of the close of any one year. The Directors may establish and approve written criteria or guidelines that may be taken into account when determining whether an Annual Bonus should be paid and the amount in which it is paid. In exercising their discretion, the Directors will take into account industry standards in relation to annual bonuses awarded to people employed in comparable positions to Executive.

**4.3** **Discretionary Bonuses**. At any time and from time to time during the Employment Term, the Executive shall be eligible to earn discretionary bonuses (each a "**Discretionary Bonus**"). Such Discretionary Bonuses shall be at the sole and absolute discretion of the Directors.

**4.4** **Long Term Incentive Plan**: Executive shall participate in the Long Term Incentive Plan ("**LTIP**"). The LTIP will cover a period of three (3) years. For purposes of this agreement, the LTIP will cover the period from March 24, 2021 through March 24, 2024 (the "**First LTIP**") and is awarded in the total amount of $4,759,000. The second LTIP period will cover the period from March 25, 2024 through March 24, 2027 (the "**Second LTIP**"). The Second LTIP may be awarded at the discretion of the Directors through a cash payment made at the end of 2027, or by periodic awards in the equity of investments of the Company, or a combination of both.

**4.5** **Retirement Incentive Plan**. At the discretion of the Directors, the Company may authorize a "Retirement Incentive Plan" to be put into place on behalf of the Executive.

**4.6** **Employee Benefits**. During the Employment Term, Executive shall be entitled to participate in an employee benefit plan, including but not limited to health insurance, disability benefits, and retirement plan or other benefit practices and programs as may be implemented from time to time by the Company (collectively, "**Employee Benefit Plans**"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

**4.7** **Vacation; Paid Time Off**. During the Employment Term, Executive shall be entitled to forty (40) days of paid vacation per calendar year (prorated for partial years). Executive shall receive other paid time off in accordance with Company policies as may exist from time to time or as otherwise determined by the Directors.

**4.8** **Business Expenses**. Executive shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by Executive in connection with the performance of Executive's duties hereunder.

**4.9** **Indemnification**. In the event that Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**"), other than any Proceeding initiated by Executive or the Company related to any contest or dispute between Executive and the Company or any of its affiliates or subsidiaries with respect to this Agreement or Executive's employment hereunder, by reason of the fact that Executive is or was a director or officer of the Company, or any affiliate or subsidiary of the Company, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, Executive shall be indemnified and held harmless by the Company from and against any liabilities, costs, claims, and expenses, including all costs and expenses incurred in defense of any Proceeding (including attorneys' fees).

**5.** **Employment Term and Termination of Employment**. The initial term of employment of Executive shall be the period from the Effective Date until December 31, 2021, and thereafter shall automatically renew from year-to-year for additional one (1) year periods, unless either Party provides written notice of non-renewal to the other Party within sixty (60) days prior to the expiration of the applicable Employment Term, or Executive's employment is otherwise terminated in accordance with this Section 5 below (the "**Employment Term**"). In the event of non-renewal of the Employment Term by either Party, Executive shall be entitled to payment of the Severance Payment Amount (as defined in Section 5.2(d) below). The Employment Term and Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party shall be required to give the other Party at least sixty (60) days advance written notice of any termination of Executive's employment. On termination of Executive's employment during the Employment Term, Executive shall be entitled to the compensation and benefits described in this Section 5 and shall have no further rights to any compensation or any other benefits from the Company or any of its affiliates.

**5.1** **For Cause or Without Good Reason**.

(a) Executive's employment hereunder may be terminated by the Company for Cause or by Executive without Good Reason. If Executive's employment is terminated by the Company for Cause or by Executive without Good Reason, Executive shall be entitled to receive:

(i) any accrued but unpaid Base Salary and accrued but unused vacation which shall be paid on the Termination Date (as defined below);

(ii) any earned but unpaid Annual Bonus with respect to any completed calendar year immediately preceding the Termination Date, which shall be paid on the otherwise applicable payment date; provided that, if Executive's employment is terminated by the Company for Cause, then any such accrued but unpaid Annual Bonus shall be forfeited;

(iii) reimbursement for unreimbursed business expenses properly incurred by Executive in accordance with Section 4.8 of this Agreement; and

(iv) such employee benefits, if any, to which Executive may be entitled under the Company's employee benefit plans as of the Termination Date; provided that, in no event shall Executive be entitled to any payments in the nature of severance or termination payments except as specifically provided herein; and

(v) accrued and unpaid First or Second LTIP.

Items 5.1(a)(i) through 5.1(a)(v) are referred to herein collectively as the "**Accrued Amounts**". For the avoidance of doubt, any LTIP that has awarded any exposure to an investment such as equity shall be deemed vested if not vested already.

(b) For purposes of this Agreement, "**Cause**" shall mean:

(i) Executive's conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony (or state law equivalent);

(ii) Executive's material breach of the provisions of this Agreement in the course of performing Executive's duties that results in material harm to the Company; or

(iii) Executive is deemed by a court of competent jurisdiction to have engaged in any act or omission constituting willful misconduct, gross negligence, or fraud in the course of performing Executive's duties.

Notwithstanding the foregoing, for subsections (i) to (iii), the Employment Term and Executive's employment shall not be deemed to have been terminated for Cause unless the Company shall have given Executive: (A) written notice setting forth the reasons for the Company's intention to terminate Executive's employment for Cause, and (B) a reasonable opportunity, not to exceed thirty (30) days, to cure such default.

(c) For purposes of this Agreement, "**Good Reason**" shall mean the occurrence of any of the following, in each case during the Employment Term, without Executive's written consent:

(i) a material reduction of, or failure to pay, Executive's Base Salary; or

(ii) a material, adverse change in Executive's authority, duties, or responsibilities (other than (i) temporarily while Executive is physically or mentally incapacitated, (ii) where, if applicable, in Executive's capacity as a director, officer, managing member or other position to exert control or influence in the Company or subsidiary (**"Controlling Position"**), the Executive has directed or caused a material adverse change himself, (iii) where the Company's business has materially changed through no fault of the Company, (iv) or as required by applicable law); or

(iii) Company's material breach of the provisions of this Agreement.

Executive cannot terminate employment for Good Reason unless: (i) Executive has provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company has had at least thirty (30) days from the date on which such notice is provided to cure such circumstances. Executive agrees and acknowledges that if he holds a Controlling Position he is obliged to act in good faith and with all due diligence and expedition to help the Company cure any such grounds.

**5.2** **Without Cause or for Good Reason**. The Employment Term and Executive's employment hereunder may be terminated by Executive (i) for Good Reason, (ii) by the Company without Cause, or in the event of non-renewal of the Employment Term in accordance with Section 5. In the event of such termination, Executive shall be entitled to receive the Accrued Amounts and, subject to Executive's compliance with Section 6, Section 7, and Section 8 of this Agreement, Executive shall be entitled to receive the following:

(a) continued Base Salary for twelve (12) months following the Termination Date payable in equal installments, but no less frequently than monthly;

(b) a payment equal to the product of (i) the Annual Bonus, if any, that Executive would have earned for the fiscal year in which the Termination Date (as determined in accordance with Section 5.5) occurs based on achievement of the applicable performance goals for such year and (ii) a fraction, the numerator of which is the number of days Executive was employed by the Company during the year of termination and the denominator of which is the number of days in such year (the "**Pro-Rata Bonus**"), plus any accrued but unpaid Discretionary Bonuses as determined by the Directors. These amounts shall be paid on the date that Annual or Discretionary Bonuses are normally paid;

(c) If Executive timely and properly elects health continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), the Company shall reimburse Executive for the monthly COBRA premium paid by Executive for Executive and Executive's dependents. Such reimbursement shall be paid to Executive on the seventh (7th) day of the month immediately following the month in which Executive timely remits the premium payment. Executive shall be eligible to receive such reimbursement until the earliest of: (i) the date Executive is no longer eligible to receive COBRA continuation coverage; and (ii) the date on which Executive becomes eligible to receive substantially similar coverage from another employer or other source; and

(d) An early termination payment in the nature of a severance payment in the amount of $10,000,000 payable at termination (the "**Severance Payment Amount**").

**5.3 Death or Disability.**

(a) Executive's employment hereunder shall terminate automatically on Executive's death during the Employment Term, and the Company may terminate Executive's employment on account of Executive's Disability.

(b) If Executive's employment is terminated during the Employment Term on account of Executive's death or Disability, Executive (or Executive's estate and/or beneficiaries, as the case may be) shall be entitled to receive the following:

(i) the Accrued Amounts; and,

(ii) a lump sum payment equal to the Pro-Rata Bonus, and any accrued but unpaid discretionary bonuses, if any, that Executive earned for the fiscal year in which the termination date occurs which shall be payable on the date that annual bonuses are normally paid to the Company's executives, but in no event later than three (3) months following the end of the fiscal year in which the termination date occurs; and,

(iii) in the event of the Executive's death or disability, the Company shall pay the Executive's estate an amount equal to the Severance Payment Amount.

Notwithstanding any other provision contained herein, all payments made in connection with Executive's Disability shall be provided in a manner which is consistent with federal and state law.

(c) For purposes of this Agreement, "**Disability**" shall mean a condition that entitles Executive to receive long-term disability benefits under the Company's long-term disability plan, or if there is no such plan, Executive's inability, due to physical or mental incapacity, to perform the essential functions of Executive's job, with or without reasonable accommodation, for a period of ninety (90) consecutive days or a period of ninety (90) days in any one hundred eighty (180) day period. Any question as to the existence of Executive's Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of this Agreement.

**5.4 Notice of Termination**. Any termination of Executive's employment hereunder by the Company or by Executive during the Employment Term (other than termination pursuant to Section 5.3(a) on account of Executive's death) shall be communicated by written notice of termination ("**Notice of Termination**") to the other party hereto in accordance with Section 20 herein. The Notice of Termination shall specify:

(a) The termination provision of this Agreement relied upon;

(b) To the extent applicable, the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated;

(c) To the extent applicable, the date notice of intention to terminate Executive's employment was provided or the date notice of existence of the circumstances providing grounds for termination for Good Reason was provided; and

(d) The applicable Termination Date.

**5.5 <u>Termination Date</u>**. Executive's "**Termination Date**" shall be:

(a) If Executive's employment hereunder terminates on account of Executive's death, the date of Executive's death;

(b) If Executive's employment hereunder is terminated on account of Executive's Disability, the date that it is determined that Executive has a Disability;

(c) Unless otherwise indicated herein, if the Company terminates Executive's employment hereunder for Cause, the date the Notice of Termination is delivered to Executive. If the Company is required to give notice of intention to terminate Executive's employment and an opportunity to cure, and Executive fails to cure same, the date on which the cure period expires;

(d) If the Company terminates Executive's employment hereunder without Cause, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(e) If Executive terminates Executive's employment hereunder without Good Reason, the date specified in Executive's Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(f) If Executive terminates Executive's employment hereunder with Good Reason, and subject to Executive providing written notice to Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company having had at least thirty (30) days from the date on which such notice is provided to cure such circumstances and fails to cure same, the date on which the cure period expires; and

(g) In the event of non-renewal of the Employment Term by either Party, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered

**5.6 <u>Resignation of All Other Positions</u>**. On termination of Executive's employment hereunder for any reason, Executive shall be deemed to have resigned from all positions that Executive holds as an officer or director of the Company or any of its affiliates or subsidiaries.

**6.** **Cooperation**. The parties agree that certain matters in which Executive will be involved during the Employment Term may necessitate Executive's cooperation in the future. Accordingly, following the termination of Executive's employment for any reason, to the extent reasonably requested by the Directors, Executive shall cooperate with the Company, its affiliates and subsidiaries in connection with matters arising out of Executive's service to the Company; its affiliates or subsidiaries, provided that, the Company shall make reasonable efforts to minimize disruption of Executive's other activities. The Company shall reimburse Executive for reasonable expenses incurred in connection with such cooperation.

**7.** **Confidential Information**. Executive understands and acknowledges that during the Employment Term, Executive will have access to and learn about Confidential Information, as defined below.

**7.1** **Confidential Information Defined**.

(a) Definition.

For purposes of this Agreement, "**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company, or its businesses including its affiliates and subsidiaries, or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company or its businesses including its affiliates and subsidiaries in confidence.

Executive understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Executive understands and agrees that Confidential Information includes information developed by Executive in the course of employment by the Company, its affiliates or subsidiaries as if the Company, its affiliates or subsidiaries furnished the same Confidential Information to Executive in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to Executive; provided that, such disclosure is through no direct or indirect fault of Executive or person(s) acting on Executive's behalf.

(b) Disclosure and Use Restrictions.

Executive agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company, its affiliates or subsidiaries) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company, its affiliates or subsidiaries and, in any event, not to anyone outside of the direct employ of the Company, its affiliates or subsidiaries, except as required in the performance of Executive's authorized employment duties to the Company or with the prior written consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company, its affiliates or subsidiaries except as required in the performance of Executive's authorized employment duties to the Company, its affiliates or subsidiaries or with the prior consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

(c) Permitted Disclosures. Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

(d) Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA"). Notwithstanding any other provision of this Agreement:

(i) Executive will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

(A) is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

(B) is made in a complaint or other document filed under seal in a lawsuit or other proceeding.

(ii) If Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the Company's trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive:

(A) files any document containing trade secrets under seal; and

(B) does not disclose trade secrets, except pursuant to court order.

**8. Restrictive Covenants.**

**8.1 Acknowledgement**. Executive understands that the nature of Executive's position gives Executive access to and knowledge of Confidential Information and places Executive in a position of trust and confidence with the Company, its affiliates and subsidiaries. Executive understands and acknowledges that the services Executive provides to the Company, its affiliate and subsidiaries are unique, special, or extraordinary.

Executive further understands and acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company, its affiliates and subsidiaries is of great competitive importance and commercial value to the Company, its affiliates and subsidiaries and that improper use or disclosure by Executive is likely to result in unfair or unlawful competitive activity.

**8.2 Non-Competition**. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to Executive, during the Employment Term and for a period of one (1) year, beginning on the last day of Executive's employment with the Company, Executive agrees and covenants not to engage in Prohibited Activity within the areas in which the Company has conducted business.

For purposes of this Section 8.2, "**Prohibited Activity**" is activity in which Executive contributes Executive's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as the Company, or its affiliates. Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information.

Nothing herein shall prohibit Executive from purchasing or owning less than one percent (1%) of the publicly traded securities of any corporation, provided that such ownership represents a passive investment and that Executive is not a controlling person of, or a member of a group that controls, such corporation.

This Section 8 does not, in any way, restrict or impede Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

**8.3** **Non-Solicitation of Employees**. Executive agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company, or attempt to do so, for a period of one (1) year, to run consecutively, beginning on the last day of Executive's employment with the Company.

**8.4** **Non-Solicitation of Customers**. Executive understands and acknowledges that because of Executive's experience with and relationship to the Company, its affiliates and subsidiaries, Executive will have access to and learn about the Company's, its affiliates' and subsidiaries' customer information. "**Customer Information**" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, decisionmakers, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to services.

Executive understands and acknowledges that loss of this customer relationship and/or goodwill will cause significant and irreparable harm.

Executive agrees and covenants, for a period of one (1) year, not to directly or indirectly solicit, contact (including but not limited to email, regular mail, express mail, telephone, fax, instant message, or social media), attempt to contact, or meet with the Company's, its affiliates' or its subsidiaries' customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company, its affiliates or subsidiaries.

**9.** **Acknowledgement**. Executive acknowledges and agrees that the services to be rendered by Executive to the Company, its affiliates and subsidiaries, are of a special and unique character; that Executive will obtain knowledge and skill relevant to the Company's, its affiliates' and subsidiaries' industries, their methods of doing business and marketing strategies by virtue of Executive's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interest of the Company, its affiliates and subsidiaries.

Executive further acknowledges that the benefits provided to Executive under this Agreement, including the amount of Executive's compensation, reflects, in part, Executive's obligations and the Company's rights under Section 7 and Section 8, of this Agreement; that

Executive has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and that Executive will not suffer undue hardship by reason of full compliance with the terms and conditions of Section 7 and Section 8 of this Agreement or the Company's enforcement thereof.

**10. Remedies**. In the event of a breach or threatened breach by Executive of Section 7 and Section 8 of this Agreement, Executive hereby consents and agrees that the Company, its affiliates and subsidiaries shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, and that money damages would not afford an adequate remedy, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**11. Proprietary Rights**.

**11.1 Work Product**. Executive acknowledges and agrees that all right, title, and interest in and to all writings, works of authorship, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by Executive individually or jointly with others during the Employment Term and relate in any way to the business or contemplated business, products, activities, research, or development of the Company, its affiliates or subsidiaries or result from any work performed by Executive for the Company, its affiliates or subsidiaries (in each case, regardless of when or where prepared or whose equipment or other resources are used in preparing the same), all rights and claims related to the foregoing, and all printed, physical and electronic copies, and other tangible embodiments thereof (collectively, "**Work Product**"), as well as any and all rights in and to US and foreign (a) patents, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (c) copyrights and copyrightable works (including computer programs), mask works, and rights in data and databases, (d) trade secrets, know-how, and other confidential information, and (e) all other intellectual property rights, in each case whether registered or unregistered and including all registrations and applications for, and renewals and extensions of, such rights, all improvements thereto and all similar or equivalent rights or forms of protection in any part of the world (collectively, "**Intellectual Property Rights**"), shall be the sole and exclusive property of the Company, its affiliates or subsidiaries, as applicable.

**11.2 Work Made for Hire; Assignment**. Executive acknowledges that, by reason of being employed by the Company, its affiliates or subsidiaries, at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company, its affiliates or subsidiaries, as applicable. To the extent that the foregoing does not apply, Executive hereby irrevocably assigns to the Company, its affiliates or subsidiaries, as applicable, for no additional consideration, Executive's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right

to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's, its affiliates' or subsidiaries' rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company, its affiliates, subsidiaries or assigns, would have had in the absence of this Agreement.

**11.3 Further Assurances; Power of Attorney**. During and after the Employment Term, Executive agrees to reasonably cooperate with the Company, its affiliates, subsidiaries and assigns to (a) apply for, obtain, perfect, and transfer to the Company, its affiliates or subsidiaries, as applicable, the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (b) maintain, protect and enforce the same, including, without limitation, giving testimony and executing and delivering to the Company, its affiliates and subsidiaries, as the case may be, any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company, its affiliates or subsidiaries. Executive hereby irrevocably grants the Company, its affiliates or subsidiaries, as applicable, power of attorney to execute and deliver any such documents on Executive's behalf in Executive's name and to do all other lawfully permitted acts to transfer the Work Product to the Company, its affiliates or subsidiaries, as the case may be. The power of attorney is coupled with an interest and shall not be affected by Executive's subsequent incapacity.

**11.4 No License**. Executive understands that this Agreement does not, and shall not be construed to, grant Executive any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Executive by the Company.

**12. Security**.

**12.1 Security and Access**. Executive agrees and covenants (a) to comply with all security policies and procedures as in force from time to time including without limitation those regarding the Company's, its affiliates' or subsidiaries' facilities, IT resources and communication technologies ("**Facilities and Information Technology Resources**"); (b) not to access or use any Facilities and Information Technology Resources except as authorized by the Company, its affiliates or subsidiaries; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of Executive's employment by the Company, its affiliates or subsidiaries whether termination is voluntary or involuntary. Executive agrees to promptly notify the Company, its affiliates or subsidiaries, as applicable, in the event Executive learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with any Facilities and Information Technology Resources or other Company, affiliate or subsidiary property or materials by others.

**13. Entire Agreement**. Unless specifically provided herein, this Agreement contains all of the understandings and representations between Executive and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The

parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

**14. Modification and Waiver**. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by Executive and the Director of the Company. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

**15. Severability**. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

**16. Captions**. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

**17. Counterparts**. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**18. Section 409A**.

**18.1 General Compliance**. This Agreement is intended to comply with Section 409A or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from

service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

**18.2** **Specified Employees**. Notwithstanding any other provision of this Agreement, if any payment or benefit provided to Executive in connection with Executive's termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and Executive is determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date following the six-month anniversary of the Termination Date or, if earlier, on Executive's death (the "**Specified Employee Payment Date**"). The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date and interest on such amounts calculated based on the applicable federal rate published by the Internal Revenue Service for the month in which Executive's separation from service occurs shall be paid to Executive in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

**18.3** **Reimbursements**. To the extent required by Section 409A, each reimbursement or in-kind benefit provided under this Agreement shall be provided in accordance with the following:

(a) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year;

(b) any reimbursement of an eligible expense shall be paid to Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and

(c) any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit.

**18.4** **Tax Gross-ups**. Any tax gross-up payments provided under this Agreement shall be paid to Executive on or before December 31 of the calendar year immediately following the calendar year in which Executive remits the related taxes.

**19.** **Successors and Assigns**. This Agreement is personal to Executive and shall not be assigned by Executive. Any purported assignment by Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or

substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

**20.** **Notice**. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

If to the Company:

CHARITABLE DAF HOLDCO, LTD.

PAUL MURPHY
paul@gkmanagement.com.ky

If to Executive:

MARK PATRICK
Mpatricktax1040@gmail.com

**21.** **Representations of Executive**. Executive represents and warrants to the Company that:

(a) Executive's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which Executive is a party or is otherwise bound.

(b) Executive's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

**22.** **Withholding**. The Company shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

**23.** **Survival**. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

**24.** **Governing Law and Jurisdiction.** This agreement is governed by and shall be construed in accordance with the laws of Cayman Islands. Each of the parties hereto irrevocably agrees that the courts of Cayman Islands shall have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this agreement and, for such purposes, irrevocably submits to the exclusive jurisdiction of such courts.

**25.** **Acknowledgement of Full Understanding**. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

**[*SIGNATURE PAGE FOLLOWS*]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

CHARITABLE DAF HOLDCO, LTD.

By: ______________________
Name: Paul Murphy
Title: Director

**EXECUTIVE:**

______________________
MARK PATRICK

Report of Independent Auditors and
Consolidated Financial Statements

**Santa Barbara Foundation**

December 31, 2023 with
Summarized Comparative Totals for December 31, 2022

MOSSADAMS

# Table of Contents


| | Page |
|---|---|
| **Report of Independent Auditors** | 1 |
| **Consolidated Financial Statements** | |
| Consolidated Statements of Financial Position | 3 |
| Consolidated Statements of Activities and Changes in Net Assets | 4 |
| Consolidated Statements of Functional Expenses | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7 |

MOSSADAMS

# Report of Independent Auditors

The Audit Committee
Santa Barbara Foundation

## Report on the Audit of the Financial Statements

### *Opinion*

We have audited the accompanying consolidated financial statements of Santa Barbara Foundation and its supporting organizations and affiliates, which comprise the consolidated statement of financial position as of December 31, 2023, and the related consolidated statements of activities and changes in net assets, functional expenses, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Santa Barbara Foundation and its supporting organizations and affiliates as of December 31, 2023, and the changes in their net assets and cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

### *Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor’s Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of Santa Barbara Foundation and its supporting organizations and affiliates and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### *Other Matter*

We have previously audited the Santa Barbara Foundation and its supporting organizations and affiliates’ December 31, 2022, consolidated financial statements, and our report dated September 7, 2023, expressed an unmodified audit opinion on those audited consolidated financial statements. In our opinion, the summarized comparative information presented herein as of and for the year ended December 31, 2023, is consistent, in all material respects, with the audited consolidated financial statements from which it has been derived.

### *Responsibilities of Management for the Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Santa Barbara Foundation and its supporting organizations and affiliates' ability to continue as a going concern within one year after the date that the consolidated financial statements are available to be issued.

***Auditor's Responsibilities for the Audit of the Financial Statements***

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Santa Barbara Foundation and its supporting organizations and affiliates' internal control. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.
- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Santa Barbara Foundation and its supporting organizations and affiliates' ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

Moss Adams LLP

Los Angeles, California
September 5, 2024

# Consolidated Financial Statements

# Santa Barbara Foundation
## Consolidated Statements of Financial Position
## December 31, 2023 With Summarized Comparative Totals for 2022

### ASSETS

| | Without Donor Restrictions | With Donor Restrictions | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|
| ASSETS | | | | |
| Cash and cash equivalents | $ 82,285,249 | $ 56,094 | $ 82,341,343 | $ 68,287,954 |
| Investments | 543,799,297 | 67,038,247 | 610,837,544 | 458,590,918 |
| Contributions receivable, net | 13,553,708 | 206,926 | 13,760,634 | 21,780,784 |
| Notes receivable, net | 1,390,156 | - | 1,390,156 | 2,336,894 |
| Beneficial interest in trusts | - | 81,184,680 | 81,184,680 | 78,421,897 |
| Property and equipment, net | 12,414,779 | - | 12,414,779 | 12,866,063 |
| Other assets | 258,749 | - | 258,749 | 289,531 |
| Total assets | $ 653,701,938 | $ 148,485,947 | $ 802,187,885 | $ 642,574,041 |

### LIABILITIES AND NET ASSETS

| | Without Donor Restrictions | With Donor Restrictions | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|
| LIABILITIES | | | | |
| Accounts payable and accrued expenses | $ 593,763 | $ - | $ 593,763 | $ 397,965 |
| Grants payable, net | 68,750 | - | 68,750 | 132,940 |
| Note payable | 2,741,924 | - | 2,741,924 | 2,828,357 |
| Liabilities under split-interest agreements | - | 1,032,190 | 1,032,190 | 1,035,112 |
| Funds held on behalf of others | 33,165,254 | - | 33,165,254 | 27,537,507 |
| Total liabilities | 36,569,691 | 1,032,190 | 37,601,881 | 31,931,881 |
| NET ASSETS | 617,132,247 | 147,453,757 | 764,586,004 | 610,642,160 |
| Total liabilities and net assets | $ 653,701,938 | $ 148,485,947 | $ 802,187,885 | $ 642,574,041 |

See accompanying notes.



012484
CONFIDENTIAL
728
TDIT003994

# Santa Barbara Foundation
## Consolidated Statements of Activities and Changes in Net Assets
### Year Ended December 31, 2023 With Summarized Comparative Totals for 2022

| | Without Donor Restrictions | With Donor Restrictions | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|
| REVENUE, GAINS, AND OTHER SUPPORT | | | | |
| Contributions | $ 128,873,729 | $ 1,282,500 | $ 130,156,229 | $ 51,180,134 |
| Less contributions raised on behalf of others | (2,306,227) | - | (2,306,227) | (3,105,942) |
| Total contributions and bequests | 126,567,502 | 1,282,500 | 127,850,002 | 48,074,192 |
| Investment income net | 53,348,430 | 7,589,590 | 60,938,020 | 40,128,982 |
| Less investment (income) loss on behalf of others, net | (892,414) | - | (892,414) | 3,862,958 |
| Total investment income, net | 52,456,016 | 7,589,590 | 60,045,606 | 43,991,940 |
| Change in value of split-interest agreements | - | 3,278,277 | 3,278,277 | (4,412,801) |
| Other income | 398,023 | - | 398,023 | 460,673 |
| Net assets released from restrictions | | | | |
| Available for distribution per spending policy | 2,853,154 | (2,853,154) | - | - |
| Reclassifications and other releases from restrictions | 1,154,491 | (1,154,491) | - | - |
| Total revenue, gains, and other support | 183,429,186 | 8,142,722 | 191,571,908 | 88,114,004 |
| EXPENSES | | | | |
| Program services | | | | |
| Grants, net of rescinds | 28,279,240 | - | 28,279,240 | 27,653,249 |
| Less grants made on behalf of others | (564,508) | - | (564,508) | (1,050,740) |
| Total grants, net of rescinds | 27,714,732 | - | 27,714,732 | 26,602,509 |
| Grant making and direct program | 4,715,266 | - | 4,715,266 | 3,749,274 |
| Total program services | 32,429,998 | - | 32,429,998 | 30,351,783 |
| Support services | | | | |
| Administrative and fund management | 3,293,005 | - | 3,293,005 | 2,953,052 |
| Fundraising and development | 1,905,061 | - | 1,905,061 | 1,569,928 |
| Total support services | 5,198,066 | - | 5,198,066 | 4,522,980 |
| Total expenses | 37,628,064 | - | 37,628,064 | 34,874,763 |
| CHANGE IN NET ASSETS | 145,801,122 | 8,142,722 | 153,943,844 | 53,239,242 |
| NET ASSETS, beginning of year | 471,331,125 | 139,311,035 | 610,642,160 | 557,402,918 |
| NET ASSETS, end of year | $ 617,132,247 | $ 147,453,757 | $ 764,586,004 | $ 610,642,160 |

See accompanying notes.



012485

# Santa Barbara Foundation
## Consolidated Statements of Functional Expenses
### Year Ended December 31, 2023 With Summarized Comparative Totals for 2022

| | Program Services | Administrative and Fund Management | Fundraising and Development | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|---|
| EXPENSES | | | | | |
| Grants, net of rescinds | $ 27,714,732 | $ - | $ - | $ 27,714,732 | $ 26,602,509 |
| Salaries | 1,177,854 | 1,781,244 | 885,822 | 3,844,920 | 3,385,689 |
| Consultants and professional services | 1,298,783 | 258,161 | 45,310 | 1,602,254 | 1,280,988 |
| Employee benefits | 302,636 | 416,124 | 226,976 | 945,736 | 758,898 |
| Project | 731,022 | - | - | 731,022 | 310,942 |
| Depreciation and amortization | 171,858 | 222,086 | 119,819 | 513,763 | 502,228 |
| Technology | 121,944 | 161,392 | 80,158 | 363,494 | 291,011 |
| Community relations | 166,538 | 4,339 | 185,796 | 356,673 | 294,751 |
| Meetings and conferences | 204,176 | 77,806 | 38,543 | 320,525 | 200,558 |
| Payroll taxes | 83,692 | 115,076 | 62,769 | 261,537 | 235,257 |
| Occupancy | 68,548 | 75,289 | 56,312 | 200,149 | 195,114 |
| Rent | 133,892 | 36,673 | 18,167 | 188,732 | 152,931 |
| Advertising | 72,631 | - | 69,268 | 141,899 | 121,849 |
| Publications | 39,056 | 8,926 | 53,560 | 101,542 | 99,026 |
| Dues, subscriptions, licenses, and permits | 39,288 | 38,798 | 19,220 | 97,306 | 134,192 |
| Interest | 29,130 | 39,178 | 16,544 | 84,852 | 87,431 |
| Office | 33,091 | 23,782 | 9,507 | 66,380 | 53,925 |
| Telephone | 19,260 | 21,457 | 10,630 | 51,347 | 49,767 |
| Insurance | 21,867 | 12,674 | 6,660 | 41,201 | 50,697 |
| Unrelated business income tax | - | - | - | - | 67,000 |
| Total expenses, 2023 | $ 32,429,998 | $ 3,293,005 | $ 1,905,061 | $ 37,628,064 | |
| Percentage of total expenses, 2023 | 86% | 9% | 5% | 100% | |
| Total expenses, 2022 | $ 30,351,783 | $ 2,953,052 | $ 1,569,928 | | $ 34,874,763 |
| Percentage of total expenses, 2022 | 87% | 8% | 5% | | 100% |

See accompanying notes.

# Santa Barbara Foundation
## Consolidated Statements of Cash Flows
## Years Ended December 31, 2023 and 2022

| | 2023 | 2022 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Contributions received from donors, net of amounts restricted for endowments | $ 31,401,782 | $ 33,828,587 |
| Cash received (spent) into funds held on behalf of others, net of distributions and fees | 5,627,747 | (1,807,755) |
| Cash received from state, county, and city contracts and grants | 791,262 | 969,679 |
| Interest and dividends received | 7,306,381 | 4,426,741 |
| Miscellaneous receipts | 398,023 | 460,674 |
| Interest paid | (84,852) | (87,431) |
| Unrelated business income tax paid | - | (67,000) |
| Grants and awards paid | (26,778,922) | (25,741,569) |
| Cash paid to employees and suppliers for program services | (4,686,136) | (3,719,258) |
| Cash paid to employees and suppliers for support services | (4,402,000) | (3,584,758) |
| Net cash provided by operating activities | 9,573,285 | 4,677,910 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Payment of lease commissions | (62,479) | - |
| Purchases of property and equipment | - | (74,201) |
| Purchases of investments | (66,406,472) | (336,769,209) |
| Proceeds from sales of investments | 66,024,096 | 356,949,829 |
| Proceeds from notes receivable | 25,000 | 25,000 |
| Return on capital shareholder distribution | 3,250,828 | 1,003,245 |
| Net cash provided by investing activities | 2,830,973 | 21,134,664 |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Distributions received from charitable remainder trusts | 453,064 | 1,108,367 |
| Contributions restricted for endowments | 1,282,500 | 51,530 |
| Payments on notes payable | (86,433) | (83,854) |
| Net cash provided by financing activities | 1,649,131 | 1,076,043 |
| CHANGE IN CASH AND CASH EQUIVALENTS | 14,053,389 | 26,888,617 |
| CASH AND CASH EQUIVALENTS, beginning of year | 68,287,954 | 41,399,337 |
| CASH AND CASH EQUIVALENTS, end of year | $ 82,341,343 | $ 68,287,954 |

See accompanying notes.

**Note 1 – Organization and Summary of Significant Accounting Policies**

**Organization** – The Santa Barbara Foundation (SBF) is a community foundation incorporated in 1928 under the laws of the State of California as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. It is the mission of SBF to mobilize collective wisdom and philanthropic capital to build empathetic, inclusive, and resilient communities. SBF continues to serve as one of the largest private funding sources for area nonprofits, agencies, and college-bound students.

**Supporting organizations** – SBF works with entities organized as supporting organizations to SBF for the specific and primary purpose of benefiting, performing functions of, and engaging in activities consistent with SBF's charitable purposes. SBF appoints a majority of the members of the governing boards of the supporting organizations. Each governing board may create its own investment policy and grant guidelines. In 2023 and 2022, the following supporting organizations were effectively under SBF's control and were consolidated for financial statement purposes:

- Highland Santa Barbara Foundation, Inc. (HSBF) – organized in November 2011; and
- The Eric and Kelly Schwartz Charitable Trust (EKSCT) – organized in August 2015.

**Affiliates** – In 2023 and 2022, the following affiliates were effectively under SBF's control and were consolidated for financial statement purposes:

- 1111 Chapala Street, LLC, whose primary operating asset is a commercial building located in Santa Barbara, California;
- 300 East Islay Street, LLC, whose primary operating asset is a residential building located in Santa Barbara, California; and
- SBF Properties, LLC, whose purpose is to receive gifts of real property.

**Principles of consolidation** – The accompanying consolidated financial statements as of December 31, 2023 and 2022, include the financial statements of SBF and its supporting organizations and affiliates, listed above. All material inter-organizational transactions and balances have been eliminated in the consolidation.

**Basis of accounting** – The accompanying consolidated financial statements of SBF have been prepared on the accrual basis of accounting under generally accepted accounting principles (U.S. GAAP).

**Reclassifications** – Certain amounts from the December 31, 2022, financial statements have been reclassified to conform to the December 31, 2023 financial statement presentation.

**Description of net assets** – SBF reports information regarding its financial position and activities in two classes of net assets—with donor restrictions and without donor restrictions—based on the existence or absence of donor-imposed restrictions.

SBF's governing documents provide the Board of Trustees with the variance power to modify any restriction or condition placed on gifts to SBF if, in its sole judgment, the Board of Trustees determines that the restriction becomes in effect unnecessary, incapable of fulfillment, or inconsistent with the charitable needs of the community served.

- *Net assets without donor restrictions* represent net assets that are not subject to donor-imposed time restrictions. Net assets without donor restrictions include board-designated funds that have been purposed for designing an Impact Investing program that will promote philanthropic donations, further community impact, and enhance opportunity for financial return.

- *Net assets with donor restrictions* represent net assets that are subject to donor-imposed time restrictions. Net assets with donor restrictions generally include contributions and bequests receivable and planned gifts. Earnings on net assets with donor restrictions are reported as an increase in net assets with donor restrictions. Earnings on donor-restricted endowment funds that have not yet been appropriated are also classified as net assets with donor restrictions. When a restriction expires, net assets with donor restrictions are reclassified to net assets without donor restrictions and reported in the consolidated statements of activities and changes in net assets as "net assets released from restrictions." Net assets with donor restrictions include perpetual income trusts for which the related income is reported as contributions without donor restrictions when received on the consolidated statements of activities and changes in net assets. The change in value of the underlying assets is recorded as an unrealized gain or loss in net assets with donor restrictions on the consolidated statements of activities and changes in net assets. Net assets with donor restrictions also consist of those donor-restricted endowments held by SBF as defined under the Uniform Prudent Management of Institutional Funds Act (UPMIFA).

**Functional expense allocation** – Salaries, employee benefits, and payroll taxes are allocated based on time spent in each functional area by specific employee as estimated by management. Indirect costs included in meetings and conferences, depreciation and amortization, technology, occupancy, office, and rent expense are allocated based on number of employees by functional area based on time spent by specific employee as estimated by management. Certain advertising costs are allocated based on the percentage of the publication devoted to each functional area. All other costs are charged directly to the appropriate functional category.

**Comparative amounts** – The amounts shown for 2022 in the accompanying consolidated financial statements are included to provide a basis for comparison with 2023 and are not intended to present all information necessary for a fair presentation of the 2022 consolidated financial statements in conformity with U.S. GAAP. Accordingly, such information should be read in conjunction with SBF's consolidated financial statements for the year ended December 31, 2022, from which the summarized information was derived.

**Cash and cash equivalents** – SBF considers all highly liquid investments with an initial maturity of three months or less to be cash equivalents.

**Use of estimates** – The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect certain amounts and disclosures. Those estimates and assumptions affect the reported amounts of assets, liabilities, the disclosure of contingent assets and liabilities, and the reported revenues and expenses. It is at least reasonably possible that the significant estimates could change in the coming year.

# Santa Barbara Foundation
## Notes to Consolidated Financial Statements

Significant estimates used in the preparation of these consolidated financial statements include:

- Allocation of certain expenses by function;
- Discount factors used in determining contributions receivable, notes receivable, grants payable, annuities payable by charitable trust, and income interest in charitable trusts;
- Allowance for uncollectible contributions;
- Fair value of assets held by charitable trusts;
- Fair value of certain investments; and
- Depreciable lives of property and equipment.

**Contributions** – Unconditional contributions received are recorded at their fair value on the date of donation. Contributions have been evaluated and determined to be non-reciprocal and unconditional for the year ended December 31, 2023. Unconditional contributions, including promises to give, are recognized as revenue when received. Unconditional promises to give must be accompanied by written documentation prior to being recognized as revenue. Conditional promises to give are recognized when the conditions on which they depend are substantially met. Bequests are recorded at their estimated fair value when all the events required for the transfer of the assets from the estate of the donor to SBF have occurred and/or the court has issued an order to transfer the assets. Noncurrent contributions and bequests receivable are discounted at the net present value utilizing the applicable federal rate set by the Internal Revenue Service (IRS) at the date of the gift.

**Donated goods and services** – Donated goods and services received by SBF are recorded as contributions at fair value at the time of the donation or receipt. For the year ended December 31, 2023, numerous volunteers gave their time and expertise to SBF in a wide variety of areas including: committees, administrative activities, technical and financial advice, and office and public relations activities. These contributions, despite their considerable value to the mission of SBF, are not reflected in the consolidated financial statements. Donated or contributed services are reported at fair value in the consolidated financial statements for voluntary donations of services when those services (1) create or enhance nonfinancial assets, or (2) require specialized skills provided by individuals possessing those skills and are services which would be typically purchased if not provided by donation.

**Investments** – SBF records investments at fair value. The fair value of investments in securities traded on national securities exchanges is valued at the closing price on the last business day of the year. The investments in hedge funds, partnerships, and private equity, for which quoted market prices are not readily available, are determined by management in good faith with the assistance of third-party investment managers using methods they consider appropriate at net asset value (NAV). Realized and unrealized gains and losses are included in the change in net assets, net of investment expenses.

**Income taxes** – SBF and its supporting organizations and affiliates are tax exempt organizations and are not subject to federal or state income taxes, except on unrelated business income, in accordance with Section 501(a) of the Internal Revenue Code. In addition, SBF and its supporting organizations and affiliates qualified for the charitable contribution deduction under Section 170(b)(1)(A) of the Internal Revenue Code and have been classified as organizations that are not private foundations. Unrelated business income tax, if any, is immaterial and no tax provision has been made in the accompanying consolidated financial statements.

SBF and its supporting organizations and affiliates evaluate uncertain tax positions, whereby the effect of the uncertainty would be recorded if the outcome were considered probable and reasonably estimable. As of December 31, 2023, SBF and its supporting organizations and affiliates have no uncertain tax positions requiring accrual.

**Beneficial interest in trusts and split interest agreements** – SBF has a beneficial interest in various trusts and other split-interest agreements. A split-interest agreement is a contribution that results in the sharing of legal rights to certain assets by the nonprofit entity and the donor, including other specified individuals or organizations designated by the donor. Such split-interest agreements are held in charitable remainder trusts, life insurance policies, charitable lead trusts, charitable gift annuities, pooled income funds, and perpetual interest trusts, as follows:

*Charitable remainder trusts* – SBF is named as an irrevocable remainder beneficiary of charitable trusts, which have been established by donors to provide income, generally for life, to designated beneficiaries. SBF is also the irrevocable remainder beneficiary of two life insurance policies. At the end of the term, or upon the death of the income beneficiaries, assets remaining in the trusts will be transferred to SBF. Each year, beneficiaries receive a percentage of the trust’s fair value, generally limited to net income or net income with make-up provisions.

If SBF is the trustee, the fair value of the trust is included in investments within the consolidated statements of financial position, a corresponding liability is recorded for the present value of estimated future payments as specified in the trust agreement, and the difference is recognized as a contribution. As of December 31, 2023, there were six such trusts valued at $937,813, with a corresponding liability for estimated future payments of $611,069, factored by discount rates ranging between 2% and 8.2%.

If SBF is not the trustee, contribution revenue and related assets are recognized at the fair value of the trusts’ investments, net of the present value of estimated future payments to beneficiaries. As of December 31, 2023, there were thirty such trusts and two life insurance policies valued at a total of $60,502,543, factored by discount rates ranging between 1.4% and 10%, included in beneficial interests in trusts within the consolidated statements of financial position.

*Charitable lead trusts* – SBF is named the lead beneficiary for a charitable lead trust held by third-party trustees. The charitable lead trust is included in beneficial interests in trusts within the consolidated statements of financial position at the present value of future payments to be received under the trust agreement. As of December 31, 2023, there was one such trust valued at $753,114, factored by a discount rate of 1.6%.

**Santa Barbara Foundation**
**Notes to Consolidated Financial Statements**

*Charitable gift annuities* – Charitable gift annuity donors have contributed assets to SBF in exchange for a promise by SBF to pay a fixed amount for a specified period to the donor or to individuals or organizations designated by the donor. Under the terms of the agreements, no trust exists, as the assets received are held by SBF, and the liability is an obligation of SBF. SBF records new gifts at the fair value of the assets net of the present value of the estimated future payments to beneficiaries factored by the IRS applicable federal rate (AFR) discount rate in effect at the date of the gift contract. As of December 31, 2023, there were twenty-four charitable gift annuities valued at $511,515 with a corresponding liability for estimated future payments of $334,213, factored by discount rates ranging between 4.0% and 11.3%, included in investments within the consolidated statements of financial position. The value of $511,515 exceeds the state of California required reserve of $392,362 by $119,153.

*Pooled income funds* – Pooled income fund donors have contributed assets to SBF in exchange for a net income payout for a specified period. Under the terms of the agreements, no trust exists, as the assets are held by SBF. The fair value of the asset is included in investments within the consolidated statements of financial position and a corresponding liability is recorded for the present value of estimated future payments to beneficiaries factored by the highest yearly rate of return for the past three years for each portfolio ranging between -11.3% and 7.9%. As of December 31, 2023, the fair value of the pooled income funds was $426,525 with a corresponding liability of $86,908.

*Perpetual income trust interest* – SBF is an income beneficiary of seven perpetual trusts. Under these arrangements, the corpus is not controlled by the management of SBF, but SBF has the irrevocable right to receive income on the underlying assets in perpetuity. Five trusts provide discretionary income, and two trusts provide restricted income for student aid and Lompoc area projects. As of December 31, 2023, SBF's share of the fair value of the trusts' investments of $19,929,023 is included in beneficial interests in trusts within the consolidated statements of financial position.

For all beneficial interests in trusts and split-interest agreements, changes in value in subsequent years are recognized in the consolidated statements of activities and changes in net assets as change in value of split-interest agreements.

Beneficial interests in trusts and split-interest agreements for which SBF is trustee totaled $1,875,853 with a corresponding liability under split interest agreements of $1,032,190 as of December 31, 2023. Beneficial interests in trusts and split-interest agreements for which SBF is not trustee and does not control contribution revenue and related assets totaled $81,184,680 as of December 31, 2023.

**Property and equipment** – Property and equipment are stated at cost, or fair value if donated. In general, SBF capitalizes assets with a cost of $5,000 or more and an expected useful life of greater than one year. Depreciation is calculated using the straight-line method over their estimated useful lives as follows:

| | |
|---|---|
| Land | Non-depreciable |
| Building | 27.5–40 years |
| Leasehold improvements | Lesser of lease term or 10–40 years |
| Office equipment | 3–10 years |
| Furniture | 5–10 years |



CONFIDENTIAL
012492 736
TDIT004002

**Funds held on behalf of others** – SBF receives and distributes assets under certain agency and intermediary arrangements. If a not-for-profit organization (NPO) establishes a fund at SBF with its own funds and specifies itself or its affiliate as the beneficiary of that fund, then SBF accounts for this transfer of assets by such NPO as a liability. The liability is established at the fair value of the funds, which is generally equivalent to the present value of future payments expected to be made to the NPO and is reflected under “funds held on behalf of others” on the consolidated statements of financial position.

**Grants** – Grants are recorded as expenses when they are approved by the Board of Trustees. Grants that are expected to be paid in more than one year are recorded at the present value of future payments factored by a discount using the applicable federal rate at the date of the grant award. All grants payable as of December 31, 2023, are expected to be paid within one year and are not required to be discounted at the present value. SBF records the rescission of grants in the year the grant is cancelled.

**Recently adopted accounting standards** – In June 2016, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* (CECL), which introduced an expected credit loss methodology for the measurement and recognition of credit losses on most financial assets, including trade accounts receivables. The expected credit loss methodology under ASU 2016-13 is based on historical experience, current condition, and reasonable and supportable forecasts, and replaces the measurement under current U.S. GAAP. The ASU also requires disclosure of information regarding how a company developed its allowance, including changes in the factors that influenced management’s estimate of expected credit losses and the reason for those changes. The ASU and its related clarifying updates are effective for fiscal years beginning after December 15, 2022, and interim periods for those fiscal years, for non-public entities. SBF adopted the new standard on January 1, 2023, using the modified-retrospective approach, which did not have a material impact on the consolidated financial statements as of and for the year ended December 31, 2023. Therefore, there was no cumulative effect to beginning net assets as it was determined to be immaterial.

**Subsequent events** – SBF has evaluated subsequent events through September 5, 2024, the date which the consolidated financial statements were available to be issued.

**Note 2 – Contributions Receivable**

Unconditional promises to give are included in the consolidated financial statements as contributions receivable, net. There is no allowance for contributions receivable recorded at December 31, 2023. At December 31, 2023, contributions and bequests receivable are expected to be collected as follows:

| | |
|---|---|
| In one year or less | $ 13,553,708 |
| In more than one year | 242,100 |
| Total contributions receivable | 13,795,808 |
| Discount to present value | (35,174) |
| Contributions receivable, net | $ 13,760,634 |

**Note 3 – Notes Receivable**

SBF has two unsecured promissory notes from a donor-advised fund and from a board-designated fund to a nonprofit charitable organization. The notes are presented within the consolidated statements of financial position as notes receivable, net, and are comprised of the following as of December 31, 2023:

| | |
|---|---|
| Receivable in less than one year | $ 225,000 |
| Receivable in two to five years | 1,225,000 |
| Total notes receivable | 1,450,000 |
| Discount to present value | (59,844) |
| Notes receivable, net | $ 1,390,156 |

In December 2016, SBF issued two promissory notes in the amount of $4,000,000 and $500,000, each bearing interest at a variable rate of 1-month SOFR, formerly LIBOR (5.38% at December 31, 2023), plus 1%, not to exceed 5%. Interest is payable in semi-annual installments. Principal payments of 5% of the original principal amount have been due annually since October 15, 2022, with the remaining principal balance due October 15, 2026. The $4,000,000 note has been partially forgiven, $1,000,000 annually, in December 2021, 2022, and 2023. The forgiven portion of the loan satisfied the conditions to be recognized as a contribution expense pursuant to FASB Accounting Standards Codification (ASC) 720-25-25 and FASB ASC 958-605-25-11. The notes are discounted at a rate of 1.68%.

**Note 4 – Investments Return**

The following summarizes the investment return in the consolidated statements of activities and changes in net assets for the year ended December 31, 2023:

| | |
|---|---|
| Interest and dividends | $ 8,372,201 |
| Less interest and dividends on behalf of others | (556,105) |
| Total interest and dividends | 7,816,096 |
| Realized gain on investments | 1,966,761 |
| Unrealized gain on investments | 54,359,839 |
| Less net realized and unrealized gain on behalf of others | (3,670,584) |
| Total realized and unrealized gain on investments | 52,656,016 |
| Less: investment fees | (472,734) |
| Add back investment fees on behalf of others | 46,228 |
| Total investment fees | (426,506) |
| Investment income, net | $ 60,045,606 |

**Note 5 – Fair Value Measurement**

Fair value is defined as the price that would be received by SBF to sell an asset or be paid by SBF to transfer a liability (an exit price) in an orderly transaction between market participants on the measurement date. A fair value hierarchy has been established that prioritizes valuation inputs into three broad levels to ensure consistency and comparability. There are three levels of inputs to measure fair value. The valuation hierarchy gives the highest priority to quoted prices in active markets (Level 1) and the lowest priority to unobservable inputs (Level 3).

The standard describes the three levels used to measure fair value:

**Level 1** – Quoted prices in active markets for identical assets or liabilities.

**Level 2** – Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, discounted cash flows, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

**Level 3** – Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

Following is a description of the valuation methodologies used for instruments measured at fair value on a recurring basis and recognized in the consolidated statements of financial position, as well as the general classification of such instruments pursuant to the valuation hierarchy.

Where quoted market prices are available in an active market, securities are classified within Level 1 of the valuation hierarchy. If quoted market prices are not available, then Level 2 fair values are estimated by using pricing models for quoted prices of securities with similar characteristics or discounted cash flows. The asset's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement.

Fair value of Level 3 securities is based on information provided by fund managers, external investment advisors, and other market factors to determine if the carrying value of these investments should be adjusted. Other factors may include, but are not limited to, estimates of liquidation value, prices of recent transactions in the same or similar funds, current performance, future expectations of the particular investment, and changes in market outlook and the financing environment. Because of the inherent uncertainty of valuations, however, those estimated values may differ from the values that would have been used had a ready market existed, and the differences could be material. Independent appraisals of significant real estate held for investment are conducted at frequencies as determined by the fund manager for valuation purposes.

Financial instruments are considered valued at NAV when the investments (hedge funds, private equity, commingled funds, and real asset/real estate funds) are valued at NAV based on capital statements provided by entities that calculate fair value using NAV per share or its equivalent.

The Investment Committee, in conjunction with the external investment advisors, monitors and analyzes the valuation of the investments on a quarterly basis. The Investment Committee reports to the Board of Trustees. The valuation considers variables such as financial performance of investments, recent sale prices of investments, and other pertinent information.

The following table presents assets recognized in the consolidated statements of financial position measured at fair value on a recurring basis and the level in which the fair value measurements fall at December 31, 2023:

| Description | Level 1 | Level 2 | Level 3 | NAV or Equivalent | Total |
|---|---|---|---|---|---|
| Investments | | | | | |
| Global equities | $ 76,289,230 | $ - | $ - | $ 32,312,633 | $ 108,601,863 |
| Domestic equities | 34,381,933 | - | - | - | 34,381,933 |
| International equities | 6,228,985 | - | - | - | 6,228,985 |
| Domestic fixed income funds | 7,285,201 | - | - | - | 7,285,201 |
| Global fixed income funds | 31,334,450 | - | - | 20,528,566 | 51,863,016 |
| Fixed income (illiquid) | - | - | 78,284,712 | - | 78,284,712 |
| Closely held stock | - | - | 249,568,735 | - | 249,568,735 |
| Real estate/natural resources | 7,967,280 | - | - | 17,106,498 | 25,073,778 |
| Infrastructure | - | - | - | 8,195,753 | 8,195,753 |
| Private equity | - | - | - | 26,858,685 | 26,858,685 |
| Partnerships | - | - | 3,094,723 | - | 3,094,723 |
| Hedge funds | - | - | - | 11,400,160 | 11,400,160 |
| Total investments | 163,487,079 | - | 330,948,170 | 116,402,295 | 610,837,544 |
| Beneficial interest in trusts | | | | | |
| Remainder and lead | - | - | 61,255,657 | - | 61,255,657 |
| Perpetual income | - | - | 19,929,023 | - | 19,929,023 |
| Total beneficial interest in trusts | - | - | 81,184,680 | - | 81,184,680 |
| Total assets measured at fair value | $ 163,487,079 | $ - | $ 412,132,850 | $ 116,402,295 | $ 692,022,224 |
| Liabilities under split-interest agreements | $ - | $ 1,032,190 | $ - | $ - | $ 1,032,190 |

The following is a description of the general classification of investments pursuant to the valuation hierarchy:

*Global equities* – Includes investment in domestic and international equities of varying market capitalizations selected by the investment manager. Equities are held as separate ownership shares of a specific company or in the form of mutual funds, commingled funds, or exchange-traded funds (ETFs).

*Domestic and international equities* – Includes investment in either domestic or international equities of varying market capitalizations. Equities are held as separate ownership shares of a specific company or in the form of mutual funds, commingled funds, or ETFs.

*Domestic fixed income funds* – Includes investment in domestic fixed income positions as held in the investment portfolio through either individual bond holdings (treasuries, corporate, government, mortgage, etc.), commingled funds, or through fixed income mutual funds.

*Global fixed income funds* – Includes investment in domestic and international fixed income positions held through either individual bond holdings (treasuries, corporate, government, mortgage, etc.) or through fixed income mutual funds, commingled funds, or ETFs.

*Fixed income (illiquid)* – Includes 100 participation shares in a non-controlling partnership interest composed primarily of collateralized loan obligations. 100% of this investment is held by a supporting organization, HSBF, at fair value.

*Closely held stock (illiquid)* – Includes shares of a C corporation held by EKSCT, a supporting organization; series seed shares of a California nonpublic benefit corporation; and series seed units of a limited liability company focusing on renewable energy development.

*Real estate/natural resources* – Includes thirteen limited partnerships that invest in a diverse group of private real estate investment funds or similar entities that focus on the acquisition, redevelopment, operation, and management of real estate properties or natural resources: timber, precious metals, commodities, mining, energy, etc.; and a local residential rental property held in SBF Properties, LLC.

*Infrastructure* – Includes four core infrastructure funds that have exposure in transportation, communication, food-related water and electricity, power, and energy services.

*Private equity* – Includes twenty-one broadly diversified private equity partnerships with varying allocations to buyouts, distressed opportunities, venture capital, special situations, and secondary funds. Holdings are invested in diversified portfolios of investment partnerships, each of which has a defined term, typically ten to fifteen years, with no right to withdraw prior to termination of the investment partnership. Funds are called as needed by managers and distributions are received through the liquidation of the underlying assets of the fund.

*Partnerships* – Includes three limited partnership interests that are illiquid and receive varying income distributions controlled by the general partner: (1) 24% interest, invested locally in a real estate holding; (2) 45% interest, terminating in June 2062, invested locally in multiple real estate holdings; and (3) 7% interest, invested in multiple other partnerships with domestic and international exposure.

*Hedge funds* – Includes four risk mitigating hedge funds.

The following table provides a reconciliation of assets measured at fair value using significant unobservable inputs (Level 3) for the year ended December 31, 2023:

| Description | January 1, 2023 | Net Gains and (Losses) | Purchases and Issuances | Transfers In and Out | Sales and Settlements | December 31, 2023 |
|---|---|---|---|---|---|---|
| Fixed income (illiquid) | $ 76,654,941 | $ 1,629,771 | $ - | $ - | $ - | $ 78,284,712 |
| Partnerships | 3,216,723 | (169,000) | 47,000 | - | - | 3,094,723 |
| Beneficial interest in trusts | 78,421,897 | 3,204,122 | - | (441,339) | - | 81,184,680 |
| Closely held stock | 126,267,375 | 25,159,762 | 101,392,426 | (3,250,828) | - | 249,568,735 |
| Total assets measured at fair value – Level 3 | $ 284,560,936 | $ 29,824,655 | $ 101,439,426 | $ (3,692,167) | $ - | $ 412,132,850 |

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

The following table represents the Level 3 financial instruments as of December 31, 2023, the valuation techniques used to measure the fair value of those financial instruments, and the significant unobservable inputs and the ranges of values for those inputs.

| Investment | Total Fair Value | Valuation Technique | Unobservable Inputs | Range |
|---|---|---|---|---|
| Fixed income (illiquid) | $ 78,284,712 | Fair value with qualitative discounting model | Lack of control discount and lack of marketability discount | 6.5%–8% |
| Partnerships | 3,094,723 | Market comparable | Listing prices and general partner estimates | 6%–34% |
| Beneficial interest in trusts | 81,184,680 | Present value of annuity or remainder interest | Discounted rate, life expectancies, and remaining payments | 1.4%–10%, 2 to 65 years |
| Closely held stock | 249,568,735 | Discounted cash flow method | Control premium, lack of marketability discount | 5%–25% |
| Total assets measured at fair value – Level 3 | $ 412,132,850 | | | |

The following table provides redemption data and unfunded commitments for investments held at NAV or equivalent:

| Investment | Total Fair Value | Unfunded Commitments | Redemption Frequency | Redemption Notice Period |
|---|---|---|---|---|
| Global equities | $ 32,312,633 | $ - | Monthly | 2 to 14 days |
| Global fixed income | 20,528,566 | - | Monthly | 2 to 10 days |
| Real estate/natural resources | 17,106,498 | 8,656,210 | Non-redeemable | - |
| Infrastructure | 8,195,753 | 2,147,611 | Non-redeemable | - |
| Private equity | 26,858,685 | 15,987,785 | Non-redeemable | - |
| Hedge funds | 11,400,160 | - | Daily to Semiannually | 2 to 90 days |
| Total | $ 116,402,295 | $ 26,791,606 | | |

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

**Note 6 – Property and Equipment**

Property and equipment at December 31, 2023, consist of the following:

| | |
|---|---|
| Building and leasehold improvements | $ 14,280,359 |
| Land | 3,265,379 |
| Office equipment | 385,971 |
| Furniture | 347,086 |
| Donated artwork | 17,500 |
| Total property and equipment | 18,296,295 |
| Less accumulated depreciation and amortization | (5,881,516) |
| Property and equipment, net | $ 12,414,779 |

**Note 7 – Note Payable**

**Mortgage note payable** – SBF has a mortgage note payable on the 1111 Chapala Street building with Montecito Bank & Trust, which is secured by the property, at an interest rate of 3%. Principal and interest payments of $14,274 are due monthly, with a final balloon payment due on January 20, 2031. In January 2021, the mortgage was refinanced to modify the interest rate to 3% and to extend the maturity date to January 20, 2031. The outstanding principal balance on the mortgage as of December 31, 2023, is $2,741,924.

Future maturities of principal obligations for years ending December 31 are as follows:

| | |
|---|---|
| Years ending December 31: | |
| 2024 | $ 88,914 |
| 2025 | 91,889 |
| 2026 | 94,724 |
| 2027 | 97,645 |
| 2028 | 100,457 |
| Thereafter | 2,268,295 |
| Total | $ 2,741,924 |

**Note 8 – Grants**

Grants payable as of December 31, 2023, of $68,750 are due within one year.

Grant expense is comprised of the following for the years ended December 31, 2023 and 2022:

| | 2023 | 2022 |
|---|---|---|
| Donor advised | $ 17,520,112 | $ 16,776,698 |
| Competitive | 3,714,747 | 4,074,689 |
| Field of interest | 2,022,143 | 2,564,099 |
| Donor designated | 1,900,816 | 1,685,353 |
| Supporting organizations | 2,124,957 | 876,157 |
| Fiscal sponsorships | 281,899 | 455,147 |
| Pass-through | 150,058 | 170,366 |
| Total grants, net of rescinds | $ 27,714,732 | $ 26,602,509 |

**Note 9 – Concentrations and Risks**

**Credit risk** – SBF maintains cash balances at several banks insured by the Federal Deposit Insurance Corporation (FDIC). The FDIC only insures the first $250,000 of funds on deposit at any one institution. SBF had uninsured cash of approximately $13,237,000 deposited with four different banks. In addition, SBF maintains significant cash balances in money market funds. Such balances are not fully insured. Certain Investments held with financial institutions are insured up to a specific limit by the Securities Investors Protection Corporation (SIPC). At December 31, 2023, the Foundation had amounts that were in excess of the SIPC insurance limits.

**Market risk** – SBF holds its investments in a diversified portfolio. Nevertheless, these investments are exposed to various risks and overall market volatility. Due to the level of risk associated with certain investments, it is reasonably possible that changes in the values of investments will occur in the near term and that such change could materially affect the amounts reported in the consolidated financial statements.

**Concentrated investments** – As of the year ended December 31, 2023, approximately 54% of the fair value of investments and a significant portion of the unrealized gains and losses are attributable to the two supporting organizations, HSBF and EKSCT. The fair value of HSBF’s illiquid fixed income and EKSCT’s closely held stock position are based upon annual independent third-party valuations using the same techniques and variables as in prior years.

**Supporting organization assets** – As of the year ended December 31, 2023, approximately 41% of total assets were in the two supporting organizations, HSBF and EKSCT.

**Major donors** – For the year ended December 31, 2023, approximately 78% of contributions revenue was from one donor.

**Note 10 – Endowment Funds**

**Interpretation of relevant law** – The Board of Trustees of SBF, in concurrence with the advice of legal counsel, has interpreted the California adopted UPMIFA as requiring a long-term investment strategy designed to preserve the fair value of the original gift, as of the gift date. As a result of this interpretation, SBF has classified with the explicit prohibition by the donor as net assets with donor restrictions (a) the original value of gifts donated to the perpetual endowment, (b) the original value of subsequent gifts to the perpetual endowment, and (c) accumulations to the perpetual endowment made in accordance with the direction of the applicable donor gift instrument at the time the accumulation is added to the fund. The remaining portion of the donor-restricted endowment funds are classified as net assets with donor restrictions until those amounts are appropriated for expenditure by SBF in a manner consistent with the standard for prudence prescribed by UPMIFA. In accordance with California UPMIFA, the organization considers the following factors in making a determination to appropriate or invest donor-restricted endowment funds:

1. The duration and preservation of the fund.
2. The purposes of SBF and the donor-restricted endowment fund.
3. General economic conditions.
4. The possible effect of inflation and deflation.
5. The expected total return from income and the appreciation of investments.
6. Other resources of SBF.
7. The investment policies of SBF.

**Endowment investment and spending policies** – SBF has adopted investment and spending policies for endowment assets that attempt to provide a predictable stream of funding to programs supported by its endowment while seeking to maintain the long-term purchasing power of the endowment assets. Endowment assets include those assets of donor-restricted funds that the organization must hold in perpetuity for donor-specified purposes. The endowment assets are invested in a manner that is intended to produce results that provide a reasonable balance between the quest for growth and the need to protect principal. The investment policy calls for a diversified portfolio utilizing various asset classes with a goal of reducing portfolio volatility and risk.

SBF's long-term endowment is invested in a diversified portfolio of domestic equities, international equities, fixed income, and a broad array of alternative investments. The portfolio employs both passive index funds and actively managed funds. The portfolio's objective is to achieve a total return equivalent to or greater than SBF's financial requirements over the long-term time horizon. Long-term investment strategies are used to manage risk with the goal to grow charitable dollars over time. SBF also provides four other investment options for donors that have a shorter time horizon and more immediate spending needs, including a socially responsible investment option.

SBF uses a total investment return methodology for determining its spending policy each year. The portfolio's total returns are achieved through both capital appreciation (realized and unrealized) and current yield (interest and dividends). The spending policy calculates the amount of money annually distributed from SBF's various discretionary funds and other endowed funds for grant making and administrative support. The approved spending policy for the year ended December 31, 2023, for discretionary funds was 4.5%, while other endowed funds were 4%. These percentages are calculated based on a rolling average of the market value for the previous three years.

The spending policy is reviewed annually in light of changing market assumptions, investment returns, and the rate of inflation. Accordingly, over the long term, SBF expects current spending policy to allow its endowment assets to grow.

**Endowment funds with deficiencies** – From time to time, the fair value of the assets associated with individual donor-restricted funds may fall below the level that current law requires SBF to retain for a fund of perpetual duration. In accordance with U.S. GAAP, these deficiencies are reported as a reduction in net assets with donor restrictions. Such deficiencies may result from unfavorable market fluctuations, particularly if the funds were invested in the endowment pool shortly prior to significant market declines. SBF has adopted a policy to spend from underwater endowments with certain limitations. As of December 31, 2023, SBF held seven endowment funds where the principal had fallen below the original corpus due to market conditions. The total fair values, original gift amounts, and deficiencies related to this fund as of December 31, 2023, is as follows:

| | |
|---|---|
| Fair value of underwater endowments | $ 13,296,771 |
| Original endowment gift amount | 14,402,299 |
| Deficiencies of underwater endowment funds | $ (1,105,528) |

Endowment net assets with donor restrictions totaled $65,162,394 consisting of total original gift endowment contributions of $57,176,629 and accumulated earnings of $7,985,765 as of December 31, 2023. Changes in the endowment net assets with donor restrictions for the year ended December 31, 2023, are as follows:

| | With Donor Restrictions |
|---|---|
| Endowment net assets, beginning of year | $ 59,847,087 |
| Net investment return | 7,589,590 |
| Contributions | 1,282,500 |
| Appropriation of endowment net assets for expenditure | (2,853,154) |
| Reclassifications and other releases from restrictions | (703,629) |
| Endowment net assets, end of year | $ 65,162,394 |

There were no endowment net assets without donor restrictions or assets classified as board-restricted endowment funds as of December 31, 2023.

**Note 11 – Related-party Transactions**

A majority of trustees and committee members of SBF also serve as trustees of entities receiving grants and support from SBF. Each trustee and committee member completes a conflict of interest declaration form annually. Trustees and committee members who have conflicts abstain from voting.

**Note 12 – Commitments**

SBF leases office equipment and office space under non-cancellable operating leases through January 2028. Rent expense under operating leases for the year ended December 31, 2023, was approximately $72,000.

**Note 13 – Retirement Plans**

SBF employees who work at least 1,000 hours per year are eligible to participate in a deferred salary savings plan under Section 401(k) of the Internal Revenue Code after one full calendar month of service. SBF matches at its discretion up to 4% of the eligible salary upon participation. For eligible employees with more than one year of service, SBF, at its discretion, contributes up to an additional 6% of the participant's eligible salary for a total of 10%. SBF employer contributions for the year ended December 31, 2023, totaled $303,333.

In addition, SBF has a non-qualified deferred compensation plan. SBF employer contributions for the year ended December 31, 2023, totaled $22,500.

**Note 14 – Liquidity**

SBF structures its financial assets to be available as its general expenditures, liabilities, and other obligations become due. SBF invests cash in excess of daily requirements in short-term investments and money market funds.

Financial assets available to meet cash needs for general expenditure for the following year are comprised of current assets and investments, adjusted for amounts unavailable due to illiquidity, endowments, and other funds with spending policy appropriations beyond one year, and current liabilities payable to vendors, financial institutions, and nonprofit organizations.

# Santa Barbara Foundation
## Notes to Consolidated Financial Statements

Financial assets available to meet cash needs for general expenditures within one year as of December 31, 2023:

| | |
|---|---|
| Cash and cash equivalents | $ 82,341,343 |
| Contributions and bequests receivable, current portion | 13,553,708 |
| Less non-cash bequests receivable of illiquid assets | (5,937,716) |
| Notes receivable, current portion | 225,000 |
| Other assets | 258,749 |
| Current assets | 90,441,084 |
| Investments | 610,837,544 |
| Less investments not available for general expenditures within one year | |
| Illiquid, not convertible to cash beyond one year | (330,948,170) |
| Endowments and other funds subject to spending policy appropriations beyond one year | |
| Without donor restrictions | (113,233,039) |
| With donor restrictions | (65,162,394) |
| Funds held on behalf of others | (33,165,254) |
| Investments available for general expenditures within one year | 68,328,687 |
| Financial assets available to meet cash needs for general expenditures within one year | $ 158,769,771 |

**Note 15 – Net Assets**

Net assets consist of the following for the years ended December 31, 2023 and 2022:

| **Net assets without donor restrictions** | 2023 | 2022 |
|---|---|---|
| Supporting organizations | $ 327,432,299 | $ 203,276,249 |
| Donor-advised funds | 126,914,251 | 124,955,164 |
| Undesignated funds | 96,194,074 | 89,771,251 |
| Field of interest funds | 50,561,579 | 43,271,369 |
| Donor-designated funds | 11,571,347 | 6,158,669 |
| Board-designated funds | 2,479,073 | 2,358,513 |
| Fiscal sponsorship | 1,979,624 | 1,539,909 |
| Total net assets without donor restrictions | $ 617,132,247 | $ 471,331,124 |

| **Net assets with donor restrictions** | 2023 | 2022 |
|---|---|---|
| Donor-restricted endowment funds | $ 65,162,394 | $ 59,847,087 |
| Beneficial interest in remainder and lead trusts | 61,255,657 | 61,084,833 |
| Beneficial income interest in perpetual trusts | 19,929,023 | 17,337,064 |
| Split interest agreements | 899,757 | 837,328 |
| Contributions receivable | 206,926 | 204,723 |
| Total net assets with donor restrictions | $ 147,453,757 | $ 139,311,035 |

MOSSADAMS

# VALUATION ANALYSIS OF 100 PARTICIPATION SHARES OF CHARITABLE DAF HOLDCO, LTD

AS OF

DECEMBER 31, 2023

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd

VALUESCOPE
Measure | Create | Defend

VALUESCOPE
Measure | Create | Defend

April 11, 2024

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

***RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of December 31, 2023 (the "Valuation Date"). This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[1] The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of December 31, 2023
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd
- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

---

[1] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$78,284,712**
**SEVENTY-EIGHT MILLION TWO HUNDRED EIGHTY-FOUR THOUSAND SEVEN HUNDRED TWELVE DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $277,573,090 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$910,076** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.0% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.5% | | *Schedule C.5* |
| Combined Discount | 14.0% | ($127,229) | |
| **FMV Per Share** | | **$782,847** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$78,284,712** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope, Inc.

ValueScope, Inc.

## TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW ........................................ 1**

DESCRIPTION OF THE ASSIGNMENT ........................................ 1
SCOPE........................................ 1
PROCEDURES........................................ 1

**DAF OVERVIEW........................................ 2**

COMPANY OVERVIEW ........................................ 2
SUBJECT INTEREST OVERVIEW........................................ 2
CLO OVERVIEW ........................................ 2
HISTORICAL FINANCIAL ANALYSIS ........................................ 5

**ECONOMIC AND INDUSTRY OVERVIEW........................................ 6**

**OVERVIEW OF THE U.S. ECONOMY** ........................................ 6
OVERVIEW OF THE REAL ESTATE LOANS & COLLATERALIZED DEBT INDUSTRY ............ 15

**VALUATION METHODOLOGY ........................................ 19**

VALUATION APPROACHES........................................ 19
VALUATION METHODS ........................................ 20
SUMMARY OF THE VALUATION APPROACHES AND METHODS ........................................ 20

**VALUATION ANALYSIS ........................................ 21**

ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE ........................................ 21

**CONCLUSION OF VALUE - SUBJECT INTEREST........................................ 24**

DISCOUNT FOR LACK OF CONTROL ........................................ 24
DISCOUNT FOR LACK OF MARKETABILITY ........................................ 24
CONCLUSION - SUBJECT INTEREST VALUE........................................ 26

**ASSUMPTIONS AND LIMITING CONDITIONS ........................................ 27**

**APPRAISAL CERTIFICATION ........................................ 32**

## TABLE OF SCHEDULES

**HISTORICAL VALUATION SUMMARY** ........ **SUMMARY 1**

**CURRENT VALUATION SUMMARY** ........ **SUMMARY 2**

**DAF NET ASSET VALUE ANALYSIS** ........ **A**

- CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........ A.1
- CHARITABLE DAF HOLDCO, LTD - SUMMARY BALANCE SHEET ........ A.2

**DISCOUNT FOR LACK OF CONTROL (DLOC) ANALYSIS** ........ **B**

- CLOSED-END FUND DATA - INVESTMENT GRADE BOND FUNDS ........ B.1
- CLOSED-END FUND DATA - US GENERAL EQUITY FUNDS ........ B.2
- DLOC CONCLUSION ........ B.3

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ........ **C**

- DLOM DETERMINATION - PUT OPTION APPROACH ........ C.1
- PUT OPTION APPROACH - HISTORICAL VOLATILITY SUMMARY ........ C.2
- DLOM DETERMINATION - RESTRICTED STOCK STUDIES ........ C.3
- DLOM DETERMINATION - RESTRICTED STOCK STUDIES SUMMARY STATISTICS ........ C.4
- DLOM CONCLUSION ........ C.5

# ENGAGEMENT OVERVIEW

## DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of December 31, 2023 (the "Valuation Date"). This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

## SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Company's financial position. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion and reconciliation of the fair market value of the Subject Interest.

## PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

## DAF OVERVIEW[2]

### COMPANY OVERVIEW

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. At the Company's inception, the partners agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (the "DAF Agreement") and the Companies Law of the Cayman Islands (the "Law"). As a holding company, DAF's predominant assets are interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.

### SUBJECT INTEREST OVERVIEW

Based on information provided by the Company's management ("Management"), the Subject Interest shares are participation shares that from time to time are expected to receive cash distributions to fulfill certain charitable and expense goals of the owners of the participation shares. The Subject Interest shares are directly affected by the terms of the DAF Agreement and the actions of DAF's director. According to the DAF Agreement, the appointed director controls the business, affairs, and power of the Company (Section 89), including the issuance and purchase of shares on such terms and in such manner as the director determines (Section 44). Director consent is also required for shareholders to transfer their interests in DAF (Section 34). Finally, although shareholders may determine the timing and amounts of dividends (Sections 117 and 118), no dividend can exceed an amount approved by the director (Section 118).

### CLO OVERVIEW

Because the assets ultimately held by DAF predominately reflect equity tranches in one or more CLOs, some discussion is warranted describing a CLO. The diagram below depicts a typical CLO's balance sheet and cash flow. A CLO holds a pool of income-producing assets funded through the issuance of several classes of notes and preferred shares. The notes issued by the CLO are separated into rated and unrated classes.

---

2 Based on the Company's memorandum and articles of association and information from management.




The rating of each class is primarily determined through the priority of rights in respect of the cash flows generated by the collateral and the quality of the collateral. The notes issued are long-term notes designed to match or exceed the maturity of the underlying collateral pool. The most subordinated notes or preferred shares of the CLO function in the same manner as voting common stock in a corporation and are generally unrated. They are the residual ownership interest in the CLO issuer. They earn all the excess spread, but concomitantly bear the first loss.

From the example depicted below, CLOs seek to earn the excess spread between lower-rated/higher interest collateral and lower blended cost of its liabilities. Returns are a function of excess spread, less any collateral losses and fees and expenses incurred during the life of the CLO.

**Example:**

| | |
|---|---|
| Yield on assets | LIBOR + 4.0% |
| Liabilities Weighted Avg. Coupon | LIBOR + 1.0% |
| Excess spread (or net interest margin) | 3.0% |

CLOs typically are subject to a number of collateral tests that are designed to protect the holders of, and maintain the credit ratings associated with, CLO debt. Collateral Coverage Tests are cash flow CLO tests that divert cash flows from subordinated tranches, prevent the purchase of new CLO assets, and cause senior tranches to be paid down when their standards are not met. When these tests are violated or are anticipated to be violated

due to negative downward trends, any future cash flow would be used to pay down the highest rated debt within the CLO capital structure, thus, eliminating any distributions and potential recovery to CLO equity interests. The two main collateral coverage tests are the over-collateralization test and the interest coverage test. The over-collateralization test measures how much the value of the pool of assets held by the CLO exceeds the obligations of the CLO. The interest coverage test measures how much the interest income of the CLO from its pool of assets exceeds the interest payment costs on the CLOs' obligations. Collateral Quality Tests are cash flow CLO tests that restrict sales of CLO assets. These tests may include objective measures of pool diversity, average rating, average life, prospective average recovery, and minimum weighted average coupon or spread. Concentration Tests address the presence in the pool of single issuers, percentage of the collateral represented by loan participations, non-U.S. obligors, triple-C rated credits, deferred interest instruments and other factors.

A rating agency approves the legal and credit structure of the CLO, performs due diligence on the parties involved, and rates the various tranches of the debt issued by the CLO and rates the assets owned by the CLO. The Servicer selects the initial collateral of the CLO and supervises it according to prescribed guidelines contained in an indenture or trust deed. The trustee is similar to a custodian in that it holds the assets for the benefit of the debt and equity holders, enforces the terms of the indenture, monitors and reports on collateral performance, and disburses cash to note-holders, preferred shareholders, and service providers according to the indenture.

The assets that have been purchased earn interest. That interest is used to pay fees, expenses and interest of the CLO on a prioritized basis. This is referred to as the interest waterfall. The interest earned is paid down the "waterfall" beginning with the Trustee and Administrative expenses and ending with the equity holders, with a percentage going to the Class I and Class II Equities.




The diagram above depicts the cash flow from a CLO and its respective ordering of payments and obligations. As one can see, the CLO "equity" is the last in line to receive a cash distribution. Accordingly, the valuation of the CLO equity tranches within DAF is strongly influenced by this dynamic.

## HISTORICAL FINANCIAL ANALYSIS

We were provided with the Company's internal financial statements for the three months ended December 31, 2023. These financial statements reflect various professional valuations of DAF's ultimate underlying CLO holdings (assets).

As reported as of the Valuation Date, DAF's sole asset consisted of 100% of the equity of CLO HoldCo, Ltd ("CLO HoldCo"). CLO HoldCo is a holding company which invests in CLOs and other investments. The net asset value for CLO HoldCo was reported as $277.6 million. DAF reported no liabilities as of the Valuation Date. As a result, DAF's book equity as of the Valuation Date was determined to equal $277.6 million.

DAF's balance sheet as of the Valuation Date is presented in Schedule A.2.

# ECONOMIC AND INDUSTRY OVERVIEW

## OVERVIEW OF THE U.S. ECONOMY

The third quarter of 2023 had positive economic growth, higher than the second quarter of 2023. Inflation is cooling down with its lowest rate over a twelve-month period in the last two years recorded in June 2023. This was largely on the back of declining energy prices. In its constant efforts to mitigate the effects of high inflation, the Federal Reserve has kept interest rates at elevated levels so far with cuts expected to begin in early 2024. Initial steady interest rate hikes in 2023 have led to the yield curve inverting, indicating investor's expectation of an economic slowdown. However, the US stock markets gained momentum and have closed higher than their prices at the same time last year due to the declining inflation rate and the expectation of future loosening of monetary policy.

### Gross Domestic Product[3]

Real gross domestic product (GDP) increased at an annual rate of 4.9 percent in the third quarter of 2023, following an increase of 2.1 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected an upturn in exports, and acceleration in consumer spending and private inventory investment that were partially offset by a deceleration in nonresidential fixed investment.




3 U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2023. (Release Date: 12/21/2023).

***Population***

Population growth is an important driver of long-term growth in an economy. The total population increased from 334.3 million in November 2022 to 336.0 million in November 2023.[4] The working-age population (15-64) increased from 207.2 million in October 2022 to 208.8 million in October 2023.[5]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward. In November 2022, the civilian labor force participation rate was 62.2% and stands at 62.8% as of November 2023.[6]







4 U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

5 Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

6 U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

***Employment***

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 199,000 in November 2023 and the unemployment rate edged down to 3.7 percent. Notable job gains occurred in health care and government. Employment also increased in manufacturing, reflecting the return of workers from a strike. Employment in retail trade declined.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased slightly from 6.7% in November 2022 to 7.0% in November 2023.[7]







Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 3.7% in 2023 to 4.0% in 2026.

---

7 U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

***Inflation***

According to the BLS, the Consumer Price Index for All Urban Consumers (CPI-U) increased 0.1 percent in November on a seasonally adjusted basis, after being unchanged in October. Over the last 12 months, the all-items index increased 3.1 percent before seasonal adjustment.

The index for shelter continued to rise in November, offsetting a decline in the gasoline index. The energy index fell 2.3 percent over the month as a 6.0-percent decline in the gasoline index more than offset increases in other energy component indexes. The food index increased 0.2 percent in November, after rising 0.3 percent in October. The index for food at home increased 0.1 percent over the month and the index for food away from home rose 0.4 percent.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has increased dramatically since April 2021, increasing from 74.2% as of October 2021 to a high of 96.6% in April 2022, and declined to 89.3% in December 2022. The price pressure measure for August 2023 was 86.9%.[8] The forecasters predict current-quarter headline CPI inflation will average 3.5 percent at an annual rate, slightly up from the forecast of 3.4 percent in the last survey[9].




8 Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 8, 2023.

9 Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters*, January 10, 2024.

***Interest Rates***

The interest rate on the three-month Treasury bill increased from 4.42% as of December 30, 2022, to 5.40% as of December 29, 2023.[10] The interest rate on the ten-year Treasury note remained the same at 3.88% over the same period.[11]




The interest rate on Moody's Aaa-rated corporate bonds decreased from 4.70% as of December 30, 2022 to 4.65% as of December 29, 2023.[12] The interest rate on the Moody's Baa-rated corporate bonds decreased from 5.87% to 5.49% over the same period.[13]

10 Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.
11 Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.
12 Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2024.
13 Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.




In the last twelve months, the yield curve remained inverted, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill remaining the same between December 30, 2022, to December 29,2023 at -0.59%.[14]




14 U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2024.

***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) increased $108.7 billion in the third quarter.




***Stock Markets***

The stock markets gained momentum from December 30, 2022, to December 29, 2023. The S&P 500 Total Return[15] Index closed at 7,138.77 on December 30, 2022, and closed higher at 8,971.07 on December 29, 2023. The NASDAQ Composite Total Return Index closed at 12,588.95 on December 30, 2022, and closed higher at 18,208.50 on December 29, 2023.[16] The Dow Jones Industrial Average Total Return Index closed at 79,728.48 on December 30, 2022 and closed higher at 92,630.57 on December 29, 2023.[17] In the graph below, the June 30, 2022, values were set to 100.




15 Total return indices include returns from both income and capital gains.
16 *S&P Capital IQ* Database, last accessed January 10, 2024.
17 *S&P Capital IQ* Database, last accessed January 10, 2024.

***Construction & Housing Starts***

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts increased from 1.427 million units in November 2022 to 1.560 million units in November 2023.[18] Construction spending, a seasonally adjusted annual figure, increased from $1.84 trillion in November 2022 to $2.05 trillion in November 2023.[19]




[18] U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

[19] U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

***Consumer Confidence***

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has decreased significantly since the post-COVID high of 88.3 in April 2021, coming in at 61.3 in November 2023.[20] The index remains significantly lower than the December 2019 (pre-COVID) value of 99.3. The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.




[20] University of Michigan, *Surveys of Consumers*, November 2023

## OVERVIEW OF THE REAL ESTATE LOANS & COLLATERALIZED DEBT INDUSTRY[21]

The industry comprises non-depository operators that specialize in primary and secondary market lending. Unlike banks and other traditional lenders, industry participants do not rely on deposits to issue loans. Instead, to finance primary market lending to consumers and business, industry operators generate income by securitizing and selling mortgages and other loans on the secondary market. The industry also includes miscellaneous forms of collateralized lending, such as pawn lending.

The primary activities of this industry are:

- Secondary market financing and securitization (i.e. MBSs and CDOs)
- Loans (businesses, real estate, consumers)
- Consumer lending and financing
- Providing other non-depository credit intermediation (i.e. pawnshop operations)
- International trade financing

### *Executive Summary*

The Real Estate Loans and Collateralized Debt industry is composed of non-depository institutions that conduct primary and secondary market lending. Operators in this industry include government agencies in addition to nonagency issuers of mortgage-related securities. Through 2023, rising per capita disposable income and low levels of unemployment helped fuel the increase in primary and secondary market sales of collateralized debt. Nonetheless, due to the outbreak of COVID-19 and the sharp contraction in economic activity due to lockdowns, revenue contracted in 2020, but has since rebounded as the economy has normalized and interest rates have shot up. These trends caused revenue to grow at a CAGR of 0.4% to an estimated $480.6 billion through 2023, with an anticipated spike of 6.4% in 2023. Profit, measured as revenue-less interest and noninterest income, is expected to account for 9.7% of revenue in 2023.

Higher access to credit and greater disposable income have fueled primary market lending over much of the past five years, increasing the variety and volume of loans to be securitized and sold in secondary markets. An additional boon for institutions has been an increase in interest rates, which has raised interest income as the spread between short- and long-term interest rates increased. These macroeconomic factors, combined with changing risk appetite and regulation in the secondary markets, have resurrected collateralized debt trading since the middle of the period. The pandemic had reversed the period's early gains as the 30-year conventional mortgage rate had dropped sharply. Nonetheless, this proved to only be temporary, as rates following the end of pandemic-related restrictions exceeded those earlier in the period.

---

21 IBISWorld Industry Report 52229, November 2023, *Real Estate Loans & Collateralized Debt in the U.S.*

Although institutions are poised to benefit from a strong economic recovery following the pandemic, slumping rates of homeownership, coupled with an expected plunge of the 30-year mortgage rate, are expected to damage the primary market through 2028. Shaky demand from commercial banking and uncertainty surrounding inflationary pressures will influence institutions' decisions on whether or not to sell mortgage-backed securities and commercial loans to secondary markets. These trends are expected to cause revenue to inch upward at a CAGR of 0.1% to an estimated $483.9 billion through 2028.

***Industry Performance***

The financial industry has experienced steady revenue growth, with a compound annual growth rate (CAGR) of 0.4%, leading to an estimated $480.6 billion in revenue for the year 2023. This growth includes an anticipated 6.4% surge in 2023, with profits expected to reach 9.7%. The strong economic recovery following the challenges of COVID-19 has played a pivotal role in boosting revenue for financial institutions.

Non-depository institutions within the industry rely heavily on stable economic conditions and favorable interest rates to ensure a consistent stream of revenue and customer demand for their services. During the COVID-19 pandemic, the Federal Reserve took measures to cut interest rates in an attempt to stabilize economic conditions, causing homeownership rates to falter due to dampened consumer sentiment. However, as the economy rebounded post-pandemic, homeownership rates flourished, and commercial banking demand rebounded, bolstering institutions' recovery and stimulating new consumer interest in homeownership.

Many companies dealing in mortgage-backed securities (MBSs) seek stability in the broader economy and positive trends in the consumer and real estate markets to continue financing sales into the secondary market.

The shift in Federal Reserve policy toward a more hawkish stance on interest rates and macroeconomic conditions following COVID-19 has influenced core markets among institutions. This shift has also boosted core revenue channels for operators. To counter rising inflationary pressures, the Federal Reserve adopted a hawkish stance on interest rates, leading to steady rate hikes to combat heightened inflation. This has had a notable impact on mortgage rates and the interest rates charged by commercial banks on core financial instruments. Recently, the Federal Reserve decided to hold steady the interest rate level, with the current range standing between 5.25%-5.50%. Institutions benefit from higher interest rates as they generate larger revenue when selling to secondary markets, making the Fed's pivot toward higher interest rates an accelerant for these institutions.

Consistent growth in corporate markets has further bolstered collateralized debt demand among banks. Even during challenging economic conditions, larger corporate companies and commercial banks have remained significant drivers of revenue growth for operators. Over the past five years, growth in corporate profit has heightened this trend and provided commercial banks with greater flexibility to pursue lucrative real estate and collateralized debt opportunities. Despite inflationary pressures across the broader economy, corporate clients have been able to leverage advantageous trends from the Federal Reserve through acquisitions of MBSs, contributing to the industry's growth.

However, shaky consumer metrics have tempered the industry's overall growth rate. While institutions encompass a range of entities, from government-sponsored enterprises like Fannie Mae and Freddie Mac to traditional mortgage companies, consumer sentiment plays a crucial role in influencing revenue growth. If consumers have a lower propensity to acquire mortgages or pursue student loans due to difficulties in repayment, it can shrink demand in the secondary market for MBSs and hinder growth for operators. Recent volatility in student loan delinquencies and consumers' tightening fiscal conditions during COVID-19 have dampened the potential for larger revenue growth from the sale of MBSs and collateralized mortgage obligations (CMOs). Given the uncertainty in consumer confidence due to inflationary pressures, institutions involved in direct sales of securities or policies must remain vigilant regarding consumer sentiment to maximize their growth potential.

***Industry Outlook***

The financial industry is bracing for a challenging period ahead, with anticipated revenue rising at a compound annual growth rate (CAGR) of 0.1% and expected to reach $483.9 billion by 2028. Furthermore, profit margins are poised to decrease to 11.2% in the same year. This projection is driven by several key factors that are expected to shape the industry's trajectory.

One significant factor contributing to this outlook is the uncertainty in the real estate market, which is set to push back the gains made following the COVID-19 pandemic. Despite the prospect of strong consumer confidence in the future, newfound uncertainty surrounding real estate is expected to impact institutional gains. With both the 30-year mortgage rate and homeownership rate projected to decline through 2028, institutions are facing a dual challenge of reduced revenue from core instruments like Mortgage-Backed Securities (MBSs) and decreased consumer activity in primary markets. The Federal Reserve's focus on quashing inflation further complicates matters, as future rate hikes are contingent on steady inflationary pressure, a trend expected to dissipate in the coming years as indicated by the projected decline in the Consumer Price Index (CPI).

Additionally, there is a continuous shift towards the primary market, which is impacting core revenue streams. The disposable income of consumers and their ability to cover immediate expenses, such as credit card debt and student loan payments, is crucial in determining broader consumer sentiment. As these metrics are expected to grow in the coming years, institutions are increasingly turning to primary markets for lucrative alternative loans that can be packaged and securitized. This trend is underscored by the declining agency trading of MBSs, as highlighted by recent data from the Securities Industry & Financial Market Association (SIFMA). Operators are now seeking the safest and most consistently in-demand securities to trade, with a greater focus on student loans and credit cards due to the shifting market dynamics.

Furthermore, the evolving regulatory landscape poses challenges to the lending rate of core financial instruments. The rate of adoption of new federal regulations and the enforcement of existing regulatory laws remains uncertain. Recent changes, such as the removal of a stipulation in the Dodd-Frank Act regarding collateralized loan obligations (CLOs), have impacted investment and liquidity in secondary markets. However, to prevent a recurrence of the 2008 sub-prime mortgage crisis, the federal government may consider imposing regulations aimed at increasing transparency among institutions and minimizing risks in the primary market, which would lead to higher compliance costs for operators.

Lastly, technological evolution is poised to accelerate operational efficiency within the industry. In an uncertain economic landscape, operators are turning to artificial intelligence (AI) and other technology solutions to stabilize expenditures. By upgrading back-end technology for loan processing and market trend analysis, non-depository institutions can make more informed decisions about securitizing and selling less risky loans in open markets. Moreover, leveraging technology can reduce operational costs and streamline manual labor-intensive processes, a trend that gained momentum during the pandemic and is expected to persist in the industry's future.

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

### VALUATION APPROACHES

***Income Approach***

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

***Market Approach***

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

***Asset-Based (Cost) Approach***

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1. Discounted Cash Flow Method (multi-period model)
2. Direct Capitalization Method (single period model)
3. Excess Earnings Method

B. Market Approach
1. Guideline Public Company Method
2. Merger and Acquisition Method

C. Asset-Based Approach
1. Reproduction Cost Method
2. Replacement Cost Method
3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

## VALUATION ANALYSIS

### ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE

DAF's ultimate holdings are interests in the equity tranches of CLOs, the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities. Accordingly, the fair market value of DAF's equity is based directly on the valuation of these lower tier entities' assets.

DAF's sole asset reported as of the Valuation Date consisted of 100% of the equity of CLO HoldCo. CLO HoldCo is a holding company which invests in CLOs and other investments. We relied upon DAF management's determination of CLO HoldCo's NAV based on the values of its various underlying investments and assets. CLO HoldCo's balance sheet as of the Valuation Date is shown in the following charts and in Schedule A.1.

As shown below, CLO HoldCo's primary assets consist of $513 thousand in CLO investments and $233.4 million in other investments[22]. CLO HoldCo reported $323.6 million in total assets. CLO HoldCo also reported $46.0 million in total liabilities as of the Valuation Date. Therefore, CLO HoldCo's equity can be reasonably stated as $277.6 million.

[22] Other investments consist of equity investments in approximately 44 entities.

## *CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 12/31/2023 | |
|---|---|---|
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $86,127,092 | 26.6% |
| **Total Current Assets** | 86,127,092 | 26.6% |
| **CLO Investments** | | |
| Aberdeen CLO, Ltd | 0 | 0.0% |
| Red River CLO, Ltd. Preferred Shares | 2,608 | 0.0% |
| Westchester CLO, Ltd | 98,985 | 0.0% |
| VAHA 2004-1A 0.0% | 10,244 | 0.0% |
| VAHA 2004-1X 0.0% | 8,195 | 0.0% |
| Brentwood CLO, Ltd. | 278,584 | 0.1% |
| Liberty CLO, Ltd. | 114,556 | 0.0% |
| Grayson CLO, Ltd. Class II Preference Shares | 157 | 0.0% |
| Rockwall CDO, Ltd. | 118 | 0.0% |
| HLF 1X Floating C1 | 0 | 0.0% |
| PAMCO 1997-1X B | 0 | 0.0% |
| **Total CLO Investments** | 513,446 | 0.2% |
| **Other Assets** | | |
| Other Investments | 233,444,862 | 72.1% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 811,850 | 0.3% |
| Dividends Receivable | 33,730 | 0.0% |
| Note Receivable | 1,471,448 | 0.5% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 323,591,266 | 100.0% |
| **Total Liabilities** | 46,018,176 | 14.2% |
| **Total Equity** | 277,573,090 | 85.8% |
| **Total Liabilities & Equity** | 323,591,266 | 100.0% |

### *DAF NAV Conclusion*

As of the Valuation Date, DAF's balance sheet consisted solely of a 100% ownership interest in CLO HoldCo's equity. Therefore, DAF's NAV can be reasonably stated as $277.6 million (rounded). This analysis is summarized in the following table and in Schedule A.2.

| | Balance Sheet as of: 12/31/2023 | |
|---|---|---|
| | Actual | % |
| **Assets** | | |
| CLO HoldCo, LTD | $277,573,090 | 100.0% |
| **Total Assets** | $277,573,090 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $277,573,090 | 100.0% |
| **Total Liabilities & Equity** | $277,573,090 | 100.0% |

## CONCLUSION OF VALUE - SUBJECT INTEREST

DAF's NAV was determined to equal $277.6 million as of the Valuation Date. Dividing this NAV by the 305 total participation shares outstanding results in a NAV per share of $910,076. However, sellers of fractional interests in holding companies rarely receive a price equal to the NAV of their investment. This is because the interest holders do not have direct control over the entity's assets and have a limited market for their interests. Therefore, in order to arrive at the fair market value of the Subject Interest shares that are the subject of this analysis, we applied relevant discounts (control and marketability).

### DISCOUNT FOR LACK OF CONTROL

Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Due to the Company's ultimate holdings in debt and equity investments, the Company exhibits some of the characteristics of a closed-end fund. Closed-end funds, like open-ended mutual funds, are asset holding companies that typically hold a portfolio of publicly traded securities. However, unlike unit holders in open-ended funds, closed-end fund unit holders who wish to liquidate their investment cannot look to the fund to repurchase their shares. Rather, they must sell them on the open market. The price they receive is not usually equal to the fundamental or net asset value of the investment. Therefore, the fair market value of closed-end funds is generally described in terms of a discount or premium to net asset value.

To align with the Company's holdings, we selected closed-end fund data from investment grade bond funds and general equity funds. The investment grade bond fund data shown in Schedule B.1 indicated mean and median discounts of 3.9% and 4.3%, respectively. The general equity fund data shown in Schedule B.2 indicated mean and median discounts of 10.5% and 11.7%, respectively. Based on these indications, we selected a discount for lack of control of 8.0% to be applicable to the Subject Interest, as shown in Schedule B.3.

### DISCOUNT FOR LACK OF MARKETABILITY

Discounts for lack of marketability (DLOMs) are applied to the shares of private companies based on the premise that an asset or interest in an entity without a readily available market would sell for less to a hypothetical buyer than an identical asset or interest that is readily marketable. Several factors are widely recognized to affect

marketability, such as distributions or dividends, investment performance, holding period to complete a sale, and management performance, among others. We utilized two methods of quantifying a relevant DLOM: the put option approach and an analysis of restricted stock studies.

***Put Option Approach***

The price of a contract providing the right to sell a number of shares (a put option) represents the difference between the non-marketable and marketable price of an asset. For example, if a holder of restricted or non-marketable stock purchases a put option on the underlying asset, the holder would be purchasing marketability. The price of the put determines the size of the DLOM.

In order to determine the price of such a put, we utilized the Black-Scholes put option model.[23] Based on our analysis, we determined that an appropriate volatility for investment grade bond funds and general equity bond funds such as DAF is approximately 15.0% (Schedule C.2) and between one half and one year (averaged to 0.75 years) would be required to sell the Subject Interest in an orderly transaction. As a result of these inputs, the put option approach indicated a discount for lack of marketability of 3.3%. This DLOM indication is presented in Schedule C.1.

***Restricted Stock Study Analysis***

There are several studies that attempt to measure discounts for lack of marketability, and a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.[24] As mentioned, we would expect between six months and one year to be required to sell the Subject Interest in an orderly transaction.

Schedule C.4 presents a summary of restricted stock studies performed involving issuances of shares during the time period 1997 through 2008, which is when the SEC-mandated lock-up period for restricted stocks was one year. Based on a range of low discounts of 9.0%-10.9%, we selected a 9.7% DLOM utilizing the findings of the restricted stock studies.

***DLOM Conclusion***

The put option approach in Schedule C.1 indicated a DLOM of 3.3%. The restricted stock study analysis in Schedule C.4 indicated a DLOM of 9.7%. Based on these indications, we

---

[23] Black, F. and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, May 1973

[24] See Schedule C.3

concluded a discount for lack of marketability of 6.5%. This conclusion is presented in Schedule C.5.

**CONCLUSION - SUBJECT INTEREST VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$78,284,712**
**SEVENTY-EIGHT MILLION TWO HUNDRED EIGHTY-FOUR THOUSAND SEVEN HUNDRED TWELVE DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $277,573,090 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$910,076** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.0% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.5% | | *Schedule C.5* |
| Combined Discount | 14.0% | ($127,229) | |
| **FMV Per Share** | | **$782,847** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$78,284,712** | |

Our conclusion of value is presented in Summary Schedule 2 as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, Inc. is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated; they should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Neither the valuation report, nor its contents, nor any reference to the appraiser or ValueScope, Inc. may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties without our prior written consent. In addition, except as set forth in the report, our analysis and report are not intended for general circulation or publication, nor are they to be reproduced or distributed to third parties without our prior written consent. Notwithstanding the foregoing, ValueScope, Inc. permits the Company to distribute this Report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, and we shall have no responsibility for any such unauthorized change.

The valuation may not be used in conjunction with any other appraisal or study. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The appraisal was prepared solely for the purpose, function, and party so identified in the report. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of ValueScope, Inc.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, Inc. must be made in advance. ValueScope, Inc. reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

**REGULATORY AND ENVIRONMENTAL CONSIDERATIONS**

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

**POTENTIAL FUTURE SALES**

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.
2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.
3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.
4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.
5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.
6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.
7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.
8. This report and analysis were prepared under the direction of Steven C. Hastings.
9. I am in compliance with all professional appraisal certifications and licensing.
10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By: ValueScope, Inc.

Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, Inc.

## APPENDIX: QUALIFICATIONS OF THE APPRAISER

***Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA***
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*2006 – Present* *ValueScope, Inc.*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006 *Value Capital, LLC*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000* *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was instrumental in assisting the Savings and Loan Department in writing new Mortgage

Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001* *MedCare Financial Solutions, Inc.*

*President*

Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994 *H.D. Vest Financial Services*

*Executive Vice President and CFO*

As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986 *Arthur Andersen & Co.*

*Senior Manager*

Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona
Bachelor of Science - Indiana University, Bloomington, Indiana

## CERTIFICATIONS AND LICENSES

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

## ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

## RECENT IRS CASES - OFFICE OF CHIEF COUNSEL

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.

- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015

- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.

- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*

- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*

- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.

- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.

- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.

- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.

- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.

- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

SCHEDULES

**Charitable DAF HoldCo, Ltd**
**Table of Contents** — **Valuation Date: December 31, 2023**

## Table of Contents


| Schedule Name | Schedule |
|---|---|
| **Historical Valuation Summary** | Summary Schedule 1 |
| **Current Valuation Summary** | Summary Schedule 2 |
| **DAF Net Asset Value Analysis** | |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.1 |
| Charitable DAF HoldCo, Ltd - Summary Balance Sheet | Schedule A.2 |
| **Discount for Lack of Control (DLOC) Analysis** | |
| Closed-End Fund Data - Investment Grade Bond Funds | Schedule B.1 |
| Closed-End Fund Data - US General Equity Funds | Schedule B.2 |
| DLOC Conclusion | Schedule B.3 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Put Option Approach | Schedule C.1 |
| Put Option Approach - Historical Guideline Company Volatility Summary | Schedule C.2 |
| DLOM Determination - Restricted Stock Studies | Schedule C.3 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.4 |
| DLOM Conclusion | Schedule C.5 |

**Charitable DAF HoldCo, Ltd**
**Historical Valuation Summary**

**Summary Schedule 1**
**Valuation Date: December 31, 2023**

| | For the Quarter Ended: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **12/31/2021** | **3/31/2022** | **6/30/2022** | **9/30/2022** | **12/31/2022** | **3/31/2023** | **6/30/2023** | **9/30/2023** | **12/31/2023** |
| Company Net Asset Value (NAV) | $243,189,674 | $262,539,795 | $291,234,287 | $289,502,301 | $276,241,856 | $275,227,939 | $270,414,002 | $288,884,011 | **$277,573,090** |
| Discount for Lack of Control | 5.0% | 7.3% | 5.6% | 8.0% | 8.7% | 7.8% | 11.6% | 13.9% | 8.0% |
| Discount for Lack of Marketability | 6.9% | 6.9% | 6.9% | 7.0% | 7.3% | 7.1% | 6.6% | 6.4% | 6.5% |
| Combined Discount | 11.6% | 13.7% | 12.1% | 14.4% | 15.4% | 14.3% | 17.4% | 19.4% | 14.0% |
| **FMV of Subject Interest (Per 100 Shares)** | $70,521,019 | $74,289,035 | $83,919,780 | $81,212,514 | $76,654,941 | $77,292,849 | $73,202,932 | $76,331,301 | **$78,284,712** |

**Charitable DAF HoldCo, Ltd**
**Current Valuation Summary**

**Summary Schedule 2**
**Valuation Date: December 31, 2023**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $277,573,090 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$910,076** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.0% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.5% | | *Schedule C.5* |
| Combined Discount | 14.0% | ($127,229) | |
| **FMV Per Share** | | **$782,847** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$78,284,712** | |

**Charitable DAF HoldCo, Ltd** | **Schedule A.1**
**DAF Net Asset Value Analysis** | **Valuation Date: December 31, 2023**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 12/31/2023 | |
|---|---|---|
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $86,127,092 | 26.6% |
| **Total Current Assets** | 86,127,092 | 26.6% |
| | | |
| **CLO Investments** | | |
| Aberdeen CLO, Ltd | 0 | 0.0% |
| Red River CLO, Ltd. Preferred Shares | 2,608 | 0.0% |
| Westchester CLO, Ltd | 98,985 | 0.0% |
| VAHA 2004-1A 0.0% | 10,244 | 0.0% |
| VAHA 2004-1X 0.0% | 8,195 | 0.0% |
| Brentwood CLO, Ltd. | 278,584 | 0.1% |
| Liberty CLO, Ltd. | 114,556 | 0.0% |
| Grayson CLO, Ltd. Class II Preference Shares | 157 | 0.0% |
| Rockwall CDO, Ltd. | 118 | 0.0% |
| HLF 1X Floating C1 | 0 | 0.0% |
| PAMCO 1997-1X B | 0 | 0.0% |
| **Total CLO Investments** | 513,446 | 0.2% |
| | | |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 17,737,063 | 5.5% |
| Highland CLO Funding, Ltd. - Participation Rights | 122,998 | 0.0% |
| TerreStar Corporation New Common | 1,713,498 | 0.5% |
| Sable Permian Resources 7.375% | 2 | 0.0% |
| Celtic Pharma Phinco B.V. (Pharma VII) 17.000% | 0 | 0.0% |
| Bruce Mansfield - 1-07 - Escrow Units | 0 | 0.0% |
| iHeartCommunications, Inc. (fka Clear Channel Communications, Inc.) 6.375% | 351 | 0.0% |
| Crusader Fund II, Ltd. | 113,229 | 0.0% |
| NXDT | 2,740,993 | 0.8% |
| NXRT | 1,805,440 | 0.6% |
| FFWM | 3,942,093 | 1.2% |
| .SERENC | 3,043,330 | 0.9% |
| Conservation Equity Fund I | 3,101,541 | 1.0% |
| Multi Strat | 618,844 | 0.2% |
| Highland Loan Funding V | 0 | 0.0% |
| TerreStar Corporation Term Loan A - Non Convertible | 77,770,586 | 24.0% |
| TerreStar Corporation Term Loan C - Non Convertible | 36,427 | 0.0% |
| NHT Holdco, LLC - Membership Units | 270,770 | 0.1% |
| Big Valley Power Property, LLC | 94,000 | 0.0% |
| NCI Apache Trail, LLC | 940,000 | 0.3% |
| NCI Fort Worth Land, LLC | 874,200 | 0.3% |
| NCI Royse City Land, LLC | 5,649,400 | 1.7% |
| NCI Stewart Creek, LLC | 1,250,000 | 0.4% |
| NLA Assets, LLC | 1,301,900 | 0.4% |
| WMG BELLE AVENUE MEZZANINE, LLC | 3,899,547 | 1.2% |
| WMG Belle Avenue Orlando Partners, LLC | 1,452,000 | 0.4% |
| NREA SB I Holdings LLC | 5,154,586 | 1.6% |
| NexPoint Adare - Tranche 1 | 11,283,713 | 3.5% |
| NexPoint Skorpios | 45,887,717 | 14.2% |
| Total Wire - Convertible Promissory Note | 20,560 | 0.0% |
| NexPoint Polo Glen DST | 651,162 | 0.2% |
| MPMO Appraisal Rights Claims | 527,460 | 0.2% |
| COLL | 92,248 | 0.0% |
| ACHC US | 194,400 | 0.1% |
| BIO | 107,199 | 0.0% |
| ACRG/A/U CN | 2,278 | 0.0% |
| ACRG/B/U CN | 1,728 | 0.0% |
| NREF | 6,221,786 | 1.9% |
| HRTX | 9,350 | 0.0% |
| TGTX | 243,390 | 0.1% |
| TMO | 242,571 | 0.1% |
| PRTK | 1,488 | 0.0% |
| SRG | 280,500 | 0.1% |
| SPXU | 3,858,132 | 1.2% |
| SQQQ | 3,310,274 | 1.0% |
| SRTY | 3,598,779 | 1.1% |
| NexPoint Capital, INC. | 13,305,790 | 4.1% |
| FREMF 21K-F103 CS FRN | 1,164,415 | 0.4% |
| NRSZX | 8,807,107 | 2.7% |
| RWIC | 17 | 0.0% |
| Other Investments | 233,444,862 | 72.1% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 811,850 | 0.3% |
| Dividends Receivable | 33,730 | 0.0% |
| Note Receivable | 1,471,448 | 0.5% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| | | |
| **Total Assets** | 323,591,266 | 100.0% |
| **Total Liabilities** | 46,018,176 | 14.2% |
| **Total Equity** | 277,573,090 | 85.8% |
| **Total Liabilities & Equity** | 323,591,266 | 100.0% |

**Charitable DAF HoldCo, Ltd** — **Schedule A.2**
**DAF Net Asset Value Analysis** — **Valuation Date: December 31, 2023**

*Charitable DAF HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 12/31/2023 | |
|---|---|---|
| | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $277,573,090 | 100.0% |
| **Total Assets** | $277,573,090 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $277,573,090 | 100.0% |
| **Total Liabilities & Equity** | $277,573,090 | 100.0% |

**Charitable DAF HoldCo, Ltd** | **Schedule B.1**
**Discount for Lack of Control (DLOC) Analysis** | **Valuation Date: December 31, 2023**

*Closed-End Fund Data - Investment Grade Bond Funds*

| Closed-End Fund Data - Investment Grade Bond Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| BKT | BlackRock Income Trust, Inc. | $12.73 | $12.18 | (4.3%) |
| FMY | First Trust Mortgage Income Fund | $11.72 | $12.12 | 3.4% |
| VBF | Invesco Bond Fund | $15.87 | $15.21 | (4.2%) |
| IHTA | Invesco High Income 2024 Target Term Fund | NA | $6.89 | N/A |
| JLS | Nuveen Mortgage and Income Fund | NA | $16.88 | N/A |
| JMM | Nuveen Multi-Market Income Fund | $6.35 | $5.91 | (6.9%) |
| DMO | Western Asset Mortgage Opportunity Fund Inc. | $12.05 | $11.17 | (7.3%) |

| Summary Statistics | |
|---|---|
| **Mean Premium (Discount)** | **(3.9%)** |
| **Median Premium (Discount)** | **(4.3%)** |
| **Standard Deviation** | **4.3%** |

*Source: S&P Capital IQ as of market close December 31, 2023*

**Charitable DAF HoldCo, Ltd** — **Schedule B.2**

**Discount for Lack of Control (DLOC) Analysis** — **Valuation Date: December 31, 2023**

*Closed-End Fund Data - US General Equity Funds*

| Closed-End Fund Data - US General Equity Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| ADX | Adams Diversified Equity Fund, Inc. | $20.56 | $17.71 | (13.9%) |
| BIF | Boulder Growth & Income Fund, Inc. | $0.33 | $0.54 | 65.3% |
| CET | Central Securities Corp. | $46.49 | $37.77 | (18.8%) |
| FOF | Cohen & Steers Closed-End Opportunity Fund, Inc. | NA | $11.20 | N/A |
| GRF | Eagle Capital Growth Fund, Inc. | $10.82 | $9.45 | (12.7%) |
| EVT | Eaton Vance Tax-Advantaged Dividend Income Fund | $21.57 | $22.25 | 3.1% |
| EQS | Equus Total Return, Inc. | $3.49 | $1.45 | (58.4%) |
| FXBY | Foxby Corp. | $23.65 | $13.12 | (44.5%) |
| GDV | The Gabelli Dividend & Income Trust | $25.58 | $21.64 | (15.4%) |
| GAB | The Gabelli Equity Trust Inc. | $5.19 | $5.08 | (2.1%) |
| GAM | General American Investors Company, Inc. | $51.96 | $42.95 | (17.3%) |
| HTD | John Hancock Tax-Advantaged Dividend Income Fund | $19.02 | $18.97 | (0.3%) |
| USA | Liberty All-Star Equity Fund | $6.75 | $6.38 | (5.5%) |
| ASG | Liberty All-Star Growth Fund, Inc. | $5.75 | $5.28 | (8.2%) |
| RMT | Royce Micro-Cap Trust, Inc. | $10.47 | $9.24 | (11.7%) |
| RVT | Royce Value Trust Inc. | $16.42 | $14.56 | (11.3%) |
| SOR | Source Capital, Inc. | $43.91 | $40.38 | (8.1%) |
| SPE | Special Opportunities Fund, Inc. | $14.30 | $11.86 | (17.1%) |
| FUND | Sprott Focus Trust, Inc. | $8.91 | $8.00 | (10.2%) |
| TY | Tri-Continental Corporation | $32.66 | $28.83 | (11.7%) |

| Summary Statistics | |
|---|---|
| **Mean Premium (Discount)** | **(10.5%)** |
| **Median Premium (Discount)** | **(11.7%)** |
| **Standard Deviation** | **23.3%** |

*Source: S&P Capital IQ as of market close December 31, 2023*

**Charitable DAF HoldCo, Ltd** **Schedule B.3**
**Discount for Lack of Control (DLOC) Analysis** **Valuation Date: December 31, 2023**

*DLOC Conclusion*

| Discount for Lack of Control Conclusion | | |
|---|---|---|
| DLOC Determination - Closed End Bond Funds (Mean) | 3.9% | *Schedule B.1* |
| DLOC Determination - Closed End Bond Funds (Median) | 4.3% | *Schedule B.1* |
| DLOC Determination - Closed End Equity Funds (Mean) | 10.5% | *Schedule B.2* |
| DLOC Determination - Closed End Equity Funds (Median) | 11.7% | *Schedule B.2* |
| **Concluded Discount for Lack of Control** | **8.0%** | |

**Charitable DAF HoldCo, Ltd** — **Schedule C.1**
**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: December 31, 2023**

*DLOM Determination - Put Option Approach*

## Discount for Lack of Marketability - Put Option Approach

| | | | |
|---|---|---|---|
| **Option-Pricing Inputs:** | | | |
| Stock Price | **S** | $1.00 | |
| Strike Price | **X** | $1.00 | *(Set to same as stock price)* |
| Expected Life | **T** | 0.75 | *(Years)* |
| Volatility | **s** | 15.0% | *Schedule C.2* |
| Risk-free rate | **R** | 5.50% | *US Treasury Implied Yield for Expected Life* |
| Dividend Yield | **Q** | 0.00% | * |

| | | | |
|---|---|---|---|
| *Intermediate Calculations:* | | *Intermediate Calculations:* | |
| *d1* | *0.38220588* | *-d1* | *-0.38220588* |
| *d2* | *0.25230207* | *-d2* | *-0.25230207* |
| *N(d1)* | *0.64884567* | *N(d1)* | *0.35115433* |
| *N(d2)* | *0.59959620* | *N(d2)* | *0.40040380* |
| Black-Scholes Call Option Price | $0.07 | Black-Scholes Put Option Price | $0.03 |

| | |
|---|---|
| **Implied Discount for Lack of Marketability (DLOM)** | **3.3%** |

** Distributions not expected in the near future*

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

**Schedule C.2**
**Valuation Date: December 31, 2023**

*Put Option Approach - Historical Guideline Company Volatility Summary*

| Historical | Bond Funds | | | | | Equity Funds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Volatility Term | BKT | FMY | JMM | JLS | VBF | FXBY | GRF | EQS | SPE | RVT |
| 0.5 Years | 14.1% | 15.2% | 11.5% | 14.6% | 15.0% | 30.4% | 30.3% | 40.7% | 11.7% | 18.4% |
| 1 Year | 12.7% | 15.0% | 11.5% | 12.1% | 14.7% | 27.5% | 26.0% | 40.6% | 11.6% | 19.8% |
| 1.5 Years | 13.4% | 17.0% | 15.0% | 11.9% | 16.5% | 27.2% | 34.6% | 52.3% | 14.2% | 23.9% |
| 2 Years | 13.3% | 16.4% | 15.1% | 12.0% | 15.7% | 27.9% | 37.0% | 49.5% | 14.8% | 25.5% |
| 2.5 Years | 13.1% | 15.2% | 14.1% | 11.4% | 15.1% | 27.8% | 34.0% | 47.5% | 14.3% | 24.3% |
| 3 Years | 12.5% | 14.5% | 13.2% | 10.9% | 14.6% | 122.0% | 31.7% | 48.3% | 13.8% | 23.6% |
| 3.5 Years | 11.8% | 14.1% | 13.4% | 11.0% | 14.1% | 113.8% | 30.4% | 53.8% | 14.7% | 23.1% |
| 4 Years | 12.3% | 15.3% | 18.0% | 17.2% | 16.5% | 108.4% | 32.3% | 56.1% | 24.1% | 29.6% |
| 4.5 Years | 11.7% | 14.7% | 17.3% | 16.3% | 16.1% | 102.4% | 31.5% | 54.8% | 22.9% | 28.3% |
| 5.0 Years | 11.3% | 14.1% | 16.6% | 15.6% | 15.5% | 97.9% | 31.0% | 53.2% | 21.9% | 27.3% |

| Historical | Statistical Summary | | | | | |
|---|---|---|---|---|---|---|
| Volatility Term | Low | 25th % | Median | Mean | 75th % | High |
| **0.5 Years** | 11.5% | 14.2% | **15.1%** | 20.2% | 27.3% | 40.7% |
| **1 Year** | 11.5% | 12.3% | **14.8%** | 19.2% | 24.5% | 40.6% |
| 1.5 Years | 11.9% | 14.4% | 16.8% | 22.6% | 26.4% | 52.3% |
| 2 Years | 12.0% | 14.8% | 16.1% | 22.7% | 27.3% | 49.5% |
| 2.5 Years | 11.4% | 14.2% | 15.1% | 21.7% | 26.9% | 47.5% |
| 3 Years | 10.9% | 13.4% | 14.5% | 30.5% | 29.7% | 122.0% |
| 3.5 Years | 11.0% | 13.5% | 14.4% | 30.0% | 28.6% | 113.8% |
| 4 Years | 12.3% | 16.7% | 21.0% | 33.0% | 31.6% | 108.4% |
| 4.5 Years | 11.7% | 16.1% | 20.1% | 31.6% | 30.7% | 102.4% |
| 5.0 Years | 11.3% | 15.5% | 19.3% | 30.4% | 30.1% | 97.9% |

| | |
|---|---|
| **Concluded Volatility** | **15.0%** |

*Source: Yahoo Finance*

Charitable DAF HoldCo, Ltd
Discount for Lack of Marketability (DLOM) Analysis

Schedule C.3
Valuation Date: December 31, 2023

*DLOM Determination - Restricted Stock Studies*

| | Restricted Stock Studies | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd** | **Schedule C.4**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: December 31, 2023**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies after 1997 and before 2008** | | |
| **Low** | **9.7%** | **9.0%** |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 2008** | | |
| **Low** | **10.9%** | **9.3%** |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **9.7%** | |

**Charitable DAF HoldCo, Ltd** — **Schedule C.5**

**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: December 31, 2023**

*DLOM Conclusion*

| Discount for Lack of Marketability | | |
|---|---|---|
| DLOM Determination - Put Option Approach | 3.3% | *Schedule C.1* |
| DLOM Determination - Restricted Stock Studies | 9.7% | *Schedule C.4* |
| **Concluded Discount for Lack of Marketability** | **6.5%** | |

# VALUATION ANALYSIS OF 100 PARTICIPATION SHARES OF CHARITABLE DAF HOLDCO, LTD

AS OF
SEPTEMBER 30, 2024

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

January 7, 2025

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

***RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[1] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

---

1 The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[2] The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of September 30, 2024
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd
- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope, Inc.

ValueScope, Inc.

## TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW ... 1**

DESCRIPTION OF THE ASSIGNMENT ... 1
SCOPE ... 1
PROCEDURES ... 1

**DAF OVERVIEW ... 2**

COMPANY OVERVIEW ... 2
SUBJECT INTEREST OVERVIEW ... 2
HISTORICAL FINANCIAL ANALYSIS ... 2

**ECONOMIC AND INDUSTRY OVERVIEW ... 4**

OVERVIEW OF THE U.S. ECONOMY ... 4
OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY ... 12

**VALUATION METHODOLOGY ... 15**

VALUATION APPROACHES ... 15
VALUATION METHODS ... 16
SUMMARY OF THE VALUATION APPROACHES AND METHODS ... 16

**VALUATION ANALYSIS ... 17**

ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE ... 17

**CONCLUSION OF VALUE - SUBJECT INTEREST ... 19**

DISCOUNT FOR LACK OF CONTROL ... 19
DISCOUNT FOR LACK OF MARKETABILITY ... 19
CONCLUSION - SUBJECT INTEREST VALUE ... 21

**ASSUMPTIONS AND LIMITING CONDITIONS ... 23**

**APPRAISAL CERTIFICATION ... 28**

# TABLE OF SCHEDULES

**HISTORICAL VALUATION SUMMARY** ........ **SUMMARY 1**

**CURRENT VALUATION SUMMARY** ........ **SUMMARY 2**

**DAF NET ASSET VALUE ANALYSIS** ........ **A**

CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........ A.1
CHARITABLE DAF HOLDCO, LTD - SUMMARY BALANCE SHEET ........ A.2

**DISCOUNT FOR LACK OF CONTROL (DLOC) ANALYSIS** ........ **B**

CLOSED-END FUND DATA - INVESTMENT GRADE BOND FUNDS ........ B.1
CLOSED-END FUND DATA - US GENERAL EQUITY FUNDS ........ B.2
DLOC CONCLUSION ........ B.3

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ........ **C**

DLOM DETERMINATION - PUT OPTION APPROACH ........ C.1
PUT OPTION APPROACH - HISTORICAL VOLATILITY SUMMARY ........ C.2
DLOM DETERMINATION - RESTRICTED STOCK STUDIES ........ C.3
DLOM DETERMINATION - RESTRICTED STOCK STUDIES SUMMARY STATISTICS ........ C.4
DLOM CONCLUSION ........ C.5

# ENGAGEMENT OVERVIEW

## DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[3] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

## SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Company's financial position. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion and reconciliation of the fair market value of the Subject Interest.

## PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

3 The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

## DAF OVERVIEW[4]

### COMPANY OVERVIEW

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law"). As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.

### SUBJECT INTEREST OVERVIEW

Based on information provided by the Company's management ("Management"), the Subject Interest shares are participation shares that from time to time are expected to receive cash distributions to fulfill certain charitable and expense goals of the owners of the participation shares. The Subject Interest shares are directly affected by the terms of the DAF Agreement and the actions of DAF's directors. According to the DAF Agreement, the appointed directors control the business, affairs, and power of the Company (Sections 72 and 77), including the issuance and purchase of shares on such terms and in such manner as the director determines (Sections 7-10). Director consent is also required for shareholders to transfer their interests in DAF (Section 18). Finally, although shareholders may determine the timing and amounts of dividends (Section 100), no dividend can exceed an amount approved by the directors (Section 101).

### HISTORICAL FINANCIAL ANALYSIS

We were provided with the Company's balance sheet as of September 30, 2024. These financial statements reflect various professional valuations of DAF's ultimate underlying assets.

As reported as of the Valuation Date, DAF's sole asset consisted of 100% of the equity of CLO HoldCo, Ltd ("CLO HoldCo"). CLO HoldCo is a holding company which invests in CLOs and other various investments. The net asset value for CLO HoldCo was reported as

---

4 Based on the Company's memorandum and articles of association and information from management.

$269.1 million. DAF reported no liabilities as of the Valuation Date. As a result, DAF's book equity as of the Valuation Date was determined to equal $269.1 million.

DAF's balance sheet as of the Valuation Date is presented in Schedule A.2.

## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

In the second quarter of 2024, the US economy experienced positive growth that surpassed the pace of the first quarter. Inflation has moderated significantly from its peak of 8.99% in June 2022 to 2.59% by August 2024, reflecting progress toward the Federal Reserve's inflation target. After an extended period of elevated interest rates to curb inflation, recent data pointed to a cooling labor market and continued price stability, prompting the Fed to cut rates by 50 basis points. The steady rate hikes initiated in 2023 led to an inverted yield curve, suggesting investor expectations of an economic slowdown. Nevertheless, US stock markets have gained momentum, with indices closing higher year-over-year, supported by declining inflation and anticipated further monetary easing.

### Gross Domestic Product[5]

Real gross domestic product (GDP) increased at an annual rate of 3.0 percent in the second quarter of 2024, following an increase of 1.6 percent in the first quarter. The acceleration in real GDP in the second quarter primarily reflected accelerations in consumer spending, private inventory investment, and nonresidential fixed investment. These movements were partly offset by a deceleration in residential fixed investment. Imports increased.




[5] U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Second Quarter 2024. (Release Date: 9/26/2024).

***Population***

Population growth is an important driver of long-term growth in an economy. The total population increased from 335.4 million in August 2023 to 337.2 million in August 2024.[6] The working-age population (15-64) increased from 208.7 million in August 2023 to 208.9 million in August 2024.[7]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward/flat. In August 2023, the civilian labor force participation rate was 62.8% and stands at 62.7% as of August 2024.[8]







6 U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

7 Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

8 U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

### *Employment*

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 142,000 in August 2024 and the unemployment rate increased slightly to 4.2 percent. Job gains occurred in construction and healthcare.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.1% in August 2023 to 7.9% in August 2024.[9]







Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will be 4.2% for both 2026 and 2027.

9 U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

### *Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.2 percent in August on a seasonally adjusted basis, after the same increase in July. Over the last 12 months, the all-items index increased 2.5 percent before seasonal adjustment.[10]

The index for shelter rose 0.5 percent in August and was the main factor in the all items increase. The food index increased 0.1 percent in August, after rising 0.2 percent in July. The index for food away from home rose 0.3 percent over the month, while the index for food at home was unchanged. The energy index fell 0.8 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, August 2023, declining from 88.97% to 24.05% in August 2024[11].The forecasters predict current-quarter headline CPI inflation will average 2.3 percent at an annual rate, down from the prediction of 2.8 percent in the previous survey[12].




10 Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

11 Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

12 Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* August 9, 2024.

### *Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.32% as of September 29, 2023, to 4.52% as of September 30, 2024.[13] The interest rate on the ten-year Treasury note declined from 4.59% as of September 29, 2023, to 3.81% as of September 30, 2024.[14]




The interest rate on Moody's Aaa-rated corporate bonds declined from 5.36% as of September 29, 2023, to 4.72% as of September 30, 2024.[15] The interest rate on the Moody's Baa-rated corporate bonds declined from 6.37% to 5.44% over the same time.[16]




---

13 Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

14 Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

15 Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last October 7, 2024.

16 Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

In the last twelve months, the yield curve remained inverted, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing/flattening between September 29, 2023, to September 30,2024 from -0.54% to 0.21%.[17]




***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) increased $132.4 billion in the second quarter of 2024 from the first quarter of 2024.




[17] U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed October 7, 2024.

***Stock Markets*[18]**

The stock markets gained momentum from September 29, 2023, to September 30, 2024. The S&P 500 Index (SPY) closed at 427.48 on September 29, 2023, and closed higher at 573.76 on September 30, 2024. The NASDAQ Composite Index (QQQ) closed at 334.95 on September 29, 2023, and closed higher at 423.12 on September 30, 2024. The Dow Jones Industrial Average Index (DIA) closed at 358.27 on September 29, 2023 and closed higher at 488.07 on September 30, 2024. In the graph below, the September 30, 2022, values were set to 100.




***Construction & Housing Starts***

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts increased from 1.305 million units in August 2023 to 1.356 million units in August 2024.[19] Construction spending, a seasonally adjusted annual figure, increased from $2.05 trillion in August 2023 to $2.13 trillion in August 2024.[20]

---

18 CapIQ Database, last accessed October 7, 2024.

19 U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

20 U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.




***Consumer Confidence***

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has decreased from 69.40 a year ago in August 2023 to 67.90 in August 2024. Although it has declined slightly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[21] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.




[21] University of Michigan, *Surveys of Consumers*, September 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[22]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### *Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset-management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite challenges posed by the COVID-19 pandemic in 2020 and 2021. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated, and businesses pivoted their strategies due to the unprecedented nature of the crisis. In the past five years, industry revenue grew at a CAGR of 4.0% to $312.2 billion, including 5.2% in 2024 alone, when profit will increase to 48.9%.

Industry revenue will grow at a CAGR of 4.2% to $383.6 billion over the five years to 2029, when profit will rise to 50.5%. The Federal Reserve is increasing interest rates to quell historically high inflation. These higher interest rates are reducing liquidity in the markets. Private equity firms and hedge funds will have more difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

### *Industry Performance*

The Federal Reserve has increased interest rates to combat rampant inflation, which has surged due to persistent supply chain issues and a global energy crisis. After lowering

[22] IBISWorld Industry Report 52599, July 2024, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

rates to historic lows in response to the COVID-19 pandemic, the Fed began raising them in 2022, with the current target rate ranging from 5.25% to 5.50%. These higher rates are reducing liquidity in financial markets, compelling private equity and hedge funds to seek new methods of raising capital, while those unable to adapt are exiting the industry. The previous decade's low-interest-rate environment had been advantageous for these investment vehicles, as it led investors to shift away from fixed-income and credit securities in favor of potentially higher returns. With more accessible funds during that period, fundraising activity surged, and those who capitalized on lower rates are currently benefiting from reduced interest payments and enhanced returns.

Simultaneously, there is a growing interest in Environmental, Social, and Governance (ESG) factors among investors who wish to align their investments with their values. This shift has led private equity firms and hedge fund managers to increasingly incorporate ESG considerations into their investment strategies. For instance, investments are now evaluated for their long-term environmental impact. Investors are also demanding that companies disclose information about their environmental and social performance. In response, private equity firms and hedge funds are diversifying their workforces and integrating ESG principles into their organizational frameworks.

Moreover, minority stakes are becoming more common in private equity firms. As internal competition intensifies, firms are diversifying their investments and establishing smaller, targeted funds, driven by a decrease in liquidity. The significant volatility in prominent markets like the S&P 500 during the COVID-19 pandemic encouraged companies to acquire minority stakes either in other companies or investments. There is a trend towards large private equity groups acquiring minority stakes in one another, as firms seek creative strategies to unlock potential investments. Changes in management types, with CEOs preferring to retain control while leveraging private equity expertise for growth, have also contributed to this trend.

Finally, technology and data analytics are increasingly being utilized by private equity firms and hedge funds to enhance their investment processes. These firms are employing machine learning algorithms to analyze vast amounts of data—such as financial statements, news articles, and social media posts—to uncover trends and insights not immediately visible to human analysts. Additionally, some are automating back-office functions like accounting and compliance using artificial intelligence (AI), which improves task processing and operational efficiency.

### *Industry Outlook*

The Federal Reserve's ongoing battle against inflation is likely to result in volatile interest rates in the near future. As inflation continues to affect the U.S. economy, the Fed has signaled that it may maintain or further increase interest rates if necessary. These higher rates will reduce market liquidity, making it more challenging for hedge funds and private

equity firms to raise capital. Firms that cannot adapt may be forced out of the industry. Typically, investors turn to lower-risk investments, such as bonds, when interest rates are high, which will pose significant obstacles for the industry due to decreased liquidity and shifting investor preferences. Consequently, hedge funds and private equity firms will need to be more strategic and innovative in finding profitable investments as liquidity tightens.

At the same time, there is a sustained interest in Environmental, Social, and Governance (ESG) factors. Investors are increasingly concerned about the impact of their investments on the environment and society, seeking to align their portfolios with their values. Private equity firms and hedge fund managers are expected to continue integrating ESG considerations into their investment strategies, with climate change effects increasingly influencing investment decisions across various sectors. As environmental conditions worsen, the importance of selecting investments that contribute positively to the environment will grow. Additionally, as the population becomes more diverse, there is an expectation for hedge funds and private equity firms to reflect this diversity in their operations.

The use of technology and data analytics by private equity firms and hedge funds is expected to expand further. These firms will increasingly rely on advanced technology to identify and evaluate potential investments, and to manage and monitor existing portfolios. With the growing dependence on technology, cybersecurity will become increasingly critical, prompting firms to invest more in securing their technological networks. As artificial intelligence (AI) evolves, it will enable hedge funds and private equity firms to analyze extensive data sets in real-time, facilitating more informed trading and investment decisions. Given that data is now considered a crucial asset, industry players will use improved tools to access and analyze data, aiming to discover new investment opportunities.

Moreover, fintech is emerging as an attractive investment area for private equity, hedge funds, and investment vehicles. The rapidly growing fintech and biotechnology sectors, though currently constrained, are poised for future expansion and will likely attract increased investment. The proximity of Silicon Valley and Wall Street offers industry players easy access to cutting-edge technological innovations and robust financial networks, enhancing their ability to invest in promising new ideas. As the distinction between Silicon Valley and Wall Street continues to blur, private equity firms and hedge funds that can sift through the hype to find valuable opportunities will be well-positioned in the evolving fintech landscape.

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

### VALUATION APPROACHES

#### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

#### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

#### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1. Discounted Cash Flow Method (multi-period model)
2. Direct Capitalization Method (single period model)
3. Excess Earnings Method

B. Market Approach
1. Guideline Public Company Method
2. Merger and Acquisition Method

C. Asset-Based Approach
1. Reproduction Cost Method
2. Replacement Cost Method
3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

## VALUATION ANALYSIS

### ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE

DAF's ultimate holdings are interests in various investment assets. DAF's sole asset reported as of the Valuation Date consisted of 100% of the equity of CLO HoldCo. CLO HoldCo is a holding company which invests in CLOs and other investments. We relied upon DAF management's determination of CLO HoldCo's NAV based on the values of its various underlying investments and assets. CLO HoldCo's balance sheet as of the Valuation Date is shown in the following charts and in Schedule A.1.

As shown below, CLO HoldCo's primary assets consist of cash & cash equivalents and other investment investments[23]. CLO HoldCo reported $316.3 million in total assets. CLO HoldCo also reported $47.2 million in total liabilities as of the Valuation Date. Therefore, CLO HoldCo's equity can be reasonably stated as $269.1 million.

***CLO HoldCo, Ltd - Summary Balance Sheet***

| | Balance Sheet as of: | |
|---|---|---|
| | 9/30/2024 | |
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

23 Other investments consist of investments in approximately 39 entities.

### *DAF NAV Conclusion*

As of the Valuation Date, DAF's balance sheet consisted solely of a 100% ownership interest in CLO HoldCo's equity. Therefore, DAF's NAV can be reasonably stated as $269.1 million (rounded). This analysis is summarized in the following table and in Schedule A.2.

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

## CONCLUSION OF VALUE - SUBJECT INTEREST

DAF's NAV was determined to equal $269.1 million as of the Valuation Date. Dividing this NAV by the 305 total participation shares outstanding results in a NAV per share of $882,140. However, sellers of fractional interests in holding companies rarely receive a price equal to the NAV of their investment. This is because the interest holders do not have direct control over the entity's assets and have a limited market for their interests. Therefore, in order to arrive at the fair market value of the Subject Interest shares that are the subject of this analysis, we applied relevant discounts (control and marketability).

### DISCOUNT FOR LACK OF CONTROL

Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Due to the Company's ultimate holdings in debt and equity investments, the Company exhibits some of the characteristics of a closed-end fund. Closed-end funds, like open-ended mutual funds, are asset holding companies that typically hold a portfolio of publicly traded securities. However, unlike unit holders in open-ended funds, closed-end fund unit holders who wish to liquidate their investment cannot look to the fund to repurchase their shares. Rather, they must sell them on the open market. The price they receive is not usually equal to the fundamental or net asset value of the investment. Therefore, the fair market value of closed-end funds is generally described in terms of a discount or premium to net asset value.

To align with the Company's holdings, we selected closed-end fund data from investment grade bond funds and general equity funds. The investment grade bond fund data shown in Schedule B.1 indicated mean and median discounts of 2.9% and 2.5%, respectively. The general equity fund data shown in Schedule B.2 indicated mean and median discounts of 12.1% and 13.6%, respectively. Based on these indications, we selected a discount for lack of control of 8.1% to be applicable to the Subject Interest, as shown in Schedule B.3.

### DISCOUNT FOR LACK OF MARKETABILITY

Discounts for lack of marketability (DLOMs) are applied to the shares of private companies based on the premise that an asset or interest in an entity without a readily available market would sell for less to a hypothetical buyer than an identical asset or interest that is readily marketable. Several factors are widely recognized to affect

marketability, such as distributions or dividends, investment performance, holding period to complete a sale, and management performance, among others. We utilized two methods of quantifying a relevant DLOM: the put option approach and an analysis of restricted stock studies.

***Put Option Approach***

The price of a contract providing the right to sell a number of shares (a put option) represents the difference between the non-marketable and marketable price of an asset. For example, if a holder of restricted or non-marketable stock purchases a put option on the underlying asset, the holder would be purchasing marketability. The price of the put determines the size of the DLOM.

In order to determine the price of such a put, we utilized the Black-Scholes put option model.[24] Based on our analysis, we determined that an appropriate volatility for investment grade bond funds and general equity bond funds such as DAF is approximately 12.3% (Schedule C.2) and between one half and one year (averaged to 0.75 years) would be required to sell the Subject Interest in an orderly transaction. As a result of these inputs, the put option approach indicated a discount for lack of marketability of 2.8%. This DLOM indication is presented in Schedule C.1.

***Restricted Stock Study Analysis***

There are several studies that attempt to measure discounts for lack of marketability, and a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.[25] As mentioned, we would expect between six months and one year to be required to sell the Subject Interest in an orderly transaction.

Schedule C.4 presents a summary of restricted stock studies performed involving issuances of shares during the time period 1997 through 2008, which is when the SEC-mandated lock-up period for restricted stocks was one year. Based on a range of low discounts of 9.0%-10.9%, we selected a 9.7% DLOM utilizing the findings of the restricted stock studies.

***DLOM Conclusion***

The put option approach in Schedule C.1 indicated a DLOM of 2.8%. The restricted stock study analysis in Schedule C.4 indicated a DLOM of 9.7%. Based on these indications, we

---

24 Black, F. and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, May 1973

25 See Schedule C.3

concluded a discount for lack of marketability of 6.3%. This conclusion is presented in Schedule C.5.

**CONCLUSION - SUBJECT INTEREST VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

Our conclusion of value is presented in Summary Schedule 2 as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this

report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, Inc. is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated; they should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Neither the valuation report, nor its contents, nor any reference to the appraiser or ValueScope, Inc. may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties without our prior written consent. In addition, except as set forth in the report, our analysis and report are not intended for general circulation or publication, nor are they to be reproduced or distributed to third parties without our prior written consent. Notwithstanding the foregoing, ValueScope, Inc. permits the Company to distribute this Report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, and we shall have no responsibility for any such unauthorized change.

The valuation may not be used in conjunction with any other appraisal or study. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The appraisal was prepared solely for the purpose, function, and party so identified in the report. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of ValueScope, Inc.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, Inc. must be made in advance. ValueScope, Inc. reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO CONSIDERATION IS RENDERED AS TO THE LAW OF THE CAYMAN ISLANDS**

No consideration is rendered as to the law of the Cayman Islands. Implications of Cayman Island jurisdiction are not considered.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation

guidelines.

**REGULATORY AND ENVIRONMENTAL CONSIDERATIONS**

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

**POTENTIAL FUTURE SALES**

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.
2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.
3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.
4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.
5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.
6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.
7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.
8. This report and analysis were prepared under the direction of Steven C. Hastings.
9. I am in compliance with all professional appraisal certifications and licensing.
10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By: ValueScope, Inc.



Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, Inc.

## APPENDIX: QUALIFICATIONS OF THE APPRAISER

***Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA***
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*2006 – Present* *ValueScope, Inc.*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006 *Value Capital, LLC*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000* *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was instrumental in assisting the Savings and Loan Department in writing new Mortgage

Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001* *MedCare Financial Solutions, Inc.*

*President*
Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994 *H.D. Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986 *Arthur Andersen & Co.*

*Senior Manager*
Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona
Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.

- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015

- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.

- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*

- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*

- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.

- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.

- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.

- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.

- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.

- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

**Charitable DAF HoldCo, Ltd**
**Table of Contents** **Valuation Date: September 30, 2024**

## Table of Contents


| Schedule Name | Schedule |
|---|---|
| **Historical Valuation Summary** | Summary Schedule 1 |
| **Current Valuation Summary** | Summary Schedule 2 |
| **DAF Net Asset Value Analysis** | |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.1 |
| Charitable DAF HoldCo, Ltd - Summary Balance Sheet | Schedule A.2 |
| **Discount for Lack of Control (DLOC) Analysis** | |
| Closed-End Fund Data - Investment Grade Bond Funds | Schedule B.1 |
| Closed-End Fund Data - US General Equity Funds | Schedule B.2 |
| DLOC Conclusion | Schedule B.3 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Put Option Approach | Schedule C.1 |
| Put Option Approach - Historical Guideline Company Volatility Summary | Schedule C.2 |
| DLOM Determination - Restricted Stock Studies | Schedule C.3 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.4 |
| DLOM Conclusion | Schedule C.5 |

**Charitable DAF HoldCo, Ltd**
**Historical Valuation Summary**

**Summary Schedule 1**
**Valuation Date: September 30, 2024**

| | For the Quarter Ended: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **9/30/2022** | **12/31/2022** | **3/31/2023** | **6/30/2023** | **9/30/2023** | **12/31/2023** | **3/31/2024** | **6/30/2024** | **9/30/2024** |
| Company Net Asset Value (NAV) | $289,502,301 | $276,241,856 | $275,227,939 | $270,414,002 | $288,884,011 | $277,573,090 | $272,449,558 | $270,432,538 | **$269,052,808** |
| Discount for Lack of Control | 8.0% | 8.7% | 7.8% | 11.6% | 13.9% | 8.0% | 8.7% | 9.7% | 8.1% |
| Discount for Lack of Marketability | 7.0% | 7.3% | 7.1% | 6.6% | 6.4% | 6.5% | 6.6% | 6.2% | 6.3% |
| Combined Discount | 14.4% | 15.4% | 14.3% | 17.4% | 19.4% | 14.0% | 14.7% | 15.3% | 13.9% |
| **FMV of Subject Interest (Per 100 Shares)** | $81,212,514 | $76,654,941 | $77,292,849 | $73,202,932 | $76,331,301 | $78,284,712 | $76,173,502 | $75,101,687 | **$75,961,370** |

012609



CONFIDENTIAL

**Charitable DAF HoldCo, Ltd**
**Current Valuation Summary**

**Summary Schedule 2**
**Valuation Date: September 30, 2024**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **<u>Applicable Discounts</u>** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

| Charitable DAF HoldCo, Ltd<br>DAF Net Asset Value Analysis | Schedule A.1<br>Valuation Date: September 30, 2024 |
|---|---|

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. (Participation Rights) | 69,385 | 0.0% |
| MidWave Common | 1,640,571 | 0.5% |
| MidWave - Term Loan A | 85,552,571 | 27.1% |
| MidWave - Term Loan C | 40,174 | 0.0% |
| NexPoint Capital, Inc. (BDC) | 14,223,433 | 4.5% |
| NexPoint Real Estate Strategies Fund Z | 8,487,030 | 2.7% |
| NexPoint Real Estate Finance (NREF) | 6,174,381 | 2.0% |
| NexPoint Residential (NXRT) | 2,338,207 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 2,331,025 | 0.7% |
| Small Bay II (Class I) | 3,770,609 | 1.2% |
| Small Bay II (Class II) | 4,047,276 | 1.3% |
| Small Bay II (Class III) | 2,357,682 | 0.7% |
| Polo Glen | 678,545 | 0.2% |
| NHT Holdco | 109,056 | 0.0% |
| ACHC | 158,525 | 0.1% |
| COLL | 115,804 | 0.0% |
| HRTX | 10,945 | 0.0% |
| ACRG/AU | 3,267 | 0.0% |
| ACRG/BU | 1,409 | 0.0% |
| TGTX | 333,308 | 0.1% |
| TMO | 282,686 | 0.1% |
| BIO | 111,081 | 0.0% |
| iHeart Communications | 365 | 0.0% |
| Multi Strat | 107,324 | 0.0% |
| Crusader Fund II, Ltd. | 38,131 | 0.0% |
| BVP Property | 94,000 | 0.0% |
| NCI Apache Trail | 1,104,000 | 0.3% |
| NCI Fort Worth Land | 874,200 | 0.3% |
| NCI Royse City Land | 11,448,367 | 3.6% |
| NCI Stewart Creek | 1,250,000 | 0.4% |
| NLA Assets | 1,766,000 | 0.6% |
| FFWM | 2,541,184 | 0.8% |
| SRG | 139,500 | 0.0% |
| SRTY | 2,380,529 | 0.8% |
| SQQQ | 1,818,805 | 0.6% |
| SPXU | 2,174,013 | 0.7% |
| Serengetti | 2,951,678 | 0.9% |
| Conservation Equity Fund | 3,253,139 | 1.0% |
| MMPQ | 527,460 | 0.2% |
| Total Wire Convertible Promissory Note | 20,560 | 0.0% |
| Sable Permian Resources | 2 | 0.0% |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**Charitable DAF HoldCo, Ltd** | **Schedule A.2**
**DAF Net Asset Value Analysis** | **Valuation Date: September 30, 2024**

*Charitable DAF HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

**Charitable DAF HoldCo, Ltd** — **Schedule B.1**

**Discount for Lack of Control (DLOC) Analysis** — **Valuation Date: September 30, 2024**

*Closed-End Fund Data - Investment Grade Bond Funds*

| Closed-End Fund Data - Investment Grade Bond Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| BKT | BlackRock Income Trust, Inc. | $12.65 | $12.43 | (1.7%) |
| FMY | First Trust Mortgage Income Fund | $13.05 | $12.49 | (4.3%) |
| VBF | Invesco Bond Fund | $16.87 | $17.01 | 0.8% |
| VLT | Invesco High Income Trust II | $11.74 | $11.53 | (1.8%) |
| JLS | Nuveen Mortgage and Income Fund | $19.54 | $18.43 | (5.7%) |
| JMM | Nuveen Multi-Market Income Fund | $6.68 | $6.36 | (4.8%) |
| DMO | Western Asset Mortgage Opportunity Fund Inc. | $12.28 | $11.97 | (2.5%) |

| Summary Statistics | |
|---|---|
| **Mean Premium (Discount)** | **(2.9%)** |
| **Median Premium (Discount)** | **(2.5%)** |
| **Standard Deviation** | **2.2%** |

*Sources: CEF Connect as of market close September 30, 2024*

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Control (DLOC) Analysis**

**Schedule B.2**
**Valuation Date: September 30, 2024**

*Closed-End Fund Data - US General Equity Funds*

| Closed-End Fund Data - US General Equity Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| ADX | Adams Diversified Equity Fund, Inc. | $24.31 | $21.56 | (11.3%) |
| BIGZ | BlackRock Innovat and Growth Term Trust | $8.54 | $7.55 | (11.6%) |
| CET | Central Securities Corp. | $56.17 | $45.84 | (18.4%) |
| CRF | Cornerstone Total Return Fund | $6.85 | $8.09 | 18.1% |
| GRF | Eagle Capital Growth | $12.03 | $9.88 | (17.9%) |
| FXBY | FOXBY Corp | $27.70 | $16.00 | (42.2%) |
| GDV | Gabelli Dividend & Income | $28.46 | $24.45 | (14.1%) |
| GAM | General American Investors | $62.92 | $53.61 | (14.8%) |
| USA | Liberty All-Star Equity | $7.17 | $7.10 | (1.0%) |
| ASG | Liberty All-Star Growth | $6.03 | $5.61 | (7.0%) |
| JCE | Nuveen Core Equity Alpha | $15.21 | $15.37 | 1.1% |
| RMT | Royce Micro-Cap Trust | $10.84 | $9.61 | (11.3%) |
| STEW | SRH Total Return Fund | $20.51 | $15.80 | (23.0%) |
| SPE | Special Opportunities | $16.37 | $13.91 | (15.0%) |
| FUND | Sprott Focus Trust | $8.91 | $7.70 | (13.6%) |

| Summary Statistics | |
|---|---|
| **Mean Premium (Discount)** | **(12.1%)** |
| **Median Premium (Discount)** | **(13.6%)** |
| **Standard Deviation** | **13.0%** |

*Sources: CEF Connect as of market close September 30, 2024*

**Charitable DAF HoldCo, Ltd** — **Schedule B.3**

**Discount for Lack of Control (DLOC) Analysis** — **Valuation Date: September 30, 2024**

*DLOC Conclusion*

| Discount for Lack of Control Conclusion | | |
|---|---|---|
| DLOC Determination - Closed End Bond Funds (Mean) | 2.9% | *Schedule B.1* |
| DLOC Determination - Closed End Bond Funds (Median) | 2.5% | *Schedule B.1* |
| DLOC Determination - Closed End Equity Funds (Mean) | 12.1% | *Schedule B.2* |
| DLOC Determination - Closed End Equity Funds (Median) | 13.6% | *Schedule B.2* |
| **Concluded Discount for Lack of Control** | **8.1%** | |

**Charitable DAF HoldCo, Ltd** — **Schedule C.1**
**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: September 30, 2024**

*DLOM Determination - Put Option Approach*

## Discount for Lack of Marketability - Put Option Approach

**Option-Pricing Inputs:**

| | | | |
|---|---|---|---|
| Stock Price | **S** | $1.00 | |
| Strike Price | **X** | $1.00 | *(Set to same as stock price)* |
| Expected Life | **T** | 0.75 | *(Years)* |
| Volatility | **s** | 12.3% | *Schedule C.2* |
| Risk-free rate | **R** | 4.18% | *US Treasury Implied Yield for Expected Life* |
| Dividend Yield | **Q** | 0.00% | * |

| *Intermediate Calculations:* | | *Intermediate Calculations:* | |
|---|---|---|---|
| *d1* | *0.34756838* | *-d1* | *-0.34756838* |
| *d2* | *0.24104726* | *-d2* | *-0.24104726* |
| *N(d1)* | *0.63591782* | *N(d1)* | *0.36408218* |
| *N(d2)* | *0.59524076* | *N(d2)* | *0.40475924* |
| Black-Scholes Call Option Price | $0.06 | Black-Scholes Put Option Price | $0.03 |

| | |
|---|---|
| **Implied Discount for Lack of Marketability (DLOM)** | **2.8%** |

** Distributions not expected in the near future*

012616

**Charitable DAF HoldCo, Ltd** — **Schedule C.2**
**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: September 30, 2024**

*Put Option Approach - Historical Guideline Company Volatility Summary*

| Historical Volatility Term | Bond Funds | | | | | Equity Funds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | BKT | FMY | JMM | JLS | VBF | FXBY | GRF | EQS | SPE | RVT |
| 0.5 Years | 10.1% | 10.8% | 9.5% | 9.0% | 8.3% | 20.9% | 16.6% | 43.0% | 11.6% | 20.3% |
| 1 Year | 12.3% | 13.7% | 9.9% | 12.0% | 13.0% | 20.7% | 20.2% | 41.7% | 11.4% | 20.1% |
| 1.5 Years | 11.5% | 13.2% | 10.3% | 11.0% | 12.3% | 25.9% | 23.0% | 42.1% | 10.7% | 19.3% |
| 2 Years | 11.8% | 15.3% | 12.5% | 11.0% | 14.4% | 25.6% | 28.6% | 48.3% | 12.3% | 21.7% |
| 2.5 Years | 12.7% | 15.1% | 13.3% | 11.3% | 14.8% | 25.8% | 32.2% | 48.6% | 13.6% | 23.8% |
| 3 Years | 12.6% | 14.8% | 13.4% | 11.2% | 14.2% | 27.4% | 32.2% | 47.4% | 13.6% | 23.8% |
| 3.5 Years | 12.3% | 14.1% | 12.8% | 10.8% | 13.8% | 113.1% | 30.2% | 45.4% | 13.3% | 22.9% |
| 4 Years | 11.8% | 13.9% | 12.6% | 10.6% | 13.7% | 106.5% | 29.2% | 51.4% | 13.4% | 22.7% |
| 4.5 Years | 11.5% | 13.8% | 14.2% | 12.3% | 14.0% | 101.9% | 29.4% | 52.7% | 15.9% | 24.1% |
| 5.0 Years | 11.8% | 14.5% | 16.6% | 15.9% | 15.5% | 97.5% | 30.1% | 53.5% | 22.0% | 27.6% |

| Historical Volatility Term | Statistical Summary | | | | | |
|---|---|---|---|---|---|---|
| | Low | 25th % | Median | Mean | 75th % | High |
| **0.5 Years** | 8.3% | 9.6% | **11.2%** | 16.0% | 19.4% | 43.0% |
| **1 Year** | 9.9% | 12.0% | **13.3%** | 17.5% | 20.1% | 41.7% |
| 1.5 Years | 10.3% | 11.1% | 12.8% | 17.9% | 22.1% | 42.1% |
| 2 Years | 11.0% | 12.3% | 14.8% | 20.1% | 24.6% | 48.3% |
| 2.5 Years | 11.3% | 13.4% | 15.0% | 21.1% | 25.3% | 48.6% |
| 3 Years | 11.2% | 13.5% | 14.5% | 21.1% | 26.5% | 47.4% |
| 3.5 Years | 10.8% | 13.0% | 14.0% | 28.9% | 28.3% | 113.1% |
| 4 Years | 10.6% | 12.8% | 13.8% | 28.6% | 27.6% | 106.5% |
| 4.5 Years | 11.5% | 13.9% | 15.0% | 29.0% | 28.1% | 101.9% |
| 5.0 Years | 11.8% | 15.6% | 19.3% | 30.5% | 29.5% | 97.5% |

| Concluded Volatility | 12.3% |
|---|---|

*Source: Yahoo Finance*

**Charitable DAF HoldCo, Ltd** **Schedule C.3**
**Discount for Lack of Marketability (DLOM) Analysis** **Valuation Date: September 30, 2024**

*DLOM Determination - Restricted Stock Studies*

| | Restricted Stock Studies | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd** — **Schedule C.4**
**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: September 30, 2024**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | Mean | Median |
| **All Studies after 1997 and before 2008** | | |
| **Low** | **9.7%** | **9.0%** |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 2008** | | |
| **Low** | **10.9%** | **9.3%** |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **9.7%** | |
| | | |

**Charitable DAF HoldCo, Ltd** — **Schedule C.5**

**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: September 30, 2024**

*DLOM Conclusion*

| Discount for Lack of Marketability | | |
|---|---|---|
| DLOM Determination - Put Option Approach | 2.8% | *Schedule C.1* |
| DLOM Determination - Restricted Stock Studies | 9.7% | *Schedule C.4* |
| **Concluded Discount for Lack of Marketability** | **6.3%** | |

# VALUATION ANALYSIS OF CERTAIN PARTICIPATION SHARES OF CHARITABLE DAF HOLDCO, LTD

AS OF
MARCH 25, 2025

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

***RE: Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[1]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.

---

[1] Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the DAF will continue as a going concern.[2] The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Participation Shares.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's management shareholder ("Management"). To understand the environment in which DAF operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo, Ltd. as of September 30, 2024
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd, amended and restated as of January 24, 2024

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

- Information regarding the Company's history and current operations
- Historical distributions paid to the holders of the Subject Interest
- The organizational structure chart for Charitable DAF HoldCo, Ltd
- Discussions with the Company's Management
- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024
- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date
- An interview with Management regarding expectations for future distributions
- An application of appropriate valuation techniques and procedures, including the income approach
- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope

ValueScope, LLC

TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW ........ 1**
DESCRIPTION OF THE ASSIGNMENT ........ 1
SCOPE ........ 1
PROCEDURES ........ 1
**DAF OVERVIEW ........ 2**
COMPANY OVERVIEW ........ 2
CAPITALIZATION TABLE ........ 2
COMPANY STRUCTURE CHART ........ 3
FINANCIAL POSITION ........ 3
SUBJECT INTEREST OVERVIEW ........ 6
**ECONOMIC AND INDUSTRY OVERVIEW ........ 8**
OVERVIEW OF THE U.S. ECONOMY ........ 8
OVERVIEW OF THE PRIVATE EQUITY... & INVESTMENT VEHICLES INDUSTRY ........ 16
**VALUATION METHODOLOGY ........ 17**
VALUATION APPROACHES ........ 17
VALUATION METHODS ........ 18
SUMMARY OF THE VALUATION APPROACHES AND METHODS ........ 18
**VALUATION ANALYSIS ........ 20**
INCOME APPROACH ANALYSIS ........ 20
**CONCLUSION OF VALUE - SUBJECT INTEREST ........ 22**
DISCOUNT FOR LACK OF MARKETABILITY ........ 22
PRE-IPO STUDIES ........ 34
APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST ........ 35
DISCOUNT ADJUSTMENT DISCUSSION ........ 36
SUBJECT INTEREST DISCOUNT CALCULATION ........ 37
FAIR MARKET VALUE CONCLUSION ........ 38
**ASSUMPTIONS AND LIMITING CONDITIONS ........ 39**
**APPRAISAL CERTIFICATION ........ 44**

## TABLE OF SCHEDULES

**VALUATION SUMMARY ............ SUMMARY SCHEDULE**

**HISTORICAL FINANCIAL ANALYSIS ............ A**

HISTORICAL DISTRIBUTIONS TABLE ............ A.1
HISTORICAL DISTRIBUTIONS CHARTS ............ A.2
CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ............ A.3

**INCOME APPROACH ............ B**

DISCOUNTED CASH FLOW (DCF) ANALYSIS ............ B.1
SENSITIVITY ANALYSIS – HYPOTHETICAL RISK-FREE BOND ............ B.2

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS ............ C**

RESTRICTED STOCK STUDIES............ C.1
RESTRICTED STOCK STUDIES SUMMARY STATISTICS............ C.2
DLOM QUALITATIVE SCORING ............ C.3
CALCULATION OF MARKETABILITY DISCOUNT............ C.4
DLOM FOOTNOTES AND COMMENTS............ C.5

## ENGAGEMENT OVERVIEW

### DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[3]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

### SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Subject Interest. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

### PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

3 Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

## DAF OVERVIEW

### COMPANY OVERVIEW[4]

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law"). As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities. In recent periods, however, the DAF's underlying assets have been allocated across a broader and more diverse range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

### CAPITALIZATION TABLE

On February 7, 2025, the Company issued 318 participation shares to *DFW Charitable Foundation*, increasing the total number of participation shares to 623, composed of:

- 318 participation shares held by *DFW Charitable Foundation*
- 100 participation shares held by *Highland Dallas Foundation, Inc.*
- 100 participation shares held by *Highland Kansas City Foundation, Inc.*
- 100 participation shares held by *Highland Santa Barbara Foundation, Inc.*
- 5 participation shares held by *The Community Foundation of North Texas*

All the Company's management shares are held by Mark Patrick.

4 Based on the Company's memorandum and articles of association and information from Management.

## COMPANY STRUCTURE CHART




## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million. CLO HoldCo has net assets of $269.1 million on its books as of September 30, 2024. The Balance Sheet is presented below and in Schedule A.3.

## *CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

The Company paid distributions to the Participation Shareholders of $819,050 in 2019, $619,050 in 2020, $834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three quarters of 2024. Fourth quarter distributions were historically larger than in the first three quarters.[5] Historical Distributions are presented in the following charts and in Schedules A.1 and A.2.

5 Distributions are typically paid a few months following the end of a quarter. As a result, fourth quarter distributions may be paid in the first or second quarter of the following calendar year.




Note: Q4 2024 distributions have not yet been paid.



**SUBJECT INTEREST OVERVIEW**

The Subject Interest consists of participation shares, which from time to time may receive discretionary cash distributions intended to support the charitable and expense goals of the holders. The rights and limitations of the participation shares are defined by the DAF Agreement and are directly influenced by the discretion and actions of the Company's Management and directors.

The DAF Agreement grants the directors substantial discretion over distributions, share issuances, governance, and financial transparency, leaving participation shareholders with little influence over corporate decisions. They are subject to potential dilutions, transfer restrictions, and limited access to information, with limited voting rights and no ability to amend governing documents. Given these extensive limitations, the participation shares represent a highly restricted and passive financial interest with limited control or enforceable rights.

***Limited Rights Over Distributions***

Participation shareholders do not have:

- The right to cause, vote on, or receive pro-rata distributions.
- The right to annual, timed, or guaranteed distributions.
- The right to receive notice of distributions made to other participation shareholders.
- The ability to amend the DAF Agreement to modify distribution rights.

***Governance and Voting Limitations***

Participation shareholders do not have:

- The right to remove or appoint directors.
- The right to vote on the issuance of additional participation shares, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of share redemptions.

The appointed directors and Management have full control over the management, operations, and affairs of the Company (subject to requiring a two-thirds majority of the participation shareholders for any material adverse variation or abrogation of rights attached to the participation shares), including the issuance and purchase of shares on terms they determine. Since participation shareholders do not have voting or approval rights over further issuances, additional participation shares may be issued at any time, potentially impacting the economic interests associated with existing shares (noting that

the purchase of participation shares, or issuance of further shares ranking pari passu or subsequent to the participation shares, is not regarded as causing a material adverse variation or abrogation of the rights of the participation shareholders). Additionally, the transfer of participation shares requires director approval, and directors may reject transfer at their discretion.

***Restrictions on Meetings and Information Access***

Participation shareholders do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at the director's sole discretion (or in the very limited circumstances conferred by law).
- The ability to modify or amend the DAF Agreement in any capacity.

***Restricted Persons Clause***

Certain individuals or entities may be classified as Restricted Persons, including:

- Any holder of participation shares in breach of applicable laws.
- Any holder that is not exempt from taxation under Section 501(c)(3).
- Any holder whose participation, in the opinion of the directors, could cause the Company to incur tax, legal, regulatory, administrative, or pecuniary liabilities that it would not otherwise face.

If the directors become aware that any participation shares are held by a Restricted Person, they may, by written notice, require the transfer of such shares in accordance with the DAF Agreement.

For further details, refer to Appendix A for key provisions of the DAF Agreement.

## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter. Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target. After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December. The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election. Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

### Gross Domestic Product[6]

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending. These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.




6 U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

***Population***

Population growth is an important driver of long-term growth in an economy. The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7] The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward/flat. In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]







7 U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

8 Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

9 U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

***Employment***

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]







Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

10 U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### *Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].




---

11 Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

12 Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

13 Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

***Interest Rates***

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14] The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]




The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]




[14] Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[15] Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[16] Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2025.

[17] Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]




***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.




[18] U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2025.

***Stock Markets***[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024. The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024. The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024. In the graph below, the December 30, 2022, values were set to 100.




***Construction & Housing Starts***

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20] Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

---

19 CapIQ Database, last accessed January 10, 2025.

20 U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

21 U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.




### *Consumer Sentiment*

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.




22 University of Michigan, *Surveys of Consumers*, November 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[23]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### *Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

---

23 IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

### VALUATION APPROACHES

#### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

#### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

#### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1. Discounted Cash Flow Method (multi-period model)
2. Direct Capitalization Method (single period model)
3. Excess Earnings Method

B. Market Approach
1. Guideline Public Company Method
2. Merger and Acquisition Method

C. Asset-Based Approach
1. Reproduction Cost Method
2. Replacement Cost Method
3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up. Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.[24]

Given the nature of the participation shares, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[25]

---

24 Previous valuations conducted by ValueScope did not account for the rights of the participation shares under the applicable law, specifically that these shares confer an extremely limited enforceable claim to the entity's underlying NAV.

25 The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the participation shares.

This approach estimates the present value of expected future distributions, if any, based on reasonable assumptions regarding the manager's discretion in making such distributions. If no future distributions are expected, the value of the Subject Interest would be nominal. The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Participation Shares.

## VALUATION ANALYSIS

### INCOME APPROACH ANALYSIS

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits. In the case of the Participation Shares, these economic benefits are exclusively tied to discretionary distributions made by the director, rather than earnings or cash flows of the DAF's underlying assets. The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these payments. The resulting present value represents the fair market value of the Subject Interest.

#### *Discounted Cash Flow Method*

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date. The DCF method projects the distributions that the Participation Shareholders are expected to receive. Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

#### *Projected Distributions*

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions. Management indicated that the timing and size of future distributions will be discretionary, and that DAF does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid over the past 12 to 24 months. We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000. Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

#### *Cost of Equity*

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, extremely limited claim on underlying NAV, and absence of control over distributions. This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature of potential cash flows, significant legal and governance risks, and the

inability to force a sale or liquidity event. The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions. Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

***Conclusion – Income Approach Analysis***

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[26]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows. In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied. Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%. However, this analysis does not reflect the substantial risks associated with the Subject Interest.

26 Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

### CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

### DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity. A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions. These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

***Restricted Stock Studies***

The restricted stock studies reviewed included data from 1966 through 2010. The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity. The restricted stocks were identical to the traded stock except for marketability. A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

**Summary of Restricted Stock Studies**




**SEC Institutional Investor Study**[27]

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969. The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer. The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer. Stocks listed on the major exchanges had lower

[27] U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

discounts than smaller exchanges and over-the-counter stocks. The study found higher discounts for companies with smaller sales and lower earnings.

**Johnson & Racette Study**[28]

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973. The study included 86 observations sent from 75 investment companies that met the selection criteria. Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

**Gelman Study**[29]

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970. The investment companies were formed in 1968 to specialize in restricted securities. A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders. Gelman's analysis found mean and median discounts of approximately 33%. In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

**Trout Study**[30]

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972. Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares. Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

28 Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

29 Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company, "*The Journal of Taxation*, June 1972, 353-354.

30 Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

**Moroney Study**[31]

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972. The study was subsequently published in 1973. The analysis focused on 146 transactions in restricted securities by 10 registered investment companies. The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

**Maher Study**[32]

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976. The study observed discounts for 34 restricted stock transactions from 1966 to 1973. The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

**Standard Research Consultants Study**[33]

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982. The discounts varied from 7% to 91% with a median of 45%. The results of the study tend to suggest higher discounts for companies with smaller revenues.

**Wruck Study**[34]

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample. On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%. The median discount indicated was similar at 12.2%.

---

31 Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

32 J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

33 William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

34 Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

**FMV Opinions Study**[35]

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144. The mean and median discounts were 22.3% and 20.1%, respectively. The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

**Barclay, Holderness, Sheehan Study**[36]

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996. Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management. Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements. In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

**Hertzel & Smith Study**[37]

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987. The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms. While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

35 Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

36 Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

37 Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

### Management Planning Study[38]

Management Planning, Inc. published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H. Meyers, ASA, CFA. They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights. A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|---|---|---|---|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment. Certain factors were also cited by the authors as the most influential in determining discounts. The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

### Hertzel, Lemmon, Linck, Rees Study[39]

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996. A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million. Of the 619 private

---

[38] A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370. Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability*. 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

[39] Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts. The study indicated a mean discount of 16.5% and a median discount of 13.4%.

**Wruck & Wu Study**[40]

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies between 1980 and 1999. 1,976 private placements were selected in the sample. Of these, 1,854 had data for observed discounts. The study found a mean discount of 11.33% and a median discount of 10.96%.

**Angrist, Curtis, Kerrigan (MPI) Study**[41]

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

**Results of Angrist, Curtis, Kerrigan (MPI) Study**

| Period | Observations | Mean Discount | Median Discount |
|---|---|---|---|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

**Willamette Management Associates Study**[42]

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984. There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study. The Willamette study resulted in a mean discount of 31.2%.

---

40 Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.

41 Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.

42 Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

**Silber Study**[43]

William L. Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989. Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%. Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

**Krishnamurthy, et al. Study**[44]

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992. The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined). The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively. The overall mean discount was 19.4%.

**Wu Study**[45]

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004. The study analyzed 301 private placements taking place from 1986 to 1997. Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

**Bajaj Study**[46]

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith. This study analyzed 88 private placements occurring between 1990 and 1995. The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively. The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

[43] William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

[44] Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

[45] Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

[46] Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

**Johnson Study (Business Valuation Review)**[47]

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995. The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%. Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

**Finnerty Study**[48]

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008. The first study focused on private placements from 1991 to 1997 and resulted in mean and median discounts of 26% and 20%, respectively. The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

**Chaplinsky Purchase Discount and Warrant Study**[49]

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms. The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount. The indicated mean discount considering only the purchase discount was 19%, and the median was 15%. The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

**Brophy PIPE Study**[50]

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors. The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

47 Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

48 John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

49 Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

50 David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

**Columbia Financial Advisors Study**[51]

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998. The one-year holding period became effective April 29, 1997. A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

| | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|---|---|---|
| Number of Transactions | 23 | 15 |
| Low | 0.8% | 0.0% |
| Mean | 21.0% | 13.0% |
| Median | N/A | 9.0% |
| High | 67.5% | 30.0% |

**Meidan Study**[52]

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003. The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%. The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample. The weighted average of the mean discounts was calculated as 9.8%.

**Verdasca Study**[53]

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions. The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

51 Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

52 Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

53 Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

**Billett & Floros Study**[54]

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008. These factors were found to both complement and substitute for the other depending on individual circumstances. By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

**Stout Risius Ross Study**[55]

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods. The chosen time period includes transactions both before and after Rule 144 implementation. The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively. Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

**Harris-Trugman Study**[56]

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables. The study originally included 80 transactions of restricted stock sales that took place in 2007-2008. Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011. For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively. The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively. The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively. The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

[54] Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

[55] Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

[56] William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

### Summary of Restricted Stock Studies

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010. Reported mean discounts range from 8.7% to 35.6%. The average of reported mean discounts was 20.8%, while the median was 19.4%. Reported median discounts range from 9.0% to 45.0%. The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed. Prior to April 1997, the SEC-required holding period for restricted stocks was two years. That was decreased to one year on April 29, 1997. Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

**Analysis of Restricted Stock Studies for Different Periods**

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | Mean | Median |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

The studies also cited several company and security specific factors in determining the estimated discount.

**PRE-IPO STUDIES**

In recent years, a number of pre-IPO studies were performed to support marketability discounts. The methodology applied in these studies is based on the initial offering price (the price prior to public trading). This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period. The resulting amount is divided by the initial offering price to arrive at the appropriate discount. The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders. Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

***Emory Studies***

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC. Emory has completed nine studies with the original published in June 1986. The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share. The ninth study deviated from the previous studies as follows:

- Included only companies with “com” in their names
- Review period was increased from 18 months in the previous studies to 35 months
- All transactions were actual sales as opposed to the previous studies that included options
- Most of the companies did not have earnings

The study consisted of 53 transactions. The mean and median discounts by study are presented in the following chart.




### *Willamette Management Associates Pre-IPO Study*

This study observed 556 companies and 1,007 transactions from 1975 through 1997. The adjusted mean discount[57] for each time period varied from 28.9% to 56.8%. The mean for the entire review period was 44.2%. The median discount range was from 31.8% to 73.1% with the overall median at 50.4%. The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

### *Valuation Advisors Pre-IPO Study*

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000. The mean discount of these studies was 48.9%. The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO. The study confirmed the author’s initial hypothesis that higher discounts accompany longer holding periods.

## APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest. The mean and median discounts from the restricted stock studies ranged from 9% to 45%. The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

---

57 Excluded highest and lowest deciles of indicated discounts

The latest restricted stock studies indicate mean and median marketability discounts in 14% range. We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis. Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions. Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company. We did not use these studies for our analysis.

***Factors Affecting Marketability***

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase. We also note that various other factors affected discounts observed in the other studies. Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

**DISCOUNT ADJUSTMENT DISCUSSION**

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section. Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison. Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature. Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest. This results in a range of outputs from -4 to +4

(from significantly worse to significantly better). The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature. An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

## SUBJECT INTEREST DISCOUNT CALCULATION

### *Adjustment Analysis – Marketability*

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile. The Participation Shares have restrictions on the transfer of their shares and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock. Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis. Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

## FAIR MARKET VALUE CONCLUSION

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest. Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated. They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC. Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein. This report may be used alongside other appraisals or studies for comparative or analytical purposes. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

**REGULATORY AND ENVIRONMENTAL CONSIDERATIONS**

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

**POTENTIAL FUTURE SALES**

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.
2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.
3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.
4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.
5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.
6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.
7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.
8. This report and analysis were prepared under the direction of Steven C. Hastings.
9. I am in compliance with all professional appraisal certifications and licensing.
10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By: ValueScope, LLC



Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

**APPENDIX A**
**KEY DAF AGREEMENT PROVISIONS**

1. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restriction whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided. [Paragraph 7, Memorandum]

2. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   a. issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   b. and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued. [Article 7]

3. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, establishing and designated (or re-designated as the case may be) and the variations in the relative rights (including without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligation as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution. [Article 8]

4. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether

absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerages as may be lawful on any issue of Shares. [Article 9]

5. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason. [Article 10]

6. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote in general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles. [Article 12]

7. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes. [Article 13]

8. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares raking *pari passu* with or subsequent to them or the redemption of purchase of any Participating Shares of any Class by the Company. [Article 14]

9. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws. [Article 18]

10. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles. [Article 21]

11. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution. [Article 65]

12. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed. [Article 72]

13. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article. [Article 77]

14. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor. [Article 100]

15. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors. [Article 101]

16. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rate basis as to the paid-up or par value of the Shares. [Article 105]

17. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions and regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors of by Ordinary Resolution. [Article 110]

# APPENDIX B
# QUALIFICATIONS OF THE APPRAISER

***Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA***
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

## EMPLOYMENT HISTORY

*2006 – Present* *ValueScope, LLC*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006 *Value Capital, LLC*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000* *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001* *MedCare Financial Solutions, Inc.*

*President*
Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994 *H.D. Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986 *Arthur Andersen & Co.*

*Senior Manager*
Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.

- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.

- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*

- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*

- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.

- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.

- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.

- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.

- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.

- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

# SCHEDULES

**Charitable DAF HoldCo, Ltd**
**Table of Contents** **Valuation Date: March 25, 2025**

Table of Contents


| Schedule Name | Schedule |
|---|---|
| **Valuation Summary and Conclusion** | Summary Schedule |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| **Income Approach** | |
| Discounted Cash Flow (DCF) Analysis | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discount | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

**Charitable DAF HoldCo, Ltd** | **Summary Schedule**
**Valuation Summary and Conclusion** | **Valuation Date: March 25, 2025**

*Synthesis of Fair Market Value*

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | **Value** | **Reference** |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | **Shares** | **Fair Market Value** |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

**Schedule A.1**
**Valuation Date: March 25, 2025**

*Historical Distributions Table*

| Quarterly Distributions - Previous 5 Years | | | | | |
|---|---|---|---|---|---|
| **Organization** | **Highland Dallas Foundation, Inc.** | **Highland Kansas City Foundation, Inc.** | **Highland Santa Barbara Foundation, Inc.** | **The Community Foundation of North Texas** | **Total** |
| **Holding** | **100 Participation Shares** | **100 Participation Shares** | **100 Participation Shares** | **5 Participation Shares** | **305 Participation Shares** |
| **31-Mar-19** | 39,750 | - | $51,000 | - | $90,750 |
| **30-Jun-19** | 39,438 | - | 50,688 | - | 90,125 |
| **30-Sep-19** | 36,813 | - | 48,063 | - | 84,875 |
| **31-Dec-19** | 231,738 | - | 53,313 | - | 553,300 |
| **2019 Subtotal** | **$347,738** | **$168,250** | **$203,063** | **$100,000** | **$819,050** |
| **31-Mar-20** | 25,750 | - | 37,000 | - | 62,750 |
| **30-Jun-20** | 27,625 | - | 38,875 | - | 66,500 |
| **30-Sep-20** | 27,125 | - | 38,375 | - | 65,500 |
| **31-Dec-20** | 162,738 | 120,250 | 41,313 | 100,000 | 424,300 |
| **2020 Subtotal** | **$243,238** | **$120,250** | **$155,563** | **$100,000** | **$619,050** |
| **31-Mar-21** | 33,188 | - | 44,438 | - | 77,625 |
| **30-Jun-21** | 40,063 | - | 51,313 | - | 91,375 |
| **30-Sep-21** | 43,063 | - | 54,313 | - | 97,375 |
| **31-Dec-21** | 236,513 | 176,250 | 55,313 | 100,000 | 568,075 |
| **2021 Subtotal** | **$352,825** | **$176,250** | **$205,375** | **$100,000** | **$834,450** |
| **31-Mar-22** | 46,438 | - | 57,688 | - | 104,125 |
| **30-Jun-22** | 52,438 | - | 63,688 | - | 116,125 |
| **30-Sep-22** | 50,750 | - | 62,000 | - | 112,750 |
| **31-Dec-22** | 285,013 | 191,750 | 59,188 | 100,000 | 635,950 |
| **2022 Subtotal** | **$434,638** | **$191,750** | **$242,563** | **$100,000** | **$968,950** |
| **31-Mar-23** | 48,313 | - | 59,563 | - | 107,875 |
| **30-Jun-23** | 45,750 | - | 57,000 | - | 102,750 |
| **30-Sep-23** | 47,688 | - | 58,938 | - | 106,625 |
| **31-Dec-23** | 277,741 | 195,712 | 60,178 | 100,000 | 633,631 |
| **2023 Subtotal** | **$419,491** | **$195,712** | **$235,678** | **$100,000** | **$950,881** |
| **31-Mar-24** | 47,608 | - | 58,858 | - | 106,467 |
| **30-Jun-24** | 46,939 | - | 58,189 | - | 105,127 |
| **30-Sep-24** | 47,476 | - | 58,726 | - | 106,202 |
| **31-Dec-24** | **TBD** | **TBD** | **TBD** | **TBD** | **TBD** |
| **2024 Subtotal** | **$142,023** | **$0** | **$175,773** | **$0** | **$317,796** |
| **Grand Total (2019 - 2024)** | **$1,939,952** | **$852,212** | **$1,218,013** | **$500,000** | **$4,510,177** |

Note: Payments are typically made a few months following the end of each period.

012686

**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

**Schedule A.2**
**Valuation Date: March 25, 2025**

*Historical Distributions Charts*







Note: Q4 2024 distributions have not yet been paid.

012687

**Charitable DAF HoldCo, Ltd** **Schedule A.3**
**Historical Financial Analysis** **Valuation Date: March 25, 2025**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**Charitable DAF HoldCo, Ltd**
**Income Approach**

**Schedule B.1**
**Valuation Date: March 25, 2025**

*Discounted Cash Flow (DCF) Analysis*

| | | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **18-Apr-25** | **30-Jun-25** | **30-Sep-25** | **31-Dec-25** | **31-Mar-26** | **30-Jun-26** | **30-Sep-26** | **31-Dec-26** | **31-Mar-27** | **30-Jun-27** | **30-Sep-27** | **31-Dec-27** | **Residual (Annual)** |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = | 68.3% | *0.9663* | *0.8484* | *0.7449* | *0.6540* | *0.5742* | *0.5041* | *0.4426* | *0.3886* | *0.3412* | *0.2995* | *0.2630* | *0.2309* | |
| **Present Value (PV) Net Cash Flow** | | **$613,430** | **$90,926** | **$77,423** | **$69,593** | **$373,598** | **$55,377** | **$47,153** | **$42,384** | **$227,533** | **$33,726** | **$28,718** | **$25,813** | |

| | |
|---|---|
| PV net cash flow | $1,685,675 |
| PV residual value | $359,856 |
| **Value of Subject Interest, Minority, Marketable** | **$2,045,531** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$1,637,192** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$5,368** |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | *0.2309* |
| PV residual value : | $359,856 |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

**Charitable DAF HoldCo, Ltd**
**Income Approach**

**Schedule B.2**
**Valuation Date: March 25, 2025**

*Sensitivity Analysis - Hypothetical Risk-Free Bond*

| | | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ Risk Free Rate = | 4.7% | *0.9970* | *0.9858* | *0.9746* | *0.9636* | *0.9527* | *0.9420* | *0.9313* | *0.9208* | *0.9104* | *0.9001* | *0.8899* | *0.8799* | |
| **Present Value (PV) Net Cash Flow** | | **$632,896** | **$105,644** | **$101,300** | **$102,540** | **$619,894** | **$103,473** | **$99,219** | **$100,433** | **$607,158** | **$101,348** | **$97,180** | **$98,370** | |

| | |
|---|---|
| PV net cash flow | $2,769,456 |
| PV residual value | $41,969,350 |
| **Value of Subject Interest, Minority, Marketable** | **$44,738,806** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$35,807,821** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$117,403** |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 4.7% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 46.5x |
| Residual value : | $47,699,415 |
| x PV factor : | *0.8799* |
| PV residual value : | $41,969,350 |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |

012690

Charitable DAF HoldCo, Ltd — Schedule C.1
Discount for Lack of Marketability (DLOM) Analysis — Valuation Date: March 25, 2025

*DLOM Determination - Restricted Stock Studies*

| | Restricted Stock Studies | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd** | **Schedule C.2**

**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

**Schedule C.3**
**Valuation Date: March 25, 2025**

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on director discretion as to the timing and amount. Distributions are not required. Howevever, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size. Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. The Company and CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years. Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the directors. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Participating shareholders have no direct rights to the underlying net asset value other than in a winding up. CLO HoldCo is expected to generate revenue well in excess of the expected distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets. The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | Participation shareholders are small, private foundations. The foundations must be 501c3 non-profit organizations. At the director's discretion, participating shareholders may be diluted through the issuance of additional participation shares to non-existing participating shareholders. | Poor | Worse |

**Charitable DAF HoldCo, Ltd** | **Schedule C.4**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: March 25, 2025**

*Calculation of Marketability Discount*

| Feature | Net Advantage | Gross Adjustment | Importance | Weight | Adjustment | Scaling Adjustment | Final Adjustment |
|---|---|---|---|---|---|---|---|
| | A (Schedules B) | B = F(A) | C | D = F(C) | E = B x D | F = 1+E or 1/(1-E) | |
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | 104% | 0.8% |
| **Net Scaling Adjustment** | **G = Product ($F_i$), i = 1 to n** | | | | | **96%** | **-0.8%** |
| | | | | | | | |
| **Marketability Discount** | | | | | | | |
| Unadjusted discount | I (See Report) | | | | 20.8% | | |
| Scaling adjustment | G (See above) | | | | 96% | | |
| **Concluded Marketability Discount** | **J = G x I** | | | | | **20.0%** | |

**Charitable DAF HoldCo, Ltd** — **Schedule C.5**
**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: March 25, 2025**

*DLOM Footnotes and Comments*

**A)** Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.

1 = Poor 2 = Weak 3 = Fair 4 = Good 5 = Excellent

We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

| | | | | |
|---|---|---|---|---|
| 0 = Equal | 1 = Slightly Better | 2 = Better | 3 = Much Better | 4 = Significantly Better |
| | -1 = Slightly Worse | -2 = Worse | -3 = Much Worse | -4 = Significantly Worse |

**B)** B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

**C)** The importance of the feature is assessed.
1 = Low 2 = Medium 3 = High

**D)** Weights are allocated as follows:
Low = 25% Medium = 50% High = 100%

**E)** To compute the adjustment, B is multiplied by D.

**F)** The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

**G)** The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

**H)** The net scaling adjustment for control factors is the product of all control features' scaling adjustments.

**I)** This is the concluded baseline marketability discount determined for comparable investments.

**J)** This is the baseline marketability discount multiplied by the scaling factor.

**K)** This is the concluded baseline minority interest discount determined for comparable investments.

**L)** This is the baseline minority interest discount multiplied by the scaling factor.

**M)** This is the combined discount of both marketability and minority interest discounts.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

From: David N. Corkern
To: Charitable DAF HoldCo, Ltd.
Date: March 25, 2025

Executive Summary

This memorandum will serve to amplify the initial thoughts I provided regarding the U.S. tax issues as they related to the issuance of new participation shares in and reorganization of Charitable DAF HoldCo, Ltd. and its related companies (collectively "DAF"). My analysis is based upon a review of relevant sections of the Internal Revenue Code of 1986, as amended ("Code"), United States Treasury regulations ("Treasury Regulations" or "Treas. Reg."), relevant case law, and the facts that you have provided to me (outlined below) concerning DAF, James Dondero ("Dondero"), DAF's shareholders/supporting organizations, i.e., Highland Dallas Foundation, Inc. ("Highland Dallas"), Highland Kansas City Foundation, Inc. ("Highland Kansas City"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara"), and HMLP Charitable Fund (collectively "SOs"), and the historical interactions by and among DAF, Dondero, Dondero affiliates/entities, and SOs. I have not been asked to nor have I independently verified the facts that you have provided to me as they relate to DAF, Dondero, SOs (individually or collectively, including tax-exempt status by the IRS), and other individuals or entities associated therewith or who may have contracted or interacted therewith.

Facts[1]

DAF currently has four (4) non-voting SOs, each of which has been recognized as an organization exempt from U.S. income taxes under Code Section 501(c)(3).

Dondero appointed his college roommate, Grant Scott ("Scott"), to be the control person of DAF, who, at no time during his tenure at DAF, hired outside counsel, an independent director, or outside valuation experts to evaluate the transactions that Dondero undertook with DAF, either directly or through various entities that he controlled or exercised significant influence, including, but not limited to, SOs. In addition, Highland Capital Management, LP, an entity controlled by Dondero, charged investment manager fees to DAF. (It is my understanding that Scott never evaluated the reasonableness of those fees.) As outlined in the ValueScope Presentation (defined below), Scott approved deals with various Dondero-controlled entities for below-mark investment returns, effectively enriching Dondero to the detriment of both DAF and SOs, and the charitable organizations that they serve.

Dondero has operated his businesses (including Highland and now NexPoint) with very little excess cash and has looked to DAF as a source of $300 million that he can control, typically

[1] See Exhibit C for a timeline of relevant events.

CARRINGTON COLEMAN
David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

approaching DAF to serve as short-term or emergency bridge financing to enable his businesses to close speculative investments, each of which require DAF to take outsize risk for below-market investment returns.

In November 2023, Dondero attempted to exert influence over DAF's current director/manager, Mark Patrick, asking him to transfer from DAF approximately $1,500,000 to Sentinel Reinsurance, Ltd. (a Dondero-owned entity)[2] in payment of legal fees unrelated to DAF or its charitable purposes. This request would have taken money from DAF and its charitable beneficiaries and put it into Dondero's pockets. Outside counsel advised DAF leadership that the cash transfer proposed by Dondero would be "impermissible and illegal for a number of reasons."

Dondero is enmeshed in Highland Dallas, Highland Kansas City, and Highland Santa Barbara (the "Highland SOs"). Dondero is the Individual Member under the Bylaws of each. Dondero is also one of three members of the Board of Directors of each Highland SO, as well as the President of each. In addition to the authority granted by the Bylaws of the Highland SOs to Dondero, Dondero wields broad influence over the Highland SOs and their officers and directors, who view him as the "donor"[3] with respect to DAF. Dondero has appointed his public relations specialist, Lucy Bannon, as his primary contact with the Highland SOs.[4]

On October 2, 2024, Mark Patrick resigned from his position at Skyview Group, which is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or owned by Dondero. Skyview Group itself is owned by Scott Ellington, a long-time associate of Dondero.[5] On the same date, Mark Patrick also directed the DAF to terminate its services agreement with Skyview Group. Douglas Mancino of Seyfarth Shaw LLP, long-time compliance counsel to DAF, advised Mark Patrick to resign from Skyview Group to create more independence from Dondero. While Mark Patrick was at Skyview Group, Dondero had made demands that Mark Patrick meet with him three times a week in person regarding various Dondero-proposed investment opportunities to benefit Dondero and/or his affiliated entities, which demands Mark Patrick declined on behalf of DAF. While Mark Patrick was at Skyview Group, the Highland SOs had never raised a concern with Mark Patrick's leadership or his investment decisions or the financial information provided to the SOs. When Mark Patrick resigned from Skyview Group, he

---

[2] Dondero used Sentinel as part of a fraudulent insurance scheme to hide assets from a creditor of a fund and other investors.
[3] Dondero has donated an antique gun collection and hedge fund interest to the Highland Dallas Foundation. A confidential source has indicated to DAF that Dondero is promising the Dallas Foundation he will donate NexBank stock (the predominant source of his wealth) into a similar structure as DAF.
[4] DAF believes Ms. Bannon is assisting in writing the correspondence (detailed below) from Holland & Knight. A confidential source has indicated to DAF that Ms. Bannon has been appointed to an official position with the Highland SOs to act on their behalf.
[5] Although Ellington owns Skyview Group, all Skyview employees know, including its human resources department, that Dondero determines Skyview's employee's compensation, including Scott Ellington's. This is another example of Dondero creating a façade of an independent entity that is not independent.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

made clear to Dondero associates that he did not intend to have further conversations directly with Dondero and that Mark Patrick viewed his resignation and the termination of the Skyview Group services agreement as in the best interest of DAF.

Immediately after Mark Patrick's resignation from Skyview Group, Dondero was furious and directed his associates at Skyview Group and NexPoint to begin a campaign to turn the Highland SOs against DAF. Dondero's associates, including Chris Rice (who works for both Skyview Group and NexPoint), reached out to DAF's back-office services provider, SEI, and requested financial information on the DAF. Chris Rice did not reveal to SEI that he was working at Dondero's behest. Chris Rice promptly took this information, after modifying it and trying to frame it as a parade of horrible, to the Highland SOs. The inaccurate information Chris Rice presented to the Highland SOs included: (i) 2024 director fees were on track to exceed $5 million (which is false and several multiples higher than the true amount) and (ii) 2024 legal expenses were on track to equal $12 million (which is again false and represents an annualized number only through June 30, 2024). Skyview Group had access to DAF financials throughout Mark Patrick's tenure, but Skyview Group did not go running to the Highland SOs until after Mark Patrick resigned from Skyview Group. Other than via the Skyview Group and the ValueScope quarterly reports, the Highland SOs do not have access to any of DAF's financial information.

Following Mark Patrick's resignation from Skyview Group and to assure the Highland SOs that DAF's charitable giving to the Highland SOs would continue as usual and that the Highland SOs would continue to receive the quarterly ValueScope reports as usual, Mark Patrick arranged meetings with the heads of the Highland SOs[6]. These meetings went well, and the discussions raised no concerns about DAF, its finances, or its governance. Despite these meetings and open lines of communication, Mark Patrick was never asked whether the information Chris Rice presented to the Highland SOs was true or false, which demonstrates the Highland SOs had marching orders by Dondero to attempt to wind up DAF and reject any other solution.

In early November 2024, DAF made clear it would not proceed with a Dondero-recommended investment, TCAL, which is outlined in the ValueScope presentation. NexPoint proposed TCAL to DAF in September 2024. TCAL represented an illiquid asset with no income, and the Dondero-proposed structure would have required DAF to pay all the costs while providing a right of repurchase to a Dondero-controlled entity to capture the upside, if any. This is another example of Dondero's hubris and his view of DAF's money as his money.

While the meetings by and among Mark Patrick, Doug Mancino, and the SOs were occurring, during October and November 2024, Dondero directed his personal attorney, Johnny Sutton at Ashcroft Sutton Reyes LLC, to reach out to DAF's counsel and ask if Mark Patrick would accept money to resign from the DAF. Sutton made various offers, including offering Mark Patrick

[6] These meetings are listed on Exhibit C.

CARRINGTON COLEMAN
David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

large sums of money, his own island in the Caribbean, and other accommodations (including releases) to resign. Each of these offers were rejected. Mark Patrick believed that Dondero made these offers because Dondero sensed he had lost any semblance of control over DAF and its assets. Mark Patrick believed that, if he were to resign, Dondero would appoint another individual loyal to Dondero's personal interests, which would enable Dondero to use DAF's assets to enrich himself once again at DAF's expenses. Johnny Sutton also suggested that he spoke on behalf of the Highland SOs.

On November 20, 2024, DAF arranged a presentation by ValueScope, a financial services provider to DAF, to counsel to the Highland SOs (the "ValueScope Presentation"). Attached as Exhibit A is the ValueScope Presentation. Among other things, this detailed DAF's historical investments and Dondero's influence on DAF's investments, and it also explained the voluminous and expensive lawsuits for which Dondero was responsible. It detailed that DAF had been named as a defendant in at least eight lawsuits due to its affiliation with Dondero and had also brought at least four lawsuits at Dondero's recommendation and insistence. The ValueScope presentation also outlines certain transactions proposed by Dondero to DAF that would have had outsized benefits for Dondero's own pockets[7] while creating significant risk and capped upside for DAF.

Courts have ruled that Dondero is a "vexatious litigant" due to his long, documented, and colorful history of bringing frivolous lawsuits motivated by personal animus, which are, almost without exception, losing cases.[8] Dondero's lawsuits follow a consistent theme: Dondero is sued for taking other peoples' money.[9] This is precisely what Dondero has tried to do with DAF.

Unbeknownst to DAF, prior to the ValueScope Presentation, the Highland SOs had written a letter dated November 11, 2024, asserting that the Highland SOs had no confidence in the governance structures of DAF and directing (without authority) DAF to avoid any depletion of assets (the "No Confidence Letter"). The No Confidence Letter was not mentioned during the

[7] There are numerous examples of Dondero financially benefitting from the DAF. A few include: (i) the Tall Pine scheme where Dondero employees appropriated $1MM from the DAF in a fraudulent transaction, (ii) directing money due by a Dondero entity to a DAF entity to instead pay one of Dondero's personal friends, Patrick McCabe, for a payment McCabe was owed by a Highland SO, and (iii) the aforementioned embezzlement request for Sentinel.

[8] Attached as Exhibit D is Dondero's Vexatious Reply Brief, in which he acknowledges he has no indirect or direct control over DAF and transferred control of Charitable DAF GP, LLC, the general partner of Charitable DAF Fund, LP to Grant Scott.

[9] A examples include: (i) Dondero diverted $160MM from a Highland-advised fund to a private insurance company under the guise of a fraudulent insurance policy to frustrate UBS on collection of a judgment and now is being sued in New York State Court by UBS for over $1 billion, (ii) Dondero withdrew tens of millions in cash from a fund called Crusader and justified it as "management fees owed"; the eventual arbitration award against him was so large his investment company had to file bankruptcy, (iii) Dondero funneled assets from a joint venture he had with Highland partner Josh Terry; this resulted in an involuntary bankruptcy to prevent the assets being funneled out of a joint venture to a Dondero entity, and (iv) after a falling out with Patrick Daughtery, Dondero funneled assets out of an employee retention vehicle and effectively away from Daughtery, resulting in extensive litigation.

CARRINGTON COLEMAN
David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

ValueScope Presentation. Further, the No Confidence Letter was not received from the Highland SOs or their counsel—the No Confidence Letter was provided by Johnny Sutton of Ashcroft, Dondero's personal attorneys, nearly a month after it was written, on December 6, 2024. Given the timing (barely a month after Mark Patrick had resigned from Skyview Group) and the source (Dondero's personal attorneys), it seems highly probable that the No Confidence Letter was written at Dondero's behest.

The No Confidence Letter also came as a surprise to DAF and its counsel because the ValueScope Presentation and the Murphy Presentation were well received. The Highland SOs made no effort to verify the information provided to them by Chris Rice and were undeterred and even communicating in bad faith given the No Confidence Letter's timing and the ValueScope and Murphy Presentations.

Following the ValueScope Presentation, on December 11, 2024, DAF held a presentation by its independent director, Paul Murphy, that provided extensive corporate governance and investment information (the "Murphy Presentation"), which is attached as Exhibit B. During the Murphy Presentation, Michael Stockham of H&K said the contents of the presentation were exactly what he wanted to hear and asked Paul Murphy to present it directly to the Highland SOs. Walkers (Cayman counsel to DAF) was also scheduled to present on the rights of participation shareholders during the Walkers presentation, but Stockham indicated that if Walkers were there to detail the limited rights of participation shareholders, he was already aware, and the presentation was unnecessary.

Based on the reception to the presentations (including Michael Stockham indicating he wanted to end on a "positive" note), and with a promise to continue addressing the Highland SOs' concerns, DAF's counsel requested the No Confidence Letter be withdrawn. This request was rejected. Notwithstanding the rejection of this request, DAF and the Highland SOs' counsel agreed that the best next step was to schedule a presentation by Paul Murphy directly to the Highland SOs.

On January 7, 2025, the ValueScope quarterly financial update was provided to the Highland SOs, which has been provided on a quarterly basis for years.

On January 10, 2025, Mark Patrick successfully negotiated that Dondero direct about $8 million to pay amounts that were due to DAF on the Small Bay II transaction. Since Mark Patrick's resignation from Skyview Group in October, Dondero had directed NexPoint to cease required payments to DAF on Small Bay II and other NexPoint-led investments.

On January 21, 2025, the Highland SOs' counsel emailed a request to set up a Zoom call for the Murphy presentation to the Highland SOs. Only two days later, on January 23, 2025, despite the pending Zoom call, Julie Diaz, CEO of the Highland Dallas Foundation, emailed Mark

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Patrick's out-of-use email address (which was communicated to her previously) to request additional financial information by February 10, 2025. On January 28, 2025, despite the pending Zoom call and the timeline in January 23, 2025, email, Julie Diaz sends a second email, this time requesting a winding up of DAF. These emails, of course, were inconsistent with the Zoom call with Paul Murphy.

On January 30, 2025, DAF responded to the Highland SOs and expressed concern (not for the first time) that Dondero was directing the Highland SOs to express these concerns and send this inconsistent communication.

On January 31, 2025, the Highland SOs' counsel responded and ignored DAF's concern that Dondero was controlling the Highland SOs. Instead, the Highland SOs' counsel adopted a confrontational, accusatory, and threatening tone, in stark contrast to the "positive" note that concluded the Murphy Presentation.

DAF emailed on February 4, 2025; to express it was willing to cooperate with the Highland SOs and provide them information but also requested the Highland SOs confirm they would like to continue to work with DAF to resolve their concerns.

H&K responded with an adversarial email on February 7, 2025, that contained misleading claims such as "over the last three months, you have not provided any information about the assets and financial health of the fund." This email ignored the fact that DAF provided the quarterly financial report for 9/30/24 on January 7, 2025, the ValueScope Presentation, and the Murphy Presentation. It is clear to DAF's leadership that the Highland SOs will not be satisfied by additional information and are being directed and controlled by their Individual Member, Director, and President—Dondero. Holland & Knight, as counsel to the Highland SOs, has opted for an adversarial, ostrich-head-in-the-sand approach to Dondero's misdeeds.

H&K's February 7, 2025, response also discussed Charitable DAF GP, LLC, the former general partner of Charitable DAF Fund, LP. Historically, Dondero once owned Charitable DAF GP, LLC, but transferred it to Grant Scott in 2012. DAF and its counsel identified that Dondero would be likely to contest the transfer to Scott and thereby seek to gain control of DAF and its assets, so for compliance purposes, DAF dissolved Charitable DAF GP, LLC and transitioned to a Cayman general partner for Charitable DAF Fund, LP.[10]

---

[10] Prior to receiving the February 7, 2025, email, DAF also heard from a confidential source that Dondero's associates were planning to assert control of Charitable DAF GP, LLC and thereby regain control of DAF. DAF interpreted this as a strategy that Dondero would attempt to assert his transfer to Grant Scott was invalid and then Dondero would control the general partner and direct the DAF to distribute its assets to Dondero or Dondero's affiliates.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

On February 12, 2025, Andrew Johnstone of Johnstone Law emailed Paul Murphy to say he represents Charitable DAF Fund 2 LP (DAF 2) and requested a meeting with Paul to discuss "DAF 1 and DAF 2." DAF has information that Dondero has been working to form another "DAF" with the intention to combine the two DAFs and assert control over the assets. DAF believes this is another attempt, directly or indirectly, by Dondero to assert control over DAF and its assets.

On February 13, 2025, Atlas IDF, LP, an entity controlled by Mark Patrick, filed a lawsuit against NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC ("NREP") and Nancy Dondero, as Trustee of The Dugaboy Investment Trust, due to NREP's and Dugaboy's (as a guarantor) failure to repay ~$13 million in demand notes. While Atlas IDF, LP is not owned by DAF, this filing shows more independence between Mark Patrick and Dondero.

On February 14, 2025, Doug Mancino emailed Michael Stockham of H&K correcting the various financial misstatements in H&K's email, addressing the control that Dondero is seeking to exert over DAF and the Participating Shareholders, and offering to have a call with Paul Murphy as previously discussed.

On February 25, 2025, Liberty CLO HoldCo, Ltd. ("Liberty"), a subsidiary of Charitable DAF HoldCo, Ltd., filed a lawsuit against Highland Capital Management Services, Inc. ("HCMSI"), an entity believed to be controlled by NexPoint and/or Dondero, because HCMSI defaulted on a ~$1.3 million promissory note payable to Liberty. Instead of making a required payment to Liberty, HCMSI directed the payment to a personal friend of Dondero named Patrick McCabe. This is more evidence that NexPoint and Dondero fail to repay their debts and more evidence of independence between DAF and Dondero.

On February 27, 2025: Michael Stockham of H&K sent letter requesting presentation from Paul Murphy in the next two weeks, as initially discussed in December. This request is a change of course from the January 21 and January 28 letters from Julie Diaz, which said that a presentation would not occur before DAF turned over to them substantial financial information.

On February 28, 2025, Liberty filed a lawsuit against Nancy Dondero, as Trustee for Dugaboy, Grant Scott, as Trustee of The SLHC Trust, NexPoint Advisors, and other NexPoint entities due to the NexPoint Affiliates' failure to satisfy their obligations under a put option contract. This is more evidence that Dondero and his entities fail to repay their debts and more evidence of independence between DAF and Dondero.

---

DAF believes the frustration in H&K's email is due, in large part, to the realization that the Dondero-GP strategy would not work. H&K attempted to twist the GP reorganization as evidence Mark Patrick was going rogue, but the GP reorganization also had benefits from a Cayman legal standpoint. This Dondero-GP strategy is also inconsistent with Dondero's Vexatious Reply Brief attached as Exhibit D, in which he acknowledges (i) he has no direct or indirect control over DAF and (ii) he transferred Charitable DAF GP, LLC to Grant Scott.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Historically, DAF was funded with assets from Highland Capital Management Partners Charitable Trust #2, which Dondero funded and obtained a charitable deduction for his contribution.

Application

1. Donative intent; Self-dealing penalties

Under U.S. tax law, when someone donates to charity, they have to give up "dominion and control" of the donated assets, meaning the donor has to completely and irrevocably transfer ownership and control of the property to the charity. This includes relinquishing any power to change the use or disposition of the donated assets. For the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used. See Code Section 170; Code Section 2511; Treas. Reg. Section 25.2511-2(b). The aforementioned facts suggest that Dondero is attempting, through his control of the Highland SOs, to exert dominion and control over the cash and property that he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit). If the Internal Revenue Service ("IRS") were to make a finding that Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he took, and impose civil penalties, including, but not limited to, the accuracy-related penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663.

In addition, Code Section 4941 imposes significant penalties on self-dealings between a private foundation (such as each Highland SO) and a "disqualified person." The term "disqualified person" is defined by Code Section 4946(a)(1) to include a "substantial contributor," as well as a "foundation manager" (i.e., officer, director, or trustee of a foundation) Based upon the facts provided, it seems clear that Dondero would be considered a "disqualified person" with respect to each and every Highland SOs. Dondero's past transactions (e.g., NexPoint) and other attempts to garner personal benefit at the expense of DAF and the Highland SOs. Along with the potential for self-dealing penalties under Code Section 4941, Dondero's persistent pattern of self-dealing with the Highland SOs exposes each of those entities to revocation by the IRS of its tax-exempt status. If the IRS were to determine that Dondero's pattern of self-dealing constituted a willful attempt to evade or avoid federal income taxes, then the IRS could refer to the matter for criminal prosecution. See Code Section 7201, et seq.

2. Private inurement/benefit

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Organizations enjoying tax-exempt status under Code Section 501(c)(3) must comply with requirements set forth in relevant Code sections, as well as relevant Treasury Regulations. Code Section 501(c)(3) provides:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to ) any candidate for public office. (*Emphasis added*.)

The prohibition against private inurement is a statutory in nature and is also set forth in Treas. Reg. Section 1.501(c)(3)-1(c)(2). Private inurement is a subset of private benefit (discussed below) and has often been restricted to unjust payments of money to those individuals in positions of control within tax-exempt organizations. See IRS EO CPE (2001).

The concept of private benefit is derived from that part of Code Section 501(c)(3) that requires organizations (such as SOs) to be operated exclusively for tax-exempt purposes. Organizations will not be deemed exempt under Code Section 501(c)(3) unless they serve public rather than a private function. According to Treas. Reg. Section 1.501(c)(3)-1(d)(ii), an organization will not be deemed exempt unless it serves a public rather than a private interest. This concept was endorsed by the United States Supreme Court when it addressed the predecessor to Code Section 501(c)(3). See Better Business Bureau of Washington, D.C. v. United States, 326 U.S. 279 (1945). If an activity would benefit an individual or for-profit entity (regardless of whether such individual or for-profit entity is affiliated with or controls the tax-exempt entity) substantially, then the transaction would run afoul of the private benefit proscription, regardless of whether payments were unreasonable or excessive. See Church by Mail v. Commissioner, 765 F. 2d 1387 (9th Cir. 1985), aff'g TCM 1984-349 (1984). Other examples of private benefit/inurement have involved an inadequately secured loan (Lowry Hospital Association v. Commissioner, 66 T.C. 850 (1976) and payment of excessive rent (Texas Trade School v. Commissioner, 30 T.C. 642, aff'd 272 F. 2d 168 (5th Cir. 1959). The United States Tax Court has opined that, while some benefits can be conferred without jeopardizing an organizations tax-exempt status, "private benefits" should be defined as "nonincidental benefits conferred on disinterested persons that serve private interests."

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

IRS and Treasury Regulations require that organizations enjoying tax-exempt status under Code Section 501(c)(3) be both organized and operated exclusively for tax-exempt purposes. Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." While it is my understanding that each of the SOs has met the organizational test of Code Section 501(c)(3) and relevant Treasury Regulations, each SO must also pass the operational test throughout its existence. Whether a tax-exempt organization has engaged in activities that violate the proscriptions against private inurement and/or private benefit is highly fact specific. Treas. Reg. Section 1.501(c)(3)-1(d)(ii) places the burden of proof squarely upon a tax-exempt organization to demonstrate its continued compliance with the operational test described above.

While the current manager has been acting independently of Dondero and those under Dondero's influence and/or control, this pattern of Dondero's using DAF as his personal "piggy bank" may be perceived by the IRS and Dondero's creditors that DAF has been or is as his financial alter ego. Any suggestion or perception of alter ego status between Dondero and DAF increases the risk that DAF could find itself embroiled in litigation directed against Dondero, one or more SOs, and any of the other entities that he does or may control, whether directly or indirectly.

To the extent that any of the SOs have either encouraged or acquiesced in Dondero's accessing DAF funds for his personal benefit, either directly or through the entities that he controls or in which he has considerable financial interest, those organizations run an increased risk of losing their tax-exempt status by operating for private and not public benefit. As discussed above, each organization that has received tax-exempt status under Code Section 501(c)(3) must be organized <u>and</u> operating primarily for charitable purposes.

Given what has been detailed about Dondero's past and continued actions with SOs and DAF, there is a significantly heightened risk that the IRS could severely penalized and/or revoke the tax-exempt status of one or more SOs, which could imperil the status and assets of DAF. To help insulate DAF from any such exposure and to facilitate and expand its charitable purposes, DAF adopted a corporate restructuring on December 18, 2024, which resulted in the use of a Delaware blocking corporation to lessen the negative effect to DAF of Dondero's influence over the existing SOs.

Increasing the number of supporting organizations to current SOs would mitigate considerations of undue influence/private inurement/private benefit and broaden the scope of DAF's charitable reach to the public. The IRS will look favorably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and private inurement.

CARRINGTON COLEMAN

David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

**Exhibit A**

**November 20, 2024, ValueScope Presentation to Foundations**

[See attached.]

CARRINGTON COLEMAN
David N. Corkern
Senior Counsel
214-855-3099
DCorkern@ccsb.com

**Exhibit B**

**December 11, 2024, Paul Murphy Presentation to Foundations**

[See attached.]

# Exhibit C

## Timeline

- June 2023: DAF exposure to NexPoint DST transactions is over $100MM.[11]
- October 2023: DAF turns down NexPoint-proposed Storage Partners DST IV due to unfavorable economics for DAF.
- November 2023: DAF turns down NexPoint-proposed Storage Partners DST V due to unfavorable economics for DAF.
- November 2023: Dondero requests Mark Patrick direct DAF to wire money to Dondero's entity, Sentinel Reinsurance Ltd., so that Sentinel can pay some legal bills. The legal bills bear no relation to the DAF. Mark seeks the advice of counsel who suggests doing this may be illegal, so Mark refuses to do so.
- March 7, 2024: David Rosenberg emails Mark Patrick and NexPoint to inform them that Highland Dallas Foundation, Inc. will do business in Texas under the assumed name NexPoint Philanthropies, Inc.
- June 13, 2024: DAF closes NexPoint-proposed Small Bay II transaction, which diverts $10MM to Dondero's trust, Dugaboy.
- August 22, 2024: Doug Mancino speaks with David Rosenberg about various developments regarding the Highland Dallas Foundation and Jim Dondero
- September 2024: DAF turns down two NexPoint-proposed transactions that would benefit NexPoint and Dondero: (i) the preferred dividend financing and (ii) a new Storage Partners DST VI.
    - Rob Harris, NexPoint' s general counsel, tells Shields that if DAF does not do the deal, "People will lose their jobs, and it isn't going to be me."
- September 2024: NexPoint proposed DAF invest $45 million in TCAL, receive a capped upside on its investment, and assume all the financial risk.
- September 26, 2024: Scott Ellington and Dylan Wiltermuth at Carey Olsen reach out to Paul Murphy and ask whether Paul would consider becoming a director of the DAF (which he obviously already was).
- September 30, 2024: Doug Mancino provides advice to Mark Patrick that there is a conflict of interest between DAF and Skyview Group and recommends Mark Patrick resign from Skyview Group and terminate the services agreement with Skyview Group

---

[11] From June 2023 until the present day, DAF and its counsel have successfully reduced this exposure level to about $700k in February 2025. In October 2023, DAF received advice from counsel "…you should substantially reduce any such [Dondero-led investments] so that they compromise only an insubstantial amount of the assets held in the DAF structure" due to concerns that, as of June 2023, DAF entities' investments in Dondero-led investments was 44% of its total investments. DAF was concerned that Dondero would direct his entities (including NexPoint) to stop payment on Dondero-led investments if DAF rejected Dondero's proposals. This concern was validated in October, November, and December of 2024 because, when Mark Patrick left Skyview Group, Dondero directed NexPoint to stop paying DAF about $8 million that it was due on Small Bay II.

- October 2, 2024: Mark Patrick resigns from Skyview Group
- October 2, 2024: DAF terminates services agreement with Skyview Group
- October 3-October 24, 2024: Chris Rice (a Skyview Group employee and a NexPoint employee) reaches out to SEI and convinces SEI to provide financial information relating to the DAF
- October 10, 2024
  - o Mark Patrick meets with Julie Diaz of the Highland Dallas Foundation, Inc.
  - o Mark Patrick has a telephone call with Debbie Wilkerson, the CEO of Highland Kansas City Foundation, Inc.
- October 10, 2024: NexPoint ceases payments to DAF that NexPoint is contractually obligated to make regarding Small Bay II
- October 14, 2024: Doug Mancino talks to Tammy Sims Johnson of the Highland Santa Barbara Foundation, Inc.
- October 3-November 11, 2024: Supporting organizations hire H&K (including a litigator) to represent them
- November 8, 2024: DAF effectively declines TCAL transaction proposed to Mark Patrick by Dondero because the economics were unfavorable for DAF
- November 11, 2024: Supporting organizations sign letter addressed to Paul Murphy, conspicuously not signed by Dondero
  - o This letter is the first indication to DAF, Mark Patrick, Paul Murphy, and Doug Mancino that the supporting organizations have any issues, despite
- November 20, 2024: ValueScope and Doug Mancino make presentation to H&K, counsel to the supporting organizations
- December 6, 2024: Supporting organizations' letter received by Brian Shaw, counsel to DAF/Mark Patrick, who forwards it to Paul Murphy, who confirms he had not previously received it.
- December 11, 2024: DAF holds presentation with Paul Murphy re: corporate governance and investments. Walkers (Cayman counsel) also joins. H&K declines to hear from Walkers re: participation share rights.
- December 13, 2024: Doug Mancino emails H&K requesting withdrawal of the November 11 letter and proposing a path forward.
- December 18, 2024: Doug Mancino follows up on his December 13, 2024, email.
- December 19, 2024: David Rosenberg of H&K refuses to withdraw letter and discusses a presentation by Paul Murphy to the foundations.
- January 7, 2025: the ValueScope 9/30/24 quarterly report is provided to the Highland SOs.
- January 8, 2025: David Rosenberg of H&K proposes times for presentation by Paul Murphy to the foundations.

- January 10, 2025: In a matter related to the HCMLP bankruptcy, Mark Patrick successfully negotiated that Dondero direct about $8 million to pay amounts that were due to DAF on the Small Bay II transaction.
- January 21, 2025: David Rosenberg confirms a Zoom call is fine.
- January 23, 2025: Julie Diaz, CEO of the Highland Dallas Foundation, emailed Mark Patrick's out-of-use email address (which was communicated to her previously) to request additional financial information by February 10, 2025
- January 28, 2025: Julie Diaz sends a second email, this time requesting a winding up of the DAF.
- January 30, 2025: DAF (Paul Murphy) responded to the Highland SOs and expressed concern (not for the first time) that Dondero was directing the Highland SOs to express these concerns and send this inconsistent communication.
- January 31, 2025: Michael Stockham of H&K sends an adversarial email ignoring DAF's concerns.
- February 4, 2025: DAF (Paul Murphy) emails and says it is willing to cooperate with the Highland SOs and provide them with information but also requested the Highland SOs confirm they would like to continue to work with DAF to resolve their concerns.
- February 7, 2025: DAF HoldCo approves issuance of participation shares to DFW Charitable Foundation, which result in DFW Charitable Foundation holding 51.04% of the participation shares.
- February 7, 2025: Michael Stockham of H&K sends another adversarial email that contains misleading claims.
- February 12, 2025: Andrew Johnstone of Johnstone Law emails Paul Murphy saying Johnstone acts for "Charitable DAF Fund 2 LP (DAF 2)".
- February 13, 2025: Atlas IDF, LP, an entity controlled by Mark Patrick, filed lawsuit against NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, and Nancy Dondero, as Trustee of The Dugaboy Investment Trust, alleging that NexPoint (as payor) and Dugaboy (as guarantor) failed to repay ~$13 million in demand notes following demand.
- February 14, 2025: Doug Mancino emails Michael Stockham of H&K correcting the various financial misstatements in H&K's email, addressing the control that Dondero is seeking to exert over DAF and the Participating Shareholders, and offering to have a call with Paul Murphy as previously discussed.
- February 25, 2025: Liberty CLO HoldCo, Ltd. ("Liberty"), a subsidiary of Charitable DAF HoldCo, Ltd., filed lawsuit against Highland Capital Management Services, Inc. ("HCMSI"), an entity believed to be controlled by NexPoint and/or Dondero, alleging that HCMSI defaulted on a ~$1.3 million promissory note payable to Liberty. Instead of making a payment to Liberty, HCMSI directed the payment to a personal friend of Dondero, Patrick McCabe.

- February 27, 2025: Michael Stockham of H&K sent letter requesting presentation from Paul Murphy in the next two weeks.
    - This is the presentation that was planned for January prior to the letters on January 21, 2025 and January 28, 2025, which effectively retracted the request for a presentation.
- February 28, 2025: Liberty filed lawsuit against Nancy Dondero, as Trustee for Dugaboy, Grant Scott, as Trustee of The SLHC Trust, NexPoint Advisors, and other NexPoint entities due to the NexPoint Affiliates' failure to satisfy their obligations under a put option contract.
- February 28, 2025: Charitable DAF HoldCo, Ltd. received FTI Consulting valuation analysis that suggests a discount of 95% of net value should be applied to the Participation Shares.
- March 3, 2025: Charitable DAF HoldCo, Ltd. received ValueScope valuation analysis of 100 Participation Shares at $529,183.
- March 20, 2025: Charitable DAF HoldCo, Ltd. sends letter to Internal Revenue Service raising issues with Highland Dallas Foundation, Inc.
- March 21, 2025: Charitable DAF HoldCo, Ltd. sent copy of IRS letter to Texas AG, Missouri AG, and California AG

**Exhibit D**

**Vexatious Reply Brief**

Dondero Vexatiuos
Reply Brief and DAF

Seyfarth

Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
T (310) 277-7200
F (310) 201-5219

dmancino@seyfarth.com
T (310) 201-5241

www.seyfarth.com

March 20, 2025

**FEDEX**

TEGE Referrals Group
Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re: Highland Dallas Foundation, Inc. (EIN: 45-3961755)

Dear Sir or Madam:

I am writing on behalf of my client, Charitable DAF Holdco, Ltd., a Cayman Islands exempt[1] company ("DAF Holdco"), concerning the deterioration of its relationship with one of its Participating Shareholders, Highland Dallas Foundation, Inc. ("Highland Dallas"). Highland Dallas is a supporting organization of the Dallas Foundation.[2]

The deterioration of this relationship is due directly to the undue influence and control exercised over Highland Dallas by James D. Dondero and his affiliates, as described in this Form 13909, *Tax-Exempt Organization Complaint (Referral)*. This disclosure letter supplements in detail and in exhibits the more general information described in the accompanying Form 13909 and is an integral part of that form (collectively, the Form 13909 and this letter are referred to as the "Referral").

We believe the information described in this Referral will demonstrate clearly that Mr. Dondero's influence and control is an inappropriate donor relationship with representatives of the Dallas Foundation who serve on the Board of Directors of and as officers of Highland Dallas. We believe this undue influence and control potentially jeopardizes the tax-exempt status of Highland Dallas as an organization described in section 501(c)(3) and, at a minimum, causes it to fail to remain a supporting organization described in section 509(a)(3) because of the

---

[1] To be clear, DAF Holdco is not a tax-exempt organization under U.S. tax law, notwithstanding the use of the term "DAF" in its corporate name.. However, under its Cayman Islands Articles of Association, a "Restricted Person," i.e., an entity that *cannot* own Participating Shares, is an organization that is *not* described in section 501(c)(3) of the Code. As a consequence, all Participating Shareholders of DAF Holdco must be and remain organizations described in section 501(c)(3).
[2] The Dallas Foundation is a tax-exempt community foundation described in sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code of 1986 (the "Code").

excessive influence of a disqualified person and substantial contributor, i.e., Mr. Dondero, under section 509(a)(3)(C).

This Referral is divided into three major parts, with multiple subparts.

Part I provides the Internal Revenue Service (the "IRS" or the "Service") with extensive factual information concerning Highland Dallas, its governance and control. As will be seen, Mr. Dondero exerts undue influence and control over Highland Dallas directly, as a director, President and substantial contributor, and indirectly through his and his associates' influence over Highland Dallas's supported organization representatives on the Highland Dallas Board of Directors, and the Dallas Foundation itself.

Part II provides the IRS with background information on DAF Holdco and Mr. Dondero's efforts to exert dominion and control over DAF Holdco and its assets. Because Highland Dallas is a Participating Shareholder of DAF Holdco, Mr. Dondero's efforts (both successful and unsuccessful) to control DAF Holdco for his personal gain directly affect Highland Dallas financially and provide him an additional amount of private benefit and private inurement from a donation where he once benefitted from a charitable contribution deduction to a charitable remainder trust ("CRT").

As will be discussed in Part III, the tax discussion section, Mr. Dondero's influence and control is pervasive and is exercised primarily for Mr. Dondero's financial benefit directly and for the financial benefit he derives indirectly through several entities owned or controlled by him. We believe he therefore derives more than insubstantial benefit form Highland Dallas and causes its net earnings to inure to his benefit, all in violation of section 501(c)(3)'s most basic operational requirements. Also, at a minimum, we believe his influence and control over Highland Dallas has caused it to become a private foundation, thereby subjecting Mr. Dondero to Chapter 42 excise tax exposure.

## I. Background Concerning the Formation and Legal Structure of Highland Dallas, Highland Capital Management, L.P., and NexPoint Advisors, L.P.

### A. Highland Dallas

Highland Dallas was incorporated as a Delaware nonprofit nonstock corporation by Mr. Dondero in 2011 in connection with his desire to form three tax-exempt public charities to become the three remaindermen of a CRT of which he was the income beneficiary. Highland Dallas applied for and was recognized by the IRS as a charitable organization described in section 501(c)(3) of the Code and as a supporting organization of the Dallas Foundation described in section 509(a)(3) of the Code. Highland Dallas did not register as a foreign corporation to do business in Texas until 2020.

At the time of its formation, Mr. Dondero became the sole "individual" member of Highland Dallas, with the legal power to select one director. The Dallas Foundation became the sole "institutional" member of Highland Dallas, with the power to select two directors. Thus, in 2011, Highland Dallas satisfied the requirements for being classified as a Type I supporting organization of the Dallas Foundation.

In addition, Mr. Dondero, in 2011, became and remains today the President of Highland Dallas and a member of its Board of Directors.

The other two supporting organizations are the Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara") (EIN: 45-3962008) and the Highland Kansas City Foundation, Inc. ("Highland Kansas City") (EIN: 45-3961865). These two supporting organizations of the Santa Barbara Foundation and Greater Kansas City Community Foundation, respectively, also have the same legal structure as Highland Dallas and, like Highland Dallas, each owns 100 Participating Shares of DAF Holdco.

We do not believe either Highland Santa Barbara or Highland Kansas City is as easily manipulated by Mr. Dondero and his affiliates as Highland Dallas because, according to their Forms 990 for 2023 (which is the last year those forms are available on Guidestar.com), Participating Shares of DAF Holdco are their only assets. By contrast, Mr. Dondero has made substantial additional contributions to Highland Dallas after 2011, either directly or through trusts or other entities owned or controlled by Mr. Dondero, some of which will be addressed later in this Referral. Thus, we believe Mr. Dondero is in a position to exert greater influence as a substantial contributor to Highland Dallas on the Directors of Highland Dallas appointed by the Dallas Foundation (including the Dallas Foundation's President & CEO, Julie Diaz).[3]

**B. Mr. Dondero and Highland Capital Management, L.P.**

Highland Capital Management, L.P. ("HCM") is an investment management firm located in Dallas, Texas that was co-founded in 1993 and controlled by Mr. Dondero and individuals close to him. As described on page 7 of the *Special Turnover Petition* filed by UBS Securities LLC and UBS AG London Branch in the New York Supreme Court in 2023, a complete copy of which is enclosed with this Referral as Exhibit 1 (the "2023 UBS Petition"), before HCM filed for bankruptcy, "HCM was an investment management firm that managed billions of dollars of assets 'through its organizational structure of approximately 2,000 separate business entities.'" (citation omitted). It is estimated by a plaintiff in another action that, at its height, HCM managed as much as $40 billion in assets.

Mr. Dondero was not only HCM's co-founder with Mark Okada,[4] he served as HCM's President and Chief Executive Officer until he was removed by the bankruptcy trustee in 2020.

---

[3] By way of example, the consolidated financial statements of the Dallas Foundation for 2023 available on its website include the assets of seven supporting organization, including Highland Dallas. Page 22 of the statements disclose that approximately $163.4 million of its assets were held by supporting organizations. On page 19, it appears that approximately $92.3 million (almost 57%) represent Highland Dallas assets. Also, in 2023, Highland Dallas received almost $34 million in charitable contributions, presumably all from Mr. Dondero and entities affiliated with or controlled by him. Thus, it is understandable why the Dallas Foundation representatives who serve on the Highland Dallas Board would acquiesce to almost any request or demand made by Mr. Dondero or one of his associates such as Lucy Bannon.

[4] In the Dallas Foundation's 2022 Form 990, the most recent available on Guidestar.com, Mr. Okada was listed as a member of the Board of Governors of the Dallas Foundation. On its website, the Dallas Foundation identifies another confidant and employee of Mr. Dondero, Lucy Bannon, as an "Advisory Member" of the Board of Governors (last visited March 5, 2025). Thus, Mr. Dondero continues to exert substantial indirect influence over Highland Dallas's supported organization, the Dallas Foundation.

### C. Mr. Dondero, NexPoint Advisors, L.P., and NexPoint Hospitality Trust

In 2012, prior to his removal as President of HCM in 2020, Mr. Dondero formed NexPoint Advisors, L.P. ("NexPoint Advisors"), a Dallas-based portfolio real estate and investment firm. NexPoint Advisors is one of a vast array of entities operating under the "NexPoint" umbrella. After the HCM bankruptcy, Mr. Dondero and his affiliates seamlessly shifted their operations from HCM to NexPoint Advisors and its affiliates.

As alleged in another lawsuit filed in 2021 in the United States Bankruptcy Court of the Northern District of Texas by Marc S. Kirshner as a litigation trustee in the HCM bankruptcy case, "NexPoint [Advisors] was effectively a shell entity that Dondero created in March 2012 to siphon profits from [HCM] in order to evade [HCM's] creditors." *See Complaint and Objection to Claims,* in *Kirschner v. Dondero, et. Al.* Case No. 19-34054-sgj11, at pages 18-21, a copy of which is attached as Exhibit 2.

Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.

One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").

Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026. *See* the Dugaboy/REIT documents included as Exhibit 2.

The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,605,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy. We also assume that Highland Dallas signed a Form 8283, *Noncash Charitable Contributions*, form acknowledging it received the Units that would have been included with Mr. Dondero's 2019 Form 1040 along with a qualified appraisal of the Units (we have no actual knowledge of this, however).

On information and belief, we believe Mr. Dondero has used his influence and control over Highland Dallas to cause it defer exercising the Put Option at least through the effective time of the merger for at least three reasons.

- First, the forbearance to exercise the Put Option allows Mr. Dondero and Dugaboy to enjoy the benefits of an interest-free loan of $9,285,000 (the put exercise price ($6.19 x 1,500,000 units)) while the Put Option remains outstanding and unexercised.

- Second, the forbearance to exercise the Put Option effectively has protected Mr. Dondero from the declining value of the REIT between December 2019 and November 2024. As of November 22, 2024, the reported fair value of the Units was $0.015 per Unit, so the fair value on that date of 1,500,000 Units was only $22,500, less than one percent of the Put Option value of $9,285,000.

- Third, most charitable organizations have a policy of immediately selling contributed shares that are listed for trading on a stock exchange in order both to diversify and to reinvest the sale proceeds in a manner that aligns more closely with the charity's investment policy. Had Highland Dallas sold the Units on the TSXV at any time within three years after their receipt, Highland Dallas would have been required to file a Form 8282, *Donee Information Return,* with the Service that would likely have reflected a much lower value of the original contribution amount claimed in 2019. Thus, in effect, Highland Dallas was acting to protect Mr. Dondero from having to address the precipitous fall in fair market value as the REIT Units plummeted in value beginning shortly after the gift was made.

Highland Dallas's failure to exercise the Put Option up until now becomes all the more significant because on November 25, 2024, the REIT announced the execution of a definitive agreement (the "Merger Agreement") pursuant to which the REIT will be dissolved and its subsidiary entities will be merged with and into entities owned or controlled, directly or indirectly, by NexPoint Diversified Real Estate Trust. Under the Merger Agreement, The proposed price per Unit is $0.36 per Unit. According to the press release issued by the REIT announcing the merger, "[t]he proposed price of US$0.36 per Unit represents a premium of approximately 2300% to the 30-day volume weighted average price per Unit on the TSXV ended November 22, 2024 of US$0.015."

Last month, in a press release issued on February 21, 2025, it was announced that a majority of minority votes approved of the merger. Under Canadian law, when a person such as Mr. Dondero owns or controls a majority of a Canadian public company's voting shares, a transaction such as this merger must be approved by two-thirds of the minority shares, or in this instance the 5,131,020 Class B non-voting Units.

Based on public filings with the U.S. Securities and Exchange Commission, we believe the REIT had approximately 29,353,660 Units, of which 82.52% were owned by entities owned or controlled by Mr. Dondero.

We have to assume that Highland Dallas voted its 1,500,000 Units in favor of the merger at Mr. Dondero's request.[5] That suggests that the merger needed Highland Dallas's 29.2% (almost one-third of the two-thirds vote required) of minority Unit's approval. That also suggests that

---

[5] We understand that the Board of Directors of Highland Dallas usually acts by Unanimous Written Consent Without a Meeting, which means the Mr. Dondero along with the two Dallas Foundation Board appointees would have approved voting in favor of the merger. Presumably the same would be true if a decision were taken by the Board to refrain from exercising the Put Option.

Highland Dallas chose not to exercise its Put Option to permit Mr. Dondero to retain control over the REIT even as its finances deteriorated.

We have no way of knowing whether Highland Dallas will exercise the Put Option before the REIT is dissolved (projected for the end of the first quarter of 2025, i.e., by the end of this month), but clearly if it fails to do so this will result in a $9 million inappropriate windfall to both Dugaboy and Mr. Dondero. Obtaining the answer to this question would only require the IRS to open an examination of Highland Dallas and issue an Information Document Request and/or issue a third-party subpoena to Dugaboy.[6]

**D. Highland Dallas's Assumed Name**

In March 2024, Highland Dallas filed an Assumed Name certificate with the Texas Secretary of State to permit it to operate under the name "NexPoint Philanthropies Dallas, Inc." This is consistent with Mr. Dondero's current ownership and control of NexPoint Advisors and his loss of control of HCM in the bankruptcy and consistent with the goal of allowing a private company (NexPoint) and Mr. Dondero to take credit for and enjoy the halo effect from NexPoint Philanthropies Dallas's (really Highland Dallas's) charitable giving.

**E. Mr. Dondero's Firearms Contributions to Highland Dallas**

Several years ago, Mr. Dondero (either directly or through entities owned and controlled by him) made contributions of a collection of firearms to Highland Dallas. Presumably, a Highland Dallas officer signed the donee acknowledgement on Form 8283, *Noncash Charitable Contributions*, and checked the box "No" asking whether the organization intended to use the property for an unrelated use, because checking "Yes" would limit Mr. Dondero's charitable contribution deduction to his adjusted basis and not its appraised fair market value. This in itself demonstrates Mr. Dondero's improper influence over the Dallas Foundation representatives serving as Board members and officers of Highland Dallas, especially as it is hard to believe a supporting organization of a community foundation could possibly use firearms in a related trade or business.

But to further demonstrate his abuse and diversions of assets for his own benefit, earlier this year in 2025 he diverted a substantial debt service payment of $1.3 million on a loan owed to one of DAF Holdco's subsidiaries to pay for a specially-designed and built vault for those firearms (shotguns). That diversion of assets has caused a default of that loan that has now landed in Texas State court, thereby depleting DAF Holdco's assets further because of legal fees. It is unknown whether the vault was requested by anyone associated with the Dallas Foundation serving as a director or officer of Highland Dallas, such as Julie Diaz, but we believe it likely was.

**F. Mr. Dondero's Character**

Mr. Dondero has a demonstrated pattern of behavior of stealing assets from those he perceives as adversaries. What is also demonstrated by even a cursory reading of the 2023 UBS Petition

---

[6] We will be happy to provide the IRS with a copy of the S-4 filed with the SEC available on EDGAR and the REIT's press releases that were used to develop this data.

and the *First Amended Original Complaint* filed by Highland Employee Retention Assets LLC against Mr. Dondero and his affiliates on July 15, 2024 in the U.S. District Court for the Northern District of Texas, Dallas Division, a complete copy of which is enclosed as Exhibit 4 with this Referral (the "2024 Complaint"), Mr. Dondero, to put it mildly, has no respect for corporate formalities and is willing to engage in self-dealing to strip entities of their assets without regard to any fiduciary duty of care or loyalty to serve his personal needs and to benefit himself financially to the detriment of others, including his own former HCM employees.[7]

The 2023 UBS Petition outlines how Mr. Dondero, facing a $1 billion judgment, directed various entities he owned and controlled to shift substantially all of their assets offshore to a Cayman Islands insurance company for a fraudulent insurance policy. The 2023 UBS Petition is an attempt to collect on a 2020 $1 billion judgment in favor of the UBS entities. Mr. Dondero has been so successful at hiding assets that the UBS entities have not been paid.

The 2024 Complaint seeks recovery of hundreds of millions from Mr. Dondero. It describes how a former Mr. Dondero employee at HCM, Patrick Daugherty, had a falling out with Mr. Dondero. After the falling out, Mr. Dondero took extraordinary steps to ruin Mr. Daugherty's life—depriving him of assets, removing his long-term incentive plan, embroiling him in lawsuits, and the list goes on.

These are not isolated incidents. In the ACIS Capital Management, L.P. matter,[8] Mr. Dondero had a falling out with Josh Terry, a former employee of HCM, and took extraordinary steps to ruin Mr. Terry's life—the same playbook as above with Mr. Daugherty.

In fact, Mr. Dondero and his litigiousness is widely known in the Dallas/Fort Worth area. Mr. Dondero is variously described as "Highland Capital's Giraffe-Eating Hedge Fund Manager" (Dallas Observer June 1, 2012), and "the distressed debt investor who was once a scourge to private equity. . . " (Financial Times March 10, 2023).

As it relates to this Referral more specifically, in a May 3, 2023 post entitled "James Dondero: Dallas's Surprising Philanthropy Hero," the post states: "Most gifts are made through the Highland Dallas Foundation, Inc., the philanthropic arm of Highland Capital Management." Note that this post appears to have been prepared by Mr. Dondero himself and appeared three years after he was ousted as HCM's President. What's more to the point is that it outlines in Mr. Dondero's own words the likely failures of Highland Dallas to comply with the section 509(a)(3) operational test discussed below. A copy of that post is included as Exhibit 6.

**G. Skyview Group**

Skyview Group is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or controlled by Mr. Dondero. Mr. Mark Patrick was engaged as a tax

---

[7] *See also In Re: Highland Capital Management L.P. v. Dondero,* Case No. 19-34054-sgj11 (June 6, 2021), a decision by the U.S. Bankruptcy Court for the Northern District of Dallas. In that opinion, the Bankruptcy Judge found Mr. Dondero to be in contempt for violating a temporary restraining order. A copy of that opinion is enclosed as Exhibit 5.
[8] We can provide the IRS with a copy of this complaint if that would be of interest.

consultant by Skyview Group until Mr. Patrick resigned in October 2024 on the advice of the undersigned counsel. Skyview Group charged DAF Holdco management fees for its services.

Skyview Group is nominally owned and controlled by Scott Ellington, who was HCM's Chief Legal Officer and General Counsel until his removal by the bankruptcy trustee in 2021. Despite this nominal ownership and control by Mr. Ellington, Mr. Dondero controls all compensation decisions, including decisions relating to Mr. Ellington's compensation, and thus dominates Skyview Group as if he owned it himself.

Since Mr. Patrick's resignation from Skyview Group, Mr. Patrick has been directly employed and compensated by DAF Holdco rather than Skyview Group. In addition, Mr. Patrick, again acting on advice of counsel, caused DAF Holdco to give six-months' notice in October 2024 to Skyview Group that it was terminating its contract with Skyview Group.

Mr. Dondero became furious when he learned of these actions, and that is when (for the first time in over a decade) Highland Dallas and Dallas Foundation executives and attorneys started raising questions about DAF Holdco's investments and management. In addition, this is when Highland Dallas, and Julie Diaz (who serves as both the President of the Dallas Foundation and as a Director and Vice President of Highland Dallas), began voicing concerns over DAF Holdco's investment performance, concerns that were never raised when Mr. Dondero's lackey, Grant Scott was rubber-stamping NexPoint and other Dondero-related investments and that were never raised prior to Mr. Patrick's resignation from Skyview Group.

## II. DAF Holdco

### A. The Grant Scott Control Era

Back in 2011, when Highland Dallas and the two other supporting organizations were being formed, one of the highly successful types of investments designed and marketed by HCM through investment partnerships were collateralized loan obligations, or CLOs.

A CLO is a single security backed by a pool of corporate debt issued by corporate borrowers with low credit ratings or loans taken out by private equity firms to conduct leveraged buyouts. With a CLO, the investor receives scheduled debt payments from the underlying loans, assuming most of the risk in the event of a default. In exchange for taking on that default risk, the investor is offered greater diversity and the potential for higher-than-average investment returns. DAF Holdco was formed initially in 2011 to hold partnership interests in partnerships that held CLOs.

Mr. Dondero caused DAF Holdco to be formed to have a structure through which he could have his CRT make remainder interest distributions of the Participating Shares of DAF Holdco to Highland Dallas and to the other two supporting organizations.[9] How CLOs work is not relevant

---

[9] This is documented in Part III, Line 4a of each of the three supporting organizations' Form 990, *Return of Organization Exempt From Income Tax*, for 2023 (the last year for which a Form 990 for the organizations was posted on Guidestar.com).

to this Referral except to the extent that Management Shares of DAF Holdco were initially issued to Mr. Dondero's college roommate and long-time close friend, Grant Scott.[15]

Grant Scott's ownership of the Management Shares from 2011 to 2021 effectively allowed Mr. Dondero to retain control of DAF Holdco and, thereby, use DAF Holdco's assets as a piggybank for other investments described below. Management Shares have no economic right to distributions; the value for Mr. Dondero is in their control over DAF Holdco and the ability to utilize its assets either to make dividend distributions to the Participating Shareholders (i.e., the supporting organizations) or to fund Dondero-managed investments on non-market terms and with below-market returns on investment.

NexPoint Advisors repeatedly reached out to DAF Holdco for investment-backing with below market terms and rates of returns while under the control of Grant Scott. Grant Scott consummated these transactions without hiring outside counsel or valuation experts for DAF Holdco. The lack of arm's-length dealing under Grant Scott's control is made patently obvious in the ValueScope November 18, 2024 presentation materials included as Exhibit 7. The economics of these transactions clearly show that Mr. Dondero was directing Grant Scott to cause DAF Holdco to enter into below-market deals for DAF Holdco that redirected the profits to Mr. Dondero and entities he owns. In other words, Mr. Dondero was stealing from DAF Holdco and, in turn, the supporting organizations.

Mr. Dondero's theft was not limited to below-market transactions. In March 2020, Mr. Dondero and his affiliates directed Grant Scott to make a $1 million payment to an entity called Tall Pine Group, LLC. The payment was allegedly for professional services rendered, but no such services were rendered to DAF Holdco. In subsequent court filings, it became clear that the $1 million went to pay Mr. Dondero's affiliates' employment compensation bonuses, which could not be paid in the normal course because HCM was subject to various bankruptcy restrictions at the time. Further detail is available in the *Kirschner* Complaint, at page 81, a copy of which is attached hereto as Exhibit 2.

**B. The Mark Patrick Control Era (including present day)**

Grant Scott assigned the Management Shares to Mark Patrick in March 2021. Mr. Patrick now controls DAF Holdco and the timing of distributions to the supporting organizations, including Highland Dallas. Mr. Patrick also controls the negotiations and approvals of the terms and conditions of all investments since he assumed control. Since then, under Mark Patrick's leadership DAF Holdco has begun to diversify away from Dondero-managed investments.

Total DAF Holdco (including its subsidiaries) exposure to Dondero-managed investments was over $100 million in June 2023. Because of the formation history of DAF Holdco and the various transactions between DAF Holdco and Dondero-managed investments, DAF Holdco has been named as a defendant in numerous lawsuits claiming it is an alter ego of Mr. Dondero and his

---

[15] On pages 7 and 8 of the litigation trustee's Complaint and Objection to Claims in *Kirschner v. Dondero* included as Exhibit 2, the trustee described Grant Scott as follows: "Dondero personally selected Scott as his successor to run the Charitable DAF Fund . . . . Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and [HCM's] directives without asking questions or requesting additional information."

entities and that the initial funds transferred to DAF Holdco from the CRT were fraudulent transfers. These lawsuits have been very expensive and time-consuming for DAF Holdco, which disadvantages Highland Dallas and the other Participating Shareholders because the payment of legal fees depletes available cash.

Because Mr. Patrick viewed the $100 million exposure to Dondero-related and the lawsuits as a risk to DAF Holdco (and therefore the Participating Shareholders), he has taken steps to create layers of independence between DAF Holdco and Mr. Dondero. As documented by an independent valuation consultant, ValueScope, LLC (a copy of the ValueScope report is enclosed as Exhibit 7), upon assuming control of DAF Holdco, Mr. Patrick engaged independent counsel to assist him in negotiating "market" terms and returns on investment for investments with all outside parties, especially those controlled by or affiliated with Mr. Dondero, such as NexPoint Advisors. Neither Mr. Dondero nor his associates expected this because no market discipline was exercised by DAF Holdco when it was controlled by Mr. Dondero's college roommate and close friend Grant Scott.

Outside counsel and valuation experts frequently either negotiated more market-standard (and more favorable to DAF Holdco) terms for Dondero-managed investments or advised against the transactions on the terms proposed by Mr. Dondero (via his various entities, including NexPoint Advisors). And, because Mr. Patrick refused to simply rubber-stamp Dondero-related investment asks, Mr. Dondero became upset with Mr. Patrick and demanded that Mr. Patrick provide him with increased levels of control over DAF Holdco, including meetings between Mr. Patrick and Mr. Dondero three times per week when he was still a consultant with Skyview Group, and permitting one of Mr. Dondero's affiliates increased access to DAF Holdco information and finances. Mr. Patrick refused these requests.

Mr. Patrick also hired an independent director for DAF Holdco, Paul Murphy. During Mr. Scott's control, Mr. Scott served as sole director and sole person in control. There was no requirement under Cayman law to hire an independent director. Mr. Patrick did so for the benefit of DAF Holdco (and, indirectly, Highland Dallas and the other Participating Shareholders).

Mark Patrick also resigned from Skyview Group in October 2024. As noted above, Mr. Dondero effectively controls Skyview Group, and it is nominally owned by one of his affiliates, Scott Ellington. Mr. Dondero viewed this as the last straw—he viewed this as his final loss of control over DAF Holdco and its assets. On the same day, in order to complete the separation, Mr. Patrick directed DAF Holdco to terminate a services agreement with Skyview Group.

Mr. Patrick's resignation from Skyview Group was recommended by outside counsel, including this firm. Mr. Patrick recognizes he has fiduciary duties to DAF Holdco and its subsidiaries. Mr. Dondero created tension with these duties by demanding that Mr. Patrick rubber-stamp Dondero-managed investments, as did Grant Scott. For example, in September 2024, Mr. Dondero recommended that DAF Holdco consummate a real property acquisition on The Campus at Legacy (described in Exhibit 7) for $45 million and provide one of Mr. Dondero's entities a repurchase option if the price were to appreciate. In no uncertain terms, DAF Holdco would take all the downside financial and real estate risk and transfer the upside financial benefit to Mr. Dondero if this proposal had been accepted. This was typical for Dondero-managed investments.

Mr. Dondero also demanded that Mr. Patrick cause DAF Holdco to wire one of Mr. Dondero's offshore entities, Sentinel, $1.5 million in November 2023. Mr. Patrick sought the advice of outside counsel, who told Mr. Patrick the payment would be "impermissible and illegal for a number of reasons". Mr. Patrick accordingly refused the payment (i.e., embezzlement) request.

Mr. Dondero's behavior and attitude toward DAF Holdco is nothing if not consistent. Whether Mr. Scott or Mr. Patrick was in control, Mr. Dondero never abandoned the belief that the assets he caused his CRT to distribute to DAF Holdco remained his own. Mr. Patrick's steps toward independence and then resigning from Skyview Group in October 2024 led to Mr. Dondero exerting his influence over Highland Dallas in a manner we believe results in improper private benefit accruing to him as discussed in the tax aspects portion of this disclosure letter.

Following Mr. Patrick's resignation from Skyview Group, Mr. Dondero directed his entities to cease all principal and interest payments owed on Dondero-managed investments to DAF Holdco and its subsidiaries, which has led to several ongoing lawsuits discussed below and outlined in Exhibit 7. It is inevitable that Mr. Patrick will receive the same treatment as Mr. Daugherty and Mr. Terry (described above)—he will be subject to frivolous, vexatious lawsuits and harassment because he is Mr. Dondero's newest villain.

**C. October 2024 to Present**

The events that have unfolded show Mr. Dondero's anger at his loss of control of DAF Holdco's assets. Mr. Patrick met with Highland Dallas shortly after his resignation from Skyview Group and assured Julie Diaz of Highland Dallas and the Dallas Foundation that his resignation would not modify management of distributions to the Dallas Foundation. Mr. Patrick believed the meeting went well; Ms. Diaz voiced no concerns and actually requested additional distributions.

Shortly thereafter, Highland Dallas and the two other Participating Shareholders hired the law firm Holland & Knight (which had already represented the Dallas Foundation for years) to represent them and to send a "no confidence" letter to DAF Holdco. This purported lack of confidence was a new sentiment by Highland Dallas, which had never previously expressed any concern when it received ValueScope reports from Grant Scott. The "no confidence" letter came out of the blue—there were no calls, emails, or other communications that expressed a lack of confidence or requested any information whatsoever.

DAF Holdco subsequently learned that Mr. Dondero directed his subordinates at Skyview Group and NexPoint Advisors to provide false and misleading financial information to Highland Dallas and to the other Participating Shareholders. Rather than contact DAF Holdco or Mr. Patrick to question this information (especially given the questionable source), Highland Dallas sent the "no confidence" letter without any attempt to verify it. (As a post-script, DAF Holdco has refuted the false and misleading information, but the dispute continues because it was never really about that.)

Despite the November 11, 2024 date on the "no confidence" letter, DAF Holdco did not receive it until December 6, 2024, after the November 18, 2024 presentation to the supporting organizations' attorneys, Holland &Knight. In addition, DAF Holdco received the "no confidence" letter from Mr. Dondero's personal attorneys, who do not represent Highland Dallas or the other Participating Shareholders.

DAF Holdco responded and voiced its concerns that Mr. Dondero was directing Highland Dallas to take these actions. Recall that Mr. Dondero is a Director and President of Highland Dallas. Holland & Knight ignored the accusations that Mr. Dondero was calling the shots and began sending acrimonious (but toothless) emails to DAF Holdco. Finally, Julie Diaz, a Director and Vice President of Highland Dallas (and President of the Dallas Foundation), sent an email requesting a winding up of DAF Holdco and distribution of all of its assets to Highland Dallas and the other Participating Shareholders.

Paul Murphy, an independent Director of DAF Holdco, made a presentation to the supporting organizations' attorneys from Holland & Knight in which he reviewed all of the governance and management improvements that have already been made, but they persist behind the scenes to facilitate Mr. Dondero's attempts to undermine Mr. Patrick and regain control over DAF Holdco's assets for use by NexPoint for investments.

DAF Holdco was contacted in February 2025 by Cayman Islands counsel stating they represent "DAF 2." DAF Holdco believes this "DAF 2" is an attempt by Mr. Dondero and his affiliates to fraudulently obtain DAF's assets.

In February 2025, DAF Holdco subsidiaries filed two lawsuits against Mr. Dondero's entities for non-payment on Dondero-managed investments. Mr. Patrick also directed a non-DAF entity he controls to file a third lawsuit against Mr. Dondero's entities for non-payment. These lawsuits are fundamentally the same as other lawsuits where creditors have sued Mr. Dondero and his entities for nonpayment. Mr. Dondero has not changed—he refuses to pay his debts and he believes he is the rightful owner of DAF Holdco's assets. Mr. Dondero's instrument is Highland Dallas. He controls Highland Dallas and will cause it to continue its crusade against DAF Holdco. As noted by James Seery, the HCM bankruptcy trustee who removed Mr. Dondero from HCM, Mr. Dondero will "burn the place down" if he does not get his way.

### III. Discussion of Tax Exemption-Related Lack of Compliance and Outright Avoidance

In order for an organization to qualify for tax-exempt status under section 501(a) of the Code as a charitable organization described in section 501(c)(3) of the Code, it must be organized and operated exclusively for one or more charitable purposes described in section 501(c)(3) and the Treasury Regulations promulgated thereunder. We do not question whether Highland Dallas is organized for charitable purposes, nor do we question whether Highland Dallas's grantmaking to the Dallas Foundation and other bona-fide charitable organizations is consistent with its charitable purposes.

We do question whether Mr. Dondero's influence and control over at least Highland Dallas has allowed some portion of their net earnings to indirectly inure to Mr. Dondero's benefit as a result of his historic access to DAF Holdco's assets at below market rates and terms that appear to have been acquiesced to by each supporting organization. As we discuss below, Mr. Dondero's influence and control over DAF Holdco when Grant Scott was the Management Shareholder was never of concern, especially to Highland Dallas, even as each supporting organization received periodic valuation reports prepared by ValueScope detailing DAF Holdco's NexPoint investments. See report prepared for Grant Scott by ValueScope, attached hereto as Exhibit E. In fact, we believe those valuation reports were used by each of them to prepare their Forms 990 and to prepare consolidated financial statements.

We also believe that each of the supporting organizations operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets now that Mr. Patrick declined NexPoint investment requests that are both on non-market proposed terms and provide below market returns on investment.

If Highland Dallas elects not to exercise the Put Option before the REIT dissolves, we believe that would be an excess benefit transaction under section 4958 of the Code in which the organization managers had to have knowingly participated.

We also believe Mr. Dondero exercises such control as a substantial contributor of Highland Dallas, resulting from gifts he has made since the initial gift of Participating Shares were made by the CRT in 2011, that Highland Dallas should no longer satisfy the requirement in section 509(a)(3)(C) that there be no control by disqualified persons.

Finally, as discussed briefly below, we believe the donor advised fund rules in section 4966 and 4967 may be implicated, but have insufficient knowledge of the facts to assert conclusively that they do apply.

**A. Private Benefit**

We respectfully submit that Highland Dallas in particular no longer satisfies the operational test of section 501(c)(3) because its actions taken at Mr. Dondero's direction serve his private interests more than incidentally as prohibited by Treasury Regulation § 1.501(c)(3)-1(d)(1)(ii).

As we have outlined above, Mr. Dondero and affiliates such as NexPoint Advisors used DAF Holdco, when it was controlled by Grant Scott, as his personal piggybank. And, when Grant Scott controlled DAF Holdco, neither Julie Diaz (in her capacity as Director and Vice President of Highland Dallas) nor the Dallas Foundation questioned whether DAF Holdco's investment were prudent or generated market returns. Rather, even as they received and used for tax and financial reporting purposes the ValueScope valuation opinions which disclosed DAF Holdco's NexPoint and other Dondero-related investments, they never questioned whether the terms were market terms or whether the asset allocations were prudent. It was only after Mr. Patrick took over as Management Shareholder of DAF Holdco and (a) started declining NexPoint investment asks—really demands, (b) started diversifying DAF Holdco's investments away from NexPoint investments, (c) began demanding repayment of amounts owed with respect to NexPoint investments, and (d) Mr. Patrick resigned from Skyview Group and terminated its contract for back office and other services, that the supporting organizations collectively hired outside counsel and, under the lead of Julie Diaz, a Director and Vice President of Highland Dallas began sending no-confidence emails to DAF Holdco Directors (including Mr. Patrick and Mr. Murphy) demanding information to which they were not even legally entitled (a fact that their attorneys openly acknowledged in a Zoom call) and a complete restructuring of DAF Holdco to bring it back under Mr. Dondero's control.

In the seminal decision, *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the Tax Court concluded that the absence of private inurement to the benefit of a private shareholder or individual does not end the analysis of whether an organization satisfies the operational test of exemption under section 501(c)(3). It went on to state: "when the Court concludes that no prohibited inurement of net earnings exists, it cannot stop there but must

inquire further and determine whether a prohibited private benefit is conferred."(citations omitted) *Id.* at 1070. It concluded that "an organization's conferral of benefits on disinterested persons may cause it to serve 'a private interest' within the meaning of section 1.501(c)(3)-1(d)(1)(ii)." *Id.* at 1070.

Finally, after looking at the organization's exclusive source of funding (much the same as Mr Dondero's exclusive funding of Highland Dallas), control of a majority of the Board by members of the Republican Party (analogous to Mr. Dondero's role as President and Director of Highland Dallas and his substantial influence over the two Dallas Foundation directors evidenced by their epiphany that something has to be done since Mr. Dondero no longer controls DAF Holdco), and several other factors, "we conclude that petitioner is operated for the benefit of private interests, a nonexempt purpose." *Id.* at 1080.

In another case, *Airlie Foundation, Inc. v. United States*, 55 F.3d 684 (D.C. Cir. 1995), the relationship between the founder and executive director of the foundation bears a strong resemblance to the relationship between Mr. Dondero and Highland Dallas and served as a basis for sustain the Service's revocation of its section 501(c)(3) exemption on the ground that it provided more than incidental private benefit to the founder. Although the actual basis for revocation of exemption was a finding of inurement of net earnings, the pervasive control of the founder clearly influenced the D.C. Circuit to affirm the District Court and, equally important, the court cited *American Campaign Academy* for the proposition that an organization does not operate exclusively for tax-exempt purpose if it serves a private interest rather than a public interest and "[t]his requirement applies to the organization's actual, not purported purposes." *Id.* at 75 AFTR 2d 95-2068, 95-2071.

**B. Potential Inurement**

Section 501(c)( also requires that "no part of the net earnings " of the organization may "inure to the benefit of any private shareholder or individual." As observed in the *Airlie Foundation* case, "the extent of the inurement is immaterial." *Id.* As noted in that case, and as is the case with Mr. Dondero, the founder of Airlie Foundation, Inc. "established and controlled a network of taxable and tax-exempt entities. The transactions that took place within the network organizations formed the basis for the IRS's revocation of AFI's tax-exempt status, as discussed at length by the district court."

We respectfully submit that if the Service audits Highland Dallas it will identify many more instances of inurement, beyond the single instance of forgiving $33,672 by Airlie Foundation, Inc. owed by one of the founder's affiliated entities. The Dugaboy effective interest-free loan and potential windfall if Highland Dallas fails to exercise its Put Option should be enough, but we believe there will be many other transactions such as management and administrative fees that generate income for Dondero-related entities.

As discussed above in Section II.A., during the Grant Scott control era of DAF Holdco, Mr. Dondero's effective control of DAF Holdco led DAF Holdco to make investments that benefitted him personally. These investment deprived DAF Holdco of assets that could be distributed to Participating Shareholders, including Highland Dallas.

**C. The Failure to Exercise the Put Option as an Excess Benefit Transaction**

As you know, section 4958 treats as excess benefit transactions between a public charity such as Highland Dallas and a disqualified person such as Mr. Dondero economic arrangements that are above or below market between them. Section 4958(c)(3)(A) also treats as "automatic" excess benefit transactions "any grant, loan, compensation or other similar payment to" a disqualified person such as a substantial contributor.

We believe, upon examination, the Service will find that Highland Dallas has engaged in multiple automatic excess benefit transactions with Mr. Dondero or entities owed and controlled by him such as NexPoint Advisors.

First, the forbearance to exercise the Put Option effectively created an interest free loan to Dugaboy, a disqualified person. Thus, the mere fact it has remained outstanding for years means it is an automatic excess benefit transaction that requires not only the payment of the 25% excise tax by Dugaboy but also the correction of it through the payment of the full $8,250,000 plus interest.

Second, if NexPoint Advisors performs investment management services for a fee, that would be an automatic excess benefit transaction requiring not only correction but also payment of the 25% excise tax. In fact, we know from public SEC filings that NexPoint Advisors or one of its affiliates does perform investment management services for the REIT, which may itself be an excess benefit transaction requiring correction.

Finally, while other excess benefit transactions may be identified during an examination of Highland Dallas, any forbearance to exercise the Put Option to benefit Dugaboy should be regarded, at a minimum, as a "similar payment" given the fact that Mr. Dondero benefits economically in a substantial way from that forbearance.

Given that the other two directors must act to approve these actions, it is likely they have done so knowingly and willfully.

**D. Potential Non-Compliance with Section 509(a)(3) Operational Test Sufficient to Cause Highland Dallas to be Reclassified as a Private Foundation and Thus Subject to Chapter 42 Rules**

In Mr. Dondero's article entitled "James Dondero: Dallas's Surprising Philanthropy Hero" (May 3, 2023, copy enclosed as Exhibit 6), Mr. Dondero said as follows:

> "Mr. Dondero and his firm have supported The Family Place, The Dallas Zoo, SMU's Tower Scholars program, The Perot Museum of Nature and Science, Education is Freedom, and many more local charity organizations. Most gift are made through the philanthropic arm of Highland Capital Management."

Thus, in his own words, Mr. Dondero has acknowledged Highland Dallas has violated the section 509(a)(3) operational test in Treasury Regulation § 1.509(a)-4(e)(1) concerning permissible beneficiaries of a supporting organization and should be re-classified as a private foundation. That would mean that all dealings between Highland Dallas and entities owned or controlled by Mr. Dondero should be scrutinized to determine whether they constitute acts of

self-dealing described in section 4941 of the Code or violate other provisions of Chapter 42 of the Code, such as the taxable expenditure rules in section 4945.

Under Treasury Regulation § 1.509(a)(-4(e)(1), "[a] supporting organization will be regarded as 'operated exclusively' to support one or more specified publicly supported organizations **only if it engages solely in activities which support or benefit the specified publicly supported organizations**." (emphasis supplied)

The only exception to the requirement that a supporting organization benefit the supported organization "solely" is when the supporting organization provides benefits to individual members of the charitable class benefitted by the supported organization, such as by granting scholarships to graduates of a particular high school for college. See, *e.g.*, *Nellie Callahan Scholarship Fund v. Commissioner*, 73 T.C. 626 (1980). The word "solely" is unambiguous, therefore, Mr. Dondero's own acknowledgement that Highland Dallas is the source of his funding of other admittedly charitable organizations provides conclusive evidence that Highland Dallas fails the operational test of section 509(a)(3).

Furthermore, section 509(a)(3)(C) provides that a supporting organization may not be controlled directly or indirectly by a disqualified person. A substantial contributor to a supporting organization is a disqualified person under section 4946(a)(1)(A). Thus, Mr. Donero's Dugaboy gift of the REIT Units to Highland Dallas made him a disqualified person and his effective veto power places him in control of Highland Dallas.

Therefore, we respectfully submit that that the Service should examine Highland Dallas to determine if it should be reclassified as a private foundation for the foregoing reasons and, if it is so-reclassified, all transactions between Mr. Dondero and his related or controlled entities should be evaluated to determine whether any constitute acts of self-dealing under section 4941. This should include the failure on the part of Highland Dallas to exercise its Put Option.

**E. Potential Non-Compliance with Section 4966/4967 Rules Applicable to Donor Advised Funds**

Finally, we respectfully submit that the Service should examine Highland Dallas to determine whether it, in effect, functions as a donor advised fund of Mr. Dondero given the fact he provided substantially all of its funding, effectively controls it and may personally benefit financially more than incidentally through entities he owns or controls from management fees, charity special events such as banquets and other means.

* * * *

Representatives of DAF Holdco will be available to be interviewed by the Service in a manner that will not result in compromising confidentiality under section 6103 and without the need for an administrative summons.

Very truly yours,

SEYFARTH SHAW LLP

Douglas M. Mancino

cc. Mark Patrick, Paul Murphy and Texas, California and Missouri Offices of the Attorney General (Charitable Trusts Sections)

DMM

FTI CONSULTING

# Memorandum

TO: **Charitable DAF Holdco, Ltd**

FROM: **FTI Consulting**

DATE: **27 March 2025**

RE: **Discounts relating to participation shares**

PRIVILEGED AND CONFIDENTIAL

## 1. Introduction

1.1 Charitable DAF Holdco, Ltd ("**DAF**") is a Cayman Islands registered company formed in 2011. We understand DAF invests in real estate, hedge funds, and money market funds.

1.2 DAF's share classes comprise: (i) Management Shares; and (ii) Participating Shares. The 100 Management Shares are solely held by Mark Patrick ("**Mr Patrick**"), a director of DAF at all relevant times.[1] In respect of the Participating Shares:

(1) 305 Participating Shares had been issued as of 30 September 2024 (the "**Valuation Date**").[2] These were held by: (i) Highland Dallas Foundation, Inc; (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) The Community Foundation of North Texas. We understand that these companies are all "Support Organizations" for nonprofit charities, except for The Community Foundation of North Texas which is a nonprofit charity itself;

(2) 623 Participating Shares had been issued as of 11 February 2025 following the Board's resolution on 7 February 2025 ("**Feb 2025 Resolution**"). Under the Feb 2025 Resolution, 318 new Participating Shares were issued to DFW Charitable Foundation (a nonprofit charity). We understand that the number of Participating Shares held by each of the other parties in point (1) above has not changed.

1.3 Holders of Participating Shares may, from time to time and subject to the Directors' sole discretion, receive cash distributions from DAF to fulfil their charitable goals. As we explain further in this memo, the rights conferred to the Management Shares and Participating Shares are significantly different.

---

1 Paul Murphy is the other director of DAF. Based on our discussion, we understand that Mr Patrick is the main decision maker.

2 Valuescope Report, page 7.



FTI Consulting LLP. Registered in England and Wales at the above address. Registered number OC372614, VAT number GB 815 0575 42.
A full list of Members is available for inspection at the registered address.

1.4 Valuescope, Inc prepared a report dated 7 January 2025 (the "**Valuescope Report**") for Mr Patrick.[3] Valuescope's scope was to perform a valuation of the fair market value of 100 Participation Shares of DAF as of the Valuation Date, and they conclude on a value of US$ 76m as summarised in the table below.

**Table 1-1: Summary of Valuescope's conclusions**

| | | |
|---|---|---|
| DAF's net asset value ("**NAV**") | [a] | US$ 269.05m |
| Participation Shares outstanding | [b] | 305 |
| **NAV per share** | **[c] = [a]/[b]** | **US$0.88m** |
| Discount for lack of control | [d] | 8.1% |
| Discount for lack of marketability | [e] | 6.3% |
| Subject shares | [f] | 100 |
| **FMV of subject shares** | **[g] = [c] x (1-[d]-[e]) x [f]** | **$75.96m** |

*Source: Valuescope Report, page 4.*

**FTI's scope**

1.5 We have been asked to prepare a memorandum setting out our indicative view of the discount applicable (if any) in assessing the fair market value of Participating Shares by considering: (i) how the rights associated with the Participating Shares differ from the rights typically associated with ordinary shares in a company; and (ii) the impact of the existence of an additional share class (being the management shares owned by Mr Patrick).

1.6 We understand the above issues have not been considered by Valuescope in their report. That is, we assume that Valuescope's conclusions are based on a valuation of 100 Participating Shares as if they confer rights that are typically attached to a minority holding of ordinary shares in a private company.

1.7 As we explain in this memorandum, we consider that the rights conferred to Participating Shares are extremely limited, and the potential distribution of cash flows is highly dependent on whether the shareholder's specific circumstance is aligned with the mission of DAF. As a result, we expect:

(1) a limited discount due to lack of control and marketability (i.e., close to the range concluded by Valuescope) if the shareholder is fully aligned with the mission of DAF; and

(2) a high discount due to lack of control and marketability for a shareholder who is not aligned with the mission of DAF of over **95%** to be applicable. The reason for not fully discounting the value is that there may be some option value to the shareholder if, with the passage of time, the interests of the Managing Shareholder become aligned with the shareholder's interests.

[3] We understand that Valuescope provides quarterly updates of such report.

**Limitations and restrictions**

1.8 We understand that this memo will be used by the DAF in order to assist it in the context of understanding how a valuation expert may assess the discount referenced in 1.5. It is understood that this analysis is indicative in nature and should not be used to support a transaction. This memo does not constitute: (i) our views on the value of any Participating Shares; and/or (ii) financial or tax advice on the fair value (or any other basis of value) of such shares. It should not be relied upon for any other purpose other than that as stated.

1.9 It is not within our scope to verify or assess the accuracy of any financial information of DAF, including its NAV (as provided in the Valuescope Report or otherwise). We do not opine on matters of law. If any of our assumptions regarding legal matters change, then our opinion may change.

1.10 This memorandum is confidential. It should not be used, reproduced or circulated for any other purpose, in whole or in part, without our prior written consent.

**Structure of memorandum**

1.11 In the remainder of this memorandum, we:

(1) summarise our understanding of the history and structure of DAF relevant to our assessment. This is set out in Section 2;

(2) explain whether the rights of holders in Participating Shares materially affects the value of the shares compared to ordinary shares. This is set out in Section 3 below; and

(3) conclude on the discount applicable in valuing the Participating Shares. This is summarised in Section 4 below.

## 2. Our understanding of DAF's history and structure

2.1 We have the following understanding from Mr Patrick in relation to DAF's history and current position, in respect of: (i) intent of the shareholding structure; (ii) dividend distribution policy; and (iii) the assets that are held by DAF and its reported NAV. We summarise our understanding of these topics in turn below.

**Intent of the shareholding structure**

2.2 DAF is set up in a structure such that the Participating Shareholders (i.e., nonprofit organisations) hold a passive economic, non-voting interest. The Participating Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed – we understand that any attempts to do so may be regarded as a criminal offense by the IRS or result in significant tax liabilities.

2.3 The foregoing tax issues and structure is the primary reason for the separation of control between Participating Shares (holders of which have very limited rights as described further in Section 3) and the Management Shares (holders of which have effective control over DAF). That is, the holder of the Management Shares needs to exercise independence and act on an arms' length basis to the holders of the Participating Shares and their affiliates.

**CDMCFAD LLC**

2.4 As at February 2025, DAF holds a 100% of CDMCFAD LLC (the "**Delaware LLC**"), a Delaware limited liability company, which in turn owns a 100% LP interest in Charitable DAF Fund, LP. Mr Patrick is the Manager of the Delaware LLC.[4]

2.5 We understand that Mr Patrick, as the Manager of the Delaware LLC, has similar rights to the Delaware LLC as he does to DAF. Therefore, we consider the discount applicable to the shares in Delaware LLC to be the same as the discount we estimate for the Participation Shares.

2.6 We understand that no specific arrangements in the LLC agreement are considered to be extraordinary. In this context, we note that the discount applicable when determining the value of the DAF shares (which is based on the value of CLO Holdco, Ltd) should only consider the discount we estimate as applicable to the Participation Shares (as opposed to discount applicable to the Participation Shares multiplied by the discount applicable to the Delaware LLC shares).

**Dividend distribution policy**

2.7 When DAF was created in 2011, it was roughly targeting US$ 3m to 4m of annual distributions. It has done so until around 2019. From 2019, DAF became involved in a legal dispute, and the quantum of distributions has declined. [5]

---

4 2025.02.12 DAF Structure Chart.

5 We have not received details supporting the figure of historical distributions by DAF.

2.8 Going forwards, we understand that DAF has recently wrote its charitable mission into its corporate documents. The Directors of DAF aim to use and distribute DAF's funds to organisations that are aligned DAF's charitable mission, which may include educational and communal projects.

**Assets held by DAF**

2.9 We understand that, in addition to cash and liquid assets (such as money market type funds), DAF holds CLOs and real estate assets. We provide a snapshot of the assets as at 30 September 2024, as shown in the Valuescope Report.

FTI CONSULTING

Privileged and Confidential

**Figure 2-1: NAV reported by DAF as of 30 September 2024**

| | Balance Sheet as of: 9/30/2024 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. (Participation Rights) | 69,385 | 0.0% |
| MidWave Common | 1,640,571 | 0.5% |
| MidWave - Term Loan A | 85,552,571 | 27.1% |
| MidWave - Term Loan C | 40,174 | 0.0% |
| NexPoint Capital, Inc. (BDC) | 14,223,433 | 4.5% |
| NexPoint Real Estate Strategies Fund Z | 8,487,030 | 2.7% |
| NexPoint Real Estate Finance (NREF) | 6,174,381 | 2.0% |
| NexPoint Residential (NXRT) | 2,338,207 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 2,331,025 | 0.7% |
| Small Bay II (Class I) | 3,770,609 | 1.2% |
| Small Bay II (Class II) | 4,047,276 | 1.3% |
| Small Bay II (Class III) | 2,357,682 | 0.7% |
| Polo Glen | 678,545 | 0.2% |
| NHT Holdco | 109,056 | 0.0% |
| ACHC | 158,525 | 0.1% |
| COLL | 115,804 | 0.0% |
| HRTX | 10,945 | 0.0% |
| ACRG/AU | 3,267 | 0.0% |
| ACRG/BU | 1,409 | 0.0% |
| TGTX | 333,308 | 0.1% |
| TMO | 282,686 | 0.1% |
| BIO | 111,081 | 0.0% |
| iHeart Communications | 365 | 0.0% |
| Multi Strat | 107,324 | 0.0% |
| Crusader Fund II, Ltd. | 38,131 | 0.0% |
| BVP Property | 94,000 | 0.0% |
| NCI Apache Trail | 1,104,000 | 0.3% |
| NCI Fort Worth Land | 874,200 | 0.3% |
| NCI Royse City Land | 11,448,367 | 3.6% |
| NCI Stewart Creek | 1,250,000 | 0.4% |
| NLA Assets | 1,766,000 | 0.6% |
| FFWM | 2,541,184 | 0.8% |
| SRG | 139,500 | 0.0% |
| SRTY | 2,380,529 | 0.8% |
| SQQQ | 1,818,805 | 0.6% |
| SPXU | 2,174,013 | 0.7% |
| Serengeti | 2,951,678 | 0.9% |
| Conservation Equity Fund | 3,253,139 | 1.0% |
| MMPQ | 527,460 | 0.2% |
| Total Wire Convertible Promissory Note | 20,560 | 0.0% |
| Sable Permian Resources | 2 | 0.0% |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

*Source: Valuescope report, page 46.*

FTI CONSULTING



2.10 We understand that the NAV in the snapshot above is unlikely to reflect updated market value of the assets. For example, some real estate assets are reported at historical cost, which are dated and would not reflect their market values as at the reporting date.

2.11 Valuescope applies two discounts to the reported NAV of $269m in their valuation:

(1) a 8.1% discount for lack of control. This is calculated by reference to the average discount in traded close-end funds against their reported NAV; and

(2) a 6.3% discount for lack of marketability. This is calculated as the average of: (i) 2.8%, calculated using a put option approach; and (ii) 9.7%, based on findings of studies on restricted stocks.

2.12 We understand from you that Valuescope has not considered the rights of the Participating Shares in their assessment of the above discounts. That is, Valuescope valued the Participating Shares as if they confer rights that are typically attached to a hypothetical minority holding of ordinary shares in a private company.

2.13 The studies and approaches considered by Valuescope are commonly referred to in valuations in the context of tax reporting in US. We consider that other approaches may be used and further adjustments may be required to reflect the circumstance of DAF's history (even in respect of valuing a hypothetical ordinary share).[6] However, it is not within our scope to review and/or adjust Valuescope's assessment.

6 Further, the discount to NAV observed in traded close-end funds may not necessarily reflect a 'lack of control'. Such discounts may be due to the assumptions regarding the yield curve and other assumptions used by the fund in determining its NAV.

## 3. Participating Shareholder Rights

3.1 In this section, we discuss the rights of the holders in Participating Shares, specifically in respect of:

(1) the issuance of new shares;

(2) dividends;

(3) voting and the appointment and removal of directors;

(4) share transfers;

(5) share redemption; and

(6) the access to information.

3.2 The analysis of these rights is based on information you have provided to us.

3.3 At the outset, we note an overarching point relating to the Participating Shares. That is, we understand from you that Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission. We understand that the Directors acting in the best interests of the company is generally regarded as the interests of the members as a whole and in certain circumstances the object of the company may be taken into account when determining what is in the best interests of the company. In preparing this note, we have assumed, as agreed with you, that Directors acting in the best interests of the company relates to the interests of the members, and ensuring charitable causes are served, in alignment with, as we understand it, DAF's mission.

**(1) Issuance of new shares**

3.4 We understand that Participating Shareholders do not have: (i) the right to vote on the issuance of further Participating Shares; (ii) pre-emption rights; or (iii) the right to receive notice of such issuance.

3.5 In accordance with the Articles, DAF's Directors may unilaterally issue additional Participating Shares and thereby dilute the power of existing shareholders. On 7 February 2025, through the Board's resolution, DAF issued 318 new Participating Shares (reflecting 51% of all outstanding Participating Shares) to DFW Charitable Foundation, thereby diluting the power of other shareholders.

3.6 Based on the above, we understand that the Participation Shares can be diluted (without corresponding price or compensation paid to existing shareholders) without approval from any shareholders. This introduces a high uncertainty to the value of such shares. Such risks of dilution (without compensation) in the Participating Shares would therefore be materially higher than ordinary shares in typical companies, which confer rights to block such dilution.

**(2) Dividends**

3.7 In respect of the timing and amounts of dividends in Participation Shares, DAF's Directors have "*sole and absolute discretion*" to declare dividends "*without a requirement to pay such dividends on a pro-rata basis*".

3.8 We understand from you that Participating Shareholder do not have

- the right to cause or vote on distributions;
- the right to pro rata distributions based on their shareholding;
- the right to annual or timed distributions; or
- the right to receive notice of distributions to other Participating Shareholders.

3.9 With respect to these four points, we have regard to the UK 'Model Articles for private companies limited by shares' as a guide to what would be considered typical rights to ordinary shareholders in respect of dividends.[7] [8]

(1) **Cause or vote on distributions**. Dividends may be declared 'by ordinary resolution'. A dividend must not be declared unless the directors have made a recommendation for such amount. Therefore, whilst ordinary shareholders typically have a final vote on distributions, it is expected that such dividends need to be recommended by the director in the first place. In the context of DAF, the lack of rights to cause or vote on distributions may not merit a significant discount because of the common reliance placed on the directors' recommendation.

(2) **Pro rata distributions**. Under the UK's model articles: "*Unless the shareholders' resolution to declare or directors' decision to pay a dividend, or the terms on which shares are issued, specify otherwise, it must be paid by reference to each shareholder's holding of shares*".[9] The default position of ordinary shareholder is that they would receive dividends on a pro rata basis (by reference to each shareholder's holding of shares). Alternatively, if the terms of shares allow, or that there would be a shareholders' resolution, there may be non pro rata distributions. However, in our experience we expect the extent of the disproportionate distribution to be clearly defined in the company's articles or shareholder's agreement (e.g., Shareholder A gets 10% voting rights but 50 % access to dividends).

---

7 We understand that in Cayman Islands, the companies act is designed to be flexible so that the memorandum and articles can be tailored to meet the requirements of the company. Therefore we have chosen the UK's guide as that would be more informative of the expectations of a 'typical ordinary shareholder'.

8 https://www.gov.uk/government/publications/model-articles-for-private-companies-limited-by-shares/model-articles-for-private-companies-limited-by-shares#declaringdividends

9 See also UK government's guide on directors' duties, stating that "*You must usually pay dividends to all shareholders.*" https://www.gov.uk/running-a-limited-company/print

In the context of DAF, we consider that the discount relating to the uncertainty of dividends is high, given that: (i) the directors have the sole discretion to issue dividends without the Participating Shareholders' approval; and (ii) the terms do not specify to the extent of the potential non pro rata distribution, such that the uncertainty arises for each dividend payment.

(3) **Annual or timed distributions**. This is not a typical right attached to ordinary shareholders (such characteristic may be more prevalent in preference shares). We therefore do not consider this to merit additional discount.

(4) **Right to receive notice of distributions to other shareholders.** In itself, this right is not valuable if the shareholders are expected to receive a pro rata dividend (or are clear about the extent of disproportion of their dividends), as they can calculate the dividends received by each shareholder. It is only the uncertainty of non pro rata distributions (i.e., point 2 above) which means this right may be useful. We therefore do not consider any additional discounts applied based on point 2 above.

3.10 As above, since 2019, DAF has continued to make distributions, albeit of a reduced quantum. Therefore, in respect of the Participating Shareholder, there is a high uncertainty regarding: (i) whether its charity goals are aligned with DAF's mission such that it would receive distributions (this may change over time but also appears binary at any given date); (ii) the timing of any future cash flows; and (iii) the relevant amount of such cash flows.

3.11 We understand that the Participating Shareholders' only right to DAF's assets is in the situation where DAF gets wound up.[10] We understand that the Participating Shareholders have the right to seek a winding up of the company, as conferred upon them by the Companies Act. However, it is not clear whether the court would approve the winding up of the company. We understand that if the company is acting in a manner consistent with its articles then the winding up petition is unlikely to be successful.

3.12 Given the differences to rights that are typically attached to ordinary shareholders as explained above, we consider that a very material discount to be applicable.

**(3) Voting and the appointment and removal of directors**

3.13 Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the company. Further, the right to appoint or remove directors is held by the Management Shareholder.

3.14 The above rights are typically granted to ordinary shareholders. In this regard, the Participating Shares are similar to typical 'preferred shares' or non-voting shares. This can be considered as a lack of control over the company's operations or investments.

---

10 Article 121 to 123, Memorandum and articles of association.

3.15 Normally, the discount applied to non-voting rights is relatively low (valuers typically consider a range of 3-5%[11]). This is because this risk, generally labelled as corporate governance risk, is somewhat contained by the directors' duties to act in the best interest of the shareholders. For example, the UK companies act requires a director of a company to act in the way he or she considers, in good faith, would "*most likely promote the success of the company for the benefit of its members as a whole*" and having regard to "*the need to act fairly as between members of the company*."[12]

3.16 We understand that the above is not fully applicable to DAF, given the Articles of the company and that its Directors only need to act to promote its charitable mission without any influence exerted by the holders of the Participating Shares.[13]

3.17 In our view, the lack of rights to appoint or remove directors would merit a discount that would be more material than the usual discounts considered for a lack of voting rights.

**(4) Share transfer**

3.18 DAF's Directors may require the transfer of Participating Shares if it comes into notice that such shares are held by a Restricted Person, i.e., a person in breach of laws and regulations or in the Directors' opinion might result in DAF incurring liabilities or suffering penalties.

3.19 Given that such transfer happens only in cases relating to potential threats to the company (including legal threats), we understand that this clause offers protection to DAF's operations. Therefore, additional discounts to the Participating Shareholders may not be applicable, unless there is doubt as to the Directors' judgement, which is discussed in the topic of appointment and removal of directors above.

**(5) Redemption of shares**

3.20 Participating Shares are defined as non-redeemable shares. We therefore do not consider discounts relating to this feature in respect of the Participating Shares.

3.21 To the extent that CDMCFAD LLC shares are redeemable, given the potential dilution and no guarantee to a pro rata cash distribution rights (as explained above), we have not considered any additional discount to be applied on this factor. That is, we consider that the discount applied to the factors above would also cover the risk of redemption.

---

11 See, e.g., BVR's guide to discounts for lack of marketability, page 281; and Stanford Law Review (2019), Nonvoting Shares and Efficient Corporate Governance, page 44.

12 https://www.legislation.gov.uk/ukpga/2006/46/section/172

13 As explained above, the attempt to exert influence may be a criminal tax offense.

**(6) Access to information**

3.22 Participating shareholders have limited information rights (except those as conferred by law or authorised by the Directors). Specifically, the articles do not provide the Participating Shareholders with the following: (i) the right to inspect any account; (ii) the right to inspect any book; or (iii) the right to inspect any document of the Company.

3.23 The lack of information creates uncertainty to the shareholder. However, we understand that the shareholders have quarterly financial reports that provide basic access to the company's financial information but are not entitled to further information except as provided at the discretion of management. For the purpose of a valuation of the Participating Shares' fair market value based on its NAV - which we understand to be accurate for the purpose of our exercise - a discount may not be applicable (or in any case would be covered under the lack of control).

FTI CONSULTING



## 4. Discounts applicable in valuing the Participating Shares

4.1 The table below summarises our view of the materiality of each factors in considering the value of Participating Shares as discussed in Section 3.

**Table 4-1 Materiality of rights in Participating Shareholders in valuation**

| | **Materiality (in principle)** |
|---|---|
| Issuance of new shares | Very material due to potential dilution effect |
| Dividends | Very material due to no rights for pro-rata distribution, and uncertainty as to alignment with mission of DAF |
| Voting and change in Directors | Material due to uncertainty as to alignment with mission of DAF |
| Share transfer | Limited |
| Share redemption | None for Participating Shares. Potentially material for CDMCFAD LLC; however discount would be covered in the discount due to lack of control over issuance of new shares and rights to dividends |
| Access to information | Very limited – has certain access conferred by law |

4.2 Judge Laro's comments in *Mandelbaum v Commissioner* on discount for lack of marketability is often referred to by valuation practitioners determining discounts for lack of marketability:

> *"Ascertaining the appropriate discount for lack of marketability is a factual determination. Critical to this determination is an appreciation of the fundamental elements of value that are used by an investor making his or her investment decision."*

4.3 The list of issues that Judge Laro went on to cite as important in a determination of the discount are now commonly referred to as the "Mandelbaum factors", which are broadly summarised as:

(1) Financial statement analysis

(2) Dividend policy

(3) Nature of the company (history, position in industry, economic outlook)

(4) Company's management

(5) Amount of control in the transferred shares

(6) Restrictions on transferability of stock

(7) Holding period for stock

(8) Company's redemption policy

(9) Costs associated with a public offering

4.4 Due to the specific context of DAF (including the tax-related constraints for the Participating Shareholders and the Directors' control), the discounts primarily relate to dividend, nature of the company, company's management, and amount of control.

4.5 The restricted stock studies (which suggests typical discounts of 10% - 35%) or put option approach relied upon by Valuescope focus on the restrictions on transferability of stock (i.e., discount for the shares requiring between six months and one year to be sold).[14] In our view such studies do not provide a guide as to the discount for the rights of the Participating Shares.

4.6 As explained above, the rights conferred to Participating Shares are extremely limited, and the potential distribution of cash flows is highly dependent on whether the shareholder's specific circumstance is aligned with the mission of DAF. As a result, we expect:

(1) a limited discount due to lack of control and marketability (i.e., close to the range concluded by Valuescope) if the shareholder is fully aligned with the mission of DAF; and

(2) a high discount due to lack of control and marketability for a shareholder who is not aligned with the mission of DAF of over **95%** to be applicable. The reason for not fully discounting the value is that there may be some option value to the acquirer that with the passage of time: (i) they become aligned with the Managing Shareholder's interest; or (ii) there is a change in the Managing Shareholder.

4.7 Our indicative view, as set out in this memorandum, may change if we are provided with further information.

14 Valuescope Report, pages 26 and 53.

Mercer

*Confidential – Subject to Attorney / Client Privilege*

# Market Compensation Assessment

## Charitable DAF

August 26, 2024

**Heidi O'Brien,** Partner
**Matthew Mullen**, Senior Principal
**Katy Ringenberg–Means**, Senior Associate
**Chuhan Huang**, Senior Analyst

A business of Marsh McLennan



# Context

- Mercer was engaged to assess compensation for Charitable DAF's top executive, Mark Patrick, who serves as:
  - President, Chief Investment Officer and General Counsel of Charitable DAF Holdco, Ltd.
  - President and Chief Investment Officer for seven subsidiaries/affiliated entities
- To gather additional context and understand the current role, we conducted stakeholder interviews with Mr. Patrick and six other individuals that work closely with him:
  - Alex McGeoch *(Partner, Hunton Andrews Kurth)*
  - Steve Hastings *(Principal, Valuescope, Inc.)*
  - Ken Gill *(Principal, GILL Real Estate Advisory)*
  - Shawn Raver *(Tax Attorney/Consultant)*
  - Paul Murphy *(G.K. Management)*
  - Jim Shields *(Founder/Attorney, Shields Legal)*
- Mercer summarized market compensation levels for:
  - Base salary
  - Total Compensation *(base salary + annual incentives + long-term incentives)*

This report summarizes our interview findings, benchmarking methodology, market compensation findings, and recommendations for the go-forward compensation package

# Summary of Interview Findings

- Our stakeholder interviews illustrated the complexity of the current role, with the incumbent serving in multiple different capacities:

1 **Chief Executive Officer (CEO):** Managing Charitable DAF corporate structure and operational issues, and determining charitable disbursements

2 **Chief Investment Officer (CIO)**: fund management and investment strategy development, dealing with highly complex investments

3 **Legal:** Handling complex and contentious litigation, asset recovery, and complex tax structures – some stemming from the Highland Capital Management bankruptcy

4 **Compliance:** Navigating regulations and compliance requirements across multiple states and internationally

# Methodology

- ***Market positions***: based on input from the stakeholder interviews and our understanding of the role, the **Chief Executive Officer** and **Chief Investment Officer** are the most relevant positions for the purposes of benchmarking compensation
  - While there is a legal and compliance component of Mr. Patrick's role, the CEO and CIO roles will reflect the highest-level roles in the market and are a better representation of the complexity of the role
- ***Market Sectors***: As Charitable DAF and Mr. Patrick's role are unique in structure and complexity, we summarized market data for a variety of sectors/industries. Data were scoped as closely as possible to Charitable DAF's asset size of $350M, or revenue size of $78M *(for those surveys that scope only on revenue)*

CEO Markets
- **Publicly-traded REITs**[1] with assets of $3B or less
- **Private Equity firms** with assets of $150M-$500M[2]
- **General Industry companies** with revenue of $25M-$100M

CIO Markets
- **Private Equity firms** with assets of $400M-$1B
- **Non-profit Endowments and Foundations** with assets of $3B or less

- We also summarized market practices for benefits and perquisites

[1] Combination of mortgage REITs (which invest in collateralized loan obligations (CLOs)) and other REITs. The REIT reference is relevant given that the portfolio Mr. Patrick oversees has 1) a large concentration of CLOs and 2) a focus on real estate development on a large amount of raw land

[2] Reflects an equal blend of two survey sources, Preqin and Heidrick & Struggles *(see Appendix for details)*

# Summary of Recommendations

- **Recommended package includes base salary, plus long-term incentive (LTI) tied to fund returns:**
  - – Base salary: $850K ($750K, if general partner liability insurance can be acquired to mitigate Mr. Patrick's personal risk exposure)
  - – LTI: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return)
    - Initial LTI cycle should capture some past performance, as annual compensation to date (which Charitable DAF confirmed has been far below the market salary levels reflected in this report) has not reflected fund performance
- Rationale for the recommended package:
  - – Salary is targeted at top quartile of the composite market given the complexity of Mr. Patrick's role, and aligns more closely with the publicly traded REITs, which have additional complexity of their own
  - – Recommended salary also incorporates market benefits value*, as benefits are not provided by Charitable DAF
  - – LTI opportunity links pay to fund performance, with an upside limit to prevent excessive levels of pay
- **Question for Charitable DAF to consider:** Whether 2021 performance should be captured in the initial cycle, given Mr. Patrick's start date in March 2021, or whether performance should be considered only for 2022 and later years

*See Appendix for overview of market benefits practices

# Base Salary Market Data

- Average base salary *(at the median)* is $525K for CEO and $455K for CIO
- Blending the data for the two roles is not recommended, as it reduces the higher-paid role, rather than reflecting an incumbent playing multiple roles
- In this case the more relevant reference is likely the CEO data, because:
  - Mr. Patrick's role is more complex than that of a typical CIO
  - While CEOs of organizations of the sizes reflected here likely have broader employee size / operational scope, Mr. Patrick's role reflects other complexities that may not be reflected in these CEO roles

*Compensation values in $000's*

| CEO | 25th %ile | Median | 75th %ile |
|---|---|---|---|
| **Private Equity firms** *($150-$500M assets)* | $391 | $477 | $565 |
| **REITs** | $409 | $663 | $987 |
| **General Industry** | $347 | $436 | $646 |
| **Composite** | $382 | $525 | $733 |

| CIO | 25th %ile | Median | 75th %ile |
|---|---|---|---|
| **Private Equity firms** *($400M-$1B assets)* | $314 | $338 | $559 |
| **Endowments and Foundations** | $481 | $571 | $714 |
| **Composite** | $398 | $455 | $637 |

# Total Compensation Market Data

- Total compensation is the sum of **base salary, annual incentives, and long-term incentives** *(where provided)*
  - The market data also include carried interest, where we were not able to break it out separately
  - We would typically exclude carried interest *(when itemized)*, as 1) the value fluctuates meaningfully based on fund returns, 2) value is often reported on an accumulated rather than annualized basis, and 3) individuals receiving carried interest are also typically responsible for raising funds/capital
- Average total compensation *(at the median)* is $1.4M for CEO and $1.5M for CIO

*Compensation values in $000's*

| CEO | 25th %ile | Median | 75th %ile |
|---|---|---|---|
| **Private Equity firms**[1] *($150-$500M assets)* | $888 | $1,837 | $2,927 |
| **REITs** | $725 | $1,840 | $3,012 |
| **General Industry** | $365 | $570 | $1,000 |
| **Composite** | $659 | $1,416 | $2,313 |

| CIO | 25th %ile | Median | 75th %ile |
|---|---|---|---|
| **Private Equity firms**[2] *($400M-$1B assets)* | $1,523 | $1,983 | $6,166 |
| **Endowments and Foundations** | $731 | $941 | $1,313 |
| **Composite** | $1,127 | $1,462 | $3,740 |

*(1) Includes carried interest in one of the two surveys used, as the survey combined LTI and carried interest into one value*
*(2) Includes carried interest, as the survey combined LTI and carried interest into one value*

# Long-Term Incentive (LTI) Tied to Fund Returns

## 3-Year Performance Example

- Payment after 3 years: **7.5% of fund earnings** (net of expenses) **in excess of 10%** annualized
  - Maximum annualized return included in calculation: **25%**

**Payout after 3 years**

**7.5% of Excess Fund Earnings**

**Year 1** | **Year 2** | **Year 3**

Assumptions:
- **Starting Salary:** $750K
- **Starting Fund Value:** $350M
- **Annualized Net Fund Return**: 15%

*Values in $000's*

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Payment | — | — | — | $4,984 | — | — | $7,580 |

Annualized Pay Years 1-3: **$2.4M**
*(Avg. salary* + 1/3 of $4.98M payment)*

*Example assumes 3% annual salary increases

## LTI Outcomes Assuming Various Net Fund Returns

- With **3-year performance periods** and a starting fund value of $350M, payment opportunity after 3 years ranges from **$0 - $16.3M**

**LTI Payment after 3 Years**
*(in $000's)*

| Annualized Return | Payment After *3 Years* |
|---|---|
| 10% | — |
| 15% | $4,984 |
| 20% | $10,421 |
| 25% | $16,331 |
| 30% | $16,331 |

# Initial LTI Period Can Recognize Some Prior Performance

- Mr. Patrick assumed the role during 2021. Compensation to date has been base salary only (not been tied to fund returns)
- The first 3-year performance period could measure 2021-2023 performance, or, a 2022-2024 performance period could be more appropriate given Mr. Patrick's mid-2021 start date
- If the first period measures performance for 2021-2023, LTI payment for that period would be $4.46M or $5.76M, depending on whether the return calculation is net of legal expenses:

| Return Calculation Approach | LTI Payment for 2021-2023* *($000's)* |
|---|---|
| Net of All Expenses | $4,459 |
| Net of Fund Expenses Only | $5,759 |

- Charitable DAF should consider which approach is more appropriate, given the circumstances. Things to consider:
  - While the legal expenses are tied to the operation of Charitable DAF, most of these legal expenses are *not* tied to the operation of the fund.
  - Mr. Patrick indicated that he uses litigation as an investment tool; therefore, some of the legal fees likely *are* tied to fund management (although this may be a small portion). If these investment-related legal fees were to become significant in the future, excluding them would become more inappropriate.
  - Mark's salary was positioned high relative to market in part due to his personal risk exposure from the ongoing litigation.

*Reflects LTI formula of 7.5% of annualized returns in excess of 10% (capped at 25% annualized), and based on the historical fund balances and fund earnings provided to use by Charitable DAF

997

TDIT004263

# Appendix

CONFIDENTIAL

# Benchmarking Methodology

| | Description |
|---|---|
| ***Geographic Scoping*** | • National, to reflect the national labor market for executive talent (i.e. no geographic adjustment) |
| ***Compensation Data Sources and Size Scopes*** | **<u>Private Equity Firms</u>**<br>• 2024 & 2023 Preqin Private Capital Compensation and Employment Review *(scoped to 7 private equity companies with $150M-$400M in assets and 11 private equity companies with $400M-$1B in assets)*<br>• 2022 Heidrick & Struggles' North America Private Equity Compensation Survey *(scoped to 10 private equity companies with $250-$500M in assets)*<br>**<u>REITs</u>**<br>• Most recent Proxy filings *(10 REITs with less than $3B in assets)*<br>**<u>General Industry</u>**<br>• 2023 Mercer US Benchmark Database *(scoped to 38 general industry companies with $25M-$100M in revenue)*<br>**<u>Endowments and Foundations</u>**<br>• 2024 US Endowments and Foundations Investment Groups Survey *(scoped to 37 orgs with less than $3B in assets)* |
| ***Data Aging*** | • Data were aged to 7/1/2024 by an annual aging factor of 3%, which reflects average increases for executives according to Mercer's *US Compensation Planning Survey* |
| ***Benefit Survey Sources*** | • Mercer's North America Executive Rewards Year-End Survey *(scoped to 42 US banking/financial services companies)*<br>• Mercer's Executive and Broad-based Employee Retirement Tool *(scoped to 51 US financial services companies)*<br>• Mercer's Executive Benefit and Perquisite Practices Survey for Tax-Exempt Organizations *(scoped to 71 foundations & higher education institutions)* |

# Details on Market Data Sources

| Compensation Data Sources and Size Scopes | |
|---|---|
| **Private Equity Firms** | **2024 & 2023 Preqin Private Capital Compensation and Employment Review**<br>• **Overview:** The review analyzes the data on thousands of professionals at contributing private capital firms with data by fund type<br>• **Survey Scope:** Scoped to *$150M-$400M in assets (CEO data) & $400M-$1B in assets (CIO data; smaller cut not available)*<br>• **Sample Size:** 7 orgs (*$150M-$400M in assets) & 11 orgs ($400M-$1B in assets)*<br>**2022 Heidrick & Struggles' North America Private Equity Compensation Survey**<br>• **Overview:** This report provides a comprehensive picture of compensation for North American private equity executives<br>• **Survey Scope:** Scoped to organizations with *$250-$500M* in assets<br>• **Sample Size:** 10 orgs |
| **REITs** | **Most recent Proxy filings**<br>• **Overview:** Proxy filings for publicly traded of REITs<br>• **Survey Scope:** Scoped to organizations with $69M-$2.7B in assets (median asset size $509M)<br>• **Sample Size:** 10 orgs (5 REITs and 5 MREITs) |
| **General Industry** | **2023 Mercer US Benchmark Database (MBD)**<br>• **Overview:** MBD delivers data for 7+ million incumbents<br>• **Survey Scope:** Scoped to general industry companies with $25M-$100M in revenue<br>• **Sample Size:** 38 orgs |
| **Endowments and Foundations** | **2024 Mercer US Endowments and Foundations Investment Groups Survey**<br>• **Overview: T**he most comprehensive and credible source of compensation data for the not-for-profit investment community<br>• **Survey Scope:** Scoped to organizations with less than $3B in assets (smallest available cut)<br>• **Sample Size:** 37 orgs |

# REIT Details

- Mercer initially focused on mortgage REITs *(MREITs)*, given the portfolio Mr. Patrick oversees; however, given the insufficient number of MREITs with similar asset size to Charitable DAF, other REITs were added as well

| Companies | Classification | Assets ($M) | Executive Name | Executive Title | Base Salary | Total Compensation |
|---|---|---|---|---|---|---|
| Granite Point Mortgage Trust Inc. | MREIT | $2,720 | John ("Jack") A. Taylor | President & CEO | $1,000,000 | $4,036,920 |
| Seven Hills Realty Trust | MREIT | $698 | Thomas J. Lorenzini | President & CEO | $944,308 | $2,027,633 |
| Wheeler Real Estate Investment Trust, Inc. | REIT | $668 | M. Andrew Franklin | President & CEO | $400,000 | $600,000 |
| Sachem Capital Corp | MREIT | $627 | John L. Villano | Chairman of the Board, CEO, President & Director | $750,000 | $1,500,000 |
| Postal Realty Trust, Inc. | REIT | $584 | Andrew Spodek | CEO | $388,265 | $2,545,584 |
| NewLake Capital Partners, Inc. | REIT | $433 | Anthony Cogniglio | President, CEO & Director | $400,000 | $1,139,706 |
| Sotherly Hotels Inc. | REIT | $405 | David R. Folsom | President & CEO | $537,595 | $738,082 |
| Highlands REIT, Inc. | REIT | $344 | Richard Vance | President & CEO | $750,000 | $3,250,000 |
| Bimini Capital Management Inc | MREIT | $122 | Robert E. Cauley | President & CEO | $1,088,805 | $2,815,555 |
| Manhattan Bridge Capital, Inc. | MREIT | $69 | Assaf Ran | President & CEO | $350,000 | $480,000 |
| ***Summary Statistics*** [(1)] | | | | | | |
| *75th Percentile* | | *$675* | | | *$986,978* | *$3,011,891* |
| *50th Percentile (Median)* | | *$509* | | | *$663,111* | *$1,839,906* |
| *25th Percentile* | | *$288* | | | *$408,978* | *$724,668* |

*(1) Summary statistics for base salary and total compensation have been aged to 7/1/2024*

# Private Equity Market Details for CEO Role

*Compensation values in $000's*

| CEO | 2024 Market Data | | | | | |
|---|---|---|---|---|---|---|
| | Base Salary | | | Total Compensation | | |
| | 25th %ile | Median | 75th %ile | 25th %ile | Median | 75th %ile |
| **Preqin: $150M-400M Assets** (1) | $357 | $419 | $535 | $892 | $1,783 | $3,176 |
| **Heidrick & Struggles: $250M-500M Assets** | $424 | $535 | $594 | $883 | $1,890 | $2,677 |
| **Composite** | $391 | $477 | $565 | $888 | $1,837 | $2,927 |

*(1) Includes carried interest in one of the two surveys used, as the survey combined LTI and carried interest into one value*

# 2023 Market Data

*Compensation values in $000's*

| CEO | Base Salary | | | Total Compensation | | |
|---|---|---|---|---|---|---|
| | 25th %ile | Median | 75th %ile | 25th %ile | Median | 75th %ile |
| **Private Equity firms**[1] *($150-$500M assets)* | $379 | $463 | $548 | $862 | $1,783 | $2,841 |
| **REITs** | $397 | $644 | $958 | $704 | $1,786 | $2,924 |
| **General Industry** | $336 | $423 | $627 | $355 | $554 | $971 |
| **Composite** | $371 | $510 | $711 | $640 | $1,374 | $2,245 |

| CIO | Base Salary | | | Total Compensation | | |
|---|---|---|---|---|---|---|
| | 25th %ile | Median | 75th %ile | 25th %ile | Median | 75th %ile |
| **Private Equity firms**[2] *($400M-$1B assets)* | $305 | $329 | $543 | $1,479 | $1,926 | $5,987 |
| **Endowments and Foundations** | $467 | $555 | $693 | $710 | $913 | $1,275 |
| **Composite** | $386 | $442 | $618 | $1,095 | $1,420 | $3,631 |

*(1) Includes carried interest in one of the two surveys used, as the survey combined LTI and carried interest into one value*
*(2) Includes carried interest, as the survey combined LTI and carried interest into one value*

# Incentive Plan Alternatives

- Compensation package can consist solely of base salary, or can be a combination of salary *(at a lower level)* plus annual and/or long-term incentives

| | Annual Incentive | Long–Term Incentive | Deferred Compensation |
|---|---|---|---|
| **Description** | • Annual incentive tied to fund returns or other metrics | • Incentive based on fund returns over a 3–5 year period | • Deferred compensation granted annually; balance grows at the fund's rate of return |
| **Example** | • Target annual payment is 100% of salary, max is 200% | • Target as % of salary, OR as a % of excess returns<br>• Payment made every 3–5 years | • Paid at termination of employment (or earlier date, if elected) |

- While deferred compensation is feasible for some organizations, Charitable DAF's outside legal counsel has confirmed that IRC Section 457A would likely apply, which would tax any deferred compensation at vesting. Therefore, this report focuses only on annual and long-term incentives as viable alternatives

# Pros/Cons of Alternatives

- Note that for outcomes tied to fund returns, absolute return *(vs. relative)* may be the only feasible measure, as a comparable benchmark return likely doesn't exist

| | Annual Incentive | Long–Term Incentive (LTI) | |
|---|---|---|---|
| | | % of Salary | % of Excess Returns |
| **Pros** | • Fairly simple, formulaic approach | • More predictable incentive value than a % of excess returns approach<br>• Rewards longer–term vs. annual performance | • Greater upside / greater linkage to performance vs. % of salary approach<br>• Rewards longer–term vs. annual performance |
| **Cons** | • Pays based on annual results, not long–term returns<br>• If not tied to fund returns, requires goal setting each year | • Less upside potential than % of returns approach<br>• Greater cost to organization in low performance years<br>• Delay in payment compared to annual incentive | • No value provided unless fund returns exceed threshold<br>• Greater cost to organization in high performance years<br>• Delay in payment compared to annual incentive |

- Based on our interviews, long-term performance seems a more appropriate measure than annual performance; however, the organization should consider whether a focus on short-term and/or long-term results is more appropriate

# Market Benefits Landscape

**Retirement Benefits:**

- At the executive level, retirement benefits are typically the largest component of benefits value. Total employer contributions as a % of base salary are**:**

| | Median | 75th %ile |
|---|---|---|
| **For-profit Financial Services** | 4% | 6% |
| **Non-profit Foundations & Higher-Ed** | 8% | 11% |

**Other Benefits:**

- Most companies provide basic health and welfare benefits, which typically is not feasible until the employee size is larger

**Perquisites:**

- While perquisites have declined in prevalence, **~75%** of Financial Services and **~60%** of Foundations & Higher-Ed provide at least one perquisite to the CEO



# Disclaimers

- Mercer is not licensed to practice law, and our evaluation should not be considered a legal opinion on the level or structure of Mr. Patrick's compensation; legal counsel should weigh in on both matters
- In determining where to set pay, the organization should also consider the impact on overall organizational expenses, and the organization's ability to meet the expected distributions to the charities
- Charitable DAF should confirm with counsel the tax implications of the chosen compensation structure/program

1007
TDIT004273

Copyright © 2024 Mercer (US) LLC. All rights reserved.

Mercer

A business of Marsh McLennan

CONFIDENTIAL

# MEMORANDUM

**Date: July 9, 2021**

**To: Mark Patrick**

**Company: Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From: Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject: Donor Advised Funds ("*DAFs*"), Sponsoring Organizations and Supporting Organizations -- The Reasons for Making Investments in Offshore Jurisdictions**

---

1. ***What are Donor Advised Funds, Sponsoring Organizations and Supporting Organizations?***

A donor advised fund, or DAF, is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) organization), which is generally referred to as a sponsor. Sponsors may include a community foundation, university, religious organization, or financial institution. The donor (or the donor's designee) typically maintains certain advisory privileges over the DAF funds or account – specifically with respect to charities that should receive donations, although the DAF account is fully and completely owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a "supporting organization" which also is a Section 501(c)(3) public charity. A supporting organization is a separate entity controlled by the sponsor through its ability to elect a majority of the supporting organization's governing board. Because of this control, a supporting organization is treated financially as part of a consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting organization named Highland Dallas Foundation, Inc. ("***Highland Dallas Foundation***") to assist The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of community affairs. Donations were made to the Highland Dallas Foundation as both the sponsor and the supporting organization. The Highland Dallas Foundation from time to time makes distributions of funds to The Dallas Foundation which in turn makes further distributions to local public charities. ***Exhibit 1*** attached shows these above-described entities, as well as other entities referenced herein that are pertinent to this donor advised fund.

2. ***How Does a Donor Establish a DAF Account?***

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets, such as cash, stock or securities or other business or financial assets, to a sponsoring public charity. The donor's contribution is recorded and recognized as a donation to the sponsoring

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable. This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3. ***What Type of Investments Can be Made by a Sponsor/Supporting Organization?***

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds. But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. ***Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?***

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations. As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes. A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate. The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization. UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to "block" this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. The blocker corporation thereafter distributes the income to the tax-exempt

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

b*. Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?*

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership. In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.") Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor). This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds. In fact, if a U.S. law firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

4. ***Who Has Control and Authority over the Assets Held by the Sponsor?***

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation. Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a). But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. ***What Are the Benefits to a Donor of a Contribution to a DAF account?***

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future. Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets. This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

EXHIBIT 3

**Exhibit 1**

**Charitable DAF/CLO Holdco
Structure Chart**



**IN THE MATTER OF:**

**CHARITABLE DAF HOLDCO LTD**

---

**OPINION**

---

## A. INTRODUCTION

1. I am asked to advise Charitable DAF Holdco Ltd (the "**Company**") upon the following matters:

   a. Whether the issue and allotment of shares in February 2025 is potentially open to challenge by the Company's pre-existing shareholders;

   b. Whether certain changes to the Company's memorandum and articles of association that were adopted in February 2025 are open to challenge (in particular, the Company's adoption of revised objects, changes made to the voting and quorum provisions for board meetings, to the appointment of directors and approval of transactions, and the dispute resolution clauses in the Company's articles);

   c. Whether it is open to the board of directors forcibly to redeem the shares of certain Participating Shareholders; and

   d. Whether it is open to the board of directors to require certain Participating Shareholders to transfer their shares.

## B. BACKGROUND

2. I am instructed that the Company's "mission statement" provides that the Company makes investments "*in order to support community-focused non-profit foundations with a demonstrates focus of giving funds to worth causes and making a difference*".

**The 2024 Memorandum and Articles of Association**

3. The Company adopted an amended and restated memorandum of association pursuant to a special resolution dated 24 January 2024 (the "**2024 Memorandum**"). Despite the mission statement referred to above, the 2024 Memorandum made no reference to the Company's charitable purposes and merely provided at para. 3 that the objects for which the Company

is established "*are unrestricted*" and "*the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Act )(as revised) of the Cayman Islands*".

4. Para. 7 of the 2024 Memorandum provided that the capital of the Company was divided into 4,999,900 "*Participating Shares*" of a nominal or par value of $0.01 each and 100 "*Management Shares*" of equivalent nominal/par value per share. Para. 7 provides further as follows (emphasis added):

> "*provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares …* *and to issue all or any part of its capital whether original, redeemed, increased or reduced without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided".*

5. I have also been provided with a set of Articles of Association which I understand were adopted by special resolution in January 2024 (the "**2024 Articles**").[1]

6. The 2024 Articles included the following provisions:

   a. Subject to the Articles, all Shares for the time being unissued were under the control of the Directors, who might, inter alia, issue, allot and dispose of the same (Art. 7);

   b. Management Shares in the Company carried the right to receive notice of, to attend and vote at a general meeting of the Company, but conferred no right to participate in the profits and assets of the Company save where provided in the Articles (Art. 11);

   c. Participating Shares conferred no right upon the holder to receive notice of, to attend or vote at a general meeting but such shareholders "*may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article [i.e. Art. 13]*" (Art.12);

   d. The *"rights attached to any such Class may ….. only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a*

---

[1] The version I have seen does not identify the day in January 2024 that the special resolution was passed. I proceed, however, on the basis that there was such a special resolution adopting the 2024 Articles in January 2024.

*resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting*" (Art.13);

e. The rights conferred upon the holders of the Participating Shares of any Class issued with preference or other rights shall not *"… be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Participating Shares ranking pari passu with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company*" (Art. 14);

f. When paying any dividends, such dividends shall be declared and paid "*by the Directors in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares*" (Art. 105);

g. In a winding up of the Company, the assets available for distribution among shareholders fell to be divided first between the holders of Participating and Management Shares up to the par value of their shares, and then between the Participating Shareholders in proportion to their shareholding of that class of shares (Art. 123);

h. Subject to the Companies Act and the rights attaching to the various classes of shares, the Company could by Special Resolution alter the Articles in whole or in part (Art. 125).

7. I set out other relevant articles where appropriate in the discussion below.

8. The Company's 100 Management Shares are held by Mr Mark Patrick. Mr Patrick is a director of the Company together with Mr Paul Murphy.

**The 2025 Share Issue**

9. By resolutions of the directors dated 7 February 2025, the Company resolved to issue 318 Participating Shares to DFW Charitable Foundation ("**DFW**"), described in para. 5.1 as "*a Delaware non-profit non-stock corporation*" (the "**February 2025 Resolutions**"). Those shares were subsequently issued and allotted to DFW (the "**2025 Share Issue**"). It would appear that the shares were issued at par, and so the 2025 Share Issue did not generate a benefit in the form of a capital inflow into the Company.

10. Prior to the 2025 Share Issue, the Company had four Participating Shareholders. Of those, Highland Dallas Foundation, Inc, Highland Kansas City Foundation, Inc and Highland Santa Barbara Foundation Inc (together, the "**Highland Shareholders**") each held 100 Participating shares. Mr James Dondero was or is affiliated with the Highland Shareholders. The fourth Participating Shareholder, The Community Foundation of North Texas ("**CFNT**"), held 5 participating shares.

11. I understand that the Highland Shareholders and CFNT were "gifted" their shares.

12. The effect of the 2025 Share Issue is as follows:

    a. DFW now holds 51.04% of the total Participating Shares;

    b. The percentage of the Participating Shares held by each of the Highland Shareholders has reduced to 16.05% of the total Participating Shares; and

    c. CFNT's holding has reduced to 0.8% of the total Participating Shares.

13. The February 2025 Resolutions include a narrative explanation of the rationale for the 2025 Share Issue. I discuss that explanation later in this opinion.

**The 2025 Memorandum and Articles**

14. On 20 February 2025, by a special resolution, the Company resolved to replace the 2024 Memorandum and the 2024 Articles with a new memorandum and articles of association (the "**2025 M&A**").

## C. IS THE 2025 SHARE ISSUE POTENTIALLY OPEN TO CHALLENGE?

15. As set out above, the 2024 Memorandum contains express power on the part of the directors to issue fresh shares. The 2025 Share Issue was accordingly within the Company's corporate capacity and within the powers of the board of directors of the Company. Equally, it was not an action which engaged the requirement for approval of a two-thirds majority of the Participating Shareholders: Art. 14 of the 2024 Articles makes clear that the creation, allotment or issue of further Participating Shares is not deemed to materially adversely vary or abrogate the rights of Participating Shareholders.

16. Although there is no doubt that the directors had power to cause the 2025 Share Issue, the question remains whether that exercise by the directors of their powers is capable of

challenge. The Privy Council has recently confirmed in *Tianrui (International) Holding Company Ltd v China Shanshui Cement Group Ltd* [2024] UKPC 36 at [4], on appeal from the Cayman Islands, that a shareholder has a right of action against the company to challenge the allotment of shares by the board of directors if the allotment was made for an improper purpose in circumstances where the allotment will cause detriment to the shareholder. I address below the relevant legal principles and the application of those principles to the facts as I understand them.

**Relevant legal principles**

17. Based on the authorities as they stand, the following principles apply:

a. When registered, a company's memorandum of association binds the company and its members as if each member had subscribed the memorandum and it contained a covenant on the part of the member, his heirs and administrators to observe all its conditions: s.12 of the Companies Act (2023 revision) ("**CA**"). Similarly, when registered the articles of association bind the company and its members as if each member had subscribed the articles and it contained a covenant on the part of the member, his heirs and administrators to conform to the regulations contained in the articles: s.25 of the CA.

b. The consequence is that there is a contract between the company and its members and between its members *inter se* that the company and its members will observe the conditions of the memorandum and the regulations of the articles of association (*Tianrui*, [31]).

c. Directors of a company have duties owed to the company, including a fiduciary duty to exercise their powers only for proper purposes. Where the memorandum confers a power upon the directors of a company to issues shares, that power is necessarily a fiduciary power and must therefore only be exercised for proper purposes (*Tianrui*, [69]). As "*an intrinsic feature of the contract constituted by the memorandum and articles of association*", it is "*implicit that when exercising their powers on behalf of the company the directors will exercise them in accordance with their fiduciary duties, including the duty to exercise powers only for a proper purpose" (Tianrui*, [43] and see [70]). As it was put in Tianrui at [75] and [76], "*the contract between the shareholder and the company contains the implied term that, in exercising the power to allot and issue shares, the directors as the company's agents will do so in accordance*

*with their fiduciary duties*", which term "*falls to be implied into the contract between the shareholder and the company and between the shareholders inter se and it arises out of the nature of the contractual constitution of the company*". That term is implied "*as a result of the nature of the contract and the relationship thereby created between the parties to that contract*".

d. The proper purposes for the exercise of the power to allot and issue shares "*<u>include</u> the raising of new capital where that is genuinely considered to be in the best interests of the company, <u>but there can be other legitimate purposes</u>*" (*Tianrui,* [69]); although "*[n]o part of those proper purposes includes <u>deliberately</u> altering the balance of power between shareholders*" (emphasis added).

e. Where the directors exercise their powers for an improper purpose, then the act is voidable not void (*Tianrui,* [74]). It might be challenged by the affected shareholder(s) bringing their own action against the Company to set aside the relevant transaction (*Tianrui*, [72]). Additionally, or alternatively, it might in itself be relied upon as a ground for arguing that it is just and equitable to wind up the company pursuant to s.92(e) of the CA.

f. Whether or not the directors have breached that duty to exercise their powers for proper purposes involves identifying the directors' subjective reasons for exercising the relevant power (*i.e.* the reasons which led them to act as they did): *Eclairs Group Ltd v JKX Oil & Gas plc* [2015] UKSC 71 at [15].

g. Those reasons must then be considered in light of the purposes for which the relevant power was conferred, in order to identify whether the directors' subjective reason meant that they exercised the power for an improper purpose. In identifying the purpose of the relevant power, there is, or may be, some complexity.

h. Where the directors act for multiple reasons, and where some reasons are legitimate reasons for exercising the relevant power and others reasons are not, although the matter is not yet finally settled as a matter of law, on present authority it is likely that

the Court will look to whether, but for the improper reason(s) the relevant action would still have been taken (*Eclairs*, [21]).[2]

18. I make reference to further authorities which illuminate the application of the above principles in the discussion which follows.

**Analysis**

19. As the above summary makes clear, whether an issue of shares by directors is capable of challenge is an intensively fact-sensitive question which requires consideration of the reasons behind the exercise of the power to issue shares and an evaluation of whether such reasons are in conformity with the proper purpose for which the power to issues shares is to be exercised.

*The effect of the 2025 Share Issue*

20. In the instant case, the Participating Shareholders have limited voting rights: whilst they are not in general entitled to attend or vote at meetings of the Company, Arts. 12 and 13 of the 2024 Articles provide that the Participating Shareholders are able to vote at a meeting convened in relation to the modification of rights attached to their class of shares where such modification may materially adversely vary or abrogate their rights. At such a meeting (or in order for such a modification to be approved in writing) a majority of two-thirds of the class must support the modification. The effect of the 2025 Share Issue is that, if there were to be a meeting / proposal to approve a modification that effects the Participating Shareholders' rights, the ability of the prior Participating Shareholders to vote down such a change has been negatively affected (DFW now having over 50% of the total Participating Shares). It follows that the issue of the additional shares has an impact upon the balance that previously existed, at least in relation to changes that might have a material adverse effect upon or cause an abrogation of rights attached to the Participating Shares.

21. In addition to the impact upon voting rights in such circumstances, there are other consequences which may flow from the 2025 Share Issue. As set out earlier, Art. 105 of the 2024 Articles conferred discretion upon the directors as to the payment of dividends, "*without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the*

[2] That was the view of Lord Sumption, supported by Lord Hodge. Lord Clarke was inclined to agree but considered that further argument was needed on this point. Lord Mance (with whom Lord Neuberger agreed) also felt that the point would require further argument.

*Shares*". Whilst it follows that the issue of additional Participating Shares did not necessarily entail any impact upon the sums that the existing Participating Shareholders might receive by way of dividend upon their shareholding (as the directors retained the ability to spread the dividends as they so fit), there are still further effects upon the Participating Shareholders:

22. First, whilst they had no right to a pro-rata share of any dividend declared by the Company payable out of profits, the 2024 Articles made clear that, in the event of a winding up of the Company, Participating Shareholders would be entitled to share in the division of the Company's surplus assets (*i.e.* those available after discharge of the Company's prior debts and liabilities) in proportion to their shareholding within the class. The issue and allotment to DFW of additional Participating Shares thus had an potential impact upon the return they might receive in the event of the Company's entry into liquidation.

23. Second (and to some extent linked to the first point), the issue of fresh shares may have impacted negatively upon the value of the original Participating Shareholders' shares. The dilution of voting rights (albeit in the limited circumstances discussed earlier in connection with modifications to their rights) may make the shares less attractive to a third party. Further, an increase in the number of Participating Shareholders (and/or the addition of a different Participating Shareholder), might be perceived to a potential purchaser as making it less likely that any dividend declared by the Company would be paid to the existing Participating Shareholders (or else, might reduce the amount paid).

24. All that said, it is important to note that the dilution of voting rights will commonly be a consequence of the issue of additional shares. Equally, it will commonly be the case that the issue of additional shares with similar rights will impact upon the value of the shares of those already holding shares. That is particularly so if (as I understand happened here) the new shares were allotted at par value rather than for a premium, so there was no corresponding in-flow of capital into the Company.[3] However, the fact that the issue of shares has such effects is not in itself a problem – not least since, as a matter of general law, a shareholder does not have a right not to be diluted. Rather, what matters is whether the purpose for which the shares were issued so as to cause such effects was a proper one.

25. This point was made in *Tianrui*:

---

[3] Even if there were, in this case, the absence of any expectation to a pro rata share in any dividends would likely mean that the inflow would not result in a correlative increase in the value of the existing Participating Shares.

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final~~35772500.2.C8689.187150

a. At [69]: *"The proper purposes for the exercise of the power to allot and issue shares include the raising of new capital where that is genuinely considered by the directors to be in the best interests of the company, but there can be other legitimate purposes. No part of those proper purposes includes deliberately altering the balance of power between shareholders. <u>But, of course, an allotment and issue of new shares will frequently have that effect</u>, save where the allotment is made to, and taken up by, all existing shareholders in strict proportion to their existing holdings. <u>Equally, an allotment to the whole of one class of shareholders may alter that balance of power,</u> …"* (emphasis added).

b. At [71] (emphasis added): *"<u>It is not, of course, any part of the corporate contract that a shareholder's holding will not be diluted, or that nothing will be done by the directors which alters the balance of power between shareholders</u>. The Board may for example perfectly legitimately decide to issue shares for proper business purposes to new shareholders and that issue, while diluting all existing shareholders' holdings in equal proportions, incidentally alters the balance of power by depriving a shareholder or group of majority control, or of negative control. But it is part of the corporate contract that, if this is to happen, it is done only by a proper exercise of the power, ie one that is exercised bona fide for the benefit of the company as a whole and exercised for the purposes for which the power was conferred. This will necessarily exclude, for example, an allotment and issue of shares which is deliberately aimed at altering the balance of power between shareholders, so as to advance the power of one (or one group) at the expense of another"* (emphasis added).

26. As those statements suggest, an allotment and issue of shares "*which is <u>deliberately</u> aimed at altering the balance of power between shareholders*" is problematic. The Privy Council referred in general to the requirement that the power is "*exercised bona fide for the benefit of the company as a whole and exercised for the purposes for which the power was conferred".*

27. It is important to note that a power may be exercised improperly even where the directors genuinely believe that they are acting for good reason.

*28.* In *Hogg v Cramphorn Ltd* [1967] Ch 254 the directors of a company, fearing a takeover bid and their own dismissal from the board, took steps which included allotting shares to persons who would support them. It was common ground that the directors were not motivated by

personal advantage and believed that, in acting to preserve their position on the board, they were serving the company's best interests (it being their view that they believed that their actions to prevent the takeover bid and maintaining their status were in the company's interests). However, it was held that they had used the power of allotment for a purpose for which it was not intended to be used and that the allotment was accordingly voidable:

> *"Accepting as I do that the board acted in good faith and that they believed that the establishment of a trust would benefit the company, and that avoidance of the acquisition of control by Mr. Baxter would also benefit the company, I must still remember that an essential element of the scheme, and indeed its primary purpose, <u>was to ensure control of the company by the directors and those whom they could confidently regard as their supporters</u>. Was such a manipulation of the voting position a legitimate act on the part of the directors?"*

29. The Judge concluded that it was not a legitimate act.

30. In *Punt v. Symons & Co. Ltd* [1903] 2 Ch 506, an injunction was granted against a company to restrain it from holding a general meeting after its directors had issued shares for the purpose of gaining a sufficient majority to pass a special resolution to alter the company's articles of association. The Judge said this (emphasis added):

> *"<u>A power of the kind exercised by the directors in this case, is one which must be exercised for the benefit of the company: primarily it is given them for the purpose of enabling them to raise capital when required for the purposes of the company</u>. There may be occasions when the directors may fairly and properly issue shares in the case of a company constituted like the present for other reasons. For instance, it would not be at all an unreasonable thing to create a sufficient number of shareholders to enable statutory powers to be exercised; <u>but when I find a limited issue of shares to persons who are obviously meant and intended to secure the necessary statutory majority in a particular interest, I do not think that is a fair and bona fide exercise of the power</u>."*

31. The suggestion that the only purpose for the issue of shares is for raising capital was rejected by the Privy Council in *Howard Smith Ltd v Ampol Petroleum* [1974] AC 821 as being unduly narrow. However, it was said that:

> *"it must be unconstitutional for directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist. To do so is to interfere with that element of the company's constitution which is separate from and set against their powers."*

32. In *Piercy v S. Mills & Co. Ltd* [1920] 1 Ch 77, it was said that:

> *"... directors are not entitled to use their powers of issuing shares merely for the purpose of maintaining their control or the control of themselves and their friends over the affairs of the company, or merely for the purpose of defeating the wishes of the existing majority of shareholders. That is, however, exactly what has happened in the present case. With the merits of the dispute as between the directors and the plaintiff I have no concern whatever. The plaintiff and his friends held a majority of the shares of the company, and they were entitled, so long as that majority remained, to have their views prevail in accordance with the regulations of the company; and it was not, in my opinion, open to the directors, for the purpose of converting a minority into a majority, and solely for the purpose of defeating the wishes of the existing majority, to issue the shares which are in dispute in the present action."*

33. The Judge said that it did not therefore matter if the directors said that "*We genuinely believe that what we seek to prevent the majority from doing will harm the company and therefore our act in arming ourselves or our party with sufficient shares to outvote the majority is a conscientious exercise of our powers under the articles, which should not be interfered with*". The Judge said (emphasis added):

> *"Such a belief, even if well founded, would be irrelevant. A majority of shareholders in general meeting is entitled to pursue what course it chooses within the company's powers, however wrong-headed it may appear to others, provided the majority do not unfairly oppress other members of the company."*

34. The overall tenor of those authorities (as further explained by the Privy Council in *Tianrui*), is that the exercise of the power to issue shares is one that should not be exercised with a view to altering an existing balance of power, and that is the case irrespective of whether the directors consider that doing so is in the interests of the company.

35. To this, I would add one potential qualification. It might be possible to argue that the statements contained in the various authorities should be interpreted against the particular facts, and should not be read out of their particular context and treated as setting red lines which can never be crossed. It might be said (for example) that whilst the court in *Hogg* appears to have suggested that it would never be permissible for directors to issue shares so as to defeat a takeover bid, there may be circumstances where doing so is permissible. In that regard, in the first instance decision in *Cayne v Global Natural Resources Plc* [1984] 1 All ER 225[4], the judge suggested that it might be permissible for directors to issue shares to remove the threat of control from a competing company that had acquired a large holding of

[4] There was an appeal but the judge's comments were not discussed, as the Court of Appeal's focus was on different aspects of the appeal.

shares in the target company in order to run that company down. The Judge suggested that in such circumstances:

> *"[t]he object is not to retain control as such, but to prevent [their company] from being reduced to impotence and beggary, and the only means available to the directors for achieving this purpose is to retain control."*

*The Directors' reasons for the 2025 Share Issue*

36. The February 2025 Resolutions contain information which illuminates the reasons behind the decision to bring about the 2025 Share Issue.

37. It would appear that some of the Participating Shareholders had sent communications "*requesting information and making false and misleading claims regarding the Company's and its subsidiaries' finances*" which the directors believed were motivated or else directed by Mr Dondero.[5] It is further recorded that the directors believed that Mr Dondero's motivations were connected to Mr Patrick's resignation from "*Skyview Group*" as well as efforts taken by the Company to "*create independence between the Company and its subsidiaries*" on the one hand and "*Mr Dondero and his affiliates*" on the other hand. Pausing there, it is not immediately clear – at least form the text of the February 2025 Resolutions – whether those particular matters (which appear under the heading, "*Recent Developments*") were actually relevant to the decision to enter into the 2025 Share Issue. If they were relevant, it is not explained in the text why the issue of shares to DFW would prevent information requests or false claims being made by Mr Dondero / his affiliates. It may be, therefore, that those matters are part of the context, rather than part of the reason for the decision to issue the shares.

38. There is a separate section of the February 2025 Resolutions headed "*U.S. Counsel's Tax Advice*" which appears more directly relevant. It is there stated that the Directors had received United States Tax Counsel advice to the effect that:

    a. There was a "*significantly heighted risk*" that the US Internal Revenue Service (the "**IRS**") could "*severely penalise and/or revoke the tax-exempt status of one or more of*

[5] I understand that Mr Dondero was behind Highland Capital Management, which is the subject of insolvency proceedings in the USA.

*the current Participating Shareholders, which could imperil the status and assets of the Company*";

b. An increase in the number of Participating Shareholders "*would mitigate considerations of undue influence/private inurement/private benefit*" and "*broaden the scope of [the Company's] reach to the public*"; and

c. The IRS "*will look favourably upon any and all attempts for [the Company] to maintain its independence from what seems to be persistent attempts by James Dondero and the entities controled by him to use [the Company] for his private benefit and private inurement*".

39. Although a full understanding of those passages would require a detailed familiarity not only with the various parties and the background, and also of the taxation and related issues adverted to in the February 2025 Resolutions (to which I am not privy), on their face, those passages in the February 2025 Resolutions suggest that the directors were motivated by a desire to benefit the Company.

40. Of course, if called upon to justify their decision as being for the benefit of the Company:

a. It would be necessary for the directors to be able to explain how the penalisation or loss of tax-exempt status of one or more of the current Participating Shareholders would potentially have "*imperil[ed]*" the *"status"* and *"assets"* of the Company, and hence why the issue of shares was considered to be in the interests of the Company.

b. Similarly, an explanation would be needed of the detrimental issues that the Company was facing that the directors believed would be beneficially mitigated by the addition of DFW as a Participating Shareholder – and why DFW's addition as a shareholder had the effect of broadening "*the scope*" of the Company's reach to the public (and what exactly this meant and why it was beneficial for the Company).

c. Likewise, the references to how the IRS would look upon attempts to "*maintain independence*" would need explanation – this would include explaining why the Company would benefit, and how this was able to be achieved by the 2025 Share Issue.

41. I assume that such explanations can be provided and would support the conclusion that the directors caused the 2025 Share Issue for proper purposes.

42. I have discussed above that the genuine desire by directors to benefit a company by altering the existing balance of power is not relevant, since that would still not be a proper purpose. However, given that Participating Shareholders do not have the voting powers that enable them to remove the board and such-like, this does not appear to be a case where it can be said that the purpose of the 2025 Share Issue was to remove an operative majority or to prejudice the existing balance of power.[6] Nor does it appear that the Company was concerned with imminent liquidation such that the share issue was motivated by a desire to reduce any possible distribution to the existing Participating Shareholders.

43. It is worth noting that, if the 2025 Share Issue is challenged by the Participating Shareholders, they might still suggest that the February 2025 Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board. As I have said, there is no doubt a considerable background to the decision, which will inform the steps taken. I am not in a position to evaluate the evidence for and against any such arguments. Sufficient to say, it would be for the shareholders making the challenge to the 2025 Share Issue: (a) to identify the reasons which they say caused the directors' decision to issue the shares; (b) to prove that such reasons were behind the decision; and (c) to establish that such reasons meant the exercise of the power to issue shares was carried out for an improper purpose. Moreover, as earlier discussed, on current authority, in order to set aside the 2025 Share Issue the challenging shareholders are likely to have to show that the "improper" reasons were causative of the 2025 Share Issue, in the sense that, had such reasons not been present in the directors' mind, the share issue would not have come about.[7]

44. I should add that I have seen an email sent by Mr Patrick seeking clarification of the potential implications if the Participating Shareholders were to seek a winding up of the Company on the just and equitable basis and that petition was opposed by the holders of newly issued shares. In an email in response from a Mr Murphy, it was said that the issue of new participating shares, which had the effect of reducing the percentage held by the others, would "*weaken any petition based on the just and equitable grounds*" but "*we must be careful that they don't point to this as [a] ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluted them therefore the company should be*

[6] I have adverted earlier to the fact that the 2025 Share Issue changed the balance in relation to possible amendments to rights attached to Participating Shareholders (which require a two-thirds majority of the relevance class). However, it does not appear from what I have seen that the directors were motivated by a desire to affect such rights and that they issued the shares to make that easier. Consistent with this, to my knowledge there has been no class meeting / decision in which a two-thirds majority was sought to make any such changes.

[7] That might not be a hurdle if they rely upon the 2025 Share Issue as conduct justifying a just and equitable winding up of the Company.

*wound up or an order made for change of management / revocation of the share issuances*". I note that those instructing me (who were copied into that exchange) subsequently commented that if other shareholders are opposed to a just and equitable winding up, that will be taken into consideration but it may not be determinative of any such petition, since the "*question will still be whether, in all of the circumstances, it is just and equitable for the company to be wound up*".

45. In light of this, and noting its absence from the February 2025 Resolutions, I do not know whether in ultimately bringing about the 2025 Share Issue the directors were motivated by the view that dilution might affect the prospects of a winding up if one were sought by any of the existing Participating Shareholders.

46. If they were so motivated, there is a potential argument that this would involve the exercise of the power to issue shares for an improper purpose. The argument would run as follows:

a. Participating Shareholders have the statutory right to petition to wind up the Company (that right not having been excluded by the 2024 Articles). It seems to me that there is force in the argument that this right, which was an incident of their membership, was one that should be respected.

b. Whilst the issue of additional shares plainly would not deprive the other shareholders of their right to seek a winding up (and the percentage of shares held by the petitioner does not affect whether or not the grounds for a winding up may be established), it can be relevant to the exercise of the court's powers whether or not other shareholders support or oppose the relief sought in the petition.

c. If shares are issued for the purpose of prejudicing the ability of existing shareholders to obtain the appointment of a liquidator, this might be seen by the Court as an improper purpose. This is on the basis that the allotment is designed to invade the rights of the existing shareholders and to cause them detriment in the exercise of their existing rights, which rights (whilst statutory) are incidental to their shareholding.

d. There is, I think, some possible similarity with the reasoning underlying the following comments in *Howard Smith*:

> *"The constitution of a limited company normally provides for directors, with powers of management, and shareholders, with defined voting powers having power to appoint the directors, and to take, in general meeting, by majority vote, decisions on matters not reserved for management. Just as it is established that directors, within their*

*management powers, may take decisions against the wishes of the majority of shareholders, and indeed that the majority of shareholders cannot control them in the exercise of these powers while they remain in office ..., so it must be unconstitutional for directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist. To do so is to interfere with that element of the company's constitution which is separate from and set against their powers."*

e. Whilst that discussion was about the separation between rights in the articles and the directors' powers, I think that the fact that the right to petition is an incident of the status of shareholder (which has not been excluded by the articles) could support the conclusion that the power to issue shares should not be exercised for the purpose of prejudicing that right, or indeed its exercise. I recognise that the issue of shares does not deprive the shareholders of the right to petition, but if the shares are issued for the purpose of adversely affecting that right, there could be scope for characterising that as an improper purpose.

47. All that said, as I have observed, it is not clear to me that this was part of the reasoning for the 2025 Share Issue.

*Shares issued at par*

48. For completeness, I note that the shares were issued to DFW at par. The editors of *Gore-Browne on Companies* say (at Ch. 16, [4]):

> *"It has been suggested that if the directors issue shares at par at a time when they would be able to find shareholders willing to take them at a premium, they are in breach of duty for having caused the company to lose the amount of the premium, but it cannot be said that this is a firmly established rule. On the other hand, it is clear that the directors must not in such circumstances allot the shares to themselves or to their friends at par, without obtaining the approval of the company in general meeting."*

49. One of the authorities cited in support of the above propositions is *Lowry v Consolidated African Selection Trust Limited* [1940] AC 648. In that case it was said:

> *"The power to issue further capital is only a potentiality. But the fact of issue makes it actual capital, and creates the fasciculus of rights and liabilities between the company and the shareholder which flow from the share when issued. If the share stands at a premium, the directors prima facie owe a duty to the company to obtain for it the full value which they are able to get. It is true that it is within their powers under the Companies Acts to issue it at par, even in such a case, but their duty to the company is not to do so unless for good reason. Normally they would transfer the difference between the market value and the par value to a premium reserve or similar capital account. But*

> *they could justify issuing the share at par on the ground that the difference has been utilized to secure a benefit to the company, as here by paying the extra remuneration to the employees and it may be also by giving them an interest in the company."*

50. In *Hilder v Dexter* [1902] AC 474, Lord Davey observed that he was not aware "*of any law which obliges a company to issue its shares above par because they are saleable at a premium in the market. It depends on the circumstances of each case whether it will be prudent or even possible to do so, and it is a question for the directors to decide*".

51. I am not aware whether the shares would have commanded a premium, and if so, of what amount. Given the limited nature of the rights attached to Participating Shares and the nature of the business of the Company (which I understand was not designed to generate profits but rather to pursue charitable objects), I expect that there is reason to doubt that the shares would have had significant value. In any case, as the cases mentioned above make clear, the circumstances may well justify issuing shares at par even if they are saleable at a premium in the market.[8]

52. It may be that the directors had good reason to issue and allot the shares to DFW at par, even if they might otherwise have commanded a premium.

**Approval / ratification by the holder of the Management Shares?**

53. If the directors did exercise their powers for an improper purpose when they brought about the 2025 Share Issue, is that something that the Company could ratify by a vote at a general meeting (i.e. by Mr Patrick as the holder of the Management Shares)? In my view, that is unlikely to be possible.

54. As was explained in *Tianrui*:

    a. At [81]: *"... if the shareholders seek to use their power to act by a majority, then they are constrained by the equitable principle that they may not do so by way of oppression of the dissenting minority ... That constraint is inherent in the power of the majority of a class to bind the minority. Whether it is actionable by the minority having a mere equity of their own to set the majority action aside, or because that constraint is also*

---

[8] As I understand it, that is consistent with the fact that the other Participating Shareholders did not contribute to the Company in respect of their shares – although I do not know the full circumstances of that prior allotment.

*embedded in the corporate contract, may be a matter for debate, but it makes no practical difference for present purposes."*

b. At [83]: *"There will also be cases where the nature of the breach of duty by the directors is such that ratification will be seen to be impossible, either because it has been attempted without success or because any attempt in the future would be bound to fail. For example, a breach constituted by the directors having the improper purpose of assisting an existing majority to oppress a minority could hardly be ratified by the majority, without itself falling foul of the constraint against majority oppression: see in* <u>Residues</u> *at p 1167, King CJ's doubt whether the share allotment in that case could be ratified. As Dixon J explained in Peters, pp 504ff and especially pp 511-513, the power of the shareholders in general meeting to alter the articles of association must be exercised in a manner which is both within the power and consistent with the contemplated purpose of the power"*.

55. It seems to me that <u>if</u> the directors acted for an improper purpose in the issue of the shares and hence invaded the rights of the Participating Shareholders, it would be surprising if the Company (acting by the holder of the Management Shares) could validate such an action. That would involve the oppression of the class (the Participating Shareholders) whose rights were invaded. I do not think that would be permissible.

## D. THE ADOPTION OF THE 2025 M&A

56. Art. 125 of the 2024 Articles provided that, subject to the CA and the rights attaching to the various classes of shares, the Company could by Special Resolution alter the Articles in whole or in part.

57. Section 10 of the CA provides that, subject to s.13 (which is not relevant for present purposes), a company may, by special resolution, alter its memorandum with respect to any objects, powers or other matters specified therein. Section 24 provides that subject to the Act and to conditions contained in its memorandum, a company may by special resolution, alter or add to its articles.

58. The Company adopted the 2025 M&A upon a special resolution passed by Mr Patrick as holder of the Management Shares. This was not, therefore, the exercise by <u>the directors</u> of a power conferred upon them, but the exercise by a class of shareholder of its rights. As discussed earlier, in *Tianrui*, it was said at [81] that "*if the shareholders seek to use their*

*power to act by a majority, then they are constrained by the equitable principle that they may not do so by way of oppression of the dissenting minority … That constraint is inherent in the power of the majority of a class to bind the minority".*

**Alteration of the Company's objects**

59. The Company's 2024 Memorandum was amended to replace para. 3 with a new objects clause in the following terms:

> *"The objects for which the Company is established are:*
>
> *(a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charities, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worth causes and making a difference"; and*
>
> *(b) to do all such things [which] in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them".*

60. Given that the Company's objects were previously unlimited, and the alternation was designed to reflect the Company's mission statement, I see no realistic basis for any challenge to this. I cannot see how this change could amount to oppression and (for completeness) I do not consider that this involved any material adverse variation or abrogation of rights of Participating Shareholders which might have required the consent of a majority of two-thirds of the Participating Shareholders under Art. 13.

**Weighted voting at board meetings**

61. Under the 2025 M&A, Art. 70 of the articles provides that the Management Director (defined as the holder of the Management Shares) shall be entitled to cast ten votes on all matters and each other director shall be entitled to cast one vote.

62. As I see it, this did not involve affecting any rights attached to the shares of Participating Shareholders, so the requirements of a two-third majority consent under Art. 14 was not engaged.

63. The original and revised articles provide that, unless fixed by ordinary resolution, the minimum and maximum number of directors shall be one and two, respectively. I do not know whether there was any resolution that required at least two directors.

64. Given that there does not appear to be any particular need to have more than one director (and if there had been any ordinary resolution that effect, it could be changed) it is not wholly clear to me what the reason was for the change. It does not appear to me to give rise to oppression given that the Management Shareholder is able to procure that there be a single director in any event.

**No provision for alternate directors and proxies**

65. Arts. 70 and 71 of the 2024 Articles, which enabled a director to appoint another as their alternate and to appoint another as proxy have been deleted. Given that the prior directors were able to choose whether to appoint another, presumably this was linked to a perception that one of the directors might appoint an inappropriate alternate / proxy.

66. I cannot see that this is likely to be challengeable.

**Quorum at director's meetings**

67. Art. 87 of the new articles provides that the quorum necessary for the transaction of the business of the Company may be fixed by the directors, and unless so fixed, shall be two if there be two or more directors, and shall include the Management Director.

68. Given that there only appear to be two directors and Art. 88 of the 2024 Articles already provided that, if there were two directors, the quorum for a meeting needed to be two directors (unless otherwise fixed by the directors), I cannot see any material effect of this change. It does not appear to me to be likely to be challengeable.

**Material transaction**

69. Art. 93 of the new articles introduces a requirement for a notarised written resolution of the directors in respect of a Material Transaction (any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000).

70. It does not appear to me to be likely to be challengeable.

**Optional dispute resolution clauses**

71. Art. 136 provides that the existing dispute resolution provisions (which were previously mandatory) are now subject to the consent of the parties.

72. Given that those provisions are ones that were exercisable by shareholders, it seems to me that this involved the change of a "*right conferred upon*" Participating Shareholders, so as potentially to engage the requirements in Art. 14, if such changes materially adversely varied or abrogated such rights.

73. The question then is whether the change "*materially adversely varied or abrogated*" the right to require mediation or arbitration. I think that, from first principles, it may be. Participating Shareholders previously had a right to insist on mediation / arbitration; they no longer can do so.

74. This might therefore require compliance with Art.14, noting that (if the 2025 Share Issue is not challenged), the new Participating Shareholder can vote as well. However, I would not suggest taking that step – not least as it would potentially feed a narrative that the 2025 Share Issue was driven by the aim of changing the balance of votes with a view to obtaining alterations in the articles that might otherwise be refused.

75. It may be sensible to circulate the 2025 M&A (if that has not yet been done) to see whether there is any challenge to this change, however. If they did, the alteration could always be reversed.

## E. DO THE DIRECTORS HAVE THE POWER TO REDEEM SHARES?

76. There are two issues to consider:

a. Whether there is a power vested in the directors to require the redemption of the shares of Participating Shareholders;

b. If such a power exists, what constraints there may be on the exercise by the directors of such a power.

**Is there a power to redeem?**

77. Section 37(1) and (2) of the CA provides as follows:

***37. Redemption and purchase of shares***

> *(1) Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, issue shares which are to be redeemed or are liable to be redeemed at the option of the company or the shareholder and, for the avoidance of doubt, it shall be lawful for the rights attaching to any shares to be varied, subject to the provisions of the company's articles of association, so as to provide that such shares are to be or are liable to be so redeemed.*
>
> *(2) Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, purchase its own shares, including any redeemable shares.*
>
> *(3) (a) No share may be redeemed or purchased unless it is fully paid. (b) A company may not redeem or purchase any of its shares if, as a result of the redemption or purchase, there would no longer be any issued shares of the company other than shares held as treasury shares. (c) Redemption or purchase of shares may be effected in such manner and upon such terms as may be authorised by or pursuant to the company's articles of association. (d) If the articles of association do not authorise the manner and terms of the purchase, a company shall not purchase any of its own shares unless the manner and terms of purchase have first been authorised by a resolution of the company. (da) For the avoidance of doubt — (i) a company's articles of association; or (ii) a resolution of the company, may authorise the company's directors to determine the manner or any of the terms of, any such redemption or purchase not being inconsistent with such articles of association or resolution and subject to such restrictions (if any) as may be provided therein.*

78. In *Culross Global SPC Ltd.* v. *Strategic Turnaround Partnership Ltd* 2010 (2) CILR 364, Lord Mance said at [8]:

> *"It is a basic principle of company law that capital subscribed to a company may not be redeemed to shareholders otherwise than as prescribed by statute. Section 37(1) of the Companies Law permits the issue by a company of shares liable to be redeemed at the option of the company or the shareholder, and s.37(3)(c) goes on to provide that "redemption of shares may be effected in such manner as may be authorised by or pursuant to the company's articles of association." It is uncontroversial that this means that the manner in which any redemption may be effected must be authorized by or pursuant to the articles of association."*

79. It seems to me that it is implicit in s.37(1) that to be redeemable a share must be either: (a) ~~be~~ issued as a redeemable share (and this can only happen if the articles permit the issue of the shares); or (b) subsequently converted into a redeemable share by variation of the rights attached to the share (again, so far as permissible under the articles).

80. As I understand it, the Participating Shareholders' shares were not issued as redeemable shares.

81. I note that the Company's memorandum (both the 2024 and 2025 version) provides that the Company "*shall have power to redeem or purchase any of its shares*", and that the articles also have references to the redemption of shares (*e.g.* Arts. 14, 28 and 29). However, as I see it, that does not address the prior question, which is whether the shares in question were issued as redeemable shares. If they were not issued as such, then unless the rights attached to them are varied so as to make them redeemable, it does not seem to me that the pre-condition for redemption is met.

82. On the basis that (as I understand it) they were not issued as redeemable shares, I am doubtful that the Participating Shares may be redeemed, unless there is first a variation of the rights ascribed to them. That would require the consent of a two-thirds majority of Participating Shareholders. Needless to say, were there to be a proposal to vary the rights attached to the shares to make them redeemable, that would feed an argument that the 2025 Share Issue was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders, and that this was accordingly an improper exercise of the power to issue the shares.

**Constraints on the exercise of the power to redeem**

83. If there is a power to redeem the shares (which as set out above, I doubt), following the analysis in *Tianrui*, in exercising the power to redeem, the directors must ensure that they exercise that power for a proper purpose. If they failed to do so, that would render any redemption challengeable and also potentially amount to a ground for seeking a winding-up on a just and equitable basis.

84. The critical question, therefore, would be the reasons why the directors redeemed the shares and whether such reasons would mean the exercise of the power is for a proper purpose. I do not know what the specific reasons would be. Some general observations may be of assistance, however.

85. As a starting point, the power to redeem the shares of particular shareholders is one that should be exercised for the benefit of the Company. In identifying what might be for the benefit of the Company in relation to such a power, assistance -might be found in the decision in *Gaiman v National Association for Mental Health* [1971] Ch 317. That case involved a company limited by guarantee which was a non-profit mental health association. –The directors had a power to request a member of the company to resign, so as to bring about

their resignation. A number of members of the company (who were Scientologists) were expelled by the directors and then sought to challenge their expulsion.

86. The Court noted that there was "*a direct power to deprive a member of his membership: it is not a power to reduce capital (if that could be good) which is being employed with the ulterior purpose of depriving a member of his membership".* Having identified that power, it was said:

> *"The question, then, is whether that power of deprivation of membership has been exercised by the council in good faith for the purpose for which it was conferred. Such a power is, I think, plainly conferred in order that it may be exercised in the best interests of the association. The association is, of course, an artificial legal entity, and it is not very easy to determine what is in the best interests of the association without paying due regard to the members of the association. The interests of some particular section or sections of the association cannot be equated with those of the association, and I would accept the interests of both present and future members of the association, as a whole, as being a helpful expression of a human equivalent..."*

87. It was held that the power had been properly exercised:

> *"The basic reason for the decision is stated to be 'the threat that Scientology posed to the association and all that it stood for', and various other factors are set out, including the loss of moral and active support for the association, loss of revenue, and the association's responsibility to those in its charge. The evidence before me provides ample grounds for saying that at the very lowest this is a possible view to hold."*

88. Essentially, therefore, an express power to deprive members of their membership was properly used when the individuals were posing a "threat" to the association's future both financially and more broadly, having regard to its purposes/objectives.

89. Whilst not a company case, a similar approach can be found in *RSPCA v Attorney General* [2002] 1 WLR 448. The council of the Royal Society for the Prevention of Cruelty to Animals had a discretion as to who to admit to membership. The council wished to exclude from membership supporters of hunting with dogs. The court declined to interfere (citing *Gaiman*):

> *"...the powers are fiduciary and accordingly the obligation is upon the council to exercise the powers for the purposes for which they are conferred in what they consider to be the best interests of the society. I am satisfied that the council is acting in good faith and in what it considers to be the best interests of the society in deciding that it should adopt the membership policy. It seems to me that if the trustees honestly take this view and it is one that they can honestly and reasonably take ... this is a course which they are entitled to take and which I can and should endorse; see e.g. Gaiman v National Association for Mental Health [1971] Ch 317 ."*

90. In the present case, I have already noted the content of the February 2025 Resolutions. If, as I apprehend might be the case, the continued shareholding of certain Participating Shareholders risks undermining the Company in the pursuit of charitable objectives, then that might well be a justification for the exercise of the power (if it exists). Needless to say, the precise reasons why continued membership poses a risk, and how, and to what degree, would need careful consideration.

## F. EXERCISE OF POWER TO REQUIRE THE TRANSFER OF SHARES

91. Art. 21 provides as follows:

> *"If it comes to the attention of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles".*

92. The term "*Restricted Person*" is defined in Art.1. It includes any Person (defined as including natural persons and companies and other entities) holding Participating Shares:

> *"in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered."*

93. If any shares are held by such a person then the Directors have the power to require such person to transfer their shares. Of course, the exercise of such power must be exercised for a proper purpose. In that regard, the purpose of the power is fairly easily identifiable from the definition of a Restricted Person: –if shares are held by a person that falls within the description, then the power has been conferred to enable a change to remedy that issue.

94. Of course, the particular sub-definition identified above requires the directors to be of the opinion that the holding of shares in the Company by the particular person might result in the consequences that are identified (*e.g.* suffering administrative disadvantage). That opinion will need to be one genuinely held. There is likely to be a requirement (linked to the equitable nature of a directors' powers) that the disadvantages are of some degree of materiality and likelihood. Put another way, if the justification for treating a person as a "*Restricted Person*" is a self-evidently slight concern about the possible consequences to the Company, that could leave the decision more open to challenge.

## G. CONCLUSION

95. I have set out my answers to the questions posed above. I would be happy to advise further if any additional matters come to light.

**Tony Beswetherick KC**

**Twenty Essex**

**March 2025**

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Jamie Lawlor (KY) <jamie.lawlor@pwc.com> |
| **Sent:** | 11 February 2025 4:43 PM |
| **To:** | Geoffrey Sykes; Dakshina Vyas (KY) |
| **Cc:** | Barnaby Gowrie; Philip Aubry; Simon Conway (KY); Christian Begg (KY) |
| **Subject:** | Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181] |

**[this message is from an external sender]**

Hi Geoffrey - thanks for arranging the call today.

Having discussed again on our side, our view is that the new Delaware entity (CDMCFAD, LLC) effectively has full economic interest *and* control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity.

As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd, we don't think we can reliably estimate the value / discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another).

On that basis, I don't think there is a fee / scope that can work for us currently. If you think we've misunderstood something, or can provide more clarity on the legal position in the future, then we could perhaps revisit this. It sounds like the situation is evolving daily so let us know if anything changes and we can be of assistance elsewhere in the case.

Best,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, February 11, 2025 2:43 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Simon, Jamie, all

Thanks for your time on the phone.

Further to the call, we would be grateful if you could please revert back with your views as to next steps by COB tomorrow.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Geoffrey Sykes
**Sent:** 10 February 2025 17:50
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie.

We'll send a dial-in shortly.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 10 February 2025 16:15
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - yes, I think that would make sense too. We can do 2pm if you're happy to share an invite?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Monday, February 10, 2025 3:42 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Happy to discuss. We suggested looping in onshore counsel as they will likely have more information, and in turn they would like to include Delaware counsel.

Unfortunately we can't do tomorrow at 9am, but we have sought onshore counsel's availability for a call tomorrow at 2pm. Would that suit you?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 10 February 2025 13:12
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - would you be available for a quick call with Simon on this, and the other updates we discussed earlier.

Conscious the scope / nature of the request is moving around a bit so just want to get aligned on next steps. We could do 9am tomorrow if that works for you?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Friday, February 7, 2025 3:17 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>

**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Geoffrey - let us discuss internally briefly before confirming.

My initial thought is that there is no meaningful difference between the two separate valuations being requested. I.e. The economic interest in the underlying NAV still fully accrues to the participating shareholders. However, voting power / control is with Mark (or entities controlled by Mark). Do you know what your client is expecting to achieve with the restructuring (as this may help us understand the valuation implications)?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Friday, February 7, 2025 8:02 AM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Following on from the below, we had a call with onshore counsel yesterday afternoon.

A new Delaware entity, CDMCFAD LLC, has been inserted into the structure between Charitable DAF HoldCo Ltd and Charitable DAF Fund LP. Please see attached an updated structure chart and the LLC agreement of CDMCFAD.

In addition to the initial exercise, our client would also like a valuation of all of the issued shares in CDMCFAD (all of which are held by Charitable DAF HoldCo), which valuation will again rely on the underlying NAV as previously advised. Please could you provide us with a fee estimate in respect of that valuation, and an updated engagement letter containing Part 1 (Charitable DAF HoldCo) and Part 2 (CDMCFAD).

Please let us know if you require any further information at this stage or if it would be helpful to discuss.

Separately, our client is considering your template NDA, we will let you know once we hear back from them.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Geoffrey Sykes
**Sent:** 05 February 2025 09:23
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie, will do.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 05 February 2025 08:39
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Thanks Geoffrey - see NDA attached. Let us know if this works for your client.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, February 4, 2025 5:01 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Thanks for your draft engagement letter, we will pass on to our client and let you know if they have any comments.

Thanks also re your template NDA – we expect any time saving (in respect of your internal risk approval) will be welcomed by our client, so yes if you could please send a draft we will seek instructions on that as well.

Regarding the further related valuation exercise we discussed briefly on the phone yesterday, we have a call with our clients tomorrow and will revert back with more detail after that.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 04 February 2025 13:41
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey - please see a draft engagement letter attached for your client's review.

Let us know any comments from your side. Please also send through the NDA when you can. Alternatively, we have a standard template we can use without needing separate risk approval on our side if you'd rather use that?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Monday, February 3, 2025 11:19 AM
**To:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Dakshina

Thanks for confirming, and noted re ensuring privilege is maintained if this becomes an expert witness report in due course.

We are content to proceed on that basis, please could you share with us your engagement letter so that we may pass on to our client?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Sent:** 31 January 2025 10:53
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey,

Thank you for confirming. We are happy to contract directly with the client at this stage. However, I wanted to confirm that if this engagement were to move to an expert witness stage later on, we would need to structure it in a way to ensure that our privilege is maintained over the information we share.

Looking forward to your confirmation on this matter.

Regards,
Dakshina

**Dakshina Vyas**
PwC | Manager | Corporate Finance
Office: +1 (345) 914 1791| Mobile: +1 (345) 525 1791
Email: dakshina.vyas@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1-1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 30, 2025 5:08 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie, Dakshina

Thanks for your emails. We appreciate that you would prefer to contract with Walkers or on a joint basis, however unfortunately our firm policy is not to act as the client in matters such as these. Are you able to enter into the agreement directly with Charitable DAF HoldCo Ltd?

We will revert back regarding a proposed NDA as soon as possible.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Wednesday, January 29, 2025 2:38 PM
**To:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey - yes, thanks for confirming.

Just to follow up on this, we'd prefer to contract with Walkers, but we can make it a joint engagement contract with the underlying client as the party responsible for payment of our fees, and Walkers responsible for giving instructions if that's preferred?

Re: onboarding info - I think we have what we need but will confirm tomorrow. Do you have a standard NDA you'd need us to enter into? If so, please could you share this so we can have our risk team review and approve.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Sent:** Wednesday, January 29, 2025 2:34 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip.Aubry@walkersglobal.com <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Geoffrey,

Thanks for this. Could you please confirm if the Engagement Letter should be with Charitable DAF HoldCo Ltd (as the Client) and Walkers as our point of contact, or if Walkers will be contracting us on behalf of the client and should be addressed as the client?

Regards,

Dakshina

**Dakshina Vyas**
PwC | Manager | Corporate Finance
Office: +1 (345) 914 1791| Mobile: +1 (345) 525 1791
Email: dakshina.vyas@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1-1104
http://www.pwc.com/kyHi geo,

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Wednesday, January 29, 2025 2:12 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

We are pleased to have been instructed to retain your firm for the valuation.

Please could you send us your engagement letter and let us know what else you need in terms of onboarding.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Geoffrey Sykes
**Sent:** Tuesday, January 28, 2025 6:31 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie.

We will pass that on to our client and revert back once we have instructions.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Tuesday, January 28, 2025 5:00 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey - I would say 1.5-2 weeks realistically (from date of engagement / receipt of information) for a relatively short-form report.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, January 28, 2025 3:20 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Many thanks for your time on the call last week and your estimate.

As indicated on the call, our client considers that time is of the essence – when is the soonest you could produce the valuation report following formal engagement and execution of an NDA?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Tuesday, January 28, 2025 2:41 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>

**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi all - thanks again for the time on Friday to get a bit more background on this.

As discussed, we've attached an estimate for the valuation work, including the assumptions we've made about the requirements and the specifics of the capital structure.

Let us know if you'd like to discuss.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 23, 2025 3:28 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Apologies, my mistake – yes 9.30am tomorrow still works.

We look forward to speaking then.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Thursday, January 23, 2025 3:23 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)

<simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - I think we've already got a call in the diary for 9.30am tomorrow if that still works?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 23, 2025 2:23 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Happy to discuss – would 3.30 tomorrow afternoon suit you?

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Thursday, January 23, 2025 12:22 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - thanks for the update. I think it would still be helpful to jump on a quick call just for a bit more background on the context and what the varying rights are that need to be considered.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 23, 2025 9:16 AM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

We have had a further discussion with onshore counsel – they would like to proceed with the valuation relying on an NAV figure contained in a previous report dated 30 September 2024. That report found that the NAV of Charitable DAF HoldCo Ltd is $269,052,808. If we are instructed to retain your firm for the valuation our client would be happy to share that report with you following entry into an appropriate NDA.

On that basis, we expect that the valuation will now be primarily concerned with the rights attached to the shares, rather than an analysis of the underlying assets and businesses.

Please let us know if you would still like to discuss tomorrow morning, or if you are able to provide an estimate on that basis.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Geoffrey Sykes
**Sent:** Wednesday, January 22, 2025 9:37 AM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie.

9.30am tomorrow suits us. I will send a dial-in shortly.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Wednesday, January 22, 2025 8:31 AM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - yes, we could do 9.30am or 10.30am on Friday morning if either of those times work?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, January 21, 2025 8:35 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Thanks for confirming. Are you available for a call on Friday morning this week?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Tuesday, January 21, 2025 5:53 PM
**To:** Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Philip - just wanted to follow up on the below to let you know that all our checks are now complete and clear. Let us know when works to discuss.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Monday, January 20, 2025 11:21 AM
**To:** Simon Conway (KY) <simon.r.conway@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi all - thanks again for reaching out on this.

We've cleared conflicts and are just waiting for one last adverse data check to come back, which we should have tomorrow. Don't foresee any issues with that, so perhaps we could set up a call to discuss the requirement in a bit more detail. Let us know if you have any availability within the windows below:

- Weds 22nd - 11 - 11.30am
- Thurs 23rd - 1pm - 4pm
- Friday 24th - 9.30am - 10am

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Simon Conway (KY) <simon.r.conway@pwc.com>
**Sent:** Tuesday, January 14, 2025 1:52 PM
**To:** Philip Aubry <Philip.Aubry@walkersglobal.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Philip,

Thanks for your note.

Yes, certainly we'll run our conflict checks on the below and, assuming we're clear, a call to discuss the matter would be very helpful for us in coming up with an estimate.

I've copied my colleague Jamie Lawlor, who runs our valuation practice.

Best regards,
Simon

Simon Conway

PwC | Partner
Office: +1 (345) 914 8688 | Mobile: +1 (345) 938 8685 | Fax: +1 (345) 945 4237
Email: simon.r.conway@pwc.com
PricewaterhouseCoopers
PO Box 258, 18 Forum Lane, Camana Bay, Grand Cayman, KY1 1104 Cayman Islands
http://www.pwc.com/

**From:** Philip Aubry <Philip.Aubry@walkersglobal.com>
**Sent:** Tuesday, January 14, 2025 1:35 PM
**To:** Simon Conway (KY) <simon.r.conway@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Subject:** Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Simon,

I am working with Barney Gowrie and am reaching out for assistance with respect to a potential valuation of the shares of Charitable DAF HoldCo Ltd. In the first instance, we would be grateful if you could please run a conflict check in respect of the parties below and confirm you are able to proceed with this instruction. If you are able to proceed with this instruction, please provide an estimate so that we can seek instructions from the client.

For the purposes of your conflict check, the parties are the following:

a) We act for Charitable DAF HoldCo Ltd. (a Cayman entity); and

b) The potential adverse parties are: Highland Dallas Foundation Inc., Highland Kansas City Foundation Inc., and Highland Santa Barbara Foundation Inc. (all Delaware entities), which all hold the participating shares in Charitable DAF HoldCo Ltd.

For your reference, please find attached a structure chart illustrating the above.

Please let us know if you require anything further at this stage.

If helpful, we are happy to discuss.

Best regards,

**Philip Aubry**
Senior Counsel
Walkers (Cayman) LLP

**Walkers** | Making financial services work

**T** +1 345 814 4666 | **M** +1 345 938 4666 | **E** Philip.Aubry@walkersglobal.com
190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands
www.walkersglobal.com

**Secretary**
Monina Thompson | **T** +1 345 814 6842 | **E** Monina.Thompson@walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is

disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

**Rachel Baxendale**

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 17 March 2025 1:48 PM
**To:** Geoffrey Sykes
**Cc:** Bart Higgins; Brandon R. Schaller; Barnaby Gowrie; Philip Aubry; Hugh Anderson
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Agree we need to finalize the reports. I thought they were finalized. We should request any limits on use removed.

We are seeking U.S. tax counsel to send emails to both Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of the its interests.

After that, an alternative approach is to give them what they want - liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero.

US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled. That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions (all of which they will do anyway under a wind up).

We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is....

Note : US LLC would make DFW its sole owner.

On Mon, Mar 17, 2025, 1:11 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

> Hi Mark, Bart, Brandon
>
> **IRS complaint**
>
> Thanks for providing the draft IRS complaint. We have reviewed and attach our comments on the Cayman Islands aspects of the letter.

**Details of transfer**

In response to Brandon's question, we would not advise seeking to perform the redemption in the alternative. In our view, any purported redemption would be susceptible to challenge for the reasons previously set out, and accordingly we should focus on the forced transfer under Article 21.

In respect of the details of a forced transfer, noting Mark's comments, our views are as follows:

*The signatories to the share transfer instrument*

1. Article 21 provides that "*If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles*." The Articles do not provide that the directors may complete the transfer on behalf of the relevant Restricted Person, rather than they can give notice to require that the shares are transferred. In the absence of any additional guidance in the Articles, and in light of Article 17 noted below, we anticipate that this will require that the directors give notice to the relevant Restricted Person requiring them to transfer their shares to a person who is not a Restricted Person within a reasonable period of time to comply with Article 21. Failing this, the Company, would need to bring proceedings in the Cayman Court to seek orders that the shares are transferred as is required under the Articles.

2. Article 17 provides that "*The instrument of transfer of any Share shall … be executed by or on behalf of the transferor*". We appreciate your comments that it may not make sense for the transferor to be required to sign the transfer form when a transfer is being forced, and that Article 17 also provides that the directors have discretion as to the form of the instrument of transfer. However, on our reading of Article 17, whatever form the transfer instrument may be in, we cannot escape the requirement for it to be signed by the transferor. Article 21 does not provide that the transfer mechanics for shares are altered in the case of a Restricted Person and as such, Article 17 will still apply. If we purported to transfer the shares without the signature of the transferor, it is difficult to say that the transfer is made in accordance with the Articles, we may have difficulty convincing the Registered Office to update the register (and in Cayman the Register is *prima facie* evidence of the true shareholders of the company), and in any event we consider that the transfer would be more susceptible to challenge.

*The identity of the transferee*

3. Article 21 does not confer upon the directors the power to dictate to whom those shares may be transferred, although Article 18 provides the directors with "*absolute discretion decline to register any transfer of Shares without assigning any reason therefor [sic]*". On that basis, whilst the directors cannot force a transfer to any particular entity, the letter requiring Highland Dallas Foundation ("**HDF**") to transfer its shares could indicate that the directors would approve a transfer to the DFW Charitable Foundation ("**DFW**").

*The price of the transfer*

4. Similarly, the directors do not have the power to mandate the price paid for the transfer. If HDF found a willing buyer and the directors approved of them, HDF could transfer the shares for whatever value they could agree with the buyer. However, if we had the agreement of DFW to pay a certain price, then in addition to indicating that DFW would accept the transfer, the letter to HDF requiring the transfer of shares could also indicate a suggested price.

5. To come up with a suggested price, we should look to our valuation reports. We note Mark's preference for the ValueScope report as it specifies a figure rather than percentage discount. However, as we already have two reports we consider that we should have regard to both in arriving at market value (and if we choose to rely only on one we may need to be able to justify why that was appropriate). Further:

   a. The reports are in draft form and should be finalised before we rely on them;
   b. We have substantive comments on both draft reports, which we consider should be addressed before the reports are finalised; and
   c. Both reports have limitations on use including that they may not be circulated to third parties without the written consent of the authors (FTI report at [1.8]-[1.10], ValueScope report at page 38). Whilst we may not wish to circulate the reports initially, we may be called upon to justify our approach and will likely want to rely on them at that stage. Accordingly, we will need the valuers to give us their written consent for the reports to be used in this context.

6. If the transfer price could not be agreed with HDF, establishing an appropriate price could form part of an application to Court to force the transfer.

**Next steps**

On the basis of the above, the following are what we see as the next steps:

7. **Finalise valuation reports**

   a. We will reach out to ValueScope and FTI to request that they finalise their reports on the basis outlined above, noting the context in which we will seek to rely on them. We appreciate that this is likely to delay the subsequent steps to a degree, however we consider it to be a critical part of the plan, and part which should be completed before the letters to the IRS and HDF are issued.

8. **Seek DFW's views**

   a. We suggest that Mark reaches out to DFW (we understand he has the relationship) to confirm whether they are prepared to become involved on the basis set out above (in principle and subject to review of the documents).

9. **Resolutions**

   a. Mark and Paul execute resolutions in respect of the issue of the letter to the IRS, and the forced transfer of shares (including the payment of market value on the basis set out above). We do not consider resolutions in respect of sending the letter to be strictly speaking necessary, but we do consider that

there is no harm in doing so and it will add an extra layer of protection. We do, however, consider resolutions in respect of Article 21 to be necessary.

10. **IRS letter**

   a. The letter is issued to the IRS.

11. **Letter to Highland Dallas Foundation**

   a. Immediately after the IRS letter is issued, a letter should be issued to the Highland Dallas Foundation requiring it to transfer its shares under Article 21. A copy of the IRS letter should be sent at the same time, along with the board resolutions in respect of the issue of the IRS letter and the share transfer, a share purchase agreement, and the share transfer instrument. That letter will specify a reasonable time for Highland Dallas to sign the transfer documents or otherwise transfer its shares, following which we will reserve the right to commence proceedings to force the transfer without further notice.

12. **IRS letter issued to other recipients**

   a. Copies of the IRS letter should then be sent to the other intended recipients, who we understand are the other Participating Shareholders and the Texas Attorney-General.

13. **Prepare for litigation**

   a. At this stage, this seems likely to take the form of us commencing proceedings to enforce the Articles and force the transfer, or HDF commencing proceedings potentially by filing a just and equitable winding up petition relying in part on the attempt to force the transfer.

Please let us know if you have any comments on the above approach. Subject to your views, concurrently with seeking finalised valuation reports, we will circle back as soon as possible with drafts of the following for consideration:

14. the resolutions in respect of the issue of the letter to the IRS, and the forced transfer of shares;
15. the letter to the Highland Dallas Foundation;
16. a short form share purchase agreement; and
17. the share transfer instrument.

Finally, we have followed Tony up regarding his availability to discuss the further documents, and will let you know once we have some proposed times.

Please let us know if you have any comments or if you would like to discuss.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 15 March 2025 06:13
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Walkers:

If a holder is determined to be a Restricted Person by the directors, and so under article 21 the directors can cause a transfer of that holder's shares, then implicit in the execution of Article 21 is that the directors are causing effectuation of the transfer. Therefore, the Transfer Agreement would look similar to a redemption action of such shares, in that the directors would be sole signatories to the document (acting in the place of the transferor) and DFW Foundation as the appointed transferee (by the directors / or management shareholder) - would be the accepting party.

It would make no sense that a participation holder would agree to the Restricted label and sign any document. Therefore, Article 21 leaves corporate discretion in the practical implementation of such Article 21 as it implicitly assumes the non-agreement by the former Restricted person holder.

Further, directors could cause the value of such interest to be paid to the former holder, but it's not clear that would be consistent with the charitable mission of the company. However it would be consistent perhaps following corporate formalities (like a redemption) of giving value for property had. Therefore, It would seem conservative here to pay out such value to the holder nevertheless via director resolution for the Transfer.

I would agree and reference FTI valuation and ValueScope valuations in the resolutions, and use the specific number valuescope determined (as both valuations where independently arrived yet determined the same method of valuation) to pay for the share transfered. (Taking the conservative approach in balance)

In sum, corporate effectuation of Article 21 via implementation at the directors discretion as to what the corporate plumbing might look like is as follows:

1. Transfer Agreement written similar to a redemption. Directors sign, transferring the Restricted person's shares to dfw Foundation. The current holder does not sign the agreement (as it's akin to a forced redemption for value).

2. Dfw Foundation "accepts" the transfer either as a separate acknowledgement letter or signs the transfer agreement. Consider both proposals.

3. The transfer is recorded in the books of the company and register.

4. A Notice document is sent to the former holder Restricted Person, (like a redemption would do) along with consideration paid for such transfer.

Does the company attach the two valuations conducted with such Notice and payment or just reference it? What happens in a typical forced redemption situation?

Thoughts on this overall approach?

Mark

On Fri, Mar 14, 2025, 12:38 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

> Hi Bart, Brandon
>
> Taking your initial questions in turn:

1. *Do you think any other provisions are relevant?*

    a. There are other provisions in the M&A which refer to redemption, for example the Memorandum at Para 7, and Article 30. However, on further consideration, in our view the relevant point is that the Participating Shares were not issued as redeemable (as per their definition), and the rights attaching to them do not appear to have been varied. On that basis, they are not liable to be redeemed at the option of either shareholder or company.

2. *If you take the position that "non-redeemable" is operative, doesn't that make other provisions inoperative?*

    a. Whilst there are provisions in the M&A which refer to redemption, the better view is that they do not provide redemption rights or indicate that the Company necessarily holds such rights; they contemplate that redeemable shares may be issued. Those provisions are currently 'inoperative' in relation to the Participating Shares, but may be 'operative' in relation to Management Shares (noting that Management shares are redeemable by the Company). Further, they may become 'operative' in relation to the Participating Shares if those shares are converted to redeemable, or if further Participating Shares are issued which are redeemable.

3. *If you take the position that "non-redeemable" is operative, do you think the directors could amend the definition of Participating Shares pursuant to Art. 14 (without Participating Shareholder consent) to make them redeemable and then consummate the redemption?*

    a. We do not consider that such an amendment could be made without Participating Shareholder consent. In our view, amending the definition of Participating Shares to convert them to redeemable would likely constitute a material adverse variation or abrogation of the rights of the Participating Shareholders, and as such it would require a two-thirds majority of the Participating Shareholders (Article 13).
    b. Further consideration would need to be given as to whether the rights of the Participating Shares could be varied in that manner even with two-thirds Participating Shareholder consent. As we do not expect there will be any appetite to seek the consent of the Participating Shareholders at this stage, we have not considered that question in detail.
    c. However, the directors have a right to require the transfer of Participating Shares held by a Restricted Person (Article 21). If the directors form the view that one of the Participating Shareholders is a Restricted Person, assuming they are acting for proper purposes they would be able to exercise that right to require the transfer of those Participating Shares. Noting that the M&A is silent on the mechanics of a required transfer, if the directors intend to exercise that right further consideration will need to be given as to how that would work in practice, for example whether consideration would be required, and to whom the shares may be transferred. However, we note that if the directors can require the shares of one of the Highland Foundations to be transferred to the DFW Charitable Foundation, it would then hold 67.09% of the Participating Shares.
    d. At that stage, if any further action was required, further consideration could be given as to whether we seek to vary the rights of the Participating Shares with two-thirds consent of the Participating Shareholders, or to pursue another course of action, for example agreeing with DFW Charitable Foundation a repurchase of the relevant shares, which could then be cancelled, and new shares issued which are redeemable by the Company.

We are available to discuss this afternoon at 3pm, including regarding the preparation of the documents as below. Please let us know if that is convenient for you.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 14 March 2025 11:53
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey,

In the interim, can you please continue prepping the documents for (i) redemption and (ii) exercising rights under Art. 21?

We need these to be ready to execute on Monday.

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Friday, March 14, 2025 9:51 AM
**To:** Bart Higgins <bhiggins@shieldslegal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Thanks Bart, noted.

We will do what we can.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Bart Higgins <bhiggins@shieldslegal.com>
**Sent:** 14 March 2025 09:44
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey, client would like a conference today if you can make it work.

Sent from my iPhone

On Mar 14, 2025, at 9:38 AM, Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

CAUTION: This email originated from outside of the organization.

Hi Brandon

Apologies for the delay, we are finalising our views and will revert back as soon as possible regarding a call, which will likely be this afternoon or early next week.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 14 March 2025 08:32
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey,

Adding Mark. We were hoping to have a call scheduled by now. Please let us know.

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Wednesday, March 12, 2025 12:14 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Hi Brandon

Thanks for the below. We will revert back in substance once we've had a chance to consider, including regarding a time for a call.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 12 March 2025 09:56
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey,

Trying to collect the relevant provisions in one email for reference.

Pro-redemption

1. Art. 8: suggests Directors can redeem shares.
2. Art. 14: Rights conferred on Participating Shares shall not be materially adversely varied or abrogated by…redemption…of any Participating Shares…by the Company.
    1. Art. 13: Participating Shares can vote if materially adversely varied or abrogated.
    2. Arts. 13 and 14: Directors can redeem Participating Shares, and Participating Shares cannot vote on that.

Anti-redemption

1. Definition of “Participating Share: “non-redeemable”.
2. Art. 28(b) and (d): refers to “any redeemable Shares”, suggesting some are redeemable and others may not be.

Do you think any other provisions are relevant?

If you take the position that "non-redeemable" is operative, doesn't that make other provisions inoperative?

If you take the position that "non-redeemable" is operative, do you think the directors could amend the definition of Participating Shares pursuant to Art. 14 (without Participating Shareholder consent) to make them redeemable and then consummate the redemption?

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Brandon R. Schaller
**Sent:** Wednesday, March 12, 2025 8:31 AM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

Thanks Geoffrey. Can you please let us know some times you are available to discuss?

Also, we agree that a call with Tony prior to his next draft would be helpful, and we are happy to join that.

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, March 11, 2025 11:23 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Hi Brandon

We have forwarded those documents to counsel for review. Once Tony has had a chance to consider, we suggest that a call to discuss would be helpful.

Regarding the question as to redeemability of the Participating Shares, in light of Tony's advice we have considered and discussed further with colleagues in our corporate team. We note that the Memorandum at Para 7 appears to provide the Company with the right to redeem its shares, and certain provisions of the Articles envisage redemption by the Company (e.g. Arts 14 and 28). On the other hand, the rights attached to the Participating Shares as per their definition include that they are non-redeemable (without specifying whether that applies to the company or the shareholder). Following further consideration, on the basis of the documents we have seen we consider that the better view is that the Participating Shares are not redeemable by either the company or the shareholder. If you are aware of any further documents (e.g. resolutions) which might operate to alter the rights attached to the Participating Shares, please let us know.

However, we note that Tony's advice, with which we agree, is that the company does have the power to force the transfer of shares held by a Restricted Person. In the circumstances, we may be able to rely on that power.

Once Tony has considered the further documents we will revert back regarding a time for a call.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 06 March 2025 12:24
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

Hi Brandon

Thanks for your time on the phone and the below.

We will share those documents with Tony and discuss his advice in light of them.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 06 March 2025 11:38
**To:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Materials for KC

**[this message is from an external sender]**

---

Walkers team,

Here are factual materials to be shared with KC:

1. Carrington Coleman (US law firm) tax memo – this provides a general history (see Exhibit C) of the facts, so we would suggest the review begin here.
2. ValueScope Presentation to Supporting Organizations – this was presented to the Supporting Organizations on November 20, 2024 and provides financial background.
3. Paul Murphy Presentation – this was presented to the Supporting Organizations in early December 2024 and provides corporate governance background.
4. Walkers Presentation re: Participation Shareholder rights – this provides an overview of the rights of the Participation Shareholders
5. UBS Petition – this provides background on Dondero's various misdeeds. In particular, search for "Sentinel". It is not necessary to review the entire petition.
6. Highland Employee Retention Assets Petition – this provides background on Dondero's various misdeeds. In particular, search for "A Recurring Theme" and read pgs. 36-47.
7. News article re: Judge Jernigan -Texas Judge Jernigan Accused of More Ethics Violations – Dondero attempted to weaponize the U.S. Securities and Exchange Commission to investigate Judge Jernigan, who had ruled against him in numerous bankruptcy matters.

We are happy to discuss with KC after he has had a chance to review. Let us know of any questions.

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

---

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

---

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Anaman, Alexis <Alexis.Anaman@fticonsulting.com> |
| **Sent:** | 27 March 2025 2:11 AM |
| **To:** | Geoffrey Sykes; Shek, Chun Yin |
| **Cc:** | Barnaby Gowrie; Philip Aubry; Chris Beck |
| **Subject:** | RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181] |
| **Attachments:** | Non reliance letter (Template).docx |

**[this message is from an external sender]**

Hi Geoffrey,

Thanks for the comments. A few questions

- You have asked for us to include language which notes: "We understand that the Directors acting in the best interests of the company is generally regarded as the interests of the members as a whole, which includes future members ..." The underlined language is new. Can you confirm reference to a member relates to participating shareholders? What is the intention of adding that directors should act in the interests of future members? I am struggling conceptually to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders. Therefore the addition seems unnecessary.
- I am surprised that distributions were made. This seems inconsistent with a phone call we had. But perhaps I misheard. Can you provide more detail as to the nature of the distributions. The proposed language is as follows: "From 2019, DAF became involved in a legal dispute, and whilst DAF has still made distributions to allow the Participating Shareholders to make unrestricted grants to the supported community foundations, it has curtailed additional discretionary distributions". What is an unrestricted grant? What falls in the category of additional discretionary distributions?
- The limitations in our note will remain. To do a valuation which can support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. However, this will require *inter alia* approval from our risk committee to proceed and more information on the proposed transaction and situation.
- We are happy for CDMCFAD LLC to have our memo on a non-reliance basis – please see attached for our template NRL. But this memo should not be used to support a transaction.

Happy to discuss.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 26 March 2025 13:02
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for the below.

We have discussed further with our client and onshore counsel, and together with them set out some further clarificatory amendments as per the comments in the attached.

In addition to those minor amendments, we note that:

1. we have not received any material addressing reliance on the memorandum by CDMCFAD LLC; and
2. the "*Limitations and restrictions*" section is unchanged, and still provides that the memorandum "*should not be used to support a transaction*" ([1.8]-[1.10]).

In order for the memorandum to be useful in the circumstances, CDMCFAD needs to be able to rely on it (in addition to DAF HoldCo), or a separate, comparable memorandum would need to be addressed to CDMCFAD on which it may rely. Further, both entities will need to be able to rely on the memorandum(s) to support the proposed transaction. We confirm that we do not intend to disclose the memorandum(s) to any third parties. Apologies if we did not communicate those points clearly during our call on Friday.

Please let us know if there are any issues with either of those – if so, of course we would be happy to discuss.

Otherwise, we would be grateful to receive a draft engagement letter addressed to CDMCFAD LLC, and appropriate amendments to the memorandum(s) regarding reliance by both entities, and in support of a transaction.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 25 March 2025 10:54
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey, please find attached a comparison against the last draft of the original version on our server.

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**

+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 25 March 2025 12:55
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Thanks Alexis.

Please could you also send a redline against the previous version in word?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 25 March 2025 02:15
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

Please find attached an updated memo.

Thank you

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 24 March 2025 17:55

**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

A Participating Shareholder may consider an absence of distributions to be sufficient grounds for a winding up order on the just and equitable basis, and they would be able to present a winding up petition on those grounds. However, it is difficult for us to say whether that petition would be successful, i.e. whether a Court would agree with the Participating Shareholder. In coming to a determination, the Court would consider all of the circumstances surrounding the absence of distributions, whatever those circumstances might be. In saying that, one point which would be relevant to the Court's determination is that the quantum of dividends is to be determined by the directors "*in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis*" (Article 104).

If a winding up petition is presented and a winding up order is then made, any alteration in the status of a company's members after the petition was presented is void unless the Court orders otherwise (Companies Act sections 99 and 100). On that basis, if: (a) a Participating Shareholder presented a winding up petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and accordingly would not impact the amounts the existing Participating Shareholders would receive in the winding up (unless the Court ordered otherwise).

Please let us know if you need anything else.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 22 March 2025 03:36
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

Many thanks for your response.

Would an absence of distributions be sufficient grounds to make an application to wind the company up?

If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 21 March 2025 20:00
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for your time on the phone last night and your email.

We confirm that, if DAF HoldCo was wound up, the Participating Shareholders would receive distributions. Those distributions would be made *pari passu*, and Mark (if he was the liquidator) would not be able to ensure that the existing Participating Shareholders get nothing. Article 122 provides that in a winding up, the assets available for distribution between Shareholders shall be applied: (a) first to pay both Participating and Management Shareholders *pari passu* for the par value of their shares, then (b) to pay any balance to the Participating Shareholders "*in proportion to the number of Participating Shares of the relevant Class and Series held*". The M&A are attached for convenience.

Whilst the Participating Shareholders have the right to seek to cause a winding up under the Companies Act, they need to have a proper basis on which to make an application to wind the company up. Until they have such a basis, they cannot cause the company to be wound up. We can only assume that the current Participating Shareholders have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so, but of course we do not know what is in their minds.

Please let us know if we can be of any further assistance.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 21 March 2025 09:34
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Walkers team,

Your comments note that "the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles)".

Can you confirm that if the firm was wound down, it would result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing?

Given they haven't received dividends since 2019 (and presumably would like cash from DAF), why haven't the existing participating shareholders just triggered a wind down?

If the holder of the share can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 20:23
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Further to the below, and noting that it is getting quite late for you, we could do a call this afternoon at 4.30pm (Cayman) / 9.30pm (London) if that was more convenient than tomorrow?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Geoffrey Sykes
**Sent:** 20 March 2025 14:31
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

We appreciate you making yourself available at that hour this evening, but unfortunately we cannot do 8pm UK tonight.

We are under some time pressure from the client to progress the proposed transaction, and accordingly to have the report finalised as soon as we can. We would prefer to have the call before Monday if possible, are there any times tomorrow that would suit you?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 20 March 2025 14:07
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

I am travelling at that time tomorrow.

Monday would be better if possible. I can also do 20.00 UK time tonight.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 18:42
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

We think it would be best to discuss on a call, are you available tomorrow at 10am (Cayman) / 3pm (London)?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 20 March 2025 12:45
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Excellent. Many thanks.

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 14:19
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for getting back to us.

We are instructed that our client has settled your invoice this morning.

We will otherwise consider your comments and revert back.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 20 March 2025 05:50

**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

Some comments below in red.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 00:47
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

We have considered your draft valuation report dated 28 February 2025, and attach a version including our comments (along with the current Memorandum and Articles dated 20 February 2025).

**The Substance of the Report**

Most significantly:

1. We have obtained clarification from onshore counsel regarding the operation of the DAF structure. Accordingly, please replace [2.2] and [2.3] with the following amended versions:
   "*2.2 DAF is set up in a structure such that the Participating Shareholders (i.e., nonprofit organisations) hold a passive economic, non-voting interest. The Participating Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed – we understand that any attempts to do so may be regarded as a criminal offense by the IRS or result in significant tax liabilities.*
   *2.3 The foregoing tax issues and structure is the primary reason for the separation of control between Participating Shares (holders of which have very limited rights as described further in Section 3) and the Management Shares (holders of which have effective control over DAF). That is, the holder of the Management Shares needs to exercise independence and act on an arms' length basis to the holders of the Participating Shares and their affiliates.*" Fine to make change.

2. It is stated at [3.2(1)] that Mr Patrick has "*an ultimate right to override the articles*". However, any amendment to the articles which constitutes a material adverse variation or abrogation of the rights of the Participating Shareholders must be approved by two-thirds of the Participating Shareholders, which is a significant restriction on Mr Patrick's ability to affect the rights of the Participating Shareholders (Article 13). We can delete this paragraph.

3. It is stated at [3.2(2)] that "*there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission*". However, as a matter of Cayman law, DAF's directors owe their various duties to the company, and must act in the best interests of the company. The best interests of the company are generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in the best interests of the company. Can you explain how it was in the interests of the company to materially dilute the existing shareholders?

4. It is stated at [3.10] that "*the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company*". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles). Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states *"Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed".*

5. As per our comments in a number of places, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege. Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction? The more colour you can give the better.

In addition, we note that you were provided with material which indicated that the Participating Shares were redeemable at the option of the Company but not at the option of the shareholder. On further consideration, we consider the better view to be that the Participating Shares are not redeemable at the option of the Company or the shareholder. It appears that your report refers to redemption rights at [3.1], [3.19]-[3.20], and [4.1]. Noting your comments that "*the discount applied to the factors above would also cover the risk of redemption*" (at [3.20]) this may not impact your assessment of value, but please consider and make amendments to the draft as necessary. Sure, will do.

The above comments are also reflected in the attached, along with some other comments which are relatively minor and we hope will be self-explanatory. In any event, please let us know if you have any queries. We can run through these comments.

Of course, please consider the impact that any of the above may have on your assessment of value.

**The Permitted Uses of the Report**

Further, the context in which our client is operating has changed since your draft report was issued. Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDMCFAD, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDMCFAD, and in turn DAF HoldCo. This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDMCFAD, LLC redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note that our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets.

**Next Steps**

On the basis of the above, please could you provide an updated draft:

1. In light of our comments as above and in the attached, including to account for any amendment to your assessment of value; and
2. With the section headed "*Limitations and restrictions* " (at [1.8]-[1.10]) amended so as to permit the report to be used and relied on in the manner set out above.

If you could consider the next step (prior to the above) being our invoice for work done so far to be settled it would be appreciated.

Please let us know if you would like to discuss.

Best regards,

**Geoffrey Sykes**
Associate

**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 18 March 2025 02:12
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Great. Look forward to receiving the comments and thanks re invoice.

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 17 March 2025 23:36
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for your timely email.

We do have some comments on your draft report – we are discussing with onshore counsel and our client and will revert back in substance in the coming days.

We have also passed on a reminder regarding your invoice.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 17 March 2025 11:45
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>

**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

Trust all is well with the report?

Will the invoice be settled soon?

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 03 March 2025 15:15
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Many thanks for the below.

We will consider in tandem with our client, and will let you know if we have any comments.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 02 March 2025 10:26
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Walkers team,

Please find attached our draft memo and invoice (fees are at the bottom of our fee estimate range).

If you have any comments on the draft memo, or would like to discuss it, please do let me know.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 February 2025 14:52
**To:** Shek, Chun Yin <Marco.shek@fticonsulting.com>; Mark Patrick <mpatrick@dafholdco.com>
**Cc:** Stahl, Matt <Matt.Stahl@fticonsulting.com>; Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Mark, Marco

That suits us, and thanks Marco and team for making yourselves available at that hour.

**Mark** – please let us know if that suits you.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Sent:** 20 February 2025 09:30
**To:** Mark Patrick <mpatrick@dafholdco.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Stahl, Matt <Matt.Stahl@fticonsulting.com>; Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Mark, Geoffrey,

Alexis and I are available to speak at 3-4pm Cayman (8-9pm UK) today, if that works for you.

Otherwise please suggest times for Friday/early next week and we will try our best to accommodate.

Best regards,
Marco

**Chun Yin (Marco) Shek, CFA**
Senior Director

**FTI Consulting**
+44 203 727 1410 T | +44 7976 326 013 M
Email: marco.shek@fticonsulting.com

200 Aldersgate | Aldersgate Street
London | EC1A 4HD | United Kingdom
www.fticonsulting.com

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 20 February 2025 00:09
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Shek, Chun Yin <Marco.shek@fticonsulting.com>; Stahl, Matt <Matt.Stahl@fticonsulting.com>; Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

I'm traveling in the morning tomorrow. Either late afternoon Thursday or late afternoon Friday works for me.

On Wed, Feb 19, 2025, 6:01 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

> Hi Mark, Marco
>
> Mark, as we understand you have discussed with Brandon, and Marco, as per our previous emails with you, we are arranging a call to further discuss the valuation exercise.
>
> In particular, Mark would like to discuss his plans for future distributions, and Marco and the FTI team would like to discuss the 30 September 2024 valuation and the 7 February 2025 share issue.
>
> Please let us know if you are available tomorrow (Thursday) at 10.30am (CT) / 11.30am (Cayman) / 4.30pm (London).
>
> Otherwise, we are available tomorrow anytime after that, or on Friday during the Cayman morning.

Best regards,

**Geoffrey Sykes**
Associate
Walkers (Cayman) LLP

**Walkers** | Making financial services work

**T** +1 345 814 6834 | **M** +1 345 814 6834 | **E** Geoffrey.Sykes@walkersglobal.com
190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands
www.walkersglobal.com

**Secretary**
Alexandra Irwin | **T** +1 345 814 4609 | **E** Alexandra.Irwin@walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.

FTI Consulting LLP. Registered Number OC372614. Registered in England and Wales at 200 Aldersgate, Aldersgate Street, London, EC1A 4HD. A full list of Members is available for inspection at the registered address.

**[to be printed on relevant FTI letterhead]**

[COMPANY]
[ADDRESS 1]
[ADDRESS 2]
[ADDRESS 3]
[ADDRESS 4]

[date]

Dear Sir or Madam,

**Release Letter for [*matter description / project name*]**

FTI Consulting LLP ("FTI") refers to its report regarding [●] (the "Report") regarding [●], supplied to [●] (the "Client") pursuant to an engagement letter between FTI and Client dated [●] 20[●].

FTI understands that you are [*insert description of recipient and purpose of disclosure of report*] (the "Purpose") and wish to be provided with a copy of the Report. The Client has authorised FTI to provide a copy of the Report to you. This letter sets out the terms on which FTI will agree to release the Report to you and explains certain matters in relation to the Report. Those terms are:

1) You accept that in providing you with a copy of the Report and otherwise communicating with you concerning the Report or the Client, FTI shall have no responsibility or liability to you, whether in contract, tort (including negligence) or otherwise. Any use that you or any of Representatives (as defined below) make of the Report is entirely at your own risk. You agree to release FTI and its personnel from any claim arising out of or in connection with the Report (and shall procure that your Representatives (as defined below) do the same).

2) You shall keep the Report confidential and shall not provide the Report to third parties by any means without FTI's prior written consent, unless you are requested to do so by order of a court of competent jurisdiction or pursuant to law or regulation or any valid request or demand of any governmental or regulatory body or authority. Unless FTI has given its consent in this release letter, it may, at its sole discretion, withhold consent. Whether or not FTI has given its consent, FTI will not accept any liability or responsibility to any third party who may get access to the Report.

3) You may make copies of the Report available to your directors and officers, those employees involved in considering the Report, and your legal advisers (your "Representatives"), provided that in each case you take reasonable steps to ensure that they understand and agree that:

a) The Report is confidential and may not be disclosed to any other parties without FTI's prior written consent;

b) The Representatives may use the Report only for the Purpose, in the case of advisers, only for the purpose of advising you in relation to the Purpose; and

c) FTI accepts no duty of care to the Representatives in respect of any use they may make of the Report, and/or any other information and explanations we may provide.

You shall be responsible for any breach of the terms of this letter agreement by your Representatives.

The terms of this letter will continue to apply in respect of the Report released under its terms, even if FTI later agrees to accept a duty of care to you in respect of some other report.

The work underlying the Report covered only the matters set out in FTI's contract or engagement letter with Client. In agreeing to the scope of work with the Client, FTI had regard to possible areas of interest to Client in general, but without the interests or concerns of any other third party in mind. The issues covered in the Report and the emphasis placed upon them, may not address or reflect your specific requirements, interests or circumstances.

FTI has not carried out any work or made any enquiries of the Client's management since [●] 20[●] being the date on which we completed our fieldwork. The Report does not incorporate the effects, if any, of events and circumstances which may have occurred or information which may have come to light subsequent to that date. FTI makes no representation as to whether, had it carried out such work or made such enquiries, there would have been a material effect on the Report. Further, FTI has no obligation to notify you if any matters come to its attention which might affect the continuing validity of the comments or conclusions in the Report.

The Report may contain Personal Data as defined by the General Data Protection Regulation (EU) 2016/679. In respect of any such Personal Data, we shall each be separate and individual controllers and shall each be responsible for compliance with our own obligations under applicable data protection laws. You shall ensure that you will comply with the requirements of applicable data protection laws in respect of your receipt, use and any subsequent disclosure of the Personal Data, including any disclosures made pursuant to this release.

This letter, any non-contractual obligations arising out of or in connection with it and our relationship with you, shall be governed by and interpreted in accordance with the laws of England & Wales. The English courts shall have exclusive jurisdiction in respect of all disputes or claims (including non-contractual disputes or claims) arising out of or in connection with this letter or the Report.

If you wish to receive a copy of the Report on the terms set out above, please acknowledge and agree to the terms by signing the enclosed copy of this letter in the space provided and returning it to FTI.

Yours faithfully,

**[*name*]**
**Senior Managing Director**
**For and on behalf of FTI Consulting LLP**

**Confirmation**

We confirm that we wish to receive a copy of the Report on the Client and acknowledge and agree to abide by the terms set out in the letter dated [●] from FTI Consulting LLP. We also acknowledge and agree that these terms will apply to each version of the Report provided to us.

ACKNOWLEDGED AND AGREED:

For and on behalf of [*INSERT NAME OF RECIPIENT COMPANY*]

By: ________________________________________
Signature

________________________________________
Title

________________________________________
Date

Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**D** +1 345 914 5898
**T** +1 345 949 2648
**F** +1 345 949 8613
**E** MGoodman@campbellslegal.com

campbellslegal.com

Our Ref: MGM/ROD/18955-44959
Your Ref: 20250506

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Margot McInnis and Sandipan Bhowmilk
Grant Thornton Specialist Services (Cayman) Limited
2nd Floor Century Yard
Cricket Square
Grand Cayman KY1-1102
Cayman Islands

16 March 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

We refer to our letter dated 12 March 2025 ("**Our Letter**") and adopt the definitions used therein.

**Communications with Service Providers**

We acknowledge receipt of your email dated 14 May 2025 indicating that the JOLs are considering Our Letter. We enclose herewith a letter from US Counsel for the CDM Entities, Richards Layton and Finger, to Vista Bank which reinforces the points made in Our Letter, i.e. that the JOLs have no power or authority to act on behalf of any of the CDM Entities, or with respect to the accounts or assets of any of the CDM Entities which are held with Vista Bank.

Please confirm that the JOLs have not contacted any other third-party service providers connected with the CDM Entities' operations, and that the JOLs will not issue similar requests to such parties in respect of any assets of the CDM Entities in future.

**Appointment Order**

We note from the Appointment Order which accompanied Your Letters that, pursuant to paragraph 6(a) and 6(b), the JOLs are authorized to exercise the below powers without further sanction of the Court:

a) "*the power to present a petition for the winding up of Charitable DAF Fund, LP (the "**Fund**") if so advised; and*

b) *the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

It is not immediately clear to us on what basis the JOLs could seek to present a petition for the winding up of the Fund in circumstances where, *inter alia*, (i) the Company was not a shareholder/limited partner of the Fund; and (ii) where the Company is not a creditor of the Fund. To the extent that it is alleged that the restructuring of the Company's assets gives rise to a claim by the Company (which is denied), it is trite law that a petitioner cannot rely on a speculative or potential claim to wind up a company (which any claim brought by the JOLs in respect of the restructuring of the Company would be).

It follows that where the Company has neither standing nor grounds to petition for the liquidation of the Company it would have neither standing nor grounds to apply for the appointment of provisional liquidators, irrespective the manner in which the CDM Entities are being managed (as to which, see below).

It is therefore surprising that the Appointment Order contained those provisions. Please provide a copy of the transcript of the petition hearing as it relates to paragraph 6 of the Appointment Order. To the extent that paragraph 6(a) and (b) were not specifically addressed in submissions, please confirm that. As a party affected by that order, we reserve the right to apply to vary the Appointment Order to remove these provisions, which do not appear to have been made in a manner consistent with the requirements of the CWR, or with any proper consideration of the relevant facts.

It is also telling that the Appointment Order, which was presumably drafted by counsel to the petitioner, prospectively included these provisions before the JOLs could possibly have had any basis to objectively consider those matters and calls into serious question the propriety of the JOLs now retaining the petitioner's counsel as their own.

**Ex Parte Relief**

As you are aware, Messrs Patrick and Murphy are independent professional directors. They are well aware of their duty to act in the interests of the company over which they are appointed, which is (when solvent) equated with the interests of shareholders, present and future. Messrs Patrick and Murphy also have access to legal advice, which they have (without waiver of privilege) sought and followed where necessary or appropriate. The CDM Entities, including the Fund, continue to operate in accordance with the objects for which they were established (i.e. to make investments on behalf of, and to support charitable causes).

Accordingly, the Company would be unable to overcome the 'necessity hurdle' described by Justice Doyle in *Re Position Mobile Ltd SEZC* (Unreported, 31 October 2023) and "*prove that the appointment of JPLs is "necessary" in order to prevent (i) the dissipation or misuse of the company's assets, or (ii) the oppression of minority shareholders; or (iii) mismanagement or misconduct on the part of the company's directors*" (at paragraph 133).

However, in an effort to assuage any concerns the JOLs may have regarding the commercial activities of the Fund and the risk of dissipation of assets outside of the ordinary course of business, the CDM Entities would be prepared to enter into a form of Protocol which provided for, amongst other necessary and appropriate terms, the reporting of material transactions on the basis that such information was held confidentially by the JOLs. We would be happy to discuss the terms of that Protocol in further detail.

Should the JOLs choose to disregard this offer and take steps to seek either the appointment of provisional liquidators, or any other interim relief, we expect that you will provide this letter to the Court in furtherance of the duty of full and frank disclosure. For the avoidance of doubt, we will strenuously oppose any such application on behalf of the Fund and will rely on this letter for costs purposes.

Nothing in this letter should be taken as a waiver of privilege or as an admission of any position advanced in Your Letters.

Yours faithfully,




**Campbells LLP**

JOHNSTONE
LAW

30 May 2025

aj@j-law.ky
+1 (345) 929 3000
Ref: 00022

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman, KY1-9010
Cayman Islands
Your ref: MGM/ROD/18955-44959

**By email: mgoodman@campbellslegal.com**

Dear Colleagues

**In the matter of Charitable DAF HoldCo, Ltd (In Official Liquidation) (the *Company*) | Proceedings FSD No. 116 of 2025 (JAJ)**

We refer to our letter dated 22 May 2025 (the ***Letter***) to which you have failed to respond.

You did however attend the directions hearing before Justice Asif KC on 23 May 2025 (the ***Directions Hearing***) purportedly on behalf of your clients, notwithstanding the fact that the hearing was held in chambers and, as had been made clear in the Letter, that your clients have no standing in the liquidation (and certainly not in respect of any sanction application). Not only did your clients have no standing (and indeed should not have even attended the Directions Hearing at all), but to compound the situation your Mr Doherty, without invitation, made submissions from the back of the Court in which he represented that your clients had sought to cooperate and comply with the JOLs' requests for information in your letter of 16 May 2025 by proposing a 'protocol' with which the JOLs had not engaged, which is a plain mischaracterisation of events.

(a) In your letter dated 12 May 2025, you expressly stated: "*the [JOLs'] request for documents relating to the business of the CDM Entities is not properly made. The CDM Entities decline to provide any such documents at this stage*."

(b) In your letter dated 16 May 2025, you stated: "*the CDM Entities would be prepared to enter into a form of Protocol which provided for, amongst other necessary and appropriate terms, the reporting of material transactions on the basis that such information was held confidentially by the JOLs. We would be happy to discuss the terms of that Protocol in further detail*."

(c) By our Letter, the JOLs' advised that as your clients are not willing to assist the JOLs, it is likely to be necessary to seek the Court's assistance to enable them to discharge their obligations, and noting "*it would be regrettable if your clients were to seek to obstruct reasonable requests from the JOLs, requiring them to obtain orders compelling your clients to provide information*". In this regard, the JOLs' requested that your clients confirm by 5pm on 23 May 2025:

> *"a) The identity of the parties for whom you act;*
>
> *b) Details of the full structure of the "CDM Entities" including registers of members and directors for each entity;*
>
> *c) The assets held by each of your clients and details of any transactions undertaken by your clients since 1 July 2024; and*
>
> *d) Firm undertakings that no transactions will be taken in respect of the assets held by your clients without 7 clear days advance notice to the JOLs."*

(d) The Letter noted that you act for three named entities "*along with other unspecified directly and indirectly held subsidiaries*" and requested that you therefore provide a full list of the parties for whom you act by return.

Your clients failed to respond to the Letter or to cooperate with the JOLs' reasonable requests for information. It is in this context that Mr Doherty made submissions at the Directions Hearing without standing to do so to the effect that your clients had in fact sought to cooperate with the JOLs, including by proposing a protocol – with which the JOLs had not engaged – such matters being plainly incorrect, if not actively misleading.

In these circumstances, the JOLs request as a matter of urgency but certainly by no later than 5pm on **30 May 2025** that you and your clients provide: (i) an explanation for your conduct and the representations from the back of the Court at the Directions Hearing, and (ii) substantive responses to all matters raised in our Letter, including with respect to the JOLs' request for confirmation that no transactions will be taken in respect of the assets held by your clients without 7 clear days advance notice to the JOLs. In particular, it has come to our attention that your clients have, since the date of the Letter, sought approval of a transaction involving Hunter Mountain Investment Trust without consultation with the JOLs. The JOLs assert proprietary claims over all assets held by the Fund and any transaction involving the Fund's assets must therefore be undertaken only on notice to the JOLs.

Separately we understand that you (Campbells) have circulated outstanding invoices to the JOLs and have indicated that you intend to submit a proof of debt against the Company in due course. Please also explain therefore the basis on which as a purported creditor of the Company you consider you are able to act for the entities holding assets to which the Company has *prima facie* claims.

Should you and/or your clients fail to provide satisfactory responses to the JOLs by 5pm on **30 May 2025**, the JOLs reserve their right to seek appropriate orders against your clients without further notice.

Yours faithfully




**Johnstone Law**

Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

D +1 345 914 5898
T +1 345 949 2648
F +1 345 949 8613
E MGoodman@campbellslegal.com

campbellslegal.com

Our Ref: MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Johnstone Law
Unit 9, Tropic Centre
18 Earth Close,
PO Box 926,
Grand Cayman, KY1-9006
Cayman Islands

30 May 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

We refer to your letters dated 22 and 30 May 2025 sent on behalf of the joint official liquidators (the "**JOLs**") of the Company. Capitalised terms, unless otherwise defined, adopt the definitions applied in our letters dated 12 and 16 May 2025 ("**Our Letter**)" which were addressed to the JOLs.

As a preliminary point, we received a letter from Maples and Calder dated 28 May 2025 indicating that they have recently been instructed to act for the JOLs. We understood, based on your 22 May letter, that Johnstone Law were engaged as counsel by the JOLs (subject to sanction by the Court). In circumstances where two law firms are now corresponding with us, purportedly on behalf of the JOLs, it is incumbent on the JOLs to immediately clarify the situation.

Please confirm, by **no later than 5pm on Monday, 2 June 2025**, the respective roles of Maples and Calder and Johnstone Law.

**Attendance at the Directions Hearing**

1. Your letters repeatedly assert that our clients have "*no standing in the liquation*". This is patently incorrect. The JOLs were specifically authorised to commence proceedings against our client as a direct result of the evidence and draft order prepared by your firm, on behalf of the petitioner, at

the supervision hearing.[1] This resulted in the Court making an Order which granted the JOLs authority to present a petition / seek the appointment of provisional liquidators to the Fund before they could possibly have had an opportunity to consider the relevant facts, or if such steps were necessary or appropriate. In the circumstances, it is obvious that, (i) your firm cannot objectively advise the JOLs, and (ii) the Fund, as a party named in the Appointment Order, have standing to address the Court on those provisions.

2. As Lord Millet observed on behalf of the Privy Council in *Deloitte and Touche AG v Johnson,*[2] "*Orders made by the court are coercive. Every order of the court affects the freedom of action of the party against whom it is made*". Accordingly, when determining whether an applicant has standing, the Court will first consider if it has jurisdiction to make the order, and secondly, in words of Lord Millet, whether the applicant has a "*legitimate interest in the relief which they seek*". Clearly, given the Fund is the party directly affected by the inclusion of these '*coercive*' provisions, they have standing to bring an application to have the offending paragraphs removed from the Appointment Order.

3. As regards the reporting 'Protocol' proposed in Our Letter and referred to at the Directions Hearing, your 22 May letter, despite seeking "*assurances regarding the assets under the control of*" our clients, did not address the Protocol, or take us up on our offer to "*discuss the terms of the Protocol in further detail*". We were therefore surprised to hear Mr Johnstone summarily dismiss the Protocol as "*paper thin*" at the Directions Hearing. For the avoidance of doubt, our clients' offer to enter into a reporting Protocol in respect of material transactions remains open (to which, see paragraph 12 below).

4. As to the balance of the entirely baseless criticisms in your 30 May letter, we have no obligation to, and no intention of, addressing these. The appropriate forum to address those issues was in front of Mr Justice Asif KC at the Directions Hearing. They warrant no further comment.

**<u>JOLs' Powers</u>**

5. As regards paragraph 3 of your 22 May letter, the powers conferred on liquidators by the CWR and the Act to collect in the books and records of a company in liquidation, including those in paragraph 1 of Part II to Schedule 3, are to be exercised by the liquidator in respect the "*property of the Company*" and / or "*the company's books and records*". As these statutory powers do not extend to distinct legal entities which are not the subject of a liquidation or other court order, it follows

---

[1] Your 22 May letter indicates that these provisions were granted by the Court "*on the basis of the evidence before it*", although it is notable that you have not provided the transcript of the petition hearing (insofar as it relates to paragraphs 6(a) and (b) of the Appointment Order) we requested in Our Letter, or confirmation as to whether these provisions were addressed in legal submissions.

[2] [1999] CILR 297

that our clients' documents are not the "*property of the Company*" and JOLs have no basis to claim that the Company is entitled to these documents.

6. Further, any duty which Messrs Patrick or Murphy owe to the JOLs in their capacity as former directors of the Company does not extend to the books and records of the CDM Entities which are separate entities over which the JOLs have no power or authority. It is plainly incorrect to suggest that directors of the CDM Entities can disregard their duties to those companies on the basis of your assertion that they fall within the definition of "relevant persons" under s.103 of the Act. Directors are bound by duties under common law and statute to protect the interests, confidentiality, and assets of the companies they serve. To comply with your baseless requests would place them in breach of those duties unless and until a court determines otherwise.

7. If the JOLs believe it necessary to investigate particular transactions involving the CDM Entities, the proper course is to seek the appropriate order from the Grand Court under section 103 or 138 of the Act. This approach ensures that the statutory process is respected and our clients' rights are protected.

**<u>Response to Requests in your 22 May Letter</u>**

8. In response to the requests listed at paragraph 5 of your 22 May letter, please see the Schedule to this letter which lists each of the CDM Entities we represent.

9. As to paragraphs 5(b), (c) and (d), for the reasons outlined above, your request for extensive documentation, including registers, asset holdings, and transaction histories, has no legal basis. Nor is there any basis on which the JOLs can demand "*firm undertakings*" from our clients not to deal with their assets.

10. We do not understand the reference to the purported transaction involving Hunter Mountain Trust in your 30 May letter. The bare assertion of a proprietary claim (which is made for the first time in this letter) is completely unsubstantiated and legally flawed. Needless to say, the JOLs have no interest, proprietary or otherwise, in any assets held by the Fund and our clients do not need to seek approval or consult with the JOLs regarding transactions in the ordinary course of business.

11. Notwithstanding, our clients have already offered to enter into a reporting Protocol in an effort to assuage any misplaced concerns the JOLs may have regarding the commercial activities of the Fund and the risk of dissipation of assets outside of the ordinary course of business. However, it is notable that your letters have eschewed this reasonable and constructive proposal in favour of misconceived and unsustainable requests of our clients.

12. We now enclose a draft reporting Protocol whereby our clients offer to provide, *inter alia*, the following information to the JOLs:

    (a) a report listing all transactions undertaken by the Fund, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000;

    (b) a 'business plan' explaining the ordinary day to day business of the Fund;

    (c) a monthly transactions report; and

    (d) advance notice of any single transaction exceeding US$5,000,000, or any series of transactions in an aggregate amount exceeding US$5,000,000 (save for transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers).

13. For the avoidance of doubt, our clients reject the suggestion that they are under any duty to provide this information. However, in circumstances where the CDM Entities, including the Fund, are operating in the ordinary course to make investments on behalf of, and to support charitable causes, our clients are offering this Protocol to ensure that these charitable operations are not unnecessarily impacted by the JOLs.

14. Please confirm your agreement to, or provide any comments on, the draft protocol by **3pm on Wednesday, 4 June 2025**.

**Paragraphs 6(a) and 6(b) of the Appointment Order**

15. With regard to paragraphs 6(a) and (b) of the Appointment Order, as noted above and in Our Letter, we have serious concerns regarding the propriety of the JOLs seeking to retain the same counsel who had expressly sought, and obtained, an order that the JOLs be authorised to present a petition for the winding up of, and appointment of provisional liquidators to, the Fund "*if so advised*". There is simply no legal or practical basis for the JOLs to present a petition for the winding up of the Fund and, as foreshadowed at the Directions Hearing, our clients intend to apply to have paragraphs 6(a) and (b) struck from the Appointment Order.

16. It is well established in this jurisdiction that, per Mr Justice Jones KC in *Re ICP Strategic Credit Income Fund Limited*,[3] "*an official liquidator's power to 'bring or defend any action or other legal proceeding in the name and on behalf of the company' is exercisable only with the sanction of the Court.*" In addition, when determining whether to sanction such proceedings, "*the court must be satisfied that they have causes of action against the proposed defendants with a reasonable prospect of success*

[3] [2014] 1 CILR 314

*and that the interests of the creditors will be best served by allowing proceedings to be commenced. As officers of the court, official liquidators are expected to behave in an exemplary manner and to perform their duties and exercise their powers fairly. The court will not allow its official liquidators to threaten or commence litigation speculatively as a means of extracting a settlement from a party against whom there is no genuine cause of action or no evidence from which to infer that a possible cause of action has any real prospect of success*" (at paragraph 10).

17. Accordingly, it is clear that, despite the inexplicable inclusion of paragraphs 6(a) and (b) in the Appointment Order, the JOLs should be expected to obtain Court sanction before issuing any proceedings in the name of the Company. However, were the JOLs to seek sanction for the presentation of a winding up petition against the Fund, such an application would be destined to fail in circumstances where, for the reasons outlined in Our Letter, there is no genuine cause of action and no realistic prospect of the petition being successful.

18. Furthermore, given these provisions were sought and included in the Appointment Order without any proper consideration of the underlying transactions or the relevant facts, our clients have serious concerns with the manner in which the JOLs, presumably influenced by legal counsel, appear to have predetermined the course of the liquidation and the investigations which will be required into the affairs of our clients. Such conduct by the JOLs, without first ensuring they are "*thoroughly acquainted with the affairs of the company*" clearly disregards the dicta of the Court of Appeal in *In re Contract Corporation, Gooch's Case* (as applied by the Cayman Islands Court of Appeal in *In Re China Branding Group Ltd*).[4] In the circumstances, Mr Justice Jones KC's observation at paragraph 11 in *Re ICP Strategic Credit Income Fund Limited* that "*the Court's decision to sanction the commencement of litigation can never be entirely divorced from questions about how and by whom it will be financed*" seems particularly relevant.

19. We enclose herewith a draft Summons seeking a variation of the Appointment Order by removing paragraphs 6(a) and (b). As stated at the Directions Hearing, our instructions are to file this Summons and, given the narrow scope of the issue to be determined, to request that it is heard with the existing JOLs' sanction application on 24 June 2025.

20. However, in the circumstances, including, *inter alia*, the reasons set out above, we believe it would be practical for the JOLs to agree to vary the Appointment Order without requiring the issuance of

[4] In *re Contract Corporation, Gooch's Case* [1871] 12 LR Ch App 207, p 211: "*In truth, it is of the utmost importance that <u>the liquidator should, as the officer of the Court, maintain an even and impartial hand between all the individuals whose interests are involved in the winding up. He should have no leaning for or against any individual whatever</u>. <u>It is his duty to the whole body of shareholders, and to the whole body of creditors, and to the Court, to make himself thoroughly acquainted with the affairs of the company</u>; and to suppress nothing, and to conceal nothing, which has come to his knowledge in the course of his investigation, which is material to ascertain the exact truth in every case before the Court. And it is for the Judge to see that he does his duty in this respect*" (emphasis added).

a Summons and the associated hearing costs. We therefore invite the JOLs to agree a consent order agreeing that paragraphs 6(a) and (b) should be struck from the Appointment Order which we can jointly submit for His Lordship's consideration.

21. Please confirm by **3pm (Cayman Islands time) on Wednesday, 4 June 2025**, if the JOLs are amenable to agreeing a consent order in the manner proposed. If we do not hear from you before this, we are instructed to file a Summons without further notice to you and will rely on this letter for costs purposes.

Yours faithfully,




**Campbells LLP**

**Schedule**

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

---

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> **"***The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> *(a)* *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b) *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

(the "**DAF Provisions**")



DRAFT

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick and Paul Murphy are the directors of the GP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a) To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

b) To the Directors:

[1] Letter dated 22 May from Johnstone Law to Campbells.

Mark Patrick - mpatrick@dafholdco.com
Paul Murphy - paul@gkmanagement.com.ky

**2 Transactional Reporting**

2.1 Upon execution of this Protocol, the Directors will provide a report to the JOLs listing all transactions undertaken by DAF LP, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000.

2.2 The Directors shall provide a business plan within 21 days of the signing of this Protocol which can be revised from time-to-time if it is determined to be necessary by the Directors and within the ordinary course of buisness for DAF LP (the "**Business Plan**"). Steps taken with respect to the management of DAF LP will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.3 The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Mission Statement. The Directors shall provide a monthly transactions report to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.

2.4 If the JOLs have any doubt about whether a transaction is or is not in the ordinary course of DAF LP's business, they may contact the Directors for clairfation.

2.5 The Directors will endeavour to provide advance notice to the JOLs in respect of any single transaction of DAF LP exceeding US$ 5,000,000 or any series of transactions in an aggregate amount exceeding US$5,000,000 **SAVE THAT** advance notice is not required, in relation to any single transaction or series of transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.6 Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3 Legal and Professional Fees**

The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4 Consultation**

Save in exceptional circumstances, the JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM

Entities. The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.

## 5 Confidentiality

5.1 In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 6.2 below; and

(b) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

(a) to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c) with the Directors' prior written consent.

## 6 Formalities

6.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3 For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4 In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such

complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct. If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary). Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

**Annexure 1 – List of CDM Entities**

(i) CDH GP, Ltd. (Cayman Islands)
(ii) CDMCFAD, LLC (Delaware)
(iii) Charitable DAF Fund 2, LP (Cayman Islands)
(iv) Charitable DAF Fund, LP (Cayman Islands)
(v) CLO HoldCo, Ltd. (Cayman Islands)
(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)
(vii) HCT Holdco 2, Ltd. (Cayman Islands)
(viii) MGM Studios Holdco, Ltd. (Cayman Islands)
(ix) Liberty CLO HoldCo, LLC (Delaware)
(x) Liberty Sub, Ltd. (Delaware)
(xi) Charitable DAF Holdings Corp. (Delaware)
(xii) DST Investco, LLC (Delaware)
(xiii) Allanon Capital Management LLC (Texas)

DRAFT

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**SUMMONS**

---

**LET ALL PARTIES CONCERNED** attend before the Judge in Chambers, at the Law Courts, George Town, Grand Cayman on day of 2025, at am/pm, on the hearing of an application by Charitable DAF Fund, LP (the "**DAF LP**") that:

1. The supervision order in these proceedings dated 6 May 2025 which ordered, *inter alia*, that the voluntary liquidation of Charitable DAF HoldCo, Ltd be continued under the supervision of the Court pursuant to s.131 of the Companies Act (2025 Revision) and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation) (the "**Supervision Order**") be varied such that paragraphs 6(a) and 6(b) of the Supervision Order, which authorised the joint official liquidators to take certain steps in respect of DAF LP, be deleted forthwith.

2. Such further or other orders and directions as the Court thinks fit.

3. Orders as to costs.

This **Summons** was filed by Campbells LLP, Attorneys-at-Law for and on behalf of the DAF LP, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959).

#3245656v1

Dated: [.] May 2025

____________________________

**Campbells LLP**

Attorneys for the Charitable DAF Fund, LP

| | |
|---|---|
| **TO:** | The Registrar of the Financial Services Division |
| **AND TO**: | Johnstone Law, Attorneys for the Joint Official Liquidators |
| **TIME ESTIMATE**: | 1 hour |



This **Summons** was filed by Campbells LLP, Attorneys-at-Law for and on behalf of the DAF LP, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)

#3245656v1

JOHNSTONE
LAW

5 June 2025

aj@j-law.ky
+1 (345) 929 3000
Ref: 00022

Campbells LLP
Floor 4, Willow House Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

**By email:** mgoodman@campbellslegal.com

Dear Colleagues

**Charitable DAF HoldCo, Ltd (In Official Liquidation) (the *Company*) | FSD No. 116 of 2025 (JAJ)**

We refer to your letter dated 30 May 2025 and our recent correspondence in relation to the above matter.

**Maples engagement**

1. The JOLs have engaged both Johnstone Law (***JL***) and Maples and Calder (Cayman) LLP (***Maples***) in these proceedings and their respective involvement subject to the JOLs oversight and instruction. Both engagements are subject to the sanction of the Court.

**Directions Hearing**

2. The Directions Hearing related to an application for sanction under s.110 of the Act of the attorneys engaged by the JOLs. Irrespective of wider questions of standing (see below), your clients have and had no arguable standing to appear on a sanction application, being neither creditors nor contributories of the Company. You avoid this question because there is no answer to it.

3. With respect to your assertion that the specific terms of the Appointment Order give your clients standing to challenge it – you are simply wrong.

**JOLs' Powers and Requests for Information**

4. The JOLs assert no right to the books and records of your clients under their powers to collect in the books and records of the Company and your refusal to cooperate on this basis is entirely unhelpful.

5. The JOLs were appointed on 6 May 2025 and have now been in office almost a month. Despite ample opportunity, almost no information of substance or genuine utility has been provided to the JOLs by the majority of parties, your clients included. Instead, the weeks since the JOLs' appointment have been occupied with meritless challenges and tenuous technical objections at best rather than assisting the liquidators in their investigation of the C$270m that has been removed from the Company.

6. It is mandatory for your clients to cooperate with the JOLs and they are choosing not to do so. If required, as warned, the JOLs will take steps to obtain the information they require with the assistance of the Court.

**Protocol**

7. The JOLs' preliminary view is that the Company may have inter alia clear prima facie proprietary and other claims to the asset transferred pursuant to the transfer of the Company's interest in the Charitable DAF Fund, LP to your client, CDMCFAD, LLC, pursuant to a deed of assignment and assumption on 18 December 2024 (the ***Deed***). Nothing in your letter changes that analysis.

8. The protocol you propose is entirely inappropriate both to responding to proprietary claims and to the current circumstances. No dealing of any nature is appropriate in assets over which proprietary claims are asserted, whether in the ordinary course of business or subject to any threshold. Further, no expenditure from these assets on legal or any other professional fees is appropriate at any time.

9. It is in any event impossible for the JOLs to engage with the protocol in circumstances where they have no serious knowledge or understanding of what is happening at any underlying level. Your clients have had since 12 May 2025 to provide that knowledge and understanding and continue to decline to provide it to the JOLs. We again urge all your clients to set aside their distractive tactics and cooperate, and provide all information and documents, in an open and frank manner.

10. In the circumstances, the JOLs require your clients to provide undertakings by **3pm on 6 June 2025** that there will be no dealing in the assets formerly owned by the Company, and the provision of full and complete information on the whereabouts, ownership and control of all assets owned by the Company (directly or indirectly, legally or beneficially) prior to execution of the Deed. Nothing short of those assurances and undertakings is acceptable at this stage to the JOLs.

**Hunter Mountain Investment Trust**

11. We highlight below one specific aspect of the JOLs' concerns about dealing in assets. This relates to the Hunter Mountain Investment Trust (***HMIT***) transaction. As stated in our 30 May letter, the JOLs have become aware that your clients have, since receipt of the JOLs letter dated on 12 May 2025 (the ***Initial Letter***), and without notice to the JOLs, sought approval of a transaction involving HMIT. We requested information about this transaction and sought your urgent confirmation that no transactions will be undertaken involving any assets held by them.

12. HMIT was formerly the sole beneficiary of the Rand PE Fund, I, LP. The disclosure of those for whom you act includes a number of entities unknown to the JOLs, and does not include the HMIT Entities[1] which formerly held Fund assets.

[1] '***HMIT Entities'*** defined in Settlement Agreement as Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors LLC, Rand PE Fund I, L.P, Rand-PE Fund Management, LLC, Atlas IDF, LP, and Atlas IDF GP, LLC

13. In your 30 May letter, you stated that your clients *"do not understand the reference to the purported transaction involving HMIT"*. The JOLs have however since been provided with a copy of a settlement agreement between the Highland Entities[2] and the HMIT Entities[3] (the ***Settlement Agreement***) which was **executed by Mark Patrick on behalf of the HMIT Entities** on **19 May 2025** – a mere matter of days after receipt of the Initial Letter.

14. Under the Settlement Agreement, HMIT stands to receive *inter alia* (i) initial payment of US$500,000, (ii) promissory note with an original face amount of $24,268,621.69 and other interests, (iii) distributions from its *Class 10 Interest* until 2029, and (iv) distributions from various other interests.

15. This appears to be a transaction involving assets which at some stage were indirectly owned by the Company, although your clients' continued non-disclosure makes it difficult for the JOLs to conduct a full and complete analysis of the true position. It is particularly concerning however that this transaction was executed after the JOLs' appointment and without notice to the JOLs, and it would be inappropriate for this transaction to be approved without their input, or at the very least prior to the JOLs being fully apprised of the nature and circumstances giving rise to this transaction. Please provide a full explanation, with all relevant details, by return.

**Appointment Order**

16. It is a matter for your clients if they wish to seek to challenge the Appointment Order, albeit such an application would clearly be hopeless.

17. The evidence supporting the applications in FSD No. 99 and FSD No. 116 was uncontested, and the issues ventilated over the course of two hearings during which Justice Asif KC engaged with the parties as to the form of the draft order, and indeed variously amended its terms (which is abundantly clear on the face of the draft and final versions).

18. The JOLs do not consent to the proposed (or any other) variation of the Appointment Order.

**Conclusion**

19. The JOLs would prefer to work cooperatively and constructively with your clients to protect the assets of the Fund and to "hold the ring", to obtain information necessary for the JOLs' investigations, and to expedite the conclusion of those investigations. They have provided a more than significant opportunity for your clients to offer and provide such cooperation, but it has not been forthcoming. On the contrary, your clients have continued to deal in assets to which the JOLs assert claims, without notice to the JOLs and have behaved antagonistically and obstructively.

20. Should your clients fail to provide the information and undertakings requested by **4pm** on **6 June 2025**,

---

[2] '***Highland Entities'*** defined in H Settlement MIT Agreement as Highland Capital Management, L.P, Highland Claimant Trust, Highland Litigation Sub-Trust, and Highland Indemnity Trust

[3] As defined in [1] above.

the JOLs will seek the assistance of the Court on these matters, without further notice.

Yours faithfully



**Johnstone Law**

Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

D +1 345 914 5898
T +1 345 949 2648
F +1 345 949 8613
E MGoodman@campbellslegal.com

campbellslegal.com

Our Ref: MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Johnstone Law
Unit 9, Tropic Centre
18 Earth Close,
PO Box 926,
Grand Cayman, KY1-9006
Cayman Islands

9 June 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

1. Further to previous correspondence in relation to this matter, we enclose herewith a revised reporting protocol for the JOLs' consideration.

2. As indicated in previous correspondence, we believe the appropriate course of action is for the JOLs to engage on the terms of the protocol, which will appease any concerns they may have regarding the dissipation or misuse of the Fund's assets outside of the ordinary course of business during the currency of the liquidation.

3. For convenience, our clients' proposed amendments are tracked in the enclosure and serve to; (i) remove the value threshold from the historical reporting obligation at paragraph 2.1, and (ii) reduce the value threshold for the provision of advance notice at paragraph 2.5.

4. Please confirm your agreement to, or provide any comments on, the draft protocol by **3pm on Wednesday, 11 June 2025**, failing which we are instructed to file a Summons without further notice and will rely on this letter, and previous correspondence, for costs purposes.

Yours faithfully,

Campbells LLP

3203729-1

#3264473v1

**Campbells LLP**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

---

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

Formatted: Font: Bold

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> **"***The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> *(a)* *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b) *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…"*

(the "**DAF Provisions**")

Formatted: Font: (Default) Calibri, 10 pt

2033932-1

~~#3253267v3#3253267v3#3253267v2~~

DRAFT

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick and Paul Murphy are the directors of the GP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a) To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

[1] Letter dated 22 May from Johnstone Law to Campbells.

**Formatted:** Font: (Default) Calibri, 10 pt

b) To the Directors:

Mark Patrick - mpatrick@dafholdco.com
Paul Murphy - paul@gkmanagement.com.ky

**2 Transactional Reporting**

2.1 Upon execution of this Protocol, the Directors will provide a report to the JOLs listing all transactions undertaken by DAF LP, or any of the CDM Entities, since 27 March 2025~~ which exceed US$5,000,000~~.

2.2 The Directors shall provide a business plan within 21 days of the signing of this Protocol which can be revised from time-to-time if it is determined to be necessary by the Directors and within the ordinary course of buisness for DAF LP (the "**Business Plan**"). Steps taken with respect to the management of DAF LP will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.3 The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Mission Statement. The Directors shall provide a monthly transactions report to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.

2.4 If the JOLs have any doubt about whether a transaction is or is not in the ordinary course of DAF LP's business, they may contact the Directors for clairfation.

2.5 The Directors will endeavour to provide advance notice to the JOLs in respect of any single transaction of DAF LP exceeding US$ ~~5~~1,000,000 or any series of transactions in an aggregate amount exceeding US$~~5~~1,000,000 **SAVE THAT** advance notice is not required, in relation to any single transaction or series of transactions in the ordinary course of business involving or related to (i) the proper operation and administration of the DAF Structure; and (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.6 Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3 Legal and Professional Fees**

The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4 Consultation**

**Formatted:** Font: (Default) Calibri, 10 pt

Save in exceptional circumstances, the JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities. The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.

**5 Confidentiality**

5.1 In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph ~~6~~5.2 below;

~~(a)~~(b) Not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

~~(b)~~(c) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

(a) Subject to the restrictions in paragrpah 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c) with the Directors' prior written consent.

**6 Formalities**

6.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

**Formatted:** Font: (Default) Calibri, 10 pt

6.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3 For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4 In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct. If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary). Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

**Formatted:** Font: (Default) Calibri, 10 pt

**Annexure 1 – List of CDM Entities**

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

DRAFT

**Formatted:** Font: (Default) Calibri, 10 pt

MAPLES GROUP

**Our ref:** CJM/JRN/858403-000001/83247181
**Direct tel:** +1 345 814 5245 / +1 345 814 5497
**Email:** caroline.moran@maples.com / luke.armitage@maples.com

**By Email**

Campbells LLP
Floor 4, Willow House
Cricket Square
Grand Cayman
KY1-9010
Cayman Islands

Attn: Mark Goodman

19 June 2025

Dear Colleagues

**Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Company")**

**FSD Cause No: 2025-116 (JAJ)**

1 We refer to your letter to Johnstone Law dated 9 June 2025 and the previous correspondence in relation to the draft protocol as to the conduct and management of Charitable DAF Fund, LP (the "**Fund**") and related entities.

2 The JOLs appreciate your clients preparing a revised version of the protocol (the "**CDM Protocol**"). However, the JOLs' position is that the terms proposed by your clients are inadequate to serve the purpose of the protocol in a number of respects.

3 Rather than seek to significantly amend the CDM Protocol, the JOLs have prepared their own version in a form acceptable to them (copy enclosed) (the "**JOLs' Protocol**"). The JOLs' Protocol approximates as much as possible the level of protection that the JOLs/Company could expect to receive from an injunction order against your clients and ancillary disclosure orders. This is both necessary and justified in the present circumstances. Please note that whilst we are happy to use the language of "protocol", we will require any agreed scheme to be incorporated into an undertaking given formally in writing to the Court not only by your clients but also by the clients of Baker & Partners and Kobre & Kim (each of whom are copied to this letter).

4 Without being exhaustive, some of the aspects of the CDM Protocol which are unacceptable to the JOLs are:

4.1 There is no provision expressly requiring CDH GP, Ltd. (the "**GP**"), CDMCFAD, LLC ("**CDM**") and DFW Charitable Foundation ("**DFW**") from disposing of or diminishing the value of any interest they hold in the Fund and its assets. This is an essential term that is needed in order to preserve the status quo whilst the JOLs continue their investigations.

4.2 Similarly, there should be an express requirement that Mark Patrick and Paul Murphy (together, the "**Directors**") and DFW must preserve any assets in their possession or control which have been previously been paid to them by the Company, the Fund and/or CDM, whether by way of distribution, divided or otherwise.

4.3 In relation to the proposed historical transaction report, the CDM Protocol would only require the Directors to provide confirmation of all transactions of the Fund and related entities since 27 March 2025 (i.e. just over 2 months ago). That period is obviously inadequate to serve the purpose of the protocol. The JOLs' position is that the period should commence on no later than 27 February 2024, being the date that the GP was incorporated and took over management of the Fund. Further, your clients' proposed reporting period would not cover the full period of the relevant sequence of transactions involved in the DAF Restructuring, which is not acceptable to the JOLs.

4.4 The CDM Protocol is lacking in any details of what is to be included in the historical transaction report (and in the monthly transaction reports moving forward). This is provided for at sections 3.1-3.2 and 4.9-4.12 of the JOLs' Protocol. This will add necessary certainty to your clients' obligations and will minimise the scope for future disputes about what is required. The required details are uncontroversial and we expect your clients will have no objection to them.

4.5 The CDM Protocol also would not require your clients to give full disclosure of the Fund's and related entities' assets and their current value. This is necessary in order for the JOLs to be able to properly police your clients' property preservation obligations referred to above and properly assess any requests by your clients to approve certain transactions moving forward.

4.6 The CDM Protocol is lacking any meaningful details as to what is to be included in the business plan for the ongoing management of the Fund and related entities and the deadline by which it should be submitted to the JOLs for approval. The JOLs' Protocol expressly provides for the information that is to be included in the business plan and requires the business plan to be provided to the JOLs within 21 days of execution of the protocol (with the JOLs then having 21 days to agree to it or reject it, in which case the JOLs can seek appropriate relief from the Court).

4.7 As there is likely scope for debate as to what is meant by the "ordinary course of business", we propose that your clients provide a written outline of what activities are within the Fund's "ordinary course of business" for the JOLs' approval. Your clients' proposed Protocol also does not prevent your clients from undertaking transactions that are not in the Fund's ordinary course of business. That is, for obvious reasons, an essential requirement for the JOLs and has therefore been included in the JOLs' Protocol.

4.8 The protocol needs to put in place protections for the period between the protocol being executed and the Business Plan being agreed. The JOLs' position is that the appropriate way to address this is to require that your clients must provide the JOLs with at least 7 days'

advance notice of any transactions affecting the Fund, or any assets of the Fund, and for the JOLs to review and approve the transactions.

4.9 The US$1,000,000 threshold for transactions that are to be reported to the JOLs in the monthly transaction reports is still far too high. The threshold should be set at what would be a typical threshold for a freezing injunction and disclosure orders, say US$10,000. In addition, merely requiring the Directors to "endeavour" to provide advance notice of transactions is not sufficient. The Directors must be required to provide written notice of a proposed transaction and the JOLs will then have the opportunity to approve or reject if it appears to be outside of the Fund's ordinary course of business or otherwise raises concerns.

4.10 Clause 2.6 of the CDM Protocol is not acceptable to the JOLs. It is far too broad and leaves it up to the Directors to take virtually any action if they, in their discretion, consider it reasonably necessary to comply with their legal obligations.

4.11 Clause 4 of the CDM Protocol is also unacceptable to the JOLs. The clause as presently drafted presupposes that the JOLs would consciously decide to exceed their powers, which the JOLs wholly disagree with. The JOLs will exercise their powers in accordance with the order appointing them, any sanction obtained from the Court and their powers under the Companies Act (As Revised). If the JOLs need to obtain sanction to exercise a certain power, the JOLs will make a sanction application and attend to service as required.

5 Please confirm your clients' agreement to giving an undertaking to the Court in the form of the enclosed Protocol or provide comments by no later than 12pm on Thursday, 26 June 2025. If ultimately the Protocol cannot be agreed by our respective clients, the JOLs reserve all of their rights to take other appropriate protective measures.

Yours faithfully



Maples and Calder (Cayman) LLP

With copy to:

Baker & Partners
PO Box 636
Buckingham Square
720 West Bay Road
Grand Cayman
KY1-1107
Cayman Islands
Attn: Jennifer Colegate

Kobre & Kim
9 Forum Lane
Camana Bay

Grand Cayman
KY1-9006
Cayman Islands
Attn: Peter Tyers-Smith

**PROTOCOL AND COURT UNDERTAKING IN RESPECT OF CHARITABLE DAF FUND, LP (THE "FUND") AND THE FUND ENTITIES**

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision).

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025, the Court determined the supervision application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmik be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

**Preliminary statement**

The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011. CDH GP, Ltd. (the "**GP**"), is a Cayman Islands company incorporated on 27 February 2024 and is the general partner of the Fund. Mark Patrick is the sole director of the GP. Mr Patrick is also the Manager of CDMCFAD, LLC ("**CDM**") and the registered director, president and sole member of DFW Charitable Foundation ("**DFW**"). HoldCo was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. Until its voluntary liquidation on 2 April 2025, the directors of HoldCo were Mr Patrick and Paul Murphy (the "**Directors**"). From its incorporation until 27 March 2025, HoldCo was the sole limited partner of the Fund through which it indirectly owned the other entities in the DAF Structure (the "**Fund Entities**")[1]. For the avoidance of doubt, "Fund Entities" includes any other entities identified pursuant to clause 4.4(a) below.

The purpose of this protocol (the "**Protocol**") is to ensure the efficient and orderly administration of the Fund and the Fund Entities. The Protocol is designed to avoid conflict between the JOLs and the Fund, to assuage any concerns the JOLs may have regarding the commercial activities of the Fund and the Fund Entities with respect to the risk of dissipation / misuse of assets, and to (subject to compliance with the terms of this Protocol) avoid the need for the JOLs to seek injunctions and ancillary disclosure orders against the Fund and/or the Fund Entities.

## 1 Notices

1.1 In the interests of expedience, the JOLs and the Directors agree that any notices or communication required under this Protocol shall be sent by email as follows:

(a) To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com

Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com

CDAF Core - CDAF.Core@uk.gt.com

(b) To the Directors, the Fund, the GP, CDM and DFW:

Mark Patrick - mpatrick@dafholdco.com and mpatricktax1040@gmail.com

[1] As listed in Schedule A to the Protocol

Paul Murphy - paul@gkmanagement.com.ky

**2 Preservation of Property**

2.1 The GP, CDM and DFW each agree that they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in the Fund, and/or the Fund Entities and/or any assets of the Fund.

2.2 The Directors and DFW each agree that they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly) by way of distribution, disposition, dividend, benefit, payment or other transfer from the HoldCo, and/or CDM and/or the Fund, and/or the Fund Entities and/or any assets of the Fund.

2.3 The Directors, the Fund, GP, CDM and DFW each agree that they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of the above clauses 2.1 and 2.2 of this Protocol.

**3 Historical Transaction Report and Disclosure of Assets**

3.1 Within 14 days of the execution of this Protocol, the Directors shall provide to the JOLs a written report listing all transactions undertaken by the Fund and/or any of the Fund Entities since 27 February 2024 to the date of the report (the "**Historical Transaction Report**"). For each transaction in the Historical Transaction Report, the Directors shall include at least the following details:

(a) The date of the transaction;

(b) The identity of any party(ies) depositing funds in respect of the transaction;

(c) The identity of any party(ies) receiving funds in respect of the transaction; and

(d) An explanation as to the nature and purpose of the transaction.

3.2 Notwithstanding the above, the Historical Transaction Report must include the following:

(a) Full details of all entities owned by the Fund, whether through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

(b) With respect to the Fund Entities, full details of the holders of shares or other membership interests, directors, officers or other controllers, and places and details of incorporation.

(c) Insofar as not covered by the above, full details of all assets owned by the Fund and their current values, whether the Fund holds such assets through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

(d) Full details of all disposals, assignments, transfers, sales, purchases or other transactions in respect of all or part of any asset owned by the Fund, whether the Fund holds such assets through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise for the period commencing on 27 February 2024 until the date of the Historical Transaction Report.

(e) Full details of every payment by way of salary, bonus, dividend, distribution or other compensation made to the Directors and/or any other officer, employee or consultant by HoldCo, the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(f) Full details of every payment to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, by HoldCo, the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(g) Full and complete copies of all financial statements or records, including statements prepared on a consolidated basis and/or management accounts prepared in respect of the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report ("**Statements, Records and Accounts**"). Any Statements, Records and Accounts provided must be independently prepared and verified by a reputable accountancy firm to the satisfaction of the JOLs.

(h) Full data and documents in support of the above. Copy documents shall be provided in electronic form but must be identified in clear terms (on a category basis) in the Historical Transaction Report.

(i) The Directors must sign the Historical Transaction Report and confirm its accuracy.

**4 Regulation of the Fund**

Business Plan

4.1 Within 21 days of signing this Protocol, the Directors shall provide to the JOLs a written business plan (the "**Business Plan**").

4.2 The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of the Fund and the Fund Entities. The Business Plan requires the approval of the JOLs.

4.3 If agreement is not reached on the terms of the Business Plan within 21 days of the JOLs' receipt of it, or such other date as agreed between the Directors and the JOLs in writing,

the JOLs may apply to the Court for directions or seek any other relief they deem appropriate.

4.4 The Business Plan shall include, at a minimum, the following information:

(a) A current and accurate group structure chart, clearly identifying all entities within the DAF Structure (including any of those not listed in Schedule A to this Protocol), their jurisdiction of incorporation, and their inter-relationships;

(b) Up-to-date director registers for each of the Fund Entities, including full names, appointment dates, and any changes since the last reporting period;

(c) Current member (shareholder or partner) registers for each of the Fund Entities, detailing ownership interests, classes of shares or partnership interests, and any recent transfers or changes; and

(d) A detailed outline of the proposed operations and strategic objectives of the Fund and the Fund Entities. This should include key initiatives, anticipated expenditures, revenue projections, and any material contracts or engagements expected to be entered into.

4.5 The items listed in 4.4(a)-(c) above will be prepared by an independent advisor, [insert independent advisor] to be selected by the JOLs within [ ] days (the "**[ ] Advice**") on the following terms:

(a) The instructions provided to [ ] shall be those set out at clauses 4.4(a)-(c) above; and

(b) The JOLs shall be informed of, and given the opportunity to participate in, any discussions between the Directors and [ ] in respect of the [ ] Advice; and

(c) The [ ] Advice shall be incorporated in the Business Plan as an exhibit to the Business Plan in the same form as it was provided to the Directors.

4.6 The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of Fund and the Fund Entities in accordance with the Business Plan (once agreed).

4.7 Any proposed revisions to the Business Plan must be submitted to the JOLs for prior written approval before implementation.

<u>Overriding Principles applicable at all times</u>

4.8 Where any proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer which affects the Fund, or any assets of the Fund, is with or to any of the Directors, the GP, CDM or DFW or their nominees, those parties (and each of them) shall not be entitled to execute or complete such transaction, distribution, disposition, dividend, benefit, payment or other transfer unless in receipt of the prior written approval of the JOLs.

4.9 In respect of any proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer which affects the Fund, or any assets of the Fund, which exceeds

US$10,000, or any series of transactions that are connected or related in any way in an aggregate amount exceeding US$10,000:

(a) The Directors and the GP shall inform the JOLs in writing in advance of any such proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer, and shall explain full details of the nature and purpose of the proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer, together with documentary support to the satisfaction of the JOLs;

(b) Such advance information and explanation of proposed transactions shall be provided at least 7 days prior unless the circumstances are an extreme emergency, in which case the information and explanation shall be provided as soon as possible and the urgent nature and inability to provide at least 7 days' prior notice shall be explained by the Directors in writing as soon as possible; and

(c) No such transactions will be executed without the prior written approval of the JOLs.

<u>Monthly Transaction Reports</u>

4.10 Commencing on the date that the Business Plan is agreed and until further agreement or order of the Court, the Directors shall, within 7 days of the end of each calendar month, provide the JOLs with a written report listing all transactions that have been undertaken by the Fund and/or any of the Fund Entities during the calendar month just passed (the "**Monthly Transaction Report**").

4.11 Notwithstanding the above, the first Monthly Transaction Report shall list all such transactions dating back to the date of the provision of the Historical Transaction Report to the JOLs.

4.12 For each transaction in a Monthly Transaction Report, the Directors shall include the following details:

(a) The date of the transaction;

(b) The identity of any party(ies) depositing funds in respect of the transaction;

(c) The identity of any party(ies) receiving funds in respect of the transaction; and

(d) An explanation as to the nature and purpose of the transaction.

<u>Legal expenses</u>

4.13 The JOLs acknowledge the need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of the Fund, the GP, CDM, DFW, the Directors or the Fund Entities to seek legal or professional advice. However, it is agreed that any and all such expenses shall not be paid for out of assets which currently are or formerly were assets of the Fund, whether held directly or indirectly.

**5 Confidentiality**

5.1 In respect of any information of whatever nature relating to the Fund or any of the Fund Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (hereinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by clause 5.2 below;

(b) not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities (except to the extent that any of them become members of the Company's liquidation committee and the information is provided to them in furtherance of the JOLs' duty to consult with the liquidation committee); and

(c) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

(a) to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required for the purpose of any application to, or directed by, any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c) with the Directors' prior written consent.

**6 The Directors**

6.1 Each of the Directors will procure that the Fund, CDM, DFW, the GP, the other Director and the Fund Entities fully comply with this Protocol.

**7 Reservation of Rights**

7.1 Nothing in this Protocol shall prevent or inhibit the JOLs from making any application to any Court of competent jurisdiction for any relief or remedy which the JOLs in their absolute discretion consider necessary or appropriate.

**8 Formalities**

8.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

8.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

8.3 This Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the exclusive jurisdiction of the Grand Court of the Cayman Islands.

**SCHEDULE A: LIST OF FUND ENTITIES / ENTITIES IN THE DAF STRUCTURE**

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

(xiv) DFW Charitable Foundation (Delaware)

(xv) CLO HoldCo LLC (Delaware)

(xvi) Rand Advisors LLC (Delaware)

(xvii) CDHC Royse City Land LLC (Texas)

(xviii) Royse City Land Company LLC (Texas)

(xix) CDHC Assets LLC (Texas)

(xx) CDHC Fort Worth Land LLC (Texas)

(xxi) CDHC Stewart Creek LLC (Texas)

(xxii) BVP Property LLC (Delaware with CA registration)

Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

D +1 345 914 5898
T +1 345 949 2648
F +1 345 949 8613
E MGoodman@campbellslegal.com

campbellslegal.com

Our Ref: MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Maples and Calder (Cayman) LLP
Ugland House
PO Box 309
Grand Cayman, KY1-1104
Cayman Islands

29 June 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

1. We refer to your letter dated 19 June 2025 (the "**Protocol Letter**"), to previous correspondence between this firm and Johnstone Law regarding a draft reporting protocol in respect of the assets and operations of Charitable DAF Fund, LP and related entities, to the letter sent by the joint official liquidators (the "**JOLs**") of the Company to the Trustees of the Highland Capital Management L.P. (the "**Trustees**") dated 24 June 2025 (the "**Trustee Letter**"), and to the **enclosed** stipulation dated 27 June 2025 entered into in between the Dallas Foundation and the HMIT Entities in the Highland Capital Management L.P. bankruptcy proceedings and which has been filed with the United States Bankruptcy Court (the "**Stipulation**").

2. Capitalised terms, unless otherwise defined, adopt the definitions applied in the Protocol Letter.

<u>**Previous Correspondence in respect of CDM Protocol and JOLs' standing**</u>

3. Before addressing the draft protocol enclosed with the Protocol Letter, it appears to be necessary to remind the JOLs of our previous correspondence with Johnstone Law regarding the CDM Protocol and the JOLs' standing to take steps against the Fund.

4. The JOLs have not established any direct or indirect beneficial interest in or creditor claim against the Fund or the CDM Entities. At most, the JOLs appear to have formed the view that they have an as yet unparticularized and unasserted claim to an indirect beneficial interest in the CDM Entities.

It is not necessary for us to pass comment on any such claim, other than to note that, even if the JOLs were able to establish an indirect beneficial interest in the Fund or any of the CDM Entities, that would not displace the directors' control of the CDM Entities.

5. We would remind you that the CDM Entities are managed by professionally qualified individuals who have repeatedly acknowledged their obligations to the companies to which they are appointed, and whose actions are guided by legal and other professional advice. The JOLs have no mandate or authority to interfere with the management of the CDM Entitles by those individuals.

6. However, in good faith, and without any legal obligation to do so, the CDM Entities voluntarily offered a transactional reporting protocol to the JOLs in an effort to alleviate (unwarranted) concerns the JOLs had with respect to the management of the CDM Entities and to demonstrate that their business operations were and are being conducted appropriately and transparently. This offer was made to the JOLs, by letter dated 16 May 2025. It is our clients' view that the JOLs, acting objectively, would have considered this protocol to be perfectly sufficient to allow them to discharge any duty they had to exercise oversight of the management of the CDM Entities.

7. However, Johnstone Law engaged in correspondence with this firm on behalf the JOLs but inexplicably refused to meaningfully engage with our clients' offer to provide a reporting protocol. Consequently, under cover of letter dated 30 May 2025, we sent a draft of the CDM Protocol to Johnstone Law and invited their agreement or comments. As noted at paragraph 13 of that letter, "*our clients reject the suggestion that they are under any duty to provide this information. However, in circumstances where the CDM Entities, including the Fund, are operating in the ordinary course to make investments on behalf of, and to support charitable causes, our clients are offering this Protocol to ensure that these charitable operations are not unnecessarily impacted by the JOLs*."

8. Johnstone Law responded on 5 June 2025 and again inexplicably refused to engage with the CDM Protocol. Our response dated 9 June 2025 reiterated that our clients are under no obligation to provide information to the JOLs, but were willing to do so "*in an attempt to assuage the JOLs' misplaced concerns and demonstrate that the CDM Entities are operating in the ordinary course of business*".

9. In a subsequent letter also dated 9 June 2025, the CDM Entities enclosed a revised version of the CDM Protocol which removed the value threshold from the proposed historical reporting protocol, and reduced the value threshold for the provision of advance notice from $5m to $1m. The letter reiterated the CDM Entities belief that "*the appropriate course of action is for the JOLs to engage on the terms of the protocol, which will appease any concerns they may have regarding the dissipation or misuse of the Fund's assets outside of the ordinary course of business during the currency of the liquidation*."

10. We note that at the hearing of the JOLs' sanction application on 24 June 2025, His Lordship, in obiter dictum, indicated that entry into a protocol seemed a sensible course of action. We believe that Court appointed liquidators acting objectively and in an even-handed manner would have accepted the original CDM Protocol, and that the JOLs' failure to do so indicates a predetermination that the conduct of the CDM Entities and their management merit investigation, which position is inconsistent with the JOLs' duty to "*maintain an even and impartial hand*".[1] However, we hope that the JOLs are willing to moderate their position in light of judicial encouragement to do so.

**The JOLs' Protocol**

11. In light of the foregoing, it is no surprise that our clients fundamentally object to the approach adopted in the JOLs' Protocol, which is completely inappropriate and unwarranted. The proposed restrictions, controls and undertakings sought by the JOLs would impose severe limitations on our clients' ability to operate, and would have the practical effect of placing their ongoing charitable activities under the de facto control of the JOLs, notwithstanding that no such legal authority exists.

12. Your references to the JOLs requiring what are, in effect, restrictions mirroring injunctive relief is entirely misguided. The only circumstances in which the draconian conditions sought in the JOLs' Protocol could be imposed would be if the JOLs, with the sanction of the Grand Court, sought and obtained a freezing injunction. That injunction would require the JOLs to, *inter alia*, make out a good arguable case (where it is denied that such a case exists) and provide evidence of that there is a real risk of dissipation of assets (where the CDM Protocol clearly demonstrates there is no such risk). Furthermore, were the JOLs to seek injunctive relief the CDM Entities would at least have the benefit of the protection afforded by the cross-undertaking in damages (which they do not have under the JOLs' Protocol). Following recent authority,[2] that cross-undertaking in damages would likely need to be supported by an indemnity from relevant stakeholders. The JOLs' Protocol seeks all of the benefits of an injunction without the JOLs or those funding them assuming any of the burdens that such relief would entail.

13. If the JOLs believe that injunctive or other restrictive relief is warranted, the proper course is for them to make an application to the Court in the ordinary course and satisfy these well-established

[1] See In *re Contract Corporation, Gooch's Case* [1871] 12 LR Ch App 207, p 211: "*In truth, it is of the utmost importance that the liquidator should, as the officer of the Court, maintain an even and impartial hand between all the individuals whose interests are involved in the winding up. He should have no leaning for or against any individual whatever. It is his duty to the whole body of shareholders, and to the whole body of creditors, and to the Court, to make himself thoroughly acquainted with the affairs of the company; and to suppress nothing, and to conceal nothing, which has come to his knowledge in the course of his investigation, which is material to ascertain the exact truth in every case before the Court. And it is for the Judge to see that he does his duty in this respect*" (emphasis added).

[2] See *Hunt v Ubhi* [2023] EWCA Civ 417 which cited SC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2015] EWCA Civ 139

legal requirements. Our clients will of course strenuously resist any such application. However, there is no lawful or reasonable basis for the JOLs to seek to impose such intrusive restrictions on the CDM Entities, nor to demand undertakings that would exceed what the Court could properly order on an application for interim relief. If the JOLs and our clients are unable to agree the terms of a protocol, the correct course of action is to have the Court determine the scope of any such protocol as opposed to the JOLs seeking injunctive relief - the specter of which seems to be threatened in the Protocol Letter.

**The Stipulation**

14. Further, we note the Dallas Foundation and other entities referred to in the Stipulation as the 'Foundation Parties', have now entered into a binding term sheet (the "**Term Sheet**") with the HMIT Entities. As you can see, the Foundation Parties withdrew their objections to the Settlement Motion (defined below) with prejudice. At the hearing of the Settlement Motion, Mr. Dondero was allowed to testify in opposition to the settlement on behalf of a family trust (Dugaboy), though we understand that a material portion of his attempted testimony was stricken or subject to successful objection, and it appears that the US Bankruptcy Court gave his testimony no weight. Ms Diaz of the Dallas Foundation, who signed the Term Sheet on behalf of the Foundation Parties, swore affidavits on behalf of the petitioners in both the just and equitable winding up, and supervision applications. Ms Diaz's evidence in the supervision application, which was provided on behalf of all 'Supporting Organisations', was that a supervision order was required in order to "*allow the JOLs to conduct a proper investigation of the affairs of the Company*"[3] (as you know, this evidence is disputed).

15. Page two of the Term Sheet mandates that the Dallas Foundation will undertake various actions in relation to "DAF", which is described in the Term Sheet as "*the historical corporate structure of Charitable DAF Holdco, Ltd, its parents and subsidiaries, in existence as of January 1, 2024, and changes thereto*" (which would include the CDM Entities). These actions include the Dallas Foundation agreeing to meet with Mr Raver (as a representative of HMIT) to review the DAF structure and the balance sheets of DAF as of 30 September 2024, 31 December 2024 and 31 March 2025. The Term Sheet also provides that the Dallas Foundation will be provided with "*an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any other entity, including another entity within the DAF structure*".

16. This meeting is now scheduled for 2 July 2025. The meeting will be face to face, and Mr. Raver intends to provide additional balance sheet information beyond that required under the Term Sheet. The meeting (defined as the "DF Meeting") is specifically described as a confidential settlement meeting "*with an eye to commencing negotiations with DF about the use of current*

[3] Paragraph 15(a) of the Second Affidavit of Julie Diaz dated 29 April 2025.

*support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution")."* The Term Sheet also provides for the prospect of a subsequent meeting which Mr Patrick will attend with the objective being to further discussions toward a "Resolution". The Term Sheet explicitly provides that if the parties can agree on a Resolution, then "*Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above*".

17. That the lead petitioner—having given evidence on behalf of all Supporting Organisations at the supervision application—has now entered into the Term Sheet is a clear indication that there is no longer any justification for the investigations it originally proposed (and which the JOLs appear to be myopically pursuing), and no real or justifiable risk of asset dissipation, particularly given that the CDM Entities' balance sheets and financial information will be shared with the Dallas Foundation. Given that the Term Sheet contemplates the Dallas Foundation and Supporting Organisations requesting a meeting with the JOLs with a view to concluding the liquidation of the Company and avoiding any application to wind up the Fund, it is difficult to reconcile the actions of the JOLs with the stated intention of the purported primary stakeholder.

**Updated CDM Protocol**

18. Notwithstanding, our clients remain willing to agree a reasonable protocol that provides the JOLs with an appropriate level of visibility into relevant matters while preserving our clients' right to conduct their charitable operations in the ordinary course of business. We do not, however, accept that the JOLs' Protocol represents a fair or proportionate proposal - it is neither necessary nor justified.

19. In particular, we make the following general observations:

    (a) The JOL's Protocol seeks to prohibit entirely lawful transactions from being conducted in the ordinary course of business, absent Court order, and effectively subjects all of the CDM Entities' operations to prior approval and veto - a degree of control that (i) is completely unwarranted, and (ii) could only properly be obtained through injunctive relief.

    (b) The financial thresholds, advance approvals, and granularity of the reporting provisions proposed in the JOLs' Protocol would materially and unfairly impede the CDM Entities' ordinary and necessary charitable operations and increase the costs of those operations to no obvious benefit to those entities.

(c) The JOLs' request that the CDM Entities provide extensive documentation, including registers, asset holdings, and transaction histories, appears to simply repeat misconceived requests made by Johnstone Law on behalf of the JOLs and has no legal basis. As stated in response to those previous requests, "*Directors are bound by duties under common law and statute to protect the interests, confidentiality, and assets of the companies they serve. To comply with your baseless requests would place them in breach of those duties unless and until a court determines otherwise.*"[4]

(d) Your letter asserts that the scope of disclosure sought by the JOLs' Protocol is necessary to enable the JOLs "*to properly police* [our] *clients' property preservation obligations*". There is simply no basis for this assertion, which was also addressed in correspondence with Johnstone Law when it was suggested the JOLs are somehow authorized to "hold the ring" in order to protect the assets of the Fund.[5]

(e) Similarly, for the reasons outlined above, your proposal to set the advance reporting threshold at US$10,000 as "*that would be a typical threshold for a freezing injunction and disclosure order*" is wholly unrealistic and impractical. Despite the JOLs not having obtained a freezing injunction, the CDM Entities are willing to set a reporting threshold which would afford the JOLs advance notice of substantial and meaningful transactions. However, requiring the CDM Entities to provide advance notice of such de minimus transactions, and to wait for the JOLs to prospectively approve these transactions, would severely hamper the charitable operations of the CDM Entities.

20. We **enclose** a revised version of the CDM Protocol with this letter. This updated version reflects a number of clarifications aimed at addressing the JOLs' concerns, while preserving our clients' ability to conduct their affairs in the ordinary course of business. These revisions are marked-up against the previous version of the CDM Protocol sent to Johnstone Law on 9 June 2025 and include, *inter alia*:

(a) Confirmation that the CDM Entities will engage Armanino LLP as an independent accounting firm to provide the financial reporting and accounting analysis required under the CDM Protocol;

---

[4] Paragraph 6 of Campbells letter to Johnstone Law dated 30 May 2025.

[5] Paragraph 17 of Campbells letter to Johnstone Law dated 9 June 2025. "*As we have explained numerous times and attempted to demonstrate by way of our proposed reporting protocol, the CDM Entities, including the Fund, are operating in the ordinary course to support charitable causes and their assets do not need to be protected by the JOLs.*"

(b) Inclusion of the details which are to be provided in the Historical and Monthly Transaction Reports (which reflect the information requested at sections 3.1 and 4.12 of the JOLs' Protocol;

(c) Inclusion of wording at paragraph 2.6 which would require the JOLs to consult with the 'Directors' before unilaterally contacting our clients' third-party service providers. Unfortunately, given the JOLs repeated attempts to interfere with our clients' lawful operations (to which, see below regarding the Trustee Letter), we believe this is necessary;

(d) Extension of the date for the Historical Transaction Report to 1 July 2024 (we understand that the Skyview Group had access to the CDM Entities' financials through to 30 June 2024 so the JOLs can obtain any older financial information from other sources); and

(e) Reduction of the value threshold for the provision of advance notice from US$1m to US$250,000.

21. We invite the JOLs to consider the revised draft of the CDM Protocol and to engage with us to agree terms that are reasonable and proportionate. For the reasons outlined above, our clients are unwilling to accept the fundamentally disproportionate proposals set out in the JOLs' Protocol. However, they remain open to agreeing an appropriate protocol to facilitate the JOLs' ongoing investigations (which the Dallas Foundation no longer support or think necessary) and to avoid the need for unnecessary and costly Court proceedings.

22. Please confirm your agreement to, or provide any comments on, the revised CDM Protocol by **5pm on 4 July 2025**.

23. If, notwithstanding the proffered protocol, the JOLs consider it necessary to seek injunctive relief that is, of course, a matter for them, but given the extensive correspondence on this issue we would expect (i) any application for injunctive relief to be served on this firm where it would be plainly inappropriate to proceed on an ex parte basis; or (ii) at the very least, if the JOLs do seek injunctive relief on an ex parte basis, that this and previous correspondence regarding the protocol be provided to the Court in furtherance of the JOLs' duty of full and frank disclosure.

__Trustee Letter__

24. We refer to the Trustee Letter, which related to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11 (Bankr. N.D.Tex.) [Dkt. 4216] (the "**Settlement Motion**"). We understand that your firm were also copied to this correspondence.

25. The Trustee Letter, sent on the eve of the hearing of the Settlement Motion, requested an adjournment to afford the JOLs additional time to progress their investigations of the HMIT Entities, or alternatively, that the Trustees defer making distributions to the HMIT Entities to allow the JOLs time to carry out investigations "*without the risk of asset dissipation in connection with protocol discussions*". The protocol discussions were referred to in the JOLs' Letter, which notes that the JOLs "*are concerned to ensure the parameters of the protocol mitigate the risk of asset dissipation pending the completion of their investigations.*"

26. Quite how the JOLs were able to form the extraordinary view that a professionally qualified director acting with the benefit of legal and other professional advice seeking approval from the US Court to enter into a settlement with a resultant accretion to HMIT of $67 million might represent an attempt at asset dissipation calls for an explanation in and of itself, but particularly in light of the repeated attempts by the CDM Entities to engage in discussions with the JOLs and Johnstone Law about the terms of a protocol which was directly aimed at addressing the JOLs' (baseless) concerns in that regard.

27. To address unparticularised assertions in Johnstone Law's letters dated 30 May and 5 June 2025 of proprietary claims to certain assets of the CDM Entities, including in respect of assets which were the subject of the HMIT settlement agreement, our first letter dated 9 June 2025, to which we did not receive a reply, is worth repeating:

> "*Your reference to the so-called HMIT transaction is vague, speculative, and appears to rely on materials filed in separate bankruptcy proceedings in the United States concerning entities related to Mr James Dondero (the individual who swore evidence in support of FSD No. 99 seeking to have the Company and the Fund wound up on a just and equitable basis and who agreed to fund those proceedings). Given the assertions in your letter alleging the JOLs have received minimal cooperation, it is curious that you have such detailed knowledge of a transaction undertaken by entities which the JOLs have no interest in. Please confirm the source of this information.*
>
> *Further, it is clear that the Settlement Agreement benefits the HMIT Entities (as defined in your letter) and, accordingly, there is no question that assets of the CDM entities are being dissipated or misused. Taking your unfounded assertions in relation to the proprietary claims at their height, the HMIT transaction would inure to the benefit of the liquidation estate. It is perhaps telling that it is our understanding the HMIT transaction does not benefit Mr Dondero and his broader interests. In the circumstances, we do not understand*

*why the JOLs would not support the HMIT transaction even if a proprietary claim has not been established.*

*Our clients do not accept that any transaction involving the HMIT Entities warrants the JOLs' oversight, and they are not aware of any basis on which the JOLs are entitled to be 'notified' or to 'approve' their lawful dealings. Your claim that HMIT was formerly the beneficiary of a fund in which the Company had an indirect interest does not confer any rights on the JOLs in relation to any of the assets involved in the HMIT transaction.*"

28. By failing to accurately address the correspondence relating to the CDM Protocol and any of the points made in our letter of 9 June 2025, the Trustee Letter was vague and misleading, and it is regrettably the case that the JOLs' attempt to interfere with the Settlement Motion in this manner can only be described as improper.

29. The fact that entities affiliated with Mr. Dondero immediately seized upon the Trustee Letter to support their own request for an adjournment, in circumstances where their previous application for an adjournment had been refused, leads to the impression that this was the true purpose of the Trustee Letter.

30. Similarly, the JOLs' initial failure to engage with the proposed protocol at all, and the insistence now that the protocol must replicate the effect of injunctive relief, do nothing to dispel the impression of a tendency towards bias in favour of the position of Mr. Dondero and his affiliates, particularly in light of Mr. Dondero's subsequent testimony at the Settlement Motion.

31. We reserve the right to refer to this and previous correspondence in any subsequent proceedings.

Yours faithfully



**Campbells LLP**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

---

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> **"***The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> *(a)* *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b) *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

(the "**DAF Provisions**")



DRAFT

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick is the director of the GP and Paul Murphy and Mark Patrick are the directors of the Cayman-domiciled operating entities owned by DAF LP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the direct or indirect limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

1.2 In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a) To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

[1]Letter dated 22 May from Johnstone Law to Campbells.

b) To the Directors:

Mark Patrick - mpatrick@dafholdco.com
Paul Murphy - paul@gkmanagement.com.ky

**2 Transactional Reporting**

2.1 The CDM Entities have engaged Armanino LLP ("**Armanino**"), an independent accountancy firm to provide the financial statement reporting and accounting analysis required under this Protocol.

2.2 Within 14 days of the execution of this Protocol, the Directors shall provide to the JOLs a written report listing all Transactions (as defined below) undertaken by the CDM Entities between 1 July 2024 and the date of this Protocol (the "**Historical Transaction Report**"). For each Transaction in the Historical Transaction Report, the Directors shall include the following details:

(a) The date of the Transaction;

(b) The identity of any party(ies) depositing funds in respect of the Transaction;

(c) The identity of any party(ies) receiving funds in respect of the Transaction; and

(d) An explanation as to the nature and purpose of the Transaction.

"**Transaction(s)**" as used in this Protocol shall mean the acquisition or disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$10,000; provided, however, that "Transaction(s)" shall not include renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.3 Within 21 days of the signing of this Protocol, the Directors shall provide a business plan to the JOLs (which can be revised from time-to-time if it is reasonably determined to be necessary by the Directors and within the ordinary course of busisness for DAF LP and the CDM Entities) (the "**Business Plan**"). The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of DAF LP and the CDM Entities. Steps taken with respect to the management of DAF LP and the CDM Entities will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.4 The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Business Plan.

2.5 Armanino shall provide a monthly Transactions report and balance sheet (the "**Monthly Transaction Report**") to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business. For each Transaction in the Monthly Transaction Report, Armanino shall include the following details:

(e) The date of the Transaction;

(f) The identity of any party(ies) depositing funds in respect of the Transaction;

(g) The identity of any party(ies) receiving funds in respect of the Transaction; and

(h) An explanation as to the nature and purpose of the Transaction.

2.6 If the JOLs have any doubt about whether a Transaction is or is not in the ordinary course of DAF LP's business, the JOLs shall consult with the Directors who agree to make reasonable efforts to provide clairfation. For the avoidance of doubt, the JOLs shall not unilaterally contact third party service providers of the CDM Entities in respect of any Transaction, or any any anticipated transaction which they have been put on notice of pursuant to paragraph 2.7, without first consulting with, and seeking clarifcation from, the Directors.

2.7 The Directors will use reasonable efforts to provide advance notice to the JOLs in respect of any disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$250,000 **SAVE THAT** advance notice is not required in relation to any disposition related to (i) the operation or administration of the DAF Structure in the ordinary course of business or (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.8 Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3 Legal and Professional Fees**

3.1 The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4 Consultation**

4.1 The JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities.

**5 Confidentiality**

5.1 In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 5.2 below;

(b) not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

(c) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

(a) Subject to the restrictions in paragraph 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall agree in writing to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c) with the Directors' prior written consent.

## 6 Formalities

6.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3 For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4 In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct. If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary). Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

**Annexure 1 – List of CDM Entities**

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

DRAFT

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

---

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> **"***The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> *(a)* *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b) *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

(the "**DAF Provisions**")

2033932-1

#3253267v5



DRAFT

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick is the director of the GP and Paul Murphy and Mark Patrick are the directors of the ~~GP~~Cayman-domiciled operating entities owned by DAF LP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the direct or indirect limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

1.2 In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a) To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

[1]Letter dated 22 May from Johnstone Law to Campbells.

b) To the Directors:

Mark Patrick - mpatrick@dafholdco.com
Paul Murphy - paul@gkmanagement.com.ky

## 2 Transactional Reporting

2.1 ~~Upon~~ The CDM Entities have engaged Armanino LLP ("**Armanino**"), an independent accountancy firm to provide the financial statement reporting and accounting analysis required under this Protocol.

~~2.1~~ Within 14 days of the execution of this Protocol, the Directors ~~will~~shall provide ~~a report~~ to the JOLs a written report listing all ~~transactions~~ Transactions (as defined below) undertaken by ~~DAF LP, or any of the CDM Entities, since 27 March 2025.~~

2.2 ~~The~~ the CDM Entities between 1 July 2024 and the date of this Protocol (the "**Historical Transaction Report**"). For each Transaction in the Historical Transaction Report, the Directors shall ~~provide a business plan within~~include the following details:

(a) The date of the Transaction;

(b) The identity of any party(ies) depositing funds in respect of the Transaction;

(c) The identity of any party(ies) receiving funds in respect of the Transaction; and

(d) An explanation as to the nature and purpose of the Transaction.

"**Transaction(s)**" as used in this Protocol shall mean the acquisition or disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$10,000; provided, however, that "Transaction(s)" shall not include renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

~~2.2~~2.3 Within 21 days of the signing of this Protocol, the Directors shall provide a business plan to the JOLs (which can be revised from time-to-time if it is reasonably determined to be necessary by the Directors and within the ordinary course of ~~buisness~~busisness for DAF LP and the CDM Entities) (the "**Business Plan**"). The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of DAF LP and the CDM Entities. Steps taken with respect to the management of DAF LP and the CDM Entities will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.4 The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the ~~Mission Statement. The Directors~~Business Plan.

2.32.5 Armanino shall provide a monthly transactionsTransactions report and balance sheet (the "**Monthly Transaction Report**") to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business. For each Transaction in the Monthly Transaction Report, Armanino shall include the following details:

(e) The date of the Transaction;

(f) The identity of any party(ies) depositing funds in respect of the Transaction;

(g) The identity of any party(ies) receiving funds in respect of the Transaction; and

(h) An explanation as to the nature and purpose of the Transaction.

2.42.6 If the JOLs have any doubt about whether a transactionTransaction is or is not in the ordinary course of DAF LP's business, they may contact the JOLs shall consult with the Directors for who agree to make reasonable efforts to provide clairfation. For the avoidance of doubt, the JOLs shall not unilaterally contact third party service providers of the CDM Entities in respect of any Transaction, or any any anticipated transaction which they have been put on notice of pursuant to paragraph 2.7, without first consulting with, and seeking clarifcation from, the Directors.

2.52.7 The Directors will endeavouruse reasonable efforts to provide advance notice to the JOLs in respect of any disposition of assets in a single transaction of DAF LP exceeding US$ 1,000,000 or any series of related transactions in an aggregate amount exceeding US$1,000that is equal to or exceeds US$250,000 **SAVE THAT** advance notice is not required, in relation to any single transaction or series of transactions in the ordinary course of business involving or disposition related to (i) the proper operation andor administration of the DAF Structure; and in the ordinary course of business or (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.62.8 Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

## 3 Legal and Professional Fees

3.1 The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

## 4 Consultation

4.1 Save in exceptional circumstances, theThe JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall

discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities. ~~The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.~~

**5 Confidentiality**

5.1 In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 5.2 below;

(b) ~~Not~~not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

(c) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

(a) Subject to the restrictions in ~~paragrpah~~paragraph 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall ~~be notified by the JOLs~~agree in writing to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c) with the Directors' prior written consent.

**6 Formalities**

6.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3 For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4 In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct. If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary). Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

**Annexure 1 – List of CDM Entities**

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

DRAFT

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
**ENTERED**
THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 27, 2025**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | **Re: Docket No. 4231** |

**STIPULATION WITHDRAWING OBJECTION OF THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD TO MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

‘ This stipulation (the “Stipulation”) is made by and among Hunter Mountain Investment Trust (“HMIT”), Beacon Mountain LLC (“Beacon Mountain”), Rand Advisors, LLC (“Rand Advisors”), Rand PE Fund I, LP (“Rand PE Fund”), Rand PE Fund Management, LLC (“Rand

[1] Highland’s last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities"); The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation Parties"); Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by and through their respective undersign counsel.

## RECITALS

**WHEREAS**, on May 19, 2025, the Movants filed that certain *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Dkt. No. 4216] (the "9019 Motion");

**WHEREAS**, on June 9, 2025, the Foundation Parties filed that certain *Objection* [Dkt. No. 4231] to the 9019 Motion (the "Foundation Objection");

**WHEREAS**, on June 24, 2025, the Foundation Parties and the HMIT Entities entered into that certain *Settlement Term Sheet* which is annexed hereto as Attachment 1 to this Stipulation (the "Term Sheet");

**NOW, WHEREFORE, IT IS HEREBY JOINTLY STIPULATED AND AGREED** as follows:

1. The Foundation Parties withdraw the Foundation Objection with prejudice in accordance with the terms of the Term Sheet annexed hereto as **Attachment 1**.

2. The Foundation Parties, the HMIT Entities, and the Movants agree that the following language shall be contained in the proposed order on the 9019 Motion:

Notwithstanding anything in the Settlement Agreement or the 9019 Order to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (the "Foundation Parties") are or will be included in the definitions of HMIT Releasors or Highland Releasors. For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com
***Counsel for the HMIT Entities***

and

**OKIN ADAMS BARTLETT CURRY LLP**
*By: /s/ David L. Curry*______
Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
1113 Vine Street, Suite 240
Houston, Texas 77002
Telephone: (713) 28-4100
Facsimile: (346)247-7158

Email: mokin@okinadams.com
dcurry@okinadams.com
**ATTORNEYS FOR THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.**

and

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/John A. Morris* ___________
Jeffrey N. Pomerantz (admitted pro hac vice)
John A. Morris (admitted pro hac vice)
Gregory V. Demo (admitted pro hac vice)
Jordan A. Kroop (admitted pro hac vice)
Hayley R. Winograd (admitted pro hac vice)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com
- and -

**HAYWARD PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
***Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust***

and

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
*/s/ Robert S. Loigman*___________
Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
-and SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
***Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust***

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this June 25, 2025.

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)

# Attachment 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**<u>BINDING TERM SHEET</u>**

This Summary of Terms and Conditions (this "<u>Term Sheet</u>") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Trust, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

Julie Diaz (signature)

Julie Diaz, Chief Executive Officer

The HMIT Entities

____________________

Mark Patrick

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**BINDING TERM SHEET**

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

| | |
|---|---|
| The Dallas Foundation | The HMIT Entities |
| ______________________ | ______________________ |
| Julie Diaz, Chief Executive Officer | Mark Patrick |

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Daniel Mills <Daniel.Mills@kobrekim.com> |
| **Sent:** | 30 June 2025 9:16 AM |
| **To:** | Luke Armitage; #MaplesCDAF |
| **Cc:** | Nia Statham; Peter Tyers-Smith; jennifercolegate@bakerandpartners.com; rodoherty@campbellslegal.com; mgoodman@campbellslegal.com |
| **Subject:** | RE: [EXTERNAL] RE: In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ) |
| **Attachments:** | 2025 06 13 (KK) Letter to Maples-c-c.pdf; 2025 05 14 (KK) Second Letter to GT-c-c.PDF |

*****This email has originated from outside your organisation*****

Dear Maples

We refer to your email below.

Your letter of 19 June 2025 is addressed to Campbells and cc'd to us. This is the third time we are making the same points:

1. Kobre & Kim acts for the Management Shareholder and the Directors of Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**").

2. Our clients, as Management Shareholder and Directors of the Company have no powers to deal with any assets of the Fund or the asset-holding entities owned by the Fund.

3. Moreover, and in any event under O.15, r.8(3) of the CWR, all of the powers of the Directors of the Company ceased on 6 May 2025 when the supervision order was made.

4. In the circumstances, to the extent your 19 June 2025 letter requests undertakings from our clients (which it doesn't), that request is misconceived and they will not be providing any.

We will refer to this email as well as our letters of 14 May 2025 and 13 June 2025 (which make the same unanswered points above – attached again for your attention) on the question of costs as is required.

Kind regards

Daniel Mills
+1 345 749 4023

KOBRE & KIM

www.kobrekim.com

**Americas** (New York, Delaware, Miami, San Francisco, São Paulo, Washington DC)
**APAC** (Hong Kong, Seoul, Shanghai), **Caribbean** (BVI, Cayman Islands), **EMEA** (Cyprus, Dubai, London, Tel Aviv)

This e-mail message is from Kobre & Kim (Cayman), a general partnership established under the laws of the Cayman

Islands, referred to above as Kobre & Kim, and may contain legally privileged and/or confidential information. If the reader of this message is not the intended recipient(s), or the employee or agent responsible for delivering the message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this e-mail message and any attachments from your computer without retaining a copy.

---

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** Friday, June 27, 2025 1:09 PM
**To:** mgoodman@campbellslegal.com; rodoherty@campbellslegal.com
**Cc:** Nia Statham <NiaStatham@bakerandpartners.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; jennifercolegate@bakerandpartners.com; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** [EXTERNAL] RE: In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ)

Dear Campbells, Bakers and K&K

We refer to the attached letter to each of your firms, which enclosed a draft protocol, and adopt the defined terms therein. Our letter requested that you each confirm your clients' agreement to giving an undertaking to the Court in the form of the draft protocol or provide comments by no later than midday today. You have each failed to do so. This matter is, for obvious reasons, highly time sensitive. The JOLs are not willing to let the negotiation of the protocol drag on indefinitely whilst the interest in the Fund and the Fund's assets remain under your clients' effective control without any acceptable safeguards in place. Please therefore provide a substantive response to our letter, including agreement in principle to give an undertaking and comments on the draft protocol (if any), by no later than noon on Monday, 30 June 2025. Absent a response from each of your firms by that time, the JOLs will have to consider their options to ensure that the position is adequately protected whilst the JOLs' continue their investigations. This will be without reference to your clients.

Kind regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

maples.com

---

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** 19 June 2025 9:27 AM
**To:** Mark Goodman | Campbells <MGoodman@campbellslegal.com>; rodoherty@campbellslegal.com
**Cc:** Nia Statham <NiaStatham@bakerandpartners.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; jennifercolegate@bakerandpartners.com; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ)

Dear Counsel

Please see attached correspondence and enclosure.

Best regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

maples.com

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes. For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Jennifer Colegate <JenniferColegate@bakerandpartners.com> |
| **Sent:** | 30 June 2025 11:18 AM |
| **To:** | Luke Armitage |
| **Cc:** | Nia Statham; Peter Tyers-Smith; Daniel Mills; #MaplesCDAF; Mark Goodman \| Campbells; rodoherty@campbellslegal.com; Justina Zofia Stewart |
| **Subject:** | RE: In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ) |

*****This email has originated from outside your organisation*****

---

Dear Counsel

We refer to your letter dated Friday 27 June 2025 to which this office was copied.

We understand that Campbells have provided a substantive response to your correspondence regarding the proposed protocol. We do not propose to add further to that correspondence save to note that his Lordship provided what we regard as a clear indication that it would be a sensible way forward for the JOLs to enter a protocol in respect of the CDM entities and assets. DFW agrees with the views expressed by his Lordship in that regard.

For the avoidance of doubt, DFW was not an addressee of your letter 27 June and has not been requested by its terms to provide any form of undertaking to the JOLs.

DFW is giving further consideration to the letter that was issued by the JOLs immediately following the sanction hearing of last week to US attorneys engaged in the approval of the Hunter Mountain settlement, and the representations that were made at that hearing. DFW's rights to bring the interference and overreach of the JOLs to the attention of the Court are reserved in full.

Best regards,
Jennifer

**Jennifer Colegate**
Partner

Tel: +1 (345) 746 3650

Baker & Partners

www.bakerandpartners.com
Baker & Partners LLP
P.O. Box 636, Buckingham Square, 720 West Bay Road
Cayman Islands, KY1-1107




DISCLAIMER: This e-mail is confidential and may contain legally privileged information. If you are not named above as an addressee it may be unlawful for you to read, copy, distribute, disclose or otherwise use the information in this e-mail. Any views or opinions presented are solely those of the author, and do not necessarily represent those of Baker & Partners. If you are not the intended recipient and have received this e-mail in error please notify Baker & Partners on +44 (0) 1534 766254.

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** 27 June 2025 13:09
**To:** Mark Goodman | Campbells <MGoodman@campbellslegal.com>; rodoherty@campbellslegal.com
**Cc:** Nia Statham <NiaStatham@bakerandpartners.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** RE: In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ)

Dear Campbells, Bakers and K&K

We refer to the attached letter to each of your firms, which enclosed a draft protocol, and adopt the defined terms therein. Our letter requested that you each confirm your clients' agreement to giving an undertaking to the Court in the form of the draft protocol or provide comments by no later than midday today. You have each failed to do so. This matter is, for obvious reasons, highly time sensitive. The JOLs are not willing to let the negotiation of the protocol drag on indefinitely whilst the interest in the Fund and the Fund's assets remain under your clients' effective control without any acceptable safeguards in place. Please therefore provide a substantive response to our letter, including agreement in principle to give an undertaking and comments on the draft protocol (if any), by no later than noon on Monday, 30 June 2025. Absent a response from each of your firms by that time, the JOLs will have to consider their options to ensure that the position is adequately protected whilst the JOLs' continue their investigations. This will be without reference to your clients.

Kind regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

maples.com

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** 19 June 2025 9:27 AM
**To:** Mark Goodman | Campbells <MGoodman@campbellslegal.com>; rodoherty@campbellslegal.com
**Cc:** Nia Statham <NiaStatham@bakerandpartners.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; jennifercolegate@bakerandpartners.com; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ)

Dear Counsel

Please see attached correspondence and enclosure.

Best regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
**Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands**

**maples.com**

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes. For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

**CAUSE NO. ____________________**

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,**<br><br>*Plaintiffs,*<br><br>**v.**<br><br>**MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd.,**<br><br>*Defendants.* | **IN THE TEXAS BUSINESS COURT**<br><br>**1ST DIVISION**<br><br>**DALLAS, TEXAS** |

**PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**

**TO THE HONORABLE JUDGE OF SAID COURT:** The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (collectively, the "Plaintiffs" or "Supporting Organizations") file this Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Application for Appointment of Receiver, and in support thereof, respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1.1 Defendant, Mark Patrick, through a host of corporate manipulations, took over $270 million in cash and assets that supported some of the most important community-based

charities in the country. In Patrick's own testimony from just last Wednesday, June 25th, the Supporting Organizations, plaintiffs here, were left with "nothing."[1]

1.2 Through the mechanism of Charitable DAF GP, LLC (organized in Delaware) and later via a secretly incorporated entity, CDH GP, Ltd., Mark Patrick held the sole control position of what was a $270 million charitable fund (Charitable DAF Fund, LP) that four charities and the Supporting Organizations relied on to perform vital and sustained philanthropic work in specific communities in the United States. Patrick flagrantly violated both his express and implied fiduciary duties to the Supporting Organizations. He did so in order to redirect the fund's beneficial ownership to a brand-new sham charitable organization controlled by him, DFW Charitable Foundation. These actions come against a backdrop and pattern of sustained self-aggrandizement by Patrick using the fund's resources and his technical authority over them. If the Defendants here are not immediately prevented from taking further adverse actions, then placed into receivership and subjected to judicial scrutiny, the Plaintiffs will be cut off from the lifeblood of their charitable work by the very person whose duty was to act in their interests. Accordingly, Plaintiffs seek a Temporary Restraining Order and Temporary Injunction freezing the funds, followed by the appointment of a Receiver over the funds and the organization holding them.

## II. DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1 Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure. Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

---

[1] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200)

2.2 Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III. PARTIES

3.1 **The Highland Dallas Foundation, Inc. ("HDF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HDF provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of public needs.

3.2 **The Highland Kansas City Foundation, Inc. ("HKCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HKCF provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $7 billion in in charitable grants that support a broad range of public needs.

3.3 **The Highland Santa Barbara Foundation, Inc. ("HSBF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HSBF provides funding to the Santa Barbara Foundation, established in 1928, that supports a broad range of public needs.

3.4 **DFW Charitable Foundation ("DFWCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. It was organized on December 9, 2024, with Defendant Mark Patrick as DFWCF's sole member. It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes. DFWCF is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254. DFWCF maintains a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, where it may be served with process.

3.5 **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Fund structure, as explained more thoroughly below. Patrick resides and may be served with process at 6716 Glenhurst Drive, Dallas, Texas 75254, or served anywhere he may be found.

3.6 **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at 6716 Glenhurst Drive, Dallas, Texas 75254. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3.7 **CDH GP, Ltd**. is a Cayman Island limited company with its registered office at Campbells Corporate Services Limited, Floor 4 Willow House, Cricket Square, Grand Cayman Ky1-9010. It may be served with process through Patrick, its 100% owner and sole director, at 6716 Glenhurst Drive, Dallas, Texas 75254, or anywhere he may be found.

3.8 **CHARITABLE DAF GP, LLC** is a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## IV. JURISDICTION AND VENUE

4.1 Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and DAF HoldCo, Ltd;

- and is an action by an owner of an organization, namely the Supporting Organizations as participating and beneficial owners of DAF HoldCo, Ltd and thereby Charitable DAF, L.P., and is brought against a controlling person and managerial official of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFWCF, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF, GP, LLC's, and CDH GP, Ltd's obligations in the capacity of a controlling person and managerial official of DAF HoldCo, Ltd and Charitable DAF, L.P.;
- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Supporting Organizations as a controlling owner of DAF HoldCo, Ltd, CDMCFAD, LLC, and Charitable DAF, L.P., DFW Charitable Foundation by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith.

4.2 The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3 The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4 Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident,

Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition. Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas. Defendants have also consented to the jurisdiction of Texas courts.

4.5 Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas. On information and belief, DFWCF, CDH GP, Ltd. and CDMCFAD are headquartered in Dallas County. Dallas County is within the 1st Division of the Texas Business Court.

## V. FACTUAL BACKGROUND

### A. *The Fund Structure*

5.1 James Dondero was the President of Highland Capital Management, L.P. ("**Highland**"), an SEC registered investment advisor. At Mr. Dondero's direction, in 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States.

5.2 To that end, in 2011, "Charitable DAF Fund, L.P. ("**Charitable DAF Fund**") was formed to hold the donated assets.

5.3 The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4 At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, Ltd ("**Charitable DAF HoldCo**"), a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5 The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities and their supporting organizations in California, Kansas, and Texas. Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo. The four Supporting Organization held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the four Supporting Organizations owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Supporting Organizations are the Plaintiffs in this Lawsuit.

5.6 In turn and as intended, the funds provided to the Plaintiff Supporting Organizations from the Charitable DAF Fund empowered them to provide funding directly to charitable foundations in three regions of the United States. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Supporting Organizations and receive regular grants for charitable work ultimately funded by Charitable DAF Fund.

5.7 Since the Charitable DAF Fund's inception, the Supporting Organizations have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Supporting Organizations and the charitable organizations perform irreplaceable philanthropic work in their respective communities, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

**B.** ***Control of the Fund***

5.8 The founders of the Charitable DAF Fund and of Charitable DAF HoldCo wanted to ensure that the fund assets were professionally managed by experts. So, although the Supporting Organizations were the sole beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it, management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those organizations but rather in "Management Shares," with general partner status. These "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations.

5.9 So, the "Management Shares" exercised control over the assets and over the operations of Charitable DAF HoldCo, even though they conveyed no economic benefit. In the interest of efficient management, the Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the "**Control Position**." The Control Position was therefore responsible to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of their economic beneficiaries—the "Supporting Organizations," which held their "Participating Shares." The Control Position therefore owed the

Supporting Organizations fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10 In essence, the governing documents of Charitable DAF HoldCo grant complete control of Charitable DAF Fund structure to the holder of the 100 Management Shares in Charitable DAF HoldCo. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Charitable DAF Fund structure.

5.11 The Charitable DAF Fund, however, is also expressly, separately controlled by the Control Position. Similar to control over Charitable DAF HoldCo, control over the Charitable DAF Fund is separate from the beneficial economic ownership of the Charitable DAF Fund (which belongs entirely to the Supporting Organizations). Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC[2] (the "**Delaware GP**"). The Delaware GP was the managing general partner in the Charitable DAF Fund.

5.12 The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund, dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. The ARLPA makes it clear the Control Position is to exercise his powers for the sole benefit of the Supporting Organizations.

5.13 For example, the Preamble to the ARLPA states: "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code

[2] The Charitable DAF GP, LLC, held all the general partnership shares in Charitable DAF Fund, which provided all management control over the Charitable DAF Fund, but conveyed no beneficial economic interest.

of 1986, as amended and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein[.]"

5.14 Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*."[3]

5.15 Section 1.6 (Powers) likewise emphasizes: "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*."[4]

5.16 The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Indirect Charitable Owners" and contemplates the engagement of investment (and other service) advisors to achieve this. In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support. The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Supporting Organizations.

5.17 Grant Scott was initially selected for the Control Position. Mr. Scott was a longtime friend of Mr. Dondero's and a lawyer in North Carolina. Mr. Dondero knew and trusted Mr. Scott.

---

[3] Emphasis added.
[4] Emphasis added.

Mr. Scott effectively served the Supporting Organizations' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of decade. During this time, the Supporting Organizations and their respective charitable foundations made great strides in creating philanthropic, and charitable, work that was efficient, that was steady and reliable, and that grew and built on their progress year after year.

**C. *Mark Patrick's Assumption of Control***

5.18 Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

5.19 Mark Patrick, a tax attorney and employee of Mr. Dondero who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested to Mr. Scott and Mr. Dondero that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund. At the time, Patrick was an employee of Mr. Dondero's enterprises and was serving as Mr. Dondero's attorney and Mr. Dondero had no objection to Mr. Scott transferring the Control Position to Patrick. As a result of his attorney and employee status, Mr. Patrick owed significant fiduciary duties to Mr. Dondero's entities and to the Charitable DAF Fund structure—fiduciary duties that he has violated in a series of self-serving and self-dealing transactions.

5.20 On March 25, 2021, Mr. Scott resigned and appointed Patrick as director of DAF HoldCo, transferring all his management shares and membership interest to Patrick for nominal consideration. Patrick therefore assumed the Control Position from that date. Patrick then hired

Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

5.21 At the time Patrick assumed the Control Position, he was employed at Skyview Partners, a service organization that provided support primarily to Mr. Dondero and entities in which Mr. Dondero had an interest. As an employee of Skyview, he owed fiduciary duties to his employer.

**D. *Patrick's Breaches of Fiduciary Duty***

5.22 In 2023, while still employed by Dondero entities, and as the sole fiduciary for the Charitable DAF Fund and DAF HoldCo, Patrick initiated a two-year pattern of malfeasance all culminating in his current effort to abscond with $270 million. His initial small infidelities quickly blossomed into a brazen, fraudulent play for the Charitable DAF Fund and its $270 million in holdings, putting at risk the charitable works supported by the Supporting Organizations.

**E. *Undisclosed Self-Dealing***

5.23 In June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity, which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

**F. *Attempted Fraudulent Kickback Scheme***

5.24 In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that

the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.25 Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.26 Mr. Dondero ensured that Supporting Organizations were also informed about Patrick's kickback scheme. Despite significant concern, the Supporting Organizations had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

**G. *Insider Trading***

5.27 In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview to advise The Dallas Foundation to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

5.28 Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.29 Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

**H. *Financial Irregularities and Lack of Transparency***

5.30 After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Supporting Organizations were essentially cut off from any view into the financial transactions and soundness of the fund. As of September 2024, the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Supporting Organizations and ultimately their supported Charities.

5.31 But a review of the Charitable DAF Fund's last accessible financial records showed dramatic and unexplained increases in expenditures:

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).
- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).
- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.32 Despite repeated requests from the Supporting Organizations and their counsel and counsel for the Charitable DAF Fund, Patrick and Murphy have ignored and refused to provide requested financial information or explanations for these dramatic expenditure increases.

5.33 Patrick must have personally benefited from the dramatic increases in director's fees and, given Patrick's prior attempt to implement a kickback scheme through Mr. Cronin, the other remarkable increases in expenses raise deep concerns about potential self-dealing.

**I. *Patrick Ignores the Supporting Organizations Concerns***

5.34 On November 11, 2024, given what the Supporting Organizations already knew, the three major Supporting Organizations drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[5]

5.35 The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."[6]

5.36 Patrick and Murphy never responded to the letter, other than a threat that if the Supporting Organizations did not withdraw it, then Patrick and Murphy would embark on an effort at the Internal Revenue Service to revoke the Supporting Organizations' charitable status.

5.37 In January 2025, the Supporting Organizations demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. Murphy responded via email to this request stating that he and Patrick would "present directly to the foundations/supporting organi[z]ations" to address some of the concerns in the No Confidence Letter. Murphy never did.[7]

[5] *See* Ex. 4-A, Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)
[6] *Id.*
[7] *See* Ex. 4-B, Email chain ending Jan. 23, 2025 (Appx. Pg. 171)

5.38 Counsel for the Supporting Organizations and for the Charitable DAF Fund exchanged further communications, but Patrick, Murphy, and the Charitable DAF Fund's counsel never provided answers and information in response to the Supporting Organizations' basic requests. Instead, they wrapped all their future communications in half-truths and subterfuge.[8] At the same time, they offered the Supporting Organizations vague assurances that all their maneuvers were to improve the structure, focus, and performance of the fund, for the benefit of the Supporting Organizations.

5.39 The Charitable DAF Fund's counsel promised a meeting to address the Supporting Organizations' concerns, but after the Supporting Organizations' counsel suggested dates, the Charitable DAF Fund and its counsel delayed and delayed until it eventually went silent.[9]

5.40 In the interim, Patrick accelerated his multi-year fraud.

**J. *Dilution Scheme and Liquidation Maneuver***

5.41 Between December 2024 and the present, Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund, and alienate those same assets entirely away from them. The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets. In short, he stole them.

5.42 In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself in a brazen act of self-dealing. He never notified the Supporting Organizations of this massive

[8] *See* Exs. 4-A, Ltr. of Feb. 14, 2025 & Ex. 4-C Ltr. of Feb. 27, 2025 (Appx. Pg. 162-182).
[9] *See* Ex. 4-C, Email chain ending April 9, 2025 (Appx Pg. 179-182).

reorganization of the Charitable DAF Fund. Indeed, the Supporting Organizations found out about this monumental reorganization only when Patrick and his counsel had to admit it in a Cayman court as part of the Supporting Organization's successful effort to appoint Cayman Liquidators to unravel Patrick's fraud in that jurisdiction.

5.43 In a move that would make most fraudsters blanch, and certainly continued to violate all his fiduciary duties, on December 9, 2024, Patrick formed Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and its registered address was Patrick's home. Patrick then issued his charity a fifty-one percent (51%) interest in the charitable assets. In essence, Patrick awarded himself the ability to distribute over half of the Charitable DAF Fund's $270 million in economic interest to his own entity, from his living room in Dallas.

5.44 Three days later, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.45 In secret, and without notice to the Supporting Organizations, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100 percent of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100 percent of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick ensured a different and new entity (CDMCFAD) held Charitable DAF Fund.

5.46 Patrick's fraud continued to evolve in February 2025. On February 7, 2025, again without notice to the Supporting Organizations, DAF HoldCo (in an *ultra vires act)* allotted 318

participating shares to DFWCF, the Sham Charity controlled by Patrick. This sham dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[10] interest was diluted from 1.639% to 0.80%. Said another way, Patrick absconded with over half of the participating interest of the Supporting Organizations and other charitable funds. Before, during, and after this action—and at all times it was contemplated and executed—Patrick and Charitable DAF HoldCo still owed fiduciary duties to the Supporting Organizations.

5.47 In February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Patrick's complete control of the assets of Charitable DAF Fund.

5.48 On March 27, 2025, Patrick caused CDMCFAD (the holder of $270 million in assets) to issue shares to the Sham Charity, *and only to the Sham Charity*. He issued no shares in CDMCFAD to the Supporting Organizations. His fraudulent scam was nearly complete. Now, Patrick's Sham Charity controlled all the direct economic interest in the entity Patrick had inserted between Charitable DAF HoldCo and the assets in Charitable DAF Fund, and the Supporting Organizations were left out in the cold.

5.49 On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6

[10] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

million, a ridiculous transaction bereft of reasonably equivalent value.[11] After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[12]

5.50 Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Patrick allegedly distributed a paltry portion of $1.6 million to the Supporting Organizations, receipt of those funds has yet to be verified. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Supporting Organizations' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Supporting Organizations.

### K. *The Cayman Island Proceedings*

5.51 On April 2, 2025, again unbeknownst to the Supporting Organizations, Patrick placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.52 But the Supporting Organizations already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Supporting Organizations well-

[11] *See* Ex. 3, p. 5, Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[12] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, CaseNo. 19-34054-sgj-11; (Appx. Pg. 200).

founded concerns including their expression of no-confidence; (3) engaged in a pattern of fraudulent self-dealing; (4) taken all participating ownership from the Supporting Organizations without any approval or appropriate compensation; and (5) and restructured the underlying funds. This was enough to convince the Supporting Organizations to take action.

5.53 The Supporting Organizations filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Supporting Organizations would not have learned about Patrick's voluntary liquidation.

5.54 Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFWCF and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.55 The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[13]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

---

[13] Ex. 8, Supervision Order (Appx. Pg. 244-246)

6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.56 While the Cayman Islands-appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick, DFWCF, and CDMCFAD (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the Charitable DAF Fund and DAF HoldCo. In the meantime, the rightful beneficial owners, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the Charitable DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that rely on funding from the Charitable DAF Fund.

## VI. CAUSES OF ACTION

### Count I - Breach of Fiduciary Duty Against Patrick, CDH GP, Ltd., and Charitable DAF GP, LLC

6.1 Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

6.2 In "a limited partnership, the general partner stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of a trust." *Hughes v. St. David's Support Corp.*, 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (There "has never been any serious doubt that

the general partner of a Delaware limited partnership owes fiduciary duties."). Likewise, under traditional principles of equity, and various statutes generally hold that a manager of an LLC would qualify as a fiduciary of that LLC and its members. *Auriga Capital Corp. v. Gatz Properties*, 40 A.3d 839, 850 (Del. Ch. 2012), judgment entered sub nom. *Auriga Capital Corp. v. Gatz Properties, LLC* (Del. Ch. 2012), aff'd, 59 A.3d 1206 (Del. 2012); *Davis v. Crawford*, 700 S.W.3d 438, 449 (Tex. App.—Eastland 2024, no pet.) ("[T]he relationship between a managing member of an LLC and a nonmanaging member is similar to that of a general partner/limited partner relationship, and that such an arrangement thereby creates a fiduciary obligation on the part of the managing member.").

6.3 By virtue of Patrick's Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, Patrick owed fiduciary duties to the Plaintiffs.

6.4 Patrick breached his fiduciary duties to the Plaintiffs by stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.5 Patrick breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.6 Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.

6.7 Patrick breached his fiduciary duty by successfully soliciting a charitable contribution ultimately from a Supporting Organization to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.8 The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support. Plaintiffs have suffered damages as a result of Patrick's breach of his fiduciary duties.

**Count II - Constructive Fraud Against Patrick**

6.9 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.10 "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied). "[I]n a claim for constructive fraud, the actor's intent is irrelevant." *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 879 (Tex. App.—El Paso 2021, pet. denied). "[C]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.*

6.11 As a fiduciary, Patrick's conduct in diluting the Plaintiffs' interests, selling assets at below-market values to undisclosed parties, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.12 Patrick injured public interests by his conduct. Plaintiffs have suffered damages as a result of Patrick's fraud.

**Count III - Unjust Enrichment Against Patrick, CDMCFAD, and DFWCF**

6.13 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.14 A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.15 Patrick and DFWCF stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.16 Patrick and DFWCF took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with DFWCF.

6.17 Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.18 Patrick and DFWCF have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damages by Patrick's unjust enrichment.

**Count IV – Conversion Against Patrick, CDMCFAD, and DFWCF**

6.19 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.20 Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the defendant refused the plaintiff's demand for return of the property. *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

6.21 The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.22 Patrick with DFWCF has unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial economic interests to Patrick's controlled entity, DFWCF.

6.23 The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which Patrick and now, DFWCF, have ignored and refused. Plaintiffs have been damages as a result of these conversions.

**Count V – Imposition of Constructive Trust Against Patrick, CDMCFAD, and DFWCF**

6.24 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.25 "A constructive trust is considered a legal fiction and is a creation of equity to prevent a wrongdoer from profiting from his wrongful acts." *In re Harding*, 563 S.W.3d 366, 372 (Tex. App.—Texarkana 2018, no pet.). "[T]o obtain a constructive trust, [a party] must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Id.* (cleaned up).

6.26 Patrick through DFWCF has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of DFWCF and Patrick.

6.27 All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

## VII. EMERGENCY APPLICATION FOR RECEIVERSHIP

7.1 Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

7.2 The Plaintiffs seek the immediate appointment of a receiver over Defendants DFWCF and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code §§ 64.001(a)(3), (7), Texas Business and Organizations Code § 11.410, and the Court's inherent equitable powers.

### A. *Texas Civil Practice & Remedies Code*

7.3 [U]nder section 64.001 of the Texas Civil Practice and Remedies Code ("**CPRC**"), a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," CPRC §§ 64.001(a)(3) or "in any case in which a receiver may be appointed under the rules of equity." CPRC §§ 64.001(a)(7); *Elliott v. Weatherman*, 396 S.W.3d 224, 228 (Tex. App.—Austin 2013, no pet.).

7.4 A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. CPRC § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5 A probable interest exists by statute in actions between partners and in actions between joint owners of property. CPRC § 64.001(a)(3).

7.6 One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM*

*Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App. – Dallas 2024, pet. denied, reh'g denied).

**B. *Texas Business and Organizations Code***

7.7 Like CPRC § 64.001, a court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." Tex. Bus. & Orgs. Code § 11.403(a)(3).

7.8 Additionally, under Section 11.410 of the Texas Business and Organizations Code ("TBOC"), a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. TBOC § 11.410(a).

**C. *Rules of Equity***

7.9 In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. The CPRC, § 64.004 makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision.

**D. *Receivership Standards Under Texas Law and Equity***

7.10 "The appointment of a receiver lies within the sound discretion of the trial court." *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.). "The appointment of a receiver, either as authorized by statute or usages of equity, will not be disturbed on appeal unless the record reveals a clear abuse of discretion." *O & G Carriers, Inc. v. Smith Energy 1986-A P'ship*, 826 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1992, no writ).

7.11 The party submitting an application for appointment of a receiver bears the burden of proof to present evidence justifying the appointment. *Furgerson v. First Nat'l Bank*, 218 S.W.2d 1019, 1020 (Tex. Civ. App. – Texarkana 1949, no writ). The party can meet that burden by submitting a sworn verification supporting the claimed grounds for the appointment, *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App. – Corpus Christi 1999, no pet.), and a court may consider oral testimony as evidence in support of an application. *See Furgerson*, 218 S.W.2d at 1020.

7.12 An application seeking a receivership pursuant to a statutory provision must allege facts that meet the elements of the provision. *Associated Bankers Credit Co. v. Meis*, 456 S.W.2d 744, 748 (Tex. Civ. App. – Corpus Christi 1970, no writ). The facts alleged in the application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.], no writ).

7.13 Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

**E. *The Supporting Organizations are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities***

7.14 The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.15 Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.16 Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure. The Plaintiffs have not received any

just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17 Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.18 Patrick dominates and controls the Receivership Entities. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.19 The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.20 The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

7.21 The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.22 The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate

the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.23 Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

**Count VI – APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP**

8.1. Plaintiffs seek immediate injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund as of the instant date of this filing, regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.2. A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." Tex. Civ. Prac. & Rem. Code § 65.011. "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties.'" *Lometa Bancshares, Inc. v. Potts,* 952 S.W.2d 631, 633 (Tex. App.-Austin 1997) (*quoting Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966)). "In cases like the present, an applicant for the writ must show (1) a probable right to

recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued." *Lometa*, 952 S.W.2d at 633 (citing Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (West 1997); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968)).

8.3. Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending. In other words, "the adequacy of an available legal remedy must be judged in the circumstances of the particular case[,]" and "[i]n such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety[.]" *Lometa*, 952 S.W.2d at 633; *see also Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters*., 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ); *Baucum v. Texam Oil Corp*., 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.4. The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

8.5. Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without

limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.6. Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Restraining Order ("**TRO**") is not granted against the Defendants. Accordingly, Plaintiffs request the Court issue a TRO that freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.7. The harm to Plaintiffs is imminent, and if the Court does not issue a TRO and injunctive relief, it will be irreparably injured, as set forth herein. Conversely, the granting of a TRO will merely require Defendants to refrain from doing anything with the funds for two weeks. If the Defendants prevail on the merits, the funds will still be available to them for their use in future. The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent immediate injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.8. The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants due to the entry of a TRO, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent

scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

8.9. A temporary restraining order is necessary to maintain the *status quo* during the pendency of this action. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("defining the status quo as "the last, actual, peaceable, non-contested status which preceded the pending controversy.") The facts above establish the required elements for Plaintiffs to obtain a TRO against Defendant, specifically: (1) a cause of action against Defendants with a probable right to relief; (2) a probable, imminent, and irreparable injury to Plaintiffs in the interim; (3) the threatened injury outweighs any damage the injunction might cause the opposing party; and (4) the injunction will not disserve the public interest. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198. 204 (Tex. 2002).

**A. *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.***

8.10. Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 597 (Tex. App.— Amarillo 1995, no writ). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58; *see also Gryphon Master Fund, L.P. v. Path 1 Network Technologies, Inc.*, No. 3:06 CV 0107 D, 2007 WL 1723703, at *5 (N.D. Tex., Jun. 14, 2007) (citing *Metcalfe*).

8.11. Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail

above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that forms the lifeblood of vital philanthropic efforts relied upon by key communities across the nation. The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B. *Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.***

8.12. Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above. Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *Lometa*, 952 S.W.2d at 633; see also *Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters.*, 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.13. Plaintiffs have no adequate remedy at law. Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds. These losses, as well as others which will inevitably occur if Defendants are not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seeks a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

## VIII. PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B. Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C. Require the reversal of the dilution scheme and unauthorized asset transfers;

D. Impose a constructive trust over the res of DAF HoldCo, CDMCFAD, LLC and the Charitable DAF Fund wrongfully taken from the Plaintiffs;

E. Award actual damages in an amount to be proven at trial;

F. Award exemplary damages as permitted by law;

G. Award attorneys' fees and costs;

H. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**McCarty Law PLLC**

*/s/ Darren L. McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street
Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, July 1, 2025, on all counsel or parties of record.

*/s/ Darren L. McCarty*
Darren L. McCarty

**VERIFICATION**

I, Julie Diaz, Vice President of Highland Dallas Foundation, Inc., and President of The Dallas Foundation, have read the above and foregoing Petition and the facts stated therein are true and correct to the best of my knowledge and belief.

Julie Diaz

My name is Julie Diaz, my date of birth is 3/23/64, and my address is 5711 Prestwick Lane Dallas. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Barnstable County, State of MA, on the 1 day of July, 2025

Julie Diaz

**The Business Court of Texas,**
**First Division**

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § | |
| *Plaintiffs*, | § | Cause No. ______________ |
| v. | § | |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | § | |
| *Defendants*. | § | |

**Table of Contents—Exhibits**


| Exhibit | Document | Appx. Page Nos. |
|---|---|---|
| Exhibit 1-A | DFW Charitable Foundation Formation Documents (12/9/2024) | 40-42 |
| Exhibit 1-B | CDMCFAD, LLC Formation Documents (12/12/2024) | 43 |
| Exhibit 1-C | CDH GP, Ltd. Formation Documents | 44-45 |
| Exhibit 2-A | Nov. 7, 2011, Amended and Restated Exempted Limited Partnership Agreement | 46-66 |

| | | |
|---|---|---|
| Exhibit 2-B | Jan. 19, 2025, Amended and Restated Memorandum and Articles of Association | 67-96 |
| Exhibit 3 | Sykes Affidavit Exhibit GS-I | 97-161 |
| Exhibit 4-A | Nov. 11, 2024, No Confidence Letter | 162-163 |
| Exhibit 4-B | Jan. 23-Feb. 7, 2025, Emails Julie Diaz, Mark Partick, Paul Murphy, and Michael Stockham | 164-177 |
| Exhibit 4-C | Feb 14-April 3, 2025, Letters and Emails between David Rosenberg, Paul Murphy, Michael Stockham, and Douglas Mancino | 178-182 |
| Exhibit 5 | Hearing Transcript (Patrick Testimony) | 183-209 |
| Exhibit 6 | Dondero Declaration | 210-221 |
| Exhibit 7 | Diaz Declaration | 222-243 |
| Exhibit 8 | Supervision Order | 244-246 |

EXHIBIT
1-A

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:06 PM 12/09/2024
FILED 04:06 PM 12/09/2024
SR 20244432762 - File Number 10030937

# CERTIFICATE OF INCORPORATION
# OF
# DFW CHARITABLE FOUNDATION
a nonprofit nonstock corporation

I.

The name of the Corporation is DFW Charitable Foundation.

II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

IV.

A. The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person. It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B. In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

VI.

A. No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

B. Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

**VII.**

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

**VIII.**

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

**IX.**

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

/s/ Douglas Mancino
Douglas Mancino, Incorporator

EXHIBIT
1-B

**CERTIFICATE OF FORMATION**

**OF**

**CDMCFAD, LLC**

This Certificate of Formation of CDMCFAD, LLC (the "Company"), is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 *Del. C.* § 18-101 *et seq.*) (the "Act").

1. Name. The name of the limited liability company formed hereby is CDMCFAD, LLC.

2. Registered Office. The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

3. Registered Agent. The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation in accordance with the Act.

[signature]
Name: Mark Patrick
Authorized Person

4930-4296-2948\1

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:33 AM 12/12/2024
FILED 11:33 AM 12/12/2024
SR 20244471736 - File Number 10035168

EXHIBIT
1-C

# Search Report

| | |
|---|---|
| **Entity Name :** | CDH GP, Ltd. |
| **Jurisdiction :** | Cayman Islands |
| **Registration Number :** | 407515 |
| **Registration Date :** | 27th February 2024 |
| **Entity Type :** | EXEMPT |
| **Registered Office :** | CAMPBELLS CORPORATE SERVICES LIMITED<br>Floor 4<br>Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |
| **Initial Subscriber:** | |
| **Authorised Share Capital:** | CI$41,000.00 |
| **Nature of Business:** | General Partner |
| **Financial Year End:** | 31st December |

| | |
|---|---|
| **Status :** | ACTIVE |
| **Status Date :** | 27th February 2024 |

- INFORMATION REGARDING THE CORPORATE RECORDS AND REGISTERS ARE NOT AVAILABLE FOR PUBLIC INSPECTION

- THIS REPORT DOES NOT CONFIRM THE ENTITY IS IN GOOD STANDING

Authorisation Code : 379989138381
www.verify.gov.ky
10 February 2025

# Director Details

Entity Name: **CDH GP, LTD.**

| Director Name |
| --- |
| Mark E. Patrick |

EXHIBIT
2-A

**DATED NOVEMBER 7, 2011**

**AMENDED AND RESTATED**

**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF**

**CHARITABLE DAF FUND, LP**

---

**WARNING**

**THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY**

## TABLE OF CONTENTS


| | | PAGE |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS; COMPENSATION AND EXPENSES | 2 |
| 1.1 | Continuation | 2 |
| 1.2 | Name | 2 |
| 1.3 | Purpose and Powers | 2 |
| 1.4 | Registered Office | 2 |
| 1.5 | Partners | 2 |
| 1.6 | Powers. | 2 |
| 1.7 | Term | 3 |
| 1.8 | Admission of New Partners | 3 |
| 1.9 | Taxable Year | 3 |
| 1.10 | Liability of Partners | 3 |
| 1.11 | Limitation on Assignability of Partners' Interests. | 3 |
| 1.12 | Definitions | 4 |
| 1.13 | Service Providers | 4 |
| 1.14 | Partnership Expenses | 4 |
| 1.15 | Withdrawal of Initial Limited Partner | 5 |
| ARTICLE II | POWERS | 5 |
| 2.1 | Partnership Powers | 5 |
| 2.2 | Rights, Powers, Limitations on Liability and Indemnification of General Partner. | 6 |
| ARTICLE III | CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES | 9 |
| 3.1 | Capital Contributions. | 9 |
| 3.2 | Capital Account; Allocation of Profits and Losses. | 9 |
| ARTICLE IV | LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT | 9 |
| 4.1 | Legal Interest | 9 |
| 4.2 | Distributions. | 10 |
| 4.3 | Withdrawal | 10 |
| ARTICLE V | DURATION OF PARTNERSHIP | 10 |
| 5.1 | Termination | 10 |
| 5.2 | Winding Up | 11 |
| ARTICLE VI | MISCELLANEOUS | 11 |
| 6.1 | Tax Matters Partner | 11 |
| 6.2 | Right to Hire. | 11 |
| 6.3 | Applicable Law, etc | 12 |
| 6.4 | Power of Attorney | 12 |
| 6.5 | Tax Elections Under the Internal Revenue Code | 12 |
| 6.6 | Amendments to Partnership Agreement | 12 |

6.7 Investment Representation ....13
6.8 Notices ....13
6.9 General Partner Determinations ....14
6.10 Dispute Resolution ....14
6.11 Successors and Assigns ....16
6.12 Severability ....16
6.13 No Third Party Rights ....16
6.14 No Right to Partition ....16

**AMENDED AND RESTATED**
**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF**
**CHARITABLE DAF FUND, LP**

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1) Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2) Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3) Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4) Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

## ARTICLE I
## GENERAL PROVISIONS; COMPENSATION AND EXPENSES

1.1 Continuation. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2 Name. The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3 Purpose and Powers. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 Registered Office. The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5 Partners. The name and addresses of the Partners are as follows:

| **Name** | **Address** |
|---|---|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |
| Charitable DAF HoldCo Ltd<br>(Limited Partner) | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |

1.6 Powers.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7 Term. The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8 Admission of New Partners. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9 Taxable Year. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10 Liability of Partners.

(a) The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b) Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11 Limitation on Assignability of Partners' Interests.

(a) A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

(b) The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12 Definitions. For the purpose of this Agreement, unless the context otherwise requires:

(a) General Partner. The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) Indirect Charitable Owners. The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(c) Limited Partner. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(d) Partner. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13 Service Providers. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14 Partnership Expenses. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

1.15 Withdrawal of Initial Limited Partner. The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

**ARTICLE II**
**POWERS**

2.1 Partnership Powers. The Partnership shall have the following powers:

(a) To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

(b) To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c) To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d) To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e) To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f) To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g) To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2 Rights, Powers, Limitations on Liability and Indemnification of General Partner.

(a) Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b) To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e) Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f) The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g) The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h) **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i) **WAIVER OF CONSUMER RIGHTS: The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j) No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person. Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k) This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

## ARTICLE III
## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1 Capital Contributions.

(a) Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2 Capital Account; Allocation of Profits and Losses.

(a) There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(b) Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(c) For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(d) To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(e) Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV
## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT

4.1 Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

4.2 Distributions.

(a) Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

(b) The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3 Withdrawal. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V
## DURATION OF PARTNERSHIP

5.1 Termination. The Partnership shall be required to be wound up and dissolved upon:

(a) the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or



CONFIDENTIAL

(b) the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c) the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2 Winding Up. Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law. Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement. The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

## ARTICLE VI
## MISCELLANEOUS

6.1 Tax Matters Partner. The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership. In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2 Right to Hire.

(a) Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

(b) Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3 Applicable Law, etc. This Limited Partnership Agreement: (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require. The term “gross negligence” and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4 Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement. This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5 Tax Elections Under the Internal Revenue Code. The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6 Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7 Investment Representation. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8 Notices. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

6.9 General Partner Determinations. Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10 Dispute Resolution. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation.

(1) Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2) The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3) The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(4) Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b) Arbitration. If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of this document will control.

(1) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the

Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5) All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6) The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11 Successors and Assigns. Subject to the limitations set forth in Section 1.11, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12 Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13 No Third Party Rights. Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14 No Right to Partition. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By ______________________
James D. Dondero
Managing Member

Witnessed By: ______________________

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD.

By: ______________________
Name: Grant Scott
Title: Director

Witnessed By: ______________________

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: ______________________
Name:
Title:

Witnessed by: ______________________

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: ______________________________
James D. Dondero
Managing Member

Witnessed By: ______________________

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: ______________________________
Name: Grant Scott
Title: Director

Witnessed By: Candi L. Riggs
Candi L. Riggs

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: ______________________________
Name: ROD PALMER
Title:

Witnessed by: Gianna S Gay

EXHIBIT 2-B

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

WALKERS

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100 F +1 345 949 7886 www.walkersglobal.com

REF: SSJ/VT/H0851-120776

AMER_Docs 11255406.3 H0851.120776

GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

**(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)**

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands, provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

TABLE OF CONTENTS


| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 4 |
| SHARES | 4 |
| MANAGEMENT SHARES | 5 |
| PARTICIPATING SHARES | 6 |
| MODIFICATION OF RIGHTS | 6 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |


GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

THE SEAL ..... 15
DISQUALIFICATION OF DIRECTORS ..... 15
PROCEEDINGS OF DIRECTORS ..... 16
DIVIDENDS ..... 18
ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ..... 18
CAPITALISATION OF RESERVES ..... 19
SHARE PREMIUM ACCOUNT ..... 20
NOTICES ..... 20
NON-RECOGNITION OF TRUSTS ..... 21
WINDING UP ..... 21
AMENDMENT OF ARTICLES OF ASSOCIATION ..... 22
CLOSING OF REGISTER OR FIXING RECORD DATE ..... 22
REGISTRATION BY WAY OF CONTINUATION ..... 22
MERGERS AND CONSOLIDATION ..... 22
DISCLOSURE ..... 23
INDEMNITY ..... 23
DISPUTE RESOLUTION ..... 24



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Law and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Law and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "**Participating Shares**" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the US Internal Revenue Code of 1986, as amended (the "**Code**") or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:39 EST
Filed: 04-Feb-2015 00:13 EST

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case, and

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

2. Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

**SHARES**

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b) grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions,



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:40 EST
Filed: 04-Feb-2015 09:13 EST

preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

12. Any Management Shares held by Grant Scott will be automatically redeemed by the Company upon his death or upon the Company receiving written notice from two board certified physicians confirming that he is of unsound mind or otherwise incapacitated ("**Automatic Redemption**").

13. If at the time of an Automatic Redemption, Grant Scott is the sole Director of the Company, such office will be automatically vacated by Grant Scott.

14. Upon an Automatic Redemption, the Company shall issue 100 Management Shares to a successor management shareholder ("**Successor Management Shareholder**") designated by James Dondero ("**Designator**"), or, if he is unable or declines to act, by an individual or individuals designated by James Dondero ("**Successor Designator**"), in either case within 15 days of the Automatic Redemption. If the Designator is:

(a) deceased and has not named a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made in accordance with the provisions of the Designator's will, or if his will contains no such provisions, by the qualified personal representative of his estate (the "**Designator's Personal Representative**"); or

(b) otherwise incapacitated and has not previously designated a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made by the Designator's attorney-in-fact appointed for such purpose, under a valid, effective power of attorney instrument (the "**Designator's Attorney**").

15. Any designation of a Successor Management Shareholder must be notified to the Company in writing and signed by either the Designator, the Successor Designator, the Designator's Personal Representative, or the Designator's Attorney, as appropriate, and accompanied by a consent to become a Shareholder signed by the Successor Management Shareholder ("**Issue Notice**"). The issue of the 100 Management Shares to the Successor Management Shareholder shall take effect upon receipt by the Company of the Issue Notice and the Register will be updated accordingly.

16. The Designator may name a Successor Designator (including an individual, or a series of individuals) at any time pursuant to a written notice delivered to the Company during his lifetime or by a provision in his will. Each Successor Designator upon succeeding and replacing the Designator or a prior Successor Designator, may in the same manner as set out above, designate an individual, or a series of individuals, to succeed him as Successor Designator. In the event of a conflict between such instruments, the one bearing the latest date shall control. A Successor Designator will assume such office upon consenting to so act.

17. The Successor Management Shareholder may not be a "disqualified person" (as that term is defined in Section 4946 of the United States Internal Revenue Code of 1986, as amended), other than a foundation manager, with respect to Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., or Highland Kansas City Foundation, Inc.

18. In connection with the appointment of the Successor Management Shareholder, the Company and its registered office service provider will be entitled to rely on the advice of counsel confirming that the designation of the Successor Management Shareholder has been made in accordance with the procedures set out in these Articles.

## PARTICIPATING SHARES

19. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

20. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

21. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.



GENERAL REGISTRY CAYMAN ISLANDS

## CERTIFICATES

22. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

23. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## TRANSFER OF SHARES

24. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

25. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

26. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

27. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

28. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

29. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

30. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person



GENERAL REGISTRY CAYMAN ISLANDS

could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

31. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

32. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

33. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

34. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

35. Subject to the Law, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:14 EST

36. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

37. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

38. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## TREASURY SHARES

39. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

40. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

41. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

42. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

## GENERAL MEETINGS

43. The Directors may, whenever they think fit, convene a general meeting of the Company.

44. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

45. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jun-2013 16:49 EST
Filed: 04-Feb-2015 09:13 EST

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

46. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

47. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

48. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

49. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

50. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

51. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

52. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

53. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

54. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

55. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

56. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

57. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

58. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

59. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

60. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:39 EST
Filed: 04-Feb-2015 09:13 EST

Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

61. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

62. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

63. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

64. On a poll votes may be given either personally or by proxy.

65. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

66. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

67. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

68. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

69. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

70. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

71. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.



Uploaded: 27-Jun-2015 16:49 EST
Filed: 04-Feb-2015 00:11 EST

72. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

73. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

74. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

75. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

76. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

77. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR

78. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

79. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

80. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.



GENERAL REGISTRY CAYMAN ISLANDS

81. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

82. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

83. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

84. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit; and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

85. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

86. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

87. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded 27-Jun-2013 16:49 EST
Filed 04-Feb-2013 09:33 EST

88. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

89. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

90. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

91. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

92. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

93. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:11 EST

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

## PROCEEDINGS OF DIRECTORS

94. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

95. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

96. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

97. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

98. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

99. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jun-2017 16:39 EST
Filed: 01-Feb-2018 09:13 EST

100. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

101. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

102. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

103. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

104. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

105. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

106. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

107. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

GENERAL REGISTRY CAYMAN ISLANDS

## DIVIDENDS

108. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

109. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

110. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

111. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

112. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

113. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

114. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

115. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

116. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

117. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

118. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 18:49 EST
Filed: 04-Feb-2015 09:13 EST

being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

119. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

120. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

121. Subject to the Law and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares,



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:39 EST
Filed: 04-Feb-2015 09:13 EST

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

122. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

123. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

124. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

125. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

126. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

127. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

128. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

129. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

130. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such



Uploaded: 27-Jan-2015 16:19 EST
Filed: 04-Feb-2015 09:31 EST

assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

133. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

134. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

135. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

136. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

137. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

138. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded 27-Jan-2013 16:49 EST
Filed: 04-Feb-2013 09:13 EST



CONFIDENTIAL

## DISCLOSURE

139. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

## INDEMNITY

140. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or Gross Negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

141. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

142. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

143. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

144 The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

## DISPUTE RESOLUTION

145 The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in these Articles and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:19 EST
Filed: 04-Feb-2015 09:13 EST

issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2017 16:49 EST
Filed: 04-Feb-2018 09:43 EST

reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

EXHIBIT
3

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 99 OF 2025 (JAJ)**

| | |
|---|---|
| **IN THE MATTER OF:** | **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)** |
| **AND IN THE MATTER OF:** | **CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)** |
| **BETWEEN** | **(1) THE HIGHLAND DALLAS FOUNDATION, INC.**<br>**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**<br>**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**<br>**(4) THE HCMLP CHARITABLE FUND** |

**PLAINTIFFS**

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

**DEFENDANT**

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 2026**
**Date:** 27 April 2025.

**NOTARY PUBLIC**

36068395.1.C8689.187150



CONFIDENTIAL

JOHNSTONE
LAW

24 April 2025

Charitable DAF HoldCo Ltd
c/o Campbells Corporate Services Limited
Floor 4, Willow House, Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

Dear Sir or Madam

**In the matter of Charitable DAF HoldCo Ltd | FSD No. 99 of 2025 | Service of Documents**

We act for the participating shareholders of the Charitable DAF HoldCo Ltd (***Company***), namely: (i) Highland Dallas Foundation, Inc., (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) HCMLP Charitable Fund (***Supporting Organisations***) which presented a winding up petition in relation to the Company (***Petition***), and a summons dated 10 April 2025 (***Summons***).

The Summons is listed for hearing before Justice Asif at 2pm on 28 April 2025.

Please find enclosed by way of service copies of the following:

1. The Petition (including Notice of Hearing)
2. The Summons
3. Affirmation of Julie Diaz and Exhibit JD-1
4. Affirmation of James Dondero and Exhibit JDD-1
5. Consent to act of Margot MacInnis and Exhibit MM-1
6. Consent to act of Sandipan Bhowmik and Exhibit SB-1

*Acknowledgment of Service*

I ______________________________ am duly authorised to accept service of the enclosed documents, which were served at _______ pm on 24 April 2025.

______________________________
**Signed**

If you have any questions in relation to the above, please contact our office.

Yours faithfully

**Johnstone Law**

Walkers

**BY EMAIL**

25 April 2025

Our Ref: PP/PA/187150

Johnstone Law
10 Market Street, PO Box 926
Grand Cayman KY1-9006

Dear Mr Johnstone

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

1. We act as Cayman Islands counsel to the Company.

2. We refer to the documents served yesterday by your firm on the Company at its registered office, which include a winding up petition ("**Petition**"), an application for the appointment of provisional liquidators ("**PL Application**"), and a cover letter of service ("**Service Letter**").

**The Company is already in Voluntary Liquidation**

3. Please note the following (all documents enclosed):

   (a) On 29 March 2025, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd executed a consent to act as joint voluntary liquidators of the Company ("**JVLs**").

   (b) On 2 April 2025: (i) the directors of the Company executed written resolutions including to recommend to the management shareholder that the Company be wound up voluntarily and the JVLs be appointed; (ii) the management shareholder executed special resolutions that the Company be wound up voluntarily and the JVLs be appointed; and (iii) the directors of the Company executed a declaration of solvency.

   (c) On 14 April 2025, Gazette Issue No. 8/2025 was published, which included notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the JVLs appointed.

4. Further, please see enclosed:

   (a) The current Memorandum and Articles of the Company, dated 20 February 2025 ("**M&A**").

(b) The current Register of Members of the Company, dated 25 April 2025.

(c) An email chain between your firm and our firm dated 23-24 April 2025.

5. As outlined above, the Company is in Voluntary Liquidation.

6. That fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice referred to at paragraph 3(c) above.

7. Further, the email chain referred to at paragraph 4(c) above is all that we received from your firm by way of pre-action correspondence. We enquired as to the nature of the proceedings to be served, and had we been informed that it was a winding up petition and application for the appointment of provisional liquidators (rather than simply that the proceedings were in the process of being served on the Company's registered office), we would have informed you that the Company was already in Voluntary Liquidation.

8. There is nothing in the M&A which entitles your clients to receive notice from the Company of its entry into Voluntary Liquidation.

**The appropriate course of action**

9. As the Company is already in Voluntary Liquidation, the Petition and PL Application are plainly redundant, and we invite your clients to withdraw them without delay.

10. If the JVLs (or your clients) consider it appropriate that the Voluntary Liquidation be brought under the supervision of the court, any of them may make an application for a supervision order pursuant to the Companies Act section 131. If your clients would like to discuss such an application with the JVLs, including in respect of funding, please let us know.

11. In the event that the Petition and PL Application are not withdrawn, or at the very least the hearing of the PL Application (which we understand from your firm's Service Letter is listed on Monday 28 April 2025 at 2pm) is not adjourned, this letter must be brought to the attention of the Court, and we will appear on behalf of the Company.

12. If it becomes appropriate to do so, we will put this letter before the Court including on the question of costs.

Yours faithfully

Walkers (Cayman) LLP

**WALKERS (CAYMAN) LLP**

Direct Tel: +1 345 914 6365
Email: Barnaby.Gowrie@walkersglobal.com

**THE COMPANIES ACT (AS AMENDED)**

**JOINT VOLUNTARY LIQUIDATORS' CONSENT TO ACT**

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

To: The Registrar of Companies

**TAKE NOTICE** that we, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, hereby consent to act as Joint Voluntary Liquidators of the above-named Company with effect from the commencement of the liquidation.

**DATED** this 29th day of March, 2025.

________________________________

**Mitchell Mansfield**
**Joint Voluntary Liquidator**

E: mitchell.mansfield@kroll.com
T: +1 345 743 8805

________________________________

**William Clarke**
**Joint Voluntary Liquidator**

E: will.clarke@kroll.com
T: +1 345 623 9905

CHARITABLE DAF HOLDCO, LTD.
(THE "COMPANY")

WRITTEN RESOLUTIONS OF THE
DIRECTORS OF THE COMPANY DATED 2 APRIL 2025

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025), unless the context otherwise requires.

The undersigned, being all the Directors of the Company for the time being, hereby take the following actions and adopt the following resolutions.

1. **VOLUNTARY LIQUIDATION**

1.1 **IT IS NOTED** that:

(a) the Company's sole investment, being 100% of the limited liability company interests in CDMCFAD, LLC, a Delaware limited liability company, was redeemed on 27 March 2025 (the "**CDMCFAD Redemption**");

(b) proceeds lawfully available for distribution from the CDMCFAD Redemption in the amount of $1,612,192 were distributed to holders of Participating Shares of the Company by way of a cash dividend paid on April 2;

(c) the Company will not be engaging in any further business or investment activity and the operations of the Company have been fully wound down;

(d) the Company has no assets and no liabilities;

(e) in the circumstances, there is no reason for the Company to continue as a going concern and the Directors are of the view that the Company should therefore be wound up voluntarily;

(f) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands have indicated that they consent to act as joint voluntary liquidators of the Company (the "**JVLs**") if so appointed;

(g) the Directors have received and reviewed a liquidation proposal from the JVLs, together with its terms and conditions (the "**Liquidation Proposal**");

(h) the Directors have conducted a full enquiry into the Company's affairs and to the best of the Directors' knowledge and belief the Company will be able to pay its debts in full together with interest at the prescribed rate within twelve-month period from the commencement of the voluntary winding up; and

(i) the Directors have received a form of the declaration of solvency for execution pursuant to section 124 of the Companies Act (as amended) (the "**Declaration of Solvency**").

1.2 **IT IS RESOLVED** that:

(a) the Liquidation Proposal be approved;

(b) the Directors recommend to Mark Patrick, being the only Shareholder having the right to receive notice of, attend, speak at and vote at general meetings of the Company, that:

(i) the Company be wound up voluntarily; and

(ii) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company; and

(c) if the Company is wound up voluntarily, each Director execute the Declaration of Solvency.

2. **GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively), and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3. **RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

Mark Patrick
**Director**

Paul Murphy
**Director**

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE VOTING SHAREHOLDER OF THE COMPANY DATED 2 APRIL 2025**

---

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025) (the "**Articles**"), unless the context otherwise requires.

The undersigned, being the only Shareholder of the Company having the right to receive notice of, attend, speak at and vote at general meetings and having considered the written resolutions of the Directors dated 2 April 2025 which state that the Directors recommend that the Company be wound up voluntarily and that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands be appointed as the joint voluntary liquidators of the Company (the "**JVLs**"), hereby consents to the following actions and adopts the resolutions set out below.

**1. VOLUNTARY LIQUIDATION**

1.1 **IT IS RESOLVED BY SPECIAL RESOLUTION** that:

(a) the Company be wound up voluntarily; and

(b) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company.

1.2 **IT IS RESOLVED BY ORDINARY RESOLUTION** that:

(a) the JVLs be authorised, in accordance with Article 123 of the Articles, to divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for that purpose, set such value as they deem fair upon any property to be divided as aforesaid and may determine how such division will be carried out as between the Participating Shareholders or different Classes; and

(b) the JVLs shall have the power to retain the Company's administrator, manager or such other person as determined by the JVLs to assist them in discharging any registration and notification obligations and any obligation to complete the Company's final filings and retain records pursuant to the US Foreign Account Tax Compliance Act and/or Common Reporting Standard and/or Economic Substance Reporting.

[signature]

Mark Patrick

**THE COMPANIES ACT (AS AMENDED)**

**DECLARATION OF SOLVENCY**

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

We, Mark Patrick and Paul Murphy, being the Directors of the Company do solemnly and sincerely declare that we have made a full inquiry into the affairs of the Company and that, having done so, we believe that the Company will be able to pay its debts in full, together with interest at the prescribed rate within a period of twelve (12) months from the commencement of the winding up.

[signature]

**Mark Patrick**

6716 Glenhurst Drive, Dallas, Texas, TX 75254, United States

Date of signature: 4/2/2025

Date of appointment as Director: 25 March 2021

[signature]

**Paul Murphy**

Windsor Village, Unit 24, South Sound, Grand Cayman, Cayman Islands

Date of signature: 2nd April 2025

Date of appointment as Director: 22 April 2021

**Contacts for enquiries:**
Bryce Doran or Zhouming Kang
Telephones: (345) 949 7576 or +852 2583 1167
Emails: BDoran@RHRestructuring.com
or zhouming.kang@acclime.com

**GATN FINANCE LIMITED**
**Notice of Voluntary Winding Up (O.13, r.2)**
**(In Voluntary Liquidation)**
**The Companies Act (As Amended)**

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman, KY1-1102 Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

**AMP FUNDING LIMITED**
**(In Voluntary Liquidation)**
**The Companies Act (As Amended)**
**Notice of Voluntary Winding Up (O.13, r.2)**

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman KY1-1102, Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

**CHARITABLE DAF HOLDCO, LTD.**
**(In Voluntary Liquidation)**
**("The Company")**
**The Companies Act (As Amended)**
**Notice Of Voluntary Winding Up**
**Registration No: 263805**

TAKE NOTICE that the Company was put into liquidation on 2 April 2025 by a special resolution passed by written resolution of the sole voting shareholder of the Company, executed on 2 April 2025.

AND FURTHER TAKE NOTICE that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, have been appointed as joint voluntary liquidators of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice and to establish any title they may have under the Companies Act (as amended) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of

any distribution made before such debts and/or claims are proved or from objecting to the distribution.

**Dated this 14th day of April 2025**

MITCHELL MANSFIELD AND WILLIAM CLARKE
Joint Voluntary Liquidators

**Contact for enquiries:**
William Clarke
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman KY1-1204
Cayman Islands
E: will.clarke@kroll.com
T: +1 345 623 9905

**Address for service:**
Kroll (Cayman) Ltd
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman, KY1-1204
Cayman Islands

**AARO DIRECTIONAL CRYPTO MULTIFUND LIMITED**
**(In Voluntary Liquidation)**
**(the Company)**
**Notice Of Voluntary Winding Up**
**Registration No: 390083**

TAKE NOTICE that the Company was placed into voluntary liquidation on 28 March 2025 by a special resolution passed by written resolution of the voting shareholder of the Company.

AND FURTHER TAKE NOTICE that R&H Restructuring VL Services Ltd. of Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands has been appointed voluntary liquidator of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice to establish any title they may have under the Companies Act (as revised) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of any distribution made before such debts and/or claims are proved or from objecting to the distribution.

**Dated: 03 April 2025**

OWEN WALKER
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator
MARTIN TROTT
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator

**Contact for Enquiries:**
Robert Knight
Telephone: +1 (345) 949 7576
Email: RKnight@RHRestructuring.com

**XP PHALANX CT FUND**
**(In Voluntary Liquidation)**
**(the "Company")**
**The Companies Act (as amended)**
**Notice of Voluntary Winding Up**
**Registration No: 391110**

TAKE NOTICE that the above-named Company was put into liquidation on 26 March 2025 by a Special Resolution passed by the sole voting shareholder by way of a written resolution in lieu of a meeting.

AND FURTHER TAKE NOTICE that FFP Limited of 2nd Floor Harbour Centre, 159 Mary Street, George Town, Grand Cayman, Cayman Islands has been appointed Voluntary Liquidator of the Company.

CREDITORS OF THE COMPANY are to prove their debts or claims within 21 days of the publication of this notice, and to establish any title they may have under the Companies Act (as amended) or are to be excluded from the benefit of any distribution made before the debts are proved or from objecting to the distribution.

**Dated this 3rd day of April 2025**

FFP LIMITED
Voluntary Liquidator

**Contact for enquiries:**
James Allen
FFP Limited
2nd Floor Harbour Centre
159 Mary Street
George Town, Grand Cayman
Cayman Islands

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)



www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

35631852.5.C8689.187150

CONFIDENTIAL

013040 1284
TDIT004550

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are:

   (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

   (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power



GENERAL REGISTRY CAYMAN ISLANDS

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

CONFIDENTIAL

013042 1286
TDIT004552

**TABLE OF CONTENTS**

**CLAUSE** **PAGE**

**TABLE A** .......... 1
**INTERPRETATION** .......... 1
**PRELIMINARY** .......... 5
**SHARES** .......... 6
**MANAGEMENT SHARES** .......... 6
**PARTICIPATING SHARES** .......... 7
**MODIFICATION OF RIGHTS** .......... 7
**CERTIFICATES** .......... 7
**FRACTIONAL SHARES** .......... 7
**TRANSFER OF SHARES** .......... 8
**TRANSMISSION OF SHARES** .......... 8
**ALTERATION OF SHARE CAPITAL** .......... 9
**REDEMPTION, PURCHASE AND SURRENDER OF SHARES** .......... 9
**TREASURY SHARES** .......... 10
**GENERAL MEETINGS** .......... 11
**NOTICE OF GENERAL MEETINGS** .......... 11
**PROCEEDINGS AT GENERAL MEETINGS** .......... 11
**VOTES OF SHAREHOLDERS** .......... 13
**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS** .......... 14
**DIRECTORS** .......... 14
**POWERS AND DUTIES OF DIRECTORS** .......... 15

GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**BORROWING POWERS OF DIRECTORS** ........ 17

**THE SEAL** ........ 17

**DISQUALIFICATION OF DIRECTORS** ........ 17

**PROCEEDINGS OF DIRECTORS** ........ 18

**DIVIDENDS** ........ 21

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION** ........ 21

**CAPITALISATION OF RESERVES** ........ 22

**SHARE PREMIUM ACCOUNT** ........ 23

**NOTICES** ........ 23

**NON-RECOGNITION OF TRUSTS** ........ 24

**WINDING UP** ........ 25

**AMENDMENT OF ARTICLES OF ASSOCIATION** ........ 25

**CLOSING OF REGISTER OR FIXING RECORD DATE** ........ 25

**REGISTRATION BYWAY OF CONTINUATION** ........ 26

**MERGERS AND CONSOLIDATION** ........ 26

**DISCLOSURE** ........ 26

**INDEMNITY** ........ 27

**DISPUTE RESOLUTION** ........ 28

**AEOI** ........ 30



Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as amended) of the Cayman Islands.

"**AEOI**" means:

(i) sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii) the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

(iii) any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv) any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;



Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h) any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act; and

(i) sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2. Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

**SHARES**

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   (b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

**PARTICIPATING SHARES**

12. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

**MODIFICATION OF RIGHTS**

13. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

**CERTIFICATES**

15. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

**FRACTIONAL SHARES**

16. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## TRANSFER OF SHARES

17. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

22. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

28. Subject to the Act, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

CONFIDENTIAL
013053 1297
TDIT004563

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

32. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

**NOTICE OF GENERAL MEETINGS**

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

**PROCEEDINGS AT GENERAL MEETINGS**

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS**

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

**DIRECTORS**

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

69. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70. The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

**POWERS AND DUTIES OF DIRECTORS**

71. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and



www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

80. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

**THE SEAL**

81. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

84. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

013061 1305

CONFIDENTIAL HCMLPHMIT004571

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

85. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

95. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

99. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

107. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.


www.verify.gov.ky File#: 263805
GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

112. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

(iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

113. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

## NOTICES

115. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

117. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

120. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

121. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

124. Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

125. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

0130691313

CONFIDENTIAL HCMLPHMIT004579

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

**REGISTRATION BYWAY OF CONTINUATION**

128. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

**MERGERS AND CONSOLIDATION**

129. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

**DISCLOSURE**

130. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**INDEMNITY**

131. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

135. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

**DISPUTE RESOLUTION**

136. Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c) Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

**AEOI**

137. Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138. In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

(iii) ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139. In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

(a) create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b) may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c) allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d) adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

## Annexure

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.



www.verify.gov.ky File#: 263805

GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

# Register of Members of
## Charitable DAF HoldCo, Ltd
**Registration No: 263805**

**Share Class: Management**

**Authorised Capital of USD 1.00 divided into 100.00 Management shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **WNL Limited**<br>190 Elgin Avenue<br>George Town<br>Grand Cayman KY1-9001<br>Cayman Islands | 7-Nov-2011 | | 1.00 | 0.01 | In Full | 7-Nov-2011 : Allotment of 1.00 Management share(s) | 7-Nov-2011 | 1.00 | | 0.00 | 7-Nov-2011 : Repurchase of 1.00 Management share(s) |
| 2 | **Grant James Scott**<br>Highland Capital Managment, L.P.<br>13455 Noel Road, Suite 800<br>Dallas, TX 75240<br>USA | 7-Nov-2011 | | 100.00 | 1.00 | In Full | 7-Nov-2011 : Allotment of 100.00 Management share(s) | 25-Mar-2021 | 100.00 | | 0.00 | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick |
| 3 | **Mark E. Patrick**<br>6716 Glenhurst Dr<br>Dallas, TX 75254<br>USA | 25-Mar-2021 | | 100.00 | 1.00 | In Full | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick | | 0.00 | | 100.00 | |

Notes

1 *Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.*

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Mark E. Patrick | 100.00 | Management |
| | | |
| **Total Management Shares outstanding: 100.00** | | |
| **Total Management Shares remaining unissued: 0.00** | | |

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Share Class: Participating**

**Authorised Capital of USD 49,999.00 divided into 4,999,900.00 Participating shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **The Highland Capital Management Partners CharitableTrust #2**<br>Highland Capital Management, L.P<br>13455 Noel Rd, Suite 800<br>TX 75240<br>Dallas Texas<br>USA | 7-Nov-2011 | | 300.00 | 3.00 | In Full | 7-Nov-2011 : Allotment of 300.00 Participating share(s) | 30-Nov-2011 | 300.00 | | 0.00 | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc<br>30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc<br>30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc |
| 2 | **Highland Kansas City Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc | | 0.00 | | 100.00 | |
| 3 | **Highland Dallas Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc | | 0.00 | | 100.00 | |
| 4 | **Highland Santa Barbara Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc | | 0.00 | | 100.00 | |

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Forth Worth TX 76102 USA | 13-Aug-2015 | | 5.00 | 0.05 | In Full | 13-Aug-2015 : Allotment of 5.00 Participating share(s) | | 0.00 | | 5.00 | |
| 6 | **DFW Charitable Foundation** The Corporation Trust Company 1209 Orange Street Wilmington, DE 19801 United States | 7-Feb-2025 | | 318.00 | 3.18 | In Full | 7-Feb-2025 : Allotment of 318.00 Participating share(s) | | 0.00 | | 318.00 | |

Notes

1 *Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.*

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Highland Kansas City Foundation, Inc | 100.00 | Participating |
| Highland Dallas Foundation, Inc | 100.00 | Participating |
| Highland Santa Barbara Foundation, Inc | 100.00 | Participating |
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT | 5.00 | Participating |
| DFW Charitable Foundation | 318.00 | Participating |
| **Total Participating Shares outstanding: 623.00** | | |
| **Total Participating Shares remaining unissued: 4,999,277.00** | | |

**Geoffrey Sykes**

**From:** Andrew Johnstone <aj@j-law.ky>
**Sent:** 24 April 2025 11:46 AM
**To:** Geoffrey Sykes; Barnaby Gowrie
**Cc:** Rhiannon Zanetic; Philip Aubry; Nicholas Geldard; Chris Beck
**Subject:** Re: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoff

Given your failure to respond yesterday, we are in the course of serving on Charitable DAF HoldCo Ltd at its registered office.

Best

AJ

**Andrew Johnstone**
Founder | Partner

**+1 (345) 929-3000**
**www.j-law.ky** | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 24 April 2025 11:35
**To:** Andrew Johnstone <aj@j-law.ky>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181]

Dear Mr Johnstone

Please could you confirm the nature of the proceeding to be served.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Andrew Johnstone <aj@j-law.ky>
**Sent:** 23 April 2025 13:42
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>
**Subject:** Charitable DAF HoldCo, Ltd

**[this message is from an external sender]**

---

Dear Colleagues

We act for the Participating Shareholders of Charitable DAF HoldCo, Ltd (the ***Company***).

Please can you confirm whether you are instructed to act for and accept service on behalf of the Company.

Best

AJ

**Andrew Johnstone**
Founder | Partner

**+1 (345) 929-3000**
**www.j-law.ky** | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

---

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

---

**Geoffrey Sykes**

| | |
|---|---|
| **From:** | Brandon R. Schaller <bschaller@shieldslegal.com> |
| **Sent:** | 24 April 2025 4:52 PM |
| **To:** | Barnaby Gowrie; Philip Aubry; Geoffrey Sykes; Chris Beck |
| **Cc:** | mpatrick@dafholdco.com; Paul Murphy; sraver@dafholdco.com; Bart Higgins |
| **Subject:** | FW: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232] |
| **Attachments:** | 2025 24 04 - Charitable DAF HoldCo Ltd.zip |
| **Importance:** | High |

**[this message is from an external sender]**

FYI

**Brandon R. Schaller**
ATTORNEY

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

**From:** Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 4:45 PM
**To:** Michelle Richie | Campbells <MRichie@campbellslegal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]
**Importance:** High

CAUTION: This email originated from outside of the organization.

All

Johnstone law, who are acting for the participating shareholders of Charitable DAF HoldCo Ltd, served the following documents this afternoon (via Campbells, as we remain Charitable DAF's registered office):

- A Petition seeking orders that Charitable DAF be wound up and that joint official liquidators be appointed.
- A Summons seeking an order appointing joint provisional liquidators over Charitable DAF.
- Supporting affirmations of Julie Diaz (of The Dallas Foundation) and James Dondero.
- Consent to acts as a liquidator from Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton.

The Summons seeking the appointment of joint provisional liquidators over Charitable DAF has been listed for hearing before Justice Asif at 2pm on **Monday, 28 April 2025**.

We will forward copies of the attached materials to Kroll, as the voluntary liquidators of Charitable DAF. Our understanding is that Kroll will be taking point on next steps as the voluntary liquidators, but we will review and are available to assist. We will also forward these materials onto Walkers, who have requested a copy.

Kind regards

**Matheo Vinciullo**
Associate

E mvinciullo@campbellslegal.com
T +1 345 949 2648 D +1 345 914 6931 C +1 345 327 6931

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010, Cayman Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is subject to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.

---

**From:** Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 1:00 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]

Brandon

We have not received anything as yet but will provide copies when we do. We have received a similar request from Walkers attached. Do we have authorisation to provide the same to them?

**Michelle Richie**
Partner

E mrichie@campbellslegal.com
T +1 345 949 2648 D +1 345 914 6933 C +1 345 525 6933

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010, Cayman Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Thursday, April 24, 2025 12:48 PM
**To:** Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Charitable DAF HoldCo, Ltd.

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

---

Campbells team,

We heard that Johnstone law is attempting service on Charitable DAF HoldCo, Ltd. as its registered office. Can you please advise if you have received anything, and if not, provide us a copy when you do?

Thanks,
Brandon

**Brandon R. Schaller**
ATTORNEY

16400 Dallas Parkway, Suite 300
Dallas, TX 75248

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**
This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

**Geoffrey Sykes**

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 27 April 2025 12:51 AM
**To:** Mansfield, Mitchell
**Cc:** Paul Murphy
**Subject:** Voluntary Liquidators

**[this message is from an external sender]**

Dear Voluntary Liquidators

I write to you in my capacity as the management shareholder and director of the company. My fellow director, Paul Murphy, is copied to this email and agrees with its contents.

Please note the following:

The management shareholder of the company and its directors intend in providing cooperation to the voluntary liquidators in accordance with Cayman law.
The management shareholder has no intention of taking any steps to remove the voluntary liquidators from office.
Assuming the voluntary liquidators consider it appropriate having consulted with relevant stakeholders of the company, the management shareholder and the directors have no objections to the voluntary liquidators making the necessary court application to have the voluntary liquidation brought under the supervision of the Cayman Court.
If you have any questions, please do not hesitate to contact me.

Kind regards.

Mark Patrick
Management Shareholder

1331
TDIT004597

# Before




Appendix Page 155



CONFIDENTIAL

# Current – DAF Holdco



1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 99 OF 2025 (JAJ)**

**IN THE MATTER OF:** **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF:** **CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)**

**BETWEEN**

**(1) THE HIGHLAND DALLAS FOUNDATION, INC.**
**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**
**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**
**(4) THE HCMLP CHARITABLE FUND**

**PLAINTIFFS**

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

**DEFENDANT**

---

**FIRST AFFIDAVIT OF GEOFFREY SYKES**

---

I, **GEOFFREY SYKES**, of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands being duly sworn **MAKE OATH and SAY** as follows:

**Preliminary**

1. I am an Attorney-at-Law and Associate in the Insolvency and Dispute Resolution Group at Walkers (Cayman) LLP ("**Walkers**"), and I act for Charitable DAF HoldCo, Ltd (in Voluntary Liquidation) (the "**Company**").

2. I make this Affidavit in response to the winding up petition by which Cause No. FSD 99 of 2025 was commenced, and the summons listed in that proceeding seeking, among other things, "*An order appointing joint provisional liquidators over Charitable DAF HoldCo*…".

3. There is now shown to me a bundle of documents marked Exhibit "**GS-1**" and references to page numbers herein are to pages of that Exhibit. For the avoidance of doubt, no privilege is waived by the inclusion of the information set out herein.

4. Save where the contrary is stated to be the case, the facts and matters to which I depose are within my own knowledge and are true. Where the facts and matters are not within my own knowledge, they derive from my instructions by the company, acting either through its directors or the Joint Voluntary Liquidators (defined below) as the case may be at the relevant time, or I identify the source of my knowledge and confirm that those facts and matters are true to the best of my knowledge and belief.

**Recent events and documents**

5. On 24 April 2025, Johnstone Law served on the Company at its registered office a bundle of documents including the winding up petition and the summons referred to above. A copy of the cover letter to this bundle of documents is at

**page 1** (noting that the remainder of the documents will already be before the Court).

6. On 25 April 2025, Walkers sent to Johnstone Law a letter enclosing the following documents:

(a) A consent to act as joint voluntary liquidators of the Company by Mitchell Mansfield and William Clarke of Kroll Cayman Ltd (the "**Joint Voluntary Liquidators**"), dated 29 March 2025;

(b) Written resolutions of the directors of the Company including to recommend to the management shareholder that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(c) Special resolutions of the management shareholder of the Company that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(d) A declaration of solvency by the directors of the Company, dated 2 April 2025;

(e) An extract from Gazette Issue No. 8/2025, which includes notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the Joint Voluntary Liquidators were appointed, dated 14 April 2025;

(f) The current Memorandum and Articles of the Company, dated 20 February 2025;

(g) The current Register of Members of the Company, dated 25 April 2025; and

(h) An email chain between Walkers and Johnstone law, dated 23-24 April 2025.

7. That letter and its enclosures are at **pages 2 – 53**.

8. On 24 April 2025, emails were exchanged between Campbells LLP as the registered office of the Company, and Shields Legal (acting for the directors of the Company), in respect of the bundle of documents served by Johnstone Law. A copy of that email chain is at **pages 54 – 56**.

9. On 27 April 2025, Mark Patrick (in his capacity as the management shareholder and a director of the Company) sent an email to the Joint Voluntary Liquidators in respect of the joint voluntary liquidation. A copy of that email is at **page 57**.

10. A copy of the structure chart of the Company prior to 27 March 2025 is at **page 58**. A copy of the current structure chart Company as of 27 March 2025 is at **page 59**.

| | |
|---|---|
| **SWORN** at George Town, | ) |
| Grand Cayman | ) [signature] |
| | **GEOFFREY SYKES** |
| on the 27th day of April 2025 | ) |
| before me | ) |
| [signature] | ) |
| **NOTARY PUBLIC** | |

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 20** 26
**Date:** 27th April 2025

This **AFFIDAVIT** is filed by Walkers (Cayman) LLP, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Applicant whose address for service is care of said Attorneys-at-Law.

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 99 OF 2025 (JAJ)**

**IN THE MATTER OF:** **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF:** **CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)**

**BETWEEN**

**(1) THE HIGHLAND DALLAS FOUNDATION, INC.**
**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**
**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**
**(4) THE HCMLP CHARITABLE FUND**

**PLAINTIFFS**

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

**DEFENDANT**

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 2026**
**Date:** 27 April 2025.

[signature]

**NOTARY PUBLIC**

EXHIBIT
4-A

November 11, 2024

**From**: Highland Dallas Foundation, Inc.
Highland Kansas City Foundation, Inc.
Highland Santa Barbara Foundation, Inc.

**To**: Mr. Paul Murphy
Director of Charitable DAF HoldCo, Ltd.
and Charitable DAF Holdings Corp.
paul@gkmanagement.com.ky

Dear Mr. Murphy:

We write to you collectively on behalf of the following organizations:

1. Highland Dallas Foundation, Inc., a participation shareholder in Charitable DAF HoldCo, Ltd., of which you are a director along with Mark Patrick. As you know, Mr. Patrick also is the managing member of the Charitable DAF GP, LLC, which governs the related Charitable DAF Fund, LP.

2. Highland Kansas City Foundation, Inc., also a participation shareholder in Charitable DAF HoldCo, Ltd.

3. Highland Santa Barbara Foundation, Inc., also a participation shareholder in Charitable DAF Holdco, Ltd.

Highland Dallas Foundation, Inc is a supporting organization of The Dallas Foundation. Highland Kansas City Foundation, Inc. is a supporting organization of Greater Kansas City Community Foundation. Highland Santa Barbara Foundation, Inc. is a supporting organization of Santa Barbara Foundation. The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (collectively the "Foundations") have worked closely with their respective supporting organizations named above to award grants and funding to a wide range of charitable causes that have made tangible, lasting impacts on the communities they serve. Our primary commitment has been, and always will be, our concern for the community, respect for donors, thoughtful giving, and careful investing—core values that have guided each of us throughout our existence.

With these core values and with the well-being of these Foundations in mind, we write you to voice that we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "DAF-related entities"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable. Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner

Docusign Envelope ID: 11CD8132-6630-49A0-A1FE-D8548E9451F8



workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities.

Thank you for your attention to this matter. Our counsel with the law firm of Holland & Knight LLP is copied on this letter should you have any questions.

Sincerely yours,

HIGHLAND DALLAS FOUNDATION, INC.

Signed by:
By: ______________________
8C324EA989434F3...
Julie Diaz
Vice President

HIGHLAND KANSAS CITY FOUNDATION, INC.

DocuSigned by:
By: Deborah L Wilkerson ______________________
71ED433BB136439...
Debbie Wilkerson
Vice President

HIGHLAND SANTA BARBARA FOUNDATION, INC.

DocuSigned by:
By: Jackie Carrera ______________________
66D757ACD1A1461...
Jacqueline M. Carrera
Secretary and Treasurer

cc: David M. Rosenberg
(via email at david.rosenberg@hklaw.com)

Michael Stockham
(via email at michael.stockham@hklaw.com)

EXHIBIT
4-B

**Rhiannon Zanetic**

**Subject:** [EXTERNAL]-RE: DAFHoldCo information request

**From:** Michael.Stockham@hklaw.com
**Date:** February 7, 2025 at 12:43:56 PM CST
**To:** Paul Murphy <paul@gkmanagement.com.ky>, Julie Diaz <jdiaz@dallasfoundation.org>, mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>, Jackie Carrera <jcarrera@sbfoundation.org>, David.Rosenberg@hklaw.com, DMancino@seyfarth.com
**Subject: [EXTERNAL]-RE: DAFHoldCo information request**

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Paul-

I appreciate your email, and your willingness to find a framework to resolve the concerns, but am flummoxed by your, "struggle" to understand our growing frustration.

I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees. If I'm wrong, please educate me.

Your failure to be forthcoming about the underlying assets, the investment philosophy of the fund, and the "revised" governance, have caused me to start digging. I am not only a lawyer but also a Certified Fraud Examiner and a Certified Compliance & Ethics

Professional, and what I have found is nothing short of alarming.

- As I mentioned, director fees for 2024 appeared to be on track to exceed $5 million, which was an over 12,000 percent increase—up from zero. It is hard to fathom what you and Mr. Patrick have changed or contributed to the funds to warrant such a drastic change in director fees. I could be wrong, but if so, then tell me why. What is the dramatic value add?

- As I understand it, the annualized expenses of the funds were on pace to outstrip the actual return on the investments. So I am at a loss as to how you can justify running the fund at a loss while apparently paying the directors handsomely and freezing Supporting Organizations (the shareholders) out of basic information.

On November 6, 2024, we had an introductory video call with Doug Mancino, who announced himself as Compliance Counsel. But no details of the assets or financial condition of the funds were communicated.

On November 20, 2024, we had another video call with folks from your side, including ValueScope, and it was informative; however, the thrust of the presentation was why you refused proposed investments from NexPoint. It had nothing to do with the underlying assets and financial conditions of the fund. This was perplexing as ValueScope has been the valuation firm for the fund for years; yet they were silent about the condition of the fund.

On December 11, 2024, we had a video call with you, Doug Mancino, and your Cayman counsel. The thrust of that discussion was your vision of running the fund more as an institutional investment vehicle and a promise to provide financial information in the future. But the presentation again lacked any information on the underlying assets and financial conditions of the fund. It did, however, include a discussion that the Supporting Orgs had no right to information under the structure of the funds.

Shortly after the December 11 call, we received your first demand to withdraw our concerns about the governance of the funds, and it also advanced that if the Supporting Organizations wanted more

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

---

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*

Dear Mike,

We remain open to finding a framework within which we can resolve your clients' concerns.

I don't want to repeat points already made in my email dated 30th January 2025, but our understanding was that we were to prepare a presentation for the Foundations to address these concerns. This was a course of action suggested by you in our call last year and one which we thought was very sensible.

We are struggling to understand what happened between 21st January (when David Rosenburg, from your firm, confirmed a video conference would be acceptable) and 23rd January when an email was sent to Mark's old email address repeating various allegations that we were going to address in the presentation.

We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so.
Many thanks,
Paul.

---

**From:** Michael.Stockham@hklaw.com <Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; David.Rosenberg@hklaw.com; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you are represented by counsel, I believe it appropriate to loop him in for this communication. I also told you that I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 — before Mr. Patrick shut down that line of communication and information — showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. Yet, no information has been provided by you

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

---

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Julie,

I am an independent director of Charitable DAF HoldCo, Ltd. (which I believe is the entity you refer to as "DAF HoldCo" in your email dated 28 January 2025 (the "**28 January Email**")).

As an initial matter, I hope you will find the tone of this initial response to the 28 January Email conciliatory as I am keen to avoid any misunderstandings in circumstances where I had understood the next steps following the meetings between our respective legal

representatives (Douglas Mancino and David Rosenberg) in December last year was for us to present directly to the foundations/supporting organizations in order to address some of the concerns in the letter dated 11 November 2024 (the "**11 November Letter**"). This proposed presentation would supplement the two Zoom conference calls with your attorneys held by me and our independent valuation experts, ValueScope, in December last year as well as the ValueScope 9/30/24 report sent to you on 7 January that provided a balance sheet and information on all investment holdings.

As recently as 21 January 2025, David again confirmed that a Zoom conference call with yourselves would be an effective way to address your concerns and move forward in a cooperative manner.

Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter. Please note that neither Mark nor myself received your email dated 23 January 2025 given that it was sent to an out-of-use email address for Mark (which I understand he communicated to you and your assistant in person) and did not copy me. Therefore, the basis of the concerns and request to wind-up expressed in the 28 January Email, appears to be the single failure to respond to an email that was sent to a defunct email address. Having now been reminded that the email address is not functional, I hope you can take some comfort that you were not being ignored.
However, given the content and tone of the 28 January Email and David's request to progress the direct presentation to the foundations/supporting organizations only 7 days prior on 21 January 2025, there seems to be a disconnect between the conciliatory approach adopted in the latter and the more aggressive position set out in the former.

For our part, at this stage we are more than happy to continue to engage with the foundations/supporting organizations in an

effort to provide clarity on investments and the DAF HoldCo governance structure.

I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.

Please let us know if you are prepared to withdraw the allegations made in the 11 November Letter and the 23 and 28 January Emails and are content to proceed with our proposed delivery of the presentation which we are confident will provide a complete answer to your concerns.

Finally, as a matter of record, it is important that I outline the following:

The 11 November 2024 Letter was not directly sent to me. I received it from Charitable DAF HoldCo's US attorneys who had, in turn, received it from a US law firm acting for Mr. Dondero. As set out above, this supports our belief, which is also based on other actions we have seen to date, that Mr. Dondero is seeking to improperly

exerting influence over the foundations and supporting organizations for self-serving purposes to the detriment of DAF HoldCo, the foundations and supporting organizations.

We note that your communications to date contain several misstatements of fact and we reject all of your allegations. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.

We look forward to hearing from you in relation to the proposed presentation and withdrawal of the allegations.

Kind regards,

Paul.

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman KY1-1007
Cayman Islands
**Phone:** +1 345 946 3459
**Mobile:** +1 345 324 1121
**Fax:** +1 345 946 3493
**E-mail:** paul@gkmanagement.com.ky

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Tuesday, January 28, 2025 9:14 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Michael.Stockham@hklaw.com; Rosenberg, David M (DFW - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

Mark and Paul-

We have great concern that our reasonable requests below have not been acknowledged. This failure to provide the courtesy of a response continues a pattern of a lack of communication and transparency as to assets and financials of DAF HoldCo under your stewardship. These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

**From:** Julie Diaz
**Sent:** Thursday, January 23, 2025 9:45 AM
**To:** MPatrick@CharitableDAF.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>
**Subject:** DAFHoldCo information request

Hi Mark –

Since we spoke last fall, the three CEOs from Santa Barbara, Kansas City, and Dallas community foundations (copied here) were discussing our plans for 2025 and wanted to reach out to you to check in on the DAFHoldCo. We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place.

Specifically, could you send:

- **Income Statements for the last for years**: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses
- **Listing of Underlying Assets**: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.
- **Audited Financial Statements**: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.
- **Current Structure of DAFHoldCo Operations:** An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

As you can appreciate, our job as leaders of our respective community foundations is to ensure proper stewardship of the charitable assets that are owned by our organizations. We are grateful for the decade plus of charitable investments that we have been able to make from the proceeds of the DAFHoldCo and would like to have confidence that this vehicle will continue to grow and make

additional meaningful contributions to our respective communities.

Please let us know your ability to get this information to us by Feb. 10, 2025.

Thank you and happy New Year.

---

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything

in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

---

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

<~WRD0000.jpg> <~WRD0000.jpg> <~WRD0000.jpg>

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Skyview Group. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Skyview Group.

EXHIBIT
4-C

February 27, 2025

*Via Email: dmancino@seyfarth.com*

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

Sincerely yours,

Michael W. Stockham

cc: David Rosenberg

**Rhiannon Zanetic**

**From:** David.Rosenberg@hklaw.com
**Sent:** 18 March 2025 09:27
**To:** Mancino, Douglas; Michael.Stockham@hklaw.com
**Cc:** Paul Murphy
**Subject:** RE: Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.

Doug, we are available on:

- Wednesday March 26, after 4:00 p.m. U.S. Central Daylight Time.
- Monday, March 31, until 12:00 p.m. U.S. Central Daylight Time.
- Thursday, April 3 until 12:00 p.m. U.S. Central Daylight Time.

**David Rosenberg | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** Mancino, Douglas
**Sent:** Monday, March 17, 2025 1:00 PM
**To:** Rosenberg, David M (DAL - X61508) ; Stockham, Michael W (DAL - X62515)
**Cc:** Paul Murphy
**Subject:** Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.

Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 03 April 2025 09:51 |
| **To:** | Mancino, Douglas |
| **Cc:** | Michael.Stockham@hklaw.com; Paul Murphy |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, no such call is on our calendar, so I am not sure of the source of the confusion. We will circle back with our clients and provide some windows starting on April 16.

I wish your wife the best of health with her back. Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | https://urldefense.proofpoint.com/v2/url?u=http-3A__www.hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dUaYK7RyBQ-__Uvhuz_UbZY9LLgA8fqgfSQfMU9IREk&e=

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <https://urldefense.proofpoint.com/v2/url?u=http-3A__David.Rosenberg-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dK186X1LRwbLe82XNr4DiwVprLY83NgIEL5KUk2L9wM&e=>
Cc: Stockham, Michael W (DAL - X62515) <https://urldefense.proofpoint.com/v2/url?u=http-3A__Michael.Stockham-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=H8AOyc2PQyRIKod6ljjomBwRDxne7__BsTh9i-RGFDY&e=>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

---------------------------------------------
CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.
---------------------------------------------

**Rosenberg, David M (DAL - X61508)**

| | |
|---|---|
| **From:** | Rosenberg, David M (DAL - X61508) |
| **Sent:** | Wednesday, April 9, 2025 11:40 AM |
| **To:** | Mancino, Douglas |
| **Cc:** | Stockham, Michael W (DAL - X62515) |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, here is our availability beginning April 16 and for the next week:

April 16 - available after 2:30 p.m.

April 17 - available between 10:00 a.m. and noon and after 1:30 p.m.

April 21 - generally available after 1:30 p.m.

April 22 - available after 2:00 p.m.

April 23 - generally available except between 11:00 a.m. and 12:30 p.m.

All times are CDT. Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
Cc: Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

EXHIBIT 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Reorganized Debtor. | **Case No. 19-34054-sgj-11**<br>Chapter 11<br><br>Dallas, Texas<br>June 25, 2025<br>9:30 a.m. Docket<br><br>- MOTION TO EXTEND DURATION OF TRUSTS (4213)<br>- MOTION TO APPROVE SETTLEMENT (4216) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For the Highland Capital Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>(212) 561-7732 |
| For the Highland Capital Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>(310) 277-6910 |
| For Marc S. Kirschner, Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>295 5th Avenue<br>New York, NY 10016<br>(212) 849-7000 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Hunter Mountain Entities: | Louis M. Phillips<br>Amelia L. Hurt<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For the Dugaboy Investment Trust: | Deborah Rose Deitsch-Perez<br>STINSON, LLP<br>2200 Ross Avenue, Suite 2900<br>Dallas, TX 75201<br>(214) 560-2201 |
| For the Dugaboy Investment Trust: | Michael Justin Lang<br>CRAWFORD WISHNEW & LANG, PLLC<br>1700 Pacific Avenue, Suite 2390<br>Dallas, TX 75201<br>(214) 817-4500 |
| For Crown Global Life Insurance, Ltd. and The Dallas Foundation: | David L. Curry, Jr.<br>OKIN ADAMS, LLP<br>1113 Vine Street, Suite 240<br>Houston, TX 77002<br>(713) 228-4100 |
| For Patrick Daugherty: | Andrew K. York<br>Drake Rayshell<br>Joshua Smeltzer<br>GRAY REED & MCGRAW, LLP<br>1601 Elm Street, Suite 4600<br>Dallas, TX 75201<br>(214) 954-4135 |
| For the U.S. Trustee: | Erin Marie Schmidt<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242-1496<br>(214) 767-1075 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

THE WITNESS: My bad.

THE COURT: -- call my attention to it when you find it.

THE WITNESS: All right.

(The witness steps down.)

THE COURT: All right. Your next witness?

MR. YORK: I believe we're calling Mark Patrick.

THE COURT: All right, Mr. Patrick. All right. Please raise your right hand.

MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT: All right. Please be seated.

And, Courtney, you're going to start the clock going. I show 2:12. I don't know if my clock's right.

You may proceed.

MR. LANG: And, Your Honor, may I hand the witness -- this is from Mr. Morris' opening. May I use this as Exhibit 3?

THE COURT: Oh, okay. You're talking about the back page of his PowerPoint?

MR. LANG: Yes. Org chart.

THE COURT: Yes. I've got it in front of me. And for the record, I'm going to put this PowerPoint, even though it's not an exhibit *per se*, as a demonstrative aid in the file for this matter. And so it's the last item of the Highland PowerPoint. All right.

MR. LANG: Yes.

DIRECT EXAMINATION

BY MR. LANG:

Q Mr. Patrick, does this Hunter Mountain Investment Trust org chart that I just handed you accurately reflect the structure of the Hunter Mountain Investment Trust ownership today?

A Just give me a few moments to review.

Q Sure.

MR. LEWIS: Your Honor, I had mentioned early on that we object to this whole line of questioning because it's outside the scope of the objection of Dugaboy. And I don't want to interrupt, but I want to make sure that my objection is continuing, because this has nothing to do with the objection presented by Dugaboy.

THE COURT: All right.

MR. PHILLIPS: So we object to the question.

THE COURT: Okay. So the record will reflect basically a running objection from Hunter Mountain?

MR. PHILLIPS: We would appreciate that, Your Honor.

THE COURT: Okay. In light of the failure of Dugaboy to disclose Mark Patrick as a witness, as well as the failure to challenge in a written objection his authority. Okay. So I recognized that this was quite a persuasive objection, but given the magnitude, I would say, of what is going on here,

potentially a settlement that could come very close to ending this long-running plan implementation process, I'm erring, if it's an error, I'm erring on the side of allowing this. All right. But you have a running objection that the record will reflect if one day there is an appeal.

MR. MORRIS: And, Your Honor, the Highland Claimant Trust and the Highland Litigation Subtrust and Highland Capital Management, LP join Mr. Phillips' objection.

THE COURT: Okay. Understood.

MR. PHILLIPS: Thank you very much, Your Honor.

THE COURT: All right.

BY MR. LANG:

Q Mr. Patrick, have you had time to study this Hunter Mountain Investment Trust org chart?

A Yes, I have.

Q And does this accurately show the ownership structure for Hunter Mountain Investment Trust today?

A I'm not sure, without reviewing the underlying corporate documents on some of these entities that you have listed here.

Q Did you help prepare this chart?

A No.

Q No? Okay. So Hunter Mountain Investment Trust is owned by Beacon Mountain, LLC, correct?

A Yes.

Q And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

correct?
A Correct.
Q And CLO Holdco, LLC is owned by CLO Holdco, Limited?
A That's correct.
Q And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?
A Correct.
Q And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?
A The ultimate beneficial owner is DFW Charitable Foundation. To my -- to the best of my recollection, I would say that appears accurate. I'm just not a hundred percent.
Q Okay. And --
A But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner. And I'm a hundred percent that Dugaboy Investment Trust has no interest in it. And I'm also a hundred percent that The Dallas Foundation or any --
MR. LANG: Judge, I haven't asked --
THE WITNESS: -- or any other nonprofit has any --
MR. LANG: -- any of these questions.
THE COURT: Okay. There's an objection, nonresponsive. I sustain.
BY MR. LANG:
Q Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?
A (Pause.) I'm just waiting for a relevancy. I don't

understand how that's relevant to my authority --

THE COURT: Okay. You're not allowed to make a relevancy objection. Okay.

MR. PHILLIPS: Your Honor, I think the problem is that, if I could, we have made an objection. And our objection, our running objection is founded on relevancy and founded on improper process. So I would like to just tell the Court, and so my client representative can hear it, that the fact that I'm not standing up every time there's a problematic question, --

THE COURT: Okay.

MR. PHILLIPS: -- because every question is problematic, my objection is being maintained to every question that's being asked.

THE COURT: Okay. You understand that, right?

THE WITNESS: I --

THE COURT: There's a running relevancy objection. You're the witness. You can't make the objection. But it's on the record for whatever use it might have down the road.

MR. PHILLIPS: I have objected to every question that's coming in connection with this line of questioning on the basis of relevance.

THE COURT: I got it. I think we all have it.

MR. PHILLIPS: I'm just --

MR. LANG: Understood.

THE COURT: Yes. And you're thinking he's eating into your 30 minutes?

MR. LANG: Yes.

THE COURT: Okay. We've got it.

THE CLERK: I stopped the time.

MR. LANG: So -- thank you.

THE COURT: Did you stop the time for a minute?

THE CLERK: Yes, I did.

MR. LANG: Thank you.

THE COURT: Okay.

BY MR. LANG:

Q So, to my question, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct? Charitable DAF Holdco, Limited?

A And where is that on the chart?

Q I'm asking, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, Limited.

A Can you show me a corporate document so I know the precise corporation you're referring to?

Q You're the -- you are the manager of -- or the control person of CDHGP Limited, correct?

A Again, I'd have to refresh my recollection, but I am the control person over CDMC.

Q Okay. And CDMC --

A As well as Charitable DAF Fund. I'll represent that to

you.

Q Okay. Was there a transaction in December of 2024 where Charitable DAF Holdco, Limited sold its interest or transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A I know you're trying to help other litigation and --

MR. PHILLIPS: Mark.

THE COURT: Okay. Nonresponsive.

THE WITNESS: Your Honor, he's using your time to fish for other litigation to support that --

THE COURT: Okay. Okay. We have a running objection to relevance. I'm going to say that one more time. Okay. Just answer the question as best you can.

THE WITNESS: I'd have to review the corporate documents to refresh my recollection for that time period.

BY MR. LANG:

Q Up until December of 2024, Charitable DAF Fund, LP was owned 100 percent by Charitable DAF Holdco, Limited, wasn't it?

A I don't know what entity you're referring to without a refreshment of corporate documents of that entity. There could be a lot of entities called that.

Q You're aware that there is a proceeding in the Caymans investigating the December 2024 transaction that sold -- where Charitable DAF Holdco, Limited sold its interest in -- and or

transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A There are several parts to that question. So the answer is no.

Q Are you aware of a proceeding pending in the Caymans involving Charitable DAF Holdco, Limited?

A Again, I don't know what entity you're referring to. Show me a -- show me a corporate document.

MR. LANG: Your Honor, this was on the Foundation's exhibit list. We cross-designated any document designated as an exhibit by any other party in this case. And I'd like to hand this to the witness.

MR. MORRIS: Which exhibit is it?

THE COURT: Which is -- yes.

MR. LANG: It was on the -- it was on the DAF -- or, the Foundation's exhibit list.

MR. MORRIS: They haven't been admitted into evidence and they've withdrawn their objection. We object, Your Honor.

THE COURT: Yes, they've not been admitted.

MR. LANG: Okay. Well, can I --

MR. PHILLIPS: We object to that, Your Honor. We object to any witness --

MR. LANG: We cross-designated every --

THE COURT: I already discussed at the beginning what we were admitting and that was not disclosed.

MR. LANG: Okay.

THE COURT: As I recall, I said you've only designated the plan and settlement agreement, and the answer was yes.

MR. LANG: Okay.

BY MR. LANG:

Q And we're aware that the Joint Official -- are you aware that there is a Joint Official Liquidator appointed over a Charitable DAF entity in the Cayman Islands?

MR. PHILLIPS: Objection to form.

THE WITNESS: Again, without more specific --

THE COURT: Overruled. Yes.

THE WITNESS: -- specificity, there could be a thousand different actions that you're referring to, in my mind.

BY MR. LANG:

Q Are you aware that the Joint Official Liquidators in the Caymans are investigating transactions involving Charitable DAF Fund, LP and Charitable DAF Holdco, Limited?

A Again, again, I don't specifically know what you're referring to.

MR. PHILLIPS: Your Honor, may I -- excuse me. I don't know that my running objection includes an objection to form for each of the questions. This objection is to form of the questions about, quote, --

THE COURT: What's wrong with the form?

MR. PHILLIPS: -- investigation.

THE COURT: What is wrong with the form of that question? I'm not clear.

MR. PHILLIPS: My objection to form is that the question is an open-ended question with an undefined term, investigation.

THE COURT: Overruled. I don't think that's a vague term. So you may answer.

THE WITNESS: If you show me some document, some complaint or something, I'll be very happy to verify whatever questions related to that. But just giving me verbal words of entities and names and actions, I don't know precisely what you are talking about.

BY MR. LANG:

Q Mr. Patrick, who set up the entities in the Hunter Mountain Investment Trust org chart that is sitting in front of you?

A I'm sorry. Repeat the question?

Q Who set up the various entities that are in the org chart that is on your -- on the stand?

MR. PHILLIPS: Objection to form. Set up. What does that mean?

THE WITNESS: It -- yeah, it's very --

THE COURT: I think we know what it means. Creating,

perhaps.

BY MR. LANG:

Q Created?

A Who? Are you asking if I created it?

Q Did you participate in creating them?

A Did I participate? In which ones?

Q CDMC FAD, LLC.

A What do you mean by participate?

Q Were you involved in creating -- did you initiate the creation of CDMC FAD, LLC?

A Lawyers were.

Q Did you engage in any capacity on behalf of any entity? Were you involved in engaging the lawyers to set up CDMC FAD, LLC?

A Yes, I engaged lawyers to set up entities.

MR. LANG: Objection. Nonresponsive.

THE COURT: Sustained.

MR. LANG: Did you --

THE COURT: He asked about this one particular entity, I think.

BY MR. LANG:

Q Did you --

A Which entity, again, did you ask?

Q CDMC FAD, LLC.

A Yes, I believe I hired a lawyer.

Q And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?

A Around the end of March of 2025. I believe.

Q And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?

A What do you mean by involved? How?

THE COURT: Okay. I can see what's happening here or I have an impression of what's happening here. I feel like you're slowing down this process where I've given 30 minutes to this lawyer. Okay? And I feel like you're feigning confusion. I don't mean to be insulting, but that's how it comes across. Okay? So I need you to speed up your answers and not be confused about things you shouldn't be confused about. Okay?

THE WITNESS: Okay.

THE COURT: I feel like it's late 1980s *Dondi*. Does anyone know what I mean by that? Okay. We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling. That's what they did in *Dondi*. Confusion. Delay. Okay?

So I don't mean to chastise you. I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this. Okay?

THE WITNESS: Understood.
THE COURT: Thank you.
BY MR. LANG:
Q Okay. So you were involved in the transaction in which CDMC FAD, LLC acquired 100 percent ownership interest in Charitable DAF Fund, LP in or around March of 2025, correct?
A Correct.
Q Who did CDMC FAD, LLC obtain its interests in Charitable DAF Fund, LP from in March of 2025?
A From an -- from an entity called Charitable DAF Holdco, Ltd.
Q Charitable DAF Holdco, Ltd., the entity that I asked about earlier, correct?
A Of the same name.
Q Yes. And Charitable DAF Holdco, Ltd. has had Joint Liquidated -- Liquidators, Joint Official Liquidators appointed over it in the Cayman Islands, correct?
A Yes.
Q And those Joint Official Liquidators were appointed over Charitable DAF Holdco, Limited in or around May 6th, 2025?
A In May is what I recall.
MR. LANG: Your Honor, we'll pass the witness.
THE COURT: All right. Do we have any questions?
MR. YORK: No questions, Your Honor.
THE COURT: Okay. Any cross?

MR. MORRIS: Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q Mr. Patrick, do you know who initiated the proceedings to get the appointment of the Joint Official Liquidators in the Cayman Islands?

A The director and myself, we initially filed for a voluntary joint liquidation in May.

Q And did there come a time when the Cayman court appointed the Joint Official Liquidators?

A Yes.

Q Do you know who asked the court to appoint the Joint Official Liquidators?

A We did, as well as other -- it was an agreement with the participation holders of that entity.

Q And who are the participation holders of that entity?

A It was the DFW Charitable Foundation as a 51 percent holder as well as the Highland Dallas Foundation, Highland Santa Barbara Foundation, and the Highland Kansas City Foundation.

Q And those three foundations that you just mentioned, do you know who controls them?

A Jim Dondero.

Q Is it your understanding that Mr. Dondero was funding the litigation in the Cayman Islands?

A Yes.
Q The Joint Official Liquidators, are you aware of any statement that they've ever made that you are not authorized to act on behalf of any of the HMIT entities?
A Yeah, they've never made a statement that I'm not authorized to act under any of those entities.
Q Okay. Did you receive a letter last night that was purportedly authored by the Joint Official Liquidators?
A Yes.
Q Did you review that letter?
A Yes.
Q Did that letter refer to today's hearing?
A Yes.
Q Are you aware of the Joint Official Liquidators making any appearance in this proceeding?
A No, I'm not aware they made any appearance in this proceeding.
Q Based on your recollection of the contents of that letter, did the Joint Official Liquidators challenge your authority to enter into the settlement agreement on behalf of the HMIT entities?
A No, they did not, because there's no ownership interest.
Q Okay. And what do you mean by that?
A The entity in liquidation owns nothing. And the DFW Charitable Foundation is the ultimate beneficial owner.

Q Are you aware that The Dallas Foundation filed an objection to the settlement agreement on behalf of Empower Dallas Foundation, the Okada Family Foundation, and Crown Global?
A Yes.
Q Are you aware that that objection was withdrawn?
A Yes.
Q Was the withdrawal of that objection the product of negotiations that your counsel had with lawyers for The Dallas Foundation and Crown Global?
A Yes, it was.
Q Did The Dallas Foundation or Crown Global require you to surrender your control position of the HMIT entities as a condition to the withdrawal of their objection?
A To give up my control? No.
Q They didn't ask you to do that, did they?
A No. No.
Q You are the control person for each of the HMIT entities that are party to the settlement agreement, correct?
A That is correct.
Q Are you aware of any requirement in any of the governance documents --
MR. CURRY: Your Honor, I'm not questioning, but I'm going to object to the line of questioning here about what was asked and what was not received into negotiations, because,

frankly, you're getting an imperfect picture there. And I don't think it should be misrepresented. The communications didn't happen with Mr. Patrick.

THE COURT: Okay. I don't know if that objection was a confidential settlement communications.

MR. CURRY: It's a combination of foundation and that he's going into confidential settlement discussions.

MR. MORRIS: Your Honor, it's a very simple question. I'll ask it again.

THE COURT: Okay. We'll let --

BY MR. MORRIS:

Q To the best of best of your knowledge, Mr. Patrick, did The Dallas Foundation or any of the entities on whose behalf it filed its objection require you to surrender your position as the control person of the HMIT entities in exchange for the withdrawal of their objection?

A No, they did not.

Q Thank you. Are you aware -- are you familiar with the governance documents for the HMIT entities?

A Yes, I am.

Q Are you aware of any restriction on your ability to act on behalf of those HMIT entities with respect to -- withdrawn. Are you required to obtain the consent of anyone in order to enter into the settlement agreement on behalf of the HMIT entities?

A No, I am not. I'm the sole authority and control person for that entity.

Q And do you believe that you're entering into the settlement agreement on behalf of the HMIT entities in good faith?

A Yes, I do.

Q Have you received legal counsel before entering into the agreement?

A Yes, I have.

Q Do you believe that you've negotiated the best terms that you could get on behalf of the HMIT entities?

A Yes, I do.

Q Do you believe that you received the information that you believed you required in order to make an informed decision before you entered into the settlement agreement on behalf of the HMIT entities?

A Yes, I did.

MR. MORRIS: I have no further questions, Your Honor.

THE COURT: All right. Mr. Phillips, anything from you?

MR. PHILLIPS: No questions.

THE COURT: Okay. Any redirect?

MR. LANG: Briefly.

THE COURT: Uh-huh.

MR. LANG: Your Honor, because they mentioned the

letter of last night from Grant Thornton, the Liquidators, I'm going to offer that into evidence as the letter that we talked about this morning. But Mr. Morris directly asked him if he reviewed it and asked him questions about it.

THE COURT: Response?

MR. MORRIS: No objection, Your Honor. Go right ahead.

THE COURT: I'll admit it.

MR. LANG: This is --

THE COURT: Do I have it in my notebook?

MR. LANG: -- Dugaboy --

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. LANG:

Q Mr. Patrick, I've handed you --

THE COURT: We're going to call this Dugaboy 3?

MR. LANG: Dugaboy 3.

THE COURT: Okay.

(Dugaboy Investment Trust's Exhibit 3 is admitted into evidence.)

BY MR. LANG:

Q Mr. Patrick, I've handed you a letter. It's from Grant Thornton dated June 24th, 2025. Do you see that?

A Yes.

Q And is this a true and correct copy of the letter that you

received or that you reviewed from the Joint Liquidators that you referred to in your answers to Mr. Morris' questions?
A Well, it's a PDF. I mean, I'm assuming it's from the Official Liquidators.
Q But this is the letter you were referring to in your testimony a few minutes ago?
A Yes.
Q And do you see on the second paragraph it says that, on May 6th, 2025, the Grand Court of Cayman Islands Financial Services Division appointed Margot MacInnis and Sandipan Bhowmik, each of Grant Thornton Special Services (Cayman) Limited, as the Joint Official Liquidators of the company. Do you see that?
A Yes.
Q And do you see on the second page, it says: Since our appointment, we have been diligently investigating these transactions, including a corporate transaction that occurred in or around December 2024 where the company transferred a hundred percent of its interest in the Fund to CDMC FAD, LLC, which resulted in the company being the sole member of CDM and subsequent redemptions of the company's interests in CDM.
Do you see that?
A Yes.
Q Is that your understanding of what is happening in the Caymans right now, is investigating these transactions?

A Correct.
MR. LANG: Pass the witness.
MR. MORRIS: May I just have that letter, please?
THE COURT: Any recross?
MR. MORRIS: Yeah, just real brief.

RECROSS-EXAMINATION

BY MR. MORRIS:
Q None of the transactions that you were just asked about has anything to do with any of the HMIT entities, correct?
A That's absolutely correct.
Q Okay. And now that we have the letter in the record, if you could look at the third paragraph. Do you see --
A Yeah.
Q Do you see it refers to the Highland Dallas Foundation, Highland Santa Barbara Foundation, and Highland Kansas City Foundation?
A Yes.
Q Are those the three entities that you referred to earlier that are, to the best of your understanding, controlled by Mr. Dondero?
A Yes.
Q Okay. And this is the letter that you said you reviewed and concluded that the Joint Official Liquidators weren't challenging your authority to enter into the agreement on behalf of the HMIT entities; do I have that right?

A Yes. Yes, you do.

MR. MORRIS: I have no further questions, Your Honor.

THE COURT: Okay. I have a question or two.

EXAMINATION BY THE COURT

THE COURT: And again, I apologize if I sounded harsh earlier. I recognize different people present different ways when they testify. It just appeared to me that maybe we were slowing things down unnecessarily. All right?

THE WITNESS: I apologize, too. I'm just a little emotionally upset they're using this proceeding for a benefit someplace else.

THE COURT: Okay. My question, very general question: Do you think this settlement is fair and equitable as far as HMIT is concerned?

THE WITNESS: Absolutely.

THE COURT: And could you tell me why?

THE WITNESS: Yeah. There was no obvious pathway for HMIT to, in my mind, to receive the residual interest of the bankruptcy estate without a settlement with the Debtor. Otherwise, it just seemed to me that it would go on forever. And then I balanced that against the existing litigation and the probability of the outcome weighted against the costs, and determined that it made sense from HMIT's perspective to enter into the settlement agreement.

THE COURT: Okay. And you understand that, as part

of this, you're giving up some litigation claims that have been waged now for a couple of years or more?

THE WITNESS: That is correct, but I'm also receiving the Kirschner Litigation, which I did negotiate to receive.

THE COURT: Okay. And there was a note that the estate -- I've heard it called at some point the $57 million note that HMIT owed Highland, a December 2015 note -- that basically gets credited against the capital account. You understand that?

THE WITNESS: Yes, I do.

THE COURT: Okay. And then you understand that if I approve this deal, I'm not sure why there's going to be $500,000 to HMIT and then also another $10 million to HMIT, but subsequent payments could get held up if there are litigation threats to the Highland Claimant Trust. You understand that, correct?

THE WITNESS: Yes, I do.

THE COURT: Okay. I just, I have to ask. I'm confused about what's going on here. I thought that -- well, let me just ask this: Would you consider yourself crossways with Mr. Dondero now?

THE WITNESS: No, but I'll answer the question. Upon advice of counsel, I quit Skyview Group. And upon advice of counsel, I terminated the back office services that Skyview Group was providing to the DAF.

THE COURT: Okay. Well, you said you're getting maybe a little emotional because of other litigation. I'm just trying -- I don't understand what all that other --

THE WITNESS: Unrelated -- well, unrelated to that. They're clearly trying to use this forum to benefit their Cayman actions. They hired U.S. counsel called Reed Smith, and they've been begging for an organization chart to issue a variety of frivolous lawsuits against the operating DAF entities. So I do apologize, but that's a little upsetting to me because I know we're going to -- that I've just fed them a list of targets in another unrelated matter.

THE COURT: Okay. Reed Smith. Here we go again with -- they've made an appearance for Mr. Seery in this litigation.

MR. MORRIS: Exactly. And we have raised that issue.

THE COURT: Okay.

MR. MORRIS: And I'm surprised to hear that they think they still have the ability to do this. But we will pursue that later.

THE COURT: Okay. All right. I had nothing further. Thank you, Mr. Patrick.

(The witness steps down.)

THE COURT: All right. So where are we now? I said that, again, just trying to balance the playing field, if Dugaboy was given the ability to question Mr. Patrick, then I

EXHIBIT
6

**CAUSE NO. ____________________**

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., et al.,**<br><br>*Plaintiffs*,<br><br>v.<br><br>**MARK PATRICK, et al.,**<br><br>*Defendants.* | **IN THE TEXAS BUSINESS COURT**<br><br>**1ST DIVISION**<br><br>**DALLAS, TEXAS** |

**DECLARATION OF JAMES DAVID DONDERO**

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, DECLARE under penalty of perjury:

1. I am the President of NexPoint Advisors, L.P. (***NexPoint***), an investment advisor registered with the U.S. Securities and Exchange Commission (***SEC***). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

3. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding $16 billion in value. I was formerly the President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or

my affiliates. In December 2015, I divested my majority stake of Highland (***2015 Transaction***).

**THE FUND**

4. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

5. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the ***Supporting Organizations***) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the ***Charities***).

6. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (***ARLPA***), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (***Articles***), govern the Fund and its partners.

7. The LP held 100% of the economic interest in the Fund. The Fund's general partner, Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011, held management shares.

8. The LP issued 100 management shares (the ***Management Shares***) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in

the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

9. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

10. The governing documents of the Fund plainly state in multiple places that all of the powers of the Control Position exist solely for the purpose of benefitting the Supporting Organizations and their Charities. This ubiquitous language was created for an express purpose. The expectation by the founders of the Fund (myself included) at the time it was formed was that the governing documents would ensure that the Control Position would be bound through his or her fiduciary obligations to safeguard and advance the interests of the charitable organizations that held actual beneficial ownership of the Fund.

**GRANT SCOTT**

11. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

12. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr. Scott as the Control Person. However, Mr. Scott had complete discretion in adopting or rejecting the

investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr. Scott was paid $60,000 per annum.

13. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

14. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax- deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr. Patrick served that role at Highland from 2008 until his departure in February 2021.

15. In March 2021, Mr. Patrick was hired by Skyview as Tax Counsel and continued to perform substantially similar tax counsel duties for me. At Mr. Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

16. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr. Patrick working with outside counsel. Mr. Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

17. In March 2021, Mr. Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the bankruptcy of Highland filed in 2019, and he did not believe he was equipped to handle those disputes. Mr. Patrick suggested to Mr. Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr. Patrick was my attorney and Mr. Scott was my trusted friend, and I was happy for Mr. Scott to pass the Control Position to Mr. Patrick.

18. On 25 March 2021, Mr. Scott: (i) resigned as director of the LP, (ii) appointed Mr. Patrick as director of the LP, and (iii) transferred to Mr. Patrick the Management Shares for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

19. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr. Murphy, Mr. Patrick's vote counts as the tiebreaker for corporate voting.

**MR. PATRICK'S CONTROL OF THE FUND**

20. In the initial period following Mr. Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr. Patrick was free (as Mr. Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

21. Subsequently, however, communications between Mr. Patrick, Skyview, and me began to become less frequent, and over time I came to suspect that Mr. Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the

Fund, but rather for his own personal enrichment.

22. On 28 June 2023, Mr. Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms. Short learned that the directors of the entity were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick had made the grant request without disclosing his and/or his family's involvement.

23. Ms. Short discussed the matter with Mr. Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms. Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms. Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely. I was informed of this process by Ms. Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

24. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr. Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

25. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr. Cronin was known to me personally. In September 2023, Mr. Cronin and I met, and he informed me that he had been approached by Mr. Patrick with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick as a supplement to Mr. Patrick's compensation. Mr. Cronin informed me that he had asked Mr. Patrick if this arrangement would amount to fraud, and that Mr. Patrick's response had been: "*you can't steal from yourself*."

26. Mr. Cronin informed me that he understood from this statement that Mr. Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr. Cronin further informed me that he was uncomfortable about Mr. Patrick's proposal and that he subsequently communicated this to Mr. Patrick, whereupon Mr. Patrick cut off all further communications between them.

27. Mr. Cronin's allegations that Mr. Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my attorneys in the United States that, had Mr. Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr. Cronin contacted me, I met with Mr. Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations about the matter and Mr. Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr. Patrick's powers or remove him from his position.

28. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr. Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the ***Expense Summary***) which indicated substantial increases in expenditures during Mr. Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a) Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023 – and increased even further to around $2.25 million in the first half of 2024 alone.

(b) Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

29. The Expense Summary reinforced my concern that Mr. Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

30. In August 2024, I became aware of yet another issue concerning Mr. Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the

Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr. Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

31. I was informed that my director of charitable giving had been contacted by Ms. Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms. Diaz stated that on August 28, 2024, Mr. Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr. Patrick through his employment at Skyview and constituted MNPI, which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr. Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr. Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr. Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

32. Upon receipt of the allegations against Mr. Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr. Patrick's knowledge, so as to avoid potentially tipping off Mr. Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr. Patrick's actions constituted a serious breach of his compliance and employee obligations. On October 1, 2024, as part of the finalization of the investigation report, Skyview's chief compliance officer interviewed Ms. Diaz about the allegations against Mr. Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on October 11,

2024 and concluded that Mr. Patrick had attempted a serious breach of U.S. securities laws.

33. On October 2, 2024, Mr. Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr. Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr. Patrick became aware of the investigation into his behavior and resigned before the report was published.

34. On the same day that Mr. Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr. Patrick as my counsel, I believe that Mr. Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

**FUNDING OF PROCEEDINGS**

35. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations for the purpose of understanding how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. I am only one of three votes, and the other two votes on each board are held by the respective Charity. Historically, the boards have had no hesitation in exercising their powers to chart

independent courses even if those decisions differ from my preferences.

36. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

***************REMAINER OF PAGE INTENTIONALLY LEFT BLANK***************

My name is James David Dondero, my date of birth is June 29, 1962, and my address is 300 Crecent Court, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing is true and correct. Executed in Dallas County, State of Texas, on the 1st day of July 2025.

**JAMES DAVID DONDERO**

EXHIBIT 7

**CAUSE NO. ____________________**

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,**<br><br>*Plaintiffs,*<br><br>**v.**<br><br>**MARK PATRICK and DFW CHARITABLE FOUNDATION,CDMCFAD, LLC, CDH GP, Ltd., and CHARITABLE DAF FUND, LP**<br><br>*Defendants.* | **IN THE TEXAS BUSINESS COURT**<br><br>**1ST DIVISION**<br><br>**DALLAS, TEXAS** |

**DECLARATION OF JULIE DIAZ**

I, **JULIE DIAZ**, of 3000 Pegasus Park Dr, Suite 930, Dallas, Texas 75247, declare under penalty of perjury as follows:

1. I am the President and Chief Executive Officer of The Dallas Foundation, an exempt charitable organization based in Dallas, Texas which partners with donors and works with the community to support various philanthropic causes in Greater Dallas.

2. I am also a Director of the Highland Dallas Foundation Inc., an exempt charitable entity incorporated in Delaware as a supporting organization to provide funding directly to The Dallas Foundation.

3. I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4. This Declaration is presented in support of Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver in the above-captioned case. I verify that, to the best of my knowledge, information, and belief, the statements in it are true.

**PROFESSIONAL EXPERIENCE**

5. I hold a Bachelor's Degree in Arts Management from Salem College, and a Masters Degree in Business Administration from Boston University.

6. I joined The Dallas Foundation in 2019 as Vice President, Philanthropic Partnerships. I was appointed as President and CEO in 2024.

7. I have extensive nonprofit experience in strategy, governance, and revenue growth, having led resource development teams at the Perot Museum, Greenhill School and Southern Methodist University, and having held leadership roles at the Philadelphia Orchestra, the Boston Symphony Orchestra, and GBH Public Television and Radio in Boston.

8. I am an active member of The Dallas Assembly and Charter 100, organizations which champion collaboration in community development and philanthropy.

9. I also served in 2018 as an adjunct professor at SMU Meadows School for the Arts.

**THE FUND**

10. The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Walkers Corporate Services Ltd, Walker House, 87 Mary St, George Town, Grand Cayman, KY1-9005, Cayman Islands.

11. The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the ***ARLPA***).

12. From approximately its inception until approximately March 2025, the sole limited partner of the Fund (the LP) was a Cayman Islands exempt company incorporated on 27 October 2011

(registration number 263805) called Charitable DAF Holdco, Ltd.

13. The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the ***Articles***).

14. The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011.

<u>Ownership and Management</u>

15. The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the* ***Code****) … for the economic benefit of the Limited Partner and its <u>Indirect Charitable Owners</u>*" (ARLPA, Recitals).

16. From my experience in nonprofit entities, I understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organizations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities. The relationship between a supporting organization and its supported charity is sometimes described as similar to that of a parent and subsidiary.

17. In this context:

(a) The LP holds or held all of the economic interest in the Fund. The GP held control shares, but had no economic interest.

(b) The LP issued 305 participation shares (the ***Participation Shares***), 300 of which are held by three Delaware corporate entities (together, the ***Supporting Organizations*** and/or ***Petitioners***). Each Supporting Organization provides funding to its respective U.S.-charitable foundation (together, the ***Charities***) which are the ultimate beneficial

owners of the Fund's entire economic interest. These Supporting Organizations are the Plaintiffs in the above-captioned litigation.

(c) The LP also issued 100 management shares (the ***Management Shares***) which attach the only voting rights for all shareholders of the LP. The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the entire issued share capital in the GP (the ***Membership Interest***).

18. The Management Shares and Membership Interest have at all material times been held by a single individual who as a result has substantial control of the Fund structure (the ***Control Position***). In this regard, the relevant terms of the ARLPA and Articles are as follows.

(a) **The ARLPA**

Clause 1.12

(a) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

Clause 1.6

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have

full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

(b) **The Articles**

Article 11

The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. *Management Shares confer no other right to participate*

*in the profits or assets of the Company*.

Article 19

Participating Shares … shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

**SUPPORTING ORGANIZATIONS**

19. The Supporting Organizations provide funding directly to the Charities as follows:

(a) Prior to the events at issue in this Action, The Highland Dallas Foundation, Inc. (***HDF***) held 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1.2 billion in charitable grants that support a broad range of public needs and manages over $650 million in assets.

(b) Prior to the events at issue in this Action, The Highland Kansas City Foundation, Inc. (***HKCF***) held 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants that support a broad range of public needs and currently manages over $5 billion in assets.

(c) Prior to the events at issue in this Action, The Highland Santa Barbara Foundation, Inc. (***HSBF***) held 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

(d) Prior to the events at issue in this Action, HCMLP Charitable Fund (***HCMLP***) held 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million that support a broad

range of public needs and donated $38.9 million to local nonprofits in 2023.

20. Since the Fund's inception in 2011, the Supporting Organizations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

**BACKGROUND**

21. As stated in paragraph 6 above, I joined The Dallas Foundation in 2019 and do not therefore have direct personal knowledge of any factual matters, including regarding the formation of the Fund and/or the Fund's operations, prior to that time. I understand these matters are covered in the declaration of James Dondero.

22. A summary of those matters that I understand to be most relevant to this application are accurately summarized as follows:

(a) **Control Position**. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr. Scott: (i) resigned as director of the Fund and LP (ii) appointed Mark Patrick as director of the Fund and LP; and (iii) transferred to Mr. Patrick the Management Shares in the LP and Management Interest in the GP for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

(b) **Mark Patrick**. From 2008 to 2021, Mr. Patrick was employed as tax counsel by Highland Capital Management, LP (***Highland***), an investment advisor founded by Mr. Dondero. From March 2021 to October 2024, Mr. Patrick was employed as tax counsel at Skyview Group (***Skyview***). In both positions, Mr. Patrick acted as an advisor to Mr. Dondero. Mr. Patrick played a significant role in developing the overall Charitable DAF Fund structure.

**CONCERNS ABOUT MR. PATRICK'S CONDUCT**

23. I became aware that in June 2023, Mr. Patrick made a grant request to the Highland Dallas Foundation in relation to 'Creative HEARTS TX', an entity of which Mr. Patrick and his family

were directors, without disclosing this information. I became aware of this situation contemporaneously with its occurrence and it caused me concern regarding Mr. Patrick.

24. I understand from the Dondero Declaration (not my personal knowledge) that in September 2023, Mr. Patrick approached Kevin Cronin of Fortaris with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick. I became aware of this situation shortly after its occurrence and it caused me concern regarding Mr. Patrick.

25. In August 2024, I personally became aware of the potential disclosure of material non-public information (***MNPI***) to the Highland Dallas Foundation (***HDF***). On 28 August 2024, I was informed by David Rosenberg of Holland & Knight (***H&K***), the Charities' US-attorneys, that Mr. Douglas Mancino, an attorney with Seyfarth Shaw LLP (***Seyfarth***) in Los Angeles, California, had called Mr. Rosenberg, identified himself as Mr. Patrick's "*outside compliance counsel*" and recommended that Mr. Rosenberg advise HDF to exercise put-options over units it holds in the NexPoint Hospitality Trust (***NHT***). Mr. Rosenberg reported this to me. I was very concerned by this information and therefore immediately contacted Lucy Bannon, an employee of NexPoint and someone I have known in a professional capacity for many years, to inform her of the situation.

26. I have since become aware through my position at The Dallas Foundation and role as a board member of HDF, that the information Mr. Mancino provided to H&K could have constituted MNPI. This matter is discussed in more detail in paragraphs 33-35 of Dondero 1.

## FINANCIAL IRREGULARITIES

27. In or around August 2024, NexPoint provided the Charities with a financial analysis of the Fund's annual expenses (the ***Expense Summary***) which appeared to indicate substantial

increases in expenditures in recent years.

28. As stated in paragraph 31 of Dondero 1, the Expense Summary indicated as follows:

(a) Directors' fees increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, directors' fees increased further to around US$2.25 million.

(b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount had been spent in2023 (i.e. US$18.6 million). I was not aware of any basis for this extraordinary legal expenditure in a period of just 18 months.

29. The Charities were concerned by the Expense Summary and considered it was necessary to seek to verify and/or understand the apparent increases in expenditure. Accordingly, in October 2024, the Charities made a reasonable request to Mr. Patrick for financial information about the Fund, which Mr. Patrick failed to provide at that time, or any time thereafter.

30. On 11 November 2024, the Charities' US-attorneys, Holland & Knight (***H&K***), conveyed a letter to Mr. Murphy from the Charities (the ***No Confidence Letter***) advising that the Charities no longer have confidence in the governance of the Fund and consider a reorganization is required:

> "Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. **The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed**. **As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts**.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

31. The Charities did not receive a response to the No Confidence Letter. Accordingly, on 23 January 2025, I sent an email to Mr. Murphy (a director that Mr. Patrick appointed in the Cayman Islands) stating that the Charities wished to better understand the Fund's asset position and requesting that the Fund provide certain information by 10 February 2025, including: (i) income statements for the past four years, (ii) listing of underlying assets, (iii) audited financial statements, and (iv) the current structure of the LP's operations.

32. On 28 January 2025, I sent a further email to Mr. Patrick and Mr. Murphy expressing serious concern that the Charities' requests continued to be disregarded, reflecting an ongoing lack of transparency about the Fund:

"...These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the

assets further".

33. On 30 January 2025, I received a response from Mr. Murphy stating that neither he nor Mr. Patrick received my 23 January 2025 email, and that he understood the next step was that he and Mr. Patrick would "present directly to the foundations/supporting organizations" to address some of the concerns in the No Confidence Letter:

> "…**we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets.** As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control … any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero …
>
> …**We note that your communications to date contain several misstatements of fact and we reject all of your allegations**. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.
>
> **Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so** (which is not disputed).

In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies."

34. I understand (and as stated in paragraph 12 of Dondero 1) the Control Position to be responsible for governance and management functions to enable the Fund to carry out its sole purpose of benefiting its ultimate beneficial owners (i.e. the Charities). In this context, the Charities were very surprised and concerned by Mr. Patrick and Mr. Murphy's responses to requests for information and the lack of transparency regarding the Fund's financial position. It remains unclear to the Charities the basis upon which access to such information was (and continues to be) restricted.

35. On 31 January 2025, H&K responded to Mr. Murphy's email as follows:

"As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions

...

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024, before Mr. Patrick shut down [communication] **showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022.** If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. **Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024.** Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. **Yet, no information has been provided by you and Mr. Patrick,**

**<u>no clarity given</u>.** It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10% on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. **If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns**…

36. On 4 February 2025, Mr. Murphy responded that while open to resolving the concerns, they were struggling to understand the Charities' change in position.

37. On 7 February 2025, H&K responded as follows:

> "I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees.
>
> …
>
> Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted."

38. On 14 February 2025, H&K received a fax from Seyfarth which rejected the reported increases

in legal and directors' fees and sent a further email on 18 February 2025 which attached a valuation of the Fund from 2020 in support of his suggestion that similar information was provided to the Charities when Mr. Scott was in the Control Position. Copies are at **Tabs 15** and **16**, respectively.

39. On 27 February 2025, H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund.

40. On 17 March 2025, Seyfarth sent an email to H&K requesting available dates for Mr. Murphy to make a presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth replied, stating they had just learned of a call arranged for the following day, and seeking to reschedule. H&K responded that they had no knowledge of the purported call and would revert with available dates from 16 April 2025. On 9 April 2025, HK responded with its availability.

41. At the date of this declaration, none of the financial information requested by the Charities has been provided by Mr. Patrick or Mr. Murphy.

**MR. PATRICK DILUTES THE SUPPORTING ORGANIZATION'S INTERESTS IN THE CHARITABLE DAF FUND.**

42. I am aware that between December 2024 and the present, Mr. Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund and then to entirely alienate those assets. Mr. Patrick's acted to eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets, while awarding ownership to at least one purported charitable entity that he personally controls.

43. I have come to know now that Mr. Patrick held the controlling general partner shares in the

Charitable DAF Fund via the Delaware GP. Without any prior notice or even disclosure to the Supporting Organizations, in February 2024, Mr. Patrick incorporated CDH GP, Ltd in the Cayman Islands, with Mr. Patrick as the sole director. He used this newly created Cayman Islands entity to replace and redomicile Delaware GP. CDH GP became the general partner holding all the controlling shares in the DAF Fund. The Supporting Organizations only found out about the replacement and redomicile of the Delaware GP in February 2025, through independent investigation.

44. On December 9, 2024, Mr. Patrick created Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Mr. Patrick was named the Sham Charity's sole member and sole director; its registered address is Mr. Patrick's home address. The apparent purpose and the clear effect of forming DFWCF was to create a facsimile of the Charitable DAF Fund beneficiaries—the nonprofit charities and their Supporting Organizations—but in the form of a "charitable" entity controlled by Mr. Patrick.

45. I learned that Mr. Patrick later incorporated CDMCFAD, LLC, a Delaware limited liability company.

46. Without notice to the Supporting Organizations or to me, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC. The Supporting Organizations' technical interest was in Charitable DAF Holdco. As a result, CDMCFAD effectively was inserted as a company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets in Charitable DAF Fund. Instead, a different and new entity (CDMCFAD) held the assets in Charitable DAF Fund; the Supporting Organizations only held shares in an

entity (Charitable DAF Holdco) that notionally held that new entity.

47. On February 7, 2025, again without notice to the Supporting Organizations or to me, DAF HoldCo allotted 318 participating shares to DFWCF, the Sham Charity controlled by Mr. Patrick himself. This dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF Holdco from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; and (iii) HSBFI's interest was diluted from 32.787% to 16.05%.

48. I now know that in February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Mr. Patrick's complete control of the assets of DAF Fund.

49. And I now know that on March 27, 2025, Mr. Patrick caused CDMCFAD to issue shares to the Sham Charity, and only to the Sham Charity. None of the Supporting Organizations were issued shares in CDMDFAD. Now, the sham charity controlled by Mr. Patrick held a direct economic interest in the entity that Mr. Patrick had newly inserted between Charitable DAF Holdco and the assets in Charitable DAF Fund. Meanwhile, the two direct beneficial owners of CDMCFAD were (1) Charitable DAF Holdco—in which the Supporting Organizations still held a minority beneficial interest; and (2) Mr. Patrick's new sham charity, which he controlled.

50. On April 2, 2025, Mr. Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million, after which Charitable DAF Holdco purportedly had no assets and no remaining interest in Charitable DAF Fund at all. Needless to say, a one-time $1.6 Million payment for the release of the beneficial ownership of more than

$270 Million in the Fund—held entirely for the benefit of the Supporting Organizations as late as December 2024—is not an exchange that I or any other person with fiduciary loyalty to the Supporting Organizations would ever have approved, had we known it was happening at the time. As a result, Mr. Patrick's Sham Charity, Defendant DFWCF, was the sole remaining limited partner and beneficial owner of Charitable DAF Fund, through its 100% ownership of the fund by CDMCFAD. The effect of this final step was to consummate the complete severance of the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund.

51. Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned more than 98% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Mr. Patrick purportedly caused $1.6 million to be distributed to the Supporting Organizations receipt of those funds have yet to be verified.

**REPLACEMENT OF GP**

52. For the first time, in February 2025, I learned that Mr. Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior. This information was, I understand, obtained via background checks into the various parties.

53. I understand that on 27 February 2024, CDH GP, Ltd (the ***New GP***) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

54. I also understand that Mr. Patrick is the sole director of the New GP.

55. It is unclear to the Charities on what basis Mr. Patrick and/or Mr. Murphy removed and redomiciled the general partner of the Fund, nor the reason the Charities were not notified of

this change.

**PURPOSE OF APPLICATION**

56. It is clear the Fund's assets are being diminished for the benefit of Mr. Patrick and Mr. Murphy; and in any case, the Defendants in this Action are engaged in a series of secretive transactions intended to completely alienate from the Supporting Organizations more than $270 Million that was held for their benefit, and upon which their charitable activities depend. These are the sole motivations of the Charities in bringing this application.

57. Unless enjoined, Mr. Patrick and the other Defendants will cause and continue to cause irreparable harm to the Charities including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $250 Million that can never be replaced because the Defendants lack the means. In addition to the permanent loss of funds in the future, the immediate continuation of key programs at the Charities is imperiled by the conduct at issue here and the reality that the Charities, as of this moment, are cut off from the funds intended for their support. Moreover, the conduct of the Defendants to date creates a pattern suggesting that further creative transfers, alienation, spending, and dissipation of the monies in the fund are likely to be imminent. If this happens, it is likely they will never be recovered.

58. The harm to the Charities is imminent if the Defendants are not enjoined. Enjoining the Defendants will merely require them to refrain from doing anything with the Funds for two weeks. If the Defendants are not acting adversely to the Charities, the Funds will still be available to them for their use in future. The Charities suffer a greater burden as they stand to lose everything.

59. Enjoining the Defendants will not disserve the public interest as without the injunction, there is significant potential for irreparable harm to the Charities and the Defendants will not be harmed

if enjoined. Freezing the funds to ensure that Mr. Patrick's scheme is not hurting charitable interests vital to key communities serves the public interest.

**ARGUMENTS THAT MAY BE MADE BY THE RESPONDENT**

60. I draw attention to the following matters which the Defendants may raise by way of attempted defense against the application.

61. The Defendants may assert (as they have repeatedly suggested in correspondence) that the Charities are acting on the instructions of Mr. Dondero and that we are being used as a proxy for his own disputes with Mr. Patrick. Any suggestion of that nature is entirely rejected. On the contrary, the Charities have at all times taken steps to independently verify information provided to them by Mr. Dondero and entities associated with him, have taken advice solely from their own attorneys in the US and Cayman, and have required Mr. Dondero to recuse himself from board meetings of the Supporting Organisations at which decisions as to whether to bring these proceedings were discussed. The Charities have no interest in any dispute there may be between Mr. Patrick and Mr. Dondero.

62. The Defendants also may assert that the Charities are not entitled to any information regarding the Fund, and that the structure was designed specifically to exclude the Charities from information or control rights. Whether that is true or not, the Charities are the sole economic beneficiaries of the Fund's activities, and Defendants owed and owe them fiduciary duties of care, loyalty, and candor. If the Fund is being used for a purpose other than that for which it was established, that cannot be allowed to continue to the detriment of the charitable causes and in violation of those duties. The Fund would otherwise be an unsupervised vehicle susceptible to being used for the wishes and benefit of the individual holding the Control Position, to the detriment of the Charities and the express purposes of the governing documents.

63. The Defendants may deny that the expenditures are as significant as that appearing from the documents. If that is the case, the Defendants have had ample opportunity to correct this, but have chosen not to do so.

64. I am not aware of any other points that the Defendants have made or alluded to in correspondence which could materially affect this application.

## THE CAYMAN ISLANDS PROCEEDINGS

65. Given Patrick's pattern of malfeasance the Supporting Organizations filed an involuntary Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*

66. Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, DFWCF as a Delaware entity was not expressly named in the Grand Court proceedings.

67. The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:



CONFIDENTIAL

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

68. While the Cayman Islands appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick and DFWCF (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the DAF Fund and DAF HoldCo. In the meantime, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that relief on funding from the DAF Fund.

69. Further, while Defendants Patrick and DFWCF wrongfully remain in control of the participation shares that rightfully belong to the Supporting Organizations, the Defendants wrongfully hold a seat on the liquidators' committee.

**ORDERS SOUGHT**

70. Given the refusal of the Defendants to answer legitimate questions raised by the Charities and the weight of evidence that suggests that the Defendants are dealing with or spending the assets of the Fund in a manner that is not in the best interest of the Charities, the Charities respectfully seek orders placing the Fund, its Limited Partner, and its General Partner under the control of an independent Receiver who can investigate the affairs of the Fund and the decisions taken by management, and manage those affairs for the benefit of the intended beneficiaries, under the supervision of the Court. The Charities have no confidence in the current management to provide this information themselves without independent oversight.

71. Until such time as a Receiver may be appointed, the Charities further seek a temporary

restraining order and temporary injunction to prevent the Defendants from the use, transfer, dispersal, and/or alienation of any interests or assets, regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment.

My name is Julie Diaz, my date of birth is 3/23/64, and my address is 5711 Prestwick Lane Dallas, TX 75252. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Barnstable County, State of MA,

on the 1 day of July, 2025.

/s/ [signature]
**JULIE DIAZ**

EXHIBIT 8

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

# SUPERVISION ORDER

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1. The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).

2. The following persons are appointed as joint official liquidators of the Company:

| Name | Address | Contact Details |
|---|---|---|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588<br>margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588<br>sandipan.bhowmik@uk.gt.com |

3. The joint official liquidators may act jointly and severally.

4. The joint official liquidators are not required to give security for their appointment.

5. The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

   a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

   b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6. The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

   a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

   b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

   c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7. The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8. The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9. The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.

10. The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**
Filed 6 May 2025

______________________________________
**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

CAUSE NO. ____________________

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,,** *Plaintiffs,* | **IN THE TEXAS BUSINESS COURT** |
| **v.** | **1ST DIVISION** |
| **MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd.,** *Defendants.* | **DALLAS, TEXAS** |

**TEMPORARY RESTRAINING ORDER**
**AND ORDER SETTING HEARING FOR TEMPORARY INJUNCTION**

After considering the application for temporary restraining order filed by The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (collectively, the "Plaintiffs"), Plaintiff's Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Application for Appointment of Receiver (the "Petition"), the Affidavit of Julie Diaz in support of the injunctive relief sought in the Petition (the "Affidavit"), and statements of counsel, the Court finds there is evidence that harm is imminent to Plaintiffs, and if the Court does not issue the temporary restraining order, Plaintiffs will be irreparably injured because they will be denied their rights to realize the full value of the assets that were held in the Charitable DAF Fund, L.P. (the "Charitable DAF Fund") expressly held for the Plaintiffs' as indirect charitable owners if Defendants transfer, conceal, encumber or endanger those assets or liquidate or modify the governance or ownership

of Charitable DAF Fund or any of its affiliates or subsidiaries, or the DFW Charitable Foundation, or any of its affiliates or subsidiaries, CDMCFAD, LLC, or any of its affiliates or subsidiaries, Charitable DAF GP, LLC, or any of its affiliates or subsidiaries, and CDH GP, Ltd. or any of its affiliates or subsidiaries (collectively the "Covered Entities") and that the injury to Plaintiffs will be irreparable because of the inability to recover the assets coupled with the likely insolvency of Defendants.

Therefore, by this order, the Court:

(a) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from transferring, concealing, withdrawing, alienating, expending, dispersing, or otherwise disposing of any and all funds, assets, receivables, or shares ever held by the Covered Entities, regardless of where they are presently held;

(b) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from taking any action to dissolve, winddown, liquidate, or otherwise alter the corporate standing of Covered Entities;

(c) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from taking any action to modify or alter the corporate governance of the Covered Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

(d) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from taking any action to modify or alter the current ownership of the Covered Entities, including but not limited to the admission of new shareholders, partners, members, or other equity interest holders or the transfer of any shares, partnership interests, member interests, or other equity interests to any other party;

(e) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from altering, concealing, or destroying any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(f) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from exercising any control over the Covered Entities;

(g) orders the clerk to issue notice to Defendants, that the hearing on Plaintiff's application for temporary injunction is set for July ____, 2025, at ___________ a.m./p.m. to determine whether this temporary restraining order should be made a temporary injunction pending a full trial on the merits; and

(h) Sets bond at $____________________, which may be paid by Plaintiff with check (or by attorney or law firm check) payable to the [Dallas County District Clerk], approved and conditioned as the law requires.

Once effective, this temporary injunction shall remain in full force and effect until it expires fourteen (14) days after the date and hour of issue reflected below, unless extended by this Court or by agreement of the parties.

SO ORDERED.

SIGNED on July ___, 2025, at __________ a.m./p.m.

________________________________
JUDGE PRESIDING

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN

DuaneMorris®

*FIRM and AFFILIATE OFFICES*

JOSEPH M. COX
PARTNER
DIRECT DIAL: +1 214 257 7252
PERSONAL FAX: +1 214 853 9480
*E-MAIL:* JMCox@duanemorris.com

*www.duanemorris.com*

HANOI
HO CHI MINH CITY
SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NORTH JERSEY
LAS VEGAS
SOUTH JERSEY
SYDNEY
MYANMAR

ALLIANCES IN MEXICO

July 11, 2025

Mr. Brian Shaw *Sent via email*
Carrington, Coleman, Sloman, & Blumenthal
901 Main Street, Suite 5500
Dallas, Texas 75202
bshaw@ccsb.com

**Re: The Highland Dallas Foundation, Inc, et al v. Mark Patrick, et al,**
**Cause No. 25-BC01B-0027**
**Rule 11 Agreement**

Dear Mr. Shaw:

Pursuant to Texas Rule of Civil Procedure 11, the parties in this matter The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (collectively "Plaintiffs"), and Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd. (collectively "Defendants"), agree to the following:

(1) The "Covered Entities" as referred to herein is defined to include collectively Charitable DAF Fund, LP and/or any of its subsidiaries, the DFW Charitable Foundation and/or any of its subsidiaries, CDMCFAD, LLC and/or any of its subsidiaries, and/or any of its subsidiaries, and CDH GP, Ltd. and/or any of its subsidiaries.

(2) Defendants shall have until Monday, July 14, 2025, to file a challenge to the court's jurisdiction (the "Plea").

(3) Plaintiffs shall have until Monday, July 21, 2025, to file a response to the Plea.

(4) Defendants shall have until Thursday, July 24, 2025, to file a reply to the Plea.

(5) The Parties agree to the following limits on discovery prior to any hearing on Plaintiffs' application for temporary injunction/appointment of receiver (the "Temporary Injunction")

DuaneMorris



in this matter (these limits shall have no effect on any discovery conducted after the Temporary Injunction is decided):

a. Plaintiffs and Defendants each (not per party) may serve 25 requests for production to the other, may serve 5 interrogatories, may serve 10 requests for admission, and may take 3 depositions (2 of which shall be limited to 3 hours, and one of which shall be limited to 6 hours, the selection of the witness for the six hour deposition to be determined by the party seeking the deposition).

b. The Parties shall serve all discovery requests no later than Wednesday, July 16, 2025.

c. Responses to the written discovery and substantial completion of related any related document production shall be served as follows: (1) if the Court denies the Plea as to any Defendant, seven business days after the Court order denying the Plea is entered; (2) if the Court grants the Plea as to all Defendants, then responses to written discovery shall not be due, if at all, until seven business days after the Court's order granting the Plea is reversed or overturned.

Depositions shall take place within seven days after the written discovery responses and documents are served as set forth in c. above.

(6) If the Court denies the Plea, the Temporary Injunction shall be heard as reasonably practicable after the ruling, unless stayed by an appellate court. If the Plea is granted, but is later reversed or overturned, the same timelines for discovery provided in (5) above shall be followed and the Parties shall then seek to expeditiously set a hearing before the Court.

(7) Pending the Court's decision on the Temporary Injunction or grant of the Plea relating to the Temporary Injunction or Plea), the Covered Entities and their respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for any Covered Entity, agree:

a. not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares outside of the ordinary course of business;

b. not take any action to increase the compensation paid to any employee of the Covered Entities;

c. not to take any action to dissolve, winddown, liquidate, or otherwise alter the corporate standing of Covered Entities;

d. not to take any action to modify or alter the corporate governance of the Covered Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

e. not to take any action to sell, exchange, or dispossess any asset of one of the Covered Entities unless (i) the sale is to a bona third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide

DuaneMorris



purchaser is made aware of this Rule 11 Agreement, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the Covered Entities;

f. not to alter, conceal, or destroy any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(8) This Agreement shall be filed with the Court and, as provided in the first sentence of this letter, constitutes an enforceable agreement pursuant to Texas Rule of Civil Procedure 11. This Agreement shall expire and be of no force or effect on the earlier of (a) thirty days after a final order of the Court dismissing this case or (b) the Court's ruling on Plaintiffs' current request for a temporary injunction (or as subsequently amended). This does not prevent a party from requesting that a court of appeals issue an order to keep this Rule 11 Agreement in place during the pendency of such appeal or any objection to such request.

If the terms above accurately reflect our agreement, please acknowledge your agreement by signing below.

Best regards.

Sincerely,

Joseph M. Cox

AGREED TO FORM AND CONTENT:

Brian Shaw, Counsel for Defendants

JMC/kr
cc: (all via email)
Darren McCarty, Esq.
Craig Warner, Esq.
Clients

DM1 16831875.1




**Department of State: Division of Corporations**

Allowable Characters

HOME

Entity Details

THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | **10030937** | Incorporation Date / Formation Date: | **12/9/2024** (mm/dd/yyyy) |
| Entity Name: | **DFW CHARITABLE FOUNDATION** | | |
| Entity Kind: | **Corporation** | Entity Type: | **Exempt** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **THE CORPORATION TRUST COMPANY** | | |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

Submit

New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.




**Department of State: Division of Corporations**

Allowable Characters

HOME

Entity Details

THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | **10035168** | Incorporation Date / Formation Date: | **12/12/2024** (mm/dd/yyyy) |
| Entity Name: | **CDMCFAD, LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **THE CORPORATION TRUST COMPANY** | | |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like (•) Status ( ) Status,Tax & History Information

Submit

New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

WK–263805

# *Certificate Of Incorporation*

*I, **FLOSSIEBELL M. MARAGH** Assistant Registrar of Companies of the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said Law in respect of registration were complied with by*

**Charitable DAF HoldCo, Ltd**

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 27th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 27th day of October Two Thousand Eleven*

*CERTIFIED TO BE A TRUE AND CORRECT COPY*

*Sig..* *Flossiebell M. Maragh*
*Assistant Registrar*
*Date* *27 October 2011*

*(SGD. FLOSSIEBELL M. MARAGH)*

**Assistant Registrar of Companies,**
**Cayman Islands.**

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

COPY

# MEMORANDUM – WORK PLAN[1]

RE: Work Plan, Scope of Work, and Deliverables

DATE: November 9, 2023

---

This Memorandum is intended to be informational and provide guidance. It sets forth the work plan, scope of work, and requested deliverables for your review of matters relating to the following entities (highlighted in red). We would like your review to focus on the entities highlighted. As a general overview, we are looking for memorandums and opinions relating to potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc., as further outlined below and to be flagged as part of your review.




I. **LEGAL RESEARCH/ POTENTIAL LITIGATION ISSUES[2]**

a. <u>Transfer of 100% of Management Shares in Charitable DAF Holdco, Ltd., and 100% ownership interest in Charitable DAF GP, LLC, by Grant Scott to Mark Patrick.</u>

---

[1] This Memorandum is attorney worked product, privileged, and confidential. Neither it nor its contents may be shared in any manner without express written permission from Shields Legal Group, P.C.
[2] The client will require a written agreement detailing the scope of work (this may be used as an attachment or reference) and hourly rates.

1. Confirm each of these transfers is valid and enforceable under Cayman law?
2. Is consideration a requirement under Cayman law?
3. If so, did each transfer have consideration under Cayman law?
4. Note: we understand there was no monetary consideration for each transfer, but there were tax considerations for this transfer including potential future tax liability. Donor also implicitly consented to the transfer of the voting shares by not objecting since the transfer.
5. Analyze whether holders of the participation shares in org chart have legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.?
6. Analyze whether Donor has legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.

ii. **Priority: high[3].**

iii. **Work product: legal opinion[4] and/or memorandum.**

1. **Note: we may need to rely on opinions and memoranda in potential future disputes.**

iv. **Anticipated attorney hours to completion: 30.**

b. Who would have standing under Cayman law for alleged corporate malfeasance or assert lack of corporate control from the transfers? Specifically, we want to understand third parties' abilities (in addition to regulators' abilities).

[3] Guides for priority:
-High: response requested within two weeks;
-Medium: response requested within four weeks; and
-Low: response requested within six weeks.
[4] Legal opinions and memorandums should include citations to and copies of relevant and applicable authorities.

i. **Priority: high.**

ii. **Work product: legal opinion and/or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

c. What are defenses under Cayman law – estoppel, waiver, statute of limitations, consent, others?

i. **Priority: high.**

ii. **Work product: legal opinion and/or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

d. Is there a corporate alter ego concept under Cayman law, and if so, what are defenses to it?

i. **Priority: high.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

**II. CORPORATE REVIEW**.

a. Top-down review of each entity with respect to corporate structure, management, ownership, capitalization, and voting.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 30.**

b. Written confirmation that the DAF is not a "regulated entity" under Cayman law and not subject to those compliance requirements. To reiterate, the DAF is not a "Fund" in the traditional sense: (i) there is no PPM and (ii) there are no subscribers/investors.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

c. Confirm who controls these entities. We have reviewed the corporate documents and understand the Delaware law implications but only the plain language of the Cayman documents. To streamline your review, our short-form analysis is attached on Annex A

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 25.**

d. Who can remove a director?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 0.**

e. Who, or under what circumstances, can change the ownership of the Management Shares in Charitable DAF Holdco, Ltd.?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 0.**

f. What control rights does the donor James Dondero have (note: it appears he appoints the successor to the Management Shares if there is a death or disability event)?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 5.**

g. Are there any actions the controlling person/managing member cannot take?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 2.**

h. Given there are two directors of several entities (Mark Patrick and Paul Murphy) and Mark appears to control the ownership/shareholder voting interest, and given certain provisions

seem to say "the directors run the business," how is this share of control divided among what one director can do, what two directors can do, and what the voting interest can do?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

i. Can the controlling person dilute shares, e.g., the Participation Shares in Charitable DAF Holdco, Ltd.?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

j. Can the controlling person redeem shares, e.g., the Participation Shares in Charitable DAF Holdco, Ltd.?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

k. Is there any Cayman law requirement that Charitable DAF Holdco, Ltd. distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

l. Could Charitable DAF Holdco, Ltd. liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

III. **CORPORATE PROACTIVE ACTIONS**.

a. What can be done at this point to make these share transfers bulletproof?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 15.**

b. Is it possible to proactively confirm the validity of these transfers with the government?

   i. **Priority: low.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 10.**

c. Would Cayman regulators perform a prophylactic checkup?

   i. **Priority: low.**

   ii. **Work product: email answer.**

   iii. **Anticipated attorney hours to completion: 1.**

d. Determine whether any compliance with corporate formalities generally or new rules effective 10/13/23 is required or advisable.

   i. **Priority: low.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 5.**

e. Given the scope and focus of this review, please feel free to flag any other ideas that supplement these points. Our "issue spotting" is from the standpoint of a U.S. law firm.

   i. **Priority: low.**

   ii. **Work product: email advice/discussion.**

   iii. **Anticipated attorney hours to completion: TBD.**

f. For your context, we are working on an indemnification and affidavit from the former Director of these entities, Grant Scott, who will attest to the validity of the share transfer.

**Annex A**

**Plain Language Control Analysis**[5]

1. Charitable DAF Holdco, Ltd.: Mark Patrick controls this entity.
    a. Mark Patrick owns 100% of the Management Shares[1], which are the only voting shares[2].
    b. The Directors run the company.[3] The Directors are Mark Patrick and Paul Murphy.[4]
    c. Mark Patrick may remove Paul Murphy as Director.[5]
2. Charitable DAF GP, LLC: Mark Patrick controls this entity.
    a. Mark Patrick is the Managing Member and Sole Member.[6]
    b. The Managing Member runs the company.[7]
3. Charitable DAF Fund, LP: Mark Patrick controls this entity.
    a. Mark Patrick controls Charitable DAF GP, LLC.[8]
    b. Charitable DAF GP, LLC is the GP and controls this entity.[9]
4. CLO Holdco, Ltd.: Mark Patrick controls this entity.
    a. Mark Patrick controls Charitable DAF Fund, LP.[10]
    b. Charitable DAF Fund, LP is the sole shareholder.[11]
    c. The Directors run the company.[12] The Directors are Mark Patrick[13] and Paul Murphy[14].
    d. Mark Patrick may remove Paul Murphy as Director.[15]
5. Liberty CLO Holdco, Ltd.: Mark Patrick controls this entity.
    a. Mark Patrick controls CLO Holdco, Ltd.
    b. CLO Holdco, Ltd. is the sole shareholder.[16]
    c. The Directors run the company.[17] Mark Patrick and Paul Murphy are Directors.[18][19]

---

[5] This is not intended to be legal advice and is provided in a summary format for reference purposes only.
[1] *See* Tab 24_Share Trans_Scott to Patrick_03.24.21; Tab 25_Assign & Assump of Mem Int Agr_ 03.24.21; and Tab 31_Reg of Mems_10.27.11.
[2] *See* definitions of "Management Shares" and "Participating Shares" and Paragraph 11 of Tab 22_A&R Memo and Arts of Assoc_01.19.15.
[3] *See* Paragraph 80 of Tab 22_A&R Memo and Arts of Assoc_01.19.15.
[4] *See* Tabs 26-27_SH Resol of Sole SH, appt Patrick as Dir_03.24.21 and Tab 32_Resol of Sole Dir, appt Murphy_4.22.21.
[5] *See* Paragraph 93(d) of Tab 22_A&R Memo and Arts of Assoc_01.19.15 (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Management Shares).
[6] *See* Tab 25_Assign & Assum of Mem Int Agr_ 03.24.21.
[7] *See* Paragraph 5 of Tab 07_A&R Co Agr_substit Scott for Dondero as Managing Mem (the Managing Member controls the company).
[8] See above.
[9] *See* Section 1.6(a) of Tab 10_A&R LP Agr_11.07.11 (the GP shall have full discretion in management and control).
[10] See above.
[11] *See* Tab 03_Regist of Mems_12.13.10.
[12] *See* Paragraph 85 of Tab 01_Memo and Arts of Assoc_12.13.10 (the business of the Company shall be managed by the Directors).
[13] *See* Tab 30_SH Resol of Sole SH, appt Patrick as Dir_04.02.21.
[14] *See* Tab 32_Resol of Sole Dir, appt Murphy_4.22.21.
[15] *See* Paragraph 98(d) of Tab 01_Memo and Arts of Assoc_12.13.10 (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Shares).
[16] *See* LIBERTYCLO HOLDCO, LTD_ROM.
[17] *See* Paragraph 89 of Liberty CLO Holdco, Ltd. Memorandum and Articles of Incorporation (6 Jun 12).
[18] *See* Tab 26_Resol of Sole SH, appt Patrick as Dir_03.24.21 and Tab 32_Resol of Sole Dir, appt Murphy_4.22.21.
[19] *See* LIBERTY CLO HOLDCO, LTD._ROD (the Intertrust Register of Directors, listing Mark E. Patrick and Paul Murphy).

d. Mark Patrick may remove Paul Murphy as Director.[20]

6. Charitable DAF Holdings Corp. (f/k/a Rand Advisors Holding Corp.): Mark Patrick controls this entity.
   a. Mark Patrick controls Charitable DAF Fund, LP.[21]
   b. Charitable DAF Fund, LP is the sole shareholder.[22]
   c. Mark Patrick is the sole member of the Board of Directors[23] and runs the company[24].

[20] *See* Paragraph 102(d) of Liberty CLO Holdco, Ltd. Memorandum and Articles of Incorporation (6 Jun 12) (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Shares).

[21] See above.

[22] *See* fourth "Resolved" paragraph in Tab 03_Consent of BOD_01.05.22.

[23] *See* Tab 03_Consent of BOD_01.05.22.

[24] *See* Section 3.01 of Tab 04_Bylaws.

Seyfarth

Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
T (310) 277-7200
F (310) 201-5219

dmancino@seyfarth.com
T (310) 201-5241

www.seyfarth.com

May 1, 2025

Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re: Update to Form 13909 previously filed on behalf of Charitable DAF Holdco, Ltd.

Dear Sir or Madam:

I sent a letter to the Internal Revenue Service dated March 20, 2025 on behalf of my client, Charitable DAF Holdco, Ltd, a Cayman Islands exempt company ("DAF Holdco"[1]), along with an IRS Form 13909, *Tax-Exempt Organization Complaint (Referral)*. In my letter, I identified three Participating Shareholders of DAF Holdco which are supporting organizations of The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation. In a letter dated April 15, 2025, I supplemented that letter with additional information relevant to the extensive and improper control James Dondero exerts over these three supporting organizations.

**The Dugaboy Investment Trust Charitable Contribution**

In my March 20, 2025 letter, at pages 4-6, I brought to your attention that Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), contributed 1,500,000 Class B Units of NexPoint Hospitality Trust, a real estate investment trust majority-controlled by Mr. Dondero and his related entities (the "REIT"), to Highland Dallas Foundation, Inc., a supporting organization of The Dallas Foundation ("Highland Dallas"). This contribution likely caused Dugaboy and Mr. Dondero (Dugaboy's beneficiary) to become (if they were not already) substantial contributors of Highland Dallas and, therefore, disqualified persons with respect to Highland Dallas for purposes of section 4958(c)(3) of the Code.

At the same time Mr. Dondero caused Dugaboy to make the contribution of REIT Units to Highland Dallas, Dugaboy also granted Highland Dallas an "embedded" put option to sell those Units back to Dugaboy for $6.19 per Unit (the "Put Option"). The use of this Put Option (theoretically, in the opinion of ValueScope) allowed Dugaboy to claim a higher valuation for its charitable contribution deduction of $11,505,000 at that time than its stand-alone valuation without the Put Option for the benefit of Mr. Dondero.

---

[1] As a reminder, DAF Holdco is neither a charitable corporation nor is it a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code.

Seyfarth



The Put Option, if exercised, would have a value to Highland Dallas of $9,285,000 ($6.19 X 1,500,000 Units) on the date of the gift.

The merger of the REIT's subsidiaries with and into another Dondero-controlled entity, NexPoint Diversified Real Estate Trust, closed on April 17, 2025, and there is no evidence from publicly-available information that Highland Dallas ever exercised its Put Option. The Form 8-K filed with the Securities and Exchange Commission with respect to the merger (copy enclosed) disclosed a number of material transactions (many of a compensatory nature) that took place in connection with the REIT subsidiary mergers but there is no continued recognition of the enforceability of the Put Option, which presumably would have been a material disclosure item if extended or exercised after the merger was approved by the REIT's Unitholders.

The fiduciary behavior of the management and Board of Directors of Highland Dallas with respect to their handling of this gift raises a number of federal income tax and Texas law fiduciary duty issues, from the time of its acceptance of the gift on December 19, 2019 through the effective time of the merger of the REIT's subsidiaries with and into NexPoint Diversified Real Estate Trust and the REIT's dissolution on April 17, 2025.

First, at the time of the acceptance of the gift, in December 2019, the objective facts raise serious questions concerning Highland Dallas's decision to accept the gift with a purported fair market value of $11,505,000 in the first place.[2] Although the value of the REIT's assets had at the time a theoretical value of $6.19 per Unit, according the ValueScope valuation previously provided to the Service with my March 20, 2025 letter, public information concerning the REIT's trading price per Unit on December 19, 2020 (see detailed attachment) suggests that the actual value per Unit was only $4.00 on the date of the contribution.

As the Service has argued, in cases such as *Pierre v. Commissioner*, 113 T.C. 24 (2009) (for gift tax purposes) and *RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1 (2917) (for section 170 purposes), the value of a gift must be based on the interest transferred, not the value of the assets held by the separate legal entity, especially when there are other related or unrelated shareholders or owners as in the case of the REIT. *See, e.g., Shepherd v. Commissioner*, 1115 T.C. 376 (2000), *aff'd*, 283 F.3d 1258 (11th Cir. 2002); *Senda v. Commissioner*, 433 F.3d 1044 (8th Cir. 2006).

The willingness of Highland Dallas's officers and directors (who are essentially the same people) to accept property so over-valued (by approximately 35% on the date of the gift based on public information readily available at that time) suggests Highland Dallas may have willingly acted as an accommodation party (i.e., as an aider or abettor) to a tax shelter scheme within the meaning of section 6701 of the Internal Revenue Code (the "Code") because of Mr. Dondero's influence as a previous substantial contributor and thus made the Put Option price of $6.19 per Unit and the decision to exercise or not exercise it all the more important.

Furthermore, this pattern of substantial overvaluations (including the firearms gift mentioned on page 6 of my March 20, 2025 letter) not only raises concerns under the gross valuation

---

[2] Highland Dallas would be aware of the valuation of the gift because a representative signed the Form 8283, *Noncash Charitable Contributions*, form at that time, which calls for a disclosure of the amount claimed as a deduction as well as other relevant information.

Seyfarth



misstatement penalty provisions in section 6662 but also may implicate civil fraud, which could suspend running of the statute of limitations under section 6501(c)(1).

Then, one has to question whether the officers and Board of Highland Dallas acted prudently when they chose not to exercise the Put Option promptly after receiving the gift in 2021, 2022, 2023, and in any case before November 25, 2024, when the Unit value on November 22, 2024 (the Friday before the announcement of the going private transaction) was a mere $0.02. This is especially problematic in our view because the present value of the Put Option would decline for every year it went unexercised given the continued decline of the Unit price from the date of the initial gift, and, as we noted in our March 20 letter, was essentially a $9.285 million interest-free loan to Dugaboy, itself an automatic excess benefit transaction under section 4958(c)(3)(A) of the Code.

While we are speculating, because we have no knowledge of what type of agreement, written or otherwise, was reached between The Dallas Foundation representatives on the Highland Dallas Board and with Mr. Dondero or his designated NexPoint representative Lucy Bannon, if a deal was in fact made to vote in favor of the going private transaction or to refrain from exercising the Put Option, that would suggest sufficient interest to make the business judgment rule inapplicable to all directors.

The REIT announced the going private transaction on November 25, 2024 and ultimately it was consummated on April 17, 2025, theoretically netting Highland Dallas $540,000, about 0.58% of what it would have realized had the Put Option been exercised.at any time prior to April 17, 2025. But any prudent investor would have, or should have, known by the one-year anniversary of the contribution that the Unit price dropped precipitously (i.e., by more than a third of its value) between December 19, 2019 ($4.00 per Unit) and December 17, 2020 ($2.50 per Unit). By the two-year anniversary of the contribution, on December 17, 2021, it was $2.10 per Unit (i.e., by then, about one-third of the Put Option exercise price), and by the three-year anniversary, on December 19, 2022 it was $1.50 per Unit. By December 19, 2023, the fourth anniversary of the gift, a Unit's trading price became essentially valueless at $0.01 per Unit.

All the while, the Units remained thinly traded. Thus, the conclusion is inescapable that either the directors and officers were potentially grossly negligent by not exercising the Put Option or they were unduly influenced by Mr. Dondero if they made a conscious decision not to exercise the Put Option. We respectfully submit that even a cursory review of the Highland Dallas corporate minutes will have a complete explanation of that forbearance decision-making process. The absence of such a discussion will support a conclusion that two Dallas Foundation Board members, including Julie Diaz, acted in a grossly negligent manner by not insisting the Put Option be exercised well before the going-private transaction was even contemplated.

Finally, it appears that the Put Option was not exercised prior to the announcement of the going private transaction and the vote by the theoretically independent Unitholders as required under Canadian corporate law. If this proves to be the case, Dugaboy would have received a material economic benefit from Highland Dallas, resulting in inurement of net earnings to Dugaboy and most likely an automatic excess benefit transaction under section 4958(c)(3)(A) of the Code requiring correction.

In addition, if Highland Dallas failed to exercise the Put Option and allowed it to lapse, it raises the possibility that the Service should look into whether other contributions made directly or

Seyfarth



indirectly by Mr. Dondero to Highland Dallas were similarly overvalued, such as the contribution of firearms mentioned on page 6 of my March 20th letter. If that is determined to be the case, then section 6700's tax shelter promoter penalties may be implicated for both Mr. Dondero and Dugaboy and Highland Dallas may be implicated as an aider and abettor under section 6701 by serving as a willing accommodation party. *See, e.g., Tarpey v. United States* collection of cases involving inflated time share deductions made to a controlled charitable organization and Rev. Rul. 80-69, 1980-1 C.B. 55.

**NexBank (Dondero-Controlled) Banking Relations with Highland Dallas**

We also recommend that the IRS review the banking relationships between Highland Dallas and NexBank, a privately held bank owned or controlled by Mr. Dondero. Based on our information, we believe that Highland Dallas's officers and directors (other than Mr. Dondero) have exercised little or no control over bank accounts maintained in Highland Dallas's name with NexBank. Instead, control over those accounts is, to the best of our knowledge, vested with employees of Mr. Dondero's private entities, including NexPoint Advicors, L.P. If this is proven correct, this will further demonstrate that Highland Dallas is being operated for the private benefit of Mr. Dondero.

As a recent example, on April 2, 2025, Highland Dallas's NexBank account received a wire transfer in the amount of $528,587.54, but Highland Dallas's officers could not locate the money, cannot access it, and cannot confirm theyhad received it. Upon information and belief, this NexBank account was was the sole bank account for Highland Dallas from 2012 until at least 2021, yet their officers do not seem to know of its existence.[3]

**Further Evidence of Non-Compliance with Section 509(a)(3)'s**

In another recent development, on April 17, 2025, NexPoint Philanthropies Dallas, Inc. (the d/b/a now used by Highland Dallas, as explained page 6 of my March 20, 2025 letter), announced a $1,299,410 committed funding to the Community Park at Fair Park in Dallas. While on its face this grant is laudable, it violates the operational test applicable to section 509(a)(3) supporting organizations, discussed on pages 15-16 of my March 20,2025 letter.

**New, Ongoing Texas Attorney General Investigation**

Finally, the Texas Attorney General has opened an investigation of DAF Holdco and its relationship to Highland Dallas. We believe this was initiated by Highland Dallas at Mr. Dondero's request/demand as a means to get a State actor like the Texas Attorney General to wrest control of DAF Holdco from Mark Patrick (even though DAF Holdco is not itself a charitable organization). We believe Mr. Dondero's motive is to use DAF Holdco's assets to satisfy a growing number of his judgment creditors like UBS described in my earlier correspondence.

---

[3] After Mark Patrick advised David Rosenberg (outside counsel to Highland Dallas) that it would be important for Highland Dallas to have a bank account not held at NexBank due to its control and ownership by Mr. Dondero, Mr. Rosenberg caused Highland Dallas to open an account with Schwab.

Seyfarth



We have provided the attorneys and investigators of the Texas AG with copies of all letters and materials we have provided to the Service and have requested a meeting in Austin with them as we have with you to discuss our concerns/positions in a manner that complies with your section 6103 obligations and the Texas law equivalent.

In addition, the behavior of the Highland Dallas Board and officers of Highland Dallas raise concerns about waste of corporate assets (e.g., failure to exercise the Put Option when the value of the Class B Units held by Highland Dallas dropped precipitously from $4.00 on December 19, 2019 to $0.02 on November 22, 2024, days before the going private transaction was announced), breach of the duty of care (e.g., failure to exercise adequate oversight of the NexBank banking relationship), and multiple breaches of the duty of loyalty by Mr. Dondero (e.g., by using his influence and control over Highland Dallas to attempt to wrest control of DAF Holdco so he can use its assets as his own piggy bank to pay his creditors).

This is not just a matter of Texas corporate law, it is a matter of federal tax law as well. As Judge Posner, now retired, famously said, in *United Cancer Council v. Commissioner*, 165 F.3d 1173 (7th Cir. 1999), after he concluded the fundraiser (Watson & Hughey) was not an insider for purposes of the inurement prohibition in section 501(c)(3) of the Code:

> "Remember the IRS's alternative basis for yanking UCC's exemption? It is that as a result of the contract's terms, UCC was not really operated exclusively for charitable purposes, but rather for the private benefit of W&H as well. Suppose that UCC was so irresponsibly managed that it paid W&H twice as much for fundraising services as W&H would have been happy to accept for those services, so that UCC's $26 million in fundraising expense $13 million was the equivalent of a gift to the fundraiser. Then it could be argued that UCC was in fact being operated to a significant degree for the private benefit of W&H, though not because it was the latter's creature. That then would be a route for using tax law to deal with the problem of improvident or extravagant expenditures by a charitable organization that do not, however, inure to the benefit of insiders."
>
> . . .
>
> "[T]he board of a charity has a duty of care, just like a the board of an ordinary business corporation,[citations omitted], and a violation of that duty of care which involved the dissipation of the charity's assets might . . . support a finding that the charity was conferring a private benefit, even if the contracting party did not control, or exercise undue influence over the charity. This, for all we know, may be such a case." 83 AFTR 2d 99-812, at 99-818-819.

Of course, all Highland Dallas officers and directors are insiders for purposes of the inurement prohibition.

* * *

Feel free to reach me (or have one of your staff reach me) on my mobile (310-890-1300) if you desire to discuss the Form 13909 or have any questions. Also, as indicated in my March 20th letter, I can arrange to meet you, along with Mark Patrick, to meet you in your Dallas office to

Seyfarth

May 1, 2025
Page 6

discuss this and my previous correspondence in a manner consistent with your section 6103 obligations.

Very truly yours,

SEYFARTH SHAW LLP

Douglas M. Mancino

Douglas M. Mancino

cc. Mark Patrick, Shawn Raver and Paul Murphy and Christopher Krhovjak, Investigator, Charitable Trust Section, Texas Attorney General (w/Encls.)