**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee

§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 34**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Case 19-34054-sgj11 Doc 4707 Filed 08/07/26 Entered 08/07/26 19:37:31 Desc
Main Document Page 2 of 23

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru Vol. 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| | | | |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7<br>003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8<br>004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9<br>005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 9 | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 04/17/2026 005330 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 04/21/2026 005590 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026 005594 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026 005615 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026 005682 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

| vol. 11 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

Vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 05/06/2026 005913 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005920 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005927 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 05/07/2026 005929 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/08/2026 005936 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 05/08/2026 005939 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 05/08/2026 005942 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 005945 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 05/08/2026 006100 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

Thru Vol 21

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10).22 008156 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 28 | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 05/11/2026 010664 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 05/11/2026 010736 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 05/11/2026 011150 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 05/11/2026 011734 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 05/11/2026 013203 Thru Vol 33 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 05/11/2026 014888 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 05/11/2026 015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 05/18/2026 015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016679 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 39 | | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 016729 | 07/10/2026 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 016731 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 016733 | 07/24/2026 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 016742 | 07/28/2026 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S THIRD AMENDED**
**EXHIBIT LIST FOR THE MAY 11, 2026 HEARING**

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Exhibit List for the May 11, 2026 Hearing in the Bankruptcy Case.

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | HCM-D10000002-HCM-D10000013 |
| 2 | Settlement Agreement and General Release | 000813-000836 |
| 3 | 6/4/2024 First Affidavit of Mark Patrick | Dkt. 401-2 (21-03076-sgj) |
| 4 | 7/21/2025 [4-33] Original DAF Org Chart | Dkt. 4-33 (25-11376-BLS) |
| 5 | 7/11/2011 Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP | Dkt. 4-36 (25-11376-BLS) |
| 6 | 2/20/2025 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd. | Dkt. 4-06 (25-11376-BLS) |
| 7 | 11/9/2023 Shields Work Plan Memorandum | |
| 8 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 9 | 12/12/2024 Certificate of Formation of CDFMCAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 10 | 12/18/2024 Charitable DAF HoldCo, Ltd. Unanimous Written Resolutions of all of the Directors of the Company | Dkt. 4-45 (25-11376-BLS) |
| 11 | 9/30/2024 Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 12 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 13 | 3/27/2025 CDMCFAD, LLC Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 14 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D100000330 |
| 15 | 2/12/2025 Membership Interest Purchase Agreement | HCM-D10000021-HCM-D10000036 |
| 16 | 2/12/2025 Member Consent of Beacon Mountain | HCM-D10000019-HCM-D10000020 |
| 17 | 11/30/2015 Amended and Restated Limited Partnership Agreement of Atlas IDF, LP | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 18 | 6/26/2025 Audit of RAND PE Fund I, LP | HMIT_Entities_000022-HMIT_Entities_000039 |
| 19 | 3/6/2024 DAF Structure Chart in 2024 and 2025 | |
| 20 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | |
| 21 | 12/2015-8/2022 Rand Structure Chart | |
| 22 | 2/12/2025 Feb. and May 2025 Rand Structure Chart | |
| 23 | 10/15/2019 Empower Dallas Foundation, Inc. Partial Surrender Request | |
| 24 | 2/22/2021 Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief | Dkt. 1943 (19-34054-sgj11) |
| 25 | 4/8/2025 Email regarding Settlement Agreement | HCMLPHMIT00000656-HCMLPHMIT00000661 |
| 26 | 12/16/2015 Crown Global Deferred Variable Annuity Policy for Empower Dallas Foundation, Inc. | |
| 27 | 11/30/2015 Participation Agreement between Crown Global Life Insurance Ltd. and Other Entities | |
| 28 | 9/12/2025 First Affidavit of Mark Eric Patrick | |
| 29 | 10/21/2025 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 9/30/2025 | Dkt. 4438 (19-34054-sgj11) |
| 30 | 10/21/2025 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 9/30/2025 | Dkt. 4439 (19-34054-sgj11) |
| 31 | 1/21/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 12/31/2025 | Dkt. 4503 (19-34054-sgj11) |
| 32 | 1/21/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 12/31/2025 | Dkt. 4504 (19-34054-sgj11) |
| 33 | 4/20/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 3/31/2026 | Dkt. 4552 (19-34054-sgj11) |
| 34 | 4/20/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 3/31/2026 | Dkt. 4553 (19-34054-sgj11) |
| 35 | 6/25/2025 Hearing Transcript for Case No. 19-34054-sgj-11 | |
| 36 | 4/16/2025 Affidavit of James David Dondero | Dkt. 4534-7 (19-34054-sgj11) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 37 | 6/9/2025 Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC § 363 Approving Settlement with the HMIT Entities | Dkt. 4230 (19-34054-sgj11) |
| 38 | HMIT Structure as of 8/12/2022 – 2/12/2025 | |
| 39 | 2/6/2025 Letter to Dolomiti LLC re Notice of Your Withdrawal from Rand PE Fund I, L.P. | |
| 40 | 2024 Tax Form 990 – Highland Dallas Foundation Inc. | Dkt. 4556-2 (19-34054-sgj11) |
| 41 | 3/27/2025 Admission and Amendment to No. 1 Agreement | Dkt. 4-54 (25-11376-BLS) |
| 42 | 12/12/2024 Certificate of Formation of CDMCFAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 43 | 2/7/2015 Unanimous Written Resolutions of the Board of Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-22 (25-11376-BLS) |
| 44 | 12/18/2024 Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-45 (25-11376-BLS) |
| 45 | 4/2/2025 Written Resolutions of the Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-47 (25-11376-BLS) |
| 46 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 47 | 7/21/2025 Defendants' Motion to Dismiss and Plea to the Jurisdiction filed in Cause No. 25-BC-01B-0027, The Highland Foundation, Inc. et al. v. Mark Patrick, et al., The Business Court of Texas, First Division | Dkt. 4-91 (25-11376-BLS) |
| 48 | 3/27/2025 Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 49 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 50 | 9/30/2024 Valuation Analysis of 100 Participation Shars of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 51 | 3/7/2024 Written Consent of the Managing Member of Charitable DAF GP, LLC | Dkt. 4-38 (25-11376-BLS) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 52 | 6/9/2025 Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000001-HCM-D10000001 |
| 53 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) on December 17, 2015 | HCM-D10000002-HCM-D10000013 |
| 54 | Email chain regarding the sale of Class C limited partnership interests from Highland Capital Management, L.P. to Hunter Mountain Investment Trust. Mark Patrick | HCM-D10000014-HCM-D10000015 |
| 55 | Email from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer. | HCM-D10000016-HCM-D10000016 |
| 56 | Email chain from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer | HCM-D10000017-HCM-D10000018 |
| 57 | CLO Holdco, LLC's purchase of all membership interests in Beacon Mountain, LLC from Rand PE Fund I, L.P. | HCM-D10000019-HCM-D10000020 |
| 58 | Membership Interest Purchase Agreement - | HCM-D10000021-HCM-D10000036 |
| 59 | Organizational structure of HMIT entities before and after February 12, 2025. | HCM-D10000037-HCM-D10000038 |
| 60 | Investment Management Agreement -establishes Rand Advisors, LLC as the investment manager for Atlas IDF, LP. | HCM-D10000039-HCM-D10000045 |
| 61 | Investment Management Agreement - establishes Rand Advisors, LLC as the investment manager for Rand PE Fund I, L.P. | HCM-D10000046-HCM-D10000052 |
| 62 | Register of Members for CLO Holdco, Ltd. | HCM-D10000053-HCM-D10000055 |
| 63 | Unanimous Written Consent - executed by Mark Patrick as sole director of Rand Advisors Holding Corp. | HCM-D10000056-HCM-D10000069 |
| 64 | Charitable DAF Fund, LP transferred DAF Holdings stock to CLO HoldCo, Ltd | HCM-D10000070-HCM-D10000072 |
| 65 | Register of Members for Liberty CLO Holdco, Ltd. CLO Holdco, Ltd. | HCM-D10000073-HCM-D10000073 |
| 66 | Limited Liability Company Agreement - establishing Liberty CLO Holdco, LLC as a Delaware limited liability company. | HCM-D10000074-HCM-D10000090 |
| 67 | Register for CDH GP, Ltd. | HCM-D10000091-HCM-D10000091 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 68 | Register of Members for CDH GP, Ltd. | HCM-D10000092- HCM-D10000092 |
| 69 | Register for CLO HoldCo, Ltd. | HCM-D10000093- HCM-D10000094 |
| 70 | Register of General Partners for Charitable DAF Fund, LP. | HCM-D10000095- HCM-D10000095 |
| 71 | Register of Limited Partners for Charitable DAF Fund, LP | HCM-D10000096- HCM-D10000096 |
| 72 | Limited Liability Company Agreement for CDMCFAD, LLC. | HCM-D10000097- HCM-D10000124 |
| 73 | Collation of various documents including resolutions from CDMCFAD, LLC, and a March 2025 letter from Seyfarth Shaw LLP to the IRS reporting potential tax violations by Highland Dallas Foundation, Inc. (Jim Dondero). | HCM-D10000125- HCM-D10000251 |
| 74 | Letter from three Highland foundations to Paul Murphy | HCM-D10000264- HCM-D10000265 |
| 75 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000266- HCM-D10000267 |
| 76 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000268- HCM-D10000269 |
| 77 | Email chain between K. Hendrix and J. Seery, et al. | HCM-D10000270- HCM-D10000271 |
| 78 | Email chain James Seery to Mark Patrick and Shawn Raver | HCM-D10000272- HCM-D10000272 |
| 79 | Email chain from Shawn Raver to J. Seery, et al. | HCM-D10000273- HCM-D10000273 |
| 80 | Email chain from M. Tax to S. Raver, et al. | HCM-D10000274- HCM-D10000274 |
| 81 | Email chain from K. Hendrix to S. Raver, et al. | HCM-D10000275- HCM-D10000276 |
| 82 | Email chain from S. Raver to K. Hendrix, et al. | HCM-D10000277- HCM-D10000278 |
| 83 | Email chain from S. Raver to M. Tax, et al. | HCM-D10000279- HCM-D10000280 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 84 | Note Elevation and Assignment Agreement | HCM-D10000281-HCM-D10000301 |
| 85 | Email from A. Hurt to T. Cournoyer, et al. | HCM-D10000302-HCM-D10000303 |
| 86 | Letter to Dugaboy Investment Trust | HCM-D10000304-HCM-D10000308 |
| 87 | Claims Assignment Agreement | HCM-D10000309-HCM-D10000315 |
| 88 | Email from David Klos at Highland Capital Management to James Seery | HCM-D10000316-HCM-D10000316 |
| 89 | Trust Agreement establishes the Hunter Mountain Investment Trust on December 17, 2015 | HCM-D10000317-HCM-D10000328 |
| 90 | Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000329-HCM-D10000329 |
| 91 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D10000330-HCM-D10000330 |
| 92 | Email from K. Hendrix to A. Gunther, et al. | HCM-D10000331-HCM-D10000332 |
| 93 | Email from K. Hendrix to D. Klos, et al. | HCM-D10000333-HCM-D10000334 |
| 94 | Letter from Campbells LLP to James Seery (CEO of Highland Capital Management, L.P.) and Marc Kirschner | HCM-D10000335-HCM-D10000338 |
| 95 | Email chain from A. Kapuria to S. Raver, et al. | HMIT_Entities_000001-HMIT_Entities_000006 |
| 96 | Email chain from K. Jackson to S. Raver, et al. | HMIT_Entities_000007-HMIT_Entities_000010 |
| 97 | Email chain from S. Reynolds to S. Raver, et al. | HMIT_Entities_000011-HMIT_Entities_000015 |
| 98 | Email from Chris Rice to K. Jackson, et al. | HMIT_Entities_000016-HMIT_Entities_000020 |
| 99 | Email from Chris Rice to S. Raver, et al. | HMIT Entities 000021-HMIT Entities 000021 |
| 100 | Audited financial statements for Rand PE Fund I, L.P. | HMIT_Entities_000022-HMIT_Entities_000039 |
| 101 | Email chain from K. Jackson to S. Raver | HMIT_Entities_000040-HMIT_Entities_000043 |
| 102 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000044-HMIT_Entities_000047 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 103 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities_000048- HMIT Entities 000051 |
| 104 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000052- HMIT_Entities_000054 |
| 105 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000055- HMIT Entities 000057 |
| 106 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000058- HMIT Entities 000058 |
| 107 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000059- HMIT Entities 000059 |
| 108 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000060- HMIT_Entities_000060 |
| 109 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000061- HMIT Entities 000061 |
| 110 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000062- HMIT Entities 000063 |
| 111 | Email chain between Crown Global Insurance and Rand Advisors | HMIT_Entities_000064- HMIT_Entities_000065 |
| 112 | Email from Robert Kipp to M. Patrick, et al. | HMIT Entities 000066- HMIT Entities 000066 |
| 113 | Email chain from A. Gunther to S. Raver, et al. | HMIT Entities 000067- HMIT Entities 000070 |
| 114 | Email chain from S. Raver to A. Gunther, et al. | HMIT_Entities_000071- HMIT_Entities_000074 |
| 115 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000075- HMIT_Entities_000076 |
| 116 | Email chain from S. Raver to J. Seery, et al. | HMIT Entities 000077- HMIT Entities 000078 |
| 117 | Email from C. Rice to S. Raver, et al. | HMIT Entities_000079- HMIT Entities_000079 |
| 118 | Bloomberg invoice | HMIT Entities 000080- HMIT Entities 000080 |
| 119 | Email thread with S&P Global | HMIT_Entities_000081- HMIT_Entities_000083 |
| 120 | S&P Global invoice | HMIT Entities_000084- HMIT Entities_000084 |
| 121 | Email exchange between auditors Chris Rice (NexPoint Services) and Patrick Casale (Cohen & Co) | HMIT Entities_000085- HMIT Entities_000086 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 122 | Financial statement audit | HMIT_Entities_000087-HMIT_Entities_000103 |
| 123 | Email chain C. Rice to S. Raver | HMIT_Entities_000104-HMIT_Entities_000114 |
| 124 | Email chain from S. Raver to C. Rice | HMIT_Entities_000115-HMIT_Entities_000124 |
| 125 | Email from K. Longwell to M. Tax, et al. | HMIT Entities_000125-HMIT Entities_000125 |
| 126 | Civil Investigative Demand issued by the Texas Attorney General's Office to Hunter Mountain Investment Trust (HMIT) on July 14, 2025 | HMIT_Entities_000126-HMIT_Entities_000133 |
| 127 | Email from K. Longwell to M. Tax, et al. | HMIT Entities 000134-HMIT Entities 000134 |
| 128 | Dkt. 23, Notice of Hearing dated 8/27/2025 | HMIT_Entities_000135-HMIT_Entities_000254 |
| 129 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000260-HMIT_Entities_000261 |
| 130 | Email chain from D. Klos to K. Hendrix, et al. | HMIT_Entities_000262-HMIT_Entities_000263 |
| 131 | Email chain from M. Tax to J. Seery, et al. | HMIT_Entities_000264-HMIT_Entities_000264 |
| 132 | Email chain from K. Hendrix to S. Raver, et al. | HMIT_Entities_000265-HMIT_Entities_000266 |
| 133 | Email chain from K. Hendrix to A. Gunther, et al. | HMIT_Entities_000267-HMIT_Entities_000268 |
| 134 | DAF entity structure | VALUESCOPE 000001-VALUESCOPE 000001 |
| 135 | DAF/Rand entity structure | VALUESCOPE_000002-VALUESCOPE_000002 |
| 136 | Law firm forwards legal filing to Mark Patrick (DAF HoldCo) re Chapter 15 filing | VALUESCOPE_000003-VALUESCOPE_000007 |
| 137 | Chapter 15 Petition filing | VALUESCOPE_000008-VALUESCOPE_000026 |
| 138 | Charitable DAF Org structure | VALUESCOPE_000027-VALUESCOPE_000027 |
| 139 | Letter from Reed Smith LLP | VALUESCOPE_000028-VALUESCOPE_000029 |
| 140 | ValueScope, LLC Response | VALUESCOPE_000030-VALUESCOPE_000030 |
| 141 | Certificate of Incorporation, Charitable DAF HoldCo, Ltd. | TDIT004698 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 142 | Legal Relationship Agreement, Highland Kansas City Foundation | TDIT003396–TDIT003398 |
| 143 | Supporting Organization Operating Agreement - Highland Dallas Foundation, Inc. | TDIT003399–TDIT003406 |
| 144 | Supporting Organization Operating Agreement - Highland Santa Barbara Foundation, Inc. | TDIT003407–TDIT003413 |
| 145 | Letter - Highland Dallas Foundation, Inc. | TDIT003389–TDIT003390 |
| 146 | Letter - Highland Santa Barbara Foundation, Inc. | TDIT003391–TDIT003393 |
| 147 | Letter - Highland Kansas City Foundation, Inc. | TDIT003394–TDIT003395 |
| 148 | Employment Agreement - Mark Patrick | TDIT003971–TDIT003988 |
| 149 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011256–TDIT011268 |
| 150 | Memo - Harneys (H&B) | TDIT004274–TDIT004278 |
| 151 | Invoice - G.K. Management Limited | TDIT011038–TDIT011039 |
| 152 | Invoice - G.K. Management Limited | TDIT011040 |
| 153 | Invoice - G.K. Management Limited | TDIT011041 |
| 154 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011058–TDIT011062 |
| 155 | Certificate of Incorporation - Highland Kansas City Foundation, Inc. | TDIT003304–TDIT003306 |
| 156 | Certificate of Incorporation - Highland Dallas Foundation, Inc. | TDIT003326–TDIT003328 |
| 157 | Certificate of Incorporation - Highland Santa Barbara Foundation, Inc. | TDIT003344–TDIT003346 |
| 158 | Invoice - G.K. Management Limited | TDIT011042–TDIT011043 |
| 159 | Invoice - G.K. Management Limited | TDIT011044–TDIT011045 |
| 160 | Invoice - G.K. Management Limited | TDIT011046–TDIT011047 |
| 161 | Invoice - G.K. Management Limited | TDIT011048–TDIT011049 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 162 | Invoice - G.K. Management Limited | TDIT011050–TDIT011051 |
| 163 | Invoice - G.K. Management Limited | TDIT011052–TDIT011053 |
| 164 | Invoice - G.K. Management Limited | TDIT011054–TDIT011055 |
| 165 | Expense Reimbursement - G.K. Management Limited | TDIT011056–TDIT011057 |
| 166 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011088–TDIT011092 |
| 167 | Memorandum – Work Plan - Shields Legal Group | TDIT004699–TDIT004706 |
| 168 | Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT011093–TDIT011128 |
| 169 | Email - Shields Legal Group | TDIT003704 |
| 170 | Limited Partnership Agreement - Charitable DAF Fund, LP | TDIT003414–TDIT003431 |
| 171 | ValueScope Report - ValueScope, Inc. | TDIT004017–TDIT004075 |
| 172 | Expense Report - CLO HoldCo, Ltd. | TDIT003432–TDIT003435 |
| 173 | Audited Financial Statements - Highland Santa Barbara Foundation, Inc. | TDIT003989–TDIT004016 |
| 174 | Resolution of the Directors - Mark Patrick | TDIT003961–TDIT003962 |
| 175 | Resolution of the Directors - Mark Patrick | TDIT003963–TDIT003970 |
| 176 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011129–TDIT011136 |
| 177 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011137–TDIT011150 |
| 178 | Letter - Highland Dallas Foundation, Inc. | TDIT003707–TDIT003708 |
| 179 | Email - Paul Murphy | TDIT003709–TDIT003713 |
| 180 | Email - Walkers | TDIT003714–TDIT003719 |
| 181 | Certificate of Incorporation - DFW Charitable Foundation | TDIT003701–TDIT003703 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 182 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011151–TDIT011164 |
| 183 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011165–TDIT011170 |
| 184 | Resolution - Charitable DAF HoldCo, Ltd. | TDIT003720–TDIT003726 |
| 185 | Assignment - Charitable DAF HoldCo, Ltd. | TDIT003727–TDIT003732 |
| 186 | Agreement - CDMCFAD, LLC | TDIT003733–TDIT003760 |
| 187 | Email - David N. Corkern | TDIT003791–TDIT003792 |
| 188 | ValueScope Report - ValueScope, LLC | TDIT004076–TDIT004130 |
| 189 | Draft Legal Advice - Walkers | TDIT003761–TDIT003765 |
| 190 | Share Issuance Resolution - Charitable DAF HoldCo, Ltd. | TDIT003766–TDIT003790 |
| 191 | Email - PricewaterhouseCoopers (PwC) | TDIT004305–TDIT004323 |
| 192 | Memorandum and Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT003267–TDIT003303 |
| 193 | Form ADV - Rand Advisors, LLC | TDIT003646–TDIT003674 |
| 194 | Brochure - Rand Advisors, LLC | TDIT003675–TDIT003700 |
| 195 | Email - Mark Patrick | TDIT004324–TDIT004340 |
| 196 | ValueScope Report - ValueScope, LLC | TDIT004131–TDIT004205 |
| 197 | Email - FTI Consulting | TDIT004341–TDIT004358 |
| 198 | Director Services Agreement - CDMCFAD, LLC | TDIT011171–TDIT011185 |
| 199 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003955–TDIT003957 |
| 200 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003958–TDIT003959 |
| 201 | Prospectus - NexPoint Real Estate Strategies Fund | TDIT003463–TDIT003599 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 202 | Proxy Statement - NexPoint Capital, Inc. | TDIT003440–TDIT003462 |
| 203 | Written Resolution - CLO HoldCo, Ltd. | TDIT011196–TDIT011197 |
| 204 | Texas Petition - Highland Dallas Foundation, Inc. | TDIT004443–TDIT004688 |
| 205 | Rule 11 Agreement - Highland Dallas Foundation, Inc. | TDIT004693–TDIT004695 |
| 206 | Exhibit Index to Affidavit - Margot MacInnis | TDIT003261-TDIT004712 |
| 207 | Affidavit - Jim Dondero Dugaboy Investment Trust | TDIT004713-TDIT004778 |
| 208 | Texas Petition (Amended) - Highland Dallas Foundation, Inc. | TDIT006527–TDIT006580 |
| 209 | Liquidator's Certificate - Margot MacInnis (JOL) | TDIT006492 |
| 210 | Form ADV - Mark Patrick, Rand PE Fund | TDIT006581-TDIT006609 |
| 211 | Affidavit & Exhibit Index - Margot MacInnis | TDIT004967-TDIT006484 |
| 212 | Affidavit & Exhibit Index | TDIT006485-TDIT006580 |
| 213 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011394-TDIT011405 |
| 214 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011382-TDIT011393 |
| 215 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011425-TDIT011443 |
| 216 | Objection filed by Highland Dallas Foundation, Inc. Grant James Scott III | TDIT011444-TDIT011475 |
| 217 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011476-TDIT011509 |
| 218 | Supplemental Declaration - DFW Charitable Foundation CDMCFAD LLC | TDIT004869-TDIT004945 |
| 219 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) | TDIT006664-TDIT006675 |
| 220 | Affirmation by Mark Patrick | TDIT010529-TDIT010532 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 221 | Operating agreement between Highland Dallas Foundation, Inc. and The Dallas Foundation. | TDIT011406-TDIT011406 |
| 222 | Email exchange between Michael Stockham and Paul Murphy | TDIT010831-TDIT010840 |
| 223 | Form ADV Instructions - None | TDIT006628-TDIT006663 |
| 224 | Declaration by Caroline Maron | TDIT004846-TDIT004868 |
| 225 | Email from Louis M. Phillips requesting execution of two letters with attached documents | TDIT011318-TDIT011323 |
| 226 | Auditor's Report - Highland Capital Management L.P. | TDIT006610-TDIT006627 |
| 227 | Email chain from March 2025 | TDIT011407-TDIT011424 |
| 228 | Amended and Restated Limited Partnership Agreement - Atlas IDF LP | TDIT004779-TDIT004812 |
| 229 | Participation Agreement establishes the framework for Crown Global Life Insurance Ltd to purchase | TDIT004813-TDIT004845 |
| 230 | Investment Management Agreement - Rand PE Fund I | TDIT004946-TDIT004952 |
| 231 | Investment Management Agreement - Rand PE Fund I, L.P. | TDIT004953-TDIT004959 |
| 232 | Limited Partnership Agreement - Rand PE Fund | TDIT004960-TDIT004966 |
| 233 | By-Laws - Highland Kansas City Foundation, Inc. | TDIT003307–TDIT003325 |
| 234 | By-Laws - Highland Dallas Foundation, Inc. | TDIT003329–TDIT003343 |
| 235 | By-Laws - Highland Santa Barbara Foundation, Inc. | TDIT003347–TDIT003361 |
| 236 | Organizational Procedures - Greater Kansas City Community Foundation | TDIT003362–TDIT003388 |
| 237 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003705 |
| 238 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003706 |
| 239 | Expenses Table - Charitable DAF HoldCo, Ltd. | TDIT003960 |
| 240 | Delaware Division of Corporations Search Results - DFW Charitable Foundation | TDIT004696 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 241 | Delaware Division of Corporations Search Results - CDMCFAD, LLC | TDIT004697 |
| 242 | Demonstrative: DAF-Rand Structure Chart | |
| 243 | Certificate of Incorporation of CDH GP, Ltd. | Dkt. 4-95 (25-11376-BLS) |

Dugaboy also reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

Dated: May 11, 2026

Respectfully submitted,

*/s/ Avery Joseph Welker*
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)

New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 11, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*<u>/s/ Avery Joseph Welker</u>*
Avery Joseph Welker

Plaintiff
M MacInnis
Second Affidavit
July 2025
Exhibit MM-2

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**SECOND AFFIDAVIT OF MARGOT MACINNIS**

---

I, **MARGOT MACINNIS** of Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands MAKE OATH AND SAY as follows:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/LRA/858403-000002/83769899)

1 I am the same Margot MacInnis who swore an affidavit in this proceeding on 15 July 2025 ("**MacInnis 1**"). Capitalised terms used in this affidavit have the same meaning as in MacInnis 1.

2 I am Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("**Grant Thornton**"). I am one of the joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "**Company**"), alongside Sandipan Bhowmik also of Grant Thornton. Mr Bhowmik and I were appointed as JOLs of the Company by an order of this Honourable Court dated 6 May 2025 in Cause No. 116 of 2025 (JAJ) (the "**Appointment Order**").

3 I am duly authorised by my fellow JOL, Sandipan Bhowmik, to make this affidavit on the JOLs' behalf in support of the JOLs' summons dated 15 July 2025 (the "**Application**").

4 The facts and matters set out in this affidavit that are within my own personal knowledge are true and correct. Where the contents of this affidavit are not within my own personal knowledge, I have stated the source of my knowledge and such facts are true and correct to the best of my information and belief.

5 There is now produced and shown to me a paginated exhibit marked "**MM-2**". This contains true copies of certain documents to which I refer in this affidavit. Where I refer to a page in this affidavit, I am referring to a page in "**MM-2**".

6 The purpose of this affidavit is to update the Court on material developments that have occurred since I swore my first affidavit on 15 July 2025, namely:

6.1 The outcome of the Company's first meeting of contributories convened by the JOLs;

6.2 The recent correspondence with Campbells LLP ("**Campbells**"), who now act for Mark Patrick in addition to the Third, Fifth and Sixth Defendants; and

6.3 The Texas Proceedings.

**First Meeting of Contributories**

7 On 9 July 2025, the JOLs held the Company's first meeting of contributories at the JOLs' offices of Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, P.O. Box 1044, Grand Cayman, KY1-1102 and via teleconference. The purpose of the meeting was to (i) provide contributories of the Company with a summary of actions taken by the JOLs since their appointment; and (ii) to consider the appointment of a liquidation committee pursuant to the Companies Winding Up Rules (As Revised) ("**CWR**").

8 At the meeting, the following contributories were appointed to the Company's liquidation committee:

8.1 The Supporting Organisations, being Highland Dallas Foundation, Highland Kansas City Foundation, Inc., Highland Santa Barbara Foundation, Inc., and North Texas Community Foundation; and

8.2 DFW, the Fourth Defendant to these proceedings.

9 A copy of the Company's sealed CWR Form 15 confirming the composition of the Company's liquidation committee is at page 1 of MM-2.

**Correspondence with Campbells**

10 On 15 July 2025, Maples on behalf of the JOLs sent the Writ and Statement of Claim, the Application, and supporting evidence to the respective Cayman Islands attorneys acting for the Defendants.

11 On 21 July 2025, Campbells sent a letter to Maples whereby they: (i) gave notice that they now act for the Second Defendant (Mark Patrick) in addition to the Third, Fifth and Sixth Defendants;

(ii) confirmed that their clients would be filing Acknowledgements of Service[1]; and (iii) foreshadowed that their clients would shortly be filing a summons seeking orders to –

11.1 Postpone the hearing of the Application to a later date on the condition that their clients, the other Defendants and the Fund Entities[2] give undertakings to this Honourable Court to comply with the terms of the Rule 11 Agreement entered into with the Supporting Organisations in the Texas Proceedings (the "**CDM Undertakings**") (page 6 of MM-2);

11.2 Use the time allotted for the hearing of the Application on 31 July 2025 to give directions in relation Campbells' summons and the postponed hearing of the Application; and

11.3 Have the summons filed by DFW on 9 June 2025 in the Company's Cayman Islands liquidation proceedings[3] (the "**DFW Summons**") timetabled and heard together with the Application. I understand the DFW Summons is included in the hearing bundle for this Application. In short, the DFW Summons seeks orders in the liquidation proceedings that the issue of the lawfulness of the Relevant Transactions be determined in the Cayman Islands by way of declaratory relief proceedings.

12 Shortly thereafter, Campbells sent an email to the Court attaching the letter to Maples and the foreshadowed summons, which included in Schedule 1 the CDM Undertakings. (pages 8 to 9 of MM-2)

13 On 23 July 2025, Maples sent a letter to Campbells explaining that the JOLs would agree to postpone the hearing of the Application if Campbells' clients, the other Defendants and all Fund Entities give a revised form of undertaking to the Court pending the determination of the injunction application (the "**JOLs' Undertakings**") (pages 26 to 35 of MM-2). The changes

---

[1] However, as at the date of swearing this affidavit, no Acknowledgements of Service have been filed

[2] Referred to as "CDM Entities" in the CDM Undertakings

[3] FSD Cause No.116 of 2025 (JAJ)

that the JOLs made to the CDM Undertakings were to: (i) change them from undertakings to comply with the Rule 11 Agreement to standalone undertakings that will apply from the date they are given until the determination of the Application; (ii) include a requirement that the Defendants and Fund Entities seek approval from the JOLs for any payments above US$10,000; and (iii) revise the broad carve-out for ordinary course of business payments to limit them to those under US$10,000, subject to the Defendants and Fund Entities providing the JOLs with a monthly listing of said payments and supporting financial statements.

14 The JOLs believe that the JOLs' Undertakings represent a fair middle ground between the CDM Undertakings and the injunctions and disclosure orders sought by the JOLs by way of their Application, which undertakings will stay in place for the short period from now until the Application is heard and determined. As at the date of this affidavit, Maples is yet to receive a response from Campbells to the JOLs' Undertakings, but the JOLs will keep this Honourable Court apprised of any material developments, including any agreement reached between the parties.

**The Texas Proceedings**

15 On 20 July 2025, the Supporting Organisations filed in the Texas Proceedings an amended Petition, a true copy of which is at pages 36 to 88 of MM-2.

SWORN to at George Town, )
Grand Cayman, Cayman Islands, )
this 24th day of July 2025 )
before me )

Notary Public

Margot MacInnis

Rachel Baxendale
Notary Public - Cayman Islands

Commission expires on 31 January 2026

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/LRA/858403-000002/83769899)

Plaintiff
M MacInnis
Second Affidavit
July 2025
Exhibit MM-2

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**EXHIBIT MM-2**

---

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/LRA/858403-000002/83769899)

This is the Exhibit shown to me and marked "**MM-2**" to the Second Affidavit of **MARGOT MACINNIS**.

Sworn before me this 24TH day of July 2025

Notary Public



Rachel Baxendale
Notary Public - Cayman Islands

Commission expires on 31 January____

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/LRA/858403-000002/83769899) 2

**INDEX TO EXHIBIT MM-2**
**TO SECOND AFFIDAVIT OF MARGOT MACINNIS**



| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 1. | Company's sealed CWR Form 15 | 21 July 2025 | 1 |
| 2. | Letter from Campbells to Maples | 21 July 2025 | 2-7 |
| 3. | Email from Campbells to the Court | 21 July 2025 | 8-25 |
| 4. | Letter from Maples to Campbells | 23 July 2025 | 26-35 |
| 5. | Texas Proceedings – Amended Petition | 20 July 2025 | 36-88 |

**CWR Form No 15**

**Liquidator's Certificate (Composition of Liquidation Committee) (O. 9, r. 1)**

THE COMPANIES LAW

OFFICIAL LIQUIDATOR'S CERTIFICATE

COMPOSITION OF LIQUIDATION COMMITTEE

Charitable DAF HoldCo, Ltd. (In Official liquidation)

Grand Court FSD Cause No. 116 of 2025

The Official Liquidator hereby certifies that a liquidation committee has been constituted on the basis that he has determined the Company to be solvent for the purposes of section 110(4) of the Companies Law and CWR Order 9 and that the following contributories have been appointed:

1. Julie Diaz, representing Highland Dallas Foundation, Inc., 3000 Pegasus Park Drive #930, Dallas, TX 75247 (jdiaz@dallasfoundation.org)

2. Deborah Wilkerson, representing Highland Kansas City Foundation, Inc.,1055 Broadway Blvd. #130, Kansas City, MO 64105 (wilkerson@growyourgiving.org)

3. Jacqueline M. Carrera, representing Highland Santa Barbara Foundation, Inc., 1111 Chapala Street, Santa Barbara, CA 93101 (jcarrera@sbfoundation.org)

4. Rose Bradshaw, representing North Texas Community Foundation, 7777 Main Street, Suite 2850, Fort Worth, TX 76102 (rbradshaw@northtexascf.org)

5. Jennier Colegate, representing DFW Charitable Foundation c/o Baker & Partners (Cayman) Limited, P.O. Box, 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 (jennifercolegate@bakerandpartners.com)

Dated this 21st day of July 2025.

Margot MacInnis – Joint Official Liquidator of Charitable DAF HoldCo, Ltd. (In Official Liquidation)
Grant Thornton Specialist Services (Cayman) Ltd
2nd floor, Century Yard, Cricket Square
PO Box 1044, Grand Cayman, Cayman Islands KY1-1102
Contact: +1 345 949 7100

Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

D +1 345 914 5898
T +1 345 949 2648
F +1 345 949 8613
E MGoodman@campbellslegal.com

campbellslegal.com

Our Ref: MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Maples and Calder (Cayman) LLP
Ugland House
PO Box 309
Grand Cayman, KY1-1104
Cayman Islands

21 July 2025

Dear Sirs

**Charitable DAF HoldCo, Ltd (In Official Liquidation) v (1) Mark Eric Patrick (2) Paul Murphy (3) CDMCFAD, LLC (4) DFW Charitable Foundation (5) CDH GP, Ltd as General Partner for and on behalf of Charitable DAF Fund, LP, and in its personal capacity as General Partner (6) CLO HoldCo, Ltd.**
**FSD 201 of 2025 (RPJ) (the "Proceedings")**

1. We refer to your letters dated 15 July 2025 addressed to this firm and the Court ("**Your Letters**") which enclosed copies of the documents recently filed in the Proceedings. We are in the process of filing Acknowledgements of Service on behalf of the First, Third, Fifth and Sixth Defendants.

2. Capitalised terms, unless otherwise defined, adopt the definitions applied in your letter.

**Liquidation Proceedings and the Protocol**

3. The Liquidation Proceedings were commenced by way of a special resolution for voluntary liquidation signed by Mr Patrick, and have been underway since 2 April 2025. Your clients were appointed as official liquidators pursuant to a supervision order made on 6 May 2025.

4. In connection with the hearing on 24 June 2025 of an application to sanction the engagement of your firm (and Reed Smith as US legal counsel) (the "**Sanction Application**"), the hearing bundle contained approximately 17 affidavits and 2,700 pages of material which addressed in detail, *inter alia*, the Company's restructuring and the allegations of fraudulent conduct made against the former directors of the Company by certain of the Supporting Organisations. We note that the majority of this material is not before the Court in the current Proceedings.

5. At the hearing of the Sanction Application, your Ms Moran informed the Court that "(t)*he liquidators are not saying that there has been a fraud and they're not saying that the company definitely has a proprietary claim to any assets. They're saying that there needs to be an investigation because the facts are complicated, not straightforward and they need to be understood*".[1]

6. It was precisely in light of the need for such an investigation that our clients offered, of their own volition, a financial reporting protocol (the "**Protocol**") in correspondence on 30 May 2025, which offer was variously repeated in correspondence on 9 June 2025 and 29 June 2025 (the latter of which we have received no response to).

7. It is notable that at the Sanction Application Mr Justice Asif KC, who had the benefit of all of the material and had seen an earlier draft of the Protocol offered by our clients, observed that "*something along the lines of the protocol that is floating around seems a sensible way forward*".[2]

8. In the context of the JOLs' application to sanction the engagement of US legal counsel, His Lordship also observed that "*if there is agreement on a protocol, then the liquidators won't need to pursue chapter 15 because they'll be confident that the assets are safeguarded*".[3]

9. Although the Protocol was not the subject of the Sanction Application, His Lordship had the benefit of detailed evidence and submissions regarding the Protocol and the funding of the Liquidation Proceedings, to the point where your Ms Moran observed that much of the hearing was spent discussing these issues.[4]

10. Despite those comments by your Ms Moran and the learned Judge, our clients have inexplicably received no response to the letter of 29 June 2025 before the Proceedings were issued. It is disappointing that these matters receive only scant treatment in your clients' evidence.

**Texas Petition / TRO Motion**

11. By the Texas Petition, the Supporting Organisations are seeking, *inter alia*, the imposition of a constructive trust over all assets, interests, and property of, and immediate injunctive relief to freeze all assets held in, the Fund.

---

[1] Page 68, lines 6 - 9 of transcript from Sanction Application
[2] Page 42, lines 19 and 20 of transcript from Sanction Application
[3] Page 56, lines 7 - 9 of transcript from Sanction Application
[4] Page 57, lines 10 and 11, and page 83, lines 18 and 19 of transcript from Sanction Application

12. Quite how the Supporting Organisations are able to maintain their own proprietary claim in the Texas Petition while at the same time purporting to support the JOLs' alleged proprietary claim in the Cayman Islands is something that your clients will have to explain in due course. For present purposes, it is sufficient for us to record that at a hearing on 2 July 2025, the Supporting Organisations unsuccessfully attempted to obtain an emergency temporary restraining order ("**TRO**") against certain of our clients. At the hearing of the TRO Motion, the Judge expressly stated that he did not consider there to be a real risk of irreparable harm or dissipation of assets, concluding that: "*I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to move further* [sic.] *away.*[5] *But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that*"[6] (emphasis added).

13. Notwithstanding the Judge's clear indication that he did not see a proper basis to grant a TRO, our clients voluntarily entered into a Rule 11 Agreement[7] by which the Texas Defendants and the CDM Entities have agreed to (i) operate in the ordinary course of business; (ii) ensure that the proceeds of any assets remain in the relevant entity (i.e. are not transferred to any other entity within the group); and (iii) not engage in any corporate restructuring. The Rule 11 Agreement therefore operates so as to restrict the Texas Defendants and the CDM Entities from any conduct which might be considered a misappropriation or dissipation of assets.

14. In addition to the Rule 11 Agreement and the proffered Protocol (and as foreshadowed in our 29 June Letter and in the binding term sheet enclosed therewith), Mr Raver, the COO of HMIT and several of the CDM Entities, met with representatives of The Dallas Foundation (one of the Supporting Organisations which provided evidence in support of the just and equitable winding up and supervision applications) on 2 July 2025 and shared detailed financial information with them, including, *inter alia*, balance sheets for the last three quarters and details of any transfers of assets out of the DAF corporate structure. Our clients' US counsel have since written to the Dallas Foundation and offered to meet with them again to discuss potential resolutions.

15. We note your clients' assertion that they have only "*recently become aware*" of the Texas Petition (despite it being referred to in the JOLs' First Report to Contributories dated 2 July 2025). That fact:

    a. Merely evidences the willingness and apparent ability of the Supporting Organisations to manipulate the Cayman liquidation for their own ends, where it is now well-documented

---

[5] The words which appear in the uncorrected transcript are "*confirm it away*", rather than "*move further away*", which is an error and it is clear from the full context of the Judge's remark that he was referring to the risk of further movement or dissipation of the US$270m, concluding that there was and is no immediate threat of that occurring.
[6] Page 42, lines 15 – 20 of transcript from TRO Motion.
[7] Being a binding form of agreement between the parties entered into in open court and entered on the court record.

that the Supporting Organisations (or parties affiliated with them) are funding your clients; and

b. Does not allow your clients to simply ignore the Texas Judge's astute observation with respect to the complete absence of any evidence to suggest that there is a risk of any further movement of assets, which observation applies with even more force in the context of the Rule 11 Agreement.

**Urgency**

16. In the context of the Rule 11 Agreement, our clients' repeated offers to voluntarily enter into the Protocol, the further financial disclosure provided to The Dallas Foundation and the attempts by our clients' US counsel to meet with them, your clients' evidence and written representations to the court with respect the listing make no, or no adequate, attempt to explain the basis on which it is said that there is any genuine urgency arising from a risk of misappropriation or dissipation.

17. If our clients were intent on dissipating assets they would have had ample opportunity to do so (i) before the commencement of the liquidation (which was initiated by Mr Patrick as the management shareholder of the Company); and (ii) at any time between the commencement of the liquidation and the Rule 11 Agreement. They have not done so.

18. Based on a preliminary review of your clients' evidence, it appears that the height of their concerns regarding the alleged misappropriation of the Fund's assets are the baseless allegations that Mr Patrick is receiving excessive remuneration. These allegations will be addressed in evidence at the appropriate time. However, the representations in Ms MacInnis' affidavit are grossly misleading. Even a cursory investigation by the JOLs would have revealed that Mr Patrick's remuneration is a fraction of the millions of dollars extracted from the DAF corporate structure by 'investment advisors' associated with Mr. Dondero and the Supporting Organisations during Mr. Scott's tenure in the same role.

19. It is noteworthy also that Ms MacInnis' affidavit minimizes the independent benchmarking report provided by Mercer LLP and instead attempts to portray Mr Patrick's remuneration as a justification for the injunctive relief now sought. The next payment under Mr Patrick's long-term incentive plan is not due until 24 March 2027. Consequently, there can be no basis for your clients' assertion that there is a pressing or 'real risk' of misappropriation of assets in the near term. There is, in fact, no irreparable harm articulated in the pleadings at all, and even on your clients' own case, any harm alleged is entirely financial and, therefore, compensable in damages - especially given that (i) no non-financial harm is claimed, and (ii) there is (and can be) no suggestion that assets are being dissipated.

20. The only reasonable conclusion which can be drawn (and the inference we will be asking the court to draw) from these inherently weak allegations, the coincidence of the timing of the application following the failed attempt to seek a TRO in Texas, and the willingness of your clients to completely ignore the impact of the Rule 11 Agreement and repeated offers of the Protocol, is that the unsustainable assertions of urgency are made in the hope of gaining a perceived strategic advantage in the contemplated litigation.

**Listing**

21. As it is, the hearing has now been listed where (i) the defendants have been given no proper opportunity to respond to the voluminous evidence filed by your clients; (ii) the Second Defendant and the lead partners acting respectively for the Second and Fourth Defendants are all currently on vacation, and the partner acting for the First, Third, Fifth and Sixth Defendants has a conflicting listing before Mr Justice Asif KC from 2:00pm on 31 July 2025; and (iii) a one-day listing is clearly inadequate given the number of parties and the volume of material already submitted.

22. We also understand, from your correspondence with the Court, that your clients may have instructed Leading Counsel to appear. As you are well aware, the recent guidance from the Court is that you are expected to be transparent about that intention in order to allow our clients (and the Defendants generally) to consider whether to instruct Leading Counsel themselves, and (if so advised) to then make those arrangements.

23. In the event, this application has been listed without reference to the availability of Cayman Islands counsel and with no proper opportunity for the Defendants generally to engage and brief Leading Counsel.

24. In the circumstances, we are instructed to file a summons for directions seeking:

    a. directions for a substantive hearing of your summons dated 15 July 2025 with an appropriate time estimate on the first available dates in the new term;

    b. that the summons dated 9 June 2025 filed by DFW Charitable Foundation in FSD Cause No. 116 of 2025 (JAJ), be timetabled and heard together with your summons;

    c. that the Court use the allotted time on 31 July 2025 to give directions in order to allow the summonses to be properly and fairly determined at a subsequent hearing; and

    d. that the Court accept an undertaking from our clients, to cover the period between now and the hearing of the summonses, which essentially repeats the assurances given to the Texas Court pursuant to the Rule 11 Agreement.

25. In the interests of avoiding unnecessary costs, we would invite you to agree directions and a form of undertaking by consent.

26. We will be providing a copy of this letter to the Court with our summons for directions by way of a response to your clients' assertions of urgency and reserve the right to refer to it and previous correspondence on the question of costs.

Yours faithfully

Campbells LLP

**Campbells LLP**

| | |
|---|---|
| **From:** | Ronan O"Doherty \| Campbells |
| **To:** | Rachel Baxendale; Bridget Clare; Daniel Mills; Luke Armitage; Nia Statham; Gabrielle David |
| **Cc:** | Karen Hoskins; Peter Tyers-Smith; Jennifer Colegate; Mark Goodman \| Campbells; #MaplesCDAF; Faith Manville; Jenesha Simpson; George Connolly \| Campbells |
| **Subject:** | RE: [EXTERNAL] FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495] [IMAN-IMANLIT.FID170624] |
| **Date:** | 21 July 2025 4:33:28 PM |
| **Attachments:** | image001.jpg<br>image002.png<br>2025.07.21 - Letter to Maples (FSD 201 of 2025 (RPJ)).pdf<br>Summons for Directions and Draft Order - FSD 201 of 2025.pdf |

*****This email has originated from outside your organisation*****

Dear Ms Hoskins / Ms David

Please see attached summons for directions filed today on behalf of the First, Third, Fifth and Sixth Defendants in these proceedings (the "**Directions Summons**"), along with a copy of our letter to Maples & Calder sent earlier today, in which we foreshadowed the issuance of the Directions Summons ("**Our Letter**"). We will send a sealed copy of the Directions Summons once available.

As outlined in Our Letter, there is no genuine urgency warranting the listing of the JOLs' summons (the "**JOLs Summons**") on 31 July 2025 without reference to the availability of the other parties. This is especially so given that:

- Certain of the Defendants have, since 30 May 2025, offered a financial reporting protocol to the JOLs which would provide them with oversight of the Defendants' (and all related group entities) investment activities, financial performance, and steps taken in the ordinary course of business;
- The 'Supporting Organisations' sought and were denied an urgent temporary restraining order against certain of the Defendants by the Texas Business Court on 2 July 2025;
- Notwithstanding that decision, the defendants to that action (four of whom are also Defendants in these proceedings) voluntarily entered into a Rule 11 Agreement, whereby they agreed - on behalf of themselves and all related group entities - not to engage in any corporate restructuring or asset dissipation outside the ordinary course of business (the "**Rule 11 Agreement**"); and
- The Second Defendant and the lead partners acting for the Second and Fourth Defendants are all currently on vacation, and the partner acting for the First, Third, Fifth and Sixth Defendants has a conflicting listing before Mr Justice Asif KC from 2:00pm on 31 July 2025.

By the Directions Summons, the Defendants seek procedural directions for a substantive hearing of the JOLs' Summons on the first available dates in the new term. Further, we respectfully submit that, given the overlapping issues, it would promote the Overriding Objective for the JOLs' Summons to be timetabled and heard alongside the Fourth Defendant's summons dated 9

June 2025 in FSD Cause No. 116 of 2025 (JAJ), which seeks a determination on the lawfulness and validity of the Company's restructuring.

To alleviate any concerns the JOLs or the Court may have regarding potential dissipation or misappropriation pending determination of the JOLs' Summons, the Defendants undertake to the Court to abide by the terms of the Rule 11 Agreement and to comply with the undertakings set out at Schedule 1 to the draft order in the Directions Summons.

We would be most grateful if this email, Our Letter, and the Directions Summons could be forwarded to His Lordship, and we respectfully suggest that the time allocated on 31 July 2025 be used to address the Directions Summons.

Please let us know if we can assist the Court further.

Kind regards

Ronan

**Ronan O'Doherty**
Counsel

E RODoherty@campbellslegal.com
T +1 345 949 2648 D +1 345 914 5847 C +1 345 526 5847

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010, Cayman Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is subject to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.

---

**From:** Rachel Baxendale <Rachel.Baxendale@maples.com>
**Sent:** Monday, July 21, 2025 1:40 PM
**To:** Bridget Clare <Bridget.clare@Judicial.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Luke Armitage <Luke.Armitage@maples.com>; Nia Statham <NiaStatham@bakerandpartners.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: [EXTERNAL] RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

---

Dear Ms Hoskins, Ms David

Please could you send us the Zoom link for the hearing once available?

Also, may we please request approval to have the hearing recorded so that we can prepare a transcript?

Kind regards

Rachel

**Rachel Baxendale**
Senior Paralegal

**MAPLES GROUP**
**Mobile +1 345 525 5230 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

maples.com

---

**From:** Bridget Clare <Bridget.clare@Judicial.ky>
**Sent:** 16 July 2025 3:31 PM
**To:** Daniel Mills <Daniel.Mills@kobrekim.com>; Luke Armitage <Luke.Armitage@maples.com>; Nia Statham <NiaStatham@bakerandpartners.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; mgoodman@campbellslegal.com; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: [EXTERNAL] RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

*****This email has originated from outside your organisation*****

---

Dear Counsel

Please note the Summons is listed for 31 July 2025 at 9 a.m.

Many thanks

**Bridget Clare | Registrar | Financial Services Division**
Law Courts I 61 Edward St. I P.O. Box 495 I Grand Cayman, KY1-1106 I Cayman Islands
Main: (345) 949-4296 I Direct: (345) 244-3890
Email: Bridget.clare@Judicial.ky I Website: www.judicial.ky

***"Delivering justice fairly and efficiently"***

DISCLAIMER: This email (including any attachments) is confidential and may be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed or otherwise used by anyone else. If you have received this email in error, please delete it from your system and notify the sender immediately. Internet communications are not secure, and therefore, the Cayman Islands Law Courts do not accept legal responsibility for the contents of this message. Although the Cayman Islands Law Court operates antivirus programs, it does not accept responsibility for any damage caused by viruses being passed.

**Please consider the environment before printing this e-mail.**

---

**From:** Daniel Mills <Daniel.Mills@kobrekim.com>
**Sent:** Wednesday, July 16, 2025 2:44 PM
**To:** Bridget Clare <Bridget.clare@Judicial.ky>; Luke Armitage <Luke.Armitage@maples.com>; Nia Statham <NiaStatham@bakerandpartners.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; mgoodman@campbellslegal.com; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: [EXTERNAL] RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

Dear Ms Bridget

We refer to the JOLs' Summons filed by Maples at 3:15pm yesterday.

In their correspondence with the Court, the JOLs have requested that the Summons be listed for a one-day hearing on an urgent basis (with or without our clients' attendance). The Court has confirmed availability for 31 July 2025 before the Honourable Justice Parker.

We received the Summons (and other documents) from Maples less than 24 hours ago and are taking instructions accordingly. In the meantime, we respectfully request that the Summons is not listed until our clients have had the opportunity to respond and state their position. As will be explained more fully in correspondence, we do not consider that there is any genuine urgency in listing the Summons.

We will endeavour to respond as soon as possible, and in the meantime should be grateful if this email could be shared with His Lordship.

Kind regards

Daniel Mills
+1 345 749 4023

www.kobrekim.com

**Americas** (New York, Delaware, Miami, San Francisco, São Paulo, Washington DC) **APAC** (Hong Kong, Seoul, Shanghai), **Caribbean** (BVI, Cayman Islands), **EMEA** (Cyprus, Dubai, London, Tel Aviv)

This e-mail message is from Kobre & Kim (Cayman), a general partnership established under the laws of the Cayman Islands, referred to above as Kobre & Kim, and may contain legally privileged and/or confidential information. If the reader of this message is not the intended recipient(s), or the employee or agent responsible for delivering the message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this e-mail message and any attachments from your computer without retaining a copy.

---

**From:** Bridget Clare <Bridget.clare@Judicial.ky>
**Sent:** Wednesday, July 16, 2025 11:20 AM
**To:** Luke Armitage <Luke.Armitage@maples.com>; Nia Statham <NiaStatham@bakerandpartners.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; mgoodman@campbellslegal.com; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** [EXTERNAL] RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

Thank you. The Summons is now available for download.

**Bridget Clare | Registrar | Financial Services Division**
Law Courts I 61 Edward St. I P.O. Box 495 I Grand Cayman, KY1-1106 I Cayman Islands
Main: (345) 949-4296 I Direct: (345) 244-3890
Email: Bridget.clare@Judicial.ky I Website: www.judicial.ky

***"Delivering justice fairly and efficiently"***

DISCLAIMER: This email (including any attachments) is confidential and may be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed or otherwise used by anyone else. If you have received this email in error, please delete it from your system and notify the sender immediately. Internet communications are not secure, and therefore, the Cayman Islands Law Courts do not accept legal responsibility for the contents of this message. Although the Cayman Islands Law Court operates antivirus programs, it does not accept responsibility for any damage caused by viruses being passed.

**Please consider the environment before printing this e-mail.**

---

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** Wednesday, July 16, 2025 10:47 AM
**To:** Bridget Clare <Bridget.clare@Judicial.ky>; Nia Statham <NiaStatham@bakerandpartners.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

Dear Ms Bridget

Thank you for your email and for the confirmation of the Judge's availability to hear the application on 31 July 2025. We will be sure to have the bundles filed and delivered to His Lordship's UK address by noon UK time on 25 July.

Best regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

maples.com

---

**From:** Bridget Clare <Bridget.clare@Judicial.ky>
**Sent:** 16 July 2025 10:44 AM
**To:** Luke Armitage <Luke.Armitage@maples.com>; Nia Statham <NiaStatham@bakerandpartners.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

*****This email has originated from outside your organisation*****

---

Dear Counsel

I note his Lordship's comments…

**" Please let the parties know that I am only available on 31st of July of the dates**

suggested by Maples"

That said, please ensure that the hearing materials (hard copy) are delivered to His Lordship's UK address by noon (UK time) on 25 July, followed by the electronic copies to the attention of Ms. Karen.

**Address**

**Attn: Raj Parker**
**Griffin Building, Gray's Inn**
**London, WC1R 5LN**
**T: +44 (0)20 7404 3447**

The zoom details will be shared in short order.

The endorsed Summons will be available for download shortly.

**Bridget Clare | Registrar | Financial Services Division**
Law Courts I 61 Edward St. I P.O. Box 495 I Grand Cayman, KY1-1106 I Cayman Islands
Main: (345) 949-4296 I Direct: (345) 244-3890
Email: Bridget.clare@Judicial.ky I Website: www.judicial.ky

***"Delivering justice fairly and efficiently"***

DISCLAIMER: This email (including any attachments) is confidential and may be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed or otherwise used by anyone else. If you have received this email in error, please delete it from your system and notify the sender immediately. Internet communications are not secure, and therefore, the Cayman Islands Law Courts do not accept legal responsibility for the contents of this message. Although the Cayman Islands Law Court operates antivirus programs, it does not accept responsibility for any damage caused by viruses being passed.

**Please consider the environment before printing this e-mail.**

---

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** Wednesday, July 16, 2025 10:34 AM
**To:** Bridget Clare <Bridget.clare@Judicial.ky>; Nia Statham <NiaStatham@bakerandpartners.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark

Eric Patrick & Ors [BAKER-LIVE.FID1000495]

Dear Ms Bridget

Thank you for the helpful clarification. Given the Judge is available on 31 July 2025, we would be very grateful if the hearing could be listed for that date (on the basis set out in our email below).

Best regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

maples.com

---

**From:** Bridget Clare <Bridget.clare@Judicial.ky>
**Sent:** 16 July 2025 10:28 AM
**To:** Luke Armitage <Luke.Armitage@maples.com>; Nia Statham <NiaStatham@bakerandpartners.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

*****This email has originated from outside your organisation*****

---

Dear Counsel

The judge's assistant initially proposed the 30th or 31st of July, but I overlooked your available dates. My apologies for that.

I have also forwarded your email to the judge for his feedback.

**Bridget Clare | Registrar | Financial Services Division**
Law Courts I 61 Edward St. I P.O. Box 495 I Grand Cayman, KY1-1106 I Cayman Islands
Main: (345) 949-4296 I Direct: (345) 244-3890
Email: Bridget.clare@Judicial.ky I Website: www.judicial.ky

***"Delivering justice fairly and efficiently"***

DISCLAIMER: This email (including any attachments) is confidential and may be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed or otherwise used by anyone else. If you have received this email in error, please delete it from your system and notify the sender immediately. Internet communications are not secure, and therefore, the Cayman Islands Law Courts do not accept legal responsibility for the contents of this message. Although the Cayman Islands Law Court operates antivirus programs, it does not accept responsibility for any damage caused by viruses being passed.

**Please consider the environment before printing this e-mail.**

---

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** Wednesday, July 16, 2025 10:17 AM
**To:** Bridget Clare <Bridget.clare@Judicial.ky>; Nia Statham <NiaStatham@bakerandpartners.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

Dear Ms Bridget

Thank you for your quick response, which is greatly appreciated. Could we kindly just confirm that the 30 July date is not meant to refer to 31 July? Unfortunately our client's leading counsel is not available on 30 July and our letter sought the Court's availability for a hearing on 28, 29 or 31 July. Does the Honourable Justice Parker (or any other Judges) have availability on 28, 29 or 31 July to hear our client's application?

With respect to the email from Ms Statham below, please note that:

1. Baker and Partners' client, the Fourt Defendant, has not yet filed and served an acknowledgement of service to the Writ. If they intend to do so today, we would invite them to confirm that.

2. In any event, as we stated in our letter to the Court, we wrote to counsel for the Defendants (including Baker and Partners) seeking their availability for a hearing on 28, 29 or 31 July in order to accommodate the Defendants' availability as much as possible. However, our letter to the Court and to the Defendant's counsel was clear that our client intends to seek a listing on one of the above dates regardless given the urgency of the application.

3. In light of the urgency of the application, which is explained in our letter to the Court, our client intends to proceed with a hearing on one of the above dates even if one or more of the Defendants is unavailable. The application was filed with a sufficient lead time for the Defendants to decide whether they wish to: (i) accept service of the Writ; and (ii) appear at the hearing and contest the application on an inter partes basis. However, due to the urgency of the relief sought in the application, the Defendants' counsel's availability cannot delay the hearing of the application beyond the above dates (especially not if it would lead to the hearing taking place in October after the Court's summer recess).

4. Should any Defendants not be available for the hearing on one of the above dates, and subject of course to the availability of the Court, our clients will proceed with the application on an ex parte on notice basis.

Please let us know if we can be of any further assistance.

Best regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

maples.com

---

**From:** Bridget Clare <Bridget.clare@Judicial.ky>
**Sent:** 16 July 2025 10:01 AM
**To:** Nia Statham <NiaStatham@bakerandpartners.com>; Luke Armitage <Luke.Armitage@maples.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

*****This email has originated from outside your organisation*****

---

Dear Counsel

The next available date is in October.

**Bridget Clare | Registrar | Financial Services Division**
Law Courts I 61 Edward St. I P.O. Box 495 I Grand Cayman, KY1-1106 I Cayman Islands
Main: (345) 949-4296 I Direct: (345) 244-3890
Email: Bridget.clare@Judicial.ky I Website: www.judicial.ky

***"Delivering justice fairly and efficiently"***

DISCLAIMER: This email (including any attachments) is confidential and may be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed or otherwise used by anyone else. If you have received this email in error, please delete it from your system and notify the sender immediately. Internet communications are not secure, and therefore, the Cayman Islands

Law Courts do not accept legal responsibility for the contents of this message. Although the Cayman Islands Law Court operates antivirus programs, it does not accept responsibility for any damage caused by viruses being passed.

**Please consider the environment before printing this e-mail.**

---

**From:** Nia Statham <NiaStatham@bakerandpartners.com>
**Sent:** Wednesday, July 16, 2025 9:41 AM
**To:** Bridget Clare <Bridget.clare@Judicial.ky>; Luke Armitage <Luke.Armitage@maples.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors [BAKER-LIVE.FID1000495]

Dear Ms Clare

Thank you for your email.

Ms Colegate is unavailable between 26 July 2025 and 10 August 2025, and therefore will not be able to attend a hearing on 30 July 2025.

Could the Court kindly confirm whether any alternative dates are available for the hearing?

With kind regards

**Nia Statham**
Associate

Tel: +1 345 746 3655

www.bakerandpartners.com
Baker & Partners (Cayman) Limited
P.O. Box 636, Buckingham Square
720 West Bay Road
Cayman Islands
KY1-1107

DISCLAIMER: This e-mail is confidential and may contain legally privileged information. If you are not named above as an addressee it may be unlawful for you to read, copy, distribute, disclose or otherwise use the information in this e-mail. Any views or opinions presented are solely those of the author, and do not necessarily represent those of Baker & Partners. If you are not the intended recipient and have received this e-mail in error please notify Baker & Partners on +44 (0) 1534 766254.

---

**From:** Bridget Clare <Bridget.clare@Judicial.ky>
**Sent:** 16 July 2025 08:52

**To:** Luke Armitage <Luke.Armitage@maples.com>; Gabrielle David <Gabrielle.David@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Nia Statham <NiaStatham@bakerandpartners.com>; #MaplesCDAF <#MaplesCDAF@maples.com>; Faith Manville <Faith.Manville@Judicial.ky>; Jenesha Simpson <Jenesha.Simpson@Judicial.ky>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors

Dear Counsel

The court can accommodate the hearing on 30th July 2025 @ 9 a.m. via video link.

Please ensure that the hearing materials (hard copy) are delivered to His Lordship's UK address by no later than noon (UK time) on 24 July followed by the electronic copies to the attention of Ms. Karen.

**Address**

**Attn: Raj Parker**
**Griffin Building, Gray's Inn**
**London, WC1R 5LN**
**T: +44 (0)20 7404 3447**

The zoom details will be shared in short order.

The endorsed Summons is available for download at your convenience.

Many thanks

**Bridget Clare | Registrar | Financial Services Division**
Law Courts I 61 Edward St. I P.O. Box 495 I Grand Cayman, KY1-1106 I Cayman Islands
Main: (345) 949-4296 I Direct: (345) 244-3890
Email: Bridget.clare@Judicial.ky I Website: www.judicial.ky

***"Delivering justice fairly and efficiently"***

DISCLAIMER: This email (including any attachments) is confidential and may be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed or otherwise used by anyone else. If you have received this email in error, please delete it from your system and notify the sender immediately. Internet communications are not secure, and therefore, the Cayman Islands Law Courts do not accept legal responsibility for the contents of this message. Although the Cayman Islands Law Court operates antivirus programs, it does not accept responsibility for any damage caused by viruses being passed.

Please consider the environment before printing this e-mail.

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** Tuesday, July 15, 2025 4:36 PM
**To:** Gabrielle David <Gabrielle.David@Judicial.ky>; Bridget Clare <Bridget.clare@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; jennifercolegate@bakerandpartners.com; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Nia Statham <NiaStatham@bakerandpartners.com>; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors

Thank you, Ms David.

We are very grateful for that confirmation and will wait to hear from you once you have a response from his Lordship.

Best regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

maples.com

**From:** Gabrielle David <Gabrielle.David@Judicial.ky>
**Sent:** 15 July 2025 3:30 PM
**To:** Luke Armitage <Luke.Armitage@maples.com>; Bridget Clare <Bridget.clare@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; jennifercolegate@bakerandpartners.com; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Nia Statham <NiaStatham@bakerandpartners.com>; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** Re: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors

*****This email has originated from outside your organisation*****

Dear Counsel,

I confirm safe receipt of the same and that it has been passed on to the judge for review.

Kindest regards,

**Gabrielle David | Judge's Personal Assistant | Financial Services Division**

Law Courts I 61 Edward St. I P.O. Box 495 I Grand Cayman, KY1-1106
I Cayman Islands
Main: (345) 949-4296 I Direct: (345) 244-3814
Email: Gabrielle.David@Judicial.ky I Website: www.judicial.ky

***"Delivering justice fairly and efficiently"***

DISCLAIMER: This email (including any attachments) is confidential and may be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed or otherwise used by anyone else. If you have received this email in error, please delete it from your system and notify the sender immediately. Internet communications are not secure, and therefore, the Cayman Islands Law Courts do not accept legal responsibility for the contents of this message. Although the Cayman Islands Law Court operates antivirus programs, it does not accept responsibility for any damage caused by viruses being passed.

**Please consider the environment before printing this e-mail.**

---

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** Tuesday, July 15, 2025 3:14 PM
**To:** Gabrielle David <Gabrielle.David@Judicial.ky>; Bridget Clare <Bridget.clare@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Karen Hoskins <Karen.Hoskins@Judicial.ky>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; jennifercolegate@bakerandpartners.com <jennifercolegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Nia Statham <NiaStatham@bakerandpartners.com>; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** RE: FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors

Dear Ms David

I received an out of office message from Ms Hoskins referring me to you in relation to matters pertaining to the Honourable Justice Parker. We would be most grateful if you could bring the attached letter and enclosures to his Lordship's attention as soon as you are able.

Please do let us know if we can be of any further assistance at this stage.

Best regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
**Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands**

**maples.com**

---

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** 15 July 2025 3:07 PM
**To:** Karen Hoskins <Karen.Hoskins@Judicial.ky>; Bridget Clare <Bridget.clare@Judicial.ky>
**Cc:** Ronan O'Doherty | Campbells <RODoherty@campbellslegal.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>;

jennifercolegate@bakerandpartners.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Nia Statham <NiaStatham@bakerandpartners.com>; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** FSD 201 of 2025 (RPJ) - Charitable DAF HoldCo, Ltd (In Official Liquidation) v Mark Eric Patrick & Ors

Dear Ms Hoskins and Ms Bridget

We refer to the above proceeding and attach a letter to the Court and enclosures on behalf of our client, the Plaintiff.

By the letter, our client seeks confirmation of the Court's availability to hear our client's application for injunctions and other relief on one of 28, 29 or 31 July 2025 (prior to the Court summer recess). The reasons as to why the application is urgent, and it is necessary for a hearing to take place on one of the above dates in order to protect our client's position in these proceedings, are set out in the letter. We would be most grateful if you could bring this letter and its enclosures to the attention of the Honourable Justice Parker as soon as you are able.

The Cayman Islands attorneys whom we understand represent the Defendants to these proceedings are copied.

Best regards
Luke

**Luke Armitage**
Associate

**MAPLES GROUP**
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
**Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands**

**maples.com**

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes. For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes. For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes. For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes. For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes. For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than

the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes.
For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

MAPLES GROUP

**Our ref:** CJM/LRA/858403-000001/83770009
**Direct tel:** +1 345 814 5245 / +1 345 814 5497
**Email:** caroline.moran@maples.com / luke.armitage@maples.com

**By Hand**

Campbells LLP
Floor 4, Willow House
Cricket Square
Grand Cayman
KY1-9010
Cayman Islands

Attn: Mark Goodman and Ronan O'Doherty

23 July 2025

Dear Sirs

**Charitable DAF HoldCo, Ltd (In Official Liquidation) v (1) Mark Eric Patrick (2) Paul Murphy (3) CDMCFAD, LLC (4) DFW Charitable Foundation (5) CDH GP, Ltd as General Partner for and on behalf of Charitable DAF Fund, LP, and in its capacity as General Partner (6) CLO HoldCo, Ltd. – FSD 2021 of 2025 (RPJ) (the "Proceedings")**

We refer to your letter dated 21 July 2025 and your email to the Court of the same date attaching your client's Summons dated 21 July 2025 ("**Your Summons**"). We adopt the defined terms from our letter of 15 July 2025 and from the First Affidavit of Margot MacInnis sworn 15 July 2025 in these Proceedings ("**MacInnis 1**").

Addressing each of the substantive points made in your letter in turn:

**Liquidation Proceedings and the Protocol**

1 As to why the JOLs did not reply to your letter of 29 June 2025 and the draft protocol enclosed with it –

1.1 In our letter of 19 June 2025, we identified the various deficiencies in the version of the protocol previously offered by your client. Most if not all of those deficiencies were not addressed in the version of the protocol proposed by your client on 29 June 2025.

1.2 Having undertaken several rounds of correspondence with your clients in relation to the protocol, it had become clear to the JOLs that your clients were not willing to offer anything close to the protection that the JOLs are seeking. In particular, your protocol did not contain any undertakings in respect of the preservation of assets and the limited partnership

interest held by the Third Defendant. The protections sought by the JOLs in the injunction are necessary to properly identify and preserve the assets to which the Company asserts a proprietary claim in the Proceedings.

1.3 At various points of your letter of 29 June 2025, your clients made their position clear that they would not agree to the full suite of protections sought by the JOLs, which protections "*could only properly be obtained through injunctive relief*". The JOLs now seek that relief. Any criticism your clients have of the JOLs for taking that approach, as opposed to continuing to engage in correspondence with your clients as to a draft protocol over which our respective clients were at an unbridgeable impasse, is misconceived.

2 In relation to the hearing of the JOLs' application for sanction to engage counsel, Justice Asif made no comment as to the adequacy of the protocol that your clients were offering at that stage – he merely indicated that it would be sensible for the parties to agree to a protocol. For the reasons set out above, that was not possible.

3 The most recent round of correspondence with your clients in relation to the protocol was put before the Court at the hearing of the JOLs' *ex parte* application for sanction to commence these Proceedings. His Lordship approved the JOLs commencing these Proceedings, including after having been made aware of the JOLs intention to seek injunctions against the Defendants[1] The points made at paragraphs 5-10 of your letter are therefore misguided.

4 As regards paragraph 4 of your letter, the evidence filed by Mark Patrick and Paul Murphy in the liquidation proceedings is referred to at paragraph 59 of MacInnis 1. These materials will be before the Court in the hearing bundles for the JOLs' Summons dated 15 July 2025 (the "**Injunction Summons**")

**Texas Petition / TRO Motion**

5 As regards paragraphs 11-15 of your letter –

5.1 As has already been explained in paragraph 95 of MacInnis 1, the Supporting Organisations are acting independently of the JOLs with advice from their own independent US counsel. They filed the Texas Petition and TRO Motion without reference to the JOLs - the JOLs were only informed of the Texas Petition and TRO Motion *after* they were filed.

5.2 We disagree with the suggestion that the Rule 11 Agreement "*operates so as to restrict the Texas Defendants and the CDM Entities from any conduct which might be considered a misappropriation or dissipation of assets*". Whilst the Rule 11 Agreement offers some protection, it still has a broad carve-out for ordinary course of business transactions, where the Texas Defendants (including your clients) seemingly have complete discretion as to what transactions are and are not part of their ordinary course of business. Your clients apparently considered that the Relevant Transactions leading to all of the assets of the Company being transferred away to the Third Defendant constituted ordinary course of business transactions in order to "*ensure that DAF could continue to further its charitable mission*"[2]. Further, in light of the JOLs' serious concerns as to the Remuneration Transactions explained in paragraphs 49-51 and 78 of MacInnis 1, the JOLs have little faith

[1] See paragraphs 84 and 85 of the redacted Fifth Affidavit of Margot MacInnis sworn 10 July 2025 in the liquidation proceedings under the heading "PROTOCOL CORRESPONDENCE AND POTENTIAL INJUNCTION".

[2] Paragraph 22 of the First Affidavit of Mark Patrick sworn 4 June 2025 and filed in the liquidation proceedings.

that Mr Patrick will not exploit the ordinary course of business exception by continuing to pay himself exorbitant expenses, salaries and bonuses out of the CDM Entities' assets. Further, the Rule 11 Agreement is also finite and could be discharged as soon as the hearing of the Texas Defendants' motion to dismiss the Texas Petition and TRO Motion on jurisdictional grounds. This means that the JOLs cannot fully rely on the Rule 11 Agreement to protect the Company's position in these Proceedings until trial.

5.3 The indication of the Texas Judge at a hearing at which the JOLs understand no determination was made on the TRO Motion, has no direct bearing on whether the Company is entitled to the proprietary injunctions and disclosure orders sought against the Defendants in these Proceedings. Your clients' decision to voluntarily enter into the Rule 11 Agreement also suggests that your clients were not confident of avoiding a TRO had the Rule 11 Agreement not been entered into.

5.4 In relation to paragraph 15 of your letter:

(a) The Texas Petition was filed on 1 July 2025 and the JOLs' First Report was dated 2 July 2025. There is no inconsistency here and it is not clear what criticism you are trying to make.

(b) Paragraph 15(a) is once again unclear. To the extent you are alleging that the JOLs as officers of the Court are permitting themselves to be "manipulated" this is denied.

(c) The Texas Judge reached his conclusions based on the evidence before him. The Cayman Islands Court will need to consider the evidence before it at the injunction hearing. The JOLs are seeking a proprietary injunction over property that was misappropriated from the Company by your clients by way of the Relevant Transactions. That conduct alone evidences a massive dissipation of the Company's assets at the behest of Mr Patrick (and Mr Murphy) for the benefit of himself and the entities under his control. In any event, the test for a proprietary injunction does not require risk of dissipation to be proven (although on the JOLs' case there is a real risk of dissipation if the injunctions are not granted as explained in MacInnis 1 and will be expanded upon in the JOLs' skeleton argument).

**Urgency**

6 With respect to paragraph 17 of your letter, and as noted above, the Company's case is that Mr Patrick and entities under his control *did* dissipate the Company's assets prior to the liquidation. Respectfully, with the incomplete information the JOLs have to hand[3], and given the serious cause for concerns about your clients' involvement in the Relevant Transactions, the JOLs are not willing to simply take your clients at their word that no further dissipation has occurred or will occur in future.

7 With respect to paragraph 18 of your letter –

7.1 the Remuneration Transactions are certainly part of the JOLs' concerns, but they are secondary to their primary concern over the complete lack of justification for the Relevant Transactions pursuant to which the Company received approx. US$1.6 million for the

[3] Which is due in part to certain Defendants refusing to cooperate or properly address the JOLs' requests for the Company's books and records

limited partner interest in the Fund that was transferred to CDM, representing a very significant undervalue against the approx. US$270 million value of the Fund and its assets.

7.2 The explanations your clients have given for the Relevant Transactions have been explained at paragraphs 60-64 of MacInnis 1. The reasons why those explanations do not stand up to scrutiny have been explained at paragraphs 65-78 of MacInnis 1. As explained above, should the Rule 11 Agreement fall away, there would be nothing to prevent your clients from undertaking further unjustified transactions for their own gain to the detriment of the Company and its claims in these Proceedings.

7.3 We reject entirely that Ms MacInnis' affidavit was misleading in any respect. The facts set out in paragraphs 49-51 of MacInnis 1 give rise to serious questions about the significant increases in Mr Patrick's salaries and bonuses in 2023-2024 as compared to previous years, including when compared against the US$60,000 per annum salary paid to Grant Scott when he was previously a director of the Company. Your client had the opportunity to address or correct the remuneration concerns in the evidence for the sanction hearing on 24 June 2025 and/or in correspondence with the JOLs but has failed to do so.

8 We disagree with paragraph 19 of your letter –

8.1 The JOLs' concerns about the integrity and purpose of the Mercer Report are set out at paragraph 78 of MacInnis 1.

8.2 In addition to payments made under Mr Patrick's long-term incentive plan, he is presumably continuing to be paid a salary in his positions as sole director of the Fifth Defendant, manager of the Third Defendant, sole member of the Fourth Defendant, and a director of the Sixth Defendant. We would invite your clients to confirm if that is not the case.

8.3 The reasons as to why damages would not be an adequate remedy in this case are set out at paragraphs 91.3-91.4 of MacInnis 1 and will be expanded upon in the JOLs' skeleton argument.

9 The suggestions in paragraph 20 of your letter are also baseless. The JOLs did not "ignore" the Rule 11 Agreement and your client's draft protocols (both of which have been addressed above). Rather, the Injunction Summons was filed *because* of your clients' refusal to agree to an appropriate protocol, and with the scope and duration of the Rule 11 Agreement in mind. These matters are fully addressed in MacInnis 1 and do not need be repeated here.

10 As we have already explained in our letter to the Court and to your clients both dated 15 July 2025, the JOLs sought that the Injunction Summons be listed on an urgent basis: (i) to ensure it will be determined prior to any possibility of the Rule 11 Agreement falling away; and (ii) because the JOLs do not believe the Rule 11 Agreement offers sufficient protection to the JOLs from dissipation or misappropriation of the assets to which the Company asserts a proprietary claim in these Proceedings. We requested a listing with a sufficient runway for your clients and the other Defendants to participate and file evidence on an inter partes basis, but noted that if the Defendants were unavailable, we would proceed *ex parte* on notice given the urgency. Should your clients, as it seems will be the case, not contest the Injunction Summons on 31 July 2025 and the injunctions are granted, they will have the opportunity to do so at the return date (and our client will have had appropriate protection in place in that intervening period through the injunctions granted). Your clients appear to fundamentally misunderstand the nature of an *ex parte* on notice application in this respect.

**Listing and Undertakings**

11 In relation to paragraphs 21 to 23 of your letter, we refer you to paragraph 10 of our letter above.

12 As regards Your Summons –

12.1 As a preliminary matter, the order sought in paragraph 3 of Your Summons is not workable given the DFW Summons was filed in the liquidation proceedings, which are presided over by a different Judge. The order sought in Your Summons can only be made in the liquidation proceedings which are the responsibility of the Honourable Justice Asif. In any event, the JOLs do not agree to the DFW Summons being listed for the same date as the Injunction Summons. The DFW Summons is nothing more than a self-serving attempt by DFW to have the question of its and the other Defendants' involvement in any wrongdoing determined within the parameters they consider to be most favourable to them. However, it is for the JOLs to decide how to conduct their investigations and what actions they should take to protect the assets of the Company. Having obtained sanction of the Court to commence these Proceedings, the issues sought to be determined in the DFW Summons will now be determined in these Proceedings, such that the DFW Summons is redundant.

12.2 We note that your clients are suddenly now willing to offer more protection than they ever were previously in their draft protocols, which suggests that your clients did not engage in the protocol correspondence in good faith. However, the draft undertakings offered by your clients replicate the terms of the Rule 11 Agreement and would cease to apply if the Rule 11 Agreement falls away for any reason. This means that, in practice, the draft undertakings offer no protections to the JOLs over and above those already in place and therefore are effectively meaningless. As noted above, the Rule 11 Agreement (or any undertaking to comply with it) is not sufficient to protect the Company's position in these Proceedings when compared against the injunctions and disclosure orders sought by the JOLs in the Injunction Summons.

12.3 However, the JOLs would be willing to agree to an adjournment of the hearing of the Injunction Summons and appropriate directions for an inter partes hearing on the first available date after the Court's summer recess, **provided that** your clients, the other Defendants (DFW and Mr Murphy) and all other CDM Entities give the revised form of undertaking enclosed[4] pending the determination of the Injunction Summons, and all Defendants confirm by return that they consent to the jurisdiction of the Cayman Court in these Proceedings. We have copied the Cayman Islands counsel whom we understand act for DFW and Mr Murphy to this correspondence accordingly.

12.4 As regards the changes the JOLs' have made to the draft undertakings, given the short timeframe involved and considering the passive nature of the Fund's investments, it should be possible for the Defendants and CDM Entities (as applicable) to agree with the JOLs any reasonable payments above US$10,000 fairly quickly. Payments under US$10,000 would not require the approval of the JOLs, but a monthly report should be provided listing all such payments for the calendar month just passed. This represents the absolute minimum level of protection that the JOLs are willing to accept in this intervening period. Please confirm your clients' agreement (and procure the agreement of the other Defendants and CDM Entities) by no later than **4pm on Thursday 24 July 2025**.

[4] in both clean and redline showing the changes to your clients' version of the undertakings

12.5 Should the revised undertaking not be agreed, the JOLs intend to proceed *ex parte* on notice at the hearing of the Injunction Summons on 31 July 2025 and will oppose any attempt by your clients to have Your Summons heard on that date in its place. The JOLs' are also conscious that the longer this correspondence continues without an agreed set of undertakings in place, the JOLs' costs of preparing for the ex parte on notice hearing will continue to accumulate. A substantial part of those costs would have been incurred unnecessarily if your clients do not agree to the JOLs' Undertakings prior to the above deadline but subsequently agree to give those undertakings closer to the hearing date. Accordingly, the JOLs' reserve their right to seek an order that your clients and the other Defendants pay the JOLs' costs of preparing for the ex parte on notice hearing in that period.

Yours faithfully




Maples and Calder (Cayman) LLP

With a copy to:

Ms Jennifer Colegate
Baker & Partners
Buckingham Square
720 West Bay Road
Grand Cayman
KY1-1107
Cayman Islands

Mr Peter Tyers-Smith
Kobre & Kim
9 Forum Lane
Camana Bay
Grand Cayman
KY1-9006
Cayman Islands

**Schedule 1**

Defendants' Asset Preservation Protocol

1. Pending the determination of the JOLs' Summons, the Defendants, and the related entities listed in Schedule 2 hereto (the "**CDM Entities**") and their respective agents, servants, employees, and representatives, agree and undertake to:

1.1 not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares of the CDM Entities outside of payments of under US$10,000 made in the ordinary course of business;

1.2 not to take any action to increase the remuneration paid to any employee, manager or director of the CDM Entities;

1.3 not to take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

1.4 not to take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

1.5 not to take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona fide third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this Protocol, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities; and

1.6 not to alter, conceal, or destroy any business records concerning the Defendants or the CDM Entities, including any transfers of funds, assets, receivables, or shares to or from the Defendants or CDM Entities.

2. Further, and to the extent not addressed by the foregoing, the Defendants and the CDM Entities undertake and agree that:

2.1 they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in Charitable DAF Fund, LP (the "**Fund**"), and/or the CDM Entities and/or any assets of the Fund (subject to the allowance of payments of under US$10,000 made in the ordinary course of business as provided for in paragraph 1.1 above); and

2.2 they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of this undertaking.

3. From the date of this undertaking to the date of the determination of the JOLs' Summons, the Defendants and the CDM Entities will give written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$10,000. Such request must include full supporting information and documentation as well as an explanation of the rationale for the transaction. The JOLs shall be required to give their approval or non-approval to the proposed transaction within 7 days of the request being made. Should the JOLs not approve the proposed transaction, the Defendant or CDM Entity making the request shall not consummate the proposed transaction.

4. From the date of this undertaking to the date of the determination of the JOLs' Summons, the Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$10,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the Defendants or the CDM Entities.

5. The Defendants and the CDM Entities consent to the entry of one or more orders in the chapter 15 case, *In re Charitable DAF Holdco, Ltd (In Official Liquidation)*, United States Bankruptcy Court for the District of Delaware, Case No. 25-11376 (BLS), recognising and enforcing the above undertakings in the United States.

**Schedule 1**

Defendants' Asset Preservation Protocol

1. Pending the determination of the JOLs' Summons, the Defendants, and the related ~~entites~~entities listed
in Schedule 2 hereto (the "**CDM Entities**") and their respective agents, servants, employees, and representatives, agree and undertake to ~~comply with the Rule 11 Agreement which provides as follows:~~:

1.1 not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares of the CDM Entities outside of payments of under US$10,000 made in the ordinary course of business;

1.2 not to take any action to increase the remuneration paid to any employee, manager or director of the CDM Entities;

1.3 not to take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

1.4 not to take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

1.5 not to take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona fide third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this Protocol, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities; and

1.6 not to ~~to~~ alter, conceal, or destroy any business records concerning the Defendants or the CDM Entities, including any transfers of funds, assets, receivables, or shares to or from the Defendants or CDM Entities.

2. Further, and to the extent not addressed by the foregoing, the Defendants and the CDM Entities undertake and agree that:

2.1 they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in Charitable DAF Fund, LP (the "**Fund**"), and/or the CDM Entities and/or any assets of the Fund~~, other than~~ (subject to the allowance of payments of under US$10,000 made in the ordinary course of business~~,~~ as provided for in paragraph 1.1 above); and

2.2 they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of this ~~Protocol.~~undertaking.

3. From the date of this undertaking to the date of the determination of the JOLs' Summons, the Defendants and the CDM Entities will give written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$10,000. Such request must include full supporting information and documentation as well as an explanation of the rationale for the transaction. The JOLs shall be required to give their approval or non-approval to the proposed transaction within 7 days of the request being made. Should the JOLs

not approve the proposed transaction, the Defendant or CDM Entity making the request shall not consummate the proposed transaction.

4. From the date of this undertaking to the date of the determination of the JOLs' Summons, the Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$10,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the Defendants or the CDM Entities.

5. The Defendants and the CDM Entities consent to the entry of one or more orders in the chapter 15 case, *In re Charitable DAF Holdco, Ltd (In Official Liquidation)*, United States Bankruptcy Court for the District of Delaware, Case No. 25-11376 (BLS), recognising and enforcing the above undertakings in the United States.

E-filed in the Office of the Clerk
for the Business Court of Texas
7/20/2025 10:25 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

**CAUSE NO. 25-BC01B-0027**

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § | IN THE TEXAS BUSINESS COURT |
| *Plaintiffs*, | § | |
| v. | § | FIRST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § | |
| *Defendants*. | § | DALLAS, TEXAS |

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**

Plaintiffs (together, the "Charitable Owners") file this First Amended Petition, Application for Temporary Injunction, and Emergency Application for Appointment of Receiver, and respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1.1 Defendant Mark Patrick took over $270 million in funding support from some of the best community-based charities in the country. He testified on June 25, 2025 that, by the time his plan was complete, Plaintiffs were left with "nothing."[1]

1.2 Patrick flagrantly violated his fiduciary duties to Plaintiffs, and he redirected the fund's beneficial ownership to a new sham organization he controlled. This follows his pattern of using Plaintiffs' resources to enrich himself at the expense of charities and the communities and

[1] *See* June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200).

people they benefit. So far, he has paid himself at least $3.9 million in a single year from funds meant to support the charities he betrayed.

1.3 If the Court does not bar Patrick's and the other Defendants' further adverse actions through a receivership, Plaintiffs will lose millions in charitable funds earmarked for the communities they serve. And, their loss will be at the hands of the very person who was supposed to protect them. Accordingly, Plaintiffs seek a Temporary Injunction freezing the funds and the appointment of a Receiver over the funds and the organization holding them.

## II. DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1 Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure. Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

2.2 Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III. PARTIES

3.1 **The Highland Dallas Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Dallas Foundation, Inc. provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of needs.

3.2 **The Highland Kansas City Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Kansas City Foundation, Inc. provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $8 billion in in charitable grants that support a broad range of needs.

3.3 **The Highland Santa Barbara Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Santa Barbara Foundation, Inc. provides funding to charitable organizations including the Santa Barbara Foundation, established in 1928, which has awarded over $750 Million in charitable grants and supports a broad range of needs.

3.4 **DFW Charitable Foundation** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. It was organized on December 9, 2024, with Defendant Mark Patrick as the DFW Charitable Foundation's sole member and sole director. It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes. The DFW Charitable Foundation is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.5 **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Charitable DAF Fund ("Charitable DAF Fund" or the "Fund") structure, as explained more thoroughly below. Patrick resides and at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.6 **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.7 **CDH GP, Ltd**. is a Cayman Island limited company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.8 **CHARITABLE DAF GP, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

**IV. JURISDICTION AND VENUE**

4.1 Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and Charitable DAF HoldCo, Ltd;

- and is an action by an owner of an organization, namely the Charitable Owners as participating and beneficial owners of Charitable DAF Holdco, Ltd ("Charitable DAF Holdco") and thereby the Fund in which the Charitable Owners held the sole economic interest, and through a sham transaction, briefly owners of CDMCFAD, LLC, and is brought against a controlling person and managerial entities of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFW Charitable Foundation, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF GP, LLC's, and CDH GP, Ltd.'s obligations in the capacity of a controlling person and managerial official of Charitable DAF Holdco, Ltd and the Fund. and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Charitable Owners as a controlling owner of Charitable DAF Holdco, and thus an equitable owner of CDMCFAD, LLC and Charitable DAF Fund, L.P. by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith;

- and is an action seeking equitable and injunctive relief.

4.2 The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3 The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4 Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition. Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas. Defendants have also consented to the jurisdiction of Texas courts.

4.5 Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas. On information and belief, the DFW Charitable Foundation, CDH GP, Ltd., Charitable DAF GP, LLC, and CDMCFAD are headquartered in Dallas County. Dallas County is within the 1st Division of the Texas Business Court.

## V. FACTUAL BACKGROUND

### A. *The Charitable DAF Fund Structure*

5.1 Highland Capital Management, L.P. ("**Highland**") was an SEC registered investment advisor. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated by Highland's founder, James Dondero, through his charitable trust to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States through several Charitable Owners. Together, three of those Charitable Owners are the Plaintiffs here.[2] As with all "supporting organizations," disinterested parties must hold a majority of the voting rights in the Charitable Owners. So, Mr. Dondero as the original donor held one vote as a director; and the Foundations supported by the Charitable Owners held the remaining two votes and thus control over them.

5.2 To that end, in 2011, the Fund was formed to hold the donated assets.

5.3 The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4 At the same time the Charitable DAF Fund was created, DAF HoldCo, a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5 The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities in California, Missouri, and Texas. The governing documents of the Charitable DAF Fund specifically refer to these Charitable

[2] A fourth charitable owner that held less than a 2% interest is not party to this action.

Owners. Participating shares in Charitable DAF HoldCo were therefore issued to Charitable Owners, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the Charitable Owners owned 100% of the Participating Shares of Charitable DAF HoldCo. The Charitable Owners held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the Charitable Owners owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Charitable Owners are the Plaintiffs in this Lawsuit and held 98.34% of the economic interests in the Fund.

5.6 In turn and as intended, the funds generated by the Charitable DAF Fund enabled the Charitable Owners to provide funding directly to charitable causes foundations in three regions of the United States, primarily through nonprofit organizations. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Charitable Owners and receive regular grants for charitable work ultimately funded by Charitable DAF Fund. For example, funds have supported schools for the needy, children's advocacy, educational and recreational institutions accessible to the public, and important medical facilities and programs. From funding education programs and healthcare services to supporting economic development and community welfare projects, these funds help strengthen the Charitable Owners' ability to serve individuals and families in need.

5.7 Since the Charitable DAF Fund's inception, the Charitable Owners have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Charitable Owners perform irreplaceable

philanthropic work in their communities and/or throughout the nation, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

**B.** ***Control of the Charitable DAF Fund***

5.8 The Charitable Owners, via Charitable DAF HoldCo, were the sole economic beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it. Management control of the Charitable DAF Fund and Charitable DAF HoldCo, however, was vested not with those organizations but rather in "Management Shares." The "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But these shares explicitly did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged and was expressly reserved solely to the Charitable Owners (the Plaintiffs).

5.9 Ownership of the general partner in the Charitable DAF Fund and the Management Shares in Charitable DAF HoldCo were concentrated in one person, vested with enormous trust (the "**Control Position**"). The Control Position was expressly obligated to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of the Charitable Owners. The Control Position therefore owed the Charitable Owners fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10 The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. These were the effective governing documents over the Charitable DAF Fund and Charitable DAF Holdco at the time the conduct alleged herein commenced. The ARLPA and the Articles, from which the Control Position derives its authority, also impose a clear duty

upon the Control Position to exercise his powers for the sole benefit of the Charitable Owners (the Plaintiffs).

5.11 For example, the Preamble to the ARLPA states: "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended and the parties hereto desire for the Partnership to be *for the economic benefit of the Limited Partner and its Charitable Owners* (as defined below) as set forth herein[.]"[3]

5.12 Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Charitable Owners*."[4]

5.13 Section 1.6 (Powers) likewise emphasizes: "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*."[5]

5.14 The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners." In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Charitable Owners and the Charities they support.

---

[3] Emphasis added
[4] Emphasis added.
[5] Emphasis added.

5.15 The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Charitable Owners. The governing documents of the Charitable DAF Fund thus form the foundation of a special factual relationship based on direct and close contact between the Control Position and the Charitable Owners. The governing documents establish that by virtue of the role and express obligations, the Control Position holds himself out as an agent acting for the benefit of the Charitable Owners and supplies them the information upon which they must rely. Patrick and the Defendants thus undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them. As set forth herein, the Parties built upon that foundation through their conduct over years, and it is this conduct directly pertinent to the instant case.

5.16 Grant Scott was initially selected for the Control Position. Mr. Scott effectively served the Charitable Owners' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of a decade. During this time, the Charitable Owners and their respective charitable foundations made great strides in creating philanthropic, charitable work that was efficient, steady, and reliable, and that grew and built on their progress year after year.

**C. *Mark Patrick's Assumption of Control***

5.17 Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

5.18 Mark Patrick, a tax attorney who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.

5.19 On March 25, 2021, Mr. Scott resigned transferring all his management shares and membership interest to Patrick for nominal consideration, and Patrick was appointed as director of Charitable DAF HoldCo. Patrick therefore assumed the Control Position from that date. Patrick then hired Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

**D. *Patrick's Breaches of Fiduciary Duty***

5.20 In 2023, while acting as the sole fiduciary for the Charitable Owners at Charitable DAF Fund and DAF HoldCo, Patrick embarked upon a brazen and calculated conspiracy to defraud the Charitable Owners of their beneficial interest in the $270 Million held by the Charitable DAF Fund, in direct violation of the fiduciary duties imposed by the Charitable DAF Fund's governing documents and by common law. Patrick further conspired to transfer that entire $270 Million interest to a new entity controlled by Patrick and operated out of his living room in Dallas, Texas.

**E. *Undisclosed Self-Dealing***

5.21 Patrick engaged in a series of ethically and legally dubious conduct prior to embarking upon his grand scheme to defraud the Charitable Owners. For example, in June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity,

which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

**F. *Attempted Fraudulent Kickback Scheme***

5.22 In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.23 Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.24 Mr. Dondero ensured that Charitable Owners were also informed about Patrick's kickback scheme. Despite significant concern, the Charitable Owners had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

**G. *Insider Trading***

5.25 In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview through his self-described "outside compliance counsel" Douglas Mancino to advise the Highland Dallas Foundation, Inc. to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

5.26 Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.27 Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

**H. *Patrick Raids the Charitable DAF Fund***

5.28 After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Plaintiffs were essentially cut off from any view into the finances of the fund. As of September 2024—the last reliable data accessible to the Plaintiffs prior to filing this Action—the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Plaintiffs and ultimately their supported Charities.

5.29 Prior to Patrick's tenure in the Control Position and for a period thereafter, the Control Position received a reasonable but measured stipend of $60,000 per year, consistent with the nature of the position as a fiduciary for charitable organizations serving those in need. Patrick's predecessor never awarded himself compensation more than $60,000 per annum. During that time, the Charitable DAF Fund was a tremendous success, growing in value and contributing to the good works of the Charitable Owners.

5.30 No later than 2024, however, Patrick raided the fund for personal gain. A review of the Charitable DAF Fund's last accessible financial records—provided in August 2024—showed dramatic and unexplained increases in expenditures:

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).
- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).
- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.31 This was only a warmup. In September 2024, without advising the Charitable Owners or their supported charities, and without approval from anyone other than himself and his hand-picked second Director-for-hire in the Cayman Islands, Mr. Murphy, Patrick used his authority over Charitable DAF Holdco to award himself an annual salary of $850,000 per year. Patrick also awarded himself a "long-term incentive" payment tied to the fund's returns, amounting to 7.5% of annualized net fund returns in excess of 10% (capped at an annualized 25% return). Then, the next month, on the basis of this "LTI" calculation Patrick awarded himself an "LTI" payment of $975,000 and an "annual discretionary bonus" for 2023 in the amount of 2.5 times his base salary. The result: In two months in Fall 2024, Partick awarded himself $3,925,000 in compensation directly from the Charitable DAF Fund that was held for the benefit of the Charitable Owners. Patrick did this even though the governing documents of the Charitable DAF Fund, by which both his powers and his duties to the Charitable Owners arose, were explicit that the Charitable DAF Fund was to be managed "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners [the Plaintiffs]" and "not for the economic benefit of the General Partner [Patrick]."

5.32 Patrick did all this in secret. Because of the structure of the Charitable DAF Fund and its management, no one supervised his compensation decisions aside, presumably, from his self-appointed fellow Director Murphy. The beneficiaries of the Charitable DAF Fund were never

advised, and had no opportunity to learn, that in a few short years, Patrick had unilaterally increased his personal compensation from the Charitable DAF Fund by 6,441%. Patrick and the other Defendants provided the Plaintiffs with partial information about the Charitable DAF Fund's finances, doing so through half-truths and partial disclosures that obscured the whole truth from them. Patrick did so despite repeated requests from the Plaintiffs and their counsel and counsel for the Charitable DAF Fund for complete information.

**I. *Patrick Ignores the Charitable Owners' Concerns***

5.33 On November 11, 2024, given what the Charitable Owners already knew, the three major Charitable Owners drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[6]

5.34 The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

5.35 On January 23, 2025, the Charitable Owners again demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. The Plaintiffs requested:

---

[6] Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)

- Income Statements for the last for years: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses.
- Listing of Underlying Assets: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.
- Audited Financial Statements: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.
- Current Structure of DAFHoldCo Operations: An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

5.36 The Defendants never acknowledged receipt of this January 23, 2025 email. On January 28, 2025, therefore, the Charitable Owners requested a winding up of the Charitable DAF Fund's assets:

> These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Charitable Owners so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

Importantly, at the time of this communication, Charitable DAF Fund still held the beneficial interest in the Charitable DAF Fund, though (as set forth below, and unknown to the Plaintiffs), that interest was now layered through Patrick's new entity, CDMCFAD. In other words, at the time the Plaintiffs requested a winding up, there is no question that they remained the 100%

beneficial owners of the assets in the Charitable DAF Fund and were entitled to the distribution of those assets under the Charitable DAF Fund's governing documents. By contrast, Patrick (whether individually or through one or more of his secretly-created entities) held nothing more than the miniscule par value of the Management Shares.

5.37 As set forth below in more detail, Patrick and the Defendants eventually responded to the Charitable Owners' inquiries by making a series of false statements, promising information and meetings that never arrived, and presenting carefully selected, incomplete information to mislead the Plaintiffs into a false sense of security and delay any decisive action on their part to effect a distribution. Meanwhile, Defendants used that veil of secrecy and misrepresentation to embark upon a conspiracy intended to defraud the Plaintiffs from their entire beneficial interests in the Charitable DAF Fund, before they could act to effect a distribution of its assets.

**J. *Patrick Conspires to Defraud Three Charities of $270 Million***

5.38 Between November 2024 and the present, internal documents obtained through proceedings in the Cayman Islands reveal that Patrick entered into a conspiracy to defraud the Charitable Owners of their beneficial interest in the $270 Million in assets held by the Charitable DAF Fund. At the outset of the scheme, the Defendants' agents summarized the essence of the task they had been assigned: "Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"[7] The entire premise of Patrick's project was to sever the Charitable Owners and their related Charities from the assets of the Charitable DAF Fund that Patrick was supposed to invest and maintain for their economic benefit, leaving them with worthless shares.

---

[7] Writ of Summons and Statement of Claim, ¶ 80.4, filed on July 15, 2025 at Cause No. FSD2025-0201 in the Grand Court of the Cayman Islands between Charitable DAF HoldCo, Ltd. v. Mark Eric Patrick, et al. (the "CI Statement of Claim")

5.39 Patrick and the other Defendants first diluted the Charitable Owners' interests in the Charitable DAF Fund to impede them from being able to exercise their right to wind up the Charitable DAF Fund's operations and thereby obtain their equitable share of the $270 Million fund. Patrick then engaged in a calculated series of moves to defraud the charities of their $270 Million interest in the Charitable DAF Fund. He did this while a demand to "wind up" the Charitable DAF Fund was pending from the Charitable Owners, and with the express intent of lifting the Charitable DAF Fund's assets away from the Charitable Owners before that wind-up could occur. In November 2024, Partick and Murphy began to contemplate how they could defraud the charities of their interests in the Charitable DAF Fund. One challenge they identified was the prospect that the Charitable Owners might file a petition in the Cayman Islands to "wind up" Charitable DAF Holdco and its asset (the Charitable DAF Fund), which would then entitle the charities to its proceeds and Patrick to nothing. But Patrick and Murphy found a solution: By issuing new participation shares in Charitable DAF Holdco to a new "charity" that Patrick himself controlled, they could dilute down the Charitable Owners so they represent a smaller percentage of Holdco's shares. As expressly contemplated by Patrick and Murphy, this would undermine any future petition to "wind up" because the shares in Charitable DAF Holdco controlled by Partick's new entity could oppose the petition. Patrick believed that the opposition of his new "charity" to any "winding up" petition could insulate him against any effort by the Charitable Owners to thwart his scheme.[8]

5.40 Accordingly, on December 9, 2024, Patrick formed Defendant DFW Charitable Foundation (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and sole director and its registered address

[8] CI Statement of Claim, ¶ 91.

was Patrick's home in Dallas. This entity was formed for the express purpose of later diluting down the Charitable Owners and blocking them from opposing the remainder of Patrick's scheme.

5.41 In February 2025, Patrick, Murphy, and the Defendants issued new Participating Shares in Charitable DAF Holdco to the Sham Charity created by Patrick, with the intent and for the express and stated purpose of blocking a possible equitable winding up petition by the Charitable Owners. Notably, this was after the Charitable Owners had requested in writing that the Charitable DAF Fund be wound up. In other words, Patrick and the other Defendants issued the shares expressly in order to alter the balance of power between the holders of Participating Shares. Defendants did this in direct contravention of their express obligations to the Charitable Owners; and his specific knowledge that, under Cayman law, the power to issue shares is a fiduciary power that may only be exercised for proper purposes and may never be deliberately intended to alter the balance of power between shareholders. On February 7, 2025, Patrick issued his newly-formed and personally-created-and-controlled Sham Charity a fifty-one percent (51%) interest in the charitable assets—318 participating shares in Charitable DAF Holdco, more than were held by all the Charitable Owners put together. This sham dilution reduced the Charitable Owners' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) The Highland Dallas Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (ii) The Highland Kansas City Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (iii) The Highland Santa Barbara Foundation, Inc.'s interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[9] interest was diluted from 1.639% to 0.80%.

[9] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

5.42 Patrick and the other Defendants never advised the Charitable Owners of any of these steps, and as set forth below, made affirmative misrepresentations and material omissions to hide them, and to dissuade and delay the Plaintiffs from taking certain specific actions to discover, oppose, or reverse them. The formation of the new "charity" controlled by Patrick, and the award of 318 new participating shares to that Sham Charity, were all done in secret, with the cooperation of all the Defendants. Moreover, throughout this very same secret process, as set forth in more detail below, Patrick and the Defendants (directly and through their agents) were falsely presenting a partial picture to the Plaintiffs about these facts, and were falsely representing to the Charitable Owners that (A) the reported increases in expenditures on Director's fees were inaccurate; and (B) the "restructuring" of the fund was proper and for the benefit of the Charitable Owners. Accordingly, Plaintiffs had no opportunity to learn the facts that the Defendants were keeping secret, and in fact the Defendants affirmatively misled the Plaintiffs about them.

5.43 Around the same time, Patrick formed the sham charity, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.44 In secret, and without notice to the Charitable Owners, on December 18, 2024, Patrick caused Charitable DAF HoldCo to transfer to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund. In turn, Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Charitable Owners, and the Charitable DAF Fund itself (where the $270M assets resided). Suddenly, the Charitable Owners no longer held a 100% beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick

ensured a different and new entity (CDMCFAD) held Charitable DAF Fund. This was a critical step in the plan to "make the Participation Shares [held the Charities] worthless[.]"[10]

5.45 In February 2024, without telling the Charitable Owners, Patrick formed a new entity in the Cayman Islands to replace the General Partner entity managing the Charitable DAF Fund. The prior General Partner had been a Delaware entity. Patrick's express directive was that the new General Partner be "hard to find or track or trace. Or find owners etc. Strong litigation protection."[11] By early March 2025, Patrick had formed this new secret entity, and it had replaced the General Partner of the Charitable DAF Fund. Again, the Charitable Owners were never informed.

5.46 On March 27, 2025, Patrick caused CDMCFAD (the new holder of $270 million in assets) to issue new shares to the Sham Charity, *and only to the Sham Charity*. He issued no additional shares in CDMCFAD to the Charitable Owners. His fraudulent scam was nearly complete.

5.47 Now, only two entities held direct economic interests in CDMCFAD (the entity that now held the $270M Charitable DAF Fund). Those two entities were Charitable DAF Holdco (still owned 48.5% by the Plaintiffs) and DFW Charitable Foundation.

5.48 Now that Holdco's interest in the Charitable DAF Fund existed only through CDMCFAD, Patrick and Murphy knew that causing Holdco to exchange or redeem its interest in CDMCFAD would sever the Charitable Owners entirely from the Charitable DAF Fund.

5.49 The remaining problem for Patrick and the Defendants was the obvious value of the interests the Charitable Owners held in the Charitable DAF Fund. Valuations of those interests had been performed continuously for years and had consistently, unerringly, and correctly reflected

---

[10] CI Statement of Claim, ¶ 80.4.
[11] CI Statement of Claim, ¶ 82.

that they were roughly equivalent to the value of the Charitable DAF Fund itself. In other words, as recently as September 2024, they were valued at roughly $270 Million.

5.50 Patrick and the Defendants thus faced a problem. They had no interest in exchanging the interests of the Charitable Owners in Holdco (and therefore in the Charitable DAF Fund) for equivalent value. Instead, their goal from the beginning had been to "liquidate" Holdco, "distribute all its assets elsewhere," and "make the Participation Shares [belonging to the Charitable Owners here] worthless[.]"[12] So, to achieve this and to give themselves "cover" for doing so, Patrick and the Defendant embarked on a self-interested, results-oriented, fraudulent exercise in valuation-shopping.

5.51 Thus began a shopping expedition for a valuation firm willing to provide a deflated valuation of Holdco's interest in the Charitable DAF Fund, now held via CDMCFAD. In January 2025, Patrick's legal counsel in the Cayman Islands, Walkers, approached PricewaterhouseCoopers ("**PwC**"), seeking a valuation of shares in Charitable DAF HoldCo, noting that the Charitable Owners were "potential adverse parties." In February 2025, Walkers informed PwC that CDMCFAD was inserted into the structure and also requested a valuation of membership interests in CDMCFAD, on the one hand, and of the Participation Shares held by the Charitable Owners in Holdco, on the other. But PwC gave an unwelcome answer, responding that "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders[.]*" In other words, PwC's professional guidance was precisely what the Defendants did not want to hear—any fair "redemption" of the Plaintiffs' interest in the Fund would require a payment at or very near the face value of the Fund itself. A phone call followed wherein PwC asked for clarity about what

[12] *See Id.*

Mr Patrick was trying to achieve by the Restructuring. After that call, PwC declined the assignment. The Defendants, however, brazenly ignored the guidance they had just obtained and rushed forward to find a more compliant valuator.

5.52 The next stop on Patrick's shopping trip was FTI Consulting in London ("**FTI**"). Walkers again presented the scenario. FTI suggested that depending on the alignment with the Charitable DAF Fund's mission, a discount of approximately 14% on the low end or 95% on the high end. But FTI was also clear that a real valuation in support of a transaction would require a much closer inspection of the specific terms of the transaction, the restructuring of the organizations, and the underlying assets themselves. FTI thus advised that their preliminary analysis could not be used in support of any transaction.

5.53 Patrick was anxious to finish his scheme to steal all the Charitable Owners' interests. On March 17, 2025, Patrick informed and instructed Walkers that they needed to have FTI remove its restriction against using any valuation for the purposes of a transaction. Patrick also disclosed his attempt at a post-hoc justification for his fraudulent, tortious, and unethical conduct: Patrick was seeking "new advice of two separate U.S. Tax counsel" that the "best interests of the Company [was] to have non Dondero holders of its interests." Once again, all of this brazen conduct was hidden from the Plaintiffs.

5.54 Over the next several days, Walkers sought to have FTI issue a valuation opinion that was unrestricted for use to support Patrick's transaction against the Charitable Owners. For its part, Walkers opined to FTI that the directors owed no "overriding duty to act in the shareholders' interest," but only in the "best interest of the company." FTI responded with a pertinent question, "Can you explain how it was in the interests of the company to materially dilute the existing shareholders?" There was never a satisfactory answer.

5.55 Slightly later, Walkers asked FTI, "please could you delete references to our advice so as to avoid any arguments about waiver of privilege." Walkers further advised FTI that what it really wanted was a "valuation report which may, in connection with a proposed redemption of the membership interests in CDM[CFAD], be disclosed to third parties and relied on to establish fair market value[.]"

5.56 Now realizing that Walkers was hiding the ball, FTI responded: "This is material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM[CFAD] redeem the shares owned in by DAF? . . . We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation we would need to do a more detailed exercise, including valuing the underlying assets." Shortly thereafter, FTI further elaborated: "If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing?"[13] Then FTI touched the point with a needle, in language making it clear that the rigged estimate Defendants were seeking could not survive scrutiny: "[W]hy haven't the participating shareholders triggered a wind-down? If they can trigger a wind down and then in short order receive $300m of distributions, ***it does change things re discount***."[14]

5.57 Walkers continued on behalf of Defendants to push FTI to give a valuation opinion that could be used to justify their intended fraud. But, now understanding some of what Defendants intended, FTI refused. FTI closed the book as follows on March 26: "What is the intention of adding that directors should act in the interests of future members***? I am struggling to understand how a director could act in a manner that is beneficial for future shareholders which is not also***

[13] CI Statement of Claim, ¶ 134
[14] CI Statement of Claim, ¶ 134 (emphasis added).

***helpful for existing shareholders.*** The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work . . . [T]his memo should not be used to support a transaction."[15] So in the end, FTI—like PwC—explained to the Defendants that the Charitable Owners' interests had substantial value given all the facts and circumstances, and it could not issue an opinion for use in a transaction that said otherwise. Again, the Defendants got news they did not want to hear; again, they ignored the guidance received and moved on to find a more malleable partner.

5.58 Patrick's next stop seeking a deflated valuation was ValueScope. Since year-end 2020, ValueScope had provided valuations for Charitable DAF Fund net assets, ranging between $177 million and $277 million, with the most recent being September 2024, at $270 million. Over the same time period, ValueScope had provided fair market value for the Charitable Owners' shares on a per share basis ranging from $481,468 to $782,847, with the September 2024 valuation at $759,614. In other words, ValueScope had valued the Charitable Owners' interests at around $270 Million just six months earlier. Unlike FTI and PwC, however, ValueScope saw its way to applying a 99.2% discount against the Charitable Owners' interests for "Lack of Control" (a situation that had *always* been inherent in the structure of the Fund) and entirely changed its methodology from prior periods. The end result: ValueScope determined that each participating share had a fair market value of $5368 in March 2025, down from $759,614, just several months earlier. According to ValueScope's "work," the Charitable Owners total value was approximately $1.6 million. ValueScope failed in their "valuation" even to address a key point that PwC and FTI had emphasized: The Charitable Owners would acquire the lion's share of $270 Million if they

[15] *Id.* ¶ 135 (emphasis added).

triggered an equitable wind-up, which they likely had the right to do. But the Defendants were happy to take "yes" for an answer.

5.59 Patrick wasted no time before weaponizing his sham valuation. The April 2 "redemption" outlined below relied extensively on the sham ValueScope report—without ever mentioning ValueScope's sharp change in methodology from years of its earlier reports; without recognizing that ValueScope failed to account for the possibility or right of the Plaintiffs to wind up; without any serious effort to justify the 99.2% reduction in value estimation from the report issued just six months earlier; and without giving the Plaintiffs any chance even to see the report, much less rebut it.

5.60 But, the Defendants also relied upon and cited in the "redemption" the FTI "memo," despite FTI's express assertion and disclaimer that its preliminary work ***could not be used to support a transaction***, and despite FTI's clear advice that the reality of the Charitable Owners' rights to effect a wind up and acquire the value of the Charitable DAF Fund required a substantial necessary adjustment upwards to the estimated value of their shares.

5.61 On April 2, 2025, Patrick and the Defendants caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6 million, a ridiculous transaction bereft of reasonably equivalent value.[16] Their goal—to "make the Participation Shares [belonging to the Plaintiffs here] worthless"—was achieved.[17] CDMCFAD participated directly by "buying" Charitable DAF Holdco's shares; the General Partner entities participated directly by causing the redemption.

5.62 After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFW

[16] Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[17] CI Statement of Claim, ¶ 80.4.

Charitable Foundation, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Charitable Owners and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[18]

5.63 Before the start of these self-dealing transactions, in October 2024, the Charitable Owners owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Charitable Owners owned Participation Shares worth zero. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Charitable Owners' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Charitable Owners.

**K. *The Defendants' Material Misstatements and Omissions***

5.64 Through this entire conspiracy, from Fall 2024 through May 2025, the Defendants and their agents engaged in an orchestrated effort to mislead the Plaintiffs about their actions and intentions. The Defendants did so in order to convince the Plaintiffs that the assets in the Charitable DAF Fund were secure; to hide their efforts to "make the Participation Shares worthless" from the Plaintiffs; to falsely convince the Charitable Owners that Defendants' strange corporate "restructuring" acts were in legitimate service to the Charitable DAF Fund's charitable objectives and the needs of the Plaintiffs; and to dissuade or delay any action by the Charitable Owners to protect or secure the value of their beneficial interests in the Charitable DAF Fund, and/or to reverse the dilution of their Participation Shares in Charitable DAF Holdco or the sham

[18] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11; (Appx. Pg. 200).

"redemption" of Charitable DAF Holdco by CDMCFAD—by, for instance, the filing of an equitable "winding up" petition.

5.65 Due to the position of trust the governing documents assigned to the Control Position; and due to Patrick's practice of sharing information about the Charitable DAF Fund only through close and direct interactions or transmissions, the Plaintiffs were factually dependent upon the special relationship between them and Patrick—both for any information about the Fund, its assets, and its transactions, and for the protection of the Plaintiffs' interests. The Plaintiffs were required to rely on information and advice that Patrick provided directly to them and depended on him to make material disclosures to them of pertinent information regarding transactions, acquisitions, and the like. This rendered the Plaintiffs unusually vulnerable to material misrepresentations and omissions the Defendants made while they were executing their scheme. By virtue of the governing documents and the Parties' relations over time, Patrick and the Defendants had undertaken, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs entrusted their interests, transactions, affairs, and property to them. The Defendants, for their own benefit, used the position and special inside knowledge they held to take improper and unfair advantage of the Charitable Owners, especially through their material misrepresentations and omissions.

5.66 On or about November 5, 2024, "compliance counsel" for Defendants, Doug Mancino, held a call with outside counsel for the Charitable Owners. In that call, Defendants' counsel represented that the increased legal spend by the Defendants in 2024 was due to the need to settle legal disputes, and that the 2025 legal spend was thus expected to decrease. Defendants' counsel mentioned nothing about increased legal expenditures associated with a massive, contemplated restructuring.

5.67 On or about December 11, 2024, even while the Defendants were executing their scheme to render the Participation Shares "worthless," Defendants' counsel arranged for a video call with outside counsel for the Charitable Owners. In an email the prior day, on December 10, 2024 "compliance counsel" for the Defendants referenced the Charitable Owners' "concerns about depletion of assets" and asserted that, "in fact . . . just the opposite has been happening under the leadership of Paul Murphy and Mark Patrick." In response, outside counsel for the Charitable Owners emphasized their vulnerability and their inability to independently assess the Defendants' representations, given their reliance on the Defendants: ""[W]ithout detailed financials, or any financials at all, the Supporting Organizations are left in the unenviable position of having [to] rely on presentations about what parties say the numbers show rather than being able to see precisely the story the numbers tell."

5.68 In the December 11, 2024 video call, the Defendants worked to allay the concerns expressed in the November 2024 no-confidence letter and thereby delay or dissuade any action on the part of the Plaintiffs to petition for an equitable wind-up until Patrick's self-dealing "restructuring" was complete. Patrick, Murphy, and their agents attended. The meeting literally happened the same week the Defendants formed CDMCFAD (the entity "inserted" below Holdco to hold the Charitable DAF Fund) and the DFW Foundation (the Sham Charity controlled by Patrick); and just one week before the Defendants executed the fatal transfer of Holdco's interests in the Charitable DAF Fund to CDMCFAD. At this meeting, the Defendants purported to provide to the Charitable Owners a global survey on their plans for the Charitable DAF Fund. The Defendants presented their purported vision of running the Charitable DAF Fund as a more professional and institutional investment vehicle, for the benefit of its charitable purposes and the Charitable Owners. They promised to provide more financial information in the future. Through

this presentation, the Defendants expressed two fundamental messages: First, the Control Position remained dedicated to the duty imposed by the Charitable DAF Fund's governing documents—managing Charitable DAF Fund assets for the benefit of the Charitable Owners; Second, Defendants' "restructuring" was for the purpose of executing that duty in a more professional and institutional manner. These messages were explicitly false, as the Defendants well knew that they were in the very midst of executing their scheme to "make the Participation Shares worthless." And they were false by omission, as the Defendants shared some information but failed to disclose the critical lodestar by which that information could be accurately read: Defendants' pending, concrete acts to subvert the Plaintiffs' interests in Holdco and the Charitable DAF Fund, and the intentions and overall scheme behind those acts.

5.69 The very next day, on December 12, 2024, the Defendants secretly formed CDMCFAD, the entity the Defendants intended to use to replace Charitable DAF Holdco, and ultimately to sever the connection between the Charitable Owners and the Fund.

5.70 Just one day later, on December 13, 2024, "compliance counsel" for the Defendants sent a follow-up email to outside counsel for the Charitable Owners. That correspondence did not disclose the formation or intended use of CDMCFAD. Instead, it encouraged and demanded the Charitable Owners rely on the representations made in the meeting and unilaterally abandon their well-founded concerns on that express basis. The email asserted: "[T]hese two meetings have provided the [Supporting Organizations] with a great deal of transparency regarding governance, financial matters, and independence of Charitable DAF Holdco, Ltd. and its affiliates. (collectively, the DAF). Therefore, we believe it is imperative that each [Supporting Organization] not only retract the November 11 [no confidence] letter in writing but also affirmatively disavow the concerns[.]" The Defendants' counsel further asserted: "The DAF is actively working on one

or more development projects from which your [Supporting Organization] clients (and independently their supported organizations) will benefit from financially from Participating Shareholder dividend distributions for many years to come." Again, the Defendants' representatives made these assertions and encouraged and demanded that the Plaintiffs rely upon them, while literally in the midst of executing their plan to permanently sever the Plaintiffs from the very "dividend distributions" referenced in the correspondence.

5.71 On January 30, 2025, Paul Murphy (copying Mark Patrick), acting for the Defendants, sent an email to the Charitable Owners offering additional meetings, and asserting that "we are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF Holdco structure." In the same correspondence, Murphy added: "DAF Holdco holds itself to the highest standards in achieving its goal of maximizing returns in risk adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF Holdco's independence and are advised by best-in-class, independent experts." Defendants sent this promise of "clarity on investments and the DAF Holdco structure" little more than a month after secretly inserting CDMCFAD into that structure as a "blocker" between the Charitable Owners and their interests in the Charitable DAF Fund; and less than a week before executing on their scheme to replace the Charitable DAF Fund's General Partner to better insulate Patrick. Again, Defendants' statement was an express untruth and a failure to perform on an express promise—they had no intent to provide "clarity" to the Plaintiffs, but in fact were in the midst of forming a replacement General Partner entity that was "hard to find or track or trace. Or find owners."[19] And again, these statements omitted the critical facts that would have informed the Plaintiffs of the true landscape.

---

[19] CI Statement of Claim, ¶ 82.

Again, Patrick and the Defendants intended by these misrepresentations and omissions to forestall and defeat an effort by the Charitable Owners to secure the value of their Participating Shares. Indeed, they had no regard for any inferences the Charitable Owners would draw from their misstatements and omissions—indeed, they were counting on misdirection.

5.72 On February 4, 2025, Paul Murphy (copying Mark Patrick) sent an additional email note to the Charitable Owners on behalf of the Defendants, promising a further meeting at which the Defendants could "resolve [their] concerns." The Defendants again failed to provide key details that would render the statements they did make not misleading, misrepresented facts, and expressed a false promise of "working with" the Charitable Owners, hoping to delay or undermine any decisive action on their part to protect their valuable interests in the Charitable DAF Fund. The Defendants represented: "We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so." This happened at the same time the Defendants were deeply entrenched in executing their plot. Again, the Defendants made expressly false statements—their "commit[ment]" to "work with" the Charitable Owners; made a false promise to work with the Charitable Owners when the Defendants had no intent to do so, and at the same time, omitted critical facts essential to accurately understand the true nature of the Defendants' actions and commitments.

5.73 On February 14, 2025—one day after the Defendants engaged FTI in an effort to secure a sham valuation reducing the value of the Plaintiffs' interests by more than 99%--"compliance counsel" for the Defendants continued to gaslight the Charitable Owners, asserting that "Charitable [D]AF is not paying Paul or Mark 'millions in director fees."

5.74 On March 17, 2025—while the scheme to defraud the Plaintiff was nearing its end—"compliance counsel" for the Defendants reached out to the Charitable Owners' outside

counsel, purportedly seeking "a couple of dates for Paul Murphy to make a presentation to your three clients." Plaintiffs' counsel responded with three options for dates the following day. Defendants never set the meeting. At this point, the Defendants were irrevocably committed to the path of severing the Charitable Owners from the Fund, and the only possible purpose for such an overture was to keep the charade begun with earlier promises of cooperation, transparency, and future benefits from the Participation Shares going for just a bit longer—just long enough to consummate the conspiracy.

5.75 The Plaintiffs relied on the misrepresentations of the Defendants throughout the relevant period. That reliance was justified under all the circumstances, including Defendants' course of conduct, Defendants' specific representations, and Defendants' obligations to Plaintiffs arising under the governing documents and common law. Those representations were effective in dissuading and delaying the Plaintiffs from taking action that would have secured to them their interests in the $270 Million Fund, including by discovering and opposing the dilution of their interest in the Charitable DAF Fund and by seeking an equitable winding up to secure their interest.

**L. *The Cayman Island Proceedings***

5.76 On April 2, 2025, again unbeknownst to the Charitable Owners, the Defendants voted to place placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.77 But the Charitable Owners already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Charitable Owners well-founded concerns including their expression of no-confidence; and (3) engaged in a pattern of fraudulent self-dealing.

5.78 As a result, the Charitable Owners filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Charitable Owners would not have learned about Patrick's voluntary liquidation.

5.79 Cayman Islands counsel for the Charitable Owners alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFW Charitable Foundation and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.80 The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[20]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:
>
> a) the power to present a petition for the winding up of Charitable DAF Fund, LP if so advised;
>
> b) the power to file a summons and to apply for an order appointing provisional liquidators of the Charitable DAF Fund if so advised; and

[20] Supervision Order (Appx. Pg. 244-246)

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.81 Once appointed to fill the shoes of Charitable DAF Holdco, the Joint Official Liquidators performed an internal investigation, reviewing the documents and correspondence belonging to that entity. Based on that investigation and in the interests of Charitable DAF Holdco (not a party here), they determined to waive privilege over substantial records now in their control. On July 15, 2025, the Joint Official Liquidators filed a Statement of Claim in the Grand Court of the Cayman Islands on behalf of Charitable DAF Holdco. The Statement of Claim quotes extensively from the records belonging to Charitable DAF Holdco, which document in detail the conduct of the Defendants in this Action.[21]

## VI. CAUSES OF ACTION

### Count 1 – Common Law Fraud Against All Defendants

6.1 Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.2 The Defendants made material misrepresentations to the Plaintiffs, as set forth above and herein.

6.3 The Defendants made the representations with knowledge of their falsity; or recklessly as a positive assertion, without knowledge of their truth, as set forth above and herein.

6.4 The Defendants intended for the Plaintiffs to rely upon the representations, or to induce reliance upon the representations. Specifically, amongst other purposes, the Defendants intended that their representations would dissuade or delay the Plaintiffs from discovering or contesting the dilution of their interest in Charitable DAF Holdco; and dissuade or delay the Plaintiffs from filing an equitable winding up petition or taking other decisive action to protect

[21] CI Statement of Claim.

their interest in the Charitable DAF Fund, reverse the dilution, and/or reverse the sham "redemption," all of which would have saved and preserved the value of their interest in the Charitable DAF Fund and defeated the Defendants' scheme to "make the Participation Shares [belonging to the Plaintiffs] worthless[.]"

6.5 Patrick has testified that through their hidden manipulations, at great expense of the funds meant for charitable purposes via the Plaintiffs, the Plaintiffs now own "nothing."

6.6 The Plaintiffs justifiably relied upon the representations, as set forth herein and otherwise, as they knew Defendants were charged by the governing documents of the Charitable DAF Fund to always manage its assets for the economic benefit of the Charitable Owners (the Plaintiffs), and the Defendants repeatedly asserted that the purpose of their actions and the changes in Charitable DAF Fund management were not to harm the Plaintiffs, but to better serve the Plaintiffs through more professional and institutional structures and procedures.

6.7 The Plaintiffs suffered injury and damages as a result of the reliance, and seek actual and exemplary damages in an amount to be determined at trial.

**Count 2 – Fraud by Nondisclosure Against All Defendants**

6.8 Paragraphs 1.1 - 5.81 are incorporated as though fully set forth herein.

6.9 The Defendants deliberately failed to disclose certain material facts.

6.10 The Defendants had a duty to disclose those facts to the Plaintiffs, arising from their obligations pursuant to the Charitable DAF Fund's governing documents to always manage the Charitable DAF Fund for the economic benefit of the Plaintiffs.

6.11 The Defendants had a further duty to disclose those facts to the Plaintiffs arising from their fiduciary obligations arising under common law.

6.12 The Defendants had a further duty to disclose those facts to the Plaintiffs because the Defendants made a partial disclosure that created a false impression, as set forth above and herein, as set forth above and herein.

6.13 The Defendants had a further duty to disclose those facts to the Plaintiffs because they voluntarily disclosed certain information, creating a duty to disclose the whole truth, as set forth above and herein.

6.14 The Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.15 The Defendants knew the Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.16 The Defendants intended that the Plaintiffs act or refrain from acting based on the nondisclosure, as set forth above and herein.

6.17 The Plaintiffs relied on the nondisclosure, which resulted in their injury in the amount to be proven at trial, but which exceeds $250 Million.

**Count 3 – Breach of Fiduciary Duty against Patrick, CDH GP, Ltd., and Charitable DAF GP, LLC**

6.18 Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.19 By virtue of Defendants' Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, and his special relationship with Plaintiffs, Patrick owed fiduciary duties to the Plaintiffs.

6.20 The Defendants held a special factual relationship of direct and close reliance with the Plaintiffs, as set forth above, expressed by the governing documents and then by the reality that the Plaintiffs were dependent upon the Defendants to protect their interests in the transactions, finances, and acquisitions of the Fund, and were required to rely (and did rely) on information and

advice the Defendants provided about the Fund. Patrick and the Defendants undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them. On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

6.21 By virtue of their assertions and by virtue of the governing documents empowering them to act, the Defendants expressly and implicitly asserted that they acted on behalf of the Plaintiffs as agents for them in the transactions of the Fund. On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

6.22 Patrick's position of trust was underscored by the governing documents of the Charitable DAF Fund, which expressed his required fidelity to the Plaintiffs in making all decisions in the Control Position for their economic benefit.

6.23 The Defendants breached their fiduciary duties to the Plaintiffs by diluting and then stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit. In so doing, Defendants for their own benefit used their position and special inside knowledge acquired by them to take improper or unfair advantage of the Plaintiffs.

6.24 The Defendants breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity. Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Charitable Owners.

6.25 Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit. Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Plaintiffs.

6.26 Patrick breached his fiduciary duty by successfully causing a transfer of assets ultimately from the Plaintiffs to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.27 The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support, including by causing them to lose the value of their Participation Shares at an undervalue. Plaintiffs have suffered damages as a result of Defendants' breach of their fiduciary duties.

**Count 4 – Civil Conspiracy against all Defendants.**

6.28 Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.29 The Defendants conspired and combined their efforts to effect a common scheme.

6.30 The Defendants sought through that combination to achieve a common object and course of action—to wit, to "make the Participation Shares worthless" and thereby transfer away from the Plaintiffs, and to the Defendants, the entire beneficial ownership of the $270 Million in assets in the Charitable DAF Fund.

6.31 The Defendants took one or more unlawful, overt acts in pursuit of the object and course of action of the combination and conspiracy—to wit, at minimum, fraud, breach of fiduciary duty, conversion, and constructive fraud, as set forth herein.

6.32 The Plaintiffs suffered damages as a proximate result of the combination and conspiracy.

**Count 5 - Constructive Fraud Against All Defendants**

6.33 Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.34 "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Tex. Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.—Dallas 2009). "In constructive fraud the actor's intent is irrelevant." *Id*. "Constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent because it violates a fiduciary duty." *Id.*

6.35 As a fiduciary, Patrick's and the other Defendants' conduct in diluting the Plaintiffs' interests, selling interests at below-market values, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.36 Plaintiffs have suffered damages as a result of Patrick's fraud.

**Count 6 - Unjust Enrichment Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation**

6.37 Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.38 A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.39 Patrick, CDMCFAD**,** and the DFW Charitable Foundation stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.40 Patrick, CDMCFAD, and the DFW Charitable Foundation took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with the DFW Charitable Foundation.

6.41 Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.42 Patrick, CDMCFAD, and DFW Charitable Foundation have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damaged by Patrick's unjust enrichment.

**Count 7 – Conversion Against Patrick, CDMCFAD, LLC, CDH GP, Ltd., and DFW Charitable Foundation**

6.43 Paragraphs 1.1 – 5.81 are incorporated as if fully restated herein.

6.44 Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the plaintiff demanded the property, and (4) defendant refused the return of the property. *Wells Fargo Bank Northwest, N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 699 (Tex. App.—Dallas 2012 no pet.).

6.45 The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.46 Patrick with the other named Defendants have unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted

all the legal and beneficial economic interests to Patrick's controlled entity, DFW Charitable Foundation.

6.47 The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which all have ignored and refused. Plaintiffs have been damaged as a result of these conversions.

**Count 8 – Imposition of Constructive Trust Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation**

6.48 Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.49 "A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment." *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas, no pet.). "To obtain a constructive trust, the proponent must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res." *Id*.

6.50 Patrick through the DFW Charitable Foundation has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of the DFW Charitable Foundation and Patrick.

6.51 All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

## VII. APPLICATION FOR RECEIVERSHIP

7.1 Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

7.2 The Plaintiffs seek the immediate appointment of a receiver over Defendants the DFW Charitable Foundation and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code sections 64.001(a), Texas Business Organizations Code section 11.410, and the Court's inherent equitable powers.

**A. *Texas Civil Practice & Remedies Code***

7.3 Under section 64.001 of the Texas Civil Practice and Remedies Code, a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," or "in any case in which a receiver may be appointed under the rules of equity." TEX. CIV. PRAC. & REM. CODE § 64.001(a)(3), (7).

7.4 A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. *Id*. § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5 A probable interest exists by statute in actions between partners and in actions between joint owners of property. *Id*. § 64.001(a)(3).

7.6 One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App.–Dallas 2024, pet. denied, reh'g denied).

**B. *Texas Business and Organizations Code***

7.7 A court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." TEX. BUS. ORG. CODE § 11.403(a)(3).

7.8 Additionally, under Section 11.410 of the Texas Business Organizations Code, a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. *Id*. § 11.410(a).

**C. *Rules of Equity***

7.9 In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. Texas law makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision. TEX. CIV. PRAC. & REM. CODE § 64.004

**D. *Receivership Standards Under Texas Law and Equity***

7.10 The appointment of a receiver lies within the discretion of the trial court. *See Spiritas v. Davidoff*, 459 S.W.3d 224, 231 (Tex. App.—Dallas 2015, no pet.).

7.11 The facts alleged in the receivership application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.] 1976, writ dismissed).

7.12 Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

**E. *The Charitable Owners are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities***

7.13 The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.14 Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.15 Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure. The Plaintiffs have not received any just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.16 Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.17 Patrick dominates and controls the Receivership Entities. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.18 The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.19 The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

7.20 The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.21 The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.22 Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

**VIII – APPLICATION FOR TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP**

8.1. Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

8.2. Plaintiffs seek injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund following a hearing on Plaintiffs' Application for Temporary Injunction , regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.3. A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act

would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." TEX. CIV. PRAC. & REM. CODE § 65.011. "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties." *Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966). An applicant for the writ must show (1) a probable right to recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued. *See* TEX. CIV. PRAC. & REM. CODE § 65.011; *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002)

8.4. Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending. In other words, the adequacy of an available legal remedy must be judged in the circumstances of the particular case, and in such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety. *See Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ).

8.5. The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

8.6. Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.7. Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Injunction is not ordered against the Defendants. Accordingly, Plaintiffs request the Court freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.8. The harm to Plaintiffs is imminent, and if the Court does not enjoin the Defendants, they will be irreparably injured, as set forth herein. If the Defendants prevail on the merits, the funds will still be available to them for their use in future. The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.9. The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

**A. *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.***

8.10. Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See id*; *Transport Co. of Tex. v. Robertson Transports, Inc.*, 261 S.W.2d 549, 552 (Tex. 1953). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58.

8.11. Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that funds vital philanthropic efforts relied upon by key communities across the nation. The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B. *Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.***

8.12. Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above. Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *See Staubach*, 667 S.W.2d at 567–68.

8.13. Plaintiffs have no adequate remedy at law. Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds. These losses, as well as others which will inevitably occur if Defendants are

not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seek a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

## VIII. PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B. Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C. Impose a Constructive Trust against Patrick, CDMCFAD, LLC and DFW Charitable Fund;

D. Require the reversal of the dilution scheme and unauthorized asset transfers;

E. Require recission of improper redemption of shares and share transfers;

F. Award actual damages in an amount to be proven at trial;

G. Award exemplary damages as permitted by law;

H. Award attorneys' fees and costs;

I. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**MCCARTY LAW PLLC**

*/s/ Darren McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street, Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200

Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, July 20, 2025, on all counsel or parties of record.

*/s/ Craig M. Warner*
Craig M. Warner

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Benjamin Warden on behalf of Benjamin Warden
Bar No. 24115926
BWarden@duanemorris.com
Envelope ID: 103353344
Filing Code Description: Amended Filing
Filing Description: 2025.07.20 Plts First Amended Petition
Status as of 7/21/2025 9:19 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 7/20/2025 10:25:19 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 7/20/2025 10:25:19 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 7/20/2025 10:25:19 PM | SENT |

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

In re: Highland Capital Management, LP §
§
§
Debtor(s) §

Case No. 19-34054

☐ Jointly Administered

# Post-confirmation Report

Chapter 11

Quarter Ending Date: 03/31/2026

Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021

Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: ○ Reorganized Debtor

◉ Other Authorized Party or Entity: Highland Claimant Trust
Name of Authorized Party or Entity

/s/ Zachery Z. Annable
Signature of Responsible Party

04/20/2026
Date

Zachery Z. Annable, Hayward PLLC
Printed Name of Responsible Party

10501 N. Central Expressway, Suite 106
Dallas TX 75231
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Debtor's Name Highland Capital Management, LP Case No. 19-34054

## Part 1: Summary of Post-confirmation Transfers

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $822,543 | $468,389,541 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $3,321,685 |
| d. Total transferred (a+b+c) | $822,543 | $471,711,226 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor | | *Aggregate Total* | | | | |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | | | | | | |
| | ii | | | | | | |
| | iii | | | | | | |
| | iv | | | | | | |
| | v | | | | | | |
| | vi | | | | | | |
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |


CONFIDENTIAL 015002

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor | | *Aggregate Total* | | | | |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | | | | | | |
| | ii | | | | | | |
| | iii | | | | | | |
| | iv | | | | | | |
| | v | | | | | | |
| | vi | | | | | | |

Case 19-34054-sgj11 Doc 4583 Filed 02/17/26 Entered 02/17/26 17:27:44 Desc
Exhibit C Page 5 of 12

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | $0 | | |

## Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $0 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $0 | $387,308,940 | $397,485,568 | 97% |
| e. Equity interests | $0 | $0 | $19,100,071 | | |

## Part 4: Questionnaire

a. Is this a final report? Yes ○ No ◉

If yes, give date Final Decree was entered: ____________

If no, give date when the application for Final Decree is anticipated: ____________

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? Yes ◉ No ○

Debtor's Name Highland Capital Management, LP Case No. 19-34054

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

| | |
|---|---|
| /s/ James Seery | James Seery |
| Signature of Responsible Party | Printed Name of Responsible Party |
| Claimant Trustee | 04/20/2026 |
| Title | Date |

Case 19-34054-sgj11 Doc 3332 Filed 04/21/26 Entered 04/21/26 17:27:04 Desc Exhibit 21 Page 12 of 17

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Page 1

Other Page 1

Page 2 Minus Tables

Bankruptcy Table 1-50

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page



CONFIDENTIAL

015010

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |

**GLOBAL NOTES TO POST-CONFIRMATION REPORT**

The Highland Claimant Trust has filed the attached post-confirmation report (the "PCR") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), with respect to the case of Reorganized Debtor Highland Capital Management, L.P., Case No. 19-34054 (SGJ) (the "Bankruptcy Case"). The Highland Claimant Trust prepared the PCR with the assistance of the Reorganized Debtor's employees, advisors, and professionals. The PCR was prepared solely for the purpose of complying with the post-confirmation quarterly reporting requirements established by the United States Trustee Program (*see* https://www.justice.gov/ust/chapter-11-operating-reports). The PCR should not be relied upon by any persons for any information in connection with current or future financial conditions or events relating to the Highland Claimant Trust, the Reorganized Debtor or its estate.

The financial information contained in the PCR is preliminary, unaudited, limited in scope, and is not prepared in accordance with accounting principles generally accepted in the United States of America nor in accordance with other applicable non-bankruptcy law. In preparing the PCR, the Highland Claimant Trust relied on financial data from the books and records available to it at the time of such preparation, as well as certain filings on the docket in the Bankruptcy Case. Although the Highland Claimant Trust made commercially reasonable efforts to ensure the accuracy and completeness of the PCR, inadvertent errors or omissions may exist. The Highland Claimant Trust reserves the right to amend and supplement the PCR as may be necessary or appropriate.

**Part 2: Preconfirmation Professional Fees and Expenses**

The Highland Claimant Trust did not make any payment of professional fees prior to Confirmation of the Plan.

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The service address for the Reorganized Debtor is 6333 Mockingbird Ln., Ste 147 #5045, Dallas, Texas 75214.

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

For presentation purposes, the chart showing claims anticipated under the plan, paid claims and allowed claims are reflected in both the Reorganized Debtor and Claimant Trust post-confirmation report under Part 3: Recoveries of the Holders of Claims and Interests under the Confirmed Plan.

The presentation contained in this PCR does not reflect the material and necessary reserves that will be taken in accordance with the Claimant Trust's governing documents and the Plan.

The General unsecured claims line item (Part 3. d.) encapsulates the claims of Classes 6, 7, 8, and 9 under the Plan.

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

| | | | |
|---|---|---|---|
| In re: Highland Capital Management, LP | § | Case No. | 19-34054 |
| | § | | |
| | § | | |
| Debtor(s) | § | ☐ Jointly Administered | |

# Post-confirmation Report

Chapter 11

Quarter Ending Date: 03/31/2026

Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021

Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: ◉ Reorganized Debtor

○ Other Authorized Party or Entity: ____________

Name of Authorized Party or Entity

/s/ Zachery Z. Annable
Signature of Responsible Party

Zachery Z. Annable, Hayward PLLC
Printed Name of Responsible Party

04/20/2026
Date

10501 N. Central Expressway, Suite 106
Dallas TX 75231
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Debtor's Name Highland Capital Management, LP Case No. 19-34054

## Part 1: Summary of Post-confirmation Transfers

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $1,728,289 | $194,493,977 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $5,194,652 |
| d. Total transferred (a+b+c) | $1,728,289 | $199,688,629 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | $0 | $33,005,136 | $0 | $33,005,136 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | Pachulski Stang Ziehl & Jones | Lead Counsel | $0 | $24,312,860 | $0 | $24,312,860 |
| | ii | Development Specialists, Inc. | Financial Professional | $0 | $5,765,448 | $0 | $5,765,448 |
| | iii | Kurtzman Carson Consultants | Other | $0 | $2,054,716 | $0 | $2,054,716 |
| | iv | Hayward & Associates PLLC | Local Counsel | $0 | $872,112 | $0 | $872,112 |
| | v | | | | | | |
| | vi | | | | | | |
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | $0 | $7,604,472 | $0 | $7,604,472 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | Hunton Andrews Kurth LLP | Other | $0 | $1,149,807 | $0 | $1,149,807 |
| | ii | Foley Gardere, Foley & Lardne | Other | $0 | $629,088 | $0 | $629,088 |
| | iii | Deloitte | Financial Professional | $0 | $553,413 | $0 | $553,413 |
| | iv | Mercer (US) Inc. | Other | $0 | $204,767 | $0 | $204,767 |
| | v | Teneo Capital, LLC | Financial Professional | $0 | $1,364,823 | $0 | $1,364,823 |
| | vi | Wilmer Cutler Pickering Hale | Other | $0 | $2,650,937 | $0 | $2,650,937 |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| vii | Carey Olsen | Other | $0 | $280,264 | $0 | $280,264 |
| viii | ASW Law | Other | $0 | $4,976 | $0 | $4,976 |
| ix | Houlihan Lokey Financial Advi | Other | $0 | $766,397 | $0 | $766,397 |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |
| xxxvii | | | | | | |
| xxxviii | | | | | | |
| xxxix | | | | | | |
| xl | | | | | | |
| xli | | | | | | |
| xlii | | | | | | |
| xliii | | | | | | |
| xliv | | | | | | |
| xlv | | | | | | |
| xlvi | | | | | | |
| xlvii | | | | | | |
| xlviii | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | $0 | $60,171,929 | $0 | $60,171,929 |

## Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $0 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $0 | $387,308,940 | $397,485,568 | 97% |
| e. Equity interests | $0 | $0 | $19,100,071 | | |

## Part 4: Questionnaire

a. Is this a final report? Yes ◯ No ◉

If yes, give date Final Decree was entered: ____________

If no, give date when the application for Final Decree is anticipated: ____________

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? Yes ◉ No ◯

Debtor's Name Highland Capital Management, LP Case No. 19-34054

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

| | |
|---|---|
| /s/ James Seery | James Seery |
| Signature of Responsible Party | Printed Name of Responsible Party |
| CEO | 04/20/2026 |
| Title | Date |



CONFIDENTIAL

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Page 1

Other Page 1

Page 2 Minus Tables

Bankruptcy Table 1-50



CONFIDENTIAL

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page



CONFIDENTIAL

015022

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) | |

**GLOBAL NOTES TO POST-CONFIRMATION REPORT**

The Reorganized Debtor has filed the attached post-confirmation report (the "PCR") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), on behalf of debtor Highland Capital Management, L.P., Case No. 19-34054 (SGJ) (the "Bankruptcy Case"). The Reorganized Debtor prepared the PCR with the assistance of the Reorganized Debtor's employees, advisors, and professionals. The PCR was prepared solely for the purpose of complying with the post-confirmation quarterly reporting requirements established by the United States Trustee Program (*see* https://www.justice.gov/ust/chapter-11-operating-reports). The PCR should not be relied upon by any persons for any information in connection with current or future financial conditions or events relating to the Reorganized Debtor or its estate.

The financial information contained in the PCR is preliminary, unaudited, limited in scope, and is not prepared in accordance with accounting principles generally accepted in the United States of America nor in accordance with other applicable non-bankruptcy law. In preparing the PCR, the Reorganized Debtor relied on financial data from the books and records available to it at the time of such preparation, as well as certain filings on the docket in the Bankruptcy Case. Although the Reorganized Debtor made commercially reasonable efforts to ensure the accuracy and completeness of the PCR, inadvertent errors or omissions may exist. The Reorganized Debtor reserves the right to amend and supplement the PCR as may be necessary or appropriate.

**Part 2: Preconfirmation Professional Fees and Expenses**

In Section A of the PCR, the Reorganized Debtor listed the bankruptcy related professionals employed in connection with the Bankruptcy Case.

In Section B of the PCR, the Reorganized Debtor listed non-bankruptcy professionals, those that would have been retained absent the Bankruptcy Case, and the ordinary course professionals ("OCP"). Hunton Andrews Kurth LLP ("Hunton") and Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale") were originally ordinary course professionals but were later employed

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The service address for the Reorganized Debtor is 6333 Mockingbird Ln., Ste 147 #5045, Dallas, Texas 75214.

professionals. The amounts listed for Hunton and Wilmer Hale include the OCP payments and employed professional payments.

In Section C of the PCR, the Reorganized Debtor totals all payments included in Sections A and B, along with payments made to professional employed by the official committee of unsecured creditors (the "Committee").

The approved current quarter, approved cumulative, and paid cumulative will have the same amount listed due to approval and payment of final fee applications.

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

For presentation purposes, the chart showing claims anticipated under the plan, paid claims and allowed claims are reflected in both the Reorganized Debtor and Claimant Trust post-confirmation report under Part 3: Recoveries of the Holders of Claims and Interests under the Confirmed Plan.

The presentation contained in this PCR does not reflect the material and necessary reserves that will be taken in accordance with Reorganized Debtor's governing documents and the Plan.

The Debtor reserves all right to object to any claim in accordance with the terms of the Plan.

The General unsecured claims line item (Part 3. d.) encapsulates the claims of Classes 6, 7, 8, and 9 under the Plan.

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

**COUNSEL FOR THE CHARITABLE DEFENDANTS**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| **Debtor** | § | |



CONFIDENTIAL

| | | |
|---|---|---|
| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**CLO HOLDCO, LTD., CHARITABLE DAF HOLDCO, LTD., CHARITABLE DAF FUND, LP, HIGHLAND DALLAS FOUNDATION, INC., THE DUGABOY INVESTMENT TRUST, GRANT JAMES SCOTT III IN HIS INDIVIDUAL CAPACITY, AS TRUSTEE OF THE DUGABOY INVESTMENT TRUST, AND AS TRUSTEE OF THE GET GOOD NONEXEMPT TRUST, AND JAMES D. DONDERO,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 20-03195**<br>**Relates to Dkt. No. 70** |

**OBJECTION TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO FURTHER EXTEND THE STAY OF THE ADVERSARY PROCEEDING THROUGH OCTOBER 15, 2021**

CLO HoldCo, LTD. and Highland Dallas Foundation, Inc. (the "Charitable Defendants") file this Objection to the *Motion for Further Extend the Stay of the Adversary Proceeding Through October 15, 2021* (Dkt. No. 70) (the "Second Stay Motion") filed by the Official Committee of Unsecured Creditors (the "Committee") and Litigation Trustee (together, the "Movants").

**PRELIMINARY STATEMENT**

1. The Movants' latest attempt to delay adjudication of this adversary proceeding (the "Adversary Proceeding") is as baseless as its previous delays. The Committee was granted standing to investigate and pursue Estate Claims in January 2020 and thereafter engaged in extensive and costly discovery, much of which was alleged on an emergency basis. *See* Case No. 19-34054-sgj11 ("Bankruptcy Case"), Dkt. No. 353-1 (charging Committee with pursuit of Estate



CONFIDENTIAL 

Claims, defined as causes of action against Debtor related entities specifically including DAF entities), Dkt. Nos. 808, 872 (discovery pleadings filed by the Committee); Dkt. Nos. 570, 883, 1244, 1655, 2221 and 2611 (Committee's financial advisor fee statements); Dkt. Nos. 569, 831, 1296, 1853, 2240, 2585 (Committee's counsel fee statements).

2. Now some twenty (20) months later, and some eight (8) months after the filing of the initial complaint (which was supposed to have been filed by the end of June 2020 and which was amended before service), the Movants cite to their newly propounded Rule 2004 discovery in the underlying Bankruptcy Case as cause to stay this Adversary Proceeding further, so that the Movants can, through extra Rule 2004 discovery, bolster the allegations in the Complaint and/or add new causes of action. *See* Dkt. No. 70 (stating that an additional stay of the Adversary Proceeding is needed to provide "additional necessary time to determine whether to seek leave to amend the complaint").

3. In other words, the Committee, having filed an adversary proceeding, after having twenty (20) months to investigate Estate Claims, and having charged the estate millions of dollars, now seeks to stay the same proceeding so it can do further discovery outside Rule 26 process to bolster its complaint. While at the same time asserting (falsely) that the Rule 2004 discovery will not include any discovery relevant to the transaction made the subject of the complaint (which the Movants describe as the "CLO HoldCo Transaction"). But this is a feint, and the Movants know it.

4. There is no single transaction alleged within the complaint (Dkt. No. 6) (the "Complaint"), as shown below. Simply, the Movants should not be allowed to use FED. R. BANKR. P. 2004 ("Rule 2004") to supplement any of their allegations in their Complaint, or deal with the subject matter of the Complaint, and therefore the Court should deny the requested stay so the

defendants can proceed to have their day before the required Article III court, have its motion to dismiss heard (and granted), and be shed of the Committee and its antics.

## BACKGROUND

5. In the underlying bankruptcy case, Case No. 19-34054, on October 29, 2019, the Committee selected Sidley Austin LLP ("Committee Counsel") as counsel. *See* Bankruptcy Case, Dkt. No. 2306, ¶3. On December 17, 2020, the Committee through Committee Counsel commenced this Adversary Proceeding against the defendants (the "Defendants"). Dkt. No. 2. On April 14, 2021, the *Charitable Defendants filed a Motion to Dismiss, or in the alternative, Motion for More Definite Statement* (Dkt. No. 23) (the "Charitable Defendants Motion to Dismiss") and the *Motion to Withdraw the Reference* (Dkt. No. 24) (the "Charitable Defendants Motion to Withdraw the Reference").

6. Several other Defendants filed motions to dismiss (Dkt. Nos. 22, 25, 30, 32), collectively with the Charitable Defendants Motion to Dismiss, the "Motions to Dismiss"), and motions to withdraw the reference (Dkt. No. 33) (collectively, with the Charitable Defendants Motion to Withdraw the Reference, the "Motions to Withdraw the Reference").

### a. The First Agreed Extension

7. Pursuant to Local Bankruptcy Rule 5011-1, on April 16, 20211, the Court provided a setting for a status conference on the Motions to Withdraw the Reference for May 25, 2021. Before the Charitable Defendants filed the notice of setting, the Committee requested an extension of time to oppose the Motions to Dismiss and Motions to Withdraw the Reference to May 21, 2021. At the time of its request, the estate had already employed Teneo Capital, LLC (the "Litigation Trustee"). *See Application for Order Pursuant to Section 1103 of the Bankruptcy Code Authorizing the Employment and Retention of Teneo Capital, LLC as Litigation Advisor to the*

*Official Committee of Unsecured Creditors Effective April 15, 2021* (the "Application to Employ the Litigation Advisor") [Bankruptcy Case, Dkt. No. 2306] (noting that Teneo was retained the day before the Committee requested its first extension).

8. Despite having retained the Litigation Trustee the day before and with full knowledge of the role of the Litigation Trustee, the Committee did not disclose the retention to the Charitable Defendants nor that it would serve as the basis for the Committee to seek a stay from the Court at the expiry of the agreed extension. Because none of this was disclosed to the Charitable Defendants, the Charitable Defendants agreed to an extension of the response deadline to May 25, 2021. In light of the agreed extension, the Committee and Defendants cancelled their proposed discovery conference.

**b. The First Motion to Stay Adversary Proceeding**

9. At the expiration of the agreed extension, on May 18, 2021, the Committee filed a *Motion to Stay the Adversary Proceeding for Ninety Days* [Dkt. No. 46] (the "First Motion Stay"). The Committee asserted that it needed an additional ninety (90) days in the form of a stay of the Adversary Proceeding so that the Litigation Trustee could have the "necessary time to familiarize itself with the Adversary Proceeding, so as to adequately and efficiently defend the Motions to Withdraw the References, the Motions to Dismiss, and to effectively manage the litigation of the Adversary Proceeding in its entirety." *See* First Motion to Stay, ¶11.

10. The Charitable Defendants opposed the requested stay, noting that the Litigation Trustee had been retained on April 15, 2021, one day after the Motion to Withdraw the Reference and the Motion to Dismiss were filed (*see* Dkt. No. 50), and therefore, the Litigation Trustee had already had forty (40) days to "familiarize himself" with the Committee's Complaint (with which, one would think, counsel who drafted it would be familiar and could easily explain), so that the

Committee could mount a purely legal defense first to the Motion to Withdraw the Reference—which is of course far more time than the twenty-four (24) days provided by Local Bankruptcy Rule 7007-1(e), and second to the motion to dismiss under Rule 12(b)(6) (also a legal matter). Of course, the Committee Counsel who filed the Adversary Proceeding (after some 8 months during which it held the authority to investigate and prosecute Estate Claims) will continue on to represent the Litigation Trustee (we guess). Presumably, Committee Counsel could advise their client on an appropriate legal defense to a motion to withdraw the reference (a purely legal issue) during the April through August time frame.

11. Further, the Charitable Defendants noted that the Court had in effect already stayed the Adversary Proceeding pending disposition of the Motion to Withdraw the Reference pursuant to FED. R. BANKR. P. 5011(c). The Court had already cancelled hearings on the Motions to Dismiss, and the Charitable Defendants advised the Court and the Committee that it did not oppose staying these other matters, while the Motion to Withdraw the Reference was decided. However, the Charitable Defendants urged the Court to conduct a status conference on the Motions to Withdraw the Reference and prepare its report and recommendation to the district court pursuant to Local Bankruptcy Rule 5011-1(a), (b) so that the parties could at least know before which court the Adversary Proceeding will be litigated.

12. At the May 20, 2021 hearing on the First Motion to Stay, the Committee argued that there could be no harm to the Charitable Defendants and again cited the Court to its characterization of entities related to Mr. Dondero as "byzantine". In an attempt to distinguish the case law cited to by the Charitable Defendants, the Committee essentially argued that only a plaintiff could ever be harmed by stays of litigation. But of course, this is not true. As courts have found time and time again, it is "clear that a court must tread carefully in granting a stay of

proceedings, since **a party** has a right to a determination of its rights and liabilities without undue delay." *Ohio Env't Council v. U.S. Dist. Ct., S. Dist. of Ohio, E. Div*., 565 F.2d 393, 396 (6th Cir. 1977).

13. At the time of the hearing on the First Motion to Stay, the Committee's sole cited-to justification for staying the Adversary Proceeding was that the Litigation Trustee needed almost double the time that litigants are given by local rule to mount a purely legal defense to Motions to Withdraw the Reference, even though his counsel, who filed the Adversary Proceeding, ostensibly after a reasonable inquiry, and after at least $9 million in charged lawyer time, should have become sufficiently "familiarized" with the Bankruptcy Case to provide advice to the now Litigation Trustee. And while the Committee and the Litigation Trustee were already working on their Rule 2004 discovery which is the basis for the Second Motion to Stay, the Committee declined to inform the Charitable Respondents or the Court that it would seek an additional stay based on its forthcoming Rule 2004 discovery requests. Bankruptcy Case, Dkt. No. 2570 (numerous time entries before the May 20, 2021 hearing regarding Rule 2004 strategy, drafting, and research and discussions with the Litigation Trustee regarding the same).

14. The Court nonetheless granted the Motion to Stay, resting its decision on two fundamentally flawed grounds. First, the Court found that because it would take the district court at least ninety (90) days to decide the Motions to Withdraw the Reference, the Committee's requested ninety (90) day stay was of no moment. But of course, the Committee's ninety (90) day stay will in fact be a one-hundred (180) day delay if the Court is correct that the natural process will take ninety (90) days to conclusion of the Motions to Withdraw the Reference. Second, the Court imputed an improper motive to the Charitable Defendants' objection, finding that the Charitable Defendants' unspoken aim was to make the Litigation Trustee work for free. But the

Charitable Defendants introduced the *Application to Employ the Litigation Trustee* as Exhibit 1 which expressly stated that the Litigation Trustee's employment would be *nunc pro tunc* and in fact would be compensated for his time dating back to April 15, 2021. *See* Dkt. No. 54.

15. The Charitable Defendants noted these manifestly erroneous conclusions of the Court in its *Post-Hearing Memorandum* [Dkt. No. 57]. The Court swatted these suggestions away.

**c. The Rule 2004 Motion in the Bankruptcy Case**

16. Some seventy (70) days into the granted ninety (90) day stay, the Committee and Litigation Trustee filed their *Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties pursuant to Rule 2004 of the Federal Rules Of Bankruptcy Procedure* [Bankruptcy Case, Dkt. No. 2620] (the "Rule 2004 Motion"). In the Rule 2004 Motion, the Committee and Litigation Trustee are seeking extensive discovery from well over one-hundred parties including the Charitable Defendants and the other defendants in this Adversary Proceeding.

17. The Rule 2004 Motion is facially improper for many reasons which the Charitable Defendants brief more fully in their opposition to the Rule 2004 which will be filed contemporaneously herewith. But of note, the Committee and/or Litigation Trustee is in possession (whether through documents received from the Debtor or by virtue of the access provided to the Debtor's documents in the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*,) of the requested documents from the Debtor, who as the Court is aware provided finance, accounting, tax, legal, trade, facilities, public relation support, and information technology infrastructure support for Charitable DAF Fund, LP, Charitable DAF GP, LLC and any affiliate pursuant to *Second Amended and Restated Service Agreement effective January 1, 2017* (the "Second Amended and Restated Service Agreement").

18. The Movants cite to the fact that they waited until the end of the section 546 of the Bankruptcy Code deadline to file the Rule 2004 Motion as "cause" for extending the stay of this Adversary Proceeding. But the Committee has been in actual possession of the documents related to the Charitable Defendants for almost a year, and has had full ability to issue Rule 2004 discovery at any point since January 2020 when they were granted to standing in the Final Term Sheet. The Litigation Trustee, similarly, has been involved in the case since February 2021 and formally retained in April 2021, and is represented by Committee Counsel, who has been entrenched in the Bankruptcy Case and discovery specific to the Charitable Defendants for over a year. *See* Phillips Dec. ¶3 (*Fourth Request for Production of Documents* (propounded on July 8, 2020)).

**d. The Second Motion to Stay Adversary Proceeding**

19. On July 29, 2021, the Movants filed their Second Motion to Stay requesting the Adversary Proceeding be stayed for an additional fifty-seven (57) days, or until October 14, 2021, to: provide the Litigation Trustee "the additional necessary time to determine whether to seek leave to amend the complaint filed in the Adversary Proceeding, and/or file additional Causes of Action, add other parties, or add factual allegations unrelated to the current subject of the Adversary Proceeding to the Complaint, and to ensure that the Complaint or any amended complaint and any additional Causes of Action that may be commenced may be litigated on a consolidated basis." *Id*.

## LEGAL ARGUMENT

20. When deciding whether to grant a discretionary stay, courts should consider the competing interests which will be affected by granting or refusal to grant a stay. *Fishman Jackson PLLC v. Israely*, 180 F. Supp. 3d 476, 483 (N.D. Tex. 2016) (citing to *Landis v. N. Am. Co.*, 299 U.S. 248, 255, 57 S. Ct. 163, 166, 81 L. Ed. 153 (1936)). But the "party seeking a stay bears the

burden of **justifying a delay by making a clear case of hardship or inequity in being required to go forward**." *Ohio Env't Council*, 565 F.2d 393, 396. (quoting *Landis,* 299 U.S. at 255) (emphasis added). This party "**bears a heavy burden to demonstrate that it is appropriate**." *Mott's LLP v. Comercializadora Eloro, S.A.,* 507 F. Supp. 3d 780, 785 (W.D. Tex. 2020); *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co*., 761 F.2d 198, 203 n.6 (5th Cir. 1985). But rather than attempting to meet this burden by showing hardship or inequity, the Committee and the Litigation Trustee simply assert that they want more time to bolster their claims made against the Charitable Respondents nine months ago.

**a. Even assuming *arguendo* that the Committee and Litigation Trustee's justification for needing an additional stay were plausible, it does not meet the heavy burden required.**

21. The most obvious flaw in the Committee and Litigation Trustee's position is that they cannot obtain any discovery related to this Adversary Proceeding in the context of Rule 2004 in the Bankruptcy Case yet they seek to stay this Adversary Proceeding so that they will be able to amend their Complaint in this Adversary Proceeding based on their Rule 2004 in the Bankruptcy Case. The Committee and Litigation Trustee's reasoning is circular, at best.

22. The pending proceeding rule provides that: "[i]f an adversary proceeding or a contested matter is pending, then the parties to that proceeding or matter may no longer utilize the liberal provisions of Bankruptcy Rule 2004 and should utilize the discovery devices provided for in Rule 7026 through 7037." *See* Colliers on Bankruptcy, ¶2004.01[8]; Local Bankruptcy Rule 2004-1(b). The Committee and the Litigation Trustee attempt to escape the pending proceeding rule by stating that their Rule 2004 discovery has "multiple carveouts to exclude discovery related to the CLO Holdco Transaction." *See* Second Motion to Stay, ¶14. This fundamentally misstates the nature of this Adversary Proceeding and the content of the Complaint.

23. The Complaint recites the formation of CLO HoldCo, the DAF HoldCo, and the DAF and states that: "upon information and belief, Dondero indirectly controls CLO Holdco, DAF Holdco, and the DAF." *See* Complaint, ¶19-25. Again unsurprisingly, the Committee uses its favorite adjective "byzantine" and offers conclusory narrative throughout the Complaint regarding its allegations of Dondero's control and influence over all of the defendants. *See e.g. Complaint*, ¶¶25 ("Moreover, upon information and belief, Dondero indirectly controls CLO Holdco, DAF Holdco, and the DAF"); 46 ("This control over Dugaboy and the repayment of the Dugaboy Note effectively rendered the Dugaboy Note valueless to the Debtor"); 50 ("[i]ndeed, such a last minute wholesale change only further underscores the control that Dondero had over all parties to the CLO Holdco Transaction."); 56 ("it is clear that Dondero and the Debtor exercise significant control over the various entities involved in the CLO Holdco Transaction, including CLO Holdco"). In fact, the Committee specifically "seeks a judgment that DAF Holdco, the DAF, and CLO Holdco are corporate fictions of Dondero and the Debtor (controlled by Dondero) and used to perpetrate a fraud directed by Dondero, and thus, Dondero, DAF Holdco, the DAF, and CLO Holdco are liable for damages pursuant to an alter ego theory," and that each Defendant was part of a conspiracy and therefore are jointly and severely liable. *See* Complaint, ¶¶80, 90.

24. Given the allegations in the Complaint, the scope of topics that must be excluded from Rule 2004 discovery is much broader than just the CLO Holdco Transaction. And in fact, given the allegation and request for declaratory judgment that DAF Holdco, the DAF, and CLO Holdco are corporate fictions of Dondero and the Debtor, it is difficult to imagine any discovery topic from those entities that would be permissible.

25. The Movant's shallow attempt to avoid the Pending Proceeding Rule is to characterize the Complaint and Adversary Proceeding as solely concerning the CLO HoldCo

Transaction, which is identical to the equally feeble attempt made by the trustee in *Bennett Funding*. In *Bennett Funding*, a trustee commenced an adversary proceeding against numerous defendants alleging that Patrick Bennett ("P. Bennett") diverted millions of dollars from the debtor to other entities controlled by P. Bennett to pay for the construction of a hotel for he and his wife's ("G. Bennett"), financial benefit. 203 B.R. at 26. Other allegations in the complaint included assertions that P. Bennett used various entities which were owned or controlled by he or his wife to move money and property. *Id*. at 26-27. The trustee served a Rule 2004 subpoena on the wife and other related entities. *Id*. The trustee represented that he was not seeking any discovery related to the hotel transaction which was the only cause of action against G. Bennett, instead the trustee wanted to explore other sources of assets the wife received or owned to determine if there were other assets wrongfully diverted from the debtor. *Id*.

26. The *Bennett* court rejected this argument, explaining that after review of the adversary complaint:

> [I]t is clear that the Trustee has alleged the creation by the defendants of what can rightfully be described as a **<u>financial superweb</u>**. As such it is difficult at this point, if not impossible, to determine whether and to what extent information gleaned from a Fed. R. Bankr. P. 2004 examination of G. Bennett will not be related to the parties and subject matter covered by the Amended Complaint. **<u>In fact, it appears highly unlikely that even a carefully crafted examination of G. Bennett by the Trustee could not avoid delving into issues regarding the other defendants and subject matter covered in the extensive Amended Complaint</u>**, and thus examination of the issues requested would not be in addition to or beyond the scope of the Trustee's pending adversary proceeding. It appears then that G. Bennett and the parties and subject matter of the Amended Complaint are not easily separable because of the complex relationship between them, and the Court recognizes that use of a Fed. R. Bankr. P. 2004 examination would unavoidably and unintentionally create a back door through which the Trustee could circumvent the limitations of Fed. R. Bankr. P. 7026 *et seq.*, which are properly applied in this instance.

*Id*. at 20-30 (emphasis added).

27. The parallels here are striking, just replace "financial superweb" with "byzantine empire." But even more compelling here, the Committee has actually asserted causes of action for a declaratory judgment for alter ego and conspiracy against the Charitable Defendants. There is no discovery in the Rule 2004 Motion into the Charitable Respondents that would not be "related to" to the issues raised by and the parties that have been made defendants (formally or by allegations made against DAF GP) in the Adversary Proceeding.

28. Yet, the Committee and the Litigation Trustee now cite this impermissible Rule 2004 requests as cause to stay this Adversary Proceeding in which it will be able to seek discovery under FED. R. BANKR. P. 7026, *et seq*. if could prevail over the Motions to Dismiss (which we believe it cannot).

**b. The Committee and Litigation Trustee's justification is belied by their own conduct.**

29. The Committee and the Litigation Trustee assert that they have not had enough time to investigate what claims can be brought against the Charitable Defendants. Unsurprisingly, the Committee and the Litigation Trustee once again decry the "byzantine" nature of the Charitable Defendants as cause for why they have not been able to understand what claims they can bring. But what the Committee and the Litigation Trustee do not include in their Second Motion to Stay is just how long the Committee has been investigating claims against the Charitable Respondents.

30. Pursuant to the Final Term Sheet entered into on January 14, 2020, the Committee was explicitly granted standing to pursue Estate Claims, defined as "any and all estate claims and causes of actions against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including promissory notes held by any of the foregoing." *See* Complaint, ¶6, Bankruptcy Case, Dkt. No.654-1. Therefore, the Committee, represented by Committee Counsel, has known of its charge to pursue Estate Claims for twenty (20) months.

31. And Committee Counsel has been actively engaged in the Bankruptcy Case since its inception, billing over ten million dollars of its professional time to the estate since its retention. The Committee's financial advisor FTI has spent $1,118,921.50 investigating intercompany transactions and avoidance actions. *See* Dkt. Nos. 570, 883, 1244, 1655, 2221 and 2611. Committee counsel has not broken its time out regarding avoidance actions but has spent $5,995,235.50 on litigation and their time entries reflect **extensive** time and fees engaging in discovery of documents and investigation of Estate Claims. *See* Dkt. Nos. 569, 831, 1296, 1853, 2240, 2585.

32. In fact, back in July 2020, the Committee stated that it had already been working for eight months to investigate Estate Claims, serving requests for production on the Debtor on November 10, 2019, February 3, 2020, and February 24, 2020. *See* Dkt. No. 808, ¶¶2, 7. But what is more is that this investigation was largely specifically targeted at the Charitable Respondents. On July 8, 2020, the Committee served its *Fourth Request for Production of Document*s (the "Fourth Committee RFP") on the Debtor in which it specifically targeted CLO HoldCo, Highland Dallas Foundation; Charitable DAF GP; Charitable DAF HoldCo; and Charitable DAF Fund, LP. And on July 13, 2020, the Committee served CLO HoldCo with its *First Request for Production of Documents* (the "Committee CLO Holdco RFPs"). CLO HoldCo served its Response to the Committee CLO Holdco RFPs on August 12, 2020, **over a year ago**. Phillips Dec., ¶4.

33. CLO HoldCo produced some 6,000 emails from Grant Scott, and it is thought that in fact the Debtor produced some three (3) times more of Grant Scott emails, plus responded to the Fourth Request for production (and the First, and the Second, and the Third). Phillips Dec.,

¶7. Assumedly, any alleged gap information received could have been addressed by the Committee at some point in the past year.

34. Notably, these document requests came after the Committee's months' long possession of the Debtor's general ledger, non-email transactional documents, and audited financials with specific footnotes regarding material, related party transactions. *See* Dkt. No. 845, ¶ 17. The Debtor raised concerns regarding the Committee's dilatory claims investigation in its objection to the Committee's Motion to Compel relating to the Fourth Committee RFP several times, but nonetheless clearly stated that it was fully cooperating with the Committee and supplying documents responsive to the Fourth Committee RFP. *Id*. at ¶¶17, 22 at n.4, 54.

35. To the extent the Committee will argue that although it has had twenty months to conduct discovery and determine causes of action, the Litigation Trustee was not retained until April 2021, Committee Counsel will represent Litigation Trustee. Hopefully, for the sake of the estate, there will be at least some level of efficiency to be gained from Committee Counsel remaining on, given the millions of estate dollars which have gone to develop the Committee Counsel's expertise and for the Committee to conduct its investigations. See also *In re ADPT DFW Holdings LLC*, Case No. 17-31432-sgj, Dkt. No. 1268 at 66:18-67:15, 94:22-95:3 (noting that the committee's investigation into estate claims should be provided to post-confirmation trustees).

36. Further, from the date of retention, the Litigation Trustee was certainly well-aware of this Adversary Proceeding. While it can manage its investigation as it sees fit, knowing of the Adversary Proceeding and not prioritizing investigation of related claims because the Litigation Trustee would just seek another stay is certainly not the requisite "hardship" or "inequity" required to obtain a stay.

**c. The Charitable Defendants have and will continue to suffer real, identifiable harm by delay of this Adversary Proceeding.**

37. At the hearing on the First Motion to Stay, the Committee argued that there is no prejudice in staying the Adversary Proceeding. But in additional to the generalized harm to a party where its right to a determination of its rights and liabilities without undue delay is curtailed, the Charitable Respondents have suffered and will continue to suffer identifiable harm.

38. First, on May 27, 2021, given this pending Adversary Proceeding against Highland Dallas Foundation, Highland Dallas Foundation and the almost one-hundred years old The Dallas Foundation (which is one of the most well-respected and largest charitable organizations in the state) lost their D&O insurance coverage. *See* Patrick Dec., ¶9.

39. Additionally, as this Court is well-aware, there are significant funds held in the Registry of the Court that belong to CLO HoldCo which were the subject of this *Court's Order Denying Motion for Remittance of Funds Held in Registry of Court* [Bankruptcy Case, Dkt. No. 825] (the "Registry Order"). Pursuant to the Registry Order, the funds belonging to CLO HoldCo were ordered to remain in the Registry of the Court and the Committee was to file adversary proceeding and in connection therewith, an application for injunctive relief to continue to hold the funds in the Registry of the Court, or the funds would be released to CLO HoldCo. *Id.*

40. While the Committee filed the Adversary Proceeding and a Motion for Preliminary Injunction (Dkt. No. 7), in the eight (8) months since filing, the Committee has not prosecuted its motion. The Committee could never meet the "irreparable injury" standard for such an exceptional remedy, because the Fifth Circuit has held many times that it is: "well-established that an injury is irreparable only if it cannot be undone through monetary remedies." *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984); *see also Deerfield Med. Ctr. v. City of Deerfield Beach*,

661 F.2d 328, 338 (5th Cir.1981); *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir.1981); *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir.1975). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir.1975).

41. But through the continued stay of the Adversary Proceeding, the Court is effectively granting the plainly impermissible relief sought without conducting any hearing or giving any other party the required "fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted." *Custom Teleconnect, Inc. v. Billing Concepts, Inc.*, No. CV SA-11-CA-204-FB, 2011 WL 13324104, at *8 (W.D. Tex. Apr. 8, 2011), *report and recommendation adopted*, No. SA-11-CA-204-FB, 2011 WL 13324103 (W.D. Tex. Apr. 25, 2011).

## CONCLUSION

The Committee was charged with investigating Estate Claims in January 2020 and filed this Adversary Proceeding after engaging in extensive discovery from the Debtor and the Charitable Respondents. But now some twenty (20) months later, having waited until the expiration of the well-known Section 546 deadline is nearly here to issue obviously overbroad and impermissible Rule 2004 discovery, the Committee and Litigation Trustee cite to their own delay and inability as "cause" to stay this Adversary Proceeding. Such a justification could never meet the high burden of showing of hardship or inequity required to obtain a discretionary stay.

The Second Motion to Stay is unwarranted and the Defendants have the right to ruling s and to proceed further to get the claims thrown out by an Article III court as shown by the previous briefing for the Motion to Withdraw Reference.

**Respectfully submitted:**

**KELLY HART PITRE**

***/s/ Louis M. Phillips***
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

**CERTIFICATE OF SERVICE**

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this August 16, 2021.

***/s/ Louis M. Phillips***
Louis M. Phillips

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

**COUNSEL FOR THE CHARITABLE RESPONDENTS**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| | § | |
| **Debtor** | § | **Relates to Dkt. No. 2620** |

---

**OBJECTION TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE LITIGATION ADVISOR FOR ENTRY OF AN ORDER**



CONFIDENTIAL

**AUTHORIZING THE EXAMINATION OF RULE 2004 PARTIES PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

**INTRODUCTORY STATEMENT**

The parties defined herein as Charitable Defendants make this introductory statement. We do not know whether the Committee and Litigation Advisor (not as we can tell the Litigation Sub-Trust) ("Movants") are (i) simply asking the Court for authority to send out the discovery that is listed within the exhibits, in which case all objections and rights would be preserved, or (ii) whether the Movants are seeking approval of the discovery requests in a manner that would cut off objections to the requests themselves, whether upon service of the Court's order or of a subpoena, as may be required (certainly against parties who have never been before the Court). The Charitable Defendants assume the latter; but also note that there has been no meet and confer about the requests that are the exhibits to the Rule 2004 Motion (the only question being would we object to Rule 2004 discovery without having seen any of it or previewed the Rule 2004 Motion). So, we may be incorrect.

**OBJECTION**

Charitable DAF Fund, L.P. (the "DAF Fund"); Charitable DAF HoldCo, Ltd. ("DAF HoldCo"); Charitable DAF GP, L.P., (the "DAF GP") (these entities, collectively, the "DAF"), and Highland Dallas Foundation, Inc. ("Highland Dallas Foundation"),[1] (together with the DAF,

---

[1] Highland Dallas Foundation filed a *Motion to Withdraw the Reference* in Adversary Case No. 20-03195 (the "Adversary Proceeding"), at Adversary Proceeding, Dkt. No. 24, and neither the fact nor content of this Objection is intended to be nor shall be deemed a waiver of their right to a trial by jury on all claims asserted in the Adversary Proceeding nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court. DAF Fund and DAF HoldCo are also a defendants in the Adversary Proceeding but have not been served. Neither the fact nor content of this Objection is intended to be nor shall be deemed: a waiver of service requirements in the Adversary Proceeding; acceptance of service of citation or summons in the Adversary Proceeding; waiver of any right to a trial by jury on all claims in the Adversary Proceeding (if ever served), nor consent to the entry of final orders in the

the "Charitable Respondents") file this *Objection* (the "Objection") to the *Motion for Entry of an Order Authorizing the Examination of Rule 2004 Parties pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* (Dkt. No. 2620) (the "Rule 2004 Motion") filed by the Official Committee of Unsecured Creditors (the "Committee") and the Trustee of the Litigation Sub-Trust (the "Litigation Trustee," along with the Committee, the "Movants") in the above-captioned bankruptcy case (the "Bankruptcy Case").

## PRELIMINARY STATEMENT

1. On June 18, 2021, the Court issued its *sua sponte Order Requiring Disclosures* (Dkt. No. 2640) (the "Disclosures Order") requiring disclosures from Charitable Respondents, among others, so that the Court could evaluate the **hypothetical** standing of the targeted entities (many of whom had never appeared before the Court, and to the knowledge of the Charitable Respondents have never had any intention of making a voluntary appearance). As previously pointed out, the Disclosures Order was entered independent and outside of any pending case or controversy and could, itself, not constitute a case or controversy. Disclosures Order, p.1. Certain of the Charitable Respondents (DAF Fund and Highland Dallas Foundation) provided robust disclosures to fully comply with the Disclosures Order ("Charitable Entity Response" - *see* Dkt. No. 2547).[2] The Charitable Entity Response noted how prejudicial (and legally improper) the Disclosures Order was, given that the Committee had sued the Charitable Respondents (and others) under their unsupported theory they were under the *de facto* control of Dondero (*see* Dkt. No. 2547

---

Adversary Proceeding by the Bankruptcy Court (again, if ever served). The Charitable Respondents submit this Objection in the Bankruptcy Case solely because the Movants have targeted them with the Rule 2004 Motion.

[2] CLO HoldCo, Ltd. was also a party to the response to the Court's Disclosures Order, but it is not a named party to the Rule 2004 Motion (it is not mentioned and was not served), so it is not a party to this Objection.

at §C); and further noted that the Court appeared to have already decided the issue (stating without any citation that the Charitable Respondents "acted at Mr. Dondero's direction"), and was now launching its own *sua sponte* investigation into the Charitable Respondents in aid of the Committee. *See* Disclosures Order, p. 11. In fact, the responding Charitable Respondents specifically stated that: "This Court, in its assumed posture as investigative body as well as prosecutor and decider, has given cover to the utterly conclusory assertions of the Committee, and has, practically, joined the Committee as a plaintiff." *See* Dkt. No. 2547 at ¶92

2. Now, the Committee expressly confirms the assertions in the Charitable Entity Response to be true, and affirmatively asserts that it is joining the Court's investigation as co-investigator: *See* Rule 2004 Motion, ¶2 ("This Rule 2004 Motion expands on the Order Requiring Disclosures…"). So it appears that the Charitable Respondents were correct; the Committee is now joining forces with the Court to pick up the Court's investigation.

3. But, again, the Committee has already sued the Charitable Respondents[3], specifically alleging that the Charitable Respondents are improperly under Mr. Dondero's control. *See* Adversary Case No. 20-03195 (the "Adversary Proceeding"). Based upon those allegations, in the Adversary Proceeding, the Committee has asserted causes of action under an alter ago theory and conspiracy, but now seek to use FED. R. BANKR. P. 2004 ("Rule 2004") to bolster their allegations. *See* Adversary Proceeding, Dkt. No. 70 (stating that an additional stay of the Adversary Proceeding is needed to provide "additional necessary time to determine whether to seek leave to amend the complaint"). The Committee chose its lawsuit and the allegations it made

[3] *See* Adversary Case No. 20-03195 Dkt. No. 6 (formally naming DAF HoldCo, DAF Fund, and Highland Dallas as defendants and making allegations against DAF GP).

therein and cannot be permitted to use Rule 2004 to evade the application of Federal Rules of Civil Procedure to a pending proceeding.

4. But interestingly, the Movants are in possession of most, if not all, documents they request from the Charitable Respondents. The *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (Dkt. No. 1808) (the "Plan"), specifically provides them with full access to all documents to which the Debtor has possession - which as this Court previously recognized, includes documents belonging to parties like the DAF who were managed by the Debtor. Dkt. No. 935, p. 2-3.

5. Moreover, it is unclear why the Movants, having been tasked with investigating Estate Claims (claims against any Debtor-related entity) in **January 2020 (by our calculation, almost 20 months ago)** and having since continually decried the "byzantine" nature of the Debtor-related entities, seek to propound such sweeping Rule 2004 discovery now, when it is clearly too late. The Rule 2004 Motion seeks discovery from **one-hundred thirty-five (135) parties** relating to over **one-thousand (1,000) entities**. While Rule 2004 is certainly broad, the Rule 2004 Motion's scope appears to render its stated purpose (claims investigation before the expiration of the 11 U.S.C § 546 ("Section 546") deadline by which to bring avoidance actions) at least improbable and likely impossible. So it might as well be said up-front: the Committee having waited some 20 months, now is attempting to manufacture grounds for an extension of the Section 546 deadline. Proper Rule 2004 discovery could have been commenced far more than a year ago, and as we will show, the Committee in fact did engage in broad discovery. Further, the Committee is now in possession of all information possessed by the Debtor, who managed the DAF, that is related to the claims it has had the authority to bring for some 20 months.

6. The pending proceeding (because of the allegations that the Committee in fact has pled) is very different from and much more expansive than the transparently wrong limited definition of the "CLO HoldCo Transaction" with which it supposes to trick the defendants and the Court. The supposed CLO HoldCo Transaction is only a fraction of the counts and allegations plead in the Adversary Proceeding Complaint. We brief these positions below.

## Background

### A. The Shared Service Agreements with the Debtor

7. Prior to and throughout the Bankruptcy Case until January 2021, the Debtor provided back offices services for various entities pursuant to shared services agreements (collectively, the "Shared Service Agreements"), including the DAF pursuant to *Second Amended and Restated Service Agreement effective January 1, 2017* (the "Second Amended and Restated Service Agreement"). *See* Patrick Dec. at ¶4.

8. Under the terms of the Second Amended and Restated Service Agreement, the Debtor provided: finance, accounting, tax, legal, trade, facilities, public relation support, and information technology infrastructure support for the DAF. By virtue of these Shared Service Agreements, the Debtor was and still should be in possession of documents and ESI that are the property of the counterparties, including the Charitable Respondents DAF. *See* Patrick Declaration, ¶5.

9. Specific to the DAF, the Debtor was in control and possession of documents and ESI belonging to the DAF through January 2021. *See* Patrick Declaration, ¶8. The DAF does not have employees and at all relevant times exclusively relied upon the Debtor's management through the Second Amended and Restated Service Agreement. *See* Patrick Declaration, ¶6.

### B. The Committee's Investigation into Estate Claims

10. On January 9, 2020, the Court approved the final term sheet (Dkt. No. 354-1) (the "Final Term Sheet") which charged the Committee with pursuing Estate Claims, as defined in the Final Term Sheet as "any and all estate claims and causes of action against Dondero, Mark Okada, other insiders of the Debtor, and each of the Related Entities[4], including promissory notes held by any of the foregoing," specifically including transactions with the DAF.

11. Included in the Final Term Sheet was a Document Production Protocol which provided the Committee with broad discovery rights with respect to Estate Claims, including the right to obtain privileged communications related to Estate Claims. *See* Final Term Sheet, Protocols ¶¶ E.b, G.b-d.

12. On February 2020, the Committee began serving extensive documents requests on the Debtor with the specific and stated purpose of investigating Estate Claims. *See* Dkt. No. 808, ¶¶2, 7. This included requests for production specific to transfers amongst what the Committee referred to as Highland Entities or Highland Entity affiliates. *See* Dkt. No. 811-1 *Second Requests for Production of Documents to Highland* (the "Second RFP to Debtor"), RFP Nos. 3, 6, 7, 8, 14.

---

[4] "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in Schedule B hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

13. In early 2020, the Debtor provided the Committee with the Debtor's general ledger, non-email transactional documents, and audited financials with specific footnotes regarding material, related party transactions. *See* Dkt. No. 845, ¶ 17.

14. The Debtor served its written responses to the Second RFP to Debtor, and thereafter, it appears that the Debtor and the Committee engaged in discussions regarding production, with the Committee appearing to cause significant delays in the Debtor's production process. *See* Dkt. No. 845, n.4 (noting that the Committee often took weeks and in one case an entire month to respond to the Debtor's proposed email production logistics).

15. Nonetheless, in April 2020, the Debtor produced all responsive non-email documents to the Committee, which totaled over 20,000 pages. Dkt. No. 845, ¶4. According to the Debtor, thereafter, the Committee "went silent until mid-May." *Id*. at ¶24.

16. On July 8, 2020, the Committee filed its *Emergency Motion to Compel Production by the Debtor* (Dkt. No. 808) (the "Emergency Motion to Compel") and the following day, the Debtor filed a *Motion for Protective Order* (Dkt. No. 810) (the "Motion for Protective Order"). Additionally, the Debtor and many other parties filed objections to the Emergency Motion to Compel. *See* Dkt. Nos. 845, 832, 837, 841, 844, 846, 847, 855, and 858. The objections to the Emergency Motion to Compel stemmed largely from the fact of the Debtor's possession of ESI belonging to various other entities who were parties to the various shared service agreements (the "Shared Service Agreements") and other shared services agreements and attendant confidentiality and privilege obligations. Specifically, the Debtor proposed to review ESI to for confidentiality and privilege concerns while the Committee demanded blanket access. Dkt. No. 845, ¶33.

17. Also on July 8, 2020, the Committee served its *Fourth Request for Production of Documents* (the "Fourth RFP to Debtor") which was specifically targeted at the Charitable

Respondents and others. The Charitable Respondents have not found the First, Second or Third Requests made by the Committee, but given the responses of the Debtor as described above, we have gleaned something of content, though remain in the dark about what was actually requested, or produced by the Debtor. *See* Phillips Dec. ¶3. Also, on July 13, 2020, the Committee served CLO HoldCo, Ltd. ("CLO HoldCo"), a co-defendant in the Adversary Proceeding, with its *First Request for Production of Documents* (the "Committee CLO Holdco RFPs"), again specifically targeted at the Charitable Respondents, with broad requests. *See* Phillips Dec. ¶4.

18. The requests within the Fourth Request for Production from the Committee to the Debtor that target the Charitable Respondents (and others, including the supporting organizations and the Foundations) are remarkably similar to the requests in Exhibit 7 to the Rule 2004 Motion (the Rule 2004 discovery the Movants wants to send out now) to "start over." They read as follows (Emphasis supplied):

> 40. Any and all Documents or Communications relating to the approximately $42.3 million received by Highland Dallas Foundation in 2016 and/or the approximately $5.1 million received by Highland Dallas Foundation in 2018.
>
> 41. Any and all Documents or Communications relating to the creation, ownership, management structure, or governing documents of Dugaboy; **Highland Dallas Foundation; Charitable DAF HoldCo; Charitable DAF Fund; CLO HoldCo**; Dynamic Income Fund; Highland Loan Fund, Ltd.; Highland Capital Loan Fund GP; Highland Loan Master Fund; Eames, Ltd.; and Multi Strat.
>
> 42. Any and all Documents or Communications relating to any transfers between or among the Debtor, Get Good, **Highland Dallas Foundation, Charitable DAF HoldCo, Charitable DAF Fund, and CLO HoldCo since the inception of Charitable DAF GP, Charitable DAF HoldCo, Charitable DAF Fund, and CLO HoldCo,** including without limitation, any agreements or related documents pertaining to the separately managed account that **HCMLP managed on behalf of the Charitable DAF Fund LP.**
>
> 43. Any and all Documents or Communications relating to any investments or ownership interests that **CLO HoldCo** has made in any funds or business entities relating to the Debtor, Dondero, or **any related parties**, including without limitation, a complete list of transactions, financial statements, communications to

> control persons, supporting foundations or any other relevant stakeholder, books and records (including general ledger details).
>
> 45. Any and all Documents or Communications relating to investment management agreements between the **Highland Dallas Foundation, the Highland Kansas City Foundation, and/or the Highland Santa Barbara Foundation, and the Charitable DAF Fund, Charitable DAF GP, and/or Charitable DAF HoldCo.**
>
> 50. **Any and all Documents or Communications relating to the creation, ownership, management structure, or governing documents of all entities connected to the DAF/CLO Holdco Structure (Bates number Highland/PEO-002398)**.
>
> 51. **Any and all Documents or Communications relating to payments, distributions, investments, transfers, or the remittance of anything of value to, from or between the Debtor**, Hunter Mountain Trust, any Limited Partner, Beacon Mountain, Rand PE Fund I, L.P., Rand PE Fund Management, LLC, Atlas IDF, LP, Atlas IDF GP, LLC, Crown Global, Honis, Empower Dallas Foundation, Okada Family Foundation, and **any of the entities connected to the DAF/CLO Holdco Structure (Bates number Highland/PEO-002398) since the inception of Charitable DAF GP, Charitable DAF HoldCo, Charitable DAF Fund, and CLO HoldCo**.

19. On July 17, 2020, the Committee filed its *Omnibus Response* in support of its Motion to Compel (Dkt. No. 872) (the "Omnibus Response") in which the Committee argued that none of the parties to the Shared Service Agreements could assert any privilege in their own documents because to the extent the documents were privileged, it would be a joint privilege with the Debtor, and the Committee was merely stepping into the shoes of the Debtor. *Id*. at ¶¶9-10.

20. Interestingly, the Committee, back in July 2020 (over a year before it filed the Rule 2004 Motion), argued that:

> The Committee has been patient, but **time is running out**. Even though the Debtor explicitly granted the Committee standing to pursue and investigate Estate Claims because of the Debtor's obvious conflicts with pursuing those claims itself, the Committee has been seeking documents from the Debtor for months with minimal progress. **The Proposed Protocol would finally provide the Committee access to documents relevant and necessary to its pursuit of the Estate Claims in the most efficient and fair way.** Therefore, the Motion to Compel should be granted.

*Id*. at ¶15 (emphasis added).

21. On July 21, 2020, the Court held a hearing on the Motion to Compel and the Debtor's Motion for Protective Order, and considered the various objections. The Court entered an oral ruling which was later amended and encompassed in *August 11, 2020 Order on Motion for Clarification* (Dkt. No. 935) (the "Discovery Order").

22. In the Discovery Order, the Court noted that the Debtor and the various objectors shared IT, including shared servers for emails and other documents. Dkt. No. 935, p. 2-3. "Thus, documents of the separate Highland Non-Debtor Entities are in some or all cases on the Debtor's servers, in the Debtor's employees' files, and generally available to the Debtor's personnel." *Id*. The Court determined that all documents that were part of joint representation were discoverable to the Committee, as the Committee's investigation of Estate Claims against the various parties to the Shared Service Agreement was adverse litigation. *Id*. p. 7.

23. On August 12, 2020, CLO HoldCo served its responses to the Committee CLO Holdco RFPs. *See* Phillips Dec. ¶5.

24. The Debtor informed counsel for CLO HoldCo that it would be producing thousands of pages of ESI belonging to or concerning CLO HoldCo to the Committee and stated its intent to run searches of the Debtor's servers (which necessarily would include the ESI belonging to the Charitable Respondents ) to provide additional documents related to the Charitable Respondents. *See* Phillips Dec. ¶6. Additionally, the Debtor provided the Committee an additional 6,000 plus emails that were to/from/cc/bcc Grant Scott, the previous holder of management shares in DAF HoldCo. *See* Phillips Dec. ¶7.

25. From just the Fourth Request for Production sent by the Committee to the Debtor, it is clear that there has already been extensive discovery of the kind now asked for, again, and after the filing of the Adversary Proceeding described below. Since early 2020, the Committee

has been concerned with the structure of the DAF (*see* the references to the Structure Chart with "**Bates number Highland/PEO-002398" contained in the above Fourth Requests (the Bates number, 2398 indicates that the chart was one of the earliest documents produced)**), and has, since January 2020, been authorized to investigate and prosecute Estate Claims.

**C. The Adversary Proceeding against the Charitable Respondents**

26. As this Court is well-aware, there are significant funds held in the Registry of the Court that belong to CLO HoldCo which were the subject of this Court's *Order Denying Motion for Remittance of Funds Held in Registry of Cour*t [Dkt. No. 825] (the "Registry Order"), entered on July 13, 2020. Pursuant to the Registry Order, the funds belonging to CLO HoldCo were ordered to remain in the Registry of the Court, and the Committee was to file, within 90 days, an adversary proceeding against CLO HoldCo and in connection therewith, an application for injunctive relief to assert a basis for its unfounded conclusion that the funds should remain in the Court's registry because, well, just because. Failure to comply would result in the funds being released to CLO HoldCo. *Id.*

27. On December 17, 2020 (157 days, not 90) after entry of the Registry Order, the Committee commenced Adversary Proceeding No. 20-03195 (the "Adversary Proceeding") by filing its *Complaint* (Dkt. No. 6) (the "Complaint") and a *Motion for Preliminary Injunction* (Dkt. No. 3) (the "Injunction Motion"). *See* Phillips Dec. ¶6. The Complaint formally names CLO HoldCo, DAF HoldCo, DAF Fund, Highland Dallas Area Foundation, the Dugaboy Investment Trust, Grant Scott, and James Dondero (collectively, the "Defendants") as defendants and contains multiple allegations against DAF GP throughout the conclusory narrative.

28. The Complaint recounts the formation of CLO HoldCo, DAF HoldCo, DAF GP, and DAF Fund and states that: "upon information and belief, Dondero indirectly controls CLO

Holdco, DAF Holdco, and the DAF." *See* Complaint, ¶19-25. The Committee makes numerous specific factual allegations against DAF GP, including that it acted in concert with CLO HoldCo, DAF HoldCo, and DAF Fund to transfer assets. *Id*. at ¶¶21, 35.

29. Unsurprisingly, the Committee uses its favorite adjective "byzantine" and paints a long story throughout the Complaint (comprised of non-fact based conclusions and "upon information and belief" suggestions) proposing that Dondero controls and holds controlling influence over the Defendants. *See e.g.* Complaint, ¶¶25 ("Moreover, upon information and belief, Dondero indirectly controls CLO Holdco, DAF Holdco, and the DAF"); 46 ( This control over Dugaboy and the repayment of the Dugaboy Note effectively rendered the Dugaboy Note valueless to the Debtor); 50 ("[i]ndeed, such a last minute wholesale change only further underscores the control that Dondero had over all parties to the CLO Holdco Transaction."); 56 ("it is clear that Dondero and the Debtor exercise significant control over the various entities involved in the CLO Holdco Transaction, including CLO Holdco").

30. In the Complaint, Committee asserts causes of action under the Texas Uniform Fraudulent Transfers Act regarding a series of transactions which it alleges to be both an actual fraudulent transfer and a constructively fraudulent transfer (the "CLO HoldCo Transaction"). *Id*. (Causes of Action One and Two).

31. However, the Committee next asserts causes of action for declaratory judgment that "DAF Holdco, the DAF, and CLO Holdco are corporate fictions of Dondero and the Debtor (controlled by Dondero)". *Id*. at ¶80. The Committee also alleges that DAF Holdco, the DAF and CLO HoldCo were part of a conspiracy to remove assets from the Debtor's estate. *Id*. at ¶86.

32. The Injunction Motion similarly argues the conclusion that Dondero used DAF HoldCo, the DAF Fund, and CLO HoldCo as an alter ego for himself and as a business conduit of

the Debtor due to his control over the entities - "Because I assert my conclusion, I have proven the conclusion and am entitled to judgment."[5]

33. To date, the Committee has not prosecuted its Injunction Motion, instead electing to stay the Adversary Proceeding over the Charitable Respondents' objection whilst enjoying injunctive relief for a period of some eighteen (18) months (and counting), and still seeking to avoid having to prosecute the injunction action. So, the Court has in fact granted a free injunction without actually granting an injunction grounded in injunction law, just to maintain the alleged status quo, in case the Committee might one day (has not happened yet) make a cognizable claim for injunctive relief. Of course the Committee cannot ever make a claim for injunctive relief. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (noting that injuries in terms of money cannot be cause for a preliminary injunction). The defendants filed a motion to dismiss for failure to state a claim back in March of 2021, along with a motion to withdraw reference. The Committee, afraid that it will be found out, sought and obtained a stay

---

[5] As described herein the Debtor managed the DAF pursuant to the Second Amended and Restated Shared Service Agreement. Under the Committee's theory, the Debtor was being compensated under the Second Amended and Restated Shared Service Agreement for running a corporate sham. On January 9, 2020, the Court entered the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course entered January 9, 2020* (Dkt. No. 339) (the "January 9 Order"). In the January 9 Order, the Court approved the appointment of an independent board of directors (the "Independent Board") at Strand Advisors, Inc. ("Strand"), the Debtor's general partner. The appointment of the Independent Board removed Dondero control over the Debtor. *See* January 9 Order at ¶8. The Independent Board determined to appoint a chief executive officer and determined that Mr. Seery would be the best fit for the role. See Dkt. No. 774, ¶15. Thereafter, on July 16, 2020, the Court entered the *Order Approving Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020 entered July 16, 2020* (Dkt. No. 854) (the "July 16 Order"), authorizing the Debtor to retain Seery as CEO and CRO.

Under the Independent Board and Seery's management, the Debtor continued to provide services to the DAF pursuant to the Second Amended and Shared Service Agreement and be compensated for such services through January 31, 2021. *See* Termination Letter (sent on November 30, 2020, terminating on January 31, 2021). So under the Committee's theory, the Independent Board and Seery were compensated for months for managing a corporate sham.

of the Adversary Proceeding (and now seeks a further stay (we have filed a companion objection to that second stay motion).

34. As mentioned, the Charitable Respondents, and many other defendants, filed Motions to Dismiss the Adversary Proceeding for failure to state a claim. Adversary Proceeding, Dkt. Nos. 22, 23, 25, 30, and 32 (the "Motions to Dismiss").

35. The Adversary Proceeding has been stayed since May 2021, with the Committee having sought to stay the Adversary Proceeding further until October 14, 2021, expressly due to the Rule 2004 Motion. *See* Adversary Proceeding, Dkt. No. 70, ¶13.

**D. The Court's Disclosures Order**

36. On June 18, 2021, the Court issued its *sua sponte Order Requiring Disclosures* (Dkt. No. 2460) (the "Disclosures Order"). The Court stated that its Disclosures Order was issued pursuant to section 105 of the Bankruptcy Code and its "inherent ability to efficiently monitor its docket and evaluate standing of parties who ask for relief in the [Bankruptcy Case]." Disclosures Order, p. 1.

37. CLO HoldCo, DAF Fund, and Highland Dallas Foundation filed their Charitable Entity Response. In the Charitable Entity Response, the Charitable Respondents noted that the Bankruptcy Court had ordered disclosures from several entities who were not parties to the Bankruptcy Case and were not served with the Court's Disclosures Order (the "Non-Party Targets"). *Id*. at ¶¶1, 2. While the Charitable Respondents were not authorized to appear on behalf of the Non-Party Targets, nonetheless much of the information provided in the Charitable Entity Response provided the Court and other parties with significant insight into the Non-Party Targets.

38. The Charitable Respondents provided extensive information and documentation regarding the ownership, structure, and management of all parties comprising the charitable network of which the Charitable Respondents are a part.

39. But the Charitable Respondents specifically noted the inability of the Court to issue an advisory opinion on hypothetical standing and patent the impropriety of the Court's *sua sponte* investigation into the Charitable Respondents in aid of the Committee.

**E. The Rule 2004 Motion**

40. On July 29, 2021, the Committee, expressly stating that it was continuing the Court's *sua sponte* investigation in the Disclosures Order, filed the Rule 2004 Motion. *See* Rule 2004 Motion, ¶2.

41. The Rule 2004 Motion was filed twenty (20) months after the Committee was first charged with investigation of Estate Claims, and seeks likely millions of pages of discovery from one-hundred and thirty five (135) distinct parties, grouped into thirteen (13) different categories (collectively, the "Rule 2004 Targets"). *See* Dkt. No. 2620.

42. But the Movants clearly did not review any of the information and documentation provided to the Court in the Charitable Entity Response as they include the Dallas Foundation, Kansas City Community Foundation, and The Santa Barbara Foundation (the "Foundations") and some of their (long since former) employees as "Highland Charities." *Id.*, ¶44. The Foundations have storied histories of giving completely unrelated to the Debtor, yet, the Movants seeks intrusive discovery into the Foundation that have no conceivable bearing on Estate Claims and have deemed the Foundation "Highland Charities". *See* Rule 2004, Exhibit 7. For instance, the Movants seek all Documents and Communications relating to the formation of the Foundations, where the Movants know that the Dallas Foundation was formed in **1927**, the Santa Barbara

Foundation in **1928**, and the Greater Kansas City Community Foundation in **1978**. *See* Rule 2004, Exhibit 7, RFP 1; Charitable Entity Response, ¶¶33, 39, 44. Tailored request? Thought out scope? We think not.

43. The Movants included a Certificate of Service in the Rule 2004 Motion indicating that they would serve the Rule 2004 Targets who are not parties to the Bankruptcy Case in a manner provided by Bankruptcy Rule 7004 and would subsequently file certificates of service evidencing such service. *See* Rule 2004 Motion, p. 40. The Charitable Respondents are aware of some of the 135 Rule 2004 Targets being served, but to date, it appears that the Movants have served only a handful of such entities. *See* Bankruptcy Case Docket (absence of certificates of services).

44. The timing of service is acutely problematic here, as the Movants' Proposed Order provides that the "Rule 2004 Parties are directed to produce documents, communications, and other materials to the Requests substantially the forms attached as Exhibits 2 through 14 to the Motion no later than twenty-one (21) days after service thereof." Dkt. No. 2620-1, ¶2. This would mean that for the parties to the Bankruptcy Case receiving CM/ECF service, production would be due **one day before the hearing** on the Rule 2004 Motion.

45. The Movants included a Certificate of Conference in the Rule 2004 Motion in which counsel certified that the Committee conferred with thirty (34) parties regarding the Rule 2004 Motion. *Id*. at p.39-40. But the Committee makes no recitation of any attempt to confer with the other one-hundred Rule 2004 Targets. Local Bankruptcy Rule 2004-1(a) provides that:

> Before filing a motion for examination under Bankruptcy Rule 2004, **counsel for the moving party shall confer with the proposed examinee or the examinee's counsel (if represented by counsel)** to arrange for a mutually agreeable date, place and time for the examination. All motions for examination shall include either: (1) a certificate which states that a conference was held as required and that all parties have agreed to the date, time and place of examination; (2) a certificate explaining

> why it was not possible for the required conference to be held; or (3) a certificate which states that a conference was held as required, that no agreement could be reached and that the motion is presented to the Bankruptcy Court for determination

Local Bankruptcy Rule 2004-1(a) (emphasis added).

46. It would not have been difficult for the Movants to comply with Local Bankruptcy Rule 2004-1(a) by at least attempting to contact the other Rule 2004 Targets. The Foundations, for instance, are easily googled and their contact information was actually provided in the Charitable Entity Response. *See* Dkt. Nos. 2556-2, 2574-23, and 2547-23. Yet, the Movants flouted Local Bankruptcy Rule 2004-1(a) [and as will be discuss *infra* Local Bankruptcy Rule 2004-1(b) as well] and did not even mention that were one hundred Rule 2004 Targets who were not contacted.

47. Specific to the Charitable Respondents , the Movants request, among others:

> Any and all Documents or Communications relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value between or among any of the Debtor, any Highland Charity and Trust, or any Related Entity

Of note, "Related Entity" is defined to include **over one-thousand (1000) entities**. Of course, given the structure of the Charitable Respondents , which has been made very clear to the Court and to the Movants, this would include **every** Document and **every** Communication as the purpose of the Charitable Respondents is to facilitate the charitable giving of funds through the Supporting Organizations to the Foundations.

**F. The Plan has gone effective.**

48. On February 22, 2021, the Bankruptcy Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, (the "Confirmation Order") confirming the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (Dkt. No. 1808) (the "Plan").

49. The Plan specifically provides that: "the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action." *See* Plan, ¶5.B.7.

50. The Effective Date of the Plan occurred on August 11, 2021. *See* Dkt. No. 2700.

51. As such, the Movants have full access to and are therefore in possession, custody, and/or control of **all** documents and information of the Debtors that has any relation or bearing on Estate Claims.

## LEGAL ARGUMENT

52. FED. R. BANKR. P. 2004 ("Rule 2004") is unquestionably broad, but it is not also not unlimited. *See* Colliers on Bankruptcy, ¶2004.01[1]. Legally, the Rule 2004 Motion runs afoul of the most well-recognized limitation: the pending proceeding rule (the "Pending Proceeding Rule"). Factually, the Rule 2004 Motion suffers from the most fundamental of flaws as the Movants already have the documents that they are requesting. The Charitable Respondents are greatly concerned that the given the Movants' extreme delay in filing the Rule 2004 Motion and the obvious over-breadth of the requests therein (issued to 135 entities, requesting documents and communications amongst or between over 1,000 entities), the Rule 2004 Motion might be an inroads at a Section 546(a) extension. As set forth herein, such an extension is legally impermissible and belied by the Movants' conduct.

### A. The Pending Proceeding Rule precludes discovery under Rule 2004 from the Charitable Respondents



CONFIDENTIAL 015062

53. The Pending Proceeding Rule provides that: "[i]f an adversary proceeding or a contested matter is pending, then the parties to that proceeding or matter may no longer utilize the liberal provisions of Bankruptcy Rule 2004 and should utilize the discovery devices provided for in Rule 7026 through 7037." *See* Colliers on Bankruptcy, ¶2004.01[8]. The Pending Proceeding Rule has well-recognized and widely applied proscription on the use of Rule 2004 in aid of pending litigation. *In re Kipp,* 86 B.R. 490, 491 (Bankr. W.D. Tex. 1988); *Matter of M4 Enterprises, Inc*., 190 B.R. 471, 475 (Bankr. N.D. Ga. 1995).

54. This Court has specifically incorporated the Pending Proceeding Rule in Local Bankruptcy Rule 2004-1(b) which states that:

> If a contested matter or an adversary proceeding is pending, the adversary discovery rules (Bankruptcy Rules 7027 - 7036), not Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1, govern discovery pertaining to such contested matter or adversary proceeding.

Local Bankruptcy Rule 2004-1(b); *but see In re Mirant Corp*., 326 B.R. 354, 357 (Bankr. N.D. Tex. 2005) (J. Lynn) (questioning Pending Proceeding Rule but noting in that case, there was no pending adversary proceeding or contested matter).

55. The purpose of the Pending Proceeding Rule is to "prevent the use of Rule 2004 examinations to circumvent the safeguards and protections of the discovery rules." *See In re Young*, No. 17-14065-NPO, 2018 WL 6060338, at *4 (Bankr. N.D. Miss. Nov. 19, 2018) (citing *In re Enron*, 281 B.R. 836, 841 (Bankr. S.D.N.Y. 2002)). As the *Enron* court explained:

> [There is a] well recognized rule that once an adversary proceeding or contested matter is commenced, discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004. The basis for this … proscription lies in the distinction between the broad nature of the Rule 2004 exam and the more restrictive nature of discovery under the Federal Rules of Civil Procedure. Based on Rule 2004's substantive differences, courts have expressed concern that Rule 2004 examinations not be used as a tactic to circumvent the safeguards of the Federal Rules of Civil Procedure.

281 B.R. at 840-41.

56. The Pending Proceeding Rule does not apply to issues not raised in a pending adversary proceeding or contested matter. *In re Buick*, 174 B.R. 299, 306 (Bankr. D. Col. 1994). But "discovery of evidence **related to** the pending proceeding must be accomplished in accord with the more restrictive provisions of the [FED. R. BANKR. P. 7026, *et seq*.]." *In re Bennett Funding Grp., Inc*., 203 B.R. 24, 29 (Bankr. N.D.N.Y. 1996) (emphasis in original); *M4 Enterprises*, 190 B.R. at 475 (explaining that, "once the parties have commenced an adversary proceeding, they may not employ Rule 2004 as a discovery device by which to uncover evidence **related to** that proceeding") (emphasis added).

57. As such, pursuant to the Pending Proceeding Rule, the Movants are precluded from seeking discovery through Rule 2004 that is related to the Adversary Proceeding.

58. Throughout the Rule 2004 Motion, the Movants state several times that "they are not seeking discovery … relating to the CLO HoldCo Transaction" and that the Charitable Respondents and other defendants in the Adversary Proceeding should read their requests to "exclude documents" related to the CLO HoldCo Transaction detailed in paragraphs 30-60 of the Complaint. *See* Instructions, ¶5.

59. But the Complaint and the Adversary Proceeding are clearly not just about the CLO HoldCo Transaction. The Complaint details the Committee's (unfounded) allegations concerning the "byzantine empire" that the Defendants comprise including the formation, management, organization, and purported purpose of the Charitable Respondents. The Committee paints a conclusory narrative about how Dondero allegedly controlled the defendants, including the Charitable Respondents. *See e.g. Complaint*, ¶¶25 ("Moreover, upon information and belief, Dondero indirectly controls CLO Holdco, DAF Holdco, and the DAF"); 46 ( "This control over

Dugaboy and the repayment of the Dugaboy Note effectively rendered the Dugaboy Note valueless to the Debtor"); 50 ("[i]ndeed, such a last minute wholesale change only further underscores the control that Dondero had over all parties to the CLO Holdco Transaction."); 56 ("it is clear that Dondero and the Debtor exercise significant control over the various entities involved in the CLO Holdco Transaction, including CLO Holdco").

60. Based upon these allegations in the Complaint, the Committee asserts a cause of action against the Charitable Respondents for declaratory judgment that the Charitable Respondents are: "are corporate fictions of Dondero and the Debtor (controlled by Dondero) and used to perpetrate a fraud directed by Dondero, and thus, Dondero, DAF Holdco, the DAF, and CLO Holdco are liable for damages pursuant to an alter ego theory." *See* Complaint, ¶80 (Third Cause of Action). The Committee also asserts a cause of action for conspiracy by and amongst all defendants, including the Charitable Respondents . *Id*. at ¶90 (Fourth Cause of Action).

61. As such, the Adversary Proceeding goes far beyond the CLO HoldCo Transaction, and any evidence **related to** the Adversary Proceeding cannot be obtained through Rule 2004.

62. The Movant's shallow attempt to avoid the Pending Proceeding Rule is to characterize the Complaint and Adversary Proceeding as solely concerning the CLO HoldCo Transaction, which is identical to the equally feeble attempt made by the trustee in *Bennett Funding*. In *Bennett Funding*, a trustee commenced an adversary proceeding against numerous defendants alleging that Patrick Bennett ("P. Bennett") diverted millions of dollars from the debtor to other entities controlled by P. Bennett to pay for the construction of a hotel for he and his wife's ("G. Bennett"), financial benefit. 203 B.R. at 26. Other allegations in the complaint included assertions that P. Bennett used various entities which were owned or controlled by he or his wife to move money and property. *Id*. at 26-27. The trustee served a Rule 2004 subpoena on the wife

and other related entities. *Id*. The trustee represented that he was not seeking any discovery related to the hotel transaction which was the only cause of action against G. Bennett, instead the trustee wanted to explore other sources of assets the wife received or owned to determine if there were other assets wrongfully diverted from the debtor. *Id*.

63. The *Bennett* court rejected this argument, explaining that after review of the adversary complaint:

> [I]t is clear that the Trustee has alleged the creation by the defendants of what can rightfully be described as a **financial superweb**. As such it is difficult at this point, if not impossible, to determine whether and to what extent information gleaned from a Fed. R. Bankr. P. 2004 examination of G. Bennett will not be related to the parties and subject matter covered by the Amended Complaint. **In fact, it appears highly unlikely that even a carefully crafted examination of G. Bennett by the Trustee could not avoid delving into issues regarding the other defendants and subject matter covered in the extensive Amended Complaint**, and thus examination of the issues requested would not be in addition to or beyond the scope of the Trustee's pending adversary proceeding. It appears then that G. Bennett and the parties and subject matter of the Amended Complaint are not easily separable because of the complex relationship between them, and the Court recognizes that use of a Fed. R. Bankr. P. 2004 examination would unavoidably and unintentionally create a back door through which the Trustee could circumvent the limitations of Fed. R. Bankr. P. 7026 *et seq.*, which are properly applied in this instance.

*Id*. at 20-30 (emphasis added).

64. The parallels here are striking, just replace "financial superweb" with "byzantine empire." But even more compelling here, the Committee has actually asserted causes of action for a declaratory judgment for alter ego and conspiracy against the Charitable Defendants. There is no discovery in the Rule 2004 Motion into the Charitable Respondents that would not be "related to" to the issues raised by and the parties that have been made defendants (formally or by allegations made against DAF GP) in the Adversary Proceeding.

65. And lastly, the procedural history here is much more egregious. The Committee, after months of discovery, commenced the Adversary Proceeding by filing the Complaint. The



CONFIDENTIAL

Complaint was then met with several Motions to Dismiss. Rather than respond, the Committee moved to stay the Adversary Proceeding, which the Court permitted, over objection. Now, the Committee wants to use Rule 2004 to try to conduct an investigation of the very same allegations made in the Complaint, both against the same parties made defendants and other parties whose relationship with Defendants has for months (likely in excess of a year, closer to two), been known to the Committee. The purpose we hear, is so the Committee through its investigations outside of formal adversary proceeding discovery may be able to amend the Complaint. *See* Adversary Proceeding, Dkt. No. 70 (stating that an additional stay of the Adversary Proceeding is needed to provide "additional necessary time to determine whether to seek leave to amend the complaint"). But that is what formal adversary proceeding discovery is meant to allow for, within the strictures of FED. R. BANKR. P. 7026 *et seq*. Of course, the Committee sees that it has a friendly forum (it is joining the Court's investigation), and would much rather proceed unabated before this Court than deal with an Article III court who would first determine the Motions to Dismiss before even discussing discovery.

66. The Rule 2004 Motion is indisputably a violation of the Pending Proceeding Rule. The Movants should be directed to Local Bankruptcy Rule 2004-1(b) and engage in discovery related to the Adversary Proceeding through the FED. R. BANKR. P. 7026 *et seq.*

**B. The Movants cannot demonstrate any need for documents that they already have (which is everything).**

67. Again, the Charitable Respondents recognize the broadness of Rule 2004, but another import limitation is that Rule 2004 cannot be used "in a fashion which unduly harasses" or that "frivolously wastes the assets of the estate." *M4 Enterprises*, 190 B.R. at 475 (citing to *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985) and *In re Georgetown of Kettering*, 17 B.R. 73, 75 (Bankr. S.D. Ohio 1981)).

68. As set forth herein, the Court has previously recognized "the documents of the separate Highland Non-Debtor Entities are in some or all cases on the Debtor's servers, in the Debtor's employees' files, and generally available to the Debtor's personnel." Dkt. No. 935, p. 2-3. The Court ordered that any of the documents belonging to these parties that were in the possession or control of the Debtor were to be turned over to the Committee to the extent they related to the Committee's investigation of Estate Claims. *Id*. p. 7.

69. At least as to the DAF, the Debtor did so, producing thousands of pages of ESI (and perhaps other documents) to the Committee that belong to the DAF. Assumedly, the Committee has reviewed these documents and already knew this when it filed the Rule 2004 Motion. So why would the Charitable Respondents have to go to the Debtor to obtain their documents and then provide those documents to the Movants, who has already either have or should have received those same documents from the Debtor, or now could at any point go get them themselves? This is unduly harassing.

70. But even worse now, the Plan has gone effective. The Movants, by order of this Court, now have full access to any of the documents the Debtor or Reorganized Debtor has which relates to their investigation of Estate Claims. The Movants instruct the Rule 2004 Targets to produce "those Documents not only in [their] physical control, but also those Documents within [their] custody or control, including without limitation, Documents in the possession of … agents, employees, affiliates, advisors, or consultants and any other person or entity acting on your behalf." Rule 2004 Motion, Instructions, ¶3. But it is the Movants themselves who have custody and control of the DAF's documents.

71. Committee has already incurred significant fees pursuing these same documents from the Debtor (*see e.g.* extensive time entries related to Debtor document production throughout



CONFIDENTIAL 

Dkt. Nos. 639, 767, 877, 969, 1074, 1283). But now, no matter what the Debtor previously produced, there can be no question that the Movants have all documents related to its investigation of Estate Claims from the Debtor—who is the party who controlled the DAF's ESI. At an absolute minimum, the Rule 2004 Motion as relates to the Charitable Respondents has been and will continue to be a waste of assets of the estate.

72. In *ADPT DFW Holdings LLC*, this Court considered the post-confirmation motions for Rule 2004 examination filed by the trustee of a litigation trust which by the plan was given the "right, authority, and discretion to pursue Litigation Trust Causes of Action" which included chapter 5 causes of action and any suit against the Debtor's current and former officers. *See* 17-31432-sgj, Dkt. Nos. 719, §1.1; Dkt. Nos. 1062–1066 (the motions for rule 2004 examination). The trustee specifically argued that Rule 2004 discovery sought was in "aid of the [t]rustee in its investigation and evaluation of potential claims." *See e.g*. 17-31432-sgj, Dkt. No. 1064, ¶21.

73. This Court held a hearing on the various rule 2004 motions on March 27, 2018. 17-31432-sgj, Dkt. No. 1268. At the hearing, the proposed examinees argued that the litigation trustee had more than 9,000 documents from the debtor to launch an investigation from and there would be more documents coming in from the debtor on a rolling basis and that the litigation trustee should work with the committees involved prior to confirmation who had done their own pre-confirmation investigation. *Id*. at 36:13-24. The proposed examinees went on to query that if millions of dollars were spent by the committees (equity and unsecured creditors) to investigate estate causes of action but these investigations were apparently all for naught and the trustee had to start over, should those professional costs be reimbursed to the estate? *Id*. at 66:6-17.

74. In response, this Court stated:

> We have the argument that you've gotten thousands upon thousands of documents from [various parties], more coming, but we had an Unsecured Creditors

> Committee who was investigating claims and, in fact, at one time I gave them standing to -- so they obviously have information to share, the [committee counsel] and business people that were on the committee… So between - or you've got the document that the debtor's former counsel has produced. You've got the publically available documents. You have the ability to talk to [various professionals working on behalf of the estate]. Why — between that and the descriptions in the disclosure statement, why isn't that all you need to go ahead and filed lawsuits and then have the Federal Rules of Civil Procedure apply?

*Id*. at 66:18-67:15.

75. This Court then denied each of the trustee's motions for Rule 2004 examinations for a failure to show good cause. *Id*. at 94:10-96:16. Specifically, in support, this Court noted that there was a cooperating debtor who was producing documents to the trustee. *Id*. at 94:13-17 (noting "that's an important fact here"). Here, not only has the Debtor provided countless documents to the Committee but the Litigation Trustee specifically has access to **all of the relevant documents** of the Debtor. Even stronger here, the Debtor managed the DAF and is in possession of documents and ESI belonging to the DAF.

76. This Court also specifically noted that:

> The committees "were extremely active and had the opportunity and I think did investigate claims and causes of action during the case to a sufficient level where their information shared with the Liquidating Trustee could enable the drafting of claims and causes of action in a complaint. And, to be specific, this was a big deal, there was hot negotiation over how the claims and causes of action and waterfall of distributions from the Liquidating Trust would be shared among unsecureds, equity, and Deerfield. I will take judicial notice of the Akin Gump final fee application and Brown Rudnick final fee application. My law clerk and I checked during the break, Akin Gump billed 1,015 hours at a tab of $843,592 for the category general adversary proceedings and litigation matters. … I think they should be able to provide a treasure trove of information to connect the dots to the extent the Litigation Trustee has not connected all the dots yet."

*Id*. at 94:22-95:3.

77. As detailed herein, the Committee has been actively investigating Estate Causes of Action since January 2020. The Committee's financial advisor FTI has spent $1,118,921.50

investigating intercompany transactions and avoidance actions. *See* Dkt. Nos. 570, 883, 1244, 1655, 2221 and 2611. Committee counsel has not broken its time out regarding avoidance actions but has spent $5,995,235.50 on litigation and their time entries reflect **extensive** time and fees engaging in discovery of documents and investigation of Estate Claims. *See* Dkt. Nos. 569, 831, 1296, 1853, 2240, 2585.

78. Relying on its analysis of time spent, work done, and fees incurred in the *ADPT DFW* case, this Court **denied** all of the trustee's motions for Rule 2004 examination explaining that: "[t]he Litigation Trustee I think has information at his fingertips to file complaints or not and then can obviously take discovery pursuant to the Federal Rules of Civil Procedure or if it's state court, the state rules of civil procedure." 17-31432-sgj, Dkt. No. 1268 at 96:12-16.

79. Here, much more compellingly than the trustee in *ADPT DFW*, the Litigation Trustee has full access to all documents of the Debtor that could relate to Estate Claims and the Committee has spent seven times more than the committee in *ADPT DFW* investigating Estate Claims. The Movants have the information at their fingertips to file complaints (like they did against the Charitable Defendants) and should be directed to use FED. R. BANKR. P. 7026, *et seq.* or whatever applicable discovery rules to prove up any lawsuit, as every other litigant must do.

**C. The Movants cannot be rewarded for their own dilatory conduct.**

80. As detailed herein, the Committee was charged with investigating Estate Claims in January 2020. While the Committee engaged in some discovery, it was not nearly as robust as the Rule 2004 Motion that the Movants filed less than two and half months before the expiration of the Section 546 deadline. The Rule 2004 Motion seeks discovery from 135 parties relating to over 1,000 entities.

81. Of course, the Rule 2004 Motion was objectionable so the Movants set their Rule 2004 Motion for August 20, 2021, just fifty-seven (57) days before the Section 546 deadline would be up. Given the breadth of the Rule 2004 Motion and delay or lack of service on many of the Rule 2004 Targets (who will certainly be permitted to file motions to quash), it is not conceivable Movants could receive all requested discovery any time prior to the expiration of the Section 546 deadline. So Movants have set themselves to have no real time to review what would likely be millions of pages of discovery. The Charitable Respondents are greatly concerned that this timeline was manufactured by the Movants to support a Section 546 extension.

82. While this is issue is not before the Court at this time, a Section 546 deadline cannot be extended through FED. R. BANKR. P. 9006(b) ("Rule 9006"). Section 546(a) is a statute of limitations, so it can be extended by **agreement, tolled, waiver, or the subject of estoppel**. *In re Margaux Texas Ventures, Inc.*, 545 B.R. 506, 526 (Bankr. N.D. Tex. 2014) (Emphasis Supplied) - (explaining that "clear majority of courts hold that 546(a) is a true statute of limitations and does not serve as a jurisdictional bar. To be clear, a statute of limitations, unlike a statute of repose, can be extended by agreement, tolled, waived, or the subject of estoppel.").

83. So while a statute of limitations is not jurisdictional, a court still must have some source of authority to extend it. Rule 9006(b) provides for extension by order of the court for cause if the an "act is required or allowed to be done at or within a specified period **by these rules** or by notice given thereunder or **by order of the court**." (emphasis added). Noticeably absent from Rule 9006(b) is any recitation that the Court can order an extension of a time period specified by the Bankruptcy Code. Congress has dictated that the Bankruptcy Rules "shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075. Where the Bankruptcy Rules and Bankruptcy Code are inconsistent, the statutory Code controls. H.R. Rep. No. 95–595, pt. 1, at 449

(1977). Therefore, "Rule 9006(b) cannot apply to the Section 546 deadline without violating the separation of powers preserved in the Constitution. Where the legislature has spoken authoritatively, it is not within the province of the judiciary to modify its determination." *In re Walnut Hill, Inc*., No. 16-20960 (JJT), 2018 WL 2672242, at *2 (Bankr. D. Conn. June 1, 2018).

84. The Charitable Respondents are cognizant of case law finding that Rule 9006(b) applies to Section 546, but these cases are akin to equitable tolling. *See In re Int'l Admin. Servs., Inc*., 408 F.3d 689, 700 (11th Cir. 2005) .

85. A statute of limitations is subject to equitable tolling. But "equitable tolling applies only in rare and exceptional circumstances." *Harris v. Boyd Tunica, Inc*., 628 F.3d 237, 239 (5th Cir. 2010). Courts have typically extended equitable tolling where "the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Id*.

86. Discovery as sweeping as the Rule 2004 Motion should have been filed by the end of June 2020 at the latest, so that process could have occurred to whittle down the requested scope (for example, the requests include a demand for formation documents of the Foundations, though they were formed almost 100 years ago). In fact, in early July, 2020, the Committee stated that "time is running out" to investigate Estate Claims. Instead, the Committee, whilst billing millions of dollars in professional fees to the estate, waited until the expiration of the Section 546 deadline to seek to propound incredibly broad Rule 2004 discovery (after having access to discovery from the Debtor, discovery of thousands of pages from CLO HoldCo (by agreement), and the right (before filing a complaint) to Rule 2004 discovery against multiple parties).

87. The upcoming motion to extend the Section 546 deadline (we are projecting such a filing) could never meet the "rare and exceptional circumstances" required for an equitable tolling of Section 546. As the Fifth Circuit has noted, when a "party has not diligently pursued discovery of [the evidence it now seeks] the court need not accommodate the [that] party's belated request." *Klein v. Great Atl. & Pac. Tea Co.,* 117 F.3d 1417 (5th Cir. 1997)

**CONCLUSION**

The Committee chose to make expansive (and unfounded) allegations in their Complaint against the Charitable Respondents including its favored "byzantine empire" characterization. Now, the Movants seek to use Rule 2004 to obtain discovery from the Charitable Respondents to prove up these allegations, and even more prejudicially, the Adversary Proceeding is stayed and the Movants want it stayed even longer so that the Movants can use Rule 2004 discovery to plead around the pending Motions to Dismiss. The Committee was charged with investigating Estate Claims in January 2020 and decided on the allegations to assert against the Charitable Respondents (including pleading alter ego, conspiracy, and its byzantine characterization) in December 2020. If the Movants want additional discovery related to the those cause of action and allegations, they must proceed under FED. R. BANKR. P. 7026, *et seq*. as directed by Local Bankruptcy Rule 2004-1(b).

**Respectfully submitted:**

**KELLY HART PITRE**

***/s/ Louis M. Phillips***

**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this August 16, 2021.

***/s/ Louis M. Phillips***
Louis M. Phillips



CONFIDENTIAL

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

**Counsel for The Dallas Foundation, The Santa Barbara Foundation, the Greater Kansas City Community Foundation, Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., and Mary Jalonick (all for this limited purpose)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| **Debtor** | § | **Relates to Dkt. No. 2620** |

**OBJECTION TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE LITIGATION ADVISOR FOR ENTRY OF AN ORDER**

---

**INTRODUCTORY STATEMENT**

The parties defined herein as Objectors make this introductory statement. We do not know whether the Committee and Litigation Advisor (not as we can tell the Litigation Sub-Trust) ("Movants") are (i) simply asking the Court for authority to send out the discovery that is listed within the exhibits, in which case all objections and rights would be preserved, or (ii) whether the Movants are seeking approval of the discovery requests in a manner that would cut off objections to the requests themselves, whether upon service of the Court's order or of a subpoena, as may be required (certainly against parties who have never been before the Court). The Objectors assume the latter; but also note that there has been no meet and confer about the requests that are the exhibits to the Rule 2004 Motion (the only question being would we object to Rule 2004 discovery without having seen any of it or previewed the Rule 2004 Motion). So, we may be incorrect.

**OBJECTION**

The Dallas Foundation ("Dallas Foundation"), The Santa Barbara Foundation ("Santa Barbara") and the Greater Kansas City Community Foundation ("Greater Kansas City") (the forgoing, collectively the "Non-Party Foundations"),[1] along with the Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara") and the Highland Kansas City Foundation, Inc. ("Highland Kansas City") (together, the "Supporting Organizations"), and Mary Jalonick ("Ms.

---

[1] Undersigned counsel has been retained to represent the Non-Party Foundations and Ms. Jalonick; however, neither the Non-Party Foundations nor Ms. Jalonick have ever made an appearance in this bankruptcy case, and the Non-Party Foundations and Ms. Jalonick are not by the filing of this Objection submitting themselves to the Court's jurisdiction. Specifically, Santa Barbara is evaluating whether it was properly served with the Motion, and as such, Santa Barbara is a party to this Objection with full reservation of rights regarding defects in or lack of service.

Jalonick") (the non-Party Foundations, the Supporting Organizations and Ms. Jalonick are collectively referred to as the "Objectors") file this *Objection* ("Objection") to the *Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* (Dkt. No. 2620) (the "Motion").

**PRELIMINARY STATEMENT**

1. As a preliminary matter, the Objectors raise the failure of the Official Committee of Unsecured Creditors (the "Committee") and Litigation Advisor (together with the Committee, the "Movants") to adhere to Local Rule 2004-1(a), which states:

> Before filing a motion for examination under Bankruptcy Rule 2004, counsel for the moving party shall confer with the proposed examinee or the examinee's counsel (if represented by counsel) to arrange for a mutually agreeable date, place and time for the examination. All motions for examination shall include either: (1) a certificate which states that a conference was held as required and that all parties have agreed to the date, time and place of examination; (2) a certificate explaining why it was not possible for the required conference to be held; or (3) a certificate which states that a conference was held as required, that no agreement could be reached and that the motion is presented to the Bankruptcy Court for determination.

The Movants have not contacted any of the Objectors (or apparently even attempted to contact the Objectors) to confer with respect to the Motion as required by the Local Rule, even though the Movants did file a Certificate of Conference with respect to other parties named in the Motion, and so were clearly aware of their obligation under the Local Rules. Thus, although the Objectors have not appeared in this Court and do not submit to the Court's jurisdiction, the Objectors are forced to file this Objection to preserve their rights to object to the Motion or risk entry of an Order by the Court without proper notice or opportunity to be heard. The Objectors note that they object to the failure of the Movants to follow the procedures set forth in the Local Rules, despite the fact

that the contact information, at least for the Non-Party Foundations has been previously provided. *See* Dkt. Nos. 2556-2, 2574-23, and 2547-23.

2. Further, because the Movants failed to follow the Local Rules, and confer with the Objectors prior to filing their Motion, the Objectors must now file this Objection to the Rule 2004 Motion, if for no other reason than to preserve their right to object or to move to quash any forthcoming subpoena's or further requests.[2] The Objectors hereby reserve all rights to object to or move to quash any further discovery requests or subpoenas issued by the Movants in connection with this Rule 2004 Motion and any orders issued by the Court in connection therewith.

3. The Objectors received service of the Motion between August 2 and August 13, 2021, and as such, the Objectors have been given minimal time to respond.

4. Further, the Motion is confusing. It was filed on July 29, 2021, set for hearing on August 19, 2021, and asks for an Order to be entered that directs the parties named in the Motion to produce all of the documents and other responsive materials no later than 21 days after service of the **Motion** (not an Order granting the Motion). It is unclear to the Objectors how a motion for 2004 examination can be set for hearing on a certain date, but then request entry of an order that requires the parties to produce documents before that hearing ever occurs, or so shortly thereafter that any such production would be an undue burden (upon parties that have never been before the Court in any capacity for the last two (2) years).

5. At most, the Non-Party Foundations are targeted as part of the Movants' now-too-late attempt to start an investigation that it has had 20 months to pursue. And, it is clear by the

---

[2] Of course the Objectors assume the purpose of the Court's Local Rule is to enable the parties to discuss objections of the nature raised by the Objectors herein (particularly those of the Non-Party Foundations), and to promote resolution of any differences that can be resolved without wasting the Court's time on hearing discovery motions that could have been resolved without Court intervention.

prior discovery served by the Committee upon the Debtor over a year ago, that the Committee knew of the structure of the charitable enterprise, including the Supporting Organizations and Non-Party Foundation's roles (*see* the response by the Charitable Respondents, referring to the Structure Chart long possessed by the Committee - Bates number **2398**).

**BACKGROUND INFORMATION ABOUT THE PARTIES**

6. As already set forth in the *Response and Disclosures* (Dkt. No. 2547) in response to the Court's *Order Requiring Disclosures* (Dkt. No. 2460) ("Response and Disclosures") (and thus known to the Movants when they filed their Motion), The Dallas Foundation is a Texas nonprofit corporation that is the successor in interest to the Dallas Community Trust, a charitable trust that was formed in 1929. The Dallas Foundation works with hundreds of donors regularly to make charitable grants supporting numerous causes. The Dallas Foundation (as well as many large foundations) often uses the structure explained in Exhibit 4 to the Response and Disclosures (Memorandum from K. Bebozo) to set up supporting organizations with donors. The Highland Dallas Foundation, Inc. ("Highland Dallas") is one of (many of) of the Dallas Foundation's supporting organizations. As set forth in the Response and Disclosures, Highland Dallas (like all of the supporting organizations with which the Dallas Foundation conducts operations) is controlled by the Dallas Foundation through its ability to elect a majority of the supporting organization's governing board. But, Highland Dallas is a separate legal entity from the Dallas Foundation and a separate 501(c)(3) charity.

7. Also already set forth in the Response and Disclosures, Santa Barbara is a California nonprofit corporation incorporated in 1928. Santa Barbara also utilizes supporting organizations to accomplish its good works. Highland Santa Barbara is one of these supporting organizations, and the relationship between the two is structured in the same manner as the Dallas

Foundation and Highland Dallas structure, with Santa Barbara controlling Highland Santa Barbara through its majority control of Highland Santa Barbara's governing board. Highland Santa Barbara is a separate legal entity from Santa Barbara.

8. Greater Kansas City, a Missouri nonprofit, was founded in 1978. Highland Kansas City is one of 18 supporting organizations, that Greater Kansas City works with, along with thousands of donor-advised funds, scholarship funds, other charitable fund, and individual accounts, all as described in Exhibit 25 to the Response and Disclosures. The relationship between Greater Kansas City and Highland Kansas City is also structured in the same manner as the Dallas Foundation and Highland Dallas structure, with Greater Kansas City controlling Highland Kansas City through its majority control of Highland Kansas City's governing board. Highland Kansas City is a separate legal entity from Greater Kansas City .

9. Mary Jalonick is the former president and chief executive officer ("CEO") of the Dallas Foundation. She retired in 2017. She also served as a board member on Highland Dallas's governing board because of her leadership of the Dallas Foundation. She was appointed as one of the two controlling members of the Highland Dallas board by the Dallas Foundation.

10. As explained in the Response and Disclosures, the Charitable Respondents[3] were created to hold donations and maintain investments for purposes of having the Supporting Organizations be able to make grants and donations to the charitable foundations they support. Now the Committee, after some 20 months of investigative and prosecutorial authority has "discovered" one transaction that started with the Debtor, in which a Dondero related trust

---

[3] The "Charitable Defendants" are Charitable DAF Fund, L.P. (the "DAF Fund"); Charitable DAF HoldCo, Ltd. ("DAF HoldCo"); and Charitable DAF GP, L.P., (the "DAF GP"), They are defendants in Adversary Proceeding No. 20-3195.

purchased worthless interests in Crusader funds with a real promissory note, upon which the Debtor has been paid millions of dollars, and then donated the worthless interests to Highland Dallas Foundation, which then transferred the interests through the charitable structure to CLO HoldCo, to manage, in its capacity as investment manager for the charitable enterprise. No allegation that Dallas Foundation was involved. No allegation that any other Supporting Organization of Non-Party Foundation was involved. as investment manager. Of course, as this Court and the Committee know, the Committee has refused to prosecute the adversary proceeding involving the allegedly problematic transfer (in which the debtor obtained a promissory note for some $24 Million and transferred worthless Crusader interests. It has refused to respond to the Charitable Defendants' Motion seeking withdrawal of reference to an Article III court.

11. It now, after 20 months, alleges that it needs to start an investigation.

12. As discussed more fully in the Objection to the Rule 2004 Motion filed by the Charitable Respondents, certain of the Charitable Respondents had entered into shared services agreements with the Debtor. One effect of these shared services agreements was that the Debtor provided finance, accounting, tax, legal, trade, facilities, public relation support, and information technology infrastructure support for the Charitable Respondents.

13. Upon information and belief, the Debtor has retained all of this information with respect to the Charitable Respondents and it is presumed that the Debtor provided full responses to at least four (4) requests for production of documents. At least the fourth request directly involved the Charitable Respondents and the Non-Party Foundations and Supporting Organizations.

14. As of the Effective Date of the Debtor's confirmed plan of reorganization, the Litigation Advisor is in possession of all information under the prior possession of the Debtor in

any way related to Estate Claims (that the Committee (now counsel to the Litigation Advisor and Litigation Sub-Trust) has held the authority to investigate and prosecute for over 20 months). This information should contain the details of all transactions in any way involving the Debtor as well as the transactions involving the Charitable Respondents and the Supporting Organizations.

15. Also, the tenor of the Rule 2004 Motion is, to put it lightly, an overall affront. For example, the Non-Party Foundations are assumed to be controlled by Dondero as corporate fictions established and maintained as slavish participants in a Dondero web (and defined as "Highland Charities"). This despite being in existence for decades and independently serving their communities. As for Ms. Jalonick, she is defined as one of the "Individual Highland Parties" against whom the Movants must proceed as one of the "**key non-debtor entities within the Highland web** including the Non-Debtor Dondero Related Entities, **the Individual Highland Parties**, the Highland Charities And Trusts, and other affiliated entities." So, Mary Jalonick is one of the key Individual Parties within the Highland web. For reference, attached hereto is a news article announcing the retirement of Ms. Jalonick. Key actor in the Highland web indeed. Movants should be ashamed, but of course, sadly, of shame they are incapable.

16. To the extent that the Motion requests information related to the business of the Non-Party Foundations or Ms. Jalonick, the Non-Party Foundations and Ms. Jalonick vehemently object. The Non-Party Foundations will not open their books to the Movants regarding donations to third party charitable organizations (much of this information is publicly available and can be accessed by the Movants in that manner to the extent that they think they require such information). Further, the Non-Party Foundations object to Requests concerning (and will not provide information related to) donors other than the Supporting Organizations and any of the specific charitable entities named in the Adversary Proceeding (the "Highland Parties").

17. Again, the Non-Party Foundations and Ms. Jalonick object vehemently to the pejorative narrative of the Movants. For example, for the Movants to suggest that the Non-Party Foundations are legal fictions and under the control of James Dondero is so preposterous as to be sanctionable. Two of the Non-Party Foundations were formed nearly 100 years ago and the other in 1987, and they set up the Supporting Organizations to facilitate charitable giving from the "DAF" some 10 years ago. They exist to do charitable work. For the Movants to suggest in its customary inflammatory and conclusory fashion that the Non-Party Foundations exist for the nefarious purpose of assisting Mr. Dondero to effect evil deeds shows that the Committee and its counsel, and now the Litigation Advisor and Litigation Sub-Trust, are a shameless group.

**RELIEF SOUGHT**

18. The Objectors object to the broad scope of the proposed Rule 2004 examination because the Movants have not shown that the information sought about the Objectors is sufficiently related to the Debtor's bankruptcy proceeding or the administration of that proceeding so as to be the proper subject of examination by the Movants. Additionally, the Movants have not satisfied their burden of showing good cause for the examination by "demonstrating that the discovery request is necessary to establish its claim in the bankruptcy case or that denial of the discovery request would cause undue hardship or injustice to the [Committee]." *In re Orion Healthcorp, Inc.* 596 B.R. 228, 235 (Bankr. E.D.N.Y. 2019).

**19.** The Movants' requests to the Non-Party Foundations are far too broad, and many of them do not relate sufficiently (or at all) to the Non-Party Foundations' knowledge of the Debtor or the affairs of the Debtor as required by Rule 2004 and the cases interpreting the scope of that Rule as to third parties. For example, the Non-Party Foundations will never agree that their

formation documents and all documents related to transactions involving their charity work (for nearly a hundred years) are discoverable.

## Legal Argument

20. The primary purpose of a Rule 2004 examination is to give the parties a tool "to quickly ascertain the extent and location of the estate's assets." *In re Fearn*, 96 B.R. 135 (Bankr. S.D. Ohio 1989); *see also In re Martin*, 403 B.R. 359, 362 (Bankr. D.S.C. 2009). In addition to discovering assets, these examinations are often used to "unearth[ ] frauds." *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985); *see also In re Moore Trucking, Inc.*, 2020 WL 6948987, at *6 (Bankr. S.D.W. Va.). However, the examination must be "relevant and reasonable." *Moore* at *6, *citing*; *In re Symington*, 209 B.R. 678, 684 Bankr. D. Md. 1997). Furthermore, it cannot be used to "harass, abuse, or to inquire into irrelevant matters," and it "should not be so broad as to be more disruptive and costly to the party sought to be examined than beneficial to the party seeking discovery. *Moore*, 2020 WL 6948987 at *6 (*citing In re Lufkin*, 255 B.R. 204, 209 (Bankr. E.D. Tenn. 2000)); *Fearn*, 96 B.R. at 138; *see also In re Hammond*, 140 B.R. 197, 201 (S.D. Ohio 1992).

21. The persons to be examined and the parties in interest who may conduct the examination are not defined in the Rules nor the Code. However, by looking to the language of Rule 2004, it is evident that an examination may be had only of those persons possessing knowledge of a debtor's acts, conduct or financial affairs so far as this relates to a debtor's proceeding in bankruptcy. *In re GHR Energy Corp*., 35 B.R. 534, 537 (Bankr. D. Mass. 1983); *see also In re Yellowstone Mountain Club, LLC*, 2009 WL 982233, at *3 (Bankr. D. Mont.)

22. "[A]lthough the scope of the examination permitted under Bankruptcy Rule 2004 is broad it is not without limits. The examination of a witness as to matters having no relationship

to the debtor's affairs or no effect on the administration of his estate is improper." *In re Yellowstone Mountain Club, LLC*, No. 08-61570-11, 2009 WL 982233, at *3 (Bankr. D. Mont. Feb. 18, 2009), *citing In re Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985); *see also In re Gay,* 2016 WL 1612942 at *2 (Bankr. W.D. Okla.) (while Rule 2004 permits examinations of "third parties", the language of the rule makes it "evident that an examination may be had only of those persons possessing knowledge of the debtor's acts, conduct or financial affairs so far as it relates to a debtor's proceeding in bankruptcy). It is clear that Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs. *Wilcher,* 56 B.R. at 434*, quoting, In Re GHR Energy Corp.,* 35 B.R. 534, 537 (Bankr.D.Mass.1983). Likewise, "[s]uch examination ... cannot be 'used for purposes of abuse or harassment' and it 'cannot stray into matters which are not relevant to the basic inquiry.'" *In re W & S Investments, Inc.*, 985 F.2d 577 (9th Cir.1993), *quoting, In re Table Talk*, 51 B.R. 143, 145 (Bankr. D. Mass 1985) (*quoting In re Mittco, Inc*., 44 B.R. 35, 36 (Bankr.E.D.Wis.1984)).

23. "[T]he one seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks." *In re Express One Int'l, Inc*., 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998), *citing In re Eagle–Picher Industries, Inc*., 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994). *See also In re Orion Healthcorp., Inc.*, 596 B.R. 228, 235 (Bankr. E.D.N.Y. 2019); *Moore* 2020 WL 6948987, at *7. Generally, good cause requires a showing that the examination sought is necessary to establish the claim of the party seeking the examination, or the denial of such request would cause the proposed examiner undue hardship or injustice. *Express One*, 217 B.R. at 217 (*citing In re Dinubilo*, 177 B.R. 932, 940 (E.D.Cal.1993)). The party bearing the burden of proof may satisfy the burden by demonstrating that the discovery request is necessary to establish its claim in the bankruptcy case or that denial of the discovery request would cause undue hardship

or injustice to the examiner. *In re Orion Healthcorp., Inc.*, 596 B.R. 228, 235 (Bankr. S.D.N.Y. 2019); *see In re Metiom, Inc*. 318 B.R. 263, 268 (Bankr. S.D.N.Y 2004). Furthermore, if the cost and disruption to the examinee attendant to a requested examination outweigh the benefits to the examiner, the request should be denied. *In re Eagle–Picher Industries*, 169 B.R. at 134.

24. The court in *In re Countrywide Home Loans* formulated the following test that has been adopted by many courts: "it is appropriate to apply the "good cause" standard in what may be termed a "sliding scale" manner or balancing test. That is to say, the level of good cause required to be established by the [movant] before she can obtain certain documents or pursue a certain line of inquiry in a Rule 2004 examination involving a creditor will vary depending on the potential intrusiveness involved." *In re Countrywide Home Loans, Inc*., 384 B.R. 373 (Bankr. W.D. Pa. 2008). The court went on to explain:

> Under this standard inquiries that are tightly-focused on the creditor's relationship with a particular debtor will require a relatively low level of good cause because they represent a low level of intrusion into the creditor's business affairs and a low risk of abuse. Inquiries that seek far-reaching information on policies and procedures of general application in the creditor's operation will require a correspondingly higher showing of good cause because they are inherently more intrusive and present a greater potential for abuse.
>
> *In re Countrywide Home Loans, Inc*., 384 B.R. at 393.

**A. As a threshold matter, the Movants cannot demonstrate good cause for any Rule 2004 discovery.**

25. The Committee was first tasked with pursuit its of Estate Claims (defined as any estate claims and causes of action against Debtor-related entities) in January 9, 2020. *See* Dkt. No. 354-1. The Committee engaged in robust discovery from the Debtor with regard to Estate Claims throughout this Bankruptcy Case. *See* Dkt. Nos. 808, 810, 845. The Committee professionals have billed millions of dollars to the estate for investigating Estate Claims. *See* Dkt. Nos. 570, 883, 1244, 1655, 2221 and 2611 (FTI fee applications) and Dkt. Nos. 569, 831, 1296, 1853, 2240,

2585 (Sidley Austin fee applications). Now, that the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (Dkt. No. 1808) (the "Plan") has gone effective, the Movants have with full access to **all documents** to which the Debtor has possession that related to Estate Claims. *See* Dkt. No. 2700.

26. Yet, the Movants seek to foist overly burdensome production onto third-parties under the theory such discovery is in furtherance of the investigation of Estate Claims which began in January 2020. But this Court has recently considered and outright rejected a similar (though much less egregious) argument by a litigation trust.

27. In *ADPT DFW Holdings LLC*, this Court considered the post-confirmation motions for Rule 2004 examination filed by the trustee of a litigation trust which by the plan was given the "right, authority, and discretion to pursue Litigation Trust Causes of Action" which included chapter 5 causes of action and any suit against the Debtor's current and former officers. *See* 17-31432-sgj, Dkt. Nos. 719, §1.1; Dkt. Nos. 1062–1066 (the motions for rule 2004 examination). The trustee specifically argued that Rule 2004 discovery sought was in "aid of the [t]rustee in its investigation and evaluation of potential claims." *See e.g*. 17-31432-sgj, Dkt. No. 1064, ¶21.

28. This Court held a hearing on the various rule 2004 motions on March 27, 2018. 17-31432-sgj, Dkt. No. 1268. At the hearing, the proposed examinees argued that the litigation trustee had more than 9,000 documents from the debtor to launch an investigation from and there would be more documents coming in from the debtor on a rolling basis and that the litigation trustee should work with the committees involved prior to confirmation who had done their own pre-confirmation investigation. *Id*. at 36:13-24. The proposed examinees went on to query that if millions of dollars were spent by the committees (equity and unsecured creditors) to investigate

estate causes of action but these investigations were apparently all for naught and the trustee had to start over, should those professional costs be reimbursed to the estate? *Id*. at 66:6-17.

29. In response, this Court stated:

> We have the argument that you've gotten thousands upon thousands of documents from [various parties], more coming, but we had an Unsecured Creditors Committee who was investigating claims and, in fact, at one time I gave them standing to -- so they obviously have information to share, the [committee counsel] and business people that were on the committee… So between - or you've got the document that the debtor's former counsel has produced. You've got the publically available documents. You have the ability to talk to [various professionals working on behalf of the estate]. Why — between that and the descriptions in the disclosure statement, why isn't that all you need to go ahead and filed lawsuits and then have the Federal Rules of Civil Procedure apply?

*Id*. at 66:18-67:15.

30. This Court then denied each of the trustee's motions for Rule 2004 examinations for a failure to show good cause. *Id*. at 94:10-96:16. Specifically, in support, this Court noted that there was a cooperating debtor who was producing documents to the trustee. *Id*. at 94:13-17 (noting "that's an important fact here"). Here, not only has the Debtor provided countless documents to the Committee but the Litigation Trustee specifically has access to **all of the relevant documents** of the Debtor.

31. This Court also specifically noted that:

> The committees "were extremely active and had the opportunity and I think did investigate claims and causes of action during the case to a sufficient level where their information shared with the Liquidating Trustee could enable the drafting of claims and causes of action in a complaint. And, to be specific, this was a big deal, there was hot negotiation over how the claims and causes of action and waterfall of distributions from the Liquidating Trust would be shared among unsecureds, equity, and Deerfield. I will take judicial notice of the Akin Gump final fee application and Brown Rudnick final fee application. My law clerk and I checked during the break, Akin Gump billed 1,015 hours at a tab of $843,592 for the category general adversary proceedings and litigation matters. … I think they should be able to provide a treasure trove of information to connect the dots to the extent the Litigation Trustee has not connected all the dots yet."

*Id*. at 94:22-95:3.

32. As detailed herein, the Committee has been actively investigating Estate Causes of Action since January 2020. The Committee's financial advisor FTI has spent $1,118,921.50 investigating intercompany transactions and avoidance actions. *See* Dkt. Nos. 570, 883, 1244, 1655, 2221 and 2611. Committee counsel has not broken its time out regarding avoidance actions but has spent $5,995,235.50 on litigation and their time entries reflect **extensive** time and fees engaging in discovery of documents and investigation of Estate Claims. *See* Dkt. Nos. 569, 831, 1296, 1853, 2240, 2585.

33. Relying on its analysis of time spent, work done, and fees incurred in the *ADPT DFW* case, this Court **denied** all of the trustee's motions for Rule 2004 examination explaining that: "[t]he Litigation Trustee I think has information at his fingertips to file complaints or not and then can obviously take discovery pursuant to the Federal Rules of Civil Procedure or if it's state court, the state rules of civil procedure." 17-31432-sgj, Dkt. No. 1268 at 96:12-16.

34. Here, much more compellingly than the trustee in *ADPT DFW*, the Litigation Trustee has full access to all documents of the Debtor that could relate to Estate Claims and the Committee has spent seven times more than the committee in *ADPT DFW* investigating Estate Claims. The Movants have the information at their fingertips to file complaints and should be directed to use FED. R. BANKR. P. 7026, *et seq.* or whatever applicable discovery rules to prove up any lawsuit, as every other litigant must do.

**B. Worse here, the Non-Party Foundations have no direct relationship with the Debtor.**

35. The Non-Party Foundations first point out that none of them have had any direct relationship with the Debtor in this case. Rather, as explained in detail in the Response and Disclosures, and above, the Non-Party Foundations have a relationship with the Supporting

Organizations. The Movants, in their Rule 2004 Motion state that the purpose of the Motion is to expand their "limited knowledge of the Highland corporate structure, the economic relationships and entanglements between the entities and individuals within that structure, and the intercompany arrangements and transactions that have redistributed value therein."

36. The problem for the Movants is that they can allege no facts that would give rise to an inference that the Non-Party Foundations are part of the "byzantine web" it alleges was created by Mr. Dondero for the purpose of concealing assets and evading creditors. The other problem, of course, is that Movants have been investigating for 20 months, and one of the earliest documents produced (Bates number 2398) was the organizational structure that showed the charitable structure.

37. The Rule 2004 Motion states that it seeks information so that it can determine,

> (i) whether the Debtor was harmed by these intricate schemes; (ii) the extent of any harm; (iii) whether any Individual Highland Parties or Strand breached their fiduciary duties to the Debtor by engaging in transactions with the Highland Charities And Trusts; (iv) the purposes and motivations for creating the Highland Charities And Trusts; (v) the actual uses of Debtor assets that were transferred to the Highland Charities And Trusts; (vi) whether the Highland Charities And Trusts operated as legitimate independent entities or, conversely, were simply vehicles for Dondero to advance an elaborate shell game and generate fees for himself and other fiduciaries of the Debtor; and (vii) whether any Individual Highland Parties were unjustly enriched via the transactions between the Highland Charities And Trusts, on the one hand, and the Debtor or any of its alter egos, on the other hand.

38. The Rule 2004 Motion then defines the "Highland Charity(ies) and Trust(s) as:

> Charitable DAF Fund, L.P., Charitable DAF GP, Charitable DAF Holdco, Ltd., Community Foundation of North Texas Inc., **Dallas Foundation**, The Dondero Insurance Rabbi Trust, The Dugaboy Investment Trust, the Dondero Family Dynasty Trust, the Fourays Trust, Empower Dallas Foundation, Get Good, the Get Good Nonexempt Trust No. 1 (formerly known as the Get Better Trust), the Get Good Nonexempt Trust No. 2 (formerly known as the Canis Minor Trust), the Get Better Trust, the Canis Minor Trust, **the Greater Kansas City Community Foundation**, Highland Capital Management L.P. Charitable Fund, Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., Highland Santa Barbara Foundation, Inc., Okada Family Foundation, Inc., The Mark & Pamela Okada

Family Trust – Exempt Trust #1, The Mark & Pamela Okada Family Trust – Exempt Trust #2, The Okada Insurance Rabbi Trust, SLHC Trust, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.[4]

The inclusion of the Non-Party Foundations (and "any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing") in this broad category has placed the Non-Party Foundations in the position that they must object to the Motion or risk losing the right to later move to quash any subpoenas issued by the Movants as well as entry of an order requiring them to respond to the overly broad and misdirected Requests.

39. The Non-Party Foundations assume (but do not know, because they were never contacted by the Committee or its counsel) that the Movants are not really seeking some of this information as it relates to the Non-Party Foundations themselves, but rather the Movants are seeking information about the Supporting Organizations and other entities affiliated with the Debtor. Nonetheless, because the Movants did not comply with the Local Rules of this Court, the Highland Charity(ies) and Trust(s) are defined broadly to include the Non-Party Foundations (or at least Dallas Foundation and Greater Kansas City), and because the Requests set forth in the Motion are written so broadly, the Non-Party Foundations are now forced to address each of the Requests as if they were directed at the Non-Party Foundations.

[4] The Non-Party Foundations note that Santa Barbara is not listed in this category, although it is named elsewhere in the Motion and was served with the Motion.

40. The Rule 2004 Motion states that the Committee intends to pursue examination of the Highland Charities and Trusts in order to determine, among other thing:

> (i) whether the Debtor was harmed by these intricate schemes; (ii) the extent of any harm; (iii) whether any Individual Highland Parties or Strand breached their fiduciary duties to the Debtor by engaging in transactions with the Highland Charities And Trusts; (iv) the purposes and motivations for creating the Highland Charities And Trusts; (v**) the actual uses of Debtor assets that were transferred to the Highland Charities And Trusts**; (vi) **whether the Highland Charities And Trusts operated as legitimate independent entities or, conversely, were simply vehicles for Dondero to advance an elaborate shell game and generate fees for himself and other fiduciaries of the Debtor**; and (vii) **whether any Individual Highland Parties were unjustly enriched via the transactions between the Highland Charities And Trusts, on the one hand, and the Debtor or any of its alter egos, on the other hand**.

41. In pursuit of this stated objective, the Committee first requests:

> Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, beneficial, or other), and management of any Highland Charity and Trust, other than the Adversary Defendants, including without limitation, governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, trust agreements and any business, charitable, tax or other purpose or motivation for their creation.

Absent some further showing of good cause, (i.e. demonstrating that the discovery request is necessary to establish its claim in the bankruptcy case or that denial of the discovery request would cause undue hardship or injustice to the Movants) by the Movants (including how it relates to the Committee's stated purpose for the 2004 Exam), the Non-Party Foundations will not produce this information. As already stated in the Response and Disclosures (and thus information that is known or should be known to the Committee), Dallas Foundation and Santa Barbara were formed almost 100 years ago, and Greater Kansas City was formed in 1978. What possible bearing could the information about their formation have in this matter, and how would it relate to a claim of the bankruptcy estate?

42. Additionally, although the Non-Party Foundations cannot believe the Movants are seriously alleging such, the Non-Party Foundations can confirm that Dondero has never served on any of their Boards of Directors, and has never been involved in the management of any of the Non-Party Foundations.

43. The Movants next seek:

> Any and all Documents or Communications **relating to the financial status of any Highland Charity and Trust**, other than the Adversary Defendants, including but not limited to financial statements, balance sheets, statements of cash flows, owner's equity calculations, investment summaries, valuations, reports, or memoranda from auditors or financial consultants, or account summaries.

The Movants have not and cannot show good cause for its demand that the Non-Party Foundations to provide one hundred percent of all information relating to the financial status of any Highland Charity. This request would encompass the entirety of the financial information of each entity for the past five years. This request is so broad as to be meaningless. But this is the how the Document Request is written. "It is clear that Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs." *Wilcher*, 56 B.R. at 434.

44. But the request as written is absurd. The Non-Party Foundations cannot and will not provide the complete set of information about operations since inception. Because the Movants violated this Court's Local Rules, we have no real idea what the Motion really seeks, and must make this blanket objection. Because of the violation of this Court's Local Rules by the Movants, it is unclear what the Movants are asking for, it may be that a protocol for production of responsive non-privileged information can be agreed to regarding transactions between the Supporting organizations and the Non-Party Foundations. However, because of the improper Motion and uncertainty about any rational response process, the Objectors object to Request 2.

45. Request Number 3 asks for:

> Any and all Documents or Communications relating to any shared services agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind involving any combination of the Debtor or any Related Entity and any Highland Charity and Trust, other than in connection with the CLO Holdco Transaction, including without limitation the business purpose for any such agreement and the negotiation of the terms of any such agreement.

The Movants have not and cannot show good cause for its demand that the Non-Party Foundations provide the information about themselves and agreements with the many other supporting organizations and other entities with which the Non-Party Foundations are affiliated, if Request 3 is asking for such information. *See Wilcher*, 56 B.R. at 434. Because of the violation of this Court's Local Rules by the Movants, it is unclear what the Movants are asking for but if properly limited, it may be that a protocol for production of responsive non-privileged information can be agreed to. However, because of the improper Motion and uncertainty about any rational response process, the Objectors object to Request 3.

46. Request Number 4 asks for:

> Any and all Documents or Communications relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value between or among any of the Debtor, any Highland Charity and Trust, or any Related Entity, other than the CLO Holdco Transaction, including without limitation the amount, the date, and any bases or purpose and the negotiation of the terms of any such transaction.

To the extent that the Committee seeks information about the relationship between the Non-Party Foundations and the Supporting Organizations, much of that information was provided as exhibits to the Response and Disclosures or has already been produced by the Debtor or filed in the record of these proceedings. Because of the violation of this Court's Local rules by the Movants, it is unclear what the Movants are asking for but if properly limited, it may be that a protocol for production of responsive non-privileged information can be agreed to. However, because of the

improper Motion and uncertainty about any rational response process, the Objectors object to Request 4.

47. Requests 5 through 8 seek various types of information related to the transactions referenced in Request Number 4, such as valuation of assets and liabilities involved in transactions, tax implications related to transactions, Documents and Communications relating to the involvement of Dondero or any Individual Highland Party (more on this in the next paragraph), and Documents or Communications relating to the source of funds used in any transaction described in Request 4. Because of the violation of this Court's Local Rules by the Movants, it is unclear what the Movants are asking for but if properly limited, it may be that a protocol for production of responsive non-privileged information can be agreed to. However, because of the improper Motion and uncertainty about any rational response process, the Objectors object to Requests 5 through 8.

48. To the extent that the Movants seek any Documents or Communications that the Dallas Foundation has had with Mary Jalonick, who was formerly the President and CEO of the Dallas Foundation , the Movants have not shown good cause that it is entitled to examine the Dallas Foundation or Ms. Jalonick about all Documents and Communications related to her role as the president and CEO of the Dallas Foundation. Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs. *Wilcher,* 56 B.R. at 434. To the extent that the Movants seeks information in the possession of Ms. Jalonick related to her tenure as a Board Member of Highland Dallas that relates to the relationship between the Dallas Foundation and Highland Dallas it may be that a protocol for production of responsive non-privileged information can be agreed to. However, because of the improper Motion and uncertainty about any rational response process, the Objectors object.

49. The remaining requests (9 through 17) seek information that the Movants have not shown good cause for requesting from the Non-Party Foundations because they have not demonstrated that the discovery requests to the Non-Party Foundations are necessary to establish its claim any claims related to the bankruptcy case or that denial of the discovery request as to the Non-Party Foundations would cause undue hardship or injustice to the Movants. To the extent that the Movants seek information about the relationship between the Non-Party Foundations and the Supporting Organizations, much of that information was provided as exhibits to the Response and Disclosures or has already been produced or filed in the record of these proceedings. Because of the violation of this Court's Local Rules by the Movants, it is unclear what the Movants are asking for but if properly limited, it may be that a protocol for production of responsive non-privileged information can be agreed to. However, because of the improper Motion and uncertainty about any rational response process, the Objectors object to Requests 9 through 17.

50. The reason, presumably, for the Court's Local Rule 2004-1(a) is to prevent wasting time and resources in the manner caused by the Movants here. In fact, given the inappropriately short timeframe caused by delayed service, no pre-filing contact, etc., these objections are necessary and should be sustained.

51. Finally, the Objectors hereby expressly adopt the position of the Charitable Respondents with respect to their argument concerning any future request by the Movants for an extension of the deadline provided for by section 546(a) of the Bankruptcy Code.

[*signature block on following page*]

**Respectfully submitted:**

**KELLY HART PITRE**

***/s/ Louis M. Phillips***
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this August 16, 2021.

***/s/ Louis M. Phillips***
Louis M. Phillips

The Dallas Morning News

Sign In

SUBSCRIBE NOW 99¢/week

BUSINESS > PHILANTHROPY

# Mary Jalonick, charitable force and head of The Dallas Foundation, to step down after 30 years

The foundation's first full-time employee, she has overseen its growth from unknown entity to an organization that has helped shape the city



By Marc Ramirez
7:29 AM on Feb 6, 2017 CST

Listen to this article now
07:52 Powered by Trinity Audio

Mary Jalonick, who has overseen The Dallas Foundation's growth into a major community force, will step down as president and CEO this year after 30 years with the organization.

The longtime civic leader is making the announcement with some sorrow but also eagerness for what lies ahead, as she plans to continue her work as a proponent for quality early-education programs.

In 1987, when she began as the foundation's s first full-time employee, it had little more than $15 million and a part-time accountant.

Under her leadership, The Dallas Foundation has grown into a charitable powerhouse with 19 employees, hundreds of donors and unrestricted funds totaling about $340 million. It is the oldest community foundation in Texas.

"Mary's contributions to The Dallas Foundation are immeasurable," said Jim Moroney, chairman of The Dallas Foundation Board of Governors and publisher of *The Dallas Morning News*. "She is a visionary whose leadership, high ethical

standards and warm, gracious demeanor have shaped our philanthropic community."



J. Puckett, who runs the global education practice for Boston Consulting Group, met Jalonick in 2003 when he helped the foundation develop its strategy and continued to work with her over the years, until recently even chairing the foundation board.

"She's a connector," Puckett said. "Impact-focused. Service-oriented. In many ways, she is synonymous with philanthropy in Dallas."

A Dallas native, Jalonick briefly attended The Hockaday School but eventually graduated from Rosemary Hall, an independent girls' school in Greenwich, Conn., before going to Mount Vernon Junior College in Washington, D.C.

She returned to Dallas, planning to major in art history at Southern Methodist University, but she married instead. (Her husband, George Jalonick IV, died of Parkinson's disease in 2005.)

Initially, her marriage allowed her to start volunteering again -- a practice that went back to her teens, when, as a so-called "Gray Lady" for the American Red Cross, she pushed a rolling library around the Dallas VA Medical Center, distributing books to patients.

Eventually, her extensive volunteer work got her noticed by John Scovell, CEO and president of Woodbine Development, the force behind Reunion Tower. Scovell was on the board when members decided it was time to hire a full-time employee to lead the foundation that had started in 1929.

He said he helped persuade the board to take a chance on someone whose community foundation experience was fairly thin at the time.

"She has been unbelievable in that capacity," Scovell said. "I am a Mary Jalonick fan."



Jalonick, who had been treasurer of the Junior League of Dallas, brought not only financial smarts but a volunteer's perspective to her role.




Dallas mayor Mike Rawlings listens as Mary Jalonick announces that about $10 million has been raised to benefit the officers and families affected by the July 7 police shooting in downtown Dallas. The Foundation helped the Assist The Officer Foundation identify how to effectively distribute the funds entrusted to the two organizations. ((Andy Jacobsohn / Staff Photographer))

"Mary understood this community," Scovell said. "It was, 'What can we bring to the city?' Not just, 'How much do we have under management?' She wasn't sitting on the 20th floor somewhere, looking out."

Disclaimer

For Jalonick, the idea that someone would pay her to do what she was already doing just tickled her. And as she looked into the history of the foundation she was being asked to lead, she discovered an unusual fact: Her grandfather had been a member of the organization's original board.

"So, you know what?" she said. "I feel like it was meant to be."

Jalonick's role as foundation president requires linking donors with potential nonprofit causes, as well as understanding where funds can make the biggest or most important impact. Donors may have already given to their schools or churches, she said, but they want to do more and just don't know how.

She talks with them about what causes they care about, then introduces them to nonprofits that could use their support. Sometimes that support is what helps organizations stay afloat.

"The nonprofits are doing important work, but they can't do it without the donors," she said.

About a decade ago, foundation leaders decided to identify an issue to direct the foundation's unrestricted funds toward. A year's worth of study told them that educating the very youngest children was a cause for which they could be most effective.

Jalonick approached the Meadows Foundation, which was pursuing related projects, and offered to pool research and outreach efforts. That the pre-K

readiness initiative now involves 39 collaborating foundations illustrates a new theory in philanthropy called collective impact, she said.

"Basically, it's that you can do more together than you can do by yourself," she said. "When I started here, every foundation did its own thing. Now we're working together. No one institution can do it all. It's just not possible."

The pre-K efforts led to the formation of the Zero To Five funders' collaborative, which works with children in the Bachman Lake neighborhood. The project involves entire families and has spawned a community center.

That work in turn led to Early Matters Dallas, a coalition of business, civic, nonprofit and philanthropic organizations raising awareness of the importance of early education. Jalonick chaired the group's policy committee and received the organization's inaugural award for community involvement.



Mary Jalonick with Doug Curtis at the Aurora sponsor reception in October 2015 in the Dallas Arts District ((Carter Rose Photography))

In the process, Jalonick has become a passionate authority on the cause. It's what she plans to focus on after her work with the foundation is done.

"Those are such critical years for children," she said. "There's so much to be done."

Several years ago, when Bob Mong was editor of *The Dallas Morning News*, the newspaper successfully applied for a $250,000 Knight Foundation grant to launch a Hispanic community program focused on literacy and pre-kindergarten readiness.

"We'd set up a series of meetings with community leaders to get their thoughts on where we could do the most good," said Mong, who is now president of the University of North Texas at Dallas. "And the person who shaped my thinking more than anybody was Mary Jalonick. We really kind of followed her lead."

"She's realistic, but more of a glass-half-full personality," he added. "She believes things can get better through philanthropy."

Under her leadership, Mong said, the foundation has not only beefed up its financial strength, it has earned credibility through its process of vetting

nonprofits and measuring effectiveness.

"People like to know that their donations are making a difference," he said. "They don't want to just give money and hope for the best. She has brought more accountability to The Dallas Foundation."

Scovell echoed that sentiment, noting the "incredible amount of trust" that Jalonick has built into the institution.

"She's just a model citizen," Scovell said.

Jalonick said she has never dreaded going to work even once, because of the people she interacts with: donors and nonprofits wanting to help others.

"They're giving people," she said.

She's proudest of the foundation's role in contributing to causes including veterans' needs and the arts and, most recently, overseeing the funds that were donated to the families of police officers killed or wounded in a gunman's July 7 attack in downtown Dallas.

Jalonick will stay on until a successor is found, and Scovell said the strength of the team she has assembled at the foundation will carry the organization forward.

"It's set," he said. "There's still a bunch of offensive linemen there so they can block for a new quarterback. I'm excited for her. She ain't retiring. She's a special force in this community and always will be."

Jalonick said she'll stay long enough to make any necessary introductions and assist with the transition. And then she'll be ready to go.

"I feel like it's time," she said. "I've been doing this every day for 30 years. So there's some sadness, but there's also some excitement. I can now spend all of my time focused on one issue. When you make a big change like this, you start thinking about all that has happened at The Dallas Foundation. And I'm proud of it."

Marc Ramirez. Marc Ramirez is a Dallas-based lifestyles journalist and food and drink enthusiast who would rather think about what's for lunch than anything on

his to-do list.

typewriterninja@gmail.com /MarcRamirez.Journalist @typewriterninja

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARITABLE DAF HOLDCO, LTD. (In Official Liquidation),[1]<br><br>Debtor in a foreign proceeding. | Chapter 15<br><br>Case No. 25-11376 (BLS)<br><br>**Re: D.I. 21** |

**DECLARATION OF MARGOT MACINNIS IN SUPPORT OF MOTION OF PETITIONERS FOR ENTRY OF ORDER GRANTING PROVISIONAL RELIEF COMPELLING TURNOVER OF THE DEBTOR'S BOOKS AND RECORDS PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 542, 1519 AND 1521**

I, Margot MacInnis, pursuant to 28 U.S.C. § 1746, hereby declare (this "Supplemental Declaration") under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

**A. The Joint Official Liquidators and Original MacInnis Declaration**

1. My colleague, Sandipan Bhowmik, and I (the "Petitioners"),[2] both of Grant Thornton Specialist Services (Cayman) Limited ("Grant Thornton"), are the duly appointed Joint Official Liquidators (the "JOLs") of Charitable DAF HoldCo, Ltd. (in Official Liquidation) ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"),[3] before the Grand Court of the Cayman Islands (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025)(JAJ) (the "Supervision Order").

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 263805. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Motion.

[3] Entitled *In the matter of section 131 of the Companies Act (2025 Revision) and in the matter of Charitable DAF HoldCo Ltd.*, FSD 116 of 20256 (JAJ).

2. On July 21, 2025, by its undersigned United States counsel, Reed Smith LLP, the JOLs commenced the above-captioned chapter 15 case in respect of the Debtor (the "Chapter 15 Case") by filing the respective chapter 15 petition [D.I. 1] (the "Petition Form") and a *Verified Petition for (I) Recognition of the Foreign Main Proceeding, (II) Recognition of the Foreign Representatives, and (III) Certain Related Relief* [D.I. 2] (the "Verified Petition," and together with the Petition Form, the "Petitions") seeking recognition of (a) the Cayman Proceeding as a "foreign main proceeding", and (b) the JOLs as "foreign representatives" of HoldCo.

3. On July 21, 2025, the Debtor filed the *Declaration of Margot MacInnis in Support of Chapter 15 Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 4] (the "Original MacInnis Declaration"). This Supplemental Declaration incorporates the statements made in the Original MacInnis Declaration as if made herein.

4. I respectfully submit this Supplemental Declaration in support of the *Motion of Petitioners for Provisional Relief Compelling Turnover of the Debtor's Books and Records Pursuant to Bankruptcy Code Sections 105(A), 542, 1519 and 1521* (the "Motion") seeking immediate provisional relief, pending recognition by this Court of the Cayman Proceeding, in the form of discovery under sections 105(a), 542(e), 1519, and 1521 of title 11 of the Bankruptcy Code to require Carrington Coleman, Valuescope, Hunton, and Mancino, within seven (7) days of entry of the Proposed Order, to turn over all books and records in their possession belonging to, or otherwise arising in connection with their engagement by, HoldCo.

5. I am duly authorized to make this Supplemental Declaration on behalf of the JOLs. I am fully familiar with the facts of this matter. Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of

HoldCo's operations and financial condition, my review of relevant documents and my conversations with relevant personnel. I am over the age of 18 and, if called to testify, would testify competently about the facts set forth herein.

6. I make this Supplemental Declaration in my statutory capacity as an officer of the Cayman Court and request an extension of comity for the benefit of all of HoldCo's creditors and investors, whose interests I represent. For the reasons discussed below, I submit that provisional relief, pending recognition by this Court of the Cayman Proceeding, in the form of discovery under sections 105(a), 542(e), 1519, and 1521 of title 11 of the Bankruptcy Code to require the Turnover Targets, within seven (7) days of entry of the Proposed Order, to turn over all books and records in their possession belonging to, or otherwise arising in connection with their engagement by, HoldCo, is appropriate and warranted under the circumstances.

**B. Conduct of Cayman Proceeding and Cayman Litigation Since the Commencement of the Chapter 15 Case**

7. Since the Petition Date, the JOLs have progressed in discharging their duties under the Companies Act both in relation to HoldCo's assets and in investigating HoldCo's assets and affairs.

8. On July 31, 2025, the Cayman Court entered the Cayman Consent Order, in which it ordered by consent, among other things, that the Named Defendants in the Cayman Litigation and the CDM Entities shall abide by certain undertakings intended to prevent asset dissipation and provide transparency and disclosure to the JOLs pending the Cayman Court's determination of the Injunction Summons.

9. On August 5, 2025, the JOLs filed the *Certification of Counsel Regarding Agreed Order Granting Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* [D.I. 18] (the "Certification of Counsel"), seeking approval of a stipulation (the "Stipulation")

among the JOLs, the Applicable Named Defendants, and the CDM Entities that, among other things: (a) recognizes and enforces the Cayman Consent Order, and (b) adjourns the hearing to recognize the Cayman Proceeding under chapter 15 of the Bankruptcy Code (the "Recognition Hearing") from its originally scheduled date of August 14, 2025 (the "Original Recognition Hearing Date"), *sine die*, pending the scheduling of the hearing on the Injunction Summons by the Cayman Court.

10. On August 6, 2025, this Court entered the U.S. Court Order approving the Stipulation [D.I. 19]. The entry of the Cayman Consent Order and the U.S. Court Order recognizing and enforcing the Stipulation significantly furthers the JOLs' goal of preventing the dissipation of assets subject to HoldCo's potential proprietary and other claims pending the resolution of the Cayman Litigation.

11. On August 19, 2025, DFW issued a summons seeking the removal of the Petitioners as Joint Official Liquidators of HoldCo and made various allegations regarding the Petitioners' purported lack of independence and other matters related to their handling of the liquidation. The JOLs are reviewing the summons and will respond in due course in the Cayman Proceeding.

**C. JOLs' Investigations into HoldCo's Assets and Affairs**

12. Consistent with the purpose of official liquidation under Part V of the Companies Act, the JOLs are empowered to investigate: (a) the causes for the failure of HoldCo, as necessary; and (b) generally, the promotion, business, dealings and financial affairs of HoldCo. *See* Companies Act, § 110(2).

13. To identify, secure, and recover HoldCo's books and records, the JOLs have: (a) issued formal correspondence to over 50 parties, including directors, shareholders, banks, service providers, various third parties, and the prior appointed joint voluntary liquidators,

notifying them of the JOLs' appointment and requesting books and records; and (b) held discussions with various parties to discuss the history and financial affairs of HoldCo.

14. Furthermore, since the date of their appointment, the JOLs have been conducting an extensive and detailed ongoing investigation into HoldCo's affairs. This investigation has involved a review of HoldCo's books and records (to the extent that they have been able to obtain them and to the extent that they are complete) and numerous inquiries and requests for information directed to persons previously involved with HoldCo.

15. While the vast majority of parties that the JOLs have contacted have cooperated with the JOLs, certain US-based service providers have asserted that they do not recognize the JOLs' authority under the Supervision Order and have refused to provide copies of the requested information absent an order from this Court. In particular, Carrington Coleman,[4] who provided advice in respect to HoldCo's affairs, Valuescope,[5] HoldCo's historic financial advisor and valuation services provider, and Hunton,[6] who provided HoldCo tax law advice, have declined to voluntarily turn over to the JOLs HoldCo's books and records in their possession despite numerous requests by HoldCo and its counsel requesting the same. Additionally, Mancino,[7] one of HoldCo's tax consultants, previously indicated a willingness to cooperate with the JOLs' turnover requests but has yet to comply.

---

[4] Ex. 1, May 7 Carrington Coleman Letter; Ex. 2, May 22 Carrington Coleman Letter; Ex. 3, May 28 Carrington Coleman Email; Ex. 4, June 2 Carrington Coleman Letter; Ex. 5, June 25 Carrington Coleman Letter; Ex. 6, July 9 Carrington Coleman Letter; Ex. 7, July 30 Carrington Coleman Letter; Ex. 8, August 6 Carrington Coleman Letter.

[5] Ex. 9, May 7 Valuescope Letter; Ex. 10, May 15 Valuescope Letter; Ex. 11, May 30 Valuescope Letter; Ex. 12, June 2 Valuescope Letter; Ex. 13, June 25 Valuescope Letter; Ex. 14, July 30 Valuescope Letter.

[6] Ex. 20, May 8 Hunton Letter; Ex. 21, August 6 Hunton Letter; Ex. 22, August 8 Hunton Email; Ex. 23, August 20 Hunton Letter.

[7] Ex. 15, May 6 Seyfarth Shaw Letter; Ex. 16, May 6 Seyfarth Shaw Email; Ex. 17, May 12 Grant Thornton Email; Ex. 18, May 13 Seyfarth Shaw/Grant Thornton Email Chain; Ex. 19, August 13 Seyfarth Shaw Letter.

(i) **Carrington Coleman**

16. On May 7, 2025, the JOLs made their first request to Carrington Coleman to produce a copy of their complete file relating to the engagement by HoldCo, including, without limitation, copies of engagement letters with HoldCo, invoices, statements of account, details of any retainer, trust accounts or other funds held on behalf of HoldCo, the AML or KYC files Carrington Coleman possesses with respect to HoldCo and its directors, and any books and records held on behalf of HoldCo.[8]

17. Carrington Coleman responded that "it is unlikely [it] would have many, if any, documents to provide"[9] in response to the JOLs' requests for HoldCo's books and records,[10] despite its prior work for HoldCo.[11] Upon further investigation, Carrington Coleman admitted it is in possession of documents related to a memo prepared by Carrington Coleman regarding U.S. tax issues as they relate to HoldCo and its related affiliates.[12]

18. Despite numerous requests from HoldCo and its counsel,[13] Carrington Coleman has declined to voluntarily turn over books and records in its possession belonging to, or otherwise arising in connection with their engagement by, HoldCo. Carrington Coleman's position is that it is only required to respond and only will respond to the JOLs' requests if and when the JOLs' authority is recognized by the U.S. Bankruptcy Court in Delaware in the Chapter 15 Case.

---

[8] Ex. 1, May 7 Carrington Coleman Letter.

[9] Ex. 2, May 22 Carrington Coleman Letter; Ex. 3, May 28 Carrington Coleman Email; Ex. 6, July 9 Carrington Coleman Letter.

[10] Ex. 1, May 7 Carrington Coleman Letter; Ex. 4, June 2 Carrington Coleman Letter; Ex. 5, June 25 Carrington Coleman Letter; Ex. 7, July 30 Carrington Coleman Letter.

[11] Ex. 3, May 28 Carrington Coleman Email.

[12] Ex. 3, May 28 Carrington Coleman Email.

[13] Ex. 1, May 7 Carrington Coleman Letter; Ex. 4, June 2 Carrington Coleman Letter; Ex. 5, June 25 Carrington Coleman Letter; Ex. 7, July 30 Carrington Coleman Letter.

**(ii) <u>Valuescope</u>**

19. On May 7, 2025, and May 15, 2025, the JOLs made their initial requests to Valuescope to produce all of HoldCo's files in their possession, including, without limitation, all engagement letters with HoldCo, any books and records held by Valuescope on behalf of HoldCo, all instructions, work papers and documents reviewed by, provided to or prepared by Valuescope in connection with the valuation analyses it conducted for HoldCo as of December 31, 2020 and onwards concerning 100 Participating Shares in HoldCo and/or HoldCo's 100% membership interest in CDM.[14]

20. Valuescope acknowledges that it possesses records relating to its prior valuation work for HoldCo.[15]

21. However, despite numerous requests by HoldCo and its counsel,[16] Valuescope has declined to voluntarily turn over books and records in its possession belonging to, or otherwise arising in connection with its engagement by, HoldCo. Valuescope's refusal rests on its assertion that, absent recognition of the Cayman Court's appointment of the JOLs by a U.S. bankruptcy court or other U.S. legal authority, Valuescope has no obligation to turn over the requested records.[17]

**(iii) <u>Hunton</u>**

22. On May 8, 2025, the JOLs made their first request to Hunton to produce a copy of their complete file relating to the engagement by HoldCo, including, without limitation, copies of engagement letters with HoldCo, invoices, statements of account, details of any retainer, trust

---

[14] Ex. 9, May 7 Valuescope Letter; Ex. 10, May 15 Valuescope Letter.

[15] Ex. 11, May 30 Valuescope Letter.

[16] Ex. 9, May 7 Valuescope Letter; Ex. 10, May 15 Valuescope Letter; Ex. 12, June 2 Valuescope Letter; Ex. 13, June 25 Valuescope Letter; Ex. 14, July 30 Valuescope Letter.

[17] Ex. 11, May 30 Valuescope Letter.

accounts or other funds held on behalf of HoldCo, the AML or KYC files Hunton possesses with respect to HoldCo and its directors, and any books and records held on behalf of HoldCo.[18]

23. Hunton acknowledges that HoldCo is a former client and that it possesses documents on its representation of HoldCo.[19] Additionally, Hunton responded that it "has not held, and does not hold, trust funds of HoldCo, there are no outstanding debts HoldCo owes Hunton, and thus [it has] no document with a statement of a HoldCo account that is due, and Hunton holds no retainer funds of HoldCo."[20]

24. Despite numerous requests from HoldCo and its counsel,[21] Hunton has declined to voluntarily turn over books and records in its possession belonging to, or otherwise arising in connection with their engagement by, HoldCo. Hunton's position is that it is only required to respond and only will respond to the JOLs' requests if and when the JOLs' authority is validated in the Chapter 15 Case as the parties with the rights to assert HoldCo's privileges and rights to receive HoldCo's legal file held by Hunton.[22]

**(iv) <u>Douglas Mancino of Seyfarth Shaw LLP</u>**

25. On May 6, 2025, the JOLs made their first request to Mancino to produce a copy of his complete file relating to the engagement by HoldCo, including, without limitation, copies of engagement letters with HoldCo, invoices, statements of account, details of any retainer, trust accounts or other funds held on behalf of HoldCo, the AML or KYC files Mancino possesses with respect to HoldCo and its directors, and any books and records held on behalf of HoldCo.[23]

---

[18] Ex. 20, May 8 Hunton Letter.

[19] Ex. 23, August 20 Hunton Letter.

[20] *Id.*

[21] Ex. 20, May 8 Hunton Letter; Ex. 21, August 6 Hunton Letter.

[22] Ex. 23, August 20 Hunton Letter.

[23] Ex. 15, May 6 Seyfarth Shaw Letter.

26. Mancino acknowledges that he possesses the requested documents.[24]

27. Initially, Mancino had indicated a willingness to cooperate with the JOLs, including during a May 12, 2025 meeting with the JOLs, as well as in subsequent correspondence, and was seemingly prepared for document production.[25] Yet, without explanation, to date Mancino has failed to produce HoldCo's books and records.

28. I believe, based on correspondence received from Carrington Coleman, that Carrington Coleman maintains at least certain books and records belonging to HoldCo that are relevant to the JOLs in our investigation of the facts and circumstances surrounding the Relevant Transactions, pursuant to which HoldCo's primary and most valuable asset was transferred to DFW. Likewise, I believe that HoldCo's books and records held by Valuescope go directly to valuation issues that are critical to these transactions and the JOLs' investigation of the same. Finally, I believe that as HoldCo's tax advisor, the books and records held by Mancino and Hunton may be central to the investigation of the Relevant Transactions.

29. In particular, Carrington Coleman, Valuescope, Hunton, and Mancino may have possession, custody, or control of books and records belonging to, or otherwise arising in connection with their engagement by, HoldCo, including files regarding the facts, circumstances and alleged justifications for: (1) the Directors to execute the Relevant Transactions, which ultimately divested HoldCo of its interest in the Fund; and (2) the Remuneration Transactions, which dramatically increased the Directors' compensation.

[24] Ex. 17, May 12 Grant Thornton Email; Ex. 18, May 13 Seyfarth Shaw/Grant Thornton Email Chain.

[25] Ex. 15, May 6 Seyfarth Shaw Letter; Ex. 16, May 6 Seyfarth Shaw Email; Ex. 17, May 12 Grant Thornton Email; Ex. 18, May 13 Seyfarth Shaw/Grant Thornton Email Chain; Ex. 19, August 13 Seyfarth Shaw Letter.

## D. Need for Discovery from the Turnover Targets

30. On the Petition Date and in my capacity as one of the JOLs of the Debtor, I, alongside Mr. Bhowmik, filed the Petitions, thereby commencing the Debtor's Chapter 15 Case.

31. I was authorized pursuant to the Supervision Order to act as one of the JOLs of the Cayman Proceeding and to seek recognition and approval of the Cayman Proceeding as necessary, including the power to seek recognition of the JOLs and the Cayman Proceeding for the purpose connected with the exercise of the JOLs' power to commence legal proceedings in the name and on behalf of HoldCo to obtain the provision of information and/or documents in the United States.

32. I am aware that this Court can afford the JOLs broad discovery rights pursuant to sections 105(a), 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code.

33. I am of the belief that the JOLs must be afforded discovery rights in the United States with respect to the Turnover Targets to facilitate their investigations. Affording the JOLs the ability to compel the Turnover Targets to return files belonging to the Debtor expeditiously is imperative to enable the JOLs to: (a) progress their investigation of the Debtor's assets and affairs, and, in particular, their examination into the Relevant Transactions and the Remuneration Transactions, in a timely manner for the benefit of all stakeholders, (b) avoid incurring burdensome costs by needlessly extending the duration of the JOLs' investigations, and (c) align incentives with respect to all potential discovery targets to promote cooperation with the JOLs in their efforts to discharge their statutory duties in lieu of encouraging such parties to obstruct and delay.

34. I submit that granting the Provisional Relief would result in the JOLs obtaining return of HoldCo's books and records from the Turnover Targets on timing that is broadly consistent with the JOLs' expectations based on the scheduling of the Original Recognition Hearing Date. Moreover, I submit that granting the Provisional Relief is particularly necessary

because, based on scheduling constraints in the Cayman Proceeding, the JOLs now expect that the Injunction Summons will be heard some time in November or December 2025, which is many weeks later than the JOLs originally anticipated, thereby significantly lengthening the "gap" period between the Petition Date in this Chapter 15 Case and the date when the Recognition Hearing will be scheduled.

35. I understand that in the Third Circuit, the general standards for the Provisional Relief requested in the Motion require a showing of: (1) a substantial likelihood of obtaining recognition of the Cayman Proceeding; (2) the likelihood of irreparable injury if the Provisional Relief is not granted; (3) the hardships in granting the Provisional Relief balance in favor of the JOLs; and (4) the Provisional Relief will serve the public interest.

36. I submit that there is no reason why this Court should not recognize the Cayman Proceeding on the Adjourned Recognition Hearing Date. As set forth in the Verified Petition, the Cayman Proceeding is clearly a "foreign proceeding" under chapter 15, and the Debtor's center of main interests is in the Cayman Islands. *See* Verified Petition, ¶¶ 132-144. The Petitioners satisfy the requirements of a "foreign representative" under Bankruptcy Code section 101(24). Id. ¶¶ 148-149. There can be no serious question that the Petitioners are entitled to and will succeed in obtaining relief under sections 1517 and 1520 of the Bankruptcy Code on the Adjourned Recognition Hearing Date and would have obtained such relief by the Original Recognition Hearing Date absent the Stipulation. Accordingly, the Petitioners will successfully demonstrate that the Cayman Proceeding constitutes a "foreign main proceeding" entitled to chapter 15 recognition.

37. I also submit that the Petitioners need the Provisional Relief to avert irreparable harm. Not being able to seek turnover of the Debtor's own books and records to uncover the facts

and circumstances surrounding the Relevant Transactions—which divested the charitable organizations for whose benefit the Debtor was formed of their most valuable and primary asset—and the Remuneration Transactions until after the Adjourned Recognition Hearing Date will cause irreparable injury by delaying the Petitioners from progressing their investigation in accordance with their duties as officers of the Cayman Court for potentially several months. This delay burdens the Debtor's estate with unnecessary costs to the detriment of all of its stakeholders.

38. I also submit that granting the Provisional Relief will not result in significant hardships to the Turnover Targets, while their delay in turning over the Debtor's own books and records will substantially hinder the Debtor's stakeholders by delaying the JOLs' investigation and burdening the estate with unnecessary costs. The relief requested by the Motion will benefit the Debtor and its stakeholders by ensuring an equitable and orderly implementation of the Cayman Proceeding. The requested Provisional Relief provides the JOLs with the ability to expeditiously carry out their investigatory duties, reducing estate costs and preventing unnecessary delays.

39. The Provisional Relief will not meaningfully harm the Turnover Targets, and any potential harm is far outweighed by the benefit to HoldCo's estate. The Turnover Targets would eventually be subject to turnover requests in the context of this Chapter 15 Case regardless of the Motion. Moreover, there is no credible basis to claim that granting Provisional Relief would cause any hardship, let alone significant hardship. Carrington Coleman, for example, has repeatedly stated that "it is unlikely [it] would have many, if any, documents to provide."[26]

40. I also submit that granting the Provisional Relief will serve the public interest because the Supervision Order provides for the JOLs' ability to investigate HoldCo's affairs,

---

[26] Ex. 2, May 22 Carrington Coleman Letter; Ex. 3, May 28 Carrington Coleman Email; Ex. 6, July 9 Carrington Coleman Letter.

which should be respected and enforced in the United States. The Provisional Relief is also in the public interest because it will facilitate the Debtor's efforts to pursue and complete a successful liquidation for the benefit of the Debtor's stakeholders by providing efficient discovery tools. Additionally, the Provisional Relief conforms with the public interest because it facilitates the Debtor's cross-border liquidation for the benefit of all of its creditors. In particular, the Provisional Relief aligns incentives with respect to all of the JOLs' potential discovery targets to promote cooperation with the JOLs in discharging their duties under the Companies Act rather than obstruction.

41. For all of these reasons, I respectfully request that this Court (i) grant the Motion in its entirety, (ii) enter the Proposed Order, substantially in the form attached to the Motion as Exhibit A, granting immediate provisional relief, pending recognition by this Court of the Cayman Proceeding, in the form of discovery under sections 105(a), 542(e), 1519, and 1521 of the Bankruptcy Code to require the Turnover Targets within seven (7) days of entry of the Proposed Order, to turn over all books and records in their possession belonging to, or otherwise arising in connection with their engagement by HoldCo, and (iii) grant such other relief as the Court deems appropriate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 27, 2025
Cayman Islands

*/s/ Margot MacInnis*
MARGOT MACINNIS

*Joint Official Liquidator of*
*Charitable DAF HoldCo, Ltd*
*(in Official Liquidation)*

# EXHIBIT 1

Commercial in Confidence

Grant Thornton

Our Ref: 20250507 – Charitable DAF HoldCo, Ltd

**Grant Thornton Specialist Services (Cayman) Limited**
2nd floor Century Yard,
Cricket Square,
PO Box 1044,
Grand Cayman, KY1-1102
Cayman Islands

T +1 (345) 949 8588
F +1 (345) 949 7120

Carrington Coleman LLP
FAO Mr. Shaw
901 Main Street
Suite 5500
Dallas
Texas 75202

Via email: bshaw@ccsb.com

7 May 2025

Dear Mr. Shaw,

**Re: Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Company")**
**FSD Cause No: 2025-116 (JAJ)**
**Reg. No: 263805**

**Notice of Liquidation and Appointment of Official Liquidators**

As you might be aware, the Company was placed in voluntary liquidation on 2 April 2025, with Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd appointed as Joint Voluntary Liquidators ("**JVLs**") of the Company.

Please be advised that pursuant to an application made by (1) The Highland Dallas Foundation, Inc, (2) The Highland Kansas City Foundation, Inc, (3) The Highland Santa Barbara Foundation, Inc, (4) The HCMLP Charitable Fund, in their capacity as participating shareholders of the Company, it was ordered on 6 May 2025, that the voluntary liquidation of the Company be continued under supervision of the Grand Court of the Cayman Islands (the "**Court**") and that Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton Specialist Services (Cayman) Limited, be appointed as Joint Official Liquidators ("**JOLs**") of the Company. A copy of the order confirming their appointment is attached for your records.

We understand that your firm was engaged to act on behalf of the Company. As a result of our appointment, you are no longer to act on instructions from the directors or former JVLs of the Company, unless explicit authorisation to do so is supplied by us, or any other party previously authorised to give instructions and should only take instructions from the JOLs on matters pertaining to the Company. Please also be advised that pursuant to the Order no suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Company in accordance with section 97 of the Companies Act (As Revised) except with the leave of the Court and subject to such terms as the Court may impose.

**Delivery of Books & Records**

Pursuant to Order 26, Rule 3 (1) of the Companies Winding-up rules (As Amended) ("**CWRs**"), the JOLs are required to take possession or control of all the Company's books and records, including those maintained in electronic format. As such, we request that you supply the JOLs with a copy of your complete file relating to the engagement by the Company, both prior to and after the appointment of JVLs.

Chartered Accountants. Grant Thornton Specialist Services (Cayman) Limited is a member firm of Grant Thornton International Ltd (GTIL) and a subsidiary of Grant Thornton UK LLP. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. Please see grantthornton.ky for further details. Subject to local regulations.

We ask that this file includes but is not limited to the following documentation:

1. A copy of your engagement letter dated 22 March 2024;
2. All invoices from engagement to present;
3. Details of any outstanding debts owed by the Company to you;
4. Statement of account and evidence of the associated remittance;
5. Historical statements of trust account(s) held on behalf of the Company;
6. Summary of any books and records held on behalf of the Company;
7. The details of any retainer or funds held on behalf of the Company;
8. Details of any Company bank accounts that you are aware of. If your firm has any information identifying the bank accounts or clearing banks used by the Company, we ask that you look at the records of the payments your firm received from the Company to see if you have records that can assist us in this regard;
9. Summary of the matters that you were engaged to assist the Company with; and
10. The AML and KYC files you have on the Company and the Company Directors.

Please arrange for the above as well as any books and records held by you on behalf of the Company to be immediately delivered up to the JOLs. Should you be aware of any property of the Company that is currently not in your possession, please let us know of their whereabouts as a matter of urgency.

**Proof of Debt**

If you believe you are a creditor of the Company, please provide full details of any amounts owed to you by completing the attached proof of debt form which should be returned to our office with any supporting documentation within 21 days of the date of this letter.

If you have any questions or concerns, please contact us via e-mail at cdaf.core@uk.gt.com.

Yours sincerely,
For and on behalf of Charitable DAF HoldCo Ltd (in Official Liquidation)

Sandipan Bhowmik
**Joint Official Liquidator**
As agent and without personal liability

Encl.
- Supervision Order – 2025-116 (JAJ)
- Proof of Debt – CWR 24

# EXHIBIT 2

CARRINGTON COLEMAN

Kelli Hinson
Partner
214.855.3110
khinson@ccsb.com

May 22, 2025

***Via Email***
Jamie Gallagher jamie.r.gallagher@uk.gt.com
Michael Aquino michael.aquino@uk.gt.com
Sandipan Bhowmik cdaf.core@uk.gt.com
Grant Thornton
2nd Floor, Century Yard, Cricket Square
P.O. Box 10144
Grand Cayman, Cayman islands KY 1-1102

Re: Charitable DAF HoldCo, Ltd.

Dear Sirs:

I am the General Counsel of Carrington Coleman Sloman & Blumenthal, LLP, and I am responding to your letter dated May 7, 2025 to my law partner, Brian Shaw. Please direct any future communications regarding this matter to me.

We are, of course, willing to comply with our ethical duties to provide client files upon an appropriate request. However, we must do so in a way that comports with our other legal obligations. I understand your position that the Joint Official Liquidators ("JOLs") have been appointed as such by the Grand Court of the Cayman Islands and that you make your request in that capacity. It is my understanding, however, that such appointment by a foreign court is not recognized under United States law unless or until the order is recognized by a United States Bankruptcy Court pursuant to 11 U.S. Code Chapter 15. If you have obtained such recognition, please let me know. Otherwise, we cannot comply with your request to release confidential and privileged client files.

In addition, I understand you purport to represent and seek documents concerning only Charitable DAF HoldCo, Ltd. (the "Company"). We have not represented the Company in any lawsuits, arbitrations, or other proceedings, and I am unaware of any legal advice we have provided specifically to the Company. We have not sent invoices to or, to our knowledge, received payment from the Company. Accordingly, even if the JOLs had authority to request this information, it is unlikely we would have many, if any, documents to provide.

Sincerely,



Kelli M. Hinson

# EXHIBIT 3

**From:** Kelli M. Hinson <khinson@CCSB.com>
**Sent:** Wednesday, May 28, 2025 3:19 PM
**To:** Jamie R Gallagher; Michael Aquino; CDAF Core
**Cc:** Brian P. Shaw
**Subject:** Follow up to Carrington Coleman response to letter from JOLs

**Email from EXTERNAL source - Please exercise caution and validate email before accessing links or files**

I write to follow up on my letter dated May 22, 2025. In that letter, I stated that I was unaware of any legal advice CCSB had provided specifically to Charitable DAF HoldCo, Ltd. (the "Company"). Since sending the letter, it has come to my attention that one of our lawyers, David Corkern, prepared a memo regarding U.S. tax issues as they related to the Company and its related affiliates. Accordingly, there may be a small number of documents related to that project that the Company may be entitled to. That being said, we still have the same reservations concerning the JOLs' authority to speak for the Company in the United States prior to complying with Chapter 15 of the U.S. Bankruptcy Code.

**Kelli M. Hinson**
*Partner*

CARRINGTON COLEMAN

O 214.855.3110 / M 214.289.9982
khinson@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

**From:** Kelli M. Hinson <khinson@CCSB.com>
**Sent:** Thursday, May 22, 2025 4:37 PM
**To:** jamie.r.gallagher@uk.gt.com; michael.aquino@uk.gt.com; cdaf.core@uk.gt.com
**Cc:** Brian P. Shaw <bshaw@CCSB.com>
**Subject:** Carrington Coleman response to letter from JOLs

Please see the attached correspondence in response to the May 7, 2025 letter from the Charitable DAF HoldCo Ltd. JOLs.

**Kelli M. Hinson**
*Partner*

CARRINGTON COLEMAN

O 214.855.3110 /
khinson@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust, for the sole

purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone at 214-855-3000, and delete the message from your system. Carrington, Coleman, Sloman & Blumenthal, L.L.P. www.carringtoncoleman.com

# EXHIBIT 4

ReedSmith
Driving progress
through partnership

Casey D. Laffey
Direct Phone: +1 212 549 0389
Email: claffey@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

June 2, 2025

**Via Email (khinson@ccsb.com)**

Kelli Hinson
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas 75202

**Re: Charitable DAF HoldCo, Ltd. (In Official Liquidation)**
**FSD No. 2025-116 (JAJ)**
**Reg. No. 263805**

Dear Ms. Hinson:

We represent Sandipan Bhowmik and Margot MacInnis of Grant Thornton Specialist Services (Cayman) Limited in their capacity as joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd. (In Official Liquidation) ("**Company**"). We write in response to your letter, dated May 23, 2025, which responded to the JOLs' letter, dated May 7, 2025, requesting the Company's complete file.

Although Carrington Coleman insists that it is "willing to comply with" the JOLs' request for the Company's file, the May 23, 2025 letter and delay suggests otherwise. The letter states that Carrington Coleman is unwilling to comply with the JOLs' reasonable requests because the JOLs' appointment has not yet been recognized under Chapter 15 of the Bankruptcy Code. However, Chapter 15 recognition is irrelevant for Carrington Coleman to comply with the JOLs' request.

The JOLs have been duly appointed by the Grand Court of the Cayman Islands and are requesting that Carrington Coleman provide them with the Company's files pursuant to the JOLs' statutory and court mandated powers. There is nothing about the JOLs' appointment or their status in the United States precluding Carrington Coleman's cooperation with the JOLs' reasonable requests, and Carrington Coleman's argument to the contrary is wrong.

The JOLs therefore renew their request that Carrington Coleman **immediately** provide them with Company's files. Should Carrington Coleman decline to cooperate, the JOLs will have no choice but to assume that Carrington Coleman intends to obstruct the JOLs' duties and the JOLs will pursue all appropriate legal remedies to compel production of the requested documents, including seeking legal fees and costs for Carrington Coleman's stonewalling. The JOLs sincerely hope and expect, however, that those measures will not be necessary.

Kelli Hinson
June 2, 2025
Page 2

ReedSmith

Sincerely,

Casey D. Laffey

cc: Aaron Javian (ajavian@reedsmith.com)

# EXHIBIT 5

ReedSmith
Driving progress
through partnership

Casey D. Laffey
Direct Phone: +1 212 549 0389
Email: claffey@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

June 25, 2025

**By Electronic Mail**

Kelli Hinson
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas 75202
khinson@ccsb.com

**Re**: **Charitable DAF HoldCo, Ltd. (In Official Liquidation)**
**FSD No. 2025-116 (JAJ)**
**Reg. No. 263805**

Dear Ms. Hinson:

We represent Sandipan Bhowmik and Margot MacInnis of Grant Thornton Specialist Services (Cayman) Limited in their capacity as joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd. (In Official Liquidation) ("**Company**"). We write in furtherance of the JOLs' letter to Carrington Coleman dated June 2, 2025, wherein the JOLs "renew[ed] their request that Carrington Coleman **immediately** provide them with Company's files."

We have yet to receive a response to our June 2, 2025 letter. Please respond immediately, as we hope and expect to resolve this matter amicably. As we stated in our letter, should "Carrington Coleman decline to cooperate, the JOLs will have no choice but to assume that Carrington Coleman intends to obstruct the JOLs' duties and the JOLs will pursue all appropriate legal remedies to compel production of the requested documents, including seeking legal fees and costs for Carrington Coleman's stonewalling." Again, the JOLs sincerely hope and expect that those measures will not be necessary.

Very truly yours,

Casey D. Laffey

# EXHIBIT 6

CARRINGTON COLEMAN

Kelli Hinson
Partner

214.855.3110
khinson@ccsb.com

July 9, 2025

***Via Email*** ***claffey@reedsmith.com***
Casey Laffey
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650

Re: Charitable DAF HoldCo, Ltd.

Dear Casey:

I am responding to your letter dated June 25, 2025 on behalf of the "joint official liquidators" or "JOLs" of Charitable DAF HoldCo, Ltd. Although you accuse Carrington Coleman of "stonewalling" and "obstruct[ing] the JOLs' duties," you have failed to meaningfully respond to the concerns stated in my letter dated May 23, 2025 other than to say they are "irrelevant" and "wrong." If you have authority supporting your assertion that the appointment of JOLs by a court in the Cayman Islands is appropriately recognized in the United States in the absence of a Chapter 15 proceeding, please provide that to me and I'm happy to take a look at it. *See, contra, Rsrv. Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd.*, No. 09 CIV. 9021 (PGG), 2010 WL 1779282, at *5 (S.D.N.Y. Apr. 29, 2010) ("If this Court were to allow the Liquidators to take the place of the Fund Board, such an action would constitute a tacit recognition that the BVI liquidation proceeding is valid and, as a result, the Liquidators are in control of the Fund. This is precisely the kind of determination that must be made in a Chapter 15 proceeding.").

I also reiterate my earlier point that, even if the JOLs had authority to request this information, it is unlikely we would have many, if any, documents to provide.

Sincerely,

Kelli M. Hinson

# EXHIBIT 7

ReedSmith
Driving progress through partnership

**Casey D. Laffey**
Direct Phone: +1 212 549 0389
Email: claffey@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

July 30, 2025

**Via Email**

Kelli Hinson
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas 75202
khinson@ccsb.com

**Re: Charitable DAF HoldCo, Ltd. (In Official Liquidation)**
**FSD No. 2025-116 (JAJ)**
**Reg. No. 263805**

Dear Ms. Hinson:

We represent Sandipan Bhowmik and Margot MacInnis of Grant Thornton Specialist Services (Cayman) Limited in their capacity as joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd. (In Official Liquidation) ("**Company**"). We write in furtherance of the JOLs' letter to Carrington Coleman dated June 25, 2025, wherein the JOLs "renew[ed] their request that Carrington Coleman **immediately** provide them with the Company's files," and in response to your July 9, 2025 letter to the JOLs declining that request.

In its July 9, 2025 letter, Carrington Coleman demanded that the JOLs adequately demonstrate their authority to demand and obtain the Company's records. But the JOLs already have provided the necessary proof. Indeed, Carrington Coleman does not dispute that the Company exists under the laws of the Cayman Islands, and that the Grand Court of the Cayman Islands has ordered that the JOLs stand in the shoes of the Company. Carrington Coleman lacks standing and authority to question the propriety of that order (the "**Liquidation Order**"), especially given that the order is final and unchallenged.

Carrington Coleman argues that Chapter 15 recognition is a precondition of the firm's obligation to produce the requested records. That is wrong for at least two reasons:

***First***, as stated in *Rsrv. Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd.*, No. 09 CIV. 9021 (PGG), 2010 WL 1779282, at *5 (S.D.N.Y. Apr. 29, 2010), the case cited in Carrington Coleman's July 9, 2025 letter, Chapter 15 recognition is a gatekeeper to U.S. *judicial* intervention on grounds of comity. "[R]ecognition is required before a foreign representative may avail themselves ***of the federal courts***." *Id.* at *14 (emphasis added). Carrington Coleman is not a federal court, and the firm is not authorized to dispense judicial remedies.

***Second***, judicial intervention is not required to trigger Carrington Coleman's duty to produce the requested records. Rather, as you are aware, Carrington Coleman and its attorneys are subject to the Texas Disciplinary Rules of Professional Conduct, pursuant to which "the documents, papers and other

ReedSmith

information received from a client or received or generated in the course of representing the client (including the lawyer's notes and work product) ***are the property of the client and must be transferred to a former client on request***." Tex. Comm. On Professional Ethics, Op. 657 (2016) (emphasis added). That duty inures immediately and by default to all Carrington Coleman's former clients—whether foreign or domestic—including the Company.

Thus, neither the Company nor the JOLs must, as you suggest, obtain U.S. judicial approval, intervention, or compulsion to obtain the Company's own records pursuant to the Texas Disciplinary Rules of Professional Conduct. Rather, Carrington Coleman must produce the records or justify its failure to do so.

Regardless, on July 21, 2025, the Company filed a Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code (the "Verified Petition"). *In re: Charitable DAF HoldCo, Ltd. (In official Liquidation)*, Case No. 25-11376 (D. Del.). In it, the JOLs formally petitioned the United States Bankruptcy Court for the District of Delaware court to recognize the Cayman liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code. If necessary, the JOLs are prepared to use powers afforded by the Bankruptcy Court to compel Carrington Coleman to return to the Company its own records. For all the reasons stated herein, including pursuant to the JOLs powers under the undisputed Liquidation Order and as required pursuant to the Texas Disciplinary Rules of Professional Conduct, however, it should not have to come to that.

Accordingly, the JOLs demand, for the final time, that Carrington Coleman immediately produce the Company's requested records. Carrington Coleman's failure to comply will result in legal action, including a request for sanctions for Carrington Coleman's noncooperation.

Very truly yours,

/s/ Casey D. Laffey

# EXHIBIT 8

CARRINGTON COLEMAN

Kelli Hinson
Partner

214.855.3110
khinson@ccsb.com

August 6, 2025

***Via Email** claffey@reedsmith.com*
Casey Laffey
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650

Re: Charitable DAF HoldCo, Ltd.

Dear Casey:

I am responding to your letter dated July 30, 2025 on behalf of the "joint official liquidators" or "JOLs" of Charitable DAF HoldCo, Ltd. I respectfully disagree with your conclusion that Carrington Coleman must recognize the authority of the JOLs absent such recognition by a United States court.

It is not our position that we do not have to honor requests from foreign former clients. Our position is that the alleged authority of the JOLs to speak for any such client has not been recognized in the United States. Although I readily concede that Carrington Coleman "is not a federal court," and I have not suggested otherwise, the point of the *Rsrv. Int'l Liquidity Fund* case is that the question of whether Liquidators appointed by a foreign court are actually in control of a foreign entity is a question that must be made in a Chapter 15 proceeding. Despite two requests, you have failed to provide any authority to support your assertion otherwise.

In any event, I understand that you have now instituted a Chapter 15 proceeding in the United States, so it seems this issue should be resolved in due course. If and when the authority of the JOLs is recognized by the Court in Delaware, the firm will respond to your request.

Sincerely,

Kelli M. Hinson

# EXHIBIT 9

Commercial in Confidence

Grant Thornton

Our Ref: 20250507 – Charitable DAF HoldCo, Ltd

**Grant Thornton Specialist Services (Cayman) Limited**
2nd floor Century Yard,
Cricket Square,
PO Box 1044,
Grand Cayman, KY1-1102
Cayman Islands

T +1 (345) 949 8588
F +1 (345) 949 7120

Valuescope Inc.
950 E. State Highway 114
Suite 120
Southlake
TX 76092
USA

Via email to: info@valuescopeinc.com & shastings@valuescopeinc.com

7 May 2025

Dear Sirs,

**Re: Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Company")**
**FSD Cause No: 2025-116 (JAJ)**
**Reg. No: 263805**

**Notice of Liquidation and Appointment of Official Liquidators**

We write to advise that the Company was placed in voluntary liquidation on 2 April 2025, with Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd appointed as Joint Voluntary Liquidators of the Company.

We also write to advise that pursuant to an application made by (1) The Highland Dallas Foundation, Inc, (2) The Highland Kansas City Foundation, Inc, (3) The Highland Santa Barbara Foundation, Inc, (4) The HCMLP Charitable Fund (together the "**Petitioners**"), in their capacity as participating shareholders of the Company, it was ordered on 6 May 2025, that the voluntary liquidation of the Company be continued under supervision of the Grand Court of the Cayman Islands (the "**Court**") and that Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton Specialist Services (Cayman) Limited ("**GTSS**"), be appointed as Joint Official Liquidators ("**JOLs**") of the Company. A copy of the sealed order confirming their appointment is attached for your records.

In accordance with the Cayman Islands Companies Act (As Revised) (the "**Act**") and the powers conferred on the JOLs as per the sealed order, the JOLs act in the name and on behalf of the Company. As such, with effect from the date of our appointment, the JOLs are empowered to take control of the Company's assets and investigate its affairs. Although you may be aware, our responsibilities as JOLs require that we advise you that you can no longer act on instructions from the directors of the Company as their powers ceased upon our appointment.

**Delivery of Books & Records**

We understand that you may have been engaged by the Company or its subsidiaries. Pursuant to Order 26, Rule 3 (1) of the Companies Winding-up rules (As Amended) ("**CWRs**"), the JOLs are required to take possession or control of all the Company's books and records, including those maintained in electronic format. As such, we request that you:

Chartered Accountants. Grant Thornton Specialist Services (Cayman) Limited is a member firm of Grant Thornton International Ltd (GTIL) and a subsidiary of Grant Thornton UK LLP. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. Please see grantthornton.ky for further details. Subject to local regulations.

1. Arrange for any books and records held by you on behalf of the Company to be immediately delivered up to the JOLs. Should you be aware of any property of the Company that is currently not in your possession, please let us know of their whereabouts as a matter of urgency.

2. To the extent that such books and records are not in your possession and/or custody, please inform us of the location of these books and records.

3. Please send all future correspondence relating to the Company to our attention at cdaf.core@uk.gt.com.

**Proof of Debt**

If you believe you are a creditor of the Company, please provide full details of any amounts owed to you by completing the attached proof of debt form which should be returned to our office with any supporting documentation within 21 days of the date of this letter. Non-receipt of a claim from you by the aforesaid date will be taken to mean you have no claim against the Company.

If you have any questions or concerns, please contact us via e-mail at cdaf.core@uk.gt.com.

Yours faithfully,
For and on behalf of the Company



Sandipan Bhowmik
**Joint Official Liquidator**
As agent and without personal liability

Encl.
-Supervisory Court Order – 2025-116 (JAJ)
-Proof of Debt – CWR 24

# EXHIBIT 10

Grant Thornton

Our Ref: 20250515 – Charitable DAF HoldCo, Ltd

**Grant Thornton Specialist Services (Cayman) Limited**
2nd floor Century Yard,
Cricket Square,
PO Box 1044,
Grand Cayman, KY1-1102
Cayman Islands

T +1 (345) 949 8588
F +1 (345) 949 7120

Valuescope Inc.
950 E. State Highway 114
Suite 120
Southlake
TX 76092
USA

Via email to: info@valuescopeinc.com & shastings@valuescopeinc.com

15 May 2025

Dear Sirs,

**Re: Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Company")**
**FSD Cause No: 2025-116 (JAJ)**
**Reg. No: 263805**

**Request for information on Valuation Analysis for the Company and CDMCFAD LLC**

I refer to my letter dated 7 May 2025 notifying your office that Margot MacInnis and I, both of Grant Thornton Specialist Services (Cayman) Limited, were appointed as Joint Official Liquidators ("**JOLs**") of the Company by the Grand Court of the Cayman Islands.

We understand that Valuescope were engaged by the Company to perform the valuation of the participating shareholders for the Company, and a valuation on the membership interest in CDMCFAD LLC. Copies of the reports are enclosed for ease of reference.

Pursuant to Order 26, Rule 3 (1) of the Companies Winding-up rules (As Amended) ("**CWRs**"), the JOLs are required to take possession or control of all the Company's books and records, including those maintained in electronic format.

As such, we request that you:

1. Provide a copy of your engagement letter and instructions for the Valuation Analysis prepared as of 31 December 2020, 31 December 2021, 31 December 2022, 31 December 2023 and 30 September 2024 concerning 100 Participation Shares of the Company.

2. If you were engaged by the Company for the purpose of preparing the valuation analysis of a 100% Membership Interest in CDMCFAD, LLC dated 25 March 2025, please provide a copy of this engagement letter and the associated instructions;

3. Provide copies of all documents provided to Valuescope by the Company that assisted with the Valuation Analyses; and

Chartered Accountants. Grant Thornton Specialist Services (Cayman) Limited is a member firm of Grant Thornton International Ltd (GTIL) and a subsidiary of Grant Thornton UK LLP. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. Please see grantthornton.ky for further details. Subject to local regulations.

4. Provide copies of any research or reference material obtained / prepared by Valuescope during the Valuation Analyses.

In addition, we would appreciate that our previous requests in our 7 May 2025 letter be fulfilled. For ease of reference this includes that you:

1. Arrange for any books and records held by you on behalf of the Company to be immediately delivered up to the JOLs. Should you be aware of any property of the Company that is currently not in your possession, please let us know of their whereabouts as a matter of urgency.

2. To the extent that such books and records are not in your possession and/or custody, please inform us of the location of these books and records.

3. Please send all future correspondence relating to the Company to our attention at cdaf.core@uk.gt.com.

**Proof of Debt**

If you believe you are a creditor of the Company, please provide full details of any amounts owed to you by completing the attached proof of debt form which should be returned to our office with any supporting documentation within 21 days of the date of this letter. Non-receipt of a claim from you by the aforesaid date will be taken to mean you have no claim against the Company.

If you have any questions or concerns, please contact us via e-mail at cdaf.core@uk.gt.com.

Yours faithfully,
For and on behalf of the Company

Sandipan Bhowmik
**Joint Official Liquidator**
As agent and without personal liability

Encl.
-Proof of Debt – CWR 24
-Valuation report for CDMCFAD LLC dated 25 March 2025
-Valuation reports for the Company dated:
- 31 December 2020
- 31 December 2021
- 31 December 2022
- 31 December 2023
- 30 September 2024

# EXHIBIT 11

VALUESCOPE
a marshall + stevens company

May 30, 2025

**Via Email to:**
Sandipan Bhowmik | Sandipan.bhowmik@uk.gt.com |cdaf.core@uk.gt.com
Jamie Gallagher | jamie.r.gallagher@uk.gt.com
Michael Aquino | michael.aquino@uk.gt.com

**Re: Request for information pertaining to Charitable DAF HoldCo, Ltd.**

Dear Sirs:

Thank you for your correspondence regarding the records relating to our prior valuation work for Charitable DAF HoldCo, Ltd.

We are committed to meeting our ethical and professional obligations, including providing client records where appropriate. At the same time, we are bound by legal duties, including the obligation to protect confidential and privileged information.

We understand that you have been appointed as Joint Official Liquidators by the Grand Court of the Cayman Islands, and we acknowledge your request is made in that capacity. However, under U.S. law, a foreign court appointment does not automatically grant authority over records or compel disclosure unless the foreign proceeding has been formally recognized by a U.S. Bankruptcy Court pursuant to Chapter 15 of the U.S. Bankruptcy Code.

If such recognition has been granted, please provide the relevant documentation for our review. In the absence of that, we are unable to release confidential materials or client records. Please let us know if you have obtained recognition under Chapter 15 or other legal authority in the U.S. We remain open to reviewing any such documentation and cooperating as appropriate under applicable law.

Sincerely,

Steven Hastings, CPA/ABV/CFF/CGMA, ASA, CVA
Principal
ValueScope, LLC

# EXHIBIT 12

ReedSmith
Driving progress
through partnership

Casey D. Laffey
Direct Phone: +1 212 549 0389
Email: claffey@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

June 2, 2025

**Via Email (shastings@valuescopeinc.com)**

Steven Hastings
ValueScope, LLC
950 E. State Highway 114, Suite 120
Southlake, TX 76092

**Re: Charitable DAF HoldCo, Ltd. (In Official Liquidation)**
**FSD No. 2025-116 (JAJ)**
**Reg. No. 263805**

Dear Mr. Hastings:

We represent Sandipan Bhowmik and Margot MacInnis of Grant Thornton Specialist Services (Cayman) Limited in their capacity as joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd. (In Official Liquidation) ("**Company**"). We write in response to ValueScope, LLC's letter, dated May 30, 2025, which responded to the JOLs' letters, dated May 7, 2025 and May 15, 2025, and emails, dated May 20, 2025 and May 26, 2025, each of which requested the Company's files.

Although ValueScope insists that it is "committed to meeting our ethical and professional obligations, including providing client records where appropriate," its correspondence and delay suggests otherwise. ValueScope states that it is unwilling to cooperate with the JOLs' reasonable requests because the JOLs' appointment has not yet been recognized under Chapter 15 of the Bankruptcy Code. However, Chapter 15 recognition is irrelevant for ValueScope to comply with the JOLs' request.

The JOLs have been duly appointed by the Grand Court of the Cayman Islands and are requesting that ValueScope provide them with the Company's files pursuant to the JOLs' statutory and court mandated powers. There is nothing about the JOLs' appointment or their status in the United States precluding ValueScope's cooperation with the JOLs' reasonable requests, and ValueScope's argument to the contrary is wrong.

The JOLs therefore renew their request that ValueScope **immediately** provide them with Company's files. Should ValueScope decline to cooperate, the JOLs will have no choice but to assume that ValueScope intends to obstruct the JOLs' duties and the JOLs will pursue all appropriate legal remedies to compel production of the requested documents, including seeking legal fees and costs for ValueScope's stonewalling. The JOLs sincerely hope and expect, however, that those measures will not be necessary.

Sincerely,

Casey D. Laffey

cc: Aaron Javian (ajavian@reedsmith.com)

# EXHIBIT 13

ReedSmith
Driving progress
through partnership

**Casey D. Laffey**
Direct Phone: +1 212 549 0389
Email: claffey@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

June 25, 2025

**By Electronic Mail**

Steven Hastings
ValueScope, LLC
950 E. State Highway 114, Suite 120
Southlake, TX 76092
shastings@valuescopeinc.com

Re: **Charitable DAF HoldCo, Ltd. (In Official Liquidation)**
**FSD No. 2025-116 (JAJ)**
**Reg. No. 263805**

Dear Mr. Hastings:

We represent Sandipan Bhowmik and Margot MacInnis of Grant Thornton Specialist Services (Cayman) Limited in their capacity as joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd. (In Official Liquidation) ("**Company**"). We write in furtherance of the JOLs' letter to ValueScope dated June 2, 2025, wherein the JOLs "renew[ed] their request that ValueScope **immediately** provide them with Company's files."

We have yet to receive a response to our June 2, 2025 letter. Please respond immediately, as we hope and expect to resolve this matter amicably. As we stated in our letter, should "ValueScope decline to cooperate, the JOLs will have no choice but to assume that ValueScope intends to obstruct the JOLs' duties and the JOLs will pursue all appropriate legal remedies to compel production of the requested documents, including seeking legal fees and costs for ValueScope's stonewalling." Again, the JOLs sincerely hope and expect that those measures will not be necessary.

Very truly yours,

Casey D. Laffey

# EXHIBIT 14

Casey D. Laffey
Direct Phone: +1 212 549 0389
Email: claffey@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

July 30, 2025

**By Email (shastings@valuescopeinc.com)**

Steven Hastings
ValueScope, LLC
950 E. State Highway 114, 120
Southlake, Texas 76092

**Re: Charitable DAF HoldCo, Ltd. (In Official Liquidation)**
**FSD No. 2025-116 (JAJ)**
**Reg. No. 263805**

Dear Mr. Hastings:

We represent Sandipan Bhowmik and Margot MacInnis of Grant Thornton Specialist Services (Cayman) Limited in their capacity as joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd. (In Official Liquidation) ("**Company**"). We write in furtherance of my letters, dated June 2, 2025 and June 25, 2025, which ValueScope has not responded to.

Be advised that on July 21, 2025, the Company filed a Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code (the "Verified Petition"). *In re: Charitable DAF HoldCo, Ltd. (In official Liquidation)*, Case No. 25-11376 (D. Del.). In it, the JOLs formally petitioned the United States Bankruptcy Court for the District of Delaware court to recognize the Cayman liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code. Although the JOLs are prepared to use powers afforded by the Bankruptcy Court to compel ValueScope to return to the Company its own records, it should not have to come to that.

Accordingly, the JOLs demand, for the final time, that ValueScope immediately produce the Company's requested records. ValueScope's failure to comply will result in legal action, including a request for sanctions for ValueScope's noncooperation.

Very truly yours,

/s/ Casey D. Laffey

# EXHIBIT 15

Commercial in Confidence

Grant Thornton

Our Ref: 20250506 – Charitable DAF HoldCo, Ltd

**Grant Thornton Specialist Services (Cayman) Limited**
2nd floor Century Yard,
Cricket Square,
PO Box 1044,
Grand Cayman, KY1-1102
Cayman Islands

T +1 (345) 949 8588
F +1 (345) 949 7120

**Seyfarth Shaw LLP**
Douglas Mancino
1075 Peachtree St NE
Suite 2500,
Atlanta GA 30309

Via email: dmancino@seyfarth.com

6 May 2025

Dear Mr. Mancino,

**Re: Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Company")**
**FSD Cause No: 2025-116 (JAJ)**
**Reg. No: 263805**

**Notice of Liquidation and Appointment of Official Liquidators**

As you may be aware, the Company was placed in voluntary liquidation on 2 April 2025, with Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd appointed as Joint Voluntary Liquidators of the Company.

Please be advised that pursuant to an application made by (1) The Highland Dallas Foundation, Inc, (2) The Highland Kansas City Foundation, Inc, (3) The Highland Santa Barbara Foundation, Inc, (4) The HCMLP Charitable Fund, in their capacity as participating shareholders of the Company, it was ordered on 6 May 2025, that the voluntary liquidation of the Company be continued under supervision of the Grand Court of the Cayman Islands (the "**Court**") and that Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton Specialist Services (Cayman) Limited, be appointed as Joint Official Liquidators ("**JOLs**") of the Company. A copy of the order confirming their appointment is attached for your records.

We understand that your firm was engaged to act on behalf of the Company. As a result of our appointment, you are no longer to act on instructions from the directors or former JVLs of the Company, unless explicit authorisation to do so is supplied by us, or any other party previously authorised to give instructions and should only take instructions from the JOLs on matters pertaining to the Company. Please also be advised that pursuant to the Order no suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Company in accordance with section 97 of the Companies Act (As Revised) except with the leave of the Court and subject to such terms as the Court may impose.

**Delivery of Books & Records**

Pursuant to Order 26, Rule 3 (1) of the Companies Winding-up rules (As Amended) ("**CWRs**"), the JOLs are required to take possession or control of all the Company's books and records, including those maintained in electronic format. As such, we request that you supply the JOLs with a copy of your complete file relating to the engagement by the Company, both prior to and after the appointment of JVLs.

We ask that this file includes but is not limited to the following documentation:

Chartered Accountants. Grant Thornton Specialist Services (Cayman) Limited is a member firm of Grant Thornton International Ltd (GTIL) and a subsidiary of Grant Thornton UK LLP. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. Please see grantthornton.ky for further details. Subject to local regulations.

Commercial in Confidence

1. A copy of your engagement letter;
2. All invoices from engagement to present;
3. Details of any outstanding debts owed by the Company;
4. Statement of account and evidence of the associated remittance;
5. Historical statements of trust account(s) held on behalf of the Company;
6. Summary of any books and records held on behalf of the Company;
7. The details of any retainer or funds held on behalf of the Company;
8. Details of any Company bank accounts that you are aware of. If your firm has any information identifying the bank accounts or clearing banks used by the Company, we ask that you look at the records of the payments your firm received from the Company to see if you have records that can assist us in this regard;
9. Summary of the matters that you were engaged to assist the Company with; and
10. The AML and KYC files you have on the Company and the Company Directors.

Please arrange for the above as well as any books and records held by you on behalf of the Company to be immediately delivered up to the JOLs. Should you be aware of any property of the Company that is currently not in your possession, please let us know of their whereabouts as a matter of urgency.

**Proof of Debt**

If you believe you are a creditor of the Company, please provide full details of any amounts owed to you by completing the attached proof of debt form which should be returned to our office with any supporting documentation within 21 days of the date of this letter.

If you have any questions or concerns, please contact us via e-mail at cdaf.core@uk.gt.com.

Yours sincerely,
For and on behalf of Charitable DAF HoldCo Ltd (in Official Liquidation)

Sandipan Bhowmik
**Joint Official Liquidator**
As agent and without personal liability

Encl.
-Supervision Order – 2025-116 (JAJ)
-Proof of Debt – CWR 24

# EXHIBIT 16

**From:** Mancino, Douglas <DMancino@seyfarth.com>
**Sent:** Tuesday, May 6, 2025 10:31 PM
**To:** Michael Aquino
**Cc:** CDAF Core
**Subject:** Re: Charitable DAF HoldCo Ltd (In Official Liquidation) - Legal Notice (Seyfarth)
**Attachments:** image001.png; image002.png; 2025.05.06 CDAF HoldCo - Ntc. of Appt. OL - Legal (Seyfarth Shaw LLP).pdf

**Email from EXTERNAL source - Please exercise caution and validate email before accessing links or files**

I want to acknowledge receipt of your letter. I am traveling to Washington, DC tomorrow morning and will return Friday night.
I would like to schedule a call Monday to discuss attorney client and work product privileges.
I am completely unfamiliar with this Cayman Islands process.
Let me know some times Monday that work, considering the three hour time difference.
Doug Mancino

Sent from my iPhone

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

On May 6, 2025, at 6:01 PM, Michael Aquino <Michael.Aquino@uk.gt.com> wrote:

Commercial in Confidence

Dear Mr. Mancino,

**Charitable DAF HoldCo Ltd (In Official Liquidation) (the "Company")**
**FSD Cause No: 2025-0116 (JAJ)**

Please find attached correspondence in relation to the Company for your attention.

Should you have any queries, please do not hesitate to contact us.

Yours sincerely,

For and on behalf of
The Joint Official Liquidators of the Company

**Michael Aquino**
Insolvency Administrator Trainee, OFC
Grant Thornton Specialist Services (Cayman) Limited

**T** +1345-949-7100
**E** Michael.Aquino@uk.gt.com

**grantthornton.ky** [grantthornton.ky]

2nd Floor, Century Yard, Cricket Square
PO Box 1044, Grand Cayman, Cayman Islands KY1-1102

Grant Thornton is a brand name under which Grant Thornton UK LLP (registered number OC307742) and Grant Thornton UK Advisory & Tax LLP (registered number OC454533) provide professional services. Each of them is a limited liability partnership, registered in England and Wales, whose registered office is at 30 Finsbury Square, London EC2A 1AG. Lists of their members are available from the registered office.

For the purposes of designated investment business, Grant Thornton UK Advisory & Tax LLP is an appointed representative of Grant Thornton UK LLP, which is authorised and regulated by the Financial Conduct Authority.

Grant Thornton UK LLP and Grant Thornton UK Advisory & Tax LLP are member firms of Grant Thornton International Limited ("GTIL"). GTIL and its member firms are not a worldwide partnership. Services are delivered by the member firms. GTIL and its member firms are not agents of and do not bind one another and are not liable for one another's acts or omissions.

This email is confidential. It cannot be guaranteed to be secure or free from error or virus. All email communication with Grant Thornton UK LLP or Grant Thornton UK Advisory & Tax LLP is monitored and a record is kept. If you are not the intended recipient, please accept our apologies. It is intended for the addressee only. If you are not the addressee, please do not use it in any way. If received in error please inform the sender and delete all copies.

Anything in this email which does not relate to the official business of Grant Thornton UK LLP or Grant Thornton UK Advisory & Tax LLP is neither given nor endorsed by them. To the extent permitted by law, neither of them accepts any responsibility for any use by anyone other than the intended addressee. Where relevant, please note that, unless expressly stated otherwise, any written advice contained in or attached to this email is not intended and cannot be used by any person for avoiding any US penalties that may be imposed under the US Internal Revenue Service Code.

For further information please visit our website grantthornton.co.uk [grantthornton.co.uk]

# EXHIBIT 17

**From:** Bradley J Graham
**Sent:** Monday, May 12, 2025 8:42 PM
**To:** dmancino@seyfarth.com
**Cc:** CDAF Core
**Subject:** RE: Charitable DAF HoldCo Ltd (In Official Liquidation) - Legal Notice (Seyfarth)

Commercial in Confidence

Dear Douglas

I refer to our discussion on Teams earlier today in relation to the above matter.

As discussed, a banker's box of physical books and records is being prepared for postage to us by this Friday.

I confirm that we are able to receive the books and records via Reed Smith LLC in LA, the contact details are below:

**Ruben Montoya, Paralegal**
Reed Smith LLP
515 South Flower Street, Suite 4300
Los Angeles, CA 90071
Telephone: 213-457-6409

Mr Montoya has been notified of the above and is expecting your contact.

We appreciate your assistance to date and look forward to further discussion once the records are received and reviewed.

Kind regards,

Brad Graham
Assistant Manager, Insolvency, Forensics & Restructuring
Grant Thornton Specialist Services (Cayman) Limited

T + 1345 3258462
E bradley.j.graham@uk.gt.com

grantthornton.ky

2nd Floor, Century Yard, Cricket Square
PO Box 1044, Grand Cayman, Cayman Islands. KY1-1102

Grant Thornton

**From:** Mancino, Douglas <DMancino@seyfarth.com>
**Sent:** 06 May 2025 21:31
**To:** Michael Aquino <Michael.Aquino@uk.gt.com>
**Cc:** CDAF Core <CDAF.Core@uk.gt.com>
**Subject:** Re: Charitable DAF HoldCo Ltd (In Official Liquidation) - Legal Notice (Seyfarth)

**Email from EXTERNAL source - Please exercise caution and validate email before accessing links or files**

---

I want to acknowledge receipt of your letter. I am traveling to Washington, DC tomorrow morning and will return Friday night.
I would like to schedule a call Monday to discuss attorney client and work product privileges.
I am completely unfamiliar with this Cayman Islands process.
Let me know some times Monday that work, considering the three hour time difference.
Doug Mancino

Sent from my iPhone

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

Seyfarth

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

On May 6, 2025, at 6:01 PM, Michael Aquino <Michael.Aquino@uk.gt.com> wrote:

Commercial in Confidence

Dear Mr. Mancino,

**Charitable DAF HoldCo Ltd (In Official Liquidation) (the "Company")**
**FSD Cause No: 2025-0116 (JAJ)**

Please find attached correspondence in relation to the Company for your attention.

Should you have any queries, please do not hesitate to contact us.

Yours sincerely,

For and on behalf of
The Joint Official Liquidators of the Company

Michael Aquino

Insolvency Administrator Trainee, OFC
Grant Thornton Specialist Services (Cayman) Limited

T +1345-949-7100
E Michael.Aquino@uk.gt.com

**grantthornton.ky** [grantthornton.ky]

2nd Floor, Century Yard, Cricket Square
PO Box 1044, Grand Cayman, Cayman Islands KY1-1102

Grant Thornton is a brand name under which Grant Thornton UK LLP (registered number OC307742) and Grant Thornton UK Advisory & Tax LLP (registered number OC454533) provide professional services. Each of them is a limited liability partnership, registered in England and Wales, whose registered office is at 30 Finsbury Square, London EC2A 1AG. Lists of their members are available from the registered office.

For the purposes of designated investment business, Grant Thornton UK Advisory & Tax LLP is an appointed representative of Grant Thornton UK LLP, which is authorised and regulated by the Financial Conduct Authority.

Grant Thornton UK LLP and Grant Thornton UK Advisory & Tax LLP are member firms of Grant Thornton International Limited ("GTIL"). GTIL and its member firms are not a worldwide partnership. Services are delivered by the member firms. GTIL and its member firms are not agents of and do not bind one another and are not liable for one another's acts or omissions.

This email is confidential. It cannot be guaranteed to be secure or free from error or virus. All email communication with Grant Thornton UK LLP or Grant Thornton UK Advisory & Tax LLP is monitored and a record is kept. If you are not the intended recipient, please accept our apologies. It is intended for the addressee only. If you are not the addressee, please do not use it in any way. If received in error please inform the sender and delete all copies.

Anything in this email which does not relate to the official business of Grant Thornton UK LLP or Grant Thornton UK Advisory & Tax LLP is neither given nor endorsed by them. To the extent permitted by law, neither of them accepts any responsibility for any use by anyone other than the intended addressee. Where relevant, please note that, unless expressly stated otherwise, any written advice contained in or attached to this email is not intended and cannot be used by any person for avoiding any US penalties that may be imposed under the US Internal Revenue Service Code.

For further information please visit our website grantthornton.co.uk [grantthornton.co.uk]

# EXHIBIT 18

**From:** Margot MacInnis
**Sent:** Tuesday, May 13, 2025 3:32 PM
**To:** Mancino, Douglas
**Subject:** RE: Request for clarification

Commercial in Confidence

Hi Doug

The call yesterday was attended by me along with Bradley Graham who is supporting the joint official liquidators (JOLs) and is an employee of Grant Thornton Specialist Services in the Cayman Islands. Andrew Johnstone who is the JOLs' Cayman counsel was also in attendance and on screen. There was no one else dialed into the call or in attendance.

With regard to preservation of privilege I don't follow the concern. We have stepped into the shoes of the Company for which we act, any advice provided to which privilege attaches is retained by the Liquidators. We have engaged Reed Smith as our US counsel and accordingly the privilege is preserved if you provide the documents directly to them.

We look forward to receiving the documents.

Kind regards
Margot

Margot MacInnis
Practice Leader Insolvency, Forensics & Restructuring Advisory
Grant Thornton Specialist Services (Cayman) Limited

D +1 (345) 769 7218
E margot.macinnis@uk.gt.com

grantthornton.ky

**Address**
2nd Floor, Century Yard, Cricket Square
PO Box 1044, Grand Cayman, Cayman Islands, KY1-1102

Grant Thornton

**From:** Mancino, Douglas <DMancino@seyfarth.com>
**Sent:** 13 May 2025 13:21
**To:** Margot MacInnis <margot.macinnis@uk.gt.com>
**Subject:** Request for clarification

**Email from EXTERNAL source - Please exercise caution and validate email before accessing links or files**

Ms. MacInnis,

Thank you for arranging the Zoom call yesterday to discuss your role in the liquidation of Charitable DAF Holdco Ltd. and attorney-client privilege matters.

I understand your role on the Zoom call as a liquidator, but can you confirm the role of the others on the call? As I said, I am new to this process and not a litigator.

I am consulting with my partners on my ability to preserve the privilege when I provide the requested documents to your firm through Reed Smith so it will take more time to gather and provide the requested documents than I projected. And I would like to know the roles of the others shown on the screen and confirm whether any others were listening in to the call but not shown on the screen.

Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

Seyfarth

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

# EXHIBIT 19

ReedSmith
Driving progress
through partnership

Commercial in Confidence

**Casey D. Laffey**
Direct Phone: +1 212 549 0389
Email: claffey@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

August 13, 2025

**Via Email (dmancino@seyfarth.com)**

Douglas Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021

**Re: Charitable DAF HoldCo, Ltd (In Official Liquidation)**
**FSD Cause No: 2025-116 (JAJ)**
**Reg. No: 263805**

Dear Douglas:

We represent Sandipan Bhowmik and Margot MacInnis of Grant Thornton Specialist Services (Cayman) Limited in their capacity as joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd. (In Official Liquidation) ("**Company**"). We write in furtherance of the JOLs' letter to Seyfarth Shaw LLP ("**Seyfarth**"), dated May 6, 2025, and the subsequent emails and calls between the parties.

As you know, in accordance with the Cayman Islands Companies Act (As Revised) and the powers conferred on the JOLs pursuant to the order entered by the Grand Court of the Cayman Islands on May 6, 2025 (the "**Appointment Order**"), the JOLs act in the name and on behalf of the Company. As such, with effect from the date of their appointment, the JOLs are empowered to exercise their fiduciary duties to preserve the value of the Company's assets—including by taking control of such assets through legal proceedings or other appropriate means in the JOLs' discretion—and to do all other things incidental to the exercise of the JOLs' powers to act for and on behalf of the Company. And, in furtherance of their fiduciary duties, and with effect from the date of their appointment, the JOLs have assumed control of the Company pursuant to the powers granted in the Appointment Order, and the powers of the Company's directors are suspended unless expressly authorized by the JOLs.

In the JOLs' May 6, 2025 letter, the JOLs requested that Seyfarth provide them with the complete file relating to its engagement by the Company, including:

1. A copy of your engagement letter with the Company;
2. All invoices from engagement to present;
3. Details of any outstanding debts owed by the Company to Seyfarth;
4. Statement of account and evidence of the associated remittance;

ReedSmith

Douglas Mancino, Esq.
August 12, 2025
Page 2

5. Historical statements of trust account(s) held on behalf of the Company;

6. Summary of any books and records held on behalf of the Company;

7. The details of any retainer or funds held on behalf of the Company;

8. Details of any Company bank accounts that you are aware of;

9. A summary of the matters that you were engaged to assist the Company with; and

10. The AML and KYC files Seyfarth has on the Company and the Company Directors.

On May 12, 2025, you spoke with the JOLs and confirmed that you would prepare a banker's box of physical books and records that were responsive to the foregoing requests and mail them to Reed Smith LLP, the JOLs' counsel in the United States, by May 16, 2025.

To date, however, Seyfarth has not produced any of the promised documents or any documents in its possession.

Accordingly, the JOLs reiterate their request that Seyfarth **immediately** provide them with the Company's files. Should Seyfarth decline to cooperate, the JOLs will be compelled to pursue all appropriate legal remedies to obtain the requested documents, including seeking legal fees and costs if necessary.

To that end, be advised that on July 21, 2025, the Company filed a Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code. *In re: Charitable DAF HoldCo, Ltd. (In Official Liquidation)*, Case No. 25-11376 (D. Del.). In it, the JOLs formally petitioned the United States Bankruptcy Court for the District of Delaware to recognize the Cayman liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

Nothing in this letter should be construed as a waiver of the JOLs' rights, remedies, or arguments, all of which are expressly preserved.

Very truly yours,

Casey D. Laffey

# EXHIBIT 20

Grant Thornton

Our Ref: 20250508 – Charitable DAF HoldCo, Ltd

**Grant Thornton Specialist Services (Cayman) Limited**
2nd floor Century Yard,
Cricket Square,
PO Box 1044,
Grand Cayman, KY1-1102
Cayman Islands

T +1 (345) 949 8588
F +1 (345) 949 7120

Hunton Andrews Kurth LLP
FAO Alexander McGeoch
1445 Ross Ave Ste 3700
Dallas
TX 75202

Via email: amcgeoch@hunton.com

8 May 2025

Dear Mr. McGeoch,

**Re: Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Company")**
**FSD Cause No: 2025-116 (JAJ)**
**Reg. No: 263805**

**Notice of Liquidation and Appointment of Official Liquidators**

I write to advise that the Company was placed in voluntary liquidation on 2 April 2025, with Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd appointed as Joint Voluntary Liquidators ("**JVLs**") of the Company.

Please be advised that pursuant to an application made by (1) The Highland Dallas Foundation, Inc, (2) The Highland Kansas City Foundation, Inc, (3) The Highland Santa Barbara Foundation, Inc, (4) The HCMLP Charitable Fund, in their capacity as participating shareholders of the Company, it was ordered on 6 May 2025, that the voluntary liquidation of the Company be continued under supervision of the Grand Court of the Cayman Islands (the "**Court**") and that Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton Specialist Services (Cayman) Limited, be appointed as Joint Official Liquidators ("**JOLs**") of the Company. A copy of the order confirming their appointment is attached for your records.

We understand that your firm was engaged to act on behalf of the Company. As a result of our appointment, you are no longer to act on instructions from the directors or former JVLs of the Company, unless explicit authorisation to do so is supplied by us, or any other party previously authorised to give instructions and should only take instructions from the JOLs on matters pertaining to the Company. Please also be advised that pursuant to the Order no suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Company in accordance with section 97 of the Companies Act (As Revised) except with the leave of the Court and subject to such terms as the Court may impose.

**Delivery of Books & Records**

Pursuant to Order 26, Rule 3 (1) of the Companies Winding-up rules (As Amended) ("**CWRs**"), the JOLs are required to take possession or control of all the Company's books and records, including those maintained in electronic format. As such, we request that you supply the JOLs with a copy of your complete file relating to the engagement by the Company, both prior to and after the appointment of JVLs.

Chartered Accountants. Grant Thornton Specialist Services (Cayman) Limited is a member firm of Grant Thornton International Ltd (GTIL) and a subsidiary of Grant Thornton UK LLP. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. Please see grantthornton.ky for further details. Subject to local regulations.

grantthornton.ky

We ask that this file includes but is not limited to the following documentation:

1. A copy of your engagement letter with the Company;
2. All invoices from engagement to present;
3. Details of any outstanding debts owed by the Company to you;
4. Statement of account and evidence of the associated remittance;
5. Historical statements of trust account(s) held on behalf of the Company;
6. Summary of any books and records held on behalf of the Company;
7. The details of any retainer or funds held on behalf of the Company;
8. Details of any Company bank accounts that you are aware of. If your firm has any information identifying the bank accounts or clearing banks used by the Company, we ask that you look at the records of the payments your firm received from the Company to see if you have records that can assist us in this regard;
9. Summary of the matters that you were engaged to assist the Company with; and
10. The AML and KYC files you have on the Company and the Company Directors.

Please arrange for the above as well as any books and records held by you on behalf of the Company to be immediately delivered up to the JOLs. Should you be aware of any property of the Company that is currently not in your possession, please let us know of their whereabouts as a matter of urgency.

**Proof of Debt**

If you believe you are a creditor of the Company, please provide full details of any amounts owed to you by completing the attached proof of debt form which should be returned to our office with any supporting documentation within 21 days of the date of this letter.

If you have any questions or concerns, please contact us via e-mail at cdaf.core@uk.gt.com.

Yours sincerely,
For and on behalf of Charitable DAF HoldCo Ltd (in Official Liquidation)

Sandipan Bhowmik
**Joint Official Liquidator**
As agent and without personal liability

Encl.
- Supervision Order – 2025-116 (JAJ)
- Proof of Debt – CWR 24

# EXHIBIT 21

ReedSmith
Driving progress
through partnership

Commercial in Confidence

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

**Casey D. Laffey**
Direct Phone: +1 212 549 0389
Email: claffey@reedsmith.com

August 6, 2025

**Via Email (amcgeoch@hunton.com)**

Alexander G. McGeoch
Hunton Andrews Kurth LLP
1445 Ross Ave. Ste 3700
Dallas, Texas 75202

**Re: Charitable DAF HoldCo, Ltd (In Official Liquidation)**
**FSD Cause No: 2025-116 (JAJ)**
**Reg. No: 263805**

Dear Mr. McGeoch:

We represent Sandipan Bhowmik and Margot MacInnis of Grant Thornton Specialist Services (Cayman) Limited in their capacity as joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd. (In Official Liquidation) ("**Company**"). We write in furtherance of the JOLs' letter to Hunton Andrews Kurth LLP ("**Hunton**"), dated May 8, 2025.

As you know, in accordance with the Cayman Islands Companies Act (As Revised) and the powers conferred on the JOLs pursuant to the order entered by the Grand Court of the Cayman Islands on May 6, 2025 (the "**Appointment Order**"), the JOLs act in the name and on behalf of the Company. As such, with effect from the date of their appointment, the JOLs are empowered to exercise their fiduciary duties to preserve the value of the Company's assets—including by taking control of such assets through legal proceedings or other appropriate means in the JOLs' discretion—and to do all other things incidental to the exercise of the JOLs' powers to act for and on behalf of the Company. And, in furtherance of their fiduciary duties, and with effect from the date of their appointment, the JOLs have assumed control of the Company pursuant to the powers granted in the Appointment Order, and the powers of the Company's directors are suspended unless expressly authorized by the JOLs.

In the JOLs' May 8, 2025 letter, the JOLs requested that Hunton provide them with the complete file relating to its engagement by the Company, including:

1. A copy of your engagement letter with the Company;
2. All invoices from engagement to present;
3. Details of any outstanding debts owed by the Company to Hunton;
4. Statement of account and evidence of the associated remittance;
5. Historical statements of trust account(s) held on behalf of the Company;

6. Summary of any books and records held on behalf of the Company;
7. The details of any retainer or funds held on behalf of the Company;
8. Details of any Company bank accounts that you are aware of;
9. A summary of the matters that you were engaged to assist the Company with; and
10. The AML and KYC files Hunton has on the Company and the Company Directors.

To date, however, Hunton has not responded to the JOLs' May 8, 2025 letter.

Accordingly, the JOLs reiterate their request that Hunton **immediately** provide them with the Company's files. Should Hunton decline to cooperate, the JOLs will be compelled to pursue all appropriate legal remedies to obtain the requested documents, including seeking legal fees and costs if necessary.

To that end, be advised that on July 21, 2025, the Company filed a Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code. *In re: Charitable DAF HoldCo, Ltd. (In Official Liquidation)*, Case No. 25-11376 (D. Del.). In it, the JOLs formally petitioned the United States Bankruptcy Court for the District of Delaware to recognize the Cayman liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

Nothing in this letter should be construed as a waiver of the JOLs' rights, remedies, or arguments, all of which are expressly preserved.

Very truly yours,

Casey D. Laffey

Casey D. Laffey

# EXHIBIT 22

**From:** Turetsky, Ian M.
**Sent:** Friday, August 8, 2025 2:56 PM
**To:** CDAF Core
**Cc:** Charitable DAF Team (S)
**Subject:** FW: Charitable DAF Holdco, Ltd.--Letter to Hunton Andrews Kurth LLP
**Attachments:** 2025-08-06 - Hunton Andrews Kurth(207566116.2).pdf

All,

Please see the below email we received from Hunton Andrews Kurth. We will keep you posted with any further developments.

Thanks.

Ian

**Ian M. Turetsky**
ituretsky@reedsmith.com
D: +1 212.549.0352
M: +1 917.514.8747

reedsmith.com

---

**From:** Locher, Scott <SLocher@hunton.com>
**Sent:** Friday, August 8, 2025 2:51:11 PM
**To:** Laffey, Casey D. <CLaffey@ReedSmith.com>
**Subject:** Charitable DAF Holdco, Ltd.--Letter to Hunton Andrews Kurth LLP

**External E-Mail - FROM Locher, Scott <slocher@hunton.com>**

---

This message needs your attention

- This is their first email to your company.

Report or Mark Safe

Powered by Mimecast

Mr. Laffey: I'm in Hunton's General Counsel office. I'm writing to acknowledge our receipt of your August 6, 2025 letter to Alex McGeoch. I will be Hunton's point of contact with respect to your letter's request, so please have all further communications about this directed to me. Previously, our General Counsel's office did not receive nor know about your May 8, 2025 letter due to an internal miscommunication, and so I apologize for us not acknowledging receipt of your letter sooner. In the coming days I will be working to get my arms around this internally, and externally.

**Scott Locher**
Partner
slocher@hunton.com
p 713.220.4416

bio | vCard

Hunton Andrews Kurth LLP
600 Travis Street
Suite 4200
Houston, TX 77002

Hunton.com

# EXHIBIT 23

HUNTON

HUNTON ANDREWS KURTH LLP
600 TRAVIS, SUITE 4200
HOUSTON, TEXAS 77002-2929

TEL 713 • 220 • 4200
FAX 713 • 220 • 4285

SCOTT LOCHER
DIRECT DIAL 713 • 220 • 4416
EMAIL slocher@hunton.com

August 20, 2025

***VIA EMAIL: CLAFFEY@REEDSMITH.COM***
Casey D. Laffey
Reed Smith LLP
599 Lexington Ave.
New York, NY 10022-7650

Re: Letter Request to Hunton Andrews Kurth LLP regarding Charitable DAF HoldCo Ltd. ("Holdco")

Dear Mr. Laffey:

I am an Assistant General Counsel of Hunton Andrews Kurth LLP ("Hunton"), and I write as a follow-up to my email to you of August 8, 2025, to respond to your August 6, 2025 letter addressed to Alexander G. McGeoch, a Hunton partner.

As your letter advises, your firm has filed a petition under Chapter 15 of the Bankruptcy Code ("Chapter 15") for recognition of the JOLs[1] as Holdco's foreign representatives pursuant to the Cayman Court's May 6, 2025 Appointment Order. It is my understanding that Chapter 15, which largely adopted the UNCITRAL Model Law on Cross-Border Insolvency ("Model Law") and replaced 11 U.S.C. § 304, provides legal process through which the JOLs obtain United States court validation of their authority to act on behalf of the foreign entity. *See Reserve Intern. Liquidity Fund, Ltd. v. Caxton Intern. Ltd.*, 2010 WL 1779282, at **5-6 (S.D.N.Y. Apr. 29, 2010); *Orchard Enterps. NY, Inc. v. Megabop Records, Ltd.*, 2011 WL 832881, at *2 (S.D.N.Y. Mar. 4, 2011). Congress stated that the purpose of Chapter 15 adopting the Model Law included providing "greater legal certainty for trade and investment" and "fair and efficient administration of cross-border insolvencies that protects interests of all creditors, and other interested parties, including the debtor," 11 U.S.C. § 501(a)(2-3), and that Chapter 15 applies where "assistance is sought in the United States by . . . a foreign representative in connection with a foreign proceeding." *Id.* at § 501(b)(1). Other "interested parties" the Chapter 15 process protects should include law firms facing requests from foreign liquidators for the foreign debtor's legal files. The Chapter 15 process gives assurance to U.S. firms in carrying out their legal and ethical obligations to former clients, including in preserving the confidentiality of and privileges attaching to information in its legal files, that the foreign liquidation proceeding and the appointed liquidators are in fact legitimate and valid in the eyes of U.S. law. Once the Chapter 15 recognition is finally granted, unless Hunton

[1] Unless otherwise defined in this letter, this letter will use the defined terms in your August 6, 2025 letter.

were to learn or be directed to the contrary, I recognize the U.S. court authorities which hold that the foreign appointed liquidators validated in a Chapter 15 proceeding are the parties with the rights to assert the in-liquidation foreign entity's privileges and, thus also, the rights to receive such entity's legal file held by its former U.S. firm. *See In re China Medical Techns., Inc.*, 539 B.R. 643, 658 (S.D.N.Y. 2015); *In re Gold & Appel Transfer S.A.*, 342 B.R. 386, 388 (Bankr. D.D.C. 2006) (holding under repealed section 304 ancillary proceeding).

For these reasons, Hunton believes that its and its former client's interests are best served and protected by awaiting the bankruptcy court's final determination of your firm's pending Chapter 15 petition before complying with your request on behalf of the JOLs for Hunton to provide its file on its representation of Holdco to the JOLs. As stated, upon an order granting the petition becoming final, Hunton then will be in position to comply. In the meantime, Hunton will prepare a copy of its file for transfer if and when the recognition order becomes final without need of further court intervention. Should you have authorities which you believe compel U.S. attorneys to turnover their file to liquidators of a foreign company appointed by a foreign court in a foreign proceeding before a filed Chapter 15 recognition petition has been ruled upon, we will consider those authorities further in consideration of your letter request.

In the interim, however, I can answer some of your inquiries in your August 6, 2025 letter. Per Hunton's accounting department, Hunton has not held, and does not hold, trust funds of Holdco, there are no outstanding debts Holdco owes Hunton, and thus we have no document with a statement of a Holdco account that is due, and Hunton holds no retainer funds of Holdco.

Sincerely,

W. Scott Locher

# TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this "Trust Agreement"), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor"), John Honis as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee").

1. Definitions. Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to "the Agreement" or "this Agreement" are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

"Account" means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in his sole and absolute discretion.

"Delaware Act" means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"Honis Cause" means conduct by Honis, in any capacity, amounting to (i) Honis's conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis's using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

"Honis Trigger Event" means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis's employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16. Honis agrees to give the Partnership ten (10) days' written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2. Scope. This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising. Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3. Name; Certificate of Trust. The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided. The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act. It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4. Account Establishment. The Administrator shall establish and control the Account. The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5. Beneficial Owner; Liability of Beneficial Owner. The beneficial owner of the trust shall be Beacon Mountain LLC. Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6. Title to Trust Property. Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator. Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

7. Purpose and Powers of the Trust; Administrator's Powers. The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement. The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust. The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement. The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8. Fiduciary Duties of Administrator. (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b) The Administrator agrees to perform his duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust. For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c) To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for his good faith reliance on the provisions of this Trust Agreement.

(d) Unless otherwise expressly provided herein:

(i) whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii) whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

(e) Notwithstanding any other provision of this Trust Agreement or otherwise applicable law, whenever in this Trust Agreement the Administrator is permitted or required to make a decision:

(i) in his "discretion" or under a grant of similar authority, the Administrator shall be entitled to consider such interests and factors as it desires, including its own interest, and, to the fullest extent permitted by applicable law, shall have no duty or obligation to give any consideration to any interest of or factors affecting the Trust or any other Person; or

(ii) in his "good faith" or under another express standard, the Administrator shall act under such express standard and shall not be subject to any other or different standard. The term "good faith" as used in this Trust Agreement shall mean subjective good faith as such term is understood and interpreted under Delaware law.

(f) The Administrator and any of his affiliates may engage in or possess an interest in other profit-seeking or business ventures of any nature or description, independently or with others, whether or not such ventures are competitive with the Trust and the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to the Administrator. The Administrator insofar as he acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Trust shall not have any duty to communicate or offer such opportunity to the Trust, and the Administrator shall not be liable to the Trust or to the beneficial owners for breach of any fiduciary or other duty by reason of the fact that the Administrator pursues or acquires for, or directs such opportunity to another Person or does not communicate such opportunity or information to the Trust. Neither the Trust nor any beneficial owner shall have any rights or obligations by virtue of this Trust Agreement or the trust relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the activities of the Trust, shall not be deemed wrongful or improper. The Administrator may engage or be interested in any financial or other transaction with the Trust or any affiliate of the Trust, or may act as depositary for, trustee or agent for, or act on any committee or body of holders of, securities or other obligations of the Trust or its affiliates.

9. <u>Recordkeeping and Accounting</u>. The Administrator shall maintain appropriate records in which he shall record the Trust Property and the acquisition and disposition of Limited Partnership Interests.

10. <u>Tax Treatment</u>. The Sponsor and the Administrator acknowledge and agree that for United States Federal Income Tax purposes (i) the Trust shall be disregarded as an entity for federal income tax purposes. The Administrator shall comply with the information reporting requirements applicable to the Trust under the Internal Revenue Code and prepare and furnish to Beacon Mountain LLC any appropriate Internal Revenue Service forms required to be provided to Beacon Mountain LLC as beneficial owner of the Trust.

11. <u>No Other Interests</u>

(a) The Sponsor acknowledges that it has no rights or claims to specific Trust Property, including funds in the Account, and otherwise has no interest in the Trust Property or the Account other than a beneficial interest in the Trust Property and the Account.

(b) The Administrator acknowledges that he has no right, title, or interest in the Trust, the Trust Property, or the Account in his personal capacity and has no beneficial interest in the Trust.

12. <u>Compensation; Administrator Liability</u>. The Administrator shall not receive any compensation for his role as Administrator. Nothing herein shall be construed to limit the Administrator's ability to receive compensation pursuant to other agreements for services he may provide other than his role as Administrator. The Administrator shall be indemnified, defended and held harmless by the Trust for any liability incurred by him while acting hereunder, and shall not be liable to the Trust or the Sponsor, except for a breach of his fiduciary duties hereunder, his own bad faith, willful misconduct or gross negligence in the performance of his express duties under this Trust Agreement.

13. <u>Amendment</u>. The Administrator, solely with the consent of the beneficial owner, shall have the right at any time or times to amend or supplement the provisions of this Trust Agreement, in each case by a writing or writings signed by the Administrator; provided that no such amendment shall be permitted if it would subject any amount held hereunder to any right, charge, security interest, lien or claim by, of or for the benefit of any creditor or creditors of the Sponsor or its subsidiaries and affiliates in its corporate or personal capacity. If any such amendment or supplement affects the rights, immunities or obligations of the Delaware Trustee, the Administrator shall be required to obtain the prior written consent of the Delaware Trustee.

14. <u>Duration</u>. The Trust shall be perpetual unless otherwise dissolved and terminated pursuant to paragraph 15 below.

15. <u>Termination</u>. The Administrator shall have the power solely upon the prior written consent of the beneficial owner to dissolve the Trust and to distribute all Trust Property held in the Account to, or for the benefit of, such persons (including the Sponsor) as the Administrator shall determine in his sole discretion and after satisfying the claims and obligations of the Trust in accordance with the Delaware Act. Following any such dissolution, the Administrator shall proceed to wind up the affairs of the Trust in an orderly manner and within a reasonable period of time considering relevant circumstances and shall have the powers necessary to wind up the Trust's affairs, including but not limited to the power to fulfill or discharge the contracts of the Trust, collect its assets, sell, convey, exchange or otherwise dispose of all or any part of the remaining property of the Trust to one or more Persons at public or private sale (for consideration which may consist in whole or part of cash, securities or other property of any kind), discharge or pay its liabilities, defend or prosecute suits or administrative proceedings and do all other acts appropriate to the winding up and liquidation of the property and affairs of the Trust. After paying or making reasonable provision for the payment of all claims and obligations of the Trust as required by the Delaware Act, and upon receipt of such releases, indemnities or like documentation as the Administrator may reasonably deem necessary

for the protection of the Administrator, the Administrator shall distribute the remaining property of the Trust as contemplated by this Trust Agreement. Upon the completion of winding up, the Trust shall terminate and the Administrator shall provide written notice directing the Delaware Trustee to file an appropriate form of Certificate of Cancellation to be filed in the Office of the Secretary of State of the State of Delaware by the Delaware Trustee.

16. Removal of Administrator. Upon any Honis Trigger Event, the Administrator shall immediately be removed without any action by the Delaware Trustee or any other party.

17. Successor Administrator. The Administrator may resign as Administrator hereunder, without leave of court, at any time, and, in such event, the Adminstrator shall appoint a successor Administrator unless, prior to the effective date of his resignation, the Administrator dissolves the Trust in accordance with paragraph 15 above. Any appointment of a successor Administrator shall be in writing signed by the appointing Administrator, or by a duly authorized officer or officers of the appointing Administrator, if an entity. Whenever this Trust Agreement refers to the Administrator, such reference shall include any successor Administrator appointed under this paragraph. All powers hereby granted to the Administrator shall be exercisable by any successor Administrator, and each successor Administrator shall be deemed to have assumed the duties hereby undertaken by the Administrator.

Upon the termination of the Administrator in accordance with paragraph 16 above, Beacon Mountain, LLC shall appoint a successor Administrator within a reasonable period of time.

The Administrator shall not be required to furnish any bond or surety. No one dealing with the Administrator need inquire concerning the validity of anything the Administrator purports to do or see to the application of any money paid upon the Administrator's order.

18. Delaware Trustee.

(a) For purposes of satisfying Sections 3807 of the Delaware Act, during the existence of the Trust, there shall at all times be a "Delaware Trustee" hereunder who shall, in the case of a natural person, be a person who is a resident of the State of Delaware, or, in all other cases, is a trustee with its principal place of business in the State of Delaware. The Delaware Trustee shall not have any duties (including fiduciary duties) or liabilities except to the extent and for the limited purposes described in this paragraph. Accordingly, no reference in this Trust Agreement to the "Administrator" shall include, or be deemed to refer to, the Delaware Trustee. The sole power and duty of the Delaware Trustee shall be to accept service of process in accordance with Section 3804 of the Delaware Act and to execute and deliver for filing all documents required to be filed with the State of Delaware as required by the Delaware Act.

(b) The Sponsor and the Administrator hereby appoint Wilmington Trust, National Association as the initial Delaware Trustee. The initial Delaware Trustee and any successor Delaware Trustee may resign and may be removed by the Sponsor then serving for any reason, with or without cause. If the Delaware Trustee resigns or is removed, or if there is no Delaware Trustee serving at any time for any other reason, the Administrator shall appoint a successor Delaware Trustee who qualifies under the terms of this paragraph 18. Upon each

appointment of a successor Delaware Trustee, the Administrator shall cause an amendment to the Certificate of Trust of the Trust that reflects such change to be filed with the Secretary of State of the State of Delaware in accordance with the Delaware Act.

(c) By its execution hereof, the Delaware Trustee accepts its appointment hereunder. Except as otherwise expressly required by clause (a) above, the Delaware Trustee shall not have any duty or liability with respect to the administration of the Trust, the investment of the Trust Property or the payment of any distributions of income or principal to the beneficial owners.

(d) The Delaware Trustee shall not be liable for the acts or omissions of the Administrator, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of or performing the duties and obligations of the Administrator, the Sponsor or the Trust under this Trust Agreement or any other document. The Delaware Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith or gross negligence in the performance of its express duties under this Trust Agreement. In particular, but not by way of limitation:

(i) the Delaware Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes gross negligence on its part;

(ii) no provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder, if the Delaware Trustee shall have reasonable grounds for believing that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii) under no circumstances shall the Delaware Trustee be personally liable for any representation, warranty, covenant, agreement, or indebtedness of the Trust;

(iv) the Delaware Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Sponsor or the Administrator;

(v) the Delaware Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties. The Delaware Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Delaware Trustee may for all purposes hereof rely on a certificate, signed by the Administrator, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

(vi) in the exercise or administration of the Trust hereunder, the Delaware Trustee (a) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Delaware Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Delaware Trustee in good faith and with due care and (b) may consult with counsel, accountants and other skilled persons to be selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons; and

(vii) except as expressly provided in this Section, in accepting and performing the Trust hereby created the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all Persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement or the Trust Agreement shall look only to the Trust's property for payment or satisfaction thereof.

(e) The Delaware Trustee (or any successor Delaware Trustee) shall be entitled to receive compensation from the Sponsor or from the Trust for its services in accordance with such fee agreements and schedules as shall have been separately agreed to from time to time by the Delaware Trustee and the Sponsor. The Delaware Trustee may consult with counsel (who may be counsel for the Sponsor or for the Delaware Trustee). The reasonable legal fees incurred in connection with such consultation shall be reimbursed to the Delaware Trustee pursuant to this Section, provided that no such fees shall be payable to the extent that they are incurred as a result of the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(f) The Delaware Trustee shall serve for the duration of the Trust and until the earlier of (i) the effective date of the Delaware Trustee's resignation, or (ii) the effective date of the removal of the Delaware Trustee. The Delaware Trustee may resign at any time by giving thirty (30) days written notice to the Administrator; provided, however, said resignation shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. The Delaware Trustee may be removed at any time by the Administrator by providing thirty (30) days written notice to the Delaware Trustee; provided, however, such removal shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. Upon the resignation or removal of the Delaware Trustee, the Administrator shall appoint a successor Delaware Trustee. If no successor Delaware Trustee shall have been appointed and shall have accepted such appointment within forty five (45) days after the giving of such notice of resignation or removal, the Delaware Trustee may, at the expense of the Sponsor, petition any court of competent jurisdiction for the appointment of a successor Delaware Trustee. Any successor Delaware Trustee appointed pursuant to this Section shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section, shall become fully vested with the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Delaware Trustee.

(g) The Delaware Trustee or any officer, affiliate, director, employee, or agent of the Delaware Trustee (each an "Indemnified Person") shall be entitled to indemnification from the Sponsor, to the fullest extent permitted by law, from and against any and all losses, claims, actions, suits, taxes, damages, reasonable expenses, and liabilities (including liabilities under state or federal securities laws) of any kind and nature whatsoever (collectively, "Expenses"), to

the extent that such Expenses arise out of or are imposed upon or asserted against such Indemnified Persons with respect to the creation, operation or termination of the Trust, the execution, delivery or performance of this Trust Agreement or the transactions contemplated hereby; provided, however, that the Sponsor shall not be required to indemnify any Indemnified Person for any Expenses which are a result of the willful misconduct, bad faith or gross negligence of such Indemnified Person. The obligations of the Sponsor to indemnify the Indemnified Persons as provided herein shall survive the termination of this Trust Agreement and the resignation or removal of the Delaware Trustee.

(h) The Delaware Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.

19. Waiver of Jury Trial. THE PARTIES HERETO HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO A TRIAL BY JURY IN ANY LITIGATION RELATING TO ANY CLAIM ARISING HEREUNDER OR RELATED HERETO.

20. Governing Law. The validity and construction of this Trust Agreement and all amendments hereto shall be governed by the laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof; provided, however, that the parties hereto intend that the provisions hereof shall control over any contrary or limiting statutory or common law of the State of Delaware (other than the Delaware Act) and that, to the maximum extent permitted by applicable law, there shall not be applicable to the Trust, the Sponsor, or the Delaware Trustee any provision of the laws (statutory or common) of the State of Delaware (other than the Delaware Act) pertaining to trusts which relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Sponsor or the Delaware Trustee set forth or referenced in this Trust Agreement. Sections 3540, 3542 and 3561 of Title 12 of the Delaware Code shall not apply to the Trust.

21. Exclusive Jurisdiction. Each of the parties hereto, to the fullest extent permitted by law, (i) irrevocably agrees that any claims, suits, actions or proceedings arising out of or relating in any way to this Agreement (including any claims, suits or actions to interpret, apply or enforce (A) the provisions of this Agreement or (B) the duties, obligations or liabilities of the Sponsor, the Administrator and the Delaware Trustee, or (C) the rights or powers of, or

restrictions on, the Trust, Sponsor, the Delaware Trustee or the Administrator, or (D) any provision of the Delaware Act, or (E) any other instrument, document, agreement or certificate contemplated by any provision of the Delaware Act relating to the Trust (regardless of whether such claims, suits, actions or proceedings (x) sound in contract, tort, fraud or otherwise, (y) are based on common law, statutory, equitable, legal or other grounds, or (z) are derivative or direct claims)), shall be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, any other court in the State of Delaware with subject matter jurisdiction, (ii) irrevocably submits to the exclusive jurisdiction of such courts in connection with any such claim, suit, action or proceeding, (iii) irrevocably agrees not to, and waives any right to, assert in any such claim, suit, action or proceeding that (A) it is not personally subject to the jurisdiction of such courts or any other court to which proceedings in such courts may be appealed, (B) such claim, suit, action or proceeding is brought in an inconvenient forum, or (C) the venue of such claim, suit, action or proceeding is improper, (iv) expressly waives any requirement for the posting of a bond by a party bringing such claim, suit, action or proceeding, and (v) consents to process being served in any such claim, suit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address set forth in the books and records of the Trust, and agrees that such service shall constitute good and sufficient service of process and notice thereof; provided, nothing in clause (v) hereof shall affect or limit any right to serve process in any other manner permitted by law.

22. Application to Successors. This Trust Agreement shall extend to and be binding upon the successors, executors, administrators and assigns of each of the Sponsor, the Delaware Trustee and the Administrator.

23. Transfer of Beneficial Ownership. Beacon Mountain LLC shall be the sole beneficial owner of the Trust to the extent provided herein and the interests of Beacon Mountain LLC hereunder shall not be represented by a certificate. To the fullest extent permitted by law, the beneficial interest of Beacon Mountain LLC in the Trust may not be offered, sold, transferred, pledged, hypothecated or otherwise disposed of.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By: ______________________
Name: John Honis
Title: President

JOHN HONIS, as Administrator

______________________
1-11-16

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By: ______________________
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By:____________________________
Name: John Honis
Title: President

JOHN HONIS, as Administrator

______________________________

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By:____________________________
Name: Jennifer A. Luce
Title: Vice President

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| UBS SECURITIES LLC and UBS AG LONDON BRANCH,<br><br>Petitioners,<br>v.<br><br>JAMES DONDERO, SCOTT ELLINGTON, HIGHLAND CDO HOLDING COMPANY, HIGHLAND CDO OPPORTUNITY MASTER FUND L.P., HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY, CLO HOLDCO, LTD., MAINSPRING LTD., and MONTAGE HOLDINGS, LTD.,<br><br>Respondents. | Index No. 650744/2023 |

**AFFIRMATION OF MARK PATRICK IN SUPPORT OF RESPONDENT CLO HOLDCO, LTD'S MOTION TO DISMISS PETITIONERS' SPECIAL TURNOVER PETITION**

I, Mark Patrick, as Director of CLO HoldCo, Ltd. ("CLOH"), hereby swears the following to be true under penalty of perjury:

1. I am over the age of eighteen and I am competent to make this Affirmation. I serve as a Director of CLOH, a Respondent in the above-referenced action, and I have held this position from April 2021 to present. The facts stated in this Affirmation are within my personal knowledge and are true and correct.

2. I reside in Dallas, Texas, and my business address is 2101 Cedar Springs Road, Suite 1200, Dallas, Texas 75201. I submit this Affirmation in support of CLOH's Motion to Dismiss (the "Motion") Petitioner's Special Turnover Petition (the "Petition").

3. CLOH was organized in 2010 as an exempt company under the laws of the Cayman Islands with its registered office in the Cayman Islands. CLOH's principal place of business is,

and has always been, located in the Cayman Islands. Aside from its Directors, CLOH has no other officers or employees. Instead, CLOH uses independent, third-party service providers to perform business functions that are not otherwise performed by its Directors. In 2010, when CLOH was first formed, CLOH used the services of employees of Highland Capital Management, LP ("HCM"), as described in more detail below. I was employed in HCM's tax department at that time, and I have personal knowledge concerning the organization of CLOH.

4. From CLOH's inception to April 2021, CLOH's sole Director was Grant J. Scott, who, at all relevant times, was a resident of North Carolina. Since April 2021, only Paul Murphy—who is a Cayman Islands resident—and I have served as Directors of CLOH.

5. CLOH is currently wholly owned by Charitable DAF Fund, L.P. ("DAF"), also a Cayman Islands entity. DAF is a charitable fund that helps fund several causes throughout the country, including veteran's welfare associations, women's shelters, public works, and education. CLOH's sole purpose is to provide funding to DAF to support DAF's charitable causes.

6. Mr. Dondero has never served as a director of CLOH, and Mr. Dondero has never owned any interest in CLOH.

7. My general understanding is that Highland CDO Holding Company ("CDO Holding") also had no employees and utilized third-party service providers at HCM to perform its business functions in the 2010 timeframe. This observation is based upon my personal knowledge at HCM.

8. In my former capacity within the tax department at HCM, I was involved in structuring the transaction at issue in the Petition whereby CLOH purchased assets (Collateralized Loan Obligations or "CLOs") from CDO Holding (the "Asset Purchase"). The purpose of the Asset Purchase was to secure significant tax benefits for CDO Holding's investors. Specifically, by

selling its assets to CLOH, phantom income was avoided. In exchange, CDO Holding had to relinquish its interest in these assets.

9. Thus, CLOH was created and CDO Holding sold assets to CLOH in exchange for $6,597,862 in cash and a promissory note issued by CLOH, as Maker, in the principal amount of $32,801,593, together with interest, made payable to CDO Holdings, as Payee (the "Note"). The Note was executed by CLOH's then-director, Grant J. Scott.

10. The Asset Purchase was effectuated by third-party service providers at HCM in its Dallas, Texas office, including me. On December 23, 2010, CLOH wired $6,597,862 to CDO Holding.

11. At the time of the Asset Purchase, CLOH was wholly owned by Highland Capital Management Partners Charitable Trust #2 ("CRT #2"), a non-profit entity qualified under the Internal Revenue Code. CRT #2 was independently controlled by its trustee, Grant Scott.

12. At no time relevant to the 2010 Asset Purchase was CLOH (or anyone affiliated with CLOH) physically present in New York or engaged in any activities in the State of New York related to the Asset Purchase. Rather, at all relevant times, CLOH's Director and third-party service providers were located in Texas, North Carolina, and/or the Cayman Islands.

13. Furthermore, at no time did CLOH direct anyone in New York to perform any act, transaction or other business activity in New York related to the Asset Purchase, including, but not limited to, negotiation of the transaction and execution of the Note. CLOH also did not engage in any negotiations with CDO Holding in New York concerning the Asset Purchase, nor did CLOH seek to direct CDO Holding to engage in any conduct in New York concerning the Asset Purchase.

14. CLOH has not regularly conducted or solicited any transaction or business activities, or engaged in any other course of conduct, or derived substantial revenue from goods

used or services rendered, in the state of New York. CLOH's only business involves purchasing and selling securities on the open market, and then using the gains from those sales to ultimately support charities located primarily in Texas, California, and Missouri. Furthermore, none of CLOH's records, files, or witnesses are located in New York, CLOH does not operate its business in New York, and CLOH does not have any employees in New York.

I affirm this 16th day of February, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

MARK PATRICK

3147931

Holland & Knight

One Arts Plaza | 1722 Routh Street, Suite 1500 | Dallas, TX 75201-2532 | T 214.964.9500 | F 214.964.9501
Holland & Knight LLP | www.hklaw.com

Michael Stockham
+1 214-969-2515
Michael.Stockham@hklaw.com

February 27, 2025

*Via Email: dmancino@seyfarth.com*

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

Sincerely yours,

Michael W. Stockham

cc: David Rosenberg

#517320412_v1

EXHIBIT 4-B

**Rhiannon Zanetic**

**Subject:** [EXTERNAL]-RE: DAFHoldCo information request

**From:** Michael.Stockham@hklaw.com
**Date:** February 7, 2025 at 12:43:56 PM CST
**To:** Paul Murphy <paul@gkmanagement.com.ky>, Julie Diaz <jdiaz@dallasfoundation.org>, mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>, Jackie Carrera <jcarrera@sbfoundation.org>, David.Rosenberg@hklaw.com, DMancino@seyfarth.com
**Subject: [EXTERNAL]-RE: DAFHoldCo information request**

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Paul-

I appreciate your email, and your willingness to find a framework to resolve the concerns, but am flummoxed by your, "struggle" to understand our growing frustration.

I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees. If I'm wrong, please educate me.

Your failure to be forthcoming about the underlying assets, the investment philosophy of the fund, and the "revised" governance, have caused me to start digging. I am not only a lawyer but also a Certified Fraud Examiner and a Certified Compliance & Ethics

Professional, and what I have found is nothing short of alarming.

- As I mentioned, director fees for 2024 appeared to be on track to exceed $5 million, which was an over 12,000 percent increase—up from zero. It is hard to fathom what you and Mr. Patrick have changed or contributed to the funds to warrant such a drastic change in director fees. I could be wrong, but if so, then tell me why. What is the dramatic value add?

- As I understand it, the annualized expenses of the funds were on pace to outstrip the actual return on the investments. So I am at a loss as to how you can justify running the fund at a loss while apparently paying the directors handsomely and freezing Supporting Organizations (the shareholders) out of basic information.

On November 6, 2024, we had an introductory video call with Doug Mancino, who announced himself as Compliance Counsel. But no details of the assets or financial condition of the funds were communicated.

On November 20, 2024, we had another video call with folks from your side, including ValueScope, and it was informative; however, the thrust of the presentation was why you refused proposed investments from NexPoint. It had nothing to do with the underlying assets and financial conditions of the fund. This was perplexing as ValueScope has been the valuation firm for the fund for years; yet they were silent about the condition of the fund.

On December 11, 2024, we had a video call with you, Doug Mancino, and your Cayman counsel. The thrust of that discussion was your vision of running the fund more as an institutional investment vehicle and a promise to provide financial information in the future. But the presentation again lacked any information on the underlying assets and financial conditions of the fund. It did, however, include a discussion that the Supporting Orgs had no right to information under the structure of the funds.

Shortly after the December 11 call, we received your first demand to withdraw our concerns about the governance of the funds, and it also advanced that if the Supporting Organizations wanted more

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hkland.com | www.hklaw.com

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*

Dear Mike,

We remain open to finding a framework within which we can resolve your clients' concerns.

I don't want to repeat points already made in my email dated 30th January 2025, but our understanding was that we were to prepare a presentation for the Foundations to address these concerns. This was a course of action suggested by you in our call last year and one which we thought was very sensible.

We are struggling to understand what happened between 21st January (when David Rosenburg, from your firm, confirmed a video conference would be acceptable) and 23rd January when an email was sent to Mark's old email address repeating various allegations that we were going to address in the presentation.

We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so.
Many thanks,
Paul.

---

**From:** Michael.Stockham@hklaw.com <Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; David.Rosenberg@hklaw.com; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you are represented by counsel, I believe it appropriate to loop him in for this communication. I also told you that I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 — before Mr. Patrick shut down that line of communication and information — showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. Yet, no information has been provided by you

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

---

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Julie,

I am an independent director of Charitable DAF HoldCo, Ltd. (which I believe is the entity you refer to as "DAF HoldCo" in your email dated 28 January 2025 (the "**28 January Email**")).

As an initial matter, I hope you will find the tone of this initial response to the 28 January Email conciliatory as I am keen to avoid any misunderstandings in circumstances where I had understood the next steps following the meetings between our respective legal

representatives (Douglas Mancino and David Rosenberg) in December last year was for us to present directly to the foundations/supporting organizations in order to address some of the concerns in the letter dated 11 November 2024 (the "**11 November Letter**"). This proposed presentation would supplement the two Zoom conference calls with your attorneys held by me and our independent valuation experts, ValueScope, in December last year as well as the ValueScope 9/30/24 report sent to you on 7 January that provided a balance sheet and information on all investment holdings.

As recently as 21 January 2025, David again confirmed that a Zoom conference call with yourselves would be an effective way to address your concerns and move forward in a cooperative manner.

Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter. Please note that neither Mark nor myself received your email dated 23 January 2025 given that it was sent to an out-of-use email address for Mark (which I understand he communicated to you and your assistant in person) and did not copy me. Therefore, the basis of the concerns and request to wind-up expressed in the 28 January Email, appears to be the single failure to respond to an email that was sent to a defunct email address. Having now been reminded that the email address is not functional, I hope you can take some comfort that you were not being ignored.
However, given the content and tone of the 28 January Email and David's request to progress the direct presentation to the foundations/supporting organizations only 7 days prior on 21 January 2025, there seems to be a disconnect between the conciliatory approach adopted in the latter and the more aggressive position set out in the former.

For our part, at this stage we are more than happy to continue to engage with the foundations/supporting organizations in an

effort to provide clarity on investments and the DAF HoldCo governance structure.

I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.

Please let us know if you are prepared to withdraw the allegations made in the 11 November Letter and the 23 and 28 January Emails and are content to proceed with our proposed delivery of the presentation which we are confident will provide a complete answer to your concerns.

Finally, as a matter of record, it is important that I outline the following:

The 11 November 2024 Letter was not directly sent to me. I received it from Charitable DAF HoldCo's US attorneys who had, in turn, received it from a US law firm acting for Mr. Dondero. As set out above, this supports our belief, which is also based on other actions we have seen to date, that Mr. Dondero is seeking to improperly

exerting influence over the foundations and supporting organizations for self-serving purposes to the detriment of DAF HoldCo, the foundations and supporting organizations.

We note that your communications to date contain several misstatements of fact and we reject all of your allegations. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.

We look forward to hearing from you in relation to the proposed presentation and withdrawal of the allegations.

Kind regards,

Paul.

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman KY1-1007
Cayman Islands
**Phone:** +1 345 946 3459
**Mobile:** +1 345 324 1121
**Fax:** +1 345 946 3493
**E-mail:** paul@gkmanagement.com.ky

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0049 |
| Expires: | July 31, 2027 |
| Estimated average burden hours per response | 10.72 |

# FORM ADV (Paper Version)

- **UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND**
- **REPORT FORM BY EXEMPT REPORTING ADVISERS**

## Form ADV: General Instructions

Read these instructions carefully before filing Form ADV. Failure to follow these instructions, properly complete the form, or pay all required fees may result in your application or report being delayed or rejected.

In these instructions and in Form ADV, "you" means the investment adviser (*i.e.*, the advisory firm).

If you are a "separately identifiable department or division" (SID) of a bank, "you" means the SID, rather than your bank, unless the instructions or the form provide otherwise.

If you are a *private fund* adviser filing an *umbrella registration*, "you" means the *filing adviser* and each *relying adviser*, unless the instructions or the form provide otherwise. The information in Items 1, 2, 3 and 10 (including corresponding schedules) should be provided for the *filing adviser* only.

Terms that appear in *italics* are defined in the Glossary of Terms to Form ADV.

### 1. Where can I get more information on Form ADV, electronic filing, and the IARD?

The SEC provides information about its rules and the Advisers Act on its website: <http://www.sec.gov/iard>.

NASAA provides information about state investment adviser laws and state rules, and how to contact a *state securities authority*, on its website: <http://www.nasaa.org>.

FINRA provides information about the IARD and electronic filing on the IARD website: <http://www.iard.com>.

### 2. What is Form ADV used for?

Investment advisers use Form ADV to:

- Register with the Securities and Exchange Commission
- Register with one or more *state securities authorities*

- Amend those registrations
- Report to the SEC as an *exempt reporting adviser*
- Report to one or more *state securities authorities* as an *exempt reporting adviser*
- Amend those reports; and
- Submit a final report as an *exempt reporting adviser*

**3. How is Form ADV organized?**

Form ADV contains five parts:

- Part 1A asks a number of questions about you, your business practices, the *persons* who own and *control* you, and the *persons* who provide investment advice on your behalf.
  - All advisers registering with the SEC or any of the *state securities authorities* must complete Part 1A.
  - *Exempt reporting advisers* (that are not also registering with any *state securities authority*) must complete only the following Items of Part 1A: 1, 2, 3, 6, 7, 10, and 11, as well as corresponding schedules. *Exempt reporting advisers* that are registering with any *state securities authority* must complete all of Form ADV.

  Part 1A also contains several supplemental schedules. The items of Part 1A let you know which schedules you must complete.

  - Schedule A asks for information about your direct owners and executive officers.
  - Schedule B asks for information about your indirect owners.
  - Schedule C is used by paper filers to update the information required by Schedules A and B (see Instruction 18).
  - Schedule D asks for additional information for certain items in Part 1A.
  - Schedule R asks for additional information about *relying advisers*.
  - Disclosure Reporting Pages (or DRPs) are schedules that ask for details about disciplinary events involving you or your *advisory affiliates*.

- Part 1B asks additional questions required by *state securities authorities*. Part 1B contains three additional DRPs. If you are applying for SEC registration or are registered only with the SEC, you do not have to complete Part 1B. (If you are filing electronically and you do not have to complete Part 1B, you will not see Part 1B).

- Part 2A requires advisers to create narrative *brochures* containing information about the advisory firm. The requirements in Part 2A apply to all investment advisers registered with or applying for registration with the SEC, but do not apply to *exempt reporting advisers*. Every application for registration must include a narrative brochure prepared in accordance with the requirements of Part 2A of Form ADV. See Advisers Act Rule 203-1.

- Part 2B requires advisers to create *brochure supplements* containing information about certain *supervised persons*. The requirements in Part 2B apply to all investment advisers registered with or applying for registration with the SEC, but do not apply to *exempt reporting advisers*.

- Part 3 requires advisers to create relationship *summary* (Form CRS) containing information for *retail investors*. The requirements in Part 3 apply to all investment

advisers registered or applying for registration with the SEC, but do not apply to *exempt reporting advisers*. Every adviser that has *retail investors* to whom it must deliver a *relationship summary* must include in the application for registration a *relationship summary* prepared in accordance with the requirements of Part 3 of Form ADV. See Advisers Act Rule 203-1.

**4. When am I required to update my Form ADV?**

- SEC- and State-Registered Advisers:

  - *Annual updating amendments*: You must amend your Form ADV each year by filing an *annual updating amendment* within 90 days after the end of your fiscal year. When you submit your *annual updating amendment*, you must update your responses to all items in Part 1A, 1B, 2A and 2B (as applicable), including corresponding sections of Schedules A, B, C, and D and all sections of Schedule R for each *relying adviser*. You must submit your summary of material changes required by Item 2 of Part 2A either in the *brochure* (cover page or the page immediately thereafter) or as an exhibit to your *brochure*. You may, but are not required, to submit amended versions of the *relationship summary* required by Part 3 as part of your *annual updating amendment.*

  - Other-than-annual amendments: In addition to your *annual updating amendment*,

    - If you are registered with the SEC or a *state securities authority*, you must amend Part 1A, 1B, 2A and 2B (as applicable) of your Form ADV, including corresponding sections of Schedules A, B, C, D, and R, by filing additional amendments (other-than-annual amendments) promptly, if:

      - you are adding or removing a *relying adviser* as part of your *umbrella registration;*

      - information you provided in response to Items 1 (except 1.O. and Section 1.F. of Schedule D), 3, 9 (except 9.A.(2), 9.B.(2), 9.E., and 9.F.), or 11 of Part 1A or Items 1, 2.A. through 2.F., or 2.I. of Part 1B or Sections 1 or 3 of Schedule R becomes inaccurate in any way;

      - information you provided in response to Items 4, 8, or 10 of Part 1A, or Item 2.G. of Part 1B, or Section 4 of Schedule R becomes materially inaccurate; or information you provided in your *brochure* becomes materially inaccurate (see note below for exceptions).

**Notes**: Part 1: If you are submitting an other-than-annual amendment, you are not required to update your responses to Items 2, 5, 6, 7, 9.A.(2), 9.B.(2), 9.E., 9.F., or 12 of Part 1A, Items 2.H. or 2.J. of Part 1B, Section 1.F. of Schedule D or Section 2 of Schedule R even if your responses to those items have become inaccurate.

Part 2: You must amend your *brochure supplements* (see Form ADV, Part

2B) promptly if any information in them becomes materially inaccurate. If you are submitting an other-than-annual amendment to your *brochure*, you are not required to update your summary of material changes as required by Item 2. You are not required to update your *brochure* between annual amendments solely because the amount of *client* assets you manage has changed or because your fee schedule has changed. However, if you are updating your *brochure* for a separate reason in between annual amendments, and the amount of *client* assets you manage listed in response to Item 4.E. or your fee schedule listed in response to Item 5.A. has become materially inaccurate, you should update that item(s) as part of the interim amendment.

- If you are an SEC-registered adviser, you are required to file your *brochure* amendments electronically through IARD. You are not required to file amendments to your *brochure supplements* with the SEC, but you must maintain a copy of them in your files.

- If you are a state-registered adviser, you are required to file your *brochure* amendments and *brochure supplement* amendments with the appropriate *state securities authorities* through IARD.

Part 3: If you are registered with the SEC, you must amend Part 3 of your Form ADV within 30 days whenever any information in your *relationship summary* becomes materially inaccurate by filing with the SEC an additional *other-than-annual amendment* or by including the *relationship summary* as part of an *annual updating amendment*. You must include an exhibit highlighting the most recent changes required by Form ADV, Part 3 (Form CRS), General Instruction 8.C.

- *Exempt reporting advisers*:

  - *Annual Updating Amendments*: You must amend your Form ADV each year by filing an *annual updating amendment* within 90 days after the end of your fiscal year. When you submit your *annual updating amendment*, you must update your responses to all required items, including corresponding sections of Schedules A, B, C, and D.
  - Other-than-Annual Amendments: In addition to your *annual updating amendment*, you must amend your Form ADV, including corresponding sections of Schedules A, B, C, and D, by filing additional amendments (other-than-annual amendments) promptly if:

    - information you provided in response to Items 1 (except Item 1.O. and Section 1.F. of Schedule D), 3, or 11 becomes inaccurate in any way; or
    - information you provided in response to Item 10 becomes materially inaccurate.

**Failure to update your Form ADV, as required by this instruction, is a violation of SEC rules or similar state rules and could lead to your registration being revoked.**

**5. What is SEC *umbrella registration* and how can I satisfy the requirements of filing an *umbrella registration?***

An *umbrella registration* is a single registration by a *filing adviser* and one or more *relying advisers* who advise only *private funds* and certain separately managed account *clients* that are *qualified clients* and collectively conduct a single advisory business. Absent other facts suggesting that the *filing adviser* and *relying adviser*(s) conduct different businesses, *umbrella registration* is available under the following circumstances:

i. The *filing adviser* and each *relying adviser* advise only *private funds* and *clients* in separately managed accounts that are *qualified clients* and are otherwise eligible to invest in the *private funds* advised by the *filing adviser* or a *relying adviser* and whose accounts pursue investment objectives and strategies that are substantially similar or otherwise related to those *private funds*.

ii. The *filing adviser* has its *principal office and place of business* in the United States and, therefore, all of the substantive provisions of the Advisers Act and the rules thereunder apply to the *filing adviser's* and each *relying adviser's* dealings with each of its *clients*, regardless of whether any *client* of the *filing adviser* or *relying adviser* providing the advice is a *United States person*.

iii. Each *relying adviser*, its *employees* and the *persons* acting on its behalf are subject to the *filing adviser's* supervision and *control* and, therefore, each *relying adviser*, its *employees* and the *persons* acting on its behalf are "persons associated with" the *filing adviser* (as defined in section 202(a)(17) of the Advisers Act).

iv. The advisory activities of each *relying adviser* are subject to the Advisers Act and the rules thereunder, and each *relying adviser* is subject to examination by the SEC.

v. The *filing adviser* and each *relying adviser* operate under a single code of ethics adopted in accordance with SEC rule 204A-1 and a single set of written policies and procedures adopted and implemented in accordance with SEC rule 206(4)-7 and administered by a single chief compliance officer in accordance with that rule.

To satisfy the requirements of Form ADV while using *umbrella registration* the *filing adviser* must sign, file, and update as required, a single Form ADV (Parts 1 and 2) that relates to, and includes all information concerning, the *filing adviser* and each *relying adviser* (*e.g.*, disciplinary information and ownership information), and must include this same information in any other reports or filings it must make under the Advisers Act or the rules thereunder (*e.g.*, Form PF). The *filing adviser* and each *relying adviser* must not be prohibited from registering with the SEC by section 203A of the Advisers Act (*i.e.*, the *filing adviser* and each *relying adviser* must individually qualify for SEC registration).

Unless otherwise specified, references to "you" in Form ADV refer to both the *filing adviser* and each *relying adviser*. The information in Items 1, 2, 3 and 10 (including corresponding schedules) should be provided for the *filing adviser* only. A separate Schedule R should be completed for each *relying adviser*. References to "you" in Schedule R refer to the *relying*

*adviser* only.

A *filing adviser* applying for registration with the SEC should complete a Schedule R for each *relying adviser*. If you are a *filing adviser* registered with the SEC and would like to add or delete *relying advisers* from an *umbrella registration*, you should file an other-than-annual amendment and add or delete Schedule Rs as needed.

Note: *Umbrella registration* is not available to *exempt reporting advisers*.

**6. Where do I sign my Form ADV application or amendment?**

You must sign the appropriate Execution Page. There are three Execution Pages at the end of the form. Your initial application, your initial report (in the case of an *exempt reporting adviser*), and all amendments to Form ADV must include at least one Execution Page.

- If you are applying for or are amending your SEC registration, or if you are reporting as an *exempt reporting adviser* or amending your report, you must sign and submit either a:
  - Domestic Investment Adviser Execution Page, if you (the advisory firm) are a resident of the United States; or
  - *Non-Resident* Investment Adviser Execution Page, if you (the advisory firm) are not a resident of the United States.
- If you are applying for or are amending your registration with a *state securities authority*, you must sign and submit the State-Registered Investment Adviser Execution Page.

**7. Who must sign my Form ADV or amendment?**

The individual who signs the form depends upon your form of organization:

- For a sole proprietorship, the sole proprietor.
- For a partnership, a general partner.
- For a corporation, an authorized principal officer.
- For a "separately identifiable department or division" (SID) of a bank, a principal officer of your bank who is directly engaged in the management, direction, or supervision of your investment advisory activities.
- For all others, an authorized individual who participates in managing or directing your affairs.

The signature does not have to be notarized, and in the case of an electronic filing, should be a typed name.

**8. How do I file my Form ADV?**

Complete Form ADV electronically using the Investment Adviser Registration Depository (IARD) if:

- You are filing with the SEC (and submitting *notice filings* to any of the *state securities authorities*), or

- You are filing with a *state securities authority* that requires or permits advisers to submit Form ADV through the IARD.

  **Note:** SEC rules require advisers that are registered or applying for registration with the SEC, or that are reporting to the SEC as an *exempt reporting adviser*, to file electronically through the IARD system. See SEC rules 203-1 and 204-4.

To file electronically, go to the IARD website (<www.iard.com>), which contains detailed instructions for advisers to follow when filing through the IARD.

Complete Form ADV (Paper Version) on paper if:

- You are filing with the SEC or a *state securities authority* that requires electronic filing, but you have been granted a continuing hardship exemption. Hardship exemptions are described in Instruction 17.

- You are filing with a *state securities authority* that permits (but does not require) electronic filing and you do not file electronically.

**9. How do I get started filing electronically?**

First, obtain a copy of the IARD Entitlement Package from the following website: <http://www.iard.com/GetStarted.asp>. Second, request access to the IARD system for your firm by completing and submitting the IARD Entitlement Package. The IARD Entitlement Package explains how the form may be submitted. Mail the forms to: FINRA Entitlement Group, 9509 Key West Avenue, Rockville, MD 20850.

When FINRA receives your Entitlement Package, they will assign a *CRD* number (identification number for your firm) and a user I.D. code and password (identification number and system password for the individual(s) who will submit Form ADV filings for your firm). Your firm may request an I.D. code and password for more than one individual. FINRA also will create a financial account for you from which the IARD will deduct filing fees and any state fees you are required to pay. If you already have a *CRD* account with FINRA, it will also serve as your IARD account; a separate account will not be established.

Once you receive your *CRD* number, user I.D. code and password, and you have funded your account, you are ready to file electronically.

Questions regarding the Entitlement Process should be addressed to FINRA at 240.386.4848.

**10. If I am applying for registration with the SEC, or amending my SEC registration, how do I make *notice filings* with the *state securities authorities*?**

If you are applying for registration with the SEC or are amending your SEC registration, one or more *state securities authorities* may require you to provide them with copies of your SEC

filings. We call these filings "*notice filings*." Your *notice filings* will be sent electronically to the states that you check on Item 2.C. of Part 1A. The *state securities authorities* to which you send *notice filings* may charge fees, which will be deducted from the account you establish with FINRA. To determine which *state securities authorities* require SEC-registered advisers to submit *notice filings* and to pay fees, consult the relevant state investment adviser law or *state securities authority*. See General Instruction 1.

If you are granted a continuing hardship exemption to file Form ADV on paper, FINRA will enter your filing into the IARD and your *notice filings* will be sent electronically to the *state securities authorities* that you check on Item 2.C. of Part 1A.

**11. I am registered with a state. When must I switch to SEC registration?**

If at the time of your *annual updating amendment* you meet at least one of the requirements for SEC registration in Item 2.A.(1) to (12) of Part 1A, you must apply for registration with the SEC within 90 days after you file the *annual updating amendment*. Once you register with the SEC, you are subject to SEC regulation, regardless of whether you remain registered with one or more states. See SEC rule 203A-1(b)(2). Each of your *investment adviser representatives*, however, may be subject to registration in those states in which the representative has a place of business. See Advisers Act section 203A(b)(1); SEC rule 203A-3(a). For additional information, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business." See General Instruction 1.

**12. I am registered with the SEC. When must I switch to registration with a *state securities authority*?**

If you check box 13 in Item 2.A. of Part 1A to report on your *annual updating amendment* that you are no longer eligible to register with the SEC, you must withdraw from SEC registration within 180 days after the end of your fiscal year by filing Form ADV-W. See SEC rule 203A-1(b)(2). You should consult state law or the *state securities authority* for the states in which you are "doing business" to determine if you are required to register in these states. See General Instruction 1. Until you file your Form ADV-W with the SEC, you will remain subject to SEC regulation, and you also will be subject to regulation in any states where you register. See SEC rule 203A-1(b)(2).

**13. I am an *exempt reporting adviser*. When must I submit my first report on Form ADV?**

- <u>All *exempt reporting advisers*</u>:
  You must submit your initial Form ADV filing within 60 days of relying on the exemption from registration under either section 203(l) of the Advisers Act as an adviser solely to one or more venture capital funds or section 203(m) of the Advisers Act because you act solely as an adviser to private funds and have assets under management in the United States of less than $150 million.

- <u>Additional instruction for advisers switching from being registered to being *exempt reporting advisers*</u>:

If you are currently registered as an investment adviser (or have an application for registration pending) with the SEC or with a *state securities authority*, you must file a Form ADV-W to withdraw from registration in the jurisdictions where you are switching. You must submit the Form ADV-W before submitting your first report as an *exempt reporting adviser*.

**14. I am an *exempt reporting adviser*. Is it possible that I might be required to also register with or submit a report to a *state securities authority*?**

Yes, you may be required to register with or submit a report to one or more *state securities authorities*. If you are required to register with one or more *state securities authorities*, you must complete all of Form ADV. See General Instruction 3. If you are required to submit a report to one or more *state securities authorities*, check the box(es) in Item 2.C. of Part 1A next to the state(s) you would like to receive the report. Each of your *investment adviser representatives* may also be subject to registration requirements. For additional information about the requirements that may apply to you, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business." See General Instruction 1.

**15. What do I do if I no longer meet the definition of "*exempt reporting adviser*"?**

- Advisers Switching to SEC Registration:
  - You may no longer be an *exempt reporting adviser* and may be required to register with the SEC if you wish to continue doing business as an investment adviser. For example, you may be relying on section 203(l) and wish to accept a *client* that is not a venture capital fund as defined in SEC rule 203(l)-1, or you may have been relying on SEC rule 203(m)-1 and reported in Section 2.B. of Schedule D to your *annual updating amendment* that you have *private fund* assets of $150 million or more.
    - If you are relying on section 203(l), unless you qualify for another exemption, you would violate the Advisers Act's registration requirement if you accept a *client* that is not a venture capital fund as defined in SEC rule 203(l)-1 before the SEC approves your application for registration. You must submit your final report as an *exempt reporting adviser* and apply for SEC registration in the same filing.
    - If you were relying on SEC rule 203(m)-1 and you reported in Section 2.B. of Schedule D to your *annual updating amendment* that you have *private fund* assets of $150 million or more, you must register with the SEC unless you qualify for another exemption. If you have complied with all SEC reporting requirements applicable to an *exempt reporting adviser* as such, you have up to 90 days after filing your *annual updating amendment* to apply for SEC registration, and you may continue doing business as a *private fund* adviser during this time. You must submit your final report as an *exempt reporting adviser* and apply for SEC registration in the same filing. Unless you qualify for another exemption, you would violate the Advisers Act's registration requirement if you accept a *client* that is not a *private fund* during this

transition period before the SEC approves your application for registration, and you must comply with all SEC reporting requirements applicable to an *exempt reporting adviser* as such during this 90-day transition period. If you have not complied with all SEC reporting requirements applicable to an *exempt reporting adviser* as such, this 90-day transition period is not available to you. Therefore, if the transition period is not available to you, and you do not qualify for another exemption, your application for registration must be approved by the SEC before you meet or exceed SEC rule 203(m)-1's $150 million asset threshold.

- You will be deemed in compliance with the Form ADV filing and reporting requirements until the SEC approves or denies your application. If your application is approved, you will be able to continue business as a registered adviser.

- If you register with the SEC, you may be subject to state *notice filing* requirements. To determine these requirements, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business." See General Instruction 1.

**Note**: If you are relying on SEC rule 203(m)-1 and you accept a *client* that is not a *private fund*, you will lose the exemption provided by SEC rule 203(m)-1 immediately. To avoid this result, you should apply for SEC registration in advance so that the SEC has approved your registration before you accept a *client* that is not a *private fund*.

The 90-day transition period described above also applies to investment advisers with their *principal offices and places of business* outside of the United States with respect to their *clients* who are *United States persons* (*e.g.*, the adviser would not be eligible for the 90-day transition period if it accepted a *client* that is a *United States person* and is not a *private fund*).

- Advisers Not Switching to SEC Registration:

  - You may no longer be an *exempt reporting adviser* but may not be required to register with the SEC or may be prohibited from doing so. For example, you may cease to do business as an investment adviser, become eligible for an exemption that does not require reporting, or be ineligible for SEC registration. In this case, you must submit a final report as an *exempt reporting adviser* to update only Item 1 of Part 1A of Form ADV.

  - You may be subject to state registration requirements. To determine these requirements, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business." See General Instruction 1.

**16. Are there filing fees?**

Yes. These fees go to support and maintain the IARD. The IARD filing fees are in addition to any registration or other fee that may be required by state law. You must pay an IARD filing fee for your initial application, your initial report, and each *annual updating*

*amendment*. There is no filing fee for an other-than-annual amendment, a final report as an *exempt reporting adviser*, or Form ADV-W. The IARD filing fee schedule is published at <http://www.sec.gov/iard>; <http://www.nasaa.org>; and <http://www.iard.com>.

If you are submitting a paper filing under a continuing hardship exemption (see Instruction 17), you are required to pay an additional fee. The amount of the additional fee depends on whether you are filing Form ADV or Form ADV-W. (There is no additional fee for filings made on Form ADV-W.) The hardship filing fee schedule is available by contacting FINRA at 240.386.4848.

**17. What if I am not able to file electronically?**

If you are required to file electronically but cannot do so, you may be eligible for one of two types of hardship exemptions from the electronic filing requirements.

- A **temporary hardship exemption** is available if you file electronically, but you encounter unexpected difficulties that prevent you from making a timely filing with the IARD, such as a computer malfunction or electrical outage. This exemption does not permit you to file on paper; instead it extends the deadline for an electronic filing for seven business days. See SEC rules 203-3(a) and 204-4(e).
- A **continuing hardship exemption** may be granted if you are a small business and you can demonstrate that filing electronically would impose an undue hardship. You are a small business, and may be eligible for a continuing hardship exemption, if you are required to answer Item 12 of Part 1A (because you have assets under management of less than $25 million) and you are able to respond "no" to each question in Item 12. See SEC rule 0-7.

  If you have been granted a continuing hardship exemption, you must complete and submit the paper version of Form ADV to FINRA. FINRA will enter your responses into the IARD. As discussed in General Instruction 16, FINRA will charge you a fee to reimburse it for the expense of data entry.

**18. I am eligible to file on paper. How do I make a paper filing?**

When filing on paper, you must:

- Type all of your responses.
- Include your name (the same name you provide in response to Item 1.A. of Part 1A) and the date on every page.
- If you are amending your Form ADV:
  - complete page 1 and circle the number of any item for which you are changing your response.
  - include your SEC 801-number (if you have one), or your 802-number (if you have one), and your *CRD* number (if you have one) on every page.
  - complete the amended item in full and circle the number of the item for which you are changing your response.
  - to amend Schedule A or Schedule B, complete and submit Schedule C.

Where you submit your paper filing depends on why you are eligible to file on paper:

- If you are filing on paper because you have been granted a continuing hardship exemption, submit one manually signed Form ADV and one copy to: IARD Document Processing, FINRA, P.O. Box 9495, Gaithersburg, MD 20898-9495.

  **If you complete Form ADV on paper and submit it to FINRA but you do not have a continuing hardship exemption, the submission will be returned to you.**

- If you are filing on paper because a state in which you are registered or in which you are applying for registration allows you to submit paper instead of electronic filings, submit one manually signed Form ADV and one copy to the appropriate *state securities authorities*.

**19. Who is required to file Form ADV-NR?**

Every *non-resident* general partner and *managing agent* of all SEC-registered advisers and *exempt reporting advisers*, whether or not the adviser is a resident in the United States, must file Form ADV-NR in connection with the adviser's initial application or report. A general partner or *managing agent* of an SEC-registered adviser or *exempt reporting adviser* who becomes a *non-resident* after the adviser's initial application or report has been submitted must file Form ADV-NR within 30 days. Absent a temporary hardship, Form ADV-NR must be filed electronically through IARD.

**Failure to file Form ADV-NR promptly may delay SEC consideration of your initial application.**

**20. How is Form ADV-NR filed?**

Form ADV-NR is filed electronically with the Investment Adviser Registration Depository (IARD). Information for how to file with IARD is available on the SEC's website at <www.sec.gov/iard> and on <www.iard.com>.

## Federal Information Law and Requirements

Sections 203 and 204 of the Advisers Act [15 U.S.C. §§ 80b-3 and 80b-4] authorize the SEC to collect the information required by Form ADV. The SEC collects the information for regulatory purposes, such as deciding whether to grant registration. Filing Form ADV is mandatory for advisers who are required to register with the SEC and for *exempt reporting advisers*. The SEC maintains the information submitted on this form and makes it publicly available. The SEC may return forms that do not include required information. Intentional misstatements or omissions constitute federal criminal violations under 18 U.S.C. § 1001 and 15 U.S.C. § 80b-17.

## SEC's Collection of Information

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of

information unless it displays a currently valid control number. The Advisers Act authorizes the SEC to collect the information on Form ADV from investment advisers. See 15 U.S.C. §§ 80b-3 and 80b-4. Filing the form is mandatory.

The form enables the SEC to register investment advisers and to obtain information from and about *exempt reporting advisers*. Every applicant for registration with the SEC as an adviser, and every *exempt reporting adviser*, must file the form. See 17 C.F.R. §§ 275.203-1 and 204-4. By accepting a form, however, the SEC does not make a finding that it has been completed or submitted correctly. The form is filed annually by every adviser, no later than 90 days after the end of its fiscal year, to amend its registration or its report. It is also filed during the year to reflect material changes. See 17 C.F.R. § 275.204-1. The SEC maintains the information on the form and makes it publicly available through the IARD.

Anyone may send the SEC comments on the accuracy of the burden estimate on page 1 of the form, as well as suggestions for reducing the burden. The Office of Management and Budget has reviewed this collection of information under 44 U.S.C. § 3507.

The information contained in the form is part of a system of records subject to the Privacy Act of 1974, as amended. The SEC has published in the Federal Register the Privacy Act System of Records Notice for these records.

# FORM ADV (Paper Version)

- **UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND**
- **REPORT BY EXEMPT REPORTING ADVISERS**

**Form ADV: Instructions for Part 1A**

These instructions explain how to complete certain items in Part 1A of Form ADV.

**1. Item 1: Identifying Information**

**Separately Identifiable Department or Division of a Bank.** If you are a "separately identifiable department or division" (SID) of a bank, answer Item 1.A. with the full legal name of your bank, and answer Item 1.B. with your own name (the name of the department or division) and all names under which you conduct your advisory business. In addition, your *principal office and place of business* in Item 1.F. should be the principal office at which you conduct your advisory business. In response to Item 1.I., the website addresses and social media information you list on Schedule D should be those that provide information about your own activities, rather than general information about your bank.

**2. Item 2: SEC Registration and SEC Report by *Exempt Reporting Advisers***

If you are registered or applying for registration with the SEC, you must indicate in Item 2.A. why you are eligible to register with the SEC by checking at least one of the boxes.

a. **Item 2.A.(1): Adviser with Regulatory Assets Under Management of $100 Million or More.** You may check box 1 only if your response to Item 5.F.(2)(c) is $100 million or more, or you are filing an *annual updating amendment* with the SEC and your response to Item 5.F.(2)(c) is $90 million or more. While you may register with the SEC if your regulatory assets under management are at least $100 million but less than $110 million, you must apply for registration with the SEC if your regulatory assets under management are $110 million or more. If you are a SEC-registered adviser, you may remain registered with the SEC if your regulatory assets under management are $90 million or more. See SEC rule 203A-1(a). Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management.

   If you are a state-registered adviser and you report on your *annual updating amendment* that your regulatory assets under management increased to $100 million or more, you may register with the SEC. If your regulatory assets under management increased to $110 million or more, you must apply for registration with the SEC within 90 days after you file that *annual updating amendment*. See SEC rule 203A-1(b)(1) and Form ADV General Instruction 11.

b. **Item 2.A.(2): Mid-Sized Adviser.** You may check box 2 only if your response to Item 5.F.(2)(c) is $25 million or more but less than $100 million, and you satisfy one of the requirements below. Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management.

You must register with the SEC if you meet at least one of the following requirements:

- You are not required to be registered as an investment adviser with the *state securities authority* of the state where you maintain your *principal office and place of business* pursuant to that state's investment adviser laws. If you are exempt from registration with that state or are excluded from the definition of investment adviser in that state, you must register with the SEC. You should consult the investment adviser laws or the *state securities authority* for the particular state in which you maintain your *principal office and place of business* to determine if you are required to register in that state. See General Instruction 1.

- You are not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*. To determine whether such *state securities authority* does not conduct such examinations, see: https://www.sec.gov/divisions/investment/midsizedadviserinfo.htm

See section 203A(a)(2) of the Advisers Act.

c. **Item 2.A.(5): Adviser to an Investment Company.** You may check box 5 only if you currently provide advisory services under an investment advisory contract to an investment company registered under the Investment Company Act of 1940 and the investment company is operational (i.e., has assets and shareholders, other than just the organizing shareholders). See sections 203A(a)(1)(B) and 203A(a)(2)(A) of the Advisers Act. Advising investors about the merits of investing in mutual funds or recommending particular mutual funds does not make you eligible to check this box.

d. **Item 2.A.(6): Adviser to a Business Development Company.** You may check box 6 only if your response to Item 5.F.(2)(c) is $25 million or more of regulatory assets under management, and you currently provide advisory services under an investment advisory contract to a company that has elected to be a business development company pursuant to section 54 of the Investment Company Act of 1940, that has not withdrawn the election, and that is operational (i.e., has assets and shareholders, other than just the organizing shareholders). See section 203A(a)(2)(A) of the Advisers Act. Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management.

e. **Item 2.A.(7): Pension Consultant.** You may check box 7 only if you are eligible for the pension consultant exemption from the prohibition on SEC registration.

- You are eligible for this exemption if you provided investment advice to employee benefit plans, governmental plans, or church plans with respect to assets having an aggregate value of $200 million or more during the 12-month period that ended within 90 days of filing this Form ADV. You are not eligible for this exemption if you only advise plan participants on allocating their investments within their pension plans. See SEC rule 203A-2(a).

- To calculate the value of assets for purposes of this exemption, aggregate the assets of

the plans for which you provided advisory services at the end of the 12-month period. If you provided advisory services to other plans during the 12-month period, but your employment or contract terminated before the end of the 12-month period, you also may include the value of those assets.

f. **Item 2.A.(8): Related Adviser.** You may check box 8 only if you are eligible for the related adviser exemption from the prohibition on SEC registration. See SEC rule 203A-2(b). You are eligible for this exemption if you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC, and you have the same *principal office and place of business* as that other investment adviser. Note that you may not rely on the SEC registration of an Internet adviser under rule 203A-2(e) in establishing eligibility for this exemption. See SEC rule 203A-2(e)(1)(iii). If you check box 8, you also must complete Section 2.A.(8) of Schedule D.

g. **Item 2.A.(9): Adviser Expecting to be Eligible for Registration within 120 Days.** You may check box 9 only if you are eligible for the exemption from the prohibition on SEC registration available to advisers expecting to be eligible for SEC registration within 120 days, such as a newly formed adviser. See SEC rule 203A-2(c). You are eligible for this exemption if immediately before you file your application for registration with the SEC:

- you were not registered or required to be registered with the SEC or a *state securities authority*; and
- you have a reasonable expectation that you will be eligible to register with the SEC within 120 days after the date that your registration with the SEC becomes effective.

If you check box 9, you also must complete Section 2.A.(9) of Schedule D.

You must file an amendment to Part 1A of your Form ADV that updates your response to Item 2.A. within 120 days after the SEC declares your registration effective. You may not check box 9 on your amendment; since this exemption is available only if you are not registered, you may not "re-rely" on this exemption. If you indicate on that amendment (by checking box 13) that you are not eligible to register with the SEC, you also must file a Form ADV-W to withdraw your SEC registration no later than 120 days after your registration was declared effective. You should contact the appropriate *state securities authority* to determine how long it may take to become state-registered sufficiently in advance of when you are required to file Form ADV-W to withdraw from SEC registration.

*Note*: If you expect to be eligible for SEC registration because of the amount of your regulatory assets under management, that amount must be $100 million or more no later than 120 days after your registration is declared effective.

h. **Item 2.A.(10): Multi-State Adviser.** You may check box 10 only if you are eligible for the multi-state adviser exemption from the prohibition on SEC registration. See SEC rule 203A-2(d). You are eligible for this exemption if you are required to register as an investment adviser with the *state securities authorities* of 15 or more states. If you check

box 10, you must complete Section 2.A.(10) of Schedule D. You must complete Section 2.A.(10) of Schedule D in each *annual updating amendment* you submit.

If you check box 10, you also must:

- create and maintain a list of the states in which, but for this exemption, you would be required to register;
- update this list each time you submit an *annual updating amendment* in which you continue to represent that you are eligible for this exemption; and
- maintain the list in an easily accessible place for a period of not less than five years from each date on which you indicate that you are eligible for the exemption.

If, at the time you file your *annual updating amendment*, you are required to register in less than 15 states and you are not otherwise eligible to register with the SEC, you must check box 13 in Item 2.A. You also must file a Form ADV-W to withdraw your SEC registration. See Part 1A Instruction 2.j.

i. **Item 2.A.(11): Internet Adviser.** You may check box 11 only if you are eligible for the Internet adviser exemption from the prohibition on SEC registration. See SEC rule 203A-2(e). If you check box 11, you must complete Section 2.A.(11) of Schedule D. You are eligible for this exemption if:

- You provide investment advice to all of your clients exclusively through an *operational interactive website* at all times during which you rely on rule 203A-2(e). Other forms of online or Internet investment advice do not qualify for this exemption;
- You maintain a record demonstrating that you provide investment advice to your *clients* exclusively through an *operational interactive website* in accordance with these limits.

j. **Item 2.A.(13): Adviser No Longer Eligible to Remain Registered with the SEC.** You must check box 13 if:

- you are registered with the SEC;
- you are filing an *annual updating amendment* to Form ADV in which you indicate in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $90 million; and
- you are not eligible to check any other box (other than box 13) in Item 2.A. (and are therefore no longer eligible to remain registered with the SEC).

You must withdraw from SEC registration within 180 days after the end of your fiscal year by filing Form ADV-W. Until you file your Form ADV-W, you will remain subject to SEC regulation, and you also will be subject to regulation in the states in which you register. See SEC rule 203A-1(b)(2).

k. **Item 2.B.: Reporting by *Exempt Reporting Advisers*.** You may check box 2.B.(1) only if you qualify for the exemption from SEC registration as an adviser solely to one or more venture capital funds. See SEC rule 203(l)-1. You may check box 2.B.(2) only if

you qualify for the exemption from SEC registration because you act solely as an adviser to *private funds* and have assets under management in the United States of less than $150 million. See SEC rule 203(m)-1. You may check both boxes to indicate that you qualify for both exemptions. You should check box 2.B.(3) if you act solely as an adviser to *private funds* but you are no longer eligible to check box 2.B.(2) because you have assets under management in the United States of $150 million or more. If you check box 2.B.(2) or (3), you also must complete Section 2.B. of Schedule D.

**3. Item 3: Form of Organization**

If you are a "separately identifiable department or division" (SID) of a bank, answer Item 3.A. by checking "other." In the space provided, specify that you are a "SID of" and indicate the form of organization of your bank. Answer Items 3.B. and 3.C. with information about your bank.

**4. Item 4: Successions**

a. **Succession of an SEC-Registered Adviser.** If you (1) have taken over the business of an investment adviser or (2) have changed your structure or legal status (e.g., form of organization or state of incorporation), a new organization has been created, which has registration obligations under the Advisers Act. There are different ways to fulfill these obligations. You may rely on the registration provisions discussed in the General Instructions, or you may be able to rely on special registration provisions for "successors" to SEC-registered advisers, which may ease the transition to the successor adviser's registration.

To determine if you may rely on these provisions, review "Registration of Successors to Broker-Dealers and Investment Advisers," Investment Advisers Act Release No. 1357 (Dec. 28, 1992). If you have taken over an adviser, follow Part 1A Instruction 4.a.(1), Succession by Application. If you have changed your structure or legal status, follow Part 1A, Instruction 4.a.(2), Succession by Amendment. If either (1) you are a "separately identifiable department or division" (SID) of a bank that is currently registered as an investment adviser, and you are taking over your bank's advisory business; or (2) you are a SID currently registered as an investment adviser, and your bank is taking over your advisory business, then follow Part 1A Instruction 4.a.(1), Succession by Application.

(1) **Succession by Application.** If you are not registered with the SEC as an adviser, and you are acquiring or assuming substantially all of the assets and liabilities of the advisory business of an SEC-registered adviser, file a new application for registration on Form ADV. You will receive new registration numbers. You must file the new application within 30 days after the succession. On the application, make sure you check "yes" to Item 4.A., enter the date of the succession in Item 4.B., and complete Section 4 of Schedule D.

Until the SEC declares your new registration effective, you may rely on the registration of the adviser you are acquiring, but only if the adviser you are acquiring

is no longer conducting advisory activities. Once your new registration is effective, a Form ADV-W must be filed with the SEC to withdraw the registration of the acquired adviser.

(2) **Succession by Amendment.** If you are a new investment adviser formed solely as a result of a change in form of organization, a reorganization, or a change in the composition of a partnership, and there has been no practical change in *control* or management, you may amend the registration of the registered investment adviser to reflect these changes rather than file a new application. You will keep the same registration numbers, and you should not file a Form ADV-W. On the amendment, make sure you check "yes" to Item 4.A., enter the date of the succession in Item 4.B., and complete Section 4 of Schedule D. You must submit the amendment within 30 days after the change or reorganization.

b. **Succession of a State-Registered Adviser.** If you (1) have taken over the business of an investment adviser or (2) have changed your structure or legal status (e.g., form of organization or state of incorporation), a new organization has been created, which has registration obligations under state investment adviser laws. There may be different ways to fulfill these obligations. You should contact each state in which you are registered to determine that state's requirements for successor registration. See Form ADV General Instruction 1.

5. **Item 5: Information About Your Advisory Business**

a. **Newly-Formed Advisers:** Several questions in Item 5 that ask about your advisory business assume that you have been operating your advisory business for some time. Your response to these questions should reflect your current advisory business (i.e., at the time you file your Form ADV), with the following exceptions:

- base your response to Item 5.E. on the types of compensation you expect to accept;
- base your response to Item 5.G. and Item 5.J. on the types of advisory services you expect to provide during the next year; and
- skip Item 5.H.

b. **Item 5.F.: Calculating Your Regulatory Assets Under Management.** In determining the amount of your regulatory assets under management, include the securities portfolios for which you provide continuous and regular supervisory or management services as of the date of filing this Form ADV.

(1) **Securities Portfolios.** An account is a securities portfolio if at least 50% of the total value of the account consists of securities. For purposes of this 50% test, you may treat cash and cash equivalents (i.e., bank deposits, certificates of deposit, bankers acceptances, and similar bank instruments) as securities. You must include securities portfolios that are:

(a) your family or proprietary accounts;

(b) accounts for which you receive no compensation for your services; and

(c) accounts of *clients* who are not *United States persons*.

For purposes of this definition, treat all of the assets of a *private fund* as a securities portfolio, regardless of the nature of such assets. For accounts of *private funds*, moreover, include in the securities portfolio any uncalled commitment pursuant to which a *person* is obligated to acquire an interest in, or make a capital contribution to, the *private fund*.

(2) **Value of Portfolio.** Include the entire value of each securities portfolio for which you provide continuous and regular supervisory or management services. If you provide continuous and regular supervisory or management services for only a portion of a securities portfolio, include as regulatory assets under management only that portion of the securities portfolio for which you provide such services. Exclude, for example, the portion of an account:

(a) under management by another *person*; or

(b) that consists of real estate or businesses whose operations you "manage" on behalf of a *client* but not as an investment.

Do not deduct any outstanding indebtedness or other accrued but unpaid liabilities.

(3) **Continuous and Regular Supervisory or Management Services.**

**General Criteria.** You provide continuous and regular supervisory or management services with respect to an account if:

(a) you have *discretionary authority* over and provide ongoing supervisory or management services with respect to the account; or

(b) you do not have *discretionary authority* over the account, but you have ongoing responsibility to select or make recommendations, based upon the needs of the *client*, as to specific securities or other investments the account may purchase or sell and, if such recommendations are accepted by the *client*, you are responsible for arranging or effecting the purchase or sale.

**Factors.** You should consider the following factors in evaluating whether you provide continuous and regular supervisory or management services to an account.

(a) **Terms of the advisory contract.** If you agree in an advisory contract to provide ongoing management services, this suggests that you provide these services for the account. Other provisions in the contract, or your actual management practices, however, may suggest otherwise.

(b) **Form of compensation.** If you are compensated based on the average value of the *client's* assets you manage over a specified period of time, that suggests that

you provide continuous and regular supervisory or management services for the account. If you receive compensation in a manner similar to either of the following, that suggests you do not provide continuous and regular supervisory or management services for the account

(i) you are compensated based upon the time spent with a *client* during a *client* visit; or

(ii) you are paid a retainer based on a percentage of assets covered by a financial plan.

(c) **Management practices.** The extent to which you actively manage assets or provide advice bears on whether the services you provide are continuous and regular supervisory or management services. The fact that you make infrequent trades (e.g., based on a "buy and hold" strategy) does not mean your services are not "continuous and regular."

**Examples.** You may provide continuous and regular supervisory or management services for an account if you:

(a) have *discretionary authority* to allocate *client* assets among various mutual funds;

(b) do not have *discretionary authority*, but provide the same allocation services, and satisfy the criteria set forth in Instruction 5.b.(3);

(c) allocate assets among other managers (a "manager of managers"), but only if you have *discretionary authority* to hire and fire managers and reallocate assets among them; or

(d) you are a broker-dealer and treat the account as a brokerage account, but only if you have *discretionary authority* over the account.

You do not provide continuous and regular supervisory or management services for an account if you:

(a) provide market timing recommendations (i.e., to buy or sell), but have no ongoing management responsibilities;

(b) provide only *impersonal investment advice* (e.g., market newsletters);

(c) make an initial asset allocation, without continuous and regular monitoring and reallocation; or

(d) provide advice on an intermittent or periodic basis (such as upon *client* request, in response to a market event, or on a specific date (e.g., the account is reviewed and adjusted quarterly)).

(4) **Value of Regulatory Assets Under Management.** Determine your regulatory assets under management based on the current market value of the assets as determined within 90 days prior to the date of filing this Form ADV. Determine market value using the same method you used to report account values to *clients* or to calculate fees for investment advisory services.

In the case of a *private fund*, determine the current market value (or fair value) of the *private fund's* assets and the contractual amount of any uncalled commitment pursuant to which a *person* is obligated to acquire an interest in, or make a capital contribution to, the *private* fund.

(5) **Example.** This is an example of the method of determining whether an account of a *client* other than a *private fund* may be included as regulatory assets under management.

The *client's* portfolio consists of the following:

| | |
|---|---|
| $6,000,000 | stocks and bonds |
| $1,000,000 | cash and cash equivalents |
| $3,000,000 | non-securities (collectibles, commodities, real estate, etc.) |
| $10,000,000 | Total Assets |

**First, is the account a securities portfolio?** The account is a securities portfolio because securities as well as cash and cash equivalents (which you have chosen to include as securities) ($6,000,000 + $1,000,000 = $7,000,000) comprise at least 50% of the value of the account (here, 70%). (See Instruction 5.b.(1)).

**Second, does the account receive continuous and regular supervisory or management services?** The entire account is managed on a *discretionary basis* and is provided ongoing supervisory and management services, and therefore receives continuous and regular supervisory or management services. (See Instruction 5.b.(3)).

**Third, what is the entire value of the account?** The entire value of the account ($10,000,000) is included in the calculation of the adviser's total regulatory assets under management.

## 6. Item 7: Financial Industry Affiliations and Private Fund Reporting

Item 7.A. and Section 7.A. of Schedule D ask questions about you and your *related persons'* financial industry affiliations. If you are filing an *umbrella registration*, you should not check Item 7.A.(2) with respect to your *relying advisers*, and you do not have to complete Section 7.A. in Schedule D for your *relying advisers*. You should complete Schedule R with respect to your *relying advisers*. Item 7.B. and Section 7.B. of Schedule D ask questions about the *private funds* that you advise. You are required to complete a Section 7.B.(1) of Schedule D for each *private fund* that you advise, except in certain circumstances described under Item 7.B. and below.

a. If your *principal office and place of business* is outside the United States, for purposes of

Item 7 and Section 7.B. of Schedule D you may disregard any *private fund* that, during your last fiscal year, was not a *United States person*, was not offered in the United States, and was not beneficially owned by any *United States person*.

b. When filing Section 7.B.(1) of Schedule D for a *private fund*, you must acquire an identification number for the fund by logging onto the IARD website and using the private fund identification number generator. You must continue to use the same identification number whenever you amend Section 7.B.(1) for that fund. If you file a Section 7.B.(1) for a *private fund* for which an identification number has already been acquired by another adviser, you must not acquire a new identification number, but must instead utilize the existing number. If you choose to complete a single Section 7.B.(1) for a master-feeder arrangement under Instruction 6.d. below, you must acquire an identification number also for each feeder fund.

c. If any *private fund* has issued two or more series (or classes) of equity interests whose values are determined with respect to separate portfolios of securities and other assets, then each such series (or class) should be regarded as a separate *private fund*. In Section 7.B.(1) and 7.B.(2) of Schedule D, next to the name of the *private fund*, list the name and identification number of the specific series (or class) for which you are filing the sections. This only applies with respect to series (or classes) that you manage as if they were separate funds and not a fund's side pockets or similar arrangements.

d. In the case of a master-feeder arrangement (see questions 6-7 of Section 7.B.(1) of Schedule D), instead of completing a Section 7.B.(1) for each of the master fund and each feeder fund, you may complete a single Section 7.B.(1) for the master-feeder arrangement under the name of the master fund if the answers to questions 8, 10, 21 and 23 through 28 are the same for all of the feeder funds (or, in the case of questions 24 and 25, if the feeder funds do not use a prime broker or custodian). If you choose to complete a single Section 7.B.(1), you should disregard the feeder funds, except for the following:

(1) **Question 11:** State the gross assets for the master-feeder arrangement as a whole.

(2) **Question 12:** List the lowest minimum investment commitment applicable to any of the master fund and the feeder funds.

(3) **Questions 13-16:** Answer by aggregating all investors in the master-feeder arrangement (but do not count the feeder funds themselves as investors).

(4) **Questions 19-20:** For purposes of these questions, the *private fund* means any of the master fund or the feeder funds. In answering the questions, moreover, disregard the feeder funds' investment in the master fund.

(5) **Question 22:** List all of the Form D SEC file numbers of any of the master fund and feeder funds.

e. Additional Instructions:

(1) **Question 9: Investment in Registered Investment Companies:** For purposes of

this question, disregard any open-end management investment company regulated as a money market fund under rule 2a-7 under the Investment Company Act if the *private fund* invests in such a company in reliance on rule 12d1-1 under the same Act.

(2) **Question 10: Type of *Private Fund*:** For purposes of this question, the following definitions apply:

"Hedge fund" means any *private fund* (other than a securitized asset fund):

(a) with respect to which one or more investment advisers (or *related persons* of investment advisers) may be paid a performance fee or allocation calculated by taking into account unrealized gains (other than a fee or allocation the calculation of which may take into account unrealized gains solely for the purpose of reducing such fee or allocation to reflect net unrealized losses);

(b) that may borrow an amount in excess of one-half of its net asset value (including any committed capital) or may have gross notional exposure in excess of twice its net asset value (including any committed capital); or

(c) that may sell securities or other assets short or enter into similar transactions (other than for the purpose of hedging currency exposure or managing duration).

A commodity pool is categorized as a hedge fund solely for purposes of this question. For purposes of this definition, do not net long and short positions. Include any borrowings or notional exposure of another *person* that are guaranteed by the *private fund* or that the *private fund* may otherwise be obligated to satisfy.

"Liquidity fund" means any *private fund* that seeks to generate income by investing in a portfolio of short-term obligations in order to maintain a stable net asset value per unit or minimize principal volatility for investors.

"Private equity fund" means any *private fund* that is not a hedge fund, liquidity fund, real estate fund, securitized asset fund, or venture capital fund and does not provide investors with redemption rights in the ordinary course.

"Real estate fund" means any *private fund* that is not a hedge fund, that does not provide investors with redemption rights in the ordinary course, and that invests primarily in real estate and real estate related assets.

"Securitized asset fund" means any *private fund* whose primary purpose is to issue asset backed securities and whose investors are primarily debt-holders.

"Venture capital fund" means any *private fund* meeting the definition of venture capital fund in rule 203(l)-1 under the Advisers Act.

"Other *private fund*" means any *private fund* that is not a hedge fund, liquidity fund, private equity fund, real estate fund, securitized asset fund, or venture

capital fund.

(3) **Question 11: Gross Assets.** Report the assets of the *private fund* that you would include in calculating your regulatory assets under management according to Instruction 5.b. above.

(4) **Questions 19-20: Other *clients'* investments:** For purposes of these questions, disregard any feeder fund's investment in its master fund. (See questions 6-7 for the definition of "master fund" and "feeder fund").

**7. Item 10: *Control Persons***

If you are a "separately identifiable department or division" (SID) of a bank, identify on Schedule A your bank's executive officers who are directly engaged in managing, directing, or supervising your investment advisory activities, and list any other *persons* designated by your bank's board of directors as responsible for the day-to-day conduct of your investment advisory activities, including supervising *employees* performing investment advisory activities.

**8. Additional Information**

If you believe your response to an item in Form ADV Part 1A requires further explanation, or if you wish to provide additional information, you may do so on Schedule D, in the Miscellaneous section. Completion of this section is optional.

## GLOSSARY OF TERMS

1. **Advertisement:** (i) Any direct or indirect communication an investment adviser makes to more than one ***person***, or to one or more ***persons*** if the communication includes ***hypothetical performance***, that offers the investment adviser's investment advisory services with regard to securities to prospective ***clients*** or investors in a ***private fund*** advised by the investment adviser or offers new investment advisory services with regard to securities to current ***clients*** or investors in a ***private fund*** advised by the investment adviser, but does not include: (A) extemporaneous, live, oral communications; (B) information contained in a statutory or regulatory notice, filing, or other required communication, provided that such information is reasonably designed to satisfy the requirements of such notice, filing, or other required communication; or (C) a communication that includes ***hypothetical performance*** that is provided: (1) in response to an unsolicited request for such information from a prospective or current ***client*** or investor in a ***private fund*** advised by the investment adviser; or (2) to a prospective or current investor in a ***private fund*** advised by the investment adviser in a one-on-one communication; and (ii) any ***endorsement*** or ***testimonial*** for which an investment adviser provides compensation, directly or indirectly, but does not include any information contained in a statutory or regulatory notice, filing, or other required communication, provided that such information is reasonably designed to satisfy the requirements of such notice, filing, or other required communication. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

2. **Advisory Affiliate:** Your advisory affiliates are (1) all of your officers, partners, or directors (or any ***person*** performing similar functions); (2) all ***persons*** directly or indirectly ***controlling*** or ***controlled*** by you; and (3) all of your current ***employees*** (other than ***employees*** performing only clerical, administrative, support or similar functions).

   If you are a "separately identifiable department or division" (SID) of a bank, your ***advisory affiliates*** are: (1) all of your bank's ***employees*** who perform your investment advisory activities (other than clerical or administrative ***employees***); (2) all ***persons*** designated by your bank's board of directors as responsible for the day-to-day conduct of your investment advisory activities (including supervising the ***employees*** who perform investment advisory activities); (3) all ***persons*** who directly or indirectly ***control*** your bank, and all ***persons*** whom you ***control*** in connection with your investment advisory activities; and (4) all other ***persons*** who directly manage any of your investment advisory activities (including directing, supervising or performing your advisory activities), all ***persons*** who directly or indirectly ***control*** those management functions, and all ***persons*** whom you ***control*** in connection with those management functions. *[Used in: Part 1A, Items 7, 11, DRPs; Part 1B, Item 2]*

3. **Annual Updating Amendment:** Within 90 days after your firm's fiscal year end, your firm must file an "annual updating amendment," which is an amendment to your firm's Form ADV that reaffirms the eligibility information contained in Item 2 of Part 1A and updates the responses to any other item for which the information is no longer accurate. *[Used in: General Instructions; Part 1A, Instructions, Introductory Text, Item 2; Part 2A, Instructions, Appendix 1 Instructions; Part 2B, Instructions]*

4. **Borrowings:** Borrowings include secured borrowings and unsecured borrowings,

collectively. Secured borrowings are obligations for borrowed money in respect of which the borrower has posted collateral or other credit support and should include any reverse repos (i.e., any sale of securities coupled with an agreement to repurchase the same (or similar) securities at a later date at an agreed price). Unsecured borrowings are obligations for borrowed money in respect of which the borrower has not posted collateral or other credit support. *[Used in: Part 1A, Instructions, Item 5, Schedule D]*

5. **Brochure:** A written disclosure statement that you must provide to ***clients*** and prospective ***clients***. See SEC rule 204-3; Form ADV, Part 2A. *[Used in: General Instructions; Used throughout Part 2]*

6. **Brochure Supplement:** A written disclosure statement containing information about certain of your ***supervised persons*** that your firm is required by Part 2B of Form ADV to provide to ***clients*** and prospective ***clients***. See SEC rule 204-3; Form ADV, Part 2B. *[Used in: General Instructions; Used throughout Part 2]*

7. **Charged:** Being accused of a crime in a formal complaint, information, or indictment (or equivalent formal charge). *[Used in: Part 1A, Item 11; DRPs]*

8. **Client:** Any of your firm's investment advisory clients. This term includes clients from which your firm receives no compensation, such as family members of your ***supervised persons***. If your firm also provides other services (e.g., accounting services), this term does not include clients that are not investment advisory clients. *[Used throughout Form ADV and Form ADV-W]*

9. **Commodity Derivative:** Exposures to commodities that you do not hold physically, whether held synthetically or through derivatives (whether cash or physically settled). *[Used in: Part 1A, Schedule D]*

10. **Control:** The power, directly or indirectly, to direct the management or policies of a ***person***, whether through ownership of securities, by contract, or otherwise.

    - Each of your firm's officers, partners, or directors exercising executive responsibility (or ***persons*** having similar status or functions) is presumed to control your firm.
    - A ***person*** is presumed to control a corporation if the ***person***: (i) directly or indirectly has the right to vote 25 percent or more of a class of the corporation's voting securities; or (ii) has the power to sell or direct the sale of 25 percent or more of a class of the corporation's voting securities.
    - A ***person*** is presumed to control a partnership if the ***person*** has the right to receive upon dissolution, or has contributed, 25 percent or more of the capital of the partnership.
    - A ***person*** is presumed to control a limited liability company ("LLC") if the ***person***: (i) directly or indirectly has the right to vote 25 percent or more of a class of the interests of the LLC; (ii) has the right to receive upon dissolution, or has contributed, 25 percent or more of the capital of the LLC; or (iii) is an elected manager of the LLC.
    - A ***person*** is presumed to control a trust if the ***person*** is a trustee or ***managing agent*** of

the trust.

*[Used in: General Instructions; Part 1A, Instructions, Items 2, 7, 10, 11, 12, Schedules A, B, C, D, R; DRPs]*

11. **Credit Derivative:** Single name credit default swap, including loan credit default swap, credit default swap referencing a standardized basket of credit entities, including credit default swap indices and indices referencing leveraged loans, and credit default swap referencing bespoke basket or tranche of collateralized debt obligations and collateralized loan obligations (including cash flow and synthetic) other than mortgage backed securities. *[Used in: Part 1A, Schedule D]*

12. **Custody:** Holding, directly or indirectly, ***client*** funds or securities, or having any authority to obtain possession of them. You have custody if a ***related person*** holds, directly or indirectly, ***client*** funds or securities, or has any authority to obtain possession of them, in connection with advisory services you provide to ***clients***. Custody includes:

    - Possession of ***client*** funds or securities (but not of checks drawn by ***clients*** and made payable to third parties) unless you receive them inadvertently and you return them to the sender promptly, but in any case within three business days of receiving them;

    - Any arrangement (including a general power of attorney) under which you are authorized or permitted to withdraw ***client*** funds or securities maintained with a custodian upon your instruction to the custodian; and

    - Any capacity (such as general partner of a limited partnership, managing member of a limited liability company or a comparable position for another type of pooled investment vehicle, or trustee of a trust) that gives you or your ***supervised person*** legal ownership of or access to ***client*** funds or securities.

    *[Used in: Part 1A, Item 9; Part 1B, Instructions, Item 2; Part 2A, Items 15, 18]*

13. **Digital Investment Advisory Service:** Investment advice to *clients* that is generated by the *operational interactive website's* software-based models, algorithms, or applications based on personal information each *client* supplies through the *operational interactive website*.

14. **Discretionary Authority or Discretionary Basis:** Your firm has discretionary authority or manages assets on a discretionary basis if it has the authority to decide which securities to purchase and sell for the ***client***. Your firm also has discretionary authority if it has the authority to decide which investment advisers to retain on behalf of the ***client***. *[Used in: Part 1A, Instructions, Item 8; Part 1B, Instructions; Part 2A, Items 4, 16, 18; Part 2B, Instructions]*

15. **Employee:** This term includes an independent contractor who performs advisory functions on your behalf. *[Used in: Part 1A, Instructions, Items 1, 5, 11; Part 2B, Instructions]*

16. **Endorsement:** Any statement by a person other than a current ***client*** or investor in a ***private fund*** advised by the investment adviser that: (i) indicates approval, support, or recommendation of the investment adviser or its ***supervised persons*** or describes that indirectly solicits any current or prospective ***client*** or investor to be a ***client*** of, or an investor in a ***private fund*** advised by, the investment adviser; or (iii) refers any current or prospective ***client*** of, or an investor in a ***private fund*** advised by, the investment adviser. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

17. **Enjoined:** This term includes being subject to a mandatory injunction, prohibitory injunction, preliminary injunction, or a temporary restraining ***order***. *[Used in: Part 1A, Item 11; DRPs]*

18. **Equity Derivative:** Includes both listed equity derivative and derivative exposure to unlisted securities. Listed equity derivative includes all synthetic or derivative exposure to equities, including preferred equities, listed on a regulated exchange. Listed equity derivative also includes a single stock future, equity index future, dividend swap, total return swap (contract for difference), warrant and right. Derivative exposure to unlisted equities includes all synthetic or derivative exposure to equities, including preferred equities that are not listed on a regulated exchange. Derivative exposure to unlisted securities also includes a single stock future, equity index future, dividend swap, total return swap (contract for difference), warrant and right. *[Used in: Part 1A, Schedule D]*

19. **Exempt Reporting Adviser:** An investment adviser that qualifies for the exemption from registration under section 203(l) of the Advisers Act because it is an adviser solely to one or more venture capital funds, or under rule 203(m)-1 of the Advisers Act because it is an adviser solely to ***private funds*** and has assets under management in the United States of less than $150 million. *[Used in: Throughout Part 1A; General Instructions; Form ADV-H; Form ADV-NR]*

20. **Felony:** For jurisdictions that do not differentiate between a felony and a ***misdemeanor***, a felony is an offense punishable by a sentence of at least one year imprisonment and/or a fine of at least $1,000. The term also includes a general court martial. *[Used in: Part 1A, Item 11; DRPs; Part 2A, Item 9; Part 2B, Item 3]*

21. **Filing Adviser:** An investment adviser eligible to register with the SEC that files (and amends) a single ***umbrella registration*** on behalf of itself and each of its ***relying advisers***. *[Used in: General Instructions; Part 1A, Items 1, 2, 3, 10 and 11; Schedule R]*

22. **FINRA CRD** or **CRD:** The Web Central Registration Depository ("CRD") system operated by FINRA for the registration of broker-dealers and broker-dealer representatives. *[Used in: General Instructions; Part 1A, Item 1, Schedules A, B, C, D, R, DRPs; Form ADV-W, Item 1]*

23. **Foreign Exchange Derivative:** Any derivative whose underlying asset is a currency other than U.S. dollars or is an exchange rate. Cross-currency interest rate swaps should be included in foreign exchange derivatives and excluded from ***interest rate derivatives***. *[Used in: Part 1A, Schedule D]*

24. **Foreign Financial Regulatory Authority:** This term includes (1) a foreign securities authority; (2) another governmental body or foreign equivalent of a ***self-regulatory organization*** empowered by a foreign government to administer or enforce its laws relating to the regulation of ***investment-related*** activities; and (3) a foreign membership organization, a function of which is to regulate the participation of its members in the activities listed above. *[Used in: Part 1A, Items 1, 11, DRPs; Part 2A, Item 9; Part 2B, Item 3]*

25. **Found:** This term includes adverse final actions, including consent decrees in which the respondent has neither admitted nor denied the findings, but does not include agreements, deficiency letters, examination reports, memoranda of understanding, letters of caution, admonishments, and similar informal resolutions of matters. *[Used in: Part 1A, Item 11; Part 1B, Item 2; Part 2A, Item 9; Part 2B, Item 3]*

26. **Government Entity:** Any state or political subdivision of a state, including (i) any agency, authority, or instrumentality of the state or political subdivision; (ii) a plan or pool of assets ***controlled*** by the state or political subdivision or any agency, authority, or instrumentality thereof; and (iii) any officer, agent, or employee of the state or political subdivision or any agency, authority, or instrumentality thereof, acting in their official capacity. *[Used in: Part 1A, Item 5]*

27. **Gross Notional Value:** The gross nominal or notional value of all transactions that have been entered into but not yet settled as of the reporting date. For contracts with variable nominal or notional principal amounts, the basis for reporting is the nominal or notional principal amounts as of the reporting date. For options, use delta adjusted notional value. *[Used in: Part 1A, Schedule D]*

28. **High Net Worth Individual:** An individual who is a ***qualified client*** or who is a "qualified purchaser" as defined in section 2(a)(51)(A) of the Investment Company Act of 1940. *[Used in: Part 1A, Item 5]*

29. **Home State:** If your firm is registered with a ***state securities authority***, your firm's "home state" is the state where it maintains its ***principal office and place of business***. *[Used in: Part 1B, Instructions]*

30. **Hypothetical Performance:** Performance results that were not actually achieved by any portfolio of the investment adviser. (i) ***Hypothetical performance*** includes, but is not limited to: (A) performance derived from model portfolios; (B) performance that is backtested by the application of a strategy to data from prior time periods when the strategy was not actually used during those time periods; and (C) targeted or projected performance returns with respect to any portfolio or to the investment services offered in the ***advertisement***; however: (ii) ***Hypothetical performance*** does not include: (A) an interactive analysis tool where a ***client*** or investor, or prospective ***client***, or investor, uses the tool to produce simulations and statistical analyses that present the likelihood of various investment outcomes if certain investments are made or certain investment strategies or styles are undertaken, thereby serving as an additional resource to investors in the evaluation of the potential risks and returns of investment choices; provided that the investment adviser: (1)

provides a description of the criteria and methodology used, including the investment analysis tool's limitations and key assumptions; (2) explains that the results may vary with each use and over time; (3) if applicable, describes the universe of investments considered in the analysis, explains how the tool determines which investments to select, discloses if the tool favors certain investments and, if so, explains the reason for the selectivity, and states that other investments not considered may have characteristics similar or superior to those being analyzed; and (4) discloses that the tool generates outcomes that are hypothetical in nature; or (B) ***predecessor performance*** that is displayed in compliance with rule 206(4)-1(d)(7). *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

31. **Impersonal Investment Advice:** Investment advisory services that do not purport to meet the objectives or needs of specific individuals or accounts. *[Used in: Part 1A, Instructions; Part 2A, Instructions; Part 2B, Instructions]*

32. **Independent Public Accountant:** A public accountant that meets the standards of independence described in rule 2-01(b) and (c) of Regulation S-X (17 CFR 210.2-01(b) and (c)). *[Used in: Part 1A, Item 9; Schedule D]*

33. **Interest Rate Derivative:** Any derivative whose underlying asset is the obligation to pay or the right to receive a given amount of money accruing interest at a given rate. Cross-currency interest rate swaps should be included in ***foreign exchange derivatives*** and excluded from interest rate derivatives. This information must be presented in terms of 10-year bond equivalents. *[Used in: Part 1A, Schedule D]*

34. **Investment Adviser Representative:** Any of your firm's ***supervised persons*** (*except* those that provide only ***impersonal investment advice***) is an investment adviser representative, if

- the ***supervised person*** regularly solicits, meets with, or otherwise communicates with your firm's ***clients***,
- the ***supervised person*** has more than five ***clients*** who are natural persons and not ***high net worth individuals***, and
- more than ten percent of the ***supervised person's clients*** are natural persons and not ***high net worth individuals***.

NOTE: If your firm is registered with the ***state securities authorities*** and not the SEC, your firm may be subject to a different state definition of "investment adviser representative." Investment adviser representatives of SEC-registered advisers may be required to register in each state in which they have a place of business.

*[Used in: General Instructions; Part 1A, Item 5; Part 2B, Item 1]*

35. **Investment-Related:** Activities that pertain to securities, commodities, banking,

insurance, or real estate (including, but not limited to, acting as or being associated with an investment adviser, broker-dealer, municipal securities dealer, government securities broker or dealer, issuer, investment company, futures sponsor, bank, or savings association). *[Used in: Part 1A, Items 7, 11, Schedule D, DRPs; Part 1B, Item 2; Part 2A, Items 9 and 19; Part 2B, Items 3, 4 and 7]*

36. **Involved:** Engaging in any act or omission, aiding, abetting, counseling, commanding, inducing, conspiring with or failing reasonably to supervise another in doing an act. *[Used in: Part 1A, Item 11; Part 2A, Items 9 and 10; Part 2B, Items 3 and 7]*

37. **Legal Entity Identifier:** A "legal entity identifier" assigned by a utility endorsed by the Global LEI Regulatory Oversight Committee (ROC) or accredited by the Global LEI Foundation (GLEIF). *[Used in: Part 1A, Item 1, Schedules D and R]*

38. **Management Persons:** Anyone with the power to exercise, directly or indirectly, a ***controlling*** influence over your firm's management or policies, or to determine the general investment advice given to the ***clients*** of your firm.

    Generally, all of the following are management persons:

    - Your firm's principal executive officers, such as your chief executive officer, chief financial officer, chief operations officer, chief legal officer, and chief compliance officer; your directors, general partners, or trustees; and other individuals with similar status or performing similar functions;

    - The members of your firm's investment committee or group that determines general investment advice to be given to ***clients***; and

    - If your firm does not have an investment committee or group, the individuals who determine general investment advice provided to ***clients*** (if there are more than five people, you may limit your firm's response to their supervisors).

*[Used in: Part 1B, Item 2; Part 2A, Items 9, 10 and 19]*

39. **Managing Agent:** A managing agent of an investment adviser is any ***person***, including a trustee, who directs or manages (or who participates in directing or managing) the affairs of any unincorporated organization or association that is not a partnership. *[Used in: General Instructions; Form ADV-NR; Form ADV-W, Item 8]*

40. **Minor Rule Violation:** A violation of a ***self-regulatory organization*** rule that has been designated as "minor" pursuant to a plan approved by the SEC. A rule violation may be designated as "minor" under a plan if the sanction imposed consists of a fine of $2,500 or less, and if the sanctioned ***person*** does not contest the fine. (Check with the appropriate ***self-regulatory organization*** to determine if a particular rule violation has been designated as "minor" for these purposes.) *[Used in: Part 1A, Item 11]*

41. **Misdemeanor:** For jurisdictions that do not differentiate between a ***felony*** and a misdemeanor, a misdemeanor is an offense punishable by a sentence of less than one year imprisonment and/or a fine of less than $1,000. The term also includes a special court martial. *[Used in: Part 1A, Item 11; DRPs; Part 2A, Item 9; Part 2B, Item 3]*

42. **Non-Resident:** (a) an individual who resides in any place not subject to the jurisdiction of the United States; (b) a corporation incorporated in or that has its ***principal office and place of business*** in any place not subject to the jurisdiction of the United States; and (c) a partnership or other unincorporated organization or association that is formed in or has its ***principal office and place of business*** in any place not subject to the jurisdiction of the United States. *[Used in: General Instructions; Form ADV-NR]*

43. **Notice Filing:** SEC-registered advisers may have to provide ***state securities authorities*** with copies of documents that are filed with the SEC. These filings are referred to as "notice filings." *[Used in: General Instructions; Part 1A, Item 2; Execution Page(s); Form ADV-W]*

44. **Operational Interactive Website:** A website, mobile application, or similar digital platform through which the investment adviser provides *digital investment advisory services* on an ongoing basis to more than one *client* (except during temporary technological outages of a de minimis duration).

45. **Order:** A written directive issued pursuant to statutory authority and procedures, including an order of denial, exemption, suspension, or revocation. Unless included in an order, this term does not include special stipulations, undertakings, or agreements relating to payments, limitations on activity or other restrictions. *[Used in: Part 1A, Items 2 and 11, Schedules D and R; DRPs; Part 2A, Item 9; Part 2B, Item 3]*

46. **Other Derivative:** Any derivative that is not a ***commodity derivative***, ***credit derivative***, ***equity derivative***, ***foreign exchange derivative*** or ***interest rate derivative***. *[Used in: Part 1A, Schedule D]*

47. **Parallel Managed Account:** With respect to any registered investment company or series thereof or business development company, a parallel managed account is any managed account or other pool of assets that you advise and that pursues substantially the same investment objective and strategy and invests side by side in substantially the same positions as the identified investment company or series thereof or business development company that you advise. *[Used in: Part 1A, Schedule D]*

48. **Performance-Based Fee:** An investment advisory fee based on a share of capital gains on, or capital appreciation of, ***client*** assets. A fee that is based upon a percentage of assets that you manage is not a performance-based fee. *[Used in: Part 1A, Item 5; Part 2A, Items 6 and 19]*

49. **Person:** A natural person (an individual) or a company. A company includes any partnership, corporation, trust, limited liability company ("LLC"), limited liability partnership ("LLP"), sole proprietorship, or other organization. *[Used throughout Form*



CONFIDENTIAL

*ADV and Form ADV-W]*

50. **Predecessor Performance:** Investment performance achieved by a group of investments consisting of an account or a ***private fund*** that was not advised at all times during the period shown by the investment adviser advertising the performance. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

51. **Principal Office and Place of Business:** Your firm's executive office from which your firm's officers, partners, or managers direct, ***control***, and coordinate the activities of your firm. *[Used in: Part 1A, Instructions, Items 1 and 2; Schedules D and R; Form ADV-W, Item 1]*

52. **Private Fund:** An issuer that would be an investment company as defined in section 3 of the Investment Company Act of 1940 but for section 3(c)(1) or 3(c)(7) of that Act. *[Used in: General Instructions; Part 1A, Instructions, Items 2, 5, 7, and 9; Part 1A, Schedule D]*

53. **Proceeding:** This term includes a formal administrative or civil action initiated by a governmental agency, ***self-regulatory organization*** or ***foreign financial regulatory authority***; a ***felony*** criminal indictment or information (or equivalent formal charge); or a ***misdemeanor*** criminal information (or equivalent formal charge). This term does not include other civil litigation, investigations, or arrests or similar charges effected in the absence of a formal criminal indictment or information (or equivalent formal charge). *[Used in: Part 1A, Item 11, DRPs; Part 1B, Item 2; Part 2A, Item 9; Part 2B, Item 3]*

54. **Qualified Client:** A ***client*** that satisfies the definition of qualified client in SEC rule 205-3. *[Used in: General Instructions; Part 1A, Schedule D]*

55. **Related Person:** Any ***advisory affiliate*** and any ***person*** that is under common ***control*** with your firm. *[Used in: Part 1A, Items 7, 8 and 9; Schedule D; Form ADV-W, Item 3; Part 2A, Items 10, 11, 12 and 14; Part 2A, Appendix 1, Item 6]*

56. **Relying Adviser:** An investment adviser eligible to register with the SEC that relies on a ***filing adviser*** to file (and amend) a single ***umbrella registration*** on its behalf. *[Used in: General Instructions; Part 1A, Items 1, 7 and 11; Schedules D and R]*

57. **Self-Regulatory Organization** or **SRO:** Any national securities or commodities exchange, registered securities association, or registered clearing agency. For example, the Chicago Board of Trade ("CBOT"), FINRA and New York Stock Exchange ("NYSE") are self-regulatory organizations. *[Used in: Part 1A, Item 11; DRPs; Part 1B, Item 2; Part 2A, Items 9 and 19; Part 2B, Items 3 and 7]*

58. **Sovereign Bonds:** Any notes, bonds and debentures issued by a national government (including central government, other governments and central banks but excluding U.S. state and local governments), whether denominated in a local or foreign currency. *[Used in: Part 1A, Schedule D]*



CONFIDENTIAL

59. **Sponsor:** A sponsor of a ***wrap fee program*** sponsors, organizes, or administers the program or selects, or provides advice to ***clients*** regarding the selection of, other investment advisers in the program. *[Used in: Part 1A, Item 5, Schedule D; Part 2A, Instructions, Appendix 1 Instructions]*

60. **State Securities Authority:** The securities commissioner or commission (or any agency, office or officer performing like functions) of any state of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States. *[Used throughout Form ADV]*

61. **Supervised Person:** Any of your officers, partners, directors (or other ***persons*** occupying a similar status or performing similar functions), or ***employees***, or any other ***person*** who provides investment advice on your behalf and is subject to your supervision or ***control***. *[Used throughout Part 2]*

62. **Testimonial**: Any statement by a current ***client*** or investor in a ***private fund*** advised by the investment adviser: (i) about the ***client*** or investor's experience with the investment adviser or its ***supervised persons*** (ii) that directly or indirectly solicits any current or prospective ***client*** or investor to be a client of, or an investor in a ***private fund*** advised by, the investment adviser; or (iii) that refers any current or prospective ***client*** or investor to be a ***client*** of, or an investor in a ***private fund*** advised by, the investment adviser. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

63. **Third-party Rating**: A rating or ranking of an investment adviser provided by a ***person*** who is not a ***related person*** and such ***person*** provides such ratings or rankings in the ordinary course of its business. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

64. **Umbrella Registration:** A single registration by a ***filing adviser*** and one or more ***relying advisers*** who collectively conduct a single advisory business and that meet the conditions set forth in General Instruction 5. *[Used in: General Instructions; Part 1A, Items 1, 2, 3, 7, 10 and 11, Schedules D and R]*

65. **United States person:** This term has the same meaning as in rule 203(m)-1 under the Advisers Act, which includes any natural person that is resident in the United States. *[Used in: Part 1A, Instructions, Item 5; Schedule D]*

66. **Wrap Brochure or Wrap Fee Program Brochure:** The written disclosure statement that ***sponsors*** of ***wrap fee programs*** must provide to each of their ***wrap fee program clients***. *[Used in: Part 2, General Instructions; Used throughout Part 2A, Appendix 1]*

67. **Wrap Fee Program:** Any advisory program under which a specified fee or fees not based

directly upon transactions in a ***client's*** account is charged for investment advisory services (which may include portfolio management or advice concerning the selection of other investment advisers) and the execution of ***client*** transactions. [*Used in: Part 1, Item 5; Schedule D; Part 2A, Instructions, Item 4, used throughout Appendix 1; Part 2B, Instructions]*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1]<br><br>Debtor in a foreign proceeding. | Chapter 15<br><br>Case No. 25-11376 (___) |

**DECLARATION OF CAROLINE MORAN AS CAYMAN ISLANDS COUNSEL TO THE DEBTOR IN SUPPORT OF THE MOTION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**
**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE**

I, Caroline Moran, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

## I. INTRODUCTION

1. I am an attorney-at-law duly permitted to practice in the Cayman Islands and the Global Head of the Dispute Resolution, Insolvency and Restructuring team at the law firm Maples and Calder (Cayman) LLP ("Maples"). My professional address is Ugland House, South Church Street, Grand Cayman KY1-1104, Cayman Islands. I am duly admitted to practice in the Cayman Islands.

2. Maples is acting as Cayman Islands counsel to Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited, who on May 6, 2025 were appointed by the Grand Court of the Cayman Islands (the "Cayman Court") as joint official liquidators (in such capacity, the "JOLs") of Charitable DAF Holdco, Ltd, an exempted company

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

incorporated under the laws of the Cayman Islands ("HoldCo" or the "Debtor"). Holdco is the subject of a liquidation proceeding before the Cayman Court entitled *In the matter of section 131 of the Companies Act (2025 Revision) and in the matter of Charitable DAF Holdco Ltd* FSD 116 of 2025 (JAJ) (the "Cayman Liquidation Proceedings"). The JOLs have been appointed as foreign representatives in the Cayman Liquidation Proceedings for the purpose of seeking Chapter 15 relief. I am the partner at Maples primarily responsible for handling the Cayman Liquidation Proceedings.

3. I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "Declaration"). The facts and matters contained in this Declaration are true and correct to the best of my information, knowledge and belief.

4. In preparing this Declaration, I reviewed the final form drafts of: (a) the *Verified Petition of Foreign Representatives for (i) Recognition of the Foreign Main Proceeding, (ii) Recognition of the Foreign Representatives, and (iii) Certain Related Relief* (the "Verified Petition")[2]; (b) the Declaration of Margot MacInnis in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code (the "MacInnis Declaration"); (c) the documents prepared and/or filed in connection with the Cayman Liquidation Proceedings (as defined herein); and (d) relevant provisions of the Cayman Islands Companies Act (2025 Revision) (the "Companies Act"), a copy of which is attached hereto as **Exhibit 1**, the Companies Winding Up Rules (2023 Consolidation) (the "CWR"), a copy of which is annexed hereto as **Exhibit 2**, the Insolvency Practitioners' Regulations (2023 Consolidation) and Insolvency Practitioners' (Amendment) Regulations, 2024 (collectively, the "IPR"), a copy of which is attached hereto as

[2] Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to them in the Verified Petition.

**Exhibit 3**, the Grand Court Rules of the Cayman Islands (2023 Revision), a copy of which is attached hereto as **Exhibit 4**, the Grand Court Law of the Cayman Islands (2015 Revision), a copy of which is attached hereto as **Exhibit 5**, and other provisions of Cayman Islands law as they relate to chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") and other aspects of U.S. bankruptcy law referred to in this Declaration. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5. HoldCo is a Cayman Islands exempted company, incorporated on October 27, 2011, and was, between November 2011 and December 18, 2024, the sole limited partner of the Charitable DAF Fund, LP (the "Fund"),[3] a Cayman Islands exempted limited partnership formed on October 28, 2011, to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organizations in the U.S.

6. I submit this Declaration in support of (a) the Verified Petition; and (b) the *Motion Pursuant to Fed. R. of Bankr. P. 2002 and 9007 Requesting Entry of an Order (I) Scheduling the Recognition Hearing, and (II) Approving the Form and Manner of Service of Notice* (the "Scheduling Motion"), filed contemporaneously herewith.

7. This Declaration comprises matters that are statements of my view of Cayman law or statements of fact. Where the matters stated in this Declaration are statements regarding Cayman law, such statements represent my view of Cayman law as an attorney admitted and authorized to practice in the Cayman Islands. Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, I believe them to be true. Where the matters stated in this Declaration are statements of fact that are not within my personal knowledge, they are derived, as

[3] The term DAF stands for *Donor Advised Fund*, a vehicle defined by reference to s.4966(d)(2) of the US Internal Revenue Code of 1986, which grants certain tax benefits and the reasonable expectation of advisory privileges to the donor of assets to a DAF as regards the distribution or investment of amounts, provided their donation is irrevocable and beyond the donor's control.

appropriate, from documents maintained by the Cayman Islands Registrar of Companies, from the records maintained by Maples as a result of advising the JOLs in connection with the Cayman Liquidation Proceedings, and/or from information supplied to me by or on behalf of the JOLs and are true to the best of my knowledge, information, and belief. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## II. PERSONAL BACKGROUND AND QUALIFICATIONS

8. I graduated from Trinity College, Dublin in 2000 with an LLB in Law and French and received a diploma in Accounting and Finance from Dublin Business School in 2003. I was admitted as solicitor in the Republic of Ireland in 2004. I joined Maples Dublin in 2007, at which time I was also admitted as a solicitor of the Supreme Court of England and Wales and the Eastern Caribbean Supreme Court (British Virgin Islands). I moved to the Maples Cayman Islands office in 2009 and was admitted as an attorney-at-law in the Cayman Islands in 2010. I was elected partner of Maples in 2016.

9. My practice, in my 21 years since qualification, has focused on complex cross-border restructurings, insolvency, and workouts of distressed companies and contentious litigation. My clients over this period have included leading international and regional accountancy practices, financial institutions, insolvency office holders, official and unofficial creditors' committees, private equity sponsors, hedge funds, directors, trustees, shareholders and corporate debtors, and my casework has included matters across the world including (without limitation) the United States and Asia.

10. I am a member of Insol International, the International Insolvency Institute and IWIRC. I was one of the two lawyers responsible for spearheading and drafting the recent legislative reforms in the Cayman Islands implementing the Restructuring Officer Regime which

was passed into law in August 2022. I was also a member of the IWIRC delegation to Working Group V on the UNCITRAL Model Law at the United Nations.

11. Although I am not admitted in the United States, I am familiar with the provisions of Chapter 15 of the Bankruptcy Code as a consequence of my Cayman practice specifically arising from my involvement with other Cayman liquidations and schemes of arrangement that have required Chapter 15 Bankruptcy Code recognition proceedings.

12. I, together with other partners and associates at Maples, have been advising the JOLs on all legal aspects of the Cayman Liquidation Proceedings and the extraterritorial effects and recognition of the same since May 2025.

## III. STATEMENTS OF CAYMAN LAW AND PRACTICE

### A. Cayman Islands Legal System

12. The Cayman Islands is a British Overseas Territory and a distinct legal jurisdiction. The courts of the Cayman Islands administer justice in accordance with local statutes, subordinate legislation, statutes passed by the parliament of the United Kingdom that have been expressly extended to the Cayman Islands, orders of His Majesty's Privy Council applicable in the Cayman Islands, and the common law. The Financial Services Division of the Cayman Court is the court of first instance for insolvency and restructuring matters, with appeals lying directly to the Cayman Islands Court of Appeal (the "Court of Appeal") and finally to His Majesty's Judicial Committee of the Privy Council (the "Privy Council"), which sits in London and is comprised of members of the English Supreme Court (the highest court in England) and senior judges from other Commonwealth countries.

13. The doctrine of judicial precedent applies in the Cayman Islands and the structure of the court system is hierarchical. Therefore, decisions of the Privy Council are binding on the Court of Appeal and the Cayman Court, and the decisions of the Court of Appeal are similarly

binding on the Cayman Court. The Cayman Court will follow its own previous decisions unless satisfied that they are clearly wrong.

14. The reported case law in the Cayman Islands is contained in the Cayman Islands Law Reports. There are also unreported judgments published on the judicial website (www.judicial.ky). In the absence of binding Cayman Islands authority, the Cayman Islands courts will look to, and apply, English and other common law authorities, which are persuasive, but not binding. Generally, in the absence of Cayman Islands precedent, the Cayman Islands courts will follow English authorities on the relevant point to the extent that they are not inconsistent with either Cayman Islands statutory provisions or Cayman Islands authorities, and to the extent that they do not relate to English statutory provisions that have no equivalent in the Cayman Islands. Decisions of courts in other common law jurisdictions (such as Ireland, Australia and New Zealand) are also of persuasive, but not binding, authority.

**B. Cayman Islands Companies**

15. Cayman Islands companies are incorporated pursuant to the Companies Act. All companies must maintain registered offices in the Cayman Islands to which all communications and notices may be addressed or served, and where matters such as the administration of annual filings and the payment of annual fees with the Cayman Islands Registrar of Companies are usually dealt with. Cayman Islands companies are also required to maintain statutory registers of members (*i.e.* shareholders), mortgages and charges, and directors.

16. Various types of companies may be incorporated under the Companies Act, but the vast majority of companies are incorporated as exempted companies under Part VII of the Companies Act. The Debtor is an exempted company.

17. The principal distinction between "exempted" and "ordinary" companies is that, pursuant to section 174 of the Companies Act, an exempted company is prohibited from trading in the Cayman Islands except in furtherance of its business outside the Cayman Islands. Section 174 clarifies that it is not to be construed so as to prevent the exempted company from effecting and concluding contracts in the Cayman Islands and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands. An exempted company can therefore, for example, maintain premises and employ staff and appoint directors and other agents who are residents in the Cayman Islands, in furtherance of the company's business outside the Cayman Islands.

18. In any event, as I explain below, these restrictions cease to have any practical relevance in an official liquidation of an exempted company, such as the Cayman Liquidation Proceedings of the Debtor, where the official liquidators are given the powers necessary to conduct the Debtor's liquidation, whether within or without the Cayman Islands.

**C. Insolvency Proceeding in Respect of Cayman Islands Companies**

19. Part V of the Companies Act governs the winding up of companies in the Cayman Islands. Part V of the Companies Act applies to companies incorporated and registered under the Companies Act (including exempted companies such as the Debtor) or its predecessors, and to certain foreign companies.

20. Part V is supplemented by the following rules and regulations made pursuant to section 155: the Companies Winding Up Rules (2023 Consolidation), the Insolvency Practitioners' Regulations (2023 Consolidation), and the Foreign Bankruptcy Proceedings (International Cooperation) Rules 2018.

21. A company may be wound up in one of three ways[4]: (i) compulsorily by order of the Cayman Court, (ii) voluntarily, or (iii) under the supervision of the Cayman Court. Neither compulsory nor voluntary liquidations are of relevance in this case.

22. The court-supervised liquidation of a Cayman Islands company is carried out by the Cayman Court pursuant to certain statutory mechanisms set out in the Companies Act. Specifically, where a resolution has been passed by the shareholders of a Cayman Islands company to wind up that company voluntarily, the liquidator or any contributory or creditor may apply to the Cayman Court for an order for the continuation of the winding up under the supervision of the Cayman Court on the grounds that (a) the company is or is likely to become insolvent; or (b) the supervision of the Cayman Court will facilitate a more effective, economic or expeditious liquidation of the company in the interests of the contributories and creditors.[5] When making a supervision order, the Cayman Court shall appoint one or more qualified insolvency practitioners and may also appoint one or more foreign practitioners to serve as liquidators of the company,[6] and the supervision order takes effect for all purposes as if it was an order that the company be wound up by the Cayman Court.[7]

23. A general principle underlying the Cayman Islands' insolvency regime is that the claims of investors and creditors within the same class are treated on a *pari passu* basis.[8]

24. Section 97(1) of the Companies Act provides that upon the entry of a winding up order, no suit or other proceedings may be commenced or continued against the company except

[4] Companies Act § 90.

[5] Companies Act § 131.

[6] Companies Act § 132(1).

[7] Companies Act § 133.

[8] Companies Act § 140.

with leave of the Cayman Court and subject to such terms as the Cayman Court may impose. This automatic stay, similar to the automatic stay provided for in the Bankruptcy Code, serves to promote the JOLs' ability to deal with the claims of creditors collectively and comprehensively.

## IV. THE CAYMAN LIQUIDATION PROCEEDINGS

### A. Commencement

25. On April 2, 2025, without informing the Supporting Organizations, Mr. Mark Patrick as the Management Shareholder of Holdco resolved to place HoldCo into voluntary liquidation and appointed Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd as joint voluntary liquidators. Unaware of this development, the Supporting Organizations, on April 23, 2025, presented a petition seeking the winding up of HoldCo on a just and equitable basis under section 92(e) of the Companies Act (the "J&E Petition").

26. On April 24, 2025, the Supporting Organizations served the J&E Petition on the registered office of Holdco. On April 25, 2025, the attorneys for Holdco informed the Supporting Organizations for the first time that Holdco had been placed into voluntary liquidation on April 2, 2025.

27. On May 2, 2025 the Supporting Organizations therefore filed a petition seeking an order for the voluntary liquidation of HoldCo to continue under the supervision of the Cayman Court pursuant to section 131 of the Companies Act on the basis that Court supervision would result in a more effective, economic and expeditious liquidation because there was a need for an investigation into the affairs of Holdco and the conduct of the directors (the "Supervision Petition"). Following a hearing and review of the Supervision Petition, supporting affidavits and affirmations with exhibits, and the documents filed in Cause No. FSD 2025-0099 (JAJ)—including the J&E Petition and the affidavits of the JOLs confirming their consent to act—on May 6, 2026, the Cayman Court issued an order (the "Supervision Order") that the voluntary liquidation of

Holdco be continued under the supervision of the Cayman Court pursuant to section 131 of the Companies Act and Order 15, rule 8 of the CWR and appointing the JOLs to act as joint official liquidators of HoldCo.

28. As detailed below, as joint official liquidators appointed by the Cayman Court, the JOLs may exercise such powers as are conferred by the Companies Act and the Supervision Order appointing them (*see* Companies Act § 110), and they are specifically authorized pursuant to paragraph 6(c) of the Supervision Order to file the Verified Petition in order to obtain recognition in the United States, and to take any actions as may be necessary or desirable in order to do so.

29. In my experience, Cayman Islands liquidation proceedings are fair and equitable. All creditors and interest holders have an opportunity to be heard by the Cayman Court and no creditor will be prejudiced because it may be foreign-based.

**B. The Cayman Litigation for breaches of fiduciary duty, unlawful means conspiracy, unjust enrichment, restitution and other equitable relief and damages**

30. On July 4, 2025, the JOLs applied to the Cayman Court in the Cayman Liquidation Proceedings on an *ex parte* basis for sanction to commence litigation proceedings by way of filing a "Writ and Statement of Claim" against the following "Named Defendants": (1) Mark Patrick; (2) Paul Murphy; (3) CDMCFAD, LLC ("CDM"); (4) DFW Charitable Foundation ("DFW") (5) CDH GP, Ltd. for and on behalf of the Fund and in its capacity as general partner; and (6) CLO HoldCo, Ltd (the "Cayman Litigation").

31. The Writ and Statement of Claim sets forth the legal and factual basis for various claims that the Debtor will assert in the Cayman Litigation. In summary, the Cayman Litigation arises out of a series of transactions whereby it appears that Mr. Mark Patrick (a director and the sole Management Shareholder of the Debtor) and Mr. Paul Murphy (a director of the Debtor), caused the Debtor to transfer away its valuable limited partnership interest in the Fund to entities

controlled by Mr. Patrick. The end result of these transactions was that the Debtor exchanged an asset worth approximately $270 million for a membership interest in CDM, a Delaware limited liability company. Mr. Patrick then caused the CDM to redeem the Debtor's membership interest for the sum of c. $1.6 million leaving DFW, an entity controlled by Mr. Patrick, as the sole remaining member of the CDM. The Debtor also claims that the Mr. Patrick has paid himself excessive remuneration from the assets of the Debtor. These transactions have severely prejudiced the Debtor and its ultimate beneficial owners which are four large charitable organizations registered in the U.S.[9]

32. At the hearing of the sanction application on July 14, 2025, to obtain an order granting the JOLs sanction to commence the Cayman Litigation, the JOLs were required to satisfy the Cayman Court in the Cayman Liquidation Proceedings that (a) the Cayman Litigation had a reasonable prospect of success and (b) that the interests of the Debtor's stakeholders were best served by the JOLs commencing the Cayman Litigation.[10] The Cayman Court granted sanction for the JOLs to commence the Cayman Litigation.

33. On July 15, 2025, the Debtor proceeded to file the Writ and Statement of Claim with the Cayman Court to commence the Cayman Litigation (which has the cause number FSD 201 of 2025 (RPJ)) (the "Cayman Litigation Proceedings"). At the same time the JOLs filed an application in the Cayman Litigation Proceedings for (a) a proprietary injunction to prevent the Named Defendants from dealing with the assets of the Debtor that are held now or controlled by the Named Defendants together with disclosure orders (the "Injunction Application") and (b) leave to serve the US Defendants (defined below) with the Writ and Statement of Claim and Injunction

[9] The Dallas Foundation; the Greater Kansas City Foundation; the Santa Barbara Foundation and the Community Foundation of North Texas.

[10] *Re ICP Strategic Credit Income Fund* [2014] 1 CILR 314.

Application (the "Leave to Serve Application" and, together with the Injunction Application, the "Applications").

34. Additionally, on July 15, 2025, the Debtor (1) emailed copies of the Writ and Statement of Claim and the Applications to the Cayman Islands attorneys for the Named Defendants and asked them to accept service and (2) served copies of the Writ and Statement of Claim at the Cayman Islands registered addresses of CDH GP, Ltd. and CLO HoldCo, Ltd.

35. The Applications have been listed for hearing on July 31, 2025. The Named Defendants are entitled to participate and be heard on that date. In the event the Named Defendants consider that they have had insufficient time to respond to the Injunction Application within this timeframe, the Cayman Court will hear the Injunction Application on an *ex parte on notice* basis and, if the Injunction Application is granted, will schedule an *inter partes* hearing for a later date.

**C. Leave to Serve Application**

36. Mr. Patrick, DFW and CDM are all incorporated or reside outside the Cayman Islands in the United States (the "US Defendants"). As a result, pursuant to Order 11 of the Grand Court Rules of the Cayman Islands ("GCR"), the Debtor must seek leave to serve the Writ and Statement of Claim and Injunction Application out of the jurisdiction of the Cayman Islands.

37. The US Defendants have, however, already instructed Cayman Islands attorneys and have appeared in or observed aspects of the Cayman Liquidation Proceedings. And, in moving to dismiss proceedings commenced on July 1, 2025, by the Supporting Organizations in the Business Court of Texas, the US Defendants, admitted that the JOLs have standing to bring claims on behalf of the Debtor. In "*Defendants' Motion to Dismiss and Plea to the Jurisdiction*" filed in the Business Court of Texas, First Division, cause no. 25-BC-0B-0027 on July 14, 2025, the US Defendants stated:

> *"The liquidators, appointed by the Grand Court of the Cayman Islands, have exclusive standing and power to pursue any claims against [Mr. Patrick, DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, and CDH GP, Ltd.] on behalf of the Debtor arising out of the actions [the Supporting Organizations] complain of here, if they choose to do so."*

Accordingly, the US Defendants can elect to accept service of the Writ and Statement of Claim and Injunction Application through their Cayman Islands attorneys, which would obviate the need for a Leave to Serve Application.

38. In the event it is necessary for the Debtor to move the Leave to Serve Application, in order to be granted leave, the Debtor must satisfy the following tests:

a. First, that there is a serious issue to be tried on the merits;

b. Second, that there is a good arguable case that the Company's claims fall within one of the jurisdictional gateways under GCR O.11 pursuant to which the Cayman Court can accept jurisdiction over foreign defendants;

c. Third, that the Cayman Islands is in any event clearly or distinctly the appropriate forum for the trial of the claim, and all the circumstances the Court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction.

39. In respect of the merits, the JOLs have already succeeded in persuading the Cayman Court (albeit in the Cayman Liquidation Proceedings which are presided over by a different judge to the Cayman Litigation Proceedings) that the Cayman Litigation has reasonable prospects of success at hearing of the sanction application on July 14, 2025.

40. In respect of the jurisdictional gateways under GCR O.11, the relevant gateways that will be applicable are:

a. As against Mr Patrick, GCR O.11, r.1(1)(ff), covers claims "*brought against a person who is or was a director, officer or member of a company registered within the jurisdiction or who is or was a partner of a partnership, whether general or limited, which is governed by the laws of the Islands and the subject matter of the claim relates in any way to such company or partnership or to the status, rights or duties of such director, officer, member or partner in relation thereto*."

b. As against CDM and DFW:

(a) GCR O.11,r.1(1)(c) covers claims "*brought against a person who has been or will be duly served within or out of the jurisdiction and a person out of the jurisdiction is a necessary or proper party thereto*";

(b) GCR O.11, r.1(1)(f) covers claims "*founded on a tort, fraud or breach of duty whether statutory at law or in equity and the damage was sustained, or resulted from an act committed, within the jurisdiction*";

(c) GCR O. 11,r.1(1)(f) covers claims "*brought for any relief or remedy in respect of any trust, whether express, implied or constructive, that is governed by or ought to be executed according to the laws of the Islands.*"

41. In respect of the Cayman Islands being the appropriate forum, the Cayman Court must conduct an assessment of the "connecting factors" between the case and the jurisdictions in which it could be litigated.[11]

**D. Injunction Application**

42. On an application for a proprietary injunction, the Debtor must show:

a. A serious issue to be tried as to whether it has a proprietary interest in the asset. This connotes a relatively low standard, under which the Court should ask whether the claim is one that would be capable of withstanding a summary judgment application.

b. That the balance of convenience is in favor of granting the injunction. As to this, Grant and Mumford (eds), Civil Fraud: Law, Practice, & Procedure ("Civil Fraud") at 28-206 comment that *"[i]n reality, unlike other types of interim injunction where the balance of convenience may create real room for argument, it is likely that a claimant with a properly arguable claim to a proprietary interest in particular property will be able to persuade the Court that damages will not be an adequate remedy should the property be dealt with pending trial, and the balance of convenience will generally favour him*". As Flaux J put it in Madoff Securities v Raven [2011] EHWC 3102 (Comm) at [140], once a sufficiently arguable proprietary case has been established, arguments by respondents that ""*it would be frightfully inconvenient to tell you what I've done with your money or to be prevented from continuing to use it"*

[11] *Aspect Properties* [2022] 1 CILR 685.

*when, on this hypothesis [the respondent] should not have had the money in the first place, do not cut much ice*"; and

c. That it is otherwise just and convenient to grant the injunction.

d. As regards the balance of convenience, whilst the Cayman Court will not enquire too closely into the merits, where the scales are evenly balanced in relation to the balance of convenience, one can take into account the relative strengths of the parties' cases: Polly Peck International plc v Nadir [1992] 4 All ER 769 at 784G–784H.

43. The Debtor also seeks disclosure orders in support of the Injunction Application requiring the Named Defendants to provide historical, present and future information about the Debtor's assets that they now hold and/or control.

44. The Cayman Court's jurisdiction to make a disclosure order is derived from s.11 of the Grand Court Law (2015 Revision), which provides that the Cayman Court has the same power as is held by the Courts of England and Wales under s.37(1) of the Senior Courts Act 1981:

> "*the like jurisdiction within the Islands which is vested in or capable of being exercised in England by — (a) Her Majesty's High Court of Justice; and (b) the Divisional Courts of that Court, as constituted by the Senior Courts Act, 1981[U.K. Act], and any Act of the Parliament of the United Kingdom amending or replacing that Act.*"

45. The Cayman Court therefore has jurisdiction to order a party to provide disclosure of information where it is just and convenient to do so. It is common (indeed, usual) for disclosure orders to be made to accompany freezing and proprietary injunctions, to enable the applicant to police compliance with the injunction.

**E. No Cross Undertaking as to Damages**

46. The Debtor has not offered to provide a cross undertaking as to damages in the Injunction Application. This is because in this case, the JOLs are not only acting in the Debtor's best interests but also in a position analogous to the public interest. This is because of the charitable or non-profit status of at least the underlying Charities, which are the intended recipients

of donations made from the Debtor. No cross-undertaking in damages should be required in such circumstances.

47. In the alternative, the Debtor's position is that any cross-undertaking should be limited to the assets available in the liquidation.

**F. The JOLs**

48. The JOLs are fiduciaries and officers of the Cayman Court. As joint official liquidators of HoldCo, their duties are to: (a) collect, realize and distribute the assets of HoldCo to its creditors and, if there is a surplus, to equity holders; and (b) report to HoldCo's creditors and other stakeholders upon the affairs of HoldCo and the manner in which it is being wound up.[12]

49. Schedule 3, Part I to the Companies Act sets out the powers that the liquidators may exercise with the sanction of the Cayman Court. They are:

a. Power to bring or defend any action or other legal proceeding in the name and on behalf of the company.

b. Power to carry on the business of the company so far as may be necessary for its beneficial winding up.

c. Power to dispose of any property of the company to a person who is or was related to the company.

d. Power to pay any class of creditors in full.

e. Power to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the company or for which the company may be rendered liable.

[12] Companies Act § 110.

f. Power to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the company and a contributory or alleged contributory or other debtor or person apprehending liability to the company.

g. Power to deal with all questions in any way relating to or affecting the assets or the winding up of the company, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it.

h. The power to sell any of the company's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels.

i. The power to raise or borrow money and grant securities therefor over the property of the company.

j. The power to engage staff (whether or not as employees of the company) to assist them in the performance of his functions.

k. The power to engage attorneys and other professionally qualified persons to assist them in the performance of their functions.

50. Pursuant to Section 5 of the Supervision Order, the Cayman Court expressly granted sanction to the JOLs to exercise the following powers in Schedule 3, Part I of the Companies Act:

a. the power to commence legal proceedings in the name and on behalf of HoldCo to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

b. the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which HoldCo is or may arguably be entitled.

51. Schedule 3, Part II of the Companies Act further provides that the JOLs are permitted to exercise the following powers without the Cayman Court's sanction:

a. The power to take possession of, collect and enter the property of HoldCo and for that purpose to take all such proceedings as they consider necessary.

b. The power to do all acts and execute, in the name and on behalf of HoldCo, all deeds, receipts and other documents and for that purpose to use, when necessary, HoldCo's seal.

c. The power to prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against his estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and ratably with the other separate creditors.

d. The power to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of HoldCo, with the same effect with the respect of HoldCo's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of HoldCo in the course of its business.

e. The power to promote a scheme of arrangement pursuant to section 86.

f. The power to convene meetings of creditors and contributories.

g. The power to do all other things incidental to the exercise of their powers.

52. Pursuant to Section 6 of the Supervision Order, the Cayman Court authorized the JOLs to exercise the following powers in and to take the following steps without further sanction by the Court:

a. the power to present a petition for the winding up of the Fund if so advised;

b. the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c. the power to seek registration or recognition of themselves and/or the Cayman Liquidation Proceedings in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of the Supervision Order.

53. Accordingly, the JOLs have been expressly authorized by the Cayman Court to seek recognition of their appointment in the United States by means of the Verified Petition without further sanction from the Cayman Court.

54. The JOLs are also empowered and required to investigate: (i) the causes for the failure of HoldCo's business; and (ii) generally, the promotion, business dealings and affairs of HoldCo.[13]

**G. The Cayman Liquidation Proceedings as a "Foreign Proceeding"**

55. I am advised by U.S. counsel that "foreign proceeding" is defined in section 101(23) of the Bankruptcy Code to mean:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the Debtors are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation

11 U.S.C. § 101(23).

56. Although the application of Bankruptcy Code § 101(23) is ultimately a question of applicable United States law on which I am not qualified to opine, based on my reading of the language of the section, I believe that the Cayman Liquidation Proceedings would fall within that definition.

57. The Cayman Liquidation Proceedings are collective judicial proceedings, in the Cayman Islands. The JOLs' initial determination is that Holdco is solvent but both solvent and insolvent liquidations are considered to be collective proceedings in the Cayman Islands.[14]

58. The Cayman Liquidation Proceedings are governed by Part V of the Companies Act which is the Cayman Islands statute applicable to corporate insolvencies and liquidations, in

---

[13] Companies Act § 102.

[14] In the matter of Euro Bank Corporation AG v Euro Bank and Crystal Limited [2001] CILR 517 at para. 81(a) per Smellie CJ: "*the general and well-established principle [is] that once a company goes into liquidation all its property becomes impressed with a statutory trust, creating a fund against which its creditors and contributories (if a solvent liquidation) must claim. The rights of the claimants thus take the form of a collective enforcement and there are no identifiable rights* in personam *…. to be asserted: see* Ayerst (Inspector of Taxes) *v.* C. & K. (Constr.) Ltd. *(2). The rights of creditors become the rights to claim for dividends in the liquidation fund, in keeping with the scheme created by the statute*"

which the Debtor's assets and affairs are subject to the supervision of the Cayman Court, for the purpose of liquidation, pursuant to the Supervision Order made by the Cayman Court. I am therefore of the belief that Part V of the Companies Act is a law relating to insolvency.

59. The liquidation of the Debtor is being continued under the supervision of the Cayman Court. Its assets and affairs are therefore subject to the control of the Cayman Court for the purpose of liquidation.[15]

**H. The JOLs as "Foreign Representatives"**

60. I am also advised by U.S. Counsel that "foreign representative" is defined in the Bankruptcy Code to mean:

> [A] person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

Bankruptcy Code § 101(24).

61. Again, the application of Bankruptcy Code §101(24) is ultimately a question of applicable United States law on which I am not qualified to opine, but in my view the JOLs constitute "foreign representatives" based on a plain reading of the language of the section. They have been appointed by the Cayman Court to administer the liquidation of the Debtor's assets and affairs, and they have been authorized by the order appointing them to (among other matters) seek recognition under Chapter 15 of the Bankruptcy Code.

[15] In the matter of UCF Fund Limited [2011] 1 CILR 305 at para 4 per Jones J "*Section 110(2) of the Companies Law provides that an official liquidator may exercise the powers contained in Part I of the Third Schedule only with the sanction of the court, whereas the general powers contained in Part II may be exercised with or without sanction. The purpose of this provision is to subject official liquidators to the general supervisory jurisdiction of the court. In respect of the Part I powers, the onus is on the official liquidator to make a sanction application in every case, whether or not the exercise of the power is controversial. In respect of the Part II powers, the onus is on the creditors or contributories to make a sanction application if they disapprove of the way in which the official liquidator has exercised or intends to exercise the powers*."

**Factors relevant to the Determination of COMI**

62. I am advised by U.S. Counsel that certain other provisions of Cayman Islands law may be relevant to the determination of the center of main interests ("COMI") of the Debtor under section 1517 of the Bankruptcy Code. I set out below an overview of Cayman Islands law and practice which may be relevant to the determination of this question. Again, I note that my statement of facts below is based on the MacInnis Declaration.

63. The Debtor was incorporated as an exempted company limited by shares in accordance with the laws of the Cayman Islands. The Debtor's registered address is at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands, and was previously Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

64. As noted above, the restriction on the carrying on of an exempted company's business inside the Cayman Islands, only in support of its business outside the Cayman Islands, does not have any practical effect in the context of the liquidation of that company by official liquidators appointed by the Cayman Court. Official liquidators are empowered and required to take control of all of the company's affairs in order to realize its assets and repay its creditors (and, if there is a surplus of assets, distribute them to its shareholders). As set out above, they are granted all powers necessary for them to do so (in some cases, subject to sanction of the Cayman Court). There are no restrictions on them exercising those powers in the Cayman Islands, and their exercise of those powers is at all times subject to the supervision of the Cayman Court. In all cases, at least one official liquidator of any Cayman Islands company must be resident in the Cayman Islands.[16]

[16] IPR Regulations 5(1)(b) and 8(1).

65. The Debtor has had a presence in the Cayman Islands from its incorporation, for example the location of its registered office, as noted above. Following the commencement of the Cayman Liquidation Proceedings, the liquidation of the Debtor has been conducted from the Cayman Islands, and all of the affairs of the Debtor have been managed from the Cayman Islands by the JOLs, who are both residents of the Cayman Islands.

66. The JOLs are further required to report to the Cayman Court and the Debtor's stakeholders as to the conduct of the liquidation. On July 2, 2025, the JOLs issued HoldCo's First Report to Contributories.

67. As noted above, the JOLs' conduct of the liquidation is subject to the supervision of the Cayman Court. The JOLs were granted sanction to file the Verified Petition by the Cayman Court under the terms of the Supervision Order but would require the express sanction of the Cayman Court to take any further steps to exercise any of the powers set out in paragraph 49 above. Other matters have been reported to the Cayman Court in the JOLs' first report (and will be reported in subsequent reports), in affidavits and in letters to the Cayman Court. The JOLs' remuneration is also subject to the Cayman Court's approval.

68. As a consequence of the appointment of the JOLs as joint official liquidators, the management of the Debtor's business has therefore been conducted from the Cayman Islands in respect of the matters referred to above.

[*Remainder of page intentionally left blank.*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 21, 2025

/s/ Caroline Moran
Caroline Moran

**From:** Louis M. Phillips
**To:** Rosenberg, David M.; Lauren Short; Lucy Bannon
**Cc:** Amelia L. Hurt
**Subject:** FW: outstanding final exhibits TDF/HDF/SBF
**Date:** Friday, July 9, 2021 1:04:57 PM
**Attachments:** image002.png
image003.png
Letter to Judge Jernigan - Highland (26734662) (3).docx
SBF HSBF overview letter 7-2-21.docx

---

Lauren, Lucy and David,

Somehow I lost track of the letters, and thought we had executed originals. Can you get these executed and sent back to us? Note that the header needs to be filled in on Mr. Randazzo's letter and the SBF letter needs letterhead, letter format, etc.

**Louis M. Phillips**
*Partner*

KELLY HART PITRE
ATTORNEYS AT LAW

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

**From:** Louis M. Phillips
**Sent:** Friday, July 9, 2021 12:39 PM
**To:** 'Mark Tax' <mpatricktax1040@gmail.com>
**Cc:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Subject:** FW: outstanding final exhibits

Mark,

Are these the letters in proper form?

**Louis M. Phillips**
*Partner*

KELLY HART PITRE
ATTORNEYS AT LAW

KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

**[LETTERHEAD OF THE DALLAS FOUNDATION]**

___________, 2021

Honorable Stacy G. C. Jernigan
United States Bankruptcy Judge
Northern District of Texas

Re: Highland Dallas Foundation, Inc.

Dear Judge Jernigan:

I am the President and Chief Executive Officer of The Dallas Foundation ("TDF"). TDF is a Texas nonprofit corporation, and is the successor in interest to Dallas Community Trust, a charitable trust which was formed in 1929. TDF works with hundreds of donors regularly to make charitable grants supporting numerous worthy causes. It also manages funds for nonprofit organizations and critical community initiatives such as COVID-19 recovery efforts and disaster relief, serving as a fiscal sponsor for more than 100 community funds. In 2020 alone, TDF awarded more than $62 million in grants, utilizing its core values of concern for the community, respect for donors, thoughtful giving and careful investing.

One of the most popular tools TDF uses to carry out its charitable mission is a donor-advised fund. A donor establishes a donor-advised fund by making a contribution to TDF of cash or property. TDF maintains the donor-advised fund as a separate fund on TDF's books, but the donor-advised fund is owned by TDF, and the assets of TDF's donor-advised funds are invested together as part of TDF's investment pool. Most donor-advised funds have an advisory committee consisting of the donor and others appointed by the donor. The committee makes recommendations to TDF for charitable distributions from the donor-advised fund. TDF's experienced staff vets the proposed distributions to ensure that the recipients are qualified charitable organizations with purposes and values consistent with those of TDF. Importantly, TDF is not bound by the committee's recommendations, and retains the authority to reject any recommendation, and to make distributions to other organizations it selects.

Another popular tool TDF uses to carry out its charitable mission is a "supporting organization." A supporting organization is a separate entity that TDF controls through its ability to elect at least a majority of the entity's governing board. Because of this control, TDF's several supporting organizations are included in TDF's annual externally audited financial statements. With both donor-advised funds and supporting organizations, TDF personnel assist in all management and administrative functions.

Aware of TDF's sterling reputation among both donors and nonprofit organizations in the community, Jim Dondero and Highland Capital Management reached out to TDF in 2011 with their proposal to establish Highland Dallas Foundation, Inc. ("HDF") as a supporting organization of TDF. HDF was incorporated in 2011 and was recognized by the IRS as exempt from federal income tax as a charitable organization described in Section 501(c)(3) of the Internal Revenue Code, and as a supporting organization of TDF.

HDF is a membership corporation, and its members have the ultimate authority to elect (or remove) its Board of Directors and to amend, or prevent the amendment of, its Certificate of

Incorporation and Bylaws. HDF qualifies as a supporting organization of TDF because (i) HDF's Certificate of Incorporation provides that HDF "is organized and operated exclusively to support and benefit" TDF and "shall be controlled by TDF"; (ii) under HDF's Bylaws, HDF has two (2) classes of members, an "Institutional Member" (TDF), and an "Individual Member" (Jim Dondero); and (iii) the Institutional Member has two (2) votes and the Individual Member has only one (1) vote on any matter submitted to the members. HDF's Bylaws further provide that the Institutional Member elects two (2) of HDF's three (3) directors, and the Individual Member elects one (1) director.

The Board of Directors of HDF consists of Mr. Dondero, Julie Diaz (Chief Philanthropic Partnerships Officer of TDF) and me. Mr. Dondero serves as President, I serve as Vice President and Ms. Diaz serves as Secretary and Treasurer.

Shortly after HDF was established, Highland Capital Management and Mr. Dondero established the Highland Dallas Foundation Fund, a donor-advised fund (the "Highland DAF"), with TDF. Consistent with its status as a supporting organization of TDF, HDF makes periodic grants to the Highland DAF. The Highland DAF advisory committee then makes recommendations with respect to grants to be made from the Highland DAF, after which the TDF staff vets these recommendations to ensure recommended grants and prospective grantees meet all qualifications. If all qualifications are met, grants are made to the recommended grantees.

Since their formation, HDF and the Highland DAF have supported numerous and diverse charitable organizations that focus on areas such as education, economic and community development, youth and family, and military, veterans, and first responders. To date, more than $20 million in total grants have been made to the community via HDF and the Highland DAF, with an additional $9 million pledged through multiyear commitments. Their support has strengthened our community in many ways, including, for example, giving low-income students access to high-quality education, providing emergency shelter to victims of family violence, and helping to thank our veterans and local law enforcement for their service and sacrifice.

In summary, TDF has a more than 90-year history of stewardship and stability and is one of the most prominent charitable institutions in the Dallas area. The relationship among TDF, HDF, the Highland DAF and Mr. Dondero is founded upon a mutual desire to support and encourage philanthropy, and TDF is not controlled by or beholden to Mr. Dondero in any way. TDF looks forward to a continuing relationship that advances the work of HDF and Highland DAF for the benefit of the community.

Thank you.

Sincerely,

Matthew Randazzo
President & Chief Executive Officer

**Overview of the Santa Barbara Foundation**

The Santa Barbara Foundation ("SBF") is a community foundation incorporated in 1928 under the laws of the state of California as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. The mission of SBF is to mobilize collective wisdom and philanthropic capital to build empathetic, inclusive, and resilient communities. Working in partnership with individuals, families, community organizations, nonprofits, businesses, and government, SBF funds a wide range of initiatives, projects, and organizations. SBF has supported nearly every Santa Barbara County nonprofit organization and essential community project during its 93-year history and continues to serve as one of the largest private funding sources for area nonprofits, agencies, and college-bound students.

In 2020, SBF awarded $31 million in grants, received $36 million in contributions, and had $514 million in assets. Nonprofit support included annual grant programs (behavioral health, health care, food, shelter & safety, and child care), laying the groundwork for workforce development strategies, and creating the Collaboration for Social Impact to help nonprofits with capacity building and leadership development. Additionally, SBF co-organized and co-led the countywide COVID-19 Joint Response Effort, broadened its grantmaking to include small businesses through the Santa Barbara Better Together Fund, co-led the 2020 census efforts with the County of Santa Barbara, sponsored and produced educational events to promote diversity, equity, inclusion and access, and continued its annual funding of the Scholarship Foundation of Santa Barbara. Grants are made through SBF from various types of funds, including donor advised, donor designated, and field of interest. Discretionary grants, totaling over $7 million in 2020, are also supported by SBF's unrestricted contributions and investment income.

**Supporting Organizations**

SBF works with entities organized under Section 509(a)(3) of the Internal Revenue Code as supporting organizations to SBF for the specific and primary purpose of benefiting, performing functions of, and engaging in activities consistent with SBF's charitable purposes. SBF appoints a majority of the members of the governing boards of the supporting organizations. Each governing board may create its own investment policy and grant guidelines. Each organization is a separate legal entity required to file its own IRS Form 990, "Return of Organization Exempt from Income Tax". SBF and its supporting organizations are considered under SBF's control and thus consolidated in SBF's audited financial statements.

**Overview of Highland Santa Barbara Foundation, Inc.**

Highland Santa Barbara Foundation, Inc. (HSBF) was formed in November 2011 as a Delaware nonprofit nonstock corporation to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of SBF. HSBF is a Type I supporting organization under Section 509(a)(3) of the Internal Revenue Code. SBF is a supported organization under Section 509(a)(1) of the Internal Revenue Code.

The Bylaws of HSBF describe the governance of HSBF by its members, directors, and officers. HSBF has two classes of members, institutional and individual, and one member in each class. SBF is the institutional member. James Dondero is the individual member. HSBF has three directors, two elected by SBF and one elected by James Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors.

SBF and HSBF have an operating agreement whereby SBF provides grant administration and other services to HSBF and HSBF pays support fees to SBF. The fees are calculated using a tiered schedule based on the fair market value of 100 participation shares of Charitable DAF HoldCo, Ltd., which is the primary asset of HSBF. The fair market value is determined by an independent valuation firm at least annually.

**Relationship and Mission Advancement**

SBF meets annually with HSBF to discuss SBF activities, alignment of SBF priorities and focus areas with HSBF philanthropic objectives, and proposed HSBF funding for the upcoming year. Since its inception, HSBF has funded over $5 million of the grants awarded by SBF, including nearly $3 million in Santa Barbara County. See HSBF, Inc. History, attached.

HSBF has augmented SBF’s discretionary grants in the areas of: early childhood, youth, and workforce development and education; scholarships; veterans and military education and job training; Community Caregiving Initiative; and Food Action Plan. HSBF has also funded grants to specific organizations, including: $400,000 to Children’s Museum of Santa Barbara d.b.a. MOXI - The Wolf Museum of Exploration and Innovation; $90,000 to Reasoning Mind, Inc. for identified local schools to participate in a math literacy program; and $30,000 to Boy Scouts of America - Los Padres Council for rebuilding of Camp Rancho Alegre following the Whittier Fire.

# RAND PE FUND I, L.P.

(A DELAWARE “SERIES” LIMITED PARTNERSHIP)

## FINANCIAL STATEMENTS

INDEPENDENT AUDITOR’S REPORT

FOR THE YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24,2025 (LIQUIDATION DATE)

# RAND PE FUND I, L.P.

## TABLE OF CONTENTS

DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24,2025 (LIQUIDATION DATE)

**Page**

**Independent Auditor's Report** ........ 1

**Financial Statements**

Statements of Assets, Liabilities and Partners' Capital ........ 3

Schedule of Investments ........ 4

Statements of Operations ........ 5

Statements of Changes in Partners' Capital ........ 6

Statements of Cash Flows ........ 7

Notes to Financial Statements ........ 8

Cohen & Co®

Independent Auditor's Report

To the Partners of
Rand PE Fund I, L.P.

***Opinion***

We have audited the accompanying financial statements and financial statements in liquidation of Rand PE Fund I, L.P., which comprise the statement of asset and liabilities, including the schedule of investments, as of December 31, 2024 and as of February 24, 2025 (liquidation date), and the related statements of operations, changes in partners' capital and cash flows for the year and period then ended, and the related notes to the financial statements.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Rand PE Fund I, L.P. as of December 31, 2024 and as of February 24, 2025 (liquidation date), and the results of its operations, changes in its partners' capital and cash flows for the year and period then ended in accordance with accounting principles generally accepted in the United States of America.

***Basis for Opinion***

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of Rand PE Fund I, L.P. and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

***Partnership Liquidation***

As discussed in Note 1 to the financial statements, in February 2025, in accordance with the Partnership's operating agreement, the Manager approved a plan for the orderly liquidation of the Partnership and notified the partners of their intentions to liquidate the partnership effective February 24, 2025 (liquidation date). Our opinion is not modified with respect to this matter.

***Responsibilities of Management for the Financial Statements***

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

***Auditor's Responsibilities for the Audit of the Financial Statements***

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Rand PE Fund I, L.P.'s internal control. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

Cohen & Company, Ltd.

Cleveland, Ohio
June 26, 2025

# RAND PE FUND I, L.P.

## STATEMENTS OF ASSETS, LIABILITIES AND PARTNERS' CAPITAL

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | December 31,2024 | February 24, 2025 (liquidation date) |
|---|---|---|
| **Assets** | | |
| Investment, at fair value (cost $15,986,892 and $0, respectively) | $ 1,000,000 | $ - |
| Cash and cash equivalents | 19,891 | 1,019,678 |
| Total assets | $ 1,019,891 | $ 1,019,678 |
| **Liabilities** | | |
| Accrued expenses | $ 43,900 | $ 69,965 |
| Distributions payable | - | 949,713 |
| Total liabilities | 43,900 | 1,019,678 |
| **Partners' capital** | 975,991 | - |
| Total liabilities and partners' capital | $ 1,019,891 | $ 1,019,678 |

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.
## SCHEDULE OF INVESTMENTS
YEAR ENDED DECEMBER 31, 2024

| Ownership Percentage | Description | Fair Value | % of Partners' Capital |
|---|---|---|---|
| | **Investment in LLC interests** | | |
| | United States | | |
| | Financial | | |
| 100% | *Beacon Mountain, LLC (cost $15,986,892)* | $ 1,000,000 | 102.46% |
| | **Total Investment (cost $15,986,892)** | $ 1,000,000 | 102.46% |

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.

## STATEMENTS OF OPERATIONS

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | Year ended December 31, 2024 | Period ended February 24, 2025 (liquidation date) |
|---|---|---|
| **Investment income and expenses** | | |
| **Income** | | |
| Investment income | $ - | $ - |
| **Expenses** | | |
| Professional fees | 43,900 | 25,000 |
| Custodian fees | 2,650 | 1,278 |
| Other expense | - | - |
| Total expenses | 46,550 | 26,278 |
| Net investment loss | (46,550) | (26,278) |
| **Realized gain** | | |
| Net realized loss from settlement income | (52,242) | - |
| Net realized loss on investments | - | (14,986,892) |
| Net change in unrealized depreciation on investments | 1,000,000 | 14,986,892 |
| | 947,758 | - |
| **Net increase (decrease) in partners' capital resulting from operations** | $ 901,208 | $ (26,278) |

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.

## STATEMENTS OF CHANGES IN PARTNERS' CAPITAL

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | General Partner | Series I Limited Partners | Total |
|---|---|---|---|
| **Partners' capital at December 31, 2023** | $ - | $ 74,783 | $ 74,783 |
| **Operating activities** | | | |
| Net investment loss | - | (46,550) | (46,550) |
| Net realized loss from settlement income | - | (52,242) | (52,242) |
| Net change in unrealized depreciation on investments | - | 1,000,000 | 1,000,000 |
| Net increase in partners' capital resulting from operations | - | 901,208 | 901,208 |
| **Partners' capital at December 31, 2024** | **$ -** | **$ 975,991** | **$ 975,991** |

| | General Partner | Series I Limited Partners | Total |
|---|---|---|---|
| **Partners' capital at December 31, 2024** | $ - | $ 975,991 | $ 975,991 |
| **Operating activities** | | | |
| Net investment loss | - | (26,278) | (26,278) |
| Net realized loss on investments | - | (14,986,892) | (14,986,892) |
| Net change in unrealized depreciation on investments | - | 14,986,892 | 14,986,892 |
| Net decrease in partners' capital resulting from operations | - | (26,278) | (26,278) |
| **Capital activities** | | | |
| Capital distributions* | - | (949,713) | (949,713) |
| Net change in partners' capital resulting from capital activities | - | (949,713) | (949,713) |
| **Partners' capital at February 24, 2025 (liquidation date)** | **$ -** | **$ -** | **$ -** |

**Capital distributions have not been paid as of the date of the audit opinion*

The accompanying notes are an integral part of these financial statements.



CONFIDENTIAL 015286

# RAND PE FUND I, L.P.

## STATEMENTS OF CASH FLOWS

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | December 31,2024 | February 24, 2025 (liquidation date) |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net increase (decrease) in partners' capital resulting from operations | $ 901,208 | $ (26,278) |
| Adjustments to reconcile net increase (decrease) in partners' capital resulting from operations to net cash provided by (used in) operating activities: | | |
| Proceeds from the disposition of investments | - | 1,000,000 |
| Net realized loss on investment transactions | - | (14,986,892) |
| Net change in unrealized depreciation on investments | (1,000,000) | 14,986,892 |
| Net changes in operating assets and liabilities | | |
| Increase in other assets | 62,242 | - |
| Increase in accrued expenses | (5,100) | 26,065 |
| Net cash provided by (used in) operating activities | (41,650) | 999,787 |
| **Cash flows from financing activities** | | |
| Capital distributions, net of payable* | - | - |
| Net cash provided by financing activities | - | - |
| Net increase (decrease) in cash | (41,650) | 999,787 |
| Cash and cash equivalents, beginning of year | 61,541 | 19,891 |
| Cash and cash equivalents, end of year | $ 19,891 | $ 1,019,678 |

**Capital distributions have not been paid as of the date of the audit opinion*

The accompanying notes are an integral part of these financial statements.

**1. Organization**

Rand PE Fund I, L.P. (the "Partnership") was organized as a “series” limited partnership under the laws of Delaware Revised Uniform Limited Partnership Act on October 29, 2015, and commenced operations on December 17, 2015. The Partnership offered partner interests in the Partnership (“Interests”) in a private placement pursuant to section 4(a)(2) of the Securities Act of 1933, as amended (“Securities Act”), and Regulation D promulgated thereunder.

Rand PE Fund Management, LLC, a Delaware limited liability company (the “General Partner”), is the general partner of the Partnership and is responsible for the management of the Partnership’s affairs. Rand Advisors, LLC, a Delaware limited liability company (the “Investment Manager”), is the investment manager of the Partnership and has discretionary investment authority over the Partnership’s assets. The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission (“SEC”). The Investment Manager has a shared services agreement with Skyview Group (“Skyview”) to provide certain limited back office services including, but not limited to, bookkeeping, financial reporting, tax preparation, operations, and IT support. Neither the Investment Manager nor Skyview receives any compensation from the Partnership for these services.

The Partnership was formed to pool investment funds of its investors (each, a “Limited Partner” and, collectively, “Limited Partners”; and, together with the General Partner (as defined above), “Partners”) for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

The Partnership is governed by the Agreement of Limited Partnership (the “Partnership Agreement”) dated October 29, 2015. Interests in the Partnership will be offered in separate series of interests (“Series”). All current Limited Partners have been enrolled in “Series 1 Interests”. Each Series will have separate rights and obligations. In addition, each Series may correspond to a separate portfolio of assets, which may have different investment objectives and strategies. The Partnership may issue additional Series in the future, which may have rights and obligations that differ from those of the Series 1 Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined in the Partnership Agreement) and other rights and terms. The terms of such additional Series will be determined by the General Partner, in its sole discretion.

Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations. The Partnership will maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series.

On June 21, 2022, the Partnership entered into a confidential settlement agreement with certain third-parties who agreed to pay all legal, audit, and custody expenses incurred by Hunter Mountain Investment Trust ("HMIT"), an entity which the Partnership had owned indirectly through its investment in Beacon Mountain, LLC, and the Partnership for the duration of the Highland Capital Management, L.P. ("HCMLP") bankruptcy. As of December 31, 2024 this agreement is not expected to result in any further actual reimbursement to the Partnership and all related income and receivables have been written off.

On August 1, 2022, Rand Advisors, LLC was acquired by Rand Advisors Holding Corp, effecting a change in control of the Investment Manager.

On February 6, 2025, the General Partner redeemed certain limited partners in the Partnership for their Capital Account value of $0. Following the sale of the Partnership's sole investment thereafter, the Partnership caused distributions to be made to such limited partners for their respective share of such sale proceeds pursuant to the "side pocket" status of such investment.

On February 12, 2025, the Partnership's sole investment was sold and thereafter on February 24, 2025, the Investment Manager decided to dissolve the Partnership at which point liquidation became imminent. Under the plan of liquidation, the Partnership plans to settle all outstanding liabilities and pay out distributions to the partners. The adoption of the liquidation basis of accounting did not have a material effect on the carrying value of the Partnership's assets and liabilities and was therefore not adopted.

## 2. Significant Accounting Policies

The following is a summary of the significant accounting policies followed by the Partnership in the preparation of its financial statements.

**Basis of Accounting**
The Partnership's financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and are stated in United States dollars. The Partnership is an investment company in conformity with U.S. GAAP and as such follows the accounting and reporting guidance under Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 946, *Financial Services – Investment Companies*.

**Use of Estimates**
The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of increases and decreases in partners' capital from operations during the period. The Partnership's significant estimates include the fair value of its investments and derivative contracts. Actual results could differ from those estimates.

**Investment Transactions**
Investment transactions are recorded on a trade-date basis. Realized gains and losses on investment transactions are determined based on specific identification using the first-in, first-out method.

Investments are valued at market or fair value at the date of the financial statements with the resulting net unrealized appreciation or depreciation reflected in the Statements of operations.

See Note 6 for the Partnership's fair value hierarchy disclosures.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. banks or brokers and deposits with original maturities of less than 90 days. Cash equivalents are carried at cost, which approximates fair value. At December 31, 2025, the Partnership held cash balances at certain financial institutions within the federally insured limit of $250,000. At February 24, 2025 the Partnership held cash balances at certain financial institutions which exceeded the federally insured limit of $250,000 by approximately $770,000. The Investment Manager regularly monitors the credit quality of these institutions.



CONFIDENTIAL

**Income and Expense Recognition**
Interest on currently paying debt instruments is accrued as earned. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums are accreted or amortized to interest income except for deeply discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis. Amendment fees are recognized when received. Operating expenses are recorded on the accrual basis as incurred.

**Allocation of Gains and Losses**
Net capital change as a result of operations is generally allocated to the capital accounts of each limited partner in proportion to their respective ownership percentages as determined at the beginning of each accounting period adjusted for any additional contributions or withdrawals.

**3. Taxes**

The Partnership is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of the Partnership's net taxable income. Interest, dividends and other income realized by the Partnership from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

The Partnership applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the application of this guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2024.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2024, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from December 31, 2021 forward.

The Partnership recognizes interest and penalties, if any, related to unrecognized tax benefits as income tax expense in the Statements of operations. During the year ended December 31, 2024 and period ended February 24, 2025 (liquidation date), the Partnership did not incur any interest or penalties.

**4. Limited Partnership Agreement**

**Capital Contributions and Withdrawals**
The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000. The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000. In each case, the General Partner has discretion to accept lesser amounts. Generally, new Limited Partners will be admitted on the first day of each month, and withdrawals may be made on the last day of each calendar quarter upon 91 days' prior written notice and subject to certain other restrictions as described herein (unless, in each case, the General Partner, in its sole discretion, permits subscriptions or withdrawals at another time).

There is no public market for the limited partner interests in the Partnership ("Interests") nor is any expected to develop. Even if such a market develops, no distribution, resale or transfer of an Interest will be permitted, except in accordance with the provisions of the Securities Act, the rules and regulations promulgated thereunder, any applicable state securities laws and the terms and conditions of the Partnership Agreement. Any transfer of an Interest by a Limited Partner, public or private, will require the consent of the General Partner.

Each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion, upon at least 91 days' prior written notice. Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's capital account balance below $500,000. Generally, not less than 90% of the withdrawal proceeds (excluding any amounts held in any Side Pocket Accounts) will be paid within 90 days after the applicable withdrawal date. The balance of the amount payable upon such withdrawal will be paid without interest, within 90 days after the completion of the audited financial statements for the fiscal year in which the withdrawal occurs.

**Limitations on Withdrawals**
The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from capital accounts: (i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners; (ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation; (iii) if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications; or (iv) for such other reasons or for such other periods as the General Partner may in good faith determine.

**Side Pocket Accounts**
A Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of an illiquid investment held in a Side Pocket Account until such time that such illiquid investment (or the sales proceeds thereof) is reallocated to such Limited Partner's capital account. At the sole discretion of the Investment Manager, an illiquid investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined in the Partnership Agreement). At December 31, 2024, the Partnership's investment was held in a side pocket account. At February 24, 2025 (liquidation date), the investment had been sold.

**Management Fees**
The Partnership has entered into an investment management agreement (as the same may be amended and/or restated from time to time, the "Investment Management Agreement") by and among the Partnership and the Investment Manager. In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager will receive a quarterly management fee ("Management Fee"), equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined herein), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |

| | |
|---|---|
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

The Management Fee will be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A pro rata Management Fee will be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No management fees were paid to the Investment Manager during the year or period presented, as the Investment Manager elected to waive its management fees. The Investment Manager can, at its discretion, waive or reduce the management fee.

**Allocation of Net Increase/(Decrease) in Partners' Capital Resulting from Operations**
The Partnership Agreement specifies the allocation of net income or loss (increases and decreases in net worth, as defined in the Limited Partnership Agreement) to each partner's capital account. Net income or loss includes all gains and losses, whether realized or unrealized, plus all other items of income (such as interest) and less all expenses. Generally, net income and loss for each month (or other period, as the case may be) will be allocated to the partners in proportion to their capital account balances at the start of such month (or such other period). Capital account balances will reflect capital contributions, previous allocations of increases and decreases in net worth and withdrawals.

**5. Financial Instruments with Concentration of Credit Risk and Other Risks**

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership due to a change in the market value of its investments. The Partnership's exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership's investments. Volatility or illiquidity could impair the Partnership's performance or result in losses. The Partnership may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets.

**Liquidity Risk**
The Partnership's limited partner interests have not been registered under the Securities Act or any other applicable securities laws. There is no public market for the interests and neither the Partnership nor the Investment Manager expects such a market to develop.

**Market Concentration**
The Partnership was formed to invest in small to medium-sized companies (i.e., generally with market capitalization of under $1 billion) that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions. All of the assets attributable to Series I have been invested in LLC interests of Beacon Mountain, LLC. This limited diversification could expose the Partnership to losses that are disproportionate to market movements as a whole.

**Litigation Risk**
The Partnership is periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in material losses to the Partnership.

**Limited Diversification**
The Partnership's portfolio could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of risk may increase the losses suffered by the Partnership. In addition, it is possible that the Investment Manager may select investments that

are concentrated in certain classes of financial instruments. This limited diversification could expose the Partnership to losses that are disproportionate to market movements as a whole. As of December 31, 2024, the Partnership's portfolio consisted of one investment in the LLC interests of Beacon Mountain, LLC. At February 24, 2025 (liquidation date), the investment had been sold.

**Custody Risk**

The clearing operations for the Partnership's investments are provided by major financial institutions. In addition, all of the Partnership's cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of major securities exchanges. The Partnership may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership might be unable to recover the full value of its assets or incur losses due to its assets being unavailable for a period of time.

**Concentration of Investor Risk**

One affiliated entity, Atlas IDF, L.P., held approximately 96.5% of the Partnership's capital balance as of December 31, 2024.

## 6. Fair Value Hierarchy of Financial Instruments

In accordance with the authoritative guidance on fair value measurements and disclosures under U.S. GAAP, the Partnership discloses the fair value of its investments in a hierarchy that prioritizes the inputs to valuation techniques used to measure the fair value. The hierarchy gives the highest priority to valuations based upon unadjusted quoted prices in active markets for identical assets or liabilities (level 1 measurements) and the lowest priority to valuations based upon unobservable inputs that are significant to the valuation (level 3 measurements). The guidance establishes three levels of the fair value hierarchy as follows:

Level 1 – Valuations based on unadjusted prices in active markets for identical assets and liabilities that the Partnership has the ability to access as of the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for which identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership uses prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's nonperformance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership uses actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available or are determined to be unreliable, the Partnership develops methodologies that provide appropriate fair value estimates. Management reviews these methodologies on a continuous basis to account for changing market conditions.

The Investment Manager has established policies, as described above, processes and procedures intended to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent.

As of December 31, 2024, the Partnership's investment consisted of an LLC interest. As of February 24, 2025 (liquidation date), the investment had been sold.

**LLC interests**
As of December 31, 2024, the Partnership's investment was comprised entirely of a membership interest in a nonpublic limited liability company that was valued using commonly accepted valuation methodologies due to not having a readily determinable fair value. The LLC's sole investment is an indirect non-voting limited partner interest in 99.5% of a private investment management firm. This private investment management firm owns equity in a company that is in bankruptcy. The LLC interest is classified as level 3 as it is priced using inputs that are not readily observable.

The following table provides a summary of the investment recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2024. As of February 24,2025, no investments were held by the partnership.

| | Level 1 | Level 2 | Level 3 | Total fair value at December 31, 2024 |
|---|---|---|---|---|
| LLC interests | $ - | $ - | $ 1,000,000 | $ 1,000,000 |

The following table provides a roll forward of the amounts for the year ended December 31, 2024 and February 24, 2025 for financial instruments classified within Level 3. The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement.



CONFIDENTIAL 015294

| | LLC interests |
|---|---|
| Fair value as of December 31, 2023 | $ - |
| Purchases | - |
| Sales and maturities | - |
| Transfers in | - |
| Transfers out | - |
| Net realized gains/(losses) | - |
| Net change in unrealized gains/(losses) | 1,000,000 |
| Fair value as of December 31, 2024 | $ 1,000,000 |

| | LLC interests |
|---|---|
| Fair value as of December 31, 2024 | $ 1,000,000 |
| Purchases | - |
| Sales and maturities | (1,000,000) |
| Transfers in | - |
| Transfers out | - |
| Net realized gains/(losses) | (14,986,892) |
| Net change in unrealized gains/(losses) | 14,986,892 |
| Fair value as of February 24, 2025 (liquidation date) * | $ - |

*The values in the preceding table are equal to zero.

No transfers between levels occurred during the year ended December 31, 2024, or period ended February 24, 2025.

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy as of December 31, 2024. As of February 24, 2025 no investments were held by the Partnership.

| Category | Fair Value at December 31, 2024 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| LLC interests | $ 1,000,000 | Transaction Indication of Value | Sales Price | $ 1,000,000 |

## 7. Commitments and Contingencies

In the normal course of business, the Partnership may enter into contracts that provide general indemnifications and contain a variety of representations and warranties that may expose the Partnership to some risk of loss. The amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

## 8. Related Party Transactions

**Management Fees**
For its services to the Partnership, the Investment Manager is entitled to management fees as described in Note 4. For the year ended December 31, 2024 and period ended February 24, 2025 (liquidation



CONFIDENTIAL

date), the Investment Manager did not earn management fees. The Investment Manager does not charge a management fee on investments in related funds.

**9. Financial Highlights**

Financial highlights for the year ended December 31, 2024 and February 24, 2025 are as follows:

| | Year ended December 31, 2024 Series I | Period ended February 24, 2025 (liquidation date) Series I |
|---|---|---|
| Total return [1] | 1205.10 % | (17.87)% |
| Ratios to average limited partners' capital [2] | | |
| Investment income | 0.0 % | 0.0 % |
| Operating expenses | (37.18)% | (17.87)% |
| Net investment loss | (37.18)% | (17.87)% |

[1] Total return is determined using a time-weighted rate of return methodology in which rates of return are geometrically linked. Total return is reflected after all investment related and operating expenses. An individual investor's return may vary from these returns based on timing of capital transactions.

[2] Expense ratios are determined by dividing the total investment related and operating expenses by the average limited partners' capital. The ratio of net investment income/(loss) is determined by dividing the net investment income/(loss) by the average limited partners' capital.

**10. Subsequent Events**

The General Partner has evaluated subsequent events through June 26, 2025, which is the date the financial statements were available for issuance and has determined no subsequent event disclosure is necessary.



CONFIDENTIAL

**From:** Mark Patrick
**To:** Geoffrey Sykes
**Cc:** Bart Higgins; Brandon R. Schaller; Barnaby Gowrie; Philip Aubry; Hugh Anderson
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]
**Date:** 17 March 2025 1:47:59 PM

**[this message is from an external sender]**

Agree we need to finalize the reports. I thought they were finalized. We should request any limits on use removed.

We are seeking U.S. tax counsel to send emails to both Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of the its interests.

After that, an alternative approach is to give them what they want - liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero.

US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled. That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions (all of which they will do anyway under a wind up).

We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is....

Note : US LLC would make DFW its sole owner.

On Mon, Mar 17, 2025, 1:11 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

> Hi Mark, Bart, Brandon
>
> **IRS complaint**
>
> Thanks for providing the draft IRS complaint. We have reviewed and attach our comments on the Cayman Islands aspects of the letter.
>
> **Details of transfer**

In response to Brandon's question, we would not advise seeking to perform the redemption in the alternative. In our view, any purported redemption would be susceptible to challenge for the reasons previously set out, and accordingly we should focus on the forced transfer under Article 21.

In respect of the details of a forced transfer, noting Mark's comments, our views are as follows:

*The signatories to the share transfer instrument*

1. Article 21 provides that "*If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles*." The Articles do not provide that the directors may complete the transfer on behalf of the relevant Restricted Person, rather than they can give notice to require that the shares are transferred. In the absence of any additional guidance in the Articles, and in light of Article 17 noted below, we anticipate that this will require that the directors give notice to the relevant Restricted Person requiring them to transfer their shares to a person who is not a Restricted Person within a reasonable period of time to comply with Article 21. Failing this, the Company, would need to bring proceedings in the Cayman Court to seek orders that the shares are transferred as is required under the Articles.

2. Article 17 provides that "*The instrument of transfer of any Share shall … be executed by or on behalf of the transferor*". We appreciate your comments that it may not make sense for the transferor to be required to sign the transfer form when a transfer is being forced, and that Article 17 also provides that the directors have discretion as to the form of the instrument of transfer. However, on our reading of Article 17, whatever form the transfer instrument may be in, we cannot escape the requirement for it to be signed by the transferor. Article 21 does not provide that the transfer mechanics for shares are altered in the case of a Restricted Person and as such, Article 17 will still apply. If we purported to transfer the shares without the signature of the transferor, it is difficult to say that the transfer is made in accordance with the Articles, we may have difficulty convincing the Registered Office to update the register (and in Cayman the Register is *prima facie* evidence of the true shareholders of the company), and in any event we consider that the transfer would be more susceptible to challenge.

*The identity of the transferee*

3. Article 21 does not confer upon the directors the power to dictate to whom those shares may be transferred, although Article 18 provides the directors with "*absolute discretion decline to register any transfer of Shares without assigning any reason therefor [sic]*". On that basis, whilst the directors cannot force a transfer to any particular entity, the letter requiring Highland Dallas Foundation ("**HDF**") to transfer its shares could indicate that the directors would approve a transfer to the DFW Charitable Foundation ("**DFW**").

*The price of the transfer*

4. Similarly, the directors do not have the power to mandate the price paid for the transfer. If HDF found a willing buyer and the directors approved of them, HDF could transfer the shares for whatever value they could agree with the buyer. However, if we had the agreement of DFW to pay a certain price, then in addition to indicating that DFW would accept the transfer, the letter to HDF requiring the transfer of shares could also indicate a suggested price.

5. To come up with a suggested price, we should look to our valuation reports. We note Mark's preference for the ValueScope report as it specifies a figure rather than percentage discount. However, as we already have two reports we consider that we should have regard to both in arriving at market value (and if we choose to rely only on one we may need to be able to justify why that was appropriate). Further:

    a. The reports are in draft form and should be finalised before we rely on them;
    b. We have substantive comments on both draft reports, which we consider should be addressed before the reports are finalised; and
    c. Both reports have limitations on use including that they may not be circulated to third parties without the written consent of the authors (FTI report at [1.8]-[1.10], ValueScope report at page 38). Whilst we may not wish to circulate the reports initially, we may be called upon to justify our approach and will likely want to rely on them at that stage. Accordingly, we will need the valuers to give us their written consent for the reports to be used in this context.

6. If the transfer price could not be agreed with HDF, establishing an appropriate price could form part of an application to Court to force the transfer.

**Next steps**

On the basis of the above, the following are what we see as the next steps:

7. **Finalise valuation reports**

    a. We will reach out to ValueScope and FTI to request that they finalise their reports on the basis outlined above, noting the context in which we will seek to rely on them. We appreciate that this is likely to delay the subsequent steps to a degree, however we consider it to be a critical part of the plan, and part which should be completed before the letters to the IRS and HDF are issued.

8. **Seek DFW's views**

    a. We suggest that Mark reaches out to DFW (we understand he has the relationship) to confirm whether they are prepared to become involved on the basis set out above (in principle and subject to review of the documents).

9. **Resolutions**

   a. Mark and Paul execute resolutions in respect of the issue of the letter to the IRS, and the forced transfer of shares (including the payment of market value on the basis set out above). We do not consider resolutions in respect of sending the letter to be strictly speaking necessary, but we do consider that there is no harm in doing so and it will add an extra layer of protection. We do, however, consider resolutions in respect of Article 21 to be necessary.

10. **IRS letter**

   a. The letter is issued to the IRS.

11. **Letter to Highland Dallas Foundation**

   a. Immediately after the IRS letter is issued, a letter should be issued to the Highland Dallas Foundation requiring it to transfer its shares under Article 21. A copy of the IRS letter should be sent at the same time, along with the board resolutions in respect of the issue of the IRS letter and the share transfer, a share purchase agreement, and the share transfer instrument. That letter will specify a reasonable time for Highland Dallas to sign the transfer documents or otherwise transfer its shares, following which we will reserve the right to commence proceedings to force the transfer without further notice.

12. **IRS letter issued to other recipients**

   a. Copies of the IRS letter should then be sent to the other intended recipients, who we understand are the other Participating Shareholders and the Texas Attorney-General.

13. **Prepare for litigation**

   a. At this stage, this seems likely to take the form of us commencing proceedings to enforce the Articles and force the transfer, or HDF commencing proceedings potentially by filing a just and equitable winding up petition relying in part on the attempt to force the transfer.

Please let us know if you have any comments on the above approach. Subject to your views, concurrently with seeking finalised valuation reports, we will circle back as soon as possible with drafts of the following for consideration:

14. the resolutions in respect of the issue of the letter to the IRS, and the forced transfer of shares;
15. the letter to the Highland Dallas Foundation;
16. a short form share purchase agreement; and
17. the share transfer instrument.

Finally, we have followed Tony up regarding his availability to discuss the further documents, and will let you know once we have some proposed times.

Please let us know if you have any comments or if you would like to discuss.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 15 March 2025 06:13
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Walkers:

If a holder is determined to be a Restricted Person by the directors, and so under article 21 the directors can cause a transfer of that holder's shares, then implicit in the execution of Article 21 is that the directors are causing effectuation of the transfer. Therefore, the Transfer Agreement would look similar to a redemption action of such shares, in that the directors would be sole signatories to the document (acting in the place of the transferor) and DFW Foundation as the appointed transferee (by the directors / or management shareholder) - would be the accepting party.

It would make no sense that a participation holder would agree to the Restricted label and sign any document. Therefore, Article 21 leaves corporate discretion in the practical implementation of such Article 21 as it implicitly assumes the non-agreement by the former Restricted person holder.

Further, directors could cause the value of such interest to be paid to the former holder, but it's not clear that would be consistent with the charitable mission of the company. However it would be consistent perhaps following corporate formalities (like a redemption) of giving value for property had. Therefore, It would seem conservative here to pay out such value to the holder nevertheless via director resolution for the

Transfer.

I would agree and reference FTI valuation and ValueScope valuations in the resolutions, and use the specific number valuescope determined (as both valuations where independently arrived yet determined the same method of valuation) to pay for the share transfered. (Taking the conservative approach in balance)

In sum, corporate effectuation of Article 21 via implementation at the directors discretion as to what the corporate plumbing might look like is as follows:

1. Transfer Agreement written similar to a redemption. Directors sign, transferring the Restricted person's shares to dfw Foundation. The current holder does not sign the agreement (as it's akin to a forced redemption for value).

2. Dfw Foundation "accepts" the transfer either as a separate acknowledgement letter or signs the transfer agreement. Consider both proposals.

3. The transfer is recorded in the books of the company and register.

4. A Notice document is sent to the former holder Restricted Person, (like a redemption would do) along with consideration paid for such transfer.

Does the company attach the two valuations conducted with such Notice and payment or just reference it? What happens in a typical forced redemption situation?

Thoughts on this overall approach?

Mark

On Fri, Mar 14, 2025, 12:38 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

> Hi Bart, Brandon

Taking your initial questions in turn:

1. *Do you think any other provisions are relevant?*

   a. There are other provisions in the M&A which refer to redemption, for example the Memorandum at Para 7, and Article 30. However, on further consideration, in our view the relevant point is that the Participating Shares were not issued as redeemable (as per their definition), and the rights attaching to them do not appear to have been varied. On that basis, they are not liable to be redeemed at the option of either shareholder or company.

2. *If you take the position that "non-redeemable" is operative, doesn't that make other provisions inoperative?*

   a. Whilst there are provisions in the M&A which refer to redemption, the better view is that they do not provide redemption rights or indicate that the Company necessarily holds such rights; they contemplate that redeemable shares may be issued. Those provisions are currently 'inoperative' in relation to the Participating Shares, but may be 'operative' in relation to Management Shares (noting that Management shares are redeemable by the Company). Further, they may become 'operative' in relation to the Participating Shares if those shares are converted to redeemable, or if further Participating Shares are issued which are redeemable.

3. *If you take the position that "non-redeemable" is operative, do you think the directors could amend the definition of Participating Shares pursuant to Art. 14 (without Participating Shareholder consent) to make them redeemable and then consummate the redemption?*

   a. We do not consider that such an amendment could be made without Participating Shareholder consent. In our view, amending the definition of Participating Shares to convert them to redeemable would likely constitute a material adverse variation or abrogation of the rights of the Participating Shareholders, and as such it would require a two-thirds majority of the Participating Shareholders (Article 13).
   b. Further consideration would need to be given as to whether the rights of the Participating Shares could be varied in that manner even with two-thirds Participating Shareholder consent. As we do not expect there will be any appetite to seek the consent of the Participating Shareholders at this stage, we have not considered that question in detail.
   c. However, the directors have a right to require the transfer of Participating Shares held by a Restricted Person (Article 21). If the directors form the view that one of the Participating Shareholders is a Restricted Person, assuming they are acting for proper purposes they would be able to exercise that right to require the transfer of those Participating Shares. Noting that the M&A is silent on the mechanics of a required transfer, if the directors intend to exercise that right further consideration will need to be given as to how that would work in practice, for example whether consideration would be required, and to whom the shares may be transferred.

However, we note that if the directors can require the shares of one of the Highland Foundations to be transferred to the DFW Charitable Foundation, it would then hold 67.09% of the Participating Shares.

d. At that stage, if any further action was required, further consideration could be given as to whether we seek to vary the rights of the Participating Shares with two-thirds consent of the Participating Shareholders, or to pursue another course of action, for example agreeing with DFW Charitable Foundation a repurchase of the relevant shares, which could then be cancelled, and new shares issued which are redeemable by the Company.

We are available to discuss this afternoon at 3pm, including regarding the preparation of the documents as below. Please let us know if that is convenient for you.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 14 March 2025 11:53
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey,

In the interim, can you please continue prepping the documents for (i) redemption and (ii) exercising rights under Art. 21?

We need these to be ready to execute on Monday.

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Friday, March 14, 2025 9:51 AM
**To:** Bart Higgins <bhiggins@shieldslegal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Thanks Bart, noted.

We will do what we can.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Bart Higgins <bhiggins@shieldslegal.com>
**Sent:** 14 March 2025 09:44
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey, client would like a conference today if you can make it work.

Sent from my iPhone

> On Mar 14, 2025, at 9:38 AM, Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:
>
> CAUTION: This email originated from outside of the organization.
>
> Hi Brandon
>
> Apologies for the delay, we are finalising our views and will revert back as soon as possible regarding a call, which will likely be this afternoon or early next week.
>
> Best regards,
>
> **Geoffrey Sykes**
> Associate
> **Walkers (Cayman) LLP**
>
> **T** +1 345 814 6834 | **M** +1 345 814 6834
> www.walkersglobal.com
>
> Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore
>
> ---
>
> **From:** Brandon R. Schaller <bschaller@shieldslegal.com>
> **Sent:** 14 March 2025 08:32
> **To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>

**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey,

Adding Mark. We were hoping to have a call scheduled by now. Please let us know.

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Wednesday, March 12, 2025 12:14 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Hi Brandon

Thanks for the below. We will revert back in substance once we've had a chance to consider, including regarding a time for a call.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 12 March 2025 09:56
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Geoffrey,

Trying to collect the relevant provisions in one email for reference.

Pro-redemption

1. Art. 8: suggests Directors can redeem shares.
2. Art. 14: Rights conferred on Participating Shares shall not be materially adversely varied or abrogated by… redemption…of any Participating Shares…by the Company.

1. Art. 13: Participating Shares can vote if materially adversely varied or abrogated.
2. Arts. 13 and 14: Directors can redeem Participating Shares, and Participating Shares cannot vote on that.

Anti-redemption

1. Definition of "Participating Share: "non-redeemable".
2. Art. 28(b) and (d): refers to "any redeemable Shares", suggesting some are redeemable and others may not be.

Do you think any other provisions are relevant?

If you take the position that "non-redeemable" is operative, doesn't that make other provisions inoperative?

If you take the position that "non-redeemable" is operative, do you think the directors could amend the definition of Participating Shares pursuant to Art. 14 (without Participating Shareholder consent) to make them redeemable and then consummate the redemption?

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

Bio | LinkedIn | vCard

**From:** Brandon R. Schaller
**Sent:** Wednesday, March 12, 2025 8:31 AM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

Thanks Geoffrey. Can you please let us know some times you are available to discuss?

Also, we agree that a call with Tony prior to his next draft would be helpful, and we are happy to join that.

**Brandon R. Schaller**

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

Bio | LinkedIn | vCard

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, March 11, 2025 11:23 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Hi Brandon

We have forwarded those documents to counsel for review. Once Tony has had a chance to consider, we suggest that a call to discuss would be helpful.

Regarding the question as to redeemability of the Participating Shares, in light of Tony's advice we have considered and discussed further with colleagues in our corporate team. We note that the Memorandum at Para 7 appears to provide the Company with the right to redeem its shares, and certain provisions of the Articles envisage redemption by the Company (e.g. Arts 14 and 28). On the other hand, the rights attached to the Participating Shares as per their definition include that they are non-redeemable (without specifying whether that applies to the company or the shareholder). Following further consideration, on the basis of the documents we have seen we consider that the better view is that the Participating Shares are not redeemable by either the company or the shareholder. If you are aware of any further documents (e.g. resolutions) which might operate to alter the rights attached to the Participating Shares, please let us know.

However, we note that Tony's advice, with which we agree, is that the company does have the power to force the transfer of shares held by a Restricted Person. In the circumstances, we may be able to rely on that power.

Once Tony has considered the further documents we will revert back regarding a time for a call.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 06 March 2025 12:24
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

Hi Brandon

Thanks for your time on the phone and the below.

We will share those documents with Tony and discuss his advice in light of them.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 06 March 2025 11:38
**To:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Materials for KC

**[this message is from an external sender]**

---

Walkers team,

Here are factual materials to be shared with KC:

1. Carrington Coleman (US law firm) tax memo – this provides a general history (see Exhibit C) of the facts, so we would suggest the review begin here.
2. ValueScope Presentation to Supporting Organizations – this was presented to the Supporting Organizations on November 20, 2024 and provides financial background.
3. Paul Murphy Presentation – this was presented to the Supporting Organizations in early December 2024 and provides corporate governance background.
4. Walkers Presentation re: Participation Shareholder rights

– this provides an overview of the rights of the Participation Shareholders

5. UBS Petition – this provides background on Dondero's various misdeeds. In particular, search for "Sentinel". It is not necessary to review the entire petition.
6. Highland Employee Retention Assets Petition – this provides background on Dondero's various misdeeds. In particular, search for "A Recurring Theme" and read pgs. 36-47.
7. News article re: Judge Jernigan -Texas Judge Jernigan Accused of More Ethics Violations – Dondero attempted to weaponize the U.S. Securities and Exchange Commission to investigate Judge Jernigan, who had ruled against him in numerous bankruptcy matters.

We are happy to discuss with KC after he has had a chance to review. Let us know of any questions.

Thanks,

Brandon

**Brandon R. Schaller**

ATTORNEY

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or

constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

---

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

---

SadisGoldberg LLP

# Amended and Restated Limited Partnership Agreement of Atlas IDF, LP

**A DELAWARE "SERIES" LIMITED PARTNERSHIP**

**As of November 30, 2015**

## Exhibit A

Neither Atlas IDF, LP nor the limited partner interests therein ("**Interests**") have been or will be registered under the Securities Act of 1933, as amended ("**Securities Act**"), the Investment Company Act of 1940, as amended, or the securities laws of any of the States of the United States. The offering of the Interests is being made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, and analogous exemptions under state securities laws.

These securities are subject to restrictions on transferability and resale, may not be transferred or resold, except: (i) as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom, and (ii) in accordance with the requirements and conditions set forth in this Amended and Restated Limited Partnership Agreement.

This Amended and Restated Limited Partnership Agreement of Atlas IDF, LP, a Delaware "series" limited partnership ("**Partnership**"), is entered into as of November 30, 2015 ("**Agreement**") by and among: (i) Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), with an address at 87 Railroad Place, Suite 403, Saratoga Springs, New York, 12866; (ii) such persons and entities who are or may become limited partners in accordance with the terms hereof ("**Limited Partners**"; and, together with the General Partner, shall collectively be referred to as the "**Partners**"); (iii) John Honis, as the initial Limited Partner ("**Initial Limited Partner**"); and (iv) such other persons who may become parties to this Agreement from time to time.

**WITNESSETH:**

**WHEREAS**, the General Partner and the Initial Limited Partner entered into a Limited Partnership Agreement, dated and effective as of October 29, 2015 ("**Current Agreement**"); and

**WHEREAS**, the General Partner desires to amend and restate the Current Agreement in its entirety pursuant to, and in accordance with the terms of, **Section 28** thereof, including to reflect the conversion of the Partnership into a "series" limited partnership.

**NOW THEREFORE**, in consideration of the mutual promises of the parties hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties agree to amend and restate the Current Agreement in its entirety with the following terms and conditions:

## ARTICLE I
## GENERAL PROVISIONS

**Section 1.01** **Formation of Partnership**. The Partnership was formed as a limited partnership under the Delaware Revised Uniform Limited Partnership Act (as in effect on the date hereof and as amended from time to time, the "**Act**") by the filing of its Certificate of Limited Partnership (the "**Certificate**") with the Secretary of State of the State of Delaware (the "**Delaware Secretary**") on October 29, 2015. On November 19, 2015, an amended Certificate was filed with the Delaware Secretary to convert the Partnership into a "series" limited partnership under Section 17-218 of the Act. The General Partner, for itself and as agent for the Limited Partners, shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all the requirements for the formation and operation of the Partnership as a limited partnership under this Agreement and the Act and under all other laws of the State of Delaware and such other jurisdictions in which the General Partner determines that the Partnership may conduct business. Each Limited Partner admitted to the Partnership by the General Partner shall promptly execute all relevant certificates and other documents, as the General Partner shall request.

**Section 1.02** **Partnership Name**. The name of the Partnership is Atlas IDF, LP.

**Section 1.03** **Purpose**. The Partnership was organized for the purpose of investing and trading in a wide variety of securities and financial instruments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including but not limited to, common and preferred stocks, bonds and other debt securities, convertible securities, limited partner interests, mutual fund shares, options, warrants, commodities, futures, derivatives (including swaps, forward contracts and structured instruments), currencies, monetary instruments, and cash and cash equivalents. In furtherance of the foregoing, the Partnership may engage in any lawful act or activity for which limited partnerships may be formed under the Act, and any and all activities necessary or incidental thereto, including any other business activities described in the Partnership's confidential private placement memorandum (as amended and supplemented from time to time, the "**Memorandum**"). In addition to investing in individual traded assets, the Partnership may invest a significant portion of its assets in other investment vehicles, including, without limitation, hedge funds, managed accounts and other private investment funds (collectively, the "**Portfolio Funds**"), including those managed by, or otherwise affiliated or related to, the Investment Manager (as defined in **Section 3.01**). Portfolio Funds may allocate their assets to Illiquid Investments (as defined in **Section 9.07(a)**).

**Section 1.04** **Place of Business**. The Partnership shall have offices located at 87 Railroad Place, Suite

403, Saratoga Springs, New York, 12866, or elsewhere as the General Partner may from time to time determine. The Partnership may have more than one (1) office as may from time to time be determined by the General Partner.

**Section 1.05** **Fiscal Year**. The fiscal year of the Partnership (the "**Fiscal Year**") shall end on December 31 of each year, except that it may be changed at any time by the General Partner in its sole discretion. In the event that the General Partner changes the Partnership's Fiscal Year, the dates and time periods referred to in this Agreement shall be appropriately adjusted.

**Section 1.06** **Term of Partnership**. The term of the Partnership commenced upon filing of the Partnership's Certificate with the Delaware Secretary and shall continue indefinitely; *provided, however*, that the Partnership shall be dissolved forthwith upon the occurrence of any one of the events set forth in **Section 13.01**.

## ARTICLE II
## COMPOSITION; ADMISSIONS

**Section 2.01** **Names of the Partners**. Atlas IDF GP, LLC, a Delaware limited liability company, is the sole general partner of the Partnership as of the date hereof. The names and addresses of the General Partner and of each of the Limited Partners shall be set forth in the records of the Partnership to be kept on file at all times at the principal place of business of the Partnership.

**Section 2.02** **Admission of Partners**. Additional Limited Partners (as defined in **Section 8.01**) may be admitted to the Partnership at such times as provided in **Article VIII**. In connection with the admission of a Limited Partner to the Partnership, such Limited Partner shall, in advance of such admission and as a condition thereto, sign a copy of this Agreement or an agreement to become bound by the provisions of this Agreement and such other subscription materials as shall be determined by the General Partner. Upon the admission of a Limited Partner, the Initial Limited Partner listed on the signature page hereof shall automatically be deemed to have withdrawn from the Partnership. For the avoidance of doubt, the General Partner shall be permitted to make an investment in the Partnership and be issued Partnership Interests hereunder, and such Interests of the General Partner shall be treated as a Limited Partner's Partnership Interests hereunder. A substitute general partner and additional general partners may be admitted to the Partnership as provided in **Article IV**.

**Section 2.03** **Partnership Interests**.

(a) For purposes of this Agreement, the term "**Partnership Interest**" shall mean the quotient resulting from dividing (i) the amount in a Partner's Capital Account (as defined in **Section 9.01**), including the fair value of such Partner's interests in any Side Pocket Accounts (as defined in **Section 9.07**) or New Issues Accounts (as defined in **Section 9.08(a)**) and other memorandum accounts, by (ii) the aggregate amount in the Capital Accounts of all Partners, including the fair value of any Side Pocket Accounts, New Issues Accounts and other memorandum accounts. "**Partnership Interests**" shall mean the sum of all amounts in the Capital Accounts of all Partners (including all Side Pocket Accounts, New Issues Accounts and other memorandum accounts).

(b) The Partnership is an "insurance-dedicated" fund. The Partnership Interests are being offered only to Limited Partners that are: (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state or local government pension plans, qualified tuition plans ("**§529 plans**"), and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet certain suitability standards, as further set forth in the Memorandum. While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies.

Each life insurance company Limited Partner will be deemed to hold a Partnership Interest in respect of the account of each Policy Owner and will be treated as a separate Limited Partner with respect to each such Partnership Interest.

**Section 2.04** **Issuance of Interests in Series**.

(a) Pursuant to Section 17-218 of the Act, the Partnership Interests will be offered in separate series ("**Series**"). The Partnership is currently offering one Series of Partnership Interests: "**Series 1 Partnership Interests**". Each Series of Partnership Interests will have separate rights and obligations.

(b) In addition, each Series of Partnership Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies. The Partnership may issue additional Series of Partnership Interests in the future, which may have rights and obligations that differ from those of the Series 1 Partnership Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined) and other rights and terms. The terms of such additional Series shall be determined by the General Partner, in its sole discretion.

(c) Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations. The Partnership shall maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series. The Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.

(d) Pursuant to Section 17-218 of the Act, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

(e) As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined in **Section 2.04(f)**). However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(f) As of the date hereof, (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction (as defined in the Memorandum), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal (as defined in the Memorandum) is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series, as further set forth in the Memorandum.

(g) Unless the context otherwise requires, Series 1 Partnership Interests and any other Series of Partnership Interests shall be collectively referred to throughout this Agreement as the "**Partnership Interests**." As the context may require, the holders of Series 1 Partnership Interests may be referred to herein as "**Series 1 Limited Partners**". Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Agreement the "**Limited Partners**".

(h) References herein to the Partnership shall include, where appropriate, each Series of the Partnership. The terms of the other Series may be set forth in an amended version of this Agreement and/or in a separate supplement thereto.

## ARTICLE III
## MANAGEMENT

**Section 3.01** **Management of Partnership**

(a) The business and affairs of the Partnership shall be managed exclusively by the General Partner. The Limited Partners shall take no part in the management or control of the Partnership's business and shall have no authority to act for or bind the Partnership. The General Partner shall have sole discretion and authority to select investments, shall invest the funds of the Partnership from time to time as the General Partner deems appropriate in accordance with the purposes set forth in **Section 1.03**, and shall have (without limitation) the powers set forth in **Section 3.02**. The General Partner may select an investment manager ("**Investment Manager**") to provide all or any portion of the portfolio management services required by the Partnership, including the valuation of assets of the Partnership. The Investment Manager may be changed from time to time by the General Partner in its sole and absolute discretion. The initial Investment Manager shall be Rand Advisors, LLC, a Delaware limited liability company and an affiliate of the General Partner. If at any time there is no Investment Manager, then the General Partner shall provide such portfolio management services, and be subject to the provisions of this Agreement applicable to the Investment Manager.

(b) Each of the General Partner and the Investment Manager shall not be required to devote its full time to the business of the Partnership, but shall devote so much of its time and efforts to the affairs of the Partnership as may in its judgment be necessary to accomplish the purposes of the Partnership. Nothing herein contained shall prevent the General Partner or the Investment Manager from conducting any other business, including any business with respect to securities (and/or other investments), whether or not such business ventures are in direct or indirect competition with the Partnership. Each of the General Partner and the Investment Manager is not prohibited from buying or selling securities for its own account, including the same securities (and/or other investments) as are purchased, sold or held by the Partnership, but none of the General Partner, the Investment Manager or any of their respective affiliates (which shall not include, for purposes of this paragraph, advisory clients or managed funds) shall buy securities (and/or other investments) from or sell securities (and/or other investments) to the Partnership without the written consent of either all Limited Partners or a committee of independent Limited Partners.

**Section 3.02** **Powers of the General Partner**. Without in any way intending to limit the powers of the General Partner, the General Partner shall have the right, power and authority on behalf of the Partnership (or to delegate any portion of such rights, power and authority):

(a) As provided in **Section 3.01**, to allocate all of the assets of the Partnership among securities (and/or other investments) to be selected by the General Partner in its sole and absolute discretion, including, but not limited to the right to:

(i) purchase, hold and sell securities (and/or other investments) and rights therein of any kind or nature;

(ii) allocate any and all of the assets of the Partnership among a number of Portfolio Funds;

(iii) purchase, hold, sell and otherwise deal in put and call options, monetary instruments and any combinations thereof and any other financial instruments or contracts of any nature or kind;

(iv) maintain margin accounts with brokers, pledge securities for loans and, in connection with any such pledge, effect borrowings from brokers or banks in such amounts as may be determined from time to time; and

(v) transact business through brokers and dealers and other persons selected by the General Partner in its sole discretion, and in selecting such brokers, dealers and other persons, and determining the compensation payable to such persons, it shall seek to obtain the best execution for the Partnership taking into account the value of any research and brokerage services or products provided by such persons to the General Partner or the Partnership even though other persons may be able to provide transactional services (without any accompanying research or brokerage services or products) at lower rates of compensation;

(b) To acquire and enter into any contract of insurance that the General Partner deems necessary or appropriate for the protection of the Partnership and the General Partner or for any purpose convenient or beneficial to the Partnership;

(c) To engage in any transaction with affiliates of the General Partner, including entering into and amending and restating an investment management agreement with the Investment Manager (any such agreement, in effect from time to time, "**Investment Management Agreement**"), subject to the restrictions in **Section 3.01(b)**;

(d) To employ persons, whether full-time or part-time, in the operation and management of the business of the Partnership, on such terms and for such compensation as the General Partner shall determine, regardless of whether or not such persons also may be employed by the General Partner or its affiliates;

(e) To file, conduct and defend legal proceedings of any form, including proceedings against Partners, and to compromise and settle any such proceedings or any claims, including claims against Partners, on whatever terms deemed appropriate by the General Partner;

(f) To open brokerage, bank and other accounts and, to the extent that funds are not invested, to deposit and maintain such funds in the name of the Partnership in such accounts and to temporarily invest such funds in short term United States and/or foreign government securities, money market accounts and/or other short term interest-bearing instruments; *provided, however*, that the Partnership's funds shall not be commingled with the funds of any other person or entity;

(g) To cause the Partnership to make or revoke any of the elections referred to in Section 754 of the Internal Revenue Code of 1986, as amended ("**Code**"), or any similar provision enacted in lieu thereof;

(h) To act as the "tax matters partner" of the Partnership within the meaning of Section 6231(a)(7) of the Code;

(i) To select as its accounting year the annual period ending December 31 or any other Fiscal Year as is permitted by the Internal Revenue Service ("**IRS**");

(j) To engage independent accountants, attorneys, investment managers, sub-advisers, broker-dealers, administrators, custodians, consultants and such other persons as the General Partner may deem necessary or advisable;

(k) To establish and maintain for the conduct of Partnership affairs one or more offices and in connection therewith rent or acquire office space, engage personnel, whether part time or full time, and do such other acts and incur such expenses as the General Partner may deem necessary or advisable in connection with the maintenance or administration of such office;

(l) To require a provision in any Partnership contract that the General Partner shall not have any personal liability therefor, but that the person or entity contracting with the

Partnership is to look solely to the Partnership and its assets for satisfaction;

(m) To purchase and sell Partnership assets at such price or amount for cash, securities or other property and upon such terms as are deemed in the General Partner's absolute discretion to be in the best interests of the Partnership;

(n) To prepare (or cause to be prepared), execute, acknowledge and/or deliver any and all instruments to effectuate the business of the Partnership, including, but not limited to, annual and/or interim reports, a copy of which shall be delivered to each Partner, as provided in **Sections 3.06(b) and 13.05**;

(o) To effect on behalf of the Partnership any "agency cross transaction" (as contemplated in Rule 206(3)-2 under the U.S. Investment Advisers Act of 1940, as amended ("**Advisers Act**")) through the General Partner or any of its affiliates that is registered as a broker or dealer; *provided* that the authority granted in this subsection may be revoked at any time by the General Partner or by vote or consent of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners;

(p) To "cross" any transaction for the purchase or sale of securities between two or more advisory clients or managed funds, including the Partnership (as contemplated in Rule 206(3) under the Advisers Act and interpretations thereunder) ("**Cross Trading**"); *provided* that the General Partner receives no additional compensation in connection with such Cross Trading activities, and subject to the restrictions in **Section 3.01(b)**;

(q) To waive or reduce, in whole or in part, any notice period, minimum amount requirement, or other limitation or restriction imposed on Capital Contributions (as defined in **Section 8.01**), withdrawals of capital, any fee, any payment to the General Partner and/or any requirement imposed on a Limited Partner by this Agreement, regardless of whether such notice period, minimum amount, limitation, restriction, withdrawal provision, fee, payment or other requirement of this Agreement, or the waiver or reduction thereof, operates for the benefit of the Partnership, the General Partner or fewer than all the Limited Partners;

(r) To establish such reserves for the Partnership as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with U.S. generally accepted accounting principles ("**GAAP**"));

(s) To value the assets and liabilities of the Partnership;

(t) To create special purpose vehicles to make or pursue investments either alone or as a joint-venture with other persons or entities;

(u) To establish and offer multiple Series of Partnership Interests with such rights and privileges as the General Partner shall determine, and to amend this Agreement in connection therewith to reflect such multi-Series structure;

(v) To convert the Partnership from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, and to amend this Agreement pursuant thereto to reflect such master-feeder structure;

(w) To create a liquidating fund entity (e.g., a liquidating trust or similar vehicle), and to transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership assets; and

(x) To do any act, engage in any activity or execute any agreement of any nature, necessary or incidental to the accomplishment of the purposes of the Partnership in accordance with the provisions of this Agreement, the Memorandum and all applicable federal, state and local laws and regulations.

**Section 3.03** **Actions of General Partner**. The General Partner is authorized, directed and empowered to act individually on behalf of the Partnership, and in accordance therewith, to execute all documents and instruments on behalf of the Partnership. Third parties may rely on the execution of any documents on behalf of the Partnership by the General Partner.

**Section 3.04** **Liability and Indemnification**

(a) None of the General Partner, the Investment Manager or any of the Investment Manager Affiliates (as defined in **Section 6.02(a)**) shall be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. It shall be conclusively presumed and established that the General Partner, the Investment Manager and such persons acted in good faith if any action is taken, or not taken, by any of them on the advice of legal counsel or other independent outside consultants; *provided* that the General Partner, the Investment Manager and such persons did not act with gross negligence or willful misconduct in the selection of such counsel or consultants. Any exculpation under this **Section 3.04(a)** shall apply only to the extent that such exculpation does not violate applicable federal and state laws.

(b) The Partnership shall indemnify and hold harmless the General Partner, the Investment Manager and the Investment Manager Affiliates (which, for purposes of this **Section 3.04(b)**, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction. Any indemnity under this **Section 3.04(b)** shall be paid from and to the extent of Partnership assets only, and shall apply only to the extent that such indemnity does not violate applicable federal and state laws. The Partnership shall, in the sole discretion of the General Partner, advance amounts and/or pay expenses as incurred in connection with the indemnification obligation herein. In the event this indemnification obligation shall be deemed unenforceable, whether in whole or in part, such unenforceable portion shall be stricken or modified so as to give effect to this paragraph to the fullest extent permitted by law. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis.

(c) If, to the extent, and at such times as, any assets of the Partnership are deemed to be "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), of any Limited Partner that is an employee benefit plan governed by ERISA, the General Partner shall be, and hereby acknowledges that it shall be considered to be, a fiduciary within the meaning of Section 3(21) of ERISA as to that Limited Partner. In such an event, or if any manager, member, officer, employee, agent or affiliate of the General Partner, is ever held to be a fiduciary of any Limited Partner, then, in accordance with Sections 405(b)(1), 405(c)(2) and 405(d) of ERISA, the fiduciary responsibilities of that person shall be limited to the person's duties in administering the business of the Partnership, and the person shall not be responsible for any other duties to such Limited Partner, specifically including evaluating the initial or continued appropriateness of this investment in the Partnership under Section 404(a)(1) of ERISA.

**Section 3.05** **No Prohibition Against Other Business Ventures**. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage and hold interests in other business ventures of every kind and description for its own account, including, without limitation, other investment entities similar to the Partnership, whether or not such

business ventures are in direct or indirect competition with the Partnership, and whether or not the Partnership or any of the Partners also has an interest therein, without having to account to the Partnership or any Partner for any profits or other benefits derived therefrom and without incurring any obligation to offer any interest in any such activity to the Partnership or any Partner.

**Section 3.06** **<u>Duty to Keep Books, Financial and Tax Reports</u>**

(a) At all times during the existence of the Partnership, the General Partner shall keep true and complete records and books of account, in which each transaction of the Partnership shall be entered fully and accurately. The General Partner has the power, in its sole and absolute discretion, to delegate some or all of the administrative bookkeeping functions relating to the Partnership to an administrator or other agent, which may be the Partnership's accountants.

(b) The General Partner shall cause to be prepared and distributed to each Partner as soon as practicable following each Fiscal Year the Partnership's annual financial statements prepared in accordance with GAAP (except to the extent that the Memorandum or this Agreement states or contemplates that such statements may be inconsistent with GAAP) and audited by an independent certified public accounting firm. The General Partner shall also have prepared and filed all federal, state and local income, franchise, gross receipts, payroll and other tax returns that the Partnership is obligated to file. Subject to the limitations set forth in **<u>Section 5.04</u>**, copies of all Partnership tax returns, information returns or reports shall be available to all Partners as soon as possible after the close of the Partnership's Fiscal Year at the principal office of the Partnership. Copies of each Partner's Schedule K-1 of the Partnership's Tax Return (Form 1065) shall be distributed to such Partner as soon as practicable after the close of the Partnership's Fiscal Year. The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information. For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

(c) The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**<u>IFRS</u>**"). In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

## ARTICLE IV
## GENERAL PARTNER RESIGNATION; TRANSFER OF GENERAL PARTNER INTEREST; CONTINUATION OF PARTNERSHIP; SUBSTITUTION OF GENERAL PARTNER

**Section 4.01** **<u>General Partner Resignation and Involuntary Withdrawal; Admission of Additional General Partners and Transfer by General Partner</u>**

(a) The General Partner shall not be permitted to voluntarily withdraw or resign as the general partner of the Partnership, except upon no less than thirty (30) days' prior written notice to all Limited Partners. In the event of dissolution of the General Partner, or if a voluntary or involuntary petition for bankruptcy shall be filed by or against the General Partner, or the General Partner shall make any assignment for the benefit of its creditors (any of the foregoing, an "**<u>Involuntary Withdrawal</u>**"), the General Partner or the General Partner's trustee, receiver or assignee shall have none of the rights and powers of a general partner hereunder, and shall have no authority to act on behalf of the Partnership or have any voice in the management and operation of the Partnership, except as provided in **<u>Section 13.02</u>**.

(b) The General Partner may admit additional general partners to the Partnership at such times as the General Partner shall determine, without the consent of the Limited Partners. Notwithstanding anything herein to the contrary, the General Partner shall have the right to transfer its interest, as the general partner of the Partnership, to any affiliate of the General Partner, including any person or entity controlled by the

General Partner, controlling the General Partner or under common control with the General Partner, without the consent of the Limited Partners. In the event of such transfer by the General Partner to an affiliate, the General Partner shall not be deemed to have resigned or withdrawn from the Partnership for purposes of **Section 13.01(a)**. Any affiliate transferee of the General Partner under this **Section 4.01(b)** shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to such transfer. The General Partner shall not assign, transfer, sell, mortgage or otherwise encumber or transfer its interest as the general partner of the Partnership, except as set forth herein. Any additional general partner or transferee of the General Partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate. For the avoidance of doubt, should the General Partner transfer its interest, as the general partner of the Partnership, to any non-affiliate of the General Partner, the Limited Partners shall have the right to revoke such appointment within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners.

**Section 4.02** **Continuation of Partnership; Appointment of Substitute General Partner by Limited Partners**. If an event as set forth in **Section 13.01(a)** occurs, the Limited Partners shall have the right, within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, to appoint a substitute general partner, in which event the Partnership shall not dissolve and shall continue its existence.

**Section 4.03** **Substitute General Partner Requirements**. Any substitute general partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a substitute general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate. Any successor to such office of general partner shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to its withdrawal, resignation or Involuntary Withdrawal from the Partnership.

## ARTICLE V
## STATUS, RIGHTS, POWERS AND VOTING RIGHTS OF LIMITED PARTNERS

**Section 5.01** **Limited Liability**. No Limited Partner, Substitute Limited Partner (as defined in **Section 10.02**) or Additional Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Partner's Capital Account in the relevant Series, from time to time, including any amounts thereof attributable to Capital Contributions, except that such Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership (x) in an amount up to its aggregate Capital Contributions in the relevant Series (including any income or gains thereon) to the Partnership in order to pay such Partner's *pro rata* share of any Partnership liabilities that arose while such Partner held Partnership Interests, and (y) as required under **Section 5.02(b)**.

**Section 5.02** **Capital Contributions**

(a) No Limited Partner shall be entitled to a return of such Limited Partner's Capital Contribution or any portion thereof, except as set forth in **Section 7.01**, and no time has been agreed upon for the return of any Partner's Capital Contribution, except as herein provided.

(b) Each Limited Partner, if such Limited Partner receives a return of all or any part of such Limited Partner's Capital Contribution, may, to the extent provided for in the Act, be liable to the Partnership or the relevant Series for an amount equal to such distribution, if at the time of such distribution, the Limited Partner knew the

Partnership or the relevant Series was prohibited from making such distribution under the Act.

**Section 5.03** **Liability of Limited Partner for Additional Contributions and Loans**. No Limited Partner shall be obligated to provide any contributions to the Partnership, other than the Original Capital Contribution (as defined in **Section 9.02**) of such Limited Partner. No Limited Partner shall be obligated to make any loan to the Partnership.

**Section 5.04** **Rights of Limited Partners to Inspect Books, Records, and Partnership Documents**. Upon reasonable advance written notice and during reasonable business hours, a Limited Partner may inspect and copy, at the Limited Partner's expense and solely for a purpose reasonably related to the Limited Partner's interest as a Partner, the records of the Partnership required to be maintained pursuant to Section 17-305 of the Act and any financial statements maintained by the Partnership. Any such inspection must be in good faith without any intent to damage the Partnership or any of its Partners in any manner. Notwithstanding the foregoing, the General Partner in its discretion may limit the information that a Limited Partner may obtain pursuant to this **Section 5.04** to the extent that such information shall allow a Limited Partner to identify any other Limited Partner. As a result, each Limited Partner agrees and acknowledges that any books and records of the Partnership made available to a Limited Partner for inspection may be redacted to exclude any information concerning the identity of the other Limited Partners, and, to the extent such books and records cannot be so redacted, such books and records may be withheld for inspection to such requesting Limited Partner. Copies of this Agreement and all amendments hereto shall be furnished to each Limited Partner upon request. For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

**Section 5.05** **No Restriction on Other Activities**. Limited Partners may engage and hold interests in business ventures of every kind and description for their own accounts, including, without limitation, business ventures which are, directly or indirectly, in competition with the Partnership and whether or not the Partnership or any of the Partners also has an interest therein. Neither the Partnership nor any of the Partners shall have any rights in such independent business ventures by virtue of this Agreement.

**Section 5.06** **Voting Rights**. In addition to the rights to vote conferred upon the Limited Partners in **Sections 3.01(b), 3.02, 4.02 and 13.02** or otherwise specifically set forth herein, Limited Partners shall have the right to vote on amendments to this Agreement to the extent provided in **Section 14.08**.

**Section 5.07** **Constructive Consent by Limited Partners**. In the event that the General Partner requires the consent of the Limited Partners in order to take action (including approving amendments to this Agreement), and written notice of such action is sent to any such Limited Partners by (i) certified mail, return receipt requested, (ii) electronic mail, or (iii) overnight delivery by a reputable private carrier or by the postal service, those Limited Partners not affirmatively objecting in writing within thirty (30) days after such notice is deemed to have been mailed or sent (under **Section 14.01**) be deemed to have consented to the proposed action set forth in the General Partner's notice.

**Section 5.08** **Rights as to Dissolution**. The Limited Partners shall have no right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise or to withdraw or reduce their Capital Contributions, except as set forth in the Certificate and this Agreement. No Limited Partner shall have the right to bring an action for partition against the Partnership, and each Partner hereby waives any right to partition of the Partnership's property.

**Section 5.09** **Consent by Partners in Lieu of Meeting**. Any action required by this Agreement or the Act to be taken at any regular or special meeting of the Partners, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Partners (or shall be deemed signed by the Partners pursuant to **Section 5.07**) having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Partners entitled to vote thereon were present and voted.

**Section 5.10** **Non-Voting Interests of BHC Limited Partners; Other Non-Voting Interests**

(a) The portion of any Partnership Interest held for its own account by a BHC Limited Partner (as defined in this **Section 5.10(a)**) whose interests in the Partnership are determined, at any time, to be in excess of 4.99% (or such greater or lesser percentage as may be permitted or required from time to time under Section 4(c)(6) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) of the aggregate outstanding Partnership Interests of all Limited Partners, excluding any other Partnership Interests that are non-voting Partnership Interests pursuant to this **Section 5.10**, shall be deemed to be non-voting Partnership Interests to the extent of such excess above 4.99% (whether or not subsequently transferred, in whole or in part, to any other person or entity) (collectively, "**Non-Voting Interests**"); *provided* that such Non-Voting Interests shall be permitted to participate in any vote by the Limited Partners on (i) any proposal to dissolve or continue the business of the Partnership under this Agreement, (ii) any vote pursuant to **Section 4.02**, and (iii) matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to this Agreement or modifications of the terms of its Partnership Interest). Except as provided in **Section 13.01(a)**, a BHC Limited Partner shall not be permitted to vote on the selection of any successor general partner of the Partnership, and each BHC Limited Partner irrevocably waives its right to vote its Non-Voting Interest on the selection of a successor general partner of the Partnership under Section 17-801 of the Act, which waiver shall be binding upon such BHC Limited Partner or any person or entity that succeeds to its Partnership Interest. A "**BHC Limited Partner**" shall mean any Limited Partner that is, or is an affiliate of, a bank holding company (as defined in Section 2(a) of the BHCA) that is subject to the provisions of Regulation Y issued by the Board of Governors of the Federal Reserve System.

(b) To the extent permitted by the BHCA, and except as otherwise provided in this **Section 5.10**, Non-Voting Interests shall not be counted as Partnership Interests held by any Limited Partner for purposes of determining whether any vote or consent required by this Agreement has been approved or given by the requisite percentage of the Limited Partners.

(c) Notwithstanding the foregoing, any BHC Limited Partner may elect to no longer be treated as a BHC Limited Partner for the purposes of this Agreement by delivering written notice of such election to the General Partner. Any such election made by a BHC Limited Partner may be rescinded at any time by providing written notice thereof to the General Partner.

(d) The General Partner may, for legal, regulatory or other reasons, designate any other Partnership Interests as non-voting, in whole or in part. Except as provided in this **Section 5.10**, a Partnership Interest held by a Limited Partner as a non-voting Partnership Interest shall be identical in all regards to all other Partnership Interests held by Limited Partners.

(e) For the avoidance of doubt, the provisions of this **Section 5.10** shall apply on a Series-by-Series basis.

## ARTICLE VI
## FEES AND EXPENSES; BROKERAGE PRACTICES

**Section 6.01** **Management Fee**.

(a) In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager shall receive a quarterly management fee ("**Management Fee**") equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined in **Section 9.04**), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|

| | |
|---|---|
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis. For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually. The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each Capital Account will be charged a blended Management Fee based on the above schedule.

The Management Fee shall be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A *pro rata* Management Fee shall be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No part of the Management Fee shall be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's Capital Account during any calendar quarter. Management Fees shall be payable with respect to the Partnership Interests of a Limited Partner in any Side Pocket Account.

(b) For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments (each as defined in **Section 9.07**) shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

(c) With respect to any Limited Partner who has requested to withdraw all of its Partnership Interests from the Partnership, with the exception of any Partnership Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Partnership Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account shall remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**"). The Management Fee Reserve shall be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, shall be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

(d) The Partnership will also bear its *pro rata* share of the management fees charged by the managers of the Portfolio Funds. Notwithstanding the foregoing, the Investment Manager intends to waive any management fees due to the Investment Manager with respect to any investment of the Partnership in any Affiliated Funds (as defined in the Memorandum), including the PE Portfolio Fund (as defined in the Memorandum). Accordingly, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees.

**Section 6.02** **Expenses**

(a) **Organizational and Initial Offering Expenses**. The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or their respective managers, members, shareholders, directors, officers, partners, employees, agents and/or affiliates (collectively, "**Investment Manager Affiliates**") for all organizational

and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including blue sky filing fees). The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to sixty (60) months from the date the Partnership commences operations. Amortization of such expenses is a divergence from GAAP. In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may elect to: (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in Fiscal Year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of this Agreement). If the Partnership capitalizes and amortizes such expenses and is then terminated within sixty (60) months of its commencement, any unamortized expenses shall be recognized. If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly.

(b) **Operating Expenses**. The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Partnership Interests, including, but not limited to, printing of the Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Partnership's administrator ("**Administrator**"), costs of communications with Limited Partners, and ongoing legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership. Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses. Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

The Partnership will also bear its *pro rata* share of the expenses of each Portfolio Fund.

(c) **Allocation of Expenses Among Series**. The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

(d) **General Partner and Investment Manager Expenses**. The General Partner and the Investment Manager shall pay for their own general operating and overhead expenses associated with providing the management and investment management services required under this Agreement and the Investment Management Agreement, respectively. These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above. The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended, as set forth in the Memorandum.

**Section 6.03** **Marketing Fees and Sales Charges**. The General Partner and/or the Investment Manager may sell Partnership Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense. The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the Capital Contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership. If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer shall be disclosed to, and acknowledged by, such Limited Partner.

**Section 6.04** **Directed Brokerage**. The Investment Manager is authorized to direct Partnership brokerage transactions to brokers or other persons who refer prospective Limited Partners to the Partnership. The Investment Manager is authorized to pay finders' fees or other compensation at its own expense to such persons.

**Section 6.05** **Allocation of Investment Opportunities**. The Investment Manager may at times determine that certain investments shall be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, the Investment Manager's own accounts or accounts of an affiliate. If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager shall endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable. The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

**Section 6.06** **Aggregation of Orders**. The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership shall be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors. In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities. Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold. In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

## ARTICLE VII
## WITHDRAWALS FROM CAPITAL ACCOUNT; DISTRIBUTIONS

**Section 7.01** **Permissible Withdrawals**. A Limited Partner may withdraw all or any of the value in such Limited Partner's Capital Account in any Series in the manner and to the extent provided in **Section 7.02**. Each of the General Partner and its principals and affiliates may withdraw all or any of the value in its respective Capital Account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners.

**Section 7.02** **Withdrawal Procedures**

(a) Subject to certain restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date shall be referred to herein as a "**Withdrawal Date**"), upon at least ninety-one (91) days' prior written notice to the Administrator, with a copy to the General Partner. Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's Capital Account balance below $500,000. All withdrawals shall be deemed made prior to the commencement of the following calendar quarter (or other relevant period).

(b) The General Partner believes (but cannot guarantee) that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests. The General Partner may, in its sole discretion: (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Partnership Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal. In addition, notwithstanding anything to the contrary herein, the General Partner may limit and/or suspend withdrawals in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(c) A Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's Capital Account. At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined in **Section 9.07**). **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

(d) The following provision shall apply to withdrawals, on a Series-by-Series basis:

(i) A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, less than ninety percent (90%) of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts) shall be paid within ninety (90) days after the applicable Withdrawal Date.

(ii) In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, ninety percent (90%) or more of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute, in the aggregate during such Fiscal Year ninety percent (90%) of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within ninety (90)

days after the applicable Withdrawal Date. The balance of the amount payable upon such withdrawal shall be paid, without interest, within ninety (90) days after completion of the audited financial statements for the Fiscal Year in which the withdrawal occurs. Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full Capital Account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within ninety (90) days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

(e) The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's Capital Accounts on at least five (5) days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

(f) The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's Capital Account under this **Article VII**.

(g) All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.

(h) All notices of withdrawal must specify the dollar amount or percentage of value of a Limited Partner's Capital Account to be withdrawn. The General Partner, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts and notice periods, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

(i) If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal. Such fee shall be payable to the relevant Series of the Partnership and shall be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

(j) Upon withdrawal of all of the capital in its Capital Account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner shall be deemed to have withdrawn from the Partnership or the relevant Series and, upon notice of such withdrawal, a Limited Partner shall not be entitled to exercise any voting rights afforded to Limited Partners under this Agreement.

(k) In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds, as applicable. For example, the ability of the Partnership to provide withdrawal proceeds to a Limited Partner may be subject to, among other things, various notice period requirements of the Portfolio Funds.

**Section 7.03 Limitations on Withdrawals**

(a) The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from Capital Accounts:

(i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners;

(ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation, including any diversification requirements applicable to insurance-dedicated investment funds;

(iii) if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications;

(iv) a Portfolio Fund suspends the right to, or the payment of proceeds due upon, withdrawal and/or a Portfolio Fund allocates assets to its side pocket account;

(v) a Portfolio Fund satisfies a withdrawal request by making an in-kind distribution; or

(vi) for such other reasons or for such other periods as the General Partner may prudently and in good faith determine.

(b) All Limited Partners shall be notified in writing of any such suspension or postponement and the termination thereof. Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement shall be effected as of the first Withdrawal Date following the recommencement of withdrawals.

**Section 7.04** **<u>Distributions</u>**

(a) The Partnership (or any Series) is not required, and generally does not intend, to make any distributions of cash or other property. However, the Partnership (or any Series) may make such distributions at such times and in such amounts as the General Partner shall determine in its sole discretion.

(b) All distributions hereunder (other than those made related to withdrawals from Capital Accounts) shall be made *pro rata* to all Partners in accordance with their relative Capital Accounts (or Side Pocket Accounts, New Issues Accounts or other memorandum accounts, as applicable) at the time of any such distribution. The General Partner may set up such reserves as it shall determine shall be appropriate or necessary to accomplish the purposes of the Partnership (even if such reserves are not in accordance with GAAP). If the Partnership (or a Series) shall distribute property other than cash pursuant to this **<u>Section 7.04</u>**, the Capital Accounts of the Partners shall be adjusted as if such property were sold at the value of such property as determined under **<u>Section 9.04</u>**, and the cash proceeds of such sale were distributed.

(c) Notwithstanding anything to the contrary herein, to the extent that the Partnership makes any distributions, the General Partner may limit such distributions, in its sole discretion, in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds.

## ARTICLE VIII
## ADDITIONAL LIMITED PARTNERS

**Section 8.01** **<u>Future Issuance of Partnership Interests</u>**. The General Partner may admit as of the first day

of each month (each such date, a "**Contribution Date**"), or at any other time that the General Partner determines in its sole and absolute discretion, as additional Limited Partners ("**Additional Limited Partners**"), persons who contribute cash or, in the General Partner's sole discretion, persons who contribute securities (and/or other investments), for Partnership Interests ("**Capital Contributions**"). If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including, but not limited to, the costs of liquidating, or otherwise adjusting the Partnership's portfolio to accommodate, such securities (and/or other investments), and legal, accounting and administration costs. Such special charge shall be assessed as of such dates deemed appropriate by the General Partner. Any securities (and/or other investments) accepted as a Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

## ARTICLE IX
## CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS; NET ASSET VALUE ADJUSTMENTS; TAXABLE INCOME AND LOSS AND DISTRIBUTIONS

**Section 9.01** **Capital Accounts**. A Partner's "**Capital Account**" as of a particular date shall consist of the following:

(a) an amount equal to the Partner's Original Capital Contribution;

(b) the increases, if any, to such account by reason of Additional Capital Contributions (as defined in **Section 9.03(a)**);

(c) the decreases, if any, to such account by reason of withdrawals (and distributions) from such Capital Account; and

(d) the increases or decreases, if any, to such Capital Account in accordance with the provisions of this **Article IX**.

Capital Accounts shall be maintained in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2), or any successor provisions thereto.

**Section 9.02** **Original Capital Contributions**. A Partner's "**Original Capital Contribution**" shall be the amount of the cash, or in the sole discretion of the General Partner, securities (and/or other investments), contributed by such party upon such Partner's admission as a Partner. The General Partner may establish such minimum Original Capital Contribution as the General Partner deems appropriate and that minimum may thereafter be waived or changed by the General Partner. In the event an Original Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. At any time that a Partner is admitted, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Original Capital Contribution, and commence a new accounting period on the date of such admission, and upon such admission, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners.

**Section 9.03** **Additional Capital Contributions**

(a) A Partner shall be permitted, with the consent of the General Partner, to make additional Capital Contributions in an amount deemed appropriate by the General Partner in cash or, in the sole discretion of the General Partner, securities (and/or other investments) ("**Additional Capital Contributions**") to the capital of the Partnership as of any Contribution Date, or at any other time that the General Partner determines in its sole and absolute discretion. In the event an Additional Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. At any time that Additional

Capital Contributions are accepted pursuant to this **Section 9.03**, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Additional Capital Contributions, and commence a new accounting period on the date of such acceptance, and upon such acceptance, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners. Any securities accepted as an Additional Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

(b) In connection with an Additional Capital Contribution by an existing Limited Partner, the General Partner shall (i) treat such Additional Capital Contribution as a Capital Contribution with respect to one of such Limited Partner's existing Capital Accounts or (ii) establish a new Capital Account to which such Capital Contribution shall be credited and which shall be maintained for the benefit of such Limited Partner separately from any existing Capital Account of such Limited Partner. Such separate Capital Account may be maintained for any purpose, in the discretion of the General Partner. If a Limited Partner has more than one Capital Account, any withdrawals by or distributions to such Limited Partner shall be applied to such Capital Accounts in such manner and proportion as the General Partner shall determine in its sole discretion.

**Section 9.04** **Determination of Net Asset Value**

(a) The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, shall be determined on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with GAAP, consistently applied (except that: (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to sixty (60) months from the date the Partnership commences operations and (y) reserves may be taken that are inconsistent with GAAP), the Memorandum and the following:

(1) No value shall be assigned to goodwill;

(2) All accrued debts and liabilities shall be treated as liabilities, including, but not limited to, all compensation payable to the Investment Manager that has been earned but not yet paid (e.g., Management Fees), any allowance for the Partnership's estimated annual audit and legal fees and other operating expenses and any contingencies for which reserves are required;

(3) Securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, shall be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date;

(4) Options that are listed on a securities or commodities exchange shall be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; provided that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options shall be valued at the midpoint between the last "bid" and "ask" prices for such options on such date;

(5) Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, shall be valued based upon quotations obtained from market makers, dealers or pricing services;

(6) Securities (and/or other investments) contributed to the Partnership as subscription proceeds shall be treated as if purchased by the Partnership at market value on the date of contribution, and securities (and/or other

investments) distributed from the Partnership as withdrawal proceeds shall be treated as if sold by the Partnership at market value on the date of distribution;

(7) Net profits and net losses from New Issues (as defined in **Section 9.08(a)**) shall only be credited or debited to the Net Asset Value of the New Issues Accounts, except to the extent permitted by the applicable rules of the FINRA (as defined in **Section 9.08(a)**), in which case a portion of the net profits and net losses from New Issues may be credited or debited to the Net Asset Value of the Capital Accounts of Limited Partners who are Restricted Persons (as defined in **Section 9.08(a)**) up to an amount permitted by applicable FINRA rules;

(8) Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, shall be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value; and

(9) In the case of investments in Portfolio Funds, which investments are expected to constitute most of the Partnership's assets, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value. The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund. None of the General Partner, the Investment Manager or any of their respective affiliates will be responsible for calculating the net asset value of the Portfolio Funds or for verifying the accuracy and completeness of any such values received.

(b) If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument does not fairly represent its market value, the Investment Manager shall value such security, commodity, option or other financial instrument as it reasonably determines.

(c) In connection with the determination of the Net Asset Value of the Partnership, the Investment Manager may consult with and is entitled to rely upon the advice of the Partnership's brokers and any other third parties deemed appropriate by the Investment Manager. In no event and under no circumstances shall the Investment Manager, the Partnership's brokers or such other third parties incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith.

(d) Absent bad faith or manifest error, all Net Asset Value determinations pursuant to this Agreement are conclusive and binding as to all Partners.

(e) After the foregoing determinations have been made, a further calculation shall be made to determine the increase or decrease in Net Asset Value of the Partnership during the month (or other time period, as the case may be) just ended. The term "**increase in Net Asset Value**" shall be the excess of Net Asset Value at the end of any month (or other time period, as the case may be) over that of the Net Asset Value of the Partnership as of the end of the preceding period, after adjusting for Capital Contributions, distributions and withdrawals. The term "**decrease in Net Asset Value**" shall be the amount by which the Net Asset Value at the end of the month (or other time period, as the case may be) is less than the Net Asset Value of the Partnership as of the end of the preceding period, after making the adjustments specified above.

**Section 9.05** **Allocation of Increases and Decreases in Net Asset Value**

(a) Any net increase or decrease in Net Asset Value during any month (or such other period, as the case may be) shall be allocated as of the end of such month (or such other period, as the case may be) to the Capital Account of each Partner in the proportion which such Partner's Capital Account bore to the sum of the Capital Accounts of all the Partners as of the beginning of such month (or such other period, as the case may be); *provided* that net increases or decreases in Side Pocket Accounts, New Issues Accounts and other memorandum accounts shall be allocated as provided in **Sections 9.07 and 9.08**, respectively.

(b) Notwithstanding the provisions set forth above, if the Partnership has a material item of income or loss in any fiscal period which relates to a matter or transaction occurring during a prior fiscal period (e.g., if the Partnership wins a cash settlement in a case it began in a prior period) the item of income or loss may, at the sole discretion of the General Partner, be shared among the Partners (including persons who ceased to be Partners) in accordance with each such Partner's Partnership Interest in the Partnership during the prior period.

**Section 9.06** **Allocations for Tax Purposes; General Partner Discretion on Allocations; Withholding**

(a) Ordinary income, gains, losses and deductions of the Partnership for each Fiscal Year shall accrue to, and be borne by, the Partners in proportion to their sharing of net increases or decreases in Net Asset Value, the allocations of various types of taxable income and losses likewise being as nearly as possible proportionate.

(b) All allocations under this **Section 9.06** shall be made pursuant to the principles of Section 704 of the Code and in conformity with Treasury regulations promulgated thereunder ("**Regulations**"), or the successor provisions to such Code Section and Regulations.

(c) All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion, and the General Partner is expressly permitted to use the aggregate method of apportioning taxable gain and loss under Treasury Regulation Section 704(b). The General Partner is expressly authorized to make special allocations to the Partners of such gains or income as shall be necessary to satisfy the "qualified income offset" requirements of Treasury Regulations Section 1.704-1(b)(2)(ii)(d). The General Partner's determination of the foregoing matters shall be final and conclusive as to all parties.

(d) Notwithstanding anything to the contrary contained in this Agreement, in the event a Partner withdraws all of the capital in its Capital Account from the Partnership (excluding any amounts held in Side Pocket Accounts), the General Partner shall have the discretion to specially allocate an amount of the Partnership's taxable gains or losses to the withdrawing Partner to the extent that the Partner's Capital Account exceeds, or is less than, its federal income tax basis in its Partnership Interest.

(e) Any taxes, fees or other charges that the Partnership is required to withhold under applicable law with respect to any Partner shall be withheld by the Partnership (and paid to the appropriate government authority) and shall be deducted from the Capital Account of such Partner as of the last day of the Fiscal Year (or earlier if the Partner withdraws) with respect to which amounts are required to be withheld.

(f) For the avoidance of doubt, the provisions of this **Section 9.06** shall apply on a Series-by-Series basis.

**Section 9.07** **Side Pocket Accounts**

(a) The Investment Manager may designate that certain investments held by a Series of

the Partnership and/or by the Portfolio Fund(s) be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines. Such investments may include: (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; (iii) an investment into a Portfolio Fund that invests in illiquid assets; (iv) that portion of an investment in a Portfolio Fund that is attributable to side pocket accounts designated by the manager of such Portfolio Fund (which may be designated with respect to assets that are subject to legal or contractual restrictions on transferability, or that the Investment Manager believes either lack a readily assessable market value (without impairing the value of such investments) or should be held until the resolution of a special event or circumstance; and (v) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**"). **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in a Side Pocket Account, and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely**. Illiquid Investments held in a Side Pocket Account shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager. For the avoidance of doubt, each Policy Owner investing through the relevant Limited Partner will indirectly participate in the economics from a *pro rata* portion of a Side Pocket Account and the corresponding Illiquid Investment.

(b) At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event. Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) shall be reallocated, *pro rata*, from the Side Pocket Account to the Capital Accounts of participating Partners in accordance with their respective interests in such Side Pocket Account. Until such reallocation, a Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of Illiquid Investments held in a Side Pocket Account. Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account shall receive an amount equal to its interest in such Side Pocket Account (net of any accrued Management Fees and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve), with respect thereto) within ninety (90) days after such reallocation. A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

(c) Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission. **For the avoidance of doubt, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.** Notwithstanding any provisions of this Agreement to the contrary, any expenses relating specifically to a Side Pocket Account shall be charged to the Partners participating in such account in proportion to their respective interests therein, as of the commencement of such Side Pocket Account.

(d) If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment (each, a "**Follow-On Investment**"), only the Partners participating in such original investment shall participate in such Follow-

On Investment in proportion to their interest in the related Side Pocket Account; *provided, however*, that if a Partner shall have withdrawn from the Partnership, the General Partner shall equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the Follow-On Investment. In its discretion, the Investment Manager need not designate as a "Follow-On Investment" an additional investment in the same or similar opportunity as the investment for which a Side Pocket Account has been established, but instead may designate such investment as a new investment with a separate Side Pocket Account. Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment.

**Section 9.08** **New Issues; Other Memorandum Accounts for Restricted Transactions**.

(a) From time to time, the Partnership may invest in initial public offerings of equity securities ("**New Issues**"). Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in New Issues, each subject to a de minimis exemption ("**De Minimis Limit**"). To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular Capital Accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**"). Participation in New Issues Accounts shall be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed the De Minimis Limit.

(b) In the event a New Issues Account is established, to effect a transaction in New Issues, the requisite funds shall be transferred from the Partnership to the New Issues Account. Securities held in the New Issues Account shall be held there until they are eventually sold or transferred. Upon the sale or other disposition of New Issues (including any transfer of the underlying securities in the New Issues Account to the Capital Accounts of all of the Partners after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period shall be credited or debited to the Capital Accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein. In the event that the Partnership establishes one or more New Issues Accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that Limited Partners that are not Restricted Persons were receiving profits based in part on the capital of Limited Partners that are Restricted Persons. Such adjustment may, in the sole and absolute discretion of the General Partner, and to the extent not prohibited by rules of FINRA, consist of: (i) assessing an interest charge to the Capital Accounts of Limited Partners that are not Restricted Persons, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by Limited Partners that are not Restricted Persons in connection with New Issue trades; or (ii) such other adjustment as the General Partner considers equitable and is not inconsistent with the rules of FINRA.

(c) In addition to the foregoing provisions with respect to New Issues Accounts and Side Pocket Accounts, to the extent that certain Limited Partners are restricted from participating in any transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such non-participating Limited Partners. Only those Limited Partners who the General Partner determines are eligible shall participate in such accounts. In the event that the Partnership establishes one or more memorandum accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that participating

Limited Partners were receiving profits based in part on the capital of non-participating Limited Partners. Such adjustment may, in the sole and absolute discretion of the General Partner, consist of: (i) assessing an interest charge to the Capital Accounts of participating Limited Partners, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by participating Limited Partners in connection with such trades; or (ii) such other adjustment as the General Partner considers equitable.

## ARTICLE X
## RESTRICTIONS ON TRANSFERS OF PARTNERSHIP INTERESTS OF LIMITED PARTNERS; ADMISSION OF SUBSTITUTE LIMITED PARTNERS; OTHER MATTERS AFFECTING PARTNERSHIP INTERESTS

**Section 10.01** **Restrictions on Transfer of Partnership Interests of Limited Partners**

(a) Except for transfers by will or intestate succession or by operation of law, no Limited Partner may offer, sell, transfer, assign, exchange, hypothecate or pledge, or otherwise dispose of or encumber (hereinafter collectively, "**Transfer**" or "**Transferred**"), in whole or in part, such Limited Partner's Partnership Interest without the consent of the General Partner, which may be given or withheld in the sole and absolute discretion of the General Partner.

(b) No Limited Partner may Transfer, in whole or in part, such Limited Partner's Partnership Interest if, in the General Partner's discretion, such Transfer could result in the termination of the Partnership for federal income tax purposes, and any purported Transfer that could result in the termination of the Partnership for federal income tax purposes shall be void *ab initio*. In its sole and absolute discretion, the General Partner may request a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) as to whether any contemplated Transfer could result in the termination of the Partnership for federal income tax purposes, and the General Partner shall be entitled to rely conclusively upon such opinion in determining whether such Transfer could result in the termination of the Partnership and whether consent to such disposition should be given.

(c) The Partnership Interests may not be transferred without documentation acceptable to the General Partner, which may include a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) that such proposed Transfer may be effected without:

(i) registration of the Partnership Interest being made under the Securities Act of 1933, as amended;

(ii) violating any applicable state securities or "blue sky" law (including investment suitability standards) or the laws of any other jurisdiction;

(iii) the Partnership becoming subject to the Investment Company Act of 1940, as amended ("**1940 Act**"); or

(iv) violating the Act.

(d) In no event shall the Partnership Interest of a Limited Partner or any portion thereof be Transferred to a minor or incompetent, unless by will or intestate succession.

**Section 10.02** **Admission of Substitute Limited Partner**

(a) Subject to the provisions of this **Article X**, an assignee of the Partnership Interest of a Limited Partner (which shall include any purchaser, transferee, donee or other recipient of any disposition of such Partnership Interest) shall be deemed admitted to the Partnership as a Limited Partner (a "**Substitute Limited Partner**") only upon the satisfactory completion of the following:

(i) consent of the General Partner shall have been given, which may be given or withheld in the sole and absolute discretion of the General Partner and which shall be evidenced by a written document executed by the General Partner;

(ii) the assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement (as it may be amended from time to time) by executing a counterpart hereof and such assignee shall have expressly assumed all of the rights and obligations of the assignor Limited Partner hereunder, and shall have executed such other documents or instruments as the General Partner may require in its sole and absolute discretion in order to effect the admission of such person as a Limited Partner;

(iii) an amendment to the Certificate, if required by the Act (in the opinion of the General Partner), evidencing the admission of such person as a Limited Partner shall have been filed;

(iv) the assignee shall have delivered a letter containing a representation that the assignee's acquisition of the Partnership Interest is made as a principal, for the assignee's own account, for investment purposes only and not with a view to the resale or distribution of such Partnership Interest, and that the assignee will not Transfer such Partnership Interest or any fraction thereof to anyone in violation of this Agreement;

(v) if the assignee is a corporation, partnership, limited liability company, trust or other entity, the assignee shall have provided to the General Partner evidence satisfactory to the General Partner of its authority to become a Limited Partner under the terms and provisions of this Agreement;

(vi) the assignee shall have complied with all applicable governmental rules and regulations, if any;

(vii) the assignee meets the suitability requirements for investing in the Partnership and the assignee completes the subscription documents ("**Subscription Documents**") provided by the General Partner; and

(viii) all costs and expenses incurred by the Partnership and the General Partner in connection with this **Section 10.02** shall be paid by the person or entity seeking to become a Substitute Limited Partner (or the transferor Limited Partner).

**Section 10.03 Rights of Assignee of Partnership Interest**

(a) Subject to **Section 10.01(b)**, if a Limited Partner Transfers all or a portion of such Limited Partner's Partnership Interest, involuntarily, by operation of law or voluntarily, without the consent required by this **Article X**, the transferee or assignee shall: (i) be entitled only to receive that proportion of profit and loss, and any distribution of Partnership assets, attributable to the Partnership Interest acquired by reason of such disposition from and after the effective date of such disposition, and only upon written notification of same to the General Partner consistent with **Section 10.03(b)**; and (ii) have no other rights as a Limited Partner unless admitted as a Substitute Limited Partner in accordance with the terms of this Agreement.

(b) Subject to the provisions of **Section 10.01**, and except as required by operation of law, the Partnership shall not be obligated for any purposes whatsoever to recognize the assignment by any Limited Partner of such Limited Partner's Partnership Interest until the General Partner has received notice thereof.

(c) Any person or entity who is the assignee of all or any portion of the Partnership Interest of a Limited Partner, but who has not become a Substitute Limited Partner, and desires to make a further disposition of such Partnership Interest, shall be subject to all the provisions of this **Article X** to the same extent and in the same manner as

any Limited Partner desiring to make a disposition of such Limited Partner's Partnership Interest.

**Section 10.04** **Effect of Bankruptcy, Death or Incompetence of a Limited Partner**. The bankruptcy, dissolution or winding up of a Limited Partner, the death of a Limited Partner or an adjudication that a Limited Partner is incompetent (which term shall include, but not be limited to, insanity), shall not cause the termination, wind-down or dissolution of the Partnership and the business of the Partnership shall continue. If a Limited Partner becomes bankrupt, dissolved or wound up, the trustee or receiver of such Limited Partner's estate or, if a Limited Partner dies, such Limited Partner's executor, administrator or trustee, or, if such Limited Partner is adjudicated incompetent, such Limited Partner's committee, guardian or conservator, shall have the rights of such Limited Partner for the purposes of settling or managing such Limited Partner's estate or property and such power as the bankrupt, deceased or incompetent Limited Partner possessed to dispose of all or any part of such Limited Partner's Interest and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a Substitute Limited Partner.

**Section 10.05** **Attachment by Creditors**. If a Partnership Interest is subjected to attachment by a creditor, or is assigned for the benefit of any creditor, the Partnership Interest obtained by such creditor shall be only that of an assignee, and in no event shall such creditor have the rights of a Substitute Limited Partner or an Additional Limited Partner.

## ARTICLE XI
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 11.01** **Limited Partners**. Each Limited Partner represents, warrants and covenants to the Partnership and to every other Partner as follows:

(a) Such Limited Partner shall provide promptly, upon request by the General Partner, all financial data, documents, reports, certifications or other information necessary or appropriate to enable the Partnership to apply for and obtain an exemption from the registration provisions of applicable law and any other information required by governmental agencies having jurisdiction over the Partnership.

(b) There is no misrepresentation contained in the Subscription Documents and the forms attached thereto completed by such Limited Partner.

(c) If such Limited Partner is a corporation, partnership, limited liability company, trust or other entity, that the officer (or other signatory) signing on its behalf has been duly authorized to execute and deliver this Agreement and, to the extent requested by the General Partner, the Certificate.

(d) Such Limited Partner that is an entity that would be an "investment company" under the 1940 Act, but for an exclusion under either Section 3(c)(1) or Section 3(c)(7) thereof, has advised the General Partner of the number of persons that constitute "beneficial owners of such Limited Partner's outstanding securities (other than short-term paper)" within the meaning of Section 3(c)(1)(A) of the 1940 Act, and shall advise the General Partner promptly upon any change in that number.

## ARTICLE XII
## SPECIAL POWER OF ATTORNEY

**Section 12.01** **Execution and Consent**. Each Limited Partner hereby irrevocably constitutes and appoints the General Partner and its respective successors (hereinafter referred to as "**Special Attorney**") as the attorney-in-fact for such Limited Partner with power and authority to act in the Limited Partner's name and on the Limited Partner's behalf to execute, acknowledge, swear to and file documents and instruments necessary or appropriate to the conduct of the Partnership's business, which shall include, but not be limited to, the following:

(a) the Certificate and this Agreement, as well as amendments thereto as required by the

laws of any state, or any other jurisdiction, or as otherwise permitted under the terms of this Agreement;

(b) any other certificates, instruments and documents, including fictitious name certificates, as may be required by, or may be appropriate under, the laws of any state;

(c) the amendment and/or restatement of this Agreement in accordance with **Section 14.08**; and

(d) any documents that may be required to effect the continuation of the Partnership, the admission of an Additional Limited Partner or a Substitute Limited Partner, the withdrawal of a Limited Partner, or the dissolution and termination of the Partnership, *provided* that such continuation, admission, withdrawal or dissolution and termination are in accordance with the terms of the Certificate and this Agreement.

**Section 12.02** **Procedural Aspects**. The power of attorney granted by each Limited Partner to the Special Attorney:

(a) is a special power of attorney, coupled with an interest, and is accordingly irrevocable;

(b) may be exercised by the Special Attorney for each Limited Partner either by signing separately as attorney-in-fact for each Limited Partner or, by executing any instrument with the single signature of such Special Attorney acting as attorney-in-fact for all of the Limited Partners; and

(c) shall survive the assignment by a Limited Partner of the whole or any portion of such Limited Partner's Partnership Interest; *provided* that where the assignee has been approved in accordance with the provisions of this Agreement for admission to the Partnership as a Substitute Limited Partner, the Power of Attorney shall survive such assignment for the sole purpose of enabling the Special Attorney to execute, acknowledge and file any instrument necessary to effect such substitution.

## ARTICLE XIII
## DISSOLUTION AND LIQUIDATION

**Section 13.01** **Dissolution**. The Partnership shall be dissolved upon the earliest to occur of:

(a) the withdrawal, resignation or Involuntary Withdrawal of the General Partner, or any other event that results in such entity ceasing to be a general partner, unless the remaining Limited Partners agree, within ninety (90) days after such event, to continue the Partnership with a new and qualified substitute general partner pursuant to and in accordance with the terms and conditions set forth in **Article IV**;

(b) an election to dissolve the Partnership made by the General Partner, in its discretion, upon thirty (30) days' prior written notice to the Limited Partners; or

(c) the happening of any other event, including the entry of a decree of judicial dissolution under Section 17-802 of the Act, that under the law of the State of Delaware, mandatorily requires the dissolution of the Partnership.

For the avoidance of doubt, the termination of the Partnership shall constitute the termination of all Series. For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership.

**Section 13.02** **Liquidation**. Upon the dissolution of the Partnership, the "**Liquidators**", namely: (i) the General Partner or, if there is no general partner at the time, or if the principal(s) of the General Partner are unable to act on its behalf, (ii) (A) the person or persons previously designated in writing by the General Partner and notified to the Partnership's auditors, or (B) if the General Partner has not made such a designation, the person or persons designated by Limited

Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, shall cause the cancellation of the Certificate, liquidate (or distribute) the assets of the Partnership, and apply and distribute the balance of the proceeds of such liquidation in accordance with the following order of priority: (1) pay off known liabilities; (2) establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP); and (3) distribute the remainder to the Partners in proportion to the Capital Account balances maintained in accordance with the provisions of **Section 9.01** and the Act. The Liquidators shall take all other steps necessary to wind up the affairs of the Partnership as promptly as practicable. To the extent reasonable, the business of the Partnership may continue to be conducted until liquidation is complete. For purposes hereof, the term "Liquidators" shall also include the trustees, receivers or other persons required by law to wind up the affairs of the Partnership.

**Section 13.03** **Notice of Dissolution**

(a) Upon the dissolution of the Partnership or the relevant Series, the Liquidators shall promptly notify the Partners of such dissolution as well as known creditors and claimants whose addresses appear on the Partnership's or the relevant Series' records.

(b) The General Partner shall give at least fifteen (15) days' prior written notice to each Limited Partner that is a BHC Limited Partner (as defined in **Section 5.10**) of any proposal to distribute property in-kind to such Limited Partner and the proposed date of such distribution, and shall not make any such distribution in-kind to the extent that such Limited Partner advises the General Partner at least five (5) days prior to the date set forth in such notice for such distribution that such distribution in-kind could reasonably be expected to cause it to violate the BHCA. In the event that a BHC Limited Partner notifies the General Partner to such effect, the General Partner shall be authorized to make such arrangements for the property that it would have otherwise distributed in-kind as the General Partner shall determine in its reasonable discretion.

**Section 13.04** **Deferred Liquidation; Distribution In-Kind of Joint Interests in Property**. For the avoidance of doubt, the following provisions of this **Section 13.04** shall apply on a Series-by-Series basis. Notwithstanding the provisions of **Section 13.02**, if on dissolution of the Partnership the Liquidators shall determine that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners, the Liquidators may, in their absolute discretion, either defer for a reasonable time the liquidation of any assets, except those necessary to satisfy liabilities of the Partnership (other than those to Partners), or distribute to the Partners, in lieu of cash, as tenants in common and in proportion to their respective interests in the Partnership, undivided interests in such Partnership assets as the Liquidators deem not suitable for liquidation. To the extent that the General Partner exercises its right, power and authority under **Section 3.02(w)**, this Section shall be construed by the Liquidators in their reasonable discretion to give effect thereto.

**Section 13.05** **Final Statement**. As soon as practicable after the dissolution of the Partnership or the relevant Series, a final statement of its assets and liabilities shall be prepared by the General Partner and/or the internal accountants for the Partnership or the relevant Series and furnished to the Partners.

## ARTICLE XIV
## GENERAL PROVISIONS

**Section 14.01** **Address and Notices**. The address of each Partner (other than the General Partner) for all purposes shall be the address set forth on the signature page to this Agreement or such other address of which the General Partner has received written notice in accordance with this **Section 14.01**. The address of the General Partner for all purposes shall be the address set forth in **Section 1.04** or such other address of which the General Partner has provided written notice to the Partners in accordance with this **Section 14.01**. Any notice, demand or request required or permitted to be given or made hereunder shall be in writing and shall be deemed given or made (i) when delivered in person, (ii) when sent to such Partner at such address by

registered or certified mail, return receipt requested, or by electronic mail, or (iii) when delivered by overnight delivery by a reputable private carrier or by the postal service.

**Section 14.02** **Titles and Captions**. All Article and Section titles and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

**Section 14.03** **Pronouns and Plurals**. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms. The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

**Section 14.04** **Further Action**. The Limited Partners shall execute and deliver all documents, provide all information and take or forbear from taking all such action as may be necessary or appropriate, in the discretion of the General Partner, to achieve the purposes set forth in this Agreement.

**Section 14.05** **Governing Law, Personal Jurisdiction and Venue**. **EACH LIMITED PARTNER ACKNOWLEDGES AND AGREES THAT ANY CLAIM, CONTROVERSY, DISPUTE OR ACTION RELATING IN ANY WAY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP SHALL BE GOVERNED SOLELY AND EXCLUSIVELY BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICT OF LAWS DOCTRINES. EACH LIMITED PARTNER UNDERSTANDS AND AGREES THAT IT IS WAIVING THE PROTECTION OF STATUTES IN ITS STATE OF RESIDENCE THAT PROVIDE IT WITH CERTAIN RIGHTS, REMEDIES AND PROTECTIONS IN THE CASE OF FRAUD OR MISREPRESENTATION AND AGREES TO RELY SOLELY UPON THE LAWS OF THE STATE OF DELAWARE AND ANY APPLICABLE FEDERAL LAWS. EACH LIMITED PARTNER MAKES THIS WAIVER KNOWINGLY AND REPRESENTS THAT IT HAS CONSULTED INDEPENDENT COUNSEL, OR THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH SUCH INDEPENDENT COUNSEL BUT HAS ELECTED NOT TO DO SO, AND AGREES THAT THE ONLY STATE LAWS THAT WILL APPLY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT AND ITS INVESTMENT IN THE PARTNERSHIP ARE THE LAWS OF THE STATE OF DELAWARE.**

**EACH OF THE LIMITED PARTNERS, FUND COUNSEL AND ANY OTHER PARTY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR ANY OTHER AGREEMENT REGARDING SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP (COLLECTIVELY, FOR PURPOSES OF THIS CLAUSE, THE "PARTIES") IRREVOCABLY CONSENTS TO BEING SERVED WITH LEGAL PROCESS ISSUED FROM THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK AND IRREVOCABLY CONSENTS TO THE EXCLUSIVE PERSONAL JURISDICTION OF THE FEDERAL AND STATE COURTS SITUATED IN THE STATE OF NEW YORK. THE PARTIES IRREVOCABLY WAIVE ANY OBJECTIONS TO THE PERSONAL JURISDICTION OF THESE COURTS. SAID COURTS SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL CLAIMS, CONTROVERSIES, DISPUTES AND ACTIONS, OF ANY KIND OR MANNER, WHICH IN ANY WAY RELATE TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT, OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP. THE PARTIES ALSO IRREVOCABLY WAIVE ANY OBJECTIONS THAT THESE COURTS CONSTITUTE AN OPPRESSIVE, UNFAIR, OR INCONVENIENT FORUM AND AGREE NOT TO SEEK TO CHANGE VENUE ON THESE GROUNDS OR ANY OTHER GROUNDS. THE PARTIES FURTHER AGREE THAT THEY WILL NOT FILE SUIT IN A JURISDICTION OTHER THAN NEW YORK AND THAT, SHOULD THEY DO SO, THEY SHALL BE LIABLE FOR ALL DAMAGES AS A RESULT OF MAKING SUCH A FILING AND SHALL PAY ALL ATTORNEYS' FEES INCURRED BY ANY PARTY IN CONNECTION WITH MOVING TO DISMISS THE SUIT FOR FAILURE TO COMPLY WITH THIS PROVISION.**

In the event that (i) any current or prior Limited Partner ("**Claiming Party**") initiates or asserts any litigation, arbitration or similar claim or counterclaim, or joins, offers substantial assistance to or has a direct financial interest in any claim ("**Claim**") against the Partnership, the General Partner, the Investment Manager or any Investment Manager Affiliates, including any Claim purportedly filed on behalf of the Partnership or any Limited Partner, and (ii) the Claiming Party (or the third party that received substantial assistance from the Claiming Party or in whose

Claim the Claiming Party had a direct financial interest) does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then each Claiming Party shall be obligated jointly and severally to reimburse the Partnership and/or the General Partner, the Investment Manager or any such Investment Manager Affiliate for all fees, costs and expenses of every kind and description (including, but not limited to, all reasonable attorneys' fees and other litigation expenses) that the parties may incur in connection with such Claim.

**Section 14.06** **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and permitted assigns; *provided*, however, that fund counsel shall be a party to this Agreement solely with respect to **Sections 3.04(b) and 14.05** hereof in order to benefit from and enforce such Sections, and a conformed signature page for fund counsel is included as a counterpart to this Agreement.

**Section 14.07** **Entire Agreement**. This Agreement, together with the related Subscription Documents and any other written agreement between the General Partner, on behalf of the Partnership (acting severally in the name of and for the account of any individual Series), and any Limited Partner of that Series, shall constitute the entire agreement and understanding among all the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter, including, without limitation, the Current Agreement. The parties hereto acknowledge that, notwithstanding any other provision of this Agreement or the Subscription Documents, the General Partner, on its own behalf or on behalf of the Partnership, without any act, consent or approval of any other Partner, may enter into side letters or other writings to or with one or more Limited Partners that have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or the Subscription Documents ("**Side Letters**"). The parties agree that any rights established, or any terms of this Agreement or the Subscription Documents altered or supplemented, in a Side Letter to or with one or more Limited Partners shall govern with respect to such Limited Partner(s) notwithstanding any other provision of this Agreement or the Subscription Documents. No covenant, representation or condition not expressed in this Agreement or such Subscription Documents (and, if applicable, any Side Letter) shall affect or be deemed to interpret, change or restrict the express provisions hereof and thereof.

**Section 14.08** **Amendment**. This Agreement may be modified or amended only by the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of all of the outstanding Partnership Interests of each Series; *provided* that the General Partner may amend this Agreement from time to time (x) only with the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners of a specific Series of Partnership Interests, if such amendment, in the opinion of the General Partner, only has a material effect on such Series of Partnership Interests, and (y) without the consent, approval or other authorization of, or notice to, any of the Limited Partners (including pursuant to **Sections 3.02(u)** and **(v)**) if, in the opinion of the General Partner, the amendment does not have a material adverse effect on any Limited Partner. Notwithstanding the foregoing, no amendment may: (i) convert a Limited Partner's interest to that of a general partner or, modify the limited liability of any Limited Partner, without the consent of each affected Partner or (ii) amend any provision hereof which requires the consent or approval of a specified percentage in interest of the Limited Partners without the consent of such specified percentage in interest of the Limited Partners.

**Section 14.09** **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership or the relevant Series.

**Section 14.10** **Waiver by Partner**

(a) Any Partner by notice to the General Partner may, but shall be under no obligation to, waive any of its rights or any conditions to its obligations hereunder, or any duty, obligation or covenant of any other Partner to such first mentioned Partner.

(b) No such waiver shall affect or alter the remainder of this Agreement, but each and every covenant, agreement, term and condition hereof shall continue in full force and



CONFIDENTIAL

effect with respect to any other existing or subsequent breach.

**Section 14.11** **Rights and Remedies**

(a) The rights and remedies of any of the Partners hereunder shall not be mutually exclusive, and the implementation of one or more of the provisions of this Agreement shall not preclude the implementation of any other provision.

(b) Each of the Partners confirms that damages at law may be an inadequate remedy for a breach or threatened breach of any provision hereof. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy but nothing herein contained is intended to or shall limit or affect any rights at law or by statute or otherwise of any Partner aggrieved as against the other Partners for a breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear that the respective rights and obligations of the Partners hereunder shall be enforceable in equity as well as at law or otherwise, except as provided in **Section 5.08**.

**Section 14.12** **Counterparts**. This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on all parties, notwithstanding that all the parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing his, her or its signature hereto, independently of the signature of any other party.

**Section 14.13** **Certain Tax Matters**

(a) *Tax Matters Partner*

(i) The Tax Matters Partner (as such term is defined in Section 6231(a)(7) of the Code) of the Partnership shall be the General Partner. The General Partner shall have all powers necessary to perform fully in its capacity as Tax Matters Partner and, in such capacity, the General Partner shall use its reasonable efforts to comply with the responsibilities outlined in Sections 6221 through 6233 of the Code (including the Regulations) and shall have any powers necessary to perform fully in such capacity.

(ii) In furtherance of the foregoing, the General Partner is authorized to represent the Partnership before taxing authorities and courts in tax matters affecting the Partnership and the Partners in their capacity as such and shall keep the Partners informed of any such administrative and judicial proceedings. The General Partner shall be entitled to be reimbursed by the Partnership for all costs and expenses incurred by it in connection with any administrative or judicial proceeding affecting tax matters of the Partnership and the Partners in their capacity as such and to be indemnified by the Partnership (solely out of Partnership assets) with respect to any action brought against it in connection with any judgment in or settlement of any such proceeding, except in the case of the General Partner's own fraud, gross negligence, willful misconduct or conduct that is the subject of a criminal proceeding (where the General Partner has a reasonable cause to believe that such conduct was unlawful).

(iii) Any Partner that is in dispute with any tax authority in relation to any Partnership matter shall notify the General Partner within thirty (30) calendar days, and if the General Partner reasonably determines that the matter is of material relevance to the tax position of the Partnership, such Partner shall consult with the General Partner (or any advisor appointed by the General Partner for the purpose) as to how that dispute shall be handled. Any Partner who enters into a settlement agreement with respect to any Partnership item shall notify the Tax Matters Partner of such settlement agreement and its terms within thirty (30) calendar days after the date of settlement.

(iv) The provisions of this **Section 14.13(a)** shall survive any termination of this Agreement.

(b) *Tax Elections*. Each Partner agrees to provide the Partnership with such information which may be necessary or desirable in order for the General Partner to carry out its powers under this **Section 14.13** and **Section 3.02(g)**, including, without limitation, to facilitate compliance with Section 743 of the Code and elections permitted thereunder.

(c) *Classification as a Partnership*. The parties hereto intend that the Partnership be classified as a partnership for federal income tax purposes. The General Partner shall not elect to have the Partnership classified as an association taxable as a corporation for federal income tax purposes pursuant to Regulation Section 301.7701–3. The General Partner shall, for and on behalf of the Partnership, take all steps as it may deem reasonably necessary to maintain the Partnership's classification as a partnership for federal income tax purposes.

(d) *Tax Audits*. Each Limited Partner shall reasonably cooperate with the General Partner in connection with any tax audit of the Partnership or any existing or former investment.

[*remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, this Amended and Restated Limited Partnership Agreement has been duly executed as of the day and year first above written.

**Atlas IDF GP, LLC**, as General Partner
(acting severally in the name of and for the account of each individual Series)

By: ______________________
Name: John Honis
Title: Managing Member

INITIAL LIMITED PARTNER:

/s/ John Honis
John Honis

[SIGNATURES OF ADDITIONAL LIMITED PARTNERS AND OTHER PARTIES ARE SET FORTH ON SEPARATE SIGNATURE PAGES]