**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P**.**

§

§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§

vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee

§

§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 36**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

Vol. 2 000648 thru Vol. 3

Vol. 4 001843

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| | | |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7<br>003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8<br>004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9<br>005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 9 | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 04/17/2026 005330 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 04/21/2026 005590 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026 005594 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026 005615 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026 005682 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 10 | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 04/22/2026 005692 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 04/24/2026 005705 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 04/24/2026 005726 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 04/25/2026 005727 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/27/2026 005729 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026 005737 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

Vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 05/06/2026 005913 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005920 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005927 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 05/07/2026 005929 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/08/2026 005936 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 05/08/2026 005939 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 05/08/2026 005942 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 005945 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 05/08/2026 006100 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

Thru Vol 21

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10).22 05/08/2026 008156 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 008172 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 05/09/2026 008188 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol. 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 28 | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 05/11/2026 010664 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 05/11/2026 010736 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 05/11/2026 011150 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 05/11/2026 011734 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 05/11/2026 013203 Thru Vol 33 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 05/11/2026 014888 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35<br>05/11/2026<br>015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026<br>015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026<br>015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026<br>015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026<br>015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026<br>015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36<br>05/18/2026<br>015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026 016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026 016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026 016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026 016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S SIXTH AMENDED**
**EXHIBIT LIST FOR THE MAY 11, 2026 HEARING**

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Sixth Amended Exhibit List for the May 11, 2026 Hearing in the Bankruptcy Case.

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | HCM-D10000002-HCM-D10000013 |
| 2 | Settlement Agreement and General Release | 000813-000836 |
| 3 | 6/4/2024 First Affidavit of Mark Patrick | Dkt. 401-2 (21-03076-sgj) |
| 4 | 7/21/2025 [4-33] Original DAF Org Chart | Dkt. 4-33 (25-11376-BLS) |
| 5 | 7/11/2011 Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP | Dkt. 4-36 (25-11376-BLS) |
| 6 | 2/20/2025 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd. | Dkt. 4-06 (25-11376-BLS) |
| 7 | 11/9/2023 Shields Work Plan Memorandum | |
| 8 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 9 | 12/12/2024 Certificate of Formation of CDFMCAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 10 | 12/18/2024 Charitable DAF HoldCo, Ltd. Unanimous Written Resolutions of all of the Directors of the Company | Dkt. 4-45 (25-11376-BLS) |
| 11 | 9/30/2024 Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 12 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 13 | 3/27/2025 CDMCFAD, LLC Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 14 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D100000330 |
| 15 | 2/12/2025 Membership Interest Purchase Agreement | HCM-D10000021-HCM-D10000036 |
| 16 | 2/12/2025 Member Consent of Beacon Mountain | HCM-D10000019-HCM-D10000020 |
| 17 | 11/30/2015 Amended and Restated Limited Partnership Agreement of Atlas IDF, LP | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 18 | 6/26/2025 Audit of RAND PE Fund I, LP | HMIT_Entities_000022-HMIT_Entities_000039 |
| 19 | 3/6/2024 DAF Structure Chart in 2024 and 2025 | |
| 20 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | |
| 21 | 12/2015-8/2022 Rand Structure Chart | |
| 22 | 2/12/2025 Feb. and May 2025 Rand Structure Chart | |
| 23 | 10/15/2019 Empower Dallas Foundation, Inc. Partial Surrender Request | |
| 24 | 2/22/2021 Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief | Dkt. 1943 (19-34054-sgj11) |
| 25 | 4/8/2025 Email regarding Settlement Agreement | HCMLPHMIT00000656-HCMLPHMIT00000661 |
| 26 | 12/16/2015 Crown Global Deferred Variable Annuity Policy for Empower Dallas Foundation, Inc. | |
| 27 | 11/30/2015 Participation Agreement between Crown Global Life Insurance Ltd. and Other Entities | |
| 28 | 9/12/2025 First Affidavit of Mark Eric Patrick | |
| 29 | 10/21/2025 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 9/30/2025 | Dkt. 4438 (19-34054-sgj11) |
| 30 | 10/21/2025 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 9/30/2025 | Dkt. 4439 (19-34054-sgj11) |
| 31 | 1/21/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 12/31/2025 | Dkt. 4503 (19-34054-sgj11) |
| 32 | 1/21/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 12/31/2025 | Dkt. 4504 (19-34054-sgj11) |
| 33 | 4/20/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 3/31/2026 | Dkt. 4552 (19-34054-sgj11) |
| 34 | 4/20/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 3/31/2026 | Dkt. 4553 (19-34054-sgj11) |
| 35 | 6/25/2025 Hearing Transcript for Case No. 19-34054-sgj-11 | |
| 36 | 4/16/2025 Affidavit of James David Dondero | Dkt. 4534-7 (19-34054-sgj11) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 37 | 6/9/2025 Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC § 363 Approving Settlement with the HMIT Entities | Dkt. 4230 (19-34054-sgj11) |
| 38 | HMIT Structure as of 8/12/2022 – 2/12/2025 | |
| 39 | 2/6/2025 Letter to Dolomiti LLC re Notice of Your Withdrawal from Rand PE Fund I, L.P. | |
| 40 | 2024 Tax Form 990 – Highland Dallas Foundation Inc. | Dkt. 4556-2 (19-34054-sgj11) |
| 41 | 3/27/2025 Admission and Amendment to No. 1 Agreement | Dkt. 4-54 (25-11376-BLS) |
| 42 | 12/12/2024 Certificate of Formation of CDMCFAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 43 | 2/7/2015 Unanimous Written Resolutions of the Board of Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-22 (25-11376-BLS) |
| 44 | 12/18/2024 Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-45 (25-11376-BLS) |
| 45 | 4/2/2025 Written Resolutions of the Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-47 (25-11376-BLS) |
| 46 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 47 | 7/21/2025 Defendants' Motion to Dismiss and Plea to the Jurisdiction filed in Cause No. 25-BC-01B-0027, The Highland Foundation, Inc. et al. v. Mark Patrick, et al., The Business Court of Texas, First Division | Dkt. 4-91 (25-11376-BLS) |
| 48 | 3/27/2025 Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 49 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 50 | 9/30/2024 Valuation Analysis of 100 Participation Shars of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 51 | 3/7/2024 Written Consent of the Managing Member of Charitable DAF GP, LLC | Dkt. 4-38 (25-11376-BLS) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 52 | 6/9/2025 Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000001- HCM-D10000001 |
| 53 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) on December 17, 2015 | HCM-D10000002- HCM-D10000013 |
| 54 | Email chain regarding the sale of Class C limited partnership interests from Highland Capital Management, L.P. to Hunter Mountain Investment Trust. Mark Patrick | HCM-D10000014- HCM-D10000015 |
| 55 | Email from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer. | HCM-D10000016- HCM-D10000016 |
| 56 | Email chain from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer | HCM-D10000017- HCM-D10000018 |
| 57 | CLO Holdco, LLC's purchase of all membership interests in Beacon Mountain, LLC from Rand PE Fund I, L.P. | HCM-D10000019- HCM-D10000020 |
| 58 | Membership Interest Purchase Agreement - | HCM-D10000021- HCM-D10000036 |
| 59 | Organizational structure of HMIT entities before and after February 12, 2025. | HCM-D10000037- HCM-D10000038 |
| 60 | Investment Management Agreement -establishes Rand Advisors, LLC as the investment manager for Atlas IDF, LP. | HCM-D10000039- HCM-D10000045 |
| 61 | Investment Management Agreement - establishes Rand Advisors, LLC as the investment manager for Rand PE Fund I, L.P. | HCM-D10000046- HCM-D10000052 |
| 62 | Register of Members for CLO Holdco, Ltd. | HCM-D10000053- HCM-D10000055 |
| 63 | Unanimous Written Consent - executed by Mark Patrick as sole director of Rand Advisors Holding Corp. | HCM-D10000056- HCM-D10000069 |
| 64 | Charitable DAF Fund, LP transferred DAF Holdings stock to CLO HoldCo, Ltd | HCM-D10000070- HCM-D10000072 |
| 65 | Register of Members for Liberty CLO Holdco, Ltd. CLO Holdco, Ltd. | HCM-D10000073- HCM-D10000073 |
| 66 | Limited Liability Company Agreement - establishing Liberty CLO Holdco, LLC as a Delaware limited liability company. | HCM-D10000074- HCM-D10000090 |
| 67 | Register for CDH GP, Ltd. | HCM-D10000091- HCM-D10000091 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 68 | Register of Members for CDH GP, Ltd. | HCM-D10000092-HCM-D10000092 |
| 69 | Register for CLO HoldCo, Ltd. | HCM-D10000093-HCM-D10000094 |
| 70 | Register of General Partners for Charitable DAF Fund, LP. | HCM-D10000095-HCM-D10000095 |
| 71 | Register of Limited Partners for Charitable DAF Fund, LP | HCM-D10000096-HCM-D10000096 |
| 72 | Limited Liability Company Agreement for CDMCFAD, LLC. | HCM-D10000097-HCM-D10000124 |
| 73 | Collation of various documents including resolutions from CDMCFAD, LLC, and a March 2025 letter from Seyfarth Shaw LLP to the IRS reporting potential tax violations by Highland Dallas Foundation, Inc. (Jim Dondero). | HCM-D10000125-HCM-D10000251 |
| 74 | Letter from three Highland foundations to Paul Murphy | HCM-D10000264-HCM-D10000265 |
| 75 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000266-HCM-D10000267 |
| 76 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000268-HCM-D10000269 |
| 77 | Email chain between K. Hendrix and J. Seery, et al. | HCM-D10000270-HCM-D10000271 |
| 78 | Email chain James Seery to Mark Patrick and Shawn Raver | HCM-D10000272-HCM-D10000272 |
| 79 | Email chain from Shawn Raver to J. Seery, et al. | HCM-D10000273-HCM-D10000273 |
| 80 | Email chain from M. Tax to S. Raver, et al. | HCM-D10000274-HCM-D10000274 |
| 81 | Email chain from K. Hendrix to S. Raver, et al. | HCM-D10000275-HCM-D10000276 |
| 82 | Email chain from S. Raver to K. Hendrix, et al. | HCM-D10000277-HCM-D10000278 |
| 83 | Email chain from S. Raver to M. Tax, et al. | HCM-D10000279-HCM-D10000280 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 84 | Note Elevation and Assignment Agreement | HCM-D10000281-HCM-D10000301 |
| 85 | Email from A. Hurt to T. Cournoyer, et al. | HCM-D10000302-HCM-D10000303 |
| 86 | Letter to Dugaboy Investment Trust | HCM-D10000304-HCM-D10000308 |
| 87 | Claims Assignment Agreement | HCM-D10000309-HCM-D10000315 |
| 88 | Email from David Klos at Highland Capital Management to James Seery | HCM-D10000316-HCM-D10000316 |
| 89 | Trust Agreement establishes the Hunter Mountain Investment Trust on December 17, 2015 | HCM-D10000317-HCM-D10000328 |
| 90 | Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000329-HCM-D10000329 |
| 91 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D10000330-HCM-D10000330 |
| 92 | Email from K. Hendrix to A. Gunther, et al. | HCM-D10000331-HCM-D10000332 |
| 93 | Email from K. Hendrix to D. Klos, et al. | HCM-D10000333-HCM-D10000334 |
| 94 | Letter from Campbells LLP to James Seery (CEO of Highland Capital Management, L.P.) and Marc Kirschner | HCM-D10000335-HCM-D10000338 |
| 95 | Email chain from A. Kapuria to S. Raver, et al. | HMIT_Entities_000001-HMIT_Entities_000006 |
| 96 | Email chain from K. Jackson to S. Raver, et al. | HMIT_Entities_000007-HMIT_Entities_000010 |
| 97 | Email chain from S. Reynolds to S. Raver, et al. | HMIT_Entities_000011-HMIT_Entities_000015 |
| 98 | Email from Chris Rice to K. Jackson, et al. | HMIT_Entities_000016-HMIT_Entities_000020 |
| 99 | Email from Chris Rice to S. Raver, et al. | HMIT Entities 000021-HMIT Entities 000021 |
| 100 | Audited financial statements for Rand PE Fund I, L.P. | HMIT_Entities_000022-HMIT_Entities_000039 |
| 101 | Email chain from K. Jackson to S. Raver | HMIT_Entities_000040-HMIT_Entities_000043 |
| 102 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000044-HMIT_Entities_000047 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 103 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities_000048- HMIT Entities 000051 |
| 104 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000052- HMIT_Entities_000054 |
| 105 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000055- HMIT Entities 000057 |
| 106 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000058- HMIT Entities 000058 |
| 107 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000059- HMIT Entities 000059 |
| 108 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000060- HMIT_Entities_000060 |
| 109 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000061- HMIT Entities 000061 |
| 110 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000062- HMIT Entities 000063 |
| 111 | Email chain between Crown Global Insurance and Rand Advisors | HMIT_Entities_000064- HMIT_Entities_000065 |
| 112 | Email from Robert Kipp to M. Patrick, et al. | HMIT Entities 000066- HMIT Entities 000066 |
| 113 | Email chain from A. Gunther to S. Raver, et al. | HMIT Entities 000067- HMIT Entities 000070 |
| 114 | Email chain from S. Raver to A. Gunther, et al. | HMIT_Entities_000071- HMIT_Entities_000074 |
| 115 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000075- HMIT_Entities_000076 |
| 116 | Email chain from S. Raver to J. Seery, et al. | HMIT Entities 000077- HMIT Entities 000078 |
| 117 | Email from C. Rice to S. Raver, et al. | HMIT Entities_000079- HMIT Entities_000079 |
| 118 | Bloomberg invoice | HMIT Entities 000080- HMIT Entities 000080 |
| 119 | Email thread with S&P Global | HMIT_Entities_000081- HMIT_Entities_000083 |
| 120 | S&P Global invoice | HMIT Entities_000084- HMIT Entities_000084 |
| 121 | Email exchange between auditors Chris Rice (NexPoint Services) and Patrick Casale (Cohen & Co) | HMIT Entities_000085- HMIT Entities_000086 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 122 | Financial statement audit | HMIT_Entities_000087-HMIT_Entities_000103 |
| 123 | Email chain C. Rice to S. Raver | HMIT_Entities_000104-HMIT_Entities_000114 |
| 124 | Email chain from S. Raver to C. Rice | HMIT_Entities_000115-HMIT_Entities_000124 |
| 125 | Email from K. Longwell to M. Tax, et al. | HMIT Entities_000125-HMIT Entities_000125 |
| 126 | Civil Investigative Demand issued by the Texas Attorney General's Office to Hunter Mountain Investment Trust (HMIT) on July 14, 2025 | HMIT_Entities_000126-HMIT_Entities_000133 |
| 127 | Email from K. Longwell to M. Tax, et al. | HMIT Entities 000134-HMIT Entities 000134 |
| 128 | Dkt. 23, Notice of Hearing dated 8/27/2025 | HMIT_Entities_000135-HMIT_Entities_000254 |
| 129 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000260-HMIT_Entities_000261 |
| 130 | Email chain from D. Klos to K. Hendrix, et al. | HMIT_Entities_000262-HMIT_Entities_000263 |
| 131 | Email chain from M. Tax to J. Seery, et al. | HMIT_Entities_000264-HMIT_Entities_000264 |
| 132 | Email chain from K. Hendrix to S. Raver, et al. | HMIT_Entities_000265-HMIT_Entities_000266 |
| 133 | Email chain from K. Hendrix to A. Gunther, et al. | HMIT_Entities_000267-HMIT_Entities_000268 |
| 134 | DAF entity structure | VALUESCOPE 000001-VALUESCOPE 000001 |
| 135 | DAF/Rand entity structure | VALUESCOPE_000002-VALUESCOPE_000002 |
| 136 | Law firm forwards legal filing to Mark Patrick (DAF HoldCo) re Chapter 15 filing | VALUESCOPE_000003-VALUESCOPE_000007 |
| 137 | Chapter 15 Petition filing | VALUESCOPE_000008-VALUESCOPE_000026 |
| 138 | Charitable DAF Org structure | VALUESCOPE_000027-VALUESCOPE_000027 |
| 139 | Letter from Reed Smith LLP | VALUESCOPE_000028-VALUESCOPE_000029 |
| 140 | ValueScope, LLC Response | VALUESCOPE_000030-VALUESCOPE_000030 |
| 141 | Certificate of Incorporation, Charitable DAF HoldCo, Ltd. | TDIT004698 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 142 | Legal Relationship Agreement, Highland Kansas City Foundation | TDIT003396–TDIT003398 |
| 143 | Supporting Organization Operating Agreement - Highland Dallas Foundation, Inc. | TDIT003399–TDIT003406 |
| 144 | Supporting Organization Operating Agreement - Highland Santa Barbara Foundation, Inc. | TDIT003407–TDIT003413 |
| 145 | Letter - Highland Dallas Foundation, Inc. | TDIT003389–TDIT003390 |
| 146 | Letter - Highland Santa Barbara Foundation, Inc. | TDIT003391–TDIT003393 |
| 147 | Letter - Highland Kansas City Foundation, Inc. | TDIT003394–TDIT003395 |
| 148 | Employment Agreement - Mark Patrick | TDIT003971–TDIT003988 |
| 149 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011256–TDIT011268 |
| 150 | Memo - Harneys (H&B) | TDIT004274–TDIT004278 |
| 151 | Invoice - G.K. Management Limited | TDIT011038–TDIT011039 |
| 152 | Invoice - G.K. Management Limited | TDIT011040 |
| 153 | Invoice - G.K. Management Limited | TDIT011041 |
| 154 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011058–TDIT011062 |
| 155 | Certificate of Incorporation - Highland Kansas City Foundation, Inc. | TDIT003304–TDIT003306 |
| 156 | Certificate of Incorporation - Highland Dallas Foundation, Inc. | TDIT003326–TDIT003328 |
| 157 | Certificate of Incorporation - Highland Santa Barbara Foundation, Inc. | TDIT003344–TDIT003346 |
| 158 | Invoice - G.K. Management Limited | TDIT011042–TDIT011043 |
| 159 | Invoice - G.K. Management Limited | TDIT011044–TDIT011045 |
| 160 | Invoice - G.K. Management Limited | TDIT011046–TDIT011047 |
| 161 | Invoice - G.K. Management Limited | TDIT011048–TDIT011049 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 162 | Invoice - G.K. Management Limited | TDIT011050–TDIT011051 |
| 163 | Invoice - G.K. Management Limited | TDIT011052–TDIT011053 |
| 164 | Invoice - G.K. Management Limited | TDIT011054–TDIT011055 |
| 165 | Expense Reimbursement - G.K. Management Limited | TDIT011056–TDIT011057 |
| 166 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011088–TDIT011092 |
| 167 | Memorandum – Work Plan - Shields Legal Group | TDIT004699–TDIT004706 |
| 168 | Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT011093–TDIT011128 |
| 169 | Email - Shields Legal Group | TDIT003704 |
| 170 | Limited Partnership Agreement - Charitable DAF Fund, LP | TDIT003414–TDIT003431 |
| 171 | ValueScope Report - ValueScope, Inc. | TDIT004017–TDIT004075 |
| 172 | Expense Report - CLO HoldCo, Ltd. | TDIT003432–TDIT003435 |
| 173 | Audited Financial Statements - Highland Santa Barbara Foundation, Inc. | TDIT003989–TDIT004016 |
| 174 | Resolution of the Directors - Mark Patrick | TDIT003961–TDIT003962 |
| 175 | Resolution of the Directors - Mark Patrick | TDIT003963–TDIT003970 |
| 176 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011129–TDIT011136 |
| 177 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011137–TDIT011150 |
| 178 | Letter - Highland Dallas Foundation, Inc. | TDIT003707–TDIT003708 |
| 179 | Email - Paul Murphy | TDIT003709–TDIT003713 |
| 180 | Email - Walkers | TDIT003714–TDIT003719 |
| 181 | Certificate of Incorporation - DFW Charitable Foundation | TDIT003701–TDIT003703 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 182 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011151–TDIT011164 |
| 183 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011165–TDIT011170 |
| 184 | Resolution - Charitable DAF HoldCo, Ltd. | TDIT003720–TDIT003726 |
| 185 | Assignment - Charitable DAF HoldCo, Ltd. | TDIT003727–TDIT003732 |
| 186 | Agreement - CDMCFAD, LLC | TDIT003733–TDIT003760 |
| 187 | Email - David N. Corkern | TDIT003791–TDIT003792 |
| 188 | ValueScope Report - ValueScope, LLC | TDIT004076–TDIT004130 |
| 189 | Draft Legal Advice - Walkers | TDIT003761–TDIT003765 |
| 190 | Share Issuance Resolution - Charitable DAF HoldCo, Ltd. | TDIT003766–TDIT003790 |
| 191 | Email - PricewaterhouseCoopers (PwC) | TDIT004305–TDIT004323 |
| 192 | Memorandum and Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT003267–TDIT003303 |
| 193 | Form ADV - Rand Advisors, LLC | TDIT003646–TDIT003674 |
| 194 | Brochure - Rand Advisors, LLC | TDIT003675–TDIT003700 |
| 195 | Email - Mark Patrick | TDIT004324–TDIT004340 |
| 196 | ValueScope Report - ValueScope, LLC | TDIT004131–TDIT004205 |
| 197 | Email - FTI Consulting | TDIT004341–TDIT004358 |
| 198 | Director Services Agreement - CDMCFAD, LLC | TDIT011171–TDIT011185 |
| 199 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003955–TDIT003957 |
| 200 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003958–TDIT003959 |
| 201 | Prospectus - NexPoint Real Estate Strategies Fund | TDIT003463–TDIT003599 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 202 | Proxy Statement - NexPoint Capital, Inc. | TDIT003440–TDIT003462 |
| 203 | Written Resolution - CLO HoldCo, Ltd. | TDIT011196–TDIT011197 |
| 204 | Texas Petition - Highland Dallas Foundation, Inc. | TDIT004443–TDIT004688 |
| 205 | Rule 11 Agreement - Highland Dallas Foundation, Inc. | TDIT004693–TDIT004695 |
| 206 | Exhibit Index to Affidavit - Margot MacInnis | TDIT003261-TDIT004712 |
| 207 | Affidavit - Jim Dondero Dugaboy Investment Trust | TDIT004713-TDIT004778 |
| 208 | Texas Petition (Amended) - Highland Dallas Foundation, Inc. | TDIT006527–TDIT006580 |
| 209 | Liquidator's Certificate - Margot MacInnis (JOL) | TDIT006492 |
| 210 | Form ADV - Mark Patrick, Rand PE Fund | TDIT006581-TDIT006609 |
| 211 | Affidavit & Exhibit Index - Margot MacInnis | TDIT004967-TDIT006484 |
| 212 | Affidavit & Exhibit Index | TDIT006485-TDIT006580 |
| 213 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011394-TDIT011405 |
| 214 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011382-TDIT011393 |
| 215 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011425-TDIT011443 |
| 216 | Objection filed by Highland Dallas Foundation, Inc. Grant James Scott III | TDIT011444-TDIT011475 |
| 217 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011476-TDIT011509 |
| 218 | Supplemental Declaration - DFW Charitable Foundation CDMCFAD LLC | TDIT004869-TDIT004945 |
| 219 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) | TDIT006664-TDIT006675 |
| 220 | Affirmation by Mark Patrick | TDIT010529-TDIT010532 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 221 | Operating agreement between Highland Dallas Foundation, Inc. and The Dallas Foundation. | TDIT011406-TDIT011406 |
| 222 | Email exchange between Michael Stockham and Paul Murphy | TDIT010831-TDIT010840 |
| 223 | Form ADV Instructions - None | TDIT006628-TDIT006663 |
| 224 | Declaration by Caroline Maron | TDIT004846-TDIT004868 |
| 225 | Email from Louis M. Phillips requesting execution of two letters with attached documents | TDIT011318-TDIT011323 |
| 226 | Auditor's Report - Highland Capital Management L.P. | TDIT006610-TDIT006627 |
| 227 | Email chain from March 2025 | TDIT011407-TDIT011424 |
| 228 | Amended and Restated Limited Partnership Agreement - Atlas IDF LP | TDIT004779-TDIT004812 |
| 229 | Participation Agreement establishes the framework for Crown Global Life Insurance Ltd to purchase | TDIT004813-TDIT004845 |
| 230 | Investment Management Agreement - Rand PE Fund I | TDIT004946-TDIT004952 |
| 231 | Investment Management Agreement - Rand PE Fund I, L.P. | TDIT004953-TDIT004959 |
| 232 | Limited Partnership Agreement - Rand PE Fund | TDIT004960-TDIT004966 |
| 233 | By-Laws - Highland Kansas City Foundation, Inc. | TDIT003307–TDIT003325 |
| 234 | By-Laws - Highland Dallas Foundation, Inc. | TDIT003329–TDIT003343 |
| 235 | By-Laws - Highland Santa Barbara Foundation, Inc. | TDIT003347–TDIT003361 |
| 236 | Organizational Procedures - Greater Kansas City Community Foundation | TDIT003362–TDIT003388 |
| 237 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003705 |
| 238 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003706 |
| 239 | Expenses Table - Charitable DAF HoldCo, Ltd. | TDIT003960 |
| 240 | Delaware Division of Corporations Search Results - DFW Charitable Foundation | TDIT004696 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 241 | Delaware Division of Corporations Search Results - CDMCFAD, LLC | TDIT004697 |
| 242 | Demonstrative: DAF-Rand Structure Chart | |
| 243 | Certificate of Incorporation of CDH GP, Ltd. | Dkt. 4-95 (25-11376-BLS) |
| 244 | April 27, 2025 Email Exchange Between Mark Patrick and Geoffrey Sykes | |
| 245 | 2024.12.04 - Murphy Presentation re Shareholders Rights | Dkt. 4-87 (25-11376-BLS) |
| 246 | Affirmation of Patrick ISO Motion to Dismiss | NYSCEF DOC. NO. 278 |
| 247 | 12.31.24 Rand PE Fund I Audit Schedules | |
| 248 | 2023 Annual Certification and Conflicts of Interest Disclosure | |
| 249 | 2023 Annual Compliance Training -Skyview Group Excerpt | |
| 250 | 2023.12.12 Skyview In Person | |
| 251 | 2024.10.2 DAF Termination of Skyview Services Agreement | |
| 252 | 2024.10.2 Patrick Resignation Letter | |
| 253 | Empower Dallas Foundation Director Consent 11.25.2025 | |
| 254 | Compliance Manual Excerpt - Insider Trading Policy | |
| 255 | DAF Structure Chart | |
| 256 | DAF Trustee Fees (1) | |
| 257 | DAF Trustee Fees (2) (1) | |
| 258 | DAF Trustee Fees (2) | |
| 259 | DAF Trustee Fees | |
| 260 | Dkt. 4 - MacInnis Dec - Ex. 57 | Dkt. 4-58 (25-11376-BLS) |
| 261 | Dkt. 4 - MacInnis Dec - Ex. 58 | Dkt. 4-59 (25-11376-BLS) |
| 262 | EDF Second Amended and Restated Bylaws 12.31.2024 (executed) | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 263 | Fwd EXTERNAL-Q3 2024 Charitable DAF Holdco Valuation | |
| 264 | HCM Dkt. 167 | 3:21-cv-00881-X Dkt. 167 |
| 265 | Highland 2547 (select exhibits) | Dkt. 2547 (19-34054-sgj11) |
| 266 | Letter from Atlas IDF GP, LLC - March 31, 2026 | |
| 267 | Mark Patrick 2021 W-2 | |
| 268 | Mark Patrick 2022 W-2 | |
| 269 | Mark Patrick 2023 W-2 Skyview Group | |
| 270 | Mark Patrick 2024 W-2 Skyview Group | |
| 271 | Mark Patrick Manager Evaluation 2022.pdf | |
| 272 | NHT (1) | |
| 273 | NHT Embedded Put Option Letter 06.29.2020 | |
| 274 | NHT on RL as of October 11, 2024 | |
| 275 | NHT | |
| 276 | Q1 2024 - Questionnaire and Transactions Certification | |
| 277 | Q2 2024 - Questionnaire and Transactions Certification | |
| 278 | Q4 2023 - Questionnaire and Transactions Certification | |
| 279 | Email regarding 2024 Foundation information request | |
| 280 | Email regarding DAF Trustee Fee | |
| 281 | Email regarding FW_ DAF Quarterly 3.31.22 | |
| 282 | Email regarding FW_ DAF Quarterly 3.31.22 | |
| 283 | Email regarding Management Agreements | |
| 284 | Email regarding NDA | |
| 285 | Email regarding Q1 2023 Trustee Fees | |
| 286 | Email regarding Q2 Valuation & Trustee Fees | |
| 287 | Email regarding Q2 Valuation & Trustee Fees | |
| 288 | Email regarding Q3 2021 Trustee Fees | |
| 289 | Email regarding Q4 2021 DAF Valuation Report & Trustee Fees | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 290 | Charitable DAF Fund, L.P. letter to SEC | |
| 291 | The Dallas Foundation and Affiliates Consolidated Financial Report Year Ended December 31, 2023 | |

Dugaboy also reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

Dated: May 18, 2026

Respectfully submitted,

*__/s/ Sydney Rose__*
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP

101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 18, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*<u>/s/ Syndey Rose</u>*
Sydney Rose

# EXHIBIT 246

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

UBS SECURITIES LLC and UBS AG LONDON BRANCH,

Petitioners,

v.

JAMES DONDERO, SCOTT ELLINGTON, HIGHLAND CDO HOLDING COMPANY, HIGHLAND CDO OPPORTUNITY MASTER FUND L.P., HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY, CLO HOLDCO, LTD., MAINSPRING LTD., and MONTAGE HOLDINGS, LTD.,

Respondents.

Index No. 650744/2023

**AFFIRMATION OF MARK PATRICK IN SUPPORT OF RESPONDENT CLO HOLDCO, LTD'S MOTION TO DISMISS PETITIONERS' <u>SPECIAL TURNOVER PETITION</u>**

I, Mark Patrick, as Director of CLO HoldCo, Ltd. ("CLOH"), hereby swears the following to be true under penalty of perjury:

1. I am over the age of eighteen and I am competent to make this Affirmation. I serve as a Director of CLOH, a Respondent in the above-referenced action, and I have held this position from April 2021 to present. The facts stated in this Affirmation are within my personal knowledge and are true and correct.

2. I reside in Dallas, Texas, and my business address is 2101 Cedar Springs Road, Suite 1200, Dallas, Texas 75201. I submit this Affirmation in support of CLOH's Motion to Dismiss (the "Motion") Petitioner's Special Turnover Petition (the "Petition").

3. CLOH was organized in 2010 as an exempt company under the laws of the Cayman Islands with its registered office in the Cayman Islands. CLOH's principal place of business is,

and has always been, located in the Cayman Islands. Aside from its Directors, CLOH has no other officers or employees. Instead, CLOH uses independent, third-party service providers to perform business functions that are not otherwise performed by its Directors. In 2010, when CLOH was first formed, CLOH used the services of employees of Highland Capital Management, LP ("HCM"), as described in more detail below. I was employed in HCM's tax department at that time, and I have personal knowledge concerning the organization of CLOH.

4. From CLOH's inception to April 2021, CLOH's sole Director was Grant J. Scott, who, at all relevant times, was a resident of North Carolina. Since April 2021, only Paul Murphy—who is a Cayman Islands resident—and I have served as Directors of CLOH.

5. CLOH is currently wholly owned by Charitable DAF Fund, L.P. ("DAF"), also a Cayman Islands entity. DAF is a charitable fund that helps fund several causes throughout the country, including veteran's welfare associations, women's shelters, public works, and education. CLOH's sole purpose is to provide funding to DAF to support DAF's charitable causes.

6. Mr. Dondero has never served as a director of CLOH, and Mr. Dondero has never owned any interest in CLOH.

7. My general understanding is that Highland CDO Holding Company ("CDO Holding") also had no employees and utilized third-party service providers at HCM to perform its business functions in the 2010 timeframe. This observation is based upon my personal knowledge at HCM.

8. In my former capacity within the tax department at HCM, I was involved in structuring the transaction at issue in the Petition whereby CLOH purchased assets (Collateralized Loan Obligations or "CLOs") from CDO Holding (the "Asset Purchase"). The purpose of the Asset Purchase was to secure significant tax benefits for CDO Holding's investors. Specifically, by

selling its assets to CLOH, phantom income was avoided. In exchange, CDO Holding had to relinquish its interest in these assets.

9. Thus, CLOH was created and CDO Holding sold assets to CLOH in exchange for $6,597,862 in cash and a promissory note issued by CLOH, as Maker, in the principal amount of $32,801,593, together with interest, made payable to CDO Holdings, as Payee (the "Note"). The Note was executed by CLOH's then-director, Grant J. Scott.

10. The Asset Purchase was effectuated by third-party service providers at HCM in its Dallas, Texas office, including me. On December 23, 2010, CLOH wired $6,597,862 to CDO Holding.

11. At the time of the Asset Purchase, CLOH was wholly owned by Highland Capital Management Partners Charitable Trust #2 ("CRT #2"), a non-profit entity qualified under the Internal Revenue Code. CRT #2 was independently controlled by its trustee, Grant Scott.

12. At no time relevant to the 2010 Asset Purchase was CLOH (or anyone affiliated with CLOH) physically present in New York or engaged in any activities in the State of New York related to the Asset Purchase. Rather, at all relevant times, CLOH's Director and third-party service providers were located in Texas, North Carolina, and/or the Cayman Islands.

13. Furthermore, at no time did CLOH direct anyone in New York to perform any act, transaction or other business activity in New York related to the Asset Purchase, including, but not limited to, negotiation of the transaction and execution of the Note. CLOH also did not engage in any negotiations with CDO Holding in New York concerning the Asset Purchase, nor did CLOH seek to direct CDO Holding to engage in any conduct in New York concerning the Asset Purchase.

14. CLOH has not regularly conducted or solicited any transaction or business activities, or engaged in any other course of conduct, or derived substantial revenue from goods

used or services rendered, in the state of New York. CLOH's only business involves purchasing and selling securities on the open market, and then using the gains from those sales to ultimately support charities located primarily in Texas, California, and Missouri. Furthermore, none of CLOH's records, files, or witnesses are located in New York, CLOH does not operate its business in New York, and CLOH does not have any employees in New York.

I affirm this 16th day of February, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

MARK PATRICK

3147931

# EXHIBIT 248

| CERTIFICATION | EMPLOYEE | CERTIFICATION PERIOD | CERTIFICATION DUE DATE | COMPLETED DATE | STATUS |
|---|---|---|---|---|---|
| 2023 Annual Certification and Conflicts of Interest Disclosure | Mark Patrick | January 1, 2023 - December 31, 2023 | January 26, 2024 | January 12, 2024 | Complete |

## Certification Instructions

Please answer all questions below and certify that your holdings, as of 12/31/2023, are correct. If any information is missing or otherwise incorrect, then please contact Compliance before attesting to this form.

1. Do you currently conduct any outside business activities? *

Yes

Please provide a detailed explanation *

Mangement of Charitable DAF Fund, L.P. and its subsidiaries and ownership entities.

2. Do you or any of your immediate family members serve on the Board of Directors, Credit Committee, Advisory Board of, act as a Trustee, Officer, Director, Senior Executive of, or hold any position or have any business relationship with a publicly or privately traded entity? *

No

3. Are any of your immediate family members employed by a financial services business, broker/dealer, investment adviser, fund administrator or other private investment vehicle (i.e. hedge fund, private equity firm, etc.)?*

No

4. Have you received any gifts or participated in any entertainment events during the past year which were outside the scope of the Gifts and Entertainment Policy? *

No

5. Did you or your spouse make any political contributions over the amount of $350 for a local candidate that you can vote for, $150 for a local candidate that you cannot vote for, or $2,700 for a federal candidate which were not disclosed to Compliance? *

No

6. Do you hold any professional certifications currently? *

Yes

Please provide a detailed explanation *

Texas and Florida bar license

7. Are there any other existing or potential conflicts of interest as they relate to your employment with the firm?*

No

8. Did you invest in or hold any private offerings or funds in 2023?*

No

9. In the past year, have you conducted business communications via non-Company approved systems such as text message?*

No

10. I hereby certify that the below is a complete and accurate record of all of my holdings as of December 31, 2023.*

Yes

HOLDINGS

CERTIFIED

| Account Provider | Account # | Security Name | Security Description | Quantity | Price |
|---|---|---|---|---|---|
| Charles Schwab | 74422160 | CIBR | First Trust NASDAQ Cybersec | 680 | 54.14 |
| Charles Schwab | 74422160 | HACK | ETFMG Prime Cyber Security | 628 | 61.31 |
| Charles Schwab | 74422160 | IHAK | iShares Cybersecurity & Tec | 960 | 45.58 |
| Vanguard | 21373832 | VFMXX | Vanguard Federal Money M | 63.55 | 1 |
| Vanguard | 21373832 | 50047H201 | Kona Grill Inc | 9479 | 0.0394 |
| Vanguard | 66936322 | 50047H201 | Kona Grill Inc | 500 | 0.0394 |
| Charles Schwab | 86034385 | XLF | Financial Select Sector SPDF | 750 | 37.81 |

CERTIFIED

☑ I hereby certify that I have disclosed all existing and potential conflicts of interest, for which I am aware, as they relate to my employment with the firm. Should any additional conflicts of interest arise, I agree to promptly notify the Chief Compliance Officer. I also certify that I have read, understood and will continue to comply with the most current version, as provided on the firm's intranet, of the Compliance Manual, Code of Ethics and Privacy Policy. I have received, have access to, and have read a copy of the Employee Handbook (the "Handbook") and I am in compliance with the obligations applicable to employees set forth therein. I understand it is my responsibility to read the Handbook and to bring any questions I may have about its provisions to my supervisor, Human Resources, or an appropriate member of senior management prior to signing this acknowledgment. I further understand that if I do not abide by the policies and procedures outlined in the Handbook that my actions might result in the termination of my employment. I understand that the firm may change, modify, amend, add to or subtract from any or all of the contents of this Handbook at any time, in its sole discretion, and with or without notice, and that the current Handbook replaces and supersedes any previous Handbooks that I have received or that have been issued by the firm. I understand and acknowledge that my employment is at-will, and nothing contained in the Handbook in any way alters the at-will employment relationship between the firm and me and I acknowledge and agree that the firm has not made any statements altering the at-will nature of employment, and has not made guarantees or promises of continuing employment. *

# EXHIBIT 249

# Insider Trading

- Trading while in possession of material non-public information ("MNPI").
- Communicating MNPI to others (tipping)
- **What is material?**
  - Material information is information that a reasonable investor would consider important in making an investment decision.
  - Information that should be considered material includes, but is not limited to, dividend changes, earnings estimates, changes in previously released earnings estimates, significant merger or acquisition proposals or agreements, major litigation problems, antitrust charges, labor disputes, pending large commercial or government contracts, major new products or services, significant shifts in operating or financial circumstances (such as major write-offs and strikes at major plants) and extraordinary management developments (such as key personnel changes).
- **Poison One, Poison All**
  - If MNPI is given or communicated to one person, then it poisons the entire firm.
  - It does not matter if you have not communicated it to others.
- Can the MNPI "go stale"?
  - Our policy is after six months have passed from the original receipt of the MNPI the information is generally considered "stale", subject to any specific facts/circumstances that preserve materiality.
- Penalties
  - Civil liability, disgorgement of profits, fines of 3x profit, jail sentence
  - DOJ and SEC each have jurisdiction to bring insider trading cases, which are often brought simultaneously.

# EXHIBIT 250

| MEETING SIGN-IN SHEET | | | |
|---|---|---|---|
| **Project:** | Skyview Annual Compliance Training | **Meeting Date:** | December 12, 2023 |
| **Facilitator:** | Compliance Team (Stephanie Vitiello, Lauren Fetty, Mark Nguyen) | **Place/Room:** | Skyview Office |

| **Printed Name** | **Signature** |
|---|---|
| Moriah Matthews | [signature] |
| Kaylynn McKool | [signature] |
| Steven Halton | [signature] |
| Mark Patrick | [signature] |
| Kari Kovela | [signature] |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| MEETING SIGN-IN SHEET | | | |
|---|---|---|---|
| **Project:** | Skyview Annual Compliance Training | **Meeting Date:** | December 12, 2023 |
| **Facilitator:** | Compliance Team (Stephanie Vitiello, Lauren Fetty, Mark Nguyen) | **Place/Room:** | Skyview Office |

| **Printed Name** | **Signature** |
|---|---|
| Deborah Cole | [signature] |
| Mark Nguyen | [signature] |
| Matthew Kern | [signature] |
| Heather Falgout | [signature] |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| MEETING SIGN-IN SHEET | | | |
|---|---|---|---|
| **Project:** | Skyview Annual Compliance Training | **Meeting Date:** | December 12, 2023 |
| **Facilitator:** | Compliance Team (Stephanie Vitiello, Lauren Fetty, Mark Nguyen) | **Place/Room:** | Skyview Office |

| Printed Name | Signature |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# EXHIBIT 251

October 2, 2024

**Via Email and FedEx:**
Highgate Consulting Group, Inc. d/b/a Skyview Group
Skyview Group
3839 McKinney Avenue
Suite 155 PMB2484
Dallas, TX 75204

Attention: Legal Department
Email: legal@skyviewgroup.com

**With Copy to:**
Highgate Consulting Group, Inc. d/b/a Skyview Group
Skyview Group
2101 Cedar Springs Road
Suite 1200
Dallas, TX 75201
Email: legal@skyviewgroup.com

**With Copy to**:
Email: sellington@skyviewgroup.com

**With Copy to**:
Email: fwaterhouse@skyviewgroup.com

RE: Services Agreement dated effective April 1, 2021

To whom it may concern:

This letter serves as notice that Charitable DAF Fund, L.P. ("**DAF**") terminates the Services Agreement dated effective April 1, 2021 (the "**Agreement**") by and between Highgate Consulting Group, Inc. ("**Skyview**") and DAF. Pursuant to Section 6.02 of the Agreement, termination is effective for any party by providing written notice of non-renewal at least one-hundred-eighty days prior to the last day of the then-current term.

As a reminder, and for the avoidance of doubt, we are relying on Skyview's continued adherence to the confidentiality and non-disclosure restrictions contained in Section 5.04 of the Agreement with respect to discussions of our intent to terminate.

Pursuant to Section 6.02 of the Agreement, DAF wired Skyview the estimated Services Payment (as defined in the Agreement) in the amount of $500,000, which wire has been confirmed by the bank.

[*the remainder of this page is intentionally left blank*]

Signed,

**CHARITABLE DAF FUND, L.P., a Cayman Islands limited partnership**

Charitable DAF Fund, L.P.
By: CDH GP, Ltd., its general partner
By: Mark Patrick, its Director and authorized representative and Director of each subsidiary
Address for acceptance and electronic signature: mpatricktax1040@gmail.com

# EXHIBIT 252

# Resignation Letter

October 2, 2024

**Via Email (sellington@skyviewgroup.com) and FedEx**

Skyview Group
c/o Scott Ellington
2101 Cedar Springs Road
Suite 1200
Dallas, Texas 75201

Dear Scott:

Please accept this letter as my formal notice of resignation as an employee from Skyview Group, effective immediately. The associations I've made during my employment here will truly be memorable for years to come.

Thank you very much for the opportunity to work here.

Sincerely,

Mark Patrick, Managing Director

Cc: legal@skyviewgroup.com
Jsevilla@skyviewgroup.com
fwaterhouse@skyviewgroup.com

# EXHIBIT 253

**EMPOWER DALLAS FOUNDATION, INC.**

**Unanimous Written Consent of Directors**
**In Lieu of Meeting**

THE UNDERSIGNED, being all of the directors of Empower Dallas, Inc. ("Foundation"), a Delaware nonprofit nonstock corporation, do hereby consent to the adoption of, and do hereby adopt, the following resolutions pursuant to Section **141(f)** of the General Corporation Law of the State of Delaware, and hereby direct that this Written Consent be filed with the minutes of the proceedings of the Board of Directors of the Foundation, effective as of November 25, 2025 ("Effective Date"):

WHEREAS, the Foundation is the policyholder and sole beneficiary of that certain Deferred Variable Annuity Policy, Policy Number 30218 (the "Policy"), issued by Crown Global Life Insurance Ltd., a Bermuda exempted company ("Crown");

WHEREAS, the Board of Directors desire to have the Foundation request a partial surrender of the Policy in the amount of $8,000,000.00 ("Partial Surrender Request");

NOW, THEREFORE, be it hereby

RESOLVED, that the Board of Directors of the Foundation hereby approve the issuance of the Partial Surrender Request to Crown pursuant to Article VIII of the Policy;

FURTHER RESOLVED, that the officers of the Foundation are hereby authorized to execute and deliver such documents, and to take such other actions, as are appropriate to implement the purposes of the foregoing resolution, with such additional terms and conditions, consistent therewith, as may be approved by such officers; and

FURTHER RESOLVED, that this Written Consent may be validly executed by electronic means to the fullest extent permitted by Delaware law.

IN WITNESS WHEREOF, the undersigned, being all of the directors of the Foundation, have caused this Unanimous Written Consent to be executed as of the Effective Date.

[remainder of page intentionally left blank]

Signed by:
8C324EA989434F3...

Julie Diaz, President

Signed by:
Torrey Littleton
C8A401EBDDC94A5...

Torrey Littleton, Treasurer

Case 3:26-cv-02496-D Document 17-36 Filed 09/08/26 Page 66 of 451 PageID 16780

# EXHIBIT 254

underlying security or options covering 10,000 shares or more of such security. In the case of a thinly traded security, fewer than 10,000 shares may constitute a block transaction.

## Prohibition Against Insider Trading

### General

The Company forbids any Employee from trading, either personally or on behalf of others, including registered investment companies, private investment funds and private accounts advised by the Company, on material non-public information or communicating material non-public information to others in violation of the law. This conduct is frequently referred to as "insider trading." The Company's policy extends to activities within and outside each person's duties at the Company.

The term "insider trading" is not defined in the federal securities laws, but generally is used to refer to the use of material non-public information to trade in securities (whether or not one is an "insider") or to communications of material non-public information to others.

While the law concerning insider trading is not static, it is generally understood that the law prohibits:

(i) Trading by an insider while in possession of material non-public information;

(ii) Trading by a non-insider while in possession of material non-public information, where the information either was disclosed to the non-insider in violation of an insider's duty to keep it confidential or was misappropriated; or

(iii) Communicating material non-public information to others.

### Insider Trading

The elements of insider trading and the penalties for such unlawful conduct are discussed below. If Employees have any questions, they should consult the Chief Compliance Officer.

### Who is an Insider?

The concept of who is an "insider" is broad. It includes generally officers, directors and employees of a company. In addition, a person can become a "temporary insider" if he or she enters into a special confidential relationship in the conduct of a company's affairs and, as a result, is given access to information solely for the company's purposes. A temporary insider can include, among others, a company's attorneys, accountants, consultants, agents, bank lending officers, and certain employees of such organizations. In addition, although it is unlikely to occur in the normal conduct of its business, the Company or an Employee could

become a temporary insider of a company it advises or for which it performs other services. According to the U.S. Supreme Court, the company must expect an outsider to keep the disclosed non-public information confidential and the relationship must at least imply such a duty before the outsider will be considered an insider.

## What is Material Information?

Trading on inside information is not a basis for liability unless the information is material. "Material information" is defined generally as information for which there is a substantial likelihood that a reasonable investor would consider it important in making his or her investment decisions, or information that is reasonably certain to have a substantial effect on the price of a Company's securities. Information that should be considered material includes, but is not limited to, dividend changes, earnings estimates, changes in previously released earnings estimates, significant merger or acquisition proposals or agreements, major litigation problems, antitrust charges, labor disputes, pending large commercial or government contracts, major new products or services, significant shifts in operating or financial circumstances (such as major write-offs and strikes at major plants) and extraordinary management developments (such as key personnel changes).

## What is Non-Public Information?

Information is non-public until it has been effectively communicated to the market place. One must be able to point to some fact to show that the information is generally public. For example, information found in a report filed with the SEC, or appearing in Dow Jones, Reuters Economic Services, The Wall Street Journal or other publications of general circulation would be considered public.

## Penalties for Insider Trading

Penalties for trading on or communicating material non-public information are severe, both for individuals involved in such unlawful conduct and their employers. A person can be subject to some or all of the penalties below even if he or she does not personally benefit from the violation. Penalties include:

(i) civil injunctions;

(ii) disgorgement of profits;

(iii) jail sentences;

(iv) fines for the person who committed the violation of up to three times the profit gained or loss avoided, whether or not the person actually benefited; and

(v) fines for the employer or other controlling person of up to the greater of $1,000,000 or three times the amount of the profit gained or loss avoided.

In addition, violations can be expected to result in serious sanctions by the Company, detailed in the Sanction Provisions section in this Policy, potentially including dismissal of the person(s) involved.

**Procedures to Detect and Prevent Insider Trading**

The following procedures have been established to aid Employees in avoiding insider trading, and to aid the Company in preventing, detecting and imposing sanctions against individuals for insider trading. Each Employee must follow these procedures or risk serious sanctions, including dismissal, substantial personal liability and criminal penalties.

**Identifying Inside Information**

Before trading for yourself or others, including any Client Account, in the securities of a Company about which you may have potential inside information, ask yourself the following questions:

(i) Is the information material? Is this information that an investor would consider important in making his or her investment decisions? Is this information that would substantially affect the market price of the securities if disclosed?

(ii) Is the information non-public? To whom has this information been provided? Has the information been effectively communicated to the marketplace by appearing in publications of general circulation? Is the information already available to a significant number of other traders in the market?

If after consideration of the foregoing you believe that the information is material and non-public, or if you have questions as to whether the information is material and non-public, you should take the following steps:

(i) Report the matter immediately to the Chief Compliance Officer.

(ii) Do not purchase or sell the securities on behalf of yourself or others, including any Client Account.

(iii) Do not communicate the information within or outside of the Company other than to the Chief Compliance Officer.

## Client Account Trading

In connection with Company investments, certain Employees may gain access to material, non-public information relating to the applicable borrower or issuer. In such cases, the applicable borrower or issuer will be placed on the Company's Restricted List discussed below. In addition, in connection with investments, the Company will often enter into a confidentiality agreement relating to information that it may receive. It is the Company's general policy that all companies who are the subject of a confidentiality agreement will be placed on the Company's Restricted List. An example of a circumstance where the Company may agree to a confidentiality agreement or undertaking and not place the subject company on the Company's Restricted List is when the Company is required to agree to a confidentiality undertaking as a condition precedent to the access of information that is expressly designated as "public side" information on intralinks/syndtrak/debt domain or similarly situated service providers. Notwithstanding the foregoing, should any employee believe information so designated as "public side" does in fact constitute material non-public information, the subject company should either immediately be added to the Company's Restricted List or, if such determination is unclear, the CCO should be consulted for further guidance as to whether restriction is necessary.

Subject to the foregoing, prior to a confidentiality agreement being executed and an issuer being placed on the internal Company restricted list, an email should be circulated by the investment professional or his/her designee to an internal restricted list, which comprises members of investments, notifying his/her intention to become restricted in an issuer. This notification will provide members of the firm time to opine or reject the execution of the confidentiality agreement. After a period of 24 hours has passed and if there are no objections received, the issuer will be placed on the Company's restricted list. Each proposed confidentiality agreement shall be emailed to the Company's Legal department for review, prior to execution.

## Restricting Access to Material Non-Public Information

Information in your possession that you identify as material and non-public may not be communicated to anyone, including any person within the Company other than those persons who need to know such information in order to perform their job responsibilities at the Company. In addition, care should be taken to keep the information secure. For example, memos, reports, correspondence or files containing the information should be restricted.

## Resolving Insider Trading Issues

If, after consideration of the provisions of this Code of Ethics, you have questions as to whether information is material or non-public, the propriety of any action, or about the foregoing procedures, please contact the Legal/Compliance Department to discuss your questions before trading or communicating the information to anyone.

**Restricted Lists**

Prior to voluntarily receiving any private-side or otherwise non-public information regarding any issuer (regardless of whether it is currently owned by the Company or any Client Account, but particularly if the Company is analyzing or recommending securities for Client transactions) in any form (oral, written, electronic, etc.) or in any manner (by conversation, by accessing private-side information on intralinks/syndtrak/debt domain, by fax, by e-mail, by confidentiality agreement, etc.), Employees should email restrictedlist@nexpoint.com requesting permission for the issuer to become restricted. This email is intended to put all relevant parties on notice of the potential restriction. Please include in your email the issuer name and whether or not the issuer has public securities. Also, please indicate the anticipated length of the restriction (Note: for confidentiality agreements, this period is assumed to be the term of the agreement, absent CCO approval of a shorter period). Each analyst is responsible for notifying the Compliance Department immediately when the name of an issuer he or she monitors changes.

After receipt of the email notification, recipients of the restricted list request are generally provided 24 hours to object to the request to become restricted. If an objection is received, the relevant portfolio managers and other Employees should discuss the matter with Compliance to determine whether we will proceed with receiving the private information and become restricted. Note that electronic confidentiality undertakings associated with electronic public-side only information do not require an addition to the Restricted List unless MNPI is specifically identified on such site (Intralinks, Syndtrak, Debt Domain, etc.); however, when we expressly indicate access limited to public-side information via the above referenced electronic forums, we generally do not restrict the issuer but investment personnel are subject to an ongoing obligation to immediately report to Compliance if they believe any MNPI is contained in such public-side information. If MNPI is identified, such issuer must immediately be added to the Restricted List.

Notwithstanding anything in this Policy to the contrary, if an Employee of the Company receives or otherwise is in possession of material, non-public information with respect to an issuer, there is no applicable waiting period and the Employee receiving the information must immediately notify the Compliance Department via restrictedlist@nexpoint.com to immediately add the issuer to the Restricted List. Specific instances where an issuer must immediately be added to the Company's Restricted List include, but are not limited to, the following:

- In the event NexPoint has a representative or observer on the Board of Directors of an issuer, the employee appointed or the portfolio manager responsible for the issuer must also immediately submit a Restricted List request for such issuer.

- In the event any NexPoint personnel becomes aware that any NexPoint portfolio company in respect of which NexPoint has a board designee or observer rights is (i) entering into or has entered into a confidentiality or non-disclosure agreement with respect to an M&A transaction, the counterparties (e.g., the acquiring, merging or target company) should be immediately placed on the Restricted List; or (ii) presenting any other transaction to the board of such portfolio company for approval, then the facts and circumstances regarding such transaction shall be immediately communicated to the CCO for a determination as to whether the Company needs to add one or more parties to the transaction to the Company's Restricted List.

Any questions regarding whether we are in possession of material non-public information or whether we need to add an issuer to the Restricted List must be brought to the immediate attention of the CCO for a determination. The CCO may, but is not required to, consult legal counsel for further guidance in making such a determination.

Exceptions to this policy can only be granted with express Compliance Approval upon a showing that none of the information in the possession of the Company constitutes material non-public information. The Compliance Department also has discretion to place an issuer on the Restricted List even though no Employee has or is expected to receive any material, non-public information about the issuer. Such action may be taken for the purpose of avoiding any appearance of the misuse of material, non-public information. When an issuer is placed on the Restricted List, all Employees are prohibited from personal trading in securities of those issuers. In addition, no trades in Client Accounts may be made in securities of an issuer on the Restricted List until the Compliance Department makes a determination as provided below.

In the event that the Company desires to engage in a securities transaction relating to an issuer that is listed on the Restricted List, the Chief Compliance Officer will consider all relevant factors, which may include: (i) whether the proposed transaction involves a security, (ii) the circumstances surrounding the placement of such issuer on the Restricted List, (iii) the extent to which any Employee may have material, non-public information, (iv) whether the counterparty to the transaction has access to the same information, and (v) whether the counterparty is entering into customary "big-boy"/non-reliance representations. The Chief Compliance Officer will then determine whether such factors prevent the Company from engaging in such security transaction. All such determinations will be made on a case-by-case basis and may be made in conjunction with advice from internal and/or external legal counsel. The Legal/Compliance Department may condition its determination on the Portfolio Manager providing a certification affirming that, as of such trade date, he or she does not possess any material, non-public information relating to such issuer. In addition, in certain circumstances the Chief Compliance Officer may authorize one or more groups to trade while the firm is in possession of material nonpublic information, subject to appropriate ethical

walls determined by the Chief Compliance Officer following consultation with any internal and/or external legal counsel that the Chief Compliance Officer may deem appropriate, being imposed that insulate the authorized groups from the information otherwise in possession of the firm.

All confidentiality or non-disclosure agreements must be reviewed by a member of the Company's legal department prior to execution, other than standard electronic confidentiality undertakings on intralinks/syndtrak/debt domain or similarly situated service providers.

There are two processes to remove an issuer from the Restricted List:

- Process A: Restricted List Expiration
    - Five days prior to the issuer's expiration date a computer-generated email reminder will be sent to the Portfolio Managers listed on the Restricted List as well as to the Compliance Department.
    - The issuer will be removed from the Restricted List upon the expiration date if the Portfolio Managers affirmatively indicate to the Compliance Department that the issuer should be removed.
- Process B: Removal Prior to Expiration
    - For removals that are prior to the Restricted List expiration date, send an email to the Compliance Department confirming the basis for why we no longer have material non-public information.
    - Compliance will only remove a particular issuer from the Restricted List with Chief Compliance Officer approval following review of the relevant facts and circumstances, as described above.

The only persons who are authorized to remove issuers from the Restricted List are members of the Compliance Department.

## Wall Crossing

If a representative from an issuer, sponsor, bank, dealer, or any other source (the "Issuer Representative") contacts any NexPoint or its affiliates' employee wishing to disclose MNPI usually in connection with a potential unannounced transaction (a "Wall Crossing"), the NexPoint employee must direct the Issuer Representative to share the issuer's name with the Compliance Department by emailing compliance@nexpoint.com in order to clear the issuer before restricting it. However please note, a restriction can potentially occur even

where information is shared on a no names basis if sufficient information about the issuer and the transaction are shared such that a NexPoint employee is able to determine the identity of the issuer. For this reason, it is important that Wall Crossings be directed to the Compliance Department to avoid this risk.

Following the email by the Issuer Representative to the Compliance Department, Compliance will determine if NexPoint holds a position in the issuer, if the issuer is already on the Restricted List, or if the name is under consideration by a different team. During this process, the investment team member requesting the Wall Crossing may decline the Wall Crossing by notifying Compliance and the Issuer Representative immediately. However, if the Issuer Representative shares the name of the issuer and/or other MNPI to the investment team after Compliance directs the Issuer Representative to send such information (subsequent to Compliance determining that NexPoint does not hold a position, is not currently restricted, and is not considering the name), the name of the issuer and other affected entities, as applicable, will be added to NexPoint's Restricted List. Once the investment team member learns of the issuer's name and/or other MNPI, the Wall Crossing can no longer be declined and the issuer, and applicable entities, must be added to the Restricted List.

If NexPoint has an existing position, Compliance may discuss with a member of the investment team, without revealing MNPI, if possible, to determine if NexPoint is willing to become restricted. Compliance will discuss the transaction and the issuer in generic terms to avoid disclosing specifics which could indirectly reveal private information or the identity of the issuer, resulting in a restriction. This policy is subject to change depending on the volume of Wall Crossings.

To remove a Wall Crossed issuer from the Restricted List, an investment team member shall email Compliance detailed information of the cleansing event, such as a press release or other evidence that NexPoint no longer has MNPI, and once reviewed, Compliance will remove the Wall Crossed issuer from the Restricted List immediately and notify the investment team.

<u>Steps</u>:

1. If an Issuer Representative wants to disclose MNPI to NexPoint's investment team, the relevant NexPoint investment team member must direct the Issuer Representative to email Compliance at compliance@nexpoint.com the name of the issuer.

    a. During this process, the investment team member requesting the Wall Crossing may decline the Wall Crossing by notifying Compliance and the Issuer Representative immediately. However, if the investment team member fails to decline the Wall Crossing prior to learning the issuer's name and/or

other MNPI, the issuer, and applicable entities, must be added to the Restricted List.

2. Compliance will check to determine if NexPoint currently holds a position in the issuer or if the issuer is on the Restricted List, and may reach out to different members of the investment team to determine if the issuer is under consideration.

    a. If the issuer is not already a NexPoint holding, on the Restricted List, or being considered, Compliance will notify the Issuer Representative that they are clear to share the MNPI. Once the Issuer Representative shares the name of the issuer and/or other MNPI to the investment team, the issuer will be added to the Restricted List immediately.

    b. If the issuer is a NexPoint holding, on the Restricted List, or is being considered, Compliance will discuss with the relevant investment team members if they are willing to become restricted.

        i. If becoming restricted is approved, Compliance will notify the Issuer Representative that they are clear to share the MNPI.

        ii. If becoming restricted is denied, Compliance will notify the Issuer Representative that the Wall Crossing is denied.

3. To remove a Wall Crossed issuer from the Restricted List, an investment team member shall email compliance detailed information of the cleansing event, such as a press release or other evidence that NexPoint no longer has MNPI, and once reviewed, Compliance will remove the Wall Crossed issuer from the Restricted List immediately and notify the investment team.

## Personal Trading Policy

*Policy Overview*

The purpose of this policy regarding employee personal trading is to ensure that employee's personal trading activity complies with applicable laws and regulations and is carried out in a manner consistent with Company policy. The Company has an obligation to monitor employee personal trading to ensure that all trades meet the requirements set forth in this policy and that all personal trading transactions must avoid even the appearance of a conflict of interest. (For additional information regarding the Personal Trading Policy, including the list of approved brokerage firms, please see Employee Trading Policy).

# EXHIBIT 255

# DAF Structure Chart




Updated 2.14.2022

I, Mark Patrick, Director of CLO HoldCo, Ltd., attest this structure chart to be complete organizational structure of CLO HoldCo, Ltd.

Mark Patrick, Director Dated May 26, 2022

# EXHIBIT 260

# EXHIBIT 57

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY**

**MADE ON 13th September 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions.

**1. REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK.**

1.1 **NOTED THAT:**

(a) Since 24 March 2021, Mr. Mark Patrick has been appointed as President, Chief Investment Officer and General Counsel of the Company, and appointed as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(b) In or about March 2024, the Company, including Charitable DAF Fund LP, engaged Mercer LLP to conduct an independent compensation review of Mr. Mark Patrick's duties as President, Chief Investment Officer and General Counsel of the Company, and as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(c) Mercer LLP prepared an independent report dated 26 August 2024 ("Mercer Report") which contains a summary of Mr. Patrick's roles and responsibilities and their methodology for calculating market comparables. At page 5 of that report, Mercer recommended that Mr Patrick's compensation be structured as follows:

a. Base salary: USD $850,000 or USD $750,000 if general partner liability insurance can be acquired to mitigate Mr Patrick's personal risk exposure.

b. Long-term incentive ("LTI") tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(d) The Mercer report raised two issue for the Company to consider::

a. Whether performance for the LTI compensation be calculated based on 2021 performance or start for the 2022 cycle; and

b. Whether the LTI calculation should be calculated net of all Company expenses or new of fund expenses only.

(e) On 12th September 2024, Mr. Paul Murphy, a co-director of the Company, spoke to Heidi O'Brien, a Partner at Mercer, to discuss the issues identified in 1, 1.1 (d) a. and b. Following this conversation and based on the fact that (i) Ms. O'Brien confirmed that it was not uncommon for similar companies to award employees for the complete fiscal year when starting part way through the year, and (ii) Mr. Patrick was appointed in March 2021, the Directors have concluded that Mr. Patrick's LTI compensation should be calculated on the basis of the 2021 cycle.

(f) In addition, the Directors have concluded that the Company should assess the legal expenses

attributable to investments which impact the LTI compensation and, after that assessment, determine whether the LTI compensation should be increased.

(g) Based on the knowledge of the Directors of Mr. Patrick's roles and responsibilities, the Mercer LLP report and fact that Mr. Patrick is considered a key employee, the Directors have concluded that Mr. Patrick's compensation should be set in accordance with the recommendation in the Mercer report with the additional caveat that Mercer identified that CEOs and CIOs are often compensated on the basis of a base salary, annual incentive and LTI and an annual incentive is not included in the Mercer report. The Directors have concluded that it is in the Company's interest to determine whether an annual incentive should also be included as part of Mr. Patrick's compensation and, if so, how this is to be assessed.

(h) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

1.2 **IT IS RESOLVED** by unanimous written resolution that:

(a) Mr. Patrick's compensation be fixed, in accordance with recommendation of the Mercer LLP report, as follows:

a. Base salary: USD $850,000, provided that, 100% of the base salary for calendar year 2024 may be paid on or about the date of these resolutions.

b. Long-term incentive tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return), less any amounts previously advanced to Mr. Patrick.

(b) The Directors will assess:

a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

Executed by the Directors comprising the entire Board of Directors of the Company:

**BY** ______________________
Paul Murphy - Director
CHARITABLE DAF HOLDCO, LTD.

**BY** ______________________
Mark Patrick - Director
CHARITABLE DAF HOLDCO, LTD.

# EXHIBIT 261

# EXHIBIT 58

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY**

**MADE ON 1 October 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions. Any capitalized terms not defined herein are taken from the Directors' Resolution dated 12th September 2024.

**1. ESTABLISHMENT OF COMPENSATION COMMITTEE/GUIDELINES AND APPOINTMENT OF MEMBERS OF COMPENSATION COMMITTEE.**

1.1 **NOTED THAT:**

(a) The Company does not presently have a compensation committee and the Directors believe it is in the best interest of the Company to establish a compensation committee which will be guided and governed by compensation committee guidelines established by the Directors.

(b) Given the Directors knowledge and experience of the Company, the initial appointments to the compensation committee will be Mark Patrick and Paul Murphy.

1.2 **IT IS RESOLVED THAT:**

(a) The Company establish a compensation committee (**"Compensation Committee"**) and adopt the guidelines in the form substantially contained in Appendix 1 to these resolutions (**"Compensation Committee Guidelines"**).

(b) Mark Patrick and Paul Murphy be appointed to the Compensation Committee.

(c) The Company empowers the Compensation Committee to make recommendations to the Directors on all matters outlined in the Compensation Committee Guidelines, provided that, all recommendations by the Compensation Committee are subject to review and approval by the Directors.

(d) The Compensation Committee shall not make any recommendations in relation to Mark Patrick's compensation arising from the resolution passed by the Directors on 12th September 2024, in particular, the LTI payment and annual bonus resolution passed in these Directors' Resolutions paragraph number 2.

**2. FURTHER REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK AND EMPLOYMENT AGREEMENT.**

2.1 **NOTED THAT:**

(a) On 12 September 2024, the Directors passed a directors' resolution addressing Mark Patrick's compensation as a Director, President/CEO, Chief Investment Officer and General Counsel of the Company. The Directors approved compensation in the following amounts:

a. Base salary: USD $850,000.

b. LTI tied to Charitable DAF Fund LP ("DAF LP") returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(b) In addition, the Directors resolved that they would assess:

a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

LTI

(c) Paul Murphy noted that the return of the Company is impacted by whether legal expenses should be included as an operational expense of the Company (in which case the LTI payment would be lower) or whether legal expenses have been incurred not as an operational expense but as an expense to preserve, protect and maximize returns to the Company (in which case it is appropriate to exclude these expenses when assessing the Company's return thereby raising the LTI payment, in whole or in part).

(d) Paul Murphy, having a detailed and working knowledge of the Company's legal issues, and having commissioned Shawn Raver, legal advisor to the Company, to provide a breakdown of legal fees (i) which are attributable to the normal operation of the Company's investment portfolio, and (ii) which have been incurred to preserve, protect and maximize returns to the Company, who has assessed that 75% of those legal fees have been incurred to preserve, protect and maximize returns to the Company.

(e) Accordingly, the LTI calculation should be adjusted to award 75% of the difference between the figures noted in page 9 of the Mercer Report which is $975,000.[1]

Annual Bonus

(f) Paul Murphy conducted an independent assessment of whether Mark Patrick should receive an annual bonus and the basis of that annual bonus having regard to the Mercer Report, further discussions with Heidi O'Brien (Partner at Mercer), further review of industry comparables with CEO/CIO roles in complex structured finance senior positions, and assessment of other charitable organisations/structures (acknowledging that the Company and its subsidiaries are not subject to United States of America regulations).

(g) Having (i) reviewed the Compensation Committee Guidelines and, (ii) a detailed working knowledge of the Company and Mark Patrick's roles and responsibilities, Paul Murphy assessed that Mark Patrick is eligible for an annual bonus in the amount of 2.5 times his base salary for the year 2023 and payable immediately for, inter alia, the following reasons:

a. CEOs and CIOs in comparable positions are typically awarded a base salary, annual bonus and form of long term incentive plan which is designed to compensate senior executives for their performance and value to a company on an annual and long term basis (see Mercer Report page 17, which is consistent with and supported by Paul Murphy's

[1] The calculation net of all expense is $4,459,000 and net of fund expenses is $5,759,000 leaving a difference of $1.3m of which $975,000 is 75%.

knowledge of US based asset managers).

b. The Company, in the absence of a senior executive willing to undertake the roles and responsibilities of a CEO, CIO and general counsel would, in the US, have to incur annual expenses of at least $3-4m at the median range and $5-6m at the upper range[2] to appropriately staff these positions.[3] By undertaking the roles of CEO, CIO and General Counsel, Mark Patrick would be undercompensated if the Company were only to award a base salary and LTI.

c. The Company has faced/is facing significant and complex legal issues in Texas, New York, the Cayman Islands and, until recently, Guernsey, which it has had to manage on a reactive and proactive basis and which Mark Patrick has been instrumental in the prosecution and defence of. These include sophisticated parties including US Bank, UBS and a Trustee in Bankruptcy.

d. Mark Patrick was instrumental in 2023/2024 defeating an action by UBS against the Company in New York which significantly reduced the Company's potential liabilities.

e. The risk profile to Mark Patrick as a director, CEO and CIO is high and his decision making will and is likely to be scrutinized which may lead to personal liability. He is undertaking these positions without the benefit of directors' and officers' insurance.

f. Mark Patrick has been instrumental in implementing and driving forward policies that will bring rigorous scrutiny and governance to the Company.

g. The Company's investments over the past three years have outperformed the S&P 500 significantly where the average returns for the S&P 500 over the same period returned 11.49% compared to 16.46% for the Company.

h. To date, Mark Patrick has not been awarded an annual bonus during his tenure at the Company nor has he received benefits which a CEO/CIO would typically enjoy.

(h) These are not a comprehensive list of factors Paul Murphy took into account but form the basis of his independent conclusion that the Directors should (i) enter into an employment agreement in a form drafted by the Company's US and Cayman Islands counsel which reflects the on-going compensation package, and (ii) award an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

(i) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

2.2 **IT IS RESOLVED** by unanimous written resolution that:

---

[2] Per Mercer Report at page 7 and adjusted to account for base compensation and annual bonus/long term incentive for general counsel.

[3] It is noted that the basis for these figures includes assessment of charities and foundations in the US which the Company is not. Whilst useful guidance, the Company must be mindful of the fact that the Company is a Cayman Islands company that holds complex structured financial products through Cayman Islands companies and is not bound by the same provisions that relate to US charities and foundations.

(a) Mark Patrick be awarded:

a. An adjustment to the LTI incentive payment in the amount of $975,000.

b. An annual bonus for the year 2023, payable immediately, of 2.5 times his base salary.

c. No annual bonus for the years 2021 and 2022 given the entirety of the compensation package provided to Mark Patrick as of 12th September 2024 and the date of this resolution.

Executed by the Directors comprising the entire Board of Directors of the Company:

**BY** ______________________________
Paul Murphy - Director

CHARITABLE DAF HOLDCO, LTD.

**BY** ______________________________
Mark Patrick - Director

CHARITABLE DAF HOLDCO, LTD.

**APPENDIX 1**
**COMPENSATION COMMITTEE GUIDELINES**

**Compensation Policy for Executives and Directors**

As adopted on October 1, 2024

1. **Overview and Objectives**

This document sets forth the Compensation Policy for Executives and Directors of Charitable DAF HoldCo, Ltd., its subsidiaries, and CDH GP, Ltd. (collectively, "**Company**").

Compensation is a key component of the Company's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance the Company's value and otherwise assist the Company's to reach its long-term goals. Accordingly, the structure of this Policy is established to tie the compensation of each officer to the Company's goals and performance.

For purposes of this Policy, "Executive Officers" shall mean the Company's Chief Executive Officer, Chief Investment Officer, Chief Company Officer, and Chief Operating Officer, and such other executive officers as appointed by the Company from time to time.

For purposes of this Policy, "Directors" shall mean the Directors as defined in the organizational and governing documents of the Company.

This Policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from, provisions of applicable law to the extent not permitted.

This Policy shall apply to compensation agreements and arrangements which will be approved after the date on which this Policy is adopted and shall serve as Company's Compensation Policy for five (5) years, commencing as of its adoption, unless amended earlier.

The Compensation Committee and the Board of Directors of the Company (the "**Compensation Committee**" and the "**Board**", respectively) shall review and reassess the adequacy of this Policy from time to time.

The Compensation Committee and Board shall have regard to the fact that Charitable DAF HoldCo, Ltd. and its subsidiaries are incorporated and subject to Cayman Islands law (**"Cayman Islands Entities"**). Accordingly, whilst US law, regulation and industry standards (**"US Practices"**) may be taken into account when considering the Objectives (as defined below), the US Practices are not binding on the Cayman Islands Entities, the Cayman Islands Entities having been purposely established as non-US entities, and the Compensation Committee will have regard to all factors which, in its discretion, achieve the Objectives (as defined below).

2. **Objectives**

Company's objectives and goals in setting this Policy are to attract, motivate and retain highly experienced leaders who will contribute to Company's success and enhance shareholder value, while demonstrating professionalism in a highly achievement-oriented culture that is based on merit and rewards excellent performance in the long term, and embedding Company's core values as part of a motivated behavior (**"Objectives"**). To that end, this Policy is designed, among others:

2.1. To closely align the interests of the Executive Officers and Directors with those of Company's shareholders in order to enhance shareholder value;

2.2. To align a significant portion of the Executive Officers' and Directors' compensation with Company's short and long-term goals and performance;

2.3. To provide the Executive Officers and Directors with a structured compensation package, including competitive salaries, performance-motivating cash and equity incentive programs and benefits;

2.4. To strengthen the retention and the motivation of Executive Officers and Directors in the long term; and

2.5. To provide appropriate awards in order to incentivize superior individual excellency and corporate performance.

3. **Compensation Instruments**

3.1 Compensation instruments under this Policy may include, but need not be limited to, the following:

3.1.1 Base salary;

3.1.2 Benefits;

3.1.3 Annual cash bonuses;

3.1.4 Change of control terms;

3.1.5 Retirement and termination terms; and

3.1.6 Long-term and short-term incentive payments

3.2 When fixing compensation instruments the Company may have regard to any matter which, in the Company's complete discretion, is commensurate with the Objectives. Without limitation, this may include:

3.2.1 Assessing an Executive Officer and Director's performance with regard to their contribution to and management of any assets or investments the Company sources or owns from time to time;

3.2.2 Assessing the performance of assets or investments of the Company in relation to overall returns to the Company;

3.2.3 Mitigation of Company liabilities;

3.2.4 Ensuring sound and prudent corporate governance including compliance with all legal, regulatory and industry standards;

3.2.5 Efficient management of service providers;

3.2.6 Risk the Executive Officer and/or the Director is exposed to;

3.2.7 Responsibilities the Executive Officer and/or the Director undertakes; and

3.2.8 Achieving the Company's business and charitable objectives

4. **Benefits**

4.1 The following benefits may be granted to the Executive Officers and Directors in order, among other things, to comply with legal requirements:

4.1.1 Vacation days in accordance with market practice;

4.1.2 Sick days in accordance with market practice;

4.1.3 Convalescence pay according to applicable law;

4.1.4 Company may contribute on behalf of the Executive Officer or Director to an insurance policy (including, without limitation, split-dollar life insurance) or a pension fund, as allowed by applicable law and with reference to Company's policies and procedures and the practice in peer group companies (including contributions on bonus payments); and

4.1.5 Company may contribute on behalf of the Executive Officer or Director towards work disability insurance, as allowed by applicable law and with reference to Company's policies and procedures and to the practice in peer group companies.

4.2 In events of relocation or repatriation of an Executive Officer or Director to another geography, such Executive Officer or Director may receive other similar, comparable or customary benefits as applicable in the relevant jurisdiction in which he or she is employed or additional payments to reflect adjustments in cost of living. Such benefits may include reimbursement for out of pocket one-time payments and other ongoing expenses, such as housing allowance, car allowance, and home leave visit, etc.

4.3 Company may offer additional benefits to its Executive Officers and Directors, which will be comparable to customary market practices, such as, but not limited to: cellular and land line phone benefits, company car and travel benefits, reimbursement of business travel including a daily stipend when traveling and other business related expenses, insurances, other benefits (such as newspaper subscriptions, academic and professional studies), etc., provided, however, that such additional benefits shall be determined in accordance with Company's policies and procedures.

5. **Miscellaneous**

5.1 Nothing in this Policy shall be deemed to grant to any of Company's Executive Officers, employees, directors, or any third party any right or privilege in connection with their employment by or service to the Company, nor deemed to require Company to provide any compensation or benefits to any person. Such rights and privileges shall be governed by applicable personal

employment agreements or other separate compensation arrangements entered into between Company and the recipient of such compensation or benefits. The Board may determine that none or only part of the payments, benefits and perquisites detailed in this Policy shall be granted, and is authorized to cancel or suspend a compensation package or any part of it.

5.2 In the event that new regulations or law amendment in connection with Executive Officers' and Directors' compensation will be enacted following the adoption of this Policy, Company may follow such new regulations or law amendments, even if such new regulations are in contradiction to the compensation terms set forth herein.

*********************

This Policy is designed solely for the benefit of Company and none of the provisions thereof are intended to provide any rights or remedies to any person other than Company.

# EXHIBIT 262

# SECOND AMENDED AND RESTATED BYLAWS

# OF

# EMPOWER DALLAS FOUNDATION, INC.

**TABLE OF CONTENTS**

**Page**

ARTICLE I. OFFICES....1

Section 1.1 Registered Office....1
Section 1.2 Other Offices....1

ARTICLE II. MEMBERSHIP....1

Section 2.1 Classes and Number....1
Section 2.2 Voting....1
Section 2.3 Transfer of Membership....1
Section 2.4 Resignation of Member....2
Section 2.5 Place of Meetings....2
Section 2.6 Annual Meetings....2
Section 2.7 Special Meetings....2
Section 2.8 Notice of Meetings of Members....2
Section 2.9 Quorum....3
Section 2.10 Voting....3
Section 2.11 Proxies....3
Section 2.12 Action by Written Consent....3
Section 2.13 Control of Investments....3

ARTICLE III. DIRECTORS....4

Section 3.1 General Powers....4
Section 3.2 Number of Directors....4
Section 3.3 Vacancies....5
Section 3.4 Place of Meetings....5
Section 3.5 Committees of Directors....5
Section 3.6 Compensation of Directors....5
Section 3.7 Annual Meeting....5
Section 3.8 Additional Regular Meetings....5
Section 3.9 Special Meetings....5
Section 3.10 Method and Timing of Notice....6
Section 3.11 Purpose not Required in Notice....6
Section 3.12 Waiver of Notice....6
Section 3.13 Action by Written Consent....6
Section 3.14 Validation of Action by Consent....6
Section 3.15 Quorum and Manner of Acting....7
Section 3.16 Resignation and Removal of Directors....7

ARTICLE IV. OFFICERS....7

Section 4.1 Officers....7
Section 4.2 Election, Term of Office and Eligibility....7
Section 4.3 Subordinate Officers....7



#516186600_v1 189540.00017

015638

Section 4.4 Removal .....7
Section 4.5 The President .....8
Section 4.6 The Secretary .....8
Section 4.7 The Assistant Secretaries .....8
Section 4.8 Chairman .....8
Section 4.9 The Chief Financial Officer .....8
Section 4.10 The Assistant Chief Financial Officers .....9
Section 4.11 Delegation of Duties .....9

ARTICLE V. BOOKS AND RECORDS .....9

Section 5.1 Location .....9
Section 5.2 Inspection .....9

ARTICLE VI. MISCELLANEOUS PROVISIONS .....9

Section 6.1 Fiscal Year .....9
Section 6.2 Depositories .....9
Section 6.3 Checks, Drafts and Notes .....9
Section 6.4 Contracts and Other Instruments .....10
Section 6.5 Conflicts of Interest .....10
Section 6.6 Waivers of Notice .....10
Section 6.7 Ownership Interests in Other Entities .....10
Section 6.8 Indemnification .....11
Section 6.9 Amendment of Bylaws .....12

SECOND AMENDED AND RESTATED BYLAWS

OF

EMPOWER DALLAS FOUNDATION, INC.

Adopted: December 31, 2024

## ARTICLE I.

## OFFICES

Section 1.1 Registered Office. The registered office of EMPOWER DALLAS FOUNDATION, INC. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II.

## MEMBERSHIP

Section 2.1 Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members, In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Dondero, as the Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his or her lifetime or by a provision in his or her Will or other testamentary document, transfer his or her Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights

of the predecessor Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his or her Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his or her transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his or her estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4 Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5 Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6 Annual Meetings. Except as otherwise provided by these Bylaws, an annual meeting of the members shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7 Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall he called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8 Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be

delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9 Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting, if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10 Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11 Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting,

Section 2.13 Control of Investments. Notwithstanding any other provision contained in these Bylaws to the contrary, the Institutional Member shall have the sole and exclusive power and authority to direct the management and investment of the assets of the Corporation. Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of the Corporation which have no power or authority with respect to the matters delegated hereby to the Institutional Member with respect to investments. Such power and authority of the Institutional Member shall include, but not be limited to: [a] the power to purchase, sell and retain assets of the Corporation; [b] the power to exercise voting, subscription, conversion, redemption, withdrawal, cancellation, option and similar rights with respect to such assets; [c] the power to participate in and consent to any voting trust, reorganization, merger, dissolution or other action affecting any such property; [d] the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) and [e] the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments. The Corporation shall furnish the Institutional Member with such information as is necessary or desirable for it to fulfill its responsibilities. The Corporation shall furnish the Institutional Member with such clerical and other assistance as the Institutional Member may need to carry out its powers and authority. The Institutional Member shall advise the Board of Directors periodically of the investments of the assets of the Corporation and changes thereto. The Institutional Member shall have the sole power to retain investment advisors and custodians to assist it in carrying out its powers and authority under this Section 2.13 and it may delegate to any such investment advisors and custodians any and all such powers and authority subject to limitations on such delegation provided under the law, if any. The Corporation shall be responsible for all costs and expenses incurred by the Institutional Member in carrying out its powers and authority under this Section 2.13.

## ARTICLE III.

## DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's

successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7 Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days' notice to each director. The person or persons calling a special

meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, or (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation. If mailed, such notice shall he deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.

Section 3.11 Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall he deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall he the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV.

## OFFICERS

Section 4.1 Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2 Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3 Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4 Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or

without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5 The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6 The Secretary. The Secretary shall:

(a) keep the minutes of the meetings of the members and of the Board of Directors;

(b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c) be custodian of the records of the Corporation; and

(d) in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7 The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4,3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 Chairman. The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 The Chief Financial Officer. The Chief Financial Officer, if any, shall:

(a) receive and he responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief' Financial Officer.

Section 4.11 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V.

## BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI.

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time

be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances,

Section 6.5 Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6 Waivers of Notice. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members. Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7 Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8 Indemnification.

(a) Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all, costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking. by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b) If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of

nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct,

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.8, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9 Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

## ARTICLE VII.

## AMENDMENTS

These Bylaws may be amended or repealed, or new bylaws may be adopted at any meeting of the members at which a quorum is present by the unanimous vote of the members present at the meeting, provide notice of the proposed amendment, repeal or adoption be contained in the notice of such meeting; and provided further, that the foregoing notice requirement shall not prohibit the members from adopting the proposed amendment, effecting the proposed repeal or adopting the

proposed new bylaws, as the case may be, in a modified form which is not identical to that described or set forth in the notice of such meeting.

* * * * *

The undersigned, being the duly elected and qualifying Secretary of the Corporation, hereby certifies that the foregoing Second Amended and Restated Bylaws of the Corporation were duly adopted by the members of the Corporation by unanimous written consent effective December 31, 2024.

Julie Diaz

Julie Diaz, Secretary

# EXHIBIT 263

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Wednesday, January 8, 2025 3:27 PM
**To:** Lucy Bannon
**Subject:** Fwd: [EXTERNAL]-Q3 2024 Charitable DAF Holdco Valuation
**Attachments:** DAF 09.30.2024 Valuation Report - Final.pdf

Thanks,
Julie Diaz

Begin forwarded message:

**From:** Shawn Raver
**Date:** January 7, 2025 at 11:23:07 AM CST
**To:** Julie Diaz , Torrey Littleton
**Cc:** Mark Patrick
**Subject: [EXTERNAL]-Q3 2024 Charitable DAF Holdco Valuation**

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Julie & Torrey –
Please find attached the Q3 2024 valuation report for Charitable DAF Holdco, Ltd.
We have calculated a Q3 2024 unrestricted grant of **$47,476**. It is my understanding that this amount will be funded out of HDF's Schwab account.
Please let me know if you have any questions.
Thanks,
Shawn

---

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

# EXHIBIT 264

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

**COUNSEL FOR THE CHARITABLE RESPONDENTS**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 3:21-cv-00881-X** |
| | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., et al.,** | § | |
| | § | |
| | § | |
| **Respondents.** | § | |
| | § | |

**MEMORANDUM IN OPPOSITION TO MOTION TO DEEM DONDERO ENTITIES VEXATIOUS LITIGANTS AND FOR RELATED RELIEF**

The Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (together the "Charitable Respondents") respectfully submit this *Response in Opposition* (the "Response") to the *Motion to Deem Dondero Entities Vexatious Litigants and for Related Relief* [Dkt. No. 136] (the "Motion")



1934054231215000000000004
015656

and the *Memorandum of Law in Support* [Dkt. No. 137] (the "Memo") filed by Highland Capital Management, L.P. ("HCMLP").

# I. TABLE OF CONTENTS

I. TABLE OF CONTENTS ....................III

II. TABLE OF AUTHORITIES ....................V

III. PRELIMINARY STATEMENT ....................1

IV. RELEVANT FACTUAL BACKGROUND ....................2

A. The Charitable Respondents ....................2

B. Baseless Litigation *Against* the Charitable Respondents ....................4

1. The Unprosecuted Adversary Proceeding and Improper Rule 2004 Discovery Attempt 4

2. The Kirschner Adversary ....................7

C. Gatekeeping Orders in Place ....................9

D. This Proceeding ....................13

E. Remaining Complained of Actions by the Charitable Respondents. ....................13

1. The HarbourVest Settlement Dispute ....................13

2. The Amended Proof of Claim ....................14

V. ARGUMENT ....................15

A. This Court cannot find that a nonparties who have no relationship whatsoever to this proceeding are vexatious litigants. ....................16

B. HCMLP cannot make the requisite showing to obtain a vexatious litigant sanction against the Charitable Respondents ....................17

1. The litigation is not vexatious, harassing, or duplicative ....................17

2. The Charitable Respondents have a good faith basis for the litigation and almost all of the major pieces are on appeal ....................19

3. The Covered Parties have burdened the court system and the Charitable Respondents now seek to add an additional layer of burden. ....................21

4. There are already numerous protections in place that cannot be squared with the requested relief. ....................22

C. The proposed vexatious litigant sanction is impermissibly broad and unlike

any sanction imposed in the cases HCMLP cites to. ....24

VI. CONCLUSION ....25

## II. TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baum v. Blue Moon Ventures, LLC*,
513 F.3d 181 (5th Cir. 2008) ....................16, 22

*Matter of Carroll*,
850 F.3d 811 (5th Cir. 2017) ....................23

*In re Carroll*,
No. 08-10756, 2016 WL 1084287 (Bankr. M.D. La. Mar. 17, 2016), *aff'd sub nom. Carroll v. Abide*, No. 316CV00218JWDRLB, 2016 WL 4127768 (M.D. La. Aug. 2, 2016), *aff'd sub nom. Matter of Carroll*, 850 F.3d 811 (5th Cir. 2017) ....................15, 17, 23

*Clark v. Mortenson*,
93 F. App'x 643 (5th Cir. 2004) ....................15

*Connor v. Stewart*,
No. 1:17-CV-827-RP, 2018 WL 4169150 (W.D. Tex. Aug. 30, 2018) ....................24

*Crear v. JPMorgan Chase Bank, N.A.*,
491 F. Supp. 3d 207 (N.D. Tex. 2020) ....................17

*Farguson v. MBank Houston, N.A.*,
808 F.2d 358 (5th Cir. 1986) ....................19

*Matter of Highland Cap. Mgmt., L.P.*,
48 F.4th 419 (5th Cir. 2022) ....................10

*Nix v. Major League Baseball*,
62 F.4th 920 (5th Cir. 2023), *cert. denied*, No. 22-7810, 2023 WL 6378365 (U.S. Oct. 2, 2023) ....................17

*In re Oliver*,
682 F.2d 443 (3d Cir. 1982) ....................17

*Schum v. Fortress Value Recovery Fund I LLC*,
No. 3:19-CV-00978-M, 2019 WL 7856719 (N.D. Tex. Dec. 2, 2019), *aff'd sub nom. Matter of Renaissance Radio, Inc.*, 805 F. App'x 319 (5th Cir. 2020) ....................23

*U.S. Bank Nat'l Ass'n v. Jefferson*,
314 F. Supp. 3d 768 (S.D. Tex. 2018) ....................17

**Other Authorities**

Oral Argument in Contempt Appeal available at:
https://www.youtube.com/watch?v=wAja9cwxu_U ..........11

FED. R. BANKR. P. 2004 ..........6

## III. PRELIMINARY STATEMENT

1. As briefed by HCMLP, HCMLP's Bankruptcy Case[1] has never been "garden variety." Bankruptcy Case, Dkt. No. 1943, ¶¶4, 8, 16, 52. Rather, the Bankruptcy Case involves ***billions*** of dollars and a complex global enterprise, involving over 2,000 entities and thousands of transactions and contracts. *Id.* at ¶¶4, 6, 52.Unsurprisingly, following the ousting of management and key employees from HCMLP, there has been litigation. But litigation arising out of the Bankruptcy Case was expressly ***anticipated*** by HCMLP, and the basis for an existing pre-filing injunction (the "Plan Gatekeeper"). Bankruptcy Case, Dkt. No. 1943, ¶79.

2. Yet, now HCMLP, in the name of alleviating the burden court system, moves this Court to act as another gatekeeper under a different standard for those same claims or causes of action subject to the Plan Gatekeeper. Left out of HCMLP's narrative is the antagonism aimed at the Charitable Respondents, including numerous proceeding instituted against them that proved to be unsuccessful, obvious litigation tactics.

3. So much unlike the case law in which courts impose vexatious litigant sanctions here, there are billions of dollars at stake in a myriad of distinct legal disputes; sharp elbowed litigation from all directions; and an existing, functional pre-filing injunction (in addition to a hundred million dollar plus indemnification fund for the Covered Parties (as defined in the Motion) which comes out of the pockets of other respondents to the Motion). These facts cannot be the basis for a vexatious litigant sanction, even ignoring the fact that the Charitable Respondents are not parties to this proceeding.

---

[1] Bankruptcy Case No. 19-34054 (Bankr. N.D. Tex.), hereinafter the "Bankruptcy Case."

## IV. RELEVANT FACTUAL BACKGROUND

### A. The Charitable Respondents

4. The Charitable Respondents refer to themselves as "charitable" because the DAF has funded more than $30 million in charitable contributions to numerous non-profit organizations and committed to fund $42 million more. Bankruptcy Case, Dkt. No. 2547-1 at ¶4, 2547-31.. Recipients of these charitable donations include The Family Place; Cristo Rey Dallas, Dallas Children's Advocacy Center; and The Dallas Foundation, all of which have written letters in the Bankruptcy Case explaining the importance of the support of the DAF to their missions. *See* Bankruptcy Case Dkt. Nos. 2547-32; 2547-33; 2547-34; 2556-2.

5. The structure and management of the charitable enterprise that the Charitable Respondents are a part of has been provided to the Bankruptcy Court in great detail at Bankruptcy Case, Dkt. No. 2547. In short, the DAF is a donor advised fund which is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) organization) which allows a donor to make an irrevocable charitable contribution and receive an immediate tax deduction. Bankruptcy Case, Dkt. No. 2547-4. CLO HoldCo is a "blocker corporation" for the DAF which insulates the DAF from any United States tax implications, as the DAF is a Cayman Islands entity, as is CLO HoldCo. *Id*.

6. CLO HoldCo is managed and controlled by directors who are appointed by shareholders of CLO HoldCo. Bankruptcy Case, Dkt. Nos. 2547-6.. The current directors of CLO HoldCo are Mark Patrick and Paul Murphy. Bankruptcy Case, Dkt. Nos. 2547-37. The sole shareholder of CLO HoldCo is the DAF. Bankruptcy Case, Dkt. No. 2547-7.

7. The DAF is a limited partnership organized under the laws of the Cayman Islands, with an entity called Charitable DAF HoldCo, Ltd. ("DAF HoldCo") as limited partner of the DAF and Charitable DAF GP, LLC ("DAF GP") as general partner of the DAF. Bankruptcy Case, Dkt.

No. 2547-10. The management shares in DAF HoldCo are held by Mark Patrick. Bankruptcy Case, Dkt. No. 2547-13. 100% of the limited liability company interests in the DAF GP are held by Mark Patrick. Bankruptcy Case, Dkt. No. 2547-12.

8. In short, Mr. Dondero nor any of his affiliates nor the defendants in this proceeding have a direct or indirect ability or right to control or direct the Charitable Respondents. The Charitable Respondents are real charitable giving vehicle that have and continue to provide tens of millions of dollars in crucial support to charities benefiting families across the Dallas area and beyond.

9. From 2012 through January 2021, HCMLP provided the Charitable Respondents with both investment advisory services and all office services via two separate agreements: *Second Amended and Restated Service Agreement* and the *Second Amended and Restated Investment Advisory Agreement* [Bankruptcy Case, Dkt. Nos. 3428-4, 3428-54, the "Advisory Agreements"; *see also* Bankruptcy Case, Dkt. No. 3428-7, 3428-9 (the notices of termination of the Advisory Agreements ].

10. Additionally, the Charitable Respondents were, and are, investors in funds which HCMLP managed and/or controlled, and held participation and tracking interests in shares of funds held by HCMLP. *See e.g*. Bankruptcy Case, Dkt. No. 590-1, 590-2, 590-3; 3428-3.

11. Therefore, there have been through a large expanse of time, numerous complex legal relationships between the Charitable Respondents and HCMLP involving large amounts of money and extensive services provided (by HCMLP).

**B. Baseless Litigation *Against* the Charitable Respondents**

**1. The Unprosecuted Adversary Proceeding and Improper Rule 2004 Discovery Attempt**

12. On February 24, 2020, HCMLP filed its *Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities"* (the "Dynamic and AROF Motion") [Bankruptcy Case, Dkt. No. 474] in which it described two funds, Dynamic and AROF (as defined in Dynamic and AROF Motion) which HCMLP had determined to liquidate. HMCLP notified the Official Committee of Unsecured Creditors (the "Committee") that it intended to distribute to CLO HoldCo $872,194 from Dynamic and $1,516,354.38 in AROF. *See* Dynamic and AROF Motion, p. 10. The Committee objected to the distribution to CLO HoldCo, and the Bankruptcy Court ordered that the distributions be put in the registry of the court (the "Registry Funds"). Bankruptcy Case, Dkt. No. 512.

13. CLO HoldCo immediately filed a *Motion for Remittance of Funds Held in Registry of the Court* [Bankruptcy Case, Dkt. No. 590], explaining that there is no legal basis to enjoin CLO HoldCo from receiving the Registry Funds. The Bankruptcy Court denied the motion, but ordered that the Committee had to file an adversary proceeding against CLO HoldCo within ninety (90) days or move for further extension of time to do so. Bankruptcy Case, Dkt. No. 825

14. The Committee moved for an extension in October 2020, and on December 17, 2020, the Committee commenced adversary proceeding: *Official Committee of Unsecured Creditors vs. CLO Holdco, Ltd., et a*l., Adv. Pro. No. 20-03195-sgj (the "CLO HoldCo Adversary Proceeding"), in which both Charitable Respondents were defendants to $24 million in claims. In the CLO HoldCo Adversary Proceeding, the Committee also filed a *Motion for Preliminary Injunction* [CLO HoldCo Adversary Proceeding, Dkt. No. 7] which concerned the Registry Funds. The Charitable Respondents filed a *Motion to Dismiss* and *Motion to Withdraw the Reference*

[CLO HoldCo Adversary Proceeding, Dkt. Nos. 23, 24]. The Committee requested an extension to respond to May 21, 2021 from the Charitable Respondents, to which the Charitable Respondents agreed (of course, never mentioning that it would not actually be filing a response but instead would seek to stay the litigation).

15. Rather than responding to the motions by the agreed extension, the Committee instead filed a *Motion to Stay the Adversary Proceeding for Ninety Days* [CLO HoldCo Adversary Proceeding, Dkt. No. 46] (the "First Motion Stay"). The request was purportedly required because the newly appointed Litigation Trustee[2] needed "time to familiarize itself with the Adversary Proceeding, so as to adequately and efficiently defend the Motions to Withdraw the References, the Motions to Dismiss, and to effectively manage the litigation of the Adversary Proceeding in its entirety." *See* First Motion to Stay, ¶11. But the time records submitted to the Bankruptcy Court bely this explanation as the Litigation Trustee had been retained months before (and in fact, only one day after the Motions to Withdraw the References, the Motions to Dismiss were filed). The Bankruptcy Court granted the stay of the CLO HoldCo Adversary Proceeding [CLO HoldCo Adversary Proceeding, Dkt. No. 62].

16. Some seventy (70) days into the granted ninety (90) day stay, the Committee and Litigation Trustee filed their *Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties pursuant to Rule 2004 of the Federal Rules Of Bankruptcy Procedure* [Bankruptcy Case, Dkt. No. 2620] (the "Rule 2004 Motion"). In the Rule 2004 Motion, the Charitable Respondents were made

---

[2] Pursuant to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* [Dkt. No. 1943],the debtor transferred estate causes of action to the Claimant Trust (as defined in the Plan which then transferred those estate causes of action to the Litigation Trust which is managed by the Litigation Trustee.

targets along with hundreds of other parties, including the supporting organizations that donate millions to charities and the retired president and chief executive officer of the Dallas Foundation, lauded for her lifetime of charitable service. In the Rule 2004 Motion and in the proposed order submitted therewith, the Litigation Trustee expressly asked the Court to order that: "The Rule 2004 Parties are ***directed*** to produce documents, communications, and other materials responsive to the Requests…" Bankruptcy Case, Dkt. No. 2620-1.

17. Then, on expiration of that first stay, the Committee and Litigation Trustee filed a *Second Motion to Stay* [CLO HoldCo Adversary Proceeding, Dkt. No. 70] (the "Second Motion to Stay") requesting a stay of the CLO HoldCo Adversary Proceeding. This time the basis for the stay was that more discovery was needed through the Rule 2004 Motion and " additional necessary time to determine whether to seek leave to amend the complaint…" The Charitable Respondents objected to both the Rule 2004 Motion and the Second Motion to Stay, at great time and expense.

18. The Charitable Respondents noted that the Registry Funds were being held hostage for a year and half with ***no legal proceeding*** by the Litigation Trustee. Rather than prosecute its Motion for Preliminary Injunction (which they would have lost as there was no legal basis for holding the Registry Funds), the Litigation Trustee instead sought continued stays of the CLO Holdco Adversary for demonstrably specious reasons.

19. Upon the Charitable Respondents' opposition to the further stay, the Bankruptcy Court refused to stay the injunction component of the CLO HoldCo Adversary proceeding, and quickly thereafter, on October 7, 2021, the Litigation Trustee agreed to the release of the Registry Funds, after such funds had been withheld from CLO HoldCo ***since February 2020*** without any legal proceeding or action taken that in fact sought injunctive relief. CLO HoldCo, Dkt. No. 92.

20. As to the Rule 2004 Motion, the Charitable Respondents noted several reasons why the requests were wholly improper including that FED. R. BANKR. P. 2004 discovery is, of course, not permitted when there is a pending proceeding involving those same topics. After the targeted parties spent an incredible amount of time and effort to object to the Rule 2004 Motion, the Litigation Trustee changed course and stated that despite the request in his proposed order and Rule 2004 Motion stating otherwise, he actually did not "request that the Court compel the production of any particular documents." Bankruptcy Case, Dkt. No. 2741 (*compare* to Proposed Order language *supra* expressly requesting the Bankruptcy Court direct the parties to produce documents).

21. After this change, an agreed order between the Litigation Trustee and the targeted parties purported to permit the Litigation Trustee to issue subpoenas pursuant to FED. R. BANKR. P. 2004 (which he, of course, already had the right to do) but reserved all objections thereto, i.e. the entire Rule 2004 Motion litigation was of no moment. Bankruptcy Case, Dkt. No. 2750. The Litigation Trustee never issued a Rule 2004 subpoena to the Charitable Respondents.

22. Then on October 15, 2021, the Litigation Trustee dismissed the CLO HoldCo Adversary, without ever having responded to the various motions to dismiss and motions to withdraw reference. CLO HoldCo Adversary, Dkt. No. 96. Again, a complete waste of time and resources of the parties and court system..

23. In sum, the Charitable Respondents have been on the receiving end of proceedings that were designed litigation tactics that were ultimately abandoned after their utter lack of legal support was shown, but only after the Charitable Respondents expended incredible amounts of resources defending themselves.

**2. The Kirschner Adversary**

24. After dismissing the CLO HoldCo Adversary, the Litigation Trustee commenced *Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust vs. Dondero et al* Adv. Pro. No. 21-03076-sgj (the "Kirschner Adversary"), in which the Litigation Trustee asserts over one hundred million dollars in claims against the Charitable Respondents.

25. While the merits of these claims have not been adjudicated, the Charitable Respondents invite this Court to review the Charitable Respondents' *Motion to Dismiss* filed in the Kirschner Adversary Proceeding at Dkt. No. 191, which explains in detail the baseless nature of these claims.[3] The time and expenses incurred in the defense of the Kirschner Adversary have been immense and discovery is not even complete, with the fees for the Litigant Trustee's attorneys ranging from $830 an hour for first year associates to over $2,100 per hour for senior partners.

26. But what makes this costly, baseless litigation against the Charitable Respondents even more troubling is that it is being pursued when HCMLP's own filings indicate that the estate is likely ***solvent***. *See* Bankruptcy Case, Dkt. No. 3872.

27. On July 6, 2023, HCMLP filed that certain *Current Balance Sheet of the Highland Claimant Trus*t [Dkt. No. 3872] (the "Current Balance Sheet"). The Current Balance Sheet reflects $152 million in assets (which is exclusive of any recovery on the notes at issue in this consolidated

---

[3] For instance, CLO HoldCo is being sued for $75 million under an unjust enrichment theory because HCMLP advised CLO HoldCo, pursuant to its role as CLO HoldCo's investment advisor, to sell 49.9% of its interests in a fund (HCLOF) to a third party. That third party ultimately filed a claim against HCMLP for the amount of the sale arguing that it was fraudulent induced into the purchase, and that HCMLP breached duties as manager of HCLOF. HCMLP settled the claim expressly **not** based on the fraud in the inducement theory but rather, because HCMLP thought there was evidence that HCMLP had breached its duties to holders of HCLOF interests (in which CLO HoldCo retained the half of it investment). But somehow the Litigation Trustee argues that CLO HoldCo, the advisee of HCMLP, should pay its investment advisor's estate for following the investment advisor's advice! In other words, the Debtor's estate says it should be paid by the advisee who acted upon advisor advice because the advisor did someone else wrong. Of course, once it became clear that the HCMLP estate was solvent, the Kirschner Adversary was abated (after the expenditure of millions of dollars in fees and expenses on all sides).

appeal and assumes $0 recovery in the Kirschner Adversary). The total amount owed to general unsecured creditors is $139 million.

28. Also, HCMLP asserts that it needs to hold an additional $90 million in indemnification reserves (which is in addition to the $35 million in the Indemnity Sub-Trust[4]) — HCMLP is therefore holding ***$125 million in indemnification*** reserves for Covered Parties.

29. So against this backdrop, where there are sufficient assets to pay off all creditors in full, and HCMLP, the Claimant Trust, and Indemnity Sub-Trust are holding $125 million in reserves (purportedly) for indemnification obligations, the Litigation Trustee was pursuing, and we suppose could still pursue, additional hundreds of millions of dollars of groundless claims against the Charitable Respondents, at a staggering cost to the estate. The Kirschner Adversary has no place in payment of creditors, but rather, appears to be perpetuated to pay the fees for professionals generated by perpetuating the lawsuit—litigation for litigation's sake targeted at the Charitable Respondents and other respondents.

**C. Gatekeeping Orders in Place**

30. On February 22, 2021, the Bankruptcy Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* [Bankruptcy Case, Dkt. No. 1943] (the "Plan" and "Confirmation Order"). The Plan contains three (3) gatekeeper provisions.

31. Prior to confirmation of the Plan, the Bankruptcy Court had entered two gatekeeping orders: the *Order Approving Settlement with Official Committee of Unsecured*

---

[4] *See Order Approving Debtor's Motion for Entry of an Order (I) Authorizing the (A) Creation of an Indemnity Subtrust and (B) Entry Into an Indemnity Trust Agreement and (II) Granting Related Relief* at Bankruptcy Case, Dkt. No. 2599 (ordering the creation of an indemnity sub-trust, the "Indemnity Sub-Trust" referred to herein).

*Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Bankruptcy Case, Dkt. No. 339] (the "January 9 Order") and the *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Bankruptcy Case, Dkt. No. 854] (the "Seery Order").

32. The January 9 Order requires all entities to come to the Bankruptcy Court before commencing or pursuing a claim of cause of action of any kind against an Independent Director (as defined in the January 9 Order) relating in any way to the Independent Director's role as independent director.

33. The Seery Order requires all entities to come to the Bankruptcy Court before commencing or pursuing a claim or cause of action of any kind against Mr. Seery (the COO/CRO and Claimant Trustee) relating in any way to his role as chief executive officer and chief restructuring officer of the Debtor.

34. The Confirmation Order states that both the January 9 Order and Seery Order shall remain in place. The Plan and Confirmation Order also contain the Plan Gatekeeper which provides that:

> [No] Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party…

Confirmation Order, ¶AA; Plan, Art. IX, ¶F. Enjoined Parties includes all of the Respondents and Protected Parties includes the Covered Parties (except that Covered Parties' definition removes "official capacity" restrictions for the Claimant Trust Oversight Board members).

35. The Plan Gatekeeper was appealed by certain respondents, amongst other Plan provisions including the third party exculpations. *Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022). The Fifth Circuit struck down the third party exculpations, but the inclusion of the Plan Gatekeeper was affirmed. *Id*. at 439. While this matter is on appeal to the Supreme Court, to date, the Plan Gatekeeper remains in place.

36. The sole transgression of these gatekeeping provisions cited to by HCMLP is that the Bankruptcy Court found that the Charitable Respondents violated the Seery Order and Plan Gatekeeper by filing a motion for leave to file an amended complaint in the HarbourVest Settlement Dispute (defined herein) which named Mr. Seery (the "Seery Motion") in this Court rather than the Bankruptcy Court, although the Charitable Respondents highlighted the Plan Gatekeeper in the Seery Motion. *See* Case No. 21-01974 (N.D. Tex.), Dkt. No. 49.

37. In affirming the contempt finding, this Court did not find that the Charitable Respondents lacked candor or were deceitful but rather, that the Plan Gatekeeper applies regardless of their candor. *Id*. This Court stated, "[f]orthright disregard of a court order is no defense." *Id*. On October 20, 2022, the Charitable Respondents appealed this order to the Fifth Circuit (after paying the contempt sanction pursuant to a stipulation within which all appeal rights were reserved). Case No. 21-01974, Dkt. No. 50; Case No. 22-11036 (the "Contempt Appeal").

38. The Fifth Circuit granted oral argument in the Contempt Appeal, and the Charitable Respondents invite this Court to review the oral argument from the Contempt Appeal available at: https://www.youtube.com/watch?v=wAja9cwxu_U (the "Oral Argument").

39. Although the Contempt Appeal has not been decided, the panel stated "it's hard to say cynical and bad blood when the text of the [Seery Motion] discloses everything that's going on…. I am just having a hard time with contemptuous when it's candid." And important here, the panel appears greatly concerned with HCMLP's costly "investigation" into the filing of the Seery Motion and litigation created by HCMLP. After expressly recognizing that there is "a ton of bad blood on both sides," the panel asks why HCMLP did not just file a "one paged document" pointing out the fact that the Seery Motion was filed in the wrong court, and further states that it did not understand the multi-day hearing and hundreds of thousands of dollars in fees and sanctions and penalties for a thing evident from the caption.

40. And since the finding of contempt in 2021 for filing the Seery Motion in this Court, the Charitable Respondents and other Respondents have been particularly ***deferential*** to the Plan Gatekeeper.

41. For instance, in September 2022, because CLO HoldCo believed that it had claims against Highland CLO Funding, Ltd. ("HCLOF") arising in the Royal Court of Guernsey, CLO HoldCo came to the Bankruptcy Court in an abundance of caution seeking a determination that the Plan Gatekeeper did not apply to the proposed action (although the Plan Gatekeeper specifically excludes from the definition of a Protected Party HCLOF and even members of HCLOF, which would include the subsidiary of the HCMLP that owns a majority in HCLOF), because under Guernsey law and practice, an HCMLP subsidiary had the right to intervene in an unfair prejudice action in Guernsey. *See* Bankruptcy Case, Dkt. No. 3507. Eventually, the parties reached an *Agreed Order on the Motion for Leave* [Bankruptcy Case, Dkt. No. 3584] in which it was stipulated that HCLOF was not a Protected Party and that the proceeding against HCLOF could go forward in Guernsey. Of course, this deference to the Plan Gatekeeper, despite the action

clearly not being subject to it, and in connection with which CLO HoldCo obtained a stipulation from HCMLP, cannot be seen as vexatious.

42. So contrary to HCMLP's claims that Plan Gatekeeper is being undermined or challenged, it is simply being utilized. The sole finding of a "breach" of the Plan Gatekeeper is on appeal, with the Fifth Circuit panel questioning why HCMLP instituted such a costly, seemingly unnecessary contempt proceeding.

**D. This Proceeding**

43. In January 2021, HCMLP filed five (5) adversary proceedings against the above-captioned defendants(the "Notes Respondents") alleging breaches of certain pre-petition promissory notes (collectively, the "Notes") issued to HCMLP. Importantly, the Charitable Respondents are not Notes Respondents, have nothing to do with Notes, nor are they a party to this proceeding whatsoever. In July 2023, this Court adopted the Bankruptcy Court's report and recommendation and entered summary judgment against the Notes Respondents. Dkt. No. 133. Shortly thereafter, HCMLP filed this Vexatious Litigant Motion on July 14, 2023. On September 1, 2023, the Notes Respondents appealed this Court's judgment to the Fifth Circuit. Dkt. Nos. 153-158; Case No. 23-1092 (5th Cir. 2023).

**E. Remaining Complained of Actions by the Charitable Respondents.**

44. The remaining complained of actions by the Charitable Respondents are two distinct matters involving against millions of dollars and involving separate contractual relationships between the Charitable Respondents and HCMLP. Further, both matters on currently on appeal.

**1. The HarbourVest Settlement Dispute**

45. The Charitable Respondents assert causes of action against HCMLP related to HCMLP's settlement with an entity called HarbourVest. *See* Case No. 23-cv-01503 (N.D. Tex.),

Dkt. No. 22 (the "HarbourVest Settlement Dispute"). In summary form, HCMLP settled with HarbourVest for the transfer of its interests in HCLOF, a fund in which CLO HoldCo also held ownership of approximately 49%. The Charitable Respondents allege that HCMLP concealed the value of these assets and usurped the opportunity from CLO HoldCo, its advisee pursuant to the Advisory Agreements, when it received the majority interest in HCLOF from HarbourVest as well as taking over control of HCLOF. At stake in this dispute is approximately ***$24 million*** in just the profit from transfer as well as damages from HCMLP becoming the majority owner of HCLOF.

46. It is subject to a single lawsuit. And while the procedure may be somewhat complex, it includes a ***successful appeal*** by the Charitable Respondents, in which this District Court (Hon. Judge Boyle) reversed the original decision of Bankruptcy Court in part. The subsequent ruling of the Bankruptcy Court after remand is currently on appeal at to the District Court. *See* Case No. 21-03129, Dkt. No. 28; Case No.:23 -1503-B.

**2. The Amended Proof of Claim**

47. Pre-petition, CLO HoldCo was the holder of certain participation and tracking interests in HCMLP's shares of a fund (the Crusader Fund). *See* Case No. 23-10660 (5th Cir. 2023) (the "Amended POC Matter"). Again, in summary form, in the Bankruptcy Case, HCMLP agreed to implement a pre-bankruptcy arbitration ruling that provided for the cancellation of its shares in the Crusader Fund in exchange for a reduction in certain amounts owed to pre-petition creditors whose claims arose from mismanagement of the Crusader Fund. *Id*. at Dkt. No. 39. The cancellation of shares in accordance with the arbitration award was net of the purchase price that HCMLP had paid for the shares.

48. CLO HoldCo initially filed a proof of claim for the full amount of its participation and tracking interests but then after the Crusader Fund settlement was reached in the Bankruptcy Case, it amended its claim to $0, with full reservation to amend further. *Id*. After confirmation of

the Plan, but before distribution to general unsecured creditors were generally commenced, CLO HoldCo amended its proof of claim to account for the reduction in damages received from the cancellation of HCMLP's shares by the amount of the purchase price paid by HCMLP, because under the assignment documents by which CLO HoldCo obtained the interests, HCMLP owed back to CLO HoldCo any proceeds from the disposition of the shares.. *Id*.

49. The Bankruptcy Court denied CLO HoldCo's motion to ratify the second amendment to the proof of claim and this Court affirmed. CLO HoldCo appealed this decision to the Fifth Circuit where it is currently briefed awaiting adjudication.

## V. ARGUMENT

50. The facts before this Court are nothing like those in which courts enter vexatious litigant sanctions. These disputes involve distinct legal relationships and transactions, involving hundreds of millions of dollars. With so much at stake and such complex relationships, along with the obvious antagonism on all sides, litigation is no surprise. In fact, it is why HCMLP advocated for the Plan Gatekeeper which is an existing pre-filing injunction that HCMLP has not even attempted to show is inadequate (other than citing to an appeal).

51. So much unlike the cases which find vexatious litigant sanctions appropriate, here, the Charitable Respondents have defended themselves against numerous baseless litigation tactics; are litigating distinct matters, each with millions at stake; and the parties that purportedly need protection are already protected by the Plan Gatekeeper (as well as being insulated from all costs by a one hundred million dollar plus indemnification reserve). But to make all these matters worse, HCMLP seeks to have this Court make factual findings about entities that are ***not parties***.

**A. This Court cannot find that a nonparties who have no relationship whatsoever to this proceeding are vexatious litigants.**

52. HCMLP argues that this Court can enjoin not only the Notes Defendants but also parties "under such parties' control or that act in concert with them". Memo, ¶37. In support, HCMLP cites to cases in which courts enjoin nonparties that act in control or concert with the vexatious litigants ***in the proceeding in which the injunction order was issued, either to be vexatious in the proceeding or to violate the already issued order in the proceeding*.**

53. For instance, in *Carroll*, the court barred the debtors, their daughters, and "anyone acting on their behalf" from filing any pleadings without obtaining bankruptcy court permission. *In re Carroll*, No. 08-10756, 2016 WL 1084287, at *10 (Bankr. M.D. La. Mar. 17, 2016), *aff'd sub nom. Carroll v. Abide*, No. 316CV00218JWDRLB, 2016 WL 4127768 (M.D. La. Aug. 2, 2016), *aff'd sub nom. Matter of Carroll*, 850 F.3d 811 (5th Cir. 2017). In *Clark v. Mortenson*, the court ordered that the parties could not file, directly or indirectly, any suit without written permission. *Clark v. Mortenson*, 93 F. App'x 643, 649 (5th Cir. 2004).

54. Of course, any person or entity that assists a party in violating a pre-filing injunction, or such person or entity itself violates such an order, assuming knowledge of the order, would be subject to sanctions.

55. But that situation does not fit what HCMLP is asking this Court to do, which is for this Court to reach out against entities such as the Charitable Respondents, who are not before this Court in this proceeding, and preclude the non-party Charitable Respondents from acting in their own right, just the same as if they were actually parties here before this Court. The Charitable Respondents have nothing to do with the Notes, nor does HCMLP state they do.

56. As briefed herein, the Charitable Respondents are an independent charitable giving enterprise that is in part (CLO HoldCo) governed by independent directors. If they act in concert

with any party subject to a pre-filing injunction, then, they would be in violation of that order, certainly. But this does not confer authority to this Court to make findings about nonparties (that have never been made by any other court in proceedings in which the Charitable Respondents are actually parties).

57. Even worse, what HCMLP is really after is to try to get this Court to rule on the matters currently under appeal, by trying to obtain a ruling, that doubtless HCMLP would somehow attempt to use, that the DAF and CLO HoldCo's current appeals cannot be meritorious, because this Court has (somehow) reviewed these other proceedings in which the Charitable Respondents are in fact parties and has decided (upon some form of roving authority to opine as to the conduct of parties before other courts) that the Charitable Respondents have been "vexatious".

### B. HCMLP cannot make the requisite showing to obtain a vexatious litigant sanction against the Charitable Respondents

58. Assuming this Court has the authority that HCMLP says it does, which is denied, in determining whether it should impose a pre-filing injunction or should modify an existing injunction to deter vexatious filings, a court must weigh all the relevant circumstances, including the following four factors:

> (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

*Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008).

#### 1. The litigation is not vexatious, harassing, or duplicative

59. The Bankruptcy Case has spurred a large amount of litigation—coming from all sides—but litigiousness alone cannot support a vexatious litigant sanction. *In re Oliver*, 682 F.2d

443, 446 (3d Cir. 1982) (collecting cases). "Access to the courts is a fundamental tenet of our judicial system; legitimate claims should receive a full and fair hearing no matter how litigious the plaintiff may be." *Id.*

60. Rather, the typical vexatious litigant cases involve the serial litigation of a particular matter. For instance, in *Nix v. Major League Baseball*, the plaintiff believed that his company's substance was wrongly prohibited by Major League Baseball's selectively enforced "fake" IGF-1 ban. 62 F.4th 920, 927 (5th Cir. 2023), *cert. denied*, No. 22-7810, 2023 WL 6378365 (U.S. Oct. 2, 2023). Prior to issuing the vexatious litigation determination, the Fifth Circuit specifically noted that all but one of the plaintiff's claims was barred by claim preclusion, as he had been litigating essentially the same claims repeatedly in different forums. *Id*. at 928. And in *Crear v. JPMorgan Chase Bank, N.A.*, the district court noted that the current suit was plaintiff's sixth lawsuit challenging foreclosure proceedings related to a particular property (and actually even this conduct was not sufficient to enter a vexatious litigant sanction). 491 F. Supp. 3d 207, 219 (N.D. Tex. 2020). In *U.S. Bank Nat'l Ass'n v. Jefferson*, the defendants filed multiple, identical, and unsuccessful removal petitions related to a single proceeding. 314 F. Supp. 3d 768, 783–84 (S.D. Tex. 2018). In *Carroll*, the debtors and their adult children generated 100 pleadings and two appeals relating solely to the sale of their residence. 2016 WL 1084287, at *4.

61. Much unlike these typical cases, here the litigation identified by HCMLP involve completely different transactions and contractual relationships. A conclusion that is no surprise as HCMLP was not a "garden variety debtor," but instead a global investment manager with billions of dollars under management. And there are hundreds of contracts and transactions between the respondents and HCMLP.

62. The pre-petition relationships between the Charitable Respondents and HCMLP were particularly complex. The Charitable Respondents and HCMLP were party to Advisory Agreements which generated duties owed by HCMLP to the Charitable Respondents, extending far into the Bankruptcy Case, including an extensive amount of time during which HCMLP was controlled by Mr. Seery, who therefore was in control of HCMLP in its capacity as advisor to the Charitable Respondents (including the time of the HarbourVest Settlement Dispute). The Charitable Respondents were holders of participation and tracking interests issued by HCMLP which generated a completely distinct set of obligations owed by HCMLP to the Charitable Respondents and are at issue the Amended POC Matter. Each matter concerns completely distinct legal relationships with millions of dollars at stake, not the duplicative litigation of the same claims or over the same assets.

**2. The Charitable Respondents have a good faith basis for the litigation and almost all of the major pieces are on appeal**

63. As attested to in sworn filings in the Bankruptcy Court, the Charitable Respondents vigorously pursued claims to protect the DAF's investments, which are used to make tens of millions of dollars of charitable contributions. *See* Bankruptcy Case, Dkt. No. 2547-1.

64. But there has not been a single finding of ***bad faith*** by any court against the Charitable Respondents. Rather than filing to harass, every pleading filed by the Charitable Respondents has been for the clear purpose of protecting the hundreds of millions of dollars at stake. *See* HarbourVest Settlement Dispute (alleging $24 million plus in damages from a breach of the investment advisory agreement and breach of duty as investment advisor); Amended POC Matter (alleging a claim between $3-$5.5 million arising from participation and tracking interests issued); the Guernsey matter (alleging claims in the amount $70 million for HCLOF unfairly

prejudicing CLO Holdco). Again, these are distinct legal relationships concerning millions of dollars.

65. The only proceeding in which the Charitable Respondents were found to be in contempt was the Seery Motion, which this Court noted was not a finding based upon lack of candor or deceitfulness. Further, unlike *Carroll*, where there a dozen contempt orders and a failure to abide by previous orders, the Charitable Respondents complied with the contempt sanction, with reservation of right to appeal, pursuant to a stipulation with HCMLP. Recently, at oral argument, the Fifth Circuit panel appeared to question whether the Seery Motion was contemptuous at all, given that the disclosures in the Seery Motion. And like the Seery Motion, the complained of causes of action by the Charitable Respondents in the HarbourVest Settlement Dispute and Amended POC Matter are also on appeal (there has been no mention of any claim being made within these appeals that the appeals are frivolous, because there have been no such claims). .

66. Of course, even if the appeals prove unsuccessful, being unsuccessful in an appeal would certainly not render these proceedings sanctionable. *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359 (5th Cir. 1986) ("[t]his court has no desire to deter any litigant from advancing any claim or defense which is arguably supported by existing law, or any reasonably based suggestion for its extension, modification, or reversal. Positions thus taken cannot be considered as frivolous, although they may be unsuccessful and indeed may be given short shrift.").

67. In sum, to enter a vexatious litigant sanction here, this Court would have to issue findings against nonparties that they have acted in bad faith in proceeding not before this Court, even though in those proceedings in which the Charitable Respondents are actually parties, there have been no such findings. This is because the litigation undertaken by the Charitable Respondents has been pursued in good faith for the purpose of protecting DAF investments.

### 3. The Covered Parties have burdened the court system and the Charitable Respondents now seek to add an additional layer of burden.

68. HCMLP argues that the litigation emanating from the HCMLP Bankruptcy has been burdensome and costly. But HCMLP fails to mention that the Covered Parties' own pattern of pursuing burdensome litigation tactics, or state with clarity that in fact the HCMLP proposal to ***alleviate*** the burden on the court system is to establish dual (or, as shown, dueling) gatekeepers.

69. As briefed herein, the Covered Parties' own litigation tactics aimed at the Charitable Respondents has burdened the court system. The Litigation Trustee and his predecessor commenced a lawsuit with no intention of actually pursuing claims, but instead improperly holding the Registry Funds, only to dismiss that suit a year and half later. The Litigation Trustee commenced Rule 2004 Motion proceeding which he abandoned, claiming to have in fact never asked for the production of documents that he in fact had unambiguously sought, after forcing the Charitable Respondents to incur great costs and burden. The Litigation Trustee also perpetuated the Kirschner Adversary seemingly to pay the fees and costs of the professionals perpetuating the litigation. Even HCMLP itself has been accused of pursing litigation for litigation's sake. In the recent Fifth Circuit argument in the Contempt Appeal, the panel questioned why HCMLP instituted a multiday hearing costing hundreds of thousands of dollars when a one paged document would have sufficed.

70. The Bankruptcy Case has spurred an immense amount of litigation, much of which has been aggressive, but again, it is not in one direction. HCMLP itself has argued that the Bankruptcy Case is not a garden variety case nor is HCMLP a garden variety debtor. When there

are billions of dollars at stake and complex transactions and relationships, along with antagonism from all sides, litigation is the expected consequence.[5]

71. Further, the HCMLP proposed "fix" to the burden on the court system is to duplicate the pre-filing injunction contained in the Plan Gatekeeper. Not satisfied with an already functioning Plan Gatekeeper, HCMLP now argues that two are needed, so that two courts, each ordering that no action be filed without ***first*** seeking leave in each court. This duality is a practical impossibility. To even seek leave, two motions for leave would have to be filed, one in each court, simultaneously, lest the filing party run afoul of the dual gatekeepers, each requiring no action in any other court before leave is sought there.

**4. There are already numerous protections in place that cannot be squared with the requested relief.**

72. HCMLP expected litigation. So much so that it included the Plan Gatekeeper in the Plan, along with continuing the January 9 Order and Seery Order. Further, HCMLP and the Claimant Trust are hoarding ***one hundred twenty five million dollars*** in indemnification funds to indemnify themselves for any costs incurred.

73. As provided in the Plan, once general unsecured claims are paid, pre-petition equity holders, who are respondents to this Motion, become beneficiaries of the Claimant Trust. The Balance Sheet shows that there are sufficient assets to pay general unsecured claims in full, yet the Claimant Trustee will not pay the general unsecured claims. Instead, the Claimant Trustee, who is also the trustee of the Indemnity Sub-Trust and CRO/COO, is an indemnified party who has

---

[5] Of note, large amounts of litigation in any billion dollar bankruptcy case is to be expected. For instance, in the FTX Trading Ltd. Bankruptcy (Case No. 22-11068, Bankr. D.E.), there are been more filings in a year than in the Highland Bankruptcy Case. As this Court is aware, a single large bankruptcy case often generates numerous appeals as well.

elected to hold over one hundred twenty five million dollars in funds to indemnify himself and other indemnified parties rather than pay creditors.

74. Important here, the same parties that claim to need protections from further litigation, are already incredibly protected. Their fees are administrative expenses of the Claimant Trust and/or subject to indemnification from the Indemnity Sub-Trust. Every dollar incurred by HCMLP and the Claimant Trust comes out of what would be the return to pre-petition equity, who are respondents to this Motion. And there is already the Plan Gatekeeper, which requires that the Charitable Respondents (and any other party) go to the Bankruptcy Court before commencing or pursuing any cause of action against the Protected Parties. As HCMLP recently argued to the Fifth Circuit, the purpose of the Plan Gatekeeper is to give the Bankruptcy Court "the first say, not the second say about any proposed lawsuit covered by the terms of [the Plan Gatekeeper] so going to a different court whether it's the district court [or a state court] is violating the [Plan Gatekeeper]. It is contempt of court." *See* Oral Argument. So according to HCMLP, it is contemptuous for the Charitable Respondents to ask this Court for leave to file a claim against HCMLP.

75. But now HCMLP also requests an order that the Charitable Respondents are prohibited from pursuing, instituting, or commencing, a claim or cause of action against the Covered Parties without ***this Court's prior approval*** obtained after reasonable notice to the applicable Covered Parties, and a hearing. It would be impossible to comply with both the proposed vexatious litigant sanction and the Plan Gatekeeper as prior approval from this Court can only be interpreted as not giving the Bankruptcy Court the "first say." And these provisions have different legal standards with no mechanism to harmonize the two, which will do nothing but increase the burden on the court system.

76. Not only is the requested sanction practically impossible to comply with, but it is also unsupported. This Court must consider the adequacy of alternative sanctions. *Baum*, 513 F.3d at 189. The sole basis cited for inadequacy of the Plan Gatekeeper is that it has been appealed (or "actively challenged"). Memo, ¶47. But the record in Bankruptcy Case shows that the respondents have complied with the Plan Gatekeeper (with the Seery Motion being the sole violation, which again is on appeal).

77. The proposed vexatious litigation sanction is unworkable and unsupported. There are adequate protections in place for Covered Parties. THERE IS ALREADY THE PLAN GATEKEEPER, AS WELL AS TWO OTHER PRE-PLAN GATEKEEPERS IN PLACE.

**C. The proposed vexatious litigant sanction is impermissibly broad and unlike any sanction imposed in the cases HCMLP cites to.**

78. The facts before this Court are unlike any case in which a court imposes a vexatious litigant pre-filing injunction. In *Carroll*, the bankruptcy court had already made countless bad faith findings and issues numerous ignored contempt orders. *Matter of Carroll*, 850 F.3d 811, 816 (5th Cir. 2017); *Carroll*, 2016 WL 1084287 at *2. After finding that the litigants were vexatious, the court entered a pre-filing injunction requiring leave of the bankruptcy court before filing any pleading or document in the bankruptcy case or its associated cases or adversary proceedings and from filing any future cases in the bankruptcy court. *Id*. at *10. So in a case with actual bad faith findings, multiple contempt orders, and the serial re-litigation, the vexatious litigant sanction barred named parties (and those who assist them) from filing pleadings in the ***bankruptcy court*** without prior approval.

79. HCMLP also relies upon *Schum v. Fortress Value Recovery Fund I LLC*, No. 3:19-CV-00978-M, 2019 WL 7856719, at *5 (N.D. Tex. Dec. 2, 2019), *aff'd sub nom. Matter of Renaissance Radio, Inc.*, 805 F. App'x 319 (5th Cir. 2020). But again in that case, the court ordered

that the ***party*** before it be "enjoined from making any future filings related to the [certain named] bankruptcies in a ***United States bankruptcy court*** without first obtaining leave from the United States Bankruptcy Court for the Northern District of Texas." *Id*. at *6. So again, the vexatious litigant sanction was limited to name parties and only applied to U.S. bankruptcy courts. In fact, a broader sanction than that ordered by the *Schum* court is already in place as to any person or entity, through the Plan Gatekeeper.

80. Here, the proposed pre-filing injunction would enjoin non-parties from filing any action of any kind in any court or regulatory or administrative agency without prior approval. While standing alone such an unlimited injunction could never stand, the request is even more egregious in light of the existing Plan Gatekeeper and the lack of showing of any "inadequacy" thereof. *Connor v. Stewart*, No. 1:17-CV-827-RP, 2018 WL 4169150, at *2 (W.D. Tex. Aug. 30, 2018)(citing *Baum*, 513 F.3d at 190 (noting that pre-filing injunctions must be narrowly tailored)).

## VI. CONCLUSION

The HCMLP case has been litigious, on all sides. There is a Plan Gatekeeper in place that already requires the Charitable Respondents to seek leave of the Bankruptcy Court before commencing or pursuing any claim against HCMLP and any Protected Party. There can be no vexatious litigant sanction against the Charitable Respondents under established Fifth Circuit law, if for no other reason than that they are not parties to this proceeding, and HCMLP has not made a single allegation that the Charitable Respondents have been in any way involved in the actions taken by any party to this proceeding. But as well for the additional reasons briefed above. The Motion is misguided and groundless. The Motion should be denied and dismissed.

**[***signature block on following page***]**

**Respectfully submitted:**

**KELLY HART PITRE**

***/s/ Louis M. Phillips***
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this December 15, 2023.

***/s/ Louis M. Phillips***
Louis M. Phillips

# EXHIBIT 265

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

**COUNSEL FOR CLO HOLDCO, LTD., CHARITABLE DAF FUND, LP AND HIGHLAND DALLAS FOUNDATION, INC.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Chapter 11** |
| | § | |
| **Debtor** | § | **Relates to Dkt. No. 2460** |

**RESPONSE AND DISCLOSURES RELATED TO THE COURT'S ORDER REQUIRING DISCLOSURES**

1934054210709000000000015
015689

CLO HoldCo, Ltd. ("CLO HoldCo"), Charitable DAF Fund, LP ("DAF Fund"), Highland Dallas Foundation, Inc., ("Highland Dallas Foundation," collectively, the "Charitable Respondents"), [1] file this *Response* ("Response") and submit these *Disclosures* ("Disclosures") to comply with the Court's *sua sponte Order Requiring Disclosures* (Dkt. No. 2460) (the "Disclosures Order").

---

[1] CLO Holdco and Highland Dallas Foundation have filed a *Motion to Withdraw the Reference* in Adversary Case No. 20-03195 (the "Adversary Proceeding"), at Dkt. No. 24 (in the Adversary Proceeding), and neither the fact nor content of this Response is intended to be nor shall be deemed a waiver of their right to a trial by jury on all claims asserted in the Adversary Proceeding nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court. DAF Fund is also a defendant in the Adversary Proceeding but has not been served. Neither the fact nor content of this Response by DAF Fund is intended to be nor shall be deemed: a waiver of service requirements in the Adversary Proceeding; acceptance of service of citation or summons in the Adversary Proceeding; waiver of its right to a trial by jury on all claims in the Adversary Proceeding (if ever served), nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court (again, if ever served). The Charitable Respondents submit this Response in the Bankruptcy Case solely because the Court has ordered them to do so, and because they have appeared before this Court previously.

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ I

TABLE OF AUTHORITIES ........ II

PRELIMINARY STATEMENT ........ 1

PROCEDURAL HISTORY ........ 4

RESPONSE ........ 7

I. The Charitable Respondents are independently owned and controlled charitable organizations. ........ 7

a) CLO HoldCo ........ 9
b) DAF Fund ........ 9
c) DAF Holdco ........ 10
d) DAF GP ........ 11
e) The Supporting Organizations ........ 11
f) Mr. Patrick's role ........ 15

II. The Charitable Respondents have donated tens of millions of dollars to charitable causes ........ 16

III. CLO HoldCo and DAF Fund may be creditors of the Debtor ........ 18

IV. The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing. ........ 20

a) The Court does not have the power to require non-parties to provide it with disclosures. ........ 20
b) The Court's *sua sponte* investigation into hypothetical standing is improper. ........ 22
c) The Disclosures Order is not just improper, it is prejudicial. ........ 26

CONCLUSION ........ 28

## Table of Authorities

**Page(s)**

**Cases**

*Baum v. Blue Moon Ventures, LLC*,
513 F.3d 181 (5th Cir. 2008) ....................26

*Berry v. CIGNA/RSI-CIGNA*,
975 F.2d 1188 (5th Cir. 1992) ....................21

*Brackeen v. Haaland*,
994 F.3d 249 (5th Cir. 2021) ....................24

*Castro v. United States*,
540 U.S. 375, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003) ....................23

*In re Delta Underground Storage Co., Inc.*,
165 B.R. 596 (Bankr. S.D. Miss. 1994) ....................25

*Franklin v. Laughlin*,
No. SA-10-CV-1027 XR, 2011 WL 598489 (W.D. Tex. Jan. 13, 2011) ....................26

*In re Friede Goldman Halter Inc.*,
600 B.R. 526 (Bankr. S.D. Miss. 2019) ....................25

*Greenlaw v. United States*,
554 U.S. 237 (2008) ....................23

*NASCO, Inc. v. Calcasieu Television & Radio, Inc.*,
894 F.2d 696 (5th Cir.1990) ....................22

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
2 F.3d 1397 (5th Cir. 1993) ....................21, 22

*Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*,
No. 219CV184FTM99MRM, 2019 WL 3219667 (M.D. Fla. July 17, 2019) ....................24

*In re Saldana*,
531 B.R. 141 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R. 678 (N.D. Tex. 2015) ....................22

*Sanchez-Llamas v. Oregon*,
548 U.S. 331 (2006) ....................23

*Simon v. Taylor*,
794 F. App'x 703 (10th Cir. 2019) ....................23

*Thompson v. Gonzales*,
No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436 (E.D. Cal. Sept. 27, 2016) ........................22

*Uberoi v. Labarga*,
769 F. App'x 692 (11th Cir. 2019) ........................24

*United States v. Sineneng-Smith*,
140 S. Ct. 1575 (2020) ........................23

*Matter of Ward*,
978 F.3d 298 (5th Cir. 2020) ........................21

*Wood v. Milyard*,
566 U.S. 463 (2012) ........................23

**Statutes**

11 U.S.C. § 101(10) ........................20

11 U.S.C. § 105 ........................5, 20, 21, 24

**Other Authorities**

Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245 (2002) ........................23

Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832 (2000) ........................24

Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR. L.J. 461, 563 (2002) ........................24

## Preliminary Statement

1. CLO HoldCo, DAF Fund, and Highland Dallas Foundation have each previously filed pleadings in this Court and are, at least arguably, parties to the Bankruptcy Case. As set forth herein, several targets of the Court's Disclosures Order have never made an appearance before this Court including Charitable DAF Holdco, Ltd.[2] ("DAF Holdco"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation"), and Highland Kansas City Foundation, Inc. ("Highland Kansas City Foundation," collectively with DAF Holdco and Highland Santa Barbara Foundation, the "Non-Party Targets").[3] The Court does not have the power to order a non-party to produce documents nor undertake *sua sponte* investigations, particularly into non-parties. The fact that these entities are non-parties and at the same time targets, is telling. Further the Non-Party Targets have not been served with the Disclosures Order.

2. Neither the Charitable Respondents nor undersigned counsel are authorized to make appearances for the Non-Party Targets, and the Non-Party Targets are not by this Response submitting themselves to this Court's jurisdiction. The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Non-Party Targets. Nonetheless, much of the Disclosures provided by the Charitable Respondents on their own behalf will be informative regarding the Non-Party Targets. Further, the Non-Party Targets have provided limited authorization for the

---

[2] Undersigned counsel has been retained to represent DAF Holdco; however, DAF Holdco has never made an appearance in this bankruptcy case and has not been served in the Adversary Proceeding. Nor has DAF Holdco been served with this Disclosures Order. DAF Holdco has not authorized undersigned counsel to accept service nor to make an appearance for it in this Bankruptcy Case.

[3] The Highland Dallas Foundation, the Highland Santa Barbara Foundation, and the Highland Kansas City Foundation are sometimes also referred to as "Supporting Organizations."

Charitable Respondents, through Mr. Mark Patrick ("Patrick"), to provide the information to the Court that is submitted by the Charitable Respondents in this Response.

3. Further, the Disclosures Order does not mention the third-party foundation level entities included in the Structure Chart (*infra*) ("Foundations"); however, these Foundations have provided the Charitable Respondents with documents and important information regarding their charitable giving structures and the supporting organizations include the Highland Dallas Foundation and the supporting organizations that are Non-Party Targets. The fact and content of this Response is not intended to be nor shall be deemed to be an appearance by these Foundations in this Bankruptcy Case, nor submission by them to this Court's jurisdiction. The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Foundations.

4. Patrick has provided a declaration regarding the information provided by and/or about the Foundations and the Supporting Organizations, and as provided herein within the Disclosures. As well, he has reviewed the Response and Disclosures. *See* **Exhibit 1** [Mark Patrick Declaration]

5. As set forth herein, contrary to the Court's unsupported and highly prejudicial *sua sponte* assertions that the Charitable Respondents and Non-Party Targets "appear to be under the *de facto* control of Mr. Dondero," the Charitable Respondents and Non-Party Targets (along with the Foundations) make up a legal and viable charitable giving structure, established through a non-byzantine set of entities that has committed over $42 million in grants, and funded $32.5 million, to nonprofits across a wide-range of issues including education, support of military, veterans, and first-responders, and victims of family violence and child abuse. With respect to Mr. Dondero, of course he is involved, personally in the capacity as the Donor personality. In addition, as disclosed

within the Disclosures, he holds positions within the Supporting Organizations, which are subject to the authority of the Foundations they support. As well, and as established by Mr. Patrick's uncontroverted testimony before this Court, Mr. Dondero currently acts as an unpaid investment advisor to CLO HoldCo and DAF Fund. However, as will be shown Mr. Dondero is not in "de facto" or legal control of the Charitable Respondents nor the Non-Party Targets (nor the Foundations).

6. The Charitable Respondents take the time to refute the Court's assertions in the Disclosures Order because not only are they factually inaccurate—which will be shown herein and through the submitted Disclosures—but worse, these *sua sponte* findings bear directly upon the causes of action asserted by Official Committee of Unsecured Creditors (the "Committee") against CLO HoldCo, DAF Holdco, DAF Fund, and Highland Dallas Foundation (the "Charitable Defendants") in Adversary Proceeding No. 20-03195 (the "Adversary Proceeding"). While there are several motions to withdraw the reference pending in the Adversary Proceeding, this Court should, at an absolute minimum, refrain from espousing, *sua sponte*, any "findings" or "conclusions" that in fact are indistinguishable from allegations made in conclusory fashion (much like the Court's expositions) by a plaintiff party in litigation currently pending in this Court. Such an "approach" to exercise of the judicial function (under the notion of maintaining the Court's docket) is, frankly, not recognizable as a constitutional approach to exercise of judicial power. This Court, it appears has become litigant, investigator and decider, far outside the scope of case or controversy. Through its assertions the Court appears to have decided integral issues in the Adversary Proceeding *sua sponte* without considering any evidence nor offering the Charitable Defendants any opportunity to present their case, and all this notwithstanding pending motions to

withdraw reference (that the Court has previously stayed over the objection of the Charitable Defendant movers).

## Procedural History

7. As the Court is aware, there was a show cause hearing on June 8, 2021 (the "Show Cause Hearing") related to the lawsuit filed by CLO HoldCo and DAF Fund against the Debtor captioned *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P. et al.*, case no. 21-cv-00842, pending in the United States District Court for the Northern District of Texas (the "District Court Suit"). In the District Court Suit, the plaintiffs filed a motion to amend their complaint (the "Seery Motion"), and thereafter, the Court issued what it titled: *Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Dkt. No. 2255] (the "Show Cause Order") to determine if the "Violators" should be held in contempt of court for filing the Seery Motion. The Court ordered the "Violators," as defined by the Court, including CLO HoldCo and DAF Fund, those persons who authorized the filing of the Seery Motion and the District Court Suit (and the law firm representing the plaintiffs), along with Mr. Dondero, to appear at the Show Cause Hearing.

8. Patrick identified himself as the person who authorized the filing of the Seery Motion and the District Court Suit and identified that he was vested with such authority by virtue of his position as the director CLO HoldCo and control person of DAF Fund. *See* Response, Dkt. No. 2309. The Debtor undertook extensive discovery related to the Show Cause Hearing with the express purpose of attempting to prove that despite Mr. Patrick authorizing the filings and being the control person of the plaintiffs, Mr. Dondero should nonetheless be held in contempt.

9. Therefore, at the Show Cause Hearing, the respondents, including Patrick, introduced evidence reflecting the structure of the Charitable Respondents,[4] the ownership of the Charitable Respondents,[5] and the controlling entities/persons of the Charitable Respondents.[6] At the Show Cause Hearing, Patrick further provided extensive testimony regarding the creation, structure, organization, purpose, and control of the Charitable Respondents. *See* **Exhibit 2** [Transcript, June 8, 2021 Hearing, Excerpts].

10. On June 17, 2021, the Court issued its Disclosures Order *sua sponte* pursuant to Section 105 of the Bankruptcy Code and its "inherent ability to efficiently monitor its docket and evaluate standing of parties who ask for relief in the [Bankruptcy Case]." Disclosures Order, p. 1.

11. Importantly, the Disclosures Order does not relate to and was not issued in connection with any contested matter or adversary proceeding before the Bankruptcy Court. Instead, the Court states that the Disclosures Order is "in furtherance of [its] desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings." Disclosures Order, p. 12. As such, the Court appears to be attempting to ascertain some sort of generalized standing where there is no proceeding before it and contemplating the issuance of pre-filing injunctions against the Charitable Respondents and Non-Party Targets.

12. Based on the forgoing, the Disclosures Order requires numerous parties (whether before the Court or not), including the Charitable Respondents and Non-Party Targets, to file a notice in the Bankruptcy Case disclosing: (a) who owns the entity (showing percentages); (b)

[4] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 1)

[5] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 9, 10, 11, 12, 15, 16, 17, 18, 19, 20)

[6] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 3, 4, ,5, 6, 7, 8, 29)

whether Mr. Dondero or his family trusts have either a direct or indirect ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity (this itself looks to be a determination by this Court of "relationship" with damaging consequences); and (d) whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and substance of its claims).

13. The Disclosures Order does not even pretend to be concerned with such mundane matters as proper service, or the right of parties not before the Court, even if creditors, to remain outside the Court. Certainly the Court does not exhibit a glimpse of concern about possible limitations upon the judicial power to compel parties to appear before it. Because of its assertions concerning Mr. Dondero's "de facto control" of third party entities (again, outside of any pending case or controversy and in fact contrary to evidence put before the Court), the Court has (i) dispensed with case or controversy boundaries, and (ii) sent its Disclosures Order into the universe as an all-powerful compulsion imposed upon entities that have never made appearance before the Court - all without service. All because this Court has concluded that these third parties are controlled by Mr. Dondero, and because this Court has power over Mr. Dondero, it need not think twice about its power over any entity it has determined (without ground) to be controlled by Mr. Dondero because such party may have some relation to Mr. Dondero.

14. As mentioned above, the Charitable Respondents are responding. But the entities outside the scope of the Court's authority are not appearing in Response. As set forth below, the Charitable Respondents believe this Response and the Disclosures provided herein are sufficient and compliant. The Charitable Respondents reserve all rights.

## Response

15. The Charitable Respondents file their Response to the Disclosures Order to comply with it, but with full reservations concerning the propriety of such a *sua sponte* investigation into standing where there is no proceeding before the Court and the prospective issuance of pre-filing injunctions against parties who have never participated in the Bankruptcy Case (i.e. the Non-Party Targets), or have only do so on a limited basis or were compelled to by order of the Court (i.e. the Charitable Respondents).

16. The Charitable Respondents have already provided the Debtor and the Court with much of the information ordered by the Court, and do so again and more robustly herein, to show to the Court that the Charitable Respondents are not "under the *de facto* control of Mr. Dondero" and its directors do not act "at Mr. Dondero's direction." *See* Disclosures Order, pp. 5, 11.

17. The Charitable Respondents, however, take this opportunity to correct any misunderstanding regarding their structure and control, while noting and reserving all rights regarding the impropriety of such prejudicial *sua sponte* assertions.

### I. The Charitable Respondents are independently owned and controlled charitable organizations.

18. The best starting point to understand the structure of the Charitable Respondents is the Structure Chart attached hereto as **Exhibit 3** ["Structure Chart"]. For ease of reference, the Structure Chart is reproduced as follows:




19. Second, the Charitable Respondents provide the Court with a legal memorandum of Kenneth K. Bezozo, a partner with Haynes and Boone, LLP, determined by the Charitable Respondents to be a legal expert in the field of taxation and organizational structures. *See* **Exhibit 4** [Kenneth K. Bezozo Memorandum]. As the Bezozo Memorandum explains, the Structure Chart and the entity structure of which the Charitable Respondents are a part (along with the Supporting Organizations and the Foundations) is a structure including offshore entities that is a typical industry standard investment structure to facilitate tax-exempt ownership and charitable giving. Given that the structure employed is in fact, within the tax-exempt, charitable entity structures neither unusual nor exotic, the Charitable Respondents submit that contrary to the jargon appropriated by the Court from the Committee and the Debtor and its counsel, this structure is not at all "Byzantine."

**The Entities**

**a) CLO HoldCo**

20. As the Structure Chart reflects, CLO HoldCo is a company limited by shares incorporated in the Cayman Islands. *See* **Exhibit 5** [Certificate of Incorporation - CLO HoldCo, Ltd.]. CLO HoldCo was incorporated in 2010. *See* **Exhibit 6** [Memorandum of Association of CLO HoldCo, Ltd.]. CLO HoldCo is managed and controlled by directors who are appointed by resolution of shareholders of CLO HoldCo. *See* Memorandum of Association of CLO HoldCo, Ltd., p. 11-12 ("Directors"). The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 36** [CLO HoldCo - Register of Directors].

21. CLO HoldCo is owned by the holder of its sole share. The sole shareholder of CLO HoldCo was previously DAF Holdco who contributed the share on November 7, 2011 to DAF Fund. *See* **Exhibit 7** [Ordinary Share Registry - CLO HoldCo]. Therefore, CLO HoldCo is wholly owned by DAF Fund.[7]

**b) DAF Fund**

22. DAF Fund is a limited partnership organized under the laws of the Cayman Islands. *See* **Exhibit 8** [Certificate of Registration of Exempted Limited Partnership - DAF Fund]. Pursuant to the *Amended and Restated Exempted Limited Partnership Agreement dated November 7, 2011* (the "DAF Fund LP Agreement"), DAF Holdco is the limited partner of the DAF Fund and the Charitable DAF GP, LLC ("DAF GP") is the general partner. *See* **Exhibit 9** [DAF Fund

[7] While not appearing on the Structure Chart, nor made subject of the Disclosures Order, there are subsidiaries of CLO HoldCo as well, and these are named, with corresponding ownership and director exhibits identified as follows: (i) Liberty CLO Holdco, Ltd. (*see* **Exhibits 38 and 39** [Register of Directors and Share Register]); (ii) MGM Studios HoldCo, Ltd. (*see* **Exhibits 40 and 41** [Register of Directors and Share Register]); (iii) HCT HoldCo 2, Ltd. (*see* **Exhibits 42 and 43** [Register of Directors and Share Register]). Note, Dondero holds no directorship or ownership.

LP Agreement]. Pursuant to the terms of the DAF Fund LP Agreement, DAF Holdco contributed its equity interest in CLO HoldCo to DAF Fund pursuant to a Contribution and Transfer Agreement dated November 7, 2011. Ordinary Share Class Transfers - CLO HoldCo; DAF Fund LP Agreement, ¶3.1.

23. The express purpose of DAF Fund is and always was to invest and trade in securities of all type and other investment vehicles for the purpose of befitting, direct and indirectly, the indirect equity owners of DAF Holdco, which were required to be Section 501(c)(3) of the IRS Code entities or organizations or have sole beneficiaries which are entities or organizations exempt from taxation under Section 501(c)(3) of the IRS Code. *See* DAF Fund LP Agreement, ¶1.3.

24. Because DAF Fund is a limited partnership, the DAF GP has the exclusive and complete discretion in the management and control of the DAF Fund. DAF Fund LP Agreement, ¶1.6, **Exhibit 10** [DAF Fund General Partner Register].

**c) DAF Holdco**

25. DAF Holdco is a company limited by shares incorporated under the laws of the Cayman Islands. See **Exhibit 11** [Amended and Restated Memorandum of Association of DAF Holdco]. DAF Holdco's equity ownership consists of holders of Management and Participating Shares. *Id*. The Management Shares confer no right to participate in profits but rather to manage DAF Holdco, whereas Participating Shares confer the right to participate in profits or assets but not management rights. *Id*.

26. The Management Shares of DAF Holdco were allotted to Grant Scott ("Scott") in 2011 but as will be discussed herein, were transferred to Patrick in 2021. *See* **Exhibit 12** [Register of Management Shares DAF Holdco]. The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 37** [DAF Holdco - Register of Directors]. The Participating Shares of DAF

Holdco are held by the "Supporting Organizations," which are Highland Kanas City Foundation [32.78%], Highland Dallas Foundation [32.78%], Highland Santa Barbara Foundation [32.78%], and Highland Community Foundation of North Texas [1.63%].[8] *See* **Exhibit 13** [Register of Participating Shares DAF Holdco].

27. As set forth in the DAF Fund LP Agreement, DAF Fund's investments are for the benefit of the equity owners of DAF Holdco which were required to be non-profit organizations. The Supporting Organizations are those non-profit organizations.

**d) DAF GP**

28. DAF GP is a limited liability company organized under the laws of Delaware. *See* **Exhibit 14** [Certificate of Formation of DAF GP]. Again, DAF GP is the general partner of DAF Fund who manages and controls DAF Fund. Prior to March 2021, 100% of the limited liability company interests in the DAF GP (the "DAF GP Membership Interests") were held by Mr. Scott. Mr. Scott transferred all of the DAF GP Membership Interests to Mr. Patrick. **Exhibit 15** [Assignment and Assumption of Membership Interests Agreement Dated March 24, 2021].

29. As shown by the Exhibits hereto, Dondero holds no ownership, officer, or director status in any of: CLO HoldCo; DAF Fund; DAF HoldCo; or DAF GP.

**e) The Supporting Organizations**

30. As mentioned, the Supporting Organizations are Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, and Highland Community Foundation of North Texas. These Supporting Organizations were established by the Foundations.

---

8 The Court has not included Highland Community Foundation of North Texas in its Disclosures Order.

- **Highland Dallas Foundation**

31. Highland Dallas Foundation is a corporation incorporated in 2011 under the laws of Delaware. **Exhibit 16** [HDF Certificate of Incorporation]. The Highland Dallas Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code. **Exhibit 17** [IRS Determination - HDF].

32. The Highland Dallas Foundation supports and benefits the Dallas Foundation. *See* HDF Certificate of Incorporation, **Exhibit 18** [Narrative Description of Activities]. The Dallas Foundation is a third-party and is the oldest community foundation in Texas.

33. As set forth in the attached letter from the President and Chief Executive Officer of the Dallas Foundation, the Dallas Foundation is a Texas nonprofit corporation, and is the successor in interest to Dallas Community Trust, a charitable trust which was formed in 1929. **Exhibit 19** [reserved for supplementation]. The Dallas Foundation has hundreds of donors with whom it works regularly to make charitable grants supporting numerous worthy causes and regularly utilizes donor-advised funds and supporting organizations to carry out its charitable mission. *Id.*

34. The Highland Dallas Foundation is a membership corporation, and its members have the ultimate authority to elect its Board of Directors. *Id.* **Exhibit 20** [HDF Bylaws]. The Highland Dallas Foundation has two (2) classes of members, an "Institutional Member" (the TDF), and an "Individual Member" (Mr. Dondero). *Id.*

35. The Institutional Member has two (2) votes and the Individual Member has only one (1) vote on any matter submitted to the members. *Id.* Further, the Institutional Member elects two (2) of Highland Dallas Foundation's three (3) directors, and the Individual Member elects one (1) director. *Id.* The Board of Directors of Highland Dallas Foundation consists of Mr. Dondero, Julie Diaz (Chief Philanthropic Partnerships Officer of TDF) and Matthew Randazzo (President

& Chief Executive Officer of Dallas Foundation). Mr. Dondero serves as President, Mr. Randazzo serves as Vice President and Ms. Diaz serves as Secretary and Treasurer.

36. So while Mr. Dondero is a member with some level of influence within the Highland Dallas Foundation, he has 1/3 of the voting power, where TDF employees have 2/3 of voting power.

37. The Highland Dallas Foundation is an independent supporting organization of the Dallas Foundation. While Mr. Dondero is on the Board of Directors and is President of the Highland Dallas Foundation, it cannot be said to be "under the control" (de facto or otherwise) of Mr. Dondero, because of the control of the Board of Directors held by the Dallas Foundation.

- **Highland Santa Barbara Foundation**

38. The Highland Santa Barbara Foundation was formed in November 2011 as a Delaware nonprofit nonstock corporate to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Santa Barbara Foundation. See **Exhibit 21** [HSBF Certificate of Incorporation]; **Exhibit 22** [IRS Determination - HSBF].

39. The Santa Barbara Foundation is a third-party community foundation incorporated in 1928 as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. **Exhibit 23** [SBF Letter Overview]. The Santa Barbara Foundation funds a wide range of initiatives, projects, and organizations and has supported nearly every Santa Barbara County nonprofit organization and essential community sproject during its 93-year history. *Id.*

40. Similarly to the Dallas Foundation, the Santa Barbara Foundation works with entities organized under Section 509(a)(3) of IRS Code as supporting organizations to Santa Barbara Foundation for the specific and primary purpose of benefiting, performing functions of,

and engaging in activities consistent with Santa Barbara Foundation's charitable purposes. *Id*. Highland Santa Barbara Foundation is one such supporting organization. *Id*.

41. Again as is common amongst supporting organizations, Highland Santa Barbara Foundation has two classes of members, institutional and individual, and one member in each class. *Id*., *see also* Bylaws HSBF. Santa Barbara Foundation is the institutional member and Mr. Dondero is the individual member. Highland Santa Barbara Foundation has three directors, two elected by SBF and one elected by Mr. Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors. *Id*. The directors are Mr. Dondero, Jacqueline M. Carrera (President & CEO of SBF), and Arnold Brier (Santa Barbara County community volunteer). Currently, Mr. Dondero serves as President, Jacqueline M. Carrera as Vice President, and the Secretary position is vacant pending board of directors election.

42. Again, while Mr. Dondero positions in the Highland Santa Barbara Foundation, it is certainly not under his "de facto" control, nor do the other directors and officers act under Mr. Dondero's direction. The Highland Santa Barbara Foundation is an independent supporting organization of the Santa Barbara Foundation, and is controlled by the Santa Barbara Foundation. Imputing a lack of independence based on what is a typical structure for supporting organization management sets a unwarrantable precedent for charitable organizations.

- **Highland Kansas City Foundation**

43. Highland Kansas City Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code, and to support and benefit the Greater Kansas City Community Foundation ("GKCCF"). *See* **Exhibit 24** [GKCCF Certificate of Formation].

44. The Greater Kansas City Community Foundation was created in 1978 and manages over $4 billion in assets, and again uses donor-advised funds and supporting organizations. *See* **Exhibit 25** [GKCCF Letter]. As explained by the President & CEO of Greater Kansas City Community Foundation, Highland Kansas City Foundation is one of 18 supporting organizations that Greater Kansas City Community Foundation works with. *Id*.

45. Highland Kansas City Foundation has two classes of members, institutional and individual, and one member in each class. *See* **Exhibit 26** [Bylaws HKCF]. Greater Kansas City Community Foundation is the institutional member and Mr. Dondero is the individual member.

46. The Directors of Highland Kansas City Foundation are: Brenda Chumley (Senior Vice President of Greater Kansas City Community Foundation), Mr. Dondero, and Deborah Wilkerson (the President & CEO of Greater Kansas City Community Foundation). The Highland Kansas City Foundation has not named officers. All three directors approve grants by unanimous consent.

**f) Mr. Patrick's role**

47. Prior to March 24, 2021, Mr. Scott was the holder of Management Shares in the DAF Holdco. On March 24, 2021, Mr. Scott executed the *Share Transfer Form*, in which he transferred the management shares in DAF Holdco to Mr. Patrick. **Exhibit 27** [Share Transfer Form]. Further on March 24, 2021, Mr. Scott and Mr. Patrick entered into that certain *Assignment and Assumption of Membership Interest* whereby Mr. Scott assigned and Mr. Patrick assumed one hundred percent of the limited liability company interest in the DAF GP. *See* Assignment and Assumption Agreement.

48. As the holder of the management shares in DAF Holdco, Mr. Patrick executed a resolution removing Mr. Scott as Director and appointing Mr. Patrick as Director. **Exhibit 28** [March 25 Resolution - DAF Holdco].

49. On April 2, 2021, Mr. Patrick, as holder of one hundred percent of the interest in DAF GP, executed the shareholder resolution removing Mr. Scott as Director of CLO HoldCo and appointing Mr. Patrick as director. **Exhibit 29** [April 2 Resolution - CLO HoldCo].

50. While on paper the switch from Mr. Scott to Mr. Patrick was completed, it became obvious that this switch would be practically more complicated. Therefore, there was a transitional period wherein Mr. Scott had to continue to authorize certain actions with Mr. Patrick assisting him. As of the date of filing, Mr. Scott no longer has authority/ control over the Charitable Respondents.

51. After Mr. Patrick's appointment, he determined that given the breadth of issues facing the Charitable Respondents, including but not limited to the Adversary Proceeding, it would be in the best interest of DAF Holdco, CLO HoldCo and others for another director to be appointed. As such, on April 22, 2021, Paul Murphy was appointed a director of DAF Holdco and CLO HoldCo. **Exhibit 30** [Written Resolution - Murphy].

### II. The Charitable Respondents have donated tens of millions of dollars to charitable causes

52. The Court included the Charitable Respondents and Non-Party Targets as part of what it terms — borrowing from the Committee's verbiage in the Adversary Proceeding — Mr. Dondero's "byzantine" empire and made *sua sponte* assertions regarding their lack of independence and Mr. Dondero's "de facto" control. Again, as will be set forth herein, these findings are procedurally improper and highly prejudicial to the Charitable Defendants. But most importantly, they are wrong.

53. The Charitable Respondents are part of a charitable structure that donates tens of millions of dollars to charitable causes focusing on education; support for military, veterans, and

first responders; health and medical research; economic and community development initiatives; and youth and family. *See* **Exhibit 31** [Charitable Giving Overview, Grant Summary: 2012-2020].

54. Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations, and have funded $32 million of the total commitments (with the remaining commitments being comprised of future scheduled installments). *Id*.

55. The Supporting Organizations' charitable giving has made a tangible impact on some of the most vulnerable including grants to the Dallas Children's Advocacy Center which serves over 8,000 abused children a year and The Family Place which serves more than 11,000 victims of family violence. *Id*. The CEO of The Family Place has submitted a letter in support which is attached hereto as **Exhibit 32** [The Family Place Letter]. The Family Place empowers victims of family violence by providing safe housing and counseling, and identifies its partnership with the Highland Dallas Foundation as "instrumental" in providing community exposure and awareness of domestic violence as well as providing essential services to family violence victims. *Id*. As stated by the CEO, The Family Violence Place would not be able to successfully serve its domestic violence clients without this support.

56. Cristo Rey Dallas also submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 33** [Cristo Rey Letter]. Cristo Rey Dallas provides college preparatory high school curriculum accessible to those of limited financial resources. Highland Dallas Foundation provided impactful donations which allow Crito Rey Dallas to provide services to its 465 students, including funding work study programs and remote work places during COVID-19 pandemic. *Id*.

57. Dallas Children's Advocacy Center submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 34** [DCAC Letter]. Dallas Children's

Advocacy Center's mission is to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues. *Id*. Highland Dallas Foundation has robustly supported this mission since 2016, including providing funding that has been critical to the sustainability of its programs. *Id.*

58. The Supporting Organizations' grants to the Center for BrainHealth helped provide and training other programming to members of the military, veterans, and local law enforcements to improve their congestive health. *See* Charitable Giving Overview.

59. The Friends of the Dallas Police grants show appreciation to men and women who risk their lives every day to make Dallas a safer city and the Supporting Organizations have funded awards programs and educational sponsorships for children of police officers. *Id*.

60. The Charitable Respondents invite the Court, and others who have characterized the Supporting Organizations as mere "puppets" of Mr. Dondero, to review the Charitable Giving Overview provided herewith as well as the letters in support from The Family Place, Cristo Rey Dallas, Dallas Children's Advocacy Center, the Santa Barbara Foundation, and the Highland Kansas City Foundation. The Charitable Respondents have and will continue to make meaningful impacts on the communities they serve through the tens of millions of dollars of philanthropic giving they facilitate.

**III. CLO HoldCo and DAF Fund may be creditors of the Debtor**

61. In the Disclosures Order, the Court requires all entities to state whether the entity is a creditor of the Debtor and explain in reasonable detail the amount and substance of its claims. Disclosures Order, p. 13.

62. All claims bar dates have long since passed [*see* General Claims Bar Date Order [Dkt. No. 498].

63. The Court states that CLO HoldCo filed two proofs of claim. Disclosures Order, p. 11. This is not correct. CLO HoldCo filed a proof of claim on April 8, 2020 [Proof of Claim No. 133] and on October 21, 2021, CLO HoldCo amended that same proof of claim [Proof of Claim No. 198] (the "Amended Proof of Claim"). In the Amended Proof of Claim, CLO HoldCo explained that as a result of certain proceedings that effectuated a termination of the Debtor's participation interests in the funds referred to in the CLO HoldCo proof of claim, such termination served to cancel the CLO HoldCo interests, as well, as the CLO HoldCo interests were in effect derivative of the Debtor's interests. Accordingly, the Amended Proof of Claim reflected that the CLO HoldCo claim was reduced to $0.00, and therefore resolved.

64. The Court stated in the Disclosures Order that it was unaware of whether DAF Holdco, DAF Fund, Highland Dallas Foundation, Highland Santa Barbara Foundation, or Highland Kansas City Foundation filed proofs of claims (notwithstanding this "uncertainty" the Court deemed it appropriate nevertheless to try to compel appearance). Disclosures Order, p. 11. A review of the Court's Claims Register and that of the Debtor's claims and noticing agent reflects that none of these entities filed proofs of claim against the Debtor.

65. Therefore, none of the Charitable Respondents are pre-petition creditors of the Debtor, as the claims bar date has long since passed and no claims were filed which have not been fully resolved.

66. It is unclear from the Disclosures Order whether the Court is referring to the term "creditor" as defined in section 101(10) of the Bankruptcy Code or using creditor as a lay term. If it is the former, the Charitable Respondents are not creditors of the Debtor. *See* 11 U.S.C. § 101(10) (defining a "creditor" an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor).

67. As the Court is aware from the Show Cause Hearing, CLO HoldCo and DAF Fund filed the District Court Suit against the Debtor. The causes of action asserted by CLO HoldCo and DAF Fund arose after the order for relief. **Exhibit 35** [Complaint]. The substance of these claims is set forth in the Complaint.

## IV. The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing.

68. The Charitable Defendants have fully complied with the Court's Disclosures Order and provided the Court with complete information regarding: (a) who owns each entity, (b) whether Mr. Donerdo or his family trusts have direct or indirect ownership, (c) who the officers, directors, and managers are, and (d) whether the entity is a creditor of the Debtor. The Charitable Defendants have done so because they were expressly ordered by the Court do; however, the Disclosures Order is procedurally improper and highly prejudicial.

### a) The Court does not have the power to require non-parties to provide it with disclosures.

69. The Charitable Defendants are those named entities who have made appearances before this Court. The Court does not have the power to order production or disclosures from non-parties including the Non-Party Targets.

70. In the Disclosures Order, the Court states that the order is issued "*sua sponte* pursuant to Section 105 of the Bankruptcy Code and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties who ask for relief in the above-referenced case." Disclosures Order, p. 1. But yet, the Disclosures Order goes on to target entities who have never asked for the relief in the Bankruptcy Case.

71. Of course, it is undisputed that the Court has the inherent power to manage its own docket "to ensure the orderly and expeditious disposition of cases." *Berry v. CIGNA/RSI-CIGNA*, 975 F.2d 1188, 1191 (5th Cir. 1992) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31

(1962)). But this inherent authority is limited, as is the Court's authority pursuant to section 105 of the Bankruptcy Code. *Matter of Ward*, 978 F.3d 298, 303 (5th Cir. 2020) (noting that "the powers afforded to bankruptcy courts pursuant to § 105, however, are not unlimited").

72. In *Energy Gathering*, the Fifth Circuit considered whether the district court could *sua sponte* order a party's attorney, a non-party to the case, to produce documents. *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1412 (5th Cir. 1993). In that case, the district court found that the attorney had purposefully withheld documents from the court, and "ordered [him] to produce every document in his possession relating to [his client] or business he had done with [his client]." *Id*. at 1404. The district court did not explain the source of its perceived authority to do so. *See id.* at 1405.

73. On appeal by the attorney, the plaintiffs asserted that the district court had the inherent authority to order him to produce documents. *Id*. at 1406. The Fifth Circuit disagreed with the plaintiffs. *See id.* at 1408-09. Specifically addressing whether the district court had the inherent authority to issue its order, the Fifth Circuit acknowledged that the district court had certain limited power "to conduct discovery not recognized by rule or statute," observing that federal courts "possess[ ] all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion." *Id*. at 1409. The Fifth Circuit suggested that the district court had the inherent authority to order the attorney to produce documents—if at all—under its power to issue a "bill of discovery," a common law "chancery tool" that the Supreme Court has described as "the forerunner of all modern discovery procedures." *Id*. at 1409. But recognizing that bills of discovery "could not be used to obtain documents (or other discovery) from someone who was not a party," the Fifth Circuit

therefore concluded that district courts do not have the inherent authority to order non-parties to produce discovery. *Id*.

74. Important here, the Fifth Circuit noted the impropriety of the *sua sponte* investigation by the district court. *Id*. at 1411 (noting "factors [that] contribute to the order's unreasonableness" as being the *sua sponte* nature of the order and that the "court engaged in a fishing expedition"). Expressly relying upon the *Energy Gathering* opinion, the court in *Thompson v. Gonzales* determined that the court lacked inherent authority to order disclosures from non-parties. *Thompson v. Gonzales*, No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436, at *8 (E.D. Cal. Sept. 27, 2016).

**b) The Court's *sua sponte* investigation into hypothetical standing is improper.**

75. As the Fifth Circuit noted in *Energy Gatherings* and this Court and others numerous have many times since, inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc*., 894 F.2d 696, 702 (5th Cir.1990); *In re Saldana,* 531 B.R. 141, 166 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R. 678 (N.D. Tex. 2015).

76. Here, the Court has launched a *sua sponte* investigation into parties under the stated purpose of evaluating their hypothetical standing.

77. The American adversarial system differs from its European (and other) inquisitorial counterparts in that its central features are "party presentation of evidence and arguments" for resolution before a "neutral and passive decision maker[]." Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245, 272 & n.143 (2002); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *Wood v. Milyard*, 566 U.S. 463, 472 (2012).

78. The judge "does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356 (2006) (quotation omitted). Thus,"[i]t is normally incumbent on each party to prove its claims," and a *sua sponte* investigation upsets the normal burden of persuasion between the parties." Domitille Baizeau and Tessa Hayes, *The Arbitral Tribunal's Duty and Power to Address Corruption Sua Sponte*, in Andrea Menaker (ed), International Arbitration and the Rule of Law: Contribution and Conformity, ICCA Congress Series, Volume 19, pp. 225 -265.

79. Thus, federal courts have been instructed to restrain from conducting such an inquest which is antithetical to the American adversarial system. *Simon v. Taylor*, 794 F. App'x 703, 718 (10th Cir. 2019) (noting that scientific evidence involving environmental contamination from the district court's own *sua sponte* investigation cannot be considered); *Wood*, 566 U.S. at 472 ("federal court does not have carte blanche to depart from the principle of party presentation basic to our adversary system"); *Castro v. United States*, 540 U.S. 375, 381–383, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003).

80. The Court asserts that it launched its investigation because standing is an issue of subject matter jurisdiction and that it must gain "clarity" with regard to standing. Disclosures Order, p. 2. But what the Court proposes to do is render an impermissible advisory opinion on the hypothetical standing of the various entities, including some of have never filed a pleading in the Bankruptcy Case. How can this Court have blanket power to compel investigation of entities that have never made appearances before the Court, or that have only been made parties because they have been sued, on the purported ground it needs to investigate standing? As shown here, it cannot.

81. A bankruptcy case itself is not a justiciable controversy; rather, it is the individual proceedings (contested matters or adversary proceedings) which create a justiciable case or controversy.[9] Here, there is no proceeding, and instead, the Court expressly stated that it will determine standing *sua sponte* pursuant to section 105 of the Bankruptcy Code. While this general rule of justiciablity standing alone would prohibit such a determination, evaluating a party's hypothetical standing absent a justiciable controversy is acutely problematic. *See Uberoi v. Labarga*, 769 F. App'x 692, 697 (11th Cir. 2019) ("The Court should not speculate concerning the existence of standing."); *Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*, No. 219CV184FTM99MRM, 2019 WL 3219667, at *2 (M.D. Fla. July 17, 2019) (noting that advisory opinions on standing are improper).

82. This is because "standing is not dispensed in gross," rather, standing must be established for each claim a party seeks to press and for each form of relief that is sought. *Brackeen v. Haaland*, 994 F.3d 249, 291 (5th Cir. 2021) (quoting *Town of Chester v. Laroe Estates, Inc.*, –— U.S. ——, 137 S. Ct. 1645, 1650, 198 L.Ed.2d 64 (2017) and *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008)).

83. This is rule is no less applicable in a bankruptcy case. The Bankruptcy Code does not define "party in interest," offering instead a non-exclusive list of who "may raise and may appear and be heard on any issue" in cases under chapter 11. *In re Friede Goldman Halter Inc.*,

---

[9] Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832 (2000); Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR. L.J. 461, 563 (2002) (explaining that: "the appropriate constitutional explanation for the entirety of federal bankruptcy jurisdiction materializes only when one recognizes that the fundamental jurisdictional unit in bankruptcy is an individual bankruptcy 'proceeding' raising a justiciable controversy between adverse parties.").

600 B.R. 526, 530–31 (Bankr. S.D. Miss. 2019). "The lack of definition was intentional." *In re Delta Underground Storage Co., Inc.*, 165 B.R. 596, 598 (Bankr. S.D. Miss. 1994).

84. Congress' failure to define a party in interest specifically was discussed by both Senator DeConcini and Representative Edwards during the proceedings preceding the enactment of the Code. Senator DeConcini stated:

> Rules of bankruptcy procedure or court decisions will determine who is a party in interest **for the particular purposes of the provision in question.**' 124 Cong.Rec. § 12407 (daily ed. Oct. 6, 1978).... Party in interest is an expandable concept **depending on the particular factual context in which it is applied**.

*Id. (*citing *In re North American Oil & Gas, Inc.*, 130 B.R. 473, 479 (Bankr.W.D.Tex.1990)) (emphasis added). Congress has thus expressly directed that standing in a bankruptcy case must be determined in the particular proceeding before the bankruptcy court.

85. But here, there is no "particular purpose" or "particular factual context" in which this Court can properly evaluate party in interest standing. Instead, it appears that the Court proposes to render an advisory opinion on the named entities' standing to file pleadings without any requisite justiciable controversy before it. But none of this makes sense, with respect to entities not before the Court or only before the Court in capacity as defendants. In fact the Disclosures Order appears to be more of an investigation to find evidence that the Court could point to as supporting its assertions about Dondero's *de facto* control.

86. Additionally, the Court further states that beyond determining the hypothetical standing of such parties, it also must "ascertain whether their interests are sufficiently aligned such that the parties might be required to file joint pleadings hence forth, rather than each file pleadings that are similar in content." Disclosures Order, p. 1. What the Court is describing are pre-filing injunctions, which "are an extreme remedy" that courts should not issue "with undue haste because such sanctions can tread on a litigant's due process right of access to the courts." *Franklin v.*

*Laughlin,* No. SA-10-CV-1027 XR, 2011 WL 598489, at *7 (W.D. Tex. Jan. 13, 2011), *report and recommendation adopted*, No. SA-10-CV-1027-XR, 2011 WL 672328 (W.D. Tex. Feb. 15, 2011).

87. Specifically, the Fifth Circuit has explained that:

> "In determining whether it should impose a pre-filing injunction or should modify an existing injunction to deter vexatious filings, a court must weigh all the relevant circumstances. Four factors must be specifically considered: (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

*Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008).

88. What is more, this purported reason makes no sense, as multiple entities the Court seeks to compel have never made an appearance and the Court has no basis to even suspect that they might make an appearance. With respect to parties who have filed pleadings, for example the Charitable Defendants, the Court already knows that Highland Dallas Foundation and CLO HoldCo have filed joint pleadings within the Adversary Proceeding (a single motion to dismiss for failure to state claims and a single motion to withdraw reference). The Non-Party Targets are nowhere to be found within the Bankruptcy Case or any proceedings before the Court; yet the Court must conduct an investigation into these entities to see whether to compel the filing of joint pleadings? Cannot be.

**c) The Disclosures Order is not just improper, it is prejudicial.**

89. As this Court is aware, the Charitable Defendants are defendants in the Adversary Proceeding instituted by the Committee (DAF Fund and DAF Holdco are also defendants, though yet unserved—despite the Adversary Proceeding being pending for over 6 months). Central to the Committee's claims against the Charitable Defendants are the conclusions posing as allegation(s)

that the Charitable Defendants are part of civil conspiracy to fraudulently transaction assets out of the estate orchestrated by Mr. Dondero whom the Committee characterized as: standing on top of byzantine empire, moving assets and funds from one entity to another to meet various needs. *See* Adversary Proceeding, Dkt. No. 6, ¶2. (Sounds familiar).

90. In the Disclosures Order, the Court, seemingly already deciding this highly disputed issue in the Adversary Proceeding (which is not even a dispute—CLO HoldCo and Highland Dallas Foundation have filed a (joint) motion to dismiss under Rule 7012 for failure to state a claim), as it borrows the Committee's "byzantine" characterization and states that the targets of its Disclosures Order "appear to be under the *de facto* control of Mr. Dondero" and that the DAF Fund's decisions are "presumably at Mr. Dondero's direction." (the word "byzantine" is a much overworked word within this Bankruptcy Case, and its proceedings, pleadings, and orders of this Court). Disclosures Order, pp. 5, 11. This constitutes direct, specific, and express pre-judgment by this Court, and, of course, has tainted the Adversary Proceeding.

91. First and foremost, as shown herein, these assertions/findings are wrong. The Charitable Respondents and Non-Party Targets comprise an independent charitable giving structure that has facilitated the donation of tens of millions of dollars to important philanthropic causes. They are not under the *de facto* control of Mr. Dondero nor does Mr. Dondero direct their decisions—though like any donor would expect, Mr. Dondero has some say in the causes which the Supporting Organizations donate to.

92. But the fact that the Court has made these assertions/findings *sua sponte* outside of the Adversary Proceeding (or any case or controversy), when it has no authority to adjudicate the Adversary Proceeding (that is the subject of a motion to withdraw reference), is highly prejudicial to the Charitable Defendants. This Court, in its assumed posture as investigative body as well as

prosecutor and decider, has given cover to the utterly conclusory assertions of the Committee, and has, practically, joined the Committee as a plaintiff.

93. At an absolute minimum, the Court should refrain from deciding or even commenting upon contested issues of law and fact *sua sponte* outside of the Adversary Proceeding, and should retract its supposed findings (issued under the transparently incorrect suggestion of its power to manage its own docket [by pre-screening parties for standing????? - again, the case law cited above shows this is not proper]). The Charitable Respondents urge the Court, particularly after reviewing the information and documents provided in this Response and Disclosures, to reconsider such findings, and respectfully request that this Court retract its Disclosure Order or at least the problematic content therein.

**CONCLUSION**

By this Response and the Disclosures, the Charitable Respondents have fully complied with this Court's Disclosures Order, but have done so with the express reservations concerning the impropriety of the Disclosures Order and the non-appearance or submission by the Non-Party Targets. But most important to the Charitable Respondents is that the Court closely review this Response and Disclosures and reconsider its assumptions/assertions/findings/conclusion that the Charitable Respondents are under the *de facto* control of or act at the direction of Mr. Dondero. The Charitable Respondents are real, independent charitable giving vehicles that have affected, very positively, the lives of countless people through the tens of millions of dollars donated to important philanthropic causes.

[***signature block on following page***]

**Respectfully submitted:**

**KELLY HART PITRE**

***/s/ Louis M. Phillips***

**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

**CERTIFICATE OF SERVICE**

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this July 9, 2021.

***/s/ Louis M. Phillips***
Louis M. Phillips

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Chapter 11** |
| | § | |
| **Debtor** | § | **Relates to Dkt. No. 2460** |

**Declaration of Mark Patrick**

I, Mark Patrick, hereby declare as follows:

1. My name is Mark Patrick, and I am over the age of 21. I have personal knowledge of the facts set forth herein, and make this declaration pursuant to 28 U.S.C. § 1746.

2. I am a Director of Charitable DAF Holdco, Ltd. and the managing member of the sole general partner of Charitable DAF Fund, L.P. (Charitable DAF Holdco, Ltd. and Charitable DAF Fund, L.P., and their direct and indirect subsidiaries will be referred to herein as the "DAF"). A more robust discussion of these entities and their interrelation is set forth in the Response and Disclosures (defined herein).

3. I appreciate the opportunity to describe the important charitable work the DAF is doing through its charitable beneficiaries.

4. Since its inception in 2012, the DAF has had a significant impact in the communities where the supporting organizations that are the DAF's beneficiaries deploy their capital. In fact, such supporting organizations have funded more than $32 million in charitable contributions to numerous non-profit organizations. The DAF's charitable commitments are in excess of $42 million. The non-profit organizations that have received support from the DAF include The Family Place, which provides emergency shelter to those in need, and the Dallas Children's Advocacy Center, which serves the needs of abused and neglected children. A more

detailed summary of the DAF's charitable impact is an exhibit filed with the Response and Disclosures referenced herein.

5. I ultimately agreed to take on the roles I currently hold with the DAF because I believe in the causes the DAF is supporting. In college, I was a guardian ad litem for abused and neglected children. I have seen firsthand how the DAF is helping people every day who are struggling with abuse or difficult life situations. I have visited the Cristo Rey Dallas school campus, where low income and disadvantaged children are receiving a high-quality education that they otherwise would likely not receive.

6. The actions taken by me on behalf of the DAF in connection with the bankruptcy case of Highland Capital Management, L.P., and the lawsuit I authorized to be filed on behalf of CLO Holdco, Ltd. and DAF Fund against Highland Capital Management, L.P., were done so the DAF can continue to support these worthy causes. I am only trying to protect the DAF's investments, which are the source of the millions in charitable contributions the DAF has made over the past decade.

7. My actions aren't taken under the direction of James Dondero, or to somehow protect a direct or indirect economic benefit Mr. Dondero receives from the DAF. As the Response and Disclosures set forth in greater detail, Mr. Dondero has no direct or indirect economic ownership in the DAF.

8. My concern in vigorously pursuing claims for the DAF, or defending claims against the DAF, is to protect the DAF's investments from being taken by creditors who have no credible basis to obtain such investments.

9. I have been provided with and reviewed this Court's Order Requiring Disclosures (the "Disclosures Order").

10. In my capacity with the DAF, I assisted counsel in preparing the Response and Disclosures related to the Disclosures Order on behalf of CLO Holdco, Ltd., Charitable DAF Fund, L.P., and Highland Dallas Foundation, Inc. (the "Response and Disclosures," and capitalized terms used herein which are not otherwise defined are as defined in the Response and Disclosures).

11. With respect to the documents and Exhibits provided by the Foundations about the Supporting Organizations and Non-Party Targets I or those acting under my direction dealt with the Foundations to obtain such information. Multiple Exhibits have already been provided as evidence to the Bankruptcy Court at the Show Cause Hearing. I have reviewed the exhibits to the Response and Disclosures and affirm that the Exhibits provided about the Charitable Respondents are true and correct copies of what each document is identified as in the Response and Disclosures. With respect to the documents and Exhibits provided by the Foundations, I affirm, upon information and belief that these Exhibits are true and correct copies of what each document is identified as in the Response and Disclosures. As I am not a person with authority over the Supporting Organizations I cannot identify such documents and Exhibits of my own personal knowledge, but am satisfied that I can upon information and belief.

12. I have reviewed the Response and Disclosures and certify that the factual recitations therein are accurate.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.**

**Executed on July 9, 2021**

[signature]

**Mark Patrick**

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Debtor. | **Case No. 19-34054-sgj-11**<br>Chapter 11<br><br>Dallas, Texas<br>Tuesday, June 8, 2021<br>9:30 a.m. Docket<br><br>- SHOW CAUSE HEARING (2255)<br>- MOTION TO MODIFY ORDER AUTHORIZING RETENTION OF JAMES SEERY (2248)<br>- MOTION FOR ORDER FURTHER EXTENDING THE PERIOD WITHIN WHICH DEBTOR MAY REMOVE ACTIONS (2304) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jeffrey Nathan Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067-4003<br>(310) 277-6910 |
| For the Debtor: | John A. Morris<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7700 |
| For the Debtor: | Zachery Z. Annable<br>HAYWARD & ASSOCIATES, PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, TX 75231<br>(972) 755-7104 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Charitable DAF, CLO Holdco, Show Cause Respondents, Movants, and Sbaiti & Company: | Mazin A. Sbaiti<br>Jonathan E. Bridges<br>SBAITI & COMPANY, PLLC<br>Chase Tower<br>2200 Ross Avenue, Suite 4900W<br>Dallas, TX 75201<br>(214) 432-2899 |
| For Mark Patrick: | Louis M. Phillips<br>KELLY, HART & HALLMAN, LLP<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 338-5308 |
| For Mark Patrick: | Michael D. Anderson<br>KELLY, HART & HALLMAN, LLP<br>201 Main Street, Suite 2500<br>Fort Worth, TX 76102<br>(817) 332-2500 |
| For James Dondero: | Clay M. Taylor<br>Will Howell<br>BONDS ELLIS EPPICH SCHAFER JONES, LLP<br>420 Throckmorton Street, Suite 1000<br>Fort Worth, TX 76102<br>(817) 405-6900 |
| For the Official Committee of Unsecured Creditors: | Matthew A. Clemente<br>SIDLEY AUSTIN, LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br>(312) 853-7539 |
| For the Official Committee of Unsecured Creditors: | Paige Holden Montgomery<br>SIDLEY AUSTIN, LLP<br>2021 McKinney Avenue, Suite 2000<br>Dallas, TX 75201<br>(214) 981-3300 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |

Case 19-34054-sgj11 Doc 2547-2 Filed 07/01/21 Entered 07/01/21 18:49:58 Desc



Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

Q Was there any effort whatsoever to hide the prior order of the Bankruptcy Court?

A No.

MR. ANDERSON: Pass the witness.

THE COURT: Okay. Other examination?

MR. SBAITI: Yes, Your Honor. Just a couple of questions.

CROSS-EXAMINATION

BY MR. SBAITI:

Q Do you mind flipping to Exhibit 25, which I believe is the org chart, the one that you were looking at before?

A Okay.

Q It'll still be in --

A Okay. Yeah.

Q -- the defense binder. No reason to swap out right now.

A I've got the right binders. Some of them are repeatable exhibits, so --

Q Yeah.

A -- I have to grab the right binder. Yes.

Q As this org chart would sit today, is the only difference that Grant Scott's name would instead be Mark Patrick?

A Yes.

Q Was there ever a period of time where Jim Dondero's name would sit instead of Grant Scott's name prior?

A Yes, originally, when this -- yes.

Case 19-34054-sgj11 Doc 2547-29 Filed 07/09/25 Entered 07/09/25 18:26:29 Page 6 of 12



Q So did Mr. Dondero both have the control shares of the GP, LLC and DAF Holdco Limited?
A No, I believe not. I believe he only held the Charitable DAF GP interest and that Mr. Scott at all times held the Charitable DAF Holdco, LTD interest, until he decided to transfer it to me.
Q Can you just tell us how Mr. Scott came to hold the control shares of the Charitable DAF Holdco, LTD?
A When he was the independent trustee of the Charitable Remainder Trust, he caused that -- the creation of that entity, and that's how he became in receipt of those management shares.
Q And does the Charitable DAF GP, LLC have any control over Charitable DAF Fund, LP's actions or activities?
A Yes, it does.
Q What kind of control is that?
A I would describe complete control. It's the managing member of that entity and can -- and effectively owns, you know, the hundred percent interest in the respective subsidiaries, and so the control follows down.
Q And when did Mr. Scott replace Mr. Dondero as the GP -- managing member of the GP?
A Well, I think as the -- and Mr. Morris had shown me with respect to that transfer occurring on March 2012.
Q So nine years ago?

A Yes.
Q Does Mr. Dondero today exercise any control over the activities of the DAF Charitable -- the Charitable DAF, GP or the Charitable DAF Holdco, LTD?
A No.
Q Is he a board member of sorts for either of those entities?
A No.
Q Is he a board members of CLO Holdco?
A No.
Q Does he have any decision-making authority at CLO Holdco?
A None.
Q The decision to authorize the lawsuit and the decision to authorize the motion that you've been asked about, who made that authorization?
A I did.
Q Did you have to ask for anyone's permission?
A No.

MR. SBAITI: No more questions, Your Honor.

THE COURT: Okay. Any -- I guess Mr. Taylor, no. All right. Any redirect?

REDIRECT EXAMINATION

BY MR. MORRIS:

Q Since becoming the authorized representative of the Plaintiffs, have you ever made a decision on behalf of those

entities that Mr. Dondero disagreed with?

A I have made decisions that were adverse to Mr. Dondero's financial -- financial decision. I mean, financial interests. Whether he disagreed with them or not, I don't -- he has not communicated them to me. But they have been adverse, at least two very strong instances.

Q Have you ever -- have you ever talked to him about making a decision that would be adverse to his interests? Did he tell -- did --

A I didn't -- I don't -- I did not discuss with him prior to making the decisions that I made that were adverse to his economic interests.

MR. MORRIS: Okay. No further questions, Your Honor.

THE COURT: Any further examination? Recross on that redirect?

MR. ANDERSON: No further questions.

MR. SBAITI: No further questions, Your Honor.

MR. ANDERSON: Sorry.

THE COURT: Nothing?

MR. ANDERSON: I think we're good.

THE COURT: Okay. I have one question, Mr. Patrick. My brain sometimes goes in weird directions.

EXAMINATION BY THE COURT

THE COURT: I'm just curious. What are these Cayman Island entities, charitable organizations formed in the Cayman

THE COURT: Uh-huh.

THE WITNESS: The offshore master fund structure typically will have two different types of -- they call it foreign feeder funds. One foreign feeder fund is meant to accommodate foreign investors; the other foreign feeder fund is meant to accommodate U.S. tax-exempt investors.

Why, why is it structured that way? In order to avoid something called -- I was trying not to be wonkish -- UBTI. That's, let's see, Un -- Unrelated Trader Business Income. I probably have that slightly wrong. But it's essentially, it's a means to avoid active business income, which includes debt finance income, which is what these CLOs tend to be, that would throw off income that would be taxable normally if the exempts did not go through this foreign blocker, and it converts that UBTI income -- it's called (inaudible) income -- into passive income that flows -- that flows up to the charities.

And so it's very typical that you'll have a U.S. tax-exempt investor, when they make an investment in a fund, prefer to go through an offshore feeder fund, which is actually Charitable DAF Holdco, LTD. That's essentially what, from a tax perspective, represents as a UBTI blocker entity. And then you have the offshore investments being held offshore because there's a variety of safe harbors where the receipt of interest, the portfolio interest exception, is not taxable.

The creation of capital gains or losses under the -- they call it the trading, 864(b) trading safe harbor, is not taxable. So that's why you'll find these structures operating offshore to rely on those safe harbor provisions as well as -- as well as what I indicated with respect to the two type blocker entities. It's very typical and industry practice to organize these way. And so when this was set --

THE COURT: It's very typical in the charitable world to --

THE WITNESS: In the investment management --

THE COURT: -- form this way?

THE WITNESS: In the investment management world, when you have charitable entities that are taking some exposure to assets that are levered, to set this structure up in this way. It was modeled after -- they just call them offshore master fund structures. They're known as Mickey Mouse structures, where you'll have U.S. investors --

THE COURT: Yes. I -- yes, I --

THE WITNESS: -- enter through a U.S. partnership, and the foreign investors enter through a blocker.

THE COURT: It was really just the charitable aspect of this that I was --

THE WITNESS: Yeah. Yeah.

THE COURT: -- getting at.

THE WITNESS: Yeah. No, but I'm just trying to

emphasize if --

THE COURT: All right. It's --

THE WITNESS: Yeah.

THE COURT: -- neither here nor there. All right.

MR. SBAITI: Your Honor, may I ask a slightly clarifying leading question on that, because I think I understand what he was trying to say, just for the record?

THE COURT: Well, --

MR. MORRIS: I object.

THE COURT: -- I tell you what. Anyone who wants to ask one follow-up question on the judge's question can do so. Okay? You can go first.

MR. SBAITI: I'll approach, Your Honor.

THE COURT: Okay.

RECROSS-EXAMINATION

BY MR. SBAITI:

Q Would it be a fair summary of what you were saying a minute ago that the reason the bottom end of that structure is offshore is so that it doesn't get taxed before the money reaches the charities on the U.S. side?

A Tax -- it converts the nature of the income that is being thrown off by the investments so that it becomes a tax friendly income to the tax-exempt entity. Passive income. That's --

Q So, essentially, --

THE COURT: Okay. Okay.

MR. SBAITI: -- so it doesn't get taxed before it hits the --

THE COURT: I said one question.

MR. SBAITI: Sorry, Your Honor.

THE COURT: Okay. He answered it.

MR. PHILLIPS: And I have one question, Your Honor

THE COURT: Okay.

MR. PHILLIPS: I don't know if I need to ask this question, but I'd rather not ask you if I need to ask it.

THE COURT: Go ahead.

MR. PHILLIPS: But if I do, you know, I could --

THE COURT: Go ahead.

MR. PHILLIPS: Well, okay.

RECROSS-EXAMINATION

BY MR. PHILLIPS:

Q We've talked about the offshore structure. Are the foundations in the top two tiers of the organizational chart offshore entities?

A No.

Q They're --

A They're onshore entities. They're tax-exempt entities.

Q Thank you.

A The investments are offshore.

Q Thank you.

# EXHIBIT 3

Case 19-34054-sgj11 Doc 2547-3 Filed 07/01/21 Entered 07/01/21 23:49:58 Desc Exhibit 3 Page 58 of 148

Charitable DAF/CLO HoldCo
Structure Chart



# EXHIBIT 4

# MEMORANDUM

**Date: July 9, 2021**

**To: Mark Patrick**

**Company: Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From: Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject: Donor Advised Funds ("*DAFs*"), Sponsoring Organizations and Supporting Organizations -- The Reasons for Making Investments in Offshore Jurisdictions**

---

1. ***What are Donor Advised Funds, Sponsoring Organizations and Supporting Organizations?***

A donor advised fund, or DAF, is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) organization), which is generally referred to as a sponsor. Sponsors may include a community foundation, university, religious organization, or financial institution. The donor (or the donor's designee) typically maintains certain advisory privileges over the DAF funds or account – specifically with respect to charities that should receive donations, although the DAF account is fully and completely owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a "supporting organization" which also is a Section 501(c)(3) public charity. A supporting organization is a separate entity controlled by the sponsor through its ability to elect a majority of the supporting organization's governing board. Because of this control, a supporting organization is treated financially as part of a consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting organization named Highland Dallas Foundation, Inc. ("***Highland Dallas Foundation***") to assist The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of community affairs. Donations were made to the Highland Dallas Foundation as both the sponsor and the supporting organization. The Highland Dallas Foundation from time to time makes distributions of funds to The Dallas Foundation which in turn makes further distributions to local public charities. ***Exhibit 1*** attached shows these above-described entities, as well as other entities referenced herein that are pertinent to this donor advised fund.

2. ***How Does a Donor Establish a DAF Account?***

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets, such as cash, stock or securities or other business or financial assets, to a sponsoring public charity. The donor's contribution is recorded and recognized as a donation to the sponsoring

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable. This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3. ***What Type of Investments Can be Made by a Sponsor/Supporting Organization?***

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds. But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. ***Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?***

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations. As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes. A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate. The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization. UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to “block” this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. The blocker corporation thereafter distributes the income to the tax-exempt

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

b***. Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?***

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership. In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.") Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor). This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds. In fact, if a U.S. law firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

4. ***Who Has Control and Authority over the Assets Held by the Sponsor?***

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation. Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a). But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. ***What Are the Benefits to a Donor of a Contribution to a DAF account?***

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future. Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets. This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

# Exhibit 1

## Charitable DAF/CLO Holdco
## Structure Chart



# EXHIBIT 18

## Attachment 4

***Part IV*** Narrative Description of Activities

The Applicant is organized and will be operated exclusively as a supporting organization within the meaning of section 509(a)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), to support and benefit The Dallas Foundation ("TDF"), a Texas nonprofit corporation. TDF is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code and a public charity described in section 509(a)(1) of the Code.

The Applicant received its funding as one of three charitable remainder beneficiaries of a charitable remainder trust created by James Dondero, which terminated on November 30, 2011. As the attached Schedule D reflects, the Applicant qualifies as a Type I supporting organization within the meaning of section 509(a)(3)(B)(i) because a majority of its board is elected by TDF.

The Applicant's supported organization, TDF, is the oldest community foundation in Texas and serves donors and nonprofit agencies throughout North Texas. As a community foundation, TDF offers a range of ways for local philanthropists to assist the community, including donor advised funds, designated and agency endowment funds, field of interest funds, scholarship funds, and unrestricted funds. TDF focuses on challenges facing North Texas and searches for nonprofit agencies that address these issues most efficiently and effectively, and it assists in connecting donors to causes they care about. In 2010, TDF paid out $31,408,988 in grants to charitable organizations in North Texas. The Applicant will support and benefit TDF by making grants directly to TDF in support of its charitable purposes. In addition, upon the direction and on behalf of TDF, the Applicant may make grants to such other public charities that TDF wishes to benefit in furtherance of TDF's exempt purposes. The total annual grants from the Applicant to or on behalf of TDF are expected to average approximately $1,000,000 per year.

# EXHIBIT 20

# Attachment 3

***Part II, Line 5*** Bylaws

# BYLAWS
# OF

# HIGHLAND DALLAS FOUNDATION, INC.

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I OFFICES | | 1 |
| Section 1.1 | Registered Office | 1 |
| Section 1.2 | Other Offices | 1 |
| ARTICLE II MEMBERSHIP | | 1 |
| Section 2.1 | Classes and Number | 1 |
| Section 2.2 | Voting | 1 |
| Section 2.3 | Transfer of Membership | 1 |
| Section 2.4 | Resignation of Member | 2 |
| Section 2.5 | Place of Meetings | 2 |
| Section 2.6 | Annual Meetings | 2 |
| Section 2.7 | Special Meetings | 2 |
| Section 2.8 | Notice of Meetings of Members | 2 |
| Section 2.9 | Quorum | 3 |
| Section 2.10 | Voting | 3 |
| Section 2.11 | Proxies | 3 |
| Section 2.12 | Action by Written Consent | 3 |
| ARTICLE III DIRECTORS | | 4 |
| Section 3.1 | General Powers | 4 |
| Section 3.2 | Number of Directors | 4 |
| Section 3.3 | Vacancies | 4 |
| Section 3.4 | Place of Meetings | 4 |
| Section 3.5 | Committees of Directors | 4 |
| Section 3.6 | Compensation of Directors | 4 |
| Section 3.7 | Annual Meeting | 4 |
| Section 3.8 | Additional Regular Meetings | 5 |
| Section 3.9 | Special Meetings | 5 |
| Section 3.10 | Method and Timing of Notice | 5 |
| Section 3.11 | Purpose not Required in Notice | 5 |
| Section 3.12 | Waiver of Notice | 5 |
| Section 3.13 | Action by Written Consent. | 6 |
| Section 3.14 | Validation of Action by Consent | 6 |
| Section 3.15 | Quorum and Manner of Acting | 6 |
| Section 3.16 | Resignation and Removal of Directors | 6 |
| ARTICLE IV OFFICERS | | 6 |
| Section 4.1 | Officers | 6 |
| Section 4.2 | Election, Term of Office and Eligibility | 7 |

Section 4.3 Subordinate Officers ....7
Section 4.4 Removal ....7
Section 4.5 The President ....7
Section 4.6 The Secretary ....7
Section 4.7 The Assistant Secretaries ....7
Section 4.8 Chairman ....8
Section 4.9 The Chief Financial Officer ....8
Section 4.10 The Assistant Chief Financial Officers ....8
Section 4.11 Delegation of Duties ....8

ARTICLE V BOOKS AND RECORDS ....8

Section 5.1 Location ....8
Section 5.2 Inspection ....9

ARTICLE VI MISCELLANEOUS PROVISIONS ....9

Section 6.1 Fiscal Year ....9
Section 6.2 Depositories ....9
Section 6.3 Checks, Drafts and Notes ....9
Section 6.4 Contracts and Other Instruments ....9
Section 6.5 Conflicts of Interest ....9
Section 6.6 Waivers of Notice ....10
Section 6.7 Ownership Interests in Other Entities ....10
Section 6.8 Indemnification ....10
Section 6.9 Amendment of Bylaws ....11

BYLAWS

OF

HIGHLAND DALLAS FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1 Registered Office. The registered office of Highland Dallas Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1 Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4 Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5 Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6 Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7 Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8 Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9 Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10 Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11 Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7 Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11 Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV

## OFFICERS

Section 4.1 Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2 Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3 Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4 Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5 The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6 The Secretary. The Secretary shall:

(a) keep the minutes of the meetings of the members and of the Board of Directors;

(b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c) be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d) in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7 The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 Chairman. The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 The Chief Financial Officer. The Chief Financial Officer, if any, shall:

(a) receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5 Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6 Waivers of Notice. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7 Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8 Indemnification.

(a) Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b) If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9 Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the

Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

# EXHIBIT 21

# Delaware



*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND SANTA BARBARA FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:36 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

SECRETARY OF STATE · DELAWARE · 1776 · 1970

Jeffrey W. Bullock, Secretary of State

5069989 8100

111224480

AUTHENTICATION: 9177064

DATE: 11-23-11

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:36 PM 11/22/2011
SRV 111224480 - 5069989 FILE

# CERTIFICATE OF INCORPORATION

# OF

# HIGHLAND SANTA BARBARA FOUNDATION, INC.

FIRST: The name of the corporation is Highland Santa Barbara Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated, exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit Santa Barbara Foundation, a California nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code of 1986 as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by Santa Barbara Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to Santa Barbara Foundation. If Santa Barbara Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 21st day of November, 2011.

James Dondero

# EXHIBIT 23

SANTA BARBARA FOUNDATION

**BOARD OF TRUSTEES**

Pamela Gann
**Chair**

Stephen Hicks
**Vice Chair**

Susan T. Richards
**Treasurer**

Nicolasa Sandoval, Ph.D.
**Secretary**

Diane Adam
Phil Alvarado
Randall Day
Donna France
Angel Iscovich, M.D.
Danna McGrew
Robert C. Nakasone
Ernesto Paredes
Cathy Pepe
James Rogers
Matt Rowe
Ginger Salazar
Tracy Stouffer
Michael D. Young, Ph.D.

**President & CEO**
Jacqueline M. Carrera

**South County Headquarters**
1111 Chapala Street, Suite 200
Santa Barbara, CA 93101-3100
Phone: (805) 963-1873
Fax: (805) 966-2345

**North County Headquarters**
2625 S. Miller Street, Suite 101
Santa Maria, CA 93455-1777
Phone: (805) 346-6123
Fax: (805) 346-6125

**SBFoundation.org**

@sbfoundation
@sbfoundation
/santa-barbara-foundation
@santabarbarafoundation

July 9, 2021

Honorable Stacy G. C. Jernigan
United States Bankruptcy Judge
Northern District of Texas

Re: Highland Dallas Foundation, Inc.

Dear Judge Jernigan:

The Santa Barbara Foundation ("SBF") is a community foundation incorporated in 1928 under the laws of the state of California as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. The mission of SBF is to mobilize collective wisdom and philanthropic capital to build empathetic, inclusive, and resilient communities. Working in partnership with individuals, families, community organizations, nonprofits, businesses, and government, SBF funds a wide range of initiatives, projects, and organizations. SBF has supported nearly every Santa Barbara County nonprofit organization and essential community project during its 93-year history and continues to serve as one of the largest private funding sources for area nonprofits, agencies, and college-bound students.

In 2020, SBF awarded $31 million in grants, received $36 million in contributions, and had $514 million in assets. Nonprofit support included annual grant programs (behavioral health, health care, food, shelter & safety, and child care), laying the groundwork for workforce development strategies, and creating the Collaboration for Social Impact to help nonprofits with capacity building and leadership development. Additionally, SBF co-organized and co-led the countywide COVID-19 Joint Response Effort, broadened its grantmaking to include small businesses through the Santa Barbara Better Together Fund, co-led the 2020 census efforts with the County of Santa Barbara, sponsored and produced educational events to promote diversity, equity, inclusion and access, and continued its annual funding of the Scholarship Foundation of Santa Barbara. Grants are made through SBF from various types of funds, including donor advised, donor designated, and field of interest. Discretionary grants, totaling over $7 million in 2020, are also supported by SBF's unrestricted contributions and investment income.

<u>Supporting Organizations</u>

SBF works with entities organized under Section 509(a)(3) of the Internal Revenue Code as supporting organizations to SBF for the specific and primary purpose of benefiting, performing functions of, and engaging in activities consistent with SBF's charitable purposes. SBF appoints a majority of the members of the governing boards of the supporting organizations. Each governing board may create its own investment policy and grant guidelines. Each organization is a separate legal entity required to file

its own IRS Form 990, "Return of Organization Exempt from Income Tax". SBF and its supporting organizations are considered under SBF's control and thus consolidated in SBF's audited financial statements.

<u>Overview of Highland Santa Barbara Foundation, Inc.</u>

Highland Santa Barbara Foundation, Inc. (HSBF) was formed in November 2011 as a Delaware nonprofit nonstock corporation to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of SBF. HSBF is a Type I supporting organization under Section 509(a)(3) of the Internal Revenue Code. SBF is a supported organization under Section 509(a)(1) of the Internal Revenue Code.

The Bylaws of HSBF describe the governance of HSBF by its members, directors, and officers. HSBF has two classes of members, institutional and individual, and one member in each class. SBF is the institutional member. James Dondero is the individual member. HSBF has three directors, two elected by SBF and one elected by James Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors.

SBF and HSBF have an operating agreement whereby SBF provides grant administration and other services to HSBF and HSBF pays support fees to SBF. The fees are calculated using a tiered schedule based on the fair market value of 100 participation shares of Charitable DAF HoldCo, Ltd., which is the primary asset of HSBF. The fair market value is determined by an independent valuation firm at least annually.

<u>Relationship and Mission Advancement</u>

SBF meets annually with HSBF to discuss SBF activities, alignment of SBF priorities and focus areas with HSBF philanthropic objectives, and proposed HSBF funding for the upcoming year. Since its inception, HSBF has funded over $5 million of the grants awarded by SBF, including nearly $3 million in Santa Barbara County. See HSBF, Inc. History, attached.

HSBF has augmented SBF's discretionary grants in the areas of: early childhood, youth, and workforce development and education; scholarships; veterans and military education and job training; Community Caregiving Initiative; and Food Action Plan. HSBF has also funded grants to specific organizations, including: $400,000 to Children's Museum of Santa Barbara d.b.a. MOXI - The Wolf Museum of Exploration and Innovation; $90,000 to Reasoning Mind, Inc. for identified local schools to participate in a math literacy program; and $30,000 to Boy Scouts of America - Los Padres Council for rebuilding of Camp Rancho Alegre following the Whittier Fire.

Thank you.

Sincerely,

Jacqueline M. Carrera

Jacqueline M. Carrera
President & Chief Executive Officer

# EXHIBIT 25

GREATER KANSAS CITY
COMMUNITY FOUNDATION℠

July 7, 2021

To Whom It May Concern:

Thank you for this opportunity to share our experience working with the Highland Kansas City Foundation, Inc.

I represent the Greater Kansas City Community Foundation, which exists to serve philanthropic donors by providing vehicles for their charitable giving. The Community Foundation was founded in 1978, and now has an asset base of more than $4 billion, housing thousands of donor-advised funds, scholarship funds, supporting organizations and other charitable funds and accounts established by individuals, families and businesses. In 2020, the Community Foundation's donors used their charitable dollars to grant over $550 million to their favorite causes across the country.

The Community Foundation currently works with 18 supporting organizations, one of which is the Highland Kansas City Foundation, established in 2011. Supporting organizations operate under their own legal entities but require the Community Foundation's active oversight and involvement. The Community Foundation's Board of Directors controls the Board of the Highland Kansas City Foundation. The Community Foundation oversees all of the Highland Kansas City Foundation's grants, ensuring every dollar is distributed for charitable purposes.

Since 2011, the Highland Kansas City Foundation has granted more than $9 million to support education and college preparation, historical preservation, medical research, veterans, the arts, the environment and more.

The Community Foundation's mission is to increase philanthropy and connect donors to the causes they care about, and we are honored to further the Highland Kansas City Foundation's generosity through significant annual distributions to important causes in our country.

Sincerely,

Deborah L Wilkerson

Deborah L. Wilkerson
President & CEO

1055 Broadway Blvd., Suite 130 | Kansas City, MO 64105 | 816.842.0944 | www.growyourgiving.org

# EXHIBIT 26

# BYLAWS

# OF

# HIGHLAND KANSAS CITY FOUNDATION, INC.

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I | OFFICES | 1 |
| Section 1.1 | Registered Office | 1 |
| Section 1.2 | Other Offices | 1 |
| ARTICLE II | MEMBERSHIP | 1 |
| Section 2.1 | Classes | 1 |
| Section 2.2 | Voting | 1 |
| Section 2.3 | Transfer of Membership | 1 |
| Section 2.4 | Resignation of Member | 2 |
| Section 2.5 | Place of Meetings | 2 |
| Section 2.6 | Annual Meetings | 2 |
| Section 2.7 | Special Meetings | 2 |
| Section 2.8 | Members' List | 2 |
| Section 2.9 | Notice of Meetings of Members | 2 |
| Section 2.10 | Quorum | 3 |
| Section 2.11 | Voting | 3 |
| Section 2.12 | Proxies | 3 |
| Section 2.13 | Action by Written Consent | 3 |
| ARTICLE III | DIRECTORS | 4 |
| Section 3.1 | General Powers | 4 |
| Section 3.2 | Number of Directors | 4 |
| Section 3.3 | Vacancies | 4 |
| Section 3.4 | Place of Meetings | 4 |
| Section 3.5 | Committees of Directors | 4 |
| Section 3.6 | Compensation of Directors | 4 |
| Section 3.7 | Annual Meeting | 5 |
| Section 3.8 | Additional Regular Meetings | 5 |
| Section 3.9 | Special Meetings | 5 |
| Section 3.10 | Method and Timing of Notice | 5 |
| Section 3.11 | Purpose not Required in Notice | 6 |
| Section 3.12 | Waiver of Notice | 6 |
| Section 3.13 | Action by Written Consent | 6 |
| Section 3.14 | Validation of Action by Consent | 6 |
| Section 3.15 | Quorum and Manner of Acting | 6 |
| Section 3.16 | Resignation and Removal of Directors | 7 |
| Section 3.17 | Chairman Presiding | 7 |
| ARTICLE IV | OFFICERS | 7 |
| Section 4.1 | Officers | 7 |

| | | |
|---|---|---|
| Section 4.2 | Election, Term of Office and Eligibility | 7 |
| Section 4.3 | Subordinate Officers | 7 |
| Section 4.4 | Removal | 7 |
| Section 4.5 | The President | 8 |
| Section 4.6 | The Secretary | 8 |
| Section 4.7 | The Assistant Secretaries | 8 |
| Section 4.8 | The Chief Financial Officer | 8 |
| Section 4.9 | The Assistant Chief Financial Officers | 9 |
| Section 4.10 | Delegation of Duties | 9 |
| ARTICLE V | BOOKS AND RECORDS | 9 |
| Section 5.1 | Location | 9 |
| Section 5.2 | Inspection | 9 |
| ARTICLE VI | MISCELLANEOUS PROVISIONS | 9 |
| Section 6.1 | Fiscal Year | 9 |
| Section 6.2 | Depositories | 9 |
| Section 6.3 | Checks, Drafts and Notes | 9 |
| Section 6.4 | Contracts and Other Instruments | 10 |
| Section 6.5 | Waivers of Notice | 10 |
| Section 6.6 | Ownership Interests in Other Entities | 10 |
| Section 6.7 | Indemnification. | 10 |
| Section 6.8 | Amendment of Bylaws. | 12 |

BYLAWS

OF

HIGHLAND KANSAS CITY FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1 Registered Office. The registered office of Highland Kansas City Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1 Classes. The Corporation shall have two classes of members, the Institutional Member, which shall be the Greater Kansas City Community Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 Voting. Except as otherwise provided in these Bylaws, each member shall be entitled to one vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document designate an individual, or series of individuals, to serve as a successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Each successor Individual Member may in the same manner designate an individual, or

series of individuals, to serve as successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such appointments, the one bearing the earliest date shall control. Each Individual Member may at any time revoke his or her appointment notice or other document in whole or in part by written notice delivered to the Institutional Member. If at any time there is no Individual Member and no individual has been designated in accordance with the foregoing provisions of this Section to act as such, then the Individual Member shall be the individual designated by a majority of the eldest generation of then living descendants of James Dondero that has at least one descendant then living.

Section 2.4 Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5 Place of Meetings. All meetings of the members shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6 Annual Meetings. An annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.7 Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.8 Members' List. At least ten days before every meeting of members, a complete list of the members entitled to vote at said meeting, arranged in alphabetical order, shall be prepared by the Secretary. Such list shall be open to the examination of any member, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any member who is present.

Section 2.9 Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting. Notice shall be given (a) by written notice delivered personally,

(b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.10 Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business except as otherwise provided by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall again be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.11 Voting. When a quorum is present at any meeting, the vote of a majority of the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.12 Proxies. At any meeting of the members, a member is entitled to be counted as present and to vote by written proxy executed by that member or his or her duly authorized attorney-in-fact. No proxy shall be valid after three (3) months from the date of its execution.

Section 2.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of members necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.13. Prompt notice of the taking of an action by the members without a

meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and

expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7 Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 Method and Timing of Notice. When notice is required to be given for a meeting of the Board of Directors, such notice shall specify the date, time, and location of the meeting and shall be given to each Director at least ten (10) days prior to the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11 Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of Directors necessary to authorize or take such action at a meeting at which all Directors entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Prompt notice of the taking of an action by the Board of Directors without a meeting by less than unanimous written consent shall be given to each Director who did not consent in writing to the action. Each such consent must state the date of each Director's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 Quorum and Manner of Acting. Except as otherwise provided in these Bylaws, a quorum for the transaction of business at any meeting of the Board of Directors shall consist of all three of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. A Director shall be considered present at any meeting of the Board of Directors if the Director participates in person or by proxy or if during the meeting he or she can communicate with all other persons

participating in the meeting by using conference telephone or another suitable electronic communications system. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

Section 3.17 Chairman Presiding. If a Chairman is appointed by the Board of Directors, the Chairman shall preside at all meetings of the Board of Directors and in general shall perform all duties incident to a nonexecutive chairman of a board of directors.

## ARTICLE IV

## OFFICERS

Section 4.1 Officers. The officers of the Corporation shall be a President, a Secretary and a Chief Financial Officer. One person may hold any number of said offices.

Section 4.2 Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers need be members of the Board of Directors.

Section 4.3 Subordinate Officers. The Board of Directors may appoint such Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4 Removal. The President, the Secretary and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5 The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6 The Secretary. The Secretary shall:

(a) Keep the minutes of the meetings of the members and of the Board of Directors;

(b) See that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c) Be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized;

(d) In general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7 The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 The Chief Financial Officer. The Chief Financial Officer shall:

(a) Receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) Render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation;

(c) In general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.9 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.10 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection by any member of the Board of Directors at all times; and open to inspection by the members at such times, and subject to such regulations as the Board of Directors may prescribe, except as otherwise provided by statute.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or

agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5 Waivers of Notice. Whenever any notice is required to be given under the provisions of the statutes or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.6 Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.7 Indemnification.

(a) Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any

such proceeding in advance of its final disposition upon receipt by the corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b) If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.8 Amendment of Bylaws.

(a) The members, by the affirmative unanimous vote of the members entitled to vote, may, at any annual or special meeting if notice of such alteration or amendment of the Bylaws is contained in the notice of such meeting, adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors.

(b) The Board of Directors, by unanimous vote, may adopt, amend, or repeal these Bylaws at any meeting, except as provided in Section 6.8(a), above. Any alterations or amendments to these Bylaws made by the Board of Directors may be altered or repealed by the members.

HUNTON & WILLIAMS

HUNTON & WILLIAMS LLP
FOUNTAIN PLACE
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS 75202-2799

TEL 214 • 979 • 3000
FAX 214 • 880 • 0011

ANDREW W. LAWRENCE
DIRECT DIAL: 214 • 979 • 3052
EMAIL: alawrence@hunton.com

FILE NO: 78673.000002

November 9, 2011

Deborah L. Wilkerson
General Counsel
Greater Kansas City Community Foundation
9001 W. 110th Street, Suite 220
Overland Park, KS 66210

***Via E-Mail***

Re: Highland Capital Management Partners Charitable Trust #2

Dear Debbie:

In accordance with your request during our telephone conversation last week, the paragraphs below describe briefly the proposed distribution of assets from Highland Capital Management Partners Charitable Trust #2 (the "Trust") to a to-be-formed supporting organization (i.e., Highland Kansas City Foundation, Inc.) with respect to which the Greater Kansas City Community Foundation ("GKCCF") is the supported organization.

1. The Trust. As you know, James Dondero, as the Settlor, and Grant Scott, as the Trustee, established the Trust by a trust agreement dated December 1, 2006 (the "Trust Agreement"). Under the terms of the Trust Agreement, Mr. Dondero, as Settlor, is entitled to name remainder beneficiaries and substitute new remainder beneficiaries from time to time until the remainder interest is ultimately distributed.

2. Assets of the Trust/Cayman Islands Company. The remainder interest will be comprised solely of one hundred percent (100%) of the non-voting shares (the "Shares") of Charitable DAF HoldCo, Ltd., a Cayman Islands corporation ("HoldCo"). Highland Kansas City Foundation, Inc. will receive one-third (1/3) of the Shares. HoldCo will own one hundred percent (100%) of the limited partner interests in Charitable DAF Fund, LP, a Cayman Island limited partnership, which, in turn, will own one hundred percent (100%) of the shares of CLO Holdco, Ltd., a Cayman Islands exempted company, which, in turn, owns minority equity interests in Cayman Islands investment companies that own portfolios of debt instruments issued by various public companies.

HUNTON& WILLIAMS



3. The Supporting Organizations. Mr. Dondero intends to name as the remainder beneficiaries of the Trust three supporting organizations (each an "SO", collectively, the "SOs"), each of which will support one of three separate community foundations. Each SO will receive an equal number of HoldCo Shares. Highland Capital Management, L.P. currently receives management fees from the companies that own the corporate debt portfolios and will continue to receive those fees under existing agreements with those companies after the Holdco Shares are transferred to the SOs.

4. Use of Multiple Supporting Organizations. Rather than the remainder interest being distributed in its entirety to just one or two SOs, the remainder interest is being distributed in equal shares to the three SOs out of an abundance of caution in light of the excess benefit transaction rules under Section 4958(c)(3) of the Code, such that no SO will own more than fifty percent (50%) of the stock of HoldCo.

Please let me know if you have additional questions regarding this matter.

Very truly yours,

Andrew W. Lawrence

AWL/bt

cc: Alexander G. McGeoch, Esq.
Douglas M. Mancino, Esq.

# EXHIBIT 31

# Charitable Giving Overview

GRANT SUMMARY : 2012-2020

The following provides an overview of philanthropic activities across the group of charitable entities that operate as supporting organizations to community foundation: the Highland Dallas Foundation, Inc., the Highland Santa Barbara Foundation, Inc., and the Highland Kansas City Foundation, Inc. (together the "Supporting Organizations" or "we").

Each of the entities within the Supporting Organizations has its own independent board, which provides oversight for the organization's grantmaking activity.

Data represents activity between January 1, 2012, and December 31, 2020 unless otherwise noted.

# Highlights

| | |
|---|---|
| $42M+ | Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations operating across a range of issue areas. |
| $32M+ | We have funded over $32 million of our total commitments; remaining commitments are comprised of future scheduled installments of multiyear grants. |
| $3.7M | Average annual grant payments total $3.7 million. |
| 275+ | The Supporting Organizations have made donations to more than 275 individual organizations. |
| 2029 | Through our multiyear grants we have over $10 million in funds committed through 2029. |

GRANTS OVERVIEW

# Total committed: $42.7 million[1]

The Supporting Organizations have committed **$42,688,403** in grants to nonprofits across a range of issue areas, with a focus on:

- civic and cultural institutions in the Dallas-Ft. Worth area;
- education;
- support for military, veterans, and first responders;
- health and medical research;
- economic and community development initiatives; and
- youth and family.

GRANT COMMITMENTS BY ISSUE AREA[2]




1. As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds. "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

GRANTS OVERVIEW

# Total funded: $32.5 million[1]

The Supporting Organizations have funded **$32,548,403** in grants, representing payments made directly to nonprofit organizations that are improving lives and addressing pressing issues in our local community—and beyond.




1. As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds. "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

GRANTS OVERVIEW

# Average annual funding: $3.7 million[1]




1. As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2. Represents amount paid in grants and/or grant installments during each calendar year. Not inclusive of grants committed but not funded.

GRANTS OVERVIEW

# Highlights of grants' impact

### Supporting 4,000 military and law enforcement members

Grants to the Center for BrainHealth helped provide training and other programming to members of the military, veterans, and local law enforcement that aims to improve the cognitive health—all at no cost.

### Providing a path to safety for 11,000 victims of family violence

Grants to The Family Place helped the organization serve more than 11,000 clients in 2019, including providing more than 62,000 days of Emergency Shelter.

### Enabling 1.2M visitors to make memorable experiences with wildlife

Grants funding the construction of the new hippo exhibit and providing support for the organization's membership program helped the Dallas Zoo draw a record-breaking 1.2 million visitors in 2017.

### Supporting and defending 8,000 abused children

Grants to the Dallas Children's Advocacy Center helped the organization serve over 8,000 children who have been abused each year,

### Providing educational opportunities for 600 low-income students in southeast Dallas

Grants to expand the Cristo Rey Dallas campus in Pleasant Grove enable the school to accommodate up to 600 students. 95% of CRD students are the first in their families to attend college, and with a 100% college acceptance rate, the expansion will help create an estimated 570 first-generation college students every four years.

GRANT HIGHLIGHT

# Dallas Zoo

### About the Dallas Zoo

The Dallas Zoological Society (the "Zoo"), the largest zoological park in Texas, has become a staple in the Dallas community over its 130-year history. Home to over 430 different species, the Dallas Zoo engages and educates visitors, while seeking to create a better world for animals.

### Promoting Visitor Engagement: Grant to Support Zoo Membership

The Supporting Organizations have supported the Zoo's membership program since 2014 through a series of multiyear grants that help the Dallas Zoo continue to reach new audiences. In the first full year of the grant, the Zoo welcomed a record 600,000 guests, and that number has steadily increased since. With our support, the Zoo continues to find new ways to deliver unforgettable experiences. As a result, it regularly ranks in the top-10 zoos in the U.S. by USA Today.

### Increasing Community Access: Grant to Support Discounted Admission

The Supporting Organizations pursue grant opportunities that increase community access to local civic and cultural institutions. With this goal, we expanded our support of the Zoo in 2017 to include the annual sponsorship of the "Penguin Days" program. The grant enables the Zoo to reduce the price of general admission to $7 on select days from December-February, making the Zoo more accessible to the North Texas Community and allowing families who might not otherwise visit the Zoo to do so in an affordable way.

### Opening a New Exhibit: Grant to Support Construction of an Educational/Event Space at the Hippo Exhibit

The Zoo announced in early 2016 that it was planning to break ground on a new exhibit that would bring hippos to the Zoo for the first time in 16 years. The project also marked the first major exhibit opening at the Zoo since 2010. The Supporting Organizations contributed to this project through a grant that helped establish a 4,485-square-foot indoor/outdoor multipurpose event space, which engages visitors in interactive activities that further the Zoo's animal education mission. Currently, the space is a walkthrough exhibit highlighting conservation efforts of hippo habitats around the world. This exhibit helped increase attendance to a record-breaking 1.2 million visitors in 2017.

Issue Area: **Civic & Cultural Institutions**

GRANT HIGHLIGHT

# George W. Bush Presidential Center

### About the George W. Bush Presidential Center

The George W. Bush Presidential Center (the "Bush Center") is comprised of the George W. Bush Presidential Library and Museum, which houses the official records of the presidency of George W. Bush, and the George W. Bush Institute, an action-oriented, nonpartisan policy organization. Through these dual operations, the Bush Center works to both preserve history and shape the future. The Bush Center is uniquely equipped to promote leadership development, advance policy initiatives, and inspire action on a local, national, and global scale. Its work covers three major Impact Centers: Domestic Excellence; Global Leadership; and Engagement. Through these Impact Centers, the Bush Center is dedicated to solving some of today's most pressing challenges.

### Driving a Local Institution's Ambitious Global Agenda: Grant Supporting the Construction of the Bush Center in Dallas

In 2008, the Bush Center officially selected Dallas as its permanent home, announcing plans to construct its building on the campus of SMU. The Supporting Organizations helped make the vision of the Bush Center's Dallas home a reality, making a grant to help complete construction and design for the building. On May 1, 2013, the Bush Center opened its doors to the public. In its first five years after opening, the Bush Center welcomed over $1.6 million visitors.

### Securing a Legacy and Driving Engagement: Grant Supporting the Center's Long-term Operations and Engagement Agenda

In 2018, the Bush Center launched an important fundraising initiative to ensure its mission endures for generations to come. With its "A Charge to Keep" capital campaign, the Bush Center aimed to raise funds that would sustain its operations beyond the lifetimes of President and Mrs. Bush.

The Supporting Organizations made a grant to help ensure the Bush Center can continue its important work well into the future. The grant specifically focused on the public speaker series, Engage at the Bush Center. The series brings newsmakers, thought leaders, and authors to the Bush Center for thought-provoking panel discussions and keynote conversations that allow guests to connect with the Bush Center in a meaningful way and dive deeper into many of today's most pressing policy areas and issues.

Issue Area: **Civic & Cultural Institutions**

GRANT HIGHLIGHT

# Perot Museum

### About the Perot Museum

The Perot Museum of Nature and Science (the "Perot") promotes science and education in the North Texas community through hands-on exhibits, educator resources, unique films, and other special programming that engages audiences of all ages.

### Helping Establish a World Class Museum in Downtown Dallas: Grant to Support Construction of the New Perot Museum:

With support from Dallas' philanthropic community, the Perot Museum opened a new building in December 2012. With its bold architectural design, it quickly became a fixture in its new location in Dallas' Victory Park. The project also sparked a renewed commitment to inspire minds and improve community achievement, giving rise to new initiatives that promote science learning.

The Supporting Organizations contributed to the project by issuing a challenge grant, which matched donations, inciting additional giving and helping complete the project's capital campaign. Since then, we have contributed additional funding to support ongoing educational programming, special exhibitions, and community engagement initiatives.

### Increasing Community Access: Grant to Support the Perot's Traveling Exhibition Programs

In 2014, the Supporting Organizations began issuing a series of grants to support the traveling exhibitions program. The initial exhibition, the "The World's Largest Dinosaurs" exhibition, educated audiences on the gigantic sauropods that once roamed the earth, drawing nearly 200,000 visitors to the museum. Since then, our grants have made possible the many captivating exhibitions that have been hosted by the Perot, covering a range of subject areas. With two special exhibitions held each year, the grants enable the museum to deliver new experiences that give visitors a reason to keep coming back and serve as a complement to the museum's 11 permanent exhibit halls. The program draws exhibitions from around the globe to the Perot, providing the North Texas community with access to world-class educational experiences. All the special exhibition grants include funding that allows the Perot to make all traveling exhibitions bilingual (with programming in both English and Spanish). These exhibits have helped increase community access to the North Texas Hispanic population.

Issue Area: **Civic & Cultural Institutions**

GRANT HIGHLIGHT

# Cristo Rey Dallas

### About Cristo Rey Dallas

Cristo Rey Dallas College Prep ("CRD") is a private, independent Catholic high school located in the Pleasant Grove area of Southeast Dallas. The Cristo Rey Network's formula for success is a proven, revolutionary model of college preparatory high school curriculum accessible to those of limited financial resources. It integrates rigorous college preparatory academics with professional work experience through the Corporate Work Study Program—a key component of the fiscal sustainability of the Cristo Rey model. Through the Work Study Program, students work in a professional setting five days per month to earn the majority of their tuition. The 144 job partners include some of Dallas's most prominent companies.

*The Cristo Rey model is proven, with 100% of graduates gaining acceptance to a two- or four-year college and 90% matriculating. For students in Pleasant Grove—where only 4% of the population graduated from college—CRD offers access and opportunity that can change their trajectory.*

### Building Space for Innovation: Grant to Support CRD Campus Expansion and Renovations

The 30th school in the nationwide Cristo Rey network, CRD opened in August 2015, operating out of an old elementary school and aging gymnasium. They quickly outgrew the space and had to begin turning away prospective students. In 2019, CRD launched a $15 million capital campaign to expand the campus, adding new academic and athletic buildings and conducting much needed renovations on the existing buildings.

The Supporting Organizations issued the campaign's lead grant, helping build a new 37,000 sq. ft. Innovation Center, which boasts spaces for fine arts and counseling. The campaign also created a new cafeteria and gymnasium, as well as a new soccer field – something the school never had before. The new buildings opened in time for the 2020 school year.

The Supporting Organizations also helped provide space for CRD students off campus in a centrally located office building near Downtown Dallas. The space gave students a place to study and complete work study programs that were moved to Work From Home due to the pandemic.

Issue Area: **Education & Research**

GRANT HIGHLIGHT

# Education Is Freedom

### About Education Is Freedom

Education Is Freedom ("EIF") is committed to transforming students' lives through education. With a focus on college planning, the organization provides underserved students in the North Texas community with a range of resources to ensure every student has the opportunity to pursue a college education.

EIF's higher education advisors work onsite at public high schools across the region, helping students and their families navigate the college process. In 20XX, EIF helped high school seniors complete 21,000 college applications and receive over $132 million in scholarships.

In addition to their college planning initiatives, EIF operates a number of supplementary programs to enhance access to postsecondary education and promote workforce readiness.

### Developing a Skilled and Educated Workforce: Grant Supporting the Mayor's Intern Fellows Program

In 2008, EIF worked with the Mayor's Office to create the Mayor's Intern Fellows Program ("MIFP"), an initiative to provide workforce readiness. The program provides Dallas high school students with internship opportunities at local companies, nonprofits, and government entities. Through the eight-week, paid internship, students gain real-world experience and insight into the professional opportunities available to them. Not only does the program prepare students for future careers, but it also connects local businesses with the future workforce, promoting collaboration to strengthen the pipeline of talent.

The Supporting Organizations have issued grants to EIF to support the MIFP. The grants have helped EIF put on the program's annual Job Fair. Held in the spring, the Job Fair provides an opportunity for students to interview with prospective employers in the hopes of securing an internship for the summer. Education Is Freedom conducts extensive training with the students throughout the program, offering workshops and coaching on everything from interview preparation to professional etiquette.

In 2018, over 2,400 students from 52 high schools applied for the program. Of those applicants, 1,050 were selected to attend the Job Fair. At the 2018 Job Fair, over 200 employers from across the Dallas-Fort Worth region interviewed internship candidates, ultimately offering positions to 395 students for the summer. In addition to the Job Fair, our grants have funded internships at various nonprofit partners, covering the cost for organizations that might not otherwise be able to hire paid interns.

Issue Area: **Education & Research**

GRANT HIGHLIGHT

# SMU Tower Center

### About the SMU Tower Scholars Program

The Southern Methodist University ("SMU") Tower Scholars Program provides top undergraduate students with an opportunity to integrate public policy and international affairs into their studies through a dedicated curriculum of academic coursework and real-world experiences. Students in the program receive a minor in public policy and international affairs, offered through SMU's John Goodwin Tower Center for Political Studies (the "Tower Center").

*"The Tower Scholar Program's resources and curriculum allow me to not only learn public policy principles through lectures, but also gain tactile experience with practicums and classes taught by policy practitioners. Without this program, I would have been unable to experience and explore my interest in public policy."*

*– Tower Scholar, Class of 2020*

### Investing in the Next Generation of Policymakers: Grant to Endow the Tower Scholars Undergraduate Program at SMU

In 2014, the Supporting Organizations worked with the Tower Center to create a dedicated undergraduate program that carries out the center's mission of bridging the gap between the scholarship and practice of politics and striving to inspire ethical public service. The grant established an endowment that provides long-term funding for the Tower Scholars Program.

A hallmark of the program is its interdisciplinary focus. Over 75% of the Tower Scholars either earned or are pursuing more than one major—and that is in addition to the minor they earn in the program. Outside the classroom, each student is involved in multiple on-campus organizations, many in leadership positions.

The Supporting Organizations' grant makes possible the unique academic experiences—from meeting with global leaders, to working on real policy issues for major corporations—offered to the Tower Scholars. The program accepts 10 students each year, and recently welcomed its eighth cohort.

Issue Area: **Education & Research**

GRANT HIGHLIGHT

# Center for BrainHealth

### About the Center for BrainHealth

The Center for BrainHealth ("CBH"), part of The University of Texas at Dallas, is a research institute committed to enhancing, protecting and restoring brain health across the lifespan. CBH is composed of independent labs that are responsible for more than 60 fully funded research projects that investigate brain health, injury, and disease. Many of the center's programs use functional and structural neuroimaging techniques to better understand the neurobiology supporting cognition and emotion in health and disease. Areas of research include addiction, aging, Alzheimer's disease, autism, multiple sclerosis, social cognition, and traumatic brain injuries.

### Applying Innovative Research to Improve the Lives of Post-9/11 Veterans and First Responders: Grant Supporting the Warriors Program Through the Brain Performance Institute

In 2015, CBH broke ground on new building dedicated to translating leading-edge science to scalable solutions for the public at large. Through construction of the Brain Performance Institute, CBH sought to extend the reach and applications of its research, providing solutions to the public to maximize brain performance in health, injury, and disease.

The Supporting Organizations made a grant to help fund the construction of the Brain Performance Institute and expand CBH's Warrior Initiative, which that focused on translating research into cognitive therapies for former military personnel. The Warrior Initiative was established to provide high performance brain training to current and former military service men and women and their families.

The goal of the Warrior Initiative program is to arm veteran and active-duty service members with the necessary tools to achieve successful, enriching, and fulfilling lives by proactively optimizing brain performance, building resilience in cognitive brain function, and reversing losses in cognitive capacity. The program was expanded in 2016 to support first responders, specifically focusing on local law enforcement.

The grant help create a space in the Brain Performance Institute building specifically for veterans, first responders, and their families, where these groups are able to come together in a safe, relaxing environment and get to know other members of service before and after training sessions.

Issue Area: **Military, Veterans & First Responders**

GRANT HIGHLIGHT

# Friends of the Dallas Police

### About Friends of the Dallas Police

The Friends of Dallas Police was founded in 1982 to recognize the commitment that the employees of the Dallas Police Department make to better the city and its residents' quality of life. The organization's mission is to raise and provide funds to be used to host a major awards banquet each year honoring Dallas Police Department personnel for outstanding performance in the line of duty. Over the years, approximately 4,400 awards have been presented to officers and civilian staff, and more than $43,000 in educational scholarships have been awarded to their children.

### Helping Show Appreciation and Recognition to Local Law Enforcement: Grant Supporting the Annual Awards Program

The Supporting Organizations have provided grants to help the Friends of the Dallas Police show appreciation to the men and women of the Dallas Police Department who risk their lives every day to make Dallas a safer city. Our grants have helped fund the annual awards event hosted by the Friends of the Dallas Police, which honors and recognizes outstanding employees throughout the Dallas Police Department.

Through our grants, the Supporting Organizations have facilitated the production of the annual awards program, enabled sworn and non-sworn employees and their spouses to attend the event, and provided educational sponsorships for children of police officers.

The Supporting Organizations have also drawn on its philanthropic network to provide gifts to award recipients and their families, including tickets to visit organizations like the Dallas Zoo, George W. Bush Presidential Center, and Perot Museum.

Issue Area: **Military, Veterans & First Responders**

GRANT HIGHLIGHT

# Snowball Express

### About Snowball Express

Snowball Express (now part of the Gary Sinise Foundation) serves the children of fallen military heroes. By providing events and other experiences in a stress-free environment, the organization is creating a community to learn, grow, and make lasting memories with new friends.

The organization hosts an annual five-day experience for 1,750+ children of the fallen and their surviving parent or guardian. As a therapeutic retreat with a blend of fun and inspiring programs, these families can lean on their peers for support. The organization also hosts community-driven events for these families all year long. From baseball games, to arts and educational opportunities, to camping trips, the events strengthen the local networks of Gold Star families, helping children and surviving spouses to build bonds with the only people who can truly understand their loss: each other.

### Supporting Families of Fallen Service Members: Grant to Support Programming for Gold Star Children

In 2014, Myles Eckert, the nine-year-old son of U.S. Army Sergeant was killed in Iraq on active duty, gave a $20 bill that he found to a veteran in a pay-it-forward act of kindness towards our military. Myles's story was shared widely online, and the gift quickly received national attention.

In honor of Myles Eckert's gift, the Supporting Organizations issued a challenge grant to Snowball Express to support the organization's programming for children that have lost one or both parents during active service.

The grant inspired significant giving from individuals and organizations around the world, enabling Snowball Express to expand its services for Gold Star children and their families.

Snowball Express used the proceeds from the challenge grant to provide services to over 8,000 Gold Star children in 2014—almost 6,000 more than the year before and a new record for the organization.

Issue Area: **Military, Veterans & First Responders**

GRANT HIGHLIGHT

# Dallas Children's Advocacy Center

### About Dallas Children's Advocacy Center

Dallas Children's Advocacy Center ("DCAC") is the only agency of its kind in Dallas County, working in agreement with public and private agencies to investigate, prosecute, and provide healing services for child abuse cases in Dallas County. DCAC reduces the re-victimization of the child, removes barriers to investigation and treatment, and enhances criminal prosecution with its distinctive multidisciplinary approach to these complex and severe cases.

### Fostering Crucial Collaboration: Grant to Support DCAC's Operations and Strengthen Collaboration Among Agencies Involved in Child Abuse Cases

The Supporting Organizations have been a longtime partner of the Dallas Children's Advocacy Center ("DCAC"), issuing annual grants that provide funding for a range of operating costs. The grants help DCAC serve over 8,000 children (and their non-offending family members) each year who were sexually abused, severely physically abused, or who had witnessed a violent crime. DCAC's average client is a 9-year-old girl, sexually abused by someone she knows and trusts.

The grants also support DCAC in its efforts to foster crucial collaboration across government agencies and other organizations involved in child abuse cases. The DCAC building houses the Child Abuse Unit of the Dallas Police Department, six units of CPS, and a Dallas County Assistant District Attorney. Having all of these professionals under one roof drives collaboration and communication in the very sensitive cases that DCAC coordinates.

Not only have the Supporting Organizations been a long-time financial supporter of DCAC, we have also provided support in other ways, leveraging connections with our network of nonprofit partners. Most recently, we worked with the Dallas Zoo to provide animal encounter demonstrations during DCAC's summer camps, which serve as a way to deliver ongoing support to—and help build a community for—children who have experienced trauma.

Issue Area: **Youth & Family**

GRANT HIGHLIGHT

# The Family Place

### About The Family Place

The Family Place was founded in 1978 and has grown to become the largest family violence prevention agency in North Texas, providing shelter and assistance to victims across the region along with counseling and education. Since its founding, the organization has served over 839,000 clients through counseling, shelter, and hotline responses.

In 2019, The Family Place served nearly 12,000 clients, providing over 62,000 days of emergency shelter, over 36,000 days of transitional housing, and over 18,000 hours of counseling to nonresidential clients, and over 8,000 hours of counseling to batterers. All services are in Spanish and in English.

### Providing Support for Victims of Family Violence Across North Texas

The Family Place empowers victims of family violence by providing safe housing, counseling, and skills that create independence while building community engagement and advocating for social change to stop family violence.

While The Family Place supports clients in several different ways, its Residential Services, which provide safe shelter for families affected by violence, are one of crucial components of its work. These services include the Emergency Shelter Services, which provide immediate shelter for families escaping abuse, and the Supportive Living Program, which provides long-term housing for families as they rebuild their lives. Not only does the organization provide necessities like food, clothing, and transportation, but it also offers childcare, legal services, counseling, and case management.

As The Family Place expanded, its Residential Services were constrained by the capacity of its emergency shelters, and at many times the organization had to house clients in hotels and other temporary housing in order to meet demand.

In 2016, the Supporting Organizations issued a challenge grant to help The Family Place build a new shelter facility to expand its Residential Services. The new facility provides space and support services for over 2,000 victims per year. It also includes onsite Medical and Dental Clinics and even an Animal Kennel so families can bring their beloved pets with them to safety. The shelter has been operating at full capacity since October 2017. With the new facility, The Family Place now has three emergency shelters, providing 177 shelter beds each night, and three counseling centers.

Issue Area: **Youth & Family**

# EXHIBIT 32

the family place
*Where family violence stops*

July 7, 2021

To Whom It May Concern:

I am pleased to write this letter outlining the relationship between The Family Place and the Highland Dallas Foundation. The Family Place empowers victims of family violence by providing safe housing, counseling and skills that create independence while building community engagement and advocating for social change to stop family violence. Our agency provides emergency shelter, individual and group counseling, case management, transitional housing as well as other essential services to help those seeking refuge from family violence. The Family Place provides free, comprehensive services in both Spanish and English that prevent violence and fully support women, children, and men on their path from fear to safety.

In 2020, The Family Place successfully navigated through COVID-19 and the barriers it presented, serving 11,933 unduplicated clients across our programs. Our emergency shelters served 678 women, 886 children and 58 men for a total of 62,118 shelter nights. 98% of our shelter clients did not return to their abuser after exiting one of our shelters. In our counseling programs, we served 2,258 clients, an 11.5% increase over 2019. 98% of our counseling clients reported feeling safer after attending counseling at The Family Place. At our on-site medical and dental clinics, we treated 778 clients and referred 571 clients to more intensive medical and dental services.

The Highland Dallas Foundation has been a long-standing partner with The Family Place in providing services to domestic violence clients. In 2016, The Family Place launched a 5-year, $16.5 million dollar capital campaign to build a new facility specifically designed to provide all necessary services for victims seeking shelter and counseling. The Family Place successfully reached our capital campaign goal due in large part to the commitment of a $1 million matching grant by the Highland Dallas Foundation. In December 2016, the Highland Dallas Foundation donated $13,950 for Christmas gifts for our clients. In 2017, when the Highland Hippo Hut was opened at the Dallas Zoo, the Highland Dallas Foundation generously invited our shelter clients to a special Mother's Day luncheon.

The collaboration between the Highland Dallas Foundation and The Family Place has been instrumental in providing community exposure and awareness of domestic violence in our community as well as providing essential services to family violence victims. With our new facility, completed in 2017, The Family Place has been able to expand programs and execute on the long-range plans developed for these programs. For victims of family violence, The Family Place is the Dallas area's leading organization delivering proven programs that address emotional and physical abuse and incest. Without the ongoing support of the Highland Dallas Foundation, The Family Place would not be able to successfully serve our domestic violence clients who are in desperate need of support.

Sincerely,

Paige Flink

Paige Flink
CEO, The Family Place

P.O Box 7999
Dallas, Texas 75209
214 559 2170
fax 214 443 7797
www.familyplace.org

BOARD OF DIRECTORS
PRESIDENT
Harold Ginsburg
TREASURER
Wes McCown
SECRETARY
Thomas McCollum
V.P. COMMUNITY ENGAGEMENT
Clarisa Lindenmeyer
V.P. DEVELOPMENT
Lindsay Jacaman
V.P. FACILITIES
Jim Buddrus
V.P. HUMAN CAPITAL
David Oliver
V.P. LONG RANGE PLANNING
Radhika Zaveri
V.P. NOMINATIONS
Belinda Griffin
V.P. PUBLIC AFFAIRS
Delia Jasso
GENERAL COUNSEL
Kristin Bauer
Eric White

Sandra Aguirre
Lisa Armstrong
Mandy Austin
Steven Bauer
Melinda Bell
Laurie Berger
Nancy Bierman
Julie Bosché
Eric Chandler
Kerry Cole
Nicole Collins
Barbara Durham
Monika Flood
Theresa Flores
Beth Garvey
Lauran Goldberg
Carlos Gonzalez-Jaime
Michelle Goolsby
Rhonda Green
Tasha Grinnell
Johnese Howard
Stacee Johnson-Williams
Linda Knox
Holly Krug
Emily Maduro
Margo McClinton Stoglin
Mary McNulty
Sam Megally
Aaliyah Miranda
Mike Montgomery
Tiffany Moon
Elizabeth Saab
Nathaniel St. Clair
Kristen Sanger
Ryan Scripps
Carol Seay
Lisa Singleton
Ghousuddin Syed
Jill Tananbaum
Samantha Wortley
Ana Yoder

Chief Executive Officer
Paige Flink

United Way

# EXHIBIT 33

CRISTO REY DALLAS COLLEGE PREP
9701 San Leon Ave. Dallas, TX 75217

**Cristo Rey Dallas Update**

Cristo Rey Dallas (CRD) is incredibly grateful for the gifts from Highland Dallas Foundation, Inc. CRD is excited to have the Highland Capital Academic Center and the NexBank Gymnasium in the Innovation Center on our campus. These naming rights were given as the result of a donation that Highland Dallas Foundation, Inc.made to our Innovation Center Capital Campaign. These facilities truly impact our students and allow us to provide our services to our population of 465 students.

CRD also receives support from Highland Dallas Foundation, Inc. through the Corporate Work Study Program (CWSP). Cornerstone Healthcare and NexBank both currently have one job team (a team of 4 students) that work in their offices. In the upcoming year, NexBank will host two teams of students. One team is funded through the gift from Highland Dallas Foundation, Inc. and the other is supported by NexBank. The work study program allows students to earn about 60% percent of their tuition to CRD, and the involvement in the work study program makes such a difference in the lives of the 8 students that work in those businesses.

Finally, CRD is incredibly thankful for the remote workspace at Cityplace Tower. CWSP has been greatly affected by COVID-19. This year, many partners were unable to host students in their offices. The space at Cityplace Tower allows 30 students to work remotely for their job partners each day which means that about 120 students benefit from the offices each week. Without this space, CRD would not have the capacity to allow these students to work remotely.

The support of Highland Dallas Foundation, Inc. has meant so much to us at CRD. We are so appreciative, and we look forward to continuing our partnership for many years.

# EXHIBIT 34

Dallas Children's Advocacy Center™
PROVIDING JUSTICE • RESTORING HOPE

**Dallas Children's Advocacy Center (DCAC)**
**Partnership with Highland Dallas Foundation, Inc.**

**Organization Mission and History**
The mission of DCAC is *to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues*. Since opening its doors in 1991, DCAC has served more than 60,000 of the most severely abused children and their non-offending family members in Dallas County. In FY2021, DCAC will serve 8,400 children and their non-offending family members.

DCAC was created to coordinate the investigation of child abuse cases that rise to the criminal level in a seamless, collaborative process. We facilitate a coordinated approach to child abuse cases that results in more successful investigation and prosecution outcomes and provides a less traumatic response to child victims and families. DCAC partners with 39 organizations to form a Multidisciplinary Team (MDT) that includes medical, legal, and law enforcement and is designed to ensure child clients receive the appropriate services for healing and safety.

In 2015 DCAC's Partner Relations Team began reading all reports of abuse and neglect made to DFPS in Dallas County as part of a state-wide effort to ensure every child who needs services from a children's advocacy center (CAC) gets them. In FY2019 we read 28,131 reports of child abuse for Dallas County. At the beginning of March 2020 before COVID-19 safety measures were implemented, we had experienced a 15% increase in the number of cases read. While case reports went down during quarantine, we have projected and experienced a dramatic increase in cases; at the end of February 2021, we had experienced a 35% increase in cases read year-over-year.

In addition to supportive services provided by the MDT, DCAC also provides the following Core Programs at no cost to our clients. Please note, for the second half of FY2020, DCAC provided therapy and family advocacy services via a HIPPA-approved telehealth platform, Doxy.me. Forensic interviews were always conducted on-site during quarantine. Below you will find details and outcomes for FY 2020.

***Forensic Interview Program***
Trained DCAC forensic interviewers conduct interviews of children, both as a first step in the child's healing process and as a vital component of the investigation and prosecution of alleged perpetrators. The result is a legally defensible investigative interview of each alleged child victim. During FY2020, DCAC conducted 1,921 forensic interviews.

***Family Advocacy Program***
The Family Advocacy Team is committed to helping each family navigate the complex process of investigation, prosecution and healing after a child makes an outcry of abuse. The team helps the family learn about their rights and resources available to them during crisis as well as provides tangible, critical needs items like clothing, toiletries, and financial assistance on an as-needed basis. During FY 2020, the Family Advocacy Program supported 7,431 children and their non-offending family members.

***Evidence-Based Therapy Program***

Dallas Children's Advocacy Center
PROVIDING JUSTICE • RESTORING HOPE

The Evidence-Based Therapy Program provides clients and their non-offending caregivers with cutting-edge, no-cost therapeutic services. Treatment is informed by an initial assessment to enhance engagement between families and therapists toward the recovery of children. When clients are assessed at the end of treatment, over 70% report a reduction in trauma symptoms. During FY 2020, the DCAC Therapy Program provided services to 2,498 clients.

***Education Program***

DCAC has pioneered a comprehensive, multi-part training curriculum that provides holistic responses to Texas child abuse reporting laws. In the past year, 100,405 people were educated in our curriculum by means of in-person instruction or online learning. In addition to our cutting-edge curriculum, we also host a Lecture Series at the Center. Lecture Series topics are designed to provide continuing education for medical, legal, clinical, law enforcement and other children's advocacy professionals. Since the start of the pandemic, we moved all lecture series' online; we continue to provide this education virtually and as such have discovered we can reach even more professional.

**Partnership with Highland Dallas Foundation, Inc.**

Since 2016, Highland Dallas Foundation, Inc. has supported DCAC through yearly, general operating investments towards our mission. We have received over $85,000 over the past five years through sponsorship of our Art for Advocacy event as well as from a golf tournament where DCAC was the dedicated beneficiary. This funding has been critical to the sustainability of our programs and each dollar allows us to serve our clients with transformative services at no cost to them. Alongside the financial commitment, Highland Dallas Foundation, Inc. has gone above and beyond in introducing us to additional community advocates who individually support our efforts as well. The ripple effect of our partnership with Highland Dallas Foundation, Inc. is invaluable and for that we are so grateful.

# EXHIBIT 36

intertrust GROUP

Registration No.: **249232**

Client No.: **KY057017**

REGISTER OF DIRECTORS
FOR:
**CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 17 Dec 2010 | 17 Dec 2010 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 17 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | 31 Mar 2021 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 31 Mar 2021 | 02 Apr 2021 |
| **Mark E. Patrick**<br>. | Director | 02 Apr 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 37

intertrust GROUP

Registration No.: **263805**

Client No.: **KY059904**

REGISTER OF DIRECTORS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 04 Nov 2011 | 04 Nov 2011 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 04 Nov 2011 | 25 Mar 2021 |
| **Patrick Mark**<br>Highland Capital Management, L.P.; 13455 Noel Rd, Suite 800; Dallas; TX 75240; USA. | Director | 25 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 38

intertrust GROUP

Registration No.: **269389**
Date of Incorporation: **6 June 2012**
Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 6 Jun 2012 | Allotment | 1.00 | 6 Jun 2012 : Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | | | | |
| | | | | | | Nil | Nil | 26 Jun 2012 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 26 Jun 2012 | Transfer | 1.00 | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

intertrust
GROUP

Registration No.: **269389**
Date of Incorporation: **6 June 2012**
Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

Date printed: 19 May, 2021

[2 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 39

intertrust GROUP

Registration No.: **269389**

Client No.: **KY061847**

REGISTER OF DIRECTORS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 26 Jun 2012 | 26 Jun 2012 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 26 Jun 2012 | 24 Mar 2021 |
| **Mark E. Patrick**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 40

intertrust GROUP

Registration No.: **293607**

Client No.: **KY073541**

REGISTER OF DIRECTORS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| **Name & Address** | **Office Held** | **Date of Appointment** | **Date of Resignation** |
|---|---|---|---|
| **WNL Limited**<br>190 Elgin Avenue; George Town; Grand Cayman KY1-9001; Cayman Islands. | Director | 12 Nov 2014 | 12 Nov 2014 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 12 Nov 2014 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 41

intertrust GROUP

Registration No.: **293607**
Date of Incorporation: **12 November 2014**
Client No.: **KY073541**

REGISTER OF MEMBERS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited**<br>190 Elgin Avenue<br>George Town<br>Grand Cayman KY1-9001<br>Cayman Islands | 12 Nov 2014 | Allotment | 1.00 | 12 Nov 2014: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | | | | |
| | | | | | | **Nil** | **Nil** | 12 Nov 2014 |
| **CLO HOLDCO, LTD.**<br>Intertrust Corporate Services (Cayman) Limited<br>One Nexus Way<br>Camana Bay<br>Grand Cayman KY1-9005<br>Cayman Islands | 12 Nov 2014 | Transfer | 1.00 | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | No Cert | | | |
| | | | | | | **100** | **1.00** | |

Notes:

Date printed: 21 May, 2021

[1 / 1]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

015830

# EXHIBIT 42

intertrust GROUP

Registration No.: **249848**

Client No.: **KY058111**

REGISTER OF DIRECTORS
FOR:
**HCT HOLDCO 2, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 30 Dec 2010 | 30 Dec 2010 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 30 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 43

intertrust GROUP

Registration No.: **249848**
Date of Incorporation: **29 December 2010**
Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

Share Class: **Ordinary**
Nominal Value: **USD 1.00**
Voting Rights: Yes
Conditional: No

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands | 29 Dec 2010 | Allotment | 1.00 | 29 Dec 2010: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | | | | |
| | | | | | | Nil | Nil | 30 Dec 2010 |
| **Highland Capital Management Partners, Charitable Trust #2**<br>13455 Noel Road<br>Suite 800<br>Dallas TX 75240<br>USA | 30 Dec 2010 | Transfer | 1.00 | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | No Cert | | | |
| | | Transfer | (1.00) | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution | | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED



015834

intertrust
GROUP

Registration No.: **249848**
Date of Incorporation: **29 December 2010**
Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | Agreement | | | | |
| | | | | | | Nil | Nil | 24 Oct 2011 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 24 Oct 2011 | Transfer | 1.00 | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution Agreement | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 21 May, 2021

[2 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

015835

# EXHIBIT 266

**Atlas IDF GP, LLC**
**6716 Glenhust Dr.**
**Dallas, TX 75254**

March 31, 2026

Crown Global Life Insurance Ltd.
Suite 3206A, 2nd Floor
39 Market Street
P.O. Box 10467
Camana Bay, Grand Cayman KY1-1004
Cayman Islands

**RE: Withdrawal Request of Crown Global Life Insurance Ltd.**

Dear Sir/Madam:

We hereby acknowledge receipt of Crown Global Life Insurance Ltd.'s ("Crown Global") request to withdraw $8,000,000 from Atlas IDF, LP ("Atlas" or the "Partnership"), dated December 1, 2025, on behalf of Crown Global IRO Separate A/C 30218 (the "Separate Account").[1]

Pursuant to Section 7.03(c) of the LPA, if, on any particular withdrawal date, the Limited Partners of Atlas request withdrawals that in total represent more than twenty-five percent (25%) of the aggregate balances of Atlas' Capital Accounts (excluding any Side Pocket Accounts), the General Partner may determine, in its sole discretion, to reduce the withdrawal amounts to twenty-five percent (25%) of Atlas' Capital Account balances (excluding any Side Pocket Accounts) as of that date.

As of the March 31, 2026, withdrawal date, Atlas' Capital Account balances are estimated to total $19,500,000. Therefore, Crown Global's $8,000,000 withdrawal request on behalf of the Separate Account represents more than 25% of the aggregate balances of Atlas' Capital Accounts.

Pursuant to the authority granted to it in Section 7.03(c) of the LPA, Atlas IDF GP, LLC, in its capacity as the General Partner of Atlas, has determined to reduce Crown Global's $8,000,000 withdrawal amount to $4,875,000 (the "Withdrawal Amount"). We estimate that this Withdrawal Amount will represent approximately twenty-five percent (25%) of the Capital Account balances of the Partnership, as of the March 31, 2026, withdrawal date.

The Withdrawal Amount will be paid within ninety (90) days after the withdrawal date, in accordance with Section 7.02(e) of the LPA.

Please contact the undersigned if you have any questions regarding the information in this letter.

Sincerely,

______________________________
**Atlas IDF GP, LLC**, *as General Partner*
**Name:** Mark Patrick
**Title:** President

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Amended and Restated Limited Partnership Agreement of Atlas IDF, LP (the "LPA")

# EXHIBIT 267

# TO BE FILED UNDER SEAL

# EXHIBIT 268

# TO BE FILED UNDER SEAL

# EXHIBIT 269

# TO BE FILED UNDER SEAL

# EXHIBIT 270

# TO BE FILED UNDER SEAL

# EXHIBIT 271

MP **Mark Patrick**
Review Date: 11/30/2022

## Manager Evaluation 2022

**Employee Name**
Mark Patrick

**Reviewer**
Frank Waterhouse

**Position**
--

**Supervisor**
Frank Waterhouse

**Hire Date**
01/07/2008

**Review Date**
11/30/2022

**Company Name**
Highgate Consulting Group Inc

### Contributions

Complete the performance evaluation for your employee, taking into careful consideration overall contribution to the firm, strengths, opportunities for development, and expectations for the following year. On the Ratings tab you will provide an overall performance ranking.

#### Employee Contributions

What were your employee's overall contributions to your team and/or the firm in 2022? Include progress made towards achieving each of their 2022 goals.

**Comments from Reviewer**

Mark has taken on a signicant role in the DAF and litigation

### Opportunities

.

#### Opportunities

What are your employee's opportunities for professional development or improvement? Please be specific (for example, describe the skills or knowledge that could be developed or area for improvement).

**Comments from Reviewer**

His communication style can be gruff to employees and hard to understand at times

### Improvements

.

#### Improvements

Did the employee show growth / improvement in performance compared to the previous year? Please explain.

**Comments from Reviewer**

From what I have been involved with, Mark continues to do an outstanding job in his focus areas

### Goals

.

#### 2023 Goals

What are the professional goals for your employee to accomplish in 2023, and what metrics will be used to evaluate progress towards the goals? These goals will be used to gauge performance in 2023, so please be specific.

**Comments from Reviewer**

Continue to oversee the DAF and stay on top of tax planning and structuring

### Overall Comments

.

#### Overall Comments

What are your overall comments on your employee?

**Comments from Reviewer**

Mark is an asset to the firm and has continued to show his commitment by growing in areas that were typically outside his scope

### Rating

What performance rating would you assign to your employee based on the scale from 1 - 9 below?

**Year-End Rating**

9 - Above Expectations/High Tier; 8 - Above Expectations/Middle Tier; 7 - Above Expectations/Low Tier; 6 - Meets Expectations/High Tier; 5 - Meets Expectations/Middle Tier; 4 - Meets Expectations/Low Tier; 3 - Below Expectations/High Tier; 2 - Below Expectations/Middle Tier; 1 - Below Expectations/Low Tier

**Comments from Reviewer**

8

## Supporting Information

Include the supporting documentation for this review.

You haven't included any supporting information for this review yet.

## Approvals

| Name | Action | Date |
|---|---|---|

Approver's actions and comments will appear here.

## Summary

### Overview

| Name |
|---|
| Contributions |

| Name | Reviewer Comments |
|---|---|
| Employee Contributions | ✓ |

| Name |
|---|
| Opportunities |

| Name | Reviewer Comments |
|---|---|
| Opportunities | ✓ |

| Name |
|---|
| Improvements |

| Name | Reviewer Comments |
|---|---|
| Improvements | ✓ |

| Name |
|---|
| Goals |

| Name | Reviewer Comments |
|---|---|

| Name |
| --- |

| Name | Reviewer Comments |
| --- | --- |
| 2023 Goals | ✓ |

| Name |
| --- |
| Overall Comments |

| Name | Reviewer Comments |
| --- | --- |
| Overall Comments | ✓ |

| Name |
| --- |
| Rating |

| Name | Reviewer Comments |
| --- | --- |
| Year-End Rating | ✓ |

Review Status

**Reviewer Signature**

**Comments**

04/18/2023 1:55 pm

--

# EXHIBIT 272

**From:** Robert Harris
**Sent:** Thursday, May 9, 2024 12:40 PM
**To:** Restricted List; Restrictedlist
**Subject:** NHT

Please restrict NexPoint Hospitality Trust. Please maintain the restriction until directed otherwise by Matt McGraner, Brian Mitts, DC Sauter, or me.

Robert R. Harris | CORPORATE COUNSEL, REAL ESTATE

NEXPOINT

O: 214.550.8275 | C: 214.886.4203
rharris@nexpoint.com | www.nexpoint.com

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

# EXHIBIT 273

VALUESCOPE
Measure | Defend | Create

June 29, 2020

The Highland Dallas Foundation, Inc.
c/o Mr. David Rosenberg
Partner
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201

***RE: Value of Embedded Put Options Gifted with NexPoint Hospitality Trust Units***

Dear Mr. Rosenberg:

In our February 25, 2020 valuation report regarding Mr. Dondero's December 24, 2019 gift of 1,500,000 units of NexPoint Hospitality Trust (the "Units"), which was subject to an embedded put option (the "Embedded Put") (collectively, the "Gift" or "Subject Interest") to the Highland Dallas Foundation, Inc. ("HDF"), we determined the fair market value of the Gift to be $11,505,000 or $7.67 per unit.[1] NexPoint Hospitality Trust, Inc. is a publicly traded real estate investment trust with its Units traded on the TSX Venture Exchange. The Embedded Put is a 7-year, $6.19 strike price American put option entered into by HDF and The Dugaboy Investment Trust ("Dugaboy") on December 23, 2019. A copy of the executed Embedded Put is attached as Appendix A.

A summary of our valuation conclusion on a per unit basis is as follows:

| | |
|---|---|
| Fair Market Value per Unit – Minority, Marketable | $6.19 |
| Less: Discount for Lack of Marketability (13.0%) | ($0.80) |
| **Fair Market Value per Unit – Minority, Non-Marketable** | **$5.39** |
| Plus: Value of 7-Year, $6.19 Strike Embedded Put Option per Unit | $2.28 |
| **Fair Market Value of Gift per Unit - Minority, Non-Marketable** | **$7.67** |

It is our understanding that The Dallas Foundation's auditor BKD has questioned our valuation of the Embedded Put as a separate asset and suggested that it should instead be considered in the calculation of the discount for lack of marketability of the Units. While the Embedded Put is not a publicly traded instrument, it has economic value to HDF above and beyond the Units that can be separately measured. The Units are benefitted by the Put such that the value of the Gift is greater than the value of the Units alone. The

[1] For purposes of this discussion, we refer to the units and the embedded put option separately as the Units and the Embedded Put and collectively as the Gift or Subject Interest.

purpose of this memo is to provide additional commentary to address the auditor's question.

**BACKGROUND ON OUR DISCOUNT FOR LACK OF MARKETABILITY ANALYSIS**

While the Units are publicly traded, they have limited trading volume and limited liquidity. Therefore, we included a discount for lack of marketability (DLOM) in our analysis of the fair market value of the Units. Our concluded DLOM of 13% was based on the average of our analysis of restricted stock studies of 14.1% and a Black-Scholes put option of 11.9%. Our estimate of DLOM using the Black-Scholes option pricing model assumed an at-the-money put option with a 1-year term. These assumptions are typical when utilizing an option pricing model to estimate DLOM. The assumption of one year was based on the estimated time it would take to market and sell the Units based on the limited liquidity of the Units.

**DISCUSSION**

From a valuation perspective, there are two reasons why the Embedded Put must be considered separate from the DLOM analysis:

1. The term of the Embedded Put is substantially longer than would be implied by a lack of marketability.
2. The fixed strike price of the Embedded Put provides a floor price to the Units, not just a market to sell the Units at the then FMV.

***Term of the Embedded Put***

Typical analysis of DLOM utilizing option pricing models assumes that due to impaired liquidity, it would take one to two years to market and sell a security. In this case, the Units have limited liquidity but are publicly listed and face no other transfer or sell restrictions typically found in private securities. As such, we concluded that a 1-year period best reflected the liquidity of the Units.

The Embedded Put, on the other hand, had a substantially longer term of 7 years, setting a floor on the value of the Units for 7 years. With put options, the longer the holding period, the higher the value. All else equal, if an investor held the Units, was short 1-year put options, and long 7-year put options, the total value of the instruments would be greater than just holding the Units.

***Strike Price of the Embedded Put***

While there is a limitation on the liquidity of the Units based on the trading volume, the Embedded Put was constructed to do substantially more than create a market by which

HDF could sell the units received back to Dugaboy (which is what a DLOM captures). The Embedded Put was intended to provide a guaranteed minimum value of the Gift by protecting against potential downside risk.

In fact, as written, the Embedded Put provides a floor of $6.19 to the price of the Units over the next seven years. Had the option agreement been written such that HDF would only be able to sell the Units back to Dugaboy at the then fair market value instead of at a fixed strike price, then the Embedded Put would have simply provided a ready market, reducing only the liquidity impact on price.

In terms of our analysis, the assumed strike for our DLOM analysis was at the money. The strike price of the Embedded Put was in the money ($6.19 strike vs $5.39 fair market value of the Units). All else equal, if an investor held the Units, was short at the money put options, and long in the money put options, the total value of the instruments would be greater than just holding the Units.

Should you have any questions concerning this issue, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA at 817-481-4901 or shastings@valuescopeinc.com.

Very truly yours,

ValueScope, Inc.

ValueScope, Inc.

Attachment: Appendix A – Put Option Agreement

# PUT OPTION AGREEMENT

This PUT OPTION AGREEMENT (this "***Agreement***"), dated as of December 23, 2019, is entered into by and between Highland Dallas Foundation, Inc. ("***HDF***") and The Dugaboy Investment Trust ("***Dugaboy***").

## RECITALS

WHEREAS, pursuant to that certain Exercise of Inter Vivos Special Power of Appointment (the "***Assignment***"), a charitable contribution to HDF of 1,500,000 units of NexPoint Hospitality Trust (ISIN #CA65344N1078) ("***NHT***") held in Raymond James Account No. IRJ-014506 in Dugaboy's name (the "***Put Units***"), is being made and will be effective upon the recordation of the Put Units in HDF's Raymond James Account No. 1RJ015891 prior to the close of business on December 31, 2019 (the ***"Effective Time"***);

WHEREAS, the parties desire the put rights agreed to herein with respect to the Put Units to be effective concurrently with the Effective Time of the contribution of the Put Units to HDF; and

WHEREAS, Dugaboy desires that HDF present opportunities for Dugaboy to make additional charitable contributions in furtherance of the philanthropic interests of Dugaboy's sole beneficiary.

NOW, THEREFORE, in consideration of the premises, representations, warranties, covenants and agreements set forth herein, the payment of $1,000.00 by HDF to Dugaboy and other good and adequate consideration, the sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the following meanings:

"***Agreement***" has the meaning set forth in the Preamble of this Agreement.

"***Assignment***" has the meaning set forth in the Preamble of this Agreement.

"***Business Day***" means any day excluding Saturday, Sunday and any other day on which banking institutions in New York City are authorized or required by law or other governmental actions to remain closed.

"***Closing***" means, with respect to each exercise of the Put Option hereunder, the consummation of the transactions contemplated by the applicable Put Notice.

"***Closing Date***" has the meaning set forth in the Section 2.2 of this Agreement.

"***Dugaboy***" has the meaning set forth in the Preamble of this Agreement.

"***Effective Time***" has the meaning set forth in the Recitals to this Agreement.

"***Equity Interests***" means the NHT Units or other equity ownership interests in NHT, and any warrants, options, convertible securities or other rights entitling the holder thereof to purchase or acquire any such equity interest, but excluding any debt security that is convertible into, or exchangeable for, any of the foregoing until such debt security is converted into, or exchanged for any of the foregoing.

"***HDF***" has the meaning set forth in the Preamble of this Agreement.

"***NHT Units***" means the units issued by NHT.

"***Person***" means an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, sole proprietorship, unincorporated organization, governmental authority or any other form of entity not specifically listed herein.

"***Purchase Price***" means $6.19 per Put Unit.

"***Purchased Units***" has the meaning set forth in Section 2.2 of this Agreement.

"***Put Notice***" has the meaning set forth in the Section 2.2 of this Agreement.

"***Put Option***" has the meaning set forth in the Section 2.1 of this Agreement.

"***Put Units***" has the meaning set forth in the Recitals of this Agreement.

"***Put Period***" has the meaning set forth in Section 2.4 of this Agreement.

"***Related Parties***" has the meaning set forth in Section 4.12 of this Agreement.

"***Securities Act***" means the Securities Act of 1933, as amended.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1 Right to Put. From and after the Effective Time and upon the terms and subject to the conditions set forth herein, at any time and from time to time during the Put Period (as defined in Section 2.4 of this Agreement), HDF shall have the right to sell to Dugaboy, and Dugaboy shall purchase from HDF, such portion of the Put Units as shall be determined by HDF, in its reasonable discretion (the "***Put Option***").

Section 2.2 Delivery of a Notice; Closing Dates. HDF may exercise the Put Option in accordance with the terms and conditions of this Agreement by delivering to Dugaboy during the Put Period a written notice substantially in the form set forth in Exhibit A hereto (a "***Put Notice***") specifying the number of Put Units that Dugaboy shall purchase from HDF pursuant to the Put Option (the "***Purchased Units***"). Dugaboy shall purchase the Purchased Units from HDF

no later than fifteen (15) Business Days following the delivery of the Put Notice to Dugaboy (a "***Closing Date***").

Section 2.3 Purchase Price and Delivery. Upon the terms and subject to the conditions set forth herein, on each Closing Date, Dugaboy shall pay or cause to be paid to HDF, by wire transfer of immediately available funds to an account designated by HDF, an amount in cash equal to the Purchase Price for each Purchased Share and HDF shall deliver to Dugaboy evidence of the transfer and assignment of all of the Purchased Units.

Section 2.4 Put Period. HDF shall have the right to exercise the Put Option during the period commencing at the Effective Time and ending on the seventh anniversary of this Agreement (the "***Put Period***").

Section 2.5 Additional Charitable Gift Proposals. During the course of each year of the Put Period, HDF agrees to provide Dugaboy with at least three proposals regarding additional charitable gift opportunities that are consistent with the philanthropic goals of Dugaboy's sole beneficiary.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1 Representations and Warranties of HDF. HDF hereby represents and warrants to Dugaboy as of the date hereof, and as of each Closing Date, as follows:

(a) this Agreement has been duly executed and delivered by HDF and constitutes a valid and binding agreement, enforceable against HDF in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganizations, fraudulent transfer or similar laws relating to or affecting creditors generally or by general equitable principles (whether applied in equity or at law);

(b) HDF is not subject to any law, rule, regulation, order, judgment or decree (including federal or state security laws) which would prohibit it from performing its obligations under this Agreement and the execution, delivery and performance by HDF of this Agreement and the transactions contemplated hereby will not result in any violation of law, rule, regulation, order, judgment or decree (including federal or state security laws) applicable to HDF;

(c) at each Closing, HDF will transfer title to the Put Units being sold by HDF free and clear of any liens other than restrictions imposed by applicable securities laws; and

(d) HDF is not a party to any agreement, arrangement or understanding that could restrict or prohibit it from performing its obligations under this Agreement.

Section 3.2 Representations and Warranties of Dugaboy. Dugaboy hereby represents and warrants to HDF as of the date hereof and as of each Closing Date as follows:

(a) this Agreement has been duly executed and delivered by Dugaboy and constitutes a valid and binding agreement, enforceable against Dugaboy in accordance with its

terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganizations, fraudulent transfer or similar laws relating to or affecting creditors generally or by general equitable principles (whether applied in equity or at law);

(b) Dugaboy is not subject to any law, rule, regulation, order, judgment or decree (including federal or state security laws) which would prohibit it from performing its obligations under this Agreement and the execution, delivery and performance by Dugaboy of this Agreement and the transactions contemplated hereby will not result in any violation of law, rule, regulation, order, judgment or decree (including federal or state security laws) applicable to Dugaboy;

(c) Dugaboy is not a party to, nor shall it enter into, any agreement, arrangement or understanding that could restrict or prohibit it from performing its obligations under this Agreement; and

(d) Dugaboy is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act that is purchasing the Put Units for its own account, and is not acquiring the Put Units with a present view to any resale or distribution thereof.

## ARTICLE IV
## MISCELLANEOUS

Section 4.1 Further Assurances. From and after the date hereof, at the request of Dugaboy or HDF, the other party shall execute and deliver such other agreements or instruments, in addition to those required by this Agreement and take such other action, as may reasonably be requested, in order to implement the transactions contemplated by this Agreement.

Section 4.2 Expenses. Each of the parties shall bear their respective expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

Section 4.3 Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of Texas without regard to principles of conflicts of law thereof.

Section 4.4 Amendment and Waiver. No amendment or waiver of this Agreement will be effective with respect to any party unless made in writing and signed by such party, if an individual, or otherwise a duly authorized officer of such party. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The conditions to each party's obligation to consummate the transactions contemplated hereby are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable law. No waiver of any party to this Agreement will be effective unless it is in a writing signed by such party, if an individual, or otherwise a duly authorized officer of the waiving party that makes express reference to the provision or provisions subject to such waiver.

Section 4.5 Counterparts. For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Agreement may be delivered by facsimile or electronically in portable document format (pdf) or other electronic format and such facsimiles or electronically delivered counterparts will be deemed as sufficient as if original signature pages had been delivered.

Section 4.6 Effectiveness. It is understood that this Agreement is not effective and binding upon any of the parties hereto until executed and delivered by each of the parties hereto.

Section 4.7 Headings. The headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

Section 4.8 Benefit of Agreement. This Agreement is made solely for the benefit of the parties hereto and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person, and no other Person shall have any rights, interest or claims hereunder or otherwise be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise.

Section 4.9 Notices. Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally or by telecopy or electronic mail, upon confirmation of receipt, (b) on the first Business Day following the date of dispatch if delivered by a recognized next-day courier service, or (c) on the third Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

If to HDF:

Highland Dallas Foundation, Inc.
Attn: Matthew Randazzo
3963 Maple Ave. #390
Dallas, TX 75219
Tel: (214) 741-9898
E-mail: mrandazzo@dallasfoundation.org

If to Dugaboy:

The Dugaboy Investment Trust
Attn: Nancy Dondero
c/o Melissa Schroth
300 Crescent Court, Suite 700
Dallas, TX 75201
Tel: (972) 419-2514
E-mail: nancy97@bellsouth.net

mschroth@highlandcapital.com

Section 4.10 Entire Agreement. (a) This Agreement constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, between the parties, with respect to the subject matter hereof; (b) the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors, and its permitted assigns; and (c) without the prior written consent of all parties hereto, this Agreement will not be assignable by any means whatsoever, whether voluntary, involuntary, by operation of law or otherwise (any attempted assignment in contravention hereof being null and void).

Section 4.11 WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 4.12 No Recourse. All proceedings, obligations, losses or causes of action (whether in contract, in tort, in law or in equity, or granted by statute whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to (i) this Agreement, (ii) the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with, or as inducement to, this Agreement), (iii) any breach or violation of this Agreement and (iv) any failure of the sale of the Purchased Units or any other transaction contemplated by this Agreement to be consummated, in each case, may be made only against (and are those solely of) the Persons that are expressly identified as parties to this Agreement. In furtherance and not in limitation of the foregoing, and notwithstanding any other provision of this Agreement to that contrary, Dugaboy covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any of HDF's affiliates, officers, directors, members, former, current or future direct or indirect stockholders, controlling persons, employees, agents, managers, general or limited partners or assignees (collectively, the "***Related Parties***"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of HDF or any of its affiliates under this Agreement or any documents or instruments delivered in connection herewith or therewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation.

Section 4.13 Rules of Construction. Words such as "herein," "hereunder," "hereof" and the like shall be deemed to refer to this Agreement as a whole and not to any particular document or Article, Section or other portion in which such words appear. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Any reference to any federal, state, local or foreign statute, law or other legal regulation shall be deemed to also to refer to all rules and regulations promulgated thereunder. References herein to "$" shall be references to United States Dollars. The words

"include" and "including" shall be deemed to mean "include, without limitation," and "including, without limitation."

Section 4.14 Severability. If any provision of this Agreement or the application thereof to any person (including, the officers and directors of a HDF) or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.

Section 4.15 Termination. This Agreement shall terminate at such time as HDF no longer holds any Put Units.

***[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]***

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**HDF:**

**HIGHLAND DALLAS FOUNDATION, INC.**

By:______________________________
Name: Matthew Randazzo
Title: Vice President

**DUGABOY:**

**THE DUGABOY INVESTMENT TRUST**

By:______________________________
Name:
Title:

[*Signature Page to Put Option Agreement*]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**HDF**:

**HIGHLAND DALLAS FOUNDATION, INC.**

By:____________________________
Name:
Title:

**DUGABOY**:

**THE DUGABOY INVESTMENT TRUST**

By: Nancy Dondero
Name: NANCY DONDERO
Title: TRUSTEE

**Exhibit A**

**Exercise of Option Notice**
Under Put Option Agreement
dated December ___, 2019

Date: ____________

To: The Dugaboy Investment Trust
Attn: Nancy Dondero
c/o Melissa Schroth
300 Crescent Court, Suite 700
Dallas, TX 75201
Tel: (972) 419-2514
E-mail: nancy97@bellsouth.net
mschroth@highlandcapital.com

Dear Mr. Dondero:

**Re: Nexpoint Units - Exercise of Put Option**

Reference is hereby made to that certain Put Option Agreement, dated as of December ___, 2019 (the "***Agreement***"), by and between Highland Dallas Foundation, Inc. ("***HDF***") and The Dugaboy Investment Trust ("***Dugaboy***"). Capitalized terms used herein without definition shall have the respective meanings ascribed thereto in the Agreement.

This is to notify you that the undersigned hereby exercises its Put Option and hereby requires that Dugaboy purchase an aggregate number of _______ Put Units at the Purchase Price set forth in the Agreement, all pursuant to the terms and subject to the conditions set forth in the Agreement.

Yours very truly,

**HIGHLAND DALLAS FOUNDATION, INC.**

By:______________________________
Name:
Title:

# EXHIBIT 274

SkyView Group | Restricted List

https://nexpoint.siepe.io/Legal/RestrictedList/

PACER: Login | Legal - Home | Remote Desktop W... | EDGAR | Directors Desk Secu... | Smarsh - Complianc... | Restricted List | HOME | Wealth Managemen...

My Home | Investments | Funds | Performance | FrontOffice | BackOffice | search | TimeKeeper | Sign Out

Restricted List | Issuer Mappings

Non-HCMLP

Add Restricted Issuer | Add Issuer | Upload To Bloomberg

Export

| Issuer | Status | Start Date | End Date | PM | Restricted By | Category | Comments | Company | Request Type | Actions |
|---|---|---|---|---|---|---|---|---|---|---|
| NexPoint Diversified Real Estate Trust OP, L.P. | Temporary | 08/09/2022 | 08/09/2025 | | Team Legal | Trade Restriction Period | Discuss with Legal/Compliance and Winston before trading | Non-HCMLP | | Edit Remove |
| NexPoint Diversified Real Estate Trust OP, L.P. | Permanent | 05/03/2021 | | | Team Legal | Watch List | 10b-18 | Non-HCMLP | | Edit Remove |
| NexPoint Homes Acquisitions, LLC | Temporary | 02/16/2023 | 02/16/2025 | | Team Legal | Trade Restriction Period | Discuss with Legal/Compliance and Winston before trading. | Non-HCMLP | | Edit Remove |
| NexPoint Homes Trust, Inc | Temporary | 02/16/2023 | 02/16/2025 | | Team Legal | Trade Restriction Period | Discuss with Legal/Compliance and Winston before trading. | Non-HCMLP | | Edit Remove |
| Nexpoint Hospitality Trust | Temporary | 12/23/2023 | 12/23/2024 | | Robert Harris | Trade Restriction Period | NHT is restricted from trading until further notice from Matt McGraner, Brian Mitts, DC Sauter or Rob Harris. | Non-HCMLP | | Edit Remove |
| Nexpoint Hospitality Trust | Temporary | 08/09/2022 | 08/09/2025 | | Team Legal | Trade Restriction Period | Discuss with Legal/Compliance and Winston before trading | Non-HCMLP | | Edit Remove |
| Nexpoint Real Estate Finance Operating Partnership, LP | Temporary | 10/10/2024 | 11/04/2024 | | Team Legal | Trade Restriction Period | Q3 Blackout | Non-HCMLP | | Edit Remove |
| Nexpoint Real Estate Finance Operating Partnership, LP | Temporary | 03/08/2023 | 03/08/2025 | | Team Legal | Trade Restriction Period | Discuss with Legal/Compliance and Winston before trading | Non-HCMLP | | Edit Remove |
| Nexpoint Real Estate Finance Operating Partnership, LP | Permanent | 03/08/2023 | | | Team Legal | Watch List | S.16 monitoring | Non-HCMLP | | Edit Remove |
| Nexpoint Real Estate Finance Operating Partnership, LP | Permanent | 03/08/2023 | | | Team Legal | Watch List | Sales of NREF preferred by NREF issuer/OP need to be discussed with Legal/Compliance and Winston before proceeding. | Non-HCMLP | | Edit Remove |
| NexPoint Real Estate Finance, Inc. | Temporary | 05/13/2024 | 11/13/2024 | | Team Legal | Trade Restriction Period | Affiliate bank restriction. Discuss with Compliance before investing. | Non-HCMLP | | Edit Remove |
| NexPoint Real Estate Finance, Inc. | Temporary | 10/10/2024 | 11/04/2024 | | Team Legal | Trade Restriction Period | Q3 Blackout | Non-HCMLP | | Edit Remove |
| NexPoint Real Estate Finance, Inc. | Temporary | 08/13/2024 | 08/13/2025 | | Rick Swadley | Trade Restriction Period | Purchase and/or funding (both debt and equity) is restricted for HFRO until further notice. Contact Compliance. | Non-HCMLP | | Edit Remove |
| NexPoint Real Estate Finance, Inc. | Temporary | 08/09/2022 | 08/09/2025 | | Team Legal | Trade Restriction Period | Discuss with Legal/Compliance and Winston before trading | Non-HCMLP | | Edit Remove |

1 2 3 ... items per page | 251 - 500 of 552 items

© Siepe, LLC 2024 All Rights Reserved · Release Date 09/26/2024

4

# EXHIBIT 275

**From:** Robert Harris
**Sent:** Saturday, December 23, 2023 10:17 AM
**To:** Restricted List; Restrictedlist
**Subject:** NHT

Please restrict NHT immediately and maintain the restriction until DC or I release it.

ROBERT R. HARRIS | CORPORATE COUNSEL, REAL ESTATE

NEXPOINT

O: 214.550.8275 | C: 214.886.4203
rharris@nexpoint.com | www.nexpoint.com

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

# EXHIBIT 276

| CERTIFICATION | EMPLOYEE | CERTIFICATION PERIOD | CERTIFICATION DUE DATE | COMPLETED DATE | STATUS |
|---|---|---|---|---|---|
| Q1 2024 - Questionnaire and Transactions Certification | Mark Patrick | January 1, 2024 - March 31, 2024 | April 25, 2024 | April 15, 2024 | Complete |

Certification Instructions

*If any of this information is incorrect or any transactions are missing, please contact Compliance before attesting to this form.*

Definitions

"*Affiliate*" means a person or entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, another person or entity.

"*Artificial Intelligence*" or "*AI*" means computer systems able to perform tasks that normally require human intelligence, such as visual perception, speech recognition, decision-making, and translation between languages, more commonly known as "Generative AI". For the avoidance of doubt, if there is any question as to whether an application is or is not considered "Generative AI", such applications have been determined to not constitute "Generative AI" under this policy. The Company understands that the use of AI is relatively new, and the regulatory landscape is evolving. In light of this, the policies and procedures herein are subject to change.

"*Compensated Solicitor*" means any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of Securities.

"*Executive Officer*" means the president, any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function, or any other person who performs similar policy making functions for the issuer, including executive officers of an affiliate of the issuer if such executive officers perform policy making functions for the relevant entity. Executive officers of subsidiaries may be deemed executive officers of the parent if they perform policy making functions for the parent.

"*Final Order*" means a written directive or declaratory statement issued by a federal or state agency described in Rule 506(d)(1)(iii) under the Securities Act of 1933 under applicable statutory authority that provides for notice and an opportunity for a hearing, which constitutes a final disposition or action by that federal or state agency. An order may still be subject to appeal and still be deemed to constitute a "final order."

"*participating in the offering*" can encompass, but is not limited to, activities such as participation or involvement in due diligence activities related to the offering, involvement in the preparation of disclosure documents, and communications with the issuer, prospective investors or other offering participants. Whether activities are considered *participating in the offering* is a question of fact.

"*Promoter*" includes (i) any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer; or (ii) any person who, in connection with the founding and organizing of the business or enterprise of an issuer, directly or indirectly receives in consideration of services or property, or both services and property, 10% or more of any class of securities of the issuer or 10% or more of the proceeds from the sale of any class of such securities. However, a person who receives such securities or proceeds either solely as underwriting commissions or solely in consideration of property shall not be deemed a promoter within the meaning of this paragraph if such person does not otherwise take part in founding and organizing the enterprise.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*You*" means the person identified on the signature page of this Questionnaire. If you are a compensated solicitor, "you" means the person identified on the signature page along with (i) the compensated solicitor's directors, executive officers and any other officers participating in the offering, (ii) any of the compensated solicitor's general partners or managing members, and (iii) any directors, executive officers and any officers participating in the offering of such general partner or managing member. Any responses for persons described in (i), (ii) or (iii) above should be made after due inquiry and any explanation provided should identify the person that was the subject of the conviction, order, suspension, bar, expulsion or injunction.

Have you been convicted, within the past ten years (or five years, in the case of the Funds affiliated issuers), of any felony or misdemeanor in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment advisor or paid solicitor of purchasers of securities?*

No

Are you subject to any order, judgment, or decree of any court of competent jurisdiction, entered within the past five years, that currently restrains or enjoins you from engaging or continuing to engage in any conduct or practice in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser, or paid solicitor of purchasers of securities?*

No

Are you subject to a final order of a state securities commission (or an agency or officer of a state performing like functions), a state authority that supervises or examines banks, savings associations, or credit unions, a state insurance commission (or an agency or officer of a state performing like functions), an appropriate federal banking agency, the U.S. Commodity Futures Trading Commission, or the National Credit Union Administration that currently bars you from association with an entity regulated by such commission, authority, agency or officer, engaging in the business of securities, insurance or banking, engaging in savings association or credit union activities, or constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within the past ten years?*

No

Are you subject to an order of the SEC entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the Exchange Act), or Section 203(e) or 203(f) of the Investment Advisers Act of 1940, as amended (the Advisers Act) that currently suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser, places limitations on the activities, functions or operations of, or imposes civil money penalties on, such person, or bars you from being associated with any entity or from participating in the offering of any penny stock?*

No

Are you subject to any order of the SEC, entered within the past five years, that, currently orders you to cease and desist from committing or causing a violation or future violation of any scienter-based anti-fraud provision of the federal securities laws, including, without limitation, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10(b)(5) thereunder, Section 15(c)(1) of the Exchange Act and Section 206(1) of the Advisers Act or any other rule or regulation thereunder or Section 5 of the Securities Act?*

No

Are you currently suspended or expelled from membership in, or suspended or barred from association with a member of, a securities self regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?*

No

Have you filed (as a registrant or issuer), or were you named as an underwriter in any registration statement or Regulation A offering statement filed with the SEC that, within the past five years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?*

No

Are you subject to a United States Postal Service false representation order entered within the past five years, or are you currently subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?*

No

Are you the subject of any ongoing proceeding, arbitration, action, indictment or charge that if resolved against you or such person could result in a yes answer to any of the above questions?*

No

Are you involved in any outside business activity such as a second job or board seat (excluding Company Affiliates)?*

Yes

Please provide a detailed explanation *

Daf trustee. Portfolio manager for Rand advisors.

I hereby certify that during the past quarter I have NOT used non-Company approved systems such as text messaging to conduct business communications.*

Yes

I hereby certify that during the past quarter I have NOT used non-Company approved Artificial Intelligence systems in my day-to-day duties without explicit approval from the IT or Compliance department.*

Yes

I hereby certify that I have read, acknowledge, and abide by the employee IT policy.*

Yes

I hereby certify that the below is a complete and accurate record of all of my transactions from the most recent fiscal quarter. *

Yes

TRANSACTIONS

| Account Provider | Account # | Security Description | Trade Date | Type | Quantity |
| --- | --- | --- | --- | --- | --- |

CERTIFIED

No records to display

I hereby certify that the above information is true and accurate. I hereby certify to continue to comply with obligations as set forth in the firm's Compliance Manual, including without limitation, provisions around confidentiality, cybersecurity, and reporting compliance violations if they occur. I have received, have access to, and have read a copy of the Employee Handbook (the "Handbook") and I am in compliance with the obligations applicable to employees set forth therein. I understand it is my responsibility to read the Handbook and to bring any questions I may have about its provisions to my supervisor, Human Resources, or an appropriate member of senior management prior to signing this acknowledgment. I further understand that if I do not abide by the policies and procedures outlined in the Handbook that my actions might result in the termination of my employment. I understand that the firm may change, modify, amend, add to or subtract from any or all of the contents of this Handbook at any time, in its sole discretion, and with or without notice, and that the current Handbook replaces and supersedes any previous Handbooks that I have received or that have been issued by the firm. I understand and acknowledge that my employment is at-will, and nothing contained in the Handbook in any way alters the at-will employment relationship between the firm and me and I acknowledge and agree that the firm has not made any statements altering the at-will nature of employment, and has not made guarantees or promises of continuing employment. *

CERTIFIED

# EXHIBIT 277

| CERTIFICATION | EMPLOYEE | CERTIFICATION PERIOD | CERTIFICATION DUE DATE | COMPLETED DATE | STATUS |
|---|---|---|---|---|---|
| Q2 2024 - Questionnaire and Transactions Certification | Mark Patrick | April 1, 2024 - June 30, 2024 | July 24, 2024 | September 3, 2024 | Completed Late |

Certification Instructions

*If any of this information is incorrect or any transactions are missing, please contact Compliance before attesting to this form.*

Definitions

"*Affiliate*" means a person or entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, another person or entity.

"*Artificial Intelligence*" or "*AI*" means computer systems able to perform tasks that normally require human intelligence, such as visual perception, speech recognition, decision-making, and translation between languages, more commonly known as "Generative AI". For the avoidance of doubt, if there is any question as to whether an application is or is not considered "Generative AI", such applications have been determined to not constitute "Generative AI" under this policy. The Company understands that the use of AI is relatively new, and the regulatory landscape is evolving. In light of this, the policies and procedures herein are subject to change.

"*Compensated Solicitor*" means any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of Securities.

"*Executive Officer*" means the president, any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function, or any other person who performs similar policy making functions for the issuer, including executive officers of an affiliate of the issuer if such executive officers perform policy making functions for the relevant entity. Executive officers of subsidiaries may be deemed executive officers of the parent if they perform policy making functions for the parent.

"*Final Order*" means a written directive or declaratory statement issued by a federal or state agency described in Rule 506(d)(1)(iii) under the Securities Act of 1933 under applicable statutory authority that provides for notice and an opportunity for a hearing, which constitutes a final disposition or action by that federal or state agency. An order may still be subject to appeal and still be deemed to constitute a "final order."

"*participating in the offering*" can encompass, but is not limited to, activities such as participation or involvement in due diligence activities related to the offering, involvement in the preparation of disclosure documents, and communications with the issuer, prospective investors or other offering participants. Whether activities are considered *participating in the offering* is a question of fact.

"*Promoter*" includes (i) any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer; or (ii) any person who, in connection with the founding and organizing of the business or enterprise of an issuer, directly or indirectly receives in consideration of services or property, or both services and property, 10% or more of any class of securities of the issuer or 10% or more of the proceeds from the sale of any class of such securities. However, a person who receives such securities or proceeds either solely as underwriting commissions or solely in consideration of property shall not be deemed a promoter within the meaning of this paragraph if such person does not otherwise take part in founding and organizing the enterprise.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*You*" means the person identified on the signature page of this Questionnaire. If you are a compensated solicitor, "you" means the person identified on the signature page along with (i) the compensated solicitor's directors, executive officers and any other officers participating in the offering, (ii) any of the compensated solicitor's general partners or managing members, and (iii) any directors, executive officers and any officers participating in the offering of such general partner or managing member. Any responses for persons described in (i), (ii) or (iii) above should be made after due inquiry and any explanation provided should identify the person that was the subject of the conviction, order, suspension, bar, expulsion or injunction.

Have you been convicted, within the past ten years (or five years, in the case of the Funds affiliated issuers), of any felony or misdemeanor in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment advisor or paid solicitor of purchasers of securities? *

No

Are you subject to any order, judgment, or decree of any court of competent jurisdiction, entered within the past five years, that currently restrains or enjoins you from engaging or continuing to engage in any conduct or practice in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser, or paid solicitor of purchasers of securities? *

No

Are you subject to a final order of a state securities commission (or an agency or officer of a state performing like functions), a state authority that supervises or examines banks, savings associations, or credit unions, a state insurance commission (or an agency or officer of a state performing like functions), an appropriate federal banking agency, the U.S. Commodity Futures Trading Commission, or the National Credit Union Administration that currently bars you from association with an entity regulated by such commission, authority, agency or officer, engaging in the business of securities, insurance or banking, engaging in savings association or credit union activities, or constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within the past ten years? *

No

Are you subject to an order of the SEC entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the Exchange Act), or Section 203(e) or 203(f) of the Investment Advisers Act of 1940, as amended (the Advisers Act) that currently suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser, places limitations on the activities, functions or operations of, or imposes civil money penalties on, such person, or bars you from being associated with any entity or from participating in the offering of any penny stock?*

No

Are you subject to any order of the SEC, entered within the past five years, that, currently orders you to cease and desist from committing or causing a violation or future violation of any scienter-based anti-fraud provision of the federal securities laws, including, without limitation, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10(b)(5) thereunder, Section 15(c)(1) of the Exchange Act and Section 206(1) of the Advisers Act or any other rule or regulation thereunder or Section 5 of the Securities Act?*

No

Are you currently suspended or expelled from membership in, or suspended or barred from association with a member of, a securities self regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?*

No

Have you filed (as a registrant or issuer), or were you named as an underwriter in any registration statement or Regulation A offering statement filed with the SEC that, within the past five years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?*

No

Are you subject to a United States Postal Service false representation order entered within the past five years, or are you currently subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?*

No

Are you the subject of any ongoing proceeding, arbitration, action, indictment or charge that if resolved against you or such person could result in a yes answer to any of the above questions?*

No

Are you involved in any outside business activity such as a second job or board seat (excluding Company Affiliates)?*

No

I hereby certify that during the past quarter I have NOT used non-Company approved systems such as text messaging to conduct business communications.*

Yes

I hereby certify that during the past quarter I have NOT used non-Company approved Artificial Intelligence systems in my day-to-day duties without explicit approval from the IT or Compliance department.*

Yes

I hereby certify that I have read, acknowledge, and abide by the employee IT policy.*

Yes

I hereby certify that the below is a complete and accurate record of all of my transactions from the most recent fiscal quarter. *

Yes

TRANSACTIONS

| Account Provider | Account # | Security Description | Trade Date | Type | Quantity |
|---|---|---|---|---|---|

No records to display

I hereby certify that the above information is true and accurate. I hereby certify to continue to comply with obligations as set forth in the firm's Compliance Manual, including without limitation, provisions around confidentiality, cybersecurity, and reporting compliance violations if they occur. I have received, have access to, and have read a copy of the Employee Handbook (the "Handbook") and I am in compliance with the obligations applicable to employees set forth therein. I understand it is my responsibility to read the Handbook and to bring any questions I may have about its provisions to my supervisor, Human Resources, or an appropriate member of senior management prior to signing this acknowledgment. I further understand that if I do not abide by the policies and procedures outlined in the Handbook that my actions might result in the termination of my employment. I understand that the firm may change, modify, amend, add to or subtract from any or all of the contents of this Handbook at any time, in its sole discretion, and with or without notice, and that the current Handbook replaces and supersedes any previous Handbooks that I have received or that have been issued by the firm. I understand and acknowledge that my employment is at-will, and nothing contained in the Handbook in any way alters the at-will employment relationship between the firm and me and I acknowledge and agree that the firm has not made any statements altering the at-will nature of employment, and has not made guarantees or promises of continuing employment.*

# EXHIBIT 278

| CERTIFICATION | EMPLOYEE | CERTIFICATION PERIOD | CERTIFICATION DUE DATE | COMPLETED DATE | STATUS |
|---|---|---|---|---|---|
| Q4 2023 - Questionnaire and Transactions Certification | Mark Patrick | October 1, 2023 - December 31, 2023 | January 26, 2024 | January 12, 2024 | Complete |

Certification Instructions

*If any of this information is incorrect or any transactions are missing, please contact Compliance before attesting to this form.*

Definitions

"*Affiliate*" means a person or entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, another person or entity.

"*Compensated Solicitor*" means any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of Securities.

"*Executive Officer*" means the president, any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function, or any other person who performs similar policy making functions for the issuer, including executive officers of an affiliate of the issuer if such executive officers perform policy making functions for the relevant entity. Executive officers of subsidiaries may be deemed executive officers of the parent if they perform policy making functions for the parent.

"*Final Order*" means a written directive or declaratory statement issued by a federal or state agency described in Rule 506(d)(1)(iii) under the Securities Act of 1933 under applicable statutory authority that provides for notice and an opportunity for a hearing, which constitutes a final disposition or action by that federal or state agency. An order may still be subject to appeal and still be deemed to constitute a "final order."

"*participating in the offering*" can encompass, but is not limited to, activities such as participation or involvement in due diligence activities related to the offering, involvement in the preparation of disclosure documents, and communications with the issuer, prospective investors or other offering participants. Whether activities are considered *participating in the offering* is a question of fact.

"*Promoter*" includes (i) any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer; or (ii) any person who, in connection with the founding and organizing of the business or enterprise of an issuer, directly or indirectly receives in consideration of services or property, or both services and property, 10% or more of any class of securities of the issuer or 10% or more of the proceeds from the sale of any class of such securities. However, a person who receives such securities or proceeds either solely as underwriting commissions or solely in consideration of property shall not be deemed a promoter within the meaning of this paragraph if such person does not otherwise take part in founding and organizing the enterprise.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*You*" means the person identified on the signature page of this Questionnaire. If you are a compensated solicitor, "you" means the person identified on the signature page along with (i) the compensated solicitor's directors, executive officers and any other officers participating in the offering, (ii) any of the compensated solicitor's general partners or managing members, and (iii) any directors, executive officers and any officers participating in the offering of such general partner or managing member. Any responses for persons described in (i), (ii) or (iii) above should be made after due inquiry and any explanation provided should identify the person that was the subject of the conviction, order, suspension, bar, expulsion or injunction.

Have you been convicted, within the past ten years (or five years, in the case of the Funds affiliated issuers), of any felony or misdemeanor in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment advisor or paid solicitor of purchasers of securities? *

No

Are you subject to any order, judgment, or decree of any court of competent jurisdiction, entered within the past five years, that currently restrains or enjoins you from engaging or continuing to engage in any conduct or practice in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser, or paid solicitor of purchasers of securities? *

No

Are you subject to a final order of a state securities commission (or an agency or officer of a state performing like functions), a state authority that supervises or examines banks, savings associations, or credit unions, a state insurance commission (or an agency or officer of a state performing like functions), an appropriate federal banking agency, the U.S. Commodity Futures Trading Commission, or the National Credit Union Administration that currently bars you from association with an entity regulated by such commission, authority, agency or officer, engaging in the business of securities, insurance or banking, engaging in savings association or credit union activities, or constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within the past ten years? *

No

Are you subject to an order of the SEC entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the Exchange Act), or *

Section 203(e) or 203(f) of the Investment Advisers Act of 1940, as amended (the Advisers Act) that currently suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser, places limitations on the activities, functions or operations of, or imposes civil money penalties on, such person, or bars you from being associated with any entity or from participating in the offering of any penny stock?*

No

Are you subject to any order of the SEC, entered within the past five years, that, currently orders you to cease and desist from committing or causing a violation or future violation of any scienter-based anti-fraud provision of the federal securities laws, including, without limitation, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10(b)(5) thereunder, Section 15(c)(1) of the Exchange Act and Section 206(1) of the Advisers Act or any other rule or regulation thereunder or Section 5 of the Securities Act?*

No

Are you currently suspended or expelled from membership in, or suspended or barred from association with a member of, a securities self regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?*

No

Have you filed (as a registrant or issuer), or were you named as an underwriter in any registration statement or Regulation A offering statement filed with the SEC that, within the past five years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?*

No

Are you subject to a United States Postal Service false representation order entered within the past five years, or are you currently subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?*

No

Are you the subject of any ongoing proceeding, arbitration, action, indictment or charge that if resolved against you or such person could result in a yes answer to any of the above questions?*

No

Are you involved in any outside business activity such as a second job or board seat (excluding Company Affiliates)?*

Yes

Please provide a detailed explanation *

Charitable DAF Holdco Ltd. owner and related entities.

I hereby certify that during the past quarter I have NOT used non-Company approved systems such as text messaging to conduct business communications.*

Yes

I hereby certify that I have read, acknowledge, and abide by the employee IT policy.*

Yes

I hereby certify that the below is a complete and accurate record of all of my transactions from the most recent fiscal quarter. *

Yes

TRANSACTIONS

| Account Provider | Account # | Security Description | Trade Date | Type | Quantity |
|---|---|---|---|---|---|

No records to display

CERTIFIED

☑ I hereby certify that the above information is true and accurate. I hereby certify to continue to comply with obligations as set forth in the firm's Compliance Manual, including without limitation, provisions around confidentiality, cybersecurity, and reporting compliance violations if they occur. I have received, have access to, and have read a copy of the Employee Handbook (the "Handbook") and I am in compliance with the obligations applicable to employees set forth therein. I understand it is my responsibility to read the Handbook and to bring any questions I may have about its provisions to my supervisor, Human Resources, or an appropriate member of senior management prior to signing this acknowledgment. I further understand that if I do not abide by the policies and procedures outlined in the Handbook that my actions might result in the termination of my employment. I understand that the firm may change, modify, amend, add to or subtract from any or all of the contents of this Handbook at any time, in its sole discretion, and with or without notice, and that the current Handbook replaces and supersedes any previous Handbooks that I have received or that have been issued by the firm. I understand and acknowledge that my employment is at-will, and nothing contained in the Handbook in any way alters the at-will employment relationship between the firm and me and I acknowledge and agree that the firm has not made any statements altering the at-will nature of employment, and has not made guarantees or promises of continuing employment.*

# EXHIBIT 279

**From:** Shawn Raver <Sraver@CharitableDAF.com>
**Sent:** Wednesday, October 22, 2025 5:34 PM
**To:** Sarah Alvarado; Lauren Short
**Subject:** Re: 2024 Foundation information request

Nothing was distributed for Q4 that I'm aware of.

---

**From:** Sarah Alvarado <SAlvarado@skyviewgroup.com>
**Sent:** Wednesday, October 22, 2025 5:32 PM
**To:** Shawn Raver <Sraver@CharitableDAF.com>; Lauren Short <lshort@nexpoint.com>
**Subject:** RE: 2024 Foundation information request

Hi Shawn,

Related to the other Foundations – I see below you provided Q1-Q3. Can we also get Q4 information?

---

**From:** Shawn Raver <Sraver@CharitableDAF.com>
**Sent:** Wednesday, October 22, 2025 5:25 PM
**To:** Lauren Short <LShort@nexpoint.com>; Sarah Alvarado <SAlvarado@skyviewgroup.com>
**Subject:** RE: 2024 Foundation information request

Hi Lauren –

Kansas City didn't receive any trustee fees related to 2024 valuations.

Thanks,
Shawn

---

**From:** Lauren Short <LShort@nexpoint.com>
**Sent:** Wednesday, October 22, 2025 11:34 AM
**To:** Shawn Raver <Sraver@CharitableDAF.com>; Sarah Alvarado <SAlvarado@skyviewgroup.com>
**Subject:** Re: 2024 Foundation information request

Hi Shawn,

Hope you are getting to enjoy some of this nice fall weather (or at least what Texas can provide for fall weather). Deloitte is also asking for Kansas City trustee fees for 2024. Would you mind providing as you did with the others?

Best,
Lauren Short
(c) 214-476-3780

---

**From:** Shawn Raver <Sraver@CharitableDAF.com>
**Sent:** Wednesday, August 27, 2025 12:18 PM
**To:** Sarah Alvarado <SAlvarado@skyviewgroup.com>; Lauren Short <lshort@nexpoint.com>
**Subject:** Re: 2024 Foundation information request

$142,022.85 was distributed to Dallas Foundation with respect to Q1-Q3 valuations.

$175,772.85 was distributed to Santa Barbara with respect to Q1-Q3 valuations.

---

**From:** Sarah Alvarado <SAlvarado@skyviewgroup.com>
**Sent:** Monday, August 25, 2025 5:59 PM
**To:** Shawn Raver <Sraver@CharitableDAF.com>; Lauren Short <lshort@nexpoint.com>
**Subject:** RE: 2024 Foundation information request

Attached is what we received in PY, hopefully this is helpful.

---

**From:** Shawn Raver <Sraver@CharitableDAF.com>
**Sent:** Monday, August 25, 2025 5:50 PM
**To:** Lauren Short <LShort@nexpoint.com>
**Cc:** Sarah Alvarado <SAlvarado@skyviewgroup.com>
**Subject:** Re: 2024 Foundation information request

Do you want amounts paid in 2024 or amounts paid based on 2024 values?

---

**From:** Lauren Short <LShort@nexpoint.com>
**Sent:** Monday, August 25, 2025 4:48 PM
**To:** Shawn Raver <sraver@charitabledaf.com>
**Cc:** Sarah Alvarado <SAlvarado@skyviewgroup.com>
**Subject:** Re: 2024 Foundation information request

Hi Shawn!

Would you please provide the DAF Trustee Fee schedule by foundation for 2024 per Sarah/Tax's request below? It looks like the last report I have for 2024 is for Q1 sent on 7/29/24. Let me know if there is anything I can do to assist!

Best,
Lauren Short
(c) 214-476-3780

---

**From:** Sarah Jimenez <SJimenez@skyviewgroup.com>
**Sent:** Tuesday, August 12, 2025 10:34 AM
**To:** Lauren Short <lshort@nexpoint.com>
**Subject:** 2024 Foundation information request

Hi Lauren,

I believe you helped get this information the last several years. Can you please provide the below for each of the Foundations as of 12/31/2024?

- Charitable Giving Summary – "Summary of Grants" excel
- DAF Trustee Fee schedule by foundation
- Any changes to the board?

Sarah Alvarado

Manager - Tax

SKYVIEW

SJimenez@skyviewgroup.com

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

# EXHIBIT 280

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Friday, July 16, 2021 11:57 AM
**To:** Chris Rice
**Cc:** Will Mabry; Shawn Raver
**Subject:** Re: DAF Trustee Fees
**Attachments:** image001.png

Approved!

On Fri, Jul 16, 2021, 11:54 AM Chris Rice <CRice@skyviewgroup.com> wrote:

> Mark –
>
> Attached, you will find the calculation for the quarterly trustee fees.
>
> Please review and approve the following wires and cash movement:
>
> - Cash transfer: $33,187.50 from CLO Holdco LTD to HDF NexBank account (916)
> - Cash transfer: $44,437.50 from CLO Holdco LTD to Highland Santa Barbara NexBank account (890)
> - Wire: $33,187.50 from HDF NexBank account (916) to the Dallas Foundation
> - Wire: $44,437.50 from HSB NexBank account (890) to SB Foundation
>
> Thanks
>
> **Chris Rice | Manager – Fund Analysis**
>
> CRice@Skyviewgroup.com
> (m) 801-669-1297
>
> DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

# EXHIBIT 281

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Thursday, July 7, 2022 3:01 PM
**To:** Chris Rice
**Cc:** Will Mabry; Shawn Raver
**Subject:** Re: FW: DAF Quarterly 3.31.22
**Attachments:** image002.png

**Flag Status:** Completed

Approved

On Thu, Jul 7, 2022, 1:55 PM Chris Rice <CRice@skyviewgroup.com> wrote:

See attached for the draft Q1 valuation report. I looked through and had no comments or changes.

I've also attached the quarterly trustee fee calculation. If you have no comments, please approve and we can get the trustee fees out too.

Thanks

Chris Rice CPA
Manager – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
CRice@Skyviewgroup.com

---

**From:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
**Sent:** Thursday, July 7, 2022 12:56 PM
**To:** Chris Rice <CRice@skyviewgroup.com>
**Cc:** Erin Buck <ebuck@valuescopeinc.com>
**Subject:** RE: DAF Quarterly 3.31.22

Hey Chris, sorry meant to send this yesterday, but got caught up in meetings. Attached is a draft of the 3/31/22 quarterly update for the DAF.

Let me know if you have any questions or comments.

Thanks,

**Nathan Hoelscher**
Senior Associate

nhoelscher@valuescopeinc.com
(Direct) 817-310-5998 | (Cell) 817-642-7939 | (Fax) 817-310-5998
**Email** | **Web** | **Bio** | **VCard** | **Map**

VALUESCOPE
950 E. State Highway 114 | Suite 120 | Southlake, TX | 76092

BUSINESS VALUATION | LITIGATION SUPPORT | FINANCIAL REPORTING | TRANSACTION ADVISORY | FAIRNESS OPINIONS | QUALITY OF EARNINGS
TAX REPORTING | MANAGEMENT CONSULTING | TRANSFER PRICING | PUBLIC COMPANY SERVICES | HEALTHCARE VALUATION

ValueScope is a Member of AGN International

This transmission and/or attachment(s) may be confidential communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmission in error; any review, dissemination, distribution, or copying of this transmission is prohibited. If you have received this transmission and/or attachment(s) in error, please notify us immediately by email reply and immediately delete this transmission and all of its attachments. ValueScope is not a licensed CPA firm.

---

**From:** Chris Rice <CRice@skyviewgroup.com>
**Sent:** Thursday, July 7, 2022 8:40 AM
**To:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
**Cc:** Erin Buck <ebuck@valuescopeinc.com>
**Subject:** RE: DAF Quarterly 3.31.22

Hi Nathan –

I wanted to follow-up on the 3/31/2022 quarterly valuation.

Thanks

Chris Rice CPA
Manager – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
CRice@Skyviewgroup.com

---

**From:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
**Sent:** Thursday, June 23, 2022 11:14 AM
**To:** Chris Rice <CRice@skyviewgroup.com>
**Cc:** Erin Buck <ebuck@valuescopeinc.com>
**Subject:** RE: DAF Quarterly 3.31.22

Thanks Chris, we'll get started on the valuation update shortly.

Best,

**Nathan Hoelscher**
Senior Associate

nhoelscher@valuescopeinc.com
(Direct) 817-310-5998 | (Cell) 817-642-7939 | (Fax) 817-310-5998
**Email** | **Web** | **Bio** | **VCard** | **Map**

VALUESCOPE
950 E. State Highway 114 | Suite 120 | Southlake, TX | 76092
BUSINESS VALUATION | LITIGATION SUPPORT | FINANCIAL REPORTING | TRANSACTION ADVISORY | FAIRNESS OPINIONS | QUALITY OF EARNINGS
TAX REPORTING | MANAGEMENT CONSULTING | TRANSFER PRICING | PUBLIC COMPANY SERVICES | HEALTHCARE VALUATION

ValueScope is a Member of AGN International

This transmission and/or attachment(s) may be confidential communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmission in error; any review, dissemination, distribution, or copying of this transmission is

prohibited. If you have received this transmission and/or attachment(s) in error, please notify us immediately by email reply and immediately delete this transmission and all of its attachments. ValueScope is not a licensed CPA firm.

---

**From:** Chris Rice <CRice@skyviewgroup.com>
**Sent:** Thursday, June 23, 2022 11:10 AM
**To:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
**Subject:** RE: DAF Quarterly 3.31.22

See attached.

Chris Rice CPA
Manager – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
CRice@Skyviewgroup.com

---

**From:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
**Sent:** Friday, June 17, 2022 10:05 AM
**To:** Chris Rice <CRice@skyviewgroup.com>
**Subject:** DAF Quarterly 3.31.22

Hey Chris, just following up on the status of the data for the DAF's March 31 quarterly valuation.

Thanks,

**Nathan Hoelscher**
Senior Associate

nhoelscher@valuescopeinc.com
(Direct) 817-310-5998 | (Cell) 817-642-7939 | (Fax) 817-310-5998
**Email** | **Web** | **Bio** | **VCard** | **Map**

VALUESCOPE
950 E. State Highway 114 | Suite 120 | Southlake, TX | 76092
BUSINESS VALUATION | LITIGATION SUPPORT | FINANCIAL REPORTING | TRANSACTION ADVISORY | FAIRNESS OPINIONS | QUALITY OF EARNINGS
TAX REPORTING | MANAGEMENT CONSULTING | TRANSFER PRICING | PUBLIC COMPANY SERVICES | HEALTHCARE VALUATION

ValueScope is a Member of AGN International

This transmission and/or attachment(s) may be confidential communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmission in error; any review, dissemination, distribution, or copying of this transmission is prohibited. If you have received this transmission and/or attachment(s) in error, please notify us immediately by email reply and immediately delete this transmission and all of its attachments. ValueScope is not a licensed CPA firm.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from

malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# EXHIBIT 282

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Thursday, July 7, 2022 3:01 PM
**To:** Chris Rice
**Cc:** Will Mabry; Shawn Raver
**Subject:** Re: FW: DAF Quarterly 3.31.22
**Attachments:** image002.png

**Flag Status:** Completed

Approved

On Thu, Jul 7, 2022, 1:55 PM Chris Rice <CRice@skyviewgroup.com> wrote:

> See attached for the draft Q1 valuation report. I looked through and had no comments or changes.
>
> I've also attached the quarterly trustee fee calculation. If you have no comments, please approve and we can get the trustee fees out too.
>
> Thanks
>
> Chris Rice CPA
> Manager – Fund Analysis
>
> O: (214) 550-4549 | C: (801) 669-1297
> CRice@Skyviewgroup.com
>
> ---
>
> **From:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
> **Sent:** Thursday, July 7, 2022 12:56 PM
> **To:** Chris Rice <CRice@skyviewgroup.com>
> **Cc:** Erin Buck <ebuck@valuescopeinc.com>
> **Subject:** RE: DAF Quarterly 3.31.22
>
> Hey Chris, sorry meant to send this yesterday, but got caught up in meetings. Attached is a draft of the 3/31/22 quarterly update for the DAF.
>
> Let me know if you have any questions or comments.
>
> Thanks,
>
> **Nathan Hoelscher**
> Senior Associate
>
> nhoelscher@valuescopeinc.com
> (Direct) 817-310-5998 | (Cell) 817-642-7939 | (Fax) 817-310-5998
> **Email** | **Web** | **Bio** | **VCard** | **Map**
>
> **VALUE**SCOPE
> 950 E. State Highway 114 | Suite 120 | Southlake, TX | 76092

BUSINESS VALUATION | LITIGATION SUPPORT | FINANCIAL REPORTING | TRANSACTION ADVISORY | FAIRNESS OPINIONS | QUALITY OF EARNINGS
TAX REPORTING | MANAGEMENT CONSULTING | TRANSFER PRICING | PUBLIC COMPANY SERVICES | HEALTHCARE VALUATION

ValueScope is a Member of AGN International

This transmission and/or attachment(s) may be confidential communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmission in error; any review, dissemination, distribution, or copying of this transmission is prohibited. If you have received this transmission and/or attachment(s) in error, please notify us immediately by email reply and immediately delete this transmission and all of its attachments. ValueScope is not a licensed CPA firm.

---

**From:** Chris Rice <CRice@skyviewgroup.com>
**Sent:** Thursday, July 7, 2022 8:40 AM
**To:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
**Cc:** Erin Buck <ebuck@valuescopeinc.com>
**Subject:** RE: DAF Quarterly 3.31.22

Hi Nathan –

I wanted to follow-up on the 3/31/2022 quarterly valuation.

Thanks

Chris Rice CPA
Manager – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
CRice@Skyviewgroup.com

---

**From:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
**Sent:** Thursday, June 23, 2022 11:14 AM
**To:** Chris Rice <CRice@skyviewgroup.com>
**Cc:** Erin Buck <ebuck@valuescopeinc.com>
**Subject:** RE: DAF Quarterly 3.31.22

Thanks Chris, we'll get started on the valuation update shortly.

Best,

**Nathan Hoelscher**
Senior Associate

nhoelscher@valuescopeinc.com
(Direct) 817-310-5998 | (Cell) 817-642-7939 | (Fax) 817-310-5998
**Email** | **Web** | **Bio** | **VCard** | **Map**

**VALUE**SCOPE
950 E. State Highway 114 | Suite 120 | Southlake, TX | 76092

BUSINESS VALUATION | LITIGATION SUPPORT | FINANCIAL REPORTING | TRANSACTION ADVISORY | FAIRNESS OPINIONS | QUALITY OF EARNINGS
TAX REPORTING | MANAGEMENT CONSULTING | TRANSFER PRICING | PUBLIC COMPANY SERVICES | HEALTHCARE VALUATION

ValueScope is a Member of AGN International

This transmission and/or attachment(s) may be confidential communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmission in error; any review, dissemination, distribution, or copying of this transmission is

prohibited. If you have received this transmission and/or attachment(s) in error, please notify us immediately by email reply and immediately delete this transmission and all of its attachments. ValueScope is not a licensed CPA firm.

**From:** Chris Rice <CRice@skyviewgroup.com>
**Sent:** Thursday, June 23, 2022 11:10 AM
**To:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
**Subject:** RE: DAF Quarterly 3.31.22

See attached.

Chris Rice CPA
Manager – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
CRice@Skyviewgroup.com

**From:** Nathan Hoelscher <nhoelscher@valuescopeinc.com>
**Sent:** Friday, June 17, 2022 10:05 AM
**To:** Chris Rice <CRice@skyviewgroup.com>
**Subject:** DAF Quarterly 3.31.22

Hey Chris, just following up on the status of the data for the DAF's March 31 quarterly valuation.

Thanks,

**Nathan Hoelscher**
Senior Associate

nhoelscher@valuescopeinc.com
(Direct) 817-310-5998 | (Cell) 817-642-7939 | (Fax) 817-310-5998
**Email** | **Web** | **Bio** | **VCard** | **Map**

VALUESCOPE
950 E. State Highway 114 | Suite 120 | Southlake, TX | 76092
BUSINESS VALUATION | LITIGATION SUPPORT | FINANCIAL REPORTING | TRANSACTION ADVISORY | FAIRNESS OPINIONS | QUALITY OF EARNINGS
TAX REPORTING | MANAGEMENT CONSULTING | TRANSFER PRICING | PUBLIC COMPANY SERVICES | HEALTHCARE VALUATION

ValueScope is a Member of AGN International
This transmission and/or attachment(s) may be confidential communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmission in error; any review, dissemination, distribution, or copying of this transmission is prohibited. If you have received this transmission and/or attachment(s) in error, please notify us immediately by email reply and immediately delete this transmission and all of its attachments. ValueScope is not a licensed CPA firm.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from

malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# EXHIBIT 283

**From:** Shawn Raver <Sraver@CharitableDAF.com>
**Sent:** Monday, June 17, 2024 11:28 AM
**To:** Chris Rice
**Subject:** RE: Management Agreements

Ok, thanks. Thought it might be a long shot because I think the agreements were in a folder at old Highland that didn't make the transition.

---

**From:** Chris Rice <CRice@nexpointservices.com>
**Sent:** Monday, June 17, 2024 9:14 AM
**To:** Shawn Raver <Sraver@CharitableDAF.com>
**Subject:** RE: Management Agreements

I can keep digging, but I am not seeing the agreements saved down in my files right now.

The attached excel has details of the trustee fees for each and how they are to be calculated, but it does not have screenshots of the agreements or anything like that.

Chris Rice CPA
Senior Manager – Fund Analysis
NEXPOINT
O: (214) 550-4549 | C: (801) 669-1297
crice@nexpointservices.com | www.nexpoint.com

---

**From:** Shawn Raver <Sraver@CharitableDAF.com>
**Sent:** Monday, June 17, 2024 9:00 AM
**To:** Chris Rice <CRice@nexpointservices.com>
**Subject:** Management Agreements

Chris –

Do you have access to the management agreements (or similarly named agreements) between the supporting organizations and the public charities, which set forth the quarterly or annual trustee fees payable by the supporting orgs? I haven't been able to locate them.

Thank you.

Shawn

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

# EXHIBIT 284

**From:** Mark Patrick <MPatrick@skyviewgroup.com>
**Sent:** Friday, November 3, 2023 3:54 PM
**To:** Rick Swadley; Lucy Bannon
**Cc:** Heriberto Rios; Shawn Raver
**Subject:** Re: NDA

Probably pushed down and through until U.S. corporation.

Sent via the Samsung Galaxy S23 Ultra 5G, an AT&T 5G smartphone
Get Outlook for Android

---

**From:** Rick Swadley <rswadley@skyviewgroup.com>
**Sent:** Friday, November 3, 2023 3:19:56 PM
**To:** Lucy Bannon <lbannon@nexpoint.com>; Mark Patrick <MPatrick@skyviewgroup.com>
**Cc:** Heriberto Rios <HRios@skyviewgroup.com>
**Subject:** FW: NDA

Lucy,
DC indicated that legal will need a signed NDA (attached) from Mark and a representative of the Highland Dallas Foundation. Then they can provide the pitch book for the IQHQ investment that will potentially be donated. We have also confirmed that GP consent would be required for the transfer.

Mark,
The GP will likely have questions about the recipient of the transfer. Do you think the investment would be permanently held at the Highland Dallas Foundation level or pushed down into the DAF structure, ultimately being held in the US corporation?

Let me know if you have any questions. Thanks!

---

**From:** Paul Broaddus <pbroaddus@nexpoint.com>
**Sent:** Friday, November 3, 2023 2:33 PM
**To:** Rick Swadley <rswadley@skyviewgroup.com>; Heriberto Rios <hrios@skyviewgroup.com>
**Subject:** NDA

Lucy does not need to sign.

It looks like Mark would need to sign one separately along with the Dallas Foundation.

Thank you!
Paul

Paul Broaddus

NEXPOINT

C: 915.241.6809
pbroaddus@nexpoint.com | www.nexpoint.com

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

# EXHIBIT 285

**From:** Shawn Raver <Sraver@charitabledaf.com>
**Sent:** Tuesday, July 18, 2023 8:44 AM
**To:** Chris Rice
**Subject:** RE: Q1 2023 Trustee Fees

There is a template for the Dallas Foundation Grants Acct. Is that where I wire the trustee fee? Thanks.

---

**From:** Chris Rice <CRice@skyviewgroup.com>
**Sent:** Monday, July 17, 2023 4:02 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Shawn Raver <Sraver@charitabledaf.com>
**Cc:** Frank Waterhouse <fwaterhouse@skyviewgroup.com>; Hayley Eliason <IMCEAEX-_o=ExchangeLabs_ou=Exchange+20Administrative+20Group+20+28FYDIBOHF23SPDLT+29_cn=Recipients_cn=user172f4a4f@namprd22.prod.outlook.com>
**Subject:** Q1 2023 Trustee Fees
**Importance:** High

Mark –

I don't anticipate any changes between the draft valuation report and the final report, so I've completed the quarterly trustee fees calculation.

If you're good with the calculation, you will need to do the following tomorrow on NexBank:

**Internal Transfers**

1. Transfer $48,312.50 from CLO Holdco LTD [*639] to Highland Dallas Foundation Inc. [*916]
   a. Memo: HDF Q1 Trustee Fee
2. Transfer $59,562.50 from CLO Holdco LTD [*639] to Highland Santa Barbara Foundation [*890]
   a. Memo: HSBF Q1 Trustee Fee

**Wires**

1. Wire $48,312.50 from Highland Dallas Foundation Inc. [*916] to the Dallas Foundation
   a. Memo: Q1 Trustee Fee
   b. Note that there should be a template for the Dallas Foundation
2. Transfer $59,562.50 from Highland Santa Barbara Foundation [*890] to the Santa Barbara Foundation
   a. Memo: Q1 Trustee Fee
   b. Note that there should be a template for the Santa Barbara Foundation

I'll send the foundations the draft report and let them know to expect the trustee fee if you're good with everything.

Thanks

Chris Rice CPA
Senior Manager – Fund Analysis

SKYVIEW

O: (214) 550-4549 | C: (801) 669-1297
CRice@Skyviewgroup.com

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

# EXHIBIT 286

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Wednesday, September 15, 2021 12:02 PM
**To:** Chris Rice
**Cc:** Will Mabry
**Subject:** Re: Q2 Valuation & Trustee Fees
**Attachments:** image001.png

Approve

On Wed, Sep 15, 2021, 11:35 AM Chris Rice <CRice@skyviewgroup.com> wrote:

> Hi Mark –
>
> Attached you will find the Q2 2021 trustee fee calculation. Let me know if you have any comments or questions.
>
> Additionally, please approve payment of the trustee fees as follows:
>
> - $40,062.50 to Highland Dallas Foundation and ultimately the Dallas Foundation
> - $51,312.50 to Highland Santa Barbara Foundation and ultimately the Santa Barbara Foundation
>
> Note that I will also circulate the finalized Q2 2021 valuation report to the various foundations.
>
> Thanks
>
> **Chris Rice | Manager – Fund Analysis**
>
> CRice@Skyviewgroup.com
> (m) 801-669-1297
>
> DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

# EXHIBIT 287

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Wednesday, September 15, 2021 12:02 PM
**To:** Chris Rice
**Cc:** Will Mabry
**Subject:** Re: Q2 Valuation & Trustee Fees
**Attachments:** image001.png

Approve

On Wed, Sep 15, 2021, 11:35 AM Chris Rice <CRice@skyviewgroup.com> wrote:

> Hi Mark –
>
> Attached you will find the Q2 2021 trustee fee calculation. Let me know if you have any comments or questions.
>
> Additionally, please approve payment of the trustee fees as follows:
>
> - $40,062.50 to Highland Dallas Foundation and ultimately the Dallas Foundation
> - $51,312.50 to Highland Santa Barbara Foundation and ultimately the Santa Barbara Foundation
>
> Note that I will also circulate the finalized Q2 2021 valuation report to the various foundations.
>
> Thanks
>
> **Chris Rice | Manager – Fund Analysis**
>
> CRice@Skyviewgroup.com
> (m) 801-669-1297
>
> DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

# EXHIBIT 288

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Tuesday, December 14, 2021 1:30 PM
**To:** Chris Rice
**Cc:** Mark Patrick; Frank Waterhouse; Will Mabry
**Subject:** Re: Q3 2021 Trustee Fees
**Attachments:** image001.png

Approved

On Tue, Dec 14, 2021, 1:20 PM Chris Rice <CRice@skyviewgroup.com> wrote:

> Mark –
>
> The Q3 valuation has been completed, and I've run the calculation for the trustee fees.
>
> TDF will receive **$43,062.50**.
>
> SBF will receive **$54,312.50**.
>
> Please approve the necessary cash movement for these.
>
> Thanks
>
> **Chris Rice | Manager – Fund Analysis**
>
> CRice@Skyviewgroup.com
> (m) 801-669-1297
>
> DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

# EXHIBIT 289

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Monday, March 28, 2022 1:46 PM
**To:** Chris Rice
**Cc:** Frank Waterhouse; Will Mabry
**Subject:** Re: Q4 2021 DAF Valuation Report & Trustee Fees
**Attachments:** image001.png

Approved.

On Mon, Mar 28, 2022, 1:27 PM Chris Rice <CRice@skyviewgroup.com> wrote:

Mark –

Now that the Q4 2021 valuation report has been finalized, we can send the trustee fees. I will circulate the final report once available, but since we had no comments, we will not see any changes to the figures in the draft report.

Note that we will send trustee fees as follows:

| | |
|---|---|
| Kansas City: | $176,250.00 |
| Dallas: | $236,512.50 |
| Santa Barbara: | $55,312.50 |
| NTCF: | $100,000.00 |
| | |
| Total: | $468,075.00 |

Please approve at your earliest convenience.

Thanks

Chris Rice CPA
Manager – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
CRice@Skyviewgroup.com

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

# EXHIBIT 290

**CHARITABLE DAF FUND, L.P.**

[illegible]

**Via E-Mail**

[illegible]

**Re: Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews**
**<u>File No. S7-03-22</u>**

[illegible]

**BACKGROUND**

[illegible]

*Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews* [illegible]

[illegible] **Exhibit A** [illegible]

[illegible]

[illegible]

[illegible]

[illegible] **Exhibit B** [illegible] **Exhibit C** [illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible] **Exhibit B** [illegible]

*Id.*

*Form ADV and Investment Advisers Act Rules*

**Exhibit B**

*See* **Exhibit C**

*See* **Exhibit C**

**COMMENTS**

[illegible]

*Id.*

*Id.*

*See* [illegible]

**CONCLUSION**

[redacted]

# Exhibit A

**EXHIBIT A**

Charitable DAF/CLO HoldCo
Structure Chart



# Exhibit B

**EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.**<br>**and CLO HOLDCO, LTD.,**<br>***directly and derivatively,***<br><br>***Plaintiffs,***<br><br>**v.**<br><br>**HIGHLAND CAPITAL MANAGEMENT, L.P. , HIGHLAND HCF ADVISOR, LTD., and HIGHLAND CLO FUNDING, LTD.,**<br>***nominally,***<br><br>***Defendants.*** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. ________________________** |

**ORIGINAL COMPLAINT**

**I.**

**INTRODUCTION**

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

[1] https://adviserinfo.sec.gov/firm/summary/110126

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

**1.** Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

**2.** Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

**3.** Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

**4.** Defendant Highland HCF Advisor, Ltd. is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

**5.** Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**6.** Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

## III.

## JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

**12.** At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

**13.** On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

**14.** Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

**15.** On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

**The Harbourvest Settlement with**
**Highland Capital Management in Bankruptcy**

**16.** On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

**17.** The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

**18.** Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

**19.** Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

**20.** Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

**21.** In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

**22.** The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

**23.** Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

**24.** HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

**25.** Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

**26.** While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

**27.** In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

**28.** HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

**29.** On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

**30.** HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

**31.** On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

**32.** An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

**33.** As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

**34.** HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

**35.** Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

**36.** At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

**37.** It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

**38.** On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

**39.** The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

**40.** Typically, the value of the securities reflected by a market price quote.

**41.** However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

**42.** There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

**43.** Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

**44.** Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

**45.** It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

**46.** For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

**47.** Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

**48.** Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

**49.** Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

**50.** Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

**51.** That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

**52.** The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

**53.** Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

**54.** HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

**55.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

**56.** HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

**57.** The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

**58.** HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

**59.** In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

**60.** The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

**61.** While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

**62.** HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

**63.** As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

**64.** The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

**65.** This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

**66.** The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

**67.** The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

**68.** HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

**69.** This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

**70.** It also violated HCM's own internal policies and procedures.

**71.** Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

**72.** HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

**73.** HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

**74.** In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

**75.** At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

**76.** Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

**77.** Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

**78.** Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

**79.** Seery's knowledge is imputed to HCM.

**80.** Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

**81.** As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

**82.** Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

**83.** Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

**84.** Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

**85.** In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

**86.** Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

**87.** What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

**88.** Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

**89.** For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

**90.** HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

**91.** Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

### Second Cause Of Action
***Breach of HCLOF Company Agreement***
**(By Holdco against HCLOF, HCM and HCFA)**

**92.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

**93.** On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

**94.** The Company Agreement governs the rights and duties of the members of HCLOF.

**95.** Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

**96.** Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

**97.** The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

**98.** Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

**99.** Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

**100.** Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**101.** No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**102.** Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
***Negligence***
**(By the DAF and CLO Holdco against HCM and HCFA)**

**103.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**104.** Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**105.** Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**106.** Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**107.** It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

**108.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.** Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.** Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

**113.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.** Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.** HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

**116.** The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

**117.** Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

**118.** HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

**119.** In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

**120.** On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

**121.** On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

**122.** Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

**123.** However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

**124.** The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

**125.** On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

**126.** In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

**127.** Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

**128.** In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

**129.** Seery was at all relevant times operating as an agent of HCM.

**130.** This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

**131.** The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

**132.** Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

**133.** Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

## FIFTH CAUSE OF ACTION
### *Tortious Interference*
### (CLO Holdco against HCM)

**134.** Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

**135.** At all relevant times, HCM owned a 0.6% interest in HCLOF.

**136.** At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

**137.** Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

**138.** HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

**139.** HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

**140.** But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

**141.** Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

**VI.**

**JURY DEMAND**

**142.** Plaintiff demands trial by jury on all claims so triable.

**VII.**

**PRAYER FOR RELIEF**

**143.** Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

a. Actual damages;

b. Disgorgement;

c. Treble damages;

d. Exemplary and punitive damages;

e. Attorneys' fees and costs as allowed by common law, statute or contract;

f. A constructive trust to avoid dissipation of assets;

g. All such other relief to which Plaintiff is justly entitled.

Dated: April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ Mazin A. Sbaiti*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
jeb@sbaitilaw.com

**Counsel for Plaintiffs**

# Exhibit C

**EXHIBIT C**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **THE CHARITABLE DAF FUND, LP.,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **Cause No. ________________________** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | |
| ***Defendant.*** | § | |

**ORIGINAL COMPLAINT**

This matter concerns self-dealing and seeks redress for violation of state and federal law, including, but not limited to, violations of the Advisers Act of 1940, and other state causes of action.

**I.**

**PARTIES**

**1.** Plaintiff The Charitable DAF Fund, L.P. ("Plaintiff" or "DAF") is a limited partnership formed under the laws of the Cayman Islands.

**2.** Defendant Highland Capital Management L.P. ("Highland" or "HCMLP") is a Delaware limited partnership, whose principal place of business is in Dallas, Texas, at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**II.**

**JURISDICTION AND VENUE**

**3.** Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1331 and under 28 U.S.C. § 1334 because the suit arises out of post-petition acts or omissions of the debtor and certain of its principals.

**4.** This Court has personal jurisdiction over Defendant Highland Capital Management, L.P. because it has continuously done business in this state, and the causes of action arise from the acts or omissions committed in this state.

**5.** Venue is proper in this Court because a substantial number of the acts or omissions giving rise to this lawsuit and the causes of action asserted herein occurred in Dallas County.

## III.

## FACTUAL BACKGROUND

**6.** HCMLP is a registered investment advisor ("RIA") subject to the regulations of the Securities Exchange Commission.

**7.** HCMLP is both the advisor of and investor in Highland Multi Strategy Credit Fund, L.P. ("Multistrat"), a Delaware limited partnership. Highland Multi Strategy Credit Fund GP, L.P., itself a Delaware limited partnership, is the general partner of Multistrat, and HCMLP is the sole member of the general partner of Highland Multi Strategy Credit Fund GP, L.P.

**8.** HCMLP's advisory capacity is governed, or at all relevant times was governed, by the Third Amended and Restated Investment Management Agreement, effective November 1, 2013 (the "*IMA*").

**9.** The purpose of Multistrat as a vehicle was stated as such: "The Fund's investment objective is to seek attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management."

**10.** The Confidential Private Placement Memorandum for Multistrat disclosed that "[t]he Investment Manager is registered as an investment adviser with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended (the 'Advisers Act').

Each prospective investor will be required to make a representation to indicate that it is a 'qualified client' as defined in the Advisers Act."

**11.** Because of these agreements and roles as the General Partner and RIA, Highland owed contractual and fiduciary duties to Plaintiff as an investor in Multistrat.

**12.** James Seery, the principal, CEO, and CRO of HCMLP. in its capacity as a debtor, admitted under oath that HCMLP owes fiduciary duties to the investors of the funds HCMLP manages—which would include Multistrat—and therefore, has admitted under oath that HCMLP and its governed persons owe fiduciary duties to the investors in Multistrat, which include Plaintiff, The Charitable DAF Fund, and Highland Capital Management Services, Inc., among others.

**13.** As an investment vehicle advised at all times and controlled at all times by HCMLP, Multistrat purchased and owned a pool of viaticals—investments in life insurance policies keyed to the lives of other persons. When a person passes away, the life insurance money is paid to the owner of the policy—in this case, Multistrat.

**14.** The notional value of the viatical pool was approximately $145 million.

**15.** In or around August 2020, HCMLP sold the entire viatical pool for approximately $35,000,000—less than one quarter of the insured value.

**16.** The policies insured people aged 90 on average, suggesting that the policies were highly likely to pay off in the ensuing few years given the age and life expectancies of the insureds, as well as considering the actuarial impact of the COVID pandemic.

**17.** In the spring of 2020, Multistrat raised funds specifically for the purpose of paying the premiums on the viatical pool—amounts raised, borrowing availability, and liquid securities provided enough cash to pay the premiums. But HCMLP did not pursue this path as promised.

Instead, it sold the assets. To this day, it is unclear why the policies were sold, and why, just prior to a planned mediation.

**18.** Furthermore, the process of selling was severely flawed. For example, the health assessments used to determine the likelihood and timeline for the payout were two years old. HCMLP did not cause new, up-to-date health assessments to be performed, and instead was content to rely on stale information or worse, no information at all.

**19.** Furthermore, HCMLP made no effort to adjust the projected life expectancies due to the increasing age of the insureds during a process that stretched over seven months, nor for the potential impact of COVID on people over the age of 90, which would have impacted the price..

**20.** Equally troubling is that Multistrat obtained the funds to pay the premiums from another investor—yet, it apparently did not use the funds for that purpose.

**21.** HCMLP apparently used the proceeds of the sale to pay itself, notwithstanding the fact that there were redeemed interests waiting to be paid—interests to whom HCMLP also owed fiduciary duties.

**22.** In short, HCMLP caused Multistrat to sell the viatical pool at a substantially discounted amount to curry favor with the brokers and buyers in the marketplace for no apparent benefit to Multistrat's investors or the debtor's estate.

## III.

## CAUSES OF ACTION

### First Cause of Action
### Breach of the Advisers Act

**23.** Plaintiff incorporates the foregoing allegations as if fully set forth herein.

**24.** Highland's actions violate the Advisers Act.

**25.** As an RIA, HCMLP is subject to the Investment Advisers Act of 1940.

**26.** The IMA imposes and incorporates the duties and obligations of the Investment Advisers Act of 1940.

**27.** Under this federal law, an investment adviser is a fiduciary.[1] This includes a duty of care, a duty of loyalty, and a duty to refrain from engaging in transactions in which it is not a disinterested person.

**28.** The duty of loyalty imposed by the Advisers Act of 1940 is not specifically defined in the Advisers Act or in Commission rules but reflects a Congressional recognition "of the delicate fiduciary nature of an investment advisory relationship" as well as a Congressional intent to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested."

**29.** To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship, including disclosing transactions in which the advisor has an interest, and to disclose all pertinent facts of a transaction that could affect the client or the client's interest.[2] In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent.

---

[1] *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963). *Santa Fe Indus.* v. *Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing SEC v. Capital Gains, stating that the Supreme Court's "references to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"); Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing *Proxy Voting by Investment Advisers*, Investment Advisers Act Release No. 2106 (Jan. 31, 2003) ("Investment Advisers Act Release 2106")).

[2] *SEC v. Capital Gains*, supra, at 200 ("Failure to disclose material facts must be deemed fraud or deceit within its intended meaning."). Investment Advisers Act Release 3060, supra, footnote 15 ("as a fiduciary, an adviser has an ongoing obligation to inform its clients of any material information that could affect the advisory relationship"); see also General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship.").

**30.** This fiduciary duty also requires an adviser "to adopt the principal's goals, objectives, or ends." This means the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client and must at all times act for the interests of its investors.[3]

**31.** Here, the goals of Multistrat included "to seek attractive risk adjusted returns, consistent with the preservation of capital and prudent investment management."

**32.** The duty of care includes, among other things: (i) the duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship.

**33.** These fiduciary duties are **unwaivable**, and any agreement made in derogation of the obligations under the Advisers Act is **void**.

**34.** Therefore, Plaintiff seeks to declare the sale of the viaticals void because they were accomplished in violation of the Advisers Act.

**35.** Plaintiff further seeks to declare the agreement(s) between Highland and Multistrat void because they were continued in violation of the Advisers Act.

**Second Cause of Action**
**Breach of Fiduciary Duty**

**36.** Plaintiff incorporates the foregoing allegations as if fully set forth herein.

---

[3] Investment Advisers Act Release 3060 (adopting amendments to Form ADV and stating that "[u]nder the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Investment Advisers Act Release 2106, supra footnote 15). *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund..."); *Sec. & Exch. Commission v. Moran*, 944 F. Supp. 286, 297 (S.D.N.Y 1996) ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").

**37.** As an RIA, HCMLP is subject to the Investment Advisers Act of 1940.

**38.** The IMA imposes and incorporates the duties and obligations of the Investment Advisers Act of 1940.

**39.** Under this federal law, an investment adviser is a fiduciary.[4] This includes a duty of care, a duty of loyalty, and a duty to refrain from engaging in transactions in which it is not a disinterested person.

**40.** The duty of loyalty imposed by the Advisers Act of 1940 is not specifically defined in the Advisers Act or in Commission rules, but reflects a Congressional recognition "of the delicate fiduciary nature of an investment advisory relationship" as well as a Congressional intent to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested."

**41.** To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship, including disclosing transactions in which the advisor has an interest, and to disclose all pertinent facts of a transaction that could affect the client or the client's interest.[5] In order for disclosure to be full and fair, it should be

[4] *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963). *Santa Fe Indus.* v. *Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing SEC v. Capital Gains, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"); Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing *Proxy Voting by Investment Advisers*, Investment Advisers Act Release No. IA2106 (Jan. 31, 2003) ("Investment Advisers Act Release 2106")).

[5] *SEC v. Capital Gains*, supra, at 200 ("Failure to disclose material facts must be deemed fraud or deceit within its intended meaning."). Investment Advisers Act Release 3060, supra, footnote 15 ("as a fiduciary, an adviser has an ongoing obligation to inform its clients of any material information that could affect the advisory relationship"); see also General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship.").

sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent.

**42.** This fiduciary duty also requires an adviser "to adopt the principal's goals, objectives, or ends." This means the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client and must at all times act for the interests of its investors.[6]

**43.** Here, the goals of Multistrat included "to seek attractive risk adjusted returns, consistent with the preservation of capital and prudent investment management."

**44.** The duty of care includes, among other things: (i) the duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship.

**45.** These fiduciary duties are **unwaivable**, and any agreement made in derogation of the obligations under the Advisers Act is **void**.

**46.** HCMLP's CEO testified under oath that he and HCMLP were aware of these duties and had to comply with them.

**47.** Section 204 of the Advisers Act requires HCMLP to carry written policies and procedures that must be followed in order to adhere to its federal obligations.

[6] Investment Advisers Act Release 3060 (adopting amendments to Form ADV and stating that "[u]nder the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Investment Advisers Act Release 2106, supra footnote 15). *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund..."); *SEC v. Moran*, 944 F. Supp. 286, 297 (S.D.N.Y 1996) ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").

**48.** Section 206 of the Advisers Act prohibits transactions by an adviser that were accomplished via a "deceit" on a client or prospective client, e.g., by concealing the role and interest the adviser has in the transaction, or via engaging in a course of conduct that has a tendency to mislead a client or which is manipulative.

**49.** These breaches include, but are not limited to (1) selling the viatical pool at a distressed price when it was not in distress and there was no need for Multistrat to sell; (2) concealing the information about the transaction from the Plaintiff; (3) failing to advise the Plaintiff of the opportunity to purchase the viatical pool—especially when it knew the Plaintiff had an interest in the pool and had the means of purchasing it for more cash than $35 million; (4) concealing the purpose behind the sale of the viatical pool and the conflicts of interest that inhere in the transaction; (5) causing the viatical pool to be sold in a manner that violated the rights of the Plaintiff as an investor in Multistrat (e.g., by failing to conduct an auction, obtaining competitive bids and taking the pool to market); and (6) utilizing the sale proceeds for its own ends—namely, to enrich itself.

**50.** The Advisers Act declares any contract that was made in violation of its provisions or regulations, or any contract that has been performed in violation of the Advisors Act, **void**.

**51.** The Advisers Act created a private right of action to void unlawful agreements and acts and to seek such equitable relief as accompanies such claims.

**52.** Texas law allows a fiduciary plaintiff to seek damages for breaches of fiduciary duty and to seek disgorgement of all ill-gotten gains obtained by a fiduciary.

**53.** Plaintiff has been damaged due to the breaches of fiduciary duty outlined herein, and it is entitled to recover damages, punitive damages, and attorneys' fees.

**54.** To the extent this claim must be brought as a derivative action, it is plain that the demand requirement under Delaware law could not be met because serving a demand on Highland or to sue Highland would have been futile.

**Third Cause of Action**
**Breach of Contract**

**55.** Plaintiff incorporates the foregoing allegations as if fully set forth herein.

**56.** The IMA imposes a duty of prudent investment management for the benefit of the investors in Multistrat and incorporate the duties and obligations of the Investment Advisers Act of 1940.

**57.** The violations set forth above constitute a breach of each or both of these agreements.

**58.** These breaches include, but are not limited to (1) selling the viatical pool at a distressed price when it was not in distress and there was no need for Multistrat to sell; (2) concealing the information about the transaction from the Plaintiff; (3) failing to advise the Plaintiff of the opportunity to purchase the viatical pool—especially when it knew the Plaintiff had an interest in the pool and had the means of purchasing it for more cash than $35 million; (4) concealing the purpose behind the sale of the viatical pool and the conflicts of interest that inhere in the transaction; (5) causing the viatical pool to be sold in a manner that violated the rights of the Plaintiff as an investor in Multistrat (e.g., by failing to conduct an auction, obtaining competitive bids, and taking the pool to market); and (6) utilizing the sale proceeds for its own ends—namely, to enrich itself.

**59.** Plaintiff has been damaged by the breaches of contract outlined herein.

**60.** Plaintiff is entitled to recover damages and attorneys' fees.

**JURY DEMAND AND PRAYER**

**61.** Plaintiff demands trial by jury.

**62.** Plaintiff respectfully requests judgment and an order:

- Disgorging all ill-gotten gains in an amount to be determined at trial;
- Voiding the sale and other relevant agreements herein with HCMLP pursuant to the Advisers Act;
- Awarding damages in an amount to be determined at trial;
- Awarding punitive damages in an amount to be determined at trial;
- Awarding attorneys' fees and costs in an amount to be determined at trial;
- Awarding all interim and final relief to which Plaintiff is legally or equitably entitled under the facts and circumstances raised herein.

Dated: July 22, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ Mazin A. Sbaiti*
**Mazin A. Sbaiti**
[redacted]
**Jonathan Bridges**
[redacted]
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
[redacted]

**Counsel for Plaintiff**

# EXHIBIT 291

# The Dallas Foundation and Affiliates

Consolidated Financial Report
Year Ended December 31, 2023

weaver
Assurance • Tax • Advisory

# CONTENTS

Page

Independent Auditor's Report........................................1

Consolidated Financial Statements

Consolidated Statement of Financial Position........................................3

Consolidated Statement of Activities........................................4

Consolidated Statement of Functional Expenses........................................5

Consolidated Statement of Cash Flows........................................6

Notes to Consolidated Financial Statements........................................7

weaver
Assurance • Tax • Advisory

## Independent Auditor's Report

To the Board of Governors of
The Dallas Foundation and Affiliates
Dallas, Texas

### Opinion

We have audited the consolidated financial statements of The Dallas Foundation and its affiliates (the Foundation), which comprise the consolidated statement of financial position as of December 31, 2023, and the related consolidated statements of activities, functional expenses, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of The Dallas Foundation and its affiliates as of December 31, 2023, and the changes in their net assets and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

### Basis for Opinion

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Consolidated Financial Statements section of our report. We are required to be independent of the Foundation and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Responsibilities of Management for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Foundation's ability to continue as a going concern for one year after the date that the consolidated financial statements are issued or when applicable, one year after the date that the financial statements are available to be issued.

The Board of Governors of
The Dallas Foundation and Affiliates

**Auditor's Responsibilities for the Audit of the Consolidated Financial Statements**

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Foundation's internal control. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.
- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about the Foundation's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control–related matters that we identified during the audit.

Weaver and Tidwell, L.L.P.

WEAVER AND TIDWELL, L.L.P.

Dallas, Texas
September 10, 2024

# The Dallas Foundation and Affiliates

## Consolidated Statement of Financial Position

## December 31, 2023

| | | |
|---|---|---|
| **ASSETS** | | |
| **ASSETS** | | |
| Cash and cash equivalents | $ | 24,813,753 |
| Investments | | 517,225,219 |
| Prepaid expenses and other receivables | | 643,844 |
| Contributions receivable, net | | 2,850,169 |
| Interests in irrevocable trusts | | 45,146,340 |
| Real estate and mineral interests | | 3,456,294 |
| Operating lease, right-of-use asset | | 2,100,920 |
| Property and equipment, net | | 68,841 |
| **TOTAL ASSETS** | $ | 596,305,380 |
| **LIABILITIES AND NET ASSETS** | | |
| **LIABILITIES** | | |
| Accounts payable and other liabilities | $ | 1,117,700 |
| Grants and program services payable, net | | 8,058,078 |
| Operating lease liability | | 2,156,123 |
| Assets held for others | | 19,027,214 |
| Total liabilities | | 30,359,115 |
| **NET ASSETS** | | |
| Without donor restrictions | | 496,252,293 |
| With donor restrictions | | 69,693,972 |
| Total net assets | | 565,946,265 |
| **TOTAL LIABILITIES AND NET ASSETS** | $ | 596,305,380 |

The Notes to Consolidated Financial Statements
are an integral part of this statement.

# The Dallas Foundation and Affiliates

Consolidated Statement of Activities
Year Ended December 31, 2023

| | Without Donor Restrictions | With Donor Restrictions | Total |
|---|---|---|---|
| **REVENUES AND SUPPORT** | | | |
| Donor contributions | $ 83,267,375 | $ (1,844,150) | $ 81,423,225 |
| Special event revenue | 218,209 | - | 218,209 |
| Less amounts raised or received on behalf of others | (584,947) | - | (584,947) |
| Net contributions | 82,900,637 | (1,844,150) | 81,056,487 |
| Provision for uncollectible pledges | - | (435,051) | (435,051) |
| Total investment income, net | 8,547,516 | 579,165 | 9,126,681 |
| Less income on assets held for others | (496,503) | - | (496,503) |
| Net investment income | 8,051,013 | 579,165 | 8,630,178 |
| Total investment realized / unrealized gains (losses), net | 29,296,884 | 1,897,687 | 31,194,571 |
| Less investment gains (losses) on assets held for others | (1,573,044) | - | (1,573,044) |
| Net investment realized / unrealized gains (losses) | 27,723,840 | 1,897,687 | 29,621,527 |
| Change in value of interests in irrevocable trusts and related income | 1,400,748 | 2,940,475 | 4,341,223 |
| Rental, royalty, and other income | 745,772 | 6,231 | 752,003 |
| Net assets released from restrictions | 1,616,687 | (1,616,687) | - |
| Total revenues and support | 122,438,697 | 1,527,670 | 123,966,367 |
| **EXPENSES AND DISTRIBUTIONS** | | | |
| Total grants and program services | 75,138,881 | - | 75,138,881 |
| Educational support | 1,019,119 | - | 1,019,119 |
| Total program services | 76,158,000 | - | 76,158,000 |
| Supporting services and administrative | 5,559,738 | - | 5,559,738 |
| Fundraising | 2,598,684 | - | 2,598,684 |
| Total expenses and distributions | 84,316,422 | - | 84,316,422 |
| Change in net assets | 38,122,275 | 1,527,670 | 39,649,945 |
| **NET ASSETS, beginning of year** | 458,130,018 | 68,166,302 | 526,296,320 |
| **NET ASSETS, end of year** | $ 496,252,293 | $ 69,693,972 | $ 565,946,265 |

The Notes to Consolidated Financial Statements are an integral part of this statement.

# The Dallas Foundation and Affiliates

## Consolidated Statement of Functional Expenses

## Year Ended December 31, 2023

| | Grants and Program Services | Educational Support | Total Program Services | General and Administrative | Fundraising | Total |
|---|---|---|---|---|---|---|
| Grants and other assistance | $ 67,446,449 | $ - | $ 67,446,449 | $ - | $ - | $ 67,446,449 |
| Salaries and benefits | 926,472 | 1,019,119 | 1,945,591 | 1,436,031 | 1,250,737 | 4,632,359 |
| Professional services | 4,219,394 | - | 4,219,394 | 2,528,839 | 633,423 | 7,381,656 |
| Marketing and advertising | 482,030 | - | 482,030 | 175,605 | 77,299 | 734,934 |
| Meetings, conferences, and travel | 189,471 | - | 189,471 | 314,872 | 244,593 | 748,936 |
| Office expenses | 45,454 | - | 45,454 | 314,760 | 205,647 | 565,861 |
| Occupancy | 1,057 | - | 1,057 | 219,067 | 180,433 | 400,557 |
| Information technology | 6,906 | - | 6,906 | 220,311 | 6,552 | 233,769 |
| Insurance | - | - | - | 96,377 | - | 96,377 |
| Other expenses | 1,821,648 | - | 1,821,648 | 182,810 | - | 2,004,458 |
| Depreciation | - | - | - | 71,066 | - | 71,066 |
| **TOTAL EXPENSES** | $ 75,138,881 | $ 1,019,119 | $ 76,158,000 | $ 5,559,738 | $ 2,598,684 | $ 84,316,422 |

The Notes to Consolidated Financial Statements are an integral part of this statement.

# The Dallas Foundation and Affiliates

## Consolidated Statement of Cash Flows
## Year Ended December 31, 2023

| | |
|---|---|
| **OPERATING ACTIVITIES** | |
| Change in net assets | $ 39,649,945 |
| Adjustments to reconcile change in net assets to net cash used in operating activities: | |
| Provision for losses on uncollectible contributions | (112,334) |
| Write off of fixed assets | (45,595) |
| Amortization of contributions receivable discount | (27,615) |
| Amortization of grants payable | 210,209 |
| Change in value of beneficial interests | 23,954 |
| Realized loss on sale of assets | 5,065 |
| Realized and unrealized gains on investments | (22,067,890) |
| Realized and unrealized gains on beneficial interest trusts | (2,211,351) |
| Unrealized loss on real estate and mineral interests | 398,595 |
| Investment income restricted for long term purposes | (579,165) |
| Noncash investment contributions | (33,032,354) |
| Depreciation expense | 71,066 |
| Changes in operating assets and liabilities | |
| Prepaid expenses and other receivables | (159,899) |
| Contributions receivable | 3,919,472 |
| Accounts payable and other liabilities | (190,581) |
| Grants and program services payable | (3,590,087) |
| Operating lease | 19,576 |
| Assets held for others | 1,535,868 |
| Net cash used in operating activities | (16,183,121) |
| **INVESTING ACTIVITIES** | |
| Purchases of investments | (126,993,209) |
| Proceeds from sales and maturities on investments | 144,393,552 |
| Net cash provided by investing activities | 17,400,343 |
| **FINANCING ACTIVITIES** | |
| Distributions from beneficial interests in charitable remainder trusts | 38,048 |
| Investment income restricted for long term purposes | 579,165 |
| Net cash provided by financing activities | 617,213 |
| Net increase in cash, cash equivalents, and cash in investments | 1,834,435 |
| **CASH AND CASH EQUIVALENTS, beginning of year** | 22,979,318 |
| **CASH AND CASH EQUIVALENTS, end of year** | $ 24,813,753 |
| **SUPPLEMENTAL DISCLOSURE OF NON-CASH INFORMATION** | |
| Operating lease right-of-use asset obtained in exchange for lease liability | $ 2,393,467 |

The Notes to Consolidated Financial Statements
are an integral part of this statement.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

## Note 1. Nature of Operations

The Dallas Foundation (The Foundation) is a community foundation that brings together people, ideas and investments in Greater Dallas. The Foundation partners with donors and donor families to help them create and execute their philanthropic vision while simultaneously focusing on key community issues. Grants awarded benefit a range of areas including arts and humanities, education, health, animal welfare, and social services. The Foundation also serves as the administrative home for mission-driven initiatives requiring fiscal sponsorship.

## Note 2. Summary of Significant Accounting Policies

A summary of the significant accounting policies consistently applied in the preparation of the accompanying consolidated financial statements are as follows:

**Principles of Consolidation**

The consolidated financial statements include the assets, liabilities, net assets, and changes in net assets, statement of functional expenses, and cash flows of the Foundation and its seven affiliated supporting organizations. The affiliated organizations are included with the Foundation in the accompanying consolidated financial statements because the Foundation has an economic interest in the organizations and controls the affiliated organizations' Boards of Directors. All significant inter-organization transactions have been eliminated. The Foundation and its affiliates are collectively referred to as the Foundation throughout these consolidated financial statements.

**Basis of Presentation**

The Foundation's consolidated financial statements have been prepared on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America (GAAP). The financial statement presentation follows the recommendations of the FASB Accounting Standards Codification (ASC) Topic 958, *Financial Statements of Not-for-Profit Organizations*. Under FASB ASC 958, the Foundation is required to report information regarding its financial position and activities according to two classes of net assets: net assets without donor restrictions and net assets with donor restrictions. Net assets, revenues, expenses, gains and losses are classified based on the existence or absence of donor imposed restrictions. Accordingly, net assets and changes therein are classified and reported as follows:

<u>Net assets without donor restrictions</u> – Net assets that are not subject to donor-imposed use or time restrictions. When the Board of Governors (the Board) has the ability to remove a donor restriction (i.e., variance power), the contribution is classified as without donor restrictions. Under the terms of certain gift instruments, the assets are held and invested in a manner similar to endowment funds; however, the Board has the authority, if it deems it prudent and appropriate, to expend the entirety of the principal or appreciation.

In addition, the Foundation receives contributions from donors with advice regarding distribution of the assets and their related earnings. The Foundation attempts to meet the desires expressed by the donors at the time of the contribution; however, the Foundation reserves the right to modify any restrictions or conditions on the distribution of funds for any specified charitable purpose or to specified organizations if, in the sole judgment of the Board, such restrictions or conditions become unnecessary, incapable of fulfillment, or inconsistent with the charitable needs of the community. Accordingly, all net assets and related activity over which the management of the Foundation exercises direct control are classified as net assets without donor restrictions in the consolidated financial statements.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

Net assets with donor restrictions – Net assets subject to donor-imposed restrictions that will either be met by actions of the Foundation, by the passage of time, or are to be maintained perpetually. Net assets and related activity from term trusts, whereby the Foundation has a beneficial interest in a stream of income over a specified period of time, as well as contributions receivable restricted to use in future periods, are recorded as net assets with donor restrictions. These assets are released from their implicit time restriction when the cash (or other assets) is collected. Net assets and related activity from perpetual trusts, whereby the Foundation has a beneficial interest in a stream of income in perpetuity, are also recorded as net assets with donor restrictions.

The State of Texas has adopted the Uniform Prudent Management of Institutional Funds Act (UPMIFA) and the Board, on the advice of legal counsel, has determined that the Foundation's net assets do not meet the definition of an endowment under UPMIFA. The Foundation is governed subject to the terms of its by-laws and articles of incorporation, and some contributions are subject to the terms of these governing documents. Under the terms of the Foundation's governing documents, the Board has the ability to distribute the corpus of any trust or separate gift, device, bequest, or fund as the Board in its sole discretion shall determine. As a result of the ability to distribute corpus, all contributions to the Foundation (except as previously explained) are classified as without donor restrictions for financial statement purposes. While the assets of the Foundation do not meet the definition of an endowment as defined under UPMIFA, some of the assets function as endowments and are managed by The Foundation similar to endowment funds.

Transfers of financial assets from a resource provider to the Foundation for the benefit of the resource provider and/or its affiliates are recorded at fair value. The Foundation recognizes the assets received concurrent with its recognition of a liability to the specified beneficiary (i.e., assets held for others). The Foundation follows the gross method of reporting such transactions; therefore, all assets of this type, and the activity associated with those assets, are reported as assets held for others in the consolidated statement of financial position (see Note 9).

**Cash and Cash Equivalents**

The Foundation considers all highly liquid investments with a maturity of three months or less when purchased, excluding cash equivalent funds held in the Foundation's investment portfolio, to be cash equivalents. Amounts included in Cash in investments on the Statement of Cash Flows represent cash balances held in investments accounts. Cash in investments are included in Investments on the Statement of Financial Position.

# The Dallas Foundation and Affiliates



**Contributions and Contribution Receivable**

Contributions received (including unconditional promises to give) are recorded as without or with donor-restricted support in the period received depending on the existence and/or nature of any donor restrictions. The Foundation reports contributions as restricted support if the support is received with donor restrictions that limit the use of the donated assets. When and if a donor restriction expires, that is, when a stipulated time restriction ends or purpose restriction is accomplished, restricted net assets are reclassified to net assets without restriction and reported in the consolidated statement of activities as net assets released from restriction. Contributions initially restricted by donor stipulation and for which the restriction will be satisfied in the same year are recorded as net assets without donor restrictions.

Support that is not restricted by the donor or in cases where the Foundation has clear legal variance power over the funds are reported as an increase in net assets without donor restrictions in the reporting period in which the support is recognized. Contributions of assets other than cash are recorded at their estimated fair value. Conditional promises to give depend on the occurrence of a specified future and uncertain event to bind the potential donor. Conditional promises to give are not recognized until they become unconditional, that is, when the conditions on which they depend are substantially met. No amounts have been recognized in the consolidated financial statements for conditional promises to give, which generally arise from the Foundation being named as a beneficiary in a revocable will or trust, because the conditions on which such contributions depend have not been substantially met.

Unconditional gifts expected to be collected within one year are reported at their net realizable value. Unconditional promises to give that are expected to be collected in future years are initially reported at fair value, which is determined using the discounted present value of estimated future cash flows technique and using a discounted rate commensurate with the risks involved. The resulting discount is amortized and reported as restricted contribution revenue.

An allowance for uncollectible accounts is estimated based on management's analysis of specific pledges in addition to a reserve based on historical collection experience, type of contribution, and nature of the fund-raising activity, and is adjusted for those contributions receivable for which collection is uncertain. The allowance for uncollectible accounts is approximately $88,260 for the year ended December 31, 2023. Such amounts will be written-off if they are deemed uncollectible. Management believes that the allowance for uncollectible accounts adequately provides for any unexpected uncollectible contributions. Bad debt losses associated with the allowance for uncollectible accounts for restricted net assets are reported in other changes in net assets. Historically, the Foundation has experienced minimal losses on receivables.

Certain contributed services are reflected in the consolidated financial statements at the estimated fair value of the services received. Contributed services are recognized as revenue in the accompanying consolidated financial statements if the services received (a) create or enhance non-financial assets or (b) require specialized skills that are provided by individuals possessing those skills and (c) would typically need to be purchased if not provided by donation.

The Foundation received $ 31,306 of donated goods and services primarily for marketing and professional services in the year ended December 31, 2023. Such donated services are included in without donor restrictions contributions revenue and general and administrative expense.

# The Dallas Foundation and Affiliates
Notes to Consolidated Financial Statements

**Investments**

Investments are made according to the Statement of Investment Policy adopted by the Foundation's Board. These guidelines provide for investment in equities, fixed income, and other securities with performance measured against appropriate indices. The Foundation contracts with outside parties to provide investment management and consulting services.

Investments, including U.S. government securities, fixed income securities, equity securities (including stock funds), land, oil and gas leaseholds, interests in private equity and hedge funds, partnership interests and other investments are carried at fair value.

Other real estate is carried at the lower of cost or fair value. Fair value is determined through valuation techniques using Level 3 inputs.

**Investment Income**

Investment income includes dividend, interest and other investment income; realized and unrealized gains and losses on investments carried at fair value calculated based on the cost of the investment sold less the original purchase price less external and direct investment expenses. Interest income is recorded when earned and dividends are recorded on the ex-dividend date.

Investment income and realized gains and losses in restricted net assets are reported as increases in restricted net assets until budgeted for spending. The change in fair value between years along with realized gains or losses are reflected in the consolidated statement of revenues and expenses in the year of the change.

Investment return that is initially restricted by donor stipulation and for which the restriction will be satisfied in the same year is included in net assets without donor restrictions. Other investment return is reflected in the accompanying consolidated statement of activities with or without donor restrictions based upon the existence and nature of any donor or legally imposed restrictions.

**Investment Valuation**

Investments are comprised of short term funds, certificates of deposit, common and preferred stock, U.S. treasuries, corporate bonds, municipal bonds, mutual funds, and non-marketable securities. The fair value of investments in U.S. government securities, fixed income securities, and equity securities, traded on national securities exchanges is valued at the closing price on the last business day of the fiscal year; securities traded on the over-the-counter market are valued at the last reported bid price.

In establishing the fair value of investments in limited partnerships, the Foundation utilizes the reported net asset value or its equivalent for those investments that are reported consistent with current investment company guidance and do not have a readily determinable fair value. For those investments that do not meet the requirements to be valued using net asset value or its equivalent, the Foundation takes into consideration information received from those partnerships, including their financial statements, issues related to liquidity or redemption requirements and other pertinent information that impacts the fair value determination.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

The difference between cost and fair value is reflected as change in net unrealized appreciation or depreciation of investments. Realized gains and losses are the difference between the proceeds of sale and the cost of the investments. Cost of the investment at each redemption is determined based on the percentage of the fair value redeemed. Expenses are recorded on the accrual basis as incurred.

Real property values are initially based on independent appraisals which are updated as deemed necessary by management. Additionally, on an annual basis, Foundation management analyzes comparable sales data sourced from independent third parties to estimate changes in real property fair values.

Oil and gas leaseholds are valued by management based on current cash flow from the properties multiplied by a market multiple to estimate fair value.

The carrying values of certificates of deposit are valued using quoted market value which approximates fair value.

The fair values of mutual funds are determined primarily by reference to quoted market prices.

Nonexchange-traded instruments and over-the-counter positions are primarily valued using independent pricing services, broker quotes or models with externally verifiable inputs. The fair values of alternative investments (interests in private equity, hedge, real estate and other similar funds) for which quoted market prices are not available are generally measured based on reported partner's capital or net asset value (NAV) provided by the associated external investment managers. The reported partner's capital or NAV is subject to management's assessment that the valuation provided is representative of fair value. The Foundation exercises diligence in assessing the policies, procedures and controls implemented by its external investment managers, and thus believes the carrying amount of these assets represents a reasonable estimate of fair value. However, because alternative investments are generally not readily marketable, their estimated value is subject to inherent uncertainty and therefore may differ from the value that would have been used had a ready market for such investments existed.

The Foundation uses NAV to determine fair value of those underlying investments that (a) do not have a readily determinable fair value and (b) either have attributes of an investment company or prepare its financial statements consistent with the measurement principles of an investment company. The Foundation has $9,336,282 of investments that are reported at NAV at December 31, 2023. For these investments, the Foundation has concluded that the NAV reported by the underlying fund is a practical expedient to estimating fair value.

All non-cash contributions are recorded at fair value at the date of receipt. Stock is recorded at the average of the high and low selling price on the date received. The policy of the Foundation is to immediately sell donated stock unless there is a donor restriction not to do so.

Investment securities, in general, are exposed to various risks, such as interest rate, credit, and overall market volatility. Due to the level of risk associated with certain long term investments, it is reasonably possible that changes in the values of these investments will occur in the near term and that such changes could materially affect the amounts reported in the consolidated statements of financial position.

The Foundation targets a diversified asset allocation that places a greater emphasis on equity based investments to achieve its long-term return objectives within prudent risk constraints. Additionally, the Finance Committee of the Board reviews the investment policy and recommends changes when necessary.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

**Interest in Irrevocable Trusts**

The Foundation is the beneficiary of various trusts created by donors, the assets of which are not in the possession of the Foundation. The Foundation has an irrevocable right to a portion of the net income of these trusts. The Foundation's interest in these trusts is recorded at fair value of the estimated future cash flows, which is measured using the fair value of the underlying trust assets adjusted for the Foundation's beneficial interest percentage of the total trust. The trusts are recorded in the period in which the Foundation receives notice that the trust agreement conveys an unconditional right to receive specified benefits. The trusts generally distribute 5% of the average fair market value of the trust for the previous three years or the actual trust income to the Foundation. The beneficial interest is classified as net assets with donor restrictions.

Distributions received from these trusts are recorded as investment income based upon relevant restrictions, and changes in the market value are recorded as a change in value of interest in irrevocable trusts and related income in the consolidated statement of activities. These trusts totaled $34,916,000 as of December 31, 2023 and are included in interest in irrevocable trusts on the consolidated statement of financial position.

Under a charitable lead trust agreement, the Foundation receives annual benefits over the term of the trust with remaining trust assets at the end of the trust's term being distributed to a third party beneficiary. For irrevocable charitable lead trusts when the Foundation is not the trustee, assets of the trust are classified as restricted and carried at fair value in the consolidated statement of financial position based on the present value of amounts which the Foundation expects to receive over the terms of the agreement. The assets of the trusts are valued over an initial period ranging from 15 to 20 years using the current discount rate of 6% at December 31, 2023 and the estimated net investment return of the trust which is estimated at 8.0% at December 31, 2023. The trust will terminate in December 2025. Changes in the fair value of beneficial interests are reflected as restricted changes in value of interest in irrevocable trusts in the consolidated statement of activities. The trust totaled $94,810 as of December 31, 2023 and are included in interest in irrevocable trusts on the consolidated statement of financial position.

The Foundation is the beneficiary of various charitable remainder trusts. The fair value of the assets, net of associated liabilities as of December 31, 2023, is $10,135,650. Specified distributions are to be made to designated beneficiaries over the trusts' terms. Upon termination of the trusts, the Foundation receives the assets remaining in the trust. The trusts are recorded as an increase to net assets at the fair value of the trusts' assets, less the present value of the estimated future payments to be made under the specific terms of the trust.

**Revenue and Expenses**

Contribution revenue is reported as an increase in net assets without donor restriction unless use of the related asset is limited by a donor-imposed time restriction. Expenses are reported as decreases in net assets without donor restrictions. Gains and losses on investments and other assets and liabilities are reported as increases or decreases in net assets without donor restrictions unless their use is limited by a donor-imposed time restriction. Expirations of temporary restrictions on net assets (i.e., the stipulated time period has elapsed or the cash has been collected) are reported as net assets released from restrictions.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

### Grants

Support funded by grants is recognized as the Foundation meets the condition prescribed by the grant agreement, performs the contracted services, or incurs outlays eligible for reimbursement under the grant agreement. Grant activities and outlays are subject to audit and acceptance by the granting agency, and as a result of such audit, adjustments could be required.

### Property and Equipment

Furniture and equipment are stated at cost or, if donated, the fair market value at the date of the gift, less accumulated depreciation. The Foundation capitalizes purchases (or donations) of furniture and equipment in excess of $5,000. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. The estimated useful lives are seven years for furniture and fixtures, three to five years for software, and three to seven years for equipment. Leasehold improvements are amortized over the life of the lease.

The Foundation evaluates whether events and circumstances have occurred that indicate the remaining estimated useful life of long-lived assets may warrant revision or that the remaining balance of an asset may not be recoverable.

The assessment of possible impairment is based on whether the carrying amount of the asset exceeds the expected total undiscounted cash flows expected to result from the use of the assets and their eventual disposition. No impairments were recorded in 2023.

### Grants and Program Service Payable

Grants and program services payable consist of unconditional amounts awarded, but not paid, to not-for-profit organizations or vendors on their behalf. Unconditional grants are recognized as an expense in the period in which they are approved by the Board. Management has the ability, as permitted by the Board, to approve certain types of grants which are not ratified by the Board until the subsequent year. Grants are made from available principal and income in accordance with the designations of donors. Grants dependent on the occurrence of a specified and uncertain event are not recognized until the conditions on which they depend are substantially met. Grants to be paid after one year are initially recognized at fair value using risk and an adjusted discount rate of 7.84% at December 31, 2023. Amortization of the discount is recorded as additional grant expense.

### Income Taxes

The Foundation is a public charitable trust organized under the laws of the State of Texas and is exempt from federal income tax under Section 501(c) (3) of the Internal Revenue Code (the Code).

Highland Dallas Foundation, Inc., Empower Dallas Foundation, Inc., Okada Family Foundation, Inc., The Suder Foundation, Reis Bisor Foundation, JSR Foundation, and Schweitzer Family Foundation are public charities organized under the laws of the State of Delaware and Texas and are exempt from federal income tax under Section 501(c)(3) of the Code. They are organized to operate exclusively to support and benefit the Foundation (and are classified as Type 1 supporting organizations). Generally, all revenue earned outside the purpose for which the Foundations are created is taxable as earned income. No income tax provision has been recorded as the net income, if any, from any unrelated trade or business, in the opinion of management, is not material to the consolidated financial statements taken as a whole.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

The Foundation follows the provisions of ASC 740-10, *Income Taxes*, related to unrecognized tax positions. The Foundation recognizes the tax benefits from uncertain tax positions only if it is more likely than not that the tax positions will be sustained on examination by the taxing authorities, based on the technical merits of the positions. The tax benefits recognized in the consolidated financial statements from such positions are measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. The Foundation does not believe there are any material uncertain tax positions and accordingly, it will not recognize any liability for unrecognized tax benefits. For the year ended December 31, 2023 there were no interest or penalties recorded or included in the financial statements.

The Foundation is relying on its tax-exempt status and its adherence to all applicable laws and regulations to preserve that status. However, the conclusions regarding accounting for uncertainty in income taxes will be subject to review and may be adjusted at a later date based on factors including, but not limited to, ongoing analysis of tax laws, regulations, and interpretations thereof.

The Foundation recognizes interest and penalties, if any, related to uncertain tax positions as income tax expense. The Foundation's informational returns are generally subject to examination for three years after the later of the due date or date of filing. As a result, the Foundation is no longer subject to income tax examinations by tax authorities for years prior to 2019.

**Functional Allocation of Expenses**

The costs of providing the various programs and other activities have been summarized on a functional basis in the statement of activities. Certain costs have been allocated among the programs, management and general supporting services, and fundraising categories based on head counts, time and effort spent, and other methods. Costs are allocated based on evaluations of the related activities into four functional categories as follows:

*Grants and Program Services*: Grants and program services represent amounts awarded to various not-for-profit organizations and/or fiscal sponsorships to assist with funding of general operations or specific programs.

*Educational Support*: Educational support includes activities to educate current donors, affiliated professional advisors, and the local community on philanthropic issues and opportunities. This education process involves researching and disseminating information about the not-for-profit community and educating others on methods to leverage resources more effectively.

*Supporting Services and Administrative*: General and administrative costs include activities which are not directly identifiable with any other specific function but provide for the overall support and direction of the Foundation. General and administrative expenses include oversight, business management, general record keeping, budgeting, financing, and other similar activities.

*Fundraising*: Fundraising includes development costs as well as the cost of special events. Development costs include activities which involve inducing potential donors to contribute money, securities, other assets, or time. They include publicizing and conducting fundraising campaigns, maintaining donor mailing lists, and other similar activities. Special event expenses include the costs of direct benefits to donors attending various special events hosted by the Foundation.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

**Concentration of Credit Risk**

The Foundation places its cash, cash equivalents, short-term funds, and marketable securities with high credit quality financial institutions which, at times, may exceed federally insured limits. The Foundation has not experienced any losses on such accounts.

The majority of the Foundation's donors are located in Dallas, Texas and the surrounding areas. In 2023, the Foundation received contributions from five donors totaling approximately $35,108,489 (46% of total donor contribution revenue).

The Foundation's grants payable reflected in the consolidated statement of financial position are primarily due to one fund with outstanding commitments representing approximately 43% of gross grants payable at December 31, 2023.

**Use of Estimates**

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

**Significant Estimates**

Estimates that are particularly susceptible to significant change include the valuation of investments, interest in irrevocable trusts, and pledges receivable. Investments and interest in irrevocable trusts in general are exposed to various risks, such as interest rate, credit, and overall market volatility. Due to the level of risk associated with these assets, it is reasonably possible that changes in the values of investments and interest in irrevocable trusts will occur in the near term and that such changes could materially affect the amounts reported in the consolidated statement of financial position. Significant fluctuations in fair values could occur from year to year, and the amounts the Foundation will ultimately realize could differ materially. Management's estimate of pledges receivable is based on consideration of all relevant available information and an analysis of the collectability of individual contributions, which arise primarily from pledges and estates at the financial statement date.

**Fair Value Measurements**

The Foundation follows FASB ASC Topic 820, *Fair Value Measurements*, which provides the framework for measuring fair value. FASB ASC 820 established a three-tier hierarchy to maximize the use of observable market data and minimize the use of unobservable inputs, and to establish classification of fair value measurements for disclosure purposes.

Inputs refer broadly to the assumptions that market participants would use in pricing the asset or liability, including assumptions about risk. Inputs may be observable or unobservable. Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity. Unobservable inputs are inputs that reflect the reporting entity's assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

*Assets measured at NAV*: Certain investments that are measured at fair value using the net asset value per share (or its equivalent) practical expedient, which is a reasonable estimate of fair value, have not been classified in the fair value hierarchy. The fair value amounts are presented to permit reconciliation of the fair value hierarchy to the amounts presented in the consolidated statement of financial position.

The three-tier hierarchy of inputs is summarized in the three broad levels listed as follows:

Level 1 inputs: Quoted prices are available in active markets that the Organization has the ability to access for identical investments as of the reporting date, without adjustment. The types of investments in Level 1 include listed equities held in the name of the Organization.

Level 2 inputs: Other significant observable inputs to the valuation methodology include:

- Quoted prices for similar assets or liabilities in active markets;
- Quoted prices of identical or similar assets or liabilities in inactive markets;
- Inputs other than quoted prices that are observable for the asset or liability;
- Inputs that are derived principally from, or corroborated by, observable market data by correlation or other means; and
- If the asset or liability has a specified contractual term, the Level 2 input must be observable for substantially the full term of the asset or liability.

Level 3 inputs: Significant unobservable inputs. Pricing inputs are unobservable for the investment and includes situations where there is little, if any, market activity for the investment. Investments that are included in this category generally include privately held investments and securities.

In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, the determination of which category within the fair value hierarchy is appropriate for any given asset or liability is based on the lowest level of input that is significant to the fair value measurement. The Foundation's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment and considers factors specific to the asset or liability.

Financial assets and liabilities carried at fair value on a recurring basis include investments, interest in irrevocable trusts, and the liability for agency transfers.

**Recent Accounting Pronouncements**

In June 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2016-13, *Financial Instruments – Credit Losses* (Topic 326): *Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"), which replaced the current incurred loss impairment methodology for measurement of credit losses on financial instruments, including the Foundation's accounts receivable, with a methodology (the "current expected credit losses model" or "CECL model") that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates. Under the CECL model, the allowance for losses on financial assets, measured at amortized cost, reflects management's estimate of credit losses over the remaining expected life of such assets.

The Foundation adopted ASU 2016-13 as of January 1, 2023 using the modified retrospective method, and the adoption did not have a material impact on its financial statements.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

## Note 3. Investments

Investments are stated at fair value and consisted of the following as of December 31, 2023:

| | |
|---|---|
| Investments | |
| Common and preferred stocks | $ 57,668,679 |
| U.S. Treasury notes | 70,056,294 |
| Corporate bonds | 5,671,597 |
| Mutual funds | 226,293,751 |
| Non-marketable securities | 157,534,898 |
| Total investments | $ 517,225,219 |

Investment income consisted of the following for the year ended December 31, 2023:

| | |
|---|---|
| Interest and dividends | $ 9,126,681 |
| Beneficial interest distributions | 4,367,418 |
| | 13,494,099 |
| Less: interest and dividends on assets held for others | (496,503) |
| Total investment income | $ 12,997,596 |
| Net realized gains on investments | $ 12,095,307 |
| Net unrealized losses on investments | 20,118,226 |
| Less: external and direct investment expenses | (1,018,962) |
| | $ 31,194,571 |
| less: realized and unrealized gains on assets held for others, net | (1,573,044) |
| Total realized and unrealized gains | $ 29,621,527 |

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

## Note 4. Fair Value Measurements

The following methods and assumptions were used to estimate the fair value of assets and liabilities in the consolidated financial statements and to determine the resulting classification within the fair value hierarchy.

**Cash and Cash Equivalents**

Cash and cash equivalents are stated at fair value based on quoted market prices and accordingly are classified as Level 1 in the fair value hierarchy.

**Investments**

All of the Foundation's marketable securities are valued by the custodian, broker, or the fund/account manager using nationally recognized third party pricing services. The Foundation gives highest priority to quoted prices in active markets for identical assets accessed at the measurement date and classifies all such assets as Level 1. The Foundation gives a Level 2 priority to valuation prices where the valuation process involves inputs other than quoted prices included in Level 1 that are observable for the asset, either directly or indirectly. The values provided by the pricing services use the market approach and the income approach. Observable Level 2 inputs under the market approach include quoted prices for similar assets in active markets, quoted prices for identical or similar assets in markets where there is not sufficient activity, and/or where price quotations vary substantially either over time or among market makers, or in which little information is released publicly. Mid-market pricing or other pricing conventions may be used for fair value measurements within a bid-ask spread. Observable Level 2 inputs under the income approach include commonly quoted interest rates, yield curves, volatilities, prepayment speeds, loss severities, credit risks, and default rates.

**Interests in Irrevocable Trusts**

The Foundation maintains interests in Charitable Lead Trusts, Charitable Remainder Trusts, and Perpetual Trusts. These Trusts have various investment mixes and various level investments. The Foundation values these investments based on the valuation of the custodian of the Trust and then applying the Foundation's contractual allocation of the investments in the underlying trusts. Due to the significant and unobservable nature of the key inputs, the measurement is classified as Level 3 in the fair value hierarchy.

**Real Estate and Mineral Interests**

The assets are carried at fair value using the income approach. Real estate is valued using discounted cash flows from related leases and mineral interests are valued using a multiple of related revenues. Due to the significance and unobservable nature of key inputs, the measurement is classified as Level 3 in the fair value hierarchy.

# The Dallas Foundation and Affiliates

## Notes to Consolidated Financial Statements

**Assets Held for Others**

The liability is carried at fair value as determined using the income approach. Fair value is based on the fair value of the cash and investment assets held by the Foundation for the benefit of the recipient agencies; however, as there is no market for similar liabilities, the key input is the future cash flow obligations to the recipients. The specific assets held have been classified within the hierarchy for investment (as discussed above). The assets held for others are directly offset by a corresponding liability for the full amount of the assets held.

The related and associated liability is classified as Level 3 in the hierarchy as there is no market for a similar liability and principal input (i.e., fair value of future cash flows to recipients is based on the fair market value of the assets in the portfolio and management's allocation for shares in the pool) are unobservable and significant to the overall fair value measurement.

Assets and liabilities measured at fair value on a recurring basis are classified within the fair value hierarchy at December 31, 2023 as follows:

| | NAV | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Assets | | | | | |
| Cash and cash equivalents | $ - | $ 24,813,753 | $ - | $ - | $ 24,813,753 |
| Investments | | | | | |
| Marketable securities | | | | | |
| Cash and short-term funds | $ - | $ - | $ - | $ - | $ - |
| Common and preferred stocks | - | 57,668,679 | - | - | 57,668,679 |
| U.S. Treasury notes and government sponsored | - | - | 70,056,294 | - | 70,056,294 |
| Corporate bonds | - | - | 5,671,597 | - | 5,671,597 |
| Mutual funds-Fixed Income | - | 83,950,439 | - | - | 83,950,439 |
| Mutual funds-Equity | - | 142,343,312 | - | - | 142,343,312 |
| | - | 283,962,430 | 75,727,891 | - | 359,690,321 |
| Non-marketable securities | | | | | |
| Common funds, hedge funds and limited partnership | | | | | |
| Equity funds | 335,710 | - | - | - | 335,710 |
| Fixed income funds | 576,346 | - | - | - | 576,346 |
| REIT | 8,280,000 | - | - | - | 8,280,000 |
| Funds of funds | - | - | 3,008,924 | 1,208,979 | 4,217,903 |
| Income funds | 144,226 | - | - | - | 144,226 |
| Collateralized loan obligations | - | - | - | 78,284,714 | 78,284,714 |
| Other limited partnerships | - | - | - | 65,695,999 | 65,695,999 |
| | 9,336,282 | - | 3,008,924 | 145,189,692 | 157,534,898 |
| Total investments | $ 9,336,282 | $ 283,962,430 | $ 78,736,815 | $ 145,189,692 | $ 517,225,219 |
| Interests in irrevocable trusts | $ - | $ - | $ - | $ 45,146,340 | $ 45,146,340 |
| Real estate and mineral interests | $ - | $ - | $ - | $ 3,456,294 | $ 3,456,294 |
| | $ 9,336,282 | $ 308,776,183 | $ 78,736,815 | $ 193,792,326 | $ 590,641,606 |
| Liabilities | | | | | |
| Assets held for others | $ - | $ - | $ - | $ (19,027,214) | $ (19,027,214) |

# The Dallas Foundation and Affiliates

## Notes to Consolidated Financial Statements

The following tables summarize the changes in the fair value of the Foundation's Level 3 financial assets and liabilities:

| | Collateralized Loan Obligations | Other Limited Partnerships |
|---|---|---|
| Balance at January 1, 2023 | $ 76,654,941 | $ 86,202,486 |
| Net unrealized gains (losses) | 2,274,060 | 4,526,399 |
| Net realized gains (losses) | - | (1,153,950) |
| Distributions | (644,287) | (37,316,182) |
| Contributions | - | 13,437,246 |
| Balance at December 31, 2023 | $ 78,284,714 | $ 65,695,999 |

| | Assets | | Liabilities |
|---|---|---|---|
| | Interests in Irrevocable Trusts | Real Estate and Mineral Interests | Liability for Assets Held for Others |
| Balance at January 1, 2022 | $ 42,996,991 | $ 3,854,889 | $ 17,491,346 |
| Investment income | - | - | 496,503 |
| Net realized gains | - | - | 369,643 |
| Net unrealized gains | 2,211,351 | (398,595) | 1,387,236 |
| Change in value of interests in irrevocable trusts | (23,954) | - | - |
| Administrative and other fees | - | - | (193,574) |
| Grants payments | - | - | (1,108,887) |
| Distributions | (38,048) | - | - |
| Contributions | - | - | 584,947 |
| Balance at December 31, 2023 | $ 45,146,340 | $ 3,456,294 | $ 19,027,214 |

The summary of changes in fair value of Level 3 assets and liabilities has been prepared to reflect the same categories as those used in the statement of activities and cash flows, except (1) net realized gains and net unrealized gains (losses) presented above are combined in the consolidated statement of activities as net investment realized/unrealized losses and (2) although the liability for assets held for others has been prepared to reflect the same categories as those used in the consolidated statement of activities, none of this activity is included in the change in net assets, except administrative and other fees which increase net assets and decrease the liability for assets held for others.

# The Dallas Foundation and Affiliates
## Notes to Consolidated Financial Statements

The Foundation's investments in certain entities that calculate net asset value per share include the following at December 31, 2023:

| | Fair Value | Redemption or Liquidity | Days Notice |
|---|---|---|---|
| Equity funds | $ 335,710 | Daily | 1-3 |
| Fixed income funds | 576,346 | Daily | 1-3 |
| REIT | 8,280,000 | Daily | 15 |
| Income funds | 144,226 | Daily | 1-3 |
| | $ 9,336,282 | | |

At December 31, 2023, the Foundation had no remaining lock-up periods or unfunded commitments for any of its investments. A summary of the significant investment strategies and additional relevant information for investments carried at NAV are summarized as follows:

*Equity funds – other*: This class seeks to provide long-term capital growth through investment in primarily domestic companies with market capitalization ranging from $100 million to $15 billion.

*Equity funds – global:* The class seeks to achieve capital appreciation through investment in companies primarily headquartered in emerging markets and through exposure to international stock markets.

*Fixed income funds:* This class seeks to maximize total investment return through investment in intermediate to high yield bond portfolios.

*Fixed income funds – global:* This class seeks to capture interest income and generate principal growth through capital appreciation by investing in a portfolio of sovereign debt and currencies of non-U.S. countries and investment and non-investment grade corporate bonds.

*REIT:* This class seeks to acquire and operate income-producing hotel properties in the United States, focusing on extended-stay and select service properties with a value enhancement strategy.

*Income funds:* This class seeks to provide a high level of current income through investment in dividend-paying common stocks, preferred stocks, convertibles securities, partnerships, trusts, and selected debt instruments.

The following table summarizes the valuation techniques and significant unobservable inputs used for the Foundation's assets and liabilities that are categorized within Level 3 of the fair value hierarchy at December 31, 2023:

| Investment Type | Fair Value | Valuation Techniques | Unobservable Input [c] | Range of Inputs (Weighted Averages) |
|---|---|---|---|---|
| Interests in irrevocable trusts | $ 45,146,340 | flows and Income | Expected rate of return [b] | 6% (6%)<br>5% - 8% (5%) |

[a] Represents amounts used when the Foundation has determined that market participants would take into account these discounts when pricing the investments.

[b] Represents the amounts used when the Foundation has determined that market participants would take into account these returns when pricing the investments.

[c] Fair value of the asset/liability is the expected future cash inflows/outflows, which are based on the fair value of the underlying investment assets, and at this time, management believes no discounts to the fair value are appropriate.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

Approximately $144,000,000 and $19,000,000 of level 3 investment assets and liabilities have been valued based on the use of specialist, audited reports, agreed upon procedures, and other valuation techniques that are not reported in the above table as no discounting was required related to valuation approach.

## Note 5. Liquidity and Funds Available

The Foundation's financial assets available for general expenditure, that is, without donor or other restrictions limiting their use, within one year of the consolidated statement of financial position date, are as follows:

| | |
|---|---|
| Cash and cash equivalents | $ 24,813,753 |
| Investments | 517,225,219 |
| Contributions receivable, net | 2,850,169 |
| Interests in irrevocable trusts | 45,146,340 |
| Real estate and mineral interests | 3,456,294 |
| Total financial assets, year end | 593,491,775 |
| Less | |
| Real estate and mineral interests | 3,456,294 |
| Other illiquid assets | 17,969,763 |
| Interests in irrevocable trusts | 45,146,340 |
| Perpetual Endowment assets not in irrevocable trusts | 7,243,182 |
| Board designated funds functioning as Endowments | 12,263,211 |
| All remaining Endowment funds | 123,814,154 |
| Agency funds | 19,027,214 |
| Donor objective funds | 174,457,911 |
| Supporting organizations | 163,408,609 |
| Total financial assets not available to be used within one year | 566,786,678 |
| Total financial assets available to meet general expenditures within one year | $ 26,705,097 |

Donor objective funds represent funds for which the Foundation has variance power and therefore are classified as net assets without donor restrictions. However, these types of funds have associated donor wishes. The balance represents funds for fiscal sponsorships, donor advised funds as well as other funds with charitable intent.

Agency funds represent assets from a nonprofit resource provider to the Foundation for the benefit of the resource provider and/or its affiliates. These assets are considered as assets held for others.

Supporting organizations assets relate to the assets of the Foundation's affiliates which are consolidated in this financial statement. The financial assets related to these types of funds are not considered to be available to meet the general expenditures of the Foundation.

# The Dallas Foundation and Affiliates
Notes to Consolidated Financial Statements

## Note 6. Contributions Receivable

Contributions receivable consists of unconditional promises to give to the Organization in the future and are recorded at their estimated fair value. Contributions receivable are summarized as follows at December 31, 2023:

| | | |
|---|---|---|
| Contributions receivable due in less than one year | $ | 2,854,000 |
| Contributions receivable due in one to five years | | 88,000 |
| Gross contributions receivable | | 2,942,000 |
| Less: allowance for uncollectible pledges | | (3,571) |
| Less: discount on contributions receivable | | (88,260) |
| Contributions receivable, net | $ | 2,850,169 |

## Note 7. Property and Equipment

Property and equipment are summarized as follows at December 31, 2023:

| | | |
|---|---|---|
| Furniture and fixtures | $ | 1,470 |
| Software | | 257,540 |
| | | 259,010 |
| Less: accumulated depreciation | | (190,169) |
| | $ | 68,841 |

Depreciation expense for the year ended December 31, 2023 was $71,066.



015985

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

## Note 8. Grants and Program Services Payable

Grants and program services payable consist of unconditional amounts awarded, but not paid, to various not-for-profit organizations or vendors on their behalf. Unconditional grants and program services payable are summarized as follows at December 31, 2023:

| | | |
|---|---|---|
| Grants and program services payable | | |
| in less than one year | $ | 4,521,548 |
| in one to five years | | 4,000,347 |
| Gross grants and program services payable | | 8,521,895 |
| Less discount to net present value | | (463,817) |
| Grants and program services payable, net | $ | 8,058,078 |

For the year ending December 31, 2023, grants and program services payable beyond one year are reported at the present value of their estimated future cash flows using a discount rate of 7.84%.

## Note 9. Assets Held for Others

The Foundation follows the ASC guidance for *Transfers of Assets to a Not-for- Profit Organization or Charitable Trust That Raises or Holds Contributions for Others,* which establishes standards for transactions in which the Foundation accepts a contribution from a donor and agrees to transfer those assets, the return on investment of those assets, or both to another entity that is specified by the donor. This guidance specifically requires that if a not-for-profit organization establishes a fund at a community foundation with its own funds and specifies itself or one of its affiliated organizations as the beneficiary of that fund, the community foundation must account for the transfer of such assets and the activity associated with those assets as a liability.

The Foundation maintains variance power, as described in the governing documents of the Foundation, and legal ownership over these funds and, as such, continues to report the funds as assets of the Foundation. Variance power assures donors that if the charitable purpose of their contribution becomes impractical or impossible, the distributions will be directed to similar purposes in the community. At December 31, 2023, the consolidated statement of financial position includes a liability for agency transfers at the fair value of the assets held for the benefit of not-for-profit organizations in the amount of $19,027,214.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

## Note 10. Net Assets

Net assets restricted in perpetuity at December 31, 2023 are designated for the following purposes:

| | |
|---|---|
| Community competitive grants | $ 15,400,133 |
| Phlanthropic education programs | 1,015,233 |
| Arts and education | 5,239,949 |
| Religious support | 988,000 |
| Social services | 19,476,424 |
| | $ 42,119,739 |

Time and purpose restricted net assets restricted for beneficial interests in charitable lead trusts consist of the following at December 31, 2023:

| | |
|---|---|
| Subject to passage of time | $ 13,247,136 |
| Beneficial interest in CLTs | 94,810 |
| Subject to expenditure for specified purpose | 14,232,287 |
| | $ 27,574,233 |

Net assets without donor restrictions consist of the following at December 31, 2023:

| | |
|---|---|
| Undesignated | $ 2,517,915 |
| Board designated | 13,995,820 |
| Donor objectives | 316,329,949 |
| Supporting organizations | 163,408,609 |
| | $ 496,252,293 |

Net assets were released from restrictions by incurring expenses to satisfy the following purpose restrictions or by the passage of time during the year ended December 31, 2023:

| | |
|---|---|
| Expiration of time restrictions | $ 468,120 |
| Satisfaction of purpose restriction | (2,084,807) |
| | $ (1,616,687) |

## Note 11. Endowment Disclosures

Endowment net asset composition by type of fund is as follows at December 31, 2023:

| | |
|---|---|
| Net assets without donor restrictions | $ 126,436,336 |
| Net assets with donor restrictions | 20,858,011 |
| Net assets with donor restrictions in perpetuity | 42,119,737 |
| Total endowment funds | $ 189,414,084 |

# The Dallas Foundation and Affiliates

## Notes to Consolidated Financial Statements

Changes in endowment net assets are as follows as of December 31, 2023:

| | As of December 31, 2023 | | | |
|---|---|---|---|---|
| | Without Donor Restrictions | With Donor Restrictions | With Donor Restrictions in Perpetuity | Total |
| Endowment net assets, beginning of year | $ 79,526,626 | $ 18,098,096 | $ 40,950,366 | $ 138,575,088 |
| Investment return, net | 10,842,382 | 3,451,485 | 1,169,371 | 15,463,238 |
| Contributions | 39,726,164 | - | - | 39,726,164 |
| Appropriation of endowment assets for expenditures | (4,517,892) | (647,220) | - | (5,165,112) |
| Other changes: | | | | |
| Transfer to affiliated accounts | 859,056 | (44,350) | - | 814,706 |
| Endowment net assets, end of year | $ 126,436,336 | $ 20,858,011 | $ 42,119,737 | $ 189,414,084 |

**Return Objectives and Risk Parameters, Strategies Employed for Achieving Objectives, and Spending Policy and How the Investment Objectives Relate to Spending Policy**

The Foundation's endowment consists of approximately 185 individual funds established for a variety of purposes. The Foundation has adopted investment and spending policies for endowment assets that attempt to provide a predictable stream of funding to programs supported by its endowment while seeking to maintain the purchasing power of the endowment assets. The Foundation's spending and investment policies work together to achieve these objectives.

Generally, the Foundation follows a spending policy of 5% of total assets calculated over twelve-quarters, which based on the expected rate of return is designed to ensure preservation of capital. The investment policy establishes an achievable long-term return objective through diversification of asset classes.

To achieve its long-term rate-of-return objectives, the Foundation relies on a total return strategy in which investment returns are achieved through both capital appreciation (realized and unrealized) and current yield (interest and dividends). The Foundation targets a diversified asset allocation that places a greater emphasis on equity-based investments to achieve its long-term return objectives within prudent risk parameters.

## Note 12. Employee Benefit Plan

The Foundation has a defined contribution plan (the Plan) under Section 401(k) of the Internal Revenue Code (IRC), which covers all eligible employees. Employees may contribute up to 100% of their compensation to the Plan, but not to exceed the annual limit set by the Internal Revenue Service. The Foundation's contributions are voluntary and at the discretion of the Board. The Foundation contributed $134,302 to the Plan in 2023.

# The Dallas Foundation and Affiliates

Notes to Consolidated Financial Statements

## Note 13. Leases

The Foundation enters into non-cancelable operating lease agreements for office space and office equipment in the normal course of business. The Foundation determines if an arrangement is a lease at inception.

As of December 31, 2023 the Foundation has leases for Office Space and office equipment. These leases are classified as operating lease agreements and have lease terms remaining ranging from 5 to approximately 12 years.

The Foundation has lease agreements with lease and non-lease components, which are generally accounted for separately. These variable lease payments, which are primarily comprised of common area maintenance, utilities, and real estate taxes that are passed on from the lessor, are recognized in operating expenses in the period in which the obligation for those payments was incurred.

The lease terms may include options to extend the lease when it is reasonably certain that the option will be exercised. The optional renewal period was considered for all leases. The Foundation determined that lease renewal to be reasonably certain for one of their leases and considered the renewal lease rates into their calculation.

None of the Foundation's lease agreements contain contingent rental payments, material residual value guarantees or material restrictive covenants. The Foundation has no sublease agreements.

During 2023, the Foundation recognized rent expense associated with leases as follows:

| | 2023 |
|---|---|
| Operating Lease Cost | |
| Rent and Lease Expense | $ 22,716 |

Amounts recognized as right-of-use (ROU) assets related to leases and lease liabilities are included in in the accompanying statement of financial position. As of December 31, 2023, the right-of-use assets and lease liabilities related to leases were as follows:

| | 2023 |
|---|---|
| Operating lease ROU assets | $ 2,100,920 |
| Operating lease liabilities | $ 2,156,123 |

# The Dallas Foundation and Affiliates

## Notes to Consolidated Financial Statements

During the year ended December 31, 2023, the Foundation had the following cash and non-cash activities associated with our leases:

| | 2023 |
|---|---|
| Cash paid for amounts included in the measurement of lease liabilities | |
| Operating cash flows from operating leases | $ 116,689 |

The future payments due under those leases as of December 31, 2023 are as follows:

| Year Ending December 31, | |
|---|---|
| 2024 | $ 198,089 |
| 2025 | 199,089 |
| 2026 | 199,089 |
| 2027 | 199,089 |
| Thereafter | 1,588,136 |
| Total minimum lease payments | $ 2,383,492 |

As of December 31, 2023, the weighted-average remaining lease term for all operating leases is 8.67 years. The Foundation elected practical expedient for nonpublic business entities to use a risk-free rate for a period comparable to the lease term.

## Note 14. Subsequent Events

Management has evaluated subsequent events through September 10, 2024, the date the consolidated financial statements were available to be issued. During this period, there were no material subsequent events that required recognition or additional disclosure in these consolidated financial statements.

# EXHIBIT 247

# PRODUCED IN NATIVE

# EXHIBIT 256

## PRODUCED IN NATIVE

# EXHIBIT 257

# PRODUCED IN NATIVE

# EXHIBIT 258

# PRODUCED IN NATIVE

# EXHIBIT 259

# PRODUCED IN NATIVE