**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P**.**

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee

§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 39**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru vol 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 4 001845 thru Vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 + 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| Vol. 7 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

vol 9

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 9 | | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 005330 | 04/17/2026 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol. 10 005590 | 04/21/2026 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 005594 | 04/22/2026 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005615 | 04/22/2026 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 005682 | 04/22/2026 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | **Date Filed** | **Docket No.** | **Description/Docket Text** |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

Vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 04/28/2026 005746 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005755 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005761 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 005767 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 005776 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 005783 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10).22 008156 | 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 | 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 | 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25<br>009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26<br>009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol. 27<br>010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28<br>010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28 010664 | 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010736 | 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 011150 | 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 011734 | 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 013203 Thru Vol 33 | 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014888 | 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 015349 05/11/2026 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 015505 05/11/2026 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 015506 05/12/2026 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 015538 05/12/2026 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 015565 05/12/2026 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 015566 05/15/2026 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 015569 05/18/2026 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 39 | | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 016729 | 07/10/2026 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 016731 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 016733 | 07/24/2026 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 016742 | 07/28/2026 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Michael J. Edney
Martha B. Stolley
Avery Joseph Welker
Morgan Lewis Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
martha.stolley@morganlewis.com
avery.welker@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj |

**THE DUGABOY INVESTMENT TRUST'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

III. LEGAL STANDARD ..... 7

IV. ARGUMENT ..... 9

A. The Evidence of Mark Patrick Having Stolen the Assets of the Charitable DAF Was Not Stated in the April 2025 Dondero Affidavit and Is Evidence Newly Discovered After the 9019 Motion ..... 9

B. Relief is Warranted under Rule 60(b)(3) Due to Mark Patrick's Omissions, Misrepresentations, and Misconduct During Highly Restricted Discovery. ..... 19

C. Rule 60(b)(6) Relief is Warranted Absent Restoration of the Charitable Structures to Avoid Rewarding Mark Patrick's Misconduct. ..... 23

V. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Balfour Beatty Rail, Inc. v. Kan. City S. R.R. Co.*,
173 F.Supp.3d 363 (N.D. Tex. 2016) ....................18

*Banister v. Davis*,
590 U.S. 504 (2020)....................7

*Bank One, Texas, N.A. v. Federal Deposit Ins. Corp.*,
16 F. Supp. 2d 698 (N.D. Tex. 1998) ....................7

*In re Charitable DAF Holdco Ltd. (In Official Liquidation)*,
No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1 ....................5

*Charles L.M. v. N.E. Indep. Sch. Dist.*,
884 F.2d 869 (5th Cir. 1989) ....................7

*Demahy v. Schwarz Pharma, Inc.*,
702 F.3d 177 (5th Cir. 2012) ....................7

*Dupree v. Younger*,
598 U.S. 729 (2023)....................2

*Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*,
6 F.3d 350 (5th Cir. 1993) ....................8, 23

*In re Endeavour Highrise, L.P.*,
432 B.R. 583 (Bankr. S.D. Tex. 2010) ....................18

*Gen. Universal Sys., Inc. v. Lee*,
379 F.3d 131,156–57 (5th Cir. 2004) ....................19

*Hamilton Plaintiffs v. Williams Plaintiffs*,
147 F.3d 367 (5th Cir. 1998) ....................6

*Heirs of Guerra v. United States*,
207 F.3d 763 (5th Cir. 2000) ....................18

*Inryco, Inc. v. Metro. Engr. Co., Inc.*,
708 F.2d 1225 (7th Cir. 1983) ....................7

*In re J.A.R. Concrete, Inc.*,
673 B.R. 663 (W.D. Tex. 2025)....................18

*In re Kakal*,
2019 WL 1868626 (S.D. Tex. Bankr. 2019)....................6

*Pruett v. Stephens*,
608 Fed. Appx. 182 (5th Cir. 2015)....................7

*Rhodes v. Amarillo Hosp. Dist.*,
654 F.2d 1148 (5th Cir. 1981)....................18

*Rismed Oncology Systems, Inc. v. Baron*,
297 F.R.D. 637 (N.D. Ala. 2014)....................21

*Shepherd v. Int'l Paper Co.*,
372 F. 3d 326 (5th Cir. 2004)....................6

*Silas v. Sears, Roebuck & Co.*,
586 F.2d 382 (5th Cir. 1978)....................7

*In re Transtexas Gas Corp.*,
303 F.3d 571 (5th Cir. 2002)....................7

*Williams v. French*,
2024 WL 3929894 (S.D. Tex. Aug. 23, 2024)....................7

**Statutes**

Bankruptcy Code Chapter 15....................5

**Rules**

Federal Rule of Bankruptcy Procedure 9019.................... *passim*

Federal Rule of Bankruptcy Procedure 9023....................6, 7

Federal Rule of Bankruptcy Procedure 9023(a)....................1

Federal Rule of Bankruptcy Procedure 9024....................1

Federal Rule of Civil Procedure 50(e)....................6

Federal Rule of Civil Procedure 59(e)....................1, 6, 7, 24

Federal Rule of Civil Procedure 60(b).................... *passim*

Federal Rule of Civil Procedure 60(b)(3).................... *passim*

Federal Rule of Civil Procedure 60(b)(6).................... *passim*

Rule 60(b)(2).................... *passim*

The Dugaboy Investment Trust ("Dugaboy") respectfully moves under Fed. R. Civ. P 59(e), as incorporated by Federal Rule Bankruptcy Procedure 9023(a), to alter or amend and otherwise to reconsider the Court's June 15, 2026 Order denying Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) (the "Denial Order"), as incorporated by Federal Rule Bankruptcy Procedure 9024. The Court should alter its order to grant the motion to vacate the approval of the settlement between the Highland entities and the Hunter Mountain Investment Trust.

## I. **<u>INTRODUCTION</u>**

The Court should alter, amend, and otherwise reconsider its denial of Dugaboy's motion for relief under Federal Rule of Civil Procedure 60(b) for multiple reasons. The June 2025 order approving the settlement between the Highland-related entities and the Hunter Mountain Investment Trust should be vacated.

First, the Court's denial of Dugaboy's motion based on newly discovered evidence under Rule 60(b)(2) rests on an incorrect factual premise: That Mr. Dondero and his family trust already possessed the evidence of Mr. Patrick's theft of Charitable DAF on which the motion to vacate was based, as of April 16, 2025,. April 16, 2025, is when Mr. Dondero filed an affidavit supporting the opening of liquidation proceedings in the Cayman Islands, proceedings that only much later revealed the outcomes, mechanisms, and motives of Mr. Patrick's brazen theft of the assets that had been maintained under a charitable structure that included the Hunter Mountain Investment Trust ("Hunter Mountain") and the equity position in Highland Capital Management, L.P. ("Highland").

The April 16, 2025, affidavit did not set forth the evidence of Mr. Patrick's fraudulent restructuring of the Charitable DAF, including his theft of the Highland equity position from an

established Dallas charity. Instead, the affidavit detailed Mr. Patrick's lack of transparency with respect to this recent operation of the Charitable DAF and compliance lapses in areas separate and apart from his Charitable DAF restructuring efforts. Mr. Patrick's brazen theft of all the assets of the charitable structures was instead first alleged by the Cayman Liquidators in a July 15, 2025, "statement of claim," with actionable evidence of those allegations later revealed in the Cayman proceedings and elsewhere.

Relief is also appropriate under Federal Rule of Civil Procedure 60(b)(3). In its Denial Order, the Court held that no one had engaged in fraud or discovery misconduct in the proceedings leading up to the 9019 order in June 2025. That is not so. That process was unnecessarily rushed and frantic. But Mark Patrick was deposed, and he lied in that deposition to conceal his theft of the charitable assets until the very last minute.

Finally, the Court should grant relief under Federal Rule of Civil Procedure 60(b)(6). The fraud and misconduct is not adjacent to this Court's mission and charge. We know today, due to the evidence elicited in the May 2026 hearings, that Mark Patrick came to this Court in May 2025 asking for approval to deal away stolen property to Highland. That is because, by the time he had arrived, he had misappropriated Hunter Mountain and the residual equity position in Highland from the established charity to which it was given and belonged. Having (albeit unwittingly) approved the transfer of stolen property is an anathema to justice and this Court's role as a court of equity, and that is a "reason" in addition to many others "that justifies relief." Fed. R. Civ. P. 60(b)(6).

In addition, this Court has a special responsibility to monitor arrangements made between Highland's appointed managers and third parties. That is because the predecessor bankruptcy judge stimulated the removal of Highland's founder and most effective guardian of its equity

interest in the first hearing after this case was transferred from Delaware. And at the Court's insistence, appointed managers effectively acting in the Court's stead followed. If the Highland managers made an arrangement with wrongdoers (either knowingly or not), that should be of special concern to the Court. Today, we know Mr. Patrick was a wrongdoer and the appointed managers reached a settlement with him precisely because he was eager to advance and to deter scrutiny into his wrongdoing.

Dugaboy limits this motion for reconsideration to these issues but reserves the right to address additional errors in the appellate courts in the event the instant motion is not granted. See *Dupree v. Younger*, 598 U.S. 729 (2023) (holding that parties are not required to renew legal arguments to preserve them for appellate review). Today, Dugaboy has also filed a notice of appeal in an abundance of caution to ensure all timelines to secure future review if necessary. The Bankruptcy Rules provide that this Court retains jurisdiction to decide the motion to amend until it is decided or withdrawn, despite the sequential filing of a notice of appeal. Fed. R. Bankr. P. 8002(b)(2).

## II. <u>BACKGROUND</u>

This motion arises from the Chapter 11 bankruptcy proceedings involving Highland. On May 19, 2025, Highland and Hunter Mountain moved for approval of a settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. Dkt. 4216. Although Dugaboy challenged this proposed settlement, *see* Dkt. 4230, it ultimately was approved on June 30, 2025. *See* Dkt. 4297 ("9019 Settlement Approval Order").

Dugaboy filed a motion to vacate the settlement approval order under Federal Rule of Civil Procedure 60(b). Dkt. 4513 ("Rule 60(b) Motion"). Dugaboy moved for relief under Rule 60(b)(2) based on newly discovered evidence, under Rule 60(b)(3) based on fraud, misrepresentations, and

misconduct by an opposing party, and under Rule 60(b)(6) for any other reason justifying relief. *Id.* at 33–43. With respect to its motion for relief under Rule 60(b)(2), Dugaboy directed the Court to developments in proceedings in the Cayman Islands that had occurred after the Court's hearing regarding and order approving the settlement agreement with Hunter Mountain. In those proceedings, the Grand Court of the Cayman Islands had appointed a form of receiver—what the Cayman legal system calls Joint Official Liquidators—to step into the shoes of one of the core, Cayman-incorporated entities at the heart of the Charitable DAF structure, the Charitable DAF Fund, L.P.

Mr. Dondero had established the Charitable DAF years earlier to create a legacy of good works in the community that would outlive him. May 21, 2026 Hr'g Tr. at 135:23–24. At the top of this structure were four charities that Mr. Dondero had selected, each with a decades-long track record for doing good. *Id.* at 136:24–137:8 (App. 115). They were to be the recipients of Mr. Dondero's generosity and the growth of the assets Mr. Dondero had given to the structure. And each had set up a structure—a so-called "supporting organization"—that would allow Mr. Dondero to have a significant say in how the charities used the proceeds from the DAF. May 21, 2026 Hr'g Tr. at 137:9–18; May 11, 2026 Hr'g Tr. at 208:1–12.

The Cayman Liquidators uncovered detailed, new, and breathtaking evidence of Mr. Patrick's stealing all the Charitable DAF's assets from the charities and from Mr. Dondero's ability to guide the good works to which they were to be put. Mr. Patrick proceeded to put them in his own pocket, in the hands of a sham "charity" run from his kitchen table. And along the way, he looted the charitable assets, paying himself more than $14 million in just over 18 months. He went out of his way to conceal his misconduct. The Cayman Liquidators uncovered communications instructing his co-conspirators to make the new entities "hard to find or track, or trace." *See*

Dugaboy Ex. 169 at 1 (App. 042). And he told the charities that he was going to "leave the structure exactly as it was" and that transparency in the form of financial statements would be coming soon. *See* Dugaboy Ex. 204 at 171-72 (App. 049– 050) ("Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter . . . [W]e are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF HoldCo governance structure."); *id.* at 167 (App. 045) ("[O]ur understanding was that we were to prepare a presentation for the Foundations to address these concerns."); *id.* at 179 (App. 057) (unanswered scheduling emails from charities' counsel). All of this legerdemain occurred from late 2024 through the spring of 2025.

Mr. Patrick's theft of the Charitable DAF's assets had everything to do with the Hunter Mountain Investment Trust, which owned most of the equity in the Debtor, Highland Capital Management LP. The Court will recall that on February 12, 2025, Mr. Patrick sold Hunter Mountain for $1 million to CLO HoldCo, LLC. Dugaboy Ex. 15 at 1 (App. 027); May 12, 2026 Hr'g Tr. at 69:23–25 (App. 110). That entity was entirely owned by Charitable DAF LP and the entire Charitable DAF structure. May 12, 2026 Hr'g Tr. at 72:11–13; *see also* Dugaboy Ex. 242 at 18 (App. 066). Before the sale, all the value in Hunter Mountain was supposed to be entirely for the benefit of The Dallas Foundation. Dugaboy Ex. 242 at 12 (App. 065). After the sale, it became part of the Charitable DAF structure, which was to be owned by The Dallas Foundation and three other established charities, with Mr. Dondero having input as to the philanthropic ends for which his charitable gift would be used. *Id.* at 14; May 21, 2026 Hr'g Tr. at 137:9–18. But, on March 27, 2025, Mr. Patrick stole the Charitable DAF's assets—including Hunter Mountain

and the equity position in Highland Capital Management—from The Dallas Foundation and from Mr. Dondero's guidance. Highland Ex. 63 at 53. He did this through a secret transaction that dispossessed the established charities from the equity stake in Highland and $270 million in other assets in exchange for a mere $1.6 million, transferring hundreds of millions of dollars to the sham charity he set up in his basement. *Id.*

The evidence documenting this perfidy came from the Cayman Liquidators, who were able to obtain it because they were empowered to step into the shoes of The Charitable DAF Fund, L.P., the core entity in the Charitable DAF, and obtain information in its name from Cayman government registrars, corporate service providers, and the company's own files. May 11, 2026 Hr'g Tr. at 77:4–19. Importantly, this fraud was largely pulled off in the Cayman Islands, by corporate entities outside the United States. Unbeknownst to the predecessor bankruptcy judge in this case, by the time Mr. Patrick was trading away the property interests of the equity holders in Highland Capital Management, he was dealing in stolen property. The Court-appointed managers of Highland were receiving settlement of Hunter Mountain's claims from the very person who had stolen the assets from the charities they were meant to benefit. And the Court was blessing it.

The Cayman Liquidators first alleged what they had uncovered in a Statement of Claim, filed on July 15, 2025. That Statement contained only allegations, but those allegations were so earthshattering that Dugaboy asked the predecessor judge to stay the effect of her settlement approval ruling in light of them. Dkt. 4326. The evidence behind those allegations was presumptively confidential under Cayman law. May 11, 2026 Hr'g Tr. at 77:16–19. It was released later, beginning with the Liquidators' July 21, 2025, filing in Delaware bankruptcy court seeking Chapter 15 recognition of its proceedings and then in successive affidavits of Margot MacInnis (one of the joint liquidators), only made accessible in the weeks surrounding hearings in

the Cayman proceedings. *See* Caymans Exhibit D, Chapter 15 Petition for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code, *In re Charitable DAF Holdco Ltd. (In Official Liquidation)*, No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1. The full evidentiary record, thus, came into focus only in December 2025, less than three months before Dugaboy filed its Rule 60(b) motion. *See* May 11, 2026 Hr'g Tr. at 78:4–21 (App. 085); Dkt. 4513 (Dugaboy's Feb. 9, 2026 Rule 60(b) motion).

On June 15, 2026, after full briefing and a three-day evidentiary hearing, this Court denied Dugaboy's motion to vacate. Dkt. 4678. With respect to the request for relief under Rule 60(b)(2), the Court ruled that the evidence presented at the May 2026 hearing was not "newly discovered" because Mr. Dondero had introduced evidence of Mr. Patrick's misconduct in an affidavit he filed on April 16, 2025—before the Rule 9019 hearing in June 2025. *Id.* at 10–11. The Court also denied relief under Rule 60(b)(3) on the grounds that the provision requires fraud or misconduct to have occurred in the judicial proceedings itself, and that Highland had not provided misleading or incomplete answers to inquiries in discovery leading to the Rule 9019 order. *Id.* at 12–13. Finally, the Court denied relief under Rule 60(b)(6) by determining that Dugaboy did not present a basis for equitable relief that was separate from the grounds presented for Rules 60(b)(2) and 60(b)(3), and by determining that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain. *Id.* at 13–14.

## III. <u>LEGAL STANDARD</u>

While the Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration, a party seeking such relief may file a request that "may be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment or

order." *See Shepherd v. Int'l Paper Co.,* 372 F. 3d 326, 328 n. 1 (5th Cir. 2004) (citing *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998)). If such a motion is filed within 14 days of the judgment or order of which the party complains, it is considered a Rule 59(e) motion. *In re Kakal*, 2019 WL 1868626, at *1 (S.D. Tex. Bankr. 2019) (citing *Shepherd*, 372 F.3d at 328 n.1). *See also* Fed. R. Bankr. P. 9023 (incorporating Fed. R. Civ. P. 50(e) and requiring that a Rule 59(e) motion "be filed within 14 days after the judgment is entered). Importantly, motions to alter or amend a judgment can be made with respect to orders denying or granting motions to vacate prior judgments under Rule 60(b). *See, e.g.*, *Charles L.M. v. N.E. Indep. Sch. Dist.*, 884 F.2d 869 (5th Cir. 1989); *Pruett v. Stephens*, 608 Fed. Appx. 182, 184 (5th Cir. 2015); *see also Inryco, Inc. v. Metro. Engr. Co., Inc.*, 708 F.2d 1225, 1232 (7th Cir. 1983) ("[D]enial of a Rule 60(b) motion is itself an appealable judgment…. Therefore, a losing party may challenge that judgment with a motion to alter or amend under Rule 59(e)"). Here, the Denial Order[1] was issued on June 15, 2026. Dugaboy files this Motion on June 29, 2026, fourteen days after the Denial Order's issuance. Accordingly, this Motion is a timely Fed. R. Civ. P. 59(e) motion under Fed. R. Bankr. P. 9023.

A Rule 59(e) motion "calls into question the correctness of a judgment," *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002), and "gives a district court the chance to rectify its own mistakes in the period immediately following its decision." *Banister v. Davis*, 590 U.S. 504, 508 (2020). Under Fed. R. Civ. P. 59(e), amending or altering a judgment is appropriate (1) when there has been an intervening change in the controlling law; (2) where the movant presents newly discovered evidence that was previously unavailable; or (3) to correct a manifest error of law or

[1] The Denial Order of Dugaboy's Rule 60(b) motion is a final, appealable order. *See Silas v. Sears, Roebuck & Co.*, 586 F.2d 382, 384 n.2 (5th Cir. 1978).

fact. *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012). In the Fifth Circuit, a "manifest error of fact" sufficient to warrant Rule 59(e) relief is one that is "an obvious mistake or departure from the truth." *Williams v. French*, 2024 WL 3929894, at *3 (S.D. Tex. Aug. 23, 2024) (citing *Bank One, Texas, N.A. v. Federal Deposit Ins. Corp.*, 16 F. Supp. 2d 698, 712 (N.D. Tex. 1998)). In deciding a Rule 59(e) motion, this Court has "considerable discretion" but must "strike the proper balance between two competing imperatives: (1) finality and (2) the need to render just decisions on the basis of all facts." *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993).

## IV. ARGUMENT

### A. The Evidence of Mark Patrick Having Stolen the Assets of the Charitable DAF Was Not Stated in the April 2025 Dondero Affidavit and Is Evidence Newly Discovered After the 9019 Motion.

Mr. Dondero executed an affidavit on April 16, 2025. *See* Dugaboy Ex. 36 (App. 030–040). Its purpose was to support the three established charities at the top of the Charitable DAF structure in their request that the Cayman Islands Grand Court step in and appoint a neutral to run the key corporate entity at the heart of the structure, The Charitable DAF Fund, L.P.

Without question, that affidavit was not a hagiography of Mark Patrick. It asserted that Mr. Patrick had not been doing a great job when, in addition to his role with the Charitable DAF, he was also working for Skyview, an entity that provides legal and other services to Mr. Dondero's corporate entities.

The Court, however, manifestly erred in determining that the information that later arose from the Cayman proceedings—after the Caymans Liquidators stepped into the shoes of The Charitable DAF Fund, L.P.—was not "newly discovered" because of the assertions in the April 2025 affidavit. There is a yawning chasm between the criticisms of Mr. Patrick on other matters in that April 2025 affidavit and the conclusive and directly germane evidence of his theft of the

Charitable DAF assets—including *the equity position in the Debtor* and a quarter billion dollars in other assets—later uncovered in the Cayman proceedings. Because of the timing of the revelation of that evidence by the Cayman Liquidators, the predecessor bankruptcy judge did not consider this significant evidence of misconduct, directly relevant to the equity interests that were attempting to compromise their claims in front of her. By that point, unbeknownst to anyone but Mark Patrick and his co-conspirators, Mr. Patrick was dealing away stolen property right under the predecessor judge's nose.

i. **<u>The Dondero Affidavit Lacked Any Evidence of Mark Patrick's Theft of the DAF Structure.</u>**

The April 2025 affidavit initiating the Cayman proceedings did not detail Mr. Patrick's theft of the Charitable DAF's assets. It is important to be precise about what the April 2025 affidavit said. That affidavit expressed concerns about two compliance issues in Mr. Patrick's past work, as well as his more recent lack of transparency regarding his operations of the Charitable DAF.

First, in late June 2023, Mr. Patrick sought to have the Charitable DAF make a $10,000 donation to a charity called Creative Hearts TX. Dugaboy Ex. 36 at 4–5 (App. 034–035). His wife and daughter were directors of Creative Hearts. *Id.* at 5 (App. 035). Also in June 2023, Mr. Patrick asked former FBI agent Kevin Cronin and his firm to charge $25,000-$50,000 in fees for financial advisory services and to split the proceeds with him. *Id.* Mr. Cronin promptly informed Mr. Dondero of Mr. Patrick's conduct. Importantly, Mr. Dondero had addressed both of these issues in 2023 with Mr. Patrick and did not seek to remove him from his position at Skyview, his corporate services company, much less from the Charitable DAF. Mr. Dondero believed Mr. Patrick's actions were inappropriate but did not warrant terminating Mr. Patrick. Third, Mr. Patrick contacted one of the charitable entities, The Dallas Foundation, to advise the entity to

exercise a put option on one of its investments in a fund related to Mr. Dondero. *Id.* at 6–7 (App. 036–037). The advice was based on material non-public information Mr. Patrick had gained from his employment at Skyview. *Id.* The Dallas Foundation did not act on the advice, and informed Mr. Dondero. Mr. Patrick resigned from Skyview in October 2024 while Skyview was investigating the facts and potential compliance issues of the episode. *Id.*

With the background of these historical episodes, Mr. Dondero became concerned when Mr. Patrick began to avoid answering the charities' questions regarding the financial condition of the DAF. The affidavit recounted that Mr. Patrick and (who ultimately proved to be) his co-conspirators declined to provide information regarding its financial condition, while promising Mr. Dondero the structure would remain the same. *Id.* at 7–8 (App. 037–038); May 21, 2026 Hr'g Tr. at 144:23–145:1. Mr. Dondero also recounted the bits and pieces of information he had learned regarding recent transactions, including indications that Mr. Patrick had effected a sale of Beacon Mountain (and therefore of its wholly-owned subsidiary Hunter Mountain) for $1 million, but expressly noting that he lacked information regarding the other details of that transaction, including the identity of the buyer. *Id.* at 8 (App. 038). For these reasons, Mr. Dondero supported judicial appointment of a neutral steward for both Charitable DAF Holdco and The Charitable DAF Fund, L.P., who could then make sure that the Charitable DAF entities were being run correctly. *Id.* at 1 (App. 031), 9–10 (App. 039–040). *See also* Dkt. 4534-6 at 1.

Importantly, Cayman law does not require a showing of fraud or misconduct for the appointment of a liquidator. Testimony of Margot McInnis, May 11, 2026 Hr'g Tr. at 71:11–18 (App. 078). Instead, a Cayman court may appoint a liquidator on a petition from a concerned creditor seeking independent review of the winding up of an insolvent company without more allegations. *Id.* ("Broadly, it's – your appointment comes about when a – in an insolvent case

where a creditor or stakeholder petitions the court to appoint an independent person to review the affairs or wind up the company.")

ii. Using Court-Appointed Authority over a Charitable DAF Entity, the Cayman Liquidators Uncover Mr. Patrick's Brazen Theft of Hundreds of Millions of Dollars in Charitable Assets.

What was revealed by the Cayman Liquidators was of a different character and severity far beyond anything mentioned in the April 2025 affidavit. Because the Cayman Liquidators were able to take over management of a Charitable DAF entity, they obtained otherwise confidential records that were in the hands of Cayman government agencies, law firms, accounting firms, and advisors. This unparalleled power revealed that *Mr. Patrick had stolen everything from the four established charities that owned the Charitable DAF* and had stuffed it into his own pocket. The product of the Liquidators' investigation began to be revealed in a July 15, 2025, Statement of Claim. As the chief liquidator testified in this Court, the Statement of Claim itself is not evidence in the Cayman judicial system, and it is not evidence in the United States; it is akin to a complaint—a series of allegations. Testimony of Margot McInnis, May 11, 2026 Hr'g Tr. 73:1–22 (App. 080) (stating a statement of claim requires "reasonable prospect of success on that claim" to initiate liquidation proceedings). But it was backed by evidence that the Liquidators needed Cayman judicial permission or open proceedings to reveal. *Id.* at 77:4–19 (App. 084); 78:6–21 (App. 085) (noting the circumstances which "lift[] the sort of privacy rules governing Cayman proceedings" and allowed the documents in connection with the Statement of Claim to be made public). And that evidence was revealed through later filings in Delaware and in the Cayman Islands by the Liquidators. In the May 2026 hearing, Ms. MacInnis was called to testify and that evidence was authenticated and admitted.

The Cayman Liquidators uncovered:

- That Mr. Patrick had embarked on a complicated scheme, starting in late 2024, to scramble the Charitable DAF by creating a series of new entities. *Id.* at 85:18–21 (App. 086); *compare* Dugaboy Ex. 242 at 2 (App. 064) *with* Dugaboy Ex. 242 at 18 (App. 066).
- That the object of Mr. Patrick's ultimately successful scheme was to exit the Dallas Foundation and three other charities from beneficial ownership—and Mr. Dondero from a say in the use for good works of—more than a quarter billion dollars in assets. May 11, 2026 Hr'g Tr. 128:7–11 (App. 098) (noting that the four original charities were "left with nothing"); Dugaboy Ex. 7 at 8 –9 (App. 012–014); *compare* Dugaboy Ex. 11 at 3 (App. 019) *with* Dugaboy Ex. 12 at 4 (App. 025).
- That the destination of the ill-gotten gains was a sham "charity" run from Mr. Patrick's basement, the so-called "DFW Charitable Foundation." Testimony of Margot MacInnis, May 11, 2026 Hr'g Tr. 106:10–18 (App. 091) ("I understand [DFW Charitable Foundation's headquarters is] at Mark Patrick's residence") 128:12–14 (App. 098) (noting that DFW Charitable received the DAF's assets); *see also* Dugaboy Ex. 8; Dugaboy Ex. 13.
- That, as if stealing all the assets from the charities were not enough, Mr. Patrick was also diverting eight figures in charitable assets into his own bank account, ostensibly as compensation for running the Charitable DAF. Testimony of Margot MacInnis, May 11, 2026 Hr'g Tr. 131:15–23 (App. 101).
- That, if there were any doubt that DFW Charitable is a sham, it is easily dispelled by looking at what DFW has given away: Less than $1 million during its 15 months of sitting on the charitable assets. Testimony of Margot MacInnis, May 12, 2026 Hr'g Tr. 83:18–21 (App. 114). At the same time, Mr. Patrick has used those assets to pay himself and his "directors" 20 times the amount he has given to charity. Testimony of Margot McInnis, May 12, 2026 Hr'g Tr. 82:5–14

(App. 113), 82:25–83:12 (App. 113–114). And he has paid law firms and advisors millions more to arrange and then cover up his fraud. May 12, 2026 Hr'g Tr. 75:13–76:9 (App. 111–112); Dugaboy Ex. 211 at 34 (App. 061).

- That there was zero justification for Mr. Patrick's moves other than enriching himself. To divorce the charities from more than a quarter billion dollars in assets, Mr. Patrick conspired with an accounting firm named ValueScope to paper the transactions. May 11, 2026 Hr'g Tr. 123:6–124:13 (App. 093) (noting that ValueScope's March 2025 valuation of the assets was "materially different from others on the basis that the valuation method changed and the level of discount changed"); *see also* Dugaboy Ex. 11 at 3 (App. 019); Dugaboy Ex. 12 at 4 9App. 025). ValueScope obligingly reversed course in March 2025 from valuations it had provided just a half a year earlier, claiming a cache of assets it said were worth $270 million in September 2024 was now worth just $1.6 million. *Compare* Dugaboy Ex. 11 at 3 (App. 019) *with* Dugaboy Ex. 12 at 4 (App. 025). Mr. Patrick happily paid that much and ran off with hundreds of millions.

- That Mr. Patrick from the earliest days of his scheme took steps to conceal his theft. He instructed his lawyers to create Cayman Islands corporate entities that would be "hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection." Dugaboy Ex. 169 at 1 (App. 042); May 11, 2026 Hr'g Tr. 89:11–17. This resulted in the birth of an alphabet soup of indecipherable corporate entities, such as CDMCFAD LLC and CDH GP, Ltd. May 12, 2026 Hr'g Tr. 48:25–49:7; May 11, 2026 Hr'g Tr. 87:9–23 (App. 090). He deliberately took steps to avoid apprising the charities or anyone else that he was either in the process of stealing or had stolen all Charitable DAF's assets from them. May 12, 2026 Hr'g Tr. 29:17–24 (App. 106); Dugaboy Ex. 204 at 167 (App. 045), 171–72 (App. 049–050), 179 (App. 057).

- That all of this came to a head on March 27, 2025. On that day, Mr. Patrick and his co-conspirators gave the boot to the four historical charities from the "hard to track or trace" corporate entities they had created, by separating those charities from more than a quarter billion dollars in assets for $1.6 million. Highland Ex. 63 at 53. Of course, he did not tell anyone associated with the charities or Mr. Dondero that he had done so. *Id.* at 55.

March 27, 2025, was a momentous day indeed. The exiting of the traditional charities from beneficial ownership of the Charitable DAF's assets was not just theft of the $270 million dollars that had grown from Mr. Dondero's generous donations of historical assets to the Charitable DAF. *Id.* at 53. It was also the event that finally stole the Hunter Mountain Investment Trust and its equity position in the Debtor from the Dallas Foundation. Dugaboy Ex. 242 at 7, 18 (App. 066). In the April 2025 affidavit, Mr. Dondero said there were indications that Hunter Mountain and its residual equity interest in Highland had been sold from its historical structure. Dugaboy Ex. 36 at 8 (App. 038). But he expressly stated he did not know to whom it was sold. *Id*. Prior to the sale, the equity interest in Highland Capital Management resided in the structure to which Mr. Dondero generously gave it, with the Dallas Foundation to receive and (with the input of Mr. Dondero) to deploy the value of that equity position.

