**Case No. 3:26-cv-02496-D**

---

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

---

**IN RE HIGHLAND CAPITAL MANAGEMENT, L.P.,**
***Reorganized Debtor***

---

**THE DUGABOY INVESTMENT TRUST**

***Appellant***

**v.**

**HIGHLAND CAPITAL MANAGEMENT, L.P., *et al.***

***Appellees***

---

On Appeal from the United States Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11

---

# BRIEF OF APPELLANT THE DUGABOY INVESTMENT TRUST

---


Geoffrey S. Harper
gharper@kslaw.com
John Michael Gaddis
mgaddis@kslaw.com
**KING & SPALDING LLP**
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
*Counsel of Record*
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202) 739-3000
F: (202) 739-3001
michael.edney@morganlewis.com


*Additional counsel listed on next page*

Avery Joseph Welker
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T: (713) 890-5000
F: (713) 890-5001
avery.welker@morganlewis.com

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, Federal Rule of Bankruptcy Procedure 8012(c)(2), Local Bankruptcy Rule 8012.1, and Local Civil Rules 3.1(c), 3.2(e), 7.4, 81.1(a)(4)(D), and 81.2, Appellant The Dugaboy Investment Trust provides the following information:

1. The Dugaboy Investment Trust ("Dugaboy") is the only Appellant in this Appeal.
2. Mr. James Dondero is the 100% primary irrevocable beneficiary of Dugaboy and accordingly has a financial interest in the outcome of this Appeal.
3. Dugaboy is represented in this Appeal by Michael J. Edney and Avery Joseph Welker of Morgan, Lewis & Bockius LLP; and Geoffrey S. Harper and John Michael Gaddis of King & Spalding LLP.
4. Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Hunter Mountain Investment Trust are the Appellees in this Appeal.
5. Highland Capital Management, L.P. and the Highland Claimant Trust are represented by Jeffrey Nathan Pomerantz, Gregory Vincent Demo, and John A. Morris of Pachulski Stang Ziehl & Jones LLP; Mark T. Stancil and Joshua S. Levy of Willkie Farr & Gallagher LLP; and Melissa S. Hayward and Zachery Z. Annable of Hayward PLLC.

6. Highland Litigation Sub-Trust is represented by Jeffrey Nathan Pomerantz, Gregory Vincent Demo, John A. Morris, and Jordan A. Kroop of Pachulski Stang Ziehl & Jones LLP; Melissa S. Hayward and Zachery Z. Annable of Hayward PLLC.

7. The Hunter Mountain Investment Trust is represented by Louis M. Phillips and Amelia L. Hurt of Kelly Hart & Hallman LLP.

8. Appellant Dugaboy reserves the right to amend or supplement this Certificate of Interested Persons and Corporate Disclosures if necessary or appropriate.

Dated: October 8, 2026

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: *<u>/s/ Michael J. Edney</u>*

Michael J. Edney
D.C. Bar No. 492024
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202) 739-3000
F: (202) 739-3001
michael.edney@morganlewis.com

***Counsel for Appellant***
***The Dugaboy Investment Trust***

# TABLE OF CONTENTS


Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ....... i

TABLE OF AUTHORITIES ....... vi

STATEMENT REGARDING ORAL ARGUMENT ....... 1

STATEMENT OF JURISDICTION ....... 1

INTRODUCTION ....... 1

STANDARD OF REVIEW ....... 9

STATEMENT OF ISSUES ....... 10

STATEMENT OF THE CASE ....... 11

I. James Dondero Establishes Two Charitable Structures to Do Good ....... 11

II. Highland Files for Chapter 11 Bankruptcy ....... 13

III. Mark Patrick's Scheme to Plunder the Established Charities ....... 14

IV. Mr. Patrick Seeks to Settle with the Debtor to Further His Fraud and Misconduct. ....... 17

V. Discovery of the Fraudulent Restructuring ....... 19

VI. Judge Jernigan Recuses Herself Following Judicial Misconduct Complaints ....... 21

VII. Dugaboy Asks the Bankruptcy Court to Vacate the Settlement Approval Due to Mr. Patrick's Misconduct ....... 22

VIII. The Bankruptcy Court Denies Dugaboy's Rule 60(b) Motion ....... 23

ARGUMENT ....... 27

I. The Bankruptcy Court Erred in Holding that the Misconduct and Fraud of a Counterparty to a Settlement Is Not Relevant to Its Approval....27

A. The Bankruptcy Court Erred In Refusing to Consider Mark Patrick's Fraud....27

B. Mark Patrick Was an "Opposing Party" in the Settlement Proceedings, and His Deceptive Conduct Warranted Relief Under Rule 60(b)(3)....31

C. Despite Its Focus on Debtor Misconduct, the Bankruptcy Court Ignored Highland's Discovery Misconduct Prior to the Settlement Approval....35

D. Mark Patrick's Theft of Charitable Assets Independently Warranted Relief Under 60(b)(6)....38

II. The Bankruptcy Court Erred in Refusing to Revisit Its Deference to a Settlement Negotiated by Court-Appointed Administrators....39

III. Dugaboy and Mr. Dondero Did Not Forfeit Their Right to Argue That the Settlement Should Be Vacated Due to a Massive Heist Because of Earlier Indications of Mr. Patrick's Compliance Lapses....42

A. Nothing in Mr. Dondero's Affidavit Suggested Dugaboy Knew About the Misdeeds of Mr. Patrick that Mattered for the Rule 60(b) Motion....43

B. Mr. Dondero's Forbearance Toward Unrelated and Lesser Misconduct Did Not Waive a Later Claim that Mr. Patrick Lacked Authority to Enter the Settlement Due to His Automatic Removal as Administrator of Hunter Mountain....47

C. Dugaboy Clearly Demonstrated That the Full Scope of Mr. Patrick's Fraud Was Not Apparent Until After the Deadline to Seek Reconsideration of the Settlement Order Had Passed....50

IV. The Court Should Review *De Novo* the Rulings or Findings of Fact of an Article I Bankruptcy Judge. ....52

CONCLUSION ....54

CERTIFICATE OF SERVICE ....56

CERTIFICATE OF COMPLIANCE ....57

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Balfour Beatty Rail, Inc. v. Kan. City S. R.R. Co.*,
173 F. Supp. 3d 363 (N.D. Tex. 2016) ....................49

*Chilson v. Metro. Transit Auth.*,
796 F.2d 69 (5th Cir. 1986) ....................47

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986)....................53

*Dondero v. Jernigan*,
No. 24-10287, 2025 WL 1122466 (5th Cir. Apr. 16, 2025)....................22

*Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*,
6 F.3d 350 (5th Cir. 1993) ....................28

*Gache v. Hill Realty Assocs., LLC*,
No. 13-CV-1650 (CS), 2014 WL 5048336 (S.D.N.Y. Sept. 22, 2014) ....................32

*Gen. Universal Sys., Inc. v. Lee*,
379 F.3d 131 (5th Cir. 2004) ....................31

*Ginsberg v. Yeshiva of Far Rockaway*,
325 N.E.2d 876 (N.Y. App. 1975)....................49

*Goldstein v. MCI Worldcom*,
340 F.3d 238 (5th Cir. 2003) ....................47

*Guy v. Crown Equip. Corp.*,
394 F.3d 320 (5th Cir. 2004) ....................9

*Hesling v. CSX Transp., Inc.*,
396 F.3d 632 (5th Cir. 2005) ....................32, 43

*Hess v. Cockrell*,
281 F.3d 212 (5th Cir. 2002) ....................39

*Hewlett-Packard Co. v. Quanta Storage, Inc.*,
961 F.3d 731 (5th Cir. 2020) ....................9

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935)....................................................................................53

*In re Age Refining, Inc.*,
801 F.3d 530 (5th Cir. 2015) ........................................................................28

*In re Bartee*,
212 F.3d 277 (5th Cir. 2000) ..........................................................................1

*In re Clay*,
35 F.3d 190 (5th Cir. 1994) ..........................................................................52

*In re CWNevada LLC*,
602 B.R. 717 (Bankr. D. Nev. 2019)...............................................................27

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
888 F.3d 753 (5th Cir. 2018) ...................................................................32, 35

*In re Endeavour Highrise, L.P.*,
432 B.R. 583 (Bankr. S.D. Tex. 2010) ...........................................................49

*In re Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ..........................................................................28

*In re Kallstrom*,
298 B.R. 753 (10th Cir. BAP 2003) ...............................................................29

*In re Life Partners Holdings, Inc.*,
926 F.3d 103 (5th Cir. 2019) ..........................................................................9

*In re Mendoza*,
111 F.3d 1264 (5th Cir. 1997) ........................................................................9

*In re New Valley Corp.*,
181 F.3d 517 (3d Cir. 1999) ..........................................................................29

*In re Sylvester*,
23 F.4th 543 (5th Cir. 2022)..........................................................................10

*In re Thomas*,
337 B.R. 879 (Bankr. S.D. Tex. 2006) ...........................................................27

*In re Vega*,
102 B.R. 552 (Bankr. N.D. Tex. 1989)....................28

*In re Wood*,
825 F.2d 90 (5th Cir. 1987)....................52

*In re Yazoo Pipeline Co., L.P.*,
459 B.R. 636 (Bankr. S.D. Tex. 2011)....................28

*Kneale v. Bonds*,
452 S.E.2d 840 (S.C. Ct. App. 1994)....................49

*La. World Exposition v. Fed. Ins. Co.*,
858 F.2d 233 (5th Cir. 1988)....................40

*Matter of Garfinkle*,
672 F.2d 1340 (11th Cir. 1982)....................29

*Myers v. Armstrong*,
324 P.3d 388 (N.M. App. 2014)....................49

*Northbay Wellness Grp., Inc. v. Beyries*,
789 F.3d 956 (9th Cir. 2015)....................29

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co*.,
458 U.S. 50 (1982)....................52

*Pepper v. Litton*,
308 U.S. 295 (1939)....................29, 40

*Philadelphia Fresh Food Terminal Corp. v. M. Levin & Co. et al.*,
361 A.2d 886 (Pa. 1976)....................49

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945)....................28

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968)....................40

*Rhodes v. Amarillo Hosp. Dist.*,
654 F.2d 1148 (5th Cir. 1981)....................48

*Rismed Oncology Sys., Inc. v. Baron*,
297 F.R.D. 637 (N.D. Ala. 2014) ....................................................................32

*Seven Elves, Inc. v. Eskenazi*,
635 F.2d 396 (5th Cir. 1981) ....................................................................38, 49

*Stern v. Marshall*,
564 U.S. 462 (2011)....................................................................................52–53

*The Dugaboy Investment Trust v. Highland Capital Mgmt., L.P.*,
No. 3:25-cv-02072-S, Dkt. 28 (N.D. Tex. Oct. 2, 2026).......................................3

*Trump v. Slaughter*,
609 U.S. 422 (2026)..........................................................................................53

*U.S. v. Energy Res. Co., Inc.*,
495 U.S. 545 (1990)..........................................................................................27

*Watts v. Fritz*,
194 N.E.2d 276 (Ill. 1963)................................................................................49

*Williams v. French*,
No. H-23-2593, 2024 WL 3929894 (S.D. Tex. Aug. 23, 2024)............................9

**STATUTES**

28 U.S.C. § 157 ..............................................................................................1, 52

28 U.S.C. § 158 ....................................................................................................1

**RULES**

Fed. R. Bankr. P. 8002 ......................................................................................25

Fed. R. Bankr. P. 8014 ......................................................................................16

Fed. R. Bankr. P. 9019 ..................................................................................*passim*

Fed. R. Civ. P. 59 ........................................................................................*passim*

Fed. R. Civ. P. 60 ........................................................................................*passim*

Loc. Bankr. R. 8014.1 ........................................................................................16

## STATEMENT REGARDING ORAL ARGUMENT

This case concerns the responsibility of bankruptcy courts, as courts of equity, to ensure that their proceedings are not tainted by, or used to further, fraud. Given the complexity of the legal issues and the lengthy factual record and procedural history, Appellant respectfully requests oral argument.

