**Case No. 3:26-cv-02496-D**

---

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

---

**IN RE HIGHLAND CAPITAL MANAGEMENT, L.P.,**
***Reorganized Debtor***

---

**THE DUGABOY INVESTMENT TRUST**

***Appellant***

**v.**

**HIGHLAND CAPITAL MANAGEMENT, L.P., et al.**

***Appellees***

---

On Appeal from the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj11
The Honorable Chief Judge Stacey G. C. Jernigan, Presiding

---

# APPENDIX TO BRIEF OF APPELLANT THE DUGABOY INVESTMENT TRUST

---

Michael J. Edney
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202) 739-3000
F: (202) 739-3001
michael.edney@morganlewis.com

Geoffrey S. Harper
gharper@kslaw.com
John Michael Gaddis
mgaddis@kslaw.com
**KING & SPALDING LLP**
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Additional counsel listed on next page*

Avery Joseph Welker
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T: (713) 890-5000
F: (713) 890-5001
avery.welker@morganlewis.com

| | Record Reference | Exhibit Description | Doc Date(s) | Page Range(s) |
|---|---|---|---|---|
| 1. | May 11, 2026, Hearing Transcript | Dkt. 4655 | 05/11/2026 | |
| 2. | May 12, 2026, Hearing Transcript | Dkt. 4662 | 05/12/2026 | |
| 3. | May 21, 2026, Hearing Transcript | Dkt. 4671 | 05/21/2026 | |
| 4. | Bankruptcy court Order Approving the Proposed Rule 9019 Settlement | | 06/30/2025 | R. 000718–21 |
| 5. | Statement of Claim | Cayman Dkt. 4-60 | 07/15/2025 | R. 001855–1937 |
| 6. | Order Denying Dugaboy's Request to Stay the Settlement Approval in light of the Statement of Claim | Dkt. 4513-35 | 02/09/2026 | R. 001426<br>R. 001428 |
| 7. | Dugaboy's Motion for Reconsideration of the Court's Order Pursuant to Bankruptcy Rule 9019 | Dkt. 4513 | 02/09/2026 | R. 000648–704 |
| 8. | Evidentiary hearing between May 11 and May 21, 2026 | | 05/11/2026–05/21/2026 | R. 000625, 000634–35 |
| 9. | Memorandum Opinion and Order Denying the Rule 60(b) Motion | Dkt. 4678 | 06/15/2026 | R. 016490–504 |
| 10. | Rule 59(e) Motion | Dkt. 4684 | 06/29/2026 | R. 016505–666 |
| 11. | Notice of Appeal of the denial of the Rule 60(b) Motion | Dkt. 4685 | 06/29/2026 | R. 016667–73 |
| 12. | Bankruptcy Court Order Denying the Rule 59(e) Motion | Dkt. 4689 | 07/10/2026 | R. 000010–11 |

| | Record Reference | Exhibit Description | Doc Date(s) | Page Range(s) |
|---|---|---|---|---|
| 13. | Notice of Appeal of the denial of the Rule 59(e) Motion | Dkt. 4698 | 07/24/2026 | R. 016733–41 |
| 14. | Dondero Affidavit | Dkt. 4684-1 | 06/29/2026 | R. 016568–77 |

Dated: October 8, 2026

Respectfully submitted,

By: /s/ *Michael J. Edney*

Michael J. Edney
D.C. Bar No. 492024
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202) 739-3000
F: (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Ave.
New York, NY 10178
T: (212) 309-6000
F: (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T: (713) 890-5000
F: (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
**KING & SPALDING LLP**
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

***Attorneys for Appellant***
***The Dugaboy Investment Trust***

UNITED STATES BANKRUPTCY COURT ★ NORTHERN DISTRICT OF TEXAS ★

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 10, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj11** |
| | § | |
| | § | |
| **Debtor.** | § | |

**<u>ORDER DENYING MOTION TO RECONSIDER</u>**

On June 15, 2026, the Court entered its Memorandum Opinion and Order denying the relief sought by the Dugaboy Investment Trust's ("Dugaboy") *Memorandum of Law in Support of the Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate*. Dkt Nos. 4678, 4679.

Thereafter, on June 29, 2026, Dugaboy filed its *Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* (the "Motion to Reconsider").[1] Dkt. No. 4684. On July 6, 2026, Highland Capital Management, L.P. and the Highland Claimant Trust (together, "Highland") filed their opposition to the Motion to Reconsider. Dkt. No. 4687.

[1] On the same day, Dugaboy also filed a Notice of Appeal. Dkt. No. 4685.

Then, on July 9, 2026, Dugaboy filed its *Notice of Intent to Reply and Request for Hearing on its* [Motion to Reconsider], in which Dugaboy attached a complaint pending in the 14th Judicial District of Dallas County filed by Mark Patrick and DFW Charitable Foundation against Matt Gaetz, Lance Gooden, and another defendant. Dkt. No. 4688.

The Court reviewed the Motion to Reconsider, Highland's opposition, and Dugaboy's July 9 notice. The Court finds that further briefing and a hearing on the issues raised in the Motion to Reconsider are not necessary for the Court to rule on the Motion to Reconsider.

Based on its review of the pleadings, the Court finds that Dugaboy's Motion to Reconsider is without merit. It is, therefore,

ORDERED that the Motion to Reconsider [Dkt. No. 4684] is denied; and it is further

ORDERED that, under Fed. R. Bankr. P. 8002(b)(1), (2), Dugaboy's Notice of Appeal [Dkt. No. 4685] becomes effective upon entry of this Order.

### End of Order ###

| | |
|---|---|
| | 4567 Notice *to Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s)4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 − Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026 | 4568 Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/28/2026 | 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A − Meet and Confer Email # 2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 | 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s)4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 | 4571 Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 | 4572 Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s)4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 | 4573 Hearing set (RE: related document(s)4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s)4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust) Hearing to be held on 4/29/2026 at 04:00 PM via WebEx for 4569 and for 4570, (Wimberley, Shelby) |
| 04/29/2026 | 4574 **COPY REQUEST**. Request for Transcript regarding a hearing held on 4/24/2026. The requested turn−around time is 3−day expedited. filed by U.S. Trustee United States Trustee. (Thompson, Christi)Modified on 4/29/2026 (nn). |
| 04/29/2026 | 4575 Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s)4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 | 4576 Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc# 4571)(document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| | |
|---|---|
| | Exhibit 89) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, 4613 Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, 4614 Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, 4615 Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4513 Motion to Reconsider(related documents 4297 Order on motion to compromise controversy)*and Motion to Vacate*). filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust). (Kass, Albert) |
| 05/12/2026 | 4645 Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s)4513 Motion to Reconsider(related documents 4297 Order on motion to compromise controversy)*and Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/13/2026 | 4644 INCORRECT ENTRY (SEE CORRECTED AT 4645). Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s)4513 Motion to Reconsider(related documents 4297 Order on motion to compromise controversy)*and Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas)Modified on 5/13/2026 (nn).Modified on 5/13/2026 (sdw). |
| 05/13/2026 | 4646 ***COPY REQUEST*** Request for Transcript regarding a hearing held on 5/11/2026. The requested turn−around time is hourly. filed by Partner Dugaboy Investment Trust. (Gaddis, John Michael)Modified on 5/13/2026 (sdw). |
| 05/13/2026 | 4647 ***COPY REQUEST*** Request for Transcript regarding a hearing held on 5/12/2026. The requested turn−around time is daily. filed by Partner Dugaboy Investment Trust. (Gaddis, John Michael)Modified on 5/13/2026 (sdw). |
| 05/13/2026 | 4648 Request for Audio regarding a hearing held on 5/11/2026.(Fee Amount $34) filed by Debtor Highland Capital Management, L.P.. (Hayward, Melissa) |
| 05/13/2026 | 4649 Request for Audio regarding a hearing held on 5/12/2026.(Fee Amount $34) filed by Debtor Highland Capital Management, L.P.. (Hayward, Melissa) |
| 05/13/2026 | Receipt of filing fee for Request for transcript/audio( 19−34054−sgj11) [misc,tsreq] ( 34.00). Receipt number A33724686, amount $ 34.00 (re: Doc# 4648). (U.S. Treasury) |
| 05/13/2026 | Receipt of filing fee for Request for transcript/audio( 19−34054−sgj11) [misc,tsreq] ( 34.00). Receipt number A33724686, amount $ 34.00 (re: Doc# 4649). (U.S. Treasury) |
| 05/13/2026 | 4650 ***COPY REQUEST*** Request for Transcript regarding a hearing held on 5/11/2026. The requested turn−around time is hourly. filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis)Modified on 5/13/2026 (sdw). |
| 05/13/2026 | 4651 ***COPY REQUEST*** Request for Transcript regarding a hearing held on 5/12/2026. The requested turn−around time is hourly. filed by Creditor Hunter Mountain |

| | |
|---|---|
| | Investment Trust. (Phillips, Louis)Modified on 5/13/2026 (sdw). |
| 05/13/2026 | 4652 Request for Audio regarding a hearing held on 5/11/2026.(Fee Amount $34) filed by Partner Dugaboy Investment Trust. (Gaddis, John Michael) |
| 05/13/2026 | 4653 Request for Audio regarding a hearing held on 5/12/2026.(Fee Amount $34) filed by Partner Dugaboy Investment Trust. (Gaddis, John Michael) |
| 05/13/2026 | Receipt of filing fee for Request for transcript/audio( 19−34054−sgj11) [misc,tsreq] ( 34.00). Receipt number A33725853, amount $ 34.00 (re: Doc# 4653). (U.S. Treasury) |
| 05/13/2026 | Receipt of filing fee for Request for transcript/audio( 19−34054−sgj11) [misc,tsreq] ( 34.00). Receipt number A33725906, amount $ 34.00 (re: Doc# 4652). (U.S. Treasury) |
| 05/13/2026 | 4654 ***COPY REQUEST*** Request for Transcript regarding a hearing held on 5/12/2026. The requested turn−around time is hourly. filed by U.S. Trustee United States Trustee. (Thompson, Christi)Modified on 5/13/2026 (sdw). |
| 05/13/2026 | 4655 Transcript regarding Hearing Held 05/12/2026 before Judge Brad W. Odell RE: Motion to Reconsider (4513). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 08/11/2026. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972−786−3063. (RE: related document(s) 4637 Hearing continued (RE: related document(s)4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy)*and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Gaddis, John Michael)) Hearing to be held on 5/21/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,). Transcript to be made available to the public on 08/11/2026. (Rehling, Kathy) |
| 05/14/2026 | 4656 Certificate of service re: *Reorganized Debtors Motion for Entry of an Order Further Extending the Period Within Which it May Remove Actions Pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure; Notice of Hearing on Reorganized Debtors Motion for Entry of an Order Further Extending the Period Within Which it May Remove Actions Pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure* Filed by Claims Agent Kurtzman Carson Consultants, LLC dba Verita Global (related document(s)4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s)4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. filed by Debtor Highland Capital Management, L.P., 4603 Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s)4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s)4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). filed by Debtor Highland Capital Management, L.P.). (Kass, Albert) |
| 05/14/2026 | 4657 BNC certificate of mailing − PDF document. (RE: related document(s)4640 Order granting motion to appear pro hac vice adding Martha B. Stolley for Dugaboy Investment Trust (related document 4616) Entered on 5/12/2026. (Okafor, M.)) No. of Notices: 1. Notice Date 05/14/2026. (Admin.) |
| 05/15/2026 | 4658 Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s)4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**MEMORANDUM OF LAW IN SUPPORT OF THE DUGABOY INVESTMENT TRUST'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 5

A. Patrick Serves as a Tax Attorney and Advisor to Dondero and His Companies for More than 16 Years ..... 5

B. Patrick Designs a Pooled Investment Vehicle to Fund and Protect Dondero's Charitable Endeavors ..... 6

C. Patrick Creates Hunter Mountain as a Tax-Advantaged, Charitable Vehicle to Hold the Majority of Highland's Equity and to Further Ensure Highland's Charitable Legacy ..... 7

D. Highland Seeks Bankruptcy Protection, the Court Confirms Highland's Plan, and Litigation Ensues ..... 10

E. Hunter Mountain Initially Aligned With Dondero to Oppose the Bankruptcy Professionals' Misuse of Highland's Assets ..... 12

F. Patrick Secretly Steals the DAF's Assets from the Charities Through Secret Corporate Restructurings and Brazen Self-Dealing ..... 13

G. The Charitable Owners Send a "No Confidence" Letter, and Patrick Carries Out His Secret "Work Plan" ..... 15

H. Patrick Moves to Liquidate the Original DAF, and the Charitable Owners Ask the Cayman Islands Court to Throw Patrick Out ..... 18

I. Patrick Repeats His Theft Playbook to Convert Hunter Mountain's Assets from The Dallas Foundation ..... 19

J. While Stakeholders Scramble to Unravel Patrick's Fraudulent Scheme, Highland and Hunter Mountain Announce their 9019 Settlement ..... 22

K. New Evidence on Patrick's Actions Demands Additional Scrutiny ..... 27

L. The Predecessor Judge in this Matter Recuses ..... 29

III. THE COURT SHOULD RECONSIDER AND VACATE THE 9019 SETTLEMENT ORDER ..... 31

A. This Court Has Ample Authority to Reconsider and Reverse Settlement Orders That Were Error, Are Undermined by Newly Discovered Evidence, Are Affected by Fraud or Misconduct, or Are Themselves Inequitable ..... 31

B. The Court Should Reconsider and Vacate the 9019 Settlement Order Due to Patrick's Fraud and Misconduct ..... 33

1. This Court Should Reconsider and Vacate the 9019 Settlement Order Because Newly Discovered Evidence Shows It Was Affected by Fraud and Misconduct ..... 33

2. This Court Should Vacate the 9019 Settlement Order Because It Is the Product of Patrick's Misconduct and Fraud ..... 40

3. This Court Should Vacate the 9019 Settlement Order Because Letting It Stand Is Contrary to this Court's Equitable Purpose and Powers ................ 42

C. The Court Should Reconsider and/or Vacate the Rule 9019 Settlement Order Because It Was Issued by a Judge Who Lacked Authority Because She Should Have Been Disqualified ................ 43

IV. CONCLUSION ................ 50

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abshire v. Seacoast Prods., Inc.*,
668 F.2d 832 (5th Cir. 1982) ....31, 40, 44, 49

*In re Acis Cap. Mgmt., L.P.*,
No. 18-03078-sgj, Bankr. N.D. Tex. Dkt. 85-2 at 190 ....46

*Allen v. United States*,
No. 3:96-cv-256-K, 2015 WL 3824448 (N.D. Tex. June 18, 2015) ....33, 40

*Matter of AWECO, Inc.*,
725 F.2d 293 (5th Cir. 1984) ....42

*Brengettecy v. Horton*,
423 F.3d 674 (7th Cir. 2005) ....31

*Cap. Exp., LLC v. Zinus, Inc.*,
996 F.3d 1332 (Fed. Cir. 2021) ....42

*Carter v. Fenner*,
136 F.3d 1000 (5th Cir. 1998) ....42

*Castner v. First Nat'l Bank of Anchorage*,
278 F.2d 376 (9th Cir. 1960) ....32

*In re Charitable DAF Holdco Ltd. (In Official Liquidation)*,
No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1 ....19

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*,
No. 05-26-90042 (Dec. 29, 2025), https://tinyurl.com/yynh3u67 ....29, 45

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*,
No. 05-26-90044 (Dec. 29, 2025), https://tinyurl.com/3vym9yu4 ....45

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*,
No. 05-26-90045 (Dec. 29, 2025), https://tinyurl.com/2vka5dn6 ....45

*Demodulation, Inc. v. United States*,
114 Fed. Cl. 655 (2014) ....50

*Diaz v. Methodist Hosp.*,
46 F.3d 492 (5th Cir. 1995) ....................................................................41

*Dondero et al. v. Stacey G. Jernigan*,
No. 3:21-CV-0879-K, Dkt. 39 (N.D. Tex. Feb. 9, 2022) ....................................48

*Dondero v. Jernigan*,
No. 24-10287, 2025 WL 1122466 (5th Cir. Apr. 16, 2025)....................30, 47, 48, 49

*Dondero v. Jernigan*,
No. 25-355 (Sup. Ct.) ....................................................................31, 48

*Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P.*,
No. 23-03038-sgj, Dkt. 1 (Bankr. N.D. Tex. May 10, 2023) ..............................13

*Exxon Corp. v. United States*,
931 F.2d 874 (Fed. Cir. 1991) ....................................................................32

*In re Ford Motor Co.*,
591 F.3d 406 (5th Cir. 2009) ....................................................................32

*Frew v. Janek*,
780 F.3d 320 (5th Cir. 2015) ....................................................................33

*Greyhound Corp., Inc. v. Int'l Bus. Machs. Corp.*,
559 F.2d 488 (9th Cir. 1977) ....................................................................31

*Harrison v. Byrd*,
765 F.2d 501 (5th Cir. 1985) ....................................................................34

*Hayman Cash Reg. Co. v. Sarokin*,
669 F.2d 162 (3d Cir. 1982) ....................................................................31

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
322 U.S. 238 (1944) ....................................................................33

*Hernandez v. Results Staffing, Inc.*,
907 F.3d 354 (5th Cir. 2018) ....................................................................41

*In re Highland Cap. Mgmt., L.P.*,
No. 19-cv-34054-sgj (Bankr. N.D. Tex.) ..............................................1, 46

*In re J.P. Jeanneret Assocs., Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011) ....................................................38

*Jackson v. Thaler*,
348 F. App'x 29 (5th Cir. 2009)....................................................................40

*Johnson Waste Materials v. Marshall*,
611 F.2d 593 (5th Cir. 1980) ........................................ 33

*Kirschner v. Dondero*,
Adv. Proc. No. 21-03076-sgj, Dkt. 1 (Bankr. N.D. Tex. Oct. 15, 2021) .................... 4, 12

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) ........................................ 49

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) ........................................ 44

*Loumar, Inc. v. Smith*,
698 F.2d 759 (5th Cir. 1983) ........................................ 31, 32, 33

*Nelson v. City of Albuquerque*,
921 F.3d 925 (10th Cir. 2019) ........................................ 32

*In re Osborne*,
379 F.3d 277 (5th Cir. 2004) ........................................ 42

*In re Paradigm Cap. Mgmt., Inc.*, Securities and Exchange Commission Investment
Advisers Act Release No. 3857, 2014 WL 2704311 (June 16, 2014) .................... 38

*Philip Morris USA Inc. v. Lee*,
494 F. Supp. 2d 544 (W.D. Tex. 2007) ........................................ 34

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) ........................................ 40, 41

*Stilwell v. Travelers Ins. Co.*,
327 F.2d 931 (5th Cir. 1964) ........................................ 34

*Tramonte v. Chrysler Corp.*,
136 F.3d 1025 (5th Cir. 1998) ........................................ 44

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
444 U.S. 11 (1979) ........................................ 38

*In re United States*,
733 F.2d 10 (2d Cir. 1984) ........................................ 31

*United States v. Balistrieri*,
779 F.2d 1191 (7th Cir. 1985) ........................................ 49

*United States v. O'Keefe*,
128 F.3d 885 (5th Cir. 1997) ........................................ 32

*United States v. Philpot*,
773 F. App'x 583 (11th Cir. 2019) ........................................ 32

*Zarnow v. City of Wichita Falls, Tex.*,
614 F.3d 161 (5th Cir. 2010) ........................................ 32

*Zeyen v. Bonneville Joint Dist., #93*,
114 F.4th 1129 (9th Cir. 2024) ........................................ 32

**Statutes**

11 U.S.C. § 363 ........................................ *passim*

15 U.S.C. § 80b-15(b) ........................................ 38

28 U.S.C. § 455 ........................................ 32, 47, 49

28 U.S.C. § 455(a) ........................................ 43, 44, 47, 49

Bankruptcy Code Chapter 15 ........................................ 19

Investment Advisors Act § 206 ........................................ 37, 38

Investment Advisors Act § 215 ........................................ 37

**Other Authorities**

Federal Rule of Bankruptcy Procedure 9019 ........................................ *passim*

Crown Global Insurance Group, LLC Website,
https://www.crownglobalinsurance.com ........................................ 8

Dallas Foundation Website, https://www.thedallasfoundation/about-us/ ........................................ 8

Fed. R. Bankr. P. 2015.3 ........................................ 11, 12

Fed. R. Bankr. P. 9024 ........................................ 1, 33, 34

Fed. R. Civ. P. 60 ........................................ 33, 49

Fed. R. Civ. P. 60(b) ........................................ 1, 33, 44

Fed. R. Civ. P. 60(b)(1)–(6) ........................................ 33

Fed. R. Civ. P. 60(b)(2) ........................................ 33, 34

Fed. R. Civ. P. 60(b)(3) ........................................ 40, 41, 42

Fed. R. Civ. P. 60(d) ........................................ 40

Internal Revenue Service, Donor-advised funds (Nov. 26, 2024), https://www.irs.gov/charities-non-profits/charitable-organizations/donor-advised-funds ........ 6

Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (Jan. 16, 2019) ........ 46, 47

Stacey G. Jernigan, *Hedging Death*, White Bird Publications (Mar. 22, 2022) ........ 46, 47

Fifth Circuit Judicial Conduct and Discipline Rule 4(a)(7) ........ 45

Securities and Exchange Commission, Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Inv. Adv. Act Rel. No. 1732 (July 17, 1998), 63 Fed. Reg. 39,056 (July 23, 1998) ........ 38

The Dugaboy Investment Trust ("Dugaboy") files this motion (1) for reconsideration of the Court's Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, No. 19-34054-sgj11, Dkt. 4297[1] (Bankr. N.D. Tex. June 30, 2025) (Exhibit 1, "Rule 9019 Settlement Order"); (2) seeking relief under Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(b); and (3) asking the Court to use its inherent power to vacate the Rule 9019 Settlement Order. The Court should do so because the Rule 9019 Settlement Order was the product of fraud and misconduct, is being used to advance and protect from further inquiry that fraud and misconduct, and was entered by a judge who should already have been disqualified.

## I. INTRODUCTION

The Movant represents James Dondero, one of the principal former equity owners of Highland Capital Management, L.P. ("Highland"). Highland is a Dallas-based, Delaware-domiciled hedge fund manager, commenced its bankruptcy in late 2019 in the District of Delaware, after encountering a significant judgment. Highland needed temporary bankruptcy protection to sell a handful of assets in an orderly manner to satisfy that judgment. The bankruptcy was to be a reorganization, and a short and discrete one at that.

When the case was transferred to the Northern District of Texas, all that changed. Several participants in the bankruptcy—including a law firm that Highland's owners retained to ensure a brief and straightforward process—saw an opportunity to extend the bankruptcy into a multi-year saga. It was a perfect storm. The bankruptcy judge had encountered Dondero in a prior case and formed a very negative view of him and his line of business. So much so that the judge was writing

[1] Unless otherwise specified, all references to "Dkt." herein are references to the docket in the main bankruptcy case, *In re Highland Cap. Mgmt., L.P.*, No. 19-cv-34054-sgj (Bankr. N.D. Tex.).

books deriding a hedge fund and manager that resembled Highland and Dondero.

In the very first hearing, the bankruptcy judge suggested on her own initiative that Dondero should be removed from Highland's management during the pendency of the restructuring. Exhibit 2, Transcript of Status and Scheduling Conference Hearing Held 12/6/19 at 23:2–15, Dkt. 207. From that point forward, the bankruptcy professionals took every opportunity to make Highland look as though it were irredeemably insolvent and had to be saved from financial crisis by a long, drawn-out, liquidation that would take years and generate massive fees for those professionals.

This windfall was only possible because Highland was not then, and is not now, insolvent. It had more than enough assets to pay its actual creditors what they were legitimately owed. Through a variety of means—from not reporting on the value of Highland's assets (as ordinarily required in bankruptcy) to inflating Highland's supposed liabilities—the bankruptcy professionals dragged out the bankruptcy and turned it into a multi-year liquidation. Along the way, the chief restructuring officer appointed to run Highland gave long-time colleagues at selected hedge funds the opportunity to scoop up creditor claims, with assurances that there would ultimately be plenty of money to pay them.

Despite all these efforts to portray Highland as a company in financial shambles, Highland has paid most creditor claims and was poised to have something left over for equity holders. That is where the June 2025 Rule 9019 settlement that is the subject of this Motion became relevant.

Dondero and his partners—long ago—had restructured Highland to achieve certain long-term tax efficiencies and so that the company could serve a long-term charitable purpose. To that end, in 2015, Dondero and the other Highland equity holders sold their equity stake in Highland to Hunter Mountain Investment Trust ("Hunter Mountain"). And they selected The Dallas

Foundation as the primary charitable beneficiary of the restructuring. The Dallas Foundation is a century-old charity dedicated to improving the lives of people in the hometown of Dondero and Highland. It was ultimately structured to run like a donor-advised fund, controlled by an administrator—charged with acting in the best interest of the charitable beneficiaries—and advised by the donors as to the fund's investments and charitable purposes.

In 2021 and 2022, Mark Patrick became that administrator. Patrick hijacked the fund to benefit himself instead of charitable causes. He pulled this off by defrauding the charitable beneficiaries of the fund and the donors to it. As explained below, he secretly reorganized the corporate structure of the donor-advised fund to make its beneficiary a sham charity run out of his house, rather than the genuine charities Dondero meant to benefit. And Patrick started mowing through the charitable assets to pay himself massive "bonuses," including more than $11 million in 2024 alone. To put this theft into scale, his predecessor was compensated only tens of thousands of dollars per year.

The charities that were the fund's intended beneficiaries started asking questions. By early 2025, Patrick's misconduct was being investigated by the judicial system of the Cayman Islands, where the key donor-advised fund entities had been incorporated. Patrick went into overdrive to cover up his misconduct, in the face of these inquiries. He saw an opportunity in the form of Hunter Mountain, the entity that held much of the interests of Highland's former equity holders. For years, Hunter Mountain had pressed those equity rights in an effort to stem and to remedy the above-described unjustifiable financial bleeding from the bankruptcy professionals and process. Given the investigations into his misconduct, that was no longer important for Patrick. He was willing to sacrifice any charitable asset to deter or slow inquiries into his theft. And Patrick knew he had a short window of time to remain in nominal charge of the donor-advised fund, as

the investigations advanced.

Patrick secretly started negotiations with Highland's bankruptcy professionals. They offered Patrick a modest cash payment for the donor-advised fund and (more importantly for Patrick) for an assignment of the so-called *Kirschner* litigation. *Kirschner* consisted of meritless claims by the Highland corporate debtor against the former equity owners and leaders of Highland, including Dondero and his colleagues, for allegedly mismanaging Highland.[2] Highland's chief restructuring officer knew that Patrick would sign away all the rights of former Highland equity owners, for virtually nothing, to gain a weapon against the donors who were urging investigations into his misconduct. And that is exactly what happened.

So the Highland Entities[3] and the HMIT Entities[4] entered into a Rule 9019 settlement that crushed the interests of the equity owners, to serve the short-term, fraudulent ends of Mark Patrick. There were already indicia of Patrick's misconduct when the predecessor judge in this matter approved the 9019 Settlement in June 2025, in the form of the ongoing investigations of the Cayman Islands court and the plea of the Texas Attorney General for this Court to pause these proceedings pending his own inquiry. The predecessor judge erred in glossing over those concerns. But subsequent to the approval of the 9019 Settlement, newly discovered evidence has laid bare the breathtaking scope and severity of Patrick's perfidy.

The formerly presiding bankruptcy judge's approval of the 9019 Settlement should be set aside. First, this Court should exercise its authority to reevaluate the rulings of its predecessor

---

[2] *See Kirschner v. Dondero, et al.*, Adv. Proc. No. 21-cv-03076-sgj (N.D. Tex.).

[3] The "Highland Entities" are Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust. *See* Exhibit 24, Settlement Agreement & General Release, Dkt. 4217-1, at 1.

[4] The "HMIT Entities" are Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, and Atlas IDF, LP. *Id.*

judge and to reconsider the Rule 9019 Settlement Order. The predecessor judge should not have approved—and this Court cannot let stand—a settlement effectively advancing Patrick's inequitable and, indeed, criminal conduct. Newly discovered evidence proves that the settlement agreement was the product of misconduct and obtained by fraud, that the settlement is being used to perpetrate a continuing fraudulent scheme, and that the settlement could interfere with the victims' ability to recover nine figures' worth of stolen assets.

Second, the predecessor bankruptcy judge who approved the 9019 Settlement should have recused herself long before that approval due to her novel writing and concomitant stripping away of the public confidence in judicial impartiality, as subsequent developments discussed below have made more apparent. Amid the judicial and governmental investigations into Patrick, the most reasonable course of action would have been for the Court to pause consideration of the settlement. But the Court—at the urging of its appointed bankruptcy professionals—accelerated it. This created a situation where the predecessor judge's impartiality could reasonably be called into question. In particular, one might reasonably wonder whether the predecessor judge's reason for rushing the settlement—whatever its merits—was to dampen inquiries into her handling of the bankruptcy and whether she should have been presiding over it at all. This Court should determine that the predecessor judge should have recused herself before issuing the Rule 9019 Settlement Order, vacate that order, and examine the 9019 resolution on a clean slate.

## II. BACKGROUND

### A. Patrick Serves as a Tax Attorney and Advisor to Dondero and His Companies for More than 16 Years

James Dondero and Mark Okada founded Highland in 1993. Before its bankruptcy, Highland was an SEC-registered multi-billion-dollar investment advisor that employed dozens of individuals to manage its complex financial vehicles and investments.

Mark Patrick—a Texas-licensed attorney and tax professional—initially came to work for Highland as tax counsel in January 2008. *See* Caymans Exhibit A, First Affidavit of Mark Eric Patrick, *In the Matter of Charitable DAF Holdco, Ltd.* ("First Patrick Aff."), No. FSD 116 of 2025 (JAJ) (Grand Ct. Cayman Islands – Financial Services Division), ¶ 64.[5] In his capacity as tax counsel, Patrick advised Dondero, Highland, and Dondero's affiliates (including Dugaboy) on the tax consequences of various transactions and corporate structures. Patrick continued in this role until February 2021, when he left Highland to join Skyview Group, a company founded by former Highland employees to provide Dondero and his companies the same legal and tax services that Patrick had provided while at Highland. Once at Skyview, Patrick performed essentially the same role as tax counsel. *Id.*, ¶¶ 64, 67.

### B. Patrick Designs a Pooled Investment Vehicle to Fund and Protect Dondero's Charitable Endeavors

As Highland grew and enjoyed financial success, Dondero sought to create a charitable legacy. In 2006, he gave an initial gift to a newly formed charitable trust that, in October 2011, was converted into an investment vehicle for long-term charitable endeavors. That investment vehicle was a form of donor-advised fund.[6] Patrick, as Highland's longtime tax counsel, was the architect of the vehicle and oversaw internal and external professionals in its creation. *See* Exhibit 3, Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for

[5] The lettered exhibits in this Motion have been segregated in accordance with a Protective Order governing confidential materials in the parallel Cayman Islands proceedings. Dugaboy will file a motion for protective order in this Court seeking leave to submit the complete, unredacted exhibits under seal.

[6] A donor-advised fund is a philanthropic giving vehicle set up as a fund or account within a public charity (the "sponsoring organization"). The donor contributes assets (cash, stock, etc.) to the sponsoring 501(c)(3) charity and receives an immediate tax deduction, but legally the charity owns and controls the donation. The donor (or designated advisor) retains advisory privileges—meaning it can recommend how the charity should invest the assets and which charitable causes to grant funds to over time. *See* Internal Revenue Service, Donor-advised funds (Nov. 26, 2024), available at https://www.irs.gov/charities-non-profits/charitable-organizations/donor-advised-funds.

Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("Charities' Obj."), Dkt 4231, ¶ 12. At the top of the structure sat Charitable DAF HoldCo, Ltd. (the "DAF").[7] Control of the DAF rested with an independent fiduciary, which for many years was Grant Scott ("Scott"), while the beneficial ownership was held by three (and eventually four) charitable foundations through "participation shares." *See* Caymans Exhibit B, Writ of Summons and Statement of Claim, *In the Matter of Charitable DAF HoldCo, Ltd.*, Cause No. FSD 201 of 2025 (Grant Ct. Cayman Islands – Financial Services Division July 15, 2025) ("Statement of Claim"), ¶¶ 54–57.

The DAF was the sole limited partner of Charitable DAF Fund, LP (the "DAF Fund"), a Cayman Islands limited partnership formed to invest and manage assets for the benefit of the charitable foundations. For most of its existence, the DAF Fund was managed by its general partner, Charitable DAF GP, LLC ("DAF GP"), whose managing member was also Scott. *See* DAF Org Chart, Ex. 4; *see also* Ex. 3, Charities' Obj., Dkt. 4231, ¶ 11. Under Scott's management, the DAF Fund grew to almost $300 million in assets and distributed more than $40 million to a wide range of causes, including support for military veterans, underserved youth, and victims of domestic violence.

### C. Patrick Creates Hunter Mountain as a Tax-Advantaged, Charitable Vehicle to Hold the Majority of Highland's Equity and to Further Ensure Highland's Charitable Legacy

In 2015, Patrick devised a plan that he believed would minimize taxes paid by Highland and its owners, while expanding Dondero's charitable legacy. The plan involved a complex series of transactions, summarized as follows:

- Highland's co-founders, Dondero and Okada, donated $29.5 million to an independent charitable organization. Ultimately, they chose The Dallas

[7] Attached as Exhibit 4 is the DAF's original organizational chart ("DAF Org Chart").

Foundation, a charity formed in 1929 and dedicated to improving the lives of people in Dallas.[8] *See* Caymans Exhibit C, Transcript of Deposition of Torrey Littleton ("Littleton Dep.") at 19:16–25.

- The Dallas Foundation invested the $29.5 million donation through an independent insurance company, Crown Global Insurance Group, LLC ("Crown Global").[9] In exchange for that investment, Crown Global issued The Dallas Foundation's sponsoring charities—Empower Dallas and the Okada Foundation—annuity policies that would guarantee the charities a regular stream of income.[10] *Id.* at 17:3–24, 21:8–13; *see also* Ex. 3, Charities' Obj., Dkt. 4231, ¶ 18. The charities' use of an insurance mechanism is a common method of financial planning to ensure more regular income over the life of a charitable gift.

- Crown Global then invested in various income-producing vehicles. Among those was an entity called Atlas IDF, LP ("Atlas Fund"). Caymans Ex. C, Littleton Dep. at 17:25–18:7. The Atlas Fund, in turn, invested into Rand PE Fund I, LP ("Rand PE Fund"). *See id.* For many years, Rand PE Fund was managed by John Honis ("Honis"), a financial professional working for an SEC-registered investment advisor, Rand Advisors, LLC ("Rand Advisors"). *See* Exhibit 5, Rand Advisors, LLC Form ADV Part 2A (March 2021) at 5–7.

---

[8] *See* The Dallas Foundation Website, available at https://www.thedallasfoundation/about-us/.

[9] *See* Crown Global Insurance Group, LLC Website, available at https://www.crownglobalinsurance.com.

[10] The "annuity" given to the charities effectively operated as equity with an optional redemption. The charities could redeem the accrued equity by surrendering the policy.

- Rand PE Fund was the sole member of a company called Beacon Mountain, LLC ("Beacon Mountain"), which in turn became the sole owner of Hunter Mountain. *See* Caymans Ex. C, Littleton Dep. at 17:25–18:7.[11]




To ensure that The Dallas Foundation and its sponsoring charities became the ultimate beneficiaries of Highland's financial success, the principal equity owners of Highland (Dondero and Okada, and their associated entities, including Dugaboy) sold their limited partnership interests in Highland to Hunter Mountain in exchange for cash payments and notes payable. Hunter Mountain thus became the holder of 99.5% of the outstanding limited partnership shares of Highland. *See* Exhibit 6, Amended Complaint and Objection to Claims, *Kirschner v. Dondero*,

[11] Attached as Exhibit 40 is the original organizational chart for Hunter Mountain.

Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Dkt. 158, ¶ 27. The idea was that The Dallas Foundation would become Highland's ultimate beneficiary and use its assets for good works. In the interim, The Dallas Foundation and its sponsoring charities would receive the income that the structure was designed to produce. *See* Charities' Obj., Dkt. 4231, ¶ 18; Caymans Ex. C, Littleton Dep. at 21:8–13.

### D. Highland Seeks Bankruptcy Protection, the Court Confirms Highland's Plan, and Litigation Ensues

In October 2019, Highland sought bankruptcy protection in the District of Delaware. That move was a limited effort to sell in an orderly manner some less liquid assets to satisfy an unanticipated judgment that Highland encountered. Exhibit 43, Voluntary Petition, Dkt. 3. At the time, the company's equity ownership was as follows: (i) Hunter Mountain (99.5%); (ii) Dugaboy (a family trust associated with Dondero) (0.1866%); (iii) Okada, personally and through family trusts (0.0627%); and (iv) Strand Advisors, Inc. ("Strand"), Highland's general partner (0.25%). Exhibit 41, Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief ("Confirmation Order"), Dkt. 1943, ¶ 5. The lawyers who encouraged Dondero to have Highland seek Chapter 11 protection confidently projected Highland would enter and exit the bankruptcy process in a few months.

The bankruptcy did not go as planned.

The case was transferred to the Northern District of Texas, on grounds that its chief bankruptcy judge there was familiar with Dondero's businesses. At her first hearing, the predecessor judge in this case began acting on her negative views of Dondero, suggesting that he be removed from Highland's management while the restructuring occurred. That ultimately led to a chief restructuring officer being given sole control over Highland. The Unsecured Creditors Committee became stacked with Highland's historic litigation adversaries. *See* Ex. 41,

Confirmation Order, Dkt. 1943, ¶ 8.

Highland's bankruptcy counsel—originally hired by Dondero—began to see the financial opportunity of a long-drawn out bankruptcy and quickly took sides against Dondero. They and the chief restructuring officer began misleadingly portraying Highland as insolvent, in need of what effectively would become a marathon liquidation, instead of the short-duration restructuring necessary to satisfy an emergency judgment and then resume normal operations. To do so, they consistently refused to provide any information on Highland's present financial condition (in stark contravention of the rules governing any bankruptcy, such as Rule 2015.3). Instead, they kept citing stale data from the deepest darkest financial hour of the country at the beginning of the Covid-19 pandemic in March 2020. And they began inflating the claims of creditors.

On February 22, 2021, over the objections of all equity holders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization (as Modified) (the "Plan"). Ex. 41, Confirmation Order, Dkt. 1943. The Plan stretched the word "Reorganization" beyond the limits of the English language; it was effectively a liquidation. It classified all claims into eleven classes. Hunter Mountain, as a holder of pre-bankruptcy Class B and C limited partnership interests, received an unliquidated Class 10 claim subordinate to all pre-bankruptcy creditors. *Id.* at Caymans Ex. A at Art. I.B, ¶¶ 33–36, III.B, III.H.11. The other equity holders, which held pre-bankruptcy Class A limited partnership interests in Highland, received an unliquidated Class 11 claim, subordinate to Hunter Mountain. *Id.* at Caymans Ex. A at Art. I.B.33, III.B, III.H.11. As holders of the lowest classes of claims under the Plan, all the former equity holders were given "Contingent Claimant Trust Interests" in the Plan-created Highland Claimant Trust—the entity created to hold, monetize, and distribute the assets of Highland's estate. *Id.* at Art. III.H.10–11, Art. IV.B. Contingent Claimant Trust Interests were to vest only upon certification by the

Claimant Trustee—James P. Seery, Jr. ("Seery")—that all unsecured creditors had been paid in full with interest. *Id.* at Art. I.B, ¶ 44. Notably, the Claimant Trust had no fixed value; it was to receive the residual value of the Highland estate. *Id.* at Art.1.B.26–27, Art. III.H.10–11.

The Plan became effective on August 11, 2021. Exhibit 7, Notice of Occurrence of Effective Date of Confirmed Plan of Reorganization, Dkt. 2700. Because the bankruptcy professionals were inaccurately portraying Highland as insolvent, they urged the need for some complicated mechanism to recover the fictitious gap between assets and liabilities from Highland's former owners and managers. At their urging, the bankruptcy judge approved the creation of a Litigation Sub-Trust and the appointment of a Litigation Trustee to sue Highland's pre-bankruptcy management to fill the supposed gap between Highland's assets and liabilities. The Litigation Trustee was Marc A. Kirschner ("Kirschner"), and in October 2021, he filed a 36-count complaint (the "Kirschner Litigation") against dozens of defendants, including Dondero, Okada, Dugaboy, Strand, Hunter Mountain, and Rand PE Fund. Exhibit 8, *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj, Dkt. 1 (Bankr. N.D. Tex. Oct. 15, 2021).

**E. Hunter Mountain Initially Aligned With Dondero to Oppose the Bankruptcy Professionals' Misuse of Highland's Assets**

All along, the equity owners disputed the bankruptcy professionals' claims that Highland was insolvent and advocated that Highland should be restructured to pay creditors what they were legitimately owed and then to return Highland to its equity owners. They pressed the chief restructuring officer to file required reports on Highland's financial condition, but the predecessor judge refused to enforce compliance with the bankruptcy rules' transparency requirements. *See* Exhibit 45, Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2256; Exhibit 46, Order Denying Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2812.

The DAF Fund was one of the parties aligned with former equity holders in arguing that

Highland's estate was worth far more than what bankruptcy management was publicly representing. Exhibit 12, Complaint to (I) Compel Disclosures About the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiffs' Interests in the Claimant Trust, *The Dugaboy Investment Trust v. Highland Cap. Mgmt., L.P.*, No. 23-03038-sgj, Dkt. 1 (Bankr. N.D. Tex. May 10, 2023) ("Valuation Litigation"). In March 2021, Scott—the DAF's longtime trustee—decided to move on. Patrick, who had participated in the DAF's creation, volunteered to assume that role. Accordingly, in April 2021, Scott transferred the DAF's management shares and ownership of the DAF Fund's general partner to Patrick. Ex. 3, Charities' Obj., Dkt. 4231 at ¶ 12.

In August 2022, Patrick became Hunter Mountain's administrator when a subsidiary of the DAF Fund became the manager of Hunter Mountain. Patrick directed Hunter Mountain to vindicate the rights of equity holders through a series of motions and lawsuits which are summarized in Appendix A to this Motion. For their part, Highland's professionals continued to delay resolution of the estate while paying themselves handsome salaries and fees. Although the chief restructuring officer and his retained bankruptcy professionals have not been required to account for their compensation for some time, the post-effective date administrative expenses look to be well over $225 million.[12]

**F. Patrick Secretly Steals the DAF's Assets from the Charities Through Secret Corporate Restructurings and Brazen Self-Dealing**

As early as mid-2023, Patrick set out to take advantage of his positions of power. In June 2023, Patrick stated that the DAF would make a $10,000 distribution to Highland Dallas

[12] This amount was calculated using the post-effective date quarterly operating reports reflecting distributions and total expenditures. *See* Dkts. 3200–3202, 3325–3326, 3409–3410, 3582–3583, 3652–3653, 3756–3757, 3888–3889, 3955–3956, 4020–4021, 4049–4050, 4130–4131, 4171–4172, 4201–4202, 4207–4208, 4319–4320, 4438–4439, 4503–4504.

Foundation and asked that the foundation, in turn, make a $10,000 charitable donation to an entity named Creative Hearts TX. Ex. 3, Charities' Obj., Dkt. 4231, ¶ 14. Patrick did not disclose that he, his wife, and his daughter had recently formed Creative Hearts and were its directors. *Id.* A few months later, Patrick attempted a kick-back scheme with a vendor, Fortaris Capital Advisors ("Fortaris"). Patrick approached Fortaris principal Kevin Cronin and proposed that the DAF make a monthly payment of $25,000 to $50,000 to an entity controlled by Cronin that Cronin would then split with Patrick. Believing that such an arrangement constituted fraud, Cronin declined the proposal and informed Dondero. Patrick has admitted his effort to effectuate this illegal scheme. *See* Caymans Ex. A, First Patrick Aff., ¶ 173.

After learning of the attempted embezzlement, Dondero demanded greater transparency into the DAF's operations. New evidence shows that within two months of Dondero's request, Patrick reached out to a loyalist law firm, The Shields Law Group, seeking guidance on how to steal the DAF from the charities. Caymans Ex. B, Statement of Claim, ¶¶ 77–80. At the heart of this scheme was secretly creating a new general partner for the DAF. Patrick's instruction was that this new corporate entity be "***hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection***." *Id.* ¶ 82 (emphasis added). These lawyers created a shocking "Work Plan" that outlined how to insert a couple of surreptitious companies into the corporate structure so that Patrick could separate the DAF from the charities it was created to benefit.

Patrick began to execute this scheme, setting up new companies in the dark of night. *See id.*, ¶¶ 36–37, 82–84. Patrick needed to divorce the DAF from the charities because he was stealing the DAF's assets. The scale of his self-dealing, new evidence shows, was breathtaking. Patrick increased his "director fees" *more than fifty-fold*, from approximately $40,000 in 2022 to nearly $600,000 in 2023 and then to $2.25 million in the first half of 2024. Patrick also awarded himself

"bonuses," resulting in total compensation of $11.259 million in September and October 2024 alone. *Id.*, ¶¶ 86–87. All of this for something—running the DAF—that would not have been a full-time job for anyone not busy stealing its assets. Patrick shut down any disclosures to the charities and gave them no notice or explanation for this staggering "compensation." *Id.*; *see also* Ex. 3, Charities' Obj., Dkt. 4231, ¶ 22.

### G. The Charitable Owners Send a "No Confidence" Letter, and Patrick Carries Out His Secret "Work Plan"

In November 2024, the charities told Patrick they had "no confidence" in his management and requested protections against misuse of their assets. Caymans Ex. B, Statement of Claim, ¶ 90. Between December 2024 and April 2025,[13] while feigning a desire to engage with the charities on an amicable path forward, Patrick secretly implemented his planned restructuring of the DAF. Here is the DAF structure before Patrick's restructuring:

[13] In February 2024, Patrick replaced the DAF Fund's Delaware general partner, Charitable DAF GP, LLC, with a new Cayman entity as the general partner, CDH GP, Ltd. ("New GP"). He did not inform the Charities of this change.

**DAF Structure Chart**
*(as of 3/6/2024)*




Patrick restructured it as follows:

- Patrick incorporated a new charitable foundation in Delaware, DFW Charitable Foundation. Caymans Ex. B, Statement of Claim, at ¶¶ 25, 93. The new foundation, which is based out of Patrick's home, conducts almost no known charitable activity, and Patrick is its sole director, president, and member. *Id.* ¶ 26.

- Patrick created a new donor-advised fund ("DAF 2.0") in Delaware and made himself its sole manager. *Id.* ¶¶ 39, 42, 97.

- Patrick and Murphy, without providing notice to anyone, much less the charities, assigned the DAF's limited partnership interests to DAF 2.0 in exchange for 100% of the member interests in DAF 2.0. *Id.* ¶¶ 98–99.[14]

- Patrick caused the new DAF 2.0 to enter into a new limited liability company agreement with himself as sole manager. The agreement was a homemade recipe for facilitating Patrick's theft. It provided that Patrick would have no fiduciary duties to the new donor-advised fund or to protect the assets of his charities, and that Patrick would have the sole power and discretion to value and to redeem any member's interest in the DAF. *Id.* ¶¶ 99–101.

- Finally, Patrick asked a loyalist financial advisor to figure out a way to devalue the charitable owners' membership interests by more than 99% from just a few months earlier. With that bogus valuation in hand, he secretly added his new foundation

[14] Attached as Exhibit 19 is an organizational chart reflecting the DAF restructuring.

as the owner of DAF 2.0 and redeemed the charitable owners' collective interests for $1.6 million. *Id.* ¶¶ 121–122, 136–145, 146.7, 148.

The problem is that the DAF did not hold $1.6 million in assets, but instead ***nearly 200 times as much.*** The charitable owners received approximately $1.6 million for assets worth approximately $270 million. And Patrick's personal charitable foundation became the sole beneficial owner of his new DAF and its $270 million in assets. The result was two remaining structures: DAF 1.0, owned by Patrick and the Charities, with zero assets; and DAF 2.0, owned entirely by Patrick, with $270 million in assets.






### H. Patrick Moves to Liquidate the Original DAF, and the Charitable Owners Ask the Cayman Islands Court to Throw Patrick Out

Now that Patrick had drained the original DAF of any assets, he placed it into voluntary liquidation in the Cayman Islands court on April 2, 2025. Caymans Ex. B, Statement of Claim, ¶ 151. He did so without informing the charities or anyone else.

For their part, the charities were unaware of what Patrick had been up to, except that Patrick was not answering any of their questions. The charities separately filed a petition in the Cayman Islands court seeking to take the DAF away from Patrick. *See* Caymans Exhibit E, Winding Up Petition, *In the Matter of Charitable DAF Holdco, Ltd.*, No. FSD 99 of 2025 (JAJ) (Grand Court, Cayman Islands, Financial Services Division Apr. 23, 2025).

Only after that filing did the charities learn of Patrick's parallel and secret attempt to liquidate the DAF. The liquidators selected by Patrick immediately resigned. *See* Charities' Obj.,

Dkt. 4231, ¶ 31 n.4. And on May 6, 2025, the Cayman Islands court stepped in, determining that there was enough evidence of misconduct that Patrick could no longer manage the DAF and that the court needed to remove Patrick from its management. It did so by appointing what the Cayman Islands court calls "joint official liquidators"—the equivalent of a court-appointed receiver in the U.S. legal system—to oversee the DAF's operations. *See* Caymans Ex. B, Statement of Claim, ¶ 154; Ex. 3, Charities' Obj., Dkt. 4231, ¶ 31.

As the court-appointed liquidators sought discovery into Patrick's activities, Patrick spent millions from the charitable assets opposing those investigative efforts. On July 21, 2025, the joint official liquidators filed a Writ of Summons and Statement of Claim in the Cayman Islands proceeding, naming as defendants Patrick, Paul Murphy, and Patrick's new corporate entities that (as it turns out) had stolen the DAF's assets. On the same date, to ensure that they could discover the additional details of Patrick's fraud, the joint official liquidators filed a separate Chapter 15 petition in the United States Bankruptcy Court for the District of Delaware seeking recognition of the Cayman Islands proceeding. *See* Caymans Exhibit D, Chapter 15 Petition for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code, *In re Charitable DAF Holdco Ltd. (In Official Liquidation)*, No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1.

### I. Patrick Repeats His Theft Playbook to Convert Hunter Mountain's Assets from The Dallas Foundation

Patrick next moved against Hunter Mountain. At the time, Patrick was a fiduciary of Hunter Mountain and the entities in its ownership chain (including Rand PE Fund and Atlas Fund) because of his role in Rand Advisors, the SEC-registered investment adviser tasked with managing those entities.

But rather than acting as a trusted fiduciary, Patrick had other plans. On February 20, 2025,

one of the 4 percent minority investors in Rand PE Fund received an unexplained notice of a distribution. *See* Exhibit 20, Email from Shawn Raver to Chris Rice dated Feb. 20, 2025. The sole asset of Rand PE Fund was Beacon Mountain—the sole (100%) beneficial owner of Hunter Mountain. After inquiring, the minority investor was told that Rand PE Fund had sold its investment in Beacon Mountain (and thereby Beacon Mountain's interest in Hunter Mountain) to an undisclosed third party for $1 million. *See* Exhibit 21, Email from Chris Rice to Skyview Group dated Mar. 12, 2025. Despite further investigation, it was impossible to determine who the undisclosed third-party purchaser was or how the sale of the Hunter Mountain interest had been accomplished.

It has since come to light that Patrick engineered the sale to the structure owned by DFW Charitable, a company he controlled. And no doubt his playbook mirrors the one he used in the DAF restructuring: Obtain a sham valuation from a loyalist financial advisor, use that valuation to justify the sale of an otherwise valuable asset to a captive company owned by Patrick, and then extract all the value for himself. Through this playbook, Patrick ensured that the entire beneficial interest in Hunter Mountain was diverted from its original charitable purpose and went into a structure over which he has absolute control and that he can manipulate for his personal enrichment. As was later discovered, the interest in Beacon Mountain/Hunter Mountain was sold in February 2025 to CLO Holdco, LLC—an entity whose sole economic beneficiary is, by virtue of Patrick's fraudulent DAF restructuring, Patrick's own sham "charity." *See* Exhibit 23, Transcript of Hearing dated June 25, 2025 ("9019 Hrg. Tr.") at 173:22–174:14.

To represent the transaction, here is the ownership of Hunter Mountain before Patrick's self-dealing:




Patrick then caused Rand Fund to receive $1 million in exchange for the Hunter Mountain Asset:




### J. While Stakeholders Scramble to Unravel Patrick's Fraudulent Scheme, Highland and Hunter Mountain Announce their 9019 Settlement

Knowing he would shortly be taking ownership of Hunter Mountain, Patrick approached Highland to settle Hunter Mountain's stake in the Highland bankruptcy estate in the hopes of monetizing his fraud and deterring further inquiry into his misconduct. The Dallas Foundation and the other charities for which Mr. Dondero established these funds and entities were in it for the long term. Patrick's horizon—with investigations bearing down upon him—could not have been shorter term. He needed to make off with as much cash as he could before investigations progressed further and courts kicked him out from control of these entities. And he needed weaponry to deter the donors and others from pressing the investigation forward.

So in the Spring of 2025, Patrick sharply pivoted with respect to Hunter Mountain's duty to protect the asset of the former equity stake in Highland. He started to negotiate with Highland's chief restructuring officer. And on May 19, 2025, while the charities were still attempting to understand and unravel Patrick's machinations, Highland and its constituents filed their Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Motion"), Dkt. 4216, Exhibit 22. The settlement would:

- Resolve all pending disputes between Hunter Mountain and the Highland Entities;
- Transfer all remaining claims in the Kirschner Litigation to Hunter Mountain;
- Make an immediate, lump-sum payment of $500,000 to Hunter Mountain;
- Make an immediate initial distribution on Hunter Mountain's Class 10 claim of $10 million, with subsequent distributions of $6,500,000 planned in 2027 and 2028;
- Grant Hunter Mountain an allowed Class 10 claim in the amount of $336,940,230.58; and
- Entitle Hunter Mountain to receive a "final distribution" of "all excess remaining Indemnity Trust Assets" at the close of all proceedings involving the estate.

Exhibit 24, Settlement Agreement & General Release, Dkt. 4217-1, ¶¶ 1–8. There was nothing special about the last two items. Hunter Mountain was a Class 10 claimant. And it was entitled to a substantial amount of the excess after the creditors were paid.

What Hunter Mountain "got" for attempting to give the bankruptcy professional running Highland a free pass was a half-million dollar wire payment and a $10 million distribution for its Class 10 status that frankly it should have received long ago. And Patrick got the right to control the Kirschner litigation against Dondero and his colleagues for purportedly ruining Highland. *That he needed desperately*, because Dondero was asking hard questions about what Patrick had stolen from Dondero's charitable legacy. Patrick—rightly—was on defense against the emerging

evidence of his theft and misconduct. He needed something with which to fight back.

Several parties, including Dugaboy, objected to the 9019 Settlement. *See generally* Exhibit 25, Preliminary Objection of The Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities, Dkt. 4230. The Dallas Foundation and Crown Global also objected to the 9019 Settlement, but the objection itself (and the stale documents offered as exhibits in support of their objection) highlights the dearth of information they had at the time about Patrick's misconduct. As those two entities explained:

> [T]he Settlement is ***potentially tainted*** by the actions of Mark Patrick, ***the apparent sole manager and director*** of the HMIT Entities. Specifically, ***upon information and belief,*** Mr. Patrick illicitly restructured the ownership of the HMIT Entities in a manner ***that seems to facilitate the diversion of millions of dollars*** in assets from the charitable entities that are the beneficial owners of the HMIT Entities. . . . [G]iven the actions of Mr. Patrick and the pending proceedings related thereto, rather than provide the peace sought by Movants, approval of and consummation of the Settlement will ***most likely*** result in further litigation both before this Court and in jurisdictions outside of the United States.

Ex. Charities' Obj., Dkt. 4231, ¶ 2 (emphasis added).

The objection from Crown Global and The Dallas Foundation prompted a show of overwhelming force in defense of Patrick from the bankruptcy professionals. Highland insisted on deposing their representatives—Julie Diaz, the President and CEO of The Dallas Foundation, and Torrey Littleton, its CFO—on an emergency basis over the following weekend, giving them very little time to prepare to give testimony in a very contentious bankruptcy proceeding.[15] Following their depositions, Highland pressured Diaz and Littleton to withdraw their objection in exchange for the disclosure of information regarding Patrick's actions vis-à-vis the DAF. Faced

---

[15] *See* Caymans Ex. F, Transcript of Deposition of Julie Diaz at 9:21–23; Caymans Ex. C, Littleton Dep. at 11:4–14.

with a fight they felt ill-equipped to handle, Diaz and Littleton relented.

The Court held a hearing on Highland's Rule 9019 Motion on June 25, 2025. *See* Ex. 26, Notice of Hearing Held, Dkt. 4295. At the beginning of that hearing, Highland announced its agreement with The Dallas Foundation and Crown Global and explained that those two entities would be withdrawing their objections to the Rule 9019 Settlement. *See* Ex. 23, 9019 Hrg. Tr., at 22:3–16. The terms of that agreement provided, among other things, that (1) Hunter Mountain would hold $7.5 million of any initial settlement payments received for a period of 30 calendar days in an identified account; and (2) Hunter Mountain's representative Shawn Raver would meet with The Dallas Foundation by no later than July 7, 2025, to explain the DAF's current structure, provide its most recent balance sheets, and account for any transfers of assets made by the DAF during periods covered by the balance sheets. *See* Ex. 27, Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("Withdrawal Stip."), Dkt. 4291 at Attachment 1.

After The Dallas Foundation and Crown Global withdrew their objections, Dugaboy's counsel orally objected to the 9019 Settlement on similar grounds to those raised in the withdrawn objections—including Patrick's fraud and his lack of authority based on that fraud to enter into the settlement. Ex. 23, 9019 Hrg. Tr. at 33:11–12. The Court overruled Dugaboy's objection and approved the Rule 9019 Settlement. *See* Ex. 1, Rule 9019 Settlement Order, Dkt. 4297, ¶ 10. To do so, the Court had to address whether the "Settlement Agreement was negotiated and entered into by . . . the HMIT Entities without collusion or fraud [and] in good faith . . . ." *Id.* ¶ 4. The Court found that the HMIT Entities were "acquiring the Transferred Claims and Dugaboy Note in

good faith" and had "proceeded with all aspects of the Settlement Agreement in good faith." *Id.* ¶ 6.

On July 9, 2025, Texas Attorney General Ken Paxton asked the Court to grant a brief stay of the bankruptcy proceeding to allow the AG's office time to investigate and enforce potential breaches of fiduciary duties by those entrusted with managing charitable trusts and other nonprofit organizations involved in the proceedings. *See* Exhibit 28, Letter from Ken Paxton re: Request for a Stay; Dkt. 4308.

The meeting Patrick promised the Dallas Foundation did not materialize as planned. Patrick failed to show up to explain himself. And Raver was unable to convey the information that The Dallas Foundation had demanded as a prerequisite to their capitulation.

After filing its notice of appeal of the Rule 9019 Settlement Order, on July 17, 2025, Dugaboy likewise sought a stay of the Order pending appeal. *See* Ex. 29, Notice of Appeal, Dkt. 4311; Ex. 30, The Dugaboy Investment Trust's Motion to Stay 9019 Order ("Dugaboy Motion to Stay"), Dkt. 4326. Dugaboy explained that filings by the joint official liquidators in the Cayman Islands proceeding demonstrated that Patrick had "restructured the ownership of the HMIT Entities in a manner that seems to facilitate the diversion of millions of dollars in assets from the charitable entities that are the beneficial owners of the HMIT Entities." Ex. 30, Dugaboy Motion to Stay, Dkt. 4326, ¶ 2. Dugaboy argued that Patrick's actions called the validity of the 9019 Settlement into question and that the settlement itself helped further Patrick's fraudulent scheme. *Id.*, ¶¶ 33–34.

Three days later, on July 21, 2025—and without the benefit of any further briefing or oral argument on the stay requests—the predecessor judge summarily denied the requests. In doing so, the Court concluded that: "***Whatever the misdeeds may or may not be of Mark Patrick, they***

***are not sufficiently intertwined with the Highland bankruptcy estate (or the Settlement Agreement) to justify a stay.***" Ex. 31, Memorandum Order and Opinion Regarding Stay Requests ("Stay Order"), Dkt. 4333, at 4 (emphasis in original). The Court refused a stay despite knowing of judicial proceedings in the Cayman Islands that already had removed Patrick from control of the DAF structure and that were likely to eventually reach the entities over which he claimed authority to enter into the 9019 Settlement. The Court also held that neither the bankruptcy case nor the contested matter involving the 9019 Settlement was a "proceeding involving a charitable trust." *Id.* Finally, the Court concluded that "the parties have other avenues to address any malfeasance of Mark Patrick," including the liquidation proceedings in the Cayman Islands. *Id.*

**K. New Evidence on Patrick's Actions Demands Additional Scrutiny**

As explained above, in the lead up to the June 25, 2025, hearing on the 9019 Settlement, the charitable owners, The Dallas Foundation, Crown Global, Dugaboy, and various other interested parties were scrambling to determine what Patrick had done vis-à-vis various charitable assets, how far his potential fraud extended, and whether there was any path forward to ensure that he could not abscond with money and assets earmarked for long-term charitable purposes.

It was not until the hearing itself that Dugaboy and others learned that Hunter Mountain had been sold to CLO HoldCo and that the ultimate beneficial owner of the Hunter Mountain interest was Patrick's captive charity rather than The Dallas Foundation and its supporting charitable organizations. *See* Ex. 23, 9019 Hrg Tr. at 173:22–174:16. But that shocking news was only the beginning.

On July 15, 2025, the first real evidence about the scale of Patrick's fraudulent scheme began to emerge. On that date, the joint official liquidators appointed in the Cayman Islands filed a Writ of Summons and Statement of Claim against Mark Patrick, Paul Murphy, CDMCFAD, LLC (referred to as "DAF 2.0"), DFW Charitable Foundation (Patrick's personal charitable foundation),

CDH GP, Ltd. (Patrick's newly-created general partner for DAF 2.0), and CLO HoldCo, Ltd. Caymans Ex. B, Statement of Claim, ¶ 1. The evidence in that Statement of Claim is highlighted throughout the discussion above. That Statement of Claim revealed, for the first time, that Patrick had secretly effectuated the DAF restructuring and thereby fraudulently absconded with $270 million in charitable assets belonging to the charitable owners. *See generally id.* Further evidence of this wrongdoing was unearthed by the Joint Liquidators in December 2025 filings, just a few weeks ago. *See, e.g.*, Caymans Ex. A, First Patrick Aff. (released December 2025); *but see* Caymans Ex. B, Statement of Claim; Caymans Ex. C, Littleton Depo. Trans.; Caymans Ex. D, Ch. 15 Petition; Caymans Ex. E, Winding Up Petition; Caymans Ex. F, Diaz Depo. Trans.; Caymans Ex. G, MacInnis Dec. (released July 2025).

And while representatives of Highland repeatedly suggested at the hearing on the Rule 9019 Settlement that the DAF and Hunter Mountain structures were entirely separate, what is now crystal clear is that is untrue. Patrick made sure that Hunter Mountain was folded into the DAF structure through the sale of Beacon Mountain's interest in Hunter Mountain to CLO HoldCo. That transaction—surreptitiously orchestrated by Patrick (and about which Dugaboy still has few salient details)—made certain that Patrick could control all of Hunter Mountain's assets that should belong to charitable organizations.

Much of this information has only recently come to light, however, as the proceedings in the Cayman Islands investigating Patrick's and his associates' malfeasance have been subject to a protective order under the confidentiality rules of the Cayman Islands judicial system. After a hearing in December 2025, the formerly confidential documents arising after July 2025 in the Caymans proceedings appended hereto became publicly available.

The documents released in December 2025 revealed details of the charitable assets Patrick and his conspirators have been stuffing in their own pockets. Patrick took more than $10.5 million and $3.32 million in director's fees alone in 2024 and 2025, respectively, for work that did not amount to a full-time job. *See* Third Affidavit of Margot MacInnis ("MacInnis Aff. 3") at ¶ 52. Patrick's co-conspirator Murphy even revised his own compensation plan to pay himself $500,000 in fees triggered when injunctions are sought against the DAF, the very proceedings now pending in the Caymans. *Id.* at ¶ 79.2. This revision was backdated to the beginning of 2025 in monthly installments, and thus Murphy is receiving additional compensation from the very fund the liquidators in the Cayman Islands are working to save. *Id.* Moreover, both Patrick and Murphy sought indemnification from the DAF for their own legal fees incurred obstructing the joint liquidators' investigation into *the fraud they committed*. Ex. MM-3, at 199–202, 829.

The December 2025 documents revealed Patrick's desperate efforts to prevent the courts from learning about his shifting of funds. In response to judicial orders that he open the books of the DAF and all related entities, Patrick provided only a consolidated balance sheet for the overall Fund so that his corporate shell game could not be traced. *Id.* at ¶¶ 102–03. And the December 2025 documents showed his intent to defraud, revealing how he confided in advisors about getting assets away from the charities and into his own, exclusive control. *See* Ex. MM-3, 61–82.

### L. The Predecessor Judge in this Matter Recuses

As explained further below, the predecessor judge who approved the challenged settlement in July 2025 has been recused from this case. That outcome was announced by the Fifth Circuit Judicial Council in resolutions of judicial conduct complaints dated December 29, 2025.[16] That is

[16] *See, e.g.*, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90042 (Dec. 29, 2025), at 7, available at https://tinyurl.com/yynh3u67.

an outcome the predecessor judge resisted, denying multiple motions seeking it.

The grounds for the recusal was the predecessor judge's authoring of novels that negatively depicted a hedge fund and its manager. Dondero contended the novel's hedge fund and manager was hard to distinguish from his own. This novel writing was occurring when the case was started and well before the July 2025 Rule 9019 Settlement Order at issue here.

The Fifth Circuit's Chief Judge resolved the judicial conduct complaint through arranging for extensive "corrective action," including the predecessor judge's recusal from this case and professional education. Of the more than 500 Fifth Circuit Judicial Council resolutions of judicial conduct complaints in the last decade, there had been only four prior instances of resolving them through "corrective action" rather than dismissal. (One other had been referred to a special committee for sanction, some others were cut off by resignation of the subject judge).

The Fifth Circuit Chief Judge's resolution noted that it did not pass judgment on whether the predecessor judge's prior refusals to recuse were error, or on the validity of her prior orders. Ex. 32, Order 05-26-90042 at 6 n.3. Nor could it have, because those issues must be addressed inside the pending case, with arguments from the parties to it.[17]

Most notably, Dondero and others challenged the predecessor judge's refusal to recuse through a writ of mandamus. The Fifth Circuit held that there was "a strong argument that [the predecessor judge] had a duty to recuse" due to the novels and their similarity to Dondero, but that the argument did not rise to the level of a "clear and indisputable" abuse of discretion required for mandamus relief. *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *7 (5th Cir. Apr. 16, 2025). The Fifth Circuit distinguished that high standard from the more searching review that would be available on direct review from an eventual final judgment. *Id*. at *4.

[17] *See* R. Judicial-Conduct and Judicial-Disability Procs., r. 3 Fifth Cir. cmt. 3.2.

Dondero is seeking review of the mandamus-stage decision in the Supreme Court. *See Dondero v. Jernigan*, No. 25-355. The Supreme Court initially denied certiorari on January 12, 2026. In doing so, neither Dondero nor the Supreme Court was aware of the Fifth Circuit Judicial Council resolution imposing the corrective action of recusal. Dondero timely petitioned for rehearing in the Supreme Court alerting it to these intervening developments on February 6, 2026. That petition remains pending.

## III. THE COURT SHOULD RECONSIDER AND VACATE THE 9019 SETTLEMENT ORDER

The Rule 9019 Settlement Order was obtained by and unintentionally advances fraud and misconduct, as newly discovered evidence conclusively demonstrates. Only *after* the hearing on Highland's 9019 Motion did shocking but clear and convincing evidence of Patrick's fraud and misconduct come to light. It was also entered by a judge who lacked the authority to act, because circumstances were already in place disqualifying her from presiding. The Court should reconsider and vacate the Rule 9019 Settlement Order.

### A. This Court Has Ample Authority to Reconsider and Reverse Settlement Orders That Were Error, Are Undermined by Newly Discovered Evidence, Are Affected by Fraud or Misconduct, or Are Themselves Inequitable

The Court has the power to reconsider, vacate, or otherwise grant relief from the Rule 9019 Settlement Order. When a successor judge takes over a case from a predecessor, "[t]he successor judge has the same discretion as the first judge to reconsider [] order[s]" issued previously in the case. *Abshire v. Seacoast Prods., Inc.*, 668 F.2d 832, 837–38 (5th Cir. 1982). This is a well-established power that a majority of circuits have confirmed. *See In re United States*, 733 F.2d 10, 13 (2d Cir. 1984); *Hayman Cash Reg. Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982); *Loumar, Inc. v. Smith*, 698 F.2d 759, 762–63 (5th Cir. 1983); *Brengettecy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005); *Greyhound Corp., Inc. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488, 508 (9th Cir. 1977);

*Nelson v. City of Albuquerque*, 921 F.3d 925, 930 n.2 (10th Cir. 2019); *United States v. Philpot*, 773 F. App'x 583, 588 (11th Cir. 2019); *Exxon Corp. v. United States*, 931 F.2d 874, 878 (Fed. Cir. 1991). Some circuits require a showing that the operation of the previous ruling be "clearly erroneous and its enforcement would work a manifest injustice" or that "intervening controlling authority" makes reconsideration appropriate, see, e.g., *Zeyen v. Bonneville Joint Dist., #93*, 114 F.4th 1129, 1138 (9th Cir. 2024), and other circuits have described a successor judge's authority as "plenary" to reconsider prior orders, *see Philpot*, 773 Fed. Appx. at 588. The Fifth Circuit strikes a middle path, empowering a successor judge with discretion to reconsider an order of the predecessor judge, but cautioning not to overrule an earlier order "merely because the later judge might have decided matters differently" in order to maintain general principles of comity. *In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009).

Concern for leaving prior rulings undisturbed gives way "to the interests of justice and economy." *Id.* at 837. The successor judge need only have "reason [he] deems sufficient" to overturn a prior judge's orders, even in the absence of new evidence or a change of law. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010). The successor judge has "necessarily bountiful discretion" to review prior work in a case before it. *Loumar, Inc.*, 698 F.2d at 763. To "conscientiously carry out his judicial function," a judge has discretion to correct "what he believes to be a prior erroneous ruling[.]" *Castner v. First Nat'l Bank of Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960). This is particularly so when a predecessor judge has recused herself: the successor judge must be able to reconsider the order or else risk jeopardizing the important values of impartial adjudication underlying 28 U.S.C. § 455. *United States v. O'Keefe*, 128 F.3d 885, 891 n.6 (5th Cir. 1997).

In addition, the Court may revisit its orders for any of several enumerated reasons within a

"reasonable" time after the order's issuance, even when the order has come in the form of a final judgment ending a case. Fed. R. Civ. P. 60(b).[18] Specifically, Rule 60(b) empowers the Court to give relief from a "final judgment, order, or proceeding" for the following reasons: (1) mistake, (2) newly discovered evidence, (3) fraud, misrepresentation, or misconduct by an opposing party, (4) the judgment is void; (5) applying it prospectively is no longer equitable, or (6) "any other reason that justifies relief." Rule 60(b)(1)–(6). Rule 60(b) "is to be construed liberally to do substantial justice. . . [it] is broadly phrased and many of the itemized grounds are overlapping, freeing Courts to do justice in hard cases where the circumstances generally measure up to one or more of the itemized grounds." *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015) (quoting *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 600 (5th Cir. 1980)). As explained below, relief is warranted in this case under several of Rule 60(b)'s subsections. Finally, even beyond the powers bestowed by Rule 60(b), the Court has the inherent power "to vacate a judgment obtained by fraud." *Allen v. United States*, No. 3:96-cv-256-K, 2015 WL 3824448, at *2 (N.D. Tex. June 18, 2015) (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)).

### B. The Court Should Reconsider and Vacate the 9019 Settlement Order Due to Patrick's Fraud and Misconduct

#### 1. This Court Should Reconsider and Vacate the 9019 Settlement Order Because Newly Discovered Evidence Shows It Was Affected by Fraud and Misconduct

The Court should reconsider its Rule 9019 Settlement Order because the scope of Patrick's misconduct was unknown before the hearing on Highland's 9019 Motion. The Court should exercise its "necessarily bountiful discretion" to reconsider the Rule 9019 Settlement Order. *See Loumar*, 698 F.2d at 763. In addition, Federal Rule of Civil Procedure 60(b)(2) authorizes reversal

[18] Federal Rule of Civil Procedure 60 applies in bankruptcy proceedings. Fed. R. Bankr. P. 9024.

or vacatur of an order, even a final judgment, based on "newly discovered evidence." Fed. R. Civ. P. 60(b)(2); *see also* Fed. R. Bankr. P. 9024. Reconsideration is appropriate where the evidence "could not through due diligence have been discovered" before the prior order and "would have clearly produced a different result if presented to the court before" the prior order. *Harrison v. Byrd*, 765 F.2d 501, 503 (5th Cir. 1985); *see also Stilwell v. Travelers Ins. Co.*, 327 F.2d 931, 933 (5th Cir. 1964) (reversing trial court's denial of Rule 60(b)(2) motion where newly discovered evidence changed facts of the case). The newly discovered evidence may be direct or circumstantial. *Philip Morris USA Inc. v. Lee*, 494 F. Supp. 2d 544, 550 (W.D. Tex. 2007). And the evidence may include affidavits of the moving party. *Harrison*, 765 F.2d at 502–03.

Here, newly discovered evidence amply demonstrates that Patrick was not presenting his settlement proposal to the Court "without collusion or fraud [and] in good faith," as the predecessor judge had determined. Ex. 1, Rule 9019 Settlement Order, Dkt. 4297, ¶ 4. The newly discovered evidence, instead, demonstrates that Patrick remained in his position only because of fraudulent efforts to cover up his misconduct and that, indeed, he was seeking the settlement to deter investigation into it.

There was smoke of this misconduct at the June 25, 2025, hearing approving the settlement, including signs of wrongdoing and requests for caution from Cayman Islands court-appointed investigators and the Texas Attorney General. The flames of the misconduct were revealed, however, by successive later filings in July and December of 2025 by the joint official liquidators appointed in the Cayman Islands.

First, those filings showed that Patrick had secretly restructured the DAF and Hunter Mountain to steal their assets from the charities they were meant to benefit. Then, we learned that Patrick had established his own sham charity, run out of his house with his family as directors, to

take over more than $270 million in assets actually belonging to established charities. It became apparent that Patrick effected this restructuring in the dark of night, with instructions to lawyers to make the new maze of companies he was setting up untraceable.

At the heart of all this is Patrick's newly created sham charity, the so-called DFW Foundation. Leading up to the hearing, Patrick wanted to keep everyone away from this curious new entity. At his deposition on June 23, 2025, Patrick avoided answering whether his sham charity was the ultimate owner of Hunter Mountain, ultimately testifying it was another company instead. *See* Exhibit 49, Transcript of Deposition of Mark Patrick, 8:1–6 (June 23, 2025) ("Q: Does DFW Charities own CDMCFAD, LLC? A: Yeah, again, you know Mr. Lang, you know, there are several entities in this structure, and I – I just don't want to go beyond what I have a hundred percent knowledge of."); *see id.* at 11:10–12:7 (testifying that the ultimate owner of Hunter Mountain was a company called Beacon Mountain). The Liquidators' later filings laid bare the truth: That Patrick's sham charity had been reorganized into its role as the ultimate beneficial owner of Hunter Mounter, the settling entity. Documents from the Cayman litigation later revealed that Patrick is the registered director, sole member, and president of DFW Foundation. *See* Caymans Ex. G, First Affidavit of Margot MacInnis dated July 15, 2025 at ¶¶ 11.5, 31.4, and 31.5.

And that sham charity was part of a massive fraud scheme to steal DAF's more than $270 million in charitable assets. *See id*. at Ex. 33, pages 448–53 (internal Patrick email Nov. 26, 2024 at 4:11 pm). Internal communications, not available before the 9019 Hearing, revealed that in November 2024, Patrick sought advice on creating DFW Foundation to dilute the existing Charities and take the ownership of the DAF. *See* Caymans Ex. B, Statement of Claim at ¶¶ 91–93. He intentionally misled the Charities and obfuscated his self-dealing transactions in

communications with the Charities in November 2024–March 2025. *See* Caymans Ex. G (MacInnis Declaration dated July 21, 2025) at Ex. 60–64, 70–71, 75–76, and 86. This enabled Patrick to enter into a series of self-dealing transactions whose result was that the new buyer of Hunter Mountain was entirely controlled by him. *See id.* at Ex. 44–47, 49, 52–55, and 65. Had this series of transactions been revealed before the 9019 hearing, the Court would have known that the owners of Hunter Mountain who signed the 9019 Settlement only recently came to that ownership through breach of fiduciary duty and fraud, and that the 9019 Settlement essentially provided the Court's approval of Patrick's monetization of a stolen asset.

Second, newly discovered evidence showed that Patrick paid himself more than $12 million in September and October 2024 alone for the part-time job of running this charitable exercise. *See* Caymans Ex. B, July Statement of Claim at ¶¶ 86–88. The proceeds of any distribution approved by the 9019 Motion would have gone into the same pool of charitable assets from which Patrick had just paid himself $12 million. This Court never would have poured settlement proceeds into Patrick's vessel if it had known there was a hole in the bottom of it leading directly to Patrick's pocket.

Third, the newly discovered evidence shows that Patrick structured the settlement to protect himself from further investigation into his misconduct. Dondero and others were asking questions about his handling of the DAF, so Patrick gave away asset value for the charities in exchange for acquiring the Kirschner claims. Ex. 24, Settlement and General Release, ¶¶ 3–4, 8(a). These are meritless claims that historical managers of Highland mismanaged it. And obtaining them would give Patrick an offensive weapon against Dondero and his partners who had donated to the DAF and wished to see their gift flourish for the charities' benefit. In this way, Patrick used the settlement for his own personal benefit, to obtain at the expense of the charitable beneficiaries

some kind of deterrence against Dondero and his former owner partners from asking hard questions about Patrick's misconduct going forward. Patrick set out immediately to deploy it, asking the predecessor judge to take the Kirschner claims out of hibernation and to freeze all Dondero's other assets, lest they be used to investigate Patrick. Caymans Exhibit H, Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver, No. 25-BC01B-0027 (July 1, 2025). And it led to a bizarre world in which the beneficiaries of Dondero's gift—through the self-interested intervention of Patrick—would be suing Dondero for alleged historical misconduct.

The prominence of the Kirschner aspect of the settlement should have given the Court a moment of pause. But with the newly discovered evidence showing the scale of Patrick's misconduct, Patrick's motive in seeking the Kirschner claims—and dealing away value for the charitable beneficiaries to obtain those claims—becomes apparent. Patrick's clear objective in entering into the rushed settlement was to obtain a weapon against Dondero so that he could deter further inquiry into his misconduct. That weapon was the Kirschner litigation, and Patrick sacrificed the long-term assets of pressing the case of former equity holders against Highland for the short-term cudgel of gaining a litigation tool against Dondero. Equity demands that this Bankruptcy Court not allow a 9019 settlement to help a wrongdoer deter investigation into misconduct and cover up his wrongdoing. When it becomes apparent that happened, a settlement should be reconsidered and/or vacated. And this one should be.

Fourth, the newly discovered evidence shows that Patrick's self-dealing to transfer the economic benefit of Hunter Mountain from the Dallas Foundation to himself violated Sections 206 and 215 of the Investment Advisors Act and that the 9019 settlement advances that clear violation of federal law. As the control person of Rand Advisors, Patrick caused Hunter Mountain to be

traded to the DAF structure under his new DFW Foundation entity.[19] This rendered the trade a principal transaction prohibited under Advisors Act § 206. *See* Securities and Exchange Commission, Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Inv. Adv. Act Rel. No. 1732 (July 17, 1998), 63 Fed. Reg. 39,056 (July 23, 1998) (internal citations omitted). Additionally, it would have rendered the entire transaction void and subject to rescission. 15 U.S.C. §80b-15(b); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 367 (S.D.N.Y. 2011) (*citing Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 24, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)).

It also violates a provision of the governing documents of Atlas Fund, the 96% owner of Rand Fund, which prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent. *See* Ex. 50, Amended and Restated Limited Partnership Agreement of Atlas Fund as of November 30, 2015 at §3.01(b). As revealed in Rand Fund's audit issued *the day after* the 9019 Hearing, as of December 2024, Rand Fund's sole asset was Beacon Mountain, the beneficiary of Hunter Mountain. *See* Ex. 48, Rand Fund 2024 Audit at 4. As a result, while Patrick did not transfer Atlas Fund's direct ownership of Rand Fund, Patrick did transfer all of Rand Fund's value without disclosure to, or consent from, a client. Ex. 23, Hrg. Tr. June 25, 2025 at 214:2–6.

Under applicable law, Patrick was not permitted to use his position as investment advisor of Atlas Fund to approve of Rand Fund selling an asset to Patrick's own account. *See In re Paradigm Cap. Mgmt., Inc.*, Securities and Exchange Commission Investment Advisers Act

[19] Rand Advisors was the investment advisor of Rand PE Fund, which was the owner of Beacon Mountain, the sole beneficiary of Hunter Mountain. Exhibit 5, Rand Advisors, LLC Form ADV Part 2A (March 2021). Beacon Mountain, with its beneficial ownership of Hunter Mountain, was the asset transferred by Patrick to his own ultimate benefit.

Release No. 3857, 2014 WL 2704311, at *2 ¶ 15 (June 16, 2014). Patrick should have sought the consent of Crown Global as the sole limited partner of Atlas Fund, which in turn was the 96% owner of Rand Fund, the selling party. Ex. 40, Hunter Mountain Org. Chart. Crown Global, the annuity policy issuer, would have taken instructions from the Dallas Foundation, the annuity policy beneficiary. *See* Ex. 47, Deferred Variable Annuity Policy No. 30218 dated as of December 10, 2015, issued to Empower Dallas as Policyholder and Beneficiary. Rescission of the transfer renders the 9019 Settlement fatally flawed because the Debtor signed the agreement with the wrong owner of Hunter Mountain. Had Patrick timely disclosed both that DFW Foundation was the ultimate beneficial owner of Hunter Mountain after it was traded, and his own relationship to DFW Foundation, the parties objecting to the 9019 Settlement, both Dugaboy and the Dallas Foundation, would have been able to take additional discovery, submit additional exhibits, and brief additional arguments opposing the 9019 Settlement. Patrick prevented them from doing so.

That this information had to come out after the hearing was not for lack of diligent inquiry. When asked at the 9019 hearing to explain the recent changes in Hunter Mountain's ownership structure, Patrick first lodged his own relevance objections from the witness stand, then argued he should not have to answer because it would affect related litigation, and finally resorted to being entirely confused as to the names of entities even when spelled out in their entirety. Ex. 23, Hrg. Tr. June 25, 2025 at 174:23–175:3 and 177:2–22. He even feigned unfamiliarity with the DAF itself even though he personally put it into liquidation less than three months earlier. *Id.* at 178:5–8, 179:7–21.

None of this information was available to Dugaboy before the 9019 hearing, despite its diligence. As explained above, because Patrick carefully hid his machinations from all affected parties, including his clients Dondero and Dugaboy and the charities for which he served as a

fiduciary, it was impossible for any relevant stakeholders to know or fully grasp the extent of Patrick's deception. Nor could Dugaboy have known that Patrick had self-dealt Hunter Mountain into the DAF structure through the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco. Despite inquiries, Patrick and his inner circle refused to reveal the details of the sale.

This evidence—which was unknown and unavailable at the hearing on Highland's 9019 Motion—was material and should have produced a different result had it been presented to the Court before the Rule 9019 Settlement Order was issued.

**2. This Court Should Vacate the 9019 Settlement Order Because It Is the Product of Patrick's Misconduct and Fraud**

For many of the same reasons, the Court also should reconsider the Rule 9019 Settlement Order because Patrick's elaborate, carefully concealed fraud prevented Dugaboy (or any other affected stakeholder) from fully and fairly objecting to the 9019 Settlement. Upholding a previous order begotten in part by fraud weighs against "the interests of justice and economy," and thus this Court should not rigidly adhere to prior order it is empowered to rectify. *Abshire v. Seacoast Prods., Inc.*, 668 F.2d at 837. Further, where a party engages in "fraud . . . , misrepresentation, or misconduct," the opposing party is entitled to reconsideration of a prior court order. Fed. R. Civ. P. 60(b)(3); Fed. R. Civ. P. 60(d) (recognizing court's power to "set aside a judgment for fraud on the court"). As the Fifth Circuit has recognized, Rule 60(b)(3) "allows the courts to 'set aside a judgment for fraud on the court' without a strict time bar." *Jackson v. Thaler*, 348 F. App'x 29, 34 (5th Cir. 2009) (per curiam) (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978)). And "[c]ourts are given wide discretion in determining whether relief should be granted under Rule 60(b)(3) based on fraud." *Allen v. United States*, 2015 WL 3824448, at *2 (N.D. Tex. June 18, 2015) (citation omitted). That is because Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." *Rozier*, 573 F.2d at 1339.

Reconsideration is particularly appropriate where, as here, the offending party's "misconduct prevented the moving party from fully and fairly presenting his case." *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 364 (5th Cir. 2018). The offending party's misconduct need not rise to the level of actionable fraud. *See* Fed. R. Civ. P. 60(b)(3). Rather, misconduct warranting reconsideration may consist of misleading statements or a failure to disclose relevant information. *Hernandez*, 907 F.3d at 365. The test is whether the misconduct "inhibited the unearthing of evidence" or "substantially interfered" with the moving party's "preparation." *Id*. (internal quotation marks omitted). The analysis thus rests on whether an order was "unfairly obtained" as a result of the offending party's misconduct. *Id.* at 364 n.20 (quoting *Diaz v. Methodist Hosp*., 46 F.3d 492, 496 (5th Cir. 1995)).

As described above,[20] Patrick's actions involve just the sort of fraud, misrepresentations, or misconduct that requires reconsideration of the Rule 9019 Settlement Order. Patrick concealed his restructurings of the DAF and Hunter Mountain so that he could divert assets intended to flow to charitable beneficiaries to entities that he owned and controlled. Indeed, Patrick specifically told his lawyers when crafting his fraudulent scheme that he wanted to hide his actions by creating a new entity that was "hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection." Caymans Ex. B, Statement of Claim, ¶ 82. He also surreptitiously increased his own compensation to the tune of millions of dollars to the detriment of the same charitable beneficiaries he was planning to defraud. He then sought out and negotiated a settlement on behalf of Hunter Mountain knowing that all the settlement value would benefit entities he controlled instead of funding the charitable legacy that the Hunter Mountain structure was created to benefit. The courts routinely employ their powers to correct much less significant wrongdoing. *See Rozier*,

[20] *See supra* Sections II.F–II.K.

573 F.2d at 1342–46 (reversing district court's denial of Rule 60(b)(3) motion for new trial where non-moving party failed to produce materials during discovery); *Cap. Exp., LLC v. Zinus, Inc.*, 996 F.3d 1332, 1342 (Fed. Cir. 2021) (affirming vacatur under Rule 60(b)(3) where expert witness misrepresented his knowledge of material prior art in patent case); *Carter v. Fenner*, 136 F.3d 1000, 1005–07 (5th Cir. 1998) (voiding judgment approving wrongful death settlement due to lack of authority to consent).

Patrick's restructuring of the DAF and Hunter Mountain to divert valuable charitable assets to his own control and use amounts to self-dealing, fraud, and—at the bare minimum—misconduct.

**3. This Court Should Vacate the 9019 Settlement Order Because Letting It Stand Is Contrary to this Court's Equitable Purpose and Powers**

The Court should reconsider its Rule 9019 Settlement Order because equity strongly favors a hearing to explore the scope of Patrick's fraud and how it impacts Hunter Mountain. *See In re Osborne*, 379 F.3d 277, 284 (5th Cir. 2004).

The facts of this case overwhelmingly militate in favor of reconsideration. In fashioning its Rule 9019 Settlement Order, the Bankruptcy Court explicitly concluded that the 9019 Settlement was "negotiated and entered into by . . . the HMIT Entities without collusion or fraud [and] in good faith." Ex. 1, Rule 9019 Settlement Order, Dkt. 4297, ¶ 4. That finding was a prerequisite to approving a settlement under Rule 9019. *See Matter of AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984).

For the above reasons, this settlement was the product of fraud and misconduct, not free of it. And there was no good faith here. As important, the settlement itself was structured by Patrick to help him keep his misconduct from public view. It was designed to throw charitable assets—the interests in pressing the rights of former Highland equity holders in and regarding the

administration of the bankruptcy estate—over the side of the boat so that Patrick could obtain a weapon against Dondero. It was a desperate attempt to deter those whose generosity created these charitable structures from asking the hard questions about Patrick—criminally—running off with them.

Parties with unclean hands cannot come to courts of equity and ask for relief. That is because the orders of courts of equity should not be sullied with misconduct. A natural corollary is that when the perfidious have obtained relief from courts of equity, and worse when such relief advances their misconduct to the slightest degree, it should be reversed.

Under the circumstances, equity and justice favor Dugaboy (*i.e.*, the deceived party) over Patrick (*i.e.*, the deceiving party). And equity and justice require reconsideration of the Rule 9019 Settlement Order in light of Patrick's many uncovered misdeeds.

### C. The Court Should Reconsider and/or Vacate the Rule 9019 Settlement Order Because It Was Issued by a Judge Who Lacked Authority Because She Should Have Been Disqualified

Finally, the Court should reconsider the 9019 Settlement Order because the predecessor judge lacked the authority to enter it, as already existing circumstances disqualified her from acting in this case. Congress mandated that the judge "shall disqualify" herself "in any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). By the time of the 9019 Settlement Order, the circumstances compromising the appearance of her impartiality were already present: the writing of novels about a hedge fund and its manager similar to Dondero. That has resulted in the Fifth Circuit Judicial Council taking corrective action to recuse the predecessor judge from the case going forward. This Court should address the consequences of these circumstances going backward.

The bankruptcy remains pending, and the currently presiding judge retains discretion to reverse any ruling made in the bankruptcy, for any reason, before the bankruptcy is closed through

a final judgment. *Abshire v. Seacoast Prods., Inc.*, 668 F.2d at 837–38. In addition, Federal Rule of Civil Procedure Rule 60(b) authorizes vacatur of orders issued when a judge should have recused herself. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–64 (1988). This is because "to perform its high function in the best way[,] 'justice must satisfy the appearance of justice.'" *Id.* at 864 (citation omitted); *see also Tramonte v. Chrysler Corp.*, 136 F.3d 1025, 1028 (5th Cir. 1998) (stating that a judge that should have recused lacks authority to enter subsequent orders).

In determining whether a judgment should be vacated for a violation of 28 U.S.C. § 455(a)—which mandates recusal whenever a judge's impartiality "might reasonably be questioned")—courts must consider "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. In discussing the third prong, the Supreme Court explained that because the purpose of the recusal statute is "to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible . . . it is critically important in a case of this kind to identify the facts that *might reasonably cause an objective observer* to question [a judge's] impartiality." *Id.* at 865 (emphasis added). The *Liljeberg* Court therefore affirmed the circuit court's granting of a Rule 60(b) motion to vacate a judgment where the judge *was not even aware* of his fiduciary interest in the litigation. *Id.* at 867–68. As described below, the facts present here weigh even heavier in favor of vacatur.

Here, the Fifth Circuit Judicial Council, acting through the Fifth Circuit Chief Judge, effected a recusal of the predecessor judge as "corrective action" for books she authored and published critical of the hedge-fund industry and negatively depicting characters with striking similarity to Dondero while presiding over the Highland bankruptcy. The corrective action was

taken in disposition of three ethics complaints by the Judicial Council of the Fifth Circuit regarding the judge's impartiality.[21] In the dispositions, Chief Judge Elrod determined that recusal was one of several significant measures constituting "appropriate corrective action that acknowledges and remedies the problems" raised by the complainants. Ex. 32, Order 05-26-90042 at 7; Ex. 33, Order 05-26-90044 at 3–4; Ex. 34, Order 05-26-90045 at 3. The corrective action of recusal was meant to redress "conduct occurring outside the performance of official duties if the conduct is reasonably likely to have prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people." Ex. 32, Order 05-26-90042 at 5 (quoting Judicial Conduct and Discipline Rule 4(a)(7)).

The Fifth Circuit Chief Judge noted that the judicial misconduct resolution should not "be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse . . . or on the validity of any decision" she had issued. Ex._32, Order 05-26-90042 at 6 n.3, Ex._33, Order 05-26-90044 at 3 n.1, & Ex. 34, Order 05-26-90045 at 3 n.1. That is because there are judicial proceedings to address consequences for rulings in a case. The Judicial Conduct and Discipline Rules are clear that proceedings thereunder are not to be used to reverse rulings in pending cases, because all the parties to those cases should be heard on such rulings. R. Judicial-Conduct and Judicial-Disability Procs., r. 3 Fifth Cir. cmt. 3.2. This motion is one such mechanism for that.

As the corrective action acknowledges, the predecessor judge wrote and published *He*

[21] *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90042 (Dec. 29, 2025), at 7, available at https://tinyurl.com/yynh3u67; *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90044 (Dec. 29, 2025), at 3, available at https://tinyurl.com/3vym9yu4; *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90045 (Dec. 29, 2025), at 3, available at https://tinyurl.com/2vka5dn6.

*Watches All My Paths*[22] and *Hedging Death*,[23] while presiding over this bankruptcy and the previous involuntary bankruptcy commenced against Acis Capital Management, L.P. and Acis Capital Management GP, L.L.C.—entities owned by or closely associated with Dondero.

The novels follow a Texas bankruptcy judge—portrayed to be heroic and modeled after Judge Jernigan herself—who faces hedge funds and a nefarious hedge-fund manager, Cade Graham, in her court. Graham bears striking similarities to Dondero. For instance, Graham shares much of the same biographical information as Dondero, such as stature, age, and general professional experience. Ex. 35, *Hedging Death* excerpt, at 112a.[24] Graham's hedge fund is named Ranger Capital, just as Dondero's had been before rebranding as Highland Capital Management. *Id.*, 133a (*Hedging Death* excerpt); Exhibit 36, Memorandum of Law in Support of Highland Capital Management Fund Advisors, L.P.'s Motion to Recuse at 16–17, *Highland Cap. Mgmt. L.P. v. Kirschner*, Adv. Proc. No. 21-03076, Dkt. 310 (Bankr. N.D. Tex. Feb. 27, 2023) ("Motion to Recuse"). References to the historical name of Dondero's hedge fund were made in both the Acis and Highland bankruptcies, which Judge Jernigan presided over while writing the books in question.[25] Ranger Capital also had a unique mix of investments that mirrored Highland—with "hedge funds . . . private equity funds, CDOs, CLOs, REITs, life settlement, all

---

[22] Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (Jan. 16, 2019), available on Amazon at http://bit.ly/4nhfTRd. Movants are submitting a hard copy of this book, which is designated as Exhibit 54 and will be delivered to the Court later this week.

[23] Stacey G. Jernigan, *Hedging Death*, White Bird Publications (Mar. 22, 2022), available on Amazon at http://bit.ly/3KfFCL6. Movants are submitting a hard copy of this book, which is designated as Exhibit 53 and will be delivered to the Court later this week.

[24] Attached to this Motion as Exhibits 35 (*Hedging Death*) and 51 (*He Watches All My Paths*) are pertinent excerpts of both novels, as included in Movants' Petition Appendix to their Petition for Certiorari at the Supreme Court filed on September 22, 2025. The pagination in these book excerpts matches that used in the Petition Appendix.

[25] *In re Acis Cap. Mgmt., L.P.*, Case No. 18-03078-sgj, Dkt. 85-2 at 190; *In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054-sgj, Dkts. 74-2 at 5; 247 at 59-60; 400 at 6; 675 at 23; 883 at 57; 1719 at 7; 1761 at 33; 1810-1 at 8; 1811 at 6; 1875-5 at 6; 1895-1 at 46; 1895-6 at 60–61; 1943 at 159.

manner of complicated financial products." Ex. 35, *Hedging Death* excerpt, at 112a; Ex. 36, Mot. to Recuse at 16–17 (Dkt. 310). ("As Judge Jernigan is well aware, [Highland] and its affiliates managed hedge funds, private equity funds, CDOs, CLOs, REITs, life settlement portfolios and private investment accounts for institutions around the world—exactly the same unusual mix of investments at issue in Judge Jernigan's second 'fictional' novel."). This combination is not just rare; it is one of a kind.

The novels also make derogatory comments about hedge funds and their managers, describing them as "suck[ing] up money . . . like an i-Robot vacuum" with "outrageous amount[s] of hubris." Ex. 51, *He Watches All My Paths* excerpt, at 104a. The books further deride certain international tax structures as "byzantine," a word Judge Jernigan has frequently used to describe Dondero's companies. Ex. 35, *Hedging Death* excerpt at 144a; *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *7 (5th Cir. Apr. 16, 2025), *cert. denied*, No. 25-355, 2026 WL 79972 (U.S. Jan. 12, 2026). Moreover, *Hedging Death* describes the life-settlement industry as "creepy," and as mentioned, Highland and Dondero invested in the life-settlement industry. Ex. 35, *Hedging Death* excerpt at 117a.

Dondero and others sought recusal on the basis of these novels long before the 9019 Settlement Order. Exhibit 37, Movant's Supplemental Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455, No. 19-34054, Dkt. 3673 (Bankr. N.D. Tex. Mar. 3, 2023). On March 6, 2023, the predecessor judge denied that motion, with the same explanations provided to the Fifth Circuit Chief Judge in response to the judicial misconduct complaints. *Compare* Exhibit 38, Memorandum Opinion and Order Denying "Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455," No. 19-34054, Dkt. 3676 at 32–36 (Bankr. N.D. Tex. Mar. 6, 2023), *with* Ex. 32, Order 05-26-90042 at 5, Ex. 33, Order 05-

26-90044 at 3, & Ex. 34, Order 05-26-90045 at 2–3.

Dondero and the other parties seeking recusal then appealed. The District Court held a direct appeal of the recusal denial to be jurisdictionally improper, and that the issue could be reviewed only through a petition for writ of mandamus. Order*, Dondero et al. v. Stacey G. Jernigan*, No. 3:21-CV-0879-K, at 1, 12–13, Dkt. 39 (N.D. Tex. Feb. 9, 2022). Dondero and the other parties then filed a mandamus petition with the District Court. *See* Exhibit 39, Order re: Writ of Mandamus at 3, No. 3:23-cv-00726-S, Dkt. 25 (N.D. Tex. Mar. 8, 2024). The issue as raised on mandamus reached the United States Court of Appeals for the Fifth Circuit. After a petition for rehearing, the Fifth Circuit amended its opinion with renewed focus on the novels, and the Court observed that "[d]ue to the similarities between the characters in Chief Judge Jernigan's novel and the litigants currently before her in court, a strong argument could be made that she had a duty to recuse." *Dondero*, 2025 WL 1122466, at *7. However, the Fifth Circuit withheld relief on mandamus, reasoning that the Court could act at the interlocutory, mandamus stage only upon a "clear and indisputable abuse of discretion." *Id.* The Fifth Circuit repeatedly explained how high a bar the "clear and indisputable" standard on mandamus is, and distinguished it from the lower standard of review to be applied on appeal from a final order affected by the recusal issue. *See id.* at *4 (describing the standard as a "high burden," and explaining that "in general, if a matter is within the district court's discretion, the litigant's right to a particular result cannot be 'clear and indisputable," and that such relief is granted on disqualification "only in exceptional circumstances") (citations and quotation marks omitted).

Dondero sought Supreme Court review of the Fifth Circuit's mandamus-stage decision. *Dondero v. Jernigan*, No. 25-355 (Sup. Ct.) Unaware of the Fifth Circuit Judicial Council's parallel corrective action recusing the predecessor judge from this matter going forward, the

Supreme Court denied certiorari on January 12, 2026. Dondero timely filed a petition for rehearing based on the intervening Fifth Circuit corrective action, which is pending. *See* Petition for Rehearing, *Dondero v. Jernigan* (attached as Exhibit 52).

This Court is not restrained by the standard of review issues that appeared to be the only thing keeping the recusal decision from already having been reversed on mandamus.[26] The law is clear: A successor judge in an ongoing proceeding may reverse any prior order for any reason and without deference to the rulings of the previous judge. *Abshire v. Seacoast Prods., Inc.*, 668 F.2d at 837–38. That is because the prior rulings become those of the replacement judge when addressed on appeal from a final order in the case. This Court can and should do the following: Determine that, as the Fifth Circuit put it, the "strong argument that [the predecessor judge] had a duty to recuse" disqualified her from ruling on and deprived her of authority to enter the 9019 Order, thus voiding it. Because this Court is not sitting as a reviewing court, no standard of review or extremely elevated showing required on mandamus restrains it from taking such action. This Court, instead, is cleaning up one aspect of the docket so that the reviewing courts are not presented with a problem when this issue arrives on direct review. As the Supreme Court has made clear, successor judges should use Rule 60 even after final judgment (and presumably other authorities before) to void orders by a judge who was disqualified from acting in a matter under 28 U.S.C. §

[26] Dugaboy, Dondero, and others continue to contest that the standard of appellate review of orders denying recusal is abuse of discretion. Congress made recusal under certain circumstances—including where a judge's impartiality may be reasonably questioned—mandatory, not optional or discretionary. 28 U.S.C. § 455(a) (mandating that a judge "*shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned") (emphasis added); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (explaining that "the mandatory 'shall[]'" in a statute "normally creates an obligation impervious to judicial discretion"). Moreover, no one is a particularly good judge of her own misconduct, making *de novo* review particularly appropriate when the grounds of recusal overlap with violations of the rules of judicial conduct. *See* Ex. 32, Order 05-26-90042 at 4–5, Ex.33, Order 05-26-90044 at 3, & Ex. 34, Order 05-26-90045 at 2. For these and other reasons, the Seventh Circuit reviews a judge's decision not to recuse *de novo*. *United States v. Balistrieri*, 779 F.2d 1191, 1202–03 (7th Cir. 1985).

455.

Given the predecessor judge's disqualification and lack of authority, this Court should reconsider the 9019 Settlement Order on a "clean slate." *See Demodulation, Inc. v. United States*, 114 Fed. Cl. 655, 657 (2014) ("[I]f the orders of the now-recused judge were allowed to stand, Plaintiff could one day wonder whether the outcome of the case was influenced by a judge who later recused herself from the case"). The Court should vacate that order, subject to Highland somehow reasserting its motion to approve the settlement if the circumstances now extant with the evidence of Patrick's misconduct could possibly support such a move.

## IV. CONCLUSION

Highland's bankruptcy has been long and complicated, but the issues raised by Dugaboy's Motion are not. Something very bad happened here, and the Bankruptcy Court's Rule 9019 Settlement Order facilitated that conduct. This Court should ensure that all bankruptcy constituents act fairly and free of fraud. Recent events make clear that the 9019 Settlement at issue was tainted by both, and the Court should exercise its considerable discretion to reconsider and vacate the Rule 9019 Settlement Order.

Dated: February 9, 2026

Respectfully submitted,

*/s/ John Michael Gaddis*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 30, 2025**

[signature]

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

**ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "Motion")[2] filed by Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion or the Settlement Agreement, as applicable.

Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered (a) the Motion, (b) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Objection") filed by Patrick Daugherty, (c) the *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Objection," and together with the Daugherty Objection, the "Objections"), filed by The Dugaboy Investment Trust, (d) the *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Charitable Foundation Objection"), filed by The Dallas Foundation (the "Dallas Foundation") (on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation ("Okada Family"), and Crown Global Life Insurance, Ltd., not individually, but solely in respect of Segregated Accounts 30218 and 30219 ("Crown"), (e) the evidence admitted into the record during the hearing on the Motion on June 25, 2025 (the "Hearing") in support of, and in opposition to, the Motion, including the Court's assessment of the witnesses' credibility, and (f) all arguments heard at the Hearing in connection therewith; and the Court having found that the legal and factual bases set forth in the Motion establish sufficient

cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

1. The Court's findings of fact and conclusions of law set forth on the record at the conclusion of the Hearing are incorporated by reference except as supplemented in this Order, and as may be further supplemented by the Court.

2. Entry into the Settlement Agreement is an appropriate exercise of the Movants' business judgment.

3. The Settlement Agreement is fair, reasonable, and in the best interests of each of the Highland Entities and their creditors and constituents.

4. The Settlement Agreement was negotiated and entered into by the Highland Entities and the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's- length negotiations.

5. The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(31) and 101(2).

6. The HMIT Entities entered into the Settlement Agreement, are acquiring the Transferred Claims and Dugaboy Note in good faith, and have proceeded with all aspects of the Settlement Agreement in good faith, and have received fair value in consideration of their entry into the Settlement Agreement.

7. The Transferred Claims and Dugaboy Note are property of the estate, and the Highland Entities' sale of those assets free and clear of all liens and encumbrances but otherwise subject to the Settlement Agreement is a proper exercise of their business judgment.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

8. The Motion is **GRANTED**.

9. As stated on the record during the Hearing, The Charitable Foundation Objection is withdrawn with prejudice.

10. All other Objections to the Motion are overruled.

11. The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

12. HMIT's Class 10 Interest is Allowed in the amount of $336,940,230.58.

13. The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

14. The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

15. Notwithstanding anything in the Settlement Agreement to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (collectively, the "Foundation Parties") are or will be included in the definitions of "HMIT Releasors" or "Highland Releasors." For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

16. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**### END OF ORDER ###**

action on the complaint is no longer necessary because of intervening events").

*Comments and Opinions Regarding Complainant's Integrity and Character*

Complainant also takes issue with negative comments made about his character and credibility and actions against him taken by the judge during hearings. Complainant states that at one hearing, the judge enjoined him and his subordinate from sharing confidential information they received as in-house attorneys for the company without permission, even though they were not parties to the adversary proceeding and they were not present at the hearing.

Complainant states that the judge's "willingness to make credibility assessments about [him] without hearing from him is evidence of her repeated animus, and has otherwise caused a loss of public confidence in the Court as an instrument of justice" in violation of Rule 4(a)(2)(B) of the JC&D Rules. Though Complainant frames the judge's statements as "mak[ing] credibility assessments about [him] without hearing from him," Complainant appears to be alleging that the judge formed a negative view or bias against him based on her prior dealings with him in a prior bankruptcy proceeding. The Supreme Court has long recognized that "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings*, do not constitute a basis for a bias or partiality motion . . . ." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (emphasis added). Further, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* This includes "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men

her ability to fairly adjudicate, and in turn, have a prejudicial effect on the administration of the court," in violation of Rule 4(a)(7) of the JC&D Rules.

JC&D Rule 4(a)(7) states that "[c]ognizable misconduct includes conduct occurring outside the performance of official duties if the conduct is reasonably likely to have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people."

In her response to my request to address the allegations in this complaint, the judge advised that: her novels are not about the company or anything that happened in the company's bankruptcy case; the references in her novels to hedge funds are "relatively infrequent"; such references are not "gleaned from knowledge or information from" the company's bankruptcy case; and that in the beginning of her novels she states that the opinions expressed or implied by the characters in her novels are not necessarily her opinions. The judge further states that she has presided "over countless cases in [her] lifetime and worked on even more, before becoming a judge, involving hedge funds, private equity funds, and exotic financial products" and that "[u]ntil now, [she] is not aware of anyone suggesting that [she] ha[s] shown any biases or animus where they are concerned."

The Fifth Circuit has also addressed the matter. In an appeal of a district court order denying their petition for mandamus, the company's former CEO and others challenged the judge's decision not to recuse in the company's bankruptcy proceedings. The Fifth Circuit opined that whether a reasonable reader and observer of these proceedings could question the judge's impartiality is debatable, and due to the similarities between the characters in the judge's novel and the litigants currently before her court, a strong argument could be made that she had a duty to recuse. Nonetheless, while noting that some similarities between the books and the cases before the judge may raise cause for concern, the court held that the similarities were

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**WRIT OF SUMMONS**

---

TO: (1) **MARK ERIC PATRICK** of 6716 Glenhurst Drive, Dallas, Texas, 72554, United States of America

THIS WRIT was issued by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83527361)

(2) **PAUL MURPHY** of Windsor Village #24, South Church Street, Grand Cayman, Cayman Islands

(3) **CDMCFAD, LLC** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(4) **DFW CHARITABLE FOUNDATION** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

(6) **CLO HOLDCO, LTD.** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, or, if you are served out of the jurisdiction, within such other period of time as the Court may order, you must either satisfy the claim or return to the Registrar of the Financial Services Division, Court Office, PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 15th day of July 2025

NOTE - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.

**IMPORTANT**

Directions for Acknowledgment of Service are given with the accompanying form

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**STATEMENT OF CLAIM**

---

**INTRODUCTION**

1 The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2 The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3 The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**"). At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4 The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5 In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company. In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6 By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**") of the Company, Mr Patrick caused:

6.1 the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

December 2024 and controlled by Mr Patrick, in exchange for a membership interest in that entity;

6.2 the Company, with the agreement and concurrence of Mr Murphy, to issue and allot further Participating Shares (representing a majority of the issued participating share capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024 and controlled by Mr Patrick;

6.3 the Third Defendant to redeem the Company's membership interest in the Third Defendant for a consideration of c. US$1.6 million, representing approximately 0.59% of the total net asset value of the assets held by the Fund; and

6.4 the Company, with the agreement and concurrence of Mr Murphy, to be placed into voluntary liquidation after having made a final distribution to all Original Participating Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the "**Impugned Transactions**".

7 The First and Second Defendants effected the Impugned Transactions in breach of their fiduciary and other duties to the Company in order to bring ownership of the Fund and its assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr Patrick’s effective control to the exclusion of the interests of the Charities. The Charities, as the original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8 Further, during the period March 2021 to June 2024, the First and Second Defendants, in breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr Patrick.

## THE PARTIES

The Company

9 The Company is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10 The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy (appointed by Mr Patrick on 22 April 2021).

11 The Company has been governed by the following memorandum and articles of association from time to time:

11.1 The memorandum and articles of association dated 27 October 2011; and

11.2 The amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.

The Company remains governed by the memorandum and articles of association as amended and restated on 20 February 2025 (the "**Articles**") save that the Company reserves the right to challenge the validity of the Articles.

12 Save as set out above, the Company will rely on the Articles and all previous iterations for their applicable full terms and effect.

13 Pursuant to the Articles and at all relevant times, the authorised share capital of the Company was US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.

14 The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15 The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16 The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17 The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18 On 7 November 2011, the Company issued:

18.1 300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

18.2 100 Management Shares to Grant Scott.

19 On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

19.1 Highland Kansas City Foundation, Inc.;

19.2 Highland Dallas Foundation, Inc.[1]; and

19.3 Highland Santa Barbara Foundation, Inc.,

collectively, the "**Supporting Organisations**".

[1] Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

20 On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21 On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22 The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23 Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24 As a result of the Impugned Transactions, the Company now has no material assets.

<u>DFW</u>

25 DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26 DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.

The Fund

27 The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28 The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership agreement of the Fund was dated 25 October 2011, was amended and restated on 7 November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021). The Company will rely on the LPA for its applicable full terms and effect.

29 Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund structure.

30 Until 18 December 2024, the Company was the sole limited partner of the Fund.

31 On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third Defendant) in exchange for a membership interest in CDM.

32 The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. The Original GP was the general partner from the Fund's formation until 7 March 2024.

33 On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth Defendant).

34 The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35 The assets of the Fund were valued at c. $270 million in September 2024.

<u>The New GP</u>

36 The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on 27 February 2024, having its registered office located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37 Mr Patrick is the New GP's sole director and sole shareholder.

38 The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these proceedings.

<u>CDM</u>

39 CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12 December 2024, having its registered address c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40 CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December 2024.

41 Since 18 December 2024, the primary asset of CDM has been the limited partnership interest in the Fund.

42 The sole manager of CDM is Mark Patrick.

43 From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

44 On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

CLO HoldCo

45 CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund's main subsidiary.

46 The directors of CLO Holdco are Messrs Patrick and Murphy.

47 The sole shareholder of CLO Holdco is the Fund.

The Directors

*Mark Patrick*

48 Mr Patrick (the First Defendant) is a U.S. resident who is:

48.1 a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

48.2 the Manager of CDM (the Third Defendant);

48.3 the sole director and the sole member of DFW (the Fourth Defendant);

48.4 the sole director and sole shareholder of the New GP (the Fifth Defendant); and

48.5 a director of CLO HoldCo (the Sixth Defendant).

49 Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**") from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024.

*Paul Murphy*

50 Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

50.1 a director of the Company;

50.2 a director of CLO HoldCo (the Fifth Defendant); and

50.3 a director of various other entities in the Charitable DAF structure.[2]

51 Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

**THE CHARITABLE PURPOSE OF THE FUND**

52 The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland to enable certain assets, held through the shares in CLO Holdco, to be donated to a charitable foundation.

53 Upon the formation of the Fund, the Company was admitted as a limited partner and, by way of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the Fund.

54 The purpose of the Fund was to make investments for the ultimate benefit of the Original Participating Shareholders and the Charities:

[2]Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub, Ltd., HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

54.1 The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*…".

54.2 Clause 1.3 of the LPA provides that "… *the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3 Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4 "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5 Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses*…".

54.6 The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55 The Charities are the following four US charitable or non-profit foundations:

55.1 *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2 *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3 *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4 *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56 The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the "**Supported Organisations**") hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57 CFNT holds its Participating Shares in the Company directly.

**THE TAX STRUCTURE**

58 As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

58.1 S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income ("**UBTI**"); and

58.2 the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59 As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60 In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

**THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS**

61 The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62 Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called “supported organisations”). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63 Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer’s adjusted gross income, or

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64 The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

64.1 S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations. The supported organisations must also be s501(c)(3) entities;

64.2 There are three types of supporting organisations, known as “Type I”, “Type II” and “Type III”. S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each “Type”, respectively;

64.3 S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

64.4 S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65 The Supporting Organisations are so controlled by the respective Supported Organisations.

66 The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67 The Certificates of Incorporation provide (amongst other things) that:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

67.1 the Supporting Organisation:

(a) is organised and shall be operated exclusively for charitable, educational and scientific purposes;

(b) is organised and operated exclusively to support and benefit the particular charity that controls it; and

(c) is a non-profit non-stock corporation and cannot issue any capital stock;

67.2 no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3 net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68 The Bylaws provide that (amongst other things):

68.1 There are two classes of members of the Supporting Organisations with one member in each such class:

(a) the institutional member (the "**Institutional Member**") which shall be the Supported Organisation; and

(b) the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2 In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

(a) the Institutional Member is entitled to two votes; and

(b) the Individual Member is entitled to one vote.

68.3 Institutional membership is not transferable or assignable.

68.4 Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5 Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6 There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69 The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively "**Operating Agreements**"). These agreements provide, among other things, that:

69.1 the Supported Organisation will provide certain services to the Supporting Organisation;

69.2 the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3 in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

70 Mr Dondero sits on the board of each of the Supporting Organisations with two other directors from each of the Supported Organisations respectively.

71 The relationships, rights and obligations created by and between the Supported Organisations and the Supporting Organisations pursuant to the agreements entered into between them were at all material times in summary that:

71.1 the Supported Organisations control the Supporting Organisations through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations;

71.2 the Supporting Organisations support the Supported Organisations by way of making grants to them from time to time from their assets, including any dividends received from the Company;

71.3 the Supporting Organisations have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to the relevant Charity in furtherance of their charitable purposes; and

71.4 while Mr Dondero sits on the board of the Supporting Organisations, he does not control them, as a supermajority of the votes are always held by the respective Charity.

72 The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73 The terms of the LPA grant sole control over the management and distribution of the Fund's assets to the General Partner. The terms of the Articles grant sole control over the management and distribution of the Company's assets to the Management Shareholder.

The LPA

73.1 Clause 1.12

(i) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2 Clause 1.6

*(i) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

*(ii) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

<u>The Articles</u>

73.3 Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4 Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5 Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6 Article 84 (d)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

*The office of Director shall be vacated if the Director…is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7 Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8 Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74 The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1 In or around November 2011:

(a) Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b) Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

thereby assuming the Control Position from that date.

74.2 In or around 24 March 2021, Mr Scott:

(a) assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

(b) transferred to Mr Patrick the 100 Management Shares in the Company; and

(c) resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3 On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4 Mr Patrick therefore assumed the Control Position from that date.

74.5 On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6 On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7 Mr Patrick is the sole shareholder and director of the New GP.

74.8 Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

75 Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant). Mr Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021 and 22 April 2021 respectively.

76 The Control Position was not and is not a term of art but was nevertheless a legal and factual position:

76.1 where a single individual was the sole Management, and therefore voting, Shareholder of the Company;

76.2 where the same individual was a director of the Company;

76.3 where the same individual was the sole shareholder or controller of the General Partner;

76.4 where the same individual was a director of the General Partner;

76.5 where the same individual was in complete and effective control of at least the Company, of the General Partner, of the Fund and of CLO Holdco;

76.6 where the same individual was in effective sole control of all assets of the Fund;

76.7 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Company;

76.8 where the same individual had no economic, residual, beneficial or winding up interest in assets of the General Partner;

76.9 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Fund;

76.10 where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11 where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12 in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

**EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS**

Plan to defeat the interests of the Original Participating Shareholders

77 On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78 It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79 The Work Plan stated that (amongst other things):

79.1 the advice required related to "…*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc*…"; and

79.2 "…*we may need to rely on opinions and memoranda in potential future disputes*…"

80 The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1 'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2 'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3 'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4 'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5 'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81 The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1 On 8 January 2024, Walkers (Cayman) LLP ("**Walkers**") (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things)*:*

(a) the Directors have power under the Articles to issue new Participating Shares that dilute the current Participating Shareholders, but must consider their fiduciary duties (including the duty to act in the best interests of the Company) when issuing such shares;

(b) the Participating Shares are non-redeemable;

(c) while payment of a dividend or other distribution is at the discretion of the Directors, if the Company were to have distributable reserves available, there may be a question of whether the Directors would be acting in its best interests to not pay some dividend or distribution; and

(d) the Directors have fiduciary duties to the Company which are paramount when considering (i) making a distribution and (ii) the distributable reserves available from which to make payments; they must have regard to what is in the Company's best interests, its future cash requirements, and its present and future solvency.

82 In February 2024, without telling the Supporting Organisations or the Charities, Mr Patrick sought to form a new entity to replace the Original GP. On 5 February 2024, Walkers emailed Mr Patrick to ask whether that entity should be a Cayman LLC or an exempted company, to which he responded later that day: "*Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection*."

83 On 27 February 2024, without telling the Supporting Organisations or the Charities, the New GP (the Fifth Defendant) was incorporated in the Cayman Islands.

84 On 7 March 2024, Mr Patrick, in his capacity as Managing Member of the Original GP, and without telling the Supporting Organisations or the Charities, executed a written consent for the

transfer of the GP Interest to the New GP, thereby replacing the Fund's General Partner. The Supporting Organisations subsequently discovered this change only by chance in February 2025.

85 In or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further relevant facts and matters relating to Directors' fees or expenses):

85.1 directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

85.2 expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

86 On 13 September 2024, without telling the Supporting Organisations or the Charities, the Directors resolved (amongst other things) with respect to Mr Patrick's compensation:

86.1 to increase Mr Patrick's salary to US$850,000 per annum;

86.2 include a long-term incentive ("**LTI**") tied to the Fund's returns, being 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return); and

86.3 the Company should assess legal expenses attributable to investment which impacted the LTI compensation and then determine whether the LTI compensation should be increased.

87 On 1 October 2024, without telling the Supporting Organisations or the Charities:

87.1 the Directors resolved (amongst other things) that Mr Patrick would receive:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(a) an LTI payment of US$975,000; and

(b) an ‘annual discretionary bonus’ for 2023 at an amount of 2.5 times his base salary.

87.2 Previously, in or around October 2021, Mr Patrick had signed an ‘employment agreement’ for his position at the Company, for the period commencing 24 March 2021, which provides that Mr Patrick:

(a) shall receive a base salary of US$850,000;

(b) shall receive an LTI payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and

(c) is eligible for both annual and discretionary bonuses as determined at the ‘sole and absolute discretion of the Directors’.

88 Comparatively, Mr Scott’s salary during his tenure in the Control Position was approximately US$60,000 per annum. Notwithstanding the above, the Supporting Organisations were not informed of these increases to the Directors’ fees, remuneration and/or benefits.

89 In late October 2024, as a result of concerns arising from this additional expenditure, the Supporting Organisations requested that Mr Patrick provide relevant financial information for the Company and the Fund. Mr Patrick did not do so.

90 On 11 November 2024, Holland and Knight ("**H&K**"), U.S. attorneys for the Supporting Organisations, issued a letter to Mr Murphy advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

91 On 26 November 2024, Mr Patrick sought advice from Walkers as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations so as to weaken any winding-up petition brought by the Supporting Organisations on just and equitable grounds. Mr Murphy wrote that:

> "*Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…*"

92 On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help.

93 On 9 December 2024, DFW was incorporated as a non-profit non-stock company in Delaware, by or with the assistance of Mr Douglas Mancino, partner of U.S. firm, Seyfarth Shaw LLP ("**Seyfarth**"), who, worked alongside Mr Patrick in the establishment of the Company and the Fund structure. The sole member of DFW was and is Mr Patrick.

94 On 7 February 2025, 318 Participating Shares were issued to DFW.

95 On 20 February 2025, Mr Patrick as the Management Shareholder of the Company resolved to adopt the Amended and Restated Memorandum and Articles of Association dated 20 February 2025 which, among other things:

95.1 Amended the Memorandum at paragraph 3 to give the Company charitable objects;

95.2 Amended article 70 to introduce the concept of a Management Director (being a director holding the Management Share) and to weight the voting such that on all matters the Management Director had 10 votes and any other directors had 1 vote;

95.3 Deleted the previous articles 70 and 71 giving the right to appoint alternate directors and proxies. By email dated 27 February 2025, Walkers confirmed that the purpose of this deletion was to "*avoid the risk of 'outsiders' being brought into the fold*".

96 The Company reserves its position in respect of the validity of these amendments.

The purported restructuring: Mr Patrick causes the assignment of the Partnership Interest to CDM

97 On 12 December 2024, CDM was incorporated as a limited liability company in Delaware.

98 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Directors of the Company resolved (the "**Transfer Resolutions**") to approve the transfer of the entirety of the Company's limited partnership interest in the Fund to CDM, in consideration for the contribution by the sole member of CDM of 100% of the membership interest in CDM. The Transfer Resolutions provide (amongst other things) that, based apparently on U.S. tax advice, the transfer of the limited partnership interest to CDM:

98.1 *"…would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*";

98.2 "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement*";

98.3 As a Delaware limited liability company (CDM): "…*as permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee*".

99 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Company, CDM and the New GP entered into a Deed of Assignment and Assumption (the "**Deed**") which was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as Director; (ii) CDM in his capacity as Manager; and (iii) the New GP in his capacity as Director. Pursuant to the terms of the Deed:

99.1 The Company assigned its entire limited partnership interest in the Fund to CDM (the "**CDM Assignment**").

99.2 The New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with clause 1.11(a) of the LPA.

99.3 CDM agreed to exercise its reasonable best endeavours to ensure that 100% of the membership interest in CDM held by Mr Patrick would be transferred to the Company (the "**CDM Membership Interest**").

100 On 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "**LLC Agreement**").

101 The LLC Agreement, materially provides (amongst other things) that:

*"Fair Market Value shall have the meaning set forth in Section 6.9(b).*

*…*

*The initial Manager shall be Mark Patrick.*

*…*

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

*…*

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

*…*

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the*

*Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined* by *the Manager in its sole discretion."*

102 The Company will rely on the terms of the LLC Agreement for their applicable full terms and effect.

103 The effect of these transactions was that:

103.1 CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the limited partnership interest in the Fund previously held by the Company; and

103.2 The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been its limited partnership interest in the Fund, was exchanged for the CDM Membership Interest

(the "**Restructuring**")

104 The Restructuring was at an undervalue and not in the interests of the Company (in that the CDM Membership Interest was less valuable than the limited partnership interest that the Company assigned to CDM) because (amongst other things)*:*

104.1 The General Partner owed fiduciary duties to the Company in the Fund, but the Manager (Mr Patrick) did not owe any fiduciary duties to CDM; and

104.2 The CDM Membership Interests were susceptible to being redeemed by Mr Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e. a "good faith determination of the value".

105 On 3 April 2025, the Company obtained retrospective advice from Leading Counsel on the steps taken by the Company in December 2024 to effect the Restructuring and whether the transfer is "*open to challenge by the Participating Shareholders*", which advice:

105.1 refers to the justifications for the decisions taken as set out in the Restructuring Resolutions, and considers that, if called upon to justify the purpose of those decisions, the Directors would need to explain:

(a) how the penalisation or loss of tax-exempt status any of the current Participating Shareholders could have "*imperil[ed]*" the *"assets"* of the Company;

(b) the detrimental issues the Company was facing that the Directors believed would be mitigated by the interposition of CDM into the Fund structure; and

(c) how and/or why the Restructuring would (i) benefit the Company and (ii) reduce the influence of Mr Dondero; and

105.2 considers that a shareholder reviewing the reasons listed in the Restructuring Resolutions "*might suggest that the contents of the resolution are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board*".

<u>Persistent and continual lack of information for the Supporting Organisations</u>

106 On 23 January 2025, having received no response from Mr Murphy to the No-Confidence Letter, Julie Diaz, the CEO of The Dallas Foundation, sent Mr Patrick an email advising that the Supporting Organisations needed to better understand the Company's/Fund's asset position, and requesting certain information be provided by 10 February 2025.

107 Having received no response, on 28 January 2025, Ms Diaz sent a further email to the Directors expressing serious concern (i) that the Supporting Organisations' requests for information

continued to be disregarded, and (ii) about the ongoing lack of transparency on the part of the Directors.

108 On 30 January 2025, Mr Murphy replied to Ms Diaz stating that the Directors:

108.1 had not received the 23 January email – but understood the next step was for the Directors to "*present directly*" to the Supporting Organisations to address the No-Confidence Letter; and

108.2 are cooperating with the Supporting Organisations to provide additional information – but "*have no legal obligation to do so*" and such cooperation "*should not be construed as an implicit acknowledgement of any duty to continue providing information to you*".

109 On 31 January 2025, Mr Michael Stockham of H&K responded to Mr Murphy noting that he and Mr Patrick were fiduciaries, managing US$270 million in assets for the benefit of charities that support the most vulnerable (i.e. the Charities) and: *"[w]hatever your side's obvious antagonism to Mr Dondero, the fact remains that the underlying assets are ultimately for these charitable missions.*"

110 On 4 February 2025, Mr Murphy responded that while open to resolving the concerns, they (i.e. the Directors) were struggling to understand the Supporting Organisations' change in position.

111 On 7 February 2025, H&K responded that the Directors were fiduciaries in control of US$270 million for the benefit of charities: "*these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees*".

112 On 14 February 2025, H&K received a letter from Mr Mancino which rejected the accuracy of the reported increases in expenditure. On 27 February 2025, H&K responded that his clients

were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr Murphy to make the promised presentation to the Supporting Organisations. H&K responded the next day with three potential dates/times for the proposed call between 26 March and 3 April 2025. Mr Mancino did not respond.

113 On 20 March 2025, Mr Mancino sent a letter purportedly on behalf of the Company to the IRS about alleged undue influence and control exercised over the Supporting Organisations by Mr Dondero. The letter makes serious and unsubstantiated allegations about the Supporting Organisations, absent evidential support, including that they each (i.e. all of them): "*operates for Mr Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets…*".

114 On 3 April 2025, Mr Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the apparent source of confusion.

115 Mr Mancino, and Mr Patrick and Mr Murphy (each in part through Mr Mancino as an instructed attorney) acted in bad faith by maintaining a pretence of actual or potential cooperation with the Supporting Organisations when this was not the case, and by sending or causing to be sent the email of 20 March 2025 in secret:

115.1 four (4) months after the Directors and/or the Company transferred away the Company's interest in the Fund without telling the Supporting Organisations or the Charities;

115.2 two (2) months after the Directors and/or the Company diluted the existing Participating Shareholders without telling the Supporting Organisations or the Charities (see below);

115.3 one (1) week after the Directors and/or the Company redeemed the Company's interest in CDM without telling the Supporting Organisations or the Charities (see below);

115.4 one (1) day after the Directors placed the Company in voluntary liquidation, without telling the Supporting Organisations or the Charities.

Purported Share Issuance and allotment to DFW

116 In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders - "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations.

117 On 7 February 2025, Walkers advised that, while there must be a corporate benefit to the exercise of the power, the Articles grant the Directors power to issue new shares that dilute the Participating Shareholders, and recommended the shares be issued sooner than later, and before any winding up petition was presented, since any alteration to the Company's membership made after the presentation of the petition would be void.

118 On 7 February 2025, without telling the Supporting Organisations or the Charities, the Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issue Resolutions**"), resulting in DFW owning 51.04% of the Participating Shareholding and the dilution of the Supporting Organisations from an aggregate shareholding of 100% to 48.96% (the "**Share Issuance**"). The Share Issue Resolutions provided that:

118.1 Participating Shareholders had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

118.2 Based apparently on U.S. tax advice:

(a) There was a heightened risk the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company.

(b) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero.

(c) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

118.3 The Directors believed the Share Issuance to DFW would protect the Company and the Participating Shareholders and resolved that the Share Issuance to DFW be approved.

119 On 5 March 2025, Leading Counsel (Mr Tony Beswetherick KC) issued draft retrospective (but final) advice to the Company on the Share Issuance in which he opined (amongst other things) as follows:

119.1 where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares "…*deliberately aimed at altering the balance of power between*" is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

119.2 the effect of the Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights,

the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

119.3 it is not immediately clear from the Share Issue Resolutions whether the justifications stated were actually relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

119.4 the Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

Plan to redeem the Original Participating Shareholders

120 In January and February 2025, the Directors, in connection with a plan to try to redeem the Participating Shareholders and/or the CDM Membership Interest held by the Company, and without telling the Supporting Organisations or the Charities, sought to obtain an analysis of the fair market value of the Participation Shares, and the discount that should be applied to such valuation, given the limited rights conferred upon Participating Share under the Articles.

*Historic ValueScope Valuations*

121 At the request of the Company, ValueScope, Inc. ("**ValueScope**") conducted a series of valuation analyses of 100 Participation Shares on a net asset value ("**NAV**") basis between December 2020 and September 2024 to determine their fair market value ("**FMV**"). These valuations were apparently prepared for internal reporting purposes and apparently applied consistent methodologies throughout the period. The results of these valuations are summarised below:

| Valuation date | NAV | NAV Per Share | Combined Discounts | FMV Per Share | FMV (100 shares) |
|---|---|---|---|---|---|
| 31 December 2020 | $176.96M | $580,193 | 17.0% | $481,468 | $48,146,754 |
| 31 December 2021 | $243.19M | $797,343 | 11.6% | $705,210 | $70,521,019 |
| 31 December 2022 | $276.24M | $905,711 | 15.4% | $766,549 | $76,654,941 |
| 31 December 2023 | $277.57M | $910,076 | 14.0% | $782,847 | $78,284,712 |
| 30 September 2024 | $269.05M | $882,140 | 13.9% | $759,614 | $75,961,370 |

122 The final NAV-based valuation prepared by ValueScope prior to the Restructuring was dated 7 January 2025, and gave a valuation of 100 Participating Shares as at 30 September 2024 (the "**September 2024 Valuation**").

*PwC and FTI*

123 On 14 January 2025, Walkers inquired with PwC about a valuation of "*the shares of Charitable DAF Holdco*". In that email, Walkers, presumably on instructions from the Directors, listed the Supporting Organisations as “*potential adverse parties*”.

124 On 7 February 2025, Walkers informed PwC that CDM had been inserted into the structure and requested that a second valuation be prepared of all the CDM Membership Interest, which valuation Walkers said was also to rely on the NAV as previously advised (rather than leaving

PwC to determine their own valuation methodology). PwC responded that their initial view is "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders*" - but that voting power/control remains with Mr Patrick (or with entities he controls). PwC asked for further information about what Mr Patrick was trying to achieve by the Restructuring to help them understand the valuation implications.

125 On 10 February 2025, PwC suggested a call with Walkers to discuss the second valuation, which call took place on 11 February 2025, and was also attended by Mr Patrick's '*onshore and Delaware counsel*'. Following that call, PwC declined to take on the instructions:

> *"... our view is that the new Delaware entity (CDMCFAD) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity. As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd., we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently."*

*The FTI Memo*

126 On 13 February 2025, without telling the Supporting Organisations or the Charities, the Company engaged FTI Consulting in London ("**FTI**") to advise on (i) the discount applicable (if any) to a valuation considering how the rights attached to Participation Shares differed from those typically associated with ordinary shares, and (ii) the impact of the existence of an additional share class (being the Management Shares held by Mr Patrick). FTI's engagement

letter also stated that "*The Memo will also include a valuation of the ordinary shares of CDMCFAD, LLC, the immediate subsidiary of Charitable DAF HoldCo*".

127 On 2 March 2025, FTI provided a draft memorandum to Walkers/the Company.

128 On 27 March 2025, FTI issued its final memorandum (the "**FTI Memo**"), which stated (amongst other things) that the rights of Participating Shares were extremely limited, and the potential distribution of cash was highly dependent on a member's alignment with the Fund's mission. The FTI Memo concluded that a "limited discount" for lack of control and marketability should be applied where a member is aligned with the Fund's mission (said to be close to the range concluded by ValueScope in its 7 January ValueScope Report, i.e. a discount of 13.9%), and a "high discount" of 95% where a member is not.

*Legal advice sought*

129 On 25 February 2025, without telling the Supporting Organisations or the Charities, the Directors sought advice from Walkers and Shields Legal on any powers under the Articles to enable the removal of the Supporting Organisations, including by (i) redemption of the Participating Shares (Art 14 and 28), (ii) a forced transfer of Participating Shares held by a Restricted Person (Art 21) (iii) or an alternative course whereby DFW repurchased the shares, which could then be cancelled, and new shares issued which are redeemable by the Company. Walkers advised that both redemption and forced transfers were not permitted but agreed with the alternative course involving DFW.

130 On 5 March 2025, as stated above, Leading Counsel provided retrospective advice to the Company regarding the Share Issuance, which also considered whether the Directors had power under the Articles to redeem the Participating Shares. Leading Counsel opined that they did not, on the basis that the Participating Shares were not issued as redeemable shares, and could not be redeemed unless there were a prior variation of the rights ascribed to them. That said, any proposal to vary the rights attached to the shares to make them redeemable would

support an argument "*that the [DFW Share Issue] was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders*".

131 On 17 March 2025, Mr Patrick wrote to Walkers in the following terms:

> *"Agree we need to finalise the [FTI valuation] reports …We should request any limits on use removed.*
>
> *We are seeking U.S. tax counsel to send emails to Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of its interests. After that, an alternative approach is to give them what they want – liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero. US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled. That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions …*
>
> *We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is.*
>
> *Note US LLC would make DFW its sole owner."*

132 The email of 19 March 2025 makes plain that the Directors, or at least Mr Patrick, intended to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct

the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds.

133 On 20 March 2025, Walkers provided comments on the FTI draft valuation, and FTI responded. These comments include, amongst other things*:*

> "Walkers: *It is stated at [3.2(2)] that "there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission". However, as a matter of Cayman law, directors owe duties to the company, and must act in its best interests [which are] generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in its best interests.*
>
> FTI: *Can you explain how it was in the interests of the company to materially dilute the existing shareholders*?
>
> …
>
> Walkers: *It is stated at [3.10] that "the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles).*
>
> FTI: *Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states* "*Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed*".
>
> …

Walkers: *As per our comments, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege.*

FTI: *Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction?*

…

Walkers: *Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDM, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDM, and in turn HoldCo.*

FTI: *This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets."*

134 On 21 to 24 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"FTI: *If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing? Given they haven't received dividends since 2019, why haven't the participating shareholders triggered a wind down? If they can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Walkers: *if HoldCo was wound up, the Participating Shareholders would receive distributions which would be made pari passu, and Mark (if he was the liquidator) would not be able to ensure the existing Participating Shareholders get nothing. Whilst the Participating Shareholders have the right to seek to wind up under the Companies Act, they need a proper basis to do so… We can only assume [they] have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so …*

…

FTI: *Would an absence of distributions be sufficient grounds to make an application to wind the company up? If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?*

Walkers: *A Participating Shareholder may consider an absence of distributions sufficient grounds for a winding up order on the just and equitable basis… But it is difficult for us to say whether that petition would be successful. If (a) a Participating Shareholder presented a petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and not impact the amounts the Participating Shareholders would receive.*"

135 On 26 and 27 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"Walkers: *We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

*the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely. Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*

FTI: *What is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction.*"

*March 2025 ValueScope Valuation*

136 Following the Restructuring, ValueScope was requested by Shields Legal, without telling the Supporting Organisations or the Charities, to prepare two valuation analyses:

136.1 100% Membership Interest in CDM; and

136.2 Certain Participating Shares of the Company as at 25 March 2025 (the "**March 2025 Valuation**").

137 The March 2025 Valuation had the same instructions, definition of value and scope of work as the September 2024 Valuation. Like the September 2024 Valuation, the March 2025 Valuation also referenced a 30 September 2024 balance sheet (and did not refer to any later analysis of

assets and liabilities). As shown below, the September 2024 Valuation and March 2025 Valuation produced very different results.

138 A comparative summary of the September 2024 and March 2025 Valuations is set out below:

| **Valuation Date** | **DLOC*** | **DLOM**** | **Valuation Basis** | **FMV (100 Shares)** |
|---|---|---|---|---|
| 30 September 2024 | 8.1% | 6.3% | NAV | $75,961,370 |
| 25 March 2025 | 99.2% | 20.00% | DCF*** | $536,784 |
| **Difference** | **+91.1%** | **+13.7%** | | **-$75,424,586** |

*DLOC – Discounted for Lack of Control

**DLOM – Discounted for Lack of Marketability

***DCF – Discounted Cash Flow

139 The March 2025 Valuation stated: "*for the valuation of non-controlling assets in holding companies such as DAF, the asset-based approach is most commonly used [as Valuescope had always done previously]. When applied to such companies, the approach consists of measuring the underlying net asset value of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity. However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.*"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

140 ValueScope does not appear to have considered whether winding up was a possibility, and therefore, whether value could have been realised that way and by reference to NAV.

141 For reasons which are unclear to the Company, the March 2025 Valuation expressly rejected the asset-based (NAV) approach on the basis that the economic benefits of the Participating Shares in the Company were contingent on discretionary distributions by its manager. The report states.

> '*Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality*'.

142 Accordingly, the methodology applied in the March 2025 Valuation was markedly different from the methodology applied in the September 2024 Valuation. Instead of relying on discounted net assets, the March 2025 Valuation:

142.1 applied a discounted cash flow ("**DCF**") methodology to estimate the present value of expected future distributions, rather than an asset-based approach, as had been applied in at least the past five annual valuations by ValueScope;

142.2 determined the FMV of 100 Participating Shares to be US$536,784;

142.3 applied a discount of 99.2% for DLOC; and

142.4 applied a discount of 20.00% for DLOM.

143 The DCF model is based on the present value of future distributions to the Company. ValueScope's report shows that these were estimated based on historic distributions themselves controlled by Mr Patrick.

144 Based on the valuations above, between 30 September 2024 and 25 March 2025, the FMV of 100 Participating Shares in the Company apparently declined from US$75,961,370 to US$536,784, representing a reduction in value of 99.29% in less than a six month period, in which the Restructuring occurred, attributable to a change in valuation basis (amongst other things) from NAV to DCF.

145 Furthermore, ValueScope does not appear to have sense-tested their valuation. Although they identified “total equity” of c. US$270 million and concluded that all of the Participation Shares had a value of only c. US$1.6 million, they did not address themselves to who benefitted from the residual value of c. US$268 million.

Admission and Redemption

146 On 27 March 2025, Mr Patrick, as manager of CDM, executed a written consent (the "**Manager Consent**") to (a) cause CDM to admit DFW as an additional member of CDM pursuant to the terms of an Admission and Amendment No.1 Agreement (the "**Admission Agreement**") and (b) redeem the CDM Membership Interest held by the Company pursuant to the terms of a Redemption and Amendment No. 2 Agreement (the "**Redemption Agreement**" and together with the Admission Agreement, the "**Restructure Agreements**"):

146.1 The recitals to the Manager Consent stated that the redemption of the Company's membership interest was justified by reason of alleged attempts by the Supporting Organisations to exert control, and the potential loss of their (i.e. the Supporting Organisations’) non-profit and tax-exempt status:

> *“… the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control*

*over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)*"

146.2 The Manager Consent further stated:

"*WHEREAS, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests of the Company from ValueScope and FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests*"

146.3 Exhibits C and D to the Manager Consent are documents purportedly containing information regarding various alleged U.S. tax issues relating to the Company.

146.4 Exhibit C is the letter from Mr Mancino to the IRS dated 20 March 2025, in which Mr Mancino (amongst other things) stated:

(a) there has been "deterioration" of the Company's relationship with Highland Dallas Foundation, Inc. ("**HDF**") due to the undue influence and control exercised over HDF by Mr Dondero.

(b) the information in the letter will demonstrate clearly that Mr Dondero's influence and control is an inappropriate donor relationship with representatives of the HDF who serve on the Board of Directors of and as officers of HDF.

(c) such undue influence and control potentially jeopardises the tax-exempt status of HDF as an organisation described in s.501(c)(3) and, at a minimum, causes it to fail to remain a supporting organisation described in s. 509(a)(3).

146.5 Exhibit D is an advice produced by Carrington Coleman (U.S. law firm) dated 25 March 2025 (the "**Carrington Advice**") which amongst other things:

(a) asserts that Mr Dondero has been attempting "*through his control of the Highland SOs, to exert dominion and control over the cash and property he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit.*"

(b) suggests that Mr Dondero was using the Company as his personal "*piggy bank*", and that it may be perceived by the IRS that the Fund has been or is his financial alter ego.

(c) concludes that "*the IRS will look favourably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and inurement.*"

146.6 Exhibit E contained two valuation reports:

(a) The first was a ValueScope valuation.

(b) The second is the FTI Memo referred to above, in which FTI expressly stated that the analysis in the FTI Memo should not be used in support of a transaction, but which Mr Patrick, in any event:

(i) expressly relied upon in the Manager Consent to determine the fair market value of the CDM Membership Interest and the basis for the redemption of the Company's interests; and

(ii) permitted Carrington Coleman to refer to and rely on in the FTI Memo (indeed, having provided the 27 March 2025 copy which was a draft copy only).

146.7 On 27 March 2025, without telling the Supporting Organisations or the Charities, Mr Patrick executed the:

(a) Admission Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(b) Redemption Agreement under which CDM redeemed the Company's membership interest in CDM for the same sum of US$1,637,192 (the "**Redemption Sum**").

147 On 27 March 2025, without telling the Supporting Organisations or the Charities, the Company entered into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which the Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement and CDM agreed to assume the liabilities and obligations in respect of those contracts.

148 On 2 April 2025, the Directors of the Company, by way of written resolution:

148.1 Noted the redemption of the Company's membership interest in CDM for the Redemption Sum (the "**Redemption**").

148.2 Resolved to pay a dividend to the Original Participating Shareholders of US$1,612,192.01 in the amount of (i) US$528,587.54 with respect to each of HDF, Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.; and (ii) US$26,429.39 with respect to CFNT.

149 The substantive financial effect of the Redemption, under which DFW did or was committed to make a capital contribution equivalent to the Redemption Sum to CDM, and the CDM Membership Interest held by the Company were redeemed for the Redemption Sum, was that the Company's membership interest in CDM was purchased by or otherwise transferred to DFW for the Redemption Sum.

150 The substantive effect of the overall transaction or series of transactions pleaded above, including the Impugned Transactions already pleaded, was that:

150.1 The Company realised its interest in the Fund, which had a NAV of c. US$270 million, for c. US$1.6 million.

150.2 The Company made a distribution to the Original Participating Shareholders (c. US$1.6 million).

150.3 The Supporting Organisations and the Charities were actually or effectively divested of their indirect interest in the Fund, and the assets underlying the Fund; and

150.4 The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Voluntary Liquidation and Supervision Order

151 On 2 April 2025, the Directors resolved, without telling the Supporting Organisations or the Charities, to place the Company into voluntary liquidation and appoint Mitchell Mansfield and William Clarke (the JVLs) of Kroll (Cayman) Ltd as voluntary liquidators.

152 However, unaware of the voluntary liquidation, on 10 April 2025, the Supporting Organisations presented a petition seeking the winding up of the Company on a just and equitable basis, under section 92(e) of the Companies Act (2025 Revision) (the "**J&E Petition**").

153 On 25 April 2025, Walkers and Shields Legal held a call to discuss the J&E Petition. Following that call, Mr Patrick wrote in an email that the "*message ideas*" "*for Monday*" were to "*poison the well*", by which he meant to create a negative impression of Mr Dondero in the eyes of the Court.

154 On 6 May 2025, Justice Jalil Asif KC made a supervision order, under which voluntary liquidation of the Company was to be continued under the supervision of the Court pursuant to s.131 of the Companies Act (As Revised), and the JOLs were appointed.

**OBLIGATIONS OWED BY THE DIRECTORS**

155 At all material times, the Directors, as directors, owed the following duties individually to the Company:

155.1 A fiduciary duty to act *bona fide* in what he considers to be the best interests of the Company (the "**Best Interests Duty**").

155.2 A fiduciary duty to exercise his powers for a proper purpose, and for the purposes for which they were conferred (the "**Proper Purpose Rule**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

155.3 A fiduciary duty not to place himself in a position where his personal interest actually or potentially conflicted with his duty of loyalty to the Company (the "**First No-Conflicts Duty**").

155.4 A fiduciary duty not to place himself in a position where his duty to another actually or potentially conflicted with his duty of loyalty to the Company (the "**Second No-Conflicts Duty**").

155.5 A fiduciary duty to not make an unauthorised profit from or by reason of his fiduciary position (the "**No Profit Duty**").

155.6 A fiduciary duty not to accrue or take a benefit or commercial opportunity from the Company without the full and informed consent of the Company (the "**No Self-Dealing Rule**").

155.7 A duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director (the "**Reasonable Care Duty**").

156 With respect at least to Mr Patrick, his duties above and the standard to which he was obliged to comply with such duties are affected by being in the Control Position and the trustee or trustee-like position he occupied. Paragraph 76 above is also relied upon.

157 The Company reserves its position as to whether Mr Patrick, by reason of being in the Control Position and the trustee or trustee-like position he occupied, was an express or other trustee of the assets of the Fund for the Original Participating Shareholders and, through or in addition to them, the Charities.

**ATTRIBUTION OF KNOWLEDGE AND INTENTION**

158 As a matter of Cayman Islands law, Mr Patrick's intention and knowledge of facts and matters for all such purposes relevant to this claim is to be attributed to each of DFW, CDM, and the New GP on the basis of at least the following facts:

158.1 As regards DFW, Mr Patrick is listed under DFW's certificate of incorporation, dated 9 December 2024, as "the member of the corporation", and the Admission Agreement showed he served as its "President". Mr Patrick is also the registered director of DFW. Mr Patrick the agent of DFW, in which capacity Mr Patrick executed the Admission Agreement.

158.2 As regards CDM, Mr Patrick is described under the LLC Agreement as the "Manager" of CDM, in which role Mr Patrick was CDM's agent, and in which capacity he (i) executed the Deed of Assignment and Assumption on behalf of CDM, and (ii) executed a written 'Manager Consent' (the "**Manager Consent**") approving the Redemption and Admission Agreements; and executed the Redemption and Admission Agreements.

158.3 As regards the New GP, Mr Patrick was and remains its director, and therefore its agent (in which capacity, Mr Patrick executed the Deed of Assignment and Assumption on the New GP's behalf). Further, Mr Patrick is the sole shareholder of the New GP.

159 Further, if applicable, as a matter of the laws of the State of Delaware, Mr Patrick's knowledge and intention is to be attributed to DFW, CDM, and the New GP on a like basis.

**CLAIMS AGAINST THE DEFENDANTS**

Breaches of fiduciary and other duty

160 The First and Second Defendants, and each of them, in their capacity as a Director of the Company, acted in breach of their fiduciary and other duties to the Company as follows.

Restructuring, including the CDM Assignment

161 The Directors (and each of them), in procuring, directing or effecting the Restructuring as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Restructuring as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

161.1 The Plaintiff relies on paragraphs 77 to 105 above.

161.2 With the assistance of Mr Mancino, Mr Patrick took steps to form CDM and appoint himself as Manager of CDM.

161.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Restructuring in his capacity as Director of the Company, Director of the New GP, and Manager of CDM, being each of the parties to the Deed, and signed the Deed on behalf of each party.

161.4 The Directors (and each of them) approved the transfer of the Company's entire limited partnership interest in the Fund (having net assets worth c. US$270 million) to CDM, a Delaware entity whose LLC Agreement excluded any fiduciary obligations owed by its Manager (i.e. Mr Patrick) to CDM itself or to its members; in exchange for membership interest in CDM, which interest was capable of being extinguished, by redemption, and for a "fair value", determined at the discretion of the Manager (i.e. Mr Patrick).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

161.5 The Restructuring was of no benefit to the Company and not in its best interests, and Mr Patrick was subject to conflicts of interest (First and Second No-Conflicts Duties) and committed acts of self-dealing.

161.6 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the Company was proposing to exchange the Partnership Interest for a membership interest in CDM that was subject to redemption entirely at Mr Patrick's discretion, and for a "*fair value*" determined, in good faith, in his discretion.

(b) knew or ought to have known that the Company was therefore proposing to trade its Partnership Interest, which was not in practical terms defeasible, for an interest that could be extinguished: (i) at a time over which it had no control, (ii) for a price over which it had very limited control and (iii) for a potential valuation basis which excluded a net asset valuation of the assets held in the Fund.

(c) knew or ought to have known that the CDM Membership Interest was to be in a Delaware-incorporated company whose LLC Agreement excluded any fiduciary obligations owed by its Manager either to CDM itself or to its members and was therefore less valuable than the Partnership Interest.

(d) knew or ought to have known that the CDM Assignment was therefore a transaction at an undervalue.

161.7 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from CDM without the full authorisation or full and informed consent of the Company.

161.8 Further, and in any event, the Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the CDM Assignment was the first step in a series of connected future transactions, including those pursuant to the CDM Assignment, the Share Issuance, the Admission Agreement, the Redemption Agreement and the Redemption, under which the Directors were able to and ultimately did procure the redemption of the Company's CDM Membership Interest, thus extinguishing the Company's interest in the Fund, for an undervalue.

(b) knew or ought to have known that:

(i) the full terms and effect of the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(ii) the full terms and effect the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk to the Company, which was not itself a Donor Advised Fund and/or did not enjoy or require tax-exempt status under s.501(c)(3) of the U.S. Internal Revenue Code.

(iii) other approaches to address concerns with respect to the tax-exempt status of the HDF short of undertaking the Restructuring (and entering into the CDM Assignment) included notifying the HDF of the conflict and/or concerns and requesting it to remedy it or them.

(iv) even if the facts and matters alleged in relation to the HDF were correct, there was more than a possibility, after an extended passage of time and at least two levels of appeal, that a U.S. tax audit would result in an adverse determination with respect to the tax-exempt status of the HDF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(v) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(c) knew or ought to have known that they were keeping the Restructuring, the CDM Assignment, CDM itself and all the surrounding circumstances secret from the Participating Shareholders.

162 By reason of the foregoing breaches of duty or any of them:

162.1 The CDM Assignment is void, alternatively voidable and hereby avoided.

162.2 CDM holds the Partnership Interest on trust or constructive trust for the Company.

162.3 CDM is required to re-transfer the Partnership Interest to the Company and account for any profits on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

Share Issuance

163 The Directors (and each of them), in procuring, directing or effecting the Share Issuance as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Share Issuance as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

163.1 The Plaintiff relies on paragraphs 77 to 84, 91 to 96 and 106 to 119 above.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

163.2 The Directors (and each of them) designed and/or engineered the Share Issuance, having sought legal advice in relation to the powers conferred on them as Directors of the Company, for the improper purpose of:

(a) diluting without any proper reason or corporate purpose the existing Participating Shareholders and/or depriving the ability of the Supporting Organisations to continue to comprise a majority of the Participating Shareholders.

(b) inserting DFW as a new Participating Shareholder, an entity under the sole control of Mr Patrick, to obstruct and/or prejudice and/or adversely affect the exercise of a Participating Shareholders' right to petition for the just and equitable winding-up of the Company.

163.3 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known the issue and allotment of shares at par to DFW was of no benefit to the Company.

(b) knew or ought to have known that the exercise of the power to issue shares and allot them to DFW was for the improper purpose of diluting the interest of the Original Participating Shareholders.

(c) knew or ought to have known that the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was a response to the prospect that the Supporting Organisations might present a petition for the winding-up of the Company on a just and equitable basis, as indeed they did on 10 April 2025 in ignorance of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(d) knew or ought to have known that the sole or primary purpose of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was to insert a new majority Participating Shareholder (under their or at least Mr Patrick's control) into the Company's share capital structure to (if they or at least Mr Patrick deemed fit) to oppose the actions of the Supporting Organisations and/or the Original Participating Shareholders, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

163.4 Mr Patrick designed and/or directed and/or effected the Share Issuance in his capacity as Director of the Company, even though he was 'President' of DFW and the sole member and the sole director of DFW.

163.5 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from DFW (if not also from CDM) without the full authorisation or full and informed consent of the Company.

164 By reason of the foregoing breaches of duty or any of them:

164.1 the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW is void, alternatively voidable and hereby avoided.

164.2 DFW holds its shares on trust or constructive trust for the Company.

164.3 DFW is required to concur in the rescission of the allotment and to re-transfer its shares to the Company on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

164.4 The Company's register of shareholders shall be rectified accordingly.

Admission and Redemption

165 The Directors (and each of them), in procuring or entering into the Admission Agreement and the Redemption Agreement, and/or in procuring, directing or effecting the Redemption acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring or entering into the Admission Agreement and the Redemption Agreement, or in procuring, directing or effecting the Redemption as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

165.1 The Plaintiff relies on paragraphs 120 to 150 above.

165.2 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that:

(i) proceeding on the basis of the Seyfarth/Mancino letter to the IRS dated 20 March 2025 was flawed or unreasonable.

(ii) proceeding was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(iii) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(iv) proceeding on the basis of the March 2025 Valuation and the FTI Report was flawed in that: (i) the 99.2% discount in value proposed by the

ValueScope Report was a manifestly excessive discount, and resulted in the Company parting with its indirect ownership of 99% of the economic interest in the Fund (which had net assets worth c. US$270 million) for a mere US$1,637,192; and (ii) as pleaded above, the FTI Report expressly stated that *"this memo should not be used to support a transaction."*

(v) the Admission Agreement and the Redemption Agreement were steps in a series of connected transactions, including those pursuant to the CDM Assignment, the Share Issuance, under which the Directors were able to and ultimately did procure the extinguishment of the Company's interest in the Fund, through the redemption of the Company's membership interest in CDM, for an undervalue.

(b) knew or ought to have known that the sole or primary purpose of the Admission Agreement, the Redemption Agreement and the Redemption was to ensure that the Company was fully and finally deprived of an asset (its interest in the Fund) at an undervalue; and to enable a third party, DFW, controlled by Mr Patrick, to procure ownership of an interest in the Fund in complete replacement of the Company.

165.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Admission Agreement, the Redemption Agreement and the Redemption as Director of the Company, even though he was Manager of CDM and 'President' of DFW, sole member of CDM and sole member and sole director of DFW.

166 By reason of the foregoing breaches of duty or any of them:

166.1 DFW holds the CDM Membership Interest on trust or constructive trust for the Company.

166.2 DFW is required to concur in the transfer of the CDM Membership Interest to the Company or as the Company directs on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

<u>Further claims against Mr Murphy</u>

167 In respect of any breach of duty as set out above for which Mr Patrick alone is liable:

167.1 At all material times, Mr Murphy worked in close concert with Mr Patrick, including at his direction.

167.2 Mr Murphy knew or ought to have known all the facts and matters pleaded above as known or ought to have been known by Mr Patrick.

167.3 Mr Murphy knew or ought to have known of all the facts and matters pertaining to such breach or breaches by Mr Patrick.

167.4 Mr Murphy took no steps to stop Mr Patrick or to prevent or report the breach or breaches of duty by Mr Patrick.

167.5 Mr Murphy accepted and acquiesced in all steps and actions suggested, promoted or effected by Mr Patrick.

167.6 Mr Murphy accepted and acquiesced in the breach or breaches of duty by Mr Patrick.

167.7 As a consequence, Mr Murphy has acted in breach of his duties to the Company, including the Best Interests Duty and the Reasonable Care Duty.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Directors' Fees, Remuneration and Expenses

168 The Company is still unclear as to what precise fees or remuneration or emoluments or benefits were afforded to the Directors and from what source, and as to the proper expenses of the Company, in the period after March 2021 and thus reserves its position.

169 As is pleaded above in paragraphs 85 to 89, the Directors approved large increases for Mr Patrick's remuneration, benefits or emoluments: by around 1 October 2024, Mr Patrick's remuneration comprised a base salary of US$850,000, a bonus of 2.5 times that base salary, an LTI incentive payment of US$975,000; for the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000; and eligibility for discretionary and annual bonuses in addition, to be determined at the sole and absolute discretion of the Directors. By contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000.

170 Insofar as the Directors (or each of them) approved of or procured any payment or benefit to or for Mr Patrick or Mr Murphy more than the sum of US$60,000 per annum each in respect of fees or remuneration or emoluments or benefits, such sum was excessive and conferred in breach of duty to the Company, including the Best Interests Duty, the Proper Purpose Rule, the first No-Conflicts Duty, the No Self-Dealing Rule and the Reasonable Care Duty.

171 Further, as is pleaded above, the Directors (or each of them) approved or caused the payment of considerable sums by way of expenses, amounting for example to US$18.3 million for the first half of 2024, and US$18.6 million spent over 2023. Such expenses may include the expenses incurred in effecting the transactions which are the subject matter of these proceedings. The reasonableness or *bona fides* of these expenses is not accepted by the Company.

172 The Company claims:

172.1 Full information, documents and discovery as to the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

172.2 Full information, documents and discovery as to expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

172.3 Repayment to the Company of all fees or remuneration or emoluments or benefits paid or claimed by Mr Patrick or Mr Murphy and each of them in excess of US$60,000 per annum; together with all improperly paid expenses caused or procured by Mr Patrick or Mr Murphy (or damages or equitable compensation in relation thereto).

Unlawful Means Conspiracy

173 The facts and matters pleaded above amount to an unlawful means conspiracy as follows:

173.1 It is unclear when the conspiracy began but it appears to have started by around the start of 2024.

173.2 The original conspirators were Mr Patrick and Mr Murphy. The Company is unaware of the circumstances in which Mr Patrick and Mr Murphy agreed or combined and is unable to plead further pending further information or discovery.

173.3 As they were incorporated and participated in the facts and matters pleaded above, the New GP, CDM and DFW joined the conspiracy but remain liable in damages for all losses, including prior to joining the conspiracy.

173.4 The conspiracy was a conspiracy to injure the Company.

173.5 The overt acts of the conspiracy were all the facts and matters pleaded above, including as breaches by Mr Patrick or Mr Murphy.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

173.6 The unlawful means of the conspiracy were all the facts and matters pleaded above as breaches of duty by Mr Patrick or Mr Murphy.

173.7 Each of the conspirators intended to injure the Company. This averment is an inference from all the facts and matters pleaded above.

173.8 As a consequence, the Company has suffered loss and damage, as a result of the Restructuring, the CDM Assignment, and the Admission and Redemption, and the combined effect thereof, as set out above.

Proprietary claim and/or unconscionable receipt

174 The facts and matters pleaded above give rise to claims by the Company for unconscionable receipt as follows:

174.1 CDM received the Company's Partnership Interest in the Fund under the CDM Assignment.

174.2 The knowledge of CDM was and is that of Mr Patrick.

174.3 The breaches of duty in relation to the CDM Assignment above are relied upon.

174.4 CDM knew that the CDM Assignment was at an undervalue and that causing or procuring the Company to enter into the CDM Assignment was a breach of fiduciary duty by Mr Patrick and/or Mr Murphy.

174.5 By reason of the foregoing, it is unconscionable for CDM to retain the Partnership Interest in the Fund and CDM is liable to account to the Company in equity, by restoring Partnership Interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Unjust Enrichment

175 In receiving the Company's Partnership Interest in the Fund, CDM was unjustly enriched at the Company's expense and is liable to the Company in restitution:

175.1 The Partnership Interest was transferred on the basis that there was a valid assignment agreement effecting that transfer.

175.2 That basis has totally failed, the CDM Assignment being either void, or avoided hereby.

Alter Ego and Lifting the Corporate Veil

176 In order to obtain the return to it of the Partnership Interest in the Fund, together with an Account of Profits, the Company does not need as a matter of law to make any allegation of "alter ego" or to lift the corporate veil in relation to CDM or DFW.

177 If, contrary to the paragraph above, the Company does so need, it makes the following allegations for the purposes of all relevant claims or causes of action set out above.

177.1 CDM is the "alter ego" of Mr Patrick.

177.2 DFW is the "alter ego" of Mr Patrick.

177.3 In relation to the receipt of any property by CDM directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

177.4 In relation to the receipt of any property by DFW directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

PARTICULARS

(a) In relation to CDM:

(i) Mr Patrick was and is the Manager. There are no other officers or managers.

(ii) Mr Patrick was and is the managing member.

(iii) CDM was incorporated at Mr Patrick's instigation in order to enter into the CDM Assignment or a transaction of like nature.

(iv) CDM's sole or primary purpose was to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company.

(v) CDM exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

(b) In relation to DFW:

(i) Mr Patrick was and is the 'President'. There are no other officers or managers.

(ii) Mr Patrick was and is the sole member.

(iii) Mr Patrick was and is the sole registered director.

(iv) DFW was incorporated at Mr Patrick's instigation in order to enter into a transaction whereby it would in effect take over the Company's interest in CDM pursuant to the CDM Assignment.

(v) DFW's sole or primary purpose was (i) to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company, (ii) to be the ultimate vehicle by which Mr Patrick would so control of the Company's Partnership Interest in the Fund and (iii) to be a newly-inserted majority Participating Shareholder (under at least Mr Patrick's control) in the Company's share capital structure to oppose the actions of the Supporting Organisations, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

(vi) DFW exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

Loss and Damage

178 As a consequence of the above, the Company has suffered loss and damage, including but not limited to:

178.1 Its Partnership Interest in the Fund.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

178.2 The costs and expenses incurred in relation to the CDM Assignment, the Share Issuance, the Letter Agreement and the Redemption (including all legal or other advice taken in relation thereto).

178.3 Excessive Directors' fees or remuneration or emoluments or benefits.

178.4 Improper expenses (if any).

178.5 The lost opportunity cost of the Fund and its subsidiaries deploying such funds (as set out in (1), (2) and (3) above) elsewhere, and the consequent fall in value of the Company's interest in the Fund.

178.6 The legal and liquidation costs of investigating the conspiracy, and the costs of these proceedings.

**RESERVATION OF POSITION**

179 The Company and the JOLs (who direct the Company in bringing these proceedings) fully reserve their position to apply to amend this claim in any way or to bring fresh or further proceedings against any of the Defendants (whether in the Cayman Islands or elsewhere) in the name of the Company or in the name of the JOLs.

**OTHER**

180 CLO Holdco is joined as a party to these proceedings in order that, as the main subsidiary of the Fund, it may abide by any Order that the Court may make.

**INTEREST**

181 The Company claims interest pursuant to section 34 of the *Judicature Act (2021 Revision)* and the *Judgment Debts (Rates of Interest) Rules (2021 Revision)*, alternatively pursuant to the

Court's equitable jurisdiction, compounded in equity at quarterly rests, alternately at common law, for such period and at such rate as the Court thinks just.

**PRAYER FOR RELIEF**

In the premises, the Company claims:

(1) Damages or equitable compensation.

(2) Orders for restitution or disgorgement.

(3) Orders for the restoration of property to the Company.

(4) Interlocutory or final injunctions as may be necessary or appropriate.

(5) Orders for the appointment of a Receiver or Receivers, as may be necessary or appropriate.

(6) Orders for the provision of documents or information at an early interlocutory stage.

(7) Orders for the cancellation of the Share Issuance, as appropriate.

(8) Rectification of the register of the Company, as appropriate.

(9) Orders pursuant to s.99 of the Companies Act (as revised), as appropriate.

(10) An Account of the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

(11) An Account of all expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(12) All other Accounts, including an Account of Profits, or Inquiries as may be necessary or appropriate; and further Orders to give effect to the outcome of such Accounts or Inquiries, including Orders for payment of sums to the Company.

(13) All such declarations as may be necessary or appropriate, including to give effect to the continuing interest of the Company in the Fund on the basis of a proprietary interest, trust, constructive trust or otherwise.

(14) All such other relief relating to the Impugned Transactions as may be necessary or appropriate.

(15) Interest as above.

(16) Further or other relief.

(17) Costs.

DATED this 15th day of July 2025

Maples and Calder (Cayman) LLP

**Maples and Calder (Cayman) LLP**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**DIRECTIONS FOR ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

182 The accompanying form of Acknowledgment of Service should be completed by an Attorney acting on behalf of the Defendant or by the Defendant if acting in person.

After completion it must be delivered or sent by post to the Law Courts, PO Box 495G, George Town, Grand Cayman, KY1-1106, Cayman Islands.

183 A Defendant who states in the Defendant's Acknowledgment of Service that the Defendant intends to contest the proceedings must also serve a Defence on the Attorney for the Plaintiff (or on the Plaintiff if acting in person).

If a Statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear on the top of page 2), the Defence must be served within 14 days after the time for acknowledging service of the Writ, unless in the meantime a summons for judgment is served on the Defendant.

If the Statement of Claim is not indorsed on the Writ, the Defence need not be served until 14 days after a Statement of Claim has been served on the Defendant.

If the Defendant fails to serve his Defence within the appropriate time, the Plaintiffs may enter judgment against the Defendant without further notice.

184 A Stay of Execution against the Defendant's goods may be applied for where the Defendant is unable to pay the money for which any judgment is entered. If a Defendant to an action for a debt or liquidated demand (i.e. a fixed sum) who does not intend to contest the proceedings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiffs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

states, in answer to Question 3 in the Acknowledgment of Service, that the Defendant intends to apply for a stay, execution will be stayed for 14 days after that Defendant's Acknowledgment, but the Defendant must, within that time, issue a Summons for a stay of execution, supported by an affidavit of the Defendant's means. The affidavit should state any offer which the Defendant desires to make for payment of the money by instalments or otherwise.

**See overleaf for Notes for Guidance**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**Notes for Guidance**

1 Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Courts Office.

2 For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to the Defendant.

3 Where the Defendant is sued in a name different from the Defendant's own, the form must be completed by the Defendant with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4 Where the Defendant is a FIRM and an attorney is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "Partner in the firm of (.......................................)" after that Partner's name.

5 Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN THAT PERSON'S OWN, the form must be completed by the Defendant with the addition in paragraph 1 of the description "trading as (...........................)" after that Defendant's name.

6 Where the Defendant is a LIMITED COMPANY the form must be completed by an Attorney or by someone authorised to act on behalf of the Company, but the Company can take no further step in the proceedings without an Attorney acting on its behalf.

7 Where the Defendant is a MINOR or a MENTAL PATIENT, the form must be completed by an Attorney acting for a guardian *ad litem*.

8 A Defendant acting in person may obtain help in completing the form at the Courts Office.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

**ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

If you intend to instruct an Attorney to act for you, give that Attorney this form IMMEDIATELY.

Important. Read the accompanying directions and notes for guidance carefully before completing this form. If any information required is omitted or given wrongly, THIS FORM MAY HAVE TO BE RETURNED.

Delay may result in judgment being entered against a Defendant whereby he may have to pay the costs of applying to set it aside.

1. State the full name of the Defendant by whom or on whose behalf the service of the Writ is being acknowledged.

2. State whether the Defendant intends to contest the proceedings (tick appropriate box)

☐ yes ☐ no

3. If the claim against the Defendant is for a debt or liquidated demand, AND the Defendant does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff (tick box)

☐yes ☐ no

Service of the Writ is acknowledged accordingly

(Signed)......................................................

Attorney for

**Notes on address for service**

Attorney: where the Defendant is represented by an attorney, state the attorney's place of business in the Cayman Islands. A Defendant may not act by a foreign attorney.

Defendant in person: where the Defendant is acting in person, the Defendant must give the Defendant's post office box number and the physical address of the Defendant's residence or, if the Defendant does not reside in the Cayman Islands, the Defendant must give an address in Grand Cayman where communications for the Defendant should be sent. In the case of a limited company, "residence" means its registered or principal office.

Indorsement by plaintiff's Attorney (or by plaintiff if suing in person) of that Plaintiff's name, address and reference, if any, in the box below.

| |
|---|
| Maples and Calder (Cayman) LLP<br>PO Box 309 Ugland House<br>Grand Cayman KY1-1104<br>Cayman Islands: CJM/JRN/LRA/TQR/858403-01 |

Indorsement by defendant's Attorney (or by defendant if suing in person) of that defendant's name, address and reference, if any, in the box below.

| |
|---|
| |

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 15, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj11** |
| | § | |
| | § | |
| **Debtor.** | § | |

**MEMORANDUM OPINION**

Pending before the Court is a *Memorandum of Law in Support of the Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* (the "Rule 60 Motion"). Dkt. No. 4513.[1] The Rule 60 Motion received objections from Highland Capital Management, L.P. and the Highland Claimant Trust (collectively, "Highland Capital") [Dkt. Nos. 4535, 4536], which were joined by Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Atlas IDF, LP, and Atlas IDF GP, LLC

---

[1] Unless otherwise stated, all "Dkt. No." references herein are to the above captioned case.

Supplemental exhibits to the Rule 60 Motion were filed at Dkt. No. 4521.

(collectively, the "HMIT Entities") [Dkt. No. 4537]. Over three days, the Court took evidence and heard arguments in support of each party's position. At the conclusion of trial, the Court took the Rule 60 Motion, and the admissibility of one exhibit, under advisement.

For the reasons stated herein, the Rule 60 Motion is denied. Additionally, the Court sustains Dugaboy Investment Trust's objection to the admission of Highland Capital's Exhibit 300.

**Background**

1. The Court endeavors to give a short history of events that prompted the Rule 60 Motion. On October 16, 2019, Highland Capital Management, L.P. (the "Debtor") filed a voluntary chapter 11 petition, the venue for which was eventually transferred to this district. The Debtor confirmed a plan of reorganization on February 22, 2021, which, among other things, established the Highland Claimant Trust and a litigation sub-trust. Dkt. No. 1943. The Debtor's confirmed plan provided for the treatment of classes 10 and 11 that included Class B/C Limited Partnership Interest and Class A Limited Partnership Interest, respectively.[2]

2. Post-confirmation, on October 15, 2021, the litigation trustee of the Debtor's litigation sub-trust, Mark Kirschner, initiated an adversary proceeding against 20 defendants, including Nancy Dondero as trustee of the Dugaboy

[2] The plan defines the limited partnership interest as "the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest[,]" "the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust[,]" and "the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust." Dkt No. 1808 at 6, ¶¶ 33–36.

Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("HMIT"). Case No. 21-03076, Dkt. No. 1, and as amended at Dkt. No. 158. Seeking to resolve their many differences, including the claims asserted by Mr. Kirschner, the Debtor and the HMIT Entities reached a settlement for which they sought this Court's approval. Dkt. Nos. 4216, 4217. According to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* ("9019 Motion"), HMIT's Class B/C Limited Partnership Interest "represented 99.50% of the Debtor's prepetition total equity[,]" and the remaining 0.50% represented the Class A Limited Partnership Interest.[3] Dkt. No. 4216, ¶¶ 5–6. The settlement agreement, filed separately from the 9019 Motion, includes broadly defined mutual releases, dismissal of pending litigation, cash payments to HMIT, valuation of HMIT's class 10 interest in Debtor's plan, and a transfer of claims alleged by Mr. Kirschner in Case No. 21-03076 to HMIT. Dkt. No. 4217-1. Mark Patrick, the administrator of HMIT, signed the settlement agreement on behalf of the HMIT Entities.

3. The 9019 Motion drew objections from several parties—Patrick Daugherty, Dugaboy, and Crown Global Life Insurance, Ltd. ("Crown Global") and The Dallas Foundation. Dkt Nos. 4229–31. Crown Global's and The Dallas Foundation's objection was the only objection that raised concerns about Mark Patrick's authority to sign the settlement agreement on behalf of the HMIT Entities. *See* Dkt. No. 4231. Prior to the 9019 Motion hearing, the HMIT Entities,

---

[3] *See supra* n.2.

Crown Global, The Dallas Foundation, Empower Dallas Foundation, the Okada Family Foundation, and the Debtor entered into a stipulation requiring inclusion of certain language in any order approving the 9019 Motion. Dkt. No. 4282. This stipulation was approved by the Court, Dkt. No. 4291, and resulted in Crown Global and The Dallas Foundation withdrawing their objection.

4. On June 25, 2025, the Court commenced a hearing on the 9019 Motion. At the hearing, Dugaboy raised for the first time the issue of Mr. Patrick's authority to execute the settlement agreement on behalf of the HMIT Entities. Despite Dugaboy's failure to raise this issue in its written objection, the Court received evidence of, both in favor and against, Mr. Patrick's authority to settle on behalf of the HMIT Entities. The 9019 Motion was approved the same day, and the Court entered an order to that effect on June 30, 2025 (the "9019 Order"). Dkt. No. 4297. On July 14, 2025, Dugaboy and Patrick Daugherty each appealed the 9019 Order to the District Court. *See* Dkt. Nos. 4310–11; Case No. 3:25-cv-01876-K, Dkt. No. 1 (N.D. Tex.).[4] This appeal is not resolved.[5]

---

[4] There were initially two district court appellate cases that were consolidated on August 8, 2025.

[5] Online the appeal appears closed, but the matter is stayed pending resolution of Appellee's Motion to Dismiss Appeal as Moot, and the District Court entered the following docket note:

> There appears to be no further reason at this time to maintain the file as open for statistical purposes. The Clerk is, therefore, instructed to submit a JS-6 form to the Administrative Office, thereby removing this case from the statistical records. <u>Nothing in this Order shall be considered a dismissal or disposition of this case</u>. Once the pending motion has been determined, the Court will lift the stay and reopen this matter. This case will proceed in the same manner as if this Order had not been entered.

Case No. 3:25-cv-01876-K, Dkt. No. 66 (N.D. Tex.) (emphasis in original).

**Dugaboy's Rule 60 Motion and Highland Capital's Objection**

5. About six months post-appeal, Dugaboy filed its Rule 60 Motion. Dkt. No. 4513. The Rule 60 Motion argues two reasons for vacating the 9019 Order: (1) newly discovered evidence demonstrates that the settlement was the product of fraud and misconduct; and (2) the presiding judge that entered the 9019 Order was without authority to do so because she was disqualified.[6] According to Dugaboy's Rule 60 Motion, Mark Patrick was without authority to settle on behalf of the HMIT Entities because he breached fiduciary duties owed to HMIT's charitable beneficiaries. Moreover, the scope and effect of Mr. Patrick's alleged misconduct could not have been discovered with due diligence prior to entry of the 9019 Order. Thus, under Rule 60(b)(2) and (3), the Court should vacate the 9019 Order.[7]

6. As newly discovered evidence, the Rule 60 Motion points to proceedings involving a charitable donor advised fund in the Grand Cayman Islands, over which joint official liquidators ("JOLs") were appointed. According to the JOLs, Mr. Patrick "effectuated the DAF restructuring and thereby fraudulently absconded with $270 million in charitable assets belonging to the charitable owners." Dkt. No. 4513 at 28. The DAF restructuring, said most succinctly, refers to

---

[6] Judge Stacey G.C. Jernigan presided over the 9019 Motion and entered the 9019 Order. Judge Jernigan voluntarily recused herself from deciding the Rule 60 Motion, and the matter was assigned to above-signed judge. At trial on the Rule 60 Motion, Dugaboy minimally argued that Judge Jernigan was disqualified from entering the 9019 Order. Throughout the trial, Dugaboy did not introduce any evidence on this issue. The Court deems this argument abandoned. *See Kovac v. Wray*, 363 F. Supp. 3d 721, 748–49 (N.D. Tex. 2019) ("When a party fails to pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned or waived.") (citing *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002)).

[7] Fed. R. Civ. P. 60 is made applicable in bankruptcy proceedings by Bankruptcy Rule 9024.

a series of transactions undertaken by Mr. Patrick to dissolve certain charitable beneficiaries' interests in HMIT's assets. To Dugaboy, such conduct amounted to a breach of fiduciary duties that divested Mr. Patrick of his authority over the HMIT Entities. And because these alleged breaches occurred before the settlement was reached, the 9019 Order should be vacated.

7. Highland Capital's objection argues that none of Dugaboy's evidence of Mr. Patrick's alleged fraud or breaches of fiduciary duties is newly discovered. *See* Dkt. No. 4535. Dugaboy, Highland Capital contends, knew everything it needed to know about the relevant entity restructurings to challenge Mr. Patrick's authority to sign the settlement agreement on behalf of the HMIT Entities *before* June 25, 2025. And to the extent Dugaboy learned any additional information after this date, it could have timely moved for a new trial under Rule 59.[8] Dugaboy, thus, cannot meet the standard under Rule 60(b)(2).

8. Highland Capital also argues that Dugaboy cannot meet its burden under Rule 60(b)(3) because it fails to allege that an opposing party committed any fraud, misrepresentation, or misconduct in seeking entry of the 9019 Order. Lastly, based on the pending appeal of the 9019 Order, Highland Capital urges the Court to deny the Rule 60 Motion for lack of jurisdiction.

9. All parties were permitted limited discovery on these issues. At trial, the Court admitted hundreds of exhibits and heard testimony from five witnesses.

---

[8] Fed. R. Civ. P. 59 is made applicable in bankruptcy proceedings by Bankruptcy Rule 9023.

Before turning to the ultimate issue, the Court will first resolve admission of Highland Capital's Exhibit 300.

**Highland Capital's Exhibit 300**

10. The Court reserved at trial admission of Highland Capital's Exhibit 300. The exhibit is one page and is best described as a screenshot of a PDF page with the "Highlights Properties" pop-up displayed. The page comes from Dugaboy's Exhibit I that was filed under seal [Dkt. No. 4525] and Highland Capital's Exhibit 70 that was not filed under seal [Dkt. No. 4608-82]. Both are the Third Affidavit of Margot MacInnis, and neither was admitted at trial.

11. Highland Capital used its Exhibit 300 for impeachment purposes during its cross-examination of Margot MacInnis, who is one of the joint official liquidators in the proceeding pending in the Grand Cayman Islands. Primarily, the information contained in Highland Capital's Exhibit 300 is meant to demonstrate that counsel for James Dondero, the beneficiary of Dugaboy, was provided access to Ms. MacInnis's affidavit despite a Grand Cayman Islands court order that prohibited such access.

12. The Court denies admission of Highland Capital's Exhibit 300. The evidence is not relevant. Without this evidence, it is not more or less probable that Mark Patrick had authority to settle on behalf of the HMIT Entities, nor is it of consequence to determine the Rule 60 Motion.

13. Having resolved this issue, the Court now turns to the Rule 60 Motion.

**Jurisdiction to Decide the Rule 60 Motion**

14. Filing an appeal is an event of jurisdictional significance. It confers jurisdiction upon the court to which the appeal is taken and divests the lower court of jurisdiction over aspects of the case involved in the appeal. *See, e.g.*, *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982); *see also Tex. Comptroller of Pub. Accts. v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*, 303 F.3d 571, 578–79 (5th Cir. 2002) ("[The *Griggs*] rule applies with equal force to bankruptcy cases.").

15. This Court is, therefore, without jurisdiction to reconsider and vacate the 9019 Order. That being said, Bankruptcy Rule 8008(a) states,

> If a party files a timely motion in the bankruptcy court for relief that the court lacks authority to grant because an appeal has been docketed and is pending, the bankruptcy court may: (1) defer considering the motion; (2) deny the motion; (3) state that it would grant the motion if the court where the appeal is pending remands for that purpose; or (4) state that the motion raises a substantial issue.

So, to the extent Bankruptcy Rule 8008(a) permits the Court to issue a ruling concerning a matter on appeal, the Court denies the Rule 60 Motion. *See In re Skyline Ridge, LLC*, No. 4:18-bk-01908-BMW, 2021 WL 1093928, at *9 (Bankr. D. Ariz. Mar. 15, 2021) (denying motion under Bankruptcy Rule 8008(a)(2)); *Geron v. Holding Cap. Grp., Inc. (In re PBS Foods, LLC)*, 549 B.R. 586, 597 (Bankr. S.D.N.Y. 2016) (same).

**Relief Under Rule 60(b)**

16. Beginning where we must, Rule 60(b) states, in relevant part,

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; . . . or (6) any other reason that justifies relief.

The Fifth Circuit states that Rule 60(b) relief is "extraordinary" and compliance with the rule is strict. *Longden v. Sunderman*, 979 F.2d 1095, 1102 (5th Cir. 1992).

17. To prevail under Rule 60(b)(2), the movant must present evidence that (1) was in existence at the time of trial; (2) not discovered until after trial; (3) is not cumulative; and (4) is material, such that a new trial would probably produce a different result. *Id.* at 1102–03. Evidence that is merely cumulative or impeaching, and clearly would not have produced a different result if presented before the original judgment, is not sufficient to sustain vacatur under Rule 60(b)(2). *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 639 (5th Cir. 2005).

18. "A Rule 60(b)(3) assertion must be proved by clear and convincing evidence, and the conduct complained of must be such as to prevent the losing party from fully and fairly presenting its case or defense." *Longden*, 979 F.2d at 1103. There is no requirement under Rule 60(b)(3) that the information withheld be such that it alters the outcome of the case. *See Hesling*, 396 F.3d at 641. "The rule is remedial and should be liberally construed" to vacate judgments that were unfairly obtained. *Id.*

19. Lastly, Rule 60(b)(6) is the "grand reservoir" for relief from judgments where "appropriate to accomplish justice." *Harrell v. DCS Equip. Leasing Corp.*, 951

F.2d 1453, 1458 (5th Cir. 1992). A Rule 60(b)(6) motion is granted only if extraordinary circumstances are present. *Hess v. Cockrell*, 281 F.3d 212, 216 (5th Cir. 2002). Vacatur under Rule 60(b)(6), though, is mutually exclusive of the relief available in the other subsections of Rule 60(b). *Hesling*, 396 F.3d at 643. "The reason for relief set forth under 60(b)(6) cannot be the reason for relief sought under another subsection of 60(b)." *Id.* Thus, where a party's Rule 60(b)(6) allegations are essentially identical to the Rule 60(b)(3) allegations of fraud or misconduct, relief under Rule 60(b)(6) is not appropriate. *See id.*

20. With this framework in mind, the Court explains its reasons for denying the Rule 60 Motion.

***The Alleged Evidence of Mark Patrick's Misconduct is not Newly Discovered.***

21. The Court agrees with Highland Capital that Dugaboy had, or could have obtained via discovery before trial on the 9019 Motion, all the facts necessary to challenge Mr. Patrick's authority to settle on behalf of the HMIT Entities. Reviewing James Dondero's Affidavit ("Dondero Affidavit"), filed April 16, 2025, in the Grand Court of the Cayman Islands, lends support for this conclusion.[9]

22. It is worth repeating that Mr. Dondero is a beneficiary of Dugaboy. And, on May 11, 2026, Highland Capital and Dugaboy filed a stipulation in which the parties agreed that "Dugaboy previously designated Mr. Dondero as agent on

[9] Admitted as Highland Capital Ex. 48. While not admitted into evidence, Dugaboy designated the Dondero Affidavit as Dugaboy Ex. 36.

Dugaboy's behalf for all purposes relating to the Relevant Litigation and Dugaboy's [Rule 60 Motion]." Dkt. No. 4615.

23. The Dondero Affidavit summarizes Mr. Dondero's allegations against Mr. Patrick that, in his reading of the HMIT trust agreement, automatically removed Mr. Patrick as administrator of the trust.[10] While it may be true that Dugaboy, and others, later came to know the magnitude and effect of Mr. Patrick's actions as described in the Dondero Affidavit, this is not newly discovered evidence that necessitates vacatur of the 9019 Order.

24. In ruling on a motion to stay the 9019 Order, Judge Jernigan characterized the challenges related to Mark Patrick's authority: "***Whatever the misdeeds may or may not be of Mark Patrick, they are not sufficiently intertwined with the Highland bankruptcy estate (or the Settlement Agreement) to justify a stay***. . . . Mark Patrick is merely a signatory for a counter-party to a settlement agreement with the bankruptcy estate (that counter-party being the former 99.5% equity owner of Highland, namely Hunter Mountain). Dkt. No. 4333 (emphasis in original).[11] This characterization is equally true here. Though allegations related to Mr. Patrick's "misdeeds" were distilled into a *Writ of Summons and Statement of Claim* filed in the Grand Cayman Islands court,[12] the information is not new.

[10] The HMIT Trust Agreement was admitted as Highland Capital's Ex. 1 and Dugaboy's Exs. 1, 20, and 219.

[11] Admitted as Highland Capital's Ex. 65.

[12] Admitted as Highland Capital's Ex. 63.

***Highland Capital Complied with Dugaboy's Discovery Requests Before Trial on the 9019 Motion.***

25. On June 10, 2025, Dugaboy's counsel served Highland Capital with interrogatories and requests for production.[13] None of the interrogatories or requests for production appear to directly seek information or documents about Mr. Patrick's authority to negotiate and sign the settlement agreement on behalf of the HMIT Entities. Nevertheless, James Seery, as Highland Capital's CEO and trustee of the Highland Claimant Trust, provided responses to Dugaboy's discovery requests. Mr. Seery testified at trial that this production included over 4000 pages of documents, the contents of which included organization documents for the HMIT Entities. At no time prior to trial on the 9019 Motion did Dugaboy challenge Highland Capital's discovery responses as insufficient.

26. The charitable beneficiaries at the center of Dugaboy's complaint were also deposed prior to trial on the 9019 Motion. President and CEO of The Dallas Foundation, Julie Diaz, was deposed on June 22, 2025.[14] Counsel for Dugaboy was present as Ms. Diaz's deposition. The same is true for the deposition of Torrey Littleton, who is CFO of The Dallas Foundation.[15] It was The Dallas Foundation, with Crown Global, that filed an objection to the 9019 Motion based on questions

---

[13] Admitted as Highland Capital's Ex. 53.

[14] Ms. Diaz's deposition transcript was admitted as Highland Capital's Ex. 56-A. At trial, only specific parts of Ms. Diaz's deposition were admitted as Highland Capital's Ex. 56. Afterward, Highland Capital and Dugaboy stipulated that Highland Capital "may substitute the Deposition Designations for the full transcripts lodged on [Highland Capital's] W&E list." Dkt. No. 4673.

[15] Ms. Diaz's deposition transcript was admitted as Highland Capital's Ex. 57-A. *See supra* note 14 for additional explanation.

surrounding Mr. Patrick's authority, and both witnesses were questioned on this topic. After these depositions, that objection was withdrawn.

27. Overall, there is no evidence, much less clear and convincing evidence, that Highland Capital withheld evidence from Dugaboy that prevented it from fully and fairly litigating its case prior to entry of the 9019 Order. Thus, Rule 60(b)(3) vacatur of the 9019 Order is not appropriate.

***Vacating the 9019 Order Will not Restore the Original Charitable Structure.***

28. The overwhelming majority of Dugaboy's arguments focused on Mr. Patrick's restructuring of entities related to HMIT's charitable beneficiaries (referred to during trial as the DAF restructuring). To be clear, this Court makes no findings about whether those restructurings were well-intended, appropriate, or otherwise. But in the context of the Rule 60 Motion, it is important to note that vacating the 9019 Order will not restore the prior HMIT structure or the charitable beneficiaries' structure. As much was admitted during multiple points at trial:

- On the Court's examination of Margot MacInnis, she testified that her analysis of the settlement is not complete, but any analysis of claims would inure to the benefit or detriment of HMIT or the DAF structure, not Highland Capital.[16]

- On cross/direct examination of Mark Patrick, he testified that he would still have full control over HMIT's assets even if the DAF restructuring were rescinded.[17]

[16] May 11, 2026, Trial Tr. 199:18–201:9.

[17] May 12, 2026, Trial Tr. 118:12–14.

- During closing argument, counsel for Dugaboy stated that vacating the 9019 Order would not impact the DAF restructuring in any way.[18]

With this in mind, there is no reason, as a Court of equity, to reassess whether the settlement was the product of arm's-length, good faith negotiations. Whatever Mr. Patrick did or did not do with his authority over HMIT assets and the charitable beneficiaries' structure, is not for this Court to decide.

29. And Rule 60(b)(6) relief is likewise inappropriate, because Dugaboy failed to articulate a "mutually exclusive" reason for vacating the 9019 Order. Duagboy's request for equitable relief is identical to its requests for relief under Rule 60(b)(3). This is insufficient and, thus, the request is denied.

**Conclusion**

The Court denies the Rule 60 Motion and does not admit Highland Capital's Exhibit 300. The Court will enter a separate order consistent with this memorandum opinion.

###End of Memorandum Opinion###

[18] May 21, 2026, Trial Tr. 208:13–17; 211:9–212:8.

Michael J. Edney
Martha B. Stolley
Avery Joseph Welker
Morgan Lewis Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
martha.stolley@morganlewis.com
avery.welker@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj |

**THE DUGABOY INVESTMENT TRUST'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1
II. BACKGROUND .......... 3
III. LEGAL STANDARD .......... 7
IV. ARGUMENT .......... 9
A. The Evidence of Mark Patrick Having Stolen the Assets of the Charitable DAF Was Not Stated in the April 2025 Dondero Affidavit and Is Evidence Newly Discovered After the 9019 Motion .......... 9
B. Relief is Warranted under Rule 60(b)(3) Due to Mark Patrick's Omissions, Misrepresentations, and Misconduct During Highly Restricted Discovery. .......... 19
C. Rule 60(b)(6) Relief is Warranted Absent Restoration of the Charitable Structures to Avoid Rewarding Mark Patrick's Misconduct. .......... 23
V. CONCLUSION .......... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Balfour Beatty Rail, Inc. v. Kan. City S. R.R. Co.*,
173 F.Supp.3d 363 (N.D. Tex. 2016) ....................18

*Banister v. Davis*,
590 U.S. 504 (2020)....................7

*Bank One, Texas, N.A. v. Federal Deposit Ins. Corp.*,
16 F. Supp. 2d 698 (N.D. Tex. 1998) ....................7

*In re Charitable DAF Holdco Ltd. (In Official Liquidation)*,
No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1 ....................5

*Charles L.M. v. N.E. Indep. Sch. Dist.*,
884 F.2d 869 (5th Cir. 1989) ....................7

*Demahy v. Schwarz Pharma, Inc.*,
702 F.3d 177 (5th Cir. 2012) ....................7

*Dupree v. Younger*,
598 U.S. 729 (2023)....................2

*Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*,
6 F.3d 350 (5th Cir. 1993) ....................8, 23

*In re Endeavour Highrise, L.P.*,
432 B.R. 583 (Bankr. S.D. Tex. 2010) ....................18

*Gen. Universal Sys., Inc. v. Lee*,
379 F.3d 131,156–57 (5th Cir. 2004) ....................19

*Hamilton Plaintiffs v. Williams Plaintiffs*,
147 F.3d 367 (5th Cir. 1998) ....................6

*Heirs of Guerra v. United States*,
207 F.3d 763 (5th Cir. 2000) ....................18

*Inryco, Inc. v. Metro. Engr. Co., Inc.*,
708 F.2d 1225 (7th Cir. 1983) ....................7

*In re J.A.R. Concrete, Inc.*,
673 B.R. 663 (W.D. Tex. 2025)....................18

*In re Kakal*,
2019 WL 1868626 (S.D. Tex. Bankr. 2019)....................6

*Pruett v. Stephens*,
608 Fed. Appx. 182 (5th Cir. 2015)....................7

*Rhodes v. Amarillo Hosp. Dist.*,
654 F.2d 1148 (5th Cir. 1981)....................18

*Rismed Oncology Systems, Inc. v. Baron*,
297 F.R.D. 637 (N.D. Ala. 2014)....................21

*Shepherd v. Int'l Paper Co.*,
372 F. 3d 326 (5th Cir. 2004)....................6

*Silas v. Sears, Roebuck & Co.*,
586 F.2d 382 (5th Cir. 1978)....................7

*In re Transtexas Gas Corp.*,
303 F.3d 571 (5th Cir. 2002)....................7

*Williams v. French*,
2024 WL 3929894 (S.D. Tex. Aug. 23, 2024)....................7

**Statutes**

Bankruptcy Code Chapter 15....................5

**Rules**

Federal Rule of Bankruptcy Procedure 9019.................... *passim*

Federal Rule of Bankruptcy Procedure 9023....................6, 7

Federal Rule of Bankruptcy Procedure 9023(a)....................1

Federal Rule of Bankruptcy Procedure 9024....................1

Federal Rule of Civil Procedure 50(e)....................6

Federal Rule of Civil Procedure 59(e)....................1, 6, 7, 24

Federal Rule of Civil Procedure 60(b).................... *passim*

Federal Rule of Civil Procedure 60(b)(3).................... *passim*

Federal Rule of Civil Procedure 60(b)(6).................... *passim*

Rule 60(b)(2).................... *passim*

The Dugaboy Investment Trust ("Dugaboy") respectfully moves under Fed. R. Civ. P 59(e), as incorporated by Federal Rule Bankruptcy Procedure 9023(a), to alter or amend and otherwise to reconsider the Court's June 15, 2026 Order denying Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) (the "Denial Order"), as incorporated by Federal Rule Bankruptcy Procedure 9024. The Court should alter its order to grant the motion to vacate the approval of the settlement between the Highland entities and the Hunter Mountain Investment Trust.

## I. <u>INTRODUCTION</u>

The Court should alter, amend, and otherwise reconsider its denial of Dugaboy's motion for relief under Federal Rule of Civil Procedure 60(b) for multiple reasons. The June 2025 order approving the settlement between the Highland-related entities and the Hunter Mountain Investment Trust should be vacated.

First, the Court's denial of Dugaboy's motion based on newly discovered evidence under Rule 60(b)(2) rests on an incorrect factual premise: That Mr. Dondero and his family trust already possessed the evidence of Mr. Patrick's theft of Charitable DAF on which the motion to vacate was based, as of April 16, 2025,. April 16, 2025, is when Mr. Dondero filed an affidavit supporting the opening of liquidation proceedings in the Cayman Islands, proceedings that only much later revealed the outcomes, mechanisms, and motives of Mr. Patrick's brazen theft of the assets that had been maintained under a charitable structure that included the Hunter Mountain Investment Trust ("Hunter Mountain") and the equity position in Highland Capital Management, L.P. ("Highland").

The April 16, 2025, affidavit did not set forth the evidence of Mr. Patrick's fraudulent restructuring of the Charitable DAF, including his theft of the Highland equity position from an

established Dallas charity. Instead, the affidavit detailed Mr. Patrick's lack of transparency with respect to this recent operation of the Charitable DAF and compliance lapses in areas separate and apart from his Charitable DAF restructuring efforts. Mr. Patrick's brazen theft of all the assets of the charitable structures was instead first alleged by the Cayman Liquidators in a July 15, 2025, "statement of claim," with actionable evidence of those allegations later revealed in the Cayman proceedings and elsewhere.

Relief is also appropriate under Federal Rule of Civil Procedure 60(b)(3). In its Denial Order, the Court held that no one had engaged in fraud or discovery misconduct in the proceedings leading up to the 9019 order in June 2025. That is not so. That process was unnecessarily rushed and frantic. But Mark Patrick was deposed, and he lied in that deposition to conceal his theft of the charitable assets until the very last minute.

Finally, the Court should grant relief under Federal Rule of Civil Procedure 60(b)(6). The fraud and misconduct is not adjacent to this Court's mission and charge. We know today, due to the evidence elicited in the May 2026 hearings, that Mark Patrick came to this Court in May 2025 asking for approval to deal away stolen property to Highland. That is because, by the time he had arrived, he had misappropriated Hunter Mountain and the residual equity position in Highland from the established charity to which it was given and belonged. Having (albeit unwittingly) approved the transfer of stolen property is an anathema to justice and this Court's role as a court of equity, and that is a "reason" in addition to many others "that justifies relief." Fed. R. Civ. P. 60(b)(6).

In addition, this Court has a special responsibility to monitor arrangements made between Highland's appointed managers and third parties. That is because the predecessor bankruptcy judge stimulated the removal of Highland's founder and most effective guardian of its equity

interest in the first hearing after this case was transferred from Delaware. And at the Court's insistence, appointed managers effectively acting in the Court's stead followed. If the Highland managers made an arrangement with wrongdoers (either knowingly or not), that should be of special concern to the Court. Today, we know Mr. Patrick was a wrongdoer and the appointed managers reached a settlement with him precisely because he was eager to advance and to deter scrutiny into his wrongdoing.

Dugaboy limits this motion for reconsideration to these issues but reserves the right to address additional errors in the appellate courts in the event the instant motion is not granted. See *Dupree v. Younger*, 598 U.S. 729 (2023) (holding that parties are not required to renew legal arguments to preserve them for appellate review). Today, Dugaboy has also filed a notice of appeal in an abundance of caution to ensure all timelines to secure future review if necessary. The Bankruptcy Rules provide that this Court retains jurisdiction to decide the motion to amend until it is decided or withdrawn, despite the sequential filing of a notice of appeal. Fed. R. Bankr. P. 8002(b)(2).

## II. <u>BACKGROUND</u>

This motion arises from the Chapter 11 bankruptcy proceedings involving Highland. On May 19, 2025, Highland and Hunter Mountain moved for approval of a settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. Dkt. 4216. Although Dugaboy challenged this proposed settlement, *see* Dkt. 4230, it ultimately was approved on June 30, 2025. *See* Dkt. 4297 ("9019 Settlement Approval Order").

Dugaboy filed a motion to vacate the settlement approval order under Federal Rule of Civil Procedure 60(b). Dkt. 4513 ("Rule 60(b) Motion"). Dugaboy moved for relief under Rule 60(b)(2) based on newly discovered evidence, under Rule 60(b)(3) based on fraud, misrepresentations, and

misconduct by an opposing party, and under Rule 60(b)(6) for any other reason justifying relief. *Id.* at 33–43. With respect to its motion for relief under Rule 60(b)(2), Dugaboy directed the Court to developments in proceedings in the Cayman Islands that had occurred after the Court's hearing regarding and order approving the settlement agreement with Hunter Mountain. In those proceedings, the Grand Court of the Cayman Islands had appointed a form of receiver—what the Cayman legal system calls Joint Official Liquidators—to step into the shoes of one of the core, Cayman-incorporated entities at the heart of the Charitable DAF structure, the Charitable DAF Fund, L.P.

Mr. Dondero had established the Charitable DAF years earlier to create a legacy of good works in the community that would outlive him. May 21, 2026 Hr'g Tr. at 135:23–24. At the top of this structure were four charities that Mr. Dondero had selected, each with a decades-long track record for doing good. *Id.* at 136:24–137:8 (App. 115). They were to be the recipients of Mr. Dondero's generosity and the growth of the assets Mr. Dondero had given to the structure. And each had set up a structure—a so-called "supporting organization"—that would allow Mr. Dondero to have a significant say in how the charities used the proceeds from the DAF. May 21, 2026 Hr'g Tr. at 137:9–18; May 11, 2026 Hr'g Tr. at 208:1–12.

The Cayman Liquidators uncovered detailed, new, and breathtaking evidence of Mr. Patrick's stealing all the Charitable DAF's assets from the charities and from Mr. Dondero's ability to guide the good works to which they were to be put. Mr. Patrick proceeded to put them in his own pocket, in the hands of a sham "charity" run from his kitchen table. And along the way, he looted the charitable assets, paying himself more than $14 million in just over 18 months. He went out of his way to conceal his misconduct. The Cayman Liquidators uncovered communications instructing his co-conspirators to make the new entities "hard to find or track, or trace." *See*

Dugaboy Ex. 169 at 1 (App. 042). And he told the charities that he was going to "leave the structure exactly as it was" and that transparency in the form of financial statements would be coming soon. *See* Dugaboy Ex. 204 at 171-72 (App. 049– 050) ("Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter . . . [W]e are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF HoldCo governance structure."); *id.* at 167 (App. 045) ("[O]ur understanding was that we were to prepare a presentation for the Foundations to address these concerns."); *id.* at 179 (App. 057) (unanswered scheduling emails from charities' counsel). All of this legerdemain occurred from late 2024 through the spring of 2025.

Mr. Patrick's theft of the Charitable DAF's assets had everything to do with the Hunter Mountain Investment Trust, which owned most of the equity in the Debtor, Highland Capital Management LP. The Court will recall that on February 12, 2025, Mr. Patrick sold Hunter Mountain for $1 million to CLO HoldCo, LLC. Dugaboy Ex. 15 at 1 (App. 027); May 12, 2026 Hr'g Tr. at 69:23–25 (App. 110). That entity was entirely owned by Charitable DAF LP and the entire Charitable DAF structure. May 12, 2026 Hr'g Tr. at 72:11–13; *see also* Dugaboy Ex. 242 at 18 (App. 066). Before the sale, all the value in Hunter Mountain was supposed to be entirely for the benefit of The Dallas Foundation. Dugaboy Ex. 242 at 12 (App. 065). After the sale, it became part of the Charitable DAF structure, which was to be owned by The Dallas Foundation and three other established charities, with Mr. Dondero having input as to the philanthropic ends for which his charitable gift would be used. *Id.* at 14; May 21, 2026 Hr'g Tr. at 137:9–18. But, on March 27, 2025, Mr. Patrick stole the Charitable DAF's assets—including Hunter Mountain

and the equity position in Highland Capital Management—from The Dallas Foundation and from Mr. Dondero's guidance. Highland Ex. 63 at 53. He did this through a secret transaction that dispossessed the established charities from the equity stake in Highland and $270 million in other assets in exchange for a mere $1.6 million, transferring hundreds of millions of dollars to the sham charity he set up in his basement. *Id.*

The evidence documenting this perfidy came from the Cayman Liquidators, who were able to obtain it because they were empowered to step into the shoes of The Charitable DAF Fund, L.P., the core entity in the Charitable DAF, and obtain information in its name from Cayman government registrars, corporate service providers, and the company's own files. May 11, 2026 Hr'g Tr. at 77:4–19. Importantly, this fraud was largely pulled off in the Cayman Islands, by corporate entities outside the United States. Unbeknownst to the predecessor bankruptcy judge in this case, by the time Mr. Patrick was trading away the property interests of the equity holders in Highland Capital Management, he was dealing in stolen property. The Court-appointed managers of Highland were receiving settlement of Hunter Mountain's claims from the very person who had stolen the assets from the charities they were meant to benefit. And the Court was blessing it.

The Cayman Liquidators first alleged what they had uncovered in a Statement of Claim, filed on July 15, 2025. That Statement contained only allegations, but those allegations were so earthshattering that Dugaboy asked the predecessor judge to stay the effect of her settlement approval ruling in light of them. Dkt. 4326. The evidence behind those allegations was presumptively confidential under Cayman law. May 11, 2026 Hr'g Tr. at 77:16–19. It was released later, beginning with the Liquidators' July 21, 2025, filing in Delaware bankruptcy court seeking Chapter 15 recognition of its proceedings and then in successive affidavits of Margot MacInnis (one of the joint liquidators), only made accessible in the weeks surrounding hearings in

the Cayman proceedings. *See* Caymans Exhibit D, Chapter 15 Petition for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code, *In re Charitable DAF Holdco Ltd. (In Official Liquidation)*, No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1. The full evidentiary record, thus, came into focus only in December 2025, less than three months before Dugaboy filed its Rule 60(b) motion. *See* May 11, 2026 Hr'g Tr. at 78:4–21 (App. 085); Dkt. 4513 (Dugaboy's Feb. 9, 2026 Rule 60(b) motion).

On June 15, 2026, after full briefing and a three-day evidentiary hearing, this Court denied Dugaboy's motion to vacate. Dkt. 4678. With respect to the request for relief under Rule 60(b)(2), the Court ruled that the evidence presented at the May 2026 hearing was not "newly discovered" because Mr. Dondero had introduced evidence of Mr. Patrick's misconduct in an affidavit he filed on April 16, 2025—before the Rule 9019 hearing in June 2025. *Id.* at 10–11. The Court also denied relief under Rule 60(b)(3) on the grounds that the provision requires fraud or misconduct to have occurred in the judicial proceedings itself, and that Highland had not provided misleading or incomplete answers to inquiries in discovery leading to the Rule 9019 order. *Id.* at 12–13. Finally, the Court denied relief under Rule 60(b)(6) by determining that Dugaboy did not present a basis for equitable relief that was separate from the grounds presented for Rules 60(b)(2) and 60(b)(3), and by determining that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain. *Id.* at 13–14.

## III. <u>LEGAL STANDARD</u>

While the Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration, a party seeking such relief may file a request that "may be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment or

order." *See Shepherd v. Int'l Paper Co.,* 372 F. 3d 326, 328 n. 1 (5th Cir. 2004) (citing *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998)). If such a motion is filed within 14 days of the judgment or order of which the party complains, it is considered a Rule 59(e) motion. *In re Kakal*, 2019 WL 1868626, at *1 (S.D. Tex. Bankr. 2019) (citing *Shepherd*, 372 F.3d at 328 n.1). *See also* Fed. R. Bankr. P. 9023 (incorporating Fed. R. Civ. P. 50(e) and requiring that a Rule 59(e) motion "be filed within 14 days after the judgment is entered). Importantly, motions to alter or amend a judgment can be made with respect to orders denying or granting motions to vacate prior judgments under Rule 60(b). *See, e.g.*, *Charles L.M. v. N.E. Indep. Sch. Dist.*, 884 F.2d 869 (5th Cir. 1989); *Pruett v. Stephens*, 608 Fed. Appx. 182, 184 (5th Cir. 2015); *see also Inryco, Inc. v. Metro. Engr. Co., Inc.*, 708 F.2d 1225, 1232 (7th Cir. 1983) ("[D]enial of a Rule 60(b) motion is itself an appealable judgment…. Therefore, a losing party may challenge that judgment with a motion to alter or amend under Rule 59(e)"). Here, the Denial Order[1] was issued on June 15, 2026. Dugaboy files this Motion on June 29, 2026, fourteen days after the Denial Order's issuance. Accordingly, this Motion is a timely Fed. R. Civ. P. 59(e) motion under Fed. R. Bankr. P. 9023.

A Rule 59(e) motion "calls into question the correctness of a judgment," *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002), and "gives a district court the chance to rectify its own mistakes in the period immediately following its decision." *Banister v. Davis*, 590 U.S. 504, 508 (2020). Under Fed. R. Civ. P. 59(e), amending or altering a judgment is appropriate (1) when there has been an intervening change in the controlling law; (2) where the movant presents newly discovered evidence that was previously unavailable; or (3) to correct a manifest error of law or

[1] The Denial Order of Dugaboy's Rule 60(b) motion is a final, appealable order. *See Silas v. Sears, Roebuck & Co.*, 586 F.2d 382, 384 n.2 (5th Cir. 1978).

fact. *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012). In the Fifth Circuit, a "manifest error of fact" sufficient to warrant Rule 59(e) relief is one that is "an obvious mistake or departure from the truth." *Williams v. French*, 2024 WL 3929894, at *3 (S.D. Tex. Aug. 23, 2024) (citing *Bank One, Texas, N.A. v. Federal Deposit Ins. Corp.*, 16 F. Supp. 2d 698, 712 (N.D. Tex. 1998)). In deciding a Rule 59(e) motion, this Court has "considerable discretion" but must "strike the proper balance between two competing imperatives: (1) finality and (2) the need to render just decisions on the basis of all facts." *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993).

## IV. ARGUMENT

### A. The Evidence of Mark Patrick Having Stolen the Assets of the Charitable DAF Was Not Stated in the April 2025 Dondero Affidavit and Is Evidence Newly Discovered After the 9019 Motion.

Mr. Dondero executed an affidavit on April 16, 2025. *See* Dugaboy Ex. 36 (App. 030–040). Its purpose was to support the three established charities at the top of the Charitable DAF structure in their request that the Cayman Islands Grand Court step in and appoint a neutral to run the key corporate entity at the heart of the structure, The Charitable DAF Fund, L.P.

Without question, that affidavit was not a hagiography of Mark Patrick. It asserted that Mr. Patrick had not been doing a great job when, in addition to his role with the Charitable DAF, he was also working for Skyview, an entity that provides legal and other services to Mr. Dondero's corporate entities.

The Court, however, manifestly erred in determining that the information that later arose from the Cayman proceedings—after the Caymans Liquidators stepped into the shoes of The Charitable DAF Fund, L.P.—was not "newly discovered" because of the assertions in the April 2025 affidavit. There is a yawning chasm between the criticisms of Mr. Patrick on other matters in that April 2025 affidavit and the conclusive and directly germane evidence of his theft of the

Charitable DAF assets—including *the equity position in the Debtor* and a quarter billion dollars in other assets—later uncovered in the Cayman proceedings. Because of the timing of the revelation of that evidence by the Cayman Liquidators, the predecessor bankruptcy judge did not consider this significant evidence of misconduct, directly relevant to the equity interests that were attempting to compromise their claims in front of her. By that point, unbeknownst to anyone but Mark Patrick and his co-conspirators, Mr. Patrick was dealing away stolen property right under the predecessor judge's nose.

i. **The Dondero Affidavit Lacked Any Evidence of Mark Patrick's Theft of the DAF Structure.**

The April 2025 affidavit initiating the Cayman proceedings did not detail Mr. Patrick's theft of the Charitable DAF's assets. It is important to be precise about what the April 2025 affidavit said. That affidavit expressed concerns about two compliance issues in Mr. Patrick's past work, as well as his more recent lack of transparency regarding his operations of the Charitable DAF.

First, in late June 2023, Mr. Patrick sought to have the Charitable DAF make a $10,000 donation to a charity called Creative Hearts TX. Dugaboy Ex. 36 at 4–5 (App. 034–035). His wife and daughter were directors of Creative Hearts. *Id.* at 5 (App. 035). Also in June 2023, Mr. Patrick asked former FBI agent Kevin Cronin and his firm to charge $25,000-$50,000 in fees for financial advisory services and to split the proceeds with him. *Id.* Mr. Cronin promptly informed Mr. Dondero of Mr. Patrick's conduct. Importantly, Mr. Dondero had addressed both of these issues in 2023 with Mr. Patrick and did not seek to remove him from his position at Skyview, his corporate services company, much less from the Charitable DAF. Mr. Dondero believed Mr. Patrick's actions were inappropriate but did not warrant terminating Mr. Patrick. Third, Mr. Patrick contacted one of the charitable entities, The Dallas Foundation, to advise the entity to

exercise a put option on one of its investments in a fund related to Mr. Dondero. *Id.* at 6–7 (App. 036–037). The advice was based on material non-public information Mr. Patrick had gained from his employment at Skyview. *Id.* The Dallas Foundation did not act on the advice, and informed Mr. Dondero. Mr. Patrick resigned from Skyview in October 2024 while Skyview was investigating the facts and potential compliance issues of the episode. *Id.*

With the background of these historical episodes, Mr. Dondero became concerned when Mr. Patrick began to avoid answering the charities' questions regarding the financial condition of the DAF. The affidavit recounted that Mr. Patrick and (who ultimately proved to be) his co-conspirators declined to provide information regarding its financial condition, while promising Mr. Dondero the structure would remain the same. *Id.* at 7–8 (App. 037–038); May 21, 2026 Hr'g Tr. at 144:23–145:1. Mr. Dondero also recounted the bits and pieces of information he had learned regarding recent transactions, including indications that Mr. Patrick had effected a sale of Beacon Mountain (and therefore of its wholly-owned subsidiary Hunter Mountain) for $1 million, but expressly noting that he lacked information regarding the other details of that transaction, including the identity of the buyer. *Id.* at 8 (App. 038). For these reasons, Mr. Dondero supported judicial appointment of a neutral steward for both Charitable DAF Holdco and The Charitable DAF Fund, L.P., who could then make sure that the Charitable DAF entities were being run correctly. *Id.* at 1 (App. 031), 9–10 (App. 039–040). *See also* Dkt. 4534-6 at 1.

Importantly, Cayman law does not require a showing of fraud or misconduct for the appointment of a liquidator. Testimony of Margot McInnis, May 11, 2026 Hr'g Tr. at 71:11–18 (App. 078). Instead, a Cayman court may appoint a liquidator on a petition from a concerned creditor seeking independent review of the winding up of an insolvent company without more allegations. *Id.* ("Broadly, it's – your appointment comes about when a – in an insolvent case

where a creditor or stakeholder petitions the court to appoint an independent person to review the affairs or wind up the company.")

ii. Using Court-Appointed Authority over a Charitable DAF Entity, the Cayman Liquidators Uncover Mr. Patrick's Brazen Theft of Hundreds of Millions of Dollars in Charitable Assets.

What was revealed by the Cayman Liquidators was of a different character and severity far beyond anything mentioned in the April 2025 affidavit. Because the Cayman Liquidators were able to take over management of a Charitable DAF entity, they obtained otherwise confidential records that were in the hands of Cayman government agencies, law firms, accounting firms, and advisors. This unparalleled power revealed that *Mr. Patrick had stolen everything from the four established charities that owned the Charitable DAF* and had stuffed it into his own pocket. The product of the Liquidators' investigation began to be revealed in a July 15, 2025, Statement of Claim. As the chief liquidator testified in this Court, the Statement of Claim itself is not evidence in the Cayman judicial system, and it is not evidence in the United States; it is akin to a complaint—a series of allegations. Testimony of Margot McInnis, May 11, 2026 Hr'g Tr. 73:1–22 (App. 080) (stating a statement of claim requires "reasonable prospect of success on that claim" to initiate liquidation proceedings). But it was backed by evidence that the Liquidators needed Cayman judicial permission or open proceedings to reveal. *Id.* at 77:4–19 (App. 084); 78:6–21 (App. 085) (noting the circumstances which "lift[] the sort of privacy rules governing Cayman proceedings" and allowed the documents in connection with the Statement of Claim to be made public). And that evidence was revealed through later filings in Delaware and in the Cayman Islands by the Liquidators. In the May 2026 hearing, Ms. MacInnis was called to testify and that evidence was authenticated and admitted.

The Cayman Liquidators uncovered:

- That Mr. Patrick had embarked on a complicated scheme, starting in late 2024, to scramble the Charitable DAF by creating a series of new entities. *Id.* at 85:18–21 (App. 086); *compare* Dugaboy Ex. 242 at 2 (App. 064) *with* Dugaboy Ex. 242 at 18 (App. 066).

- That the object of Mr. Patrick's ultimately successful scheme was to exit the Dallas Foundation and three other charities from beneficial ownership—and Mr. Dondero from a say in the use for good works of—more than a quarter billion dollars in assets. May 11, 2026 Hr'g Tr. 128:7–11 (App. 098) (noting that the four original charities were "left with nothing"); Dugaboy Ex. 7 at 8 –9 (App. 012–014); *compare* Dugaboy Ex. 11 at 3 (App. 019) *with* Dugaboy Ex. 12 at 4 (App. 025).

- That the destination of the ill-gotten gains was a sham "charity" run from Mr. Patrick's basement, the so-called "DFW Charitable Foundation." Testimony of Margot MacInnis, May 11, 2026 Hr'g Tr. 106:10–18 (App. 091) ("I understand [DFW Charitable Foundation's headquarters is] at Mark Patrick's residence") 128:12–14 (App. 098) (noting that DFW Charitable received the DAF's assets); *see also* Dugaboy Ex. 8; Dugaboy Ex. 13.

- That, as if stealing all the assets from the charities were not enough, Mr. Patrick was also diverting eight figures in charitable assets into his own bank account, ostensibly as compensation for running the Charitable DAF. Testimony of Margot MacInnis, May 11, 2026 Hr'g Tr. 131:15–23 (App. 101).

- That, if there were any doubt that DFW Charitable is a sham, it is easily dispelled by looking at what DFW has given away: Less than $1 million during its 15 months of sitting on the charitable assets. Testimony of Margot MacInnis, May 12, 2026 Hr'g Tr. 83:18–21 (App. 114). At the same time, Mr. Patrick has used those assets to pay himself and his "directors" 20 times the amount he has given to charity. Testimony of Margot McInnis, May 12, 2026 Hr'g Tr. 82:5–14

(App. 113), 82:25–83:12 (App. 113–114). And he has paid law firms and advisors millions more to arrange and then cover up his fraud. May 12, 2026 Hr'g Tr. 75:13–76:9 (App. 111–112); Dugaboy Ex. 211 at 34 (App. 061).

- That there was zero justification for Mr. Patrick's moves other than enriching himself. To divorce the charities from more than a quarter billion dollars in assets, Mr. Patrick conspired with an accounting firm named ValueScope to paper the transactions. May 11, 2026 Hr'g Tr. 123:6–124:13 (App. 093) (noting that ValueScope's March 2025 valuation of the assets was "materially different from others on the basis that the valuation method changed and the level of discount changed"); *see also* Dugaboy Ex. 11 at 3 (App. 019); Dugaboy Ex. 12 at 4 9App. 025). ValueScope obligingly reversed course in March 2025 from valuations it had provided just a half a year earlier, claiming a cache of assets it said were worth $270 million in September 2024 was now worth just $1.6 million. *Compare* Dugaboy Ex. 11 at 3 (App. 019) *with* Dugaboy Ex. 12 at 4 (App. 025). Mr. Patrick happily paid that much and ran off with hundreds of millions.

- That Mr. Patrick from the earliest days of his scheme took steps to conceal his theft. He instructed his lawyers to create Cayman Islands corporate entities that would be "hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection." Dugaboy Ex. 169 at 1 (App. 042); May 11, 2026 Hr'g Tr. 89:11–17. This resulted in the birth of an alphabet soup of indecipherable corporate entities, such as CDMCFAD LLC and CDH GP, Ltd. May 12, 2026 Hr'g Tr. 48:25–49:7; May 11, 2026 Hr'g Tr. 87:9–23 (App. 090). He deliberately took steps to avoid apprising the charities or anyone else that he was either in the process of stealing or had stolen all Charitable DAF's assets from them. May 12, 2026 Hr'g Tr. 29:17–24 (App. 106); Dugaboy Ex. 204 at 167 (App. 045), 171–72 (App. 049–050), 179 (App. 057).

- That all of this came to a head on March 27, 2025. On that day, Mr. Patrick and his co-conspirators gave the boot to the four historical charities from the "hard to track or trace" corporate entities they had created, by separating those charities from more than a quarter billion dollars in assets for $1.6 million. Highland Ex. 63 at 53. Of course, he did not tell anyone associated with the charities or Mr. Dondero that he had done so. *Id.* at 55.

March 27, 2025, was a momentous day indeed. The exiting of the traditional charities from beneficial ownership of the Charitable DAF's assets was not just theft of the $270 million dollars that had grown from Mr. Dondero's generous donations of historical assets to the Charitable DAF. *Id.* at 53. It was also the event that finally stole the Hunter Mountain Investment Trust and its equity position in the Debtor from the Dallas Foundation. Dugaboy Ex. 242 at 7, 18 (App. 066). In the April 2025 affidavit, Mr. Dondero said there were indications that Hunter Mountain and its residual equity interest in Highland had been sold from its historical structure. Dugaboy Ex. 36 at 8 (App. 038). But he expressly stated he did not know to whom it was sold. *Id.* Prior to the sale, the equity interest in Highland Capital Management resided in the structure to which Mr. Dondero generously gave it, with the Dallas Foundation to receive and (with the input of Mr. Dondero) to deploy the value of that equity position.

This structure is captured in the following chart, which was admitted into evidence:



Dugaboy Ex. 242 at 12 (App. 065).

Mr. Patrick, as it turns out, sold Hunter Mountain to CLO Holdco LLC, an entity organized under the historical Charitable DAF structure. May 12, 2026 Hr'g Tr. at 69:23–25 (App. 110). That sale occurred on February 12, 2025, and brought it into the following ownership structure:




Dugaboy Ex. 242 at 18 (App. 066); *see* Dugaboy Ex. 15 at 1 (App. 027).

Had Mr. Patrick stopped with just there, at least the asset would have resided under the ultimate beneficial ownership of the Dallas Foundation and three other established charities, all with structures that enabled Mr. Dondero to provide input into the ultimate good causes the success of the Debtor's equity position was to serve. But the mortal sin was stealing Hunter Mountain, the equity position in Highland, and the rest of the Charitable DAF assets from those charities in a series of steps, including on March 27, 2025, having been sold into the Charitable DAF structure. And that heist was unknown to Dugaboy or Mr. Dondero at the time of the April 16, 2025 affidavit, its mechanisms and outcomes revealed only later by the work of the Cayman Liquidators. May 11, 2026 Hr'g Tr. at 76:21–77:23 (App. 083–084) (the documents were not available until appointment as a liquidator because it was "private company information"), 172:23–173:1 (App. 102–103) (Cayman Liquidators' investigation began on May 6, 2025).

To the extent the Court in its June 14, 2026, order is determining that, even though Mr. Patrick's massive theft scheme was unknown leading into the Rule 9019 settlement proceedings, Mr. Dondero should have sought Mr. Patrick's removal from his seat at the Hunter Mountain Investment Trust on the basis of the compliance issues detailed in the April 2025 affidavit, that decision would be incorrect. Such arguments would have been met with a louder version of the indecorous guffaws of Highland's appointed managers and their lawyers witnessed in the May 2026 hearings. They would have said that the issues identified in the April 2025 affidavit were minor deviations from best practices at most and had nothing to do with Hunter Mountain itself. That, even if the Hunter Mountain Trust Agreement automatically removes administrators for crimes, or fraud, or breaches of fiduciary duty, there must be some materiality threshold and the lapses ought to have something to do with Hunter Mountain itself. And that, for many of the issues, Mr. Dondero somehow forfeited pursuing remedies for them, because Mr. Dondero learned of them while Mr. Patrick was working for a company associated with Mr. Dondero—Skyview—and tolerated Mr. Patrick retaining his job despite the minor compliance issues. Dugaboy Ex. 36 at 5–6 (App. 035–036).

Of course, Highland's Court-appointed managers could not make any of these arguments with respect to Mr. Patrick's theft of a quarter billion dollars in assets—including the equity stake in Highland—from four established charities. Is it material? Nine figures of thievery counts. Is it germane to Hunter Mountain? Absolutely, the March 27, 2025, fraudulent dispossession of the charities from the Charitable DAF's assets included stealing Hunter Mountain too. Had Mr. Dondero tolerated this theft for too long? Of course not. He pulled the fire alarm with the Court just two days after the Cayman Liquidators released their Statement of Claim, with Dugaboy's motion to stay the judgment. Dkt. 4326 (Dugaboy's July 17, 2025 Motion to Stay 9019 Order).

In the end, Mr. Patrick's earlier deviations from the path of righteousness might have been portrayed as simple disputes between Mr. Dondero and Mr. Patrick about how he handled Mr. Dondero's confidential information or other internecine disputes. But his misconduct with respect to the Charitable DAF—which included the Highland equity position when he struck his March 27, 2025, perfidious final blow—meant the following: , By the time Mr. Patrick arrived at the Court for the Rule 9019 hearing on June 25, 2025, he was attempting to deal stolen assets to the Court-appointed managers of Highland. No court of equity should have tolerated that. The newly discovered evidence of Mr. Patrick's theft is grounds for vacatur not only under Rule 60(b)(2), but also Rule 60(b)(6), which is precisely designed to remedy courts unwittingly having descended into the inequitable misconduct of the parties before it. *See Heirs of Guerra v. United States*, 207 F.3d 763, 767 (5th Cir. 2000) (Rule 60(b)(6) relief available to vacate a judgment where "appropriate to accomplish justice" otherwise not available under the judgment). Bankruptcy courts have a responsibility to avoid that, especially when one of the parties is the appointed manager of the Debtor, installed at judicial urging.

In addition, there is absolutely no support for the proposition that a party somehow waives his contractual rights against certain conduct if he does not press remedies against earlier, materially different, and less severe instances of other breaching conduct. That argument has been tried and rejected by court after court after court. *See e.g., Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1152 (5th Cir. 1981) (prior forbearance in seeking remedies does not waive subsequent breach); *Balfour Beatty Rail, Inc. v. Kan. City S. R.R. Co.*, 173 F.Supp.3d 363 (N.D. Tex. 2016) (continued contractual performance does not operate to waive prior breach); *In re J.A.R. Concrete, Inc.*, 673 B.R. 663, 715 n.294 (W.D. Tex. 2025) ("forbearance does not permit reliance" on waiver by breaching party); *In re Endeavour Highrise, L.P.*, 432 B.R. 583, 655-56 (Bankr. S.D. Tex.

2010) ("[N]either an innocent party's continuing performance following a breach of contract nor his efforts to induce a breaching party to perform under a defaulted contract constitute a waiver."). Nor does Rule 60(b)(2) supply any analogous principle supporting waiver. It speaks to the presence of "newly discovered evidence." It does not disqualify that newly discovered evidence as grounds for relief simply because evidence of other lesser or unrelated wrongful conduct was already known at the time of the prior judgment.

B. <u>Relief is Warranted under Rule 60(b)(3) Due to Mark Patrick's Omissions, Misrepresentations, and Misconduct During Highly Restricted Discovery.</u>

In addition, Mr. Patrick's omissions and misrepresentations are actionable under Rule 60(b)(3) because obstructed discovery into his theft. Rule 60(b)(3) permits relief due to "fraud (whether intrinsic or extrinsic), misrepresentation, or misconduct by and opposing party[.]" Fed. R. Civ. P. 60(b)(3). Such relief is warranted when "the opposing party withheld information called for by discovery or willfully committed perjury." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131,156–57 (5th Cir. 2004).

Here, most notable were Mr. Patrick's obstructive conduct and lies during his June 23, 2025, deposition, just two days before the Rule 9019 hearing, which included:

- His testimony that he could not remember whether one of his new entities—CDMCFAD, LLC—was owned by the four traditional charities. We know now that Mr. Patrick had used this new entity to steal the charitable assets and had put it under the total ownership and control of his sham charity, DFW Charitable. *Compare* Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 7:22–25 (App. 068) ("Yeah, again, without corporate documents that you can present to me, I – you know – I – I just don't want to be inaccurate" when asked who owned CDMCFAD, LLC) *with* Dugaboy Hr'g Ex. 35 (June 25, 2025 Hearing Transcript) at 174:8–14 (App. 074) ("I am hundred percent that DFW Charitable Foundation is the ultimate beneficial

owner" of CDMCFAD, LLC). Of course, Mr. Patrick was not having a memory lapse, as the Court astutely concluded at the June 25, 2025 hearing. Dugaboy Hr'g Ex. 35 (June 25, 2025 Hearing Transcript) at 182:4–15 (App. 074) ("I can see what's happening here or I have an impression of what's happening here . . . I feel like you're feigning confusion . . . I need you to speed up your answers and not be confused about things you shouldn't be confused about."). He orchestrated every detail of this theft, conducting the orchestra of lawyers and agents to steal a quarter billion dollars from established charities.

- His testimony that he could not remember whether he had changed the general partner of The Charitable DAF Fund, L.P. (the Charitable DAF entity directly on top of all the assets). Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 7:5–9 (App. 068) ("I don't – I don't recall precisely and I, you know, I want – I want to be – when I give you an answer, a hundred percent accurate" when asked about the general partner of The Charitable DAF Fund, L.P.); 13:6–18 (App. 070) ("Yeah, and then this is where my memory is – is – I'd have to kind of revisit the actual organizational documents to give you a confident a hundred percent answer" when asked about the general partner of The Charitable DAF Fund, L.P.). Of course, his lack of recollection was a lie. Mr. Patrick had secretly substituted in his own entity as general partner of the DAF structure on March 7, 2024. Dkt. 4521-1 (Statement of Claim) at 28.

- His testimony that he did not know whether DFW Charitable, the supposed charity Mr. Patrick had set up and run from his home address with almost nonexistent charitable activities, had any ownership in the CDMCFAD entity. Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 8:1–6 (App. 068) ("Yeah, again, you know, Mr. Lang, you know, there are several entities in this structure, and I – I just don't want to go beyond what I have a hundred percent knowledge of" when asked whether DFW Charitable owned CDMCFAD). Of

course, this too was a lie. After all, just a few weeks earlier, on March 27, 2025, he had thrown the charities out of any beneficial interest in anything and left DFW Charitable alone at the top with all the assets (to the extent he had not paid them to himself in more than $10 million in compensation).

- His misleading answers to questions about who owned Hunter Mountain. He testified that Beacon Mountain was the ultimate owner of Hunter Mountain when in fact multiple entities, including DFW Charitable, sat in the ownership chain above both Hunter Mountain and Beacon Mountain. Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 11:10–19 (App. 069) ("Beacon Mountain LLC" owns Hunter Mountain).

Mr. Patrick's omissions and misrepresentations suffice by themselves to warrant relief under Rule 60(b)(3), because Mr. Patrick is an "opposing party" by virtue of his control over Hunter Mountain, which is an opposing party for purposes of the Rule 9019 settlement proceedings. *See, e.g.*, *Rismed Oncology Systems, Inc. v. Baron*, 297 F.R.D. 637, 656 (N.D. Ala. 2014) (applying Rule 60(b)(3) to fraudulent conduct by party entity's corporate officers who were not named parties). Hunter Mountain is a party in interest in this bankruptcy, and it has been specifically adverse to Dugaboy throughout the Rule 9019 settlement proceedings. Hunter Mountain was one of the two parties to the 9019 Settlement and argued strenuously in favor of its approval, which Dugaboy opposed. And no one disputes that Mr. Patrick controlled Hunter Mountain. Accordingly, Mr. Patrick's fraud is attributable to Hunter Mountain and Rule 60(b)(3) applies.

Furthermore, the discovery misconduct was not limited to Mr. Patrick. Highland's Court-appointed managers—who are unquestionably "opposing parties" under Rule 60(b)(3)—also were eager to throw parties off the scent. Highland was asked for documents pertinent to its review of the propriety of Mr. Patrick acting on behalf of Hunter Mountain. It produced a string of corporate

documents, all relating to the historical structure of companies leading to The Dallas Foundation's beneficial interest. Cross-Examination of James Seery, May 21, 2026 Hr'g Tr. at 46:8–52:6 (App. 118–124) (questions and answers comparing the list of documents (Dkt. 4277) that he testified at the 9019 proceedings as those he reviewed to establish Mr. Patrick's current authority to act on behalf of the Hunter Mountain Investment Trust to the historical ownership structure of Hunter Mountain and its new structure under the DAF); *see also* Closing Deck, Demonstrative Exhibit 292, at Slides 63–65 (doing same). If those Highland managers were aware that Mr. Patrick had sold Hunter Mountain and the Debtor equity position into the Charitable DAF and restructured it, they withheld that documentation in discovery and gave misleading testimony when testifying about Mr. Patrick's authority to act. *See* Dugaboy Ex. 35 at 99:13–20 (Seery testifying that Mr. Patrick had "complete authority over" Hunter Mountain and the associated entities). During trial for the Rule 60(b) Motion, Mr. Seery testified that he had only reviewed the organizational documents identified in Highland's June 24, 2025, exhibit list for the 9019 Settlement Hearing. *See* Cross-Examination of James Seery, May 21, 2026 Hr'g Tr. at 47:14–24 (App. 119). Those documents related to Hunter Mountain as part of the stack of companies as originally formulated by Mr. Dondero in 2011, including Atlas IDF and the Rand PE Fund. *Id.* at 52:7–11 (App. 124). Yet by that time, Hunter Mountain was no longer within the previous structure, having been sold to the Charitable DAF stack of entities on February 12, 2025. Mr. Seery agreed that he was aware that Beacon Mountain had sold Hunter Mountain by the consummation of the 9019 Settlement but requested no additional documentation of the Charitable DAF structure to confirm Mr. Patrick's authority to enter into the settlement. *Id.* at 52:7–10 (App. 124); *but see id.* at 55:17–23 (App. 127).

Even if Mr. Patrick had not omitted or misrepresented his knowledge about the DAF restructuring he had engaged in, the highly truncated discovery process prior to the Rule 9019 Settlement hearing could not have produced the evidence in the later-released Statement of Claim. Discovery lasted all of two weeks from June 10 to June 25, 2025.[2] Dkt. 4678 at 12.

More importantly, the Cayman evidence would not have popped up in this heavily truncated process. The theft of the Charitable DAF assets occurred, for the most part, overseas, and obtaining discovery from foreign corporate custodians would have been impossible in the time allotted. On top of that, the undisputed evidence in the record is that the information that the Cayman Liquidators uncovered was confidential under Cayman law and could only have been unearthed by the Liquidators stepping into the shoes of a Charitable DAF entity and using that authority to request it. May 11, 2026 Hr'g Tr. at 77:4–19 (App. 084) (Official Liquidator Margot MacInnis testifying that company documents were "private" or otherwise confidential and were only accessible to her because as liquidator she "steps into the shoes of the company"). This is equally true of information in the hands of Cayman government agencies, regarding corporate formation and transactions. *Id.* Engagement with a foreign judicial system through the Hague Convention on the Taking of Evidence is a time-consuming and sometimes fruitless endeavor.

C. **<u>Rule 60(b)(6) Relief is Warranted Absent Restoration of the Charitable Structures to Avoid Rewarding Mark Patrick's Misconduct.</u>**

At its core, denying the Rule 60(b) motion because Dugaboy should have discovered Mr. Patrick's misconduct sooner rewards only the intentional concealment of the scheme here and is exactly what Mr. Patrick intended. This Court, particularly as a court of equity, must consider the "need to render a just decision on the basis of all facts." *Banning Co., Inc.*, 6 F.3d at 355. Were

[2] Because of the Court's requirement to produce exhibit and witness lists three days prior to a hearing, effectively discovery lasted only 12 days.

the Court to deny this motion, it would not have considered all the facts and, instead, it would reward the very misconduct that concealed the evidence which necessitated this briefing in the first place.

We now know, due to the evidence adduced in the May 2026 hearings before the Court, that Mr. Patrick was dealing away stolen property when he "settled" with Highland's appointed managers and transferred to them a bundle of the rights of Highland's residual equity. If the Court had been fully informed, the Court should not have approved the transfer of this property from the corporate entities to which it was secreted, to Highland's managers, who would claim some level of protection from it being recovered, due to the settlement approval. It would be inconsistent with the Court's role as one of equity and with a charge to do justice.

Whatever the merits of bankruptcy courts taking a light touch when evaluating settlements between the Debtor and third parties,[3] this Court has a special responsibility to make sure managers of a Debtor appointed at the Court's insistence and separating the Debtor from its owners are getting involved with parties who have engaged in misconduct. The Court to grant relief today need not determine that the appointed managers of Highland knew about the misconduct that brought Mr. Patrick to its doorstep. The evidence presented in the motion to vacate now shows that court-appointed managers and the Court should have stayed away from Mr. Patrick, a man that should have been acting in the best interests of four established charities and came to the Court through misconduct and fraud, acting only for himself.

The Denial Order points out that vacatur of the 9019 Settlement Approval Order would not undo Mark Patrick's misconduct as a reason why Rule 60(b)(6) relief is inappropriate. Denial

[3] And this touch is not as light as some have claimed, as bankruptcy courts ought not and do not approve settlements when one of the parties or the settlement arrives at the court through fraud, collusion, or bad faith conduct. *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).

Order at 13–14. That misses the point. Dugaboy does not seek to unwind the restructuring—at least before this Court—but seeks to vacate the 9019 Settlement. This Court, as a court of equity, should not reward Mr. Patrick with approval of a highly favorable settlement agreement gained as a result of his illusory control, control he was automatically divested of when he absconded with the charitable entities' assets for his own benefit. Mr. Patrick's statement that he would retain control even if the DAF restructuring were rescinded is false, as effectuating a complex scheme to steal from the DAF would constitute cause to automatically remove Mr. Patrick as administrator. *See* Dugaboy Ex. 1 at 1 (App. 002). His further assertion that he would (or even could) reappoint himself as administrator should he be removed for fraud or theft from the DAF shocks the conscience and offends this Court's equitable powers to assist such misconduct by blessing the 9019 Settlement Agreement. May 12, 2026 Hr'g Tr. at 103:3–6.

## V. <u>CONCLUSION</u>

Rule 59(e) exists to permit a court to correct factual mistakes before appellate review becomes necessary. The Denial Order rests upon one such mistake. It treats evidence first disclosed after the Rule 9019 hearing as though Dugaboy possessed it before that hearing. The record establishes otherwise. Because the Court's Rule 60(b)(2) analysis depends upon that erroneous factual premise, reconsideration is warranted. It should also be granted under Rules 60(b)(3) and 60(b)(6) for the reasons discussed above. Denying this motion would only reward the very misconduct that concealed the evidence which necessitated this briefing in the first place.

Date: June 29, 2026

By: */s/ Michael J. Edney*

Michael J. Edney
Martha Stolley
Avery Joseph Welker
MORGAN LEWIS BOCKIUS LLP
1111 Pennsylvania Avenue NW

Washington, DC 20004
Michael.edney@morganlewis.com
Martha.stolley@morganlewis.com
Avery.welker@morganlewis.com
T: 202-739-3000
F: 202-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

***Counsel for The Dugaboy Investment Trust***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 29, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ Michael J. Edney
Michael J. Edney

Michael J. Edney
MORGAN LEWIS BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj |

**THE DUGABOY INVESTMENT TRUST'S INDEX IN SUPPORT OF MOTION FOR RECONSIDERATION FROM ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

The following exhibits are submitted in support of the Dugaboy Investment Trust's Motion for Reconsideration from Order Denying Motion for Relief from Order and Motion to Vacate:


| Description | Page No. |
|---|---|
| Dugaboy Ex 001 - 2015-12-17 HMIT Trust Agreement | App. 001 |
| Dugaboy Ex 007 - 2025-07-15 Shields Work Plan | App. 005 |
| Dugaboy Ex 011 - 2024-09-30 Valuation Analysis of 100 Participation Shares of DAF HoldCo, Ltd. | App. 015 |

| Description | Page No. |
|---|---|
| Dugaboy Ex 012 - 2025-03-25 Valuation Analysis of Certain Participation Shares of DAF HoldCo, Ltd. | App. 020 |
| Dugaboy Ex 015 - 2025-02-12 Membership Interest Purchase Agreement | App. 026 |
| Dugaboy Ex 036 - 2025-04-09 Dondero Affidavit | App. 030 |
| Dugaboy Ex 169 - 2024-02-05 Email-Shields Legal Group_Mark Patrick | App. 041 |
| Dugaboy Ex 204 - 2025-07-01 Texas Business Court Petition | App. 043 |
| Dugaboy Ex 211 - 2025-08-19 Aff & Exh Index-MacInnis | App. 059 |
| Dugaboy Ex 242 - 2024-03-06 DAF-Rand Structure Chart | App. 063 |
| June 23, 2025 Transcript – Highland Ex. 58 | App. 067 |
| June 25, 2025 Transcript – Dugaboy Ex. 35 | App. 072 |
| May 11, 2026 Transcript | App. 077 |
| May 12, 2026 Transcript | App. 105 |
| May 21, 2026 Transcript | App. 116 |

# EXHIBIT 1

# TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this "Trust Agreement"), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor"), John Honis as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee").

1. Definitions. Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to "the Agreement" or "this Agreement" are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

"Account" means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in his sole and absolute discretion.

"Delaware Act" means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"Honis Cause" means conduct by Honis, in any capacity, amounting to (i) Honis's conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis's using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

"Honis Trigger Event" means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis's employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16. Honis agrees to give the Partnership ten (10) days' written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2. Scope. This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising. Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3. Name; Certificate of Trust. The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided. The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act. It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4. Account Establishment. The Administrator shall establish and control the Account. The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5. Beneficial Owner; Liability of Beneficial Owner. The beneficial owner of the trust shall be Beacon Mountain LLC. Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6. Title to Trust Property. Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator. Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

7. Purpose and Powers of the Trust; Administrator's Powers. The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement. The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust. The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement. The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8. Fiduciary Duties of Administrator. (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b) The Administrator agrees to perform his duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust. For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c) To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for his good faith reliance on the provisions of this Trust Agreement.

(d) Unless otherwise expressly provided herein:

(i) whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii) whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

# EXHIBIT 7

Plaintiff
M MacInnis
First Affidavit
15 July 2025
Exhibit MM-1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (      )**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**EXHIBIT MM-1**

---

This is the Exhibit shown to me and marked "**MM-1**" to the First Affidavit of **MARGOT MACINNIS**.

Sworn before me this 15TH day of July 2025

Rachel Baxendale
Notary Public - Cayman Islands

Commission expires on 31 January 2026

Notary Public

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/

**INDEX TO EXHIBIT MM-1**
**TO FIRST AFFIDAVIT OF MARGOT MACINNIS**

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 1. | Company's Memorandum and Articles | 20 February 2025 | 1-37 |
| 2. | Highland Kansas Foundation – Certificate of Incorporation | 23 November 2021 | 38-40 |
| 3. | Highland Kansas Foundation – By-laws | Undated | 41-59 |
| 4. | Highland Dallas Foundation – Certificate of Incorporation | 23 November 2021 | 60-62 |
| 5. | Highland Dallas Foundation – By-laws | Undated | 63-77 |
| 6. | Highland Santa Barbara Foundation – Certificate of Incorporation | 23 November 2021 | 78-80 |
| 7. | Highland Santa Barbara Foundation – By-laws | Undated | 81-95 |
| 8. | Procedures for Establishment and Operation of Funds and Supporting Organizations | Undated | 96-122 |
| 9. | Highland Dallas Foundation – IRS Determination Letter | 19 January 2013 | 123-124 |
| 10. | Highland Santa Barbara Foundation - IRS Determination Letter | 12 February 2013 | 125-127 |
| 11. | Highland Kansas Foundation - IRS Determination Letter | 21 March 2013 | 128-129 |
| 12. | Highland Kansas City Foundation - Legal Relationship Agreement | 30 November 2011 | 130-132 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 13. | Highland Dallas Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 133-140 |
| 14. | Highland Santa Barbara Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 141-147 |
| 15. | Charitable DAF Fund, LP - LPA | 11 March 2024 | 148-165 |
| 16. | CLO HoldCo - Expense report of as of 30 June 2024 | 30 June 2024 | 166-169 |
| 17. | Letter from Stinson LLP to the JOLs | 8 May 2025 | 170-173 |
| 18. | NexPoint Capital, Inc. – Proxy Statement | 7 May 2025 | 174-196 |
| 19. | NexPoint Real Estate Strategies Fund – Prospectus | 30 April 2025 | 197-333 |
| 20. | Complaint - Liberty CLO HoldCo, Ltd v Nancy Dondero and others (United States District Court for the State of Delaware) | 28 February 2025 | 334-345 |
| 21. | CDHC Royse City Land, LLC – Property Tax Assessments | Various | 346-356 |
| 22. | CDHC Assets, LLC - Property Tax Assessments | May 2025 | 357-368 |
| 23. | CDHC Fort Worth Land, LLC - Property Tax Assessments | Various | 369-378 |
| 24. | CDHC Stewart Creek, LLC – Property Tax Assessment | 29 May 2025 | 379 |
| 25. | Rand Advisors LLC – Form ADV | March 2025 | 380-408 |
| 26. | Rand Advisors LLC – Brochure | March 2025 | 409-434 |
| 27. | DFW Charitable Foundation – Certificate of Incorporation | 9 December 2024 | 435-437 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 28. | Email from Shields Legal to Mr Patrick | 5 February 2024 | 438 |
| 29. | Structure chart showing the JOLs' understanding of the Fund holding structure prior to the Relevant Transactions | Undated | 439 |
| 30. | Structure chart showing the JOLs' understanding of the Fund holding structure after the Relevant Transactions | Undated | 440 |
| 31. | No Confidence Letter | 11 November 2024 | 441-442 |
| 32. | Email from Mr Murphy to Mr Patrick | 26 November 2024 | 443-447 |
| 33. | Email from Walkers to the Directors | 27 November 2024 | 448-453 |
| 34. | 18 December Resolution | 18 December 2024 | 454-460 |
| 35. | CDM Assignment | 18 December 2024 | 461-466 |
| 36. | CDMCFAD, LLC LLC Agreement | 18 December 2024 | 467-494 |
| 37. | Walkers' Draft Advice | February 2025 | 495-499 |
| 38. | Share Issuance Resolution | 7 February 2025 | 500-524 |
| 39. | Carrington Coleman Email | 18 December 2024 | 525-526 |
| 40. | Letter Agreement | 27 March 2025 | 527-531 |
| 41. | Manager Consent (Admission and Redemption Documents exhibited) | 27 March 2025 | 532-688 |
| 42. | Resolution of the Directors (Redemption) | 2 April 2025 | 689-691 |
| 43. | Resolution of the Directors (Assignment) | 2 April 2025 | 692-693 |
| 44. | Expenses Table | Undated | 694 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 45. | Resolution of the Directors (Mr Patrick's Salary) | 13 September 2024 | 695-696 |
| 46. | Resolution of the Directors (Mr Patrick's LTI Payment and Annual Discretionary Bonus) | 1 October 2024 | 697-704 |
| 47. | Employment Agreement | 24 March 2021 | 705-722 |
| 48. | Santa Barbara Foundation - Audited Financial Statements (year ended 31 December 2023) | 5 September 2024 | 723-750 |
| 49. | Valuescope Report | 11 April 2024 | 751-809 |
| 50. | Valuescope Report | 7 January 2025 | 810-864 |
| 51. | Valuescope Report | 26 March 2025 | 865-939 |
| 52. | Carrington Coleman Memo | 25 March 2025 | 940-956 |
| 53. | IRS Complaint | 20 March 2025 | 957-973 |
| 54. | FTI Report | 27 March 2025 | 974-987 |
| 55. | Mercer Report | 26 August 2024 | 988-1007 |
| 56. | H&B Memorandum | 9 July 2021 | 1008-1012 |
| 57. | Opinion (Mr Tony Beswetherick KC) | 5 March 2025 | 1013-1038 |
| 58. | Email from PwC to Walkers | 11 February 2025 | 1039-1057 |
| 59. | Email from Mr Patrick to Walkers | 17 March 2025 | 1058-1074 |
| 60. | Email chain between FTI and Walkers | 26 March 2025 | 1075-1092 |
| 61. | Letter from Campbells to the JOLs | 16 May 2025 | 1093-1095 |
| 62. | Letter from Johnstone Law to Campbells | 30 May 2025 | 1096-1097 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 63. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 30 May 2025 | 1098-1112 |
| 64. | Letter from Johnstone Law to Campbells | 5 June 2025 | 1113-1116 |
| 65. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 9 June 2025 | 1117-1124 |
| 66. | Letter from Maples to Campbells (enclosing draft protocol) | 19 June 2025 | 1125-1136 |
| 67. | Letter from Campbells to Maples (enclosing Revised Campbells Draft Protocol) | 29 June 2025 | 1137-1170 |
| 68. | Email from Kobre & Kim to Maples | 30 June 2025 | 1171-1173 |
| 69. | Email from Baker & Partners to Maples | 30 June 2025 | 1174-1176 |
| 70. | Texas Petition | 1 July 2025 | 1177-1422 |
| 71. | Texas Petition – Proposed Order | Undated | 1423-1426 |
| 72. | Second Rule 11 Agreement | 11 July 2025 | 1427-1429 |
| 73. | DFW Charitable Foundation – Delaware Division of Corporations Search Results | Undated | 1430 |
| 74. | CDMCFAD, LLC – Delaware Division of Corporations Search Results | Undated | 1431 |
| 75. | Company's Certificate of Incorporation | 27 October 2011 | 1432 |
| 76. | Shields Legal – Memorandum – Work Plan | 9 November 2023 | 1433-1440 |
| 77. | Letter from Seyfarth Shaw LLP to the IRS | 1 May 2025 | 1441-1446 |

# MEMORANDUM – WORK PLAN[1]

RE: Work Plan, Scope of Work, and Deliverables

DATE: November 9, 2023

---

This Memorandum is intended to be informational and provide guidance. It sets forth the work plan, scope of work, and requested deliverables for your review of matters relating to the following entities (highlighted in red). We would like your review to focus on the entities highlighted. As a general overview, we are looking for memorandums and opinions relating to potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc., as further outlined below and to be flagged as part of your review.




## I. LEGAL RESEARCH/ POTENTIAL LITIGATION ISSUES[2]

a. Transfer of 100% of Management Shares in Charitable DAF Holdco, Ltd., and 100% ownership interest in Charitable DAF GP, LLC, by Grant Scott to Mark Patrick.

---

[1] This Memorandum is attorney worked product, privileged, and confidential. Neither it nor its contents may be shared in any manner without express written permission from Shields Legal Group, P.C.

[2] The client will require a written agreement detailing the scope of work (this may be used as an attachment or reference) and hourly rates.

1. Confirm each of these transfers is valid and enforceable under Cayman law?
2. Is consideration a requirement under Cayman law?
3. If so, did each transfer have consideration under Cayman law?
4. Note: we understand there was no monetary consideration for each transfer, but there were tax considerations for this transfer including potential future tax liability. Donor also implicitly consented to the transfer of the voting shares by not objecting since the transfer.
5. Analyze whether holders of the participation shares in org chart have legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.?
6. Analyze whether Donor has legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.

ii. **Priority: high[3].**

iii. **Work product: legal opinion[4] and/or memorandum.**

1. **Note: we may need to rely on opinions and memoranda in potential future disputes.**

iv. **Anticipated attorney hours to completion: 30.**

b. Who would have standing under Cayman law for alleged corporate malfeasance or assert lack of corporate control from the transfers? Specifically, we want to understand third parties' abilities (in addition to regulators' abilities).

---

[3] Guides for priority:
-High: response requested within two weeks;
-Medium: response requested within four weeks; and
-Low: response requested within six weeks.
[4] Legal opinions and memorandums should include citations to and copies of relevant and applicable authorities.

i. **Priority: high.**

ii. **Work product: legal opinion and/or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

c. What are defenses under Cayman law – estoppel, waiver, statute of limitations, consent, others?

i. **Priority: high.**

ii. **Work product: legal opinion and/or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

d. Is there a corporate alter ego concept under Cayman law, and if so, what are defenses to it?

i. **Priority: high.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

**II. CORPORATE REVIEW**.

a. Top-down review of each entity with respect to corporate structure, management, ownership, capitalization, and voting.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 30.**

b. Written confirmation that the DAF is not a "regulated entity" under Cayman law and not subject to those compliance requirements. To reiterate, the DAF is not a "Fund" in the traditional sense: (i) there is no PPM and (ii) there are no subscribers/investors.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

# EXHIBIT 11

# VALUATION ANALYSIS OF 100 PARTICIPATION SHARES OF CHARITABLE DAF HOLDCO, LTD

AS OF
SEPTEMBER 30, 2024

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

January 7, 2025

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

***RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[1] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

1 The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[2] The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of September 30, 2024
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd
- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope, Inc.

ValueScope, Inc.

# EXHIBIT 12

# VALUATION ANALYSIS OF CERTAIN PARTICIPATION SHARES OF CHARITABLE DAF HOLDCO, LTD

AS OF
MARCH 25, 2025

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

***RE: Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[1]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.

---

[1] Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the DAF will continue as a going concern.[2] The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Participation Shares.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's management shareholder ("Management"). To understand the environment in which DAF operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo, Ltd. as of September 30, 2024
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd, amended and restated as of January 24, 2024

---

2 The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

- Information regarding the Company's history and current operations
- Historical distributions paid to the holders of the Subject Interest
- The organizational structure chart for Charitable DAF HoldCo, Ltd
- Discussions with the Company's Management
- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024
- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date
- An interview with Management regarding expectations for future distributions
- An application of appropriate valuation techniques and procedures, including the income approach
- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | **Value** | **Reference** |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | **Shares** | **Fair Market Value** |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope, LLC

# EXHIBIT 15

Execution Version

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as of February 12, 2025, is entered into between RAND PE FUND I, L.P., a Delaware limited partnership ("**Seller**") and CLO HOLDCO, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

(A) WHEREAS, Seller owns all of the issued and outstanding membership interests (the "**Membership Interests**"), of BEACON MOUNTAIN, LLC, a Delaware limited liability company (the "**Company**"); and

(B) WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Membership Interests, subject to the terms and conditions set forth herein.

(C) NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined herein), Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in and to the Membership Interests, free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance ("**Encumbrance**"), for the consideration specified in Section 1.02.

**Section 1.02 Purchase Price.** The aggregate purchase price for the Membership Interests shall be $1,000,000.00 (the "**Purchase Price**"). The Buyer shall pay the Purchase Price to Seller at the Closing (as defined herein) in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on Schedule 1.02 hereto.

**Section 1.03 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") remotely by exchange of documents and signatures (or their electronic counterparts). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at noon on the Closing Date.

**Section 1.04 Transfer Taxes.** Buyer shall pay, and shall reimburse Seller for, any sales, use or transfer taxes, documentary charges, recording fees or similar taxes, charges, fees, or expenses, if any, that become due and payable as a result of the transactions contemplated by this Agreement.

**Section 1.05 Withholding Taxes.** Buyer shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable law. Buyer shall provide Seller with written notice of its

intent to withhold prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by law. dTo the extent that amounts are so withheld and paid over to the appropriate tax authority by the Buyer, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made.

**Section 1.06 Allocation of Company Income and Loss.** Buyer and Seller shall request that the Company allocate all items of Company income, gain, loss, deduction, or credit attributable to the Membership Interests for the taxable year of the Closing based on a closing of the Company's books as of the Closing Date.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE II are true and correct as of the date hereof. For purposes of this Article II, "Seller's knowledge," "knowledge of Seller," and any similar phrases shall mean the actual knowledge of those persons listed on Schedule 2 of the Schedules.

**Section 2.01 Organization and Authority of Seller; Enforceability.** Seller is a limited partnership duly organized, validly existing and in good standing under the laws of the state of Delaware. Seller has full limited partnership power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited partnership action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution, and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

**Section 2.02 No Conflicts; Consents.** The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of limited partnership, limited partnership agreement, or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to Seller, except where the violation or conflict would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party, except where the conflict, violation, default, termination, cancellation, modification, or acceleration would not, individually or in the aggregate, have a

material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (d) result in any violation, conflict with or constitute a default under the Company's organizational documents (the "**Beacon Organizational Documents**"); or (e) result in the creation or imposition of any Encumbrance on the Membership Interests. No consent, approval, waiver, or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery, and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby, except such consents, approvals, waivers, or authorizations which would not, in the aggregate, have a material adverse effect on the Seller's ability to consummate the transactions contemplated hereby on a timely basis.

**Section 2.03 Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Membership Interests; or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement, except any Actions that would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 2.04 Financial Statements.** True, correct, and complete copies of any financial statements requested by the Buyer (collectively, the "**Financial Statements**") have been provided to Buyer. To Seller's Knowledge, the Financial Statements, if any, are true, correct, and complete.

**Section 2.05 Ownership of Membership Interests.**

(a) Seller is the sole legal, beneficial, record, and equitable owner of the Membership Interests, free and clear of all Encumbrances whatsoever.

(b) To Seller's Knowledge, the Membership Interests were issued in compliance with applicable laws. To Seller's Knowledge, the Membership Interests were not issued in violation of the organizational documents of the Company or any other agreement, arrangement, or commitment to which Seller or the Company is a party and are not subject to or in violation of any preemptive or similar rights of any Person.

(c) Other than the organizational documents of the Company, there are no voting trusts, proxies, or other agreements or understandings in effect with respect to the voting or transfer of any of the Membership Interests.

**Section 2.06 Beacon Organizational Documents.** The Seller has provided Buyer a true, correct, and complete copy (including all amendments and modifications) of the Beacon Organizational Documents, which agreement is in full force and effect and is the only agreement in effect with respect to the matters described therein.

**Section 2.07 Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

# EXHIBIT 36

Digitally signed by Advance Performance Exponents Inc
Date: 2025.04.16 20:39:55 -05:00
Reason: Apex Certified
Location: Apex



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. OF 2025 ( )**

**IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO LTD AND THE CHARITABLE DAF FUND LP**

---

**AFFIDAVIT OF JAMES DAVID DONDERO**

---

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, **MAKE OATH AND SAY** as follows:

1. I am the President of NexPoint Advisors, L.P. (***NexPoint***), an investment advisor registered with the U.S. Securities and Exchange Commission (***SEC***). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this affidavit in support of the petition (the ***Petition***) filed by the Supporting Organizations (as defined below) seeking the winding up on the just and equitable basis of Charitable DAF HoldCo, Ltd (the ***LP***) and the Charitable DAF Fund, LP (the ***Fund***) pursuant to section 92(e) of the Companies Act (2025 Revision) (the ***Act***) and Order 3, rule 3 of the Companies Winding Up Rules (2025 Consolidation) (the ***CWR***).

3. I make this affidavit from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4. Now produced and shown to me and marked "**JDD-1**" is a bundle of true copy documents to which I refer in this affidavit. References to page numbers in this affidavit are references to that exhibit unless otherwise specified.

**BACKGROUND**

5. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding US$16 billion in value.

6. I was formerly the President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or my affiliates. In December 2015, I divested my majority stake of Highland (***2015 Transaction***). On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code (***Highland Bankruptcy***) in the Northern District of Texas. The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

7. In February 2021, as part of the Highland Bankruptcy, the employment contracts of the majority of Highland's employees were terminated. Many of the former back-office employees of Highland thereafter became employees of a newly formed company called Skyview Group (***Skyview***) that provides middle and back-office services to various clients, including companies in which I hold an interest such as NexPoint.

**THE FUND**

8. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

9. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the ***Supporting Organizations***) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the ***Charities***).

10. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (***ARLPA***), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (***Articles***), govern the Fund and its partners.

11. The LP holds 99% ninety-nine percent (99%) of the economic interest in the Fund. The remaining one percent (1%) is (or at least was as at the time of the Fund's formation) held by its general partner, Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011.

12. In addition to the Participation Shares, the LP issued 100 management shares (the ***Management Shares***) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

13. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

**GRANT SCOTT**

14. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

15. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr Scott as the Control Person. However, Mr Scott had complete discretion in adopting or rejecting the investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr Scott was paid $60,000 USD per annum.

16. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

17. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax-deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr Patrick served that role at Highland from 2008 until his departure in February 2021.

18. In March 2021, Mr Patrick was hired by Skyview as Tax Counsel and continued to perform

substantially similar tax counsel duties for me. At Mr Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

19. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr Patrick working with outside counsel. Mr Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

20. In March 2021, Mr Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the Highland Bankruptcy, and he did not believe he was equipped to handle those disputes. Mr Patrick suggested to Mr Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr Patrick was my attorney and Mr Scott was my trusted friend, and I was happy for Mr Scott to pass the Control Position to Mr Patrick.

21. On 25 March 2021, Mr Scott: (i) resigned as director of the LP, (ii) appointed Mr Patrick as director of the LP, and (iii) transferred to Mr Patrick the Management Shares for nominal consideration. Mr Patrick therefore assumed the Control Position from that date.

22. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr Murphy, Mr Patrick's vote counts as the tiebreaker for corporate voting.

**MR PATRICK'S CONTROL OF THE FUND**

23. In the initial period following Mr Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr Patrick was free (as Mr Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

24. Subsequently, however, communications between Mr Patrick and Skyview and me began to become less frequent, and over time I came to suspect that Mr Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the Fund, but rather for his own personal enrichment.

25. On 28 June 2023, Mr Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas

Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms Short learned that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

26. Ms Short discussed the matter with Mr Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on 5 September 2023, but Mr Patrick was informed that further payments were unlikely. I was informed of this process by Ms Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

27. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

28. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr Cronin was known to me personally. In September 2023, Mr Cronin and I met, and he informed me that he had been approached by Mr Patrick with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation. Mr Cronin informed me that he had asked Mr Patrick if this arrangement would amount to fraud, and that Mr Patrick's response had been: "*you can't steal from yourself.*"

29. Mr Cronin informed me that he understood from this statement that Mr Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr Cronin further informed me that he was uncomfortable about Mr Patrick's proposal and that he subsequently communicated this to Mr Patrick, Mr Patrick cut off all further communications between them.

30. Mr Cronin's allegations that Mr Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my U.S. attorneys that, had Mr Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr Cronin contacted me, I met with Mr Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations

about the matter and Mr Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr Patrick's powers or remove him from his position.

31. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the ***Expense Summary***) which indicated substantial increases in expenditures during Mr Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased even further to around US$2.25 million in the first half of 2024 alone.

(b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

32. The Expense Summary reinforced my concern that Mr Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

33. In August 2024, I became aware of yet another issue concerning Mr Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

34. I was informed that my director of charitable giving had been contacted by Ms Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms Diaz stated that on 28 August 2024, Mr Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI,

which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

35. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations. On 1 October 2024, as part of the finalisation of the investigation report, Skyview's chief compliance officer interviewed Ms Diaz about the allegations against Mr Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on 11 October 2024 and concluded that Mr Patrick had attempted a serious breach of U.S. securities laws. A copy of the report and its attachments is at **page 1**.

36. On 2 October 2024, Mr Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr Patrick became aware of the investigation into his behaviour and resigned before the report was published.

37. On the same day that Mr Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr Patrick as my counsel, I believe that Mr Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

38. After his resignation from Skyview and the termination of Skyview's services agreement with the Fund, I have received repeated reports and evidence of Mr Patrick causing certain DAF entities to liquidate their assets, some at below-market value. For example, on 20 February 2025, Mr Patrick's subordinate Shawn Raver asked for the in-bound wire instructions for one of my affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain owns most of the distribution rights of the equity position in the Highland Bankruptcy, meaning most of the residual value of the estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy. According to

Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value.

39. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. I am familiar with the Highland Bankruptcy estate and there is no valuation, net, gross, or otherwise, that I can imagine that would support a $1 million sales price. Additionally, given my founding and my affiliates' ownership of Highland, Mr Patrick would know that I was one of a few natural buyers of the Hunter Mountain position. While Mr Patrick of course would not be obliged to sell Hunter Mountain to me, the fact that Mr Patrick authorized the sale of Hunter Mountain at a below-market value without even approaching a natural buyer indicates a non-market, non-fiduciary reason for the sale.

40. Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the DAF. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policy holder is Empower Dallas Foundation, a charitable foundation for which I serve as President whose purpose is to benefit the Dallas Foundation.

41. On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of my affiliates) dated 7 May 2014 in the amount of $2,3M and 27 May 2014 in the amount of $5M, held by the Partnership; and (iii) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the two Notes, including accumulated interest, was in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 attempted sale of the Notes to an affiliate.

42. On 27 February 2025, H&K as counsel for the Empower Dallas Foundation (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes to CLO Holdco. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*" The initial zero valuation and

proposed $500,000 sale price was confusing given that HCRE Partners had offered to pay the full amounts due in an amortizing schedule. After the withholding of consent, the revised offer of 28 February 2025 still is confusing given that the amortization schedule is longer than 12 months.

**ATTORNEY GENERAL INVESTIGATION**

43. I have become aware that, on 14 March 2025, the Texas Attorney General (***Texas AG***) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organization, conduct and management of Charitable DAF GP, LLC, and its related entities.

44. I understand that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

45. I understand that the Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**DONATIONS TO THE CHARITIES**

46. Until Mr Patrick's departure in October 2024, I regularly donated to through the Charities to the Fund as part of my charitable giving program. My affiliates and I, which donated through the Charities to the DAF entities in 2023 and in various years prior, and are the primary funding source for the Fund. As allowed pursuant to US law, I direct the Charities to utilize the Fund's assets to sponsor charitable causes I particularly value, including underprivileged youth education, cancer research, heart health, veterans' services, and local institutions such as zoos and museums. Though I wish to continue to support these charitable causes, I will not give any future donations through the Charities to the Fund while it is under Mr Patrick's management and/or control.

**FUNDING OF PROCEEDINGS**

47. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations simply for the purpose of overseeing how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. In this context, I became aware that the Supporting Organizations were meeting to vote on the decision to take legal action to take steps to preserve the assets of the Charities they exist to support. Given my connection with the Fund and personal relationship with Mr Patrick, I recused myself from that meeting and was not otherwise involved in the decision taken by the Supporting Organizations to commence these proceedings.

48. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not

at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

**SWORN** by the above named )
**JAMES DAVID DONDERO** )
This 9th day of April 2025 )
at 4:46 pm )

[signature]
**JAMES DAVID DONDERO**

**BEFORE ME:**

[signature] Krystal Hughes
**NOTARY PUBLIC**

KRYSTAL HUGHES
Notary ID #129488160
My Commission Expires
July 12, 2025
NOTARY PUBLIC STATE OF TEXAS

**THIS AFFIDAVIT** was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

# EXHIBIT 169

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Brandon R. Schaller <bschaller@shieldslegal.com> |
| **Sent:** | 05 February 2024 1:20 PM |
| **To:** | Philip Aubry |
| **Cc:** | Geoffrey Sykes; Bart Higgins |
| **Subject:** | FW: Cayman GP |
| **Attachments:** | image001.png |

**[this message is from an external sender]**

FYI

SHIELDS LEGAL GROUP

**BRANDON R. SCHALLER**
**Attorney**
16400 Dallas Parkway, Suite 300
Dallas, Texas 75248
Direct: (469) 726-3055
Email: bschaller@shieldslegal.com

**Legal Solutions. Business Insight. Your Trusted Advisor.**

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Monday, February 5, 2024 12:18 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Shawn Raver <sraver@hotmail.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Re: Cayman GP

CAUTION: This email originated from outside of the organization.

Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.

On Mon, Feb 5, 2024, 11:43 AM Brandon R. Schaller <bschaller@shieldslegal.com> wrote:

> Mark,
>
> Question from Walkers. Do you want the new Cayman GP to be a Cayman LLC or an exempted company?

# EXHIBIT 204

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*

Dear Mike,

We remain open to finding a framework within which we can resolve your clients' concerns.

I don't want to repeat points already made in my email dated 30th January 2025, but our understanding was that we were to prepare a presentation for the Foundations to address these concerns. This was a course of action suggested by you in our call last year and one which we thought was very sensible.

We are struggling to understand what happened between 21st January (when David Rosenburg, from your firm, confirmed a video conference would be acceptable) and 23rd January when an email was sent to Mark's old email address repeating various allegations that we were going to address in the presentation.

We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so.
Many thanks,
Paul.

---

**From:** Michael.Stockham@hklaw.com <Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; David.Rosenberg@hklaw.com; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you are represented by counsel, I believe it appropriate to loop him in for this communication. I also told you that I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 — before Mr. Patrick shut down that line of communication and information — showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. Yet, no information has been provided by you



CONFIDENTIAL

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Julie,

I am an independent director of Charitable DAF HoldCo, Ltd. (which I believe is the entity you refer to as "DAF HoldCo" in your email dated 28 January 2025 (the "**28 January Email**")).

As an initial matter, I hope you will find the tone of this initial response to the 28 January Email conciliatory as I am keen to avoid any misunderstandings in circumstances where I had understood the next steps following the meetings between our respective legal

representatives (Douglas Mancino and David Rosenberg) in December last year was for us to present directly to the foundations/supporting organizations in order to address some of the concerns in the letter dated 11 November 2024 (the "**11 November Letter**"). This proposed presentation would supplement the two Zoom conference calls with your attorneys held by me and our independent valuation experts, ValueScope, in December last year as well as the ValueScope 9/30/24 report sent to you on 7 January that provided a balance sheet and information on all investment holdings.

As recently as 21 January 2025, David again confirmed that a Zoom conference call with yourselves would be an effective way to address your concerns and move forward in a cooperative manner.

Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter. Please note that neither Mark nor myself received your email dated 23 January 2025 given that it was sent to an out-of-use email address for Mark (which I understand he communicated to you and your assistant in person) and did not copy me. Therefore, the basis of the concerns and request to wind-up expressed in the 28 January Email, appears to be the single failure to respond to an email that was sent to a defunct email address. Having now been reminded that the email address is not functional, I hope you can take some comfort that you were not being ignored.
However, given the content and tone of the 28 January Email and David's request to progress the direct presentation to the foundations/supporting organizations only 7 days prior on 21 January 2025, there seems to be a disconnect between the conciliatory approach adopted in the latter and the more aggressive position set out in the former.

For our part, at this stage we are more than happy to continue to engage with the foundations/supporting organizations in an

effort to provide clarity on investments and the DAF HoldCo governance structure.

I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.

Please let us know if you are prepared to withdraw the allegations made in the 11 November Letter and the 23 and 28 January Emails and are content to proceed with our proposed delivery of the presentation which we are confident will provide a complete answer to your concerns.

Finally, as a matter of record, it is important that I outline the following:

The 11 November 2024 Letter was not directly sent to me. I received it from Charitable DAF HoldCo's US attorneys who had, in turn, received it from a US law firm acting for Mr. Dondero. As set out above, this supports our belief, which is also based on other actions we have seen to date, that Mr. Dondero is seeking to improperly

exerting influence over the foundations and supporting organizations for self-serving purposes to the detriment of DAF HoldCo, the foundations and supporting organizations.

We note that your communications to date contain several misstatements of fact and we reject all of your allegations. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.

We look forward to hearing from you in relation to the proposed presentation and withdrawal of the allegations.

Kind regards,

Paul.

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman KY1-1007
Cayman Islands
**Phone:** +1 345 946 3459
**Mobile:** +1 345 324 1121
**Fax:** +1 345 946 3493
**E-mail:** paul@gkmanagement.com.ky

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Tuesday, January 28, 2025 9:14 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Michael.Stockham@hklaw.com; Rosenberg, David M (DFW - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

Mark and Paul-

We have great concern that our reasonable requests below have not been acknowledged. This failure to provide the courtesy of a response continues a pattern of a lack of communication and transparency as to assets and financials of DAF HoldCo under your stewardship. These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

**From:** Julie Diaz
**Sent:** Thursday, January 23, 2025 9:45 AM
**To:** MPatrick@CharitableDAF.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>
**Subject:** DAFHoldCo information request

Hi Mark –

Since we spoke last fall, the three CEOs from Santa Barbara, Kansas City, and Dallas community foundations (copied here) were discussing our plans for 2025 and wanted to reach out to you to check in on the DAFHoldCo. We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place.

Specifically, could you send:

- **Income Statements for the last for years**: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses
- **Listing of Underlying Assets**: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.
- **Audited Financial Statements**: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.
- **Current Structure of DAFHoldCo Operations:** An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

As you can appreciate, our job as leaders of our respective community foundations is to ensure proper stewardship of the charitable assets that are owned by our organizations. We are grateful for the decade plus of charitable investments that we have been able to make from the proceeds of the DAFHoldCo and would like to have confidence that this vehicle will continue to grow and make



CONFIDENTIAL

additional meaningful contributions to our respective communities.

Please let us know your ability to get this information to us by Feb. 10, 2025.

Thank you and happy New Year.

---

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything

in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

---

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

<~WRD0000.jpg> <~WRD0000.jpg> <~WRD0000.jpg>

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Skyview Group. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Skyview Group.

EXHIBIT
4-C

February 27, 2025

*Via Email: dmancino@seyfarth.com*

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

Sincerely yours,

Michael W. Stockham

cc: David Rosenberg

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 18 March 2025 09:27 |
| **To:** | Mancino, Douglas; Michael.Stockham@hklaw.com |
| **Cc:** | Paul Murphy |
| **Subject:** | RE: Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this. |

Doug, we are available on:

- Wednesday March 26, after 4:00 p.m. U.S. Central Daylight Time.
- Monday, March 31, until 12:00 p.m. U.S. Central Daylight Time.
- Thursday, April 3 until 12:00 p.m. U.S. Central Daylight Time.

**David Rosenberg | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** Mancino, Douglas
**Sent:** Monday, March 17, 2025 1:00 PM
**To:** Rosenberg, David M (DAL - X61508) ; Stockham, Michael W (DAL - X62515)
**Cc:** Paul Murphy
**Subject:** Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.

Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 03 April 2025 09:51 |
| **To:** | Mancino, Douglas |
| **Cc:** | Michael.Stockham@hklaw.com; Paul Murphy |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, no such call is on our calendar, so I am not sure of the source of the confusion. We will circle back with our clients and provide some windows starting on April 16.

I wish your wife the best of health with her back. Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | https://urldefense.proofpoint.com/v2/url?u=http-3A__www.hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dUaYK7RyBQ-__Uvhuz_UbZY9LLgA8fqgfSQfMU9IREk&e=

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <https://urldefense.proofpoint.com/v2/url?u=http-3A__David.Rosenberg-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dK186X1LRwbLe82XNr4DiwVprLY83NgIEL5KUk2L9wM&e=>
Cc: Stockham, Michael W (DAL - X62515) <https://urldefense.proofpoint.com/v2/url?u=http-3A__Michael.Stockham-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=H8AOyc2PQyRIKod6ljjomBwRDxne7__BsTh9i-RGFDY&e=>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

# EXHIBIT 211

(a) Admission and Amendment No.1 Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192;

(b) Redemption and Amendment No.2 Agreement under which CDM redeemed the Company's CDM Membership for the same sum of US$1,637,192 (the "**Redemption Amount**"); and

(c) A written consent of the manager of CDM in connection with the matters referred to at paragraphs 46.1(a) and 46.1(b) above (the "**Manager Consent**").

46.3 Copies of the Letter Agreement, the Manager Consent and the Admissions and Redemption Documents (which are Exhibits A and B of the Manager Consent) are exhibited at pages 527 to 688 of MM-1.

47 On 2 April 2025, the Directors of the Company resolved to approve the:

47.1 redemption of the Company's CDM Membership for the Redemption Amount; and

47.2 shareholder distribution of US$1,612,192.01 to the Community Foundation of North Texas and the Supporting Organisations.

Copies of the resolutions are exhibited at pages 689 to 691 of MM-1.

48 The effect of the Redemption was that the Company's CDM Membership were in effect purchased by or transferred to DFW for the Redemption Amount.

The Remuneration Transactions

49 The Company's expenses have increased materially following Mr Patrick's appointment as a director on 25 March 2021. Specifically (and amongst other things):

49.1 The Directors' fees increased from around US$40,000 in 2022 to approximately US$600,000 in 2023 (page 694 of MM-1).

49.2 On 13 September 2024, the Directors resolved to increase Mr Patrick's salary to US$850,000 per annum and approve a long-term incentive ("**LTI**") of 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return). A copy of this resolution is exhibited at pages 695 to 696 of MM-1.

49.3 On 1 October 2024:

(a) the Directors resolved that Mr Patrick was to receive an LTI payment of US$975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary. A copy of this resolution is exhibited at pages 697 to 704 of MM-1.

(b) Mr Patrick signed an employment agreement for his own position at the Company for the period from 24 March 2021 which provided, among other things, for a base salary of US$850,000 and an LTI payment of US$4,759,000. A copy of this agreement is exhibited at pages 705 to 722 of MM-1.

50 By way of contrast to the remuneration that Mr Patrick resolved that he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately US$60,000 per annum.

51 As regards expenses, expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

**THE JOLS' CONCERNS**

52 The JOLs' overarching concern is that the Relevant Transactions and the Remuneration Transactions were pursued by the Directors for the sole or primary reason of removing assets from the Company to benefit entities controlled by Mr Patrick or for his benefit personally, to the detriment of the Charities.

Impacts on Charities

53 The JOLs continue to investigate the impact that the Relevant Transactions have on the Charities. The Relevant Transactions have reduced the ability the Supporting Organisations and the Charities to meet their charitable objectives by: (i) stripping them of some of their assets and creating a hole in their balance sheets; (ii) reducing the Charities' ability to pay their overheads because, historically, these have been (in part) financed by the Supporting Organisations, where the fees charged by the Charities are typically based on a percentage of the market value of assets controlled by the Supporting Organisations; and (iii) the Remuneration Transactions have reduced the Fund's ability to provide financial support to the Supporting Organisations and, by extension, the Charities.

*A Hole in the Charities' Balance Sheets*

54 Although the JOLs' investigations continue, they understand that, historically, the Supporting Organisations have held the Participating Shares on their own balance sheets and the Charities have held them on their consolidated balance sheets.

55 For example, the Santa Barbara Foundation:

55.1 Its publicly available, independently audited financial statements for the year ended 31 December 2023 (a copy of which are exhibited at pages 726 to 750 of MM-1) disclose the following:

# EXHIBIT 242

**DAF Structure Chart**
*(as of 3/6/2024)*



**Rand Structure Chart**
*(effective as of 12/2015 – 8/2022)*



**DAF/Rand Structure Chart**
*(May 2025)*



Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

§
In re § Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P, § Case No. 19-34054-sgj11
Reorganized Debtor. §
§

-----------------------------------------------

ORAL DEPOSITION OF
MARK PATRICK
JUNE 23, 2025
(Reported remotely)

-----------------------------------------------

ORAL DEPOSITION OF MARK PATRICK, produced as a witness duly sworn by me at the instance of the Defendant, taken in the above-styled and numbered cause on the 23RD day of June, 2025, from 12:05 p.m. to 1:14 p.m., via Zoom videoconference before Ida Alcala, Certified Shorthand Reporter No. 12565, in and for the State of Texas, reported by oral stenographic means, pursuant to the Texas Rules of Civil Procedure, and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

Mr. Sawnie A. Mcentire (Via Videoconference)
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Ave Ste 4400
Dallas, Texas 75201-7324
214-237-4300

Mr. Michael Lang (Videoconference)
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave Ste 2390
Dallas, Texas 75201
214-817-4500

Mr. Louis M. Phillips (Via Videoconference)
KELLY HART ATTORNEYS AT LAW (LOUISIANA)
Baton Rouge Office
301 N. Main Street Ste. 1600
Baton Rouge, LA 70801
225-381-9643

Mr. John R. Morris (Via Videoconference)
ATTORNEY AT LAW
P.O. Box 470472
Fort Worth, Texas 76147-0472
817-262-7762

Ms. Deborah A. 'Deborah' Newman (Via Videoconference)
NEWMAN LAW FIRM
245 W. 18th Street
Houston, Texas 77008-4005
713-942-2501

Mr. Matthew Okin (Via Videoconference)
OKIN ADAMS LLP
1113 Vine St Ste 240
Houston, Texas 77002-1044
713-228-4100

(CONTINUED ON NEXT PAGE)

Page 3

(CONTINUED)

Mr. Andrew Kohl 'Drew' York (Via Videoconference)
GRAY REED & MCGRAW
1601 Elm St. Ste 4600
Dallas, Texas 75201-7212
469-320-6114

Ms. Kathryn George (Via Videoconference)
LATHAM AND WATKINS LLP
Chicago Office
330 North Wabash Avenue Ste 2800
Chicago, IL 60611
312-876-7700

ALSO PRESENT:
Ms. Amelia Hurt (Videoconference)
Mr. Jeff Pomerantz (Videoconference)
Mr. Gregory Demo (Videoconference)

Page 4

I N D E X


| | PAGE |
|---|---|
| WITNESS: MARK PATRICK | |
| Appearances................................ | 2 |
| Examination by Mr. Lang.................... | 5 |
| Examination by Mr. York.................... | 24 |
| Further Examination by Mr. Lang............ | 42 |
| Changes and Signature...................... | 44 |
| Reporter's Certification................... | 46 |

INFORMATION REQUESTED TO BE FURNISHED
(None)

EXHIBITS INDEX
COUNSEL FOR DUGABOY INVESTMENT TRUST

| EXHIBITS | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 1 | Charitable DAF/CLO HoldCo Structure Chart | 8 |
| 2 | Rand Structure Chart | 8 |
| 3 | Proposed settlement agreement | 16 |

Page 5

PROCEEDINGS

MARK PATRICK,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. LANG:

Q. Please state your name for the record.

A. Mark Patrick.

Q. And, Mr. Patrick, how are you currently employed?

A. I -- what do you mean by --

Q. Who's your -- who do you work for?

A. I work for DAF entities.

Q. And when you say the DAF entities, can you be more specific into which entities that are?

A. You know, there -- it's just a group of entities that hold investment assets for charitable purposes.

Q. Specifically, do you have the names of these entities?

A. Some -- some of them such as CLO HoldCO.

Q. Anybody else?

A. Liberty, I think. Charitable DAF HoldCo Inc, US entity, Charitable DAF Fund LP. I'm probably missing several others. It's a sophisticated structure, but that's generally the gist of when I refer to DAF entities.

Q. And what about Hunter Mountain? Are you employed by Hunter Mountain?

Page 6

A. Well, no -- I know -- I appreciate that. I'm -- like, when I think of employment, I'm also the preferred manager for Wind Advisers, which is an investment adviser that advises investment funds -- and then -- so then I have roles and that's why when you ask about employment, you know, there's -- it's kind of a different question than roles.

Q. That's fair. Tell you what. Why don't I put up a work chart and we'll talk through it. Will that work?

A. Yeah, I'll take a look anything.

Q. Okay. Do you see this chart?

A. Yes, I do.

Q. Okay. So this is the charitable DAFs, you know, the whole structure comp chart. Do you see that at the top?

A. Yes.

Q. Okay. Is this how the DAF CLO HoldCo structure currently looks today?

A. No, it does not.

Q. Okay. What is different?

A. Well, there's a lot of differences. I'd have to kind of see the specific documentation to be exact.

Q. Well, can you generally describe the -- the changes that have been made to this flowchart?

MR. MCENTIRE: I'll object as to form and relevance.

Page 7

A. Yeah. I mean, I -- I think I have already, you know, with respect to the listing of entities. You'd have to show me some documents with respect to these entities and I can, you know, walk you through it.

Q. Would charitable DAF GP LLC still the GP for charitable DAF CLO Co?

A. I don't -- I don't recall precisely and I, you know, I want -- I want to be -- when I give you an answer, a hundred percent accurate.

Q. Okay. Does charitable DAF Fund LP still own a hundred percent of CLO Hold Co?

A. Yes, that is my understanding.

Q. And this charitable DAF CLO CO limited still own a hundred percent of charitable DAF Fund LP?

MR. MCENTIRE: Objection, form.

A. No.

Q. (By Mr. Lang) Okay. Charitable DAF FUND LP, is that owned by CDM CFAD LLP?

MR. MCENTIRE: Objection, form.

A. That's my general -- that's my general understanding.

Q. (By Mr. Lang) Okay. And who owns CDM CFAD LLC?

A. Yeah, again, without corporate documents that you can present to me, I -- you know -- I -- I just don't want to be inaccurate.

Page 8

Q. Does DFW Charities own CDM CFAD LLC?

MR. MCENTIRE: Objection, form. Relevant.

A. Yeah, again, you know, Mr. Lang, you know, there are several entities in this structure, and I -- I just don't want to go beyond what I have a hundred percent knowledge of.

Q. I'm sharing this charitable DAF CLO CO structure chart as Exhibit 1, to be fair. And this is a RAND structured chart, which I'm marking as Exhibit 2. Do you recognize this document?

MR. MCENTIRE: Mark, at this time he's only asking whether you recognize it.

A. Yeah, I haven't made it to the bottom, I apologize.

MR. MCENTIRE: Okay.

A. What is the question now?

Q. (By Mr. Lang) Well, do you recognize this organizational structure? Let me change the question.

A. Do I recognize this structure. Generally -- very generally.

Q. Okay. And starting at the top, charitable DAF Holdings Corp, do you see that box?

A. Yes, I do.

Q. Is that owned by CLO HOLD CO?

MR. MCENTIRE: Objection, form.

A. I don't know -- I don't know. I can't recall

precisely if there's other entities in -- in between that, you know, whether that links up to CLO Hold Co.
Q. (By Mr. Lang) Does CLO Hold Co indirectly own charitable -- charitable DAF holdings Corp.?
MR. MCENTIRE: Objection, form.
A. Yeah, again, I can't answer with accuracy here unless you showed me a corporate -- some actual corporate filings or something like that.
Q. (By Mr. Lang) Is this generally the structure for the RAND -- structure -- is it generally a structure it looks like today?
MR. MCENTIRE: Objection, form.
A. What part of the structure are you referring to, Mr. Lang?
Q. (By Mr. Lang) Well, the whole thing. Charitable DAF Holdings Corp?
A. No.
Q. Does it own Rand Advises LLC?
A. Yeah, can you restate that question, again?
Q. Does charitable DAF Holdings Corp, top box, the sole member of Rand Advisers LLC? The green box to the left.
A. Yes, that is -- that is my understanding.
Q. Okay. Does charitable DAF holdings Corp, the box at the top, is it still the sole member of Rand PD fund



management LLC?
A. I would -- I would believe so.
Q. Okay. And is RAND PE fund management LLP still the general partner for RAND PE Fund One LP? See it just below it?
A. Yes, I would believe so.
Q. And then charitable DAF Holdings Corp, the box at the top, is it still the sole member for Atlas IDF GP PLLC?
MR. MCENTIRE: Objection, form.
A. Yes, I would believe so.
Q. (By Mr. Lang) Okay. And is Atlas IDF GP LLC still the general corporate for Atlas IDF LP?
MR. MCENTIRE: Objection, form?
A. Yes, I would believe so.
Q. (By Mr. Lang) Okay. And is Atlas IDF LP still the 99 percent limited partner for RAND PE FUND I LP?
MR. MCENTIRE: Objection, form.
A. I'm trying to recall because I have RAND PE FUND in a wind down situation. So I -- I don't know if that is accurate or not offhand.
Q. (By Mr. Lang) And does RAND PE FUND ONE LP still the sole member of Beacon LLC?
MR. MCENTIRE: Objection, form.
A. No.
Q. (By Mr. Lang) Okay. Who -- who owns Beacon



Mountain LLC?
A. An entity called CLO HOLD CO LLC.
Q. And that's different than CLO HOLD CO limited?
A. Yes.
Q. Who owns CLO HOLD CO LLP?
A. I believe it's CLO HOLD CO limited, from my understanding.
Q. And the CLO HOLD CO LLC owned Hunter Mountain?
A. No.
Q. Who owns Hunter Mountain?
A. Beacon Mountain LLC. And I would clarify one thing. I -- it's beneficial -- it's a beneficial ownership. Hunter Mountain investment trust is a trust.
Q. Okay. I appreciate that.
A. Can you do -- if you don't mind, do a summary? I just want to make sure that we're sort of accurate here?
Q. Okay. From what I understand --
A. Yeah, from Beacon Mountain ownership. I just want to make sure you are understanding is --
Q. Beacon Mountain LLC is owned by CLO HOLD CO LLC?
A. Yes.
Q. Beacon Mountain LLC owns Hunter or -- Hunter Mountain Investment Trust is owned by Beacon Mountain LLP?
A. Yes.
MR. MCENTIRE: Objection.



A. (inaudible) beneficial.
MR. MCENTIRE: Yeah, I would object to mischaracterizing his testimony.
MR. LANG: Nobody's mischaracterizing.
Q. (By Mr. Lang) The beneficial owner of Hunter Mountain Investment Trust.
A. Yeah, this is all a current state.
Q. Current state.
And what is your role with Hunter Mountain Investment Trust?
A. My understanding is I'm the -- an administrator which is a -- the control person for that trust.
Q. Are you the control person for Beacon Mountain LLP?
A. Yes.
Q. Are you the control person for CLO HOLD CO LLC?
A. Yes.
Q. Are you the control person for RAND Advisers LLC?
A. Yes.
Q. Are you the control person for RAND PE FUND Management LLC?
A. Yes.
Q. Are you the control person for Atlas IDF GP LLC?
A. Yes.
Q. Are you the control person for the Charitable DAF Holdings Corp?

Page 13

A. Yes.
Q. And you're the control person for Charitable DAF Fund LP?
I'll -- I'll go back here.
MR. MCENTIRE: Objection, form.
Q. (By Mr. Lang) Are you the control person for Charitable DAF Fund LP?
MR. MCENTIRE: Objection, form.
A. It's -- no, but you should ask me a follow-up question.
Q. What's your role at Charitable DAF Fund LP?
A. Yeah, I'm the control person for the general partner of that limited partnership.
Q. And who's the general partner of the limited partnership?
A. Yeah, and then this is where my memory is -- is -- I'd have to kind of revisit the actual organizational documents to give you a confident a hundred percent answer.
MR. MCENTIRE: Yeah, Mark, let's don't -- let's don't speculate unless he has a document, okay?
A. Yes.
Q. (By Mr. Lang) Are you the control person for CDMCFAD LLC?
MR. MCENTIRE: Can you repeat the question, I didn't hear it, Mr. Lang.

Page 14

Q. (By Mr. Lang) Mr. Patrick, are you the control person for CDMCFAD LLC?
A. I believe I am.
Q. Does that stand for anything out of curiosity?
A. I don't remember.
Q. All right.
MR. PHILLIPS: Objection, formatting.
Q. (By Mr. Lang) Did you -- you negotiated the settlement agreement that is the subject of (inaudible) correct?
A. Correct.
Q. Did you initiate settlement discussion with about events?
A. What do you mean by initiate.
Q. Well, did you approach them about settlement or did they approach you?
A. I'm sorry, you were slightly muffled there.
Q. I said did they approach you about settling or did you approach them about a potential settlement?
MR. PHILLIPS: Objection to the form of the question?
A. I can't -- I can't recall offhand. Who approached who or -- yeah.
Q. Under the settlement agreement, Hunter Mountain is to receive among other things the Dugaboy note and the

Page 15

Kirschner claims. Do you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims?
A. I -- I would appreciate it if you could pull up the -- the Dugaboy note document that you are referring to. There's an awful lot of Dugaboy notes out there, and -- and as a starter and I'd also appreciate if you could pull up for me the -- what you're referring to as the Kirschner Litigation complaint.
Q. I'm referring to what's in the settlement agreement. It refers to the Dugaboy note --
A. Well, then the document speaks for itself, sir. If you want to show me the document, I'll definitely testify to the accuracy of what I signed.
Q. I'm asking if you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims as re restricted at that point out from Patricia claims as referenced in the settlement agreement.
A. Yeah, and I'm asking you to show me the settlement agreement with the lines and then I -- and I'll verify that for you if you don't mind.
There's a lot of Dugaboy notes out there you have to appreciate that, Mr. Lang.
Q. Which one have you bargained to receive in the settlement agreement?
A. And -- and there's a lot of Kirschner litigation as

Page 16

well.
Q. Well, the Kirschner litigation is that -- Styled Kirschner versus Dondero Adversary Proceeding 2103076.
Are you familiar with that one?
A. I'm not familiar with that caption. If you could just show me the document that you're -- the complaint that you're referring to, then I will say that is -- that is the litigation that -- that we negotiated for.
Q. Okay.
A. You can bring up the settlement agreement, I'll happily verify that whatever is referenced in there is what I negotiated for, but I'm not gonna broad brush generically say that I negotiated for some Dugaboy note without a little more precision, if you don't mind.
Q. Can you see my screen?
A. Here we go. Yes.
Q. Okay. When I refer to the Dugaboy note, that's the note that I'm referring to. Does that help you?
MR. MCENTIRE: Well, for the record, Mr. Lang, can we just identify that you have put up the actual settlement agreement, is that correct?
MR. LANG: Yes. Sorry. Exhibit 3 will be the settlement agreement. The proposed settlement agreement.
A. Yes, so you're having me refer to the Dugaboy note dated May 31st, 2017, with a face amount of roughly

Page 45

I, MARK PATRICK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

__________________
MARK PATRICK

THE STATE OF TEXAS
COUNTY OF ________

Before me, ___________________, on this day personally appeared MARK PATRICK, known to me (or proved to me under oath or through __________________)(description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ______ day of ______________, 20___.

________________________
Notary Public in and for
the State of Texas

Page 46

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| | § |
| In re | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

REPORTER'S CERTIFICATION
DEPOSITION OF MARK PATRICK
JUNE 23, 2025

I, IDA ALCALA, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MARK PATRICK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ________________, 2025, to the witness or to the attorney for the witness for examination, signature and return to me by ________________, 2025;

That the amount of time used by each party at the deposition is as follows:

Mr. Lang : (00:28)
Mr. York : (00:27)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Mr. Michael Lang, Attorney for Dugaboy Investment Trust.
Mr. Sawnie Mcentire, Attorney for Mark Patrick.
Mr. Drew York, Attorney for Patrick Daugherty.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action

Page 47

in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of the Texas Rules of Civil Procedure will be certified to after they have occurred.

Certified to by me this 23rd day of June, 2025.

[signature]
Ida Alcala, CSR#12565
CSR Expiration Date: 12/31/26
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on __________, 2025.

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Mcentire, Custodial Attorney;

That $__________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of ___________, 2025.

[signature]
Ida Alcala, CSR#12565
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008
CSR Expiration Date: 12/31/26

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| | ) | **Case No. 19-34054-sgj-11** |
| In Re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Dallas, Texas<br>June 25, 2025<br>9:30 a.m. Docket |
| Reorganized Debtor. | ) | |
| | ) | - MOTION TO EXTEND DURATION OF TRUSTS (4213)<br>- MOTION TO APPROVE SETTLEMENT (4216) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For the Highland Capital Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>(212) 561-7732 |
| For the Highland Capital Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>(310) 277-6910 |
| For Marc S. Kirschner, Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>295 5th Avenue<br>New York, NY 10016<br>(212) 849-7000 |

the Cayman Islands?
A I hesitate to say generally aware. I'm aware that there's a proceeding in the Cayman Islands about involving a blocker corp. And there's disclosure in this Court about what that entity is. It's a blocker corp. in the Caymans that prevents the ultimate charitable entities -- and I put that in quotes -- to -- from receiving UBTI, which is Unrelated Business Income. And in that case, they would have to pay tax on it, and the idea is that they don't want to pay taxes and they don't pay taxes. So that corp. apparently is in some sort of proceeding. That's on the DAF side. That is not on the HMIT side.
Q Okay. So, based on the work that you did and the documents that you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT entities?
A Yes.
Q And what view did you reach?
A He has complete authority over each of these entities. They run up to entities that he controls or he owns. And he's had that, and it's the structure that was set up a long time ago, and any changes to that structure are just consistent with the documents that let him do these things. And the proceeding in Cayman, whatever that is, has no impact on Mr. Patrick's authority over these entities or any of the entities

correct?
A Correct.
Q And CLO Holdco, LLC is owned by CLO Holdco, Limited?
A That's correct.
Q And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?
A Correct.
Q And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?
A The ultimate beneficial owner is DFW Charitable Foundation. To my -- to the best of my recollection, I would say that appears accurate. I'm just not a hundred percent.
Q Okay. And --
A But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner. And I'm a hundred percent that Dugaboy Investment Trust has no interest in it. And I'm also a hundred percent that The Dallas Foundation or any --
MR. LANG: Judge, I haven't asked --
THE WITNESS: -- or any other nonprofit has any --
MR. LANG: -- any of these questions.
THE COURT: Okay. There's an objection, nonresponsive. I sustain.
BY MR. LANG:
Q Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?
A (Pause.) I'm just waiting for a relevancy. I don't

Q And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?
A Around the end of March of 2025. I believe.
Q And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?
A What do you mean by involved? How?

THE COURT: Okay. I can see what's happening here or I have an impression of what's happening here. I feel like you're slowing down this process where I've given 30 minutes to this lawyer. Okay? And I feel like you're feigning confusion. I don't mean to be insulting, but that's how it comes across. Okay? So I need you to speed up your answers and not be confused about things you shouldn't be confused about. Okay?

THE WITNESS: Okay.

THE COURT: I feel like it's late 1980s *Dondi*. Does anyone know what I mean by that? Okay. We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling. That's what they did in *Dondi*. Confusion. Delay. Okay?

So I don't mean to chastise you. I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this. Okay?

comments on the record, and to the extent that Your Honor wants to amend that, you'll do so at your leisure?

THE COURT: Yes.

MR. MORRIS: Perfect.

THE COURT: All right.

MR. MORRIS: Thank you.

THE COURT: Thank you all. We're adjourned.

MR. PHILLIPS: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 4:38 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **06/27/2024**

______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 19-34054-SGJ-11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Chapter 11 |
| Debtor. | |
| | Monday, May 11, 2026<br>9:06 A.M. |

TRANSCRIPT OF HEARING ON
MOTION TO RECONSIDER (RE: DOCUMENT 4297 ORDER ON MOTION TO COMPROMISE CONTROVERSY) AND MOTION TO VACATE FILED BY PARTNER DUGABOY INVESTMENT TRUST (4513)
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor, Highland Capital Management:

Pachulski Stang Ziehl & Jones LLP
BY: JOHN A. MORRIS, ESQUIRE
1700 Broadway, Suite 36th Floor
New York, New York 10019

Pachulski Stang Ziehl & Jones LLP
BY: JEFFREY POMERANTZ, ESQUIRE
10100 Santa Monica Boulevard
13th Floor
Los Angeles, California 90067

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder: Nicholas Noble
Earle Cabell Federal Building
501 West 10th Street
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

Q Is that the Charitable DAF Fund, LP?
A Charitable DAF Fund, LP. Yes.
Q Okay. And we mentioned that you're a court-appointed liquidator of that company. Is that right?
A Yes. I was appointed on May 6 pursuant to an order from the Cayman court.
Q So I didn't really know about the court liquidator until I encountered this case. Could you tell me a little bit more about what a court-appointed liquidator in the Cayman Islands is?
A Broadly, it's -- your appointment comes about when a -- in an insolvent case when a creditor or stakeholder petitions the court to appoint an independent person to review the affairs or wind up the company. In a case like this, broadly my role will be to secure and protect the assets of the company. Often in cases where there's been misappropriation or fraud, that activity is quite involved because you have to trace the assets and look to enforce and recover them.

Once I have the assets in the estate, I do an exercise to adjudicate the claims that are filed in the estate. And then if there are funds available for distribution, I would distribute those funds. So those are the broad categories. There are a lot of other elements of the liquidation, but those broadly are the are the functions.
Q All right. And I think you mentioned when you were

appointed in this position. Could you restate that again?
A That was on May 6.
Q What were the circumstances that led to your appointment?
A As I understand it, the supporting orgs of the Charitable DAF Holdco petitioned the court for a just and equitable winding up of the Charitable DAF Holdco largely on the basis of concerns of misappropriation of the assets of the structure.
Q You mentioned the term the supporting organizations. Could you tell us what your understanding of what those are?
A So the Limited Charitable DAF Holdco is a hundred percent shareholder in the Charitable DAF Fund, LP. And the supporting organizations, which include the Dallas Foundation, the Kansas City Foundation, and the Santa Barbara Foundation, and the Community Foundation of North Texas, they are the participating shareholders of CDAF Holdco.
Q And what do you think your court-appointed mission is with respect to the Charitable DAF (indiscernible)?
A Well, it is to recover the assets of the estate and administer them for the benefit of the economic stakeholders in the company.
Q As a court-appointed liquidator for the Charitable DAF Holdco, Ltd., do you have the power to bring claims against other parties?
A I do have the power to bring proceedings by Cayman law statute and with the sanction of the Cayman court.

Q And did you bring any proceedings against Mark Patrick?

A Yes. We filed a statement of claim on July 15 in the Cayman court. The process to do that, I had to first seek sanction of the what I'm going to refer to as the liquidation judge, the judge that supervises my position and authority in CDAF Holdco.

I sought permission from him to bring these -- to bring this claim. And then once I had permission to bring it, I then filed it on July 15th. And that proceeding was assigned to Justice Parker, so it's not the liquidation judge that reviews and considers the statement of claim. It's Justice Parker. And the claim is presently I think paused, stayed pending the outcome of the injunction application that we filed off the back of our statement of claim.

Q Okay. What if anything did you have to show the liquidating judge in order to initiate litigation (indiscernible)?

A The liquidation judge would expect that I need to show that I have reasonable prospects of success on that claim. And practically speaking, that usually entails and it did in our case providing an expert opinion from a King's counsel an, independent King's counsel, on the merits of the case.

We're also required, I have a duty to present not only the reasons I feel that there's a reasonable prospect of success but also any material weaknesses or considerations of my claim

so that the judge has that all before him.
Q And did you provide opinions of King's counsel?
A Yes, we did. And we received sanctions so.
Q Now towards the latter half of your answer a couple of questions ago, you started talking about the status of the Cayman proceedings.
A Yes.
Q Could you give us a brief overview of that?
A So we filed the initial claim on July 15th. The judge set down and then we filed our -- I don't recall the date exactly but shortly thereafter an application for injunctive relief that was set down for December 15 and 16 in the Cayman Islands.

We filed an amended statement of claim on October 15. The matter was heard for the injunction on December 15th and 16th. In February, Justice Parker issued his ruling which found that we have a serious issue to be tried. That's the threshold for seeking injunctive relief. He denied our injunction on the basis he didn't consider our proprietary interest went as far as we said it did in the application. And so he found on the balance of convenience that it was in favor of the defendants.

We appealed that decision. We were in front of the Court of Appeal on an interim application for injunctive relief. They also affirmed there is a serious issue to be tried and granted the interim relief. And the main injunction action is pending for September 2nd and 3rd.

Q Okay. And what was the interim relief that you secured from the Court of Appeals?

A In the Court of Appeals, we essentially have -- there is to be no transfer, dissipation, withdrawal, removal apart from the ordinary course of business from any of the defendants. And there is also a limitation on no increases and remuneration can be made in this period and DFW is limited to $200,000 a month in distributions.

Q Just bear with me for a minute.

Okay. So there's a -- you mentioned that there's a limitation on what Charitable DAF Holdco can do with certain assets during the pendency of (indiscernible). Is that right?

A Yes, that's correct.

Q And does that apply to assets that is held directly by Charitable DAF Holdco or (indiscernible)?

A Well, because our injunction is against CLO Holdco, all of -- all of the assets in that structure and anything under CLO Holdco would be caught by the terms of that injunction.

Q And what are the limitations that this injunction places upon those assets?

A In layman's terms, it essentially keeps those assets safe from being dissipated, removed, transferred, diminished, any sort of transaction that would put them further away from this structure except they are allowed to do -- make payments in the ordinary course.

Q So if an asset is held under this structure and Mr. Patrick decided to sell them or trade them away or settle claims, would he need the Cayman court's permission?

A It would be a -- it would be a breach of the injunctive relief if he didn't have the permission to do that and it's outside of the ordinary course of business, yes.

Q And did Mr. Patrick oppose the imposition of this interim relief?

A Well they -- yes, it was -- the interim relief hearing was opposed by the defendants.

Q And his objection was (indiscernible). Is that correct?

A Yes.

Q Now did -- now with respect to the Cayman proceedings, did you take any actions to bring them to the attention of the courts in the United States?

A We were also -- filed our application for recognition Chapter 15, so our statement of claim was exhibited to that application. I believe that was done on July 25th.

Q And where is that application pending?

A It's in Delaware.

Q As a liquidator of the Charitable DAF Holdco, Ltd., do you have a special ability to obtain documents that are related to that company?

A Yes, I have the power to compel the production of documents certainly from service providers in the Cayman

Islands. A Chapter 15 recognition would also give me the subpoena powers in the United States for any third parties who are here who have books and records belonging to Holdco.

Q And does that include documents that with respect to other third parties might be considered confidential or privileged?

A Yes, I can -- if they're the documents of Holdco which we have obtained some, we're still in the process of getting parties to cooperate and provide their documents. But we receive, for example the lawyers acting for Holdco would be compelled to provide us with the information belonging to Holdco.

Q Is that because you're practically in charge of Holdco now?

A Yeah, I step into the shoes of the company. I replace the directors and others who have power.

Q And prior to being appointed a liquidator, would you have been able to have obtained access to some of these otherwise confidential documents?

A No, no it would be private company information.

Q When were you first able to gain access to some of these confidential documents?

A We started getting documents within the early days, the first few days of our appointment. That process is usually fairly involved, you'll appreciate it. Oftentimes the records of Cayman Islands companies aren't held in the Cayman Islands.

But for those parties who were there and we were able to ask them for the books and records and they cooperated. There were a number of parties who did not cooperate.

Q And when did you start making some of these confidential documents publicly accessible?

A We made the documents in connection with the statement of claim public when we filed in Chapter 15. I believe also that -- in the Cayman Islands, documents aren't going to become public unless they do something like file them in the Chapter 15 proceeding, until they're brought up in court or mentioned in court. And then that lifts the sort of privacy rules governing Cayman proceedings.

So some of those documents wouldn't have been capable of being referred to publicly until we held the injunction hearing in December.

Q December of 2025?

A December 15, 16 was the injunction hearing in Cayman.

Q So some of the documents you obtained you were able to make public when you filed them as an attachment to the Chapter 15 recognition proceeding?

A Yes.

Q And you filed that -- do you remember what date that was?

A That was July 25th.

Q July 25th --

A Yes.

those entities with the Charitable DAF Holdco?
A They are the -- they hold the economic benefit of Charitable DAF Holdco from Charitable DAF Holdco's inception. It was these four charities. I think Community Foundation of Texas was added after the first three in that list, but all four of them were for the -- up until the restructuring, were the sole economic interests in the Charitable DAF Holdco.
Q Now you mentioned the restructuring. Was there a restructuring that occurred with this chart of entities?
A Yes. That's what is behind our statement of claim. We've alleged or impugned this restructuring for --
Q Maybe you should stop. Let me ask --
A Okay.
Q -- (indiscernible).
A Okay.
Q Okay. And do you have a sense of what time period during which that restructuring occurred?
A I believe it started around the planning for the late December, late 2023, and the bulk of the transactions and documents supporting it from December 2024 to March 25th or 27th, 2025.
Q Based on your investigation and your work as liquidator, do you believe this chart is an accurate understanding of how the DAF Entities were organized prior to the restructuring (indiscernible)?

A Yes.
Q And why do you believe so?
A Based on the review of documents since our appointment, we were able to confirm how DAF Holdco did hold its interest in Charitable DAF Fund and the general partner arrangements.
Q And do you have an understanding based on your role as liquidator of the amount of assets that was held under this structure prior to the restructuring?
A I'll broadly refer to it as it was roughly $270 million at various points. I think it was somewhat below that and somewhat above that.

MR. EDNEY: All right. Let me put this demonstrative aside for a moment and look at the Slide 4 of the demonstrative, please.

(Pause)

BY MR. EDNEY:
Q So, I'm showing you Slide 4 of our demonstrative chart. Did there come a point where the general partner of the Charitable DAF Fund, LP was changed?
A Yes. Yes, it was.
Q Okay. And what's your -- do you have an understanding of the relationship between the general partner and the limited partnership?
A Yes. The general partner is the one that controls the decisions and the management of the fund.

Q And then I guess the general partner is distinguished from the limited partners. Is that right?

A Yeah. The general partner has the -- would hold the 100 percent of the management share, so it can affect control and voting of the structure. The limited partners, they have the participating shares or interest, so they get the economic benefit, but the general partner is the one that makes all the decisions about how funds are invested and used.

Q Now, the change in the identity of the general partner, from what entity to what entity did it change?

A I think it changed from what was called Charitable DAF General Partner to CDH GP.

Q And where was that new general partner (indiscernible)?

A Here on your chart, it says Cayman Islands.

Q But do you have an independent awareness of that?

A I've seen it on the documents that we obtained.

Q And based on your investigation, who is in charge of this new entity, CDH GP, Ltd.?

A Mark Patrick and Paul Murphy.

Q And tell me a little bit more about that, if you have any knowledge.

A I only understand them to have been in control of and appointed over CDH GP.

Q Okay, all right. I'm going to show you -- let's just see if I can just check my chart here for a second to see if this

exhibit.

Earlier, we talked about some of your efforts to obtain documents from service providers and DAF companies. Is that right?

A Yes.

Q Were you able to obtain documents relating to a law firm called the Shields Law Firm?

A Yes. I believe we've obtained some, but not all.

MR. EDNEY: Okay. Let's pull up Exhibit 169.

BY MR. EDNEY:

Q I'm handing you what's been --

MR. MORRIS: (Indiscernible).

THE COURT: I mean, he hasn't offered it into evidence, so when he --

MR. MORRIS: He's showing it to the witness.

THE COURT: I mean, how else is he going to lay a foundation without showing it to the witness?

MR. MORRIS: I won't make suggestions (indiscernible).

BY MR. EDNEY:

Q I'll show you what's been marked as Movant's Exhibit 169. Do you recognize this document?

A Yes.

Q And do you -- what is it?

A It's an email between Shields and Mark Patrick in relation

to a query from Walkers about how they want the new Cayman GP to be structured, whether a Cayman LLC or an exempted company.
Q Did you obtain this document in the course of your duties as liquidator?
A I've seen it before so, yes, I believe I have.
Q And do you know whether it was included as an exhibit to one of the affidavits that you filed in the Cayman proceeding?
A There were a number of exhibits attached to that, so I can't recall specifically where it was in the statement of claim.
Q How did you obtain this document, Ms. MacInnis?
A Well, we obtained, as I said, some discovery in books and records from Shields, from Walkers themselves, so it could have been from Mr. Patrick as well filed evidence in the Cayman proceedings. So without seeing my own document log and reference, I can't confirm specifically which exhibit or in which production it came through.
Q Okay. Do you recognize the name Brandon Schaller --
A Yes.
Q -- on the top of the email? Who's that?
A An attorney who works for Shields.
Q Okay. And if you scroll down to the second email, this is an email from an address with the name Mark Patz and Patrick Patz (indiscernible). com. Do you see that?
A Yes, I do.

Exhibit 8. Ms. MacInnis, I'm showing you what's been previously admitted as Exhibit 8. This is a certificate of incorporation of DFW Charitable Foundation, a nonprofit stock corporation. Do you see that on the first page?

A I do.

Q Is this a document that you gathered in the course of your investigation?

A Yes.

Q Do you know what it is?

A Yes. It's -- it incorporates DFW and confirms that, I was correct, it was formed in the State of Delaware.

Q Do you have an understanding of where DFW Charitable Foundation is headquartered?

A I understand it's at Mark Patrick's residence.

Q And do you have an understanding as to Mr. Patrick's role in DFW Charitable Foundation?

A Nothing more than I understand him to be named as the director and holder of the shares of DFW.

Q Let's move on to Movant's Exhibit 43 which is not in evidence. Ms. MacInnis, just in the manner of some preliminary questions, in the course of your investigation, did you gather the business records of Charitable DAF Holdco and use them?

A Yes.

Q And did that include resolutions of the board of directors of Charitable DAF Holdco?

If we could scroll to the second page.

BY MR. EDNEY:

Q The second email there dated November 26, 2024 at 4:11 p.m., if you can just take a moment to read that, and I'll read it into the record, as well.

"If new participating shares are issued to a nonprofit and say (indiscernible) tried to implement an equitable winding down of the company, do the new shareholders object. Will that help? Also, what could possibly be the basis for any equitable liquidation of the articles if the articles don't give such rights?" Do you see that?

A Yes, I do.

Q Are you familiar with this passage?

A Yes.

Q What is your understanding of some of the efforts to issue new shares to DFW Charitable and restructure this company?

A The dilution of the supporting org's interest in the structure would make it very difficult for them to bring a winding-up petition and have the ability to cause the company to be either wound up, or to prevent a winding-up. They wouldn't have enough economic interest to sway that sort of application.

Q All right. Let's move on to Movant's Exhibit 45. I do believe this document has --

THE COURT: I show this on my list of agreed-to

A They were very clear it couldn't be used to support or justify the fairness of the transaction being proposed.
Q And based upon your review of the business records of Charitable DAF Holdco, did that limitation on use ever change?
A Not that I'm aware of.
Q After speaking with PricewaterhouseCoopers and after speaking with FTI Consulting, did Charitable DAF Holdco move on to another valuation company?
A I understand they used ValueScope.
Q Let's go to previously admitted Movant's Exhibit 12. I'm handing you what's been marked as a valuation analysis of certain participation shares of the Charitable DAF Holdco, Ltd., as of March 25th, 2025. Do you see that?
A Yes, I do.
Q Do you recognize this document?
A Yes, I do.
Q What is it?
A It's the valuation used to support -- to put structure in the transaction.
Q And based upon your investigation and review of this document, what conclusions did ValueScope reach about the value of the org charitable institutions that historically had been in charge of Charitable DAF Holdco as of March 25th, 2025?
A They reached the conclusion that they were entitled to $1.6 million in total from the assets of that structure.

Q And in your role as liquidator, were you in a position to review previous valuation efforts by ValueScope?
A Yes. We looked at the September -- even earlier today we looked at the September 2024 -- 2024 valuation.
Q And did you see even others beyond that?
A Yes, I have.
Q Had ValueScope ever valued the stake of the four charities that (indiscernible) 1.61 million before?
A No. They had generally been in the ballpark of 270 million. And the discount provisions sort of ranged between 10 and 30 percent, whereas this one is materially different from the others on the basis that the valuation method changed and the level of discount changed.
MR. EDNEY: Perhaps if we could scroll down to the summary chart of ValueScope's conclusions. Just one up, please.
BY MR. EDNEY:
Q So directing you to what's Page 46 of the electronic document that has a fair market value conclusion, and you see down at the bottom in bold subject interest. Can you read that number for me?
A It's 1.6 -- 17,000, 1.6 million, 17 thousand and --
Q Is that what it is? Maybe we can blow that up a little bit.
A Sorry. If you mean the one per share, it's the per share

valuation was $5,368. But the total interest for the original SOs was 1.6 million.

Q Can you give us the exact number, please?

A 1,637,192.

Q Now, in the course of your investigation, were you -- did you reach a conclusion about whether this March 25th ValueScope valuation was reconcilable with ValueScope's previous valuations of the (indiscernible) shares?

A I did.

Q And what was that conclusion?

A That it isn't.

Q And why not?

A As I said, it changed the valuation approach, the discount assumptions that are the subject matter now of our statement of claim, and a matter to be resolved by the Cayman court.

Q Now, as of March 25th, 2025, the date of this valuation, had the assets under the DAF management changed in any significant magnitude?

A No.

Q And as of that date, what was your understanding of how many assets were underneath the DAF?

A My understanding is the corpus of that structure and the assets was about $270 million.

Q Let's move to -- well, let me ask you this. This ValueScope valuation, did you obtain this in the course of your

work as a liquidator?
A Yes, I did.
Q And was this one of the confidential documents that you were only able to gain access to by stepping into the shoes of the Charitable DAF Holdco?
A Yes.
Q Let's move to Movant's Exhibit 48, which appears to have been previously admitted. So I'm handing you what's been previously admitted as Movant's Exhibit 48. It's the redemption amendment number two dated March 27, 2025. Do you see that?
A Yes.
Q And it's on behalf of CDMCFAD, LLC. Do you see that?
A Yes.
Q Are you familiar with this document?
A Yes.
Q What do you understand it to be?
A I understand it to be the step that redeemed Holdco from its interest in CDMCFAD.
Q And redemption and amendment agreement, it was -- what was the date of it again?
A March 27th, 2025.
Q And how long after the ValueScope evaluation was that?
A ValueScope, was it March 25th?
Q Yes.

A I want to direct your attention to the third paragraph of Page 1, starting with, "Whereas, in accordance with the terms of this LLC agreement." Do you see that?
A Yes.
Q It says a manager desires to redeem the entire limited liability company interest in the company currently held by Charitable DAF Holdco of the effective as of the effective date of $1,647,192. Do you see that?
A Yes.
Q Now, what was the economics of this redemption transaction? Who, if anyone, got paid what through this?
A This resulted in Charitable DAF Holdco being completely divorced from the assets in the estate, and it received $1.6 million and change in that exchange.
Q And Charitable DAF Holdco, who were the economic beneficiaries of that company?
A In Holdco, it was the four supporting orgs and DFW.
Q And when did DFW come to have a stake in Charitable DAF Holdco?
A Off the top of my head, I think that was the resolution looked at in February.
Q Now, after this redemption, where were all the assets held that used to be in the DAF structure?
A They were still in CDMCFAD, and then held, one of your earlier charts shows still all held through CL Holdco.

Q All right. Let's turn to Slide 9 of the demonstrative, please. I'm handing you part of our demonstrative exhibit, Slide 9. It has a series of charts on it, DFW Charitable Foundation at the top. CDMCFAD, LLC below that. Do you see that?
A Yes, I do.
Q After the redemption of the stake of Charitable DAF Holdco, Ltd. and CDMCFAD, what stake did the four original charities have in the $270 million in assets in the DAF structure?
A They're left with nothing.
Q And what organization had the economic interest in those assets after the redemption that we just referenced?
A DFW.
Q And were there any other organizations that had such interest?
A No.
Q Turning back to -- and let's just stay there for a second, on Slide 9. Do you regard Slide 9 as an accurate representation of the current structure of the DAF after the redemption event that we just talked about?
A Yes.
Q Let's turn back to Slide 7. So I'm showing you Slide 7 that refers to Charitable DAF Holdco, Ltd. down at the bottom. And then it has the familiar supporting and other historical

charitable foundations at the top. Do you see that?

A Yes.

Q After the redemption even that we just referenced, what stake did Charitable DAF Holdco, Ltd. have in the $270 million in assets of the DAF structure?

A It didn't have any.

Q And what did it receive for that?

A One-point-six million.

Q And for that 1.6 million in cash, which entities had a stake in that now?

A That would be the four supporting orgs, excluding DFW.

Q And even in that 1.6 million, DFW Charitable Foundation had a stake in 50 percent of that? Is that right?

A No. The 1.6 represents the stake for the SOs.

Q Okay. And then, so after this transaction, what was the Dallas Foundation and the Highland Dallas Foundation left with in terms of assets?

A They don't have any recourse or access to these funds in the Charitable DAF structure.

Q Do they have any portion of the 1.6 million?

A They received the -- that was divided as between them. So I don't have the exact allocations. I think it was on the ValueScope summary.

Q At the end of this process, Ms. MacInnis, what was the sum of effect of the restructuring on these four historical

charities?

A They lost their economic interest and right to distributions from the 270 million in the structure. And as I understand it, you know, they, each of them had multi-year grant obligations and charitable works that they were contributing to using the distributions from the structure. And they'd been left in serious straits, not being able to fund those projects.

Q And the Dallas Foundation, was that a charitable organization that was founded in just the last couple years?

A No. As I understand it, it's been around for a century.

Q And do you have similar views with respect to the other four?

A Yes.

Q All right. Ms. MacInnis, in your role as liquidator, you had access to the communications that were going out of the Charitable DAF Holdco structure?

A Yes.

Q And in your role of liquidator, did you see any evidence that these four charities were informed of the redemption and the shift of their interest from 270 million to 1.61 million when it happened?

A No, I did not.

Q Now, in the course of your investigation, did -- have you inquired into what Mr. Patrick had been paid by various DAF

Entities over the course of the last few years?

A Yes, I have.

Q And what did you do to determine the source and amount of this compensation over that period?

A We received information in connection with the disclosures of our injunction that was in place from the end of July to early January. And from the disclosure of various cash outlays from the structure, we were able to determine what amounts had been paid to Mr. Patrick and Mr. Murphy.

Q And did you develop a view, based on your investigation, of how much Mr. Patrick was paid by the entities in the calendar year of 2024?

A Yes.

Q And what was that view?

A I don't have the exact numbers in front of me, but it's set out in our statement of claim. But it was substantial increases in remuneration were paid out to Mr. Murphy and Mr. Patrick from the end of 2024 through 2/2025.

Q And was that amount in excess of $10 million?

A Yes.

Q Was it in excess of $13 million?

A Yes. I believe the total was 18, 18 million and change. But I don't recall the exact figure.

Q And was there a short period of time in September or October of 2024, where these payments were concentrated?

Dugaboy at this time?
A Well, Michael Edney.
Q No, no. I apologize. I don't mean now. Going back from the -- around the time of your appointment, do you recall being in communication with other lawyers from there?
A For Dugaboy, I don't know. I don't know who those lawyers would be.
MR. MORRIS: Okay. Is there a way to call up Dugaboy Exhibit 206? It's a very large exhibit.
(Pause)
THE COURT: Mr. Morris, let me ask you real quick while they're pulling this up. How much longer do you anticipate --
MR. MORRIS: About ten minutes.
THE COURT: Okay. All right. Ms. MacInnis, are you good for ten minutes?
THE WITNESS: Yes.
THE COURT: I know you've been on the stand for a while. We could -- so --
(Counsel confer)
MR. MORRIS: Thank you everybody for your patience.
BY MR. MORRIS:
Q Okay. So, again, your investigation begins on May 8th. And you receive, this is a letter dated -- I apologize. Your investigation begins on the 6th.

A The 6th, yes.
Q And this letter's dated on the 8th. Do you see that?
A Yes.
Q And you see that the author of the letter, tells you that she represents the Dugaboy Investment Trust, NexPoint?
A Yes.
Q Again, Dugaboy has no relationship to Holdco, correct?
A No.
Q And to the best of your knowledge, Dugaboy has no relationship to any of the DAF Entities, correct?
A Yes.
Q And that they're writing to you as the official liquidator of Holdco to provide information to you against Mr. Patrick. Is that right?
A Yes.
Q And the supporting organizations sit on Holdco's liquidation, correct?
A Yes, they do.
Q And they sat on the Holdco liquidation committee since, I think you said July 9th?
A July 7th.
Q July 7th.
A 7th.
Q Since early July, right? So the liquidation committee -- was the liquidation committee provided with a copy of the

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.



__________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: May 15, 2026

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | **Case No. 19-34054-sgj11** |
| | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Lubbock, Texas |
| | May 12, 2026 |
| | 9:00 a.m. Docket |
| Reorganized Debtor. | |
| | MOTION TO RECONSIDER (4513) |
| | OBJECTION (4535) |
| | JOINDER TO OBJECTION (4537) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BRAD W. ODELL,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Reorganized Debtors: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For The Dugaboy Investment Trust: | Michael J. Edney<br>MORGAN LEWIS<br>1111 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>(202) 739-3000 |
| For Mark Patrick, et al.: | Louis M. Phillips<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For Highland Capital Management, et al.: | Joshua Seth Levy<br>WILLKIE FARR & GALLAGHER, LLP<br>1875 K Street, NW<br>Washington, DC 20006<br>(202) 303-1147 |

the question without divulging any privileged communication, you may answer it. Otherwise, it is a sustained objection.

THE WITNESS: My understanding, Walkers was counsel for CLO Holdco.

MR. PHILLIPS: Your Honor, Mr. Patrick, the judge asked you to answer the question without reference --

THE WITNESS: Oh.

MR. PHILLIPS: -- to legal advice.

THE WITNESS: Oh, okay.

MR. PHILLIPS: If you can do that, it would be (inaudible).

THE WITNESS: All right. I can't. Thank you.

BY MR. EDNEY:

Q All right. Mr. Patrick, last Thursday did you sit for a deposition with me asking questions?

A Yes, I did.

Q And during that deposition, did you tell the court reporter that your lawyers told you that you had no obligation to inform the charities of their dilution?

A Yes.

Q All right. And aside from not having an obligation to inform them, you chose not to inform them anyway. Isn't that right?

A Correct.

Q Now, after this transaction issuing new shares to DFW

Q I see. So Rand Advisors, LLC had an investment management agreement relationship with Atlas IDF Fund, LP, too, didn't it?
A Yes.
Q And you controlled Rand Advisors, LLC; isn't that right?
A Yes.
Q And did you draw compensation from your role at Rand Advisors, LLC?
A Personally?
Q Yes, sir.
A No. Just holistically, my compensation's paid that way. The management fees simply go to that -- that entity, and then its ownership.
Q Okay. Who is the ownership of Rand Advisors, LLC?
A I believe it's Charitable DAF Holdco Corporation, Inc.
Q Okay. And you control that company?
A Yes, I do.
Q And does that company pay you?
A Yes.
Q So let's just talk about your -- your compensation from the DAF structure in 2024. What entity would be providing that compensation? I'm not asking (inaudible), but where is it paid out of?
A Yeah. It's -- generally speaking, it's paid out of Charitable DAF Holdco Corporation, Inc.

Q And that is a company that's part of the DAF structure; is that right?
A Yes.
Q Okay. And that's a company that benefits from the Rand Advisor, LLC management; is that right?
A Yes.
Q Okay. And Rand Advisors, LLC charges management fees to entities with which it has an investment management agreement; is that right?
A Yes.
Q And what -- how -- what are those fees running (inaudible)?
A Oh, it's based upon the value of the asset that it manages.
Q So it's like points or something like that?
A I agree.
Q Okay. Now, you started the creation of new entities in the DAF structure around December 2024, didn't you?
A Yes, generally speaking. That is kind of a non-specific question, but yes.
Q One of the first moves you made to reorganize the structure was you created a new general partner of Charitable DAF Fund, LP. Isn't that right?
A Yes.
Q Prior to the winter of 2024, the general partner of

Charitable DAF Fund, LP was Charitable DAF GP, LLC. Isn't that right?
A Yes.
Q And that was a Delaware company; is that right?
A Yes.
Q And you changed that general partner to a company called CDH GP, Ltd. Isn't that right?
A Yes.
Q Let's go back to the previously-admitted Slide 19 with Exhibit 242. So I -- is that the company reflected in green over at the left on Slide 19 in Exhibit 242?
A Yes.
Q And that company was created in the Cayman Islands; isn't that right?
A Yes.
Q Now, in 2024, Mr. Patrick, when you created this new general partner, you told your lawyer to design it in a way that would conceal its creation from any (inaudible). Isn't that right?
A I wouldn't characterize that email like that as far as the context.
Q Okay. And you told your lawyers to do it in a jurisdiction that would make it harder to hold you accountable for any future restructuring moves you might make. Isn't that right?

upward to Crown Global; is that right?
A They haven't asked for it. That is right.
Q You didn't tell them that they were (inaudible)?
A They received the same -- similar financial statements as -- as what you see here with respect to Atlas PDF. But it -- so they haven't made a request.
Q Let's go to Page 15 of the document. All right. So I take it you informed the auditors of Rand PE I Fund that the Beacon Mountain asset had been sold; is that right?
A Yes.
Q And do you see down at -- right above Paragraph 7 where it says LLC interests, fair market value, a million dollars? Do you see that?
A Yes.
Q You sold Beacon Mountain out from Rand PE Fund for a million dollars; isn't that right?
A Yes.
Q Okay.
A Yes.
Q And the auditors then, their ability to value that asset was just based on the transaction price. Isn't that right?
A Yes.
Q And you sold the Beacon Mountain asset to a company that you control, right, CLO Holdco, LLC?
A Yes. It was, for all intents and purposes, a sub-account

Q Okay. So you're not sure?

A I'm not sure.

Q Do you know where that cash is today, Mr. Patrick?

A In the -- in the general accounts of the DAF. But not specifically.

Q When you say the general accounts of the DAF, do you mean Charitable DAF Fund, LP?

A Yeah, and its constituent subsidiary entities. It's in there. Like the Prego commercial.

Q In some bank account somewhere in the current DAF structure. Is that right?

A Yes.

Q Okay. Has any of it been spent?

A Money is fungible. So there's legal bills and -- so you could say it's spent. It's -- or it's -- just, money is fungible. So it's in the same pot with all the other assets, is how I kind of would think of it.

Q Ballpark, Mr. Patrick, how much has the DAF entity spent on lawyers in 2026?

A 2026? (Pause.) I don't know precisely. I would -- I'm speculating, but I'll give you an answer, roughly maybe five, six million.

Q Okay. What about in 2025?

A Yeah. Yeah. I don't -- I don't know specifically.

Q Is it more than $10 million?

A It could be.
Q Is it more than $20 million?
A No. I would be very surprised by that.
Q Okay. 2024? Do you have a sense of how much was spent on lawyers then?
A Yes. I think that was around $12 million.
Q Okay. So about how many law firms has the Charitable DAF entity retained?
A I would -- closer to a dozen than half a dozen.

THE COURT: Mr. Edney, I'm sorry to interrupt you, but we're at 11:00 o'clock. We're going to take a 10-minute recess. If you're wanting to catch a plane at 1:00 p.m., you're trying to get through this witness, we're going to need to move things along.

MR. EDNEY: Yes, Your Honor.

THE COURT: So I just want to make sure that the parties are aware of their own time management. But we're going to take a 10-minute recess.

MR. EDNEY: Thank you, Your Honor.

THE CLERK: All rise.

(A recess ensued from 11:01 a.m. until 11:15 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

A VOICE: Your Honor, (inaudible) Mr. Edney, but there's also (inaudible). (inaudible) to see what it is

by Mercer. And then an LTIP award that's awarded every three years. And so part of that compensation was an LTIP that is based upon the value of the DAF from 2021 through the increase into the 2024 year, is my general recollection.

Q So the answer to my question about how much the DAF entities paid you in 2024 is $10-1/2 million?

A Yes.

Q Okay. And we did talk about your compensation in the deposition on Thursday, didn't we?

A Yes, we did.

Q And I asked you then whether you got paid more than $13 million in 2024, and you said you weren't sure. Isn't that right?

A That is correct.

Q And why are you so certain of the $10-1/2 million number now?

A Because I made an inquiry to confirm exactly what that number was.

Q Did you review documents to do that?

A No.

Q Who did you ask?

A I just called up Mr. Raver, the CFO of the DAF, and I asked him specifically how much was I paid in that year, and that's the number he gave me.

Q Okay. How much did the DAF entities pay you in 2025?

A In the year 2025, I received a bonus for the 2024 work. Paul Murphy awarded me a multiple of three. On a Mercer bench scale of two to four, he awarded me a 3 off of my base of $850,000. And that was paid in roughly February of 2025. And then for the remainder of 2025, I should -- I received my base compensation of $850,000.

Q Okay. I mean, I appreciate the explanation, but can you give me a total number of compensation for 2025, please?

A For 2025, yeah, it would be $850,000 plus $2,550,000, if I'm correct. So add those two numbers together.

Q So about $3.4 million; is that right?

A I'm -- $850,000 plus $2.5 million, yes.

Q Okay. And how about for 2026, Mr. Patrick?

A It's -- it's -- the award for the 2025 work awarded in 2026 was the same multiple and it's the same base.

Q So you expect to make about $3.4 million in 2026?

A Yes.

Q And since its inception, Mr. Patrick, the DFW Charitable Foundation has given away less than a million dollars; is that correct?

A Correct.

Q All right. Do you remember when we earlier talked about the Amended and Restated Partnership Agreement of Charitable DAF Fund, LP?

A Yes.

Let's continue to be respectful of each other and we can stop with the sidebars about counsel. I'd appreciate that. That's what's required of all attorneys and all of us.

So, okay. I understand your position. We'll deal with that come May 21st when you call him, if you're going to call him.

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay?

MR. EDNEY: Thank you, Your Honor.

THE COURT: All right. Anything further before we finish up today?

MR. EDNEY: Not from the Movant, Your Honor.

THE COURT: Anything from Highland? All right. With that, we will be adjourned.

MR. EDNEY: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 12:54 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript to the best of my ability from the electronic sound recording available of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **05/13/2026**

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 19-34054-SGJ-11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Chapter 11 |
| Debtor. | Thursday, May 21, 2026<br>9:02 A.M. |

TRANSCRIPT OF CONTINUED HEARING ON
MOTION TO RECONSIDER (RE: DOCUMENT 4297 ORDER ON MOTION TO COMPROMISE CONTROVERSY) AND MOTION TO VACATE FILED BY PARTNER DUGABOY INVESTMENT TRUST (4513)
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor, Highland Capital Management:

Pachulski Stang Ziehl & Jones LLP
BY: JOHN A. MORRIS, ESQUIRE
1700 Broadway, Suite 36th Floor
New York, New York 10019

Willkie Farr & Gallagher LLP
BY: JOSHUA LEVY, ESQUIRE
787 Seventh Avenue
New York, New York 10019

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder: Nicholas Noble
Earle Cabell Federal Building
501 West 10th Street
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

agreements.

Q All right. The documents that you looked at were identified on Highland's exhibit list for that hearing, weren't they?

A I believe they were. Yes.

Q As a matter of fact, further down in this hearing, you were asked what documents you looked at, correct?

A I'm sure I was. If you could show me it, I'm sure that that's the case.

Q Yeah, if you go down to Lines 23 and 24. Are those the documents that are in the exhibit list from 70 to 104? Do you see that?

A I see that it says that, yes.

Q So --

THE COURT: Hold on one second, Mr. Edney.

MR. MORRIS: Your Honor, I object to this line of questioning. The transcript is in evidence already. It speaks for itself. If he wants to impeach Mr. Seery and look at the transcript, by all means. But otherwise, he should just be asking the questions, not just validating the transcript.

THE COURT: Response, Mr. Edney?

MR. EDNEY: Your Honor, I do think I am trying to hold Mr. Seery's testimony to his previous questions and answers in the May 19, 2025 hearing. I think I am using it for an appropriate impeachment purpose.

THE COURT: I don't know the rule. What I am going to say, if you can move this along. I mean, we do have the transcript, but if you've got specific questions where you believe he's not answering the same way and you want to use this, go ahead.

MR. EDNEY: All right. Thank you, Your Honor.

BY MR. EDNEY:

Q So the documents that you looked at to confirm Mr. Patrick's authority, they were listed on the exhibit list of Highland leading to that hearing, weren't they?

A I believe so. I said I'd have to check the actual numbers. It looks like I'm cut off, but we tried to put everything into evidence at the 9019. And we put on a very robust 9019 case by going through every one of the documents, but it was on direct and we didn't beat the dead horse.

Q Fair enough.

MR. EDNEY: Let's go to the exhibit list for the 9019 hearing filed by Highland on June 24, 2025. If we could pull that up, please.

THE COURT: I'm sorry, which exhibit is this, Mr. Edney?

MR. EDNEY: It's not an exhibit.

THE COURT: Okay.

MR. EDNEY: It's for purposes of cross-examination.

THE COURT: Okay.

MR. EDNEY: It's a filing in the main bankruptcy case, Your Honor.

All right. If we could go to Page 8, please.

BY MR. EDNEY:

Q There's a heading there that says "Patrick Authority." Do you see that?

A Yes. And there's a series of exhibits that follow.

MR. EDNEY: If we could scroll down to the next page, 9. And then 10 and then 11.

BY MR. EDNEY:

Q Then there's a heading break that says "Dugaboy Note." Do you see that?

A Yes.

Q So Exhibits 70 through 104 are under the heading "Patrick Authority." Do you see that?

A I'm looking at the Dugaboy Note, but I saw it before. Yes, 70 to 104 under the -- we broke this out so it would be really easy to understand in each of the categories of things we were covering.

Q And Exhibits 70 through 104 were the exhibits, were the documents that you looked at, the organizational documents you looked at to confirm Mr. Patrick's authority. Isn't that right?

A I believe that's most of them, if not all.

Q Okay. As a matter of fact, you stated on the record back

in that hearing that those were the exhibits, Exhibits 70 through 104.

A I stated those were the exhibits. I don't know if that's every document I looked at, but I looked at all 34 of those documents. Yeah.

MR. EDNEY: Okay. All right. Let's go up to the -- I think we're at the right page here. As we do this, let's pull up side-by-side Exhibit 242, Slide 12, please. Do we have that capability to do two at a time?

Just bear with us for a second. I promise this will speed things up.

(Pause)

MR. EDNEY: All right. That's good.

BY MR. EDNEY:

Q Can you see both?

A I can see both, but I apologize because it's going to be hard for me to read this.

Q Yeah, we'll blow it up a touch.

Okay, all right. So one of the documents you reviewed was Exhibit 70, which was the trust agreement at Hunter Mountain, right?

A Yes.

Q And that's the Hunter Mountain Investment Trust in the second to bottom square on this chart. Isn't that right?

A Yes. But to be clear, your chart's incorrect. But okay

-- but that is in that box, yes.
Q Okay. And then at Exhibit 73, we have the Limited Liability Company Agreement of Atlas IDF GP. Do you see that?
A Yes.
Q And that entity is in green on this chart. Isn't that right?
A Yes.
MR. EDNEY: Let's go to the next page of the exhibit list.
BY MR. EDNEY:
Q Now, Exhibits 75 through 85 are documents regarding HMIT, right? See that?
A That's the appointment of Mark Patrick as the successor administrator, yes.
Q And then several organizational documents for Rand Entities and Atlas Entities. Do you see that?
A Yes. Just let me --
Q If you can take him down to 85, please.
A Some are consents. Some are the constituent docs, yes.
Q Okay. But they all concern the Rand and Atlas Entities, right?
A I believe so looking at each of these headings, yes.
Q And these entities, these --
A Just to be clear, I'm looking at the list, not the document.

Q Correct, right. And these Rand and Atlas Entities, they are on this chart over here, Exhibit 242, Slide 15. Aren't they?

A I'd have to check each one, but you certainly have Rand Entities and you certainly have an Atlas entity. And, again, there's so many mistakes in your chart, it's hard to use it. But you have those names listed, yes.

Q All right. So then if we go to the next page, Exhibit Numbers 86 through 93, those are also organizational documents from the various Rand and Atlas Entities. Isn't that right?

A Some are. Some are other documents related to their organization are not organization or constituent documents, yes.

Q But they all concern the Rand and Atlas Entities. Isn't that right?

A They are documents that concern those entities. You're going up to what number?

Q 94. 93, I'm sorry. 86 through 93.

A Yes.

Q Okay. And then Exhibit 94, that concerns Beacon Mountain, LLC. Isn't that right?

A Yes.

Q As does Exhibit 95?

A That's correct.

Q And then Exhibits 96 through 100 concern the Okada Family

Foundation, the Empower Dallas Foundation, and the Crown Global Company. Do you see that?

A I see that, but those are Crown Global Policies.

Q Uh-huh.

A And a term sheet.

Q But they concern the Crown Global Company, right?

A I believe they concern the policy that the entities Empower and Okada Family Trust purchased. I don't believe they concern the Crown Global Company.

Q Okay. They relate to the Crown Global Company, don't they, Mr. Seery?

A To the extent that a policy they issued relates to it. Everything else you've shown is a constituent document, so if you're trying to tie that to being constituent document, I believe you know what that term means, these are not those.

Q All right, Mr. Seery. And the Crown Global Insurance Company, the Empower Dallas Foundation, the Okada Family Trust, they're listed over on the right of Slide 15 of Exhibit 242. Do you see that in pink?

A I see that you have them on your chart, yes.

Q All right. If we go to the next page, we have Exhibits 101 and 102. Those relate to Crown Global, correct?

A Again, those relate to the policies that Crown Global issued, yes.

Q And then we have two HMIT opinions from 2016. Isn't that

right?

A Those are the opinion letters that were -- there's a rep letter, which is Dondero swearing that he's read the opinion and he abides by all of the representations in the opinion. And the opinion which blessed the Hunter Mountain, you know, tax scheme.

Q Mr. Seery, were you aware that by the time of the June 25th hearing, that Hunter Mountain had been sold out of the stack of companies that the Rand PE Fund was a part of?

A Certainly by the hearing, yes. Hold on a second. Can you repeat the question? I think I misunderstood what you said.

Q Sure. By the time of the June 25th hearing, 2025, you were aware that Beacon Mountain and Hunter Mountain had been sold out of the stack of companies that involved Rand PE Fund I, L.P. Isn't that right?

A No. So the interest in Beacon Mountain was sold from one -- I was aware that the interest in Beacon Mountain was sold from one entity that Patrick controlled to another entity that Patrick controlled called CLO Holdco, LLC. It's on our chart that we used as a demonstrative and then your prior counsel used to cross in the 9019 hearing.

Q Okay. And after reviewing Documents 70 through 104 on this exhibit list, you concluded Mr. Patrick had complete authority to enter into the settlement agreement. Isn't that right?

A Yes.
Q And you concluded that the proceedings in the Cayman Islands had no impact on Mr. Patrick's authority over any of the entities in the chain of entities that owned Hunter Mountain. Is that right?
A That's correct, yes.
Q And you concluded that the relevant entities to Hunter Mountain run up to companies he owns and controls, and it's a structure that was set up a long time ago. Is that right?
A That's a pretty broad brush. But I concluded that he had authority over each of the entities and these were entities that I wanted to have as counterparties to the settlement agreement.
Q You had not concluded that the relevant entities to Hunter Mountain were in a structure that was set up a long time ago?
A The Hunter Mountain structure was set up in 2015 to shelter hundreds of millions of dollars of income from taxes that Dondero and Okada were going to be hit with. So I'm very familiar with the structure.
Q All right.
A It was set up in 2015. Yeah, that's I guess a pretty long time.
MR. EDNEY: Let's go to Exhibit 35. Page 99, please.
BY MR. EDNEY:
Q All right. Going to Line 13. At the June 25, 2025

hearing, were you asked the following question, "So based on the work that you did and the documents you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT Entities?" And your answer was "Yes." Do you see that?
A Yes.
Q And then were you asked the question, "What view did you reach?" And the answer follows, "He has complete authority over each of these entities. They run up to entities that he controls or he owns, and he's had that. It's a structure that was set up a long time ago, and any changes to that structure are consistent with the documents that let him do those things." Did I accurately read that question and answer?
A Yes.
Q Did the Hunter Mountain Entities concern a structure that was set up a long time ago?
A That's exactly what I just testified to in 2015.
Q All right. And you concluded that the Dallas Foundation had no rights with respect to the -- at all with respect to the management of these entities because Crown Global had only issued an annuity policy. Isn't that right?
A It was the entire structure of the Crown policy and the layers that they separated those entities from control of the entity. Yes, they had no voting, no consent. Virtually no rights at all, other than to receive the payments from Crown.

Q But by the time of this testimony, Hunter Mountain and Beacon Mountain had been sold out from under the Crown Global structure. Isn't that right?

A Again, you keep doing this, and it's not fair and it's not correct. Be specific. Hunter Mountain, the interest in Beacon Mountain was sold. Yes.

Q And it was sold away from the Crown Global structure. Isn't that right?

A It was sold away -- I've got to look back at the structure. It was sold by Rand through the multiple layers of the structure. And they didn't have any rights to consent. And it was between two entities that Mr. Patrick controlled.

I'm not trying to be difficult. That's exactly what I testified to. That's what the documents say, and that's what we've done. And as you know, the Dallas Foundation objection and withdrew their objection, so go ahead.

Q Before entering into the settlement agreement, did you ask Mr. Patrick to provide Highland with any of the documents from the Cayman Islands proceedings concerning the Charitable DAF?

A I don't -- I don't know. I know I had some of them. I had the supervision application, for sure. I don't know that I asked him to provide them. I don't know where I got them. I think we may have gotten those elsewhere, but I don't know.

Q All right. Now, Mr. Morris asked you a question about whether the liquidators had been in touch with you regarding

the potential settlement prior to the June 25th hearing, right?
A If he -- no, he asked me if they had been in touch with me prior to June 24th.
Q I see.
A No, that's the question he asked. You can look at the transcript. You can see or not see. You don't have to be snide with me. I'm sorry, Your Honor.
THE COURT: Yeah. Let's make sure both for witness and attorney, let's make sure that we're keeping our comments professional and we don't need snide marks.
BY MR. EDNEY:
Q So did they get in touch with you on June 24th, 2025?
A I received a letter, it's in evidence, that came on June 24th for -- it may have come late and I might have gotten it the morning of the 25th.
Q And what did that letter say?
A That letter said, we're aware of the transactions that were the -- we've seen the CDMCFAD that collapsed on the DAF side, a number of entities, and that removed those DAF structures from the entity that the JOLs were now appointed for. So they were aware of the redemption -- the dilution and redemption transaction, as they've so described, and asked for a 45-day stay of the hearing.
Q So did the Cayman Island Liquidators ask the Court to delay the approval of the settlement agreement for 45 days?

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: May 26, 2026

Digitally signed by Advance Performance Exponents Inc
Date: 2025.04.16 20:39:55 -05:00
Reason: Apex Certified
Location: Apex



GRAND COURT
FINANCIAL SERVICES DIVISION
CAYMAN ISLANDS

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. OF 2025 ( )**

**IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO LTD AND THE CHARITABLE DAF FUND LP**

---

**AFFIDAVIT OF JAMES DAVID DONDERO**

---

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, **MAKE OATH AND SAY** as follows:

1. I am the President of NexPoint Advisors, L.P. (***NexPoint***), an investment advisor registered with the U.S. Securities and Exchange Commission (***SEC***). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this affidavit in support of the petition (the ***Petition***) filed by the Supporting Organizations (as defined below) seeking the winding up on the just and equitable basis of Charitable DAF HoldCo, Ltd (the ***LP***) and the Charitable DAF Fund, LP (the ***Fund***) pursuant to section 92(e) of the Companies Act (2025 Revision) (the ***Act***) and Order 3, rule 3 of the Companies Winding Up Rules (2025 Consolidation) (the ***CWR***).

3. I make this affidavit from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4. Now produced and shown to me and marked "**JDD-1**" is a bundle of true copy documents to which I refer in this affidavit. References to page numbers in this affidavit are references to that exhibit unless otherwise specified.

**BACKGROUND**

5. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding US$16 billion in value.

6. I was formerly the President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or my affiliates. In December 2015, I divested my majority stake of Highland (***2015 Transaction***). On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code (***Highland Bankruptcy***) in the Northern District of Texas. The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

7. In February 2021, as part of the Highland Bankruptcy, the employment contracts of the majority of Highland's employees were terminated. Many of the former back-office employees of Highland thereafter became employees of a newly formed company called Skyview Group (***Skyview***) that provides middle and back-office services to various clients, including companies in which I hold an interest such as NexPoint.

**THE FUND**

8. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

9. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the ***Supporting Organizations***) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the ***Charities***).

10. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (***ARLPA***), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (***Articles***), govern the Fund and its partners.

11. The LP holds 99% ninety-nine percent (99%) of the economic interest in the Fund. The remaining one percent (1%) is (or at least was as at the time of the Fund's formation) held by its general partner, Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011.

12. In addition to the Participation Shares, the LP issued 100 management shares (the ***Management Shares***) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

13. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

**GRANT SCOTT**

14. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

15. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr Scott as the Control Person. However, Mr Scott had complete discretion in adopting or rejecting the investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr Scott was paid $60,000 USD per annum.

16. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

17. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax-deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr Patrick served that role at Highland from 2008 until his departure in February 2021.

18. In March 2021, Mr Patrick was hired by Skyview as Tax Counsel and continued to perform

substantially similar tax counsel duties for me. At Mr Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

19. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr Patrick working with outside counsel. Mr Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

20. In March 2021, Mr Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the Highland Bankruptcy, and he did not believe he was equipped to handle those disputes. Mr Patrick suggested to Mr Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr Patrick was my attorney and Mr Scott was my trusted friend, and I was happy for Mr Scott to pass the Control Position to Mr Patrick.

21. On 25 March 2021, Mr Scott: (i) resigned as director of the LP, (ii) appointed Mr Patrick as director of the LP, and (iii) transferred to Mr Patrick the Management Shares for nominal consideration. Mr Patrick therefore assumed the Control Position from that date.

22. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr Murphy, Mr Patrick's vote counts as the tiebreaker for corporate voting.

**MR PATRICK'S CONTROL OF THE FUND**

23. In the initial period following Mr Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr Patrick was free (as Mr Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

24. Subsequently, however, communications between Mr Patrick and Skyview and me began to become less frequent, and over time I came to suspect that Mr Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the Fund, but rather for his own personal enrichment.

25. On 28 June 2023, Mr Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas

Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms Short learned that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

26. Ms Short discussed the matter with Mr Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on 5 September 2023, but Mr Patrick was informed that further payments were unlikely. I was informed of this process by Ms Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

27. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

28. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr Cronin was known to me personally. In September 2023, Mr Cronin and I met, and he informed me that he had been approached by Mr Patrick with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation. Mr Cronin informed me that he had asked Mr Patrick if this arrangement would amount to fraud, and that Mr Patrick's response had been: "*you can't steal from yourself.*"

29. Mr Cronin informed me that he understood from this statement that Mr Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr Cronin further informed me that he was uncomfortable about Mr Patrick's proposal and that he subsequently communicated this to Mr Patrick, Mr Patrick cut off all further communications between them.

30. Mr Cronin's allegations that Mr Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my U.S. attorneys that, had Mr Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr Cronin contacted me, I met with Mr Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations

about the matter and Mr Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr Patrick's powers or remove him from his position.

31. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the ***Expense Summary***) which indicated substantial increases in expenditures during Mr Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased even further to around US$2.25 million in the first half of 2024 alone.

(b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

32. The Expense Summary reinforced my concern that Mr Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

33. In August 2024, I became aware of yet another issue concerning Mr Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

34. I was informed that my director of charitable giving had been contacted by Ms Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms Diaz stated that on 28 August 2024, Mr Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI,

which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

35. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations. On 1 October 2024, as part of the finalisation of the investigation report, Skyview's chief compliance officer interviewed Ms Diaz about the allegations against Mr Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on 11 October 2024 and concluded that Mr Patrick had attempted a serious breach of U.S. securities laws. A copy of the report and its attachments is at **page 1**.

36. On 2 October 2024, Mr Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr Patrick became aware of the investigation into his behaviour and resigned before the report was published.

37. On the same day that Mr Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr Patrick as my counsel, I believe that Mr Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

38. After his resignation from Skyview and the termination of Skyview's services agreement with the Fund, I have received repeated reports and evidence of Mr Patrick causing certain DAF entities to liquidate their assets, some at below-market value. For example, on 20 February 2025, Mr Patrick's subordinate Shawn Raver asked for the in-bound wire instructions for one of my affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain owns most of the distribution rights of the equity position in the Highland Bankruptcy, meaning most of the residual value of the estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy. According to

Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value.

39. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. I am familiar with the Highland Bankruptcy estate and there is no valuation, net, gross, or otherwise, that I can imagine that would support a $1 million sales price. Additionally, given my founding and my affiliates' ownership of Highland, Mr Patrick would know that I was one of a few natural buyers of the Hunter Mountain position. While Mr Patrick of course would not be obliged to sell Hunter Mountain to me, the fact that Mr Patrick authorized the sale of Hunter Mountain at a below-market value without even approaching a natural buyer indicates a non-market, non-fiduciary reason for the sale.

40. Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the DAF. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policy holder is Empower Dallas Foundation, a charitable foundation for which I serve as President whose purpose is to benefit the Dallas Foundation.

41. On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of my affiliates) dated 7 May 2014 in the amount of $2,3M and 27 May 2014 in the amount of $5M, held by the Partnership; and (iii) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the two Notes, including accumulated interest, was in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 attempted sale of the Notes to an affiliate.

42. On 27 February 2025, H&K as counsel for the Empower Dallas Foundation (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes to CLO Holdco. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*" The initial zero valuation and

proposed $500,000 sale price was confusing given that HCRE Partners had offered to pay the full amounts due in an amortizing schedule. After the withholding of consent, the revised offer of 28 February 2025 still is confusing given that the amortization schedule is longer than 12 months.

**ATTORNEY GENERAL INVESTIGATION**

43. I have become aware that, on 14 March 2025, the Texas Attorney General (***Texas AG***) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organization, conduct and management of Charitable DAF GP, LLC, and its related entities.

44. I understand that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

45. I understand that the Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**DONATIONS TO THE CHARITIES**

46. Until Mr Patrick's departure in October 2024, I regularly donated to through the Charities to the Fund as part of my charitable giving program. My affiliates and I, which donated through the Charities to the DAF entities in 2023 and in various years prior, and are the primary funding source for the Fund. As allowed pursuant to US law, I direct the Charities to utilize the Fund's assets to sponsor charitable causes I particularly value, including underprivileged youth education, cancer research, heart health, veterans' services, and local institutions such as zoos and museums. Though I wish to continue to support these charitable causes, I will not give any future donations through the Charities to the Fund while it is under Mr Patrick's management and/or control.

**FUNDING OF PROCEEDINGS**

47. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations simply for the purpose of overseeing how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. In this context, I became aware that the Supporting Organizations were meeting to vote on the decision to take legal action to take steps to preserve the assets of the Charities they exist to support. Given my connection with the Fund and personal relationship with Mr Patrick, I recused myself from that meeting and was not otherwise involved in the decision taken by the Supporting Organizations to commence these proceedings.

48. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not

at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

**SWORN** by the above named )
**JAMES DAVID DONDERO** )
This 9th day of April 2025 )
at 4:46 pm )

**JAMES DAVID DONDERO**

**BEFORE ME:**

Krystal Hughes
**NOTARY PUBLIC**

KRYSTAL HUGHES
Notary ID #129488160
My Commission Expires
July 12, 2025
NOTARY PUBLIC STATE OF TEXAS

**THIS AFFIDAVIT** was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

Michael J. Edney
MORGAN LEWIS BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj |

**NOTICE OF APPEAL TO THE**
**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS**

Under the Federal Rules of Bankruptcy Procedure 8002 and 8003, The Dugaboy Investment Trust ("Dugaboy") appeals to the United States District Court for the Northern District of Texas from the Court's June 15, 2026, Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate under Fed. R. Civ. P. 60(b) (the "Denial Order"). A copy of the Denial Order is attached to this Notice of Appeal at **Exhibit A**.

The Parties to the June 15, 2026, Order and the names, addresses, and telephone numbers of their attorneys are as follows:

1. *Party/Appellant*: The Dugaboy Investment Trust

Attorneys:

MORGAN LEWIS BOCKIUS LLP
Michael J. Edney
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202)-739-3000
F: (202)-739-3001

And

KING & SPALDING LLP
Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
2601 Olive Street, Suite 2300
Dallas, TX 75201
T: (214) 764-4600

2. *Party/Appellee:* Highland Capital Management, L.P.

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

3. *Party/Appellee:* Highland Claimant Trust

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

4. *Party/Appellee:* The Highland Litigation Sub-Trust

Attorneys:

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor New York, NY 10010
T: (212) 849-7000

And

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
T: (214) 981-3300

5. *Party/Appellee:* Hunter Mountain Investment Trust

KELLY HART PITRE
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
T: (225) 381-9643

F: (225) 336-9763

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
T: (504) 522-1812
F: (504) 522-1813

Dated: June 29, 2026

MORGAN LEWIS BOCKIUS LLP

*/s/ Michael J. Edney*
Michael J. Edney
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

*Attorneys for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on June 29, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*<u>/s/ Michael J. Edney</u>*
Michael J. Edney

# Exhibit A

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 15, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj11** |
| | § | |
| | § | |
| **Debtor.** | § | |

**ORDER**

Consistent with the Memorandum Opinion issued on this date, it is hereby

ORDERED that the Motion for Relief from Order and Motion to Vacate[1] filed by the Dugaboy Investment Trust ("Dugaboy") [Dkt. No. 4513] is denied; and it is further

ORDERED that Dugaboy's objection to Exhibit 300, which was offered into evidence by Highland Capital Management, L.P. and the Highland Claimant Trust, is sustained.

### End of Order ###

---

[1] The full title of the pleading filed is Memorandum of Law in Support of the Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 8, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Michael J. Edney*
Michael J. Edney