This structure is captured in the following chart, which was admitted into evidence:



Dugaboy Ex. 242 at 12 (App. 065).

Mr. Patrick, as it turns out, sold Hunter Mountain to CLO Holdco LLC, an entity organized under the historical Charitable DAF structure. May 12, 2026 Hr'g Tr. at 69:23–25 (App. 110). That sale occurred on February 12, 2025, and brought it into the following ownership structure:




Dugaboy Ex. 242 at 18 (App. 066); *see* Dugaboy Ex. 15 at 1 (App. 027).

Had Mr. Patrick stopped with just there, at least the asset would have resided under the ultimate beneficial ownership of the Dallas Foundation and three other established charities, all with structures that enabled Mr. Dondero to provide input into the ultimate good causes the success of the Debtor's equity position was to serve. But the mortal sin was stealing Hunter Mountain, the equity position in Highland, and the rest of the Charitable DAF assets from those charities in a series of steps, including on March 27, 2025, having been sold into the Charitable DAF structure. And that heist was unknown to Dugaboy or Mr. Dondero at the time of the April 16, 2025 affidavit, its mechanisms and outcomes revealed only later by the work of the Cayman Liquidators. May 11, 2026 Hr'g Tr. at 76:21–77:23 (App. 083–084) (the documents were not available until appointment as a liquidator because it was "private company information"), 172:23–173:1 (App. 102–103) (Cayman Liquidators' investigation began on May 6, 2025).



016524

To the extent the Court in its June 14, 2026, order is determining that, even though Mr. Patrick's massive theft scheme was unknown leading into the Rule 9019 settlement proceedings, Mr. Dondero should have sought Mr. Patrick's removal from his seat at the Hunter Mountain Investment Trust on the basis of the compliance issues detailed in the April 2025 affidavit, that decision would be incorrect. Such arguments would have been met with a louder version of the indecorous guffaws of Highland's appointed managers and their lawyers witnessed in the May 2026 hearings. They would have said that the issues identified in the April 2025 affidavit were minor deviations from best practices at most and had nothing to do with Hunter Mountain itself. That, even if the Hunter Mountain Trust Agreement automatically removes administrators for crimes, or fraud, or breaches of fiduciary duty, there must be some materiality threshold and the lapses ought to have something to do with Hunter Mountain itself. And that, for many of the issues, Mr. Dondero somehow forfeited pursuing remedies for them, because Mr. Dondero learned of them while Mr. Patrick was working for a company associated with Mr. Dondero—Skyview—and tolerated Mr. Patrick retaining his job despite the minor compliance issues. Dugaboy Ex. 36 at 5–6 (App. 035–036).

Of course, Highland's Court-appointed managers could not make any of these arguments with respect to Mr. Patrick's theft of a quarter billion dollars in assets—including the equity stake in Highland—from four established charities. Is it material? Nine figures of thievery counts. Is it germane to Hunter Mountain? Absolutely, the March 27, 2025, fraudulent dispossession of the charities from the Charitable DAF's assets included stealing Hunter Mountain too. Had Mr. Dondero tolerated this theft for too long? Of course not. He pulled the fire alarm with the Court just two days after the Cayman Liquidators released their Statement of Claim, with Dugaboy's motion to stay the judgment. Dkt. 4326 (Dugaboy's July 17, 2025 Motion to Stay 9019 Order).

In the end, Mr. Patrick's earlier deviations from the path of righteousness might have been portrayed as simple disputes between Mr. Dondero and Mr. Patrick about how he handled Mr. Dondero's confidential information or other internecine disputes. But his misconduct with respect to the Charitable DAF—which included the Highland equity position when he struck his March 27, 2025, perfidious final blow—meant the following: , By the time Mr. Patrick arrived at the Court for the Rule 9019 hearing on June 25, 2025, he was attempting to deal stolen assets to the Court-appointed managers of Highland. No court of equity should have tolerated that. The newly discovered evidence of Mr. Patrick's theft is grounds for vacatur not only under Rule 60(b)(2), but also Rule 60(b)(6), which is precisely designed to remedy courts unwittingly having descended into the inequitable misconduct of the parties before it. *See Heirs of Guerra v. United States*, 207 F.3d 763, 767 (5th Cir. 2000) (Rule 60(b)(6) relief available to vacate a judgment where "appropriate to accomplish justice" otherwise not available under the judgment). Bankruptcy courts have a responsibility to avoid that, especially when one of the parties is the appointed manager of the Debtor, installed at judicial urging.

In addition, there is absolutely no support for the proposition that a party somehow waives his contractual rights against certain conduct if he does not press remedies against earlier, materially different, and less severe instances of other breaching conduct. That argument has been tried and rejected by court after court after court. *See e.g., Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1152 (5th Cir. 1981) (prior forbearance in seeking remedies does not waive subsequent breach); *Balfour Beatty Rail, Inc. v. Kan. City S. R.R. Co.*, 173 F.Supp.3d 363 (N.D. Tex. 2016) (continued contractual performance does not operate to waive prior breach); *In re J.A.R. Concrete, Inc.*, 673 B.R. 663, 715 n.294 (W.D. Tex. 2025) ("forbearance does not permit reliance" on waiver by breaching party); *In re Endeavour Highrise, L.P.*, 432 B.R. 583, 655-56 (Bankr. S.D. Tex.

2010) ("[N]either an innocent party's continuing performance following a breach of contract nor his efforts to induce a breaching party to perform under a defaulted contract constitute a waiver."). Nor does Rule 60(b)(2) supply any analogous principle supporting waiver. It speaks to the presence of "newly discovered evidence." It does not disqualify that newly discovered evidence as grounds for relief simply because evidence of other lesser or unrelated wrongful conduct was already known at the time of the prior judgment.

B. Relief is Warranted under Rule 60(b)(3) Due to Mark Patrick's Omissions, Misrepresentations, and Misconduct During Highly Restricted Discovery.

In addition, Mr. Patrick's omissions and misrepresentations are actionable under Rule 60(b)(3) because obstructed discovery into his theft. Rule 60(b)(3) permits relief due to "fraud (whether intrinsic or extrinsic), misrepresentation, or misconduct by and opposing party[.]" Fed. R. Civ. P. 60(b)(3). Such relief is warranted when "the opposing party withheld information called for by discovery or willfully committed perjury." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131,156–57 (5th Cir. 2004).

Here, most notable were Mr. Patrick's obstructive conduct and lies during his June 23, 2025, deposition, just two days before the Rule 9019 hearing, which included:

- His testimony that he could not remember whether one of his new entities—CDMCFAD, LLC—was owned by the four traditional charities. We know now that Mr. Patrick had used this new entity to steal the charitable assets and had put it under the total ownership and control of his sham charity, DFW Charitable. *Compare* Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 7:22–25 (App. 068) ("Yeah, again, without corporate documents that you can present to me, I – you know – I – I just don't want to be inaccurate" when asked who owned CDMCFAD, LLC) *with* Dugaboy Hr'g Ex. 35 (June 25, 2025 Hearing Transcript) at 174:8–14 (App. 074) ("I am hundred percent that DFW Charitable Foundation is the ultimate beneficial

owner" of CDMCFAD, LLC). Of course, Mr. Patrick was not having a memory lapse, as the Court astutely concluded at the June 25, 2025 hearing. Dugaboy Hr'g Ex. 35 (June 25, 2025 Hearing Transcript) at 182:4–15 (App. 074) ("I can see what's happening here or I have an impression of what's happening here . . . I feel like you're feigning confusion . . . I need you to speed up your answers and not be confused about things you shouldn't be confused about."). He orchestrated every detail of this theft, conducting the orchestra of lawyers and agents to steal a quarter billion dollars from established charities.

- His testimony that he could not remember whether he had changed the general partner of The Charitable DAF Fund, L.P. (the Charitable DAF entity directly on top of all the assets). Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 7:5–9 (App. 068) ("I don't – I don't recall precisely and I, you know, I want – I want to be – when I give you an answer, a hundred percent accurate" when asked about the general partner of The Charitable DAF Fund, L.P.); 13:6–18 (App. 070) ("Yeah, and then this is where my memory is – is – I'd have to kind of revisit the actual organizational documents to give you a confident a hundred percent answer" when asked about the general partner of The Charitable DAF Fund, L.P.). Of course, his lack of recollection was a lie. Mr. Patrick had secretly substituted in his own entity as general partner of the DAF structure on March 7, 2024. Dkt. 4521-1 (Statement of Claim) at 28.

- His testimony that he did not know whether DFW Charitable, the supposed charity Mr. Patrick had set up and run from his home address with almost nonexistent charitable activities, had any ownership in the CDMCFAD entity. Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 8:1–6 (App. 068) ("Yeah, again, you know, Mr. Lang, you know, there are several entities in this structure, and I – I just don't want to go beyond what I have a hundred percent knowledge of" when asked whether DFW Charitable owned CDMCFAD). Of

course, this too was a lie. After all, just a few weeks earlier, on March 27, 2025, he had thrown the charities out of any beneficial interest in anything and left DFW Charitable alone at the top with all the assets (to the extent he had not paid them to himself in more than $10 million in compensation).

- His misleading answers to questions about who owned Hunter Mountain. He testified that Beacon Mountain was the ultimate owner of Hunter Mountain when in fact multiple entities, including DFW Charitable, sat in the ownership chain above both Hunter Mountain and Beacon Mountain. Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 11:10–19 (App. 069) ("Beacon Mountain LLC" owns Hunter Mountain).

Mr. Patrick's omissions and misrepresentations suffice by themselves to warrant relief under Rule 60(b)(3), because Mr. Patrick is an "opposing party" by virtue of his control over Hunter Mountain, which is an opposing party for purposes of the Rule 9019 settlement proceedings. *See, e.g.*, *Rismed Oncology Systems, Inc. v. Baron*, 297 F.R.D. 637, 656 (N.D. Ala. 2014) (applying Rule 60(b)(3) to fraudulent conduct by party entity's corporate officers who were not named parties). Hunter Mountain is a party in interest in this bankruptcy, and it has been specifically adverse to Dugaboy throughout the Rule 9019 settlement proceedings. Hunter Mountain was one of the two parties to the 9019 Settlement and argued strenuously in favor of its approval, which Dugaboy opposed. And no one disputes that Mr. Patrick controlled Hunter Mountain. Accordingly, Mr. Patrick's fraud is attributable to Hunter Mountain and Rule 60(b)(3) applies.

Furthermore, the discovery misconduct was not limited to Mr. Patrick. Highland's Court-appointed managers—who are unquestionably "opposing parties" under Rule 60(b)(3)—also were eager to throw parties off the scent. Highland was asked for documents pertinent to its review of the propriety of Mr. Patrick acting on behalf of Hunter Mountain. It produced a string of corporate

documents, all relating to the historical structure of companies leading to The Dallas Foundation's beneficial interest. Cross-Examination of James Seery, May 21, 2026 Hr'g Tr. at 46:8–52:6 (App. 118–124) (questions and answers comparing the list of documents (Dkt. 4277) that he testified at the 9019 proceedings as those he reviewed to establish Mr. Patrick's current authority to act on behalf of the Hunter Mountain Investment Trust to the historical ownership structure of Hunter Mountain and its new structure under the DAF); *see also* Closing Deck, Demonstrative Exhibit 292, at Slides 63–65 (doing same). If those Highland managers were aware that Mr. Patrick had sold Hunter Mountain and the Debtor equity position into the Charitable DAF and restructured it, they withheld that documentation in discovery and gave misleading testimony when testifying about Mr. Patrick's authority to act. *See* Dugaboy Ex. 35 at 99:13–20 (Seery testifying that Mr. Patrick had "complete authority over" Hunter Mountain and the associated entities). During trial for the Rule 60(b) Motion, Mr. Seery testified that he had only reviewed the organizational documents identified in Highland's June 24, 2025, exhibit list for the 9019 Settlement Hearing. *See* Cross-Examination of James Seery, May 21, 2026 Hr'g Tr. at 47:14–24 (App. 119). Those documents related to Hunter Mountain as part of the stack of companies as originally formulated by Mr. Dondero in 2011, including Atlas IDF and the Rand PE Fund. *Id.* at 52:7–11 (App. 124). Yet by that time, Hunter Mountain was no longer within the previous structure, having been sold to the Charitable DAF stack of entities on February 12, 2025. Mr. Seery agreed that he was aware that Beacon Mountain had sold Hunter Mountain by the consummation of the 9019 Settlement but requested no additional documentation of the Charitable DAF structure to confirm Mr. Patrick's authority to enter into the settlement. *Id.* at 52:7–10 (App. 124); *but see id.* at 55:17–23 (App. 127).

Even if Mr. Patrick had not omitted or misrepresented his knowledge about the DAF restructuring he had engaged in, the highly truncated discovery process prior to the Rule 9019 Settlement hearing could not have produced the evidence in the later-released Statement of Claim. Discovery lasted all of two weeks from June 10 to June 25, 2025.[2] Dkt. 4678 at 12.

More importantly, the Cayman evidence would not have popped up in this heavily truncated process. The theft of the Charitable DAF assets occurred, for the most part, overseas, and obtaining discovery from foreign corporate custodians would have been impossible in the time allotted. On top of that, the undisputed evidence in the record is that the information that the Cayman Liquidators uncovered was confidential under Cayman law and could only have been unearthed by the Liquidators stepping into the shoes of a Charitable DAF entity and using that authority to request it. May 11, 2026 Hr'g Tr. at 77:4–19 (App. 084) (Official Liquidator Margot MacInnis testifying that company documents were "private" or otherwise confidential and were only accessible to her because as liquidator she "steps into the shoes of the company"). This is equally true of information in the hands of Cayman government agencies, regarding corporate formation and transactions. *Id.* Engagement with a foreign judicial system through the Hague Convention on the Taking of Evidence is a time-consuming and sometimes fruitless endeavor.

### C. <u>**Rule 60(b)(6) Relief is Warranted Absent Restoration of the Charitable Structures to Avoid Rewarding Mark Patrick's Misconduct.**</u>

At its core, denying the Rule 60(b) motion because Dugaboy should have discovered Mr. Patrick's misconduct sooner rewards only the intentional concealment of the scheme here and is exactly what Mr. Patrick intended. This Court, particularly as a court of equity, must consider the "need to render a just decision on the basis of all facts." *Banning Co., Inc.*, 6 F.3d at 355. Were

[2] Because of the Court's requirement to produce exhibit and witness lists three days prior to a hearing, effectively discovery lasted only 12 days.

the Court to deny this motion, it would not have considered all the facts and, instead, it would reward the very misconduct that concealed the evidence which necessitated this briefing in the first place.

We now know, due to the evidence adduced in the May 2026 hearings before the Court, that Mr. Patrick was dealing away stolen property when he "settled" with Highland's appointed managers and transferred to them a bundle of the rights of Highland's residual equity. If the Court had been fully informed, the Court should not have approved the transfer of this property from the corporate entities to which it was secreted, to Highland's managers, who would claim some level of protection from it being recovered, due to the settlement approval. It would be inconsistent with the Court's role as one of equity and with a charge to do justice.

Whatever the merits of bankruptcy courts taking a light touch when evaluating settlements between the Debtor and third parties,[3] this Court has a special responsibility to make sure managers of a Debtor appointed at the Court's insistence and separating the Debtor from its owners are getting involved with parties who have engaged in misconduct. The Court to grant relief today need not determine that the appointed managers of Highland knew about the misconduct that brought Mr. Patrick to its doorstep. The evidence presented in the motion to vacate now shows that court-appointed managers and the Court should have stayed away from Mr. Patrick, a man that should have been acting in the best interests of four established charities and came to the Court through misconduct and fraud, acting only for himself.

The Denial Order points out that vacatur of the 9019 Settlement Approval Order would not undo Mark Patrick's misconduct as a reason why Rule 60(b)(6) relief is inappropriate. Denial

---

[3] And this touch is not as light as some have claimed, as bankruptcy courts ought not and do not approve settlements when one of the parties or the settlement arrives at the court through fraud, collusion, or bad faith conduct. *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).

Order at 13–14. That misses the point. Dugaboy does not seek to unwind the restructuring—at least before this Court—but seeks to vacate the 9019 Settlement. This Court, as a court of equity, should not reward Mr. Patrick with approval of a highly favorable settlement agreement gained as a result of his illusory control, control he was automatically divested of when he absconded with the charitable entities' assets for his own benefit. Mr. Patrick's statement that he would retain control even if the DAF restructuring were rescinded is false, as effectuating a complex scheme to steal from the DAF would constitute cause to automatically remove Mr. Patrick as administrator. *See* Dugaboy Ex. 1 at 1 (App. 002). His further assertion that he would (or even could) reappoint himself as administrator should he be removed for fraud or theft from the DAF shocks the conscience and offends this Court's equitable powers to assist such misconduct by blessing the 9019 Settlement Agreement. May 12, 2026 Hr'g Tr. at 103:3–6.

## V. CONCLUSION

Rule 59(e) exists to permit a court to correct factual mistakes before appellate review becomes necessary. The Denial Order rests upon one such mistake. It treats evidence first disclosed after the Rule 9019 hearing as though Dugaboy possessed it before that hearing. The record establishes otherwise. Because the Court's Rule 60(b)(2) analysis depends upon that erroneous factual premise, reconsideration is warranted. It should also be granted under Rules 60(b)(3) and 60(b)(6) for the reasons discussed above. Denying this motion would only reward the very misconduct that concealed the evidence which necessitated this briefing in the first place.

Date: June 29, 2026

By: */s/ Michael J. Edney*
Michael J. Edney
Martha Stolley
Avery Joseph Welker
MORGAN LEWIS BOCKIUS LLP
1111 Pennsylvania Avenue NW

Washington, DC 20004
Michael.edney@morganlewis.com
Martha.stolley@morganlewis.com
Avery.welker@morganlewis.com
T: 202-739-3000
F: 202-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

***Counsel for The Dugaboy Investment Trust***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 29, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ Michael J. Edney
Michael J. Edney

Michael J. Edney
MORGAN LEWIS BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj |

**THE DUGABOY INVESTMENT TRUST'S INDEX IN SUPPORT OF MOTION FOR RECONSIDERATION FROM ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

The following exhibits are submitted in support of the Dugaboy Investment Trust's Motion for Reconsideration from Order Denying Motion for Relief from Order and Motion to Vacate:

| Description | Page No. |
|---|---|
| Dugaboy Ex 001 - 2015-12-17 HMIT Trust Agreement | App. 001 |
| Dugaboy Ex 007 - 2025-07-15 Shields Work Plan | App. 005 |
| Dugaboy Ex 011 - 2024-09-30 Valuation Analysis of 100 Participation Shares of DAF HoldCo, Ltd. | App. 015 |

| Description | Page No. |
|---|---|
| Dugaboy Ex 012 - 2025-03-25 Valuation Analysis of Certain Participation Shares of DAF HoldCo, Ltd. | App. 020 |
| Dugaboy Ex 015 - 2025-02-12 Membership Interest Purchase Agreement | App. 026 |
| Dugaboy Ex 036 - 2025-04-09 Dondero Affidavit | App. 030 |
| Dugaboy Ex 169 - 2024-02-05 Email-Shields Legal Group_Mark Patrick | App. 041 |
| Dugaboy Ex 204 - 2025-07-01 Texas Business Court Petition | App. 043 |
| Dugaboy Ex 211 - 2025-08-19 Aff & Exh Index-MacInnis | App. 059 |
| Dugaboy Ex 242 - 2024-03-06 DAF-Rand Structure Chart | App. 063 |
| June 23, 2025 Transcript – Highland Ex. 58 | App. 067 |
| June 25, 2025 Transcript – Dugaboy Ex. 35 | App. 072 |
| May 11, 2026 Transcript | App. 077 |
| May 12, 2026 Transcript | App. 105 |
| May 21, 2026 Transcript | App. 116 |

# EXHIBIT 1

# TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this "Trust Agreement"), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor"), John Honis as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee").

1. Definitions. Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to "the Agreement" or "this Agreement" are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

"Account" means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in his sole and absolute discretion.

"Delaware Act" means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"Honis Cause" means conduct by Honis, in any capacity, amounting to (i) Honis's conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis's using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

"Honis Trigger Event" means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis's employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16. Honis agrees to give the Partnership ten (10) days' written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2. Scope. This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising. Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3. Name; Certificate of Trust. The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided. The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act. It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4. Account Establishment. The Administrator shall establish and control the Account. The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5. Beneficial Owner; Liability of Beneficial Owner. The beneficial owner of the trust shall be Beacon Mountain LLC. Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6. Title to Trust Property. Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator. Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

7. Purpose and Powers of the Trust; Administrator's Powers. The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement. The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust. The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement. The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8. Fiduciary Duties of Administrator. (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b) The Administrator agrees to perform his duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust. For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c) To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for his good faith reliance on the provisions of this Trust Agreement.

(d) Unless otherwise expressly provided herein:

(i) whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii) whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

# EXHIBIT 7

Plaintiff
M MacInnis
First Affidavit
15 July 2025
Exhibit MM-1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**EXHIBIT MM-1**

---

This is the Exhibit shown to me and marked "**MM-1**" to the First Affidavit of **MARGOT MACINNIS**.

Sworn before me this 15TH day of July 2025

Rachel Baxendale
Notary Public - Cayman Islands

Notary Public

Commission expires on 31 January 2026

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for
309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/

**INDEX TO EXHIBIT MM-1**
**TO FIRST AFFIDAVIT OF MARGOT MACINNIS**

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 1. | Company's Memorandum and Articles | 20 February 2025 | 1-37 |
| 2. | Highland Kansas Foundation – Certificate of Incorporation | 23 November 2021 | 38-40 |
| 3. | Highland Kansas Foundation – By-laws | Undated | 41-59 |
| 4. | Highland Dallas Foundation – Certificate of Incorporation | 23 November 2021 | 60-62 |
| 5. | Highland Dallas Foundation – By-laws | Undated | 63-77 |
| 6. | Highland Santa Barbara Foundation – Certificate of Incorporation | 23 November 2021 | 78-80 |
| 7. | Highland Santa Barbara Foundation – By-laws | Undated | 81-95 |
| 8. | Procedures for Establishment and Operation of Funds and Supporting Organizations | Undated | 96-122 |
| 9. | Highland Dallas Foundation – IRS Determination Letter | 19 January 2013 | 123-124 |
| 10. | Highland Santa Barbara Foundation - IRS Determination Letter | 12 February 2013 | 125-127 |
| 11. | Highland Kansas Foundation - IRS Determination Letter | 21 March 2013 | 128-129 |
| 12. | Highland Kansas City Foundation - Legal Relationship Agreement | 30 November 2011 | 130-132 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 13. | Highland Dallas Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 133-140 |
| 14. | Highland Santa Barbara Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 141-147 |
| 15. | Charitable DAF Fund, LP - LPA | 11 March 2024 | 148-165 |
| 16. | CLO HoldCo - Expense report of as of 30 June 2024 | 30 June 2024 | 166-169 |
| 17. | Letter from Stinson LLP to the JOLs | 8 May 2025 | 170-173 |
| 18. | NexPoint Capital, Inc. – Proxy Statement | 7 May 2025 | 174-196 |
| 19. | NexPoint Real Estate Strategies Fund – Prospectus | 30 April 2025 | 197-333 |
| 20. | Complaint - Liberty CLO HoldCo, Ltd v Nancy Dondero and others (United States District Court for the State of Delaware) | 28 February 2025 | 334-345 |
| 21. | CDHC Royse City Land, LLC – Property Tax Assessments | Various | 346-356 |
| 22. | CDHC Assets, LLC - Property Tax Assessments | May 2025 | 357-368 |
| 23. | CDHC Fort Worth Land, LLC - Property Tax Assessments | Various | 369-378 |
| 24. | CDHC Stewart Creek, LLC – Property Tax Assessment | 29 May 2025 | 379 |
| 25. | Rand Advisors LLC – Form ADV | March 2025 | 380-408 |
| 26. | Rand Advisors LLC – Brochure | March 2025 | 409-434 |
| 27. | DFW Charitable Foundation – Certificate of Incorporation | 9 December 2024 | 435-437 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 28. | Email from Shields Legal to Mr Patrick | 5 February 2024 | 438 |
| 29. | Structure chart showing the JOLs' understanding of the Fund holding structure prior to the Relevant Transactions | Undated | 439 |
| 30. | Structure chart showing the JOLs' understanding of the Fund holding structure after the Relevant Transactions | Undated | 440 |
| 31. | No Confidence Letter | 11 November 2024 | 441-442 |
| 32. | Email from Mr Murphy to Mr Patrick | 26 November 2024 | 443-447 |
| 33. | Email from Walkers to the Directors | 27 November 2024 | 448-453 |
| 34. | 18 December Resolution | 18 December 2024 | 454-460 |
| 35. | CDM Assignment | 18 December 2024 | 461-466 |
| 36. | CDMCFAD, LLC LLC Agreement | 18 December 2024 | 467-494 |
| 37. | Walkers' Draft Advice | February 2025 | 495-499 |
| 38. | Share Issuance Resolution | 7 February 2025 | 500-524 |
| 39. | Carrington Coleman Email | 18 December 2024 | 525-526 |
| 40. | Letter Agreement | 27 March 2025 | 527-531 |
| 41. | Manager Consent (Admission and Redemption Documents exhibited) | 27 March 2025 | 532-688 |
| 42. | Resolution of the Directors (Redemption) | 2 April 2025 | 689-691 |
| 43. | Resolution of the Directors (Assignment) | 2 April 2025 | 692-693 |
| 44. | Expenses Table | Undated | 694 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 45. | Resolution of the Directors (Mr Patrick's Salary) | 13 September 2024 | 695-696 |
| 46. | Resolution of the Directors (Mr Patrick's LTI Payment and Annual Discretionary Bonus) | 1 October 2024 | 697-704 |
| 47. | Employment Agreement | 24 March 2021 | 705-722 |
| 48. | Santa Barbara Foundation - Audited Financial Statements (year ended 31 December 2023) | 5 September 2024 | 723-750 |
| 49. | Valuescope Report | 11 April 2024 | 751-809 |
| 50. | Valuescope Report | 7 January 2025 | 810-864 |
| 51. | Valuescope Report | 26 March 2025 | 865-939 |
| 52. | Carrington Coleman Memo | 25 March 2025 | 940-956 |
| 53. | IRS Complaint | 20 March 2025 | 957-973 |
| 54. | FTI Report | 27 March 2025 | 974-987 |
| 55. | Mercer Report | 26 August 2024 | 988-1007 |
| 56. | H&B Memorandum | 9 July 2021 | 1008-1012 |
| 57. | Opinion (Mr Tony Beswetherick KC) | 5 March 2025 | 1013-1038 |
| 58. | Email from PwC to Walkers | 11 February 2025 | 1039-1057 |
| 59. | Email from Mr Patrick to Walkers | 17 March 2025 | 1058-1074 |
| 60. | Email chain between FTI and Walkers | 26 March 2025 | 1075-1092 |
| 61. | Letter from Campbells to the JOLs | 16 May 2025 | 1093-1095 |
| 62. | Letter from Johnstone Law to Campbells | 30 May 2025 | 1096-1097 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 63. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 30 May 2025 | 1098-1112 |
| 64. | Letter from Johnstone Law to Campbells | 5 June 2025 | 1113-1116 |
| 65. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 9 June 2025 | 1117-1124 |
| 66. | Letter from Maples to Campbells (enclosing draft protocol) | 19 June 2025 | 1125-1136 |
| 67. | Letter from Campbells to Maples (enclosing Revised Campbells Draft Protocol) | 29 June 2025 | 1137-1170 |
| 68. | Email from Kobre & Kim to Maples | 30 June 2025 | 1171-1173 |
| 69. | Email from Baker & Partners to Maples | 30 June 2025 | 1174-1176 |
| 70. | Texas Petition | 1 July 2025 | 1177-1422 |
| 71. | Texas Petition – Proposed Order | Undated | 1423-1426 |
| 72. | Second Rule 11 Agreement | 11 July 2025 | 1427-1429 |
| 73. | DFW Charitable Foundation – Delaware Division of Corporations Search Results | Undated | 1430 |
| 74. | CDMCFAD, LLC – Delaware Division of Corporations Search Results | Undated | 1431 |
| 75. | Company's Certificate of Incorporation | 27 October 2011 | 1432 |
| 76. | Shields Legal – Memorandum – Work Plan | 9 November 2023 | 1433-1440 |
| 77. | Letter from Seyfarth Shaw LLP to the IRS | 1 May 2025 | 1441-1446 |

# MEMORANDUM – WORK PLAN[1]

RE: Work Plan, Scope of Work, and Deliverables

DATE: November 9, 2023

---

This Memorandum is intended to be informational and provide guidance. It sets forth the work plan, scope of work, and requested deliverables for your review of matters relating to the following entities (highlighted in red). We would like your review to focus on the entities highlighted. As a general overview, we are looking for memorandums and opinions relating to potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc., as further outlined below and to be flagged as part of your review.




I. **LEGAL RESEARCH/ POTENTIAL LITIGATION ISSUES[2]**

a. <u>Transfer of 100% of Management Shares in Charitable DAF Holdco, Ltd., and 100% ownership interest in Charitable DAF GP, LLC, by Grant Scott to Mark Patrick.</u>

---

[1] This Memorandum is attorney worked product, privileged, and confidential. Neither it nor its contents may be shared in any manner without express written permission from Shields Legal Group, P.C.
[2] The client will require a written agreement detailing the scope of work (this may be used as an attachment or reference) and hourly rates.

1. Confirm each of these transfers is valid and enforceable under Cayman law?
2. Is consideration a requirement under Cayman law?
3. If so, did each transfer have consideration under Cayman law?
4. Note: we understand there was no monetary consideration for each transfer, but there were tax considerations for this transfer including potential future tax liability. Donor also implicitly consented to the transfer of the voting shares by not objecting since the transfer.
5. Analyze whether holders of the participation shares in org chart have legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.?
6. Analyze whether Donor has legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.

ii. **Priority: high[3].**

iii. **Work product: legal opinion[4] and/or memorandum.**

1. **Note: we may need to rely on opinions and memoranda in potential future disputes.**

iv. **Anticipated attorney hours to completion: 30.**

b. Who would have standing under Cayman law for alleged corporate malfeasance or assert lack of corporate control from the transfers? Specifically, we want to understand third parties' abilities (in addition to regulators' abilities).

---

[3] Guides for priority:
-High: response requested within two weeks;
-Medium: response requested within four weeks; and
-Low: response requested within six weeks.
[4] Legal opinions and memorandums should include citations to and copies of relevant and applicable authorities.

i. **Priority: high.**

ii. **Work product: legal opinion and/or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

c. What are defenses under Cayman law – estoppel, waiver, statute of limitations, consent, others?

i. **Priority: high.**

ii. **Work product: legal opinion and/or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

d. Is there a corporate alter ego concept under Cayman law, and if so, what are defenses to it?

i. **Priority: high.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

**II. CORPORATE REVIEW**.

a. Top-down review of each entity with respect to corporate structure, management, ownership, capitalization, and voting.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 30.**

b. Written confirmation that the DAF is not a "regulated entity" under Cayman law and not subject to those compliance requirements. To reiterate, the DAF is not a "Fund" in the traditional sense: (i) there is no PPM and (ii) there are no subscribers/investors.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

# EXHIBIT 11

# VALUATION ANALYSIS OF
# 100 PARTICIPATION SHARES OF
# CHARITABLE DAF HOLDCO, LTD

AS OF
SEPTEMBER 30, 2024

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd

VALUESCOPE
a marshall + stevens company

**VALUESCOPE**
a marshall + stevens company

January 7, 2025

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

***RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[1] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

---

1 The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[2] The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of September 30, 2024
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd
- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope, Inc.