## STATEMENT OF JURISDICTION

The United States Bankruptcy Court for the Northern District of Texas exercised jurisdiction under 28 U.S.C. § 157(b)(1). On July 10, 2026, the bankruptcy court entered an order R. 000008–9 denying Appellant The Dugaboy Investment Trust's ("Dugaboy") Motion to Alter or Amend and for Reconsideration (the "Rule 59(e) Motion") of the bankruptcy court's order denying Dugaboy's Motion for Relief from Order and Motion to Vacate (the "Rule 60(b) Motion") R. 016505–666.

On July 24, 2026, Dugaboy timely filed its Notice of Appeal from that Order. R. 000001–6.

The bankruptcy court's denial of the Rule 59(e) Motion constitutes a final appealable order. *See In re Bartee*, 212 F.3d 277, 281–82 (5th Cir. 2000). This Court has jurisdiction under 28 U.S.C. § 158(a)(1) over this Appeal from a final decision of the bankruptcy court.

## INTRODUCTION

This case is about the extent to which a bankruptcy court, a court of equity, should tolerate—and even facilitate—fraud and misconduct occurring right before

it. The fraud and misconduct are that of a gentleman named Mark Patrick, who was holding himself out as the administrator of Hunter Mountain Investment Trust, which held much of the equity ownership of a hedge fund in bankruptcy—Highland Capital Management. The bankruptcy court approved a bizarre settlement between the debtor hedge fund (really a series of bankruptcy professionals who should not still be running it) and Hunter Mountain. The scale and depravity of his fraud are breathtaking: Mr. Patrick stole more than a *quarter billion dollars* from four *established charities* dedicated to doing good in Dallas and beyond. And the connection of his fraud to the bankruptcy was direct: The assets of Highland that Mr. Patrick was dealing away were *stolen*, and the settlement directly advanced Mr. Patrick's effort to insulate his theft from reversal.

The evidence of Mr. Patrick's massive conversion of charitable assets came from proceedings in the Cayman Islands, where a receiver was appointed over one of the entities that was supposed to be stewarding those assets and that, unfortunately, was entrusted to Mr. Patrick's care. That evidence was made public by the receiver *after* the settlement was approved. And James Dondero and his family trust—the Dugaboy Investment Trust—urged the bankruptcy court to vacate the settlement through the appropriate means for bringing to light newly discovered evidence and evidence of fraud or misconduct: Federal Rule of Civil Procedure 60(b).

But the bankruptcy court said that Mr. Patrick's fraud was none of its business. Only fraud of the Debtor, the bankruptcy court held, is relevant to whether it should approve a debtor's settlement with a third party under the bankruptcy procedural rule that requires the court to sign on them. And the bankruptcy court determined that Mr. Dondero should have sought to remove Mr. Patrick from his position of trust sooner, because there were earlier indications that he was not a great guy, even if not of his eight-figure heist.

There were many errors that led to the bankruptcy court declining to vacate the settlement approval. Some were so plain that Dugaboy gave the bankruptcy court an opportunity to correct them, through a Rule 59(e) motion to amend his judgment declining to vacate. He declined, and that order is at issue in the appeal before this Court. The errors identified here and others are on appeal of the bankruptcy court's ruling declining to vacate pending before Judge Starr.[1]

---

[1] Appellant recognizes the overlap between the two appeals. For that reason, Dugaboy asked Judge Starr to consolidate this appeal and the Rule 60(b) appeal, as they arise from orders separated by about a month based on the same evidentiary record. *The Dugaboy Investment Trust v. Highland Capital Mgmt., L.P.*, No. 3:26-cv-02315-X, Dkt. 33 (N.D. Tex. Sept. 11, 2026) ("2315-X Appeal"). Highland opposed that motion, apparently because Highland thought it interfered with a much broader and wrong effort to consolidate four pending appeals spanning years. 2315-X Appeal, Dkt. 34; *see also The Dugaboy Investment Trust v. Highland Capital Mgmt., L.P.*, No. 3:25-cv-02072-S, Dkt. 28 (N.D. Tex. Oct. 2, 2026) (Judge Scholer recognizing the meritless nature of Highland's broader consolidation effort). The motion to consolidate before Judge Starr remains pending.

This Court should reverse the bankruptcy court's July 10, 2026 order denying Appellant The Dugaboy Investment Trust's ("Dugaboy") motion under Federal Rule of Civil Procedure 59(e) to reconsider its denial of Dugaboy's motion to vacate the bankruptcy court's order under Federal Rule of Civil Procedure 60(b) ("Rule 59(e) Motion").

This appeal arises from the long-running bankruptcy of Highland Capital Management in the Northern District of Texas. Highland was founded by Mr. Dondero and became one of the most successful investment and hedge funds in the country. Facing an unexpected judgment in 2019, the fund entered Chapter 11 bankruptcy to pause enforcement of that judgment so that it could sell a few assets, pay the judgment, and get back to business. The very bankruptcy lawyers who have now hijacked Highland and will defend it in this appeal—the Pachulski law firm—told Mr. Dondero this would be a short-term process to get Highland back to normalcy.

Not so. The case started in the District of Delaware and appeared poised there to enter and exit bankruptcy in a matter of months. But several creditors then successfully sought to transfer the case to Judge Stacey Jernigan in the Northern District of Texas, claiming she had better familiarity with Highland's structure because she had presided in a case about an entity tangentially related to Mr. Dondero. The Pachulski law firm said then what these creditors were really up to, explaining: "she formed negative views regarding certain members of the Debtor's management that

the [creditors] hope will carry over to this case." Dec. 2, 2019, Hr'g Tr., *In re Highland Capital Management, L.P.*, No. 19-12239-CSS (Bankr. D. Del. Dec. 3, 2019), Dkt. 181 at 77:18–78:8.

And negative views of Mr. Dondero she had. In her first hearing, she more or less insisted that Mr. Dondero be removed from managing Highland during the bankruptcy. That led to Highland being put in the hands of a bankruptcy professional, the so-called Chief Restructuring Officer, James Seery. And the Pachulski firm began to see the economic boon for it and other bankruptcy-dedicated accountants and law firms in a prolonged bankruptcy. All of a sudden, Seery, Pachulski, and their other agents began claiming that Highland was hopelessly insolvent and somehow needed to be liquidated. Rather than a quick and easy bankruptcy, Highland was plunged into a winding up that saw hundreds of millions paid to those bankruptcy professionals.

As it turns out, Highland was never insolvent. It paid a series of outrageously inflated creditor claims, and even after spending hundreds of millions more on the bankruptcy professionals, has massive assets left over. Those and more, given the mismanagement of this bankruptcy, should be for the equity owners of Highland, and Highland's management itself should be back with its founders. But Mr. Seery, the Pachulski firm, and the other bankruptcy professionals are still feeding off of Highland.

In the midst of all this, a new scheme targeted much of the equity stake in Highland and hundreds of millions in other assets that Mr. Dondero had donated to established charities as part of two charitable structures. The first—centered around the Hunter Mountain Investment Trust—had received the majority of Mr. Dondero and his co-founder of Highland's equity stake in the fund several years before the bankruptcy. This generous transfer was meant to benefit a 100-year-old charity, The Dallas Foundation. To the second charitable structure, Mr. Dondero made initial gifts of approximately $35 million that grew to more than $270 million in assets, again for the benefit of The Dallas Foundation and three other established charities.

Mark Patrick, a former tax attorney at Highland who assisted in the creation of the charitable structures to advance Mr. Dondero's charitable legacy, volunteered to manage the structures when their former caretakers retired in 2021 and 2022. Beginning no later than 2024, he used his position of trust to steal both structures' assets, larding them into a sham "charity" of his own, run from his home, and raking in millions of dollars in excessive compensation. He did so through a secret corporate restructuring that ended up divorcing four charities from hundreds of millions of dollars in assets. Using entities intentionally designed to be "hard to track or trace" and issuing false statements designed to lull into inaction the charitable owners from whom he was stealing, Mr. Patrick completed his scheme in March 2025. By then, hundreds of millions of dollars of assets were diverted to benefit only the sham

charity run from Mr. Patrick's home, while Mr. Patrick and an accomplice paid themselves—as "compensation"—$18 million in salary along the way. They disclosed this to no one. After months of the charities' questions remaining unanswered by Mr. Patrick and his accomplices, in May 2025, a type of receiver was appointed by Cayman Islands courts over one of the entities in the charitable DAF structure.

To prevent investigation of his misconduct by Mr. Dondero, and to protect the $18 million he and his accomplice had already collected in salary, Mr. Patrick turned to Highland's management for assistance. Purporting to act on behalf of Hunter Mountain—an entity for which he had purported to serve as administrator—Mr. Patrick began negotiating a settlement that traded away valuable assets and received litigation claims against Mr. Dondero to use as a cudgel against further efforts to uncover his fraud. In dealing away the rights of Hunter Mountain, which was supposed to be owned by one of Dallas's most established charities, he was peddling stolen goods.

After the bankruptcy court blessed that settlement, allegations of Mark Patrick's massive fraud, and later evidence of the same, came to light in filings by the Cayman Islands receiver. Only by standing in the shoes of the entity was the receiver able to discover the plotting by Mr. Patrick and his associates to remove valuable assets from supporting good works, for pennies on the dollar, to line their own pockets.