ValueScope, Inc.

# EXHIBIT 12

# VALUATION ANALYSIS OF
# CERTAIN PARTICIPATION SHARES OF
# CHARITABLE DAF HOLDCO, LTD

AS OF
MARCH 25, 2025

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

***RE: Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[1]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.

---

[1] Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the DAF will continue as a going concern.[2] The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Participation Shares.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's management shareholder ("Management"). To understand the environment in which DAF operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo, Ltd. as of September 30, 2024
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd, amended and restated as of January 24, 2024

---

2 The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

- Information regarding the Company's history and current operations
- Historical distributions paid to the holders of the Subject Interest
- The organizational structure chart for Charitable DAF HoldCo, Ltd
- Discussions with the Company's Management
- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024
- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date
- An interview with Management regarding expectations for future distributions
- An application of appropriate valuation techniques and procedures, including the income approach
- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | **Value** | **Reference** |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | **Shares** | **Fair Market Value** |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope

ValueScope, LLC

# EXHIBIT 15

Execution Version

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as of February 12, 2025, is entered into between RAND PE FUND I, L.P., a Delaware limited partnership ("**Seller**") and CLO HOLDCO, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

(A) WHEREAS, Seller owns all of the issued and outstanding membership interests (the "**Membership Interests**"), of BEACON MOUNTAIN, LLC, a Delaware limited liability company (the "**Company**"); and

(B) WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Membership Interests, subject to the terms and conditions set forth herein.

(C) NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined herein), Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in and to the Membership Interests, free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance ("**Encumbrance**"), for the consideration specified in Section 1.02.

**Section 1.02 Purchase Price.** The aggregate purchase price for the Membership Interests shall be $1,000,000.00 (the "**Purchase Price**"). The Buyer shall pay the Purchase Price to Seller at the Closing (as defined herein) in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on Schedule 1.02 hereto.

**Section 1.03 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") remotely by exchange of documents and signatures (or their electronic counterparts). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at noon on the Closing Date.

**Section 1.04 Transfer Taxes.** Buyer shall pay, and shall reimburse Seller for, any sales, use or transfer taxes, documentary charges, recording fees or similar taxes, charges, fees, or expenses, if any, that become due and payable as a result of the transactions contemplated by this Agreement.

**Section 1.05 Withholding Taxes.** Buyer shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable law. Buyer shall provide Seller with written notice of its

intent to withhold prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by law. dTo the extent that amounts are so withheld and paid over to the appropriate tax authority by the Buyer, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made.

**Section 1.06 Allocation of Company Income and Loss.** Buyer and Seller shall request that the Company allocate all items of Company income, gain, loss, deduction, or credit attributable to the Membership Interests for the taxable year of the Closing based on a closing of the Company's books as of the Closing Date.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE II are true and correct as of the date hereof. For purposes of this Article II, "Seller's knowledge," "knowledge of Seller," and any similar phrases shall mean the actual knowledge of those persons listed on Schedule 2 of the Schedules.

**Section 2.01 Organization and Authority of Seller; Enforceability.** Seller is a limited partnership duly organized, validly existing and in good standing under the laws of the state of Delaware. Seller has full limited partnership power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited partnership action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution, and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

**Section 2.02 No Conflicts; Consents.** The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of limited partnership, limited partnership agreement, or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to Seller, except where the violation or conflict would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party, except where the conflict, violation, default, termination, cancellation, modification, or acceleration would not, individually or in the aggregate, have a

material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (d) result in any violation, conflict with or constitute a default under the Company's organizational documents (the "**Beacon Organizational Documents**"); or (e) result in the creation or imposition of any Encumbrance on the Membership Interests. No consent, approval, waiver, or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery, and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby, except such consents, approvals, waivers, or authorizations which would not, in the aggregate, have a material adverse effect on the Seller's ability to consummate the transactions contemplated hereby on a timely basis.

**Section 2.03 Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Membership Interests; or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement, except any Actions that would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 2.04 Financial Statements.** True, correct, and complete copies of any financial statements requested by the Buyer (collectively, the "**Financial Statements**") have been provided to Buyer. To Seller's Knowledge, the Financial Statements, if any, are true, correct, and complete.

**Section 2.05 Ownership of Membership Interests.**

(a) Seller is the sole legal, beneficial, record, and equitable owner of the Membership Interests, free and clear of all Encumbrances whatsoever.

(b) To Seller's Knowledge, the Membership Interests were issued in compliance with applicable laws. To Seller's Knowledge, the Membership Interests were not issued in violation of the organizational documents of the Company or any other agreement, arrangement, or commitment to which Seller or the Company is a party and are not subject to or in violation of any preemptive or similar rights of any Person.

(c) Other than the organizational documents of the Company, there are no voting trusts, proxies, or other agreements or understandings in effect with respect to the voting or transfer of any of the Membership Interests.

**Section 2.06 Beacon Organizational Documents.** The Seller has provided Buyer a true, correct, and complete copy (including all amendments and modifications) of the Beacon Organizational Documents, which agreement is in full force and effect and is the only agreement in effect with respect to the matters described therein.

**Section 2.07 Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

# EXHIBIT 36

Digitally signed by Advance Performance Exponents Inc
Date: 2025.04.16 20:39:55 -05:00
Reason: Apex Certified
Location: Apex



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. OF 2025 ( )**

**IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO LTD AND THE CHARITABLE DAF FUND LP**

---

**AFFIDAVIT OF JAMES DAVID DONDERO**

---

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, **MAKE OATH AND SAY** as follows:

1. I am the President of NexPoint Advisors, L.P. (***NexPoint***), an investment advisor registered with the U.S. Securities and Exchange Commission (***SEC***). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this affidavit in support of the petition (the ***Petition***) filed by the Supporting Organizations (as defined below) seeking the winding up on the just and equitable basis of Charitable DAF HoldCo, Ltd (the ***LP***) and the Charitable DAF Fund, LP (the ***Fund***) pursuant to section 92(e) of the Companies Act (2025 Revision) (the ***Act***) and Order 3, rule 3 of the Companies Winding Up Rules (2025 Consolidation) (the ***CWR***).

3. I make this affidavit from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4. Now produced and shown to me and marked "**JDD-1**" is a bundle of true copy documents to which I refer in this affidavit. References to page numbers in this affidavit are references to that exhibit unless otherwise specified.

**BACKGROUND**

5. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding US$16 billion in value.

6. I was formerly the President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or my affiliates. In December 2015, I divested my majority stake of Highland (***2015 Transaction***). On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code (***Highland Bankruptcy***) in the Northern District of Texas. The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

7. In February 2021, as part of the Highland Bankruptcy, the employment contracts of the majority of Highland's employees were terminated. Many of the former back-office employees of Highland thereafter became employees of a newly formed company called Skyview Group (***Skyview***) that provides middle and back-office services to various clients, including companies in which I hold an interest such as NexPoint.

**THE FUND**

8. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

9. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the ***Supporting Organizations***) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the ***Charities***).

10. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (***ARLPA***), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (***Articles***), govern the Fund and its partners.

11. The LP holds 99% ninety-nine percent (99%) of the economic interest in the Fund. The remaining one percent (1%) is (or at least was as at the time of the Fund's formation) held by its general partner, Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011.

12. In addition to the Participation Shares, the LP issued 100 management shares (the ***Management Shares***) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

13. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

**GRANT SCOTT**

14. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

15. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr Scott as the Control Person. However, Mr Scott had complete discretion in adopting or rejecting the investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr Scott was paid $60,000 USD per annum.

16. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

17. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax-deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr Patrick served that role at Highland from 2008 until his departure in February 2021.

18. In March 2021, Mr Patrick was hired by Skyview as Tax Counsel and continued to perform

substantially similar tax counsel duties for me. At Mr Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

19. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr Patrick working with outside counsel. Mr Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

20. In March 2021, Mr Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the Highland Bankruptcy, and he did not believe he was equipped to handle those disputes. Mr Patrick suggested to Mr Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr Patrick was my attorney and Mr Scott was my trusted friend, and I was happy for Mr Scott to pass the Control Position to Mr Patrick.

21. On 25 March 2021, Mr Scott: (i) resigned as director of the LP, (ii) appointed Mr Patrick as director of the LP, and (iii) transferred to Mr Patrick the Management Shares for nominal consideration. Mr Patrick therefore assumed the Control Position from that date.

22. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr Murphy, Mr Patrick's vote counts as the tiebreaker for corporate voting.

**MR PATRICK'S CONTROL OF THE FUND**

23. In the initial period following Mr Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr Patrick was free (as Mr Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

24. Subsequently, however, communications between Mr Patrick and Skyview and me began to become less frequent, and over time I came to suspect that Mr Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the Fund, but rather for his own personal enrichment.

25. On 28 June 2023, Mr Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas

Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms Short learned that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

26. Ms Short discussed the matter with Mr Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on 5 September 2023, but Mr Patrick was informed that further payments were unlikely. I was informed of this process by Ms Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

27. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

28. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr Cronin was known to me personally. In September 2023, Mr Cronin and I met, and he informed me that he had been approached by Mr Patrick with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation. Mr Cronin informed me that he had asked Mr Patrick if this arrangement would amount to fraud, and that Mr Patrick's response had been: "*you can't steal from yourself.*"

29. Mr Cronin informed me that he understood from this statement that Mr Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr Cronin further informed me that he was uncomfortable about Mr Patrick's proposal and that he subsequently communicated this to Mr Patrick, Mr Patrick cut off all further communications between them.

30. Mr Cronin's allegations that Mr Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my U.S. attorneys that, had Mr Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr Cronin contacted me, I met with Mr Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations

about the matter and Mr Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr Patrick's powers or remove him from his position.

31. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the ***Expense Summary***) which indicated substantial increases in expenditures during Mr Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased even further to around US$2.25 million in the first half of 2024 alone.

(b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

32. The Expense Summary reinforced my concern that Mr Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

33. In August 2024, I became aware of yet another issue concerning Mr Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

34. I was informed that my director of charitable giving had been contacted by Ms Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms Diaz stated that on 28 August 2024, Mr Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI,

which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

35. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations. On 1 October 2024, as part of the finalisation of the investigation report, Skyview's chief compliance officer interviewed Ms Diaz about the allegations against Mr Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on 11 October 2024 and concluded that Mr Patrick had attempted a serious breach of U.S. securities laws. A copy of the report and its attachments is at **page 1**.

36. On 2 October 2024, Mr Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr Patrick became aware of the investigation into his behaviour and resigned before the report was published.

37. On the same day that Mr Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr Patrick as my counsel, I believe that Mr Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

38. After his resignation from Skyview and the termination of Skyview's services agreement with the Fund, I have received repeated reports and evidence of Mr Patrick causing certain DAF entities to liquidate their assets, some at below-market value. For example, on 20 February 2025, Mr Patrick's subordinate Shawn Raver asked for the in-bound wire instructions for one of my affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain owns most of the distribution rights of the equity position in the Highland Bankruptcy, meaning most of the residual value of the estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy. According to

Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value.

39. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. I am familiar with the Highland Bankruptcy estate and there is no valuation, net, gross, or otherwise, that I can imagine that would support a $1 million sales price. Additionally, given my founding and my affiliates' ownership of Highland, Mr Patrick would know that I was one of a few natural buyers of the Hunter Mountain position. While Mr Patrick of course would not be obliged to sell Hunter Mountain to me, the fact that Mr Patrick authorized the sale of Hunter Mountain at a below-market value without even approaching a natural buyer indicates a non-market, non-fiduciary reason for the sale.

40. Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the DAF. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policy holder is Empower Dallas Foundation, a charitable foundation for which I serve as President whose purpose is to benefit the Dallas Foundation.

41. On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of my affiliates) dated 7 May 2014 in the amount of $2,3M and 27 May 2014 in the amount of $5M, held by the Partnership; and (iii) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the two Notes, including accumulated interest, was in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 attempted sale of the Notes to an affiliate.

42. On 27 February 2025, H&K as counsel for the Empower Dallas Foundation (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes to CLO Holdco. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*" The initial zero valuation and

proposed $500,000 sale price was confusing given that HCRE Partners had offered to pay the full amounts due in an amortizing schedule. After the withholding of consent, the revised offer of 28 February 2025 still is confusing given that the amortization schedule is longer than 12 months.

**ATTORNEY GENERAL INVESTIGATION**

43. I have become aware that, on 14 March 2025, the Texas Attorney General (***Texas AG***) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organization, conduct and management of Charitable DAF GP, LLC, and its related entities.

44. I understand that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

45. I understand that the Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**DONATIONS TO THE CHARITIES**

46. Until Mr Patrick's departure in October 2024, I regularly donated to through the Charities to the Fund as part of my charitable giving program. My affiliates and I, which donated through the Charities to the DAF entities in 2023 and in various years prior, and are the primary funding source for the Fund. As allowed pursuant to US law, I direct the Charities to utilize the Fund's assets to sponsor charitable causes I particularly value, including underprivileged youth education, cancer research, heart health, veterans' services, and local institutions such as zoos and museums. Though I wish to continue to support these charitable causes, I will not give any future donations through the Charities to the Fund while it is under Mr Patrick's management and/or control.

**FUNDING OF PROCEEDINGS**

47. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations simply for the purpose of overseeing how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. In this context, I became aware that the Supporting Organizations were meeting to vote on the decision to take legal action to take steps to preserve the assets of the Charities they exist to support. Given my connection with the Fund and personal relationship with Mr Patrick, I recused myself from that meeting and was not otherwise involved in the decision taken by the Supporting Organizations to commence these proceedings.

48. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not

at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

**SWORN** by the above named )
**JAMES DAVID DONDERO** )
This 9th day of April 2025 )
at 4:46 pm )

**JAMES DAVID DONDERO**

**BEFORE ME:**

KRYSTAL HUGHES
Notary ID #129488160
My Commission Expires
July 12, 2025

NOTARY PUBLIC
STATE OF TEXAS

Krystal Hughes
**NOTARY PUBLIC**

**THIS AFFIDAVIT** was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

# EXHIBIT 169

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Brandon R. Schaller <bschaller@shieldslegal.com> |
| **Sent:** | 05 February 2024 1:20 PM |
| **To:** | Philip Aubry |
| **Cc:** | Geoffrey Sykes; Bart Higgins |
| **Subject:** | FW: Cayman GP |
| **Attachments:** | image001.png |

**[this message is from an external sender]**

FYI

SHIELDS LEGAL GROUP

**BRANDON R. SCHALLER**
**Attorney**
16400 Dallas Parkway, Suite 300
Dallas, Texas 75248
Direct: (469) 726-3055
Email: bschaller@shieldslegal.com

**Legal Solutions. Business Insight. Your Trusted Advisor.**

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Monday, February 5, 2024 12:18 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Shawn Raver <sraver@hotmail.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Re: Cayman GP

CAUTION: This email originated from outside of the organization.

Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.

On Mon, Feb 5, 2024, 11:43 AM Brandon R. Schaller <bschaller@shieldslegal.com> wrote:

> Mark,
>
> Question from Walkers. Do you want the new Cayman GP to be a Cayman LLC or an exempted company?

# EXHIBIT 204

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*

Dear Mike,

We remain open to finding a framework within which we can resolve your clients' concerns.

I don't want to repeat points already made in my email dated 30th January 2025, but our understanding was that we were to prepare a presentation for the Foundations to address these concerns. This was a course of action suggested by you in our call last year and one which we thought was very sensible.

We are struggling to understand what happened between 21st January (when David Rosenburg, from your firm, confirmed a video conference would be acceptable) and 23rd January when an email was sent to Mark's old email address repeating various allegations that we were going to address in the presentation.

We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so.
Many thanks,
Paul.

---

**From:** Michael.Stockham@hklaw.com <Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; David.Rosenberg@hklaw.com; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you are represented by counsel, I believe it appropriate to loop him in for this communication. I also told you that I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 — before Mr. Patrick shut down that line of communication and information — showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. Yet, no information has been provided by you

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Julie,

I am an independent director of Charitable DAF HoldCo, Ltd. (which I believe is the entity you refer to as "DAF HoldCo" in your email dated 28 January 2025 (the "**28 January Email**")).

As an initial matter, I hope you will find the tone of this initial response to the 28 January Email conciliatory as I am keen to avoid any misunderstandings in circumstances where I had understood the next steps following the meetings between our respective legal

representatives (Douglas Mancino and David Rosenberg) in December last year was for us to present directly to the foundations/supporting organizations in order to address some of the concerns in the letter dated 11 November 2024 (the "**11 November Letter**"). This proposed presentation would supplement the two Zoom conference calls with your attorneys held by me and our independent valuation experts, ValueScope, in December last year as well as the ValueScope 9/30/24 report sent to you on 7 January that provided a balance sheet and information on all investment holdings.

As recently as 21 January 2025, David again confirmed that a Zoom conference call with yourselves would be an effective way to address your concerns and move forward in a cooperative manner.

Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter. Please note that neither Mark nor myself received your email dated 23 January 2025 given that it was sent to an out-of-use email address for Mark (which I understand he communicated to you and your assistant in person) and did not copy me. Therefore, the basis of the concerns and request to wind-up expressed in the 28 January Email, appears to be the single failure to respond to an email that was sent to a defunct email address. Having now been reminded that the email address is not functional, I hope you can take some comfort that you were not being ignored.
However, given the content and tone of the 28 January Email and David's request to progress the direct presentation to the foundations/supporting organizations only 7 days prior on 21 January 2025, there seems to be a disconnect between the conciliatory approach adopted in the latter and the more aggressive position set out in the former.

For our part, at this stage we are more than happy to continue to engage with the foundations/supporting organizations in an



CONFIDENTIAL

effort to provide clarity on investments and the DAF HoldCo governance structure.

I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.

Please let us know if you are prepared to withdraw the allegations made in the 11 November Letter and the 23 and 28 January Emails and are content to proceed with our proposed delivery of the presentation which we are confident will provide a complete answer to your concerns.

Finally, as a matter of record, it is important that I outline the following:

The 11 November 2024 Letter was not directly sent to me. I received it from Charitable DAF HoldCo's US attorneys who had, in turn, received it from a US law firm acting for Mr. Dondero. As set out above, this supports our belief, which is also based on other actions we have seen to date, that Mr. Dondero is seeking to improperly

exerting influence over the foundations and supporting organizations for self-serving purposes to the detriment of DAF HoldCo, the foundations and supporting organizations.

We note that your communications to date contain several misstatements of fact and we reject all of your allegations. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.

We look forward to hearing from you in relation to the proposed presentation and withdrawal of the allegations.

Kind regards,

Paul.

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman KY1-1007
Cayman Islands
**Phone**: +1 345 946 3459
**Mobile**: +1 345 324 1121
**Fax**: +1 345 946 3493
**E-mail**: paul@gkmanagement.com.ky

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Tuesday, January 28, 2025 9:14 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Michael.Stockham@hklaw.com; Rosenberg, David M (DFW - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

Mark and Paul-

We have great concern that our reasonable requests below have not been acknowledged. This failure to provide the courtesy of a response continues a pattern of a lack of communication and transparency as to assets and financials of DAF HoldCo under your stewardship. These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

**From:** Julie Diaz
**Sent:** Thursday, January 23, 2025 9:45 AM
**To:** MPatrick@CharitableDAF.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>
**Subject:** DAFHoldCo information request

Hi Mark –

Since we spoke last fall, the three CEOs from Santa Barbara, Kansas City, and Dallas community foundations (copied here) were discussing our plans for 2025 and wanted to reach out to you to check in on the DAFHoldCo. We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place.

Specifically, could you send:

- **Income Statements for the last for years**: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses
- **Listing of Underlying Assets**: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.
- **Audited Financial Statements**: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.
- **Current Structure of DAFHoldCo Operations:** An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

As you can appreciate, our job as leaders of our respective community foundations is to ensure proper stewardship of the charitable assets that are owned by our organizations. We are grateful for the decade plus of charitable investments that we have been able to make from the proceeds of the DAFHoldCo and would like to have confidence that this vehicle will continue to grow and make

additional meaningful contributions to our respective communities.

Please let us know your ability to get this information to us by Feb. 10, 2025.

Thank you and happy New Year.

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything

in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

<~WRD0000.jpg> <~WRD0000.jpg> <~WRD0000.jpg>

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Skyview Group. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Skyview Group.

EXHIBIT
4-C

February 27, 2025

*Via Email: dmancino@seyfarth.com*

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

Sincerely yours,

Michael W. Stockham

cc: David Rosenberg

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 18 March 2025 09:27 |
| **To:** | Mancino, Douglas; Michael.Stockham@hklaw.com |
| **Cc:** | Paul Murphy |
| **Subject:** | RE: Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this. |

Doug, we are available on:

- Wednesday March 26, after 4:00 p.m. U.S. Central Daylight Time.
- Monday, March 31, until 12:00 p.m. U.S. Central Daylight Time.
- Thursday, April 3 until 12:00 p.m. U.S. Central Daylight Time.

**David Rosenberg | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** Mancino, Douglas
**Sent:** Monday, March 17, 2025 1:00 PM
**To:** Rosenberg, David M (DAL - X61508) ; Stockham, Michael W (DAL - X62515)
**Cc:** Paul Murphy
**Subject:** Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.

Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**Rhiannon Zanetic**

**From:** David.Rosenberg@hklaw.com
**Sent:** 03 April 2025 09:51
**To:** Mancino, Douglas
**Cc:** Michael.Stockham@hklaw.com; Paul Murphy
**Subject:** RE: Zoom call with Paul Murphy

Doug, no such call is on our calendar, so I am not sure of the source of the confusion. We will circle back with our clients and provide some windows starting on April 16.

I wish your wife the best of health with her back. Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | https://urldefense.proofpoint.com/v2/url?u=http-3A__www.hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dUaYK7RyBQ-__Uvhuz_UbZY9LLgA8fqgfSQfMU9IREk&e=

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <https://urldefense.proofpoint.com/v2/url?u=http-3A__David.Rosenberg-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dK186X1LRwbLe82XNr4DiwVprLY83NgIEL5KUk2L9wM&e=>
Cc: Stockham, Michael W (DAL - X62515) <https://urldefense.proofpoint.com/v2/url?u=http-3A__Michael.Stockham-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=H8AOyc2PQyRIKod6ljjomBwRDxne7__BsTh9i-RGFDY&e=>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

# EXHIBIT 211

(a) Admission and Amendment No.1 Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192;

(b) Redemption and Amendment No.2 Agreement under which CDM redeemed the Company's CDM Membership for the same sum of US$1,637,192 (the "**Redemption Amount**"); and

(c) A written consent of the manager of CDM in connection with the matters referred to at paragraphs 46.1(a) and 46.1(b) above (the "**Manager Consent**").

46.3 Copies of the Letter Agreement, the Manager Consent and the Admissions and Redemption Documents (which are Exhibits A and B of the Manager Consent) are exhibited at pages 527 to 688 of MM-1.

47 On 2 April 2025, the Directors of the Company resolved to approve the:

47.1 redemption of the Company's CDM Membership for the Redemption Amount; and

47.2 shareholder distribution of US$1,612,192.01 to the Community Foundation of North Texas and the Supporting Organisations.

Copies of the resolutions are exhibited at pages 689 to 691 of MM-1.

48 The effect of the Redemption was that the Company's CDM Membership were in effect purchased by or transferred to DFW for the Redemption Amount.

The Remuneration Transactions

49 The Company's expenses have increased materially following Mr Patrick’s appointment as a director on 25 March 2021. Specifically (and amongst other things):

49.1 The Directors' fees increased from around US$40,000 in 2022 to approximately US$600,000 in 2023 (page 694 of MM-1).

49.2 On 13 September 2024, the Directors resolved to increase Mr Patrick's salary to US$850,000 per annum and approve a long-term incentive ("**LTI**") of 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return). A copy of this resolution is exhibited at pages 695 to 696 of MM-1.

49.3 On 1 October 2024:

(a) the Directors resolved that Mr Patrick was to receive an LTI payment of US$975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary. A copy of this resolution is exhibited at pages 697 to 704 of MM-1.

(b) Mr Patrick signed an employment agreement for his own position at the Company for the period from 24 March 2021 which provided, among other things, for a base salary of US$850,000 and an LTI payment of US$4,759,000. A copy of this agreement is exhibited at pages 705 to 722 of MM-1.

50 By way of contrast to the remuneration that Mr Patrick resolved that he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately US$60,000 per annum.

51 As regards expenses, expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

**THE JOLS' CONCERNS**

52 The JOLs' overarching concern is that the Relevant Transactions and the Remuneration Transactions were pursued by the Directors for the sole or primary reason of removing assets from the Company to benefit entities controlled by Mr Patrick or for his benefit personally, to the detriment of the Charities.

Impacts on Charities

53 The JOLs continue to investigate the impact that the Relevant Transactions have on the Charities. The Relevant Transactions have reduced the ability the Supporting Organisations and the Charities to meet their charitable objectives by: (i) stripping them of some of their assets and creating a hole in their balance sheets; (ii) reducing the Charities' ability to pay their overheads because, historically, these have been (in part) financed by the Supporting Organisations, where the fees charged by the Charities are typically based on a percentage of the market value of assets controlled by the Supporting Organisations; and (iii) the Remuneration Transactions have reduced the Fund's ability to provide financial support to the Supporting Organisations and, by extension, the Charities.

*A Hole in the Charities' Balance Sheets*

54 Although the JOLs' investigations continue, they understand that, historically, the Supporting Organisations have held the Participating Shares on their own balance sheets and the Charities have held them on their consolidated balance sheets.

55 For example, the Santa Barbara Foundation:

55.1 Its publicly available, independently audited financial statements for the year ended 31 December 2023 (a copy of which are exhibited at pages 726 to 750 of MM-1) disclose the following:

# EXHIBIT 242

**DAF Structure Chart**
*(as of 3/6/2024)*



**Rand Structure Chart**
*(effective as of 12/2015 – 8/2022)*



**DAF/Rand Structure Chart**
*(May 2025)*



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

§
In re § Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P, § Case No. 19-34054-sgj11
Reorganized Debtor. §
§

------------------------------------------------

ORAL DEPOSITION OF
MARK PATRICK
JUNE 23, 2025
(Reported remotely)

------------------------------------------------

ORAL DEPOSITION OF MARK PATRICK, produced as a witness duly sworn by me at the instance of the Defendant, taken in the above-styled and numbered cause on the 23RD day of June, 2025, from 12:05 p.m. to 1:14 p.m., via Zoom videoconference before Ida Alcala, Certified Shorthand Reporter No. 12565, in and for the State of Texas, reported by oral stenographic means, pursuant to the Texas Rules of Civil Procedure, and the provisions stated on the record or attached hereto.



APPEARANCES

Mr. Sawnie A. Mcentire (Via Videoconference)
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Ave Ste 4400
Dallas, Texas 75201-7324
214-237-4300

Mr. Michael Lang (Videoconference)
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave Ste 2390
Dallas, Texas 75201
214-817-4500

Mr. Louis M. Phillips (Via Videoconference)
KELLY HART ATTORNEYS AT LAW (LOUISIANA)
Baton Rouge Office
301 N. Main Street Ste. 1600
Baton Rouge, LA 70801
225-381-9643

Mr. John R. Morris (Via Videoconference)
ATTORNEY AT LAW
P.O. Box 470472
Fort Worth, Texas 76147-0472
817-262-7762

Ms. Deborah A. 'Deborah' Newman (Via Videoconference)
NEWMAN LAW FIRM
245 W. 18th Street
Houston, Texas 77008-4005
713-942-2501

Mr. Matthew Okin (Via Videoconference)
OKIN ADAMS LLP
1113 Vine St Ste 240
Houston, Texas 77002-1044
713-228-4100

(CONTINUED ON NEXT PAGE)



(CONTINUED)

Mr. Andrew Kohl 'Drew' York (Via Videoconference)
GRAY REED & MCGRAW
1601 Elm St. Ste 4600
Dallas, Texas 75201-7212
469-320-6114

Ms. Kathryn George (Via Videoconference)
LATHAM AND WATKINS LLP
Chicago Office
330 North Wabash Avenue Ste 2800
Chicago, IL 60611
312-876-7700

ALSO PRESENT:
Ms. Amelia Hurt (Videoconference)
Mr. Jeff Pomerantz (Videoconference)
Mr. Gregory Demo (Videoconference)



I N D E X


| | PAGE |
|---|---|
| WITNESS: MARK PATRICK | |
| Appearances................................ | 2 |
| Examination by Mr. Lang.................... | 5 |
| Examination by Mr. York.................... | 24 |
| Further Examination by Mr. Lang............ | 42 |
| Changes and Signature...................... | 44 |
| Reporter's Certification................... | 46 |


INFORMATION REQUESTED TO BE FURNISHED
(None)

EXHIBITS INDEX
COUNSEL FOR DUGABOY INVESTMENT TRUST

| EXHIBITS | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 1 | Charitable DAF/CLO HoldCo Structure Chart | 8 |
| 2 | Rand Structure Chart | 8 |
| 3 | Proposed settlement agreement | 16 |

Page 5

PROCEEDINGS

MARK PATRICK,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. LANG:

Q. Please state your name for the record.
A. Mark Patrick.
Q. And, Mr. Patrick, how are you currently employed?
A. I -- what do you mean by --
Q. Who's your -- who do you work for?
A. I work for DAF entities.
Q. And when you say the DAF entities, can you be more specific into which entities that are?
A. You know, there -- it's just a group of entities that hold investment assets for charitable purposes.
Q. Specifically, do you have the names of these entities?
A. Some -- some of them such as CLO HoldCO.
Q. Anybody else?
A. Liberty, I think. Charitable DAF HoldCo Inc, US entity, Charitable DAF Fund LP. I'm probably missing several others. It's a sophisticated structure, but that's generally the gist of when I refer to DAF entities.
Q. And what about Hunter Mountain? Are you employed by Hunter Mountain?

Page 6

A. Well, no -- I know -- I appreciate that. I'm -- like, when I think of employment, I'm also the preferred manager for Wind Advisers, which is an investment adviser that advises investment funds -- and then -- so then I have roles and that's why when you ask about employment, you know, there's -- it's kind of a different question than roles.
Q. That's fair. Tell you what. Why don't I put up a work chart and we'll talk through it. Will that work?
A. Yeah, I'll take a look anything.
Q. Okay. Do you see this chart?
A. Yes, I do.
Q. Okay. So this is the charitable DAFs, you know, the whole structure comp chart. Do you see that at the top?
A. Yes.
Q. Okay. Is this how the DAF CLO HoldCo structure currently looks today?
A. No, it does not.
Q. Okay. What is different?
A. Well, there's a lot of differences. I'd have to kind of see the specific documentation to be exact.
Q. Well, can you generally describe the -- the changes that have been made to this flowchart?
MR. MCENTIRE: I'll object as to form and relevance.

Page 7

A. Yeah. I mean, I -- I think I have already, you know, with respect to the listing of entities. You'd have to show me some documents with respect to these entities and I can, you know, walk you through it.
Q. Would charitable DAF GP LLC still the GP for charitable DAF CLO Co?
A. I don't -- I don't recall precisely and I, you know, I want -- I want to be -- when I give you an answer, a hundred percent accurate.
Q. Okay. Does charitable DAF Fund LP still own a hundred percent of CLO Hold Co?
A. Yes, that is my understanding.
Q. And this charitable DAF CLO CO limited still own a hundred percent of charitable DAF Fund LP?
MR. MCENTIRE: Objection, form.
A. No.
Q. (By Mr. Lang) Okay. Charitable DAF FUND LP, is that owned by CDM CFAD LLP?
MR. MCENTIRE: Objection, form.
A. That's my general -- that's my general understanding.
Q. (By Mr. Lang) Okay. And who owns CDM CFAD LLC?
A. Yeah, again, without corporate documents that you can present to me, I -- you know -- I -- I just don't want to be inaccurate.