Since this revelation, Dugaboy asked the bankruptcy court to vacate the settlement. That request was denied. Presentation of evidence of Mr. Patrick's clandestine activities over a three-day evidentiary hearing on the Rule 60(b) Motion did not sway the bankruptcy court. Even following Dugaboy's Rule 59(e) Motion, the bankruptcy court declined to review manifest errors of law and fact it had made.

That should stop here. As an Article III court, this Court should apply de novo review of the bankruptcy court's decision, and should correct three principal categories of error identified in Dugaboy's Rule 59(e) Motion:

First, the bankruptcy court incorrectly treated Mr. Patrick's misconduct as irrelevant to the bankruptcy court's inquiry in approving the settlement, because it was not that of the debtor. And even as it agreed that it should be concerned about the *debtor's* fraud and misconduct when reviewing settlements, it ignored evidence of Highland's own misconduct during discovery.

Second, the bankruptcy court opted to take the lightest touch when reviewing a settlement negotiated, on the one hand, by a party alleged to have been engaged in fraud, and, on the other hand, a court-appointed administrator.

Third, the bankruptcy court erroneously found that Mr. Dondero had known that Mr. Patrick had engaged in lesser compliance lapses in the past, which somehow divested him of the right to ask for relief when later evidence of his massive theft came to light.

## STANDARD OF REVIEW

Courts grant motions to alter or amend a judgment to correct manifest errors of law or fact. *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 128 (5th Cir. 2019). Under Rule 59(e), "manifest error is one that is plain and indisputable, and that amounts to a complete disregard of the controlling law." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (cleaned up). "A manifest error of fact is an obvious mistake or departure from the truth." *Williams v. French*, No. H-23-2593, 2024 WL 3929894, at *3 (S.D. Tex. Aug. 23, 2024) (cleaned up).

For the reasons stated in Section IV of the argument below, this Court should review all aspects of the bankruptcy court's ruling *de novo*, because the Constitution's Appointments Clause requires plenary supervision of an Article I judge by an officer listed in the Constitution—here, an Article III judge.

Before the Supreme Court's most recent Appointments Clause cases, this Court's review of a bankruptcy court's denial of a Rule 59(e) motion was for an abuse of discretion. *Life Partners*, 926 F.3d at 128. Misapplying law to facts is an abuse of discretion. *See Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 743 (5th Cir. 2020). Further, a bankruptcy court applies an improper legal standard—and commits an abuse of discretion—when it erroneously concludes that its discretion is more constrained than the law provides. *In re Mendoza*, 111 F.3d 1264, 1266 (5th Cir. 1997). And it abuses its discretion when it applies an improper or faulty

procedure to arrive at a decision. *See In re Sylvester*, 23 F.4th 543, 546 (5th Cir. 2022).

## STATEMENT OF ISSUES

1. Whether the bankruptcy court erred by not correcting its legal determination that the misconduct and fraud of a settlement counterparty to the debtor is categorically not relevant to determining whether a debtor settlement should be approved under Federal Rule of Bankruptcy Procedure 9019.

2. Whether the bankruptcy court erred in not correcting the deference it gave to the deal struck between the Debtor and a counterparty purporting to act on behalf of debtor equity, when the Debtor's management essentially had been installed by the court and equity holders and founders should have already been back in control of the Debtor, all of its creditors having been paid.

3. Whether the bankruptcy court erred by not correcting its determination that prior knowledge of lesser unrelated compliance lapses rendered later revealed evidence of Mr. Patrick stealing hundreds of millions of dollars in charitable assets, somehow evidence not "newly discovered" for purposes of providing relief from a judgment under Federal Rule of Civil Procedure 60(b)(2).

4. Whether, in light of recent United States Supreme Court decisions addressing the Constitution's Appointment Clause, this Court should review all aspects of the bankruptcy court's rulings *de novo*, because the Appointments Clause requires

plenary supervision of an Article I judge by an officer listed in the Constitution, such as an Article III judge.

## STATEMENT OF THE CASE

### I. James Dondero Establishes Two Charitable Structures to Do Good

In 1993, James Dondero and Mark Okada founded Highland Capital Management, L.P. R.000660. After years of extraordinary success, Mr. Dondero sought to direct the fruits of his investment enterprises to good works, creating two charitable structures that were designed to offer stable, long-term funding for charitable purposes.

In 2011, Mr. Dondero and his family trust—the Dugaboy Investment Trust—created a tax-advantaged charitable structure called the "Charitable DAF." R. 000661–62. The Charitable DAF was created to be owned by and support four long-established charities: The Dallas Foundation, The Greater Kansas City Community Foundation, Santa Barbara Foundation, and Community Foundation of North Texas. R. 000671. The Charitable DAF was structured to allow Mr. Dondero to make assets available for charity while retaining a voice in how the assets are invested and the good works to which they are ultimately deployed.

Prior to 2023, this structure was a massive success. From an initial gift of $35 million, the Charitable DAF's assets grew to hundreds of millions of dollars. By that time, more than $40 million had been spent towards charitable ends, and more than

$270 million remained for future charitable use. R. 000662. The Charitable DAF had supported the noblest of causes, including assisting Mr. Dondero in becoming one of the Nation's largest benefactors of veterans injured in the Global War on Terror, standing up Christo Rey High School for disadvantaged youth in Dallas, and serving as the anchor donor for the President George W. Bush Presidential Library.

In 2015, Mr. Dondero and the equity stakeholders in Highland created another charitable structure to support The Dallas Foundation. *Id.* A core part of this structure was the Hunter Mountain Investment Trust, to which Mr. Dondero and his co-founder gave most of their equity ownership stakes in Highland. R. 000662–65.

Both the Charitable DAF and the Hunter Mountain structures had inherent protections to ensure the assets contained within were used for good works, holding their managers to strict fiduciary duties to act in the best interests of the charities benefiting from the structures. In addition, Hunter Mountain's trust agreement included an automatic removal provision for the administrator. If the administrator engaged in breaches of fiduciary duty, dishonesty, fraud, willful misconduct, bad faith, or theft "in any capacity," he would be removed without any further action. R. 008490. If the qualifying misconduct occurred, the administrator was stripped of his powers and his actions thereafter would be void.

## II. Highland Files for Chapter 11 Bankruptcy

In 2019, Highland faced an unexpected judgment of approximately $100 million. R. 000665. To address that unanticipated financial challenge, Highland needed to convert illiquid assets into cash, pay the judgment, and resume operations. *Id.* In October 2019 Highland sought reorganization under Chapter 11 in the United States Bankruptcy Court for the District of Delaware. *Id.*

Initially, the plan worked in Delaware, with a series of rulings poised to sell some assets and return Highland to work quickly. Then the aforementioned transfer to the Northern District of Texas occurred.

Following the transfer, the bankruptcy turned to chaos—a wholesale liquidation of Highland. During the *first* hearing in the Highland bankruptcy, Chief Judge Jernigan insisted on Mr. Dondero's removal from Highland's management. R. 000665. Highland's current counsel—the Pachulski firm—effectively switched sides and became adverse to Mr. Dondero.

The bankruptcy court put a bankruptcy lifer—the so-called "Chief Restructuring Officer" James Seery—at the helm, and he attempted to paint the company as insolvent. He began raining professional fees on lawyers and accountants and commenced a fire sale of Highland's assets. Together, Seery and his legion collected fees worth more than $260 million. R. 000668. The claims of a hopelessly insolvent estate were self-serving and false. Highland had enough assets to pay, and ultimately

did pay, the inflated claims of all creditors. Yet to this day—seven years after the initiation of the bankruptcy and three years after all creditors were paid in full—Highland and its substantial remaining assets remain controlled by loosely supervised appointed professionals who recognize no fiduciary duty, have no incentive to maximize the estate for the benefit of equity holders, and use Highland as a trough for endless fees.

## III. Mark Patrick's Scheme to Plunder the Established Charities

Mark Patrick was a tax lawyer in Mr. Dondero's organization who assisted creating the two charitable structures in question. After the caretakers of the Charitable DAF and Hunter Mountain structures retired in 2021 and 2022, Mark Patrick volunteered to fill those positions. *Id*.

The first year or so went without incident. In 2023, however, Mr. Patrick secretly planned to thieve the charitable assets of both structures and pay himself tens of millions of dollars along the way. He asked a local law firm—the Shields Law Group—to devise a plan for doing so, which was essentially a how-to guide for corporate fraud. *See* R. 008658–65.

Ultimately, Mr. Patrick would use the Charitable DAF to steal both the approximately $270 million in assets held there and the equity stake in Highland held in the Hunter Mountain structure. He created an alphabet soup of nondescript entities and inserted them into the structure as vehicles to steal the charitable assets through

a *sub rosa* "corporate restructuring" without anyone noticing. This included DFW Charitable Foundation, a sham charity that Mr. Patrick created in December 2024 and ran from his basement, and CDH Ltd., the new general partner of the Charitable DAF. *See, e.g.*, R. 008667–70; R. 008672–73. Mr. Patrick wanted no one to notice these moves, so he instructed his lawyers to choose a "generic name" that was "hard to find or track, or trace." R. 010717.

Once he had prepared the restructured Charitable DAF as a vehicle to steal assets, Mr. Patrick "sold" Hunter Mountain and its equity stake in Highland into the Charitable DAF structure on February 7, 2025, for a nominal $1 million, with Mr. Patrick signing for both sides. R. 008822–30.

With Hunter Mountain now inside the Charitable DAF structure, Mr. Patrick took final action to divorce the Highland equity asset and the more than $270 million in historical Charitable DAF assets from their established charitable owners. To do so, on March 27, 2025, Mr. Patrick "redeemed" the established charities' ownership in the Charitable DAF for $1.6 million. To repeat, *Mr. Patrick cashed the charities out of their ownership of $270 million in assets and equity ownership in Highland worth potentially hundreds of millions more* for $1.6 million.

Mr. Patrick attempted to paper the fraudulent sale against discovery, seeking accounting firm after accounting firm to validate the legerdemain that somehow hundreds of millions were worth a little more than one. After two legitimate firms

declined, Mr. Patrick enlisted ValueScope to come up with an explanation. Bankr. Dkt. 4655, May 11, 2026, Hr'g Tr. at 117:2–17, 123:6–125:23.[2] This same firm—even before the Charitable DAF's acquisition of the Highland equity interest—had reported a net asset value of approximately $270 million as of September 30, 2024. R. 008706. On March 26, 2025, ValueScope did an about-face and obligingly opined that the established charities' ownership interests were worth only $1.6 million. R. 008743. The next day, on March 27, 2025, Mr. Patrick redeemed the established charities' ownership for $1.6 million and then shut them out of the DAF structure. That move left DFW Charitable Foundation, the made-up charity Mr. Patrick ran from his home, as the sole owner of well over $270 million in assets. R. 008815–17; Bankr. Dkt. 4662, May 12, 2026, Hr'g Tr. at 16:5–7.