Page 8

Q. Does DFW Charities own CDM CFAD LLC?
MR. MCENTIRE: Objection, form. Relevant.
A. Yeah, again, you know, Mr. Lang, you know, there are several entities in this structure, and I -- I just don't want to go beyond what I have a hundred percent knowledge of.
Q. I'm sharing this charitable DAF CLO CO structure chart as Exhibit 1, to be fair. And this is a RAND structured chart, which I'm marking as Exhibit 2. Do you recognize this document?
MR. MCENTIRE: Mark, at this time he's only asking whether you recognize it.
A. Yeah, I haven't made it to the bottom, I apologize.
MR. MCENTIRE: Okay.
A. What is the question now?
Q. (By Mr. Lang) Well, do you recognize this organizational structure? Let me change the question.
A. Do I recognize this structure. Generally -- very generally.
Q. Okay. And starting at the top, charitable DAF Holdings Corp, do you see that box?
A. Yes, I do.
Q. Is that owned by CLO HOLD CO?
MR. MCENTIRE: Objection, form.
A. I don't know -- I don't know. I can't recall

Page 9

precisely if there's other entities in -- in between that, you know, whether that links up to CLO Hold Co.
Q. (By Mr. Lang) Does CLO Hold Co indirectly own charitable -- charitable DAF holdings Corp.?
MR. MCENTIRE: Objection, form.
A. Yeah, again, I can't answer with accuracy here unless you showed me a corporate -- some actual corporate filings or something like that.
Q. (By Mr. Lang) Is this generally the structure for the RAND -- structure -- is it generally a structure it looks like today?
MR. MCENTIRE: Objection, form.
A. What part of the structure are you referring to, Mr. Lang?
Q. (By Mr. Lang) Well, the whole thing. Charitable DAF Holdings Corp?
A. No.
Q. Does it own Rand Advises LLC?
A. Yeah, can you restate that question, again?
Q. Does charitable DAF Holdings Corp, top box, the sole member of Rand Advisers LLC? The green box to the left.
A. Yes, that is -- that is my understanding.
Q. Okay. Does charitable DAF holdings Corp, the box at the top, is it still the sole member of Rand PD fund

Page 10

management LLC?
A. I would -- I would believe so.
Q. Okay. And is RAND PE fund management LLP still the general partner for RAND PE Fund One LP? See it just below it?
A. Yes, I would believe so.
Q. And then charitable DAF Holdings Corp, the box at the top, is it still the sole member for Atlas IDF GP PLLC?
MR. MCENTIRE: Objection, form.
A. Yes, I would believe so.
Q. (By Mr. Lang) Okay. And is Atlas IDF GP LLC still the general corporate for Atlas IDF LP?
MR. MCENTIRE: Objection, form?
A. Yes, I would believe so.
Q. (By Mr. Lang) Okay. And is Atlas IDF LP still the 99 percent limited partner for RAND PE FUND I LP?
MR. MCENTIRE: Objection, form.
A. I'm trying to recall because I have RAND PE FUND in a wind down situation. So I -- I don't know if that is accurate or not offhand.
Q. (By Mr. Lang) And does RAND PE FUND ONE LP still the sole member of Beacon LLC?
MR. MCENTIRE: Objection, form.
A. No.
Q. (By Mr. Lang) Okay. Who -- who owns Beacon

Page 11

Mountain LLC?
A. An entity called CLO HOLD CO LLC.
Q. And that's different than CLO HOLD CO limited?
A. Yes.
Q. Who owns CLO HOLD CO LLP?
A. I believe it's CLO HOLD CO limited, from my understanding.
Q. And the CLO HOLD CO LLC owned Hunter Mountain?
A. No.
Q. Who owns Hunter Mountain?
A. Beacon Mountain LLC. And I would clarify one thing. I -- it's beneficial -- it's a beneficial ownership. Hunter Mountain investment trust is a trust.
Q. Okay. I appreciate that.
A. Can you do -- if you don't mind, do a summary? I just want to make sure that we're sort of accurate here?
Q. Okay. From what I understand --
A. Yeah, from Beacon Mountain ownership. I just want to make sure you are understanding is --
Q. Beacon Mountain LLC is owned by CLO HOLD CO LLC?
A. Yes.
Q. Beacon Mountain LLC owns Hunter or -- Hunter Mountain Investment Trust is owned by Beacon Mountain LLP?
A. Yes.
MR. MCENTIRE: Objection.

Page 12

A. (inaudible) beneficial.
MR. MCENTIRE: Yeah, I would object to mischaracterizing his testimony.
MR. LANG: Nobody's mischaracterizing.
Q. (By Mr. Lang) The beneficial owner of Hunter Mountain Investment Trust.
A. Yeah, this is all a current state.
Q. Current state.
And what is your role with Hunter Mountain Investment Trust?
A. My understanding is I'm the -- an administrator which is a -- the control person for that trust.
Q. Are you the control person for Beacon Mountain LLP?
A. Yes.
Q. Are you the control person for CLO HOLD CO LLC?
A. Yes.
Q. Are you the control person for RAND Advisers LLC?
A. Yes.
Q. Are you the control person for RAND PE FUND Management LLC?
A. Yes.
Q. Are you the control person for Atlas IDF GP LLC?
A. Yes.
Q. Are you the control person for the Charitable DAF Holdings Corp?

A. Yes.
Q. And you're the control person for Charitable DAF Fund LP?
I'll -- I'll go back here.
MR. MCENTIRE: Objection, form.
Q. (By Mr. Lang) Are you the control person for Charitable DAF Fund LP?
MR. MCENTIRE: Objection, form.
A. It's -- no, but you should ask me a follow-up question.
Q. What's your role at Charitable DAF Fund LP?
A. Yeah, I'm the control person for the general partner of that limited partnership.
Q. And who's the general partner of the limited partnership?
A. Yeah, and then this is where my memory is -- is -- I'd have to kind of revisit the actual organizational documents to give you a confident a hundred percent answer.
MR. MCENTIRE: Yeah, Mark, let's don't -- let's don't speculate unless he has a document, okay?
A. Yes.
Q. (By Mr. Lang) Are you the control person for CDMCFAD LLC?
MR. MCENTIRE: Can you repeat the question, I didn't hear it, Mr. Lang.



Q. (By Mr. Lang) Mr. Patrick, are you the control person for CDMCFAD LLC?
A. I believe I am.
Q. Does that stand for anything out of curiosity?
A. I don't remember.
Q. All right.
MR. PHILLIPS: Objection, formatting.
Q. (By Mr. Lang) Did you -- you negotiated the settlement agreement that is the subject of (inaudible) correct?
A. Correct.
Q. Did you initiate settlement discussion with about events?
A. What do you mean by initiate.
Q. Well, did you approach them about settlement or did they approach you?
A. I'm sorry, you were slightly muffled there.
Q. I said did they approach you about settling or did you approach them about a potential settlement?
MR. PHILLIPS: Objection to the form of the question?
A. I can't -- I can't recall offhand. Who approached who or -- yeah.
Q. Under the settlement agreement, Hunter Mountain is to receive among other things the Dugaboy note and the



Kirschner claims. Do you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims?
A. I -- I would appreciate it if you could pull up the -- the Dugaboy note document that you are referring to. There's an awful lot of Dugaboy notes out there, and -- and as a starter and I'd also appreciate if you could pull up for me the -- what you're referring to as the Kirschner Litigation complaint.
Q. I'm referring to what's in the settlement agreement. It refers to the Dugaboy note --
A. Well, then the document speaks for itself, sir. If you want to show me the document, I'll definitely testify to the accuracy of what I signed.
Q. I'm asking if you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims as re restricted at that point out from Patricia claims as referenced in the settlement agreement.
A. Yeah, and I'm asking you to show me the settlement agreement with the lines and then I -- and I'll verify that for you if you don't mind.
There's a lot of Dugaboy notes out there you have to appreciate that, Mr. Lang.
Q. Which one have you bargained to receive in the settlement agreement?
A. And -- and there's a lot of Kirschner litigation as



well.
Q. Well, the Kirschner litigation is that -- Styled Kirschner versus Dondero Adversary Proceeding 2103076.
Are you familiar with that one?
A. I'm not familiar with that caption. If you could just show me the document that you're -- the complaint that you're referring to, then I will say that is -- that is the litigation that -- that we negotiated for.
Q. Okay.
A. You can bring up the settlement agreement, I'll happily verify that whatever is referenced in there is what I negotiated for, but I'm not gonna broad brush generically say that I negotiated for some Dugaboy note without a little more precision, if you don't mind.
Q. Can you see my screen?
A. Here we go. Yes.
Q. Okay. When I refer to the Dugaboy note, that's the note that I'm referring to. Does that help you?
MR. MCENTIRE: Well, for the record, Mr. Lang, can we just identify that you have put up the actual settlement agreement, is that correct?
MR. LANG: Yes. Sorry. Exhibit 3 will be the settlement agreement. The proposed settlement agreement.
A. Yes, so you're having me refer to the Dugaboy note dated May 31st, 2017, with a face amount of roughly

Case 19-34054-sgj11 Doc 4608-61 Filed 05/08/26 Entered 05/08/26 23:42:09 Desc Exhibit 58 Page 13 of 13



Page 45

I, MARK PATRICK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

__________________
MARK PATRICK

THE STATE OF TEXAS
COUNTY OF ________

Before me, ___________________, on this day personally appeared MARK PATRICK, known to me (or proved to me under oath or through __________________)(description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ______ day of ______________, 20___.

_______________________
Notary Public in and for
the State of Texas

Page 46

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

§
In re § Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P, § Case No. 19-34054-sgj11
Reorganized Debtor. §
§

REPORTER'S CERTIFICATION
DEPOSITION OF MARK PATRICK
JUNE 23, 2025

I, IDA ALCALA, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MARK PATRICK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ________________, 2025, to the witness or to the attorney for the witness for examination, signature and return to me by ________________, 2025;

That the amount of time used by each party at the deposition is as follows:

Mr. Lang : (00:28)
Mr. York : (00:27)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Mr. Michael Lang, Attorney for Dugaboy Investment Trust.
Mr. Sawnie Mcentire, Attorney for Mark Patrick.
Mr. Drew York, Attorney for Patrick Daugherty.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action

Page 47

in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of the Texas Rules of Civil Procedure will be certified to after they have occurred.

Certified to by me this 23rd day of June, 2025.

[signature]
Ida Alcala, CSR#12565
CSR Expiration Date: 12/31/26
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on __________, 2025.

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Mcentire, Custodial Attorney;

That $___________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this ______ day of ____________, 2025.

[signature]
Ida Alcala, CSR#12565
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008
CSR Expiration Date: 12/31/26

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | **Case No. 19-34054-sgj-11** Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., Reorganized Debtor. | Dallas, Texas June 25, 2025 9:30 a.m. Docket |
| | - MOTION TO EXTEND DURATION OF TRUSTS (4213) - MOTION TO APPROVE SETTLEMENT (4216) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For the Highland Capital Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>(212) 561-7732 |
| For the Highland Capital Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>(310) 277-6910 |
| For Marc S. Kirschner, Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>295 5th Avenue<br>New York, NY 10016<br>(212) 849-7000 |

the Cayman Islands?

A I hesitate to say generally aware. I'm aware that there's a proceeding in the Cayman Islands about involving a blocker corp. And there's disclosure in this Court about what that entity is. It's a blocker corp. in the Caymans that prevents the ultimate charitable entities -- and I put that in quotes -- to -- from receiving UBTI, which is Unrelated Business Income. And in that case, they would have to pay tax on it, and the idea is that they don't want to pay taxes and they don't pay taxes. So that corp. apparently is in some sort of proceeding. That's on the DAF side. That is not on the HMIT side.

Q Okay. So, based on the work that you did and the documents that you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT entities?

A Yes.

Q And what view did you reach?

A He has complete authority over each of these entities. They run up to entities that he controls or he owns. And he's had that, and it's the structure that was set up a long time ago, and any changes to that structure are just consistent with the documents that let him do these things. And the proceeding in Cayman, whatever that is, has no impact on Mr. Patrick's authority over these entities or any of the entities

correct?

A Correct.

Q And CLO Holdco, LLC is owned by CLO Holdco, Limited?

A That's correct.

Q And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?

A Correct.

Q And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

A The ultimate beneficial owner is DFW Charitable Foundation. To my -- to the best of my recollection, I would say that appears accurate. I'm just not a hundred percent.

Q Okay. And --

A But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner. And I'm a hundred percent that Dugaboy Investment Trust has no interest in it. And I'm also a hundred percent that The Dallas Foundation or any --

MR. LANG: Judge, I haven't asked --

THE WITNESS: -- or any other nonprofit has any --

MR. LANG: -- any of these questions.

THE COURT: Okay. There's an objection, nonresponsive. I sustain.

BY MR. LANG:

Q Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?

A (Pause.) I'm just waiting for a relevancy. I don't

Q And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?
A Around the end of March of 2025. I believe.
Q And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?
A What do you mean by involved? How?
THE COURT: Okay. I can see what's happening here or I have an impression of what's happening here. I feel like you're slowing down this process where I've given 30 minutes to this lawyer. Okay? And I feel like you're feigning confusion. I don't mean to be insulting, but that's how it comes across. Okay? So I need you to speed up your answers and not be confused about things you shouldn't be confused about. Okay?
THE WITNESS: Okay.
THE COURT: I feel like it's late 1980s *Dondi*. Does anyone know what I mean by that? Okay. We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling. That's what they did in *Dondi*. Confusion. Delay. Okay?
So I don't mean to chastise you. I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this. Okay?

comments on the record, and to the extent that Your Honor wants to amend that, you'll do so at your leisure?

THE COURT: Yes.

MR. MORRIS: Perfect.

THE COURT: All right.

MR. MORRIS: Thank you.

THE COURT: Thank you all. We're adjourned.

MR. PHILLIPS: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 4:38 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **06/27/2024**

______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. 19-34054-SGJ-11 |
| | . | |
| HIGHLAND CAPITAL MANAGEMENT, | . | Chapter 11 |
| L.P., | . | |
| | . | |
| Debtor. | . | |
| | . | Monday, May 11, 2026 |
| . . . . . . . . . . . . . . . . . | . | 9:06 A.M. |

TRANSCRIPT OF HEARING ON
MOTION TO RECONSIDER (RE: DOCUMENT 4297 ORDER ON MOTION TO COMPROMISE CONTROVERSY) AND MOTION TO VACATE FILED BY PARTNER DUGABOY INVESTMENT TRUST (4513)
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor, Highland Capital Management:

Pachulski Stang Ziehl & Jones LLP
BY: JOHN A. MORRIS, ESQUIRE
1700 Broadway, Suite 36th Floor
New York, New York 10019

Pachulski Stang Ziehl & Jones LLP
BY: JEFFREY POMERANTZ, ESQUIRE
10100 Santa Monica Boulevard
13th Floor
Los Angeles, California 90067

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder: Nicholas Noble
Earle Cabell Federal Building
501 West 10th Street
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

Q Is that the Charitable DAF Fund, LP?
A Charitable DAF Fund, LP. Yes.
Q Okay. And we mentioned that you're a court-appointed liquidator of that company. Is that right?
A Yes. I was appointed on May 6 pursuant to an order from the Cayman court.
Q So I didn't really know about the court liquidator until I encountered this case. Could you tell me a little bit more about what a court-appointed liquidator in the Cayman Islands is?
A Broadly, it's -- your appointment comes about when a -- in an insolvent case when a creditor or stakeholder petitions the court to appoint an independent person to review the affairs or wind up the company. In a case like this, broadly my role will be to secure and protect the assets of the company. Often in cases where there's been misappropriation or fraud, that activity is quite involved because you have to trace the assets and look to enforce and recover them.
Once I have the assets in the estate, I do an exercise to adjudicate the claims that are filed in the estate. And then if there are funds available for distribution, I would distribute those funds. So those are the broad categories. There are a lot of other elements of the liquidation, but those broadly are the are the functions.
Q All right. And I think you mentioned when you were

appointed in this position. Could you restate that again?
A That was on May 6.
Q What were the circumstances that led to your appointment?
A As I understand it, the supporting orgs of the Charitable DAF Holdco petitioned the court for a just and equitable winding up of the Charitable DAF Holdco largely on the basis of concerns of misappropriation of the assets of the structure.
Q You mentioned the term the supporting organizations. Could you tell us what your understanding of what those are?
A So the Limited Charitable DAF Holdco is a hundred percent shareholder in the Charitable DAF Fund, LP. And the supporting organizations, which include the Dallas Foundation, the Kansas City Foundation, and the Santa Barbara Foundation, and the Community Foundation of North Texas, they are the participating shareholders of CDAF Holdco.
Q And what do you think your court-appointed mission is with respect to the Charitable DAF (indiscernible)?
A Well, it is to recover the assets of the estate and administer them for the benefit of the economic stakeholders in the company.
Q As a court-appointed liquidator for the Charitable DAF Holdco, Ltd., do you have the power to bring claims against other parties?
A I do have the power to bring proceedings by Cayman law statute and with the sanction of the Cayman court.

Q And did you bring any proceedings against Mark Patrick?
A Yes. We filed a statement of claim on July 15 in the Cayman court. The process to do that, I had to first seek sanction of the what I'm going to refer to as the liquidation judge, the judge that supervises my position and authority in CDAF Holdco.
I sought permission from him to bring these -- to bring this claim. And then once I had permission to bring it, I then filed it on July 15th. And that proceeding was assigned to Justice Parker, so it's not the liquidation judge that reviews and considers the statement of claim. It's Justice Parker. And the claim is presently I think paused, stayed pending the outcome of the injunction application that we filed off the back of our statement of claim.
Q Okay. What if anything did you have to show the liquidating judge in order to initiate litigation (indiscernible)?
A The liquidation judge would expect that I need to show that I have reasonable prospects of success on that claim. And practically speaking, that usually entails and it did in our case providing an expert opinion from a King's counsel an, independent King's counsel, on the merits of the case.
We're also required, I have a duty to present not only the reasons I feel that there's a reasonable prospect of success but also any material weaknesses or considerations of my claim

so that the judge has that all before him.

Q And did you provide opinions of King's counsel?

A Yes, we did. And we received sanctions so.

Q Now towards the latter half of your answer a couple of questions ago, you started talking about the status of the Cayman proceedings.

A Yes.

Q Could you give us a brief overview of that?

A So we filed the initial claim on July 15th. The judge set down and then we filed our -- I don't recall the date exactly but shortly thereafter an application for injunctive relief that was set down for December 15 and 16 in the Cayman Islands.

We filed an amended statement of claim on October 15. The matter was heard for the injunction on December 15th and 16th. In February, Justice Parker issued his ruling which found that we have a serious issue to be tried. That's the threshold for seeking injunctive relief. He denied our injunction on the basis he didn't consider our proprietary interest went as far as we said it did in the application. And so he found on the balance of convenience that it was in favor of the defendants.

We appealed that decision. We were in front of the Court of Appeal on an interim application for injunctive relief. They also affirmed there is a serious issue to be tried and granted the interim relief. And the main injunction action is pending for September 2nd and 3rd.

Q Okay. And what was the interim relief that you secured from the Court of Appeals?
A In the Court of Appeals, we essentially have -- there is to be no transfer, dissipation, withdrawal, removal apart from the ordinary course of business from any of the defendants. And there is also a limitation on no increases and remuneration can be made in this period and DFW is limited to $200,000 a month in distributions.
Q Just bear with me for a minute.
Okay. So there's a -- you mentioned that there's a limitation on what Charitable DAF Holdco can do with certain assets during the pendency of (indiscernible). Is that right?
A Yes, that's correct.
Q And does that apply to assets that is held directly by Charitable DAF Holdco or (indiscernible)?
A Well, because our injunction is against CLO Holdco, all of -- all of the assets in that structure and anything under CLO Holdco would be caught by the terms of that injunction.
Q And what are the limitations that this injunction places upon those assets?
A In layman's terms, it essentially keeps those assets safe from being dissipated, removed, transferred, diminished, any sort of transaction that would put them further away from this structure except they are allowed to do -- make payments in the ordinary course.

Q So if an asset is held under this structure and Mr. Patrick decided to sell them or trade them away or settle claims, would he need the Cayman court's permission?
A It would be a -- it would be a breach of the injunctive relief if he didn't have the permission to do that and it's outside of the ordinary course of business, yes.
Q And did Mr. Patrick oppose the imposition of this interim relief?
A Well they -- yes, it was -- the interim relief hearing was opposed by the defendants.
Q And his objection was (indiscernible). Is that correct?
A Yes.
Q Now did -- now with respect to the Cayman proceedings, did you take any actions to bring them to the attention of the courts in the United States?
A We were also -- filed our application for recognition Chapter 15, so our statement of claim was exhibited to that application. I believe that was done on July 25th.
Q And where is that application pending?
A It's in Delaware.
Q As a liquidator of the Charitable DAF Holdco, Ltd., do you have a special ability to obtain documents that are related to that company?
A Yes, I have the power to compel the production of documents certainly from service providers in the Cayman

Islands. A Chapter 15 recognition would also give me the subpoena powers in the United States for any third parties who are here who have books and records belonging to Holdco.

Q And does that include documents that with respect to other third parties might be considered confidential or privileged?

A Yes, I can -- if they're the documents of Holdco which we have obtained some, we're still in the process of getting parties to cooperate and provide their documents. But we receive, for example the lawyers acting for Holdco would be compelled to provide us with the information belonging to Holdco.

Q Is that because you're practically in charge of Holdco now?

A Yeah, I step into the shoes of the company. I replace the directors and others who have power.

Q And prior to being appointed a liquidator, would you have been able to have obtained access to some of these otherwise confidential documents?

A No, no it would be private company information.

Q When were you first able to gain access to some of these confidential documents?

A We started getting documents within the early days, the first few days of our appointment. That process is usually fairly involved, you'll appreciate it. Oftentimes the records of Cayman Islands companies aren't held in the Cayman Islands.

But for those parties who were there and we were able to ask them for the books and records and they cooperated. There were a number of parties who did not cooperate.

Q And when did you start making some of these confidential documents publicly accessible?

A We made the documents in connection with the statement of claim public when we filed in Chapter 15. I believe also that -- in the Cayman Islands, documents aren't going to become public unless they do something like file them in the Chapter 15 proceeding, until they're brought up in court or mentioned in court. And then that lifts the sort of privacy rules governing Cayman proceedings.

So some of those documents wouldn't have been capable of being referred to publicly until we held the injunction hearing in December.

Q December of 2025?

A December 15, 16 was the injunction hearing in Cayman.

Q So some of the documents you obtained you were able to make public when you filed them as an attachment to the Chapter 15 recognition proceeding?

A Yes.

Q And you filed that -- do you remember what date that was?

A That was July 25th.

Q July 25th --

A Yes.

those entities with the Charitable DAF Holdco?
A They are the -- they hold the economic benefit of Charitable DAF Holdco from Charitable DAF Holdco's inception. It was these four charities. I think Community Foundation of Texas was added after the first three in that list, but all four of them were for the -- up until the restructuring, were the sole economic interests in the Charitable DAF Holdco.
Q Now you mentioned the restructuring. Was there a restructuring that occurred with this chart of entities?
A Yes. That's what is behind our statement of claim. We've alleged or impugned this restructuring for --
Q Maybe you should stop. Let me ask --
A Okay.
Q -- (indiscernible).
A Okay.
Q Okay. And do you have a sense of what time period during which that restructuring occurred?
A I believe it started around the planning for the late December, late 2023, and the bulk of the transactions and documents supporting it from December 2024 to March 25th or 27th, 2025.
Q Based on your investigation and your work as liquidator, do you believe this chart is an accurate understanding of how the DAF Entities were organized prior to the restructuring (indiscernible)?

A Yes.

Q And why do you believe so?

A Based on the review of documents since our appointment, we were able to confirm how DAF Holdco did hold its interest in Charitable DAF Fund and the general partner arrangements.

Q And do you have an understanding based on your role as liquidator of the amount of assets that was held under this structure prior to the restructuring?

A I'll broadly refer to it as it was roughly $270 million at various points. I think it was somewhat below that and somewhat above that.

MR. EDNEY: All right. Let me put this demonstrative aside for a moment and look at the Slide 4 of the demonstrative, please.

(Pause)

BY MR. EDNEY:

Q So, I'm showing you Slide 4 of our demonstrative chart. Did there come a point where the general partner of the Charitable DAF Fund, LP was changed?

A Yes. Yes, it was.

Q Okay. And what's your -- do you have an understanding of the relationship between the general partner and the limited partnership?

A Yes. The general partner is the one that controls the decisions and the management of the fund.

Q And then I guess the general partner is distinguished from the limited partners. Is that right?
A Yeah. The general partner has the -- would hold the 100 percent of the management share, so it can affect control and voting of the structure. The limited partners, they have the participating shares or interest, so they get the economic benefit, but the general partner is the one that makes all the decisions about how funds are invested and used.
Q Now, the change in the identity of the general partner, from what entity to what entity did it change?
A I think it changed from what was called Charitable DAF General Partner to CDH GP.
Q And where was that new general partner (indiscernible)?
A Here on your chart, it says Cayman Islands.
Q But do you have an independent awareness of that?
A I've seen it on the documents that we obtained.
Q And based on your investigation, who is in charge of this new entity, CDH GP, Ltd.?
A Mark Patrick and Paul Murphy.
Q And tell me a little bit more about that, if you have any knowledge.
A I only understand them to have been in control of and appointed over CDH GP.
Q Okay, all right. I'm going to show you -- let's just see if I can just check my chart here for a second to see if this

exhibit.

Earlier, we talked about some of your efforts to obtain documents from service providers and DAF companies. Is that right?

A Yes.

Q Were you able to obtain documents relating to a law firm called the Shields Law Firm?

A Yes. I believe we've obtained some, but not all.

MR. EDNEY: Okay. Let's pull up Exhibit 169.

BY MR. EDNEY:

Q I'm handing you what's been --

MR. MORRIS: (Indiscernible).

THE COURT: I mean, he hasn't offered it into evidence, so when he --

MR. MORRIS: He's showing it to the witness.

THE COURT: I mean, how else is he going to lay a foundation without showing it to the witness?

MR. MORRIS: I won't make suggestions (indiscernible).

BY MR. EDNEY:

Q I'll show you what's been marked as Movant's Exhibit 169. Do you recognize this document?

A Yes.

Q And do you -- what is it?

A It's an email between Shields and Mark Patrick in relation

to a query from Walkers about how they want the new Cayman GP to be structured, whether a Cayman LLC or an exempted company.
Q Did you obtain this document in the course of your duties as liquidator?
A I've seen it before so, yes, I believe I have.
Q And do you know whether it was included as an exhibit to one of the affidavits that you filed in the Cayman proceeding?
A There were a number of exhibits attached to that, so I can't recall specifically where it was in the statement of claim.
Q How did you obtain this document, Ms. MacInnis?
A Well, we obtained, as I said, some discovery in books and records from Shields, from Walkers themselves, so it could have been from Mr. Patrick as well filed evidence in the Cayman proceedings. So without seeing my own document log and reference, I can't confirm specifically which exhibit or in which production it came through.
Q Okay. Do you recognize the name Brandon Schaller --
A Yes.
Q -- on the top of the email? Who's that?
A An attorney who works for Shields.
Q Okay. And if you scroll down to the second email, this is an email from an address with the name Mark Patz and Patrick Patz (indiscernible). com. Do you see that?
A Yes, I do.

Exhibit 8. Ms. MacInnis, I'm showing you what's been previously admitted as Exhibit 8. This is a certificate of incorporation of DFW Charitable Foundation, a nonprofit stock corporation. Do you see that on the first page?
A I do.
Q Is this a document that you gathered in the course of your investigation?
A Yes.
Q Do you know what it is?
A Yes. It's -- it incorporates DFW and confirms that, I was correct, it was formed in the State of Delaware.
Q Do you have an understanding of where DFW Charitable Foundation is headquartered?
A I understand it's at Mark Patrick's residence.
Q And do you have an understanding as to Mr. Patrick's role in DFW Charitable Foundation?
A Nothing more than I understand him to be named as the director and holder of the shares of DFW.
Q Let's move on to Movant's Exhibit 43 which is not in evidence. Ms. MacInnis, just in the manner of some preliminary questions, in the course of your investigation, did you gather the business records of Charitable DAF Holdco and use them?
A Yes.
Q And did that include resolutions of the board of directors of Charitable DAF Holdco?

If we could scroll to the second page.

BY MR. EDNEY:

Q The second email there dated November 26, 2024 at 4:11 p.m., if you can just take a moment to read that, and I'll read it into the record, as well.

"If new participating shares are issued to a nonprofit and say (indiscernible) tried to implement an equitable winding down of the company, do the new shareholders object. Will that help? Also, what could possibly be the basis for any equitable liquidation of the articles if the articles don't give such rights?" Do you see that?

A Yes, I do.

Q Are you familiar with this passage?

A Yes.

Q What is your understanding of some of the efforts to issue new shares to DFW Charitable and restructure this company?

A The dilution of the supporting org's interest in the structure would make it very difficult for them to bring a winding-up petition and have the ability to cause the company to be either wound up, or to prevent a winding-up. They wouldn't have enough economic interest to sway that sort of application.

Q All right. Let's move on to Movant's Exhibit 45. I do believe this document has --

THE COURT: I show this on my list of agreed-to

A They were very clear it couldn't be used to support or justify the fairness of the transaction being proposed.
Q And based upon your review of the business records of Charitable DAF Holdco, did that limitation on use ever change?
A Not that I'm aware of.
Q After speaking with PricewaterhouseCoopers and after speaking with FTI Consulting, did Charitable DAF Holdco move on to another valuation company?
A I understand they used ValueScope.
Q Let's go to previously admitted Movant's Exhibit 12. I'm handing you what's been marked as a valuation analysis of certain participation shares of the Charitable DAF Holdco, Ltd., as of March 25th, 2025. Do you see that?
A Yes, I do.
Q Do you recognize this document?
A Yes, I do.
Q What is it?
A It's the valuation used to support -- to put structure in the transaction.
Q And based upon your investigation and review of this document, what conclusions did ValueScope reach about the value of the org charitable institutions that historically had been in charge of Charitable DAF Holdco as of March 25th, 2025?
A They reached the conclusion that they were entitled to $1.6 million in total from the assets of that structure.

Q And in your role as liquidator, were you in a position to review previous valuation efforts by ValueScope?
A Yes. We looked at the September -- even earlier today we looked at the September 2024 -- 2024 valuation.
Q And did you see even others beyond that?
A Yes, I have.
Q Had ValueScope ever valued the stake of the four charities that (indiscernible) 1.61 million before?
A No. They had generally been in the ballpark of 270 million. And the discount provisions sort of ranged between 10 and 30 percent, whereas this one is materially different from the others on the basis that the valuation method changed and the level of discount changed.

MR. EDNEY: Perhaps if we could scroll down to the summary chart of ValueScope's conclusions. Just one up, please.

BY MR. EDNEY:
Q So directing you to what's Page 46 of the electronic document that has a fair market value conclusion, and you see down at the bottom in bold subject interest. Can you read that number for me?
A It's 1.6 -- 17,000, 1.6 million, 17 thousand and --
Q Is that what it is? Maybe we can blow that up a little bit.
A Sorry. If you mean the one per share, it's the per share

valuation was $5,368. But the total interest for the original SOs was 1.6 million.

Q Can you give us the exact number, please?

A 1,637,192.

Q Now, in the course of your investigation, were you -- did you reach a conclusion about whether this March 25th ValueScope valuation was reconcilable with ValueScope's previous valuations of the (indiscernible) shares?

A I did.

Q And what was that conclusion?

A That it isn't.