To stop the established charitable owners from sounding the alarm, Mr. Patrick kept all of them in the dark throughout. He did not tell them about the new, "hard to find or track, or trace" entities he created or the moves inserting them into the structure. He did not share the new ValueScope valuation, unlike the previous

[2] Dugaboy acknowledges that the requirement of Fed. R. Bankr. P. 8014(a)(8) "must be satisfied by citing the record page number assigned by the bankruptcy clerk." Loc. Bankr. R. 8014.1. A supplemental record that includes transcripts for the hearings on May 11, 12, and 21 was prepared by the bankruptcy clerk, who inadvertently omitted them from the original record. That record has been transmitted to the related appeal of Dugaboy's 60(b) motion, and Dugaboy will be filing a motion asking that the supplemental record also be transmitted to this appeal.

ones sent to the charities telling them they had hundreds of millions in assets. R. 008706. Beyond fraudulent concealment, Mr. Patrick and others flat out lied to the charities to lull them into inaction while he completed his plundering restructuring. They falsely assured the charities that no structural changes were being made or would be made to the Charitable DAF and that audited financial statements that would show their assets, and new moves to benefit them, were coming. R. 011648–61, 013883–84, 014027, 014037–38. But the promised disclosures never arrived. R. 000757.

Mr. Patrick took these assets from the established charities for one reason: To pay himself a grotesque amount of money. Managing the assets should have been a part-time job, as it was for Mr. Patrick's predecessors who were paid tens of thousands per year. Yet Mr. Patrick paid himself and his accomplice Paul Murphy more than $18 million from the fourth quarter of 2024 through the second quarter of 2025. Bankr. Dkt. 4655, May 11, 2026, Hr'g Tr. at 131:16–23. If he is not held accountable for his misconduct, everyone can count on this eight-figure pay day for Mr. Patrick to be an annual event.

## IV. Mr. Patrick Seeks to Settle with the Debtor to Further His Fraud and Misconduct.

In early 2025, Mr. Patrick approached Highland's court-appointed managers to forge a settlement purportedly on behalf of Hunter Mountain, which held the lion's share Highland's equity. These parties should never have been associated with each

other in the first place. Highland, having paid off its creditors, should have been returned to its owners at the end of a Chapter 11 restructuring. Not so here. The bankruptcy professionals, James Seery and his lawyers, were still running Highland. So, bizarrely, Highland was in a position where it would "settle" with the owners of its own equity and somehow keep the bankruptcy going.

Mr. Patrick by this point had secretly worked hard to separate himself, so he thought, from the obligation to act in the best interests of the established charity that had owned most of the Hunter Mountain equity stake in Highland or the donor who rightly expected the Hunter Mountain administrator to maximize value for the charity. The settlement was all about further feathering Mr. Patrick's new nest. Mr. Patrick made no significant demands for the bankruptcy professionals managing the Highland estate to turn over their hoard of cash. He agreed that Hunter Mountain would absolve the bankruptcy professionals purporting to run Highland in exchange for (1) a schedule of $25 million in cash payments, but with only $500,000 to be paid in the near term; (2) a claim over the residual bankruptcy estate to which Hunter Mountain was already entitled; and (3) taking for Mr. Patrick's self Highland's claims against its former manager and the donor who put much of Highland's equity in charitable hands in the first place—Mr. Dondero. R. 001280–91. He intended to use the last feature of the settlement to molest Mr. Dondero and deter him from doing

something about the theft that would eventually be discovered. *See* Bankr. Dkt. 4662, May 12, 2026, Hr'g Tr. at 80:25–81:7.

The proposed settlement was presented to Chief Judge Stacey Jernigan of the bankruptcy court on May 19, 2025. Several parties, including Dugaboy, objected to the settlement.

During the truncated eleven-day discovery process prior to the June 25, 2025, hearing on the 9019 Settlement, Dugaboy received documents from Highland. These included documents that Highland's management said "confirmed" that Mark Patrick possessed the authority to settle on Hunter Mountain's behalf—but those documents only concerned the old corporate structure of Hunter Mountain, not the one after Mr. Patrick's fraudulent restructuring. Bankr. Dkt. 4671, May 21, 2026, Hr'g Tr. at 46:17–53:6. Dugaboy also deposed Mr. Patrick. During that deposition, Mr. Patrick feigned ignorance regarding which persons or entities currently owned certain entities. R. 016606.

Despite Dugaboy's objections to the proposed Rule 9019 Settlement, the bankruptcy court approved it. R. 000718–21.

**V. Discovery of the Fraudulent Restructuring**

In May 2025, the Cayman Islands courts appointed a form of a receiver over one of the key Charitable DAF entities which was incorporated there. When the Cayman Islands court was considering doing so, Mr. Dondero filed an affidavit raising

compliance concerns about Mark Patrick's work for companies associated with him in the past, suggesting it might make sense for the court to have a receiver take a look. R. 009571–80. The Cayman court appointed receivers, which it called the "joint official liquidators," who stepped into the shoes of the Charitable DAF Fund, L.P., and could access its confidential documents. R. 001859; Bankr. Dkt. 4655, May 11, 2026, Hr'g Tr. at 76:21–78:25.

On July 15, 2025, some fifteen days after the settlement's approval, the Cayman liquidators filed a complaint with allegations detailing Mr. Patrick's fraudulent restructuring activities. In the Cayman Islands, this is called a "Statement of Claim." *See* R. 001855–1937.

Two days later, on July 17, 2025, Dugaboy asked Chief Judge Jernigan to stay the settlement approval in light of the allegations of fraud in the Statement of Claim. Four days later, Chief Judge Jernigan denied that request. R. 001428.

What followed between late July and December 2025 was the release of the hard evidence from the Cayman liquidation proceedings underpinning the receivers' allegations. This included Mr. Patrick's communications with co-conspirators detailing what they were up to, internal and formation documents, and the paper trail of filings proving each step of Mr. Patrick's scheme. The receivers were able to obtain the evidence only because they had authority to act for the Charitable DAF Fund, L.P. entity, as Cayman law maintains the confidentiality of "private company

information." Bankr. Dkt. 4655, May 11, 2026, Hr'g Tr. at 76:21–77:23. The receivers also obtained access to otherwise privileged conversations between Mr. Patrick and his attorneys planning the fraudulent scheme. *See, e.g.,* R. 008658, R. 010717. A large tranche of the transactional documents were disclosed on July 21, 2025, in an initial Chapter 15 recognition filing by the Caymans receivers, with additional documents disclosed up until December 2025.

## VI. Judge Jernigan Recuses Herself Following Judicial Misconduct Complaints.

Also in December 2025, the Judicial Council of the Fifth Circuit resolved judicial misconduct complaints against Judge Jernigan arising from the Highland bankruptcy through "corrective action." The complaints were in part based on Judge Jernigan's publishing of two novels, *He Watches All My Paths* and *Hedging Death*. The novels were published while Judge Jernigan oversaw the Highland bankruptcy and the bankruptcy of another Dondero-affiliated hedge fund and expressed negative views about the hedge fund industry as a whole and hedge fund managers in particular. *See, e.g.,* R. 001765–82. In the second novel, Judge Jernigan pits a bankruptcy judge protagonist identical to herself against a villainous hedge fund manager patterned off Mr. Dondero. *See* R. 001450–84. The novels were raised in a recusal motion, which was swiftly denied by Judge Jernigan in March 2023. *See* R. 001498.

Mr. Dondero sought mandamus relief to the Fifth Circuit, which acknowledged that "a strong argument that [Judge Jernigan] had a duty to recuse" existed,

but denied mandamus relief because the right to relief was not "clear and indisputable." *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466 at *7 (5th Cir. Apr. 16, 2025). The "corrective action" resulting from the Fifth Circuit Judicial Council's resolution included Judge Jernigan's recusal from matters in the bankruptcy pending before her and ethics training to avoid such conduct in the future. R. 001435.

On February 10, 2026, Judge Jernigan recused herself from the Highland bankruptcy case.

## VII. Dugaboy Asks the Bankruptcy Court to Vacate the Settlement Approval Due to Mr. Patrick's Misconduct

Shortly before Judge Jernigan's recusal in February 2026, Dugaboy asked the bankruptcy court to vacate the settlement approval under Federal Rule of Civil Procedure 60(b), in light of this intervening evidence of massive misconduct by the settlement counterparty. R. 000648–000706. Dugaboy moved for relief on three primary grounds: (1) under Rule 60(b)(2) based on the newly discovered evidence, produced during the Cayman case, of Mark Patrick's vast fraud; (2) under Rule 60(b)(3) for the fraud and misconduct of opposing parties Mark Patrick and Highland; and (3) under Rule 60(b)(6) for equitable reasons and because reasonable questions regarding Chief Judge Jernigan's partiality were presented to her, mandating her recusal and rendering her without authority to approve the 9019 Settlement. R. 000688–98.

On February 10, 2026, briefing and discovery commenced on Dugaboy's Rule 60(b) motion, and the bankruptcy court—now preside by Judge Odell—held a three-day evidentiary hearing between May 11 and May 21, 2026. R. 000625, 000634–35.

**VIII. The Bankruptcy Court Denies Dugaboy's Rule 60(b) Motion**

On June 15, 2026, Judge Odell denied Dugaboy's Rule 60(b) Motion. Relevant here, the bankruptcy court held that Mr. Patrick's misconduct was not "newly discovered" so as to justify relief. The bankruptcy court pointed to Mr. Dondero's April 2025 affidavit as establishing that Mr. Dondero—and by extension, Dugaboy—knew of prior shortcomings by Mr. Patrick and somehow lost his right to bring Mr. Patrick's nine-figure theft to the court's attention because he did not fully prosecute Mr. Patrick's prior, lesser transgressions of company policies. R. 016499–500. The bankruptcy court held more broadly that the whole exercise of dealing with Mr. Patrick's misconduct was not for a bankruptcy court deciding whether to approve a settlement or vacate its approval. That was because only fraud and misconduct committed by the debtor Highland—and not by Mr. Patrick—mattered for purposes of the bankruptcy court's role in determining whether to approve debtor settlements. R. 016501–02. And the bankruptcy court rejected Dugaboy's equitable argument on the ground that vacatur of the Rule 9019 Settlement would not undo Mr. Patrick's restructuring. R. 016503.