Q And why not?

A As I said, it changed the valuation approach, the discount assumptions that are the subject matter now of our statement of claim, and a matter to be resolved by the Cayman court.

Q Now, as of March 25th, 2025, the date of this valuation, had the assets under the DAF management changed in any significant magnitude?

A No.

Q And as of that date, what was your understanding of how many assets were underneath the DAF?

A My understanding is the corpus of that structure and the assets was about $270 million.

Q Let's move to -- well, let me ask you this. This ValueScope valuation, did you obtain this in the course of your

work as a liquidator?
A Yes, I did.
Q And was this one of the confidential documents that you were only able to gain access to by stepping into the shoes of the Charitable DAF Holdco?
A Yes.
Q Let's move to Movant's Exhibit 48, which appears to have been previously admitted. So I'm handing you what's been previously admitted as Movant's Exhibit 48. It's the redemption amendment number two dated March 27, 2025. Do you see that?
A Yes.
Q And it's on behalf of CDMCFAD, LLC. Do you see that?
A Yes.
Q Are you familiar with this document?
A Yes.
Q What do you understand it to be?
A I understand it to be the step that redeemed Holdco from its interest in CDMCFAD.
Q And redemption and amendment agreement, it was -- what was the date of it again?
A March 27th, 2025.
Q And how long after the ValueScope evaluation was that?
A ValueScope, was it March 25th?
Q Yes.

A I want to direct your attention to the third paragraph of Page 1, starting with, "Whereas, in accordance with the terms of this LLC agreement." Do you see that?
A Yes.
Q It says a manager desires to redeem the entire limited liability company interest in the company currently held by Charitable DAF Holdco of the effective as of the effective date of $1,647,192. Do you see that?
A Yes.
Q Now, what was the economics of this redemption transaction? Who, if anyone, got paid what through this?
A This resulted in Charitable DAF Holdco being completely divorced from the assets in the estate, and it received $1.6 million and change in that exchange.
Q And Charitable DAF Holdco, who were the economic beneficiaries of that company?
A In Holdco, it was the four supporting orgs and DFW.
Q And when did DFW come to have a stake in Charitable DAF Holdco?
A Off the top of my head, I think that was the resolution looked at in February.
Q Now, after this redemption, where were all the assets held that used to be in the DAF structure?
A They were still in CDMCFAD, and then held, one of your earlier charts shows still all held through CL Holdco.

Q All right. Let's turn to Slide 9 of the demonstrative, please. I'm handing you part of our demonstrative exhibit, Slide 9. It has a series of charts on it, DFW Charitable Foundation at the top. CDMCFAD, LLC below that. Do you see that?

A Yes, I do.

Q After the redemption of the stake of Charitable DAF Holdco, Ltd. and CDMCFAD, what stake did the four original charities have in the $270 million in assets in the DAF structure?

A They're left with nothing.

Q And what organization had the economic interest in those assets after the redemption that we just referenced?

A DFW.

Q And were there any other organizations that had such interest?

A No.

Q Turning back to -- and let's just stay there for a second, on Slide 9. Do you regard Slide 9 as an accurate representation of the current structure of the DAF after the redemption event that we just talked about?

A Yes.

Q Let's turn back to Slide 7. So I'm showing you Slide 7 that refers to Charitable DAF Holdco, Ltd. down at the bottom. And then it has the familiar supporting and other historical

charitable foundations at the top. Do you see that?

A Yes.

Q After the redemption even that we just referenced, what stake did Charitable DAF Holdco, Ltd. have in the $270 million in assets of the DAF structure?

A It didn't have any.

Q And what did it receive for that?

A One-point-six million.

Q And for that 1.6 million in cash, which entities had a stake in that now?

A That would be the four supporting orgs, excluding DFW.

Q And even in that 1.6 million, DFW Charitable Foundation had a stake in 50 percent of that? Is that right?

A No. The 1.6 represents the stake for the SOs.

Q Okay. And then, so after this transaction, what was the Dallas Foundation and the Highland Dallas Foundation left with in terms of assets?

A They don't have any recourse or access to these funds in the Charitable DAF structure.

Q Do they have any portion of the 1.6 million?

A They received the -- that was divided as between them. So I don't have the exact allocations. I think it was on the ValueScope summary.

Q At the end of this process, Ms. MacInnis, what was the sum of effect of the restructuring on these four historical

charities?
A They lost their economic interest and right to distributions from the 270 million in the structure. And as I understand it, you know, they, each of them had multi-year grant obligations and charitable works that they were contributing to using the distributions from the structure. And they'd been left in serious straits, not being able to fund those projects.
Q And the Dallas Foundation, was that a charitable organization that was founded in just the last couple years?
A No. As I understand it, it's been around for a century.
Q And do you have similar views with respect to the other four?
A Yes.
Q All right. Ms. MacInnis, in your role as liquidator, you had access to the communications that were going out of the Charitable DAF Holdco structure?
A Yes.
Q And in your role of liquidator, did you see any evidence that these four charities were informed of the redemption and the shift of their interest from 270 million to 1.61 million when it happened?
A No, I did not.
Q Now, in the course of your investigation, did -- have you inquired into what Mr. Patrick had been paid by various DAF

Entities over the course of the last few years?
A Yes, I have.
Q And what did you do to determine the source and amount of this compensation over that period?
A We received information in connection with the disclosures of our injunction that was in place from the end of July to early January. And from the disclosure of various cash outlays from the structure, we were able to determine what amounts had been paid to Mr. Patrick and Mr. Murphy.
Q And did you develop a view, based on your investigation, of how much Mr. Patrick was paid by the entities in the calendar year of 2024?
A Yes.
Q And what was that view?
A I don't have the exact numbers in front of me, but it's set out in our statement of claim. But it was substantial increases in remuneration were paid out to Mr. Murphy and Mr. Patrick from the end of 2024 through 2/2025.
Q And was that amount in excess of $10 million?
A Yes.
Q Was it in excess of $13 million?
A Yes. I believe the total was 18, 18 million and change. But I don't recall the exact figure.
Q And was there a short period of time in September or October of 2024, where these payments were concentrated?

Dugaboy at this time?
A Well, Michael Edney.
Q No, no. I apologize. I don't mean now. Going back from the -- around the time of your appointment, do you recall being in communication with other lawyers from there?
A For Dugaboy, I don't know. I don't know who those lawyers would be.
MR. MORRIS: Okay. Is there a way to call up Dugaboy Exhibit 206? It's a very large exhibit.
(Pause)
THE COURT: Mr. Morris, let me ask you real quick while they're pulling this up. How much longer do you anticipate --
MR. MORRIS: About ten minutes.
THE COURT: Okay. All right. Ms. MacInnis, are you good for ten minutes?
THE WITNESS: Yes.
THE COURT: I know you've been on the stand for a while. We could -- so --
(Counsel confer)
MR. MORRIS: Thank you everybody for your patience.
BY MR. MORRIS:
Q Okay. So, again, your investigation begins on May 8th. And you receive, this is a letter dated -- I apologize. Your investigation begins on the 6th.

A The 6th, yes.
Q And this letter's dated on the 8th. Do you see that?
A Yes.
Q And you see that the author of the letter, tells you that she represents the Dugaboy Investment Trust, NexPoint?
A Yes.
Q Again, Dugaboy has no relationship to Holdco, correct?
A No.
Q And to the best of your knowledge, Dugaboy has no relationship to any of the DAF Entities, correct?
A Yes.
Q And that they're writing to you as the official liquidator of Holdco to provide information to you against Mr. Patrick. Is that right?
A Yes.
Q And the supporting organizations sit on Holdco's liquidation, correct?
A Yes, they do.
Q And they sat on the Holdco liquidation committee since, I think you said July 9th?
A July 7th.
Q July 7th.
A 7th.
Q Since early July, right? So the liquidation committee -- was the liquidation committee provided with a copy of the

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.



__________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts                    Date: May 15, 2026

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | **Case No. 19-34054-sgj11** |
| | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Lubbock, Texas |
| | May 12, 2026 |
| | 9:00 a.m. Docket |
| Reorganized Debtor. | |
| | MOTION TO RECONSIDER (4513) |
| | OBJECTION (4535) |
| | JOINDER TO OBJECTION (4537) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BRAD W. ODELL,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Reorganized Debtors: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For The Dugaboy Investment Trust: | Michael J. Edney<br>MORGAN LEWIS<br>1111 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>(202) 739-3000 |
| For Mark Patrick, et al.: | Louis M. Phillips<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For Highland Capital Management, et al.: | Joshua Seth Levy<br>WILLKIE FARR & GALLAGHER, LLP<br>1875 K Street, NW<br>Washington, DC 20006<br>(202) 303-1147 |

the question without divulging any privileged communication, you may answer it. Otherwise, it is a sustained objection.

THE WITNESS: My understanding, Walkers was counsel for CLO Holdco.

MR. PHILLIPS: Your Honor, Mr. Patrick, the judge asked you to answer the question without reference --

THE WITNESS: Oh.

MR. PHILLIPS: -- to legal advice.

THE WITNESS: Oh, okay.

MR. PHILLIPS: If you can do that, it would be (inaudible).

THE WITNESS: All right. I can't. Thank you.

BY MR. EDNEY:

Q All right. Mr. Patrick, last Thursday did you sit for a deposition with me asking questions?

A Yes, I did.

Q And during that deposition, did you tell the court reporter that your lawyers told you that you had no obligation to inform the charities of their dilution?

A Yes.

Q All right. And aside from not having an obligation to inform them, you chose not to inform them anyway. Isn't that right?

A Correct.

Q Now, after this transaction issuing new shares to DFW

Q I see. So Rand Advisors, LLC had an investment management agreement relationship with Atlas IDF Fund, LP, too, didn't it?
A Yes.
Q And you controlled Rand Advisors, LLC; isn't that right?
A Yes.
Q And did you draw compensation from your role at Rand Advisors, LLC?
A Personally?
Q Yes, sir.
A No. Just holistically, my compensation's paid that way. The management fees simply go to that -- that entity, and then its ownership.
Q Okay. Who is the ownership of Rand Advisors, LLC?
A I believe it's Charitable DAF Holdco Corporation, Inc.
Q Okay. And you control that company?
A Yes, I do.
Q And does that company pay you?
A Yes.
Q So let's just talk about your -- your compensation from the DAF structure in 2024. What entity would be providing that compensation? I'm not asking (inaudible), but where is it paid out of?
A Yeah. It's -- generally speaking, it's paid out of Charitable DAF Holdco Corporation, Inc.

Q And that is a company that's part of the DAF structure; is that right?
A Yes.
Q Okay. And that's a company that benefits from the Rand Advisor, LLC management; is that right?
A Yes.
Q Okay. And Rand Advisors, LLC charges management fees to entities with which it has an investment management agreement; is that right?
A Yes.
Q And what -- how -- what are those fees running (inaudible)?
A Oh, it's based upon the value of the asset that it manages.
Q So it's like points or something like that?
A I agree.
Q Okay. Now, you started the creation of new entities in the DAF structure around December 2024, didn't you?
A Yes, generally speaking. That is kind of a non-specific question, but yes.
Q One of the first moves you made to reorganize the structure was you created a new general partner of Charitable DAF Fund, LP. Isn't that right?
A Yes.
Q Prior to the winter of 2024, the general partner of

Charitable DAF Fund, LP was Charitable DAF GP, LLC. Isn't that right?
A Yes.
Q And that was a Delaware company; is that right?
A Yes.
Q And you changed that general partner to a company called CDH GP, Ltd. Isn't that right?
A Yes.
Q Let's go back to the previously-admitted Slide 19 with Exhibit 242. So I -- is that the company reflected in green over at the left on Slide 19 in Exhibit 242?
A Yes.
Q And that company was created in the Cayman Islands; isn't that right?
A Yes.
Q Now, in 2024, Mr. Patrick, when you created this new general partner, you told your lawyer to design it in a way that would conceal its creation from any (inaudible). Isn't that right?
A I wouldn't characterize that email like that as far as the context.
Q Okay. And you told your lawyers to do it in a jurisdiction that would make it harder to hold you accountable for any future restructuring moves you might make. Isn't that right?

upward to Crown Global; is that right?
A They haven't asked for it. That is right.
Q You didn't tell them that they were (inaudible)?
A They received the same -- similar financial statements as -- as what you see here with respect to Atlas PDF. But it -- so they haven't made a request.
Q Let's go to Page 15 of the document. All right. So I take it you informed the auditors of Rand PE I Fund that the Beacon Mountain asset had been sold; is that right?
A Yes.
Q And do you see down at -- right above Paragraph 7 where it says LLC interests, fair market value, a million dollars? Do you see that?
A Yes.
Q You sold Beacon Mountain out from Rand PE Fund for a million dollars; isn't that right?
A Yes.
Q Okay.
A Yes.
Q And the auditors then, their ability to value that asset was just based on the transaction price. Isn't that right?
A Yes.
Q And you sold the Beacon Mountain asset to a company that you control, right, CLO Holdco, LLC?
A Yes. It was, for all intents and purposes, a sub-account

Q Okay. So you're not sure?
A I'm not sure.
Q Do you know where that cash is today, Mr. Patrick?
A In the -- in the general accounts of the DAF. But not specifically.
Q When you say the general accounts of the DAF, do you mean Charitable DAF Fund, LP?
A Yeah, and its constituent subsidiary entities. It's in there. Like the Prego commercial.
Q In some bank account somewhere in the current DAF structure. Is that right?
A Yes.
Q Okay. Has any of it been spent?
A Money is fungible. So there's legal bills and -- so you could say it's spent. It's -- or it's -- just, money is fungible. So it's in the same pot with all the other assets, is how I kind of would think of it.
Q Ballpark, Mr. Patrick, how much has the DAF entity spent on lawyers in 2026?
A 2026? (Pause.) I don't know precisely. I would -- I'm speculating, but I'll give you an answer, roughly maybe five, six million.
Q Okay. What about in 2025?
A Yeah. Yeah. I don't -- I don't know specifically.
Q Is it more than $10 million?

A It could be.
Q Is it more than $20 million?
A No. I would be very surprised by that.
Q Okay. 2024? Do you have a sense of how much was spent on lawyers then?
A Yes. I think that was around $12 million.
Q Okay. So about how many law firms has the Charitable DAF entity retained?
A I would -- closer to a dozen than half a dozen.

THE COURT: Mr. Edney, I'm sorry to interrupt you, but we're at 11:00 o'clock. We're going to take a 10-minute recess. If you're wanting to catch a plane at 1:00 p.m., you're trying to get through this witness, we're going to need to move things along.

MR. EDNEY: Yes, Your Honor.

THE COURT: So I just want to make sure that the parties are aware of their own time management. But we're going to take a 10-minute recess.

MR. EDNEY: Thank you, Your Honor.

THE CLERK: All rise.

(A recess ensued from 11:01 a.m. until 11:15 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

A VOICE: Your Honor, (inaudible) Mr. Edney, but there's also (inaudible). (inaudible) to see what it is

by Mercer. And then an LTIP award that's awarded every three years. And so part of that compensation was an LTIP that is based upon the value of the DAF from 2021 through the increase into the 2024 year, is my general recollection.

Q So the answer to my question about how much the DAF entities paid you in 2024 is $10-1/2 million?

A Yes.

Q Okay. And we did talk about your compensation in the deposition on Thursday, didn't we?

A Yes, we did.

Q And I asked you then whether you got paid more than $13 million in 2024, and you said you weren't sure. Isn't that right?

A That is correct.

Q And why are you so certain of the $10-1/2 million number now?

A Because I made an inquiry to confirm exactly what that number was.

Q Did you review documents to do that?

A No.

Q Who did you ask?

A I just called up Mr. Raver, the CFO of the DAF, and I asked him specifically how much was I paid in that year, and that's the number he gave me.

Q Okay. How much did the DAF entities pay you in 2025?

A In the year 2025, I received a bonus for the 2024 work. Paul Murphy awarded me a multiple of three. On a Mercer bench scale of two to four, he awarded me a 3 off of my base of $850,000. And that was paid in roughly February of 2025. And then for the remainder of 2025, I should -- I received my base compensation of $850,000.
Q Okay. I mean, I appreciate the explanation, but can you give me a total number of compensation for 2025, please?
A For 2025, yeah, it would be $850,000 plus $2,550,000, if I'm correct. So add those two numbers together.
Q So about $3.4 million; is that right?
A I'm -- $850,000 plus $2.5 million, yes.
Q Okay. And how about for 2026, Mr. Patrick?
A It's -- it's -- the award for the 2025 work awarded in 2026 was the same multiple and it's the same base.
Q So you expect to make about $3.4 million in 2026?
A Yes.
Q And since its inception, Mr. Patrick, the DFW Charitable Foundation has given away less than a million dollars; is that correct?
A Correct.
Q All right. Do you remember when we earlier talked about the Amended and Restated Partnership Agreement of Charitable DAF Fund, LP?
A Yes.

Let's continue to be respectful of each other and we can stop with the sidebars about counsel. I'd appreciate that. That's what's required of all attorneys and all of us.

So, okay. I understand your position. We'll deal with that come May 21st when you call him, if you're going to call him.

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay?

MR. EDNEY: Thank you, Your Honor.

THE COURT: All right. Anything further before we finish up today?

MR. EDNEY: Not from the Movant, Your Honor.

THE COURT: Anything from Highland? All right. With that, we will be adjourned.

MR. EDNEY: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 12:54 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript to the best of my ability from the electronic sound recording available of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **05/13/2026**

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. 19-34054-SGJ-11 |
| | . | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | . | Chapter 11 |
| | . | |
| Debtor. | . | |
| | . | Thursday, May 21, 2026 |
| . . . . . . . . . . . . . . . . . . | . | 9:02 A.M. |

TRANSCRIPT OF CONTINUED HEARING ON
MOTION TO RECONSIDER (RE: DOCUMENT 4297 ORDER ON MOTION TO COMPROMISE CONTROVERSY) AND MOTION TO VACATE FILED BY PARTNER DUGABOY INVESTMENT TRUST (4513)
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor, Highland Capital Management:

Pachulski Stang Ziehl & Jones LLP
BY: JOHN A. MORRIS, ESQUIRE
1700 Broadway, Suite 36th Floor
New York, New York 10019

Willkie Farr & Gallagher LLP
BY: JOSHUA LEVY, ESQUIRE
787 Seventh Avenue
New York, New York 10019

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder: Nicholas Noble
Earle Cabell Federal Building
501 West 10th Street
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

agreements.

Q All right. The documents that you looked at were identified on Highland's exhibit list for that hearing, weren't they?

A I believe they were. Yes.

Q As a matter of fact, further down in this hearing, you were asked what documents you looked at, correct?

A I'm sure I was. If you could show me it, I'm sure that that's the case.

Q Yeah, if you go down to Lines 23 and 24. Are those the documents that are in the exhibit list from 70 to 104? Do you see that?

A I see that it says that, yes.

Q So --

THE COURT: Hold on one second, Mr. Edney.

MR. MORRIS: Your Honor, I object to this line of questioning. The transcript is in evidence already. It speaks for itself. If he wants to impeach Mr. Seery and look at the transcript, by all means. But otherwise, he should just be asking the questions, not just validating the transcript.

THE COURT: Response, Mr. Edney?

MR. EDNEY: Your Honor, I do think I am trying to hold Mr. Seery's testimony to his previous questions and answers in the May 19, 2025 hearing. I think I am using it for an appropriate impeachment purpose.

THE COURT: I don't know the rule. What I am going to say, if you can move this along. I mean, we do have the transcript, but if you've got specific questions where you believe he's not answering the same way and you want to use this, go ahead.

MR. EDNEY: All right. Thank you, Your Honor.

BY MR. EDNEY:

Q So the documents that you looked at to confirm Mr. Patrick's authority, they were listed on the exhibit list of Highland leading to that hearing, weren't they?

A I believe so. I said I'd have to check the actual numbers. It looks like I'm cut off, but we tried to put everything into evidence at the 9019. And we put on a very robust 9019 case by going through every one of the documents, but it was on direct and we didn't beat the dead horse.

Q Fair enough.

MR. EDNEY: Let's go to the exhibit list for the 9019 hearing filed by Highland on June 24, 2025. If we could pull that up, please.

THE COURT: I'm sorry, which exhibit is this, Mr. Edney?

MR. EDNEY: It's not an exhibit.

THE COURT: Okay.

MR. EDNEY: It's for purposes of cross-examination.

THE COURT: Okay.

MR. EDNEY: It's a filing in the main bankruptcy case, Your Honor.

All right. If we could go to Page 8, please.

BY MR. EDNEY:

Q There's a heading there that says "Patrick Authority." Do you see that?

A Yes. And there's a series of exhibits that follow.

MR. EDNEY: If we could scroll down to the next page, 9. And then 10 and then 11.

BY MR. EDNEY:

Q Then there's a heading break that says "Dugaboy Note." Do you see that?

A Yes.

Q So Exhibits 70 through 104 are under the heading "Patrick Authority." Do you see that?

A I'm looking at the Dugaboy Note, but I saw it before. Yes, 70 to 104 under the -- we broke this out so it would be really easy to understand in each of the categories of things we were covering.

Q And Exhibits 70 through 104 were the exhibits, were the documents that you looked at, the organizational documents you looked at to confirm Mr. Patrick's authority. Isn't that right?

A I believe that's most of them, if not all.

Q Okay. As a matter of fact, you stated on the record back

in that hearing that those were the exhibits, Exhibits 70 through 104.

A I stated those were the exhibits. I don't know if that's every document I looked at, but I looked at all 34 of those documents. Yeah.

MR. EDNEY: Okay. All right. Let's go up to the -- I think we're at the right page here. As we do this, let's pull up side-by-side Exhibit 242, Slide 12, please. Do we have that capability to do two at a time?

Just bear with us for a second. I promise this will speed things up.

(Pause)

MR. EDNEY: All right. That's good.

BY MR. EDNEY:

Q Can you see both?

A I can see both, but I apologize because it's going to be hard for me to read this.

Q Yeah, we'll blow it up a touch.

Okay, all right. So one of the documents you reviewed was Exhibit 70, which was the trust agreement at Hunter Mountain, right?

A Yes.

Q And that's the Hunter Mountain Investment Trust in the second to bottom square on this chart. Isn't that right?

A Yes. But to be clear, your chart's incorrect. But okay

-- but that is in that box, yes.
Q Okay. And then at Exhibit 73, we have the Limited Liability Company Agreement of Atlas IDF GP. Do you see that?
A Yes.
Q And that entity is in green on this chart. Isn't that right?
A Yes.
MR. EDNEY: Let's go to the next page of the exhibit list.
BY MR. EDNEY:
Q Now, Exhibits 75 through 85 are documents regarding HMIT, right? See that?
A That's the appointment of Mark Patrick as the successor administrator, yes.
Q And then several organizational documents for Rand Entities and Atlas Entities. Do you see that?
A Yes. Just let me --
Q If you can take him down to 85, please.
A Some are consents. Some are the constituent docs, yes.
Q Okay. But they all concern the Rand and Atlas Entities, right?
A I believe so looking at each of these headings, yes.
Q And these entities, these --
A Just to be clear, I'm looking at the list, not the document.

Q Correct, right. And these Rand and Atlas Entities, they are on this chart over here, Exhibit 242, Slide 15. Aren't they?
A I'd have to check each one, but you certainly have Rand Entities and you certainly have an Atlas entity. And, again, there's so many mistakes in your chart, it's hard to use it. But you have those names listed, yes.
Q All right. So then if we go to the next page, Exhibit Numbers 86 through 93, those are also organizational documents from the various Rand and Atlas Entities. Isn't that right?
A Some are. Some are other documents related to their organization are not organization or constituent documents, yes.
Q But they all concern the Rand and Atlas Entities. Isn't that right?
A They are documents that concern those entities. You're going up to what number?
Q 94. 93, I'm sorry. 86 through 93.
A Yes.
Q Okay. And then Exhibit 94, that concerns Beacon Mountain, LLC. Isn't that right?
A Yes.
Q As does Exhibit 95?
A That's correct.
Q And then Exhibits 96 through 100 concern the Okada Family

Foundation, the Empower Dallas Foundation, and the Crown Global Company. Do you see that?
A I see that, but those are Crown Global Policies.
Q Uh-huh.
A And a term sheet.
Q But they concern the Crown Global Company, right?
A I believe they concern the policy that the entities Empower and Okada Family Trust purchased. I don't believe they concern the Crown Global Company.
Q Okay. They relate to the Crown Global Company, don't they, Mr. Seery?
A To the extent that a policy they issued relates to it. Everything else you've shown is a constituent document, so if you're trying to tie that to being constituent document, I believe you know what that term means, these are not those.
Q All right, Mr. Seery. And the Crown Global Insurance Company, the Empower Dallas Foundation, the Okada Family Trust, they're listed over on the right of Slide 15 of Exhibit 242. Do you see that in pink?
A I see that you have them on your chart, yes.
Q All right. If we go to the next page, we have Exhibits 101 and 102. Those relate to Crown Global, correct?
A Again, those relate to the policies that Crown Global issued, yes.
Q And then we have two HMIT opinions from 2016. Isn't that

right?

A Those are the opinion letters that were -- there's a rep letter, which is Dondero swearing that he's read the opinion and he abides by all of the representations in the opinion. And the opinion which blessed the Hunter Mountain, you know, tax scheme.

Q Mr. Seery, were you aware that by the time of the June 25th hearing, that Hunter Mountain had been sold out of the stack of companies that the Rand PE Fund was a part of?

A Certainly by the hearing, yes. Hold on a second. Can you repeat the question? I think I misunderstood what you said.

Q Sure. By the time of the June 25th hearing, 2025, you were aware that Beacon Mountain and Hunter Mountain had been sold out of the stack of companies that involved Rand PE Fund I, L.P. Isn't that right?

A No. So the interest in Beacon Mountain was sold from one -- I was aware that the interest in Beacon Mountain was sold from one entity that Patrick controlled to another entity that Patrick controlled called CLO Holdco, LLC. It's on our chart that we used as a demonstrative and then your prior counsel used to cross in the 9019 hearing.

Q Okay. And after reviewing Documents 70 through 104 on this exhibit list, you concluded Mr. Patrick had complete authority to enter into the settlement agreement. Isn't that right?

A Yes.
Q And you concluded that the proceedings in the Cayman Islands had no impact on Mr. Patrick's authority over any of the entities in the chain of entities that owned Hunter Mountain. Is that right?
A That's correct, yes.
Q And you concluded that the relevant entities to Hunter Mountain run up to companies he owns and controls, and it's a structure that was set up a long time ago. Is that right?
A That's a pretty broad brush. But I concluded that he had authority over each of the entities and these were entities that I wanted to have as counterparties to the settlement agreement.
Q You had not concluded that the relevant entities to Hunter Mountain were in a structure that was set up a long time ago?
A The Hunter Mountain structure was set up in 2015 to shelter hundreds of millions of dollars of income from taxes that Dondero and Okada were going to be hit with. So I'm very familiar with the structure.
Q All right.
A It was set up in 2015. Yeah, that's I guess a pretty long time.
MR. EDNEY: Let's go to Exhibit 35. Page 99, please.
BY MR. EDNEY:
Q All right. Going to Line 13. At the June 25, 2025

hearing, were you asked the following question, "So based on the work that you did and the documents you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT Entities?" And your answer was "Yes." Do you see that?
A Yes.
Q And then were you asked the question, "What view did you reach?" And the answer follows, "He has complete authority over each of these entities. They run up to entities that he controls or he owns, and he's had that. It's a structure that was set up a long time ago, and any changes to that structure are consistent with the documents that let him do those things." Did I accurately read that question and answer?
A Yes.
Q Did the Hunter Mountain Entities concern a structure that was set up a long time ago?
A That's exactly what I just testified to in 2015.
Q All right. And you concluded that the Dallas Foundation had no rights with respect to the -- at all with respect to the management of these entities because Crown Global had only issued an annuity policy. Isn't that right?
A It was the entire structure of the Crown policy and the layers that they separated those entities from control of the entity. Yes, they had no voting, no consent. Virtually no rights at all, other than to receive the payments from Crown.

Q But by the time of this testimony, Hunter Mountain and Beacon Mountain had been sold out from under the Crown Global structure. Isn't that right?

A Again, you keep doing this, and it's not fair and it's not correct. Be specific. Hunter Mountain, the interest in Beacon Mountain was sold. Yes.

Q And it was sold away from the Crown Global structure. Isn't that right?

A It was sold away -- I've got to look back at the structure. It was sold by Rand through the multiple layers of the structure. And they didn't have any rights to consent. And it was between two entities that Mr. Patrick controlled.

I'm not trying to be difficult. That's exactly what I testified to. That's what the documents say, and that's what we've done. And as you know, the Dallas Foundation objection and withdrew their objection, so go ahead.

Q Before entering into the settlement agreement, did you ask Mr. Patrick to provide Highland with any of the documents from the Cayman Islands proceedings concerning the Charitable DAF?

A I don't -- I don't know. I know I had some of them. I had the supervision application, for sure. I don't know that I asked him to provide them. I don't know where I got them. I think we may have gotten those elsewhere, but I don't know.

Q All right. Now, Mr. Morris asked you a question about whether the liquidators had been in touch with you regarding

the potential settlement prior to the June 25th hearing, right?
A If he -- no, he asked me if they had been in touch with me prior to June 24th.
Q I see.
A No, that's the question he asked. You can look at the transcript. You can see or not see. You don't have to be snide with me. I'm sorry, Your Honor.

THE COURT: Yeah. Let's make sure both for witness and attorney, let's make sure that we're keeping our comments professional and we don't need snide marks.

BY MR. EDNEY:
Q So did they get in touch with you on June 24th, 2025?
A I received a letter, it's in evidence, that came on June 24th for -- it may have come late and I might have gotten it the morning of the 25th.
Q And what did that letter say?
A That letter said, we're aware of the transactions that were the -- we've seen the CDMCFAD that collapsed on the DAF side, a number of entities, and that removed those DAF structures from the entity that the JOLs were now appointed for. So they were aware of the redemption -- the dilution and redemption transaction, as they've so described, and asked for a 45-day stay of the hearing.
Q So did the Cayman Island Liquidators ask the Court to delay the approval of the settlement agreement for 45 days?

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: May 26, 2026

Michael J. Edney
MORGAN LEWIS BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj |

**NOTICE OF APPEAL TO THE**
**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS**

Under the Federal Rules of Bankruptcy Procedure 8002 and 8003, The Dugaboy Investment Trust ("Dugaboy") appeals to the United States District Court for the Northern District of Texas from the Court's June 15, 2026, Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate under Fed. R. Civ. P. 60(b) (the "Denial Order"). A copy of the Denial Order is attached to this Notice of Appeal at **Exhibit A**.

The Parties to the June 15, 2026, Order and the names, addresses, and telephone numbers of their attorneys are as follows:

1. *Party/Appellant*: The Dugaboy Investment Trust

Attorneys:

MORGAN LEWIS BOCKIUS LLP
Michael J. Edney
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202)-739-3000
F: (202)-739-3001

And

KING & SPALDING LLP
Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
2601 Olive Street, Suite 2300
Dallas, TX 75201
T: (214) 764-4600

2. *Party/Appellee:* Highland Capital Management, L.P.