On June 29, 2026, Dugaboy filed a motion under Federal Rule of Civil Procedure 59(e) for reconsideration ("Rule 59(e) Motion") of the bankruptcy court's denial of the Rule 60(b) Motion, identifying manifest errors of fact and law inherent in the court's rulings. R. 016505–666. First, Dugaboy demonstrated that the massive fraud perpetrated by Mr. Patrick in stealing all the assets of the Charitable DAF and Hunter Mountain from the established charities was disconnected from the more minor compliance lapses detailed in the April 2025 affidavit. R. 016517–016527. Second, Dugaboy highlighted the prejudice against Dugaboy wrought by Mr. Patrick's dishonesty and misrepresentations during discovery, as well as Highland's own misleading and possibly fraudulent discovery responses. R. 016517–016527. Third, Dugaboy emphasized that relief was warranted under Rule 60(b)(6) to ensure that the bankruptcy court, as a court of equity, provides adequate scrutiny of settlements negotiated by court-appointed managers and prevents individuals with unclean hands from perpetuating and legitimizing their fraud through the court. R. 016531–33.

On July 10, 2026, the bankruptcy court denied the Rule 59(e) Motion. R. 000010–11. The bankruptcy court declined to engage with the substance of the motion, stating simply that it lacked merit and denial was warranted. R. 000011. Dugaboy appealed this denial on July 24, 2026. R. 016733.

Concurrent with filing its Rule 59(e) Motion, Dugaboy filed its Notice of Appeal from the denial of the Rule 60(b) Motion, to become effective upon disposition of the Rule 59(e) Motion under Federal Rule of Bankruptcy Procedure 8002(b)(1)(B). R. 016667; R. 016733; R. 016742. It is therefore only by a quirk of timing that Dugaboy's appeal did not encompass the bankruptcy court's denials of both its Rule 60(b) Motion and its Rule 59(e) Motion. To correct this, Dugaboy has filed a motion to consolidate this appeal with its appeal of the Rule 60(b) Motion. *See Dugaboy Investment Trust v. Highland Capital Management, L.P.*, 3:26-cv-02315-X, Dkt. 33. Highland has opposed this consolidation, oddly. Dugaboy maintains its position that the two appeals should be consolidated, but files this separate brief today.

## SUMMARY OF THE ARGUMENT

The bankruptcy court's errors in addressing the Rule 60(b) Motion were many, and Dugaboy preserved its arguments against them in its direct appeal of the denial of the Rule 60(b) Motion. R. 016667. While preserving those arguments, in its Rule 59(e) Motion, Dugaboy confined its bases for reconsideration of the denial of the Rule 60(b) Motion to a limited subset of those arguments, and this appeal addresses only those issues. R. 000001–5, 016505–534.

This Court should reverse the bankruptcy court's failure to reconsider its order declining to vacate the Hunter Mountain / Highland settlement approval.

***First***, the bankruptcy court erred by not correcting its legal determination that the misconduct and fraud of a settlement counterparty to the debtor is categorically not relevant to determining whether a debtor settlement should be approved under Federal Rule of Bankruptcy Procedure 9019. This erroneous misconception wrongly supported its denial of relief under Rule 60(b)(2), (3), and (6).

***Second***, the bankruptcy court erred in not correcting the deference it gave to the deal struck between the Debtor and a counterparty purporting to act on behalf of debtor equity, when the Debtor was still run by court-appointed management despite creditors having been paid.

***Third***, the bankruptcy court manifestly erred in denying Rule 60(b)(2) relief, because the evidence of Mark Patrick's fraud plainly was newly discovered through the Cayman proceedings and was not addressed—because it was not yet known—in James Dondero's April 2025 affidavit, and knowledge of the lesser misconduct detailed in the affidavit did not waive Mr. Dondero and Dugaboy's rights to later challenge Mr. Patrick's authority to enter the settlement.

***Fourth***, in light of the Supreme Court's recent clarification of the Constitution's Appointments Clause, which calls for plenary supervision of an Article I judge by an officer listed in the Constitution—here, an Article III judge—this Court should review the bankruptcy court's order *de novo* rather than for abuse of discretion.

## ARGUMENT

### I. The Bankruptcy Court Erred in Holding that the Misconduct and Fraud of a Counterparty to a Settlement Is Not Relevant to Its Approval.

The bankruptcy court's fundamental error was to presume that only fraud or misconduct by a debtor—and not that of a counterparty to a settlement—was relevant to whether the court should approve the settlement. As a result, the court looked only for potential misconduct by Highland while categorically ignoring the far more consequential misconduct and fraud—both extrinsic and intrinsic to the proceeding—by Mr. Patrick. R. 016502–3.

#### A. The Bankruptcy Court Erred In Refusing to Consider Mark Patrick's Fraud.

According to the bankruptcy court, "[w]hatever Mr. Patrick did or did not do with his authority over [Hunter Mountain's] assets and the charitable beneficiaries' structure, is not for this Court to decide." R. 016502–3. Yet in failing to consider Mark Patrick's massive fraud, the bankruptcy court neglected its duty as a court of equity to ensure that it did not ratify the conduct of a party with unclean hands.

Bankruptcy courts, as courts of equity, have a duty to ensure that their proceedings are conducted fairly and free of fraud and misconduct. *U.S. v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990); *see In re Thomas*, 337 B.R. 879, 888 (Bankr. S.D. Tex. 2006); *In re CWNevada LLC*, 602 B.R. 717, 737 n.44 (Bankr. D. Nev. 2019) (bankruptcy court's role in rooting out fraud by litigants "is designed to

preserve public confidence in, as well as the integrity of the court, by preventing it from becoming a participant in inequitable conduct") (citing *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945)). This duty encompasses fraud and misconduct affecting *any* part of the proceedings. *E.g.*, *In re Vega*, 102 B.R. 552 (Bankr. N.D. Tex. 1989) (removing Chapter 7 trustee for misleading and misrepresentative fund management); *In re Yazoo Pipeline Co., L.P.*, 459 B.R. 636, 648 (Bankr. S.D. Tex. 2011) (permitting post-petition fraud claims against third parties for injuries on behalf of the estate).

Bankruptcy courts do not, and should not, approve settlements when one of the parties to the settlement arrives at the court through fraud, collusion, or bad faith. *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015); *see also In re Foster Mortg. Corp.*, 68 F.3d 914, 918 (5th Cir. 1995). This includes misconduct not only of debtors, but of any party to a settlement. A bankruptcy court may approve a settlement only when it is "fair and equitable" and must weigh "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *In re Age Refining, Inc.*, 801 F.3d at 540. The inquiry turns on whether the settlement was the *product* of fraud or collusion—not the identity of the wrongdoer. *Id.*

As a court of equity, the bankruptcy court also was obligated to consider the "need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co.,*

*Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993). This included ensuring that the bankruptcy process itself was not "perverted as an instrument" against equity, and that fraud, if uncovered, was not allowed to stand. *Pepper v. Litton*, 308 U.S. 295, 312 (1939). Fulfilling this duty is particularly critical when, as here, evidence of fraud and misconduct is brought directly to the attention of the bankruptcy court. *See id.* at 310–12 (when fraud is shown, "the necessity of equitable relief against that fraud becomes insistent"). A bankruptcy court must "exercise [] its equity jurisdiction to undo" fraudulent schemes brought by parties with unclean hands. *Id.* at 312. And this duty to prevent fraud does not stop at the debtor's fraud, but extends to non-debtors as well. *See, e.g.*, *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956 (9th Cir. 2015); *Matter of Garfinkle*, 672 F.2d 1340 (11th Cir. 1982); *In re New Valley Corp.*, 181 F.3d 517 (3d Cir. 1999). Otherwise, the court risks the "legitimacy and integrity of the bankruptcy process." *In re Kallstrom*, 298 B.R. 753, 758–59 (10th Cir. BAP 2003).

Mr. Patrick's theft of more than $270 million in charitable assets was extraordinary misconduct and fraud that warranted relief under Federal Rules of Civil Procedure 60(b)(2), 60(b)(3), and 60(b)(6) because it corrupted and tainted the settlement process. The bankruptcy court's failure to even consider this entire category of conduct was a legal error contrary to the plain language and purpose of Rule 60(b)—which allows for relief in the interest of justice, based not only on fraud that is

"intrinsic" to the judicial proceeding, but also on the underlying fraud that is "extrinsic" to it. Fed. R. Civ. P. 60(b). And, during the Rule 60(b) proceedings, Dugaboy amply demonstrated how Mr. Patrick had concealed the fraud both while it was executed and during the settlement process, precluding Dugaboy from discovering it, much less "fully and fairly" presenting evidence of the fraud during the Rule 9019 hearing.

The bankruptcy court believed it could ignore these arguments because vacating the settlement would not restore the original charitable structures. R. 016502. Therefore, according to the bankruptcy court, it need not reassess whether the settlement was the product of good faith, arm's length negotiations. *Id*. In reaching that conclusion, the bankruptcy court relied in part on Mr. Patrick's testimony—against which Dugaboy presented substantial contrary evidence—that he would still control Hunter Mountain's assets even if the structure was restored. *Id.*

The bankruptcy court's failure to engage Dugaboy's arguments was a manifest error of law and fact. *First,* whether vacating the settlement would restore the charitable structures was beside the point; Dugaboy did not seek restoration of the charitable structures through the bankruptcy process. Rather, Dugaboy offered ample reasons, rooted in equity, why the settlement should not stand, and the bankruptcy court abdicated its obligation, as a court of equity, to engage with the arguments and evidence.

*Second*, as part of its reasoning, the bankruptcy court pointed to Mr. Patrick's testimony that he would control Hunter Mountain's assets no matter what, but the court explicitly declined to address the propriety of Mr. Patrick's manipulation of the charitable structures to his own benefit—even though it was that very manipulation that Dugaboy argued had divested Mr. Patrick of his authority over Hunter Mountain pursuant to its automatic removal provision. This reasoning, too, was manifestly erroneous—indeed, it is extraordinary that a court of equity would refuse to address whether certain conduct amounted to fraud and then accept, uncritically, a party's statement about its authority to recommit that conduct.

### B. Mark Patrick Was an "Opposing Party" in the Settlement Proceedings, and His Deceptive Conduct Warranted Relief Under Rule 60(b)(3).

The bankruptcy court further erred in failing to address Mark Patrick's fraud and misconduct as that of an "opposing party" under Rule 60(b)(3), and its failure to correct this error amounted to an abuse of discretion. Rule 60(b)(3) allows relief from an order due to "fraud (whether intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). Such relief is warranted when "the opposing party withheld information called for by discovery or willfully committed perjury," and the misconduct "prevented the moving party from fully and fairly presenting his case." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 156–57 (5th Cir. 2004). The rule is remedial and should be liberally construed to vacate

judgments that are unfairly obtained, regardless of whether the withheld information would have altered the outcome. *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir. 2005); *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 790 (5th Cir. 2018) (noting that the test under Rule 60(b)(3) is "whether it prevented the losing party from fully and fairly presenting his case or defense" (cleaned up)).