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

3. *Party/Appellee:* Highland Claimant Trust

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

4. *Party/Appellee:* The Highland Litigation Sub-Trust

Attorneys:

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor New York, NY 10010
T: (212) 849-7000

And

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
T: (214) 981-3300

5. *Party/Appellee:* Hunter Mountain Investment Trust

KELLY HART PITRE
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
T: (225) 381-9643

F: (225) 336-9763

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
T: (504) 522-1812
F: (504) 522-1813

Dated: June 29, 2026

MORGAN LEWIS BOCKIUS LLP

*/s/ Michael J. Edney*
Michael J. Edney
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

*Attorneys for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on June 29, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Michael J. Edney*
Michael J. Edney

# Exhibit A

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 15, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj11** |
| | § | |
| | § | |
| **Debtor.** | § | |

**ORDER**

Consistent with the Memorandum Opinion issued on this date, it is hereby

ORDERED that the Motion for Relief from Order and Motion to Vacate[1] filed by the Dugaboy Investment Trust ("Dugaboy") [Dkt. No. 4513] is denied; and it is further

ORDERED that Dugaboy's objection to Exhibit 300, which was offered into evidence by Highland Capital Management, L.P. and the Highland Claimant Trust, is sustained.

### End of Order ###

[1] The full title of the pleading filed is Memorandum of Law in Support of the Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

WILLKIE FARR & GALLAGHER LLP
Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expwy., Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) | |

**HIGHLAND CAPITAL MANAGEMENT, L.P. AND THE HIGHLAND CLAIMANT TRUST'S OPPOSITION TO THE DUGABOY INVESTMENT TRUST'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

[1] Highland's last four digits of its taxpayer identification number are (8357). The service address for Highland is 6333 E. Mockingbird Lane, Suite 147 #5045, Dallas, TX 75214.

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ........................................ 1

ARGUMENT ........................................ 3

I. DUGABOY FAILS TO SHOW ANY "MANIFEST ERROR" IN THIS COURT'S DENIAL OF DUGABOY'S MOTION UNDER RULE 60(b)(2). ........................................ 3

II. DUGABOY FAILS TO SHOW ANY "MANIFEST ERROR" IN THIS COURT'S DENIAL OF DUGABOY'S MOTION UNDER RULE 60(b)(3). ........................................ 5

III. DUGABOY FAILS TO SHOW ANY "MANIFEST ERROR" IN THIS COURT'S DENIAL OF DUGABOY'S MOTION UNDER RULE 60(b)(6). ........................................ 6

CONCLUSION ........................................ 7

Highland Capital Management, L.P., the reorganized debtor in the above-captioned chapter 11 case, and the Highland Claimant Trust (together, "Highland"), by and through its undersigned counsel, respectfully submits this opposition (the "Opposition") to The Dugaboy Investment Trust's ("Dugaboy") *Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* (the "Motion" or "Mot."; Dkt. No. 4684).[2] In support of the Opposition, Highland respectfully states the following:

**PRELIMINARY STATEMENT**

1. Dugaboy's Motion is meritless. It is a transparent attempt to delay appellate reckoning and therefore should be denied immediately. To that end, Highland sets forth below only the most glaring flaws in Dugaboy's Motion and respectfully urges this Court to deny the Motion without awaiting a reply brief from Dugaboy. Should Dugaboy file a reply before disposition of the Motion, Highland respectfully reserves the right to submit supplemental briefing further detailing the gross factual and legal inaccuracies in the Motion.[3]

2. Dugaboy was given every opportunity to pursue its Rule 60(b) Motion. This Court granted in considerable part Dugaboy's discovery requests against HMIT and Highland, which

---

[2] Capitalized terms not otherwise defined herein have the same meanings as in this Court's June 15, 2026 *Memorandum Opinion* (the "Opinion" or "Op."; Dkt. No. 4678) and/or the Motion. Unless otherwise noted, emphasis is added and alterations, citations, and quotations are omitted.

[3] As this Court will recall, at the conclusion of the Rule 60(b) trial, the Court squarely rejected the suggestion that it should delay closing arguments or authorize post-trial briefing. (May 21, 2026 Tr. at 21:24–22:17 (Dugaboy's request to delay); *id.* at 242:24–243:10 (U.S. Trustee's suggestion of post-trial briefing); *id.* at 251:9–10 (The Court: "Let me just state for the record, the Court is not going to authorize any post-trial briefing.").) By filing a motion for reconsideration that barely engages the Court's Opinion and entirely ignores the mountain of contrary evidence admitted at trial, Dugaboy has effectively granted itself the briefing this Court said it did not want and would not permit. Were Highland to prepare an exhaustive rebuttal to Dugaboy's Motion—which is rife with omission and mischaracterization on virtually every issue in the case—that would require significant time and expense, thus giving Dugaboy the very delay it is obviously seeking. While this Opposition states more than ample grounds to deny the Motion, Highland of course stands ready to submit whatever additional briefing may be helpful to this Court. For the Court's convenience, Highland has also attached to this Opposition as **Exhibit 1** its prior demonstrative, filed at Dkt. No. 4665-2, which contains a point-by-point rebuttal (with specific citations to the case docket and exhibits admitted by this Court) to the claims Dugaboy made in its reply in support of the Rule 60(b) Motion. The Motion largely recycles portions of that reply brief, so Highland's demonstrative would prove useful were this Court to desire more detailed responses.

included both documentary productions and depositions.[4] And this Court afforded Dugaboy a three-day trial, at which "the Court admitted hundreds of exhibits and heard testimony from five witnesses." (Op. ¶ 9.) At the conclusion of those proceedings, this Court entertained lengthy closing arguments and took the matter under advisement. This Court ultimately denied the motion, issuing its Opinion on June 15, 2026.

3. As a threshold matter, it is important to recognize the Herculean burden Dugaboy faces on this Motion. As Dugaboy acknowledges, this Court had "'considerable discretion'" in deciding the Rule 60(b) Motion. (Mot. 9 (quoting *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993)).) And, as Dugaboy further acknowledges, reconsideration under Rule 59(e) is not available simply because a court is believed to have erred. Rather, as relevant here, Dugaboy must show that this Court's decision rests upon a "'manifest error of fact.'" (*Id.* at 9 (quoting *Williams v. French*, 2024 WL 3929894, at *3 (S.D. Tex. Aug. 23, 2024)).)[5] For the reasons stated below (among others), this Court did not commit a "manifest" factual error that in turn led the Court to abuse its substantial discretion in denying relief under Rule 60(b). *Cf. United States v. Hernandez*, 48 F.4th 367, 373 (5th Cir. 2022) ("To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish."). In fact, this Court undoubtedly considered the mountain of evidence against the Rule 60(b) Motion versus the complete lack of support for the motion and properly denied Dugaboy's attempt to re-try previously litigated claims.

[4] Dugaboy had previously participated and received extensive written and testimonial discovery in connection with the 9019 Motion. (Op. ¶¶ 25–27.)

[5] Dugaboy does not—and cannot—contend that "there has been an intervening change in the controlling law," or that the new rehearing motion is based on "newly discovered evidence that was previously unavailable" at the Rule 60(b) trial. (Mot. at 8 (citing *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012)).)

## ARGUMENT

### I. DUGABOY FAILS TO SHOW ANY "MANIFEST ERROR" IN THIS COURT'S DENIAL OF DUGABOY'S MOTION UNDER RULE 60(b)(2).

4. Dugaboy claims that this Court erred in concluding that the Dondero Affidavit demonstrates that the purported misconduct by Mr. Patrick could not qualify as "newly discovered" evidence within the ambit of Rule 60(b)(2). Dugaboy admits that, at the very least, the Dondero Affidavit "recounted the bits and pieces of information [Dondero] had learned regarding recent transactions, including indications that Mr. Patrick had effected a sale of Beacon Mountain [which is the sole beneficiary of Hunter Mountain] for $1 million." (Mot. at 11.) Dugaboy nonetheless claims that "actionable evidence" of Mr. Patrick's purported wrongdoing was only "later revealed in the Cayman proceedings and elsewhere." (*Id.* at 2.) Dugaboy's contention suffers from at least two glaring defects.

5. ***First***, it rests on the obviously false premise that the Dondero Affidavit was the *only* evidence adduced at the Rule 60(b) trial demonstrating Dugaboy's knowledge—prior to July 14, 2025[6]—of the Charitable DAF restructuring. To the contrary, as noted in the Opinion, "the Court admitted hundreds of exhibits and heard testimony from five witnesses." (Op. ¶ 9.) As this Court will recall, Highland demonstrated beyond any conceivable doubt that the DAF Restructuring was on full display prior to and during the original 9019 Hearing. That fact was proven not least by Exhibit 60 at the 9019 Hearing, which included a structure chart laying out the entire post-restructuring organization in detail, all as was known to Dugaboy prior to the 9019 Hearing.[7] (May 11, 2026 Hr'g Tr. at 41:3–14.) What is more, as this Court's Rule 60(b) Opinion

[6] As Highland explained during the Rule 60(b) trial, the correct date under the applicable rules is July 28, 2025, but Dugaboy's Motion fails under either date.

[7] As noted in the Opinion (at ¶ 22) and reflected in testimony and filings throughout this bankruptcy case, Mr. Dondero is the driver behind all of the litigation related to the 9019 Order and proceedings in the Cayman Islands, and Dugaboy expressly acknowledged that he is and has been the designated agent of Dugaboy for all purposes relating to all of the

notes (at ¶ 3), the objection filed by Crown Global and The Dallas Foundation to the original 9019 Motion "raised concerns about Mark Patrick's authority to sign the settlement agreement on behalf of the HMIT Entities" due to the restructuring. And, as this Court further noted (Op. ¶ 4), following withdrawal of that objection with prejudice by agreement, Dugaboy itself was permitted at the 9019 Motion trial to contest "Mr. Patrick's authority to execute the settlement agreement on behalf of the HMIT Entities," despite its "failure to raise this issue in its written objection." Were that not enough, at the Rule 60(b) hearing, this Court received still further undisputed evidence that the DAF restructuring was fully known or knowable to Dugaboy within the relevant time period.[8] In short, it simply blinks reality for Dugaboy now to claim that this Court committed a "manifest error of fact" in determining, as a matter of its "substantial discretion," that Dugaboy was well aware of the DAF Restructuring prior to the 9019 Hearing.

---

"Relevant Litigation," as that term is defined in the parties' stipulation. (Dkt. No. 4615 ¶ 1.) Accordingly, all of Mr. Dondero's knowledge and involvement in the various litigations is imputed to Dugaboy. *See also, e.g.*, Exhibit 47 (The *Winding Up Petition in In re Charitable DAF Holdco, Ltd.*, filed in the Grand Court of the Cayman Islands Financial Services Division on April 16, 2025 [Docket No. 4534-6] ¶¶ 20–52; Exhibit 49 (*Petition for Court Supervision of a Voluntary Liquidation in In re Charitable DAF Holdco, Ltd.*, filed in the Grand Court of the Cayman Islands Financial Services Division on May 2, 2025 [Docket No. 4534-13] ¶¶ 8–14; Exhibit 51 (The *Affidavit of Mark Eric Patrick*, notarized on June 4, 2025, in *In re Charitable DAF Holdco, Ltd.* and filed in the Grand Court of the Cayman Islands Financial Services Division on June 4, 2025 [Docket No. 4534-10]; Exhibit 52 (*Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] ¶¶ 9–34, filed in the United States Bankruptcy Court for the Northern District of Texas on June 9, 2025 [Docket No. 4534-18]; Exhibit 55 (Deposition transcript of Shawn Raver dated June 20, 2025); Exhibit 56 (Deposition transcript of Julie Diaz dated June 22, 2025); Exhibit 57 (Deposition transcript of Torrey Littleton dated June 22, 2025); Exhibit 58 (Deposition Transcript of Mark Patrick dated June 23, 2025); Exhibit 61 (*Declaration of James David Dondero* filed in the Texas Business Court, Dallas, Texas and dated July 1, 2025 [Docket No. 4521-H-6]; Exhibit 62 (*Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver in The Highland Dallas Foundation, Inc., et. al. v. Patrick, et. al*, No. 25-BC01B-0027, filed in the Texas Business Court, 1st Division on July 1, 2025 [Docket No. 4534-15].)

[8] For example, the DAF restructuring was revealed in detail in ¶¶ 8–14 of the Supervision Application in the Cayman Islands (May 2, 2025); ¶¶ 20–52 of the Winding Up Petition in the Cayman Islands (April 23, 2025); ¶¶ 9–34 of the Dallas Foundation's Objections (June 9, 2025); 11:6-14:6 Shawn Raver's deposition (June 20, 2025); and ¶¶ 5.41–5.52 of the Texas Business Court proceeding (July 1, 2025). (Ex. 99; Dkt. No. 4665-2.)

6. ***Second***, in any event, Dugaboy fails to confront Rule 60(b)(2)'s requirement that "'newly discovered evidence'" includes only such "'evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b).'" (Op. ¶ 16 (quoting Fed. R. Civ. P. 60(b)).) As this Court found—and Dugaboy does not deny—the parties exchanged substantial discovery in connection with the 9019 Motion, which included Highland Capital's production of "over 4000 pages of documents, the contents of which included organization documents for the HMIT Entities." (*Id.* ¶ 25.) Nor does Dugaboy deny that "[a]t no time prior to trial on the 9019 Motion did Dugaboy challenge Highland Capital's discovery responses as insufficient." (*Id.*) Thus, even assuming (counter to fact) that Dugaboy lacked sufficient information regarding the supposed "perfidy" of which it now complains (Mot. at 6), that was its own fault for failing to read the documents and deposition testimony in the 9019 Motion discovery, to ask for further discovery in connection with that matter, or to object to the scope of that discovery.[9]

## II. DUGABOY FAILS TO SHOW ANY "MANIFEST ERROR" IN THIS COURT'S DENIAL OF DUGABOY'S MOTION UNDER RULE 60(b)(3).

7. Dugaboy claims that "Mr. Patrick's omissions and misrepresentations are actionable under Rule 60(b)(3) because [*sic*] obstructed discovery into his theft." (Mot. at 19.) But here again, Dugaboy fails to acknowledge its own failure to object to any of those purported obstructions. Similarly, Dugaboy baselessly claims that "[i]f those Highland managers were aware that Mr. Patrick had sold Hunter Mountain and the Debtor [*sic*] equity position into the Charitable DAF and restructured it, they withheld that documentation in discovery" during the 9019

[9] Dugaboy's conclusory suggestion that the Rule 9019 discovery "was unnecessarily rushed and frantic" (Mot. at 2) is both false and beside the point. It is false because the discovery was conducted over a period of several weeks, which is par for the course in contested matters in bankruptcy court. It is beside the point because Dugaboy failed even to object to those purported shortcomings at the time, thus forfeiting any conceivable claim of error—much less "manifest" error—based on them now.

proceedings. (*Id.* at 22.) As noted above, the DAF Restructuring was literally displayed on the screen ***by Highland*** at the 9019 trial (Ex. 60; May 11, 2026 Hr'g Tr. at 41:3–14), thus belying any claim that Highland withheld such information from Dugaboy. Nor did Dugaboy bother objecting that such information was sought but not produced in discovery (because it was produced).

## III. DUGABOY FAILS TO SHOW ANY "MANIFEST ERROR" IN THIS COURT'S DENIAL OF DUGABOY'S MOTION UNDER RULE 60(b)(6).

8. It is difficult to know what to make of Dugaboy's third argument for reconsideration, which is that denying relief under Rule 60(b)(6) was manifestly erroneous because it "rewards only the intentional concealment of the scheme." (Mot. at 23.) In one breath, Dugaboy claims that it is entitled to relief "Absent Restoration of the Charitable Structures" (*id.* at 23), and in the next it contends that "Dugaboy does not seek to unwind the restructuring" (*id.* at 25).[10] But Dugaboy does not seriously grapple with this Court's conclusion that considerations of "equity" do not compel unwinding a 9019 settlement where such relief "would not impact the DAF restructuring [*i.e.*, the purported wrongdoing] in any way." (Op. ¶ 28.) Indeed, Dugaboy is seeking such relief in at least two different venues via the Texas Business Court and the Cayman Islands (albeit unsuccessfully thus far), and the ultimate resolution of those pending matters remains wholly irrelevant to the 9019 Settlement already approved by this Court.

9. In any event, Dugaboy's new reconsideration motion utterly fails to address this Court's independent reason for denying relief under Rule 60(b)(6)—namely, that "Dugaboy failed to articulate a 'mutually exclusive' reason for vacating the 9019 Order." (*Id.* ¶ 29.) As this Court explained, Dugaboy's Rule 60(b)(6) argument "is identical to its requests for relief under

[10] This disclaimer appears to be consistent with the admission by Dugaboy's counsel during closing arguments at the Rule 60(b) trial that "Your Honor is never going to unscramble the egg in terms of the restructuring. You're not going to bring those assets back to Charitable DAF Holdco. You're not going to get Mr. Patrick's compensation back." (May 21, 2026 Hr'g Tr. at 212:4–7.)

Rule 60(b)(3)," and thus is "insufficient" to state an independent ground for relief. (*Id.*) Dugaboy does not even acknowledge—much less overcome—this alternative ground and thus is not entitled to reconsideration.

## CONCLUSION

10. For the reasons stated above, Dugaboy's Motion should be denied. Respectfully, Highland urges this Court to enter such an order as expeditiously as possible, because it is transparently obvious that Dugaboy has filed this Motion (just before midnight on the final day, no less) in hopes of delaying appellate review. As this Court noted (at Op. ¶ 4 & n.5), appeal of the underlying Rule 9019 Order remains pending. And, as Highland explained at the Rule 60(b) trial, Highland intends to move to consolidate the Rule 60(b) appeal with the 9019 appeal, such that the District Court can dispose of the matter efficiently. Dugaboy can attempt these same faulty arguments to the District Court (and then recycle them yet again in the Fifth Circuit), but Dugaboy should not be permitted to clog this Court's docket and further burden the Highland estate with what amounts to at the very least a *third* bite at the apple just in this Court.[11]

11. Should this Court choose to await a reply brief from Dugaboy, Highland respectfully reserves the right to submit supplemental briefing detailing the additional ways in which Dugaboy's latest reconsideration Motion rests on numerous factual and legal errors. As noted above (at n.3), in lieu of such additional filings, this Court may wish to review Highland's prior rebuttal filing (Dkt. 4665-2), re-attached hereto for this Court's convenience.

[11] Dugaboy's: (1) original objection to the 9019 Motion, (2) Rule 60(b) Motion, and (3) this Motion. The 9019 Order (as well as the Dugaboy *Motion to Stay 9019 Order*) is the subject of a fully briefed appeal at the District Court, and Dugaboy has also filed a notice of appeal of the Rule 60(b) Motion. And these do not even include the other collateral attacks waged in Texas and Cayman courts against Mark Patrick and entities he controls. This apple has already been eaten through to the core.

Dated: July 6, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expwy., Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**WILLKIE FARR & GALLAGHER LLP**

Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

**EXHIBIT 1**

**EXHIBIT 99**

**REBUTTAL TO DUGABOY'S REPLY IN SUPPORT OF MOTION TO VACATE (DKT 4607)**

**<u>CHART ON PG. 19 OF REPLY BRIEF</u>**

| **Dugaboy: "Highland's Alleged 'Old' Information"** | **Dugaboy: "Highland's Cited Sources of Prior Knowledge"** | **Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"** | **Highland Rebuttal** |
|---|---|---|---|
| "Patrick has controlled DAF Entities since 2021." | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025); Foundations Action (July 1, 2025). | "The Dondero Affidavit and Winding Up Petition raised concerns about Patrick's control but did not contain the transactional documentation (share transfers, resolutions, assignments) that would be necessary at an evidentiary hearing to prove the scope and method of control. Ex. 3, Affidavit of Jim Dondero; Dkt. 4315-E (Winding Up Petition).<br><br>The Dallas Foundation Objection (Dkt. 4231) expressed suspicion but explicitly stated it lacked sufficient information to make detailed allegations and requested further investigation. | **False**.<br><br>One does not need "transactional documentation" to know that something happened, and the acknowledged "concerns" and "suspicions" were enough to file sworn affidavits, declarations, and petitions seeking affirmative relief in both the Cayman Court and the Texas Business Court. *See* Highland Exs. 47-49, 61-62.<br><br>Moreover, having admitted to having "concerns about Patrick's control," Dugaboy could have exercised reasonable diligence to seek discovery on these very issues as part of the 9019 Proceeding. But while Dugaboy served document requests and interrogatories (Highland Ex. 53), and took depositions (Highland Exs. 55-58), neither Dugaboy nor the Dallas Foundation served *any* written discovery on Highland or HMIT concerning the purported "concerns about Patrick's control." |

| **<u>Dugaboy: "Highland's Alleged 'Old' Information"</u>** | **<u>Dugaboy: "Highland's Cited Sources of Prior Knowledge"</u>** | **<u>Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"</u>** | **<u>Highland Rebuttal</u>** |
|---|---|---|---|
| | | None of these documents contained the actual April 2, 2021, CLOH shareholder resolutions or the March 21, 2021, DAF GP Assignment &<br>DAF Holdco Share Transfer. Those documents first appeared in connection with the MacInnis Affidavit. *See* Ex. 2 First MacInnis Aff., (2021 CLOH Shareholder Resolution, MM-1, 1439 n.13); (DAF GP Assignment & DAF Holdco Share Transfer, MM-1, 1439 n.1).<br><br>Suspicion of control is not the same as possession of authenticated evidence proving, how, when, and through what mechanism control was obtained."<br><br>Reply at 19. | Also, the April 2, 2021 CLOH SH resolutions and the March 21, 2021 DAF GP Assignment did not "first appear" in the MacInnis Affidavit--***they were filed by Holdco and the Supporting Organizations in this Court almost five years ago, on July 9, 2021*** (Dkt. 2547, Exs. 15 and 29)<br><br>Finally, Dondero and the Charitable Organizations repeatedly acknowledged Patrick's control, including, for example:<br><br>- Highland Ex. 47 (Cayman Winding Up Pet.) 4/16/25 ¶¶ 11, 16<br>- Highland Ex. 48 (Dondero Aff. 4/16/25) ¶¶ 12, 20-21, 23<br>- Highland Ex. 52 (Dallas Foundation Obj.) 6/9/25 ¶¶ 11—12<br>- Highland Ex. 61 (Dondero Decl. 7/1/25) ¶¶ 8, 9, 17—18, 20<br>- Highland Ex. 62 (Tex. Bus. Ct. Orig. Pet. 7/1/25) ¶¶ 1.2, 3.5, 4.1, 5.8—11, 5.18—20, 5.56, 6.3, 6.16, 7.14, 7.17—18, 8.13—14 |
| "Patrick has controlled HMIT | (April 16, 2025); Dallas Foundation | "Highland cites the Membership Interest Purchase Agreement, Atlas GP Consents, and HMIT Appointment documents with Bates references (Dkt. 4255, Exs. 75, 82, | **False**.<br><br>Something learned at trial cannot constitute "newly discovered" evidence under 60(b)(2)—but |

| Dugaboy: "Highland's Alleged 'Old' Information" | Dugaboy: "Highland's Cited Sources of Prior Knowledge" | Dugaboy: "Why This Does Not Refute Rule 60(b)(2)" | Highland Rebuttal |
|---|---|---|---|
| Entities since 2022" | Objection (June 9, 2025); MIPA (Aug. 1, 2022); Atlas GP Consents (Oct. 13, 2022); HMIT Appointment (Aug. 12, 2022). | 86–88), but these are Highland's own trial exhibits that it introduced at the 9019 Hearing.<br><br>Critically, at his June 23, 2025 deposition, Patrick could not identify who owned CDMCFAD, stating he would need to "revisit the actual organizational documents." 4315-49, 6/23/2025 Patrick Deposition, 7:22–25. Two days later at the 9019 Hearing, Patrick readily confirmed that CDMCFAD owned Charitable DAF Fund, LP and that DFW Charitable Foundation was the "ultimate beneficial owner." 4315-23, 6/25/25 Hearing Transcript, 174:8–14.<br><br>Yet when pressed on the December 2024 transaction (in which Patrick caused Charitable DAF Holdco to transfer its entire $270 million interest in the Fund to CDMCFAD), Patrick repeatedly claimed not to recognize "Charitable DAF Holdco," demanding corporate documents and asserting "there could be a lot of entities called that." *Id.* at 177:21–24. The | Dugaboy's assertion that it "learned of Patrick's ownership in these entities" for the first time at the 9019 Hearing is false in any event; ownership of all entities was disclosed before and during discovery.<br><br>In fact, Dugaboy and the Supporting Organizations knew well before the 9019 Hearing that (a) Patrick formed DFW Foundation and was its sole member,[1] (b) DFW is based out of Patrick' home and (c) Patrick caused DAF Holdco to issue 318 new Participating Interests to DFW that diluted the Participation Interests of the Charitable Entities:<br><br>- Highland Ex. 49 (Pet. for Ct. Supervision 5/2/25) ¶¶ 10(a) – (d)<br>- Highland Ex. 52 (Dallas Foundation Obj. 6/9/25) ¶¶ 27—28<br><br>Moreover, while Highland included Exhibits 75, 82, and 86—88 on its W&E List, ***those documents were produced in discovery*** (that is why they are Bates Stamped with the prefix "HCMLPHMIT"; *see* Dkt. 4255). |

[1] For clarification, Patrick does not "own" DFW Foundation—it is a 501(c)(3) private foundation without economic stockholders.

| **Dugaboy: "Highland's Alleged 'Old' Information"** | **Dugaboy: "Highland's Cited Sources of Prior Knowledge"** | **Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"** | **Highland Rebuttal** |
|---|---|---|---|
| | | Court "fe[lt] like [Patrick was] feigning confusion." *Id.* at 182:4–15.<br><br>Immediately thereafter, Patrick confirmed he was involved in the transaction and that CDMCFAD obtained its interest "from an entity called Charitable DAF Holdco, Ltd." *Id.* At 187:7–12. **This was the first time Dugaboy learned of Patrick's ownership in these entities."**<br><br>Reply 19-20. | Moreover, during their respective depositions, (a) Raver unambiguously testified (with Dugaboy's counsel participating) regarding the share issuance and that the DFW Charitable Foundation owns CDMCFAD (Highland Ex. 55 at 22:7—13; 23:1—2), and (b) Patrick testified that he was the "control person" for CDMCFAD LLC. Highland Ex.58, 14:1-3.<br><br>Finally, the JOLs' 6/24/25 letter requesting an adjournment of the 9019 Hearing—offered into evidence by Dugaboy—described the 12/24 transfer of DAF Holdco's 100% interest in DAF Fund to CDMCFAD and the subsequent redemption of that interest. Doc. 4294 (Dugaboy Ex. 3). |
| "CDH GP replaced DAF GP as general partner of DAF Fund" | Winding Up Petition (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025); Raver Deposition (June 20, 2025); JOL | "Highland's own chart concedes that the JOL Writ (July 15, 2025) and Chapter 15 Petition (July 21, 2025) are among the sources both of which post-date July 14, 2025. The earlier sources (Dkt. 4315-E, ¶¶ 38–40, Winding Up Petition, Dkt. 4231, 10, Dallas Foundation Objection) mentioned that CDF GP had replaced DAF GP but did not contain the underlying GP Assignment document or explain that CDH GP was a newly formed shell entity, | **False**.<br><br>The GP change was known and every filing relating to the DAF restructuring describes how the GP controls the DAF Fund—so of course a change of the GP "wrests control" from the prior GP entity to the new GP entity. The one thing it does NOT do, however, is wrest control from Patrick as he was the sole owner and director of BOTH GP entities. |

| Dugaboy: "Highland's Alleged 'Old' Information" | Dugaboy: "Highland's Cited Sources of Prior Knowledge" | Dugaboy: "Why This Does Not Refute Rule 60(b)(2)" | Highland Rebuttal |
|---|---|---|---|
| | Writ (July 15, 2025); Ch. 15 Petition (July 21, 2025). | incorporated February 27, 2024, with Patrick as sole director, created specifically to wrest control from the existing governance structure.<br><br>The replacement's significance, as part of a broader scheme to funnel $270 million away from the charities, was not evident from the bare fact of the GP change."<br><br>Reply at 20. | In their 4/16/25 Winding Up Petition, the Supporting Organizations expressly stated that their counsel learned in "February 2025" that on "27 February 2024", Patrick "had redomiciled and replaced the General Partner of the Fund, without notice to the Charities." They also stated that the new GP was a Cayman Islands entity called CDH GP, Ltd., and that Patrick was "the sole director of the New GP." Highland Ex. 47 (Winding Up Pet. 4/16/24) ¶¶ 38—40). *See also*:<br><br>- Highland Ex. 49 (Pet. for Ct. Supervision 5/2/25) ¶¶ 10(a) – (d)<br>- Highland Ex. 52 (Dallas Foundation Obj. 6/9/25) ¶ 24<br>- Highland Ex. 55 (Raver Dep. 4/20/25) at 23:21 –25:6.<br>- Highland Ex. 62 (Tex. Bus. Ct. Orig. Pet. 7/1/25) ¶¶ 1.2, 3.2, 5.41 – 50. |
| "DFW Foundation was formed by | Supervision Application (May 2, 2025); Dallas | "The Supervision Application (filed May 2, 2025) was filed in the Cayman Court; it is a protective filing requesting court oversight of the liquidation. Dkt. 4521-G, | **False.** [2]<br><br>Highland Ex. 49 (Pet. for Ct. Supervision 5/2/25) ¶¶ 10(a) – (d) details DFW's role in the share |

[2] Again, Patrick is not the ultimate beneficial owner of DFW Foundation or the DAF—DFW is a 501(c)(3) private foundation—there is no economic equity owner.