Highland's role as movant did not make it Dugaboy's only opponent in the settlement approval proceeding. As Hunter Mountain's administrator, Mr. Patrick was a "party" to the Rule 9019 settlement, and because his position was adverse to Dugaboy's, he was an "opposing party" for purposes of Rule 60(b)(3). *See, e.g.*, *Rismed Oncology Sys., Inc. v. Baron*, 297 F.R.D. 637, 656 (N.D. Ala. 2014) (applying Rule 60(b)(3) to fraudulent conduct by party entity's corporate officers who were not named parties). In its Rule 60(b)(3) analysis, *Gache v. Hill Realty Assocs., LLC*, No. 13-CV-1650 (CS), 2014 WL 5048336, at *7 n.11 (S.D.N.Y. Sept. 22, 2014), treated the estate purchaser and officials of a municipality that had settled with the trustee as "effectively, Plaintiff's 'opposing parties' in the bankruptcy case." Hunter Mountain likewise participated directly against Dugaboy, had clearly joined with Highland in eagerly seeking the bankruptcy court's approval of the settlement and indeed participated in the proceedings leading to its approval, and received the order's benefits. R. 000720 ¶¶ 4, 6–7. Through counsel, it urged approval and adopted

Highland's arguments. R. 009349 (June 25, 2025 Hrg. Tr. at 62:21–25). Mr. Patrick's representations on their behalf were part of the approval proceeding. R. 000720 ¶¶ 4, 6–7. Yet in denying relief under Rule 60(b)(3) the bankruptcy court erroneously narrowed its focus only to arguments about *Highland's* misconduct during the discovery process R. 016502–3. The bankruptcy court did not consider Mr. Patrick's massive fraud in stealing hundreds of millions of dollars in charitable assets or his misconduct during the discovery process—each of which warranted relief under the rule.

With respect to the latter, Mark Patrick's omissions, obfuscations, and misrepresentations during discovery and the settlement hearing independently warranted relief under Rule 60(b)(3). Dugaboy presented multiple examples of this misconduct:

- Mr. Patrick repeatedly testified at his deposition that he could not remember who owned CDMCFAD LLC, a key entity that he used as part of his scheme to steal the charitable assets, including the Hunter Mountain assets. R. 001718. But as Mr. Patrick knew, the ultimate beneficiary of that key entity was Mr. Patrick's own newly formed sham charity, DFW Charitable Foundation. After all, he had secretly completed just a few weeks before his deposition the fraudulent transactions that put DFW Charitable Foundation at the top of the assets and the companies owning them.

- Mr. Patrick's testimony that Hunter Mountain's ultimate owner was Beacon Mountain, LLC, was misleading at best. R. 001718–19. In fact, by February 2025 several other owners existed above Beacon Mountain in the ownership chain, including entities Mr. Patrick used in the fraudulent restructuring, and by March 2025 the ultimate beneficiary of Hunter Mountain was Mr. Patrick's own newly formed sham charity. *Id.*
- In his deposition prior to the settlement hearing, Mr. Patrick claimed, incredibly, that he did not remember whether he had changed the general partner of the Charitable DAF structure. R. 001718. But Mr. Patrick's deposition was in June 2025; he had completed the fraudulent restructuring in March 2025, after deliberately changing the general partner to a new company that he controlled. His asserted lack of recollection—much like his feigned confusion at the settlement hearing, upon which the predecessor judge remarked, *see* R. 003583—was an intentional effort to obstruct the proceedings.

These examples establish that Mr. Patrick's deposition testimony was plainly designed to throw Dugaboy off the scent so that the settlement would be approved. That is precisely the kind of misconduct that Rule 60(b)(3) was designed to rectify, and the bankruptcy court manifestly erred as a matter of law in failing to consider it, and abused its discretion in failing to correct that error.

### C. Despite Its Focus on Debtor Misconduct, the Bankruptcy Court Ignored Highland's Discovery Misconduct Prior to the Settlement Approval.

The bankruptcy court manifestly erred in its finding that there was "no evidence" that Highland had withheld evidence during discovery for the settlement hearing. R. 016502. In fact, there was substantial evidence that, prior to entry of the 9019 order, Highland failed to produce to Dugaboy evidence of Hunter Mountain's then-current ownership structure. In concealing the true ownership of Hunter Mountain—for which Mr. Patrick's own charity was the ultimate beneficiary—Mr. Patrick and Highland deprived Dugaboy of material facts supporting its opposition to the settlement. Even if done unintentionally—which it was not—this was enough to warrant relief under Rule 60(b)(3). *In re DePuy Orthopaedics, Inc.*, 888 F.3d at 790.

The court made its finding while simultaneously asserting that Dugaboy "could have obtained via discovery before trial on the 9019 Motion[] all the facts necessary to challenge Mr. Patrick's authority to settle on behalf of [Hunter Mountain]." R. 016499. In fact, at the Rule 60(b) hearing, Dugaboy amply demonstrated that Highland—unquestionably an opposing party—worked to obstruct discovery into the settlement negotiations by, at the very least, failing to exercise due diligence in assessing Mr. Patrick's authority to act on behalf of Hunter Mountain and, at worst, deliberately concealing information showing he lacked that authority. That

evidence was highly relevant to the bankruptcy court's assessment of the propriety of the settlement, and Dugaboy did not have an alternative means of accessing it.

First, Highland's failure to produce evidence of Hunter Mountain's then-current structure amounted to discovery misconduct. When asked to produce documents pertinent to Mr. Patrick's authority, Highland produced documents addressing only the *historical* Hunter Mountain structure, giving the false impression that assets continued to be held for the benefit of the original charitable owner, The Dallas Foundation. R. 016661. Yet Hunter Mountain had already been sold into the Charitable DAF structure on February 12, 2025—well before the settlement was finalized—and by the time of the settlement those assets were held only for the benefit of Mr. Patrick's new sham charity.

Second, at the Rule 60(b) hearing, Mr. Seery acknowledged that he had been aware that Mr. Patrick had sold Hunter Mountain into another corporate structure by the time the 9019 settlement was consummated but had requested no additional documentation of Hunter Mountain's ownership structure to confirm Mr. Patrick's authority to enter into the settlement. R. 016661; *see* R. 016664. In fact, Mr. Seery testified that, prior to the settlement hearing in June 2025, he had reviewed only the *historical* organizational documents for Hunter Mountain rather than its then-current structure. R. 016656, R. 009386. He nevertheless testified at the June 2025 hearing that Mr. Patrick had "complete authority over" Hunter Mountain. *Id.* Mr. Seery either

lacked the information necessary to make that assessment or deliberately buried information that contradicted it, lest red flags be raised.

In either event, Mr. Seery's testimony falsely implied that Hunter Mountain remained in the same historical structure that existed prior to Mr. Patrick's fraudulent restructuring. And both Highland and Mr. Patrick reinforced that false impression by conceiving a settlement agreement with signatories for the Hunter Mountain side only from the stack of parent companies that had been in place *before* Mr. Patrick's transfer of Hunter Mountain into the Charitable DAF structure. Bankr. Dkt. 4662, May 12, 2026, Hr'g Tr. at 73:19–74:7; R. 016655, 016662. Neither Highland nor Mr. Patrick placed on the settlement agreement the companies in the then-current stack of ownership of Hunter Mountain, lest they alert Dugaboy or the court to the fraudulent restructuring and theft that had occurred. Bankr. Dkt. 4662, May 12, 2026, Hr'g Tr. at 70:9–71:12; R. 016661. Evidence of Hunter Mountain's true ownership clearly was called for in discovery and, while a showing of prejudice was not required, this discovery misconduct clearly prevented Dugaboy from fairly and fully presenting its case.[3]

[3] Dugaboy was given a mere two weeks for discovery leading up to the Rule 9019 Settlement hearing. Evidence of Mr. Patrick's massive theft could not have been adduced during this short discovery window, particularly because the theft of charitable assets involved Cayman Islands entities whose records were not readily accessible as a result of Cayman Islands confidentiality laws. *See* Bankr. Dkt. 4655, May 11, 2026, Hr'g Tr. at 77:4–19 (Official Liquidator Margot MacInnis testifying that

### D. Mark Patrick's Theft of Charitable Assets Independently Warranted Relief Under 60(b)(6).

Absent relief under other provisions of Rule 60(b), the bankruptcy court should have granted relief under Rule 60(b)(6), which serves as "a grand reservoir of equitable power to do justice in a particular case," and empowers a court to vacate a judgment whenever doing so is "appropriate to accomplish justice." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 n.3 (5th Cir. 1981).

The bankruptcy court denied Dugaboy's request for relief under Rule 60(b)(6) because it was "identical" to its request under Rule 60(b)(3). R. 016503. But treating Rule 60(b)(6), a catch-all provision, as foreclosed by the earlier clauses was a manifest error of law. *See, e.g., Seven Elves, Inc.*, 635 F.2d at 402 n.3 (noting "Rule 60(b)(6) may be seen as an extension of the grounds enumerated in subsections (1)–(5)").

The bankruptcy court declined to consider Mr. Patrick's theft of charitable assets under Rules 60(b)(2) and 60(b)(3). Its subsequent failure to do so under Rule 60(b)(6)—on the ground that it presented an "identical" basis—betrays a fundamental misunderstanding of the role of the residual clause. Even if Dugaboy were not entitled to relief under the other clauses, the purpose of the residual clause is to ensure that relief is still available "to do justice in a particular case." *Seven Elves,* 635

---

company documents were "private" or otherwise confidential and were only accessible to her because as liquidator she "steps into the shoes of the company").

F.2d at 402 n.3; *see also Hess v. Cockrell*, 281 F.3d 212, 215 (5th Cir. 2002) (explaining that, while "the first five clauses of Rule 60(b) and the sixth are mutually exclusive," that does not mean that Rule 60(b)(6) is unavailable simply because a litigant unsuccessfully moved for relief under one of the first five clauses). Because the bankruptcy court never engaged with Dugaboy's equitable arguments—which presented extraordinary grounds for relief—the residual clause was an appropriate mechanism to ensure they were addressed.

## II. The Bankruptcy Court Erred in Refusing to Revisit Its Deference to a Settlement Negotiated by Court-Appointed Administrators.