| **Dugaboy: "Highland's Alleged 'Old' Information"** | **Dugaboy: "Highland's Cited Sources of Prior Knowledge"** | **Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"** | **Highland Rebuttal** |
|---|---|---|---|
| Patrick with Patrick as its sole member." | Foundation Objection (June 9, 2025); Foundations Action (July 1, 2025); JOL Writ (July 15, 2025); Ch. 15 Petition (July 21, 2025). | Ex. 67. It did not detail DFW Foundation's role as the vehicle through which Patrick would become the ultimate beneficial owner of $270 million in charitable assets.<br><br>The Dallas Foundation Objection raised "suspicions" about Patrick and referenced the existence of DFW Foundation but expressly noted it lacked discovery to make full allegations. Dkt 4315-3, 3.<br><br>Notably, at his June 23 deposition, Patrick himself refused to confirm whether DFW Foundation was the ultimate owner, testifying he "just [didn't] want to go beyond what [he had] a hundred percent knowledge of." Dkt. 4513-49 at 8:1-6. The full picture that DFW Foundation was created in December 2024 specifically to receive participating shares and become the sole remaining member of CDM after Redemption, came from the July 15, 2025 MacInnis Affidavit and its internal communications. *See* Ex. 2 First MacInnis Aff, ¶38."<br><br>Reply at 20-21. | issuance and redemption transactions the left DAF Holdco with no interest in DAF Fund, and, after the redemption, "no assets."<br><br>DFW Foundation is shown as the ultimate beneficial owner of the structure on Highland's demonstrative structure chart admitted into evidence at the 9019 Hearing (Highland Ex. 60).<br><br>The Dallas Foundation's Objection and Raver's deposition testimony also revealed that HMIT is owned by Beacon Mountain, which is owned by CLO Holdco, LLC, which is owned by CLO Holdco, Ltd., which is owned by DAF Fund, which is owned by CDMCFAD, which is owned by DFW Charitable Foundation. Highland Ex. 52 (Dallas Foundation Obj. 6/9/25) ¶¶ 2, 3, 9, 24, 27 – 29, 34; Highland Ex. 55 (Raver Dep. 4/20/25) at 7:5 – 10, 11:6 – 13:5, 17:10 – 15, 22:7 – 24, 23:3 – 10, 24:4 – 16, 25:14 – 28:17. *See also* Highland Ex. 59 (Patrick testimony at trial) at 173:22 – 174:14). |

| **<u>Dugaboy: "Highland's Alleged 'Old' Information"</u>** | **<u>Dugaboy: "Highland's Cited Sources of Prior Knowledge"</u>** | **<u>Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"</u>** | **<u>Highland Rebuttal</u>** |
|---|---|---|---|
| "DAF HoldCo Issued participating shares to DFW Foundation, diluting supporting organizations." | Supervision Application (May 2, 2025); Dallas Foundation Objection (June 9, 2025); Raver Deposition (June 20, 2025); JOL Writ (July 15, 2025); Ch. 15 Petition (July 21, 2025). | "Again, Highland's own chart concedes the JOL Writ and Chapter 15 Petition as sources, both post-dating July 14. The Supervision Application did not attach or describe the share issuance resolution, the amended Memorandum and Articles (filed February 21, 2025), or quantify the dilution (from 100% to 48.96%).<br><br>The Raver Deposition (June 20, 2025) was taken only five days before the 9019 Hearing and ten days before the Settlement Order. At the hearing itself, the Court was not presented with the full transactional chain. The first document to lay out the complete dilution mechanism, with attached resolutions, valuations and the FTI/ValueScope analyses showing the shares were issued at approximately a 95% discount, was the July 15, 2025 MacInnis Affidavit. *See* Ex. 2 First MacInnis Aff., TDIT005636.<br><br>The attachments to that affidavit revealed for the first time privileged communications showing the dilution was not to issue additional shares to a charitable | **False**.<br><br>The Supporting Organization's 5/2/25 Supervision Petition and the Dallas Foundation's 6/9/25 Objection details (i) the 318 share issuance to the DFW Foundation and the resulting dilution with precise percentages, (ii) Patrick caused the formation of DFW Foundation and CDMCFAD, (iii) the transfer of DAF Holdco's interest in DAF Fund to CDMCFAD, (iv) the redemption of DAF Holdco's interest in CDMCFAD for $1,612,192.00 (Highland Ex. 49 (Supervision Petition) ¶ 10; Highland Ex. 52 (DF Objection) ¶¶ 27 – 29).<br><br>Raver also laid out the full transactional chain. Highland Ex. 55 (Raver Deposition) at 11:6-14:6. Something learned prior to the 9019 Hearing cannot constitute newly discovered evidence for purposes of Rule 60(b)(2).<br><br>Thus the documents Dugaboy cites in connection with the DAF restructuring are just cumulative evidence of facts already known and would not have changed the outcome of the 9019 proceeding. |

| **Dugaboy: "Highland's Alleged 'Old' Information"** | **Dugaboy: "Highland's Cited Sources of Prior Knowledge"** | **Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"** | **Highland Rebuttal** |
|---|---|---|---|
| | | beneficiary as provided by the documents, but rather to better position Patrick and his coconspirators in future litigation against the Charities. *Id.* At TDIT005481–005486."<br><br>Reply at 21. | |
| "DAF HoldCo transferred DAF Fund to CDM, DCM redeemed DAF HoldCo, supporting organizations left with no remaining interest in DAF Fund." | Supervision Application (May 2, 2025); Dallas Foundation Objection (June 9, 2025); Patrick Deposition (June 23, 2025); Raver Deposition (June 20, 2025); 9019 Hearing Transcript; JOL Writ (July 15, 2025); Ch. 15 Petition (July 21, 2025). | "This is the heart of the scheme: the exchange of an approximately $270 million limited partnership interest for a $1.6 million CDM membership interest. The pre-July 14 sources Highland identifies did not contain the underlying transactional documents and did not establish that the $270 million interest was exchanged for a $1.6 million CDM membership interest as part of a coordinated scheme. Patrick himself actively obstructed inquiry into the transaction at his June 23, 2025 deposition and at the 9019 Hearing. Dkt. 4513-23 at 173:13–177:22.<br><br>Dugaboy was not aware of full picture with supporting documentation until the First MacInnis Affidavit was released on July 15, 2025. *See* Ex. 2 First MacInnis Aff., at ¶40. | **False**.<br><br>Again, cumulative evidence of something already known cannot constitute newly discovered evidence under Rule 60(b)(2), nor can Dugaboy explain how such cumulative evidence could not have been obtained through reasonable diligence (*i.e.*, through discovery).<br><br>Relying on the citations above, it is indisputable that Dondero and the Supporting Organizations knew the following:<br><br>- Dugaboy knew prior to the 9019 Hearing that Patrick formed DFW Foundation and CDMCFAD.<br>- Dugaboy knew prior to the 9019 Hearing that Patrick caused DAF Holdco to issue shares to DFW Foundation, which diluted the Supporting Organzations. |

Case 19-34054-sgj11 Doc 4663-1 Filed 03/06/26 Entered 03/06/26 16:39:16 Desc
Exhibit 19 Page 10 of 21

| **Dugaboy: "Highland's Alleged 'Old' Information"** | **Dugaboy: "Highland's Cited Sources of Prior Knowledge"** | **Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"** | **Highland Rebuttal** |
|---|---|---|---|
| | | In particular, the ValueScope March 25, 2025 valuation used to justify Patrick's actions was not available until it was filed by MacInnis on July 21, 2025. *See* 4315-G, at Ex. 50. Finally, it was not known until Dugaboy obtained the First Affidavit of MacInnis that these actions were taken because Patrick was leaked information about the Charities intent to file DAF Holdco for liquidation, and the actions were taken with the intention of relocating the assets before that filing. *See* Ex. 2, First MacInnis Aff. at MM-1, p. 1058. The 9019 Hearing Transcript thus demonstrates the *absence* of available evidence: objectors raised concerns but lacked the underlying documents to prove the scheme."<br><br>Reply at 21-22. | - Dugaboy knew prior to the 9019 Hearing that Patrick caused DAF Holdco to transfer its interest in DAF Fund to CDMCFAD.<br>- The Supporting Organizations received $1,612,192 and Dugaboy knew prior to the 9019 Hearing that it was for the redemption of DAF Holdco out of CDMCFAD.<br>Highland Ex. 49 (Pet. for Ct. Supervision 5/2/25) ¶¶ 10(a) – (d).<br>Highland Ex. 52 (Dallas Foundation Obj. 6/9/25) ¶¶ 23—29. |
| "Beacon Mountain (and HMIT indirectly) was sold to CLOH, Patrick controlled | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition (Apr. 23, 2025); Dallas | "The depositions were taken only days before the hearing, June 20 and 23, 2025, and Patrick evaded questions about the ultimate ownership of the entities. He testified that Beacon Mountain was the ultimate owner of Hunter Mountain when in fact DFW Foundation sat above it. | **False**. |

| **Dugaboy: "Highland's Alleged 'Old' Information"** | **Dugaboy: "Highland's Cited Sources of Prior Knowledge"** | **Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"** | **Highland Rebuttal** |
|---|---|---|---|
| CLOH, DFW Foundation is ultimate owner." | Foundation Objection (June 9, 2025); Raver Dep. (June 20, 2025); Patrick Dep. (June 23, 2025); Littleton Dep. (June 23, 2025); Highland Ex. 95; 9019 Hearing Transcript; Email (Mar. 12, 2025); Beacon Mountain LLC Agreement (Feb. 12, 2025). | Highland's Exhibit 95 at the 9019 Hearing did not disclose that fact. Dkt. 4255–95.<br><br>The truth was not exposed until the July 15, 2025 JOL filings. The Beacon Mountain LLC Agreement (February 12, 2025) was a Patrick controlled document that Dugaboy did not possess until it was produced as an exhibit to the JOL pleadings."<br><br>Reply at 22. | First, Dugaboy knew from an earlier proceeding,[3] and from Patrick's deposition, that Beacon Mountain is the sole beneficiary of Hunter Mountain and Patrick is the sole Administrator. Dugaboy also knew that the ultimate indirect beneficial owner of Hunter Mountain—whether it be DFW Foundation (which was likewise disclosed), the Dondero Foundations, or anyone else—has no control or approval rights whatsoever with respect to the HMIT Settlement. Highland Ex. 36 (6/8/23 hearing transcript), 173:22-174:21; 185:18-25; 186:18-20; Highland Ex. 58 (Patrick deposition), 11:10-13, 12:8-14.<br><br>During his deposition, Raver also disclosed ownership of Hunter Mountain all the way up to DFW Foundation with precision. Highland Ex. 55 (Raver transcript) at 11:6-14:6; 22:5–28:17.<br><br>Dugaboy's contention that it did not possess the February 12, 2025 Beacon Mountain LLC Agreement until July 15, 2025 is, once again, false: it was on Highland's 9019 W&E List (Dkt. 4255-95), and it specifically references the transfer |

[3] HMIT was the movant in the earlier proceeding, represented by the Stinson Law Firm. When asked during his recent deposition to identify any law firms that worked for Dugaboy, Dondero could only name Stinson. Highland Ex. 77 at 15:5-16. The docket in the case reflects that Stinson represented both Dugaboy and HMIT at various times and in various matters in the Highland bankruptcy.

| **Dugaboy: "Highland's Alleged 'Old' Information"** | **Dugaboy: "Highland's Cited Sources of Prior Knowledge"** | **Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"** | **Highland Rebuttal** |
|---|---|---|---|
| | | | of Beacon Mountain from Rand PE Fund to CLOH, LLC, shows CLOH, LLC as the new sole member of Beacon Mountain, and has Patrick signing on behalf of CLOH, LLC as its Manager (Highland Ex. 4).<br><br>Finally, Highland's structure chart admitted into evidence at the 9019 Hearing shows DFW Foundation as the ultimate beneficial owner at least six entity layers above HMIT, and CLO Holdco, LLC (which is shown as owned by CLO Holdco Ltd.) as the new owner of Beacon Mountain. Highland Ex. 60.<br><br>Again, information learned days before, or even at, the 9019 Hearing cannot constitute newly discovered evidence for purposes of Rule 60(b)(2).<br><br>. |
| "Atlas IDF placed into dissolution" | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition (Apr. 23, 2025); Dallas Foundation | "Here, Highland is wrong. Atlas IDF, L.P. never was in dissolution, rather it was its subsidiary Rand PE Fund I, L.P. That Dondero did not even know which entity was dissolving demonstrates the lack of information available at that time. | Like all of the discussion of the DAF restructuring, ultimately irrelevant, but also **False**:<br><br>¶ 19 of the Dallas Foundation Objection states, "On February 20, 2025, Mr. Patrick in his capacity as the general partner of Atlas GP, sent a letter to Crown advising of the intention to dissolve Atlas IDF in accordance with the partnership agreement |

| Dugaboy: "Highland's Alleged 'Old' Information" | Dugaboy: "Highland's Cited Sources of Prior Knowledge" | Dugaboy: "Why This Does Not Refute Rule 60(b)(2)" | Highland Rebuttal |
|---|---|---|---|
| | Objection (June 9, 2025). | Moreover, the Rand Fund 2024-2025 Liquidating Audit, which confirmed that Rand Fund's sole asset (Beacon Mountain) had been disposed of on February 12, 2025, was not issued until June 26, 2025, only one day after the 9019 Hearing and four days before the Settlement Order was entered, and was not provided to Rand Fund's limited partners until months later. Dkt. 4513-48."<br><br>Reply at 22-23. | dated November 30, 2015 . . ." Highland Ex. 52 ¶19.<br><br>In any event, Dondero knew Beacon Mountain had been sold for $1 million (Highland Ex. 48 (Dondero 4/16/25 Affidavit) ¶ 39) and that Beacon was Rand PE Fund's sole asset (as had been reflected in Rand PE Fund's audits for several years, which Dugaboy's subsidiary, Dolimiti, had access to). The fact that a later audit also confirms that Beacon Mountain was Rand PE Fund's sole asset or that it had been disposed of is cumulative and irrelevant.<br><br>Dondero knew that Dolimiti and Hakusan were withdrawn from Rand PE Fund from the Feb. 2025 Withdrawal Notices, and Dolimiti (wholly-owned by Dugaboy) received the withdrawal payments. Tr. (5/11/26) at 258:6-260:3; Highland Ex. 76 (2/6/25 withdrawal letters). |
| "Allegations regarding DAF directors' fees, expenses and remuneration" | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition (Apr. 23, 2025); Dallas | "Highland labels these "allegations" that were precisely known, but the pre-hearing documents contained only general references to "increased expenses." At the time, Dugaboy had no admissible evidence of expenses or specific amounts. | **False** – the specificity with which increased director fees and expenses is repeatedly cited is obvious:<br><br>- "My team produced an annual expense summary (the "Expense Summary") of that information…(a) directors' fees increased from |

| **Dugaboy: "Highland's Alleged 'Old' Information"** | **Dugaboy: "Highland's Cited Sources of Prior Knowledge"** | **Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"** | **Highland Rebuttal** |
|---|---|---|---|
| | Foundation Objection (June 9, 2025); Foundations Action (July 1, 2025); JOL Writ (July 15, 2025); Ch. 15 Petition (July 21, 2025). | The actual quantum, $10,548,778 paid to Patrick in 2024, including $850,000 base salary, $4,759,000 LTI (backdated to 2021), $975,000 additional LTI, and a 2.5x base salary bonus, was first documented in the July 2025. Ex. 2, First MacInnis Affidavit (MM-1, 694–722).<br><br>Moreover, the Third MacInnis Affidavit (November 2025) revealed that total directors' fees across three entities were $11.6 million for 2024 alone, information that was not disclosed until September 12, 2025, when Defendants first produced income statements to the JOLs. The Dallas Foundation Objection and Winding Up Petition mentioned "concerns" about expenses but did not have access to those numbers. (Winding Up Petition - Dkt. 4315-E, Dallas Foundation Objection – Dkt. 4231)<br><br>Reply at 23. | around US$40,000 in 2022 to almost US $600,000 in 2023- and increased to around US $2.25 million in the first half of 2024 . . . (b) expenses overall for the first half of 2024 were around US$18.3 million-roughly the same amount spent over the entire course of 2023 (i.e. US$18.6 million)" Highland Ex. 48 (Dondero Aff. 04/25/25 Affidavit) ¶ 31.<br>- "legal expenses had increased to $6 million in the first six-months of 2024… (a 300% increase if annualized) and director fees skyrocketed…(a 12,400% increase, if annualized)." Highland Ex. 47 (Winding Up Petition 4/16/25) ¶ 35. *See also*:<br>- Highland Ex. 52 (Dallas Foundation Obj. 6/9/25) ¶ 22 and n.3<br>- Highland Ex. 62 (Tex. Bus. Ct. Orig. Pet. 7/1/25) ¶¶ 5.31 – 5.33. |
| "Allegations regarding Creative HEARTS TX donation." | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition | The Creative HEARTS TX donation of $10,000 to Patrick's family-run nonprofit was a well known, if small example of his fraudulent intent. | Irrelevant – the full mechanics and results of the DAF restructuring transactions was known. Moreover, Dugaboy admits that the facts concerning HEARTS TX were known to it months before the 9019 Hearing. |

| **Dugaboy: "Highland's Alleged 'Old' Information"** | **Dugaboy: "Highland's Cited Sources of Prior Knowledge"** | **Dugaboy: "Why This Does Not Refute Rule 60(b)(2)"** | **Highland Rebuttal** |
|---|---|---|---|
| | (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025); Foundations Action (July 1, 2025). | This was provided as evidence of Patrick's pattern and practice of self-dealing with DAF assets, but the CREATIVE HEARTS transaction was not part of the series of transactions that composed Patrick's later $270 million fraudulent scheme. Under *Chilson*, what matters is whether the *full evidentiary picture* was available, not whether one fragment was. 796 F.2d at 70–71.<br><br>Reply at 23. | |
| "Allegations regarding proposed fee split With Cronin/Fortaris Capital Advisors" | "Allegations regarding proposed fee split with Cronin/Fortaris Capital Advisors" | Same analysis as Creative HEARTS TX. Patrick's proposed (and rejected) kickback scheme from September 2023 is another example of his pattern and practice of self dealing with DAF assets, but the inchoate Fortaris transaction was not part of the series of transactions that composed Patrick's later $270 million fraudulent scheme. *See* 796 F.2d at 70–71.<br><br>Reply at 24. | Irrelevant – the full mechanics and results of the DAF restructuring transactions was known. Moreover, Dugaboy admits that the facts concerning Cronin/Fortaris were known to it months before the 9019 Hearing. |

**CHART ON PG. 12 OF REPLY BRIEF**

| **Dugaboy: "DATE"** | **Dugaboy: "EVENT"** | **Dugaboy: "SOURCE"** | **Highland Rebuttal** |
|---|---|---|---|
| June 26, 2025 | Cohen & Co issued the Rand PE Fund I, L.P. 2024 Audit dated as of February 24, 2025. Revealed<br>• Beacon Mountain was sold on February 12, 2025,<br>• The $1 million sale value was set solely on the transaction price,<br>• The auditors were not informed of the subsequent $23.5 million value of Beacon/HMIT,<br>• Auditors did not know Patrick dealt Beacon/HMIT to himself;<br>• Patrick redeemed out the investors of Rand PE Fund before he sold Beacon/HMIT, and<br>• First admissible evidence of $1 million sale price.<br><br>The audit was issued one day after the 9019 Hearing and only four days before the Settlement Order was entered on June 30, 2025, leaving Dugaboy without a meaningful opportunity to obtain, analyze, and present it before the Court approved the Settlement.<br><br>Reply at 12-13. | Dkt. 4513-48, Rand Fund 2024 Audit (dated June 26, 2025). | - Dugaboy learned the exact date of the Beacon Mountain sale no later than June 20, 2025, when Highland filed its W&E list in advance of the 9019 hearing. Dkt. 4255-95 (Second A&R LLC Agreement of Beacon Mountain).<br>- Dondero knew of the $1 million sale price no later than April 9, 2025 when he executed an Affidavit. Highland Ex. 48 (Dondero Aff.) ¶39.<br>- Dugaboy knew Dolimiti and Hakusan were withdrawn from the Rand PE Fund pursuant to written notices delivered to NexPoint's office on 2/6/25. Highland Ex. 76 (withdrawal notices). |
| July 14, 2025 | Cayman Court grants sanction to JOLs to commence litigation against Patrick and other | Dkt. 4513-G, MacInnis | Irrelevant, and to this day, there has been no finding of breach of fiduciary duty, unlawful |

| Dugaboy: "DATE" | Dugaboy: "EVENT" | Dugaboy: "SOURCE" | Highland Rebuttal |
|---|---|---|---|
| | defendants for breaches of fiduciary duty, unlawful means conspiracy, unjust enrichment, and equitable relief. This occurred on the final day of the Rule 9023 window—too late for Dugaboy to incorporate into a same-day motion.<br><br>Reply at 13. | Decl. ¶ 72 (Dkt. 4-60, Case 25-11376-BLS, Filed 07/21/25). | means conspiracy, or unjust enrichment as a result of such litigation. In fact, the JOLs presented all evidence to the Cayman Court that Dugaboy urges this Court to consider and denied the JOLs' request for a proprietary injunction and rejected all claims except for a claim for breach of fiduciary duty arising from the DAF restructuring. *See generally* Highland Ex. 72 (Cayman decision). |
| July 15, 2025 | JOLs file the sealed Writ and Statement of Claim in the Cayman Court, commencing litigation against Patrick, Murphy, CDMCFAD ("CDM"), DFW Charitable Foundation, CDF GP, and CLO HoldCo. The Statement<br>of claim, for the first time, revealed<br>• The extent of Patrick's compensation take,<br>• The self-dealing by which he took such compensation,<br>• The internal, otherwise privileged communications of Charitable DAF Holdco, Ltd. that demonstrated the intent and planning to commit fraud and breach of fiduciary duty, and<br>• The exact timing and mechanics of how Patrick<br>restructured the DAF.<br><br>However, these only were allegations and Dugaboy had to wait for publicly filed evidence in support of these allegations. | Dkt. 4513-B, Statement of Claim (FSD 201 of 2025 (RPJ) (Filed 07/15/25)); First MacInnis Aff., TDIT004967–TDIT006484. | Highland incorporates its prior responses to the issues raised in Dugaboy's first chart on pages 12-15 of its Reply. Moreover,<br>- Dugaboy contends the Writ and Statement of Claim was sealed, but that did not stop Dugaboy from obtaining a copy of it or attaching it to its Stay Motion just 36 hours later on July 17, 2025.<br>- MacInnis admitted that the Dondero Foundations were provided with a draft of the writ and statement of claim "in advance" of the July 14, 2025 sanction hearing. Tr. (5/11/26) 173:24-174:7.<br>- Specific compensation numbers were already known—anything additional is cumulative and non-outcome determinative.<br>- Again, Timing and mechanics of the restructuring were laid out in the Supervision Application, Dallas Foundation Objection, and TX Business Court Action. Highland Exs. 49, 52, and 62. |

| Dugaboy: “DATE” | Dugaboy: “EVENT” | Dugaboy: “SOURCE” | Highland Rebuttal |
|---|---|---|---|
| | Reply at 13. | | |
| July 15, 2025 | First application of Margot MacInnis sworn and filed in Cayman Court in support of the Statement of Claim. This was not obtained by Dugaboy or its affiliates until at the earliest October 2025. The Affidavit presents, for the first time, the JOLs’ investigation findings with 94 supporting exhibits, including:<br>• Internal Patrick emails directing creation of untraceable entities (Ex. 2, First MacInnis Aff., TDIT005476);<br>• The November 26, 2024 email laying out Patrick’s DFW Foundation scheme (Ex. 2, First MacInnis Aff., TDIT005481);<br>• Director resolutions awarding Patrick $975,000 LTI and 2.5x base salary bonus (Ex. 2, First MacInnis Aff. TDIT005735-38);<br>• Employment agreement backdated to March 2021 with $4,759,000 LTI (Ex. 2, First MacInnis Aff., TDIT005743); and<br>• Documents showing the CDM Assignment and Redemption that left CLO HoldCo with only $1.6 million from a $270 million interest. (Ex. 2, First MacInnis Aff., TDIT005903-77).<br><br>Reply at 13. | Ex. 2, First MacInnis Aff.. | Highland incorporates its prior responses to the issues raised in Dugaboy’s first chart on pages 12-15 of its Reply. Moreover,<br><br>- Specific compensation numbers were already known—anything additional is cumulative and non-outcome determinative.<br>- Timing and mechanics of the restructuring were laid out in the Supervision Application, Dallas Foundation Objection, and TX Business Court Action. Highland Exs. 49, 52, and 62. |
| July 15, 2025 | JOLs file application for proprietary injunction to prevent defendants from dealing | Dkt. 4513-G, MacInnis | Irrelevant. Moreover, the JOLs presented the same evidence Dugaboy asks this Court to |

| Dugaboy: "DATE" | Dugaboy: "EVENT" | Dugaboy: "SOURCE" | Highland Rebuttal |
|---|---|---|---|
| | with HoldCo's assets, together with disclosure orders and leave to serve U.S.-based defendants.<br><br>Reply at 14. | Decl. ¶ 73, Exs. 59, 82–83 (Case 25-11376- BLS, Dkt. 4, Filed 07/21/25) | consider in the Cayman Proceeding, but the Cayman Court rejected the JOLs' petition for a proprietary injunction. |
| July 17, 2025 | Dugaboy files its Motion to Stay 9019 Order (Dkt. 4326), promptly alerting the Court to the JOL petition and requesting 90 days to investigate allegations of fraud. This confirms Dugaboy's diligence. It moved within two days of receiving the JOL materials, but after the Rule 9023 window had already expired.<br><br>Reply at 14. | Dkt. 4513-30, Motion to Stay 9019 Order (Dkt. 4326, Filed 07/17/25). | And this Court fully considered the Stay Motion together all of the "evidence" laid out in the JOL materials and denied the Motion. |
| July 21, 2025 | Declaration of Margot MacInnis is filed in Chapter 15 Petition for Recognition of Foreign Main Proceeding in the U.S. Bankruptcy Court for the District of Delaware (Case No. 25-11376-BLS). The MacInnis Declaration provides a comprehensive account of<br>• Patrick's elimination of his fiduciary duties through insertion of CDMCFAD (¶104),<br>• The DAF restructuring documents (¶¶ 26-39),<br>• ValueScope's fraudulent March 25, 2025 valuation disclosed(¶35); | Dkt. 4513-G, 3-46, MacInnis Decl. in Support of Delaware Chapter 15 Petition (Case 25-11376-BLS, Dkt. 4, Filed 07/21/25). | Ch. 15 petition is indeed comprehensive, but substantially all relevant facts had already been laid out elsewhere. Highland incorporates its prior responses to the issues raised in Dugaboy's first chart on pages 12-15 of its Reply. |

| Dugaboy: “DATE” | Dugaboy: “EVENT” | Dugaboy: “SOURCE” | Highland Rebuttal |
|---|---|---|---|
| | • The lack of transparency (¶¶ 43-61), and<br>• The Cayman litigation (¶¶ 62-76).<br><b>This filing provided the first comprehensive,<br>U.S.-court-of-record account synthesizing the JOLs'<br>findings into a single narrative for Dugaboy's use.</b><br><br>Replay at 14. | | |
| July 31, 2025 | Cayman Court enters Consent Order imposing undertakings on Named Defendants and CDM Entities to prevent asset dissipation and provide transparency/disclosure to JOLs. | Ex. 1, MacInnis Supplemental Decl. ¶¶ 8–10 (Case 25-11376-BLS, Dkt. 22, Filed 08/27/25). | Consented to by Patrick as control person of such entities. |
| August 27, 2025 | JOLs file Supplemental Declaration of Margot MacInnis and Motion for Provisional Relief (turnover of books and records) in the Chapter 15 case, revealing that<br>service providers Carrington Coleman internal memoranda; ValueScope, Hunton, and Seyfarth Shaw refused to produce records in connection with their engagement by HoldCo. | Ex. 1, MacInnis Supplemental Decl. ¶15 (Case 25-11376-<br>BLS, Dkt. 22, Filed 08/27/25). | Irrelevant. |
| September 12, 2025 | Defendants provide income statements as the first substantive financial disclosure to JOLs, showing directors’ fees of approximately | Dkt. 4315-I, Third Affidavit of | Highland incorporates its prior responses to the issues raised in Dugaboy’s first chart on pages 12-15 of its Reply. Moreover, specific compensation |

| **Dugaboy: "DATE"** | **Dugaboy: "EVENT"** | **Dugaboy: "SOURCE"** | **Highland Rebuttal** |
|---|---|---|---|
| | $11.6 million for 2024 alone across three entities controlled by Patrick. This far exceeds what was known at the time of the 9019 Hearing on June 25, 2025. This also provides the first admissible evidence of such payments. | Margot MacInnis (Filed Under Seal, November 2025) ¶¶ 63–64. | numbers were already known – anything additional is cumulative and non-outcome determinative. |
| November 2025 | Third Affidavit of Margot MacInnis filed under seal,<br>detailing:<br>• Total payments to Patrick of $10,548,778 in salary bonuses, and LTI in 2024 (¶65);<br>• Patrick's transfer of his family home to a trust and discharge of mortgage in January 2025 (¶53);<br>• Ongoing breaches of the Interim Undertakings (¶106); and<br>• Discovery that the Defendants transferred $2.68 million to law firms and ValueScope before the July 31 injunction hearing (¶106). | Dkt. 4315-I, MacInnis Affidavit 3 (Filed Under Seal, November 2025) | Highland incorporates its prior responses to the issues raised in Dugaboy's first chart on pages 12-15 of its Reply. Moreover, specific compensation numbers were already known – anything additional is cumulative and non-outcome determinative. |
| December 15–16, 2025 | Two-day injunction hearing in the Cayman Court | Dkt. 4315-I, Third Affidavit of Margot MacInnis (Filed Under Seal, November 2025) ¶ 150. | Denied JOLs requested relief and cannot constitute newly discovered evidence under 60(b)(2) |

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S NOTICE OF INTENT TO REPLY AND REQUEST FOR HEARING ON ITS MOTION TO ALTER OR AMEND THE COURT'S JUNE 15, 2026 ORDER AND NOTICE OF INTERVENING EVENT**



016706

The Dugaboy Investment Trust ("Dugaboy") respectfully files this Notice of Intent to Reply and Request for Hearing on its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event.

## I. NOTICE OF INTENT TO REPLY AND REQUEST FOR HEARING

1. On June 15, 2026, this Court entered an Order and memorandum opinion (Dkts. 4678, 4679) denying Dugaboy's Motion for Relief from Order and Motion to Vacate (Dkt. 4513).

2. After this Court entered its order on June 15, 2026, Dugaboy timely filed a Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate (Dkt. 4684, the "Motion") on June 29, 2026.

3. Before this Court set a hearing or a briefing schedule on Dugaboy's Motion, Highland Capital Management, L.P. and The Highland Claimant Trust (collectively "Highland") filed their Opposition to the Dugaboy Investment Trust's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate (Dkt. 4687, the "Opposition") on July 6, 2026.

4. On July 7, 2026, counsel for Dugaboy inquired by telephone with the Court's Courtroom Deputy regarding available dates for a hearing on Dugaboy's motion to alter or amend and/or (if undecided about holding a hearing) a briefing schedule for any reply. Local rules set the schedule for replying in support of a motion from the hearing date but do not address a schedule in the absence of hearing.

5. Dugaboy respectfully requests a hearing on its motion to alter or amend. If the Court is unsure whether a hearing is warranted or otherwise not currently inclined to set a hearing, Dugaboy respectfully requests that the Court set just a briefing schedule for the reply and/or wait to decide how to proceed until a reply is filed.

6. Dugaboy will file a reply memorandum in support of its motion to alter or amend no later than July 17, 2026, or such other date that is set by the Court in any later determined briefing/hearing schedule.

**II. NOTICE OF INTERVENING EVENT**

7. Dugaboy also provides notice of an intervening event.

8. Two weeks after this Court entered its order, Mark Patrick and DFW Charitable Foundation filed a complaint against sitting Congressman Lance Gooden and others in the District Court, 14th Judicial District, Dallas County, Texas, on July 29, 2026, attached hereto as Attachment A.

9. Mr. Patrick alleges that the Congressman engaged in defamation when he publicly stated that Mr. Patrick enriched himself by stealing charitable assets and engaged in a $270 million fraud.

10. These alleged statements occurred on March 6, 2026.

11. The timing of the suit suggests that Mr. Patrick feels emboldened by this Court's June 15, 2026, ruling, despite the Court noting that it was not condoning or blessing Mr. Patrick's actions.

12. Indeed, Mr. Patrick brought a defamation suit against a sitting Congressman, despite the United States Constitution's Speech and Debate Clause protecting the Congressman from litigation based on statements made in the course of commenting on public affairs, such as the subject matter of the misconduct detailed in this Court's May 2026 proceedings.

Dated: July 9, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 9, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*<u>/s/ Michael J. Edney</u>*
Michael J. Edney

# Attachment A

3 CIT / E-SERVE

FILED
6/29/2026 5:12 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
ROBIN HOLLAND DEPUTY

DC-26-12041

CASE NO. ______________

| | | |
|---|---|---|
| MARK ERIC PATRICK AND<br>DFW CHARITABLE FOUNDATION,<br><br>*Plaintiffs,* | §<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | 14th<br>____ JUDICIAL DISTRICT |
| MATT GAETZ,<br>HERRING NETWORKS INC. D/B/A<br>ONE AMERICA NEWS NETWORK,<br>AND LANCE GOODEN,<br><br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§ | DALLAS COUNTY, TEXAS |

**PLAINTIFFS' ORIGINAL PETITION**

Plaintiffs, Mark Eric Patrick ("Mark Patrick" or "Patrick") and DFW Charitable Foundation ("DFW") (collectively "Plaintiffs"), file this Original Petition against Defendants Matt Gaetz ("Gaetz"), Herring Networks, Inc. d/b/a One America News Network ("OANN"), and Lance Gooden ("Gooden") (collectively "Defendants"), and respectfully show the Court and Jury the following:

## I. DISCOVERY CONTROL PLAN

1. Discovery should be conducted under Level 3 pursuant to Texas Rules of Civil Procedure 190.4.

## II. INTRODUCTION

2. This action is necessary because Defendants published and republished outrageous, false, and defamatory statements about Plaintiffs, which have caused, and

continue to cause, severe and substantial damage to Plaintiffs. Defendants' false statements, including accusations of criminal and fraudulent conduct, were first published during *The Matt Gaetz Show,* aired by OANN during a nationwide news broadcast in March 2026. This broadcast displayed Patrick's image and stated that Mark Patrick, from Dallas, Texas, is a "criminal," "fraudster" and "confidence man" who committed a "270-million-dollar fraud" and "created a fraudulent charity, has paid himself millions, has paid family and friends millions, and now we're asking where are these hundreds of millions of dollars?" Nothing could be further from the truth as demonstrated by public judicial rulings and filings available to, but ignored by, the Defendants, almost one month before they aired their defamatory broadcast. These public records and filings demonstrate that Patrick had taken steps to protect the $270 million in assets from the predatory actions of a third party. Yet OANN published outrageous, defamatory statements on multiple digital platforms, ignoring this exculpatory evidence and judicial findings, as did Defendant Gooden who also published these defamatory statements on his social media platforms.