The bankruptcy court also ignored its special responsibility under the circumstances to scrutinize a settlement negotiated by a court-appointed manager—particularly where, as here, creditors had been paid and management of the debtor should have returned to the hands of its owners. This amounted to a manifest error of law that warranted reconsideration, and ultimately vacatur, of the denial of Dugaboy's Rule 60(b) motion. The bankruptcy court abused its discretion in failing to do so.

As was revealed through the Rule 60(b) proceedings, Judge Jernigan had approved a settlement negotiated by Highland's court-appointed managers—installed at her urging—with a man who falsely asserted his authority over most of Highland's residual equity based on his position in a structure that he had fraudulently manipulated to steal over $270 million in charitable assets. *See, e.g.*, R. 016522. Dugaboy argued that the bankruptcy court had an obligation not to bless such a settlement in

light of substantial evidence that it was the product of fraud, *see Pepper*, 308 U.S. at 312, particularly given its negotiation by a court-appointed manager rather than a debtor-in-possession, which demanded "rigorous scrutiny" and not "boilerplate approval." *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 434 (1968); *see also Pepper*, 308 U.S. at 306.

Rather than engage with these arguments, the bankruptcy court applied only the lightest touch in its review of the settlement. It ignored its special responsibility to scrutinize the actions of court-appointed administrators, who did not have the same incentives as a debtor-in-possession to negotiate an arms-length settlement with an unscrupulous counterparty.

The bankruptcy court attempted to tap into a line of cases that suggest that court review of proposed settlements, under Bankruptcy Rule of Procedure 9019, need not be searching because, structurally, debtors and counterparties can be counted on to look after their own interests. *See* R. 000720. But each of these cases is distinguishable: the decision makers negotiating those settlements had financial and/or fiduciary incentives to maximize value for their company, which was not the case here. In debtor-in-possession cases, the parties who own the company continue to run it during the bankruptcy. They have a stake in making sure as much as possible is left over for the owners after the bankruptcy and are unlikely to give the rights of equity away to counterparties for nothing. *See La. World Exposition v. Fed. Ins. Co.*,

858 F.2d 233, 246 (5th Cir. 1988). At the same time, the counterparties are potential creditors who will fight for their own interests. Bargaining between these two—appropriately—self-interested parties will generally work most problems of fairness out. And perhaps there a lighter touch of review could be justified.

In this case, however, Judge Jernigan unseated the company's founders from managing it. And she effected a replacement of them with bankruptcy professionals who had a perverse interest in elongating the bankruptcy proceedings to increase fees. They were not made trustees, who would have special duties to act in the interest of the whole estate, creditors and equity holders included. These neither-fish-nor-fowl bankruptcy professionals ostensibly running Highland were effectively acting at the court's behest. And with respect to this particular settlement, they were negotiating with Mark Patrick, who was purporting to represent the equity owners of Highland, but who in reality had just stolen it from the established charity that really owned Highland and that the donor of that equity had intended to benefit. *The court could not count on normal self-interested incentives in bargaining* to iron out any problems in the settlement. The whole structure at this point was upside down. And the court had a special responsibility to make sure that Jim Seery and the Pachulski law firm, whom the court had effectively put in place to run Highland, were not descending themselves and the court into grave misconduct. Even if in the normal debtor-in-possession bankruptcy case deference to the parties' negotiations might be

appropriate in deciding whether to approve a settlement, the bankruptcy court erred by applying the typical rule in this case, which the predecessor bankruptcy judge had made anything but normal or typical.

## III. Dugaboy and Mr. Dondero Did Not Forfeit Their Right to Argue That the Settlement Should Be Vacated Due to a Massive Heist Because of Earlier Indications of Mr. Patrick's Compliance Lapses.

The bankruptcy court erred in failing to correct its ruling that the evidence revealed in the Cayman Island proceedings of Mr. Patrick running off with the equity stake in Highland and a quarter billion dollars of other assets was not somehow "newly discovered." Of course, this evidence came out through the filings of the Cayman Islands liquidators between June and December 2025. And of course only they could have found it, because they stood in the shoes of one of the charitable entities and got access to otherwise confidential corporate documents detailing the fraudulent restructuring and divestment of the charities.

But the bankruptcy court determined the evidence was not newly discovered, because an earlier, different, and lesser type of Mr. Patrick deviating from the path of righteousness was available at the time of the bankruptcy court's June 2025 order approving the settlement. The bankruptcy court cited to an April 9, 2025, affidavit from Mr. Dondero as the basis for this conclusion.

It is hard to discern why the bankruptcy court thought this affidavit was dispositive. It certainly could not be that it showed Mr. Patrick's massive theft of all

assets in two charitable structures from the Dallas Foundation and three other established charities. It did not.

The reasoning appears to be that the affidavit showed that Mr. Dondero, and therefore Dugaboy, knew that Mr. Patrick was misbehaving, generally speaking, and should have taken his lesser compliance lapses to the bankruptcy court and said Mr. Patrick was removed from power because of them. There is no indication that this would have worked. After all, the bankruptcy court held that it really did not care about the misconduct of a counterparty to the debtor; it likely would not have cared about this significantly smaller and less pertinent misconduct. But it is also wrong as a matter of law. No principle of law—not arising from Federal Rule of Civil Procedure 60(b) or anywhere else—requires a party to act on misconduct of marginal significance or relevance if it wants any chance of ringing the alarm bell on later grave crimes.

### A. Nothing in Mr. Dondero's Affidavit Suggested Dugaboy Knew About the Misdeeds of Mr. Patrick that Mattered for the Rule 60(b) Motion.

Rule 60(b)(2) requires evidence that reasonable diligence would not have uncovered in time for Rule 59 relief. In this case, that meant before July 14, 2025, which was 14 days after the settlement order was entered. The evidence must be material and controlling and clearly would have produced a different result; cumulative or merely impeaching evidence is insufficient. *Hesling*, 396 F.3d at 639–41.

In denying Rule 60(b)(2) relief, the bankruptcy court first reasoned that the evidence of Mr. Patrick's fraud was not newly discovered because Mr. Dondero's April 2025 affidavit "summarize[d] Mr. Dondero's allegations against Mr. Patrick that, in his reading of the [Hunter Mountain] trust agreement, automatically removed Mr. Patrick as administrator of the trust." R. 016500. The bankruptcy court's misreading of the April 2025 affidavit was manifest error for several reasons, and its denial of Rule 59(e) relief on these grounds was an abuse of discretion.

First, the bankruptcy court was obviously wrong on the facts. Indeed, it fundamentally misunderstood the function and context of the affidavit, whose purpose was to support the three established charities at the top of the Charitable DAF structure in their request that the Cayman Islands Grand Court step in and appoint a neutral to run the key corporate entity at the heart of the structure, The Charitable DAF Fund, L.P.

Mr. Dondero said nothing in the affidavit about the Hunter Mountain trust agreement or its automatic removal provision. *See* R. 016568–77. In fact, at the time of the affidavit, Mr. Dondero was not aware that Mr. Patrick had executed a transaction (for which he represented both the buyer and seller) that resulted in Hunter Mountain being placed into the Charitable DAF structure. Rather, Mr. Dondero was aware only of reports that Mr. Patrick had sold Hunter Mountain to an unknown

party for $1 million. R. 016574–75. But, critically, Mr. Dondero did not know who the buyer of the Hunter Mountain stake was or the details of the transaction.

A below-market sale is merely a terrible business decision; the far more significant problem, as was only later discovered, was that Mr. Patrick sold Hunter Mountain into the Charitable DAF structure and then exited its charitable beneficiary and the other three original charitable beneficiaries in favor of his own, newly formed charity, for pennies on the dollar. Those acts obviously, and severely, compromised his fiduciary duties to the charitable beneficiary of Hunter Mountain. That Mr. Dondero suspected a below-market sale does not mean he had knowledge of Mr. Patrick's massive fraud.

Second, the affidavit simply did not address the fraud that formed the basis of Dugaboy's Rule 60(b) motion. Instead, it covered only events that were venial sins in comparison. The first transgression outlined by the April 2025 affidavit concerned Mr. Patrick's authorization of a $10,000 donation to a charity run by his wife and daughter. R. 004225–6. Mr. Patrick also asked an individual to charge $25,000-$50,000 in fees for financial advisory services and to split the proceeds with him. *Id.* Importantly, Mr. Dondero spoke with Mr. Patrick regarding both issues in 2023 and, believing they had been addressed, did not seek to remove him from his position working for a company affiliated with Mr. Dondero's businesses—Skyview. *Id.* And last, Mr. Patrick contacted one of the charitable entities, The Dallas Foundation, to

advise the entity to exercise a put option based on material non-public information Mr. Patrick had gained from his employment at Skyview, an entity related to Mr. Dondero's hedge fund. R. 004227. The Dallas Foundation did not act on the advice, and informed Mr. Dondero. This conduct was a potential violation of Skyview's internal compliance policies. And Mr. Patrick resigned from Skyview in October 2024 while Skyview was investigating that potential lapse. *Id.*

The identified issues were categorically different from the fraud documented in the Rule 60(b) motion. In the Rule 60(b) motion, Dugaboy outlined how Mr. Patrick secretly restructured the Charitable DAF, transferred Hunter Mountain into it, and stole the assets they held from the charities they were meant to benefit. R. 000670–77. He stuffed them into a sham charity—the DFW Charitable Foundation—that he made up and which was headquartered at his house. This scheme involved a clandestine heist of virtually all of the Charitable DAF and Hunter Mountain assets—a shocking $270+ million—that was obscured using a labyrinth of alphabet-soup entities. R. 000672. In the process, Mr. Patrick also paid himself exorbitant fees in the tens of millions of dollars. R. 000669–70. All of this differs both in kind and orders of magnitude from the questionable $10,000 donation and the unconsummated $25,000 kickback outlined by Mr. Dondero in the April 2025 affidavit. Just because Dugaboy may have had knowledge of lesser wrongdoing before the

Rule 9019 settlement does not impute it with the knowledge of Mr. Patrick's far more significant fraud.[4]

### B. Mr. Dondero's Forbearance Toward Unrelated and Lesser Misconduct Did Not Waive a Later Claim that Mr. Patrick Lacked Authority to Enter the Settlement Due to His Automatic Removal as Administrator of Hunter Mountain.

The bankruptcy court manifestly erred in concluding that Mr. Dondero's forbearance toward Mr. Patrick's unrelated, lesser misconduct waived Dugaboy's later claim that Mr. Patrick was automatically removed from his position at Hunter Mountain based on his larger scheme to dispossess the charities of the charitable assets.