3. In truth, Mark Patrick is a law-abiding citizen and is the President and a Co-Director of DFW, a non-profit 501(c)(3) corporation. DFW has done, and continues to do, good works, providing financial support to worthy charitable causes throughout the country, including humanitarian programs involving veterans' welfare, women's shelters, public works, and education in underserved communities. Before Defendants'

defamatory statements and defamations *per se,* each Plaintiff enjoyed a good reputation. Now, their reputations and interests have been and continue to be severely damaged by Defendants' false, defamatory, and malicious statements.

## III. PARTIES

4. Mark Eric Patrick is an individual residing in Dallas, Dallas County, Texas.

5. DFW is a 501(c)(3) non-profit corporation organized under the laws of Delaware.

6. Matt Gaetz is a former United States Congressman from the State of Florida and maintains his principal residence in Florida. He may be served with process at 24 Bluewater Point Drive, Niceville, Florida 32578, or wherever he may be found.

7. Herring Networks, Inc. does business as One America News Network, which is a for-profit cable news channel. OANN's principal place of business is in San Diego, California and Herring Networks, Inc. is also incorporated in California. OANN also maintains a news bureau located in Washington, D.C. and broadcasts from its studio located at 101 Constitution Avenue, NW, Washington, D.C. 20001. OANN may be served through its registered agent for service of process in California: Robert S. Herring, 4757 Morena Boulevard, San Diego, California 92117.

8. Lance Gooden is a resident of Dallas County, Texas. He may be served with process at 374 Arbor Mill Court, Sunnyvale, Texas 75182, or wherever he may be found.

## IV. JURISDICTION

9. This Court has subject matter jurisdiction over this action because the actual damages Plaintiffs seek far exceed this Court's minimal jurisdictional requirements. Pursuant to Texas Rule of Civil Procedure 47, Plaintiffs seek monetary relief well above $1,000,000.00.

10. This Court has personal jurisdiction over Lance Gooden because he is a resident of Dallas County, Texas.

11. This Court has specific, personal jurisdiction over Matt Gaetz and Herring Networks, Inc. because each does business in the State of Texas, pursuant to Tex. Civ. Prac. & Rem. Code §17.042, and, moreover, each defendant targeted Texas residents with their defamatory publications, thereby establishing minimum jurisdictional contacts with the State of Texas. Their defamatory statements targeted Texas and Texas residents by: 1) targeting Mark Patrick, a resident of Dallas, Texas, as the alleged perpetrator of a crime and fraud; 2) stating that Patrick "created a fraudulent charity [DFW], has paid himself millions, has paid family and friends millions and now we are asked where are these hundreds of millions of dollars"; and, 3) airing similar outrageous, false and defamatory statements by another Texas resident and public official, Texas congressman Lance Gooden. Plaintiffs' claims and causes of action directly relate to and arise out of these very substantial contacts with the State of Texas. In sum, publishing and disseminating in the State of Texas these despicable, false, and defamatory statements about a Texas

resident more than satisfies the Constitutional standards that subject Defendants to the jurisdiction of the courts of this State. OANN's broadcasts are also available to tens of millions of homes, including those in Dallas County, through national cable providers, subscription streaming services, and live on their apps and websites. OANN's national cable providers include AT&T U-verse DISH Network, and Verizon. OANN's subscription streaming services include YouTube TV, Amazon Prime Video, KlowdTV3 and Sling TV.

## V. VENUE

12. Pursuant to Sections 15.002 and 15.017 of the Texas Civil Practices & Remedies Code, venue is proper in Dallas County, Texas, because defamatory statements broadcasted by Gaetz and OANN were made by Lance Gooden, a resident of Dallas County, Texas, concerning Mark Patrick, a resident of Dallas County, Texas. Pursuant to Section 15.005, venue as to all Defendants is proper because the claims and causes of action asserted herein arise out of the same transaction, occurrence or series of transactions or occurrences.

## VI. FACTUAL BACKGROUND

13. On March 6, 2026, OANN aired a news program entitled *The Matt Gaetz Show* during which Matt Gaetz falsely defamed Mark Patrick by:

- Accusing Patrick of orchestrating a "270-million-dollar fraud," taking charitable assets, and enriching himself through fraudulent conduct;

- Describing Patrick as "a criminal," "fraudster," and "confidence man;" and

- Stating, "Just remember, it's bad enough when someone steals from a business or a private citizen, but this story is about charity funds, and in a time when we're worried about fraud hurting the vulnerable, it's not just the taxpayer who is always the victim. Sometimes good folks get taken advantage of by a confidence man."

14. None of these statements were true, and Defendants Gaetz and OANN published them with knowledge of their falsity or with reckless disregard for their truth or falsity.

15. During their defamatory broadcast, Gaetz and OANN also aired a pre-recorded interview with Defendant Lance Gooden. Thus, Gaetz and OANN had ample time to conduct a prudent investigation into the truth or falsity of Gooden's defamatory allegations against Patrick, but they chose not to do so. With knowledge of the falsity, or reckless disregard for the truth, Gaetz and OANN published Gooden's separate statements that were defamatory *per se*, including statements that:

- Mark Patrick had engaged in "perhaps the largest financial charity fraud in the history of this country" and that this "270-million-dollar fraud has existed for several years."

- "We've got military families and veterans that are missing out on charitable contributions that were promised to them."

- Mark Patrick had engaged in criminal activity and had "created a fraudulent charity" and "has paid family and friends millions."

- "What we've learned is that two-hundred-and-seventy-million-dollar fraud has existed for several years. There's a gentleman by the name of Mark Patrick in Dallas, Texas that has taken over this

> charity. He was made a trustee, someone that the organizers of this charity trusted, and that people trusted, and he was supposed to oversee it. But instead, he's created a fraudulent charity, has paid himself millions, has paid family and friends millions, and now we're asking where are these hundreds of millions of dollars?"

16. None of Gooden's statements were true, and Defendant Gooden published and Gaetz and OANN republished these defamatory statements knowing they were false or with reckless disregard for their truth or falsity. Furthermore, when Gooden falsely stated that Patrick "created a fraudulent charity," persons acquainted with Mark Patrick reasonably understood this falsehood to be explicitly of and concerning DFW.

17. During *The Matt Gaetz Show*, in which Gaetz republished the defamatory interview with Lance Gooden, Gaetz made multiple references to judicially appointed "investigators" who had lodged fraud allegations against Mark Patrick in legal proceedings as a purported basis for his defamatory statements. Although Gaetz did not identify these legal proceedings by name, it is clear these references were to proceedings in the Grand Court of the Cayman Islands styled the "Official Liquidation of Charitable DAF HoldCo., Ltd.," FSD No 2525-116 (the "Cayman Proceeding"). However, Gaetz's references to these "allegations" provide no justification or colorable foundation for Defendants' false and defamatory statements. Instead, they afford just the opposite because they evidence that Defendants' false and defamatory statements were made with "actual malice," under the constitutional standard established by *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964). Both direct and circumstantial evidence will show that

Defendants' false and defamatory statements were made with "actual malice," including, but not limited to, the following:

- Defendants did not base their statements upon any conviction or judgment that a crime or fraud had occurred, because there is no judgment or conviction; and

- Defendants did not base their statements upon any conviction or judgment that Patrick "created a fraudulent charity," because he did not.

18. Defendants' statements reflect a purposeful avoidance of the truth – before stating that a person has committed a crime or fraud, any prudent broadcaster would require proof of a conviction of a crime or judgment of fraud. Defendants' statements therefore reflect a purposeful and reckless decision either not to consult the actual record in the Cayman Proceedings or to purposefully and recklessly omit the record because the record contradicts Defendants' false and defamatory statements. Specifically, Matt Gaetz, OANN, and Lance Gooden knowingly concealed exculpatory findings in an official judgment issued by the Grand Court of the Cayman Islands on February 10, 2026, nearly a month before the defamatory broadcast aired. Defendants deliberately ignored the findings of the judicial officer presiding over the Cayman Proceedings who considered the evidence and then dismantled the factual basis of the "investigators" allegations upon which Defendants seek to justify their outrageous statements:

- Although the broadcast falsely stated that Patrick created a "fraudulent charity," the judicial officer considered evidence that the charitable structure was created to protect the DAF charitable structure from the "predations and the risks [a third person]

posed to its assets and charitable mission." The judicial officer was "unpersuaded that there is a real risk that [charitable] assets will be diminished or otherwise unlawfully dealt with" as alleged by the so-called "investigators;"

- Although the broadcast falsely stated that Patrick stole $270 million, the judicial officer stated that he was "unpersuaded … that the [buyouts] undertaken were at an undervalue" as alleged by these so-called "investigators;" and that there was "no seriously arguable case" that the assets in question were even "owned legally or beneficially" by the liquidating company pushing the allegations; and

- Although the broadcast falsely stated that Patrick fraudulently enriched himself, the judicial officer concluded there "is no serious issue to be tried" concerning Mr. Patrick's compensation as alleged by the so-called "investigators," and that his compensation was commercially reasonable.

19. Because Defendant Gooden's interview was pre-recorded, Gaetz and OANN had absolute editorial control and they possessed ample time to verify Gooden's accusations against the public judicial docket, which would have immediately revealed the February 2026 exculpatory findings. Their deliberate decision to air the tape while omitting the truth constitutes a purposeful avoidance of the truth.

20. Defendants also recklessly focused on the "investigators'" allegations ***only***, and omitted any reference to the evidence presented by Patrick's lawyers in response to those allegations in the Cayman Proceedings, which was considered and ultimately found persuasive to the Grand Court. This further confirms that Defendants were not searching for the truth, but purposefully avoided the truth.

21. Defendants' defamatory statements have caused Mark Patrick great damage to his reputation, mental anguish, and emotional distress. Likewise, Defendants' defamatory statements have severely damaged DFW's reputation and interfered with its charitable mission.

22. Mark Patrick's mental anguish has been further aggravated by a recent incident that Patrick associates with the Defendants' incendiary statements calculated to make people hate and despise Patrick. By falsely and recklessly branding Patrick, a private citizen, as a '$270 million criminal' on a national broadcast, displaying Patrick's image and identifying where he lived, Defendants foreseeably endangered Mr. Patrick's safety. In this context, Patrick initiated a complaint with the relevant law enforcement authorities to investigate the intentional tampering of his personal vehicle in a manner that would cause an immediate threat to his personal safety and the safety of his loved ones.

23. OANN broadcast Gaetz's and Gooden's defamatory statements to a nationwide audience which included tens of millions of homes with access to the network, including numerous households in Dallas County, Texas, where Mark Patrick resides. OANN also published these defamatory statements on multiple digital platforms, including OANN.com, Rumble, Castro.fm, Apple Podcasts, Pocketcasts.com, Overcast.fm, and subscription streaming services YouTube TV, Amazon Prime Video,

KlowdTV3, and Sling TV. Gooden also personally published these defamatory statements on Facebook, X, and Instagram.

24. As discussed above, when Defendants published their false and defamatory statements against Patrick and DFW, they possessed no judgment from any court adjudicating Patrick or DFW guilty of any crime or fraud. That is so because there is no such judgment. Accordingly, when Defendants published their defamatory statements against Patrick and DFW on March 6, 2026, falsely stating that Patrick had committed a crime and fraud, Defendants knew their statements were false, defamatory, and calculated to cause, and would continue to cause, substantial and severe damage to Patrick and DFW. Yet, despite such knowledge, after publishing their false and defamatory statements, and although requested to do so, Defendants have not issued a public apology, retraction, or correction of their false and defamatory statements. Thus, exemplary damages are warranted against Defendants not only for the original publication of the false and defamatory statements on March 6, 2026, but also for each day thereafter that Defendants have permitted their defamatory statements to stand without Defendants' issuance of a full and complete public apology, retraction, and correction fully exonerating Plaintiffs of any purported wrongdoing.

## VII. CAUSES OF ACTION

### Count One – Defamation and Defamation *Per Se*

25. Each of the foregoing paragraphs are incorporated herein for all purposes.

26. Mark Patrick is a private individual and is neither a public official nor a public figure.

27. DFW is a non-profit entity registered in the State of Delaware and is not a public figure.

28. The subject matter of Defendants' false and defamatory statements was not a matter of public concern, in that the American public was neither discussing the subject matter of the Cayman Proceeding nor likely to feel the impact of its resolution.

29. Defendants' publications and republications were false and defamatory, both in the particular facts and in their main point, essence or gist and the context in which they were made.

30. Defendants' publications and republications directly used Mark Patrick's image and identified that he was a resident of Dallas, Texas, in connection with the defamatory comments.

31. Defendants' defamatory publications were designed to harm Plaintiffs' reputations and subject the Plaintiffs to public contempt, disgrace, ridicule, or attack.

32. Defendants acted with actual malice. Their defamatory statements were knowingly false or were made with reckless disregard for the truth or falsity of the statements at the time the statements were made.

33. Defendants' defamatory statements were not privileged. Matt Gaetz and OANN have no privilege because they failed to provide a fair, true, and impartial account

of a judicial proceeding. Lance Gooden does not enjoy any privilege because his statements were made outside of the House chambers.

34. Defendants' defamatory statements constitute defamation *per se*. The defamatory publications falsely accuse Mark Patrick of being a "criminal" and "fraudster." False implications of criminal conduct are classic examples of defamation *per se*.

35. Defendants published and republished defamatory statements to an enormous nationwide audience causing significant damages to Plaintiffs. Matt Gaetz and OANN also failed to use due care to prevent the publication and republication of defamatory utterances in its broadcast. Defendants' defamatory publications and republications have substantially injured Mark Patrick, causing substantial injury to his reputation, subjecting him to public and private hatred, contempt, ridicule, and harassment, and causing him substantial mental anguish and emotional distress. Likewise, Defendants' defamatory publications and republications have substantially injured DFW's reputation and ability to carry out its charitable mission.

36. Defendants' defamatory publications have and will continue to cause substantial harm and injury to Mr. Patrick and DFW and substantial damages in an amount to be proven at trial.

## VIII. DAMAGES

37. Each of the foregoing paragraphs are incorporated herein for all purposes.

38. Defendants' defamatory statements have proximately caused Plaintiffs to suffer actual damages, in the past and in the future, including general and special damages.

39. Defendants' publications and republications of the defamatory statements caused Mr. Patrick to suffer shame, embarrassment, humiliation, and severe mental pain and anguish. The good name and reputation of Mr. Patrick and DFW have been seriously injured and will be seriously injured in the future and they will be subjected to hatred, contempt, and ridicule.

40. Plaintiffs are entitled to a judgment and award clearing their good names and reputations.

## IX. PUNITIVE DAMAGES

41. Pursuant to Chapter 73 of the Texas Civil Practices and Remedies Code, Plaintiffs timely served written demands for retraction and correction upon all Defendants, explicitly providing them with exculpatory judicial findings. But Defendants failed and/or refused to issue appropriate retractions, further demonstrating ongoing actual malice entitling Plaintiffs to exemplary damages.

42. Plaintiffs are entitled to exemplary damages in the maximum amount allowed by the Texas because the Defendants acted with malice. Defendants' conduct, when viewed objectively from their standpoint at the time, involved an extreme degree of risk considering the probability and magnitude of the potential harm. Defendants had

actual, subjective awareness of the extreme risks of their conduct, but nevertheless proceeded with a conscious indifference to the rights, safety, and welfare of the Plaintiffs.

## X. CONDITIONS PRECEDENT

43. Plaintiffs have fully satisfied or discharged all conditions precedent to recovery of both actual damages and punitive damages by seeking, without limitation, retraction, correction, clarification of the defamatory statements, or such conditions have been waived.

## XI. PREJUDGMENT AND POST JUDGMENT INTEREST

44. Plaintiffs are also entitled to recover lawful prejudgment and post judgment interest in the maximum amount allowed by law.

## XII. JURY DEMAND

45. Plaintiffs demand a trial by jury on all triable issues of fact.

## XIII. PRAYER

**WHEREFORE PREMISES CONSIDERED** Plaintiffs, Mark Eric Patrick and DFW Charitable Foundation respectfully request that Defendants be cited to answer and appear, and that upon final trial, Plaintiffs recover actual damages, as specified above, and exemplary damages, as well as prejudgment and post-judgment interest at the highest rate permitted by law, and all other and further relief, at law and in equity, general and special, to which Plaintiffs may be justly entitled.

Respectfully submitted,

*/s/ Sawnie A. McEntire*

Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
Jeffrey R. Parsons
Texas Bar No. 15547200
jparsons@pmmlaw.com
Ian B. Salzer
Texas Bar No. 24110325
isalzer@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

**ATTORNEYS FOR PLAINTIFFS**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Katherine Jones on behalf of Ian Salzer
Bar No. 24110325
katherine@pmmlaw.com
Envelope ID: 116741615
Filing Code Description: Original Petition
Filing Description:
Status as of 7/2/2026 10:09 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ian BSalzer | | isalzer@pmmlaw.com | 6/29/2026 5:12:26 PM | SENT |
| Sawnie A.McEntire | | smcentire@pmmlaw.com | 6/29/2026 5:12:26 PM | SENT |
| Jeffrey R.Parsons | | jparsons@pmmlaw.com | 6/29/2026 5:12:26 PM | SENT |
| Katherine Jones | | Katherine@pmmlaw.com | 6/29/2026 5:12:26 PM | SENT |
| Danielle E.Ball | | dball@pmmlaw.com | 6/29/2026 5:12:26 PM | SENT |

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 10, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj11** |
| | § | |
| | § | |
| **Debtor.** | § | |

**ORDER DENYING MOTION TO RECONSIDER**

On June 15, 2026, the Court entered its Memorandum Opinion and Order denying the relief sought by the Dugaboy Investment Trust's ("Dugaboy") *Memorandum of Law in Support of the Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate*. Dkt Nos. 4678, 4679.

Thereafter, on June 29, 2026, Dugaboy filed its *Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* (the "Motion to Reconsider").[1] Dkt. No. 4684. On July 6, 2026, Highland Capital Management, L.P. and the Highland Claimant Trust (together, "Highland") filed their opposition to the Motion to Reconsider. Dkt. No. 4687.

[1] On the same day, Dugaboy also filed a Notice of Appeal. Dkt. No. 4685.

Then, on July 9, 2026, Dugaboy filed its *Notice of Intent to Reply and Request for Hearing on its* [Motion to Reconsider], in which Dugaboy attached a complaint pending in the 14th Judicial District of Dallas County filed by Mark Patrick and DFW Charitable Foundation against Matt Gaetz, Lance Gooden, and another defendant. Dkt. No. 4688.

The Court reviewed the Motion to Reconsider, Highland's opposition, and Dugaboy's July 9 notice. The Court finds that further briefing and a hearing on the issues raised in the Motion to Reconsider are not necessary for the Court to rule on the Motion to Reconsider.

Based on its review of the pleadings, the Court finds that Dugaboy's Motion to Reconsider is without merit. It is, therefore,

ORDERED that the Motion to Reconsider [Dkt. No. 4684] is denied; and it is further

ORDERED that, under Fed. R. Bankr. P. 8002(b)(1), (2), Dugaboy's Notice of Appeal [Dkt. No. 4685] becomes effective upon entry of this Order.

### End of Order ###

BTXN 113 (rev. 3/18)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In Re:<br>Highland Capital Management, L.P.<br><br>Debtor(s)<br>The Dugaboy Investment Trust<br>Appellant(s)<br>vs.<br>Highland Capital Management, L.P., et al.<br>Appellee(s) | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No.: 19−34054−sgj11<br>Chapter No.: 11 |

## NOTICE REGARDING THE RECORD FOR A BANKRUPTCY APPEAL

Federal Rule of Bankruptcy Procedure 8009 prescribes the deadlines for filing the designations of items to be included in the record, requires copies to be submitted to the bankruptcy clerk to prepare the record, and directs all parties to "take any other action necessary to enable the clerk to assemble and transmit the record." Fed.R.Bankr.P. 8009(g). The purpose of this notice is to provide guidance on the local application of this rule.

**DESIGNATION OF THE RECORD**

- If you are the appellant, when designating items for inclusion in the record,
  - ♦ list the following items first, in this order: (1) the notice of appeal, (2) the judgment, order, or decree appealed from, (3) any opinion, findings of fact, and conclusions of law of the bankruptcy court, and (4) the docket sheet;
  - ♦ then list the *other* items to be included, leaving for the end of your list any sealed documents, any exhibits, and any transcripts.
- If you are the appellee, cross−appellant, or cross−appellee and are designating additional items,
  - ♦ list the following items first, in this order: (1) any notice of cross−appeal, (2) any judgment, order, or decree appealed from that the appellant has not designated, and (3) any opinion, findings of fact, and conclusions of law of the bankruptcy court that the appellant has not designated;
  - ♦ then list the *other* items to be included, leaving for the end of your list any sealed documents , any exhibits, and any transcripts.
- All parties designating items to be included in the record on appeal must
  - ♦ for each item, specify the document number shown on the docket sheet. If an item does not have a document number, specify the date the item was filed.

- ♦ If you have designated a transcript that has not been filed, order it immediately by contacting the presiding bankruptcy judge's courtroom deputy or following the instructions at http://www.txnb.uscourts.gov/transcript−and−tape−orders.

**ASSEMBLY OF THE RECORD**

Within 14 days of filing your designation of the record, pursuant to Rule 8009, submit to the bankruptcy clerk any item that is **not available in the ECF system**, using this procedure:

- Enclose sealed items and non−documentary items (e.g., removable media) in 8.5" x 11" envelopes.
- Copy all other items in PDF files to a removable storage device (e.g., USB drives, DVDs, etc.), organized in the sequence in which they were designated. Limit files to 5.0 MB in size and do not include color.
- Save copies of court exhibits in PDF files to a removable storage device, organized in the sequence in which they are designated. Limit files to 5.0 MB in size and do not include color. (Use a separate removable storage device for each hearing.)
- Label any submission with the case caption and bankruptcy court case and/or adversary proceeding number.

**TRANSMITTAL OF THE RECORD**

- The bankruptcy clerk will electronically transmit the record to the district clerk. The parties must provide a paper copy of the record, if required.

**REQUIREMENTS REGARDING PAPER RECORD**

- If the district judge requires a paper copy, the district clerk will notify you that you are required to provide a copy of the items in *your* designation **to the bankruptcy clerk**, for quality review.
- If you are notified to provide a paper copy, organize the record according to the volumes maintained in the **district court's ECF system**.
- Even if a paper copy is not required when an appeal is entered on the docket, the district judge or the district clerk may later notify you that a paper copy is required for the use of the district judge or the court of appeals.

DATED: 7/13/26

FOR THE COURT:
Stephen J Manz, Clerk of Court

by: /s/Sheniqua Whitaker, Deputy Clerk

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj |

**NOTICE OF APPEAL TO THE**
**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS**

Under the Federal Rules of Bankruptcy Procedure 8002 and 8003, The Dugaboy Investment Trust ("Dugaboy") appeals to the United States District Court for the Northern District of Texas from the Court's July 10, 2026, Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to

Vacate under Fed. R. Civ. P. 59(a) (the "Denial Order"). A copy of the Denial Order is attached to this Notice of Appeal at **Exhibit A**.

The Parties to the July 10, 2026, Order and the names, addresses, and telephone numbers of their attorneys are as follows:

1. *Party/Appellant*: The Dugaboy Investment Trust

Attorneys:

MORGAN LEWIS BOCKIUS LLP
Michael J. Edney
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202)-739-3000
F: (202)-739-3001

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001

And

KING & SPALDING LLP
Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
2601 Olive Street, Suite 2300
Dallas, TX 75201
T: (214) 764-4600

2. *Party/Appellee:* Highland Capital Management, L.P.

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

3. *Party/Appellee:* Highland Claimant Trust

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

4. *Party/Appellee:* The Highland Litigation Sub-Trust

Attorneys:

QUINN EMANUEL URQUHART & SULLIVAN LLP

Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor New York, NY 10010
T: (212) 849-7000

And

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
T: (214) 981-3300

5. *Party/Appellee:* Hunter Mountain Investment Trust

KELLY HART PITRE
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
T: (225) 381-9643
F: (225) 336-9763

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
T: (504) 522-1812
F: (504) 522-1813

Dated: July 24, 2026

MORGAN LEWIS BOCKIUS LLP

/s/ *Michael J. Edney*

Michael J. Edney
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001

KING & SPALDING LLP
Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
2601 Olive Street, Suite 2300
Dallas, TX 75201
T: (214) 764-4600

*Attorneys for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on July 24, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

# Exhibit A

Case 19-34054-sgj11 Doc 4691 Filed 07/10/26 Entered 07/10/26 17:00:59 Desc Main Document Page 1 of 2

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 10, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj11** |
| | § | |
| | § | |
| **Debtor.** | § | |

**ORDER DENYING MOTION TO RECONSIDER**

On June 15, 2026, the Court entered its Memorandum Opinion and Order denying the relief sought by the Dugaboy Investment Trust's ("Dugaboy") *Memorandum of Law in Support of the Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate*. Dkt Nos. 4678, 4679.

Thereafter, on June 29, 2026, Dugaboy filed its *Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* (the "Motion to Reconsider").[1] Dkt. No. 4684. On July 6, 2026, Highland Capital Management, L.P. and the Highland Claimant Trust (together, "Highland") filed their opposition to the Motion to Reconsider. Dkt. No. 4687.

[1] On the same day, Dugaboy also filed a Notice of Appeal. Dkt. No. 4685.

Then, on July 9, 2026, Dugaboy filed its *Notice of Intent to Reply and Request for Hearing on its* [Motion to Reconsider], in which Dugaboy attached a complaint pending in the 14th Judicial District of Dallas County filed by Mark Patrick and DFW Charitable Foundation against Matt Gaetz, Lance Gooden, and another defendant. Dkt. No. 4688.

The Court reviewed the Motion to Reconsider, Highland's opposition, and Dugaboy's July 9 notice. The Court finds that further briefing and a hearing on the issues raised in the Motion to Reconsider are not necessary for the Court to rule on the Motion to Reconsider.

Based on its review of the pleadings, the Court finds that Dugaboy's Motion to Reconsider is without merit. It is, therefore,

ORDERED that the Motion to Reconsider [Dkt. No. 4684] is denied; and it is further

ORDERED that, under Fed. R. Bankr. P. 8002(b)(1), (2), Dugaboy's Notice of Appeal [Dkt. No. 4685] becomes effective upon entry of this Order.

### End of Order ###

BTXN 049 (rev. 03/15)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

In Re:
Highland Capital Management, L.P.
Debtor(s)
The Dugaboy Investment Trust
Appellant(s)
vs.
Highland Capital Management, L.P., et al.
Appellee(s)

Case No.: 19−34054−sgj11
Chapter No.: 11

# NOTICE OF TRANSMITTAL

I am transmitting:

- ☐ The Motion for leave to Appeal 28 U.S.C. § (USDC Civil Action No. DNC Case).
- ☐ The Motion for Stay Pending Appeal (USDC Action No. − DNC Case).
- ☐ The Proposed Findings of Fact and Conclusions of Law.
- ☐ The Motion to Extend Time To File Designation (USDC Civil Action No DNC Case).
- ☐ On , the Record on Appeal was transmitted. The designation of record or item(s) designated by were not filed when the record was transmitted. The item(s) were filed on awaiting instructions from the assigned district judge.
- ☐ Other
- ☑ Copies of: Notice of appeal, appealed order [4689] and supporting documents

**TO ALL ATTORNEYS**: File all subsequent papers captioned and numbered with the appropriate division of the United States District Clerk's Office. Any questions concerning this proceeding should be directed to the U.S. District Clerk's Office at (214) 753−2200.

DATED: 7/28/26

FOR THE COURT:
Stephen J Manz, Clerk of Court

by: /s/Sheniqua Whitaker, Deputy Clerk

BTXN 116 (rev. 07/08)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# APPEAL SERVICE LIST

## Transmission of the Record

BK Case No.: 19−34054−sgj11

Received in District Court by: ___________

Date: ________

Volume Number(s): _______

cc: Stacey G Jernigan
Emily Chang
Brock Giles
Attorney(s) for Appellant
US Trustee

**Appellant** The Dugaboy Investment Trust

MORGAN LEWIS BOCKIUS LLP
Michael J. Edney
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202)−739−3000

Martha B. Stolley (pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178−0060
T. (212) 309−6000

Avery Joseph Welker
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890−5000

And

KING & SPALDING LLP
Geoffrey S. Harper
John Michael Gaddis
2601 Olive Street, Suite 2300
Dallas, TX 75201
T: (214) 764−4600

**Appellee** Highland Capital Management, L.P.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris

Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277−6910

And

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755−7100

**Appellee** : Highland Claimant Trust

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277−6910

And

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755−7100

**Appellee** The Highland Litigation Sub−Trust

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor New York, NY 10010
T: (212) 849−7000

And

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
T: (214) 981−3300

**Appellee** Hunter Mountain Investment Trust

KELLY HART PITRE
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801−1916
T: (225) 381−9643

Amelia L. Hurt
400 Poydras Street, Suite 1812
New Orleans, LA 70130
T: (504) 522−1812

BTXN 150 (rev. 11/10)

In Re:
Highland Capital Management, L.P.

Debtor(s)

§ Case No.: 19−34054−sgj11
§ Chapter No.: 11

# CIVIL CASE COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| | |
|---|---|
| **I.** (a) **APPELLANT**<br>The Dugaboy Investment Trust | **APPELLEE**<br>Highland Capital Management, L.P., et al, |
| (b) County of Residence of First Listed Party:<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Party:<br>(IN U.S. PLAINTIFF CASES ONLY) |
| (c) Attorney's (Firm Name, Address, and Telephone Number)<br>See Service List | Attorney's (If Known)<br>See Service List |

**II. BASIS OF JURISDICTION**

- ○ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ◉ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**

| | | | | | |
|---|---|---|---|---|---|
| Citizen of This State | ○ 1 | ○ 1 | Incorporated *or* Principal Place of Business In This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated *and* Principal Place of Business In Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. NATURE OF SUIT**

- ◉ 422 Appeal 28 USC 158
- ○ 423 Withdrawal 28 USC 157
- ○ 890 Other Statutory Actions

**V. ORIGIN**

- ◉ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district
- ○ 6 Multidistrict Litigation
- ○ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity):**
422 Appeal 28 USC 158

Brief description of cause:
Notice of appeal of a bankruptcy court order

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
Judge: Docket Number: 3:26−cv−02315−X

DATED: 7/28/26

FOR THE COURT:
Stephen J Manz, Clerk of Court
by: /s/Sheniqua Whitaker, Deputy Clerk