First some context: The whole reason that Mark Patrick was in the game of potentially settling with Highland is that he purported to be acting on behalf of the Hunter Mountain Investment Trust. Mr. Dondero and his co-founder set up Hunter

---

[4] *See Goldstein v. MCI Worldcom*, 340 F.3d 238, 257–59 (5th Cir. 2003). In *Goldstein*, the plaintiffs initially filed a sprawling complaint making numerous allegations of corporate malfeasance by a company and two former executives. *Goldstein*, 340 F.3d at 243. The district court dismissed the complaint, and the plaintiffs later sought Rule 60(b) relief from the judgment pointing to newly discovered evidence—later filed public reports and other documents which further fleshed out the executives' alleged involvement in corporate malfeasance. *Id.* at 255–56. The Fifth Circuit concluded that this evidence, which built and expanded upon plaintiffs understanding of the prior alleged scheme, was "newly discovered" for purposes of Rule 60(b)—though the court concluded it failed to satisfy the requirements of Rule 60(b) for other reasons. *Id.* at 258–59. Similarly, in *Chilson v. Metro. Transit Auth.*, 796 F.2d 69, 70, 72 (5th Cir. 1986), the plaintiff had testified about overpayments before a later audit documented approximately $2.6 million in them. The court rejected categorical ineligibility based on the audit's posttrial creation: it supplied details the plaintiff may previously have been unable to establish about preexisting events. *Id.* at 72.

Mountain to house their gift of much of the equity in Highland to the Dallas Foundation. They did that because they wanted to make the world better.

It was a big gift. So they made sure the administrator of Highland could not be a scoundrel. The trust agreement automatically—without further action—removed an administrator who engaged in various specified forms of misconduct. R. 016539–41. Perhaps needless to say, ripping off hundreds of millions of dollars qualifies. The removal was automatic, in the sense that the wrongdoer stopped acting for the organization upon committing the qualifying misconduct, discovered yet or not, and his actions from that point on became void. The sinning administrator should remove himself, but absent such meticulous compliance with this term, the agreement protected the donors by rendering the administrator's actions after the commission of qualifying misconduct void.

Mr. Dondero and Dugaboy did exactly what they were supposed to. When Mr. Patrick's jaw-dropping fraud was revealed, they informed the Court that Mr. Patrick did not have authority to act in the first place because he had committed this fraud before the settlement and the agreement voided his actions going forward. Rule 60(b) was the right mechanism to deal with this amazing intervening event.

It is a well-established principle in contract law that a failure to invoke contractual remedies over less serious violations cannot waive the ability to act when grave misconduct is later discovered. *See, e.g., Rhodes v. Amarillo Hosp. Dist.*, 654

F.2d 1148, 1152 (5th Cir. 1981) (prior forbearance in seeking remedies does not waive subsequent breach); *Balfour Beatty Rail, Inc. v. Kan. City S. R.R. C*o., 173 F. Supp. 3d 363, 406–07 (N.D. Tex. 2016) (continued contractual performance does not operate to waive prior breach); *In re Endeavour Highrise, L.P*., 432 B.R. 583, 655–56 (Bankr. S.D. Tex. 2010) (neither continued performance nor efforts to induce performance following a breach constitute waiver); *Watts v. Fritz*, 194 N.E.2d 276, 279 (Ill. 1963); *Kneale v. Bonds*, 452 S.E.2d 840 (S.C. Ct. App. 1994) (waiver of objection to a minor violation does not waive right to object to subsequent and more substantial violations); *Myers v. Armstrong*, 324 P.3d 388, 392 (N.M. App. 2014) (failure to enforce against minor and trivial violations does not constitute acquiescence); *Ginsberg v. Yeshiva of Far Rockaway*, 325 N.E.2d 876 (N.Y. App. 1975) (plaintiffs' failure to object to what they deemed inoffensive violations did not forfeit rights to enforce covenant to prevent violations they deemed offensive); *Philadelphia Fresh Food Terminal Corp. v. M. Levin & Co. et al.*, 361 A.2d 886 (Pa. 1976) (same). And rightly so: the bankruptcy court's reasoning would encourage wrongdoers to test the waters, see what smaller infractions they can get away with, and then know they can commit grave crimes later if their prior shortcomings did not have immediate consequences.

Rule 60(b) does not change this. It is a rule directed at doing justice. *Seven Elves, Inc.*, 635 F.2d at 401. It does not create a world where wrongdoers can inch

into perfidy, breathe a sigh of relief that others did not contentiously press that small lapses were disqualifying, and then swing for the fences with a nine-figure heist. The bankruptcy court cited no authority for the contrary proposition, and there is none.

The bankruptcy court's suggestion that Mr. Dondero ignored this earlier misconduct is also wrong. The affidavit itself reveals that Mr. Dondero addressed many of the identified problems by raising them with Mr. Patrick through his Skyview employment and obtaining assurances they would not recur. R. 004226–27.

### C. Dugaboy Clearly Demonstrated That the Full Scope of Mr. Patrick's Fraud Was Not Apparent Until After the Deadline to Seek Reconsideration of the Settlement Order Had Passed.

In both the Rule 59(e) and Rule 60(b) motions, Dugaboy directed the bankruptcy court to the proceedings in the Cayman Islands that established that Mr. Patrick had flagrantly violated his fiduciary duties and lacked authority to enter the Rule 9019 settlement. Until the Cayman court appointed the Cayman Liquidators, no one had all the tools required to uncover Mr. Patrick's fraud. The appointment empowered the Cayman Liquidators to step into the shoes of the entity at the center of the Charitable DAF and obtain information in its name from Cayman government registrars, corporate service providers, and the company's own files. Bankr. Dkt. 4655, May 11, 2026, Hr'g Tr. at 77:4–19.

Although the Cayman Liquidators outlined some of their allegations in a Writ of Summons and Statement of Claim filed on July 15, 2025—which, to be clear, was

filed more than 14 days after the settlement order was approved, after the time to file a Rule 59(e) motion had passed—this too was insufficient to impute knowledge of Mr. Patrick's fraud to Dugaboy. As Dugaboy reiterated in its Rule 59(e) motion, the Statement of Claim is akin to an indictment or complaint; it contains only allegations and is not itself evidence of anything. R. 016520. To the extent the bankruptcy court imputed knowledge to Dugaboy based on the Statement of Claim, this was therefore unquestionably manifest error. But in all events, the Statement of Claim, like the transactional documents released later in July 2025 as part of the Chapter 15 recognition proceeding, was not available until *after* the deadline to seek reconsideration of the settlement order had passed. And it was not until December 2025 that Dugaboy finally had access to the full picture of Mr. Patrick's theft, less than three months before it filed its Rule 60(b) motion. R. 016514.

And what the Cayman Liquidators uncovered shocks the conscience. Starting in early 2024, Mr. Patrick stood up a labyrinth of new entities and then executed a series of sham transactions to divest the charitable entities of their beneficial ownership. Dkt. 4655, May 11, 2026, Hr'g Tr. at 85:15–21, 128:7–11. He then redirected the assets to a sham charity run by him and his associates, paying themselves enormous sums in the process. *Id.* at 82:5–21, 106:10–18, 128:12–14, 131:15–23. Dugaboy outlined all of this conduct in its Rule 60(b) motion, but the bankruptcy court refused to consider it because, among other reasons discussed below, it concluded

the evidence was not newly discovered. R. 000670–77, 016499–500. As outlined above, this conclusion was manifestly erroneous. And the bankruptcy court's complete refusal to revisit this decision, despite Dugaboy reiterating that this evidence could not have been fully discovered until December 2025, was an abuse of discretion.

## IV. The Court Should Review *De Novo* the Rulings or Findings of Fact of an Article I Bankruptcy Judge.

Bankruptcy courts essentially function as an adjunct of the district courts, subject to district court review and control. *See In re Clay*, 35 F.3d 190, 193–94 (5th Cir. 1994). They have historically exercised full judicial power only in a limited subset of "core" proceedings, statutorily enumerated in 28 U.S.C. § 157, involving "a substantive right provided by Title 11 or [in] a proceeding that, by its nature, could arise only in the context of the bankruptcy case." *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987). But even in "core" proceedings, bankruptcy courts' powers are circumscribed by the Constitution.

Bankruptcy courts are not listed as principal officers of the United States or contemplated as judges in the Constitution. The Supreme Court long ago held that bankruptcy courts lack the plenary judicial power granted to federal courts by Article III of the Constitution. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982); *Stern v. Marshall*, 564 U.S. 462 (2011). This is because, among other things, bankruptcy judges lack the traditional protections afforded to

Article III judges—life tenure and undiminishable salaries—that are essential to protecting our system of checks and balances. *See Stern v. Marshall*, 564 U.S. 462, 483–484 (2011).

In *Stern*, the Supreme Court held that bankruptcy courts may not enter final judgments in private-rights disputes unless "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process," regardless of whether the proceeding is "core" by statute. *Stern*, 564 U.S. at 499. And, after *Trump v. Slaughter*, 609 U.S. 422 (2026), the statutory carveout for "core" proceedings is further in doubt. Prior to *Slaughter*, the Supreme Court was more willing to indulge regimes that insulate the decisions of subordinate officials from plenary review and control by constitutionally designated officers. *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935). But Slaughter repudiates this idea. Its holding is equally instructive to statutes that limit the ability of Article III judges to review the rulings of non-Article III judges in private-rights disputes. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 854 (1986) ("[W]here private, common law rights are at stake, our examination of the congressional attempt to control the manner in which those rights are adjudicated has been searching.") Just as adjuncts of the President must remain subject to his control when wielding executive power, so too must an adjunct of the judiciary be subject to de novo review on all determinations—both legal and factual—made in a private-rights dispute,

regardless of whether that dispute arises in a statutorily defined "core" or "non-core" proceeding. Based on this reasoning, this Court should exercise de novo review over the bankruptcy court's legal and factual determinations in this private-rights case.

## CONCLUSION

The bankruptcy court's order denying Dugaboy's Rule 59(e) motion should be reversed. The order approving the Highland/Hunter Mountain settlement should be vacated.

Dated: October 8, 2026

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: */s/ Michael J. Edney*

Michael J. Edney
D.C. Bar No. 492024
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202) 739-3000
F: (202) 739-3001
michael.edney@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T: (713) 890-5000
F: (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
**KING & SPALDING LLP**
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

***Attorneys for Appellant The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 8, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Michael J. Edney*
Michael J. Edney

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limitations of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B), as modified by this Court's order enlarging the word limit, as it contains 12,955 words, excluding the portions of the document exempted by 8015(g).

I further certify that this document complies with the typeface requirements of Rule 8015(a)(5) and the type-style requirements of Rule 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman (14-point in footnotes).

*/s/ Michael J. Edney*
Michael J. Edney

***Attorney for Appellant***
***The Dugaboy Investment Trust***